UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA   :
                                  :
        v.                         :
                                  :    1:21-cr-399-RDM
ROMAN STERLINGOV        :
                                  :

**ROMAN STERLINGOV'S MOTION, PURSUANT TO 18 U.S.C. § 3145(b)**
**FOR REVOCATION OF HIS PRETRIAL DETENTION**

On June 23, 2021, Magistrate Judge Paul M. Abrams of the United States District Court for the Central District of California ordered Mr. Sterlingov detained before trial. Mr. Sterlingov now respectfully moves this Court, pursuant to 18 U.S.C. § 3145(b), for *de novo* review and revocation of that detention order.[1] For the reasons discussed below, Mr. Sterlingov does not present a serious flight risk and there are less restrictive measures than pretrial detention that will reasonably assure his future appearances in this Court. Indeed, D.C.'s Pretrial Services Agency has fashioned a comprehensive program of electronic monitoring, supervision, and intensive case management for higher risk defendants – the High Intensity Supervision Program ("HISP") – that, together with any other conditions the Court sees fit to impose, will reasonably assure Mr. Sterlingov's future court appearances. Accordingly, the Magistrate Judge's detention order should be revoked in favor of a comprehensive set of restrictive conditions.

**PRELIMINARY STATEMENT**

Defendant Roman Sterlingov is charged with operating an unlicensed money transmitting business – specifically, Bitcoin Fog, an online Bitcoin tumbler or mixing service – which was then

---

[1] 18 U.S.C. § 3145(b) provides: "Review of a detention order. If a person is ordered detained by a magistrate, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly."

purportedly misused to by others to launder money (as well as for licit transactions). Notably, the Indictment only charges Mr. Sterlingov with involvement in one improper transaction where a small fraction of bitcoin, valued at approximately $89.83 as of the transaction date, was moved by an unidentified "administrator" – an administrator the government baldly contends was Sterlingov – to a wallet controlled by the government.

The legal presumption in this case is that Mr. Sterlingov should be released. To detain him before his trial, the government must prove, by a preponderance of the evidence, that he poses a serious risk of flight *and* that no conditions exist sufficient to reasonably assure his appearance at future court proceedings. The government cannot meet its burden of proof on either of these two issues.[2]

While not a U.S. resident, Mr. Sterlingov is fluent in English, frequently visits the U.S., and has extended family in the Boston area who are close to him and are willing to serve as third-party custodians upon his release. More importantly, he has every incentive to appear in the District as required and vigorously defend himself against the novel, untested, and fundamentally flawed prosecution being brought against him. None of the charges against him carry a mandatory minimum term of incarceration, and Mr. Sterlingov strongly believes, and intends to prove at trial, that, among other things, (i) he lacked the required intent to violate any U.S. law; (ii) Bitcoin Fog is not within the statutory definition of a "money transmitter" and does not require a D.C. license; and (iii) the government lacks the evidence necessary to convict him at trial.

---

[2] The government does not contend – and the California Magistrate Judge did not find – that Mr. Sterlingov poses a risk of community danger if released. *See* **Exhibit A** (Magistrate Judge's Order of Detention) at 3. Mr. Sterlingov is not accused of a crime of violence and has no criminal history of any kind. His detention was predicated exclusively on flight risk. *Id.*

Moreover, pretrial detention is not needed here. Other release conditions exist that will reasonably assure Mr. Sterlingov's future appearances in court. Given all this, Mr. Sterlingov is entitled to pretrial release under the Bail Reform Act.

In speculating that Mr. Sterlingov may flee the U.S., the government leans heavily on the fact that he is a citizen of Russia and Sweden, with no abiding ties to the District of Columbia. This, however, is not enough for the government to meet its burden of proof. *See, e.g., United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004) (ordering pretrial release of Israeli national who resided in South Africa and had no ties to the United States); *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004) (affirming pretrial release of defendant, a resident and citizen of Denmark from where defendant could not be extradited; noting that bail statute does not "require that foreign defendants be detained simply because their return cannot be guaranteed through extradition"); *United States v. Ng*, 15-cr-706-VSB (S.D.N.Y.) (granting bail to defendant Ng who had no ties to the United States, was not a U.S. citizen, did not speak English, had seemingly endless wealth with which to flee, and was an older man for whom a 20-year sentence could effectively be a life sentence). Yet, the government can point to no facts in the record showing that Mr. Sterlingov is prepared, or has taken any concrete steps, to flee, or that he will decline to follow the Court's orders and conditions of release. All the government proffers the Court is rank, self-serving, and patently insufficient speculation. Further, any ostensible government concern can readily and reasonably be addressed short of detention.

The government already has taken away Mr. Sterlingov's passports, and the Court may impose other suitable conditions sufficient to secure his future appearances, including (i) the posting of property before he is released from custody; (ii) the continued surrender of his passports to the government; (iii) home confinement under the supervision of a responsible third-party

custodian while he helps his attorneys prepare his defense; (iv) 24/7 electronic GPS monitoring of Mr. Sterlingov, along with additional, frequent in-person visits by Pretrial Services; (v) a restriction on his contacting any consulate, whether in-person or electronically; (vi) a ban on accessing the Internet or going online; (vii) a ban on opening new financial accounts or making cryptocurrency transactions; and (viii) any other conditions the Court deems appropriate.

In a similar case in this very Court, *United States v. Larry Harmon*, 1:19-CR-395- BAH, the government opposed revocation of an order of detention for the same reasons it invokes here. Per the government, Larry Harmon (i) had deep personal and financial ties to Belize, (ii) was a defendant in a bitcoin mixing case with substantial potential penalties; and (iii) had an abundance of money and the type of internet-savvy and darkweb connections that would allow him to flee. This Court considered the government's arguments, rejected them, revoked the order of detention, and granted Mr. Harmon his release. That release was conditioned on home detention in Ohio, location monitoring, travel restrictions, computer restrictions, internet restrictions, and prohibitions on opening new financial accounts or making cryptocurrency transactions. *See id.* at ECF Docket Nos. 20 and 21.  The same result is called for here.

## STATEMENT OF FACTS

### A.  Mr. Roman Sterlingov's History and Characteristics

Roman Sterlingov was born in Leningrad, USSR in 1988. His parents divorced when he was just seven years old, and he moved with his mother to the city of Voronzeh. Life was not easy in Russia during the 1980's and 1990's, and being raised by a single mother made it even more difficult for Roman. He found his escape in school, where he worked hard, earned good grades, and showed an early passion for math, physics, and chemistry. *See* Letter from Tatiana Sterlingova, Roman's mother (attached hereto as **Exhibit B**); Letter from Alexander Koziakov, Roman's cousin (attached hereto as **Exhibit C**).

4

In 2002, when Roman was 14 years old, he and his mother, Tatiana, moved to Jonkoping, Sweden. Roman learned Swedish, proudly became a Swedish citizen, and continued applying himself in school. His mother also adjusted to life in Sweden. She married Anders Karlsson, became a Swedish citizen, and now works as an Assistant Master at the Jonkoping University's School of Health and Welfare. Tatiana Sterlingova Letter (Ex. B); *see also* Letter from Anders Karlsson (attached hereto as **Exhibit D**) ("Roman has always been very kind and helpful, both to his mother and to me. … I have always look at him as my own son.")

Attached as **Exhibit E** is a letter from Allyson Neuberg, the IB Diploma Coordinator at Per Brahegymnasiet, Roman's high school in Jonkoping. Ms. Neuberg was Roman's teacher for both English and Psychology and remembers him as "an ambitious student that did well in school." *Id.* She also remembers him as "kind and thoughtful student" who "was well-liked by his friends and teachers." *Id.* In high school, Roman helped tutor other students who were having trouble in their subjects, and he got a job distributing advertising flyers in the mornings and after school, so he could send the money he earned to his grandparents in Russia. Tatiana Sterlingova Letter (Ex. B). After finishing at Per Brahegymnasiet, Roman moved away from his parents and became a web designer in Gothenburg, Sweden. Even after he left home, Roman continued helping his grandparents however he could. *Id.* Roman worked and resided in Gothenburg until his arrest.

A consistent thread through all the letters from friends and family attached to this motion is how respectful, kind, and caring Roman is, and how willing he is to help others. *See* Tatiana Sterlingova Letter (Ex. B) ("He [Roman] is a mindful and helpful son. He treats other people with respect and understanding"); Letter from Josefin Kirsch (attached hereto as **Exhibit F**) (Roman "has always shown respect to teachers, friends, as well as strangers" and "he is always

just a call away when I have found myself in situations where I have needed love, guiding and support."); Letter from Tobias Suomalainen (attached hereto as **Exhibit G**) ("Roman is a good person and a loyal friend.").

Another consistent thread is that Roman keeps his promises and is a man of his word. *See* Letter from Alex Gustafsson (attached hereto as **Exhibit H**) ("Based on my personal experience [of about 20 years knowing him], Roman is a trustworthy person who always keeps his word."); Letter from Elin Gustaffson (attached hereto as **Exhibit I**) ("Roman is a man of his word. If he promises, you can be sure that he will keep his promise."); Letter from Albin Hofmeijer (attached hereto as **Exhibit J**) ("I have always had trust in Roman and he never failed me.").

Of note, Roman has helped many others by founding a self-help group for men in Gothenburg. "The group is about personal development and to become mature men." Tobias Suomalainen Letter (Ex. G). Roman's friend, Albin Hofmeijer, explains:

> I have had a troubled childhood, not in the sense of getting my basic needs met but in the sense that my parents weren't always there for me and even when they were they were almost always distant in mind. Roman helped me a lot in this area and we used to have long talks late at night in the studio about how to heal the wounds inflicted in my childhood. He was always there for me when I needed someone to talk to and even though we don't always see eye to eye I would consider him one of if not the person that has had the greatest positive impact on my life.
>
> I have always had trust in Roman and he never failed me.

Albin Hofmeijer Letter (Ex. J); *see also* Letter from group member Carl Lindstrom (attached as **Exhibit K**) ("Roman was a good listener and did his very best to help the other group members"); *accord* Letter from Viktor Mardstrom (attached as **Exhibit L**) ("In many ways, he's helped me to become a better person by making me reflect on what I know and what I don't know, and on what's really important in life.")

Plainly, there is much to admire in Roman Sterlingov.

## B.  Mr. Sterlingov's Family Ties to the United States

Most of Roman's larger family moved from Russia to Boston in the 1980s. Roman maintains close ties with his Boston family, and they speak and visit each other often. *See, e.g.,* Letter from Vera Koziakov, Roman's Great-Aunt (attached hereto as **Exhibit M**) ("He [Roman] always kept in touch with our family in the United States. We met with him in Sweden, and he visits us when he comes to the USA."); Alexander Koziakov Letter (Ex. C) ("I have known Roman Sterlingov for most of my life. … Me and Roman have always stayed in contact electronically and spoke on the phone often … when Roman would come to visit the US, we spent time together and explored the Boston area.").

Roman's Boston family is eager to do whatever they may to secure his release and provide for and help Roman thereafter. In particular, Alexander Koziakov, Roman's cousin, offers to be Roman's third-party custodian and offers a property he owns to secure Roman's release:

> If Your Honor releases him on bail, myself and my family will gladly provide for and help Roman. I have no doubt regarding his ability to comply with any conditions of release the court imposes. He is a man of his word and he has the support of his United States family members. I have previously offered and continue to offer to put Roman up at my home, or a potential rental if needed while his case is pending. I am also willing to post a property that I own to secure his bail.

> …[O]ur entire family is worried about him and we are a close family. Thank you for consider [sic] my letter and the letters of his other family member and friends who, like I do, love and support Roman. I am aware that the court will set conditions of release. I will make sure that I am fully cognizant of the conditions imposed by the court and will make sure that Roman complies with the conditions. Should Roman not comply with any condition; I will immediately notify Pretrial and the court and Ms. Shroff.

Alexander Koziakov Letter (Ex. C).[3] Mr. Sterlingov's mother, Tatiana, also is willing to post

---

[3] The property Mr. Koziakov offers as security is a single-family home located at 1118 Lafayette Street, St. Joseph, Missouri 64507. The home is titled to MassMo Real Estate, LLC ("MassMo"), but Mr. Koziakov is the sole member of MassMo and its Managing Member. *See* Quit-Claim Deed to Missouri property;

her home in Sweden to secure Roman's release. Tatiana Sterlingova Letter (Ex. B).

### C.  **The Allegations Against Mr. Sterlingov**

Mr. Sterlingov has been charged in a three -count Indictment.

Count One alleges money laundering, in violation of 18 U.S.C. § 1956(a)(3)(A), (B). That count is based on a single transaction. Specifically, on November 21, 2019, an operator the government contends was Mr. Sterlingov allegedly moved approximately 0.01146764 bitcoin (BTC) from Bitcoin Fog (hereafter "BTCF") to a government controlled undercover electronic wallet.

Count Two alleges that BTCF is a money transmitting business being operated without proper license, in violation of 18 U.S.C. § 1960(a).

Count Three alleges that Mr. Sterlingov transmitted money through BTCF without a D.C. license, in violation of D.C. Code § 26-1023(c).

The government also seeks the forfeiture of any real or personal property involved in the offense, or traceable thereto, pursuant to 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(p).

### D.  **The Magistrate Judge's Detention Order**

Magistrate Judge Abrams terse Detention Order (Ex. A hereto) is instructive. There was no finding that Mr. Sterlingov poses a danger to any person or community; indeed, the government did not even contend Mr. Sterlingov would be a danger if released. *See* Detention Order at 1. The only reason alleged for pretrial detention was risk of flight. *Id.* at 2.

The Magistrate Judge held there was a serious risk of flight based on four findings:

> (1) defendant is not a U.S. citizen; (2) insufficient ties to US to reasonably assure defendant's appearance; (3) inadequate bail resources proffered; and (4) alleged access to and use of false identification, including possession of

---

Formation document for MassMo; and MassMo operating Agreement (collectively attached hereto as **Exhibit N**).

multiple passports at time of arrest.

Detention Order (Ex. A) at 3.

Finally, the Detention Order merely checks the box that states, "The Court finds that no condition or combination of conditions will reasonably assure: the appearance of defendant as required." Detention Order (Ex. A) at 2.  Magistrate Judge Abrams does not state what condition(s) he considered, if any, before checking that box, or why he considered any of those conditions to be inadequate for reasonably assuring Mr. Sterlingov's future appearances in court. *Id.* at 1-4.

## <u>ARGUMENT</u>

**THE DETENTION ORDER SHOULD BE REVOKED BECAUSE THE GOVERNMENT FAILS TO MEET ITS BURDEN OF PROVING, BY A PREPONDERANCE OF THE EVIDENCE, THAT MR. STERLINGOV POSES SUCH A SERIOUS RISK OF FLIGHT THAT NO CONDITIONS SHORT OF PRETRIAL DETENTION <u>CAN REASONABLY ASSURE HIS FUTURE APPEARANCES IN COURT</u>**

## I.   THE APPLICABLE LEGAL STANDARD AND THE PRESUMPTION IN FAVOR OF BAIL

Incarceration before trial "substantially impacts the quality of the[] defense" and "increase[s] the likelihood that the detainee will be convicted, imprisoned, and subjected to prolonged deprivation of liberty, privacy, and other fundamental elements of human existence." Samuel R. Wiseman, *"Pretrial Detention and the Right to be Monitored,"* 123 YALE L. J. 1344 (2014). Accordingly, '[o]ur system of criminal justice embraces a strong presumption *against* detention." *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009) (emphasis added). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (same). Courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*,

767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id.* at 1405.

Consistent with these principles, the presumption of innocence afforded to every defendant, and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure [1] the appearance of the person as required and [2] the safety of any other person and the community." 18 U.S.C. § 3142(b) and (c)(1)(B). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 540 (D.C. Cir. 2019).

Here, Mr. Sterlingov – who is not accused of violence and has no criminal history – poses no danger to the community if released. *See, e.g.,* Magistrate Order of Detention (Ex. A) at 3 (ordering detention on flight risk alone). Therefore, the only issue before the Court is whether Mr. Sterlingov is a serious flight risk.

As the Bail Reform Act "generally favors bail release, the government carries a dual burden in seeking pretrial detention" based on flight risk. *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). First, the government must prove by a preponderance of the evidence that Mr. Sterlingov poses a serious risk of flight. *See* 18 U.S.C. § 3142(f)(2)(A); *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). Second, if the government makes such a showing, it must then show, again by a preponderance of the evidence, that no conditions of release will reasonably assure Mr. Sterlingov's appearance. *See* 18 U.S.C. § 3142(e); *Sabhnani*, 493 F.3d at 75; *Simpkins*, 826 F.2d at 96; *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (emphasizing that the "requirement that courts expressly consider alternative conditions is central to the Bail

Reform Act").

When conducting its inquiry to ensure the "flight risk" is so serious detention is required, the Court must consider the factors enumerated in 18 U.S.C. § 3142(g), including [1] the nature and circumstances of the offense charged, [2] the weight of evidence against the defendant, and [3] the history and characteristics of the defendant. *See* 18 U.S.C. § 3142(g); *Sabhnani*, 493 F.3d at 75.

Because pretrial detention is truly a last resort, a court faced with the issue must "make explicit their findings with regard to the adequacy [or inadequacy] of possible conditions for release." *United States v. Coonan*, 826 F.2d 1180, 1186 (2d Cir. 1987). "Whatever the district court ultimately decides, it should explicate the reasons underlying its conclusion." *Berrios-Berrios*, 791 F.2d at 253.

The Court applies a *de novo* standard of review to the Magistrate Judge's detention order. *See United States v. Hubbard*, 962 F.Supp.2d 212, 215 (D.D.C. 2013) (citing *United States v. Sheffield*, 799 F.Supp.2d 18, 19-20 (D.D.C. 2011)); *see also United States v. Koenig*, 912 F.2d 1190, 1192-1193 (9th Cir. 1992) (in reviewing magistrate's detention order, a district court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference").

Applying these legal standards, the government has not met its burden of proving that only detention will reasonably assure Mr. Sterlingov's future appearances in this matter.

## II. MR. STERLINGOV SHOULD BE RELEASED ON BAIL BECAUSE HE DOES NOT POSE A SERIOUS RISK OF FLIGHT AND HIS APPEARANCE IN COURT IS REASONABLY ASSURED

The necessity of pretrial release – and the appropriateness of same – is underscored in a prosecution, such as the one here, that raises novel questions of law and fact. As the government acknowledged in unsuccessfully opposing release in the *Larry Harmon* case, discussed *supra*, the

government's newly attempted prosecution of bitcoin mixers involves a "combination of unusual elements – including the Darknet, Tor, and bitcoin – [that] will undoubtedly raise issues of first impression and require specialized analysis and preparation for trial." 1:19-CR-395- BAH [ECF Docket No. 11 at p. 6]. Here, Mr. Sterlingov's specialized knowledge is key to the review of voluminous discovery in this matter, and he will be drastically hampered in helping prepare his own defense if he remains behind bars. Further, the pretrial phase in this matter likely will be sufficiently protracted that continued detention will raise due process concerns. *See, e.g., United States v. Khashoggi*, 717 F. Supp. 1048, 1051 (S.D.N.Y. 1989) ("traditional notions of cannot countenance protracted pretrial detention of an individual presumed innocent"); *United States v. Ailemen*, 165 F.R.D. 571, 601 (N.D. Cal. 1996) (same).

### A.  Mr. Sterlingov's History and Characteristics Strongly Support His Release

As shown in the twelve letters of support from family and friends accompanying this Motion (Exs. B-M), Mr. Sterlingov is a well-loved young man of 32 with no criminal history, close family ties in the United States, and an admirable history of kindness, good works, and keeping his promises. *See* Statement of Facts, Points A and B. His law-abiding history and personal characteristics militate against any flight risk and strongly supports pretrial release as both show he will abide by any conditions imposed and will appear in court as needed in this matter. *See, e.g., United States v. Chimurenga*, 760 F.2d 400, 402 (2d Cir. 1985) (upholding trial court's finding that defendant was not a flight risk, despite strong evidence of involvement in armed robbery, where defendant had no criminal record and was in school).

### B.  The Nature and Circumstances of the Offense Charged, and the Lack of Non-Circumstantial Evidence Against Mr. Sterlingov Strongly Support His Release

Likewise, both the nature of the charges and the (lack of) evidence strongly support Mr. Sterlingov's release before trial. Mr. Sterlingov has every incentive to return to court and defend

himself against the government's uncertain allegations.

As to the nature of the charges, it is undisputed that "mixing" or "tumbling" is not *per se* illegal. Nor is protecting one's personal and financial privacy on the Internet.[4] Among other things, Mr. Sterlingov will hold the government to its burden of proving each of facts that it must prove beyond a reasonable doubt, including that Mr. Sterlingov possessed the requisite intent required for money laundering and that BTCF fits the statutory definition of a "money transmitter" and required a D.C. license.

As to the weight of the government's evidence, this factor supports Mr. Sterlingov's release from detention because the government's case is entirely circumstantial and the government has provided little to support its allegations of wrongdoing by Mr. Sterlingov.[5] Certainly, this case is far from those cases where the weight of evidence is so overwhelmingly against the defendant that a reasonable presumption exists that he or she would rather flee than face an inevitable conviction. *Cf. United States v. Jackson*, 823 F.2d 4, 6 (2d Cir. 1987) (overwhelming evidence from nine different confidential sources to support allegations, including first-hand testimony of defendant's involvement in heroin deals); *United States v. Duncan*, 897 F. Supp. 688, 692 (N.D.N.Y. 1995) (five confidential informants willing to testify that defendant supplied, received, packaged, prepared, and sold cocaine in various forms for at least two years). Here, no such overwhelming evidence exists, and Mr. Sterlingov, who is considered innocent until proven otherwise, intends to vigorously contest the charges against him.

---

[4] For example, the Tor network's design and purpose is to protect a user's privacy and personally identifiable information (PII) by keeping their Internet communications and activity unmonitored. *See* https://en.wikipedia.org/wiki/Tor_(anonymity_network).

[5] Because of the presumption of innocence, courts have identified "weight of the evidence" as the "least important" of the detention factors. *See, e.g., United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990) ("The weight of the evidence against the defendant is a factor to be considered but it is 'the least important' of the various factors" (quoting *Motamedi*, 767 F.2d at 1408)).

Importantly, the charges at issue have no mandatory minimum and, in opposing release, the government improperly inflates the gravity of the claimed offenses, and with it the advisory guidelines range [6] by giving itself the benefit of every doubt. For example, as to money laundering, the government simply assumes it will be able to prove that Mr. Sterlingov was personally involved in the November 21, 2019 transaction at issue; that he knew the funds in the transaction were proceeds of, or intended to promote, drug offenses; and that he was in the business of money laundering. The government then continues its assumption by applying corresponding increases under the U.S.S.G. to get to a higher offense level, without applying any potential decreases (*e.g.*, acceptance of responsibility). The government also fails to inform the Court that the approximate value of the BTC that was moved in the November 21, 2019 transaction at issue was just $89.83. [7]

Similarly, regarding the money transmitter counts, the government simply assumes it will be able to prove that BTCF was a money transmitting business that required a D.C. operating license; that it will be able to prove that more than $250MM was transmitted by BTCF; and, again, that Mr. Sterlingov knew the funds transmitted were proceeds of, or intended to promote drug offenses, and that he was in the business of money laundering. Once again, the government applies potential U.S.S.G. increases but ignores decreases.

---

[6] The Court should bear in mind, even if the government chooses not to, that the advisory Guidelines range is one of multiple sentencing factors and "are just that, guidelines [...] they truly are advisory." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). This Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented," *Gall v. United States*, 552 U.S. 38, 50 (2007), and consider "all the [sentencing] factors listed in § 3553(a)," not just the Guidelines range. *Pepper v. United States*, 562 U.S. 476, 490 (2011). Given the lack of criminal history here, Mr. Sterlingov's admirable personal history, and the novel nature of the prosecution, there is no reason for the government – or Mr. Sterlingov – to presume or anticipate that the Court will impose a guidelines sentence, should Mr. Sterlingov even be convicted.

[7] *See* Yahoo BTC-USD Daily tracker, available at  https://finance.yahoo.com/quote/BTC-USD/history/ (showing that, on 11/21/2019, BTC opened at $8,023.64, with a high of $8110.10, a low of $7, 597.38, and a close of $7,642.75); *see also*  https://changelly.com/blog/bitcoin-btc-price-history-in-2019 ("On November 21, the price of Bitcoin again fell below $8,000").  The average between the opening and closing price on 11/21/2019 is $7,833.195. In turn, $7,833.195 x 0.01146764 = $89.83.

It is beyond cavil that all these government assumptions must be proven by the government beyond a reasonable doubt and are readily challengeable by the defense. In this regard, while the government urges the Court to weigh the issue of bail as if every bitcoin transaction on BTCF is provably illicit, it is telling that the government has indicted Mr. Sterlingov on a single transaction. Even as to that single transaction, the government contends, but has not shown, that it was conducted by, or known to, Mr. Sterlingov. Given the many readily apparent flaws in the government's case, the government's raw speculation that Mr. Sterlingov would rather live the rest of his life as a wanted fugitive, rather than remain and hold the government to its proof, is unpersuasive and does not support pretrial detention.

In any event, in finding a serious risk of flight, more is needed than the mere potential for a long sentence. *See United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988) (per curiam). Evidence supporting a finding of a serious flight risk includes skill in avoiding surveillance, prior flight from law enforcement, and use of aliases. *Id.* None of these risk factors are present here; Mr. Sterlingov came to this country openly and under his own name, has never fled or tried to circumvent court orders, and possesses skills relevant to the virtual world, but not the real world.

To flee, Mr. Sterlingov would have to do far more than get on his computer. He, a person with no criminal history, would have to break home confinement under the nose of his third-party custodian, all while evading government monitoring of his ankle monitor and the U.S. border. He would be impoverishing any sureties – including his mother Tatiana and cousin Alexander – who, in an act of trust and good faith, have agreed to post their real estate as security and be jointly and severally liable on a bond. And Mr. Sterlingov would be doing all this to avoid fighting charges of non-violent crimes that include no mandatory minimums and to which he has reasonable defenses. This makes no sense. Mr. Sterlingov is not a flight risk of any kind, let alone a serious one. Instead,

he has every incentive to continue to appear in court and fight the charges against him. Thus, the charged offenses do not require Mr. Sterlingov's pretrial detention.

Clinching the matter, the Court may easily set conditions that address any serious flight risk. The standard is not, as the government would have it, a 100 percent certainty. The Bail Reform Act merely requires conditions that ameliorate the risk of flight and "reasonably assure" a defendant's return to court. *See* 18 U.S.C. § 3142(b) and (c)(1)(B); *United States v. Madoff*, 586 F.Supp.2d 240, 249 (S.D.N.Y. 2009) (Bail Reform Act "does not require that the risk be zero, but that conditions imposed 'reasonably assure' appearance"). Here, the Court readily may set a bail package that features a series of meaningful bail conditions that will deter any serious flight risk and reasonably assure Mr. Sterlingov's return to court. Just as in *Larry Harmon*, discussed *supra*, Mr. Sterlingov's release can be conditioned on home detention, location monitoring, travel restrictions, computer restrictions, internet restrictions, and prohibitions on opening new financial accounts or making cryptocurrency transactions. 1:19-CR-395-BAH [ECF Docket Nos. 20 and 21]. The government cannot persuasively contend that these thoughtful conditions, together with any other the government or the Court may suggest, will be insufficient to reasonably assure Mr. Sterlingov's return to court.

### C. The Magistrate Judge's Order is Flawed and Unpersuasive and Should Be Rejected by the Court on *De Novo* Review

The government's "flight risk" analysis – which was misguidedly accepted by the Magistrate Judge in his Detention Order – essentially begins and ends with the fact that Mr. Sterlingov "is not a U.S. citizen" with "insufficient ties to US to reasonably assure defendant's appearance." Magistrate Judge's Order of Detention (Ex. A) at 3.[8] The Magistrate Court erred,

---

[8] The Magistrate Judge also found that "inadequate bail resources [were] proffered" and that Mr. Sterlingov has "*alleged* access to and use of false identification, including possession of multiple passports at time of arrest." Magistrate Judge's Order of Detention (Ex. A) at 3 (emphasis added). These concerns are readily

however, by materially undervaluing the strength of Mr. Sterlingov's family ties in this country.

Roman is very close to his Boston-based family, and they are willing to post bail and be his third-

party custodians upon release. *See* Statement of Facts, Points A and B.  The Magistrate Judge also

erred by materially overemphasizing the risk posed by Mr. Sterlingov residing outside the U.S.

In asserting that being a Russian and Swedish citizen makes Mr. Sterlingov a serious flight

risk, the government ignores both the difficulty of travel because of the pandemic and that Mr.

Sterlingov has surrendered his passports. The government apparently contends that Mr. Sterlingov,

if released from custody, will buy fake travel documents, and then avoid passport and border

controls to flee the jurisdiction and become a fugitive. As Judge Tanya Chutkan reasoned in *United*

*States v. Naik*, 1:19-cr-00373-TSC (D.C. Cir.), discussed below, such an attenuated and highly

speculative concern does not require incarceration, but the setting of appropriate bail conditions.

*See also Larry Harmon*, *supra* (this Court addressing the government's flight concern by imposing

a range of bail conditions, including home confinement, electronic and physical monitoring, travel

---

dealt with and should not deter Mr. Sterlingov's release.

As to bail resources, the Court now has before it offers to secure Mr. Sterlingov's bail with two homes. Alexander Koziakov (Roman's cousin) has offered to post a home he owns in St. Joseph, Missouri to secure bail (*see* Exs. C and N); Tatiana Sterlingova (Roman's mother) has offered to post her home in Sweden to secure bail (*see* Ex. B). Hence, the Court should find that bail resources is no longer a material issue preventing Mr. Sterlingov's release.

As to the *allegation* of false identification, the only actual "proof" apparently offered by the government to the Magistrate Judge in support of this allegation (as opposed to pure supposition) is that Mr. Sterlingov "possess[ed] multiple passports at time of arrest." Detention Order (Ex. A) at 3. At the time of his arrest Mr. Sterlingov had four passports – two Russian and two Swedish. But that fact does not support or prove risk of flight in any way. *All four passports were in Mr. Sterlingov's name*, and there is nothing false or untoward about him traveling with those passports. Russia issues both a "domestic" and an "international travel" passport to all its citizens. *See, e.g.*, "Why do Russians have 2 passports," available at https://www.rbth.com/lifestyle/328576-why-russians-have-2-passports. Likewise, a Swedish citizen may hold two valid Swedish passports at the same time, if needed for work or other special reasons. *See* Passport Ordinance (1979:664) at § 14 (attached hereto as **Exhibit O**). One acceptable "special reason" is the reason why Mr. Sterlingov had two Swedish passports: to be able to vacation in both Israel and Arab countries. Several Arab states reject passports that contain an Israeli entry stamp or visa.

restrictions, computer restrictions, internet restrictions, and prohibitions on opening new financial accounts or making cryptocurrency transactions).

In *Naik*, the government appealed a magistrate judge's ruling allowing pretrial release of Mr. Naik, a foreign citizen charged with child pornography offenses that carried a mandatory minimum sentence. The government argued that, if released from custody, Mr. Naik could easily go to the consulate for Afghanistan, get a new passport, and flee. In rejecting the government's argument and upholding the decision of the Magistrate Judge, District Judge Chutkan reasonably resolved the government's purported concern by requiring that Mr. Naik be accompanied by a third-party custodian and only leave the home to appear in Court. Judge Chutkan also added the condition that the defendant not apply for any international travel documents and not visit any consulate. The docket sheet in the *Naik* case proves the efficacy of these conditions. *See* **Exhibit P** (Naik Docket Sheet). Mr. Naik did not visit any consulate, appeared for trial, was convicted, and a motion to set aside his conviction notwithstanding the verdict was granted. If the Court deems it necessary, Mr. Sterlingov is ready to be subjected to restrictions like those ordered in *Naik* and *Larry Harmon* as a condition of his release.[9] Specifically, Alexander Koziakov, Mr. Sterlingov's cousin and a U.S. citizen who has lived in Boston his entire life, has agreed to be the third-party custodian here and welcome Mr. Sterlingov into his Boston home. *See* Alexander Koziakov Letter (Ex. C) at 1. Mr. Koziakov "will make sure [Mr. Sterlingov is] fully cognizant of the conditions imposed by the court and will make sure that Roman complies with the conditions." *Id.* at 2.

The government is fully able to monitor and regulate entry and egress from the United

---

[9] Courts have found that GPS monitoring and home confinement can ensure attendance in court even for those charged with serious crimes. *See, e.g.*, "Former IMF chief Dominique Strauss-Kahn granted bail," May 20, 2011, available at http://goo.gl/oYgRM9, where Strauss-Kahn, who was charged with rape and had the means and connections to flee; was released on bail terms that included electronic monitoring and home confinement.

States and flag Mr. Sterlingov should he attempt to leave the United States – just as the government did when he entered the United States prior to his arrest. In this regard, the government adduces no evidence (because none exists) that Mr. Sterlingov has any skill or experience in travelling under a false name or otherwise evading border controls. *See, e.g., Friedman*, 837 F.2d at 49 (per curiam) (finding such skills and experience material in assessing serious flight risk).

Many courts have not hesitated to reject the government's base contention here – that having ties to, and money in, another country automatically makes a defendant such a serious flight risk that he or she must be detained pretrial. See, e.g., *Naik*, discussed *supra*; *United States v. Marinez-Patino*, 2011 WL 902466, *6 (N.D. Ill. March 14, 2011) ("it is the risk that a defendant will flee, and not just his immigration status, that a court must consider under Section 3142(d)").

In *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004), defendant was alleged to have violated the Export Administration Act and IEEPA by acquiring nuclear triggers and exporting them to Pakistan. Defendant was an Israeli national who had resided in South Africa for the 18 years preceding his arrest and had "no ties to the United States or the Washington, D.C. area" of any kind. Indeed, he "was only in this country in order to participate in a ski vacation with his wife and daughter." Although "the weight of the evidence against Defendant is substantial," the Court found that none of the foregoing justified pretrial detention under the Bail Reform Act. The same conclusion is called for here.

In *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004), the Sixth Circuit Court of Appeals affirmed the district court's order of pretrial release, even though the defendant, charged with bulk cash smuggling and forfeiture, was a resident and citizen of Denmark, a non-extradition country. The Court of Appeals noted that the "bail statute does not ... require that foreign defendants be detained simply because their return cannot be guaranteed through extradition."

In *United States v. David Sidoo*, 19-cr-10080-NMG, Dkt. 13 (D. Mass), the district court ordered the release of defendant, a citizen of Canada charged with conspiracy to commit wire fraud, honest services fraud, and money laundering. The defendant, who had no status in the United States, was permitted to reside in his home in Canada during the pendency of his United States criminal case.

In *United States v. Ng*, 15 Cr. 706 (VSB) (S.D.N.Y), the district court granted bail to defendant Ng who had no ties to the United States; was not a citizen; did not speak English; had seemingly endless wealth with which to flee; and an older man, for whom a 20-year sentence could effectively be a life sentence.[10]

As these cases demonstrate, that Mr. Sterlingov lives outside the United States does not *ipso facto* create a serious risk of flight or justify his pretrial detention, particularly given all the other facts discussed above supporting his future appearances in court upon release. For all those reasons, Mr. Sterlingov is not a serious flight risk if released pending trial.

## III.   IN ANY EVENT, BAIL CONDITIONS READILY EXIST THAT WILL DETER ANY SERIOUS FLIGHT RISK AND REASONABLY ASSURE MR. STERLINGOV'S RETURN TO COURT

The Magistrate Judge should have, but did not, "make explicit [his] findings with regard

---

[10] *See also United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) (reversing district court order of detention of defendants, who were natives of Indonesia, and ordering their release despite finding (i) defendants' "strong motive to flee" because of serious charges of human slavery and "strong" evidence of guilt; (ii) defendants faced a "lengthy term of incarceration" if convicted; (iii) defendants possessed "ample means to finance flight;" (iv) defendants "maintained strong family ties to their native countries as well as personal and professional ties to various locations in Europe and the Middle East;" and (v) defendants "could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations"); *United States v. Hanson*, 613 F. Supp. 2d 85 (D.D.C. 2009) (ordering release of defendant, who, while a naturalized citizen of the United States, had "strong ties to [her home country of] China," including owning property in China, spending almost all ten years of her marriage living abroad with her husband, and spending only 22 days in the United States in 2008. The Court also acknowledged that the charges against the defendant "were serious and carried a potential for a significant period of incarceration" and that the "government has strong evidence against" the defendant "including her own statement to investigators that she smuggled the UAV autopilot components out of the United States and knew there were licensing requirements for such items" under IEEPA.).

to the adequacy of possible conditions for release" (*Coonan*, 826 F.2d at 1186) or "explicate the reasons underlying [his] conclusion," *Berrios-Berrios*, 791 F.2d at 253. The Court should correct this error as part of its *de novo* review of the instant Detention Order. Further, it is respectfully submitted that, after reviewing the matter, the Court will recognize and determine that rigorous bail conditions exist short of detention that are sufficient to mitigate any purported flight risk and reasonably assure Mr. Sterlingov's appearance in court. For this additional independent reason, the Court should revoke revoked the Detention Order in favor of a comprehensive set of restrictive conditions.

As part of its *de novo* review of a detention order, this Court is required "promptly to examine *de novo* whether there are conditions of release that will reasonably assure the safety of any other person and the community." *Hubbard*, 962 F.Supp.2d at 215 (internal citations omitted). Here, Pretrial Services' High Intensity Supervision Program ("HISP") renders Mr. Sterlingov's continued pretrial detention inappropriate under the Bail Reform Act. *See, e.g., United States v. Dabney*, 2020 U.S. Dist. LEXIS 67127, *10-13 (D.D.C. 2020) (changing pretrial detention to release under Pretrial Services Agency's High Intensity Supervision Program, with electronic monitoring, condition of permanent home confinement, and all the other "rules, regulations, and requirements of the [HISP] Program that are listed in the orientation contract, which is incorporated herein by reference"); *Larry Harmon*, 1:19-CR-395- BAH (same).

HISP is a comprehensive program of electronic monitoring, supervision, and intensive case management for higher risk defendants. Https://www.psa.gov/sites/default/files/Brochure%20-%20HISP%207.7.17%20-%20Ready%20for%20Print.pdf. Under HISP, Pretrial Services provides increased monitoring and a variety of other measures "to promote compliance with supervision conditions," including (i) *weekly* in-person contact with a Pretrial Services Officer; (ii)

at least weekly drug testing; (iii) electronic location monitoring; (iv) home confinement or curfew; and (v) weekly reports to the Court on program compliance. *Id.* Under the watchful eyes of a third-party custodian and with electronic GPS monitoring and physical monitoring by Pretrial Services, there is no *bona fide* serious risk of flight. Any claim otherwise is pure speculation.

If the government truly fears this unlikely situation, it may ask the Court to impose conditions that reasonably ameliorates any such concern. Indeed, Mr. Sterlingov does not object to the Court imposing any of the following additional bail conditions, which were previously used successfully in *United States v. Naik*, 19 Cr. 373 (TSC), and *United States v. Larry Harmon,* 1:19-CR-395- BAH, discussed *supra*:

- Mr. Sterlingov may only leave home confinement when accompanied by a third-party custodian;

- Mr. Sterlingov is to refrain from contacting or entering a consulate or embassy to obtain a passport, visa, or any other travel document;

- Mr. Sterlingov is to refrain from any internet access to any consulate and must allow Pretrial Services permission to monitor internet use and browser history.

- Mr. Sterlingov is to refrain from accessing the Internet or going online;

- Mr. Sterlingov is prohibited from opening new financial accounts or making cryptocurrency transactions.

## CONCLUSION

For the foregoing reasons, the Court should (i) revoke the detention order imposed on Mr. Sterlingov; (ii) order him released with appropriate bail conditions; and (ii) grant him such other and further relief as the Court deems just and proper.

Dated:  New York, New York
       September 8, 2021           Respectfully submitted,

                                      */s/Sabrina P. Shroff*
                                      Counsel for Mr. Roman Sterlingov

SPS/
Exhibits A-P

cc: All counsel of record (by ECF)