UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | 1:21-cr-399-RDM |
| ROMAN STERLINGOV | : | |
| | : | |

**ROMAN STERLINGOV'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION, PURSUANT TO 18 U.S.C. § 3145(b), FOR REVOCATION OF HIS PRETRIAL DETENTION**

The sole issue[1] before the Court on this *de novo* review is a narrow one: has the government proved, by a preponderance of the evidence, that Mr. Sterlingov poses a serious flight risk, *and* that no conditions exist other than detention that will reasonably assure his future appearances in court? Because the answer is "no," Mr. Sterlingov's detention should be revoked so that he may be released to home detention under the supervision of his family.

## ARGUMENT

Mr. Sterlingov is presumed innocent and presumed to receive a bond, 18 U.S.C. § 3142 (a), (b) and (j). In this case the Bail Reform Act has declared a *presumption for release.* Accordingly, there is a "strong presumption *against* detention," *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009) (emphasis added), with any "[d]oubts regarding the propriety of release … resolved in favor of the defendant." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1405 (9th Cir. 1985) (Kennedy, J.); *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.") (citing *United States v. Salerno*, 481 U.S. 739, 755 (1987)). Pretrial detention

---

[1] The government does not contend Mr. Sterlingov should be detained because he poses a threat to any person or the community.

is not permitted unless the government proves, by a preponderance of the evidence (i) that Mr. Sterlingov poses a serious risk of flight; *and* (ii) that no conditions of release will reasonably assure Mr. Sterlingov's appearance. *See* 18 U.S.C. §§ 3142(e) and 3142(f)(2)(A); *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). The government fails to do so here.

## I.    THE GOVERNMENT STILL FAILS TO PROVE THAT MR. STERLINGOV POSES A SERIOUS FLIGHT RISK

Under the Bail Reform Act, Mr. Sterlingov must pose a *serious* flight risk. He does not. In his moving papers, Mr. Sterlingov explained why, given his history and characteristics, the strong support from his aunts, uncles, and cousins in the Boston area, and the material flaws in the government's case, he is not a serious flight risk. *See* Sterlingov Br. and exhibits [ECF Doc. No. 17] at 1-22. Mr. Sterlingov also explained why each of the four supposed justifications provided by the Magistrate Judge in ordering his detention lacked merit. *Id.* at 8-9, 16-20.

In response, the government continues to contend Mr. Sterlingov poses a serious flight risk because (i) he is a foreign national who could flee to Sweden, Russia, or elsewhere;[2] (ii) he "likely" has access to millions in funds; and (iii) the evidence against him is substantial and he faces up to 30 years in jail if convicted. The government continues to be wrong.

---

[2] In its opposition, the government contends it has uncovered evidence that Mr. Sterlingov does not really live in Sweden, but in German or Spain. Opp. Br. at 43. This is not true. Mr. Sterlingov continues living in Sweden, as he has since age 14. The government's apparent confusion stems from the fact that Mr. Sterlingov frequently travels to various seminars and retreats in Spain and Germany, and once used a German address to receive packages while at a seminar. These seminars and retreats focus on such topics as natural medicine, meditation, and other anti-stress and mental health treatments. *See, e.g.,* www.APLjourneys.com (Ayahuasca Retreat Center in Spain); https://ramalsaman.com/sacred-circle/ (group healing retreats in Germany). As detailed in the Sterlingov Br., Mr. Sterlingov is deeply interested in such matters, having helped found a self-help group for men in Gothenburg, Sweden, and has been working to increase his skills and knowledge in hopes of becoming a mental health/life coach.

For purposes of this motion, what is important is that all of Mr. Sterlingov's travels were conducted in his own name and not hidden in any way. *Cf. United States v. Anderson*, 384 F. Supp. 2d 32 (D.D.C. 2005) (denying pretrial release to defendant who had used aliases and false identities when traveling abroad). Similarly, Mr. Sterlingov flew from Russia to California (where he was arrested upon entry) using his own name and passports. He chose to fly from Russia because the Russian COVID protocols allowed him to get from there to California in time for the start of his flight lessons (also registered in his own name).

Mr. Sterlingov's foreign nationality and residence is not enough to support detention. This Court and other courts have not hesitated to reject the government's base contention here – that having ties to, and money in, another country automatically makes a defendant such a serious flight risk that he or she must be detained pretrial. *See* Sterlingov Br. at 16-20 (and cases cited). To the contrary, the bail statute does not "require that foreign defendants be detained simply because their return cannot be guaranteed through extradition." *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004) (affirming pretrial release of defendant, a resident and citizen of Denmark, to his home in Denmark from where defendant could not be extradited);[3] *United States v. David Sidoo*, 19-cr-10080-NMG, Dkt. 13 (D. Mass) (allowing citizen of Canada charged with conspiracy to commit wire fraud, honest services fraud, and money laundering to reside in his home in Canada during the pendency of his United States criminal case); *United States v. Karni*, 298 F. Supp. 2d 129, 133 (D.D.C. 2004) (granting pretrial release to Israeli national resident in South African who had "no ties to the United States or the Washington, D.C. area"); *United States v. Xulam*, 84 F.3d 441, 443 (D.D.C. 1996) (per curiam) (revoking order of intention placed on Xulam, a Kurd from Turkey with no legal status in the United States); *United States v. Hanson*, 613 F. Supp. 2d 85 (D.D.C. 2009) (ordering release of defendant who had "strong" family and financial ties to China and lived outside the United States); *United States v. Ng*, 15 Cr. 706 (VSB) (S.D.N.Y) (granting release of defendant Ng who had no ties to the United States; was not a citizen; did not speak English; had seemingly endless wealth with which to flee; and was an older man, for whom a 20-year sentence could effectively be a life sentence).

Similarly, the government cannot meet its burden of proof as to flight risk by claiming it is

---

[3] As part of his release conditions of release, Mr. Sterlingov is ready to sign a waiver of any rights he may have not to be extradited to the United States. This was one of the conditions imposed by the Court in *United States v. Karni*, 298 F. Supp. 2d 129, 133 (D.D.C. 2004) (ordering release of Israeli national who resided in South Africa and had no ties to the United States).

"likely" (Opp. Br. at 43) Mr. Sterlingov has access to millions of dollars in cryptocurrency.  As the government concedes in its opposition, it has frozen or seized all of Mr. Sterlingov's funds, and it provides no evidentiary facts, admissions, or first-hand testimony in support of its extraordinary claim that Mr. Sterlingov has access to tens of millions of dollars more. In this regard, it is telling that the government can point to no extravagant spending or assets (homes, cars, yachts, or even a fancy watch) owned by this supposedly filthy rich multi-millionaire, or any other actual facts supporting its convenient accusations.

Even if the government could prove Mr. Sterlingov had millions hidden (and it provides no non-speculative support for that supposition), access to funds is not an adequate reason to deny bail, or to hold that no release conditions will suffice. *See, e.g., United States v. Ng*, 15 Cr. 706 (VSB) (S.D.N.Y) (granting bail to Ng despite his "seemingly endless wealth" and no ties to the U.S.); *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) (ordering  release despite defendants possessing "ample means to finance flight," and finding that they "could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations"). Far more than wealth is needed for the government to meet its burden of proof but is not present here.

In *United States v. Anderson*, 384 F. Supp. 2d 32 (D.D.C. 2005), for example, the defendant was not detained because he had vast wealth and substantial assets abroad, but because he had previously used aliases and false identities when traveling abroad, and there was strong, specific evidence of his clear interest in fleeing the jurisdiction and his intent and preparation to do so, including numerous books and pamphlets seized from him describing means of creating and obtaining false identification. *Id.* at 36. As opposed to the facts and evidence in *Anderson* showing Anderson's various existing preparations to flee, all the government offers here is their professed

concern that, if released, Mr. Sterlingov may choose to flee. This asserted concern – which arguably applies to every defendant seeking bail – falls far short of the government's burden of proving that the proposed restrictions that would govern Mr. Sterlingov's release are unreasonable and unworkable because of some specific reason particular to him. *Cf. United States v. Tajideen*, 2018 WL 1342475 (D.D.C. Mar. 15, 2018) (extremely wealthy 62-year-old defendant with vast overseas holdings and citizenship in Belgium, Lebanon, and Sierra Leone posed serious risk of flight because he also had a prior forgery conviction); *United States v. Morrison*, 2016 WL 7421924 (W.D.N.Y. Dec. 223, 2016) (defendants posed flight risk because they were drug mules whose crime required having the skills, knowledge, and ability to move surreptitiously across the Canada-U.S. border carrying drugs).[4]

Here, by contrast, all the government points to is Mr. Sterlingov allegedly paying the domain fees for www.bitcoinfog.com through a third-party host. Opp. Br. at 19-20. This is a far cry from the skills and experience necessary to break home confinement under the nose of his third-party custodian, evade government monitoring of his ankle bracelet, and successfully leave the country with a fake passport and an assumed identity. Unlike the defendants in *Anderson,*

---

[4]The few cases cited by the government where the defendant was detained are readily and materially distinguishable from the situation here. Thus, far from being "analogous" to Mr. Sterlingov's situation (Opp. Br. at 45), the defendant in *United States v. Bikundi*, 47 F. Supp. 3d 131 (D.D.C. 2014), was detained not just because she was a citizen of Cameroon with no legal U.S. status, but because there were risk factors there that are not present here. Bikundi posed a serious risk of flight because the government had shown (not simply alleged) that she had deposited approximately 60 million dollars to her family bank account in Cameroon, and because the Medicaid fraud for which she was indicted required skill in creating and using false identifications. *Id.* at 137. None of these additional factors are present here with Mr. Sterlingov. Likewise, in *United States v. Eccleston*, 140 F. Supp. 3d 102 (D.D.C. 2015) and *United States v. Amar*, 300 F. Supp. 3d 287 (D.D.C. 2018), cited by the government at page 46 of its opposition, the Court stressed that the defendants there had no real ties of any kind to the United States. Here by contrast, Mr. Sterlingov has close and strong ties to his Boston-area family. In letters to the Court, *see* Exhibits C and M to the Sterlingov Br. [ECF Doc. No. 17], Mr. Sterlingov's U.S. family not only memorialize their love and affection for Mr. Sterlingov, but offer to bond property, provide a place for Mr. Sterlingov to stay, and act as custodian to ensure Mr. Sterlingov complies with his release conditions. None of these family resources and guarantees were available to the defendants in *Eccleston* and *Amar.*

*Tajideen,* and *Morrison*, discussed above, there is absolutely nothing in Mr. Sterlingov's history or attributes that support any of this actually happening, or that would indicate he would be willing to severely harm his cousin Alexander Koziakov – who, in an act of trust and good faith, has agreed to post his real estate as security and be responsible for  Mr. Sterlingov's actions as his custodian (*see* Sterlingov Br. at Ex. C) – by fleeing.[5] Indeed, all the letters submitted in support of release amply demonstrate that Mr. Sterlingov is a man of his word who keeps his promises and is extremely solicitous and respectful of his friends and family. *See id.* at Exs. B-M. Under these facts, Mr. Sterlingov is not a flight risk of any kind, let alone a serious one, and pretrial detention is not needed to assure his continued appearances in Court.

Finally, in his moving papers, Mr. Sterlingov showed how the government was improperly inflating the gravity of the claimed offenses, and with it the purely advisory sentencing guidelines range, by giving itself the benefit of every doubt and making a long string of unsupported assumptions for which it lacked any real proof. *See* Sterlingov Br. at 12-15. The government's opposition brief, corrects none of these flaws, further demonstrating the many weaknesses of the government's case.

The government spends tens of opposition brief pages discussing the "Darknet," "Silk Road," "Helix," "Agora," and the wrongdoing of others (*see* Opp. Br. at 1-24) to literally paper over the fact that the government has no proof when it comes to its case-in-chief. When it comes to that case-in-chief, the government merely piles assumption on top of naked assumption to build a flimsy "house of cards" with no real support:

- While the government claims that through "analysis of bitcoin transactions, financial

---

[5] The Court actually has before it offers to secure Mr. Sterlingov's bail with two homes. In addition to the home offered by Roman's cousin, Alexander Koziakov, Roman's mother, Tatiana Sterlingova, has offered to post her home in Sweden to secure bail. *See* Sterlingov Br. at Exs. B, C, and N. Thus, any attempt to flee would harm Mr. Sterlingov's mother and cousin, and potentially open up his cousin to criminal prosecution by the government, all of which are strong disincentives substantially reducing any purported flight risk.

records, Internet service provider records, e-mail content, and additional investigative information, U.S. authorities identified the principal operator of Bitcoin Fog as Sterlingov" (Opp. Br. at 17), that is not true. All that the government actually shows is that Mr. Sterlingov helped create the Bitcoin Fog platform in late 2011. *See* Opp. Br. at 17-23. The government provides no evidence that Mr. Sterlingov ever operated Bitcoin Fog thereafter, much less in 2019, when the government-initiated transaction at the heart of this prosecution (the "D.C. Transaction") took place.

- The government provides no proof – no admission, no first-hand testimony, no documents – showing that Mr. Sterlingov is the (or even an) alleged "administrator" of Bitcoin Fog.

- The government provides no proof – no admission, no first-hand testimony, no documents – showing that Mr. Sterlingov is "Akemashite Omedetou" the anonymous person whose posts the government features in its opposition brief.

- The government provides no proof – no admission, no first-hand testimony, no documents – showing Mr. Sterlingov used Bitcoin Fog to conduct any illegal activity. In this regard, while the government asserts that Mr. Sterlingov's routed some of his Bitcoin through Bitcoin Fog, the government itself admits that these transactions took place "in the same manner as a regular user" and were ultimately deposited in virtual bank accounts openly registered in Mr. Sterlingov's own name. *See* Opp. Br. at 23-24. There is nothing illegal in investing or paying in Bitcoin, using the Bitcoin Fog mixer, storing your Bitcoin in your own name at crypto-exchanges such as Kraken, or insisting on the privacy of your financial transactions, and the government does not contend otherwise. Yet, this entirely legal activity is all the government's "analysis of Sterlingov's accounts" demonstrates. *Id.*

- The government provides no proof – no admission, no first-hand testimony, no documents – showing that Mr. Sterlingov knew about the D.C. Transaction, or the government email stating that the D.C. Transaction involved drug proceeds – a message that received no response. *See* Opp. Br. at 13-15. Remarkably, the government tries to "prove" that Mr. Sterlingov knew about the D.C. Transaction and its illicit nature because "Akemashite Omedetou" had responded to six supposedly *similar* type messages in the past. *Id.* at 15-16. However, (i) none of those messages involved or concerned illegal activity, but anodyne support issues; (ii) there is no evidence that Akemashite is Roman Sterlingov; (iii) all of the six responses were between 2012 and 2016, years from the D.C. Transaction. *Id.* That the government claims this is significant evidence" (Opp. Br. at 15) of Mr. Sterlingov's knowledge and intent shows the weak and unsupported nature of the government's case.

- The government pretends this is a 250 million dollar case (Opp. Br. at 35 n.12) and then incorporates that absurd assumption into its Guidelines calculation. *See* Opp. Br. at 35, n.12. In making this assumption, the government ignores, among other things, that (i) the government can identify only $78 million in transactions involving what the government calls "darknet markets" (*id.* at 12); (ii) not every good or service supplied

by a darknet market is illegal (*id.* at 11); (iii) the government has not shown, or even averred, that any of these transactions – beyond the entirely artificial D.C. Transaction engineered by the government – touch the United States or are illegal where a transaction took place, given the differing criminal laws (*e.g.*, drug laws) in foreign jurisdictions; and/or (iv) Mr. Sterlingov administered Bitcoin Fog in the years where these transactions took place. For these reasons, and the other reasons stated in the Sterlingov Br., the government's Guideline calculation should be rejected by the Court. This case remains one with no mandatory minimum that is built around a D.C. Transaction and a set of deeply flawed and unproveable assumptions.

At most, the government can show that Mr. Sterlingov helped create Bitcoin Fog in 2011, much like the federal government helped create the Tor Network and a functioning decentralized, anonymous Internet in the first place.[6] But the government provides no evidence that Mr. Sterlingov had any involvement in that platform thereafter, much less that Mr. Sterlingov was involved in or about 2019 when the D.C. Transaction engineered by the government took place, or that Mr. Sterlingov somehow knew about the D.C. Transaction itself. Given the evident material flaws in the government's case-in-chief, the government's *ipse dixit* assertion that Mr. Sterlingov would rather harm his family and become an international fugitive, instead of rigorously fighting a case with no mandatory minimum that is backed by no real evidence, is unpersuasive and cannot meet the government's burden of proving that Mr. Sterlingov is a serious flight risk.

## II.   THE GOVERNMENT STILL FAILS TO PROVE THAT NO BAIL CONDITIONS EXIST THAT WILL REASONABLY ASSURE MR. STERLINGOV'S RETURN TO COURT

"[T]hat courts expressly consider alternative conditions is central to the Bail Reform Act,"

---

[6] "Tor was largely created through funding from the United States government in the 1990s and early 2000s, including from the Naval Research Lab and the Defense Advanced Research Projects Agency. The anonymity service has been open source since its public release in 2002, and it transitioned to being overseen by a nonprofit, dubbed the Tor Project, in 2006." Lily Hay Newman, "The CIA Sets Up Shop on Tor, the Anonymous Internet: Even the Central Intelligence Agency has a so-called onion service now," Wired (May 7, 2019), available at https://www.wired.com/story/cia-sets-up-shop-on-tor/. Many organizations have created so-called "onion sites" on the "darkweb," so their services and communications are available on an anonymous basis to users. These organizations include Facebook, The New York Times, the BBC, the CIA, DuckDuckGo, Blockchain, and Wasabi Wallet. *See id. See also* "25 best dark web sites for 2021 (and how to access them securely)," available at https://privacysavvy.com/security/safe-browsing/best-dark-web-sites/#vpnoffer.

and explicit on-the-record findings as to the adequacy (or inadequacy) of possible conditions for release is required. *See, e.g., United States v. Berrios-Berrios*, 791 F.2d 246, 250, 253 (2d Cir. 1986). Here, the government cannot persuasive show why the rigorous bail conditions that are part of Pretrial Service's High Intensity Supervision Program ("HISP")  and were successfully used in other cases – *see, e.g., United States v. Larry Harmon*, 1:19-CR-395- BAH; *United States v. Dabney*, 2020 U.S. Dist. LEXIS 67127, *10-13 (D.D.C. 2020) – will not be equally successful here in assuring Mr. Sterlingov's appearance in court.

   *United States v. Larry Harmon*, 1:19-CR-395- BAH, another bit-coin mixing prosecution, is particularly relevant. There, a combination of restrictions imposed over the government's objections, including (i) home detention in Ohio with constant monitoring by a third-party custodian; (ii) electronic location monitoring; (iii) travel restrictions; (iv) computer restrictions; (v) Internet restrictions; and (vi) prohibitions on opening new financial accounts or making cryptocurrency transactions (*see id.* at ECF Docket Nos. 20 and 21) successfully ensured Larry Harmon's future appearances before the Court.

   The government now unsuccessfully tries to distinguish *Harmon* by emphasizing that "Larry Harmon was a U.S. citizen and lifelong resident of Ohio." Opp. Br. at 48. In opposing Harmon's bail, however, the government contended those Ohio ties were beside the point, contending – precisely as it does here – that no release conditions of any kind would be sufficient given Larry Harmon's (i) deep personal and financial ties to Belize; (ii) the weight of evidence and substantial potential penalties facing him as a defendant in a bitcoin mixing case; and (iii) his access to millions in bitcoin and the type of internet-savvy and darkweb connections that would allow him to flee. The Court considered those arguments, rejected them, revoked the order of detention previously imposed, and granted Mr. Harmon his release. The Court should reach the

same conclusion regarding Mr. Sterlingov, and order his release under similar, reasonable conditions.

In the end, the government essentially contends that no restrictions, however severe and focused, will suffice because any restrictions may be violated or evaded. Opp. Br. at 49. This, however, is not the law. The Bail Reform Act does not require foolproof conditions or that the risk of flight be reduced to zero; all that is required are reasonable conditions. *See United States v. Hassanshahi,* 989  F. Supp. 2d 110, 118 (D.D.C. 2013); *Madoff*, 586 F. Supp. 2d at 249. As this Court previously has held, any government demand that the imposed conditions be foolproof is contrary to law:

> It is true, as the Government points out, that electronic monitoring is not foolproof and that it is possible that Mr. Hassanshahi could overcome several significant obstacles to get to Iran. But those general arguments are speculative and do not focus on this defendant. The law only requires release conditions that will *reasonably* ensure a defendant's appearance, not foolproof conditions. An overall balancing of the factors favors Mr. Hassanshahi's release with conditions.

*Hassanshahi*, 989 F. Supp. 2d at 118 (emphasis in original).

The conditions here are expressly aimed at preventing Mr. Sterlingov from taking any of the many steps necessary for him to flee, including but not limited to accessing the "darkweb," or any of the cryptocurrency the government alleges, but does not come close to proving, is readily available to Mr. Sterlingov. These restrictions, which focus on Mr. Sterlingov and the government's professed concerns, will reasonably ensure his appearance.

In *United States v. Xulam*, 84 F.3d 441, 443 (D.D.C. 1996) (per curiam), this Court considered the government's objection to a proposed custodial arrangement in which defendant Xulam, a foreign national with no family or other abiding ties to the U.S., would be monitored upon release by two third parties. 84 F.3d at 443. The government contended that the two custodians did not ameliorate flight risk because "if the accused chose to leave, [Ms. Porter and

Sister Krommer] could not stop him." *Id.* The Court rejected the argument. *First*, the Court held that it would accept as true defendant's statement that he was willing to comply with the conditions of his release and had no intentions of fleeing, given that the government had provided no concrete factual evidence of a contrary intent. *Id.* at 444. *Second*, the Court observed that the government's argument proved too much:

> The magistrate judge and district court referred several times to the notion that if the defendant were to flee, his supervisors could not stop him. *That, of course, is true of every defendant released on conditions*; it is also not the standard authorized by law for determining whether pretrial detention is appropriate. Section 3142 speaks of conditions that will "reasonably" assure appearance, not guarantee it. *See also* H. REP. NO. 1030, 98th Cong., 2d Sess. 15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3198 (acknowledging feasibility of conditions even "where there is a substantial risk of flight"). The record here contains more than enough to satisfy the "reasonable" assurance test, and not enough to show by a preponderance of the evidence that no combination of conditions will assure the defendant's appearance.

*Id.* (emphasis added). Here, like *Xulam*, the government adduces no facts or evidence demonstrating that Mr. Sterlingov does not intend to keep his word and comply with the conditions of release set by the Court. In the absence of any such evidence, the Court should take Mr. Sterlingov at his word.

The government also tries to ignore the uncontested facts that support a conditioned release. For example, the government previously claimed Mr. Sterlingov was carrying false passports and false identification at the time of his arrest, a claim that was a key factor in the Magistrate Judge ordering Mr. Sterlingov's detention. *See* Detention Order at 3 (available as Exhibit A to the Sterlingov Br.). Of course, no such false passports or identification ever existed. *See* Sterlingov Br. at 16 and n.8.[7]  Moreover, in revoking detentions under the Bail Reform Act,

---

[7] In its opposition, the government continues to improperly ascribe nefarious motives to regular behavior, just as it previously falsely contended to the Magistrate Judge there was something nefarious in Mr. Sterlingov carrying multiple Russian and Swedish passports. Thus, the government now wrongly labels as "vague" Mr. Sterlingov's explanation of why he was in the United States – whereas that explanation was

"the D.C. Circuit [has] found it relevant that the documents [passports] were in government custody." *Hassanshahi*, 989 F. Supp. 2d at 116; *United States v. Nwokoro*, 651 F.3d 108, 110 (D.C. Cir. 2011) (per curiam) (defendant's surrender of his Nigerian and U.S. passports supported his release from detention). Mr. Sterlingov's passports already are in the government's possession and would be retained by it as a release condition. Further, while the government avers Mr. Sterlingov knows how to anonymize Internet addresses, it provides no evidence that Mr. Sterlingov has ever traveled under a false identity, or even would know how to do so.

Similarly, the government essentially ignores that Mr. Sterlingov would be released to home confinement and 24/7 electronic and physical monitoring. GPS monitoring is a common and effective release condition endorsed by this Court in other cases. *See, e.g., Hassanshahi, supra*; *Karni, supra*; *Hanson, supra*. Further, in this case, GPS monitoring would be in addition to 24/7 physical monitoring by a custodian. These conditions, taken together with the several other proposed conditions, will reasonably assure Mr. Sterlingov's continued appearances. In this

---

not only detailed but since has been proven honest in all particulars. *See* Opp. Br. at 25 and n.10. Likewise, the government tries to spin something untoward about the fact that Mr. Sterlingov traveled with recovery codes to his  accounts, some computers, sim cards, and debit cards, without ever acknowledging to the Court that each of these accounts, computers, and cards were all openly and notoriously registered in Mr. Sterlingov's name – a fact that the government intentionally omits because it renders the government's speculation that these things somehow were to be used in some unidentified illegal manner obviously untrue. *Id.* at 25. In this regard, the supposed programs for "location spoofing" touted by the government (*id.*) are actually readily available and popular applications (some even built into your phone's factory software) that are used for online games such as Pokemon Go, for online dating to get around geography restrictions, and to fix problems with non-accurate GPS reception on your smart phone. *See, e.g.*, https://www.youtube.com/watch?v=RZr6fJwjMTY (explaining how to "spoof" your Pokemon game). Likewise, the device the government labels "unusual" (Opp. Br. at 25-26) is actually a mass-produced travel modem readily available for purchase online that, as its advertising explains, helps provide a steady and reliable internet connection when streaming movies or conducting Internet calls. *See* livelte.ru (website where the "unusual" device is offered for sale). Lastly, the government's absurd insinuation that Mr. Sterlingov might have signed up for flight classes in California so he could conduct a 9-11 style attack – *viz*, "Sterlingov's subsequent intentions, following the conclusion of flight training, remain unknown" (Opp. Br. at 25) – merely reveals the depth of the government's desperation. If the government had any actual evidence, first-hand witnesses, or admissions, it would not have to try misleading the Court with such threadbare half-statements and innuendo.

regard, Alexander Koziakov, Mr. Sterlingov's cousin, has offered to take Roman into his Boston

home and ensure Roman's compliance with his release conditions:

> If Your Honor releases him on bail, myself and my family will gladly provide for
> and help Roman. I have no doubt regarding his ability to comply with any
> conditions of release the court imposes. He is a man of his word and he has the
> support of his United States family members. I have previously offered and
> continue to offer to put Roman up at my home, or a potential rental if needed while
> his case is pending. I am also willing to post a property that I own to secure his bail.
>
> …[O]ur entire family is worried about him and we are a close family. Thank you
> for consider [sic] my letter and the letters of his other family member and friends
> who, like I do, love and support Roman. I am aware that the court will set conditions
> of release. I will make sure that I am fully cognizant of the conditions imposed by
> the court and will make sure that Roman complies with the conditions. Should
> Roman not comply with any condition; I will immediately notify Pretrial and the
> court and Ms. Shroff.

Alexander Koziakov Letter (Ex. C to Sterlingov Br.).

While the government tries to belittle and minimize these family ties, the  government

admits, as it must, that Alexander's offer to (i) bond a home he owns, (ii) provide a place for Mr.

Sterlingov to stay while on release, and (iii) be a responsible third-party custodian, is quite

"generous." Opp. Br. at 43. And that generous offer speaks to just how close Roman is to his

American family and how committed both he and they would be to honoring the conditions of his

release.

While the government contends Alexander's offer is insufficient because Mr. Sterlingov

"likely" has access to cryptocurrency (Opp. Br. at 43), this contention misses the point. The focus

of the custodial condition is not on Roman, but on Alexander Koziakov, who would be risking

both his property and a criminal prosecution should Mr. Sterlingov flee. The government provides

no reason or basis for why Alexander would be willing risk both his property and his freedom to

aid Mr. Sterlingov's flight. In the absence of such evidence, there is nothing lacking or insufficient

about Mr. Sterlingov's Boston-based family offering him a place to live and acting as custodian to

ensure Mr. Sterlingov complies with the conditions of his release pending trial. Certainly, far less has been required to support pretrial release.

In *United States v. Karni*, 298 F. Supp. 2d 129, 133 (D.D.C. 2004), for example, this Court ordered the pretrial release of Asher Karni, an Israeli national who resided in South Africa and had no family or financial ties of any kind to the United States or Washington D.C. Because Karni had no family or friends in the U.S., he was released into the custody of Rabbi Herzel Kranz at Hebrew Sheltering Home in Silver Spring, Maryland, with the Rabbi being responsible for ensuring there would be someone with Karni on a 24/7 basis. 298 F. Supp. 2d at 133. *See also Hansen*, 108 F. App'x 331 (affirming pretrial release of defendant, a resident and citizen of Denmark, to his home in Denmark; while defendant could not be extradited from Denmark, the bail statute does not "require that foreign defendants be detained simply because their return cannot be guaranteed through extradition"); *Sidoo*, 19-cr-10080-NMG, Dkt. 13 (D. Mass) (allowing defendant, a citizen of Canada charged with conspiracy to commit wire fraud, honest services fraud, and money laundering, to reside in his home in Canada during the pendency of his United States criminal case).

Tellingly, the same arguments raised here were made in *Karni* – (i) that Karni had no U.S. ties; (ii) that Karni's offense, acquiring nuclear triggers by subterfuge and exporting them illicitly to Pakistan, was a serious one that had Karni facing substantial penalties; and (iii) that Karni had the means to flee the U.S. The Court itself even found that "the weight of the evidence against Defendant is substantial." 298 F. Supp. 2d at 130-133. None of those reasons, however, ultimately justified pretrial detention under the Bail Reform Act. Instead, as a condition precedent to his release, the Court ordered the following conditions first be met:

> 1) Defendant shall serve in home detention in the Electronic Monitoring Program.
> During the period of home detention, he shall remain at Hebrew Sheltering Home

in Silver Spring, Maryland, except for employment or other activities approved in advance by the Pretrial office. During the term of electronic monitoring, he shall maintain a telephone at his place of residence without any special features, modems, answering machines, or cordless telephones. He shall wear an electronic device and pay for the electronic monitoring service.

2) Mr. Karni must sign a waiver of any rights not to be extradited to the United States that he has under Israeli and South African extradition treaties with the United States.

3) In addition to the $75,000 bond posted on Defendant's behalf by Bruce Rosenbaum, Mr. Karni must commit $100,000 of his own funds.

4) Defendant will be released into the custody of Rabbi Herzel Kranz … [and] Rabbi Kranz must commit to have someone with Defendant on a twenty-four-hour basis, seven days a week.

*Id.* at 133. These release conditions closely correspond with the release conditions proposed by Mr. Sterlingov here. *See* Sterlingov Br. [ECF Doc. No. 17].

If defendants are allowed to return to their home countries, or are allowed to reside and be supervised by a Rabbi and his congregation, there is nothing insufficient or unworkable about releasing Mr. Sterlingov to the supervision of his cousins, aunts, and uncles in Boston. At the least, the government has not met its burden of proving, by a preponderance of the evidence, that the numerous restrictions proposed by Mr. Sterlingov, together with any other restrictions the Court believes prudent, will not be enough to reasonably assure future appearances by Mr. Sterlingov before the Court.

<u>**CONCLUSION**</u>

For the foregoing reasons, and those set forth in Mr. Sterlingov's moving papers, the Court should (i) revoke the detention order imposed on Mr. Sterlingov; (ii) order him released with appropriate bail conditions; and (ii) grant him such other and further relief as the Court deems just and proper.

Dated:  New York, New York
       October 18, 2021

                                      Respectfully submitted,

                                      */s/Sabrina P. Shroff*
                                      Assistant Federal Public Defender
                                      Counsel for Mr. Roman Sterlingov

SPS/
cc: All counsel of record (by ECF)