# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

United States of America,

    *Plaintiff*,

v.

Roman Sterlingov,

    *Defendant*.

**21-cr-399 (RDM)**

**DECLARATION OF CHRISTOPHER ROBERT VICKERY IN SUPPORT OF MOTION TO FREE SEIZED ASSETS FOR ROMAN STERLINGOV**

I, Christopher Robert Vickery, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true and correct to the best of my knowledge and belief:

1. I am currently employed as Senior Risk Assessment Specialist at a publicly traded, U.S. headquartered, critical infrastructure company. Prior to this position I spent four years as Director of Cyber Risk Research at a Silicon Valley cyber security firm serving customers such as NASA and The New York Stock Exchange.

2. My name is listed as a co-inventor of U.S. patent #11,023,610 ("Data breach detection and mitigation"), issued by the United States Patent and Trade Office on June 1, 2021.

3. Over the past 10 years I have gained extensive experience and been recognized as a notable figure in cyber security, network forensics, and information security.

4. The New York Times, Washington Post, Forbes, Reuters, BBC, LA Times, and many other publications have cited me as an expert in articles covering my work and findings.

5. I am a sought-after figure for speaking at public events, private gatherings, as well as government functions relevant to my fields of expertise.

6. My research and personal efforts have resulted in the discovery, responsible notification, and mitigation of data breaches involving entities such as Microsoft, Verizon, Citrix, the United States Department of Defense, Facebook, Hewlett Packard, Viacom, Accenture, Experian, Nokia, Dow Jones, Cambridge Analytica, as well as every registered voter across the United States of America and Mexico.

7. I have contributed digital forensic evidence and expert insight to investigations at the request of the Federal Trade Commission, Federal Bureau of Investigation, Securities and Exchange Commission, Department of Health and Human Services, the US Secret Service, the Office of Senator Dianne Feinstein, the US Senate Select Committee on Intelligence (with regard to investigation of foreign interference in the 2016 U.S. presidential election), the Internal Revenue Service, the Commodity Futures Trading Commission, as well as Offices of the Attorneys General of New York, Washington, and Texas.

8. In February 2018, The North American Electric Reliability Corporation ("NERC") levied an unprecedented $2.7 million fine against a regulated electric utility entity in which NERC confirmed that my past cyber security research and notification efforts had resulted in securing "Critical Cyber Assets" which otherwise, if left unaddressed, had "posed a serious or substantial risk to the reliability of the bulk power system" of North America.

9. A January 2020 National Security Agency publication titled *Mitigating Cloud Vulnerabilities* [ https://media.defense.gov/2020/Jan/22/2002237484/-1/-1/0/CSI-

MITIGATING-CLOUD-VULNERABILITIES_20200121.PDF ] highlights two instances of my research and notifications bolstering US national security:

    a. *In May 2017, a large defense contractor exposed sensitive NGA data and authentication credentials in publicly accessible cloud storage;*

    b. *In September 2017, a security researcher discovered CENTCOM data accessible to all public cloud users;*

10. Examples of my previous public speaking appearances include:

    a. Providing testimony and evidence to the UK Parliament Digital, Culture, Media, and Sport Committee during its investigation into allegations of malfeasance and impropriety committed by Cambridge Analytica, Facebook, and AggregateIQ.

        i. Several elements of the data I provided to Parliament are profiled within the 2020 documentary *People You May Know (*directed by Dr. Charles Kriel) in which I am featured in part.

        ii. Within his 2021 book, <u>Digital Gangsters</u>, UK MP Ian C. Lucas confirmed the accuracy of my assessment regarding criminal conduct by Brexit Referendum campaigners: *"[...] the Electoral Commission agreed with Chris Vickery […] and two months after Vickery had given his evidence to the Committee, it found that the Vote Leave campaign had broken the law by colluding with other campaigns to break electoral spending limits."*

    b. Multiple appearances before the Parliament of Canada, Standing Committee on Access to Information, Privacy and Ethics in both open and closed sessions.

    c. Presenting at Harvard's Center for Government and International Studies on the topics of privacy, security, and data breaches prior to reception of the 2016 Data

Detective Award from Harvard University's Data Privacy Lab, as supported by the John S. and James L. Knight Foundation and given at the 2016 International Summit on the Future of Health Privacy in Washington, DC.

I. **The Government has *not* connected Bitcoin Fog to Roman Sterlingov in a forensically sound manner. Allegations thus far presented by the prosecution do not withstand technical scrutiny.**

   a. Given that which has been provided as evidence to date, I firmly believe the Government is unlikely to succeed in this prosecution if Roman Sterlingov is allowed the opportunity to put on an appropriate defense, as a multitude of significant deficiencies exist in the Government's allegations.

   b. The primary mixing service at issue is alleged to have operated through the .onion website URL http://foggeddriztrcar2.onion.

      i. The Government's allegations of connection to Roman Sterlingov stem primarily from prior, separate, regular web domain registration information alleged to link the defendant's name to registration of a clearnet domain *bitcoinfog.com*.

         1. The clearnet domain bitcoinfog.com itself is not alleged to have been the operating point of a cryptocurrency tumbling/mixing service.

         2. There are significant questions surrounding the integrity, reliability, and basic chain-of-custody of 2011 data being relied upon from the now-defunct *highhosting.net* domain registration company.

Doc ID: 70aacb5bd4c663dda1dd966714fff9bfb33d4e1a

        3. While in operation, highhosting.net was not a well-reputed entity and was not considered to be one of high credibility.

c. It is common for Virtual Private Networks ("VPNs") to share Internet Protocol ("IP") addresses among multiple users. Even non-VPN hosting providers often host servers on shared IP addresses for a multitude of reasons.

    i. One of these reasons is that the total number of possible IPv4 addresses is finite and limited. Rapid internet growth has already fully exhausted the pool of publicly available IPv4 addresses.

        1. In November of 2019, RIPE (the European regional internet addressing authority) announced it had allocated the last available block of IPv4 addresses under its authority to assign.

    ii. Several technical approaches exist to provide for continued global internet functionality even though the pool of available IPv4 addresses has evaporated. Shared IPs are among those approaches and can be understood in the same way that one modern household, with one single Wi-Fi access point (and IP address), is able to stream Netflix to multiple televisions while simultaneously uploading Ring doorbell video to Amazon's cloud and allow each of the home's residents to send and receive Snapchat messages from separate smartphone devices. This is a microcosm example of Network Address Translation.

    iii. As a data point on its own, an IP address is not an identifier of one specific device and should not be considered identifiable of a specific individual.

      iv. When aiming to identify a specific individual, the probative value of an IP address, especially an IP address known to be in use by a legitimate VPN service, is vastly degraded in light of modern networking realities.

II. **The term "blockchain analysis" presented in the allegations against Roman Sterlingov allegations appears to be marketing brochure terminology and does not refer to a scientific, peer-reviewed, standardized approach to criminal investigation.**

    a. The *blockchain analysis* material provided by government investigators amounts to little more than whiteboard sketches of hypothetical scenarios and truncation to the point of absurdity which does not show definitive proof of any particular criminal act. There is no solid foundation for the charges currently levied against Roman Sterlingov.

        i. For example, Prosecutors allege to have evidence of "beta testing" of a Bitcoin mixing and laundering service during 2011. In my attempts to verify these claims, I have discovered numerous factual inaccuracies and falsehoods. I can demonstrate a high likelihood that these alleged "beta testing transactions" were not attempts to deploy or set up a Bitcoin obfuscation system.

           1. This is evidenced by my ability to manually identify Bitcoin wallet ID address typos, which investigators have submitted in these court filings, and which tend to impeach the credibility of whichever *blockchain analysis* process was utilized to reach the accusatory conclusions relied upon in these charges.

      2. If fixing a government investigator's single-character typo, and clicking a half dozen times is all that is necessary to follow a Bitcoin transaction across a publicly-available and intentionally-open blockchain, as is the case and I was able to do, then there is no obvious *beta testing* of a criminal money laundering service shown.

      3. The allegations of *beta testing* a money laundering system simply do not withstand competent technical scrutiny combined with accurate facts.

      4. A real Bitcoin wallet ID string generally contains 34 characters. It is wholly insufficient for the prosecution to attempt using no more than six characters when referring to a wallet ID. Using six-characters abbreviations is so limited and non-specific, that anyone with even a cursory understanding of statistics should recognize the result will be inaccuracies and error.

  ii. In order to reach the conclusions alleged in the charging documents, a tech-savvy practitioner in the relevant fields of knowledge would be required to suspend disbelief as if watching a Hollywood film and disregard the intended role of criminal investigations across the well-worn history of US law.

b. A core foundational concept of blockchain technology, such as in the Bitcoin implementation, is the idea that all transactions are broadcast publicly and

recorded on a public ledger, of which a full copy is held by each participating node in the network.

    i. The assumed-legitimate historic ledger of transactions is considered valid when 51% of participating computation nodes in the network agree on a version of the recorded history of transactions.

        1. The phrase *distributed ledger* appears often in discussion of cryptocurrency blockchains, but that term is largely a misnomer. The portion of a blockchain which can be considered "distributed" is the consensus of agreement upon which version of the historic transaction ledger is valid and true, as each individual node in a cryptocurrency blockchain does have access to a full and complete copy of the historic archive of transactions.

            a. Looking back through the history of recorded transactions within a blockchain ledger does not require any cooperating present-time participants and should not be confused with the idea of distributed storage, which does require communication with dispersed peers in order to retrieve shards of data which, when pulled together, then fully represent a file stored in a distributed manner.

    ii. Which means the act of looking up a historic block along the chain is not a mystical, mysterious, proprietary, or sophisticated thing in and of itself. The instant investigation leans heavily on hand waving combined with fear mongering accusations which the government has not been able to

support with facts and the type of definitive evidence normally expected to be present in a prosecution of such grand magnitude.

III. **The undercover IRS agent message (sent through http://foggeddriztrcar2.onion) on November 19, 2019, does not mention the District of Columbia or any other physical location.**

    a. It is a logical impossibility for any operator of the Bitcoin Fog service (hosted through http://foggeddriztrcar2.onion) to have gained actual knowledge of any events occurring within the District of Columbia even if the message had been received and viewed.

        i. The Government has not given reason to believe the undercover IRS agent message, submitted through http://foggeddriztrcar2.onion, was seen or reviewed by any operator of a *Bitcoin Fog* mixing service.

            1. The most recent detail within GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE DETENTION ORDER offered to suggest operators of such a service had read similarly submitted messages is tied to an unverified statement from March 16, 2014.

                a. Web sites which operate through .onion domains, such as http://foggeddriztrcar2.onion, are well-known among the cyber security community to have difficulty maintaining site reliability, functionality, and general accessibility. It is not reasonable to assume that any functionality the http://foggeddriztrcar2.onion website may have had on

    March 16, 2014, would still be functioning five and a half years later on November 19, 2019.

  b. Unless some scintilla of evidence can be shown to suggest the http://foggeddriztrcar2.onion message submissions were functioning at a time period close to November 19, 2019, there is no good reason to believe any operator of the site received the undercover IRS agent's fictitious narrative message.

IV. **In February 2020, the US DOJ published a guideline document titled "Legal Considerations when Gathering Online Cyber Threat Intelligence and Purchasing Data from Illicit Sources".**

  a. Over a span of 15 pages, the document (https://www.justice.gov/criminal-ccips/page/file/1252341/download) explains and instructs legitimate security researchers and information security professionals on how to legally utilize cryptocurrencies and Dark Web Markets without violating law.

  b. In publishing and circulating this guidance document, the US DOJ has taken a position that there is no inherent violation of law in cryptocurrency transactions which involve the deposit of cryptocurrencies to Dark Web Markets.

  c. The Government has accused Bitcoin Fog and Roman Sterlingov of, *"facilitating more than $78 million in bitcoin transactions sent directly to or from darknet markets including Silk Road, Silk Road 2.0, Agora, Evolution, and AlphaBay—markets that primarily trafficked in illegal narcotics and other illegal goods and services. Sterlingov's money laundering service fueled an immense volume of very*

*serious criminal activity by providing an anonymized bitcoin money transmission service for darknet vendors and buyers."* yet fails to account for the discrepancy in these contradictory stances.

   d. If there is no inherent illegality in cryptocurrency transactions which involve Dark Web Market wallets, as claimed by the DOJ's own self-published guidance document, then many of the claims underpinning the government's prosecution of against Roman Sterlingov become heavily contradicted.

V. **The investigators in this case have fundamental misunderstandings of critical technological concepts.**

   a. For example, page 9 of GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE DETENTION ORDER claims an advertisement for Bitcoin Fog *"appears to have been decrypted using PGP encryption"* in reference to a message shown on page 10.

   b. Anyone familiar with public key cryptography, such as PGP, should easily understand that a PGP signed message is not in any way an indication that the message was ever encrypted.

   c. Signing a message with a PGP key is not the same as encrypting or decrypting that message. The purpose of signing a message with a PGP key is to add layer of assurance to the identity of the message's author.

   d. Signing a message with a PGP key is not a form of encryption. Signing a message with a PGP key is a wholly separate functionality of public-private key pairs and should never be confused with the concept of encryption.

e. When a message contains "-----BEGIN PGP SIGNED MESSAGE-----" it indicates the message has been signed, *not* encrypted or decrypted.

f. That string of characters is not, and has never been, a reason to believe a message has been encrypted.

g. The government's glaringly incorrect assertion of PGP decryption should not have survived review of pleading documents by competent and knowledgeable experts qualified to working on this type of investigation. The inclusion of that note in the charging documents is hugely embarrassing for this prosecution and draws into question fundamental competencies underpinning the investigation.

VI. **The original Bitcoin whitepaper, authored by pseudonymous Satoshi Nakamoto, states that one of the intended purposes of Bitcoin is to *not* expose the identities of Bitcoin owners.**

a. The document goes so far as to suggest ways to strongly mitigate and make less likely the ability to identify Bitcoin wallet owners.

b. The Prosecution has already cited this same Satoshi Nakamoto whitepaper as a document of authority on page 30 of GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE DETENTION ORDER.

VII. **The allegations against Roman Sterlingov are mooted by the continued existence and operation of newer privacy-centric cryptocurrencies.**

a. Monero is a popular modern day cryptocurrency intentionally developed and deployed with mixing and tumbling built in by default.

     b. The identities of the software developers behind Monero are known, yet those individuals are not facing prosecution for having done the same thing Roman Sterlingov is accused of doing.

VIII. **Some elements of the allegations of wrongdoing reference fees charged by Bitcoin Fog and appear to stem from a lack of understanding in how cryptocurrencies function.**

     a. The Bitcoin protocol and (generally) all other cryptocurrency implementations, involve automatic fees charged on every transaction by default.

     b. These small percentages function as incentive compensation to operators of mining nodes which cryptocurrencies depend on in order for the network to operate at a fundamental level.

IX. **There are legitimate reasons for a dual Swedish-Russian citizen to desire and promote privacy in cryptocurrency transactions.**

     a. An April 2022 Reuters article (https://www.reuters.com/technology/how-crypto-giant-binance-built-ties-russian-fsb-linked-agency-2022-04-22/) reveals that Russian law enforcement have been tracking and harming individuals who support political parties with cryptocurrency.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this day  08 / 01 / 2022

Christopher Vickery

*Chris Vickery*



# Audit Trail

| | |
|---|---|
| **TITLE** | Final_Fixed_New_Vickery_Draft_Declaration_US_v._Sterlingov_[... |
| **FILE NAME** | Final_Fixed_New_V...ngov_%5B36%5D.pdf |
| **DOCUMENT ID** | 70aacb5bd4c663dda1dd966714fff9bfb33d4e1a |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

This document was requested from app.clio.com

## Document History

**SENT**
**08 / 01 / 2022**
19:40:01 UTC
Sent for signature to Christopher Vickery (cvickery@protonmail.com) from nicoleg@torekeland.com
IP: 162.83.181.202

**VIEWED**
**08 / 01 / 2022**
19:44:25 UTC
Viewed by Christopher Vickery (cvickery@protonmail.com)
IP: 73.162.238.243

**SIGNED**
**08 / 01 / 2022**
19:46:37 UTC
Signed by Christopher Vickery (cvickery@protonmail.com)
IP: 73.162.238.243

**COMPLETED**
**08 / 01 / 2022**
19:46:37 UTC
The document has been completed.

Powered by HELLOSIGN