**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO RECONSIDER PRE-TRIAL DETENTION**

The United States of America respectfully opposes the defendant's "Motion to Reconsider Pre-Trial Detention," ECF No. 47. The parties have thoroughly litigated pretrial detention twice before. The defendant now asks to relitigate the same issue a third time, but he presents no material change in circumstances; offers no new third-party custodians other than an ethically fraught offer from defense counsel himself; and presents no new evidence other than the declarations of two so-called "experts," neither with any experience in blockchain analysis, peddling nonsensical conspiracy theories and poorly-reasoned arguments. There is no basis for the Court to reconsider its well-reasoned decision finding that the defendant poses a risk of flight and that no condition or combination of conditions short of pretrial detention will reasonably assure the defendant's appearance for trial. ECF No. 25.

<u>**ARGUMENT**</u>

The defendant moves pursuant to 19 U.S.C. §§ 3142(e) and 3145(b) for the court to reconsider its order of detention, ECF No. 25.[1] In support of its efforts to urge this Court to revisit

---

[1] The defendant requests a hearing where he indicates he desires to "present evidence" to "rebut the Government's baseless allegations," ECF No. 47 at 6. To the extent the defendant proposes to present his own witnesses, the government does not object. However, to the extent the defendant intends to call government witnesses, the government objects. While the government bears the burden of showing that no condition or combination of conditions will ensure the defendant's

its well-reasoned detention determination, the defendant offers only hyperbolic and vague critiques of the weight of the government's evidence.   These issues were addressed in detail in the government's prior detention submissions, which are incorporated by reference herein.   *See* ECF No. 11 (Rule 5(c)(3) package received from Central District of California); ECF No. 19 (Gov't Opp. to Def. Mtn. To Revoke Detention Order).   The defense motion details no meaningful material change in any of the factors the Court carefully weighed last fall in determining that there was no condition or combination of conditions short of pretrial detention that could reasonably assure the defendant's appearance at trial.   The defense motion should be denied.

### A.  Procedural History

The defendant was charged by criminal complaint in the District of Columbia on April 26, 2021, on charges of Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).   He was arrested on April 27, 2021, at Los Angeles International Airport upon his arrival in the United States on an international flight arriving from Moscow.   On April 29, 2021, the government filed a Motion for Pretrial Detention in the Central District of California, in which the defendant first appeared.   The

---

appearance at trial, probable cause for the offenses has already been found by the grand jury via the indictment.   Moreover, a detention hearing is not a proper method to engage in discovery or deposition of potential government witnesses.

To the extent that the defendant wishes to be heard, the government has offered on multiple occasions to allow the defendant to explain his side of the story under the protection of a proffer agreement, and has met with defense counsel in what the government understood to be an attorney proffer but during which the defense simply made overheated arguments and failed to provide any specific or verifiable information to support any of the defendant's claims of innocence.   As explained herein, the defendant's narrative of innocence is entirely inconsistent with the significant body of incriminating evidence.   Nonetheless, if the defendant wishes to speak with the government, the government remains open and willing to speak with him.

defendant's counsel in the Central District of California filed an opposition, and a detention hearing was held on May 6, 2021.  Following the hearing, Magistrate Judge Paul Abrams of the U.S. District Court of the Central District of California ordered the defendant detained pending trial, finding that there was no condition or combinations of conditions that would reasonably assure the defendant's appearance.  *See* ECF No. 17-1.

After appearing in the District of Columbia, and after previous defense counsel had an opportunity to review discovery, defendant again challenged his pre-trial detention and filed a Motion to Revoke Pretrial Detention, ECF No. 17, on September 13, 2021.  That motion challenged the weight of the government's evidence and included numerous letters from the defendant's family and friends, most of whom were located overseas.  The government filed an Opposition on September 23, 2021, ECF No. 19, to which the defendant replied on October 18, 2021, ECF No. 22.  Arguments were presented at a Motions Hearing before this Court on October 25, 2021.

On November 10, 2021, this Court issued an Opinion and Order denying the defendant's Motion to Revoke Pretrial Detention.  ECF No. 25.  The Court's opinion carefully analyzed the nature and circumstances of the offenses, the weight of evidence against the defendant, and the history and characteristics of the defendant, and found that each factor weighed in favor of pretrial detention.

The defendant now for a third time seeks to challenge his pretrial detention.

**B.  The Court Correctly Applied the Preponderance Standard for Risk of Flight Analysis**

The defendant argues that this Court erred by applying a preponderance standard in its risk-of-flight analysis, rather than a more demanding clear and convincing evidence standard.   ECF No. 47 at 9-12.  The defendant relies on model rules from the American Bar Association and on a decision by the D.C. Court of Appeals, *Kleinbart v. United States*, 604 A.2d 861 (D.C. 1992),

seemingly oblivious to the fact that the D.C. Court of Appeals is part of a separate court system—
the equivalent of the District's state supreme court—and that *Kleinbart* was construing a D.C.
statute and not the law that applies here, the federal Bail Reform Act (BRA).  *See* 604 A.2d at 868-
71 (construing D.C. Code § 23-1325(a)).[2]

By contrast, the D.C. Circuit, whose rulings are binding on this Court, has squarely held
that the BRA imposes only a preponderance standard for pretrial detention based on risk of flight,
based on analysis of the statute's text and purpose.  *See United States v. Vortis*, 785 F.2d 327, 330-
31 (D.C. Cir. 1986) (explaining that BRA's "statutory structure . . . suggests that Congress
intended a different burden of proof for pretrial detention because of risk of flight than for danger
to the community" and that "[t]he standard of proof applicable to other kinds of pretrial
proceedings is the preponderance of the evidence and we find that to be the appropriate burden for
establishing risk of flight"); *see also, e.g.*, *United States v. Vasquez-Benitez*, 919 F.3d 546, 551
(D.C. Cir. 2019) (continuing to apply *Vortis*).  To the government's knowledge, the D.C. Circuit's
decision in *Vortis* is consistent with every other federal appellate court to have considered the
standard for establishing risk of flight under the BRA.  *See, e.g.*, *Vortis*, 785 F.2d at 331 (collecting
cases from Second, Fifth, Eighth, and Ninth Circuits; *United States v. Himler*, 797 F.2d 156, 161
(3d Cir. 1986) (collecting cases from Second, Fifth, Seventh, Eighth, Ninth, Eleventh, and D.C.

---

[2] To the extent the D.C. Court of Appeals purported to have "constitutionalized" its construction
of the D.C. pretrial detention statute at issue in *Kleinbart* , 604 A.2d at 869, its holding rests on an
overreading of the Supreme Court's decision in *United States v. Salerno*, 481 U.S. 739 (1987),
which never considered or ruled on the standard for pretrial detention based on risk of flight.
Indeed, *Salerno* framed risk of flight as the conventional and more deeply-rooted basis for pretrial
detention, and only considered whether the Bail Reform Act might justify pretrial detention "on
the basis of a compelling interest *other than* prevention of flight," 481 U.S. at 754-55 (emphasis
added); *see also id.* at 749 ("[R]espondents concede and the Court of Appeals noted that an arrestee
may be incarcerated until trial if he presents a risk of flight . . . ."); ("Respondents nevertheless
contend that [the Eighth Amendment] grants them a right to bail calculated solely upon
considerations of flight.").

Circuits and holding that "[w]e see no reason to deviate from the traditional preponderance of the evidence standard in the absence of express direction from Congress").

## C. Serious Nature and Circumstances of the Offenses Weigh Heavily in Favor of Detention

As this court already determined, "The nature and circumstances of Sterlingov's offense . . . weigh in favor of pretrial detention." ECF No. 25 at 12. The defendant is charged with operating a cryptocurrency mixing service that moved over $300 million worth of cryptocurrency, in violation of 18 U.S.C. §§ 1956(h) (money laundering conspiracy), 1956(a)(3)(A) (money laundering), and 1960 (unlicensed money transmission), and D.C. Code § 26-1023(c) (money transmission without a license). ECF No. 43. For a decade, Bitcoin Fog was an integral service for a wide swath of cyber criminals operating on the darknet. Criminals around the globe relied on Bitcoin Fog to profit from selling large quantities of illegal narcotics, trafficking in stolen identification and financial information, hacking into American businesses and institutions, and disseminating child sexual abuse materials. The defendant sought out and catered to this criminal clientele. Bitcoin Fog facilitated criminal activity on a massive scale, and the service's success and longevity is directly attributable to the defendant's painstaking efforts to avoid detection by law enforcement. The government discussed the gravity of the defendant's conduct at length in its September 23, 2021 Opposition to Defendant's Motion to Revoke Detention Order, ECF No. 19 at 28-36, and respectfully asks this Court to incorporate those arguments as though set forth herein.

Since the prior litigation surrounding the defendant's detention, a second grand jury in the District of Columbia has returned a Superseding Indictment charging the defendant with an additional count, money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). This count carries a 20-year statutory maximum. In combination with the three other counts, this raises the

defendant's total criminal exposure to up to 50 years of incarceration, with a corresponding advisory Guidelines sentencing range of up to "life" in prison. *See* ECF No. 19, at 35 & n.12 (calculating statutory maxima and applicable Guidelines estimates for original three counts, and noting possible imposition of consecutive sentences under U.S.S.G. § 5G1.2(d)).   While the sentence ultimately imposed by the Court may well be substantially less than 50 years, the possibility of such a high Guidelines sentence provides an incentive to flee.[3]

When previously considering the defendant's detention, this Court determined that "given the vast sums of money that Bitcoin Fog allegedly processed, Sterlingov's potential sentence is sufficiently lengthy to create a substantial incentive to flee." ECF No. 25 at 12. Now facing the prospect of an even longer potential jail sentence, the defendant has only greater incentive to flee.

### D. The Weight of the Evidence Against the Defendant Is Strong

The defendant devotes most of his filings to chest-thumping vagaries purporting to critique the weight of the government's evidence. The pages are rife with generic accusations and hyperbolic statements, but minimal actual substance. The defense is correct that the government does not have any eyewitnesses who saw the defendant logged into the Bitcoin Fog administrative panel. However, that hardly undercuts the strength of the government's case. Evidence may be

---

[3] The defendant misunderstands the significance of the Guidelines estimate in risk-of-flight analysis, which is based on the commonsense understanding that a potentially significant sentence provides a greater incentive to flee than a minimal sentence. Courts routinely factor a defendant's potential criminal exposure into their detention decisions—including instances where a lower potential sentence weighs in favor of release. *Compare United States v. Otunyo*, 2020 WL 2065041 (BAH), at *4 (D.D.C. Apr. 28, 2020) (finding that, *inter alia*, "guidelines sentencing range of up to 11 years in prison if convicted of the current charges," weighs "strongly in favor of detention"); *and United States v. Scali*, 738 F. App'x 32, 33 (2d Cir. Sept. 26, 2018) (unpublished) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee"); *with United States v. Xulam*, 85 F.3d 441, 442 (D.C. Cir. 1996) (finding pretrial release was appropriate where, *inter alia*, defendant's "nonviolent charge carried a maximum of six months imprisonment under the sentencing guidelines").

both circumstantial and strong. *See, e.g., United States v. Gary Harmon,* 21-cr-00433 (BAH), ECF No. 20, at *3 (D.D.C. Sept. 27, 2021) (finding that the government's "significant and strong circumstantial evidence" weighed in favor of detention).

The defendant was originally charged by criminal complaint, supported by a sworn agent affidavit which set out in detail the highlights of the government's evidence. ECF No. 1-1. Two separate grand juries found probable cause to believe the defendant is guilty of the charged offenses. ECF No. 8, 43. *See United States v. Johnson*, 212 F. Supp. 3d 126, 129 (D.D.C. 2016) (indictment is "not dispositive" but still relevant). The full scope of the government's evidence is described in greater detail in the complaint and corresponding statement of facts, ECF No. 1-1, and in the government's prior Opposition to Defendant's Motion to Revoke Detention Order, ECF No. 19. In previously reviewing these materials, this court found that, "The government has offered substantial evidence that Sterlingov was Bitcoin Fog's founder." ECF No. 25 at 12.

The defense focuses its attack on the government's blockchain evidence. These vague criticisms are misguided, as discussed below, but are also largely tangential to the core of the government's evidence in the case. The government connected the defendant to the administration of Bitcoin Fog not simply through blockchain analysis, but through reviewing traditional financial transactions, business records, Internet Protocol (IP) address logs, and the defendant's own communications. The government does not restate here the full scope of its evidence showing that the defendant operated Bitcoin Fog, but instead seeks to respond specifically to the defense's sometimes inscrutable points.

i. ***The Defendant Registered the Bitcoin Fog Clearnet Domain***

As detailed in previous filings, the government traced payments for the Bitcoin Fog clearnet domain registration to accounts controlled by defendant. This payment was made through

a six-layered transaction involving four forms of fiat and virtual currency (euros, U.S. dollars, BTC, and Liberty Reserve Dollars), three virtual currency payment services (Mt. Gox, AurumXchange, and Liberty Reserve), and accounts registered with three different burner email accounts (including shormint@hotmail.com, nfs9000@hotmail.com, and kolbasa99@rambler.ru). *See* ECF No. 1-1 at 7-9. This complicated series of transactions, which had no business purpose and was clearly designed to obfuscate the origin of the funds, originated in an account held by the defendant in his true name.

The defendant had carefully considered this funding sequence and had mapped it out in notes to himself, which were recovered in a search warrant of the defendant's personal Google account. *See* ECF No. 1-1, at 10. The defendant's obsession with maintaining his operational security is further evident in the numerous hand-written notes and electronic documents recovered at the time of the defendant's arrest detailing the defendant's extensive efforts to "mask" his online activity. The defendant was careful to use Tor, proxy services, and Virtual Private Network services to conceal his IP address when conducting criminal activity; however, on several occasions, he used the same VPN to access his criminal accounts and his personal accounts in close succession, allowing investigators to further link the activity.

The defense attempts to dismiss the significance of the defendant registering the BitcoinFog.com domain, stating, "The clearnet domain bitcoinfog.com itself is not alleged to have been the operating point of a cryptocurrency tumbling/mixing service." ECF No. 47-1 at 5. This misconstrues the significance of the clearnet site. As clearly set forth in the government's complaint and in the discovery furnished to defense counsel, BitcoinFog.com served as a portal to direct Bitcoin Fog's criminal clientele to the service's Tor-based .onion site. The clearnet site was directly and closely connected to the activity on the darknet. Bitcoin Fog's profile on the

BitcoinTalk forum and its Twitter account directed users to the clearnet domain along with the Tor-based .onion site.

Furthermore, the domain registration was not an isolated, discrete act; the defendant,[4] as "Akemashite Omedetou," continued to correspond with the hosting provider for months after the domain registration, troubleshooting technical and payment issues.  Similar communications continued as the BitcoinFog.com clearnet domain was moved to a new hosting provider.

Immediately following the filing of the defense motions on August 1, the defendant and his counsel made public statements to journalists regarding his case.  *See* Lily Hay Newman & Andy Greenberg, *Bitcoin Case Could Put Cryptocurrency Tracing on Trial*, WIRED (Aug. 2, 2022),  *available   at*  https://www.wired.com/story/bitcoin-fog-roman-sterlingov-blockchain-analysis/.  In an interview with a reporter, the defendant equivocated regarding his role in the domain registration, saying he "can't remember" whether he created BitcoinFog.com and offering by way of explanation that, at the time, he worked as a web designer for a Swedish marketing company.  *Id.*  The suggestion that the domain registration was an innocent coincidence or legitimate business activity ignores the convoluted funding path, not to mention the even more

---

[4] In his Motion for Release of Funds, the defendant lists out numerous names associated with Bitcoin Fog-associated accounts, such as "Vasily Kunnikov" and "Daniel Garcia Muñoz."  ECF No. 48 at 9.  However, these are not true names of real individuals involved in Bitcoin Fog.  As explained in the Complaint, ECF No. 1 at 7, and prior Opposition to Defendant's Motion to Revoke Detention Order, ECF No. 19 at 31, the government determined that the defendant used "burner" accounts, which are registered in fake names.

The defense also identifies an individual, A.W., whose information was provided in discovery to the defense but marked as Sensitive, and suggests that this individual actually controlled the shormint@hotmail.com account.  The defense mischaracterizes the information that the government provided in discovery, stating, "the contact email for shormint@hotmail.com is [A.W.'s email]."  Rather, A.W.'s email was a contact *of* shormint@hotmail.com.  A.W. emailed the defendant with an offer to purchase the Bitcoin Fog service.  The defendant ultimately rejected the offer.

incriminating fact that the domain was registered using the name "Akemashite Omedetou" – the unique pseudonym employed by the Bitcoin Fog founder – with an email address tied to other Bitcoin Fog accounts.  Two days after the domain registration, on October 27, 2011, "Akemashite Omedetou" began posting on the BitcoinTalk forum, promoting Bitcoin Fog with a link to the clearnet site, www.bitcoinfog.com, alongside the Tor .onion address:



The clearnet site, the BitcoinTalk account, the Twitter account, and the Tor .onion domain were all closely connected and coordinated in their promotion of the criminal Bitcoin Fog mixing service.

    ii.    ***The Government's Blockchain Analysis Has Been Tested and Vetted***

The defense argues that blockchain analysis is unreliable and untested.  In making this argument, the defense ignores the sound methodological foundation and extensive history of successful criminal investigations and prosecutions involving blockchain analysis, as well as the robust and accepted use of blockchain analysis outside of criminal prosecution by a wide range of businesses and agencies.  In the context of bitcoin, blockchain analysis refers to the practice of reviewing and analyzing the bitcoin blockchain, an authoritative public ledger containing a record of every bitcoin transaction that has ever occurred.  While much blockchain analysis can be done by hand by any member of the public – manually retrieving and reviewing individual transaction records recorded on the blockchain – blockchain analysis software can significantly speed and

improve the process. This software, sometimes likened to a graphing calculator, is particularly useful where defendants seek to conceal their activity by sending funds through a series of hundreds of transactions, or where law enforcement is investigating a criminal service – such as Bitcoin Fog – that controls thousands of bitcoin addresses. Blockchain analysis and associated software are not foreign to federal courts, particularly not in the District of Columbia. In considering a civil forfeiture action in this District, Judge Contreras observed:

> Despite Bitcoin's pseudonymous nature, law enforcement can sometimes identify parties to a transaction. By analyzing the blockchain (the public ledger that records transactions) law enforcement can ascertain the counterparties' unique bitcoin addresses. And because users often combine multiple bitcoin addresses and use them together in the same transaction … analysis of one transaction might reveal many addresses belonging to a single individual or organization. Several private companies have used that kind of analysis to identify bitcoin address clusters associated with the same parties. With the right clues, one can then attribute a cluster to a particular individual or organization. Authorities took advantage of third-party blockchain software to perform the investigation here.

*United States v. 155 Virtual Currency Assets*, Civil Action No. 20-cv-2228 (RC), 2021 U.S. Dist. LEXIS 69035, at *4 (D.D.C. Apr. 9, 2021) (cleaned up). This analysis described by Judge Contreras and others has been used in hundreds of successful criminal investigations and prosecutions, including many in this District. *See*, *e.g., United States v. Larry Harmon*, No. 19-cr-395 (D.D.C.) (operator of the darknet mixing service Helix pleaded guilty following investigation including substantial blockchain analysis); *United States v. Tal Prihar*, No. 19-cr-115 (W.D. Pa.) (administrator of DeepDotWeb pleaded guilty to money laundering following the tracing of virtual currency from darknet markets to his accounts); *United States v. Vallerius*, No. 17-CR-20648 (S.D. Fla.) (senior moderator of Dream Market pleaded guilty after he was identified through blockchain analysis); *United States v. Bridges, et al.*, No. 15-cr-319 (N.D. Ca.) (corrupt former federal agents pleaded guilty to money laundering after stolen cryptocurrency was traced to them through blockchain analysis); *United States v. Ilg*, No. 21-cr-49 (E.D. Wa.) (defendant

pleaded guilty to threats arising from his attempts to hire a hitman after investigators traced funds

to his cryptocurrency account using blockchain analysis); *United States v. Kancharla*, 1:22-cr-75

(E.D.Va.) (defendant pleaded guilty to distributing fentanyl on the darknet after he was identified

in part through blockchain analysis).

The Fifth Circuit considered blockchain analysis in another context in *United States v.

Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020), after the defendant challenged a warrant based on

blockchain analysis tying him to a darknet site trafficking in child sexual abuse materials. *United

States v. Gratkowski*, No. 18-cr-43 (W.D.T.X.). There, the court rejected the defendant's argument

that "federal agents' method of using a 'powerful and sophisticated software' to analyze the

Bitcoin blockchain intruded into a constitutionally protected area and violated the Fourth

Amendment." 964 F.3d at 312 N. 12. The Fifth Circuit observed, "Every Bitcoin user has access

to the public Bitcoin blockchain and can see every Bitcoin address and its respective transfers. Due

to this publicity, it is possible to determine the identities of Bitcoin address owners by analyzing

the blockchain." 964 F.3d at 212. Gratkowski pleaded guilty and admitted to the conduct. *United

States v. Gratkowski*, No. 18-cr-43 (W.D.T.X.).

In numerous cases, blockchain analysis has been presented in testimony at trial and has

withstood scrutiny by defense counsel. *See, e.g., United States v. Ologeanu et al*, 5:19-cr-00010

(E.D.Ky.) (defendant Iossifov was convicted at trial following testimony regarding blockchain

analysis; multiple other defendants pleaded guilty in advance of trial); *United States v. Dove*, 8:19-

cr-33 (M.D. Fla.) (defendant pleaded guilty mid-trial following testimony regarding blockchain

analysis); *United States v. Felton*, No. 20-cr-347 (N.D. Ga.) (defendant pleaded guilty mid-trial to

multiple counts of wire fraud, securities fraud, and money laundering, following blockchain

analysis testimony); *United States v. Ulbricht*, 14-cr-68 (S.D.N.Y.) (administrator of Silk Road

darknet market convicted at trial that included blockchain analysis testimony) (upheld in *United States v. Ulbricht,* 858 F.3d 71 (2d Cir. 2017)); *United States v. Costanzo*, No. 2:17-cr-00585 (D. Ariz.) (defendant found guilty of money laundering at trial following testimony regarding blockchain analysis) (upheld in *United States v. Costanzo*, 956 F.3d 1088 (9th Cir. 2020).[5]

Blockchain analysis has been considered by judges in issuing search and seizure warrants. For example, in assessing the reliability of blockchain analysis in an opinion published earlier this year in the District of Columbia, Magistrate Judge Faruqui observed: "The unprecedented rate of prior success, lack of incentive or capacity to lie, and incredible level of detail (the software draws out each transaction block-by-block that comprises a cluster), make the clustering software a reliable foundation for probable cause that is beyond compare." *In the Matter of Search of Multiple Email Accts. Pursuant to 18 U.S.C. § 2703 for Investigation of Violation of 18 U.S.C. § 1956*, 2022 WL 406410, at *13 (D.D.C. Feb. 8, 2022). In weighing the use of blockchain analysis software in that case, Judge Faruqui considered the software's previous history of success. Judge Faruqui observed that the software had a "perfect record" in one child sexual exploitation case: "For example, in an unrelated case, [Redacted] clustering software directed the government to over 50 customers of a darknet child pornography site. In each one of the 50 subsequent law enforcement actions, the software's data was corroborated by statements and search warrant returns from the targets' devices." *Id.* (alteration in original). Further, competition among the multiple vendors in

---

[5] Blockchain analysis has also been relied upon by civil litigants in support of a variety of causes of action. For example, on December 2, 2021, Google filed a civil complaint for damages and injunctive relief in the Southern District of New York seeking to enjoin several Russian cyber criminals from operating the Glupteba botnet. *Google LLC v. Dmitry Starovikov, et al.*, 21-cv-10260 (S.D.N.Y). In that matter, Google retained a blockchain analysis company to investigate the Glupteba botnet, including bitcoin addresses that were hard-coded into the Glupteba botnet, and filed a declaration from an employee of the blockchain analysis company in support of Google's action. *Google LLC v. Dmitry Starovikov, et al.*, 21-cv-10260 (S.D.N.Y), ECF No. 22.

the blockchain analytics field creates a strong incentive for them to maintain reliable and accurate tools. *See id.*

The use of blockchain analysis software is not limited to criminal investigations. Many major financial institutions use blockchain analysis software tools as part of their anti-money laundering programs needed to comply with their regulatory obligations and monitor their transactions for suspicious activity. *See, e.g.,* New York Department of Financial Services, Guidance on Use of Blockchain Analysis, April 28, 2022, *available at* https://www.dfs.ny.gov/industry_guidance/industry_letters/il20220428_guidance_use_blockchain_analytics (emphasizing "the importance of blockchain analytics" to all virtual currency businesses regulated in New York, including to address anti-money laundering requirements). Blockchain analysis is also used by other government agencies in their matters. *See, e.g.,* U.S. Department of Treasury, Treasury Takes Robust Actions to Counter Ransomware, Sept. 21, 2021, https://home.treasury.gov/news/press-releases/jy0364 (announcing designation of Russian cryptocurrency exchange Suex, finding that, "analysis of known SUEX transactions shows that over 40% of SUEX's known transaction history is associated with illicit actors."); *In the Matter of Larry Dean Harmon d/b/a Helix*, 2020-2, Assessment of Civil Money Penalty, *available at* https://www.fincen.gov/sites/default/files/enforcement_action/2020-10-19/HarmonHelix%20Assessment%20and%20SoF_508_101920.pdf (assessing a civil money penalty against the operator of a darknet mixer after tracing transactions between the mixer and numerous darknet markets and observing that "transactions equal to $121,511,877 transferred to darknet-associated addresses by, through, or to Helix."). Blockchain analysis thus enjoys broad acceptance across a range of industries.

iii.    *Defendant Recognized Validity and Power of Blockchain Analysis*

The defendant himself was keenly aware of the power of blockchain analysis; indeed, he created Bitcoin Fog in order to circumvent it.   As Akemashite Omedetou explained in his announcement of the Bitcoin Fog service on BitcoinTalk (emphasis added):

> The bitcoin network might be anonymous in terms of single-handedly revealing your ip address, but the transaction history is recorded in the block chain and is publically available, which makes your anonymity very vulnerable.   Once the interested parties, be it authorities or just interested researchers (…) have acquired any one of your addresses or transactions, **they could easily track your money around the network**.

The defendant set up Bitcoin Fog in order to defeat the very blockchain analysis capabilities the defense now questions.  Akemashite Omedetou's subsequent posts on BitcoinTalk repeatedly referenced Bitcoin Fog's concerns with evading "statistical analysis."   On June 30, 2012, Akemashite Omedetou announced on BitcoinTalk that Bitcoin Fog would begin reusing deposit addresses in order to enhance customer anonymity.   Akemashite Omedetou explained, "This seems to help obscuring the origin of the bitcoins: even if authorities would find one of your deposit addresses, they won't even be sure that all the deposits to that address were made by you." This is a reference to attempting to prevent law enforcement authorities from using blockchain analysis to trace deposits into Bitcoin Fog and attribute them to a particular user.   In a November 8, 2013, post to BitcoinTalk, Akemashite Omedetou acknowledged that authorities and researchers would be able to effectively cluster Fog's addresses, stating, "I imagine that by now, someone somewhere has sniffed enough information about fog addresses for being able to tell when a transaction goes in or out of the Fog."   In this post, the defendant predicted that the government would perform the exact analysis that it has performed in this case.   The post goes on to explain the value of Bitcoin Fog's withdrawal waiting periods, noting, "If someone sees two transactions,

in and out of the fog, approximately for the same amount at the same time, there the connection can be made as well."

Bitcoin Fog remained concerned about helping its users defeat blockchain analysis, posting a link to Twitter regarding the IRS's use of blockchain analytics software in 2017:



It is only now that he has been caught that the defendant seeks to reverse course and disavow his previous pronouncements on how law enforcement "could easily track" funds using blockchain analysis.

### iv.   *Defendant Himself Has Confirmed the Government's Blockchain Analysis*

The defense suggests that the government's clustering cannot be relied upon.   But the defendant himself has publicly confirmed the accuracy of the government's clustering by making admissions in the press:

> [Sterlingov] concedes that he did send and receive payments to Bitcoin Fog as a user of the service seeking privacy, but says he didn't use his bitcoins for anything illegal. "I think some of my transfers must have gotten mixed up with everything," he says.

Newman & Greenberg, *supra*; *see also* ECF No. 47, at 15 (admitting that "Mr. Sterlingov was merely a user of the service"). This is *precisely* what the government describes in its complaint affidavit: "Blockchain analysis revealed that … the administrator made periodic withdrawals from the BITCOIN FOG cluster to pay himself. These withdrawals occur sporadically and in the same manner as a regular user. The withdrawals appear to be concealed to blend in with regular mixing transactions in order to protect the site administrator from scrutiny." ECF No. 1-1 at 11.

The government verified the Bitcoin Fog cluster by conducting blockchain analysis on multiple undercover transactions that sent funds to Bitcoin Fog. In each transaction, the funds were sent to the cluster that the government had identified as Bitcoin Fog's wallet. The defendant now concedes that the transactions that the government traced between the defendant's own personal accounts and Bitcoin Fog were, in fact, transactions between the defendant and Bitcoin Fog. The defendant may attempt to argue that he conducted those transactions as one of Bitcoin Fog's laundering clients, rather than its administrator, but that does not undercut the blockchain analysis, only the interpretation of its significance.

     **v.**     ***Defense "Expert" Is Unfamiliar with Standard Blockchain Analysis Practice***

To critique the government evidence, the defense relies heavily on a deeply flawed declaration from Mr. Christopher Vickery, who works in the cybersecurity field. The defense modestly characterizes Mr. Vickery as "one of the world's leading blockchain analysts," ECF No. 48 at 10, but it does not appear that Mr. Vickery has *any* experience in blockchain analysis or cryptocurrency whatsoever. Mr. Vickery's own declaration does not provide a single example of his blockchain analysis credentials or previous work in the field, nor does it identify a single case for which Mr. Vickery conducted blockchain analysis.

This lack of familiarity with standard blockchain analysis practice is evident in Mr. Vickery's criticism of the government's practices in this case. First, the defense questions the

government's truncation of bitcoin addresses in the affidavits.  Abbreviating addresses is a common practice designed to facilitate the readability of documents.  Rather than list out the full address – a lengthy string of letters and numbers – the government refers to the addresses by their first few characters.  This practice has been mirrored by this Court.  *See, e.g.*, *United States v. Lichtenstein, et al.*, No. 22-mj-00022 (RMM/BAH) (D.D.C.), ECF No. 25, at 5 (order of detention) (abbreviating "Wallet 1CGA4s" even further to "Wallet 4s" in considering the government's blockchain analysis and finding that the weight of the evidence supported pretrial detention).  Such truncation is used simply for the write-up; the underlying blockchain analysis is based on the full addresses.  The government has provided that blockchain analysis to the defense in discovery.

The defendant's critique of the government's use of a root address to refer to a cluster similarly belies the Mr. Vickery's lack of familiarity with standard practices for documenting blockchain analysis.  The defendant dismisses the government's use of a root address when referring to a cluster as "coy wording," ECF No. 47 at 8, but this is simply a common drafting practice.  Like many other major darknet services, the Bitcoin Fog wallet holds hundreds of thousands of addresses.  It would be impracticable to list each of the addresses in a warrant or charging document.  For this reason, blockchain analysts commonly refer to clusters by a root address.  The address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw – or "1YZJK" – is an early address used by Bitcoin Fog which serves as the root address for the Bitcoin Fog cluster.  The current balance of that cluster is approximately 1,354 BTC.

vi.    ***Defense's Beta Testing Criticism Is Similarly Misplaced***

The defense also takes issue with the government investigators' determination that the defendant's October 2011 transactions were beta test transactions for the Bitcoin Fog mixing service.  ECF No. 47-1, Vickery Declaration, at 7-8.  The government's basis for categorizing these as beta test transactions is well established in the complaint, ECF No. 1-1 at 10-11.  Distilled

to its essence, Mr. Vickery's argument seems to be that if he can follow the flow of funds manually

on the blockchain, then it must not be beta testing of a "criminal money laundering service." This

is a non sequitur. And even accepting *arguendo* Mr. Vickery's flawed assertion that these were

not beta test transactions, they would still show that the defendant personally funded the Bitcoin

Fog wallet, and that the defendant began the process of directing funds to Bitcoin Fog before the

service was even announced.

It is worth emphasizing that the beta test transaction is the only area of the entire body of

the government's blockchain analysis in this case that involves expert interpretation. At trial, the

government will seek to admit testimony from an expert who will explain how the sequence of

transactions conducted by the defendant matched the activity seen with Bitcoin Fog, and why those

transactions are indicative of beta testing. The defense can seek to put on an actual blockchain

analysis expert to testify to an alternative explanation for that series of transactions, if they can

find one who would draw such a conclusion. But there is no dispute that the transactions did, in

fact, occur exactly how the government explained that they occurred.

This holds true for the full body of blockchain evidence in this case. Indeed, the defense's

own expert acknowledges:

> A core foundational concept of blockchain technology, such as in the Bitcoin
> implementation, is the idea that all transactions are broadcast publicly and recorded
> on a public ledger, of which a full copy is held by each participating node in the
> network. … Which means the act of looking up a historic block along the chain is
> not a mystical, mysterious, proprietary, or sophisticated thing in and of itself.

ECF No. 47- at 8-9. For this very reason, the defense's attack on the government's blockchain

analysis falls short. The foundation of blockchain analysis is built on a public data set, which

anyone can access and review. Much blockchain analysis can, in theory, be done by hand, but

doing so would be resource and labor-intensive, and impractical where sophisticated defendants

send their transaction through series of thousands of transactions or use mixers such as the one

operated by the defendant.  The government stands by its blockchain analysis in this case and is fully prepared to defend it at trial.

### vii.    *Specific Defense Arguments Regarding Weight of the Evidence Are Empty Hyperbole*

The defense criticizes the government's analysis as "full of errors," ECF No. 47 at 5, and "error laden," *id.* at 15, but declines to specify what it believes these errors to be.  Mr. Vickery's declaration provides only slightly more insight, referencing "Bitcoin wallet ID address typos" in court filings describing the defendant's beta testing of the Bitcoin Fog service—which, in itself, is only one part of the of the body of evidence incriminating the defendant.  The defense's bold claims of Government incompetence here are based on a scrivener's error that changed a lowercase "c" to an "e" when transcribing the accurate blockchain analysis graphs into the court filings.  The government's complaint affidavit explains:

> As shown by Mt. Gox records and blockchain analysis, on October 13, 2011, Mt. Gox Account 1 sent approximately two BTC to Bitcoin cluster 12NSB5.  This deposit was then broken into smaller amounts through a series of four Bitcoin transactions.  Subsequently, the bitcoin was deposited into two new bitcoin wallets, 1KWMex (0.41 BTC) and 1NeWNP (1.57 BTC).  The transaction pattern within cluster 12NSB5 is consistent with mixing/tumbling transactions, including those seen from BITCOIN FOG.

ECF No. 1-1 at 10.  The full chart setting out the government's underlying analysis was provided to defense in discovery.  As is shown in those graphs, "12NSB5" refers to the Bitcoin address 12NSB5HE8VUjK44cQPJgtLUgj6YXLeUyU4;    "1NeWNP"    refers    to 1NeWNPH7sxkCoHjvvKwWqLLFjRjLLJJiMP;    and    "1KWM**e**x"    refers    to 1KWM**c**xNJU4mneER8qLeLVHQAG5VGHHnCgt (emphasis added).  The typo that the defense suggests undermines the government's entire case is simply that a lowercase "c" was transcribed as a lowercase "e" in the reference name for a cluster.  This typo was an error only in the naming

convention, not in the underlying analysis—which the defense was evidently able to follow easily based on the blockchain analysis provided in discovery and the government's accurate description of the activity.  This does not undercut the weight of the government's evidence—the addresses could just as easily have been named as "Address 1," "Address 2," and "Address 3" in the complaint affidavit, and the weight of the evidence would be unchanged.  Mr. Vickery's attempt to extrapolate a single typo in a summary affidavit into a claim about the entire case (while failing to acknowledge that the underlying data remains accurate and valid, much less reckon with that fact) illustrates just how grasping and immaterial his criticisms are.

Mr. Vickery vaguely suggests, without identifying any particular statement that he believes to be incorrect, that the government does not understand how bitcoin mining works.  ECF No. 47-1 at 14 ("Some elements of the allegations of wrongdoing reference fees charged by Bitcoin Fog and appear to stem from a lack of understanding in how cryptocurrencies function.").  Mr. Vickery goes on to explain mining transaction fees.  However, the 2-2.5% fee charged by Bitcoin Fog is not a fee to the bitcoin miners; it is a fee charged by the Bitcoin Fog service itself.  *See* ECF No. 1-1, at 5 (describing undercover deposit of approximately 0.02488936 BTC into Bitcoin Fog, which was credited to the undercover account in the amount of approximately 0.02425700 BTC, reflecting Bitcoin Fog deducting a 2.5% service fee from the transaction).  The mining fee for customers sending funds to Bitcoin Fog would have been paid by the customer as they sent their deposit to Bitcoin Fog.  Bitcoin Fog's 2-2.5% cut is separate and apart from that fee.  To be sure, the defendant would have incurred modest operating costs, including hosting costs and any fees paid to the miners for transactions conducted after the funds were transferred to Bitcoin Fog.  However, these are minutiae compared to the substantial profits reaped by the defendant.

Separately, Mr. Vickery boldly asserts that "[t]he investigators in this case have fundamental misunderstandings of critical technological concepts," which, he claims, should be "hugely embarrassing." ECF No. 47-1, at 13. However, the sole example that the defense "expert" points to is a non-material wording choice in a government response motion drafted by the prosecutors. There, the undersigned prosecutors used the term "decrypted" rather than "signed" when describing the process by which the Bitcoin Fog administrator would have necessarily applied a cryptographic private key in order to verify his identity when sending a message about a partnership with the Agora darknet market. Mr. Vickery then agrees with the government that a message beginning with "-----BEGIN PGP SIGNED MESSAGE-----" does in fact indicate that the message has been signed using PGP encryption. This hardly calls into question the government's evidence.

Mr. Vickery points to an advisory document posted to a Department of Justice website and directed at cybersecurity researchers to claim that "the US DOJ has taken a position that there is no inherent violation of law in cryptocurrency transactions which involve the deposit of cryptocurrencies to Dark Web Markets." ECF No. 47-1 at 11 (referencing Dep't of Justice, *Legal Considerations when Gathering Online Cyber Threat Intelligence and Purchasing Data from Illicit Sources* (Feb. 2020), available at https://www.justice.gov/criminal-ccips/page/file/1252341/download). At the outset, it far from clear what the asserted relevance of this document is supposed to be. Perhaps Mr. Vickery intends to raise an affirmative defense of entrapment by estoppel, *see generally United States v. Khanu*, 664 F. Supp. 2d 35, 41 (D.D.C. 2009)—arguing that the defendant reasonably relied on the referenced Department of Justice publication when he established a service to launder more than $78 million in transactions directly to or from darknet markets trafficking in illegal drugs. Of course, that would be absurd on its face:

there is no evidence that the defendant ever read the Department of Justice publication, which was issued nearly nine years after the launch of Bitcoin Fog in 2011, and such an affirmative defense would be inconsistent with the defendant's protestations that he did not create Bitcoin Fog.  In any event, Mr. Vickery grossly misreads the Department of Justice document, which nowhere purports to immunize buying and selling drugs online or laundering drug trafficking proceeds.  Instead, it only discusses two carefully defined scenarios under which victims who find that their information is being sold on the darknet want to recover their own information, or researchers seek to purchase information about security vulnerabilities so that they may be disclosed to the appropriate vendor to develop a patch.[6]   Bitcoin Fog was not a service to help such victims or cybersecurity practitioners.  As Akemashite Omedetou explained in a post on BitcoinTalk on June 21, 2014, "Bitcoin Fog is the highest possible anonymity outpost in the Bitcoin world, it's not for people that just joke around with their money, *it's for people who have real problems with the law* and we provide them the best possible service, and highest possible anonymity" (emphasis added).

Mr. Vickery draws several other nonsensical conclusions in his declaration—largely in the vein of conclusory legal arguments rather than "expert" factual analysis.  For example, Mr. Vickery claims that the instant case is "mooted by the continued existence and operation of newer privacy-centric cryptocurrencies," though he offers no legal support for this novel concept of statutory interpretation.  None of Mr. Vickery's other criticisms offers any basis for this Court to reconsider its views of the strength of the evidence.

---

[6] Even in those narrow scenarios, the document warns that researchers may face "legal risks" and provides only that "federal prosecutors have not typically brought charges against parties who merely attempt to purchase their own stolen data or buy a security vulnerability."

#### viii.    *There Is No "Conflict of Interest" with Chainalysis*

The defense baselessly claims that there is a "conflict of interest" involving the prosecutors and others involved in this case.  ECF No. 47 at 5.  In support of this allegation, the defense attaches a declaration from Eric Garland that recites from a selection of press releases and other publicly available materials.  ECF No. 47-2.  Nothing in the record supports Mr. Garland's conspiracy theories—such as the bizarre insinuation that Chainalysis is somehow acting at the behest of the Singaporean government, *id.* ¶¶ 23-25, or that the government is engaging in this prosecution (of an allegedly innocent defendant) in order to prevent Bitcoin Fog from competing with Chainalysis's clients' market competitors, *id.* ¶ 22.

There is no grand mystery or conspiracy regarding the role of government contractors or the use of blockchain analysis software in this investigation.  Federal law enforcement agencies routinely contract for subject matter experts, such as forensic accountants, to provide specialized services.  The field of blockchain analytics is no different.  The IRS contractor referenced in the Garland declaration was one of several individuals—including both contractors and full-time government employees—who conducted blockchain analysis for this investigation.  That analysis involved the use of several different blockchain analytics tools (not just Chainalysis).  The blockchain analysis, including graphs created using Chainalysis's software product, has been produced to defense counsel in discovery.   Here, of course, Chainalysis (like any blockchain analytics company) is even more open to scrutiny than standard contractors, because (as explained above) its blockchain analytics work is subject to comparison with the publicly-available blockchain by both the government and the defense.

Mr. Garland claims that Chainalysis has "a number of clients which compete in the same market space as Bitcoin Fog," and points to several cryptocurrency exchanges and financial institutions as an example—Crypto.com, Diginex, Banco Topazio, Upbit, Bitso, and ZebPay.  ECF

No. 47-2 at 7.  This is factually inaccurate and logically incoherent.  None of the listed businesses are mixers.  These businesses are no more Bitcoin Fog "competitors" than Bank of America would be.  Bitcoin Fog was a darknet mixer that existed specifically to launder its customers' money and avoid detection by authorities.  It hardly can be said to "compete" with the listed financial institutions.  Moreover, Mr. Garland's conspiracy theory – strangely – assumes defendant did, in fact, operate Bitcoin Fog: if the defendant were truly innocent, as he claims, then the government could hardly put Bitcoin Fog out of business by prosecuting him.

### D.  History and Characteristics of the Defendant

As this Court found in 2021, the defendant's history and characteristics weigh in favor of detention.  ECF No. 25 at 14-17.  In evaluating this factor, the Court must "take into account the available information concerning … [the defendant's] character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse,[7] criminal history, and record concerning appearance at court proceedings."  18 U.S.C. § 3142(g)(3)(A).  Of particular relevance here, the defendant lacks connections to the United States and has significant assets that could fund his flight from prosecution.

### i.  The Defendant Lacks Community Ties to the United States

In considering the defendant's history and characteristics previously, the Court found "Sterlingov's lack of meaningful ties to the United States" significant.  ECF No. 25 at 15.  Nothing

---

[7] In its previous detention order, the Court observed, "There is no indication … that Sterlingov has any history relating to drug or alcohol abuse." ECF No. 25 at 14 (cleaned up).  For clarity of the record, the defendant's communications do show recreational use of and interest in psychotropic substances, including ordering LSD and "liquid acid drops" on a darknet marketplace and going on ayahuasca "retreats."  However, the defendant does not appear to have a substance abuse disorder or addiction that would significantly weigh on a detention decision, and the government does not focus on that here in its argument.

has changed in that regard.   The defense claims that the "Court's analysis of Mr. Sterlingov's history and characteristics appears to target Mr. Sterlingov for being a digital nomad."  ECF No. 47 at 18.  The defense misunderstands or misconstrues the relevance of the defendant's "digital nomad" lifestyle.  The defendant's nomadic existence, moving from one country to another while eschewing deep roots to any one location, highlights his lack of deep community ties and flight risk.

The defendant's ties to Russia significantly increase the defendant's risk of flight.  This is not "crypto hysteria tainted with an anti-Russian tinge," ECF No. 47 at 15, it simply reflects the realities of the U.S. relationship with Russia.  Russia will not extradite its own nationals to the United States, and the country has actively thwarted efforts to prosecute Russians in the United States.  *See, e.g.,* A New Russian Ploy: Competing Extradition Requests, https://www.nytimes.com/2017/12/20/world/europe/russia-extradition-levashov.html.   The defendant was born in Russia, grew up there, and communicates in the Russian language.  He traveled to Russia frequently prior to his arrest, including an extended stay before his arrival in the United States on a flight from Moscow in April 2021.  While he apparently moved with his mother to Sweden in 2002, he has continued to renew his Russian passports, and was holding two valid Russian passports at the time of his arrest.  The defendant has every incentive to flee to Russia, and in doing so, he would be able to evade U.S. prosecution.

The defense attempts to offer varying explanations for the defendant's multiple passports, ECF No. 25 at 17 (in considering detention, noting that "although Sterlingov argues that he possessed two Swedish passports to be able to vacation in both Israel and Arab countries, at the motion hearing Sterlingov's counsel acknowledged that Sterlingov had never been to an Arab country") (internal quotations omitted).  However, at a minimum, the defendant's possession of

four passports from two different countries highlights the relative ease with which he would be able to obtain new travel documents.  If the defendant were released, the government's seizure of his existing four passports would create no impediment to him acquiring new travel documents. The defendant could simply walk into a local Russian or Swedish embassy or consulate and acquire one or more new passports.  The defendant could further seek to take shelter within the Russian embassy or consulate, effectively impeding the prosecution.

The defendant could also readily purchase new identification documents and a passport on the darknet—an area that the defendant is intimately familiar with.  The defendant operated a major darknet mixing service that laundered funds from many of the most notorious darknet marketplaces.  These sites prominently advertised the sale of fraudulent identification documents, along with their other illicit wares.  It would be trivial to acquire new identification documents tied to a new name.  As this court previously determined, "Sterlingov's familiarity with darknet marketplaces, along with his history 'of creating numerous limited-use identities to obfuscate, conceal, and compartmentalize his activities online,' suggest that pre-trial services would be unable effectively to enforce any internet restrictions the Court might place on Sterlingov were he released pending trial."  ECF No. 25 at 16 (cleaned up).

### ii.  *The Defendant Has Extensive Financial Resources To Fund Flight*

The defendant has access to extensive financial resources that could fund his flight from prosecution.  Most notably, the Bitcoin Fog cluster still holds approximately 1,354 BTC, worth approximately $30 million as of the time of this filing (based on a significant decline in bitcoin's value since the previous detention litigation, when 1,354 bitcoin were worth approximately $70 million).  Significantly, the Bitcoin Fog cluster has remained essentially unchanged since the defendant's arrest and the site's shutdown—a fact that significantly corroborates the defendant's

guilt in this case.   Despite defense counsel's suggestion that, "Whoever actually operated 'BITCOINFOG' is laughing all the way to the bank, or their crypto wallet, right now," ECF No. 38 at 10, the reality is that the funds are sitting in the Bitcoin Fog wallet, awaiting the defendant's release.  Those funds would be available to the defendant to fund his flight from prosecution.

Furthermore, it is clear that the defendant holds substantial assets that he has not disclosed. By the defense's own account, the defendant was "an early adopter of cryptocurrency, [who] made significant returns as the value of Bitcoin skyrocketed in the late 2010s," ECF No. 47 at 15.  The defendant also claims he "has a couple of BTC accounts with different providers," ECF No. 48, at 21—indicating ownership over an unspecified number of "accounts" other than the one Kraken account that was the subject of the government's sole seizure.  To date, the government has seized only approximately $800,000 of the defendant's cryptocurrency and other financial holdings. While $800,000 is a sizable sum, it would be a small fraction of the defendant's riches even if he were merely a bitcoin early adopter.

In reality, the defendant has carefully squirreled away assets in a manner that would allow him to fund a life on the run.  The defendant's notes recovered from his belongings and electronic devices at the time of his arrest include discussion of numerous financial institutions where he could hold accounts without being subject to scrutiny.  In one document, the defendant laments the challenges posed by anti-money laundering controls, observing [translated from Russian through machine translation]:

> the main question is which bank your money will lie in because the fact is that there are no [banks] left in the world in which you can safely keep a five- or more-[digit] balance, and which at the same time do not [] ask tedious questions - who you are, what you do, where your money comes from, who your customers are, who is the real boss of the business, etc.

*See* Ex. 1.  The defendant's notes further suggest that he has accounts at multiple virtual currency exchanges, and detail his efforts to purchase gold—including the predicament of where he would store it.  In one message, the defendant observes, "you could technically have unlimited gold in a vault and not even have to report it" but then notes the challenges in dealing with gold, observing, "Under the pillow seems unsafe... I have some hidden but I dont know if its well enough."  *See* Ex. 2.

In considering detention previously, this court observed, "Particularly troubling is the fact that the government located (and seized) over $800,000 in U.S. dollars and cryptocurrency in June 2021, Dkt. 19 at 41, several months *after* Sterlingov submitted his financial disclosure form attesting that his assets were limited to two vehicles and checking and savings accounts containing less than ten percent of this amount."  ECF No. 25 at 16 (emphasis in original).  The government's continued review of the evidence in this case has identified *even more* accounts held by the defendant that the defendant has not disclosed.

For example, the government identified an account that the defendant held at the virtual currency exchange Binance containing proceeds from Bitcoin Fog, but discovered that the balance of 1.65 BTC, worth approximately $54,550 at the time, had been largely emptied in July 2021.  In tracing these funds (using blockchain analysis), the government discovered that funds were transferred to an account belonging to a Boston-based criminal defense attorney, Maksim Nemtsev.  *See* Ex. 3 (May 11, 2022 Discovery Letter) (informing defense counsel about inadvertent discovery of Mr. Nemtsev's account records through this analysis and describing Mr. Nemtsev as "an attorney whom we understand the defendant considered retaining").  Mr. Nemtsev had contacted the government on a handful of occasions shortly after the defendant's arrest in the spring of 2021, representing that he was working for the defendant's "family" and inquiring about

the defendant's whereabouts and the possibility of recovering the keys to the defendant's Tesla automobile, which were on the defendant's person and seized at the time of his arrest. Unbeknownst to the government—and apparently also unbeknownst to this Court and the Office of the Federal Public Defender—the defendant in fact has retained Mr. Nemtsev as his attorney since April 29, 2021, days after his arrest. The government only learned of Mr. Nemtsev's shadow representation on August 12, 2022, after contacting Mr. Nemtsev to inquire about whether his communications should be considered privileged for purposes of filtering recorded jail calls. It is unclear how this squares with the defendant's representation in his previous detention proceedings in which Sterlingov's public defender "point[ed] to the fact that he lacked sufficient funds to retain private counsel as evidence that lacks the enormous wealth that the government posits." ECF No. 25 at 16.

As the Court concluded previously, "it is likely that Sterlingov has additional funds that the government has yet to identify, which could be available to fund an effort to flee the country." ECF No. 25 at 16.

**E. Defense Release Plans are Wholly Inadequate To Prevent Defendant's Flight**

The defendant continues to seek release to his second cousin in Massachusetts. *See* ECF No. 17-1, Ex. C (Letter from Alexander Koziakov, identifying himself as the defendant's second cousin). However, this option was considered and rejected by the Court, and the defendant offers no reason to second-guess that judgment. As the Court emphasized in its order denying the defendant's motion for bond, "at the motions hearing, Sterlingov's cousin acknowledged the two had not seen each other in person since 2016." ECF No. 25, at 14. Sterlingov has no connection to Boston, where his second cousin resides. Furthermore, his second cousin is a professional real estate agent, a job that necessitates frequent showings and work outside of one's own home. Mr.

Koziakov would be unable to adequately supervise the defendant.  While Mr. Koziakov previously offered to post properties as bond, this court already noted that "the value of [the cousin's real estate properties] is dwarfed by the millions the government contends that Sterlingov has accrued through Bitcoin Fog."  *Id.* at 15.

Defense counsel suggests in the alternative that the defendant could move into defense counsel's Brooklyn, NY apartment.  This proposal is ethically fraught and rife with practical impediments.  The defendant has no community ties to New York.  Defense counsel has other clients and matters in districts across the country, necessitating travel.  Defense counsel would presumably and understandably not be able to consent to Pretrial Services monitoring defense counsel's electronics and Internet connection, even if such supervision were feasible.  If the defendant violated the conditions of his pretrial release while in defense counsel's home, defense counsel's obligation to report the violation to Pretrial Services would be in direct tension with defense counsel's obligation to his client.  Furthermore, the defendant has known this defense counsel for a matter of months, with a small number of in-person visits.  The defendant holds no deep ties or familial loyalty to defense counsel.

**F.  Release To Facilitate Trial Preparation Is Not An Appropriate Consideration**

The defendant implies that the Court should also consider whether pretrial release would be helpful in the preparation of his defense, but that is not one of the statutory factors listed under § 3142(g).  The question before the Court is solely whether the defendant poses a serious risk of flight such that no condition or combination of conditions will reasonably assure his appearance at trial.  To the extent the defendant wishes to argue that pretrial release is necessary for the preparation of his defense, he must move pursuant to 18 U.S.C. § 3142(i), and the *defendant*, not the government, bears the burden of showing that pretrial release is "necessary" for such purposes.

31

*See Otunyo*, 2020 WL 2065041, at *3 ("Section 3142(i) provides a distinct mechanism for temporarily releasing a detained defendant, in a manner that has nothing to do with a revisiting of the initial detention determination, but a defendant has the burden of showing that temporary release is 'necessary.'") (internal citations and alterations omitted); *United States v. Bikundi*, 47 F. Supp. 3d 131, 136 (D.D.C. 2014) ("[D]efense counsel pointed out at a May 29, 2014 status hearing that the defendant's ability to assist in review of the [discovery] material is adversely affected by her incarceration pending trial. . . . The remedy for that concern, however, is not pretrial release when the statutory conditions are not met, but unrelenting efforts by the government to process discovery and get ready for trial as promptly as possible.").  Numerous accommodations short of release could improve the defendant's situation, including transfer to a detention facility closer to his New York and Boston-based defense counsel and more frequent visits from defense counsel.

## CONCLUSION

For the foregoing reasons, the defendant's motion should be denied, and the defendant should continue to be detained without bail pending trial in this case.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     */s/ Christopher B. Brown*
        Christopher B. Brown, D.C. Bar No. 1008763
        Assistant United States Attorney
        U.S. Attorney's Office for the District of Columbia
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-7153
        Christopher.Brown6@usdoj.gov

        */s/ C. Alden Pelker*
        C. Alden Pelker, Maryland Bar
        Trial Attorney, U.S. Department of Justice
        Computer Crime & Intellectual Property Section
        1301 New York Ave., N.W., Suite 600
        Washington, D.C. 20005
        (202) 616-5007
        Catherine.Pelker@usdoj.gov