**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion To Dismiss the Indictment, ECF No. 46. The defendant raises a number of scattershot arguments—invoking everything from venue to the First, Fifth, and Sixth Amendments to the statute of limitations, and even arguing that criminal trials cannot constitutionally be held in the District of Columbia. The defendant's motion relies on overwrought rhetoric about computers and the Internet, but provides very little legal authority or argument to back up its overheated claims. As set forth below, the Superseding Indictment is well-supported by the weight of authority. Venue is well-founded based on the undercover transactions and the defendant's omissions in the District of Columbia; the defendant misconstrues the text, purpose, and history of the Sixth Amendment in the District of Columbia; and none of the defendant's arguments provide any basis for this Court to set aside the judgment of two separate grand juries in returning indictments against the defendant.

## ARGUMENT

### A. Standard of Review on a Motion To Dismiss an Indictment

"[T]o be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further

prosecution for the same offense." *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014).

"Because a court's use of its supervisory power to dismiss an indictment directly encroaches upon

the fundamental role of the grand jury, dismissal is granted only in unusual circumstances." *United*

*States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015) (internal citations and alterations omitted).

Accordingly, "a pretrial motion to dismiss an indictment 'allows a district court to review the

sufficiency of the government's pleadings, but it is not a permissible vehicle for addressing the

sufficiency of the government's evidence.'" *United States v. Mosquera-Murillo*, 153 F. Supp. 3d

130, 154 (D.D.C. 2015) (quoting 24 James W. Moore *et al.*, Moore's Fed. Practice § 612.02 (3d

ed. 2015)). "Thus, '[w]hen considering a motion to dismiss an indictment, a court assumes the

truth of [the government's] factual allegations.'" *Id.* (quoting *Ballestas*, 795 F.3d at 149).

### B.  Venue Is Proper in the District of Columbia

#### 1.  Legal Standard

"Although an allegation of venue is not essential to the validity of an indictment or

information, venue is a fact that must be proved at the trial . . . ." 2 Fed. Prac. & Proc. Crim. § 307

(4th ed.).[1]  "Venue may be proper in more than one district." *United States v. Lam Kwong-Wah*,

924 F.2d 298, 301 (D.C. Cir. 1991); *see also United States v. Muhammad*, 502 F.3d 646, 654 (7th

Cir. 2007) (same); *United States v. Bowens*, 224 F.3d 302, 309 (4th Cir. 2000) (same).  As this

Court explained in *United States v. El-Saadi*, 549 F. Supp. 3d 148 (D.D.C. 2021), on a motion to

---

[1] However, venue is not always a question that must be submitted to the jury at trial.  Venue is only a jury question if "(1) the defendant objects to venue prior to or at the close of the prosecution's case-in-chief, (2) there is a genuine issue of material fact with regard to proper venue, and (3) the defendant timely requests a jury instruction." *United States v. Sitzmann*, 893 F.3d 811, 824 (D.C. Cir. 2018) (quoting *United States v. Haire*, 371 F.3d 833, 840 (D.C. Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005)).  In *Haire*, as in *Sitzmann*, the D.C. Circuit upheld a trial court's refusal to instruct the jury on venue for failing both the first and second prongs.  *See Haire*, 371 F.3d at 840 ("[T]here is no genuine issue of material fact as to the commission of acts in furtherance of the offense in the District of Columbia.").

dismiss for lack of venue, the language of Fed. R. Crim. P. 12(b)(3) allows the Court to "consider evidence beyond the face of the indictment where such evidence is 'reasonably available,'" and "decisions in this District resolving pretrial motions to dismiss for improper venue in criminal cases routinely rely on allegations outside the four corners of the indictment." *Id.* at 157 n.4.

The Supreme Court has also addressed the appropriate standard for venue in two cases, *United States v. Cabrales*, 524 U.S. 1 (1998), and *United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999). In *Cabrales*, the defendant was charged in the Western District of Missouri with, *inter alia*, two substantive money laundering counts based on transactions that occurred in Florida, involving the proceeds of cocaine trafficking in Missouri. 524 U.S. at 3-4. The Supreme Court held that venue was improper in Missouri based solely on the drug offenses that generated the unlawful proceeds. *Id.* at 4. The Court indicated that venue must be based on the "*locus delicti*" of the offense, which is determined "from the nature of the crime alleged and the location of the act or acts constituting it." *Id.* at 6-7 (internal quotations omitted). Looking to the statutory definitions of the money laundering offenses, the Court found that they only punished the individual laundering transactions, not the cocaine trafficking that generated the unlawful proceeds, and so venue could only be based in the district where the transactions occurred. *Id.* at 7 ("Here, the crimes described in Counts II and III are defined in statutory proscriptions, 18 U.S.C. §§ 1956(a)(1)(B)(ii), 1957, that interdict only the financial transactions (acts located entirely in Florida), not the anterior criminal conduct that yielded the funds allegedly laundered."). The Court specifically distinguished the substantive money laundering charges in *Cabrales*, based on discrete transactions, from a hypothetical money laundering conspiracy in which venue could be based on "overt acts of a co-conspirator" in the charging district. *Id.* at 8.

In *Rodriguez-Moreno*, the Court applied *Cabrales* to the case of a defendant charged with using or carrying a firearm "during and in relation to any crime of violence," in violation of 18 U.S.C. § 924(c). 526 U.S. at 276. The defendant in *Rodriguez-Moreno* participated in drug-related kidnapping that began in Texas and continued in New Jersey, New York, and Maryland. *Id.* at 277. The defendant only used a firearm during the last leg of the journey, in Maryland, but he was charged in New Jersey. *Id.* The Third Circuit reversed his conviction, reasoning that venue should be limited to the district in which the defendant "uses" or "carries" a firearm—which, in the defendant's case, would only include Maryland. *Id.* at 277. The Supreme Court reversed. *Id.* The Court reiterated the *locus delicti* test articulated in *Cabrales*—under which "a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts," *id.* at 279—but found that the Third Circuit was unduly restrictive in applying it to the defendant's § 924(c) offense. Eschewing the Third Circuit's "verb test," the Court found that "a defendant's violent acts are essential conduct elements" of the § 924(c) offenses, because the government was required to prove that the defendant "committed all the acts necessary to be subject to punishment for kidnapping," in addition to his use of a firearm while committing the kidnapping offense. *Id.* at 279-80. Thus, the Court found "two distinct conduct elements"—kidnapping and using and carrying a firearm—and found that venue based on the continuing kidnapping offense in New Jersey was sufficient under the Constitution. *Id.* at 280, 282.

As explained in further detail below, venue is proper in the District of Columbia for the four counts in the Superseding Indictment pursuant to Rule 18, Fed. R. Crim. P. (venue is proper in "district where the offense was committed"); the continuing offense venue statute, 18 U.S.C. § 3237(a) (venue for "any offense against the United States begun in one district and completed in

another, or committed in more than one district" is proper in "any district in which [the] offense was begun, continued, or completed"); and the express venue provision in the money laundering statute, 18 U.S.C. § 1956(i) (venue for money laundering is proper in, *inter alia*, "any district in which the financial or monetary transaction is conducted," and, for conspiracy or attempt, venue in "the district where venue would lie for the completed offense under [the provision authorizing venue in district in which financial or monetary transaction is conducted], or in any other district where an act in furtherance of the attempt or conspiracy took place"). Application of these venue statutes in this case is, moreover, entirely consistent with the Supreme Court's decisions in *Cabrales* and *Rodriguez-Moreno*.

    **2.  The Undercover Transactions Support Venue in the District of Columbia**

As noted in the Superseding Indictment (ECF No. 43, ¶ 2) and described in further detail in the Complaint Affidavit (ECF No. 1-1, at 5-7), on multiple occasions, undercover agents sitting in the District of Columbia accessed Bitcoin Fog, created accounts on the Bitcoin Fog darknet site, sent money to Bitcoin Fog, submitted messages to Bitcoin Fog, provided Bitcoin Fog with instructions on where to transfer the post-laundered funds, and (on or about November 21, 2019 and on other occasions) received money from Bitcoin Fog. In addition, the undercover agents received an update on the status of the transactions in the District of Columbia by means of the defendant's Bitcoin Fog darknet site. All of that activity necessarily involved wire communications and the transfer of funds to and from locations in the District of Columbia. These undercover transactions in the District of Columbia provide ample basis for both statutory and constitutional venue.

### i.   Venue for Money Laundering Conspiracy and § 1960(b)(1)(C)

Money laundering conspiracy is a continuing offense, *see United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999), so venue is proper under 18 U.S.C. § 3237(a) in any district where the conspiracy was "begun, continued, or completed."  In addition, the money laundering statute provides that venue is proper in "any district in which the financial or monetary transaction is conducted," and, in a prosecution for conspiracy or attempt, venue is proper "in the district where venue would lie for the completed offense . . . or in any other district where an act in furtherance of the attempt or conspiracy took place."  18 U.S.C. § 1956(i)(1)(A), (2).  The Supreme Court has indicated that the money laundering venue provision in § 1956(i) provides an "alternative venue option in money laundering conspiracy cases" which "serves to supplement, rather than supplant, the default venue rule."  *Whitfield v. United States*, 543 U.S. 209, 218 (2005).

It is well-established that a "sting" transaction constitutes an act in furtherance of a conspiracy and is sufficient to justify venue in the district where it occurred.  For example, in *United States v. Sitzmann*, 74 F. Supp. 3d 96 (D.D.C. 2014)—one of the cases on which the defendant relies—Judge Friedman found venue appropriate in this District for prosecution of a drug trafficking conspiracy based on "a single wire transfer" sent to a government informant in the District of Columbia.  *Id.* at 102-04.  In fact, the government informant requested the wire transfer from one of the defendant's co-conspirators, Mr. Jones, telling him he needed the money to travel to Florida to deliver cocaine, as part of a "ruse orchestrated by law enforcement in part to establish venue in this jurisdiction."  *Id.* at 103-04.  The defendant himself was not involved in the wire transfer because he had been jailed in France the previous month.  *Id.* at 104.

Judge Friedman found that the wire transfer counted as an "overt act in support of the conspiracy," and held that, "[s]o long as Mr. Jones made the wire transfer in furtherance of the

conspiracy with Mr. Sitzmann to traffic in cocaine for profit, venue lies in the District of Columbia." *Id.* at 105, 107.  In so holding, Judge Friedman found it irrelevant that the government informant—the only person in the District of Columbia—was not an actual member of the conspiracy.  The conspiracy existed at the time, the defendant and his co-conspirator were both members of the conspiracy, and the requested wire transfer was made "in order to facilitate the transportation of drugs" in connection with the conspiracy.  *Id.* at 105.

> In these circumstances, it does not matter whether Mr. Colligan was a government informant. Nor does it matter whether Mr. Sitzmann knew about or participated in the wire transfer, so long as Sitzmann previously reached a conspiratorial agreement with Mr. Jones . . . and never affirmatively withdrew from that agreement.

*Id.* at 106.  The D.C. Circuit affirmed Sitzmann's convictions.  *See United States v. Sitzmann*, 893 F.3d 811 (D.C. Cir. 2018).

Judge Friedman's opinion in *Sitzmann* is consistent with numerous decisions finding venue appropriate based on undercover or sting activities in the district of prosecution.  Most recently, in *United States v. Iossifov*, --- F.4th ----, 2022 WL 3335692 (6th Cir. Aug. 12, 2022), the Sixth Circuit affirmed venue for a bitcoin-related RICO and money laundering conspiracy prosecution in the Eastern District of Kentucky, even though the defendant was located overseas and had never set foot inside Kentucky, based on the fact that a "confidential source, who acted in furtherance of the scheme and laundered money under the government's supervision, was based in the district," as well as the presence of victims within the district.  *Id.* at *4.  As the court explained, "venue for money laundering conspiracy is proper 'in any . . . district where an act in furtherance of the attempt or conspiracy took place," and  "[c]ritically, a co-conspirator's acts need not be foreseeable to a defendant for venue to properly lie in the district where such acts took place, nor is it necessary for a co-conspirator to 'have entered the district' where venue lies 'so long as this standard is

met.'"  *Id.* (quoting 18 U.S.C. § 1956(i)(2) and *United States v. Crozier*, 259 F.3d 503, 519 (6th Cir. 2001)).[2]

Other courts are in accord.  *See, e.g.*, *United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007) (finding in conspiracy case that "it [does not] matter whether the conspirator is communicating with someone who is a knowing confederate, an undercover agent, or an unwitting third-party," because "[w]hat is determinative of venue . . . is whether the conspirator used the [communication] to further the objectives of the conspiracy"); *United States v. Naranjo*, 14 F.3d 145, 146-47 (2d Cir. 1994) (finding venue appropriate where co-conspirator of defendant made phone calls to undercover agent in Manhattan, explaining that "[t]he defendant need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there"); *United States v. Barnes,* 681 F.2d 717, 724 (11th Cir. 1982) (affirming venue for charge of using telephone to facilitate the commission of a drug conspiracy based on single telephone call by the defendant to a government informant located in the charging district,  and explaining that " "the question is not whether [the defendant] could have conspired with a government informant, but rather whether his call to [the informant] was knowingly or intentionally made for the purpose of facilitating the conspiracy that he was involved in with persons other than [the informant]."); *United States v. Day*, 700 F.3d 713, 727 (4th Cir. 2012) (venue was proper, in prosecution for mail fraud, conspiracy, and other charges, based on at least two classes of overt acts: phone calls that a co-conspirator made in furtherance of the conspiracies and e-mail sent by coconspirators *to* victim

---

[2] *Iossifov* was only the latest in a long line of cases to hold that conspiracy defendants located overseas may be charged in the United States even if they had never set foot in the United States. *See, e.g.*, *United States v. Perez-Herrera*, 610 F.2d 289, 291 (5th Cir. 1980) (collecting cases and stating, "[w]e have repeatedly held it is not a defense to a conspiracy charge that the defendant never entered the country, at least so long as an overt act in furtherance of the conspiracy occurred within the United States").

personnel in district); *United States v. Brito*, 379 F. App'x 320, 321 (5th Cir. 2010) ("Venue can be based on evidence of any single act that initiated, perpetuated, or completed the crime . . . ."); *id*. ("'[O]ne co-conspirator's travel through a judicial district in furtherance of the crime alleged establishes venue as to all co-conspirators.'") (quoting *United States v. Mendoza*, 587 F.3d 682, 687 (5th Cir. 2009)); *United States v. Renteria*, 903 F.3d 326, 332 n.35 (3d Cir. 2018) ("[A] confidential informant's presence in the [district] during telephone calls with a co-conspirator 'sufficed to establish venue there on the conspiracy charge.'") (quoting *United States v. Gonzalez*, 683 F.3d 1221, 1225 (9th Cir. 2012)); *United States v. Cordero*, 668 F.2d 32, 43-44 (1st Cir. 1981) (venue was appropriate in Puerto Rico when an undercover law enforcement agent was located there and spoke to the conspirators on the phone there); *Smith v. United States*, 92 F.2d 460, 461 (9th Cir. 1937) (affirming venue based on "telephone from Honolulu to Los Angeles," explaining that "[a]n overt act . . . is a part of the conspiracy itself, and where, as here, it is alleged as occurring in the Territory and in California, it is sufficient to make it an offense within the statute, even though the indictment had stated that the place in which the conspiracy was formed is unknown").[3]

---

[3] Numerous courts have also rejected claims of entrapment or "manufactured" venue based on undercover law enforcement activities. *See, e.g.*, *United States v. Spriggs*, 102 F.3d 1245, 1250 (D.C. Cir. 1996) (approving venue in District of Columbia where undercover agents "purposefully" arranged to meet defendants in the District of Columbia rather than locations in Maryland or Virginia); *United States v. Al-Talib*, 55 F.3d 923, 928 (4th Cir. 1995) (finding venue proper based on location of a government sting operation, despite defense arguments that the government "manipulated events to draw defendants into a venue"); *United States v. Celaya Valenzuela*, 849 F.3d 477, 488 (1st Cir. 2017) (venue proper even where government informant drove defendant across state lines into the district in which venue was laid); *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 462 (7th Cir. 2006) (agents may influence where the federal crime occurs, and thus where venue lies); *see also United States v. Sitzmann*, 893 F.3d 811, 823 (D.C. Cir. 2018) (noting that courts "have rejected the concept of manufactured venue," and— though declining to reach the issue—emphasizing that "[w]e remain unconvinced that 'manufactured venue' or 'venue entrapment' are viable theories").

This well-established line of cases, moreover, is consistent with *Cabrales* and *Rodriguez-Moreno*.  In both cases, the Supreme Court explicitly preserved the theory of venue articulated here—conspiracy venue based on overt acts committed in the charging district, regardless of the defendant's presence.  *See Cabrales*, 524 U.S. at 8 ("In *Hyde*[ *v. United States*, 225 U.S. 347 (1912)], the defendants were convicted in the District of Columbia of conspiracy to defraud the United States.  Although none of the defendants had entered the District as part of the conspiracy, venue was nevertheless appropriate, the Court ruled, based on the overt acts of a co-conspirator there.   By contrast, the counts at issue in this case allege no conspiracy.  They describe activity in which Cabrales alone, untied to others, engaged."); *Rodriguez-Moreno*, 526 U.S. at 281-82 (citing *Hyde* as an example of proper venue).  Moreover, by permitting venue in a district where the kidnapping occurred but not the using and carrying of a firearm, *Rodriguez-Moreno* confirmed that constitutional venue does not require that *all* of the essential elements of an offense occur in the charging district.[4]   Even the Third Circuit's decision in *United States v. Aurnheimer*, 748 F.3d 525 (3d Cir. 2014), on which the defendant relies, acknowledged that "overt acts" committed in the charging district, New Jersey, could have supported venue for the conspiracy charged in that case.  *Id.* at 535.  *See also, e.g.*, *Iossifov*, 2022 WL 3335692, at *4-5 (citing *Cabrales* and affirming venue for conspiracy on both statutory and constitutional grounds).

Here, as in *Sitzmann*, the defendant and his co-conspirators (including darknet vendors and darknet market administrative teams, *see* ECF No. 43, at 1-2) participated in a money laundering conspiracy during a time period encompassing the dates of the undercover transactions in 2019.

---

[4] *Rodriguez-Moreno* further confirmed the longstanding principle for continuing offenses that, "'where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done.'"   526 U.S. at 281 (quoting *United States v. Lombardo*, 241 U.S. 73, 77 (1916)).

The funds involved in the November 21, 2019 transaction were represented to be the proceeds of illegal drug trafficking ("coins from selling ecstasy") and to promote further drug trafficking ("ive been selling on WSM and dream . . . I have more coins I need cleaned but how do I know I can trust you???").  ECF No. 1-1, at 6.  And the laundering transaction itself was conducted while the undercover agent was located in the District of Columbia, while interacting with the Bitcoin Fog site and receiving a status update confirming his transaction.

Moreover, Bitcoin Fog advertised that it "mix(es) up your bitcoins in our own pool with other users" in order to "eliminate any chance of finding your payments and making it impossible to prove any connection between a deposit and a withdraw inside our service."  ECF No. 1-1 at 2. In order to do so, Bitcoin Fog required a stream of users to provide a variety of sources of bitcoin, which Bitcoin Fog commingled with other customers' funds to ensure effective laundering.  Thus, Bitcoin Fog's processing of the undercover transactions not only furthered the conspiracy through the individual transaction with the undercover agent, but also by contributing to the pool and allowing Bitcoin Fog to launder *other* Bitcoin Fog users' transactions.  In both a specific and general sense, then, the undercover transactions constituted acts in furtherance of the money laundering conspiracy sufficient to justify venue in this District.

Similarly, the undercover transactions support venue in the District of Columbia for the third prong of Count Three, charging operation of a money transmitting business that involved the transportation and transmission of funds known to have been derived from a criminal offense and intended to be used to promote and support unlawful activity, in violation of 18 U.S.C. § 1960(b)(1)(C).  *See* ECF NO. 43, at 4.  One of the ways to prove a violation of this statute is through instances of promotional laundering—engaging in a transaction with "funds" that "are intended to be used to promote or support unlawful activity," 18 U.S.C. § 1960(b)(1)(C).  Unlike

many money laundering offenses under § 1956, this offense under § 1960(b)(1)(C) does not require the funds themselves to be the proceeds of illegal activity. *See* H.R. Rep No. 107-250(I), at 54 (Oct. 17, 2001) ("Thus, a person who agrees to transmit or to transport drug proceeds for a drug dealer, or *funds from any source* for a terrorist, knowing such funds are to be used to commit a terrorist act, would be engaged in the operation of an unlicensed money transmitting business.") (emphasis added); *cf. United States v. Krasinski*, 545 F.3d 546, 550-51 (7th Cir. 2008) (construing international promotional money laundering offense in violation of 18 U.S.C. § 1956(a)(2)(A), which also does not contain any statutory requirement that the transaction involve criminal proceeds, and finding that "[t]he absence of a 'proceeds' requirement in section 1956(a)(2)(A) reflects that Congress decided to prohibit *any* funds transfer out of the country that promotes the carrying on of certain unlawful activity") (emphasis added). Accordingly, this provision covers "sting" transactions involving undercover funds that are intended to be used to promote or support unlawful activity. Thus, in the same way that the undercover transactions here constitute acts in furtherance of the conspiracy and support venue for money laundering conspiracy, they also constitute one of the essential elements of a § 1960(b)(1)(C) offense and support venue under § 3237(a).

### ii.  Venue for Sting Money Laundering

For a substantive money laundering count, such as the "sting" money laundering offense charged in Count Two, "[t]he core of money laundering, which distinguishes one such offense from another, is the laundering transaction itself." *United States v. Smith*, 44 F.3d 1259, 1265 (4th Cir. 1995); *cf. Cabrales*, 524 U.S. at 8 (finding that venue in Missouri was improper for substantive money laundering counts based on "transactions" that "began, continued, and were completed in Florida") (internal citations omitted). The sting transaction that forms the basis of Count Two was

conducted from the District of Columbia, thus rendering venue proper under Rule 18 and 18 U.S.C. § 3237(a).

### 3. The Defendant's Failure To Obtain a License from DISB or Register with FinCEN Are Omissions that Support Venue in the District of Columbia

The first two prongs of Count Three charge the defendant with operating a money transmitting business without an appropriate money transmitting license in the District of Columbia, in violation of 18 U.S.C. § 1960(b)(1)(A); and operating a money transmitting business without registering as a money transmitting business under federal regulation, in violation of 18 U.S.C. § 1960(b)(1)(B). *See* ECF No. 43, at 4. Count Four charges the defendant with engaging in the business of money transmission without obtaining an appropriate license in the District of Columbia, in violation of the D.C. Money Transmitters Act (MTA), D.C. Code § 26-1023(c). *Id.* at 4-5. For both Counts Three and Four, the appropriate licensing and registration authorities are located in the District of Columbia—namely, the D.C. Department of Insurance, Securities, and Banking (DISB) and the Financial Crimes Enforcement Network (FinCEN).

### i. DISB and FinCEN Are Located in the District of Columbia

Pursuant to D.C. Code § 26-551.03, licensing authority for money transmitters under the MTA is held by the Commissioner of the Department of Insurance, Securities, and Banking. *See also United States v. Harmon*, 514 F. Supp. 3d 47, 49 (D.D.C. 2020) (noting that DISB is "the local MTA licensing authority"). DISB is a government agency of the District of Columbia located in Washington, D.C.

Federal registration of money transmitting businesses is regulated by the Bank Secrecy Act (BSA), 31 U.S.C. § 5311, *et seq.* Regulations promulgated under 31 U.S.C. § 5330 require registration with the FinCEN, an agency within the U.S. Department of Treasury. 31 C.F.R. § 1022.380(a)(1). FinCEN and the Treasury Department are based in Washington, D.C.

> ## ii. The Defendant's Omissions Support Venue in the District of Columbia

"Venue in cases involving a failure to make required filing is typically in the district in which that failure occurred." *United States v. Montgomery*, 441 F. Supp. 2d 58, 61 (D.D.C. 2006) (finding venue proper in District of Columbia where defendant engaged in prohibited export activity without requisite permission from the Department of Commerce, located in Washington, D.C.); *see also Johnston v. United States*, 351 U.S. 215, 221 (1956) ("[W]here the crime charged is a failure to do a legally required act, the place fixed for its performance fixes the situs of the crime"); *United States v. DiJames*, 731 F.2d 758, 762 (11th Cir. 1984) (finding venue proper in the District of Columbia for a charge of failure to file a report with the Secretary of Labor, because "he is located in the District of Columbia").

Judge Contreras considered and affirmed the question of venue based on a failure to register with the Department of Treasury in *United States v. Hassanshahi*, 185 F. Supp. 3d 55, 58 (D.D.C. 2016). The defendant in *Hassanshahi* was charged with violations of the International Emergency Economic Powers Act (IEEPA) for conspiring to export goods and technology from Canada to Iran. *Id.* at 55-56. The defendant was not alleged to have ever set foot in the District of Columbia or to have conducted any activity in the District of Columbia. However, the defendant's business—if he had conducted it lawfully—would have required a license issued by the Office of Foreign Assets Control (OFAC), FinCEN's sister agency in the U.S. Department of Treasury. *See id.* at 57. Judge Contreras held the defendant's failure to obtain a license from OFAC was sufficient to venue the criminal case in the District of Columbia. "Although Mr. Hassanshahi's failure to secure a license is admittedly only a part of the criminal offense with which he has been charged, it is a critical one." *Id.* at 57. He further explained that while OFAC license applications could be submitted online from anywhere in the world, "any application must

be sent to, received by, and then approved by the Department of the Treasury," and "[t]herefore the place of *performance* of the request—regardless of from where that request is sent— remains the District of Columbia."  *Id*. (emphasis in original).

*Hassanshahi* was not the first case to find venue in the District of Columbia for failure to obtain a license from the Department of Treasury.  *United States v. Quinn*, 401 F. Supp. 2d 80 (D.D.C. 2005), similarly involved a defendant who failed to secure necessary licenses from OFAC. In *Quinn*, Judge Bates recognized that venue was proper in the District of Columbia because "the alleged omissions that are part of the crimes charged (namely the failure to secure licenses for exports to Iran from OFAC)," *id.* at 87, occurred in the District of Columbia.  *See also, e.g.*, *Montgomery*, 441 F. Supp. 2d at 60-61 (concluding that venue was proper in the District of Columbia where the defendant was charged with exporting arms and other items in violation of a Department of Commerce Office of Export Administration denial order, because the defendant's "failure to ask for authorization to export . . . occurred in the District of Columbia").

The same venue theory was confirmed by then-Judge Ketanji Brown Jackson in a civil forfeiture proceeding, *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, 324 F. Supp. 3d 38 (D.D.C. 2018), in adopting a Report and Recommendation by Magistrate Judge Harvey that approved the forfeiture of funds involved in a North Korean money laundering scheme.  *Id.* at 42.  As Judge Harvey explained: "[T]he Defendant Funds are subject to forfeiture because the interested parties failed to procure licenses from OFAC, which is located in Washington, D.C. . . .  Each payment involving the defendant properties required a license from OFAC . . .  Yet for each payment, Minzheng failed to obtain the requisite license. That omission is sufficient to support venue [for forfeiture] in this district."  *Id.* at 46 (cleaned up).

These decisions accord with longstanding Supreme Court precedent, which has noted the appropriateness of venue in the District of Columbia in a variety of contexts where defendants failed to file required paperwork with a federal agency or official. *See Travis v. United States*, 364 U.S. 631 (1961) (venue for prosecution for false affidavits filed with the National Labor Relations Board was proper in the District of Columbia, where the Board was located); *Rumely v. McCarthy*, 250 U.S. 283 (1919) (venue for failure to file report with the Alien Property Custodian was proper in the District of Columbia, where the Custodian was located); *United States v. Lombardo*, 241 U.S. 73 (1916) (venue for prosecution for failure to file a statement with federal Commissioner General of Immigration was proper in District of Columbia, where the office of the Commissioner of Immigration was located).

Even the Third Circuit in *Aurnheimer* confirmed that an omission may be sufficient for venue so long as "a preexisting legal duty requires the act that the defendant failed to do," such as failing to report to a military draft board, failing to report to prison after being sentenced, or failure to file income tax returns. 748 F.3d at 538 (collecting cases). Similarly, here, the D.C. Money Transmitters Act and the BSA both impose preexisting legal duties for money transmitting businesses such as Bitcoin Fog to obtain a license from DISB and register with FinCEN.

The government's theory of venue falls squarely within this long line of cases, which establish that the defendant's omissions—his failure to obtain the necessary licensure and registration from agencies in the District of Columbia—are sufficient to support venue for the first two prongs of Count Three and for Count Four.

### 4. The Defendant's Failure To Register with FinCEN Is Also an Act in Furtherance of the Money Laundering Conspiracy

The defendant's failure to register with FinCEN is also an act or omission in furtherance of the charged money laundering conspiracy. The defendant promoted Bitcoin Fog as an

alternative to "legitimate" businesses that "comply with anti-money laundering laws" and cooperate with "the authorities." *See* ECF No. 19, at 5.  For example, in a post to the popular Bitcoin forum BitcoinTalk dated on or about March 9, 2014, the defendant's alter ego, "Akemashite Omedetou," responded to a comment from a poster asking about the "Shared Coin" feature offered by a mainstream wallet hosting provider, Blockchain.info.  Akemashite Omedetou contrasted "Shared Coin" with his service, Bitcoin Fog, by suggesting that Bitcoin Fog was designed for "washing" bitcoins and noting, negatively, that Blockchain.info would cooperate with authorities: "Blockchain is a public company and is required by law to comply with anti- money laundering laws, as well as revealing user information and logs, should the law require that." *Id.* In another BitcoinTalk posting dated on or about February 9, 2012, Akemashite Omedetou responded to a comment from a poster about using mainstream Bitcoin exchanges to mix virtual currency.  Akemashite stated: "most of them [exchanges] are also run as legitimate, visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities…us on the other hand, the authorities have to find first, which, as Silk Road[5] have [*sic*] demonstrated, can prove problematic."  ECF No. 1-1 at 2.

The success of the defendant's money laundering conspiracy hinged on his ability to remain undetected by "the authorities."  Eschewing the U.S. anti-money laundering laws was integral to the conspiracy.  The defendant's decision not to register with FinCEN or comply with the related regulatory requirements under the Bank Secrecy Act (BSA)—such as verifying his customers' identities, monitoring for suspicious  transactions, and filing Suspicious Activity Reports (SARs), as required by the BSA, *see* Bank Secrecy Act Regulations; Definitions and Other

---

[5] At the time of the post, Silk Road was still operating as the largest darknet marketplace, openly peddling large volumes of illegal narcotics and other criminal goods and services.  The site was seized by law enforcement and its administrator was arrested in 2013.

*Regulations Relating to Money Services Businesses*, 76 Fed. Reg. 43585, 43592 (July 21, 2011)—
is what made Bitcoin Fog such a successful criminal enterprise.

### 5. The Defendant's Counterarguments Lack Merit

The defendant provides few legal authorities to support his venue challenge (at 9-12), and
attempts to cover up the paucity of his arguments with rhetoric about 1776 and the mysteries of
the Internet. Indeed, the defendant seems to suggest that the very concept of venue cannot exist in
cyberspace. *See* ECF No. 46 at 5 ("Assuming one can even properly speak in terms of physical
world locations when it comes to cyberspace."); ("[T]o talk of [the blockchain's] location is to use
a physical analogy and not an expression of empirical reality.") ("Kansas has been digitized,
decentralized, and distributed"). That suggestion is unmoored from any legal authority, and the
defendant fails to explain why crimes committed over the Internet should have no legal venue.

To the extent the defendant offers any specific reason to doubt venue in the District of
Columbia, it seems to be (at 11) that there are "no specific allegations of Mr. Sterlingov's presence
or conduct in D.C." As outlined above, however, none of the government's venue theories relies
on the defendant's physical presence, let alone residence, in the District of Columbia. *See
generally Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 245 (1964) (rejecting as
"erroneous" the argument "that criminal defendants have a constitutionally based right to a trial in
their home districts"). Instead, they rely on the undercover transactions in the District of Columbia
and the defendant's omissions—his failure to obtain D.C. licensure or federal registration—in the
District of Columbia.

The defendant also argues (at 11-12) that the money laundering statute's specific venue provision, 18 U.S.C. § 1956(i), is "unconstitutional as applied."[6]  The defendant's argument—to the extent it can be discerned—appears to be a hand-waving argument about computers and the Internet, presented without any case law or legal authority.  But courts have encountered few difficulties applying traditional criminal statutes and legal concepts to crimes involving virtual currencies.  *See, e.g.*, *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014) (holding that bitcoin qualified as "money" or "funds" under § 1960 and that the defendant's activities in connection with the Silk Road darknet market made him a "money transmitter"); *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020) (holding that bitcoin qualified as "money" under D.C. Money Transmitters Act, and that bitcoin mixing service Helix was an unlicensed money transmitting business under § 1960, explaining that Helix "transmit[tted] to a new location on the blockchain hosted by a different entity, just as a traditional money transmitter's acceptance of funds from one bank account to send to another bank account is transmission to a new location").

Nor is there any reason to believe that the specific venue provision at issue here, § 1956(i), is unconstitutional as applied.  The Supreme Court considered it at length in *Whitfield v. United States*, 543 U.S. 209 (2005), without indicating any doubts as to its constitutionality.  Indeed, it is well-established that Congress has the power to define by statute "where it considered the place of committing the crime to be" by enacting "an express venue provision," just as it can define any other element of a crime.  *Rodriguez-Moreno*, 526 U.S. at 279 n.1 (internal quotations and alteration omitted); *see also United States v. Pendleton*, 658 F.3d 299, 303 (3d Cir. 2011) ("Congress may fix jurisdiction in any district where a 'crucial element' of the crime is

---

[6] The defendant also sweeps the extraterritoriality clause, 18 U.S.C. § 1956(f), into his vague constitutional challenge, but § 1956(f) goes to the scope of the substantive offense, not venue, and it is not necessary for the government's theory of venue in this case.

performed."). The defendant provides no reason for this Court to disregard the "express venue provision," *Rodriguez-Moreno*, 526 U.S. at 279 n.1, contained in § 1956(i). The defendant's vague and unsupported constitutional argument should be rejected.

## C.  Trials are Constitutional in the District of Columbia

The defense argues (at 12) that any criminal trial in the District of Columbia violates the Sixth Amendment, because the District of Columbia is not a state. The defendant does not cite a single case or provide any supporting legal authority, nor does he elaborate on his argument beyond the bare reliance on the word "state" in the Sixth Amendment's vicinage clause. Yet his argument, if true, would sweep away more than two centuries of continuous judicial practice and nullify venue for *any* criminal prosecution in this District. This is a gross misreading of the Sixth Amendment's text and purpose as applied to the District of Columbia.

### 1.  The District of Columbia Is a "State" For Purposes of the Sixth Amendment

First, the District of Columbia should be considered a state for purposes of the Sixth Amendment. The Supreme Court has described the District of Columbia as "'an exceptional community . . . established under the Constitution as the seat of the National Government,'" which is in many respects "*sui generis* in our government structure." *District of Columbia v. Carter*, 409 U.S. 418, 420 (1973) (quoting *District of Columbia v. Murphy*, 314 U.S. 441, 452 (1941)). As the Court further explained:

> Whether the District of Columbia constitutes a State or Territory within the meaning of any particular statutory or constitutional provision depends upon the character and aim of the specific provision involved. Indeed, such words generally have different shades of meaning, and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at, not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed.

*Carter*, 409 U.S. at 420 (internal quotations omitted).  Indeed, in *District of Columbia v. Heller*, 554 U.S. 570, 597 (2008), the Court specifically rejected a variation of the argument now advanced by the defendant: that the use of the word "state" in the Second Amendment made it inapplicable to the District of Columbia.  *See id.* at 597.  To the contrary, the Supreme Court explained that "the word 'state' did not have a single meaning in the Constitution," and construed the text of the Amendment in light of its broader history and purposes.  *Id.*  Similarly, in his 1833 Commentaries on the Constitution, Joseph Story observed that, "the word 'state' is used in various senses [and in] its most enlarged sense it means the people composing a particular nation or community." 1 Story § 208 (cited in *Heller,* 554 U.S. at 597).

Consistent with this broad understanding, the Supreme Court has found that the Sixth Amendment jury right applies on its own terms to the District of Columbia.  *See, e.g.*, *Capital Traction Co. v. Hof*, 174 U.S. 1, 5 (1899) ("It is beyond doubt at the present day that the provisions of the Constitution of the United States securing the right of trial by jury, whether in civil or in criminal cases, are applicable to the District of Columbia.").  In *Callan v. Wilson*, 127 U.S. 540 (1888), the Court relied in part on the Sixth Amendment to overturn a criminal conviction obtained without a jury trial in a "police court" of the District of Columbia.  Writing for the Court, Justice Harlan rejected the argument that the Sixth Amendment applied only to "trial by jury in the states, and nowhere else"—a "position," he stated, that "cannot be sustained without violence to the letter and the spirit of the constitution."  *Id.* at 548.  Instead, "it was taken for granted that the sixth amendment of the constitution secured to the people of the territories the right of trial by jury in criminal prosecutions," and, he reasoned, "[w]e cannot think that the people of this District have, in that regard, less rights than those accorded to the people of the territories of the United States." *Id.* at 550 (citing *Reynolds v. United States*, 98 U.S. 145 (1878)).

This understanding is consistent with the long and continuous practice of criminal prosecutions in the District of Columbia.  *See Ruthenberg v. United States*, 245 U.S. 480, 482 (1918) (relying on "continuous legislative and judicial practice from the beginning" to construe meaning of the Sixth Amendment vicinage clause).  When the Sixth Congress enacted the Organic Act of 1801 to provide for the government of the District of Columbia, *see* 2 Stat. 103, ch. 15, it established the first "circuit court of the district of Columbia," and endowed it with jurisdiction over, *inter alia*, "all crimes and offences committed within said district," *id.* §§ 3, 5.[7]  The circuit court absorbed existing courts in Alexandria, Virginia and Georgetown, Maryland, whose cases were "continued over" into the new federal court.  *Id.* § 14.  The Organic Act further provided for the appointment of a United States Attorney as well as a Marshal, who would "have the custody of the gaols" in the District of Columbia "and be accountable for the safe keeping of all prisoners legally committed therein."  *Id.* §§ 6, 9.  The following year, the Judiciary Act of 1802 established the position of "chief judge of the district of Columbia" to sit on the district court for the District of Columbia, and provided that the district court would exercise "the same powers and jurisdiction which are by law vested in the district courts of the United States."  2 Stat. 156, ch. 31, § 24.[8]

If the defense theory were correct, and the Sixth Amendment operated to limit venue for criminal trials to the "states," then the creation of the District of Columbia in 1801 would have immediately divested the courts within its borders of any power to try criminal cases.  This is, of

---

[7] The Judiciary Act of 1801, enacted earlier in the same year, had established a new federal district court for the "district of Potomac" to be seated in Alexandria, Virginia.  *See* 2 Sta. 89, ch. 4.

[8] See generally D.C. Circuit Historical Society, *The History of the Courts of the D.C. Circuit*, *available at* https://dcchs.org/wp-content/uploads/2018/12/1_History-ilovepdf-compressed-1.pdf (explaining that "Congress has repeatedly reorganized the D.C. courts, reallocating jurisdiction for federal and local matters between the various courts, sometimes unifying the courts, sometimes dividing them").

course, the opposite of how the early Congresses actually treated the question of criminal venue in the District of Columbia when they created a federal court system to operate within the District and explicitly gave it jurisdiction over "all crimes and offences committed within said district." Such early congressional enactments—roughly a decade after the Bill of Rights was ratified in 1791—are especially relevant to understanding the meaning of the Sixth Amendment as it applied in the District of Columbia. *See Heller*, 554 U.S. at 605 (relying on "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification," characterizing these as a "critical tool of constitutional interpretation" in construing Second Amendment); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127-28 (2022) (same). This early history—to say nothing of the two centuries of continuous judicial practice that followed—conclusively refutes the defendant's novel argument.

### 2. The Defendant's Counterarguments Misunderstand the Sixth Amendment Vicinage Clause

The defendant's argument appears to arise from a fundamental misunderstanding of the purpose and history of the Sixth Amendment's vicinage clause. As this history shows, the vicinage clause was not concerned with reserving to the "states" the authority to try criminal cases, but with preserving a specific common-law right to have a jury pool drawn from a particular geographic area. *See United States v. Grisham*, 63 F.3d 1074, 1079 (11th Cir. 1995) ("At common law, a criminal defendant was entitled to a jury drawn from the locality of the crime, usually an English county. In considering amendments to the Constitution, Congress debated whether to provide a guarantee to federal criminal defendants regarding vicinage. . . . The text of the Sixth Amendment represents a compromise: a constraint on the source of the jury was constitutionalized, but the size of the vicinage was left to Congressional determination.").

During the efforts to ratify the U.S. Constitution in the State Ratifying Conventions in 1788, several influential figures raised concerns at the absence of a constitutional requirement that juries be fielded from the vicinity of the trial venue. *See, e.g.,* Patrick Henry, Speech Before the Virginia Ratifying Convention (June 14, 1788), *available at* https://archive.csac.history.wisc.edu/Patrick_Henry_Speech_in_the_Virginia_Convention(2).pdf ("Under this extensive provision . . . Persons accused may be carried from one extremity of the State to another, and be tried not by an impartial jury of the vicinage"). To address these concerns, James Madison introduced what would become the Sixth Amendment. The original text that Madison introduced in the House provided: "The trial of all crimes . . . shall be by an impartial jury of freeholders of the vicinage, with the requisite of unanimity for conviction, of the right of challenge, and other accustomed requisites. . . ." 1 Annals of Cong. 435 (1789). However, this vicinage requirement was viewed as too restrictive by the Senate. Madison observed:

> [The Senate is] equally inflexible in opposing a definition of the *locality* of Juries. The vicinage they contend is either too vague or too strict a term, too vague if depending on limits to be fixed by the pleasure of the law, too strict if limited to the County. It was proposed to insert after the word juries—"with the accustomed requisites"—leaving the definition to be construed according to the judgment of professional men. Even this could not be obtained. The truth is that in most of the States the practice is different, and hence the irreconciliable difference of ideas on the subject. In some States, jurors are drawn from the whole body of the community indiscrim[in]ately; In others, from large districts comprehending a number of Counties; and in a few only from a single County.

Letter from James Madison to Edmund Pendleton, Sept. 23, 1789, *available at* https://founders.archives.gov/documents/Madison/01-12-02-0268. The Madison letters are significant in that they reveal that the Senate was concerned about being too restrictive in the localities from which a jury could be sourced, and made changes intended to *broaden* the Constitutionally permissible vicinage beyond what Madison had proposed. Ultimately, the Senate passed the final version of the Sixth Amendment, which states: "In all criminal prosecutions, the

accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."  U.S. Const. amend. VI.

### 3. Article III, Section 2 Provides an Independent Authorization for Jury Trials in the District of Columbia

In the alternative, even if the Sixth Amendment were held not to apply because the District of Columbia is not a "state," that would not render venue in the District of Columbia unconstitutional.  That is because Article III, section 2 of the Constitution authorizes Congress to specify the venue for crimes not committed within any "State":

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but *when not committed within any State*, the Trial shall be *at such Place or Places as the Congress may by Law have directed*.

U.S. Const. Art. III § 2 cl. 3 (emphasis added).  The relevant venue statutes here, Rule 18, 18 U.S.C. § 3237(a), and 18 U.S.C. § 1956(i), speak in terms of the "district," not state, where the offense was begun, continued, or completed.  This would encompass the judicial district for the District of Columbia.

The Supreme Court invoked Article III, section 2 in early cases involving crimes occurring in U.S. territories or annexed Native American lands.  In doing so, the Supreme Court explained: "The only regulation in the Constitution, as it respects crimes committed out of the limits of a State, is to be found in the 3d art., sec. 2, of the Constitution."  *United States v. Dawson*, 56 U.S. 467, 487 (1854); *see also United States v. Dawson*, 56 U.S. 467, 488 (1854) ("A crime, therefore, committed against the laws of the United States, out of the limits of a State . . . may be tried at such place as Congress shall designate by law."); *Cook v. United States*, 138 U.S. 157, 181-82 (1891) ("The Sixth Amendment added the further guaranty, in respect to the place of trial, that the district should have been previously ascertained by law, leaving the trial of offences not committed

within any State, to be controlled by the second section of article three."). Although it would hardly seem apposite to compare the seat of the federal government to unincorporated territories of the United States, such precedents would support venue under Article III, section 2 in the event this Court were to decide that the Sixth Amendment does not apply in the District of Columbia.

### D.  Count One of the Superseding Indictment Sufficiently Pleads Conspiracy

The defendant challenges (at 12-13) the sufficiency of Count One of the Superseding Indictment, which charges Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h). As the D.C. Circuit has explained, "[t]o be sufficient under the Constitution, an indictment 'need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense.'" *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018) (quoting *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014)). "'[I]t is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Id.* at 130.

Here, Count One of the Superseding Indictment sets forth the conspiracy offense and the predicate offenses that constitute the objects of the conspiracy in language that mirrors the legal and statutory elements. *See* ECF No. 43 (alleging that defendant and co-conspirators "did knowingly and willfully combine, conspire, confederate and agree to commit" violations of the money laundering statute, 18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i)). The indictment contains a plain and concise statement of *who* was involved in the conspiracy (the defendant Roman Sterlingov, "co-conspirators known and unknown," and "darknet vendors and darknet market administrative teams"); *when* the conspiracy occurred ("[f]rom on or about October 27, 2011, and

continuing until at least on or about April 27, 2021"); *where* the conspiracy reached ("in the District of Columbia and elsewhere"); and *how* the conspiracy operated ("through the operation of BITCOIN FOG").  Indeed, language of Count One answers many of the questions raised by the defendant—including the scope of the conspiracy; particularity as to the time, place, and manner of the conspiracy; and the illegal objects of the conspiracy.  Under *Williamson* and related authorities, this is more than sufficient to inform the defendant of the precise offense with which he is charged and to allow him to prepare a defense.  The defendant's challenge should be rejected.

### E.  The Indictment Is Legally and Factually Sufficient

The defendant further argues (at 13) that the entire Superseding Indictment is "insufficient as a matter of law and fact," but it is difficult to understand the basis for this sweeping claim.  The defendant cites no legal authority to support it, and, to the extent he articulates any reasoning at all, it seems to be a vague normative claim that more detail must be needed because this case involves computers.  *See* ECF No. 46, at 13 (arguing that the indictment is insufficient because this is "a complex, novel computer law case . . . that deals with revolutionary information technologies and where almost all the evidence is electronic").  The defendant's premise is hardly accurate—this is a money laundering case, not a "computer law" case, and virtually any complex criminal case in 2022 involves electronic evidence—and he offers no legal support for his contention that Rule 7(c) changes depending on how much technology is involved in the case.

To the contrary, as the D.C. Circuit has made clear: the indictment "need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense."  *Williamson*, 903 F.3d at 130.  As explained more fully in the government's opposition to the motion for a bill of particulars, the Superseding Indictment generally tracks the relevant statutory language, provides basic factual

details, and sufficiently puts the defendant on notice of the charges against him and allows him to prepare a defense.[9]  Nothing further is needed.

### F.  The Defendant's Unexplained "Due Process" Objections Are Meritless

The defendant asserts (at 13) that "all the counts in the Indictment are void" under the Fifth Amendment due process clause, including "constitutional notice, vagueness, ambiguity, and overbreadth grounds."  The defendant does not explain his reasoning or provide any specific points of law or authorities in support of this sweeping, conclusory assertion—and he has waived his opportunity to do so on reply, *see N.Y. Rehabilitation Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (arguments raised for the first time on reply are waived "in order to prevent the 'sandbagging' of another party").  Indeed, the defendant appears to be trying to raise several related but distinct constitutional doctrines under the Fifth Amendment, each with its own legal test and body of case law, *see, e.g.*, *United States v. Lanier*, 520 U.S. 259, 266 (1997) (distinguishing between vagueness, lenity, and retroactivity).[10]  The defendant ignores this complexity, and instead asks the Court to overturn the grand jury's indictment based on nothing more than invocation of legal buzzwords.

In general, a defendant raising one of these doctrines would point to particular statutory word or phrase and explain why he believes it to be vague, ambiguous, or otherwise deficient as

---

[9] In a footnote, the defendant argues (at 13 n.17) that the D.C. Money Transmitters Act violation charged in Count Four is an "unconstitutional strict liability criminal statute," but the general rule of construction is that "where a statute does not specify a heightened mental element such as specific intent, general intent is presumed to be the required element," *United States v. Brown*, 915 F.2d 219, 225 (6th Cir. 1990); *cf. United States v. E-Gold*, 550 F. Supp. 2d 82,  98 (D.D.C. 2008) ("Section 1960 sets forth a general intent crime.").

[10] Overbreadth is yet another distinct doctrine, which arises from the First Amendment and not the Fifth Amendment, and it also has its own set of legal standards—none of which the defendant addresses.  *See United States v. Williams*, 553 U.S. 285, 304 (2008) (distinguishing between vagueness under Fifth Amendment and overbreadth under First Amendment).

applied.  Without knowing the defendant's actual argument, it is impossible to respond.  Suffice it to note, however, that digital currency prosecutions are neither unusual nor novel, and courts in this District have consistently rejected due process objections in similar cases since as early as 2008.  *See, e.g.*, *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008) (rejecting vagueness, lenity, and novel construction challenges to prosecution involving the digital currency company e-Gold under 18 U.S.C. § 1960 and Bank Secrecy Act); *United States v. Harmon*, 2021 WL 1518344 (D.D.C. Apr. 16, 2021) (rejecting vagueness challenge to prosecution of involving the bitcoin mixer Helix under 18 U.S.C. § 1960, Bank Secrecy Act, and D.C. Money Transmitters Act).  The Court should disregard the defendant's conclusory and unexplained "due process" claim.

### G.  The Statute of Limitations Has Not Run on Any of the Continuing Offenses or the 2019 Undercover Transaction Charged in the Superseding Indictment

The defendant argues (at 14-16) that the statute of limitations has run on all four counts. Not so.  Counts One, Three, and Four each allege a continuing course of conduct for the duration of Bitcoin Fog's operational lifespan—from the site's public launch on or about October 27, 2011 through the date of the defendant's arrest on April 27, 2021.[11]  Meanwhile, Count Two arises from a specific money laundering transaction that was executed on or about November 21, 2019.  The original Indictment (June 14, 2021) and Superseding Indictment (July 18, 2022) were plainly returned within the applicable five- and six-year limitations periods.[12]

---

[11] The Tor site for Bitcoin Fog went down following the defendant's arrest and is currently inaccessible.

[12] The government agrees that the applicable limitations periods are five years for each of the federal offenses, pursuant to 18 U.S.C. § 3282, and six years for the D.C. Code offense alleged in Count Four, pursuant to D.C. Code § 23-113(a)(4).

###### 1. Counts One, Three, and Four Charge Continuing Offenses Within the Statute of Limitations

The money laundering conspiracy and illegal money transmitting business offenses alleged in Counts One, Three, and Four are all continuing offenses. *See Monaco*, 194 F.3d at 386 (characterizing "conspiracy to commit money laundering" as a "continuing offense"); *United States v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987) ("The classic example of a continuing offense is conspiracy."); *United States v. Elfgeeh*, 2004 WL 3767299, at *9 (E.D.N.Y. Apr. 13, 2004) (characterizing violations of 18 U.S.C. § 1960 as "continuing offenses"). As the D.C. Circuit explained in *McGoff*, the concept of a "continuing offense" refers to "an unlawful course of conduct that does perdure." 831 F.2d at 1078; *see also United States v. Midstate Horticultural Co.*, 306 U.S. 161, 166 (1939) ("A continuing offense is a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy."). "The other feature displayed by continuing offenses is that the harm done to society through their commission necessarily continues on for as long as the crime is ongoing." *United States v. Morales*, 11 F.3d 915, 921 (9th Cir. 1993) (O'Scannlain, J., concurring in part and dissenting in part).

It is a matter of black-letter law that "the statute of limitations as to prosecutions for continuing offenses runs from the last day of the continuing offense." *McGoff*, 831 F.3d at 1079.[13] Here, Bitcoin Fog operated on an ongoing basis from 2011 up until at least the date of the defendant's arrest on April 27, 2021. Thus, for the conspiracy alleged in Count One and the continuing operation of an illegal money transmitting business alleged in Counts Three and Four,

---

[13] The same rule applies to the D.C. offense alleged under Count Four. As set forth under D.C. Code, "[a]n offense is committed either when every element occurs, or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct, or the defendant's complicity therein, is terminated." D.C. Code § 23-113(b). Accordingly, "[t]ime starts to run on the day after the offense is committed or completed." *Id.*

the statute of limitations only began to run when the defendant's participation in the offense ceased—when he was arrested in 2021.

To the extent the defendant intends to argue that he withdrew from the conspiracy more than five years before his indictment, the Supreme Court has made clear that withdrawal is an affirmative defense on which the defense bears the burden of proof. "Commission of the crime within the statute-of-limitations period is not an element of the conspiracy offense. The Government need not allege the time of the offense in the indictment . . . and it is up to the defendant to raise the limitations defense." *Smith v. United States*, 568 U.S. 106, 112 (2013) (internal citations omitted). Indeed, a defendant's responsibility for a conspiracy "endures even if he is entirely *inactive* after joining it." *Id.* at 114 (emphasis in original). "To withdraw from a conspiracy, an individual must come clean to the authorities or communicate his or her abandonment in a manner reasonably calculated to reach co-conspirators." *United States v. Bostick*, 791 F.3d 127, 143 (D.C. Cir. 2015) (internal citations omitted); *see also United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000) ("[M]ere cessation of activity is not enough to start the running of the statute . . . .") (internal citations omitted). The defendant has not proffered any evidence to show withdrawal from the Bitcoin Fog conspiracy. And it would be improper to dismiss an indictment based on an affirmative defense on which the defendant bears the burden of proof at trial. *See, e.g.*, *United States v. Hoskins*, 73 F. Supp. 3d 154 (D. Conn. 2014) (denying motion to dismiss conspiracy indictment on withdrawal and statute of limitations grounds, explaining that, "[w]here a defendant asserts an affirmative defense that is not plain from the face of the indictment and that he or she bears the burden of proving, there must usually be a factual determination of the merits of the charged offense, which must be made at trial by the jury in the first instance").

### 2. Count Two Charges an Offense Arising from a 2019 Undercover Transaction Within the Statute of Limitations

The defendant also argues (at 15) that the statute of limitations has run on the sting money laundering offense alleged in Count Two. As the Superseding Indictment makes clear, that offense arises from a transaction executed on November 21, 2019. ECF No. 43, at 3; *see also* ECF No. 1-1, at 6 (describing circumstances of "sting" money laundering transaction sent by Bitcoin Fog to an undercover wallet). The defendant claims (at 15) the indictment should have alleged "where Mr. Sterlingov was or what he was doing" at the time of the transaction, but this is an argument about the merits, not an argument that the statute of limitations for the 2019 transaction had expired before the original indictment in 2021.

### H. The Defendant's Underdeveloped First Amendment Argument Is Meritless

Finally, the defendant suggests (at 16) that the Superseding Indictment suffers from some defect under the First Amendment, but the exact nature of the defendant's claim remains a mystery (and he cannot use his reply to supply the necessary explanation). The defendant appears to be suggesting that crimes committed online are constitutionally protected because they are "based on electronic digital information exchanged between networked computers," but this argument, if true, would sweep away all manner of criminal liability involving "information traveling the internet" on First Amendment grounds, including fraud, theft (*e.g.*, theft of cryptocurrencies), drug trafficking, child pornography, criminal copyright infringement, and so forth. There is no legal basis for this absurd outcome.

The fact that the defendant operated a money laundering and money transmitting business that transacted in electronic cryptocurrency, as opposed to fiat currency, is irrelevant. *See, e.g.*, *Harmon*, 474 F. Supp. 3d at 99-109 (applying 18 U.S.C. § 1960 and Bank Secrecy Act to bitcoin

mixer).  Neither of the defendant's inapposite authorities says anything remotely to the contrary.[14]
The defendant's vague invocation of computers and the Internet to conjure up a First Amendment
claim should be rejected.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion to dismiss the Superseding Indictment
should be denied.

---

[14] *Sandvig v. Barr*, 451 F. Supp. 3d 73 (D.D.C. 2020), concerned a pre-enforcement challenge to
the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, brought by two researchers who
were planning to test whether employment websites discriminated on the basis of race and gender
by submitting fake employment applications, in arguable violation of the websites' terms of
service.  *Id.* at 76.  The defendant, however, misunderstands the nature of the First Amendment
interest at stake in *Sandvig*.  The conduct for which the researchers claimed First Amendment
protection was their "research," not the mere sending of signals over the Internet.  *See id.* at 80-
81.  The defendant does not identify any comparable research or similar conduct in operating
Bitcoin Fog that he could characterize as constitutionally protected "speech."  Meanwhile, *Elonis
v. United States*, 575 U.S. 723 (2015), is even farther afield.  *Elonis* addressed the mens rea
requirement to convict a defendant of transmitting threats in interstate commerce; it did not suggest
that the mere fact that a threat was transmitted over the Internet, by itself, transforms otherwise
unprotected conduct into First Amendment speech.  *Id.* at 726.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
C. Alden Pelker, Maryland Bar
Trial Attorney, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007
Catherine.Pelker@usdoj.gov