**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR RELEASE OF SEIZED ASSETS**

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully files its opposition to "Defendant Roman Sterlingov's Pretrial Motion to Free Seized Assets," ECF No. 48.

In this case, a Magistrate Judge has signed a probable cause warrant for seizure of the funds at issue, necessarily finding probable cause both "(1) that the defendant has committed an offense permitting forfeiture"—namely, money laundering offenses and operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 1960—and "(2) that the property at issue has the requisite connection to that crime." *Kaley v. United States*, 571 U.S. 320, 323-24 (2014) (internal quotations omitted). Two separate grand juries have found probable cause that the defendant violated 18 U.S.C. § 1956 and 18 U.S.C. § 1960, offenses for which forfeiture is, by statute, "mandatory." *United States v. Viloski*, 814 F.3d 104, 111 n.11 (2d Cir. 2016). *See* ECF Nos. 8, 43. The grand jury likewise included a Forfeiture Allegation identifying the specific funds at issue in its Superseding Indictment.

The Federal Rules of Criminal Procedure provide a mechanism for litigation over the forfeitability of seized property in the normal course "[a]s soon as practical after a verdict" or other disposition on the "count in an indictment . . . regarding which criminal forfeiture is sought." Fed.

R. Crim. P. 32.2(b)(1)(A).  Rule 32.2 presumes that the Court will, post-conviction, "determine what property is subject to forfeiture" and "whether the government has established the requisite nexus between the property and the offense."  *Id.*  There is a carefully limited exception to this procedure if the funds are genuinely needed to pay for the defendant's counsel of choice—but only after the defendant satisfies a threshold burden of establishing financial need.  *See United States v. E-Gold*, 521 F.3d 411 (D.C. Cir. 2008).  And even if the defendant carries his burden, he has no right to the seized property so long as there is probable cause to believe the property is subject to forfeiture.  *See United States v. Monsanto*, 491 U.S. 600, 615-16 (1989)

The defendant's motion, while long on bluster, ignores the established legal framework, confuses basic facts, and fails at both steps of the legal analysis.  The defendant's motion should be denied—first, because the defendant has disclosed nothing about his financial assets or legal expenses and has not carried his threshold burden; and second, because ample probable cause supports forfeiture of the funds at issue.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

The defendant was charged by criminal complaint in the District of Columbia on April 26, 2021, on charges of Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).  He was arrested on April 27, 2021, at Los Angeles International Airport upon his arrival in the United States on an international flight arriving from Moscow.

---

[1] The facts of this case have been summarized in its other submissions, including the Government's Opposition to Defendant's Motion To Revoke Detention Order, ECF No. 19, which are incorporated by reference herein.

### A.  Arrest, Initial Appearance, and Detention

The defendant was presented on April 27, 2021, for his Initial Appearance before Magistrate Judge Paul L. Abrams in the Central District of California.[2]  A detention hearing was held in the Central District of California on May 6, 2021.  After reviewing the parties' written submissions and the Pretrial Services interview report and hearing oral argument, Magistrate Judge Abrams ordered the defendant detained without bond and transported to the District of Columbia for further proceedings.

### B.  Search Warrant for Defendant's Luggage and Devices

Meanwhile, the defendant's luggage and electronic devices were subject to an inventory search, transported to the District of Columbia, and then searched pursuant to a search warrant issued by Magistrate Judge Harvey on April 30, 2021.  *See* Ex. 1 (Apr. 30, 2021 Search Warrant for defendant's seized luggage and electronic devices).  Among other things, agents executing the search warrant recovered bitcoin debit cards, multiple laptops, Raspberry Pi microcomputers, approximately 15 SD memory cards, mobile phones, and an unusual cellular modem device that appears to be designed to combine up to four separate cellular Internet connections in order to anonymize a computer's Internet traffic or connections to other servers.

Contrary to the defendant's inaccurate assertions (at 6, 12, 20-21), the government did not seize any cryptocurrency or other assets pursuant to the April 30, 2021 search warrant.

---

[2] Consistent with ordinary practice in this District, the arrest warrant and criminal complaint were sealed "until the arrest of the defendant."  ECF No. 4.  On April 27, 2021, the arrest warrant return was filed with the Clerk's Office.  The case was automatically unsealed and became available on the Court's public docket.  Contrary to the defendant's insinuation (at 10) that there was anything "[c]urious[]" about initial press reporting of the arrest, it appears to have been prompted by a tip from a well-known PACER watcher.  *See* https://twitter.com/a_greenberg/status/ 1387171433709776899 (crediting Seamus Hughes with tip about defendant's arrest).

### C.  Government Is Contacted by Attorney Maksim Nemtsev, Who Does Not Identify Himself as Defendant's Attorney

Following the defendant's arrest, the government was contacted on or about April 29, 2021, and on a handful of occasions thereafter by a Boston-based criminal defense attorney, Maksim Nemtsev.  When asked if he was acting as the defendant's attorney, Mr. Nemtsev represented to the government that he was not the defendant's attorney but was considering the representation, and stated that he was working on behalf of the defendant's "family."  Mr. Nemtsev asked about recovering the keys to the defendant's Tesla automobile, which were on the defendant's person and seized at the time of his arrest.  Mr. Nemtsev also inquired about Mr. Sterlingov's whereabouts during his detention in the Central District of California and transportation to the District of Columbia.  The government did not understand Mr. Nemtsev to be retained by the defendant at this time.

### D. Seizure Warrant to Kraken

On June 9, 2021, the government obtained a seizure warrant issued by Magistrate Judge Meriweather for two of the defendant's accounts at the virtual currency exchange Kraken.  Upon service of the original seizure warrant, Kraken informed the government that one of the account numbers listed in the original warrant was missing a digit.  The government obtained a replacement warrant on June 17, 2021.  *See* Ex. 2 (June 17, 2021 Seizure Warrant for defendant's Kraken accounts).[3]  The Kraken seizure warrant authorized the seizure of the accounts on the ground that they were subject to forfeiture as property "involved in" the defendant's money laundering and

---

[3] The government produced the original warrant package in its earlier discovery productions but inadvertently omitted the replacement seizure warrant, which was produced in a supplemental production on August 23, 2022.  Other than correcting the account number for one of the accounts, the replacement seizure warrant affidavit was identical to the original warrant affidavit.

unlicensed money transmitting business offenses, pursuant to the criminal and civil forfeiture provisions in 18 U.S.C. § 982(a)(1) (criminal) and 18 U.S.C. § 981(a)(1)(A) (civil).

Kraken provided the seized funds on or about July 7, 2021, in the following amounts:[4]

- $349,625.72 in U.S. dollars;

- 0.10877 Bitcoin (BTC), valued at approximately $3,759.19 at the time of the seizure;

- 205.9625 Ethereum (ETH), valued at approximately $484,349.65 at the time of the seizure;

- 9,371.52683 Stellar (XLM), valued at approximately $8,026.79 at the time of the seizure; and

- 35.9998 Monero (XMR), valued at approximately $2,450.41 at the time of the seizure.

### E.  Indictment and Subsequent Procedural History

While the defendant was in transit to the District of Columbia, on June 14, 2021, a federal grand jury in the District of Columbia returned an Indictment against him on charges of Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).  *See* ECF No. 8.  The original Indictment contained a Forfeiture Allegation, which provided notice pursuant to Fed. R. Crim. P. 32.2(a) that the government would seek forfeiture pursuant to 18 U.S.C. § 982(a)(1) of "any property, real or personal, involved in" the defendant's violations of 18 U.S.C. § 1956 and 18 U.S.C. § 1960, as well as "any property traceable thereto."  *Id.* at 3.

---

[4] The defendant complains (at 17) that the seized cryptocurrencies have "lost substantial value" in the past year (as have virtually all cryptocurrencies), but the defense has never raised this issue in communications with the government.  Should the defense so wish, the government is willing to discuss seeking an interlocutory sale order for the seized cryptocurrencies pursuant to Fed. R. Crim. P. 32.2(b)(7).

The defendant was presented before Magistrate Judge Meriweather for his Initial Appearance in the District of Columbia and was arraigned on the Indictment on June 23, 2021. He was appointed defense counsel from the Office of the Federal Public Defender for the District of Columbia.  In a subsequent conversation with the defendant's appointed counsel, government counsel raised the topic of Mr. Nemtsev and was informed that (to his then-counsel's knowledge) she was the sole defense attorney on the case.

During the course of the government's ongoing investigation into the Bitcoin Fog money laundering conspiracy, the government discovered that the defendant held an account at the cryptocurrency exchange Binance containing proceeds of Bitcoin Fog.  The government identified transfers out of this account in July 2021 to a then-unidentified Kraken account in the amount of approximately 1.65 BTC, worth approximately $54,550 at the time.  Following up on these transfers, the government learned that the receiving account at Kraken belonged to the Boston attorney Maksim Nemtsev.  After discovering the identity of the recipient, the government did not further investigate this lead, and informed defense counsel in a discovery letter that it had discovered the transfers to "an attorney whom we understood the defendant considered retaining" but was not producing the attorney's Kraken account records in discovery.  *See* Ex. 3 (May 11, 2022 Discovery Letter).

### F.  The Superseding Indictment

On July 18, 2022, a second federal grand jury in the District of Columbia returned a Superseding Indictment against the defendant.  In addition to the original three charges, the Superseding Indictment added one count of Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h).  *See* ECF No. 43.  Like the original Indictment, the Superseding Indictment contained a Forfeiture Allegation, which provided notice pursuant to Fed. R. Crim. P. 32.2(a) that

the government would seek forfeiture pursuant to 18 U.S.C. § 982(a)(1) of "any property, real or personal, involved in" the defendant's violations of 18 U.S.C. § 1956 and 18 U.S.C. § 1960, as well as "any property traceable thereto." *Id.* at 5.  It also listed specific properties that were subject to forfeiture, comprising the funds seized from Kraken, as well as the (unseized) bitcoin held in the Bitcoin Fog wallet, which was identified by a listed root address.

### G.  The Government Belatedly Learns Mr. Nemtsev Is Acting as Defendant's Counsel

Prompted by the defendant's interview with two reporters published on August 2, 2022— apparently timed to coincide with the filing of the defense motions as part of defense counsel's public relations campaign—the government has sought discovery of the defendant's non-privileged jail communications.  Before reviewing the content of those communications, the government identified that some of the communications involved Mr. Nemtsev.

On August 12, 2022, undersigned counsel for the government contacted Mr. Nemtsev to ask if he was acting as the defendant's attorney, in order to determine whether Mr. Nemtsev's communications should be subject to a filter review.  Mr. Nemtsev stated that he was the defendant's attorney.  He stated further that, while he had not entered an appearance in the case and was not ghost-writing motions, he considered himself a part of the defense team and anticipated reviewing discovery and otherwise participating in the case.  He confirmed that he had not previously informed the government of his representation.  In a follow-up email communication, Mr. Nemtsev stated that he began acting as the defendant's attorney as early as April 29, 2021.

### LEGAL FRAMEWORK

The Supreme Court has long recognized that there is a "strong governmental interest in obtaining full recovery of all forfeitable assets." *Caplin & Drysdale, Chartered v. United States*,

491 U.S. 617, 631 (1989).  This interest "overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense."  *Id.* at 631.  As the Court explained:

> A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his; the Government does not violate the Sixth Amendment if it seizes the robbery proceeds and refuses to permit the defendant to use them to pay for his defense.

*Id.* at 626.  Accordingly, the government can properly restrain property before trial as long as there is probable cause to believe the assets are subject to forfeiture.  *United States v. Monsanto*, 491 U.S. 600, 615-16 (1989).  Where such probable cause exists, a criminal defendant has no right to the restrained property.

Under the Federal Rules of Criminal Procedure, litigation over issues of forfeitability normally occurs following conviction at trial or by plea.  *See* Fed. R. Crim. P. 32.2(b)(1)(A)-(B) (describing "Forfeiture Phase of the Trial," to be held "[a]s soon as practical after a verdict or finding of guilty . . . on any count in an indictment or information regarding which criminal forfeiture is sought"); *see also United States v. Bikundi*, 125 F. Supp. 3d 178, 184  (D.D.C. 2015) ("Once the government has obtained a seizure warrant pursuant to 21 U.S.C. § 853(f), the Federal Rules of Criminal Procedure provide for no further inquiry into the property's forfeitability until disposition of the criminal charges on which the forfeiture is predicated.").  The post-trial procedure set forth in the Rules makes sense under most circumstances—if the defendant is acquitted, there is no need to burden the Court or the trial jury with questions about the forfeitability of individual properties, or to adjudicate potential third-party claims of ownership over the property forfeited from the defendant.  But some courts, including the D.C. Circuit, have found that due process may require an earlier, pretrial proceeding if the defendant needs the

restrained property to pay for his counsel of choice at trial. *See United States v. E-Gold*, 521 F.3d 411 (D.C. Cir. 2008); *see also United States v. Monsanto*, 924 F.2d 1186, 1192-98 (2d Cir. 1991) (en banc) ("*Monsanto II*"). These courts have recognized a *qualified* right to a pretrial probable cause hearing—sometimes called a "*Monsanto* hearing"—at which a defendant who demonstrates the need for funds to retain his counsel of choice can litigate whether there is probable cause for forfeiture of those funds.

The right to a pretrial hearing is not absolute. The defendant bears a threshold burden of establishing financial need to use the funds for counsel of choice. "Every court that has addressed the issue has found that a defendant's merely conclusory allegation that he lacks the funds to retain counsel of choice is insufficient to trigger the need for a *Monsanto* hearing; in order to obtain a hearing the defendant must present some evidence that he will be deprived of counsel of choice if he cannot access the seized assets." *United States v. Emor*, 794 F. Supp. 2d 143, 149 (D.D.C. 2011) (collecting cases); *see also, e.g.*, *E-Gold*, 521 F.3d at 417, 421 (defendant has right to hearing where "need is clearly established," and where "access to assets is necessary for an effective exercise of the Sixth Amendment right to counsel"); *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998) (defendant "bears the burden of persuasion" of "demonstrat[ing] to the court's satisfaction that she has no assets, other than those restrained, with which to retain private counsel and provide for herself and her family"); *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993) ("To determine whether a hearing is required, the court must decide whether the moving papers filed, including affidavits, are 'sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.'"). That is because the defendant's entitlement to a pretrial hearing arises out of the due process balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976). "If a defendant fails to persuade the court on this point [*i.e.*,

financial need], then the private interest of the *Mathews* calculus drops out of the picture, tipping the balance of interests against a post-restraint hearing." *Jones*, 160 F.3d at 647.  The defendant's threshold burden is not just a procedural formality, but an integral part of the legal standard to justify a pretrial probable cause hearing.

Further, the scope of any pretrial hearing is strictly limited to the nexus between the property and the offense giving rise to forfeiture.  As the Supreme Court explained in *Kaley v. United States*, probable cause to believe property is subject to forfeiture reflects two findings: "(1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime."  571 U.S. at 323-24.  *Kaley* held that, in an indicted case (as here), the grand jury's determination of probable cause that the defendant committed the offense "is conclusive" and cannot be challenged in a pretrial *Monsanto* hearing.  *Id.* at 322, 331. *Kaley* left open the door for a pretrial hearing limited only to the second question—whether the property at issue is traceable to the offense.  *See id.* a 324 & n.3.

Thus, a *Monsanto* proceeding requires two steps:  first, the defendant bears the burden of establishing that he lacks other resources and that the funds will be used for counsel of choice; and second, if the defendant satisfies his burden, then he may litigate whether there is probable cause to support the requisite connection between the seized property and the crime.[5]

---

[5] Courts are not in agreement as to who bears the burden of proof, but even assuming *arguendo* that the government bears the burden of establishing probable cause as to the connection between the property and the crime, that standard is easily met on the facts here.  *Compare United States v. Bonventre*, 720 F.3d 126, 131 (2d Cir. 2013) (government bears "relatively modest burden"); *with Jones*, 274 F.3d at 805 (defendant bears burden and has "opportunity . . . to prove by a preponderance of the evidence that the government seized untainted assets without probable cause").  In *E-Gold*, the D.C. Circuit did not directly rule on the issue, but seemed to assume without holding that the defendant would bear the burden.  *See* 521 F.3d at 418 ("It would seem apparent that a *successful showing by defendants at such a hearing* provides potential protection against the quasi-temporary but effectively permanent deprivation of assets required by the

If the defendant carries his threshold burden, courts have established the following parameters for a *Monsanto* proceeding:

- The legal standard is probable cause. *Monsanto*, 491 U.S. at 615-16. "Circumstantial evidence and inferences therefrom are good grounds for a finding of probable cause in a forfeiture proceeding." *United States v. Brock*, 747 F.2d 761, 763 (D.C. Cir. 1984) (per curiam).

- The Federal Rules of Evidence do not apply, and hearsay may be relied on to establish probable cause. *See United States v. Walsh*, 712 F.3d 119, 124-25 (2d Cir. 2013); *Monsanto II*, 924 F.32d at 1198.

- Courts accept submission of an affidavit to establish probable cause prior to the *Monsanto* hearing. *See United States v. Dupree*, 2011 WL 3235637, at *3, 6 n.2 (E.D.N.Y. July 27, 2011) (permitting government to satisfy its burden at a *Monsanto* hearing by submitting a pre-hearing affidavit); *United States v. Clarkson Auto Electric, Inc.*, 2012 WL 345911, at *1, 3 (W.D.N.Y. Feb. 1, 2012) (same), *aff'd*, *United States v. LaVilla*, 553 F. App'x 45 (2d Cir. 2014); *United States v. Contents of Accounts*, 2010 WL 2556849, at *11 (W.D. Ky. June 8, 2010) (submission of agent's affidavit met the government's initial burden at the *Monsanto* hearing); *cf. United States v. $40,000*, 763 F. Supp. 1423, 1428 (S.D. Ohio 1991) (information provided in affidavit, which was hearsay, supported finding of probable cause for forfeiture). Courts typically require that the affiant be made available for cross-examination. *See Dupree*, 2011 WL 3235637, *7 (cross-examination provided the defendant with the opportunity to challenge government's establishment of probable cause

_____

defendants for an effective exercise of their Sixth Amendment right to counsel.") (emphasis added).

via affidavit); *Clarkson Auto*, 2012 WL 345911, *2, 4 (defendant was given opportunity to cross-examine the government's affiant).  In cases where the government's affidavit made a clear showing, courts have found probable cause existed prior to the *Monsanto* hearing.  *See Dupree*, 2011 WL 3235637, *6 (affidavit established probable cause as to the forfeitability of the funds); *Contents of Accounts*, 2010 WL 2556849, *11 (submission of agent's affidavit met the government's initial burden at the *Monsanto* hearing to establish probable cause).  In these cases, the *Monsanto* hearing was limited to cross-examination of the affiant or the presentation of evidence by the defendant.  *See Dupree*, 2011 WL 3235637, *6-7 (given that court found affidavit established probable cause, *Monsanto* hearing was limited to cross-examination and presentation of evidence or testimony by defendant); *Contents of Accounts*, 2010 WL 2556849, *11 (defendant was required to call and question witnesses, or offer other relevant testimony or evidence to attack the facts supporting the initial finding of probable cause).[6]

## **ARGUMENT**

### A.  The Defendant Has Not Carried Burden of Establishing Financial Need

The defendant's motion fails under the first step of analysis, because he has not offered anything to substantiate his financial need other than a conclusory assertion in his brief, through counsel (at 25), that he "has nothing to pay his legal fees except for the seized assets."  This vague

---

[6] The government does not believe that Rule 26.2 applies to a pretrial *Monsanto* hearing.  The plain text of Fed. R. Crim. P. 26.2 provides an exhaustive list of pretrial and post-trial proceedings to which it applies, and *Monsanto* hearings are not among the enumerated list.  Nor is there any basis to extend Rule 26.2 by judicial fiat to *Monsanto* hearings, especially in light of the Supreme Court's expressed concern in *Kaley* about balancing the defendant's right to such a pretrial hearing against the "burdens that a requested procedure would impose on the Government," including the use of a probable cause hearing to engage in discovery about the government's witnesses and evidence, 571 U.S. at 333-35.

assertion—which does not even identify *which* seized assets he is referring to, or in what amounts—falls well short of the legal standard necessary to trigger a *Monsanto* hearing.

The defendant's single-sentence assertion falls patently short of the adequate showings in, for instance, *E-Gold*. There, a defendant demonstrated that he had no assets available to obtain counsel by submitting an affidavit "detailing his status as a potential beneficiary of a trust, his lack of other sources of income, his liquid and non-liquid assets (including cars), his debts (including credit cards and monthly rent), his wife's income, and his dependents and assets held in the name of the dependents," and another defendant did so with an affidavit showing "his monthly expenses, gross and net income from his law practice, all assets and their values, as well as his other outstanding debts." *United States v. Edwards*, 856 F. Supp. 2d 42, 45 (D.D.C. 2012) (recounting facts in *E-Gold*); *see also Bikundi*, 125 F. Supp. 3d at 190 ("Through exhibits and representations . . . the defendant has presented evidence that he is unable to pay his utility bills, such that he must rely on borrowed funds to do so, and property taxes, such that his home is subject to a tax sale . . . . Defendant likewise has presented evidence that he is unable to pay for his children's preschool education and has recently lost private insurance coverage.").

The defendant's assertion also falls short of what Judge Sullivan found inadequate in *United States v. Sullivan*, 575 F. Supp. 3d 1 (D.D.C. 2021), *reconsideration denied*, 2022 WL 3027007 (D.D.C. Aug. 1, 2022). In that case, the defendant (who was seeking return of seized funds for living expenses, as opposed to legal fees) submitted a personal "declaration" to the Court summarizing his monthly household needs and a "partial" listing of sources of income. *Id.* at 5. Without further information about the defendant's employment, other sources of income, or "the value of any assets he may have," Judge Sullivan found that he "cannot determine whether Mr. Sullivan lacks the funds necessary to provide for his household needs, or whether he is presently

able to pay his monthly expenses via other methods." *Id.* at 6.   Judge Sullivan also faulted the defendant for failing to address discrepancies between his declaration and the Pretrial Services report documenting the defendant's ownership of multiple vehicles and "'significant funds in unspecified bank accounts.'" *Id.* (quoting government motion).

The defendant's assertion falls short even of what Judge Kollar-Kotelly deemed "undoubtedly inadequate" in *Edwards*, where the defendant personally attested in a sworn declaration that "'[b]eyond the money seized, I do not have any available funds to pay Attorney Balarezo's retainer.'"  856 F. Supp. 2d at 45.   Judge Kollar-Kotelly noted that *Emor* had likewise rejected as insufficient a more detailed declaration by a defendant asserting "that he lacks any income or investments, that his spouse is not employed, that he has six dependents, and that he has only between $22,000 and $50,000 in cash on hand or money in savings or checking accounts." *Id.*; *cf. Emor*, 794 F. Supp. 2d at 149-50 (concluding that the "bare-bones" declaration left the record "bare of any evidence suggesting that Mr. Emor's defense is endangered by a lack of funds").   As Judge Kollar-Kotelly explained, Edwards "failed to provide any detailed information as to his assets, liabilities, and sources of income," including his "ability to use other assets, liquid and non-liquid, to pay his legal fees."  856 F. Supp. 2d at 45-46.   And Edwards likewise "failed to provide any information regarding funds previously paid to his counsel, and any additional funds that counsel is requesting in order to proceed to trial in this matter," meaning there was "simply not enough information in the record for the Court to find Defendant cannot retain counsel without the seized assets."  *Id.*; *see also United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998) (affirming ruling that defendant failed to show need to use restrained assets in his defense where he submitted a "bare-bones affidavit" with no information regarding whether "other members of his family would fund his defense"); *United States v. Jamieson*, 189 F. Supp. 2d 754, 757 (N.D.

Ohio 2002) (defendant must show he has no access to funds "from family and friends"); *United States v. Hernandez-Gonzalez*, 2017 WL 2954676, at *6–7 (S.D. Fla. June 26, 2017) ("Complete financial disclosure requires that the Defendant identify his assets, liabilities, sources of income, net worth, whether he has access to financial accounts, and the expected costs of his defense team," and why "his family members . . . are unable to help pay for defense costs.").

Here, the defendant has submitted no declaration, financial affidavit, or bank statements. He has provided no information about any of his financial accounts, such as cryptocurrency exchange accounts or overseas financial accounts in Russia, Sweden, or other European countries. He has provided no information about assets such as gold, unhosted cryptocurrency wallets, or any other property to which he may have access.  He has remained studiously vague about his employment and sources of income—both in his motion and in his jailhouse interview with WIRED reporters.  *See* Lily Hay Newman & Andy Greenberg, *Bitcoin Case Could Put Cryptocurrency Tracing on Trial*, WIRED (Aug. 2, 2022), *available at* https://www.wired.com/story/bitcoin-fog-roman-sterlingov-blockchain-analysis/.

Indeed, in the defendant's own pleading, he admits (at 21) that he "has a couple of BTC accounts with different providers"—but does not explain how many accounts he has, with what providers, or what the current balance is for each account.[7]  As noted above, the defendant holds an account at the cryptocurrency exchange  Binance, which he used to direct payment of more than $50,000 to one of his attorneys, Mr. Nemtsev, in 2021.  He holds an account at the cryptocurrency

---

[7] In discussions with undersigned counsel for the government, defense counsel indicated that the defendant needed his seized mobile phone to access unspecified financial accounts.  The government pointed out that merely seizing the phone pursuant to search warrant did not effectuate a seizure of any financial accounts the phone was used to access.  The government has also turned over in discovery a forensic image of the defendant's primary mobile phone, providing the defendant and his counsel with copies of any passwords or other information saved on the phone.

exchange Bitfinex, which was active through at least 2020.  In text messages, the defendant told

an associate in April 2020 that he held an unspecified amount of gold "hidden" away, and

explained that he was interested in gold because "there seems to be no country that requires to

report it."  *See* 4 (excerpts from WhatsApp chats recovered from defendant's electronics).  These

facts raise serious questions about whether the defendant has adequately disclosed his financial

assets other than the seized Kraken funds (both in the instant motion and in seeking and obtaining

a Court-appointed public defender).

        Nor has the defendant accounted for his past and anticipated future legal expenses.  He has

not, for example, explained his current defense counsel's billing rates or provided any estimate of

his anticipated defense costs.  He claims (at 25) that "[w]ithout the seized assets, Mr. Sterlingov is

not able to retain counsel of his choice," but that claim is inconsistent with the fact that he has been

retaining Mr. Nemtsev, on a paid basis, since at least April 29, 2021.  Moreover, the failure to

acknowledge Mr. Nemtsev's retention—in communications with the government or in his filed

motion to the Court—raises questions about the defendant's candor in bringing this motion.

Further, the defendant's defense attorneys are actively soliciting "donations" to pay the

defendant's legal bills, including a bitcoin donation wallet which (to date) has received donations

of bitcoin valued at approximately $23,301 at the time of the deposits.  It is far from clear that

defense counsel would actually withdraw from the case without the seized funds.  While there is

nothing wrong with retaining multiple defense attorneys or soliciting donations, the defendant's

failure to disclose any of this—along with the absence of any accounting for his legal expenses—

raises questions about whether the defendant can, in fact, establish that he "will be deprived of

counsel of choice if he cannot access the seized assets."  *Emor*, 794 F. Supp. 2d at 149.  The

defendant must provide something more than a conclusory one-line assertion in a brief that the seized assets are necessary for him to retain his counsel of choice.

In short, the defendant bears a substantive burden of establishing that he needs the seized funds to pay for his counsel of choice, and his conclusory assertions fall well short.

## B. The Seized Funds Were Involved in Bitcoin Fog and Are Properly Subject to Forfeiture

As Magistrate Judge Meriweather has already found in issuing the Kraken seizure warrant, ample probable cause supports the seizure of the defendant's Kraken accounts as property "involved in" his money laundering and unlicensed money transmitting business offenses. Even if the defendant could carry his threshold burden, his motion would fail at the second step of the analysis, as the seized funds are subject to seizure and forfeiture under well-established law and considerable probable cause.

### 1. Broad Forfeiture Authority Supports Seizure of Any Funds "Involved In" and "Traceable To" Operation of Bitcoin Fog

The relevant forfeiture statute provides for broad and mandatory forfeiture of not just criminal proceeds, but any property "involved in" the defendant's money laundering and unlicensed money transmitting business offenses, including assets "traceable to" the tainted property:

> The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

18 U.S.C. § 982(a)(1). Courts have repeatedly affirmed the broad forfeiture authority under this statute.

Operation of an unlicensed money transmitting business in violation of § 1960 is considered a "continuing offense." *United States v. Elfgeeh*, 2004 WL 3767299, at *9 (E.D.N.Y.

Apr. 13, 2004).  Because the offense encompasses the entire operation of the illegal business, forfeiture of any property "involved in" the offense is similarly broad—including any property involved in the business as a whole, regardless of its purpose or whether it was involved in specific transactions.  *See, e.g.*, *United States v. Elfgeeh*, 515 F.3d 100, 122, 138-39 (2d Cir. 2008) ("all assets that passed through" account belonging to unlicensed hawala were subject to forfeiture); *United States v. 50.44 Bitcoins*, 2016 WL 3049166, at *2 (D. Md. May 31, 2016) (bitcoins seized from married couple that operated unlicensed Darknet virtual currency exchange were subject to forfeiture "[b]ecause the business operated by [the defendants] . . . was not registered to transmit money as required by state and federal law"); *United States v. $829,442.42 in U.S. Currency*, 2013 WL 2446486, at *8-9 (D. Conn. June 5, 2013) (bank accounts belonging to unlicensed money transmitting business were subject to forfeiture in their entirety); *United States v. $715,031.27*, 587 F. Supp. 2d 1275, 1276-78 (N.D. Ga. 2008) ("entire" bank accounts belonging to unlicensed money transmitting business were subject to forfeiture).

Similarly, "[m]oney laundering forfeiture pursuant to § 982(a)(1) applies to a larger class of property than proceeds forfeiture."  *United States v. Coffman*, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012).  Property involved in a money laundering offense includes "the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense."  *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (internal citation omitted).

In this case, the defendant is charged with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).  "[C]onspiracy" is a "classic example of a continuing offense."  *United States v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987); *see also United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999) (characterizing "conspiracy to commit money laundering" as a "continuing

offense"). Courts have construed § 982(a)(1) to require forfeiture of all of a conspiracy's transactions or assets in situations, as here, where the conspiracy took the form of a business overwhelmingly geared toward facilitating illegal transactions. *See, e.g.*, *United States v. Baker*, 227 F.3d 955, 969-70 (7th Cir. 2000) ("Specifically, . . . *all* of the funds from Baker's prostitution business over the years—both the proceeds from credit card and ATM transactions and other proceeds—were illegal, and as a result Baker laundered all of them. All of these funds were thus 'involved in' the money laundering conspiracy, not just the specific credit card transactions the government proved were for prostitution services and not just the specific monies the government proved were laundered."); *United States v. Garza-Gonzalez*, 512 F. App'x 60, 67 (2d Cir. Feb. 21, 2013) (unpublished) ("Datta used his perfume business to conceal the fact that he was laundering the proceeds of drug transactions, and the district court did not err in viewing the business's cash receipts during the period in question as 'property . . . involved in' Datta's conspiracy to violate § 1956. Those cash receipts, including the $7 million in drug money, totaled $29,505,265."); *United States v. Coffman*, 859 F. Supp. 2d 871, 879 (E.D. Ky. 2012) ("[T]he conspiracy to commit money laundering conviction . . . is not based on or limited to specific transactions, but encompasses the whole of Coffman's scheme and his attempts and plans to conceal and disguise the nature, location, source, ownership and control of the proceeds of the fraud."); *United States v. Swank Corp.*, 797 F. Supp. 497, 502 (E.D. Va. 1992) ("The ability to forfeit a business entity which is used to facilitate the offense of money laundering is well established.").

As Chief Judge Howell explained in the Helix bitcoin mixer case:

[P]roperty need not be directly derived from the predicate unlawful activity to be forfeitable, as the statute covers any property "involved in" the ongoing conspiracy. Where, as here, the conspiracy takes the form of a business, all funds flowing through the business that "bankroll" or otherwise facilitate the alleged conspiracy are "involved in" it. Thus, any untainted funds used as "seed" money to start Helix or to run Grams, Helix's companion service, were used to further Helix's core

> business, which was cleaning bitcoins used in Darknet drug purchases.  Finally, to the extent some of Helix's business came from transactions unrelated to drug activity, the fees from those transactions remain forfeitable because the evidence suggests that "the business as a whole was overwhelmingly devoted to" transactions from Darknet markets, which, in turn, overwhelmingly deal in drugs.

*United States v. Harmon*, 474 F. Supp. 3d 76, 85 n.5 (D.D.C. 2020) (internal citations omitted).

The same analysis applies here.  Bitcoin Fog was designed, advertised, and operated as a service to conceal and obfuscate transactions from lawful authorities.  Bitcoin Fog in fact facilitated an enormous volume of transactions with Darknet markets primarily trafficking in illegal drugs, including more than $78 million in transactions *directly* to or from such illicit markets.  ECF No. 1-1, at 2-5; ECF No. 19, at 1-13.  Any fees, income, profits, or operating capital that the defendant received from Bitcoin Fog fall easily within the broad forfeiture authority for any property "involved in" his operation of Bitcoin Fog.

## 2.   The Seized Kraken Funds Are Traceable to Bitcoin Fog

As the Supreme Court held in *Kaley*, the grand jury's finding of probable cause is "conclusive" and, consequently, "[a] defendant has no right to judicial review of a grand jury's determination of probable cause to think a defendant committed a crime" on a motion for return of seized funds.  *Kaley*, 571 U.S. at 331, 333.  Here, that means the Court must treat as conclusive the probable cause findings of *two* separate grand juries, which found the defendant responsible for operating Bitcoin Fog in violation of federal money laundering and unlicensed money transmitting business laws.   Accordingly, the defendant's various merits arguments and protestations of innocence are irrelevant—for the grand juries have spoken—and the Court should disregard the improper attempt to use this motion as a vehicle to litigate the merits of the case.[8]

---

[8] The government has addressed the defendant's merits arguments, including the unpersuasive declarations submitted by the two defense "experts," neither of whom has any experience in blockchain analysis, in its opposition to the defendant's motion for reconsideration of the Court's

The only question before this Court is a relatively narrow one: whether there is probable cause to believe the seized Kraken funds have the "requisite connection" to the defendant's crimes, *Kaley*, 571 U.S. at 324, meaning that they represent funds "involved in" the operation of Bitcoin Fog or are "traceable to such property" within the meaning of 18 U.S.C. § 982(a)(1).

As *Kaley* emphasized, probable cause requires only a "fair probability." 571 U.S. at 338. It is "not a high bar," and serves "only a gateway function." *Id.* at 338-39. "That is why a grand jury's finding of probable cause to think that a person committed a crime can be made reliably without an adversary hearing; it is and has always been thought sufficient to hear only the prosecutor's side." *Id.* at 338 (internal quotations and alterations omitted). The probable cause standard does not require detailed tracing to support seizure of an account, but only a showing that the account was "funded largely through tainted assets," *United States v. Kam*, 2011 WL 3039589, at *5 (E.D.N.Y. Mar. 18, 2011), *report and recommendation adopted*, 2011 WL 3104379 (E.D.N.Y. July 20, 2011). As described below, ample probable cause—including the defendant's own admissions—supports this finding of a nexus between the seized property and Bitcoin Fog.

### a. The Seizure Warrant Affidavit Establishes Probable Cause

First, the seizure warrant affidavit on its face articulates sufficient probable cause. *See* Ex. 2. The seizure warrant affidavit (a) summarized the basic methodology of blockchain analysis and clustering, *id.* ¶ 23; (b) showed that Bitcoin Fog transmitted a substantial volume of transactions to or from illicit Darknet markets primarily trafficking in illegal drugs, *id.* ¶ 24-27; (c) showed that the undercover transactions conducted by IRS-CI on Bitcoin Fog were traced back to the Bitcoin Fog cluster, corroborating the identification of the Bitcoin Fog cluster through blockchain analysis,

---

detention decision, ECF No. 50.  The government is also responding to the defendant's venue arguments in its opposition to the defendant's motion to dismiss, filed contemporaneously with this response.

*id.* ¶¶ 32, 38; (d) traced transfers of at least 94 BTC from the Bitcoin Fog cluster into the defendant's account at LocalBitcoins.com (identified in the warrant affidavit as "VIRTUAL CURRENCY EXCHANGER 1"), *id.* ¶ 61; (e) traced transfers of at least 83.84 BTC from the Bitcoin Fog cluster into the defendant's first Kraken account ("TARGET ACCOUNT 1"), and another 17.75 BTC from the defendant's LocalBitcoins.com account into TARGET ACCOUNT 1, representing funds indirectly traceable to the Bitcoin Fog cluster by way of LocalBitcoins.com, *id.* ¶ 65; and (f) traced transfers of at least 11.454 BTC from the Bitcoin Fog cluster into the defendant's second Kraken account ("TARGET ACCOUNT 2"), *id.* ¶ 66.  In addition, the seizure warrant affidavit described how the defendant funded his Swedish bank accounts out of his LocalBitcoins.com account (derived in substantial part from Bitcoin Fog), and that the defendant, a self-described freelancer and life coach, had no other significant sources of legitimate income, *id.* ¶¶ 62-63.  All of these specific details, moreover, were corroborated by the broader evidence that the defendant established and operated Bitcoin Fog—as set forth in the warrant affidavit and reflected in the two grand jury indictments—and received millions of dollars' worth of fees generated from his money laundering service.

### b.  FBI Expert Declaration Confirms Probable Cause

Second, the declaration of FBI Staff Operations Specialist Luke Scholl, attached hereto, corroborates the analysis in the seizure warrant and provides further basis to find probable cause that the Kraken funds are derived from Bitcoin Fog.  Mr. Scholl has broad investigative experience, including in cases involving virtual currency, money laundering, and the Darknet, and a depth of training and experience in cryptocurrency transactions, seizures, and blockchain analysis.    Mr.

Scholl's analysis mirrors what was already conveyed in the Kraken seizure warrant, and provides additional detail regarding the tracing of funds from the Bitcoin Fog cluster to the Kraken account.

The Scholl Declaration begins by addressing the identification of the Bitcoin Fog cluster. Mr. Scholl reviewed records of the September 11, 2019 undercover transaction conducted by IRS-CI on Bitcoin Fog, in which funds were sent from the Bitcoin Fog cluster to an IRS-controlled deposit address. The Bitcoin Fog cluster identified through the undercover transaction overlaps with at least two other sources: the cluster of addresses identified as Bitcoin Fog addresses through co-spending analysis on WalletExplorer.com, a reputable open-source blockchain analysis tool; and also the blockchain analysis software tools utilized by FBI, which have been found reliable in numerous previous investigations.

The Scholl Declaration then examines the sources of funds deposited into the defendant's accounts on LocalBitcoins.com and Kraken. Mr. Scholl (a) traced transfers of approximately 99.23 BTC, valued at $629,923, from the Bitcoin Fog cluster into the defendant's account at LocalBitcoins.com; (b) traced transfers of approximately 83.84 BTC, valued at approximately $247,396 from the Bitcoin Fog cluster into TARGET ACCOUNT 1, and another 15.75 BTC, valued at approximately $164,885, from the defendant's LocalBitcoins.com account into TARGET ACCOUNT 1; and (c) traced transfers of approximately 11.47 BTC, valued at approximately $7,871, from the Bitcoin Fog cluster into TARGET ACCOUNT 2, and another 0.57 BTC, valued at approximately $946, from the defendant's LocalBitcoins.com account into TARGET ACCOUNT 2. In total, Bitcoin Fog and LocalBitcoins.com accounted for 89% of the total Bitcoin and 96% of the total USD value deposited to TARGET ACCOUNT 1; and 83% of the total Bitcoin and 67% of the total USD value deposited to TARGET ACCOUNT 2.

The Scholl Declaration is broadly consistent with the Kraken seizure warrant affidavit.  To be sure, there are minute differences in some of the exact figures, which are largely attributable to the way the Kraken records identified relevant deposit and sending addresses, as addressed in the Scholl Declaration.  These small differences, however, show the independence of Mr. Scholl's analysis and underscore how closely his analysis tracks that in the seizure warrant affidavit,  which found that "[t]he majority of . . . deposits" into TARGET ACCOUNT 1 "were traceable to either BITCOIN FOG . . . or to VIRTUAL CURRENCY EXCHANGER 1," and that "the majority of . . . deposits" into TARGET ACCOUNT 2 "were traceable to BITCOIN FOG."

### c. The Defendant Does Not Dispute, But Corroborates, the Government's Tracing

Third, for all of his bluster, the defendant does not actually dispute the government's tracing from Bitcoin Fog to his Kraken accounts.  This is a striking concession.  Nowhere in the defendant's entire motion does he dispute that the defendant's Kraken accounts were largely funded from Bitcoin Fog.  Nowhere in the declaration by the defendant's "world's leading blockchain analyst[]," ECF No. 48, at 10, is there a word doubting the tracing from Bitcoin Fog to Kraken.  Indeed, for all the generic invective leveled by the defendant's so-called expert, he does not appear to have bothered to review any of the defendant's Kraken account records, the Kraken seizure warrant, or the government's tracing analysis (all of which was produced in discovery).

This is because the defendant *cannot* dispute the accuracy of the government's tracing analysis.  Just the opposite.  In filings by counsel and in the defendant's own words, he has repeatedly confirmed that he received a stream of payments from the Bitcoin Fog cluster.   The defendant sat for an interview with two WIRED reporters in which he personally "concede[d] that he did send and receive payments to Bitcoin Fog as a user of the service seeking privacy," and explained in his own words, "'I think some of my transfers must have gotten mixed up with

everything.'"   Newman & Greenberg, *supra*.   The defendant's filings refer to him as a "user" of

Bitcoin Fog.  ECF No. 47, at 15 (stating that the defendant "was merely a user of the service like

countless other users"); ECF No. 48, at 14 (stating that the defendant "protects his cryptocurrency

accounts by anonymizing them").   To be sure, the defendant's admissions are couched in

minimizing language, but they corroborate the nexus between Bitcoin Fog and the defendant's

Kraken accounts—which is the only question before the Court on a motion for a *Monsanto* hearing.

### 3.   The Government Is Not Seeking Forfeiture of "Substitute Property"

It is important to clarify that the government is not seeking to forfeit the Kraken accounts

as "substitute property," as the defense repeatedly and inaccurately claims (*e.g.*, at 6, 13, 18).   The

plain text of § 982(a)(1) mandates the forfeiture of property "involved in" money laundering or

unlicensed money transmitting offenses, *and* property that is "traceable to such property."   As the

Tenth Circuit has explained:

> [P]roperty "traceable to" means property where the acquisition is attributable to the
> money laundering scheme rather than from money obtained from untainted sources.
> In other words, proof that the proceeds of the money laundering transaction enabled
> the defendant to acquire the property is sufficient to warrant forfeiture as property
> "traceable to" the offense.  For example, if a defendant receives $500,000 in cash
> in a money laundering scheme and hides the cash in his house, the government may
> seize that money as property "involved in" the money laundering offense.  If, on
> the other hand, the defendant purchases a $500,000 item with that money, the
> government may seek the item purchased as property "traceable to" property
> involved in the money laundering offense.   In both scenarios the property, the
> $500,000 cash or the item purchased with the cash, is forfeitable property pursuant
> to 18 U.S.C. § 982(a)(1).

*United States v. Bornfield*, 145 F.3d 1123, 1135–36 (10th Cir. 1998) (internal citations omitted);

*see also, e.g.*, *United States v. Betancourt*, 422 F.3d 240, 251-52 (5th Cir. 2005) (affirming

forfeiture of lottery winnings where defendant "purchased his interest in the lottery ticket with

funds derived from drug trafficking").   This is consistent with the D.C. Circuit's holding in *United*

*States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997), which articulated a "but-for test" to determine

whether property was subject to forfeiture because it was derived from proceeds obtained through racketeering activity. *Id.* at 1312-13.

As applied here, that means it is irrelevant whether the defendant converted his Bitcoin Fog proceeds through one or more steps—sending bitcoin through one or more "hops" on the blockchain, funneling some of the funds through LocalBitcoins.com before transferring to Kraken, and/or exchanging his bitcoin for cash or other forms of cryptocurrency.  Any assets that were derived from Bitcoin Fog represent property "traceable to" the tainted property and are properly subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1).

### C.  Defendant's Counterarguments Lack Merit

The defendant largely ignores the governing legal framework and instead raises a variety of scattershot arguments, largely presented in conclusory fashion without supporting legal authority or explanation.

### 1.  The Seizure Warrant and Search Warrant Satisfied Particularity Standard

The defendant argues (at 20-21) that the seizure warrant lacks "particularity," but this argument appears to arise from the defendant's inexplicable confusion over which warrant authorized the seizure from Kraken.  As explained above, the only seizure of assets in this case was made pursuant to the seizure warrant served on Kraken.  The Fourth Amendment's particularity requirement "specifies only two matters that must be particularly described in the warrant: the place to be searched and the persons or things to be seized." *United States v. Grubbs*, 547 U.S. 90, 97 (2006) (internal quotations and alterations omitted).  Here, the Kraken seizure warrant specified the place to be searched (two Kraken accounts held in the name of "Roman Sterlingov" and "TO THE MOON LTD | ROMAN" and identified by specific account numbers) and the things to be seized (the contents of those accounts).  Nothing further was required.

To the extent the defendant intends to challenge the particularity of the April 30, 2021 search warrant, or argues that it was overbroad, those arguments are irrelevant to his motion: the April 30, 2021 search warrant had nothing to do with the seizure of funds from Kraken.  In any event, evidence recited in the search warrant affidavit showed that the defendant operated a Darknet-based bitcoin money laundering service which charged a variable 2% to 2.5% fee on transactions, and that the defendant received bitcoin transactions originating from the Bitcoin Fog clusters.  See Ex. 1, ¶¶ 8-53.   The affidavit further explained that cryptocurrency users may maintain copies of their private key credentials in more than one place, and "may also entrust private key information with co-conspirators or other associates, with instructions to transfer their virtual currency holdings in the event they are discovered or arrested,"[9] and that for this reason, "simply taking possession of the storage media on which private key information is stored is not always sufficient to safeguard the virtual currency for an eventual criminal prosecution and/or forfeiture proceeding."  *Id.* ¶¶ 72-73.  This would have been more than sufficient to justify the seizure of any cryptocurrency found in the defendant's electronic devices or luggage as both "evidence" and "fruits of crime," Fed. R. Crim. P. 41(c)(1), (2).

### 2.   The Seizure Warrant Was Supported by Probable Cause

The defendant argues in conclusory fashion (at 19, 20) that the seizure warrant lacked probable cause.  As a preliminary matter, the defendant ignores the deferential standard of review for a facially valid search warrant.  The question is not whether the reviewing court would, in the first instance, find probable cause, but only whether the Magistrate had a "substantial basis" in

---

[9] Indeed, as noted above, the defendant was able to transfer funds out of his Binance cryptocurrency account following his arrest and detention to help pay for one of his attorneys.

finding probable cause.  As Chief Judge Howell summarized in *United States v. Smith*, 2021 WL 2982144 (D.D.C. July 15, 2021):

> A showing of probable cause is not a high bar, and, in the context of a search warrant, requires only a fair probability that evidence of a crime will be found in a particular place. . . .  The task of a district court reviewing a magistrate's determination that a warrant is supported by probable cause is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.  While courts must conscientiously review the sufficiency of the affidavits upon which warrants were issued, the affidavits are entitled to a presumption of validity, and the magistrate's initial determination of probable cause is entitled to great deference.

*Id.* at *5 (internal citations and alterations omitted).

Here, the Kraken seizure warrant affidavit provided Magistrate Judge Meriweather with a "substantial basis" to find probable cause.  The seizure warrant affidavit closely mirrored the complaint affidavit—describing how Bitcoin Fog was designed and advertised as a bitcoin money laundering service; how Bitcoin Fog in fact processed more than $78 million in transactions directly to or from Darknet markets trafficking in illegal drugs; and how the defendant established Bitcoin Fog and continued to receive proceeds from it.  Ex. 2, ¶¶ 14-27, 43-63.  The affidavit further explained how the defendant received proceeds directly and indirectly from the Bitcoin Fog cluster and funneled those proceeds into his Kraken accounts.  *Id.* ¶¶ 64-67.  It also explained how investigators were unable to identify any significant sources of legitimate income for the defendant.  *Id.* ¶ 63.  In sum, the affidavit amply set forth probable cause to conclude that the Kraken accounts contained property "involved in" the defendant's money laundering and unlicensed money transmitting business offenses.  The defendant's conclusory assertions to the contrary provide no basis to second-guess the Magistrate's finding of probable cause—let alone to suggest that she lacked any "substantial basis" to issue the warrant.

### 3.   The Defendant's Due Process Argument Is Baseless

The defendant argues (at 22-24) that the Kraken seizure violated the defendant's Fifth Amendment due process rights.  This argument arises out of a basic misunderstanding of the procedural framework for seizures and forfeitures in criminal cases—a misunderstanding that could have been remedied by even cursory review of Fed. R. Crim. P. 32.2 and the relevant forfeiture statutes.

Specifically, seizure warrants are authorized for property believed to be subject to forfeiture under either civil or criminal forfeiture statutes, as here, pursuant to 18 U.S.C. § 981(b)(1)-(3) (for civil forfeiture), and 21 U.S.C. § 853(f) (for criminal forfeiture).  No hearing is required under those statutes before issuing a seizure warrant, any more than a hearing would be required before issuing a search warrant.  Then, Federal Rule of Criminal Procedure 32.2 sets forth the procedure for initiating and completing criminal forfeiture of property.  This begins with "notice" to the defendant in the form of a forfeiture allegation in an indictment or information, *see* Rule 32.2(a).  Then, as described above, the defendant's due process rights are generally satisfied through the *post-verdict* forfeiture phase of the trial, *see* Rule 32.2(b); *see also Bikundi*, 125 F. Supp. 3d at 184 ("Once the government has obtained a seizure warrant pursuant to 21 U.S.C. § 853(f), the Federal Rules of Criminal Procedure provide for no further inquiry into the property's forfeitability until disposition of the criminal charges on which the forfeiture is predicated.").  The forfeiture judgment becomes final as to the defendant at sentencing, *see* Rule 32.2(b)(4)(A).  The government is then required to provide direct notice and publication of the forfeiture for potential third-party claimants, *see* Rule 32.2(b)(6), and the Court conducts an ancillary proceeding to hear and adjudicate third-party claims, *see* Rule 32.2(c).

The defendant jumbles up this sequence, ignoring the relevant statutes and rules, and then faults the government for not conducting this forfeiture in practically backwards fashion—beginning with a hearing prior to seizure (at 23), then notice by publication (at 24), and then a forfeiture allegation (at 24). This is nonsense. The property was seized pursuant to a Court-authorized seizure warrant; the defendant received notice of the government's intent to forfeit the seized property through the forfeiture allegations contained in *two* indictments, pursuant to Rule 32.2(a); he will receive fulsome due process during the forfeiture phase of the trial pursuant to Rule 32.2(b)(1); and potential third-party claimants will receive direct and publication notice as appropriate and have their claims adjudicated pursuant to Rule 32.2(b)(6) and (c).[10]

The defendant argues that the seizure "violated [the] Asset Forfeiture Policy Manual,"[11] but, aside from the defendant's confused complaints about sequencing, he cites nothing other than a consultation requirement for international seizures—which does not apply here, because the seizure warrant was executed on a U.S.-based cryptocurrency exchange. In fact, the government has complied with all applicable Department of Justice regulations—and, in any event, those regulations do not confer any enforceable rights on the defendant, *see United States v. Caceres*, 440 U.S. 741 (1979); *United States v. Scarfo*, 41 F.4th 136, 221 n.104 (3d Cir. 2022); *United States v. Tracts 31A, Lots 31 and 32*, 852 F.3d 385, 392 n.7 (5th Cir. 2017). The defendant's muddled due process argument provides no basis to reverse the well-supported seizure of the Kraken accounts in this case.

---

[10] Direct and publication notice is only for third-party claimants, not for the defendant, because notice is provided to the defendant through the forfeiture allegations in the indictments.

[11] *See* U.S. Dep't of Justice, *Asset Forfeiture Policy Manual* (2021), available at https://www.justice.gov/criminal-afmls/file/839521/download.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendant has not satisfied his burden to justify a *Monsanto* hearing and his motion for the return of the seized Kraken funds should be denied.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
      Christopher B. Brown, D.C. Bar No. 1008763
      Assistant United States Attorney
      U.S. Attorney's Office for the District of Columbia
      601 D Street, N.W.
      Washington, D.C. 20530
      (202) 252-7153
      Christopher.Brown6@usdoj.gov

      */s/ C. Alden Pelker*
      C. Alden Pelker, Maryland Bar
      Trial Attorney, U.S. Department of Justice
      Computer Crime & Intellectual Property Section
      1301 New York Ave., N.W., Suite 600
      Washington, D.C. 20005
      (202) 616-5007
      Catherine.Pelker@usdoj.gov
