# Exhibit 2

AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>ALL FUNDS HELD IN TWO PAYWARD VENTURES,<br>INC. DBA KRAKEN ACCOUNTS | )<br>)<br>)<br>)<br>) |

Case No.     21-sz-16

## AMENDED APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

        I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the __Northern__ District of ____California____ is subject to forfeiture to the United States of America under ____18____ U.S.C. §§ 982(a)(1) and 18 U.S.C. § 981(a)(1)(A) (describe the property):

SEE ATTACHMENT A WHICH IS INCORPORATED HEREIN BY REFERENCE.

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

❐ Continued on the attached sheet.

*Applicant's signature*

Devon Beckett, Special Agent
*Printed name and title*

Sworn to before me and signed telephonically.

Date:     06/17/2021

Robin M. Meriweather
2021.06.17 13:29:10
-04'00'
*Judge's signature*

City and state:  Washington, D.C.

Robin M. Meriweather, U.S. Magistrate Judge
*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| ALL FUNDS HELD IN TWO PAYWARD VENTURES, | ) | Case No.   21-sz-16 |
| INC. DBA KRAKEN ACCOUNTS | ) | |
| | ) | |

## AMENDED WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the _____Northern_____ District of ____California____ be seized as being subject to forfeiture to the United States of America.  The property is described as follows:
 • SEE ATTACHMENT A WHICH IS INCORPORATED HEREIN BY REFERENCE.

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before ____07/01/2021____

*(not to exceed 14 days)*

❑ in the daytime – 6:00 a.m. to 10:00 p.m.        ☑ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge _____Robin M. Meriweather_____ .

*(name)*

❑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ❑ for _____ days *(not to exceed 30).*

❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:   ___6/17/2021___

Robin M. Meriweather
2021.06.17 13:29:57 -04'00'

*Judge's signature*

City and state:     ___Washington, D.C.___

Robin M. Meriweather, U.S. Magistrate Judge

*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>21-SZ-16 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of:

Inventory of the property taken:

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A: PROPERTY TO BE SEIZED

Pursuant to this warrant, Payward Ventures, Inc. dba Kraken ("Kraken") shall immediately effect the seizure of the property in the below identified account(s) (the "SUBJECT ACCOUNTS"), and provide the property to the law enforcement officer serving the warrant in a reasonably practicable manner.  Kraken shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate the implementation of it.

- The contents of account #██████████████**DGMY**, held in the name of **Roman Sterlingov**; and

- The contents of account #██████████████**KQ5Y**, held in the name of **TO THE MOON LTD | ROMAN**.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEIZURE OF ALL FUNDS HELD IN TWO PAYWARD VENTURES, INC. DBA KRAKEN ACCOUNTS** | **SZ No. 21sz16** <br><br> **Filed Under Seal** |

*Reference:*    *USAO Ref. #2015R02056*

**AMENDED AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEIZURE WARRANT[1]**

I, Devon Beckett, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a seizure warrant for the contents of the following two accounts held by Payward Ventures, Inc. dba Kraken (collectively, the "TARGET PROPERTIES"):

- Account #████████████**DGMY**, held in the name of **Roman Sterlingov**; and

- Account #████████████**KQ5Y**, held in the name of **TO THE MOON LTD | ROMAN**.

The particular items to be seized are described in the following paragraphs and in Attachment A.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a seizure warrant.

---

[1] On June 9, 2021, this Court issued a seizure warrant for the same two accounts held by Payward Venture, Inc. dba Kraken.  *See* ECF No. 21-sz-16.  However, upon service of the warrant, Kraken informed the government that the account number for the first account listed in Attachment A was missing a digit.  The government is seeking a replacement warrant to correct this error.  The warrant application and supporting affidavit is otherwise identical to that submitted in support of the previous warrant.

3.     I am a Special Agent with the Criminal Investigation Division of the Internal Revenue Service (IRS-CI). I have been in this position since September 2002. My responsibilities include investigation of financial fraud, more particularly criminal violations of Title 18, United States Code, Sections 1956 and 1957, and Title 31, United States Code, Section 5324. During the course of my employment as a Special Agent with IRS, I have directed or assisted in numerous investigations concerning Title 18 money laundering, Title 26 income tax, and Title 31 Bank Secrecy Act violations. These investigations focused on individuals deriving income from legal and illegal sources. I have been trained at the Federal Law Enforcement Training Center in the laws of search and seizure, and in the use of search warrants. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. I have been the affiant for many federal search and seizure warrants that involved alleged tax violations, money laundering, wire fraud, access device fraud, and mail fraud. Since August 2015 I have been assigned to the Cyber Crimes Unit within IRS-CI, and I have received training in cyber operations and in criminal schemes perpetrated via the Internet.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of money laundering, in violation of 18 U.S.C. § 1956(a)(3); unlicensed money transmission, in violation of 18 U.S.C. § 1960; and money transmission without a license, in violation of D.C. Code § 26-1023(c), have been committed by Roman STERLINGOV. There is also probable cause to seize the Target Property described in

Attachment A as property subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1) and 18 U.S.C. § 981(a)(1)(A).

<b><u>STATUTES</u></b>

5.      <u>Offense Statutes.</u>   This investigation relates to violations of, *inter alia*, 18 U.S.C. § 1956(a)(3)(B); unlicensed money transmission, in violation of 18 U.S.C. § 1960; and money transmission without a license, in violation of D.C. Code 26-1023(c), which provide/state as follows.

6.      **Sting Money Laundering:**  18 U.S.C. § 1956(a)(3)(B) makes it a crime to conduct or attempt to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity.  This offense is sometimes referred to as "sting" money laundering.  The term "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1), and it includes violations drug trafficking offenses, to wit, "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act)."  18 U.S.C. § 1961(1)(D).

7.      **Operating an Unlicensed Money Transmitting Business:**  18 U.S.C. § 1960(a) provides in relevant part that "[w]hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business" shall be guilty of a federal offense.  The term "money transmitting business" is defined as "includ[ing] transferring funds on behalf of the public by any and all means including but not limited to transfers within

this country or to locations abroad by wire, check, draft, facsimile, or courier."  18 U.S.C. § 1960(b)(2).

8.      The statute provides three definitions of an "unlicensed money transmitting business," corresponding to three kinds of violations of § 1960(a):

a.  **State Licensing Offenses:**  Under 18 U.S.C. § 1960(b)(1)(A), it is a violation to operate a money transmitting business "without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under States law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable."  The definition of "State" includes the District of Columbia.  18 U.S.C. § 1960(b)(3).

b.  In the District of Columbia, anyone engaging in the "business of money transmission" is generally required to obtain a license from the Superintendent of the Office of Banking and Financial Institutions of the District of Columbia.  D.C. Code § 26-1002(a).  "Money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  D.C. Code § 26-1001(10).  Under District of Columbia code, engaging in the business of money transmission without a license is punishable as a felony.  D.C. Code § 26-1023(c).

c.  **Federal Registration Offenses:**  Under 18 U.S.C. § 1960(b)(1)(B), it is a violation to operate a money transmitting business without "comply[ing] with the money transmitting business registration requirements under section 5330 of title 31,

United States Code, or regulations prescribed under such section." In turn, 31
U.S.C. § 5330(a)(1) requires anyone who owns or controls a money transmitting
business to register with the Secretary of the Treasury.

d. I am further aware that federal regulations issued pursuant to the Bank Secrecy Act
define "money services business" ("MSBs"), which include "money
transmitter[s]." 31 C.F.R. § 1010.100(ff)(5). Money transmitters are defined
broadly, and include anyone who "accept[s] . . . currency, funds, or other value that
substitutes for currency from one person and . . . transmi[ts] . . . currency, funds, or
other value that substitutes for currency to another location or person by any
means," as well as "[a]ny other person engaged in the transfer of funds." 31 C.F.R.
§ 1010.100(ff)(5)(i)(A)-(B). MSBs are required to register with the FinCEN,
unless specific exemptions apply. 31 C.F.R. § 1022.380(a)(1). MSBs are required
to establish and maintain anti-money laundering programs, to detect and report
suspicious transactions, and to collect certain records of customers and customer
transactions.

e. **Criminal Proceeds/Promotion Offenses:** Under 18 U.S.C. § 1960(b)(1)(B), it is
a violation to operate a money transmitting business that "otherwise involves the
transportation or transmission of funds that are known to the defendant to have been
derived from a criminal offense or are intended to be used to promote or support
unlawful activity."

9. I am further aware that Bitcoin "mixers" or "tumblers" are considered to be MSBs
under federal law, and they are also considered to be money transmitting businesses under District
of Columbia law. *See* U.S. Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's*

*Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001 (May 9, 2019), at 19-20; *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020).

10.     Forfeiture Statutes.    Pursuant to 18 U.S.C. § 982(a)(1) and 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1960 is subject to criminal and civil forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime.  These forfeitures encompass all property "involved in" the crime, which can include untainted funds that are comingled with tainted funds derived from illicit sources.

11.     This application seeks a seizure warrant under both civil and criminal authority, because the property to be seized could easily be placed beyond process if not seized by warrant, as money and cryptocurrency are fungible and easily dissipated.

12.     18 U.S.C. § 981(b) states that property subject to forfeiture under Section 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture. 18 U.S.C. § 982(b)(l) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding. Section 853 permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture. Seizures are appropriate from this district, because at least one of the predicate acts giving rise to forfeiture occurred in Washington, D.C., as described below.

## PROBABLE CAUSE

13.     The Federal Bureau of Investigation (FBI) and the Internal Revenue Service, Criminal Investigation (IRS-CI) have been investigating an illicit Bitcoin money transmitting and

money laundering service called BITCOIN FOG.  As described further below, the investigation identified Roman STERLINGOV as the operator of BITCOIN FOG.  On April 26, 2021, STERLINGOV was charged by complaint in the District of Columbia with money laundering, in violation of 18 U.S.C. § 1956(a)(3); unlicensed money transmission, in violation of 18 U.S.C. § 1960; and money transmission without a license, in violation of D.C. Code § 26-1023(c). STERLINGOV was arrested shortly after midnight on April 27, 2021, after he traveled from Moscow to Los Angeles International Airport.

### BITCOIN FOG Background

14.    BITCOIN FOG is an Internet-based service accessible from the District of Columbia and U.S. states.  As of April 26, 2021, it could be accessed through the Tor hidden website located at http://foggeddriztrcar2.onion.[2]  BITCOIN FOG functioned as a Bitcoin "tumbler" or "mixer" service.[3]  It allowed users to send bitcoins to designated recipients in a manner designed to conceal and obfuscate the source of the bitcoins.  It worked by disassociating

---

[2] Tor is a computer network designed to facilitate anonymous communication over the Internet.  The Tor network does this by routing a user's communications through a globally distributed network of relay computers, or proxies, rendering conventional Internet Protocol ("IP") address-based methods of identifying users ineffective.  To access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle," which is available at www.torproject.org.  When a Tor user accesses a website, only the IP address of the last relay computer (the "exit node"), as opposed to the user's actual IP address, is logged by the website.  The Tor network also makes it possible for users to operate websites, called "hidden services," in a manner that conceals the true IP address of the computer hosting the website.  Unlike standard Internet websites, a Tor-based web address is comprised of a series of 16 algorithm-generated characters, for example "asdlk8fs9dflku7f," followed by the suffix ".onion."  As with all Tor communications, communications between users' computers and a Tor hidden-service webserver are routed through a series of intermediary computers.  Accordingly, neither law enforcement nor hidden-service users can use public lookups or ordinary investigative means to determine the true IP address—and therefore the location—of a computer server that hosts a hidden service.  For these reasons, hidden services are often referenced as residing on the "darknet" or "Dark Web," and ordinary Internet websites are often referenced as residing on the "clearnet."

[3] The virtual currency bitcoin (abbreviated "BTC") is a form of value that is able to be transacted over the Internet using Bitcoin software.  This software provides all necessary services including allowing users to create "Bitcoin addresses," roughly analogous to anonymous accounts; the injection of new bitcoin into circulation; and securely transferring bitcoin from one Bitcoin address to another.  For security and privacy reasons, it is common for a single Bitcoin user to control numerous Bitcoin addresses, which are stored and controlled in a "wallet."  Each address is controlled through the use of a unique "private key," akin to a password.

incoming bitcoin from particular Bitcoin addresses or transactions and then comingling that bitcoin with other incoming bitcoin prior to conducting any further transactions.  This process allowed BITCOIN FOG customers engaged in unlawful activities to launder their proceeds by concealing the nature, source, and location of their "dirty" bitcoin.  BITCOIN FOG publicly advertised this service as a way to help users obfuscate the source of their bitcoin.  BITCOIN FOG charged customers a fee for this service.

15.    BITCOIN FOG was launched on or about October 27, 2011, and was operational as of April 26, 2021.  The website was one of the original Bitcoin tumbling sites on the darknet (i.e., areas of the Internet that can usually only be accessed with specific software, configurations, or authorization).  As described below, more than 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) were sent through the site from in or about October 2011 through April 26, 2021.  The largest senders of BTC through BITCOIN FOG were darknet markets, such as Agora, Silk Road 2.0, Silk Road, Evolution, and AlphaBay, that primarily trafficked in illegal narcotics and other illegal goods.

16.    BITCOIN FOG was publicly advertised on Internet forums and well-known web pages promoting darknet markets as a tool for anonymizing bitcoin transactions. The administrator of BITCOIN FOG publicly promoted the service through a clearnet site (www.bitcoinfog.com and www.bitcoinfog.info) and a Twitter page.  These outlets allowed users to easily locate and access the hidden services site through simple clearnet Internet searches.

**BITCOIN FOG Advertised Its Mixing Service Would Conceal BTC Transactions from Authorities**

17.    BITCOIN FOG's launch was announced in an October 27, 2011, posting titled "[ANNOUNCE] Bitcoin Fog: Secure Bitcoin Anonymization" on the BitcoinTalk.org online forum.  The announcement was posted by a user with the pseudonym Akemashite Omedetou

(Japanese for "Happy New Year") and included links to a clearnet website for BITCOIN FOG (www.bitcoinfog.com), the Tor onion site (http://foggeddriztrcar2.onion), and a Twitter feed for updates on the site (www.twitter.com/#!/@Bitcoinfog).

18.     The announcement post described BITCOIN FOG as a tool to make it difficult for "interested parties, be it authorities or just interested researchers" to trace users' Bitcoin transactions across the Bitcoin network.  The post stated that BITCOIN FOG: "mix(es) up your bitcoins in our own pool with other users…get paid back to other accounts from our mixed pool…can eliminate any chance of finding your payments and making it impossible to prove any connection between a deposit and a withdraw inside our service."

19.     After announcing the launch of BITCOIN FOG, the pseudonym Akemashite Omedetou continued to post on BitcoinTalk.org, extolling the anonymizing features of BITCOIN FOG and providing updates on the service.  For example, on or about November 11, 2011, in response to an online comment that questioned a design feature of BITCOIN FOG, Akemashite stated: "should we make it easier…to do statistical analysis on our payouts…to help[ing] them start finding our bitcoin client? (that could only be done by an authority of course…) We won't make their life easier."

20.     In another post, dated on or about February 9, 2012, Akemashite responded to a comment from a poster about using mainstream Bitcoin exchanges to mix virtual currency. Akemashite stated: "most of them [exchanges] are also run as legitimate, visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities…us on the other hand, the authorities have to find first, which, as Silk Road have [sic] demonstrated, can prove problematic."

21.     The Twitter account @BitcoinFog was established on or about October 27, 2011, the date on which BITCOIN FOG was launched. The @BitcoinFog account regularly posted updates regarding the status of the BITCOIN FOG hidden site, including tweeting a link on November 14, 2014, to http://foggeddriztrcar2.onion, the current hidden services address for BITCOIN FOG.

22.     The @BitcoinFog account also tweeted links to stories discussing why users should tumble bitcoins – in order to thwart law enforcement.  For example, on or about September 13, 2017, the @BitcoinFog account tweeted a link to a story about the IRS using blockchain analysis software to track bitcoin.  On or about June 11, 2019, @BitcoinFog tweeted a link to a Europol press release announcing the law enforcement takedown of Bestmixer.io, another Bitcoin mixer/tumbler, commenting: "this is why you need to use ONLY a Tor-based mixing service (Such a surprise)."

**BITCOIN FOG Operated as an Illegal Money Transmitting and Money Laundering Service on the Darknet**

23.     While the identity of a Bitcoin address owner is generally anonymous (unless the owner opts to make the information publicly available), law enforcement can often identify the owner of a particular Bitcoin address by analyzing the blockchain.[4]  The analysis can also reveal additional addresses controlled by the same individual or entity.  For example, a user or business may create many Bitcoin addresses to receive payments from different customers.  When the user wants to transact the bitcoin that it has received (for example, to exchange bitcoin for other currency or to purchase goods or services), it may group those addresses together to send a single

---

[4] All Bitcoin transactions are recorded on what is known as the blockchain.  The blockchain is essentially a distributed public ledger that keeps track of all Bitcoin transactions, incoming and outgoing, and updates approximately six times per hour.  The blockchain records every address that has ever received a bitcoin and maintains records of every transaction.

transaction.  Law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions.  These companies analyze the blockchain and attempt to identify the individuals or groups involved in the virtual currency transactions.  Specifically, these companies create large databases that group transactions into "clusters" through analysis of data underlying the virtual currency transactions.

24.     Using blockchain analysis, law enforcement confirmed that over 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) have been sent through BITCOIN FOG since the site was launched in 2011.  This figure includes BTC from various sources: all direct and indirect transactions from sources such as darknet markets; funds stolen from bitcoin addresses through hacks; direct deposits and withdrawals from Bitcoin wallets; sends and receives from wallets not apparently affiliated with a known hosted service; and other unknown sources.  IRS-CI cyber analysts reviewed all inputs and outputs from BITCOIN FOG to identify bitcoins sent directly to BITCOIN FOG from known darknet markets and bitcoins sent from BITCOIN FOG to known darknet markets.  IRS-CI's analysis determined BITCOIN FOG received approximately 486,861.69 BTC (approximately $54,897,316.44 at the time of the transactions) *directly* from darknet markets.  BITCOIN FOG sent approximately 164,931.13 BTC (approximately $23,690,956.28 at the time of the transactions) *directly* to darknet markets.  In sum, BITCOIN FOG sent or received more than $78 million in transactions involving known darknet markets, counting only direct transactions.

| Source Market | Total Received (BTC) | Total Received (USD) |
|---|---|---|
| Agora Market | 41,966.87 | $14,398,754.73 |
| Silk Road 2.0 Market | 22,863.74 | $12,518,636.97 |
| Silk Road Marketplace | 377,102.74 | $9,556,159.49 |
| Evolution Market | 11,100.79 | $3,199,542.15 |
| AlphaBay Market | 5,442.86 | $2,907,508.67 |

25.     Among these, IRS-CI cyber analysts identified direct deposits into BITCOIN FOG from at least 35 darknet markets. Below are the top five markets by U.S. dollar value of deposits:[5]

26.     IRS-CI cyber analysts identified funds sent directly from BITCOIN FOG to at least 51 different darknet markets. Below are the top five markets by dollar value of sends:

| Destination Market | Total Sent (BTC) | Total Sent (USD) |
|---|---|---|
| Agora Market | 26,398.12 | $8,680,430.34 |
| Silk Road 2.0 Market | 11,274.21 | $5,871,831.33 |
| Silk Road Marketplace | 106,522.77 | $2,289,509.42 |
| Evolution Market | 6,473.24 | $1,860,053.75 |
| AlphaBay Market | 3,375.90 | $1,557,931.95 |

27.     Based on my training and experience, including experience in other darknet investigations, darknet markets exist primarily to traffic in illegal narcotics and other illegal goods and services – a fact well-known among darknet market user and administrators, and intended by the administrators.  That the darknet markets listed above primarily traffic in illegal narcotics and other illegal goods and services would be apparent to anyone using the markets because the categories listed on each market, and the majority of specific listings, openly discuss illegal goods and services.  I am familiar with each of the darknet markets listed in the tables above and am aware that illegal narcotics and other illegal goods and services constituted the majority of items for sale on each market.  Accordingly, there is probable cause to believe that the bitcoin transactions sent to and from BITCOIN FOG involved the proceeds of "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), such as narcotics distribution (21 U.S.C. § 841); identity theft and the sale of stolen personally identifiable information (PII) (18 U.S.C. § 1028A);

---

[5] The U.S. dollar value is calculated as of the date of each BTC transaction.  Because the price of BTC has fluctuated significantly since BITCOIN FOG first became operational in or about October 2011, the tables presented above do not show a consistent exchange rate between BTC and U.S. dollars.

and computer fraud and abuse, including the sale of computer hacking tools and exploits (18 U.S.C. § 1030).

**Undercover Transactions on BITCOIN FOG**

*September 2019 Undercover Transaction*

28.     On or about September 11, 2019, an IRS-CI Special Agent (UC) physically located in the District of Columbia and operating in an online undercover capacity accessed BITCOIN FOG at foggeddriztrcar2.onion through the Tor browser.  The UC created an account through the registration page by creating a username, password, and entering a security text phrase pictured below the registration text boxes.  The registration page of BITCOIN FOG stated: "As an anonymous service, we do not collect any additional information about you besides a user name and password."

29.     The UC was never asked for any identifying information such as an email account, date of birth, social security number, or passport number, or for any other proof of identification, when creating the account.

30.     On or about September 11, 2019, while physically located in the District of Columbia, the UC sent approximately 0.02488936 BTC ($249.99) from an IRS-CI controlled covert wallet ("UC Sending Wallet") into a wallet address provided by BITCOIN FOG.

31.     On or about September 12, 2019, while physically located in the District of Columbia, the UC accessed foggeddriztrcar2.onion.  The UC's undercover BITCOIN FOG account showed a balance of approximately 0.02425700.  The difference of approximately 0.00063236 BTC between the amount the UC deposited and the balance shown is approximately 2.5% of the total deposit.  This is the service fee charged by BITCOIN FOG.  On or about

September 12, 2019, while physically located in the District of Columbia, the UC sent 0.02 BTC from BITCOIN FOG to an IRS-CI controlled covert wallet ("UC Receiving Wallet").

32.     Through blockchain analysis, investigators traced bitcoin from the BITCOIN FOG deposit address to known BITCOIN FOG Bitcoin clusters identified through blockchain analysis. IRS-CI investigators also traced bitcoin sent to the UC Receiving Wallet and confirmed that the bitcoin was sourced from BITCOIN FOG clusters.

33.     Investigators were unable to directly trace any direct link between the "UC Sending Wallet" and the "UC Receiving Wallet," confirming that BITCOIN FOG successfully tumbled the transaction by breaking the link in the blockchain between the source and ultimate destination of the funds.

*November 2019 Undercover Transaction*

34.     On or about November 18, 2019, while physically located in the District of Columbia, an IRS-CI Special Agent (UC) operating in an online undercover capacity sent approximately 0.01173987 BTC to BITCOIN FOG from an IRS-CI controlled undercover account on the Apollon darknet market.  Apollon was a darknet market known to sell illegal narcotics, stolen PII, and other illegal items.  On November 19, 2019, while physically located in the District of Columbia, the SA accessed BITCOIN FOG at foggeddriztrcar2.onion.  The UC's undercover account on BITCOIN FOG showed that the account had been credited by the amount of the send transaction, less an approximately 2.32% fee.

35.     On or about November 19, 2019, while physically located in the District of Columbia and after confirming the deposit of funds from Apollon Market had been credited to the UC's BITCOIN FOG account, the UC sent the message below to the BITCOIN FOG administrator

using the messaging function on the BITCOIN FOG site, stating the funds were the proceeds of illegal narcotics sales:



36.       On or about November 21, 2019, while physically located in the District of Columbia, the UC again accessed BITCOIN FOG operating in an online undercover capacity. There was no response to the above message posted by the SA on or about November 19, 2019. The UC then directed BITCOIN FOG to send 0.01146764 BTC from the undercover account on BITCOIN FOG to an IRS-CI controlled undercover wallet.  BITCOIN FOG did so.

37.       The UC clearly stated that the BTC was from the sale of ecstasy/molly, an illegal narcotic.  At no point did the administrator of BITCOIN FOG prevent the deposit of funds from Apollon or prevent the withdrawal of funds after the funds were represented to be the proceeds of illegal drug sales.

38.       Through blockchain analysis, investigators traced bitcoin from the IRS-CI controlled account on Apollon Market, to the BITCOIN FOG deposit address, to known BITCOIN FOG bitcoin clusters identified through blockchain analysis.  IRS-CI investigators also traced

bitcoin sent to the IRS-CI controlled undercover wallet and confirmed that the bitcoin was sourced from BITCOIN FOG clusters.

*March-April 2021 Undercover Transaction*

39.     On or about March 10, 2021, while physically located in the District of Columbia, an IRS-CI Special Agent (UC) operating in an online undercover capacity accessed BITCOIN FOG.  The UC sent three separate deposits to BITCOIN FOG in the amounts of 0.0043444 BTC, 0.00836095 BTC, and 0.0089869 BTC.

40.     On or about April 19, 2021, while physically located in the District of Columbia, the UC contacted the administrator of BITCOIN FOG and advised that the deposited funds were the proceeds of a COVID fraud scheme, stating: "I am in need of partner.  I have many targets in US for my attack.  I develop program to lock government corona checks until persons pay me bitcoin ransom.  These are first three deposits to the fog."

41.     The UC clearly stated that the BTC was from a COVID fraud.  At no point did the administrator of BITCOIN FOG prevent the use of BITCOIN FOG to launder funds that were represented to be illicit proceeds.

**BITCOIN FOG Is Not Registered with FinCEN or Licensed in the District of Columbia**

42.     Records from the Financial Crimes Enforcement Network ("FinCEN"), a division of the U.S. Department of Treasury, revealed that neither ROMAN STERLINGOV nor BITCOIN FOG was registered as a Money Services Business under federal law, despite conducting transactions with U.S. based customers.  Similarly, records from the District of Columbia Department of Insurance and Banking (DISB) revealed that neither ROMAN STERLINGOV nor BITCOIN FOG was licensed as a Money Transmitter under District of Columbia law, despite conducting transactions with persons based in the District of Columbia.

**Attribution of BITCOIN FOG to ROMAN STERLINGOV**

43.     Analysis of bitcoin transactions, financial records, Internet service provider records, e-mail records, and additional investigative information, identifies ROMAN STERLINGOV as the principal operator of BITCOIN FOG.

*"Akemashite Omedotou" and the Shormint@hotmail.com Account*

44.     Early in the investigation, identifiers connected BITCOIN FOG to the pseudonym Akemashite Omedotou and the email account shormint@hotmail.com.  As noted above, BITCOIN FOG's launch was announced in a posting on the BitcoinTalk.org forum on or about October 27, 2011, by a user called Akemashite Omedetou.  Records from BitcoinTalk.org for the account associated with Akemashite Omedetou revealed that the account was created on or about October 25, 2011, using email address shormint@hotmail.com.  The account registration information included the website title "Bitcoin Fog" and website URL http://www.bitcoinfog.com.

45.     According to account details obtained from Twitter, the account @BitcoinFog was created on October 27, 2011 (the date BITCOIN FOG was announced) and was registered with email address shormint@hotmail.com.

46.     Records from Microsoft pertaining to shormint@hotmail.com revealed that the account was created on October 7, 2011, using an apparent false name and accessed through a Virtual Private Network (VPN) service, used to anonymize user's Internet traffic.  Based on my training and experience, I know that criminals often set up "burner" accounts in order to register domains and pay for services tied to their illicit activity.

*Connecting the BITCOIN FOG Domain to STERLINGOV*

47.     Additional investigation, as described below, connects STERLINGOV to the original BITCOIN FOG clearnet domain.

48.     According to publicly available WhoIs information, www.bitcoinfog.com was registered through the web hosting service Highhosting.net on October 25, 2011.  The WhoIs records showed that the domain was registered to "Akemashite Omedetou" using email address shormint@hotmail.com.  Records from Highhosting.net revealed that Akemashite Omedetou used a Liberty Reserve[6] account (Liberty Reserve Account 1) to pay for the domain.  Liberty Reserve records showed that Liberty Reserve Account 1 was registered to shormint@hotmail.com.

49.     Investigators reviewed the account activity associated with Liberty Reserve Account 1 and determined that STERLINGOV had funded the account using a series of layered transactions through multiple payment platforms, performed in close temporal proximity and apparently designed to make it difficult to trace the payment to his true identity.  Specifically:

     a.  On September 29, 2011, according to records from the virtual currency exchange Mt. Gox,[7] Roman STERLINGOV opened an account in his true name at Mt. Gox (Mt. Gox Account 1), using the email address plasma@plasmadivision.com.

     b.  On October 3, 2011, STERLINGOV funded Mt. Gox Account 1 with 100 euros.

     c.  On October 19, 2011, Mt. Gox Account 1 sent 36 BTC through an off-platform Bitcoin address to a second Mt. Gox Account (Mt. Gox Account 2) (registered to "nfs9000@hotmail.com").

---

[6] Liberty Reserve was a Costa Rica-based digital currency exchange service that allowed users to register and transfer money to other users with only a name, e-mail address, and birth date.  Deposits could be made through third parties using a credit card or bank wire, among other deposit options.  Liberty Reserve did not directly process deposits or withdrawals.  Deposited funds were then "converted" into Liberty Reserve Dollars (LRUSD) or Liberty Reserve Euros (LREUR), which were tied to the value of the U.S. dollar and the euro, respectively.  The service was shut down by U.S. law enforcement in May 2013 after the founder was charged in the United States with money laundering and operation of an unlicensed money service business.

[7] Mt. Gox was a Bitcoin exchange based in Japan that suspended operation in April 2014 after suffering a hack that stole 850,000 bitcoins.

    d.   On October 20, 2011, Mt. Gox Account 2 sent 35 BTC to a third Mt. Gox Account (Mt. Gox Account 3) (registered to "kolbasa99@rambler.ru").

    e.   On October 20, 2011, Mt. Gox Account 3 sent $80 USD to an account at Aurum Xchange (Aurum Xchange Account 1), another digital payment platform.

    f.   On October 20, 2011, Aurum Xchange Account 1 sent $76 USD to Liberty Reserve Account 1.

    g.   On October 25, 2011, Liberty Reserve Account 1 paid the domain fees for www.bitcoinfog.com to Highhosting.net.

This series of transactions is depicted in the below chart:



50.    An analysis of the IP addresses used to access the above Liberty Reserve and Mt. Gox accounts confirmed that the accounts shared a common owner: STERLINGOV. For example, IP logs from Mt. Gox and Liberty Reserve showed that on November 24, 2011, a user using the IP address 212.117.160.123 logged into Mt. Gox Account 2, Mt. Gox Account 3, and Liberty Reserve Account 1, as well as another Liberty Reserve account registered to Roman STERLINGOV (Liberty Reserve Account 2). STERLINGOV was also the named account owner of a third Liberty Reserve account (Liberty Reserve Account 3) registered using the email address heavydist@gmail.com (Google Account 1).

51.    Liberty Reserve records revealed that Liberty Reserve Account 2 was registered in STERLINGOV's true name using the email address plasma@plasmadivision.com, the same e-mail tied to Mt. Gox Account 1.   The account registration information included a residential address in Gothenburg, Sweden corresponding to STERLINGOV's home address.   Both Liberty Reserve Account 2 and Liberty Reserve Account 3 were registered using a Swedish telephone number, TELEPHONE NUMBER 1, which Swedish telecommunications provider records revealed is registered to STERLINGOV.

52.    On August 25, 2012, Mt. Gox Account 1 received a 180 BTC deposit sent from an account at BTC-e[8] (BTC-e Account 1).   According to records from BTC-e, BTC-e Account 1 was registered to Roman STERLINGOV, using Google Account 1.

53.    Records from Google pertaining to Google Account 1 revealed that the account was registered to "Roman Heavydist" and was linked to TELEPHONE NUMBER 1, identified above as STERLINGOV's phone number.   Investigators obtained the contents of Google Account 1 pursuant to a lawfully authorized search warrant.   Google Account 1's Google Drive folder contained Russian language document titled Ввод денег  ("Putting Money"), dated September 29, 2011 (less than a month prior to the launch of BITCOIN FOG).   A translation of the document showed that the document appeared to be notes taken by STERLINGOV describing how to layer funds.   The steps outlined in the document match the steps that STERLINGOV took to pay for the domain www.bitcoinfog.com. The below chart displays the relevant text of the document overlayed on the transaction path used by STERLINGOV to pay for the BitcoinFog.com domain.

---

[8] BTC-e was cryptocurrency exchange that was shut down in July 2017 when the exchange founder was indicted in the United States for money laundering and the servers were seized by U.S. law enforcement.



***STERLINGOV's Connections to Early BITCOIN FOG Test Transactions***

54.    Blockchain analysis of the earliest transactions associated with BITCOIN FOG's activity on the blockchain revealed a series of small value transactions, beginning in early October 2011, approximately two weeks before BITCOIN FOG was officially launched on October 27, 2011.  The transactions appeared to be test transactions conducted to beta test the BITCOIN FOG mixer before it went live.  These transactions originated from Mt. Gox Account 1, registered in STERLINGOV's true name.

55.    As shown by Mt. Gox records and blockchain analysis, on October 13, 2011, Mt. Gox Account 1 sent approximately two BTC to Bitcoin cluster 12NSB5.  This deposit was then broken into smaller amounts through a series of four Bitcoin transactions.  Subsequently, the bitcoin was deposited into two new bitcoin wallets,  1KWMex (0.41 BTC) and 1NeWNP (1.57 BTC).   The transaction pattern within cluster 12NSB5 is consistent with mixing/tumbling transactions, including those seen from BITCOIN FOG.

56.      Wallet 1KWMex held its 0.41 bitcoin idle, while wallet 1NeWNP transferred its bitcoin to a new address.  Through blockchain analysis, investigators traced the outflow of the balance of 1.57 BTC from wallet 1NeWNP to BITCOIN FOG.

57.      Based on my training and experience, I know that software and web developers typically beta-test new software and websites prior to launching them.  Beta testing is conducted to confirm that a site's features work and, in the case of a mixer such as BITCOIN FOG, to ensure the tumbler's algorithm is properly working.   Law enforcement has observed on numerous occasions darknet market site administrators conduct beta testing prior to launching darknet platforms to the public. Based on my training and experience, including previous investigations of Bitcoin mixers, I believe that the activity described above is consistent with beta testing the BITCOIN FOG platform.  I am aware that such beta testing would typically only be conducted an individual involved in administrating a website or service.

***STERLINGOV's Receipt of Proceeds from BITCOIN FOG***

58.      BITCOIN FOG charges a variable fee of 2% to 2.5% on each deposit.  Blockchain analysis revealed that these fees are retained within the BITCOIN FOG cluster, and that the administrator made periodic withdrawals from the BITCOIN FOG cluster to pay himself.  These withdrawals occur sporadically and in the same manner as a regular user.  The withdrawals appear to be concealed to blend in with regular mixing transactions in order to protect the site administrator from scrutiny.   Based on BITCOIN FOG's transaction activity over time, STERLINGOV would have made approximately $8 million in commissions from BITCOIN FOG transactions if he had cashed out the administrative fees near the time that the transactions occurred.  Due to the significant increase in value of bitcoin over the course of BITCOIN FOG's operation – from a low of approximately $2 shortly after BITCOIN FOG launched in fall 2011 to

a current value of $50,000 – STERLINGOV has been able to reap significant appreciation from his profits that were kept in bitcoin.  The current value of the BITCOIN FOG cluster – including customer funds in STERLINGOV's control and STERLINGOV's own money – is nearly $70 million.

59.     IRS-CI examined bitcoin accounts controlled by STERLINGOV at several cryptocurrency exchanges. Analysis of Sterlingov's accounts revealed the vast majority of cryptocurrency deposited into his accounts was originally sourced and traced back to BITCOIN FOG.  STERLINGOV utilized a variety of methods to remove BTC from BITCOIN FOG, including direct transfers to exchange accounts held in his name, withdrawals from BITCOIN FOG to intermediary BTC wallets before cashing out BTC through exchanges, and using BTC from BITCOIN FOG to purchase goods and services, gift cards and other cryptocurrencies.

60.     For example, IRS-CI obtained STERLINGOV's account records from VIRTUAL CURRENCY EXCHANGER 1.  Based on my training and experience, I am aware that many individuals in the Bitcoin community use VIRTUAL CURRENCY EXCHANGER 1 platform to facilitate peer-to-peer exchanges of bitcoin.  Individuals often use VIRTUAL CURRENCY EXCHANGER 1 to conduct transactions because they believe the site offers more anonymity than a traditional virtual currency exchange.  VIRTUAL CURRENCY EXCHANGER 1 allows users to locate bitcoin trading partners based upon geographic location and/or desired transaction type. The site offers an escrow service that will hold a seller's bitcoin until fiat currency transfers are completed by the buyer.  VIRTUAL CURRENCY EXCHANGER 1 maintains customer account records which include account name, dates and amounts of bitcoin and fiat currency transactions, the usernames of trading partners, and the method of payment of fiat currency.

61.     VIRTUAL CURRENCY EXCHANGER 1 records indicate STERLINGOV opened an account using his true name on or about September 20, 2012 and remained open through at least April 5, 2019, which falls within with the time period during which BITCOIN FOG was operational.   STERLINGOV's VIRTUAL CURRENCY EXCHANGER 1 records revealed deposits of approximately 257.475 BTC into the account between account opening and the present. Blockchain analysis revealed that at least 94 BTC deposited into STERLINGOV's VIRTUAL CURRENCY EXCHANGER 1 account came *directly* from BITCOIN FOG between on or about October 29, 2015 through at least November 12, 2017. STERLINGOV's VIRTUAL CURRENCY EXCHANGER 1 transaction history revealed STERLINGOV made approximately 81 bitcoin trades.   All 81 of these trades were peer-to-peer sales of bitcoin in exchange for fiat currency, including 60 trades for Swedish krona (SEK), 17 trades for U.S dollars (USD), 3 trades for euros (EUR) and 1 trade for Great Britain pounds (GBP).

62.     IRS-CI obtained STERLINGOV's true-name account records from Nordea Bank and Swedbank. An analysis of account records revealed STERLINGOV received fiat currency deposits from VIRTUAL CURRENCY EXCHANGER 1 totaling approximately $176,508.46. These deposits consisted of SEK and EUR payments processed through the Swish22 and SEPA23 mobile payment systems, which are used as payment methods for, *inter alia*, VIRTUAL CURRENCY EXCHANGER 1 transactions.  In 2018 and 2019, fiat currency proceeds from BTC sales on VIRTUAL CURRENCY EXCHANGER 1 constituted almost the entirety of deposits into STERLINGOV's Nordea and Swedbank accounts.

63.     Investigators are not aware of any significant sources of legitimate income for STERLINGOV from the date of BITCOIN FOG's inception through the present.  Following his arrest on April 27, 2021, STERLINGOV told Pretrial Services that he performed "freelance work"

in web development and film, that he worked for a company named "Code Reactor," that he worked on and off in "life coaching," and that he supported himself by his investments. However, investigators have not been able to substantiate these any salary or payment from STERLINGOV's supposed clients. Instead, most of STERLINGOV's known assets appear to be derived directly or indirectly from BTC traceable to BITCOIN FOG.

**The TARGET PROPERTIES**

64.     Records from Payward Ventures, Inc. dba Kraken ("Kraken") identified two accounts opened by STERLINGOV:  account #███████████DGMY, held in the name of Roman Sterlingov ("TARGET ACCOUNT 1"); and account #████████████KQ5Y, held in the name of TO THE MOON LTD | ROMAN ("TARGET ACCOUNT 2").

65.     According to records provided by Kraken, STERLINGOV opened TARGET ACCOUNT 1 in the name of Roman Sterlingov on or about March 18, 2014, using the email address of info@dangerzone.today and providing STERLINGOV's home address in Gothenburg, Sweden.  Blockchain analysis revealed that, from the date of account opening through the present, TARGET ACCOUNT 1 received a total of 129.83 BTC in deposits (valued at approximately $593,697 based on the prices on the date of each deposit).  The majority of these deposits were traceable to either BITCOIN FOG (83.84 BTC) or to VIRTUAL CURRENCY EXCHANGER 1 (17.75 BTC).

66.     According to records provided by Kraken, STERLINGOV opened TARGET ACCOUNT 2 in the name of TO THE MOON LTD | ROMAN on or about March 16, 2015, using the email address hq@moonvpn.org and providing an address in Malta.  In connection with opening this account, STERLINGOV provided a copy of his passport to Kraken.  Blockchain analysis revealed that, from the date of account opening through the present, TARGET

ACCOUNT 2 received a total of 14.325 BTC in deposits (valued at approximately $13,145.36 based on the prices on the date of each deposit).  The majority of these deposits were traceable to BITCOIN FOG (11.454 BTC).

67.     According to records provided by Romanian police, STERLINGOV leases server space and a block of IP addresses from a hosting provider based in Romania.  Under this arrangement, STERLINGOV leases rack space but provided his own computer hardware for the server.  According to subscriber information provided by Romanian police, STERLINGOV leased the server space beginning in or about 2015 using a company called "To The Moon Ltd" using the email address info@dangerzone.today, corresponding to the company name associated with TARGET ACCOUNT 2 and the email address associated with TARGET ACCOUNT 1.

**Conclusion of Probable Cause**

68.     Based on the foregoing, there is probable cause to believe that the contents of the TARGET ACCOUNTS constitute the proceeds of, and property involved in, STERLINGOV's operation of BITCOIN FOG, in violation of, *inter alia*, 18 U.S.C. § 1956(a)(3) and 18 U.S.C. § 1960, and are therefore subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1) and 18 U.S.C. § 981(a)(1)(A).

**REQUEST TO SUBMIT WARRANT BY TELEPHONE
OR OTHER RELIABLE ELECTRONIC MEANS**

69.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that staff from the United States Attorney's Office are capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

Based on the forgoing, I request that the Court issue the proposed seizure warrants for each of the TARGET PROPERTIES.  Because the warrant will be served on Payward Ventures, Inc. dba Kraken, which will then collect the funds at a time convenient to it and wire it to the government, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Devon Beckett
Special Agent
IRS Criminal Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 17, 2021.

Robin M. Meriweather
2021.06.17 13:30:36
-04'00'

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE