# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S NOTICE AND MOTION *IN LIMINE* REGARDING WILLFUL BLINDNESS INSTRUCTION AS TO COUNTS ONE AND THREE, AND PERMISSION TO REFER TO WILLFUL BLINDNESS IN OPENING STATEMENT

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully provides notice and moves this Court *in limine* to find that a willful blindness jury instruction is appropriate for Counts One and Three, and to permit the government to refer to willful blindness in its opening statement when discussing these Counts. In support whereof, the government states as follows:

## FACTUAL BACKGROUND

On February 14, 2022, a federal grand jury in the District of Columbia returned an indictment against the defendant, Roman Sterlingov ("Sterlingov" or the "defendant"), on counts of Conspiracy To Commit Money Laundering, in violation of 18 U.S.C. § 1956(h); Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A), (B); Operating an Unlicensed Money Transmitting Business and Aiding and Abetting, in violation of 18 U.S.C. § 1960(a) and 18 U.S.C. § 2; and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).

As summarized by the sworn agent affidavit in support of the criminal complaint in this case, ECF No. 1-1, and in pretrial briefing, Sterlingov served as the principal operator of one of the largest and longest-running darknet money laundering and money transmission services known

as Bitcoin Fog from 2011 until his arrest on April 27, 2021.  For a variable fee, Bitcoin Fog allowed

users to send bitcoins to designated recipients in a manner designed to conceal and obfuscate the

source of the bitcoins.  ECF No. 1-1, at 1–2.  This type of service is commonly referred to as a

bitcoin "mixer" or "tumbler."  The largest volume of transactions sent through Bitcoin Fog, worth

more than $78 million, directly involved illegal darknet markets trafficking illegal narcotics and

other illicit goods.  *See* ECF No. 1-1, at 2-4.  One of these markets, Agora, was promoted by

Bitcoin Fog and vice-versa.  Agora market accounted for the largest identifiable share of

transaction volume on Bitcoin Fog.  *See* ECF No. 1-1, at 4.

Bitcoin Fog advertised its ability to help users evade law enforcement, including in an

online forum post announcing that Bitcoin Fog would make it difficult for "authorities" and others

to trace users' bitcoin transactions and "making it impossible to prove any connection between a

deposit and a withdraw inside our service."  ECF No. 1-1, at 2.  Evidence at trial will show that

Bitcoin Fog was designed and advertised for the purpose of laundering bitcoin without collecting

records of users' identities or their individual transactions.  Statements made on BitcoinTalk by

Sterlingov's online moniker, Akemashite Omedetou, confirmed that Bitcoin Fog was deliberately

designed to avoid collecting such information:

- When asked whether Bitcoin Fog was a "honeypot," he replied: "That's a difficult one, isn't it?  If you have any good ideas of how I could prove the service is not run by the government, I would like to hear them! :P   Everything I have is circumstantial, but here are some points:  The service specifically tries not to collect *any* extra information about users than what is needed.  Any government-run site would probably use this chance to get as much information about users as they could . . . ."

- Responding to a question asking about the difference between Bitcoin Fog and any other web service that accepts bitcoin deposits, he stated: "Well because you don't actually KNOW that the service is going to launder your coins.  And because all 'normal' services can and do keep logs of usernames/ip addresses linked to deposits.  Should the time come, the police won't try to guess what happened from the block chain, they will simply come to the service and ask for the information

from the logs, which any legitimate service will provide because they don't want any problems with the law.  They are also much easier to find and contact for the authorities than an anonymous-good-luck-to-find tor hidden service."

- Responding to a question about the difference between Bitcoin Fog and an ordinary virtual currency exchange, he stated: "As I see it, you do get some anonymity by mixing it like that (and that is the only other choice apart from mixing services I guess), but those companies do not try to make your payments anonymous deliberately, do not mix a lot just to hide all the traces.  Most of them are also run as legitimate, visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities.  I would assume they are also keeping very long logs, since they don't have any reason not to.  Us on the other hand, the authorities have to find first, which, as Silk Road have demonstrated, can prove problematic."

- "We keep logs for 1 week for debugging and troubleshooting purposes.  After that they are automatically deleted.  ALL logs are taken care of.  Even the bitcoin client we use is purged every week, starting with a fresh installation of only the block chain, and importing all the addresses we need at that point automatically.  That way, if you have received a payment from us a month ago, not even the address will be left on our server."

- "As for logs, based on my experience with similar web applications, any website that says 'we don't keep logs as all, not even for 1 second' are basically lying.  What if the server crashes in a middle of a transaction?  What if your server was down for hours yesterday and you don't know why? etc. etc.  No good web master or programmer will have such a service running without any logs at all.  That is why our policy is to be open about this, and make sure everything is deleted after one week (by making this automatic)."

- "Oh, but there is a BIG difference here.  MTGOX is an official company with official owners, addresses, taxes...  They never were nor ever said they would be anonymous.  If any problem with the law ever comes up, all their logs will be in the hands of well, you know.  Japan is probably as far from the offshore mentality as it gets.  But apart from that, if you would deposit your money to MTGOX, and then manually payout it to your other addresses, manually randomizing all the transactions, then sure, it would be like our service.  We do this automatically, anonymously and without any persisting logs."

Sterlingov's knowledge that his service, Bitcoin Fog, was transacting in the proceeds of illegal activity is one of the elements in Counts One and Three.[1]  In Count One, Sterlingov is

---

[1] Sterlingov is also charged in Count Two with violation of the "sting" money laundering statute, 18 U.S.C. § 1956(a)(3), which makes it a crime to conduct certain transactions with "property *represented to be* the proceeds of specified unlawful activity, or property used to conduct or

charged with conspiring with co-conspirators known and unknown, including darknet vendors and darknet market administrative teams, to commit various money laundering offenses—specifically, promotional money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Both violations require proof that the defendant knew that the property being laundered constituted the proceeds of "some form of unlawful activity." 18 U.S.C. § 1956(a)(1).

In Count Three, Sterlingov is charged with operating an unlicensed money transmitting business, in violation of each of the three prongs of 18 U.S.C. § 1960(b)(1).  Under the third prong, Sterlingov is charged with operating a money transmitting business that "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."  18 U.S.C. § 1960(b)(1)(C).  Thus, this prong—to the extent it relies on transmission of funds "known . . . to have been derived from" criminal activity—also requires proof of the defendant's knowledge.

## ARGUMENT

### I.      Willful Blindness Is Well-Established by Supreme Court and Other Judicial Precedent

"The doctrine of willful blindness is well established in criminal law."  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).  "[I]n the federal courts, willful blindness

---

facilitate specified unlawful activity" (emphasis added).  There is no separate knowledge requirement under § 1956(a)(3) regarding the source of the funds.  *See* 134 Cong. Rec. S17360-02 (Nov. 10, 1988) (Senate Judiciary Committee analysis of Anti-Drug Abuse Act of 1988) ("The amendment would add to section 1956 a new subsection (a)(3) dealing specifically with undercover operations. . . .  [T]here would not be any separate knowledge requirement regarding the source of the property involved in the transaction.  The defendant would not have to know or believe that the property involved in the financial transaction was drug money.  It would be sufficient that a law enforcement officer had represented it as such.  While this would mean that everyone involved in the financial transaction would be guilty of this offense whether he was aware of the law enforcement officer's representation or not, the strengthened specific intent requirement would guard against innocent persons being prosecuted.")

instructions—sometimes called 'deliberate ignorance' or 'conscious avoidance' or 'ostrich' instructions—are now commonly given and commonly upheld." *United States v. Alston-Graves*, 435 F.3d 331, 338 (D.C. Cir. 2006) (collecting cases); *see also Global-Tech*, 563 U.S. at 768 (noting the "long history of willful blindness and its wide acceptance in the Federal Judiciary").

A willful blindness jury instruction prevents defendants from "escap[ing] the reach of" statutes that require knowledge or willfulness as an element "by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances." *Global-Tech*, 563 U.S. at 766; *see also United States v. Holloway*, 731 F.2d 378, 381 (6th Cir. 1984) (deliberate ignorance instruction "prevents a criminal defendant from escaping conviction merely by deliberately closing his eyes to the obvious risk that he is engaging in unlawful conduct."). "The traditional rationale for th[e] [willful blindness] doctrine is that defendants who behave in this manner are just as culpable as those who have actual knowledge." *Global-Tech*, 563 U.S. at 766; *see also United States v. Gross*, 661 F. App'x 1007, 1020 n.25 (11th Cir. 2016) (per curiam) ("This court has consistently recognized deliberate ignorance of criminal activity as the equivalent of knowledge.") (internal quotations omitted); *United States v. Tai*, 750 F.3d 309, 314 (3d Cir. 2014) ("A willful blindness instruction is typically delivered in the context of explaining how the Government may sustain its burden to prove that a defendant acted knowingly in committing a charged offense.").

In *Global-Tech*, the Supreme Court surveyed Courts of Appeals cases applying willful blindness in the criminal context. 563 U.S. at 769 & n.9. It found that "[w]hile the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of

that fact." *Id.* at 769.  The Court held that "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.*

In *Alston-Graves*, decided before *Global-Tech*, the D.C. Circuit expressed concern that a willful blindness instruction might result in a jury "convict[ing] a defendant for acting recklessly . . . or even for acting negligently." *Alston-Graves*, 435 F.3d at 340.  The Supreme Court directly addressed that concern in *Global-Tech*.  It concluded that the two requirements for willful blindness that it had pronounced "give willful blindness an appropriately limited scope that surpasses recklessness and negligence." *Global-Tech*, 563 U.S. at 769.

The Government does not need to "present direct evidence of conscious avoidance to justify a willful blindness instruction." *United States v. Stadtmauer*, 620 F.3d 238, 259 (3d Cir. 2010) (emphasis omitted).  A sufficient factual predicate exists if "there is evidence that the defendant engaged in behavior that could reasonably be interpreted as having been intended to shield him from confirmation of his suspicion that he was involved in criminal activity." *United States v. Macias*, 786 F.3d 1060, 1062 (7th Cir. 2015); *see also United States v. Lange*, 834 F.3d 58, 78 (2d Cir. 2016) ("To establish a factual predicate, there must be evidence that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.") (internal quotations omitted); *United States v. Trejo*, 831 F.3d 1090, 1095 (8th Cir. 2016) ("A willful blindness or deliberate indifference instruction is appropriate when there is evidence to support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts."); *United States v. Ford*, 821 F.3d 63, 74 (1st Cir. 2016) (evidence supporting willful blindness instruction "can include evidence that the defendant was confronted with 'red flags'"); *United States v. Moreno-Azua*, 598

F. App'x 150, 154 (4th Cir. 2015) (per curiam) (willful blindness instruction appropriate when defendant's "theory of defense, as asserted in his opening and closing arguments, was that the Government lacked sufficient evidence to establish his knowledge" and there were a "myriad of warning signs" to support deliberate ignorance); *Moore v. Hartman*, 102 F. Supp. 3d 35, 118 (D.D.C. 2015) ("plainly or deliberately ignor[ing] [] red flags" raises issue of willful blindness).

"[T]he government is not required to choose between an actual knowledge and a conscious avoidance theory." *United States v. Addario*, 662 F. App'x 61, 64 (2d Cir. 2016) (summary order). "[A]ssuming there to be sufficient evidence as to both theories, it is not inconsistent for a court to charge a jury on both an actual knowledge theory and a willful blindness theory." *United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999). "[E]ven when there is evidence of actual knowledge, a willful blindness instruction is proper if there is sufficient evidence to support an inference of deliberate ignorance." *United States v. Magallon*, 984 F.3d 1263, 1286 (8th Cir. 2021) (quoting *United States v. Lewis*, 557 F.3d 601, 613 (8th Cir. 2009)).

## II.    A Willful Blindness Instruction Is Particularly Appropriate for Money Laundering Counts

Courts have recognized that a willful blindness instruction is particularly appropriate in money laundering cases. For example, in *United States v. McBride*, 724 F.3d 754, 757 (7th Cir. 2013), the Seventh Circuit relied on *Global Tech* and another Supreme Court decision, *United States v. Santos*, 553 U.S. 507 (2008),[2] to find that "willful blindness" was sufficient to establish

---

[2] In the plurality opinion in *Santos*, Justice Scalia observed that "the knowledge element of [a] money-laundering offense—knowledge that the transaction involves profits of unlawful activity— that will be provable (as knowledge must almost always be proved) by circumstantial evidence." 553 U.S. at 521. Separately, and in addition to circumstantial evidence of direct knowledge, the plurality went on to discuss the applicability of a willful blindness instruction: "Moreover, the Government will be entitled to a willful blindness instruction if the professional money launderer, aware of a high probability that the laundered funds were profits, deliberately avoids learning the

the knowledge required for a money laundering conspiracy in violation of 18 U.S.C. § 1956(h). The court found that that the defendant's friend was willfully blind to the source of the defendant's proceeds. *Id.* The court relied on the fact that the friend "knew the defendant was a drug dealer, knew that most of the money she was depositing didn't come from the sale of clothing, and either knew that the money could have come only from his drug dealings or suspected as much yet feared that inquiring of the defendant would confirm her suspicion—a form of willful blindness that the law equates to knowledge." *Id.* (citing *Global-Tech* and *Santos*). Thus, the failure to inquire as to the source of suspected illegal funds is a "deliberate action[]" that satisfies the willful blindness standard articulated in *Global-Tech*.

In *United States v. Flores*, the Third Circuit held that knowledge may be demonstrated by showing that a defendant either had actual knowledge or "deliberately closed his eyes to what otherwise would have been obvious to him concerning the fact in question." 454 F.3d 149, 155-56 (3rd Cir. 2006) (internal citation and quotation omitted). That the defendant "did not ask the natural follow-up questions to determine the source of those funds could reasonably be considered by a jury to be evidence of willful blindness." *Id.* (quoting *United States v. Wert-Ruiz*, 228 F.3d 250, 257 (3d Cir.2000)). Instead of asking these questions, the defendant engaged in additional money laundering transactions of the same ilk. *Flores*, 454 F.3d at 155-56. "In sum, the jury's verdict reflects that it reasonably concluded, based on the evidence before it, that Flores was willfully blind to the illegal source and disposition of the funds in the accounts of the corporations he formed." *Id.* Thus, the failure by a person to ask questions regarding the legitimacy of the

---

truth about them—as might be the case when he knows that the underlying crime is one that is rarely unprofitable." *Id.*

money involved in transactions in their name is a deliberate action warranting a willful blindness instruction.

The legislative history of the money laundering statute confirms that a willful blindness instruction is appropriate.  Relying on the Senate report for the bill that enacted Section 1956, the Sixth Circuit found that the knowledge element should be interpreted broadly.  *See United States v. Hill*, 167 F.3d 1055, 1066-67 (6th Cir. 1999).  The court relied in part on language from the Senate Report explaining that the knowledge requirement for money laundering was intended "to include instances of 'willful blindness.'" *Id.* (quoting S. Rep. No. 99-433 (1986), at 9).  Similarly, the Seventh Circuit relied upon this same report when upholding the use of a willful blindness instruction.  *See United States v. Antzoulatos*, 962 F.2d 720, 724-25 (7th Cir. 1992).  In *Antzoulatos*, the court noted in dicta that the legislative history of Section 1956 confirmed that more than a mere suspicion is required on a merchant's part that his customers are drug dealers. *Id.* at 724 n.3.  In fact, an earlier version of the statute contained "reason to know" and "reckless disregard" for the knowledge standards; however, the legislature replaced this language with "knowingly." *Id.*  Yet, the report noted, as stated above, "'knowing' was to be defined like existing 'knowing' scienter requirements, to include instances of 'willful blindness.'" *Id.*  Because the legislative history specifically identifies willful blindness as satisfying the knowledge element of money laundering, it is appropriately applied in this case.

Numerous federal courts of appeals have held that a willful blindness instruction is appropriate in a money laundering prosecution.  *See United States v. Miller*, 41 F.4th 302, 314 (4th Cir. 2022) (approving willful blindness instruction because "there was ample evidence to infer that [the defendant] subjectively believed there was a high probability [his co-conspirator spouse] was laundering their money" and "to infer that [the defendant] took deliberate actions to avoid learning

9

the specifics of the money-laundering scheme."); *United States v. Alaniz*, 726 F.3d 586, 611-13 (5th Cir. 2013) (approving "deliberate indifference" instruction where defendants conducted multiple financial transactions for which they did not have legitimate funds to conduct, allowed others to conduct transactions through their accounts, and received large cash deposits and wire transfers into their bank accounts); *United States v. Clay*, 618 F.3d 946, 953-54 (8th Cir. 2010) (finding willful blindness instruction appropriate where jury could reasonably conclude that defendant either knew of the illegal activity or buried his head in the sand); *United States v. Bohn*, 281 F. App'x 430, 441 (6th Cir. 2008) (unpublished) ("In this Circuit the knowledge requirements of § 1956 are construed to include instances of willful blindness."); *United States v. Rivera-Rodriguez*, 318 F.3d 268, 272 (1st Cir. 2003) ("[I]t would suffice for the jury to conclude that Trinidad consciously averted his eyes from the obvious explanation for the funds; he did not have to witness drug dealing or hear a confession."). In addition, at least one circuit has referenced willful blindness among its pattern money laundering instructions. *See* Eighth Circuit Pattern Instructions, at 533 n.12 ("The 1956(a)(1)(B) 'knowing' requirement encompasses instances of 'willful blindness.'"). Although *Alston* noted various circuits' decisions advising that willful blindness instructions are rarely appropriate, it also stated that willful blindness instructions "are now commonly given and commonly upheld" and that "[a]ll of the other circuits with criminal jurisdiction have approved such instructions for a wide range of criminal offenses." 435 F.3d 338, 341.

The same logic applies to the knowledge prong under 18 U.S.C. § 1960(b)(1)(C), which parallels the substance of Section 1956 in referring to the defendant's knowledge that the funds involved in the transactions were derived from a criminal offense. *Compare* 18 U.S.C. § 1956(a)(1) (referring to defendant "knowing" that property represented "proceeds of some form

of unlawful activity"), *with* 18 U.S.C. § 1960(b)(1)(C) (referring to whether funds are "known" by defendant to have been "derived from a criminal offense").  Indeed, § 1960(b)(1)(C) is sometimes characterized as a kind of "money laundering" offense, *e.g.*, *United States v. Hellinger*, 538 F. App'x 211, 213 (3d Cir. 2013) (referring to "money laundering in violation of 18 U.S.C. § 1960(b)(1)(C)"), and violations of § 1960(b)(1)(C) are sentenced under the money laundering guideline, U.S.S.G. § 2S1.1, rather than the guideline that applies to federal and state registration offenses, U.S.S.G. § 2S1.3.  Congress enacted subsection (b)(1)(C) as a new offense under Section 1960 in 2001 as part of the USA Patriot Act.  *See* Pub. L. 107-56, tit. III, § 373(b), 115 Stat. 272 (Oct. 26, 2001).  In doing so, Congress would have been aware of the existing body of case law applying willful blindness to Section 1956, including the decisions discussed above in *United States v. Hill*, 167 F.3d 1055 (6th Cir. 1999), and *United States v. Antzoulatos*, 962 F.2d 720 (7th Cir. 1992), and can be presumed to have adopted this construction of the knowledge element into the new § 1960(b)(1)(C).  *See Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, 139 S. Ct. 628, 634 (2019) ("In adopting the language used in the earlier act, Congress must be considered to have adopted also the construction given by this Court to such language, and made it a part of the enactment.") (quoting *Shapiro v. United States*, 335 U.S. 1, 16 (1948); internal quotations omitted).

Here, the government anticipates introducing both direct and circumstantial evidence of the defendant's *actual* knowledge that the bitcoin funds laundered through Bitcoin Fog represented the proceeds of darknet drug trafficking offenses and other unlawful activity.  In addition, the government respectfully submits that a willful blindness instruction would be appropriate in light

of *Global-Tech* and the other authorities discussed above.[3]  Finally, on the basis of the evidence it expects to introduce, and such legal authority, the government seeks permission to refer to willful blindness in the government's opening statement.

_____

[3] The government will submit its final proposed jury instructions as required by the Court's pretrial scheduling order.  Meanwhile, for ease of reference, other Circuit Courts of Appeals have similar model instructions. Among others, the Eighth Circuit Criminal Pattern Instruction reads:

> You may find that the defendant [(name)] acted knowingly if you find beyond a reasonable doubt that the defendant [(name)] believed there was a high probability that (state fact as to which knowledge is in question (*e.g.*, that "drugs were contained in his suitcase")) and that [he] [she] took deliberate actions to avoid learning of that fact. Knowledge may be inferred if the defendant [(name)] deliberately closed [his] [her] eyes to what would otherwise have been obvious to [him] [her]. A willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. You may not find the defendant acted "knowingly" if you find he/she was merely negligent, careless or mistaken as to (state fact as to which knowledge is in question (*e.g.*, that "drugs were contained in his suitcase")).

Instruction 7.04 ("Deliberate Ignorance/Willful Blindness") at 693 (footnote omitted), available at https://www.ca8.uscourts.gov/sites/ca8/files/2021%20Edition-Criminal%20Jury%20Instructions.pdf .  Similarly, the parallel Fifth Circuit Criminal Pattern Jury Instruction reads:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his [her] eyes to what would otherwise have been obvious to him [her]. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself [herself] to the existence of a fact.

Instruction 1.42 ("Deliberate Ignorance") at 63, available at https://www.lb5.uscourts.gov/juryinstructions/fifth/crim2019.pdf.  Other Circuits have a similar standard instruction:.  *See, e.g.*, Third Circuit Model Criminal Instruction 5.06 (Willful Blindness [Deliberate Ignorance]), available at https://www.ca3.uscourts.gov/sites/ca3/files/2021%20Chapter%205%20for%20posting%20final.pdf ; Sixth Circuit Pattern Criminal Jury Instructions, Instruction 2.09 (Deliberate Ignorance), available at https://www.ca6.uscourts.gov/sites/ca6/files/documents/pattern_jury/pdf/crmpattjur_full.pdf ; Eleventh Circuit Pattern Jury Instructions, Criminal Cases, Instruction S8 (Deliberate Ignorance as Proof of Knowledge), available at https://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormCriminalPatternJuryInstructionsRevisedMAR2022.pdf .

## CONCLUSION

For the foregoing reasons, the government respectfully provides notice and moves for this Court to allow a willful blindness jury instruction and to permit the government to refer to willful blindness in its opening statement.

<div style="margin-left: 40%;">

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
C. Alden Pelker, Maryland Bar
Trial Attorney, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007
Catherine.Pelker@usdoj.gov

</div>