**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S OMNIBUS MOTIONS *IN LIMINE***

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully files its opposition to the Defendant's Motions *in Limine*, ECF No. 59. In opposition wherefore, the government states as follows:

**I.      Blockchain Analysis Is Highly Reliable and Admissible Under *Daubert***

**A.  Introduction**

The defendant seeks to exclude evidence and testimony regarding blockchain analysis and requests a "Daubert/Frye hearing" to challenge the government's use of such evidence. *See* ECF No. 59, at 6-12. The defendant offers few specifics about the basis for his challenge other than conclusory assertions that blockchain analysis is "junk science" or otherwise unreliable. Nor does the defendant offer any meaningful analysis of Rule 702 or the established factors for considering admissibility of expert testimony. This challenge should be rejected. As set forth below, the government's proposed expert testimony regarding blockchain analysis—a widely accepted methodology relied on by the financial services industry as well as law enforcement—easily clears the *Daubert* standard and will be probative and helpful to the jury.

In the Government's Notice of Intent to Present Expert Testimony, ECF No. 61—filed contemporaneously with the defendant's motions *in limine*—the government provided notice to

the Court and the defendant that it intends to call Federal Bureau of Investigation (FBI) Staff Operations Specialist Luke Scholl and Chainalysis Director of Investigation Solutions Elizabeth Bisbee to testify as experts in blockchain analysis.  The notice set forth the areas of Mr. Scholl's and Ms. Bisbee's anticipated testimony and advised that both Mr. Scholl and Ms. Bisbee were preparing expert reports which the government would provide to the defense upon completion. *See* ECF No. 61, at 3-8.  Mr. Scholl's and Ms. Bisbee's curricula vitae detailing their extensive qualifications were provided to defense counsel under separate cover. The government has produced its analysis to the defense in discovery, and additional detail regarding the clustering methodology and tracing specific to this case will be included in Mr. Scholl's and Ms. Bisbee's reports.  The government anticipates that these reports will more than resolve any actual good-faith concerns that the defense has regarding the soundness of the government's methodologies.

As set forth in the following sections, the government's blockchain analysis far surpasses the *Daubert* standard of reliability.  Blockchain analysis is widely accepted by law enforcement and the financial services industry, has been the subject of significant academic research, and has undergone robust vetting and testing.  Findings from blockchain analysis can be verified using the publicly available blockchain, and numerous courts have found blockchain analysis to be reliable. The government submits the below information to assist the court in making its reliability finding, and will make Mr. Scholl and Ms. Bisbee available for a *Daubert* hearing if the court so chooses.

**B.  Blockchain Analysis Explained**

To undertake a *Daubert* analysis, a court need not become a technical expert in the matter, but need only "assess the methodology employed by the expert as a means of ensuring evidentiary reliability."  *SEC v. Johnson*, 525 F. Supp. 2d 66, 68 (D.D.C. 2007).  As discussed in previous filings, blockchain analysis refers to the practice of reviewing and analyzing the bitcoin

blockchain, an authoritative public ledger containing a record of every bitcoin transaction that has ever occurred.  While blockchain analysis could in theory be done by hand—manually retrieving and reviewing individual transaction records recorded on the blockchain—blockchain analysis software can significantly speed and improve the process.  This software, sometimes likened to a graphing calculator, is particularly useful where defendants seek to conceal their activity by sending funds through a series of hundreds of transactions, or where law enforcement is investigating a criminal service—such as Bitcoin Fog—that controls thousands of bitcoin addresses.  *See generally* ECF No. 50, at 10-11.

Much blockchain analysis, including a significant portion of the work done in this case, is basic tracing, following funds from one address to another.  It is similar to a forensic accountant tracing funds across multiple accounts by reviewing bank wires and statements.  The defense's own purported "expert"[1] acknowledges:

> A core foundational concept of blockchain technology, such as in the Bitcoin implementation, is the idea that all transactions are broadcast publicly and recorded on a public ledger, of which a full copy is held by each participating node in the network. . . .  Which means the act of looking up a historic block along the chain is not a mystical, mysterious, proprietary, or sophisticated thing in and of itself.

ECF No. 47-1 at 9 (Vickery Decl.).  The defense does not challenge such address-to-address tracing—which, notably, shows the defendant paying for Bitcoin Fog infrastructure and receiving proceeds from the Bitcoin Fog cluster year after year.

In addition to tracing bitcoin from one address to the next, "[i]t is possible to identify a 'cluster' of Bitcoin addresses held by one organization by analyzing the Bitcoin blockchain's transaction history," and "[o]pen source tools and private software products can be used to analyze

---

[1] The defendant has not noticed any experts for trial.  The government refers here to the declaration of Christopher Vickery, submitted in support of some of the defendant's pretrial motions.

a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).  Most notably in

this case, law enforcement was able to identify the cluster of addresses controlled by Bitcoin Fog.

In considering a civil forfeiture action in this District, Judge Contreras explained

blockchain analysis and clustering:

> By analyzing the blockchain (the public ledger that records transactions) law
> enforcement can ascertain the counterparties' unique bitcoin addresses.  And
> because users often combine multiple bitcoin addresses and use them together in
> the same transaction . . . analysis of one transaction might reveal many addresses
> belonging to a single individual or organization.  Several private companies have
> used that kind of analysis to identify bitcoin address clusters associated with the
> same parties.  With the right clues, one can then attribute a cluster to a particular
> individual or organization.  Authorities took advantage of third-party blockchain
> software to perform the investigation here.

*United States v. 155 Virtual Currency Assets*, 2021 U.S. Dist. LEXIS 69035, at *4 (D.D.C. Apr.

9, 2021) (cleaned up).

Clustering uses information from the blockchain to group addresses together into common

ownership.  At a small scale, this allows law enforcement to connect multiple addresses that were

used by a single target, perhaps held in his wallet on his personal computer.  Clustering also applies

to large services which control thousands of bitcoin addresses.  For example, law enforcement was

able to identify many addresses controlled by Bitcoin Fog and group them together as a "cluster."

Similarly, addresses controlled by darknet marketplaces, virtual currency exchanges, and other

services can often be grouped together in clusters based on their activity on the blockchain.

Clustering is based on patterns of transactional behavior observed on the bitcoin

blockchain, sometimes referred to as heuristics.  The most common basis for "clustering" is called

"co-spend," "common input," or "multi-input" analysis.  Co-spending occurs when multiple input

addresses are used to send bitcoin in a single transaction, indicating that a single owner holds the

private keys for all of those addresses.  For example, Person A may control two addresses, one

with two bitcoins (Address 1), and one with three bitcoins (Address 2).  If Person A chose to send Person B five bitcoins, analysis of the blockchain would show that Address 1 and Address 2 were both inputs in a single transaction transferring five bitcoins to the receiving address, demonstrating that Address 1 and Address 2 were both controlled by the same person.  The concept of co-spend or multi-input analysis is so fundamental that it was discussed in the white paper on bitcoin authored by its pseudonymous inventor.  *See* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System*, at 6 (2008) ("Some linking is still unavoidable with multi-input transactions, which necessarily reveal that their inputs were owned by the same owner.  The risk is that if the owner of a key is revealed, linking could reveal other transactions that belonged to the same owner."), https://bitcoin.org/bitcoin.pdf.

Co-spending is not the only technique used in blockchain analysis and tracing.  For example, in his declaration in support of the Government's Opposition to the Defendant's Motion for Return of Assets, ECF No. 53-5, Mr. Scholl noted the use of "peel chains."  Mr. Scholl described peel chains as "a pattern of Bitcoin transactions that occurs when a relatively large amount of Bitcoin is gradually spent in multiple, sequential transactions such that each transaction has two outputs; one output constituting a payment to a separate entity, and one output consisting of the 'change' (or the remainder of the initial value) sent to a new Bitcoin address which is controlled by the same entity as the original address."  *Id.* at 8.  Mr. Scholl's declaration showed an example of a peel chain, moving bitcoin from the Bitcoin Fog cluster through a sequence of five addresses before being deposited into the defendant's account.  Mr. Scholl explained that, based on his review of these transactions, these intermediary addresses are likely controlled by the same entity.  Mr. Scholl further explained: "Blockchain analysis is required to assess which output represents a payment and which output represents the 'change' and is therefore controlled by the

original entity." *Id.* Further detail regarding the clustering methodology and tracing specific to this case will be included in Mr. Scholl and Ms. Bisbee's forthcoming expert reports.

### C. The *Daubert* Framework

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and lists the four criteria that must to be met to admit expert testimony: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. Rule 702 was amended in response to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

The trial judge serves as a gatekeeper to the admissibility of expert testimony. Pursuant to *Daubert,* the trial court must undertake a "two-prong analysis that centers on evidentiary admissibility and relevancy: the district court must determine first whether the expert's testimony is based on 'scientific knowledge;' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996) (quoting *Daubert,* 509 U.S. at 592).

In *Daubert*, the Supreme Court provided several non-exclusive, non-dispositive factors for trial courts to consider when assessing the reliability of expert testimony. These factors include whether an expert's technique or theory (1) can be or has been tested; (2) has been subject to peer review and publication; (3) has a known or potential error rate; (4) has maintained standards controlling the technique's operation; and (5) has general acceptance in a relevant scientific community. *Daubert*, 509 U.S. at 593-94. Although *Daubert* listed these factors as examples of

things a trial court may consider in assessing scientific validity, the Court emphasized that the inquiry is a "flexible one." *Daubert*, 509 U.S. at 593-95. While *Daubert* focused on scientific evidence, the standard also applies to proffers of "technical, or other specialized knowledge." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999).

Since *Daubert*, the Supreme Court has cautioned that the sample factors listed in *Daubert* "do not constitute a definitive checklist or test." *Kumho Tire Co.*, 526 U.S. at 150. Rather, "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id* at 141. The Court has emphasized that district courts are granted "considerable leeway" in determining how to assess reliability. *Id.* at 152. "[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150 (internal quotations omitted). "[W]hether *Daubert*'s specific factors are, or are not, a reasonable measure of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153; *see also Ambrosini*, 101 F.3d at 139 (finding that "additional indicia of reliability" beyond the *Daubert* factors supported an expert witness's testimony); *SEC v. Johnson*, 525 F. Supp. 2d 66, 68 (D.D.C. 2007) (noting that "the factors discussed in *Daubert* were not necessarily applicable in every case, dispositive, or exhaustive"); *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 7 (D.D.C. 2002) (noting that "the standard under . . . 702 is a liberal and 'flexible' one, and that personal experience can be a reliable and valid basis for expert testimony," and "[t]his is particularly true with non-scientific testimony") (citing *Kuhmo Tire Co.¸* 526 U.S. at 149).

### D.  The *Daubert* Standard Is One of Inclusion and Favors Admission

*Daubert* provides guidelines for a trial judge in answering the question: Is the proposed

expert testimony sufficiently reliable?   "*Daubert* lowered the threshold for admissibility of scientific evidence, envisioning a 'limited gatekeeper role' for trial judges." *SEC v. Johnson*, 525 F. Supp. 2d at 68.   The Rules Advisory Committee observed: "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."   Fed. R. Evid. 702 advisory committee's note to 2000 amendment.   In exercising its gatekeeping function, courts must keep in mind the Supreme Court's admonition that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.   *Daubert* cautions against being "overly pessimistic about the capabilities of the jury and of the adversary system generally." *Id.* at 596.   Two recent cases in this Circuit have affirmed the broad view of evidence admissible under Daubert.

In *United States v. Morgan,* 45 F.4th 192 (D.C. Cir. 2022), the D.C. Circuit affirmed the district court's admission of an FBI agent's expert testimony about a two-day drive test that he conducted to determine the approximate coverage area of cell phone towers. *Id.* at 197–99.   The results of the drive test were relevant to showing that the defendant's and victim's phones were both located in the District of Columbia, and that the defendant's phone later pinged a coverage area completely in Maryland, including an area encompassing the defendant's home. *Id.*   The expert's testimony corroborated evidence that the defendant picked the victim up in D.C. before driving her to Maryland where he assaulted her. *Id.* at 198–99.

The defense challenged the government's failure to identify independent testing or sufficient peer review of the drive testing technique. The D.C. Circuit rejected this challenge, holding that the district court was reasonable in finding that "the wide acceptance of drive testing by engineers in the wireless industry, coupled with its use in law enforcement, offered sufficient

indicia of reliability to overcome the lack of independent studies." *Id.* at 203.

The Circuit also rejected the defense argument that the agent's testimony was insufficiently reliable because the agent could not explain the algorithms that processed the drive test data and generated the coverage maps used to support the testimony. *Id.* The Circuit noted that it has never held that Rule 702 "requires an expert to have a sophisticated understanding of the software underlying her technical tools," because if that was the case, then experts "could almost never testify on matters related to proprietary technology." *Id.* The Circuit noted that experts who present financial analysis conducted in Excel do not have to be experts in the program's algorithms used to generate its formulas and calculations. *Id.* The Circuit concluded:

> Even if [the agent] could not explain the inner workings of the software that generated the drive-test maps, he could assure the reliability of his drive test and the maps it generated through other means. [The agent] was indisputably qualified to testify about a technological tool that has earned wide acceptance in a relevant industry, and he used the tool in its customary manner. His inability to explain a proprietary algorithm did not pose a categorical bar to a finding of reliability.

*Id.*

In *United States v. Harris*, 502 F. Supp. 3d 28 (D.D.C. 2020), Judge Contreras found that expert testimony was admissible under *Daubert* even if it involved some element of subjective interpretation. The defendant in *Harris* unsuccessfully challenged the government's proposed expert testimony on a firearm and toolmark identification methodology, claiming that the methodology lacked a reliable scientific basis and was not the product of reliable principles, but rather "subjectivity." *Id.* at 32-33, 36. The *Harris* court found that, "[t]he fact that there are subjective elements to the firearm and toolmark identification methodology is not enough to show that the theory is not 'testable.'" *Id.* at 37. The court noted that that "a partially subjective methodology is not inherently unreliable." *Id.* at 42.

The decisions in *Morgan* and *Harris* illustrate the broad admissibility standard under

*Daubert*, which easily encompasses the verifiable, well-established, and reliable blockchain analysis methodology employed by the government's experts.

### 1. Blockchain Analysis Has Been Extensively Tested

The first *Daubert* factor considers whether the technique in question has been or can be tested. *Daubert* 509 U.S. at 593. This testability inquiry, as articulated in the Advisory Committee Notes to Rule 702, concerns "whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot be reasonably assessed for reliability." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. As *Harris* highlights, the fact that a methodology includes "subjective elements" does not indicate that the theory is not "testable." *Harris*, 502 F. Supp. 3d at 37. Nor must these tests necessarily be formal laboratory studies. As discussed at some length in the government's opposition to the most recent defense motion to reconsider pre-trial detention, ECF No. 50 at 10-17, the blockchain analysis used by the government has been extensively tested and vetted over the course of its use in numerous law enforcement investigations and by the financial services industry.

### i. Testing Through Law Enforcement Investigations

Over the course of this investigation, law enforcement traced transactions from the Bitcoin Fog cluster to clusters controlled by various virtual currency exchanges. Law enforcement then issued subpoenas to those exchanges asking for information pertaining to those transactions. This sort of tracing and subpoena issuance is a common practice among the thousands of virtual currency investigations conducted by law enforcement across the globe. Each and every subpoena issued is its own test—that the blockchain analysis software has correctly attributed a particular cluster of addresses to a particular virtual currency exchange.

This plays out similarly in searches and arrests. As the Fifth Circuit summarized in a case

involving users of a child sexual abuse material website:

> Federal agents used an outside service to analyze the publicly viewable Bitcoin blockchain and identify a cluster of Bitcoin addresses controlled by the Website. Once they identified the Website's Bitcoin addresses, agents served a grand jury subpoena on Coinbase . . . for all information on the Coinbase customers whose accounts had sent Bitcoin to any of the addresses in the Website's cluster. Coinbase identified Gratkowski as one of these customers. With this information, agents obtained a search warrant for Gratkowski's house. At his house, agents found a hard drive containing child pornography, and Gratkowski admitted to being a Website customer.

*United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

In this District, Magistrate Judge Faruqui approved a search warrant based in part on blockchain analysis performed with the assistance of specialized software, finding it particularly relevant that "'[l]aw enforcement has been able to verify the reliability of this software by ex-post analysis.'" *In the Matter of Search of Multiple Email Accts. Pursuant to 18 U.S.C. § 2703 for Investigation of Violation of 18 U.S.C. § 1956*, 585 F. Supp. 3d 1, 20 (D.D.C. 2022) (quoting search warrant affidavit). The court continued: "'For example, in an unrelated case, [Redacted] clustering software directed the government to over 50 customers of a darknet child pornography site. In each one of the 50 subsequent law enforcement actions, the software's data was corroborated by statements and search warrant returns from the targets' devices.'" *Id.* (quoting affidavit; alteration in original). Judge Faruqui emphasized, "success in the hundreds, with a perfect record in one case as corroborated by 50 search warrant returns, makes this clustering software one of the most reliable bases for a search ever." *Id.*

Similarly, law enforcement undercover operations provide additional opportunity to test a particular cluster. The government in this case verified the Bitcoin Fog cluster by conducting blockchain analysis on multiple undercover transactions that sent funds to Bitcoin Fog. In each transaction, the funds were sent to the cluster that the government had previously identified as

Bitcoin Fog's wallet.

### ii. Testing Through Comparison to the Public Bitcoin Blockchain

The ability to compare the data in Chainalysis or other blockchain analysis software products to the public blockchain offers yet another vector for testing and validation.  Chainalysis (like any blockchain analytics company) is thus particularly open to scrutiny, because its blockchain analytics work is subject to comparison with the publicly available blockchain by both the government and the defense.  The results from the blockchain analysis tracing in Chainalysis or other blockchain analytics tools can be replicated outside of the software products, it is simply labor intensive to do so.  One company explained, "Prior to selecting [Chainalysis] Reactor as its investigations solution, [the exchange] was doing the work manually, which was particularly challenging for investigating peel chains. With the new Peel Chain Detection feature in Reactor, the team can now automate much of that work with a single click."[2]

### iii. The Defense Can Conduct Its Own Testing

Because Chainalysis is a commercially available tool, the defendant has the opportunity for additional review through independent testing.  Furthermore, the foundation of blockchain analysis is built on a public data set, which anyone can access and review.  As discussed below, the government has produced discovery of its blockchain analysis in a variety of formats, including—at the defendant's request—the native Chainalysis graph files (in .grf file format) that the defense can review in the Chainalysis software itself.  The defense can completely recreate the government's blockchain analysis from scratch, address-by-address, if it so chooses.  It can probe each one of the hundreds of thousands of addresses used by the defendant in his laundering scheme.  In a prior submission, the defendant's "expert" described precisely this sort of testing in explaining

---

[2] Customer Story: Bitstamp, Chainalysis, https://www.chainalysis.com/customer-story-bitstamp/.

that, after "fixing a government investigator's single-character typo," "clicking a half dozen times is all that is necessary to follow a Bitcoin transaction across a publicly-available and intentionally open blockchain, as is the case and I was able to do."  ECF No. 47-1 at 8.

## 2.   Blockchain Analysis Is Well-Studied by Academics

The second *Daubert* factor inquires as to whether the expert methodology has been subject to peer review and publication.  *Daubert*, 509 U.S. at 593-94.  "Technical fields need not be held to the standard of peer review applicable to traditional sciences, which are often considered in scholarly journals." *Daubert,* 509 U.S. at 593-94.  "It is nevertheless appropriate to consider whether the fields have been subjected to meaningful peer review in determining its reliability." *United States v. Frabizio*, 445 F. Supp. 2d 152, 165-66 (D. Mass. 2006).  While blockchain analysis is a relatively young field, given that bitcoin emerged only in 2009, it has been the subject of extensive research interest over the past decade.  Academics from across the globe have studied blockchain analysis and written papers on numerous facets of blockchain analysis.  This includes work that has been peer reviewed and published in journals, as well as academic research that has otherwise been "submitted to the scrutiny of the scientific community." *Daubert*, 509 U.S. at 593.

The co-spend heuristic, which serves as the fundamental basis of clustering, was studied by researchers as early as 2011.  *See* Fergal Reid & Martin Harrigan, *An Analysis of Anonymity in the Bitcoin System*, 2011 IEEE International Conference on Privacy, Security, Risk, and Trust, and IEEE International Conference on Social Computing, https://users.encs.concordia.ca/~clark/biblio/bitcoin/Reid%202011.pdf.  By 2013, co-spending was commonly known and discussed among the blockchain research community.  In a 2013 research paper by a team of researchers from U.C. San Diego and George Mason University led by Sarah Meiklejohn, the team described co-spending as based on "an inherent property of the Bitcoin protocol" and recognized

that it "has already been used many times in previous work," citing to multiple research papers and conference presentations. Sarah Meiklejohn *et al.*, *A Fistful of Bitcoins: Characterizing Payments Among Men with No Names*, at 6 (IMC '13: Proceedings of the 2013 Conference on Internet Measurement Conference, Barcelona, Oct. 23-25, 2013), https://cseweb.ucsd.edu/~smeiklejohn/files/imc13.pdf.[3] In the subsequent decade, academic research focused on cryptocurrency, the blockchain, and blockchain analytics has grown tremendously.[4]

Beyond the realm of academia, Chainalysis, TRM, and other blockchain analysis companies frequently publish reports detailing tracing done by their in-house investigators.[5] These reports generally set out the companies' approach to tracing funds tied to particular incidents or groups of illicit activity.[6] They explain the companies' approaches to tracing, and show how the software tools can be used to track the funds. The reports are published online and widely promoted by the companies, offering an opportunity for review by other members of the blockchain analysis industry. Blockchain analysis companies, including Chainalysis, host

---

[3] The Meiklejohn paper cited, *inter alia*, Ellie Androulaki *et al.*, *Evaluating User Privacy in Bitcoin*, Proceedings of Financial Cryptography (2013); Fergal Reid & Martin Harrigan, *An Analysis of Anonymity in the Bitcoin System*, Sec. & Privacy in Soc. Networks (2013), at 197–223; Dorit Ron & Adi Shamir, *Quantitative Analysis of the Full Bitcoin Transaction Graph*, Proceedings of Financial Cryptography (2013).

[4] *See, e.g.,* George Kappos *et al.*, *How to Peel a Million: Validating and Expanding Bitcoin Clusters* (2022), at 2, https://arxiv.org/abs/2205.13882 (summarizing noteworthy academic work on bitcoin clustering and collecting citations). Chainalysis has shared its data with researchers, *see, e.g.*, *id.*, and Chainalysis' own staff researchers have submitted scholarly articles, both on their own and as part of larger University-led research teams. *See, e.g.*, Daniel Goldsmith et al., *Analyzing Hack Subnetworks in the Bitcoin Transaction Graph* (2019), https://arxiv.org/abs/1910.13415; Alberto Bracci et al., *Macroscopic Properties of Buyer-Seller Networks in Online Marketplaces* (2021), https://arxiv.org/abs/2112.09065.

[5] *See* blog.chainalysis.com/reports.

[6] *E.g.*, *Analysis of Recent NFT Discord Hacks Shows Some Attacks Are Connected*, TRM (July 25, 2022), https://www.trmlabs.com/post/trms-analysis-of-recent-surge-in-discord-hacks-shows-some-attacks-are-connected.

webinars and podcasts regarding tracing done using the companies' tools.[7]  Chainalysis and its peer companies frequently present their work at industry conferences, and Chainalysis hosts its own conferences to discuss blockchain analysis.

### 3.     The Government's Blockchain Analysis Is Designed To Avoid False Positives

A third *Daubert* factor inquires as to whether the expert methodology has a known or potential rate of error.  *Daubert*, 509 U.S. at 593-94.  The 2013 paper by Meiklejohn *et al.* reveals the challenge of calculating error rates in blockchain analysis—namely, that bitcoin users may engage in "adversarial" behavior deliberately designed to defeat tracing of their transactions.  As the Meiklejohn paper explains, in addition to the co-spending heuristic, there is the "change" heuristic, which "exploits a current *idiom of use* in the Bitcoin network rather than an inherent property."  Meiklejohn, *supra*, at 5.  For example, if Person A has an address holding 5 bitcoin and wants to send 1 bitcoin to Person B, Person A must initiate a transaction that spends the full 5 bitcoin, with 1 bitcoin going to Person B and the remaining 4 bitcoin being sent to another address—often, a new address automatically generated in Person A's wallet.  The pattern is similar to purchasing an item with a $20 bill and receiving change back, hence the name.  The researchers anticipated that a blind application of the change heuristic could result in an unacceptably high false positive rate; indeed, the researchers found an estimated 13% false positive rate with the first application.  The Meiklejohn paper explained that the research "focused on designing the safest heuristic possible, even at the expense of losing some utility by having a high false negative rate."  The researchers then applied additional filters, and the false positive rate dropped down to 0.17%.  Still unsatisfied with even that minimal false positive rate, the researchers further refined the

---

[7] *E.g.*, https://blog.chainalysis.com/webinars/.

heuristic and supplemented it with a manual review.  As Meiklejohn's team recognized, "changing (or adversarial) patterns in the network" would necessitate different approaches in applying additional heuristics based on idiom of use—now sometimes referred to as behavioral heuristics—rather than "inherent propert[ies]."  Meiklejohn, *supra*, at 6.

Meiklejohn's team's warning regarding "adversarial" patterns has borne out over time. Cognizant of law enforcement's advancements in blockchain analysis, some bitcoin users have taken steps to try to make it more difficult for law enforcement to trace their transactions on the blockchain.  Indeed, Bitcoin Fog is a prime example of a service that operated as a multi-million-dollar business specifically dedicated to rendering blockchain analysis less effective.  Another notable example is the use of "CoinJoin" techniques, in which multiple senders combine their bitcoin in a single transaction to make it more difficult for observers—namely, blockchain analytics companies and law enforcement—to determine which sender paid which recipient. CoinJoin is designed specifically to defeat the co-spend heuristic.  However, the use of CoinJoin is detectable, allowing researchers and practitioners to control for it.[8]

Law enforcement in this case has adopted a conservative approach to ensure that it is not including any addresses in a cluster that are not properly attributed.  As Mr. Scholl and Ms. Bisbee will testify, the clustering in the blockchain analysis used by the government is *intentionally underinclusive*.  That is, the government is intentionally conservative in its clustering in order to avoid the possibility of false positives.  Mr. Scholl will testify to numerous instances where he was able to manually review transactions, such as peel chains, with addresses that he has determined

---

[8] *See, e.g.*, Rainer Stütz, *et al.*, *Adoption and Actual Privacy of Decentralized CoinJoin Implementations in Bitcoin* (Sept. 14, 2022), https://arxiv.org/pdf/2109.10229.pdf (presenting highly accurate (>99%) algorithms pertaining to two popular CoinJoin implementations and determining that it is "possible to detect CoinJoin transactions with high accuracy using relatively simple algorithmic methods").

are controlled by Bitcoin Fog but which are *not* included in the Bitcoin Fog cluster.  This weighs in favor of the blockchain analysis' admissibility under *Daubert*.  As Judge Contreras noted in *Harris*, "the critical inquiry under this [*Daubert*] factor is the rate of error in which an examiner makes a false positive identification."  502 F. Supp. 3d at 39.  Judge Contreras in turn relied on *United States v. Otero*, 849 F. Supp. 2d 425 (D.N.J. 2012), which emphasized that "the critical validation analysis has to be the extent to which false positives occur."  *Id.* at 434.  The use of manual review or additional filtering to decrease the potential error rate does not undermine reliability under a *Daubert* analysis but instead demonstrates the low likelihood of inadvertent false positives.

While the methodology set forth above is intended to stringently safeguard against false positives, the government acknowledges that it is impossible to determine a definite error rate for blockchain analysis methodology.  This is not fatal under *Daubert*.  In considering similar situations with toolmark identification, courts have found that the absence of a definite error rate does not preclude admissibility.  Courts have continued to admit toolmark identification evidence even where the court has determined that the error rate is difficult or impossible to determine.  *See, e.g.*, *United States v. Ashburn*, 88 F. Supp. 3d 239, 246 (E.D.N.Y. 2015) ("The court finds that due to the subjective nature of the inquiry, a definite error rate is impossible to calculate, but also finds that the error rate, to the extent it can be measured, appears to be low, weighing in favor of admission of the expert testimony."); *United States v. Johnson*, 2019 U.S. Dist. LEXIS 39590, at *55-56 (S.D.N.Y. Mar. 11, 2019) ("Although concluding that it is impossible to calculate a definite error rate, courts have generally found that the available evidence . . . suggests that the error rate is sufficiently low to weigh in favor of admissibility.").

### 4. Blockchain Analysis Has Commercially Accepted Standards

A fourth *Daubert* factor is whether the expert methodology has operational standards controlling the technique's operation. *Daubert*, 509 U.S. at 593-94. Blockchain analysis does not have a universal governing standards body or certification board. However, the private sector offers certification courses on blockchain analysis generally and on specific tools, including Chainalysis. Furthermore, law enforcement agencies have developed training courses in blockchain analysis. As Mr. Scholl and Ms. Bisbee's curricula vitae show, both have been involved in developing training courses for their respective organization. These trainings establish procedures and standards for government investigators tracing virtual currency.

Numerous entities offer their own blockchain certification courses. Chainalysis offers a series of courses and certifications, including a Chainalysis Reactor Certification and an Investigation Specialist Certification. The courses are followed by an examination. Additional courses and certifications are offered by TRM Labs, CipherTrace, Elliptic, and Blockchain Intelligence Group.[9]

The Chainalysis Reactor Certification is a two-day course for individuals who already have prior training or usage of Chainalysis Reactor.[10] The program objectives include tracing the origin and destination of bitcoin, conducting transaction analysis and recognizing key patterns, learning how mixers operate and how to identify them, and applying techniques to identify services on the blockchain. The course culminates in a 100-question certification exam. Certification is good for

---

[9] *See* TRM Labs, Training and Certifications, https://www.trmlabs.com/training-and-certifications; CipherTrace, *Learning*, https://ciphertrace.com/learning/; Elliptic, *Crypto Course*, https://www.elliptic.co/crypto-course), Blockchain Intelligence Group, *Crypto Investigator Training*, https://cryptoinvestigatortraining.com/.

[10] Chainalysis, *Reactor Certification*, https://www.chainalysis.com/chainalysis-reactor-certification/.

one year, after which users must take another exam to re-certify.  Chainalysis also offers a more advanced Chainalysis Investigation Specialist Certification (CISC).[11]

### 5. Blockchain Analysis Is Widely Accepted

Like the drive testing approved in *Morgan*, blockchain analysis is a "technological tool that has earned wide acceptance in a relevant industry."  *Morgan*, 45 F.4th at 99.

#### i. Blockchain Analysis Is Widely Used by Law Enforcement and Government Authorities

Blockchain analysis is widely used by a diverse array of law enforcement agencies, in the United States and overseas.  Chainalysis in particular is viewed as an industry standard tool and has customers from the Department of the Treasury, the Department of Justice, the Department of Homeland Security, the Department of State, and the Consumer Financial Protection Bureau.[12] Other law enforcement agencies across the globe also use blockchain analysis tools, including Chainalysis, in support of their investigations.[13]

Blockchain analysis has featured in numerous significant criminal investigations and prosecutions.[14]  Blockchain analysis is also used by regulatory agencies including OFAC and

---

[11]     Chainalysis, Chainalysis Investigation Specialist Certification (CISC), https://www.chainalysis.com/cisc/.

[12] *See* Chainalysis Inc., USASpending.gov, https://www.usaspending.gov/recipient/93c1b742-3801-7f06-775d-da2c3fff3fd6-C/latest.

[13] *See, e.g., Europol and Chainalysis Reinforce Their Cooperation in the Fight Against Cybercrime*, Europol, https://www.europol.europa.eu/media-press/newsroom/news/europol-and-chainalysis-reinforce-their-cooperation-in-fight-against-cybercrime.

[14] *E.g.*, *United States v. Larry Harmon*, No. 19-cr-395 (D.D.C.) (operator of the darknet mixing service Helix pleaded guilty following investigation involving substantial blockchain analysis); *United States v. Tal Prihar*, No. 19-cr-115 (W.D. Pa.) (administrator of DeepDotWeb pleaded guilty to money laundering following the tracing of virtual currency from darknet markets to his accounts); *United States v. Vallerius*, No. 17-CR-20648 (S.D. Fla.) (senior moderator of Dream Market pleaded guilty after he was identified through blockchain analysis); *United States v. Bridges, et al.*, No. 15-cr-319 (N.D. Cal.) (corrupt former federal agents pleaded guilty to money laundering after stolen cryptocurrency was traced to them through blockchain analysis); *United*

FinCEN.[15]

### ii. Blockchain Analysis Enjoys Wide Adoption Outside of Law Enforcement

Blockchain analysis adoption is not limited to law enforcement. In fact, some of the most significant consumers of blockchain analysis software are not law enforcement at all, but members of the financial services industry. Major virtual currency exchanges and other financial institutions use blockchain analysis software tools as part of their anti-money laundering programs in order to comply with their regulatory obligations and monitor transactions for suspicious activity.[16] A 2021 survey of cryptocurrency exchanges, brokerages, and financial institutions by Jump Capital revealed that "[u]tilizing a blockchain analytics solution has become a requirement in crypto," and 96% of survey respondents indicated that they were currently using a blockchain analytics software vendor.[17] Blockchain analysis—and Chainalysis specifically—

---

*States v. Ilg*, No. 21-cr-49 (E.D. Wa.) (defendant pleaded guilty to threats arising from his attempts to hire a hitman after investigators traced funds to his cryptocurrency account using blockchain analysis); *United States v. Kancharla*, 1:22-cr-75 (E.D.Va.) (defendant pleaded guilty to distributing fentanyl after he was identified in part through blockchain analysis).

[15] *E.g.*, U.S. Dep't of Treasury, *Treasury Takes Robust Actions to Counter Ransomware* (Sept. 21, 2021), https://home.treasury.gov/news/press-releases/jy0364 (announcing designation of Russian cryptocurrency exchange Suex, finding that "analysis of known SUEX transactions shows that over 40% of SUEX's known transaction history is associated with illicit actors."); U.S. Dep't of Treasury, Financial Crimes Enforcement Network, *In the Matter of Larry Dean Harmon d/b/a Helix*, 2020-2, Assessment of Civil Money Penalty (Nov. 2020), https://www.fincen.gov/sites/default/files/enforcement_action/2020-10-19/HarmonHelix%20Assessment%20and%20SoF_508_101920.pdf (assessing civil money penalty against operator of darknet mixer after tracing transactions between the mixer and darknet markets, and observing that "transactions equal to $121,511,877 transferred to darknet-associated addresses by, through, or to Helix").

[16] *E.g., Guidance on Use of Blockchain Analysis*, N.Y. Dep't of Fin. Servs. (April 28, 2022), https://www.dfs.ny.gov/industry_guidance/industry_letters/il20220428_guidance_use_blockchain_analytics (emphasizing "the importance of blockchain analytics" to all virtual currency businesses regulated in New York, including to address anti-money laundering requirements).

[17] Peter Johnson & Doug Bowen, *Jump Capital Crypto Compliance Survey*, JumpCapital (July 26, 2021), https://jumpcap.com/insights/jump-capital-crypto-compliance-survey.

has also been relied upon by civil litigants in support of a variety of causes of action.[18]

This is the sort of industry acceptance that the D.C. Circuit recently noted favorably in considering expert testimony regarding drive testing in *Morgan*.  In evaluating the district court's finding in *Morgan* that the expert's testimony was "the product of reliable principles and methods," the Circuit relied in part on the fact that "drive testing technology has been relied upon, tested and reviewed for decades in the multibillion dollar wireless communications industry."  *Morgan*, 45 F.4th at 202.  While blockchain analysis is a relatively new field, its widespread use and adoption by the financial services industry supports weighs in favor of admissibility under *Daubert*.

### 6.    Additional Indicia of Reliability

In addition to the *Daubert* factors set out above, blockchain analysis carries additional indicia of reliability.  *See Ambrosini*, 101 F.3d at 139 (finding that "additional indicia of reliability" beyond the *Daubert* factors supported an expert witness's testimony).  These indicia include the well-established record of blockchain analysis in federal court; the competition within the blockchain analysis market that demands reliability; the defendant's launch of a cryptocurrency mixing service suggests he viewed blockchain analysis as capable of identifying darknet criminals; and the defendant himself corroborating much of the analysis in public statements to the press.

### i.    Courts Have Found Blockchain Analysis Reliable

Blockchain analysis has been used in hundreds of successful criminal investigations and prosecutions.  This has given numerous judges across the country, including those in the District of Columbia, the opportunity to consider the reliability of blockchain analysis.  In an opinion published earlier this year, Magistrate Judge Faruqui observed: "The unprecedented rate of prior

---

[18] *E.g., Google LLC v. Dmitry Starovikov, et al.*, 21-cv-10260 (S.D.N.Y), ECF No. 22 (declaration from a Chainalysis expert hired by Google in support of a civil complaint for damages and injunctive relief related to the Glupteba botnet).

success, lack of incentive or capacity to lie, and incredible level of detail (the software draws out each transaction block-by-block that comprises a cluster), make the clustering software a reliable foundation for probable cause that is beyond compare."  *Search of Multiple Email Accts.*, 585 F. Supp. 3d at 20.; *cf. Gratkowski*, 964 F.3d at 312 & n.7 (rejecting Fourth Amendment challenge to investigators' use of "'powerful and sophisticated software' to analyze the Bitcoin blockchain," explaining that "[e]very Bitcoin user has access to the public Bitcoin blockchain and can see every Bitcoin address and its respective transfers," and "[d]ue to this publicity, it is possible to determine the identities of Bitcoin address owners by analyzing the blockchain").

Blockchain analysis has been presented in testimony at numerous trials and has withstood scrutiny by defense counsel.[19]  For example, in *United States v. Dove*, No. 8:19-cr-33-T-36CPT, 2020 U.S. Dist. LEXIS 251313 (M.D. Fla. Sep. 4, 2020), the defendant raised a *Franks* challenge to a warrant based in part on blockchain analysis.  *Id.* at *3.  In denying the *Franks* motion, the magistrate judge confirmed that the affidavit was sufficient to establish probable cause.  *Id.* at *34-35.  In particular, the judge credited the affidavit's assertions related to blockchain analysis:

> Although the blockchain contains very little information about the BTC senders and recipients, blockchain analysis can be used to identify the individuals and entities involved in BTC transactions.  Blockchain analysis companies do this by creating large databases that group BTC transactions into "clusters" through the examination of the data underlying the BTC transactions.  As a result, law enforcement can utilize third-party blockchain analysis software to locate BTC

---

[19] *E.g., United States v. Ologeanu et al*, 5:19-cr-00010 (E.D. Ky.) (defendant Iossifov was convicted at trial following testimony regarding blockchain analysis; multiple other defendants pleaded guilty in advance of trial); *United States v. Dove*, 8:19-cr-33 (M.D. Fla.) (defendant pleaded guilty mid-trial following testimony regarding blockchain analysis); *United States v. Felton*, No. 20-cr-347 (N.D. Ga.) (defendant pleaded guilty mid-trial to multiple counts of wire fraud, securities fraud, and money laundering, following blockchain analysis testimony); *United States v. Ulbricht*, 14-cr-68 (S.D.N.Y.) (administrator of Silk Road darknet market convicted at trial that included blockchain analysis testimony) (upheld in *United States v. Ulbricht,* 858 F.3d 71 (2d Cir. 2017)); *United States v. Costanzo*, No. 2:17-cr-00585 (D. Ariz.) (defendant found guilty of money laundering at trial following testimony regarding blockchain analysis) (upheld in *United States v. Costanzo*, 956 F.3d 1088 (9th Cir. 2020)).

addresses that transact at the same time (*i.e.*, the blockchain logs transactions at the same time by two different BTC addresses) and then "cluster" these addresses together to represent the same owner. The third-party blockchain analysis software has supported many investigations and has been found to be reliable.

*Id.*

### ii.   Competition Within Blockchain Analysis Market Bolsters Reliability

The competition within the blockchain analysis market further bolsters the reliability of the software products. The blockchain analysis software market has numerous companies vying for business, including Chainalysis, TRM Labs, Elliptic, CipherTrace, Elementus, Coinbase Tracer, Crystal, Blockchain Intelligence Group, and numerous others. One survey conducted by Jump Capital identified Chainalysis as the market share leader, followed by TRM, Elliptic, and other companies.[20]

### iii.   The Defendant as Akemashite Omedetou Was Concerned About Blockchain Analysis

As discussed in prior briefing, *see* ECF No. 61, the defendant himself recognized the power of blockchain analysis. On posts to BitcoinTalk, the defendant's alter-ego, Akemashite Omedetou, repeatedly referenced Bitcoin Fog's concerns with evading "statistical analysis." In a November 8, 2013, post, Akemashite Omedetou acknowledged that authorities and researchers would be able to effectively cluster Bitcoin Fog's addresses: "I imagine that by now, someone somewhere has sniffed enough information about fog addresses for being able to tell when a transaction goes in or out of the Fog." The post went on to explain the value of Bitcoin Fog's withdrawal waiting periods, noting, "If someone sees two transactions, in and out of the fog, approximately for the same amount at the same time, there the connection can be made as well." In another post, Akemashite Omedetou cautioned users that they should "never withdraw the same amount as you

---

[20] Johnson & Bowen, *Jump Capital Crypto Compliance Survey*, *supra* note 16.

have deposited" from Bitcoin Fog.  As the defendant explained, "If you transfer 1.382 to us, and the next day you withdraw ~1.38 bitcoins to another account, those amounts will be visible in the block chain, and unless there were 10 other people that day that also withdrew just 1.38 bitcoins, the link between your deposit and your withdrawal will be pretty obvious."  On June 30, 2012, Akemashite Omedetou announced on BitcoinTalk that Bitcoin Fog would begin reusing deposit addresses in order to enhance customer anonymity.  Akemashite Omedetou explained: "This seems to help obscuring the origin of the bitcoins: even if authorities would find one of your deposit addresses, they won't even be sure that all the deposits to that address were made by you."  This is a reference to attempting to prevent law enforcement authorities from using blockchain analysis to trace deposits into Bitcoin Fog and attribute them to a particular user.

### iv. The Defendant's Statements to the Press Confirm the Government's Blockchain Analysis

The defendant himself has publicly confirmed the accuracy of the government's clustering by making admissions in his press interview: "[Sterlingov] concedes that he did send and receive payments to Bitcoin Fog as a user of the service seeking privacy, but says he didn't use his bitcoins for anything illegal. 'I think some of my transfers must have gotten mixed up with everything,' he says."  Lily Hay Newman & Andy Greenberg, *Bitcoin Case Could Put Cryptocurrency Tracing on Trial*, WIRED (Aug. 2, 2022), https://www.wired.com/story/bitcoin-fog-roman-sterlingov-blockchain-analysis/; *see also* ECF No. 47, at 15 (admitting that "Mr. Sterlingov was merely a user of the service").  The defendant's own words confirm the government's blockchain analysis tracing transactions from Bitcoin Fog to the defendant.

### E.  Conclusion

The defendant's shallow attack on the reliability of blockchain analysis ignores the sound methodological foundation and extensive history of successful criminal investigations and

prosecutions involving blockchain analysis, as well as the robust and accepted use of blockchain analysis outside of criminal prosecution by a wide range of businesses and agencies. The government's proposed experts, Mr. Scholl and Ms. Bisbee, will "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), by explaining key concepts, tracing transactions across the blockchain, and helping the jury to understand the hundreds of thousands of transactions at issue in this case. The Court should deny the defendant's *Daubert* challenge and admit testimony by the government's blockchain experts.

## II.     Other Challenges to Blockchain Evidence Are Meritless

The defense cites a laundry list of objections to the admission of the government's highly probative blockchain evidence, arguing, *inter alia*, that the evidence is barred by Rule 901, that the evidence cannot be admitted through witness testimony, that the defense needs access to the underlying source code, and that some unspecified information may be hearsay and/or testimonial. In support of each of the assertions, defense counsel merely restates the rule, paired with a conclusory assertion that the rule precludes presentation of the government's evidence. The defendant's conclusory objections should be denied.

### A. Authentication of Blockchain Records

First, blockchain records can be authenticated and are admissible under Fed. R. Evid. 901. The rule merely states that in order to authenticate evidence, the proponent must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. Rule 901 is a rule of inclusion, and the rule sets out a list of ways that a proponent could satisfy the rule's requirements—all while cautioning that these are "examples only" and are "not a complete list." *Id.* "The threshold for proof of authenticity is low." *Klayman v. Judicial Watch, Inc.*, 297 F. Supp. 3d 80, 84 (D.D.C. 2018). "The Court need not find that the evidence is

necessarily what the proponent claims, but only that there is sufficient evidence that the *jury* ultimately might do so." *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006) (emphasis in original).

Here, the government has explained how blockchain records will be authenticated in the Government's Notice and Motion in Limine to Admit Certain Government Exhibits, ECF No. 62, at 8-9. As the government's motion notes, blockchain records meet the business records requirements under Fed. R. Evid. 803(6)(A)-(C) and can be authenticated by a hybrid certification that satisfies Fed. R. Evid. 902(11) and 902(13) compiled by an official who regularly maintains a copy of the blockchain to perform his or her official duties.

There is no merit to the defendant's conclusory assertions (at 7) that blockchain records can only be certified through examination of the "computer code" that generated the blockchain, or that live witness testimony is "insufficient" to authenticate such records. To the contrary, as explicitly recognized by the Rules Advisory Committee, records may be admitted through someone acting merely as an observer. Fed. R. Evid. 803(6), advisory committee's notes (confirming that "[w]holly acceptable records may involve matters merely observed"); *see* ECF No. 62, at 8-9. The defendant cites no authority to the contrary.

### B. Blockchain Records Are Not Hearsay

Records on the blockchain are not hearsay because the blockchain is electronically generated through automated processes. For the purposes of the hearsay rules, a statement is defined as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). Courts have widely held that machine-generated evidence is not hearsay. The Third Circuit, for example, determined that fax headers were non-hearsay machine statements, even though that information was necessarily derived from a human who

entered the information routing the fax. *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003). The Eleventh Circuit determined that a data compilation of telephone calls, showing calls originating from the defendant's cell phone number, was similarly non-hearsay, despite the role of persons in initiating and receiving the calls. *United States v. Lamons*, 532 F.3d 1251, 1263 (11th Cir. 2008) ("We have no difficulty concluding that the statements in question are the statements of machines, not statements of persons."). As these cases make clear, the involvement of humans in activity giving rise to the computer-generated records does not transform the records themselves into hearsay statements. *See also, e.g.*, *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008); *United States v. Washington*, 498 F.3d 225, 230 (4th Cir. 2007); *United States v. Hamilton*, 413 F.3d 1138, 1142 (10th Cir. 2005); *United States v. Channon*, 881 F.3d 806, 811 (10th Cir. 2018).

Even if the court were to find that blockchain records were hearsay statements, they could be appropriately admitted in this case under several exceptions. The government intends to admit blockchain records through a certification satisfying Fed. R. Evid. 902(11) and 902(13). *See* ECF No. 62, at 8-9. Such a certification would satisfy Rule 803(6), which permits the admission of records of regularly conducted activity as an exception to the general bar of hearsay evidence. Fed. R. Evid. 803(6). Alternatively, evidence from the blockchain—a validated transaction ledger that serves as the backbone of the entire bitcoin ecosystem—would fall into the hearsay exception set forth in Fed. R. Evid. 803(17), for market reports and similar commercial publications*, as the blockchain is a "list[] . . . or other compilation" that is "generally relied on by the public or by persons in particular occupations." And the extensive protections regarding the integrity of the blockchain, *see* ECF No. 62, at 8-9, provide "sufficient guarantees of trustworthiness" to support admission under the residual hearsay exception in Fed. R. Evid. 807.

### C. Expert Testimony May Be Based on Hearsay

Even if blockchain records were considered hearsay, it is well-established that expert testimony may be based on hearsay and other evidence which would not be directly admissible. *See United States v. Smith*, 964 F.2d 1221, 1223 (D.C. Cir. 1992) ("[A]n expert may express an opinion based on inadmissible hearsay evidence so long as that evidence is of the type reasonably relied on by experts in the particular field."). Rule 703 provides that an expert may base an opinion on facts or data that the expert "has been made aware of," in addition to that which the expert personally observed. Fed. R. Evid. 703. It further provides that, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, *they need not be admissible for the opinion to be admitted*." *Id.* (emphasis added). Indeed, by the very nature of their role in the case, third-party experts are nearly always testifying to information that they have gathered or been provided from other sources.

In any event, the expert blockchain analysis testimony in this case will be based largely on evidence that is admissible at trial, including non-hearsay records of the blockchain itself; records recovered from the defendant's devices, online accounts, and financial records; the defendant's own statements to reporters conceding his transactions with Bitcoin Fog; and testimony of undercover agents and cooperating witnesses who conducted transactions using Bitcoin Fog.

### D. Blockchain Records Are Non-Testimonial

Blockchain records do not implicate the Confrontation Clause because they are non-hearsay and machine generated; and even if they were hearsay, they would be non-testimonial as business records and not created in anticipation of litigation. The Confrontation Clause of the Sixth Amendment generally bars the admission of testimonial hearsay in a criminal case where there is no opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

A statement is considered testimonial for Sixth Amendment analysis when its "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813 (2006).

"[T]he witnesses with whom the Confrontation Clause is concerned are *human* witnesses." *United States v. Lamons*, 532 F.3d 1251, 1263 (11th Cir. 2008) (emphasis in original).  As Judge Grimm, a renowned electronic evidence expert, has explained: "[W]hile [a] machine output might be prepared for litigation, *it is not testimonial because it is not hearsay*.  Machines do not make statements, and cannot be cross-examined; and the Confrontation Clause applies only to statements that are hearsay."  Paul W. Grimm, *et al.*, *Authenticating Digital Evidence*, 69 Baylor L. Rev. 1, 49 (2017).  Additionally, as the Supreme Court observed in *Crawford*, certain categories of hearsay exceptions, including business records, are non-testimonial by their nature.  541 U.S. at 56; *see also Tran v. Roden*, 847 F.3d 44, 51 (1st Cir. 2017) ("[B]usiness records [are not] testimonial as long as they are not created for the purpose of prosecution."); *United States v. Forty-Febres*, 2018 WL 2182653, at *6–7 (D.P.R. May 11, 2018) ("The registration records at issue are non-testimonial business records that were not created for the purpose of prosecution, but created in the ordinary course of DTOP's business.").  Records of transactions on the blockchain thus fall well outside of any *Crawford* bar on multiple grounds.

Further, even if blockchain evidence were considered testimonial (it is not), experts can still rely on it in formulating their opinions and sharing their conclusions with the jury.  As the D.C. Circuit has explained, "*Crawford* . . . did not involve expert witness testimony and thus did not alter an expert witness's ability to rely on (without repeating to the jury) otherwise inadmissible evidence in formulating his opinion under Federal Rule of Evidence 703."  *United States v. Henry*, 472 F.3d 910, 914 (D.C. Cir. 2007).

### E.  Lay Opinion Testimony Is Admissible in this Case

The defendant also argues (at 10-11) that the Court should bar "lay opinion testimony," and appears to go so far as to claim that the government should be barred from presenting any fact witnesses at all because—in the defendant's words—investigators worked "at desks."  This is a nonsensical argument that has no basis in law or fact.

The lack of eyewitnesses is common in cyber cases and does not preclude non-expert government witnesses from introducing admissible records and testifying about the steps taken in the investigation, or civilian and cooperator witnesses from testifying about their own knowledge of Bitcoin Fog or the defendant's online activities.  Nor does it alter the ordinary rules of lay opinion testimony, which is liberally allowed as long as the requisite foundation has been laid.  *See Lightfoot v. Rosskopf*, 377 F. Supp. 2d 31, 33 (D.D.C. 2005) ("Lay witnesses may offer opinion testimony based on their perceptions, if it is helpful and not based on specialized knowledge, provided the party offering the lay opinion testimony establishes a proper foundation, and the party opposing the admission of such testimony has an opportunity, through the process of cross-examination, to expose a weak foundation."); *United States v. Paiva*, 892 F.2d 148, 157 (1st Cir. 1989) ("No longer is lay opinion testimony limited to areas within the common knowledge of ordinary persons.  Rather, the individual experience and knowledge of a lay witness may establish his or her competence, without qualification as an expert, to express an opinion on a particular subject outside the realm of common knowledge.").

### III.    No *Daubert* Hearing Is Needed for Non-Blockchain Expert Witnesses

The defendant also challenges (*e.g.*, at 6, 10) the government's "digital forensics"— although it is unclear whether this term is meant to refer to blockchain analysis or to other testimony, such as that relating to the government's review of the defendant's electronic devices. In any event, no *Daubert* hearing is warranted for the government's other experts.

As Chief Judge Howell has explained, "'the law grants a district court the same broad latitude' in deciding 'how to determine reliability as it enjoys in' making 'its ultimate reliability determination.'" *United States v. Smith*, 2020 U.S. Dist. LEXIS 188329, at *74 (D.D.C. Oct. 9, 2020) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999)).  "It is well established that a court is not required to hold an evidentiary hearing regarding the admissibility of expert testimony."  *United States v. Jones*, 918 F. Supp. 2d 1, 7 (D.D.C. 2013) (internal quotations omitted) (collecting cases); *see also United States v. Mitchell*, 365 F.3d 215, 246 (3d Cir. 2004) ("[A] district court would not abuse its discretion by limiting, in a proper case, the scope of a *Daubert* hearing to novel challenges . . . or even dispensing with the hearing altogether if no novel challenge was raised."); *Bell v. Gonzales*, 2005 U.S. Dist. LEXIS 37879, at *55 n.16 (D.D.C. Dec. 23, 2005) ("Where, as here, the expert report, affidavits, and depositions provide the necessary information, and the matter is not unusually complex or novel, a hearing is unnecessary.")

The government noticed certain non-blockchain experts, including IRS Computer Investigative Specialist Matthew St. Jean and FBI Computer Scientist Valerie Mazars de Mazarin. *See* ECF No. 61, at 8-12.  Mr. St. Jean and Ms. Mazars de Mazarin are each extremely qualified and well-credentialed in the field of computer science and digital evidence review.  As set forth in the government's expert notice, Mr. St. Jean and Ms. Mazars de Mazarin will testify primarily as fact witnesses based on their own review of the evidence in this case.  Though they possess specialized knowledge in their fields that will assist the trier of fact in understanding the evidence, they are not expected to testify on novel or controversial methodologies that would be the appropriate subject of a *Daubert* inquiry.

The government also noticed the anticipated testimony of FinCEN Senior Compliance

Officer Theodore Vlahakis.  Mr. Vlahakis's testimony will not convey scientific knowledge but rather will provide the jury with an understanding of federal anti-money laundering regulations and their purpose, and related topics.  He was noticed as an expert out of an abundance of caution in light of his specialized knowledge.  To the extent that he would be considered an expert at all, his testimony is intended to "educate the factfinder about general principles."  Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

## IV.     The Defendant's Discovery Motion for Computer Source Code and Other Material and Related Suppression Arguments Are Meritless

The defendant repeatedly claims (at 6-7, 8, 9, 14, 16, 17) that he needs access to software "source code," "computer code," or "digital software used in this investigation."  But he never explains what he would do with this material that would make it material to the preparation of his defense.  The defendant's discovery motion for source code and other material should be denied on both relevance and ripeness grounds, and his suppression argument should be rejected.

### A.  Source Code and Computer Programs Are Not Material to the Defense

Under Rule 16(a)(1)(E), a defendant is entitled to discovery of materials "which are within the possession, custody, or control of the government, and which are material to the preparation of the defendant's defense."  Fed. R. Crim. P. 16(a)(1)(E).  For the defendant to show materiality under this Rule, there must be some indication that the pretrial disclosure of the information would enable the defendant significantly to alter the quantum of proof in his favor.  *See United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010); *United States v. Ross*, 511 F.2d 757, 763 (5th Cir. 1975). The defendant bears the burden of "mak[ing] a threshold showing of materiality, which requires a presentation of facts which would tend to show that the Government is in possession of information helpful to the defense."  *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010).

The defendant has not carried his burden of showing that software source code is material

to his defense.  As a preliminary matter, source code refers to the raw programming used to create a computer program.

> When programmers write code, they write in "source code," which is written in a programming language that humans can understand.  This source code is then compiled into object code which is essentially a translation of source code into something the computer can understand and execute.  Generally, when software is distributed, only the compiled object code is distributed and the programmer retains the source code.

*Xtomic, LLC v. Active Release Techniques, LLC*, 340 F. Supp. 3d 1092, 1096 n.3 (D. Colo. 2018). Source code is a software company's most valuable intellectual property and is closely protected; otherwise, the software could be readily duplicated or counterfeited.  The defendant nowhere explains what purpose it would serve for him to have access to the source code for computer software—nor, for that matter, does he specify which software or source code he seeks, instead referring vaguely (at 9) to "digital software used in this investigation."

The defendant asserts without elaboration (at 7) that source code is necessary for him to "confront a witness's fabrications on the stand," but that argument is illogical.  Witnesses routinely use software tools and testify about their work product without understanding the underlying source code.  For example, a forensic accountant can testify competently about analysis conducted using Microsoft Excel without any knowledge of the program's proprietary source code.  Likewise, defense counsel can effectively cross-examine the forensic accountant about their computations, methods, and conclusions without access to the source code.  If the forensic accountant were determined to lie on the stand, it is difficult to imagine how the defense counsel's knowledge source code would assist him in detecting the witness's "fabrications"—and the defendant here does not explain.

Indeed, the D.C. Circuit rejected a variation of the defendant's argument in *Morgan*, 45 F.4th 192 (D.C. Cir. 2022), holding that an expert witness was not required to "explain the inner

workings of the software he used" to generate drive-test maps used in cell-site location analysis. *Id.* at 203.  As the Circuit explained, "we have never held that Rule 702 requires an expert to have a sophisticated understanding of the software underlying her technological tools," and rejected the argument that an expert using Microsoft Excel "would be required to be an expert in the algorithms by which Excel codes its formula and calculations."  *Id.* (cleaned up).

Litigation over defense requests for software-related discovery have more typically arisen in cases involving software specifically developed by or for law enforcement, where the government *does* have arguable access to the underlying source code, and where the defense has no other avenue of access and limited information regarding the tool's capabilities.  This is a far cry from the current case, where the government has used commercially available software such as Chainalysis Reactor to which the defense and its experts have equal ability to access.  Even in cases where defendant have requested additional discovery regarding software used by defendants, courts have required a specific, detailed showing of materiality.  *See, e.g.*, *United States v. Budziak*, 697 F.3d 1105 (9th Cir. 2012) (finding additional discovery was warranted regarding an FBI-developed software program after the defense presented specific evidence through its own expert suggesting that the FBI software may have downloaded only fragments of child pornography files rather than full files, and that the software could have overridden the defendant's sharing settings).  Most courts to consider similar requests—even involving in-house law enforcement software tools—have found that the defendants failed to satisfy their threshold materiality showing to warrant supplemental discovery.  *See, e.g.*, *United States v. Pirosko*, 787 F.3d 358 (6th Cir. 2015) (affirming district court's denial of defense motion to compel disclosure of source code for law enforcement program and distinguishing *Budziak*).  The Sixth Circuit in *Pirosko* explained that the defendant had "simply alleg[ed] that he might have found such evidence [referencing the *Budziak*

defense expert's showing] had he been  given access to the government's programs," which did not meet the threshold to warrant additional discovery.  *Id.* at 365.  Here, the defendant's bare assertions fall short of the detailed showing in *Budziak* and more closely resemble the inadequate claims rejected in *Pirosko*.

### B.  The Defendant's Discovery Requests Are Unripe and Meritless

Even if the defendant could establish materiality, his discovery requests are vague and unripe for the Court's attention.  On September 23, 2022, the defense delivered a 15-page, 104-item discovery letter to the government.  See ECF No. 59-1.  The government responded on October 4, 2022, asking for clarification of the defense requests "[i]n order to narrow the range of potential discovery issues and to facilitate a more constructive dialogue."  *See* Ex. 1, at 1.  The defendant chose not to respond—waiting instead to raise these issues in a motion before the Court rather than attempting to work them out with the government.  The government remains available to confer in good faith with the defense about any legitimate discovery concerns.

The defendant's discovery letter contains excessively broad and vague requests for which the government requested further explanation.  For example, the defendant vaguely demanded that the government produce "software," such as Request No. 24 for "[a]ny software used by the government to investigate this case."  Nowhere did the defense clearly request "source code" for any of this software.[21]  The government asked for clarification: "Please explain what sort of production is contemplated by these requests, including the nature of the software being sought

---

[21] In one of the multiple discovery requests for "software," the defendant asked for "software . . . used to conduct blockchain analysis."  Buried in the "Definitions" appendix to the discovery letter was the defendant's proposed definition for the term "blockchain analysis," which the defendant defined as the meaning of the term "as used by the government" as well as "source code, algorithms, digital, analog, textual, mechanical, or investigative, methodologies used to trace any cryptocurrency or transactions in this case."  As noted above, the government asked for clarification and was rebuffed.

(*e.g.*, word processing software), whether the request seeks the literal production of software licenses or copies, whether the request seeks a civil interrogatory-style response, and the legal basis for the request." Ex. 1, at 3.  The defendant did not respond.[22]

The defendant's other vague discovery demands are equally meritless.  The discovery letter made a confusing demand for the discovery of "methodologies" used to investigate the case.  But a "methodology" is not a tangible thing, nor is it a "[d]ocument" or "[o]bject" within the meaning of Fed. R. Crim. P. 16(a)(1)(E).  The government asked for clarification, *see* Ex. 1, at 3, but the defendant did not respond.  The defendant now asks the Court (at 15) to compel the discovery of "methodologies," but he still does not explain what this production is supposed to entail.

The defendant also demands (at 15) the discovery of "datasets," and asks the Court (at 4) to "bar all statements . . . based on the Government's use of forensic computer software like Chainalysis Reactor, or Elliptic LLC's, because it has not been produced to the Defense in its native computer code in the versions used by the Government."  This is a misstatement of the record.  In fact, the government has produced a substantial volume of data underlying the analysis in the criminal complaint, seizure warrant affidavit, and other work product.  This data is not limited to "static PDFs or image files without significant metadata," as the defendant inaccurately claims (at 8), but includes detailed Excel spreadsheets listing bitcoin addresses and transaction information[23] as well as Chainalysis load files in their native .grf file format—material that was

---

[22] The defendant also fails to explain how source code for commercial software is within the government's possession, custody, or control.  As noted above, commercial software is compiled before it is sold and ordinary users generally do not have access to the original source code.

[23] To take just one example, the government produced an Excel file (in native format) called "Transaction Outputs BitcoinFog-01012015-10162015.xlsx" detailing transaction outputs for the Bitcoin Fog cluster during the first ten months of 2015.  The file includes *216,408 lines of data* showing 92,482 transactions, including the individual transaction hash, transactional details (such as date, time, and amount), and relationships to other "peer clusters" including darknet markets

specifically requested by the defense and collected and produced by the government in response. The government also produced blockchain analysis in alternative formats so that the data could be reviewed outside of the Chainalysis software.  For example, data from Chainalysis charts can be exported as .csv exports (viewable in Microsoft Excel) containing of the list of addresses in each cluster[24] and the transactions between the clusters.  Spreadsheets of such data will be attached to the government's expert reports that will be provided to the defense upon their completion.

Indeed, the defense appears to have been able to review the government's blockchain analysis evidence from these materials, as the defendant's prior submissions acknowledge.  *See, e.g.*, ECF No. 47, at 16 ("After taking some time to review the Government's findings, our experts have determined that there are a multitude of issues with the Government's blockchain analysis[.]"); *id.* at 17 (referring to "*the blockchain analysis spreadsheets*" produced by the government (emphasis added)).  The defendant's motion does not explain how the government's production is deficient or what additional discoverable materials he believes are within the government's possession, custody, or control.  The defendant's unripe and ill-explained discovery motion should be denied.

### V.     Testimony Related to Darknet Markets Is Relevant and Admissible

The defendant argues (at 9) that the Court should exclude evidence relating to "online marketplaces mentioned in the Criminal Complaint such as Silk Road, Agora and the like," citing Fed. R. Evid. 401, 403, and 404.  But such evidence relates directly to core elements of the charged

---

(Agora, Evolution, Middle Earth, Black Bank, *etc.*), exchanges and financial institutions (Paymium, Kraken, Bitstamp, Circle, *etc.*), and peer-to-peer exchange sites (LocalBitcoins).

[24] Chainalysis Reactor is graphing software that displays transactions from the public blockchain. To allow viewers to better visualize the transactions, Chainalysis (like other commercially available blockchain analysis tools) groups addresses held in the same wallet into "clusters."  Each "cluster" is depicted within Chainalysis' visual charts as a single circle, but that circle may represent numerous addresses.

offenses, is highly probative, and is not impermissible character evidence.

This evidence is plainly relevant to the charged offenses under Rule 401.  As alleged in the Superseding Indictment, Bitcoin Fog operated as an online money laundering service that specifically catered to illegal online markets engaged in drug trafficking and other illegal activity. The defendant was indicted in Count One for conspiring with "darknet vendors and darknet administrative teams" and other co-conspirators to launder the proceeds of drug transactions "through the operation of BITCOIN FOG."  ECF No. 43 (Superseding Indictment), at 1-2.  He was indicted in Count Two for laundering property "represented to be the proceeds of" drug trafficking offenses, *id.* at 3, and in Count Three for operating an unlicensed money transmitting business that, *inter alia*, involved the transmission of funds known to have been "derived from a criminal offense" and "intended to be used to promote and support unlawful activity," *id.* at 4. Bitcoin Fog's transactions and ties to various darknet markets directly relate to fundamental elements of the charged offenses, such as the existence and purpose of the money laundering conspiracy, the identities of co-conspirators, and the specified unlawful activity that generated the proceeds that were intended to be laundered as part of the conspiracy.[25]

The defendant does not explain why such evidence is supposedly "irrelevant."  He argues that the government has not "tied" particular transactions to the defendant, but ignores the fact that he was indicted for participating in the "operation of BITCOIN FOG," ECF No. 43, at 1—and through Bitcoin Fog he was responsible for facilitating a massive volume of transactions involving darknet markets.  At trial, the defendant may well dispute the evidence linking himself to Bitcoin Fog, or the evidence of Bitcoin Fog's transactions and ties to darknet markets.  The defendant's

---

[25] The fact that Bitcoin Fog catered to illegal darknet markets, moreover, explains why it operated on an anonymous basis and did not register with FinCEN or obtain a money transmitter license from the District of Columbia or other jurisdictions, as charged in Counts Three and Four.

disagreement with the government's evidence, however, does not make the evidence irrelevant.

The defendant argues that evidence related to darknet markets should be excluded under Rule 403 on grounds that it is "prejudicial." But Rule 403 does not require exclusion of evidence merely because it is prejudicial. "'Unfair prejudice as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material." *United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002) (quoting *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977)); *see id.* at 795 ("Rule 403 'tilts, as do the rules as a whole, toward the admission of evidence in close cases' . . . . '[T]he balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged.'") (quoting *United States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984)).

The defendant does not explain the nature of the unfair prejudice he would suffer from testimony and evidence relating to Bitcoin Fog's transactions and ties to darknet markets. To be sure, evidence about darknet markets serviced by Bitcoin Fog necessarily implicates crimes committed by third parties. But it also relates directly to the gravely serious charges against the defendant—namely, that he facilitated the crimes and harms perpetrated by these darknet markets, including drug trafficking, fraud and theft, ransomware, and sexual exploitation of children, by operating a money laundering service designed to make illicit darknet transactions harder to detect. Evidence relating to these darknet markets is highly probative of the indicted offenses. Any prejudice in describing the nature of the crimes facilitated by the defendant's money laundering and unlicensed money transmitting business violations does not "substantially outweigh" its probative value.

Finally, the defendant suggests that reference to darknet markets would be impermissible "character evidence." Character evidence generally refers to evidence of other crimes or bad acts

39

*by the defendant* that might prompt the jury to convict based on an impermissible propensity inference. *See United States v. Crowder*, 141 F.3d 1202, 1210 (D.C. Cir. 1998) (en banc) (explaining that concern for character evidence is "focused on the danger of the jury using the other crimes evidence in a way the rules do not permit—to conclude that because the defendant committed some other crime, he must have committed the one charged in the indictment"). The defendant does not explain how evidence relating to darknet markets constitutes evidence of the defendant's prior bad acts within the meaning of Rule 404. Even if it did, such evidence "is generally admissible under Rule 404(b) for any purpose other than to prove character and to show action in conformity therewith." *United States v. Khanu*, 664 F. Supp. 2d 80, 83 (D.D.C. 2009). As explained in the government's Rule 404(b) notice, to the extent such evidence actually qualifies as character evidence—arguably including evidence relating to the defendant's personal accounts on Silk Road and Silk Road 2.0—it is still admissible under Rule 404(b) to prove the defendant's intent, preparation, plan, and knowledge in establishing Bitcoin Fog. *See* ECF No. 63, at 7-9.

## VI.     The Defendant's Attempt To Call the Prosecutor as a Witness Is Frivolous Gamesmanship

The defendant asserts (at 14-15) that one of the prosecutors in this case, Trial Attorney Pelker, is a "material witness" and demands a hearing on her "removal as a prosecutor in this case." Yet the defendant cannot clearly explain what testimony he seeks to elicit or why such testimony is vital to his defense. This lack of specific detail—and the absence of legal authority to support his motion—shows that the defendant is not really interested in Trial Attorney Pelker's testimony at all. Instead, he is using the threatened subpoena as a sword in an attempt to force her "removal as a prosecutor in this case." This is a frivolous demand made for purposes of unfair legal gamesmanship. *See* D.C. R. Prof. Conduct 3.1. It should be denied.

### A. The Defendant Has Not Established Compelling Need and Exhaustion in Order To Justify Calling a Prosecutor as Witness

First, for the reasons articulated in the Government's Motion *in Limine* To Preclude the Defense from Calling the Prosecutor as Witness for the Defense, ECF No. 64, the defendant has not satisfied the stringent "compelling need" standard for calling a prosecutor as a witness, which requires him to prove that the anticipated testimony is "vital to his case" and that he has exhausted efforts to obtain "the same or similar facts from another source." *United States v. Watson*, 952 F.2d 982, 986 (8th Cir. 1991). Indeed, just what the defendant expects to elicit from Trial Attorney Pelker's hypothetical testimony remains a mystery. The government asked, and the defense has refused to answer. *See* ECF No. 64, at 2-3.

The defendant's motion does not fill in the necessary detail. At most, the defendant seems to imply (at 14) that the significance of Trial Attorney Pelker's testimony is that she was allegedly "instrumental in getting DOJ to purchase a Chainalysis software license." This appears to be the latest expression of the defendant's baffling (and never fully explained) conspiracy theory about Chainalysis. Whatever its merits, this theory is completely irrelevant to the defendant's guilt or innocence, which is the sole issue for the jury at trial.[26]

The defendant also asserts in conclusory fashion (at 15) that Trial Attorney Pelker is an "accuser[]" he is entitled to confront under the Sixth Amendment. But that misunderstands the nature of the Confrontation Clause right. The Confrontation Clause establishes a rule of admissibility which prevents the introduction at trial of testimonial out-of-court statements unless the declarant is available for cross-examination. *See Melendez-Diaz v. Massachusetts*, 557 U.S.

---

[26] The defendant's continuing focus on irrelevant trivia relating to Chainalysis underscores the need for the Court to set firm boundaries at trial on defense efforts to confuse and distract the jury with impermissible jury nullification arguments and evidence. *See* ECF No. 65.

305, 309 (2009).  Here, however, the government does not intend to admit any testimonial out-of-court statements by then-Intelligence Analyst Pelker.  Accordingly, she is not "bear[ing] testimony against him," *id.* (internal quotations omitted), in a way that would trigger the defendant's confrontation rights.  The Confrontation Clause does not confer a freestanding right on a defendant to call his prosecutor as a witness at trial—and the defendant cites no legal authority for his meritless claim.

Further, the defendant has not complied with the applicable *Touhy* regulations for obtaining testimony from a Department of Justice attorney.  *See* 28 C.F.R. § 16.21, *et seq.*  "The regulations set up a procedure by which Department of Justice officials make decisions about whether an employee called upon to testify in litigation is permitted to disclose the requested information, which information is summarized in a 'demand' by the individual or entity seeking the information."  *United States v. Archer*, 2010 WL 2633080, at *1 (E.D. Tenn. June 25, 2010).  The party seeking such testimony is required to submit "an affidavit, or, if that is not feasible, a statement by the party seeking the testimony or by the party's attorney setting forth a summary of the testimony sought" to the appropriate Department of Justice official for consideration under the regulations.  28 C.F.R. § 16.23(c).  The defendant's failure to comply with these procedural steps provides another ground to deny or quash the proposed subpoena.  *See, e.g.*, *Archer*, 2010 WL 2633080, at *1-2 (quashing subpoena to FBI agent); *United States v. Guild*, 2008 WL 169355, at *2-3 (E.D. Va. Jan. 15, 2008) (quashing subpoena to AUSA); *United States v. Marino*, 658 F.2d 1120, 1125 (6th Cir. 1981) (affirming denial of subpoena to FBI and U.S. Marshal's Office for failure to comply with *Touhy* regulations, and explaining that "[t]he question of whether these procedures deny the defendants their Sixth Amendment right to call and cross-examine witnesses is not reached until the defendants follow the procedures and then have their demands denied").

### B. The Defendant's Conclusory Motion To Disqualify Cannot Survive Strict Judicial Scrutiny

Second, the defendant has not shown that disqualification is appropriate. Disqualification of opposing counsel is a "'drastic measure that is disfavored by the courts.'" *Ambush v. Engelberg*, 282 F. Supp. 3d 58, 62 (D.D.C. 2017) (quoting *Konarski v. Donovan*, 763 F. Supp. 2d 128, 135-36 (D.D.C. 2011)); *see also United States v. Crowder*, 313 F. Supp. 3d 135, 141 (D.D.C. 2018) ("[D]isqualification is highly disfavored, and any motion to disqualify counsel is therefore examined with a skeptical eye."); *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 965 F. Supp. 2d 104, 110 (D.D.C. 2013) ("'Disqualification, however, is a drastic measure that is disfavored by the courts, and disqualification motions should be subject to particularly strict judicial scrutiny.'") (quoting *Konarski*, 763 F. Supp. 2d at 135-36). That is because "such motions may be used as 'procedural weapons' to advance purely tactical purposes," *Ambush*, 282 F. Supp. 3d at 62 (internal quotations omitted)—as the defendant's groundless motion well illustrates.

The defendant ignores the governing legal framework, which requires showing that (1) a violation of one of the applicable rules of professional conduct is occurring, and (2) such violation provides sufficient grounds for disqualification, *Ambush*, 282 F. Supp. 3d at 62—all under a standard of "particularly strict judicial scrutiny," *In re Rail Freight*, 965 F. Supp. 2d at 110. The defendant does not identify any alleged ethical violation that *presently* arises from Trial Attorney Pelker's appearance in this case. Instead, the defendant gestures vaguely (in a footnote) toward D.C. Rule of Professional Conduct 3.7 and its analog in the ABA Model Rules of Professional Conduct, which address whether a lawyer can serve as counsel in a case where they are a "necessary witness." In other words, the only way the defendant can show even an *arguable* ethical violation is if the defendant manufactures the violation himself, by calling the prosecutor as a witness. Rule 3.7 was not intended to be used in this circular fashion as a sword against

opposing counsel.

Finally, even if Trial Attorney Pelker were called to testify for the defense, she would not necessarily be required to withdraw her appearance from the case.  "The D.C. Circuit has cautioned that, even where a violation is found, disqualification is warranted only 'rarely' in cases where there is a 'serious question as to counsel's ability to act as a zealous and effective advocate for the client' or the 'substantial possibility of an unfair advantage to the current client because of counsel's prior representation of the opposing party[.]'"  *Ambush*, 282 F. Supp. 3d at 62 (quoting *Koller by and Through Koller v. Richardson-Merrell Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984), *vacated on other grounds*, 472 U.S. 424 (1985)).  The government reserves the right to submit supplemental briefing and argument addressing the particular circumstances of the anticipated testimony in the event Trial Attorney Pelker is ordered to appear as a witness for the defense.

### C.  Conclusion

The Court should grant the government's cross-motion *in limine* to preclude the defendant from calling Trial Attorney Pelker as a witness for the defense, and it should deny the defendant's attempt to subpoena her testimony as a pretext to obtain her "removal" as government counsel.

## VII.    The Defendant's Remaining Motions

### A.  The Defendant's Conditions of Confinement

The defendant is housed at Northern Neck Regional Jail (NNRJ), which is a state facility that is not under the control of the Bureau of Prisons or the Department of Justice.  The government takes no position on the defendant's motion as it relates to his conditions of confinement.

### B.  Translations

The defendant objects (at 14) to the use of machine translation for any of the foreign-language documents in this case, but he does not identify any particular inaccuracies in machine

44

translations produced in discovery.  The government has provided some official translations of foreign-language documents, and is undertaking to obtain official translations of a substantial volume of Russian and Swedish-language materials.  The government hopes to be able to stipulate to the translations in order to streamline the trial presentation.  *See* ECF No. 61, at 15-16.

### C.  Early Disclosure of *Jencks* Material

The government does not oppose disclosure of *Jencks* material prior to trial.  The government is making efforts to gather, review, and produce *Jencks* material on a rolling basis, and will endeavor to complete this production no later than two weeks before trial (other than for potential cooperator witnesses).  Moreover, the government has actually produced a substantial volume of *Jencks* material in discovery, including agent affidavits, agent notes and memoranda, and agent work product.  There is no basis for the defendant's inaccurate claim that the government is deliberately "withholding" *Jencks* material.[27]

## <u>CONCLUSION</u>

For the foregoing reasons, the defendant's motions *in limine* should be denied.

---

[27] The government notes that the Jencks Act and Rule 26.2 are limited to the production of any prior "statement" of a government witness that relates to the subject matter of the witness's testimony.  *See* 18 U.S.C. § 3500(b); Fed. R. Crim. P. 26.2(a).  They do not cover other categories referenced in the defendant's *Jencks* request, such as "forensics or scientific evidence."

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY: */s/ Christopher B. Brown*
   Christopher B. Brown, D.C. Bar No. 1008763
   Assistant United States Attorney
   U.S. Attorney's Office for the District of Columbia
   601 D Street, N.W.
   Washington, D.C. 20530
   (202) 252-7153
   Christopher.Brown6@usdoj.gov

   */s/ C. Alden Pelker*
   C. Alden Pelker, Maryland Bar
   Trial Attorney, U.S. Department of Justice
   Computer Crime & Intellectual Property Section
   1301 New York Ave., N.W., Suite 600
   Washington, D.C. 20005
   (202) 616-5007
   Catherine.Pelker@usdoj.gov