UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v.    : | CRIMINAL NO. 21-cr-399 (RDM) |
| : | |
| ROMAN STERLINGOV, : | |
| : | |
| Defendant.  : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
SUPPLEMENTAL MOTION FOR RELEASE OF SEIZED ASSETS**

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully files the following Opposition to the "Defendant's Supplemental Motion to Free Untainted Seized Assets," ECF No. 101.  The defendant has been indicted by a federal grand jury for operating Bitcoin Fog, a darknet bitcoin "mixer" or "tumbler" service, in violation of federal money laundering and unlicensed money transmitting business statutes.  He now admits (at 6) that "most, if not all" of the funds seized from his two Kraken accounts originated from Bitcoin Fog.  The defendant's admission conclusively establishes that the seized funds were "involved in" the indicted offenses and are subject to forfeiture.  Under well-established case law, that should end the Court's inquiry—regardless of any financial need.  *See* ECF No. 53 (Gov't Opp. to Def. Motion for Release of Seized Assets), at 7-12.

The defendant's newly submitted declaration and financial statement do not change the analysis—first, because the forfeiture statutes "override[] any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense," *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 631 (1989); and second, because the financial declaration is vague and incomplete, contradicts the defendant's prior representations to this Court,

and fails to account for his current or projected legal expenses. The defendant's motion should be denied.

## ARGUMENT

**A. The Defendant's Admission that the Seized Kraken Accounts Are Traceable to Bitcoin Fog Establishes that the Funds Were "Involved In" the Offenses and Are Subject to Forfeiture**

The defendant admits that the seized Kraken funds are traceable to Bitcoin Fog. The defendant's admission should end the Court's probable cause inquiry, as it confirms that the seized funds "are traceable or otherwise sufficiently related to the crime charged in the indictment." *Kaley v. United States*, 571 U.S. 320, 324 (2014).

### 1. The Defendant Concedes *Kaley* Step Two

Under *Kaley*, the government has the right to retain seized property, regardless of the defendant's financial need, so long as there is "probable cause to believe the property is forfeitable." 571 U.S. at 323; *see* ECF No. 53, at 7-10. That determination reflects a two-step probable cause finding "(1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime." *Id.* at 323-24.

On *Kaley* step one, the grand jury's indictment "is conclusive" and cannot be re-litigated by the defense. *Id.* at 331. Here, that means the Court must accept the probable cause finding reflected in the Superseding Indictment—specifically, that the defendant operated Bitcoin Fog as an unlicensed money transmitting business and used Bitcoin Fog to participate in a money laundering conspiracy with co-conspirators including "darknet vendors and darknet market administrative teams" to launder the proceeds of drug trafficking offenses. *See* ECF No. 43 (Superseding Indictment), at 1-2, 3-4. These violations require the forfeiture of "any property *involved in* such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1) (emphasis added); *see* ECF No. 53, at 17-20.

On *Kaley* step two, the defendant admits that the seized Kraken funds came from Bitcoin Fog. Not only does the defendant decline to challenge a single word of the government's tracing analysis contained in the two seizure warrants and in the Scholl declaration—he affirmatively states that the seized Kraken funds were derived from Bitcoin Fog. *See* ECF No. 101, at 3 ("Mr. Sterlingov, like many, used Bitcoin Fog"), 6 ("Mr. Sterlingov became a user of Bitcoin Fog"), 6 ("Mr. Sterlingov mixes most, if not all, of his Bitcoin before depositing it into his Kraken Accounts the Government seized"); ECF No. 101-1 (Sterlingov Decl.), ¶ 15 ("Early on. somebody recommended I use Bitcoin Fog to secure and protect my transactions. . . . I became a user of Bitcoin Fog for this purpose."), ¶ ("It was a common security practice of mine to mix any assets through Bitcoin Fog before depositing them into my Kraken account."). The defendant's admission validates the government's tracing of the seized funds back to Bitcoin Fog, an unlicensed money transmitting business and money laundering organization. *See* ECF No. 53, at 20-24; ECF No. 53-2 (Kraken seizure warrant); ECF No. 53-5 (Scholl Decl.). Further, by confirming the connection between the seized Kraken funds and Bitcoin Fog, the defendant's admission specifically corroborates the government's attribution of the Bitcoin Fog cluster, from which the seized Kraken funds were traced. *See* ECF No. 53-5, at 2-3 (discussing attribution of Bitcoin Fog cluster).

In light of the defendant's admission that the seized Kraken funds are traceable to Bitcoin Fog and his failure to challenge to the government's tracing analysis, there is no factual issue in dispute and no need for an evidentiary hearing on *Kaley* step two. The defendant should not be able to use a *Monsanto* hearing as a pretext to engage in early cross-examination of one of the government's trial witnesses. *See Kaley*, 571 U.S. at 334-35 (warning against "a pre-trial mini-trial" used to gain "sneak preview" of government's case).

**2. The Defendant's Admission Combined with the Indictment Establishes that the Seized Kraken Funds Were "Involved In" the Bitcoin Fog Unlicensed Money Transmitting Business and Money Laundering Conspiracy**

From the defendant's indictment for operating Bitcoin Fog and his admission that the seized Kraken funds come from Bitcoin Fog, it necessarily follows that the seized funds were "involved in" the defendant's unlicensed money transmitting business and money laundering conspiracy offenses.

At the most basic level, the mere fact that the funds were tumbled *through* Bitcoin Fog shows that they were "involved in" the indicted offenses. This would be true even if the transactions at issue belonged to a true third-party user who made a one-off mixing transaction through Bitcoin Fog. As noted in the government's opposition, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960 is a continuing offense that encompasses the entire operation of the illegal business. Accordingly, forfeiture of any property "involved in" the offense includes any property involved in the business as a whole, regardless of the purpose or nature of any particular transaction. *See United States v. Elfgeeh*, 515 F.3d 100, 122, 138-39 (2d Cir. 2008) ("all assets that passed through" account belonging to unlicensed hawala were subject to forfeiture); *United States v. 50.44 Bitcoins*, 2016 WL 3049166, at *2 (D. Md. May 31, 2016) (bitcoins seized from married couple that operated unlicensed Darknet virtual currency exchange were subject to forfeiture "[b]ecause the business operated by [the defendants] . . . was not registered to transmit money as required by state and federal law"); *United States v. $829,442.42 in U.S. Currency*, 2013 WL 2446486, at *8-9 (D. Conn. June 5, 2013) (bank accounts belonging to unlicensed money transmitting business were subject to forfeiture in their entirety); *United States v. $715,031.27*, 587 F. Supp. 2d 1275, 1276-78 (N.D. Ga. 2008) ("entire" bank accounts belonging to unlicensed money transmitting business were subject to forfeiture); *see also* ECF No. 53, at 17-18.

The same logic holds for forfeiture of any property "involved in" the money laundering conspiracy. As Chief Judge Howell explained in the Helix bitcoin mixer case:

> Where, as here, the conspiracy takes the form of a business, all funds flowing through the business that "bankroll" or otherwise facilitate the alleged conspiracy are "involved in" it. Thus, any untainted funds used as "seed" money to start Helix or to run Grams, Helix's companion service, were used to further Helix's core business, which was cleaning bitcoins used in Darknet drug purchases. Finally, to the extent some of Helix's business came from transactions unrelated to drug activity, the fees from those transactions remain forfeitable because the evidence suggests that "the business as a whole was overwhelmingly devoted to" transactions from Darknet markets, which, in turn, overwhelmingly deal in drugs.

*United States v. Harmon*, 474 F. Supp. 3d 76, 85 n.5 (D.D.C. 2020) (citations omitted); *see also United States v. Baker*, 227 F.3d 955, 969-70 (7th Cir. 2000); *United States v. Garza-Gonzalez*, 512 F. App'x 60, 67 (2d Cir. Feb. 21, 2013) (unpublished); *United States v. Coffman*, 859 F. Supp. 2d 871, 879 (E.D. Ky. 2012); *United States v. Swank Corp.*, 797 F. Supp. 497, 502 (E.D. Va. 1992); ECF No. 53, at 18-20. Even supposedly "innocent" or "untainted" funds flowing through Bitcoin Fog were still "involved in" the money laundering conspiracy because they increased the pool of bitcoin available to mix and anonymize other users' transactions, including transactions to launder the proceeds of darknet market drug trafficking offenses.[1] In other words, any funds

---

[1] In Bitcoin Fog's October 27, 2011 announcement on the BitcoinTalk.org forum, the defendant's alter-ego, Akemashite Omedetou, explained how pooling of user funds facilitated the laundering process:

> We are providing a solution for this: using our service you mix up your bitcoins in our own pool with other users' bitcoins, and get paid back to other accounts from our mixed pool, which, if properly done by you can eliminate any chance of finding your payments and making it impossible to prove any connection between a deposit and a withdraw inside our service. . . . A link could be made if you would get paid from the same address that you have deposited bitcoins to. This is not the case with Bitcoin Fog. The money you deposit actually stay on the random initial address we generate for you. Only when our main account is running low, do we transfer the money from your deposit address to the main pool. That way, you may get a payout from the pool, while your original money is still sitting on the random initial account, not linked to your payout anywhere in the block chain. Since it is just a

flowing through Bitcoin Fog count as facilitating property for the money laundering conspiracy. Thus, even if the defendant were simply a "user" of Bitcoin Fog—as he now claims—his mixing transactions through the service would still qualify as property "involved in" the money laundering conspiracy, as well as property "involved in" the unlicensed money transmitting business.[2]

Of course, the defendant was *not* simply a "user" of Bitcoin Fog. As the grand jury found, and as this Court is bound to assume for purposes of this motion, the defendant was the administrator of Bitcoin Fog who "knowingly conducted, controlled, managed, supervised, directed, and owned" the illegal business. ECF No. 43, at 3. The defendant's indictment, combined with the fact that the defendant readily admits the tracing of funds from Bitcoin Fog to his accounts at Kraken, raises a "fair probability," *Kaley*, 571 U.S. at 338, that the funds actually represent the defendant's fees and profits from operating Bitcoin Fog. *See* ECF No. 53-2 (Kraken Seizure Warrant), ¶¶ 58-63 (explaining generation of at least $8 million in fees, tracing of the majority of defendant's financial accounts to bitcoin trading activity tied to Bitcoin Fog, and noting lack of "any significant sources of legitimate income" for the defendant). This conclusion is strengthened by additional uncontested facts:

---

> bitcoin address like any other, there is no way to even see that you have deposited money to Bitcoin Fog, and not to a random account you have generated yourself. (Until the pool runs low and transfers your original money.)

Ex. 1 (BitcoinTalk forum post).

[2] A truly innocent customer of Bitcoin Fog could seek the return of forfeited funds by submitting a third-party claim in the post-conviction "ancillary proceeding," as provided by Fed. R. Crim. P. 32.2(c). *See generally United States v. Dupree*, 919 F. Supp. 2d 254, 262-64 (E.D.N.Ya. 2013) (providing overview of ancillary proceeding, and explaining that "the purpose of the ancillary proceeding is for the District Court to amend orders of forfeiture and apportion assets when one or more third parties claim an interest in the property to be forfeited") (cleaned up); *aff'd in part, vac'd in part on other grounds by United States v. Watts*, 786 F.3d 152 (2d Cir. 2015).

- The defendant lacked any other significant sources of income during the relevant time period. According to the defendant's own declaration, his only regular income ended in or about "2013/2014" when he stopped working for Capo Marknadskommunication. ECF No. 101-1, ¶¶ 19, 22. Since that time, the defendant "lived off the savings [he] had accumulated through Bitcoin." *Id.* ¶ 25. He created a business account for a VPN service called "To The Moon" but, by his own admission, "[t]he business never took off," and his "life coaching videos were not a reliable source of income." *Id.* ¶ 33.

- The pattern of deposit activity into the two Kraken accounts reflects efforts to further launder the funds coming out of Bitcoin Fog. Many of the defendant's transfers from Bitcoin Fog went first to LocalBitcoins, a "peer-to-peer cryptocurrency exchange located in Finland and offering custodial wallet services." ECF No. 53-5, ¶ 2 n.2. As documented in the Scholl Declaration, the defendant transferred approximately 99.23 BTC, valued at $629,923, from Bitcoin Fog to his LocalBitcoins account. *Id.* ¶¶ 9-10. From there, he transferred approximately 15.75 BTC ($164,885) to his first Kraken account, and another 0.57 BTC ($946) to his second Kraken account. *Id.* ¶¶ 13, 18. The effort to funnel funds from Bitcoin Fog through LocalBitcoins before depositing into the seized Kraken accounts is indicative of layering, a money laundering technique that "involves a financial transaction or series of financial transactions that separate unlawfully obtained proceeds from their source and, in the process, conceal the illegal nature of the proceeds and complicate an audit trail." *United States v. Bikundi*, 125 F. Supp. 3d 178, 195 (D.D.C. 2015) (quoting seizure warrant affidavit); *see also* U.S.S.G. § 2S1.1, Application Note 5 (defining "sophisticated laundering" to include use of "two or more levels (*i.e.* layering) of transactions").

- The defendant utilized a business account opened in the name of "To the Moon Ltd | Roman"—the second seized Kraken account—to receive and spend personal funds traceable to Bitcoin Fog, rather than for actual business operations. Using a shell company account is another hallmark of money laundering.

In sum, the grand jury's indictment of the defendant as the administrator of Bitcoin Fog, the undisputed tracing of payments from Bitcoin Fog to the defendant's Kraken accounts, and the defendant's lack of other sources of income and suspicious pattern of transactional activity raises a fair probability that the seized Kraken accounts contained property "involved in" the Bitcoin Fog unlicensed money transmitting business and money laundering conspiracy.

### 3. The Defendant's Disagreement with the Indictment and Other Counterarguments Lack Merit

The defendant spends most of his motion asserting his innocence, claiming he was only a user of Bitcoin Fog rather than its administrator, and denying that any crime even occurred. *See* ECF No. 101, at 3 ("Mr. Sterlingov, like many, used Bitcoin Fog for the completely legal purpose of securing the privacy of his rapidly appreciating Bitcoin assets."), 6 ("Concerned about the privacy and security of his assets, Mr. Sterlingov became a user of Bitcoin Fog. He never ran or operated Bitcoin Fog in any capacity."), 14 ("There is not a single piece of evidence tying Mr. Sterlingov to any identifiable crime."), 15 ("[T]here is no evidence tying Mr. Sterlingov to any identifiable crime involving any of the seized assets."), 15 ("This is a complex Bitcoin prosecution that doesn't identify a single crime."), 15 ("[T]he government has identified no actual crimes . . . ."), 15 ("[A]ll the forensic evidence is entirely consistent with the Defendant's innocence."). The defendant goes on at length about how he would host unnamed "friends and guests" at his apartment in Gothenburg, Sweden, and that he would share his WiFi password with them. ECF No. 101, at 10; ECF No. 101-1, ¶ 16. He even suggests that an unknown bad actor

8

"spoofed" or "highjacked" the defendant's residential Internet Protocol (IP) address in order to operate Bitcoin Fog. ECF No. 101, at 10. Whatever the merits of these defense theories, they run headlong into the Supreme Court's admonition in *Kaley* that the grand jury's indictment is "conclusive" on the question of whether there is "probable cause to think (1) that the defendant committed an offense permitting forfeiture." 571 U.S. at 323, 330.

To the extent the defendant makes any argument at all about the source of the seized Kraken funds, he claims (at 6, 9) that they represent the proceeds from his "legal jobs" and bitcoin trading activity. Sterlingov claims (at 6) that "someone" recommended Bitcoin Fog to him, and that "[a]s part of his routine InfoSec and OpSec measures, Mr. Sterlingov mixe[d] most, if not all, of his Bitcoin before depositing it into his Kraken Accounts the Government seized." As noted above, even if this claim were true, the funds would still be subject to forfeiture because *any* transactions mixed through Bitcoin Fog count as property "involved in" the unlicensed money transmitting business and money laundering conspiracy offenses. And on its own terms, the claim is implausible. If the defendant were only concerned about maintaining the anonymity of his legitimate cryptocurrency holdings, it would make no sense for him to take funds that are attributable to him (from his job or trading activity), mix them through Bitcoin Fog, and then deposit the funds into accounts that are also attributable to him (the Kraken accounts). That does nothing but add transaction fees and require additional time and effort to access a Tor-based bitcoin mixer service. If the defendant's story were to be believed, he could just as easily have transferred the funds from his legal sources *directly* to his Kraken accounts, without using Bitcoin Fog (and LocalBitcoins) for intermediation.

Further, if the original source of the funds mixed through Bitcoin Fog were truly legitimate, the defendant should be able to provide some record of his bitcoin holdings *before* they were mixed

9

through Bitcoin Fog. Instead, the defendant vaguely offers the source of funds as "buying, selling, and investing in Bitcoin." ECF No. 101-1, ¶ 13. The government's financial analysis has shown the defendant repeatedly receiving money *from* Bitcoin Fog—but, significantly, it does not show the defendant sending money *to* Bitcoin Fog beyond the initial test transactions and seed funding of the site. If the defendant truly had a legitimate source of funds, he should be able to match every outgoing transaction from Bitcoin Fog to his Kraken accounts (directly or indirectly) with an incoming transaction into Bitcoin Fog from a legitimate source. The defendant has offered absolutely no such documentation. The defendant has access to his financial records and numerous virtual currency exchanges, forensic images of his electronic devices, and search warrant returns for many of his email accounts, all of which were produced in discovery. As the defendant's declaration states, "[w]hen I travel, I regularly carry most of my computer equipment with me," ECF No. 101-1, ¶ 39—meaning that he should have access to his emails, text messages, bitcoin software wallet applications, and any other records of his bitcoin trading activity before allegedly depositing into Bitcoin Fog. The defendant's inability to provide any specifics about his allegedly legal acquisition of bitcoin and his transfers *into* Bitcoin Fog underscores the implausibility his claims.

      The one-way flow of funds into the defendant's accounts—from Bitcoin Fog *to* his exchange accounts—is also telling. If the defendant were truly trying to use a mixer for its supposed privacy benefits, he would be sending money *from* his accounts at exchanges (which are linked to his identity by the exchanges' know-your-customer programs) *to* Bitcoin Fog before using the bitcoin. Instead, the government's analysis shows the defendants accounts at exchange after exchange after exchange—Kraken, LocalBitcoins, Binance, Bitstamp, Poloniex, Bitfinex—*all* receiving funds *from* Bitcoin Fog.

While the defendant now claims to have been an innocent user of Bitcoin Fog, he conspicuously avoided associating himself with Bitcoin Fog or admitting to any mixer usage prior to his arrest. Indeed, when confronted with evidence of his mixer usage, he actively misled financial institutions for the purposes of evading their anti-money laundering controls. For example, on August 3, 2016, an employee of the cryptocurrency exchange BitStamp conducting due diligence directly asked whether the defendant used any mixing services: "Additionally, could you confirm if you were using any crypto-currency tumblers?" The defendant responded evasively:

> I don't know if I did with the specific funds sent to your exchange. It's not impossible. I did a lot of experimenting with bitcoins back in the day, it was a very new and exciting technology. I haven't done this recently, but my account here is very old, I don't really remember.

Ex. 2, at STERLINGOV-000253-254 (BitStamp records). The defendant's evasive response to BitStamp in 2016 contrasts with his present claim (at 6) that he mixed "most, if not all" of his bitcoin "[a]s part of his routine InfoSec and OpSec measures."[3] Further, his contemporaneous response in 2016 flatly denied that he had used any mixers "recently." That was not true. As documented in the Scholl Declaration (and undisputed by the defendant), the defendant was sending funds from Bitcoin Fog to his Kraken accounts before, during, and after his August 2016 communication with BitStamp. *E.g.*, ECF No. 53-5, ¶ 14 (defendant sent funds from Bitcoin Fog to Kraken Account 1 "from on or about 9/23/2014 to on or about 11/17/2020"), ¶ 19 (defendant

---

[3] The defendant's response to BitStamp that "I don't really remember" whether he used a mixing service echoes his evasive non-denial when questioned by WIRED journalists about whether he set up the clearnet domain for Bitcoin Fog: "Sterlingov says he 'can't remember' if he created BitcoinFog.com . . . 'That was 11 years ago,' Sterlingov says. 'It's really hard for me to say anything specific.'" Lily Hay Newman & Andy Greenberg, *Bitcoin Case Could Put Cryptocurrency Tracing on Trial*, WIRED (Aug. 2, 2022), *available at* https://www.wired.com/story/bitcoin-fog-roman-sterlingov-blockchain-analysis/.

11

sent funds from Bitcoin Fog to Kraken Account 2 "from on or about 4/5/2016 to on or about 11/12/2017").

The defendant's omission of references to "Bitcoin Fog" or "Fog" in his notes or devices is also conspicuous.  The defendant wrote detailed notes to himself, including documentation of his extensive efforts to remain "masked."  He discusses his use of different VPNs and proxy services and chronicles his use of virtual currency exchanges.  If Bitcoin Fog were truly a standard part of his routine "OpSec" practices, it is implausible that he would omit any reference to it in his notes.

Having admitted that the Kraken accounts were funded by Bitcoin Fog, the defendant falls back on the argument (at 9-10) that the timing of the transfers from Bitcoin Fog to the seized Kraken accounts is somehow exculpatory, because the transactions do not show a "steady stream" of payments from Bitcoin Fog to the defendant's accounts.[4]  But the government has never alleged that service fees from Bitcoin Fog were set up to be automatically transferred in real time to the defendant's Kraken accounts; only that the defendant used his Kraken accounts as one of many outlets for laundering and spending his illicit Bitcoin Fog proceeds.  Indeed, as the defendant's own financial statement shows, the defendant utilized a complex web of cryptocurrency accounts and bank accounts, self-hosted cryptocurrency software wallets, and gold purchases to store his wealth from Bitcoin Fog.  The defendant funneled much of the Bitcoin Fog funds through

---

[4] The defendant inaccurately complains (at 9) that the government's records are "incomplete," but the government has produced to the defense in discovery several sets of complete account records obtained from Kraken pursuant to grand jury subpoenas on different dates.  The records produced to the defendant include numerous spreadsheets documenting account trading activity, online login information including IP addresses, and customer due diligence materials including a copy of the defendant's Swedish identification documents.  The defense is in possession of all the complete Kraken account records relied upon in the government's analysis.

LocalBitcoins first, before depositing into his Kraken accounts. This complex pattern is entirely consistent with the laundering of illicit proceeds.

### B. The Defendant's Vague and Inconsistent Declaration Does Not Satisfy His Burden of Establishing Financial Need

The defendant's declaration fails to "clearly establish[]" that access to the seized Kraken accounts "is necessary for an effective exercise of the Sixth Amendment right to counsel." *United States v. E-Gold, Ltd.*, 521 F.3d 411, 417, 421 (D.C. Cir. 2008). First, the declaration is vague and inexact. The defendant professes to be unable to provide exact numbers for any of his financial accounts—including those, like his Binance account, that he has been using to pay for one of his lawyers (Maksim Nemtsev) for private representation beginning as early as April 29, 2021. *See* ECF No. 53, at 7. The defendant has presumably been paying his three trial attorneys as well, but he declines to provide exact figures for any of the assets or financial accounts that have been liquidated to pay for attorney's fees. The defendant also leaves himself an infinitely elastic escape hatch by including an entry for "Various Old Crypto Accounts" with a value of "Unknown." At best, the defendant's declaration is comparable to the "*partial* listing" of sources of income and incomplete disclosure of assets that Judge Sullivan found inadequate in *United States v. Sullivan*, 575 F. Supp. 3d 1, 5-6 (D.D.C. 2021), *reconsideration denied*, 2022 WL 3027007 (D.D.C. Aug. 1, 2022) (emphasis in original).

Second, the defendant's declaration is inconsistent with the defendant's prior representations before this Court. In the defendant's opening motion, he flatly declared that he "has *nothing* to pay his legal fees except for the seized assets." ECF No. 48, at 25 (emphasis added). Now he acknowledges spending *$184,000* in various assets, plus 1.9 bitcoin (BTC) and 33.4 Monero (XMR), to pay for his legal expenses to date. In the defendant's detention briefing, he ridiculed the government for suggesting he had access to gold. ECF No. 55, at 9 ("Nor are the

13

decrypted WhatsApp messages attached to the Government's Opposition, which jokingly discuss gold bullion being stashed under pillows. On April Fool's Day. . . . If this can even be characterized as a serious business conversation and not joking."). Now he acknowledges owning at least $36,000 in gold, including gold bullion stored with one of his relatives. And as this Court has previously noted, the defendant falsely claimed indigency in order to obtain appointed counsel from the Office of the Federal Public Defender, even as he was paying for Mr. Nemtsev's private representation out of his concealed assets. *See* ECF No. 58 (Order Denying Def. Motion for Reconsideration of Detention), at 4 ("Sterlingov's failure to disclose all of his assets at the time that he sought court-appointed representation continues to trouble the Court . . . .").

Third, the defendant's declaration fails to account for his projected legal expenses. He has not disclosed his current counsel's billing rates or provided any estimate of expenses through trial. *See* ECF No. 53, at 16-17. He claims (at 13) that "the cost of retaining experts alone could run $500,000," but this is an unrealistic and astronomically high figure, offered without any explanation or apparent basis. Rather than offer any specifics about his legal expenses, the defendant expounds at length (at 13) about his trial counsel's experience in "computer crime cases" and their media appearances in "four feature length documentaries on Netflix, Amazon, Hulu and Peacock." Presumably these details are offered to justify higher fees (without disclosing what those fees are), but it is worth noting that trial counsel's experience in Computer Fraud and Abuse Act prosecutions is not related to the issues in this case—cryptocurrency, money laundering, and federal and state money transmitting business regulations—nor do any of the defendant's New York or Boston-based attorneys provide any specialized experience litigating in this District. In any event, the defendant's choice of counsel is not at issue. Rather, it is his burden to "present some evidence that he will be deprived of counsel of choice if he cannot access the seized assets."

14

*United States v. Emor*, 794 F. Supp. 2d 143, 149 (D.D.C. 2011); *see also Caplin & Drysdale*, 491 U.S. at 625 ("Nor is it necessarily the case that a defendant who possesses nothing but assets the Government seeks to have forfeited will be prevented from retaining counsel of choice. Defendants . . . may be able to find lawyers willing to represent them, hoping that their fees will be paid in the event of acquittal, or via some other means that a defendant might come by in the future. The burden placed on defendants by the forfeiture law is therefore a limited one."). The defendant cannot carry his burden without providing some accounting for his anticipated legal expenses and showing that, absent access to the seized Kraken accounts, he *will* be deprived of his counsel of choice. *Emor*, 794 F. Supp. 2d at 149.

### C. The Defendant Has Waived His Fifth Amendment Privilege and Should Be Subject to Cross-Examination

The defendant has waived his Fifth Amendment privilege for purposes of this proceeding and should be subject to cross-examination. "It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." *Mitchell v. United States*, 526 U.S. 314, 321 (1999). To hold otherwise would "cast[] doubt on the trustworthiness of the statements and diminish[] the integrity of the factual inquiry." *Id.* at 322. "[T]he scope of the waiver is determined by the scope of relevant cross-examination." *Id.* at 321 (quotation omitted). That includes "the subject matter of the direct examination"—here, the defendant's sworn declaration—as well as "matters affecting the witness's credibility," Fed. R. Evid. 611(b). *See also Raffel v. United States*, 271 U.S. 494, 497 (1926) ("When [a defendant] takes the stand in his own behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined as to the facts in issue. He may be examined for the purpose of impeaching his credibility. . . . His

15

waiver is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing.") (citations omitted).

If the defendant refuses to take the stand for cross-examination, his declaration should be disregarded by the Court. *See, e.g.*, *United States v. Rylander*, 460 U.S. 752, 754-55, 758 (1983) (finding, in civil contempt proceeding where defendant submitted affidavit but invoked Fifth Amendment to avoid cross-examination, that defendant's "*ex parte* affidavit and uncross-examined testimony were properly disregarded by the District Court," and explaining that "while the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness such as [defendant] declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production").

Here, the government intends to call the defendant and cross-examine him about the numerous inconsistencies and illogical statements in his declaration and financial statement, including those referenced above. If the defendant is unable or unwilling to testify, the Court should disregard his declaration and hold that he has not satisfied his threshold burden. *See Rylander*, 460 U.S. at 758.

**CONCLUSION**

For the foregoing reasons and those outlined in the Government's Opposition to Defendant's Motion for Release of Seized Assets, ECF No. 53, which is incorporated by reference herein, the defendant has not satisfied his threshold burden to justify a Monsanto hearing, he has admitted that the seized funds are traceable to the indicted offenses, and his motion for the return of the seized Kraken funds should be denied.

                                          Respectfully submitted,
                                          MATTHEW M. GRAVES
                                          UNITED STATES ATTORNEY
                                          D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
           Christopher B. Brown, D.C. Bar No. 1008763
           Assistant United States Attorney
           U.S. Attorney's Office for the District of Columbia
           601 D Street, N.W.
           Washington, D.C. 20530
           (202) 252-7153
           Christopher.Brown6@usdoj.gov

           */s/ C. Alden Pelker*
           C. Alden Pelker, Maryland Bar
           Trial Attorney, U.S. Department of Justice
           Computer Crime & Intellectual Property Section
           1301 New York Ave., N.W., Suite 600
           Washington, D.C. 20005
           (202) 616-5007
           Catherine.Pelker@usdoj.gov