UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 21-cr-399 (RDM) |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MOTION TO QUASH DEFENSE
SUBPOENA TO THE GOVERNMENT PROSECUTOR**

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully moves to quash the defendant's Rule 17 trial subpoena directed at counsel for the government in this case, Trial Attorney C. Alden Pelker. Heedless of the pending cross-motions on this very subject, the defense has charged forward with a subpoena to Trial Attorney Pelker, while refusing to submit a *Touhy* request or even provide a summary of her expected testimony. Of course, the subpoena is beside the point: the true aim of the defense is to manufacture a pretext to secure Trial Attorney Pelker's removal from this case. The Court should reject the defendant's frivolous, legally unsupportable gamesmanship.

**FACTUAL BACKGROUND**

**A. Intelligence Analyst Pelker's Limited Role in the Bitcoin Fog Investigation**

Much of the relevant background is summarized in the government's previous submissions, ECF No. 64 (Gov't Mot. *In Limine* To Preclude the Defense from Calling the Prosecutor as a Witness for the Defense); ECF No. 73 (Gov't Opp. to Def. Omnibus Mots. *In Limine*), at 40-44; ECF No. 80 (Gov't Reply in Support of Mot. *In Limine* To Preclude the Defense from Calling the Prosecutor as a Witness for the Defense), which are incorporated by reference herein. As relevant here, Trial Attorney Pelker was previously employed as an FBI Intelligence

Analyst (IA).[1]  In that capacity, IA Pelker authored an "Intelligence Note" regarding Bitcoin Fog, which was distributed on or about October 28, 2014.  The Intelligence Note primarily involved open-source research: reviewing the Tor-based site for Bitcoin Fog; conducting further open-source research on sites such as BitcoinTalk.org, Twitter, and DeepDotWeb (a site publicizing illicit darknet markets); researching domain registration information for Bitcoin Fog's informational clearnet website, bitcoinfog.com; and other similar tasks.  It also cross-referenced law enforcement reporting indicating that Bitcoin Fog was being used or recommended by a variety of criminal actors, from users of a child sexual abuse material website to customers of online drug markets like Silk Road.  The Intelligence Note did not name the defendant, Roman Sterlingov.

IA Pelker was never the primary investigating case agent—she was not an "agent" at all—and she provided limited support to the investigation team, namely by engaging in preliminary blockchain analysis, showing (as of 2015) that Bitcoin Fog executed a considerable volume of transactions involving Tor-based darknet markets.  IA Pelker's position as an FBI analyst ended in 2016, when she joined the Department of Justice's Computer Crime and Intellectual Property Section as an Honors Attorney.

Out of an abundance of caution, the government produced the Intelligence Note described above in discovery to the defense.  The government does not plan to introduce the Intelligence Note or any other record involving then-IA Pelker as evidence at trial.

B. **Procedural Background**

From the beginning of their appearance in this case, the two men comprising Mr. Sterlingov's defense team have acted out a fixation on Trial Attorney Pelker and her career.  As a

---

[1] She was not an FBI "agent," as the defense repeatedly and inaccurately states.

2

Department of Justice attorney, Trial Attorney Pelker has been involved in numerous high-profile cryptocurrency-related cases, including law enforcement actions against AlphaBay, then the world's largest darknet drug marketplace, and Welcome to Video, a darknet site distributing child sexual abuse material (CSAM) which was located and shut down through blockchain analysis. In addition to the takedown of the Welcome to Video Tor site and prosecution of its administrator in South Korea, Trial Attorney Pelker's team was responsible for rescuing at least 23 children from ongoing abuse by users of the site.[2] These high-profile cases (not Bitcoin Fog) have been the focus of numerous media articles and the recent book by WIRED journalist Andy Greenberg.[3]

Yet defense counsel have sought to misrepresent Trial Attorney Pelker's career as somehow dependent on the investigation into Bitcoin Fog—in statements to this Court, and in inaccurate *ad hominem* attacks during their recent podcast and international conference appearances.[4] For example, in one podcast episode posted to YouTube, defense counsel presented

---

[2] *See* U.S. Dep't of Justice, *The Report of the Attorney General Pursuant to Section 8(b)(iv) of Executive Order 14067: How To Strengthen International Law Enforcement Cooperation for Detecting, Investigating, and Prosecuting Criminal Activity Related to Digital Assets* (2002), at 30, available at https://www.justice.gov/ag/page/file/1510931/download; U.S. Dep't of Justice Press Release, *South Korean National and Hundreds of Others Charged Worldwide in the Takedown of the Largest Darknet Child Pornography Website, Which Was Funded by Bitcoin* (Oct. 16, 2019), available at https://www.justice.gov/opa/pr/south-korean-national-and-hundreds-others-charged-worldwide-takedown-largest-darknet-child.

[3] Trial Attorney Pelker's name appears numerous times in Mr. Greenberg's book, but *none* of those instances relates to this case. Indeed, the only attorney who managed to insert his name into the book in relation to Mr. Sterlingov's case is his own defense attorney, Mr. Ekeland.

[4] Defense counsel, now practicing in this District as Court-appointed counsel under the Criminal Justice Act (CJA), should adhere to the D.C. Bar Voluntary Standards of Civility in Professional Conduct. *E.g.*, Rule 2 ("Except within the bounds of fair argument in pleadings or in formal proceedings, we will not reflect in our conduct, attitude, or demeanor our clients' ill feelings, if any, toward other participants in the legal process."), Rule 3 ("Except within the bounds of fair argument in pleadings or in formal proceedings, we will abstain from disparaging personal remarks or acrimony toward such participants and treat adverse witnesses and parties with fair consideration."), Rule 5 ("We will not bring the profession into disrepute by making unfounded accusations of impropriety or making *ad hominem* attacks on counsel, and, absent good cause, we will not attribute bad motives or improper conduct to other counsel."), Rule 23 ("We will not seek

a slide entitled "Cast of Characters" that prominently listed Trial Attorney Pelker's name, among others. They spent several minutes on inaccurate speculation about Trial Attorney Pelker's career—describing her as "a very interesting character in this prosecution," and claiming that she "begins the case" while working at the "FBI Russia desk in the National Security Division in Philadelphia, Pennsylvania" (none of which is accurate). They further stated: "Another reason, one of the main reasons you see confirmation bias in this case is both the profit motive, you know, age-old greed, we all know it, and status. And when status comes in, at the beginning of this, Catherine Alden Pelker is a nobody. Right now she's one of their star blockchain prosecutors."[5]



court sanctions or disqualification of counsel unless reasonably justified by the circumstances after conducting a reasonable investigation, which includes attempting to confer with opposing counsel."), Rule 27 ("We will not knowingly misrepresent, mischaracterize, misquote, or miscite facts or authorities."), available at https://www.dcbar.org/For-Lawyers/Legal-Ethics/D-C-Bar-Voluntary-Standards-of-Civility-in-Profess.

[5] *Roman Sterlingov – Profits over Justice*, YouTube (May 7, 2023), at 22:28-28:42, available at https://www.youtube.com/watch?v=Gjj71IMXaAA.

In another podcast, one defense counsel began: "One of the interesting threads of this case is the story of the lead prosecutor, Catherine Pelker," while the other exclaimed, "Oh God, yeah." They repeated their inaccurate claims about Trial Attorney Pelker originating the investigation, and claimed: "this case has been following her, and this case is her baby."  They continued: "Everybody involved in this case on the government side has been putting their own careers and their own financial interests over justice."  And they further stated: "They're just breaking the rules left and right, you know, a f***ing prosecutor on the case is a material fact witness, you know in any other case that would be a huge thing, but there's so much f***ed up sh** in this case that that's just like one of the ancillary side stories."[6]  Concurrent with this motion, the government is filing a motion for an order to show cause why the Court should not enter an order pursuant to Local Criminal Rule 57.7(c) to preclude defense counsel from continuing to make extrajudicial statements to the media that are likely to have a substantially prejudicial effect on this case.

In addition to calling this prosecution "her baby," defense counsel have refused refer to Trial Attorney Pelker by her title, and they have attempted to personalize and belittle the government's pleadings on this issue by referring to them as "her motion" and "her own motion." ECF No. 67, at 1, 6.

---

[6] The Vonu Podcast, *TVP #184: ChainAnalysis Coercion & Quack Science: The Troubling Case of Roman Sterlingov with Tor Ekeland, Mike Hassard, & SW from Samourai Wallet* (Apr. 29, 2023), at 41:30-44:38, 1:00:20-1:00:45, available at https://vonupodcast.com/tvp-184-chainanalysis-coercion-quack-science-the-troubling-case-of-roman-sterlingov-with-tor-ekelend-mike-hassard-sw-from-samourai-wallet/.  Of relevance to the pending motions to quash the defendant's Rule 17(c) subpoenas to Chainalysis witnesses, *see* ECF No. 93 (Gov't Mot. To Quash Early-Return Rule 17(c) Subpoenas), ECF No. 95 (Mot. To Quash Subpoena by Non-Parties Chainalysis Inc., Michael Gronager, Jonathan Levin, and Youli Lee and Incorporated Mem. of Law), defense counsel also expressed their intent to engage in future litigation against Chainalysis, stating: "Even if we win, they're not going to really face—Chainalysis, we're going to sue the crap out of 'em." *Id.* at 1:00:05.

From the outset of their appearance in this case, defense counsel have sought to remove Trial Attorney Pelker from the prosecution team. On September 12, 2022, defense counsel emailed the government with the following demand, among others: "Ms. Pelker is a material fact witness in this case and we are going to subpoena her testimony. We give you a final opportunity to have her withdraw from this case as a prosecutor before we raise the issue with the court."

The government responded by letter on September 17, 2022 to this and other topics raised by the defense, stating in relevant part:

> With respect to your statement that "Ms. Pelker is a material fact witness," please provide further detail, including the scope and substance of any testimony you would propose to elicit from her as a defense witness, the legal basis for your belief that the defense could permissibly call a prosecutor as a witness, and the legal basis for your belief that she is unable to serve as counsel for the government. We note that you frame your inquiry as the "final opportunity," but you have only raised this issue once in passing (months ago) and have never before asked for Ms. Pelker's withdrawal.

Defense counsel never responded to the government's September 17, 2022 letter.

On October 24, 2022, the government moved *in limine* to preclude the defense from calling Trial Attorney Pelker as a witness for the defense. ECF No. 64. In a cross-motion *in limine* filed the same day, the defense asked for a hearing "as to [Trial Attorney Pelker's] role as a material fact witness and removal as a prosecutor in this case."[7] ECF No. 59, at 14-15. In none of their pleadings did the defense offer any outline of the proposed testimony to be elicited from Trial Attorney Pelker, other than conclusory assertions that she is an "accuser" and vague references to Chainalysis. The cross-motions *in limine* remain pending before this Court.

On March 8, 2023, defense counsel issued nine trial subpoenas for current and former government personnel. Notwithstanding the pending cross-motions, one of the defense subpoenas

---

[7] Because the defense motion did not include any proposed order with their motion, as required by Local Criminal Rule 47(c), the precise relief sought was somewhat unclear.

was directed to Trial Attorney Pelker.  *See* Ex. 1 (Subpoena to C.A. Pelker).  On March 17, 2023, the government responded: "As you are well aware, the subpoena to government counsel, Trial Attorney Pelker, is the subject of cross-motions currently pending before the Court.  We will be following up with additional correspondence and intend to raise this matter again with the Court."

On March 23, 2023, the Chief of the Civil Division of the U.S. Attorney's Office for the District of Columbia issued a letter to defense counsel requesting cooperation with the U.S. Department of Justice's *Touhy* regulations.  *See* Ex. 2 (Letter from B. Hudak to T. Ekeland (Mar. 23, 2023)).  The *Touhy* letter highlighted the relevant regulations and requested: "[T]o assess your subpoena to Ms. Pelker and evaluate any concerns or objections the Department may have to it, we request that you provide the summary required by the Department's *Touhy* regulations to the U.S. Attorney's Office," and in particular asked the defense to "address whether any of the factors listed in 28 C.F.R. § 16.26(b) are present, and if they are, why an Assistant Attorney General should nonetheless authorize disclosure."

More than a month later, on May 3, 2023, the defense provided their response to the *Touhy* letter.  *See* Ex. 3 (Letter from T. Ekeland to B. Hudak (May 3, 2023)).  The defense flatly refused to engage with the *Touhy* procedures.  They declined to provide any summary of the proposed testimony.  They declined to address whether the proposed testimony would implicate any privilege, pursuant to 28 C.F.R. § 16.26(a)(2), or any other factors outlined under 28 C.F.R. § 16.26(b), such as grand jury secrecy under Fed. R. Crim. P. 6(e), revelation of a confidential source or informant, or revelation of investigatory records compiled for law enforcement purposes that would interfere with enforcement proceedings or disclose sensitive investigatory techniques. They declared that, "[a]s for *Touhy*, an administrative regulation cannot abrogate Mr. Sterlingov's Sixth Amendment right to confront his accusers" and stated that "the government cannot compel

7

[Mr. Sterlingov] to reveal his defense strategy pre-trial." And—of course: "given the fact that [Trial Attorney Pelker] is both a prosecutor and a material fact witness, the Department should withdraw her from this case to avoid confusing the jury as to whether she is a witness or an advocate."

## ARGUMENT

This Court has an independent duty to review the propriety of subpoenas issued in its name and backed by the threat of contempt of Court. *See Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951) ("The burden is on the court to see that the subpoena is good in its entirety and it is not upon the person who faces punishment to cull the good from the bad."). The government has explained at length the relevant legal standards for calling a government prosecutor as witness in a criminal case in its prior pleadings—which are incorporated by reference herein. *See* ECF No. 64; ECF No. 73, at 40-44; ECF No. 80. The government reiterates significant points below, if only to highlight the defendant's failure to address, let alone satisfy, the stringent legal standard for calling his own prosecutor as a witness in his case.

### A. The Defendant Cannot Show that Testimony from Trial Attorney Pelker Is Vital to His Case and Cannot Be Obtained from Another Source

As outlined in the government's prior pleadings, a defendant seeking to call a prosecutor as a witness in his case bears the burden of showing: (1) that the proposed testimony is "vital to his case," *United States v. Watson*, 952 F.2d 982, 986 (8th Cir. 1991); and (2) that the same evidence cannot be obtained from another source, *id.*, and that he has "exhausted" "all other sources of possible testimony," *United States v. West*, 680 F.2d 652, 654 (9th Cir. 1982). *See* ECF No. 64, at 3-4 (collecting cases). "Requests for such testimony are disfavored." *Watson*, 952 F.2d at 986. "The law does not liberally permit a defendant to call a prosecutor as a witness. On the contrary, a defendant must demonstrate a compelling and legitimate need to do so. Where

8

witnesses other than the prosecutor can testify to the same matters or conversations, no compelling need exists." *United States v. Wallach*, 788 F. Supp. 739, 743-44 (S.D.N.Y. 1992) (internal citations omitted).

The defendant's subpoena fails under both prongs. First, the defense has not established that the proposed testimony from Trial Attorney Pelker is "vital" to the defendant's case. Indeed, other than vague references to Chainalysis, the defense has refused to provide any summary of her proposed testimony at all. Without such details, the Court cannot determine whether the subpoena even requests *relevant* testimony—meaning testimony that "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. For example, if the focus of the proposed testimony is the Department of Justice's contracting relationship with Chainalysis, the defense cannot explain how such details would be "of consequence in determining the action," except by resort to wild and unfounded conspiracy theories that cannot satisfy the conditional relevance standard under Fed. R. Evid. 104(b). To be sure, it would be one thing to challenge a witness's conclusions, based on the underlying transactional records recorded on the Bitcoin blockchain, which may have been calculated or graphed with the assistance of a tool produced by Chainalysis (similar to tools produced by other vendors as well as open-source tools). In much the same way, if the government offered testimony from a forensic accountant who performed sophisticated equations using Microsoft Excel, the defendant would be well within his rights in challenging the witness's math or conclusions—perhaps by using another tool to perform the same analysis of the underlying records. But conspiracy theories about the government's acquisition of Microsoft Office, or its decision to use Excel rather than another software tool, bear no relationship to any "fact that is of consequence in determining the action." Fed. R. Evid. 401.

The standard here, moreover, is not just relevance, but whether the testimony from the prosecutor is "vital to his case." *Watson*, 952 F.2d at 986. The proposed testimony from Trial Attorney Pelker—to the extent it can be discerned—is anything but "vital." This is not a situation, for instance, where a prosecutor is the only witness available to testify about a key statement the defendant or another witness made in an interview. The defense is not seeking evidence related to the legal elements of the indicted charges, the defendant's state of mind, the existence of an alibi, or any other issue of material fact. Instead, the defense is seeking to call his prosecutor (at best) in order to put on a sideshow to the jury about historical government contracting practices.

Even if such testimony were relevant, and even if it were "vital" to the defendant's case, it is not *unique* testimony which the defendant cannot obtain from any other source. If there is any basis to introduce testimony about how Chainalysis was hired or how its tool was used in this investigation, the defense is obligated to exhaust efforts to seek the same information from other witnesses and documents *other than* the government attorney prosecuting the case. *See West*, 680 F.2d at 654. The fact that the defense has failed to do so—has failed even to try to obtain the same evidence from another source—speaks volumes about the true intent behind the subpoena.

**B. The Defendant Has Failed To Comply with *Touhy* Regulations and Appears To Be Seeking Privileged Testimony**

The defendant has not complied with the applicable *Touhy* regulations for obtaining testimony from a Department of Justice attorney. *See* ECF No. 73, at 42. "When one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas duces tecum will be willingly obeyed or challenged is obvious." *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 419 (1951). These procedural regulations protect important governmental interests by providing a mechanism for senior officials

10

to review prospective testimony and determine whether to invoke any substantive privilege against disclosure. *See Commonwealth of Puerto Rico v. United States* (D.P.R. Sept. 26, 2006), *aff'd*, 490 F.3d 50 (1st Cir. 2007) ("However, even though the housekeeping statute and the *Touhy* regulations do not themselves create substantive privileges, the federal government can invoke substantive privileges existing independently of those laws to protect information demanded through the *Touhy* process."). Courts have routinely upheld the need for requesting parties to provide such summaries when seeking oral testimony from Department officials. *See, e.g.*, *United States v. Springer*, 444 F. App'x 256, 263 (10th Cir. 2011); *United States v. Bizzard*, 674 F.2d 1382, 1387 (11th Cir. 1982); *United States v. Marino*, 658 F.2d 1120, 1125 (6th Cir. 1981). Failure to comply with this procedural prerequisite is a valid ground to quash or deny a subpoena. *See, e.g., United States v. Archer*, 2010 WL 2633080, at *1-2 (E.D. Tenn. June 25, 2010) (quashing subpoena to FBI agent); *United States v. Guild*, 2008 WL 169355, at *2-3 (E.D. Va. Jan. 15, 2008) (quashing subpoena to AUSA); *United States v. Marino*, 658 F.2d 1120, 1125 (6th Cir. 1981) (affirming denial of subpoena to FBI and U.S. Marshal's Office for failure to comply with *Touhy* regulations).

Here, the subpoena to Trial Attorney Pelker raises critical privilege concerns. Trial Attorney Pelker joined the Department of Justice in 2016. While the Department's *Touhy* regulations cover both attorneys and FBI employees, the defense appears to be asking for testimony overwhelmingly covering the time period during which Trial Attorney Pelker was a practicing Department of Justice attorney (2016 through the present). It is highly likely that such testimony would be protected by deliberative process privilege and/or as attorney work product. The defendant's flat refusal to participate in the *Touhy* process makes it impossible to ascertain

any potential claim of privilege in advance. This will necessitate lengthy trial delays for objections and adjudication of privilege issues if Trial Attorney Pelker is actually called to the stand.

"The deliberative process privilege . . . protects the decision-making process of government agencies and encourages the frank discussion of legal and policy issues by ensuring that agencies are not forced to operate in a fishbowl." *Mapother v. Department of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (internal citations omitted). For the privilege to apply, the information must be "pre-decisional" and "deliberative." *Hinckley v. United States*, 140 F.3d 277, 284 (D.C. Cir. 1998). Information is "pre-decisional" if it precedes, in temporal sequency, the decision to which it relates. *Id.* Communications are "deliberative" if they are "part of the agency give-and-take by which the decision itself is made." *Id.* (internal citations omitted). Attorneys in the Department of Justice must be able to confer openly with one another on cases and legal issues that arise. In fact, seeking assistance or a second opinion from another lawyer, having decisions scrutinized by supervisors, and talking through processes are imperative to the Department's ability to properly investigate and prosecute cases and "serve[s] the public's interest in honest, effective government." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). Although the government can only guess at this point what testimony the defense would seek to elicit from Trial Attorney Pelker, anything related to the course of this investigation, and possibly even details relating to Department contracting policy or decisions, would likely fall under this privilege.

A party seeking to overcome deliberative process privilege must make "a sufficient showing of need," which is a fact-specific inquiry that requires a "fresh balancing" in each instance of factors such as "the relevance of the evidence, the availability of other evidence, the seriousness of the litigation, the role of the government, and the possibility of future timidity by government employees." *Id.* at 737-38 (internal quotations and citations omitted). It is impossible for the

Department to evaluate this privilege in the abstract, and it would be impossible for this Court to rule on it in the abstract.

Separately, testimony related to written or recorded materials by attorneys involved in this investigation should be excluded as attorney work product. "[T]he work-product doctrine shields materials prepared in anticipation of litigation for trial or for that other party's representative." *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 432 F.3d 366, 369 (D.C. Cir. 2005) (quoting Fed. R. Civ. P. 26 (b)(3)). The work product doctrine shields "both deliberative materials such as mental impressions, conclusions, and opinions, and legal theories and factual materials prepared in anticipation of litigation." *Williams & Connolly LLP v. U.S. Sec. & Exch. Comm'n*, 729 F.Supp.2d 202 (D.D.C. 2010) (citing *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997)). Here, any attorney communications regarding the ongoing investigation into Bitcoin Fog and the defendant are protected work product. *See Block v. United States DOJ*, 2022 U.S. Dist. LEXIS 40895, *10 (D.D.C. March 8, 2022) (attorney emails regarding ongoing litigation protected); *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 78 (2d Cir. 2010) (holding that emails regarding a PowerPoint presentation prepared by in-house counsel properly are withheld as work product); *BBAM Aircraft Mgmt. LP v. Babcock & Brown LLC,* 2022 U.S. Dist. LEXIS 154791, *17 (D. Conn. August 29, 2022) ("Email discussions as to the substance of an attorney's work product, such as the attorney's mental impressions regarding legal strategy or the strength of the claims at issue, is confidential information to which adversaries are not entitled."). Accordingly, any attempt to elicit testimony about, or obtain copies of, written or recorded materials by Trial Attorney Pelker or any other government attorney should be precluded.

The defense claims the *Touhy* process would "abrogate Mr. Sterlingov's Sixth Amendment right to confront his accusers." Ex. 3. As explained below, this objection is misplaced because

13

Trial Attorney Pelker is not a witness for the government, none of her statements will be introduced in the government's case, and she is not a so-called "accuser" of the defendant—or more accurately, a "witness[] against him," U.S. Const. Amend. VI—for purposes of the Sixth Amendment. But even on its own terms, the defendant's argument has been squarely rejected. As the Sixth Circuit explained under identical circumstances, the Sixth Amendment does not come into play until after the defendant complies with the threshold steps prescribed by the *Touhy* regulations: "The question of whether these procedures deny the defendants their Sixth Amendment right to call and cross-examine witnesses is not reached until the defendants follow the procedures and then have their demands denied. Because [defendants] failed to make a demand in accordance with 28 C.F.R. § 16.23(c), they have no constitutional claim." *Marino*, 658 F.2d at 1125; *accord United States v. Allen*, 554 F.2d 398, 406-07 (10th Cir. 1977) ("Our record shows no effort by defendant to submit the affidavit or statement summarizing the testimony desired so that the Department could consider the request and determine whether to grant permission for the testimony. In view of this, we feel that defendant is in no position to claim error in the court's refusal to require testimony by the prosecutor. We feel that the regulation controlling such disclosures by Department of Justice employees is valid. . . . We do not have the problem, however, of whether the court should have rejected a refusal by the Department due to the constitutional guarantees of the Fifth and Sixth Amendments. Since the defendant did not follow the procedure and submit the required summary of testimony desired, the Department made no decision whether the prosecutor could testify and we do not reach the constitutional claim.").

The defense also claims that submitting a *Touhy* request would force the defendant to "disclose his defense strategy [before] trial." Ex. 3. But "there appears to be nothing inherently unconstitutional, or otherwise improper, in a requirement that a defendant make a pretrial

disclosure of his intention to assert a certain type of defense, even where the disclosure involves privileged information or may substantially affect the defendant's decisions to testify or to put on a defense case." *United States v. Mubayyid*, 2007 WL 1826067, at *2 (D. Mass. June 22, 2007). And the defense claim is risible coming from two attorneys who have embarked on a months-long media and speaking campaign to drum up interest—and donations[8]—in this case. They have appeared at conferences, on podcasts and interviews, and in Twitter feeds in which they hold forth for hours of grievously inaccurate discussion about the merits of this case—including *ad hominem* attacks on Trial Attorney Pelker. If they now express reluctance to set down those thoughts in writing in a *Touhy* submission, it is only because doing so would expose just how frivolous and unfounded their theories really are.

### C. The Defendant's Conclusory Sixth Amendment Argument Provides No Basis for the Subpoena

The Sixth Amendment Confrontation Clause provides no support for the defendant's demand to call his prosecutor to the stand at his trial. *See* ECF No. 73, at 41-42; ECF No. 80, at 4. As discussed in the government's prior submissions, the Confrontation Clause is a rule of admissibility: it prevents the introduction at trial of testimonial out-of-court statements unless the declarant is available for cross-examination. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009). As the Court explained in *Crawford v. Washington*, 541 U.S. 36 (2004), the animating concern behind the Confrontation Clause was to prevent "*admission* of testimonial statements of

---

[8] Ironically, defense counsel's fundraising efforts seem to have redoubled after this Court awarded them public funding through CJA appointment. *See* Mar. 22, 2023 Minute Order. The government assumes that those donating to the defendant's legal defense have been informed about the defense team's public CJA funding. *But see* No Bullshit Bitcoin, *Free Roman Sterlingov – US Govt Nabs Wrong Man Through Blockchain Analysis* (Apr. 14, 2023), available at https://www.nobsbitcoin.com/free-roman-sterlingov/ ("We've been paying for the case with our own money, going into debt, and are struggling to cover our expenses.").

a witness who did not appear at trial." *Id.* at 53-54 (emphasis added). That is why the remedy for a Confrontation Clause violation is exclusion of the testimonial out-of-court statement. *See* Comment Note: Construction and Application of Supreme Court's Ruling in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177, 63 Fed. R. Evid. Serv. 1077 (2004), with Respect to Confrontation Clause Challenges to Admissibility of Hearsay Statement by Declarant Whom Defendant Had No Opportunity to Cross-Examine, Part 1 of 2, 30 A.L.R.6th 1 (collecting cases in which "the Confrontation Clause may exclude a proffered testimonial hearsay statement by a declarant whom the defendant had no opportunity to cross-examine"). The question of admissibility does not arise here because the government does not intend to admit any out-of-court statements by Trial Attorney Pelker at trial.

Nor does the Sixth Amendment confer a freestanding right to call one's "accusers" at trial.[9] The text of the Constitution refers instead to a right of a defendant "to be confronted with the *witnesses* against him." U.S. Const. Amend. VI (emphasis added). As *Crawford* explained, "[o]ne could plausibly read 'witnesses against' a defendant to mean those who actually testify at trial, those whose statements are offered at trial, or something in-between." 541 U.S. at 42-43 (internal citations omitted). Under any definition, that is still limited to "witnesses," meaning a person whose testimonial statements are introduced by the government against a defendant at trial. *See id.* at 68. As the government has repeatedly stated, it does not intend to introduce any of Trial Attorney Pelker's out-of-court statements against the defendant at trial. The Sixth Amendment offers no support for the defendant's claimed "right" to round up his so-called "accusers"—

---

[9] The defense provides no basis for characterizing Trial Attorney Pelker as an "accuser," even in a colloquial sense, other than her legal work as a government prosecutor. As noted above, the 2014 Intelligence Note authored by then-IA Pelker does not name Roman Sterlingov or otherwise "accuse" him.

whether prosecutors, grand jurors, or anyone else against whom the defendant feels aggrieved—to call as defense witnesses at trial without consideration of their prospective testimony.[10]

### D. The Defendant's Subpoena Is a Pretext for a Frivolous Motion To Disqualify

The defense team's inability to articulate any straightforward legal or factual justification for the subpoena to Trial Attorney Pelker exposes their real agenda: disqualification. It is frivolous and unethical to subpoena opposing counsel as a mere pretext for securing tactical advantage at trial. *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 501 F. Supp. 326, 331 & n.19 (D.D.C. 1980) (noting that "motions for disqualification have increasingly been used for strategic litigation advantage," and explaining that "[a] party cannot disqualify its opponent's attorneys simply by threatening to call them as witnesses"). *See* ECF No. 73, at 43-44.

Disqualification of opposing counsel is a "'drastic measure that is disfavored by the courts.'" *Ambush v. Engelberg*, 282 F. Supp. 3d 58, 62 (D.D.C. 2017) (quoting *Konarski v. Donovan*, 763 F. Supp. 2d 128, 135-36 (D.D.C. 2011)); *see also United States v. Crowder*, 313 F. Supp. 3d 135, 141 (D.D.C. 2018) ("[D]isqualification is highly disfavored, and any motion to disqualify counsel is therefore examined with a skeptical eye."); *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 965 F. Supp. 2d 104, 110 (D.D.C. 2013) ("'Disqualification, however, is a drastic measure that is disfavored by the courts, and disqualification motions should be subject to particularly strict judicial scrutiny.'") (quoting *Konarski*, 763 F. Supp. 2d at 135-36). That is

---

[10] To be sure, the Sixth Amendment's Compulsory Process Clause provides a separate right for a defendant to call "witnesses in his favor," U.S. Const. Amend. VI. But such demands for testimony must be justified on their own merits, rather than through talismanic invocation of the Confrontation Clause. *See, e.g.*, *United States v. Tennessee Morales-Morales*, 181 F.3d 81 (1st Cir. 1998) ("A violation of the compulsory process clause can be established only on a showing that the missing witness's testimony would have been relevant, material, and favorable. Indeed, the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him compulsory process for obtaining witnesses in his favor.") (internal citations and quotations omitted).

17

because "such motions may be used as 'procedural weapons' to advance purely tactical purposes," *Ambush*, 282 F. Supp. 3d at 62 (internal quotations omitted). Any motion for disqualification of opposing counsel is evaluated under a standard of "strict judicial scrutiny." *In re Rail Freight*, 965 F. Supp. 2d at 110.

The government reserves its arguments on disqualification, in the event the Court orders Trial Attorney Pelker to testify on behalf of the defendant. "The D.C. Circuit has cautioned that, even where a violation is found, disqualification is warranted only 'rarely' in cases where there is a 'serious question as to counsel's ability to act as a zealous and effective advocate for the client' or the 'substantial possibility of an unfair advantage to the current client because of counsel's prior representation of the opposing party[.]'" *Ambush*, 282 F. Supp. 3d at 62 (quoting *Koller by and Through Koller v. Richardson-Merrell Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984), *vacated on other grounds*, 472 U.S. 424 (1985)). The government will wait to submit supplemental briefing and argument based on the particular content and circumstances of the prospective testimony proposed by the defense.

## **CONCLUSION**

For the foregoing reasons, the Court should quash the defendant's trial subpoena to the government prosecutor in this case, Trial Attorney Pelker.

                Respectfully submitted,
                MATTHEW M. GRAVES
                UNITED STATES ATTORNEY
                D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
           Christopher B. Brown, D.C. Bar No. 1008763
           Assistant United States Attorney
           U.S. Attorney's Office for the District of Columbia
           601 D Street, N.W.
           Washington, D.C. 20530
           (202) 252-7153
           Christopher.Brown6@usdoj.gov