UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 21-CR-399 (RDM) |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
FOR SUBPOENA TO CHAINALYSIS, INC. UNDER FED. R. CRIM. P. 17(c)

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully files its opposition to the Defendant's Motion to Authorize Issuance and Pretrial Return of Subpoena Duces Tecum to Chainalysis, Inc. Under Federal Rule of Criminal Procedure 17(c). *See* ECF No. 155. The defense is seeking leave to issue a subpoena under Fed. R. Crim. P. 17(c) that would compel third-party Chainalysis to produce its entire software source code, along with "access" to the Chainalysis Reactor software, all software change logs—and a new request for a "study" referred to in a webinar the defense found online. The requested subpoena reprises the defendant's prior subpoena to Chainalysis, which the Court quashed after briefing and argument from the defense, the government, and Chainalysis. *See* Minute Order (June 16, 2023). Although the new subpoena includes a numerically shorter list of demands, it is still sweeping in scope—demanding that Chainalysis surrender virtually its entire intellectual property to a harassing defense team engaged in a public campaign to intimidate Chainalysis—based on conclusory, *ipse dixit* assertions of relevance. That falls short of the exacting standard of relevance, admissibility, and specificity normally required to justify an early-return subpoena under Rule 17(c). *See United States v. Nixon*, 418 U.S. 683, 700 (1974). The requested subpoena is a fishing expedition intended to delay trial and intimidate a government witness (as discussed below,

defense counsel has communicated publicly about a Chainalysis witness in this case, associating the witness to a "rat") and is not a proper use of Rule 17(c).[1]

## INTRODUCTION

This is the defense's second bite at the apple in seeking to force Chainalysis to disclose its entire software source code for no relevant reason. On November 18, 2022, the defense issued four Rule 17(c) subpoenas directed at Chainalysis and its employees, spanning 81 broad discovery requests. The government and Chainalysis moved to quash the subpoenas. *See* ECF No. 93; ECF No. 95. On May 5, 2023, defense counsel purported to serve a second subpoena for the testimony of Chainalysis CEO Michael Gronager at a June *Daubert* hearing; Chainalysis moved to quash. ECF No. 126. After briefing and argument from the defense, the government, and Chainalysis, the Court quashed the subpoenas. *See* Minute Order (June 16, 2023).

In granting the motions to quash, the Court cautioned that the defense subpoenas "show[ed] no specificity whatsoever." 6/16/23 Tr. at 27. The Court cautioned the defense to provide a more narrowly tailored request, supported by an explanation by a computer coding or modeling expert about the "particular facts" being sought:

> THE COURT: Do you have a computer modeling expert or an expert on computer code, someone who is going to be able to say and -- look at the code and say, here's a problem with the code in this case?
>
> MR. EKELAND: Yes, we do, Your Honor.
>
> THE COURT: Can you have that person prepare a declaration or a statement? I don't -- it doesn't have to be anything that's subject to the penalty of perjury, as far as I'm concerned. But a statement that says, here's what I need to know in order to do my work, in order to make an assessment of whether this computer model is

---

[1] The government anticipates that Chainalysis will be able to articulate the burden and oppressiveness of the proposed defense subpoena. Accordingly, the government focuses here on the lack of relevance and the defense's campaign of harassment directed at a government expert witness.

> fairly predictive or fairly captures what you need to know. Here are the particular facts that I need to know in order to do that analysis.
>
> Prepare that, give it to Chainalysis, give it to the government, and then have the discussion that you're talking about. Then if there are other things like that in nature, if you can show them with specificity, here's what we need and here's why we need it, then I think you're moving towards satisfying the Rule 17 standard. . . .
>
> MR. EKELAND: I think that's an excellent idea. We're happy to do that, Your Honor.

6/16/23 Tr. at 32-33. The Court further urged the defense to move quickly to avoid further continuance of the trial. *Id.* at 33-34.

The defense did not take, or simply ignored, the Court's recommendation. Nearly two months later, the defense has not provided the government with any further specificity regarding its renewed request for Chainalysis source code. The defense has not noticed any expert on computer code or computer modeling, and has not explained what portion(s) of Chainalysis' source code it wants to review, what it expects to find, or how that information would be admissible or material.[2] The defense bears the burden for meeting each prong of the *Nixon* test, and the defense has simply not done so here.

---

[2] During the July 20, 2023 *Daubert* hearing, the Court asked the defense to articulate exactly what further discovery it believed it needed. 7/20/23 Tr. at 323. The defense outlined four demands, including its demand for Chainalysis source code. *Id.* at 323-26. The parties met and conferred by telephone on July 20, 2024, during which the defense piled up numerous new discovery demands on top of the four represented to this Court. The defense then served the government with a discovery letter on July 26, 2023, in which the original four demands had ballooned into *nineteen* new and expanding discovery demands. Even then, the defense simply made a bald demand for "Chainalysis source code and change logs" without further explanation.

**ARGUMENT**

I.      **The Requested Materials Are Not Relevant to Any Material Fact or Argument**

The Supreme Court has set clear, high standards for Rule 17(c) subpoenas, requiring that the requesting party "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Nixon*, 418 U.S. at 700. The subpoenaed records must be "evidentiary and relevant," and the application must be "made in good faith and [] not intended as a general fishing expedition." *United States v. Fitzsimons*, 342 F.R.D. 18, 20 (D.D.C. 2022) (quoting *Nixon*). The party seeking the information carries the burden of meeting the "the exacting standards" of each of the three prongs. *Id.* (citing *Cheney v. United States Dist. Court*, 542 U.S. 367, 386-87 (2004)).

A. **The Defense Has Not Shown How Source Code Would Be Relevant**

The defense has not met this burden. For the source code, software, or change logs to be relevant, defense counsel must articulate how it would use those items to prove or disprove some fact that is of consequence at trial. The defense has not done so. The defense relies on bald *ipse dixit* assertions of relevance—claiming without further explanation that the items it is seeking "are evidentiary and relevant" because "Chainalysis Reactor software's output is the Government's primary forensic evidence in this case," and "[f]lawed source code generates flawed outputs." ECF No. 155-1, at 8. Such rhetoric is no substitute for an explanation of how the source code itself is relevant to any material fact or argument in this case. The defense argument seems to be that it needs access to the source code because it disagrees with the government's conclusions. That is not the test.

Elsewhere, the defense suggests (at 2-3) that it needs access to Chainalysis's source code to identify the heuristics that underlie the analysis of the government's expert, Chainalysis Director of Investigation Solutions Elizabeth Bisbee. But there is no mystery about those heuristics. The

4

government has provided detailed expert reports from both FBI Staff Operations Specialist Luke Scholl and Ms. Bisbee. The reports include voluminous attachments enumerating each and every bitcoin address included in the cluster for Bitcoin Fog and specific relevant darknet marketplaces. Ms. Bisbee's report explains the reason that each of the addresses was included in its respective cluster, detailing the different heuristics that Chainalysis uses to assess common control. Mr. Scholl and Ms. Bisbee both testified at a *Daubert* hearing on June 23, 2023, and defense counsel had the opportunity to vigorously cross-examine them.

The entire defense argument appears to be that the heuristics—which are set forth in Ms. Bisbee's report—can produce erroneous results. That is a different question entirely from whether there is a flaw in the source code such that the software is not applying the heuristics with fidelity. Defense counsel may not like the heuristics, but that does not make the source code, software change logs, or even the software itself in any way relevant.

The defense claims that it "requires access to the Chainalysis source code for testing." ECF No. 155-1, at 2. However, nowhere does the defense explain what "testing" it intends to conduct (or what competent person could do such testing) or why the source code would be required for such testing. The defense points to Chainalysis' use of publicly available open-source data as part of its intelligence heuristic and then asserts, "Reliance on open-source data raises significant questions as to the accuracy and verifiability of that data that can only be answered through an analysis of the Reactor source code and the sources used to generate that code." This conclusory statement does nothing to explain how source code is in any way relevant to an assessment of the use of open-source information.[3] The defense criticizes Chainalysis' methodology for clustering

---

[3] Furthermore, as explained in Ms. Bisbee's expert report and testimony, the intelligence heuristic (Heuristic 3) was only used for the AlphaBay cluster, and Ms. Bisbee explained that the

peel chains, but again, that is a critique of a heuristic, not a supposed error in the source code. That heuristic is described in Ms. Bisbee's Expert Report (and is mischaracterized by the defense as "indiscriminate," ECF No. 155-1 at 4, despite Ms. Bisbee's report clearly defining the precise conditions in which it is applied).

### B. No Defense Expert Has Articulated Any Need for Source Code

The defense has not put forward any expert who has raised any specific issues with the Chainalysis source code. At the *Daubert* hearing on July 20, 2023, when defense counsel indicated that it intended to again seek the Chainalysis source code, the Court inquired as to whether the defense had retained an expert in computer code, noting Mr. Fischbach's apparent lack of coding credentials. 7/20/23 Tr. at 323–24. Mr. Ekeland disputed Mr. Fischbach's lack of qualifications but then responded, "I'm quite confident I can find somebody who can read the source code through my connections. I'm not going to argue the point with you here." 7/20/23 Tr. at 323–24. A month before trial, neither the defense's connections, nor the defendant, have provided notice of any such computer code expert, nor does the defense's recently filed blockchain analysis report indicate any basis for deeming the source code or software change logs relevant.[4]

The defense's proposed expert—representing Ciphertrace, a company that directly

---

information was obtained by U.S. law enforcement, making defense counsel's source code connection even more baffling.

[4] Mr. Fischbach won't do. In another case in which Mr. Fischbach appeared, he later admitted that the defense team sought to compel the government to produce source code for a sensitive government computer program used in child exploitation investigations *without knowing in advance what they expected to find*. As Mr. Fischbach explained: "We never knew that we—hopefully everybody is sort of smiling at this—we don't know that we wanted what we were asking for. And in the end, if we had gotten, if the government just given in, and given us everything we asked for, we don't know that it would have made our case any better." Nat'l Ass'n of Crim. Defense Att'ys, Challenging Digital Evidence Obtained through RoundUp and Torrential Downpour, at 55:34, available at https://www.nacdl.org/Content/Webinar-Challenging-Digital-Evidence-Obtained-thro. Mr. Fischbach also admitted that he shared the sensitive software tool discovery with a third party "coder" in apparent violation of the protective order in that case, which

competes with Chainalysis—also does not articulate any basis to demand Chainalysis's source code. (Nor, for that matter, does the proposed expert volunteer to produce Ciphertrace's own software source code for the government to review and analyze). Rather, she alleges that her analysis and verification of the Government's attribution would be aided by "a breakdown of each cluster on a per address basis"—which the government has already provided in the form of spreadsheets attached to the disclosed expert reports. ECF No. 159-1 at 7. She enumerates what information she would want included in this breakdown, much of which is already included in the provided spreadsheets or noted elsewhere in the expert report. *See* ECF No. 159-1 at 7. She also complains that "without significant time to go through each of the 527,731 addresses by hand" (referring to the additional addresses in the Chainalysis Bitcoin Fog cluster), she cannot "determine[] whether they [Chainalysis] have attributed addresses to Bitcoin Fog that never had anything to do with Bitcoin Fog." ECF No. 159-1 at 21. In other words, the proposed defense expert is saying that she needs more time for manual review and/or slightly different spreadsheets. Nowhere does the defense expert indicate a need to review Chainalysis' source code, software change logs, or any other item demanded in the defense subpoena. Even if she had, her apparent lack of any computer science or coding background makes her an inappropriate foundation to support this subpoena.

### C. The Defense Inaccurately Overstates the Relevance of Chainalysis Reactor Software to the Government's Case

In any event, the defense arguments are also based on an inaccurate and vastly exaggerated characterization of the role Chainalysis played in this case. In order to suggest an aura of materiality—without specifically explaining the supposed relevance of the materials sought—the

---

restricted access to the program to "only" Mr. Fischbach and defense counsel. *See United States v. Matthew William Schwier*, D. Alaska No. 3:17-95, ECF No. 305 (Protective Order).

defense resorts to the untrue assertion that the government's case "relies almost entirely upon Chainalysis' forensic software." ECF No. 155-1 at 2. Not so. To clarify, and to the extent it is relevant to an assessment of relevance and admissibility, the government offers the following explanation of how clustering does and does not pertain to key areas of evidence:

- **Domain Registration and Hosting Payment:** The government traced payments from an account held in Mr. Sterlingov's true name through burner accounts to pay for the Bitcoin Fog domain and clearnet server. *That tracing does not rely in any way on Chainalysis or clustering.*

- **Additional Early Transactions from Defendant to Fog:** The government traced additional payments from Mr. Sterlingov's true name accounts through those same burner accounts into addresses that the government expert, FBI SOS Luke Scholl, determined were controlled by Bitcoin Fog. The tracing up until the deposits into Bitcoin Fog *does not rely in any way on Chainalysis or clustering.* Mr. Scholl's expert determination that destination addresses were controlled by Bitcoin Fog was based not just on Chainalysis's clustering of the addresses, but through review of a competitor blockchain analysis tool that also attributed the addresses as belonging to Bitcoin Fog, and by Mr. Scholl's own review of the transactions and assessment that they were controlled by Bitcoin Fog. In fact, the defendant's transactions into Bitcoin Fog predating the site's public announcement involved addresses that Chainalysis does *not* include in its Bitcoin Fog cluster; the determination that they are, in fact, Bitcoin Fog addresses is based on Mr. Scholl's expert's assessment.

- **Transactions from Fog to the Defendant:** The government will present evidence that the defendant's accounts were funded from addresses contained in the Bitcoin Fog cluster. This tracing *does* rely in part on Chainalysis' determination that the originating addresses were controlled by Bitcoin Fog. However, the defendant already conceded this point at the January 2023 *Monsanto* hearing. *See* ECF No. 116, at 16 ("Sterlingov also contends that the blockchain tracing analysis that the government used to tie the funds in his Kraken accounts to Bitcoin Fog is unreliable. But because he has admitted that the funds in his Kraken account arrived there after being mixed in Bitcoin Fog, he has conceded the very thing that the government was trying to prove through its blockchain analysis.") (citations omitted). There is thus no disputed fact that those particular addresses were controlled by Bitcoin Fog; the defendant's own testimony has corroborated the government's cluster.

- **Flow of Funds Between Darknet Markets and Fog:** The government's primary use of Chainalysis' clustering is to show and quantify the flow of funds between various darknet marketplaces and Bitcoin Fog. Because each service controlled thousands of addresses, such analysis is impractical to do manually. The government has provided the full list of addresses for each service to the defense, and has explained the basis for assessing why each address is controlled by each service.

8

As noted above, the government has supported its blockchain analysis with detailed expert reports from Mr. Scholl and Ms. Bisbee. A proposed defense expert from a Chainalysis competitor has reviewed Mr. Scholl's and Ms. Bisbee's reports and has put forth an alternative report. *See* ECF No. 159-1. The defense report generally criticizes the use of behavioral clustering (Heuristic 2) but *fully corroborates* the government's clustering under the co-spend heuristic (Heuristic 1). The proposed defense expert explains that her company does not use Heuristic 2, but concedes that her company does rely on Heuristic 1 and, as applied to Bitcoin Fog, it would cluster the *exact same 398,011 addresses* that Chainalysis did. The proposed defense expert does not appear to have a background in computer coding and does not articulate any request for or relevance of the items enumerated in the defense subpoena. The previously noticed defense computer forensics expert, Mr. Jeffrey Fischbach, also lacks any coding expertise and has not provided any report or disclosure to the government. In sum, the defendant's purported case against Chainalysis distorts what the defendant knows through discovery that Chainalysis did, and lacks an expert basis to challenge that work warranting an extraordinary grant of the subpoena here.

## II. The Defense Subpoena Is Part of a Campaign of Intimidation Targeting the Government's Expert Witness

The defense subpoena is the latest chapter in the defense's ongoing effort to harass and intimidate potential government witnesses, which further undermine the defense's basis for the subpoena and suggest other reasons for its issuance unrelated to any factual dispute in this case. "[A] subpoena may still be unreasonable or oppressive if it is . . . abusive or harassing." *In re Grand Jury Subpoena for THCF Med. Clinic Recs.*, 504 F. Supp. 2d 1085, 1088 (E.D. Wash. 2007); *see also* Fed. R. Crim. P. 17(c)(2) (subpoena may be quashed if "unreasonable or oppressive"). Despite concerns voiced by the Court at the June 23, 2023 hearing regarding

9

potential witness intimidation, defense counsel ignored them, and has continued to make inflammatory public comments regarding this case and Chainalysis in particular.

In late July 2023, defense counsel translated a comment by another Twitter user written in Spanish, and then chose, despite the Court's admonition, to retweet his translation to his Twitter page:



"Rats" appears to refer, at a minimum, to a specific Chainalysis employee, because the original post, also retweeted on Mr. Hassard's Twitter page, included a visual of the cover page of Ms. Bisbee's declaration, reading, "Declaration of Elizabeth A. Bisbee":



Contextually, it would be reasonable to assume that the defense team, again, despite the Court's admonition, wanted to publish that Ms. Bisbee had been referenced as a "rat."

Both defense attorneys' Twitter accounts also promoted (and republished) an editorial published on a cryptocurrency news site CoinDesk leveling *ad hominem* attacks against the government's expert witness and grossly mischaracterizing her submissions before this Court. The editorial was authored by a pseudonymous writer, refers to defense counsel as "renowned lawyer Tor Ekeland," and cites passages from "an unreleased transcript of a June 23 hearing shared with CoinDesk." *See* CoinDesk, *Chainalysis Investigations Lead is 'Unaware' of Scientific Evidence*

*that the Surveillance Software Works* (July 24, 2023), https://www.coindesk.com/consensus-magazine/2023/07/24/chainalysis-investigations-lead-is-unaware-of-scientific-evidence-the-surveillance-software-works/. The editorial repeatedly attacks the government's expert witness by name, and concludes with an overwrought and deeply personal attack against Ms. Bisbee: "Unfortunately for Bisbee and her corporate overlords, we still live in a democracy in which criminal convictions prerequisite the existence of scientific evidence. Maybe Bisbee would be better suited pursuing an art history degree." *Id.* Whoever the writer is, defense counsel then made the choice to retweet the story as follows:



Defense counsel's "rats" published comment concerning a government witness and their promotion of the *ad hominem* "art history" attack is only the latest in their long history of podcast appearances, interviews, conference presentations, and other public statements regarding the case

which focus on *ad hominem* attacks on potential witnesses.  For example, among Mr. Hassard's dozens of recent public comments regarding the case:

- On July 7, Mr. Hassard tweeted, "What's happening to Roman Sterlingov as a result of Chainalysis's Junk Science forensics is severely unjust."  The tweet included the hashtag #FreeRoman.

- Mr. Hassard retweeted a post of a screenshotted portion of Ms. Bisbee's supplemental expert report with the original author's commentary, "The emperor has no clothes."

- Mr. Hassard retweeted a July 20 post describing Chainalysis as "the parasitical company that sent innocent people in jail over bullshit (see Roman Sterlingov)."

- Mr. Hassard retweeted a July 22 post stating, "Chainalysis is the biggest sin of the cryptoindustry," and concluding, "Digital quackery.  Disgusting."

As the government has repeatedly emphasized, Chainalysis did not identify Roman Sterlingov.  Chainalysis did not direct the investigation.  The defense has reviewed the extensive discovery documenting the government's lengthy and detailed investigation, including the evidence identifying the defendant.  Yet the defense counsel continues to promote a completely false narrative in order to drum up public animosity in the cryptocurrency community against one of the government's witnesses.  Viewed in this context, the proposed Rule 17(c) subpoena is a transparent attempt to impose costs and further the public promotion of animosity toward Chainalysis, whose expert is a witness in this case.

**CONCLUSION**

For the foregoing reasons, the Court should deny leave for the defense to issue its proposed Rule 17(c) subpoena on Chainalysis.

                      Respectfully submitted,
                      MATTHEW M. GRAVES
                      UNITED STATES ATTORNEY
                      D.C. Bar No. 481052

BY:   */s/ Christopher B. Brown*
           Christopher B. Brown, D.C. Bar No. 1008763
           Assistant United States Attorney
           U.S. Attorney's Office for the District of Columbia
           601 D Street, N.W.
           Washington, D.C. 20530
           (202) 252-7153
           Christopher.Brown6@usdoj.gov

           */s/ C. Alden Pelker*
           C. Alden Pelker, Maryland Bar
           Jeffrey Pearlman, D.C. Bar No. 466901
           Trial Attorneys, U.S. Department of Justice
           Computer Crime & Intellectual Property Section
           1301 New York Ave., N.W., Suite 600
           Washington, D.C. 20005
           (202) 616-5007 (Pelker)
           (202) 579-6543 (Pearlman)
           Catherine.Pelker@usdoj.gov
           Jeffrey.Pearlman2@usdoj.gov