## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S RESPONSE TO THE COURT'S AUGUST 30, 2023 ORDER REGARDING D.C. MONEY TRANSMITTERS ACT AND BANK SECRECY ACT

The United States of America, by and through the United States Attorney for the District of Columbia, files the following response to the Court's August 30, 2023 Order requiring the government to address "whether D.C. Code § 26-1023(c) applies in the circumstances alleged here and how 18 U.S.C. § 1960, especially § 1960(b)(1)(B), applies to this case." ECF No. 174.

## ARGUMENT

**A. Bitcoin Fog Was an Unlicensed Money Transmission Business in Violation of the D.C. Money Transmitters Act and 18 U.S.C. § 1960(b)(1)(A)**

### 1. Legal Framework

The District of Columbia Money Transmitters Act (MTA), D.C. Code § 26-1001, *et seq.*, provides that "no person shall engage in the business of money transmission without obtaining a license" issued by the Commissioner of the D.C. Department of Insurance, Securities, and Banking ("DISB"). D.C. Code § 26-1002(a).[1] "Money transmission" is defined broadly:

> "Money transmission" means the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer.

---

[1] The text of the MTA originally referred to the Superintendent of the former Department of Banking and Financial Institutions, *see* D.C. Code § 26-1002(a); D.C. Mun. Regs. § 26-C2299, but the code was updated in 2004 to transfer statutory authority to the Commissioner of the new Department of Insurance, Securities, and Banking, *see* D.C. Code § 26-551.03(g).

*Id.* § 26-1001(10).  As Chief Judge Howell has held, and consistent with interpretations of similar language in federal statutes, the statutory term "money" in the MTA encompasses Bitcoin.  *United States v. Harmon*, 474 F. Supp. 3d 76, 87-99 (D.D.C. 2020).

The MTA makes it a felony offense for any person to "engage[] in the business of money transmission without a license."  *Id.* § 26-1023(c).  This is a general intent crime which does not require proof that the defendant knew he was required to be licensed: "District of Columbia law . . . does not have a willful and/or knowing requirement in order for an individual to be punished for operating a money transmitting business without a license."  *United States v. Keleta*, 441 F. Supp. 2d 1, 2 n.1 (D.D.C. 2006); *cf. United States v. Talebnejad*, 460 F.3d 563, 572 (4th Cir. 2006) ("§ 1960(b)(1)(B) sets forth a constitutionally valid general intent crime . . . .  Nothing in the statutory language—such as the use of the word 'willful'—suggests that the Government must additionally prove knowledge of the law.").

### 2.  The D.C. Money Transmitters Act Is Not Limited to Entities Physically Located in the District of Columbia

The statutory text, purpose, and the practice and construction given to the MTA by its administrator, DISB, all confirm that the MTA is intended to sweep broadly and is not limited to regulating money transmitters physically located within the District of Columbia.  To hold otherwise would strip DISB of its ability to regulate online money transmitting businesses.

The Court's analysis should begin with the plain text of the MTA, which provides no basis for restricting its jurisdiction to the subset of money transmitters that choose to open a physical office within the District of Columbia.  *See Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012) ("We begin where all such inquiries must begin: with the language of the statute itself.") (citations omitted).  First, the definition of "money transmission" encompasses conduct "within the United States, or to locations abroad, by any and all means."  D.C. Code § 26-

1001(10).  This language defines the regulated conduct in broad geographic terms—"within the United States" and "to locations abroad"—and is not limited to activity originating from a physical location in the District of Columbia.  Indeed, if this Court were to impute such a geographic restriction, it would be contradicting the statute's explicit "by any and all means" language—effectively amending it to read, "*by means of a company physically located in the District of Columbia*," and placing Internet-based money transmitters outside the reach of the District's laws.  That is contrary to the plain text of the statute.  *See United States v. Harmon*, 2021 WL 1518344, at *7 (D.D.C. Apr. 16, 2021) ("The MTA's title, text and announced purpose make clear that the statute governs 'money transmitting' broadly in the District of Columbia and is sufficiently clear for the ordinary person to recognize that a bitcoin-to-bitcoin tumbler, such as Helix, was subject to regulation.").

Second, the statute provides a general prohibition that "no person shall engage in the business of money transmission without obtaining a license," *id.* § 26-1002(a)—not, for instance, "no person shall engage in the business of money transmission *from a physical location inside the District of Columbia* without obtaining a license."  The broad sweep of the MTA reflects the general practice among state money transmitter statutes.  As one treatise explains:

> Regulators tend to take a broad view of what is covered under state money transmitter laws. Moreover, every state applies its law if the party engaged in the relevant activity receives money from a person who is located within the state, *regardless of whether the party receiving the money or monetary value has a physical presence in the state*.

Judith E. Rinearson & Jeremy M. McLaughlin, *Money Transmitter Licensing, Generally*, Payment Systems and Electronic Fund Transfers Guide 300:210 (Dec. 5, 2019) (emphasis in original); *see, e.g.*, *United States v. Mazza-Alaluf*, 621 F.3d 205, 212 (2d Cir. 2010) ("Because Illinois law defines money transmitters covered by its licensing requirements as persons either 'located in or doing

3

business in this State,' 205 Ill. Comp. Stat. 657/5 . . . [defendant] concede[d] that such persons are subject to the licensing requirement 'even if they are not physically located in Illinois.'") (citation omitted). The Court should enforce the MTA's broad statutory language as written and in line with virtually every other state money transmitting regulatory regime.

To be sure, there are provisions in the MTA and its implementing regulations that refer to locations in the District of Columbia, but nothing in those provisions limits the licensing *obligation* to entities physically located in the District of Columbia. For example, a license application must include "[a] list identifying the applicant's proposed authorized delegates in the District of Columbia, *if any*," and specify "[t]he location or locations at which the applicant and its authorized delegates, *if any*, propose to conduct the licensed activities in the District of Columbia." D.C. Code § 26-1006(b)(5), (8) (emphases added). The fact that the statute treats such items as optional ("if any") indicates that the MTA contemplates awarding licenses to money transmitters that do *not* have authorized delegates or physical locations within the District of Columbia. And in any event, there is a distinction between defining what conduct triggers the legal obligation to obtain a license—*i.e.*, "engag[ing] in the business of money transmission," *id.* § 26-1002(a)—and prescribing the steps that such a business might be required to take in order to bring it into compliance with the MTA.

Indeed, DISB has taken the position since 2011 that money transmitter licensees are not required to maintain a physical, "brick and mortar" location in the District of Columbia even as a *condition of licensing*. The MTA's implementing regulations call for licensed money transmitters to establish a "location" to do business in the District of Columbia. *See* D.C. Mun. Regs. § 26-C2201.1. On June 9, 2011, however, the Commissioner of DISB issued a guidance Bulletin to "clarify the 'location' requirement for money transmission activities in the District of Columbia."

*See* Ex. 1, D.C. Dep't of Ins., Sec. & Banking, Bulletin 11-BB-01-06/09, *Location Requirement for a Money Transmitter License in the District of Columbia* (June 9, 2011), https://disb.dc.gov/sites/default/files/dc/sites/disb/publication/attachments/Bulletin_11-BB-01-06-09.pdf.   The Commissioner announced that DISB was reinterpreting its regulations not to require money transmitters to maintain a physical office in the District: "[T]he Department has concluded that while the DCMR mentions a 'location' in the District, it does not indicate that said location be 'physical' or 'brick and mortar' and is therefore adopting a broader construction of the word consistent with today's financial business reality." *Id.*  Accordingly:

> Based on its reevaluation, the Department will no longer follow historical staff interpretations requiring money transmitters to be physically located in the District as a condition of licensing.  Rather, it will require that . . . any person . . . that engages in the business of selling or issuing checks or receiving money from transmission *from persons residing or located in the District* or transmitting money *on behalf of persons residing or located in the District*, be licensed by the Commissioner.

*Id.* (emphasis added).   As the Commissioner explained, the new interpretation of DISB's regulations was informed by the need to address "transactions over the Internet." *Id.*  Significantly, even before DISB's elimination of the "brick and mortar" location requirement, that requirement was understood merely as "a condition of licensing"—meaning a requirement to bring the regulated entity into compliance with the MTA, as opposed to a limitation on the regulatory scope of the MTA itself.

The Commissioner of DISB issued another Bulletin on August 4, 2022, following Chief Judge Howell's rulings in the *Harmon* case construing the MTA to apply to Bitcoin mixers like Helix, to confirm DISB's position that certain entities engaging in Bitcoin activity are considered money transmitters that must obtain a money transmitter license.  *See* Ex. 2, D.C. Dep't of Ins., Sec. & Banking, Bulletin 22-BB-001-08/04, *Certain Bitcoin Activity Subject to District of*

*Columbia Money Transmission Laws* (June 9, 2011), https://disb.dc.gov/sites/default/files/dc/

sites/disb/page_content/attachments/bulletin-disb-cryptocurrency-money-transmission-

approved.pdf.  Consistent with the *Harmon* decisions, the Commissioner explained:

> DISB views the transactions where entities receive for transmission, store, and/or take custody of Bitcoin and other virtual currencies from consumers via kiosks (aka BTMs), *mobile applications and/or online transactions*, as engaging in the business of "money transmission."  Such entities require a money transmitter license to operate in the District.

*Id.* (emphasis added).  In other words, DISB considered the specific factual circumstances

presented here—a custodial Bitcoin mixer offering money transmission services to consumers

"via . . . online transactions"—and confirmed that they constitute "engaging in the business of

'money transmission'" and trigger the licensing requirement under the MTA.

Restricting the MTA to money transmitters physically located in the District would also

undermine its purpose as a consumer protection statute.  The MTA, like other state money

transmitter laws, imposes a variety of obligations intended to ensure the trustworthiness, safety

and soundness, and financial reserves of regulated money transmitters.[2]   As Chief Judge Howell

observed, "the MTA establishes a regulatory and licensing scheme for money transmitters, and its

purposes . . . are consumer protection and ensuring the stability of money transmitting businesses."

*Harmon*, 474 F. Supp. 3d at 94; *see generally* Kevin V. Tu, *Regulating the New Cashless World*,

65 Ala. L. Rev. 77, 85-86 (2013) ("State money transmitter laws vary by jurisdiction and focus on

---

[2] License applicants must disclose, *inter alia*, criminal convictions and the history of any material litigation for the preceding 5-year period, a history of the applicant's operations, and (for corporations) an audited financial statement.   D.C. Code § 26-1006(a)-(c).   Applicants are evaluated qualitatively to ensure that their business "will be conducted honestly, fairly, and in a manner commanding the confidence and trust of the community."   *Id.* § 26-1009(a)(1).  Licensed money transmitters are generally required to obtain a surety bond or other security device for at least $50,000, maintain a net worth of at least $100,000, and provide access to on-site examinations by the D.C. government.   *Id.* § 26-1004(a); 26-1007(a); 26-1013(a)-(b).

consumer protection concerns. As such, state money transmitter laws are essentially 'safety and soundness' statutes designed to ensure that consumer funds are protected from loss."); *MoneyGram Int'l, Inc. v. Comm'r of Internal Revenue*, 153 T.C. 185, 195 (U.S. Tax Ct. 2019) ("MoneyGram is licensed and regulated as a money transmitter by 48 States, the District of Columbia, and U.S. possessions.  To be licensed as a money transmitter, MoneyGram must satisfy State requirements concerning minimum net worth and compliance with operational procedures. It must also maintain reserves adequate to meet its outstanding payment service obligations.").

It would frustrate the purpose of the MTA if businesses were allowed to opt out of regulation simply by operating exclusively online or declining to maintain physical operations in a given state while nonetheless engaging in money transmission business there.  Were a physical location requirement added, a money transmitter in the District of Columbia, dissatisfied with DISB's regulation, could simply relocate its offices to Virginia or Maryland while continuing to offer its services—now completely unregulated—to D.C. residents.  And Internet-based money transmitters would remain totally outside the reach of DISB's regulation.  Yet consumer risk is arguably at its height when it comes to Internet-based services, which can be operated from anywhere in the world and may lie beyond the reach of traditional civil and contractual remedies. This Court should not construe the MTA in a way that would eliminate DISB's ability to regulate high-risk money transmitters doing business with D.C. residents from outside the District's boundaries.

Such a novel interpretation would also run contrary to established regulatory practice under the MTA.  DISB routinely issues money transmitter licenses to Internet-based virtual currency service providers that offer services to persons in the District of Columbia.  Searching the

Nationwide Multistate Licensing System (NMLS) database[3] shows that numerous virtual currency exchanges doing business in the United States hold D.C. money transmitter licenses—including but not limited to Coinbase (MTR1163082), Bitstamp (MTR1905429), OKX (MTR1767779), Gemini (MTR1518126), bitFlyer (MTR1528491), Foris DAX, Inc. dba Crypto.com (MTR1966158), BAM Trading Services, Ltd. dba Binance.US (MTR1906829), BitPay (MTR1496848), Circle Internet Financial, Inc. (MTR1201441)—as do other Internet-based payment companies including PayPal (MTR910457), Block, Inc. dba Cash App (MTR942933), Stripe Payments Company (MTR1280479), eToro USA LLC (MTR1769299), Robinhood Crypto, LLC (MTR1702840), Robinhood Money, LLC (MTR1990968), and SoFi Digital Assets, LLC (MTR1770414).[4] Such regulatory practice reflects a common understanding among both regulator and regulated entities that DISB has the power and authority to impose licensing requirements on money transmitters whose primary business is online.

---

[3] Nationwide Multistate Licensing System: Consumer Access, https://www.nmlsconsumeraccess.org/; *see Harmon*, 474 F. Supp. 3d at 95-96 (consulting NMLS database showing DISB licensing of virtual currency companies).

[4] A company offering payment services online marketed to a global audience can foresee that it will attract customers from numerous jurisdictions, including the District of Columbia. Recognizing this, many companies that have not or do not intend to register with individual jurisdictions take steps to prevent users from those jurisdictions from transacting through their platforms. This may involve filters based on IP address, address verification, identification document checks, terms of service that bar customers from certain states or countries, or other means. *See, e.g.*, KuCoin Terms of Use, Art. 17(5), https://www.kucoin.com/news/en-terms-of-use (restricting access from users in "Restricted Locations" including "the United States, Singapore, the mainland of China and Hong Kong, Thailand, Canada, such countries sanctioned by the Republic of Seychelles and countries sanctioned by international laws and conventions to which the Republic of Seychelles is a party"). Additionally, numerous virtual currency exchanges have declined to offer their services to customers in individual states in which they are not registered. For example, some smaller exchanges restrict business from customers in New York State, which requires entities conducting virtual currency business in the state to obtain a special "BitLicense" or a charter under the New York Banking Law. *See* N.Y. Dep't of Fin. Servs., Virtual Currency Businesses: Main Page, https://www.dfs.ny.gov/virtual_currency_businesses.

In sum, the text, purpose, and regulatory history of the MTA confirm that it applies to Internet-based money transmitters, including Bitcoin Fog, offering services to persons in the District of Columbia.

### 3. The D.C. Money Transmitters Act Is Not Limited to Money Transmission Above a Certain Dollar Amount

The statutory text of the MTA does not specify any minimum "threshold" of transactions before its obligations attach.  The definition of "money transmission" in § 26-1001(10) contains no minimum dollar value.  Similarly, the criminal prohibition in § 26-1023(c) does not carve out an exception to liability for unlicensed money transmission below a certain dollar value.  If the Court were to craft a judicial exemption from the MTA for low-dollar transactions, it would have to decide where to draw the line—one hundred dollars, ten thousand dollars?  Such legislative rulemaking is properly left to the District's lawmakers.  And given the consumer protection purpose of the MTA, it is not at all obvious that lower-dollar transactions should be excluded.

The MTA's statutory scheme stands in contrast to other state money transmission laws that *do* have an explicit monetary threshold.  For example, New York's money transmitter law contains a two-tiered enforcement scheme: unlicensed money transmitting is generally punished as a misdemeanor offense, but it becomes a felony if the transmission involves "a total of ten thousand dollars or more in a single transaction, a total of twenty-five thousand dollars or more during a period of thirty days or less, or a total of two hundred fifty thousand dollars or more during a period of one year or less."  N.Y. Banking Law § 650(2)(a), (b)(1).  The fact that the District of Columbia's legislators chose *not* to adopt a similar monetary threshold into the MTA, despite countervailing examples such as New York's, is strong evidence that that the plain text of the statute reflects deliberate legislative intent to regulate money transmission in the District regardless of dollar value.

Nor does statutory term "business" in § 26-1002(a) provide a back door to import a minimum dollar threshold into the statute. The term "business" is undefined in the MTA and should be given its ordinary meaning. *See Harmon*, 474 F. Supp. 3d at 88-89 (construing undefined term "money" in MTA according to its ordinary meaning). Courts construing the same term as it appears federal money transmitting laws have emphasized the commercial nature of "business" transactions, as opposed to a minimum dollar value. *See, e.g.*, *United States v. Mazza-Alaluf*, 607 F. Supp. 2d 484, 489 (S.D.N.Y. 2009) ("The statute does not define the word 'business,' which should be afforded its ordinary meaning as an enterprise that operates for profit."); *United States v. Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999) ("A money transmitting business receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates, usually a foreign country."); *United States v. Talebnejad*, 460 F.3d 563, 565 (4th Cir. 2006) ("A money transmitting business is one that, for a fee, accepts currency for transfer within or outside the United States through foreign currency exchanges and financial institutions"). In *United States v. $215,587.22 in U.S. Currency*, 306 F. Supp. 213 (D.D.C. 2018), Judge Cooper rejected a related argument that the definition of "unlicensed money transmitting business" in § 1960, which includes the transmission of funds "on behalf of the public," only applied to businesses of a certain size:

> [T]he Court does not read the "on behalf of the public" requirement to turn on the number of customers the money transmitter has. Rather, the most natural reading of the phrase is that the money transmissions must be made for third-parties or customers as part of a commercial or business relationship, instead of with one's own money or for family or personal acquaintances.

*Id.* at 218.  Similarly, a natural reading of the term "business" implies a commercial or arms-length relationship, not a minimum dollar value.[5]  In any event, evaluation of an entity's status as a "business" appropriately considers the full scope of its conduct.  Here, Bitcoin Fog operated a darknet web service accessible to users in the District of Columbia and across the world, it charged a fee on all transactions, and it actually processed mixing transactions of more than 1.2 million BTC, valued at $402,778,871.68.  *See* Elizabeth Bisbee, Expert Report (Dec. 2, 2022), at 9.  Under any definition, Bitcoin Fog was a business.

\* \* \*

This Court should enforce the MTA's broad and clear statutory text, and it should decline to adopt arbitrary and atextual limits on the scope of DISB's enforcement power based on geography or monetary amount.  Under the plain and ordinary meaning of the statute, Bitcoin Fog engaged in the business of money transmission without a license, in violation of the MTA, when it offered Bitcoin mixing services to undercover law enforcement agents located in the District of Columbia.

---

[5] In *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008), Judge Collyer consulted the legislative history of 18 U.S.C. § 1955, the federal prohibition of illegal gambling businesses, to inform the court's construction of § 1960.  *Id.* at 89.  Based on this legislative history, Judge Collyer inferred that § 1960 was intended to regulate "large-scale operations as opposed to small-scale or individual money transmitters."  *Id.* at 90.  But while § 1955 is relevant to construction of § 1960, there are important distinctions: the text of § 1955 provides explicit minimum thresholds on the quantum of gambling activity before liability attaches, requiring that the gambling business involve "five or more persons" and either continuously operate for more than 30 days or earn "gross revenue of $2,000 in any single day."  18 U.S.C. 1955(b)(1)(ii)-(iii).  No such explicit requirements were included in the text of either § 1960 or the MTA.  And in any event, Judge Collyer found that the virtual currency exchange e-Gold satisfied whatever threshold based on its *overall* operations, totaling more than $145 million in transactions, as opposed to the subset of transactions that occurred in the District of Columbia.  *See E-Gold*, 550 F. Supp. 2d at 90.  Similarly, Bitcoin Fog should pass muster under any quantitative threshold based on its total transactions of more than 1.2 million BTC ($402,778,871.68).  *See* Elizabeth Bisbee, Expert Report (Dec. 2, 2022), at 9.

**B. Bitcoin Fog Was an Unlicensed Money Transmitting Business in Violation of the Bank Secrecy Act and 18 U.S.C. § 1960(b)(1)(B)**

    **1. Legal Framework**

The federal registration prong of 18 U.S.C. § 1960, subsection (b)(1)(B), makes it a crime to operate a money transmitting business that "fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section." 18 U.S.C. § 1960(b)(1)(B). The statutory term "or" creates a disjunctive test, meaning that a business can violate § 1960 if it fails to register as required under the statutory text of the Bank Secrecy Act (BSA), 31 U.S.C. § 5311, *et seq.*; or if it fails to register as required under the implementing regulations to the BSA enacted by the U.S. Department of Treasury, Financial Crimes Enforcement Network ("FinCEN"). *See E-Gold*, 550 F. Supp. 2d at 95-96.

**Statutory definition:** The Bank Secrecy Act, 31 U.S.C. § 5330(a)(1), requires all "money transmitting businesses" to register with the Secretary of the Treasury (*i.e.*, with FinCEN). Subsections (d)(1) & (2) then define what is a "money transmitting business" within the meaning of the BSA:

> (1) Money transmitting business. —The term "money transmitting business" means any business other than the United States Postal Service which—
>
> > (A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;
>
> > (B) is required to file reports under section 5313; and
>
> > (C) is not a depository institution (as defined in section 5313(g)).

> (2) Money transmitting service.—The term "money transmitting service" includes accepting currency, funds, or value that substitutes for currency and transmitting the currency, funds, or value that substitutes for currency by any means, including through a financial agency or institution, a Federal reserve bank or other facility of the Board of Governors of the Federal Reserve System, or an electronic funds transfer network.

31 U.S.C. § 5330(d)(1)-(2).   These overlapping definitions were written to capture a range of emerging technologies and business models.  *See United States v. Murgio*, 209 F. Supp. 3d 698, 708 (S.D.N.Y. 2016) (construing similar definition of "money transmitting" under § 1960 and explaining that "Congress designed the statute to keep pace with evolving threats") (internal quotations and alterations omitted).  As Chief Judge Howell held in *Harmon*, the statutory definition of money transmitting business encompasses, among other things, a Bitcoin mixer.  474 F. Supp. 3d at 100-09.

**Regulatory definition:** Alternatively, federal regulations issued pursuant to 31 U.S.C. § 5330 require "money services businesses," or MSBs, to register with FinCEN.  31 C.F.R. § 1022.380(a)(1).  MSBs are defined in 31 C.F.R. § 1010.100(ff).  In relevant part, that regulation creates a category of MSBs called "Money transmitter[s]."  *See* 31 C.F.R. § 1010.100(ff)(5).  Money transmitters are defined as:

(5) Money transmitter—

(i) In general.

> (A) A person that provides money transmission services. The term "money transmission services" means the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means. "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system; or

> (B) Any other person engaged in the transfer of funds.

13

31 C.F.R. § 1010.100(ff)(5).  Chief Judge Howell considered this regulatory definition as well in *Harmon* and held that a Bitcoin mixer satisfies it "because [its] core business was receiving customers' bitcoin and transmitting that bitcoin to another location or person."  474 F. Supp. 3d at 100-01.

### 2.   Bitcoin Fog Was as a Domestic Financial Institution Under the Bank Secrecy Act

Neither the defendant nor the Court has questioned whether a Bitcoin mixer such as Bitcoin Fog falls within the functional definition of "money transmitting business" under the Bank Secrecy Act, or within the regulatory definition of MSB under FinCEN's implementing regulations. Rather, the Court has asked for clarification of whether, following the conjunctive definition set forth in 31 U.S.C. § 5330(d)(1)(A)-(C), Bitcoin Fog could be considered a business that is "required to file reports under section 5313" of the Bank Secrecy Act.  Under a straightforward reading of the statute and relevant regulations, Bitcoin Fog qualified as a "domestic financial institution" required to file such reports, and was therefore required to register with FinCEN.

In order to qualify as a "money transmitting business" under the Bank Secrecy Act, an entity must be "required to file reports under section 5313."  31 U.S.C. § 5330(d)(1)(B).  In turn, § 5313(a) imposes a requirement that any "domestic financial institution" file certain reports prescribed by regulation—namely, currency transaction reports (CTRs) required for transactions involving more than $10,000 in currency, *see* 31 C.F.R. § 1010.311.  The term "financial institution" is defined in the BSA's definitions section and (somewhat circularly) includes, among other things, "any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency" and "any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions

system." 31 U.S.C. § 5312(a)(2)(R).  Of course, this definition reflects much of the same verbiage and relevant functions as in the definition of "money transmitting business" in § 5330(d)(1)(A). The salient question, then, is whether the entity qualifies as a "*domestic* financial institution."

The BSA defines "domestic financial institution" in purely functional terms: "In this subchapter— (1) 'domestic financial agency' and 'domestic financial institution' apply to *an action in the United States* of a financial agency or institution." 31 U.S.C. § 5312(b)(1) (emphasis added).  In other words, pursuant to the BSA, a financial institution is considered a "domestic" financial institution when it acts within the United States, regardless of its formal domicile.

Courts have uniformly applied this definition of "domestic financial institution" to money transmitting businesses based outside of the United States that nevertheless carry on business— *i.e.*, take "action"—within the United States.  *See, e.g.*, *Mazza-Alaluf*, 621 F.3d at 210-11 (holding that a money transmitter with its principal place of business in Chile was a "domestic financial institution," because it "engaged in actions in the United States," including opening bank accounts in various states which received and transmitted tens of millions of dollars for customers) (cleaned up); *United States v. Eisenstein*, 731 F.2d 1540, 1543 (11th Cir. 1984) (a foreign currency exchange was a "domestic financial institution" because it "perform[ed] functions within the United States by receiving dollars in the United States, by depositing the money in a U.S. bank, and by relaying information about each transaction from Miami to headquarters in Colombia") (cleaned up); *United States v. Budovsky*, 2015 WL 5602853, at *7-8 (S.D.N.Y. Sept. 23, 2015) (describing the Second Circuit's decision in *Mazza-Alaluf* as "finding foreign-located money transmitting business qualified as a 'domestic financial institution' based on the maintenance of bank accounts in the United States," and denying motion to dismiss indictment charging overseas virtual currency business that "act[ed] in the United States" with unlicensed money transmitting).

15

As the district court pointed out in *Mazza-Alaluf*, one of the concerns of Congress in enacting the BSA was "serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal, tax, and regulatory enactments."  *Mazza-Alaluf*, 607 F. Supp. 2d at 494 (quoting *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 27 (1974)).

In *Budovsky*, the court specifically applied this definition of "domestic financial institution" to Liberty Reserve, a virtual currency issuer based in Costa Rica that was "designed to help criminals conduct illegal transactions and launder the proceeds of their crimes."  2015 WL 5602853, at *1, 6-8.  Even though Liberty Reserve's offices were located in Costa Rica, the court highlighted "the large number of Liberty Reserve's U.S. users" in finding that the Indictment sufficiently alleged "'how' Liberty Reserve engaged in actions 'in' the United States." *Id.* at *8.

The same rationale applies to Bitcoin Fog.  Although the defendant was based in Sweden, his money transmitting entity, Bitcoin Fog, laundered transactions totaling hundreds of millions of dollars for customers worldwide—including in the United States.  The government will show at trial not just specific undercover transactions with government agents located in the District of Columbia, but tens of millions of dollars in transactions on behalf of darknet drug market vendors and buyers and other transactions involving the proceeds of illegal activity.  That includes, for example, 636,682 BTC ($23,858,019) in transactions to and from Silk Road, a darknet drug market managed in the United States by Ross Ulbricht.  *See* Luke Scholl, Expert Report (Dec. 8, 2022), at 12, 18.  The existence of U.S. customers and mixing transactions executed on their behalf is sufficient to show that Bitcoin Fog operated as a "domestic financial institution."

### 3.   Bitcoin Fog Was a Money Services Business Under FinCEN Regulations

Analysis of the regulatory definition of "money services business" arrives at the same conclusion.   Under FinCEN's implementing regulations, the definition of MSB specifically encompasses "[a] person *wherever located* doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within the United States, in one or more of the capacities listed" in the section.   31 C.F.R. § 1010.100(ff) (emphasis added). This definition applies regardless of the entity's domicile ("wherever located"), it does not depend on a particular corporate form or legal status ("whether or not on a regular basis or as an organized or licensed business concern"), and it is based on the entity's business *activity* within the United States ("doing business . . . wholly or in substantial part within the United States").   It is thus in accord with the activity-based definition of "domestic financial institution" under the BSA, and it leads to the same result—that Bitcoin Fog was a "money services business" within the meaning of FinCEN's regulations based on its substantial financial activity in the United States.

FinCEN promulgated the current version of this regulation in 2011.   Prior to September 19, 2011, the definition of MSB was limited to entities physically located in the United States— referring to "[e]ach agent, agency, branch or office within the United States of any person doing business in one or more of the capacities listed" in the section.   31 C.F.R. § 1010.100(d) (2011). FinCEN broadened the definition of MSB "so that an entity qualifies as an MSB based on its activity within the United States, not the physical presence of one or more of its agents, agencies, branches, or offices in the United States."   Fin. Crimes Enforcement Network, *Bank Secrecy Act Regulations; Definitions and Other Regulations Relating to Money Services Businesses, Final Rule*, 76 Fed. Reg. 43,585, 43,588 (Jul. 21, 2011), *available at* 2011 WL 2881105.   FinCEN

explained that the rule was amended to better protect the U.S. financial system from risks posed by foreign-based money transmitters—particularly those offering services over the Internet:

> This proposal arose out of the recognition that the Internet and other technological advances make it increasingly possible for persons to offer MSB services in the United States from foreign locations.  FinCEN seeks to ensure that the BSA rules apply to all persons engaging in covered activities within the United States, regardless of each person's physical location.  To permit foreign-located persons to engage in MSB activities within the United States and not subject such persons to the BSA would be unfair to MSBs physically located in the United States and would also undermine FinCEN's efforts to protect the U.S. financial system from abuse.

*Id.*

Finally, there is no serious argument that Bitcoin Fog did not conduct business activity "in substantial part within the United States."  31 C.F.R. § 1010.100(ff).  As noted above, Bitcoin Fog laundered more than $23 million on behalf of the darknet drug market Silk Road, which was operated by an individual in the United States and serviced a large number of U.S. customers, in addition to transacting on behalf of cooperating defendants and the government's online undercover agents.  *See, e.g.*, *United States v. Bankman-Fried*, --- F. Supp. 3d ----, 2023 WL 4194773, at *13 (S.D.N.Y. June 27, 2023) (denying motion to dismiss § 1960 count against defendant for operating cryptocurrency exchange FTX in part because indictment alleged unquantified "wire transfers relating to the unlicensed [money transmitting business] were received in and were transmitted through this district"); *see also* Fin. Crimes Enforcement Network, *Amendment to the Bank Secrecy Act Regulations—Definitions and Other Regulations Relating to Money Services Businesses, Notice of Proposed Rulemaking*, 74 Fed. Reg. 22,129, 22,133 (May 12, 2009), *available at* 2009 WL 1284931 ("Establishing the degree to which the activities of a foreign-located MSB occurs within the United States depends on all the facts and circumstances and whether U.S. customers or recipients are involved in the activities.").

## **CONCLUSION**

For the foregoing reasons, Bitcoin Fog engaged in the "business of money transmission" within the meaning of the D.C. Money Transmitters Act, and the defendant may be held liable by a jury under Counts Three and Four for operating such a business without an appropriate money transmitter's license in violation of 18 U.S.C. § 1960(b)(1)(A) and D.C. Code § 26-1023(c). In addition, Bitcoin Fog qualified as a "money transmitting business" and "money services business" under the Bank Secrecy Act and FinCEN regulations, and the defendant may be held liable by a jury under Count Three for operating such a business while failing to register with FinCEN in violation of 18 U.S.C. § 1960(b)(1)(B).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:   */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
*/s/ Jeffrey Pearlman*
C. Alden Pelker, Maryland Bar
Jeff Pearlman, D.C. Bar No. 466901
Trial Attorneys, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007 (Pelker)
(202) 579-6543 (Pearlman)
Catherine.Pelker@usdoj.gov
Jeffrey.Pearlman2@usdoj.gov