```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,
                                        Criminal Action
 4              Plaintiff,              No. 1: 21-399

 5          vs.                        Washington, DC
                                       September 18, 2023
 6    ROMAN STERLINGOV,
                                       1:49 p.m.
 7              Defendant.             AFTERNOON SESSION
      _____/
 8

 9              TRANSCRIPT OF PRETRIAL CONFERENCE
            BEFORE THE HONORABLE RANDOLPH D. MOSS
10               UNITED STATES DISTRICT JUDGE

11
      APPEARANCES:
12
      For the Plaintiff:      CATHERINE PELKER
13                            U.S. DEPARTMENT OF JUSTICE
                              950 Pennsylvania Ave NW
14                            Washington, DC 20530

15                            CHRISTOPHER BRODIE BROWN
                              DOJ-USAO
16                            601 D Street, N.W.
                              Suite 5.1527
17                            Washington, DC 20530

18                            JEFFREY PEARLMAN
                              DOJ-CRM
19                            Ccips
                              US Dept of Justice
20                            1301 New York Ave. NW
                              Washington, DC 20005
21

22              APPEARANCES CONTINUED ON NEXT PAGE

23

24

25
```

```
 1                          APPEARANCES CONTINUED

 2

 3      For the Defendant:         TOR EKELAND
                                   MICHAEL HASSARD
 4                                 TOR EKELAND LAW PLLC
                                   30 Wall Street
 5                                 8th Floor
                                   Brooklyn, NY 10005
 6

 7
        Court Reporter:           SHERRY LINDSAY
 8                                Official Court Reporter
                                  U.S. District & Bankruptcy Courts
 9                                333 Constitution Avenue, NW
                                  Room 6710
10                                Washington, DC 20001

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                     P R O C E E D I N G S
2              THE COURT:  All right.  Do you want to take up
3    Ms. Glave first?
4              MR. BROWN:  Yes, Your Honor.
5              Your Honor, with the Court's permission, may I
6    approach?  I have copies of the summary charts previously
7    produced to the defense.
8              THE COURT:  Okay.
9              MR. BROWN:  Your Honor, I think that maybe we can
10   short circuit the discussion of Ms. Glave's testimony a little
11   bit.  At the bottom of page 2 of her disclosure in looking at
12   ECF 124-5 --
13             THE COURT:  Yep.
14             MR. BROWN:  -- there is the reference to, Ms. Glave
15   may also rebut the defense argument that Mr. Sterlingov's
16   proceeds were the profits of his Bitcoin sales.  That
17   paragraph, which continues onto page 3, we don't intend to
18   elicit her making those opinions.  She is not going to
19   formulate those opinions that are listed in that paragraph.
20             THE COURT:  Okay.
21             MR. BROWN:  So what we are really talking about is
22   essentially factual testimony about her -- about her financial
23   analysis, which is really described on the preceding paragraph
24   in the middle of page 2.
25             THE COURT:  Okay.
```

1            MR. BROWN:  And certainly to the extent that the

2      defense opens up this discussion about, you know -- you know,

3      is this consistent with being a dark net market operator

4      versus being consistent with being an early investor.  You

5      know, I think that the Court was clear.  Well, to the extent

6      the defense does open the door to that discussion in the

7      defense case, we may call her as a rebuttal witness to address

8      consistency or inconsistency with different theories of

9      originating those Bitcoins.  But for purposes of her direct

10     testimony is noticed, it is really just her financial

11     analysis.

12            THE COURT:  Okay.  All right.  Do you want to walk

13     through any of that now?

14            MR. BROWN:  Yes, Your Honor.

15            So I could read it to the Court, starting middle of

16     paragraph of page 2.

17            THE COURT:  Okay.  I have got that in front of me.

18            MR. BROWN:  So Ms. Glave is expected to testify

19     regarding her view of financial records and related

20     communications.  Ms. Glave will assist the jury in

21     understanding Mr. Sterlingov's transaction history and will

22     explain the flow of funds into, out of and across

23     Mr. Sterlingov's accounts, including accounts held at various

24     virtual currency exchanges, cryptocurrency wallets and

25     accounts at banks and other traditional financial

1    institutions.  Ms. Glave will summarize her findings,

2    including how she read and interpreted financial statements.

3    She will walk the jury through Mr. Sterlingov's cryptocurrency

4    deposits, as well as withdrawals and sales, noting the trading

5    price of the cryptocurrency at the time.  Ms. Glave's

6    testimony will note Mr. Sterlingov's purchases, expenditures

7    and spending as compared to his income and cash flow.

8    Ms. Glave's testimony will include the transaction set forth

9    in the relevant account records as well as those detailed in

10   the transaction confirmations and related communications

11   contained in the defendant's emails and/or electronics.

12   Ms. Glave will track and quantify Mr. Sterlingov's financial

13   activity.

14              THE COURT:  Do you want to walk me through the

15   chart?

16              MR. BROWN:  I'm sorry, Your Honor?

17              THE COURT:  Do you want to walk me through the

18   charts as well?

19              MR. BROWN:  Oh, yes, Your Honor.  So the first page

20   of the charts shows the summary of accounts that Ms. Glave

21   analyzed.  It lists the institution, the financial

22   institution.

23              THE COURT:  Are these known accounts?  So where it

24   says account owner, Roman Sterlingov, was he actually the

25   registered account or owner of record?

1            MR. BROWN:  Your Honor, in the second column under

2    which is -- where it says account owner, either those are

3    accounts that are opened in his name, Roman Sterlingov, or

4    they are opened with identify -- or accounts that use

5    identifiers that are tied to his attributable personality of

6    Roman Sterlingov.  So the unique category of accounts here are

7    the BitPay accounts.  And this is just because BitPay in the

8    way I understand it, is BitPay is not like a bank where you

9    would open an account and you use that account for multiple

10   transactions.  It is more -- it is a transaction by

11   transaction entry.  So certain entries are tied to

12   Mr. Sterlingov's personality through the use of attributable

13   email addresses, either in the "to" or "from" field.  And so

14   each of these email addresses is something -- is an email

15   address that Mr. Sterlingov in his true name can be tied to.

16            THE COURT:  Okay.  Would there be a foundation laid

17   as to that where some other witness or Ms. Glave will be able

18   to testify that this at Gmail.com for example is registered to

19   Mr. Sterlingov's name or is there some other identifying

20   connection?

21            MR. BROWN:  Yes, Your Honor.  That is our intention.

22   I believe all of these account records will be introduced

23   prior to Ms. Glave's testimony.  And either in that testimony

24   where the records themselves are introduced or in Ms. Glave's

25   testimony, either that testimony or Ms. Glave will be able to

1     explain exactly how each of these accounts is attributed to

2     Mr. Sterlingov.

3              THE COURT:  Okay.  All right.  Next page.

4              MR. BROWN:  The next page is a summary of Bitcoin

5     activity over time in the collection of accounts listed in

6     table 1.  And so it shows inflows, it shows outflows and

7     trading activity, positive and negative.  The negative is

8     denoted by the parenthesis.  And so it shows that essentially

9     the total inflows of Bitcoin into Mr. Sterlingov's variety of

10    accounts and the total outflows over time.

11             THE COURT:  Okay.

12             MR. BROWN:  The next page.  This is essentially the

13    same information as presented in the previous page.  The

14    previous page was table 2.  This is table 3 and chart 1.  And

15    this just shows the inflows -- these are just the inflows over

16    time of Bitcoin into various exchanges and this is broken out

17    by individual exchange.

18             THE COURT:  And is the way to think about these are

19    wallets that were maintained by Mr. Sterlingov in these

20    particular exchanges?  So the Mt. Gox, for example?

21             MR. BROWN:  You could think of it more like an

22    account.  I think wallet might not be exactly the right term.

23             THE COURT:  Okay.

24             MR. BROWN:  So, for instance, yeah, with Mt. Gox

25    Mr. Sterlingov had an account in his true name.  And so this

```
 1    would show the Bitcoin that came into that account, either as
 2    a deposit or -- I think as a deposit into that account.  And
 3    the same thing broken out for other accounts, including his
 4    local Bitcoin, Kraken and others.
 5              THE COURT:  Okay.
 6              MR. BROWN:  The next page, chart 2, this displays
 7    the information from the previous two tables, table 1 and --
 8    excuse me -- table 2 and table 3.  It shows the incoming
 9    Bitcoin into each of those accounts, graphed out both in terms
10    of nominal Bitcoin amounts, in other words denominated in
11    Bitcoin.  And also the value of that Bitcoin as it was
12    deposited into those accounts broken out over time.  So you
13    can see early on, in 2013, there was a large number of Bitcoin
14    deposited into his accounts.  But it wasn't as valuable on a
15    dollar basis as the Bitcoin that was deposited in 2017 and
16    2018.
17              THE COURT:  Yep.
18              MR. BROWN:  The next page, chart 3, this is
19    Ms. Glave's analysis of Mr. Sterlingov's Bitcoin balance in
20    his accounts.  And I should clarify for the Court, the
21    accounts to which we are referring is those accounts listed in
22    table 1.  So held in those accounts, is sort of the net
23    balance of Bitcoin that is held in those accounts over time,
24    both as a nominal Bitcoin value and the dollar equivalent
25    value held in those accounts over time.
```

```
1              THE COURT:  All right.
2              MR. BROWN:  The next page shows Ms. Glave's analysis
3    to control for Bitcoin that was moved from one of those table
4    1 accounts to another table 1 account.  So in the previous
5    charts Ms. Glave has shown Bitcoin coming into those accounts
6    and the dollar value of those accounts.  One issue that arose
7    is there is a significant amount of Bitcoin that was simply
8    transferred from one account to another, simply shuffled in
9    between accounts.  So if you are looking at, you know, sort of
10   net inflows of Bitcoin into the system of Mr. Sterlingov's
11   accounts over time, there is a danger of potentially double
12   counting that Bitcoin.  And so this chart shows how she
13   adjusted for incoming Bitcoin into, say, account B, that was
14   already counted as incoming from account A and shifted from
15   account A to B.  So that is how she would sort of control for
16   that double counting.
17              If you go back and look at tables 2 and table 3,
18   there is a separate line for adjusted, controlled account
19   transfers in.  The bottom of this table 4 addresses how she
20   reconciled certain inconsistencies in the data that would be
21   part of her testimony is she -- there appear to be -- there
22   were a couple of issues.  One, I think was local Bitcoins
23   appeared to underestimate some of his sales -- I think it is
24   his sales.  There appear to be a missing transaction of the
25   local Bitcoins records, so she adjusted that.  And she will be
```

1    able to explain how she did that sort of according to the

2    principles of forensic accounting and how she reconciled the

3    other issue.  I think it was when BTCE was taken down in 2017,

4    that Bitcoin no longer became available to Mr. Sterlingov.  But

5    she will be able to testify to that.

6              The next page, table 5, is the summary of income and

7    expenditures by Mr. Sterlingov.  The income is focused on

8    Mr. Sterlingov's bank accounts.  I think that is primarily

9    Nordea Bank, which was a bank account from Sweden.  And the

10   inflows -- those are not sort of broken down in great detail.

11   But she will be able to discuss on a -- at a summary level, on

12   year-by-year level net inflows into his bank accounts and as

13   compared with net expenditures.  And those expenditures are

14   bank accounts.  It is also expenditures from some of his other

15   financial accounts, including PayPal and some of his prepaid

16   debit cards, in particular prepaid financial services where he

17   is spending, you know, over $90,000 worth of prepaid debit

18   cards in two years.  And she will be able to show kind of the

19   delta between his known sources of income and his known

20   expenditures.

21             She will also be able to testify about -- to the

22   extent this is under inclusive that Mr. Sterlingov, as he

23   testified in January, had other bank accounts and other sources

24   of income or sources of expenditures for certain.  She will be

25   able to address that.  This is her analysis.

1          THE COURT:  What was the basis for sources of bank

2     inflows?  Is it just looking at the deposits in that bank

3     account?

4          MR. BROWN:  Yes, Your Honor.  So look at his Nordea

5     Bank account inflows.

6          THE COURT:  All right.

7          MR. BROWN:  And then the final page, table 6,

8     details Ms. Glave's analysis of certain invoices that were

9     found on Mr. Sterlingov's computer.  That he appeared to have

10    invoices, some of which pertained -- appeared to correlate

11    with incoming Bitcoin payments for unrelated customers, but

12    those unrelated customers were paying Mr. Sterlingov in

13    Bitcoin from the same Bitcoin address, which is unusual for

14    two completely unrelated customers.  And the source of the

15    Bitcoin address was Bitcoin Fog, so putting 2 and 2 together,

16    Mr. Sterlingov was paying himself out of Bitcoin Fog using

17    fake invoices.

18         THE COURT:  Okay.  Anything else?

19         MR. BROWN:  That is it, Your Honor.

20         THE COURT:  All right.  Mr. Ekeland.

21         MR. EKELAND:  Your Honor, the defense takes the

22    position that this doesn't meet the disclosure requirements

23    under Federal Rule of Criminal Procedure 16.  There is one

24    paragraph here that Mr. Brown just read to the Court that just

25    vaguely states that Ms. Glave will summarize her findings

1    including how she read and interpreted financial statements.

2    There is no detail on that interpretation.  We are being shown

3    this alleged summary chart where we are not being shown fully

4    what opinion she is going to be testifying to nor fully what

5    the basis of her supposed expert opinions.  If it is going to

6    be limited to factual statements and charts, regarding what

7    comes into evidence, then it is just a summary of facts.  But

8    I think what is missing here is what she is -- her -- a

9    detailed -- a disclosure on what her interpretation is.

10   And --

11          THE COURT:  Interpretation of what?

12          MR. EKELAND:  It says in the middle on page 2 of 4

13   of document number 124-5, in her disclosure and roughly in the

14   middle of the -- well, she says she will assist in

15   understanding Mr. Sterlingov's transaction history.

16          THE COURT:  You have got to slow down.

17          MR. EKELAND:  Yes.  I'm sorry, Your Honor.

18   Ms. Glave will assist the jury in understanding

19   Mr. Sterlingov's transaction history and will explain the flow

20   of funds into and out of Mr. Sterlingov's accounts, including

21   accounts held at various virtual exchanges, cryptocurrency

22   wallets and accounts at banks and other traditional financial

23   institutions.

24          If that is just a fact summary, then I don't know how

25   much of an argument we have with that.  But then the next

1    sentence is where we feel that there is a lack of disclosure as

2    to what her expert opinion is.  And that is, Ms. Glave will

3    summarize her findings.  It is not clear to us, even from this

4    chart, what her findings are -- and including how she read and

5    interpreted financial statements.  And it is really -- the

6    question is, well, how did she read them?  What was the basis

7    for her reading and what was her interpretation?  And that is

8    nowhere clear either in this very short disclosure or in the

9    charts that we're being given where we are being told, you

10   know -- I mean, every one of these pages you can ask the

11   question, what is the interpretation?  And what is the basis

12   for it, what financial forensics principles is she using?

13         THE COURT:  I mean, that was why I asked the

14   question about the foundation.  And if this is simply taking

15   other evidence that has been introduced earlier in the trial

16   and saying, you know, here is the bank account statement from

17   the bank in Sweden.  And if you look on line X of the bank

18   account statement, it shows deposits in this amount.  And so I

19   took that amount and I put it into the chart here.  That is

20   not really interpretation.  That is just --

21         MR. EKELAND:  Agreed, Your Honor.  That is not what

22   we are arguing, but I believe if I get this right, the page 1,

23   2, 3, 4, 5 -- I think it is the 6th page in, for example, on

24   the quote/unquote summary at the top it says, table 4, Bitcoin

25   controlled account transfers.  I believe Mr. Brown stated that

1    she is making adjustments there.  And there is a question of

2    how she is making adjustments, what accounting principles she

3    is using.  You know, what -- what forensic accounting

4    principles are in play, not just here but in the entire chart?

5    And what our concern is that she is going to take fact

6    evidence that, Your Honor, assuming arguendo, there is a

7    foundation for.

8              THE COURT:  Right.

9              MR. EKELAND:  And they get to opine about it in ways

10   that haven't been noticed.  That, I think, is the general

11   concern.  For instance, on the last page, Mr. Brown I think

12   said that there is those two box transactions.  And he said

13   that is unusual for two unrelated customers.  Well, that is an

14   opinion and that is not disclosed in the paragraph we just

15   read.  Why is it unusual?  What is the basis for saying that?

16   What is the forensic principle for saying that?  And then on

17   the bottom of this chart there appears to be a trace from

18   Bitcoin Fog.  And I don't believe Ms. Glave has been noticed

19   as a Bitcoin tracing expert.

20             THE COURT:  Right, I agree.

21             MR. EKELAND:  The same reasons that this Court has I

22   think rejected Mr. Verret's testimony on Bitcoin tracing, I

23   think that should be rejected.  And, again, I look at this and

24   it is a very sparse disclosure.  And she says she is going to

25   be testifying to her interpretations and readings.  But I

1    don't see any clear statement that puts the defense on notice

2    as to what those readings and interpretations are and what

3    their bases are in any financial forensic principles.

4              THE COURT:  Okay.  Fair enough.  Let me let

5    Mr. Brown respond on that.  I am also not quite sure what the

6    disclosure means when it says that you will summarize your

7    findings, that I understand, but including how she read and

8    interpreted financial statements.  I suppose the question for

9    you is, does that simply mean read?  And now the words are

10   that appear on the financial statements or are there some

11   inferences that are being made or jumps that are being made in

12   her analysis?

13             MR. BROWN:  Your Honor, I think in terms of how she

14   read and interpreted the financial statements, that is just

15   how do you read a bank statement?  How do you read a

16   cryptocurrency account statement?  There is no -- it is not

17   that she is, you know, discerning some meaning there that is

18   not there on the page.

19             I would also add, just for the record, Your Honor, we

20   have produced the summary charts.  We have also produced

21   Ms. Glave's pivot tables that the underlying Excel

22   spreadsheets -- that forms the basis of all of these, which is

23   much more than Mr. Verret has ever produced.

24             THE COURT:  When did you produce this?

25             MR. BROWN:  In August, I believe, in our discovery.

```
 1              THE COURT:  Okay.

 2              MR. BROWN:  In terms of --

 3              THE COURT:  What about the particular questions that

 4    Mr. Ekeland raised, the tracing and the opinion as to what is

 5    common or not common with respect to joint transactions?

 6              MR. BROWN:  Your Honor, with respect to the tracing,

 7    we would be happy to lay a foundation for Ms. Glave's ability.

 8    This is not an advanced, sophisticated trace.  This is

 9    something that you could click through on a block chain

10    explorer.  It is literally one, two -- two Bitcoin addresses

11    that we can walk through as a matter of fact testimony with

12    her.  The ultimate origin of that being a Bitcoin Fog, that

13    may be separate.  And if Ms. Glave is not able to testify

14    about that, that is fine.  Mr. Scholl can testify to --

15              THE COURT:  I think she is not an expert on tracing;

16    right?

17              MR. BROWN:  Your Honor, she does have -- she has

18    tracing expertise -- she has Bitcoin expertise.  It is not

19    broken out with specificity in her disclosure, that is true.

20    But she is trained on Chainalysis, on other block chain

21    analytic tools.  She has experience as a forensic accountant

22    attached to the IRS cybercrimes unit.  This is not the only --

23              THE COURT:  It does seem to the extent that we are

24    holding everybody to disclosures they have made, there is not

25    disclosure here that she was an expert or was going to opine
```

1      on -- what is and what is not Bitcoin Fog or how one can

2      attribute certain funds or transactions to Bitcoin Fog; right?

3                  MR. BROWN:  Yes, Your Honor.

4                  THE COURT:  She can testify -- an expert can delve

5      on testimony from another expert, but I don't think she is

6      qualified -- as far as I can tell, the government hasn't

7      offered her as an expert on that type of tracing.

8                  MR. BROWN:  Yes, Your Honor.  She is not -- she is

9      not being offered as the expert who can testify as to the

10     attribution of that Bitcoin Fog cluster.

11                 THE COURT:  Right.

12                 MR. BROWN:  Just looking at these two hops from the

13     invoice to this address in blue, which is 1EuDR, that is the

14     address that is listed on the invoice.  And just being able to

15     look that up on a block chain explorer and see the incoming

16     transactions that match the time and date that come from this

17     address listed in green.  That is not a sophisticated type of

18     analysis.  This is looking something up on a block chain

19     explorer and making one click.

20                 THE COURT:  The question is whether it is expert or

21     fact testimony.

22                 MR. BROWN:  There, our position would be that is

23     essentially fact testimony.  That is the same as just reading

24     an account where it says there is, you know, a wire transfer

25     from Citibank to Bank of America and matching up Citibank

1  returns and Bank of America returns.  That is really

2  essentially factual, that is not application of expert

3  methodologies and rendering some sort of expert opinion.

4          THE COURT:  What about Mr. Ekeland's point on the

5  final page of the charts that you gave us, that she,

6  Ms. Glave, is not disclosed as an expert on whether it is

7  common or not common to have two transactions like the first

8  two where it occurred here where there were separate

9  individuals in making those transactions.

10          MR. BROWN:  Your Honor, she is disclosed as a

11  forensic accounting expert with experience in investigatory

12  accounting.  It is not outside of her realm of experience to

13  say -- take this out of the Bitcoin context.  It is within her

14  core area of competence to be able to say, when you are

15  engaging in a forensic accounting exercise, if you see two --

16  one customer based in Ukraine and one customer supposedly

17  based in Hong Kong and they are both paying separate invoices

18  out of the same bank account, it would be within her expertise

19  as a forensic accountant to say, that is not something that is

20  commonly seen.

21          THE COURT:  So it may be within her competence, but

22  is it disclosed?  And I think the main point here is just that

23  we ought to have one set of rules.  And if the government is

24  going to criticize the defense for not getting specific about

25  the forensic accounting methods, then what is good for the

1    goose is good for the gander.  I need to make sure we are

2    applying the rules consistently.

3              MR. BROWN:  Yes, Your Honor.  I mean, we have

4    disclosed -- this is an actual calculation that she did,

5    which, again, is more than Mr. Verret has ever disclosed,

6    except for the one back-of-the-envelope calculation.

7              THE COURT:  Right.

8              MR. BROWN:  We have disclosed our basis for this and

9    she is qualified to -- and that is not even really an expert

10   opinion, that is just based on her experience, that you don't

11   usually see --

12             THE COURT:  I think though that is one of the

13   definitions of what an expert is is somebody who can testify

14   on training or experience.

15             MR. BROWN:  Yes, Your Honor.  It is something

16   within -- it is something within her experience.  But it is

17   not the application of sort of expert methodologies, it is

18   just something that is within her training and experience to

19   say, this is not something that you would expect to see.  This

20   is not commonly seen.

21             THE COURT:  I also wonder whether this is an issue

22   where she can testify there is one invoice being paid here.

23   And it is being paid from here and it is being paid from here.

24   You know, parties can argue to the jury about what that means

25   and whether it is just a matter of common sense that typically

1   when you are paying an invoice, they are not two unrelated

2   people from other sides of the world who are paying the

3   invoice absent some explanation for why that is the case.

4           MR. BROWN:  Yes, Your Honor.  And she can certainly

5   just testify factually like here.  And it is actually not one

6   invoice, you know, it is five invoices from Ukraine and three

7   invoices from Hong Kong that are all being paid out of the

8   same origin.

9           THE COURT:  So I just don't have in front of me at

10  the moment and there is quite a bit of expert testimony and

11  expert reports here, so I can't remember off the top of my

12  head exactly what the defense disclosures look like with

13  respect to forensics.  And I think I have made pretty clear, I

14  am okay with what you might call hard forensic analysis on

15  both sides of walking through transactions and looking at

16  transactions.  And when I start to have greater concern is,

17  you know, opinion and inference that is drawn independent of

18  what the hard facts show.  But I guess for present purposes,

19  my point is just that, you know, at trial, I am going to need

20  to make sure that we are playing by one set of rules.  And if

21  I am going to allow the government to offer testimony, which

22  admittedly is not a giant step away from what is disclosed,

23  but is not expressly disclosed, then I will presumably apply

24  the same rule when it comes to the defense.  So I need to make

25  sure that it is applied equally.  And I am not sure whether it

1    is necessary.  As I said, I don't have the -- I am working on

2    a longer opinion.  I don't have in front of me everything that

3    I have already said even with respect to all of the defense

4    experts on this and how much leeway I am giving them.  But the

5    bottom line is, I will give you both the same leeway.

6              MR. BROWN:  Yes, Your Honor.  We understand that.

7              THE COURT:  All right.  Anything else?

8              MR. BROWN:  Not on Ms. Glave.

9              THE COURT:  Okay.

10             MR. BROWN:  At the some point, we would like to be

11   heard a little bit more on the scheduling issue.

12             THE COURT:  Yeah.  I plan to come back to that.

13             So with respect to Ms. Glave, I am going to allow her

14   to testify based on this forensic analysis that she has

15   offered.  With respect to the little bit of tracing at the end

16   there, this strikes me as more factual in nature to the extent

17   she is just pointing to two particular addresses and showing

18   that.  Any attribution to Bitcoin Fog, I am not going to allow

19   from her.  The government is going to have to offer another

20   witness with respect to attribution for Bitcoin Fog.  And with

21   respect to the five invoices, what I am going to do is reserve

22   judgment on that.  And we'll see how things play out in a

23   manner in which I can just assure that both sides are playing

24   by the same set of rules.

25             Okay.  Do we want to turn to Mr. Cabanas now or -- I

1    don't know, Mr. Ekeland, if you have any further updates on

2    scheduling, if you have heard anything further from

3    CipherTrace.

4            MR. EKELAND:  Let me check.  May I check my email

5    really quick?

6            THE COURT:  Yes.

7            MR. EKELAND:  I called the number we had for

8    Mr. Torres and as well as Ms. Jennifer -- her name escapes me.

9    I left voicemails during lunch.

10           THE COURT:  Ms. Lawrence.

11           MR. EKELAND:  So Ms. Lawrence and Ms. Torres, I

12   called the numbers that were available on the internet.  I

13   explained who I was.  I explained the Court's concern.  I have

14   sent -- I have not heard back.  I have sent two emails this

15   morning to Mr. Torres explaining the Court's concerns and I

16   have not heard back.

17           THE COURT:  Do you have any objection to the

18   government reaching out not to discuss anything of substance,

19   but to request that the Mastercard or CipherTrace make some

20   lawyer available, just to talk me to about what is going on.

21           MR. EKELAND:  As long as it is just limited to them

22   reaching out and saying, I think that -- no objection as long

23   as it is just limited to them asking them to reach out and

24   maybe expressing the Court's concern and the importance of

25   this issue.

1          THE COURT:  All right.  Mr. Brown, so I think you

2     have heard that.

3          All right.  Well, why don't we go ahead then and turn

4     to Mr. Cabanas.  I guess I should say Dr. Cabanas, if he has a

5     PhD.

6          MR. EKELAND:  Your Honor, would you just like me to

7     proceed as we proceeded before by reading from his disclosure

8     which is on docket 145-1?

9          THE COURT:  Yep.

10         MR. EKELAND:  Starting -- would you like me just to

11    go the numbered paragraphs or do you want me to read that --

12    Dr. Cabanas --

13         THE COURT:  No.  There is no reason to -- you can

14    point me to the paragraphs.  I have them in front of me.

15         MR. EKELAND:  So this is page 3 of 9 on document

16    145-1 on the docket.  And I am starting at the second

17    paragraph with the numbered paragraphs starting with number 1.

18    This says, "Dr. Cabanas will testify to the critical

19    importance of identifying and quantifying both systemic error

20    bias and random error noise in the government's and

21    Chainalysis investigation into Bitcoin Fog."

22         THE COURT:  I have to say my biggest concern about

23    Dr. Cabanas, which is a fairly big concern, I am just not

24    convinced that he has any expertise, certainly related to

25    tracing or tracing technology, not a great deal of expertise

1    of any with respect to Bitcoin.  In fact, that is not what he

2    currently trades in.  He is somebody who years ago traded in

3    Bitcoin.  But his training is as a physicist and in

4    mathematics.  And he has worked in areas of real estate and

5    other fields.  And I think as the government has put it, it

6    does seem as though he is largely a hobbyist in the field of

7    cryptocurrency.  And, well, particularly with respect to

8    Bitcoin, he may have some knowledge relating to mathematics.

9    And maybe even with respect to the difference between systemic

10   error and random error.  I am just not sure what expertise he

11   has in applying that to anything that Chainalysis did in its

12   review.  So that covers quite a bit of his testimony.  And

13   that is my principle area of concern with him.

14        MR. EKELAND:  Your Honor, Dr. Cabanas I think has

15   been in the crypto space probably longer than I think anybody

16   in this room or that the government is going to put on

17   besides -- anyone in this room besides perhaps Mr. Sterlingov.

18   He is a legendary status user on the Bitcoin Talk forum, which

19   figures prominently in this case, because that is what the

20   government is going to attempt to say is Mr. Sterlingov --

21   they are trying to link him to the --

22        THE COURT:  Let's come to that separately as to

23   whether he may have some expertise as -- we'll take that as a

24   separate point.  I have probably been driving a car longer

25   than anyone else in this room, I am pretty sure as I look

1    around at everyone's age in the room here.  But I am by no

2    means more of an expert on cars or even driving cars than

3    anyone else in this room.

4            MR. EKELAND:  But the Bitcoin Talk forum is the

5    primary forum for discussions about Bitcoin Talk.  I believe

6    if I recall correctly, it was set up by Satoshi --

7    or Nakamoto's circle.  It has been fundamental to the

8    discourse in relation to Bitcoin since the beginning.  And he

9    has been involved in the space from the beginning.

10           THE COURT:  But you are still not answering the

11   question with respect to what he knows about the difference

12   between system error and random error in the government -- in

13   Chainalysis' investigation of Bitcoin, clustering tracing.

14   And there are experts on tracing that we have, Ms. Still and

15   Ms. Bisbee and others.  But, you know, I don't have any reason

16   to think that he has any particular knowledge in those fields

17   or that he has particular experience in either of those

18   fields.  I don't think he has done any tracing.  I don't think

19   he has studied tracing, so it would just be someone expressing

20   an opinion on something that is no more valuable than anyone

21   else's opinion.

22           MR. EKELAND:  Chainalysis and the government has

23   asserted that their methodology and Chainalysis reactor is

24   both scientific and deterministic.  Yet as the Court well

25   knows, they cannot produce any kind of error rate analysis.

1     Dr. Cabanas has a PhD in physics with a specialty in

2     statistical analysis of error and can help clarify for the

3     jury and help the jury understand the importance of knowing

4     the error rates in scientific endeavor.  He can also identify

5     in relation to the Chainalysis claim that their software is

6     somehow scientific and deterministic.  He has --

7              THE COURT:  I don't think -- I should look to the

8     government on this.  First of all, I don't think that everyone

9     has ever said this is science in the Daubert sense or in the

10    sense of physics.  I think the government's view is this is

11    sophisticated forensics.  But I mean, you have also said many

12    times that it is their position that it is scientific and

13    deterministic.  And I understand that the government believes

14    there are conclusions that can be drawn from this.  Maybe I

15    should ask the government, is it the government's view that

16    tracing based on clustering or on more precisely that tracing

17    based on the heuristics is deterministic in the sense that

18    there is absolute certainty with respect to the results that

19    are achieved or found?

20             MS. PELKER:  Your Honor, it is deterministic insofar

21    as you apply the algorithm.  And as long as you apply the same

22    algorithm in the same way, it gets the same results.  That is

23    what is meant by deterministic here.  The government is not

24    suggesting that block chain analysis is a science the same way

25    that physics is.  We view it much more analogous to forensic

1    accounting and these are very much like forensic accounting

2    methodologies, just on a larger scale because of the number of

3    transactions, number of addresses at play.

4            THE COURT:  But I -- it sounds to me like you all

5    may be talking past each other a little bit in the use of the

6    word deterministic.  I think Mr. Ekeland is using it in the

7    sense of if you use this algorithm, you can determine -- you

8    can make attribution determinations in the same way that if

9    you use a thermometer, you can tell us with precision how warm

10   it is in the room.  And I don't think that -- at least that is

11   not what I just heard you say.  I heard you say it is

12   deterministic in the sense that every time you run the

13   program, you get the same result.  But there are assumptions

14   or heuristics that go into the program, which I take it the

15   government is not saying lead to the same type of scientific

16   certainty that a Geiger counter might render with respect to

17   the amount of radiation in a room or a thermometer might

18   render with respect to the precise temperature of a material

19   in the room.

20           MS. PELKER:  No.  I think that we are on the same

21   page there, Your Honor, yes.

22           THE COURT:  I think we are talking past each other a

23   little bit with the respect to scientific and deterministic.

24           Go ahead.

25           MR. EKELAND:  Your Honor, so the -- I am using the

1   word scientific and deterministic, I am getting from

2   Ms. Bisbee's supplemental declarations.  And I think there is

3   a real risk of jury confusion.  Because they are going to hear

4   those words and they are going to think, oh, it is science, it

5   is 100 percent accurate.  And I think the importance of

6   Dr. Cabanas is he is a scientist.  He has a PhD in physics and

7   he is an expert in statistical error, which is not -- you

8   know, which is applicable I think across the board and also to

9   cryptocurrencies.  And he is experienced in the

10  cryptocurrencies.  And I think he would be helpful to the jury

11  in helping them understand this isn't a pure science.  There

12  is --

13          THE COURT:  Did Ms. Bisbee use the word science in

14  her report?

15          MR. EKELAND:  I believe off the top of my head that

16  she said that this is -- while there is no peer-reviewed, you

17  know, scientific papers it is scientific.  I think she even

18  used the phrase that it is based on -- I hope I am not getting

19  this wrong, hard science, it is scientific and deterministic.

20  And the concern is here and the reason we are bringing in

21  Dr. Cabanas from --

22          THE COURT:  Maybe I should just preclude her from

23  saying that at trial.  Her report is not coming into

24  testimony.  If there is a concern about jury confusion about

25  her saying that it is scientific and deterministic, maybe I

1    should just preclude her from using that phrase.

2          MR. EKELAND:  The defense welcomes that.

3          THE COURT:  Ms. Pelker.

4          MS. PELKER:  The government would note that -- I

5    think Ms. Bisbee's report -- and I am working on pulling up

6    what the exact language was in response to defense's

7    cross-examination suggesting that the heuristics themselves

8    are not deterministic and would potentially lead to disparate

9    outcomes depending on whatever is happening inside this black

10   box.  So we certainly don't intend to elicit on direct any

11   testimony from Ms. Bisbee that this is a hard science.  But on

12   cross-examination by defense counsel, if defense counsel says,

13   Ms. Bisbee, isn't it true this is just totally unscientific,

14   we think Ms. Bisbee should be able to explain what is meant by

15   that and there are different principles and different things

16   they have done in order to inform their work, which is very

17   different than -- I honestly am still not following how

18   Dr. Cabanas as a physicist in science can even be applied

19   here, but either way it is very different than what defense is

20   suggesting.

21         THE COURT:  Right.

22         MR. EKELAND:  Excuse me.  The defense maintains it

23   is important for the jury to understand notions like systemic

24   error and how things can go very, very wrong with programs

25   like Chainalysis Reactor, which is subject to the same

1    scientific principles as everything else in the universe that

2    is being put forward.  So the fact that Chainalysis has no

3    internal error rate analysis is, to the defense, something

4    obviously that is important.

5            THE COURT:  Are you going to ask that question on

6    cross, do you think?

7            MR. EKELAND:  I don't -- well, perhaps.

8            THE COURT:  I am kidding, because I will bet that I

9    hear that phrase at least a dozen times out of your mouth

10   throughout trial.

11           MR. EKELAND:  It is important for the jury to

12   understand why that is important as well.  And how there is --

13   you know, there is different types of error, that there is

14   systemic error that you can pervade a whole system.  And there

15   is random error.  And I think error rates are crucial to the

16   issues in this trial.  And Dr. Cabanas is an expert in that

17   not --

18           THE COURT:  What is he an expert in?

19           MR. EKELAND:  He is an expert in physics and

20   mathematical analysis of random and systemic errors.  That is

21   on the top paragraph of page 3 of 9 on document 145-1.

22           THE COURT:  But he is -- but you didn't quite read

23   it entirely or quite correctly.  He is --

24           MR. EKELAND:  He has over 20 years of experience in

25   the fields of experimental physics, physical chemistry and

1   radio astronomy where he specialized in mathematical analysis

2   of random errors or noise and systemic errors, bias in

3   statistics.  This is a heuristic program that is, I believe,

4   using some form of statistical analysis and algorithms to

5   arrive at --

6           THE COURT:  Is it using statistics?

7           MR. EKELAND:  I'm sorry.  What?

8           THE COURT:  Is the program using statistics?

9           MR. EKELAND:  I don't -- well, I haven't seen its

10  source code, so I don't know.

11          THE COURT:  You have seen -- you have seen the

12  detailed heuristics and methodology that has been applied,

13  quite frankly.  I think you have seen more than the source

14  code will reveal to you.  You have got a detailed description

15  of exactly how the program works.  And I didn't see anything

16  about it using statistics.  I could be wrong about this, but I

17  didn't see anything about it using statistical analysis.

18          MR. EKELAND:  Well, that may be the problem, that is

19  something he can testify to that Chainalysis has never done

20  any statistical analysis of its error rates.  He can testify

21  as to the importance of that.  They said they kept no internal

22  data on their error rates.  And one of the things he can

23  testify to is the importance of that in order to be able to do

24  a statistical analysis.  So, you know, it --

25          THE COURT:  That is not what he is noticed for, I

1    don't think.

2              MR. EKELAND:  Should we read through this more or --

3              THE COURT:  I mean, I told you that I don't see how

4    he is -- I think you -- the only thing you have even argued to

5    me is that he is an expert in mathematical analysis and random

6    errors and systemic errors in statistics.  But that has

7    nothing -- there is no expertise with respect to block chain

8    tracing, with respect to Reactor, with respect to any of the

9    specifics here.  So I think the only question, as far as I can

10   tell, is whether he should be allowed to just offer the more

11   abstract testimony.  I don't know anything about Chainalysis.

12   I don't know anything about Reactor.  I don't know anything

13   about Bitcoin tracing -- excuse me.

14        I don't know anything about those topics or I am not

15   offering testimony on any of those topics, all I am telling you

16   is that in general, when you do statistics, it is good to know

17   what the error rate is.

18             MR. EKELAND:  Well, he can --

19             THE COURT:  Go ahead.

20             MR. EKELAND:  In paragraph 2 he says Dr. Cabanas

21   will explain that while clustering over a large number of

22   transactions, statistical techniques can mitigate random error

23   clustering over a large number of transactions and using

24   statistical techniques does not mitigate systemic error.  What

25   he is going to say is --

1        THE COURT:  I understand the point.  So go ahead.

2        MR. EKELAND:  Your Honor, I have handed a quote from

3    Ms. Bisbee's report on page 5 where it says, using

4    deterministic methodology, Chainalysis identifies which

5    addresses are imagined by the same entity and therefore should

6    be grouped together in a cluster.  So that I think goes to,

7    you know, sort of what is at issue here is -- I think it is --

8    Dr. Cabanas's testimony is important to clarify for the jury

9    just that this isn't scientific, the importance of having

10   knowledge of the error rates.

11        And if the Court is going to preclude the

12   government's witnesses from testifying and saying it is

13   scientific and deterministic, we welcome that.  But I think

14   then that becomes very still difficult for them to argue about

15   the effectiveness of Chainalysis Reactor.  And we think his

16   testimony will be helpful to the jury to clarify the importance

17   of knowing these error rates and understanding why it is

18   important and why this isn't scientific.

19        THE COURT:  I guess the problem I have is not with

20   the nature of the testimony, it is whether he has any

21   expertise that is in the relevant field.

22        MR. EKELAND:  Your Honor --

23        THE COURT:  And we could probably get Stephen

24   Hawking in here to testify about the differences between

25   systemic error and random error.  But even Stephen Hawking is

1    not going to be able to tell us about Bitcoin tracing.

2         MR. EKELAND:  But, you know, he has been in the

3    crypto space longer than Ms. Bisbee.

4         THE COURT:  That is a clever choice of words to say

5    he has been in that space longer than Ms. Bisbee.  Because

6    that space is -- sort an intentionally undefined term.  If you

7    mean to say he has been engaged in tracing, I am with you.  If

8    you mean to say he was trading and buying and selling Bitcoin,

9    I don't see how that has any bearing on whether he is an

10   expert on tracing.

11        MR. EKELAND:  We are offering him as an expert on

12   statistical analysis of error, systemic bias and random bias

13   in the Bitcoin space.  And I do think that is relevant,

14   because I don't think he needs a high level of knowledge of

15   tracing to do an analysis of that.  And he is looking at, for

16   instance, the financial action task force paper on error rates

17   and the error rates that were listed and giving an opinion

18   based on that.

19        THE COURT:  So let me ask you about this:  He wants

20   to testify based on this report I have in front of me.  And as

21   far as I can tell, it shows what the proportion of identified

22   illicit Bitcoin transactions were between 2016 and 2020 on

23   page 27.  And his point is to say, well, look, it shows the

24   variation.  It doesn't say anything about who was doing the

25   testing or what methodology was applied.  So this also strikes

1    me as sort of unreliable and unhelpful.  If you could show me

2    that one of these was CipherTrace and one of these was

3    Chainalysis and show me there was a big difference and then

4    maybe the jury needs to understand why there is that big

5    difference.  This report isn't terribly helpful because it

6    just doesn't tell me anything.

7            MR. EKELAND:  Your Honor, I think that is the point

8    is that this is a newly emerging forensic science that is

9    completely standardless.

10           THE COURT:  No.  No.  You are not listening.  I am

11   saying, it doesn't tell me who is doing this.  We are not

12   talking about whether it is standardless or not.  Who

13   generated the 12.7 applying what methodology or not, how is

14   the government supposed to respond to this unless they know

15   who it is that actually generated 12.7 and who generated the

16   .5 and what methodology they applied in doing that?

17           MR. EKELAND:  The government is welcome to cross him

18   on that, but that is I believe a government document.

19           THE COURT:  I am not going to allow this -- him to

20   use this report with so limited knowledge.  I mean, you just

21   found this report and looked at it.  I am looking at it and I

22   can't tell what it is about.  And he certainly didn't indicate

23   he had any idea.  If he knows exactly what these different

24   studies were and what methodologies were applied and has some

25   expertise with respect to the methodologies that is a

1    different matter.  To say I found some report somewhere which

2    shows some variations, but I don't know what was being

3    measured by whom and under what circumstances, then it strikes

4    me under 403, it is certainly more prejudicial than probative.

5           MR. EKELAND:  Your Honor, if you are going to

6    disallow that report, we would note that that report is

7    referenced in Mr. Scholl's expert report.  And it should be

8    excluded from all of Mr. Scholl's testimony as well.

9           MS. PELKER:  That is fine.  I am not exactly sure

10   where it is referenced in his report.  But Mr. Scholl is

11   certainly not planning to testify to anything about it.  And

12   his analysis would stand on its own without any sort of

13   reliance on the report.

14          MR. EKELAND:  I refer the Court to paragraph 20 of

15   Dr. Cabanas' disclosure where he says he will explain the

16   scope of elicit asset transfers as documented by the financial

17   action task force study referenced by proffered government

18   expert Luke Scholl in his expert report.

19          THE COURT:  Okay.  I think the government said they

20   are not going to rely on that.

21          MR. EKELAND:  Okay.  So we will then just to get

22   clear, the government is not going to rely on anything from

23   the financial action task force study, referenced by

24   Mr. Scholl in his expert report and anything that is derived

25   from it in Mr. Scholl's expert report.  Am I understanding

1    that correctly, Your Honor?

2            THE COURT:  Well, if there is something that you

3    have in mind that was derived from that, I don't know what you

4    have in mind from that.

5            MR. EKELAND:  I would have to go look at his report

6    again.  That is our objection.  That is what we are asking for

7    is that everything that Mr. Scholl -- we are asking if that is

8    going to be excluded, we also ask that anything in

9    Mr. Scholl's report, that is based on that financial action

10   task force report that that testimony be excluded as well.

11           THE COURT:  So I think you have whatever

12   Ms. Pelker's representation was with respect to that.  With

13   respect to what I was saying, I wasn't saying that the FATF is

14   unreliable or that every single word that is in this report is

15   something that an expert could not possibly rely on.  I don't

16   know.  All I am telling you is the chart that Mr. Cabanas was

17   pointing to, I have looked at that chart.  And I can't tell

18   from that chart, what methodologies were being applied, what

19   entities were doing the measuring.  And I think that for that

20   reason that chart and his reliance on that chart, particularly

21   given the fact he has no independent experience or knowledge

22   or expertise in the field is more prejudicial than probative.

23   So I conclude that he can't rely on that report absent some

24   greater showing to me that he actually has greater

25   understanding of this than I understand that he does.

1          MR. EKELAND:  Your Honor, then we submit that I

2     think that is an issue in general with the whole FATF report.

3     And we then --

4          THE COURT:  You are welcome to reserve any arguments

5     you have.  And anyone who wants to rely on anything in that

6     report, make the same argument to me.  And my answer will be

7     all the same, if it is the same circumstances, it is the same

8     argument.  But I haven't sat here as we are sitting here and

9     read the entire report.  I don't know what any other expert

10    has cited to in this report.  And it may be that there are

11    portions of this report that are the type of thing that an

12    expert who actually has expertise in the relevant field could

13    rely on.  That is all I am saying.

14         MS. PELKER:  Your Honor, to the extent that it is

15    helpful, the FATF report referenced is that Mr. Scholl for his

16    report had a section that is definitions.  And he used the

17    definition of, quote, virtual asset, as the definition in the

18    FATF report.  We think that is appropriate.  But also,

19    Mr. Scholl has an independent basis for defining the term

20    virtual asset as synonymous with what is in the FATF report.

21         MR. EKELAND:  And we reserve our argument as to what

22    the Court said on the FATF.

23         THE COURT:  That is fine.

24         MR. EKELAND:  Another point, Your Honor.

25    Dr. Cabanas sits on the board of the Monero Policy Group.  And

1  Monero in part is a reaction to Chainalysis, so it is -- and

2  Chainalysis reactor and these kind of block chain tracing

3  software that people in the privacy community don't believe

4  in.  And so from that aspect, it is not like he doesn't have

5  any experience with Chainalysis or the block chain at all.

6          THE COURT:  My understanding is though that Monero

7  is not on a public block chain ledger in the same way that

8  Bitcoin is, in particular the transaction amounts are not

9  disclosed for Monero.  That is -- doesn't have anything to do

10  with tracing, other than the fact that you are taking away the

11  thing that is tracing, but it doesn't show any particular

12  knowledge or skill or expertise related to tracing.

13          MR. EKELAND:  In order for Monero to function, it

14  needs to know how the block chain tracers are working.  It is

15  not -- Monero is not going to function if Chainalysis Reactor

16  can see everything that it is doing.  So in that sense, I

17  think he does have expertise.

18          THE COURT:  You had him here for a Daubert hearing

19  and had the chance to ask him all of those questions.  And I

20  don't recall anything about any, you know, meaningful

21  expertise that he had developed while serving on Monero with

22  respect to block chain tracing and that he participated in a

23  study group by Monero to figure out how Chainalysis or other

24  block chain entities were working.  And they studied that for

25  six months, figured that out and engineered around that.  I

1    don't remember anything like that in his testimony.

2              MR. EKELAND:  I would have to go back and look at

3    his testimony, Your Honor.  We submit he does have, based on

4    his experience, the relevant expertise to testify on these

5    issues in court and particularly about systemic and random

6    error.  And we think that is important for the jury to

7    understand.  And as, you know, documented in his disclosure.

8              THE COURT:  I want to think a little bit harder

9    about whether he can just offer the abstract testimony and not

10   tying it to Chainalysis and Reactor, which as far as I can

11   tell he has no experience or knowledge of.  If he wants to

12   offer 10 minutes of testimony and say, I have studied

13   statistics and there are two types of error.  There is

14   systemic error and there is random error.  And systemic error

15   is when your model or your procedure has an error in it.  And

16   random error is the error that is introduced in the

17   application in some way.  Having large sample groups helps

18   with random error, but doesn't help with systemic error where

19   there is a problem with the model to start with.  That is

20   something I might be open to.  But as soon as he starts to

21   applying that to Chainalysis, I don't see any reason to think

22   he has any expertise in the field, other than the fact that he

23   has been quoted in the space.

24             MR. EKELAND:  Understood, Your Honor.  The defense

25   disagrees, but point taken.  And 55, we do offer him as a

1   rebuttal expert, should the government open the door.

2           THE COURT:  And I will -- I will get back to you all

3   on this question that I am leaving open and I will give you a

4   decision on that.  And I will also give the government a

5   chance to be heard on that too.  So 55 --

6           MR. EKELAND:  Is just the paragraph where we offer

7   him as a rebuttal expert.

8           THE COURT:  Well, I suppose.  I am curious as to

9   what both sides thinks.  It seems to me we ought to apply the

10  golden rule here as well to the extent to which we are

11  requiring disclosure of rebuttal witness or not with respect

12  to unanticipated testimony, I think.  The whole point of doing

13  the disclosures if you have reason to already anticipate the

14  testimony, you have to disclose it now.  If there is something

15  that you didn't anticipate, I suppose the answer is that both

16  sides reserve the rights to call experts to offer rebuttal

17  testimony.  But it would have to be something that was in

18  response to testimony that was not disclosed or otherwise

19  foreseeable at a time in which you made your disclosures.

20  Does that seem fair to both sides?

21          MR. EKELAND:  Yes, Your Honor.

22          MS. PELKER:  I think that is consistent with the

23  amendments to the rule as well.

24          THE COURT:  That is good fortune then.

25          MR. EKELAND:  Your Honor, I wanted to get clear, I

1    heard the Court say that you were going to issue an opinion

2    just on what the scope of the expert testimony is.

3              THE COURT:  I am working on a larger opinion.  I

4    have given you the rulings from the bench on a lot of this.

5    But I have not given you decisions from the bench on

6    everything related to the experts.  And I am working on an

7    opinion.  And what I am saying is, I think I have given you

8    now from the bench my conclusion that Dr. Cabanas is not an

9    expert in block chain chasing or Chainalysis or anything in

10   that field.

11             But to the extent that you want to offer him as just

12   a high level on statistics and error and to just offer general

13   testimony about the distinction between random error and

14   systemic error, but without tying it to Chainalysis or block

15   chain analysis, that is what I am going to address in the

16   opinion that is forthcoming.

17             MR. EKELAND:  We would like to offer him as an

18   expert in peer-to-peer transactions, which he has done.  I

19   believe that is on page 114 of his Daubert transcript, because

20   we do think it would be helpful.

21             THE COURT:  Do you want to point me to where in the

22   disclosure to what you are talking about?

23             MR. EKELAND:  I am getting a note based on his

24   transcript, his Daubert transcript on page 114.  I have to go

25   look through the disclosure.

1      THE COURT:  Why don't you take a minute to look at

2   the disclosures because I think that is really what we want to

3   stick to here.

4      MR. EKELAND:  I think that is -- let me finish

5   looking at this, but -- so I think it is touched on in a

6   number of points in his disclosure, particularly if you look

7   at paragraphs 14, 26 through 29, or particularly -- so 14 he

8   will explain the spacial and temporal proximity or the use of

9   the same or similar wallet software is not necessarily

10   indicative of common ownership.  I think he is talking about

11   peer-to-peer transfers there.  On paragraphs 26 through 29, he

12   will explain how public and private keys work on the block

13   chain.  He will explain how it is impossible to know for

14   certain who, if anyone, exercised direct control over the

15   keys.  28, he will explain how digital currency, like Bitcoin,

16   can be transferred off chain.  And 29, he will explain the

17   problems that off chain transfers of cryptocurrency calls for

18   block chain tracing forensics.  There I take that to mean he

19   is referring to peer to peer transfers.  And let me stop on

20   that.  And then I have one other thing I want to raise him as

21   an expert on.

22      THE COURT:  Okay.  Let me ask the government's view

23   with respect to this.

24      MS. PELKER:  I don't read any of those, Your Honor,

25   as disclosing him as an expert in peer-to-peer transfers.  And

1    I am not sure how defense gets to that.  We also don't believe

2    that he is an expert in peer-to-peer transfers.  The fact he

3    has done some peer-to-peer transfers doesn't make him an

4    expert in them.

5              THE COURT:  I suppose, frankly, that maybe the

6    better thing to do is just, if you want to call him as a fact

7    witness about what he has done and says, I have engaged in

8    transactions in the following ways on Bitcoin, maybe that is

9    okay.

10             MR. EKELAND:  We are happy to do that, Your Honor,

11   call him as a fact witness.

12             MS. PELKER:  Your Honor, the government is going to

13   have 401 and 403 concerns to the extent that defense is just

14   calling someone who has done some Bitcoin transactions to talk

15   about how Bitcoin transactions can potentially be done without

16   any sort of real grounding to any relevant fact in this case.

17             THE COURT:  Although, if they want to offer -- I

18   mean, I see your point.  And that you don't want to, like,

19   give rise to an unfair inference that they are all

20   transactions of that nature.  But if someone who has done

21   transactions wants to testify that I had a public and a

22   private key.  And, you know, I did this with my public key and

23   I did this with my private key and, you know, I didn't -- when

24   I was doing that transaction, I had no idea who was on the

25   other side of the transaction.  All I knew was there was a

1     public address.

2            MS. PELKER:  I think if it is truly fact testimony

3     about just transactions that he has specifically done, I think

4     our concern is just -- it is clear that defense is trying to

5     lead then into the expert testimony looking at item 29.  He

6     will explain the problems that off chain transfers of

7     cryptocurrency calls for block chain tracing forensics.

8            THE COURT:  I already wrote no in the margin next to

9     that in my version.  So I share your view on that and I think

10    that is crossing a line that I drew with respect to his area

11    of expertise, so we -- even practical experience.

12           I also have similar concerns with respect to 14.

13    And, again, if he wants to talk about and testify about his

14    experience and what he has done as somebody who was an early

15    and extensive user of Bitcoin, I suppose that is probably okay.

16    I will let you reserve your ability to object on 403 or 401

17    grounds at trial if it comes up.  But I suppose I don't see a

18    whole lot of harm on it, depending on how it is done.  And I

19    can see it being done in a way that is inappropriate and I can

20    see it being done in a way that is appropriate.

21           MS. PELKER:  Yes, Your Honor.  I think though that

22    the discussion of spatial and temporal proximity and whether

23    that is indicative of common ownership gets into a question of

24    block chain analysis.  And Dr. Cabanas testified and that is a

25    transcript of page 118, that he has not only never used

1   Chainalysis, but that he does not trace block chain

2   transactions as part of his work or function.

3          THE COURT:  Yeah.

4          MS. PELKER:  So we can testify to what he has done.

5   But anything about a spatial and temporal proximity analysis

6   would really be veering into the realm of expert testimony

7   that he would not be qualified to opine on.

8          THE COURT:  Okay.  I agree with that.

9          What was the other issue you wanted to raise?

10         MR. EKELAND:  This is on paragraph 41.

11         THE COURT:  That is what I thought you were going to

12  say.  So let me ask you this about that.  Tell me what it is

13  he is going to say?  So I can imagine a world where, for

14  example, the government sometimes will call experts on drug

15  gangs.  And the expert on the drug gang will say when they

16  say, you know, I want to buy 15 shirts that are 10 percent

17  acrylic, that everyone in the drug world understands that

18  means, 15 kilograms of heroin that is 10 percent pure.  And I

19  suppose the defense probably offers witnesses that do the

20  opposite.  Is that what you are talking about here?  Are

21  people talking in code in some way or what is it he is going

22  to be interpreting with respect to language that the

23  government attributes to Mr. Sterlingov on Bitcoin Talk?

24         MR. EKELAND:  Excuse me.  We anticipate of course,

25  that the government is going to attempt to introduce numerous

1    posts from somebody called Akemashite Omedetou, which they are

2    going to take the position is Mr. Sterlingov.  And it is -- so

3    the Bitcoin Talk forum is historically one of the main places

4    where conversations about Bitcoin happen.  There is my

5    understanding -- I am not an expert.  My understanding there

6    is lots of slang like you are saying, sort of -- I don't know

7    that it is in the gang context.  But I think it would be -- he

8    would be helpful for the jury in helping them understand since

9    he's been a user of it.

10            THE COURT:  Give me an example.  You have now

11   whatever posts the government intends to rely upon.  Give me

12   an example of an assertion which is ambiguous in how it would

13   be translated.

14            MR. EKELAND:  I'd have to go back and look.  I can't

15   give you one off the top of my head.

16            THE COURT:  I need that before I can make a

17   determination as to whether that is proper or not.

18            MR. EKELAND:  Understood.  But also they -- the

19   government will be putting stuff on.  And if we could notice

20   the Court if something is said that is ambiguous, I can't

21   think of something off the top of my head.  He could also

22   explain certain features of Bitcoin Talk like that you had to

23   pay for and how it functions and how you posted and what the

24   culture was.  I think it is relevant because not only is the

25   government alleging that Mr. Sterlingov is Akemashite

1    Omedetou, they are also saying he had another account on

2    Bitcoin Talk called Killdozer.

3                 I think it would be helpful to the jury to

4    understand, not only if there is any questions of ambiguity of

5    the language, but the culture.  Because I think part of what is

6    difficult here for the defense is that this is a very different

7    culture than maybe what members of the jury are involved in.

8    And so I think he has got that relevant experience to be

9    helpful to the jury.

10                THE COURT:  So what will he say about the culture?

11                MR. EKELAND:  That maybe people share accounts or

12   that there is a --

13                THE COURT:  I thought people didn't share accounts?

14   I thought that was the whole culture is this privacy and you

15   kept it to yourself.

16                MR. EKELAND:  I'm sorry.  What?

17                THE COURT:  I thought the whole culture was one of

18   privacy, in which you certainly kept your private keys to

19   yourself.  Are you talking about CoinJoin?

20                MR. EKELAND:  No, I'm sorry.  This is a chat forum.

21                THE COURT:  I thought you said people shared

22   accounts.

23                MR. EKELAND:  Chat forum accounts, because it is an

24   account you have to pay for.

25                THE COURT:  You don't have to pay for it, I thought

1    you said.

2            MR. EKELAND:  You have to pay for Bitcoin -- you

3    have -- for Bitcoin Talk, my understanding is you have to pay

4    them in Bitcoin in order to get the account.  And then it is a

5    forum for people to discuss Bitcoin.  It is not an -- it is

6    not exchange.  It is not like Mt. Gox or any of the other

7    exchanges, it is a forum with people.

8            THE COURT:  What does it cost to be able to post to

9    Bitcoin Talk?

10           MR. EKELAND:  I don't know what the rate is, but I

11   know there is a rate.

12           MS. PELKER:  Your Honor, Bitcoin Talk is a free

13   forum.  And Dr. Cabanas testified at the Daubert hearing that

14   he absolutely would not share his account credentials with

15   anyone else.  So part of me wants to say fine, the defense can

16   put that up if that is their defense.  But I don't think that

17   is doing the jury any sort of favors just listening to the

18   defense here.  I still have absolutely no idea what

19   Dr. Cabanas is going to say.  I don't think defense really

20   does either.  And it is clear that the disclosure is not

21   sufficient.

22           MR. EKELAND:  Well, for instance, there is phrases

23   like To the Moon, which is the name of Mr. Sterlingov's VPN

24   business.  There is --

25           THE COURT:  What about that phrase and what would

1    Dr. Cabanas know about the phrase?

2              MR. EKELAND:  To the Moon, that it is a common

3    expression for people in the Bitcoin community for people who

4    think that Bitcoin is going to rapidly appreciate, you know,

5    or hold --

6              THE COURT:  I guess I am not sure why that would

7    help the jury understand the facts of the case.  But --

8              MR. EKELAND:  I mean the VPN server in Romania, that

9    is what it is named.  That is the name of the business.

10              THE COURT:  No.  No.  I understand.  But the fact

11    somebody names their server or uses an identification of To

12    the Moon, okay, you know that person or that entity thinks

13    that Bitcoin is going to be up in value.  I don't know how

14    that helps the jury decide whether it was Mr. Sterlingov or

15    somebody else.

16              MR. EKELAND:  Well, I do think it would be helpful

17    for the jury to understand the culture so they don't think it

18    is some sort of mysterious, you know, criminal culture.

19    Because I think a lot of what is happening in this case is

20    that they are trying to appeal to people's fear of the dark

21    net or how exotic this is.  When what is happening in this

22    culture is very routine.  And the other thing -- my

23    understanding of Bitcoin Talk is you needed to -- you need to

24    build your account for months before you could even talk to

25    people.  So I don't think that it is even that simple of a

1   straightforward of a forum chat.  And I think it just would

2   be -- I don't think this has to be gigantic testimony.  I

3   think it would be helpful to give the central role of what we

4   expect the government to be asserting based on the Bitcoin

5   Talk forum, to have somebody who was actually a user of it

6   from early on actually discuss it a little bit and help the

7   jury understand it.

8           THE COURT:  I guess I am still struggling with what

9   it is he is going to say.  It is hard to make a determination

10  as to whether it has been adequately disclosed and whether it

11  is appropriate expert testimony.  And I also wonder whether

12  what you are really talking about once again is fact testimony

13  rather than expert testimony and whether he has actually

14  studied in some way these terms.  Or whether he can simply say

15  as a fact witness, you know, I was on Bitcoin Fog.  I'm sorry.

16  I was on Bitcoin Talk for years.  And everyone was named To

17  the Moon.  You know, it was virtually everyone who was

18  posting, that is what they were calling themselves.  That is

19  fact versus expert testimony.  If that is the sort of thing he

20  wants to say or --

21          MR. EKELAND:  We are happy to -- I think that can

22  come in as fact testimony.  And we are happy to approach it

23  that way without offering opinion, just saying this is my

24  experience of how it operated; this is, you know, what it was

25  like back then and he can --

```
1              THE COURT:  I guess I feel as though I am going to
2    need more of a proffer on this.  I think there is too much of
3    a risk that he is going to take the stand and say things that
4    either really are expert opinions that are beyond his ken or
5    there is no evidence that he studied it in any way or things
6    that were not properly disclosed.  So I need more of a proffer
7    from him as to precisely what he wanted to say about the
8    forum.
9              MR. EKELAND:  Understood.
10             THE COURT:  I think it was worth sitting here today.
11   There is disagreement among all of you as to how you got on --
12   even got onto it.  You think you had to pay and Ms. Pelker
13   said you didn't.  I don't know whether it is relevant or not.
14   But he didn't testify about any of this at the Daubert
15   hearing.
16             MR. EKELAND:  Okay.
17             THE COURT:  All right.  All right.  Should we talk
18   about scheduling?
19             MR. EKELAND:  Certainly, Your Honor.
20             THE COURT:  If you don't have anything else to
21   offer, I think the government wants to be heard on this again.
22             MR. BROWN:  Yes, Your Honor.  First of all, we did
23   check with the key witnesses that we could get in touch with.
24   The government has no immovable obstacles with either the
25   October trial date or February trial date.  So either one we
```

1    would be prepared to move forward with.  We would urge that we

2    get some lead time, because we -- there is a logistical

3    challenge.

4              THE COURT:  Right.

5              MR. BROWN:  We are very concerned that based on the

6    conversation this morning, not only are we not going to trial

7    in October, but we are not going to trial in February.

8    Because it seems like every time the Court tries to address a

9    certain issue with the experts with disclosure, you know, the

10   defense brings up ten new reasons why they can't possibly go

11   forward.  We would just ask that the defense go on record with

12   a specific filing listing the conflicts of -- if they are

13   claiming that their witnesses are not available in October, we

14   would like them to put that in writing -- put the individual

15   witnesses' conflicts in writing and when these plans were

16   made.  Because it seems like a lot of these are just very

17   convenient, witnesses saying that they happen to be busy.

18             As some point, Your Honor, we just have to go

19   forward.  We are also concerned with the fact that the

20   defense -- Mr. Ekeland seemed to be referencing that he may

21   have to seek out new experts if Ms. Still somehow doesn't work

22   out.  We should be in trial right now.  The time for the

23   defense to identify new experts and to make new disclosures has

24   long passed.  And the government is just extremely concerned

25   that if we set this out for trial in February, we will have new

1    expert disclosures from the defense.  We will have to have a

2    whole new round of Daubert hearings, arguments and have the

3    Court adjudicate those disputes.

4          And I think in the last hearing counsel for

5    Chainalysis mentioned that in litigation, if you set out

6    deadlines further out, it sort of expands like air.  And we are

7    profoundly concerned that the defense seems to be prepared to

8    raise just an endless parade of new complaints about access to

9    their client, access to discovery, getting this heuristics

10   discovery.  Now that they have it, there are all of the reasons

11   why they can't review it.  It just seems like there is one

12   thing after another.  And we are prepared to move forward with

13   trial.  And we believe that there is a public interest in

14   having a speedy trial for the defendant who asked for a speedy

15   trial, who asked for a trial before February.

16          THE COURT:  So I do want to note for the record in

17   light of the fact that you raised this, that I do think the

18   circumstances that we are in today are a product of the

19   defense's failure to comply with its obligations and failure

20   to, quite frankly, to listen to the Court and directions from

21   the Court.  And it was all of the way back in June where I

22   said that I was sympathetic to the interest in obtaining the

23   code or further information that could help the defense

24   understand exactly how the program or how Reactor worked.  And

25   I said, you need to move fast on this and you need to find an

1   expert.  We need a statement from an expert explaining what it

2   is they need to look at.  And I repeated that over the course

3   of the summer.  And I made clear over the course of the summer

4   that there was a need -- there would be a need to sign a

5   protective order.  Mr. Ekeland himself acknowledged, of

6   course, he wouldn't imagine a world in which he wouldn't have

7   to sign a protective order.  I think it was obvious that that

8   was an essential element of this request.

9           Then when Chainalysis agreed to provide the

10  information that it provided, which I should say I actually

11  think is more helpful to the defense than the source code would

12  have been.  Because reading the source code and then trying to

13  work backwards to what it is that Chainalysis provided would

14  have been additional work where, quite frankly, I don't see any

15  evidence that the defense actually had an expert who was

16  capable of doing that type of analysis with the source code and

17  working back to what the heuristics were.  But what Chainalysis

18  provided to the defense was something that didn't exist, so

19  there was no disclosure obligation with respect to that.  They

20  created something and they created something to address the

21  defense's request for the source code, where all along I have

22  been clear that we need an expert, we need somebody who could

23  explain what it was they were looking for, why they needed it

24  and who would be prepared to enter into an appropriate

25  protective order.

1          And as a result of that, and it was completely clear

2     all along that when Chainalysis volunteered to do this, to

3     actually I think make things more transparent than it would

4     have been with the source code, to the defense, and to create a

5     new document that didn't exist, in essence to do some of the

6     work for defense in that regard, it was completely clear beyond

7     any doubt there would be a need for a protective order in the

8     case.

9          I don't know what happened and why CipherTrace didn't

10    raise concerns until after the disclosure was made and we were

11    on the eve of trial in the case.  But in any event, either

12    someone had had a change of heart about the case and what they

13    wanted to do in the case or they weren't kept up to speed by

14    the defense as to what the defense had represented to the Court

15    the defense understood would be necessary in the case.  And so

16    that is what got us to this point anyway.  And I do think that

17    the fault for all of that lies with the defense.

18         But the reason that I have been perhaps more lenient

19    than I should be and perhaps my leniency is being taken

20    advantage of a little bit, but I do want to ensure that

21    Mr. Sterlingov gets a fair trial and that he is in a position

22    in which he -- his lawyers can put on the best possible defense

23    in this case.  And that is the reason I bent over backwards to

24    provide him with additional information and additional time.

25    He then requested just a few week continuance.  And it was only

1   because the Court then said, well, I don't have time because I

2   have trial that I am rolling into.  And if we have to do a

3   continuance, it is going to push the case back to February.  It

4   was only in light of that that Mr. Sterlingov then took the

5   night to think about it and I think perhaps somewhat unhappily

6   made the choice and said, okay, well, if it is a choice between

7   going now or going in February, I will go in February.  That is

8   the choice I make.  And I asked him clearly about that.  And he

9   said that he had considered it and discussed it with his

10  lawyers and made the choice.

11          It was clear to me that his preference was still to

12  go in a few weeks.  So I thought he was going to be happy when

13  my trial calendar opened up in a way that would allow me to try

14  the case in October.  And I really to this day have not

15  received a very good explanation for why the defense wants to

16  push the case back to February.  The defense said that none of

17  the experts were available.  And then as soon as I asked about

18  that, it turned out that just wasn't, in fact, true.  There may

19  be some experts who had some conflicts, but I don't know

20  precisely.  It was a misrepresentation to say none of the

21  experts were available.  Because as soon as Mr. Ekeland read me

22  the responses they received, it was clear that some of them

23  were and they might have particular days just like anyone would

24  where they couldn't make it.  But I think that was an

25  overstatement.  And I also, as you know all too well now,

1     remained puzzled by CipherTrace's response to this and why

2     CipherTrace is taking steps to try and expedite our ability to

3     get to trial to get the information.

4           So I just put that on the record as to how we got

5     here today.  It is not necessarily indicative of what I am

6     going to rule with respect to scheduling.  I do think for

7     purposes of the record, it is important to do that.  And I do

8     think if I do decide to postpone the case to February, that

9     would be cast in stone.  And everyone has to understand that I

10     am not moving the case if we do that, short of the most

11     extraordinary of circumstances.  By that I mean is, you know,

12     the essential counsel in the case becoming gravely ill or

13     something like that.  But other than that, it is not moving if

14     I move it.

15           MR. BROWN:  Yes, Your Honor.  I would just add that

16     CipherTrace has enjoyed a lot of publicity, let's say, from

17     the defense filings that have been covered by a particularly

18     sympathetic crypto press that has sort of presented a

19     one-sided view of the CipherTrace criticism of Chainalysis.

20     So it is particularly rich for CipherTrace now to be unwilling

21     to stand behind its expert and come before the Court and

22     justify why they can no longer participate in this process.

23           THE COURT:  Right.  And final thing I will say is

24     that, you know, I have -- I have also -- talking about bending

25     over backwards for the defense have extended and extended the

1   deadline for expert reports.  And Ms. Still only came in as an

2   expert because the Court agreed to extend the deadline because

3   the defense -- his prior expert didn't work out for defense.

4   It is obviously the defense responsibility to properly vet its

5   experts and to make sure they have experts who can testify and

6   can withstand cross-examination and are willing to do what

7   they need to do to testify in a case.  But I have repeatedly

8   now provided extensions to the defense.  And the deadlines

9   remain what they are at this point in the process.  And either

10  side or anyone is free to file a motion with me if they need

11  changes to that.  But given the history in this case, I am

12  just cautioning anyone who might want to seek to adjust the

13  deadlines further in this case that they are going to need a

14  particularly compelling reason to do so.  Because the Court

15  has already granted extension after extension.

16          And I do share your concern, Mr. Brown, that, quite

17  frankly, if I continue to say yes at every turn that this case

18  is just not going to go to trial.  And it is going to be a

19  never-ending game.  And there is going to come a time in which

20  the Court just has to say, I'm sorry, I have given you every

21  break I possibly can and that is the end of it and we are

22  moving forward.  I am not saying that I would deny a properly

23  supported motion.  But I am saying though it is a tough

24  standard at this point.  And I will hold folks to it.  I am not

25  going to say fine without making the appropriate showing.  And

1   also convincing me that it will not interfere with our going to

2   trial in February.  So if that is what I decide to do here, we

3   are going and there will be no more excuses.

4           MR. BROWN:  Yes, Your Honor.

5           THE COURT:  Mr. Ekeland.

6           MR. EKELAND:  Yes.  So I just got an email back from

7   Daniel Torres asking me if I am free to do a call later.  I

8   emailed him back saying I was in Court and I would reach out

9   to him as soon as I got out.  So I will --

10          THE COURT:  Why don't we go ahead and take a break.

11  Why don't you come back and tell us what he says.  And then I

12  will make a decision about the continuance request.

13          MR. EKELAND:  I think he was -- he has another

14  lawyer on and was asking me if I could send a dial in later

15  for a conference call.

16          THE COURT:  Why don't you see if you can set a dial

17  in for 3:30.

18          MR. EKELAND:  Okay.  I am happy to ask him.  And

19  then I also have -- so on Friday when the Court suggested

20  maybe we needed a continuance to look at the stuff.  And then

21  Mr. Sterlingov said, okay, well, you know, reluctantly I want

22  to go for February.  And if we can get something earlier.  We

23  hadn't had an opportunity to check with all of our experts

24  with the schedule.  As the Court instructed over the lunch

25  break, I got details as much as I could on people's schedules.

1    So I --

2              THE COURT:  So why don't we -- I would like you to

3    walk me through that.  I also want you to send this email to

4    Mr. Torres.  And so maybe the thing to do is take a break now,

5    let you send that email to Mr. Torres and come back and I'd

6    like you to put on the record exactly what the conflicts are

7    and also represent to me that they are available in February.

8              MR. EKELAND:  Certainly, Your Honor.  And I think I

9    can -- well, let me double check, but I think I can make that.

10   But in terms of sending an email to Mr. Torres so I am clear

11   on what the Court would like me to ask him to do.  Do you want

12   me to ask him to dial into this court at 3:30 or should I ask

13   him if is he free for a call right now and --

14             THE COURT:  If he has offered to talk to you, why

15   don't you start with that and see where things stand.

16             MR. EKELAND:  So I will see if I can get him on the

17   phone at 3:30 and see if I can talk to him.  What time should

18   we come back, Your Honor?

19             THE COURT:  You probably only needs 10 minutes or so

20   to -- take a 15-minute break and come back at 20 of.

21             MR. EKELAND:  Okay.  Thank you.

22             (Recess taken at 3:25 p.m.)

23             THE COURT:  Just one more thing I wanted to add for

24   clarifying the record is I think that Mr. Ekeland a number of

25   times referred to the Court suggesting a continuance last

1  week, earlier this week.  And just to be clear, I didn't

2  suggest a continuance.  I asked the defense whether the

3  defense was asking for a continuance.  The defense said,

4  absolutely not.  I said, make sure you confer with your

5  client.  The defense came back and said, well, we are not

6  asking for a continuance, but we want to reserve our right to

7  argue on appeal that we didn't have enough time to prepare.  I

8  said, you don't get it both ways.  You have to do one or the

9  other.  The defense conferred further and the defense came

10  back and requested the continuance, so I just wanted to make

11  sure the record was clear on that.

12         All right.  Mr. Ekeland, what do you have to update

13  us to?

14         MR. EKELAND:  So I just got off the phone with

15  Daniel Hoffman and Brooke Pietrzak.  Mr. Hoffman I think is a

16  product lawyer at Mastercard.  And Ms. Pietrzak is from the

17  litigation department.  They are contacting their outside

18  counsel which they are happy to have talk with the Court.

19  They asked if that could be done on this Thursday.  I said I

20  would ask the Court --

21         THE COURT:  On Thursday?

22         MR. EKELAND:  Yes.

23         THE COURT:  I think we can probably arrange that.

24  What time?

25         MR. EKELAND:  They are I think open all day.  I

1    didn't ask.

2              THE COURT:  So you have a time that works.  Are you

3    requesting that we do this live or by Zoom.  How do want to do

4    that?

5              MR. EKELAND:  I told them it would be by Zoom.

6              THE COURT:  I will leave that up to you.

7              MR. EKELAND:  I think they would probably prefer

8    Zoom.  I will double check and email the Court back.

9              THE COURT:  Is that okay with you, Mr. Sterlingov,

10   by Zoom?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Okay.

13             MR. EKELAND:  And, Your Honor, just for the record,

14   I don't know what outside counsel and -- outside counsel might

15   want to appear live.

16             THE COURT:  That is fine.  If you want to change it

17   to in person, that is fine with me as well.

18             So I think Mr. Sterlingov is at facility where they

19   don't do Zoom.  So I think we need to have at least all of us

20   here in person and then if counsel for Mastercard wants to

21   appear by Zoom, I don't have an objection as long as that is

22   okay by Mr. Sterlingov.

23             MR. EKELAND:  Okay.  That was my assumption, Your

24   Honor, we would be here in person.

25             THE COURT:  So what time should we do this?  I am

1       turning to the deputy clerk.

2                THE COURTROOM DEPUTY:  At 10:00 a.m., Your Honor.

3       Are they local?

4                MR. EKELAND:  I think they are in Miami, but I don't

5       know where their outside counsel is.  I am going to find out

6       tonight.

7                THE COURT:  Let's put it down for 10:00 a.m.  If

8       they want to move to change it, they can.

9                All right.  And then you want to give me the summary

10      of the availability of each of your witnesses for both October

11      and February?

12               MR. EKELAND:  Sure.  I am told Ms. Still -- and

13      Mr. Hassard has more information.  Ms. Still is available in

14      February.  I have her October and November scheduling.

15               THE COURT:  What is that?

16               MR. EKELAND:  October 2nd to 3rd, she is doing

17      counterterrorism finance training in Brussels.  October 7th

18      through 11th, she is in Latvia I am assuming doing some kind

19      of law enforcement training.  October 9th through the 23rd, it

20      says she is doing an MIIS prep.  I don't know what the MIIS

21      stands for.  October 10th, the 11th, there is some overlap

22      here with Latvia.  She is doing an Interpol training in

23      Erlangen, Germany.  So I guess the October 9th through the

24      23rd is the prep that she is doing while she is doing these

25      other trainings.  October 12th through the 18th, she is

1   scheduled to be in Athens and Cypress.  October 17th through

2   the 18th, it says CTCE.  I don't know what that stands for.

3   October 18th through the 23rd, she is in Dubai -- Dubai,

4   Mastercard.  October 23rd, it just said MIIS semester begins

5   prep from October 9th.  October 24th through the 25th, she is

6   in Barcelona.  October 26th through 28th is says Europool.

7   October 30th from November 4th she is scheduled to be in Hong

8   Kong.  And November it says November 4th through the 10th she

9   is scheduled to be in Belgrade.  Sometime in -- it looks like

10  there is an overlap here around the 9th or the 10th she has

11  got India with a question mark.  November 13th through the

12  17th, she is back in Dubai.  November 20th through 24th, it

13  just says CEPOL.  That is C-E-P-O-L.  And then it says

14  November 27th to December 2nd, Europool.  And then she just

15  has some notes here that just said London workshop, TBD,

16  November, December.  And then Cambridge, TBD, November,

17  December.  And she just also just said that the 4th quarter is

18  the busiest quarter of their year.

19              THE COURT:  What about February?

20              MR. EKELAND:  I'm sorry.  What?

21              February she has told us she is available.

22              THE COURT:  March?

23              MR. EKELAND:  Do we know about March?

24              We will check on March.

25              THE COURT:  It is not clear to me you are going to

1    be to the defense case before the end of February.

2              MR. HASSARD:  We got the dates for February.

3              MR. EKELAND:  We will check on March right now.

4              THE COURT:  While you are checking on that, I have

5    to say, I don't understand how she thought she could have

6    testified at trial.  Because you wouldn't have gotten to the

7    defense case October 2nd anyway with the prior trial calendar.

8    And she is unavailable through all of October.  So it sounds

9    like she either made plans before I made a decision about

10   actually changing the trial, because I indicated the February

11   date was just tentative.  But she couldn't have testified at

12   trial given this schedule.

13             MR. EKELAND:  I don't know -- she sent this today,

14   so she may have based on the Court order I think on Friday or

15   was that over the weekend with the setting the February trial

16   date, I don't know.  I would have to ask her about that.

17             MR. BROWN:  Your Honor, I mean, number 1, yes, we

18   would have been in trial in early October.  But also any of

19   these business trips anyone else from CipherTrace can do a

20   training, can attend a conference.  These are not events where

21   she personally needs to attend.  If this case is important to

22   her, then she should make time for this case.  If she is the

23   expert witness for Mr. Sterlingov, then she should make time

24   for Mr. Sterlingov for this case.

25             THE COURT:  Yeah.  I don't know with the schedule

1    also how she is going to do analysis that she wants to do as

2    well.  So you are checking, Mr. Hassard, about March?

3              MR. HASSARD:  I just sent a message.

4              THE COURT:  All right.  Next witness.

5              MR. EKELAND:  Let me find -- I am trying to find

6    Mr. Fischbach.  Mr. Fischbach is in trial in Kansas from

7    October 16th to November 10th.  And then he says he has

8    another trial in California the following --

9              THE COURT:  What does that mean?

10             What does that mean?  He is someone who does forensic

11   analysis.  Is he sitting through the entire trial?

12             MR. EKELAND:  Yeah, he generally does, because he

13   often testifies as a rebuttal witness.  And he also works as a

14   consult.  He has a very, very busy schedule.  I think the

15   trial in Kansas City is ST v. Chandler, C-H-A-N-D-L-E-R.  And

16   he says it has been on deck for a couple of years.  And he is

17   generally very busy.  And then he says after November 10, he

18   has got another trial in California the following week.  And

19   that he is still -- you know, he is doing his pretrial work.

20   And, you know, October for the Kansas City, Missouri case.

21             MR. BROWN:  Your Honor, this morning, Mr. Fischbach

22   was in trial in Missouri and this afternoon he is in trial in

23   Kansas City.

24             MR. EKELAND:  It is Kansas City, Missouri, I think

25   is what the reference is to, which I think borders both

```
1    states.
2              THE COURT:  What is his availability in February?
3    In March?
4              MR. HASSARD:  He is available in February.  The only
5    serious conflict he has is on February 23rd, but he can work
6    around it.  As for March, I am waiting to hear back.  I sent
7    that message out.
8              THE COURT:  All right.  I don't think there is much
9    point having this conversation unless we know what the
10   availability of the witness is in March, because if we start
11   on February 12th, we are probably not going to start the
12   defense case until March.
13             MR. EKELAND:  We did -- in our rush, we just asked
14   people -- we said the trial date would start potentially
15   February 12th and asked people's available in February.  So we
16   can ask them all for March and just get back to the Court on
17   that.
18             THE COURT:  Why don't I do this?  Why don't I direct
19   that you file a written statement with the availability of all
20   of your witnesses in October and early November, and in
21   February and through mid March, mid February through mid March
22   with specificity about their availability.  And I will direct
23   that you file that by 5:00 p.m. tomorrow, because I have to
24   schedule my other case that you were all sitting in on
25   Wednesday.  And so they need to know whether they are going in
```

1   October or not.

2           All right.  Anything else for today?

3           MR. EKELAND:  If we -- can we address other issues

4   on Thursday or is the -- the defense would just to like

5   discuss some stuff that may be need to be discussed under seal

6   and just in relation to the government's noticed witnesses

7   that we just think might be better to have a conversation with

8   before trial.

9           THE COURT:  We can do that today.  If we need to

10  seal the courtroom, we can do so.

11          MR. EKELAND:  Okay.

12          THE COURT:  Let me say, why don't we save that for

13  last?  Is there anything else or is that the only issue you

14  want to raise?

15          MR. EKELAND:  I think we -- do we still have some

16  outstanding motions in limine on -- I think on some 404(b)

17  stuff; right?  I think there is an outstanding motion in

18  limine.

19          MR. BROWN:  Your Honor, we are happy to address

20  Mr. Ekeland's -- if this is a new thing that he wants to bring

21  up.  There is one outstanding -- the government's 404(b)

22  notice, which was fully briefed up.

23          THE COURT:  Yeah.

24          MR. BROWN:  And we can address that now or later.

25  But, again, it is a 404(b) notice.

1          THE COURT:  I read that some time ago.  I haven't

2    reread it in the past couple of days, but I did read that

3    previously.

4          We don't we go ahead and put that one off, so I can

5    refresh my recollection and read it again before we take that

6    one up.  And we can take that on Thursday.  Okay.  Anything

7    else then, other than the matter we need to seal the courtroom

8    for.

9          MR. EKELAND:  I don't think so.  Let me just double

10   check, Your Honor.

11         No.  I think besides the 404(b) and the witnesses, I

12   think that is it for the moment.

13         THE COURT:  Okay.  Let's go ahead and seal the

14   courtroom.

15         (Proceedings sealed by order of Judge Moss.)

16

17

18

19

20

21

22

23

24

25

















1 ██████████  ████

2 ██████████  ████████████████

3 ██████████  ████

4       (End of sealed proceedings.)

5       THE COURT:  So we are now back on the public record.

6       All right.  Go ahead.

7       MR. EKELAND:  So the government witness -- noticed

8 some witnesses that we have potential 702 concern on.  And we

9 are not -- I am hedging a little bit because I want to make

10 sure I didn't -- that the research is correct.  But there is a

11 Sarah Krulikowski who we believe is an economist at

12 Georgetown.  And a Sergi Miroff who is a professor as far as

13 we can tell of cryptography.

14       MR. BROWN:  Your Honor, these are translators.

15       MR. EKELAND:  They are translators.  So they are

16 coming in --

17       MR. BROWN:  If Mr. Ekeland had mentioned this to us,

18 we could have told him.

19       MR. EKELAND:  So that is going down.  And then that

20 solved that question.  And then Alexandra Comolli and Steven

21 Santell?

22       MR. BROWN:  Your Honor, this just seems like --

23       THE COURT:  Not the best use of the Court's time.

24       What's that?

25       MR. BROWN:  Your Honor, this seems like pretrial

1    discovery Mr. Ekeland is just asking for --

2            MR. EKELAND:  I just don't recognize them as any

3    fact witness, so I am concerned.  I just want to make sure

4    that we deal with this now.

5            THE COURT:  I will make it clear, if they were not

6    noticed as expert witnesses, they cannot offer expert

7    testimony.

8            MR. EKELAND:  All right.

9            THE COURT:  Anything else then?

10           MR. EKELAND:  No, that is it, Your Honor.

11           THE COURT:  All right.  I will see you all back here

12   on Thursday then.

13           THE COURTROOM DEPUTY:  All rise.

14           (Proceedings concluded at 4:31 p.m.)

1

2                    C E R T I F I C A T E

3

4          I, SHERRY LINDSAY, Official Court Reporter, certify

5     that the foregoing constitutes a true and correct transcript of

6     the record of proceedings in the above-entitled matter.

7

8

9

10

11                           Dated this 24th day of October, 2023.

12

13                           _____
                              Sherry Lindsay, RPR
14                            Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

**MR. BROWN: [56]**   3/4 3/9 3/14
3/21 4/1 4/14 4/18 5/16 5/19 6/1
6/21 7/4 7/12 7/21 7/24 8/6 8/18
9/2 11/4 11/7 11/19 15/13 15/25
16/2 16/6 16/17 17/3 17/8 17/12
17/22 18/10 19/3 19/8 19/15 20/4
21/6 21/8 21/10 52/22 53/5 58/15
60/4 66/17 67/21 69/19 69/24
70/16 70/21 73/1 73/22 76/9 79/3
79/14 79/17 79/22 79/25
**MR. EKELAND: [111]**
**MR. HASSARD: [3]**   66/2 67/3 68/4
**MS. PELKER: [12]**   26/20 27/20
29/4 36/9 38/14 41/22 43/24 44/12
45/2 45/21 46/4 49/12
**THE COURT: [166]**
**THE COURTROOM DEPUTY: [2]**   64/2
80/13
**THE DEFENDANT: [1]**   63/11

**$**

**$90,000 [1]**   10/17

**.**

**.5 [1]**   35/16

**1**

**10 [3]**   40/12 61/19 67/17
**10 percent [2]**   46/16 46/18
**100 percent [1]**   28/5
**10005 [1]**   2/5
**10:00 a.m [2]**   64/2 64/7
**10th [4]**   64/21 65/8 65/10 67/7
**114 [2]**   42/19 42/24
**118 [1]**   45/25
**11th [2]**   64/18 64/21
**12.7 [2]**   35/13 35/15
**124-5 [2]**   3/12 12/13
**12th [3]**   64/25 68/11 68/15
**1301 [1]**   1/20
**13th [1]**   65/11
**14 [3]**   43/7 43/7 45/12
**145-1 [3]**   23/8 23/16 30/21
**15 [1]**   46/16
**15 kilograms [1]**   46/18
**15-minute [1]**   61/20
**16 [1]**   11/23
**16th [1]**   67/7
**17th [2]**   65/1 65/12
**18 [1]**   1/5
**18th [3]**   64/25 65/2 65/3
**1:49 [1]**   1/6
**1EuDR [1]**   17/13

**2**

**20 [3]**   30/24 36/14 61/20
**20001 [1]**   2/10
**20005 [1]**   1/20
**2013 [1]**   8/13
**2016 [1]**   34/22
**2017 [2]**   8/15 10/3
**2018 [1]**   8/16
**2020 [1]**   34/22
**2023 [2]**   1/5 81/11
**20530 [2]**   1/14 1/17
**20th [1]**   65/12
**21-399 [1]**   1/4
**23rd [5]**   64/19 64/24 65/3 65/4
68/5
**24th [3]**   65/5 65/12 81/11
**25th [1]**   65/5
**26 [2]**   43/7 43/11
**26th [1]**   65/6
**27 [1]**   34/23
**27th [1]**   65/14
**28 [1]**   43/15
**28th [1]**   65/6
**29 [4]**   43/7 43/11 43/16 45/5
**2nd [3]**   64/16 65/14 66/7

**3**

**30 [1]**   2/4
**30th [1]**   65/7
**333 [1]**   2/9
**399 [1]**   1/4
**3:25 [1]**   61/22
**3:30 [3]**   60/17 61/12 61/17
**3rd [1]**   64/16

**4**

**401 [2]**   44/13 45/16
**403 [3]**   36/4 44/13 45/16
**404 [4]**   69/16 69/21 69/25 70/11
**41 [1]**   46/10
**4:31 [1]**   80/14
**4th [3]**   65/7 65/8 65/17

**5**

**5.1527 [1]**   1/16
**55 [2]**   40/25 41/5
**5:00 p.m [1]**   68/23

**6**

**601 [1]**   1/16
**6710 [1]**   2/9
**6th [1]**   13/23

**7**

**702 [1]**   79/8
**7th [1]**   64/17

**8**

**8th [1]**   2/5

**9**

**950 [1]**   1/13
**9th [4]**   64/19 64/23 65/5 65/10

**A**

**a.m [2]**   64/2 64/7
**ability [3]**   16/7 45/16 58/2
**able [15]**   6/17 6/25 10/1 10/5
10/11 10/18 10/21 10/25 16/13
17/14 18/14 29/14 31/23 34/1 49/8
**about [70]**   3/21 3/22 3/22 4/2
7/18 10/21 13/14 14/9 16/3 16/14
18/4 18/24 19/24 22/20 23/22 25/5
25/11 28/24 28/24 31/16 31/16
31/17 32/11 32/12 32/13 32/14
33/14 33/24 34/1 34/19 34/24
35/12 35/22 36/11 39/20 40/5 40/9
42/13 42/22 43/10 44/7 44/15 45/3
45/13 45/13 46/5 46/12 46/20 47/4
48/10 48/19 49/25 50/1 51/12 52/7
52/14 52/18 54/8 56/12 57/5 57/8
57/17 58/24 60/12 65/19 65/23
66/9 66/16 67/2 68/22
**above [1]**   81/6
**above-entitled [1]**   81/6
**absent [2]**   20/3 37/23
**absolute [1]**   26/18
**absolutely [3]**   49/14 49/18 62/4
**abstract [2]**   32/11 40/9
**access [2]**   54/8 54/9
**according [1]**   10/1
**account [31]**   5/9 5/24 5/25 6/2
6/9 6/9 6/22 7/22 7/25 8/1 8/2
9/4 9/8 9/13 9/14 9/15 9/18 10/9
11/3 11/5 13/16 13/18 13/25 15/16
17/24 18/18 48/1 48/24 49/4 49/14
50/24
**accountant [2]**   16/21 18/19
**accounting [9]**   10/2 14/2 14/3
18/11 18/12 18/15 18/25 27/1 27/1
**accounts [39]**   4/23 4/23 4/25 5/20
5/23 6/3 6/4 6/6 6/7 7/1 7/5 7/10
8/3 8/9 8/12 8/14 8/20 8/21 8/21
8/22 8/23 8/25 9/4 9/5 9/6 9/9
12/20 12/21 12/22 48/11 48/13
48/22 48/23

**anniversary [1]**   47/25
**acknowledged [1]**   55/5
**across [2]**   4/22 28/8
**acrylic [1]**   46/17
**action [5]**   1/3 34/16 36/17 36/23
37/9
**activity [1]**   5/13 7/5 7/7
**actual [1]**   19/4
**actually [12]**   5/24 20/5 35/15
37/24 38/12 51/5 51/6 51/13 55/10
55/15 56/3 66/10
**add [3]**   15/19 58/15 61/23
**additional [3]**   55/14 56/24 56/24
**address [15]**   4/7 6/15 10/25 11/13
11/15 17/13 17/14 17/17 42/15
45/1 53/8 55/20 69/3 69/19 69/24
**addresses [7]**   6/13 6/14 9/19
16/10 21/17 27/3 33/5
**adequately [1]**   51/10
**adjudicate [1]**   54/3
**adjust [1]**   59/12
**adjusted [3]**   9/13 9/18 9/25
**adjustments [2]**   14/1 14/2
**admittedly [1]**   20/22
**advanced [1]**   16/8
**advantage [1]**   56/20
**after [4]**   54/12 56/10 59/15 67/17
**afternoon [1]**   1/7 67/22
**again [8]**   14/23 19/5 37/6 45/13
51/12 52/21 69/25 70/5
**age [1]**   25/1
**ago [2]**   24/2 70/1
**agree [2]**   14/20 46/8
**agreed [3]**   13/21 55/9 59/2
**ahead [8]**   23/3 27/24 32/19 33/1
60/10 70/4 70/13 79/6
**air [1]**   54/6
**Akemashite [2]**   47/1 47/25
**Alexandra [1]**   79/20
**algorithm [3]**   26/21 26/22 27/7
**algorithms [1]**   31/4
**all [52]**   3/2 4/12 6/22 7/3 9/1
11/6 11/20 15/22 20/7 21/3 21/7
23/1 23/3 26/8 27/4 32/15 36/8
37/16 38/7 38/13 39/5 39/19 41/2
44/19 44/25 52/11 52/17 52/17
52/22 54/10 54/21 55/21 56/2
56/17 57/25 60/23 62/12 62/25
63/19 64/9 66/8 67/4 68/8 68/16
68/19 68/24 69/2 79/6 80/8 80/11
80/11 80/13
**alleged [1]**   12/3
**alleging [1]**   47/25
**allow [5]**   20/21 21/13 21/18 35/19
57/13
**allowed [1]**   32/10
**along [2]**   55/21 56/2
**already [5]**   9/14 21/3 41/13 45/8
59/15
**also [32]**   3/15 8/11 10/14 10/21
15/5 15/19 15/20 19/21 26/4 26/11
28/8 34/25 37/8 38/18 41/4 44/1
45/12 47/18 47/21 48/1 51/11
53/19 57/25 58/24 60/1 60/19 61/3
61/7 65/17 66/18 67/1 67/13
**Although [1]**   44/17
**am [61]**   15/5 20/14 20/19 20/21
20/25 21/1 21/4 21/13 21/18 21/21
21/36 23/23 24/10 24/25 25/1
27/25 28/1 28/18 29/5 29/17 30/8
32/14 32/15 34/7 35/10 35/19
35/21 36/9 36/25 37/16 38/13 41/3
41/8 42/3 42/6 42/7 42/15 42/23
44/1 47/5 50/6 51/8 52/1 57/2
58/5 58/10 59/11 59/22 59/23
59/24 60/7 60/18 61/10 63/25 64/5
64/12 64/18 67/5 68/6 79/9 80/3
**ambiguity [1]**   48/4
**ambiguous [2]**   47/12 47/20
**amendments [1]**   41/23
**AMERICA [3]**   1/3 17/25 18/1

**A**

among [1]   52/11
amount [4]   9/7 13/18 13/19 27/17
amounts [2]   8/10 39/8
analogous [1]   26/25
analysis [30]   3/23 4/11 8/19 9/2
10/25 11/8 15/12 17/18 20/14
21/14 25/25 26/2 26/24 30/3 30/20
31/1 31/4 31/17 31/20 31/24 32/5
34/12 34/15 36/12 42/15 45/24
46/5 55/16 67/1 67/11
analytic [1]   16/21
analyzed [1]   5/21
another [10]   9/4 9/8 17/5 21/19
38/24 48/1 54/12 60/13 67/8 67/18
answer [2]   38/6 41/15
answering [1]   25/10
anticipate [3]   41/13 41/15 46/24
any [40]   4/13 15/1 15/3 21/18
22/1 22/17 23/24 24/1 25/15 25/16
25/18 25/25 29/10 31/20 32/8
32/15 33/20 34/9 35/23 36/12 38/4
38/9 39/5 39/11 39/20 40/21 40/22
43/24 44/16 44/16 48/4 49/6 49/17
52/5 52/14 55/14 56/7 56/11 66/18
80/2
anybody [1]   24/15
anyone [11]   24/17 24/25 25/3
25/20 38/5 43/14 49/15 57/23
59/10 59/12 66/19
anything [28]   11/18 21/7 22/2
22/18 24/11 31/15 31/17 32/11
32/12 32/12 32/14 34/24 35/6
36/11 36/22 36/24 37/8 38/5 39/9
39/20 40/1 42/9 46/5 52/20 69/2
69/13 70/6 80/9
anyway [2]   56/16 66/7
appeal [2]   50/20 62/7
appear [5]   9/21 9/24 15/10 63/15
63/21
APPEARANCES [3]   1/11 1/22 2/1
appeared [3]   9/23 11/9 11/10
appears [1]   14/17
applicable [1]   28/8
application [3]   18/2 19/17 40/17
applied [7]   22/25 29/18 31/12
34/25 35/16 35/24 37/18
apply [4]   20/23 26/21 26/21 41/9
applying [4]   19/2 24/11 35/13
40/21
appreciate [1]   50/4
approach [2]   3/6 51/22
appropriate [5]   38/18 45/20 51/11
55/24 59/25
are [126]
area [3]   18/14 24/13 45/10
areas [1]   24/4
argue [3]   19/24 33/14 62/7
argued [1]   32/4
arguendo [1]   14/6
arguing [1]   13/22
argument [5]   3/15 12/25 38/6 38/8
38/21
arguments [2]   38/4 54/2
arose [1]   9/6
around [4]   25/1 39/25 65/10 68/6
arrange [1]   62/23
arrive [1]   31/5
as [122]
ask [17]   13/10 26/15 30/5 34/19
37/8 39/19 43/22 46/12 53/11
60/18 61/11 61/12 61/12 62/20
63/1 66/16 68/16
asked [9]   13/13 54/14 54/15 57/8
57/17 62/2 62/19 68/13 68/15
asking [8]   22/23 37/6 37/7 60/7
60/14 62/3 62/6 80/1
aspect [1]   39/4
asserted [1]   25/23
asserting [1]   51/4
assertion [1]   47/12

asset [3]   36/16 38/17 38/20
assets [2]   38/18 41/13
assuming [2]   14/6 64/18
assumption [1]   63/23
assumptions [1]   27/13
assure [1]   21/23
astronomy [1]   31/1
Athens [1]   65/1
attached [1]   16/22
attempt [2]   24/20 46/25
attend [2]   66/20 66/21
attributable [2]   6/5 6/12
attribute [1]   17/2
attributed [1]   7/1
attributes [1]   46/23
attribution [4]   17/10 21/18 21/20
27/8
August [1]   15/25
availability [5]   64/10 68/2 68/10
68/19 68/22
available [11]   10/4 22/12 22/20
53/13 57/17 57/21 61/7 64/13
65/21 68/4 68/15
Ave [2]   1/13 1/20
Avenue [1]   2/9
away [2]   20/22 39/10

**B**

back [27]   9/17 19/6 21/12 22/14
22/16 40/2 41/2 47/14 51/25 54/21
55/17 57/3 57/16 60/6 60/8 60/11
61/5 61/18 61/20 62/5 62/10 63/8
65/12 68/6 68/16 79/5 80/11
backwards [3]   55/13 56/23 58/25
balance [2]   8/19 8/23
bank [17]   6/8 10/8 10/9 10/9
10/12 10/14 10/23 11/1 11/2 11/5
13/16 13/17 13/17 15/15 17/25
18/1 18/18
Bankruptcy [1]   2/8
banks [2]   4/25 12/22
Barcelona [1]   65/6
based [15]   18/16 18/17 19/10
21/14 26/16 26/17 28/18 34/18
34/20 37/9 40/3 42/23 51/4 53/5
66/14
bases [1]   15/3
basis [9]   8/15 11/1 12/5 13/6
13/11 14/15 15/22 19/8 38/19
be [95]
bearing [1]   34/9
became [1]   10/4
because [30]   6/7 24/19 27/2 28/3
30/8 34/5 34/14 35/5 42/19 43/2
47/24 48/5 48/23 50/19 53/2 53/8
53/16 55/12 57/1 57/1 57/21 59/2
59/2 59/14 66/6 66/10 67/12 68/8
68/23 79/9
becomes [1]   33/14
becoming [1]   58/12
been [22]   13/15 14/10 14/18 24/15
24/24 25/7 25/9 34/12 34/2 34/5
34/7 40/23 47/9 51/10 55/12 55/14
55/22 56/4 56/18 58/17 66/18
67/16
before [10]   1/9 23/7 47/16 50/24
54/15 58/21 66/1 66/9 69/8 70/5
beginning [2]   25/8 25/9
begins [1]   65/4
behind [1]   58/21
being [22]   4/3 4/4 4/4 12/2 12/3
13/9 13/9 15/11 15/11 16/12 17/9
17/14 19/22 19/23 19/23 20/7 30/2
36/2 37/18 45/19 45/20 56/19
Belgrade [1]   65/9
believe [14]   6/22 13/22 13/25
14/18 15/25 25/5 28/15 31/3 35/18
39/3 42/19 44/1 54/13 79/11
believes [1]   26/13
bench [3]   42/4 42/5 42/8
bending [1]   58/24
bent [1]   56/23

besides [3]   24/17 24/17 70/11
best [1]   69/23
bet [1]   30/8
better [2]   44/6 69/7
between [8]   9/9 10/19 24/9 25/12
33/24 34/22 42/13 57/6
beyond [2]   52/4 56/6
bias [4]   23/20 31/2 34/12 34/12
big [3]   23/23 35/3 35/4
biggest [1]   23/22
Bisbee [7]   25/15 28/13 29/11
29/13 29/14 34/3 34/5
Bisbee's [3]   28/2 29/5 33/3
bit [11]   3/11 20/10 21/11 21/15
24/12 27/5 27/23 40/8 51/6 56/20
79/9
Bitcoin [79]   3/16 7/4 7/9 7/16
8/1 8/4 8/9 8/10 8/11 8/11 8/13
8/15 8/19 8/23 8/24 9/3 9/5 9/7
9/10 9/12 10/9 10/14 11/11 11/13
11/13 11/15 11/15 11/16 13/24
14/18 14/19 14/22 16/10 16/12
16/18 17/1 17/2 17/10 18/13 21/18
21/20 23/21 24/1 24/3 24/8 24/18
25/4 25/5 25/8 25/13 32/13 34/1
34/8 34/13 34/22 39/8 43/15 44/8
44/14 44/15 45/15 46/23 47/3 47/4
47/22 48/2 49/2 49/3 49/4 49/5
49/9 49/12 50/3 50/4 50/13 50/23
51/4 51/15 51/16
Bitcoins [3]   4/9 9/22 9/25
BitPay [3]   6/7 6/7 6/8
black [1]   29/9
block [19]   16/9 16/20 17/15 17/18
26/24 32/7 39/2 39/5 39/7 39/14
39/22 39/24 42/9 42/14 43/12
43/18 45/7 45/24 46/1
blue [1]   17/13
board [2]   28/8 38/25
borders [1]   67/25
both [14]   8/9 8/24 18/17 20/15
21/5 21/23 23/19 25/24 41/9 41/15
41/20 62/8 64/10 67/25
bottom [4]   3/11 9/19 14/17 21/5
box [2]   14/12 29/10
break [5]   59/21 60/10 60/25 61/4
61/20
briefed [1]   69/22
bring [1]   69/20
bringing [1]   28/20
brings [1]   53/10
BRODIE [1]   1/15
broken [5]   7/16 8/3 8/12 10/10
16/19
Brooke [1]   62/15
Brooklyn [1]   2/5
BROWN [7]   1/15 11/24 13/25 14/11
15/5 23/1 59/16
Brussels [1]   64/17
BTCE [1]   10/3
build [1]   50/24
busiest [1]   65/18
business [3]   49/24 50/9 66/19
busy [3]   53/17 67/14 67/17
buy [1]   46/16
buying [1]   34/8

**C**

C-E-P-O-L [1]   65/13
C-H-A-N-D-L-E-R [1]   67/15
Cabanas [20]   21/25 23/4 23/4
23/12 23/18 23/23 24/14 24/1 28/6
28/21 29/18 30/16 32/20 37/16
38/25 42/8 45/24 49/13 49/19 50/1
Cabanas' [1]   36/15
Cabanas's [1]   33/8
calculation [2]   19/4 19/6
calendar [2]   57/13 66/7
California [2]   67/8 67/18
call [9]   4/7 20/14 41/16 44/6
44/11 46/14 60/7 60/15 61/13
called [4]   22/7 22/12 47/1 48/2

**C**

calling [2]  44/14 51/18
calls [2]  43/17 45/7
Cambridge [1]  65/16
came [4]  8/1 59/1 62/5 62/9
can [71]  3/9 6/15 8/13 13/10
16/11 16/14 17/1 17/4 17/4 17/6
17/9 19/13 19/22 19/24 20/4 21/23
23/13 26/2 26/4 26/14 27/7 27/8
27/9 29/18 29/24 30/14 31/19
31/20 31/22 32/9 32/18 32/22
34/21 39/16 40/9 40/10 43/16
44/15 45/19 45/19 46/4 46/13
47/16 49/15 51/14 51/21 51/25
56/22 58/22 59/5 59/6 59/21 60/16
60/22 61/9 61/9 61/16 61/17 62/23
64/8 66/19 66/20 68/5 68/16 69/3
69/9 69/10 69/24 70/4 70/6 79/13
can't [8]  20/11 35/22 37/17 37/23
47/14 47/20 53/10 54/11
cannot [2]  25/25 80/6
capable [1]  55/16
car [1]  24/24
cards [2]  10/16 10/18
cars [2]  25/2 25/2
case [30]  4/7 20/3 24/19 44/16
50/7 50/19 56/8 56/11 56/12 56/13
56/15 56/23 57/3 57/14 57/16 58/8
58/10 58/12 59/7 59/11 59/13
59/17 66/1 66/7 66/21 66/22 66/24
67/20 68/12 68/24
cash [1]  5/7
cast [1]  58/9
category [1]  6/6
CATHERINE [1]  1/12
cautioning [1]  59/12
Ccips [1]  1/19
central [1]  51/3
CEPOL [1]  65/13
certain [8]  6/11 9/20 10/24 11/8
17/2 43/14 47/22 53/9
certainly [10]  4/1 20/4 23/24
29/10 35/22 36/4 36/11 48/18
52/19 61/8
certainty [2]  26/18 27/16
certify [1]  81/4
chain [22]  16/9 16/20 17/15 17/18
26/24 32/7 39/2 39/5 39/7 39/14
39/22 39/24 42/9 42/15 43/13
43/16 43/17 43/18 45/6 45/7 45/24
46/1
Chainalysis [29]  16/20 23/21
24/11 25/22 25/23 26/5 29/25 30/2
31/19 32/11 33/4 33/15 35/3 39/1
39/2 39/5 39/15 39/23 40/10 40/21
42/9 42/14 46/1 54/5 55/9 55/13
55/17 56/2 58/19
Chainalysis' [1]  25/13
challenge [1]  53/3
chance [2]  39/19 41/5
Chandler [1]  67/15
change [3]  56/12 63/16 64/8
changes [1]  59/11
changing [1]  66/10
chart [15]  5/15 7/14 8/6 8/18
9/12 12/3 13/4 13/19 14/4 14/17
37/16 37/17 37/18 37/20 37/20
charts [8]  3/6 5/18 5/20 9/5 12/6
13/9 15/20 18/5
chasing [1]  42/9
chat [3]  48/20 48/23 51/1
check [5]  22/4 22/4 52/23 60/23
61/9 63/8 65/24 66/3 70/10
checking [2]  66/4 67/2
chemistry [1]  30/25
choice [5]  34/4 57/6 57/6 57/8
57/10
CHRISTOPHER [1]  1/15
CipherTrace [9]  22/3 22/19 35/2
56/9 58/2 58/16 58/19 58/20 66/19
CipherTrace's [1]  58/1

circle [1]  25/7
circumstance [1]  21/6
circumstances [4]  36/3 38/7 54/18
58/11
cited [1]  38/10
Citibank [2]  17/25 17/25
City [4]  67/15 67/20 67/23 67/24
claim [1]  26/5
claiming [1]  53/13
clarify [4]  8/20 26/2 33/8 33/16
clarifying [1]  61/24
clear [20]  4/5 13/3 13/8 15/1
20/13 36/22 41/25 45/4 49/20 55/3
55/22 56/1 56/6 57/11 57/22 61/10
62/1 62/1 65/25 80/5
clearly [1]  57/8
clerk [1]  64/1
clever [1]  34/4
click [2]  16/9 17/19
client [2]  54/9 62/5
cluster [1]  17/10 33/6
clustering [4]  25/13 26/16 32/21
32/23
code [9]  31/10 31/14 46/21 54/23
55/11 55/12 55/16 55/21 56/4
CoinJoin [1]  48/19
collection [1]  7/5
COLUMBIA [1]  1/1
column [1]  14/17
come [10]  17/16 21/12 24/22 51/22
58/21 59/19 60/11 61/5 61/18
61/20
comes [3]  12/7 20/24 45/17
coming [3]  9/5 28/23 79/16
common [8]  16/5 16/5 18/7 18/7
19/25 43/10 45/23 50/2
commonly [2]  18/20 19/20
communications [2]  4/20 5/10
community [2]  39/3 50/3
Comolli [1]  79/20
compared [2]  5/7 10/13
compelling [1]  59/14
competence [2]  18/14 18/21
complaints [1]  54/8
completely [4]  11/14 35/9 56/1
56/6
comply [1]  54/19
computer [1]  11/9
concern [13]  14/5 14/11 20/16
22/13 22/24 23/22 23/23 24/13
28/20 28/24 45/4 59/16 79/8
concerned [5]  53/5 53/19 53/24
54/7 80/3
concerns [4]  22/15 44/13 45/12
56/10
conclude [1]  37/23
concluded [1]  80/14
conclusion [1]  42/8
conclusions [1]  26/14
confer [1]  62/4
conference [3]  1/9 60/15 66/20
conferred [1]  62/9
confirmations [1]  5/10
conflict [1]  68/5
conflicts [4]  53/12 53/15 57/19
61/6
confusion [2]  28/3 28/24
connection [1]  6/20
considered [1]  57/9
consistency [1]  4/8
consistent [3]  4/3 4/4 41/22
consistently [1]  19/2
constitutes [1]  81/5
Constitution [1]  2/9
consult [1]  67/14
contacting [1]  62/17
contained [1]  5/11
context [2]  18/13 47/7
continuance [9]  56/25 57/3 60/12
60/20 61/25 62/2 62/3 62/6 62/10
continue [1]  59/17
CONTINUED [2]  1/22 2/1

continues [1]  3/17
continuing [1]  45/15 43/14
controlled [2]  9/18 13/25
convenient [1]  53/17
conversation [3]  53/6 68/9 69/7
conversations [1]  47/4
convinced [1]  23/24
convincing [1]  60/1
copies [1]  3/6
core [1]  18/14
correct [2]  79/10 81/5
correctly [3]  25/6 30/23 37/1
correlate [1]  11/10
cost [1]  49/8
could [19]  4/15 7/21 16/9 31/16
33/23 35/1 37/15 38/12 47/19
47/21 50/24 52/23 54/23 55/22
60/14 60/25 62/19 66/5 79/18
couldn't [2]  57/24 66/11
counsel [9]  29/12 29/12 54/4
58/12 62/18 63/14 63/14 63/20
64/5
counted [1]  9/14
counter [1]  27/16
counterterrorism [1]  64/17
counting [2]  9/12 9/16
couple [3]  9/22 67/16 70/2
course [4]  46/24 55/2 55/3 55/6
court [38]  1/1 2/7 2/8 4/5 4/15
8/20 11/24 14/21 25/24 33/11
36/14 38/22 40/5 42/1 47/20 53/8
54/3 54/20 54/21 56/14 57/1 58/21
59/2 59/14 59/20 60/8 60/19 60/24
61/11 61/12 61/25 62/18 62/20
63/8 66/14 68/16 81/4 81/14
Court's [5]  3/5 22/13 22/15 22/24
79/23
courtroom [3]  69/10 70/7 70/14
Courts [1]  2/8
covered [1]  58/17
covers [1]  24/12
create [1]  56/4
created [2]  55/20 55/20
credentials [1]  49/14
criminal [3]  1/3 11/23 50/18
critical [1]  23/18
criticism [1]  58/19
criticize [1]  18/24
CRM [1]  1/18
cross [5]  29/7 29/12 30/6 35/17
59/6
cross-examination [3]  29/7 29/12
59/6
crossing [1]  45/10
crucial [1]  30/15
crypto [3]  24/15 34/3 58/18
cryptocurrencies [2]  28/9 28/10
cryptocurrency [8]  4/24 5/3 5/5
12/21 15/16 24/7 41/17 45/7
cryptography [1]  79/13
CTCE [1]  65/2
culture [9]  47/24 48/5 48/7 48/10
48/14 48/17 50/17 50/18 50/22
curious [1]  41/8
currency [2]  4/24 43/15
currently [1]  24/2
customer [2]  18/16 18/16
customers [4]  11/11 11/12 11/14
14/13
cybercrimes [1]  16/22
Cypress [1]  65/1

**D**

danger [1]  9/11
Daniel [2]  60/7 62/15
dark [2]  4/3 50/20
data [2]  9/20 31/22
date [6]  17/16 52/25 52/25 66/11
66/16 68/14
Dated [1]  81/11
dates [1]  66/2
Daubert [7]  26/9 39/18 42/19

**D**

Daubert... **[4]** 42/24 49/13 52/14 54/2
day **[3]** 57/14 62/25 81/11
days **[2]** 57/23 70/2
DC **[5]** 1/5 1/14 1/17 1/20 2/10
deadline **[2]** 59/1 59/2
deadlines **[3]** 54/6 59/8 59/13
deal **[2]** 23/25 80/4
debit **[2]** 10/16 10/17
December **[3]** 65/14 65/16 65/17
December 2nd **[1]** 65/14
decide **[3]** 50/14 58/8 60/2
decision **[3]** 41/4 60/12 66/9
decisions **[1]** 42/5
deck **[1]** 67/16
declarations **[1]** 28/2
defendant **[3]** 1/7 2/3 54/14
defendant's **[1]** 5/11
defense **[62]** 3/7 3/15 4/2 4/6 4/7 11/21 15/1 18/24 20/12 20/24 21/3 29/2 29/12 29/12 29/19 29/22 30/3 40/24 44/1 44/13 45/4 46/19 48/6 49/15 49/16 49/18 49/19 53/10 53/11 53/20 53/23 54/1 54/7 54/23 55/11 55/15 55/18 56/4 56/6 56/14 56/14 56/15 56/17 56/22 57/15 57/16 58/17 58/25 59/3 59/3 59/4 59/8 62/2 62/3 62/3 62/5 62/9 62/9 66/1 66/7 68/12 69/4
defense's **[3]** 29/6 54/19 55/21
defining **[1]** 38/19
definition **[2]** 38/17 38/17
definitions **[2]** 19/13 38/16
delta **[1]** 10/19
delve **[1]** 17/4
denominated **[1]** 8/10
denoted **[1]** 7/8
deny **[1]** 59/22
department **[2]** 1/13 62/17
depending **[2]** 29/9 45/18
deposit **[2]** 8/2 8/2
deposited **[3]** 8/12 8/14 8/15
deposits **[3]** 5/4 11/2 13/18
Dept **[1]** 1/19
deputy **[1]** 64/1
derived **[2]** 36/24 37/3
described **[1]** 3/23
description **[1]** 31/14
detail **[2]** 10/10 12/2
detailed **[4]** 5/9 12/9 31/12 31/14
details **[2]** 11/8 60/25
determination **[2]** 47/17 51/9
determinations **[1]** 27/8
determine **[1]** 27/7
deterministic **[15]** 25/24 26/6 26/13 26/17 26/20 26/23 27/6 27/12 27/23 28/1 28/19 28/25 29/8 33/4 33/13
developed **[1]** 39/21
dial **[3]** 60/14 60/16 61/12
did **[11]** 10/1 13/6 15/24 19/4 24/11 28/13 44/22 44/23 52/22 68/13 70/2
didn't **[17]** 30/22 31/15 31/17 35/22 41/15 44/23 48/13 52/13 52/14 55/18 56/5 56/9 59/3 62/1 62/7 63/1 79/10
difference **[4]** 24/9 25/11 35/3 35/5
differences **[1]** 33/24
different **[9]** 4/8 29/15 29/15 29/17 29/19 30/13 35/23 36/1 48/6
difficult **[3]** 33/14 48/6
digital **[1]** 43/15
direct **[5]** 4/9 29/10 43/14 68/18 68/22
directions **[1]** 54/20
disagreement **[1]** 52/11
disagrees **[1]** 40/25
disallow **[1]** 36/6

discerning **[1]** 15/17
disclose **[1]** 41/24
disclosed **[13]** 14/14 18/6 18/10 18/22 19/4 19/5 19/8 20/22 20/23 39/9 41/18 51/10 52/6
disclosing **[1]** 43/25
disclosure **[21]** 3/11 11/22 12/9 12/13 13/1 13/8 14/24 15/6 16/19 16/25 23/7 36/15 40/7 41/11 42/22 42/25 43/6 43/9 43/20 53/9 55/19 56/10
disclosures **[7]** 16/24 20/12 41/13 41/19 43/2 53/23 54/1
discourse **[1]** 25/8
discovery **[4]** 15/25 54/9 54/10 80/1
discuss **[5]** 10/11 22/18 49/5 51/6 69/5
discussed **[2]** 57/9 69/5
discussion **[4]** 3/10 4/2 4/6 45/22
discussions **[1]** 25/5
disparate **[1]** 29/8
displays **[1]** 8/6
disputes **[1]** 54/3
distinction **[1]** 42/13
DISTRICT **[4]** 1/1 1/1 1/10 2/8
do **[60]** 3/2 4/12 5/14 5/17 15/15 15/15 21/21 21/25 22/17 23/11 30/6 31/23 32/16 34/13 34/15 39/9 40/25 42/20 42/21 44/6 44/10 46/19 50/16 54/16 54/17 56/2 56/5 56/13 56/16 56/20 57/2 58/6 58/7 58/7 58/8 58/10 59/6 59/7 59/14 59/16 60/2 60/7 61/4 61/11 61/11 62/8 62/12 63/3 63/3 63/3 63/19 63/25 65/23 66/19 67/1 67/1 68/18 69/9 69/10 69/15
docket **[2]** 23/8 23/16
document **[5]** 12/13 23/15 30/21 35/18 56/5
documented **[2]** 36/16 40/7
does **[17]** 4/6 15/9 16/17 16/23 24/6 32/24 37/25 39/17 40/3 41/20 46/1 49/8 49/20 67/9 67/10 67/10 67/12
does have **[1]** 16/17
doesn't **[10]** 11/22 34/24 35/6 35/11 39/4 39/9 39/11 40/18 44/3 53/21
doing **[16]** 34/24 35/11 35/16 37/19 39/16 41/12 44/24 49/17 55/16 64/16 64/18 64/20 64/22 64/24 64/24 67/19
DOJ **[2]** 1/15 1/18
DOJ-CRM **[1]** 1/18
DOJ-USAO **[1]** 1/15
dollar **[1]** 8/15 8/24 9/6
don't **[80]** 3/17 12/24 14/18 15/1 17/5 19/10 20/9 21/1 21/2 22/1 23/3 25/15 25/18 25/18 26/7 26/8 27/10 29/10 30/7 31/9 31/10 32/1 32/3 32/11 32/12 32/12 32/14 34/9 34/14 36/2 37/3 37/15 38/9 39/3 39/20 40/1 40/21 43/1 43/24 44/1 44/18 45/17 47/6 48/25 49/10 49/16 49/19 50/13 50/17 50/25 51/2 52/13 52/20 55/14 56/9 57/1 57/19 60/10 60/11 60/16 61/2 61/15 62/8 63/14 63/19 63/21 64/4 64/20 65/2 66/5 66/13 66/16 66/25 68/8 68/18 68/19 69/12 70/4 70/9 80/2
done **[16]** 25/18 29/16 31/19 42/18 44/3 44/7 44/14 44/15 44/20 45/3 45/14 45/18 45/19 45/20 46/4 62/19
door **[2]** 4/6 41/1
double **[5]** 9/11 9/16 61/9 63/8 70/9
doubt **[1]** 56/7
down **[5]** 10/3 10/10 12/16 64/7 79/19
dozen **[1]** 30/9

Dr. **[19]** 23/4 23/12 23/18 23/23 29/1 29/18 30/16 32/20 33/8 36/15 38/25 42/8 45/24 49/13 49/19 50/1
Dr. Cabanas **[17]** 23/4 23/12 23/18 23/23 24/14 26/1 28/6 28/21 29/18 30/16 32/20 38/25 42/8 45/24 49/13 49/19 50/1
Dr. Cabanas' **[1]** 36/15
Dr. Cabanas's **[1]** 33/8
drawn **[2]** 20/17 26/14
drew **[1]** 45/10
driving **[2]** 24/24 25/2
drug **[3]** 46/14 46/15 46/17
Dubai **[3]** 65/3 65/3 65/12
during **[1]** 22/9

**E**

each **[6]** 6/14 7/1 8/9 27/5 27/22 64/10
earlier **[3]** 13/15 60/22 62/1
early **[6]** 4/4 8/13 45/14 51/6 66/18 68/20
ECF **[1]** 3/12
economist **[1]** 79/11
effectiveness **[1]** 33/15
either **[15]** 6/2 6/13 6/23 6/25 8/1 13/8 25/17 29/19 49/20 52/4 52/24 52/25 56/11 59/9 66/9
EKELAND **[14]** 2/3 2/4 11/20 16/4 22/1 27/6 53/20 55/5 57/21 60/5 61/24 62/12 79/17 80/1
Ekeland's **[2]** 18/4 69/20
electronics **[1]** 5/11
element **[1]** 55/8
elicit **[3]** 3/18 29/10 36/16
else **[13]** 11/18 21/7 24/25 25/3 30/1 49/15 50/15 52/20 66/19 69/2 69/13 70/7 80/9
else's **[1]** 25/21
email **[9]** 6/13 6/14 6/14 22/4 60/6 61/3 61/5 61/10 63/8
emailed **[1]** 60/8
emails **[2]** 5/11 22/14
emerging **[1]** 35/8
end **[4]** 21/15 59/21 66/1 79/4
endeavor **[1]** 26/4
ending **[1]** 59/19
endless **[1]** 54/8
enforcement **[1]** 64/19
engaged **[2]** 34/7 44/7
engaging **[1]** 18/15
engineered **[1]** 39/25
enjoyed **[1]** 58/16
enough **[2]** 15/4 62/7
ensure **[1]** 56/20
enter **[1]** 55/24
entire **[3]** 14/4 38/9 67/11
entirely **[1]** 30/23
entities **[2]** 37/19 39/24
entitled **[1]** 81/6
entity **[2]** 33/5 50/12
entries **[1]** 6/11
entry **[1]** 6/11
envelope **[1]** 19/6
equally **[1]** 20/25
equivalent **[1]** 8/24
Erlangen **[1]** 64/23
error **[41]** 23/19 23/20 24/10 24/10 25/12 25/12 25/25 26/2 26/4 28/7 29/24 30/3 30/13 30/14 30/15 30/15 31/20 31/22 32/17 32/22 32/24 33/10 33/17 33/25 33/25 34/12 34/16 34/17 40/6 40/13 40/14 40/14 40/14 40/15 40/16 40/16 40/18 40/18 42/12 42/13 42/14
errors **[5]** 30/20 31/2 31/2 32/6 32/6
escapes **[1]** 22/8
essence **[1]** 56/5
essential **[2]** 55/8 58/12

**E**

**essentially [5]** 3/22 7/8 7/12
17/23 18/2
**estate [1]** 24/4
**Europool [2]** 65/6 65/14
**eve [1]** 56/11
**even [13]** 13/3 19/9 21/3 24/9
25/2 28/17 29/18 32/4 33/25 45/11
50/24 50/25 52/12
**event [1]** 56/11
**events [1]** 66/20
**ever [3]** 15/23 19/5 26/9
**every [6]** 13/10 27/12 37/14 53/8
59/17 59/20
**everybody [1]** 16/24
**everyone [5]** 26/8 46/17 51/16
51/17 58/9
**everyone's [1]** 25/1
**everything [5]** 21/2 30/1 37/7
39/16 42/6
**evidence [5]** 12/7 13/15 14/6 52/5
55/15
**exact [1]** 29/6
**exactly [8]** 7/1 7/22 20/12 31/15
35/23 36/9 54/24 61/6
**examination [3]** 29/7 29/12 59/6
**example [6]** 6/18 7/20 13/23 46/14
47/10 47/12
**Excel [1]** 15/21
**except [1]** 19/6
**exchange [2]** 7/17 49/6
**exchanges [5]** 4/24 7/16 7/20
12/21 49/7
**excluded [1]** 36/8 37/8 37/10
**excuse [4]** 8/8 29/22 32/13 46/24
**excuses [1]** 60/3
**exercise [1]** 18/15
**exercised [1]** 43/14
**exist [2]** 55/18 56/5
**exotic [1]** 50/21
**expands [1]** 54/6
**expect [2]** 19/19 51/4
**expected [1]** 4/18
**expedite [1]** 58/2
**expenditures [7]** 5/6 10/7 10/13
10/13 10/14 10/20 10/24
**experience [17]** 16/21 18/11 18/12
19/10 19/14 19/16 19/18 25/17
30/24 37/21 39/5 40/4 40/11 45/11
45/14 48/8 51/24
**experienced [1]** 28/9
**experimental [1]** 30/25
**expert [64]** 12/5 13/2 14/19 16/15
16/25 17/4 17/5 17/7 17/9 17/20
18/2 18/3 18/6 18/11 19/9 19/13
19/17 20/10 20/11 25/2 28/7 30/16
30/18 30/19 32/5 34/10 34/11 36/7
36/18 36/18 36/24 36/25 37/15
38/9 38/12 41/1 41/7 42/2 42/9
42/18 43/21 43/25 44/2 44/4 45/5
46/6 46/15 47/5 51/11 51/13 51/19
52/4 54/1 55/1 55/1 55/15 55/22
58/21 59/1 59/2 59/3 66/23 80/6
80/6
**expertise [18]** 16/18 16/18 18/18
23/24 23/25 24/10 24/23 32/7
33/21 35/25 37/22 38/12 39/12
39/17 39/21 40/4 40/22 45/11
**experts [14]** 21/4 25/14 41/16
42/6 46/14 53/9 53/21 53/23 57/17
57/19 57/21 59/5 59/5 60/23
**explain [4]** 22/7 1/1 10/1 12/19
29/14 32/21 36/15 43/8 43/12
43/13 43/15 43/16 45/6 47/22
55/23
**explained [2]** 22/13 22/13
**explaining [2]** 22/15 55/1
**explanation [2]** 20/3 57/15
**explorer [3]** 16/10 17/15 17/19
**expressing [2]** 22/24 25/19
**expression [1]** 50/3

**expressly [1]** 20/23
**extend [1]** 20/18
**extended [2]** 58/25 58/25
**extension [2]** 59/15 59/15
**extensions [1]** 59/8
**extensive [1]** 45/15
**extent [9]** 4/1 4/5 10/22 16/23
21/16 38/14 41/10 42/11 44/13
**extraordinary [1]** 58/11
**extremely [1]** 53/24

**F**

**facility [1]** 63/18
**fact [24]** 12/24 14/5 16/11 17/21
17/23 24/1 30/2 37/21 39/10 40/22
44/2 44/6 44/11 44/16 45/2 50/10
51/12 51/15 51/19 51/22 53/19
54/17 57/18 80/3
**facts [3]** 12/7 20/18 50/7
**factual [4]** 3/22 12/6 18/2 21/16
**factually [1]** 20/5
**failure [2]** 54/19 54/19
**fair [3]** 15/4 41/20 56/21
**fairly [1]** 23/23
**fake [1]** 11/17
**far [5]** 17/6 32/9 34/21 40/10
79/12
**fast [1]** 54/25
**FATF [6]** 37/13 38/2 38/15 38/18
38/20 38/22
**fault [1]** 56/17
**favors [1]** 50/20
**fear [1]** 50/20
**features [1]** 47/22
**February [28]** 52/25 53/7 53/25
54/15 57/3 57/7 57/7 57/16 58/8
60/2 60/22 61/7 64/11 64/14 65/19
65/21 66/1 66/2 66/10 66/15 68/2
68/4 68/5 68/11 68/15 68/15 68/21
68/21
**February 12th [2]** 68/11 68/15
**February 23rd [1]** 68/5
**Federal [1]** 11/23
**feel [2]** 13/1 52/1
**few [2]** 56/25 57/12
**field [7]** 6/13 24/6 33/21 37/22
38/12 40/22 42/10
**fields [4]** 24/5 25/16 25/18 30/25
**figure [1]** 39/23
**figured [1]** 39/25
**figures [1]** 24/19
**file [3]** 59/10 68/19 68/23
**filing [1]** 53/12
**filings [1]** 58/17
**final [3]** 11/7 18/5 58/23
**finance [1]** 64/17
**financial [21]** 3/22 4/10 4/19
4/25 5/2 5/12 5/21 10/15 10/16
12/1 12/22 13/5 13/12 15/3 15/8
15/10 15/14 34/16 36/16 36/23
37/9
**find [4]** 54/25 64/5 67/5 67/5
**findings [5]** 5/1 11/25 13/3 13/4
15/7
**fine [7]** 16/14 36/9 38/23 49/15
59/25 63/16 63/17
**finish [1]** 43/4
**first [5]** 3/3 5/19 18/7 26/8
52/22
**Fischbach [3]** 67/6 67/6 67/21
**five [2]** 20/6 21/21
**Floor [1]** 2/5
**flow [3]** 4/22 5/7 12/19
**focused [1]** 10/7
**Fog [11]** 11/15 11/16 14/18 16/12
17/1 17/2 17/10 21/18 21/20 23/21
51/15
**folks [1]** 59/24
**following [4]** 29/17 44/8 67/8
67/18
**force [4]** 34/16 36/17 36/23 37/10
**foregoing [1]** 81/5

**forensic [15]** 10/2 14/3 14/16
14/25 15/18 15/19 15/19 15/19
18/25 20/14 21/14 26/25 27/1 35/8
67/10
**forensics [5]** 13/12 20/13 26/11
43/18 45/7
**foreseeable [1]** 41/19
**form [1]** 31/4
**forms [1]** 15/22
**formulate [1]** 3/19
**forth [1]** 5/8
**forthcoming [1]** 42/16
**fortune [1]** 41/24
**forum [12]** 24/18 25/4 25/5 47/3
48/20 48/23 49/5 49/7 49/13 51/1
51/5 52/8
**forward [6]** 30/2 53/1 53/11 53/19
54/12 59/22
**found [4]** 11/9 26/19 35/21 36/1
**foundation [4]** 6/16 13/14 14/7
16/7
**frankly [5]** 31/13 44/5 54/20
55/14 59/17
**free [4]** 49/12 59/10 60/7 61/13
**Friday [2]** 60/19 66/14
**front [5]** 4/17 20/9 21/2 23/14
34/20
**fully [3]** 12/3 12/4 69/22
**function [3]** 39/13 39/15 46/2
**functions [1]** 47/23
**fundamental [1]** 25/7
**funds [4]** 4/22 12/20 17/2
**further [6]** 22/1 22/2 54/6 54/23
59/13 62/9

**G**

**game [1]** 59/19
**gander [1]** 19/1
**gang [2]** 46/15 47/7
**gangs [1]** 46/15
**gave [1]** 18/5
**Geiger [1]** 27/16
**general [4]** 14/10 32/16 38/2
42/12
**generally [2]** 67/12 67/17
**generated [3]** 35/13 35/15 35/15
**Georgetown [1]** 79/12
**Germany [1]** 64/23
**get [16]** 13/22 14/9 27/13 33/23
36/21 41/2 41/25 49/4 52/23 53/2
58/3 58/3 60/22 61/16 62/8 68/16
**gets [4]** 26/22 44/1 45/23 56/21
**getting [5]** 18/24 28/1 28/18
42/23 54/9
**giant [1]** 20/22
**gigantic [1]** 51/2
**give [9]** 21/5 41/3 41/4 44/19
47/10 47/11 47/15 51/3 64/9
**given [8]** 13/9 37/21 42/4 42/5
42/7 59/11 59/20 66/12
**giving [2]** 21/4 34/17
**Glave [18]** 3/3 3/14 4/18 4/20 5/1
5/12 5/20 6/17 6/25 9/5 11/25
12/18 13/2 14/18 16/13 18/6 21/8
21/13
**Glave's [10]** 3/10 5/5 5/8 6/23
6/24 8/19 9/2 11/8 15/21 16/7
**Gmail.com [1]** 6/18
**go [23]** 9/17 23/3 23/11 27/14
27/24 29/24 32/19 33/1 37/5 40/2
42/24 47/14 53/10 53/11 53/18
57/7 57/12 59/18 60/10 60/22 70/4
70/13 79/6
**goes [1]** 33/6
**going [62]** 3/18 12/4 12/5 14/5
14/24 16/25 18/24 20/19 20/21
21/13 21/18 21/19 21/21 22/20
24/16 24/20 28/3 28/4 30/5 32/25
33/11 34/1 35/19 36/5 36/20 36/22
37/8 39/15 42/1 42/15 44/12 46/11
46/13 46/21 46/25 47/2 49/19 50/4
50/13 51/9 52/1 52/3 53/6 53/7

**G**

going... **[18]** 57/3 57/7 57/7
57/12 58/6 59/13 59/18 59/18
59/19 59/25 60/1 60/3 64/5 65/25
67/1 68/11 68/25 79/19
**golden [1]** 41/10
**good [5]** 18/25 19/1 32/16 41/24
57/15
**goose [1]** 19/1
**got [15]** 4/17 12/16 31/14 48/8
52/11 52/12 56/16 58/4 60/6 60/9
60/25 62/14 65/11 66/2 67/18
**gotten [1]** 66/6
**government [36]** 17/6 18/23 20/21
21/19 22/18 24/5 24/16 24/20
25/12 25/22 26/8 26/13 26/15
26/23 27/15 29/4 35/14 35/17
35/18 36/17 36/19 36/22 41/1 41/4
44/12 46/14 46/23 46/25 47/11
47/19 47/25 51/4 52/21 52/24
53/24 79/7
**government's [7]** 23/20 26/10
26/15 33/12 43/22 69/6 69/21
**Gox [3]** 7/20 7/24 49/6
**granted [1]** 59/15
**graphed [1]** 8/9
**gravely [1]** 58/12
**great [2]** 10/10 23/25
**greater [3]** 20/16 37/24 37/24
**green [1]** 17/17
**grounding [1]** 44/16
**grounds [1]** 45/17
**group [2]** 38/25 39/23
**grouped [1]** 33/6
**groups [1]** 40/17
**guess [7]** 21/18 23/4 33/19 50/6
51/8 52/1 64/23

**H**

**had [21]** 7/25 10/23 22/7 35/23
38/16 39/18 39/19 39/21 44/21
44/24 47/22 48/1 52/12 55/15
56/12 56/12 56/14 57/9 57/19
60/23 79/17
**hadn't [1]** 60/23
**handed [1]** 33/2
**happen [2]** 47/4 53/17
**happened [1]** 56/9
**happening [3]** 29/9 50/19 50/21
**happy [8]** 16/7 44/10 51/21 51/22
57/12 60/18 62/18 69/19
**hard [5]** 20/14 20/18 28/19 29/11
51/9
**harder [1]** 40/8
**harm [1]** 45/18
**has [78]** 9/5 13/15 14/18 14/21
15/23 16/17 16/18 16/21 19/5
21/14 23/4 23/24 24/4 24/5 24/11
24/14 25/7 25/9 25/16 25/17 25/18
25/19 25/22 26/1 26/6 26/9 28/6
30/2 30/24 31/12 31/19 32/6 33/20
34/2 34/5 34/7 34/9 35/24 37/21
37/24 38/10 38/12 38/19 40/11
40/15 40/22 40/23 42/18 44/3 44/7
44/14 44/20 45/3 45/14 45/25 46/4
48/8 51/2 51/10 51/13 52/24 53/23
58/9 58/16 58/18 59/15 59/20
60/13 61/14 64/13 65/10 65/15
65/21 67/7 67/14 67/16 67/18 68/5
**hasn't [1]** 17/6
**HASSARD [3]** 2/3 64/13 67/2
**have [124]**
**haven't [4]** 14/10 31/9 38/8 70/1
**having [4]** 33/9 40/17 54/14 68/9
**Hawking [2]** 33/24 33/25
**he [143]**
**he is [1]** 32/4
**he's [1]** 47/9
**head [4]** 20/12 28/15 47/15 47/21
**hear [3]** 28/3 30/9 68/6
**heard [10]** 21/11 22/12 22/14 22/16

23/2 27/11 27/11 41/5 42/1 52/21
52/23 53/1 54/5 54/7 54/9 54/12
54/4
**hearings [1]** 54/2
**heart [1]** 56/12
**hedging [1]** 79/9
**held [5]** 4/23 8/22 8/23 8/25
12/21
**help [6]** 26/2 26/3 40/18 50/7
51/6 54/23
**helpful [11]** 28/10 33/16 35/5
38/15 42/20 47/8 48/3 48/9 50/16
51/3 55/11
**helping [2]** 28/11 47/8
**helps [2]** 40/17 50/14
**her [44]** 3/11 3/18 3/22 3/22 4/7
4/9 4/10 4/19 5/1 9/21 10/25
11/25 12/5 12/8 12/9 12/12 12/13
13/3 13/4 13/7 13/7 14/25 15/12
16/12 16/19 17/7 18/12 18/13
18/18 18/21 19/10 19/16 19/18
21/13 21/19 22/8 28/14 28/22
28/23 28/25 29/1 64/14 66/16
66/22
**here [38]** 6/6 11/24 12/8 13/16
13/19 14/4 16/25 18/8 18/22 19/22
19/23 19/23 20/5 20/11 25/1 26/23
28/20 29/19 32/9 33/7 33/24 38/8
38/8 39/18 41/10 43/3 46/20 48/6
49/18 52/10 58/5 60/2 63/20 63/24
64/22 65/10 65/15 80/11
**heroin [1]** 46/18
**heuristic [1]** 31/3
**heuristics [6]** 26/17 27/14 29/7
31/12 54/9 55/17
**high [2]** 34/14 42/12
**him [28]** 24/13 24/21 34/11 35/17
35/19 39/18 39/19 40/25 41/7
42/11 42/17 43/20 43/25 44/3 44/6
44/11 52/7 56/24 57/8 60/8 60/9
60/18 61/11 61/12 61/13 61/16
61/17 79/18
**himself [2]** 11/16 55/5
**his [48]** 3/16 5/7 6/3 6/5 6/15
7/25 8/3 8/14 9/20 9/23 9/24
10/12 10/14 10/15 10/19 10/19
11/4 23/7 24/3 24/12 33/15 34/23
36/10 36/12 36/18 36/24 37/5
37/20 38/15 40/1 40/3 40/4 40/7
42/19 42/23 42/24 43/6 45/10
45/13 46/2 49/14 52/4 56/22 57/9
57/11 59/3 67/19 68/2
**his disclosure [1]** 40/7
**historically [1]** 47/3
**history [4]** 4/21 12/15 12/19
59/11
**hobbyist [1]** 24/6
**Hoffman [2]** 62/15 62/15
**hold [2]** 50/5 59/24
**holding [1]** 16/24
**honestly [1]** 29/17
**Hong [3]** 18/17 20/7 65/7
**Honor [65]** 3/4 3/5 3/9 4/14 5/16
5/19 6/1 6/21 11/4 11/19 11/21
12/17 13/21 14/6 15/13 15/19 16/6
16/17 17/3 17/8 18/10 19/3 19/15
20/4 21/6 23/6 24/14 26/20 27/21
27/25 33/2 33/22 35/7 36/5 37/1
38/1 38/14 38/24 40/3 40/24 41/21
41/25 43/24 44/10 44/12 45/21
49/12 52/9 52/22 53/18 58/15
60/4 61/8 61/18 63/13 63/24 64/2
66/17 67/21 69/19 70/10 79/14
79/22 79/25 80/10
**HONORABLE [1]** 1/9
**hope [1]** 28/18
**hops [1]** 17/12
**how [48]** 5/2 7/1 9/12 9/15 9/19
10/1 10/2 12/1 12/24 13/4 13/6
14/2 15/7 15/13 15/15 15/15 17/1
21/4 21/22 27/9 29/17 29/24 30/12
31/15 32/3 34/9 35/13 39/14 39/23

43/12 43/13 43/15 44/1 44/15
45/7 46/13 46/17 46/25 47/23 50/13
50/21 51/24 52/11 54/24 54/24
54/8 64/3 66/5 67/1

**I**

**I wanted [1]** 41/25
**I'd [2]** 47/14 61/5
**I'm [8]** 5/16 12/17 31/7 48/16
48/20 51/15 59/20 65/20
**idea [3]** 35/23 44/24 49/18
**identification [1]** 50/11
**identified [1]** 34/21
**identifiers [1]** 6/5
**identifies [1]** 33/4
**identify [3]** 6/4 26/4 53/23
**identifying [2]** 6/19 23/19
**ill [1]** 58/12
**illicit [1]** 34/22
**imagine [2]** 46/13 55/6
**imagined [1]** 33/5
**immovable [1]** 52/24
**importance [8]** 22/24 23/19 26/3
28/5 31/21 31/23 33/9 33/16
**important [9]** 29/23 30/4 30/11
30/12 33/8 33/18 40/6 58/7 66/21
**impossible [1]** 43/13
**inappropriate [1]** 45/19
**include [1]** 5/8
**including [8]** 4/23 5/2 8/3 10/15
12/1 12/20 13/4 15/7
**inclusive [1]** 10/22
**income [5]** 5/7 10/6 10/7 10/19
10/24
**incoming [5]** 8/8 9/13 9/14 11/11
17/15
**inconsistencies [1]** 9/20
**inconsistency [1]** 4/8
**independent [3]** 20/17 37/21 38/19
**India [1]** 65/11
**indicate [1]** 35/22
**indicated [1]** 66/10
**indicative [3]** 43/10 45/23 58/5
**individual [2]** 7/17 53/14
**individuals [1]** 18/9
**inference [2]** 20/17 44/19
**inferences [1]** 15/11
**inflows [9]** 7/6 7/9 7/15 7/15
9/10 10/10 10/12 11/2 11/5
**inform [1]** 29/16
**information [7]** 7/13 8/7 54/23
55/10 56/24 58/3 64/13
**inside [1]** 29/9
**insofar [1]** 26/20
**instance [4]** 7/24 14/11 34/16
49/22
**institution [2]** 5/21 5/22
**institutions [2]** 5/1 12/23
**instructed [1]** 60/24
**intend [2]** 3/17 29/10
**intends [1]** 47/11
**intention [1]** 6/21
**intentionally [1]** 34/6
**interest [2]** 54/13 54/22
**interfere [1]** 60/1
**internal [2]** 30/3 31/21
**internet [1]** 22/12
**Interpol [1]** 64/22
**interpretation [6]** 12/2 12/9
12/11 13/7 13/11 13/20
**interpretations [2]** 14/25 15/2
**interpreted [5]** 5/2 12/1 13/5
15/8 15/14
**interpreting [1]** 46/22
**introduce [1]** 46/25
**introduced [4]** 6/22 6/24 13/15
40/16
**investigation [2]** 23/21 25/13
**investigatory [1]** 18/11
**investor [1]** 4/4
**invoice [6]** 17/13 17/14 19/22
20/1 20/3 20/6

## I

invoices [7]   1/18 11/10 11/17
18/17 20/6 20/7 21/21
involved [2]   25/9 48/7
IRS [1]   16/22
is [560]
is a [1]   34/4
isn't [5]   28/11 29/13 33/9 33/18
35/5
issue [11]   9/6 10/3 19/21 21/11
22/25 33/7 38/2 42/1 46/9 53/9
69/13
issues [4]   9/22 30/16 40/5 69/3
it [245]
item [1]   45/5
its [7]   24/11 31/9 31/20 36/12
54/19 58/21 59/4

## J

January [1]   10/23
JEFFREY [1]   1/18
Jennifer [1]   22/8
joint [1]   16/5
JUDGE [2]   1/10 70/15
judgment [1]   21/22
jumps [1]   15/11
June [1]   54/21
jury [24]   4/20 5/3 12/18 19/24
26/3 26/3 28/3 28/10 28/24 29/23
30/11 33/8 33/16 35/4 40/6 47/8
48/3 48/7 48/9 49/17 50/7 50/14
50/17 51/7
just [94]
JUSTICE [2]   1/13 1/19
justify [1]   58/22

## K

Kansas [5]   67/6 67/15 67/20 67/23
67/24
ken [1]   52/4
kept [4]   31/21 48/15 48/18 56/13
key [4]   44/22 44/22 44/23 52/23
keys [3]   43/12 43/15 48/18
kidding [1]   30/8
Killdozer [1]   48/2
kilograms [1]   46/18
kind [4]   10/18 25/25 39/2 64/18
knew [1]   44/25
know [72]   4/2 4/2 4/5 9/9 10/17
12/24 13/10 13/16 14/3 15/17
17/24 19/24 20/6 20/17 20/19 22/1
25/15 28/8 28/17 30/13 31/10
31/24 32/11 32/12 32/12 32/14
32/16 33/7 34/2 35/14 36/2 37/3
37/16 38/9 39/14 39/20 40/7 43/13
44/22 44/23 46/16 47/6 49/10
49/11 50/1 50/4 50/12 50/13 50/18
51/15 51/17 51/24 52/13 56/9 56/9
57/19 57/25 58/11 58/24 60/21
63/14 64/5 64/20 65/2 65/23 66/13
66/16 66/25 67/19 67/20 68/9
68/25
knowing [2]   26/3 33/17
knowledge [8]   24/8 25/16 33/10
34/14 35/20 37/21 39/12 40/11
known [3]   5/23 10/19 10/19
knows [3]   25/11 25/25 35/23
Kong [3]   18/17 20/7 65/8
Kraken [1]   8/4
Krulikowski [1]   79/11

## L

lack [1]   13/1
laid [1]   6/16
language [3]   29/6 46/22 48/5
large [4]   8/13 32/21 32/23 40/17
largely [1]   24/6
larger [2]   27/2 42/3
last [4]   14/11 54/4 61/25 69/13
later [3]   60/7 60/14 69/24
Latvia [2]   64/18 64/22

## law

law [2]   2/4 64/19
Lawrence [1]   27/3
lawyer [3]   22/20 60/14 62/16
lawyers [2]   56/22 57/10
lay [1]   16/7
lead [4]   27/15 29/8 45/5 53/2
least [3]   27/10 30/9 63/19
leave [1]   63/6
leaving [1]   41/3
ledger [1]   39/7
leeway [2]   21/4 21/5
left [1]   22/9
legendary [1]   24/18
leniency [1]   56/19
lenient [1]   56/18
let [14]   15/4 15/4 22/4 34/19
43/4 43/19 43/22 45/16 46/12 61/5
67/5 69/12 70/9
let's [4]   24/22 58/16 64/7 70/13
level [4]   10/11 10/12 34/14 42/12
lies [1]   56/17
light [2]   54/17 57/4
like [37]   6/8 7/21 18/7 20/5
20/12 21/10 23/6 23/10 27/1 27/4
29/23 29/25 39/4 40/1 42/17 43/15
44/18 47/6 47/22 49/6 49/23 51/25
53/8 53/14 53/16 54/6 54/11 57/23
58/13 61/2 61/6 61/11 65/9 66/9
69/4 79/22 79/25
limine [2]   69/16 69/18
limited [4]   12/6 22/21 22/23
35/20
LINDSAY [3]   2/7 81/4 81/13
line [4]   9/18 13/17 21/5 45/10
link [1]   24/21
listed [6]   3/19 7/5 8/21 17/14
17/17 34/17
listen [1]   54/20
listening [2]   35/10 49/17
listing [1]   53/12
lists [1]   5/21
literally [1]   16/10
litigation [2]   54/5 62/17
little [9]   3/10 21/11 21/15 27/5
27/23 40/8 51/6 56/20 79/9
live [2]   63/3 63/15
local [4]   8/4 9/22 9/25 64/3
logistical [1]   53/2
London [1]   65/15
long [5]   22/21 22/22 26/21 53/24
63/21
longer [7]   10/4 21/2 24/15 24/24
34/3 34/5 58/22
look [17]   9/17 11/4 13/17 14/23
17/15 20/12 24/25 26/7 34/23 37/5
40/2 42/25 43/1 43/6 47/14 55/2
60/20
looked [2]   35/21 37/17
looking [11]   3/11 9/9 11/2 17/12
17/18 20/15 34/15 35/21 43/5 45/5
55/23
looks [1]   65/9
lot [5]   42/4 45/18 50/19 53/16
58/16
lots [1]   47/6
Luke [1]   36/18
lunch [2]   22/9 60/24

## M

made [12]   15/11 15/11 16/24 20/13
41/19 53/16 55/3 56/10 57/6 57/10
66/9 66/9
main [2]   18/22 47/3
maintained [1]   7/19
maintains [1]   29/22
make [23]   19/1 20/20 20/24 22/19
27/8 38/6 44/3 47/16 51/9 53/23
56/3 57/8 57/24 59/5 60/12 61/9
62/4 62/10 66/22 66/23 79/9 80/3
80/5
making [6]   3/18 14/1 14/2 17/19
18/9 59/25

## manner

manner [1]   21/23
many [2]   33/7 54/1
March [12]   65/22 65/23 65/24 66/3
67/2 68/3 68/6 68/10 68/12 68/16
68/21 68/21
margin [1]   45/8
mark [1]   65/11
market [1]   4/3
Mastercard [4]   22/19 62/16 63/20
65/4
match [1]   17/16
matching [1]   17/25
material [1]   27/18
mathematical [3]   30/20 31/1 32/5
mathematics [2]   24/4 24/8
matter [5]   16/11 19/25 36/1 70/7
81/6
may [15]   3/5 3/15 4/7 16/13 18/21
22/4 24/8 24/23 27/5 31/18 38/10
53/20 57/18 66/14 69/5
maybe [13]   3/9 22/24 24/9 26/14
28/22 28/25 35/4 44/5 44/8 48/7
48/11 60/20 61/4
me [59]   4/17 5/14 5/17 8/8 15/4
20/9 21/2 21/16 22/4 22/8 22/20
23/6 23/10 23/11 23/14 23/14 27/4
29/22 32/5 32/13 34/19 34/20 35/1
35/1 35/3 35/6 35/11 36/4 37/24
38/6 41/9 42/21 43/4 43/19 43/22
46/12 46/12 46/24 47/10 47/11
49/15 57/11 57/13 57/21 59/10
60/1 60/7 60/14 61/3 61/7 61/9
61/11 61/12 63/17 64/9 65/25 67/5
69/12 70/9
mean [16]   13/10 13/13 15/9 19/3
26/11 32/3 34/7 34/8 35/20 43/18
44/18 50/8 58/11 66/17 67/6 67/10
meaning [1]   15/17
meaningful [1]   39/20
means [4]   15/6 19/24 25/2 46/18
meant [2]   26/23 29/14
measured [1]   36/3
measuring [1]   37/19
meet [1]   11/22
members [1]   48/7
mentioned [2]   54/5 79/17
message [2]   67/3 68/7
methodologies [6]   18/3 19/17 27/2
35/24 35/25 37/18
methodology [6]   25/23 31/12 33/4
34/25 35/13 35/16
methods [1]   18/25
Miami [1]   64/4
MICHAEL [1]   2/3
mid [3]   68/21 68/21 68/21
middle [4]   3/24 4/15 12/12 12/14
might [9]   7/22 20/14 27/16 27/17
40/20 57/23 59/12 63/14 69/7
MIIS [3]   64/20 64/20 65/4
mind [2]   37/3 37/4
minute [1]   43/1 61/20
minutes [2]   40/12 61/19
Miroff [1]   79/12
misrepresentation [1]   57/20
missing [2]   9/24 12/8
Missouri [5]   67/20 67/22 67/24
mitigate [2]   32/22 32/24
model [2]   40/15 40/19
moment [2]   20/10 70/12
Monero [8]   38/25 39/1 39/6 39/9
39/13 39/15 39/21 39/23
months [2]   39/25 50/24
Moon [4]   49/23 50/2 50/12 51/17
more [23]   6/10 7/21 15/23 19/5
21/11 21/16 25/2 25/20 26/16
26/25 31/13 32/2 32/10 36/4 37/22
52/2 52/6 55/11 56/3 56/18 60/3
61/23 64/13
morning [3]   22/15 53/6 67/21
MOSS [1]   1/9 70/15
most [1]   58/10
motion [3]   59/10 59/23 69/17

**M**

motions [1] 69/18
mouth [1] 30/9
move [5] 53/1 54/12 54/25 58/14 64/8
moved [1] 9/3
moving [3] 58/10 58/13 59/22
Mr [2] 5/6 16/4
Mr. [85]
Mr. Brown [6] 11/24 13/25 14/11 15/5 23/1 59/16
Mr. Cabanas [3] 21/25 23/4 37/16
Mr. Ekeland [11] 11/20 22/1 27/6 53/20 55/5 57/21 60/5 61/24 62/12 79/17 80/1
Mr. Ekeland's [2] 18/4 69/20
Mr. Fischbach [3] 67/6 67/6 67/21
Mr. Hassard [2] 64/13 67/2
Mr. Hoffman [1] 62/15
Mr. Scholl [6] 16/14 36/10 36/24 37/7 38/15 38/19
Mr. Scholl's [4] 36/7 36/8 36/25 37/9
Mr. Sterlingov [23] 6/15 7/2 7/19 7/25 10/4 10/7 10/22 11/12 11/16 24/17 24/20 46/23 47/2 47/25 50/14 56/21 57/4 60/21 63/9 63/18 63/22 66/23 66/24
Mr. Sterlingov's [16] 3/15 4/21 4/23 5/3 5/12 6/12 6/19 7/9 8/19 9/10 10/8 11/9 12/15 12/19 12/20 49/23
Mr. Torres [5] 22/8 22/15 61/4 61/5 61/10
Mr. Verret [2] 15/23 19/5
Mr. Verret's [1] 14/22
Ms [2] 11/8 29/13
Ms. [49] 3/3 3/10 3/14 4/18 4/20 5/1 5/5 5/8 5/12 5/20 6/17 6/23 6/24 6/25 8/19 9/2 9/5 11/25 12/18 13/2 14/18 15/21 16/7 16/13 18/6 21/8 21/13 22/8 22/10 22/11 22/11 23/14 25/15 28/2 28/13 29/3 29/5 29/11 29/14 33/3 34/3 34/5 37/12 52/12 53/21 59/1 62/16 64/12 64/13
Ms. Bisbee [6] 25/15 28/13 29/11 29/14 34/3 34/5
Ms. Bisbee's [3] 28/2 29/5 33/3
Ms. Glave [18] 3/3 3/14 4/18 4/20 5/1 5/12 5/20 6/17 6/25 9/5 11/25 12/18 13/2 14/18 16/13 18/6 21/8 21/13
Ms. Glave's [9] 3/10 5/5 5/8 6/23 6/24 8/19 9/2 15/21 16/7
Ms. Jennifer [1] 22/8
Ms. Lawrence [2] 22/10 22/11
Ms. Pelker [2] 29/3 52/12
Ms. Pelker's [1] 37/12
Ms. Pietrzak [1] 62/16
Ms. Still [5] 25/14 53/21 59/1 64/12 64/13
Ms. Torres [1] 22/11
Mt [3] 7/20 7/24 49/6
much [8] 12/25 15/23 21/4 26/25 27/1 52/2 60/25 68/8
multiple [1] 6/9
my [24] 20/11 20/19 22/4 23/22 24/13 28/15 38/6 39/6 42/8 44/22 44/23 45/9 47/4 47/5 47/15 47/21 49/3 50/22 51/23 56/19 57/13 63/23 68/24 70/5
mysterious [1] 50/18

**N**

N.W [1] 1/16
Nakamoto's [1] 25/7
name [7] 6/3 6/15 6/19 7/25 22/8 49/23 50/9
named [2] 50/9 51/16
names [1] 50/11

**nature [3]** 21/16 33/20 44/20
necessarily [2] 71/9 74/25
necessary [2] 21/1 56/15
need [24] 19/1 20/19 20/24 47/16 50/23 52/2 52/6 54/25 54/25 55/1 55/4 55/4 55/22 55/22 56/7 59/7 59/10 59/13 63/19 68/25 69/5 69/9
needed [3] 50/23 55/23 60/20
needs [5] 34/14 35/4 39/14 61/19 66/21
negative [2] 7/7 7/7
net [6] 4/3 8/22 9/10 10/12 10/13 50/21
never [3] 31/19 45/25 59/19
never-ending [1] 59/19
new [10] 1/20 53/10 53/21 53/23 53/23 53/25 54/2 54/8 56/5 69/20
newly [1] 35/8
next [11] 1/22 7/3 7/4 7/12 8/6 8/18 9/2 10/6 12/25 45/8 67/4
night [1] 5/7
no [31] 1/4 10/4 12/2 15/16 22/22 23/13 23/13 25/1 25/20 27/20 28/16 30/2 31/21 32/7 35/10 35/10 37/21 40/11 44/24 45/8 48/20 49/18 50/10 50/10 52/5 52/24 55/19 58/22 60/3 70/11 80/10
noise [2] 23/20 31/2
nominal [2] 8/10 8/24
none [2] 57/16 57/20
Nordea [2] 10/9 11/4
not [121]
note [5] 5/6 29/4 36/6 42/23 54/16
notes [1] 65/15
nothing [1] 32/7
notice [4] 15/1 47/19 69/22 69/23
noticed [7] 4/10 14/10 14/18 31/25 69/6 79/7 80/6
noting [1] 5/4
notions [1] 29/23
November [12] 64/14 65/7 65/8 65/8 65/11 65/12 65/14 65/16 65/16 67/7 67/17 68/20
November 10 [1] 67/17
November 10th [1] 67/7
November 13th [1] 65/11
November 27th [1] 65/14
November 4th [2] 65/7 65/8
now [18] 4/13 15/9 21/25 41/14 42/8 47/10 53/22 54/10 57/7 57/25 58/20 59/8 61/4 61/13 66/3 69/24 79/5 80/4
nowhere [1] 13/8
number [11] 8/13 12/13 22/7 23/17 27/2 27/3 32/21 32/23 43/6 61/24 66/17
numbered [2] 23/11 23/17
numbers [1] 22/12
numerous [1] 46/25
NW [3] 1/13 1/20 2/9
NY [1] 2/5

**O**

object [1] 45/16
objection [4] 22/17 22/22 37/6 63/21
obligation [1] 55/19
obligations [1] 54/19
obstacles [1] 52/24
obtaining [1] 54/22
obvious [1] 55/7
obviously [2] 30/4 59/4
obviously that [1] 30/4
occurred [1] 18/8
October [27] 52/25 53/7 53/13 57/14 64/10 64/14 64/16 64/17 64/19 64/21 64/23 64/25 65/1 65/3 65/4 65/5 65/5 65/6 65/7 66/7 66/8 66/18 67/7 67/20 68/20 69/1 81/11

**October 10th [1]** 64/21
October 16th [1] 67/7
October 17th [1] 65/1
October 18th [1] 65/3
October 23rd [1] 65/4
October 24th [1] 65/5
October 26th [1] 65/6
October 2nd [2] 64/16 66/7
October 30th [1] 65/7
October 7th [1] 64/17
October 9th [3] 64/19 64/23 65/5
off [9] 20/11 28/15 43/16 43/17 45/6 47/15 47/21 62/14 70/4
offer [14] 20/21 21/19 32/10 40/9 40/12 40/25 41/6 41/16 42/11 42/12 42/17 44/17 52/21 80/6
offered [4] 17/7 17/9 21/15 61/14
offering [3] 32/15 34/11 51/23
offers [1] 46/19
Official [3] 2/8 81/4 81/14
often [1] 67/13
oh [2] 5/19 28/4
okay [35] 3/8 3/20 3/25 4/12 4/17 6/16 7/3 7/11 7/23 8/5 11/18 15/4 16/1 20/14 21/9 21/25 36/19 36/21 43/22 44/9 45/15 46/8 50/12 52/16 57/6 60/18 60/21 61/3 63/9 63/12 63/22 63/23 69/11 70/6 70/13
Omedetou [2] 47/1 48/1
once [1] 51/12
one [32] 9/3 9/6 9/8 9/22 11/23 13/10 16/10 17/1 17/19 18/16 18/16 18/23 19/6 19/12 19/22 20/5 20/20 31/22 35/2 35/2 43/20 47/3 47/15 48/17 52/25 54/11 58/19 61/23 62/8 69/21 70/4 70/6
one-sided [1] 58/19
only [13] 16/22 32/4 32/9 45/25 47/24 48/4 53/6 56/25 57/4 59/1 61/19 68/4 69/13
open [6] 4/6 6/9 40/20 41/1 41/3 62/25
opened [3] 6/3 6/4 57/13
opens [1] 4/2
operated [1] 51/24
operator [1] 4/3
opine [1] 14/9 16/25 46/7
opinion [16] 12/4 13/2 14/14 16/4 18/3 19/10 20/17 21/2 25/20 25/21 34/17 42/1 42/3 42/7 42/16 51/23
opinions [4] 3/18 3/19 12/5 52/4
opportunity [1] 60/23
opposite [1] 46/20
order [10] 29/16 31/23 39/13 49/4 55/5 55/7 55/25 56/7 66/14 70/15
origin [2] 16/12 20/8
originating [1] 4/9
other [31] 4/25 6/17 6/19 8/3 8/10 10/3 10/14 10/23 10/23 12/22 13/15 16/20 20/2 24/5 27/5 27/22 38/9 39/10 39/23 40/22 43/20 44/25 46/9 49/6 50/22 58/13 62/9 64/25 68/24 69/7 70/7
others [2] 8/4 25/15
otherwise [1] 41/18
ought [2] 18/23 41/9
our [13] 6/21 14/5 15/25 17/22 19/8 37/6 38/21 45/4 58/2 60/1 60/23 62/6 68/13
out [29] 4/22 7/16 8/3 8/9 8/12 11/16 12/20 16/19 18/13 18/18 20/7 21/22 22/18 22/22 22/23 30/9 39/23 39/25 53/22 53/22 53/25 54/5 54/6 57/18 59/3 60/8 60/9 64/5 68/7
outcomes [1] 29/9
outflows [2] 7/6 7/10
outside [5] 18/12 62/17 63/14 63/14 64/5
outstanding [3] 69/16 69/17 69/21
over [18] 7/5 7/10 7/15 8/12 8/23

**O**

over... [13] 8/25 9/11 10/17
30/24 32/21 32/23 43/14 55/2 55/3
56/23 58/25 60/24 66/15
overlap [2] 64/21 65/10
overstatement [1] 57/25
own [1] 36/12
owner [3] 5/24 5/25 6/2
ownership [2] 43/10 45/23

**P**

p.m [4] 1/6 61/22 68/23 80/14
page [30] 1/22 3/11 3/17 3/24
4/16 5/19 7/3 7/4 7/12 7/13 7/14
8/6 8/18 9/2 10/6 11/7 12/12
13/22 13/23 14/11 15/18 18/5
23/15 27/21 30/21 33/3 34/23
42/19 42/24 45/25
pages [1] 13/10
paid [4] 19/22 19/23 19/23 20/7
paper [1] 34/16
papers [1] 28/17
parade [1] 54/8
paragraph [12] 3/17 3/19 3/23
4/16 11/24 14/14 23/17 30/21
32/20 36/14 41/6 46/10
paragraphs [5] 23/11 23/14 23/17
43/7 43/11
parenthesis [1] 7/8
part [5] 9/21 39/1 46/2 48/5
49/15
participate [1] 58/22
participated [1] 39/22
particular [9] 7/20 10/16 16/3
21/17 25/16 25/17 39/8 39/11
57/23
particularly [8] 24/7 37/20 40/5
43/6 43/7 58/17 58/20 59/14
parties [1] 19/24
passed [1] 53/24
past [3] 27/5 27/22 70/2
pay [6] 47/23 48/24 48/25 49/2
49/3 52/12
paying [5] 11/12 11/16 18/17 20/1
20/2
payments [1] 11/11
PayPal [1] 10/15
PEARLMAN [1] 1/18
peer [13] 28/16 42/18 42/18 43/11
43/11 43/19 43/19 43/25 43/25
44/2 44/2 44/3 44/3
peer-reviewed [1] 28/16
PELKER [3] 1/12 29/3 52/12
Pelker's [1] 37/12
Pennsylvania [1] 1/13
people [12] 20/2 39/3 46/21 48/11
48/13 48/21 49/5 49/7 50/3 50/3
50/25 68/14
people's [3] 50/20 60/25 68/15
percent [3] 28/5 46/16 46/18
perhaps [5] 24/17 30/7 56/18
56/19 57/5
permission [1] 3/5
person [4] 50/12 63/17 63/20
63/24
personality [2] 6/5 6/12
personally [1] 66/21
pertained [1] 11/10
pervade [1] 30/14
PhD [3] 23/5 26/1 28/6
phone [2] 61/17 62/14
phrase [5] 28/18 29/1 30/9 49/25
50/1
phrases [1] 49/22
physical [1] 30/25
physicist [2] 24/3 29/18
physics [6] 26/1 26/10 26/25 28/6
30/19 30/25
Pietrzak [2] 62/15 62/16
pivot [1] 15/21
places [1] 47/3

**Plaintiff [2]** 1/4 1/12
plan... [2] 38/24 38/24
planning [1] 36/11
plans [2] 53/15 66/9
play [3] 14/4 21/22 27/3
playing [2] 20/20 21/23
PLLC [1] 2/4
point [19] 18/4 18/22 20/19 21/10
23/14 24/24 33/1 34/23 35/7 38/24
40/25 41/12 42/21 44/18 53/18
56/16 59/9 59/24 68/9
pointing [2] 21/17 37/17
points [1] 43/6
Policy [1] 38/25
portions [1] 38/11
position [5] 11/22 17/22 26/12
47/2 56/21
positive [1] 7/7
possible [1] 56/22
possibly [3] 37/15 53/10 59/21
post [1] 49/8
posted [1] 47/23
posting [1] 51/18
postpone [1] 58/8
posts [2] 47/1 47/11
potential [1] 79/8
potentially [4] 9/11 29/8 44/15
68/14
practical [1] 45/11
preceding [1] 3/23
precise [1] 27/18
precisely [3] 26/16 52/7 57/20
precision [1] 27/9
preclude [3] 28/22 29/1 33/11
prefer [1] 63/7
preference [1] 57/11
prejudicial [2] 36/4 37/22
prep [3] 64/20 64/24 65/5
prepaid [2] 10/15 10/16 10/17
prepare [1] 62/7
prepared [4] 53/1 54/7 54/12
55/24
present [1] 20/18
presented [2] 7/13 58/18
press [1] 58/18
presumably [1] 20/23
pretrial [3] 1/9 67/19 79/25
pretty [2] 20/13 24/25
previous [4] 7/13 7/14 8/7 9/4
previously [2] 3/6 70/3
price [1] 5/5
primarily [1] 10/8
primary [1] 25/5
principle [2] 14/16 24/13
principles [7] 10/2 13/12 14/2
14/4 15/3 29/15 30/1
prior [3] 6/23 59/3 66/7
privacy [3] 39/3 48/14 48/18
private [4] 43/12 44/22 44/23
48/18
probably [9] 24/15 24/24 33/23
45/15 46/19 61/19 62/23 63/7
68/11
probative [2] 36/4 37/22
problem [3] 31/18 33/19 40/19
problems [2] 43/17 45/6
procedure [2] 11/23 40/15
proceed [1] 23/7
proceeded [1] 23/7
proceedings [4] 70/15 79/4 80/14
81/6
proceeds [1] 3/16
process [2] 58/22 59/9
produce [2] 15/24 25/25
produced [2] 3/7 15/20 15/20
15/23
product [2] 54/18 62/16
professor [1] 79/12
proffer [2] 52/2 52/6
proffered [1] 36/17
profits [1] 3/16
profoundly [1] 54/7

program [6] 27/13 27/14 31/3 31/8
programs [1] 29/24
prominently [1] 24/19
proper [1] 47/17
properly [3] 52/6 59/4 59/22
proportion [1] 34/21
protective [4] 55/5 55/7 55/25
56/7
provide [2] 55/9 56/24
provided [4] 55/10 55/13 55/18
59/8
proximity [3] 43/8 45/22 46/5
public [7] 39/7 43/12 44/21 44/22
45/1 54/13 79/5
publicity [1] 58/16
pulling [1] 29/5
purchases [1] 5/6
pure [2] 28/11 46/18
purposes [3] 4/9 20/18 58/7
push [2] 57/3 57/16
put [12] 13/19 24/5 24/16 30/2
49/16 53/14 53/14 56/22 58/4 61/6
64/7 70/4
puts [1] 15/1
putting [2] 11/15 47/19
puzzled [1] 58/1

**Q**

qualified [3] 17/6 19/9 46/7
quantify [1] 5/12
quantifying [1] 23/19
quarter [2] 65/17 65/18
question [13] 13/6 13/11 13/14
14/1 15/8 17/20 25/11 30/5 32/9
41/3 45/23 65/11 79/20
questions [3] 16/3 39/19 48/4
quick [1] 22/5
quite [9] 15/5 20/10 24/12 30/22
30/23 31/13 54/20 55/14 59/16
quote [3] 13/24 33/2 38/17
quote/unquote [1] 13/24
quoted [1] 40/23

**R**

radiation [1] 27/17
radio [1] 31/1
raise [5] 43/20 46/9 54/8 56/10
69/14
raised [2] 16/4 54/17
RANDOLPH [1] 1/9
random [15] 23/20 24/10 25/12
30/15 30/20 31/2 32/5 32/22 33/25
34/12 40/5 40/14 40/16 40/18
42/13
rapidly [1] 50/4
rate [5] 25/25 30/3 32/17 49/10
49/11
rates [8] 26/4 30/15 31/20 31/22
33/10 33/17 34/16 34/17
rather [1] 51/13
reach [2] 22/23 60/8
reaching [2] 22/18 22/22
reaction [1] 39/1
reactor [9] 25/23 29/25 32/8
32/12 33/15 39/2 39/15 40/10
54/24
read [21] 4/15 5/2 11/24 12/1
13/4 13/6 14/15 15/7 15/9 15/14
15/15 15/15 23/11 30/22 32/2 38/9
43/24 57/21 70/1 70/2 70/5
reading [4] 13/7 17/23 23/7 55/12
readings [2] 14/25 15/2
real [3] 24/4 28/3 44/16
really [14] 3/21 3/23 4/10 13/5
13/20 18/1 19/9 22/5 43/2 46/6
49/19 51/12 52/4 57/14
realm [2] 18/12 46/6
reason [9] 23/13 25/15 28/20
37/20 40/21 41/13 56/18 56/23
59/14
reasons [3] 14/21 53/10 54/10

**R**

**rebut [1]** 37/15
**rebuttal [6]** 4/7 41/1 41/7 41/11 41/16 67/13
**recall [2]** 25/6 39/20
**received [2]** 57/15 57/22
**Recess [1]** 61/22
**recognize [1]** 80/2
**recollection [1]** 70/5
**reconciled [2]** 9/20 10/2
**record [12]** 5/25 15/19 53/11 54/16 58/4 58/7 61/6 61/24 62/11 63/13 79/5 81/6
**records [5]** 4/19 5/9 6/22 6/24 9/25
**refer [1]** 36/14
**reference [2]** 3/14 67/25
**referenced [5]** 36/7 36/10 36/17 36/23 38/15
**referencing [1]** 53/20
**referred [1]** 61/25
**referring [2]** 8/21 43/19
**refresh [1]** 70/5
**regard [1]** 56/6
**regarding [2]** 4/19 12/6
**registered [2]** 5/25 6/18
**rejected [2]** 14/22 14/23
**related [5]** 4/19 5/10 23/24 39/12 42/6
**relating [1]** 24/8
**relation [3]** 25/8 26/5 69/6
**relevant [9]** 9/9 33/21 34/13 38/12 40/4 44/16 47/24 48/8 52/13
**reliance [2]** 36/13 37/20
**reluctantly [1]** 60/21
**rely [7]** 36/20 36/22 37/15 37/23 38/5 38/13 47/11
**remain [1]** 59/9
**remained [1]** 58/1
**remember [2]** 20/11 40/1
**render [2]** 27/16 27/18
**rendering [1]** 18/3
**repeated [1]** 55/2
**repeatedly [1]** 59/7
**report [31]** 28/14 28/23 29/5 33/3 34/20 35/5 35/20 35/21 36/1 36/6 36/6 36/7 36/10 36/13 36/18 36/24 36/25 37/5 37/9 37/10 37/14 37/23 38/2 38/6 38/9 38/10 38/11 38/15 38/16 38/18 38/20
**Reporter [4]** 2/7 2/8 81/4 81/14
**reports [2]** 20/11 59/1
**represent [1]** 61/7
**representation [1]** 37/12
**represented [1]** 56/14
**request [4]** 22/19 55/8 55/21 60/12
**requested [2]** 56/25 62/10
**requesting [1]** 63/3
**requirements [1]** 11/22
**requiring [1]** 41/11
**reread [1]** 70/2
**research [1]** 79/10
**reserve [6]** 21/21 38/4 38/21 41/16 45/16 62/6
**respect [30]** 16/5 16/6 20/13 21/3 21/13 21/15 21/20 21/21 24/1 24/7 24/9 25/11 26/18 27/16 27/18 27/23 32/7 32/8 32/8 35/25 37/12 37/13 39/22 41/11 43/23 45/10 45/12 46/22 55/19 58/6
**respond [2]** 15/5 35/14
**response [3]** 29/6 41/18 58/1
**responses [1]** 57/22
**responsibility [1]** 59/4
**result [2]** 27/13 56/1
**results [2]** 26/18 26/22
**returns [1]** 18/1 18/1
**reveal [1]** 31/14
**review [2]** 24/12 54/11
**reviewed [1]** 28/16

**rich [1]** 58/20
**right [20]** 11/14 11/19 11/6 11/20 13/22 14/8 14/20 16/16 17/2 17/11 17/9 21/7 23/1 23/3 29/21 52/17 52/17 53/4 53/22 58/23 61/13 62/6 62/12 64/9 66/3 67/4 68/8 69/2 69/17 79/6 80/8 80/11
**rights [1]** 41/16
**rise [2]** 44/19 80/13
**risk [2]** 28/3 52/3
**role [1]** 51/3
**rolling [1]** 57/2
**ROMAN [4]** 1/6 5/24 6/3 6/6
**Romania [1]** 50/8
**room [9]** 2/9 24/16 24/17 24/25 25/1 25/3 27/10 27/17 27/19
**roughly [1]** 12/13
**round [1]** 54/2
**routine [1]** 50/22
**RPR [1]** 81/13
**rule [5]** 11/23 20/24 41/10 41/23 58/6
**rules [4]** 18/23 19/2 20/20 21/24
**rulings [1]** 42/4
**run [1]** 27/12
**rush [1]** 68/13

**S**

**said [30]** 14/12 14/12 21/1 21/3 26/9 26/11 28/16 31/21 36/19 38/22 47/20 48/21 49/1 52/13 54/22 54/25 57/1 57/6 57/9 57/16 60/21 62/3 62/4 62/5 62/8 62/19 65/4 65/15 65/17 68/14
**sales [4]** 3/16 5/4 9/23 9/24
**same [26]** 7/13 8/3 11/13 14/21 17/23 18/18 20/8 20/24 21/5 21/24 26/21 26/22 26/22 26/24 27/8 27/13 27/15 27/20 29/25 33/5 38/6 38/7 38/7 38/7 39/7 43/9
**sample [1]** 40/17
**Santell [1]** 79/21
**Sarah [1]** 79/11
**sat [1]** 38/8
**Satoshi [1]** 25/6
**save [1]** 69/12
**say [40]** 9/13 18/13 18/14 18/19 19/19 23/4 23/22 24/20 27/11 27/11 32/25 34/4 34/7 34/8 34/23 34/24 36/1 40/12 42/1 46/12 46/13 46/15 46/16 48/10 49/15 49/19 51/9 51/14 51/20 52/3 52/7 55/10 57/20 58/16 58/23 59/17 59/20 59/25 66/5 69/12
**saying [20]** 13/16 14/15 14/16 22/22 27/15 28/23 28/25 33/12 35/11 37/13 37/13 38/13 42/7 47/6 48/1 51/23 53/17 59/22 59/23 60/8
**says [24]** 5/24 6/2 12/12 12/14 13/24 14/24 15/6 17/24 23/18 29/12 32/20 33/3 35/6 35/11 44/7 60/11 64/20 65/2 65/6 65/8 65/13 65/13 67/7 67/16 67/17
**scale [1]** 27/2
**schedule [5]** 60/24 66/12 66/25 67/14 68/24
**scheduled [3]** 65/1 65/7 65/9
**schedules [1]** 60/25
**scheduling [5]** 21/11 22/2 52/18 58/6 64/14
**Scholl [7]** 16/14 36/10 36/18 36/24 37/7 38/15 38/19
**Scholl's [4]** 36/7 36/8 36/25 37/9
**science [9]** 26/9 26/24 28/4 28/11 28/13 28/19 29/11 29/18 35/8
**scientific [15]** 25/24 26/4 26/6 26/12 27/15 27/23 28/1 28/17 28/17 28/19 28/25 30/1 33/9 33/13 33/18
**scientist [1]** 28/6
**scope [2]** 36/16 42/2

**seal [4]** 69/5 69/10 70/7 70/13 71/4
**second [2]** 6/1 23/16
**section [1]** 38/16
**see [23]** 8/13 15/1 17/15 18/15 19/11 19/19 21/22 31/15 31/17 32/3 34/9 39/16 40/21 44/18 45/7 45/19 45/20 55/14 60/16 61/15 61/16 61/17 80/11
**seek [2]** 53/21 59/12
**seem [3]** 16/23 24/6 41/20
**seemed [1]** 53/20
**seems [7]** 41/9 53/8 53/16 54/7 54/11 79/22 79/25
**seen [6]** 18/20 19/20 31/9 31/11 31/11 31/13
**selling [1]** 34/8
**semester [1]** 65/4
**send [3]** 60/14 61/3 61/5
**sending [1]** 61/10
**sense [7]** 19/25 26/9 26/10 26/17 27/7 27/12 39/16
**sent [5]** 22/14 22/14 66/13 67/3 68/6
**sentence [1]** 13/1
**separate [5]** 9/18 16/13 18/8 18/17 24/24
**separately [1]** 24/22
**September [1]** 1/5
**Sergi [1]** 79/12
**serious [1]** 68/5
**server [2]** 50/8 50/11
**services [1]** 10/16
**serving [1]** 39/21
**SESSION [1]** 1/7
**set [8]** 5/8 18/23 20/20 21/24 25/6 53/25 54/5 60/16
**setting [1]** 66/15
**share [5]** 45/9 48/11 48/13 49/14 59/16
**shared [1]** 48/21
**she [84]**
**SHERRY [3]** 2/7 81/4 81/13
**shifted [1]** 9/14
**shirts [1]** 46/16
**short [3]** 3/10 13/8 58/10
**should [22]** 8/20 14/23 23/4 26/7 26/15 28/22 29/1 29/14 32/2 32/10 33/5 36/7 41/1 52/17 53/22 55/10 56/19 61/12 61/17 63/25 66/22 66/23
**show [6]** 8/1 10/18 20/18 35/1 35/3 39/11
**showing [3]** 21/17 37/24 59/25
**shown [3]** 9/5 12/2 12/3
**shows [12]** 5/20 7/6 7/6 7/8 7/15 8/8 9/2 9/12 13/18 34/21 34/23 36/2
**shuffled [1]** 9/8
**side [2]** 44/25 59/10
**sided [1]** 58/19
**sides [6]** 20/2 20/15 21/23 41/9 41/16 41/20
**sign [2]** 55/4 55/7
**significant [1]** 9/7
**similar [2]** 43/9 45/12
**simple [1]** 50/25
**simply [5]** 9/9 13/14 15/9 51/14
**since [2]** 25/8 47/8
**single [1]** 37/14
**sits [1]** 38/25
**sitting [4]** 38/8 52/10 67/11 68/24
**six [1]** 39/25
**skill [1]** 39/12
**slang [1]** 47/6
**slow [1]** 12/16
**so [103]**
**software [3]** 26/5 39/3 43/9
**solved [1]** 79/20
**some [39]** 6/17 6/19 9/23 10/14

**S**

some... **[35]**   10/15 11/10 15/10
15/17 18/3 20/3 21/10 22/19 24/8
24/23 31/4 35/24 36/1 36/2 37/23
40/17 44/3 44/14 46/21 50/18
51/14 53/2 53/18 56/5 57/19 57/19
57/22 64/18 64/21 65/15 69/5
69/15 69/16 70/1 79/8
somebody **[8]**   19/13 24/2 45/14
47/1 50/11 50/15 51/5 55/22
somehow **[2]**   26/6 53/21
someone **[5]**   25/19 44/14 44/20
56/12 67/10
something **[23]**   6/14 16/9 17/18
18/19 19/15 19/16 19/18 19/19
25/20 30/3 31/19 37/2 37/15 40/20
41/14 41/17 47/20 47/21 55/18
55/20 55/20 58/13 60/22
Sometime **[1]**   65/9
sometimes **[1]**   46/14
somewhat **[1]**   57/5
somewhere **[1]**   36/1
soon **[4]**   40/20 57/17 57/21 60/9
sophisticated **[3]**   16/8 17/17
26/11
sorry **[8]**   5/16 12/17 31/7 48/16
48/20 51/15 59/20 65/20
sort **[18]**   8/22 9/9 9/15 10/1
10/10 18/3 19/17 33/7 34/6 35/1
36/12 44/16 47/6 49/17 50/18
51/19 54/6 58/18
sounds **[2]**   27/4 66/8
source **[8]**   11/14 31/10 31/13
55/11 55/12 55/16 55/21 56/4
sources **[4]**   10/19 10/23 10/24
11/1
space **[7]**   24/15 25/9 34/3 34/5
34/6 34/13 40/23
spacial **[1]**   43/8
sparse **[1]**   14/24
spatial **[2]**   45/22 46/5
specialized **[1]**   31/1
specialty **[1]**   26/1
specific **[2]**   18/24 53/12
specifically **[1]**   45/3
specificity **[2]**   16/19 68/22
specifics **[1]**   32/9
speed **[1]**   56/13
speedy **[2]**   54/14 54/14
spending **[2]**   5/7 10/17
spreadsheets **[1]**   15/22
ST **[1]**   67/15
stand **[4]**   36/12 52/3 58/21 61/15
standard **[1]**   59/24
standardless **[2]**   35/9 35/12
stands **[2]**   64/21 65/2
start **[6]**   20/16 40/19 61/15 68/10
68/11 68/14
starting **[4]**   4/15 23/10 23/16
23/17
starts **[1]**   40/20
stated **[1]**   13/25
statement **[7]**   13/16 13/18 15/1
15/15 15/16 55/1 68/19
statements **[7]**   5/2 12/1 12/6 13/5
15/8 15/10 15/14
states **[5]**   1/1 1/3 1/10 11/25
68/1
statistical **[9]**   26/2 28/7 31/4
31/17 31/20 31/24 32/22 32/24
34/12
statistics **[8]**   31/3 31/6 31/8
31/16 32/6 32/16 40/13 42/12
status **[1]**   24/18
step **[1]**   20/22
Stephen **[2]**   33/23 33/25
steps **[1]**   58/2
STERLINGOV **[27]**   1/6 5/24 6/3 6/6
6/15 7/2 7/19 7/20 10/4 10/7
10/22 11/12 11/16 24/17 24/20
46/23 47/2 47/25 52/14 56/21 57/4

60/21 63/9 63/18 63/22 66/23
67/4 67/4 69/17
Sterlingov's **[17]**   3/15 4/21 4/23
5/3 5/6 5/12 6/12 6/19 7/9 8/19
9/10 10/8 11/9 12/15 12/19 12/20
49/23
Steven **[1]**   79/20
stick **[1]**   43/3
still **[13]**   25/10 25/14 29/17
33/14 49/18 51/8 53/21 57/11 59/1
64/12 64/13 67/19 69/15
stone **[1]**   58/9
stop **[1]**   43/19
straightforward **[1]**   51/1
Street **[2]**   1/16 2/4
strikes **[2]**   21/16 34/25 36/3
struggling **[1]**   51/8
studied **[5]**   25/19 39/24 40/12
51/14 52/5
studies **[1]**   35/24
study **[3]**   36/17 36/23 39/23
stuff **[4]**   47/19 60/20 69/5 69/17
subject **[1]**   29/25
submit **[2]**   38/1 40/3
substance **[1]**   22/18
sufficient **[1]**   49/21
suggest **[1]**   62/2
suggested **[1]**   60/19
suggesting **[4]**   26/24 29/7 29/20
61/25
Suite **[1]**   1/16
summarize **[4]**   5/1 11/25 13/3 15/6
summary **[11]**   3/6 5/20 7/4 10/6
10/11 12/3 12/7 12/24 13/24 15/20
64/9
summer **[2]**   55/3 55/3
supplemental **[1]**   28/2
supported **[1]**   59/23
suppose **[7]**   15/8 41/8 41/15 44/5
45/15 45/17 46/19
supposed **[2]**   12/5 35/14
supposedly **[1]**   18/16
sure **[16]**   15/5 19/1 20/20 20/25
20/25 24/10 24/25 36/9 44/1 50/6
59/5 62/4 62/21 64/12 79/10 80/3
Sweden **[2]**   10/9 13/17
sympathetic **[2]**   54/22 58/18
synonymous **[1]**   38/20
system **[3]**   9/10 25/12 30/14
systemic **[15]**   23/19 24/9 29/23
30/14 30/20 31/2 32/6 32/24 33/25
34/12 40/5 40/14 40/14 40/18
42/14

**T**

table **[14]**   7/6 7/14 7/14 8/7 8/8
8/8 8/22 9/3 9/4 9/17 9/19 10/6
11/7 13/24
tables **[3]**   8/7 9/17 15/21
take **[14]**   3/2 14/5 18/13 24/23
27/14 43/1 43/18 47/2 52/3 60/10
61/4 61/20 70/5 70/6
taken **[4]**   10/3 40/25 56/19 61/22
takes **[1]**   11/21
taking **[3]**   13/14 39/10 58/2
talk **[21]**   22/20 24/18 25/4 25/5
44/14 45/13 46/23 47/3 47/22 48/2
49/3 49/9 49/12 50/23 50/24 51/5
51/16 52/17 61/14 61/17 62/18
talking **[11]**   3/21 27/5 27/22
35/12 42/22 43/10 46/20 46/21
48/19 51/12 58/24
task **[4]**   34/16 36/17 36/23 37/10
TBD **[2]**   65/15 65/16
techniques **[2]**   32/22 32/24
technology **[1]**   23/25
tell **[13]**   17/6 27/9 32/10 34/1
34/21 35/6 35/11 35/22 37/17
40/11 46/12 60/11 79/13
telling **[2]**   32/15 37/16
temperature **[1]**   27/18
temporal **[3]**   43/8 45/22 46/5

ten **[1]**   53/10
tentative **[1]**   30/4
term **[3]**   7/22 34/6 38/19
terms **[5]**   8/9 15/13 16/2 51/14
61/10
terribly **[1]**   35/5
testified **[5]**   10/23 45/24 49/13
66/6 66/11
testifies **[1]**   67/13
testify **[26]**   4/18 6/18 10/5 10/21
16/13 16/14 17/4 17/9 19/13 19/22
20/5 21/14 23/18 31/19 31/20
31/23 33/24 34/20 36/11 40/4
44/21 45/13 46/4 52/14 59/5 59/7
testifying **[3]**   12/4 14/25 33/12
testimony **[47]**   3/10 3/22 4/10 5/6
5/8 6/23 6/23 6/25 6/25 9/21
14/22 16/11 17/5 17/21 17/23
20/10 20/21 24/12 28/24 29/11
32/11 32/15 33/8 33/16 33/20 36/8
37/10 40/1 40/3 40/9 40/12 41/12
41/14 41/17 41/18 42/2 42/13 45/2
45/5 46/6 51/2 51/11 51/12 51/13
51/19 51/22 80/7
testing **[1]**   34/25
than **[23]**   15/23 19/5 24/15 24/25
25/2 25/20 29/17 29/19 31/13 34/3
34/5 36/4 37/22 37/25 39/10 40/22
48/7 51/13 55/11 56/3 56/19 58/13
70/7
Thank **[1]**   61/21
that **[540]**
their **[14]**   15/3 25/23 26/5 26/12
29/16 31/22 49/16 50/11 53/13
54/9 62/17 64/5 65/18 68/22
them **[16]**   13/6 21/4 22/21 22/23
22/23 23/14 28/11 33/14 44/4 47/8
49/4 53/14 57/22 63/5 68/16 80/2
themselves **[3]**   6/24 29/7 51/18
then **[42]**   11/7 12/7 12/24 12/25
14/16 18/25 20/23 23/3 33/14 35/3
36/3 36/21 38/1 38/3 41/24 43/20
45/5 49/4 51/25 55/9 55/12 56/25
57/1 57/4 57/17 60/11 60/19 60/20
63/20 64/9 65/13 65/14 65/16
66/22 66/23 67/7 67/17 70/7 79/19
79/20 80/9 80/12
theories **[1]**   4/8
there **[85]**
therefore **[1]**   33/5
thermometer **[2]**   27/9 27/17
these **[24]**   5/23 6/14 6/22 7/1
7/15 7/18 7/19 11/10 15/22 17/12
27/1 33/17 35/2 35/2 35/23 39/2
40/4 51/14 53/15 53/16 64/24
66/19 66/20 79/14
they **[63]**   6/4 14/9 16/24 18/17
20/1 24/21 25/25 28/3 28/4 29/16
31/21 31/21 35/14 35/16 36/19
39/24 44/17 44/19 46/15 47/1
47/18 48/1 50/17 50/20 51/18
53/10 53/12 53/12 54/10 54/11
55/2 55/19 55/20 55/23 55/23
56/12 56/13 57/22 57/23 57/24
58/22 59/5 59/7 59/9 59/10 59/13
61/7 62/17 62/18 62/19 62/25 63/7
63/18 64/3 64/4 64/8 64/8 68/25
68/25 79/15 79/15 80/5 80/6
thing **[13]**   8/3 32/4 38/11 39/11
43/20 44/6 50/23 52/19 54/12
58/23 61/4 61/23 69/20
things **[8]**   21/22 29/15 29/24
31/22 52/3 52/5 56/3 61/15
think **[134]**
thinks **[2]**   41/9 50/12
this **[140]**
those **[28]**   3/18 3/19 4/9 5/9 6/2
8/9 8/12 8/21 8/22 8/23 8/25 9/3
9/5 9/6 10/10 10/13 11/12 14/12
15/2 18/9 25/16 25/17 28/4 32/14
32/15 39/19 43/24 54/3
though **[6]**   19/12 24/6 39/6 45/21

**T**

though... [2]  52/1 59/23
thought [8]  46/11 48/13 48/14
 48/17 48/21 48/25 57/12 66/5
three [1]  20/6
through [28]  4/13 5/3 5/14 5/17
 6/12 16/9 16/11 20/15 32/2 42/25
 43/7 43/11 61/3 64/18 64/19 64/23
 64/25 65/1 65/3 65/5 65/6 65/8
 65/11 65/12 66/8 67/11 68/21
 68/21
throughout [1]  30/10
Thursday [5]  62/19 62/21 69/4
 70/6 80/12
tied [3]  6/5 6/11 6/15
time [26]  5/5 7/5 7/10 7/16 8/12
 8/23 8/25 9/11 17/16 27/12 41/19
 53/2 53/8 53/22 56/24 57/1 59/19
 61/17 62/7 62/24 63/2 63/25 66/22
 66/23 70/1 79/23
times [3]  26/12 30/9 61/25
today [6]  52/10 54/18 58/5 66/13
 69/2 69/9
together [1]  11/15 33/6
told [6]  13/9 32/3 63/5 64/12
 65/21 79/18
tomorrow [1]  68/23
tonight [1]  64/6
too [3]  41/5 52/2 57/25
took [2]  13/19 57/4
tools [1]  16/21
top [6]  13/24 20/11 28/15 30/21
 47/15 47/21
topics [2]  32/14 32/15
TOR [2]  2/3 2/4
Torres [7]  22/8 22/11 22/15 60/7
 61/4 61/5 61/10
total [2]  7/9 7/10
totally [1]  29/13
touch [1]  52/23
touched [1]  43/5
tough [1]  59/23
trace [3]  14/17 16/8 46/1
tracers [1]  39/14
tracing [29]  14/19 14/22 16/4
 16/6 16/15 16/18 17/7 21/15 23/25
 23/25 25/13 25/14 25/18 25/19
 26/16 26/16 32/8 32/13 34/1 34/7
 34/10 34/15 39/2 39/10 39/11
 39/12 39/22 43/18 45/7
track [1]  5/12
traded [1]  24/2
trades [1]  24/2
trading [3]  5/4 7/7 34/8
traditional [2]  4/25 12/22
trained [1]  16/20
training [7]  19/14 19/18 24/3
 64/17 64/19 64/22 66/20
trainings [1]  64/25
transaction [11]  4/21 5/8 5/10
 6/10 6/11 12/15 12/19 39/8
 44/24 44/25
transactions [21]  6/10 14/12 16/5
 17/2 17/16 18/7 18/9 20/15 20/16
 27/3 32/22 32/23 34/22 42/18 44/8
 44/14 44/15 44/20 44/21 45/3 46/2
transcript [6]  1/9 42/19 42/24
 42/24 45/25 81/5
transfer [1]  17/24
transferred [2]  9/8 43/16
transfers [10]  9/19 13/25 36/16
 43/11 43/17 43/19 43/25 44/2 44/3
 45/6
translated [1]  47/13
translators [2]  79/14 79/15
transparent [1]  56/3
trial [38]  13/15 20/19 28/23
 30/10 30/16 45/17 52/25 52/25
 53/6 53/7 53/22 53/25 54/13 54/14
 54/15 54/15 56/11 56/21 57/2
 57/13 58/3 59/18 60/2 66/6 66/7
66/10 66/12 66/15 66/18 67/6 67/8
 67/9 67/11 67/20 67/23 67/25
 68/14 69/8
tries [1]  53/8
trips [1]  66/19
true [6]  6/15 7/25 16/19 29/13
 57/18 81/5
truly [1]  45/2
try [2]  57/13 58/2
trying [5]  24/21 45/4 50/20 55/12
 67/5
turn [1]  21/25 23/3 59/17
turned [1]  57/18
turning [1]  64/1
two [15]  8/7 10/18 11/14 14/12
 14/13 16/10 16/10 17/12 18/7 18/8
 18/15 20/1 21/17 22/14 40/13
tying [2]  40/10 42/14
type [5]  17/7 17/17 27/15 38/11
 55/16
types [2]  30/13 40/13
typically [1]  19/25

**U**

U.S [2]  1/13 2/8
Ukraine [2]  18/16 20/6
ultimate [1]  16/12
unanticipated [1]  41/12
unavailable [1]  66/8
undefined [1]  34/6
under [6]  6/1 10/22 11/23 36/3
 36/4 69/5
underestimate [1]  9/23
underlying [1]  15/21
understand [21]  6/8 15/7 21/6
 26/3 26/13 28/4 29/23 30/12 33/1
 35/4 37/25 40/7 47/8 48/4 50/7
 50/10 50/17 51/7 54/24 58/9 66/5
understanding [11]  4/21 12/15
 12/18 33/17 36/25 37/25 39/6 47/5
 47/5 49/3 50/23
understands [1]  46/17
understood [4]  40/24 47/18 52/9
 56/15
unfair [1]  44/19
unhappily [1]  57/5
unhelpful [1]  35/1
unique [1]  6/6
unit [1]  16/22
UNITED [1]  1/1 1/3 1/10
universe [1]  30/1
unless [6]  35/14 68/9
unquote [1]  13/24
unrelated [5]  11/11 11/12 11/14
 14/13 20/1
unreliable [2]  35/1 37/14
unscientific [1]  29/13
until [2]  56/10 68/12
unusual [3]  11/13 14/13 14/15
unwilling [1]  58/20
up [17]  3/2 4/2 17/15 17/18 17/25
 25/6 29/5 45/17 49/16 50/13 53/10
 56/13 57/13 63/6 69/21 69/22 70/6
update [1]  62/12
updates [1]  22/1
upon [1]  47/11
urge [1]  53/1
us [11]  1/19 13/3 18/5 27/9 34/1
 56/16 60/11 62/13 63/19 65/21
 73/7
USAO [1]  1/15
use [10]  6/4 6/9 6/12 27/5 27/7
 27/9 28/13 35/20 43/8 79/23
used [2]  18/18 38/16 45/25
user [4]  24/18 45/15 47/9 51/5
uses [1]  50/11
using [13]  11/16 13/12 14/3 27/6
 27/25 29/11 31/4 31/6 31/8 31/16
 31/17 32/23 33/3
usually [1]  19/11

**V**

vaguely [1]  11/25
valuable [2]  8/14 25/20
value [5]  8/11 8/24 8/25 9/6
 50/13
variation [1]  34/24
variations [1]  36/2
variety [1]  7/9
various [3]  4/23 7/16 12/21
veering [1]  46/6
Verret [2]  15/23 19/5
Verret's [1]  14/22
version [1]  45/9
versus [2]  4/4 51/19
very [16]  13/8 14/24 27/1 29/16
 29/19 29/24 29/24 33/14 48/6
 50/22 53/5 53/16 57/15 67/14
 67/14 67/17
vet [1]  59/4
view [7]  4/19 26/10 26/15 26/25
 43/22 45/9 58/19
virtual [4]  4/24 12/21 38/17
 38/20
virtually [1]  51/17
voicemails [1]  22/9
volunteered [1]  56/2
VPN [2]  49/23 50/8
vs [1]  1/5

**W**

waiting [1]  68/6
walk [6]  4/12 5/3 5/14 5/17 16/11
 61/3
walking [1]  20/15
Wall [1]  2/4
wallet [2]  7/22 43/9
wallets [3]  4/24 7/19 12/22
want [30]  3/2 4/12 5/14 5/17
 21/25 23/11 40/8 42/11 42/21 43/2
 43/20 44/6 44/17 44/18 46/16
 54/16 56/20 59/12 60/21 61/3
 61/11 62/6 63/3 63/15 63/16 64/8
 64/9 69/14 79/9 80/3
wanted [6]  41/25 46/9 52/7 56/13
 61/23 62/10
wants [12]  34/19 38/5 40/11 44/21
 45/13 49/15 51/20 52/21 57/15
 63/20 67/1 69/20
warm [1]  27/9
was [85]
Washington [5]  1/5 1/14 1/17 1/20
 2/10
wasn't [3]  8/14 37/13 57/18
way [16]  6/8 7/18 26/22 26/24
 27/8 29/19 39/7 40/17 45/19 45/20
 46/21 51/14 51/23 52/5 54/21
 57/13
ways [3]  14/9 44/8 62/8
we [149]
we'll [2]  21/22 24/23
we're [1]  13/9
Wednesday [1]  68/25
week [4]  56/25 62/1 62/1 67/18
weekend [1]  66/15
weeks [1]  57/12
welcome [3]  33/13 35/17 38/4
welcomes [1]  29/2
well [33]  4/5 5/4 5/9 5/18 12/14
 13/6 14/13 22/8 23/3 24/7 25/24
 30/7 30/12 31/9 31/18 32/18 34/23
 36/8 37/2 37/10 41/8 41/10 41/23
 49/22 50/16 57/1 57/6 57/25 60/21
 61/9 62/5 63/17 67/2
were [27]  3/16 7/19 9/22 11/8
 11/12 18/8 22/12 34/17 34/22
 35/24 35/24 37/18 37/19 39/24
 42/1 46/11 51/18 52/6 53/15 55/17
 55/23 56/10 57/17 57/21 57/23
 68/24 80/5
weren't [1]  56/13
what [136]

**W**

**What's [1]** 79/24
**whatever [3]** 29/9 37/11 47/11
**when [17]** 10/3 15/6 15/24 18/14 20/1 20/16 20/24 32/16 40/15 44/23 46/15 50/21 53/15 55/9 56/2 57/12 60/19
**where [30]** 5/23 6/2 6/8 6/17 6/24 10/16 12/3 13/1 13/9 17/24 18/8 18/8 19/22 31/1 33/3 36/10 36/15 40/18 41/6 42/21 46/13 47/4 54/21 55/14 55/21 57/24 61/15 63/18 64/5 66/20
**whether [22]** 17/20 18/6 19/21 19/25 20/25 24/23 32/10 33/20 34/9 35/12 40/9 45/22 47/17 50/14 51/10 51/10 51/11 51/13 51/14 52/13 62/2 68/25
**which [37]** 3/17 3/23 6/2 8/21 10/9 11/10 11/13 15/22 17/13 19/5 20/21 21/23 23/8 23/23 24/18 27/14 28/7 28/8 29/16 29/25 33/4 36/1 40/10 41/10 41/19 42/18 47/1 47/12 48/18 49/23 55/6 55/10 56/22 59/19 62/18 67/25 69/22
**while [5]** 28/16 32/21 39/21 64/24 66/4
**who [31]** 17/9 19/13 20/2 22/13 24/2 34/24 35/11 35/12 35/15 35/15 38/5 38/12 43/14 44/14 44/20 44/24 45/14 50/3 51/5 51/17 54/14 54/15 55/15 55/22 55/24 57/19 59/5 59/12 67/10 79/11 79/12
**whole [7]** 30/14 38/2 41/12 45/18 48/14 48/17 54/2
**whom [1]** 36/3
**why [25]** 13/13 14/15 20/3 23/3 30/12 33/17 33/18 35/4 43/1 50/6 53/10 54/11 55/23 56/9 57/15 58/1 58/22 60/10 60/11 60/16 61/2 61/14 68/18 68/18 69/12
**will [64]** 4/20 4/21 5/1 5/3 5/6 5/8 5/12 6/17 6/22 6/25 9/25 10/5 10/11 10/18 10/21 10/24 11/25 12/14 12/18 12/19 13/2 15/6 20/23 21/5 23/18 30/8 31/14 32/21 33/16 36/15 36/21 38/6 41/2 41/2 41/3 41/4 43/8 43/12 43/13 43/15 43/16 45/6 45/16 46/14 46/15 47/19 48/10 53/25 54/1 57/7 58/23 59/24 60/1 60/3 60/9 60/12 61/16 63/6 63/8 65/24 66/3 68/22 80/5 80/11
**willing [1]** 59/6
**wire [1]** 17/24
**withdrawals [1]** 5/4
**within [6]** 18/13 18/18 18/21 19/16 19/16 19/18
**without [5]** 36/12 42/14 44/15 51/23 59/25
**withstand [1]** 59/6
**witness [13]** 4/7 6/17 21/20 41/11 44/7 44/11 51/15 66/23 67/4 67/13 68/10 79/7 80/3
**witnesses [11]** 33/12 46/19 52/23 53/13 53/17 64/10 68/20 69/6 70/11 79/8 80/6
**witnesses' [1]** 53/15
**wonder [2]** 19/21 51/11
**word [4]** 27/6 28/1 28/13 37/14
**words [4]** 8/10 15/9 28/4 34/4
**work [10]** 29/16 43/12 46/2 53/21 55/13 55/14 56/6 59/3 67/19 68/5
**worked [2]** 24/4 54/24
**working [7]** 21/1 29/5 39/14 39/24 42/3 42/6 55/17
**works [3]** 31/15 63/2 67/13
**workshop [1]** 65/15
**world [4]** 20/2 46/13 46/17 55/6
**worth [2]** 10/17 52/10
**would [63]** 6/9 6/16 8/1 9/15 9/20

15/19 16/7 17/22 18/18 19/19 21/12 24/17 24/25 25/5 28/2 28/11 29/8 36/6 36/12 37/5 40/2 41/17 42/17 42/20 46/6 46/7 47/7 47/8 47/12 48/3 49/14 49/25 50/6 50/16 51/1 51/3 53/1 53/1 53/11 53/14 55/4 55/11 55/13 55/24 56/3 56/7 56/15 57/13 57/23 58/9 58/15 59/22 60/8 61/2 61/11 62/20 63/5 63/7 63/24 66/16 66/18 68/14 69/4
**wouldn't [3]** 55/6 55/6 66/6
**writing [2]** 53/14 53/15
**written [1]** 68/19
**wrong [3]** 28/19 29/24 31/16
**wrote [1]** 45/8

**Y**

**yeah [6]** 7/24 21/12 46/3 66/25 67/12 69/23
**year [3]** 10/12 10/12 65/18
**years [5]** 10/18 24/2 30/24 51/16 67/16
**Yep [3]** 3/13 8/17 23/9
**yes [24]** 3/4 4/14 5/19 6/21 11/4 12/17 17/3 17/8 19/3 19/15 20/4 21/6 22/6 27/21 41/21 45/21 52/22 58/15 59/17 60/4 60/6 62/22 63/11 66/17
**Yet [1]** 25/24
**York [1]** 1/20
**you [201]**
**your [79]** 3/4 3/5 3/9 4/14 5/16 5/19 6/1 6/21 11/4 11/19 11/21 12/17 13/21 14/6 15/6 15/13 15/19 16/6 16/17 17/3 17/8 18/10 19/3 19/15 20/4 21/6 23/6 24/14 26/20 27/21 27/25 30/9 33/2 33/22 35/7 36/5 37/1 38/1 38/14 38/24 40/3 40/15 40/15 40/24 41/19 41/21 41/25 43/24 44/10 44/12 44/18 45/9 45/16 45/21 48/18 49/12 50/24 52/19 52/22 53/18 58/15 59/16 60/4 61/8 61/18 62/4 63/13 63/23 64/2 64/10 66/17 67/21 68/20 69/19 70/10 79/14 79/22 79/25 80/10
**yourself [2]** 48/15 48/19

**Z**

**Zoom [6]** 63/3 63/5 63/8 63/10 63/19 63/21