```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
      UNITED STATES OF AMERICA,        ) Criminal Action
 3                                     ) No. 1:21-CR-0399
                        Plaintiff,     )
 4                                     ) MOTIONS HEARING
      vs.                              )
 5                                     ) Washington, D.C.
      ROMAN STERLINGOV,                ) June 16, 2023
 6                                     ) Time:  10:00 A.M.
                        Defendant.     )
 7
                  TRANSCRIPT OF MOTIONS HEARING
 8         BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                  UNITED STATES DISTRICT JUDGE
 9
                     A P P E A R A N C E S
10
      For the Plaintiff:     CHRISTOPHER BROWN
11                           USAO-DOJ
                             601 D Street, NW
12                           Washington, DC 20001
13                           ALDEN PELKER
                             U.S. DEPARTMENT OF JUSTICE
14                           950 Pennsylvania Avenue, NW
                             Washington, DC 20530
15
      For the Defendant:     TOR EKELAND
16                           MICHAEL HASSARD
                             Tor Ekeland Law, PLLC
17                           30 Wall Street, 8th Floor
                             New York, NY 10005
18
      For the Movants:       WILLIAM FRENTZEN
19                           MORRISON & FOERSTER, LLP
                             425 Market Street
20                           San Francisco, CA 94105
21
22    Court Reporter:        Tamara M. Sefranek, RMR, CRR, CRC
                             Official Court Reporter
23                           United States Courthouse, Room 6714
                             333 Constitution Avenue, NW
24                           Washington, DC  20001
                             202-354-3246
25
```

```
 1                        I N D E X

 2
        WITNESS                                    PAGE
 3
        DR. FRANCISCO CABANAS
 4
             Direct Examination
 5           By Mr. Ekeland                        78

 6           Cross-Examination
             By Ms. Pelker                         102
 7
             Redirect Examination
 8           By Mr. Ekeland                        127

 9

10      EXHIBITS ADMITTED                          PAGE

11      Defense Exhibit A                          86

12      Defense Exhibit B                          96

13      Exhibits 5 through 9                       126

14      Exhibits 14 and 15                         126

15

16

17

18

19

20

21

22

23

24

25
```

WITNESS — PAGE
DR. FRANCISCO CABANAS
Direct Examination By Mr. Ekeland — 78
Cross-Examination By Ms. Pelker — 102
Redirect Examination By Mr. Ekeland — 127
EXHIBITS ADMITTED — PAGE
Defense Exhibit A — 86
Defense Exhibit B — 96
Exhibits 5 through 9 — 126
Exhibits 14 and 15 — 126

```
1                    P R O C E E D I N G S
2            THE COURTROOM DEPUTY:  Calling criminal Case 21-399,
3    United States of America v. Roman Sterlingov.
4            Would counsel state their name for the record,
5    starting with government counsel.
6            MR. BROWN:  Good morning, Your Honor.  AUSA Chris
7    Brown for the government.
8            MS. PELKER:  Good morning, Your Honor.  Alden Pelker
9    for the United States.
10           THE COURT:  Good morning to both of you.
11           MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland
12   for Defendant Roman Sterlingov, who is present in court.
13           THE COURT:  Good morning.
14           MR. HASSARD:  Good morning, Your Honor.  Michael
15   Hassard for Defendant Roman Sterlingov.
16           THE COURT:  Good morning to you and good morning to
17   Mr. Sterlingov as well.
18           So we're here today for the first of our hearings on
19   the various pretrial motions.  I am happy to proceed as the
20   parties have proposed with respect to scheduling and to start
21   with the Rule 17 subpoenas, the motions to quash, and then turn
22   to the order to show cause relating to alleged violations of
23   local Criminal Rule 5.7.  And then we can figure out where to
24   go from there after our lunch break.
25           So why don't we go ahead and start with the motions
```

1    to quash.  The first set of those are Docket Numbers 93 and 95.

2    93 is the government's Motion to Quash Early-Return Rule 17

3    Subpoena; and 95 is the Motion to Quash Subpoena by Nonparty,

4    Chainalysis, Inc., Michael Gronager, Jonathan Levin and Youli

5    Lee, and Incorporated Memorandum of Law.

6         So why don't I start with the government on

7    Docket 93.

8         MR. BROWN:  Yes, Your Honor.  The government is

9    moving to quash the Rule 17(c) early-return subpoenas served on

10   the third-party Chainalysis, Inc., and several associated

11   individuals, essentially, for two reasons.

12        Number one, those subpoenas are procedurally

13   improper.  They were served without leave of court for an early

14   return date.  And, number two, the subpoenas are grossly

15   overbroad.  They don't meet the *Nixon* test and they reflect an

16   impermissible fishing expedition.

17        The government's concerns here are not only -- the

18   government's primary concern here is about policing the

19   boundaries of relevance in this case.  The subpoenas seek

20   materials that fall far outside anything directly relevant to

21   any element of guilt or innocence for the defendant, and the

22   government is concerned that the defense, with these subpoenas,

23   as well as some other motions by the defense, the defense is

24   essentially seeking to turn the defense case in this case into

25   something that's not really about Roman Sterlingov's guilt or

1    innocence, but it's about something else.  It's about the

2    defense counsel's theories and allegations with respect to

3    Chainalysis at large.

4            That's not appropriate for a criminal trial.  That's

5    the definition of a Rule 403 excludable presentation because it

6    is not really relevant to guilt or innocence or any of the

7    elements of the offense, and it is going to be highly

8    distracting to the jury.  And it's part of an effort to,

9    essentially, tar our expert -- our one expert from Chainalysis

10   by innuendo with all of these allegations of general wrongdoing

11   about Chainalysis.

12           THE COURT:  What is the government's standing to move

13   to quash a subpoena served on a third party?

14           MR. BROWN:  Your Honor, the government's standing has

15   to do with, again, policing the boundaries of relevance,

16   procedural propriety --

17           THE COURT:  That may go to admissibility.

18           MR. BROWN:  Your Honor, the defendants, on authority,

19   *United States v. Cartagena-Albaladejo* from 299 F. Supp. 3d 378,

20   says that even -- that the government does have standing and an

21   interest in preventing "harassment of potential witnesses" --

22   which is exactly what this is -- as well as undue lengthening

23   of the trial in discovery process with evidence that may

24   either be -- that may neither be relevant nor admissible.

25           And that's exactly the case here.  We are talking

1    about undue lengthening of the trial with distracting and --

2            THE COURT:  But it's not lengthening the trial at all

3    if I just say none of it is admissible, right?

4            MR. BROWN:  That's true, Your Honor.  But even if the

5    Court allows -- even if the Court excludes it at trial, we're

6    still talking about a substantial volume of irrelevant

7    discovery that the government will also have to review.  I

8    mean, those materials -- if it's an early-return subpoena,

9    those materials need to be shared with the government so we can

10   review them.  That's going to add a significant burden on the

11   government, as well as the defense.

12           We also have an interest in preventing what is a

13   clear case of harassment of Chainalysis.  Defense counsel -- I

14   don't think that this is coming from the defendant himself.

15   Defense counsel have a fixation with Chainalysis.  This is

16   exhibited both in their filings where in their latest filing

17   they're threatening Chainalysis with all of this extraneous

18   civil litigation, which is an improper reason to ask for

19   discovery.

20           In their podcasts they have said, "Chainalysis, we're

21   going to sue the crap out of them."  That's from *The Vonu*

22   *Podcast*.  That's quoted in ECF No. 120.  In another podcast --

23           THE COURT:  Sue them for what?

24           MR. BROWN:  Sue the crap out of them.  Ask defense

25   counsel.  They're talking about post-trial they're planning to

 1    sue Chainalysis.

 2              In another podcast, the *Bitcoin Miami* podcast -- and

 3    we can supply the Court with the URL -- at one hour and 42

 4    minutes, defense counsel says, "This is our opportunity to take

 5    down Chainalysis."

 6              That's what they're saying about this trial.  It's

 7    not about the defendant's guilt or innocence.  It's about

 8    prosecuting defense counsel's pet theories about Chainalysis.

 9              And to ask for this volume of really abusive,

10    irrelevant, inadmissible discovery, which is a clear fishing

11    expedition, will burden not only defense, but will burden the

12    government, and will lead to just prolonging the trial.  Even

13    if the Court excludes it, we'll still have to litigate these

14    questions of admissibility about whether communications

15    relating to penetration testing for Chainalysis software are

16    relevant and admissible to this case.

17              There's a whole slew of totally irrelevant document

18    requests in those subpoenas that we will have to address at

19    trial unless the Court, at least, enforces the procedural

20    requirement that early-return subpoenas need to be approved by

21    prior leave of court.

22              THE COURT:  Although, isn't the authority split on

23    that question?

24              MR. BROWN:  Your Honor, I'm not aware of an authority

25    clearly holding that early-return subpoenas do not require

1   leave of court.  But I am aware of Judge Sullivan's very

2   forceful opinion in the *Binh Vo* case, where at least in this

3   district -- in the U.S. Attorney's Office, we're all familiar

4   with that case, and we are well aware of Judge Sullivan's

5   analysis there -- that Rule 17(c) explicitly calls for approval

6   by the Court for an early-return subpoena.

7           And as Judge Sullivan explained, this is not a

8   formality.  This is part of the Court's responsibility to

9   supervise the propriety of subpoenas that are issued in the

10  Court's name.

11          THE COURT:  Doesn't the *United States v. Urlacher*,

12  *United States v. Cartagena*, which you mentioned, support the

13  other; and Wright and Miller [sic] says that a motion in

14  advance of issuing a Rule 17(c)(1) subpoena is an orderly and

15  desirable procedure and one frequently followed, but the rule

16  does not require it, and the question can be raised as well on

17  a motion to quash.  It's Wright and Miller.

18          MR. BROWN:  Your Honor, there are understandably

19  different ways to read Rule 17(c).  We read it as the way that

20  Judge Sullivan read it, which is clear.  The Court may direct a

21  witness to produce the designated items in court before trial

22  or before they are to be offered in evidence.  That's Rule

23  17(c)(1).  And, Your Honor --

24          THE COURT:  That is true with respect to

25  early-return, perhaps.  It's not true with respect to the first

1    sentence of (c)(1), which is, "A subpoena may order the witness

2    to produce any books, papers, documents, data, or other objects

3    the subpoena designates."

4         So it may be, then, that an arguable reading of

5    (c)(1) is that the subpoena can just order that the materials

6    be produced for trial, and it may be on the day of trial or the

7    day before trial or something like that.  And then we might

8    have to have an adjournment if there is a big pile of exhibits

9    that are produced and people need time to go and review them.

10        But it's only the second sentence that really talks

11   about the Court's discretion, saying that the Court can order

12   it earlier.

13        MR. BROWN:  Yes, Your Honor.  That's exactly how

14   Judge Sullivan read this.  He said there's a general rule,

15   which is prior leave of court is not required if the production

16   is beyond the day of testimony.

17        But it carves out an exception to that general rule.

18   And your point about, would we need an adjournment if there's a

19   large volume, I think that dovetails with the point about the

20   substantive requirements for issuing a Rule 17(c) subpoena.

21        If the proposed production is so voluminous that the

22   parties need some sort of adjournment to review it, that shows

23   it's a fishing expedition.  Rule 17(c) is designed for specific

24   discrete items of evidence that will be admitted at trial or at

25   a hearing.

1          If the defense is asking for such a volume of

2     documents that there's no way that anyone can absorb that

3     within a day, then that does show that it fails the *Nixon* test

4     of admissibility, specificity, and relevance.

5          I would also direct the Court on the question of

6     prior leave of court to the D.C. Circuit's decision, *United*

7     *States v. Haldeman*, 559 F.2d 31.  That's cited in ECF 93 at 3.

8     The D.C. Circuit said the Court "indulges pretrial inspection

9     of subpoena papers only upon a showing," and then it lists out

10    the qualitative tests that they are --

11         THE COURT:  Do you know if Rule 17 read the same way

12    all the way back in the 1970s?

13         MR. BROWN:  Your Honor, I think it was substantively

14    the same.  The exact wording may have changed over time, but

15    they're reading, as far as I understand it, the similar

16    wording, but I don't know for sure.

17         THE COURT:  There's a version, it was from the 1970s,

18    but that's years ago at this point.

19         MR. BROWN:  Yes, Your Honor.  Yes, Your Honor.  But,

20    I mean, courts to this day -- I think if you read *Binh Vo*, *Binh*

21    *Vo* is still citing *Bowman Dairy*, other cases from much earlier,

22    involving earlier versions of Rule 17.  I think *Bowman Dairy* is

23    a good example.

24         That is an older case, but it does elucidate the --

25    that there is a substantive threshold for early-return

1    subpoenas, and there's a role for the Court in policing the

2    propriety of those subpoenas.

3           THE COURT:  Okay.  So let me hear, then, from counsel

4    for Chainalysis and the others.

5           MR. FRENTZEN:  Good morning, Your Honor.  William

6    Frentzen from Morrison & Foerster on behalf of Chainalysis,

7    Michael Gronager, Jonathan Levin, and Youli Lee.  Thank you,

8    first of all, to the Court for hearing us today.  We appreciate

9    that.

10          We, similarly, believe that the subpoenas, the 17(c)

11   subpoenas, that have been issued should be quashed in this

12   instance.  And, additionally, just so the Court is aware, there

13   is an, effectively, sort of a copycat subpoena for Michael

14   Gronager specifically to appear here next Friday on the 23rd,

15   which has been fully briefed; a motion to quash that subpoena

16   on the basis that that, as well, is -- it is similar in the

17   sense that it is a further move simply to try to harass my

18   clients and to try to obtain irrelevant information.

19          But, specifically, it is clearly not relevant to the

20   issues that the Court has said it wants to hear about here

21   today and next Friday as we've --

22          THE COURT:  Let's get to that separate one, the

23   subpoena for the *Daubert* hearing later just so I take these

24   things in order.

25          MR. FRENTZEN:  Absolutely, Your Honor.

1          THE COURT:  I'll give you a chance to address that as

2    well.

3          MR. FRENTZEN:  I appreciate that, Your Honor.

4          So in terms of the 17(c) subpoenas, we, of course,

5    agree with the government.  As we've explained under the plain

6    language in the case law, we believe that, for early

7    production, the moving party needs to have a 17(c) subpoena

8    issued by the Court.

9          And so here, instead, we simply got 17(c) subpoenas

10   which were not endorsed by the Court, and that is not just a

11   procedural failing.  It's also a failing demonstrative of what

12   was in those subpoenas.

13         It is 81 requests in total.  I think it's, like, 50

14   pages or so in length.  And the requests are incredibly broad

15   and not directed to anything in particular.  And in addition to

16   the *Nixon* test, which we believe is the law, that they've not

17   been able to show any specificity, any relevance, or

18   admissibility, which is what they have to show to the Court in

19   order to get this early return that these claims are --

20   sorry -- these requests fail.

21         In addition, Your Honor, the case law on 17(c)

22   subpoenas is clear.  That it is not an end-around on discovery.

23   In other words, what the defendant is supposed to get,

24   generally speaking, in the case includes Rule 16 and

25   disclosures from the government.  It is clear from these

1    requests that the requests are, effectively, a broad fishing

2    expedition -- I mean, in other words, in order to get early

3    return on a 17(c) subpoena, you have to say, this is a piece of

4    evidence that exists and that is relevant and is admissible,

5    but I need it in advance.

6         It's not an opportunity, as in a civil case, for

7    wide-ranging discovery on issues where, among other places,

8    they should be going to the government and asking for

9    discovery.

10        And so within the requests here, you have things that

11   allegedly relate to expert testimony and disclosures that they

12   say are necessary to test experts.  Well, Rule 16 has, in

13   fact -- I think it's Part G on behalf of the government, I

14   think it's A-something subpart G.  Sorry.  And that includes,

15   you know, appropriate disclosures and discovery regarding

16   experts, and that's how they should be testing the experts in

17   this case.

18        Instead, you've got wide-ranging requests for any

19   manner of things.  It also includes, in large part, requests

20   for communications with the government.  Well, if there are

21   requests for communications with the government which exist and

22   are relevant, then Rule 16 exists to obtain evidence from the

23   government.  But it's not a basis on which you just make

24   wide-ranging requests that are not really aimed at or specific

25   to anything.

1          And part of the problem here, Your Honor, is that --

2     for example, Chainalysis has a number of different products,

3     and those products can perform a wide variety of functions.

4     Rather than coming to the Court and saying, there is a specific

5     issue here, it is something that we contend that the other

6     side's expert got wrong; by way of example.

7          And we need to test that one specific issue or we

8     need -- we believe this information is admissible related to

9     that, then that's something that they're supposed to come to

10    the Court in the first instance and spell it out, and then the

11    Court can analyze and decide whether or not such a subpoena

12    should issue.  But in the first instance, whether or not it's

13    covered by Rule 16, in which case 17(c) is not the appropriate

14    means of getting at it.

15         And so those sorts of narrowly tailored requests are

16    one thing.  That is not what the Court has here.  It is a

17    wide-ranging fishing expedition.  The requests are also

18    factually inaccurate to the extent that they, for example, call

19    for testimony and evidence from Youli Lee, as one example here.

20         Youli Lee is an individual who was an AUSA and now is

21    a lawyer at Chainalysis.  Well, obviously, what she's doing as

22    a lawyer for Chainalysis is largely privileged.  What she did

23    in the government as an AUSA is covered by, among other things,

24    privileges there, but also the *Touhy* regs.

25         There's been no description or explanation about how

1    any of this is relevant to anything or admissible.  In

2    addition, they've taken the extra step, which was either lazy

3    and inaccurate or an outright false statement in saying that

4    she was negotiating with Chainalysis while she was at the

5    government.

6              When Youli Lee left the government, she took a job

7    with a different company, not Chainalysis, unrelated to

8    Chainalysis, and then subsequently took a job with Chainalysis.

9    So even that sort of type of speculative mudslinging is just

10   flat-out wrong.

11             Again, we believe that all of this comes back to the

12   information, and I don't need to sort of read back through what

13   counsel for the government already referenced.  But in the

14   letter -- I won't say 17(c) subpoena even since it wasn't

15   authorized by a court -- but in the letter, the cover letter

16   accompanying those documents from counsel, there was a threat

17   of a lawsuit against Chainalysis.  He did, in fact, say they

18   we're going to sue the crap out of Chainalysis.

19             THE COURT:  For what?

20             MR. FRENTZEN:  That's unclear to me, Your Honor.

21   Other than general dislike for Chainalysis and its products.

22   And a theory that somehow, if his client is acquitted, that

23   somehow Chainalysis faces some sort of liability, which is sort

24   of patently absurd.  But that's the best I can make of his

25   theory here.

1          THE COURT:  Can I ask you a question?

2          MR. FRENTZEN:  Of course, Your Honor.

3          THE COURT:  You referred to the rules relating to

4     expert disclosures.

5          MR. FRENTZEN:  Yes, Your Honor.

6          THE COURT:  The rule requires the government to

7     disclose the bases for an expert's opinion.  If an expert

8     opines that some type of complex analysis was done that led to

9     a particular result, and that complex analysis involved running

10    computer simulations or computer models, just hypothetically,

11    in your view, under Rule 16 would the government be required to

12    produce all that underlying data, computer code, everything

13    that was done?

14         And if not, then how does a defendant in a case in

15    which his liberty is at stake get an opportunity to fairly

16    challenge an expert's opinion?

17         MR. FRENTZEN:  So, Your Honor, what I think that is

18    required -- and if the Court gives me some indulgence before I

19    come back up; I know we cited a case that the -- an expert's

20    reliance on an underlying, for example, piece of software --

21         THE COURT:  Right.

22         MR. FRENTZEN:  -- does not mean that the software --

23    now, the software itself is, of course, disclosable and has

24    been disclosed, and they have --

25         THE COURT:  Disclosable by whom?  By the government

1     and as part of --

2             MR. FRENTZEN:  Sorry.  The Court would have to ask

3     the government about -- but Chainalysis is available,

4     obviously, to the defense.  In other words, the software is an

5     interactive software which the defense can utilize and, among

6     other things, can spot-check.

7             It's -- there's a very specific purpose for which the

8     software has been used in this case.  It's an investigative

9     software that does a ton of different things.  Here, as I

10    understand the two parties' cases, which is probably the least

11    in the room, but in any event --

12            THE COURT:  No.  The second least.

13            MR. FRENTZEN:  I doubt that, but thank you, Your

14    Honor.

15            There is clustering and there is a variety of means

16    of clustering.  The basics of the clustering -- there are

17    several different ways in which these types of transactions in

18    bitcoin or other cryptocurrency can be clustered.

19            That has been explained, can be explained by

20    probably -- well, I know Ms. Bisbee, who will be testifying as

21    an expert for the government and is employed at Chainalysis and

22    understands these things, but also, I believe, by other experts

23    in the case.

24            And that is, A, a sort of a -- there are known

25    processes to do that, and there are several.  But those are

1    known, and those are understood by both sides.

2           Those processes further may be spot-checked.  Now,

3    that spot-checking -- they could be, I believe, thoroughly

4    checked.  That is, it takes time and is voluminous.  But they

5    may be spot-checked and analyzed for that purpose, and they

6    have access to the basic software.

7           In other words, it can be checked.  It can be tested,

8    and witnesses, as I understand it, are going to testify about

9    that.

10          What has been requested here is documents --

11   effectively, documents and records related to the development

12   of the entirety of the software.  It is a totally broad,

13   irrelevant fishing expedition.

14          THE COURT:  What about just -- I mean, I understand

15   that it's, I assume, proprietary, and there would have to be

16   some type of protective order in place.  But if the software

17   is -- the use of the software is of central importance in the

18   case and that is the basis for expert testimony, doesn't the

19   defense have an -- shouldn't the defense have an opportunity to

20   look at that software and -- I understand you might be able to

21   confirm whether it's working right through other types of

22   checks, but their expert might look at them and say, wait a

23   second, this -- this code doesn't make any sense here, and it

24   generated these results because there's a code here, if you

25   actually look at it, that says, computer, when you don't know

1    the answer to this question, assume the following.  And that

2    assumption may be something the defense could show,

3    hypothetically, is just a completely false assumption.  And,

4    therefore, the results are not meaningful.

5         Don't they -- shouldn't they have an opportunity to

6    do that type of analysis?

7         MR. FRENTZEN:  Your Honor, what the Court has just

8    described is an example of what could be done in this case.  It

9    is not the example before the Court.  In other words --

10         THE COURT:  I understand.

11         MR. FRENTZEN:  -- the defense has not actually

12    pointed to any specific or particular issue with anything that

13    we or the government are able to respond to.

14         And it may be, Your Honor, that a proper expert may

15    say, I have an issue with X, and that expert -- then the

16    defense and the government may discuss that, they may take a

17    look into it; there may be a very specific response or answer

18    which makes sense or doesn't make sense to that expert.

19         And that, I think, is a specific request about a

20    particular aspect of a product that could be further delved

21    into, as the Court properly points out, under Rule 16.  It is

22    not a basis to issue a Rule 17(c) subpoena without asking the

23    Court in the first place or describing the first scintilla of

24    information, let alone specificity to do a dump of 51 requests

25    that have nothing to do with nothing [sic] and, frankly, Your

1    Honor, don't actually go to the specific question which the

2    Court just asked.  So that's part of the reason why the 17(c)

3    is inappropriate and should be quashed in its entirety.

4          And then, if there are specific, well-founded

5    requests regarding the experts' opinions and the bases

6    therefor, rather than give us everything you've developed from

7    the time of your inception and potentially before, because we

8    want all that information because, apparently, we're going to

9    try to sue the crap out of you, you know, say we don't think it

10   works, there's one specific -- and, instead, what we've gotten

11   in their response and their opposition is just this general,

12   well, we don't know and, therefore, give us everything, and

13   we'll hunt through it until we try to figure out whether, you

14   know, we can find something or not; which is exactly what the

15   law forbids.

16          THE COURT:  I understand.  Thank you.

17          MR. FRENTZEN:  If there's nothing further, Your

18   Honor, I'll wait to discuss the subpoena specifically to

19   Michael Gronager.

20          THE COURT:  That's fine to do that.  Mr. Ekeland?

21          MR. EKELAND:  Good morning, Your Honor.

22          THE COURT:  Good morning.

23          MR. EKELAND:  First, the defense objects to the

24   government's standing to move to quash what they're calling a

25   third-party subpoena.  But the --

1          THE COURT:  What other word is there for it?

2          MR. EKELAND:  What?

3          THE COURT:  What other word is there if it's not a

4    third-party subpoena?

5          MR. EKELAND:  Well, the issue here is that

6    Chainalysis has acted like a government agent.

7          THE COURT:  Then they do have standing.

8          MR. EKELAND:  Well, then that raises the issue of why

9    this information shouldn't just be produced under Rule 16 and

10   under --

11         THE COURT:  That's not in front of me now.  That is

12   not a motion in front of me now.  You haven't made a motion

13   under Rule 16.  You've made a motion --

14         MR. EKELAND:  Perhaps it's a motion to compel.

15         THE COURT:  You haven't.  What's in front of me is a

16   rule -- a motion to quash the Rule 17 subpoenas.  That's what

17   I'm addressing at the moment.

18         If there's a separate motion you want to make or that

19   you have made saying the government hasn't complied with its

20   discovery obligations, I can take that up in due course.

21         MR. EKELAND:  Your Honor, what's occurring to me here

22   as we talk about this is that, essentially, if this was -- this

23   was all work done by FBI cyber -- right? -- and not a private

24   vendor.  The government would have an obligation to produce it.

25         So if the Court is saying that the proper remedy for

1    that is a motion to compel under Rule 16, then that's, perhaps,

2    what the defense should do.

3          THE COURT:  I'm not saying that at all.  You're

4    saying that.  I'm just saying you're arguing about something

5    that is not raised in front of me at this point.

6          You're coming up here and saying that Chainalysis is

7    the government's agent, and, therefore, they should be required

8    to produce under Rule 16.  I don't have any basis to think

9    that's true or not true.  That's your argument.

10          That's just not what's in front of me at the moment.

11    We're not just streaming here and changing our arguments as we

12    go.  I need to take up what's in front of me.

13          MR. EKELAND:  I'm just picking up on what the Court

14    was noting about the government's standing on this issue.  We

15    can turn to the 17(c) subpoenas.

16          So the 17(c) subpoenas are doing two things.  One,

17    they're asking for the testimony of material fact witnesses in

18    this case; of Jonathan Levin and Michael Gronager, who are

19    involved in the investigation of --

20          THE COURT:  Testimony at trial?

21          MR. EKELAND:  What?

22          THE COURT:  Testimony at trial?

23          MR. EKELAND:  Testimony at trial.

24          THE COURT:  We can come to that.  What I'd like to

25    talk about at this point in time, to start with at least, are

1    the subpoenas to Chainalysis for -- the subpoenas duces tecum.

2    And not for trial testimony.  We can take the trial testimony

3    up later.

4              MR. EKELAND:  We're specifically asking for a number

5    of things in there.  For instance, we are asking for the source

6    code to Chainalysis Reactor.  And counsel for Chainalysis said

7    that we have access to this, and we don't.

8              We also don't know what --

9              THE COURT:  I don't think he said you had access to

10   the source code.

11             MR. EKELAND:  He said we had access to the software,

12   which we haven't had access to it because we don't know what

13   versions they used when they did this investigation, because

14   this investigation dates back to 2015.

15             THE COURT:  Is there any reason not to just disclose

16   to the defense which version was used?

17             MS. PELKER:  Your Honor, it's the current version is

18   what we'll be presenting at trial.  If they have an expert --

19   and there are many out there who have access to Chainalysis

20   Reactor -- they can load up into Chainalysis Reactor right now.

21   We've produced them, expecting that they will do this, based on

22   defense's request for them in that format so that their expert

23   can look at it live and do that analysis.

24             THE COURT:  I think you've got the answer to that

25   question at least.

1          MR. EKELAND:  Well, regardless, we need to see the

2     source code.  Just for the reasons that the Court raised is

3     that there's all sorts of assumptions in this software.  It's

4     what's called a heuristic software, which means it's a

5     probabilistic software, sort of doing a statistical analysis.

6          A lot of what goes on with that software depends on

7     how the algorithms are designed and how they're implemented in

8     that code.

9          THE COURT:  Point me to which one of the document

10    requests is seeking the source code.

11         MR. EKELAND:  I don't have that in front of me.

12    Mike, could you find that?  I know we asked for that in there.

13         Generally, in my experience in other courts, when

14    we've issued these kinds of subpoenas, counsel calls us up, and

15    we work through these issues before anyone files any motion to

16    quash.  That hasn't happened here.

17         And what my concern is, is that -- and I don't want

18    to bang on this other point -- is that the government is,

19    effectively, avoiding its obligations under Rule 16 and *Brady*

20    by hiding behind a private vendor.  That's what's duly highly

21    problematic about this case and makes it different than, say,

22    *Nixon* and all these other 1970 cases that are not dealing with

23    computer forensics.

24         I mean, this whole case, there are no eyewitnesses,

25    there are nothing -- this entire case turns on the computer

1    forensics.  It's at the core of this case.  They have no

2    eyewitnesses; they have nothing.  It's all this analysis.

3              The analysis in the criminal complaint the government

4    has already changed because they botched the analysis and they

5    left out a transaction and then their expert, Scholl, then went

6    to go correct it.  It's not as simple as the software is just

7    some sort of input/output very simplistic thing.  It's

8    incredibly complex.

9              Chainalysis has been involved in this investigation

10   since the beginning.  We haven't seen any of their

11   communications.  They're withholding a lot of information here.

12   We cannot analyze the forensics in this case without a

13   production from Chainalysis.  And if that production is going

14   to come in the trial, then we're going to have to ask for a

15   continuance.

16             Right now we're about, roughly, three months out from

17   trial.  We'd have time to analyze this stuff and look at it.

18   If we're getting this dump at trial, you know -- and I truly

19   expect that we would just negotiate with Chainalysis about what

20   should be produced, and then, if there was an issue, come back

21   to the Court instead of -- I didn't get any phone call from

22   counsel or anything.  That's what happens in all my other

23   cases.

24             In that sense, the Federal Rules of Criminal

25   Procedure are a little bit outdated because the practice is

1    something different, and the rules haven't really been amended

2    to reflect what happens.  In all my cases --

3              THE COURT:  The rule on expert disclosures was just

4    amended very recently.

5              MR. EKELAND:  I'm sorry.  I couldn't hear you.

6              THE COURT:  The rule on expert disclosures was just

7    amended very recently.

8              MR. EKELAND:  Yeah.  It was amended on certain

9    points.

10             But what has happened in practice in all my other

11   cases around the country is opposing counsel, counsel calls me

12   up, we go through the list, we narrow it down.  Part of the

13   problem here is so much stuff has been hidden, and the

14   government has moved its investigation from actually doing it

15   in the FBI to a private vendor, and that makes everything

16   opaque.  That changes that -- the posture of this case from

17   *Nixon*, from *Haldeman*, all of those cases.  This is very

18   different.

19             This isn't about the President's audiotapes in his

20   office, right?  This is about heuristic algorithmic software

21   that's never been tested in any court anywhere, and we're

22   asking to see what that software is comprised of, and nobody

23   wants to show it to us.

24             Our client has been accused of hiding all this stuff

25   and doing all this stuff, but everywhere I turn in this case,

1    the government doesn't want to produce anything.  If they've

2    really got such a strong case, why not just show it to us?  Why

3    do I have to go and chase this stuff?

4            Why don't they just produce a copy of Chainalysis

5    Reactor, give us a license for us to go look at this stuff?

6    Instead, you know, his funds have been seized, thousands of

7    miles away from home.  If we want to call any witnesses, like

8    his friends or family, we have to fly them in, like, 6,000

9    miles.  Everywhere we turn, we're getting sandbagged, and the

10   government --

11           THE COURT:  I'm not quite sure that that's fair.  If

12   you had very specifically asked for something as is required

13   under *Nixon* and they said, tough, go to court, I get that.  But

14   I've got to tell you, I have -- and I realize this case is

15   different.

16           I have never in a criminal case seen anything that

17   approaches this and even if this were a civil case where the

18   civil rules apply, I would have real pause over the breadth of

19   these requests.  I mean, they're breathtaking, what you're

20   asking for, and they show no specificity whatsoever.  If you

21   really wanted to get something from them meaningful, you could

22   have been a lot more specific about it.

23           I don't think it's quite fair for you to say that

24   they're stonewalling you, and this is all some great scam to

25   stick it to your client and you.  You haven't done what you're

1    supposed to do under the rules.

2              MR. EKELAND:  We've asked for the source code.

3              THE COURT:  Where?  I asked for that.

4              MR. HASSARD:  Request No. 8 in the subpoena.

5              MR. EKELAND:  Request No. 8 in the initial subpoena.

6              THE COURT:  That request is -- it's No. 8 in a

7    subpoena that has 19 requests in it.  And if that's what you're

8    really focusing on, I'm curious as to why it's No. 8.

9              Even that request is all documents, records, and

10   communications, including individual notes to one's self

11   exchanged between Chainalysis and any researcher from the

12   University College London, IC3, the Austrian Institute of

13   Technology, or the Complexity Science Hub Vienna, including but

14   not limited to George Kappos, Haaroon Yousaf, Rainer Stutz,

15   Sofia Rollet, Bernhard Haslhofer or Sarah Meiklejohn -- I'll

16   give the reporter the spellings of these later -- related to

17   the presumption of the white paper at the U-S-E-N-I-X Security

18   Symposium and the investigation that led to the prosecution in

19   the *United States v. Roman Sterlingov*.  This includes data

20   sets, draft versions of white papers, source code, object code,

21   algorithms, heuristics, methodologies, and Chainalysis research

22   sent to researchers, as well as all software additions with

23   complete code in the native file format, when the rules require

24   specificity, that just boggles the mind.

25             MR. EKELAND:  Well, Your Honor, let's address that,

1    because that is a reference to the USENIX conference where

2    Chainalysis took evidence in this case in a pending criminal

3    trial, circulated it to researchers that they were paying, and

4    then presented it publicly at a conference in Boston, saying

5    that -- implicating Mr. Sterlingov.  We're asking for the data

6    sets that they used there and what they did.

7            That's an affirmative act on Chainalysis' part for

8    information that we're under a protective order on.  I was

9    shocked to see that happen.  It's a public presentation.

10           THE COURT:  You're shifting gears on me again here.

11   Okay?  We're trying to be more specific here.

12           What is it where there's a specific need where there

13   is a real necessity -- let me finish.

14           MR. EKELAND:  The -- sorry, Your Honor.

15           THE COURT:  I kind of get the point that if there's

16   source code that is used and you have a computer expert who

17   needs to analyze the source code who can say to me

18   specifically, here's what I'm looking for; my concern is that

19   they may have used the following types of source codes which

20   could have the following assumptions in it, which could

21   prejudice the results, and I need to be able to look at that.

22   I get that.

23           You're now talking about -- again, sort of pointing

24   the finger at the government, saying, you see, this shows the

25   government is playing unfair here by releasing stuff.  I want

1    to know specifically for the purposes of what's really material

2    to the defense, not whether the government was behaving badly

3    or not by sharing something with someone else; that's not

4    really relevant to the defense one way or the other.  You're

5    just shifting gears and talking about that and sort of making

6    accusations rather than helping me by saying, Judge, this is

7    the very specific information I need in order to prepare a fair

8    defense in this case.

9         MR. EKELAND:  Your Honor, in that request, we are

10    asking for the information that Chainalysis used and produced

11    to outside researchers to write a specific white paper

12    implicating Mr. Sterlingov that they presented at the USENIX

13    conference in April 2022 in Boston.

14         That is, they're using evidence in this case; they're

15    giving it to expert researchers; I think they're paying those

16    researchers.  And then they publicly presented it and it's also

17    on YouTube.  And what we're specifically asking for there is

18    the data set that they used, all the information that they

19    used, and everything that we're entitled to ask about because

20    they wrote a white paper implicating our client and publicly

21    published it.  That's a very specific thing.

22         THE COURT:  Why is it relevant in the case, what they

23    did in a proceeding, even if they were implicating your client?

24    What is the relevance of that case?  If the government went off

25    and said, we have source code, it shows he did these terrible

1    things somewhere, that's not relevant or admissible in the

2    case.

3            What matters is, sort of, the underlying facts in the

4    case.  It may be that they've violated some other rule by doing

5    that, and they shouldn't have done it.  That's not -- I'm not

6    addressing that now.  I'm still sort of wrestling with -- it

7    seems to me extremely unfocused on what's material and relevant

8    in the criminal case that's in front of me rather than more of

9    just kind of throwing up a sense of government impropriety

10   rather than saying, no, here's what we need to know in order to

11   put on our defense.

12           MR. EKELAND:  In that instance, it's not clear to us

13   that we've been given that data that they used.  That's

14   relevant, because the way they're processing the data and how

15   they're using their data sets is directly relevant to their

16   output.  It would show us what kind of heuristic stuff they're

17   using, right?

18           THE COURT:  Can I make a suggestion here to try and

19   move us along?

20           MR. EKELAND:  Yes, sir.

21           THE COURT:  I do think that this subpoena is -- if

22   there is a definition of failing the specificity test in *Nixon*,

23   this subpoena satisfies that and is probably a model of it.  It

24   is just such a sweeping subpoena that is just -- if this were

25   just in a normal civil litigation, I would think that this was

1    a fishing expedition, even in that context, as compared to a

2    criminal case.

3          I agree with the statement that was made to me

4    earlier that Rule 17 is not intended to open the door to the

5    types of broad, sweeping discovery that takes place in civil

6    litigation.

7          But I also, as I indicated earlier, am sympathetic to

8    the notion that you may need specific information in order to

9    put on your defense.

10         Do you have a computer modeling expert or an expert

11   on computer code, someone who is going to be able to say and --

12   look at the code and say, here's a problem with the code in

13   this case?

14         MR. EKELAND:  Yes, we do, Your Honor.

15         THE COURT:  Can you have that person prepare a

16   declaration or a statement?  I don't -- it doesn't have to be

17   anything that's subject to the penalty of perjury, as far as

18   I'm concerned.  But a statement that says, here's what I need

19   to know in order to do my work, in order to make an assessment

20   of whether this computer model is fairly predictive or fairly

21   captures what you need to know.  Here are the particular facts

22   that I need to know in order to do that analysis.

23         Prepare that, give it to Chainalysis, give it to the

24   government, and then have the discussion that you're talking

25   about.  Then if there are other things like that in nature, if

1    you can show them with specificity, here's what we need and

2    here's why we need it, then I think you're moving towards

3    satisfying the Rule 17 standard.

4        I understand why you may need this before trial, if

5    you then need the opportunity for someone to do complicated

6    analysis, and they need time to do that analysis.  I would

7    recommend moving quickly in doing that.  But I think you need

8    to get down to that level of specificity in order to satisfy

9    the Rule 17 standard.  Does that make sense?

10        MR. EKELAND:  I think that's an excellent idea.

11    We're happy to do that, Your Honor.

12        THE COURT:  What I'm going to do is I'm going to

13    grant Chainalysis' motion to quash without prejudice, and

14    understand that you can come back and with greater specificity.

15    I'm going to simply deny the government's motion as moot, and

16    that way I don't have to decide the standing issue at this

17    point anyway because I'm not sure whether the government has

18    standing.

19        Since I'm already quashing the subpoena, the

20    government's motion, I don't need to reach that, in any event.

21    I do think there's at least a question as to standing that the

22    government may have there, but I think granting Chainalysis'

23    motion to quash is sufficient for those present purposes.

24        I would just encourage you-all to get your heads

25    together quickly on that and for you to get the specificity you

1    need to the government and Chainalysis because I don't want to

2    put you in a position in which we're back here in another month

3    and a half and then, by the time you actually get what you

4    need, you can't prepare in time for trial.

5         And then the other thing I will say is, I just would

6    encourage everyone, both sides, everyone involved in this to

7    work together as cooperatively -- and have some discussions

8    that you were talking about, to get that done, because I do

9    think that there's information, it sounds to me like, you're

10   going to need to do this properly.  But it's not an invitation

11   to sweep too broadly, and there are significant limits on this.

12   I think you just all have to work cooperatively to do this.

13        If you need to come back or even have a -- get me on

14   the telephone at some point to try and resolve these issues to

15   move quickly, I'd like to do that, because I don't want to be

16   in a position on which we're on the eve of trial and you're

17   telling me, Judge, we just got the code last Thursday and my

18   expert is telling me they need 60 days to review it.  Okay?

19   Yes?

20        MR. BROWN:  Your Honor, may I be heard on the Rule 16

21   issue?

22        THE COURT:  Yes, of course.

23        MR. BROWN:  With respect to our obligation to

24   disclose the bases for the expert reports, I pulled it up on my

25   computer.  I could even somehow figure out how to plug it in.

1    It's not that the defense has nothing for Ms. Bisbee's expert

2    report.  We produced literally hundreds of megabytes of CSV

3    Excel files showing --

4            THE COURT:  I don't know what CSV is.

5            MR. BROWN:  Comma-spaced something.  Essentially,

6    Excel files, just the raw data.

7            So the data that Chainalysis software is pulling from

8    is just the public blockchain.  It's just Bitcoin addresses

9    that are out there in transactional information that's publicly

10   available.  We produced appendices for those reports for all of

11   the underlying analysis done by the expert.

12           Just to give you one example, we produced an appendix

13   showing every single Bitcoin address that is clustered for

14   Bitcoin Fog, and that runs to over 925,000 entries.  It's a

15   gigantic spreadsheet.

16           Their expert can take all of this raw data; they

17   don't need Chainalysis.  There are lots of other blockchain

18   explorers that allow you to conduct analysis of the

19   transactional data on the blockchain.  They don't need -- they

20   have the raw data; they have our conclusions.

21           What I would analogize it to, if we put up a

22   government expert who says I ran this calculation in Excel and

23   what I got was 2 plus 2 equals 5; you know, one way for the

24   defense to rebut that would be, you know, well, we need to see

25   the Microsoft Excel source code; what command were you using;

1    how did Microsoft Excel calculate that?

2          Another way to address it is we have the inputs, we

3    have the outputs, and we can put up our own expert saying 2

4    plus 2 is not 5; 2 plus 2 is 4.

5          THE COURT:  But isn't the defense entitled to do both

6    of those things?

7          MR. BROWN:  Your Honor --

8          THE COURT:  If Excel really was showing 2 plus 2

9    equals 5, maybe you don't get every piece of the source code

10   for Excel and maybe the expert for the defense says, I've got a

11   pretty good idea what the problem must be here; we all know

12   that there's a potential glitch, and I need to see this portion

13   of the source code there.  They get the source code and put

14   someone in front of the jury and say, you look at the source

15   code here; there's the mistake; yes, that's the mistake.

16         MR. BROWN:  I mean, if it's in the source code,

17   that's obviously not something the expert relied upon.  I think

18   the D.C. Circuit has been clear with the Excel example, that

19   experts don't have to have a source code-level understanding of

20   software tools that they use.

21         And so what the experts need to understand is what is

22   the input, how is the analysis being conducted, and what is the

23   output.  All of that has been produced to defense counsel.

24   That's my only point.  And this idea that they need to have

25   the source code is a little bit of a red herring.

1          THE COURT:  And I don't mean to prejudge whether

2     they're entitled to the source code or not here.  My point is

3     just that they need to be specific about it.  If they can be

4     specific about it, then they may be entitled to it.  If they

5     have an expert who can say, we think this is a potential

6     problem with the source code in this particular narrow area

7     here and this is what our concern is, and we have an expert in

8     source code who thinks that if they look at this, this is what

9     they're likely to see here because it's the only thing that

10    explains the reason we're getting this anomalous -- what we

11    regard to be an anomalous result.  Therefore, we're not asking

12    to see every line of the source code, but we do need to see the

13    portion that does X in the source code because this is -- based

14    on my expert opinion, I'm pretty sure that this is what's going

15    wrong here.

16         That type of specificity might be sufficient, then,

17    to support producing the source code, or at least a portion of

18    the source code.

19         MR. BROWN:  Perhaps.  But that's not the only way to

20    challenge an expert's opinion.  You can challenge an opinion by

21    saying I understand what the computation is supposed to be; I

22    understand the inputs and the outputs, and I just come up with

23    something different.  Here's how I do it.

24         THE COURT:  Just to give you a much more accessible,

25    for me at least, analogy, you have a witness who testifies --

1    testified that they saw the defendant go into the bank.  The

2    defense says, we've got an alibi witness; we know he didn't go

3    into the bank, couldn't have possibly robbed the bank that day,

4    but there's also the camera footage from the bank.

5          And the defense says -- serves a subpoena and says,

6    we want the camera footage from the bank.  I don't think you

7    can come in front of me and say, Judge, look, they can prove it

8    another way.  They've got the alibi witness who will say that

9    the defendant was somewhere else that day; therefore, they're

10   not entitled to the camera footage of who went into the bank

11   that day.

12         My point is just that, if they can be specific and

13   show that there is something that is not just a fishing

14   expedition, but they have reason to think that there is

15   problem, for example, in a particular area of the source code,

16   they may be entitled to that.

17         MR. BROWN:  Understood, Your Honor.  It's not my

18   practice to sort of fact-check everything in the litigation,

19   but I do want to put on the record that this allegation about

20   the government or Chainalysis sharing materials that are under

21   the protective order to these researchers for this white paper,

22   it is absolutely false.  It is a fantasy concocted by defense

23   counsel.  There's no basis to it whatsoever.

24         Again, we can't respond to every false statement that

25   the defense makes in front of this Court, but I just wanted to

1    correct the record, that that is -- it is a ludicrous theory.

2                THE COURT:  All right.  Thank you.

3                So that's what I'm going to do with that motion.  The

4    other thing I should just say for the record, I don't think

5    it's necessary to my decision here, but I do think that it is a

6    fair reading of Rule 17 to say that the first clause doesn't

7    require -- or 17(c)(1), the first clause doesn't require the

8    Court's prior approval, but the better reading of the second

9    sentence seems to be that the Court's prior approval is

10   required.

11               But in a case like this one, where producing things

12   like source code on the eve of trial would likely require an

13   adjournment to provide time to analyze it, there may be good

14   reason for the Court under the second clause to -- if there's

15   something that isn't where the *Nixon* standard of specificity,

16   relevance, and admissibility is satisfied, there may be good

17   reason in a case of this nature to require the early

18   production, at least of records, that would require detailed

19   analysis.

20               Mr. Ekeland, can I ask you one question?

21               MR. EKELAND:  Sure.

22               THE COURT:  I'm a little bit concerned by the

23   accusation or the assertion that there's been some harassment

24   of Chainalysis.  If you've indicated that you're going to sue

25   them, can you tell me what your theory is?

1          MR. EKELAND:  If I recall the -- first of all, these

2     are on podcasts directed at the Bitcoin community; these are

3     not directed at Chainalysis.

4          The basis is that, when we first addressed them, we

5     wanted to put them on notice of their preservation -- their

6     document preservation obligations in case there is a civil

7     suit.  We've never said, oh, we're going to sue them.  But if

8     there is an acquittal, we do intend to pursue a malicious

9     prosecution civil action against Chainalysis.

10         THE COURT:  Is there any precedent for suing a

11    government expert on a malicious prosecution theory?  I am

12    concerned that that could be taken as intimidating or harassing

13    a witness.

14         MR. EKELAND:  That's not the intent.  I will refrain

15    from any more comments on that if that is what the Court is

16    concerned about.

17         I certainly would say that in this case, I think the

18    theory -- not to go into, like, a 1983 suit or whatever it is,

19    but the theory would be, essentially, that Chainalysis has

20    worked so intimately with the government that they're a

21    government actor and that they, in the process of being busy

22    with marketing their software, they cared more about marketing

23    their software than the accuracy of the software, and that led

24    to Mr. Sterlingov's false arrest and incarceration for now two

25    and a half years for something that he just didn't do.  And

1    there's still no evidence anywhere in the record of him ever

2    operating Bitcoin Fog, which, Your Honor, incidentally, is

3    still operational.

4            THE COURT:  I'm not going to opine on the merits of a

5    hypothetical civil suit, but my concern is that that appears to

6    be novel and a stretch, and I am just worried about anyone who

7    might be making statements that could be reasonably perceived

8    to be threatening to a potential witness.

9            MR. EKELAND:  Your Honor, while we're up here, if I

10   can address what the government said about that white paper.

11   The -- Chainalysis took evidence from this case and gave it to

12   academic researchers and publicly presented it in the paper

13   that's been published, which we're happy to give to the Court.

14   But that's not false.  That's just what happened.

15           What the government's involvement in that is I don't

16   know.  But, again, you have the problem here with the

17   government using private vendors for what FBI cyber used to do,

18   and now you've got this information circulating in the public

19   that the defense is under an obligation under a protective

20   order not to circulate.  I was shocked by that.

21           So this fact that the government said it's false we

22   disagree with.

23           THE COURT:  All I can say about it -- I don't know

24   the truth of the matter asserted, but I can just tell you that

25   Mr. Brown is shaking his head.  There's, obviously, a

1    disagreement between the parties about this.

2            MR. EKELAND:  Yes.

3            THE COURT:  All right.  Why don't we take a short

4    break now, and then we can come back and take up the subpoena

5    directed at Mr. Gronager and the subpoena directed at

6    Ms. Pelker.

7            So let's come back -- it's ten after.  Why don't we

8    come back at 11:25.

9            (Recess taken.)

10           THE COURT:  All right.  So the next motion that I

11   have up is 126.  As I promised, I'll hear from Chainalysis on

12   this one.  This is the motion to quash the subpoena of Michael

13   Gronager.

14           MR. FRENTZEN:  Thank you, Your Honor.  Appreciate it.

15   We are moving to quash a subpoena that was issued to

16   Mr. Gronager for testimony here next Friday on the 23rd, and we

17   view this as just another opportunity for counsel for the

18   defendant to kind of continue his -- whatever his purposes are

19   that are separate from what the Court should be doing -- and

20   trying to get executives from Chainalysis to come here into

21   court on irrelevant matters.  And, you know, both he and his

22   associate are, effectively, putting this stuff out in public

23   through blog posts and through Twitter as some sort of a cause

24   for which they are also, apparently, fundraising.

25           But in any event, just getting to the merits of it,

1    even in light of that obvious -- what I'd refer to as --

2    atmospherics, it's just not relevant for the purposes that the

3    Court has set out for today and next Friday, as we understand

4    them.

5              We accepted service of the subpoena for Mr. Gronager

6    to alleviate the need for the defendant to have to utilize

7    resources to serve him in person.  I think, as the Court knows,

8    that does not mean that we think that the subpoena should be

9    effective.

10             And we did, in fact, discuss that with counsel and --

11   sorry, I'll just deviate for a moment just to let the Court

12   know, I was a little surprised to hear counsel earlier say that

13   there had been no discussion about the scope of the 17(c)

14   subpoena, because that was actually a subject of discussion

15   that we had, basically, if you want to try to narrow this

16   substantially, we'll consider that.  And that was an invitation

17   that was not taken up.

18             But in any event, we did discuss the potential

19   testimony, and at that time I was simply told that they wanted

20   to ask questions of Mr. Gronager related to Mt. Gox, Mt. Gox

21   data, and Reactor, which is the name of the software at large.

22             So we moved to -- getting no more information than

23   that, effectively, we moved to quash the subpoena,

24   understanding what we understood about the Court's purposes

25   here.  And, basically, we then spelled out for the Court why

1    Mr. Gronager's testimony is not relevant to the expert

2    qualifications of Ms. Bisbee and what Ms. Bisbee is supposed to

3    be here to testify about, or any other, so far as we knew,

4    issues relevant to the *Daubert* hearings.  Mr. Gronager has not

5    been noticed as an expert by either side; and, therefore, his

6    potential testimony is just not relevant to the *Daubert* issues.

7           And so we also indicated that, with respect to the

8    Mt. Gox data, we don't see how that's relevant to the motions

9    in limine, which typically are a legal analysis of the

10   admissibility of certain evidence.

11          THE COURT:  Can you describe the Mt. Gox and Mt. Gox

12   data to me a little bit?

13          MR. FRENTZEN:  As best we understand what the defense

14   wants to get into, Your Honor, it's this.  Mr. Gronager, at a

15   certain point, did some work for the Mt. Gox bankruptcy

16   trustee.  In the course of that work, he examined the Mt. Gox

17   data that was furnished by the bankruptcy trustee.

18          In analyzing that data, among other things,

19   Mr. Gronager noticed some irregularities, which, as best I

20   understand it is, for example, only half of a transaction.  So

21   if the Court imagines seeing certain input but not an output,

22   as one would expect from the nature of these types of Bitcoin

23   transactions, and -- so he noticed a few of these things.

24          He then, subsequently, had a meeting with Mark

25   Karpeles.  Mark Karpeles was sort of the, at that time the --

1    or prior to the bankruptcy trustee -- sorry -- but the

2    custodian or administrator of Mt. Gox.  I may get his title

3    wrong.  If I do, I apologize.  Basically, the person being

4    considered as responsible for Mt. Gox.

5          And Mt. Gox had had issues related to, number one, a

6    hack, which people recently have been actually charged by the

7    federal government for the hack, as well as a -- other

8    allegations that led to the collapse, if you will, and the

9    bankruptcy status of Mt. Gox.

10          Mr. Gronager then had a conversation with

11    Mr. Karpeles about the data; effectively, sort of some of the

12    things that he had seen, which he opined were issues with the

13    data.  And Mr. Karpeles allegedly gave him an explanation that

14    related to a description of a hack being accomplished on

15    Mt. Gox; and Mr. Gronager then sort of going back to his

16    work -- and a lot of the bankruptcy work, obviously, Your

17    Honor, was bankruptcy work.  Right?  Like, who owes what to who

18    and trying to resolve that.

19          And so in the course of that, this is an observation

20    that Mr. Gronager made.  So with respect to the Mt. Gox --

21          THE COURT:  What was -- the observation was the

22    one-sided transactions, or what was the observation that he

23    made?

24          MR. FRENTZEN:  The observation, generically, Your

25    Honor, is that there were some gaps in the data.

1          THE COURT:  Okay.

2          MR. FRENTZEN:  So to be clear, Mr. Gronager is not a

3    percipient witness to the collection of the Mt. Gox data.  He's

4    not a percipient witness to the means by which any of this data

5    is or is not questionable; let's put it that way.

6          He had opinions in viewing it that there were a few

7    potential gaps in the data he was examining.  The government is

8    using, as I understand it, a version of the Mt. Gox data, which

9    comes from the Japanese government, and that, as I understand

10   it -- though, I don't know, nor does my client -- but that

11   comes from the bankruptcy trustee at some point.

12         All of which is to say that Mr. Gronager is a

13   third-party observer of a data set.  There is a data set that

14   will be used in this case.  People can examine it and opine

15   about gaps or issues, et cetera, with the Mt. Gox data set.

16         Mr. Gronager's specific opinions are not relevant to

17   either a *Daubert* hearing or a motion in limine in the context

18   of this case because he's just a third party examining the data

19   and reaching certain opinions.  He has not been announced as an

20   expert by either side; therefore, he's not in a position to

21   express those opinions.

22         What the current data set is or is not is, you know,

23   something at issue, but not something that he has directly

24   examined that we know of.  His conversation with Mr. Karpeles

25   is, at best, hearsay and inadmissible as far as we can tell.

1          But in any event, it's not relevant to the issues

2     before the Court on next Friday, which is *Daubert* and motion in

3     limine related to the Mt. Gox data.  I mean, in other words,

4     the Court can take Mr. Gronager's statement that the defense

5     has cited from whatever book, although it's not his direct

6     statement; it's a third-party reporter.

7          But in any event, it still wouldn't be relevant or

8     admissible to the issues before the Court for this hearing.

9     It's just an opportunity to try to get Mr. Gronager into court

10    and go wherever with him for however long the Court will put up

11    with it.

12          THE COURT:  Mr. Gronager is the co-founder and CEO of

13    Chainalysis, right?

14          MR. FRENTZEN:  That's correct, Your Honor.

15          THE COURT:  Ms. Bisbee works for Chainalysis?

16          MR. FRENTZEN:  That's correct, Your Honor.

17          THE COURT:  Is it Ms. Bisbee or Chainalysis that's

18    been retained by the government as its expert?

19          MR. FRENTZEN:  Well, Your Honor, I don't know.

20          MR. BROWN:  Ms. Bisbee.  But she is an employee of

21    Chainalysis.

22          THE COURT:  Okay.  Is the retention, though, with

23    both or with her?

24          MR. BROWN:  Your Honor, I think the contract and the

25    payment is -- the payment is made to Chainalysis.  Ms. Bisbee

1    is not directly receiving the witness fees.  She's just being

2    paid as an employee.

3            THE COURT:  What is her position at Chainalysis?

4            MR. FRENTZEN:  Your Honor, I'll look it up.  But she

5    is, effectively, in a -- what I would describe as a supervisory

6    position related to investigations.

7            THE COURT:  Okay.

8            MR. FRENTZEN:  But I'll get you her exact title.  I

9    think it's in the -- Your Honor, she's director of

10   investigative solutions.

11           THE COURT:  Okay.

12           MR. FRENTZEN:  I'm sorry.  Did the Court have further

13   questions?

14           THE COURT:  No, no.  That's fine.

15           MR. FRENTZEN:  Okay.  Thank you, Your Honor.  I mean,

16   the issue here is we have described why *Daubert* does not invite

17   or require some form of third-party testimony even if it were

18   relevant and admissible, which this is not.  In fact, in their

19   opposition, the defense, effectively, dropped the *Daubert* issue

20   and went with the Mt. Gox data.  And, presumably, the motion in

21   limine is the reason to call Mr. Gronager.

22           But as I've also described, his testimony is not

23   relevant to a motion in limine.  Motion in limine is not a fact

24   investigation.  The Court can make decisions based on the law,

25   typically, is what a motion in limine is.  To the extent that

1    someone wants to challenge in some form underlying evidence,

2    that's an issue for the jury at a jury trial.

3            Here, it's -- again, we view it as inadmissible, in

4    any event.  But even if it were admissible for some purpose,

5    that would only be a trial rather than for a motion in limine

6    hearing.  I can only imagine what would happen to the Court's

7    calendar if every motion in limine was an invitation to bring

8    in testimony and evidence.

9            I was an AUSA for 25 years.  I don't recall ever

10   calling a witness for testimony in support or in opposition to

11   a motion in limine.  So we think that this is, yet again, just

12   a reach by counsel given his, obviously, well-documented

13   animosity and irrelevant efforts aimed at Chainalysis, which

14   the Court has already heard about; and also reflected in --

15   most recently in a Twitter feed by his associate which, among

16   other things, he was retweeting nonsense about, for example, an

17   accusation that Chainalysis has somehow attacked a fundraiser

18   for Mr. -- for the defendant to make it harder for people to

19   contribute to his legal defense fund, which doesn't make sense

20   and is -- but is out there, you know, for the public on a

21   regular basis.  This is as recent as June 13th.

22           We just think this is a copycat additional effort --

23   I don't think the Court -- the Court may not have a hearing

24   until this case goes to trial where they don't try to subpoena

25   somebody from Chainalysis for some purpose.

1              THE COURT:  All right.  Let me hear from Mr. Ekeland.

2      Thank you.

3              MR. EKELAND:  First, Your Honor, I'd just like to

4      point out, to the extent it's not obvious to the Court, the

5      centrality of the Mt. Gox data to this case.  If you -- I

6      believe we put this in our opposition brief, which is at

7      Docket 131.

8              THE COURT:  Yes.

9              MR. EKELAND:  The primary accusation and the primary

10     piece of evidence that the government is claiming shows that

11     Mr. Sterlingov operated Bitcoin Fog is a multihop tracing that

12     they did which they put a diagram of in their criminal

13     complaint saying that Mr. Sterlingov used a layered transaction

14     through multiple Mt. Gox accounts -- I believe there's three or

15     four in the diagram.  The diagram speaks for itself -- leading

16     to a payment for the domain name, registration for the

17     www.bitcoinfog.com clearnet website.  And when I say clearnet,

18     I mean a website on the internet, not the site that they allege

19     mixes the funds.

20             Now, the reason we're calling -- we subpoenaed

21     Mr. Gronager as a fact witness to testify to the authenticity

22     of this Mt. Gox data is that in 2014 --

23             THE COURT:  To the authenticity or the

24     inauthenticity?

25             MR. EKELAND:  The inauthenticity.

```
1                    THE COURT:  Okay.

2                    MR. EKELAND:  The inauthenticity.  The 901 question.

3       He has unique knowledge of this database.  It wasn't some

4       ancillary thing when he went to Japan to go and to try and

5       chip-trace the Bitcoin that was hacked out of Mt. Gox.

6                    Mt. Gox is one of the forced Bitcoin exchanges where

7       you can exchange Bitcoin for dollars.  It went under; it

8       declared bankruptcy; it got hacked.

9                    The data that he received, as we list in our brief

10      and is well-documented in this book that Mr. Gronager gave

11      multiple interviews for -- Tracers in the Dark by Andy

12      Greenberg -- there's a whole chapter on him receiving the

13      Mt. Gox data.

14                   And one of the things that he discovers when he gets

15      the Mt. Gox data is that there's deleted files, there's missing

16      files, there's missing counterparties; basically, that this

17      data is corrupt.

18                   The other thing that he has percipient knowledge of

19      is the fact that he asked Mark Karpeles -- who was the CEO of

20      Mt. Gox, who was subsequently convicted for data fraud in a

21      Japanese court for falsifying the Mt. Gox data -- he, according

22      to the book, asked Mr. Karpeles, is there a backup of this

23      data; you know, essentially, I've seen all these mistakes and

24      errors in it.  And Mr. Karpeles told him, no, there was no

25      backup of the data.
```

1          So Mr. Gronager is a witness to the fact that the

2   data set that the government is using and the data set that

3   came out of the trustee -- the Japanese bankruptcy trustees

4   that they want to certify as authentic is actually corrupt.

5          THE COURT:  I'm sorry.  Just a second.  No, no.  I

6   just wanted to ask the question.

7          My question is, one of the things you want

8   Mr. Gronager for is because Mr. Karpeles told Mr. Gronager

9   there was no backup; is that -- do I have that right?

10         MR. EKELAND:  In part.

11         THE COURT:  Is that, in part, one of the things?

12         MR. EKELAND:  Yes.

13         THE COURT:  Why isn't it just hearsay?

14         MR. EKELAND:  Because it's effect on listener.

15         THE COURT:  That's not an effect on the listener.

16  That's what you say when you don't have an exception to the

17  hearsay rule.

18         MR. EKELAND:  That's true; I agree with that.

19         Well, he can testify to what he saw is missing in the

20  data.  He could testify to --

21         THE COURT:  The question I have is why couldn't

22  somebody else do that?  I mean, why couldn't your own expert

23  look at that and see what's missing?  Why do you need

24  Mr. Gronager to do that?

25         MR. EKELAND:  Because he may have personal knowledge

1    of the fact that it's the only copy.  One thing -- one question

2    we have here is that the Mt. Gox data got dumped on the

3    internet in about 2013, 2014.  When we're analyzing the Mt. Gox

4    data, we see all sorts of errors, right?

5         But we don't know what, actually, the government has

6    and what Gronager's work on it was when he did it and what he

7    saw.  He's a fact witness from day one as to the authenticity

8    and inauthenticity of this data.

9         THE COURT:  So that may be an area of -- again, where

10   the parties could have some discussion.  And I think, through

11   counsel, you could simply ask whether Mr. Gronager has any

12   personal knowledge as to whether there's a backup or not.  You

13   know, it may be able to explore that way.

14        If he's someone who has personal knowledge of that,

15   maybe that is relevant in a very limited sense.  Quite frankly,

16   if that's the case, I'm not sure that you actually need his

17   appearance at a hearing in front of this Court.  You could just

18   get a declaration from him as to that fact one way or the

19   other.

20        Obviously, if it's a question for the jury, you might

21   need him to testify to that, but just take things in small

22   steps.  If, in fact, he has personal knowledge that there was

23   no backup, maybe he can give you a declaration on that or give

24   you a declaration saying I don't have personal knowledge.  That

25   may obviate the need to call him as a witness, at least at the

1    pretrial stage.

2              MR. EKELAND:  Your Honor, we maintain for the

3    purposes of these hearings that he's a material fact witness

4    with unique knowledge as to the authenticity of the Mt. Gox

5    data giving his unique position in 2014 and 2015 when he goes

6    to Japan to work for the trustees, and he works in a way with

7    firsthand contact with Mark Karpeles.  He works on it -- with

8    the Japanese bankruptcy trustees that the government are using

9    to try and certify this data as authentic.

10             And so we think that his testimony goes directly to

11   the authenticity of this data, not just in what he saw, but in

12   the way that the bankruptcy court handled it and whether or not

13   it's the sole copy.  This is not an ancillary issue to this

14   case.

15             THE COURT:  I understand that.  I understand the

16   importance.

17             MR. EKELAND:  That's our position.

18             THE COURT:  I understand the importance to the case.

19   But I do think that, particularly if you're pretrial and you

20   want to subpoena a witness, I need to know that this is, again,

21   something more than a fishing expedition and the person has

22   something that is relevant, specific, and admissible to offer.

23             And if there's any, just, hearsay, that someone told

24   him something, that's not going to clear the admissibility

25   hurdle.  And with respect to specificity and relevance, if he

1    just simply reviewed the data set and saw there was something

2    missing and your expert could do the same thing, I'm not sure

3    you need him for that purpose.

4         MR. EKELAND:  Not only did he analyze it in a way

5    that we think is unique and that he's got personal knowledge of

6    it that nobody else has, he has knowledge --

7         THE COURT:  If it exists, can't someone else just

8    look at it?

9         MR. EKELAND:  No.  Because we don't know what, if

10   any, version is authentic.  And that's a problem.  Because Mark

11   Karpeles himself was convicted for data fraud for falsifying

12   these records.

13        THE COURT:  Isn't what matters is whether the version

14   that the government seeks to use in this case is authentic,

15   right?  That's what matters.

16        MR. EKELAND:  But this raises questions about that.

17   If that's the same version that Mr. -- that Mr. Gronager saw.

18   But I don't know -- like, in order to evaluate what the

19   government has, we need to cross Mr. Gronager.

20        And not only that, he has personal knowledge of how

21   the Mt. Gox data was incorporated and used by Chainalysis

22   Reactor software.  This is a threshold evidentiary issue in

23   this case.  I don't see how the government's case stands if

24   this data doesn't come in.

25        It's not just Mr. Gronager who is out there saying

1    that this data is inauthentic.  We've since discovered --

2            THE COURT:  I'm not sure he said it was inauthentic.

3            MR. EKELAND:  I'm sorry?

4            THE COURT:  I don't know that he said it was

5    inauthentic.  That's a legal conclusion.

6            MR. EKELAND:  Point taken, Your Honor.  He has

7    personal knowledge as to the state of the Mt. Gox data in its

8    original form, whether or not it's unique, how it was used by

9    Chainalysis Reactor.  And, you know, from day one, he's also

10   got knowledge of how it was handled by the Japanese bankruptcy

11   trustees, which goes directly to the government certification.

12           I mean, I think you get our point.  So he's got

13   personal knowledge from analyzing this data and at least

14   telling Mr. Greenberg that he saw serious flaws in it.  He's

15   got personal knowledge to the issue of whether or not it's the

16   only copy, and he's also got direct personal knowledge of how

17   it's incorporated --

18           THE COURT:  I'm not sure that we've established he

19   has personal knowledge as to whether it's the only copy.  I

20   mean, all -- he was told by somebody else --

21           MR. EKELAND:  Sure.  We submit that it likely does,

22   Your Honor.  That's something we feel the defense is entitled

23   to cross-examine him about to -- because we maintain we're,

24   obviously, going to be arguing that this data is corrupt and

25   inauthentic, and it's foundational to the government's case.

1      So we submit that we'd rather address those issues

2  in-depth before trial rather than having that hold up the whole

3  trial.

4      THE COURT:  I'm not sure that holds up the trial,

5  frankly, on this one, unlike where there's someone who needs to

6  do analysis.  If you wanted to call him as a trial witness and

7  put him on the stand and examine him, you might be able to do

8  that if he had personal knowledge that he could testify to with

9  respect to the authenticity of the data set.  And if I

10  concluded at trial that it was authentic, then I could grant a

11  motion with respect to that.

12      Or you could argue to the jury that there's a

13  question with respect to the reliability of the data set based

14  on that testimony, but it would have to be that he actually has

15  personal knowledge of this where he could testify as to that.

16  And then he can just be a trial witness for that purpose.

17      MR. EKELAND:  But then if he testifies to something

18  related to the Mt. -- authenticity or inauthenticity of the

19  Mt. Gox data that requires us to ask for a continuance, then --

20      THE COURT:  Why would it require a continuance?

21      MR. EKELAND:  I can't predict the future.

22      THE COURT:  That's true of any witness.

23      MR. EKELAND:  Yes.  But this witness has unique

24  personal knowledge of this Mt. Gox data, which is foundational

25  to the case.

1          THE COURT:  I guess, you have yet to convince me that

2     he has unique personal knowledge.  Unique is an important word.

3     And if the data set -- if there's a data set that the

4     government is relying on in this case and if there are flaws

5     that someone who is expert in the field can see by looking at

6     the data set, for example, seeing that there's some one-sided

7     transactions which don't make any sense -- as an example, your

8     expert can look at that, as well as Mr. Gronager can look at

9     it, and your expert could take the stand in a way which you

10    probably would have a lot more control over what happens at

11    trial if your expert testified about that rather than putting

12    somebody on the stand who you're not quite sure what he's going

13    to say.

14          MR. EKELAND:  Well, Your Honor, we'd maintain that

15    this goes directly to the government -- the government is

16    seeking to certify this Mt. Gox data pretrial as authentic, and

17    we maintain that Mr. Gronager is a necessary witness to testify

18    as to the inauthenticity of this data that the government is

19    seeking to certify.

20          We do not agree to that certification.  That's the

21    basis for our motion in limine.  And we think under 901, it's

22    inauthentic.

23          THE COURT:  I want to hear from the government.  To

24    the extent the government is seeking to certify the

25    authenticity, why isn't the defense entitled to call somebody

1    as a witness at that hearing who may have something of value to

2    say on that question?

3            MR. BROWN:  Your Honor, the reason is that the

4    threshold for authenticity and authenticity ruling is it is

5    minimal under well-established case law.  The government is not

6    required to establish beyond any sort of doubt that the

7    evidence is what we claim it is.  All we're required to do is

8    provide enough information for the jury to make that finding.

9            This exact issue was raised in front of Judge

10   Friedman in the *Safavian* case, which is 435 F. Supp. 2d 36 from

11   2006.  There was a challenge to the authenticity of emails that

12   the government was introducing.

13           The defense came in with arguments that some of the

14   emails might have been altered.  In particular, if somebody

15   were forwarding an email, and there's the forwarded email at

16   the bottom, the defense argued, well, somebody, before

17   forwarding the email, could have altered that.

18           And Judge Friedman, basically, said that's not

19   relevant to the admissibility, the authentication -- well, the

20   authentication part of admissibility.  That the government

21   is -- "The possibility of alteration does not and cannot be the

22   basis for excluding emails."  Judge Friedmann went on to rule

23   that the defendant is "free to raise this issue with the jury

24   and put on evidence that the emails are capable of being

25   altered before they're passed on."

1       But that was not a reason for Judge Friedman to deny

2   the authentication of those emails.  So to the extent --

3       THE COURT:  Is the hearing on the authentication

4   issue where you're seeking certification set for June 23rd?  Is

5   that one of the things we're taking up then?

6       MR. BROWN:  Your Honor, it's not set for June 23rd.

7   That's one of our motions in limine.  We'd be happy to argue

8   that June 23rd.

9       THE COURT:  It's later in the case then?

10       MR. BROWN:  Your Honor, we assume that all of our

11   motions in limine will be addressed at the pretrial conference.

12       THE COURT:  Right, right.

13       MR. BROWN:  This is one motion, however, that it

14   would be -- it would be beneficial to both sides for the Court

15   to make some sort of ruling about the authentication of these

16   records in advance of the summer of trial of preparation simply

17   because they are -- you know, they are important to --

18       THE COURT:  Mr. Ekeland is nodding his head yes to

19   this.

20       MR. EKELAND:  Yes, Your Honor.

21       MR. BROWN:  And, Your Honor, there's no reason to

22   question that these are records from what we say they are; that

23   they're records from the Mt. Gox trustee.  The defense is

24   claiming -- making claims about the reliability of those

25   records, not about -- these records are what the proponent says

1    they are, which is the only question before the Court.

2            THE COURT:  Right.  This is what I think we should do

3    with respect to the motion to quash the subpoena directed at

4    Mr. Gronager.  I'm going to deny the motion without

5    prejudice -- I'm going to grant the motion without prejudice to

6    renewing a subpoena for his appearance.

7            I think we should move up the hearing on the

8    government's motion to certify the admissibility of the

9    authentication of the Mt. Gox data set -- or data, I guess it

10   is, to the 23rd.  Maybe something on the 23rd may have to get

11   pushed off to make room for that.

12           If at that point, at that hearing I conclude that I

13   have enough of a question that I think I need to hear from

14   Mr. Gronager before ruling on that question, we'll schedule

15   another date to do that relatively soon so you'll have an

16   answer to that question before trial.

17           I don't see any basis as I -- for present purposes

18   why we need to hear from Mr. Gronager for purposes of the

19   *Daubert* hearing relating to any expert opinion by Ms. Bisbee,

20   but I'll say the same thing there.  At that *Daubert* hearing, if

21   something comes up and he's unable to answer some question

22   where I conclude that her qualification to offer expert

23   testimony and the reliability of the expert testimony that she

24   seeks to offer turns on information that Mr. Gronager may be

25   uniquely able to provide, I can revisit the question of his

1    appearance at that point, and we can continue that hearing, if

2    need be.

3          Otherwise, if the defense thinks it's appropriate and

4    there's good basis to list him as one of their witnesses for

5    trial and wants to subpoena him for trial, you can do that.

6          All right.  So the next one I have on my list is the

7    Rule 57.7(b) motion, and I can hear from the government to

8    start with on that.  You may proceed.

9          MR. BROWN:  Yes, Your Honor.  I'll just note at the

10   outset that the defense filed a four-week-late opposition to

11   our opening Rule 57.7 motion.  On Wednesday we filed a motion

12   to strike that response simply because it's two days before

13   oral argument.  It's unfair to the Court and to the parties.

14         THE COURT:  And what relief are you seeking?

15         MR. BROWN:  Your Honor, the relief we're seeking is

16   the proposed order, which is docketed at 127-1.  What that

17   proposed order, essentially, does is enforce the obligations

18   that are already in place on attorneys practicing before this

19   Court; those obligations which are spelled out in Rule 57.7(b).

20         THE COURT:  I have that rule in front of me, so you

21   don't need to quote it for me.

22         MR. BROWN:  And the basis for this motion is spelled

23   out in our pleadings, which is that the defense has embarked

24   on -- after receiving CJA funding, the defense has embarked on

25   a worldwide press tour where they are giving podcast

1    appearances, speaking engagements, and they are carrying on

2    about this case, and the witnesses in this case, my co-counsel,

3    prosecutors in this case, evidence in this case, in the most

4    egregiously inflammatory and inaccurate terms, and this does --

5    these sorts of statements being put out repeatedly on Twitter,

6    on podcasts, and in-person appearances, these do pose a clear

7    and present danger of tainting the jury pool.

8        This is a very avoidable problem simply by enforcing

9    the obligations that Mr. Ekeland and Mr. Hassard are already

10   subject to under 57.7(b):  To wit, not commenting about the

11   merits of the case; not commenting about the identity,

12   testimony, or credibility of prospective witnesses; so on and

13   so forth.

14       The defense has, in their late-filed opposition two

15   days ago -- without giving us the chance to reply or this Court

16   to evaluate that -- they've raised certain objections.  Well,

17   the first thing that they did is they filed a copycat motion.

18   They saw our motion, and then they literally copied and pasted

19   from our motion a cross-motion.

20       And the difference between their motion and our

21   motion is our motion identified specific statements by the

22   defendants that are inflammatory and inaccurate.  We identified

23   with specific time stamps where you could see an attorney

24   appearing in a criminal case before this Court making

25   statements that are in violation of 57.7(b).

1          Their copycat motion was just sort of, well, the

2     government is doing it too.  But the difference is they don't

3     actually point to any statements by any government attorney

4     about the merits of this case, the evidence, so on and so

5     forth.

6          And we assumed that that was their response.  It was

7     sort of, you know, I'm rubber and you're glue; and that's what

8     they thought was an appropriate response to that.  So it wasn't

9     until Wednesday that we actually first learned that they

10    opposed our motion.

11         But none of their arguments in response are really

12    persuasive.  You know, they claim they need to go out and make

13    these false, inflammatory ad hominem attacks in the media in

14    order to attract experts.

15         THE COURT:  Can you make a representation to the

16    Court that no one from the government spoke with the author of

17    *Tracers in the Dark* about this case?

18         MR. BROWN:  About this case?  No member of the

19    prosecution team, neither myself nor Ms. Pelker spoke a single

20    word to Mr. Greenberg --

21         THE COURT:  What about --

22         MR. BROWN:  -- about this case.

23         THE COURT:  What about other agents or others

24    associated with the case?

25         MR. BROWN:  Your Honor, it does appear that an agent

1   who is not a case agent on this case but who participated in

2   the arrest who had since left government did speak to

3   Mr. Greenberg.  That agent is not a government employee; he's

4   not one of our witnesses.

5        But no -- Rule 57.7(b) binds attorneys practicing in

6   this court, not to mention the D.C. Rules of Professional

7   Conduct and the D.C. Voluntary Standards of Civility; which the

8   defense team routinely violates with their ad hominem attacks.

9        I can tell you no member, no attorney for the

10  government has made a single statement to the media about this

11  case, period.

12            THE COURT:  Okay.  I appreciate that.

13            MR. BROWN:  Your Honor, there's no hardship to the

14  defense.  This doesn't impair the right of the press to cover

15  this.  It binds only the attorneys; it doesn't bind anybody

16  else.

17        And the proposed order here does nothing more than --

18  again, the language here is lifted specifically from 57.7(b);

19  specifically, I think it's (b)(3), (4) and (6) -- and make that

20  enforceable until the jury is selected in this trial.  And the

21  purpose of that is to avoid jury prejudice.

22        Now, the defendant's statements to the press and on

23  podcasts and public audiences have already made this Court's

24  task more difficult for the voir dire.  We are going to have to

25  examine witnesses [sic] very carefully, especially witnesses

1    who are familiar with cryptocurrency.  That's going to make the

2    whole witness selection process more difficult.  It's going to

3    make it harder to find witnesses -- excuse me -- jurors who are

4    going to be able to hear and understand the evidence in this

5    case.

6          And it's totally gratuitous.  There's no reason that

7    the defense needs to make these statements, and there's a clear

8    harm to the integrity of the trial.  And the government is

9    entitled to a fair trial and an untainted jury pool just as

10   much as the defense is.

11         MS. PELKER:  Your Honor, I want to make sure the

12   record is entirely clear that Mr. Greenberg asked about Bitcoin

13   Fog and Mr. Sterlingov's case, and that my response was that we

14   couldn't discuss it because it was ongoing.

15         Just to the extent that Mr. Brown said that there

16   wasn't a single word said, that would have been the only word.

17         MR. BROWN:  No substantive word.

18         MS. PELKER:  Just to make that clear.

19         MR. BROWN:  For the record, the day that the

20   complaint was unsealed, Mr. Greenberg called me, and I told him

21   I couldn't comment.

22         THE COURT:  Okay.

23         MR. BROWN:  And that was the end of it.

24         THE COURT:  Okay.  All right.  I appreciate that.

25   Thank you.  Mr. Ekeland?

1          MR. EKELAND:  The government has had extensive

2   conversations with Mr. Greenberg.

3          THE COURT:  Wait, wait, wait.  Are you telling me

4   that these two lawyers who are here in front of me are making

5   misrepresentations to the Court?

6          MR. EKELAND:  No.  No, I am not.

7          THE COURT:  The rule applies to government lawyers.

8   Identify a lawyer to me who has had a conversation with the --

9          MR. EKELAND:  Former prosecutor on this case,

10  Mr. Faruqui, is on page 270.

11         THE COURT:  I can't enter an order that deals with a

12  former prosecutor, and I'm not sure the rule does apply to a

13  former prosecutor.

14         The question is, is there somebody who is a

15  prosecutor in this case who has violated the rule or is

16  violating the rule?  All I can do is prospectively issue an

17  order saying comply with this rule.  If there's nobody on the

18  prosecution team who is violating the rule, there's nothing for

19  me to do.

20         MR. EKELAND:  Your Honor, I would maintain that there

21  are extensive interviews by the prosecution -- members of the

22  prosecution team with Mr. Greenberg hyping the very --

23  blockchain forensics that are essential to the evidence in this

24  case.

25         THE COURT:  I'm willing to put people on the stand

1    and under oath, including you, if I have to here.

2            MR. EKELAND:  Yes, sir.

3            THE COURT:  I want to know, are you saying that

4    anyone on the prosecution -- current prosecution team has

5    spoken to any member of the press about this case?

6            MR. EKELAND:  I don't know if about this case, but

7    they've --

8            THE COURT:  Well, that's the issue.

9            MR. EKELAND:  Well, Your Honor, I think it goes

10   beyond.  The fact that they're promoting this kind of

11   blockchain forensics and hyping it, I think that potentially

12   affects the juror pool.

13           I do think, based on the case law in this district,

14   there is no reasonable probability that any juror is going to

15   be tainted, because of the size of the venue in this district

16   and the fact of voir dire.  These conversations that we've been

17   having haven't been to a senior newspaper for a national

18   magazine, like *WIRED*.

19           I do have a quote in this book saying Mr. Sterlingov

20   we believe has been falsely accused.  I happen to know Andy

21   Greenberg; I've known him for ten years.  So he told me the

22   full extent of the conversations he had with members of the --

23   former members of the prosecution team and members of the

24   current prosecution team.

25           Again, I'm not saying they specifically referenced

1    this case, but to the extent that I can read things about this

2    case in the book that isn't in discovery -- for instance, the

3    conversation from the arresting officer, Tigran Gambaryan,

4    that's happening at the time that these prosecutors are on the

5    case.

6           THE COURT:  Well, the prosecution just explained to

7    me that there was a former agent who did talk to a reporter,

8    and they don't have control over former government employees.

9           MR. EKELAND:  That was at the same time that they

10   were talking to Mr. Greenberg as well.  They may have not made

11   direct comments.

12          THE COURT:  You're talking about these lawyers right

13   here who just told me that --

14          MR. EKELAND:  Ms. Pelker is all over the index to

15   this book; Mr. Brown is not.

16          THE COURT:  I'm tempted to put you all on the stand

17   and examine this and hold somebody in contempt here today if

18   anyone is lying to me.

19          You're telling me that she is lying to me when she

20   tells me she did not speak to him other than to say I won't

21   talk to you,

22          MR. EKELAND:  No, I am not.

23          THE COURT:  That's a serious accusation.

24          MR. EKELAND:  No, I am not.

25          THE COURT:  You've made it about three times in front

1    of me here with no basis whatsoever for it.

2              MR. EKELAND:  Your Honor, I am not saying that

3    Ms. Pelker spoke to Mr. Greenberg about this particular case.

4    But I am saying that Ms. Pelker -- and I think she just

5    admitted it in court -- spoke to Mr. Greenberg and --

6              THE COURT:  And told him she couldn't talk about the

7    case.

8              MR. EKELAND:  What?

9              THE COURT:  And told him she could not comment.

10   That's exactly what you expect of her.

11             MR. EKELAND:  But the context of this book, Your

12   Honor, is beyond the case.  It's seeking to validate the

13   blockchain forensics that are used in this case.  And in that

14   sense, that is a potential taint to the jury pool.

15             But I think, given the case law in this district and

16   the fact of venire and voir dire, I don't think there's any

17   reasonable probability of any juror taint.  The comments that

18   we made, we made in Europe, in Munich, and Berlin at blockchain

19   meetups.

20             THE COURT:  I thought you also made them on YouTube

21   or --

22             MR. EKELAND:  We made them on podcasts directed at

23   the blockchain community.  It's been very important for us.

24   Mr. Sterlingov has a right -- First Amendment right to reply to

25   the publicity on this case, and there is publicity on this

```
1    case.  There was a WIRED article released on the day of his

2    arrest; there was a DOJ press release tarring him as the

3    operator of Bitcoin Fog.

4            We've also, because of our public outreach, have had

5    people come up to us and tell us instances where Chainalysis

6    was used to arrest people on charges that were dropped.  And

7    that made us realize that, when they're touting all the

8    successes of Chainalysis Reactor, what they're not telling you

9    about is all the errors and the matters that were quietly

10   dropped.

11           We haven't -- although this Court has approved us for

12   CJA, we're told by CJA that we probably won't see any money

13   until after the trial.  So this public outreach has also raised

14   necessary funds.

15           THE COURT:  You can come to me and request an interim

16   payment.

17           MR. EKELAND:  I'm sorry, what?  I didn't hear you.

18           THE COURT:  You can come to me and request an interim

19   payment.

20           MR. EKELAND:  Your Honor, I will.  What I'm,

21   effectively, told by the federal defenders who are running the

22   CJA is that they're so swamped with dealing with the

23   January 6th cases, just to get onto the eVoucher system, just

24   to get set up on it, took us about two to three weeks.  So

25   it's --
```

1          THE COURT:  Anyway, I don't care what the case is

2     about.  One ought not be engaged in fundraising activities that

3     violate the Code of -- the Code of Conduct for attorneys in

4     criminal cases before this Court.

5          You're perfectly welcome to raise funds, but you

6     can't violate the rules of this court in the process of doing

7     it.

8          MR. EKELAND:  It's our understanding that the rule

9     says that if there's a reasonable possibility that a juror will

10    be influenced -- and we think that the case law and the fact of

11    the venire and voir dire just rules out any reasonable

12    possibility.

13         THE COURT:  But I don't think it's fair to say, it's

14    possible that some prospective jurors will have heard about

15    this.  We'll just exclude them and strike them for cause.  I

16    don't think that cures the problem.  If I'm striking people for

17    cause -- that's a problem -- because of statements counsel has

18    made.

19         MR. EKELAND:  Your Honor, courts in this district, in

20    the face of overwhelming negative national publicity from the

21    January 6th cases, reject arguments saying that there's -- the

22    negative press tainted the venire to the point where a transfer

23    is necessary.  This case is nothing like the level of publicity

24    of any of the January 6th cases.

25         THE COURT:  I'm just saying that there are rules of

1    conduct of attorneys in criminal cases here.  I expect the

2    lawyers appearing in front of me to comply with them.  And I

3    don't think it's an answer to say, yeah, we might taint some

4    prospective jurors, but we can just strike them.

5            MR. EKELAND:  Isn't that the point of venire and voir

6    dire?

7            THE COURT:  I mean, come on.  So you mean to say that

8    you could go out and, like, go out in the hallway during jury

9    process and go up to five jurors and say, by the way, my client

10   is innocent.  But don't worry, when it comes out in the voir

11   dire, you can just strike those people because I haven't done

12   anything wrong?

13           MR. EKELAND:  Well, we're going to have to ask them

14   whether or not they've read Mr. Greenberg's book; we're going

15   to have to ask them if they've read any WIRED articles about --

16           THE COURT:  You're barking up the wrong tree here.  I

17   do not think you should be violating this rule, and I don't

18   think the answer is to say we'll just strike people from the

19   venire based on my reading of the rule.  I expect you to comply

20   with this rule.

21           MR. EKELAND:  Okay, Your Honor.  We submit that we

22   are complying by the rule because we don't think there's any

23   reasonable probability that any juror --

24           THE COURT:  You're posting stuff on Twitter.  If

25   you're having a private conversation that's not being placed on

1    the internet with people in Europe, fine; I don't see a problem

2    there.  I get that.

3           But if you're doing stuff that is being posted on the

4    internet, on Twitter and YouTube, I think that there is a risk

5    that you're tainting the jury venire by doing that.

6           MR. EKELAND:  How does the DOJ press release not do

7    that?  How does not a national article in *WIRED* magazine

8    with -- from Chainalysis working with the government saying

9    this validates our forensics, how is that not something that

10   the defense has to reply to?

11          THE COURT:  If there is something that someone has

12   done that you think violates this rule, bring it to my

13   attention.

14          MR. EKELAND:  We filed that in our motion as well.

15          THE COURT:  I don't have any reason to think that the

16   press release -- the rule contemplates that there can be press

17   releases from the government at the initiation of the case, and

18   it also contemplates that the defense can, at the commencement

19   of a case, indicate that -- it does permit the defense at the

20   commencement of the case -- I'm looking for the exact

21   language -- to indicate -- to generally deny the allegations.

22   But neither side can go beyond those sort of limited types of

23   statements.

24          I have to say, it's particularly disturbing when it's

25   done just in terms of, sort of, ad hominem attacks on the

1    prosecutors in the case, or if it were the other way around.  I

2    don't think you would appreciate it if the government were

3    saying about you the types of things that you're saying about

4    them.

5              MR. EKELAND:  Accusing somebody of money laundering

6    $334 million worth of drug money is also an ad hominem attack.

7              THE COURT:  That's what an indictment is.

8              MR. EKELAND:  Well, that's --

9              THE COURT:  I think you've heard me on this.  I

10   expect everyone in this case to comply with this rule, and if

11   they don't, there will be consequences for doing so.

12             MR. EKELAND:  Yes, Your Honor.

13             THE COURT:  Okay.  At this point in time, I don't

14   think it's necessary for me to enter an order.  But I will say

15   this.  If I do see other violations, and other violations of

16   Rule 57.7(b) are brought to my attention, at that point in time

17   I'm just going to enter an order.  If you violate that order,

18   you will be in contempt, and there will be consequences for

19   that.

20             But as of now, I expect everyone to comply with the

21   rule.  As I said, if any further violations are brought to my

22   attention, I will actually issue an order directing compliance

23   and hold the violating parties in contempt after that.

24             But I will, for present purposes, deny both the

25   government's and the defendant's motions that I issue orders

1    under Rule 57.7(b).  I expect the lawyers who appear in this

2    court to be familiar with the rules of this court and to comply

3    with them in all respects.  And if we have any further

4    problems, you should bring it to my attention, and I will, as I

5    said, issue an order, and that will be followed up by contempt

6    proceedings if there are further violations.

7         Anything else you want to raise before the lunch

8    break?

9         MR. EKELAND:  Your Honor, maybe Ms. Pelker's --

10        THE COURT:  I mean, we can do that, I suppose -- is

11   that okay to do that after the lunch break?

12        MR. BROWN:  Yes, Your Honor.

13        THE COURT:  Let's do it after the lunch break.

14        MR. FRENTZEN:  I'm sorry, Your Honor.  I don't want

15   to hold things up, but does the Court need me any longer for

16   the rest of the proceedings today?

17        THE COURT:  I don't think so.  Anyone else think so?

18        MR. EKELAND:  No, Your Honor.

19        THE COURT:  Okay.  I appreciate you being here.

20        MR. FRENTZEN:  Appreciate it.

21        THE COURT:  I will see you all back here at 1:30.

22        (Lunch recess taken at 12:30 p.m. until 1:35 p.m.,

23        after which the following proceedings were had:)

24        THE COURT:  All right.  Why don't we go ahead and

25   take up the motion to quash the subpoena for Ms. Pelker and the

1    motion to preclude the defense from calling Ms. Pelker as a

2    witness at trial.

3            MR. BROWN:  Your Honor, we're happy to launch into

4    this and address the motions in whatever order the Court wants.

5    We wanted to -- we spoke to defense counsel briefly.  Being

6    mindful of the Court's time, and I think the Court has other

7    matters scheduled this afternoon --

8            THE COURT:  I do.

9            MR. BROWN:  -- the two defense witnesses who are here

10    today, I believe, are unavailable next week.  So if the Court's

11    amenable, we can also frontload the defense.

12            THE COURT:  That's fine.  If you want to start with

13    those, that's fine with me.

14            MR. BROWN:  Thank you, Your Honor.

15            MR. EKELAND:  May I proceed, Your Honor?

16            THE COURT:  Yes.  I just want to make sure I have the

17    right motion in front of me.  All right.  You may proceed.

18            MR. EKELAND:  Your Honor, the defense calls proffered

19    expert Dr. Francisco Cabanas.

20            THE COURT:  Okay.

21            THE COURTROOM DEPUTY:  Would you please raise your

22    right hand.

23            (Witness sworn.)

24            THE COURTROOM DEPUTY:  Thank you.  Please be seated.

25            THE COURT:  All right.  This is the expert notice at

1    Docket 122 and the government's opposition, which is at

2    Docket 130.

3            You may proceed.

4            MR. EKELAND:  Thank you, Your Honor.

5                    DIRECT EXAMINATION OF

6                    DR. FRANCISCO CABANAS

7    BY MR. EKELAND:

8    Q.  Dr. Cabanas, could you just briefly summarize your

9    educational experience for the Court.

10   A.  I obtained my Ph.D. in physics, in experimental physics

11   from the University of British Columbia in 1988; and I obtained

12   my master's in physics in 1982; and my bachelor's in physics

13   and mathematics, double honors, in 1979; and completed my high

14   school education, with a Governor General's medal, in 1975.

15   Q.  And in relation to your doctoral -- your doctorate in

16   physics, did you have any particular focus of study?

17   A.  I focused on experimental physics and -- I worked in

18   experimental physics.  Experimental physics involves a lot of

19   data analysis and -- for both my master's and Ph.D.  And those

20   are also a lot of computational analysis and the processing of

21   the data.

22            And so one has to really deal with things such as the

23   systematic errors or systemic bias on one side and random

24   errors or noise or random noise on the other side.  There are

25   two fundamental types of errors.  The only difference being

1    that noise you can address by results, while systemic bias you

2    cannot.

3    Q.  And outside of the educational experience that you just

4    described, do you have any other educational experience?

5    A.  I self-taught myself to program Fortran assembler and ASIC

6    at the time.  I also self-taught myself to do LAN

7    administration, and subsequently to that, I self-taught myself

8    starting in 2011 a lot about blockchain, Bitcoin and Monero.

9    Q.  You mentioned that you have experience as a network

10   administrator.  Could you please just explain that a little bit

11   for the Court.

12   A.  Basically, one of the -- I did work for my own company for

13   myself, and I also did work for a contractor for the Canadian

14   federal government.  And my role was to secure critically

15   private sensitive information from attacks and hackers, which I

16   was largely successful at.  And I also had roles, such as

17   removing malware, maintaining the service, et cetera, and it

18   was a Windows analytic system.  At the time it would have been

19   Windows 2003 server, Windows XP, and later Windows 7 that I

20   worked specifically in this work.

21          After that, I basically managed my own computing and

22   my own computers and my own businesses.  I've done the odd

23   consulting work on network administration also.

24   Q.  What experience, if any, do you have with cryptocurrencies

25   like bitcoin?

1    A.  Well, I started researching bitcoin in August of 2011.  I

2    started buying bitcoin in October of 2011.  At the time I was a

3    resident of Prince George.  My first purchase was $100

4    Canadian; I got a little over 18 bitcoins.  In early 2012, I

5    became a member of the BitcoinTalk forum.

6            And then I continued to invest and trade in bitcoin

7    through 2012 and 2013.  I came across Monero mainly because I

8    was studying at the time, which I was still very concerned

9    about the scaling capabilities of bitcoin and the fixed

10    block-size problems associated with bitcoin.  And so I started

11    learning about Monero.  I realized that Monero --

12            THE COURT:  What word are you saying?  You started

13    learning about what?

14            THE WITNESS:  Monero.

15            THE COURT:  Monero.

16            THE WITNESS:  It's another cryptocurrency.

17            THE COURT:  Okay.

18            THE WITNESS:  It's number 25 on CoinMarketCap, or 24,

19    in that range.

20            THE COURT:  Okay.

21            THE WITNESS:  So I started learning about Monero.  In

22    June of 2014, I started purchasing Monero.  My research about

23    Bitcoin gave me a lot of concerns about its long-term security.

24    And by September of 2015, I had sold over 99 percent of my

25    bitcoin for Monero because I had very serious concerns about

1    the future of Bitcoin.  And the last Bitcoin was sold for

2    Monero in 2017.

3              In 2016, I joined the Monero team -- this is because

4    I was already doing a fair amount of work for the Monero

5    project, volunteer work related to everything from scaling,

6    also some elements of the then ring signature were filed, which

7    was -- ring signature is a means of obfuscating the signer of a

8    transaction.  So I did some work for that -- on that.

9              And I became very involved in the Monero project,

10   primarily -- a major focus on the scaling of the

11   cryptocurrency, the ability of Monero to grow as a

12   cryptocurrency, fee, and ending with spam attacks, in

13   particular, some types of DDoS attacks and how to price them.

14   So that's a major area of my work in Monero.

15             And I also have to interact very closely with all of

16   the people that are working on the privacy elements of the

17   coin, in particular, because of transaction sizes and certain

18   types of attacks that can be mitigated by setting fees

19   correctly and by setting various medians that control the

20   growth of blockchain.

21   BY MR. EKELAND:

22   Q.  If I heard you correctly, I think you said you started

23   researching Bitcoin and other cryptocurrencies in 2011?

24   A.  In August of 2011.

25   Q.  And could you just briefly describe for the Court, like,

1    the nature of your research and what you --

2    A.  Well, the first thing I have to do is understand what it

3    did.  I have to understand the security of Bitcoin,

4    particularly how it was secured and how the public keys and the

5    private keys worked and what potential attack is the worse of

6    this technology.

7            I was approaching from the perspective of an investor

8    who was looking at investing in this or is there some flaw in

9    the design which I should keep away.  And my overall

10   conclusions were that, with the exception of the falling block

11   reward in Bitcoin and the security issues it raises, I had no

12   fundamental problems with Bitcoin.

13           I did have a very serious problem -- I had a very --

14   a lot of problems with the security and the inability of

15   Bitcoin to scale.  It's a well-known element of Bitcoin that it

16   basically captured around six transactions a second.  It,

17   therefore, on the base layer will never be able to be an

18   alternative on a worldwide basis to cash.  There's some

19   second-layer solutions that some people claim work.  I have

20   some serious doubts about them.

21           So I had focused a lot on that element.  That, in my

22   mind, combined with the falling block reward, is my biggest

23   concern so -- I had some real concerns about Bitcoin.  I think

24   it has serious problems down the road, probably within the

25   decade.

1    Q.  You mentioned private keys.  Could you just explain to the

2    Court briefly what your understanding of a private key is for

3    those of us who aren't --

4    A.  The technology behind Bitcoin is what's called a

5    public/private key technology.  And, essentially, the -- what

6    we see as a Bitcoin address is derived from the public key.

7    And there is a private key that allows you to sign a Bitcoin

8    transaction, and that key allows you then to spend Bitcoin.

9            What you see as an address is basically derived from

10   the public key.  So that's the -- kind of the basic structure

11   of it, how it functions.  So when you transfer a Bitcoin, how

12   it functions, that's the element of the cryptography.

13           So the basic approach when you sign a transaction,

14   you would sign a public key, sign with a private key, you then

15   transfer funds.  Whoever owns -- holds the private key actually

16   controls the funds.  The public key is actually an anonymous

17   data set.  Contrary to a lot of the commentary, public keys and

18   Bitcoin are -- are anonymous, and also in a derived -- the

19   address is decoupled from an individual.

20           So whoever signs the public -- sorry.  Whoever signs

21   that private key can move the bitcoins.  And that private key,

22   for example, can be transferred up chain without anything

23   showing up on the chain.  I can give you my Bitcoin private

24   key, and you will be able to spend my bitcoin.

25   Q.  Had you ever heard of Bitcointalk.org?

1    A.  Bitcointalk?

2    Q.  Yeah.  Bitcointalk.

3    A.  Bitcointalk, I've been a member of Bitcointalk since 2012,

4    and I'm actually a legendary member there.

5    Q.  Could you explain to the Court what Bitcointalk is.

6    A.  It's basically a forum that was created to discuss Bitcoin

7    and also to discuss a lot of the alternate currencies.  If you

8    were involved, particularly in 2000 -- about 2014, it was the

9    place to be if you really wanted to learn about cryptocurrency,

10   what was happening in there, and learn what's happening in

11   Bitcoin.  But also with a lot of the other coins, coins such as

12   Monero and Dash and Litecoin.  That was the place to be to find

13   out about this kind of stuff.

14   Q.  Are you familiar with Mt. Gox?

15   A.  I was a user of Mt. Gox, and I'm proud to say that I

16   escaped unscathed.  I had -- I did do some trading in Mt. Gox.

17   I sold some Bitcoins through Mt. Gox.

18            At one point in September of 2013, I had about 30,000

19   Canadian dollars in Mt. Gox, and I tried to withdraw it, and I

20   was given a bit of the runaround; the same arguments that were

21   used to -- with U.S. Dollars.

22            And one thing that really struck me about Mt. Gox was

23   that the excuses that were given were very specific to the U.S.

24   Government; like the reason we cannot withdraw funds from

25   Mt. Gox was that the U.S. Government, U.S. banking system is

1    preventing that.

2            Well, Mt. Gox was based in Japan, and I was

3    withdrawing Canadian dollars to Canada, so it does not affect

4    the U.S. Government at all.  I was getting exactly the same

5    problems.  I realized there was very likely serious financial

6    problems in there.

7            When Silk Road was seized, there was an immediate

8    drop in the price of bitcoin.  I went back, contacted their --

9    I said, put my Canadian dollars back in my account.  I bought

10   bitcoin back with my Canadian dollars, and I did manage at that

11   time to withdraw my bitcoin out of Mt. Gox.  So I have a bit of

12   a soft spot for the U.S. Government because they saved my

13   30,000 Canadian dollars.  I averted the crash and the

14   situation.  I, basically, realized at the time that Mt. Gox was

15   a problem.  I see it coming.

16           Then before they shut down, I went to the trouble of

17   taking images of all my account and downloading data from my

18   account so that I could comply with Canadian taxation

19   regulations primarily.  But also in the future, if I needed to

20   do any anti-money laundering or KYC compliance, further

21   exchanges that I have done in Mt. Gox.  But a few days --

22           THE COURT:  Make sure you keep going slower, as slow

23   as you can.

24           THE WITNESS:  I should repeat myself.

25           After I've withdrawn all my data, so I had my data

1    out of there so I could comply with all these things, Mt. Gox

2    went dark.  And it was done -- there was the bankruptcy and the

3    rest is history.

4            So, yes, my experience with Mt. Gox was some trading

5    and escaping unscathed.

6            MR. EKELAND:  Your Honor, may I approach?

7            THE COURT:  Yes.

8    BY MR. EKELAND:

9    Q.  Dr. Cabanas, I've just handed you what's been marked for

10   identification as Defendant's Exhibit A.

11           Could you just take a look at that and just look up

12   when you're done looking at it.  Can you -- do you know what

13   that is.

14   A.  This is my resume, curriculum vitae.

15   Q.  And is that an accurate copy of your resume and reflects

16   your CV?

17   A.  Yes, that's correct.

18           MR. EKELAND:  Your Honor, at this time we'd like to

19   move what's been marked for identification as Defendant's

20   Exhibit A into evidence.

21           THE COURT:  Any objection?

22           MS. PELKER:  No objection, Your Honor.

23           THE COURT:  Exhibit A is admitted.

24           (Defendant's Exhibit A was admitted.)

25           MR. EKELAND:  Thank you.

1    BY MR. EKELAND:

2    Q.  Dr. Cabanas, I'd like to move on to the scope of some of

3    your experience.

4            Do you have any experience with Chainalysis Reactor

5    or any other kind of blockchain forensic software?

6    A.  I have studied it from a global impact perspective in the

7    sense that I have not used it directly myself.  I have done

8    some research on open-source versions of this type of software

9    and have some understanding.

10           One of my research about what I call blockchain

11    surveillance software was a report from the Financial Action

12    Task Force where they compared six different blockchain

13    surveillance companies in one example and seven in the other.

14    They looked at comparisons in data for the question, what is a

15    percentage of illicit addresses in the Bitcoin blockchain.

16    It's a very, very wide variation.

17           From memory, some cases, like between .4 and about

18    over 12 on a particular year on the question of the -- if a

19    particular Bitcoin address is associated with illicit activity

20    as a percentage of the total number of addresses.  And also the

21    question of whether a wallet was associated with an exchange or

22    a VASP.  I think you used the term VASP, which is the term used

23    by the Financial Action Task Force.

24           And there's huge variations there, between 10 and 80

25    percent, depending on what particular proprietary set of --

1    well, you call it Reactor from different companies.  And the

2    companies -- remember, with Chainalysis, DRM, Ciphertrace,

3    Elliptic; there's a couple other ones.  I'd like to see the

4    document to refresh myself.  But there's a very, very wide

5    variation; over a -- I believe I remember about a four- to

6    five-year period.

7              MR. EKELAND:  Your Honor, may I approach?

8              THE COURT:  You may.

9    BY MR. EKELAND:

10   Q.  Dr. Cabanas, I just handed you what's been marked for

11   identification as Defendant's Exhibit B.

12             When you -- take a look at it.  When you're done, if

13   you could just look up.

14   A.  Yes.  This is the document I'm talking about.  The graphs

15   in question are on section -- page 26.

16   Q.  Dr. Cabanas, could you just state for the record what

17   document that is.

18   A.  This is the second 12-month review of the revised FATF

19   standards on virtual assets and Virtual Asset Service

20   Providers.

21   Q.  Do you know what FATF stands for?

22   A.  Financial Action Task Force.

23   Q.  And do you know what the Financial Action Task Force is?

24   A.  It's an international body that provides recommendations to

25   governments around the world, including the U.S. Government,

1    with respect to anti-money laundering and countering terrorism

2    financing, and how to draft regulations and -- appropriate to

3    address concerns in that area.

4    Q.  If I recall your testimony correctly, you said that that

5    document published certain ranges in relation to percentage of

6    illicit activity on certain exchanges; is that correct?

7    A.  Well, it actually -- the data is on page 26 of the

8    document, and it's a graph too.  It gives an example here.

9    This is the VASP data; then there's another one with respect to

10    illicit activity.  I think it's on the following page.  And on

11    page -- this graph, 3.  So there's two graphs.  Page 27,

12    Graph 3, it says:  Proportion of identified illicit Bitcoin

13    transactions between 2016 and 2020.  The left, number of

14    transactions; right, USD value.

15          It lists in the number of transactions, six different

16    blockchain surveillance companies.  For example, the ranges in

17    2019 range from .5 percent to 12.7 percent.

18    Q.  And what, if any, significance does that variation in

19    ranges have?

20    A.  What it tells me is that they're very substantial systemic

21    bias, and you can measure it as a relative to each company.  So

22    what this is telling me is that the difference between the

23    systemic bias in the companies themselves ranges in that range

24    of 2.5 and .7.

25          It cannot tell you if there is a bias, a systemic

1    bias, that is applicable to all the companies.  It's also

2    silent on any random errors because, given the size of the data

3    sets that they're using here, I would say that they mitigated

4    the random errors or the noise or random noise in the data.  So

5    what we're seeing here is the relative systemic bias.  The

6    range, the differences, is a systemic bias inherent in the

7    design of the system.

8            Then you asked the question why.  What could cause

9    this?  In my opinion, it is very likely, although there could

10   be other causes also, the different heuristics that are used

11   and the biases used by the heuristics.

12   Q.  I just want to back up one second.  When you used the

13   phrase systemic bias, is it fair to say that that's just

14   another way of saying systemic error?

15   A.  Yes.  You could say systematic errors is the common term

16   used in science -- in the natural sciences.  Another term is

17   systemic bias; it's essentially the same.  It's basically the

18   same thing.  You can also refer to this as bias.

19           The reason why we use the word systematic and

20   systemic is to differentiate it from random or noise-type

21   errors that can be averaged out.

22           So a systematic error -- give you an example of a

23   systematic error.  It would be, let's say, in law enforcement

24   you have a radar gun to measure the speed of a -- velocity of a

25   motor vehicle, and you miscalibrated it, and it measures

1    kilometers per hour but records miles per hour.  It would

2    create a systematic error or systemic bias of 1.6 times.

3            So the law enforcement officer will see a speed of

4    miles per hour, but, actually, the device has measured the

5    speed in kilometers per hour.  So that would be an example of

6    what a systematic error is.

7            The example of a random error in that case would be

8    how you aim it, the velocity of the vehicle from which it's

9    been moved, et cetera.  That could vary.  If you were measuring

10   large numbers of vehicles, by averaging, you would not

11   eliminate this error of mistaking kilometers for miles, but you

12   would eliminate the other noise-type errors.

13           This example here would be an example of a systematic

14   error or a bias or a systemic bias.

15   Q.  And you used the word heuristic, I believe, in your

16   testimony?

17   A.  Yes.

18   Q.  Could you just explain for us what that term means;

19   heuristic.

20   A.  In a typical situation, it is an educated guess; it is a

21   hunch.  It's maybe based on statistics; maybe not.  Where you

22   do not have the actual data itself, so you replace the data

23   with a hunch.

24           An example would be -- and I can give you an example,

25   for example, in Bitcoin.  You would make an assumption that

1    every transfer happens on chain.  That's a heuristic.

2    Q.  I'm sorry.  Could you explain that.  When you say every

3    transfer happens on chain, could you explain that for the

4    uninitiated here.

5    A.  What that would be, would be that when ownership of a

6    bitcoin is transferred, it's because you actually sent the

7    bitcoin on chain.

8    Q.  I want to slow you down.  When you say chain, you're

9    talking about the blockchain?

10   A.  On the blockchain itself, yes.

11   Q.  Which is -- what is the blockchain?

12   A.  The blockchain is the record of the transactions.  When you

13   issue a Bitcoin transaction, then it gets mined by miner.  They

14   collect all the transactions into a block, and that block has a

15   hash, and it's mined.  And the miner gets compensated by that

16   by a mining reward, which is the dominant amount of the funds

17   and the fees paid by the transactions.  So that is what a block

18   is.

19          And that's the ledger of Bitcoin.  And so each block

20   is built on the next one and so on.  So that's -- the normal

21   way you would transfer bitcoin would be to do it on the

22   blockchain.  There are other ways to transfer bitcoin, some

23   illicit.  A good example of that would be if I simply take my

24   private key and I put it on a floppy drive or on a USB drive

25   and hand it to you.  In that case, that would be an example I

1    just gave you my private key; you now have control of my

2    bitcoin.  But there's nothing showing on chain.

3            A fairly common example and an illicit example would

4    be where a person hacks into someone's computer, and they steal

5    the private key.  And then they have control of that bitcoin,

6    and they can spend the bitcoin.  Again, nothing happens on the

7    blockchain.  But now you have a transfer of control to that

8    other person.

9            If the original -- copies of the original private key

10    are lost in the original computer, that other person has

11    complete control.  So it's possible that they're completely

12    surrendered.  If there's copies, both sides have control, so

13    either one can spend the bitcoin.

14    Q.  Am I correct in understanding you that there is no way to

15    tell from the public blockchain who actually controls the

16    bitcoin that's documented on the chain?

17    A.  That is correct.  You start moving the private keys around,

18    nothing shows in the blockchain at all.  It's impossible to

19    ascertain that from the blockchain; that is correct.

20    Q.  And going back to the heuristics, you said they were -- did

21    I understand you correctly in saying that they're sort of a

22    guessing methodology to fill in the blanks about what you don't

23    know?

24    A.  That's an accurate assessment.  You're taking an educated

25    guess or a hunch as to what -- the blanks that you don't know.

1    Q.  Did I understand you correctly when you -- I think you

2    testified that -- I think you used the term blockchain

3    surveillance company.

4    A.  Yes, that's correct.

5    Q.  Could you clarify that phrase for us.  Why are you calling

6    them blockchain surveillance companies?

7    A.  The distinction I make -- and this is important -- if you

8    are just analyzing the anonymous public keys on the blockchain,

9    that could be considered analytics.  And that's totally

10   deterministic because you're just looking at relationships

11   between these anonymous public keys, which is represented by

12   Bitcoin addresses.  If, on the other hand, you start saying

13   which person or persons or entities are controlling these keys,

14   then we're moving into the role of surveillance.

15            One element of a surveillance which is different is

16   that you have to make sure that the surveilled don't realize

17   how you're surveilling them.  For example, you may want to keep

18   many of our heuristics private or not disclose them because

19   that could cause the change of behavior of the person or

20   persons you're surveilling.

21            What is occurring is you have a series of public

22   addresses which are anonymous, and then we are making that leap

23   from those anonymous addresses to person or persons or

24   entities.

25            Now, it's important -- in the Bitcoin white paper, it

1    specifically says this is the model for privacy in Bitcoin.

2    The idea is that you break the link between the anonymous

3    public address, which is essentially derived from the public

4    key, and person, or persons.

5          So the moment you do that, you apply a whole bunch of

6    heuristics that go into the surveillance.  And the reason

7    surveillance may be so popular is because you have to hide from

8    the surveilled how you do it.  If you reveal everything to the

9    people you're surveilling, then they may change their behavior

10    and then you would, presumably, not get the results you're

11    looking for.

12    Q.  Does the type of heuristic employed by a blockchain

13    forensic or surveillance company, as you call it, would that

14    affect the accuracy of the tracing of that software?

15    A.  Absolutely.  And not only will it affect it, the publicly

16    disclosed ones, but also the implied ones.  A good example --

17    let's say, for example, you say that all the transactions, all

18    the inputs into a transaction are from the same private/public

19    key pair.  You assume that it's a heuristic.

20          Then you move and say, okay, some people are doing a

21    coinjoin.  And in a coinjoin, what happens is you have

22    different public/private key pairs submitting inputs into one

23    transaction.  Well, if your heuristic doesn't take that into

24    account, you're going to create a systematic bias or a

25    systematic error in your results.

1              In fact, that was one of the explanations that I have

2       for these -- for the discrepancies in the FATF data that was

3       presented.

4              MR. EKELAND:  Your Honor, at this point in time, I'd

5       like to move the -- what's been marked for identification as

6       Defendant's Exhibit B into evidence.

7              THE COURT:  Any objection?

8              MS. PELKER:  None.

9              THE COURT:  B is admitted.

10             (Defendant's Exhibit B was admitted.)

11      BY MR. EKELAND:

12      Q.  Dr. Cabanas, are you familiar with the term cluster in

13      relation to Bitcoin?

14      A.  Yes.  I mean, cluster is an attribution of related

15      addresses.  One of the heuristics that are used in determining

16      a cluster is, for example, the concept that all of the inputs

17      come from the same key pair, from the same public/private key

18      pair into the cluster.  It may not take into consideration the

19      impact of coinjoins.

20             So when you define a cluster, which is a group of

21      related addresses, what can happen is if you have a -- if your

22      heuristic is inaccurate, the range of that cluster, the size of

23      that cluster, and the attribution of that cluster could change

24      and could change significantly.

25      Q.  I think you testified earlier about scaling.  Is that --

1    A.  That is correct.  Yes.  One of the things I work on

2    blockchain, particularly Monero, is on the ability of the

3    blockchain to scale.  This is an interesting problem in a

4    different sense because if you're going to do this type of

5    blockchain surveillance, one of the problems you'll run into

6    is, as you make the blockchain larger, then relative to the

7    size of your transactions, then you have a much harder task in

8    actually identifying or trying to track transactions.

9         Like, for example, let's say you have $7 to

10   $21 million of the Bitcoin; that's like one in 3 million

11   approximately.  So you have a lot much larger volume of

12   transactions in which you can hide the $7 transaction.  Another

13   example, let's say you have $5 billion out of a trillion

14   dollars.  That's a factor of 200.  So now you have a much

15   smaller group of transactions that you can -- in which you can

16   hide.

17        So the relative size of the transactions to the

18   overall size of the blockchain is critical in determining the

19   ability to do this type of blockchain surveillance work.  The

20   other thing you run into -- and this is an interesting problem.

21   If I have an output in a blockchain, and let's say I attach a

22   certain degree of criminality or illicit activity to a subset

23   K, well, the total number of ways that you can choose K out of

24   N is actually well-known theory; it's a binomial theorem in

25   mathematics.

1        And that scales as N factorial divided by K factorial

2    times N minus K factorial.  And that grows faster than an

3    exponential.  So as you grow the blockchain, it becomes harder

4    and harder to identify particular trends and transactions.

5    It's important to look at over time the relative size of the

6    transactions to the overall size of the blockchain in dollar

7    value.  And also at the same time, the overall number of

8    transactions in the blockchain and the number or size of your

9    clusters that you identify.

10        The larger the blockchain becomes with respect to

11    what you're trying to identify, the harder it is.

12        MR. EKELAND:  I'm sorry.  I lost track of time.  I

13    want to make sure I'm not running over.

14        THE COURT:  It's ten minutes past 2:00.  I do have

15    another matter at 3:00 and then one at 3:30, just so you know.

16        MR. EKELAND:  I'm going to ask one more question, and

17    I'll pass the witness to the government.

18    BY MR. EKELAND:

19    Q.  Dr. Cabanas, the government's proffered an expert from

20    Chainalysis named Elizabeth Bisbee in this case.  She produced

21    an expert report to the defense.

22        Did you have an opportunity to read that?

23    A.  I had an opportunity to read the report, yes.

24    Q.  And could you just briefly state for the Court what your

25    thoughts are on that report.

1    A.  I have some concerns.  One of them that's very significant

2    is the fact that there is no taking into account of coinjoins.

3    In particular, the heuristic that's applied, according to the

4    report, is based on there's no conjoins and then it's supplied

5    to a set of -- subset set of markets where one would expect

6    significant use of coinjoins, or at least more than typically,

7    which it was called a darknet market.

8           And people who will be participating in those markets

9    may want to hide that they're participating there, so far more

10   likely to be using coinjoins.  And they're trying to attribute

11   clustering to these darknet markets.

12          And there are serious concerns when you're not

13   taking, for example, coinjoins into account in that situation.

14   That's a good example.  The other problem you get into with the

15   whole, what I call the implied heuristic, and the implied

16   heuristic is that there's an implied assumption that everything

17   is happening on chain.

18          So we're not dealing with a situation where a private

19   key has been transferred off-chain to another person or

20   persons.  So there's an implicit assumption that we're talking

21   a key pair or a wallet and we're aligning that with an entity

22   or with a person.  In fact, that is an implicit heuristic,

23   because the assumption that has been made is that there's no

24   off-chain transfer of private keys.

25   Q.  Real briefly, could you just explain the concept of

1    coinjoin.

2    A.   Coinjoin is where you would take a series of transactions

3    that come from different private/public key pairs, and then you

4    take transactions from those different public/private key pairs

5    and you put them into one transaction.  Typically -- this is

6    the assumption in Ms. Bisbee's report.  They're all going to

7    come from the same key pair.

8         But in a coinjoin, you have them coming from multiple

9    key pairs.  So that has a profound impact on your conclusions

10   and particularly clustering.

11        THE COURT:  When would you want to use a coinjoin?

12   When would you do that?

13        THE WITNESS:  Well, the reason you'd want to do that

14   is to hide your spend -- that you're the person in the spend.

15   Let's say, for example, I want to spend today .01 bitcoin, and

16   I don't want anybody to know that I want to spend .01 bitcoin.

17        So I do a coinjoin with, say, 50 other people that

18   want to spend .01 bitcoin.  And then at the end of the

19   coinjoin, the .01 bitcoin goes somewhere.  But you don't know

20   which of the 50 people spent it to what respective outputs.

21        THE COURT:  So why would the other 49 people do it?

22        THE WITNESS:  Same reason.  For the very same reason.

23   That is that they want to hide where they're sending.  It's a

24   way of getting privacy.

25        THE COURT:  Logistically, how do you do a coinjoin?

1           THE WITNESS:  Logistically, what happens is there's

2    typically someone who organizes them.  You send all the

3    transactions, and then you sign them and then a party would --

4           THE COURT:  Is there a service that does this?

5           THE WITNESS:  There are services.  There's wallet

6    services.  In fact, there's even an entire coin called Dash

7    that has a privacy function based on coinjoins, and they

8    have --

9           THE COURT:  Do you have a way of assessing or is

10   there a way to assess -- is there a way to assess or evaluate

11   what percentage of the transactions in a chain are coinjoin

12   transactions?

13          THE WITNESS:  Well, it can be very difficult.  It may

14   not be possible.

15          THE COURT:  Is there anything you could do to figure

16   that out?  I mean, you know they exist.  Do you have any idea,

17   in general, the percentage of transactions in --

18          THE WITNESS:  I don't have an idea of what percentage

19   are in coinjoins, no.

20          MR. EKELAND:  I pass the witness, Your Honor.

21          THE COURT:  Thank you.  Ms. Pelker?

22          MS. PELKER:  Thank you, Your Honor.  If you don't

23   mind, would it be all right with the Court if I passed the

24   binders up to the witness to flip through?

25          THE COURT:  That's fine.

```
 1              (Tendering documents to witness.)

 2                      CROSS-EXAMINATION OF

 3                     DR. FRANCISCO CABANAS

 4    BY MS. PELKER:

 5    Q.  Dr. Cabanas, you were a physicist at the University of

 6    British Columbia until 2000; is that right?

 7    A.  Yes.  I worked at Department of Physics, and then I did --

 8    I also took a postdoctoral fellowship at -- in the Department

 9    of Chemistry, and then I worked as a research associate until

10    2000; that's correct, yes.

11    Q.  What was the circumstance under which you left the

12    university and the field?

13    A.  Oh, I left the field for a very simple reason.  I'm a baby

14    boomer.  There were no jobs in that particular market.  It's

15    just simple demographics.  If you happen to be born and the

16    generation after you is much smaller, there is not a big demand

17    for academics that would teach that large group of people.

18              So I went -- I left the field simply because there

19    was no opportunities for me in the field, simply because of the

20    demographics.

21    Q.  And why leave the university?

22    A.  Pardon me?

23    Q.  Why leave the university?

24    A.  Well, that's precisely, because it applies to every field,

25    every type of academic endeavor.  If I was going to go to be in
```

1    the faculty, where there's less students to teach, and so that

2    was the main reason.

3            So I got into other things.  I got into real estate,

4    and then I moved over to Prince George, and I did a different

5    type of work.

6    Q.  What is Aspen Investments?

7    A.  Aspen Investments is my company which I now use to hold my

8    real estate portfolio in Vancouver.  I created it in 1992, and

9    I used it initially to invest, actually, in property in the

10   United States.

11   Q.  Does Aspen Investments, in addition to your real estate

12   work, also cover employment consultancy, web design, network

13   administration?

14   A.  What it covers is some computer work in web design for its

15   own websites.

16   Q.  You mentioned that around 2014 into 2017 you converted most

17   of your Bitcoin holdings into Monero; is that right?

18   A.  Most of it occurred in 2014, 2015.  Very small percentage

19   in 2017.

20   Q.  Is a substantial portion of your income and retirement plan

21   now tied in Monero?

22   A.  I would say realistically, 50 percent, and 50 percent

23   between real estate and cash holdings.

24   Q.  And you've worked with the Monero core dev team since 2016,

25   right?

1    A.  Yes, I was a member of the Core Team since 2016, and I was

2    doing work for Monero considerably earlier than that.

3    Q.  And you've also been a part of the Monero Policy Working

4    Group since 2020; is that right?

5    A.  That is correct.

6    Q.  And has that group written a number of papers, as well as

7    blog posts, about Monero policy issues?

8    A.  Absolutely.

9    Q.  And looking now in the binder there, are Tabs 5 through 9

10   examples of that work?

11   A.  Let me take a look at them.  Yes, there is.  This is a

12   response to the European Council -- European Union, that is

13   correct.  I'm one of the authors of that work.

14           6, you have a response to the Financial Action Task

15   Force.  That is correct.  Yep, that's the document.

16           7 is a public consultation on money laundering and

17   finance by European Commission.  We responded to that.  And

18   there's a response to FinCEN, a call for responses, and we

19   responded to that.

20           I would say this one is interesting because we

21   actually -- in many of the other cases we were not supportive

22   of what was proposed.  In this particular case, we were.

23   Q.  Are these positions with the Monero Core Team and the

24   Monero Policy Working Group full-time jobs?

25   A.  No.  They're totally volunteer.  Everything I do for the

1    Monero project in its entirety is completely volunteer.  I do

2    not receive any financing at all or money from any work I do

3    for the Monero Core Team or the Monero project in any way,

4    shape, or form.

5    Q.  How many hours a month do you spend on average working for

6    either Monero Core Team or the Monero Policy Working Group?

7    A.  Well, overall, on Monero, I would say I could easily spend

8    on a monthly basis somewhere about six, seven hours a month; in

9    that kind of range.  In some cases I may go to a talk.  After

10    this, I'm going to Prague to give a talk at Monero conferences.

11    Obviously, this week I'll be spending a lot more time.  Other

12    times it could be less.

13          But, yeah, I would say realistically on a monthly

14    basis, I mean, like, easily about 10, 20 hours; in that kind of

15    range.

16    Q.  I'm sorry.  Did you say 6 to 7 or 10 to 20?

17    A.  Per month?

18    Q.  Yes, per month.

19    A.  On a monthly basis, 10 to 20 hours is reasonable.

20    Q.  Do you also advocate for Monero publicly using the name

21    Artic Mine?

22    A.  That is correct.  I've used that name since I signed up in

23    Bitcointalk in 2012.

24    Q.  And looking at Tabs 10 and 11, do those show your profiles

25    on the Bitcointalk -- I think you said you were a legendary

1    user -- as well as on Reddit using Artic Mine?

2    A.  Let me see.  This is on Tab --

3    Q.  Tab 10 should be the Artic Mine on Reddit; 10 -- 11 should

4    be --

5    A.  Reddit is me, yes.  11, that's my profile on Bitcoin forum;

6    that is correct, Bitcointalk.

7    Q.  Do you also post under the name Artic Mine in the Monero

8    community IRC channels?

9    A.  That is correct, yes.

10   Q.  Do you share your login credentials for those accounts with

11   anyone else or allow --

12   A.  No, absolutely not.

13   Q.  Do you allow anyone to post on your behalf?

14   A.  Absolutely not.

15   Q.  Is this your first time working as an expert witness?

16   A.  Yes.

17   Q.  And are you being paid for your work on this case?

18   A.  No.

19   Q.  And are you being reimbursed for your travel expenses?

20   A.  The vast majority, no.  I've had, I think, one room paid

21   for me and a couple of meals, but that's about it.  The

22   majority of it, no.

23   Q.  Is that a room here in Washington, D.C., for this hearing?

24   A.  Yes.

25   Q.  And would you expect your travel expenses to be paid,

1    including lodging, for trial?

2    A.  No.

3              THE COURT:  What is a legendary user?

4              THE WITNESS:  Oh, a legendary user is basically a --

5    it's because you've been in Bitcointalk for enough time, you've

6    contributed, and it's kind of like a status.

7              THE COURT:  It's like being a premiere member?

8              THE WITNESS:  Yes.  Someone who is there early who

9    contributed to the project.  I'm not active, but I still have

10   access to the account.  I do go in there regularly.

11             THE COURT:  Okay.

12   BY MS. PELKER:

13   Q.  How many hours have you worked on this case so far?

14   A.  In this particular case, probably in the nature of eight to

15   ten at least or more; but, of course, you also have to allow

16   the travel time, et cetera, to New York and to --

17   Q.  Not including travel time, just work spent on the case.

18   A.  Oh, work spent, yeah, I would say easily into ten hours.

19   Q.  How many hours would you expect to work if the case goes to

20   trial?

21   A.  Well, that depends on how it goes.  But it could easily be

22   30, 40.

23   Q.  And you intend to volunteer your time for that?

24   A.  Absolutely.

25   Q.  When were you first contacted by defense counsel for this

1    case?

2    A.  I actually contacted defense counsel.

3    Q.  And when was that?

4    A.  At the MoneroTopia meeting in Mexico City on May the 5th.

5    Q.  May the 5th or --

6    A.  Of this year.

7    Q.  This year.  What made you contact defense counsel?

8    A.  I wanted, among other things, to advise them about the

9    Financial Action Task Force report, Defendant's Exhibit B.

10   Q.  And how had you learned about this case?

11   A.  I learned through *Monero Talk*, and I also listened to the

12   talk in Mexico City.

13   Q.  *Monero Talk* is one of the public podcasts that the

14   defense --

15   A.  Yes, that is correct.  I learned about it also when I went

16   to MoneroTopia to give a talk myself, and I listened to the

17   attorneys present in Mexico City.

18   Q.  Did you, in fact, speak on a panel with defense counsel at

19   MoneroTopia?

20   A.  That is correct.  Oh, yes.

21   Q.  And at that point, was that part of your work on this case?

22   A.  Well, I was starting on it.

23   Q.  You were starting on it?

24   A.  Yeah.  I started after that.  That was before I started to

25   work and had any information about the specifics of the case in

1    particular because I hadn't signed any of the disclosure

2    requirements at that point in time.  I have signed them

3    afterwards, but not at that time.

4    Q.  So you hadn't received any of the discovery, reviewed any

5    of it, knew anything about the case when you appeared on that

6    talk at MoneroTopia?

7    A.  That is correct.

8    Q.  And you understand that on that talk at MoneroTopia, you

9    were appearing alongside defense counsel talking about how the

10   defendant was innocent?

11   A.  Well, I had some very serious doubts about the methodology,

12   which I've had for a long period of time, of using -- of

13   surveilling the blockchain and blockchain surveillance as a

14   means of assigning guilt or innocence in a trial.  So if you go

15   from the premise of innocent until proven guilty and you're

16   dealing with a very -- a methodology that I have very serious

17   doubts about, that, I think, is a reasonable presumption.  A

18   presumption of innocence is -- I believe, is standard.

19   Q.  At that point you hadn't actually independently done any

20   expert review of the materials to make a determination as to

21   guilt or innocence?

22   A.  What I knew about the case is that it was based on these

23   type of forensics.  What I had reviewed in great detail is the

24   document that is Defense Exhibit B because I knew that ahead of

25   time.  So that I had definitely reviewed.

1    Q.  How many hours have you spent actually reviewing the

2    discovery produced by the government in this case?

3    A.  I would say, like I said, most of my time has been

4    discovery review.

5    Q.  And does that include reviewing the defendant's financial

6    documents?

7    A.  Well, that, I admit, I have not as much spent because I

8    focused primarily on the area that I have experience, which is

9    an understanding that I've been studying, which is the

10   blockchain surveillance part of it.

11   Q.  You understand that part of blockchain analysis is coupling

12   activity that's happening on the blockchain with records from

13   other data sets, like the financial records, like Mt. Gox, like

14   Liberty Reserve; would you agree that's part of blockchain

15   analysis?

16   A.  Well, it can be, but it doesn't necessarily have to be.

17   But it is an attempt to break that relationship between the

18   public key -- anonymous public key and assigning it to an

19   individual or individuals.

20   Q.  The defense expert disclosure describes you as, quote, a

21   key contributor to the European Union's public consultation on

22   preventing money laundering and terrorism financing; is that

23   right?

24   A.  That is correct.

25   Q.  Now, turning to Tab 5, this shows the public comment that

1    you, as part of the Monero Policy Working Group, submitted to

2    the EU on that point; is that correct?

3    A.  That is correct, yes.

4    Q.  And is that the work that the defense is describing as

5    being a key contributor?

6    A.  Well, this is one of them.  Response for -- this is one of

7    them, yes.

8    Q.  And is other work regarding your contributions on Tabs 6,

9    7, and 8?

10   A.  That is correct, yes.

11   Q.  These are public comment documents; is that correct?

12   A.  That is correct.

13   Q.  And that's because EU, FATF, FinCEN put their work out for

14   public comment and solicit input; is that right?

15   A.  That is correct.

16   Q.  FinCEN, for example, isn't it true that your comment was

17   one of thousands of contributions from the public for input --

18   A.  I don't remember how many comments were.  I know ours was

19   one of the few that actually supported the position of FinCEN.

20   Q.  Now, you aren't, and you and no member of the Monero Policy

21   Working Group are actually involved in drafting the resulting

22   reports or the resulting regulations from the EU, from FinCEN,

23   or from FATF?

24   A.  I am not personally involved, but I cannot speak for the

25   rest of the members of the group.

1    Q.  Speaking about FATF, we spoke a bit with defense counsel

2    regarding the FATF document that's Defense Exhibit B, also

3    should now be in front of you, at Tab 1 after that yellow page

4    there.

5    A.  Yeah.  I got the report.

6    Q.  Now, is your understanding that the Financial Action Task

7    Force sought input from the blockchain analytics companies

8    because they are viewed as providing a source of information

9    about illicit activity on the Bitcoin blockchain?

10   A.  That would be my understanding of why it was selected, yes.

11   Q.  And that they're, in fact, very widely used by the entities

12   that FATF regulates?

13   A.  That is correct.

14   Q.  And turning your attention to paragraph 81 of this

15   report -- it should be page 28 of what you have in front of

16   you, but it was --

17   A.  It's paragraph 28?

18   Q.  Paragraph 81.  It's on page 28.

19   A.  Oh, page 28, paragraph 81.

20           THE COURT:  I'm sorry.  This is exceedingly difficult

21   for the court reporter, because you're both talking at the same

22   time.  You need to wait until the question is finished before

23   you answer, and also just speak -- continue to speak slowly.

24           MS. PELKER:  For ease of reference, this would be

25   paragraph 24 under -- page 24 of what the defense previously

1    admitted as Exhibit B.

2              THE COURT:  Okay.

3              THE WITNESS:  So we are talking paragraph 81, and

4    it's important to note that each company?

5    BY MS. PELKER:

6    Q.  Yes.  Additionally, the FATF -- does that paragraph --

7    "Additionally, the FATF recognizes that blockchain analytics

8    companies normally focus on detecting and tracking illicit

9    activity as opposed to providing metrics on the size of the P2P

10   market.  Thus, the conditions embarked on conducting this

11   exceedingly difficult research at the request of the FATF and

12   some may have less experience in conducting this type of

13   macro-level analysis."

14             Is that what's written there in that paragraph?

15   A.  That is correct.

16   Q.  And so is this indicating that, in fact, what the FATF has

17   asked to do and what -- the companies to do and what's shown in

18   this report is different than the companies' usual work in

19   blockchain analysis and tracing?

20   A.  That is not correct.  I don't agree with that.  Because

21   they actually also reported on illicit activity, which is the

22   very thing that they are supposed to be detecting on a usual

23   micro basis.

24             Furthermore, they are also reporting on -- in their

25   regular work, their also work on risk/high-risk exchanges.  So

1    they would need to identify those exchanges, as well as the

2    high risk.  And the first step in doing that is identifying if

3    they're an exchange or not.

4         So the P2P portion of it, which it got even worse for

5    them than the individual data on illicit activity, it's also

6    critical to identifying high-risk exchanges.  And if you look

7    at what work these companies do, they do on a micro basis.

8    What you're doing here is you're averaging their work,

9    particularly in the illicit case, over large numbers of

10   transactions, and that allows you to extract the systemic error

11   and bias from the data set that could otherwise be -- so what

12   has occurred here is, if you apply the same methodology that

13   has occurred in individual day-to-day work that they're doing

14   and you average that over the entire blockchain or very

15   significant portions of the blockchain, then what happens is

16   you will actually -- can easily identify a systemic bias or a

17   systematic error or a bias.

18        And if I were -- what the report does identify is the

19   relative bias.  I'll emphasize this.  This is the relative bias

20   between the companies.  It does not tell you whether there is a

21   systemic bias that applies to all the companies.  So what we're

22   dealing with in this report, what that data tells you, if you

23   take the methodologies and, yes, they say the difference -- and

24   apply them across the entire blockchain, you're trying to

25   identify the percentage of illicit activity by using that

1    methodology that's on individual cases, you get this wide range

2    of bias.

3    Q.  And doesn't it also then carry that, if this is not

4    relating to the systemic bias of an individual company, but,

5    rather, relative across the two, that there's no comparison

6    here to the data from Chainalysis to ground truth in order to

7    calculate what that bias may or may not be?

8    A.  Well, it is.  Because it's an indication between the

9    relative bias from the ones that were chosen by FATF,

10   specifically which was Chainalysis and also TRM --

11              THE COURT REPORTER:  I'm sorry.  You need to slow

12   down.

13              THE WITNESS:  Let me rephrase slowly.  My apologies,

14   Your Honor.

15              It is indicative of the relative bias between the

16   companies involved.  It does not tell you what the absolute

17   bias is, including Chainalysis and TRM Labs, which were

18   actually in the FATF request.  We're talking about illicit

19   activities in the Bitcoin blockchain.

20              What this is telling you is what the relative bias

21   is.  So it is indicative of the relative bias.  It should be

22   seen as a minimum amount of bias.  It does not take into

23   account any bias that is applicable systemic across all the

24   companies, and it would not also take into account any random

25   noise or any random errors with individual results.  So it's an

1    indicative of bias.

2              And, again, it's common when large numbers of

3    heuristics are used to find that one of the results is a

4    systemic bias in the data.  This is not specifically applicable

5    in this case.  This is a well-known result in the scientific

6    literature where -- in many fields, where if you have a series

7    of heuristics and then you apply them on our last data set, you

8    will get systemic bias.

9              What I find in the FATF report is very consistent

10   with what I would read, for example, of someone describing a

11   medical situation or a completely different situation, where

12   you have a set of heuristics and then you -- all a scientific

13   situation of a set of heuristics and you, because they're

14   applied systematically, same heuristics to a large data set,

15   you get these systemic biases.

16   BY MS. PELKER:

17   Q.  And you're basing this on your review of the FATF report in

18   front of you, not of an independent review or statistical

19   analysis that you've done of the --

20   A.  No, I have not done it.  I do not have access to the

21   information.  In fact, one of the difficulties with this is

22   because a lot of the data is proprietary and, more importantly,

23   the actual heuristics of proprietary and how they're applied.

24   Some are disclosed; some are not.

25              So it is impossible to do any kind of independent

1    statistical review of this data unless one has all of the

2    heuristics involved, not just the ones that are specifically

3    disclosed.

4            THE COURT:  By heuristics, do you simply mean

5    assumptions?

6            THE WITNESS:  Assumptions.  Yes, assumptions.  Thank

7    you, Your Honor.  That is actually a better description because

8    it's easier to understand.  Assumptions.  I will use that word

9    instead.

10           So the assumptions that are involved, which in many

11   cases are -- most cases are held proprietary; unless you know

12   that, it is not possible to do any kind of statistical analysis

13   of the data or any kind of independent analysis.  So the only

14   report that I have found is this, and I have to do what is

15   called -- basically, a black box report.

16           I'm thinking, instead of one reactor by Chainalysis,

17   there's six reactors, and I'm looking at the different results,

18   you get this relative bias.  But to actually specifically get a

19   handle on the actual bias itself, you need to see those

20   assumptions that are made, which are held proprietary, and

21   then, with knowing those assumptions, then you know what the

22   biases are and even if the results are even feasible because

23   there's simply too many assumptions, and what the risk and

24   probability of error is.  But without knowing the assumptions,

25   it's impossible to do any kind of analysis.

1    BY MS. PELKER:

2    Q.  To be clear, Dr. Cabanas, you've never actually used

3    Chainalysis; is that right?

4    A.  No, never.  I don't need to.

5    Q.  And you don't need to because Monero is considered

6    blockchain analysis resistant, right?

7    A.  Well, that's not actually true.  Monero --

8         THE COURT:  We're really short on time.  I only have

9    20 minutes left.  We're very short on time.  Make sure you just

10   answer her question.

11        THE WITNESS:  My answer on this particular question

12   is no, I don't believe that it's 100 percent resistant and, in

13   fact, there's considerable work going on in Monero to make it

14   more resistant.

15   BY MS. PELKER:

16   Q.  And you don't actually trace blockchain transactions as

17   part of your job?

18   A.  No.

19   Q.  And you don't spend any work each week devoted to

20   blockchain analysis?

21   A.  Well, other than what I'm describing, which is actually

22   looking at the macro picture and how these assumptions lead to

23   systemic errors, which you can detect without actually having

24   to deal with it.

25        THE COURT:  I just want to cut through this a little

1    bit in light of the timing here.

2              My understanding, based on the testimony I've

3    heard -- correct me if I'm wrong -- my understanding is that

4    chart you showed us early on and the chart shows a big

5    disparity in the identification of illicit or potentially

6    illicit transactions using Bitcoin, and given the disparity in

7    that chart and given no other explanation for why those

8    disparities over time would exist, you conclude, premise one,

9    or -- that there must be some systemic bias in the system; is

10   that fair?

11             THE WITNESS:  Absolutely correct, Your Honor.

12             THE COURT:  And how did that chart come to your

13   attention?  How did you reach that conclusion?

14             THE WITNESS:  I came to that chart because I did

15   research.  I actually downloaded a document from the Financial

16   Action Task Force website.

17             THE COURT:  So someone didn't point you to that; you

18   on your own found that chart and you reached that conclusion on

19   your own based on that chart; is that right?

20             THE WITNESS:  That is correct, Your Honor.

21             THE COURT:  Then my question is, you then assume --

22   then your next step is to say there must be some assumptions

23   that are made that are not disclosed, and some of those

24   assumptions must inject systemic error into the blockchain

25   analysis because you have no other explanation of why the

1    discrepancy would exist?

2         THE WITNESS:  I would say that is correct.  But I

3    will say that it's relative systemic error between the -- so

4    what this chart tells me is what the relative systemic error in

5    between the blockchain analysis companies is.  It cannot tell

6    me what the absolute is.

7         THE COURT:  Okay.

8    BY MS. PELKER:

9    Q.  Just a couple other points.

10        THE COURT:  I'll let you finish up.  I'm sorry to

11   interrupt.

12        MS. PELKER:  No, no.  Not at all, Your Honor.

13   Whatever is most helpful for the Court.

14   BY MS. PELKER:

15   Q.  Now, Dr. Cabanas, your primary focus is Monero; is that

16   right?

17   A.  In a cryptocurrency right now, it is.  Although I'm --

18   actually, on a talk that I'm going to be giving in Prague also

19   deals with Bitcoin.

20   Q.  And Monero is based on a different code than Bitcoin; isn't

21   that right?

22   A.  In the sense of the actual transaction structure, yes, that

23   is correct.

24   Q.  And Monero is specifically designed to be less traceable

25   than Bitcoin?

1    A.  That is correct, yes.

2    Q.  And Monero, in fact, has a nontransparent blockchain,

3    unlike the Bitcoin blockchain, which is transparent; is that

4    right?

5    A.  No.  I disagree with that point of view because I do not

6    believe that the Bitcoin blockchain is totally transparent.

7    Once you move from the -- we are dealing with anonymous public

8    keys, and we're trying to ascertain them to person to person.

9           So I do not believe on the premise that Bitcoin

10   blockchain is transparent at all.  It is designed to create

11   plausible deniability.

12   Q.  And the Bitcoin blockchain information that's recorded

13   includes transaction inputs, transaction outputs, and amount;

14   is that right?

15   A.  Yes.  That is correct, yes.

16   Q.  And that information is, in fact, concealed on the Monero

17   blockchain?

18   A.  The amounts are concealed; that is correct.

19   Q.  And that's --

20   A.  Well, let me explain.

21          THE COURT:  I'm sorry.  I would let you explain

22   ordinarily, but we're so short on time.  If you can just answer

23   her questions, that would be helpful.

24   BY MS. PELKER:

25   Q.  And isn't it true that blockchain analysis for Bitcoin

1    relies on that public transaction ledger with inputs, outputs,

2    amounts that's not viewable on Monero?

3    A.  Yes, that's correct, and relies -- however, relies is a

4    separate question.

5    Q.  Is part of your work with the Monero Core Group and the

6    Monero Policy Working Group to encourage adoption of Monero?

7    A.  That is correct.

8    Q.  Isn't one of the barriers to Monero adoption, as you

9    perceive it, that many exchanges with anti-money laundering

10   programs have banned Monero?

11   A.  Well, I would say the perception is that, by relying on

12   blockchain surveillance as opposed to more traditional forms of

13   anti-money laundering technique, such as what was proposed by

14   FinCEN, it disadvantages [sic] more error; that is correct.

15         This is one of the reasons why we supported -- United

16   States is actually the exception as far as this matter.

17   Because both U.S. Congress and FinCEN took a position that the

18   way to deal with this was to deal with traditional approach

19   that you would use for anti-money laundering, which is,

20   essentially, know your customer as opposed to attempting to

21   surveil the blockchain.

22         So we -- this is one of the reasons why we were

23   supportive of the FinCEN proposal and not supportive of a lot

24   of the EU proposals.

25   Q.  Now, turning your attention briefly to Tab 9 of that Monero

1    Policy Working Group material, the Monero Policy Working Group

2    has, in fact, observed every respective -- quote, every

3    respectable exchange uses blockchain analysis; is that right?

4    A.  I think that they observe that it's the case because they

5    feel obligated, yes.

6    Q.  And, in fact, don't you blame the blockchain analysis

7    companies, like Chainalysis, for contributing to Monero

8    delisting on the exchanges?

9    A.  I have very strong suspicions, what I would consider

10   circumstantial evidence, that Chainalysis was involved in

11   delisting exchanges, Monero from exchanges, yes; that is

12   correct.

13   Q.  Have you vocally made public comments to that effect

14   criticizing Chainalysis and blockchain analysis --

15   A.  I'm specifically being critical of the technique, and it

16   would apply to all the blockchain surveillance companies, that

17   is correct.

18   Q.  And, in fact, at a *Monero Talk* interview in 2021, did you

19   say, quote, the Monero is under attack and one of the major

20   threats that Monero faces right now is attacks by certain

21   companies that want to engage in blockchain surveillance; and

22   you then tied that blockchain surveillance and blockchain

23   analysis to a major drop in the price of Monero as a result of

24   delisting?

25   A.  There was a delisting and a major drop, but, yes, it is a

1    factor in my opinion.  It can be a factor.  I would agree with

2    that point of view.

3         I mean, because, essentially, what Monero does is it

4    demonstrates the failure of blockchain surveillance.  It fails

5    in Bitcoin, but Monero actually makes it obvious that it

6    doesn't work.  I would argue right now that one of the major

7    arguments for Monero is to avoid false accusations.

8    Q.  Isn't it actually true that you see yourself and the Monero

9    community in an arms race with blockchain analysis companies

10   like Chainalysis?

11   A.  I don't think we can win the arms race.  But the Monero

12   community responds to what are in many cases, we're going to do

13   this and we're going to do that; they turn around and simply

14   erase the -- the number of rings from, say, 11 to 16 in

15   response to claims made by blockchain surveillance companies.

16        But that doesn't mean those -- it's simply a

17   risk-averse response.  I mean, you hear the claims, and then

18   you turn around and harden the protocol.

19   Q.  Did you do an interview with the podcast *Crypto Vigilante*

20   where you said:  The evidence is the blockchain surveillance or

21   chain analysis companies will not be able to break Monero, and

22   we will keep toughening it up; after characterizing yourself as

23   in an arms race against privacy with chain analysis companies

24   on Reddit?

25   A.  I believe that would be very difficult for them to break

1    Monero.  I believe that the potential for false accusations and

2    a lot of harm is actually -- of Monero from blockchain

3    surveillance, yes.

4    Q.  I'd like to turn your attention to Tabs 14 and 15.

5              MS. PELKER:  And then I'll wrap up, Your Honor.  I

6    know we're short on time here.

7              THE COURT:  Okay.

8              THE WITNESS:  15 you have -- that would be an extract

9    from Reddit from what I can tell.  That's before that.

10   BY MS. PELKER:

11   Q.  Are these, in fact, public comments that you've made about

12   your views of the blockchain analysis companies and their work?

13   A.  That would be Tab 15, you say?

14   Q.  Yes.  14 should be a post there.

15   A.  That would be a comment that I would make.  That is

16   correct.  That would be my views.

17   Q.  Are you aware that defense counsel has indicated that

18   they're going to put Chainalysis on trial and put blockchain

19   analysis on trial?

20   A.  Pardon me?

21   Q.  Are you aware that defense counsel --

22   A.  That is something that I have heard privately when I was in

23   Mexico City, yes.

24             MS. PELKER:  Okay.  Your Honor, at this point we

25   would seek to admit Exhibits 14, 15, 9, and I believe that is

```
 1    it.
 2              THE COURT:  There were some others that you pointed
 3    me towards.
 4              MS. PELKER:  To the extent the Court thinks that
 5    they're helpful, 4, 5, 6 -- sorry -- 5, 6, 7, 8.
 6              THE COURT:  5, 6, 7, 8, 9, 14, 15?
 7              MS. PELKER:  5, 6, 7, 8, 9 -- I think the others were
 8    just for identification -- and then 14 and 15.
 9              THE COURT:  Any objection, Mr. Ekeland?
10              MR. EKELAND:  Just to be clear, Exhibits 5 through 9
11    and 14 and 15?
12              THE COURT:  Correct.
13              MR. EKELAND:  No objection.
14              THE COURT:  Okay.  Those exhibits are admitted.
15              (Exhibits 5 through 9 and 14 and 15 were admitted.)
16              MS. PELKER:  Thank you, Your Honor.
17              THE COURT:  All right.  It's about ten minutes of
18    3:00.  Mr. Ekeland, if you want a few minutes for redirect,
19    I'll give that to you.
20              MR. EKELAND:  I'll keep it short.
21              THE COURT:  I think, unfortunately, we're going to
22    have to bring the other witness back another day, I'm afraid.
23              MR. EKELAND:  That's okay.  I don't need to go too
24    long.
25              THE COURT:  We only have ten minutes, so we're not
```

1      going to handle the other witness in ten minutes.

2              MR. EKELAND:  I think we've sufficiently established

3      his credentials.  I would like to ask him one more question, if

4      possible.

5              THE COURT:  I'm telling you, you have time if you

6      want.

7              MR. EKELAND:  Okay.  Thank you.

8                      REDIRECT EXAMINATION OF

9                      DR. FRANCISCO CABANAS

10     BY MR. EKELAND:

11     Q.  Dr. Cabanas, you mentioned that -- you said that you don't

12     think that the blockchain is completely transparent.  Did I

13     hear you correct on that?

14     A.  Yes.  Actually, what it does in the case of Bitcoin -- I

15     presume you're talking about Bitcoin?

16     Q.  Yes.

17     A.  The blockchain is designed to create plausible deniability.

18     This is actually a design that is described right in the actual

19     Bitcoin white paper when it was written back in 2008.  I think

20     that there is an underestimation of the degree of privacy in

21     Bitcoin.

22     Q.  I also -- if I heard you correctly, I think you testified

23     that one of your concerns with the blockchain surveillance

24     companies was a possibility of false accusations and the harm

25     that follows from that.

1          Could you just elaborate why you think there's this

2    danger of false accusations resulting from blockchain

3    surveillance software?

4    A.  Well, basically, because what can happen is that a person

5    could have -- they could be in jail for some number of years.

6    Even if you then turn around and prove innocence and the person

7    gets acquitted or gets -- there's real potential for harm just

8    by -- not only by creating a false positive in a person who is

9    falsely accused; but at the same time, for every false

10   positive, there's also a false negative.  So there is a guilty

11   person that is running around free.

12          MR. EKELAND:  No further questions, Your Honor.

13          THE COURT:  So you're welcome to step down.  Thank

14   you.

15          I don't know what, if anything, you-all want to do

16   with the next ten minutes we have, and we're going to have to

17   reschedule for the remainder of the proceeding.

18          MS. PELKER:  Your Honor, do you expect your

19   sentencing to go up through the end of the day rather than --

20          THE COURT:  I have a hearing in a criminal matter at

21   3:00 and then a sentencing at 3:30, which is going to go to 4

22   :30.  I'm reluctant to keep the staff here much beyond that on

23   a Friday afternoon.

24          MS. PELKER:  Understood, Your Honor.  We do have time

25   in the schedule next Friday given that Mr. Gronager will not be

1    appearing, so that we can handle the motion arguments then.

2    I'm not sure what Mr. Scott's availability is going to be for

3    next Friday.

4            One other flag, though, Your Honor.  The government

5    does not believe that the defense has met their burden to

6    *Daubert*.  The government's non-blockchain experts, which would

7    be Ms. Mazars de Mazarin and Mr. St. Jean -- and we'd be happy

8    to be heard on that.  But, most importantly, Ms. Mazars de

9    Mazarin's partner very unexpectedly passed away on Wednesday,

10   and she is not going to be at work next week.  We're going to

11   need to reschedule her hearing.

12           THE COURT:  That's not a problem at all.  You can

13   pass along the Court's condolences.  We have enough time that

14   we can reschedule that in a period of time when it's

15   appropriate.

16           MS. PELKER:  Thank you, Your Honor.

17           THE COURT:  That's not an issue.

18           Mr. Ekeland, anything else you want to address before

19   we --

20           MR. EKELAND:  I need to check with Mr. Scott on --

21           THE COURT REPORTER:  Can you please speak into the

22   mic.

23           MR. EKELAND:  So I need to check on Mr. Scott's

24   schedule, but I don't expect this to be a problem, particularly

25   if we're able to take his testimony via Zoom; that's okay with

1    the defense.

2          THE COURT:  If it's okay with the government, I don't

3    mind doing it that way.

4          MR. BROWN:  Your Honor, we created -- Your Honor, we

5    previewed in our expert opposition that the concerns with

6    Mr. Scott are particularly deep, and we believe that we really

7    do need in-person testimony --

8          THE COURT:  Okay.

9          MR. BROWN:  -- for Mr. Scott.

10         THE COURT:  We'll just have to find a time when he's

11   available to do it in person then.

12         MR. EKELAND:  The defense understands that.  That may

13   mean we won't be able to do it on next Friday, but we'll figure

14   it out.

15         THE COURT:  We'll find some time over the course of

16   the summer to schedule all of that.

17         Are there other experts, Mr. Ekeland, that overlap

18   with Mr. Cabanas, or is he the principal expert that you're

19   offering on those topics?

20         MR. EKELAND:  We've got Dr. Cabanas; we have

21   Mr. Fischbach who, if I recall what the government's response

22   to Mr. Fischbach was, depending on if we change our expert

23   disclosure -- modify our expert disclosure in some way, we

24   might be able to come to an agreement on him.

25         Am I remembering that right.

1          MS. PELKER:  Yes.  The government's objection to the

2     expert disclosure, Your Honor, is that it basically just

3     copies/pastes for each individual witness.  It's very difficult

4     to tell.  Dr. Cabanas was supposedly an expert in blockchain

5     tracing; it's clear that he doesn't do blockchain tracing.  So

6     we really have no idea what any of the experts are testifying

7     to.

8          THE COURT:  That was sort of -- you're going in the

9     direction that I was.  I'm not saying I'm going to exclude him

10     as an expert witness at this point.  I don't know.  But it did

11     seem clear to me that the -- to the extent he is an expert, his

12     area of expertise is fairly limited, and that he's -- so I just

13     have concerns about offering him as your principal expert in

14     the case.  I just wanted to make sure you had more in the

15     works.  I didn't want to put you in a position where I end up

16     excluding him as an expert, and you're back to ground zero

17     looking for an expert on the core issue in the case.

18          MR. EKELAND:  I didn't totally hear what you said,

19     Your Honor, the last part.

20          THE COURT:  What I said was that I had concerns about

21     his testimony.  It may be that the notice is just overbroad and

22     you don't intend to offer him for all the purposes.  But you

23     certainly didn't lay a foundation of his expertise as to many

24     of the topics in the expert notice.

25          And, even more narrowly, I do have some concerns, and

1    I just wanted to make sure that you weren't going to be caught

2    off-guard where he was your principal expert in the case that,

3    I take it, will be very expert-driven.  And so I just wanted to

4    put you on some notice as to that.

5          If you have other experts that overlap, that's less

6    of an issue.  If you don't, I just wanted to make sure that I

7    was flagging that for you so that, even if at a late date you

8    still need to identify another expert, you can.

9          But dealing with someone who is trained in physics,

10   who didn't really have any expertise, as far as I can tell, in

11   blockchain analysis itself other than having read some papers

12   and having been himself involved in the cryptocurrency industry

13   as an investor and as an advocate, I do have concerns more

14   broadly about his expertise.  And there may be narrow areas in

15   which he can offer expert testimony.

16         I'm just offering that now to you.  This is not my

17   opinion or decision on this; I want to study things more

18   carefully.  I'm just mentioning this now because I want to make

19   sure you're not caught without an expert on key issues.

20         Okay.  I will see you-all then next Friday unless

21   there's anything else you want me to address today?

22         MS. PELKER:  Nothing further from the government,

23   Your Honor.

24         THE COURT:  Mr. Ekeland, anything else?

25         MR. EKELAND:  Nothing further from the defense, Your

1    Honor.   Thank you.

2              THE COURT:   Thank you all.

3                    (The hearing adjourned at 3:00 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, TAMARA M. SEFRANEK, do hereby certify that the

4      above and foregoing constitutes a true and accurate transcript

5      of my stenographic notes and is a full, true and complete

6      transcript of the proceedings to the best of my ability.

7                  Dated this 30th day of June, 2023.

8

9                            /s/ Tamara M. Sefranek_____
                             Tamara M. Sefranek, RMR, CRR, CRC
10                           Official Court Reporter
                             Room 6714
11                           333 Constitution Avenue, N.W.
                             Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

# $

**$100** [1] - 80:3
**$21** [1] - 97:10
**$334** [1] - 75:6

# /

**/s** [1] - 134:9

# 0

**01** [4] - 100:15, 100:16, 100:18, 100:19

# 1

**1** [1] - 112:3
**1.6** [1] - 91:2
**10** [7] - 87:24, 105:14, 105:16, 105:19, 105:24, 106:3
**100** [1] - 118:12
**10005** [1] - 1:17
**102** [1] - 2:6
**10:00** [1] - 1:6
**11** [4] - 105:24, 106:3, 106:5, 124:14
**11:25** [1] - 42:8
**12** [1] - 87:18
**12-month** [1] - 88:18
**12.7** [1] - 89:17
**120** [1] - 6:22
**122** [1] - 78:1
**126** [3] - 2:13, 2:14, 42:11
**127** [1] - 2:8
**127-1** [1] - 62:16
**12:30** [1] - 76:22
**130** [1] - 78:2
**131** [1] - 50:7
**13th** [1] - 49:21
**14** [8] - 2:14, 125:4, 125:14, 125:25, 126:6, 126:8, 126:11, 126:15
**15** [9] - 2:14, 125:4, 125:8, 125:13, 125:25, 126:6, 126:8, 126:11, 126:15
**16** [14] - 1:5, 12:24, 13:12, 13:22, 14:13, 16:11, 19:21, 21:9, 21:13, 22:1, 22:8, 24:19, 34:20, 124:14
**17** [9] - 3:21, 4:2, 10:11, 10:22, 21:16, 32:4, 33:3, 33:9,

39:6
**17(c** [17] - 4:9, 8:5, 9:20, 9:23, 11:10, 12:4, 12:7, 12:9, 12:21, 13:3, 14:13, 15:14, 19:22, 20:2, 22:15, 22:16, 43:13
**17(c)** [1] - 8:19
**17(c)(1** [2] - 8:14, 39:7
**17(c)(1)** [1] - 8:23
**18** [1] - 80:4
**19** [1] - 28:7
**1970** [1] - 24:22
**1970s** [2] - 10:12, 10:17
**1975** [1] - 78:14
**1979** [1] - 78:13
**1982** [1] - 78:12
**1983** [1] - 40:18
**1988** [1] - 78:11
**1992** [1] - 103:8
**1:21-CR-0399** [1] - 1:3
**1:30** [1] - 76:21
**1:35** [1] - 76:22

# 2

**2** [8] - 35:23, 36:3, 36:4, 36:8
**2.5** [1] - 89:24
**20** [4] - 105:14, 105:16, 105:19, 118:9
**200** [1] - 97:14
**2000** [3] - 84:8, 102:6, 102:10
**20001** [3] - 1:12, 1:24, 134:11
**2003** [1] - 79:19
**2006** [1] - 59:11
**2008** [1] - 127:19
**2011** [5] - 79:8, 80:1, 80:2, 81:23, 81:24
**2012** [4] - 80:4, 80:7, 84:3, 105:23
**2013** [3] - 53:3, 80:7, 84:18
**2014** [7] - 50:22, 53:3, 54:5, 80:22, 84:8, 103:16, 103:18
**2015** [4] - 23:14, 54:5, 80:24, 103:18
**2016** [4] - 81:3, 89:13, 103:24, 104:1
**2017** [3] - 81:2, 103:16, 103:19
**2019** [1] - 89:17
**202-354-3246** [1] - 1:24
**2020** [2] - 89:13, 104:4

**2021** [1] - 123:18
**2022** [1] - 30:13
**2023** [2] - 1:5, 134:7
**20530** [1] - 1:14
**21-399** [1] - 3:2
**23rd** [7] - 11:14, 42:16, 60:4, 60:6, 60:8, 61:10
**24** [3] - 80:18, 112:25
**25** [2] - 49:9, 80:18
**26** [2] - 88:15, 89:7
**27** [1] - 89:11
**270** [1] - 67:10
**28** [4] - 112:15, 112:17, 112:18, 112:19
**299** [1] - 5:19
**2:00** [1] - 98:14
**2d** [1] - 59:10

# 3

**3** [4] - 10:7, 89:11, 89:12, 97:10
**30** [3] - 1:17, 107:22, 128:22
**30,000** [2] - 84:18, 85:13
**30th** [1] - 134:7
**31** [1] - 10:7
**333** [2] - 1:23, 134:11
**36** [1] - 59:10
**378** [1] - 5:19
**3:00** [4] - 98:15, 126:18, 128:21, 133:3
**3:30** [2] - 98:15, 128:21
**3d** [1] - 5:19

# 4

**4** [5] - 36:4, 65:19, 87:17, 126:5, 128:21
**40** [1] - 107:22
**403** [1] - 5:5
**42** [1] - 7:3
**425** [1] - 1:19
**435** [1] - 59:10
**49** [1] - 100:21

# 5

**5** [14] - 2:13, 35:23, 36:4, 36:9, 89:17, 97:13, 104:9, 110:25, 126:5, 126:6, 126:7, 126:10, 126:15
**5.7** [1] - 3:23

**50** [5] - 12:13, 100:17, 100:20, 103:22
**51** [1] - 19:24
**559** [1] - 10:7
**57.7** [1] - 62:11
**57.7(b** [5] - 62:7, 63:10, 65:5, 65:18, 75:16
**57.7(b)** [3] - 62:19, 63:25, 76:1
**5th** [2] - 108:4, 108:5

# 6

**6** [8] - 65:19, 104:14, 105:16, 111:8, 126:5, 126:6, 126:7
**6,000** [1] - 27:8
**60** [1] - 34:18
**601** [1] - 1:11
**6714** [2] - 1:23, 134:10
**6th** [3] - 71:23, 72:21, 72:24

# 7

**7** [10] - 79:19, 89:24, 97:9, 97:12, 104:16, 105:16, 111:9, 126:5, 126:6, 126:7
**78** [1] - 2:5

# 8

**8** [8] - 28:4, 28:5, 28:6, 28:8, 111:9, 126:5, 126:6, 126:7
**80** [1] - 87:24
**81** [5] - 12:13, 112:14, 112:18, 112:19, 113:3
**86** [1] - 2:11
**8th** [1] - 1:17

# 9

**9** [8] - 2:13, 104:9, 122:25, 125:25, 126:6, 126:7, 126:10, 126:15
**901** [2] - 51:2, 58:21
**925,000** [1] - 35:14
**93** [4] - 4:1, 4:2, 4:7, 10:7
**94105** [1] - 1:20
**95** [2] - 4:1, 4:3
**950** [1] - 1:14
**96** [1] - 2:12
**99** [1] - 80:24

# A

**A-something** [1] - 13:14
**A.M** [1] - 1:6
**ability** [4] - 81:11, 97:2, 97:19, 134:6
**able** [15] - 12:17, 18:20, 19:13, 29:21, 32:11, 53:13, 57:7, 61:25, 66:4, 82:17, 83:24, 124:21, 129:25, 130:13, 130:24
**absolute** [2] - 115:16, 120:6
**absolutely** [8] - 11:25, 38:22, 95:15, 104:8, 106:12, 106:14, 107:24, 119:11
**absorb** [1] - 10:2
**absurd** [1] - 15:24
**abusive** [1] - 7:9
**academic** [2] - 41:12, 102:25
**academics** [1] - 102:17
**accepted** [1] - 43:5
**access** [8] - 18:6, 23:7, 23:9, 23:11, 23:12, 23:19, 107:10, 116:20
**accessible** [1] - 37:24
**accompanying** [1] - 15:16
**accomplished** [1] - 45:14
**according** [2] - 51:21, 99:3
**account** [9] - 85:9, 85:17, 85:18, 95:24, 99:2, 99:13, 107:10, 115:23, 115:24
**accounts** [2] - 50:14, 106:10
**accuracy** [2] - 40:23, 95:14
**accurate** [3] - 86:15, 93:24, 134:4
**accusation** [4] - 39:23, 49:17, 50:9, 69:23
**accusations** [5] - 30:6, 124:7, 125:1, 127:24, 128:2
**accused** [3] - 26:24, 68:20, 128:9
**accusing** [1] - 75:5
**acquittal** [1] - 40:8
**acquitted** [2] - 15:22,

128:7
**act** [1] - 29:7
**acted** [1] - 21:6
**Action** [9] - 1:2, 87:11, 87:23, 88:22, 88:23, 104:14, 108:9, 112:6, 119:16
**action** [1] - 40:9
**active** [1] - 107:9
**activities** [2] - 72:2, 115:19
**activity** [10] - 87:19, 89:6, 89:10, 97:22, 110:12, 112:9, 113:9, 113:21, 114:5, 114:25
**actor** [1] - 40:21
**actual** [5] - 91:22, 116:23, 117:19, 120:22, 127:18
**ad** [4] - 64:13, 65:8, 74:25, 75:6
**add** [1] - 6:10
**addition** [4] - 12:15, 12:21, 15:2, 103:11
**additional** [1] - 49:22
**Additionally** [1] - 113:7
**additionally** [2] - 11:12, 113:6
**additions** [1] - 28:22
**address** [17] - 7:18, 12:1, 28:25, 35:13, 36:2, 41:10, 57:1, 77:4, 79:1, 83:6, 83:9, 83:19, 87:19, 89:3, 95:3, 129:18, 132:21
**addressed** [2] - 40:4, 60:11
**addresses** [8] - 35:8, 87:15, 87:20, 94:12, 94:22, 94:23, 96:15, 96:21
**addressing** [2] - 21:17, 31:6
**adjourned** [1] - 133:3
**adjournment** [4] - 9:8, 9:18, 9:22, 39:13
**administration** [3] - 79:7, 79:23, 103:13
**administrator** [2] - 45:2, 79:10
**admissibility** [10] - 5:17, 7:14, 10:4, 12:18, 39:16, 44:10, 54:24, 59:19, 59:20, 61:8
**admissible** [11] - 5:24, 6:3, 7:16, 13:4, 14:8,

15:1, 31:1, 47:8, 48:18, 49:4, 54:22
**admit** [2] - 110:7, 125:25
**admitted** [9] - 9:24, 70:5, 86:23, 86:24, 96:9, 96:10, 113:1, 126:14, 126:15
**ADMITTED** [1] - 2:10
**adoption** [2] - 122:6, 122:8
**advance** [3] - 8:14, 13:5, 60:16
**advise** [1] - 108:8
**advocate** [2] - 105:20, 132:13
**affect** [3] - 85:3, 95:14, 95:15
**affects** [1] - 68:12
**afraid** [1] - 126:22
**afternoon** [2] - 77:7, 128:23
**afterwards** [1] - 109:3
**agent** [6] - 21:6, 22:7, 64:25, 65:1, 65:3, 69:7
**agents** [1] - 64:23
**ago** [2] - 10:18, 63:15
**agree** [7] - 12:5, 32:3, 52:18, 58:20, 110:14, 113:20, 124:1
**agreement** [1] - 130:24
**ahead** [3] - 3:25, 76:24, 109:24
**aim** [1] - 91:8
**aimed** [2] - 13:24, 49:13
**Albaladejo** [1] - 5:19
**ALDEN** [1] - 1:13
**Alden** [1] - 3:8
**algorithmic** [1] - 26:20
**algorithms** [2] - 24:7, 28:21
**alibi** [2] - 38:2, 38:8
**aligning** [1] - 99:21
**allegation** [1] - 38:19
**allegations** [4] - 5:2, 5:10, 45:8, 74:21
**allege** [1] - 50:18
**alleged** [1] - 3:22
**allegedly** [2] - 13:11, 45:13
**alleviate** [1] - 43:6
**allow** [4] - 35:18, 106:11, 106:13, 107:15
**allows** [4] - 6:5, 83:7, 83:8, 114:10

**alone** [1] - 19:24
**alongside** [1] - 109:9
**alteration** [1] - 59:21
**altered** [3] - 59:14, 59:17, 59:25
**alternate** [1] - 84:7
**alternative** [1] - 82:18
**amenable** [1] - 77:11
**amended** [4] - 26:1, 26:4, 26:7, 26:8
**Amendment** [1] - 70:24
**America** [1] - 3:3
**AMERICA** [1] - 1:2
**amount** [4] - 81:4, 92:16, 115:22, 121:13
**amounts** [1] - 121:18, 122:2
**analogize** [1] - 35:21
**analogy** [1] - 37:25
**analysis** [43] - 8:5, 16:8, 16:9, 19:6, 23:23, 24:5, 25:2, 25:3, 25:4, 32:22, 33:6, 35:11, 35:18, 36:22, 39:19, 44:9, 57:6, 78:19, 78:20, 110:11, 110:15, 113:13, 113:19, 116:19, 117:12, 117:13, 117:25, 118:6, 118:20, 119:25, 120:5, 121:25, 123:3, 123:6, 123:14, 123:23, 124:9, 124:21, 124:23, 125:12, 125:19, 132:11
**analytic** [1] - 79:18
**analytics** [3] - 94:9, 112:7, 113:7
**analyze** [6] - 14:11, 25:12, 25:17, 29:17, 39:13, 55:4
**analyzed** [1] - 18:5
**analyzing** [4] - 44:18, 53:3, 56:13, 94:8
**ancillary** [2] - 51:4, 54:13
**Andy** [2] - 51:11, 68:20
**animosity** [1] - 49:13
**announced** [1] - 46:19
**anomalous** [2] - 37:10, 37:11
**anonymous** [9] - 83:16, 83:18, 94:8, 94:11, 94:22, 94:23,

95:2, 110:18, 121:7
**answer** [11] - 19:1, 19:17, 23:24, 61:16, 61:21, 73:3, 73:18, 112:23, 118:10, 118:11, 121:22
**anti** [5] - 85:20, 89:1, 122:9, 122:13, 122:19
**anti-money** [5] - 85:20, 89:1, 122:9, 122:13, 122:19
**anyway** [2] - 33:17, 72:1
**apologies** [1] - 115:13
**apologize** [1] - 45:3
**appear** [3] - 11:14, 64:25, 76:1
**appearance** [3] - 53:17, 61:6, 62:1
**appearances** [2] - 63:1, 63:6
**appeared** [1] - 109:5
**appearing** [4] - 63:24, 73:2, 109:9, 129:1
**appendices** [1] - 35:10
**appendix** [1] - 35:12
**applicable** [3] - 90:1, 115:23, 116:4
**applied** [3] - 99:3, 116:14, 116:23
**applies** [3] - 67:7, 102:24, 114:21
**apply** [7] - 27:18, 67:12, 95:5, 114:12, 114:24, 116:7, 123:16
**appreciate** [8] - 11:8, 12:3, 42:14, 65:12, 66:24, 75:2, 76:19, 76:20
**approach** [4] - 83:13, 86:6, 88:7, 122:18
**approaches** [1] - 27:17
**approaching** [1] - 82:7
**appropriate** [7] - 5:4, 13:15, 14:13, 62:3, 64:8, 89:2, 129:15
**approval** [3] - 8:5, 39:8, 39:9
**approved** [2] - 7:20, 71:11
**April** [1] - 30:13
**area** [7] - 37:6, 38:15, 53:9, 81:14, 89:3, 110:8, 131:12
**areas** [1] - 132:14

**arguable** [1] - 9:4
**argue** [3] - 57:12, 60:7, 124:6
**argued** [1] - 59:16
**arguing** [2] - 22:4, 56:24
**argument** [2] - 22:9, 62:13
**arguments** [7] - 22:11, 59:13, 64:11, 72:21, 84:20, 124:7, 129:1
**arms** [3] - 124:9, 124:11, 124:23
**arrest** [4] - 40:24, 65:2, 71:2, 71:6
**arresting** [1] - 69:3
**Artic** [4] - 105:21, 106:1, 106:3, 106:7
**article** [2] - 71:1, 74:7
**articles** [1] - 73:15
**ascertain** [2] - 93:19, 121:8
**ASIC** [1] - 79:5
**aspect** [1] - 19:20
**Aspen** [3] - 103:6, 103:7, 103:11
**assembler** [1] - 79:5
**asserted** [1] - 41:24
**assertion** [1] - 39:23
**assess** [2] - 101:10
**assessing** [1] - 101:9
**assessment** [2] - 32:19, 93:24
**Asset** [1] - 88:19
**assets** [1] - 88:19
**assigning** [2] - 109:14, 110:18
**associate** [3] - 42:22, 49:15, 102:9
**associated** [5] - 4:10, 64:24, 80:10, 87:19, 87:21
**assume** [5] - 18:15, 19:1, 60:10, 95:19, 119:21
**assumed** [1] - 64:6
**assumption** [7] - 19:2, 19:3, 91:25, 99:16, 99:20, 99:23, 100:6
**assumptions** [14] - 24:3, 29:20, 117:5, 117:6, 117:8, 117:10, 117:20, 117:21, 117:23, 117:24, 118:22, 119:22, 119:24
**atmospherics** [1] - 43:2
**attach** [1] - 97:21
**attack** [3] - 75:6, 82:5,

123:19
attacked [1] - 49:17
attacks [8] - 64:13,
65:8, 74:25, 79:15,
81:12, 81:13, 81:18,
123:20
attempt [1] - 110:17
attempting [1] -
122:20
attention [8] - 74:13,
75:16, 75:22, 76:4,
112:14, 119:13,
122:25, 125:4
attorney [3] - 63:23,
64:3, 65:9
Attorney's [1] - 8:3
attorneys [6] - 62:18,
65:5, 65:15, 72:3,
73:1, 108:17
attract [1] - 64:14
attribute [1] - 99:10
attribution [2] - 96:14,
96:23
audiences [1] - 65:23
audiotapes [1] - 26:19
August [2] - 80:1,
81:24
AUSA [4] - 3:6, 14:20,
14:23, 49:9
Austrian [1] - 28:12
authentic [6] - 52:4,
54:9, 55:10, 55:14,
57:10, 58:16
authentication [6] -
59:19, 59:20, 60:2,
60:3, 60:15, 61:9
authenticity [11] -
50:21, 50:23, 53:7,
54:4, 54:11, 57:9,
57:18, 58:25, 59:4,
59:11
author [1] - 64:16
authority [3] - 5:18,
7:22, 7:24
authorized [1] - 15:15
authors [1] - 104:13
availability [1] - 129:2
available [3] - 17:3,
35:10, 130:11
Avenue [3] - 1:14,
1:23, 134:11
average [2] - 105:5,
114:14
averaged [1] - 90:21
averaging [2] - 91:10,
114:8
averse [1] - 124:17
averted [1] - 85:13
avoid [2] - 65:21,
124:7

avoidable [1] - 63:8
avoiding [1] - 24:19
aware [6] - 7:24, 8:1,
8:4, 11:12, 125:17,
125:21

## B

b)(3 [1] - 65:19
baby [1] - 102:13
bachelor's [1] - 78:12
backup [5] - 51:22,
51:25, 52:9, 53:12,
53:23
badly [1] - 30:2
bang [1] - 24:18
bank [6] - 38:1, 38:3,
38:4, 38:6, 38:10
banking [1] - 84:25
bankruptcy [13] -
44:15, 44:17, 45:1,
45:9, 45:16, 45:17,
46:11, 51:8, 52:3,
54:8, 54:12, 56:10,
86:2
banned [1] - 122:10
barking [1] - 73:16
barriers [1] - 122:8
base [1] - 82:17
based [14] - 23:21,
37:13, 48:24, 57:13,
68:13, 73:19, 85:2,
91:21, 99:4, 101:7,
109:22, 119:2,
119:19, 120:20
bases [3] - 16:7, 20:5,
34:24
basic [3] - 18:6, 83:10,
83:13
basics [1] - 17:16
basing [1] - 116:17
basis [20] - 11:16,
13:23, 18:18, 19:22,
22:8, 38:23, 40:4,
49:21, 58:21, 59:22,
61:17, 62:4, 62:22,
70:1, 82:18, 105:8,
105:14, 105:19,
113:23, 114:7
became [2] - 80:5,
81:9
becomes [2] - 98:3,
98:10
BEFORE [1] - 1:8
beginning [1] - 25:10
behalf [3] - 11:6,
13:13, 106:13
behaving [1] - 30:2
behavior [2] - 94:19,
95:9

behind [2] - 24:20,
83:4
beneficial [1] - 60:14
Berlin [1] - 70:18
Bernhard [1] - 28:15
best [5] - 15:24, 44:13,
44:19, 46:25, 134:6
better [2] - 39:8, 117:7
between [16] - 28:11,
42:1, 63:20, 87:17,
87:24, 89:13, 89:22,
94:11, 95:2, 103:23,
110:17, 114:20,
115:8, 115:15,
120:3, 120:5
beyond [6] - 9:16,
59:6, 68:10, 70:12,
74:22, 128:22
bias [37] - 78:23, 79:1,
89:21, 89:23, 89:25,
90:1, 90:5, 90:6,
90:13, 90:17, 90:18,
91:2, 91:14, 95:24,
114:11, 114:16,
114:17, 114:19,
114:21, 115:2,
115:4, 115:7, 115:9,
115:15, 115:17,
115:20, 115:21,
115:22, 115:23,
116:1, 116:4, 116:8,
117:18, 117:19,
119:9
biases [3] - 90:11,
116:15, 117:22
big [3] - 9:8, 102:16,
119:4
biggest [1] - 82:22
billion [1] - 97:13
bind [1] - 65:15
binder [1] - 104:9
binders [1] - 101:24
binds [2] - 65:5, 65:15
Binh [3] - 8:2, 10:20
binomial [1] - 97:24
Bisbee [9] - 17:20,
44:2, 47:15, 47:17,
47:20, 47:25, 61:19,
98:20
bisbee's [1] - 100:6
Bisbee's [1] - 35:1
bit [9] - 25:25, 36:25,
39:22, 44:12, 79:10,
84:20, 85:11, 112:1,
119:1
Bitcoin [62] - 7:2,
35:8, 35:13, 35:14,
40:2, 41:2, 44:22,
50:11, 51:5, 51:6,
51:7, 66:12, 71:3,

79:8, 80:23, 81:1,
81:23, 82:3, 82:11,
82:12, 82:15, 82:23,
83:4, 83:6, 83:7,
83:8, 83:11, 83:18,
83:23, 84:6, 84:11,
87:15, 87:19, 89:12,
91:25, 92:13, 92:19,
94:12, 94:25, 95:1,
96:13, 97:10,
103:17, 106:5,
112:9, 115:19,
119:6, 120:19,
120:20, 120:25,
121:3, 121:6, 121:9,
121:12, 121:25,
124:5, 127:14,
127:15, 127:19,
127:21
bitcoin [25] - 17:18,
79:25, 80:1, 80:2,
80:6, 80:9, 80:10,
80:25, 83:24, 85:8,
85:10, 85:11, 92:6,
92:7, 92:21, 92:22,
93:2, 93:5, 93:6,
93:13, 93:16,
100:15, 100:16,
100:18, 100:19
bitcoins [2] - 80:4,
83:21
Bitcoins [1] - 84:17
Bitcointalk [10] - 80:5,
84:1, 84:2, 84:3,
84:5, 105:23,
105:25, 106:6, 107:5
Bitcointalk.org [1] -
83:25
black [1] - 117:15
blame [1] - 123:6
blanks [2] - 93:22,
93:25
block [7] - 80:10,
82:10, 82:22, 92:14,
92:17, 92:19
block-size [1] - 80:10
blockchain [89] - 35:8,
35:17, 35:19, 67:23,
68:11, 70:13, 70:18,
70:23, 79:8, 81:20,
87:5, 87:10, 87:12,
87:15, 89:16, 92:9,
92:10, 92:11, 92:12,
92:22, 93:7, 93:15,
93:18, 93:19, 94:2,
94:6, 94:8, 95:12,
97:2, 97:3, 97:5,
97:6, 97:18, 97:19,
97:21, 98:3, 98:6,
98:8, 98:10, 109:13,

110:10, 110:11,
110:12, 110:14,
112:7, 112:9, 113:7,
113:19, 114:14,
114:15, 114:24,
115:19, 118:6,
118:16, 118:20,
119:24, 120:5,
121:2, 121:3, 121:6,
121:10, 121:12,
121:17, 121:25,
122:12, 122:21,
123:3, 123:6,
123:14, 123:16,
123:21, 123:22,
124:4, 124:9,
124:15, 124:20,
125:2, 125:12,
125:18, 127:12,
127:17, 127:23,
128:2, 129:6, 131:4,
131:5, 132:11
blog [2] - 42:23, 104:7
body [1] - 88:24
boggles [1] - 28:24
book [8] - 47:5, 51:10,
51:22, 68:19, 69:2,
69:15, 70:11, 73:14
books [1] - 9:2
boomer [1] - 102:14
born [1] - 102:15
Boston [2] - 29:4,
30:13
botched [1] - 25:4
bottom [1] - 59:16
bought [1] - 85:9
boundaries [2] - 4:19,
5:15
Bowman [2] - 10:21,
10:22
box [1] - 117:15
Brady [1] - 24:19
breadth [1] - 27:18
break [9] - 3:24, 42:4,
76:8, 76:11, 76:13,
95:2, 110:17,
124:21, 124:25
breathtaking [1] -
27:19
brief [2] - 50:6, 51:9
briefed [1] - 11:15
briefly [7] - 77:5, 78:8,
81:25, 83:2, 98:24,
99:25, 122:25
bring [4] - 49:7, 74:12,
76:4, 126:22
British [2] - 78:11,
102:6
broad [4] - 12:14,
13:1, 18:12, 32:5

**broadly** [2] - 34:11, 132:14
**brought** [2] - 75:16, 75:21
**Brown** [4] - 3:7, 41:25, 66:15, 69:15
**BROWN** [42] - 1:10, 3:6, 4:8, 5:14, 5:18, 6:4, 6:24, 7:24, 8:18, 9:13, 10:13, 10:19, 34:20, 34:23, 35:5, 36:7, 36:16, 37:19, 38:17, 47:20, 47:24, 59:3, 60:6, 60:10, 60:13, 60:21, 62:9, 62:15, 62:22, 64:18, 64:22, 64:25, 65:13, 66:17, 66:19, 66:23, 76:12, 77:3, 77:9, 77:14, 130:4, 130:9
**built** [1] - 92:20
**bunch** [1] - 95:5
**burden** [4] - 6:10, 7:11, 129:5
**businesses** [1] - 79:22
**busy** [1] - 40:21
**buying** [1] - 80:2
**BY** [18] - 78:7, 81:21, 86:8, 87:1, 88:9, 96:11, 98:18, 102:4, 107:12, 113:5, 116:16, 118:1, 118:15, 120:8, 120:14, 121:24, 125:10, 127:10

## C

**c)(1** [2] - 9:1, 9:5
**CA** [1] - 1:20
**Cabanas** [15] - 77:19, 78:8, 86:9, 87:2, 88:10, 88:16, 96:12, 98:19, 102:5, 118:2, 120:15, 127:11, 130:18, 130:20, 131:4
**CABANAS** [4] - 2:3, 78:6, 102:3, 127:9
**calculate** [2] - 36:1, 115:7
**calculation** [1] - 35:22
**calendar** [1] - 49:7
**camera** [3] - 38:4, 38:6, 38:10
**Canada** [1] - 85:3
**Canadian** [8] - 79:13, 80:4, 84:19, 85:3, 85:9, 85:10, 85:13, 85:18
**cannot** [7] - 25:12, 59:21, 79:2, 84:24, 89:25, 111:24, 120:5
**capabilities** [1] - 80:9
**capable** [1] - 59:24
**captured** [1] - 82:16
**captures** [1] - 32:21
**care** [1] - 72:1
**cared** [1] - 40:22
**carefully** [2] - 65:25, 132:18
**carry** [1] - 115:3
**carrying** [1] - 63:1
**Cartagena** [2] - 5:19, 8:12
**Cartagena-Albaladejo** [1] - 5:19
**carves** [1] - 9:17
**case** [127] - 4:19, 4:24, 5:25, 6:13, 7:16, 8:2, 8:4, 10:24, 12:6, 12:21, 12:24, 13:6, 13:17, 14:13, 16:14, 16:19, 17:8, 17:23, 18:18, 19:8, 22:18, 24:21, 24:24, 24:25, 25:1, 25:12, 26:16, 26:25, 27:2, 27:14, 27:16, 27:17, 29:2, 30:8, 30:14, 30:22, 30:24, 31:2, 31:4, 31:8, 32:2, 32:13, 39:11, 39:17, 40:6, 40:17, 41:11, 46:14, 46:18, 49:24, 50:5, 53:16, 54:14, 54:18, 55:14, 55:23, 56:25, 57:25, 58:4, 59:5, 59:10, 60:9, 63:2, 63:3, 63:11, 63:24, 64:4, 64:17, 64:18, 64:22, 64:24, 65:1, 65:11, 66:5, 66:13, 67:9, 67:15, 67:24, 68:5, 68:6, 68:13, 69:1, 69:2, 69:5, 70:3, 70:7, 70:12, 70:13, 70:15, 70:25, 71:1, 72:1, 72:10, 72:23, 74:17, 74:19, 74:20, 75:1, 75:10, 91:7, 92:25, 98:20, 104:22, 106:17, 107:13, 107:14, 107:17, 107:19, 108:1, 108:10, 108:21, 108:25, 109:5, 109:22, 110:2, 114:9, 116:5, 123:4, 127:14, 131:14, 131:17, 132:2
**Case** [1] - 3:2
**cases** [19] - 10:21, 17:10, 24:22, 25:23, 26:2, 26:11, 26:17, 71:23, 72:4, 72:21, 72:24, 73:1, 87:17, 104:21, 105:9, 115:1, 117:11, 124:12
**cash** [2] - 82:18, 103:23
**caught** [2] - 132:1, 132:19
**causes** [1] - 90:10
**central** [1] - 18:17
**centrality** [1] - 50:5
**CEO** [2] - 47:12, 51:19
**certain** [11] - 26:8, 44:10, 44:15, 44:21, 46:19, 63:16, 81:17, 89:5, 89:6, 97:22, 123:20
**certainly** [2] - 40:17, 131:23
**CERTIFICATE** [1] - 134:1
**certification** [3] - 56:11, 58:20, 60:4
**certify** [7] - 52:4, 54:9, 58:16, 58:19, 58:24, 61:8, 134:3
**cetera** [4] - 46:15, 79:17, 91:9, 107:16
**chain** [14] - 83:22, 83:23, 92:1, 92:3, 92:7, 92:8, 93:2, 93:16, 99:17, 99:19, 99:24, 101:11, 124:21, 124:23
**Chainalysis** [82] - 4:4, 4:10, 5:3, 5:9, 5:11, 6:13, 6:15, 6:17, 6:20, 7:1, 7:5, 7:8, 7:15, 11:4, 11:6, 14:2, 14:21, 14:22, 15:4, 15:7, 15:8, 15:17, 15:18, 15:21, 15:23, 17:3, 17:21, 21:6, 22:6, 23:1, 23:6, 23:19, 23:20, 25:9, 25:13, 25:19, 27:4, 28:11, 28:21, 29:2, 30:10, 32:23, 34:1, 35:7, 35:17, 38:20, 39:24, 40:3, 40:9, 40:19, 41:11, 42:11, 42:20, 47:13, 47:15, 47:17, 47:21, 47:25, 48:3, 49:13, 49:17, 49:25, 55:21, 56:9, 71:5, 71:8, 74:8, 87:4, 88:2, 98:20, 115:6, 115:10, 115:17, 117:16, 118:3, 123:7, 123:10, 123:14, 124:10, 125:18
**Chainalysis'** [3] - 29:7, 33:13, 33:22
**challenge** [5] - 16:16, 37:20, 49:1, 59:11
**chance** [2] - 12:1, 63:15
**change** [5] - 94:19, 95:9, 96:23, 96:24, 130:22
**changed** [2] - 10:14, 25:4
**changes** [1] - 26:16
**changing** [1] - 22:11
**channels** [1] - 106:8
**chapter** [1] - 51:12
**characterizing** [1] - 124:22
**charged** [1] - 45:6
**charges** [1] - 71:6
**chart** [8] - 119:4, 119:7, 119:12, 119:14, 119:18, 119:19, 120:4
**chase** [1] - 27:3
**check** [4] - 17:6, 38:18, 129:20, 129:23
**checked** [4] - 18:2, 18:4, 18:5, 18:7
**checking** [1] - 18:3
**checks** [1] - 18:22
**Chemistry** [1] - 102:9
**chip** [1] - 51:5
**chip-trace** [1] - 51:5
**choose** [1] - 97:23
**chosen** [1] - 115:9
**Chris** [1] - 3:6
**CHRISTOPHER** [1] - 1:10
**Ciphertrace** [1] - 88:2
**Circuit** [2] - 10:8, 36:18
**Circuit's** [1] - 10:6
**circulate** [1] - 41:20
**circulated** [1] - 29:3
**circulating** [1] - 41:18
**circumstance** [1] - 102:11
**circumstantial** [1] - 123:10
**cited** [3] - 10:7, 16:19, 47:5
**citing** [1] - 10:21
**City** [4] - 108:4, 108:12, 108:17, 125:23
**civil** [9] - 6:18, 13:6, 27:17, 27:18, 31:25, 32:5, 40:6, 40:9, 41:5
**Civility** [1] - 65:7
**CJA** [4] - 62:24, 71:12, 71:22
**claim** [3] - 59:7, 64:12, 82:19
**claiming** [2] - 50:10, 60:24
**claims** [4] - 12:19, 60:24, 124:15, 124:17
**clarify** [1] - 94:5
**clause** [3] - 39:6, 39:7, 39:14
**clear** [17] - 6:13, 7:10, 8:20, 12:22, 12:25, 31:12, 36:18, 46:2, 54:24, 63:6, 66:7, 66:12, 66:18, 118:2, 126:10, 131:5, 131:11
**clearly** [2] - 7:25, 11:19
**clearnet** [2] - 50:17
**client** [7] - 15:22, 26:24, 27:25, 30:20, 30:23, 46:10, 73:9
**clients** [1] - 11:18
**closely** [1] - 81:15
**cluster** [8] - 96:12, 96:14, 96:16, 96:18, 96:20, 96:22, 96:23
**clustered** [2] - 17:18, 35:13
**clustering** [5] - 17:15, 17:16, 99:11, 100:10
**clusters** [1] - 98:9
**co** [2] - 47:12, 63:2
**co-counsel** [1] - 63:2
**co-founder** [1] - 47:12
**Code** [2] - 72:3
**code** [37] - 16:12, 18:23, 18:24, 23:6, 23:10, 24:2, 24:8, 24:10, 28:2, 28:20, 28:23, 29:16, 29:17, 30:25, 32:11, 32:12, 34:17, 35:25, 36:9, 36:13, 36:15, 36:16, 36:19, 36:25, 37:2,

37:6, 37:8, 37:12, 37:13, 37:17, 37:18, 38:15, 39:12, 120:20
**code-level** [1] - 36:19
**codes** [1] - 29:19
**coin** [2] - 81:17, 101:6
**coinjoin** [10] - 95:21, 100:1, 100:2, 100:8, 100:11, 100:17, 100:19, 100:25, 101:11
**coinjoins** [7] - 96:19, 99:2, 99:6, 99:10, 99:13, 101:7, 101:19
**CoinMarketCap** [1] - 80:18
**coins** [2] - 84:11
**collapse** [1] - 45:8
**collect** [1] - 92:14
**collection** [1] - 46:3
**College** [1] - 28:12
**COLUMBIA** [1] - 1:1
**Columbia** [2] - 78:11, 102:6
**combined** [1] - 82:22
**coming** [5] - 6:14, 14:4, 22:6, 85:15, 100:8
**comma** [1] - 35:5
**comma-spaced** [1] - 35:5
**command** [1] - 35:25
**commencement** [2] - 74:18, 74:20
**comment** [7] - 66:21, 70:9, 110:25, 111:11, 111:14, 111:16, 125:15
**commentary** [1] - 83:17
**commenting** [2] - 63:10, 63:11
**comments** [6] - 40:15, 69:11, 70:17, 111:18, 123:13, 125:11
**Commission** [1] - 104:17
**common** [3] - 90:15, 93:3, 116:2
**communications** [5] - 7:14, 13:20, 13:21, 25:11, 28:10
**community** [5] - 40:2, 70:23, 106:8, 124:9, 124:12
**companies** [25] - 87:13, 88:1, 88:2, 89:16, 89:23, 90:1, 94:6, 112:7, 113:8,

113:17, 114:7, 114:20, 114:21, 115:16, 115:24, 120:5, 123:7, 123:16, 123:21, 124:9, 124:15, 124:21, 124:23, 125:12, 127:24
**companies'** [1] - 113:18
**company** [8] - 15:7, 79:12, 89:21, 94:3, 95:13, 103:7, 113:4, 115:4
**compared** [2] - 32:1, 87:12
**comparison** [1] - 115:5
**comparisons** [1] - 87:14
**compel** [2] - 21:14, 22:1
**compensated** [1] - 92:15
**complaint** [3] - 25:3, 50:13, 66:20
**complete** [3] - 28:23, 93:11, 134:5
**completed** [1] - 78:13
**completely** [5] - 19:3, 93:11, 105:1, 116:11, 127:12
**complex** [3] - 16:8, 16:9, 25:8
**Complexity** [1] - 28:13
**compliance** [2] - 75:22, 85:20
**complicated** [1] - 33:5
**complied** [1] - 21:19
**comply** [8] - 67:17, 73:2, 73:19, 75:10, 75:20, 76:2, 85:18, 86:1
**complying** [1] - 73:22
**comprised** [1] - 26:22
**computation** [1] - 37:21
**computational** [1] - 78:20
**computer** [14] - 16:10, 16:12, 18:25, 24:23, 24:25, 29:16, 32:10, 32:11, 32:20, 34:25, 93:4, 93:10, 103:14
**computers** [1] - 79:22
**computing** [1] - 79:21
**concealed** [2] - 121:16, 121:18
**concept** [2] - 96:16, 99:25

**concern** [6] - 4:18, 24:17, 29:18, 37:7, 41:5, 82:23
**concerned** [6] - 4:22, 32:18, 39:22, 40:12, 40:16, 80:8
**concerns** [13] - 4:17, 80:23, 80:25, 82:23, 89:3, 99:1, 99:12, 127:23, 130:5, 131:13, 131:20, 131:25, 132:13
**conclude** [3] - 61:12, 61:22, 119:8
**concluded** [1] - 57:10
**conclusion** [3] - 56:5, 119:13, 119:18
**conclusions** [3] - 35:20, 82:10, 100:9
**concocted** [1] - 38:22
**conditions** [1] - 113:10
**condolences** [1] - 129:13
**Conduct** [2] - 65:7, 72:3
**conduct** [2] - 35:18, 73:1
**conducted** [1] - 36:22
**conducting** [2] - 113:10, 113:12
**conference** [4] - 29:1, 29:4, 30:13, 60:11
**conferences** [1] - 105:10
**confirm** [1] - 18:21
**Congress** [1] - 122:17
**conjoins** [1] - 99:4
**consequences** [2] - 75:11, 75:18
**consider** [2] - 43:16, 123:9
**considerable** [1] - 118:13
**considerably** [1] - 104:2
**consideration** [1] - 96:18
**considered** [3] - 45:4, 94:9, 118:5
**consistent** [1] - 116:9
**constitutes** [1] - 134:4
**Constitution** [2] - 1:23, 134:11
**consultancy** [1] - 103:12
**consultation** [2] - 104:16, 110:21
**consulting** [1] - 79:23
**contact** [2] - 54:7,

108:7
**contacted** [3] - 85:8, 107:25, 108:2
**contemplates** [2] - 74:16, 74:18
**contempt** [4] - 69:17, 75:18, 75:23, 76:5
**contend** [1] - 14:5
**context** [3] - 32:1, 46:17, 70:11
**continuance** [3] - 25:15, 57:19, 57:20
**continue** [3] - 42:18, 62:1, 112:23
**continued** [1] - 80:6
**contract** [1] - 47:24
**contractor** [1] - 79:13
**contrary** [1] - 83:17
**contribute** [1] - 49:19
**contributed** [2] - 107:6, 107:9
**contributing** [1] - 123:7
**contributions** [2] - 111:8, 111:17
**contributor** [2] - 110:21, 111:5
**control** [8] - 58:10, 69:8, 81:19, 93:1, 93:5, 93:7, 93:11, 93:12
**controlling** [1] - 94:13
**controls** [2] - 83:16, 93:15
**conversation** [5] - 45:10, 46:24, 67:8, 69:3, 73:25
**conversations** [3] - 67:2, 68:16, 68:22
**converted** [1] - 103:16
**convicted** [2] - 51:20, 55:11
**convince** [1] - 58:1
**cooperatively** [2] - 34:7, 34:12
**copied** [1] - 63:18
**copies** [2] - 93:9, 93:12
**copies/pastes** [1] - 131:3
**copy** [6] - 27:4, 53:1, 54:13, 56:16, 56:19, 86:15
**copycat** [1] - 11:13, 49:22, 63:17, 64:1
**core** [2] - 25:1, 103:24, 131:17
**Core** [5] - 104:1, 104:23, 105:3, 105:6, 122:5

**correct** [47] - 25:6, 39:1, 47:14, 47:16, 86:17, 89:6, 93:14, 93:17, 93:19, 94:4, 97:1, 102:10, 104:5, 104:13, 104:15, 105:22, 106:6, 106:9, 108:15, 108:20, 109:7, 110:24, 111:2, 111:3, 111:10, 111:11, 111:12, 111:15, 112:13, 113:15, 113:20, 119:3, 119:11, 119:20, 120:2, 120:23, 121:1, 121:15, 121:18, 122:3, 122:7, 122:14, 123:12, 123:17, 125:16, 126:12, 127:13
**correctly** [6] - 81:19, 81:22, 89:4, 93:21, 94:1, 127:22
**corrupt** [3] - 51:17, 52:4, 56:24
**Council** [1] - 104:12
**counsel** [32] - 3:4, 3:5, 6:13, 6:15, 6:25, 7:4, 11:3, 15:13, 15:16, 23:6, 24:14, 25:22, 26:11, 36:23, 38:23, 42:17, 43:10, 43:12, 49:12, 53:11, 63:2, 72:17, 77:5, 107:25, 108:2, 108:7, 108:18, 109:9, 112:1, 125:17, 125:21
**counsel's** [2] - 5:2, 7:8
**countering** [1] - 89:1
**counterparties** [1] - 51:16
**country** [1] - 26:11
**couple** [3] - 88:3, 106:21, 120:9
**coupling** [1] - 110:11
**course** [9] - 12:4, 16:2, 16:23, 21:20, 34:22, 44:16, 45:19, 107:15, 130:15
**Court** [78] - 1:22, 1:22, 6:5, 7:3, 7:13, 7:19, 8:6, 8:20, 9:11, 10:5, 10:8, 11:1, 11:8, 11:12, 11:20, 12:8, 12:10, 12:18, 14:4, 14:10, 14:11, 14:16, 16:18, 17:2, 19:7,

19:9, 19:21, 19:23, 20:2, 21:25, 22:13, 24:2, 25:21, 38:25, 39:14, 40:15, 41:13, 42:19, 43:3, 43:7, 43:11, 43:25, 44:21, 47:2, 47:4, 47:8, 47:10, 48:12, 48:24, 49:14, 49:23, 50:4, 53:17, 60:14, 61:1, 62:13, 62:19, 63:15, 63:24, 64:16, 67:5, 71:11, 72:4, 76:15, 77:4, 77:6, 78:9, 79:11, 81:25, 83:2, 84:5, 98:24, 101:23, 120:13, 126:4, 134:10

court [20] - 3:12, 4:13, 7:21, 8:1, 8:21, 9:15, 10:6, 15:15, 26:21, 27:13, 42:21, 47:9, 51:21, 54:12, 65:6, 70:5, 72:6, 76:2, 112:21

COURT [209] - 1:1, 3:10, 3:13, 3:16, 5:12, 5:17, 6:2, 6:23, 7:22, 8:11, 8:24, 10:11, 10:17, 11:3, 11:22, 12:1, 15:19, 16:1, 16:3, 16:6, 16:21, 16:25, 17:12, 18:14, 19:10, 20:16, 20:20, 20:22, 21:1, 21:3, 21:7, 21:11, 21:15, 22:3, 22:20, 22:22, 22:24, 23:9, 23:15, 23:24, 24:9, 26:3, 26:6, 27:11, 28:3, 28:6, 29:10, 29:15, 30:22, 31:18, 31:21, 32:15, 33:12, 34:22, 35:4, 36:5, 36:8, 37:1, 37:24, 39:2, 39:22, 40:10, 41:4, 41:23, 42:3, 42:10, 44:11, 45:21, 46:1, 47:12, 47:15, 47:17, 47:22, 48:3, 48:7, 48:11, 48:14, 50:1, 50:8, 50:23, 51:1, 52:5, 52:11, 52:13, 52:15, 52:21, 53:9, 54:15, 54:18, 55:7, 55:13, 56:2, 56:4, 56:18, 57:4, 57:20, 57:22, 58:1, 58:23, 60:3, 60:9, 60:12, 60:18, 61:2, 62:14, 62:20, 64:15,

64:21, 64:23, 65:12, 66:22, 66:24, 67:3, 67:7, 67:11, 67:25, 68:3, 68:8, 69:6, 69:12, 69:16, 69:23, 69:25, 70:6, 70:9, 70:20, 71:15, 71:18, 72:1, 72:13, 72:25, 73:7, 73:16, 73:24, 74:11, 74:15, 75:7, 75:9, 75:13, 76:10, 76:13, 76:17, 76:19, 76:21, 76:24, 77:8, 77:12, 77:16, 77:20, 77:25, 80:12, 80:15, 80:17, 80:20, 85:22, 86:7, 86:21, 86:23, 88:8, 96:7, 96:9, 98:14, 100:11, 100:21, 100:25, 101:4, 101:9, 101:15, 101:21, 101:25, 107:3, 107:7, 107:11, 112:20, 113:2, 115:11, 117:4, 118:8, 118:25, 119:12, 119:17, 119:21, 120:7, 120:10, 121:21, 125:7, 126:2, 126:6, 126:9, 126:12, 126:14, 126:17, 126:21, 126:25, 127:5, 128:13, 128:20, 129:12, 129:17, 129:21, 130:2, 130:8, 130:10, 130:15, 131:8, 131:20, 132:24, 133:2, 134:1

Court's [11] - 8:8, 8:10, 9:11, 39:8, 39:9, 43:24, 49:6, 65:23, 77:6, 77:10, 129:13

Courthouse [1] - 1:23

COURTROOM [3] - 3:2, 77:21, 77:24

courts [3] - 10:20, 24:13, 72:19

cover [3] - 15:15, 65:14, 103:12

covered [2] - 14:13, 14:23

covers [1] - 103:14

crap [4] - 6:21, 6:24, 15:18, 20:9

crash [1] - 85:13

CRC [2] - 1:22, 134:9

create [4] - 91:2, 95:24, 121:10, 127:17

created [3] - 84:6, 103:8, 130:4

creating [1] - 128:8

credentials [2] - 106:10, 127:3

credibility [1] - 63:12

Criminal [3] - 1:2, 3:23, 25:24

criminal [12] - 3:2, 5:4, 25:3, 27:16, 29:2, 31:8, 32:2, 50:12, 63:24, 72:4, 73:1, 128:20

criminality [1] - 97:22

critical [3] - 97:18, 114:6, 123:15

critically [1] - 79:14

criticizing [1] - 123:14

CROSS [1] - 102:2

Cross [1] - 2:6

cross [3] - 55:19, 56:23, 63:19

CROSS-EXAMINATION [1] - 102:2

Cross-Examination [1] - 2:6

cross-examine [1] - 56:23

cross-motion [1] - 63:19

CRR [2] - 1:22, 134:9

Crypto [1] - 124:19

cryptocurrencies [2] - 79:24, 81:23

cryptocurrency [8] - 17:18, 66:1, 80:16, 81:11, 81:12, 84:9, 120:17, 132:12

cryptography [1] - 83:12

CSV [2] - 35:2, 35:4

cures [1] - 72:16

curious [1] - 28:8

currencies [1] - 84:7

current [4] - 23:17, 46:22, 68:4, 68:24

curriculum [1] - 86:14

custodian [1] - 45:2

customer [1] - 122:20

cut [1] - 118:25

CV [1] - 86:16

cyber [2] - 21:23, 41:17

**D**

D.C [8] - 1:5, 10:6, 10:8, 36:18, 65:6, 65:7, 106:23, 134:11

Dairy [2] - 10:21, 10:22

danger [2] - 63:7, 128:2

dark [1] - 86:2

Dark [2] - 51:11, 64:17

darknet [2] - 99:7, 99:11

Dash [2] - 84:12, 101:6

data [95] - 9:2, 16:12, 28:19, 29:5, 30:18, 31:13, 31:14, 31:15, 35:6, 35:7, 35:16, 35:19, 35:20, 43:21, 44:8, 44:12, 44:17, 44:18, 45:11, 45:13, 45:25, 46:3, 46:4, 46:7, 46:8, 46:13, 46:15, 46:18, 46:22, 47:3, 48:20, 50:5, 50:22, 51:9, 51:13, 51:15, 51:17, 51:20, 51:21, 51:23, 51:25, 52:2, 52:20, 53:2, 53:4, 53:8, 54:5, 54:9, 54:11, 55:1, 55:11, 55:21, 55:24, 56:1, 56:7, 56:13, 56:24, 57:9, 57:13, 57:19, 57:24, 58:3, 58:6, 58:16, 58:18, 61:9, 78:19, 78:21, 83:17, 85:17, 85:25, 87:14, 89:7, 89:9, 90:2, 90:4, 91:22, 96:2, 110:13, 114:5, 114:11, 114:22, 115:6, 116:4, 116:7, 116:14, 116:22, 117:1, 117:13

database [1] - 51:3

date [3] - 4:14, 61:15, 132:7

Dated [1] - 134:7

dates [1] - 23:14

Daubert [10] - 11:23, 44:4, 44:6, 46:17, 47:2, 48:16, 48:19, 61:19, 61:20, 129:6

day-to-day [1] - 114:13

days [4] - 34:18, 62:12, 63:15, 85:21

DC [3] - 1:12, 1:14,

1:24

DDoS [1] - 81:13

de [2] - 129:7, 129:8

deal [4] - 78:22, 118:24, 122:18

dealing [7] - 24:22, 71:22, 99:18, 109:16, 114:22, 121:7, 132:9

deals [2] - 67:11, 120:19

decade [1] - 82:25

decide [2] - 14:11, 33:16

decision [3] - 10:6, 39:5, 132:17

decisions [1] - 48:24

declaration [4] - 32:16, 53:18, 53:23, 53:24

declared [1] - 51:8

decoupled [1] - 83:19

deep [1] - 130:6

defendant [11] - 4:21, 6:14, 12:23, 16:14, 38:1, 38:9, 42:18, 43:6, 49:18, 59:23, 109:10

Defendant [4] - 1:6, 1:15, 3:12, 3:15

defendant's [4] - 7:7, 65:22, 75:25, 110:5

Defendant's [7] - 86:10, 86:19, 86:24, 88:11, 96:6, 96:10, 108:9

defendants [2] - 5:18, 63:22

defenders [1] - 71:21

Defense [4] - 2:11, 2:12, 109:24, 112:2

defense [81] - 4:22, 4:23, 4:24, 5:2, 6:11, 6:13, 6:15, 6:24, 7:4, 7:8, 7:11, 10:1, 17:4, 17:5, 18:19, 19:2, 19:11, 19:16, 20:23, 22:2, 23:16, 30:2, 30:4, 30:8, 31:11, 32:9, 35:1, 35:24, 36:5, 36:10, 36:23, 38:2, 38:5, 38:22, 38:25, 41:19, 44:13, 47:4, 48:19, 49:19, 56:22, 58:25, 59:13, 59:16, 60:23, 62:3, 62:10, 62:23, 62:24, 63:14, 65:8, 65:14, 66:7, 66:10, 74:10, 74:18, 74:19, 77:1,

77:5, 77:9, 77:11,
77:18, 98:21,
107:25, 108:2,
108:7, 108:14,
108:18, 109:9,
110:20, 111:4,
112:1, 112:25,
125:17, 125:21,
129:5, 130:1,
130:12, 132:25
**defense's** [1] - 23:22
**define** [1] - 96:20
**definitely** [1] - 109:25
**definition** [2] - 5:5,
31:22
**degree** [2] - 97:22,
127:20
**deleted** [1] - 51:15
**delisting** [4] - 123:8,
123:11, 123:24,
123:25
**delved** [1] - 19:20
**demand** [1] - 102:16
**demographics** [2] -
102:15, 102:20
**demonstrates** [1] -
124:4
**demonstrative** [1] -
12:11
**deniability** [2] -
121:11, 127:17
**deny** [5] - 33:15, 60:1,
61:4, 74:21, 75:24
**DEPARTMENT** [1] -
1:13
**Department** [2] -
102:7, 102:8
**depth** [1] - 57:2
**DEPUTY** [3] - 3:2,
77:21, 77:24
**derived** [4] - 83:6,
83:9, 83:18, 95:3
**describe** [3] - 44:11,
48:5, 81:25
**described** [5] - 19:8,
48:16, 48:22, 79:4,
127:18
**describes** [1] - 110:20
**describing** [4] - 19:23,
111:4, 116:10,
118:21
**description** [3] -
14:25, 45:14, 117:7
**design** [5] - 82:9,
90:7, 103:12,
103:14, 127:18
**designated** [1] - 8:21
**designates** [1] - 9:3
**designed** [5] - 9:23,
24:7, 120:24,

121:10, 127:17
**desirable** [1] - 8:15
**detail** [1] - 109:23
**detailed** [1] - 39:18
**detect** [1] - 118:23
**detecting** [2] - 113:8,
113:22
**determination** [1] -
109:20
**determining** [2] -
96:15, 97:18
**deterministic** [1] -
94:10
**dev** [1] - 103:24
**developed** [1] - 20:6
**development** [1] -
18:11
**deviate** [1] - 43:11
**device** [1] - 91:4
**devoted** [1] - 118:19
**diagram** [3] - 50:12,
50:15
**difference** [5] - 63:20,
64:2, 78:25, 89:22,
114:23
**differences** [1] - 90:6
**different** [24] - 8:19,
14:2, 15:7, 17:9,
17:17, 24:21, 26:1,
26:18, 27:15, 37:23,
87:12, 88:1, 89:15,
90:10, 94:15, 95:22,
97:4, 100:3, 100:4,
103:4, 113:18,
116:11, 117:17,
120:20
**differentiate** [1] -
90:20
**difficult** [7] - 65:24,
66:2, 101:13,
112:20, 113:11,
124:25, 131:3
**difficulties** [1] -
116:21
**dire** [6] - 65:24, 68:16,
70:16, 72:11, 73:6,
73:11
**Direct** [1] - 2:4
**direct** [8] - 8:20, 10:5,
47:5, 56:16, 69:11
**DIRECT** [1] - 78:5
**directed** [7] - 12:15,
40:2, 40:3, 42:5,
61:3, 70:22
**directing** [1] - 75:22
**direction** [1] - 131:9
**directly** [8] - 4:20,
31:15, 46:23, 48:1,
54:10, 56:11, 58:15,
87:7

**director** [1] - 48:9
**disadvantages** [1] -
122:14
**disagree** [2] - 41:22,
121:5
**disagreement** [1] -
42:1
**disclosable** [2] -
16:23, 16:25
**disclose** [4] - 16:7,
23:15, 34:24, 94:18
**disclosed** [5] - 16:24,
95:16, 116:24,
117:3, 119:23
**disclosure** [5] - 109:1,
110:20, 130:23,
131:2
**disclosures** [6] -
12:25, 13:11, 13:15,
16:4, 26:3, 26:6
**discovered** [1] - 56:1
**discovers** [1] - 51:14
**discovery** [14] - 5:23,
6:7, 6:19, 7:10,
12:22, 13:7, 13:9,
13:15, 21:20, 32:5,
69:2, 109:4, 110:2,
110:4
**discrepancies** [1] -
96:2
**discrepancy** [1] -
120:1
**discrete** [1] - 9:24
**discretion** [1] - 9:11
**discuss** [7] - 19:16,
20:18, 43:10, 43:18,
66:14, 84:6, 84:7
**discussion** [4] -
32:24, 43:13, 43:14,
53:10
**discussions** [1] - 34:7
**dislike** [1] - 15:21
**disparities** [1] - 119:8
**disparity** [2] - 119:5,
119:6
**distinction** [1] - 94:7
**distracting** [2] - 5:8,
6:1
**DISTRICT** [3] - 1:1,
1:1, 1:8
**district** [5] - 8:3,
68:13, 68:15, 70:15,
72:19
**disturbing** [1] - 74:24
**divided** [1] - 98:1
**Docket** [5] - 4:1, 4:7,
50:7, 78:1, 78:2
**docketed** [1] - 62:16
**doctoral** [1] - 78:15
**doctorate** [1] - 78:15

**document** [12] - 7:17,
24:9, 40:6, 88:4,
88:14, 88:17, 89:5,
89:8, 104:15,
109:24, 112:2,
119:15
**documented** [3] -
49:12, 51:10, 93:16
**documents** [9] - 9:2,
10:2, 15:16, 18:10,
18:11, 28:9, 102:1,
110:6, 111:11
**DOJ** [3] - 1:11, 71:2,
74:6
**dollar** [1] - 98:6
**Dollars** [1] - 84:21
**dollars** [7] - 51:7,
84:19, 85:3, 85:9,
85:10, 85:13, 97:14
**domain** [1] - 50:16
**dominant** [1] - 92:16
**done** [20] - 16:8,
16:13, 19:8, 21:23,
27:25, 31:5, 34:8,
35:11, 73:11, 74:12,
74:25, 79:22, 85:21,
86:2, 86:12, 87:7,
88:12, 109:19,
116:19, 116:20
**door** [1] - 32:4
**double** [1] - 78:13
**doubt** [2] - 17:13, 59:6
**doubts** [3] - 82:20,
109:11, 109:17
**dovetails** [1] - 9:19
**down** [8] - 7:5, 26:12,
33:8, 82:24, 85:16,
92:8, 115:12, 128:13
**downloaded** [1] -
119:15
**downloading** [1] -
85:17
**DR** [4] - 2:3, 78:6,
102:3, 127:9
**Dr** [14] - 77:19, 78:8,
86:9, 87:2, 88:10,
88:16, 96:12, 98:19,
102:5, 118:2,
120:15, 127:11,
130:20, 131:4
**draft** [2] - 28:20, 89:2
**drafting** [1] - 111:21
**drive** [2] - 92:24
**driven** [1] - 132:3
**DRM** [1] - 88:2
**drop** [2] - 85:8,
123:23, 123:25
**dropped** [4] - 48:19,
71:6, 71:10
**drug** [1] - 75:6

**duces** [1] - 23:1
**due** [1] - 21:20
**duly** [1] - 24:20
**dump** [2] - 19:24,
25:18
**dumped** [1] - 53:2
**during** [1] - 73:8

---

# E

**early** [15] - 4:9, 4:13,
6:8, 7:20, 7:25, 8:6,
8:25, 10:25, 12:6,
12:19, 13:2, 39:17,
80:4, 107:8, 119:4
**Early** [1] - 4:2
**early-return** [7] - 4:9,
6:8, 7:20, 7:25, 8:6,
8:25, 10:25
**Early-Return** [1] - 4:2
**ease** [1] - 112:24
**easier** [1] - 117:8
**easily** [5] - 105:7,
105:14, 107:18,
107:21, 114:16
**ECF** [2] - 6:22, 10:7
**educated** [2] - 91:20,
93:24
**education** [1] - 78:14
**educational** [3] - 78:9,
79:3, 79:4
**effect** [3] - 52:14,
52:15, 123:13
**effective** [1] - 43:9
**effectively** [10] -
11:13, 13:1, 18:11,
24:19, 42:22, 43:23,
45:11, 48:5, 48:19,
71:21
**effort** [2] - 5:8, 49:22
**efforts** [1] - 49:13
**egregiously** [1] - 63:4
**eight** [1] - 107:14
**either** [7] - 5:24, 15:2,
44:5, 46:17, 46:20,
93:13, 105:6
**EKELAND** [115] - 1:15,
3:11, 20:21, 20:23,
21:2, 21:5, 21:8,
21:14, 21:21, 22:13,
22:21, 22:23, 23:4,
23:11, 24:1, 24:11,
26:5, 26:8, 28:2,
28:5, 28:25, 29:14,
30:9, 31:12, 31:20,
32:14, 33:10, 39:21,
40:1, 40:14, 41:9,
42:2, 50:3, 50:9,
50:25, 51:2, 52:10,
52:12, 52:14, 52:18,

52:25, 54:2, 54:17, 55:4, 55:9, 55:16, 56:3, 56:6, 56:21, 57:17, 57:21, 57:23, 58:14, 60:20, 67:1, 67:6, 67:9, 67:20, 68:2, 68:6, 68:9, 69:9, 69:14, 69:22, 69:24, 70:2, 70:8, 70:11, 70:22, 71:17, 71:20, 72:8, 72:19, 73:5, 73:13, 73:21, 74:6, 74:14, 75:5, 75:8, 75:12, 76:9, 76:18, 77:15, 77:18, 78:4, 78:7, 81:21, 86:6, 86:8, 86:18, 86:25, 87:1, 88:7, 88:9, 96:4, 96:11, 98:12, 98:16, 98:18, 101:20, 126:10, 126:13, 126:20, 126:23, 127:2, 127:7, 127:10, 128:12, 129:20, 129:23, 130:12, 130:20, 131:18, 132:25

**Ekeland** [15] - 1:16, 2:5, 2:8, 3:11, 20:20, 39:20, 50:1, 60:18, 63:9, 66:25, 126:9, 126:18, 129:18, 130:17, 132:24
**elaborate** [1] - 128:1
**element** [5] - 4:21, 82:15, 82:21, 83:12, 94:15
**elements** [3] - 5:7, 81:6, 81:16
**eliminate** [2] - 91:11, 91:12
**Elizabeth** [1] - 98:20
**Elliptic** [1] - 88:3
**elucidate** [1] - 10:24
**email** [3] - 59:15, 59:17
**emails** [5] - 59:11, 59:14, 59:22, 59:24, 60:2
**embarked** [3] - 62:23, 62:24, 113:10
**emphasize** [1] - 114:19
**employed** [2] - 17:21, 95:12
**employee** [3] - 47:20, 48:2, 65:3
**employees** [1] - 69:8
**employment** [1] -

103:12
**encourage** [3] - 33:24, 34:6, 122:6
**end** [5] - 12:22, 66:23, 100:18, 128:19, 131:15
**end-around** [1] - 12:22
**endeavor** [1] - 102:25
**ending** [1] - 81:12
**endorsed** [1] - 12:10
**enforce** [1] - 62:17
**enforceable** [1] - 65:20
**enforcement** [2] - 90:23, 91:3
**enforces** [1] - 7:19
**enforcing** [1] - 63:8
**engage** [1] - 123:21
**engaged** [1] - 72:2
**engagements** [1] - 63:1
**enter** [3] - 67:11, 75:14, 75:17
**entire** [4] - 24:25, 101:6, 114:14, 114:24
**entirely** [1] - 66:12
**entirety** [3] - 18:12, 20:3, 105:1
**entities** [3] - 94:13, 94:24, 112:11
**entitled** [9] - 30:19, 36:5, 37:2, 37:4, 38:10, 38:16, 56:22, 58:25, 66:9
**entity** [1] - 99:21
**entries** [1] - 35:14
**equals** [2] - 35:23, 36:9
**erase** [1] - 124:14
**error** [16] - 90:14, 90:22, 90:23, 91:2, 91:6, 91:7, 91:11, 91:14, 95:25, 114:10, 114:17, 117:24, 119:24, 120:3, 120:4, 122:14
**errors** [13] - 51:24, 53:4, 71:9, 78:23, 78:24, 78:25, 90:2, 90:4, 90:15, 90:21, 91:12, 115:25, 118:23
**escaped** [1] - 84:16
**escaping** [1] - 86:5
**especially** [1] - 65:25
**essential** [1] - 67:23
**essentially** [13] - 4:11, 4:24, 5:9, 21:22,

35:5, 40:19, 51:23, 62:17, 83:5, 90:17, 95:3, 122:20, 124:3
**establish** [1] - 59:6
**established** [3] - 56:18, 59:5, 127:2
**estate** [4] - 103:3, 103:8, 103:11, 103:23
**et** [4] - 46:15, 79:17, 91:9, 107:16
**EU** [4] - 111:2, 111:13, 111:22, 122:24
**Europe** [2] - 70:18, 74:1
**European** [4] - 104:12, 104:17, 110:21
**evaluate** [3] - 55:18, 63:16, 101:10
**eve** [2] - 34:16, 39:12
**event** [7] - 17:11, 33:20, 42:25, 43:18, 47:1, 47:7, 49:4
**everywhere** [2] - 26:25, 27:9
**evidence** [24] - 5:23, 8:22, 9:24, 13:4, 13:22, 14:19, 29:2, 30:14, 41:1, 41:11, 44:10, 49:1, 49:8, 50:10, 59:7, 59:24, 63:3, 64:4, 66:4, 67:23, 86:20, 96:6, 123:10, 124:20
**evidentiary** [1] - 55:22
**eVoucher** [1] - 71:23
**exact** [4] - 10:14, 48:8, 59:9, 74:20
**exactly** [6] - 5:22, 5:25, 9:13, 20:14, 70:10, 85:4
**EXAMINATION** [3] - 78:5, 102:2, 127:8
**Examination** [3] - 2:4, 2:6, 2:7
**examine** [5] - 46:14, 56:23, 57:7, 65:25, 69:17
**examined** [2] - 44:16, 46:24
**examining** [2] - 46:7, 46:18
**example** [42] - 10:23, 14:2, 14:6, 14:18, 14:19, 16:20, 19:8, 19:9, 35:12, 36:18, 38:15, 44:20, 49:16, 58:6, 58:7, 83:22, 87:13, 89:8, 89:16,

90:22, 91:5, 91:7, 91:13, 91:24, 91:25, 92:23, 92:25, 93:3, 94:17, 95:16, 95:17, 96:16, 97:9, 97:13, 99:13, 99:14, 100:15, 111:16, 116:10
**examples** [1] - 104:10
**exceedingly** [2] - 112:20, 113:11
**Excel** [8] - 35:3, 35:6, 35:22, 35:25, 36:1, 36:8, 36:10, 36:18
**excellent** [1] - 33:10
**exception** [4] - 9:17, 52:16, 82:10, 122:16
**exchange** [4] - 51:7, 87:21, 114:3, 123:3
**exchanged** [1] - 28:11
**exchanges** [10] - 51:6, 85:21, 89:6, 113:25, 114:1, 114:6, 122:9, 123:8, 123:11
**excludable** [1] - 5:5
**exclude** [2] - 72:15, 131:9
**excludes** [2] - 6:5, 7:13
**excluding** [2] - 59:22, 131:16
**excuse** [1] - 66:3
**excuses** [1] - 84:23
**executives** [1] - 42:20
**Exhibit** [13] - 2:11, 2:12, 86:10, 86:20, 86:23, 86:24, 88:11, 96:6, 96:10, 108:9, 109:24, 112:2, 113:1
**exhibited** [1] - 6:16
**EXHIBITS** [1] - 2:10
**exhibits** [3] - 2:13, 9:8, 126:14
**Exhibits** [4] - 2:14, 125:25, 126:10, 126:15
**exist** [4] - 13:21, 101:16, 119:8, 120:1
**exists** [3] - 13:4, 13:22, 55:7
**expect** [13] - 25:19, 44:22, 70:10, 73:1, 73:19, 75:10, 75:20, 76:1, 99:5, 106:25, 107:19, 128:18, 129:24
**expecting** [1] - 23:21
**expedition** [9] - 4:16, 7:11, 9:23, 13:2, 14:17, 18:13, 32:1,

38:14, 54:21
**expenses** [2] - 106:19, 106:25
**experience** [11] - 24:13, 78:9, 79:3, 79:4, 79:9, 79:24, 86:4, 87:3, 87:4, 110:8, 113:12
**experimental** [4] - 78:10, 78:17, 78:18
**expert** [71] - 5:9, 13:11, 14:6, 16:4, 16:7, 17:21, 18:18, 18:22, 19:14, 19:15, 19:18, 23:18, 23:22, 25:5, 26:3, 26:6, 29:16, 30:15, 32:10, 34:18, 34:24, 35:1, 35:11, 35:16, 35:22, 36:3, 36:10, 36:17, 37:5, 37:7, 37:14, 40:11, 44:1, 44:5, 46:20, 47:18, 52:22, 55:2, 58:5, 58:8, 58:9, 58:11, 61:19, 61:22, 61:23, 77:19, 77:25, 98:19, 98:21, 106:15, 109:20, 110:20, 130:5, 130:18, 130:22, 130:23, 131:2, 131:4, 131:10, 131:11, 131:13, 131:16, 131:17, 131:24, 132:2, 132:3, 132:8, 132:15, 132:19
**expert's** [4] - 16:7, 16:16, 16:19, 37:20
**expert-driven** [1] - 132:3
**expertise** [4] - 131:12, 131:23, 132:10, 132:14
**experts** [11] - 13:12, 13:16, 17:22, 36:19, 36:21, 64:14, 129:6, 130:17, 131:6, 132:5
**experts'** [1] - 20:5
**explain** [9] - 79:10, 83:1, 84:5, 91:18, 92:2, 92:3, 99:25, 121:20, 121:21
**explained** [5] - 8:7, 12:5, 17:19, 69:6
**explains** [1] - 37:10
**explanation** [4] - 14:25, 45:13, 119:7, 119:25
**explanations** [1] -

96:1
**explicitly** [1] - 8:5
**explore** [1] - 53:13
**explorers** [1] - 35:18
**exponential** [1] - 98:3
**express** [1] - 46:21
**extensive** [2] - 67:1, 67:21
**extent** [10] - 14:18, 48:25, 50:4, 58:24, 60:2, 66:15, 68:22, 69:1, 126:4, 131:11
**extra** [1] - 15:2
**extract** [2] - 114:10, 125:8
**extraneous** [1] - 6:17
**extremely** [1] - 31:7
**eyewitnesses** [2] - 24:24, 25:2

## F

**F.2d** [1] - 10:7
**face** [1] - 72:20
**faces** [2] - 15:23, 123:20
**fact** [35] - 13:13, 15:17, 22:17, 38:18, 41:21, 43:10, 48:18, 48:23, 50:21, 51:19, 52:1, 53:1, 53:7, 53:18, 53:22, 54:3, 68:10, 68:16, 70:16, 72:10, 96:1, 99:2, 99:22, 101:6, 108:18, 112:11, 113:16, 116:21, 118:13, 121:2, 121:16, 123:2, 123:6, 123:18, 125:11
**fact-check** [1] - 38:18
**factor** [3] - 97:14, 124:1
**factorial** [3] - 98:1, 98:2
**facts** [2] - 31:3, 32:21
**factually** [1] - 14:18
**faculty** [1] - 103:1
**fail** [1] - 12:20
**failing** [3] - 12:11, 31:22
**fails** [2] - 10:3, 124:4
**failure** [1] - 124:4
**fair** [9] - 27:11, 27:23, 30:7, 39:6, 66:9, 72:13, 81:4, 90:13, 119:10
**fairly** [5] - 16:15, 32:20, 93:3, 131:12

**fall** [1] - 4:20
**falling** [2] - 82:10, 82:22
**false** [15] - 15:3, 19:3, 38:22, 38:24, 40:24, 41:14, 41:21, 64:13, 124:7, 125:1, 127:24, 128:2, 128:8, 128:9, 128:10
**falsely** [2] - 68:20, 128:9
**falsifying** [2] - 51:21, 55:11
**familiar** [5] - 8:3, 66:1, 76:2, 84:14, 96:12
**family** [1] - 27:8
**fantasy** [1] - 38:22
**far** [9] - 4:20, 10:15, 32:17, 44:3, 46:25, 99:9, 107:13, 122:16, 132:10
**Faruqui** [1] - 67:10
**faster** [1] - 98:2
**FATF** [16] - 88:18, 88:21, 96:2, 111:13, 111:23, 112:1, 112:2, 112:12, 113:6, 113:7, 113:11, 113:16, 115:9, 115:18, 116:9, 116:17
**FBI** [3] - 21:23, 26:15, 41:17
**feasible** [1] - 117:22
**federal** [3] - 45:7, 71:21, 79:14
**Federal** [1] - 25:24
**fee** [1] - 81:12
**feed** [1] - 49:15
**fees** [3] - 48:1, 81:18, 92:17
**fellowship** [1] - 102:8
**few** [5] - 44:23, 46:6, 85:21, 111:19, 126:18
**field** [6] - 58:5, 102:12, 102:13, 102:18, 102:19, 102:24
**fields** [1] - 116:6
**figure** [5] - 3:23, 20:13, 34:25, 101:15, 130:13
**file** [1] - 28:23
**filed** [6] - 62:10, 62:11, 63:14, 63:17, 74:14, 81:6
**files** [5] - 24:15, 35:3, 35:6, 51:15, 51:16
**filing** [1] - 6:16
**filings** [1] - 6:16

**fill** [1] - 93:22
**finance** [1] - 104:17
**financial** [4] - 85:5, 88:22, 110:5, 110:13
**Financial** [7] - 87:11, 87:23, 88:23, 104:14, 108:9, 112:6, 119:15
**financing** [3] - 89:2, 105:2, 110:22
**FinCEN** [8] - 104:18, 111:13, 111:16, 111:19, 111:22, 122:14, 122:17, 122:23
**fine** [6] - 20:20, 48:14, 74:1, 77:12, 77:13, 101:25
**finger** [1] - 29:24
**finish** [2] - 29:13, 120:10
**finished** [1] - 112:22
**First** [1] - 70:24
**first** [21] - 3:18, 4:1, 8:25, 11:8, 14:10, 14:12, 19:23, 20:23, 39:6, 39:7, 40:1, 40:4, 50:3, 63:17, 64:9, 80:3, 82:2, 106:15, 107:25, 114:2
**firsthand** [1] - 54:7
**fischbach** [2] - 130:21, 130:22
**fishing** [9] - 4:16, 7:10, 9:23, 13:1, 14:17, 18:13, 32:1, 38:13, 54:21
**five** [2] - 73:9, 88:6
**five-year** [1] - 88:6
**fixation** [1] - 6:15
**fixed** [1] - 80:9
**flag** [1] - 129:4
**flagging** [1] - 132:7
**flat** [1] - 15:10
**flat-out** [1] - 15:10
**flaw** [1] - 82:8
**flaws** [2] - 56:14, 58:4
**flip** [1] - 101:24
**Floor** [1] - 1:17
**floppy** [1] - 92:24
**fly** [1] - 27:8
**focus** [4] - 78:16, 81:10, 113:8, 120:15
**focused** [3] - 78:17, 82:21, 110:8
**focusing** [1] - 28:8
**Foerster** [1] - 11:6
**FOERSTER** [1] - 1:19
**Fog** [5] - 35:14, 41:2,

50:11, 66:13, 71:3
**followed** [2] - 8:15, 76:5
**following** [5] - 19:1, 29:19, 29:20, 76:23, 89:10
**follows** [1] - 127:25
**footage** [3] - 38:4, 38:6, 38:10
**FOR** [1] - 1:1
**forbids** [1] - 20:15
**Force** [8] - 87:12, 87:23, 88:22, 88:23, 104:15, 108:9, 112:7, 119:16
**forced** [1] - 51:6
**forceful** [1] - 8:2
**foregoing** [1] - 134:4
**forensic** [2] - 87:5, 95:13
**forensics** [8] - 24:23, 25:1, 25:12, 67:23, 68:11, 70:13, 74:9, 109:23
**form** [4] - 48:17, 49:1, 56:8, 105:4
**formality** [1] - 8:8
**format** [2] - 23:22, 28:23
**former** [6] - 67:9, 67:12, 67:13, 68:23, 69:7, 69:8
**forms** [1] - 122:12
**forth** [2] - 63:13, 64:5
**Fortran** [1] - 79:5
**forum** [2] - 80:5, 84:6, 106:5
**forwarded** [1] - 59:15
**forwarding** [2] - 59:15, 59:17
**foundation** [1] - 131:23
**foundational** [2] - 56:25, 57:24
**founded** [1] - 20:4
**founder** [1] - 47:12
**four** [3] - 50:15, 62:10, 88:5
**four-week-late** [1] - 62:10
**Francisco** [2] - 1:20, 77:19
**FRANCISCO** [4] - 2:3, 78:6, 102:3, 127:9
**frankly** [3] - 19:25, 53:15, 57:5
**fraud** [2] - 51:20, 55:11
**free** [2] - 59:23, 128:11
**Frentzen** [1] - 11:6

**FRENTZEN** [27] -
1:18, 11:5, 11:25, 12:3, 15:20, 16:2, 16:5, 16:17, 16:22, 17:2, 17:13, 19:7, 19:11, 20:17, 42:14, 44:13, 45:24, 46:2, 47:14, 47:16, 47:19, 48:4, 48:8, 48:12, 48:15, 76:14, 76:20
**frequently** [1] - 8:15
**Friday** [10] - 11:14, 11:21, 42:16, 43:3, 47:2, 128:23, 128:25, 129:3, 130:13, 132:20
**Friedman** [3] - 59:10, 59:18, 60:1
**Friedmann** [1] - 59:22
**friends** [1] - 27:8
**front** [21] - 21:11, 21:12, 21:15, 22:5, 22:10, 22:12, 24:11, 31:8, 36:14, 38:7, 38:25, 53:17, 59:9, 62:20, 67:4, 69:25, 73:2, 77:17, 112:3, 112:15, 116:18
**frontload** [1] - 77:11
**full** [3] - 68:22, 104:24, 134:5
**full-time** [1] - 104:24
**fully** [1] - 11:15
**function** [1] - 101:7
**functions** [3] - 14:3, 83:11, 83:12
**fund** [1] - 49:19
**fundamental** [2] - 78:25, 82:12
**funding** [1] - 62:24
**fundraiser** [1] - 49:17
**fundraising** [2] - 42:24, 72:2
**funds** [8] - 27:6, 50:19, 71:14, 72:5, 83:15, 83:16, 84:24, 92:16
**furnished** [1] - 44:17
**furthermore** [1] - 113:24
**future** [3] - 57:21, 81:1, 85:19

## G

**Gambaryan** [1] - 69:3
**gaps** [3] - 45:25, 46:7, 46:15
**gears** [2] - 29:10, 30:5
**general** [6] - 5:10,

9:14, 9:17, 15:21, 20:11, 101:17
**General's** [1] - 78:14
**generally** [3] - 12:24, 24:13, 74:21
**generated** [1] - 18:24
**generation** [1] - 102:16
**generically** [1] - 45:24
**George** [3] - 28:14, 80:3, 103:4
**gigantic** [1] - 35:15
**given** [9] - 31:13, 49:12, 70:15, 84:20, 84:23, 90:2, 119:6, 119:7, 128:25
**glitch** [1] - 36:12
**global** [1] - 87:6
**glue** [1] - 64:7
**government** [93] - 3:5, 3:7, 4:6, 4:8, 4:22, 5:20, 6:7, 6:9, 6:11, 7:12, 12:5, 12:25, 13:8, 13:13, 13:20, 13:21, 13:23, 14:23, 15:5, 15:6, 15:13, 16:6, 16:11, 16:25, 17:3, 17:21, 19:13, 19:16, 21:6, 21:19, 21:24, 24:18, 25:3, 26:14, 27:1, 27:10, 29:24, 29:25, 30:2, 30:24, 31:9, 32:24, 33:17, 33:22, 34:1, 35:22, 38:20, 40:11, 40:20, 40:21, 41:10, 41:17, 41:21, 45:7, 46:7, 46:9, 47:18, 50:10, 52:2, 53:5, 54:8, 55:14, 55:19, 56:11, 58:4, 58:15, 58:18, 58:23, 58:24, 59:5, 59:12, 59:20, 62:7, 64:2, 64:3, 64:16, 65:2, 65:3, 65:10, 66:8, 67:1, 67:7, 69:8, 74:8, 74:17, 75:2, 79:14, 98:17, 110:2, 129:4, 130:2, 132:22
**Government** [5] - 84:24, 84:25, 85:4, 85:12, 88:25
**government's** [20] - 4:2, 4:17, 4:18, 5:12, 5:14, 20:24, 22:7, 22:14, 33:15, 33:20, 41:15, 55:23, 56:25, 61:8, 75:25, 78:1, 98:19, 129:6,

130:21, 131:1
**governments** [1] - 88:25
**Governor** [1] - 78:14
**Gox** [51] - 43:20, 44:8, 44:11, 44:15, 44:16, 45:2, 45:4, 45:5, 45:9, 45:15, 45:20, 46:3, 46:8, 46:15, 47:3, 48:20, 50:5, 50:14, 50:22, 51:5, 51:6, 51:13, 51:15, 51:20, 51:21, 53:2, 53:3, 54:4, 55:21, 56:7, 57:19, 57:24, 58:16, 60:23, 61:9, 84:14, 84:15, 84:16, 84:17, 84:19, 84:22, 84:25, 85:2, 85:11, 85:14, 85:21, 86:1, 86:4, 110:13
**grant** [3] - 33:13, 57:10, 61:5
**granting** [1] - 33:22
**graph** [2] - 89:8, 89:11
**Graph** [1] - 89:12
**graphs** [2] - 88:14, 89:11
**gratuitous** [1] - 66:6
**great** [2] - 27:24, 109:23
**greater** [1] - 33:14
**Greenberg** [12] - 51:12, 56:14, 64:20, 65:3, 66:12, 66:20, 67:2, 67:22, 68:21, 69:10, 70:3, 70:5
**Greenberg's** [1] - 73:14
**Gronager** [38] - 4:4, 11:7, 11:14, 20:19, 22:18, 42:5, 42:13, 42:16, 43:5, 43:20, 44:4, 44:14, 44:19, 45:10, 45:15, 45:20, 46:2, 46:12, 47:9, 47:12, 48:21, 50:21, 51:10, 52:1, 52:8, 52:24, 53:11, 55:17, 55:19, 55:25, 58:8, 58:17, 61:4, 61:14, 61:18, 61:24, 128:25
**Gronager's** [4] - 44:1, 46:16, 47:4, 53:6
**grossly** [1] - 4:14
**ground** [2] - 115:6, 131:16
**group** [5] - 96:20, 97:15, 102:17, 104:6, 111:25

**Group** [9] - 104:4, 104:24, 105:6, 111:1, 111:21, 122:5, 122:6, 123:1
**grow** [2] - 81:11, 98:3
**grows** [1] - 98:2
**growth** [1] - 81:20
**guard** [1] - 132:2
**guess** [4] - 58:1, 61:9, 91:20, 93:25
**guessing** [1] - 93:22
**guilt** [6] - 4:21, 4:25, 5:6, 7:7, 109:14, 109:21
**guilty** [2] - 109:15, 128:10
**gun** [1] - 90:24

# H

**Haaroon** [1] - 28:14
**hack** [3] - 45:6, 45:7, 45:14
**hacked** [2] - 51:5, 51:8
**hackers** [1] - 79:15
**hacks** [1] - 93:4
**Haldeman** [2] - 10:7, 26:17
**half** [3] - 34:3, 40:25, 44:20
**hallway** [1] - 73:8
**hand** [3] - 77:22, 92:25, 94:12
**handed** [2] - 86:9, 88:10
**handle** [3] - 117:19, 127:1, 129:1
**handled** [2] - 54:12, 56:10
**happy** [6] - 3:19, 33:11, 41:13, 60:7, 77:3, 129:7
**harass** [1] - 11:17
**harassing** [1] - 40:12
**harassment** [3] - 5:21, 6:13, 39:23
**harden** [1] - 124:18
**harder** [6] - 49:18, 66:3, 97:7, 98:3, 98:4, 98:11
**hardship** [1] - 65:13
**harm** [4] - 66:8, 125:2, 127:24, 128:7
**hash** [1] - 92:15
**Haslhofer** [1] - 28:15
**HASSARD** [3] - 1:16, 3:14, 28:4
**Hassard** [2] - 3:15, 63:9
**head** [2] - 41:25, 60:18

**heads** [1] - 33:24
**hear** [15] - 11:3, 11:20, 26:5, 42:11, 43:12, 50:1, 58:23, 61:13, 61:18, 62:7, 66:4, 71:17, 124:17, 127:13, 131:18
**heard** [10] - 34:20, 49:14, 72:14, 75:9, 81:22, 83:25, 119:3, 125:22, 127:22, 129:8
**hearing** [19] - 9:25, 11:8, 11:23, 46:17, 47:8, 49:6, 49:23, 53:17, 59:1, 60:3, 61:7, 61:12, 61:19, 61:20, 62:1, 106:23, 128:20, 129:11, 133:3
**HEARING** [2] - 1:4, 1:7
**hearings** [3] - 3:18, 44:4, 54:3
**hearsay** [4] - 46:25, 52:13, 52:17, 54:23
**held** [2] - 117:11, 117:20
**helpful** [3] - 120:13, 121:23, 126:5
**helping** [1] - 30:6
**hereby** [1] - 134:3
**herring** [1] - 36:25
**heuristic** [14] - 24:4, 26:20, 31:16, 91:15, 91:19, 92:1, 95:12, 95:19, 95:23, 96:22, 99:3, 99:15, 99:16, 99:22
**heuristics** [15] - 28:21, 90:10, 90:11, 93:20, 94:18, 95:6, 96:15, 116:3, 116:7, 116:12, 116:13, 116:14, 116:23, 117:2, 117:4
**hidden** [1] - 26:13
**hide** [6] - 95:7, 97:12, 97:16, 99:9, 100:14, 100:23
**hiding** [2] - 24:20, 26:24
**high** [3] - 78:13, 114:2, 114:6
**high-risk** [1] - 114:6
**highly** [3] - 5:7, 24:20
**himself** [3] - 6:14, 55:11, 132:12
**history** [1] - 86:3
**hold** [5] - 57:2, 69:17,

75:23, 76:15, 103:7
**holding** [1] - 7:25
**holdings** [2] - 103:17, 103:23
**holds** [2] - 57:4, 83:15
**home** [1] - 27:7
**hominem** [4] - 64:13, 65:8, 74:25, 75:6
**Honor** [111] - 3:6, 3:8, 3:11, 3:14, 4:8, 5:14, 5:18, 6:4, 7:24, 8:18, 8:23, 9:13, 10:13, 10:19, 11:5, 11:25, 12:3, 12:21, 14:1, 15:20, 16:2, 16:5, 16:17, 17:14, 19:7, 19:14, 20:1, 20:18, 20:21, 21:21, 23:17, 28:25, 29:14, 30:9, 32:14, 33:11, 34:20, 36:7, 38:17, 41:2, 41:9, 42:14, 44:14, 45:17, 45:25, 47:14, 47:16, 47:19, 47:24, 48:4, 48:9, 48:15, 50:3, 54:2, 56:6, 56:22, 58:14, 59:3, 60:6, 60:10, 60:20, 60:21, 62:9, 62:15, 64:25, 65:13, 66:11, 67:20, 68:9, 70:2, 70:12, 71:20, 72:19, 73:21, 75:12, 76:9, 76:12, 76:14, 76:18, 77:3, 77:14, 77:15, 77:18, 78:4, 86:6, 86:18, 86:22, 88:7, 96:4, 101:20, 101:22, 115:14, 117:7, 119:11, 119:20, 120:12, 125:5, 125:24, 126:16, 128:12, 128:18, 128:24, 129:4, 129:16, 130:4, 131:2, 131:19, 132:23, 133:1
**HONORABLE** [1] - 1:8
**honors** [1] - 78:13
**hour** [5] - 7:3, 91:1, 91:4, 91:5
**hours** [2] - 105:5, 105:8, 105:14, 105:19, 107:13, 107:18, 107:19, 110:1
**Hub** [1] - 28:13
**huge** [1] - 87:24
**hunch** [3] - 91:21,

91:23, 93:25
**hundreds** [1] - 35:2
**hunt** [1] - 20:13
**hurdle** [1] - 54:25
**hyping** [2] - 67:22, 68:11
**hypothetical** [1] - 41:5
**hypothetically** [2] - 16:10, 19:3

## I

**IC3** [1] - 28:12
**idea** [7] - 33:10, 36:11, 36:24, 95:2, 101:16, 101:18, 131:6
**identification** [6] - 86:10, 86:19, 88:11, 96:5, 119:5, 126:8
**identified** [3] - 63:21, 63:22, 89:12
**identify** [9] - 67:8, 98:4, 98:9, 98:11, 114:1, 114:16, 114:18, 114:25, 132:8
**identifying** [3] - 97:8, 114:2, 114:6
**identity** [1] - 63:11
**illicit** [17] - 87:15, 87:19, 89:6, 89:10, 89:12, 92:23, 93:3, 97:22, 112:9, 113:8, 113:21, 114:5, 114:9, 114:25, 115:18, 119:5, 119:6
**images** [1] - 85:17
**imagine** [1] - 49:6
**imagines** [1] - 44:21
**immediate** [1] - 85:7
**impact** [3] - 87:6, 96:19, 100:9
**impair** [1] - 65:14
**impermissible** [1] - 4:16
**implemented** [1] - 24:7
**implicating** [4] - 29:5, 30:12, 30:20, 30:23
**implicit** [2] - 99:20, 99:22
**implied** [4] - 95:16, 99:15, 99:16
**importance** [3] - 18:17, 54:16, 54:18
**important** [7] - 58:2, 60:17, 70:23, 94:7, 94:25, 98:5, 113:4
**importantly** [2] - 116:22, 129:8

**impossible** [3] - 93:18, 116:25, 117:25
**improper** [2] - 4:13, 6:18
**impropriety** [1] - 31:9
**IN** [1] - 1:1
**in-depth** [1] - 57:2
**in-person** [2] - 63:6, 130:7
**inability** [1] - 82:14
**inaccurate** [5] - 14:18, 15:3, 63:4, 63:22, 96:22
**inadmissible** [3] - 7:10, 46:25, 49:3
**inappropriate** [1] - 20:3
**inauthentic** [5] - 56:1, 56:2, 56:5, 56:25, 58:22
**inauthenticity** [6] - 50:24, 50:25, 51:2, 53:8, 57:18, 58:18
**Inc** [2] - 4:4, 4:10
**incarceration** [1] - 40:24
**inception** [1] - 20:7
**incidentally** [1] - 41:2
**include** [1] - 110:5
**includes** [5] - 12:24, 13:14, 13:19, 28:19, 121:13
**including** [7] - 28:10, 28:13, 68:1, 88:25, 107:1, 107:17, 115:17
**income** [1] - 103:20
**incorporated** [2] - 55:21, 56:17
**Incorporated** [1] - 4:5
**incredibly** [2] - 12:14, 25:8
**independent** [3] - 116:18, 116:25, 117:13
**independently** [1] - 109:19
**index** [1] - 69:14
**indicate** [2] - 74:19, 74:21
**indicated** [4] - 32:7, 39:24, 44:7, 125:17
**indicating** [1] - 113:16
**indication** [1] - 115:8
**indicative** [3] - 115:15, 115:21, 116:1
**indictment** [1] - 75:7
**individual** [10] - 14:20,

28:10, 83:19, 110:19, 114:5, 114:13, 115:1, 115:4, 115:25, 131:3
**individuals** [2] - 4:11, 110:19
**indulgence** [1] - 16:18
**indulges** [1] - 10:8
**industry** [1] - 132:12
**inflammatory** [3] - 63:4, 63:22, 64:13
**influenced** [1] - 72:10
**information** [24] - 11:18, 14:8, 15:12, 19:24, 20:8, 21:9, 25:11, 29:8, 30:7, 30:10, 30:18, 32:8, 34:9, 35:9, 41:18, 43:22, 59:8, 61:24, 79:15, 108:25, 112:8, 116:21, 121:12, 121:16
**inherent** [1] - 90:6
**initial** [1] - 28:5
**initiation** [1] - 74:17
**inject** [1] - 119:24
**innocence** [8] - 4:21, 5:1, 5:6, 7:7, 109:14, 109:18, 109:21, 128:6
**innocent** [3] - 73:10, 109:10, 109:15
**innuendo** [1] - 5:10
**input** [5] - 36:22, 44:21, 111:14, 111:17, 112:7
**input/output** [1] - 25:7
**inputs** [7] - 36:2, 37:22, 95:18, 95:22, 96:16, 121:13, 122:1
**inspection** [1] - 10:8
**instance** [6] - 11:12, 14:10, 14:12, 23:5, 31:12, 69:2
**instances** [1] - 71:5
**instead** [7] - 12:9, 13:18, 20:10, 25:21, 27:6, 117:9, 117:16
**Institute** [1] - 28:12
**integrity** [1] - 66:8
**intend** [3] - 40:8, 107:23, 131:22
**intended** [1] - 32:4
**intent** [1] - 40:14
**interact** [1] - 81:15
**interactive** [1] - 17:5
**interest** [2] - 5:21, 6:12
**interesting** [3] - 97:3, 97:20, 104:20

**interim** [1] - 71:15, 71:18
**international** [1] - 88:24
**internet** [4] - 50:18, 53:3, 74:1, 74:4
**interrupt** [1] - 120:11
**interview** [2] - 123:18, 124:19
**interviews** [2] - 51:11, 67:21
**intimately** [1] - 40:20
**intimidating** [1] - 40:12
**introducing** [1] - 59:12
**invest** [2] - 80:6, 103:9
**investigation** [7] - 22:19, 23:13, 23:14, 25:9, 26:14, 28:18, 48:24
**investigations** [1] - 48:6
**investigative** [2] - 17:8, 48:10
**investing** [1] - 82:8
**Investments** [3] - 103:6, 103:7, 103:11
**investor** [2] - 82:7, 132:13
**invitation** [3] - 34:10, 43:16, 49:7
**invite** [1] - 48:16
**involved** [13] - 16:9, 22:19, 25:9, 34:6, 81:9, 84:8, 111:21, 111:24, 115:16, 117:2, 117:10, 123:10, 132:12
**involvement** [1] - 41:15
**involves** [1] - 78:18
**involving** [1] - 10:22
**IRC** [1] - 106:8
**irregularities** [1] - 44:19
**irrelevant** [7] - 6:6, 7:10, 7:17, 11:18, 18:13, 42:21, 49:13
**issue** [31] - 14:5, 14:7, 14:12, 19:12, 19:15, 19:22, 21:5, 21:8, 22:14, 25:20, 33:16, 34:21, 46:23, 48:16, 48:19, 49:2, 54:13, 55:22, 56:15, 59:9, 59:23, 60:4, 67:16, 68:8, 75:22, 75:25, 76:5, 92:13, 129:17, 131:17, 132:6

**issued** [5] - 8:9, 11:11, 12:8, 24:14, 42:15
**issues** [11] - 11:20, 13:7, 24:15, 34:14, 44:4, 44:6, 45:5, 45:12, 46:15, 47:1, 47:8, 57:1, 82:11, 104:7, 132:19
**issuing** [2] - 8:14, 9:20
**items** [2] - 8:21, 9:24
**itself** [6] - 16:23, 50:15, 91:22, 92:10, 117:19, 132:11

## J

**jail** [1] - 128:5
**January** [3] - 71:23, 72:21, 72:24
**Japan** [3] - 51:4, 54:6, 85:2
**Japanese** [5] - 46:9, 51:21, 52:3, 54:8, 56:10
**jean** [1] - 129:7
**job** [3] - 15:6, 15:8, 118:17
**jobs** [2] - 102:14, 104:24
**joined** [1] - 81:3
**Jonathan** [3] - 4:4, 11:7, 22:18
**JUDGE** [2] - 1:8, 1:8
**Judge** [12] - 8:1, 8:4, 8:7, 8:20, 9:14, 30:6, 34:17, 38:7, 59:9, 59:18, 59:22, 60:1
**June** [7] - 1:5, 49:21, 60:4, 60:6, 60:8, 80:22, 134:7
**juror** [5] - 68:12, 68:14, 70:17, 72:9, 73:23
**jurors** [4] - 66:3, 72:14, 73:4, 73:9
**jury** [15] - 5:8, 36:14, 49:2, 53:20, 57:12, 59:8, 59:23, 63:7, 65:20, 65:21, 66:9, 70:14, 73:8, 74:5
**JUSTICE** [1] - 1:13

## K

**Kappos** [1] - 28:14
**Karpeles** [11] - 44:25, 45:11, 45:13, 46:24, 51:19, 51:22, 51:24, 52:8, 54:7, 55:11

**keep** [6] - 82:9, 85:22, 94:17, 124:22, 126:20, 128:22

**key** [33] - 83:2, 83:5, 83:6, 83:7, 83:8, 83:10, 83:14, 83:15, 83:16, 83:21, 83:24, 92:24, 93:1, 93:5, 93:9, 95:4, 95:19, 95:22, 96:17, 99:19, 99:21, 100:3, 100:4, 100:7, 100:9, 110:18, 110:21, 111:5, 132:19

**keys** [10] - 82:4, 82:5, 83:1, 83:17, 93:17, 94:8, 94:11, 94:13, 99:24, 121:8

**kilometers** [3] - 91:1, 91:5, 91:11

**kind** [15] - 29:15, 31:9, 31:16, 42:18, 68:10, 83:10, 84:13, 87:5, 105:9, 105:14, 107:6, 116:25, 117:12, 117:13, 117:25

**kinds** [1] - 24:14

**knowing** [2] - 117:21, 117:24

**knowledge** [21] - 51:3, 51:18, 52:25, 53:12, 53:14, 53:22, 53:24, 54:4, 55:5, 55:6, 55:20, 56:7, 56:10, 56:13, 56:15, 56:16, 56:19, 57:8, 57:15, 57:24, 58:2

**known** [6] - 17:24, 18:1, 68:21, 82:15, 97:24, 116:5

**knows** [1] - 43:7

**KYC** [1] - 85:20

## L

**Labs** [1] - 115:17

**LAN** [1] - 79:6

**language** [3] - 12:6, 65:18, 74:21

**large** [9] - 5:3, 9:19, 13:19, 43:21, 91:10, 102:17, 114:9, 116:2, 116:14

**largely** [2] - 14:22, 79:16

**larger** [3] - 97:6, 97:11, 98:10

**last** [4] - 34:17, 81:1, 116:7, 131:19

**late** [3] - 62:10, 63:14, 132:7

**late-filed** [1] - 63:14

**latest** [1] - 6:16

**launch** [1] - 77:3

**laundering** [8] - 75:5, 85:20, 89:1, 104:16, 110:22, 122:9, 122:13, 122:19

**Law** [2] - 1:16, 4:5

**law** [11] - 12:6, 12:16, 12:21, 20:15, 48:24, 59:5, 68:13, 70:15, 72:10, 90:23, 91:3

**lawsuit** [1] - 15:17

**lawyer** [3] - 14:21, 14:22, 67:8

**lawyers** [5] - 67:4, 67:7, 69:12, 73:2, 76:1

**lay** [1] - 131:23

**layer** [2] - 82:17, 82:19

**layered** [1] - 50:13

**lazy** [1] - 15:2

**lead** [2] - 7:12, 118:22

**leading** [1] - 50:15

**leap** [1] - 94:22

**learn** [2] - 84:9, 84:10

**learned** [4] - 64:9, 108:10, 108:11, 108:15

**learning** [3] - 80:11, 80:13, 80:21

**least** [14] - 7:19, 8:2, 17:10, 17:12, 22:25, 23:25, 33:21, 37:17, 37:25, 39:18, 53:25, 56:13, 99:6, 107:15

**leave** [7] - 4:13, 7:21, 8:1, 9:15, 10:6, 102:21, 102:23

**led** [4] - 16:8, 28:18, 40:23, 45:8

**ledger** [2] - 92:19, 122:1

**Lee** [5] - 4:5, 11:7, 14:19, 14:20, 15:6

**left** [8] - 15:6, 25:5, 65:2, 89:13, 102:11, 102:13, 102:18, 118:9

**legal** [3] - 44:9, 49:19, 56:5

**legendary** [4] - 84:4, 105:25, 107:3, 107:4

**length** [1] - 12:14

**lengthening** [3] - 5:22, 6:1, 6:2

**less** [5] - 103:1, 105:12, 113:12,

120:24, 132:5

**letter** [3] - 15:14, 15:15

**level** [4] - 33:8, 36:19, 72:23, 113:13

**Levin** [3] - 4:4, 11:7, 22:18

**liability** [1] - 15:23

**Liberty** [1] - 110:14

**liberty** [1] - 16:15

**license** [1] - 27:5

**lifted** [1] - 65:18

**light** [2] - 43:1, 119:1

**likely** [6] - 37:9, 39:12, 56:21, 85:5, 90:9, 99:10

**limine** [13] - 44:9, 46:17, 47:3, 48:21, 48:23, 48:25, 49:5, 49:7, 49:11, 58:21, 60:7, 60:11

**limited** [2] - 28:14, 53:15, 74:22, 131:12

**limits** [1] - 34:11

**line** [1] - 37:12

**link** [1] - 95:2

**list** [4] - 26:12, 51:9, 62:4, 62:6

**listened** [2] - 108:11, 108:16

**listener** [2] - 52:14, 52:15

**lists** [2] - 10:9, 89:15

**Litecoin** [1] - 84:12

**literally** [2] - 35:2, 63:18

**literature** [1] - 116:6

**litigate** [1] - 7:13

**litigation** [4] - 6:18, 31:25, 32:6, 38:18

**live** [1] - 23:23

**LLP** [1] - 1:19

**load** [1] - 23:20

**local** [1] - 3:23

**lodging** [1] - 107:1

**login** [1] - 106:10

**logistically** [2] - 100:25, 101:1

**London** [1] - 28:12

**long-term** [1] - 80:23

**look** [24] - 18:20, 18:22, 18:25, 19:17, 23:23, 25:17, 27:5, 29:21, 32:12, 36:14, 37:8, 38:7, 48:4, 52:23, 55:8, 58:8, 86:11, 88:12, 88:13, 98:5, 104:11, 114:6

**looked** [1] - 87:14

**looking** [12] - 29:18,

58:5, 74:20, 82:8, 86:12, 94:10, 95:11, 104:9, 105:24, 117:17, 118:22, 131:17

**lost** [2] - 93:10, 98:12

**ludicrous** [1] - 39:1

**Lunch** [1] - 76:22

**lunch** [4] - 3:24, 76:7, 76:11, 76:13

**lying** [2] - 69:18, 69:19

## M

**macro** [2] - 113:13, 118:22

**macro-level** [1] - 113:13

**magazine** [2] - 68:18, 74:7

**main** [1] - 103:2

**maintain** [5] - 54:2, 56:23, 58:14, 58:17, 67:20

**maintaining** [1] - 79:17

**major** [6] - 81:10, 81:14, 123:19, 123:23, 123:25, 124:6

**majority** [2] - 106:20, 106:22

**malicious** [2] - 40:8, 40:11

**malware** [1] - 79:17

**manage** [1] - 85:10

**managed** [1] - 79:21

**manner** [1] - 13:19

**Mark** [4] - 44:24, 51:19, 54:7, 55:10

**mark** [1] - 44:25

**marked** [4] - 86:9, 86:19, 88:10, 96:5

**Market** [1] - 1:19

**market** [3] - 99:7, 102:14, 113:10

**marketing** [2] - 40:22

**markets** [3] - 99:5, 99:8, 99:11

**master's** [2] - 78:12, 78:19

**material** [5] - 22:17, 30:1, 31:7, 54:3, 123:1

**materials** [6] - 4:20, 6:8, 6:9, 9:5, 38:20, 109:20

**mathematics** [2] - 78:13, 97:25

**matter** [4] - 41:24,

98:15, 122:16, 128:20

**matters** [4] - 31:3, 42:21, 55:13, 55:15, 71:9, 77:7

**Mazarin** [1] - 129:7

**Mazarin's** [1] - 129:9

**Mazars** [2] - 129:7, 129:8

**meals** [1] - 106:21

**mean** [27] - 6:8, 10:20, 13:2, 16:22, 18:14, 24:24, 27:19, 36:16, 37:1, 43:8, 47:3, 48:15, 50:18, 52:22, 56:12, 56:20, 73:7, 76:10, 96:14, 101:16, 105:14, 117:4, 124:3, 124:16, 124:17, 130:13

**meaningful** [2] - 19:4, 27:21

**means** [7] - 14:14, 17:15, 24:4, 46:4, 81:7, 91:18, 109:14

**measure** [2] - 89:21, 90:24

**measured** [1] - 91:4

**measures** [1] - 90:25

**measuring** [1] - 91:9

**medal** [1] - 78:14

**media** [2] - 64:13, 65:10

**medians** [1] - 81:19

**medical** [1] - 116:11

**meet** [1] - 4:15

**meeting** [2] - 44:24, 108:4

**meetups** [1] - 70:19

**megabytes** [1] - 35:2

**Meiklejohn** [1] - 28:15

**member** [9] - 64:18, 65:9, 68:5, 80:5, 84:3, 84:4, 104:1, 107:7, 111:20

**members** [5] - 67:21, 68:22, 68:23, 111:25

**Memorandum** [1] - 4:5

**memory** [1] - 87:17

**mention** [1] - 65:6

**mentioned** [5] - 8:12, 79:9, 83:1, 103:16, 127:11

**mentioning** [1] - 132:18

**merits** [4] - 41:4, 42:25, 63:11, 64:4

**met** [1] - 129:5

**methodologies** [2] -

28:21, 114:23
**methodology** [5] - 93:22, 109:11, 109:16, 114:12, 115:1
**metrics** [1] - 113:9
**Mexico** [4] - 108:4, 108:12, 108:17, 125:23
**Miami** [1] - 7:2
**mic** [1] - 129:22
**Michael** [7] - 3:14, 4:4, 11:7, 11:13, 20:19, 22:18, 42:12
**MICHAEL** [1] - 1:16
**micro** [2] - 113:23, 114:7
**Microsoft** [2] - 35:25, 36:1
**might** [10] - 9:7, 18:20, 18:22, 37:16, 41:7, 53:20, 57:7, 59:14, 73:3, 130:24
**Mike** [1] - 24:12
**miles** [5] - 27:7, 27:9, 91:1, 91:4, 91:11
**Miller** [2] - 8:13, 8:17
**million** [3] - 75:6, 97:10
**mind** [4] - 28:24, 82:22, 101:23, 130:3
**mindful** [1] - 77:6
**Mine** [4] - 105:21, 106:1, 106:3, 106:7
**mined** [2] - 92:13, 92:15
**miner** [2] - 92:13, 92:15
**minimal** [1] - 59:5
**minimum** [1] - 115:22
**mining** [1] - 92:16
**minus** [1] - 98:2
**minutes** [8] - 7:4, 98:14, 118:9, 126:17, 126:18, 126:25, 127:1, 128:16
**miscalibrated** [1] - 90:25
**misrepresentations** [1] - 67:5
**missing** [5] - 51:15, 51:16, 52:19, 52:23, 55:2
**mistake** [2] - 36:15
**mistakes** [1] - 51:23
**mistaking** [1] - 91:11
**mitigated** [2] - 81:18, 90:3
**mixes** [1] - 50:19

**model** [3] - 31:23, 32:20, 95:1
**modeling** [1] - 32:10
**models** [1] - 16:10
**modify** [1] - 130:23
**moment** [4] - 21:17, 22:10, 43:11, 95:5
**Monero** [68] - 79:8, 80:7, 80:11, 80:14, 80:15, 80:21, 80:22, 80:25, 81:2, 81:3, 81:4, 81:9, 81:11, 81:14, 84:12, 97:2, 103:17, 103:21, 103:24, 104:2, 104:3, 104:7, 104:23, 104:24, 105:1, 105:3, 105:6, 105:7, 105:10, 105:20, 106:7, 108:11, 108:13, 111:1, 111:20, 118:5, 118:7, 118:13, 120:15, 120:20, 120:24, 121:2, 121:16, 122:2, 122:5, 122:6, 122:8, 122:10, 122:25, 123:1, 123:7, 123:11, 123:18, 123:19, 123:20, 123:23, 124:3, 124:5, 124:7, 124:8, 124:11, 124:21, 125:1, 125:2
**MoneroTopia** [5] - 108:4, 108:16, 108:19, 109:6, 109:8
**money** [11] - 71:12, 75:5, 75:6, 85:20, 89:1, 104:16, 105:2, 110:22, 122:9, 122:13, 122:19
**month** [5] - 34:2, 105:5, 105:8, 105:17, 105:18
**monthly** [3] - 105:8, 105:13, 105:19
**months** [1] - 25:16
**moot** [1] - 33:15
**morning** [11] - 3:6, 3:8, 3:10, 3:11, 3:13, 3:14, 3:16, 11:5, 20:21, 20:22
**Morrison** [1] - 11:16
**MORRISON** [1] - 1:19
**MOSS** [1] - 1:8
**most** [8] - 49:15, 63:3, 103:16, 103:18, 110:3, 117:11,

120:13, 129:8
**motion** [52] - 8:13, 8:17, 11:15, 21:12, 21:13, 21:14, 21:16, 21:18, 22:1, 24:15, 33:13, 33:15, 33:20, 33:23, 39:3, 42:10, 42:12, 46:17, 47:2, 48:20, 48:23, 48:25, 49:5, 49:7, 49:11, 57:11, 58:21, 60:13, 61:3, 61:4, 61:5, 61:8, 62:7, 62:11, 62:22, 63:17, 63:18, 63:19, 63:20, 63:21, 64:1, 64:10, 74:14, 76:25, 77:1, 77:17, 129:1
**Motion** [2] - 4:2, 4:3
**MOTIONS** [2] - 1:4, 1:7
**motions** [9] - 3:19, 3:21, 3:25, 4:23, 44:8, 60:7, 60:11, 75:25, 77:4
**motor** [1] - 90:25
**Movants** [1] - 1:18
**move** [12] - 5:12, 11:17, 20:24, 31:19, 34:15, 61:7, 83:21, 86:19, 87:2, 95:20, 96:5, 121:7
**moved** [5] - 26:14, 43:22, 43:23, 91:9, 103:4
**moving** [7] - 4:9, 12:7, 33:2, 33:7, 42:15, 93:17, 94:14
**MR** [182] - 3:6, 3:11, 3:14, 4:8, 5:14, 5:18, 6:4, 6:24, 7:24, 8:18, 9:13, 10:13, 10:19, 11:5, 11:25, 12:3, 15:20, 16:2, 16:5, 16:17, 16:22, 17:2, 17:13, 19:7, 19:11, 20:17, 20:21, 20:23, 21:2, 21:5, 21:8, 21:14, 21:21, 22:13, 22:21, 22:23, 23:4, 23:11, 24:1, 24:11, 26:5, 26:8, 28:2, 28:4, 28:5, 28:25, 29:14, 30:9, 31:12, 31:20, 32:14, 33:10, 34:20, 34:23, 35:5, 36:7, 36:16, 37:19, 38:17, 39:21, 40:1, 40:14, 41:9, 42:2, 42:14, 44:13, 45:24,

46:2, 47:14, 47:16, 47:19, 47:20, 47:24, 48:4, 48:8, 48:12, 48:15, 50:3, 50:9, 50:25, 51:2, 52:10, 52:12, 52:14, 52:18, 52:25, 54:2, 54:17, 55:4, 55:9, 55:16, 56:3, 56:6, 56:21, 57:17, 57:21, 57:23, 58:14, 59:3, 60:6, 60:10, 60:13, 60:20, 60:21, 62:9, 62:15, 62:22, 64:18, 64:22, 64:25, 65:13, 66:17, 66:19, 66:23, 67:1, 67:9, 67:20, 68:2, 68:6, 68:9, 69:9, 69:14, 69:22, 69:24, 70:2, 70:8, 70:11, 70:22, 71:17, 71:20, 72:8, 72:19, 73:5, 73:13, 73:21, 74:6, 74:14, 75:5, 75:8, 75:12, 76:9, 76:12, 76:14, 76:18, 76:20, 77:3, 77:9, 77:14, 77:15, 77:18, 78:4, 78:7, 81:21, 86:6, 86:8, 86:18, 86:25, 87:1, 88:7, 88:9, 96:4, 96:11, 98:12, 98:16, 98:18, 101:20, 126:10, 126:13, 126:20, 126:23, 127:2, 127:7, 127:10, 128:12, 129:20, 129:23, 130:4, 130:9, 130:12, 130:20, 131:18, 132:25
**MS** [29] - 3:8, 23:17, 66:11, 66:18, 86:22, 96:8, 101:22, 102:4, 107:12, 112:24, 113:5, 116:16, 118:1, 118:15, 120:8, 120:12, 120:14, 121:24, 125:5, 125:10, 125:24, 126:4, 126:7, 126:16, 128:18, 128:24, 129:16, 131:1, 132:22
**Mt** [52] - 43:20, 44:8, 44:11, 44:15, 44:16, 45:2, 45:4, 45:5, 45:9, 45:15, 45:20, 46:3, 46:8, 46:15,

47:3, 48:20, 50:5, 50:14, 50:22, 51:5, 51:6, 51:13, 51:15, 51:20, 51:21, 53:2, 53:3, 54:4, 55:21, 56:7, 57:18, 57:19, 57:24, 58:16, 60:23, 61:9, 84:14, 84:15, 84:16, 84:17, 84:19, 84:22, 84:25, 85:2, 85:11, 85:14, 85:21, 86:1, 86:4, 110:13
**mudslinging** [1] - 15:9
**multihop** [1] - 50:11
**multiple** [3] - 50:14, 51:11, 100:8
**Munich** [1] - 70:18
**must** [4] - 36:11, 119:9, 119:22, 119:24

**N**

**N.W** [1] - 134:11
**name** [7] - 3:4, 8:10, 43:21, 50:16, 105:20, 105:22, 106:7
**named** [1] - 98:20
**narrow** [4] - 26:12, 37:6, 43:15, 132:14
**narrowly** [2] - 14:15, 131:25
**national** [3] - 68:17, 72:20, 74:7
**native** [1] - 28:23
**natural** [1] - 90:16
**nature** [5] - 32:25, 39:17, 44:22, 82:1, 107:14
**necessarily** [1] - 110:16
**necessary** [6] - 13:12, 39:5, 58:17, 71:14, 72:23, 75:14
**necessity** [1] - 29:13
**need** [65] - 6:9, 7:20, 9:9, 9:18, 9:22, 13:5, 14:7, 14:8, 15:12, 22:12, 24:1, 29:12, 29:21, 30:7, 31:10, 32:8, 32:18, 32:21, 32:22, 33:1, 33:2, 33:4, 33:5, 33:6, 33:7, 33:20, 34:1, 34:4, 34:10, 34:13, 34:18, 35:17, 35:19, 35:24, 36:12, 36:21, 36:24, 37:3, 37:12, 43:6, 52:23, 53:16,

53:21, 53:25, 54:20, 55:3, 55:19, 61:13, 61:18, 62:2, 62:21, 64:12, 76:15, 112:22, 114:1, 115:11, 117:19, 118:4, 118:5, 126:23, 129:11, 129:20, 129:23, 130:7, 132:8

**needed** [1] - 85:19

**needs** [4] - 12:7, 29:17, 57:5, 66:7

**negative** [3] - 72:20, 72:22, 128:10

**negotiate** [1] - 25:19

**negotiating** [1] - 15:4

**network** [3] - 79:9, 79:23, 103:12

**never** [6] - 26:21, 27:16, 40:7, 82:17, 118:2, 118:4

**New** [2] - 1:17, 107:16

**newspaper** [1] - 68:17

**next** [16] - 11:14, 11:21, 42:10, 42:16, 43:3, 47:2, 62:6, 77:10, 92:20, 119:22, 128:16, 128:25, 129:3, 129:10, 130:13, 132:20

**Nixon** [8] - 4:15, 10:3, 12:16, 24:22, 26:17, 27:13, 31:22, 39:15

**nobody** [3] - 26:22, 55:6, 67:17

**noise** [8] - 78:24, 79:1, 90:4, 90:20, 91:12, 115:25

**noise-type** [2] - 90:20, 91:12

**non** [1] - 129:6

**non-blockchain** [1] - 129:6

**none** [3] - 6:3, 64:11, 96:8

**Nonparty** [1] - 4:3

**nonsense** [1] - 49:16

**nontransparent** [1] - 121:2

**normal** [2] - 31:25, 92:20

**normally** [1] - 113:8

**note** [2] - 62:9, 113:4

**notes** [2] - 28:10, 134:5

**nothing** [14] - 19:25, 20:17, 24:25, 25:2, 35:1, 65:17, 67:18,

72:23, 93:2, 93:6, 93:18, 132:22, 132:25

**notice** [5] - 40:5, 77:25, 131:21, 131:24, 132:4

**noticed** [3] - 44:5, 44:19, 44:23

**noting** [1] - 22:14

**notion** [1] - 32:8

**novel** [1] - 41:6

**number** [15] - 4:12, 4:14, 14:2, 23:4, 45:5, 80:18, 87:20, 89:13, 89:15, 97:23, 98:7, 98:8, 104:6, 124:14, 128:5

**numbers** [3] - 91:10, 114:9, 116:2

**Numbers** [1] - 4:1

**NW** [3] - 1:11, 1:14, 1:23

**NY** [1] - 1:17

## O

**oath** [1] - 68:1

**obfuscating** [1] - 81:7

**object** [1] - 28:20

**objection** [6] - 86:21, 86:22, 96:7, 126:9, 126:13, 131:1

**objections** [1] - 63:16

**objects** [2] - 9:2, 20:23

**obligated** [1] - 123:5

**obligation** [3] - 21:24, 34:23, 41:19

**obligations** [6] - 21:20, 24:19, 40:6, 62:17, 62:19, 63:9

**observation** [4] - 45:19, 45:21, 45:22, 45:24

**observe** [1] - 123:4

**observed** [1] - 123:2

**observer** [1] - 46:13

**obtain** [2] - 11:18, 13:22

**obtained** [2] - 78:10, 78:11

**obviate** [1] - 53:25

**obvious** [3] - 43:1, 50:4, 124:5

**obviously** [9] - 14:21, 17:4, 36:17, 41:25, 45:16, 49:12, 53:20, 56:24, 105:11

**occurred** [3] - 103:18, 114:12, 114:13

**occurring** [2] - 21:21, 94:21

**October** [1] - 80:2

**odd** [1] - 79:22

**OF** [8] - 1:1, 1:2, 1:7, 1:13, 78:5, 102:2, 127:8, 134:1

**off-chain** [2] - 99:19, 99:24

**off-guard** [1] - 132:2

**offense** [1] - 5:7

**offer** [5] - 54:22, 61:22, 61:24, 131:22, 132:15

**offered** [1] - 8:22

**offering** [3] - 130:19, 131:13, 132:16

**office** [1] - 26:20

**Office** [1] - 8:3

**officer** [2] - 69:3, 91:3

**Official** [2] - 1:22, 134:10

**OFFICIAL** [1] - 134:1

**older** [1] - 10:24

**once** [1] - 121:7

**One** [1] - 72:2

**one** [82] - 4:12, 5:9, 7:3, 8:15, 11:22, 14:7, 14:16, 14:19, 20:10, 22:16, 24:9, 30:4, 35:12, 35:23, 39:11, 39:20, 42:12, 44:22, 45:5, 45:22, 51:6, 51:14, 52:7, 52:11, 53:1, 53:7, 53:18, 56:9, 57:5, 58:6, 60:5, 60:7, 60:13, 62:4, 62:6, 64:16, 65:4, 78:22, 78:23, 79:12, 84:18, 84:22, 87:10, 87:13, 89:9, 90:12, 92:20, 93:13, 94:15, 95:22, 96:1, 96:15, 97:1, 97:5, 97:10, 98:15, 98:16, 99:1, 99:5, 100:5, 104:13, 104:20, 106:20, 108:13, 111:6, 111:17, 111:19, 116:3, 116:21, 117:1, 117:16, 119:8, 122:8, 122:15, 122:22, 123:19, 124:6, 127:3, 127:23, 129:4

**one's** [1] - 28:10

**one-sided** [2] - 45:22, 58:6

**ones** [5] - 88:3, 95:16,

115:9, 117:2

**ongoing** [1] - 66:14

**opaque** [1] - 26:16

**open** [2] - 32:4, 87:8

**open-source** [1] - 87:8

**opening** [1] - 62:11

**operated** [1] - 50:11

**operating** [1] - 41:2

**operational** [1] - 41:3

**operator** [1] - 79:3

**opine** [2] - 41:4, 46:14

**opined** [1] - 45:12

**opines** [1] - 16:8

**opinion** [10] - 8:2, 16:7, 16:16, 37:14, 37:20, 61:19, 90:9, 124:1, 132:17

**opinions** [5] - 20:5, 46:6, 46:16, 46:19, 46:21

**opportunities** [1] - 102:19

**opportunity** [10] - 7:4, 13:6, 16:15, 18:19, 19:5, 33:5, 42:17, 47:9, 98:22, 98:23

**opposed** [4] - 64:10, 113:9, 122:12, 122:20

**opposing** [1] - 26:11

**opposition** [8] - 20:11, 48:19, 49:10, 50:6, 62:10, 63:14, 78:1, 130:5

**oral** [1] - 62:13

**order** [32] - 3:22, 9:1, 9:5, 9:11, 11:24, 12:19, 13:2, 18:16, 29:8, 30:7, 31:10, 32:8, 32:19, 32:22, 33:8, 38:21, 41:20, 55:18, 62:16, 62:17, 64:14, 65:17, 67:11, 67:17, 75:14, 75:17, 75:22, 76:5, 77:4, 115:6

**orderly** [1] - 8:14

**orders** [1] - 75:25

**ordinarily** [1] - 121:22

**organizes** [1] - 101:2

**original** [4] - 56:8, 93:9, 93:10

**otherwise** [2] - 62:3, 114:11

**ought** [1] - 72:2

**outdated** [1] - 25:25

**output** [4] - 31:16, 36:23, 44:21, 97:21

**outputs** [5] - 36:3,

37:22, 100:20, 121:13, 122:1

**outreach** [2] - 71:4, 71:13

**outright** [1] - 15:3

**outset** [1] - 62:10

**outside** [3] - 4:20, 30:11, 79:3

**overall** [5] - 82:9, 97:18, 98:6, 98:7, 105:7

**overbroad** [2] - 4:15, 131:21

**overlap** [2] - 130:17, 132:5

**overwhelming** [1] - 72:20

**owes** [1] - 45:17

**own** [9] - 36:3, 52:22, 79:12, 79:21, 79:22, 103:15, 119:18, 119:19

**ownership** [1] - 92:5

**owns** [1] - 83:15

## P

**p.m** [3] - 76:22, 133:3

**P2P** [2] - 113:9, 114:4

**PAGE** [2] - 2:2, 2:10

**page** [11] - 67:10, 88:15, 89:7, 89:10, 89:11, 112:3, 112:15, 112:18, 112:19, 112:25

**pages** [1] - 12:14

**paid** [5] - 48:2, 92:17, 106:17, 106:20, 106:25

**pair** [5] - 95:19, 96:17, 96:18, 99:21, 100:7

**pairs** [4] - 95:22, 100:3, 100:4, 100:9

**panel** [1] - 108:18

**paper** [8] - 28:17, 30:11, 30:20, 38:21, 41:10, 41:12, 94:25, 127:19

**papers** [5] - 9:2, 10:9, 28:20, 104:6, 132:11

**paragraph** [8] - 112:14, 112:17, 112:18, 112:19, 112:25, 113:3, 113:6, 113:14

**pardon** [2] - 102:22, 125:20

**Part** [1] - 13:13

**part** [20] - 5:8, 8:8, 13:19, 14:1, 17:1,

20:2, 26:12, 29:7,
52:10, 52:11, 59:20,
104:3, 108:21,
110:10, 110:11,
110:14, 111:1,
118:17, 122:5,
131:19
**participated** [1] - 65:1
**participating** [2] -
99:8, 99:9
**particular** [22] - 12:15,
16:9, 19:12, 19:20,
32:21, 37:6, 38:15,
59:14, 70:3, 78:16,
81:13, 81:17, 87:18,
87:19, 87:25, 98:4,
99:3, 102:14,
104:22, 107:14,
109:1, 118:11
**particularly** [9] -
54:19, 74:24, 82:4,
84:8, 97:2, 100:10,
114:9, 129:24, 130:6
**parties** [6] - 3:20,
9:22, 42:1, 53:10,
62:13, 75:23
**parties'** [1] - 17:10
**partner** [1] - 129:9
**party** [10] - 4:10, 5:13,
12:7, 20:25, 21:4,
46:13, 46:18, 47:6,
48:17, 101:3
**pass** [3] - 98:17,
101:20, 129:13
**passed** [3] - 59:25,
101:23, 129:9
**past** [1] - 98:14
**pasted** [1] - 63:18
**patently** [1] - 15:24
**pause** [1] - 27:18
**paying** [2] - 29:3,
30:15
**payment** [5] - 47:25,
50:16, 71:16, 71:19
**PELKER** [30] - 1:13,
3:8, 23:17, 66:11,
66:18, 86:22, 96:8,
101:22, 102:4,
107:12, 112:24,
113:5, 116:16,
118:1, 118:15,
120:8, 120:12,
120:14, 121:24,
125:5, 125:10,
125:24, 126:4,
126:7, 126:16,
128:18, 128:24,
129:16, 131:1,
132:22
**Pelker** [10] - 2:6, 3:8,

42:6, 64:19, 69:14,
70:3, 70:4, 76:25,
77:1, 101:21
**Pelker's** [1] - 76:9
**penalty** [1] - 32:17
**pending** [1] - 29:2
**penetration** [1] - 7:15
**Pennsylvania** [1] -
1:14
**people** [20] - 9:9, 45:6,
46:14, 49:18, 67:25,
71:5, 71:6, 72:16,
73:11, 73:18, 74:1,
81:16, 82:19, 95:9,
95:20, 99:8, 100:17,
100:20, 100:21,
102:17
**per** [6] - 91:1, 91:4,
91:5, 105:17, 105:18
**perceive** [1] - 122:9
**perceived** [1] - 41:7
**percent** [7] - 80:24,
87:25, 89:17,
103:22, 118:12
**percentage** [8] -
87:15, 87:20, 89:5,
101:11, 101:17,
101:18, 103:18,
114:25
**perception** [1] -
122:11
**percipient** [3] - 46:3,
46:4, 51:18
**perfectly** [1] - 72:5
**perform** [1] - 14:3
**perhaps** [4] - 8:25,
21:14, 22:1, 37:19
**period** [4] - 65:11,
88:6, 109:12, 129:14
**perjury** [1] - 32:17
**permit** [1] - 74:19
**person** [23] - 32:15,
43:7, 45:3, 54:21,
63:6, 93:4, 93:8,
93:10, 94:13, 94:19,
94:23, 95:4, 99:19,
99:22, 100:14,
121:8, 128:4, 128:6,
128:8, 128:11,
130:7, 130:11
**personal** [16] - 52:25,
53:12, 53:14, 53:22,
53:24, 55:5, 55:20,
56:7, 56:13, 56:15,
56:16, 56:19, 57:8,
57:15, 57:24, 58:2
**personally** [1] -
111:24
**persons** [5] - 94:13,
94:20, 94:23, 95:4,

99:20
**perspective** [2] - 82:7,
87:6
**persuasive** [1] - 64:12
**pet** [1] - 7:8
**Ph.D** [2] - 78:10, 78:19
**phone** [1] - 25:21
**phrase** [2] - 90:13,
94:5
**physicist** [1] - 102:5
**physics** [9] - 78:10,
78:12, 78:16, 78:17,
78:18, 132:9
**Physics** [1] - 102:7
**picking** [1] - 22:13
**picture** [1] - 118:22
**piece** [4] - 13:3, 16:20,
36:9, 50:10
**pile** [1] - 9:8
**place** [6] - 18:16,
19:23, 32:5, 62:18,
84:9, 84:12
**placed** [1] - 73:25
**places** [1] - 13:7
**plain** [1] - 12:5
**Plaintiff** [2] - 1:3, 1:10
**plan** [1] - 103:20
**planning** [1] - 6:25
**plausible** [2] - 121:11,
127:17
**playing** [1] - 29:25
**pleadings** [1] - 62:23
**PLLC** [1] - 1:16
**plug** [1] - 34:25
**plus** [4] - 35:23, 36:4,
36:8
**Podcast** [1] - 6:22
**podcast** [5] - 6:22,
7:2, 62:25, 124:19
**podcasts** [6] - 6:20,
40:2, 63:6, 65:23,
70:22, 108:13
**point** [36] - 9:18, 9:19,
10:18, 22:5, 22:25,
24:9, 24:18, 29:15,
33:17, 34:14, 36:24,
37:2, 38:12, 44:15,
46:11, 50:4, 56:6,
56:12, 61:12, 62:1,
64:3, 72:22, 73:5,
75:13, 75:16, 84:18,
96:4, 108:21, 109:2,
109:19, 111:2,
119:17, 121:5,
124:2, 125:24,
131:10
**pointed** [2] - 19:12,
126:2
**pointing** [1] - 29:23
**points** [3] - 19:21,

26:9, 120:9
**policing** [3] - 4:18,
5:15, 11:1
**Policy** [8] - 104:3,
104:24, 105:6,
111:1, 111:20,
122:6, 123:1
**policy** [1] - 104:7
**pool** [4] - 63:7, 66:9,
68:12, 70:14
**popular** [1] - 95:7
**portfolio** [1] - 103:8
**portion** [5] - 36:12,
37:13, 37:17,
103:20, 114:4
**portions** [1] - 114:15
**pose** [1] - 63:6
**position** [10] - 34:2,
34:16, 46:20, 48:3,
48:6, 54:5, 54:17,
111:19, 122:17,
131:15
**positions** [1] - 104:23
**positive** [2] - 128:8,
128:10
**possibility** [4] - 59:21,
72:9, 72:12, 127:24
**possible** [5] - 72:14,
93:11, 101:14,
117:12, 127:4
**possibly** [1] - 38:3
**post** [4] - 6:25, 106:7,
106:13, 125:14
**post-trial** [1] - 6:25
**postdoctoral** [1] -
102:8
**posted** [1] - 74:3
**posting** [1] - 73:24
**posts** [2] - 42:23,
104:7
**posture** [1] - 26:16
**potential** [11] - 5:21,
36:12, 37:5, 41:8,
43:18, 44:6, 46:7,
70:14, 82:5, 125:1,
128:7
**potentially** [3] - 20:7,
68:11, 119:5
**practice** [3] - 25:25,
26:10, 38:18
**practicing** [2] - 62:18,
65:5
**Prague** [2] - 105:10,
120:18
**precedent** [1] - 40:10
**precisely** [1] - 102:24
**preclude** [1] - 77:1
**predict** [1] - 57:21
**predictive** [1] - 32:20
**prejudge** [1] - 37:1

**prejudice** [5] - 29:21,
33:13, 61:5, 65:21
**premiere** [1] - 107:7
**premise** [3] - 109:15,
119:8, 121:9
**preparation** [1] -
60:16
**prepare** [4] - 30:7,
32:15, 32:23, 34:4
**present** [6] - 3:12,
33:23, 61:17, 63:7,
75:24, 108:17
**presentation** [2] - 5:5,
29:9
**presented** [5] - 29:4,
30:12, 30:16, 41:12,
96:3
**presenting** [1] - 23:18
**preservation** [2] -
40:5, 40:6
**President's** [1] - 26:19
**press** [9] - 62:25,
65:14, 65:22, 68:5,
71:2, 72:22, 74:6,
74:16
**presumably** [2] -
48:20, 95:10
**presume** [1] - 127:15
**presumption** [3] -
28:17, 109:17,
109:18
**pretrial** [6] - 3:19,
10:8, 54:1, 54:19,
58:16, 60:11
**pretty** [2] - 36:11,
37:14
**preventing** [4] - 5:21,
6:12, 85:1, 110:22
**previewed** [1] - 130:5
**previously** [1] -
112:25
**price** [3] - 81:13, 85:8,
123:23
**primarily** [3] - 81:10,
85:19, 110:8
**primary** [4] - 4:18,
50:9, 120:15
**Prince** [2] - 80:3,
103:4
**principal** [3] - 130:18,
131:13, 132:2
**privacy** [6] - 81:16,
95:1, 100:24, 101:7,
124:23, 127:20
**private** [23] - 21:23,
24:20, 26:15, 41:17,
73:25, 79:15, 82:5,
83:1, 83:2, 83:7,
83:14, 83:15, 83:21,
83:23, 92:24, 93:1,

93:5, 93:9, 93:17, 94:18, 99:18, 99:24
**private/public** [2] - 95:18, 100:3
**privately** [1] - 125:22
**privileged** [1] - 14:22
**privileges** [1] - 14:24
**probabilistic** [4] - 24:5
**probability** [4] - 68:14, 70:17, 73:23, 117:24
**problem** [19] - 14:1, 26:13, 32:12, 36:11, 37:6, 38:15, 41:16, 55:10, 63:8, 72:16, 72:17, 74:1, 82:13, 85:15, 97:3, 97:20, 99:14, 129:12, 129:24
**problematic** [1] - 24:21
**problems** [8] - 76:4, 80:10, 82:12, 82:14, 82:24, 85:5, 85:6, 97:5
**procedural** [3] - 5:16, 7:19, 12:11
**procedurally** [1] - 4:12
**procedure** [1] - 8:15
**Procedure** [1] - 25:25
**proceed** [5] - 3:19, 62:8, 77:15, 77:17, 78:3
**proceeding** [2] - 30:23, 128:17
**proceedings** [4] - 76:6, 76:16, 76:23, 134:6
**process** [5] - 5:23, 40:21, 66:2, 72:6, 73:9
**processes** [2] - 17:25, 18:2
**processing** [2] - 31:14, 78:20
**produce** [7] - 8:21, 9:2, 16:12, 21:24, 22:8, 27:1, 27:4
**produced** [12] - 9:6, 9:9, 21:9, 23:21, 25:20, 30:10, 35:2, 35:10, 35:12, 36:23, 98:20, 110:2
**producing** [2] - 37:17, 39:11
**product** [1] - 19:20
**production** [6] - 9:15, 9:21, 12:7, 25:13, 39:18
**products** [3] - 14:2, 14:3, 15:21

**Professional** [1] - 65:6
**proffered** [2] - 77:18, 98:19
**profile** [1] - 106:5
**profiles** [1] - 105:24
**profound** [1] - 100:9
**program** [1] - 79:5
**programs** [1] - 122:10
**project** [5] - 81:5, 81:9, 105:1, 105:3, 107:9
**prolonging** [1] - 7:12
**promised** [1] - 42:11
**promoting** [1] - 68:10
**proper** [2] - 19:14, 21:25
**properly** [2] - 19:21, 34:10
**property** [1] - 103:9
**proponent** [1] - 60:25
**proportion** [1] - 89:12
**proposal** [1] - 122:23
**proposals** [1] - 122:24
**proposed** [7] - 3:20, 9:21, 62:16, 62:17, 65:17, 104:22, 122:13
**proprietary** [6] - 18:15, 87:25, 116:22, 116:23, 117:11, 117:20
**propriety** [3] - 5:16, 8:9, 11:2
**prosecuting** [1] - 7:8
**prosecution** [12] - 28:18, 40:9, 40:11, 64:19, 67:18, 67:21, 67:22, 68:4, 68:23, 68:24, 69:6
**prosecutor** [4] - 67:9, 67:12, 67:13, 67:15
**prosecutors** [3] - 63:3, 69:4, 75:1
**prospective** [3] - 63:12, 72:14, 73:4
**prospectively** [1] - 67:16
**protective** [4] - 18:16, 29:8, 38:21, 41:19
**protocol** [1] - 124:18
**proud** [1] - 84:15
**prove** [2] - 38:7, 128:6
**proven** [1] - 109:15
**provide** [3] - 39:13, 59:8, 61:25
**Providers** [1] - 88:20
**provides** [1] - 88:24
**providing** [2] - 112:8, 113:9

**public** [34] - 29:9, 35:8, 41:18, 42:22, 49:20, 65:23, 71:4, 71:13, 82:4, 83:6, 83:10, 83:14, 83:16, 83:17, 83:20, 93:15, 94:8, 94:11, 94:21, 95:3, 104:16, 108:13, 110:18, 110:21, 110:25, 111:11, 111:14, 111:17, 121:7, 122:1, 123:13, 125:11
**public/private** [2] - 83:5, 95:22, 96:17, 100:4
**publicity** [4] - 70:25, 72:20, 72:23
**publicly** [7] - 29:4, 30:16, 30:20, 35:9, 41:12, 95:15, 105:20
**published** [3] - 30:21, 41:13, 89:5
**pulled** [1] - 34:24
**pulling** [1] - 35:7
**purchase** [1] - 80:3
**purchasing** [1] - 80:22
**purpose** [7] - 17:7, 18:5, 49:4, 49:25, 55:3, 57:16, 65:21
**purposes** [10] - 30:1, 33:23, 42:18, 43:2, 43:24, 54:3, 61:17, 61:18, 75:24, 131:22
**pursue** [1] - 40:8
**pushed** [1] - 61:11
**put** [25] - 31:11, 32:9, 34:2, 35:21, 36:3, 36:13, 38:19, 40:5, 46:5, 47:10, 50:6, 50:12, 57:7, 59:24, 63:5, 67:25, 69:16, 85:9, 92:24, 100:5, 111:13, 125:18, 131:15, 132:4
**putting** [2] - 42:22, 58:11

## Q

**qualification** [1] - 61:22
**qualifications** [1] - 44:2
**qualitative** [1] - 10:10
**quash** [16] - 3:21, 4:1, 4:9, 5:13, 8:17, 11:15, 20:24, 21:16, 24:16, 33:13, 33:23,

42:12, 42:15, 43:23, 61:3, 76:25
**Quash** [2] - 4:2, 4:3
**quashed** [2] - 11:11, 20:3
**quashing** [1] - 33:19
**questionable** [1] - 46:5
**questions** [6] - 7:14, 43:20, 48:13, 55:16, 121:23, 128:12
**quickly** [3] - 33:7, 33:25, 34:15
**quietly** [1] - 71:9
**quite** [4] - 27:11, 27:23, 53:15, 58:12
**quote** [5] - 62:21, 68:19, 110:20, 123:2, 123:19
**quoted** [1] - 6:22

## R

**race** [3] - 124:9, 124:11, 124:23
**radar** [1] - 90:24
**Rainer** [1] - 28:14
**raise** [4] - 59:23, 72:5, 76:7, 77:21
**raised** [6] - 8:16, 22:5, 24:2, 59:9, 63:16, 71:13
**raises** [3] - 21:8, 55:16, 82:11
**ran** [1] - 35:22
**RANDOLPH** [1] - 1:8
**random** [9] - 78:23, 78:24, 90:2, 90:4, 90:20, 91:7, 115:24, 115:25
**range** [8] - 80:19, 89:17, 89:23, 90:6, 96:22, 105:9, 105:15, 115:1
**ranges** [4] - 89:5, 89:16, 89:19, 89:23
**ranging** [4] - 13:7, 13:18, 13:24, 14:17
**rather** [11] - 14:4, 20:6, 30:6, 31:8, 31:10, 49:5, 57:1, 57:2, 58:11, 115:5, 128:19
**raw** [3] - 35:6, 35:16, 35:20
**reach** [3] - 33:20, 49:12, 119:13
**reached** [1] - 119:18
**reaching** [1] - 46:19
**Reactor** [10] - 23:6,

23:20, 27:5, 43:21, 55:22, 56:9, 71:8, 87:4, 88:1
**reactor** [1] - 117:16
**reactors** [1] - 117:17
**read** [14] - 8:19, 8:20, 9:14, 10:11, 10:20, 15:12, 69:1, 73:14, 73:15, 98:22, 98:23, 116:10, 132:11
**reading** [5] - 9:4, 10:15, 39:6, 39:8, 73:19
**real** [9] - 27:18, 29:13, 82:23, 99:25, 103:3, 103:8, 103:11, 103:23, 128:7
**realistically** [2] - 103:22, 105:13
**realize** [3] - 27:14, 71:7, 94:16
**realized** [3] - 80:11, 85:5, 85:14
**really** [20] - 4:25, 5:6, 7:9, 9:10, 13:24, 26:1, 27:2, 27:21, 28:8, 30:1, 30:4, 36:8, 64:11, 78:22, 84:9, 84:22, 118:8, 130:6, 131:6, 132:10
**reason** [22] - 6:18, 20:2, 23:15, 37:10, 38:14, 39:14, 39:17, 48:21, 50:20, 59:3, 60:1, 60:21, 66:6, 74:15, 84:24, 90:19, 95:6, 100:13, 100:22, 102:13, 103:2
**reasonable** [7] - 68:14, 70:17, 72:9, 72:11, 73:23, 105:19, 109:17
**reasonably** [1] - 41:7
**reasons** [4] - 4:11, 24:2, 122:15, 122:22
**rebut** [1] - 35:24
**receive** [1] - 105:2
**received** [2] - 51:9, 109:4
**receiving** [3] - 48:1, 51:12, 62:24
**recent** [1] - 49:21
**recently** [4] - 26:4, 26:7, 45:6, 49:15
**recess** [1] - 76:22
**Recess** [1] - 42:9
**recognizes** [1] - 113:7
**recommend** [1] - 33:7
**recommendations** [1]

- 88:24
**record** [9] - 3:4, 38:19, 39:1, 39:4, 41:1, 66:12, 66:19, 88:16, 92:12
**recorded** [1] - 121:12
**records** [12] - 18:11, 28:9, 39:18, 55:12, 60:16, 60:22, 60:23, 60:25, 91:1, 110:12, 110:13
**red** [1] - 36:25
**Reddit** [5] - 106:1, 106:3, 106:5, 124:24, 125:9
**redirect** [1] - 126:18
**Redirect** [1] - 2:7
**REDIRECT** [1] - 127:8
**refer** [2] - 43:1, 90:18
**reference** [2] - 29:1, 112:24
**referenced** [2] - 15:13, 68:25
**referred** [1] - 16:3
**reflect** [2] - 4:15, 26:2
**reflected** [1] - 49:14
**reflects** [1] - 86:15
**refrain** [1] - 40:14
**refresh** [1] - 88:4
**regard** [1] - 37:11
**regarding** [4] - 13:15, 20:5, 111:8, 112:2
**regardless** [1] - 24:1
**registration** [1] - 50:16
**regs** [1] - 14:24
**regular** [2] - 49:21, 113:25
**regularly** [1] - 107:10
**regulates** [1] - 112:12
**regulations** [3] - 85:19, 89:2, 111:22
**reimbursed** [1] - 106:19
**reject** [1] - 72:21
**relate** [1] - 13:11
**related** [12] - 14:8, 18:11, 28:16, 43:20, 45:5, 45:14, 47:3, 48:6, 57:18, 81:5, 96:14, 96:21
**relating** [5] - 3:22, 7:15, 16:3, 61:19, 115:4
**relation** [3] - 78:15, 89:5, 96:13
**relationship** [1] - 110:17
**relationships** [1] - 94:10

**relative** [15] - 89:21, 90:5, 97:6, 97:17, 98:5, 114:19, 115:5, 115:9, 115:15, 115:20, 115:21, 117:18, 120:3, 120:4
**relatively** [1] - 61:15
**release** [3] - 71:2, 74:6, 74:16
**released** [1] - 71:1
**releases** [1] - 74:17
**releasing** [1] - 29:25
**relevance** [7] - 4:19, 5:15, 10:4, 12:17, 30:24, 39:16, 54:25
**relevant** [27] - 4:20, 5:6, 5:24, 7:16, 11:19, 13:4, 13:22, 15:1, 30:4, 30:22, 31:1, 31:7, 31:14, 31:15, 43:2, 44:1, 44:4, 44:6, 44:8, 46:16, 47:1, 47:7, 48:18, 48:23, 53:15, 54:22, 59:19
**reliability** [3] - 57:13, 60:24, 61:23
**reliance** [1] - 16:20
**relied** [1] - 36:17
**relief** [2] - 62:14, 62:15
**relies** [3] - 122:1, 122:3
**reluctant** [1] - 128:22
**relying** [2] - 58:4, 122:11
**remainder** [1] - 128:17
**remedy** [1] - 21:25
**remember** [3] - 88:2, 88:5, 111:18
**remembering** [1] - 130:25
**removing** [1] - 79:17
**renewing** [1] - 61:6
**repeat** [1] - 85:24
**repeatedly** [1] - 63:5
**rephrase** [1] - 115:13
**replace** [1] - 91:22
**reply** [3] - 63:15, 70:24, 74:10
**report** [17] - 35:2, 87:11, 98:21, 98:23, 98:25, 99:4, 100:6, 108:9, 112:5, 112:15, 113:18, 114:18, 114:22, 116:9, 116:17, 117:14, 117:15
**reported** [1] - 113:21
**reporter** [4] - 28:16,

47:6, 69:7, 112:21
**REPORTER** [3] - 115:11, 129:21, 134:1
**Reporter** [3] - 1:22, 1:22, 134:10
**reporting** [1] - 113:24
**reports** [3] - 34:24, 35:10, 111:22
**representation** [1] - 64:15
**represented** [1] - 94:11
**request** [11] - 19:19, 23:22, 28:4, 28:5, 28:6, 28:9, 30:9, 71:15, 71:18, 113:11, 115:18
**requested** [1] - 18:10
**requests** [18] - 7:18, 12:13, 12:14, 12:20, 13:1, 13:10, 13:18, 13:19, 13:21, 13:24, 14:15, 14:17, 19:24, 20:5, 24:10, 27:19, 28:7
**require** [10] - 7:25, 8:16, 28:23, 39:7, 39:12, 39:17, 39:18, 48:17, 57:20
**required** [8] - 9:15, 16:11, 16:18, 22:7, 27:12, 39:10, 59:6, 59:7
**requirement** [1] - 7:20
**requirements** [2] - 9:20, 109:2
**requires** [2] - 16:6, 57:19
**reschedule** [3] - 128:17, 129:11, 129:14
**research** [8] - 28:21, 80:22, 82:1, 87:8, 87:10, 102:9, 113:11, 119:15
**researcher** [1] - 28:11
**researchers** [7] - 28:22, 29:3, 30:11, 30:15, 30:16, 38:21, 41:12
**researching** [2] - 80:1, 81:23
**Reserve** [1] - 110:14
**resident** [1] - 80:3
**resistant** [3] - 118:6, 118:12, 118:14
**resolve** [2] - 34:14, 45:18
**resources** [1] - 43:7

**respect** [15] - 3:20, 5:2, 8:24, 8:25, 34:23, 44:7, 45:20, 54:25, 57:9, 57:11, 57:13, 61:3, 89:1, 89:9, 98:10
**respectable** [1] - 123:3
**respective** [2] - 100:20, 123:2
**respects** [1] - 76:3
**respond** [2] - 19:13, 38:24
**responded** [2] - 104:17, 104:19
**responds** [1] - 124:12
**response** [14] - 19:17, 20:11, 62:12, 64:6, 64:8, 64:11, 66:13, 104:12, 104:14, 104:18, 111:6, 124:15, 124:17, 130:21
**responses** [1] - 104:18
**responsibility** [1] - 8:8
**responsible** [1] - 45:4
**rest** [3] - 76:16, 86:3, 111:25
**result** [4] - 16:9, 37:11, 116:5, 123:23
**resulting** [3] - 111:21, 111:22, 128:2
**results** [10] - 18:24, 19:4, 29:21, 79:1, 95:10, 95:25, 115:25, 116:3, 117:17, 117:22
**resume** [2] - 86:14, 86:15
**retained** [1] - 47:18
**retention** [1] - 47:22
**retirement** [1] - 103:20
**return** [10] - 4:9, 4:14, 6:8, 7:20, 7:25, 8:6, 8:25, 10:25, 12:19, 13:3
**Return** [1] - 4:2
**retweeting** [1] - 49:16
**reveal** [1] - 95:8
**review** [11] - 6:7, 6:10, 9:9, 9:22, 34:18, 88:18, 109:20, 110:4, 116:17, 116:18, 117:1
**reviewed** [4] - 55:1, 109:4, 109:23, 109:25
**reviewing** [2] - 110:1, 110:5

**revised** [1] - 88:18
**revisit** [1] - 61:25
**reward** [3] - 82:11, 82:22, 92:16
**ring** [2] - 81:6, 81:7
**rings** [1] - 124:14
**risk** [6] - 74:4, 113:25, 114:2, 114:6, 117:23, 124:17
**risk-averse** [1] - 124:17
**risk/high** [1] - 113:25
**risk/high-risk** [1] - 113:25
**RMR** [2] - 1:22, 134:9
**road** [1] - 82:24
**Road** [1] - 85:7
**robbed** [1] - 38:3
**role** [3] - 11:1, 79:14, 94:14
**roles** [1] - 79:16
**Rollet** [1] - 28:15
**Roman** [5] - 3:3, 3:12, 3:15, 4:25, 28:19
**ROMAN** [1] - 1:5
**room** [4] - 17:11, 61:11, 106:20, 106:23
**Room** [2] - 1:23, 134:10
**roughly** [1] - 25:16
**routinely** [1] - 65:8
**rubber** [1] - 64:7
**rule** [26] - 8:15, 9:14, 9:17, 16:6, 21:16, 26:3, 26:6, 31:4, 52:17, 59:22, 62:20, 67:7, 67:12, 67:15, 67:16, 67:17, 67:18, 72:8, 73:17, 73:19, 73:20, 73:22, 74:12, 74:16, 75:10, 75:21
**Rule** [37] - 3:21, 3:23, 4:2, 4:9, 5:5, 8:5, 8:14, 8:19, 8:22, 9:20, 9:23, 10:11, 10:22, 12:24, 13:12, 13:22, 14:13, 16:11, 19:21, 19:22, 21:9, 21:13, 21:16, 22:1, 22:8, 24:19, 32:4, 33:3, 33:9, 34:20, 39:6, 62:7, 62:11, 62:19, 65:5, 75:16, 76:1
**Rules** [2] - 25:24, 65:6
**rules** [9] - 16:3, 26:1, 27:18, 28:1, 28:23, 72:6, 72:11, 72:25, 76:2

**ruling** [3] - 59:4, 60:15, 61:14
**run** [2] - 97:5, 97:20
**runaround** [1] - 84:20
**running** [4] - 16:9, 71:21, 98:13, 128:11
**runs** [1] - 35:14

## S

**Safavian** [1] - 59:10
**San** [1] - 1:20
**sandbagged** [1] - 27:9
**Sarah** [1] - 28:15
**satisfied** [1] - 39:16
**satisfies** [1] - 31:23
**satisfy** [1] - 33:8
**satisfying** [1] - 33:3
**saved** [1] - 85:12
**saw** [8] - 38:1, 52:19, 53:7, 54:11, 55:1, 55:17, 56:14, 63:18
**scale** [2] - 82:15, 97:3
**scales** [1] - 98:1
**scaling** [4] - 80:9, 81:5, 81:10, 96:25
**scam** [1] - 27:24
**schedule** [4] - 61:14, 128:25, 129:24, 130:16
**scheduled** [1] - 77:7
**scheduling** [1] - 3:20
**Scholl** [1] - 25:5
**school** [1] - 78:14
**science** [1] - 90:16
**Science** [1] - 28:13
**sciences** [1] - 90:16
**scientific** [2] - 116:5, 116:12
**scintilla** [1] - 19:23
**scope** [2] - 43:13, 87:2
**Scott** [3] - 129:20, 130:6, 130:9
**Scott's** [2] - 129:2, 129:23
**seated** [1] - 77:24
**second** [10] - 9:10, 17:12, 18:23, 39:8, 39:14, 52:5, 82:16, 82:19, 88:18, 90:12
**second-layer** [1] - 82:19
**section** [1] - 88:15
**secure** [1] - 79:14
**secured** [1] - 82:4
**Security** [1] - 28:17
**security** [4] - 80:23, 82:3, 82:11, 82:14
**see** [29] - 24:1, 26:22, 29:9, 29:24, 35:24,

36:12, 37:9, 37:12, 44:8, 52:23, 53:4, 55:23, 58:5, 61:17, 63:23, 71:12, 74:1, 75:15, 76:21, 83:6, 83:9, 85:15, 88:3, 91:3, 106:2, 117:19, 124:8, 132:20
**seeing** [3] - 44:21, 58:6, 90:5
**seek** [2] - 4:19, 125:25
**seeking** [9] - 4:24, 24:10, 58:16, 58:19, 58:24, 60:4, 62:14, 62:15, 70:12
**seeks** [2] - 55:14, 61:24
**seem** [1] - 131:11
**Sefranek** [3] - 1:22, 134:9, 134:9
**SEFRANEK** [1] - 134:3
**seized** [2] - 27:6, 85:7
**selected** [2] - 65:20, 112:10
**selection** [1] - 66:2
**self** [4] - 28:10, 79:5, 79:6, 79:7
**self-taught** [3] - 79:5, 79:6, 79:7
**send** [1] - 101:2
**sending** [1] - 100:23
**senior** [1] - 68:17
**sense** [14] - 11:17, 18:23, 19:18, 25:24, 31:9, 33:9, 49:19, 53:15, 58:7, 70:14, 87:7, 97:4, 120:22
**sensitive** [1] - 79:15
**sent** [2] - 28:22, 92:6
**sentence** [3] - 9:1, 9:10, 39:9
**sentencing** [2] - 128:19, 128:21
**separate** [4] - 11:22, 21:18, 42:19, 122:4
**September** [2] - 80:24, 84:18
**series** [3] - 94:21, 100:2, 116:6
**serious** [10] - 56:14, 69:23, 80:25, 82:13, 82:20, 82:24, 85:5, 99:12, 109:11, 109:16
**serve** [1] - 43:7
**served** [3] - 4:9, 4:13, 5:13
**server** [1] - 79:19
**serves** [1] - 38:5

**service** [3] - 43:5, 79:17, 101:4
**Service** [1] - 88:19
**services** [2] - 101:5, 101:6
**set** [28] - 4:1, 30:18, 43:3, 46:13, 46:15, 46:22, 52:2, 55:1, 57:9, 57:13, 58:3, 58:6, 60:4, 60:6, 61:9, 71:24, 83:17, 87:25, 99:5, 114:11, 116:7, 116:12, 116:13, 116:14
**sets** [5] - 28:20, 29:6, 31:15, 90:3, 110:13
**setting** [2] - 81:18, 81:19
**seven** [2] - 87:13, 105:8
**several** [3] - 4:10, 17:17, 17:25
**shaking** [1] - 41:25
**shape** [1] - 105:4
**share** [1] - 106:10
**shared** [1] - 6:9
**sharing** [2] - 30:3, 38:20
**shifting** [2] - 29:10, 30:5
**shocked** [2] - 29:9, 41:20
**short** [6] - 42:3, 118:8, 118:9, 121:22, 125:6, 126:20
**show** [12] - 3:22, 10:3, 12:17, 12:18, 19:2, 26:23, 27:2, 27:20, 31:16, 33:1, 38:13, 105:24
**showed** [1] - 119:4
**showing** [6] - 10:9, 35:3, 35:13, 36:8, 83:23, 93:2
**shown** [1] - 113:17
**shows** [7] - 9:22, 29:24, 30:25, 50:10, 93:18, 110:25, 119:4
**shut** [1] - 85:16
**sic** [4] - 8:13, 19:25, 65:25, 122:14
**side** [5] - 44:5, 46:20, 74:22, 78:23, 78:24
**side's** [1] - 14:6
**sided** [2] - 45:22, 58:6
**sides** [4] - 18:1, 34:6, 60:14, 93:12
**sign** [5] - 83:7, 83:13, 83:14, 101:3
**signature** [2] - 81:6,

81:7
**signed** [3] - 105:22, 109:1, 109:2
**signer** [1] - 81:7
**significance** [1] - 89:18
**significant** [5] - 6:10, 34:11, 99:1, 99:6, 114:15
**significantly** [1] - 96:24
**signs** [2] - 83:20
**silent** [1] - 90:2
**Silk** [1] - 85:7
**similar** [2] - 10:15, 11:16
**similarly** [1] - 11:10
**simple** [3] - 25:6, 102:13, 102:15
**simplistic** [1] - 25:7
**simply** [16] - 11:17, 12:9, 33:15, 43:19, 53:11, 55:1, 60:16, 62:12, 63:8, 92:23, 102:18, 102:19, 117:4, 117:23, 124:13, 124:16
**simulations** [1] - 16:10
**single** [4] - 35:13, 64:19, 65:10, 66:16
**site** [1] - 50:18
**situation** [7] - 85:14, 91:20, 99:13, 99:18, 116:11, 116:13
**six** [5] - 82:16, 87:12, 89:15, 105:8, 117:17
**size** [11] - 68:15, 80:10, 90:2, 96:22, 97:7, 97:17, 97:18, 98:5, 98:6, 98:8, 113:9
**sizes** [1] - 81:17
**slew** [1] - 7:17
**slow** [3] - 85:22, 92:8, 115:11
**slower** [1] - 85:22
**slowly** [2] - 112:23, 115:13
**small** [2] - 53:21, 103:18
**smaller** [2] - 97:15, 102:16
**Sofia** [1] - 28:15
**soft** [1] - 85:12
**software** [34] - 7:15, 16:20, 16:22, 16:23, 17:4, 17:5, 17:8, 17:9, 18:6, 18:12, 18:16, 18:17, 18:20,

23:11, 24:3, 24:4, 24:5, 24:6, 25:6, 26:20, 26:22, 28:22, 35:7, 36:20, 40:22, 40:23, 43:21, 55:22, 87:5, 87:8, 87:11, 95:14, 128:3
**sold** [3] - 80:24, 81:1, 84:17
**sole** [1] - 54:13
**solicit** [1] - 111:14
**solutions** [2] - 48:10, 82:19
**someone** [16] - 30:3, 32:11, 33:5, 36:14, 49:1, 53:14, 54:23, 55:7, 57:5, 58:5, 74:11, 101:2, 107:8, 116:10, 119:17, 132:9
**somewhere** [4] - 31:1, 38:9, 100:19, 105:8
**soon** [1] - 61:15
**sorry** [21] - 12:20, 13:14, 17:2, 26:5, 29:14, 43:11, 45:1, 48:12, 52:5, 56:3, 71:17, 76:14, 83:20, 92:2, 98:12, 105:16, 112:20, 115:11, 120:10, 121:21, 126:5
**sort** [26] - 9:22, 11:13, 15:9, 15:12, 15:23, 17:24, 24:5, 25:7, 29:23, 30:5, 31:3, 31:6, 38:18, 42:23, 44:25, 45:11, 45:15, 59:6, 60:15, 64:1, 64:7, 74:22, 74:25, 93:21, 131:8
**sorts** [4] - 14:15, 24:3, 53:4, 63:5
**sought** [1] - 112:7
**sounds** [1] - 34:9
**source** [29] - 23:5, 23:10, 24:2, 24:10, 28:2, 28:20, 29:16, 29:17, 29:19, 30:25, 35:25, 36:9, 36:13, 36:14, 36:16, 36:19, 36:25, 37:2, 37:6, 37:8, 37:12, 37:13, 37:17, 37:18, 38:15, 39:12, 87:8, 112:8
**spaced** [1] - 35:5
**spam** [1] - 81:12
**speaking** [3] - 12:24, 63:1, 112:1
**speaks** [1] - 50:15

**specific** [26] - 9:23, 13:24, 14:4, 14:7, 17:7, 19:12, 19:17, 19:19, 20:1, 20:4, 20:10, 27:22, 29:11, 29:12, 30:7, 30:11, 30:21, 32:8, 37:3, 37:4, 38:12, 46:16, 54:22, 63:21, 63:23, 84:23
**specifically** [19] - 11:14, 11:19, 20:18, 23:4, 27:12, 29:18, 30:1, 30:17, 65:18, 65:19, 68:25, 79:20, 95:1, 115:10, 116:4, 117:2, 117:18, 120:24, 123:15
**specificity** [13] - 10:4, 12:17, 19:24, 27:20, 28:24, 31:22, 33:1, 33:8, 33:14, 33:25, 37:16, 39:15, 54:25
**specifics** [1] - 108:25
**speculative** [1] - 15:9
**speed** [3] - 90:24, 91:3, 91:5
**spell** [1] - 14:10
**spelled** [3] - 43:25, 62:19, 62:22
**spellings** [1] - 28:16
**spend** [12] - 83:8, 83:24, 93:6, 93:13, 100:14, 100:15, 100:16, 100:18, 105:5, 105:7, 118:19
**spending** [1] - 105:11
**spent** [5] - 100:20, 107:17, 107:18, 110:1, 110:7
**split** [1] - 7:22
**spoken** [1] - 68:5
**spot** [5] - 17:6, 18:2, 18:3, 18:5, 85:12
**spot-check** [1] - 17:6
**spot-checked** [2] - 18:2, 18:5
**spot-checking** [1] - 18:3
**spreadsheet** [1] - 35:15
**St** [1] - 129:7
**staff** [1] - 128:22
**stage** [1] - 54:1
**stake** [1] - 16:15
**stamps** [1] - 63:23
**stand** [5] - 57:7, 58:9, 58:12, 67:25, 69:16
**standard** [4] - 33:3, 33:9, 39:15, 109:18

**Standards** [1] - 65:7
**standards** [1] - 88:19
**standing** [9] - 5:12, 5:14, 5:20, 20:24, 21:7, 22:14, 33:16, 33:18, 33:21
**stands** [2] - 55:23, 88:21
**start** [8] - 3:20, 3:25, 4:6, 22:25, 62:8, 77:12, 93:17, 94:12
**started** [9] - 80:1, 80:2, 80:10, 80:12, 80:21, 80:22, 81:22, 108:24
**starting** [4] - 3:5, 79:8, 108:22, 108:23
**state** [4] - 3:4, 56:7, 88:16, 98:24
**statement** [8] - 15:3, 32:3, 32:16, 32:18, 38:24, 47:4, 47:6, 65:10
**statements** [9] - 41:7, 63:5, 63:21, 63:25, 64:3, 65:22, 66:7, 72:17, 74:23
**STATES** [3] - 1:1, 1:2, 1:8
**States** [10] - 1:23, 3:3, 3:9, 5:19, 8:11, 8:12, 10:7, 28:19, 103:10, 122:16
**statistical** [4] - 24:5, 116:18, 117:1, 117:12
**statistics** [1] - 91:21
**status** [2] - 45:9, 107:6
**steal** [1] - 93:4
**stenographic** [1] - 134:5
**step** [4] - 15:2, 114:2, 119:22, 128:13
**steps** [1] - 53:22
**STERLINGOV** [1] - 1:5
**Sterlingov** [11] - 3:3, 3:12, 3:15, 3:17, 28:19, 29:5, 30:12, 50:11, 50:13, 68:19, 70:24
**Sterlingov's** [3] - 4:25, 40:24, 66:13
**stick** [1] - 27:25
**still** [10] - 6:6, 7:13, 10:21, 31:6, 41:1, 41:3, 47:7, 80:8, 107:9, 132:8
**stonewalling** [1] - 27:24

**streaming** [1] - 22:11
**Street** [3] - 1:11, 1:17, 1:19
**stretch** [1] - 41:6
**strike** [5] - 62:12, 72:15, 73:4, 73:11, 73:18
**striking** [1] - 72:16
**strong** [2] - 27:2, 123:9
**struck** [1] - 84:22
**structure** [2] - 83:10, 120:22
**students** [1] - 103:1
**studied** [1] - 87:6
**study** [2] - 78:16, 132:17
**studying** [2] - 80:8, 110:9
**stuff** [12] - 25:17, 26:13, 26:24, 26:25, 27:3, 27:5, 29:25, 31:16, 42:22, 73:24, 74:3, 84:13
**Stutz** [1] - 28:14
**subject** [3] - 32:17, 43:14, 63:10
**submit** [3] - 56:21, 57:1, 73:21
**submitted** [1] - 111:1
**submitting** [1] - 95:22
**subpart** [1] - 13:14
**Subpoena** [2] - 4:3
**subpoena** [42] - 5:13, 6:8, 8:6, 8:14, 9:1, 9:3, 9:5, 9:20, 10:9, 11:13, 11:15, 11:23, 12:7, 13:3, 14:11, 15:14, 19:22, 20:18, 20:25, 21:4, 28:4, 28:5, 28:7, 31:21, 31:23, 31:24, 33:19, 38:5, 42:4, 42:5, 42:12, 42:15, 43:5, 43:8, 43:14, 43:23, 49:24, 54:20, 61:3, 61:6, 62:5, 76:25
**subpoenaed** [1] - 50:20
**subpoenas** [24] - 3:21, 4:9, 4:12, 4:14, 4:19, 4:22, 7:18, 7:20, 7:25, 8:9, 11:1, 11:2, 11:10, 11:11, 12:4, 12:9, 12:12, 12:22, 21:16, 22:15, 22:16, 23:1, 24:14
**subsequently** [4] - 15:8, 44:24, 51:20, 79:7

**subset** [2] - 97:22, 99:5
**substantial** [3] - 6:6, 89:20, 103:20
**substantially** [1] - 43:16
**substantive** [3] - 9:20, 10:25, 66:17
**substantively** [1] - 10:13
**successes** [1] - 71:8
**successful** [1] - 79:16
**sue** [8] - 6:21, 6:23, 6:24, 7:1, 15:18, 20:9, 39:24, 40:7
**sufficient** [2] - 33:23, 37:16
**sufficiently** [1] - 127:2
**suggestion** [1] - 31:18
**suing** [1] - 40:10
**suit** [3] - 40:7, 40:18, 41:5
**Sullivan** [3] - 8:7, 8:20, 9:14
**Sullivan's** [2] - 8:1, 8:4
**summarize** [1] - 78:8
**summer** [2] - 60:16, 130:16
**supervise** [1] - 8:9
**supervisory** [1] - 48:5
**Supp** [2] - 5:19, 59:10
**supplied** [1] - 99:4
**supply** [1] - 7:3
**support** [3] - 8:12, 37:17, 49:10
**supported** [2] - 111:19, 122:15
**supportive** [1] - 104:21, 122:23
**suppose** [1] - 76:10
**supposed** [6] - 12:23, 14:9, 28:1, 37:21, 44:2, 113:22
**supposedly** [1] - 131:4
**surprised** [1] - 43:12
**surrendered** [1] - 93:12
**surveil** [1] - 122:21
**surveillance** [24] - 87:11, 87:13, 89:16, 94:3, 94:6, 94:14, 94:15, 95:6, 95:7, 95:13, 97:5, 97:19, 109:13, 110:10, 122:12, 123:16, 123:21, 123:22, 124:4, 124:15, 124:20, 125:3,

127:23, 128:3
**surveilled** [2] - 94:16, 95:8
**surveilling** [4] - 94:17, 94:20, 95:9, 109:13
**suspicions** [1] - 123:9
**swamped** [1] - 71:22
**sweep** [1] - 34:11
**sweeping** [2] - 31:24, 32:5
**sworn** [1] - 77:23
**sympathetic** [1] - 32:7
**Symposium** [1] - 28:18
**system** [5] - 71:23, 79:18, 84:25, 90:7, 119:9
**systematic** [11] - 78:23, 90:15, 90:19, 90:22, 90:23, 91:2, 91:6, 91:13, 95:24, 95:25, 114:17
**systematically** [1] - 116:14
**systemic** [26] - 78:23, 79:1, 89:20, 89:23, 89:25, 90:5, 90:6, 90:13, 90:14, 90:17, 90:20, 91:2, 91:14, 114:10, 114:16, 114:21, 115:4, 115:23, 116:4, 116:8, 116:15, 118:23, 119:9, 119:24, 120:3, 120:4

## T

**Tab** [5] - 106:2, 110:25, 112:3, 122:25, 125:13
**tab** [1] - 106:3
**Tabs** [4] - 104:9, 105:24, 111:8, 125:4
**tailored** [1] - 14:15
**taint** [3] - 70:14, 70:17, 73:3
**tainted** [2] - 68:15, 72:22
**tainting** [2] - 63:7, 74:5
**talks** [1] - 9:10
**TAMARA** [1] - 134:3
**Tamara** [3] - 1:22, 134:9, 134:9
**tar** [1] - 5:9
**tarring** [1] - 71:2
**Task** [8] - 87:12, 87:23, 88:22, 88:23, 104:14, 108:9,

112:6, 119:16

**task** [2] - 65:24, 97:7

**taught** [3] - 79:5, 79:6, 79:7

**taxation** [1] - 85:18

**teach** [2] - 102:17, 103:1

**team** [9] - 64:19, 65:8, 67:18, 67:22, 68:4, 68:23, 68:24, 81:3, 103:24

**Team** [4] - 104:1, 104:23, 105:3, 105:6

**technique** [2] - 122:13, 123:15

**Technology** [1] - 28:13

**technology** [3] - 82:6, 83:4, 83:5

**tecum** [1] - 23:1

**telephone** [1] - 34:14

**tempted** [1] - 69:16

**ten** [2] - 42:7, 68:21, 98:14, 107:15, 107:18, 126:17, 126:25, 127:1, 128:16

**tendering** [1] - 102:1

**term** [8] - 80:23, 87:22, 90:15, 90:16, 91:18, 94:2, 96:12

**terms** [3] - 12:4, 63:4, 74:25

**terrible** [1] - 30:25

**terrorism** [2] - 89:1, 110:22

**test** [6] - 4:15, 10:3, 12:16, 13:12, 14:7, 31:22

**tested** [2] - 18:7, 26:21

**testified** [5] - 38:1, 58:11, 94:2, 96:25, 127:22

**testifies** [1] - 37:25, 57:17

**testify** [9] - 18:8, 44:3, 50:21, 52:19, 52:20, 53:21, 57:8, 57:15, 58:17

**testifying** [2] - 17:20, 131:6

**testimony** [30] - 9:16, 13:11, 14:19, 18:18, 22:17, 22:20, 22:22, 22:23, 23:2, 42:16, 43:19, 44:1, 44:6, 48:17, 48:22, 49:8, 49:10, 54:10, 57:14, 61:23, 63:12, 89:4,

91:16, 119:2, 129:25, 130:7, 131:21, 132:15

**testing** [2] - 7:15, 13:16

**tests** [1] - 10:10

**THE** [234] - 1:1, 1:1, 1:8, 3:2, 3:10, 3:13, 3:16, 5:12, 5:17, 6:2, 6:23, 7:22, 8:11, 8:24, 10:11, 10:17, 11:3, 11:22, 12:1, 15:19, 16:1, 16:3, 16:6, 16:21, 16:25, 17:12, 18:14, 19:10, 20:16, 20:20, 20:22, 21:1, 21:7, 21:11, 21:15, 22:3, 22:20, 22:22, 22:24, 23:9, 23:15, 23:24, 24:9, 26:3, 26:6, 27:11, 28:3, 28:6, 29:10, 29:15, 30:22, 31:18, 31:21, 32:15, 33:12, 34:22, 35:4, 36:5, 36:8, 37:1, 37:24, 39:2, 39:22, 40:10, 41:4, 41:23, 42:3, 42:10, 44:11, 45:21, 46:1, 47:12, 47:15, 47:17, 47:22, 48:3, 48:7, 48:11, 48:14, 50:1, 50:8, 50:23, 51:1, 52:5, 52:11, 52:13, 52:15, 52:21, 53:9, 54:15, 54:18, 55:7, 55:13, 56:2, 56:4, 56:18, 57:4, 57:20, 57:22, 58:1, 58:23, 60:3, 60:9, 60:12, 60:18, 61:2, 62:14, 62:20, 64:15, 64:21, 64:23, 65:12, 66:22, 66:24, 67:3, 67:7, 67:11, 67:25, 68:3, 68:8, 69:6, 69:12, 69:16, 69:23, 69:25, 70:6, 70:9, 70:20, 71:15, 71:18, 72:1, 72:13, 72:25, 73:7, 73:16, 73:24, 74:11, 74:15, 75:7, 75:9, 75:13, 76:10, 76:13, 76:17, 76:19, 76:21, 76:24, 77:8, 77:12, 77:16, 77:20, 77:21, 77:24, 77:25, 80:12, 80:14, 80:15, 80:16, 80:17, 80:18, 80:20, 80:21, 85:22, 85:24, 86:7, 86:21,

86:23, 88:8, 96:7, 96:9, 98:14, 100:11, 100:13, 100:21, 100:22, 100:25, 101:1, 101:4, 101:5, 101:9, 101:13, 101:15, 101:18, 101:21, 101:25, 107:3, 107:4, 107:7, 107:8, 107:11, 112:20, 113:2, 113:3, 115:11, 115:13, 117:4, 117:6, 118:8, 118:11, 118:25, 119:11, 119:12, 119:14, 119:17, 119:20, 119:21, 120:2, 120:7, 120:10, 121:21, 125:7, 125:8, 126:2, 126:6, 126:9, 126:12, 126:14, 126:17, 126:21, 126:25, 127:5, 128:13, 128:20, 129:12, 129:17, 129:21, 130:2, 130:8, 130:10, 130:15, 131:8, 131:20, 132:24, 133:2

**themselves** [1] - 89:23

**theorem** [1] - 97:24

**theories** [2] - 5:2, 7:8

**theory** [8] - 15:22, 15:25, 39:1, 39:25, 40:11, 40:18, 40:19, 97:24

**therefor** [1] - 20:6

**therefore** [8] - 19:4, 20:12, 22:7, 37:11, 38:9, 44:5, 46:20, 82:17

**they've** [9] - 12:16, 15:2, 27:1, 31:4, 38:8, 63:16, 68:7, 73:14, 73:15

**thinking** [1] - 117:16

**thinks** [3] - 37:8, 62:3, 126:4

**third** [8] - 4:10, 5:13, 20:25, 21:4, 46:13, 46:18, 47:6, 48:17

**third-party** [6] - 4:10, 20:25, 21:4, 46:13, 47:6, 48:17

**thoroughly** [1] - 18:3

**thoughts** [1] - 98:25

**thousands** [2] - 27:6,

111:17

**threat** [1] - 15:16

**threatening** [2] - 6:17, 41:8

**threats** [1] - 123:20

**three** [4] - 25:16, 50:14, 69:25, 71:24

**threshold** [3] - 10:25, 55:22, 59:4

**throwing** [1] - 31:9

**Thursday** [1] - 34:17

**tied** [2] - 103:21, 123:22

**Tigran** [1] - 69:3

**timing** [1] - 119:1

**title** [2] - 45:2, 48:8

**today** [9] - 3:18, 11:8, 11:21, 43:3, 69:17, 76:16, 77:10, 100:15, 132:21

**together** [2] - 33:25, 34:7

**ton** [1] - 17:9

**took** [7] - 15:6, 15:8, 29:2, 41:11, 71:24, 102:8, 122:17

**tools** [1] - 36:20

**topics** [2] - 130:19, 131:24

**TOR** [1] - 1:15

**Tor** [2] - 1:16, 3:11

**total** [3] - 12:13, 87:20, 97:23

**totally** [7] - 7:17, 18:12, 66:6, 94:9, 104:25, 121:6, 131:18

**tough** [1] - 27:13

**toughening** [1] - 124:22

**Touhy** [1] - 14:24

**tour** [1] - 62:25

**touting** [1] - 71:7

**towards** [2] - 33:2, 126:3

**trace** [2] - 51:5, 118:16

**traceable** [1] - 120:24

**Tracers** [2] - 51:11, 64:17

**tracing** [5] - 50:11, 95:14, 113:19, 131:5

**track** [2] - 97:8, 98:12

**tracking** [1] - 113:8

**trade** [1] - 80:6

**trading** [2] - 84:16, 86:4

**traditional** [2] - 122:12, 122:18

**trained** [1] - 132:9

**transaction** [16] -

25:5, 44:20, 50:13, 81:8, 81:17, 83:8, 83:13, 92:13, 95:18, 95:23, 97:12, 100:5, 120:22, 121:13, 122:1

**transactional** [2] - 35:9, 35:19

**transactions** [29] - 17:17, 44:23, 45:22, 58:7, 82:16, 89:13, 89:14, 89:15, 92:12, 92:14, 92:17, 95:17, 97:7, 97:8, 97:12, 97:15, 97:17, 98:4, 98:6, 98:8, 100:2, 100:4, 101:3, 101:11, 101:12, 101:17, 114:10, 118:16, 119:6

**TRANSCRIPT** [1] - 1:7

**transcript** [2] - 134:4, 134:6

**transfer** [9] - 72:22, 83:11, 83:15, 92:1, 92:3, 92:21, 92:22, 93:7, 99:24

**transferred** [3] - 83:22, 92:6, 99:19

**transparent** [4] - 121:3, 121:6, 121:10, 127:12

**travel** [4] - 106:19, 106:25, 107:16, 107:17

**tree** [1] - 73:16

**trends** [1] - 98:4

**trial** [52] - 5:4, 5:23, 6:1, 6:2, 6:5, 6:25, 7:6, 7:12, 7:19, 8:21, 9:6, 9:7, 9:24, 22:20, 22:22, 22:23, 23:2, 23:18, 25:14, 25:17, 25:18, 29:3, 33:4, 34:4, 34:16, 39:12, 49:2, 49:5, 49:24, 57:2, 57:3, 57:4, 57:6, 57:10, 57:16, 58:11, 60:16, 61:16, 62:5, 65:20, 66:8, 66:9, 71:13, 77:2, 107:1, 107:20, 109:14, 125:18, 125:19

**tried** [1] - 84:19

**trillion** [1] - 97:13

**TRM** [2] - 115:10, 115:17

**trouble** [1] - 85:16

**true** [13] - 6:4, 8:24,

8:25, 22:9, 52:18, 57:22, 111:16, 118:7, 121:25, 124:8, 134:4, 134:5
**truly** [1] - 25:18
**trustee** [6] - 44:16, 44:17, 45:1, 46:11, 52:3, 60:23
**trustees** [4] - 52:3, 54:6, 54:8, 56:11
**truth** [2] - 41:24, 115:6
**try** [11] - 11:17, 11:18, 20:9, 20:13, 31:18, 34:14, 43:15, 47:9, 49:24, 51:4, 54:9
**trying** [8] - 29:11, 42:20, 45:18, 97:8, 98:11, 99:10, 114:24, 121:8
**turn** [9] - 3:21, 4:24, 22:15, 26:25, 27:9, 124:13, 124:18, 125:4, 128:6
**turning** [3] - 110:25, 112:14, 122:25
**turns** [2] - 24:25, 61:24
**Twitter** [5] - 42:23, 49:15, 63:5, 73:24, 74:4
**two** [13] - 4:11, 4:14, 17:10, 22:16, 40:24, 62:12, 63:14, 67:4, 71:24, 77:9, 78:25, 89:11, 115:5
**type** [15] - 15:9, 16:8, 18:16, 19:6, 37:16, 87:8, 90:20, 91:12, 95:12, 97:4, 97:19, 102:25, 103:5, 109:23, 113:12
**types** [10] - 17:17, 18:21, 29:19, 32:5, 44:22, 74:22, 75:3, 78:25, 81:13, 81:18
**typical** [1] - 91:20
**typically** [5] - 44:9, 48:25, 99:6, 100:5, 101:2

### U

**U.S** [10] - 1:13, 8:3, 84:21, 84:23, 84:25, 85:4, 85:12, 88:25, 122:17
**unable** [1] - 61:21
**unavailable** [1] - 77:10
**unclear** [1] - 15:20

**under** [26] - 12:5, 16:11, 19:21, 21:9, 21:10, 21:13, 22:1, 22:8, 24:19, 27:13, 28:1, 29:8, 38:20, 39:14, 41:19, 51:7, 58:21, 59:5, 63:10, 68:1, 76:1, 102:11, 106:7, 112:25, 123:19
**underestimation** [1] - 127:20
**underlying** [5] - 16:12, 16:20, 31:3, 35:11, 49:1
**understandably** [1] - 8:18
**understood** [4] - 18:1, 38:17, 43:24, 128:24
**undue** [2] - 5:22, 6:1
**unexpectedly** [1] - 129:9
**unfair** [2] - 29:25, 62:13
**unfocused** [1] - 31:7
**unfortunately** [1] - 126:21
**uninitiated** [1] - 92:4
**Union** [1] - 104:12
**Union's** [1] - 110:21
**unique** [8] - 51:3, 54:4, 54:5, 55:5, 56:8, 57:23, 58:2
**uniquely** [1] - 61:25
**UNITED** [3] - 1:1, 1:2, 1:8
**United** [10] - 1:23, 3:3, 3:9, 5:19, 8:11, 8:12, 10:6, 28:19, 103:10, 122:15
**University** [3] - 28:12, 78:11, 102:5
**university** [3] - 102:12, 102:21, 102:23
**unless** [4] - 7:19, 117:1, 117:11, 132:20
**unlike** [2] - 57:5, 121:3
**unrelated** [1] - 15:7
**unscathed** [2] - 84:16, 86:5
**unsealed** [1] - 66:20
**untainted** [1] - 66:9
**up** [44] - 16:19, 21:20, 22:6, 22:12, 22:13, 23:3, 23:20, 24:14, 26:12, 31:9, 34:24, 35:21, 36:3, 37:22, 41:9, 42:4, 42:11,

43:17, 47:10, 48:4, 57:2, 57:4, 60:5, 61:7, 61:21, 71:5, 71:24, 73:9, 73:16, 76:5, 76:15, 76:25, 83:22, 83:23, 86:11, 88:13, 90:12, 101:24, 105:22, 120:10, 124:22, 125:5, 128:19, 131:15
**URL** [1] - 7:3
**Urlacher** [1] - 8:11
**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**USB** [1] - 92:24
**USD** [1] - 89:14
**USENIX** [3] - 28:17, 29:1, 30:12
**user** [4] - 84:15, 106:1, 107:3, 107:4
**uses** [1] - 123:3
**usual** [2] - 113:18, 113:22
**utilize** [2] - 17:5, 43:6

### V

**validate** [1] - 70:12
**validates** [1] - 74:9
**value** [3] - 59:1, 89:14, 98:7
**Vancouver** [1] - 103:8
**variation** [3] - 87:16, 88:5, 89:18
**variations** [1] - 87:24
**variety** [2] - 14:3, 17:15
**various** [2] - 3:19, 81:19
**vary** [1] - 91:9
**VASP** [3] - 87:22, 89:9
**vast** [1] - 106:20
**vehicle** [2] - 90:25, 91:8
**vehicles** [1] - 91:10
**velocity** [2] - 90:24, 91:8
**vendor** [3] - 21:24, 24:20, 26:15
**vendors** [1] - 41:17
**venire** [6] - 70:16, 72:11, 72:22, 73:5, 73:19, 74:5
**venue** [1] - 68:15
**version** [7] - 10:17, 23:16, 23:17, 46:8, 55:10, 55:13, 55:17
**versions** [4] - 10:22, 23:13, 28:20, 87:8

**via** [1] - 129:25
**Vienna** [1] - 28:13
**view** [5] - 16:11, 42:17, 49:3, 121:5, 124:2
**viewable** [1] - 122:2
**viewed** [1] - 112:8
**viewing** [1] - 46:6
**views** [2] - 125:12, 125:16
**Vigilante** [1] - 124:19
**violate** [3] - 72:3, 72:6, 75:17
**violated** [2] - 31:4, 67:15
**violates** [2] - 65:8, 74:12
**violating** [4] - 67:16, 67:18, 73:17, 75:23
**violation** [1] - 63:25
**violations** [5] - 3:22, 75:15, 75:21, 76:6
**virtual** [1] - 88:19
**Virtual** [1] - 88:19
**vitae** [1] - 86:14
**Vo** [3] - 8:2, 10:20, 10:21
**vocally** [1] - 123:13
**voir** [6] - 65:24, 68:16, 70:16, 72:11, 73:5, 73:10
**volume** [5] - 6:6, 7:9, 9:19, 10:1, 97:11
**voluminous** [2] - 9:21, 18:4
**Voluntary** [1] - 65:7
**volunteer** [4] - 81:5, 104:25, 105:1, 107:23
**Vonu** [1] - 6:21
**vs** [1] - 1:4

### W

**wait** [6] - 18:22, 20:18, 67:3, 112:22
**Wall** [1] - 1:17
**wallet** [3] - 87:21, 99:21, 101:5
**wants** [6] - 11:20, 26:23, 44:14, 49:1, 62:5, 77:4
**Washington** [6] - 1:5, 1:12, 1:14, 1:24, 106:23, 134:11
**ways** [4] - 8:19, 17:17, 92:22, 97:23
**web** [2] - 103:12, 103:14
**website** [3] - 50:17,

50:18, 119:16
**websites** [1] - 103:15
**Wednesday** [3] - 62:11, 64:9, 129:9
**week** [5] - 62:10, 77:10, 105:11, 118:19, 129:10
**weeks** [1] - 71:24
**welcome** [2] - 72:5, 128:13
**well-documented** [2] - 49:12, 51:10
**well-established** [1] - 59:5
**well-founded** [1] - 20:4
**well-known** [3] - 82:15, 97:24, 116:5
**whatsoever** [3] - 27:20, 38:23, 70:1
**white** [8] - 28:17, 28:20, 30:11, 30:20, 38:21, 41:10, 94:25, 127:19
**whole** [7] - 7:17, 24:24, 51:12, 57:2, 66:2, 95:5, 99:15
**wide** [8] - 13:7, 13:18, 13:24, 14:3, 14:17, 87:16, 88:4, 115:1
**wide-ranging** [4] - 13:7, 13:18, 13:24, 14:17
**widely** [1] - 112:11
**William** [1] - 11:5
**WILLIAM** [1] - 1:18
**willing** [1] - 67:25
**win** [1] - 124:11
**Windows** [4] - 79:18, 79:19
**WIRED** [4] - 68:18, 71:1, 73:15, 74:7
**wit** [1] - 63:10
**withdraw** [3] - 84:19, 84:24, 85:11
**withdrawing** [1] - 85:3
**withdrawn** [1] - 85:25
**withholding** [1] - 25:11
**WITNESS** [23] - 2:2, 80:14, 80:16, 80:18, 80:21, 85:24, 100:13, 100:22, 101:1, 101:5, 101:13, 101:18, 107:4, 107:8, 113:3, 115:13, 117:6, 118:11, 119:11, 119:14, 119:20, 120:2, 125:8

**witness** [35] - 8:21,
9:1, 37:25, 38:2,
38:8, 40:13, 41:8,
46:3, 46:4, 48:1,
49:10, 50:21, 52:1,
53:7, 53:25, 54:3,
54:20, 57:6, 57:16,
57:22, 57:23, 58:17,
59:1, 66:2, 77:2,
77:23, 98:17,
101:20, 101:24,
102:1, 106:15,
126:22, 127:1,
131:3, 131:10
**witnesses** [12] - 5:21,
18:8, 22:17, 27:7,
62:4, 63:2, 63:12,
65:4, 65:25, 66:3,
77:9
**word** [11] - 21:1, 21:3,
58:2, 64:20, 66:16,
66:17, 80:12, 90:19,
91:15, 117:8
**wording** [2] - 10:14,
10:16
**words** [6] - 12:23,
13:2, 17:4, 18:7,
19:9, 47:3
**works** [5] - 20:10,
47:15, 54:6, 54:7,
131:15
**world** [1] - 88:25
**worldwide** [2] - 62:25,
82:18
**worried** [1] - 41:6
**worry** [1] - 73:10
**worse** [2] - 82:5, 114:4
**worth** [1] - 75:6
**wrap** [1] - 125:5
**wrestling** [1] - 31:6
**Wright** [2] - 8:13, 8:17
**write** [1] - 30:11
**written** [3] - 104:6,
113:14, 127:19
**wrongdoing** [1] - 5:10
**wrote** [1] - 30:20
**www.bitcoinfog.com**
[1] - 50:17

## X

**XP** [1] - 79:19

## Y

**year** [4] - 87:18, 88:6,
108:6, 108:7
**years** [5] - 10:18,
40:25, 49:9, 68:21,
128:5

**yellow** [1] - 112:3
**York** [2] - 1:17, 107:16
**you-all** [3] - 33:24,
128:15, 132:20
**Youli** [5] - 4:4, 11:7,
14:19, 14:20, 15:6
**yourself** [2] - 124:8,
124:22
**Yousaf** [1] - 28:14
**YouTube** [3] - 30:17,
70:20, 74:4

## Z

**zero** [1] - 131:16
**Zoom** [1] - 129:25