1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2
   UNITED STATES OF AMERICA,      ) Criminal Action
3                                 ) No. 1:21-CR-0399
                    Plaintiff,    )
4                                 ) **CONTINUED MOTIONS**
   vs.                            ) **HEARING**
5                                 )
   ROMAN STERLINGOV,              ) Washington, D.C.
6                                 ) **July 20, 2023**
                    Defendant.    ) **Time:  10:10 A.M.**
7
          **TRANSCRIPT OF CONTINUED MOTIONS HEARING**
8        BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                UNITED STATES DISTRICT JUDGE
9
                   A P P E A R A N C E S
10
   For the Plaintiff:      CHRISTOPHER BROWN - VIA ZOOM
11                         USAO-DOJ
                           601 D Street, NW
12                         Washington, DC 20001

13                         ALDEN PELKER
                           U.S. DEPARTMENT OF JUSTICE
14                         950 Pennsylvania Avenue, NW
                           Washington, DC 20530
15
   For the Defendant:      TOR EKELAND
16                         MICHAEL HASSARD - VIA ZOOM
                           Tor Ekeland Law, PLLC
17                         30 Wall Street, 8th Floor
                           New York, NY 10005
18

19

20

21   Court Reporter:       Tamara M. Sefranek, RMR, CRR, CRC
                           Official Court Reporter
22                         United States Courthouse, Room 6714
                           333 Constitution Avenue, NW
23                         Washington, DC  20001
                           202-354-3246
24

25

```
 1                    I N D E X

 2
       WITNESS                              PAGE
 3
       J.W. VERRET
 4
            Cross-Examination (Continued)
 5          By Mr. Brown                    217

 6          Redirect Examination
            By Mr. Ekeland                  227
 7

 8     JEFF FISCHBACH

 9          Direct Examination
            By Mr. Ekeland                  254
10
            Cross-Examination
11          By Ms. Pelker                   275

12          Redirect Examination
            By Mr. Ekeland                  312
13

14

15

16                  (NO EXHIBITS WERE ADMITTED)

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2            THE COURTROOM DEPUTY:  Calling Criminal Case 21-399,

 3    United States of America v. Roman Sterlingov.

 4            Would counsel please state their names for the

 5    record, starting with government counsel.

 6            MS. PELKER:  Good morning, Your Honor.  Alden Pelker

 7    for the United States.

 8            THE COURT:  Good morning.

 9            MS. PELKER:  And I'm joined by Mr. Chris Brown on

10    Zoom.

11            THE COURT:  Okay.  Thank you.

12            MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland

13    for defendant, Roman Sterlingov, who is present in court.  And

14    I am joined by Michael Hassard, who is on Zoom.

15            THE COURT:  Okay.  Thank you all.

16            Should we go ahead and recall the witness and

17    continue.  Anything else you wanted to say first?

18            MS. PELKER:  No, Your Honor.  I think we were

19    confused about who would be recalling.  We'd ask Mr. Verret to

20    take the stand, and Mr. Brown will resume the testimony.

21            THE COURT:  Okay.  Thank you.

22            MS. PELKER:  Thank you.

23            THE COURT:  You may continue, Mr. Brown.

24            MR. BROWN:  Thank you, Your Honor.

25                    CONTINUED CROSS-EXAMINATION OF
```

```
 1                              J.W. VERRET

 2    BY MR. BROWN:

 3    Q.  Good morning, Mr. Verret.  Can you hear me all right?

 4    A.  I can hear you fine.  Good morning.

 5    Q.  I should say Professor Verret.  Sorry.  Now, Professor --

 6    A.  It's Verret, not Verret, but no need for the professor

 7    stuff.

 8    Q.  Very good.  Mr. Verret, yesterday you testified that you

 9    did not have access to Chainalysis; is that correct?

10    A.  That's right.

11    Q.  Do you have experience with any other blockchain tracing

12    tools, such as CipherTrace or TRM?

13    A.  I have not used those tools.

14    Q.  Have you taken any blockchain tracing trainings?

15    A.  So blockchain tracing is a topic in some of the CFF and CFE

16    trainings.  But I understand you to mean the kind of training

17    that Chainalysis provides; I haven't taken that, training in

18    their tool.

19    Q.  And you haven't taken training or certification programs

20    that are open to the public from TRM or any other blockchain

21    tracing company?

22    A.  I wouldn't say that.  I'm currently taking a training

23    program I've almost completed.  I'm waiting for the background

24    check component.  It's offered by McAfee toward their

25    certification as a -- I don't know.  It's another crypto
```

 1    forensics certification that has a blockchain tracing component

 2    to that.

 3              But I have not taken the programs offered by

 4    Chainalysis or TRM that you referenced in their own specific

 5    tool.  And, again, as I mentioned, it's also a component of

 6    some CFF and CFE continuing education trainings.  Blockchain

 7    tracing and using blockchain explorers is a component of those

 8    trainings.

 9    Q.  Mr. Verret, are you aware of any traditional banks or

10    credit reporting agencies that have been victims of hacks?

11    A.  Sure.

12    Q.  I believe yesterday you mentioned Bank of America.  Are

13    there any other financial institutions that you're aware of

14    that have been victims of hacks?

15    A.  So I know that many of them have -- I mentioned Bank of

16    America yesterday in reference to a different item, I believe,

17    a different point.

18              But in any event, I concede I am aware in the popular

19    news that many banks have been subject to various criminal --

20    or customers of banks have been subject to issues that involve

21    cryptocurrency and hacks and scams, certainly.

22    Q.  And my question was specifically about hacks.  Are you

23    aware of financial institutions, like banks, that have been

24    victims of hacks?

25    A.  Sure.

1    Q.  Are you aware of a specific example?

2    A.  Yeah.  I mean, one of the credit rating agencies was

3    subject to a hack.  It was Equifax.

4         And you read all the time about banks subject to

5    hacking issues.  And I'm aware that -- as you mention banks, I

6    would include in that category the central bank, the Federal

7    Reserve.  And in my capacity as running oversight, the House of

8    Representatives oversight of the Federal Reserve for a couple

9    of years -- as indicated on my resume -- one of the things we

10   investigated was cyber security issues at the Federal Reserve

11   and the number of hacks that the Federal Reserve had been

12   subject to that they didn't tell the public about.

13        So that's a yes in answer to your question.

14   Q.  Would it be your testimony that if a bank has been the

15   victim of a hack, then you cannot rely on customer account

16   records for that bank for financial accounting purposes?

17   A.  It would depend on the nature of the hack.  If, for

18   example, the hack involves an individual's credentials being

19   obtained through phishing, then you could not rely on the bank

20   records as indication of activity by the individual because it

21   might reflect activity by the hacker.  That's one example.

22   Q.  And does that reflect your personal preference in

23   conducting this work, or is this a generally accepted

24   accounting standard or norm?

25   A.  It reflects my application of the standards that apply, as

1    I think it's fair to characterize all the opinions I've

2    expressed.  It reflects my application of the standard to --

3    standards of objectivity and reasonable reliance that apply to

4    CFFs and CFEs in working under the professional standards that

5    we're required to work under that are referenced in my

6    disclosure.  And we have to make professional judgments about

7    what records to rely on and for what purpose.

8         And this tracks back to the Bank of America question

9    and the prior case I had where there was concerns about whether

10   we could rely on -- for a specific purpose, rely on the

11   endorsement practices and -- endorsement compliance practices

12   at Bank of America in the case in which a lot of endorsements

13   seemed to occur that did not comply with their internal

14   processes on endorsements.

15        For the specific purpose of relying on the accuracy

16   of endorsement at that bank, I couldn't rely because I had

17   reasons to doubt the endorsement compliance procedures of that

18   bank.  So the reliance is going to be fit to purpose.

19   Q.  Is it fair to say that your judgment about whether account

20   records can be relied upon or not depends on specific knowledge

21   of the nature of the intrusion and whether that intrusion

22   affected a specific customer's account?

23   A.  It might.

24   Q.  Now, you have no specialized knowledge regarding the

25   Mt. Gox hack, correct?

1    A.  I have knowledge of how that hack has been described by the

2    former operator of that exchange and knowledge of how that's

3    been described in the popular press, knowledge of how that's

4    been described in case filings in which Mt. Gox touches upon

5    issues in cases, including the bankruptcy case itself in Japan.

6    I've seen some of the filings from that case.

7         So I take my knowledge of it from those -- from those

8    sources and from the tracers in the dark book that's referenced

9    in my disclosure.

10   Q.  So in sum, it's listening to a podcast, reading news

11   articles, and reading a book; is that fair to say?

12   A.  And court filings as well, yes.

13   Q.  And do the court filings for the bankruptcy proceeding in

14   Japan contain details about the nature and specific details of

15   the hack?

16   A.  I don't recall specifically.

17   Q.  Have you reviewed the defense Mt. Gox account records, the

18   account Roso [sic] 987341870?

19   A.  I have reviewed Mt. Gox records.  I don't have those in

20   front of me.  So I don't recall if -- I don't remember the

21   specific number that you're citing.

22   Q.  Have you reviewed Mt. Gox records that were registered

23   under the name of the defendant, Roman Sterlingov?

24   A.  I don't remember if they had his name at the top, but I

25   assume that they did.  I reviewed a number of Mt. Gox records

1    in the defense -- in the production.

2    Q.  And do you recall reviewing Mt. Gox customer account

3    records that had KYC information, including Roman

4    Sterlingov's -- an image of his driver's license?

5    A.  I recall a number of documents where there was a -- there

6    was a -- I'm not sure if it was a driver's license or a

7    passport, but I do recall that.

8             I don't recall exactly which institutions, but I do

9    recall seeing that a few times.

10   Q.  So you're not sure if your recollection pertains to the

11   Mt. Gox records or to some other KYC account in the name of

12   Roman Sterlingov?

13   A.  I reviewed a number of KYC documents that had

14   Mr. Sterlingov's identifying information.  I did see one that

15   appeared to have another person's identifying information, and

16   I wasn't quite sure why that was.  I still have not had a

17   sufficient answer to that particular question.

18   Q.  And that one account with another person's name and KYC

19   information, that wasn't Mt. Gox, was it?

20   A.  That wasn't Mt. Gox, that's correct.  I believe it was

21   related to Malta.

22   Q.  And would it be possible that the reason there's a second

23   customer listed is because that's an account for the

24   defendant's corporate account at Kraken, and the other

25   individual listed is the local Maltese citizen associated with

1    that corporation?

2    A.  I don't know that that is possible or impossible.  I would

3    be glad to look into that further.

4    Q.  Have you reviewed the defendant's plasmadivision.com

5    emails?

6    A.  I reviewed some emails.  I don't know that I've reviewed

7    yet that particular email.

8    Q.  Have you reviewed any email transaction confirmations for

9    Roman Sterlingov's Mt. Gox account?

10   A.  I believe I've seen something like that in some of the

11   emails that I reviewed, yes, transaction data confirmations.

12   Q.  Have you reviewed the defendant's Bitstamp account records?

13   A.  Yes.  I believe I've -- in understanding the total amount,

14   Bitstamp -- the total amount of bitcoins that he -- are

15   attributed to his possession now by the government, that's a

16   component of that inquiry, yes.

17   Q.  And have you reviewed records of correspondence between the

18   defendant's Bitstamp account administrators?

19   A.  Again, as I sit here, I don't have those in front of me.  I

20   don't remember the specific names, but I do remember

21   reviewing -- I remember seeing the email transaction

22   verification emails from various institutions.

23   Q.  Do you recall seeing, in correspondence between the

24   defendant and Bitstamp, that the defendant sent a copy of his

25   Mt. Gox bankruptcy claim form to Bitstamp?

1    A.  I don't recall that specifically.

2    Q.  Now, in your expert disclosure, you stated that there is a

3    "distinct possibility that a third-party hacker may have used

4    Sterlingov's Mt. Gox account for the purpose of obfuscating his

5    own unlawful transactions"; correct?

6    A.  That's correct.

7    Q.  And that is pure speculation on your part, correct?

8    A.  You continue to describe things in a way that is misleading

9    and then you ask correct at the end of it.  I want to give a

10   succinct answer, but I don't believe that characterization is

11   accurate.

12           I believe that it's reasonable to consider the

13   alternative possibility that I've described and that you

14   described in a little bit of a different way than I would

15   describe it.

16           You know, I -- I continue to believe it's reasonable

17   because, look, I get -- I know I get -- I conduct crypto

18   activity across a number of different venues, and I get email

19   confirmations all the time.  I don't always check them all.

20   It's absolutely possible for significant confirmations to come

21   through that I don't notice and I don't review until some point

22   later in my own practice until next year's tax filing deadline.

23           I don't know what someone else's practice is, but

24   it's possible for those to be missed.  I do understand what

25   you're suggesting, that the presence of email confirmations

1    would raise a flag for a customer.  But I don't think that

2    those obviate the reasonableness of the alternative possibility

3    that someone hacked his account and was conducting activity

4    using his account.

5    Q.  Have you conducted any study of other Mt. Gox

6    accountholders and whether their accounts were hijacked for

7    illegal purposes?

8    A.  Not specifically, no.

9    Q.  Are you aware --

10              THE COURT:  One at a time, please.

11              THE WITNESS:  As a result of my training, I do know

12    that that's a frequent pathology -- criminal pathology of

13    hackers.

14    BY MR. BROWN:

15    Q.  Are you aware of a single instance that you can speak to

16    today of a Mt. Gox accountholder whose account was hijacked by

17    a third party to conduct the third-party's transactions?

18    A.  I'm not aware of that, no, specifically.

19    Q.  So you have no factual basis to speculate that the

20    defendant's Mt. Gox account was hijacked by a third party for

21    illegal purposes?

22    A.  My basis for considering that alternative hypothesis is my

23    understanding that hacking legitimate accounts to conduct

24    criminal activity is a common fact pattern with hackers.

25    Q.  Can you cite a single piece of evidence suggesting that

1    Mr. Sterlingov was the victim of a phishing or

2    credential-stealing attack for his Mt. Gox account credentials?

3    A.  No.

4    Q.  In your review of the defendant's Mt. Gox records, can you

5    point to a single item of evidence that indicates his account

6    was hijacked by a third-party hacker to conduct a third-party

7    hacker's transactions?

8    A.  I have not seen a specific piece of evidence to that

9    effect, no.

10           But in considering my hypothesis, I also have to

11   consider the possibility that when someone -- when that happens

12   and someone hacks your account in order to engage in illegal

13   activity through your account, they often do their very best to

14   change the settings of your account to limit -- security

15   settings that might be maintained within a specific account.

16   So that's a reasonable hypothetical to consider in considering

17   that alternative hypothesis.

18   Q.  In reviewing the defendant's Mt. Gox account records, can

19   you point to a single piece of evidence indicating that his

20   account security settings were changed or that there's some

21   evidence of deletion logs or other records for his specific

22   account?

23   A.  I have not seen those records, so I cannot point to that

24   specifically.  But I would also have the concern of relying on

25   records of those settings changes given the state of the

1    Mt. Gox data.

2              MR. BROWN:  Your Honor, no further questions for this

3    witness at this time.

4              THE COURT:  All right.  Mr. Ekeland?

5                        REDIRECT EXAMINATION OF

6                              J.W. VERRET

7    BY MR. EKELAND:

8    Q.  Professor Verret, in your review of the discovery, did you

9    come across a complete set of the Mt. Gox database?

10   A.  No.

11   Q.  Do you consider it forensically sound to arrive at

12   conclusions with -- particularly in regard to your hacking

13   hypothesis and everything, without actually having full access

14   to the complete database?

15   A.  If I had access to the full database, I could have a more

16   robust conclusion, fulsome conclusion.  It limits my ability to

17   come to a full conclusion, but I still believe it is reasonable

18   to consider the alternative hypothesis of use of -- that,

19   potentially, Roman's account was hacked and used for illicit

20   purposes given that we know it was hacked multiple times.

21   Q.  But if I understand your testimony correctly, to do a

22   fulsome forensic analysis, particularly in the area that you've

23   been brought in, the financial forensic analysis, you'd need

24   access to the complete Mt. Gox database, correct?

25   A.  I think it is accurate that for the -- that to fully

1    challenge the government's assertions regarding what happened

2    from his Mt. Gox account, that would be necessary, yes.

3    Q.  And as part of your determining -- coming up with, you

4    said, the alternative hypothesis or raising the possibility

5    that Mr. Sterlingov's Mt. Gox information and data had been

6    altered, did you consider Mark Karpeles' conviction in Japan

7    for manipulation of the Mt. Gox data?

8    A.  I did.  That's one component, yes.

9    Q.  Did you consider Mr. Mark Karpeles' conviction in 2010 in

10   France for data fraud?

11   A.  I don't have independent knowledge of that, but you

12   mentioned that to me.  So that was a part of my consideration,

13   yes.

14   Q.  Now, I just want to turn briefly to -- you've reviewed the

15   government's expert disclosure for Ms. Sarah Glave, who I

16   believe they're bringing in to do the financial reporting on

17   this case?

18   A.  Correct.

19   Q.  Did you see anything in there that demonstrated the bases

20   for her opinions?

21   A.  So far I don't see a basis for a forensic opinion, no.

22   Q.  And did you come across anywhere in the discovery or have

23   you come across any expert report from Ms. Glave as to any of

24   the financial matters in this case?

25   A.  Not yet, no.

1    Q.  And just turning briefly to the government's allegation

2    that Mr. Sterlingov received service fees from his operation of

3    Bitcoin Fog, have you seen any evidence of that at all anywhere

4    in the discovery?

5    A.  I have not, no.

6    Q.  And what would you need to support that hypothesis, if it

7    were to be true?  What would you need to see to establish the

8    fact that say, hypothetically, he was receiving service fees?

9    A.  I would need to -- I would need to see his possession of

10   those fees.  And the fact that he has bitcoin that's -- that's

11   less than 7 or 8 percent of the total fees one would expect the

12   person running that to receive in bitcoin leads me to

13   understand that -- I cannot assume that the source of that -- I

14   don't want to describe it in the same way because we haven't

15   proven that they're the same bitcoin.

16          But let's consider Roman's bitcoin -- which is less

17   than 7 percent of the total amount that the person running

18   Mt. Gox would have -- that size differential leads to a

19   reasonable inference to me, related to each other.

20          What would I need to see?  The best evidence would be

21   missing assets that cannot be accounted for.  I mean, I have to

22   say -- if you'll indulge a story.  I told my son about this

23   case when I first started working on it.  And his first

24   question was, does he have a lot of fancy yachts and cars?  I

25   said, wow, buddy, that's actually the first question you ask in

1    forensic accounting.  And that's been an element of the

2    government's case is money laundering -- crypto money

3    laundering cases so far, their success so far.

4              THE COURT:  Do you know what sort of car

5    Mr. Sterlingov owned?

6              THE WITNESS:  I haven't seen any evidence that he

7    owned any sort of luxury vehicles or real estate or anything

8    unaccounted for.

9              THE COURT:  Do you consider a Tesla, I think it was a

10   Model S, to be a luxury vehicle?

11             THE WITNESS:  I don't, no.  Not in the way --

12             THE COURT:  A $100,000 car is not a luxury vehicle?

13             THE WITNESS:  I mean, it's a $50,000 car.  It

14   doesn't --

15             THE COURT:  No.  It's the Model S.

16             THE WITNESS:  Okay.  Maybe it's a $70,000 car, Your

17   Honor.

18             To my point, relative to -- at some point valued a

19   billion dollars in missing bitcoin, that doesn't lead me to an

20   inference that he was involved in those assets.

21             THE COURT:  All right.

22   BY MR. EKELAND:

23   Q.  Outside of this Tesla, have you seen any evidence anywhere

24   of any substantial asset purchases or anything by

25   Mr. Sterlingov anywhere in the discovery?

1    A.  No.

2    Q.  And have you seen anything in the evidence, in the

3    discovery that's inconsistent with Mr. Sterlingov simply being

4    an early adopter of Bitcoin who then, essentially, made all his

5    money just from the appreciation when bitcoin rapidly

6    appreciated in the mid- -- around, what is that, 2015, 2016?

7    A.  No.  And I looked for it.  When I entered this case, like I

8    enter every case, I told you the same initial warning I give

9    every lawyer when I work on a case.  I said, there may come a

10   day when my findings are not consistent with your defense, in

11   which case probably I'll have to resign from this job.  I give

12   that one to every lawyer; I gave it to you.

13          I looked for the evidence that would suggest

14   otherwise, that he wasn't someone who was just early to Bitcoin

15   who used a privacy tool.  I haven't found that evidence.

16          MR. EKELAND:  No further questions, Your Honor.

17          THE COURT:  Okay.  Thank you.  The witness is

18   excused.  Thank you for being here.

19          Do you want to call the next witness right now?  I

20   have to break at 11:00.

21          MS. PELKER:  My understanding from Mr. Ekeland is

22   that he won't be available until 1:00 p.m.

23          MR. EKELAND:  Until 1:00 p.m.  He's on the West

24   Coast.

25          THE COURT:  I see.  All right.  Do you want to offer

 1    any argument then with respect to the witnesses we've heard

 2    over the past day and a half?  I'm happy to hear that now as

 3    well.  It's up to you.  I'm just trying to make use of our

 4    time.

 5             MR. EKELAND:  I was hoping we could do some

 6    housekeeping, Your Honor, if that's possible.

 7             THE COURT:  That's fine.  Sure.

 8             MR. EKELAND:  One thing I'd like to address with the

 9    Court is we're having significant issues accessing our client

10    at the jail that he's currently in, and that's part of the

11    reasons we're having delays.  Like, it's a six-hour drive from

12    New York City; it's two hours outside of D.C.

13             THE COURT:  Where is he being held?

14             MR. EKELAND:  He's being held in the Northern Neck

15    Regional Jail in Warsaw, Virginia.  They've restricted our

16    access under the false allegation that we were trying to bring

17    cigarettes in.  I think if you just review the video, we put

18    the cigarettes in the locker.

19             They are not returning our calls.  We've had

20    significant issues.  We've also heard about other people who

21    were having federal trials that they were restricting access to

22    the attorneys.  So we're hoping that either the Court -- we can

23    have him moved to some facility in D.C. where we can access

24    him, or make him readily -- where it's much easier for our

25    experts to get in.

 1          Part of the issue here is, like, Mr. Verret needs to

 2     go see him.  We need to have our tracing people come talk to

 3     him.  And even when we try to set up video calls with the jail,

 4     they're not returning our calls, they're saying we can only do

 5     it at certain times.  It's really hampered the defense, and we

 6     do not have full and fulsome access that we need to our client

 7     to prepare this defense.

 8          So we ask the Court -- I don't know what the solution

 9     is, but can we get him to a facility in D.C. or what?  Because

10     at this point, as the Court knows, it's game time, and we need

11     full access to him, and we're not getting it.

12          THE COURT:  I can check in with the Marshals Service

13     to see what's going on.  There was a time in which -- and it

14     may still be going on -- in which a lot of folks were moved out

15     of the D.C. jail because the conditions were so bad.  And the

16     Marshals Service was actually concerned about people being

17     housed under conditions which were not appropriate.

18          So they moved folks out.  And some folks are being

19     held in Pennsylvania, some folks at Northern Neck as a result

20     of that.  I can check and see what the current status is.

21     It's, ultimately, not my decision.  It's the Marshals Service

22     decision.  But I'm happy to follow up with them and figure out

23     what's going on.

24          More generally, obviously, wherever he's held, the

25     jail needs to provide access to his counsel, and that needs to

1     occur wherever he's being held.

2          MR. EKELAND:  Your Honor, if there's something that

3     the Court could do on that or if we could have someone get an

4     instruction to the jail to give us full access.  We're getting

5     the impression, essentially, that they're just sandbagging us.

6     And it's a big issue.

7          You know, it's like that sort of soft thing where

8     they don't return your calls or they told us, oh, you can only

9     see him behind plexiglass and we're going to monitor it.  It's

10    a big problem.

11         THE COURT:  Well, I will check into what's going on

12    there.  If there's anything that I can do, I will.  As I said,

13    it is, ultimately, up to the Marshals Service to figure out

14    where someone gets housed.

15         MR. EKELAND:  Thank you, Your Honor.

16         THE COURT:  Any other housekeeping matters you wanted

17    to raise?

18         THE DEFENDANT:  Excuse me.

19         THE COURT:  Yes.  Talk to your lawyer first.

20         MR. EKELAND:  Your Honor, he just -- Mr. Sterlingov

21    just wanted to remind the Court something we discussed about

22    before is the sleep issues that he's been having with the

23    transfers.  So, essentially, whenever -- in the Northern Neck

24    Regional Jail, when he has to go to a hearing, it's like

25    they're moving him at 2:00 or 3:00 in the night and,

1    essentially, he's not getting any sleep.  I think you can see

2    him.  His concern is that that's going to affect his mental

3    state for trial.

4            THE COURT:  Okay.

5            MR. EKELAND:  Then he just asked -- I'd just ask the

6    Court this as well, to reiterate, if there's anything you can

7    do to order the jail to give us full access, we would

8    appreciate it.

9            THE COURT:  On ordering the jail to provide full

10   access, I mean, perhaps that's in my authority at some point.

11   The jail is not even a federal facility.  It's a facility

12   that's under contract with the United States Marshals Service.

13   But I'm happy to follow up and make sure that things are

14   handled appropriately.

15           But what you told me is that they're not returning

16   calls and that he's being held behind plexiglass.  Is there

17   anything more than that?

18           MR. EKELAND:  They told us they would now only let us

19   see him, actually, behind the plexiglass on the phone.  And

20   before we had access -- well, they're not letting us see him in

21   an attorney room.

22           THE COURT:  Is that because of the cigarette issue?

23           MR. EKELAND:  What they said, essentially, we came in

24   one time and you have to -- you go in a room and you empty out

25   all your pockets.  Mr. Hassard had a pack of cigarettes in his

1    pocket, and he took it out, and then we put them in the locker.

2    And then when we got back, we got a letter from the jail

3    saying, hey, you guys were trying to smuggle in contraband,

4    which was not true, Your Honor.  I've been going to jails for a

5    decade; I would never do that.

6           And then there was a whole back-and-forth between us

7    and them about if we could get access to him, and they said

8    they'd only do it behind plexiglass and --

9           THE COURT:  Because they're concerned that you're

10   going to pass him cigarettes?

11          MR. EKELAND:  Yes, Your Honor.

12          THE COURT:  Well, I will check into the situation.

13          MR. EKELAND:  Thank you, Your Honor.

14          THE COURT:  Any other housekeeping matters you want

15   to raise now?

16          MS. PELKER:  No housekeeping matters, Your Honor.

17   We're happy -- I know we've had a compressed schedule, and

18   we've got 18 minutes.  And so if there's any argument that the

19   Court would like to hear, we're happy to make it.

20          THE COURT:  If there's anything you want to add on

21   the bill of particulars, I may be able to this afternoon give

22   you just an oral decision on the bill of particulars.  If

23   there's anything you want to add on that, this may be a good

24   time to do that.

25          MS. PELKER:  Yes, Your Honor.  I'll actually pass

1    that to Mr. Brown.

2              THE COURT:  Unless -- maybe since it's Mr. Ekeland's

3    motion, if he wants to go first, that's fine with me, too.

4              MR. EKELAND:  Your Honor, we would like the Court to

5    order a bill of particulars, particularly given -- I understand

6    that the normal response with the bill of particulars is, oh,

7    if you can find from the discovery what you're defending

8    against, you don't need a bill of particulars.

9              But here we've got a particular problem.  It seems

10   like the goalposts keep moving.  To date, we don't have any

11   names on the first count of the co-conspirators.  There hasn't

12   been a single conspiratorial statement identified by the

13   government.  We know no names of the co-conspirators.  We've

14   asked.

15             In terms of the money laundering, initially, the

16   amount was $334 million.  In the Bisbee report, it's now gone

17   down to $33 million, 10 of which they're saying is indirectly

18   traced and, I think, like, 22 is directly traced.

19             The trace in the original criminal complaint does not

20   match the trace in Luke Scholl's report.  So we're not clear

21   on -- so what we're having to spend a lot of time on and it's

22   consuming a lot of resources, and Ms. Still is going -- we

23   don't know what we're actually defending against, so we have to

24   burn a lot of resources doing all sorts of traces, spending a

25   lot of money guessing what we're defending.

1          The government's barebones indictment is not

2     sufficient in a case like this involving very, very complex

3     matters of cryptocurrency tracing and attribution.  I mean,

4     that's essentially it.  We'd just like to know what we're

5     defending against and not have to guess constantly.

6          And there's not enough detail in the superseding

7     indictment for us to know what's going on.  And then when the

8     expert reports come in, the trace is different.  And then, you

9     know, we just don't know what -- if this is going to change at

10    the 11th hour and we're going to have to ask for a continuance

11    and then burn more fuel doing traces that we could have done

12    before if we had just been on notice.  I think the Court gets

13    the point.

14          THE COURT:  All right.  Thanks.  Mr. Brown?

15          MR. BROWN:  Yes, Your Honor.  The purpose of the

16    indictment is so that the defendant can understand the charges

17    against him, prepare a defense, and be able to avoid double

18    jeopardy.  Between the superseding indictment, the criminal

19    complaint affidavit, the voluminous discovery, and the

20    extremely voluminous pleadings and pretrial witness testimony

21    in this case, I think it's pretty clear that the defense

22    understands the charges, and the defense is mounting a very

23    focused and zealous defense as to the charges against

24    Roman Sterlingov.

25          The defendant's complaints here really go to certain

1    specific evidentiary issues about what is the precise amount of

2    money being laundered, you know.  The superseding indictment

3    doesn't name darknet vendors and market administrators as

4    unindicted co-conspirators.  There's no case law supporting the

5    idea that we need to provide full names of everybody.

6            In fact, for darknet market administrators, their

7    names may not be known to the grand jury.  That doesn't mean

8    the grand jury cannot consider them to be unindicted

9    co-conspirators.  I think that --

10           THE COURT:  Just to interrupt, Mr. Brown, even if you

11   didn't know the name, you can still identify who the government

12   contends the co-conspirators are.  It was the darknet

13   administrator of X or something like that; even if you didn't

14   know the name, right?

15           Mr. Brown, can you hear me okay?

16           MR. BROWN:  Yes.  Sorry.  There's about a one-second

17   delay.  I'm trying not to talk over folks on the other side.

18           To respond to the Court's question, yes, that is

19   true.  However, the case law also says that you can look at the

20   full body of materials that have been produced.  The

21   superseding indictment refers to darknet market administrators

22   and vendors.  The discovery and the other pleadings in this

23   case have referenced, and the expert reports have referenced

24   specific darknet markets, and the trace transactions between

25   those darknet markets and Bitcoin Fog specifically.

1          So there's no mystery about which darknet markets or

2     illicit markets we're talking about.  There's no mystery about

3     who the unindicted co-conspirators are.  And even if there

4     were, it is very rare for courts to order a bill of particulars

5     simply to name unindicted co-conspirators.

6          As for the other defense complaints, these are really

7     factual nitty-gritty complaints.  They say they've identified

8     this discrepancy in tracing, which we would dispute, but that's

9     not the basis for a bill of particulars.  The bill of

10     particulars is not a preview of the government's trial

11     presentation.

12          The bill of particulars is simply to provide notice

13     to the defendant about the charges he needs to prepare a

14     defense to.  And the superseding indictment, complaint and

15     affidavit, search warrant affidavits, discovery, pretrial

16     testimony, expert reports, and other discovery in this case

17     provide a wealth of notice, at the very least, to the defendant

18     sufficient to meet the standard.

19          THE COURT:  All right.  Thank you.  Anything else,

20     Mr. Brown?

21          MR. BROWN:  No, Your Honor.

22          THE COURT:  Mr. Ekeland?

23          MR. EKELAND:  Just merely on the conspiracy, we

24     really don't have the who, what, where, when, how --

25          THE COURT:  You've got to go slower for the court

1    reporter.

2              MR. EKELAND:  On the conspiracy, we don't really have

3    the who, what, when, where, and how.  There's no conspiratorial

4    statements or anything identified.  It's only stated in the

5    vaguest terms.

6              And in relation to that, you know, there's a statute

7    of limitations issue here because almost all these darknet

8    markets, if not all of them, went under and ceased practically

9    functioning well outside the statute of limitations.  Like Silk

10   Road is going down in 2013; I think Agora goes down in 2014.

11             You see the government straining with this in the

12   Scholl and the Bisbee reports where they try to identify

13   transactions that they say happened in 2021, well after these

14   markets went down.  And nothing there has been defined with any

15   particularity.  They're only the vaguest generalizations.

16             I think that not only goes to the conspiracy issue,

17   but you do have the issue with the double jeopardy.  What

18   traces are we concerned with here that the purchase of a domain

19   name registration in 2011, which in and of itself, isn't

20   illegal.  That trace is now different in the Scholl report.

21             So I'm not -- I am conscious of the Court's schedule,

22   so I'm going to leave it at that.  Essentially, what we're

23   saying is we would just like a focused statement of the

24   government's case not only to prevent double jeopardy issues,

25   but so that we don't have to burn a ton of resources because

1    the voluminous discovery is the issue.  That's what's slowing

2    us down.

3           If we had a bill of particulars, we'd be able to

4    focus more on stuff.  Now we're swimming in three terabytes of

5    data, and that burns a lot of resources that, as the Court is

6    well aware, we don't really have.  Thank you, Your Honor.

7           THE COURT:  While you're at the podium, you mentioned

8    that the witness is not available until 1:00.  I was planning

9    on starting at 1:30.  Is that okay?

10          MR. EKELAND:  That's fine, Your Honor.  Yes.

11          THE COURT:  All right.  So unless there's anything

12   else you want to raise now while we have some time, I can step

13   off the bench, and I'll come back and handle my 11:00.  And

14   then maybe after the 11:00, I can give you my thoughts on the

15   bill of particulars.

16          MS. PELKER:  Yes, Your Honor.

17          THE COURT:  I will see you back shortly then.  Thank

18   you.

19          (Recess taken at 10:50 a.m. until 1:35 p.m., after

20          which the following further proceedings were had:)

21          THE COURTROOM DEPUTY:  Recalling Criminal

22   Case 21-CR-399, United States of America v. Roman Sterlingov.

23          THE COURT:  All right.  So I can give you my decision

24   on the bill of particulars, which is the motion at Docket 45.

25   As Rule 7(c)(1) provides, an indictment is sufficient if it

1  contains "a plain, concise, and definite written statement of

2  the essential facts constituting the offense charged."  If

3  clarification of the indictment is necessary to "ensure that

4  the charges brought against a defendant are stated with enough

5  precision to allow the defendant to understand the charges, to

6  prepare a defense, and perhaps also to protect against retrial

7  on the same charges."  That's *United States v. Butler*, 822 F.2d

8  at 1193.

9          Then a court "may direct the government to file a

10  bill of particulars."  And that's just a cite to Federal Rule

11  of Criminal Procedure 7(f).

12          A bill of particulars, though, is not an ordinary

13  tool of discovery or a device to allow the defense to review

14  the government's evidence in the case.  That's *United States v.*

15  *Brodie* at 326 F.Supp.2d at page 91.  Rather, the purpose of the

16  bill of particulars is to provide clarification where

17  necessary.

18          It is not a way to force the government to

19  recapitulate information the defendant could ascertain "by

20  reasonable investigation in light of the information contained

21  in the indictment or otherwise furnished by the prosecution."

22  That's *United States v. Concord Management*, 385 F.Supp.3d at

23  page 74.  And also *Butler* at 822 F.2d at 1193.

24          At the same time, it's "not sufficient for the

25  government to respond to a motion for a bill of particulars"

1    by merely "pointing to the voluminous discovery already

2    provided or relying on a government open file policy."

3    And that's *United States v. Bazezew* at 483 F.Supp.2d at

4    page 168.

5            Here Mr. Sterlingov organizes his motion for a bill

6    of particulars by count in the superseding indictment, so

7    that's the approach that I will follow.

8            With respect to Count 1, the money laundering

9    conspiracy count, most of what Mr. Sterlingov requests with

10   respect to that count has either already been provided to him

11   or is beyond what the government, in any event, is obligated to

12   disclose in a bill of particulars.

13           "The general rule in conspiracy cases is that the

14   defendant is not entitled to obtain detailed information about

15   the conspiracy in a bill of particulars."  That's *United*

16   *States v. Sanford* at 841 F.Supp.2d, page 317.  Courts,

17   therefore, routinely deny requests for information such as

18   which conspirator committed each act alleged in the indictment;

19   the exact time, date, and place where the conspiracy began; the

20   identities of the victims where injury to those victims is not

21   an element of the offense; and the precise details about the

22   times and places the defendant participated in the alleged

23   conspiracy.

24           And there I'm citing to *Concord*, *United States v.*

25   *Martinez* at 764 F.Supp.2d at page 174; *United States v. Palfrey*

1    at 499 F.2d at page 51; the *Bazezew* case that I just mentioned;

2    and *United States v. Pollack* from the D.C. Circuit at 534 F.2d

3    at page 971.  And then, finally, you have *Butler* at 822 F.2d at

4    pages 1193-94.

5         In addition to the facts alleged in the indictment,

6    the government has provided Mr. Sterlingov with considerable

7    detail about the alleged conspiracy and his role in it and the

8    statement of facts that accompanied the complaint, the warrant,

9    affidavits, and supplemental declarations included with the

10   government's briefing on Mr. Sterlingov's motion of release of

11   funds, to say nothing of the voluminous discovery that's been

12   provided in the case.

13        I'm going to, therefore, deny the following requests

14   as already provided to Mr. Sterlingov or beyond what he's

15   entitled to in a bill of particulars.

16        In particular, I'm going to deny the request with

17   respect to the scope of the conspiracy; the precise nature of

18   the conspiratorial agreement; the date of the conspiratorial

19   agreement; the illegal object of the conspiracy; the particular

20   factual predicate for the intent to conceal or disguise the

21   nature, location, source, ownership, or control of property

22   that Mr. Sterlingov believed to be the proceeds of specified

23   unlawful activity; the particular factual predicates for the

24   intent to promote the carrying on of the specified unlawful

25   activity; the particular factual predicate for the intent to

1    avoid a transaction reporting requirement of state or federal

2    law.

3         I should note that avoiding a transaction reporting

4    requirement is neither alleged nor is part of the charged

5    offense.

6         The particular factual predicates for the alleged

7    proceeds of specified unlawful activity; the particular factual

8    predicates for the alleged property that was represented to be

9    the proceeds of or used to conduct specified unlawful activity;

10    the particular factual predicates underlying the date, time,

11    place, and manner of the alleged conspiracy; the particular

12    factual predicates that indicate Mr. Sterlingov had knowledge

13    that Bitcoin Fog was an unlicensed money transmitting business

14    in the United States.

15         And, again, I note that that knowledge is not

16    necessary for the charged conspiracy offense.

17         The identity of the particular conspirator and

18    co-conspirators who complete each conspiratorial act alleged in

19    the indictment; and the identities of all persons other than

20    co-conspirators, including victims referenced in the

21    indictment.

22         Just running through that list, I think, highlights

23    the extent to which the bill of particulars seems more

24    analogous to something that one might see in civil discovery as

25    compared to in a criminal case.

1          But I am going to grant Mr. Sterlingov's request for

2     the names or identities of the co-conspirators known to the

3     government, although only those known conspirators who the

4     government intends to identify as such at the trial, citing to

5     *Concord Consulting* at 385 F.Supp.3d at 76, and also to *United*

6     *States v. Ramirez* at 54 F.Supp.2d 25 at 30.

7          In this district:  "The disclosure of the names of

8     alleged co-conspirators is not uncommon in conspiracy cases and

9     particularly in cases alleging nonviolent offenses."  That's a

10    quotation from *Palfrey* at 499 F.Supp.2d at 52, and the *Brodie*

11    case and the *Ramirez* case support the same principle.

12         Such disclosures, particularly here, given the

13    sweeping -- given the broad sweep, duration, and complexity of

14    what is alleged here, I think that Judge Friedrich's opinion in

15    the *Concord Management* case, although not on all fours, is on

16    point in significant respects.  In granting the request for the

17    identity of the alleged co-conspirators in that case, Judge

18    Friedrich emphasized that it was not a typical case because the

19    charged conspiracy involved foreign corporate defendants,

20    hundreds of individuals, and conduct carried out on foreign

21    soil.  These considerations, among others, make disclosure here

22    appropriate as well.

23         As -- like the *Concord Management* case, this is not a

24    typical case.  I don't question that *Concord Management* was

25    atypical in further respects, but this case does involve an

1    alleged decade-long conspiracy involving many co-conspirators,

2    a complex and novel money laundering scheme, and acts carried

3    out largely on foreign soil, as was the case in *Concord*

4    *Management*.

5        The indictment here is also less detailed than the

6    one in *Concord Management*.  It does not contain a detailed

7    account of the overt acts.  It lacks the names of any

8    co-conspirators apart from references to "darknet vendors and

9    darknet administrative teams."

10        To be sure, many of the specifics absent from the

11    indictment can be found in materials the government has

12    provided, including the complaint's statement of fact, and the

13    warrants, as well as the discovery.

14        But even so, given the complexity and the breadth of

15    the alleged scheme, the Court concludes, as Judge Friedrich did

16    in *Concord Management*, that the disclosure of co-conspirator

17    identities will reduce any potential for unfair surprise at

18    trial, and here also will expedite the process of preparing for

19    trial.

20        The government resists this conclusion reading

21    *Concord Management* to turn largely on the fact that in that

22    case the defendant's access to much of the discovery was

23    limited for national security reasons.  That certainly was a

24    consideration in *Concord Management*, but I don't think it was

25    the predominant one in this respect.

1          The Court does acknowledge that some courts have

2    taken the view that defendants are generally not entitled to

3    learn the identities of co-conspirators through a bill of

4    particulars.  I don't doubt that that is true.

5          I should say that my ruling today is one that is

6    intended to be permissive for the defense, but I think in close

7    cases such as this one, it does make sense to err in the -- on

8    the side of the defense with respect to disclosures of this

9    nature.

10          The out-of-circuit cases that the government cites to

11    don't contain much by way of reasoning in support of that

12    proposition.  To be sure, Judge Howell's opinion in *United*

13    *States v. Sanford* does include extensive reasoning, but I don't

14    believe it's to the contrary here.  *Sanford* did not set forth a

15    generally applicable rule.  It simply held that disclosing

16    co-conspirators' names was not necessary under the

17    circumstances present there.

18          Given the sprawling nature of the allegations here, I

19    think that this case is different, and so I'm going to order

20    that the government disclose the names, or if the government

21    doesn't know the names, the other identifying information

22    relating to the co-conspirators that the government is aware of

23    that the government intends to identify as co-conspirators at

24    trial.

25          I'm going to deny Mr. Sterlingov's request related to

1    the money laundering count across the board.  To start, he

2    appears to believe that the money laundering offense with which

3    he has been charged requires that he laundered actual criminal

4    proceeds.  It does not.

5            He's been charged under 18 U.S.C. Section 1956(a)(3),

6    which prohibits conducting a financial transaction "involving

7    property represented to be the proceeds of specified unlawful

8    activity" with the intent to "conceal and disguise the nature,

9    location, source, ownership, and control of property believed

10   to be the proceeds of specified unlawful activity, or to

11   promote the carrying on of specified unlawful activity."

12           A representation in this context includes the

13   representation by law enforcement.  So there's no requirement

14   that the property issue, in fact, have been the proceeds of

15   ill-gotten gains.

16           That clarification does resolve several of

17   Mr. Sterlingov's requests relating to this count.  The

18   complaint's statement of fact addresses Mr. Sterlingov's other

19   request for detail that otherwise might be provided in a bill

20   of particulars.

21           The affidavit recounts step-by-step the sting

22   transaction that is the basis of Count 2 and provides

23   Mr. Sterlingov with the information that he's asked for,

24   including the specific unlawful activity alleged, the property

25   involved in the charged transaction, the transaction in which

1    the charge is based, the unlawful activity, the factual basis

2    for the allegations regarding Mr. Sterlingov's knowledge and

3    intent with respect to the sting transaction, the factual

4    predicate for the allegation that the transaction involved

5    property represented to be the proceeds of specified unlawful

6    activity, and the date, time, place, and manner of the

7    transaction.

8         Mr. Sterlingov's request related to the conspiracy

9    charge is independent of this charge.  Again, just recounting

10   what the actual requests are in the bill of particulars

11   emphasizes the fact that the bill of particulars in this case

12   more closely resembles the type of discovery one would expect

13   in a thoroughly litigated simple litigation as opposed to a

14   criminal case, including, for example, asking for the factual

15   basis for the allegations regarding Mr. Sterlingov's knowledge

16   and intent with respect to the sting transaction, and the

17   factual predicate for the allegations that the transaction

18   involved property represented to be the proceeds of the

19   specified unlawful activity.

20        With respect to Count 3, operating an unlicensed

21   money laundering -- money transmitting business,

22   Mr. Sterlingov's requests relate to the charge of operating an

23   unlicensed money transmitting business, and those requests fare

24   no better.  His assertion that he cannot discern "what he's

25   alleged to have done that constitutes running a money

1    transmission business" is not at all persuasive to the Court.

2         The indictment and the information the government has

3    provided impart ample detail regarding the factual predicates

4    of the charge, and that is that the government alleges that Mr.

5    Sterlingov operated Bitcoin Fog, a business that conducted

6    bitcoin transfers on behalf of the public.  The complaint's

7    statement of facts also describes the basis for the allegation

8    that this business was unlicensed within the meaning of 18

9    U.S.C. Section 1960(b).

10         Mr. Sterlingov's claim that he cannot "determine

11    under what statute the government is attempting to prosecute

12    him for aiding and abetting" is difficult to fathom.  The

13    indictment states that Mr. Sterlingov is charged under

14    18 U.S.C. Section 2, the general aiding and abetting statute.

15         The factual basis for the charge is also no mystery.

16    The statement of facts describes how an account allegedly

17    associated with Mr. Sterlingov would refer to Bitcoin Fog on

18    the internet forums in terms that suggest that it had ample

19    operators.  So the aiding and abetting charge is, presumably,

20    directed at Mr. Sterlingov's conduct that assisted other

21    operators.

22         And then Count 4 is the money transmission without a

23    license, and much of the same analysis holds true here.

24    Mr. Sterlingov's requests in general terms "the factual

25    predicate to support this count."  I'm not sure that, even in a

1    civil case with extensive discovery, that that would be a

2    sufficiently focused request.  But in any event, in a criminal

3    case, it's not.

4         It doesn't lay on the sufficient -- provide a

5    sufficient basis for providing a bill of particulars.  And for

6    all the reasons that I've previously provided, I will deny the

7    request in that regard as well.

8         So overall then, what I'm going to do is direct that

9    the government, with respect to the conspiracy charge, disclose

10   to Mr. Sterlingov the identity either by providing names or

11   other descriptive matter to Mr. Sterlingov of the alleged

12   co-conspirators who the government intends to identify at

13   trial, and I'm otherwise going to deny the motion for a bill of

14   particulars.

15        Should we call the next witness?

16        MR. EKELAND:  Just a housekeeping matter.  I see

17   Mr. Hassard on the Zoom.  I know our witness, Mr. Fischbach, is

18   standing by.  So I just think we need to switch or -- I don't

19   see Mr. Fischbach on the Zoom.

20        THE COURT:  There he is.

21        MR. EKELAND:  There he is.  May I proceed, Your

22   Honor?

23        THE COURT:  You may.

24        MR. EKELAND:  The defense calls Mr. Jeff Fischbach.

25        THE COURT:  If I could ask the deputy clerk to swear

1    the witness.

2              THE COURTROOM DEPUTY:  Yes, your Honor.

3    Mr. Fischbach, thank you for raising your right hand.

4              (Witness sworn.)

5              THE COURTROOM DEPUTY:  Thank you.

6                   DIRECT EXAMINATION OF

7                     JEFF FISCHBACH

8    BY MR. EKELAND:

9    Q.  Mr. Fischbach, could you state for the Court your

10   experience in forensics.

11   A.  Well, I'll be brief.  In terms of time, I've been working

12   computer forensics for about 26 years at this point, going on

13   27; mostly with regard to digitally recorded evidence, probably

14   about half of that time, electronically transmitted, wireless,

15   that sort of thing.

16              But, basically, in a nutshell, if it's saved, if it

17   gets moved, if it's digital, it tends to be somewhat in my

18   general -- obviously, there are certain areas that, I think,

19   require very specialized expertise beyond my --

20   Q.  Do you --

21              THE COURT REPORTER:  I'm having trouble hearing the

22   witness.

23              THE COURT:  It is hard to hear you, Mr. Fischbach.

24              MR. EKELAND:  Is it possible just to get

25   Mr. Fischbach on this monitor?  I see Mr. Hassard and I see

1    Mr. Brown and I see Mr. Fischbach.

2         Is there any way I can just get Mr. Fischbach on this

3    monitor and not --

4         THE COURTROOM DEPUTY:  I don't think so.

5         MR. EKELAND:  Mr. Hassard, do you mind turning your

6    video off for the moment.  There we go.  Excellent.  Thank you

7    very much.

8         MR. HASSARD:  No problem.

9    BY MR. EKELAND:

10   Q.  Mr. Fischbach, do you -- you own the business SecondWave;

11   is that right?

12   A.  That's correct, yes.  SecondWave, Inc.

13   Q.  And what does SecondWave do?  What kind of services does

14   SecondWave provide?

15   A.  Primarily forensic consulting, examination of evidence

16   relating to most of the matters, about 5 percent of that.  I do

17   training, public speaking.  I do attorney conferences and

18   judicial conferences as well, and I work -- I consult with the

19   media in the same capacity.

20   Q.  Have you had any particular training in forensics?

21   A.  Mostly on the job.  I wouldn't -- I wouldn't -- I wouldn't

22   inflate my formal training.  When I started doing this, there

23   wasn't formal training available.

24        I've certainly had the advantage of being able to

25   keep up with and have shared with me much of what the

1    government relies on, as well as other private forensic

2    examiners.  But for the most part, it's 26 years.

3    Q.  26 years.  And could you just -- you said when I just

4    started doing this.

5        Could you just add a little more detail and what, in

6    particular, type of forensics that you do mainly.

7    A.  Mainly would be difficult.  I would say probably the

8    majority of it involves either a hard drive or a cell phone or

9    some combination.

10        Secondary to that would probably be some form of data

11    transmission, such as cell phone, including using that for the

12    purposes of attempting to locate an individual or multiple

13    individuals.  But because a chip and some form of memory exists

14    in just about everything today, I examine dishwashers and, of

15    course, cars and video game machines, and cable and satellite

16    set boxes and Apple watches; you name it.  Anything that can

17    store data at some point may become part of a crime.

18        I even probably most recently, most interestingly

19    looked at data from an alarm system that was for the purposes

20    of detecting whether glass broke in order to better isolate the

21    time of a shooting because the hypothesis was that the shooting

22    may have set off the glass-break sensor on the home alarm,

23    which led us to more precisely get a time the shooting occurred

24    than maybe a coroner could.

25    Q.  Do you have forensic experience with computers and computer

1    networks, like the internet or network computers in general?

2    A.  Absolutely.  My first exposure to the internet would have

3    been in, roughly, 1987.  I was very fortunate to have grown up

4    the son of a now-retired college professor whose office was at

5    the top of one of the first buildings that connected to the

6    internet when it was still being tested, which was still before

7    that time.  By the time I was on, there was certainly plenty of

8    internet.

9         My experience with that goes back extensively

10   professionally from the beginning.  Internet data has been

11   critical to what I do.  I don't think it has -- I don't think

12   there was an early thing that didn't involve the internet.  In

13   fact, my very, very first case was a matter of -- first

14   documented case was internet spoofing and identity fraud and

15   extortion.

16   Q.  And as part of that experience with computers and the

17   internet, do you have experience with IP addresses and IP

18   address attribution?

19   A.  Absolutely.  From the standpoint of an IP address, you

20   can't have the internet without one, and you can't participate

21   in the internet without one.

22        But as far as attribution goes, yeah, that's --

23   attribution of everything.  But IP addresses, in particular,

24   when it comes to the internet, this is how the government --

25   this is the tool the government simply needs to use in order to

1    try to at least form probable cause.

2    Q.  Just so -- just so everybody -- just to go back to basics,

3    because this is a complex case.

4        Could you just briefly explain for everybody just

5    exactly what an IP address is.

6    A.  Sure.  Simplest terms, I would call it the secret sauce of

7    the internet.  It's what makes the internet different from

8    every network that preceded it.  It stands for internet

9    protocol; no surprise there.

10        What it does is it -- I think probably everybody here

11   as a part of this trial, this hearing, probably at least is

12   familiar roughly with how a telephone works where there are

13   switches.  Maybe now not so much physically, but virtually

14   connects people because even today telephone networks are run

15   very much as a part of the internet or in similar ways.

16        But, traditionally, there was -- since it was

17   switched, it electronically connected to computers to each

18   other or to individuals speaking to each other.  What the

19   internet did is the internet said let's connect everybody to

20   everybody at the same time, but let's send the payload, whether

21   it's a voice or a picture or a video, whatever it is, let's

22   send it particularly in a virtual envelope like the mail.  And

23   so where -- for a Court to serve me a subpoena, they wouldn't

24   necessarily need a dedicated courier who went from D.C. to

25   Los Angeles to my house.  They could put that addressed to me,

1    which would be the internet protocol, in an envelope, and send

2    it through mail that goes to -- goes all over the United

3    States, possibly, before reaching my little neighborhood in

4    Los Angeles.

5            And then at that point it is properly delivered to my

6    house.  And if it comes with a return receipt, you've now

7    completed how an internet protocol works, effectively.

8            Is that clear enough?  Were those good analogies?

9    Q.  If I understand you, you testified that it's a -- sort of

10   like a numerical address for locations on the internet; is that

11   correct?

12   A.  Not exactly.  Let me clear that up.  There is one big

13   difference between addressing a physical envelope and

14   addressing an internet protocol.  And that is the fact that

15   most of us today in the world don't own an IP address, so --

16   where many people here may own an address; I own an address.

17   And you can always find me at that address.  My IP address

18   changes all the time.

19           And on top of that, as we know from this case, you

20   can also use services that will change your IP address.  So it

21   is a little bit at least different in that case.  We can't

22   necessarily identify someone by an IP address.  Also, keep in

23   mind that they're shared.  So anybody that's using the

24   courthouse internet right now is sharing it with everybody else

25   who is using the internet courthouse -- the internet in the

1    courthouse right now.  So you all have the same IP address.

2            To say that someone here in this courtroom did

3    something would be difficult from that IP address, much as

4    right now there are three other individuals at least using the

5    IP address that I'm on.

6    Q.  Am I correct to understand you that IP addresses are not a

7    reliable form of personal identification?

8    A.  Well, I don't want to be overly inclusive in that

9    statement.  They could be under certain circumstances, but not

10   in a general circumstance.

11           I do, in fact, own some IP addresses.  And if I'm

12   using one of those IP addresses, you would certainly want to

13   ask me if I was using it or if I could confirm that somebody

14   else was using it.  But that's just not the way most people use

15   it.

16           The background story on that is we ran out of IP

17   addresses before most people were on the internet.  And so this

18   idea of having an IP address that could be shared became

19   essential; otherwise, the internet would have never grown.

20   Q.  Is it possible for thousands of people to share the same IP

21   address?

22   A.  Oh, absolutely.

23   Q.  And what are some of the ways that there are more than one?

24   What ways -- in what ways is that possible?

25   A.  Well, I mean, simplest example, I just came from the

1    airport a few days ago.  And I have no reason to believe -- and

2    I've tested it in the past; I don't believe it's changed.

3    Every user in the airport would have been at that moment on the

4    same IP address.

5             Once I got into the air, I connected to the

6    airplane's network, and then every single individual on that

7    airplane -- because we were all watching movies and television

8    over the Wi-Fi provided by the airline -- everybody then would

9    have been sharing the same IP address.  Conceivably, everybody

10   flying Southwest that day might have been sharing the same IP

11   address, which could have been thousands of people, just on the

12   same day; possibly tens of thousands of people.

13   Q.  And have you had the opportunity in this case to review the

14   government's IP address overlap analysis by Ms. Mazarin?

15   A.  Yes, I have.

16   Q.  And do you have an opinion as to the accuracy or the

17   validity of that analysis?

18   A.  Well, she states in her own disclosure her opinion of the

19   accuracy of her findings.  She uses terms like believe and

20   likely.

21            While I looked at it myself and, frankly, don't have

22   enough evidence or enough data at this point to necessarily

23   replicate what she did, clearly, from her own work, she's going

24   on a bit of a belief and whatever is her measure of likelihood.

25   Q.  And what -- what additional data would you need to assess

1    her conclusions?

2    A.  Well, I've been made aware for some time now in this case

3    that there are additional records that the government either

4    relied on or, for whatever reason, chose not to rely on that

5    are held by the FBI that, for whatever reason, haven't been

6    released to the defense.

7          I certainly can't render an opinion about anything

8    until I've looked at the totality of what's available in the

9    case.

10   Q.  Are you referring to the Mt. Gox database that Ms. Mazarin,

11   I believe, is basing her IP address analysis on?

12   A.  That's correct.

13   Q.  And the government, I think, as you may know, has said that

14   they will only provide access to that Mt. Gox data if we send

15   somebody physically to the FBI office down here in Washington,

16   D.C.

17          In your expert opinion, would you be able to analyze

18   that data properly at the FBI office during the times that they

19   dictate?

20   A.  For a number of reasons, the answer would be no to that,

21   but I want to be clear.  It's not as though I have never done

22   that sort of work in a case.

23          The cases that I've done that work, which is -- quite

24   frequently I'll work at what are known as regional computer

25   forensics laboratories, which are staffed, in part, by FBI

1    agents.  I've worked in FBI offices, both on the East Coast,

2    the West Coast, and in between.

3            I've certainly done examinations in the auspices of

4    the government, but they tend to be what I would refer to as

5    two-dimensional examinations.  In other words, typically, so

6    far my experience has been that the only circumstances that

7    require that are either, one, that triggers what's known as the

8    Walsh Act, which involves child pornography, which required

9    that the government keep any investigations within the auspices

10   of the FBI.  And that has been challenged as well in some

11   jurisdictions in some cases.

12           But, typically, because the sort of work that needs

13   to be done is, oh, gosh, I would say, maybe a 20th or a 30th,

14   or possibly even smaller than that, of what we're looking at in

15   this case, that's a little difficult and still becomes costly

16   and time-consuming.

17           And I just finished up a case that lasted five years

18   in Alaska because we constantly had to arrange to be able to

19   use government facilities to do it.

20           Regardless, in this case I don't even see that as

21   feasible because the specific tools and resources that are

22   needed even just to replicate the government's findings, even

23   just an attempt to get what the government -- just to validate

24   what they've done would still be less feasible to be able to do

25   in those circumstances.

1           And that's not even discussing the vulnerability to

2    privilege and attorney-client privilege, work product; and then

3    as well just the overall budget, which so far I don't have to

4    go through that in this case.

5    Q.  Just to make sure I understood your testimony correctly on

6    this point before we move on, it's your expert opinion that you

7    need full, unfettered access to the Mt. Gox database in order

8    to properly analyze Ms. Mazarin's IP address overlap

9    conclusions?

10   A.  Yes, for the purposes of having the resources to be able to

11   competently examine it.  My concern -- sorry if I didn't answer

12   your question.

13          My concern, specifically, here is that I may or,

14   certainly, other experts will be asked to put their name on

15   opinions under penalty of perjury.  To do so without knowing

16   that we've used the tools, the resources available to us in

17   order to -- and, again, I'm talking about at the least

18   replicate what the government has done, but realistically,

19   having now gotten to know the team over so many months, I

20   believe possibly exceed what the government has done and very

21   likely exceed in terms of the number of hypotheses that are

22   going to be tested.

23          I just don't see how that could ever occur with that

24   sort of constraint.  I also -- quite honestly, I don't

25   understand why.  I'm not really sure why in this circumstance.

1    I know why in the Walsh Act, and I have been given access to a

2    SCIF in the past when we've had national security concerns.

3         But I'm not certain why this case needs to be further

4    complicated beyond where it is other than if I were -- other

5    than simply it's gamesmanship to make it more difficult in

6    order to put up a defense.

7    Q.  Let me turn to a slightly different topic, Mr. Fischbach.

8         Do you have any practical experience and forensic

9    experience with websites?

10   A.  Oh, absolutely, yes.

11   Q.  Could you just briefly describe your experience with

12   websites.

13   A.  Well, are you asking -- are you asking about personal,

14   practical experience, or are you talking about forensic

15   experience, or are we talking about both?

16   Q.  Briefly on the personal and then briefly on the forensics.

17   A.  Okay.  Well, personally, as I mentioned earlier, I've been

18   a user of the internet, and specifically the World Wide Web,

19   from a time when people, I don't think, had any access to it or

20   even knew that it existed.

21        Since that time, I've run websites prior to 26 years

22   ago.  But in addition to that, as a result of some of my work

23   and as a result of my wife having her own career, I also

24   consulted with and aided in what, ultimately, became a

25   multimillion-dollar e-commerce website.  I say multimillion

1    dollar; it was roughly a million a year website.

2            And then switching to the other hat, forensically,

3    I've lost count of how many of my cases involve the internet,

4    e-commerce, encryption, and websites in particular; clearnet as

5    well as darknet.

6    Q.  Could you explain that distinction for people -- for -- the

7    distinction between the clearnet and the, quote-unquote,

8    darknet, or I prefer the term deep web.  But go ahead and use

9    darknet.

10   A.  Yeah.  I understand that the term has been reviewed for all

11   sorts of reasons that I don't know what the proper terminology

12   is for it.

13           But the difference is that there is an internet most

14   of us automatically land on when we open up a web browser, and

15   then there's an internet that requires special tools in order

16   to reach it.  Now, let me be clear.  They're both using the

17   same internet.  They're both on the same physical network, but

18   your ability to see something depends on the piece of software

19   you're using.

20           So when Your Honor or anyone else here opens up

21   whatever their favorite web browser is, Microsoft Edge or

22   Chrome or Firefox or something else, what you're doing is you

23   are using a tool to be able to see what we call the clearnet.

24   It's just a tool that interprets all that data and turns it

25   into pictures and videos and words and things we can interact

1    with; Amazon shopping.

2            There are also tools that allow us to get onto these,

3    what we call it, deep web, dark web, darknet, and it's just a

4    different tool that lets you into a portion of the web that is,

5    I don't know -- I don't know that I would consider it less

6    public.  There are certainly other areas of the web that are --

7    of the internet that are difficult to -- and require other

8    tools as well.

9            It just tends to be the place that -- I guess they're

10   more encrypted than the traditional internet.  In other words,

11   it came built-in with security in mind as a part of the network

12   itself versus the internet, which puts layers of security on

13   top of it.  So when one goes to their bank account, they then

14   see if they're paying attention.  They see the lock on their

15   browser to show that it's now encrypted.

16           That's a little different in this other alternative;

17   what we used to call the Altnet before it got all these other

18   names.  That was really developed with that in mind from

19   scratch.

20   Q.  Would the Tor browser -- no relation -- be one of the tools

21   that you use to access the deep web?

22   A.  Yes.  One of them.

23   Q.  Do you have experience with the Tor browser?

24   A.  I do, yes.

25   Q.  Do you in general -- have you done forensic work involving

1    the darknet, deep net, or Altnet, whatever we're calling it

2    here?

3    A.  Yes.  I've had cases that involved sites on that part of

4    the network, yes.

5    Q.  And are you familiar with the government's allegation that

6    Mr. Sterlingov used a series of layered transactions in 2011 to

7    purchase the DNS registration for the BitcoinFog.com clearnet

8    site?

9    A.  Yes, I'm familiar with that.

10   Q.  Could you just briefly explain to the Court exactly what a

11   DNS registration is.

12   A.  Yes.  Specifically in what I just described as clearnet,

13   there are registered services that have been allowed to provide

14   domain names.  And what those domain names do is they take

15   something that's very native to what I described before, IP,

16   internet protocol.

17         So everyone has that address; every website has that

18   address.  And even though, as I described, we might be sharing

19   an address, very likely are sharing an address at any given

20   time, those addresses are not easy to memorize.  So if in order

21   to get to Amazon you had to go to 168.1.1 -- which is not an

22   internet address; it's actually a local address.  But if you

23   had to remember an address like that, I don't think the

24   internet would have grown in the way that it did.  It would

25   have been very difficult.

1          So these DNS registries, what they do -- and

2    originally there was only one, and it has since been decided by

3    the various powers that be -- I don't know if it would be

4    powers, but the people who were influencing the internet at the

5    time, that it was something that should exist in more than one

6    set of hands.

7          But these groups will sell you something that's sort

8    of akin to a vanity plate.  You can choose a domain name, and

9    it has to be entirely unique.  And that domain name, what it

10   really is doing is, when someone types it, it's redirecting you

11   to whatever IP address that website can be found at at that

12   moment, which, again, can change.

13   Q.  Is purchasing the DNS registration, is that the same --

14   sorry.  Let me rephrase that.

15        When you register a domain name or purchase a DNS

16   registration, do you then just get a website that pops up and

17   is running miraculously, or how does that work?

18   A.  No.  Although I think if you watch a GoDaddy commercial,

19   you might be convinced that it would work that way.  And I like

20   GoDaddy.

21        No.  Purchasing a DNS is just -- in fact, I describe

22   it as being similar to a vanity plate.  In fact, you don't get

23   a plate.  You really don't get anything other than you have

24   taken that off the market and it belongs to you.  If someone

25   wants to use that, they would then have to somehow convince you

1    to give it or sell it to them, which is something I also have

2    done in the past.

3    Q.  If I'm understanding you correctly, you're just simply

4    registering the name which resolves back to a certain numerical

5    address and nothing more?

6    A.  Actually, when you register the name, it resolves nowhere.

7    Simply registering it won't send it anywhere.  At best, you'll

8    get a holding page from whatever company sold you that domain

9    name.

10        But at that point, you're typically offered some

11   tools to be able to send that domain name; by the way, not

12   necessarily just to one place.  Many of us -- I don't know if I

13   would say most of us, because I don't think most of us own

14   domain names.  I would say, perhaps, more likely than not if

15   you own a domain name, it is, in fact, funneling different

16   traffic to different places.

17        While my -- if you type www.SecondWave.com, you'll

18   get a website.  If you were to send something to

19   Jeff@SecondWave.com, it actually would go to an entirely

20   different address than my website.  It would go to a mail

21   server.

22   Q.  Have you ever registered a domain name?

23   A.  At this point, probably -- conservatively, hundreds.  But

24   it's possible that I'm beyond hundreds now.  I haven't

25   registered -- well, I register a domain name every time I think

1    of something that I think is cute or might be useful to

2    somebody or I might have some idea to use at some point.

3            So my wife will tell you I could be in the middle of

4    watching World Cup and suddenly register a domain name.

5    Q.  Have you ever registered a domain name for somebody else?

6    A.  The vast majority of domain names that I've registered have

7    been for other people.

8    Q.  Why would you do something like that?

9    A.  Well, for a host of reasons.  Some of my clients work in

10   particularly sensitive fields.  I do have -- well, their

11   clients; my clients' clients.

12           I do work for people who work for actors and

13   millionaires in film, billionaires, people who themselves have

14   some reasons that they don't want everybody following what

15   they're doing.  So oftentimes, I'll be asked to register a

16   domain name for that purpose.  That's maybe a more recent

17   example.

18           But in the past I just registered domains because a

19   lot of people didn't understand how to do that or the value of

20   doing it.  There were many clients early on where I registered

21   domain names for them simply because I knew at some point they

22   were going to be happy that I had done it.

23   Q.  When you register a domain name, do you just generally own

24   that domain name for eternity?

25   A.  No.  No, no, although that would be nice.  I lost a few

1    forgetting that I owned them.  It depends on how long you make

2    your purchase for.

3            But I have never heard of one that you could purchase

4    for eternity; typically, a year or two.  Although, just simply

5    because I'm busy, if it comes into my inbox, I'll typically try

6    to pay for ten.

7    Q.  So I want to change topic a little bit.  I mean, are you

8    familiar with the fact that the government's experts testified

9    at the *Daubert* hearing that they have no knowledge of the

10   statistical error rates for Chainalysis Reactor, its rate of

11   false positives, and its rate of false negatives?

12   A.  Yes, I'm aware of that.

13   Q.  In your opinion, is that the mark of a reliable forensic

14   software?

15   A.  That isn't the mark of any reliable software.  Even if

16   you're just talking about Microsoft Windows or Word or Apple

17   software, if you use it, even just apps on your phone, they all

18   have at least some form of log that would let you know -- at

19   least let you surmise that it has had a problem with

20   reliability in the past.

21           I'm not aware of software that hasn't had to be

22   patched or had problems, and I'm sure Chainalysis is no

23   different.  It startles me that they're not internally aware of

24   that.

25   Q.  And what kinds of data or information would you need to

1    assess the reliability and the accuracy of software -- of

2    forensic software like Chainalysis Reactor?

3    A.  Well, for me to assess that, I would actually need to have

4    a copy of the software and, more ideally, the code itself.

5    Simply because the software -- a piece of software works well

6    at the time of testing doesn't mean that we've tested it for

7    every vulnerability.

8         So it's always wise to go over the code itself to see

9    if there are any other vulnerabilities that aren't being tested

10   for.

11   Q.  And when you say the software or the code, is that

12   synonymous or saying the same thing as you would need access to

13   its source code?

14   A.  Correct.  I mean, again, need -- it's an ideal.  I want to

15   be careful because not in every circumstance is that an option.

16   A lot of software is trusted without having its source code

17   released.

18         I personally put forensic tools into a very different

19   category, and that is that -- because my area of expertise is

20   just an extension of other scientific methods and those methods

21   typically -- this is what I've been looking at for 26 years.

22   Because, typically, other tools that have been used

23   scientifically in forensics are made available down to the

24   point that you are able to understand exactly how they work and

25   why they work.

1                To my mind, it only makes sense that everything used

2       in true forensics, especially if we're talking about criminal

3       forensics, ought to be subject to at least that same standard,

4       and I honestly can't come up with a reason why it shouldn't be.

5       Q.  Just real briefly, did you have a chance to or did you see

6       the government's filing, I believe it was the other -- one or

7       two nights ago, a supplemental notice which included a

8       declaration from Elizabeth Bisbee from Chainalysis and a white

9       paper, one of the authors of whom was Sara Meiklejohn?

10               I think that's M-e-i-k-l-e-j-o-h-n.  I may be wrong

11      on that, but I think I'm in the ballpark.  Did you review it?

12      A.  I did.  Yes.  I was provided that, and I did look at it,

13      yes.

14      Q.  Do you have any opinion as to its assertions regarding

15      Chainalysis Reactor and Ms. Bisbee's declarations and as

16      discussed in Ms. Meiklejohn's white paper?

17      A.  Well, I apologize because I'm not in a position of

18      objecting.  I think it's a bit of an open-ended question.  For

19      the most part, the only way I could really answer that from

20      memory is to say I do recall noticing instances of uncertainty.

21      But if you could ask me a little bit more --

22      Q.  Do you have a general opinion as to the disclosure?

23      A.  Again, just that it appeared to be sort of rife with

24      uncertainty.

25               MR. EKELAND:  No further questions.

```
 1              THE COURT:  Okay.  Ms. Pelker?
 2                  CROSS-EXAMINATION OF
 3                    JEFF FISCHBACH
 4   BY MS. PELKER:
 5   Q.  Hello, Mr. Fischbach.  How many cases have you worked on in
 6   your career as an expert witness or as a consultant?
 7   A.  Just before I answer that, is it possible to at least get
 8   that camera on so that I can see who I am speaking with, or is
 9   that not available?
10              THE COURT:  I think we can do that.
11              THE WITNESS:  Perfect.  I apologize for the grammar.
12   With whom I'm speaking.  Perfect.  Thank you so much.
13   BY MS. PELKER:
14   Q.  Your screen is directly -- I am looking at you even though
15   it looks like I am not.
16   A.  That's fine.  I'll accept the limitations of this -- I
17   don't know -- soul-saving technology that we've all become
18   accustomed to recently.
19              So the answer to that is somewhat complicated.  I
20   have consulted on thousands of cases now over the last 26
21   years, not just for the defense, but for the government as
22   well.  And then, obviously, for plaintiffs and defendants in
23   civil cases, but to a much, much smaller degree.
24              In terms of how many times I've actually testified, I
25   think there is some -- there's some number I once put together
```

1   several years ago that probably needs to be updated, but it's a

2   much smaller number

3   Q.  How many cases, roughly, over the last year have you worked

4   on?

5   A.  Over the last year?  If we're talking about actually the

6   last months, I think I'm currently back and forth.  I just

7   ended two and started one.  I would say this year probably a

8   couple dozen.

9   Q.  Fair to say that you have a busy practice as an expert

10  witness and consultant?

11  A.  I tend to refer to it the other way, as a consultant and

12  expert witness, if that doesn't work.

13  Q.  And is it also fair to say that at least a substantial

14  portion of your work involves defendants accused of possessing

15  child sexual abuse material or violent crime?

16  A.  Yeah.  I think a substantial -- I think this is not the

17  majority, but, yes, there's quite a bit of it.

18  Q.  Does much of that work and your work generally involve

19  reviewing seized personal computers and cell phones?

20  A.  Typically, it would be more rare to see the -- to view the

21  actual device.  That does happen on occasion.  But that's

22  really rather rare.

23          What I'm typically looking at is some -- I would use

24  the technical term, but there's different ones.  But some

25  facsimile of what the government looked at.

1    Q.  Whether it's an image, a clone, some evidence that has been

2    obtained from personal computers or cell phones; is that right?

3    A.  Exactly.  Yes, that's correct.

4    Q.  And do you also often review information or testify or

5    consult regarding cell phone location information?

6    A.  I do, yes.  That's correct.

7    Q.  Have you ever testified as an expert relating to blockchain

8    analysis?

9    A.  So far I have not.  I haven't had the opportunity to

10   testify to that.  The amount of work that I've done relating to

11   it are voluminous.  But I think probably, for the most part,

12   the adoption and then the timing of the pandemic probably

13   slowed down a lot of any sort of trial work.  But there may be

14   other factors as to why I haven't been called to testify about

15   it.

16   Q.  Could you explain what cases you've worked on where your

17   work involved blockchain analysis?

18   A.  In terms of the names of the cases, I wouldn't reveal any

19   of that, especially if I haven't testified.  But in terms of

20   the types of cases, yes, a lot of cryptocurrency theft where

21   individuals have had cryptocurrency stolen from them; a number

22   of hacks involving various exchanges; as well as some concerns

23   about software that was meant to protect cryptocurrency

24   wallets.

25           That's probably a general -- if you ask me a more

1  specific question, maybe I can give you a more specific answer

2  than that.  That's sort of an overview.

3  Q.  Can you explain specifically what you've done on cases

4  involving cryptocurrency theft?

5  A.  So, typically -- and I should -- interestingly, Mr. Ekeland

6  never asked this question.  I don't know if it was deliberate

7  or not, but I'll volunteer it to you.

8       I don't hold myself out as a specific cryptocurrency

9  expert.  In fact, when asked if I would do this case, that was

10 the first thing I let Mr. Ekeland know.  Although I've enjoyed

11 working with him in the past, I want to be very cautious that

12 there are people I believe have a much more detailed expertise

13 in cryptocurrency.

14      My work in most cryptocurrency cases -- this one

15 included -- substantially is as a consultant in order to work

16 as what some attorneys have referred to as a digital-to-analog

17 converter.  Basically, helping counsel make sure that they

18 understand what resources they need in order to tap into

19 particular knowledge because just within cryptocurrency there

20 are multiple areas of expertise.

21 Q.  In your work on any of these crypto cases, or generally,

22 are you doing the actual on-chain address-to-address bitcoin

23 tracing?

24 A.  Absolutely not.  I mean, not -- not that I have not done it

25 or been a party to it, but, again, my feeling is that there are

1    people who, rightfully, have earned their place as the experts

2    in that area in terms of both the burgeoning science and

3    mastering the tools that do exist.

4            I'm always very pleased to be exposed to new tools

5    and techniques, but I don't hold myself out as the expert in

6    that.

7    Q.  You may have just rapidly shortened your testimony for the

8    cross-examination.

9            One quick point of clarification, though.  Have you

10   used -- do you have any expertise in using Chainalysis or

11   CipherTrace or any other blockchain tracing tool?

12   A.  Well, I certainly wish with regard to -- specifically with

13   regard to Chainalysis that -- because, again, while my job may

14   not be, nor my expertise, to necessarily generate the work

15   involved with that sort of tool, part of my work is in

16   understanding the reliability of that tool and relating that to

17   the defense, to the Court.  And so any ability to work with

18   Chainalysis would be instrumental to this case and very likely

19   to future cases in being able to do that, as I've done with

20   many, many other electronic forensic tools.

21           Unfortunately, while I asked for that sometime back

22   when I was first contacted in this case, it's my understanding

23   that Chainalysis only makes that available to the government.

24   So I will very honestly tell you I have some very serious

25   issues when it comes to the reliability of forensic tools that

1    are not independently analyzed and peer-reviewed.

2    Q.  I don't mean this to sound argumentative, but are you aware

3    that, in fact, many private sector experts, consultants do, in

4    fact, have Chainalysis licenses?

5    A.  Well, that sounds interesting, and I'd love to get a list

6    because that might be useful if the -- if they're not simply

7    government consultants.  So far, at least in my involvement in

8    the case, we haven't been able to find those that feel

9    comfortable working with the defense to own such licenses.

10   Q.  Have you tried to go on Chainalysis's website and just

11   click free demo or sign up for an account?

12   A.  I have.  But that's not -- unfortunately, that's not the

13   totality of what would be needed specifically in this case even

14   if I were able to get a fully unlocked tool, which does not

15   appear to be what they offer.  At this point I don't have all

16   of the resources I need even to help another expert duplicate

17   what the government has done.

18   Q.  And have you signed up for any of the free -- the free or

19   trained -- or paid trainings, certifications that Chainalysis

20   or TRM or any of the other companies offer available to the

21   public?

22   A.  No, I haven't.  And, again, that would be for the reasons I

23   stated before.  That's not my area of expertise.

24          While I think it would be instructive to understand

25   their training, the more significant aspect of my work is

1    whether or not the government, in fact, followed that training

2    and what they used in their assertions to perform those

3    assertions; how they configured their hypothesis; and how

4    complete they were in terms of their testing of that

5    hypothesis.

6           Again, all of this is useful, and I'm happy to have

7    the dialogue about it, but I do want to make sure it's very

8    clear, I'm not the person who was hired specifically to use

9    Chainalysis.  In fact, I specifically asked counsel to find

10   better individuals for that purpose.

11   Q.  I'd like to ask you a few questions about the substance of

12   your expert disclosure.  Your disclosure states that you will

13   testify to the staffing requirements to run an enterprise like

14   Bitcoin Fog.

15          Could you explain, what is your opinion of what those

16   staffing requirements are?

17   A.  Well, let's be very clear about my disclosure.  My

18   disclosure was written for me by counsel while I was out of the

19   country some of the time; some of the time, certainly out of

20   state for several weeks.

21          So while I substantially agree that I may testify to

22   the elements there, my expertise specifically within what

23   staffing it does take, I've never run a -- I've never run such

24   an operation.  I certainly worked within operations that maybe

25   would be analogous, and so for that reason, I might feel

1    comfortable rendering an opinion as to, basically, what it

2    takes in terms of the hardware staffing.

3           So based on the, sort of, turnover, the number of

4    transactions that the government is representing -- and I don't

5    know that those numbers are correct -- but even were I to

6    assume accuracy to the government's number of transactions,

7    yes, that's a -- that is the sort of thing that, typically,

8    from the management standpoint, would not be a single-person

9    operation.

10   Q.  So to be clear, is it your opinion -- are you stating that

11   you do not currently have and have not yet formed an opinion

12   about the staffing requirements, or are you stating that, if

13   asked, you will testify that the staffing requirements for

14   Bitcoin Fog would be more than one person?

15   A.  Well, while the second part is already true just based on

16   what I do know, I want to just make sure I'm very clear, if I

17   didn't articulate it clearly enough.

18          I don't want to -- I don't want to commit to a

19   specific number at this time because the information that I

20   have from the government, I'm aware, is not complete.

21   Therefore, any number that I give in terms of what a similar

22   operation would require could be vastly inaccurate once I

23   actually saw the rest of the data and had a better idea of

24   what, in fact -- what that operation, in fact, entailed.

25          But, again, what I know in general is that, based on

1    the components of that sort of an operation, that kind of a

2    website, that has been, at least in my experience, that's

3    something that's a one-person operation.

4    Q.  Could you explain what additional information you need from

5    the government in order to draw that opinion?

6    A.  Well, that's a difficult question.  Since I haven't seen

7    the rest of the information that I understand I have to go to

8    the FBI to see, I don't know.  All I know is that there's more

9    than I've seen.

10          And scientifically speaking, I don't think it's a

11   good idea to render an opinion based on incomplete information

12   even if I was only missing a page, but I understand it's quite

13   voluminous.

14   Q.  So you believe that your opinion about the staffing

15   requirements for Bitcoin Fog is contingent on a review of the

16   Mt. Gox back-end database for transactions that were used to

17   launch some initial funds into Bitcoin Fog?

18   A.  Not in as simple a way as you're presenting it.  It's just

19   simply that, until I've seen all of the data the government has

20   used to form its opinions, I don't know how accurate or

21   inaccurate those opinions are.

22   Q.  The disclosure also states that you will testify to what is

23   involved in operating a Tor site and a custodial mixer like

24   Bitcoin Fog.

25          Could you explain what your opinion is in that

1    regard.

2    A.  Again, I'll water that down a bit from how counsel

3    presented it, perhaps optimistically.  I certainly have

4    wonderful resources now in this group of people that have come

5    together on this case for the defense team.  And, collectively,

6    we've been able to come up with a number of opinions that we've

7    all contributed to and come to some agreement.

8         But I want to -- again, I want to be very careful.

9    But my opinions still, while dependent on seeing everything --

10   because I don't like to render an opinion until I have the

11   totality of everything the government has available for its

12   case -- it still is very much contingent on other individuals

13   who know very specific areas to greater detail than I do.

14        And at that point I may or may not decide that that

15   is a valid opinion.  But for the purposes of Rule 16, at least

16   it's been my experience -- and this is tightened down even more

17   recently -- it's better to overdisclose than not to disclose.

18   So where you see the words "Mr. Fischbach may," that was my

19   request, because at this point I don't know exactly what it

20   will apply to because I haven't seen everything.

21   Q.  Are you generally aware of the specialized field of cyber

22   incident response?

23   A.  Yes, I would say so.

24   Q.  And are those professionals whose specific job is to

25   respond to hacks and attacks on sometimes vast computer

1    networks?

2    A.   Sure.   I mean, it's a little bit simplified, but I would

3    agree.

4    Q.   Probably a lot of it simplified, but generally speaking.

5    A.   I'm trying to be kind.

6    Q.   Similarly, are there people whose specific job is network

7    defense -- again, very simplified -- but to ensure that

8    computer networks are not breached?

9    A.   Absolutely.   I'm very fortunate to work very closely with a

10   number of those individuals.

11   Q.   You work with some of those individuals on occasion.   But

12   your specialty is personal device forensics, not incident

13   response or network defense; is that right?

14          And I may be simplifying personal device forensics,

15   but with a general meaning.

16   A.   I would take that -- I will use that word from the

17   statement.   My expertise is not in incident response.   That's

18   not what I do.

19          Sort of like my father-in-law is a retired plumbing

20   contractor, but his expertise is not in emergency repairs.   He

21   helped build houses.   So while we use him if a pipe bursts and

22   he can do that job, that wasn't his job.

23          I have been -- my very first case was that case, very

24   first case 26-plus years ago, at a law firm -- actually, right

25   across the street from the FBI building.   That case was an

1    incident response.  That's something I have responded to simply

2    because some people know me, and know me before they know

3    somebody who can handle incident response.

4          So, theoretically, it's something I could do.  I see

5    that as such a generalized field that I think that there are

6    people that are better at doing that than others.  So much as

7    somebody who works on a ship might not put out a fire because

8    that's what they need to be trained to do working on a ship;

9    and they might be better at putting out a house fire, but

10    they're probably not as good as the fire department.

11    Q.  When were you hired by the defense in this case?

12    A.  Hired is a very difficult word.  I was contacted on this

13    case last year.  There were a number of subtle questions that

14    were -- where I didn't specifically know what case Mr. Ekeland

15    would be referring to.  But as a matter of practice, if an

16    attorney -- defense or government, you -- if an attorney calls

17    me and asks me a question or sends me an email and asks me a

18    question, I like to try to answer that question.

19          So I looked back at my emails sometime this week and

20    it looks as though possibly, if I've gotten this correctly,

21    maybe the first I ever heard of this, assuming Mr. Ekeland's

22    question was about this case, might have been about a year ago.

23    I got more involved near the end of last year and then flew to

24    D.C. in January.

25    Q.  And when did you start reviewing this discovery?  Perhaps

1    that's a better question.

2    A.  That's a good question.  I think that's -- it's subject to

3    change, but I think it might have been late last year.

4    Q.  What discovery have you reviewed?

5    A.  To my knowledge, everything.  I don't know that by memory I

6    could list everything, but I'm aware of one document in

7    yesterday's testimony that I haven't seen yet.  I understand it

8    was under seal.

9         But I have access -- I think limited access -- to the

10   storage -- online storage of every piece of material in this

11   case and have been asked questions about pretty much all of it

12   as far as I know.

13   Q.  So that includes the images or data from all of the

14   different devices?

15   A.  That's correct, yes.

16   Q.  And does it also include emails, financials, the

17   defendant's typed and handwritten notes?

18   A.  Yes.  I believe I've seen all of that.  One thing I want to

19   clarify that I may confuse is that when I was there in January,

20   some of that was presented to the Court.  So I don't know

21   necessarily that I've -- and every handwritten note is

22   something that I specifically looked at because that may -- may

23   or may not exceed what I needed at any given moment.

24        But, yeah, I feel like I've -- if I haven't seen

25   everything -- as of yesterday's testimony when I heard there

1    was a document I hadn't seen yet -- I'm surprised.

2    Q.  How many hours have you spent reviewing the discovery for

3    this case?

4    A.  So -- oh, actually, just reviewing discovery, I don't -- I

5    don't keep things separated like that.

6         But in terms of reviewing the discovery, I've got

7    probably a couple hundred hours on that.  I could check more

8    specifically, but somewhere around there.

9    Q.  And what about just for the case, generally?

10   A.  So for the case, it would add to that -- well, this and the

11   other testimonies that I have been involved in as a consultant

12   and then flying in to D.C., which was probably the largest

13   consumer of time; but all of that, even put together, probably

14   brings it up another 40 hours or so.

15   Q.  Is that ballpark?  You said a couple hundred.  Now we're at

16   300, 400 hours?

17   A.  I would -- I would imagine -- I'll explain why I'm not as

18   accurate on this, but I would imagine probably -- probably

19   somewhere in excess of 250 hours, plus -- the trick with

20   the cases -- because my understanding about this case in the

21   beginning was that Mr. Ekeland was asking me for a favor

22   because the funds weren't there.

23        One of the things I didn't do from the beginning was

24   waste a lot of time documenting hours.  I've since attempted at

25   certain points to go back and see if I could get some of that

1    together.  If that's important to you, I'll make sure I have

2    that before there's a trial.

3    Q.  No.  I think that that's sufficient, at least for today's

4    testimony.

5             Are you now being paid for your testimony or have an

6    understanding that you will be paid for your testimony and

7    work?

8    A.  From counsel, no.  My understanding is that counsel ran out

9    of money before I even made it to D.C.  I paid for D.C. out of

10   pocket and have since received some funds to at least mitigate

11   the out-of-pocket, which is unusual for me.

12             Again, Mr. Ekeland is someone that I have worked for

13   on other cases.  And when he explained this case, once I was

14   able to see it for myself, it did seem that it had some very

15   long-term precedent that goes well beyond this case.  That's

16   the sort of thing I like to be involved in, sadly, to my

17   family's disappointment, even when that doesn't come with

18   money.

19             But I do want to be very clear.  When I was there --

20   I believe it was in January -- Your Honor did make it clear

21   that there would be CJA funds available.  I have worked for CJA

22   funds before.  So my very, very practical understanding of that

23   is that I may be able to collect something at some point.  But

24   I can tell you, after five years on a case that ran out of

25   money two years ago, even when I very accurately billed, I was

1    only paid for half.

2    Q.  What is your hourly rate that you would normally charge for

3    this or that you are billing and hoping to be paid?

4    A.  Well -- and, again, I'm not billing.  As a matter of fact,

5    you've only now just reminded me, I didn't even start a timer

6    before I went on the stand, which would be smart.  I'll go back

7    and try to resurrect that.

8          But allow me to answer your question this way, and

9    you can let me know if it suffices.  If Mr. Sterlingov had

10   funds or Mr. Ekeland had funds available to him, my rate on

11   this case -- I think my current rate -- and I apologize.  I

12   think you probably get some idea that I don't generally handle

13   a lot of my own money.

14         But I think my current rate that I'm billed at is a

15   little under 600 an hour.

16   Q.  At this point, aside from trial preparation, is your review

17   of the discovery, absent potential Mt. Gox servers, complete?

18   A.  Well, that's -- that question doesn't work with the

19   stipulation.  Nothing is complete absent anything.

20   Q.  Fair enough.  What reports have you written, if any,

21   memorializing your work?

22   A.  At this point there are no reports to write.  As I have to

23   constantly remind counsels, both attorneys, other people

24   involved in this case, I can't commit anything to writing under

25   my -- that has my signature that I know is missing any sort of

1    information.  So I don't have any reports.

2             This is -- by the way, this is the reason

3    specifically that, when asked about it, I told counsel that I

4    would prefer not to -- not to make a formal Rule 16, though I

5    very well understand the most recent iterations of that, it

6    does put me in a very difficult position where the Court does

7    need -- by law, as I understand it -- to have a disclosure.

8    But I also need to be able to be in a position in front of a

9    jury to say, well, those opinions were incomplete at that time.

10            But I don't want to, in front of a jury with the

11   judge, be blaming the system because I gave incomplete answers.

12   I'm trying as best as I can to preserve any finality until I

13   have a few things.

14   Q.  So I understand you haven't written a report and may not

15   intend to.

16            Have you memorialized your work in some other way?

17   A.  Well, certainly, I have conversed with counsel and the rest

18   of the team.  So to some degree there's some memorialization

19   there.  I very likely -- on phone calls, I tend to take notes.

20   In fact, yesterday, listening to testimony, I took notes.  So

21   there may be something like that.

22            I am prone to make sure to -- at least jot down my

23   observations with the date at the time that I have them even if

24   I don't consider them report-worthy.

25   Q.  Turning back to some of the substance of your notice in the

1    disclosure, the document says that you believe the evidence in

2    this case is tainted because the government mixed evidence from

3    an unrelated case with that of Mr. Sterlingov.

4        Could you explain what specifically you're

5    referencing.

6    A.  And, again, let me make sure I clarify that.  That was

7    counsel's writing based on our conversation.  I wouldn't use

8    the word believe, and I don't think it belongs there because

9    that's not a part of what I do.  I'm not a preacher.  My belief

10   has nothing to do with this.

11       But I have certainly been exposed to information that

12   has been discussed amongst those individuals who are consulting

13   in this case.  Specifically, with regard to the hacks and

14   possibly I do see some -- I can't cite it here at this moment,

15   but I was shown a document that did appear the government may

16   have misattributed some information to another case, which does

17   frequently happen in cases.  I understand, like me, you have a

18   lot of work as well.

19       THE COURT:  Mr. -- I'm sorry.  I'll let you finish

20   that other question.

21       THE WITNESS:  Yes, Your Honor.  That was the

22   substance of that part of that discussion with Mr. Ekeland.

23       THE COURT:  My question for you, Mr. Fischbach, is

24   that you haven't signed your expert disclosure in this case

25   yet.

```
1            I guess my question for you is, is that simply
2     because you've been out of the office and haven't had access to
3     it, or is this still something that you need to review and make
4     sure you're comfortable with before you sign it?
5            THE WITNESS:  Well, at the time that I was asked to
6     sign it -- and, thank you, Your Honor.  At the time I was asked
7     to sign it, yes, I was barely maintaining a signal.
8            I went between -- all over Alaska trying to trace a
9     murder to the middle of the ocean; trying to apologize to my
10    wife for working on our anniversary in Alaska, who I did bring
11    with me.
12           So it was difficult to sign or even feel as though I
13    had competently read it.  I thought I was going to get a better
14    signal than I did during that trip.
15           Since that time, since coming back, and especially
16    since watching yesterday's testimony, I will tell you my
17    opinion, to some degree, has changed in that I now feel even
18    better that I wasn't comfortable signing it without knowing
19    that I had ample time to read through it.
20           My biggest concern right now is not the specific
21    words in it.  While I might alter something like the word
22    believe, my bigger concern is that it's a conclusion with
23    incomplete information, which is something that I brought up to
24    counsel previously.
25           But, again, I do understand that the Court does need
```

1    something.  I just need -- to whatever degree, Your Honor --

2    since you're asking the question, to whatever degree I can be

3    instructed to provide something that doesn't require me to

4    compromise science, I would be absolutely delighted to do that.

5            THE COURT:  Of course, I'm not requesting that you

6    compromise science in any way; I don't think your counsel is.

7    I can talk when you're done with your testimony with your

8    counsel -- not your counsel, but the counsel for Mr. Sterlingov

9    about timing on this.

10           But I do think we need a report from you that

11   indicates, yes, these are my expert opinions, and if there are

12   things in there that you don't feel comfortable opining on, we

13   should know that.

14           THE WITNESS:  Completely understood.

15           THE COURT:  Okay.  My apologies for the interruption.

16           THE WITNESS:  Actually, before I lose your attention,

17   if it makes any difference, Judge Breyer out of San Francisco,

18   Charles Breyer, who is --

19           THE COURT:  I know him well.

20           THE WITNESS:  Okay.  So Judge Breyer actually just

21   opined on that in San Francisco, and at least his verbal

22   opinion on that was that in such a circumstance what he was

23   inclined to opine was that a disclosure would necessarily be

24   due before testimony, but not before the government had laid

25   out its entire case.

1          THE COURT:  I'll confer with your -- with

2    Mr. Sterlingov's lawyer about that and the lawyers about that.

3    That's a separate legal question.

4          But I just want to make sure that I understood, for

5    purposes of having that discussion, what your views are, and I

6    think I understand that now.

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9    BY MS. PELKER:

10   Q.  Mr. Fischbach, I do want to follow up.  When you refer to

11   the possibility of mixed evidence from an unrelated case, is it

12   your testimony that that pertains to one of the other experts

13   remarking that, within the discovery produced, there might have

14   been some evidence that wasn't specifically related to

15   Mr. Sterlingov?

16   A.  No, ma'am, not based on a remark.  But based on another

17   expert showing me that what they had found at that time prior

18   to remarking on it.  But just part of their work.

19   Q.  And the mixing that was referenced is simply that it was

20   produced within the discovery; the voluminous discovery that

21   included lots of information from lots of sources?

22   A.  I think that's a fair statement.

23   Q.  Turning now to some of the IP-related opinions or analysis

24   that you've done, would you agree that one use of VPNs or

25   proxies is to obfuscate someone's location or even their

1    identity?

2    A.  Well, I mean, in a manner of speaking, I would say to some

3    degree all uses would be some form of obfuscation.  That's what

4    happens when you connect to your bank and suddenly your

5    connection becomes encrypted; or today every website, although

6    most people probably don't notice if it says HTTPS instead of

7    HTTP, this obfuscation is, in fact, designed into the system.

8          If your question is to the individual's mindset when

9    they were using it, I don't know that I could necessarily speak

10   to that in this form of a question.  But that's the end effect,

11   and that's why it exists.  It exists to keep us anonymous

12   because, in computer security, there really -- this may not

13   please everybody in the court.  There really is no such thing

14   as a secure computer; it just doesn't exist.  There isn't a

15   secure network; it doesn't exist.

16         But the greatest form of security that we have is

17   what many of us refer to as security from obscurity, which is

18   if an individual, or attacker in this case, doesn't know who

19   you are or where you're coming from, that's your greatest form

20   of security in terms of keeping a network safe.

21   Q.  Your expert notice indicates that you will testify to

22   "issues with the government's IP analysis."

23         Could you explain what specifically you disagree with

24   in Ms. Mazars' IP analysis.

25   A.  Well, hopefully, it says I may.  Because, again, until I've

1  looked at everything, I don't know exactly what I'll testify

2  to.

3        But in terms of her analysis, what I particularly

4  noted, the largest factor to me -- okay.  Everyone looks like

5  they were --

6  Q.  You're back with us now.  I think we --

7        THE COURT:  I'm sorry, just to pause for a second.

8        THE WITNESS:  Yes.  Thank you so much.  I believe

9  what I recall of it, said what -- what I know, number one, I

10  just want to make sure -- again, any term, "I believe," "I

11  think," anything like that, or will testify to, if it actually

12  says those words, I'll address that; it should be -- may be

13  testified to.  Again, at this point, I don't know that we know

14  because I haven't seen everything.

15        But my biggest concerns with Ms. Mazars'

16  disclosures -- if that's a proper term for it -- was that it

17  both appears that she relied on a very specific subset and I

18  don't know why other things were not included from the data.

19  But either way, at this time, I don't have the ability to

20  competently compare what she did use to the totality of the

21  data that's available for examination.

22        So this statement, in particular, is preemptory.  I'm

23  disclosing that I may need to testify to that.  On the other

24  hand, should the government release the totality of all of that

25  data so that it could be competently reviewed, what I may very

1    well find out is that she's on track.

2    Q.  Now, Mr. Fischbach, the last page of the IP overlap

3    analysis document lists off the specific file names of the

4    source information for all of Ms. Mazars' analysis.

5         It's correct that you have access to all of those

6    individual files from discovery.  You're just asking for

7    additional information; isn't that right?

8    A.  Boy, I'd love to give you one that I could just agree

9    simply with and keep the testimony short, but I don't know that

10    that would be an accurate thing to give a yes to.

11         The problem here is not that I don't have what she

12    relied upon, but that an overwhelmingly significant part of my

13    work is to understand why she didn't utilize it, yet why there

14    are other things that she did use.  Absent that information,

15    her -- scientifically, her analysis really doesn't have as much

16    value, if any.  I mean, it lacks any form of certainty.

17         It would be like -- well, it's sort of -- not to be

18    disrespectful with the Court present, but it is sort of like

19    asking narrow questions.  And to your credit, you haven't done

20    this yet.  And saying just a yes-or-no answer will suffice.

21    There's more to her analysis either in that she looked at other

22    things and chose not to include them, or that she looked at

23    other things and they weren't helpful or they weren't useful.

24         But I -- because I can't see that for myself, and it

25    wouldn't be sound to simply accept her word for it.  I don't

1    really have an answer to that at this time.

2    Q.  And at trial I may keep you at yes-or-no answers, but I do

3    think that your explanation for the purpose of the *Daubert*

4    proceeding and understanding the basis of your opinion, that

5    this is helpful.

6           Are there any specific additional data sets or files,

7    other than maybe some other records from Mt. Gox, that you

8    believe that she should have relied on in conducting this

9    analysis?

10   A.  Well, that's the -- that's the most difficult kind of

11   question you could ever ask.  What you're asking me is to tell

12   you what I have seen.  Since I haven't seen it, I don't know

13   what it is.  I only know that it exists.

14          THE COURT:  Well, let me put the question a little

15   bit differently.  You're the expert.  You're hired.  You say,

16   okay, this is what I would like to see.  What is it you want to

17   see that you haven't seen in order to form your expert opinion?

18          THE WITNESS:  Very specifically, Your Honor, what I'd

19   like to see is the totality of everything that the government

20   used to form its opinion and/or those things that they found

21   not useful to forming an opinion.  In general, in any case, I

22   want to be able to see everything that the government had

23   available to its case.  I understand *Jencks* being what it is in

24   some cases and other things.  There are some times when, as my

25   daughter would say, too bad, so sad.

1        But absent their reason, it would be extremely

2   instructive, especially for a team that Mr. Ekeland has been

3   fortunate to gather, to have everything the government has

4   available to it to us, and then we can be certain about our

5   opinions.

6        THE COURT:  All right.

7   BY MS. PELKER:

8   Q.  We can address this afterwards.  But if you were to be told

9   that the government has provided in discovery the entirety of

10  the basis of Ms. Mazars de Mazarin's opinion or her analysis,

11  would that allow you to complete your analysis absent the

12  Mt. Gox question, or are there still additional things that you

13  would want to see?

14  A.  Well, I think if that were -- if that were it, that

15  everything that I had, everything that she's seen -- again, I

16  would need to see everything else so that I would know whether

17  or not she was given a compartmentalized task and not given all

18  that information to look at.  I'm unclear, when the government

19  clearly would expect and understand that I would see the

20  totality of everything, I would think the government would

21  expect its own expert to see the totality of everything.

22        So I don't know why what she has shown -- what she's

23  provided as part of her -- it may be the basis of her opinion,

24  but it should not be the totality of what she had available to

25  her for those opinions.

1    Q.  Your expert report states that you identified errors in the

2    Mt. Gox data in discovery.  What specifically -- well, I guess

3    it's a question.

4            Have you identified errors, or are you testifying

5    that you may identify errors?

6    A.  I'm testifying that there are -- well, there are two things

7    with the Mt. Gox data.  Number one, there are some things that,

8    again, relying on the group mind that's available in this --

9    miraculously in this case, I am relying on things that other

10   experts have shown to me that have caused me concern.  Those

11   are probably better addressed directly to them because that's

12   their expertise.  But I am relying on their expertise.

13   Q.  Have you identified any specific errors within the Mt. Gox

14   data?  Mr. Fischbach, I believe you froze again.

15            (Technical difficulty.)

16            THE COURT:  Before we get going again, Ms. Pelker,

17   how much more time are you going to need?

18            MS. PELKER:  In light of this next line, I can

19   definitely finish up within half an hour.  I can expedite that.

20            THE COURT:  Mr. Ekeland, how about you?

21            MR. EKELAND:  Probably, I can cut my redirect short.

22   I can do it in 15 minutes.

23            THE COURT:  All right.  So why don't we take a

24   15-minute break now, and then we'll come back and finish up.

25   Thank you.

```
 1                    THE COURT:  Mr. Fischbach, can you come back in 15
 2      minutes?
 3                    THE WITNESS:  Absolutely.  I will be here.
 4                    THE COURT:  Thank you.
 5                    MR. HASSARD:  Thank you, Your Honor.
 6                    (Recess taken.)
 7                    THE COURT:  You can continue.
 8                    MS. PELKER:  Thank you, your Honor.
 9      BY MS. PELKER:
10      Q.  Mr. Fischbach, before we took a break, we were talking
11      about the review of the Mt. Gox records, and I asked whether
12      you've specifically identified any errors in the Mt. Gox data
13      provided in discovery.
14                    Could you reiterate your answer.  I'm not sure we
15      fully got through it.
16      A.  Sure.  Again, I'm not the one who identified any of the --
17      they were identified to me, and there probably are other
18      experts who speak better to their work.
19                    My specific take on it was that, even our
20      identification or another expert's identification of a record
21      from Mt. Gox at this time -- well, a couple possibilities.
22      Number one, it appears to be incomplete based on my
23      understanding that the government has additional information
24      that we haven't reviewed; and, number two, not entirely
25      unexpected given the hacks that Mt. Gox suffered.
```

1    Q.  Who was the other expert who identified the errors to you?

2    A.  That, at best, I might have in notes.  I'd have to go back.

3    It's been some time.  It almost appeared to be something that a

4    number of different individuals had seen and brought to

5    counsel's attention, to my attention.  To be certain about

6    that, I have to go back and see if I can find anything.

7    Q.  You and Mr. Verret, I think, have both testified that your

8    work and findings are based, in part, on information provided

9    by other experts.

10           Are you referring to just the experts whose testimony

11   has been noticed for trial, or are there additional experts

12   with whom you've consulted or discussed the work or have

13   discussed their work with you?

14   A.  Well, I'm not sure exactly who has been noticed for trial,

15   so I don't know that I could answer that.  I suppose if you

16   read them off, perhaps I could tell you.  Yeah, I just don't

17   know.  I know there have been other people that all of us have

18   consulted with who are not necessarily going to be a part of

19   the trial.

20   Q.  So the trial notice --

21   A.  Again, that's -- I'm sorry.

22   Q.  The notice trial of experts in addition to you are

23   Ms. Still from CipherTrace, Dr. Cabanas, Mr. Verret, and

24   Dr. Dror.

25           Are there other experts or individuals who have

1    provided information to you in your work and analysis?

2    A.  Well, certainly, there are other individuals that have been

3    involved in looking at things in this case.  I don't know to

4    what degree I could disclose those names or even to what degree

5    I remember them, but there certainly have been other people

6    involved.

7         But to be clear, someone else identifying a concern

8    that they have is not an opinion of mine that is necessarily a

9    valid concern.  Well, no.  Let's be careful.  Certainly, a

10   valid concern, but not that it necessarily warrants anything

11   other than a review of an additional hypothesis.

12        My understanding in this case that the government had

13   a hypothesis and chased that one hypothesis.  To date, I

14   haven't seen that the government ever pursued any other

15   hypotheses even though I've seen other individuals listed in

16   the government's work who certainly could have been or may --

17   or may at this time be co-conspirators or considered

18   co-conspirators.

19        THE COURT:  Let me put the question to you a little

20   bit differently, which is we just need to know what the bases

21   are for your expert opinion and so -- or expert opinions.  So

22   if there is a basis for an expert opinion as relying on

23   something that someone else told you, another expert, then I

24   think we need to know who that expert is and what they told

25   you.  If you're just saying by way of an aside that you heard

1    something from somebody else, but it's not forming a basis for

2    any opinion you're going to express, then I don't think -- at

3    least I don't feel like I need to know about that.

4              THE WITNESS:  Thank you for clarifying that, Your

5    Honor.  There's a combination of that, especially in the sort

6    of circumstance that the government was referring to where

7    other individuals were noticing those things do, in fact,

8    exist.

9              My ability to testify as an expert to those things

10   isn't dependent on those individuals or their opinions or

11   anything like that.  If I do testify to something, it will be

12   within my expertise and my ability to read it from the evidence

13   itself.

14             My concern right now, in terms of finalizing that

15   conclusion, is that I still think it's absent any sort of

16   completeness because we still have items that we have yet to

17   see that are with the FBI.

18   BY MS. PELKER:

19   Q.  So you testified that some other individual -- and you

20   don't recall the name but may be able to find it in your

21   notes -- told you about an error in the Mt. Gox data.

22             Did you then find the same error that the other

23   individual referred you to?

24   A.  Again, to be clear, the individual didn't tell me

25   specifically about an error, but about a concern over some data

1    and would I take a look at that data.  I took a look at that

2    data.

3              Again, I don't recall right off, and I'm not

4    looking -- personally, yesterday I had everything out in front

5    of me and ready to go.  Today I had to do this sort of commuter

6    testimony.  So I don't have everything I had available to me

7    yesterday.  It's a site-specific thing.

8              But I did, in fact, look at those items.  They do

9    merit concern.  My opinion at that time and my opinion today is

10   that, based on anything we've seen, I don't feel comfortable

11   drawing a conclusion about those things other than that

12   they deserve a full-scope look at everything else so that we

13   have some bigger picture of what we're looking at.

14             Because sometimes when you see something -- and,

15   again, I may work differently than some of the other experts.

16   But in my line of work, when I see something that appears to be

17   anomalous, that's just a hypothesis at that point.  It only

18   becomes something anomalous when you're able to look through

19   the rest of the data and see whether or not it repeats and how

20   many times it exists.

21             But at this time I don't have that other data to look

22   at.

23   Q.  Mr. Fischbach, you have testified that you have reviewed

24   those items and that when something appears anomalous, I'm

25   trying to understand what are the items and what appeared

1   anomalous.

2          When you say you had it in front of you yesterday,

3   what was in front of you yesterday and what were the items that

4   you were looking at that seemed anomalous to you?

5   A.  Well, yesterday what I had in front of me was pretty much

6   the totality of everything that I had put into the folder when

7   I was having the conversation regarding an expert disclosure.

8   So I had all of that at --

9          THE COURT:  Are you in your office now?  Is it

10  something where you just need to get up and go find a folder

11  somewhere?

12         THE WITNESS:  Unfortunately, I'm in a home office

13  right now.  I'm in a room in my office, but not where I set

14  everything up yesterday.  I was actually in a physical office.

15  BY MS. PELKER:

16  Q.  What -- were they printed documents?  Were they files on a

17  computer?

18  A.  Most of what I was looking at I printed out and actually

19  put a Post-it on it so that I'd be able to answer those

20  questions.

21  Q.  Do you remember which files they were that were printed?

22  A.  I believe there was something from Mt. Gox, and then -- I

23  believe specifically on the top was something from Mt. Gox.

24  Whatever subset of data we had that I had looked at.  And then

25  from there, the most recent disclosure the government had

1    provided with the -- with the IP address.

2    Q.  And when you're saying records from Mt. Gox, presumably,

3    it's a spreadsheet that's printed off with Mt. Gox records?

4    A.  That's correct, which I understand is an -- a copy which

5    could also explain what -- not everything appears to be

6    accurate.

7    Q.  When you say not everything appears to be accurate, what

8    are you saying does not appear to be accurate?

9    A.  Again, unfortunately, I'd have to take some time to

10   actually try to get back to whatever I was looking at

11   yesterday.  I wasn't just -- I was hoping to be able to get

12   back to that desk, but I just haven't been able to today.

13   Q.  Was it an IP address, a timestamp?  Can you reference

14   where, how far along in the document it was?

15   A.  Well, let's also be clear of one other thing.  It's not a

16   single thing.  What I do know by memory is that nothing that

17   we're referring to is a single object.

18          It's a compilation of various things, some of which

19   I've spoken to already this morning; such as other individuals

20   being involved, such as other documents appearing to be a part

21   of the file that do look as though they may not have -- they

22   perhaps were not supposed to have been included.  Which, again,

23   is why a big part of my work is actually just looking at the

24   totality of the evidence.  And more often than not, letting

25   counsel know that, okay, there are no anomalies; I've explained

1    that.

2              But at this time I haven't been allowed to see that

3    or had the opportunity to see that.

4              THE COURT:  So just for efficiency's sake here, I

5    think -- I feel like we're spinning our wheels a little bit on

6    this topic, and the witness doesn't have the materials in front

7    of him that he needs to have.  And he also hasn't, I think,

8    really fully reviewed his expert report.  I think we're

9    probably going to have to ask Mr. Fischbach to come back for

10   our hearing -- our remaining *Daubert* hearings.  If there's

11   other stuff you want to cover today, you're welcome to do that.

12             But he just doesn't have the information in front of

13   him to indicate what the basis is for any opinion regarding the

14   Mt. Gox data.  So I don't think there's much point in

15   continuing on that line, and we'll just have to defer that for

16   another time.

17             MS. PELKER:  That's fine, Your Honor.  We can go

18   ahead and wrap up.

19   BY MS. PELKER:

20   Q.  Mr. Fischbach, couple quick questions on tools that you use

21   in your work.

22             On your CV you describe having expert-level knowledge

23   of a few operating systems, Windows, Mac, iOS, Android; is that

24   accurate.

25   A.  I hope Linux is in there as well.  But, sure, all of those.

1    Q.  You've never reviewed the source code for those operating

2    systems, have you, Linux aside?

3    A.  See, that was going to be the one I was going to tell you

4    yes.

5    Q.  That is probably why it was not in my question, now that I

6    think of it.

7    A.  Absolutely.  That's -- I've got to be careful.  I have been

8    involved in cases that have involved elements of Apple's

9    operating system and Microsoft's operating system.  So to the

10   degree that I have had those, yes, I have looked at that code;

11   and, again, reviewed them with other experts.

12   Q.  You haven't done a full review of the entirety of the

13   source code for those operating systems because it's

14   proprietary; is that accurate?

15   A.  I think it would be accurate to say that those companies

16   have never provided me with the totality of their code, nor

17   have I ever asked for the totality of their code.

18   Q.  And according to your CV, you're also proficient in and

19   equipped with multiple forensic tools, including Encase, FTK,

20   Cellebrite and Axiom; is that right?

21   A.  That's correct.

22   Q.  And would you consider those accepted forensic tools?

23   A.  Today, I think they've been very well-demonstrated to be.

24   However, all of those systems have their error rates.  Not as

25   published, but studied and reviewed and, in fact, as of earlier

1    this year -- I'm trying to remember exactly when -- but through

2    the FBI, I was able to identify another error in one of those

3    and submitted that to their company.

4            So we -- I don't stand for any of those.  I do rely

5    on them, much as the government does.  Part of why I rely on

6    them is because they do give us some indication of what

7    problems they have and when they have problems.

8    Q.  So you have an expertise, in part, based on your repeated

9    use of the different software and products; is that fair to

10   say?

11   A.  Well, certainly.  I mean, the expertise certainly comes

12   from familiarity with them, yes.

13   Q.  Now, each one of those products listed and tools listed is

14   proprietary software; is that right?

15   A.  All of those ones that I listed, yes, those are all

16   proprietary.

17   Q.  And you've never reviewed the source code for Encase, for

18   FTK, for Cellebrite, or for Axiom?

19   A.  I probably could have with FTK because I have worked with

20   one of the original founders of the company.  Ultimately, that

21   wasn't necessary for my purposes because what the companies

22   have all done is they've all provided their change logs so that

23   you're aware of some problems.  If they wouldn't provide that,

24   if we had no other basis to confirm the accuracy of the

25   software or inaccuracy on occasion, then, yeah, the only way to

1     do it would be to look at the source code.

2     Q.  But you, to date, have not looked at the source code for

3     any of those tools?

4     A.  No.  I haven't needed to.

5              MS. PELKER:  No further questions.

6              THE COURT:  All right.  Redirect?  Before you turn to

7     your redirect, I'm just looking at Mr. Fischbach's curricula

8     vitae, or resume, and I don't see the education -- his

9     education.  Is that not on here?

10             MR. EKELAND:  I'm happy to ask him questions about

11    that, Your Honor.

12             THE COURT:  It would help for me to have that

13    background.

14                    REDIRECT EXAMINATION OF

15                       JEFF FISCHBACH

16    BY MR. EKELAND:

17    Q.  Mr. Fischbach, I think you've heard the Court asking about

18    your educational background.  Could you state what, if any,

19    educational background you have.

20    A.  Absolutely.  I dropped out of college just as the internet

21    was taking off.  And the opportunities, unfortunately, were so

22    voluminous that -- I don't think I knew I dropped out at the

23    time, but never ended up having time to go back and complete

24    it.  That's as far as that got.

25             Unfortunately, it's a very -- fortunately or

1    unfortunately, a very common story within this industry.  Steve

2    Jobs, Bill Gates, Michael Dell, across the board.

3            THE COURT:  What about just other training, seminars,

4    things like that?

5            THE WITNESS:  So I do -- my seminars have been, for

6    the most part, seminars I've been asked to provide.  In terms

7    of attending seminars, occasionally I'm asked to sit in on

8    various seminars, but I haven't received any specific

9    certification or anything like that.

10            The short answer is, by the time I had done the bulk

11   of my work, the vast majority of the certifications that exist

12   today weren't available.  They just hadn't been invented yet.

13           THE COURT:  All right.  Thank you.

14   BY MR. EKELAND:

15   Q.  Just to follow up on that -- on the types of training that

16   you do; do you do any forensic training for law enforcement?

17   A.  Yes, I have done law enforcement forensic training.  I'm

18   also, typically, asked by various law enforcement to provide

19   other training to other groups that they address.

20           And then, also, I specifically do regular judicial

21   trainings for judges, in particular.

22   Q.  And just if you can, name some of the law enforcement

23   agencies that you've done training for and just briefly

24   describe the type of training, if you can disclose that.

25   A.  The very, very first work I ever did in terms of anything

1    that now looking back on it was training -- I don't know that I

2    knew what I was doing back at that time.  But I was asked by an

3    agent, Manny Hurtado, of the LA, what was then called, the

4    Computer Crime Squad that he was just beginning and was asked

5    specifically if I would consult with him pro bono.  I didn't

6    even know that term back then.  It's a term I know today.

7          But I was asked if I would help the FBI in trying to

8    designate some of their practices in terms of preservation,

9    that sort of thing.  Since that time, I do regular trainings in

10   Oregon.  And probably one of the bigger trainings that I've

11   done here in California has been a federal training program

12   that I think combines -- I can't tell you, but it appears to

13   combine possibly federal prosecutors and federal defense; but,

14   in particular, as a matter of fact, I try to stay neutral to

15   that sort of thing anyway.  So I wouldn't have gone around and

16   asked everybody.  Certainly, individuals that are in law

17   enforcement.

18   Q.  What specifically are you training these agencies and

19   individuals on?

20   A.  That really depends on what the du jour is of that; what's

21   the concern.  So going way back early on, I think it would have

22   been just boring by today's standards.  It was just

23   understanding how an email can or can't be attributed; a lot of

24   training about how best to utilize IP addresses.  Not just how

25   to gather them, but how to -- how to better confirm that you're

1    using them accurately; a whole lot of evidence preservation and

2    evidence-gathering.

3              But, you know, if you were to move forward, today I

4    mostly am being asked to speak about issues of artificial

5    intelligence.  That's the -- yes.

6    Q.  Would it be just -- fair to say that what people hire you

7    to train them on, generally, is related to computers and

8    computer forensics?

9    A.  That's the -- I mean, that's the nutshell of it.

10   Q.  And that's what your company, SecondWave, does?

11   A.  One of the things that we do.

12   Q.  I want to turn -- I just want to follow up really briefly

13   on a question that Ms. Pelker asked you about whether or not

14   you'd reviewed the source code for Apple, and I can't remember,

15   actually, the other companies that she mentioned.

16             I took the gist of the question to be, have you ever

17   reviewed, say, like, the source code for any of the big tech

18   companies, like Apple or whatever, and Facebook.  Do you need

19   to review their source code to know their error rates or their

20   accuracy of that software?

21   A.  Absolutely not.  The only reason we would specifically need

22   to review that source code is because we don't have that

23   information.

24   Q.  And why wouldn't you need to do that in terms of Apple or

25   IBM or whatever?

1    A.  Well, I suppose, if there were a lawsuit that alleged that

2    Apple or Microsoft or somebody else was lying about that, that

3    would be different.

4         So if you would take the Volkswagen emissions case,

5    there was no reason to go any further than what Volkswagen

6    published in terms of their emissions until they were caught

7    scamming their emissions.  At that point now you can't trust

8    what comes with them anymore.

9         My practice has been, if a company has been regularly

10   forthcoming with that sort of information, then there typically

11   isn't a concern.  If there was, then perhaps we would ask.

12   This certainly isn't the first time we've ever asked.  There's

13   been other software we have asked.

14   Q.  I think when you were answering Ms. Pelker's question, you

15   mentioned something called a change log.

16        Could you explain to the Court what a change log is.

17   A.  Yes.  I mean, in alternate, when we don't have everything,

18   we need to understand error rates and that sort of thing.  We

19   can often extrapolate that from what was repaired in the

20   software.

21        So FTK, for instance, toolkit; one of the bigger

22   forensics companies, Accurate Data -- these companies produce

23   their change logs.  So as an analyst, if I've done a certain

24   kind of work and I've produced a particular result and in their

25   change log, they've repaired a thing, a component of the

1    software that I feel would be relevant to the accuracy of my

2    results, then I'll necessarily go back with the new software

3    and test it.

4         As I found, most people for the government, when they

5    used the same software, I witnessed lots and lots of testimony

6    where, when asked on the stand, why did you reanalyze this case

7    a year later, what was wrong with it the first time, the answer

8    typically is, well, there was an error that was corrected in a

9    future version, the company published that error, and I felt,

10   as a matter of completeness, that I should check my work and

11   make sure that my results are the same with the new piece of

12   software.

13        So that's, effectively, how we can figure out if

14   there have been errors and that sort of thing.

15   Q.  And are you aware of any reliable forensic software company

16   that doesn't publish change logs?

17   A.  From what I -- well, first of all, there aren't many

18   companies I would just go right out and say aren't reliable.

19   There are some products that I think maybe some people use.

20   I'm not aware of using these.

21        But otherwise, as far as the ones that you see the

22   FBI uses and most large law enforcement, those all produced --

23   they're all very forthcoming about their software.  I can only

24   imagine how difficult it is to have to repeatedly say, uh-oh,

25   we messed something up; here's what we fixed.  That's just good

1    practice.  Again, not just for forensic software; Microsoft

2    catches their software, I think, weekly and they produce the

3    same information.

4    Q.  Is it fair to say that the -- publishing change logs is a

5    common practice among reputable software companies?

6    A.  That is, in fact, one -- I think contingent upon a company

7    being considered to be reputable.

8            MR. EKELAND:  No further questions, Your Honor.

9            THE COURT:  All right.  Thank you.

10           So, Mr. Fischbach, thank you for participating today.

11   I think what I'm going to need you to do is to look at your

12   disclosure and figure out, sort of, what version of it you're

13   comfortable signing and doing so.  I can talk to Mr. Ekeland

14   about timing on doing that.

15           And then I think we're probably going to want to have

16   you back with that in hand, as well as the materials that you

17   were relying upon, so you can answer some of the questions that

18   you wanted to reference the materials with today, okay?

19           THE WITNESS:  Yes.  Your Honor, would it be

20   acceptable to the Court if I were to, effectively, outline

21   within the disclosure anywhere that I felt that those opinions

22   would likely be subject to change if provided additional

23   information or anywhere where it's a hypothetical conclusion

24   that's dependent on further information?

25           THE COURT:  I think you're welcome to say -- I mean,

1    I think you need to say what your expert opinion is and what

2    your basis is for your expert opinion.  If there are areas in

3    which your opinion could change if you had additional

4    information, you're welcome to disclose that as well.

5            THE WITNESS:  Okay.  I appreciate that, Your Honor.

6    I'll try to come up with something that, hopefully, the Court

7    will find useful.

8            THE COURT:  I appreciate that.  Thank you.  You're

9    excused for the day.

10            THE WITNESS:  Thank you so much.

11            THE COURT:  What about timing on that, Mr. Ekeland;

12    when do you want to submit the signed version?  Oh, go ahead.

13            MR. EKELAND:  We were discussing it in the break.  I

14    think Ms. Still's disclosures are due on -- or report, I'm

15    sorry, Jonelle Still from CipherTrace, are due on August 7th.

16    We were contemplating, if that works for the government, doing

17    the same date.

18            If I might add, before Ms. Pelker comes up, if the

19    Court wishes -- and I've mentioned this to the government, but

20    I don't know their position on it -- we could also produce an

21    expert report from Mr. Verret on the same date.

22            THE COURT:  An expert report -- was there not an

23    expert report from him?

24            MR. EKELAND:  This was the disclosures.  As I took

25    from some of the Court's questioning of Mr. Verret the other

1    day, there was some concerns about whether or not he should

2    write down some more of his stuff, and we're happy to do that.

3            In other words, we're happy to provide any more

4    disclosure or reports that the Court wishes in relation to the

5    experts, and we suggest that we just do that on the same

6    deadline as Ms. Still.

7            THE COURT:  I didn't really mean to be expressing

8    questions about the adequacy of his disclosure, although I

9    hadn't really thought about it.  What I was really trying to

10   point out for you, I just -- I was at least telegraphing that I

11   was not persuaded that, at least some of what he was testifying

12   to, really qualified as expert opinions, but more arguments of

13   a lawyer and things where you -- the expert can testify and

14   say, here are what the numbers are and there was -- if you look

15   at the value of bitcoin and how it's grown over time had

16   someone invested X dollars in bitcoin in such and such a month,

17   you would expect that over time, if they left it in bitcoin,

18   they would have X dollars -- or Y dollars at a later date, and

19   here are the accounts that show the money that he had.

20           Then the lawyers can just argue to the jury and say

21   to the jury -- you can argue to the jury and say, well, where's

22   the rest of the money?  You would expect to find the money.

23   And the government can say, well, that's what people who are

24   involved in hiding funds do; they hide it.  It's not a

25   surprise.  And that was all lawyer argument.

1      There were a bunch of places in his testimony where I

2  think he was slipping a little bit more into his role of being

3  a lawyer and less of being an expert.  That was what I was

4  principally commenting on.

5          MR. EKELAND:  Understood, your Honor.

6          THE COURT:  Okay.

7          MS. PELKER:  Your Honor, Ms. Still's late disclosure

8  is really an exceptional situation where she has been recently

9  retained by the defense, and we understand that the defense and

10 she need time to be able to provide and disclose -- to prepare

11 a report.

12         Mr. Fischbach has been working with the defense since

13 last year, has spent hundreds of hours reviewing the discovery.

14 The testimony today is that he has identified some errors that

15 may be errors that are anomalous, but that he didn't have the

16 spreadsheet printed off so he couldn't point to it.

17         It should not take him another three weeks to be able

18 to prepare a report.

19         THE COURT:  I agree with that.  I think that the

20 problem is that he -- I think that counsel had prepared the

21 report, and maybe he hadn't had an adequate chance to review

22 it.  So I don't think it's going to take a lot of time for him

23 to review it and just decide what he feels comfortable opining

24 about and what he doesn't feel comfortable opining about.

25         Let's see.  Today is the 20th of July.  Why don't I

 1    give you until the 28th, which is a little bit over a week, to

 2    submit the final version of his expert report.

 3            MS. PELKER:  The government would just ask, to the

 4    extent that there are specific errors, specific items that he

 5    believes are inaccurate, that they be identified in the report.

 6            THE COURT:  I agree with that.  That should be the

 7    case.  And all these expert reports, the reports are supposed

 8    to not identify just general areas of testimony, but the

 9    specific opinions that the expert is going to express and the

10    basis for those opinions.

11            I don't think it would be, by any means, adequate to

12    say, my view is that there are errors in the Mt. Gox data or

13    there are flaws or difficulties or concerns in it and not say

14    what they are and what the basis is, whether -- that's the

15    whole purpose of this exercise.  So I agree with that.  All

16    right.

17            MS. PELKER:  Your Honor, the government is just very

18    concerned that we are heading down a timeline in which we get

19    to the end of August and defense is asking for a further

20    continuance here.  We just want to be on the record that this

21    case has been continued many -- has been continued for a

22    lengthy period of time, and we are expecting to go to trial in

23    September.

24            And whatever we need to do to make that happen, we

25    should strive to do so.

1          THE COURT:  I agree with that.  I suspect that

2     Mr. Sterlingov agrees with that.  He's been incarcerated, and

3     he, presumably, wants to go to trial as soon as he can.

4          MR. EKELAND:  Well, yes, Your Honor.  But one of the

5     defense's concerns -- and we have discussed this before, and

6     Mr. Fischbach touched on this -- is that there's -- we

7     addressed this, I think, the other day, so I'm not going to

8     belabor the point.  I just do want to reemphasize it slightly.

9     It's our position that we need full access to the Mt. Gox

10    database.

11         THE COURT:  Just to interrupt, I was going to ask you

12    this.  Why don't you outline for me exactly what it is you

13    don't have and that you think you need.

14              So full access to the Mt. Gox data, correct?

15         MR. EKELAND:  The Chainalysis source code.

16         THE COURT:  Give me a second.

17         MR. EKELAND:  Yes.  We're preparing a letter for the

18    government that we intend to send out tomorrow asking this --

19    listing this as well.  I think the key ones are --

20         THE COURT:  The Chainalysis source code.

21         MR. EKELAND:  Chainalysis source code.

22         THE COURT:  Do you have a computer coder?  I didn't

23    see any of these experts who were computer coders.

24         MR. EKELAND:  Mr. Fischbach has told me --

25    represented to me --

```
 1            THE COURT:  He has not a single course in computer
 2    science.
 3            MR. EKELAND:  Your Honor, every -- I've been working
 4    with people involved in the computer field for the last decade.
 5    All the super-talented ones, a lot of them are dropouts.
 6            THE COURT:  But some training or some substantial
 7    experience.  I mean, he's not even a coder.
 8            MR. EKELAND:  Your Honor, Rule 702 does say
 9    experience can be the basis for an expert.
10            THE COURT:  I didn't hear any testimony about his
11    experience as a coder or knowledge as a coder.
12            MR. EKELAND:  Well, we can elicit that next time.
13    I'm quite confident I can find somebody who can read the source
14    code through my connections.  I'm not going to argue the point
15    with you here.
16            I think we have established that we need access to
17    the source code given the fact that Chainalysis does -- has no
18    data on its error rates, period.  They haven't produced change
19    logs, period.  We're, essentially, just being told trust us;
20    and I thought it was astonishing that Ms. Bisbee said that
21    Chainalysis hadn't even kept internal analysis on the error
22    rates.  So I think you get the point.
23            THE COURT:  So the Mt. Gox data, full access to that.
24    I take it there is access to it, but someone has to go to the
25    FBI to have access to it.
```

1        MR. EKELAND:  That's the issue.  We don't -- and

2   that's what Mr. Fischbach was testifying to.  He was saying he

3   can't analyze that Mt. Gox data at the FBI office.  We're told

4   we have to go during their office hours; we have to get

5   clearance.  He's not going to have all his tools.

6        That will delay the trial further because that's

7   going to involve travel time; it's going to involve expense.

8   It's a whole thing.  Like, there's no reason --

9        THE COURT:  Okay.  What else then?  Anything other

10  than those two items?

11       MR. EKELAND:  I think something that Dr. Dror made

12  relevant is we haven't seen the communications -- actually,

13  what's being told what Chainalysis is being instructed on.  We

14  requested a long time ago the communications between the

15  government and Chainalysis in regards to this investigation,

16  and we haven't gotten a single communication that I'm aware of

17  in relation to that.

18       I think that's highly relevant given that this

19  software, once again, is essentially heuristic assumption-based

20  software and everything is guesses in it.

21       THE COURT:  Okay.  Anything else?

22       MR. EKELAND:  Not off the top of my head.  I think

23  really the Mt. Gox data, the Chainalysis source code, and the

24  communications between the government and Chainalysis.  And

25  also, I think Dr. Dror did make relevant the amount of money

1    that Chainalysis is being paid for the government to work on

2    this investigation.  We've asked for those records.

3            THE COURT:  I think that is part of what expert

4    disclosure is supposed to include, compensation.  So everyone

5    should be disclosing that.

6            MR. EKELAND:  Not just the experts.  But I'm saying

7    that the amount of money that the United States Government has

8    paid Chainalysis to work on this investigation, I think, is

9    relevant information for the jury should the cognitive bias

10   testimony from Dr. Dror come in.  Because Dr. Dror specifically

11   said, you know, financial incentives can create cognitive bias.

12           And I think it's directly relevant that this is a

13   for-profit forensic vendor because I don't think you would have

14   this problem if this was FBI cyber in-house.

15           THE COURT:  Okay.  Let me hear then from Ms. Pelker

16   about those four items.

17           MS. PELKER:  So as far as full access to the Mt. Gox

18   data, the government has offered to make this available to

19   defense counsel and their experts at the Washington Field

20   Office.  We picked the Washington Field Office after

21   conversations with the supervisors to ensure that they would

22   have full access during the working hours.  Yes, there are

23   working business hours of the office, but they're committed to

24   ensuring that they will have access.

25           THE COURT:  Tell me what the reasons are for not

```
 1    simply providing a download of it or -- is it so much data that
 2    it couldn't be sent out to a California Field Office for
 3    someone to access it there?  What are the limitations you're
 4    facing?
 5             MS. PELKER:  It's extremely voluminous, but the real
 6    concern is the amount of sensitive third-party financial
 7    information and identifying information in that data set.
 8             THE COURT:  I see.
 9             MS. PELKER:  It has tens of thousands of individuals'
10    sensitive financial details.
11             We've offered -- and we put this in our filing -- if
12    there is a subset of files that defense counsel wants
13    pertaining to those -- to the servers that don't include the
14    sensitive financial information, we're happy to give it.  If
15    they want to come out and do an initial review and say, here
16    are the specific things that we need to do further analysis on
17    and take that back with them, we're happy to do it.
18             But to just turn over massive amounts of third-party
19    financial --
20             THE COURT:  That was -- you've answered the question;
21    I was wondering why it was that the government was keeping this
22    close hold.
23             What about the prospect of providing access, for
24    example, in the Los Angeles Field Office, if that's closer to
25    where Mr. Fischbach is and makes it easier for him to access
```

1    the data?

2          MS. PELKER:  We certainly did consider that, and

3    we're happy to discuss the possibility.  The concern there is

4    that hours -- with the Washington Field Office, we have a fair

5    amount of influence in ensuring that there's going to be ample

6    time for defense to be able to do the review.  It is a large

7    data set.

8          THE COURT:  Right.

9          MS. PELKER:  And if -- first of all, I'm not clear

10   that Mr. Fischbach has the expertise to do the sort of review

11   that defense counsel is suggesting of -- kind of what an

12   incident responder would do to find evidence of a hack and

13   potential deletion of logs.

14         THE COURT:  Right.

15         MS. PELKER:  But, even so, the amount of time that

16   the expert is likely to need with the data set to be able to do

17   that review, our concern is that if we move it out to the Los

18   Angeles Field Office, we're back here next week with defense

19   complaining that they weren't able to get in for five days a

20   week for the full working hours; whereas, in the Washington

21   Field Office, we have commitments from the supervisors here.

22   We can make that happen.

23         THE COURT:  Well, maybe that's something worth

24   exploring with Mr. Ekeland about whether that is a possible

25   solution.

1          What about the Chainalysis source code?

2          MS. PELKER:  The government does not have the

3     Chainalysis source code in our possession.  I think that has

4     been the subject of some of the back-and-forth litigation with

5     Chainalysis.

6          THE COURT:  I take it -- have you requested that

7     Chainalysis make it available?

8          MS. PELKER:  I don't know that we've made any

9     specific request to Chainalysis.  I'd have to go back and view.

10    We don't have any ability to direct them.

11         THE COURT:  I know you don't have the ability to

12    direct them.  It's their proprietary source code.  But, again,

13    just to try and streamline things, you might ask and see if

14    they'd be willing to do it.

15         MS. PELKER:  I think from their filings, if you --

16    their motion to quash, in part, addressed this.  They've made

17    their position on that fairly clear.

18         THE COURT:  Right.  What about the communications

19    between the government and Chainalysis?

20         MS. PELKER:  So I believe that the defense request

21    initially was very broad of every communication that the

22    government, anyone in the entire U.S. Government has ever had

23    with Chainalysis.  What I'm understanding now is that it's

24    communications between the government and Chainalysis regarding

25    this case.

1          I mean, I don't believe that's subject to discovery

2    or relevant except to the extent that they're arguing that, if

3    we disclose particular information to Ms. Bisbee and her

4    preparation of the expert report that she may have relied upon,

5    we can go back and see if there's anything that we believe may

6    be covered by that.

7          THE COURT:  I think that would be wise to do that.

8    And I did understand Mr. Ekeland just to be asking about this

9    investigation.  And so if there are assumptions, premises,

10   information that was provided, that would be helpful and, quite

11   frankly, it may well be in the government's interest.

12         If it's not provided, Mr. Ekeland is going to be

13   arguing to the jury that, for all we know there were

14   assumptions, and the government didn't provide that

15   information; therefore, we don't know what the assumptions are.

16   So it might be in everyone's interest if that can be provided.

17         And then what about the money that's been paid to

18   Chainalysis?  I take it, again, it was just relating to this

19   investigation and not over -- for all things?

20         MS. PELKER:  I mean, the money that's been paid to

21   Chainalysis is -- the work that Chainalysis is doing on this

22   case is the expert report.

23         THE COURT:  Did they do anything beforehand,

24   before -- before they were retained to be a testifying expert,

25   as a nontestifying expert to do analysis?

331

1              MS. PELKER:  No.  So what Mr. Ekeland -- part of the

2      defense conspiracy theory is that there was an IRS contractor

3      named Aaron Bice who did work on this case.  His contract was

4      post-indictment.  Then, basically, his company was acquired by

5      Chainalysis.  So he is a contractor.

6              He is -- my understanding is that IRS has a contract

7      with him for work on lots of different cases, supporting the

8      IRS's work.  But that's not a payment by the government to

9      Chainalysis for this case.

10             THE COURT:  Okay.

11             MS. PELKER:  And then the other -- the only other

12     thing would be the government generally pays for Chainalysis

13     licenses, like the license that was used by Mr. Scholl in doing

14     the tracing.  But, again, that's not a payment by the

15     government to Chainalysis for work on this case.

16             THE COURT:  What does the license cost?

17             MS. PELKER:  So I don't know the specifics.  Because

18     I know it's an enterprise license.

19             THE COURT:  I see.

20             MS. PELKER:  I believe most of the federal contracts

21     are published somewhere, but I just don't know, your Honor.

22             THE COURT:  All right.  Well, I think we know the

23     universe of things.  I've given you some guidance at least with

24     areas I hope the parties can work together.  If you need me on

25     this, let me know.

1          If the parties prefer to convene a hearing virtually

2     to try and resolve these issues -- Mr. Ekeland, if you're back

3     in New York -- I will be available for that.  But I hope that

4     you all can work these things out.

5          I will say that I understand the government's

6     position that it doesn't possess or own the Chainalysis source

7     code, and they can't require that Chainalysis turn it over.

8     They can make a request, and I think it might be wise to do

9     that.

10         With respect to the full access to the Mt. Gox data,

11    I understand the government's concerns.  And if there is a

12    great deal of sensitive financial information, I understand why

13    the FBI wants to maintain custody of that.  Maybe something can

14    be done to increase the access in some way.  I think that would

15    be advisable if that can be done.

16         I think I've just touched on the questions relating

17    to communications with the -- with Chainalysis and also the

18    payments to Chainalysis.

19         With at least that preliminary guidance from the

20    Court, hopefully, the parties can work something out here, and

21    we can keep moving forward.  Mr. Ekeland?

22         MR. EKELAND:  Just a quick procedural question.  We

23    will try to work it out with the government.  I think what

24    we're planning to do is just send a letter.

25         THE COURT:  You're welcome to send a letter, but I

1   find that that is -- ends up being less productive.  I mean,

2   you've told the government what it is that you want here.  I

3   think, frankly, conversations in which you can see whether

4   there's some give-and-take can be more productive than just

5   making the record of here, we sent you the letter.

6           MR. EKELAND:  Understood, Your Honor, yes.  Should we

7   not be able to come to some kind of agreement, we then would

8   just ask the Court for a hearing and not file a motion to

9   compel or something like that?

10          THE COURT:  I'm all in favor of expediting these

11   things.  I'm not sure how much more I can do on some of these

12   things.  I mean, if the government is providing access to the

13   Mt. Gox data here in D.C., I'm not sure they have a legal

14   obligation to be doing more than that under the circumstances.

15   I think it might expedite the case and prevent -- minimize the

16   risk that I'll need to grant a continuance if it can be

17   provided in California or in some greater way.

18          With the Chainalysis source code, again, I'm not sure

19   my -- there's much within my authority to do anything, at least

20   with respect to the government on that.  And I touched on the

21   other issues.

22          So my authority may be limited other than jawboning

23   on some of these things.  I'm happy to do that if it's helpful.

24          MR. EKELAND:  You could exclude the Chainalysis

25   Reactor's source code on the basis that it wasn't produced.

1     That's a separate motion, Your Honor.  Understood.

2              THE COURT:  Okay.  Anything else before we adjourn?

3              MS. PELKER:  No, your Honor.

4              THE COURT:  Okay.  Thank you all.

5              MR. EKELAND:  Thank you, your Honor.

6              (The hearing adjourned at 4:25 p.m.)

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, TAMARA M. SEFRANEK, do hereby certify that the

4    above and foregoing constitutes a true and accurate transcript

5    of my stenographic notes and is a full, true and complete

6    transcript of the proceedings to the best of my ability.

7          Dated this 3rd day of August, 2023.

8

9                         /s/ Tamara M. Sefranek_____
                          Tamara M. Sefranek, RMR, CRR, CRC
10                        Official Court Reporter
                          Room 6714
11                        333 Constitution Avenue, N.W.
                          Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

336

## $

**$100,000** [1] - 230:12
**$33** [1] - 237:17
**$334** [1] - 237:16
**$50,000** [1] - 230:13
**$70,000** [1] - 230:16

## /

**/s** [1] - 335:9

## 1

**1** [1] - 244:8
**10** [1] - 237:17
**10005** [1] - 214:17
**10:10** [1] - 214:6
**10:50** [1] - 242:19
**1193** [2] - 243:8, 243:23
**1193-94** [1] - 245:4
**11:00** [3] - 231:20, 242:13, 242:14
**11th** [1] - 238:10
**15** [2] - 301:22, 302:1
**15-minute** [1] - 301:24
**16** [2] - 284:15, 291:4
**168** [1] - 244:4
**168.1.1** [1] - 268:21
**174** [1] - 244:25
**18** [4] - 236:18, 250:5, 252:8, 252:14
**1956(a)(3** [1] - 250:5
**1960(b)** [1] - 252:9
**1987** [1] - 257:3
**1:00** [3] - 231:22, 231:23, 242:8
**1:21-CR-0399** [1] - 214:3
**1:30** [1] - 242:9
**1:35** [1] - 242:19

## 2

**2** [2] - 250:22, 252:14
**20** [1] - 214:6
**20001** [3] - 214:12, 214:23, 335:11
**2010** [1] - 228:9
**2011** [2] - 241:19, 268:6
**2013** [1] - 241:10
**2014** [1] - 241:10
**2015** [1] - 231:6
**2016** [1] - 231:6
**202-354-3246** [1] - 214:23
**2021** [1] - 241:13
**2023** [2] - 214:6, 335:7

**20530** [1] - 214:14
**20th** [2] - 263:13, 321:25
**21-399** [1] - 216:2
**21-CR-399** [1] - 242:22
**217** [1] - 215:5
**22** [1] - 237:18
**227** [1] - 215:6
**25** [1] - 247:6
**250** [1] - 288:19
**26** [6] - 254:12, 256:2, 256:3, 265:21, 273:21, 275:20
**26-plus** [1] - 285:24
**27** [1] - 254:13
**28th** [1] - 322:1
**2:00** [1] - 234:25

## 3

**3** [1] - 251:20
**30** [2] - 214:17, 247:6
**300** [1] - 288:16
**30th** [1] - 263:13
**317** [1] - 244:16
**326** [1] - 243:15
**333** [2] - 214:22, 335:11
**385** [2] - 243:22, 247:5
**3:00** [1] - 234:25
**3rd** [1] - 335:7

## 4

**4** [1] - 252:22
**40** [1] - 288:14
**400** [1] - 288:16
**45** [1] - 242:24
**483** [1] - 244:3
**499** [2] - 245:1, 247:10
**4:25** [1] - 334:6

## 5

**5** [1] - 255:16
**51** [1] - 245:1
**52** [1] - 247:10
**534** [1] - 245:2
**54** [1] - 247:6

## 6

**600** [1] - 290:15
**601** [1] - 214:11
**6714** [2] - 214:22, 335:10

## 7

**7** [2] - 229:11, 229:17

**7(c)(1** [1] - 242:25
**7(f)** [1] - 243:11
**702** [1] - 324:8
**74** [1] - 243:23
**76** [1] - 247:5
**764** [1] - 244:16
**7th** [1] - 319:15

## 8

**8** [1] - 229:11
**822** [3] - 243:7, 243:23, 245:3
**841** [1] - 244:16
**8th** [1] - 214:17

## 9

**91** [1] - 243:15
**950** [1] - 214:14
**971** [1] - 245:3
**987341870** [1] - 221:18

## A

**a.m** [1] - 242:19
**A.M** [1] - 214:6
**Aaron** [1] - 331:3
**abetting** [3] - 252:12, 252:14, 252:19
**ability** [9] - 227:16, 266:18, 279:17, 297:19, 305:9, 305:12, 329:10, 329:11, 335:6
**able** [31] - 236:21, 238:17, 242:3, 255:24, 262:17, 263:18, 263:24, 264:10, 266:23, 270:11, 273:24, 279:19, 280:8, 280:14, 284:6, 289:14, 289:23, 291:8, 299:22, 305:20, 306:18, 307:19, 308:11, 308:12, 311:2, 321:10, 321:17, 328:6, 328:16, 328:19, 333:7
**absent** [7] - 248:10, 290:17, 290:19, 298:14, 300:1, 300:11, 305:15
**absolutely** [12] - 224:20, 257:2, 257:19, 260:22, 265:10, 278:24,

285:9, 294:4, 302:3, 310:7, 312:20, 315:21
**abuse** [1] - 276:15
**accept** [2] - 275:16, 298:25
**acceptable** [1] - 318:20
**accepted** [2] - 219:23, 310:22
**access** [41] - 217:9, 227:13, 227:15, 227:24, 232:16, 232:21, 232:23, 233:6, 233:11, 233:25, 234:4, 235:7, 235:10, 235:20, 236:7, 248:22, 262:14, 264:7, 265:1, 265:19, 267:21, 273:12, 287:9, 293:2, 298:5, 323:9, 323:14, 324:16, 324:23, 324:24, 324:25, 326:17, 326:22, 326:24, 327:3, 327:23, 327:25, 332:10, 332:14, 333:12
**accessing** [1] - 232:9
**accompanied** [1] - 245:8
**according** [1] - 310:18
**account** [33] - 219:15, 220:19, 220:22, 221:17, 221:18, 222:2, 222:11, 222:18, 222:23, 222:24, 223:9, 223:12, 223:18, 224:4, 225:3, 225:4, 225:16, 225:20, 226:2, 226:5, 226:12, 226:13, 226:14, 226:15, 226:18, 226:20, 226:22, 227:19, 228:2, 248:7, 252:16, 267:13, 280:11
**accounted** [1] - 229:21
**accountholder** [1] - 225:16
**accountholders** [1] - 225:6
**accounting** [3] - 219:16, 219:24, 230:1

**accounts** [3] - 225:6, 225:23, 320:19
**accuracy** [8] - 220:15, 261:16, 261:19, 273:1, 282:6, 311:24, 315:20, 317:1
**Accurate** [1] - 316:22
**accurate** [12] - 224:11, 227:25, 283:20, 288:18, 298:10, 308:6, 308:7, 308:8, 309:24, 310:14, 310:15, 335:4
**accurately** [2] - 289:25, 315:1
**accused** [1] - 276:14
**accustomed** [1] - 275:18
**acknowledge** [1] - 249:1
**acquired** [1] - 331:4
**act** [2] - 244:18, 246:18
**Act** [2] - 263:8, 265:1
**Action** [1] - 214:2
**activity** [17] - 219:20, 219:21, 224:18, 225:3, 225:24, 226:13, 245:23, 245:25, 246:7, 246:9, 250:8, 250:10, 250:11, 250:24, 251:1, 251:6, 251:19
**actors** [1] - 271:12
**acts** [2] - 248:2, 248:7
**actual** [4] - 250:3, 251:10, 276:21, 278:22
**add** [5] - 236:20, 236:23, 256:5, 288:10, 319:18
**addition** [3] - 245:5, 265:22, 303:22
**additional** [11] - 261:25, 262:3, 283:4, 298:7, 299:6, 300:12, 302:23, 303:11, 304:11, 318:22, 319:3
**address** [40] - 232:8, 257:18, 257:19, 258:5, 259:10, 259:15, 259:16, 259:17, 259:20, 259:22, 260:1, 260:3, 260:5, 260:18, 260:21, 261:4, 261:9,

337

261:11, 261:14,
262:11, 264:8,
268:17, 268:18,
268:19, 268:22,
268:23, 269:11,
270:5, 270:20,
278:22, 297:12,
300:8, 308:1,
308:13, 313:19
**address-to-address**
[1] - 278:22
**addressed** [4] -
258:25, 301:11,
323:7, 329:16
**addresses** [9] -
250:18, 257:17,
257:23, 260:6,
260:11, 260:12,
260:17, 268:20,
314:24
**addressing** [2] -
259:13, 259:14
**adequacy** [1] - 320:8
**adequate** [2] - 321:21,
322:11
**adjourn** [1] - 334:2
**adjourned** [1] - 334:6
**administrative** [1] -
248:9
**administrator** [1] -
239:13
**administrators** [4] -
223:18, 239:3,
239:6, 239:21
**ADMITTED** [1] -
215:15
**adopter** [1] - 231:4
**adoption** [1] - 277:12
**advantage** [1] -
255:24
**advisable** [1] - 332:15
**affect** [1] - 235:2
**affected** [1] - 220:22
**affidavit** [3] - 238:19,
240:15, 250:21
**affidavits** [2] - 240:15,
245:9
**afternoon** [1] - 236:21
**afterwards** [1] - 300:8
**agencies** [4] - 218:10,
219:2, 313:23,
314:18
**agent** [1] - 314:3
**agents** [1] - 263:1
**ago** [8] - 261:1,
265:22, 274:7,
276:1, 285:24,
286:22, 289:25,
325:14
**Agora** [1] - 241:10

**agree** [8] - 281:21,
285:3, 295:24,
298:8, 321:19,
322:6, 322:15, 323:1
**agreement** [4] -
245:18, 245:19,
284:7, 333:7
**agrees** [1] - 323:2
**ahead** [4] - 216:16,
266:8, 309:18,
319:12
**aided** [1] - 265:24
**aiding** [3] - 252:12,
252:14, 252:19
**air** [1] - 261:5
**airline** [1] - 261:8
**airplane** [1] - 261:7
**airplane's** [1] - 261:6
**airport** [2] - 261:1,
261:3
**akin** [1] - 269:8
**alarm** [2] - 256:19,
256:22
**Alaska** [3] - 263:18,
293:8, 293:10
**Alden** [1] - 216:6
**ALDEN** [1] - 214:13
**allegation** [5] - 229:1,
232:16, 251:4,
252:7, 268:5
**allegations** [4] -
249:18, 251:2,
251:15, 251:17
**alleged** [18] - 244:18,
244:22, 245:5,
245:7, 246:4, 246:6,
246:8, 246:11,
246:18, 247:8,
247:14, 247:17,
248:1, 248:15,
250:24, 251:25,
253:11, 316:1
**allegedly** [1] - 252:16
**alleges** [1] - 252:4
**alleging** [1] - 247:9
**allow** [5] - 243:5,
243:13, 267:2,
290:8, 300:11
**allowed** [2] - 268:13,
309:2
**almost** [3] - 217:23,
241:7, 303:3
**alter** [1] - 293:21
**altered** [1] - 228:6
**alternate** [1] - 316:17
**alternative** [7] -
224:13, 225:2,
225:22, 226:17,
227:18, 228:4,
267:16

**Altnet** [2] - 267:17,
268:1
**Amazon** [2] - 267:1,
268:21
**America** [6] - 216:3,
218:12, 218:16,
220:8, 220:12,
242:22
**AMERICA** [1] - 214:2
**amount** [11] - 223:13,
223:14, 229:17,
237:16, 239:1,
277:10, 325:25,
326:7, 327:6, 328:5,
328:15
**amounts** [1] - 327:18
**ample** [4] - 252:3,
252:18, 293:19,
328:5
**analog** [1] - 278:16
**analogies** [1] - 259:8
**analogous** [2] -
246:24, 281:25
**analysis** [23] - 227:22,
227:23, 252:23,
261:14, 261:17,
262:11, 277:8,
277:17, 295:23,
296:22, 296:24,
297:3, 298:3, 298:4,
298:15, 298:21,
299:9, 300:10,
300:11, 304:1,
324:21, 327:16,
330:25
**analyst** [1] - 316:23
**analyze** [3] - 262:17,
264:8, 325:3
**analyzed** [1] - 280:1
**Android** [1] - 309:23
**Angeles** [4] - 258:25,
259:4, 327:24,
328:18
**anniversary** [1] -
293:10
**anomalies** [1] -
308:25
**anomalous** [6] -
306:17, 306:18,
306:24, 307:1,
307:4, 321:15
**anonymous** [1] -
296:11
**answer** [19] - 219:13,
222:17, 224:10,
262:20, 264:11,
274:19, 275:7,
275:19, 278:1,
286:18, 290:8,
298:20, 299:1,

302:14, 303:15,
307:19, 313:10,
317:7, 318:17
**answered** [1] - 327:20
**answering** [1] -
316:14
**answers** [2] - 291:11,
299:2
**anyway** [1] - 314:15
**apart** [1] - 248:8
**apologies** [1] - 294:15
**apologize** [4] -
274:17, 275:11,
290:11, 293:9
**appear** [3] - 280:15,
292:15, 308:8
**appeared** [4] - 222:15,
274:23, 303:3,
306:25
**appearing** [1] - 308:20
**Apple** [6] - 256:16,
272:16, 315:14,
315:18, 315:24,
316:2
**Apple's** [1] - 310:8
**applicable** [1] -
249:15
**application** [2] -
219:25, 220:2
**apply** [3] - 219:25,
220:3, 284:20
**appreciate** [3] - 235:8,
319:5, 319:8
**appreciated** [1] -
231:6
**appreciation** [1] -
231:5
**approach** [1] - 244:7
**appropriate** [2] -
233:17, 247:22
**appropriately** [1] -
235:14
**apps** [1] - 272:17
**area** [4] - 227:22,
273:19, 279:2,
280:23
**areas** [7] - 254:18,
267:6, 278:20,
284:13, 319:2,
322:8, 331:24
**argue** [3] - 320:20,
320:21, 324:14
**arguing** [2] - 330:2,
330:13
**argument** [3] - 232:1,
236:18, 320:25
**argumentative** [1] -
280:2
**arguments** [1] -
320:12

**arrange** [1] - 263:18
**arrive** [1] - 227:11
**articles** [1] - 221:11
**articulate** [1] - 282:17
**artificial** [1] - 315:4
**ascertain** [1] - 243:19
**aside** [3] - 290:16,
304:25, 310:2
**aspect** [1] - 280:25
**assertion** [1] - 251:24
**assertions** [4] - 228:1,
274:14, 281:2, 281:3
**assess** [3] - 261:25,
273:1, 273:3
**asset** [1] - 230:24
**assets** [2] - 229:21,
230:20
**assisted** [1] - 252:20
**associated** [2] -
222:25, 252:17
**assume** [3] - 221:25,
229:13, 282:6
**assuming** [1] - 286:21
**assumption** [1] -
325:19
**assumption-based**
[1] - 325:19
**assumptions** [3] -
330:9, 330:14,
330:15
**astonishing** [1] -
324:20
**attack** [1] - 226:2
**attacker** [1] - 296:18
**attacks** [1] - 284:25
**attempt** [1] - 263:23
**attempted** [1] - 288:24
**attempting** [2] -
252:11, 256:12
**attending** [1] - 313:7
**attention** [4] - 267:14,
294:16, 303:5
**attorney** [5] - 235:21,
255:17, 264:2,
286:16
**attorney-client** [1] -
264:2
**attorneys** [3] - 232:22,
278:16, 290:23
**attributed** [2] -
223:15, 314:23
**attribution** [4] - 238:3,
257:18, 257:22,
257:23
**atypical** [1] - 247:25
**August** [3] - 319:15,
322:19, 335:7
**auspices** [2] - 263:3,
263:9
**authority** [3] - 235:10,

333:19, 333:22
**authors** [1] - 274:9
**automatically** [1] -
266:14
**available** [22] -
231:22, 242:8,
255:23, 262:8,
264:16, 273:23,
275:9, 279:23,
280:20, 284:11,
289:21, 290:10,
297:21, 299:23,
300:4, 300:24,
301:8, 306:6,
313:12, 326:18,
329:7, 332:3
**Avenue** [3] - 214:14,
214:22, 335:11
**avoid** [2] - 238:17,
246:1
**avoiding** [1] - 246:3
**aware** [23] - 218:9,
218:13, 218:18,
218:23, 219:1,
219:5, 225:9,
225:15, 225:18,
242:6, 249:22,
262:2, 272:12,
272:21, 272:23,
280:2, 282:20,
284:21, 287:6,
311:23, 317:15,
317:20, 325:16
**Axiom** [2] - 310:20,
311:18

## B

**back-and-forth** [2] -
236:6, 329:4
**back-end** [1] - 283:16
**background** [5] -
217:23, 260:16,
312:13, 312:18,
312:19
**bad** [2] - 233:15,
299:25
**ballpark** [2] - 274:11,
288:15
**Bank** [4] - 218:12,
218:15, 220:8,
220:12
**bank** [8] - 219:6,
219:14, 219:16,
219:19, 220:16,
220:18, 267:13,
296:4
**bankruptcy** [3] -
221:5, 221:13,
223:25

**banks** [6] - 218:9,
218:19, 218:20,
218:23, 219:4, 219:5
**barebones** [1] - 238:1
**barely** [1] - 293:7
**based** [13] - 251:1,
282:3, 282:15,
282:25, 283:11,
292:7, 295:16,
302:22, 303:8,
306:10, 311:8,
325:19
**bases** [2] - 228:19,
304:20
**basics** [1] - 258:2
**basing** [1] - 262:11
**basis** [22] - 225:19,
225:22, 228:21,
240:9, 250:22,
251:1, 251:15,
252:7, 252:15,
253:5, 299:4,
300:10, 300:23,
304:22, 305:1,
309:13, 311:24,
319:2, 322:10,
322:14, 324:9,
333:25
**Bazezew** [2] - 244:3,
245:1
**became** [2] - 260:18,
265:24
**become** [2] - 256:17,
275:17
**becomes** [3] - 263:15,
296:5, 306:18
**BEFORE** [1] - 214:8
**beforehand** [1] -
330:23
**began** [1] - 244:19
**beginning** [4] -
257:10, 288:21,
288:23, 314:4
**behalf** [1] - 252:6
**behind** [4] - 234:9,
235:16, 235:19,
236:8
**belabor** [1] - 323:8
**belief** [2] - 261:24,
292:9
**believes** [1] - 322:5
**belongs** [2] - 269:24,
292:8
**bench** [1] - 242:13
**best** [7] - 226:13,
229:20, 270:7,
291:12, 303:2,
314:24, 335:6
**better** [13] - 251:24,
256:20, 281:10,

282:23, 284:17,
286:6, 286:9, 287:1,
293:13, 293:18,
301:11, 302:18,
314:25
**between** [13] - 223:17,
223:23, 236:6,
238:18, 239:24,
259:13, 263:2,
266:7, 293:8,
325:14, 325:24,
329:19, 329:24
**beyond** [6] - 244:11,
245:14, 254:19,
265:4, 270:24,
282:14
**bias** [2] - 326:9,
326:11
**Bice** [1] - 331:3
**big** [5] - 234:6, 234:10,
259:12, 308:23,
315:17
**bigger** [4] - 293:22,
306:13, 314:10,
316:21
**biggest** [2] - 293:20,
297:15
**bill** [27] - 236:21,
236:22, 237:5,
237:6, 237:8, 240:4,
240:9, 240:12,
242:3, 242:15,
242:24, 243:10,
243:12, 243:16,
243:25, 244:5,
244:12, 244:15,
245:15, 246:23,
249:3, 250:19,
251:10, 251:11,
253:5, 253:13
**Bill** [1] - 313:2
**billed** [2] - 289:25,
290:14
**billing** [2] - 290:3,
290:4
**billion** [1] - 230:19
**billionaires** [1] -
271:13
**Bisbee** [5] - 237:16,
241:12, 274:8,
324:20, 330:3
**Bisbee's** [1] - 274:15
**bit** [14] - 224:14,
259:21, 261:24,
272:7, 274:18,
274:21, 276:17,
284:2, 285:2,
299:15, 304:20,
309:5, 321:2, 322:1
**Bitcoin** [12] - 229:3,

231:4, 231:14,
239:25, 246:13,
252:5, 252:17,
281:14, 282:14,
283:15, 283:17,
283:24
**bitcoin** [11] - 229:10,
229:12, 229:15,
229:16, 230:19,
231:5, 232:6,
278:22, 320:15,
320:16, 320:17
**BitcoinFog.com** [1] -
268:7
**bitcoins** [1] - 223:14
**Bitstamp** [5] - 223:12,
223:14, 223:18,
223:24, 223:25
**blaming** [1] - 291:11
**blockchain** [10] -
217:11, 217:14,
217:15, 217:20,
218:1, 218:6, 218:7,
277:7, 277:17,
279:11
**board** [2] - 250:1,
313:2
**body** [1] - 239:20
**bono** [1] - 314:5
**book** [2] - 221:8,
221:11
**boring** [1] - 314:22
**boxes** [1] - 256:16
**boy** [1] - 298:8
**breached** [1] - 285:8
**breadth** [1] - 248:14
**break** [5] - 231:20,
256:22, 301:24,
302:10, 319:13
**Breyer** [3] - 294:17,
294:18, 294:20
**brief** [1] - 254:11
**briefing** [1] - 245:10
**briefly** [10] - 228:14,
229:1, 258:4,
265:11, 265:16,
268:10, 274:5,
313:23, 315:12
**bring** [1] - 232:16,
293:10
**bringing** [1] - 228:16
**brings** [1] - 288:14
**broad** [2] - 247:13,
329:21
**Brodie** [2] - 243:15,
247:10
**broke** [1] - 256:20
**brought** [4] - 227:23,
243:4, 293:23, 303:4
**BROWN** [8] - 214:10,

216:24, 217:2,
225:14, 227:2,
238:15, 239:16,
240:21
**Brown** [10] - 215:5,
216:9, 216:20,
216:23, 237:1,
238:14, 239:10,
239:15, 240:20,
255:1
**browser** [5] - 266:14,
266:21, 267:15,
267:20, 267:23
**buddy** [1] - 229:25
**budget** [1] - 264:3
**build** [1] - 285:21
**building** [1] - 285:25
**buildings** [1] - 257:5
**built** [1] - 267:11
**built-in** [1] - 267:11
**bulk** [1] - 313:10
**bunch** [1] - 321:1
**burgeoning** [1] -
279:2
**burn** [3] - 237:24,
238:11, 241:25
**burns** [1] - 242:5
**bursts** [1] - 285:21
**business** [8] - 246:13,
251:21, 251:23,
252:1, 252:5, 252:8,
255:10, 326:23
**busy** [2] - 272:5, 276:9
**Butler** [3] - 243:7,
243:23, 245:3
**BY** [16] - 217:2,
225:14, 227:7,
230:22, 254:8,
255:9, 275:4,
275:13, 295:9,
300:7, 302:9,
305:18, 307:15,
309:19, 312:16,
313:14

## C

**Cabanas** [1] - 303:23
**cable** [1] - 256:15
**California** [3] -
314:11, 327:2,
333:17
**camera** [1] - 275:8
**cannot** [7] - 219:15,
226:23, 229:13,
229:21, 239:8,
251:24, 252:10
**capacity** [2] - 219:7,
255:19
**car** [4] - 230:4, 230:12,

230:13, 230:16
**career** [2] - 265:23,
275:6
**careful** [4] - 273:15,
284:8, 304:9, 310:7
**carried** [2] - 247:20,
248:2
**carrying** [2] - 245:24,
250:11
**cars** [2] - 229:24,
256:15
**Case** [2] - 216:2,
242:22
**case** [101] - 220:9,
220:12, 221:4,
221:5, 221:6,
228:17, 228:24,
229:23, 230:2,
231:7, 231:8, 231:9,
231:11, 238:2,
238:21, 239:4,
239:19, 239:23,
240:16, 241:24,
243:14, 245:1,
245:12, 246:25,
247:11, 247:15,
247:17, 247:18,
247:23, 247:24,
247:25, 248:3,
248:22, 249:19,
251:11, 251:14,
253:1, 253:3,
257:13, 257:14,
258:3, 259:19,
259:21, 261:13,
262:2, 262:9,
262:22, 263:15,
263:17, 263:20,
264:4, 265:3, 278:9,
279:18, 279:22,
280:8, 280:13,
284:5, 284:12,
285:23, 285:24,
285:25, 286:11,
286:13, 286:14,
286:22, 287:11,
288:3, 288:9,
288:10, 288:20,
289:13, 289:15,
289:24, 290:11,
290:24, 292:2,
292:3, 292:13,
292:16, 292:24,
294:25, 295:11,
296:18, 299:21,
299:23, 301:9,
304:3, 304:12,
316:4, 317:6, 322:7,
322:21, 329:25,
330:22, 331:3,

331:9, 331:15,
333:15
**cases** [28] - 221:5,
230:3, 244:13,
247:8, 247:9, 249:7,
249:10, 262:23,
263:11, 266:3,
268:3, 275:5,
275:20, 275:23,
276:3, 277:16,
277:18, 277:20,
278:3, 278:14,
278:21, 279:19,
288:20, 289:13,
292:17, 299:24,
310:8, 331:7
**catches** [1] - 318:2
**category** [2] - 219:6,
273:19
**caught** [1] - 316:6
**caused** [1] - 301:10
**cautious** [1] - 278:11
**ceased** [1] - 241:8
**cell** [5] - 256:8,
256:11, 276:19,
277:2, 277:5
**Cellebrite** [2] - 310:20,
311:18
**central** [1] - 219:6
**certain** [10] - 233:5,
238:25, 254:18,
260:9, 265:3, 270:4,
288:25, 300:4,
303:5, 316:23
**certainly** [24] - 218:21,
248:23, 255:24,
257:7, 260:12,
262:7, 263:3,
264:14, 267:6,
279:12, 281:19,
281:24, 284:3,
291:17, 292:11,
304:2, 304:5, 304:9,
304:16, 311:11,
314:16, 316:12,
328:2
**certainty** [1] - 298:16
**CERTIFICATE** [1] -
335:1
**certification** [4] -
217:19, 217:25,
218:1, 313:9
**certifications** [2] -
280:19, 313:11
**certify** [1] - 335:3
**CFE** [2] - 217:15,
218:6
**CFEs** [1] - 220:4
**CFF** [2] - 217:15,
218:6

**CFFs** [1] - 220:4
**chain** [1] - 278:22
**Chainalysis** [47] -
217:9, 217:17,
218:4, 272:10,
272:22, 273:2,
274:8, 274:15,
279:10, 279:13,
279:18, 279:23,
280:4, 280:19,
281:9, 323:15,
323:20, 323:21,
324:17, 324:21,
325:13, 325:15,
325:23, 325:24,
326:1, 326:8, 329:1,
329:3, 329:5, 329:7,
329:9, 329:19,
329:23, 329:24,
330:18, 330:21,
331:5, 331:9,
331:12, 331:15,
332:6, 332:7,
332:17, 332:18,
333:18, 333:24
**Chainalysis's** [1] -
280:10
**challenge** [1] - 228:1
**challenged** [1] -
263:10
**chance** [2] - 274:5,
321:21
**change** [16] - 226:14,
238:9, 259:20,
269:12, 272:7,
287:3, 311:22,
316:15, 316:16,
316:23, 316:25,
317:16, 318:4,
318:22, 319:3,
324:18
**changed** [3] - 226:20,
261:2, 293:17
**changes** [2] - 226:25,
259:18
**characterization** [1] -
224:10
**characterize** [1] -
220:1
**charge** [2] - 251:1,
251:9, 251:22,
252:4, 252:15,
252:19, 253:9, 290:2
**charged** [8] - 243:2,
246:4, 246:16,
247:19, 250:3,
250:5, 250:25,
252:13
**charges** [7] - 238:16,
238:22, 238:23,

240:13, 243:4,
243:5, 243:7
**Charles** [1] - 294:18
**chased** [1] - 304:13
**check** [8] - 217:24,
224:19, 233:12,
233:20, 234:11,
236:12, 288:7,
317:10
**child** [2] - 263:8,
276:15
**chip** [1] - 256:13
**choose** [1] - 269:8
**chose** [2] - 262:4,
298:22
**Chris** [1] - 216:9
**CHRISTOPHER** [1] -
214:10
**Chrome** [1] - 266:22
**cigarette** [1] - 235:22
**cigarettes** [4] -
232:17, 232:18,
235:25, 236:10
**CipherTrace** [4] -
217:12, 279:11,
303:23, 319:15
**Circuit** [1] - 245:2
**circuit** [1] - 249:10
**circumstance** [5] -
260:10, 264:25,
273:15, 294:22,
305:6
**circumstances** [5] -
249:17, 260:9,
263:6, 263:25,
333:14
**cite** [3] - 225:25,
243:10, 292:14
**cites** [1] - 249:10
**citing** [3] - 221:21,
244:24, 247:4
**citizen** [1] - 222:25
**City** [1] - 232:12
**civil** [3] - 246:24,
253:1, 275:23
**CJA** [2] - 289:21
**claim** [2] - 223:25,
252:10
**clarification** [4] -
243:3, 243:16,
250:16, 279:9
**clarify** [2] - 287:19,
292:6
**clarifying** [1] - 305:4
**clear** [17] - 237:20,
238:21, 259:8,
259:12, 262:21,
266:16, 281:8,
281:17, 282:10,
282:16, 289:19,

289:20, 304:7,
305:24, 308:15,
328:9, 329:17
**clearance** [1] - 325:5
**clearly** [3] - 261:23,
282:17, 300:19
**clearnet** [5] - 266:4,
266:7, 266:23,
268:7, 268:12
**clerk** [1] - 253:25
**click** [1] - 280:11
**client** [3] - 232:9,
233:6, 264:2
**clients** [4] - 271:9,
271:11, 271:20
**clients'** [1] - 271:11
**clone** [1] - 277:1
**close** [2] - 249:6,
327:22
**closely** [2] - 251:12,
285:9
**closer** [1] - 327:24
**co** [22] - 237:11,
237:13, 239:4,
239:9, 239:12,
240:3, 240:5,
246:18, 246:20,
247:2, 247:8,
247:17, 248:1,
248:8, 248:16,
249:3, 249:16,
249:22, 249:23,
253:12, 304:17,
304:18
**co-conspirator** [1] -
248:16
**co-conspirators** [20] -
237:11, 237:13,
239:4, 239:9,
239:12, 240:3,
240:5, 246:18,
246:20, 247:2,
247:8, 247:17,
248:1, 248:8, 249:3,
249:22, 249:23,
253:12, 304:17,
304:18
**co-conspirators'** [1] -
249:16
**Coast** [3] - 231:24,
263:1, 263:2
**code** [29] - 273:4,
273:8, 273:11,
273:13, 273:16,
310:1, 310:10,
310:13, 310:16,
310:17, 311:17,
312:1, 312:2,
315:14, 315:17,
315:19, 315:22,

340

323:15, 323:20, 323:21, 324:14, 324:17, 325:23, 329:1, 329:3, 329:12, 332:7, 333:18, 333:25

**coder** [4] - 323:22, 324:7, 324:11

**coders** [1] - 323:23

**cognitive** [2] - 326:9, 326:11

**collect** [1] - 289:23

**collectively** [1] - 284:5

**college** [2] - 257:4, 312:20

**COLUMBIA** [1] - 214:1

**combination** [2] - 256:9, 305:5

**combine** [1] - 314:13

**combines** [1] - 314:12

**comfortable** [9] - 280:9, 282:1, 293:4, 293:18, 294:12, 306:10, 318:13, 321:23, 321:24

**coming** [3] - 228:3, 293:15, 296:19

**commenting** [1] - 321:4

**commerce** [2] - 265:25, 266:4

**commercial** [1] - 269:18

**commit** [2] - 282:18, 290:24

**commitments** [1] - 328:21

**committed** [2] - 244:18, 326:23

**common** [3] - 225:24, 313:1, 318:5

**communication** [2] - 325:16, 329:21

**communications** [6] - 325:12, 325:14, 325:24, 329:18, 329:24, 332:17

**commuter** [1] - 306:5

**companies** [9] - 280:20, 310:15, 311:21, 315:15, 315:18, 316:22, 317:18, 318:5

**company** [10] - 217:21, 270:8, 311:3, 311:20, 315:10, 316:9, 317:9, 317:15, 318:6, 331:4

**compare** [1] - 297:20

**compared** [1] - 246:25

**compartmentalized** [1] - 300:17

**compel** [1] - 333:9

**compensation** [1] - 326:4

**competently** [4] - 264:11, 293:13, 297:20, 297:25

**compilation** [1] - 308:18

**complaining** [1] - 328:19

**complaint** [4] - 237:19, 238:19, 240:14, 245:8

**complaint's** [3] - 248:12, 250:18, 252:6

**complaints** [3] - 238:25, 240:6, 240:7

**complete** [11] - 227:9, 227:14, 227:24, 246:18, 281:4, 282:20, 290:17, 290:19, 300:11, 312:23, 335:5

**completed** [2] - 217:23, 259:7

**completely** [1] - 294:14

**completeness** [2] - 305:16, 317:10

**complex** [3] - 238:2, 248:2, 258:3

**complexity** [2] - 247:13, 248:14

**compliance** [2] - 220:11, 220:17

**complicated** [2] - 265:4, 275:19

**comply** [1] - 220:13

**component** [7] - 217:24, 218:1, 218:5, 218:7, 223:16, 228:8, 316:25

**components** [1] - 283:1

**compressed** [1] - 236:17

**compromise** [2] - 294:4, 294:6

**computer** [13] - 254:12, 256:25, 262:24, 284:25, 285:8, 296:12, 296:14, 307:17, 315:8, 323:22, 323:23, 324:1, 324:4

**Computer** [1] - 314:4

**computers** [7] - 256:25, 257:1, 257:16, 258:17, 276:19, 277:2, 315:7

**conceal** [2] - 245:20, 250:8

**concede** [1] - 218:18

**conceivably** [1] - 261:9

**concern** [18] - 226:24, 235:2, 264:11, 264:13, 293:20, 293:22, 301:10, 304:7, 304:9, 304:10, 305:14, 305:25, 306:9, 314:21, 316:11, 327:6, 328:3, 328:17

**concerned** [4] - 233:16, 236:9, 241:18, 322:18

**concerns** [8] - 220:9, 265:2, 277:22, 297:15, 320:1, 322:13, 323:5, 332:11

**concise** [1] - 243:1

**concludes** [1] - 248:15

**conclusion** [8] - 227:16, 227:17, 248:20, 293:22, 305:15, 306:11, 318:23

**conclusions** [3] - 227:12, 262:1, 264:9

**Concord** [11] - 243:22, 244:24, 247:5, 247:15, 247:23, 247:24, 248:3, 248:6, 248:16, 248:21, 248:24

**conditions** [2] - 233:15, 233:17

**conduct** [7] - 224:17, 225:17, 225:23, 226:6, 246:9, 247:20, 252:20

**conducted** [2] - 225:5, 252:5

**conducting** [4] - 219:23, 225:3, 250:6, 299:8

**confer** [1] - 295:1

**conferences** [2] - 255:17, 255:18

**confident** [1] - 324:13

**configured** [1] - 281:3

**confirm** [3] - 260:13,

311:24, 314:25

**confirmations** [5] - 223:8, 223:11, 224:19, 224:20, 224:25

**confuse** [1] - 287:19

**confused** [1] - 216:19

**connect** [2] - 258:19, 296:4

**connected** [3] - 257:5, 258:17, 261:5

**connection** [1] - 296:5

**connections** [1] - 324:14

**connects** [1] - 258:14

**conscious** [1] - 241:21

**conservatively** [1] - 270:23

**consider** [14] - 224:12, 226:11, 226:16, 227:11, 227:18, 228:6, 228:9, 229:16, 230:9, 239:8, 267:5, 291:24, 310:22, 328:2

**considerable** [1] - 245:6

**consideration** [2] - 228:12, 248:24

**considerations** [1] - 247:21

**considered** [2] - 304:17, 318:7

**considering** [3] - 225:22, 226:10, 226:16

**consistent** [1] - 231:10

**conspiracy** [19] - 240:23, 241:2, 241:16, 244:9, 244:13, 244:15, 244:19, 244:23, 245:7, 245:17, 245:19, 246:11, 246:16, 247:8, 247:19, 248:1, 251:8, 253:9, 331:2

**conspirator** [3] - 244:18, 246:17, 248:16

**conspiratorial** [5] - 237:12, 241:3, 245:18, 246:18

**conspirators** [21] - 237:11, 237:13, 239:4, 239:9, 239:12, 240:3,

240:5, 246:18, 246:20, 247:2, 247:3, 247:8, 247:17, 248:1, 248:8, 249:3, 249:22, 249:23, 253:12, 304:17, 304:18

**conspirators'** [1] - 249:16

**constantly** [3] - 238:5, 263:18, 290:23

**constitutes** [2] - 251:25, 335:4

**constituting** [1] - 243:2

**Constitution** [2] - 214:22, 335:11

**constraint** [1] - 264:24

**consult** [3] - 255:18, 277:5, 314:5

**consultant** [5] - 275:6, 276:10, 276:11, 278:15, 288:11

**consultants** [2] - 280:3, 280:7

**consulted** [4] - 265:24, 275:20, 303:12, 303:18

**Consulting** [1] - 247:5

**consulting** [2] - 255:15, 292:12

**consumer** [1] - 288:13

**consuming** [2] - 237:22, 263:16

**contacted** [2] - 279:22, 286:12

**contain** [3] - 221:14, 248:6, 249:11

**contained** [1] - 243:20

**contains** [1] - 243:1

**contemplating** [1] - 319:16

**contends** [1] - 239:12

**context** [1] - 250:12

**contingent** [3] - 283:15, 284:12, 318:6

**continuance** [3] - 238:10, 322:20, 333:16

**continue** [5] - 216:17, 216:23, 224:8, 224:16, 302:7

**CONTINUED** [3] - 214:4, 214:7, 216:25

**Continued** [1] - 215:4

**continued** [2] - 322:21

**continuing** [2] - 218:6, 309:15

341

**contraband** [1] - 236:3
**contract** [3] - 235:12, 331:3, 331:6
**contractor** [3] - 285:20, 331:2, 331:5
**contracts** [1] - 331:20
**contrary** [1] - 249:14
**contributed** [1] - 284:7
**control** [2] - 245:21, 250:9
**convene** [1] - 332:1
**conversation** [2] - 292:7, 307:7
**conversations** [2] - 326:21, 333:3
**conversed** [1] - 291:17
**converter** [1] - 278:17
**conviction** [2] - 228:6, 228:9
**convince** [1] - 269:25
**convinced** [1] - 269:19
**copy** [3] - 223:24, 273:4, 308:4
**coroner** [1] - 256:24
**corporate** [2] - 222:24, 247:19
**corporation** [1] - 223:1
**correct** [22] - 217:9, 220:25, 222:20, 224:5, 224:6, 224:7, 224:9, 227:24, 228:18, 255:12, 259:11, 260:6, 262:12, 273:14, 277:3, 277:6, 282:5, 287:15, 298:5, 308:4, 310:21, 323:14
**corrected** [1] - 317:8
**correctly** [4] - 227:21, 264:5, 270:3, 286:20
**correspondence** [2] - 223:17, 223:23
**cost** [1] - 331:16
**costly** [1] - 263:15
**counsel** [21] - 216:4, 216:5, 233:25, 278:17, 281:9, 281:18, 284:2, 289:8, 291:3, 291:17, 293:24, 294:6, 294:8, 308:25, 321:20, 326:19, 327:12, 328:11

**counsel's** [2] - 292:7, 303:5
**counsels** [1] - 290:23
**count** [8] - 237:11, 244:6, 244:9, 244:10, 250:1, 250:17, 252:25, 266:3
**Count** [4] - 244:8, 250:22, 251:20, 252:22
**country** [1] - 281:19
**couple** [6] - 219:8, 276:8, 288:7, 288:15, 302:21, 309:20
**courier** [1] - 258:24
**course** [3] - 256:15, 294:5, 324:1
**COURT** [110] - 214:1, 216:8, 216:11, 216:15, 216:21, 216:23, 225:10, 227:4, 230:4, 230:9, 230:12, 230:15, 230:21, 231:17, 231:25, 232:7, 232:13, 233:12, 234:11, 234:16, 234:19, 235:4, 235:9, 235:22, 236:9, 236:12, 236:14, 236:20, 237:2, 238:14, 239:10, 240:19, 240:22, 240:25, 242:7, 242:11, 242:17, 242:23, 253:20, 253:23, 253:25, 254:21, 254:23, 275:1, 275:10, 292:19, 292:23, 294:5, 294:15, 294:19, 295:1, 295:8, 297:7, 299:14, 300:6, 301:16, 301:20, 301:23, 302:1, 302:4, 302:7, 304:19, 307:9, 309:4, 312:6, 312:12, 313:3, 313:13, 318:9, 318:25, 319:8, 319:11, 319:22, 320:7, 321:6, 321:19, 322:6, 323:1, 323:11, 323:16, 323:20, 323:22, 324:1,

324:6, 324:10, 324:23, 325:9, 325:21, 326:3, 326:15, 326:25, 327:8, 327:20, 328:8, 328:14, 328:23, 329:6, 329:11, 329:18, 330:7, 330:23, 331:10, 331:16, 331:19, 331:22, 332:25, 333:10, 334:2, 334:4, 335:1
**Court** [33] - 214:21, 214:21, 232:9, 232:22, 233:8, 233:10, 234:3, 234:21, 235:6, 236:19, 237:4, 238:12, 242:5, 248:15, 249:1, 252:1, 254:9, 258:23, 268:10, 279:17, 287:20, 291:6, 293:25, 298:18, 312:17, 316:16, 318:20, 319:6, 319:19, 320:4, 332:20, 333:8, 335:10
**court** [6] - 216:13, 221:12, 221:13, 240:25, 243:9, 296:13
**Court's** [3] - 239:18, 241:21, 319:25
**Courthouse** [1] - 214:22
**courthouse** [3] - 259:24, 259:25, 260:1
**COURTROOM** [5] - 216:2, 242:21, 254:2, 254:5, 255:4
**courtroom** [1] - 260:2
**courts** [3] - 240:4, 244:16, 249:1
**cover** [1] - 309:11
**covered** [1] - 330:6
**CRC** [2] - 214:21, 335:9
**create** [1] - 326:11
**credential** [1] - 226:2
**credential-stealing** [1] - 226:2
**credentials** [2] - 219:18, 226:2
**credit** [3] - 218:10, 219:2, 298:19
**crime** [2] - 256:17,

276:15
**Crime** [1] - 314:4
**Criminal** [4] - 214:2, 216:2, 242:21, 243:11
**criminal** [10] - 218:19, 225:12, 225:24, 237:19, 238:18, 246:25, 250:3, 251:14, 253:2, 274:2
**critical** [1] - 257:11
**CROSS** [2] - 216:25, 275:2
**cross** [1] - 279:8
**Cross** [2] - 215:4, 215:10
**CROSS-EXAMINATION** [2] - 216:25, 275:2
**Cross-Examination** [2] - 215:4, 215:10
**cross-examination** [1] - 279:8
**CRR** [2] - 214:21, 335:9
**crypto** [4] - 217:25, 224:17, 230:2, 278:21
**cryptocurrency** [10] - 218:21, 238:3, 277:20, 277:21, 277:23, 278:4, 278:8, 278:13, 278:14, 278:19
**Cup** [1] - 271:4
**current** [3] - 233:20, 290:11, 290:14
**curricula** [1] - 312:7
**custodial** [1] - 283:23
**custody** [1] - 332:13
**customer** [4] - 219:15, 222:2, 222:23, 225:1
**customer's** [1] - 220:22
**customers** [1] - 218:20
**cut** [1] - 301:21
**cute** [1] - 271:1
**CV** [2] - 309:22, 310:18
**cyber** [3] - 219:10, 284:21, 326:14

**D**

**D.C** [14] - 214:5, 232:12, 232:23, 233:9, 233:15, 245:2, 258:24, 262:16, 286:24,

288:12, 289:9, 333:13, 335:11
**dark** [2] - 221:8, 267:3
**darknet** [15] - 239:3, 239:6, 239:12, 239:21, 239:24, 239:25, 240:1, 241:7, 248:8, 248:9, 266:5, 266:8, 266:9, 267:3, 268:1
**data** [49] - 223:11, 227:1, 228:5, 228:7, 228:10, 242:5, 256:10, 256:17, 256:19, 257:10, 261:22, 261:25, 262:14, 262:18, 266:24, 272:25, 282:23, 283:19, 287:13, 297:18, 297:21, 297:25, 299:6, 301:2, 301:7, 301:14, 302:12, 305:21, 305:25, 306:1, 306:2, 306:19, 306:21, 307:24, 309:14, 322:12, 323:14, 324:18, 324:23, 325:3, 325:23, 326:18, 327:1, 327:7, 328:1, 328:7, 328:16, 332:10, 333:13
**Data** [1] - 316:22
**database** [8] - 227:9, 227:14, 227:15, 227:24, 262:10, 264:7, 283:16, 323:10
**date** [11] - 237:10, 244:19, 245:18, 246:10, 251:6, 291:23, 304:13, 312:2, 319:17, 319:21, 320:18
**Dated** [1] - 335:7
**Daubert** [3] - 272:9, 299:3, 309:10
**daughter** [1] - 299:25
**days** [2] - 261:1, 328:19
**DC** [3] - 214:12, 214:14, 214:23
**de** [1] - 300:10
**deadline** [2] - 224:22, 320:6
**deal** [1] - 332:12
**decade** [3] - 236:5, 248:1, 324:4

342

**decade-long** [1] - 248:1
**decide** [2] - 284:14, 321:23
**decided** [1] - 269:2
**decision** [4] - 233:21, 233:22, 236:22, 242:23
**declaration** [1] - 274:8
**declarations** [2] - 245:9, 274:15
**dedicated** [1] - 258:24
**deep** [4] - 266:8, 267:3, 267:21, 268:1
**DEFENDANT** [1] - 234:18
**Defendant** [2] - 214:6, 214:15
**defendant** [12] - 216:13, 221:23, 223:24, 238:16, 240:13, 240:17, 243:4, 243:5, 243:19, 244:14, 244:22
**defendant's** [10] - 222:24, 223:4, 223:12, 223:18, 225:20, 226:4, 226:18, 238:25, 248:22, 287:17
**defendants** [4] - 247:19, 249:2, 275:22, 276:14
**defending** [4] - 237:7, 237:23, 237:25, 238:5
**defense** [38] - 221:17, 222:1, 231:10, 233:5, 233:7, 238:17, 238:21, 238:22, 238:23, 240:6, 240:14, 243:6, 243:13, 249:6, 249:8, 253:24, 262:6, 265:6, 275:21, 279:17, 280:9, 284:5, 285:7, 285:13, 286:11, 286:16, 314:13, 321:9, 321:12, 322:19, 326:19, 327:12, 328:6, 328:11, 328:18, 329:20, 331:2
**defense's** [1] - 323:5
**defer** [1] - 309:15
**defined** [1] - 241:14
**definite** [1] - 243:1

**definitely** [1] - 301:19
**degree** [9] - 275:23, 291:18, 293:17, 294:1, 294:2, 296:3, 304:4, 310:10
**delay** [2] - 239:17, 325:6
**delays** [1] - 232:11
**deletion** [2] - 226:21, 328:13
**deliberate** [1] - 278:6
**delighted** [1] - 294:4
**delivered** [1] - 259:5
**Dell** [1] - 313:2
**demo** [1] - 280:11
**demonstrated** [2] - 228:19, 310:23
**deny** [6] - 244:17, 245:13, 245:16, 249:25, 253:6, 253:13
**DEPARTMENT** [1] - 214:13
**department** [1] - 286:10
**dependent** [3] - 284:9, 305:10, 318:24
**DEPUTY** [5] - 216:2, 242:21, 254:2, 254:5, 255:4
**deputy** [1] - 253:25
**describe** [7] - 224:8, 224:15, 229:14, 265:11, 269:21, 309:22, 313:24
**described** [8] - 221:1, 221:3, 221:4, 224:13, 224:14, 268:12, 268:15, 268:18
**describes** [2] - 252:7, 252:16
**descriptive** [1] - 253:11
**deserve** [1] - 306:12
**designate** [1] - 314:8
**designed** [1] - 296:7
**desk** [1] - 308:12
**detail** [6] - 238:6, 245:7, 250:19, 252:3, 256:5, 284:13
**detailed** [4] - 244:14, 248:5, 248:6, 278:12
**details** [4] - 221:14, 244:21, 327:10
**detecting** [1] - 256:20
**determine** [1] - 252:10
**determining** [1] - 228:3
**developed** [1] -

267:18
**device** [4] - 243:13, 276:21, 285:12, 285:14
**devices** [1] - 287:14
**dialogue** [1] - 281:7
**dictate** [1] - 262:19
**difference** [3] - 259:13, 266:13, 294:17
**different** [23] - 218:16, 218:17, 224:14, 224:18, 238:8, 241:20, 249:19, 258:7, 259:21, 265:7, 267:4, 267:16, 270:15, 270:16, 270:20, 272:23, 273:18, 276:24, 287:14, 303:4, 311:9, 316:3, 331:7
**differential** [1] - 229:18
**differently** [3] - 299:15, 304:20, 306:15
**difficult** [13] - 252:12, 256:7, 260:3, 263:15, 265:5, 267:7, 268:25, 283:6, 286:12, 291:6, 293:12, 299:10, 317:24
**difficulties** [1] - 322:13
**difficulty** [1] - 301:15
**digital** [2] - 254:17, 278:16
**digital-to-analog** [1] - 278:16
**digitally** [1] - 254:13
**dimensional** [1] - 263:5
**Direct** [1] - 215:9
**DIRECT** [1] - 254:6
**direct** [4] - 243:9, 253:8, 329:10, 329:12
**directed** [1] - 252:20
**directly** [4] - 237:18, 275:14, 301:11, 316:12
**disagree** [1] - 296:23
**disappointment** [1] - 289:17
**discern** [1] - 251:24
**disclose** [9] - 244:12, 249:20, 253:9, 284:17, 304:4,

313:24, 319:4, 321:10, 330:3
**disclosing** [3] - 249:15, 297:23, 326:5
**disclosure** [26] - 220:6, 221:9, 224:2, 228:15, 247:7, 247:21, 248:16, 261:18, 274:22, 281:12, 281:17, 281:18, 283:22, 291:7, 292:1, 292:24, 294:23, 307:7, 307:25, 318:12, 318:21, 320:4, 320:8, 321:7, 326:4
**disclosures** [5] - 247:12, 249:8, 297:16, 319:14, 319:24
**discovery** [34] - 227:8, 228:22, 229:4, 230:25, 231:3, 237:7, 238:19, 239:22, 240:15, 240:16, 242:1, 243:13, 244:1, 245:11, 246:24, 248:13, 248:22, 251:12, 253:1, 286:25, 287:4, 288:2, 288:4, 288:6, 290:17, 295:13, 295:20, 298:6, 300:9, 301:2, 302:13, 321:13, 330:1
**discrepancy** [1] - 240:8
**discuss** [1] - 328:3
**discussed** [6] - 234:21, 274:16, 292:12, 303:12, 303:13, 323:5
**discussing** [2] - 264:1, 319:13
**discussion** [2] - 292:22, 295:5
**disguise** [2] - 245:20, 250:8
**dishwashers** [1] - 256:14
**dispute** [1] - 240:8
**disrespectful** [1] - 298:18
**distinct** [1] - 224:3
**distinction** [2] - 266:6, 266:7

**district** [1] - 247:7
**DISTRICT** [3] - 214:1, 214:1, 214:8
**DNS** [6] - 268:7, 268:11, 269:1, 269:13, 269:15, 269:21
**Docket** [1] - 242:24
**document** [6] - 287:6, 288:1, 292:1, 292:15, 298:3, 308:14
**documented** [1] - 257:14
**documenting** [1] - 288:24
**documents** [4] - 222:5, 222:13, 307:16, 308:20
**DOJ** [1] - 214:11
**dollar** [2] - 265:25, 266:1
**dollars** [4] - 230:19, 320:16, 320:18
**domain** [19] - 241:18, 268:14, 269:8, 269:9, 269:15, 270:8, 270:11, 270:14, 270:15, 270:22, 270:25, 271:4, 271:5, 271:6, 271:16, 271:21, 271:23, 271:24
**domains** [1] - 271:18
**done** [29] - 238:11, 251:25, 262:21, 262:23, 263:3, 263:13, 263:24, 264:18, 264:20, 267:25, 270:2, 271:22, 277:10, 278:3, 278:24, 279:19, 280:17, 294:7, 295:24, 298:19, 310:12, 311:22, 313:10, 313:17, 313:23, 314:11, 316:23, 332:14, 332:15
**double** [3] - 238:17, 241:17, 241:24
**doubt** [2] - 220:17, 249:4
**down** [13] - 237:17, 241:10, 241:14, 242:2, 262:15, 273:23, 277:13, 284:2, 284:16, 291:22, 320:2, 322:18

download [1] - 327:1
dozen [1] - 276:8
Dr [6] - 303:23,
323:24, 325:11,
325:25, 326:10
draw [1] - 283:5
drawing [1] - 306:11
drive [2] - 232:11,
256:8
driver's [2] - 222:4,
222:6
dropouts [1] - 324:5
dropped [2] - 312:20,
312:22
Dror [5] - 303:24,
325:11, 325:25,
326:10
du [1] - 314:20
due [3] - 294:24,
319:14, 319:15
duplicate [1] - 280:16
duration [1] - 247:13
during [4] - 262:18,
293:14, 325:4,
326:22

E

e-commerce [2] -
265:25, 266:4
early [5] - 231:4,
231:14, 257:12,
271:20, 314:21
earned [1] - 279:1
easier [2] - 232:24,
327:25
East [1] - 263:1
easy [1] - 268:20
Edge [1] - 266:21
education [3] - 218:6,
312:8, 312:9
educational [2] -
312:18, 312:19
effect [2] - 226:9,
296:10
effectively [3] - 259:7,
317:13, 318:20
efficiency's [1] - 309:4
either [8] - 232:22,
244:10, 253:10,
256:8, 262:3, 263:7,
297:19, 298:21
ekeland [1] - 215:9
EKELAND [53] -
214:15, 216:12,
227:7, 230:22,
231:16, 231:23,
232:5, 232:8,
232:14, 234:2,
234:15, 234:20,

235:5, 235:18,
235:23, 236:11,
236:13, 237:4,
240:23, 241:2,
242:10, 253:16,
253:21, 253:24,
254:8, 254:24,
255:5, 255:9,
274:25, 301:21,
312:10, 312:16,
313:14, 318:8,
319:13, 319:24,
321:5, 323:4,
323:15, 323:17,
323:21, 323:24,
324:3, 324:8,
324:12, 325:1,
325:11, 325:22,
326:6, 332:22,
333:6, 333:24, 334:5
Ekeland [23] - 214:16,
215:6, 216:12,
227:4, 231:21,
240:22, 278:5,
278:10, 286:14,
288:21, 289:12,
290:10, 292:22,
300:2, 301:20,
318:13, 319:11,
328:24, 330:8,
330:12, 331:1,
332:2, 332:21
Ekeland's [2] - 237:2,
286:21
electronic [1] - 279:20
electronically [2] -
254:14, 258:17
element [2] - 230:1,
244:21
elements [2] - 281:22,
310:8
elicit [1] - 324:12
Elizabeth [1] - 274:8
email [7] - 223:7,
223:8, 223:21,
224:18, 224:25,
286:17, 314:23
emails [6] - 223:5,
223:6, 223:11,
223:22, 286:19,
287:16
emergency [1] -
285:20
emissions [3] - 316:4,
316:6, 316:7
emphasized [1] -
247:18
emphasizes [1] -
251:11
empty [1] - 235:24

Encase [2] - 310:19,
311:17
encrypted [3] -
267:10, 267:15,
296:5
encryption [1] - 266:4
end [5] - 224:9,
283:16, 286:23,
296:10, 322:19
ended [3] - 274:18,
276:7, 312:23
endorsement [4] -
220:11, 220:16,
220:17
endorsements [2] -
220:12, 220:14
ends [1] - 333:1
enforcement [7] -
250:13, 313:16,
313:17, 313:18,
313:22, 314:17,
317:22
engage [1] - 226:12
enjoyed [1] - 278:10
ensure [3] - 243:3,
285:7, 326:21
ensuring [2] - 326:24,
328:5
entailed [1] - 282:24
enter [1] - 231:8
entered [1] - 231:7
enterprise [2] -
281:13, 331:18
entire [2] - 294:25,
329:22
entirely [3] - 269:9,
270:19, 302:24
entirety [2] - 300:9,
310:12
entitled [3] - 244:14,
245:15, 249:2
envelope [3] - 258:22,
259:1, 259:13
Equifax [1] - 219:3
equipped [1] - 310:19
err [1] - 249:7
error [12] - 272:10,
305:21, 305:22,
305:25, 310:24,
311:2, 315:19,
316:18, 317:8,
317:9, 324:18,
324:21
errors [11] - 301:1,
301:4, 301:5,
301:13, 302:12,
303:1, 317:14,
321:14, 321:15,
322:4, 322:12
especially [5] - 274:2,

277:19, 293:15,
300:2, 305:5
essential [2] - 243:2,
260:19
essentially [9] - 231:4,
234:5, 234:23,
235:1, 235:23,
238:4, 241:22,
324:19, 325:19
establish [1] - 229:7
established [1] -
324:16
estate [1] - 230:7
eternity [2] - 271:24,
272:4
event [3] - 218:18,
244:11, 253:2
evidence [26] -
225:25, 226:5,
226:8, 226:19,
226:21, 229:3,
229:20, 230:6,
230:23, 231:2,
231:13, 231:15,
243:14, 254:13,
255:15, 261:22,
277:1, 292:1, 292:2,
295:11, 295:14,
305:12, 308:24,
315:1, 315:2, 328:12
evidence-gathering
[1] - 315:2
evidentiary [1] - 239:1
exact [1] - 244:19
exactly [11] - 222:8,
258:5, 259:12,
268:10, 273:24,
277:3, 284:19,
297:1, 303:14,
311:1, 323:12
examination [3] -
255:15, 279:8,
297:21
EXAMINATION [5] -
216:25, 227:5,
254:6, 275:2, 312:14
Examination [4] -
215:4, 215:6, 215:9,
215:10
examinations [2] -
263:3, 263:5
examine [2] - 256:14,
264:11
examiners [1] - 256:2
example [7] - 219:1,
219:18, 219:21,
251:14, 260:25,
271:17, 327:24
exceed [3] - 264:20,
264:21, 287:23

excellent [1] - 255:6
except [1] - 330:2
exceptional [1] -
321:8
excess [1] - 288:19
exchange [1] - 221:2
exchanges [1] -
277:22
exclude [1] - 333:24
excuse [1] - 234:18
excused [2] - 231:18,
319:9
exercise [1] - 322:15
EXHIBITS [1] - 215:15
exist [6] - 269:5,
279:3, 296:14,
296:15, 305:8,
313:11
existed [1] - 265:20
exists [5] - 256:13,
296:11, 299:13,
306:20
expect [6] - 229:11,
251:12, 300:19,
300:21, 320:17,
320:22
expecting [1] - 322:22
expedite [3] - 248:18,
301:19, 333:15
expediting [1] -
333:10
expense [1] - 325:7
experience [18] -
217:11, 254:10,
256:25, 257:9,
257:16, 257:17,
263:6, 265:8, 265:9,
265:11, 265:14,
265:15, 267:23,
283:2, 284:16,
324:7, 324:9, 324:11
expert [52] - 224:2,
228:15, 228:23,
238:8, 239:23,
240:16, 262:17,
264:6, 275:6, 276:9,
276:12, 277:7,
278:9, 279:5,
280:16, 281:12,
292:24, 294:11,
295:17, 296:21,
299:15, 299:17,
300:21, 301:1,
303:1, 304:21,
304:22, 304:23,
304:24, 305:9,
307:7, 309:8,
309:22, 319:1,
319:2, 319:21,
319:22, 319:23,

320:12, 320:13, 321:3, 322:2, 322:7, 322:9, 324:9, 326:3, 328:16, 330:4, 330:22, 330:24, 330:25
**expert's** [1] - 302:20
**expert-level** [1] - 309:22
**expertise** [16] - 254:19, 273:19, 278:12, 278:20, 279:10, 279:14, 280:23, 281:22, 285:17, 285:20, 301:12, 305:12, 311:8, 311:11, 328:10
**experts** [19] - 232:25, 264:14, 272:8, 279:1, 280:3, 295:12, 301:10, 302:18, 303:9, 303:10, 303:11, 303:22, 303:25, 306:15, 310:11, 320:5, 323:23, 326:6, 326:19
**explain** [13] - 258:4, 266:6, 268:10, 277:16, 278:3, 281:15, 283:4, 283:25, 288:17, 292:4, 296:23, 308:5, 316:16
**explained** [2] - 289:13, 308:25
**explanation** [1] - 299:3
**explorers** [1] - 218:7
**exploring** [1] - 328:24
**exposed** [2] - 279:4, 292:11
**exposure** [1] - 257:2
**express** [2] - 305:2, 322:9
**expressed** [1] - 220:2
**expressing** [1] - 320:7
**extension** [1] - 273:20
**extensive** [2] - 249:13, 253:1
**extensively** [1] - 257:9
**extent** [3] - 246:23, 322:4, 330:2
**extortion** [1] - 257:15
**extrapolate** [1] - 316:19
**extremely** [3] - 238:20, 300:1, 327:5

**F**

**F.2d** [5] - 243:7, 243:23, 245:1, 245:2, 245:3
**F.Supp.2d** [6] - 243:15, 244:3, 244:16, 244:25, 247:6, 247:10
**F.Supp.3d** [2] - 243:22, 247:5
**Facebook** [1] - 315:18
**facilities** [1] - 263:19
**facility** [4] - 232:23, 233:9, 235:11
**facing** [1] - 327:4
**facsimile** [1] - 276:25
**fact** [32] - 225:24, 229:8, 229:10, 239:6, 248:12, 248:21, 250:14, 250:18, 251:11, 257:13, 259:14, 260:11, 269:21, 269:22, 270:15, 272:8, 278:9, 280:3, 280:4, 281:1, 281:9, 282:24, 290:4, 291:20, 296:7, 305:7, 306:8, 310:25, 314:14, 318:6, 324:17
**factor** [1] - 297:4
**factors** [1] - 277:14
**facts** [5] - 243:2, 245:5, 245:8, 252:7, 252:16
**factual** [16] - 225:19, 240:7, 245:20, 245:23, 245:25, 246:6, 246:7, 246:10, 246:12, 251:1, 251:3, 251:14, 251:17, 252:3, 252:15, 252:24
**fair** [11] - 220:1, 220:19, 221:11, 276:9, 276:13, 290:20, 295:22, 311:9, 315:6, 318:4, 328:4
**fairly** [1] - 329:17
**false** [3] - 232:16, 272:11
**familiar** [4] - 258:12, 268:5, 268:9, 272:8
**familiarity** [1] - 311:12
**family's** [1] - 289:17
**fancy** [1] - 229:24

**far** [13] - 228:21, 230:3, 257:22, 263:6, 264:3, 277:9, 280:7, 287:12, 308:14, 312:24, 317:21, 326:17
**fare** [1] - 251:23
**father** [1] - 285:19
**father-in-law** [1] - 285:19
**fathom** [1] - 252:12
**favor** [1] - 288:21, 333:10
**favorite** [1] - 266:21
**FBI** [16] - 262:5, 262:15, 262:18, 262:25, 263:1, 263:10, 283:8, 285:25, 305:17, 311:2, 314:7, 317:22, 324:25, 325:3, 326:14, 332:13
**feasible** [2] - 263:21, 263:24
**federal** [7] - 232:21, 235:11, 246:1, 314:11, 314:13, 331:20
**Federal** [5] - 219:6, 219:8, 219:10, 219:11, 243:10
**fees** [4] - 229:2, 229:8, 229:10, 229:11
**felt** [2] - 317:9, 318:21
**few** [6] - 222:9, 261:1, 271:25, 281:11, 291:13, 309:23
**Fi** [1] - 261:8
**field** [3] - 284:21, 286:5, 324:4
**Field** [7] - 326:19, 326:20, 327:2, 327:24, 328:4, 328:18, 328:21
**fields** [1] - 271:10
**figure** [4] - 233:22, 234:13, 317:13, 318:12
**file** [5] - 243:9, 244:2, 298:3, 308:21, 333:8
**files** [5] - 298:6, 299:6, 307:16, 307:21, 327:12
**filing** [3] - 224:22, 274:6, 327:11
**filings** [5] - 221:4, 221:6, 221:12, 221:13, 329:15
**film** [1] - 271:13

**final** [1] - 322:2
**finality** [1] - 291:12
**finalizing** [1] - 305:14
**finally** [1] - 245:3
**financial** [13] - 218:13, 218:23, 219:16, 227:23, 228:16, 228:24, 250:6, 326:11, 327:6, 327:10, 327:14, 327:19, 332:12
**financials** [1] - 287:16
**findings** [4] - 231:10, 261:19, 263:22, 303:8
**fine** [6] - 217:4, 232:7, 237:3, 242:10, 275:16, 309:17
**finish** [2] - 292:19, 301:19, 301:24
**finished** [1] - 263:17
**fire** [3] - 286:7, 286:9, 286:10
**Firefox** [1] - 266:22
**firm** [1] - 285:24
**first** [21] - 216:17, 229:23, 229:25, 234:19, 237:3, 237:11, 257:2, 257:5, 257:13, 278:10, 279:22, 285:23, 285:24, 286:21, 313:25, 316:12, 317:7, 317:17, 328:9
**FISCHBACH** [4] - 215:8, 254:7, 275:3, 312:15
**Fischbach** [30] - 253:17, 253:19, 253:24, 254:3, 254:9, 254:23, 254:25, 255:1, 255:2, 255:10, 265:7, 275:5, 284:18, 292:23, 295:10, 298:2, 301:14, 302:1, 302:10, 306:23, 309:9, 309:20, 312:17, 318:10, 321:12, 323:6, 323:24, 325:2, 327:25, 328:10
**Fischbach's** [1] - 312:7
**fit** [1] - 220:18
**five** [3] - 263:17, 289:24, 328:19
**fixed** [1] - 317:25

**flag** [1] - 225:1
**flaws** [1] - 322:13
**flew** [1] - 286:23
**Floor** [1] - 214:17
**flying** [2] - 261:10, 288:12
**focus** [1] - 242:4
**focused** [3] - 238:23, 241:23, 253:2
**Fog** [10] - 229:3, 239:25, 246:13, 252:5, 252:17, 281:14, 282:14, 283:15, 283:17, 283:24
**folder** [2] - 307:6, 307:10
**folks** [3] - 233:14, 233:18, 233:19, 239:17
**follow** [6] - 233:22, 235:13, 244:7, 295:10, 313:15, 315:12
**followed** [1] - 281:1
**following** [3] - 242:20, 245:13, 271:14
**FOR** [1] - 214:1
**for-profit** [1] - 326:13
**force** [1] - 243:18
**foregoing** [1] - 335:4
**foreign** [3] - 247:19, 247:20, 248:3
**forensic** [22] - 227:22, 227:23, 228:21, 230:1, 255:15, 256:1, 256:25, 265:8, 265:14, 267:25, 272:13, 273:2, 273:18, 279:20, 279:25, 310:19, 310:22, 313:16, 313:17, 317:15, 318:1, 326:13
**forensically** [2] - 227:11, 266:2
**forensics** [14] - 218:1, 254:10, 254:12, 255:20, 256:6, 262:25, 265:16, 273:23, 274:2, 274:3, 285:12, 285:14, 315:8, 316:22
**forgetting** [1] - 272:1
**form** [14] - 223:25, 256:10, 256:13, 258:1, 260:7, 272:18, 283:20,

296:3, 296:10, 296:16, 296:19, 298:16, 299:17, 299:20
**formal** [3] - 255:22, 255:23, 291:4
**formed** [1] - 282:11
**former** [1] - 221:2
**forming** [2] - 299:21, 305:1
**forth** [4] - 236:6, 249:14, 276:6, 329:4
**forthcoming** [2] - 316:10, 317:23
**fortunate** [3] - 257:3, 285:9, 300:3
**fortunately** [1] - 312:25
**forums** [1] - 252:18
**forward** [2] - 315:3, 332:21
**founders** [1] - 311:20
**four** [1] - 326:16
**fours** [1] - 247:15
**France** [1] - 228:10
**Francisco** [2] - 294:17, 294:21
**frankly** [1] - 261:21, 330:11, 333:3
**fraud** [2] - 228:10, 257:14
**free** [3] - 280:11, 280:18
**frequent** [1] - 225:12
**frequently** [2] - 262:24, 292:17
**Friedrich** [2] - 247:18, 248:15
**Friedrich's** [1] - 247:14
**front** [10] - 221:20, 223:19, 291:8, 291:10, 306:4, 307:2, 307:3, 307:5, 309:6, 309:12
**froze** [1] - 301:14
**FTK** [4] - 310:19, 311:18, 311:19, 316:21
**fuel** [1] - 238:11
**full** [21] - 227:13, 227:15, 227:17, 233:6, 233:11, 234:4, 235:7, 235:9, 239:5, 239:20, 264:7, 306:12, 310:12, 323:9, 323:14, 324:23, 326:17, 326:22, 328:20, 332:10,

335:5
**full-scope** [1] - 306:12
**fully** [4] - 227:25, 280:14, 302:15, 309:8
**fulsome** [3] - 227:16, 227:22, 233:6
**functioning** [1] - 241:9
**funds** [9] - 245:11, 283:17, 288:22, 289:10, 289:21, 289:22, 290:10, 320:24
**funneling** [1] - 270:15
**furnished** [1] - 243:21
**future** [2] - 279:19, 317:9

**G**

**gains** [1] - 250:15
**game** [2] - 233:10, 256:15
**gamesmanship** [1] - 265:5
**Gates** [1] - 313:2
**gather** [2] - 300:3, 314:25
**gathering** [1] - 315:2
**general** [13] - 244:13, 252:14, 252:24, 254:18, 257:1, 260:10, 267:25, 274:22, 277:25, 282:25, 285:15, 299:21, 322:8
**generalizations** [1] - 241:15
**generalized** [1] - 286:5
**generally** [13] - 219:23, 233:24, 249:2, 249:15, 271:23, 276:18, 278:21, 284:21, 285:4, 288:9, 290:12, 315:7, 331:12
**generate** [1] - 279:14
**gist** [1] - 315:16
**give-and-take** [1] - 333:4
**given** [16] - 226:25, 227:20, 237:5, 247:12, 247:13, 248:14, 249:18, 265:1, 268:19, 287:23, 300:17, 302:25, 324:17,

325:18, 331:23
**glad** [1] - 223:3
**glass** [2] - 256:20, 256:22
**glass-break** [1] - 256:22
**Glave** [2] - 228:15, 228:23
**goalposts** [1] - 237:10
**GoDaddy** [2] - 269:18, 269:20
**gosh** [1] - 263:13
**Government** [2] - 326:7, 329:22
**government** [88] - 216:5, 223:15, 237:13, 239:11, 241:11, 243:9, 243:18, 243:25, 244:2, 244:11, 245:6, 247:3, 247:4, 248:11, 248:20, 249:10, 249:20, 249:22, 249:23, 252:2, 252:4, 252:11, 253:9, 253:12, 256:1, 257:24, 257:25, 262:3, 262:13, 263:4, 263:9, 263:19, 263:23, 264:18, 264:20, 275:21, 276:25, 279:23, 280:7, 280:17, 281:1, 282:4, 282:20, 283:5, 283:19, 284:11, 286:16, 292:2, 292:15, 294:24, 297:24, 299:19, 299:22, 300:3, 300:9, 300:18, 300:20, 302:23, 304:12, 304:14, 305:6, 307:25, 311:5, 317:4, 319:16, 319:19, 320:23, 322:3, 322:17, 323:18, 325:15, 325:24, 326:1, 326:18, 327:21, 329:2, 329:19, 329:22, 329:24, 330:14, 331:8, 331:12, 331:15, 332:23, 333:2, 333:12, 333:20
**government's** [20] - 228:1, 228:15,

229:1, 230:2, 238:1, 240:10, 241:24, 243:14, 245:10, 261:14, 263:22, 268:5, 272:8, 274:6, 282:6, 296:22, 304:16, 330:11, 332:5, 332:11
**Gox** [55] - 220:25, 221:4, 221:17, 221:19, 221:22, 221:25, 222:2, 222:11, 222:19, 222:20, 223:9, 223:25, 224:4, 225:5, 225:16, 225:20, 226:2, 226:4, 226:18, 227:1, 227:9, 227:24, 228:2, 228:5, 228:7, 229:18, 262:10, 262:14, 264:7, 283:16, 290:17, 299:7, 300:12, 301:2, 301:7, 301:13, 302:11, 302:12, 302:21, 302:25, 305:21, 307:22, 307:23, 308:2, 308:3, 309:14, 322:12, 323:9, 323:14, 324:23, 325:3, 325:23, 326:17, 332:10, 333:13
**grammar** [1] - 275:11
**grand** [2] - 239:7, 239:8
**grant** [2] - 247:1, 333:16
**granting** [1] - 247:16
**great** [1] - 332:12
**greater** [2] - 284:13, 333:17
**greatest** [2] - 296:16, 296:19
**gritty** [1] - 240:7
**group** [2] - 284:4, 301:8
**groups** [2] - 269:7, 313:19
**grown** [4] - 257:3, 260:19, 268:24, 320:15
**guess** [4] - 238:5, 267:9, 293:1, 301:2
**guesses** [1] - 325:20
**guessing** [1] - 237:25
**guidance** [2] - 331:23,

332:19
**guys** [1] - 236:3

**H**

**hack** [8] - 219:3, 219:15, 219:17, 219:18, 220:25, 221:1, 221:15, 328:12
**hacked** [3] - 225:3, 227:19, 227:20
**hacker** [3] - 219:21, 224:3, 226:6
**hacker's** [1] - 226:7
**hackers** [2] - 225:13, 225:24
**hacking** [3] - 219:5, 225:23, 227:12
**hacks** [11] - 218:10, 218:14, 218:21, 218:22, 218:24, 219:11, 226:12, 277:22, 284:25, 292:13, 302:25
**half** [4] - 232:2, 254:14, 290:1, 301:19
**hampered** [1] - 233:5
**hand** [3] - 254:3, 297:24, 318:16
**handle** [3] - 242:13, 286:3, 290:12
**handled** [1] - 235:14
**hands** [1] - 269:6
**handwritten** [2] - 287:17, 287:21
**happy** [14] - 232:2, 233:22, 235:13, 236:17, 236:19, 271:22, 281:6, 312:10, 320:2, 320:3, 327:14, 327:17, 328:3, 333:23
**hard** [2] - 254:23, 256:8
**hardware** [1] - 282:2
**Hassard** [5] - 216:14, 235:25, 253:17, 254:25, 255:5
**HASSARD** [3] - 214:16, 255:8, 302:5
**hat** [1] - 266:2
**head** [1] - 325:22
**heading** [1] - 322:18
**hear** [8] - 217:3, 217:4, 232:2, 236:19, 239:15, 254:23, 324:10,

326:15
**heard** [7] - 232:1,
232:20, 272:3,
286:21, 287:25,
304:25, 312:17
**hearing** [8] - 234:24,
254:21, 258:11,
272:9, 309:10,
332:1, 333:8, 334:6
**HEARING** [2] - 214:4,
214:7
**hearings** [1] - 309:10
**held** [8] - 232:13,
232:14, 233:19,
233:24, 234:1,
235:16, 249:15,
262:5
**hello** [1] - 275:5
**help** [3] - 280:16,
312:12, 314:7
**helped** [1] - 285:21
**helpful** [4] - 298:23,
299:5, 330:10,
333:23
**helping** [1] - 278:17
**hereby** [1] - 335:3
**heuristic** [1] - 325:19
**hide** [1] - 320:24
**hiding** [1] - 320:24
**highlights** [1] - 246:22
**highly** [1] - 325:18
**hijacked** [4] - 225:6,
225:16, 225:20,
226:6
**hire** [1] - 315:6
**hired** [4] - 281:8,
286:11, 286:12,
299:15
**hold** [3] - 278:8,
279:5, 327:22
**holding** [1] - 270:8
**holds** [1] - 252:23
**home** [2] - 256:22,
307:12
**honestly** [3] - 264:24,
274:4, 279:24
**Honor** [50] - 216:6,
216:12, 216:18,
216:24, 227:2,
230:17, 231:16,
232:6, 234:2,
234:15, 234:20,
236:4, 236:11,
236:13, 236:16,
236:25, 237:4,
238:15, 240:21,
242:6, 242:10,
242:16, 253:22,
254:2, 266:20,
289:20, 292:21,

293:6, 294:1, 295:7,
299:18, 302:5,
302:8, 305:5,
309:17, 312:11,
318:8, 318:19,
319:5, 321:5, 321:7,
322:17, 323:4,
324:3, 324:8,
331:21, 333:6,
334:1, 334:3, 334:5
**HONORABLE** [1] -
214:8
**hope** [3] - 309:25,
331:24, 332:3
**hopefully** [3] - 296:25,
319:6, 332:20
**hoping** [4] - 232:5,
232:22, 290:3,
308:11
**host** [1] - 271:9
**hour** [4] - 232:11,
238:10, 290:15,
301:19
**hourly** [1] - 290:2
**hours** [13] - 232:12,
288:2, 288:7,
288:14, 288:16,
288:19, 288:24,
321:13, 325:4,
326:22, 326:23,
328:4, 328:20
**house** [4] - 258:25,
259:6, 286:9, 326:14
**House** [1] - 219:7
**housed** [2] - 233:17,
234:14
**housekeeping** [5] -
232:6, 234:16,
236:14, 236:16,
253:16
**houses** [1] - 285:21
**Howell's** [1] - 249:12
**HTTP** [1] - 296:7
**HTTPS** [1] - 296:6
**hundred** [2] - 288:7,
288:15
**hundreds** [4] - 247:20,
270:23, 270:24,
321:13
**Hurtado** [1] - 314:3
**hypotheses** [2] -
264:21, 304:15
**hypothesis** [14] -
225:22, 226:10,
226:17, 227:13,
227:18, 228:4,
229:6, 256:21,
281:3, 281:5,
304:11, 304:13,
306:17

hypothetical [2] -
226:16, 318:23
**hypothetically** [1] -
229:8

**I**

**IBM** [1] - 315:25
**idea** [6] - 239:5,
260:18, 271:2,
282:23, 283:11,
290:12
**ideal** [1] - 273:14
**ideally** [1] - 273:4
**identification** [3] -
260:7, 302:20
**identified** [12] -
237:12, 240:7,
241:4, 301:1, 301:4,
301:13, 302:12,
302:16, 302:17,
303:1, 321:14, 322:5
**identify** [9] - 239:11,
241:12, 247:4,
249:23, 253:12,
259:22, 301:5,
311:2, 322:8
**identifying** [5] -
222:14, 222:15,
249:21, 304:7, 327:7
**identities** [5] - 244:20,
246:19, 247:2,
248:17, 249:3
**identity** [5] - 246:17,
247:17, 253:10,
257:14, 296:1
**ill** [1] - 250:15
**ill-gotten** [1] - 250:15
**illegal** [5] - 225:7,
225:21, 226:12,
241:20, 245:19
**illicit** [2] - 227:19,
240:2
**image** [2] - 222:4,
277:1
**images** [1] - 287:13
**imagine** [3] - 288:17,
288:18, 317:24
**impart** [1] - 252:3
**important** [1] - 289:1
**impossible** [1] - 223:2
**impression** [1] - 234:5
**IN** [1] - 214:1
**in-house** [1] - 326:14
**inaccuracy** [1] -
311:25
**inaccurate** [3] -
282:22, 283:21,
322:5
**inbox** [1] - 272:5

**Inc** [1] - 255:12
**incarcerated** [1] -
323:2
**incentives** [1] - 326:11
**incident** [6] - 284:22,
285:12, 285:17,
286:1, 286:3, 328:12
**inclined** [1] - 294:23
**include** [6] - 219:6,
249:13, 287:16,
298:22, 326:4,
327:13
**included** [6] - 245:9,
274:7, 278:15,
295:21, 297:18,
308:22
**includes** [1] - 250:12,
287:13
**including** [8] - 221:5,
222:3, 246:20,
248:12, 250:24,
251:14, 256:11,
310:19
**inclusive** [1] - 260:8
**incomplete** [5] -
283:11, 291:9,
291:11, 293:23,
302:22
**inconsistent** [1] -
231:3
**increase** [1] - 332:14
**independent** [2] -
228:11, 251:9
**independently** [1] -
280:1
**indicate** [2] - 246:12,
309:13
**indicated** [1] - 219:9
**indicates** [3] - 226:5,
294:11, 296:21
**indicating** [1] - 226:19
**indication** [2] -
219:20, 311:6
**indictment** [20] -
238:1, 238:7,
238:16, 238:18,
239:2, 239:21,
240:14, 242:25,
243:3, 243:21,
244:6, 244:18,
245:5, 246:19,
246:21, 248:5,
248:11, 252:2,
252:13, 331:4
**indirectly** [1] - 237:17
**individual** [9] -
219:20, 222:25,
256:12, 261:6,
296:18, 298:6,
305:19, 305:23,

305:24
**individual's** [2] -
219:18, 296:8
**individuals** [19] -
247:20, 256:13,
258:18, 260:4,
277:21, 281:10,
284:12, 285:10,
285:11, 292:12,
303:4, 303:25,
304:2, 304:15,
305:7, 305:10,
308:19, 314:16,
314:19
**individuals'** [1] -
327:9
**indulge** [1] - 229:22
**industry** [1] - 313:1
**inference** [2] - 229:19,
230:20
**inflate** [1] - 255:22
**influence** [1] - 328:5
**influencing** [1] - 269:4
**information** [46] -
222:3, 222:14,
222:15, 222:19,
228:5, 243:19,
243:20, 244:14,
244:17, 249:21,
250:23, 252:2,
272:25, 277:4,
277:5, 282:19,
283:4, 283:7,
283:11, 291:1,
292:11, 292:16,
293:23, 295:21,
298:4, 298:7,
298:14, 300:18,
302:23, 303:8,
304:1, 309:12,
315:23, 316:10,
318:3, 318:23,
318:24, 319:4,
326:9, 327:7,
327:14, 330:3,
330:10, 330:15,
332:12
**initial** [3] - 231:8,
283:17, 327:15
**injury** [1] - 244:20
**inquiry** [1] - 223:16
**instance** [2] - 225:15,
316:21
**instances** [1] - 274:20
**instead** [1] - 296:6
**institutions** [4] -
218:13, 218:23,
222:8, 223:22
**instructed** [2] - 294:3,
325:13

**instruction** [1] - 234:4
**instructive** [2] - 280:24, 300:2
**instrumental** [1] - 279:18
**intelligence** [1] - 315:5
**intend** [2] - 291:15, 323:18
**intended** [1] - 249:6
**intends** [3] - 247:4, 249:23, 253:12
**intent** [6] - 245:20, 245:24, 245:25, 250:8, 251:3, 251:16
**interact** [1] - 266:25
**interest** [2] - 330:11, 330:16
**interesting** [1] - 280:5
**interestingly** [2] - 256:18, 278:5
**internal** [2] - 220:13, 324:21
**internally** [1] - 272:23
**internet** [40] - 252:18, 257:1, 257:2, 257:6, 257:8, 257:10, 257:12, 257:14, 257:17, 257:20, 257:21, 257:24, 258:7, 258:8, 258:15, 258:19, 259:1, 259:7, 259:10, 259:14, 259:24, 259:25, 260:17, 260:19, 265:18, 266:3, 266:13, 266:15, 266:17, 267:7, 267:10, 267:12, 268:16, 268:22, 268:24, 269:4, 312:20
**interprets** [1] - 266:24
**interrupt** [2] - 239:10, 323:11
**interruption** [1] - 294:15
**intrusion** [2] - 220:21
**invented** [1] - 313:12
**invested** [1] - 320:16
**investigated** [1] - 219:10
**investigation** [6] - 243:20, 325:15, 326:2, 326:8, 330:9, 330:19
**investigations** [1] - 263:9
**involve** [7] - 218:20,

247:25, 257:12, 266:3, 276:18, 325:7
**involved** [20] - 230:20, 247:19, 250:25, 251:4, 251:18, 268:3, 277:17, 279:15, 283:23, 286:23, 288:11, 289:16, 290:24, 304:3, 304:6, 308:20, 310:8, 320:24, 324:4
**involvement** [1] - 280:7
**involves** [4] - 219:18, 256:8, 263:8, 276:14
**involving** [6] - 238:2, 248:1, 250:6, 267:25, 277:22, 278:4
**iOS** [1] - 309:23
**IP** [33] - 257:17, 257:19, 257:23, 258:5, 259:15, 259:17, 259:20, 259:22, 260:1, 260:3, 260:5, 260:6, 260:11, 260:12, 260:16, 260:18, 260:20, 261:4, 261:9, 261:10, 261:14, 262:11, 264:8, 268:15, 269:11, 295:23, 296:22, 296:24, 298:2, 308:1, 308:13, 314:24
**IP-related** [1] - 295:23
**IRS** [2] - 331:2, 331:6
**IRS's** [1] - 331:8
**isolate** [1] - 256:20
**issue** [9] - 233:1, 234:6, 235:22, 241:7, 241:16, 241:17, 242:1, 250:14, 325:1
**issues** [14] - 218:20, 219:5, 219:10, 221:5, 232:9, 232:20, 234:22, 239:1, 241:24, 279:25, 296:22, 315:4, 332:2, 333:21
**item** [2] - 218:16, 226:5
**items** [8] - 305:16, 306:8, 306:24, 306:25, 307:3, 322:4, 325:10, 326:16

iterations [1] - 291:5
**itself** [6] - 221:5, 241:19, 267:12, 273:4, 273:8, 305:13

**J**

**J.W** [3] - 215:3, 217:1, 227:6
**jail** [9] - 232:10, 233:3, 233:15, 233:25, 234:4, 235:7, 235:9, 235:11, 236:2
**Jail** [2] - 232:15, 234:24
**jails** [1] - 236:4
**January** [3] - 286:24, 287:19, 289:20
**Japan** [3] - 221:5, 221:14, 228:6
**jawboning** [1] - 333:22
**Jeff** [1] - 253:24
**JEFF** [4] - 215:8, 254:7, 275:3, 312:15
**Jeff@SecondWave. com** [1] - 270:19
**Jencks** [1] - 299:23
**jeopardy** [3] - 238:18, 241:17, 241:24
**job** [7] - 231:11, 255:21, 279:13, 284:24, 285:6, 285:22
**Jobs** [1] - 313:2
**joined** [2] - 216:9, 216:14
**Jonelle** [1] - 319:15
**jot** [1] - 291:22
**jour** [1] - 314:20
**Judge** [6] - 247:14, 247:17, 248:15, 249:12, 294:17, 294:20
**judge** [1] - 291:11
**JUDGE** [2] - 214:8, 214:8
**judges** [1] - 313:21
**judgment** [1] - 220:19
**judgments** [1] - 220:6
**judicial** [2] - 255:18, 313:20
**July** [2] - 214:6, 321:25
**jurisdictions** [1] - 263:11
**jury** [9] - 239:7, 239:8, 291:9, 291:10, 320:20, 320:21, 326:9, 330:13

**JUSTICE** [1] - 214:13

**K**

**Karpeles'** [2] - 228:6, 228:9
**keep** [9] - 237:10, 255:25, 259:22, 263:9, 288:5, 296:11, 298:9, 299:2, 332:21
**keeping** [2] - 296:20, 327:21
**kept** [1] - 324:21
**key** [1] - 323:19
**kind** [6] - 217:16, 255:13, 283:1, 285:5, 299:10, 316:24, 328:11, 333:7
**kinds** [1] - 272:25
**knowing** [2] - 264:15, 293:18
**knowledge** [16] - 220:20, 220:24, 221:1, 221:2, 221:3, 221:7, 228:11, 246:12, 246:15, 251:2, 251:15, 272:9, 278:19, 287:5, 309:22, 324:11
**known** [5] - 239:7, 247:2, 247:3, 262:24, 263:7
**knows** [1] - 233:10
**Kraken** [1] - 222:24
**KYC** [4] - 222:3, 222:11, 222:13, 222:18

**L**

**LA** [1] - 314:3
**laboratories** [1] - 262:25
**lacks** [2] - 248:7, 298:16
**laid** [1] - 294:24
**land** [1] - 266:14
**large** [2] - 317:22, 328:6
**largely** [2] - 248:3, 248:21
**largest** [2] - 288:12, 297:4
**last** [10] - 275:20, 276:3, 276:5, 276:6, 286:13, 286:23, 287:3, 298:2,

321:13, 324:4
**lasted** [1] - 263:17
**late** [2] - 287:3, 321:7
**launch** [1] - 283:17
**laundered** [1] - 239:2, 250:3
**laundering** [8] - 230:2, 230:3, 237:15, 244:8, 248:2, 250:1, 250:2, 251:21
**Law** [1] - 214:16
**law** [13] - 239:4, 239:19, 246:2, 250:13, 285:19, 285:24, 291:7, 313:16, 313:17, 313:18, 313:22, 314:16, 317:22
**lawsuit** [1] - 316:1
**lawyer** [7] - 231:9, 231:12, 234:19, 295:2, 320:13, 320:25, 321:3
**lawyers** [2] - 295:2, 320:20
**lay** [1] - 253:4
**layered** [1] - 268:6
**layers** [1] - 267:12
**lead** [1] - 230:19
**leads** [2] - 229:12, 229:18
**learn** [1] - 249:3
**least** [24] - 240:17, 258:1, 258:11, 259:21, 260:4, 264:17, 272:18, 272:19, 274:3, 275:7, 276:13, 280:7, 283:2, 284:15, 289:3, 289:10, 291:22, 294:21, 305:3, 320:10, 320:11, 331:23, 332:19, 333:19
**leave** [1] - 241:22
**led** [1] - 256:23
**left** [1] - 320:17
**legal** [2] - 295:3, 333:13
**legitimate** [1] - 225:23
**lengthy** [1] - 322:22
**less** [7] - 229:11, 229:16, 248:5, 263:24, 267:5, 321:3, 333:1
**letter** [5] - 236:2, 323:17, 332:24, 332:25, 333:5
**letting** [2] - 235:20,

348

308:24
**level** [1] - 309:22
**license** [6] - 222:4,
222:6, 252:23,
331:13, 331:16,
331:18
**licenses** [3] - 280:4,
280:9, 331:13
**light** [2] - 243:20,
301:18
**likelihood** [1] - 261:24
**likely** [8] - 261:20,
264:21, 268:19,
270:14, 279:18,
291:19, 318:22,
328:16
**limit** [1] - 226:14
**limitations** [4] - 241:7,
241:9, 275:16, 327:3
**limited** [3] - 248:23,
287:9, 333:22
**limits** [1] - 227:16
**line** [3] - 301:18,
306:16, 309:15
**Linux** [2] - 309:25,
310:2
**list** [3] - 246:22, 280:5,
287:6
**listed** [6] - 222:23,
222:25, 304:15,
311:13, 311:15
**listening** [2] - 221:10,
291:20
**listing** [1] - 323:19
**lists** [1] - 298:3
**litigated** [1] - 251:13
**litigation** [2] - 251:13,
329:4
**local** [2] - 222:25,
268:22
**locate** [1] - 256:12
**location** [4] - 245:21,
250:9, 277:5, 295:25
**locations** [1] - 259:10
**lock** [1] - 267:14
**locker** [2] - 232:18,
236:1
**log** [4] - 272:18,
316:15, 316:16,
316:25
**logs** [7] - 226:21,
311:22, 316:23,
317:16, 318:4,
324:19, 328:13
**long-term** [1] - 289:15
**look** [15] - 223:3,
224:17, 239:19,
274:12, 300:18,
306:1, 306:8,
306:12, 306:18,

306:21, 308:21,
312:1, 318:11,
320:14
**looked** [14] - 231:7,
231:13, 256:19,
261:21, 262:8,
276:25, 286:19,
287:22, 297:1,
298:21, 298:22,
307:24, 310:10,
312:2
**looking** [13] - 263:14,
273:21, 275:14,
276:23, 304:3,
306:4, 306:13,
307:4, 307:18,
308:10, 308:23,
312:7, 314:1
**looks** [3] - 275:15,
286:20, 297:4
**Los** [4] - 258:25,
259:4, 327:24,
328:17
**lose** [1] - 294:16
**lost** [2] - 266:3, 271:25
**love** [2] - 280:5, 298:8
**Luke** [1] - 237:20
**luxury** [3] - 230:7,
230:10, 230:12
**lying** [1] - 316:2

**M**

**M-e-i-k-l-e-j-o-h-n** [1] -
274:10
**ma'am** [1] - 295:16
**Mac** [1] - 309:23
**machines** [1] - 256:15
**mail** [3] - 258:22,
259:2, 270:20
**maintain** [1] - 332:13
**maintained** [1] -
226:15
**maintaining** [1] -
293:7
**majority** [4] - 256:8,
271:6, 276:17,
313:11
**Malta** [1] - 222:21
**Maltese** [1] - 222:25
**Management** [9] -
243:22, 247:15,
247:23, 247:24,
248:4, 248:6,
248:16, 248:21,
248:24
**management** [1] -
282:8
**manipulation** [1] -
228:7

**manner** [3] - 246:11,
251:6, 296:2
**Manny** [1] - 314:3
**Mark** [1] - 228:6
**mark** [3] - 228:9,
272:13, 272:15
**market** [4] - 239:3,
239:6, 239:21,
269:24
**markets** [6] - 239:24,
239:25, 240:1,
240:2, 241:8, 241:14
**Marshals** [5] - 233:12,
233:16, 233:21,
234:13, 235:12
**Martinez** [1] - 244:25
**massive** [1] - 327:18
**mastering** [1] - 279:3
**match** [1] - 237:20
**material** [2] - 276:15,
287:10
**materials** [5] - 239:20,
248:11, 309:6,
318:16, 318:18
**matter** [7] - 253:11,
253:16, 257:13,
286:15, 290:4,
314:14, 317:10
**matters** [6] - 228:24,
234:16, 236:14,
236:16, 238:3,
255:16
**Mazarin** [2] - 261:14,
262:10
**Mazarin's** [2] - 264:8,
300:10
**Mazars** [1] - 300:10
**Mazars'** [3] - 296:24,
297:15, 298:4
**McAfee** [1] - 217:24
**mean** [26] - 217:16,
219:2, 229:21,
230:13, 235:10,
238:3, 239:7,
260:25, 272:7,
273:6, 273:14,
278:24, 280:2,
285:2, 296:2,
298:16, 311:11,
315:9, 316:17,
318:25, 320:7,
324:7, 330:1,
330:20, 333:1,
333:12
**meaning** [2] - 252:8,
285:15
**means** [1] - 322:11
**meant** [1] - 277:23
**measure** [1] - 261:24
**media** [1] - 255:19

**meet** [1] - 240:18
**Meiklejohn** [1] - 274:9
**Meiklejohn's** [1] -
274:16
**memorialization** [1] -
291:18
**memorialized** [1] -
291:16
**memorializing** [1] -
290:21
**memorize** [1] - 268:20
**memory** [4] - 256:13,
274:20, 287:5,
308:16
**mental** [1] - 235:2
**mention** [1] - 219:5
**mentioned** [10] -
218:5, 218:12,
218:15, 228:12,
242:7, 245:1,
265:17, 315:15,
316:15, 319:19
**merely** [2] - 240:23,
244:1
**merit** [1] - 306:9
**messed** [1] - 317:25
**methods** [2] - 273:20
**Michael** [2] - 216:14,
313:2
**MICHAEL** [1] - 214:16
**Microsoft** [4] - 266:21,
272:16, 316:2, 318:1
**Microsoft's** [1] - 310:9
**mid** [1] - 231:6
**middle** [2] - 271:3,
293:9
**might** [24] - 219:21,
220:23, 226:15,
246:24, 250:19,
261:10, 268:18,
269:19, 271:1,
271:2, 280:6,
281:25, 286:7,
286:9, 286:22,
287:3, 293:21,
295:13, 303:2,
319:18, 329:13,
330:16, 332:8,
333:15
**million** [3] - 237:16,
237:17, 266:1
**millionaires** [1] -
271:13
**mind** [6] - 255:5,
259:23, 267:11,
267:18, 274:1, 301:8
**mindset** [1] - 296:8
**mine** [1] - 304:8
**minimize** [1] - 333:15
**minutes** [3] - 236:18,

301:22, 302:2
**miraculously** [2] -
269:17, 301:9
**misattributed** [1] -
292:16
**misleading** [1] - 224:8
**missed** [1] - 224:24
**missing** [4] - 229:21,
230:19, 283:12,
290:25
**mitigate** [1] - 289:10
**mixed** [2] - 292:2,
295:11
**mixer** [1] - 283:23
**mixing** [1] - 295:19
**Model** [2] - 230:10,
230:15
**moment** [7] - 255:6,
261:3, 269:12,
287:23, 292:14
**money** [27] - 230:2,
231:5, 237:15,
237:25, 239:2,
244:8, 246:13,
248:2, 250:1, 250:2,
251:21, 251:23,
251:25, 252:22,
289:9, 289:18,
289:25, 290:13,
320:19, 320:22,
325:25, 326:7,
330:17, 330:20
**monitor** [3] - 234:9,
254:25, 255:3
**month** [1] - 320:16
**months** [2] - 264:19,
276:6
**morning** [6] - 216:6,
216:8, 216:12,
217:3, 217:4, 308:19
**MOSS** [1] - 214:8
**most** [23] - 244:9,
255:16, 256:2,
256:18, 259:15,
260:14, 260:17,
266:13, 270:13,
274:19, 277:11,
278:14, 291:5,
296:6, 299:10,
307:18, 307:25,
313:6, 317:4,
317:22, 331:20
**mostly** [3] - 254:13,
255:21, 315:4
**motion** [9] - 237:3,
242:24, 243:25,
244:5, 245:10,
253:13, 329:16,
333:8, 334:1
**MOTIONS** [2] - 214:4,

214:7
**mounting** [1] - 238:22
**move** [3] - 264:6,
315:3, 328:17
**moved** [4] - 232:23,
233:14, 233:18,
254:17
**movies** [1] - 261:7
**moving** [3] - 234:25,
237:10, 332:21
**MR** [61] - 216:12,
216:24, 217:2,
225:14, 227:2,
227:7, 230:22,
231:16, 231:23,
232:5, 232:8,
232:14, 234:2,
234:15, 234:20,
235:5, 235:18,
235:23, 236:11,
236:13, 237:4,
238:15, 239:16,
240:21, 240:23,
241:2, 242:10,
253:16, 253:21,
253:24, 254:8,
254:24, 255:5,
255:8, 255:9,
274:25, 301:21,
302:5, 312:10,
312:16, 313:14,
318:8, 319:13,
319:24, 321:5,
323:4, 323:15,
323:17, 323:21,
323:24, 324:3,
324:8, 324:12,
325:1, 325:11,
325:22, 326:6,
332:22, 333:6,
333:24, 334:5
**MS** [39] - 216:6, 216:9,
216:18, 216:22,
231:21, 236:16,
236:25, 242:16,
275:4, 275:13,
295:9, 300:7,
301:18, 302:8,
302:9, 305:18,
307:15, 309:17,
309:19, 312:5,
321:7, 322:3,
322:17, 326:17,
327:5, 327:9, 328:2,
328:9, 328:15,
329:2, 329:8,
329:15, 329:20,
330:20, 331:1,
331:11, 331:17,
331:20, 334:3

**Mt** [55] - 220:25,
221:4, 221:17,
221:19, 221:22,
221:25, 222:2,
222:11, 222:19,
222:20, 223:9,
223:25, 224:4,
225:5, 225:16,
225:20, 226:2,
226:4, 226:18,
227:1, 227:9,
227:24, 228:2,
228:5, 228:7,
229:18, 262:10,
262:14, 264:7,
283:16, 290:17,
299:7, 300:12,
301:2, 301:7,
301:13, 302:11,
302:12, 302:21,
302:25, 305:21,
307:22, 307:23,
308:2, 308:3,
309:14, 322:12,
323:9, 323:14,
324:23, 325:3,
325:23, 326:17,
332:10, 333:13
**multimillion** [2] -
265:25
**multimillion-dollar** [1]
- 265:25
**multiple** [4] - 227:20,
256:12, 278:20,
310:19
**murder** [1] - 293:9
**mystery** [3] - 240:1,
240:2, 252:15

**N**

**N.W** [1] - 335:11
**name** [28] - 221:23,
221:24, 222:11,
222:18, 239:3,
239:11, 239:14,
240:5, 241:19,
256:16, 264:14,
269:8, 269:9,
269:15, 270:4,
270:6, 270:9,
270:11, 270:15,
270:22, 270:25,
271:4, 271:5,
271:16, 271:23,
271:24, 305:20,
313:22
**named** [1] - 331:3
**names** [22] - 216:4,
223:20, 237:11,

237:13, 239:5,
239:7, 247:2, 247:7,
248:7, 249:16,
249:20, 249:21,
253:10, 267:18,
268:14, 270:14,
271:6, 271:21,
277:18, 298:3, 304:4
**narrow** [1] - 298:19
**national** [2] - 248:23,
265:2
**native** [1] - 268:15
**nature** [8] - 219:17,
220:21, 221:14,
245:17, 245:21,
249:9, 249:18, 250:8
**near** [1] - 286:23
**necessarily** [12] -
258:24, 259:22,
261:22, 270:12,
279:14, 287:21,
294:23, 296:9,
303:18, 304:8,
304:10, 317:2
**necessary** [6] - 228:2,
243:3, 243:17,
246:16, 249:16,
311:21
**Neck** [3] - 232:14,
233:19, 234:23
**need** [52] - 217:6,
227:23, 229:6,
229:7, 229:9,
229:20, 233:2,
233:6, 233:10,
237:8, 239:5,
253:18, 258:24,
261:25, 264:7,
272:25, 273:3,
273:12, 273:14,
278:18, 280:16,
283:4, 286:8, 291:7,
291:8, 293:3,
293:25, 294:1,
294:10, 297:23,
300:16, 301:17,
304:20, 304:24,
305:3, 307:10,
315:18, 315:21,
315:24, 316:18,
318:11, 319:1,
321:10, 322:24,
323:9, 323:13,
324:16, 327:16,
328:16, 331:24,
333:16
**needed** [4] - 263:22,
280:13, 287:23,
312:4
**needs** [9] - 233:1,

233:25, 240:13,
257:25, 263:12,
265:3, 276:1, 309:7
**negatives** [1] - 272:11
**neighborhood** [1] -
259:3
**net** [1] - 268:1
**network** [10] - 257:1,
258:8, 261:6,
266:17, 267:11,
268:4, 285:6,
285:13, 296:15,
296:20
**networks** [4] - 257:1,
258:14, 285:1, 285:8
**neutral** [1] - 314:14
**never** [11] - 236:5,
260:19, 262:21,
272:3, 278:6,
281:23, 310:1,
310:16, 311:17,
312:23
**new** [3] - 279:4, 317:2,
317:11
**New** [3] - 214:17,
232:12, 332:3
**news** [2] - 218:19,
221:10
**next** [6] - 224:22,
231:19, 253:15,
301:18, 324:12,
328:18
**nice** [1] - 271:25
**night** [1] - 234:25
**nights** [1] - 274:7
**nitty** [1] - 240:7
**nitty-gritty** [1] - 240:7
**NO** [1] - 215:15
**nontestifying** [1] -
330:25
**nonviolent** [1] - 247:9
**norm** [1] - 219:24
**normal** [1] - 237:6
**normally** [1] - 290:2
**Northern** [3] - 232:14,
233:19, 234:23
**note** [3] - 246:3,
246:15, 287:21
**noted** [1] - 297:4
**notes** [6] - 287:17,
291:19, 291:20,
303:2, 305:21, 335:5
**nothing** [6] - 241:14,
245:11, 270:5,
290:19, 292:10,
308:16
**notice** [10] - 224:21,
238:12, 240:12,
240:17, 274:7,
291:25, 296:6,

233:25, 240:13,
257:25, 263:12,
265:3, 276:1, 309:7
**negatives** [1] - 272:11

296:21, 303:20,
303:22
**noticed** [2] - 303:11,
303:14
**noticing** [2] - 274:20,
305:7
**novel** [1] - 248:2
**now-retired** [1] -
257:4
**nowhere** [1] - 270:6
**number** [23] - 219:11,
221:21, 221:25,
222:5, 222:13,
224:18, 262:20,
264:21, 275:25,
276:2, 277:21,
282:3, 282:6,
282:19, 282:21,
284:6, 285:10,
286:13, 297:9,
301:7, 302:22,
302:24, 303:4
**numbers** [2] - 282:5,
320:14
**numerical** [2] -
259:10, 270:4
**nutshell** [2] - 254:16,
315:9
**NW** [3] - 214:11,
214:14, 214:22
**NY** [1] - 214:17

**O**

**obfuscate** [1] - 295:25
**obfuscating** [1] -
224:4
**obfuscation** [2] -
296:3, 296:7
**object** [2] - 245:19,
308:17
**objecting** [1] - 274:18
**objectivity** [1] - 220:3
**obligated** [1] - 244:11
**obligation** [1] - 333:14
**obscurity** [1] - 296:17
**observations** [1] -
291:23
**obtain** [1] - 244:14
**obtained** [2] - 219:19,
277:2
**obviate** [1] - 225:2
**obviously** [3] -
233:24, 254:18,
275:22
**occasion** [3] - 276:21,
285:11, 311:25
**occasionally** [1] -
313:7
**occur** [3] - 220:13,

234:1, 264:23

**occurred** [1] - 256:23

**ocean** [1] - 293:9

**OF** [10] - 214:1, 214:2, 214:7, 214:13, 216:25, 227:5, 254:6, 275:2, 312:14, 335:1

**offense** [5] - 243:2, 244:21, 246:5, 246:16, 250:2

**offenses** [1] - 247:9

**offer** [3] - 231:25, 280:15, 280:20

**offered** [5] - 217:24, 218:3, 270:10, 326:18, 327:11

**office** [11] - 257:4, 262:15, 262:18, 293:2, 307:9, 307:12, 307:13, 307:14, 325:3, 325:4, 326:23

**Office** [7] - 326:20, 327:2, 327:24, 328:4, 328:18, 328:21

**offices** [1] - 263:1

**Official** [2] - 214:21, 335:10

**OFFICIAL** [1] - 335:1

**often** [4] - 226:13, 277:4, 308:24, 316:19

**oftentimes** [1] - 271:15

**on-chain** [1] - 278:22

**once** [5] - 261:5, 275:25, 282:22, 289:13, 325:19

**one** [60] - 219:2, 219:9, 219:21, 222:14, 222:18, 225:10, 228:8, 229:11, 231:12, 232:8, 235:24, 239:16, 246:24, 248:6, 248:25, 249:5, 249:7, 251:12, 257:5, 257:20, 257:21, 259:12, 260:12, 260:23, 263:7, 267:13, 267:20, 267:22, 269:2, 269:5, 270:12, 272:3, 274:6, 274:9, 276:7, 278:14, 279:9, 282:14, 283:3, 287:6,

**287:18, 288:23, 295:12, 295:24, 297:9, 298:8, 301:7, 302:16, 302:22, 304:13, 308:15, 310:3, 311:2, 311:13, 311:20, 314:10, 315:11, 316:21, 318:6, 323:4**

**one-person** [1] - 283:3

**one-second** [1] - 239:16

**ones** [5] - 276:24, 311:15, 317:21, 323:19, 324:5

**online** [1] - 287:10

**open** [4] - 217:20, 244:2, 266:14, 274:18

**open-ended** [1] - 274:18

**opens** [1] - 266:20

**operated** [1] - 252:5

**operating** [8] - 251:20, 251:22, 283:23, 309:23, 310:1, 310:9, 310:13

**operation** [7] - 229:2, 281:24, 282:9, 282:22, 282:24, 283:1, 283:3

**operations** [1] - 281:24

**operator** [1] - 221:2

**operators** [2] - 252:19, 252:21

**opine** [1] - 294:23

**opined** [1] - 294:21

**opining** [3] - 294:12, 321:23, 321:24

**opinion** [39] - 228:21, 247:14, 249:12, 261:16, 261:18, 262:7, 262:17, 264:6, 272:13, 274:14, 274:22, 281:15, 282:1, 282:10, 282:11, 283:5, 283:11, 283:14, 283:25, 284:10, 284:15, 293:17, 294:22, 299:4, 299:17, 299:20, 299:21, 300:10, 300:23, 304:8, 304:21, 304:22, 305:2, 306:9, 309:13, 319:1, 319:2, 319:3**

**opinions** [18] - 220:1, 228:20, 264:15, 283:20, 283:21, 284:6, 284:9, 291:9, 294:11, 295:23, 300:5, 300:25, 304:21, 305:10, 318:21, 320:12, 322:9, 322:10

**opportunities** [1] - 312:21

**opportunity** [3] - 261:13, 277:9, 309:3

**opposed** [1] - 251:13

**optimistically** [1] - 284:3

**option** [1] - 273:15

**oral** [1] - 236:22

**order** [16] - 226:12, 235:7, 237:5, 240:4, 249:19, 256:20, 257:25, 264:7, 264:17, 265:6, 266:15, 268:20, 278:15, 278:18, 283:5, 299:17

**ordering** [1] - 235:9

**ordinary** [1] - 243:12

**Oregon** [1] - 314:10

**organizes** [1] - 244:5

**original** [2] - 237:19, 311:20

**originally** [1] - 269:2

**otherwise** [6] - 231:14, 243:21, 250:19, 253:13, 260:19, 317:21

**ought** [1] - 274:3

**out-of-circuit** [1] - 249:10

**out-of-pocket** [1] - 289:11

**outline** [2] - 318:20, 323:12

**outside** [3] - 230:23, 232:12, 241:9

**overall** [2] - 253:8, 264:3

**overdisclose** [1] - 284:17

**overlap** [3] - 261:14, 264:8, 298:2

**overly** [1] - 260:8

**oversight** [2] - 219:7, 219:8

**overt** [1] - 248:7

**overview** [1] - 278:2

**overwhelmingly** [1] - 298:12

**own** [18] - 218:4,

224:5, 224:22, 255:10, 259:15, 259:16, 260:11, 261:18, 261:23, 265:23, 270:13, 270:15, 271:23, 280:9, 290:13, 300:21, 332:6

**owned** [3] - 230:5, 230:7, 272:1

**ownership** [2] - 245:21, 250:9

## P

**p.m** [4] - 231:22, 231:23, 242:19, 334:6

**pack** [1] - 235:25

**PAGE** [1] - 215:2

**page** [10] - 243:15, 243:23, 244:4, 244:16, 244:25, 245:1, 245:3, 270:8, 283:12, 298:2

**pages** [1] - 245:4

**paid** [10] - 280:19, 289:5, 289:6, 289:9, 290:1, 290:3, 326:1, 326:8, 330:17, 330:20

**Palfrey** [1] - 247:10

**palfrey** [1] - 244:25

**pandemic** [1] - 277:12

**paper** [2] - 274:9, 274:16

**part** [33] - 224:7, 228:3, 228:12, 232:10, 233:1, 246:4, 256:2, 256:17, 257:16, 258:11, 258:15, 262:25, 267:11, 268:3, 274:19, 277:11, 279:15, 282:15, 292:9, 292:22, 295:18, 298:12, 300:23, 303:8, 303:18, 308:20, 308:23, 311:5, 311:8, 313:6, 326:3, 329:16, 331:1

**participate** [1] - 257:20

**participated** [1] - 244:22

**participating** [1] - 318:10

**particular** [22] - 222:17, 223:7,

237:9, 245:16, 245:19, 245:23, 245:25, 246:6, 246:7, 246:10, 246:11, 246:17, 255:20, 256:6, 257:23, 266:4, 278:19, 297:22, 313:21, 314:14, 316:24, 330:3

**particularity** [1] - 241:15

**particularly** [8] - 227:12, 227:22, 237:5, 247:9, 247:12, 258:22, 271:10, 297:3

**particulars** [27] - 236:21, 236:22, 237:5, 237:6, 237:8, 240:4, 240:9, 240:10, 240:12, 242:3, 242:15, 242:24, 243:10, 243:12, 243:16, 243:25, 244:6, 244:12, 244:15, 245:15, 246:23, 249:4, 250:20, 251:10, 251:11, 253:5, 253:14

**parties** [3] - 331:24, 332:1, 332:20

**party** [8] - 224:3, 225:17, 225:20, 226:6, 278:25, 327:6, 327:18

**party's** [1] - 225:17

**pass** [2] - 236:10, 236:25

**passport** [1] - 222:7

**past** [7] - 232:2, 261:2, 265:2, 270:2, 271:18, 272:20, 278:11

**patched** [1] - 272:22

**pathology** [2] - 225:12

**pattern** [1] - 225:24

**pause** [1] - 297:7

**pay** [1] - 272:6

**paying** [1] - 267:14

**payload** [1] - 258:20

**payment** [2] - 331:8, 331:14

**payments** [1] - 332:18

**pays** [1] - 331:12

**peer** [1] - 280:1

**peer-reviewed** [1] - 280:1

**PELKER** [40] - 214:13,

216:6, 216:9,
216:18, 216:22,
231:21, 236:16,
236:25, 242:16,
275:4, 275:13,
295:9, 300:7,
301:18, 302:8,
302:9, 305:18,
307:15, 309:17,
309:19, 312:5,
321:7, 322:3,
322:17, 326:17,
327:5, 327:9, 328:2,
328:9, 328:15,
329:2, 329:8,
329:15, 329:20,
330:20, 331:1,
331:11, 331:17,
331:20, 334:3
**Pelker** [7] - 215:11,
216:6, 275:1,
301:16, 315:13,
319:18, 326:15
**Pelker's** [1] - 316:14
**penalty** [1] - 264:15
**Pennsylvania** [2] -
214:14, 233:19
**people** [32] - 232:20,
233:2, 233:16,
258:14, 259:16,
260:14, 260:17,
260:20, 261:11,
261:12, 265:19,
266:6, 269:4, 271:7,
271:12, 271:13,
271:19, 278:12,
279:1, 284:4, 285:6,
286:2, 286:6,
290:23, 296:6,
303:17, 304:5,
315:6, 317:4,
317:19, 320:23,
324:4
**percent** [3] - 229:11,
229:17, 255:16
**perfect** [2] - 275:11,
275:12
**perform** [1] - 281:2
**perhaps** [8] - 235:10,
243:6, 270:14,
284:3, 286:25,
303:16, 308:22,
316:11
**period** [3] - 322:22,
324:18, 324:19
**perjury** [1] - 264:15
**permissive** [1] - 249:6
**person** [6] - 229:12,
229:17, 281:8,
282:8, 282:14, 283:3

**person's** [2] - 222:15,
222:18
**personal** [8] - 219:22,
260:7, 265:13,
265:16, 276:19,
277:2, 285:12,
285:14
**personally** [3] -
265:17, 273:18,
306:4
**persons** [1] - 246:19
**persuaded** [1] -
320:11
**persuasive** [1] - 252:1
**pertaining** [1] - 327:13
**pertains** [2] - 222:10,
295:12
**phishing** [2] - 219:19,
226:1
**phone** [6] - 235:19,
256:8, 256:11,
272:17, 277:5,
291:19
**phones** [2] - 276:19,
277:2
**physical** [3] - 259:13,
266:17, 307:14
**physically** [2] -
258:13, 262:15
**picked** [1] - 326:20
**picture** [2] - 258:21,
306:13
**pictures** [1] - 266:25
**piece** [7] - 225:25,
226:8, 226:19,
266:18, 273:5,
287:10, 317:11
**pipe** [1] - 285:21
**place** [6] - 244:19,
246:11, 251:6,
267:9, 270:12, 279:1
**places** [3] - 244:22,
270:16, 321:1
**plain** [1] - 243:1
**Plaintiff** [2] - 214:3,
214:10
**plaintiffs** [1] - 275:22
**planning** [2] - 242:8,
332:24
**plasmadivision.com**
[1] - 223:4
**plate** [3] - 269:8,
269:22, 269:23
**pleadings** [2] -
238:20, 239:22
**pleased** [1] - 279:4
**plenty** [1] - 257:7
**plexiglass** [4] - 234:9,
235:16, 235:19,
236:8

**PLLC** [1] - 214:16
**plumbing** [1] - 285:19
**plus** [1] - 288:19
**pocket** [3] - 236:1,
289:10, 289:11
**pockets** [1] - 235:25
**podcast** [1] - 221:10
**podium** [1] - 242:7
**point** [37] - 218:17,
224:21, 226:5,
226:19, 226:23,
230:18, 233:10,
235:10, 238:13,
247:16, 254:12,
256:17, 259:5,
261:22, 264:6,
270:10, 270:23,
271:2, 271:21,
273:24, 279:9,
280:15, 284:14,
284:19, 289:3,
290:16, 290:22,
297:13, 306:17,
309:14, 316:7,
320:10, 321:16,
323:8, 324:14,
324:22
**pointing** [1] - 244:1
**points** [1] - 288:25
**policy** [1] - 244:2
**Pollack** [1] - 245:2
**pops** [1] - 269:16
**popular** [2] - 218:18,
221:3
**pornography** [1] -
263:8
**portion** [2] - 267:4,
276:14
**position** [7] - 274:17,
291:6, 291:8,
319:20, 323:9,
329:17, 332:6
**positives** [1] - 272:11
**possess** [1] - 332:6
**possessing** [1] -
276:14
**possession** [3] -
223:15, 229:9, 329:3
**possibilities** [1] -
302:21
**possibility** [7] - 224:3,
224:13, 225:2,
226:11, 228:4,
295:11, 328:3
**possible** [11] - 222:22,
223:2, 224:20,
224:24, 232:6,
254:24, 260:20,
260:24, 270:24,
275:7, 328:24

**possibly** [7] - 259:3,
261:12, 263:14,
264:20, 286:20,
292:14, 314:13
**post** [1] - 331:4
**Post** [1] - 307:19
**post-indictment** [1] -
331:4
**Post-it** [1] - 307:19
**potential** [3] - 248:17,
290:17, 328:13
**potentially** [1] -
227:19
**powers** [2] - 269:3,
269:4
**practical** [3] - 265:8,
265:14, 289:22
**practically** [1] - 241:8
**practice** [7] - 224:22,
224:23, 276:9,
286:15, 316:9,
318:1, 318:5
**practices** [3] - 220:11,
314:8
**preacher** [1] - 292:9
**preceded** [1] - 258:8
**precedent** [1] - 289:15
**precise** [3] - 239:1,
244:21, 245:17
**precisely** [1] - 256:23
**precision** [1] - 243:5
**predicate** [5] - 245:20,
245:25, 251:4,
251:17, 252:25
**predicates** [6] -
245:23, 246:6,
246:8, 246:10,
246:12, 252:3
**predominant** [1] -
248:25
**preemptory** [1] -
297:22
**prefer** [2] - 266:8,
291:4, 332:1
**preference** [1] -
219:22
**preliminary** [1] -
332:19
**premises** [1] - 330:9
**preparation** [2] -
290:16, 330:4
**prepare** [6] - 233:7,
238:17, 240:13,
243:6, 321:10,
321:18
**prepared** [1] - 321:20
**preparing** [2] -
248:18, 323:17
**presence** [1] - 224:25
**present** [3] - 216:13,

249:17, 298:18
**presentation** [1] -
240:11
**presented** [2] - 284:3,
287:20
**presenting** [1] -
283:18
**preservation** [2] -
314:8, 315:1
**preserve** [1] - 291:12
**press** [1] - 221:3
**presumably** [3] -
252:19, 308:2, 323:3
**pretrial** [2] - 238:20,
240:15
**pretty** [3] - 238:21,
287:11, 307:5
**prevent** [2] - 241:24,
333:15
**preview** [1] - 240:10
**previously** [2] - 253:6,
293:24
**primarily** [1] - 255:15
**principally** [1] - 321:4
**principle** [1] - 247:11
**printed** [5] - 307:16,
307:18, 307:21,
308:3, 321:16
**privacy** [1] - 231:15
**private** [2] - 256:1,
280:3
**privilege** [2] - 264:2
**pro** [1] - 314:5
**probable** [1] - 258:1
**problem** [7] - 234:10,
237:9, 255:8,
272:19, 298:11,
321:20, 326:14
**problems** [4] - 272:22,
311:7, 311:23
**procedural** [1] -
332:22
**Procedure** [1] -
243:11
**procedures** [1] -
220:17
**proceed** [1] - 253:21
**proceeding** [2] -
221:13, 299:4
**proceedings** [2] -
242:20, 335:6
**proceeds** [9] - 245:22,
246:7, 246:9, 250:4,
250:7, 250:10,
250:14, 251:5,
251:18
**process** [1] - 248:18
**processes** [1] -
220:14
**produce** [3] - 316:22,

318:2, 319:20
**produced** [7] - 239:20, 295:13, 295:20, 316:24, 317:22, 324:18, 333:25
**product** [1] - 264:2
**production** [1] - 222:1
**productive** [2] - 333:1, 333:4
**products** [3] - 311:9, 311:13, 317:19
**professional** [2] - 220:4, 220:6
**professionally** [1] - 257:10
**professionals** [1] - 284:24
**Professor** [2] - 217:5
**professor** [3] - 217:6, 227:8, 257:4
**proficient** [1] - 310:18
**profit** [1] - 326:13
**program** [2] - 217:23, 314:11
**programs** [2] - 217:19, 218:3
**prohibits** [1] - 250:6
**promote** [2] - 245:24, 250:11
**prone** [1] - 291:22
**proper** [2] - 266:11, 297:16
**properly** [3] - 259:5, 262:18, 264:8
**property** [8] - 245:21, 246:8, 250:7, 250:9, 250:14, 250:24, 251:5, 251:18
**proposition** [1] - 249:12
**proprietary** [4] - 310:14, 311:14, 311:16, 329:12
**prosecute** [1] - 252:11
**prosecution** [1] - 243:21
**prosecutors** [1] - 314:13
**prospect** [1] - 327:23
**protect** [2] - 243:6, 277:23
**protocol** [5] - 258:9, 259:1, 259:7, 259:14, 268:16
**proven** [1] - 229:15
**provide** [17] - 233:25, 235:9, 239:5, 240:12, 240:17, 243:16, 253:4, 255:14, 262:14,

268:13, 294:3, 311:23, 313:6, 313:18, 320:3, 321:10, 330:14
**provided** [24] - 244:2, 244:10, 245:6, 245:12, 245:14, 248:12, 250:19, 252:3, 253:6, 261:8, 274:12, 300:9, 300:23, 302:13, 303:8, 304:1, 308:1, 310:16, 311:22, 318:22, 330:10, 330:12, 330:16, 333:17
**provides** [3] - 217:17, 242:25, 250:22
**providing** [5] - 253:5, 253:10, 327:1, 327:23, 333:12
**proxies** [1] - 295:25
**public** [6] - 217:20, 219:12, 252:6, 255:17, 267:6, 280:21
**publish** [1] - 317:16
**published** [4] - 310:25, 316:6, 317:9, 331:21
**publishing** [1] - 318:4
**purchase** [5] - 241:18, 268:7, 269:15, 272:2, 272:3
**purchases** [1] - 230:24
**purchasing** [2] - 269:13, 269:21
**pure** [1] - 224:7
**purpose** [11] - 220:7, 220:10, 220:15, 220:18, 224:4, 238:15, 243:15, 271:16, 281:10, 299:3, 322:15
**purposes** [10] - 219:16, 225:7, 225:21, 227:20, 256:12, 256:19, 264:10, 284:15, 295:5, 311:21
**pursued** [1] - 304:14
**put** [15] - 232:17, 236:1, 258:25, 264:14, 265:6, 273:18, 275:25, 286:7, 288:13, 291:6, 299:14, 304:19, 307:6, 307:19, 327:11

**puts** [1] - 267:12
**putting** [1] - 286:9

## Q

**qualified** [1] - 320:12
**quash** [1] - 329:16
**questioning** [1] - 319:25
**questions** [15] - 227:2, 231:16, 274:25, 281:11, 286:13, 287:11, 298:19, 307:20, 309:20, 312:5, 312:10, 318:8, 318:17, 320:8, 332:16
**quick** [3] - 279:9, 309:20, 332:22
**quite** [7] - 222:16, 262:23, 264:24, 276:17, 283:12, 324:13, 330:10
**quotation** [1] - 247:10
**quote** [1] - 266:7
**quote-unquote** [1] - 266:7

## R

**raise** [4] - 225:1, 234:17, 236:15, 242:12
**raising** [2] - 228:4, 254:3
**Ramirez** [2] - 247:6, 247:11
**ran** [3] - 260:16, 289:8, 289:24
**RANDOLPH** [1] - 214:8
**rapidly** [2] - 231:5, 279:7
**rare** [3] - 240:4, 276:20, 276:22
**rate** [6] - 272:10, 272:11, 290:2, 290:10, 290:11, 290:14
**rates** [6] - 272:10, 310:24, 315:19, 316:18, 324:18, 324:22
**rather** [2] - 243:15, 276:22
**rating** [1] - 219:2
**reach** [1] - 266:16
**reaching** [1] - 259:3
**Reactor** [3] - 272:10, 273:2, 274:15

**Reactor's** [1] - 333:25
**read** [6] - 219:4, 293:13, 293:19, 303:16, 305:12, 324:13
**readily** [1] - 232:24
**reading** [3] - 221:10, 221:11, 248:20
**ready** [1] - 306:5
**real** [3] - 230:7, 274:5, 327:5
**realistically** [1] - 264:18
**really** [25] - 233:5, 238:25, 240:6, 240:24, 241:2, 242:6, 264:25, 267:18, 269:10, 269:23, 274:19, 276:22, 296:12, 296:13, 298:15, 299:1, 309:8, 314:20, 315:12, 320:7, 320:9, 320:12, 321:8, 325:23
**reanalyze** [1] - 317:6
**reason** [11] - 222:22, 261:1, 262:4, 262:5, 274:4, 281:25, 291:2, 300:1, 315:21, 316:5, 325:8
**reasonable** [7] - 220:3, 224:12, 224:16, 226:16, 227:17, 229:19, 243:20
**reasonableness** [1] - 225:2
**reasoning** [2] - 249:11, 249:13
**reasons** [10] - 220:17, 232:11, 248:23, 253:6, 262:20, 266:11, 271:9, 271:14, 280:22, 326:25
**recalling** [2] - 216:19, 242:21
**recapitulate** [1] - 243:19
**receipt** [1] - 259:6
**receive** [1] - 229:12
**received** [3] - 229:2, 289:10, 313:8
**receiving** [1] - 229:8
**recent** [3] - 271:16, 291:5, 307:25
**recently** [4] - 256:18, 275:18, 284:17,

321:8
**recess** [1] - 302:6
**Recess** [1] - 242:19
**recollection** [1] - 222:10
**record** [4] - 216:5, 302:20, 322:20, 333:5
**recorded** [1] - 254:13
**records** [23] - 219:16, 219:20, 220:7, 220:20, 221:17, 221:19, 221:22, 221:25, 222:3, 222:11, 223:12, 223:17, 226:4, 226:18, 226:21, 226:23, 226:25, 262:3, 299:7, 302:11, 308:2, 308:3, 326:2
**recounting** [1] - 251:9
**recounts** [1] - 250:21
**redirect** [3] - 301:17, 312:6, 312:7
**Redirect** [1] - 215:6
**REDIRECT** [2] - 227:5, 312:14
**redirecting** [1] - 269:10
**reduce** [1] - 248:17
**reemphasize** [1] - 323:8
**refer** [5] - 252:17, 263:4, 276:11, 295:10, 296:17
**reference** [3] - 218:16, 308:13, 318:18
**referenced** [7] - 218:4, 220:5, 221:8, 239:23, 246:20, 295:19
**references** [1] - 248:8
**referencing** [1] - 292:5
**referred** [2] - 278:16, 305:23
**referring** [5] - 262:10, 286:15, 303:10, 305:6, 308:17
**refers** [1] - 239:21
**reflect** [2] - 219:21, 219:22
**reflects** [2] - 219:25, 220:2
**regard** [7] - 227:12, 253:7, 254:13, 279:12, 279:13, 284:1, 292:13
**regarding** [10] - 220:24, 228:1,

353

251:2, 251:15, 252:3, 274:14, 277:5, 307:7, 309:13, 329:24

**regardless** [1] - 263:20

**regards** [1] - 325:15

**Regional** [2] - 232:15, 234:24

**regional** [1] - 262:24

**register** [6] - 269:15, 270:6, 270:25, 271:4, 271:15, 271:23

**registered** [8] - 221:22, 268:13, 270:22, 270:25, 271:5, 271:6, 271:18, 271:20

**registering** [2] - 270:4, 270:7

**registration** [5] - 241:19, 268:7, 268:11, 269:13, 269:16

**registries** [1] - 269:1

**regular** [2] - 313:20, 314:9

**regularly** [1] - 316:9

**reiterate** [2] - 235:6, 302:14

**relate** [1] - 251:22

**related** [7] - 222:21, 229:19, 249:25, 251:8, 295:14, 295:23, 315:7

**relating** [8] - 249:22, 250:17, 255:16, 277:7, 277:10, 279:16, 330:18, 332:16

**relation** [4] - 241:6, 267:20, 320:4, 325:17

**relative** [1] - 230:18

**release** [2] - 245:10, 297:24

**released** [2] - 262:6, 273:17

**relevant** [7] - 317:1, 325:12, 325:18, 325:25, 326:9, 326:12, 330:2

**reliability** [4] - 272:20, 273:1, 279:16, 279:25

**reliable** [5] - 260:7, 272:13, 272:15, 317:15, 317:18

**reliance** [1] - 220:3,

220:18

**relied** [6] - 220:20, 262:4, 297:17, 298:12, 299:8, 330:4

**relies** [1] - 256:1

**rely** [9] - 219:15, 219:19, 220:7, 220:10, 220:16, 262:4, 311:4, 311:5

**relying** [8] - 220:15, 226:24, 244:2, 301:8, 301:9, 301:12, 304:22, 318:17

**remaining** [1] - 309:10

**remark** [1] - 295:16

**remarking** [2] - 295:13, 295:18

**remember** [10] - 221:20, 221:24, 223:20, 223:21, 268:23, 304:5, 307:21, 311:1, 315:14

**remind** [2] - 234:21, 290:23

**reminded** [1] - 290:5

**render** [3] - 262:7, 283:11, 284:10

**rendering** [1] - 282:1

**repaired** [2] - 316:19, 316:25

**repairs** [1] - 285:20

**repeated** [1] - 311:8

**repeatedly** [1] - 317:24

**repeats** [1] - 306:19

**rephrase** [1] - 269:14

**replicate** [3] - 261:23, 263:22, 264:18

**report** [20] - 228:23, 237:16, 237:20, 241:20, 291:14, 291:24, 294:10, 301:1, 309:8, 319:14, 319:21, 319:22, 319:23, 321:11, 321:18, 321:21, 322:2, 322:5, 330:4, 330:22

**report-worthy** [1] - 291:24

**REPORTER** [2] - 254:21, 335:1

**Reporter** [3] - 214:21, 214:21, 335:10

**reporter** [1] - 241:1

**reporting** [4] - 218:10, 228:16, 246:1, 246:3

**reports** [10] - 238:8,

239:23, 240:16, 241:12, 290:20, 290:22, 291:1, 320:4, 322:7

**representation** [2] - 250:12, 250:13

**Representatives** [1] - 219:8

**represented** [5] - 246:8, 250:7, 251:5, 251:18, 323:25

**representing** [1] - 282:4

**reputable** [2] - 318:5, 318:7

**request** [12] - 245:16, 247:1, 247:16, 249:25, 250:19, 251:8, 253:2, 253:7, 284:19, 329:9, 329:20, 332:8

**requested** [2] - 325:14, 329:6

**requesting** [1] - 294:5

**requests** [8] - 244:9, 244:17, 245:13, 250:17, 251:10, 251:22, 251:23, 252:24

**require** [6] - 254:19, 263:7, 267:7, 282:22, 294:3, 332:7

**required** [2] - 220:5, 263:8

**requirement** [3] - 246:1, 246:4, 250:13

**requirements** [5] - 281:13, 281:16, 282:12, 282:13, 283:15

**requires** [2] - 250:3, 266:15

**resembles** [1] - 251:12

**Reserve** [4] - 219:7, 219:8, 219:10, 219:11

**resign** [1] - 231:11

**resists** [1] - 248:20

**resolve** [2] - 250:16, 332:2

**resolves** [2] - 270:4, 270:6

**resources** [10] - 237:22, 237:24, 241:25, 242:5, 263:21, 264:10, 264:16, 278:18, 280:16, 284:4

**respect** [12] - 232:1,

244:8, 244:10, 245:17, 248:25, 249:8, 251:3, 251:16, 251:20, 253:9, 332:10, 333:20

**respects** [2] - 247:16, 247:25

**respond** [3] - 239:18, 243:25, 284:25

**responded** [1] - 286:1

**responder** [1] - 328:12

**response** [6] - 237:6, 284:22, 285:13, 285:17, 286:1, 286:3

**rest** [5] - 282:23, 283:7, 291:17, 306:19, 320:22

**restricted** [1] - 232:15

**restricting** [1] - 232:21

**result** [5] - 225:11, 233:19, 265:22, 265:23, 316:24

**results** [2] - 317:2, 317:11

**resume** [3] - 216:20, 219:9, 312:8

**resurrect** [1] - 290:7

**retained** [2] - 321:9, 330:24

**retired** [2] - 257:4, 285:19

**retrial** [1] - 243:6

**return** [2] - 234:8, 259:6

**returning** [3] - 232:19, 233:4, 235:15

**reveal** [1] - 277:18

**review** [22] - 224:21, 226:4, 227:8, 232:17, 243:13, 261:13, 274:11, 277:4, 283:15, 290:16, 293:3, 302:11, 304:11, 310:12, 315:19, 315:22, 321:21, 321:23, 327:15, 328:6, 328:10, 328:17

**reviewed** [26] - 221:17, 221:19, 221:22, 221:25, 222:13, 223:4, 223:6, 223:8, 223:11, 223:12, 223:17, 228:14, 266:10, 280:1, 287:4, 297:25, 302:24, 306:23,

309:8, 310:1, 310:11, 310:25, 311:17, 315:14, 315:17

**reviewing** [9] - 222:2, 223:21, 226:18, 276:19, 286:25, 288:2, 288:4, 288:6, 321:13

**rife** [1] - 274:23

**rightfully** [1] - 279:1

**risk** [1] - 333:16

**RMR** [2] - 214:21, 335:9

**Road** [1] - 241:10

**robust** [1] - 227:16

**role** [2] - 245:7, 321:2

**Roman** [8] - 216:3, 216:13, 221:23, 222:3, 222:12, 223:9, 238:24, 242:22

**ROMAN** [1] - 214:5

**Roman's** [2] - 227:19, 229:16

**room** [4] - 235:21, 235:24, 307:13

**Room** [2] - 214:22, 335:10

**Roso** [1] - 221:18

**roughly** [4] - 257:3, 258:12, 266:1, 276:3

**routinely** [1] - 244:17

**Rule** [5] - 242:25, 243:10, 284:15, 291:4, 324:8

**rule** [2] - 244:13, 249:15

**ruling** [1] - 249:5

**run** [5] - 258:14, 265:21, 281:13, 281:23

**running** [6] - 219:7, 229:12, 229:17, 246:22, 251:25, 269:17

# S

**sad** [1] - 299:25

**sadly** [1] - 289:16

**safe** [1] - 296:20

**sake** [1] - 309:4

**San** [2] - 294:17, 294:21

**sandbagging** [1] - 234:5

**Sanford** [3] - 244:16, 249:13, 249:14

**Sara** [1] - 274:9

354

**Sarah** [1] - 228:15
**satellite** [1] - 256:15
**sauce** [1] - 258:6
**saved** [1] - 254:16
**saving** [1] - 275:17
**saw** [1] - 282:23
**scamming** [1] - 316:7
**scams** [1] - 218:21
**schedule** [2] - 236:17, 241:21
**scheme** [2] - 248:2, 248:15
**Scholl** [3] - 241:12, 241:20, 331:13
**Scholl's** [1] - 237:20
**science** [4] - 279:2, 294:4, 294:6, 324:2
**scientific** [1] - 273:20
**scientifically** [3] - 273:23, 283:10, 298:15
**SCIF** [1] - 265:2
**scope** [2] - 245:17, 306:12
**scratch** [1] - 267:19
**screen** [1] - 275:14
**seal** [1] - 287:8
**search** [1] - 240:15
**second** [5] - 222:22, 239:16, 282:15, 297:7, 323:16
**secondary** [1] - 256:10
**SecondWave** [4] - 255:10, 255:13, 255:14, 315:10
**secondWave** [1] - 255:12
**secret** [1] - 258:6
**Section** [3] - 250:5, 252:9, 252:14
**sector** [1] - 280:3
**secure** [2] - 296:14, 296:15
**security** [11] - 219:10, 226:14, 226:20, 248:23, 265:2, 267:11, 267:12, 296:12, 296:16, 296:17, 296:20
**see** [64] - 222:14, 228:19, 228:21, 229:7, 229:9, 229:20, 231:25, 233:2, 233:13, 233:20, 234:9, 235:1, 235:19, 235:20, 241:11, 242:17, 246:24, 253:16, 253:19,
254:25, 255:1, 263:20, 264:23, 266:18, 266:23, 267:14, 273:8, 274:5, 275:8, 276:20, 283:8, 284:18, 286:4, 288:25, 289:14, 292:14, 298:24, 299:16, 299:17, 299:19, 299:22, 300:13, 300:16, 300:19, 300:21, 303:6, 305:17, 306:14, 306:16, 306:19, 309:2, 309:3, 310:3, 312:8, 317:21, 321:25, 323:23, 327:8, 329:13, 330:5, 331:19, 333:3
**seeing** [4] - 222:9, 223:21, 223:23, 284:9
**seem** [1] - 289:14
**Sefranek** [3] - 214:21, 335:9, 335:9
**SEFRANEK** [1] - 335:3
**seized** [1] - 276:19
**sell** [2] - 269:7, 270:1
**seminars** [5] - 313:3, 313:5, 313:6, 313:7, 313:8
**send** [10] - 258:20, 258:22, 259:1, 262:14, 270:7, 270:11, 270:18, 323:18, 332:24, 332:25
**sends** [1] - 286:17
**sense** [2] - 249:7, 274:1
**sensitive** [5] - 271:10, 327:6, 327:10, 327:14, 332:12
**sensor** [1] - 256:22
**sent** [3] - 223:24, 327:2, 333:5
**separate** [2] - 295:3, 334:1
**separated** [1] - 288:5
**September** [1] - 322:23
**series** [1] - 268:6
**serious** [1] - 279:24
**serve** [1] - 258:23
**server** [1] - 270:21
**servers** [2] - 290:17, 327:13

**service** [2] - 229:2, 229:8
**Service** [5] - 233:12, 233:16, 233:21, 234:13, 235:12
**services** [3] - 255:13, 259:20, 268:13
**set** [10] - 227:9, 233:3, 249:14, 256:16, 256:22, 269:6, 307:13, 327:7, 328:7, 328:16
**sets** [1] - 299:6
**settings** [4] - 226:14, 226:15, 226:20, 226:25
**several** [3] - 250:16, 276:1, 281:20
**sexual** [1] - 276:15
**share** [1] - 260:20
**shared** [3] - 255:25, 259:23, 260:18
**sharing** [5] - 259:24, 261:9, 261:10, 268:18, 268:19
**ship** [2] - 286:7, 286:8
**shooting** [3] - 256:21, 256:23
**shopping** [1] - 267:1
**short** [3] - 298:9, 301:21, 313:10
**shortened** [1] - 279:7
**shortly** [1] - 242:17
**show** [2] - 267:15, 320:19
**showing** [1] - 295:17
**shown** [3] - 292:15, 300:22, 301:10
**sic** [1] - 221:18
**side** [2] - 239:17, 249:8
**sign** [5] - 280:11, 293:4, 293:6, 293:7, 293:12
**signal** [2] - 293:7, 293:14
**signature** [1] - 290:25
**signed** [3] - 280:18, 292:24, 319:12
**significant** [6] - 224:20, 232:9, 232:20, 247:16, 280:25, 298:12
**signing** [2] - 293:18, 318:13
**Silk** [1] - 241:9
**similar** [3] - 258:15, 269:22, 282:21
**similarly** [1] - 285:6
**simple** [2] - 251:13,
283:18
**simplest** [2] - 258:6, 260:25
**simplified** [3] - 285:2, 285:4, 285:7
**simplifying** [1] - 285:14
**simply** [19] - 231:3, 240:5, 240:12, 249:15, 257:25, 265:5, 270:3, 270:7, 271:21, 272:4, 273:5, 280:6, 283:19, 286:1, 293:1, 295:19, 298:9, 298:25, 327:1
**single** [11] - 225:15, 225:25, 226:5, 226:19, 237:12, 261:6, 282:8, 308:16, 308:17, 324:1, 325:16
**single-person** [1] - 282:8
**sit** [2] - 223:19, 313:7
**site** [3] - 268:8, 283:23, 306:7
**site-specific** [1] - 306:7
**sites** [1] - 268:3
**situation** [2] - 236:12, 321:8
**six** [1] - 232:11
**six-hour** [1] - 232:11
**size** [1] - 229:18
**sleep** [2] - 234:22, 235:1
**slightly** [2] - 265:7, 323:8
**slipping** [1] - 321:2
**slowed** [1] - 277:13
**slower** [1] - 240:25
**slowing** [1] - 242:1
**smaller** [3] - 263:14, 275:23, 276:2
**smart** [1] - 290:6
**smuggle** [1] - 236:3
**soft** [1] - 234:7
**software** [30] - 266:18, 272:14, 272:15, 272:17, 272:21, 273:1, 273:2, 273:4, 273:5, 273:11, 273:16, 277:23, 311:9, 311:14, 311:25, 315:20, 316:13, 316:20, 317:1, 317:2, 317:5, 317:12, 317:15, 317:23, 318:1,
318:2, 318:5, 325:19, 325:20
**soil** [2] - 247:21, 248:3
**sold** [1] - 270:8
**solution** [2] - 233:8, 328:25
**someone** [17] - 224:23, 225:3, 226:11, 226:12, 231:14, 234:3, 234:14, 259:22, 260:2, 269:10, 269:24, 289:12, 304:7, 304:23, 320:16, 324:24, 327:3
**sometime** [2] - 279:21, 286:19
**sometimes** [2] - 284:25, 306:14
**somewhat** [2] - 254:17, 275:19
**somewhere** [4] - 288:8, 288:19, 307:11, 331:21
**son** [2] - 229:22, 257:4
**soon** [1] - 323:3
**sorry** [8] - 217:5, 239:16, 264:11, 269:14, 292:19, 297:7, 303:21, 319:15
**sort** [31] - 230:4, 230:7, 234:7, 254:15, 259:9, 262:22, 263:12, 264:24, 269:7, 274:23, 277:13, 278:2, 279:15, 282:3, 282:7, 283:1, 285:19, 289:16, 290:25, 298:17, 298:18, 305:5, 305:15, 306:5, 314:9, 314:15, 316:10, 316:18, 317:14, 318:12, 328:10
**sorts** [2] - 237:24, 266:11
**soul** [1] - 275:17
**soul-saving** [1] - 275:17
**sound** [3] - 227:11, 280:2, 298:25
**sounds** [1] - 280:5
**source** [27] - 229:13, 245:21, 250:9, 273:13, 273:16, 298:4, 310:1,

310:13, 311:17, 312:1, 312:2, 315:14, 315:17, 315:19, 315:22, 323:15, 323:20, 323:21, 324:13, 324:17, 325:23, 329:1, 329:3, 329:12, 332:6, 333:18, 333:25
**sources** [2] - 221:8, 295:21
**Southwest** [1] - 261:10
**speaking** [7] - 255:17, 258:18, 275:8, 275:12, 283:10, 285:4, 296:2
**special** [1] - 266:15
**specialized** [3] - 220:24, 254:19, 284:21
**specialty** [1] - 285:12
**specific** [36] - 218:4, 219:1, 220:10, 220:15, 220:20, 220:22, 221:14, 221:21, 223:20, 226:8, 226:15, 226:21, 239:1, 239:24, 250:24, 263:21, 278:1, 278:8, 282:19, 284:13, 284:24, 285:6, 293:20, 297:17, 298:3, 299:6, 301:13, 302:19, 306:7, 313:8, 322:4, 322:9, 327:16, 329:9
**specifically** [34] - 218:22, 221:16, 224:1, 225:8, 225:18, 226:24, 239:25, 264:13, 265:18, 268:12, 278:3, 279:12, 280:13, 281:8, 281:9, 281:22, 286:14, 287:22, 288:8, 291:3, 292:4, 292:13, 295:14, 296:23, 299:18, 301:2, 302:12, 305:25, 307:23, 313:20, 314:5, 314:18, 315:21, 326:10
**specifics** [2] - 248:10, 331:17

**specified** [9] - 245:22, 245:24, 246:7, 246:9, 250:7, 250:10, 250:11, 251:5, 251:19
**speculate** [1] - 225:19
**speculation** [1] - 224:7
**spend** [1] - 237:21
**spending** [1] - 237:24
**spent** [2] - 288:2, 321:13
**spinning** [1] - 309:5
**spoken** [1] - 308:19
**spoofing** [1] - 257:14
**sprawling** [1] - 249:18
**spreadsheet** [2] - 308:3, 321:16
**Squad** [1] - 314:4
**staffed** [1] - 262:25
**staffing** [7] - 281:13, 281:16, 281:23, 282:2, 282:12, 282:13, 283:14
**stand** [4] - 216:20, 290:6, 311:4, 317:6
**standard** [4] - 219:24, 220:2, 240:18, 274:3
**standards** [4] - 219:25, 220:3, 220:4, 314:22
**standing** [1] - 253:18
**standpoint** [2] - 257:19, 282:8
**stands** [1] - 258:8
**start** [3] - 250:1, 286:25, 290:5
**started** [4] - 229:23, 255:22, 256:4, 276:7
**starting** [2] - 216:5, 242:9
**startles** [1] - 272:23
**state** [7] - 216:4, 226:25, 235:3, 246:1, 254:9, 281:20, 312:18
**statement** [12] - 237:12, 241:23, 243:1, 245:8, 248:12, 250:18, 252:7, 252:16, 260:9, 285:17, 295:22, 297:22
**statements** [1] - 241:4
**States** [18] - 214:22, 216:3, 216:7, 235:12, 242:22, 243:7, 243:14, 243:22, 244:3, 244:16, 244:24,

244:25, 245:2, 246:14, 247:6, 249:13, 259:3, 326:7
**states** [5] - 252:13, 261:18, 281:12, 283:22, 301:1
**STATES** [3] - 214:1, 214:2, 214:8
**stating** [2] - 282:10, 282:12
**statistical** [1] - 272:10
**status** [1] - 233:20
**statute** [4] - 241:6, 241:9, 252:11, 252:14
**stay** [1] - 314:14
**stealing** [1] - 226:2
**stenographic** [1] - 335:5
**step** [3] - 242:12, 250:21
**step-by-step** [1] - 250:21
**Sterlingov** [30] - 216:3, 216:13, 221:23, 222:12, 226:1, 229:2, 230:5, 230:25, 231:3, 234:20, 238:24, 242:22, 244:5, 244:9, 245:6, 245:14, 245:22, 246:12, 250:23, 252:5, 252:13, 252:17, 253:10, 253:11, 268:6, 290:9, 292:3, 294:8, 295:15, 323:2
**STERLINGOV** [1] - 214:5
**Sterlingov's** [18] - 222:4, 222:14, 223:9, 224:4, 228:5, 245:10, 247:1, 249:25, 250:17, 250:18, 251:2, 251:8, 251:15, 251:22, 252:10, 252:20, 252:24, 295:2
**Steve** [1] - 313:1
**still** [17] - 222:16, 227:17, 233:14, 237:22, 239:11, 257:6, 263:15, 263:24, 284:9, 284:12, 293:3, 300:12, 303:23, 305:15, 305:16, 320:6

**Still** [1] - 319:15
**still's** [2] - 319:14, 321:7
**sting** [3] - 250:21, 251:3, 251:16
**stipulation** [1] - 290:19
**stolen** [1] - 277:21
**storage** [2] - 287:10
**store** [1] - 256:17
**story** [3] - 229:22, 260:16, 313:1
**straining** [1] - 241:11
**streamline** [1] - 329:13
**Street** [2] - 214:11, 214:17
**street** [1] - 285:25
**strive** [1] - 322:25
**studied** [1] - 310:25
**study** [1] - 225:5
**stuff** [4] - 217:7, 242:4, 309:11, 320:2
**subject** [10] - 218:19, 218:20, 219:3, 219:4, 219:12, 274:3, 287:2, 318:22, 329:4, 330:1
**submit** [2] - 319:12, 322:2
**submitted** [1] - 311:3
**subpoena** [1] - 258:23
**subset** [3] - 297:17, 307:24, 327:12
**substance** [3] - 281:11, 291:25, 292:22
**substantial** [4] - 230:24, 276:13, 276:16, 324:6
**substantially** [2] - 278:15, 281:21
**subtle** [1] - 286:13
**success** [1] - 230:3
**succinct** [1] - 224:10
**suddenly** [2] - 271:4, 296:4
**suffered** [1] - 302:25
**suffice** [1] - 298:20
**suffices** [1] - 290:9
**sufficient** [8] - 222:17, 238:2, 240:18, 242:25, 243:24, 253:4, 253:5, 289:3
**sufficiently** [1] - 253:2
**suggest** [3] - 231:13, 252:18, 320:5
**suggesting** [3] - 224:25, 225:25, 328:11

**sum** [1] - 221:10
**super** [1] - 324:5
**super-talented** [1] - 324:5
**superseding** [6] - 238:6, 238:18, 239:2, 239:21, 240:14, 244:6
**supervisors** [2] - 326:21, 328:21
**supplemental** [2] - 245:9, 274:7
**support** [4] - 229:6, 247:11, 249:11, 252:25
**supporting** [2] - 239:4, 331:7
**suppose** [2] - 303:15, 316:1
**supposed** [3] - 308:22, 322:7, 326:4
**surmise** [1] - 272:19
**surprise** [3] - 248:17, 258:9, 320:25
**surprised** [1] - 288:1
**suspect** [1] - 323:1
**swear** [1] - 253:25
**sweep** [1] - 247:13
**sweeping** [1] - 247:13
**swimming** [1] - 242:4
**switch** [1] - 253:18
**switched** [1] - 258:17
**switches** [1] - 258:13
**switching** [1] - 266:2
**sworn** [1] - 254:4
**synonymous** [1] - 273:12
**system** [5] - 256:19, 291:11, 296:7, 310:9
**systems** [4] - 309:23, 310:2, 310:13, 310:24

**T**

**tainted** [1] - 292:2
**talented** [1] - 324:5
**TAMARA** [1] - 335:3
**Tamara** [3] - 214:21, 335:9, 335:9
**tap** [1] - 278:18
**task** [1] - 300:17
**tax** [1] - 224:22
**team** [4] - 264:19, 284:5, 291:18, 300:2
**teams** [1] - 248:9
**tech** [1] - 315:17
**Technical** [1] - 301:15
**technical** [1] - 276:24
**techniques** [1] - 279:5

**technology** [1] - 275:17

**telegraphing** [1] - 320:10

**telephone** [2] - 258:12, 258:14

**television** [1] - 261:7

**ten** [1] - 272:6

**tend** [3] - 263:4, 276:11, 291:19

**tends** [2] - 254:17, 267:9

**tens** [2] - 261:12, 327:9

**terabytes** [1] - 242:4

**term** [8] - 266:8, 266:10, 276:24, 289:15, 290:10, 297:16, 314:6

**terminology** [1] - 266:11

**terms** [24] - 237:15, 241:5, 252:18, 252:24, 254:11, 258:6, 261:19, 264:21, 275:24, 277:18, 277:19, 279:2, 281:4, 282:2, 282:21, 288:6, 296:20, 297:3, 305:14, 313:6, 313:25, 314:8, 315:24, 316:6

**Tesla** [2] - 230:9, 230:23

**test** [1] - 317:3

**tested** [5] - 257:6, 261:2, 264:22, 273:6, 273:9

**testified** [10] - 217:8, 259:9, 272:8, 275:24, 277:7, 277:19, 297:13, 303:7, 305:19, 306:23

**testify** [14] - 277:4, 277:10, 277:14, 281:13, 281:21, 282:13, 283:22, 296:21, 297:1, 297:11, 297:23, 305:9, 305:11, 320:13

**testifying** [5] - 301:4, 301:6, 320:11, 325:2, 330:24

**testimonies** [1] - 288:11

**testimony** [26] - 216:20, 219:14,

227:21, 238:20, 240:16, 264:5, 279:7, 287:7, 287:25, 289:4, 289:5, 289:6, 291:20, 293:16, 294:7, 294:24, 295:12, 298:9, 303:10, 306:6, 317:5, 321:1, 321:14, 322:8, 324:10, 326:10

**testing** [2] - 273:6, 281:4

**THE** [138] - 214:1, 214:1, 214:8, 216:2, 216:8, 216:11, 216:15, 216:21, 216:23, 225:10, 225:11, 227:4, 230:4, 230:6, 230:9, 230:11, 230:12, 230:13, 230:15, 230:16, 230:21, 231:17, 231:25, 232:7, 232:13, 233:12, 234:11, 234:16, 234:18, 234:19, 235:4, 235:9, 235:22, 236:9, 236:12, 236:14, 236:20, 237:2, 238:14, 239:10, 240:19, 240:22, 240:25, 242:7, 242:11, 242:17, 242:21, 242:23, 253:20, 253:23, 253:25, 254:2, 254:5, 254:21, 254:23, 255:4, 275:1, 275:10, 275:11, 292:19, 292:21, 292:23, 293:5, 294:5, 294:14, 294:15, 294:16, 294:19, 294:20, 295:1, 295:7, 295:8, 297:7, 297:8, 299:14, 299:18, 300:6, 301:16, 301:20, 301:23, 302:1, 302:3, 302:4, 302:7, 304:19, 305:4, 307:9, 307:12, 309:4, 312:6, 312:12, 313:3, 313:5, 313:13, 318:9, 318:19, 318:25,

319:5, 319:8, 319:10, 319:11, 319:22, 320:7, 321:6, 321:19, 322:6, 323:1, 323:11, 323:16, 323:20, 323:22, 324:1, 324:6, 324:10, 324:23, 325:9, 325:21, 326:3, 326:15, 326:25, 327:8, 327:20, 328:8, 328:14, 328:23, 329:6, 329:11, 329:18, 330:7, 330:23, 331:10, 331:16, 331:19, 331:22, 332:25, 333:10, 334:2, 334:4

**theft** [2] - 277:20, 278:4

**themselves** [1] - 271:13

**theoretically** [1] - 286:4

**theory** [1] - 331:2

**therefore** [4] - 244:17, 245:13, 282:21, 330:15

**they've** [7] - 232:15, 240:7, 263:24, 310:23, 311:22, 316:25, 329:16

**third** [8] - 224:3, 225:17, 225:20, 226:6, 327:6, 327:18

**third-party** [5] - 224:3, 226:6, 327:6, 327:18

**third-party's** [1] - 225:17

**thoroughly** [1] - 251:13

**thoughts** [1] - 242:14

**thousands** [5] - 260:20, 261:11, 261:12, 275:20, 327:9

**three** [3] - 242:4, 260:4, 321:17

**tightened** [1] - 284:16

**time-consuming** [1] - 263:16

**timeline** [1] - 322:18

**timer** [1] - 290:5

**timestamp** [1] - 308:13

**timing** [4] - 277:12, 294:9, 318:14, 319:11

**today** [18] - 225:16, 249:5, 256:14, 258:14, 259:15, 296:5, 306:5, 306:9, 308:12, 309:11, 310:23, 313:12, 314:6, 315:3, 318:10, 318:18, 321:14, 321:25

**today's** [2] - 289:3, 314:22

**together** [5] - 275:25, 284:5, 288:13, 289:1, 331:24

**tomorrow** [1] - 323:18

**ton** [1] - 241:25

**took** [6] - 236:1, 291:20, 302:10, 306:1, 315:16, 319:24

**tool** [12] - 217:18, 218:5, 231:15, 243:13, 257:25, 266:23, 266:24, 267:4, 279:11, 279:15, 279:16, 280:14

**toolkit** [1] - 316:21

**tools** [21] - 217:12, 217:13, 263:21, 264:16, 266:15, 267:2, 267:8, 267:20, 270:11, 273:18, 273:22, 279:3, 279:4, 279:20, 279:25, 309:20, 310:19, 310:22, 311:13, 312:3, 325:5

**top** [6] - 221:24, 257:5, 259:19, 267:13, 307:23, 325:22

**topic** [4] - 217:15, 265:7, 272:7, 309:6

**TOR** [1] - 214:15

**Tor** [5] - 214:16, 216:12, 267:20, 267:23, 283:23

**total** [4] - 223:13, 223:14, 229:11, 229:17

**totality** [13] - 262:8, 280:13, 284:11, 297:20, 297:24, 299:19, 300:20, 300:21, 300:24, 307:6, 308:24, 310:16, 310:17

**touched** [3] - 323:6,

332:16, 333:20

**touches** [1] - 221:4

**toward** [1] - 217:24

**trace** [6] - 237:19, 237:20, 238:8, 239:24, 241:20, 293:8

**traced** [2] - 237:18

**tracers** [1] - 221:8

**traces** [3] - 237:24, 238:11, 241:18

**tracing** [12] - 217:11, 217:14, 217:15, 217:21, 218:1, 218:7, 233:2, 238:3, 240:8, 278:23, 279:11, 331:14

**track** [1] - 298:1

**tracks** [1] - 220:8

**traditional** [2] - 218:9, 267:10

**traditionally** [1] - 258:16

**traffic** [1] - 270:16

**train** [1] - 315:7

**trained** [2] - 280:19, 286:8

**training** [23] - 217:16, 217:17, 217:19, 217:22, 225:11, 255:17, 255:20, 255:22, 255:23, 280:25, 281:1, 313:3, 313:15, 313:16, 313:17, 313:19, 313:23, 313:24, 314:1, 314:11, 314:18, 314:24, 324:6

**trainings** [8] - 217:14, 217:16, 218:6, 218:8, 280:19, 313:21, 314:9, 314:10

**transaction** [14] - 223:8, 223:11, 223:21, 246:1, 246:3, 250:6, 250:22, 250:25, 251:3, 251:4, 251:7, 251:16, 251:17

**transactions** [9] - 224:5, 225:17, 226:7, 239:24, 241:13, 268:6, 282:4, 282:6, 283:16

**transcript** [2] - 335:4, 335:6

**TRANSCRIPT** [1] - 214:7

**transfers** [2] - 234:23, 252:6
**transmission** [3] - 252:1, 252:22, 256:11
**transmitted** [1] - 254:14
**transmitting** [3] - 246:13, 251:21, 251:23
**travel** [1] - 325:7
**trial** [20] - 235:3, 240:10, 247:4, 248:18, 248:19, 249:24, 253:13, 258:11, 277:13, 289:2, 290:16, 299:2, 303:11, 303:14, 303:19, 303:20, 303:22, 322:22, 323:3, 325:6
**trials** [1] - 232:21
**trick** [1] - 288:19
**tried** [1] - 280:10
**triggers** [1] - 263:7
**trip** [1] - 293:14
**TRM** [4] - 217:12, 217:20, 218:4, 280:20
**trouble** [1] - 254:21
**true** [9] - 229:7, 236:4, 239:19, 249:4, 252:23, 274:2, 282:15, 335:4, 335:5
**trust** [2] - 316:7, 324:19
**trusted** [1] - 273:16
**try** [12] - 233:3, 241:12, 258:1, 272:5, 286:18, 290:7, 308:10, 314:14, 319:6, 329:13, 332:2, 332:23
**trying** [12] - 232:3, 232:16, 236:3, 239:17, 285:5, 291:12, 293:8, 293:9, 306:25, 311:1, 314:7, 320:9
**turn** [7] - 228:14, 248:21, 265:7, 312:6, 315:12, 327:18, 332:7
**turning** [4] - 229:1, 255:5, 291:25, 295:23
**turnover** [1] - 282:3
**turns** [1] - 266:24
**two** [9] - 232:12,

263:5, 272:4, 274:7, 276:7, 289:25, 301:6, 302:24, 325:10
**two-dimensional** [1] - 263:5
**type** [4] - 251:12, 256:6, 270:17, 313:24
**typed** [1] - 287:17
**types** [3] - 269:10, 277:20, 313:15
**typical** [2] - 247:18, 247:24
**typically** [14] - 263:5, 263:12, 270:10, 272:4, 272:5, 273:21, 273:22, 276:20, 276:23, 278:5, 282:7, 313:18, 316:10, 317:8

## U

**U.S** [2] - 214:13, 329:22
**U.S.C** [3] - 250:5, 252:9, 252:14
**uh-oh** [1] - 317:24
**ultimately** [4] - 233:21, 234:13, 265:24, 311:20
**unaccounted** [1] - 230:8
**uncertainty** [2] - 274:20, 274:24
**unclear** [1] - 300:18
**uncommon** [1] - 247:8
**under** [17] - 220:4, 220:5, 221:23, 232:16, 233:17, 235:12, 241:8, 249:16, 250:5, 252:11, 252:13, 260:9, 264:15, 287:8, 290:15, 290:24, 333:14
**underlying** [1] - 246:10
**understood** [6] - 264:5, 294:14, 295:4, 321:5, 333:6, 334:1
**unexpected** [1] - 302:25
**unfair** [1] - 248:17
**unfettered** [1] - 264:7
**unfortunately** [7] - 279:21, 280:12,

307:12, 308:9, 312:21, 312:25, 313:1
**unindicted** [4] - 239:4, 239:8, 240:3, 240:5
**unique** [1] - 269:9
**United** [18] - 214:22, 216:3, 216:7, 235:12, 242:22, 243:7, 243:14, 243:22, 244:3, 244:15, 244:24, 244:25, 245:2, 246:14, 247:5, 249:12, 259:2, 326:7
**UNITED** [3] - 214:1, 214:2, 214:8
**universe** [1] - 331:23
**unlawful** [12] - 224:5, 245:23, 245:24, 246:7, 246:9, 250:7, 250:10, 250:11, 250:24, 251:1, 251:5, 251:19
**unless** [2] - 237:2, 242:11
**unlicensed** [4] - 246:13, 251:20, 251:23, 252:8
**unlocked** [1] - 280:14
**unquote** [1] - 266:7
**unrelated** [2] - 292:3, 295:11
**unusual** [1] - 289:11
**up** [33] - 228:3, 232:3, 233:3, 233:22, 234:13, 235:13, 255:25, 257:3, 259:12, 263:17, 265:6, 266:14, 266:20, 269:16, 274:4, 280:11, 280:18, 284:6, 288:14, 293:23, 295:10, 301:19, 301:24, 307:10, 307:14, 309:18, 312:23, 313:15, 315:12, 317:25, 319:6, 319:18, 333:1
**updated** [1] - 276:1
**USAO** [1] - 214:11
**USAO-DOJ** [1] - 214:11
**useful** [6] - 271:1, 280:6, 281:6, 298:23, 299:21, 319:7
**user** [2] - 261:3, 265:18

**uses** [3] - 261:19, 296:3, 317:22
**utilize** [2] - 298:13, 314:24

## V

**vaguest** [2] - 241:5, 241:15
**valid** [3] - 284:15, 304:9, 304:10
**validate** [1] - 263:23
**validity** [1] - 261:17
**value** [5] - 271:19, 298:16, 320:15
**valued** [1] - 230:18
**vanity** [2] - 269:8, 269:22
**various** [7] - 218:19, 223:22, 269:3, 277:22, 308:18, 313:8, 313:18
**vast** [2] - 271:6, 284:25, 313:11
**vastly** [1] - 282:22
**vehicle** [2] - 230:10, 230:12
**vehicles** [1] - 230:7
**vendor** [1] - 326:13
**vendors** [3] - 239:3, 239:22, 248:8
**venues** [1] - 224:18
**verbal** [1] - 294:21
**verification** [1] - 223:22
**VERRET** [3] - 215:3, 217:1, 227:6
**Verret** [13] - 216:19, 217:3, 217:5, 217:6, 217:8, 218:9, 227:8, 233:1, 303:7, 303:23, 319:21, 319:25
**version** [4] - 317:9, 318:12, 319:12, 322:2
**versus** [1] - 267:12
**VIA** [2] - 214:10, 214:16
**victim** [2] - 219:15, 226:1
**victims** [6] - 218:10, 218:14, 218:24, 244:20, 246:20
**video** [5] - 232:17, 233:3, 255:6, 256:15, 258:21
**videos** [1] - 266:25
**view** [4] - 249:2, 276:20, 322:12,

329:9
**views** [1] - 295:5
**violent** [1] - 276:15
**Virginia** [1] - 232:15
**virtual** [1] - 258:22
**virtually** [2] - 258:13, 332:1
**vitae** [1] - 312:8
**voice** [1] - 258:21
**Volkswagen** [2] - 316:4, 316:5
**voluminous** [10] - 238:19, 238:20, 242:1, 244:1, 245:11, 277:11, 283:13, 295:20, 312:22, 327:5
**volunteer** [1] - 278:7
**VPNs** [1] - 295:24
**vs** [1] - 214:4
**vulnerabilities** [1] - 273:9
**vulnerability** [2] - 264:1, 273:7

## W

**waiting** [1] - 217:23
**Wall** [1] - 214:17
**wallets** [1] - 277:24
**Walsh** [2] - 263:8, 265:1
**wants** [5] - 237:3, 269:25, 323:3, 327:12, 332:13
**warning** [1] - 231:8
**warrant** [2] - 240:15, 245:8
**warrants** [2] - 248:13, 304:10
**Warsaw** [1] - 232:15
**Washington** [10] - 214:5, 214:12, 214:14, 214:23, 262:15, 326:19, 326:20, 328:4, 328:20, 335:11
**waste** [1] - 288:24
**watch** [1] - 269:18
**watches** [1] - 256:16
**watching** [3] - 261:7, 271:4, 293:16
**water** [1] - 284:2
**ways** [4] - 258:15, 260:23, 260:24
**wealth** [1] - 240:17
**web** [8] - 266:8, 266:14, 266:21, 267:3, 267:4, 267:6, 267:21

**Web** [1] - 265:18
**website** [10] - 265:25,
266:1, 268:17,
269:11, 269:16,
270:18, 270:20,
280:10, 283:2, 296:5
**websites** [4] - 265:9,
265:12, 265:21,
266:4
**week** [4] - 286:19,
322:1, 328:18,
328:20
**weekly** [1] - 318:2
**weeks** [2] - 281:20,
321:17
**welcome** [4] - 309:11,
318:25, 319:4,
332:25
**well-demonstrated**
[1] - 310:23
**WERE** [1] - 215:15
**West** [2] - 231:23,
263:2
**wheels** [1] - 309:5
**whereas** [1] - 328:20
**white** [2] - 274:8,
274:16
**whole** [4] - 236:6,
315:1, 322:15, 325:8
**Wi** [1] - 261:8
**Wi-Fi** [1] - 261:8
**Wide** [1] - 265:18
**wife** [3] - 265:23,
271:3, 293:10
**willing** [1] - 329:14
**Windows** [2] - 272:16,
309:23
**wireless** [1] - 254:14
**wise** [3] - 273:8,
330:7, 332:8
**wish** [1] - 279:12
**wishes** [2] - 319:19,
320:4
**WITNESS** [22] - 215:2,
225:11, 230:6,
230:11, 230:13,
230:16, 275:11,
292:21, 293:5,
294:14, 294:16,
294:20, 295:7,
297:8, 299:18,
302:3, 305:4,
307:12, 313:5,
318:19, 319:5,
319:10
**witness** [15] - 216:16,
227:3, 231:17,
231:19, 238:20,
242:8, 253:15,
253:17, 254:1,

254:4, 254:22,
275:6, 276:10,
276:12, 309:6
**witnessed** [1] - 317:5
**witnesses** [1] - 232:1
**wonderful** [1] - 284:4
**wondering** [1] -
327:21
**Word** [1] - 272:16
**word** [5] - 285:16,
286:12, 292:8,
293:21, 298:25
**words** [7] - 263:5,
266:25, 267:10,
284:18, 293:21,
297:12, 320:3
**works** [5] - 258:12,
259:7, 273:5, 286:7,
319:16
**World** [2] - 265:18,
271:4
**world** [1] - 259:15
**worth** [1] - 328:23
**worthy** [1] - 291:24
**wow** [1] - 229:25
**wrap** [1] - 309:18
**write** [2] - 290:22,
320:2
**writing** [2] - 290:24,
292:7
**written** [4] - 243:1,
281:18, 290:20,
291:14
**www.SecondWave.**
**com** [1] - 270:17

## Y

**yachts** [1] - 229:24
**year** [12] - 266:1,
272:4, 276:3, 276:5,
276:7, 286:13,
286:22, 286:23,
287:3, 311:1, 317:7,
321:13
**year's** [1] - 224:22
**years** [12] - 219:9,
254:12, 256:2,
256:3, 263:17,
265:21, 273:21,
275:21, 276:1,
285:24, 289:24,
289:25
**yes-or-no** [2] - 298:20,
299:2
**yesterday** [11] - 217:8,
218:12, 218:16,
291:20, 306:4,
306:7, 307:2, 307:3,
307:5, 307:14,

308:11
**yesterday's** [3] -
287:7, 287:25,
293:16
**York** [3] - 214:17,
232:12, 332:3

## Z

**zealous** [1] - 238:23
**Zoom** [4] - 216:10,
216:14, 253:17,
253:19
**ZOOM** [2] - 214:10,
214:16