```
1               IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2
      UNITED STATES OF AMERICA,        )  Criminal Action
3                                      )  No. 1:21-CR-0399
                        Plaintiff,     )
4                                      )  MOTIONS HEARING
      vs.                              )
5                                      )  Washington, D.C.
      ROMAN STERLINGOV,                )  August 22, 2023
6                                      )  Time:  10:05 A.M.
                        Defendant.     )
7
                  TRANSCRIPT OF MOTIONS HEARING
8         BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                  UNITED STATES DISTRICT JUDGE
9
                    A P P E A R A N C E S
10
      For the Plaintiff:      CHRISTOPHER BROWN
11                            USAO-DOJ
                              601 D Street, NW
12                            Washington, DC 20001
13                            ALDEN PELKER
                              U.S. Department of Justice
14                            950 Pennsylvania Avenue, NW
                              Washington, DC 20530
15
                              JEFFREY PEARLMAN
16                            DOJ-CRM
                              U.S. Department of Justice
17                            1301 New York Ave. NW
                              Washington, DC 20005
18
      For the Defendant:      TOR EKELAND
19                            MICHAEL HASSARD
                              Tor Ekeland Law, PLLC
20                            30 Wall Street, 8th Floor
                              New York, NY 10005
21

22    Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
                              Official Court Reporter
23                            United States Courthouse, Room 6714
                              333 Constitution Avenue, NW
24                            Washington, DC  20001
                              202-354-3246
25
```

1                                 I N D E X

2
   **WITNESS**                                                    **PAGE**

3
         **JONELLE STILL**

4
            Direct Examination

5           By Mr. Ekeland                                          34

6           Cross-Examination
            By Ms. Pelker                                          137

7

8

9
   **EXHIBITS ADMITTED**                                           **PAGE**

10
   Defense Exhibit A                                               37

11
   Defense Exhibit B                                               38

12
   Defense Exhibit C                                               39

13
   Defense Exhibit D                                               39

14

15
   Government Exhibit 11                                           150

16
   Government Exhibit 13                                           150

17
   Government Exhibit 14                                           150

18
   Government Exhibit 15                                           158

19
   Government Exhibit 16                                           165

20
   Government Exhibit 17                                           167

21
   Government Exhibit 18                                           187

22

23

24

25

```
1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Calling Criminal Case

3    No. 21-399, United States of America v. Roman Sterlingov.

4              Counsel, please approach the podium and state your

5    name for the record, starting with government counsel.

6              MS. PELKER:  Good morning, Your Honor.  Alden Pelker

7    for the United States.

8              THE COURT:  Good morning.

9              MR. BROWN:  Good morning, Your Honor.  AUSA Chris

10   Brown for the government.

11             THE COURT:  Good morning.

12             MR. PEARLMAN:  Jeff Pearlman for the government.

13   Good morning, Your Honor.

14             THE COURT:  Good morning.

15             MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland

16   for Defendant Roman Sterlingov, who is present in court.

17             THE COURT:  Good morning.

18             MR. HASSARD:  Good morning, Your Honor.  Michael

19   Hassard for Defendant Roman Sterlingov.

20             THE COURT:  Good morning to you as well.

21             So I have a number of things on my agenda for today

22   in addition to the two witnesses.  First of all, let me just

23   ask Mr. Ekeland whether you've had an opportunity to confer

24   with the Marshals Service with respect to your concerns?

25             MR. EKELAND:  We had a phone call, Your Honor.  We're
```

1    still working things out with the Marshals Service.  They asked

2    us to send them an email regarding our attorney visits.  So

3    things are progressing.  We still do not have full access to

4    our client in terms of being able to visit him in an attorney

5    room.  He still does not have access to the discovery, which he

6    had previously at the jail.

7          So there was a whole hard drive, as well as all his

8    papers.  He was not allowed to take them with him.  I was

9    informed by the U.S. Marshals that he needs to sign them over

10   to us, and then we need to take them and bring them to him.

11         So we sent them an email.  We're working on it, but

12   as of yet, we still do not have full access to our client.

13         THE COURT:  Okay.  Well, let me know if there are

14   difficulties.  I know that the marshal is aware of the issue

15   and is focused on making sure that you do have access to your

16   client.

17         MR. EKELAND:  Thank you, Your Honor.

18         THE COURT:  Okay.  Why don't we also take up the

19   government's motion with respect to Rule 57.7.  I don't know if

20   anyone else -- if the government has anything else they want to

21   add on that, or if the defense would like to be heard on that

22   issue.

23         MR. BROWN:  No, Your Honor.  I think the pleadings

24   speak for themselves, and I think that it's clear that -- the

25   Court was very clear in its direction on June 16th as to Rule

1    57.7(b).  And the defense counsel has continued to ignore that

2    direction and continues to violate Rule 57.7(b).

3              THE COURT:  Okay.  Let me hear from the defense on

4    that issue.

5              MR. EKELAND:  Your Honor, we'd like to actually file

6    a reply to the government's notice.  But I would point out that

7    it's our understanding of the standard in this district for

8    57(a) [sic] that it's anything that would reasonably interfere

9    with the defendant's ability to get a fair trial.

10             THE COURT:  I don't think it's just focused on the

11   defendant's ability to get a fair trial.  I think it's focused

12   on the public's ability to have a fair trial as well.

13             MR. EKELAND:  Absolutely, Your Honor.  And we're

14   talking about a Twitter account with about a thousand followers

15   merely retweeting public commentary about this case, and we're

16   not -- first of all, I'm not doing it.

17             I believe we're talking about Mr. Hassard's account,

18   with Mr. Hassard retweeting public articles and commentary

19   about this case.

20             THE COURT:  And translating them into English in ways

21   that U.S. reporters can read them.

22             MR. EKELAND:  Well, this is a public case, Your

23   Honor, and people are --

24             THE COURT:  You're skating on very thin ice here, I

25   have to say.  Let me say this.  I thought I was really clear

1    about this last time.

2          I don't understand how, frankly, Mr. Hassard can have

3    done what he did in light of what I said last time here.  It

4    sort of boggles the mind, frankly.  And the concern is not that

5    it's just a thousand followers for a Twitter account.

6          As we get closer to trial, I have no doubt that there

7    will be press attention on this case, and the press will look

8    at Twitter accounts, and they will look at websites, public

9    websites, and that could end up in the press in ways that could

10   taint the jury pool.  And so I think there's a very real risk

11   of prejudice in this case.

12         The other thing I will say related to this is I don't

13   understand, frankly, what you're doing raising money here

14   because you're CJA counsel.  I don't know if you read the CJA

15   rules, but you either have to be CJA or not.

16         And if you want to -- if Mr. Sterlingov wants to give

17   up his CJA status, that's fine.  But you're not allowed to go

18   out and get paid separately without some special approval, and

19   then you get -- then you have to reimburse CJA for any funds

20   that you receive in that process.

21         So the whole purpose of using this for purposes of

22   raising funds I don't understand as well because I think it's

23   in violation of the CJA rules.  And you have to certify when

24   you file your CJA vouchers that you're not receiving funds from

25   other sources.

1    MR. EKELAND:  We have not applied for -- beyond just

2    getting transcripts in this case -- for that very reason, Your

3    Honor, because CJA is incredibly inefficient, and we don't

4    actually anticipate, even if we were to submit things, getting

5    paid before this trial, which is the reason most people don't

6    do CJA.  So duly noted, Your Honor, but we're --

7    THE COURT:  I think I need to know that, whether

8    Mr. Sterlingov is proceeding CJA or not.  If he wants to

9    withdraw his CJA request, that's fine, but you can't do both.

10   You can't say, well, I'm only seeking reimbursement for

11   transcripts or doing some things and not others, and I'm

12   reserving my right to CJA.  He has to decide what he's doing

13   here.  You can't do both.

14   MR. EKELAND:  Duly noted, Your Honor.

15   THE COURT:  Okay.  You should look at the rules.  It

16   says if you're seeking funding from other sources, you have to

17   get Court approval for doing that.

18   MR. EKELAND:  Yes, Your Honor.  We were seeking

19   funding before this.  But it's duly noted, and I understand the

20   Court's concern, and we will address it.

21   THE COURT:  When can you file your response on the

22   Rule 57 motion?

23   MR. EKELAND:  We were planning on filing that on

24   Friday, which is, basically, a week after they filed theirs.

25   THE COURT:  I see that Mr. Brown is getting up.  I'll

1    give him a chance.

2         MR. BROWN:  If I may be heard, Your Honor.  Your

3    Honor, I think, given that a significant part of the

4    government's concern is tainting the jury pool and, frankly,

5    witness intimidation, calling our expert witness rats and

6    parasites, it's --

7         THE COURT:  It's completely unprofessional, in

8    addition to the concerns you raise, I have to say.

9         MR. BROWN:  Yes, Your Honor.  I think we're also just

10   concerned about the timeline here.  At the June 16th hearing,

11   the Court said I expect this to stop, and if it doesn't, I will

12   enter the motion -- I will enter the proposed order and enforce

13   it by contempt.

14        I don't think that there's -- I don't think that

15   there's a need to stretch this out with full briefing, for them

16   to file a reply, especially given that the clock is ticking,

17   and the longer that these, frankly, despicable messages are up

18   on Twitter continuing to taint the jury pool, continuing to be

19   amplified by Twitter bots and the crypto press --

20        THE COURT:  Are you asking that they be taken down at

21   this point or just that they cease going forward?

22        MR. BROWN:  Well, Your Honor, as long as they're up

23   there, they're tainting the jury pool.

24        THE COURT:  That wasn't my question.  My question

25   was, are you asking that they be taken down or just not posted

```
1     in the future?

2              MR. BROWN:  I think it would be prudent for

3     Mr. Hassard to take down those --

4              THE COURT:  You're not asking the Court to order that

5     he do so?

6              MR. BROWN:  I think that Mr. Hassard has a

7     preexisting duty under the local rules not to make those

8     statements or authorize the release of such statements.  And,

9     yes, I think that if he doesn't take those down, he is in

10    violation of the local rules, and I think that the Court should

11    stand by its words and enforce the local rules.

12             THE COURT:  Well, I --

13             MR. BROWN:  Your Honor --

14             THE COURT:  I try to stand by my word.

15             MR. BROWN:  Yes, Your Honor.  Part of this is the

16    timing.  You know, we are -- what? -- three and a half weeks

17    out from trial.  If we wait another week for the defense to

18    file a pleading and maybe we want to file a reply and maybe we

19    address this at the pretrial conference, by that point the jury

20    is practically selected.  The jury notices have gone out.

21             THE COURT:  I think they're asking for three more

22    days at this point, right?  Defense is asking for three more

23    days to file something?

24             MR. BROWN:  Yes, Your Honor.  But -- fair enough.

25    The government would ask that the Court rule on the motion, you
```

1    know, with alacrity, because this is an ongoing issue of

2    tainting the jury pool and witness intimidation.

3            THE COURT:  What I'm going to do is I'm going to

4    order that nothing else new be posted at this point, and that

5    is an order enforceable by contempt.  And you have an

6    obligation to familiarize yourself with Rule 57.7(b) and make

7    sure you're complying with it.

8            I will point out to you that Rule 57.7(b)(3)(vi) says

9    that, from the time of arrest forward, a lawyer or law firm

10   associated with the prosecution or defense shall not release or

11   authorize the release of any extrajudicial statement which a

12   reasonable person would expect to be disseminated by means of

13   public communication relating to that matter and concerning,

14   among other things, any opinion as to the accused guilt or

15   innocence or as to the merits of the case or the evidence in

16   the case.

17           I think it's pretty clear that rule has been violated

18   here.  And so I'm going to order that, going forward, no

19   further material is made public or released or statements are

20   made in a manner that violates Rule 57.7(b).

21           I will, in addition to pointing to the tweets, also

22   direct that defense counsel look at the law firm website, which

23   I think also contains material that may be in violation of that

24   rule.  I will wait to get the response from the defendant to

25   decide whether I continue that order or modify it in some

1    respect and also to decide whether I direct at that point in

2    time that any material that has already been posted be taken

3    down.

4         All right.  The other thing that I wanted to take up

5    before we turn to the witnesses today is the Rule 17C motion,

6    and I'm happy to be -- to hear from you on that as well.  And

7    since it's the defense motion, why don't I hear from the

8    defense first on that.

9         Is the witness in the room?  I don't know whether

10   there's any issue about whether you want the witness excluded

11   or not for this.  It's up to you-all.

12        MR. BROWN:  No, Your Honor.  I don't think that's

13   necessary.

14        THE COURT:  Okay.  That's fine.  Mr. Ekeland.

15        MR. EKELAND:  Your Honor, at this point, in terms of

16   Chainalysis Reactor, the government can produce no evidence as

17   to its scientific validity or accuracy.  It cannot produce --

18   and it's clearly stated through Chainalysis's Elizabeth Bisbee

19   herself, who, I believe, is the head of investigations for

20   Chainalysis Global Investigations, that they have no known

21   error rates, they can't tell us the rate of --

22        THE COURT:  No.  I've heard that argument from you.

23        MR. EKELAND:  Your Honor --

24        THE COURT:  -- many, many times.  What I really want

25   to get to is just the substance of this motion here.  And I

1    understand the background to it, so you don't need to go

2    through that again.

3              And the question is just what in particular is it

4    that you need and why you need it.  As I think both Chainalysis

5    and the government noted in their responses, I did -- and I was

6    pretty clear about the process that I intended to take place,

7    and you didn't seem to follow that, where I said what I need is

8    you to provide me with some statement by a coding expert or

9    other person with the relevant knowledge to identify to me what

10   is it in the code that you need; what is it the code will

11   reveal.

12             I've reviewed Ms. Still's report, and I understand

13   her concerns with Chainalysis and the government's other

14   witnesses and their expert reports.  But what I still haven't

15   seen is, what is it that the source code is going to reveal?

16   Who is going to look at that and be able to tell us something

17   from looking at it?

18             MR. EKELAND:  Your Honor, that's a little bit of a

19   difficult question to answer because it is a black box.  So we

20   don't know what we're going to see when we open up the hood, so

21   to speak, and see.

22             And what we want to see is the algorithms that

23   they're using to implement their heuristics, as well as what

24   data sets they're using and inputting into this software.  And

25   there's no way -- perhaps, if they could come to us and tell

1    us, okay, well, you know, if they had some error rates or some

2    kind of scientific evidence that it worked.  But they've put us

3    in a position where they can't tell us anything about the

4    accuracy of the software.  I think that entitles the defense to

5    take a look under the hood and see what's going on.

6            THE COURT:  Right.  But you still haven't -- I mean,

7    I get that point.  But you haven't told me who is going to look

8    at it and what they're looking for.

9            I assume that it's not the entirety of all of the

10   code, but there's some portion of the code that reflects

11   heuristic 2 and that you want to see what assumptions go into

12   heuristic 2, and I get that.

13           But I guess what I need to understand is, like, what

14   is it that someone is going to go look for and who is that

15   going to be, and is it somebody who can be subject to a

16   protective order where they will agree that, you know, for a

17   period of, I don't know, five years, they will not compete in

18   the relevant field, or something that would provide assurances

19   to Chainalysis that they're not giving up the formula for Coke

20   to a competitor.

21           MR. EKELAND:  Well, this is a really interesting

22   problem with the government here using private vendors for

23   their investigation running into our client's constitutional

24   right to put on a complete defense.  What we're being told is

25   that IP rights and proprietary rights somehow seem to be

1    trumping his liberty.

2            THE COURT:  No, no, no.  You're not listening to me,

3    Mr. Ekeland.  I'm trying to be helpful to you here.

4            I'm saying give me an expert who can tell me what

5    they want to look at and -- someone who is not their principal

6    competitor, who is an expert in code, who knows and can tell

7    me:  I can look at code, and I can read computer code, and I

8    can tell you, based on reading that computer code, what their

9    assumptions were.  And this is the portion of the code that I

10   would need to look at in order to do that, and here's the rules

11   that I'd be prepared to live by with respect to a protective

12   order to make sure that the company doesn't sustain significant

13   competitive disadvantage.

14           MR. EKELAND:  Your Honor, if those are the parameters

15   the Court wishes for any expert that we have reviewing them, we

16   will find an expert that will meet those parameters.

17           There's never been a moment where we thought that

18   this wouldn't be subject to some kind of protective order in

19   terms of the competitive concerns.  That's not something I

20   really thought deeply about because I'm thinking about

21   defending my client, but I'm sure that fact could be

22   accommodated.

23           So if the Court were to order production of the

24   software, then I think maybe what we could do is then the

25   defense would come to the Court with the named expert and what

 1    that -- he or she would be willing to sign.

 2              THE COURT:  That's why I suggested last time, many

 3    weeks ago -- we're getting very, very close to trial now, but

 4    why I suggested many weeks ago that you sit down and have a

 5    conversation with the government and Chainalysis -- which,

 6    apparently, didn't occur -- and that you tell them, with the

 7    assistance of an expert, exactly what it is you need to look at

 8    and have a conversation about how to facilitate that.  And you

 9    just ignored that direction.

10              MR. EKELAND:  I wouldn't characterize us as ignoring

11    it.  I would just say, Your Honor, that the defense and the

12    government are at loggerheads here, and I think that --

13              THE COURT:  Well, did the conversation occur?  Did

14    you do that?

15              MR. EKELAND:  We have repeatedly asked for the source

16    code.

17              THE COURT:  I know.  I know.  You've asked me about

18    that.  I said, no, you need to do this, and you need to go

19    through this process.

20              MR. EKELAND:  Your Honor, it's the defense's

21    impression that we've, essentially, been told to go pound sand

22    on most of these points and that --

23              THE COURT:  If the government told you that after

24    what I said last time, you should have come back to me and

25    said, Judge, the government won't talk to us instead of just

1    not talking to the government.

2            MR. EKELAND:  Your Honor, we feel, like you said,

3    because of the current schedule, that it's quicker simply to

4    file the motions for early production under 17(c), which is

5    well within Mr. Sterlingov's rights.  If the Court is going to

6    deny that, so be it.

7            THE COURT:  Well, I'm just giving you the procedure,

8    and you're ignoring my procedure.  So you're the one who is

9    denying it, not me.  And you're not speeding things up; you're

10   slowing things down by ignoring the Court's orders.

11           MR. EKELAND:  Your Honor, we have been asking for the

12   source code since day one on this case.

13           THE COURT:  Yes, on a list of 80-plus items.  By the

14   way, I went back and read that.  It was not even clear to me

15   you were even asking for the source code on that extremely long

16   list, which I previously characterized as an example of what

17   you're not allowed to do under Rule 17(c), of using it like

18   civil discovery and asking for everything you can possibly

19   imagine.

20           And maybe, possibly buried in there was a request for

21   source code, although, my recollection is it dealt with source

22   code provided to some other entities.  It was unclear to me

23   that you were even asking just for the source code in that

24   original request.

25           But I'm still -- I guess I still have my question

1    here, though.  I don't want my frustration with the fact that

2    you're not following my directions to interfere with what I

3    think is a legitimate concern that you have.  I do think it's

4    fair that you understand what assumptions were applied in the

5    Reactor analysis.  I want to find some way for you to get that.

6         I just -- you need to work with the Court and with

7    government counsel and with Chainalysis in a way that achieves

8    that.

9         MR. EKELAND:  Your Honor, if the Court orders

10   production, early production of the source code, we will name

11   an expert who is willing to sign a protective order governing

12   the discovery.

13        Again, I mean, given what we've learned so far about

14   this source code, I mean, I think it's arguably exculpatory

15   what's going on in here.  There's bigger issues here just

16   beyond 17(c).

17        And I think this is a major problem when you have

18   private vendors coming in, especially in this new space, where

19   this has never been done before.  You say we're asking for

20   these extensive discovery requests, but this is a case unlike

21   almost any other in the history of federal courts.

22        It's the first time that this kind of blockchain

23   forensics and this kind of stuff has come up before, and these

24   rules, these horse-and-buggy rules about discovery severely

25   hamper the defense in a situation like this.  And we don't feel

1   like we've been given full access to what we need to defend

2   Mr. Sterlingov.

3           You know, he's been locked in jail based on what

4   appears to the defense to be junk -- junk science with no

5   scientific evidence supporting it; it's well-documented in the

6   case.  Now we're asking to see the basis of what that software

7   is doing to put him in jail.

8           THE COURT:  And you're not complying with the Court's

9   direction about how to do that.  You're ignoring what I told

10  you weeks ago.  I'm sorry.  I'm speaking.

11          If there's anybody who is responsible for the delay

12  here, it's you.  You start off by serving discovery requests

13  under Rule 17 that no one who has taken first-year criminal

14  procedure could possibly think were appropriate.

15          You then, weeks later, come back at the Court's

16  direction and focus more directly on the source code.  I tell

17  you what you need to do to do it, and you ignore me.

18          MR. EKELAND:  Your Honor, I respectfully disagree

19  with that characterization.

20          We have filed a Rule 17(c) subpoena asking for early

21  return of the source code.  And, as we said, if the Court

22  orders that early return, we'll find an appropriate expert, and

23  we'll craft an appropriate --

24          THE COURT:  But you're just standing things on their

25  head.  I told you to find the expert so the expert can tell me

1    what the expert needs to see in the source code and then talk

2    to the government about that.  And now you're saying, just give

3    us the code, and we'll go find an expert.  That's just the

4    opposite of what I told you to do.

5              MR. EKELAND:  No, Your Honor.  Perhaps, before we

6    spend the resources -- what are very limited resources for the

7    defense, that if we --

8              THE COURT:  They're not limited resources.  There's

9    CJA available.  I know you don't like CJA.  Every other CJA

10   lawyer who appears in front of me, it works just fine.

11             I just finished a nine-week trial in which I must

12   have approved hundreds of CJA vouchers.  I'm sure there were

13   hundreds of CJA vouchers, including many experts in the

14   process, and it all worked fine.  I don't know what your

15   experience with the process is, but it works fine for everybody

16   else.

17             MR. EKELAND:  Your Honor, it took about two to three

18   weeks for the CJA from the federal defenders to even return my

19   phone calls.  But I understand, Your Honor.

20             So the defense seeks early return on the 17(c)

21   subpoena of the source code to Chainalysis.  If the Court

22   orders it before production of that source code, we're happy to

23   produce the name of an expert for review of that source code.

24             THE COURT:  And what is the expert going to look at?

25             MR. EKELAND:  He wants to -- he or she will look at

1    the source code and analyze the algorithms that are being used

2    to implement the heuristics, as well as the data set that

3    Chainalysis Reactor is using to implement its algorithms.

4        This is not open source.  It's not an open-source

5    blockchain explorer like a lot of stuff out there.  There's a

6    reason for that.  And it's not as simple as just going onto the

7    blockchain and seeing what's going on.  And that's because of

8    the heuristics.

9        And the heuristics, of course, as this Court well

10    knows, is based on assumptions and is making probabilistic

11    assumptions which are fundamental to the government's money

12    laundering charges against Mr. Sterlingov.

13        I mean, like, this is the -- this case has no

14    corroborating evidence, none whatsoever, outside of this

15    heuristic software, which is a complete black box, and which is

16    shocking that it's been marketed to the government, it's being

17    used by DOJ without anybody ever checking the accuracy of it,

18    ever.

19        And so what we're asking to do, Your Honor, is look

20    under the hood.

21        THE COURT:  All right.  What I'm going to do -- and I

22    think that it's appropriate -- is anyone here from Chainalysis,

23    Counsel?

24        MS. PELKER:  No.

25        THE COURT:  No?  Okay.  So what I think I need to do

1    is I'm going to give you the same order I gave you last time.

2    Go find that expert, have that expert write down what it is the

3    expert needs to look for in the source code.  Come up with a

4    plan for how you do that, discuss it with Chainalysis, discuss

5    it with the government.  I'm not saying you need to reach

6    agreement, but you need to discuss it with them.

7            We'll come back on Monday or Tuesday; and I'll just

8    ask the deputy clerk to find a time when we can do this on

9    Monday or Tuesday.  I will -- if the government can let counsel

10   for Chainalysis know that we're going to be taking up that

11   motion on this date so they can be present, and we will get

12   into this.

13           As I've said repeatedly, I don't doubt that you're

14   entitled to understand what the assumptions were that applied,

15   but it doesn't simply mean Chainalysis turning over all of its

16   source code without any foundation being laid on the lines of

17   what I've indicated needs to be laid.

18           So, among other things to discuss, is if this is

19   going to take place, is who is it going to be?  Is it someone

20   that Chainalysis would be comfortable being subject to the

21   protective order, what is it, what portion of the source code

22   are they going to need to look at, where are they going to look

23   at it, under what conditions and so forth?  Okay?

24           Tell me what time we can come back to do this.

25   Monday at 11:00?

1          MS. PELKER:  Your Honor, the government can

2    communicate that with counsel for Chainalysis, but if they are

3    not able to make it out in person, would a Zoom appearance by

4    them be appropriate?

5          THE COURT:  If that's what they're comfortable with,

6    that's okay with me.  As I've indicated before, I have some

7    questions about the government's standing on this question,

8    although I do think it may affect just the trial process, and

9    maybe the government has a standing to raise the issue as to

10   the extent it could interfere with the smooth administration of

11   the case.

12         But I do need to hear from Chainalysis on this.  I do

13   have some questions for the government as well on this.

14         MS. PELKER:  Yes, Your Honor.

15         THE COURT:  Why not simply provide the defense at

16   least with a license for the Reactor so they can run it?  It

17   does seem that it's pretty unfair to put them in a position

18   which they can't even run the same analysis that the

19   government's expert has run.

20         MS. PELKER:  So I think two questions there.  Whether

21   they can run the same analysis -- and I think that Ms. Still's

22   report shows that they have run the same analysis and can run

23   the same analysis.  The question of whether --

24         THE COURT:  Well, how can they run the same analysis

25   without Reactor?  Because Reactor has the heuristics in it that

1    Ms. Still doesn't have, and I don't think she even knows

2    precisely what the assumptions are or how they're weighted in

3    the analysis.

4        MS. PELKER:  So, again, this is just a misconstruing

5    by defense counsel of what the heuristics do.  The heuristics

6    are not for the address-to-address tracing.  The heuristics are

7    for building the cluster.

8        So the heuristics help to inform that this list of

9    900,000 addresses are Bitcoin Fog.  CipherTrace has their own

10    heuristics and, actually, have come up with fairly similar

11    lists of addresses under CipherTrace's heuristics that they

12    also say are Bitcoin Fog.

13        But we've given them the list of addresses for what

14    are Bitcoin Fog, what is Silk Road, what is Silk Road 2.

15        THE COURT:  You've given a list of addresses that

16    your expert has concluded or associated with those.  Defense

17    disagrees, at least, and says there may be some overlap, but we

18    don't agree 100 percent.

19        In fact, I think Ms. Still said, with respect to the

20    second heuristic, that she disagrees and that that could

21    introduce a 60 percent or so difference in the bottom line.

22        MS. PELKER:  I think that that highlights the defense

23    has been able to use the information that we've provided in

24    discovery, the information about the heuristics for them to

25    take a look at the data set and say, these are the portion of

1    the addresses that we disagree with; our expert is looking at

2    them, and she is going to take the stand and issue her expert

3    opinion that these addresses are not Bitcoin Fog.

4          And that's all -- and then the government expert is

5    going to come on and say, we believe that these are Bitcoin

6    Fog.  And we have a classic battle of the experts here, of two

7    experts looking at a large data set and coming to different

8    conclusions.

9          THE COURT:  Right.  But how do you cross-examine the

10   government's expert if the government's expert says, well, I

11   used -- I ran it through Reactor -- and I'm not a coder, so I

12   don't know exactly what the assumptions were?  I can describe

13   to you in general what they are.  And I understand in general

14   what the heuristics are, but I can't really answer precise

15   questions about exactly how they apply because that's all in

16   the code, and I didn't write the code.

17         MS. PELKER:  Your Honor, I don't think that this is

18   actually a fair characteristic from defense about the detail

19   that is in Ms. Bisbee's report.  She actually goes through a

20   fairly detailed list of what goes into heuristic 2, which is a

21   behavioral heuristic which is customized for each cluster.

22         I think that defense counsel can, on

23   cross-examination, ask her about whether there could be

24   misclustering based on heuristic 2.  Ms. Still is going to come

25   in and say that there was potentially misclustering based on

1    heuristic 2.

2              But Ms. Bisbee's report puts out in a fair amount of

3    detail all of the different things that go into heuristic 2,

4    and that's not really a source-code discovery issue.

5              THE COURT:  I -- I turned this to the source code.  I

6    want to go back, first, to the question of why not just give

7    them a license so they can run it and see if they get the same

8    results?

9              MS. PELKER:  So this is -- we're not stopping defense

10    from getting a Chainalysis Reactor license.  It's, frankly,

11    baffling to us that they haven't gotten one.

12              THE COURT:  How much does a license cost?

13              MS. PELKER:  I don't -- I don't know, Your Honor,

14    because ours are in bulk contracts, and we're not part of the

15    contract.

16              But most -- there are lots of experts offering their

17    services to private entities who have multiple licenses, so

18    that they could have chosen to hire an expert who has

19    experience in Chainalysis, who has a Reactor license.

20              I don't know what the stand-alone cost is for a

21    Reactor license.  The government just doesn't have any greater

22    ability to buy that for defense counsel than defense counsel

23    does for themselves.

24              But defense counsel can use CJA funds, can use all of

25    their fundraised funds to either get a license just for

1    themselves or hire an expert who has access to Chainalysis

2    Reactor who knows how to use it.

3            THE COURT:  And what about -- how do I make sure that

4    the defense knows what the assumptions are that goes into the

5    heuristics?  I understand that Ms. Bisbee in her report

6    identifies the behavioral heuristic with some level of

7    specificity, but it's still not a level in which there's any

8    sense of how much weighting goes into particular behavioral

9    activity.

10            There's not an ability to test to see whether it,

11    really, actually is measuring that behavior, how it goes about

12    measuring that behavior, whether it double-counts or

13    triple-counts by mistake; anything that might affect the bottom

14    line.

15            And I do think it's fair that the defense have some

16    opportunity to test that and to say, not only do we disagree

17    generally with the behavioral heuristics and think that

18    behavioral heuristics are not reliable, but here it's

19    particularly troubling because X, Y, and Z, and we don't know

20    what the X, Y, and Z is unless we know how the behavioral

21    heuristic actually applied in this case.

22            MS. PELKER:  So, again, I would just point back to

23    Ms. Bisbee's report where she lists through all the different

24    parameters that go into the behavioral clustering.  Part of

25    behavioral clustering is that it is tailored to the behavior of

1    each entity.  And so Ms. Bisbee explained how they,

2    essentially, fingerprint an entity and look for how that

3    particular entity behaves.

4           And for Bitcoin Fog, I think that there's a very

5    detailed walk-through in the expert report for both Ms. Bisbee

6    and Mr. Scholl of how they looked at the activity within the

7    Bitcoin Fog cluster and how that's actually behaving.

8           THE COURT:  So I do think that the government has to

9    work with the defense on this and find some way to provide some

10   greater transparency into it and not just take Ms. Bisbee at

11   her word that these are the behavioral heuristics, but also to

12   know that they actually were applied or how they were applied

13   and to be able to test that in some way.

14          And so I would encourage you, in the same way that I

15   encourage Mr. Ekeland, to confer about this.  Because I do

16   think it's fair that the defense, to use Mr. Ekeland's words,

17   be able to look under the hood.

18          And if the government is going to rely on this as an

19   important part of its case -- and I think perhaps the defense

20   maybe overstates exactly how central it is to the government's

21   case, but it's an important part of the case; may not be the

22   entire case -- I think that there has to be some way for them

23   to be able to look under the hood and -- just to verify that

24   the computer software is doing what Ms. Bisbee indicates it

25   does and that it's doing it in a manner that is accurate, or at

1    least they have some sense of how it's doing it.

2                I don't have a firm view on the best way to do

3    it.  I'm not adept enough at coding to know whether someone can

4    just pick up lines of code and look at it and know from looking

5    at the lines of code what it is.

6                Or if the better way to do it is to have somebody who

7    was involved in the coding sit down with somebody from -- an

8    expert who would be subject to a protective order from the

9    defense and say, I can walk you through it.  You don't need all

10   our code here; let's spend two hours sitting in front of the

11   computer, and I'll show you what we did here so you can

12   understand it; something along those lines.

13                MS. PELKER:  Understood, Your Honor.

14                THE COURT:  Two hours may be an underestimate.  I

15   don't know.

16                MS. PELKER:  We'll definitely take that back.  I

17   think the government reiterates its concern that we are just

18   over three weeks out from trial.  I think the Court has been

19   very clear, government and Chainalysis have both reiterated

20   that the defense is not coming back with any sort of

21   specificity.

22                I don't know how they're going to get a coder in the

23   next several days who has the actual expertise to do the review

24   that they need and, given who the defense has hired as experts

25   in the past, I am concerned about who they're going to be

1    bringing.

2         THE COURT:  Well, that was part of my frustration

3    earlier with Mr. Ekeland in that I thought I was pretty clear

4    about this weeks ago, and I share your concern about how close

5    we are to trial, and I also share your concern about making

6    sure that you have somebody who can do this meaningfully.

7         If they have somebody who can't do it meaningfully,

8    it's just not going to help them much, and that's their choice.

9         MS. PELKER:  Yes, Your Honor.

10        THE COURT:  Okay.  Thank you.

11        Mr. Ekeland, could you come back up for a second.  Do

12   you know how much the license costs for a one-time use?

13        MR. EKELAND:  I've heard anywhere between 50- and

14   $100,000, Your Honor.  I haven't gone and actually confirmed

15   that, but that's what I've been told by a number of people.

16        THE COURT:  And what about Ms. Pelker's suggestion of

17   just having an expert who has a license to run it for you?

18        MR. EKELAND:  It's the defense's position that we

19   should be able to choose the experts that we'd like to work

20   with, and we've been extremely limited in terms of funding.  We

21   didn't have CJA for a while.  It sounds like we now may need to

22   withdraw the CJA and --

23        THE COURT:  That's up to you.  I mean, I have no idea

24   how much money you've raised privately.

25        MR. EKELAND:  Well, Your Honor, it's the defense's

1    position that if the government is going to prosecute somebody

2    using a private proprietary black box software, they should

3    make it available to the defense, and the defense should not --

4    particularly after the government has seized all the

5    defendant's assets -- have to shell out 50- to $100,000.

6              THE COURT:  You're not shelling a penny out as long

7    as you use CJA.  If that's $100,000 and you need to come back

8    to me, and if I conclude it's central to the case, I may

9    conclude that it's appropriate to authorize that payment.

10             MR. EKELAND:  Your Honor, it's basically our

11   experience with CJA so far, with the pace at which it moves,

12   that we do not expect to see any money from CJA, if we even got

13   these applications until after the trial, and that's the --

14             THE COURT:  I just don't think that's true.  I have

15   done this hundreds of times in the past where I have authorized

16   CJA payments, and they've been made.  It's just -- I have

17   authorized them in many cases for translators, experts,

18   investigators who are paid in real time.  It's just not true.

19             Maybe the counsel ordinarily doesn't get paid until

20   the end of the case unless they file an application for interim

21   payment, but it's just not correct that you can't get paid for

22   your experts as you go.  I don't think you've tried, as far as

23   I can tell.

24             MR. EKELAND:  Your Honor, after repeatedly calling

25   the CJA liaison at the federal defender's office and having to

1    wait sometimes two to three weeks for a return phone call, you

2    can --

3              THE COURT:  Just submit the form.  Go online and get

4    the form and submit it to me.

5              MR. EKELAND:  Very well, Your Honor.

6              Is the Court telling the defense that you would

7    authorize somewhere between 50- and $100,000 for the

8    Chainalysis Reactor license?

9              THE COURT:  Well, I might.  I need to know.  I would

10   need to see an application for it, and I guess I'd also need to

11   understand whether that is the most cost-effective way to do

12   it; and if there's somebody who you could retain for $20,000 to

13   run the analysis for you, who already has the license, and the

14   person is -- there's no reason to think the person is biased in

15   favor of the government in any way and just someone out there

16   who has a license who can do this, then I would think you ought

17   to take the more cost-effective approach.

18             But my bottom line is that I think you're entitled to

19   run the analysis and to make sure you get the same result using

20   Reactor, and we'll find a way to do it.  But I would direct

21   that it be done in the most cost-effective way possible.

22             MR. EKELAND:  Your Honor, the defense would submit

23   that the most cost-effective way for it to be done is simply

24   for Chainalysis and the government to give us access to the

25   software, which would cost them nothing.  They can simply grant

1    us a license to use it for the limited purposes of this case.

2    I don't see why anybody has to shell out any money.

3                THE COURT:  I don't think I have the authority to

4    order that a private vendor give you something for free.  If

5    they license things and sell it, I think we just need to pay

6    them for it.  We'll find a way to pay them for it if that's the

7    way it works.

8                MR. EKELAND:  The defense objects to that.

9                THE COURT:  You object to the Court paying --

10               MR. EKELAND:  Your Honor, I think the Court is well

11   aware that we think there's a constitutional issue here with

12   the use of private vendors by the government and the government

13   being, in the defense's opinion, able to avoid its discovery

14   allegations by simply saying, well, it's a private vendor and

15   we can't produce it, but I think we've noted that in our

16   papers.

17               THE COURT:  I think you have my marching orders on

18   this.  As I say, as with access to the code, this is very late

19   in the day, and I really, quite frankly, think it is the

20   defense to blame for that fact that we're so late in the day

21   that this is being teed up.  I realize that this is central to

22   the case, and I'm going to give you the opportunity.

23               But I do direct that you follow my instructions

24   promptly and that you find out how much the license is and you

25   contact them and ask them how much a license would be, and you

1    also see if you can find somebody who has a license who can do

2    this for you and how much they would charge.  And then I'll

3    want to know when we come back on Monday what those two costs

4    are.  And if I need to authorize a payment at that time, I'll

5    do so.

6                MR. EKELAND:  Duly noted, Your Honor.  Thank you.

7                THE COURT:  Also, you need to decide whether you're

8    CJA or not.  I can't authorize the payment from the Court if

9    you're not CJA -- or if Mr. Sterlingov is not proceeding

10   pursuant to the CJA.

11               MR. EKELAND:  Understood, Your Honor.

12               THE COURT:  All right.  I think we're now ready to

13   hear from Ms. Still, but we probably ought to take a break to

14   give everyone a chance to rest for a moment.  Then Ms. Still

15   can take the stand, and we'll see where we go from there.

16   Thank you.

17               (Recess taken.)

18               THE COURT:  All right.  Mr. Ekeland, you can call

19   Ms. Still.

20               MR. EKELAND:  Thank you, Your Honor.  The defense

21   calls Jonelle Still of CipherTrace.

22               THE COURTROOM DEPUTY:  Would you please raise your

23   right hand.

24               (Witness sworn.)

25               THE COURTROOM DEPUTY:  Thank you.  Please be seated.

```
 1              THE COURT:  All right.  You may proceed.
 2                      DIRECT EXAMINATION OF
 3                          JONELLE STILL
 4    BY MR. EKELAND:
 5    Q.  Good morning, Ms. Still.  Do you have the binder up there?
 6    A.  I do not.
 7              MR. EKELAND:  Your Honor, may I approach, please?
 8              THE COURT:  You may.
 9              MR. EKELAND:  May I proceed, Your Honor?
10              THE COURT:  You may.
11    BY MR. EKELAND:
12    Q.  Ms. Still, could you just briefly describe your educational
13    background for the Court.
14    A.  Yes.  I have a degree in radiologic technology --
15    Q.  If you could just put the microphone closer.
16    A.  It really needs to be that close?  Okay.  Excuse me.
17              I have an associate's degree in radiologic
18    technology, I have a bachelor's degree, and I have two master's
19    degrees; one in international trade and economic diplomacy, and
20    the other in international policy and development with a focus
21    on financial crimes and Arabic.
22    Q.  And where do you currently work?
23    A.  I work at CipherTrace by Mastercard.
24    Q.  And what do you do for CipherTrace?
25    A.  I am director of investigations and intelligence.
```

1    Q.  And how long have you been with CipherTrace?

2    A.  March 2020.

3    Q.  And did you start as a director of investigations?  How did

4    you start at CipherTrace?

5    A.  I began my career as an unpaid intern at CipherTrace prior

6    to being acquired by Mastercard.

7    Q.  And so you went from being an unpaid intern to being, I

8    believe you said, director of investigations at CipherTrace?

9    A.  Yes, sir.

10   Q.  Could you maybe just talk a little bit about that journey

11   and the experience you gained on that journey.

12   A.  This was the beginning of the lockdowns, COVID.  So this

13   was a bit of a career change for me.  Prior to that, I was

14   focused on weapons exports and working with the U.S. State

15   Department.

16        During COVID, I lost that position.  I went back to

17   school.  We were locked down.  And my professor suggested that

18   I take CipherTrace courses.  This was the CTCE.

19   Q.  And what does that stand for?

20   A.  Cryptocurrency Tracing Certified Examiner.

21   Q.  And you completed that training?

22   A.  Yes, I did.  My current boss, Pamela Clegg, was the

23   teacher.

24   Q.  And then did you do any other training with CipherTrace?

25   A.  Yes, I did.  I did a number of other courses and helped

1    develop courses as well through CipherTrace.  To be clear, I

2    began as an unpaid intern, but I quickly took over organizing

3    as a co-chair the Defenders League, which is the pro bono

4    arm -- or was the pro bono arm of CipherTrace.

5            Unfortunately, this program was paused, as it was too

6    popular.  We had thousands of cases and reports of theft,

7    fraud, scam, et cetera, to this, and we could no longer -- we

8    did not have the staff to take cases.

9    Q.  And as part of your role at CipherTrace, do you do

10   blockchain tracing of Bitcoin transactions?

11   A.  Yes.  And other chains as well.

12   Q.  And do you train law enforcement organizations?

13   A.  I train most law enforcement in most countries.

14   Q.  And can you just name some of those law enforcement

15   organizations that you do training for.

16   A.  Yes.  Training with Europol, Interpol, CEPOL, LaGuardia

17   Seville, Spanish national police, Greek police.

18   Q.  And do you do any training for American or United States

19   law enforcement organizations?

20   A.  And U.S. government agencies as well, like the IRS, Secret

21   Service.

22   Q.  Any other organization -- American law enforcement

23   agencies?

24   A.  I work with the FBI, and I'll be training them here in

25   about a week.

1    Q.  And just calling your attention to what's behind Tab A in

2    that binder in front of you, if you could just take a look at

3    that for a second and just look up when you're done looking at

4    it.

5         And that's your supplemental summary of qualifications

6    as an expert witness; is that correct?

7    A.  Yes, that's what I see.

8    Q.  And that's your signature on the fifth page?

9    A.  Yes.

10   Q.  And this is an accurate statement of your summary of your

11   qualifications?

12   A.  Yes.

13        MR. EKELAND:  Your Honor, we'd just like to move

14   what's been marked for identification as the Defendant's

15   Exhibit A into evidence.

16        MS. PELKER:  No objections, Your Honor.

17        THE COURT:  Exhibit A is admitted.

18        (Defense Exhibit A was admitted.)

19   BY MR. EKELAND:

20   Q.  Ms. Still, if you could turn to what's behind Tab B, and

21   just -- when you're done looking at that, just look up.

22   A.  That is my CV.

23   Q.  And is that -- that's an accurate CV for you at this

24   current time?

25   A.  Yes.

1          MR. EKELAND:  Your Honor, at this point in time the

2   defense would like to move what's been marked for

3   identification as Defendant's Exhibit B into evidence.

4          MS. PELKER:  No objection.

5          THE COURT:  Exhibit B is admitted.

6          MR. EKELAND:  Thank you.

7          (Defense Exhibit B was admitted.)

8   BY MR. EKELAND:

9   Q.  Ms. Still, you wrote an expert report in relation to this

10  case, correct?

11  A.  Yes.

12  Q.  And directing your attention to what's behind Tab C in your

13  notebook, is that your expert report?

14  A.  Yes.

15  Q.  And that expert report also had a PowerPoint attached to

16  it?

17  A.  Yes.

18  Q.  And if you could look behind Tab D.  And is that your

19  PowerPoint?

20  A.  Yes, this is my PowerPoint.

21         MR. EKELAND:  Your Honor, at this point in time the

22  defense would like to move what's been marked for

23  identification as Defendant's Exhibits C and D into evidence.

24         MS. PELKER:  No objection, Your Honor.

25         THE COURT:  Exhibits C and D are admitted into

1    evidence for purposes of today's hearing.

2              MR. EKELAND:  Thank you, Your Honor.

3              (Defense Exhibits C and D were admitted.)

4    BY MR. EKELAND:

5    Q.  Ms. Still, do you think it would be helpful to the Court,

6    just as background for you explaining your expert report, if we

7    went through your PowerPoint first?

8    A.  This would be good for everyone to understand, yes.

9    Q.  Thank you.

10             MR. EKELAND:  Your Honor, if we may, I'd like to go

11   through the PowerPoint with Ms. Still.  Mr. Hassard, if you

12   could put up the PowerPoint for us.

13             THE COURT:  That's fine.

14             THE COURTROOM DEPUTY:  You've got to give it a

15   minute.

16   BY MR. EKELAND:

17   Q.  Ms. Still, can you see the PowerPoint in front of you?

18   A.  Yes, I can.

19   Q.  Can you please take us through the PowerPoint and just

20   direct Mr. Hassard when you want to move to the next slide.

21   A.  Yes, sir.  Next slide, please, Mr. Hassard.

22             Okay.  So as an investigator, there are really two

23   things that I need to understand.  The source of the data, the

24   way that data is collected; we call that attribution.  And then

25   how that tool actually works and how the clustering algorithms

1    work as well.

2         So this is a photo of a black box indicating that

3    black box analytics hinder my ability to do that as an

4    investigator.  Next slide, please.

5         Credible analytics include active, live accounts.

6    This is something CipherTrace does.  We will go to the

7    exchanges.  All exchanges sign up for accounts.  We will pay

8    into those exchanges, we will remove money from those

9    exchanges, and we will be able then to trace out those hot

10   wallets and, essentially, gain attribution through that action.

11        Dark market, deep web, full chain nodes, we run a

12   couple hundred Bitcoin nodes ourselves.  And we also scrape the

13   deep web for information, blockchain addresses, et cetera.

14   Active hunting and targeting; private would be verified user

15   feedback.  For example, if I were to gain information via

16   subpoena on a particular address or a set of addresses

17   belonging to a certain entity, then I -- I could then use that

18   as my evidence to submit that to our attribution team, and then

19   that data would be updated.

20        Other analytics may use unverified databases and open

21   forums.  For example, there's a forum called Bitcoin Abuse, and

22   so people will put into this particular website making claims

23   of certain fraud, scams, thefts related to cryptocurrency, and

24   they will oftentimes post addresses.  So we do not include data

25   like this.

1          However, some black box companies do include that

2     data.  We don't do it because we can't verify it, and it's

3     critical for us to be able to verify the source of our

4     attribution and have that complete audit trail from the time of

5     collection all the way through for every single point, right?

6          So any changes that may be made to that attribution.

7     Let's say, for example, we have an exchange address, deposit

8     address for Binance.  This happens often with Binance, right?

9     And we think it's Binance.  However, Binance comes back after a

10    subpoena and says this isn't our account.

11         What does that mean?  Binance is actually saying that

12    that's a separate entity using them for liquidity.  So they're

13    like what we call our message exchange.  Some term it parasite

14    exchange, but Binance knows who is actually signing up for

15    their accounts.

16         So black box, unauthorized customer data, unverified

17    user feedback, and clustering errors and false positive.  This

18    increases the errors.  I don't know by how much, but this

19    increases errors.  So I would not -- I am not comfortable using

20    a black box tool.

21    Q.  What do you mean by unauthorized customer data?

22    A.  For example, if someone were to use an API to input a bunch

23    of addresses utilizing one of the blockchain analytics firms,

24    and they're not aware that that data is being collected,

25    something like this.

1    Q.  So would it be fair to say that that's just collection of

2    user or customer data without the customer's knowledge?

3    A.  Correct.

4            THE COURT:  And when you referred to Binance

5    contacting, was it you or someone else, and indicating that it

6    wasn't their account, is that something you would use or not

7    use?

8            THE WITNESS:  No.  So we would have to figure out

9    then -- law enforcement -- essentially, what you do is you back

10   the trace up one step and then resubmit the subpoena, and then

11   they will tell you who it is.

12           THE COURT:  I see.  Okay.

13           THE WITNESS:  So then you'll get the correct

14   attribution and then, therefore, we could use that.

15           THE COURT:  Okay.

16   BY MR. EKELAND:

17   Q.  But did I understand you to say that you have to verify it

18   by some way; you just couldn't rely on it as is?

19   A.  Correct.  Next slide, please.

20           So oftentimes customers of blockchain analytics

21   companies do not understand the type of model that they're

22   using.  They may not even be aware that a black box model

23   exists.

24           What I mean by that is customers are not aware that,

25   within the black box model, decisions may be made on their

1    behalf, but they are not aware those decisions are being made.

2    For example, if we have any automatic peel chain clustering --

3    right? -- this is going to heuristic 2 in a bit.  This is what

4    I'm talking about.

5              Model validation, so that's determining how that

6    particular algorithm or model is actually applied and how it

7    works in the tool itself.  That can verify the accuracy of the

8    data enrichment.  It checks the actual application, the

9    performance of the model itself; is it doing what it's supposed

10   to do.

11             Okay.  So for these companies, it's critical that you

12   have well-documented processes, that your data is fully

13   auditable, that there is an audit trail, and that we can go

14   back using external or independent verification of the data of

15   the models.

16   Q.  And as far as you're aware, is there any model validation

17   for Chainalysis Reactor?

18   A.  No.  I believe they actually testified that there was not.

19   Q.  And as far as you are aware, is there any audit trail for

20   Chainalysis Reactor?

21   A.  That's unclear.  I have asked for the source of the data.

22   So that would be the source, how do they gain attribution on

23   particular addresses.

24             And I'm thinking all of -- what was it, like, eight

25   or so dark markets and then we have Bitcoin Fog.  It's critical

1    for me to understand where that source attribution came from,

2    right?

3    Q.  Why is it critical?

4    A.  I need to know how it was gained and then, throughout the

5    entire process, that audit trail.  Was that attribution ever

6    changed?  Where did it come from?  Did it come from a

7    third-party vendor?  Did it come from unverified user feedback?

8    Did it come from a forum?  I don't know.  This could change the

9    way that we view the accuracy of the attribution.

10          Next slide, please.  All right.  So clustering

11   approaches.  Right?  So we've covered data.  Now I need to

12   understand how these tools cluster.

13          What I mean by that is right up here on the screen,

14   right?  So left-hand side we have something called separated

15   clusters.  These are truest to the actual transactions that

16   occur on-chain.  That is, if you were to go and use

17   WalletExplorer or any other publicly available tool, you will

18   see addresses co-spending together like this.  So we cluster

19   via co-spend, right?  This is what that means.

20          So at the top, 1JRE and 32L9 never co-spent together.

21   Their clusters do not touch.  They both belong to the same

22   entity, but they've never intersected on-chain.  So we keep

23   them separate for that accurate representation.  It also makes

24   auditing a lot easier as well.

25          On your right-hand side, we have something called

1    single-entity clustering.  This combines all of those clusters,

2    as you can see, into one giant cluster.  So this gives you a

3    great quick high-level overview.  This is great for

4    intelligence gathering.

5            If you want to understand entity interactions on a

6    high level, this is really good for that.  It won't be at the

7    diagnostic level, but you will get an overview of how entities

8    interact with one another.

9            However, separating out these clusters can be

10   difficult.  Perhaps it can be done on the back end, depending

11   on the tool and the company, but to separate them out as an

12   investigator, first the investigator has to know that maybe

13   that's something that they want to do.  So it depends on the

14   training and the education that the company provides their

15   users.

16           This kind of data, when it is all lumped together,

17   sometimes it can lead investigators down the wrong path.

18   Q.  And do you know what type of clustering Chainalysis Reactor

19   utilizes?

20   A.  Reactor uses the right-hand side, single-entity clustering.

21   Q.  Am I right to read that -- you've got down on the bottom

22   right of the slide that with that kind of single-entity

23   clustering, there's a higher probability of false positives and

24   errors?

25   A.  Definitely.  And we actually respond to requests from

1   Chainalysis customers.  Sometimes they're shared customers,

2   like law enforcement, regarding Chainalysis tracing.

3              THE COURT:  Can you walk me through this again.  I'm

4   not sure I understand what single-entity clustering is.  I

5   mean, the separated clustering, I take it, is just based on

6   co-spend, right?

7              THE WITNESS:  Yes, Your Honor.

8              THE COURT:  So you're clustering based on the

9   co-spend, correct?

10             THE WITNESS:  Yes, Your Honor.

11             THE COURT:  Go ahead.  So how are you clustering for

12  single-entity clustering then?

13             THE WITNESS:  Single-entity clustering would include

14  all heuristics.

15             THE COURT:  I see.  It's co-spend, but it's also then

16  what Chainalysis refers to as heuristic 2 and heuristic 3?

17             THE WITNESS:  And any other sources of data; any

18  other unnamed heuristics will show up on the graphical explorer

19  as one giant cluster.  You can see this in some of the IRS

20  traces.

21             THE COURT:  Okay.  Thank you.

22  BY MR. EKELAND:

23  Q.  You mentioned briefly, to the extent that you heard --

24  you've had Chainalysis customers come to CipherTrace to, I

25  believe, discuss problems that they were having with

1   Chainalysis.  To that extent, without revealing any customer

2   confidence, can you just describe some of the typical things

3   that you're getting told about Chainalysis Reactor?

4   A.  So it's the same type of repeated mistake that I see.  And

5   this mistake is not understanding the difference between

6   single-entity clustering and separated clusters.  So

7   mistakenly, the investigator will use single-entity clustering

8   not on a diagnostic level, but to determine true interactions

9   between entities and particular unspent transaction outputs,

10  which are termed UTXOs.

11  Q.  What's the consequence of that?  Do I understand you

12  correctly that your testimony is that that leads to errors;

13  attribution errors?

14  A.  Not only does it lead to errors, but at one point -- and

15  we'll cover this here in one of the case studies -- it can lead

16  to assumptions that a particular entity engaged in terrorism

17  finance.

18  Q.  Is that -- you're saying that case -- I guess we'll get to

19  the case study.

20  A.  Yes.

21          THE COURT:  I just want to -- before we move to the

22  next slide -- make sure I understand this slide.

23          What you're referring to as separate clusters and

24  single-entity clusters  might be labeled differently as simply

25  saying co-spend clusters and all heuristic clusters?

```
1                   THE WITNESS:  That's a way of saying it.

2                   THE COURT:  All right.  Thank you.

3                   THE WITNESS:  Next slide, please.

4              So this is an example of how that attribution and the

5       source of that attribution will differ depending on the

6       cluster.  So on the left-hand side, we have the DOJ civil

7       complaint, August 13, 2020, related to Al-Qassam Brigades,

8       which is the military name for Hamas.

9              Down below you can see this address beginning with

10      the 3.  That source of attribution for this address comes from

11      the civil complaint.  So when we're audited and they say,

12      what's the source of attribution for this, if this address

13      co-spends with other addresses, they will also then be

14      included, and that their source will be via co-spend, but 3LH

15      will be via here, the civil complaint.

16             So it's important then to understand that the way

17      that clustering works can affect attribution as well.  On the

18      right-hand side we have, I think, an advertisement from the

19      Twitter or one of Al-Qassam Brigades Telegram channels for a

20      donation address, donating to the cause, 17QAWG.

21             Both are Al-Qassam Brigades, but they have different

22      clusters.  They've never co-spent together and, therefore, we

23      have separate sources of information for each.  We keep them

24      separate.  Next slide, please.

25             This is the same two addresses you saw on the
```

1    previous slide.  Cluster ID at the top left-hand corner,

2    followed by the owner of those addresses, followed by the type,

3    the country, and the total address count.  So do please notice

4    the address counts are different for each of the clusters.

5    This is due to that co-spend heuristic.

6         The address count for the 3LH address is 156, and on

7    the right-hand side the address count for 17QAWG is 8.  In a

8    single-entity clustering, not only would these two be combined

9    in the cluster, you would have all addresses ever attributed to

10   Al-Qassam Brigades by all of the heuristics in that one

11   cluster.  That is how it would display itself on the graphical

12   explorer.

13        So if you are an investigator and you are not aware

14   of these two differences between clustering, you may mistakenly

15   think that single-clustering will give you the level of detail

16   necessary in order to determine which UTXOs spent funds

17   on-chain.

18   BY MR. EKELAND:

19   Q.  Am I understanding your testimony correctly that the

20   implication of that is -- like a context of this example is

21   that somebody could be falsely accused of financing terrorism

22   who wasn't involved in it at all?

23   A.  In fact, this did happen.  Next slide, please.

24        THE COURT:  Can you explain -- unless you're -- if

25   you're moving on to something else, can you explain that to me

1       a little bit more here.

2               What happened here, and was one of the addresses that

3       were on one of these two not associated with terrorism and then

4       charged?  Can you give me a little more detail here.

5               THE WITNESS:  So Al-Qassam Brigades is sanctioned by

6       OFAC.

7               THE COURT:  Correct.  I understand that.

8               THE WITNESS:  So they're definitely both criminal.

9       We have them associated to a criminal entity, and then we have

10      them sanctioned as well in the tool.  They just have different

11      sources.

12              On the right-hand side, that source comes from the

13      actual donation campaign itself.

14              THE COURT:  Right.  I thought you just told

15      Mr. Ekeland a moment ago that this led to someone being falsely

16      accused of financing terrorism?

17              THE WITNESS:  Single-entity clustering, an assumption

18      using that tool, led to that, yes.

19              THE COURT:  But do these charts suggest that, or are

20      these charts showing how you would have done it?

21              THE WITNESS:  This will come later on in one of the

22      case studies I can demonstrate.

23              THE COURT:  Okay.  But you're going to come back to

24      this particular example involving the Al-Qassam Brigades?

25              THE WITNESS:  These were the Al-Qassam Brigades, yes.

1          THE COURT:  Okay.  Thank you.

2          THE WITNESS:  Next slide.  Thanks.

3          Okay.  So here's the Al-Qassam Brigades example right

4     here.  A certain global exchange was contacted by a blockchain

5     analytics firm who utilized wallet-based tracing.  This will be

6     your single-entity clustering.

7          They were informed that they were related to

8     terrorism finance via about a $4 or so Bitcoin donation to

9     Al-Qassam Brigades.

10    BY MR. EKELAND:

11    Q.  Are you able to name the firm?

12    A.  I don't have their permission.  I guess I could, but it

13    feels a little funny to do that without just making sure

14    they're absolutely okay with it.

15    Q.  That's okay.  You don't have to answer that then.

16    A.  If it's okay with you, I can ask and share it.

17    Q.  We can move on.  Yeah.

18    A.  So on the left-hand side, you see the global exchange.

19    Now, this is a re-creation of the trace provided to

20    CipherTrace.  However -- and this would be like the --

21    basically, a screenshot of the trace that the exchange gave me.

22    However, I did not use that screenshot.

23          I rebuilt it in Word using this, but this is what it

24    looked like.  Again, if we need the original, I'll ask for

25    permission, and we can provide the original.

1          Here's our global exchange.  We have .1 Bitcoin being

2     sent to a self-custody address.  This address, therefore, has

3     no entity in control.  It's a user or group of users, persons

4     unknown who have access to those private keys and can spend the

5     funds tied to that address.

6     Q.  So just to touch on that one point, whoever controls the

7     private key just controls the Bitcoin?

8     A.  Yes.

9     Q.  And the identity of the person or entity controlling the

10    private key is not on a blockchain; is that correct?

11    A.  As in PII?

12    Q.  Yes, as in --

13    A.  Not in Bitcoin.

14    Q.  Right.  It's off-chain information?

15    A.  That's correct.

16          The .1 Bitcoin is then spent to Entity 1.  And if you

17    notice here, something curious happens.  .1 turns into

18    6.3 Bitcoin.  As an investigator, that gets my spidey senses

19    up.  That Bitcoin then goes into Entity 2 and then is reduced

20    down to .1 Bitcoin again to a self-custody address, and then,

21    ultimately, deposited into the Al-Qassam Brigades cluster.

22          Now, as an investigator and someone who is seasoned,

23    I understand what happened by looking at this.  The

24    investigator, whoever alerted this particular customer that

25    they had ties to terrorism finance, had improperly utilized the

1    graphical trace explorer Reactor.

2    Q.  I'm sorry.  So is it your testimony that actually what

3    happened here is that there was an improper attribution because

4    someone was using Chainalysis Reactor, which was employing the

5    single-entity clustering, and that led to somebody being

6    falsely accused of terrorism -- of financing terrorism?

7    A.  So the investigator improperly utilized Reactor.  Reactor

8    is a great tool for intelligence gathering and looking at

9    large-entity interactions.  However, again, on a diagnostic

10   level, specifically UTXOs in Bitcoin, it is critical that we

11   pull out every single address separately and verify they

12   actually spent funds in that particular interaction.

13   Q.  You've used the phrase diagnostic level a few times now.  I

14   wonder if you can elaborate just a little bit on what you mean

15   by that as opposed to what I think you said is a sort of the

16   higher-level intelligence gathering that you said Reactor is

17   good at.

18   A.  If you look on this slide, you do not see any Bitcoin

19   addresses.  You do not see any transaction hashes.  You only

20   see amounts.

21   Q.  And is this what you would typically see on the graphical

22   output from a software like Reactor?

23   A.  From what I have seen from Reactor, there should be

24   something termed a root address; otherwise, there will be no

25   transaction hashes here.  Now, it is possible to separate that

 1    stuff out from these clusters, but one must be aware that

 2    that's what one should do.

 3             Next slide, please.  This is what the trace looks

 4    like using a different tool.  This is Inspector; CipherTrace's

 5    tool here.

 6             So as you can see, those entities are actually very

 7    large CoinJoins with an anonymity set of 77.  So --

 8    Q.  Could you just briefly explain for the Court and everybody

 9    here what a CoinJoin is.

10    A.  More than one user chooses to join their coins together via

11    a service, a program, wallet software in order to obfuscate the

12    flow of funds.  That is to protect their privacy.

13    Q.  And would that disrupt -- does that disrupt heuristics?

14    A.  Yes.

15    Q.  All heuristics or some heuristics or --

16    A.  This particular trace has two errors.  It has a heuristic 1

17    error and a heuristic 2 error.  So part of Reactor's offerings

18    is that it will condense down a peel chain.

19             This is heuristic 2.  I call this the Pac-Man

20    heuristic.  It just kind of goes down that peel chain and takes

21    everything up with it.

22    Q.  So that heuristic 2, essentially, gobbles up everything on

23    the chain regardless --

24    A.  Yes.  So -- and here's evidence of that right here.

25    Additionally, there's a heuristic multi-input clustering that

1  was broken at this point in time because we do have a large

2  CoinJoin, and the amount of funds going into that CoinJoin is

3  well within the Wasabi limit.

4          Wasabi says something like up to one Bitcoin are

5  safe, that is, anonymous, or the most private amount that one

6  can deposit.  So you can read that in the Wasabi documentation.

7  And .1 Bitcoin is below that threshold.

8  Q.  What is anonymity set 77; what does anonymity set mean?

9  A.  The number of inputs, possibly the number of users.  But

10  there may be multiple of the same users in this particular set.

11  Q.  So it's not -- that 77 isn't necessarily equivalent with

12  the number of users, but it could be?

13  A.  Correct.  This is only half of the trace.  Next slide,

14  please.

15          This is a different way of describing the same error

16  that occurred twice in a row.  Entity 1 now retraced through a

17  CoinJoin.  Now we're tracing through another CoinJoin here.

18          So two Wasabi rounds were traced through .1 Bitcoin.

19  I cannot provide you the exact statistics on the error rate of

20  this, but this is most highly unlikely; in fact, an error.  It

21  is more likely errors were made here to trace through two

22  CoinJoins back-to-back under the threshold amount.

23  Q.  Are there any standards for evaluating these types of

24  traces or anything?

25  A.  I believe you're referring to a type of standard body that

1   would provide best practices and some oversight in blockchain

2   analytics.  No, that body does not yet exist.  This is a

3   relatively new field.

4   Q.  Is there any general agreement in the industry about

5   standards?

6   A.  Yes and no.  There are a lot of debates going on within the

7   industry even regarding definitions.  We do not all agree.

8   Q.  So is it fair to say, because it's such a new industry,

9   that there isn't any general consensus on what the standards

10  should be?

11  A.  I don't know that that conversation has even occurred yet.

12          Next slide, please, Mr. Hassard.  So now you can see

13  Case Study 2.  And as we can see at the top, we have a

14  self-custody address, and below we have the source of funds for

15  a theft, which is also a self-custody address.

16          Again, this is a representation of the actual trace

17  provided to CipherTrace from the client.  9.17 Bitcoin were

18  stolen.  They were spent to 1PAaf address within this Wallet 1.

19  Curiously, again, we go up to 472 Bitcoin through Wallet 2,

20  reduced down to 307 and to the client, who is an OTC desk, and

21  received a freeze funds request from law enforcement stating

22  that they had received funds directly from a theft; that is,

23  directly traceable to the theft.

24          So as you may have guessed, this was inaccurate as

25  well.  Next slide, please.

1              As you can see, this is address 1PAaf.  In its

2    lifetime, it's only spent three times in total what it has

3    received, about .8 Bitcoin, and the total spent is .8 Bitcoin.

4    Final balance, zero Bitcoin.

5    Q.  Just while we're here real quickly, could you just refresh

6    everybody on what an address is.

7    A.  Yes.  An address is derived from the public key, which is

8    derived from the private key of a Bitcoin wallet.  So the

9    address is -- essentially, you can think of it, like, as an

10   account number.  This is, essentially, saying that this person

11   has permission to spend the funds contained within this

12   address.  It doesn't exactly work like that.

13              There's a type of key exchange that occurs -- and

14   this does get more technical.  If you would like a more

15   technical definition, I can provide that, but the basics are

16   the Bitcoin address here, this is someone's account number

17   funds are being sent to.  And in order to send Bitcoin, we must

18   have that account number.

19   Q.  Is that address account number on the blockchain?

20   A.  Yes.  That would be recorded on the Bitcoin ledger.

21   Q.  And is the public key recorded on the blockchain?

22   A.  The public key is recorded on the Bitcoin ledger within the

23   metadata.

24   Q.  Is the private key recorded?

25   A.  The private key is not recorded.  There will be a

1    mathematical proof called a signature that verifies that the

2    owner who is spending funds is able to spend funds, that it is

3    the true and correct owner.

4         So going back to this case study, we do not see 9.17

5    Bitcoin ever going through 1PAaf.  So what could have possibly

6    happened?  Next slide.

7         Here's a representation of 1PAaf co-spending funds

8    and then sending those funds to two addresses on the other

9    side.  This is displayed in both a publicly available tool like

10   blockchain.com or blockchair.com, and below an actual

11   representation.

12        I would point you to the amounts here.  Again, 9.17

13   Bitcoin is not contained within this particular transaction or

14   any other 1PAaf transaction.

15        What happened here is, again, a problem with

16   single-entity clustering and the investigator not understanding

17   that that tool operates in that way and improperly determining

18   that 1PAaf received funds from the theft when, in fact, 1PAaf

19   never received funds from that theft.

20        Next slide, please.  This is what the actual trace of

21   that theft looks like.  So as you can see, when you mentioned

22   me mentioning diagnostics, this is at the UTXO level.  So if

23   you are to go and take the transaction hash from any one of

24   these gray boxes, including the yellow box --

25   Q.  And what's a transaction hash?

1    A.  Transaction hash, that's the -- transaction ID is another

2    way of terming it -- for the transaction that occurred on-chain

3    that is recorded in the ledger.

4    Q.  And that's not the same as the address?

5    A.  That is different than the address.

6    Q.  A hash is a unique identifier for the particular

7    transaction?

8    A.  Yes, it is.  That uses something called a Merkle tree, and

9    I can talk about that as well if we want.

10            But the way hashes are contained and recorded in the

11    ledger, essentially, you have blocks which are

12    cryptographically connected to one another, and each block

13    contains part of the hash of the block before it.

14            So what you have is almost like this genealogy of

15    information, and this is why we say the ledger is immutable.

16    We're referring to this type of hashing process.

17            Now, this is called a Merkle tree.  So -- well, I

18    don't know if we need to go into it.

19    Q.  I think we're okay at this high a level for the moment.  If

20    it does come up, I think we can go a little deeper.  Back to

21    this slide here.

22    A.  So we can see the 9 .17 Bitcoin transaction.  Again, that

23    is coming from the theft.  We see immediately we have -- I did

24    not know I could draw on this.  Did it draw on your screens or

25    no?

1    Q.  I see the little pencil.

2    A.  Well, now I know.

3         So we have a co-spend here and another co-spend here

4    on the outside.  So these -- again, the co-spends are the

5    circles all in the one transaction.  So that transaction block,

6    that's -- the actual transaction ID is there.  The circles are

7    the addresses themselves, the UTXOs.

8    Q.  And the UTXO is the just unspent --

9    A.  It's the unspent transaction output.  So in this case, if

10   we look at this very first co-spend, we see funds co-spent with

11   one, two, three, four addresses, which were not traced back to

12   the theft.  And only one of those addresses was.  Can you see

13   that?  Okay.

14        So the very next transaction, the funds are then

15   split into two.  And we continue the trace down to identify

16   where those funds went.  Now, we can't say for certain where

17   those funds went.  That is, the attribution, depending on how

18   we obtained it -- right? -- but we can say within a

19   probability.  Like, it's highly likely; or the funds are

20   directly traceable back to the source, back to the theft.  That

21   is how that report would be written.

22        So we see a number of outputs here, none of which are

23   the OTC desk who received the subpoena; five exchanges and two

24   services.

25        Next slide.  I don't know how to delete that on the

1    screen, so -- thank you for your help.  It's okay.  It's not in

2    the way.  Great.  Thank you.

3              So 19 total hops here.  You can see where CipherTrace

4    stopped in the middle.  By hop, I mean transaction.  So that

5    would be the gray boxes.

6              And then on the far right-hand side, you can see

7    where the actual VASP or the OTC broker is in the trace.  So

8    two things happened.  Single-entity clustering confused the

9    investigator.  They did not pull apart the cluster to get the

10   correct UTXOs which spent the funds in each of these

11   transactions.  And we have a peel chain problem.  That is

12   heuristic, too.  Again, that Pac-Man heuristic went through

13   these peel chains, collected it all and went through the

14   entities to say to the OTC broker here on the right-hand side.

15   It went too far.

16   Q.  Is it fair to say -- when you refer to heuristic 2 as the

17   Pac-Man heuristic, is that because it's overinclusive of

18   information, and that leads to erroneous results?

19   A.  Yes.  There are scientific papers that speak to that.

20   Q.  And that's the heuristic that Chainalysis Reactor uses; is

21   that correct?

22   A.  According to the testimony by Ms. Bisbee, yes.

23             So we can see it's gone too far.  I say Pac-Man

24   because it provides a visual of what actually is occurring.

25   Okay.  Next slide.

1           These are clustering false positives.  This is an

2     example, essentially, of a PayJoin or a CoinJoin and how that

3     may break clustering heuristics.  That would be heuristic 1,

4     multi-input clustering.

5           THE COURT:  I have a question for you.  Are there any

6     studies that quantify the percentage of blockchain transactions

7     involving Bitcoin that use CoinJoin versus not using CoinJoin?

8           THE WITNESS:  I've read some reports about this, but

9     I don't have any way to verify how that actually worked.  But

10    I'm extremely curious.

11          THE COURT:  What reports have you read?  What have

12    you seen?

13          THE WITNESS:  I can't recall the names.

14          THE COURT:  No, no.  I mean, what have the reports

15    indicated?

16          THE WITNESS:  Oh, I don't recall.  I don't recall,

17    but I remember thinking that's curious.  Because PayJoins -- no

18    one knows when a PayJoin occurs.  This would be, like, an

19    example of PayJoin.

20          THE COURT:  Well, someone must have some sense

21    because, among other things, there are services that provide

22    CoinJoin -- that's the service they're selling -- right? -- so

23    as long as you can track or use blockchain analysis to

24    determine how many transactions are coming from the service

25    that provides CoinJoin, you probably have some sense of the

1    magnitude.  I'm just trying to get a sense.

2        Is this 1 percent of the transactions or 80 percent

3    of the transactions that are currently taking place, or we just

4    have no idea?

5        THE WITNESS:  We cannot know.  This is an example of

6    a PayJoin, and this is exactly why we cannot know.  There will

7    be no indication on-chain that a Pay-to-Endpoint, PayJoin, has

8    occurred.

9        And to your point, about knowing which services

10    provide these CoinJoins and other anonymizing enhancing

11    techniques, they would have to have really clear markers; and

12    Ms. Bisbee talks about a fingerprint or a handprint, and

13    specifically Mr. Scholl mentioned Wasabi CoinJoin and

14    Chaumians.  He's talking about Wasabi in particular; that one

15    service, that one wallet.

16        In my testimony -- in my expert report, I talk about

17    the number of CoinJoins and anonymizing services that exist.

18    One of them is Samourai Wallet.

19        THE COURT:  Right.

20        THE WITNESS:  Samourai Wallet not only does

21    CoinJoins, but they structure out their payments in such a way

22    when a user participates or opts into the wallet software, it's

23    called a shotgun.  They don't look anything like this right

24    here.  In fact, it only comes with one output, and one output

25    per block.  So there's really no way for us to tell.

1          THE COURT:  That's the point of the CoinJoin.

2     There's only one output, but there are multiple inputs.

3          THE WITNESS:  So in the previous *Daubert* hearing,

4     Mr. Brown was asking Professor Verret about this very same

5     thing.

6          THE COURT:  Right.

7          THE WITNESS:  And he said something like, it's -- I'm

8     paraphrasing -- something like, is it fair to say that if you

9     have at least five inputs into a CoinJoin, you'll have at least

10     five outputs, and Mr. Verret responded yes, and the answer to

11     that is no, absolutely not.

12          And in that particular case and with the references

13     over and over to Wasabi, I'm coming to the understanding that

14     perhaps Wasabi CoinJoin is the primary source of understanding

15     for CoinJoins for the prosecution as according to their

16     experts, when this is definitely not the case.

17     BY MR. EKELAND:

18     Q.  Is it -- Ms. Still, is it your testimony that there's

19     actually more than one type of CoinJoin out there?

20     A.  Yes.

21     Q.  And then did I hear your testimony correctly that there's

22     CoinJoins that don't leave any on-chain information that allow

23     you to determine the statistical currents of these types of

24     CoinJoins?

25     A.  Not yet.  There are very smart people working on this

1    problem.

2    Q.  But as of today in this courtroom, there's no way to get an

3    accurate statistic on the number of different types of

4    CoinJoins that are being used to initiate transactions?

5    A.  To Your Honor's point about certain patterns, Wasabi

6    CoinJoin would -- it's a very distinct pattern.  And this is

7    what Mr. Brown is referring to, right?  That actually was in

8    this case study, like four slides back.  You have 77 inputs,

9    120 outputs, you see structuring, .1, .2, .4, 1.6, 3.2 come out

10   on the other side, plus the change.

11         That can be counted.  But as far as I'm aware, beyond

12   that, we have no way of knowing, especially when we're talking

13   PayJoins, which is a special case of CoinJoin.

14         THE COURT:  What is a PayJoin versus a CoinJoin?

15         THE WITNESS:  Yes.  So CoinJoin, two or more users

16   combine their funds together.  You might see two different

17   outputs, three different outputs, depending on that CoinJoin.

18   It depends on how many users participated.

19         Within a PayJoin, one person is actually paying the

20   other.  For example, let's say we go out for coffee and our

21   coffees are like $12.  I have $5 in my pocket and you have $10.

22   So we combine our funds together to pay for the coffees; maybe

23   only one of us takes the change.

24         There's really no way to know unless an actor is

25   watching us and can actually identify the individuals involved.

1    We can't see that.

2              THE COURT:  All right.  Thank you.

3              THE WITNESS:  You're welcome.

4    BY MR. EKELAND:

5    Q.  You want to take us through the rest.

6    A.  That's the end of the --

7    Q.  Oh, that's the end of the slide show?

8    A.  Yes.

9              MR. EKELAND:  Your Honor, we'd like to go more on the

10   expert report.  I wanted to see how the Court is feeling on

11   time right now.

12             THE COURT:  Let me just ask the court reporter how

13   she's doing.

14             (Discussion off the record.)

15             THE COURT:  Okay.  Another 15 minutes.

16   BY MR. EKELAND:

17   Q.  Ms. Still, did you review the government's expert reports

18   in this case?

19   A.  Yes.

20   Q.  And you also reviewed the discovery as well; is that right?

21   A.  Yes.

22   Q.  And, in general, let me just ask you this.  Do you think

23   that it demonstrates that -- in your expert opinion that Roman

24   Sterlingov operated Bitcoin Fog?

25             THE COURT:  I'm sorry.  I don't think that's what it

1    purports to show.  I mean, at least if we're talking about the

2    Bisbee report; I don't think that's what that report is about.

3         I think the report -- if I'm correct, I think that

4    report is intended to show the dark websites that participated

5    in Bitcoin Fog, but not -- there's a separate analysis with

6    respect to Mr. Sterlingov.

7         MR. EKELAND:  Yes, Your Honor.  I was asking her for

8    her expert opinion after reviewing all the expert reports in

9    the discovery in this case whether or not it's her expert

10   opinion that Roman Sterlingov operated Bitcoin Fog.

11        MS. PELKER:  Your Honor, I think that's an improper

12   expert opinion as to the defendant's innocence.

13        THE COURT:  Certainly, it's not something I would

14   allow in front of a jury.  If he wants to ask the question now,

15   I guess it doesn't cause any harm, but I wouldn't allow it in

16   front of a jury, you're correct.

17        MR. EKELAND:  May I ask the question again, Your

18   Honor?

19        THE COURT:  You may.

20        MR. EKELAND:  Thank you, Your Honor.

21   BY MR. EKELAND:

22   Q.  So, Ms. Still, after reviewing the discovery and the expert

23   reports in this case, is it your expert opinion that

24   Mr. Sterlingov operated Bitcoin Fog?

25   A.  I do not see evidence on-chain of that type of involvement.

1    What I do see is that he was a customer of Bitcoin Fog.

2    Q.   And you reviewed Mr. Scholl's report as part of your expert

3    report?

4    A.   Yes.

5    Q.   And what was your opinion of Mr. Scholl's report?

6    A.   So I have a number of thoughts.  If it's useful, we can go

7    through the evaluation together, generally speaking.  I was

8    struck by two things -- well, three things.

9         Number one, the table of contents were too short, and

10   it was difficult to follow; a minor detail.  But when you're

11   reviewing a lot of discovery and reports, I think it's

12   important to have those kind of links in the table of contents

13   that can take you to the correct sections and have more than

14   four sections identified in a 60-some-page report.

15        Number 2, it would be the cutting and pasting of the

16   transactional graphs.  This is -- this is not forensically

17   appropriate for a report like this.  I understand the need to

18   condense down graphs because they do get quite large and,

19   therefore, it is appropriate to include an entire graph of the

20   correct trace and then break that down via PowerPoint or other

21   method; if you prefer an Excel with a different UTXO spending

22   in every single transaction, that is appropriate.  It's a

23   little bit more difficult to follow.  It's not as easy as a

24   visual.  But, still, we can do this, and I've done this for

25   courts before.

1    Q.  And then just directing your attention to page, I think

2    it's 34 of your report, which is in evidence as Defense

3    Exhibit C; it's behind Tab C.

4            THE WITNESS:  Mr. Hassard, is this what is up on the

5    screen, 34 of the report?

6            MR. HASSARD:  Page 34 is on the left of your report.

7            THE WITNESS:  I see.

8            MR. EKELAND:  Just to be clear, on the left-hand side

9    of the screen is page 34 of Ms. Still's report.  On the

10   right-hand side of the screen is the corresponding page of

11   Mr. Scholl's report that Ms. Still's report is discussing.

12   BY MR. EKELAND:

13   Q.  Ms. Still, can you just please take us through this.

14   A.  Yes.  So page 10 we have incorrect the dates.  The 2014

15   date should be 2019.

16           And on page 34 -- okay.  So we do not have a proper

17   trace here backing up this particular conclusion from

18   blockchain analysis.  It's missing that information.  So there

19   are no lists of transactions, which I would prefer.  In fact,

20   the transaction list is something that was missing from this

21   report.

22           That's critical when we're identifying -- when we're

23   actually tracing, because just identifying by address can lead

24   to errors.  If we're saying one address or one cluster spent

25   funds but we did not identify the hash, we do not know the

 1   actual sender and the recipient.  The hash ties the senders and

 2   the recipients.  This is also missing.

 3   Q.  In your expert opinion, is this -- Mr. Scholl's trace

 4   forensically sound?

 5   A.  This is not forensically sound, nor is it complete.  In

 6   addition to this, we're talking specifically about the Mycelium

 7   Wallet.

 8           I did ask for the master extended public key, and as

 9   I understand, there were hardened derivation paths, so that

10   could not be exported.

11           What is appropriate then at this time in order for me

12   to confirm that I have all of the complete record of this

13   particular Mycelium Wallet would then be the seed phrase, so

14   then I can rebuild that wallet myself and then verify the true

15   history of the transactions and addresses.

16   Q.  That wasn't in any of the discovery produced by the

17   government that you reviewed?

18   A.  No.  I did request it.  I did not receive it.

19   Q.  Anything else on page 34 before we move on to your comments

20   on page 45?

21   A.  I'm going to take a moment to look this over, please.  Yes.

22   Page 45.  We can move on.

23           THE WITNESS:  Mr. Hassard, can you scroll down a

24   little bit.  There we go.  Thank you.

25           So I'm going to draw your attention to the actual

1    Bitcoin Fog section at the bottom of the Bitcoin blockchain on

2    page 45.  This is what this is in regards to.

3             Page 45, there's no data justifying that this address

4    is under control of Bitcoin Fog.  That is to say, CipherTrace,

5    we do not have this attributed to Bitcoin Fog.  If this is

6    contained within heuristic 2, this would be why.

7             Mr. Hassard, can you go back up to the top of the

8    page for a second.  This is a different -- okay.  We're good.

9    Please scroll down on the export -- expert report to page 35.

10   Yes.  We'll start on page 46 of Mr. Scholl's report.

11            This page has a number of errors.  You can scroll up

12   a little bit more, just to the top, Example 2 of similar fund

13   movements.  Perfect.  Thank you.  Okay.

14            So to start with, this particular address, 12MDV,

15   does not send funds to the address identified on Mr. Scholl's

16   trace.  So if we look on the right-hand side, Silk Road

17   address, 12MDV -- thank you -- spends funds to 1C8.

18            However, if you look this up in a public explorer,

19   this transaction never happened.

20   Q.  When you say look this up in a public explorer, anybody in

21   this courtroom with an internet access and a web browser could

22   look up this transaction; is that true?

23   A.  Yes, sir.

24   Q.  Can you give an example of a public explorer that people

25   could use to do that.

1    A.   Mempool.space.

2    Q.   Mempool.space.  And this is just publicly available?

3    A.   M-e-m-pool.

4    Q.   And just taking you back to the -- so it's your testimony

5    that this transaction actually never occurred?

6    A.   This transaction did not occur as it is represented on

7    Mr. Scholl's trace.

8              MS. PELKER:  Your Honor, I apologize.  I don't mean

9    to interrupt.  I just want to let the Court know, my kid took a

10   cold home from daycare a month ago, and I just have this

11   lingering cough.  I noticed the Court putting the mask on.  I

12   am definitely not contagious, but I'm also happy to wear a

13   mask.

14             THE COURT:  I take your word.  That's fine.

15             MS. PELKER:  I'm sorry to interrupt.

16             THE COURT:  Okay.  Continue.

17   BY MR. EKELAND:

18   Q.   I'm sorry.  Just to reiterate your testimony there, the

19   transaction that you just described never occurred?

20   A.   Correct.  Additionally, if I may?

21   Q.   Yes.

22   A.   User p-a-s, User ID 25- -- I can't really see that.  If you

23   want to zoom in, it's okay.  But that user ID was not

24   represented in any of the discovery that I was produced prior

25   to writing this report.

1           So that user ID for user pas did not match in the
2     Silk Road records that I was provided prior to writing the
3     report.
4     Q.  After you wrote the report, did you receive any new
5     Silk Road records?
6     A.  A few days ago we received another bunch of discovery in
7     the Silk Road records.  Unfortunately, the records were
8     combined with other users' user IDs in a way that I was unable
9     to determine actually what was going on.
10          So if I could get an explanation or a description of
11     each of the columns of what this particular CSV file contains,
12     that would help me understand what is happening here at
13     Silk Road.  I would also prefer, though, in addition to the
14     descriptions of the columns and an explanation of the data,
15     access to the true records.
16     Q.  So, essentially, the Silk Road records you got weren't the
17     original records from Silk Road?
18     A.  No.
19     Q.  And what you got were CSV, essentially, spreadsheets of
20     data; did I hear that correctly?
21     A.  Yes.
22     Q.  And is it -- would it be proper to characterize your
23     testimony as saying that data was, essentially, a little bit
24     messy and mixed up?
25     A.  It was jumbled.  It was difficult to follow.

1    Q.  Okay.  So going back to this user here, though, you said

2    here on page -- what is this?  46 of the Scholl report --

3    you're saying that when you wrote this report, you had no

4    information about that user; is that correct?

5    A.  I had information on user pas.  However, user pas, p-a-s,

6    that user ID did not match user pas.  There was a different ID.

7            Also, I'll draw your attention to the date.  If you

8    look above on November 27, 2011, 60.41 Bitcoin was sent to

9    Silk Road, user pas, and then on 10/27, one month earlier -- so

10   this must be a typo -- funds were sent.  I assume this is a

11   typo.

12   Q.  Do typos matter when it comes to this type of forensic

13   work?

14   A.  They can.

15   Q.  How can they matter?  Why would they matter?

16   A.  If somebody has the wrong address, if they've copied and

17   pasted the incorrect transaction hash, that can change the

18   conclusions made by the investigator and will dramatically

19   change the trace.

20   Q.  Would it be fair to say that if there's a typo in an

21   address, it could lead to a completely different trace?

22   A.  Yes.  It will not be the same public address.  It's not the

23   same account number, essentially.

24   Q.  Is there anything else you'd like to draw our attention to

25   on this page?

1    A.  So at the top in the Silk Road account, we can see a circle

2    with a Bitcoin -- with a 7.9 Bitcoin amount sending funds to

3    the same account.  I can't read the amount.  60 -- is that

4    60.4?

5    Q.  Looks like 60.41.  Is that --

6    A.  This would be the Mt. Gox Account 1 box.

7    Q.  60.4 is what I see.

8              THE WITNESS:  Thank you, Mr. Hassard.

9              So this looks like a representation of a co-spend

10   here.  However, there is no co-spend within Mt. Gox.  I'm not

11   sure exactly what Mr. Scholl is trying to say with these

12   arrows.

13             I'm curious if this is not a true representation of

14   how funds were spent on-chain because, if you look at the

15   actual transaction here out from Mt. Gox to the address that he

16   labels Bitcoin blockchain, this is an un- -- I don't know that

17   it was -- unhosted address.  There is no co-spend identified in

18   the Scholl report right here.

19             However, if you pull up this address in this

20   particular transaction, you can see that there's another input

21   to this transaction.

22   BY MR. EKELAND:

23   Q.  Two things.  One, you used the word unhosted address.  What

24   does that mean?

25   A.  That means self-custody.

1    Q.  Does that mean -- are you able to identify who has that

2    address if it's unhosted?

3    A.  No, sir.

4    Q.  So an unhosted address means you just don't know the

5    identity of whoever has -- controls the private keys to it; is

6    that correct?

7    A.  That's correct.

8    Q.  And then did I hear your testimony correct to say that,

9    actually, this trace here is missing an input?

10   A.  Yes, sir.

11   Q.  And what's the implication -- what, if anything, is the

12   implication of that?

13   A.  So to miss another input into this particular transaction

14   is actually to miss an opportunity to gain further information

15   on this particular transaction and ownership.

16         So as an investigator, what I did was then traced

17   back that input to a source, and I believe I had to go a number

18   of hops, transactional hops backwards, and I came to the

19   exchange Virwox.  There is nothing in discovery with Virwox on

20   it, so that's where my traces stopped.

21   Q.  Is there anything else you'd like to call our attention to

22   on this page 46 of Mr. Scholl's report?

23   A.  Tracing demonstration, complete history for cryptocurrency

24   address.  So -- I'm sorry.  Here's the co-spend, is with the

25   12MDV going back to Virwox, not with the 1PFK.

1    Q.  I'm sorry.  Are you referring to your report or where are

2    you --

3    A.  I'm on my report, looking at it.  So I just incorrectly

4    stated that the co-spend on 1PFF went to Virwox.  It's actually

5    on the Silk Road deposit address, which actually would be

6    critical, I think, if you wanted to determine ownership here or

7    have a sense of who might have sent those funds out of Virwox

8    into Silk Road.  That would be user p-a-s.  Again, I don't know

9    the exact number of transactions, but you can see this in

10   Reactor.

11          If you pull up the UTXO view of Reactor, you can look

12   at this in a publicly available tool.  You'll actually see that

13   withdrawal come out of Virwox.

14          Does that make sense?  Did I correct myself well

15   enough for everyone to understand?

16          THE COURT:  I think so.

17   BY MR. EKELAND:

18   Q.  I understood.  So is there anything else -- basically, the

19   diagram that's on your report, on what I believe is page 36 of

20   your report, that's what you were referring to with the

21   co-spend and the trace back?

22          Did you say it went through Virwox and then to Silk

23   Road; is that what you said?

24   A.  So -- yes.  So there's a withdrawal from Virwox through a

25   number of hops into this Silk Road deposit address.  Do you see

1    how there's the co-spend, the two addresses here?  And then if

2    we look on the other side, we have the receiving addresses.

3              And, again, it's too small for me to see, but there

4    are two separate addresses, none of which are on Mr. Scholl's

5    report trace.

6    Q.  Is there anything else on page 46 showing Mr. Scholl's

7    trace that you want to call our attention to?

8    A.  Could we please scroll down.  So this is going back to the

9    Silk Road records and the records that I had when I wrote this

10   report.

11             Some of the transactions, the amounts tied to the

12   transactions, did not match what actually occurred on-chain.

13   It's not clear to me exactly what happened.  But I think, to

14   clear up, like, the confusion around this particular address,

15   the withdrawal, the correct withdrawal address and the correct

16   amount, for me I don't feel comfortable making any further

17   determinations regarding that without access to the actual Silk

18   Road records.

19   Q.  Did I understand -- I'm sorry.

20             Did I understand your testimony correctly in that the

21   transaction amounts that are listed on page 46 don't match the

22   transaction amounts in the Silk Road records produced by the

23   government?

24   A.  So I don't see the actual amount represented here.  But in

25   the Silk Road record, if we were to pull up the hash -- and,

1    actually, if we could pull them up in discovery, I can show you

2    exactly which one I'm talking about.

3           Instead of spending funds, 60 Bitcoin or something --

4    it says 1 Bitcoin.  I don't know what occurred there.

5    Q.  Is there anything else you'd like to call our attention to

6    in the transaction on page 46 of Mr. Scholl's report?

7    A.  I think I've covered it.

8    Q.  In your expert opinion, is that trace that Mr. Scholl did

9    on page 46 forensically sound?

10   A.  Well, I don't think this is an actual trace because an

11   actual trace would, again, have hashes and correct identifiers.

12   And, for example, if there was a withdrawal from Silk Road,

13   from that particular user, that correct hash and address should

14   be represented; and I don't see the hash; and I see an address

15   that, when I look on a public explorer, does not match.

16          THE COURT:  Okay.  Why don't we go ahead and take our

17   lunch break now.  It's a quarter past 12:00.  Why don't we come

18   back at 1:45, and we'll continue then.

19          MR. EKELAND:  Thank you, Your Honor.

20          (Lunch recess from 12:15 p.m. to 1:45 p.m.)

21          MS. PELKER:  Your Honor, while the defendant is being

22   brought out, one quick administrative note.  We were able to

23   connect with Chainalysis's counsel over lunch.  He,

24   unfortunately, has another matter in district court in Orange

25   County on Monday.  He said he can catch a red-eye if there's

1    any time on Tuesday that would work for the Court.

2              THE COURT:  All right.  Let me see what we have.  I

3    appreciate your reaching out to him.

4              THE COURTROOM DEPUTY:  On Tuesday, the 29th, at

5    9:30 a.m.?

6              THE COURT:  Okay.  Does that work for everyone?

7              MS. PELKER:  That works for the government.

8              THE COURT:  He's going to be coming right from the

9    airport.

10             MS. PELKER:  Yes.  If there's time later in the day

11   on Tuesday, I'm sure he'd appreciate it.  But he's going to

12   make it work.

13             THE COURT:  Mr. Ekeland?

14             MR. EKELAND:  We have something scheduled, but we may

15   be able to reschedule it.

16             THE COURT:  Did we have anything else on Tuesday,

17   Glenda, or is that the best time?

18             THE COURTROOM DEPUTY:  We could do 11:30.

19             THE COURT:  Is that better for you, Mr. Ekeland?

20             MR. EKELAND:  We're in a forensic training all day,

21   actually, on blockchain that day.

22             THE COURT:  I see.

23             MS. PELKER:  Mr. Frentzen said he can do Wednesday as

24   well if that works.  We're concerned about pushing things out

25   too much.

```
1              THE COURT:  I understand.

2              MR. EKELAND:  The training that we're in is that

3      Tuesday and Wednesday.

4              THE COURT:  I see.  Well, why don't we leave it on

5      then for 9:30 and we'll hope to do it quickly.  And,

6      Mr. Ekeland, if you want to participate remotely from wherever

7      you're doing the training, just step out to do that, that's

8      okay with me.  I'll leave that up to you and to Mr. Sterlingov.

9      I would want to make sure you consult with him and that it's

10     okay with him as well.

11             MR. EKELAND:  Thank you, Your Honor.  If we want to

12     do that, should we just reach out to Ms. Walker?

13             THE COURT:  Yes.  But make sure you talk to

14     Mr. Sterlingov, because only with his consent.

15             MR. EKELAND:  Yes, Your Honor.

16             THE COURT:  All right.  You may proceed.

17             MR. EKELAND:  Thank you.

18     BY MR. EKELAND:

19     Q.  Ms. Still, just to remind you where we left off, if I

20     remember correctly, we were looking at page 36 of your report,

21     which I believe references page 46 of Mr. Scholl's report.

22     Could you just, to get us back going again, just briefly

23     explain what the -- you've got a diagram on the bottom -- well,

24     actually, what is your page 35 discussing page 46 of

25     Mr. Scholl's report.
```

1          If you'd just briefly remind us what's happening with

2     that diagram you've got on the bottom.

3     A.  Yes.  So this is a snapshot from Inspector, and this is

4     demonstrating that the address 12MDV, the deposit address at

5     Silk Road, had a co-spend of this other address you see below

6     in that trace.

7          So there was a co-spend, meaning possibly we can

8     trace this back and identify maybe some connection to the

9     Virwox.

10    Q.  And if I recall your testimony correctly, that co-spend,

11    that transaction you've got down there on the bottom of

12    page 35, that is a transaction that Mr. Scholl did not document

13    in his expert report; is that true?

14    A.  It is not documented in the expert report.  That is, it's

15    not accounted for in this trace in Mr. Scholl's report, nor is

16    the output address there, the 1C7 address, representative of

17    who received the funds, and the true transaction, which is on

18    my -- this page -- is it 35 or 36 of my report? -- 35 in this

19    booklet.

20    Q.  And then just directing your attention to the top of page

21    36 in your report, is that that transaction that you're talking

22    about?

23    A.  Yes.  So this would be mempool.space.  This is the public

24    explorer that anyone can use, and you can verify that this is

25    the true transaction that occurred between those addresses.

1    Q.  Can you just take us briefly, where -- the image where it

2    says inputs and outputs from mempool.space, can you just

3    explain what we're looking at there?

4    A.  Yes.  So on the left-hand side, you can see the address of

5    interest here, the Silk Road deposit address, 12MDV, co-spend

6    with another address in total just over about 60 Bitcoin.

7            And then the recipients are on the right-hand side.

8    We can see the funds go to address 1DT and then some leftover

9    smaller amount, 1EUJ.

10   Q.  And that -- again, just to sum up your testimony, if I'm

11   summing up correctly, that's a transaction that Mr. Scholl

12   missed in his report?

13   A.  This transaction is not accounted for in Mr. Scholl's

14   report, especially on this page where it shows the arrow going

15   from the Silk Road deposit address down to 1C7.  That

16   transaction never occurred.  On the left-hand side, you can

17   verify with CipherTrace Inspector and a publicly available

18   tool, which is a free tool, the true transaction that occurred

19   on-chain.

20           That is to say, that Mr. Scholl's representation here

21   of this trace is not true to what actually occurred on-chain.

22   Q.  Is there anything else you'd like to say about Mr. Scholl's

23   representation on -- what is that? -- page 46 of his report?

24   A.  No.  I mean, I guess I would just maybe offer -- I know

25   he's not present here today, but if this isn't meant to be a

1    true transactional graph, I think some sort of disclaimer needs

2    to be stated so it's clear to other investigators actually what

3    he's trying to demonstrate because, in my opinion and from my

4    experience, it's in best practice to include the true

5    transactions that have occurred on-chain.  And if we're not

6    going to do that, we need to state what we're doing and why.

7    Q.  And, again, it's your testimony that this is not a

8    representation of the true transactions as they occurred on the

9    blockchain?

10   A.  That's correct.

11   Q.  Moving on to page 37 of your report where you're discussing

12   page 49 of Mr. Scholl's report, you've got a diagram there,

13   where it says in the middle, 19 intermediary addresses of

14   unknown control or ownership.

15          Could you just explain what's going on here.

16   A.  Okay.  So on the left-hand side -- and I'm looking at my

17   report -- we see Mr. Sterlingov's Mt. Gox withdrawal.  So there

18   was a withdrawal made for -- what was it? -- two Bitcoin.  And

19   then we can actually visualize that entire trace as it looks on

20   a UTXO level.

21          So if we were to rebuild this trace using a publicly

22   available tool, like mempool.space, we would not have a

23   graphical explorer, but you would see all of these addresses

24   participate in each of these transactions as represented here.

25          THE COURT:  Can I ask you a question which will

1    further demonstrate my lack of sophistication in this area.

2         But when you're using the UTXO, that's the unspent

3    portion.  So those are the coins that are -- money that's left

4    over that doesn't go into purchasing the Bitcoin, correct?

5         THE WITNESS:  Exactly.

6         THE COURT:  Can you explain, why is it what you're

7    tracking is -- what is unspent versus what's spent?

8         THE WITNESS:  Sure.  So I'm using the term UTXO to

9    indicate addresses that are about to spend.  So we're sort of

10   suspending our understanding of how -- because they're about to

11   spend but they haven't spent yet.  And then we're going to

12   trace through.

13        And those UTXOs, as a fact, are actually destroyed in

14   the process when they're spent.  So the address itself may

15   still have funds attached to it, but the actual UTXO -- let's

16   say, it was a $5 bill, and I'm using that to buy coffee, and I

17   have some change left over, that $5 bill is now gone.

18        THE COURT:  Right.  I see.  It's a temporal issue.

19   It's sort of the moment before the transaction occurs?

20        THE WITNESS:  Correct.

21        THE COURT:  Okay.  Thank you.

22   BY MR. EKELAND:

23   Q.  If you could continue explaining that diagram, the 19

24   intermediary steps and what that's about.

25   A.  Yes.  As I understand it, this was the -- what was termed,

1    like, the beta transaction in the criminal complaint.  I

2    actually found that term quite confusing.  That's not typically

3    a term I would have used or -- to describe what's happening

4    here.

5            I think there's been an assumption made that this is

6    somehow a test transaction into Bitcoin Fog.  And if we look at

7    the -- this is in discovery.  It's, like, BCF Beta 2 file, if

8    you want to pull that up.  You can actually see the

9    single-entity clustering and then an arrow kind of pointing to

10   the address 1NEW or 1NEW, something like that, right?  It's

11   kind of like saying this is the -- this is where the test

12   occurred.

13           So I think the single-entity clustering confused that

14   particular investigator.  I'm not sure if that was the IRS CI

15   agent or who that was.  But that's not actually what occurred

16   on-chain.  There's also no evidence for that.  Secondly, if

17   someone were to test transactions or test out a new service or

18   protocol, they would naturally go to the testnet in order to do

19   that.

20   Q.  Just briefly, what is the testnet?

21   A.  It's a place where we can connect to a faucet and have

22   testnet coins of whatever is the native currency on that

23   particular blockchain and then test without actually spending

24   any of our own money.

25   Q.  So in your expert opinion, what -- does what we're looking

```
 1    at here, this trace -- which is also, I believe, on -- what is
 2    this? -- page 49 of Mr. Scholl's report -- is that a beta
 3    transaction where they're testing Bitcoin Fog?
 4    A.  As far as any of us can tell.  The one thing we can agree
 5    on is that this is the first-known deposit into Bitcoin Fog.
 6    But that would be 19 addresses or 10 or so hops away from that
 7    withdrawal from Mr. Sterlingov's Mt. Gox account into Bitcoin
 8    Fog, which were then commingled or co-spent with additional
 9    addresses, whose source is Bitcointalk and Instawallet and one
10    mining source.
11    Q.  So what do you think of the -- I believe Mr. Scholl's
12    conclusion and the government's implication that it's
13    Mr. Sterlingov making the first deposit into Bitcoin Fog?  Is
14    that, in your expert opinion, an accurate description or
15    attribution?
16    A.  If you were to say a low probability or assign some low
17    probability to this, that would have been better than what he
18    said instead.
19          The implication, as I'm looking at this in his
20    report, is that somehow he's tying the Mt. Gox account to this,
21    what was termed the beta transaction, and this is -- we cannot
22    do this for a number of reasons; not only distance -- so we
23    have at least ten transactions in between the deposit into
24    Bitcoin Fog -- right? -- with a number of co-spends.
25          We also have different clusters here, meaning at
```

1    least six different clusters that these addresses belong to;

2    could be at least six different private keys, six different

3    owners.  I don't have access to those private keys.  I don't

4    have access to the master extended public key, which would

5    allow me then to import all of these wallets and all of these

6    clusters to then verify who was actually in control.

7           I cannot say that these addresses belong to the same

8    wallet, neither can Mr. Scholl, nor anyone else.

9    Q.  So we see on your chart there on page -- I'm sorry, what is

10   this again? -- 37 of your expert report --

11          THE COURT:  I'm sorry.  Just to back up for a second

12   here.  Is a fair analogy of what you can see here versus the

13   former conclusion that you have a picture of a defendant in a

14   case getting into a 1982 Volkswagen Passat at a particular time

15   and the Passat -- a Passat showing up at the residence where

16   the crime was committed at a time that would be commensurate

17   with how much time it would take to drive that distance, but

18   you also know there are other Passats on the road.

19          So it's possible it was one of the other Passats, but

20   it's also not an unreasonable inference if there were other

21   evidence that it was his?

22          THE WITNESS:  Well, I think -- so for the Passat, I

23   think you would need to have -- I don't know.  I think the

24   analogy might break down here, but I'll try.

25          THE COURT:  I'm not arguing one way or the other.

1    I'm making sure I understand.  That's all.

2              THE WITNESS:  Yes, Your Honor.  I understand.  So

3    because we have different cluster identifiers and these

4    clusters did not meet, if they had met, they would have the

5    same cluster identifier.  You could say maybe from different

6    years or something like that.

7              THE COURT:  Okay.

8              THE WITNESS:  I don't know.

9              THE COURT:  I understand your point.  I mean, it's --

10   the point I was simply trying to get at was not so much that it

11   was a Passat, but just that there is some inferential evidence,

12   but that it is inferential given the fact that there are other

13   possibilities that exist.

14             THE WITNESS:  That's correct.

15             THE COURT:  Okay.

16   BY MR. EKELAND:

17   Q.  Ms. Still, just going back to the 19 intermediary addresses

18   of unknown control or ownership, is it entirely possible, in

19   your expert opinion, that those could have been controlled by

20   people other than Roman Sterlingov?

21   A.  Yes.

22   Q.  And if I understand your testimony, what you've testified

23   to is that there's actually no way of knowing because we don't

24   have the information to determine ownership or control of those

25   addresses?

1    A.  I do not have that information contained within discovery;

2    again, the master extended public key or the seed phrase that

3    would allow me to import that wallet.

4              Additionally, what I do have in discovery are lists

5    of addresses attributed to Mr. Sterlingov.  He had the Mycelium

6    Wallet, which, again, I cannot fully confirm because I'm

7    lacking the seed phrase.  But compared to what I have that was

8    produced by the government, none of these addresses here are in

9    Mr. Sterlingov's Mycelium Wallet or any other wallets

10   attributed to Mr. Sterlingov, nor on the other side of this

11   transaction here in Bitcoin Fog.

12   Q.  So let me break that down a little bit.  The first part, if

13   I understand you correctly, what you said is that there are no

14   known addresses that you know to be associated with

15   Mr. Sterlingov as presented in the discovery by the government

16   in this transaction besides that first Mt. Gox address; is

17   that -- am I understanding that correctly?

18   A.  Correct.  There are a couple of addresses in this trace

19   that Mr. Scholl references in his report and also in his

20   testimony in his *Daubert* hearing.

21   Q.  But we don't have the information in the discovery

22   presently to confirm whether or not that is related to

23   Mr. Sterlingov?

24   A.  Or anyone else.

25   Q.  Or anybody else.  And then you mentioned that on the other

1    side of this transaction, on the other side of Bitcoin Fog,

2    could you just -- that you saw something else.  Can you just

3    explain what you mean by that.

4    A.  So within this particular address, the 1YZJK, I would

5    not -- I don't exactly know how to present this, but I would

6    not completely disagree that this is some sort of intermediary

7    or internal address to Bitcoin Fog.  It does not behave the

8    same as the deposit clusters that we all agree upon -- the IRS,

9    the FBI, Chainalysis, and CipherTrace -- that are the true

10   deposit clusters of Bitcoin Fog.  This behaves very

11   differently.

12           This address only clusters with one other address

13   used one time, and I can actually build this trace out for you

14   in live time if it makes sense.  I don't know if it does.  But

15   I could show you what I'm talking about here.

16           So if we pull up the record of the transactional

17   history of this 1YZJKa address, I can see all deposits and I

18   can see all withdrawals.  Now, my question is, if this isn't an

19   internal consolidation address -- which, again, we cannot

20   confirm unless we have access to the ledger, the Bitcoin Fog

21   ledger, the servers as we know -- my sense is -- I'm curious if

22   I can trace out on the other side.  And I don't totally know.

23           So what I did do is I looked at those records of

24   deposits and withdrawals to try to match inputs and outputs

25   based upon what I can see being deposited specifically in this

1    first-known deposit to Bitcoin Fog.

2            I saw a number of interesting addresses.  So I did a

3    search, like Control F search, in the discovery to see if

4    Mr. Scholl or anyone else had identified them.  I don't know

5    who it was; someone had already done that work for me.  And I

6    have -- those interesting addresses have other data associated

7    with them specifically related to the exchange BTC-e.

8            And so there are, I think, two or three different

9    BTC-e addresses.  We have IP address records, we have records

10    of those API keys controlled or utilized by those users at

11    BTC-e, and we have some email addresses.

12            So one of the email addresses does trace back to

13    someone.  We were able to use open source to identify who

14    possibly owns that particular BTC-e account.

15    Q.  Let me -- I'd like to just unpack that a little bit.  You

16    said you attempted to trace through Bitcoin Fog and look on

17    what was on the other side, which, if I understand correctly,

18    what -- who or what was receiving deposits from Bitcoin Fog on

19    the other side of the transaction.  Did I understand that

20    correctly?

21    A.  Yes.

22            THE COURT:  Can I just ask you to pause there for a

23    second and explain -- have the witness explain to me, I thought

24    the whole point of Bitcoin Fog was that you couldn't do that

25    and it's a mixer.  And so I wouldn't think one would be looking

1    for the incoming transactions and outgoing transactions.  The

2    whole point is you can't do that.

3    BY MR. EKELAND:

4    Q.  Ms. Still, could you explain that to the Court because,

5    yes, why is it that you potentially are able to trace through

6    on this transaction and, as far as I understand, not on any of

7    the other transactions?

8    A.  I actually don't know that I'm able to do that.  What I did

9    is sort of breaking convention here.  So what I can do is also

10    look at the deposits into 1YZJK, and I can trace those

11    backwards.  They met in the middle, if that makes sense.

12            So I looked then -- I tried to identify the majority

13    of funds.  I also looked for, like, a two -- around a

14    two-Bitcoin or a little less deposit getting pulled out from

15    that --

16            THE COURT:  Is the point here, in part, that if this

17    was the first Bitcoin Fog transaction, that the way Bitcoin Fog

18    works is by having lots and lots of transactions, and if it's

19    the first one, maybe you can see what's going out, but if it's

20    the millionth one, you can't?

21            THE WITNESS:  It's possible.  I wish I could confirm

22    this.  If we have access to the ledger itself or any of the

23    Bitcoin Fog records, hopefully, that would be contained within

24    that we could verify what's going on here.

25            There is part of this, though, that I'm -- I haven't

1    said yet.  So the deposits into this particular first-known

2    deposit -- right? -- or mix cycle, if you will, it's about 43

3    or so Bitcoin; on the other side it's about 46 or so.  So we're

4    gaining some Bitcoin in there.  So possibly there was already

5    Bitcoin sitting in that account.  I don't know.  I'm kind of

6    guessing at what might have occurred.

7             But what I can see, I guess -- well, first of all,

8    did that answer your question?

9             THE COURT:  I think so.  I'll let you continue.

10            THE WITNESS:  I'm not -- I can't say with certainty

11   what's going on here without access.  I'm guessing at what may

12   have occurred.  I'm also tracing backwards from later deposits,

13   and this is mentioned -- Agent Devon --

14   BY MR. EKELAND:

15   Q.  Are you referring to Mr. Devon Beckett?

16   A.   Mr. Beckett, Agent Beckett, also looks at a later

17   transaction into the same deposit address.

18            Now, I'm going to back up a little bit here.  This

19   deposit address was only active from this, kind of, date and

20   time until about nine or ten months later.  It only transacted,

21   I think, 33 times.  I can confirm that.  Something like that.

22            Curiously, it does not behave like the rest of the

23   deposit clusters, which is why it kind of tickled my spidey

24   senses, and I think as well as Mr. Scholl's, to say this

25   doesn't really match what we know about this true deposit

1    cluster.

2         So kind of considering, even within CipherTrace:  How

3    did we gain this attribution?  Where did it come from?  Are we

4    sure this is Bitcoin Fog, or is this something else?

5         As we were looking at the deposits, the very first

6    deposit, you can see all of those addresses -- right? -- like,

7    all co-spending together.  Let's see.  I don't have a clear

8    photo of this, but there's about five addresses that co-spend

9    together and deposit into Bitcoin Fog.

10        We considered the possibility that this was a

11   CoinJoin.  I don't know.  It's possible.  Later on, in Bitcoin

12   Fog transactions, 2017, 2018, around when SegWit -- segregated

13   witness -- address types come about, around August 1st, 2017, I

14   do see evidence that Bitcoin Fog was actually utilizing

15   CoinJoins.

16        Now, I think this was -- I'm guessing again, but I'm

17   thinking this was a technique utilized here, not on behalf of

18   their customers necessarily, the later CoinJoin.  I think this

19   was done as just a practicality.  We have this new address type

20   that came out.

21        So we need to -- we're going to have a different

22   wallet, probably different sets of private keys, and we're

23   going to try to kind of funnel everything to the same place,

24   the same hot wallet for user withdrawals.  So -- I mean, it's

25   squishy here, but this is kind of the business of tracing.

1     It's a bit squishy.

2     Q.  If I may just take you -- you said when you traced through

3     or attempted to trace through and you got to the other side of

4     Bitcoin Fog, did I hear your testimony correctly that you said

5     you came across a BTC-e account?

6     A.  I came across at least two BTC-e accounts of interest.  I

7     then took those deposit addresses, copy and pasted, and did a

8     search and discovery for those addresses to see if I had any

9     information in discovery about them, and the government did

10    have information regarding those two accounts.

11    Q.  And where was that discovery?  Do you remember what folder

12    that was in?

13    A.  Can we pull up discovery, and I'll find it for you.

14    Q.  It's okay if you don't remember.  First of all, could you

15    explain to the Court what BTC-e is.

16    A.  Yes.  This is important for history.  So there are a number

17    of very interesting stories in Bitcoin, probably none of them

18    dull, as you know, if you're in this space at all.

19         BTC is very interesting.  I believe it is Alexander

20    Vinnik.  Alexander Vinnik was the CEO.  He is, I think, under

21    arrest or has been arrested for operating BTC-e as a means of

22    laundering funds from the Mt. Gox hacks that occurred from 2011

23    through 2014 through its entire history.  His two co-founders

24    were recently indicted on suspicion of having organized that

25    theft from Mt. Gox.

1          And they're on -- I don't know where they are.  No

2     one knows.  They're not arrested.

3     Q.  So on the other side of Bitcoin Fog, when you said you

4     traced through or attempted to trace through, as you said, you

5     found some BTC-e accounts, and you looked those up in the

6     discovery, were any of those accounts on the other side on your

7     trace-through of Bitcoin Fog attributable to Mr. Sterlingov?

8     A.  No.

9     Q.  Is there anything else you'd like to say or point out about

10    your trace-through through Bitcoin Fog to the BTC-e accounts?

11    A.  I mean, I could spend all day talking about this particular

12    address, I think.

13          If you have something specific -- it's just a

14    fascinating address to look through these transactions.

15    Nothing really matches everything else we know about Bitcoin

16    Fog, which is perhaps why this is -- this address is different

17    or maybe it isn't Bitcoin Fog.  Like, I'm not 100 percent

18    certain here what animal, vegetable, or mineral, what exactly

19    we're looking at here.

20          As I traced through the remaining transactions, those

21    33 or so whatever transactions, deposits, and withdrawals -- so

22    66 -- I see more deposits coming in with connections to

23    Bitcointalk, lots of Instawallet.  And from what I can tell,

24    Instawallet didn't -- or said they didn't keep any records.

25          So I don't know how we can identify who controlled

1    those particular addresses, any address that is attributed to

2    Instawallet.  I did read in discovery that the government had

3    requested that information, and Instawallet said something to

4    the effect of like, we didn't keep logs.

5    Q.  Does Mr. Scholl anywhere in his report -- and I think he

6    discusses this transaction.  We've got it up on page -- what is

7    this? -- 49 of his report, does he anywhere describe attempting

8    to trace through and finding these BTC-e addresses?

9    A.  No, he does not.

10   Q.  And do you know what KYC refers to?

11   A.  Know your customer.

12   Q.  Is it your understanding that Mr. Sterlingov's Mt. Gox

13   account here at the beginning of that trace was a KYC account?

14   A.  Yes.

15   Q.  And it looks -- going back to the other side of the Bitcoin

16   Fog transaction, we have a mining source, there's an

17   Instawallet, and there's a Bitcointalk.

18        To your knowledge, are any of those KYC accounts?

19   A.  No, not KYC accounts.  But I think there is some types of

20   identifiers that are present.

21        For example, on the mining transaction, if you put in

22   that transaction hash in the mempool.space, you can pull out

23   some kind of a code, and that code is going to identify,

24   typically, the miner or the mining group or whoever mined that

25   particular block and were awarded that Coinbase.

1    Q.  And if you -- taking a look at the diagram that Mr. Scholl

2    has of the same transaction -- on page 49 of his report that

3    you've traced on, I believe, page 37 of your report, and if you

4    compare the two, what's your opinion of Mr. Scholl's

5    representation here on page 37 of that trace that you did on

6    page 37 of your report -- I'm sorry -- page 49 of Mr. Scholl's

7    report that you traced on page 37 of yours.

8         And you should be -- should be on the right-hand side of

9    your screen right now, the Scholl trace.

10   A.  I can't read it very well, so I'm looking in this booklet.

11   Do you know where it --

12   Q.  It's not in the binder.  Although we do have it, I think,

13   in --

14   A.  I can speak -- thank you, Mr. Hassard.  You just want to

15   scooch it around as I go through the addresses.

16        So here's about the two Bitcoin withdrawal on this

17   date and time; I was able to confirm that in the Mt. Gox

18   records provided to me.  However, those records are jumbled

19   just as much as the Silk Road records.  It's difficult to go

20   through them for me.

21        I would prefer access to the true records, the

22   natives.  That just makes sense from a forensic perspective, to

23   have the true records when you're making conclusions regarding

24   any analysis related to on-chain transactions.  If it's

25   possible -- I'm in D.C.; I could do it tomorrow -- I would like

1    access.

2    Q.  Is that because you're saying that the Mt. Gox records, as

3    presented in the discovery, those were on a CSV spreadsheet?

4    A.  Yes.

5    Q.  And did you just say -- well, what's messy about that

6    spreadsheet?  Are there errors in it, or what's causing the

7    difficulty, if you can say?

8    A.  So I'm not seeing what I would expect to see with typical

9    production from an exchange.  I'll have a list of users, their

10   information will be separate, I'll have their KYC information,

11   IP addresses, log-ins, all logs, any communications.  Again,

12   this will be on a per-user basis, so there would be separate

13   CSV files with separate workbooks, separate sheets for each of

14   these users.

15            I would expect to see deposit addresses attributed to

16   that particular account holder.  Those are not there.  And the

17   way I received these records were in no particular order.  Four

18   different accounts, and they were just mixed; not in any order;

19   not by transaction; not by date and time; not by amount; not by

20   user.  They were just kind of all thrown in.  I don't know what

21   happened.

22            But this was -- it's difficult for me to pull all of

23   this apart and make sure I'm not making errors.  Honestly, from

24   a forensics perspective, it's just the right, proper way to

25   review the true record.

1    Q.  Taking you back to this trace now, I think you were

2    starting there from the Mt. Gox account.

3         That's Mt. Gox account number one, which we do attribute

4    to Mr. Sterlingov; is that right?

5    A.  That's correct.  If I may, it would almost make sense --

6    and maybe it doesn't for here -- but for me to go through this

7    and walk through a trace because it's so difficult to see on

8    this expert report, to go through transaction by transaction to

9    show you how this builds out and use that particular tool.  I

10   could do it live, if that's possible.  So we can compare from

11   the Scholl report to my trace transaction by transaction.

12   Q.  Are you asking if we could do this with -- from the -- I

13   don't know if we have that capability.

14        MR. EKELAND:  But, Your Honor, if we could take a

15   moment and actually discuss this -- if not now, at some point,

16   whether or not we can actually do -- have the expert witnesses

17   do live tracing from the stand.  I think this is kind of a

18   unique issue here.

19        THE COURT:  Ms. Pelker?

20        MS. PELKER:  Your Honor, I think that it's a unique

21   issue the defense should have broached and figured out before

22   their witness is on the stand.  I'm just very concerned about

23   timing here.  The government, obviously, would not be amenable

24   to a -- would likely not be amenable to a live trace at trial

25   where they're presenting things we've never seen before.  And I

1    think it's just outside what we need for a *Daubert* inquiry

2    here.

3              THE COURT:  I think it probably is outside what we

4    need for a *Daubert* inquiry.

5              With respect to whether you're surprised at trial,

6    maybe the answer to that is just for the defense to make a

7    proffer to you in advance of trial if they intend to do it.

8    It's not a new expert opinion she'd be offering.  It's just a

9    further explanation of her expert opinion.

10             MS. PELKER:  That's not -- I think that's just not

11   clear to us, Your Honor, what she's going to show with this

12   live trace.

13             THE COURT:  It's not clear to me either.  I suppose,

14   could counsel -- doing it in front of me just to make sure that

15   we all know where it's going, but to the extent she's just

16   using it demonstratively to explain her expert conclusions, it

17   does seem that it's within the scope of her report.

18             MS. PELKER:  I think we'd suggest that she can do a

19   video screen capture of it and walk through it.  If she then

20   wants to recreate exactly what she's done live on the stand so

21   that the government isn't surprised by it -- I don't even think

22   that that's necessarily an expert report basis issue.

23             But so far as -- I don't think it's appropriate for

24   either side to be showing things to the jury that the other

25   side has no idea in advance what's going to be shown until it

1    is actually in front of the jury, if that makes sense.  There

2    would be no way for the government or anyone to see what it is

3    until it's happening.

4            THE COURT:  This is probably the first Mr. Ekeland is

5    hearing of this as well.  But you want to respond?

6            MR. EKELAND:  Yes.  And then I'm happy to move on for

7    the time issues.

8            Again, I think the Court makes a really good point.

9    We wouldn't be doing any tracing that wasn't already in the

10   expert report.  This would, I think, more function as

11   demonstrative.  I mean, the government has repeatedly said that

12   all this information is on the blockchain.

13           We could -- we'd just simply be illustrating to the

14   jury clearly, if I'm understanding Ms. Still, what was

15   happening and just making it -- aiding them in understanding

16   what's happening in this tracing, but we're happy to do a

17   proffer and develop this issue outside the context of today.

18           THE COURT:  So why don't we leave it this way.  I am

19   concerned about time myself and moving things forward today, so

20   let's not do this on the spot today.  If this is something that

21   you conclude you would want to do at trial, make a proffer with

22   the government as to what it would actually be so they can see

23   it in advance.

24           If I need to have a hearing in the midst of trial to

25   decide whether to allow this or not, we can decide it at that

1     point in time.  I suppose the question will be whether it goes

2     beyond the scope of the expert report and whether it raises new

3     issues that the government would, in fairness, need time to

4     respond to itself or need to have its own expert do.

5                    MR. EKELAND:  Thank you, Your Honor.

6     BY MR. EKELAND:

7     Q.  Ms. Still, just going back real quickly, if you can, to the

8     extent, with our time considerations in mind, if you can take

9     us through Mr. Scholl's representation of -- on page 49 of the

10    Scholl report the best you can.

11          Just take us through it and compare it to the trace that

12    you did on page 37 of your expert report.

13    A.  Yes, sir.  So, Mr. Hassard, if you could move the graph

14    over to the left.  Yes.  So we can all see it a little bit

15    easier.  Perfect.  You went a little too far.  Okay.  Can you

16    go back a little bit to where the yellow/orange line begins.

17    That's great.  Right there.  Thank you.

18            So we can see the funds moving over into the first

19    deposit address.  There is no transaction hash accounted for

20    this.  We do not seek any cluster identifier or any other

21    address identified, just the address itself.  This is not very

22    useful as an investigator, which is why I must rebuild these

23    traces using a publicly available tool or a tool like

24    CipherTrace Inspector where I can view all of the necessary

25    information related to the addresses.

1    Additionally, there is some metadata contained within

2    each of these transaction hashes.  So if we're going to go to a

3    publicly available explorer, like mempool.space, we're going to

4    pop in one of those hashes, and I'm going to have a list of

5    details that I can expand, and then I can see all of the

6    details related to that particular transaction.  That's not

7    accounted for on here either.

8    This will tell me the public key, whether or not the

9    address is compressed or uncompressed, if there was a

10    replace-by-fee -- which there will not be; this is way too

11    early for that -- but those types of identifiers which

12    Ms. Bisbee did put in her expert report on that page with the

13    different address types.  And I know we'll get to that later.

14    So that information is missing from this trace.

15    Going forward, I can see the funds hop through these different

16    addresses.  My apologies, I can't completely read them.  This

17    looks like the 15- -- 15GL address, where you see three lines

18    going to up there.  Yes.  Thank you.  And then the funds moving

19    around and then kind of arcing around going back -- I don't

20    know -- coming back down and around.

21    So let's just follow that line.  And to the 1NEW

22    address, where those funds are then deposited into the address

23    right beside it, which I cannot read.

24    So that particular transaction right there is

25    mentioned by Mr. Scholl in his testimony and also in the

1    report, something about, like, a sweep transaction, what -- I

2    thought that was a curious term to use.  Honestly, it confused

3    me.  That's not a sweep transaction.

4         I think of a sweep transaction as funds being

5    deposited into a proper service or a custodial entity and then

6    those funds being moved over from a self-hosted address,

7    unhosted self-custodying, into that service itself.  There's no

8    evidence that any of these addresses here are services.  In

9    fact, they all very much look like -- and they are -- unhosted

10   addresses.  In the CipherTrace tool, we do not have attribution

11   that has any identity or any control or ownership determined

12   for any of these intermediary addresses here.

13        In Mr. Scholl's report, those addresses are

14   represented by, like, the Bitcoin symbol.

15   Q.  Is there anything else you'd like to say about Mr. Scholl's

16   trace on page 49 of his report?

17   A.  I believe Mr. Scholl is -- I don't want to put words in his

18   mouth, but I think he's trying to demonstrate here in Wallet 2

19   that possibly this is a deposit cluster into Bitcoin Fog.

20        We do not have this attributed to Bitcoin Fog.  These

21   are still unattributed addresses that co-spent together to make

22   the deposit into the 1YZJKa address.

23   Q.  So just to sum up your testimony in terms of the 19

24   intermediary addresses, those could be anybody or any kind of

25   entity and not be Mr. Sterlingov?

1    A.  I don't see evidence that this would be connected to

2    Mr. Sterlingov.  I also don't see any evidence that this is

3    connected to anyone else.  I have no other identities to pull

4    from.

5         I do not have that seed phrase for each of the

6    individual wallets, et cetera.  Correct.

7    Q.  Anything else you'd like to say about this trace before we

8    move on?

9    A.  Let's move on.

10   Q.  Just going to page 38 of your expert report and where you

11   discuss page 54 of Mr. Scholl's report, it looks like you've

12   got -- there's a quote from his report, it looks like, where it

13   says Tx10, which I take it means transaction 10?

14   A.  Yes.

15   Q.  Could you just explain briefly for the Court what -- why

16   you're quoting that and what you're talking about there.

17   A.  Well, this goes back to, kind of, Mr. Scholl and I agreeing

18   that this address behaves differently, and he's offering up

19   that this could possibly be an internal address at Bitcoin Fog

20   used to consolidate.  That's his quote there.

21        And I'm saying it is possible; however, we actually

22   do need those records in order to be able to confirm that.  I

23   agree, it doesn't behave like the deposit cluster.

24        THE COURT:  When you say you need those records,

25   they're not -- no one has them, as far as you know, correct?

1    These are not records that the government has or anyone else

2    has?

3                THE WITNESS:  As far as I know.  I haven't seen any

4    of the Bitcoin Fog ledgers or any of that information.  No.

5                THE COURT:  Okay.

6    BY MR. EKELAND:

7    Q.  And then, briefly, on page 38 of your report -- you discuss

8    you've got an excerpt from page 55 of Mr. Scholl's expert

9    report.

10         Could you just -- starting, "According to Chainalysis

11   Reactor, 31 out of 33 deposits" --

12               THE COURT:  If you want the court reporter to get

13   that down, you can't read that fast.

14   BY MR. EKELAND:

15   Q.  Could you just briefly explain for the Court what's -- why

16   you're quoting that and what's going on there.

17   A.  Chainalysis Reactor has attributed those deposit addresses

18   to Bitcoin Fog.  He says right here, "31 of the 33 deposits to

19   this" -- what they call -- "Bitcoin Fog cluster, are

20   attributable to Bitcoin Fog and Chainalysis."

21               He says, "Only the first two deposits, including

22   transaction 10 and one other deposit, 12" -- or deposit -- and

23   I believe that's a reference -- "were from addresses not

24   attributed by Chainalysis to the Bitcoin Fog cluster."

25               Is that what you wanted me to read?

1    Q.  Yes.  Just to -- if I understood you correctly, my

2    understanding is that what Mr. Scholl is engaged in here is

3    speculation because you can't confirm it without the internal

4    ledgers from Bitcoin Fog; is that accurate?

5             MS. PELKER:  Your Honor, I think he's

6    mischaracterizing the witness's testimony.  We're allowing some

7    degree of leading to move things along here.

8             THE COURT:  Some degree is an understatement.  I was

9    going to actually just say -- Mr. Ekeland, I just want to be

10   completely clear about this.  90 percent of these questions

11   would not be appropriate in front of a jury.  I appreciate the

12   desire to move it along, but it is true that you're testifying

13   as much as the witness is today.

14            MR. EKELAND:  I understand, Your Honor.  I wouldn't

15   ask these questions in front of a jury.  I'm trying to move

16   this along.

17   BY MR. EKELAND:

18   Q.  Do you -- did I understand your testimony correctly that

19   you said you can't confirm that these are the Bitcoin Fog

20   addresses without the internal ledger to Bitcoin Fog?

21   A.  That's true.  I've also probably skipped over an assumption

22   here.  I'm realizing, as I read this, I'm assuming that these

23   transactions will all be contained within the ledger.

24            I actually won't know until I have access to the

25   ledger whether or not I can see all of the correct user

1   deposits and they kept good records.  It's possible they didn't

2   keep good records.

3   Q.  Is there anything else you'd like to say about Mr. Scholl's

4   report before we move on to Ms. Bisbee's report?

5   A.  Well, if we look at page 39 of my expert report, I did want

6   to point out that someone registered the ENS -- ENS name, which

7   is Ethereum Name Service, for Bitcoinfog.eth.

8   Q.  And what, if anything, is the significance of that?

9   A.  I can see the address on-chain who registered this

10  particular ENS, and I can see the date and time when they did

11  that.  But this is in reference to the NFT -- NFT, nonfungible

12  token -- on the ERC-721 token type.  ERC, Ethereum Request for

13  Comment.

14  Q.  Is that what the -- what you're talking about is the

15  Ethereum Name Service that you're referencing in the middle --

16  roughly, the middle of page 39 that you're saying was

17  registered on March 31st, 2023?

18  A.  That's correct.

19  Q.  Is there anything else you'd like to comment about

20  Mr. Scholl's report before we move on to Ms. Bisbee's report?

21  A.  No, sir.

22          MR. EKELAND:  Your Honor, just checking on time.  May

23  we move on?

24          THE COURT:  You may.  I would encourage you to do so.

25  BY MR. EKELAND:

111

1    Q.  You reviewed Ms. Bisbee's report?

2    A.  Yes.

3    Q.  And I believe you discussed it -- you start discussing it

4    on page 24 of your expert report?

5    A.  There are references previously to the -- I think there was

6    a supplemental report or declaration provided by Ms. Bisbee.

7    So there are references to other testimony related to

8    Chainalysis citing scientific papers relating to their model

9    and heuristic 2.  But, yes, page 24.

10   Q.  Do you see the header there almost at the top of the page

11   saying, "Evaluation of Chainalysis Expert Reports"?

12   A.  Yes.

13   Q.  Could you just briefly take us through your discussion

14   there with -- starting, it looks like, with page 8, Table 2?

15   A.  Yes.  Okay.  To Ms. Pelker's point about Chainalysis has

16   provided detailed information regarding address types; and so

17   they've already covered kind of their bases in terms of how

18   they applied heuristic 2, I -- if this is a complete table,

19   then they are missing some items.

20        You can see that there are different address types

21   not accounted for on this.  So I have Pay-to-Public-Key, P2PK;

22   P2MS, Pay-to-Multisig; Pay-to-Witness-Script-Hash;

23   Pay-to-Taproot.

24        Additionally, the compressed and uncompressed key

25   sizes are in the incorrect unit of data.  There are eight bits

1    in a byte.  So that should read byte, not bits.

2    Q.  What's the significance of not having a number of the

3    Bitcoin types?  What does that do to the accuracy, if anything,

4    of Chainalysis Reactor?

5    A.  Well, it means if that particular heuristic is collecting

6    information and then, what they term the fingerprint, we're

7    missing fingers, or from the handprint, if that makes sense.

8         So this is not -- to me, this doesn't look like a

9    complete representation of what they're doing, which is why it

10    makes sense for me to understand, and I think for the Court to

11    understand, how was this heuristic applied; how does the

12    algorithm work; what address types are being taken into

13    consideration, if any.

14         Are the -- did they actually, in their algorithm, use

15    bits instead of bytes?  That would make a big deal for

16    compressed and uncompressed keys.  Although they will still

17    have the same private key, that seed from the private key, they

18    will not be generated the same, in the same human readable

19    address.  So you will see two different addresses for the same

20    key if it's compressed or uncompressed.

21         So this is something that I can't confirm if they've

22    used all of this information as here applied to their

23    particular heuristic and into their algorithms, but, if so,

24    we're missing some things.

25    Q.  Just directing your attention to the second bullet point

1   under the subheader page 8, Table 2 where it says, "The table

2   states that the P2SH is a 'SegWit address' that begins with the

3   3," and then you say that is false.

4        Can you elaborate on that and explain to the Court what

5   you mean there.

6   A.  So a -- SegWit stands for segregated witness, and this is a

7   way to save block space in transactions.  It will also make

8   your transaction fees a little lower.  So the idea is to

9   increase the number of transactions that can fit within a

10  block, right?  So that a miner is putting within a block.  They

11  make things a little cheaper for users.

12       However, this particular address provided is not a

13  SegWit address.  There is no separate witness data.  As you can

14  see on any public explorer, you can put that address into

15  mempool.space or Bitaps, and it will say there is no segregated

16  witness or no witness data.  That means that data is not there.

17  It's not a SegWit.

18  Q.  And then on the -- is there anything else you'd like to say

19  on that point?

20  A.  I don't think so.

21  Q.  At then at the third bullet point -- I think you mentioned

22  this slightly before -- it says, "The table uses the wrong unit

23  of data when referring to compressed or uncompressed keys."

24       Could you explain the significance of any of that.

25  A.  Well, like I said, I mean, this is the application of this

1    information in heuristic 2 and their algorithm that they use.

2    I don't know how this is being applied, if bits instead of

3    bytes is a typo, or if 33 bits were used for compressed keys

4    instead of 33 bytes.

5            So when we generate a public address -- okay.  I will

6    back up two steps.  Private keys, very large numbers, randomly

7    generated.  It comes from this prime field, and for the

8    standards of efficient cryptography, identifies the specific

9    Elliptic curve used to generate private keys.  In this case

10   Bitcoin uses SECP256K1 and R1.

11           So that's the Elliptic curve where these private keys

12   come from, right?  So now, kind of like the formula to create a

13   public key, to derive that from the private key is actually

14   quite simple, although it just involves very large prime

15   numbers.

16           So you start with P, your public key, equals K, your

17   private key multiplied by some generator point.  That generator

18   point is pretty much a standard that's on the curve itself.  It

19   is actually a point.

20           So that means, when you're multiplying this number,

21   this 256-bit number, which that means 2 caret, to the 256,

22   right?  That's an exponent.  That's like -- that's 77 zeros

23   out.  That's an enormous -- I don't even know what that number

24   is called.  It's enormous.

25           So we could say -- let's say this private key is 74

1    quadrillion or something; an odd -- right? -- prime.  So we're

2    going to take that, multiply that by this generator point on

3    the curve, and I actually -- I don't know if it's useful for me

4    to draw this out, but it does help -- a visual, when trying to

5    understand how we generate these addresses.

6              So -- but anyhow, we're going to multiply, basically,

7    and move that point around depending on what our private key

8    is, 75, 74 quadrillion times around that curve.  It's going to

9    bounce around, and we're going to end up at some point.  That

10   particular point is an X and Y coordinate.  Each of those X and

11   Y coordinates are 32 bits each, and that's on the Elliptic

12   curve itself.

13             Does that make sense?

14   Q.  I think it does.  If you've confused bits and bytes, you

15   would be really off?

16   A.  Again, I don't know.  This is compressed and uncompressed.

17   We're not even quite here yet.

18             So then we have some points for our public key on the

19   Elliptic curve.  Now, we need to do a number of things to it.

20   Our wallet software will determine whether or not we want that

21   compressed or uncompressed.  Sometimes you can choose.

22   Anymore, I believe it's kind of standard to compress that

23   particular point.

24             And then from there we're going to encode it.  And

25   depending on the address type itself, we can encode a couple of

1    different ways.  And then we'll end up, you know, with our

2    public address that came from that public key that came from

3    that entire process I just described.

4            MS. PELKER:  Your Honor, I don't want to interrupt

5    the witness, and defense counsel can continue down this road.

6    I can represent this was just a typo.  Defense can make a big

7    deal about the fact that there was a typo of bits for bytes.

8    He's welcome to continue, but just in the interest of time.

9            THE COURT:  I understand the difference between a bit

10    and a byte, so I think we can move on.

11    BY MR. EKELAND:

12    Q.  Ms. Still, directing your attention to the second-to-last

13    bullet point on the page under the subheader that says page 12,

14    Section 1.2, you've got a sentence at the end of that bullet

15    point that says, "How can the same addresses be switched from

16    uncompressed to compressed and still output the same human

17    readable address hash?"

18            This is on page 24 of your report.  Can you explain

19    that.

20    A.  That's just to say -- it's the same

21    compression/uncompression issue -- addresses are not -- you're

22    not going to switch between a compressed and uncompressed.  I'm

23    not sure exactly what they were trying to describe in this

24    particular -- perhaps they meant that Bitcoin Fog included

25    compressed addresses, but no addresses were changed from

1    compressed to uncompressed or uncompressed to compressed.

2    Q.  Then in the final bullet point on this page 24 where you're

3    saying the report states that the first known -- on the final

4    bullet point on page 24, you say -- the report states that "The

5    first-known Bitcoin Fog transaction where the change is a

6    P2SH-WPKH SegWit address in block 534129," and then there's a

7    long address.  And then you say, "Reviewing this transaction

8    reveals there is no witness data and no addresses

9    participating."

10         Could you just explain that -- what that means for the

11    Court.

12    A.  Again, this is relating to a wrapped SegWit, which was

13    something that was done to kind of help carry over the awkward

14    time from the time that SegWit was enabled around August 1st,

15    2017, until other protocols, wallet software, exchanges,

16    services could all update their nodes if they chose to accept

17    SegWit.  This was considered a soft fork.

18         So this was not a rule in terms of every node has to

19    agree or every service has to accept this particular address

20    type.  In fact, they did not, and they still have not.

21         But what this is stating here is that this -- the

22    addresses in this transaction hash -- this is a transaction

23    hash where we're in this particular wrapped SegWit address

24    type; however, there is no witness data, again, on either of

25    those addresses.  So this is incorrect.

1    Q.  Just turning to page 25 -- and you've got some images

2    there -- is that related to what you were just talking about?

3    A.  Yes.

4    Q.  And what are we seeing there?

5    A.  Mempool.space and bitaps.com.  And this is the -- some of

6    that metadata, again, contained within that particular hash.

7    So this is demonstrating there's no witness data here.

8    Q.  And then on -- turning your attention to the -- page 26,

9    just starting at the top, you've got a number of points.

10        Can you just -- starting with page 13, Section 1.2, and

11   then going down, could you just take us briefly through each of

12   your points here about Ms. Bisbee's report.

13   A.  Sure.  I'll go quickly.  Page 13, 1.2; what is RF.  If RF

14   means RBF; that should say Replace-by-Fee.  So RBF would be

15   part one of those fingers in the handprint, if you will;

16   that -- when we identify transactions by.

17        And I think that must be a typo.  However, as you can

18   see, I've written here they weren't present until after

19   November 2016.  So there would be no Replace-by-Fee prior to

20   that in Bitcoin Fog.  That first transaction occurred -- what

21   was that? -- November of 2011.

22        So missing some screenshots, page 15.  I would like

23   screenshots for those onion addresses and those services

24   referenced.  2.2, this is critical in -- regarding the AlphaBay

25   attribution.  This particular address is identified as having,

1    again, some sort of handprint in a way that allowed, as I

2    understand it, Chainalysis to identify a bunch of AlphaBay

3    attributions.

4           However, there is -- the address itself is not active

5    during those dates identified in this section, and it only had

6    two transactions ever.  So I'm curious if the AlphaBay

7    clustering is inaccurate or how this address played a role in

8    that -- attributing all of AlphaBay, if that makes sense.  But

9    to me, this is quite -- this is notable.

10   Q.  If I'm understanding you correctly, it's notable because it

11   calls into question the accuracy of the AlphaBay --

12          MS. PELKER:  Objection, Your Honor.

13          THE COURT:  Sustained.  You can just ask her why is

14   it notable.

15   BY MR. EKELAND:

16   Q.  Why is it notable?

17   A.  So this address is used to sort of create, like, a baseline

18   of behavior.  But its behavior was not accurately recorded, at

19   least according to this section here.  Anything further from

20   that could be inaccurate in one way or another.

21          I cannot, again, confirm without understanding the

22   source of attribution for each of the addresses in each of the

23   clusters, any clustering errors that might have occurred, and

24   that entire paragraph that I believe we submitted to the

25   government in requesting that information.

1   Q.  If you could just briefly take us down the rest of the page

2   there.  If there's anything you want to add.

3   A.  Missing screenshots.

4   Q.  Again, could you just remind us why the screenshots are so

5   important.

6   A.  They're great because these are V1V2 onion addresses.

7   They're not around anymore.  So if someone could just show a

8   screenshot of actually what was captured from these addresses,

9   what the web page actually looked like, what the deposits, the

10  withdrawals, whatever they're describing, it makes sense to

11  include them in a record since that record is no longer

12  accessible.

13  Q.  When you say they're not around anymore, what precisely

14  does that mean?

15  A.  I can't access these websites anymore.  So I would like --

16  I would like to see the screenshots.  If they have them and

17  they just didn't include them, I would appreciate it if they

18  could send them over.

19  Q.  And then just -- we're almost to the end here.  The -- on

20  page 27, is there anything you would like to call to the

21  attention of the Court?

22  A.  Yes.  So this is including their CSV file provided to us

23  regarding how the addresses clustered, whether they were

24  attributed via a co-spend, heuristic 1, or a peel chain

25  behavioral heuristic 2.

1          So then we compare that against our attribution data,

2     and it appears that of the 925,000-odd Bitcoin Fog data points,

3     that 527,000 or so of them came via heuristic 2, which is that

4     peel chain heuristic; the Pac-Man heuristic.

5     Q.  Is there anything else you want to call to the Court's

6     attention on page 27?

7     A.  Not on 27.  On page 28, I'll just note right here, since

8     the Court asked and we were discussing deposit addresses for

9     Bitcoin Fog, that this cluster identifier, 003739a5, was the

10    deposit cluster as we knew.  And that that 1YZJKa address that

11    didn't quite fit is not contained within that cluster.

12    Q.  Anything else on page 28 you want to call to the Court's

13    attention?

14    A.  No, sir.

15    Q.  Could you just briefly explain the -- well, the diagram on

16    page 29.

17    A.  This is showing you the deposits into that deposit cluster

18    that the IRS, the FBI, Chainalysis, and CipherTrace identify as

19    the deposit cluster and the change going back into the deposit

20    cluster and then the outputs going to the hot wallet.

21    Q.  Is there anything else you want to say about that diagram?

22    A.  No.

23    Q.  On page 30, you've got -- it says up at the top,

24    "CipherTrace Sentry API Pulls From Clusters."  And then it

25    looks like it goes on to page, like, 32.

1          Could you just briefly explain what that means to the

2     Court.

3     A.  Yes.  So I'm showing you that -- the difference in clusters

4     here.  So I'm pulling data from the deposit cluster, and I want

5     a record of transactions and where do those funds go after

6     that.  In this case, they go to a different cluster; not the

7     deposit cluster we all identified, not the hot wallet we all

8     agreed upon.  It goes to cluster 0323355a.

9          And then on the next page, 33 -- well, you can see

10    the different clusters identified by color.  There, CipherTrace

11    has these attributed to Bitcoin Fog, as does Chainalysis.

12    Q.  And then on page 34, you've got a comparison of the

13    CipherTrace and Chainalysis dark market attributions.  Could

14    you just briefly summarize that for the Court.

15    A.  So we compared our attribution data, and this would be the

16    discrepancy rate and percentage.  So you can interpret this as

17    CipherTrace is missing 20 percent of that attribution.

18          We could say, notably, AlphaBay around -- and these

19    are estimates -- around 96 percent.  This is part of the

20    6 million addresses and 20 million transactions that we were

21    looking at, and we were comparing our attribution data here.

22          THE COURT:  So when you say AlphaBay 96 percent, does

23    that mean that there was, in your view, 96 percent too many

24    attributions or 96 percent too few attributions in your view?

25          THE WITNESS:  I don't know exactly what that means,

```
1       but it's notable because the number is so high and there's such

2       a high disparity with AlphaBay.

3               And about four pages ago we did discuss AlphaBay and

4       how that one particular address was used to identify a baseline

5       behavior for AlphaBay, and that address was identified in its

6       behavior incorrectly in that Section 2.2 AlphaBay.

7               THE COURT:  What about Bitcoin Fog, what does the

8       67 percent mean?

9               THE WITNESS:  That is attributed.  That is the

10      difference between heuristic 1 and heuristic 2.

11              THE COURT:  Right.  But is it a plus or a minus, or

12      you don't know?

13              THE WITNESS:  That is -- sorry.

14              THE COURT:  Is Chainalysis identifying more

15      transactions than CipherTrace or is CipherTrace identifying

16      more?

17              THE WITNESS:  Yes.  So -- yeah, 67 percent more.

18              THE COURT:  So 67 percent where -- another way to

19      think about this is you use heuristic 1, you're using the

20      co-spend, right?

21              THE WITNESS:  Yes.

22              THE COURT:  -- heuristic, and just that?

23              THE WITNESS:  Yes.  Well, we'll use direct

24      attribution as well.

25              THE COURT:  Okay.  So direct attribution and co-spend
```

1    shows 33 percent of the transactions, and the other 67 percent

2    are based on heuristic 2 or 3 or the combination of all three?

3              THE WITNESS:  That's correct.

4              THE COURT:  Okay.  It doesn't mean that it's wrong by

5    that percentage point.  It just means --

6              THE WITNESS:  No.

7              THE COURT:  -- that there's a difference between

8    your -- you're taking a much more conservative approach?

9              THE WITNESS:  Yes, Your Honor.

10             THE COURT:  Okay.

11   BY MR. EKELAND:

12   Q.  Ms. Still, is there anything else you'd like to say about

13   your expert report?

14   A.  No, sir.

15             MR. EKELAND:  Your Honor, I pass the witness.

16             THE COURT:  All right.  How much time do you think

17   you'll need, Ms. Pelker?

18             MS. PELKER:  I think we'll go until the end of the

19   day, Your Honor.

20             THE COURT:  Okay.  Maybe we should take our break now

21   then.  We've been going an hour and 20 minutes.  Why don't we

22   come back at 2:15 (sic).

23             MS. PELKER:  Yes, Your Honor.  And we have a couple

24   housekeeping matters regarding the witnesses for tomorrow that

25   we just want an opportunity to discuss.

1           THE COURT:  Do you want to raise it now?

2           MS. PELKER:  We can raise it now or when we come

3     back.

4           THE COURT:  Let's hear about the housekeeping matters

5     and then we can take the break.

6           You will learn for purposes of trial that we're being

7     protective of the court reporter, whose job is extremely

8     challenging.  We should all make sure not to talk too quickly

9     and also not to talk at the same time and recognize that she

10    can only go for an hour and a half or so before it becomes hard

11    to keep going.

12          MS. PELKER:  I believe I'm constantly begging the

13    trial reporter's forgiveness, Your Honor, and will continue

14    doing so.

15          THE COURT:  Fair enough.

16          MS. PELKER:  Your Honor, for tomorrow we have

17    Ms. Mazars de Mazarin, who is the government's computer

18    scientist, who we had hoped to put on today; I think likely

19    tomorrow.

20          THE COURT:  Okay.

21          MS. PELKER:  We also have a disagreement with defense

22    counsel as to whether they have sufficiently raised a *Daubert*

23    challenge of Ms. Glave and Mr. Vlahakis, which we wanted to

24    discuss with the Court.  We've previewed this previously.

25          Ms. Glave is a forensic accountant.  She is not

1    giving any sort of opinion testimony.  She's just testifying to

2    the financials and summaries of them.  And Mr. Vlahakis is a

3    FinCEN fact witness.

4         These were noticed out of an abundance of caution to

5    the extent that their testimony is on specialized matters.

6    Neither one of them are going to be offering any opinions

7    whatsoever, and we don't think that there's any real question

8    as to their qualifications or methodology.

9         THE COURT:  I'm not sure whether it's opinion

10   testimony or not, but I also understand they're going to be

11   describing some of the equipment that, if I have the witnesses

12   right, Mr. Sterlingov had in his possession and what it's used

13   for.

14        MS. PELKER:  Not for -- so Ms. Mazars de Mazarin, the

15   computer scientist --

16        THE COURT:  No, no, I understand that.

17        MS. PELKER:  Mr. Vlahakis, he's from the Financial

18   Crimes Enforcement Network.  He's going to explain what the

19   Financial Crimes Enforcement Network does, what the Department

20   of Treasury obligations are for registration.  He is not going

21   to opine as to whether Bitcoin Fog was required to register.

22        That's an issue that will, ultimately, be before the

23   jury.  He's just giving fact testimony.

24        THE COURT:  Okay.

25        MS. PELKER:  And Ms. Glave is just going to testify

1    to the financials, nothing about the nature of --

2            THE COURT:  Which financials?  Give me a little bit

3    more on that.

4            MS. PELKER:  That is the various different accounts.

5    We can pull up a list.  But it is, essentially, the --

6            THE COURT:  These are the frozen accounts you're

7    talking about?

8            MS. PELKER:  Excuse me?

9            THE COURT:  The accounts that were frozen?

10           MS. PELKER:  The accounts that were frozen or that

11   were in Mr. Sterlingov's name that were used by him for

12   receiving funds from Bitcoin Fog and other sources.

13           THE COURT:  Okay.

14           MS. PELKER:  So both the cryptocurrency exchange

15   accounts and the Fiat accounts and bank accounts.

16           THE COURT:  Okay.  All right.  Mr. Ekeland?

17           MR. EKELAND:  Your Honor, the government has noticed

18   both Mr. Vlahakis and Ms. Glave as expert witnesses.

19           THE COURT:  Even if their testimony is expert

20   witnesses, are there any question under *Daubert* as to whether

21   the appropriate -- the testimony would be appropriate, either

22   whether they were qualified or whether they are using accepted

23   or reasonable methodology?

24           MR. EKELAND:  I do have that question both for

25   Mr. Vlahakis and Ms. Glave because this is, basically, a very

1    novel field, and they both --

2             THE COURT:  It's not a novel field to say this is

3    the money -- this is how much money was in a particular account

4    on a particular date, right?

5             MR. EKELAND:  I believe one of the things that

6    Ms. Glave mentions on page 2 of her expert disclosures, she

7    said she may also rebut defense argument that proceeds were

8    profits where the proceeds -- where the profits of his Bitcoin

9    sales -- which is, again, a matter of opinion.  I'm looking --

10   we just got the summary --

11            THE COURT:  I mean, I thought that was your position

12   itself.  I mean, I'm not sure it's even a disputed issue,

13   right?  Didn't you -- didn't Mr. Sterlingov testify in front of

14   me at the hearing that that's what they were; they were profits

15   that he earned from his Bitcoin transactions?

16            MR. EKELAND:  Yes.  But she's going to offer an

17   opinion that they weren't.

18            THE COURT:  They were not or they were?

19            MR. EKELAND:  That's my understanding; potentially,

20   that she's being noticed to rebut the defense argument that --

21            THE COURT:  I see.

22            THE EKELAND:  -- Mr. Sterlingov's proceeds were the

23   profits of his Bitcoin sales, which are going to be a matter of

24   her opinion and not personal knowledge.

25            THE COURT:  Maybe the bottom line would be -- with

1    all these witnesses, I worry a little bit about giving the

2    bottom line.  But the -- if she's simply saying, if you look at

3    the value of Bitcoin over time and you look at how much money

4    is in the accounts, it just doesn't match up.  That's sort of

5    classic, sort of, forensic accounting.

6          MR. EKELAND:  Well, there's some serious questions

7    about her methodologies there.  How are you valuing Bitcoin,

8    how are you accounting for --

9          THE COURT:  That's not so complicated, right?

10   Couldn't I do that at any point in time?  You go on the

11   internet, you find what the value of the Bitcoin is on a

12   particular day?

13         MR. EKELAND:  No, because early on there's no

14   established exchanges of value.  You can go back and look at

15   the historical data, but I don't think the historical value

16   goes back, and I don't think it's like looking up the price of

17   a stock on a given day because the market wasn't necessarily

18   liquid.

19         And then anything that you're looking at, I think,

20   early on, particularly starting in 2009, 2010, 2011, even maybe

21   into 2012, 2013, is bit anachronistic.  I don't think that you

22   can look at the value of Bitcoin early on and definitively say

23   its value, and then you've got its change over time.  So it

24   does matter who you're looking at, what --

25         THE COURT:  Can't you just do that -- isn't that just

1    usual cross-examination, if you want to cross-examine the

2    witness?

3              What I'm worried about here is that we're turning

4    this into a civil case with a judge sitting in on all of the

5    depositions in the case and that the purpose for a *Daubert*

6    hearing is a fairly narrow purpose.  If this isn't discovery --

7    and I have other ways to spend my time; I'm quite busy.  I just

8    don't want to be sitting in on what are really the equivalent

9    of civil depositions.

10             If it's something where there's no reasonable

11   probability I'm going to exclude her as a witness on the

12   grounds that this means of valuing Bitcoin is so suspect, then

13   it seems to me that this is reasonable ground for

14   cross-examination on your part.

15             MR. EKELAND:  Your Honor, this isn't a civil case

16   because Mr. Sterlingov's liberty is at stake.

17             THE COURT:  No, no.  I'm sorry.  My point was just

18   the opposite.  Discovery is much more limited in a criminal

19   case than in a civil case.

20             MR. EKELAND:  Well, that may be.  But the defense

21   submits that we are entitled to cross the noticed -- to *Daubert*

22   the noticed expert witnesses from the government and --

23             THE COURT:  That's not true.  It's only true if you

24   can establish some threshold that there's reason for me to

25   doubt or to -- there's some reasonable probability or

1    possibility that I would exclude the testimony on the grounds

2    that it is so unreliable that it ought not be presented to the

3    jury.  If it's not that, then it seems to me that it is

4    discovery.

5          MR. EKELAND:  Well, Your Honor, with Ms. Glave, we'd

6    submit that her valuations in relation to Bitcoin's

7    appreciation over time are going to be speculative, and we're

8    entitled to inquire into her methodologies in determining those

9    values because there isn't any solid, sound way of valuing

10   Bitcoin early on.

11         So we would argue that we're entitled to delve into

12   that.  And as for --

13         THE COURT:  Are you not going to offer any evidence

14   with respect to valuing Bitcoin early on because you think that

15   is sufficiently unreliable and there's no way to do it

16   reliably?

17         MR. EKELAND:  I just didn't hear you.

18         THE COURT:  Are you not going to offer evidence with

19   respect to the valuation of Bitcoin during that period of time?

20         MR. EKELAND:  No.  But there --

21         THE COURT:  No, you're going to; or no, you're not

22   going to?

23         MR. EKELAND:  We are going to offer our own

24   valuations.  But there is -- the serious caveat here is, where

25   are you turning to for the valuation of -- say, the exchange

1    rate of Bitcoin on November 20, 2011.  Are we going to go to

2    *Yahoo Finance*; are we going to go to *Bloomberg*; are we going to

3    go to the *Wall Street Journal*.

4              I mean, the market is liquid now, but you're making

5    assumptions that the market was liquid back then.  I don't

6    think it's as simple as just doing a Google search.  Maybe that

7    gets you initially started, but I think if you're going to make

8    these kinds of representations about the valuation and,

9    particularly, if you're going to be using the expert to make

10   the argument that Mr. Sterlingov somehow is getting service

11   fees from Bitcoin Fog and that the numbers don't add up, I

12   think that's a highly speculative venture.

13             And I think we're entitled to examine Ms. Glave on

14   the basis of her opinion there and, you know, her methodology.

15             THE COURT:  You're certainly allowed to at trial

16   examine her on that.  The question is whether you've made a

17   sufficient showing for *Daubert* purposes that her methodology is

18   unreliable or that I might conclude it's unreliable.

19             Let me ask Ms. Pelker.  What is Ms. Glave going to

20   say?  Is she going to go back and look at some past database

21   for identifying the value of Bitcoin going back to 2011 or so?

22             MS. PELKER:  We will have to check back with

23   Ms. Glave as far as which market index or indexes and exchange

24   rates she consulted, but that would be her testimony.

25             Defense is welcome at trial to cross-examine her on

1      why she chose the particular indexes or exchanges that she did.

2      Mr. Verret's testimony included his valuation from that time

3      period.  So if they want to put forward an alternative one,

4      they're welcome to do so.

5              THE COURT:  What I'll do is I'll just direct that the

6      government disclose to the defense which databases she was

7      using.  And if there's some reason to doubt the reliability in

8      a fashion that would permit exclusion or require exclusion

9      under *Daubert*, then I'll allow the defense to -- probably on

10     the day Ms. Glave comes to testify, we'll just do it outside

11     the jury for half an hour and do it that way.

12             MS. PELKER:  That's fine, Your Honor.  Thank you.

13             THE COURT:  Anything else?

14             MS. PELKER:  Just clarifying for Mr. Vlahakis --

15     there's no need for Ms. Glave or Ms. Vlahakis to come tomorrow?

16             THE COURT:  Anything on Mr. Vlahakis that you think

17     would be -- that raises *Daubert* issues?

18             MR. EKELAND:  The defense, without belaboring the

19     point, would like to *Daubert* Mr. Vlahakis, but I think we also

20     have had a -- and this is a separate question -- question as to

21     his -- relevance of his testimony in this case when it seems to

22     be that he's going to be testifying to matters of law, which

23     are the province of the Court.

24             And to the extent that he's going to be opining on

25     the regulatory environment in relation to Bitcoin Fog, again,

1    we're in speculative territory because, as far as we're aware,

2    there is no regulatory environment in 2009, 2010, 2011, 2012,

3    2013.  And there's this anachronistic element to this case

4    where there's a projection of the current standards as they're

5    perceived to be back in time.

6         What our concern is, is that Mr. Vlahakis is going to

7    come in testifying about legal matters and regulatory matters

8    that, A, are not relevant; B, are going to confuse the jury;

9    and C, be far more prejudicial than probative.  We just don't

10   see his relevance as a witness, and we object to him being

11   called and we also, again, would like to *Daubert* him.

12        THE COURT:  It doesn't strike me that what you're

13   describing is a *Daubert* issue.

14        But what about with respect to the other issues,

15   Ms. Pelker.

16        MS. PELKER:  I think, first and foremost, the Court's

17   very correct.  That is simply not a *Daubert* issue.

18   Mr. Vlahakis is absolutely not going to be offering an opinion,

19   and he is very clear and FinCEN is very clear that they're not

20   going to invade the province of the jury or the Court as far as

21   his area of testimony.

22        He is really explaining to the jury what the

23   Department of Treasury is, what the obligations are generally;

24   not speaking directly to Bitcoin Fog.  I think defense counsel

25   is grossly misstating the applicability of the law and the

1    regulations, but that is an argument that the government is

2    going to make to the jury in asking them to find Mr. Sterlingov

3    guilty of the 1960 violation, not something that Mr. Vlahakis

4    is going to be testifying about.

5                THE COURT:  So give me a little bit more about what

6    he's going to testify to.

7                MS. PELKER:  If the Court would like, I can have

8    Mr. Brown, who is handling his testimony, give a proffer.

9                THE COURT:  That's fine.  That would be helpful.

10   Thank you.

11               MR. BROWN:  Yes, Your Honor.  Mr. Vlahakis is going

12   to be testifying about what the Bank Secrecy Act is, why it

13   matters, what the obligations are for financial institutions in

14   general.  And that will provide context to the jury about,

15   well, you know, here's this offense, failure to register with

16   FinCEN, and that that is criminalized in 1960.

17               And Mr. Vlahakis's testimony will help the jury

18   understand, well, what is the point of registration, why -- you

19   know, how does FinCEN regulate these entities, what are the

20   sorts of reports that regulated entities are required to file,

21   why that's important for preventing illegal activity in the

22   financial system.  It's explaining to the jury this, sort of,

23   "so what?" of the 1960(b)(1)(B) count.

24               THE COURT:  Okay.  Mr. Ekeland?

25               MR. EKELAND:  Mr. Vlahakis is not a witness with

1     personal knowledge of anything in this case.  The government is

2     now saying that he's not going to be testifying as to any

3     opinions, if I'm understanding the government correctly, and

4     that he's going to be testifying as to questions of law and the

5     regulatory space.

6          Not only do we submit that this is relevant --

7     irrelevant, but to the extent that it is relevant, it is far

8     more prejudicial than probative.  This Court is quite capable

9     of explaining the law to the jury.  Mr. Vlahakis seems to be

10    brought in purely to -- for prejudicial purposes.

11         And I don't see how his testimony is relevant because

12    he's not a witness -- percipient witness with personal

13    knowledge of anything, and now we're being told that he's not

14    going to testify as to opinion, and he's simply going to tell

15    us the legal and regulatory framework and why it matters and

16    why it's important.

17         And I would submit to the Court that the importance

18    of the regulatory legal environment is a matter of opinion.  So

19    we object to this, Your Honor.

20         THE COURT:  I don't know whether it's opinion or not.

21    I mean, it does seem to me that it involves some expert

22    testimony in that it -- he's testifying based on his

23    specialized experience in a field and describing how that field

24    works.

25         I don't think that based on what I've heard there's a

```
 1     basis for a Daubert hearing.  But, Mr. Ekeland, you preserve

 2     any and all objections you have, and you can raise them in

 3     light of his testimony as appropriate.

 4                MR. EKELAND:  Yes, Your Honor.  We do object, and we

 5     will object on that basis.  Thank you, Your Honor.

 6                THE COURT:  That's fine.  All right.  Let's take our

 7     break, but let's not come back at 2:15.  We can come back at --

 8     I'm sorry.  Yes.  That clock is not right.  So it's 3:20.  Why

 9     don't we come back at 3:35.

10                (Recess taken.)

11                THE COURT:  All right.  Ms. Pelker.

12                MS. PELKER:  Thank you, Your Honor.  May I have the

13     Court's permission to pass the exhibit binder up to the

14     witness?

15                THE COURT:  You may.

16                MS. PELKER:  Thank you.

17                          CROSS-EXAMINATION OF

18                             JONELLE STILL

19     BY MS. PELKER:

20     Q.  Good afternoon, Ms. Still.  I'd like to direct your

21     attention to the binder in front of you, specifically Tab 10,

22     your expert report which was previously admitted as Defense

23     Exhibit, I believe, B.

24                Turning to page 41, is that your digital signature on

25     the report?
```

```
1              THE COURT:  Page 40.

2              MS. PELKER:  40.  Thank you, Your Honor.  I believe

3    it was 41 of the PDF.

4              THE WITNESS:  Yes, ma'am.

5    BY MS. PELKER:

6    Q.  Ms. Still, did you prepare this report yourself?

7    A.  Yes, ma'am.

8    Q.  Did you write it in its entirety?

9    A.  Yes, ma'am.

10   Q.  And do you still agree with all of the findings as

11   expressed in this report?

12   A.  Yes, ma'am.  However, I reserve the right to amend my

13   opinion as this is an ongoing case, and I am still reviewing

14   discovery and any further discovery.

15             THE COURT:  People always say that; I reserve my

16   right.  You only reserve whatever right the Court gives you.

17   You're welcome to note that you may want to request leave to

18   amend, but it's not directed at you in particular.  I see that

19   all the time.  It's subject to whatever the Court permits.

20             THE WITNESS:  What's the correct way to state that

21   then, if I may know?

22             THE COURT:  Well, I think you can say that you're

23   still considering issues or still engaged in analysis, and the

24   Court can then determine whether it's too late.

25             THE WITNESS:  Okay.
```

```
 1    BY MS. PELKER:
 2    Q.  Ms. Still, when did you learn about this case?
 3    A.  When did I learn about this case?  July of this year.
 4    Q.  And prior to being retained as an expert, had you listened
 5    to or read any of the defense's public statements about this
 6    case?
 7    A.  No.
 8    Q.  Have you done so since?
 9    A.  A little bit.
10    Q.  And you're aware now that a main focus of the defense
11    appears to be discrediting a CipherTrace competitor,
12    Chainalysis?
13    A.  Say that again.
14    Q.  You're aware that a main focus of the defense appears to be
15    discrediting a CipherTrace competitor, Chainalysis?
16    A.  I think there are a number of points here to unpack.  I
17    think stating that Chainalysis is a competitor is true, was
18    true.  However, we were acquired by Mastercard, so that's
19    certainly shifted our focus.
20            As you know, Mastercard is servicing acquirers and
21    other financial institutions internally who are not customers
22    of Chainalysis, and so that would be our customer base as well.
23    Q.  So you don't consider CipherTrace a competitor with
24    Chainalysis?
25    A.  I think to say it as a blanket statement generally
```

1    speaking, but I think we have to appreciate that our focus is

2    different.  I can't even recall the last time we competed for

3    the same contract, if that makes sense.

4            And the number of law enforcement are -- they will

5    use our tool, they will use Chainalysis's tools.  So we share

6    those customers.

7    Q.  CipherTrace does have an overlapping customer base with

8    competition with Chainalysis for government contracts; isn't

9    that correct?

10   A.  Yes.

11   Q.  And also for private sector clients; isn't that correct?

12   A.  For private sector, I can think of one partner that we

13   share.

14   Q.  One partner that you share.  But there are some private

15   companies that choose CipherTrace and some other private sector

16   companies that choose Chainalysis?

17   A.  Probably.  I don't know that I can totally confirm that,

18   but probably.

19   Q.  Ms. Still, how many hours did you spend reviewing the

20   discovery before beginning to draft your report?

21   A.  So in total, I've spent over 150 hours looking and working

22   on this case.  Prior to drafting the report, I actually --

23   probably 40 or so.  And I worked sort of, kind of, like this.

24   So I would go through one report, like an expert report, and I

25   would work through that report, I would do the traces, and I

1    would move on to the next expert report and so on.

2    Q.  Have you now reviewed all of the discovery?

3    A.  I think it would be -- if we could pull it up on the screen

4    or a -- a screen, if I could show you exactly what I covered, I

5    can do that file by file.  But there were thousands of files.

6    Q.  I guess that's my question.

7    A.  It's possible I didn't touch every single file, but I did

8    touch as much as I could.

9    Q.  And, Ms. Still, you testified that in the Mt. Gox records

10   that you reviewed, the -- it was a single spreadsheet with

11   multiple accounts mixed together; is that right?

12   A.  I didn't say single spreadsheet.  There were multiple

13   spreadsheets; however, the account information for each of the

14   users was combined into one.  Those were not organized by date

15   or time or user.

16   Q.  So you're aware that the government has produced trial

17   pulls that separate out each of the user's account activity

18   into its own spreadsheets, and you have reviewed those; is that

19   correct?

20   A.  Can you pull those up so I can see, please.

21   Q.  Not here, no.  I'm just trying to get a sense of what

22   you've reviewed from the discovery.

23          But you are aware that there are specific trial pulls

24   from the Mt. Gox records that will be admitted at trial.

25   A.  I guess, can you define what a trial pull is.  I'm not

1    totally clear on what a trial pull is.

2    Q.  Are you aware that there are different versions of the

3    Mt. Gox records in discovery?

4    A.  Different versions?  As in -- what does that mean?

5    Q.  Have you reviewed multiple documents relating to Mt. Gox in

6    the discovery?

7    A.  Yes.

8    Q.  And have some of those included spreadsheets recently

9    produced that separate out the activity by account?

10   A.  Recently produced?

11   Q.  In the last several months.

12   A.  I reviewed the Mt. Gox documents that were produced.

13   Q.  Your expert report indicates you've agreed to work on this

14   case pro bono; is that right?

15   A.  Yes.

16   Q.  If Mr. Sterlingov's funds are released at the end of this

17   case, do you expect to be paid?

18   A.  No.

19   Q.  What would your usual rate be for expert witness services?

20   A.  Somewhere between 1,000 and 2,000 an hour.

21   Q.  And how many hours do you expect to spend on this case if

22   it goes to trial?

23   A.  Unclear.

24   Q.  Do you have an estimate, including trial testimony?

25   A.  Our clients often ask for these types of estimates.

1    However, it's quite difficult to determine how many hours I

2    will spend in court testifying.

3            We have to include in that estimate the cost of

4    hotels and travel and then any other discovery or any other --

5    anything else produced by the government that I will need to go

6    over.  I can't be sure.

7    Q.  Well, we are now three weeks out from trial.  Are you

8    testifying that you don't know how many hours you anticipate

9    spending on this case between now and trial?

10   A.  Yes.  I can't say for certain how many hours that I'm going

11   to continue to spend, but I will continue to go through

12   discovery and trace and especially review that one particular

13   address.

14   Q.  Are you doing this work during your normal working hours at

15   CipherTrace?

16   A.  Normal working hours, as CipherTrace works, we can say yes;

17   that kind of includes weekends and evenings.

18   Q.  I guess my question is, are the hours that you are working

19   on this case considered part of hours that you are working for

20   CipherTrace, or is that in addition to hours that you would

21   normally be working at CipherTrace?

22   A.  It's a combination of both.

23   Q.  And you're continuing to be paid your usual salary during

24   this time?

25   A.  Yes.

1    Q.  And so is CipherTrace, essentially, donating your working

2    hours for this case?

3    A.  I guess they -- we could say that.  I don't know how they

4    view it.

5    Q.  What percentage of your time over the next month leading

6    into trial do you anticipate dedicating to this case relative

7    to your other CipherTrace responsibilities?

8    A.  So are you looking for -- like, in terms of a percentage,

9    like per day, per week or I guess -- I'm trying to get at what

10   exactly you need from me here.  I really can't say, again, how

11   many more hours I'm going to spend on this case.

12             I can't provide you, necessarily, with an estimate.

13   If there are more supplemental reports, I'll need to review

14   those, and I will.  I'll continue to work through the

15   discovery.

16   Q.  Who is paying your expenses in D.C. for this hearing and

17   trial testimony?

18   A.  Both myself and CipherTrace.

19   Q.  And has CipherTrace management officially sanctioned your

20   work on this case?

21   A.  Yes.

22   Q.  And does that include Dave Jevans, Pamela Clegg, and

23   CipherTrace leadership?

24   A.  Yes.  Dave Jevans was the CEO.  We are now under

25   Mastercard.

1    Q.  Has Dave Jevans and Pamela Clegg reviewed and approved the

2    report that you submitted to the Court?

3    A.  Dave Jevans did not review the report, and he's also no

4    longer CEO of CipherTrace; although perhaps in name only, it

5    would be polite to say we are now Mastercard.

6    Q.  That's because Mastercard has acquired CipherTrace, but it

7    continues to exist under the Mastercard brand?

8    A.  I actually don't know what the legal arrangement is.  It's

9    not clear to me.  But I am told at some point we will no longer

10   be CipherTrace, and we will be Mastercard.

11   Q.  Ms. Still, in preparing your expert report, have you

12   conferred with the other defense experts on this case?

13   A.  I spoke briefly to them, but nothing of -- nothing really

14   of substance here.

15   Q.  Have you participated in their group chats or email

16   exchanges about the case?

17   A.  I did get a congratulatory email on the report from

18   Professor Verret.

19   Q.  But not engaging in substantive discussion of the case by

20   chat or email?

21   A.  No.  Although I did provide a particular IP address that I

22   found really interesting, and I was curious if anyone else

23   found it interesting as well.  That IP address is outlined in

24   my report.

25   Q.  Now, Ms. Still, turning to CipherTrace's work, do you agree

1    that you can use the blockchain to follow funds from one

2    address to the next on the blockchain?

3    A.   Generally speaking, yeah, yes.  That's the -- sorry.  It's

4    kind of the point of having that immutable record, is you want

5    to be able to say which addresses are in control of the funds

6    and how that changed over time.  So you have this -- like I

7    mentioned, this sort of, like, genealogy.

8    Q.   That's something that's done by CipherTrace, by law

9    enforcement, by private sector; is that right?

10   A.   Do you mean with respect to tracing funds?

11   Q.   Tracing funds, generally, on the blockchain.

12   A.   Yes.  Even amateur investigators, if you look on Twitter,

13   there are a number; some are great.

14   Q.   CipherTrace employees have, in fact, submitted sworn

15   declarations and testified at trials to precisely that type of

16   tracing; is that right?

17   A.   I believe so.

18   Q.   And does that include CipherTrace's former CEO, Dave

19   Jevans?

20   A.   Dave Jevans, as I'm aware, did testify maybe in one case,

21   but I can't be certain.  I'd have to double-check.

22   Q.   Have you ever testified at trial?

23   A.   I've never testified at trial.  I have only provided

24   affidavits.

25   Q.   And you have provided sworn affidavits in court?

1    A.  Yes.

2    Q.  Are you familiar with CipherTrace Sentry and CipherTrace

3    Inspector?

4    A.  Yes.

5    Q.  Directing your attention to Government's Exhibit 11,

6    CipherTrace Sentry Fact Sheet, is this a fact sheet about

7    CipherTrace Sentry?

8    A.  Yes, it is.

9    Q.  Could you read the paragraph titled "Entity Identification

10   Through Superior Attribution."

11   A.  Sure.  "CipherTrace Sentry exposes relevant data from

12   CipherTrace's immense data lake, which ties crypto addresses to

13   real-world organizations, sanctioned entities and events.  This

14   data is derived from extensive open- and closed-source

15   intelligence gathering, which includes active participation in

16   the crypto economy by CipherTrace researchers.  CipherTrace's

17   proprietary clustering and other algorithms rapidly aggregate

18   and correlate various indicators to add millions of data points

19   weekly."

20   Q.  Ms. Still, do you agree that that's an accurate description

21   of CipherTrace's clustering and attribution process?

22   A.  Proprietary clustering and other algorithms, I think

23   they're including in here the way the tool works.  So I'm a

24   little -- actually, I would like clarity from them on that

25   last, sort of, section there.

1    Q.  So you don't believe that CipherTrace uses proprietary

2    clustering and other algorithms?

3    A.  That's not necessarily what I'm saying.

4    Q.  So they do use proprietary clustering and other algorithms?

5    A.  I think I would have to get with our data scientist to

6    figure out exactly what we're saying is proprietary here.  I'm

7    also not an expert in IP either; that being intellectual

8    property.

9         I don't know exactly what is considered proprietary

10   with respect to this algorithm.

11   Q.  Directing your attention to Government's Exhibit 13, is

12   this a document describing CipherTrace Inspector?

13   A.  Yes.

14   Q.  And could you read the paragraph under "Superior

15   Attribution for a More Accurate Complete Review."

16   A.  "CipherTrace's immense repository of attribution data ties

17   crypto addresses to real-world organizations, sanctioned

18   entities, IP addresses and events.  This data is derived from

19   extensive open and closed-source intelligence gathering, which

20   includes active participation in the crypto economy by

21   CipherTrace researchers.  CipherTrace's proprietary clustering

22   algorithms rapidly aggregate and correlate various indicators

23   to add millions of data points weekly providing users with

24   actionable data."

25   Q.  Now, turning your attention to Exhibit No. 14, is this

1    another CipherTrace information sheet?

2    A.  Yes.

3    Q.  Could you turn to the second page and read the paragraph in

4    blue on the top of page 2.

5    A.  "CipherTrace delivers cryptocurrency AML and

6    counterterrorism financing, CTF, blockchain forensics and

7    regulatory monitoring solutions that make crypto assets safe.

8    At the heart of these solutions is globally shared

9    cryptocurrency intelligence and a massive curated pool of

10   high-quality blockchain attribution information covering more

11   than 800 tokens.  A team of researchers automates collection of

12   this intelligence, then validates its veracity to add between

13   10 and 20 million unique pieces of trusted data to the pool

14   every month.  Applying proprietary clustering transforms this

15   raw transaction data into intelligence that de-anonymizes

16   Virtual Asset Service Providers, VASPs."

17   Q.  Ms. Still, isn't it true that in CipherTrace's descriptive

18   fact sheets for its various different products, it's describing

19   itself as using proprietary clustering and other algorithms?

20   A.  Yes.

21           MS. PELKER:  Government seeks to admit Government's

22   Exhibits 11, 13, and 14.

23           THE COURT:  Any objection?

24           MR. EKELAND:  No objection, Your Honor.

25           THE COURT:  Exhibits 11, 13, and 14 are admitted.

1          (Government Exhibits 11, 13, and 14 were admitted.)

2     BY MS. PELKER:

3     Q.  CipherTrace's blockchain analysis includes clustering;

4     isn't that right?

5     A.  Yes.

6     Q.  And on page 27 of your report, you state, "CipherTrace also

7     uses heuristic 1, multi-input clustering as the primary

8     heuristic for nondirect attribution"; is that correct?

9     A.  Yes.

10    Q.  What other heuristics does CipherTrace use?

11    A.  It depends how we're viewing the word heuristic.  And this

12    is sort of what I was getting at at the beginning of my

13    testimony.  This is also referenced in Mr. Scholl's report.

14          The way we're using this terminology depends on who

15    you ask and how we define it, and we don't necessarily all

16    agree.  So other heuristics, if we look at Chainalysis and the

17    way they describe direct attribution, they actually include it

18    under heuristic 3; whereas, typically, we would say that is

19    direct attribution, and that's how I would testify to it.

20    Q.  So you're saying that CipherTrace does use heuristic 3; you

21    just call it something different?

22    A.  So, again, we -- I wouldn't say that at all.  We just call

23    them -- if you would get intelligent -- let's pull up

24    heuristic 3, and let's read it together in Ms. Bisbee's report.

25    Q.  I'm actually asking the questions here.  Let's just -- we

1    really do need to move things along for time.

2    A.  Okay.

3    Q.  So are you saying that CipherTrace does use some

4    intelligence-based information, but they call it direct

5    information rather than heuristic 3?

6    A.  I think in terms of intelligence gathering, what we're

7    calling direct attribution is referring to us actually going

8    and collecting those addresses ourselves.  Again, that would be

9    like, for example, signing up for exchange accounts and running

10   transactions through those accounts and then, based upon those

11   exchange accounts and those transactions and clustering, we

12   would then pull in all of those deposit clusters and any

13   withdrawal clusters or hot wallets as well.

14   Q.  And that includes activity that Chainalysis may include

15   under heuristic 3?

16   A.  As I understand it.

17   Q.  And does CipherTrace also engage in some clustering, some

18   attribution activities that would be included under Chainalysis

19   heuristic 2?

20   A.  Not to my knowledge.

21   Q.  Does CipherTrace use change addresses in making any of its

22   analysis?

23   A.  We have an algorithm that will identify a change address,

24   and it is wrong, and so we're in the process of -- I'm pushing

25   that we pull that particular change identifier out, as I don't

1    think it's accurate enough, and I think it can be misleading.

2    Q.  But as it stands currently, CipherTrace does use change

3    address analysis in doing its attribution?

4    A.  Oh, not in its attribution.  I'm sorry.

5    Q.  In doing its tracing.  It does have an algorithm that

6    relates to change addresses?

7    A.  It will attempt to identify the change address if it is in

8    the same cluster.

9    Q.  And does it also have an algorithm or some sort of process

10   to attempt to identify peel chains?

11   A.  No.

12   Q.  Does it have any other algorithms that attempt to do

13   anything other than co-spending in making assessments about

14   attribution?

15   A.  Not that I'm aware of.

16   Q.  Are you aware of what the error rate is for CipherTrace's

17   clustering heuristics?

18   A.  Yes.  So we went through a model validation and data

19   assessment and audit in 2021, and there is a report.  I don't

20   know if we need it today, but I can get you those numbers if

21   it's critical for this.

22   Q.  Are you aware of what the error rate numbers were?

23   A.  It was really low, but I can't recall what the P value was

24   and all of that, if that makes sense.  I would need to -- I

25   would need to pull that up for you.

1    Q.  Have CipherTrace's heuristics ever been peer-reviewed in

2    scientific literature?

3    A.  No.

4    Q.  Have you ever personally reviewed the CipherTrace source

5    code?

6    A.  No.

7    Q.  And are you able to still conduct blockchain analysis using

8    CipherTrace without reading through that underlying source

9    code?

10   A.  I have been without reading.

11   Q.  Do you feel it's necessary for the government to review

12   CipherTrace's source code in order to respond to your analysis?

13   A.  I'm honestly not sure if this would be relevant for you or

14   not.  But if you find it useful, I think that's a conversation

15   we could have, as well as getting you access to Inspector, if

16   you find that useful.

17   Q.  But you don't feel that it's necessary for the government

18   to review the source code in order to understand your analysis?

19   A.  I think -- so I'll say this.  I think it would be if the

20   government was relying on CipherTrace data.  This might be an

21   important question for you to ask and for us to provide to you.

22           However, in this case, the government is not relying

23   on CipherTrace data, so I can't really speak to that.

24   Q.  And you're able, again, to use CipherTrace's product and

25   conduct reliable blockchain analysis using it without ever

1    having reviewed the source code?

2    A.  Yes.

3    Q.  Is CipherTrace's clustering, in your opinion, reliable?

4    A.  So multi-input clustering -- that's the clustering that we

5    use -- and reliable in terms of we have to put this in --

6    within the context of understanding that CoinJoins break that

7    heuristic.  PayJoins --

8    Q.  Are you testifying that CipherTrace's clustering, your

9    company's product, is not reliable?

10   A.  That's not what I'm saying, but I'm also not saying we're

11   100 percent accurate either.

12   Q.  Are you testifying that your product is not sufficiently

13   reliable for presentation in court?

14   A.  No.

15   Q.  Ms. Still, doesn't -- don't you and other members of

16   CipherTrace offer tracing using your products to law

17   enforcement agencies?

18   A.  Yes.

19   Q.  And you're aware that law enforcement uses that tracing in

20   support of criminal cases?

21   A.  In support of what?

22   Q.  In support of criminal cases.

23   A.  Yes.

24   Q.  And do you agree that CipherTrace's customers need reliable

25   tracing and attribution as part of the reason that they have

1    contracted with CipherTrace in the first place?

2    A.  As most accurate as possible.

3    Q.  And doesn't CipherTrace market its products as accurate and

4    reliable, including to Mastercard during the CipherTrace

5    acquisition?

6    A.  Actually, I don't know how we marketed ourselves to

7    Mastercard.  I wasn't part of that negotiation or that process.

8    Q.  You're part of presentations that are given to prospective

9    clients in the form of open trainings; is that right?

10   A.  Sorry.  What do you mean by that?

11   Q.  You give presentations to audiences that include

12   prospective clients of CipherTrace?

13   A.  Like a demo?

14   Q.  Yes.

15   A.  Yes.

16   Q.  And in doing so, are you telling those prospective clients,

17   oh, and by the way, actually none of this is sufficiently

18   reliable or accurate?

19   A.  No.  But we do definitely counter with -- and I think this

20   is quite ethical and responsible in terms of blockchain

21   tracing.  That there are some considerations here in terms of

22   the heuristics, multi-input clustering.

23           And every time we teach, we make sure to teach that

24   CoinJoins do break that heuristic.

25   Q.  We'll talk about CoinJoins a little bit later on, but in

1    the conclusion of your report on page 39, I believe -- it may

2    actually be 38 -- you state, "Blockchain forensics should only

3    be used to generate investigatory leads."

4         Is it your testimony that blockchain analysis,

5    whether by CipherTrace or anyone else, is not sufficiently

6    reliable for court testimony?

7    A.  No.

8    Q.  And are you aware that CipherTrace's then-CEO, Dave Jevans,

9    testified as an expert witness back in 2019 in Canada?

10   A.  That could be correct.  I don't know the dates.

11   Q.  Directing your attention to Government's Exhibit 15, is

12   this a CipherTrace press release regarding Mr. Jevans'

13   testimony?

14   A.  Looks like.

15   Q.  And directing your attention to the beginning of

16   paragraph 4, does this release explain that Mr. Jevans

17   testified that he could trace payments from the darknet markets

18   Agora and Evolution into the defendant's Bitcoin wallet?

19   A.  Sorry.  Which paragraph is this?

20   Q.  This would have been in paragraph 14 after the -- sorry,

21   paragraph 4 after the quote.  So the one beginning with,

22   "Mr. Jevans traveled to Ontario."

23   A.  Okay.  So what was the quote?  Where is the quote that you

24   just said?  Sorry.  I don't see it.

25   Q.  "Mr. Jevans traveled to Ontario and testified that he was

1    able to trace multiple transactions from dark web markets Agora

2    and Evolution into Phan's bitcoin addresses."

3    A.  I'm sorry.  I still don't -- oh, here we go.  I was

4    counting the top paragraph as paragraph 1.

5            So what was the question?

6    Q.  Is that what the release says?

7    A.  Okay.  Yes.

8    Q.  And Mr. Jevans would have been able to identify the

9    addresses controlled by Agora and Evolution because they were

10   clustered in CipherTrace's product; is that right?

11   A.  I actually don't -- I would need to look at the report.  I

12   actually don't have the report in front of me.  Do I need to

13   get it?

14   Q.  No.  But you're aware that he is testifying that he was

15   able to trace funds from darknet markets that have not been

16   previously seized by law enforcement; is that right?

17   A.  I'm honestly not clear on that.  I really would like to

18   review that report to understand what Mr. Jevans is saying here

19   with respect to this announcement, which may not accurately

20   represent the report.  I'm really not sure.

21   Q.  So regardless of what's in the report, this is what

22   CipherTrace is putting out and saying that Mr. Jevans testified

23   to -- is that right? -- on CipherTrace's website?

24   A.  On the CipherTrace website, yes.

25   Q.  And this would have been sworn testimony, according to this

1    press release, before a Canadian court, including an assessment

2    of the reliability of that blockchain analysis?

3    A.   Could you rephrase that.

4    Q.   This would have been sworn testimony that Mr. Jevans was

5    presenting to a Canadian court?

6    A.   It looks like he testified, so that sounds like a sworn

7    testimony to me.

8           MS. PELKER:  Government would move to admit

9    Government's Exhibit 15.

10          THE COURT:  Any objection?

11          MR. EKELAND:  No objection, Your Honor.

12          THE COURT:  Exhibit 15 is admitted.

13          (Government Exhibit 15 was admitted.)

14   BY MS. PELKER:

15   Q.   Ms. Still, was CipherTrace retained by Holland & Knight to

16   serve as experts in a matter related to the LCX Exchange?

17   A.   Yes.

18   Q.   And did you prepare an affidavit in that matter?

19   A.   I did.

20   Q.   Showing you Exhibit 16, is that a copy of your affidavit?

21   A.   This looks right.  This is only one affidavit, though.

22   Q.   Directing your attention to page 3, is that your signature

23   beneath where it states, "I declare under penalty of perjury

24   the foregoing is truth and correct"?

25   A.   Yes.

1    Q.  And did you tell the truth when you swore to this

2    statement?

3    A.  Did I tell the truth?

4    Q.  Yes.

5    A.  Yes.

6    Q.  And you mentioned that there's another affidavit.  This was

7    the only one listed in your expert disclosure.

8            Is there another affidavit that you've prepared?

9    A.  So I prepared a number of affidavits.  But I would like to

10   point out page 7; if you notice, my email address, my phone

11   number, my LinkedIn are at the top.  So we, through Mastercard

12   lawyers and corporate security, requested Holland & Knight

13   remove this from the internet for my own safety, as I was

14   receiving a number of emails, texts, calls from China, Russia,

15   North Korea, and feeling quite unsafe that it was also possible

16   to trace back where I lived because you can see there on -- was

17   that page 3? -- no, page 4 -- the county in California where

18   this was notarized.

19           So I -- before we continue, I would, like, politely

20   request if you could remove my personal information from this

21   if we're going to submit this as an exhibit.

22           MS. PELKER:  Sure.  So when we submit things in as

23   exhibits for the purpose of *Daubert* hearing, they aren't

24   generally made publicly available.  I will say that I simply

25   pulled this down from the New York State court docket, so it

1    does appear to still be there.

2             But to the extent we use this at trial, we're, of

3    course, happy to redact it.

4    A.  I understand.  We've gone back and forth with Holland &

5    Knight, and currently we are in touch with the court to remove

6    my personal information from the internet.

7    Q.  But there's no substantive difference in a subsequent

8    affidavit that was submitted?

9    A.  Honestly, I can't recall.  I'd have to look.  I think there

10   were a couple of different affidavits.  They had me trace a

11   number of times in this case.

12   Q.  So if there are additional affidavits that were filed on

13   any sort of court case, the government is just going to ask

14   that defense counsel update your expert disclosure to include

15   anything that was -- any affidavits that you also filed.

16   A.  Okay.  Is that not accounted for in there?

17   Q.  At the moment the only affidavit we are aware of was the

18   specific docketing of this.

19           Now, directing your attention to page 11, could you

20   read the second and third paragraphs here under

21   "Methodologies."

22   A.  "CipherTrace utilized the forensic standards of common

23   spend heuristics and change addresses in the unspent

24   transaction output-based cryptocurrency Bitcoin to trace the

25   flow of funds from address to address to determine the ultimate

1    destinations."

2    Q.  And the next paragraph?

3    A.  "The blockchain stores the details of every

4    cryptocurrency" --

5    Q.  I think you missed a paragraph.

6    A.  Sorry.  Yes.  "CipherTrace utilized both open source and

7    proprietary attribution data to determine entity ownership of

8    funds received at the ultimate destination address."

9    Q.  And are those, in fact, the methodologies that you used in

10   your analysis for this case?

11   A.  For open source?  So this is the Ethereum-based case.  This

12   is a bit different.  Although there is some RenVM transactions

13   there, which are on the Bitcoin ledger, but this is on the

14   Ethereum network.

15            So attribution works slightly differently, in that in

16   Ethereum we have something called smart contracts.  In those

17   smart contracts, if they belong to a certain entity or

18   controlled by a certain entity, we'll say who the owner is.

19   Q.  What I'm trying to ask is, is this an accurate description

20   of the methodologies that you used in preparing and doing your

21   work for the Holland & Knight retained work?

22   A.  For specifically Holland & Knight?

23   Q.  You have an affidavit that's describing methodology --

24   A.  No, it's --

25   Q.  You have an affidavit describing the methodologies used.

1    I'm just asking you to confirm whether these were, in fact, the

2    methodologies that you used.

3    A.  If I can go through and take a moment to read through this

4    page -- it's been a while since I've seen this -- to make sure

5    I've covered everything that I would cover today.

6    Q.  So it wouldn't be what you would cover today.  I'm just

7    asking about the methodologies that you used in preparing this

8    affidavit for the Holland & Knight case, not in your testimony

9    for the Bitcoin.

10   A.  I understand.  Could I take a moment to read through this?

11   Q.  Sure.

12   A.  Thank you.

13   Q.  Just in the interest of time, were these the methodologies

14   that you said at the time you used to prepare this report?

15   A.  You mean, did I write this?

16   Q.  Did you write this?

17   A.  Yes.

18   Q.  And looking at paragraphs 5 and 6 further down that page,

19   do those paragraphs go on to describe the co-spend and change

20   address heuristics for the analysis?

21   A.  May I have a moment to read these?

22   Q.  Sure.  Actually, we can skip straight through.  Could you

23   just read aloud paragraphs 5 and 6.

24   A.  Yes.  That's starting with "Another common," correct?

25   Q.  Yes.

1    A.   Okay.  "Another common blockchain analysis technique is to

2    identify address clusters that are under common control.  There

3    are several types of clustering analyses.  When common

4    technique involves identifying transactions with multiple

5    sending addresses funding the same transactions to one

6    receiving address, often called co-spend or consolidating

7    transactions.  Because all cryptocurrency funding the co-spend

8    transaction is transferred through one transaction to the same

9    user, one can, therefore, infer that all sending addresses are

10   controlled by the same user.  The co-spend technique is highly

11   reliable and the most-used metric in commercial blockchain

12   analysis tools."

13        "Another clustering technique is to identify change

14   addresses.  When cryptocurrency is transferred from a sending

15   to a receiving address, any funds held at the sending address

16   that are not designated for transfer are transferred to a

17   change address, which is also will controlled by the sender.

18   Thus, by identifying a change address, one may be able to show

19   that the same user controlling the sending address also

20   controls the change address; thus, demonstrating common

21   ownership of the sending address and the change address."

22   Q.   Turning to the next page, page 12, could you read starting

23   about halfway through the first paragraph.  I can read it

24   aloud.  "CipherTrace Inspector uses co-spend and change address

25   heuristics to cluster addresses together to identify additional

1      addresses under the same control.  And CipherTrace Inspector

2      uses a graph database that displays public blockchain

3      transactions and data with relationships to an anchor

4      transaction.  Like other blockchain explorers, the

5      transaction information that CipherTrace Inspector produces is

6      from a public blockchain and can be verified through any other

7      blockchain explorer."

8              Did you write that?

9      A.  Yes.

10             MS. PELKER:  Government would move to admit

11     Government's Exhibit 16.

12             THE COURT:  Any objection?

13             MR. EKELAND:  Your Honor, as long as we redact --

14             MS. PELKER:  I think Mr. Ekeland is just -- to the

15     extent that any of this would end up being made publicly

16     available, we would just redact.

17             THE COURT:  This is admitted for purposes of the

18     *Daubert* hearing.  That's true of all the documents that I've

19     admitted.  It's going to sit either on the bench here or in my

20     chambers.

21             So if you still feel like it needs to be redacted,

22     we're not publishing this on the docket.

23             MR. EKELAND:  With that understanding, then, we don't

24     object.  We just ask that if it is going to circulate that the

25     PII be redacted.

```
 1              THE COURT:  Fair enough.
 2              (Government Exhibit 16 was admitted.)
 3    BY MS. PELKER:
 4    Q.  Ms. Still, are you familiar with the money laundering steps
 5    of placement, layering, and integration?
 6    A.  Yes.  Those are, generally speaking, the three steps.
 7    Q.  And in the cryptocurrency space, do some people use mixers
 8    to assist in the layering process?
 9    A.  Yes.
10    Q.  And as part of the integration step, do some people then
11    deposit the so-called cleaned funds into exchange accounts?
12    A.  Yes.
13    Q.  And are you aware that criminals hold accounts at virtual
14    currency exchanges?
15    A.  Yes.
16    Q.  And that includes accounts that they may verify with know
17    your customer information?
18    A.  Yes.
19    Q.  And CipherTrace and other companies have whole lines of
20    products to help financial institutions identify potential
21    illicit funds coming onto their platform?
22    A.  Correct.
23    Q.  CipherTrace offers a risk scoring of transactions in its
24    products; is that right?
25    A.  Risk scoring of transactions?
```

1    Q.  Risk scoring of entities, exposures; some sort of risk

2    scoring method.

3    A.  Of addresses.

4    Q.  What risk scoring does CipherTrace assign to the darknet

5    markets listed in the government's report?

6    A.  Ten.

7    Q.  Ten out of what?

8    A.  Ten.

9    Q.  So they are considered the most risky transactions?

10   A.  Criminal.

11   Q.  Not just risky; they're considered criminal?

12   A.  We'll consider them criminal.

13   Q.  What risk scoring does CipherTrace assign to transactions

14   tied to the addresses it has associated with Bitcoin Fog?

15   A.  Ten.

16   Q.  Ten.  So CipherTrace considers those criminal?

17   A.  Yes.  I'm sorry, Bitcoin Fog?

18   Q.  Bitcoin Fog.

19   A.  No.  That's a mixer, not a dark market.

20   Q.  Right.  So what's the risk scoring that CipherTrace would

21   assign to Bitcoin Fog?

22   A.  For a mixer, it depends on the mixer itself.  Let me check

23   my attribution to see.

24   Q.  Do you know what the risk scoring would be for Bitcoin Fog,

25   specifically?

1    A.  I honestly can't recall.

2    Q.  Directing your attention to Government's Exhibit 17, is

3    this a CipherTrace anti-money laundering report?

4    A.  Sorry.  Exhibit 17?

5    Q.  Exhibit 17.

6    A.  Yes.

7    Q.  And turning your attention to page 6 -- I believe that's

8    actually page 5.  It's describing a CipherTrace study, and it

9    says just above that chart, "The study defined criminal sources

10   as dark market site, extortion, malware, mixer/tumbler/money

11   laundering site, ransomware, and terrorist financing that

12   CipherTrace has been able to identify and validate as of

13   9/28/2018."

14           Is that what CipherTrace included in its AML report?

15   A.  I haven't read this report from 2018.

16   Q.  I'm just asking whether that's what's written here.

17   A.  Yes.

18           MS. PELKER:  Government would move to admit

19   Government's Exhibit 17.

20           THE COURT:  Any objection?

21           MR. EKELAND:  No objection, Your Honor.

22           THE COURT:  Exhibit 17 is admitted.

23           (Government Exhibit 17 was admitted.)

24   BY MS. PELKER:

25   Q.  Ms. Still, you're aware that law enforcement often issues

1    subpoenas to exchanges to gather records about exchange

2    customers, aren't you?

3    A.   Yes.

4    Q.   And that information can be used to advance an

5    investigation?

6    A.   Yes.

7    Q.   You are not a sworn law enforcement officer, are you?

8    A.   No.

9    Q.   And you've never worked in law enforcement?

10   A.   No.

11   Q.   You've never actually issued a subpoena?

12   A.   I helped write a subpoena.

13   Q.   You've never been the one actually issuing the subpoena?

14   A.   I've never actually issued.

15   Q.   And before reviewing the discovery in this case, how many

16   times had you actually seen an actual grand jury subpoena in

17   real life?

18   A.   I don't know.

19   Q.   You don't recall ever seeing one?

20   A.   I'm sure I have.  I just can't think of one right now.  Are

21   those public?

22   Q.   No, they are not public.

23   A.   Then I don't know that I've seen one.

24   Q.   You've never presented a matter to a grand jury?

25   A.   Presented a matter to a grand jury?  I've never spoken with

1    a grand jury.

2    Q.  You've never executed a search warrant?

3    A.  Never executed a search warrant.

4    Q.  Never reviewed the raw search warrant returns?

5    A.  I don't even know what that means.

6    Q.  You've never seized cryptocurrency?

7    A.  I've never seized cryptocurrency.

8    Q.  And prior to joining CipherTrace, did you have any

9    experience in blockchain analysis?

10   A.  No.

11   Q.  You've never used Chainalysis?

12   A.  No.

13   Q.  Have you ever used TRM or Elliptic or any of the other

14   commercial analytics tools?

15   A.  No.

16   Q.  Ms. Still, you distinguish in a presentation that was

17   attached to your expert report between credible analytics --

18   what you call credible analytics and black box analytics; is

19   that right?

20   A.  Yes.

21   Q.  And those slides have been included in other presentations

22   to customers and prospective customers of CipherTrace; is that

23   right?

24   A.  Yes.

25   Q.  What other companies would you categorize as providing

1    credible analytics under your standards?

2    A.   It's possible that Clane and Elliptic may have these, but I

3    cannot confirm without speaking to their teams.

4    Q.   Sorry.  Not the slides.  But the actual credible analytics

5    as far as what other companies in the space you would

6    categorize as credible.

7    A.   Yeah.  I'm guessing it would be one of those two.

8    Q.   So of all of the companies in the blockchain and analytics

9    space, CipherTrace thinks, you think, that Clane and Elliptic

10   are the only other companies that offer credible analytics?

11   A.   No.  Again, I can't say for sure unless I speak with them

12   about how their tool operates.

13   Q.   And you don't know how all of the different tools operate

14   because you've only ever used CipherTrace; isn't that right?

15   A.   I've only used CipherTrace.

16          THE COURT:  Do you know if CipherTrace has a license

17   for Chainalysis or for --

18          MS. PELKER:  My understanding is, actually, there's

19   some sort of gentleman's agreement between the four firms that

20   they don't do that.

21          THE COURT:  Okay.  All right.  Thank you.  I was

22   looking for an easy way out.

23          MS. PELKER:  I don't have -- I don't know that for

24   sure, but that's my understanding.

25          THE COURT:  All right.  Thank you.

```
 1    BY MS. PELKER:

 2    Q.  Ms. Still, prior to your work on this case, were you

 3    familiar with mixers?

 4    A.  Yes.

 5    Q.  And isn't it true that criminals use mixers to hide

 6    criminal activity?

 7    A.  They can.

 8    Q.  Prior to being retained for this case, were you familiar

 9    with Bitcoin Fog?

10    A.  No.

11    Q.  You've never traced funds for any criminals who used

12    Bitcoin Fog?

13    A.  No.

14    Q.  Are you aware whether your more senior colleagues at

15    CipherTrace have done such tracing?

16    A.  I'm not aware.

17    Q.  And just to recall, you've been doing this since only 2020;

18    is that right?

19    A.  Since 2020.

20    Q.  Do you agree that Bitcoin Fog was a cryptocurrency mixer

21    that operated from 2011 through 2021?

22    A.  By all accounts.  Again, I think it's best, though, to

23    confirm via ledger and having access to those servers.

24    Q.  Do you agree that during that time period when it was

25    operating, criminals did use Bitcoin Fog to launder funds?
```

1    A.  I can see that there are a number of transactions going in

2    and out of dark markets.  So then I would infer from there that

3    that is possibly what's going on, that they are, in fact,

4    illicit transactions going in and out of Bitcoin Fog.

5    Q.  And, in fact, isn't it a significant volume of illicit

6    transactions going between Bitcoin Fog and darknet markets?

7    A.  I actually didn't calculate that, but I did look at the

8    government's numbers.

9    Q.  And even accounting for the smaller clusters with

10   CipherTrace for Bitcoin Fog and the markets, aren't we looking

11   at millions of dollars' worth of Bitcoin going from the markets

12   to Fog?

13   A.  Again, I didn't calculate that, and it's not a small

14   difference.  It's 527,000 addresses out of 925,000 or so

15   addresses.

16   Q.  I'll get to the specific numbers of the addresses in a

17   moment, but are you familiar with the ways criminals on the

18   darknet communicate?

19   A.  Generally speaking.

20   Q.  Are you familiar with the use of darknet market forums and

21   the darknet market subreddit?

22   A.  Yes.

23   Q.  And are you aware then, through your review of those

24   sources, through the discovery, that darknet market users

25   advocated using Bitcoin Fog to launder darknet proceeds?

1    A.   That is my understanding.

2    Q.   And that extended to both buyers and vendors?

3    A.   I'm actually not sure on that.

4    Q.   Do you agree that Silk Road and Silk Road 2 were darknet

5    markets that facilitated millions of dollars of illicit

6    narcotic sales?

7    A.   Well, I haven't calculated that number either, but yes.

8    The narcotics, yes.

9    Q.   And you're aware that the government did seize both of

10   those sites and has access to records of its users?

11   A.   Right.

12   Q.   And do you agree that the other darknet markets listed in

13   the government's reports, Abraxas, Agora, AlphaBay, BlackBank,

14   Nucleus, Pandora, and Sheep were all also darknet markets

15   trafficking in illicit narcotics?

16   A.   I think we have them in CipherTrace as darknet markets as

17   well.  So that would be ten, criminal.

18   Q.   Do you agree that buyers and vendors from those sites were

19   moving their funds, laundering them through Bitcoin Fog?

20   A.   Some of them, yes.

21   Q.   Are you also aware that Welcome to Video was a darknet site

22   trafficking in child sexual abuse material?

23   A.   Yes.

24   Q.   And are you aware that the government seized Welcome to

25   Video and has access to records of its users, including their

1    Bitcoin deposits to the site?

2    A.  I did not know they had access to all of the records.

3    Q.  Have you reviewed records from Welcome to Video users in

4    discovery?

5    A.  I reviewed the discovery, the addresses in discovery.  I

6    don't recall reviewing that.  If we could pull that up on the

7    screen, I can let you know.

8    Q.  If you said that you reviewed the addresses, do you agree

9    that some Welcome to Video users sent money from Bitcoin Fog to

10   the site where they would have purchased access to child sexual

11   abuse material?

12   A.  I actually don't think I looked at that.  I don't recall

13   right now.  I would have to go back through and look at my

14   traces which are saved in my case.

15   Q.  Well, CipherTrace has the exact same -- has a one percent

16   difference of its Welcome to Video cluster than Chainalysis; is

17   that right?

18   A.  Let's go back to that page, and I can tell you for sure.

19   What page is that?

20   Q.  That should be --

21   A.  Do you have it pulled up?  I just want to confirm that

22   that's the number.

23   Q.  Understandable.  You do not need to take my word for it.

24   A.  I see it.  Page 34 of my expert report.

25   Q.  And that's a one percent difference?

1    A.  Yes.

2    Q.  And so in CipherTrace there are funds going from Bitcoin

3    Fog to Welcome to Video; is that right?

4    A.  I don't think I did those traces.  I cannot recall.  I

5    would have to pull up my case and take a look to see if I saved

6    those.

7    Q.  Have you reviewed the attachments to Ms. Bisbee's and

8    Mr. Scholl's expert reports?

9    A.  Were those the exhibits?

10   Q.  So the reports themselves had CSV file or Excel spreadsheet

11   attachments with the addresses listed.

12   A.  Yes.  Yeah, I reviewed those.

13   Q.  And you're aware that they list out every address that's

14   included in the cluster for Bitcoin Fog and the other reference

15   marketplaces in Chainalysis?

16   A.  Can you say that again.  That they included every address

17   from every cluster?

18   Q.  That they included every address listed in Chainalysis for

19   that entity.

20   A.  That's my --

21   Q.  Sorry.

22   A.  That's my understanding.

23   Q.  Directing your attention to Government's Exhibit 18 in the

24   binder in front of you, this is the first page of that

25   attachment.  The actual attachment is thousands of pages long.

1    Did you review that full attachment?

2    A.  If by review you mean run it through a script, yes.

3    Q.  And which addresses in the full list, in your opinion, are

4    definitely not controlled by Bitcoin Fog?

5    A.  So if we're looking -- this is not definitely.  So we can't

6    say definitely or indefinitely here.  Again, we need to

7    understand what the source of funds are for these dark markets,

8    for Bitcoin Fog in particular.

9        If you look at the -- on the right-hand side column

10    that says co_spend_root_address, it will say the root address,

11    or it will say unclustered in co-spend.

12    Q.  So this is a different question that I'm asking.  I'm

13    asking, you have this list of addresses from Chainalysis.

14    You're saying that there are a whole bunch of addresses in this

15    list that can't be verified, that are wrong.

16        Have you identified a -- how many specific addresses

17    in that list of over 900,000 have you specifically identified

18    that are not Bitcoin Fog?

19    A.  So you are asking -- if I understand your question

20    correctly, you are asking for a list of addresses that are not

21    attributed via heuristic 1?

22    Q.  No.  I'm asking, have you identified specific errors and

23    can you point to them in the list?

24    A.  By error -- sorry.  I don't think I understand what you're

25    asking.

1    Q.  Chainalysis has a list of 900,000-plus addresses.

2    CipherTrace has a list of 400,000 that you agree with.  There's

3    a question mark about that 500,000.  You say that you're

4    reviewing that additional 500,000 in your expert report.

5           We're now two months, almost, into your review.  How

6    many of the addresses in the delta have you found and, in your

7    expert opinion, were mistakenly included by Chainalysis; were

8    an error?

9           MR. EKELAND:  Objection.

10          THE COURT:  Overruled.

11          THE WITNESS:  So, again, if you look at unclustered

12   and co-spend, these are addresses that are clustered via

13   heuristic 2, which is the behavioral cluster.

14   BY MS. PELKER:

15   Q.  And you're saying that this behavioral cluster produces

16   lots of errors.  I am asking you to identify the addresses that

17   you've determined were erroneously included.

18   A.  Well, because of the nature of this particular -- of these

19   co-spends, unclustered in co-spends, this is very difficult to

20   say one way or another exactly which -- where they fall.  So

21   CipherTrace does not include these.

22   Q.  So there are addresses that you're saying may or may not be

23   Bitcoin Fog, but you can't point to a single address in this

24   list and say, this is wrong, this is not Bitcoin Fog?

25   A.  It's not clear to me that any of the addresses that state

1    unclustered and co-spend are actually controlled by Bitcoin

2    Fog.

3    Q.  That's different than saying that they are mistaken or that

4    this is an error.

5              You're just saying that you can't determine one way

6    or another; isn't that right?

7    A.  The error rate is, as I understand -- and this is coming

8    from Sarah Meiklejohn's paper and others.  That error rate is

9    upwards of 60-plus percent.

10   Q.  We're going to get into some mischaracterization about the

11   academic research in a moment.  But I'm just asking, you've

12   gone through these addresses.

13             Is there a single one that you can point to and say,

14   I've done my own analysis.  This is definitely not Fog because

15   X, Y, Z?

16   A.  It's difficult to state with exact -- to say 100 percent in

17   this, again, because this is a heuristic.  You're asking me to

18   say 100 percent yes or no.

19             And I can tell you that CipherTrace is not confident

20   in that particular heuristic to attribute to unclustered and

21   co-spend, which is heuristic 2.  So we're not going to do it.

22   Whether or not we can say this belongs to Bitcoin Fog or not,

23   we can't really do that in this particular case.  What we are

24   comfortable --

25             THE COURT:  Just for the sake of time, if I can ask

1    you to listen very carefully to Ms. Pelker's question, and just

2    make sure you answer just her question and then we can move on.

3    Listen carefully to her question, answer that question, and

4    then we'll move on to the next topic.

5             MS. PELKER:  Thank you, Your Honor.

6    BY MS. PELKER:

7    Q.  Is there a single address in this list that you have

8    determined definitively is not Bitcoin Fog?

9    A.  No.

10   Q.  Thank you.

11            MS. PELKER:  Thank you, Your Honor.

12   BY MS. PELKER:

13   Q.  CipherTrace has its own clusters for each of the entities

14   named in Ms. Bisbee's and Mr. Scholl's reports; isn't that

15   right?

16   A.  Different clusters for?  You mean we -- we identify them

17   differently?

18   Q.  Sorry.  It has its own list of addresses it clusters

19   associated with each entity; is that right?

20   A.  So we identify our addresses via a cluster ID, and that is

21   determined based on co-spend.

22   Q.  So for any given entity -- we can take Bitcoin Fog as an

23   example.  Chainalysis has its list of addresses, CipherTrace

24   also has a list of addresses; is that right?

25   A.  Yes.

1    Q.  And in some instances, CipherTrace's clusters exactly match

2    Chainalysis's; isn't that right?

3    A.  I believe there is one cluster where we are pretty much the

4    same, and I think that was Sheep market.

5    Q.  So let's direct your attention back to your report, the

6    same page that we were just looking at, which I believe is --

7               THE COURT:  Was it 34?

8               MS. PELKER:  Page 34.  Thank you, Your Honor.

9    BY MS. PELKER:

10   Q.  Looking at that list there, you mentioned Sheep is an exact

11   match.  That the exact same addresses that Chainalysis has

12   clustered, CipherTrace also has clustered; is that right?

13   A.  I don't know about the clusters themselves, but we have the

14   same attribution, yes.

15   Q.  And for Silk Road 2, you, in fact, have a zero percent

16   discrepancy rate so that you have the exact same addresses; is

17   that right?

18   A.  Yes.

19   Q.  Now, directing your attention back to Exhibit 19 -- that's

20   Mr. Scholl's report -- looking at page 13, could you read the

21   first paragraph starting with "Silk Road 2.0 funds sent to

22   Bitcoin Fog."

23   A.  Sorry.  Where are we?  We're in 13?

24   Q.  We're in Exhibit 19.  This is page 13 under "Silk Road 2.0

25   funds sent to Bitcoin Fog."  If you could just read that aloud.

1    A.  This is the top one, correct?

2    Q.  Yes.

3    A.  "Blockchain analysis identified approximately 13,824

4    transactions which sent funds directly from Silk Road 2 to

5    Bitcoin Fog.  These transactions occurred from on or about

6    11/13/2013 to on or about 11/6/2014.  In total, these

7    transactions transferred approximately 22,864 Bitcoin worth

8    approximately $12,582,929 from Silk Road directly to Bitcoin

9    Fog."

10   Q.  Do you disagree with those numbers there?

11   A.  This is related to Silk Road 2 and 13 transactions.  I

12   haven't run these addresses as being deposited into Bitcoin

13   Fog, so I really can't confirm that.

14        I also can't confirm the dollar value.  I would just

15   need to know how that was calculated, and we could probably

16   match that up somehow if I knew what their method was for

17   calculations, the U.S. dollar value.

18   Q.  So you haven't done your own calculation of the funds

19   transferred between the various marketplaces and Bitcoin Fog

20   based on CipherTrace's clustering?

21   A.  No.

22   Q.  So you don't know how different your numbers would be, if

23   at all, than Mr. Scholl's?

24   A.  I haven't calculated this.

25   Q.  Turning your attention back to your report on page 27.  So

1    that's Exhibit 10 in the binder in front of you, page 27.  I

2    want to clarify how you counted the Chainalysis addresses in

3    heuristic 1.

4            So looking at the first line of the chart at the

5    bottom of that page, it says unclustered and co-spend 527731.

6    You counted that number of addresses that were not clustered

7    through co-spend; is that right?

8    A.  This is the last paragraph you're looking at?

9    Q.  This is page 27 of your report, in the actual chart, the

10    first line under the header.  It says unclustered and co-spend,

11    Chainalysis address count 527731.

12    A.  On page 27 or on 28?

13    Q.  It appears as 27 in my copy.  It's in your report, the top

14    entity, the actual chart.

15    A.  Actual chart.

16    Q.  So there's co-spend root address.

17    A.  Page 28 at the bottom.  The total, is that what you mean?

18    Q.  I apologize.

19            THE COURT:  Do you have the same -- I think she's

20    pointing right here on page 27.

21    BY MS. PELKER:

22    Q.  So on page 27 you have the two green -- two tables with

23    green headers.

24    A.  I see.

25    Q.  Looking at the one on the bottom, the first row there says

1    unclustered and co-spend.

2    A.  I got it.  Thank you.  Sorry.

3    Q.  Now, just above that, the table above it, you have an

4    excerpt of the Chainalysis chart, and you indicate that you got

5    that number by filtering by that right-most column, the

6    co-spend root address column; is that right?

7    A.  For the 527731, yeah.

8    Q.  I'd like to direct your attention to the column one to the

9    left.  It's a bit difficult to read on the printout, but it's

10    labeled co-spend flag.

11            To be clear, you did not include in your calculation

12    the items that had a co_spend_flag but that did not list their

13    root address; is that right?

14    A.  I don't believe we did.

15    Q.  Now, did you review the appendix key provided by

16    Chainalysis before conducting your review?

17    A.  Yeah.  So it says -- let's see.

18    Q.  Yes, you did review the appendix?

19    A.  I did.  I did review it.

20    Q.  Turning your attention to Exhibit 21, is that the appendix

21    key?

22    A.  Supplemental appendix key.

23    Q.  Could you read the entries under co_spend_flag and

24    co_spend_root_address down at the bottom?

25    A.  "0 (zero) has no relation to co-spending transactions.  1

1    is co-spending" -- "1 is co-spending transaction."

2    Q.  And then for co_spend_root_address?

3    A.  "Address for root address within cluster, uncluster in

4    co-spend, due to multiple heuristics."

5    Q.  So you did not actually include all of Chainalysis's

6    co_spend_flag addresses in your account, did you?

7    A.  By co_spend_flags, I guess you mean the no relation to

8    co-spending transactions; so accounting for ones and zeros?

9    No, we did not include that.

10   Q.  So directing your attention back to your report, page 34 --

11   sorry, 27.

12   A.  Sorry.  Which section is that again?

13   Q.  This is Exhibit 10 --

14   A.  Thank you.

15   Q.  -- page 27.  Looking at the first two lines --

16   A.  Wait.  This is where we were before.

17   Q.  Yes.  We're going right back to where we were before.

18          The top table, the first two entries, there's a

19   co_spend_flag that's set, of one, indicating that this was

20   detected by a co-spend heuristic.  But on

21   co_spend_root_address, it says unclustered and co-spend,

22   indicating that there are multiple heuristics used.

23   A.  That is the definition.

24   Q.  And so I'm asking, isn't it true that you then did not, in

25   fact, count any of the addresses that said unclustered and

1     co-spend despite having a co_spend_flag set?

2     A.  So -- I'm sorry.  Can you repeat that so I'm, like,

3     absolutely clear here.

4     Q.  So there are addresses with a co_spend_flag that are set

5     that say unclustered and co-spend because they were triggered

6     by multiple heuristics.

7                You did not count those in your calculation of the

8     co-spend addresses; is that right?

9     A.  I don't think so.

10    Q.  And are you aware that if you had correctly filtered using

11    the co_spend_flag, the number of co-spend addresses identified

12    through heuristic 1 increases from 398,011 to 573,213?

13    A.  No.  However, that says addresses attributed by other

14    heuristics.  That's why we didn't count it.  This is not

15    including the co-spend.

16    Q.  But, in fact, if it's co_spend_flag set, that was detected

17    by co-spend heuristics; it's just that other heuristics were

18    also applied?

19    A.  As it states there; however, this doesn't match our data.

20    Q.  It may not match your data.  But as far as what Chainalysis

21    is listing as triggered by co-spend, are you aware that there

22    are, in fact, 573,213 addresses that were detected by

23    heuristic 1?

24    A.  I don't have that number.

25    Q.  But --

```
1          THE COURT:  Could I pause just for a minute.  I'd
2     like to take a few-minute break.  We're going to leave pretty
3     soon.  How much more time do you think you have?
4          MS. PELKER:  I don't see us finishing today, Your
5     Honor.
6          THE COURT:  Okay.  Well, let me just take a
7     five-minute break and I want to check with staff on everyone's
8     availability, and we'll see how much later we can go tonight
9     and we'll have to continue tomorrow.
10         MS. PELKER:  Yes, Your Honor.  We're happy to stay
11    late.  I just know that the Court --
12         THE COURT:  I have staff, too.
13         MS. PELKER:  That's what I figured.
14         (Recess taken.)
15         THE COURT:  Okay.  Unfortunately, I think we can only
16    go for another ten minutes tonight and then let's talk about
17    starting time tomorrow morning to make sure we have time to get
18    through everything we need to get through.
19         MS. PELKER:  Understood, Your Honor.
20    BY MS. PELKER:
21    Q.  Ms. Still, returning back to the question of the number of
22    addresses that were identified by heuristic 1, you're aware
23    that if you correctly filter by co_spend_flag, there are, in
24    fact, 573,213 addresses identified through heuristic 1 rather
25    than 398,011 per your report?
```

```
1    A.   No.

2    Q.   No, because you did not, in fact, filter by co_spend_flag;

3    is that right?

4    A.   I did not filter by flag.

5    Q.   If you had filtered by the flag, are you aware your

6    analysis would change by 200,000 addresses, or almost

7    50 percent?

8    A.   You're telling me this now, but I would need to do this

9    action myself and count.

10              MS. PELKER:  Government moves to admit Exhibit 21.

11              THE COURT:  Any objection?

12              MR. EKELAND:  No objection, Your Honor.

13              THE COURT:  Exhibit 21 is admitted.

14              (Government Exhibit 21 was admitted.)

15   BY MS. PELKER:

16   Q.   Turning your attention back to your report, I'm looking at

17   that chart spanning pages 27 and 28.

18              The second line of that chart indicates that

19   Chainalysis connected 244,975 addresses to the root address

20   starting with 17aBK; is that right?

21   A.   Which line are you on?

22   Q.   The second -- right underneath the unclustered and co-spend

23   line, the next line, 17aBK.

24   A.   Ah, okay.  17aBK, and you're asking --

25   Q.   That the chart indicates Chainalysis connected 244,975
```

1    addresses to that root address; is that right?

2    A.  I don't see the 244 here.  Where are you looking?

3    Q.  One more column to the right under Chainalysis address

4    count.

5    A.  Oh, I see it.  Thank you.  Yeah, I can see that.

6    Q.  Did CipherTrace also have a list of addresses involving

7    that root address?

8    A.  We wouldn't call that the root address.  But, yes, we have

9    what we call the cluster or the -- what's termed here wallet ID

10   That's the 003739a5.

11   Q.  And directing your attention to the far right-hand side of

12   that chart, how many addresses did CipherTrace have associated

13   with that wallet?

14   A.  The same amount.

15   Q.  The exact same number as Chainalysis?

16   A.  Yes.

17   Q.  Did CipherTrace also identify that 244,975 addresses as

18   controlled by Bitcoin Fog?

19   A.  Yes.

20   Q.  And what about the next line, 15CLU; how many addresses did

21   Chainalysis connect through that root address?

22   A.  4 -- 46,532.

23   Q.  And how many did CipherTrace include in that wallet?

24   A.  We have the same number.

25   Q.  And just continuing down the line here, does that hold true

1  for every single one of these Chainalysis root addresses?

2  A.  Yes, going down the line.

3  Q.  And that accounts for almost 400,000 addresses that both

4  Chainalysis and CipherTrace have the exact attribution of

5  Bitcoin Fog?

6  A.  Yes.

7  Q.  Does CipherTrace also have additional addresses attributed

8  as Bitcoin Fog that are not on this list?

9  A.  Yeah.  It's possible.  I think, like, the 1YZJKa address,

10  that certain address that behaves differently.

11  Q.  At the bottom of the list here, 1YZJKa --

12  A.  Thank you.

13  Q.  -- is accounted for.

14          Are there additional addresses not on this list that

15  CipherTrace has attributed as Bitcoin Fog?

16  A.  Not to my knowledge.

17  Q.  Have you looked?

18  A.  I have looked, but I just can't recall right now.  But not

19  to my knowledge.  I think this is what we have.  However, if

20  you like, I can provide you with a list of addresses.

21  Q.  And so have you compared the list of addresses from

22  CipherTrace's Bitcoin Fog attribution to Chainalysis's to see

23  if there's additional overlap outside of this 398,011?

24  A.  I'd have to check on that.

25  Q.  And in the paragraph below this chart, don't you, in fact,

1    agree that the cluster of addresses associated with 17aBK are,

2    in fact, Bitcoin Fog deposit addresses?

3    A.  That is the top line?

4    Q.  If you look at the paragraph on page 28 underneath the

5    chart.

6    A.  Yes.  That is the same cluster.  003739a5.

7    Q.  And you and CipherTrace agree that those are Bitcoin Fog

8    deposit addresses?

9    A.  We do.

10   Q.  And you also agree in the next sentence that the cluster of

11   addresses associated with 1Dxmv or CipherTrace cluster 060e8473

12   is a withdrawal hot wallet?

13   A.  Yes.

14   Q.  Directing your attention to Mr. Scholl's report now on

15   page 49 -- actually, we will pivot a bit out of order because I

16   think this next question is going to take a bit more time.

17            MS. PELKER:  Your Honor, we're doing a hard stop at

18   5:00?

19            THE COURT:  Yes.  5:01 if you need it, but right

20   around there.

21   BY MS. PELKER:

22   Q.  Pivoting a bit, Ms. Still, when we were talking about

23   nested exchanges in your direct examination, you mentioned

24   hearing about subpoenas to Binance where it would, in turn,

25   respond that the addresses were used by a nested exchange; is

1    that right?

2    A.  No.

3    Q.  You did testify that there was process to Binance where the

4    nested exchanges would be implicated?

5    A.  I understand what you're asking.  Binance does not say

6    whether or not that is a nested exchange.  They don't say

7    whether or not it is a different entity, but the way they

8    reject the subpoena indicates to us that there is some company,

9    some entity operating with -- inside that particular deposit

10   address.

11   Q.  Are you referring to Binance coming back and saying that

12   this is a corporate account and you should go to the

13   corporation in order to get records?

14   A.  I don't know that I've actually seen it worded that neatly.

15   Q.  But that is the response from Binance that's requiring the

16   follow-up?

17   A.  It is something along the lines of this is not a customer

18   address.

19   Q.  And then you're aware that nested exchanges operate as

20   what's called exchanges within an exchange; is that sort of a

21   colloquial expression?

22   A.  Yes.

23   Q.  So the addresses are, in fact, ultimately controlled by

24   Binance even if there's a nested exchange as the customer?

25   A.  So this is a bit of nuance here.  I think that's a really

1    good question.  This really demonstrates kind of the issues of

2    control -- right? -- because Binance actually --

3    Q.  I don't think we actually want to get all the way into

4    control.

5            I'm just asking, these are, in fact, addresses that

6    are sitting within a Binance wallet even if some other customer

7    may have additional ownership rights in them?

8    A.  Addresses within another --

9    Q.  Yes.

10   A.  -- company within Binance?  As an example; not necessarily

11   as the rule.

12   Q.  Correct.  But that is what a nested exchange, in fact, is?

13   A.  Yes.

14   Q.  So this is not, in fact, an error in clustering regarding

15   the exchange's cluster?

16   A.  This would be an error if it is improperly attributed.

17   Q.  But, in fact, the addresses are controlled by Binance, and

18   Binance is the one who controls the addresses, ultimately, even

19   if a subcustomer then has particular accounts for individuals?

20   A.  I understand what you're asking, but this actually is a

21   question of control.  So I do have to talk about private keys

22   being tied to an entity controlling that particular address and

23   then the account holder themselves.

24   Q.  This is -- a company may have an account at Binance; is

25   that right?

1    A.  Yes.

2    Q.  And then Binance is the one who is serving that account on

3    behalf of the company?

4    A.  Binance has control of the private keys.

5    Q.  Right.  Do you agree with that?

6    A.  Yes.

7    Q.  Okay.  And that is a model for a nested exchange?

8    A.  That is one model for a nested exchange.

9    Q.  Okay.

10          MS. PELKER:  I think we are at 5:01.

11          THE COURT:  All right.  Well, why don't we break for

12   the day.

13          I want to talk a little bit about what time tomorrow.

14   How much more time do you think you're going to need?

15          MS. PELKER:  Probably another hour to 90 minutes.  It

16   depends a little bit on -- Your Honor, I really don't like

17   cutting off experts in the purposes of a *Daubert* hearing, but I

18   do think it's very difficult to continue moving this forward in

19   a timely manner.

20          THE COURT:  I'm just trying to figure out the plan

21   for the day tomorrow.  90 minutes, best estimate?

22          MS. PELKER:  90 minutes, Your Honor.

23          THE COURT:  Okay.  And, Mr. Ekeland, what about for

24   any reply?

25          MR. EKELAND:  I would say in the same time range.

1          THE COURT:  And then the other expert for tomorrow,

2    how much time?  I guess this is the government's expert, right?

3          MS. PELKER:  Yes.  I think 30 to 45 minutes.  If Your

4    Honor recalls, the specific *Daubert* inquiry forum for

5    Ms. Mazars de Mazarin is for the IP analysis, not the breadth

6    of her entire work on the case.

7          THE COURT:  Okay.  Mr. Ekeland, for your cross?

8          MR. EKELAND:  For Ms. Mazarin, I would estimate one

9    to two hours.

10          THE COURT:  Okay.  And then reply?

11          MS. PELKER:  Depending on what comes up, probably

12    another 30 to 45.

13          THE COURT:  I'm sorry.  How much time did you think

14    you needed for redirect here?

15          MR. EKELAND:  Probably an hour, Your Honor, if that.

16          THE COURT:  All right.  Well, I have a hard stop

17    tomorrow at 4:00 p.m., so why don't we start at 9:00 a.m.

18          MS. PELKER:  I believe Ms. Mazarin has a childcare

19    obligation with a hard stop at 3:30.  We thought she was going

20    to go today.

21          THE COURT:  Okay.  Let's make it a hard stop at 3:30;

22    that's even better.  Hard stop at 3:30 tomorrow.

23          MS. PELKER:  We can switch up the order if needed.

24          THE COURT:  Why don't we -- I think it's ideal if you

25    can continue.  Why don't we do this.  We'll start at 9:00

1    tomorrow morning, and let's expect to be done with a break by

2    noon with this witness.

3            We'll then take an early lunch, be back by 1:00,

4    which will give you two and a half hours combined for the next

5    witness, and we ought to be able to get that done.  I mean,

6    these are just *Daubert* hearings.  This is not the examination

7    in front of the jury, okay?

8            MS. PELKER:  Thank you, Your Honor.

9            THE COURT:  Anything else before we adjourn?

10           MS. PELKER:  No.  I don't believe so, Your Honor.

11           THE COURT:  See you all in the morning.

12           Given the fact that the witness is in the middle of a

13   cross-examination, I'm going to direct that she not confer with

14   anybody relating to her testimony until at least the

15   cross-examination is done.

16           MR. EKELAND:  Your Honor, I just didn't hear you.  I

17   know what you said.

18           THE COURT:  All I said is, since she's in the middle

19   of her cross-examination, don't confer with the witness until

20   she's done with her cross.

21           MR. EKELAND:  Yes.

22           MS. PELKER:  Thank you, Your Honor.

23           THE COURT:  See you all tomorrow.

24           (The hearing adjourned August 22, 2023, at 5:05 p.m.

25               until 9:00 a.m. August 23, 2023.)

```
1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, TAMARA M. SEFRANEK, do hereby certify that the

4     above and foregoing constitutes a true and accurate transcript

5     of my stenographic notes and is a full, true and complete

6     transcript of the proceedings to the best of my ability.

7              Dated this 28th day of August, 2023.

8

9                      /s/ Tamara M. Sefranek_____
                       Tamara M. Sefranek, RMR, CRR, CRC
10                     Official Court Reporter
                       Room 6714
11                     333 Constitution Avenue, N.W.
                       Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$10** [1] - 65:21
**$100,000** [4] - 29:14, 30:5, 30:7, 31:7
**$12** [1] - 65:21
**$12,582,929** [1] - 181:8
**$20,000** [1] - 31:12

## '

**'SegWit** [1] - 113:2

## /

**/s** [1] - 196:9

## 0

**0** [1] - 183:25
**003739a5** [3] - 121:9, 188:10, 190:6
**0323355a** [1] - 122:8
**060e8473** [1] - 190:11

## 1

**1** [28] - 52:1, 52:16, 52:17, 52:20, 54:16, 55:7, 55:16, 55:18, 56:18, 62:3, 63:2, 65:9, 75:6, 79:4, 120:24, 123:10, 123:19, 150:7, 157:4, 176:21, 182:3, 183:25, 184:1, 185:12, 185:23, 186:22, 186:24
**1,000** [1] - 142:20
**1.2** [3] - 116:14, 118:10, 118:13
**1.6** [1] - 65:9
**10** [8] - 69:14, 87:6, 107:13, 108:22, 137:21, 149:13, 182:1, 184:13
**10/27** [1] - 74:9
**100** [5] - 23:18, 97:17, 154:11, 178:16, 178:18
**10005** [1] - 1:20
**10:05** [1] - 1:6
**11** [6] - 2:15, 147:5, 149:22, 149:25, 150:1, 160:19
**11/13/2013** [1] - 181:6
**11/6/2014** [1] - 181:6
**11:00** [1] - 21:25

**11:30** [1] - 80:18
**12** [3] - 108:22, 116:13, 163:22
**120** [1] - 65:9
**12:00** [1] - 79:17
**12:15** [1] - 79:20
**12MDV** [5] - 71:14, 71:17, 76:25, 82:4, 83:5
**13** [12] - 2:16, 48:7, 118:10, 118:13, 148:11, 149:22, 149:25, 150:1, 180:20, 180:23, 180:24, 181:11
**13,824** [1] - 181:3
**1301** [1] - 1:17
**137** [1] - 2:6
**14** [6] - 2:17, 148:25, 149:22, 149:25, 150:1, 156:20
**15** [3] - 2:18, 66:15, 105:17, 118:22, 156:11, 158:9, 158:12, 158:13
**150** [4] - 2:15, 2:16, 2:17, 140:21
**156** [1] - 49:6
**158** [1] - 2:18
**15CLU** [1] - 188:20
**15GL** [1] - 105:17
**16** [4] - 2:19, 158:20, 164:11, 165:2
**165** [1] - 2:19
**167** [1] - 2:20
**16th** [2] - 4:25, 8:10
**17** [9] - 2:20, 18:13, 59:22, 167:2, 167:4, 167:5, 167:19, 167:22, 167:23
**17(c** [4] - 16:4, 16:17, 18:20, 19:20
**17(c)** [1] - 17:16
**17aBK** [4] - 187:20, 187:23, 187:24, 190:1
**17C** [1] - 11:5
**17QAWG** [2] - 48:20, 49:7
**18** [2] - 2:21, 175:23
**187** [1] - 2:21
**19** [8] - 61:3, 84:13, 85:23, 87:6, 89:17, 106:23, 180:19, 180:24
**1960** [2] - 135:3, 135:16
**1960(b)(1)(B** [1] - 135:23
**1982** [1] - 88:14

**1:00** [1] - 195:3
**1:21-CR-0399** [1] - 1:3
**1:45** [2] - 79:18, 79:20
**1C7** [2] - 82:16, 83:15
**1C8** [1] - 71:17
**1DT** [1] - 83:8
**1Dxmv** [1] - 190:11
**1EUJ** [1] - 83:9
**1JRE** [1] - 44:20
**1NEW** [3] - 86:10, 105:21
**1PAaf** [7] - 56:18, 57:1, 58:5, 58:7, 58:14, 58:18
**1PFF** [1] - 77:4
**1PFK** [1] - 76:25
**1st** [2] - 95:13, 117:14
**1YZJK** [2] - 91:4, 93:10
**1YZJKa** [5] - 91:17, 106:22, 121:10, 189:9, 189:11

## 2

**2** [41] - 13:11, 13:12, 23:14, 24:20, 24:24, 25:1, 25:3, 43:3, 46:16, 52:19, 54:17, 54:19, 54:22, 56:13, 56:19, 61:16, 65:9, 68:15, 71:6, 71:12, 86:7, 106:18, 111:9, 111:14, 111:18, 113:1, 114:1, 114:21, 120:25, 121:3, 123:10, 124:2, 128:6, 149:4, 151:19, 173:4, 177:13, 178:21, 180:15, 181:4, 181:11
**2,000** [1] - 142:20
**2.0** [2] - 180:21, 180:24
**2.2** [2] - 118:24, 123:6
**20** [5] - 122:17, 122:20, 124:21, 132:1, 149:13
**200,000** [1] - 187:6
**20001** [3] - 1:12, 1:24, 196:11
**20005** [1] - 1:17
**2009** [2] - 129:20, 134:2
**2010** [2] - 129:20, 134:2
**2011** [8] - 74:8, 96:22, 118:21, 129:20, 132:1, 132:21,

**134:2, 171:21**
**2012** [2] - 129:21, 134:2
**2013** [2] - 129:21, 134:3
**2014** [2] - 69:14, 96:23
**2016** [1] - 118:19
**2017** [3] - 95:12, 95:13, 117:15
**2018** [2] - 95:12, 167:15
**2019** [2] - 69:15, 156:9
**202-354-3246** [1] - 1:24
**2020** [4] - 35:2, 48:7, 171:17, 171:19
**2021** [2] - 152:19, 171:21
**2023** [5] - 1:5, 110:17, 195:24, 195:25, 196:7
**20530** [1] - 1:14
**21** [4] - 183:20, 187:10, 187:13, 187:14
**21-399** [1] - 3:3
**22** [2] - 1:5, 195:24
**22,864** [1] - 181:7
**23** [1] - 195:25
**24** [5] - 111:4, 111:9, 116:18, 117:2, 117:4
**244** [1] - 188:2
**244,975** [3] - 187:19, 187:25, 188:17
**25** [2] - 72:22, 118:1
**256** [1] - 114:21
**256-bit** [1] - 114:21
**26** [1] - 118:8
**27** [15] - 74:8, 120:20, 121:6, 121:7, 150:6, 181:25, 182:1, 182:9, 182:12, 182:13, 182:20, 182:22, 184:11, 184:15, 187:17
**28** [6] - 121:7, 121:12, 182:12, 182:17, 187:17, 190:4
**28th** [1] - 196:7
**29** [1] - 121:16
**29th** [1] - 80:4
**2:15** [2] - 124:22, 137:7

## 3

**3** [11] - 46:16, 48:10, 113:3, 124:2, 150:18, 150:20, 150:24, 151:5,

151:15, 158:22, 159:17
**3.2** [1] - 65:9
**30** [4] - 1:20, 121:23, 194:3, 194:12
**307** [1] - 56:20
**31** [2] - 108:11, 108:18
**31st** [1] - 110:17
**32** [2] - 115:11, 121:25
**32L9** [1] - 44:20
**33** [8] - 94:21, 97:21, 108:11, 108:18, 114:3, 114:4, 122:9, 124:1
**333** [2] - 1:23, 196:11
**34** [12] - 2:5, 69:2, 69:5, 69:6, 69:9, 69:16, 70:19, 122:12, 174:24, 180:7, 180:8, 184:10
**35** [5] - 71:9, 81:24, 82:12, 82:18
**36** [4] - 77:19, 81:20, 82:18, 82:21
**37** [8] - 2:10, 84:11, 88:10, 99:3, 99:5, 99:6, 99:7, 104:12
**38** [4] - 2:11, 107:10, 108:7, 156:2
**39** [5] - 2:12, 2:13, 110:5, 110:16, 156:1
**398,011** [3] - 185:12, 186:25, 189:23
**3:20** [1] - 137:8
**3:30** [3] - 194:19, 194:21, 194:22
**3:35** [1] - 137:9
**3LH** [2] - 48:14, 49:6

## 4

**4** [6] - 51:8, 65:9, 156:16, 156:21, 159:17, 188:22
**40** [3] - 138:1, 138:2, 140:23
**400,000** [2] - 177:2, 189:3
**41** [2] - 137:24, 138:3
**43** [1] - 94:2
**45** [6] - 70:20, 70:22, 71:2, 71:3, 194:3, 194:12
**46** [11] - 71:10, 74:2, 76:22, 78:6, 78:21, 79:6, 79:9, 81:21, 81:24, 83:23, 94:3
**46,532** [1] - 188:22
**472** [1] - 56:19
**49** [8] - 84:12, 87:2,

98:7, 99:2, 99:6,
104:9, 106:16,
190:15
**4:00** [1] - 194:17

## 5

**5** [6] - 65:21, 85:16,
85:17, 162:18,
162:23, 167:8
**50** [4] - 29:13, 30:5,
31:7, 187:7
**500,000** [2] - 177:3,
177:4
**527,000** [2] - 121:3,
172:14
**527731** [3] - 182:5,
182:11, 183:7
**534129** [1] - 117:6
**54** [1] - 107:11
**55** [1] - 108:8
**57** [1] - 7:22
**57(a** [1] - 5:8
**57.7** [1] - 4:19
**57.7(b** [1] - 10:6
**57.7(b)** [3] - 5:1, 5:2,
10:20
**57.7(b)(3)(vi** [1] - 10:8
**573,213** [3] - 185:12,
185:22, 186:24
**5:00** [1] - 190:18
**5:01** [2] - 190:19,
193:10
**5:05** [1] - 195:24

## 6

**6** [4] - 122:20, 162:18,
162:23, 167:7
**6.3** [1] - 52:18
**60** [4] - 23:21, 75:3,
79:3, 83:6
**60-plus** [1] - 178:9
**60-some-page** [1] -
68:14
**60.4** [2] - 75:4, 75:7
**60.41** [2] - 74:8, 75:5
**601** [1] - 1:11
**66** [1] - 97:22
**67** [4] - 123:8, 123:17,
123:18, 124:1
**6714** [2] - 1:23, 196:10

## 7

**7** [1] - 159:10
**7.9** [1] - 75:2
**74** [2] - 114:25, 115:8
**75** [1] - 115:8
**77** [5] - 54:7, 55:8,

55:11, 65:8, 114:22

## 8

**8** [5] - 49:7, 57:3,
111:14, 113:1
**80** [1] - 63:2
**80-plus** [1] - 16:13
**800** [1] - 149:11
**8th** [1] - 1:20

## 9

**9** [1] - 59:22
**9.17** [3] - 56:17, 58:4,
58:12
**9/28/2018** [1] - 167:13
**90** [4] - 109:10,
193:15, 193:21,
193:22
**900,000** [2] - 23:9,
176:17
**900,000-plus** [1] -
177:1
**925,000** [1] - 172:14
**925,000-odd** [1] -
121:2
**950** [1] - 1:14
**96** [4] - 122:19,
122:22, 122:23,
122:24
**9:00** [3] - 194:17,
194:25, 195:25
**9:30** [2] - 80:5, 81:5

## A

**A.M** [1] - 1:6
**a.m** [3] - 80:5, 194:17,
195:25
**ability** [7] - 5:9, 5:11,
5:12, 25:22, 26:10,
40:3, 196:6
**able** [30] - 4:4, 12:16,
22:3, 23:23, 27:13,
27:17, 27:23, 29:19,
32:13, 40:9, 41:3,
51:11, 58:2, 76:1,
79:22, 80:15, 92:13,
93:5, 93:8, 99:17,
107:22, 146:5,
153:7, 153:24,
157:1, 157:8,
157:15, 163:18,
167:12, 195:5
**Abraxas** [1] - 173:13
**absolutely** [5] - 5:13,
51:14, 64:11,
134:18, 185:3
**abundance** [1] - 126:4

**Abuse** [1] - 40:21
**abuse** [2] - 173:22,
174:11
**academic** [1] - 178:11
**accept** [2] - 117:16,
117:19
**accepted** [1] - 127:22
**access** [27] - 4:3, 4:5,
4:12, 4:15, 18:1,
26:1, 31:24, 32:18,
52:4, 71:21, 73:15,
78:17, 88:3, 88:4,
91:20, 93:22, 94:11,
99:21, 100:1,
109:24, 120:15,
153:15, 171:23,
173:10, 173:25,
174:2, 174:10
**accessible** [1] -
120:12
**accommodated** [1] -
14:22
**According** [1] -
108:10
**according** [4] - 61:22,
64:15, 119:19,
157:25
**account** [31] - 5:14,
5:17, 6:5, 41:10,
42:6, 57:10, 57:16,
57:18, 57:19, 74:23,
75:1, 75:3, 87:7,
87:20, 92:14, 94:5,
96:5, 98:13, 100:16,
101:2, 101:3, 128:3,
141:13, 141:17,
142:9, 184:6,
191:12, 192:23,
192:24, 193:2
**Account** [1] - 75:6
**accountant** [1] -
125:25
**accounted** [7] - 82:15,
83:13, 104:19,
105:7, 111:21,
160:16, 189:13
**accounting** [4] -
129:5, 129:8, 172:9,
184:8
**accounts** [30] - 6:8,
40:5, 40:7, 41:15,
96:6, 96:10, 97:5,
97:6, 97:10, 98:18,
98:19, 100:18,
127:4, 127:6, 127:9,
127:10, 127:15,
129:4, 141:11,
151:9, 151:10,
151:11, 165:11,
165:13, 165:16,

171:22, 189:3,
192:19
**accuracy** [7] - 11:17,
13:4, 20:17, 43:7,
44:9, 112:3, 119:11
**Accurate** [1] - 148:15
**accurate** [15] - 27:25,
37:10, 37:23, 44:23,
65:3, 87:14, 109:4,
147:20, 152:1,
154:11, 155:2,
155:3, 155:18,
161:19, 196:4
**accurately** [2] -
119:18, 157:19
**accused** [4] - 10:14,
49:21, 50:16, 53:6
**achieves** [1] - 17:7
**acquired** [3] - 35:6,
139:18, 145:6
**acquirers** [1] - 139:20
**acquisition** [1] - 155:5
**Act** [1] - 135:12
**action** [2] - 40:10,
187:9
**Action** [1] - 1:2
**actionable** [1] -
148:24
**active** [4] - 40:5,
40:14, 94:19, 119:4,
147:15, 148:20
**activities** [1] - 151:18
**activity** [7] - 26:9,
27:6, 135:21,
141:17, 142:9,
151:14, 171:6
**actor** [1] - 65:24
**actual** [23] - 28:23,
43:8, 44:15, 50:13,
56:16, 58:10, 58:20,
60:6, 61:7, 70:1,
70:25, 75:15, 78:17,
78:24, 79:10, 79:11,
85:15, 168:16,
170:4, 175:25,
182:9, 182:14,
182:15
**add** [6] - 4:21, 120:2,
132:11, 147:18,
148:23, 149:12
**addition** [6] - 3:22,
8:8, 10:21, 70:6,
73:13, 143:20
**additional** [8] - 87:8,
160:12, 163:25,
177:4, 189:7,
189:14, 189:23,
192:7
**additionally** [5] -
54:25, 72:20, 90:4,

105:1, 111:24
**address** [165] - 7:20,
9:19, 23:6, 40:16,
41:7, 41:8, 48:9,
48:10, 48:12, 48:20,
49:3, 49:4, 49:6,
49:7, 52:2, 52:5,
52:20, 53:11, 53:24,
56:14, 56:15, 56:18,
57:1, 57:6, 57:7,
57:9, 57:12, 57:16,
57:19, 59:4, 59:5,
69:23, 69:24, 71:3,
71:14, 71:15, 71:17,
74:16, 74:21, 74:22,
75:15, 75:17, 75:19,
75:23, 76:2, 76:4,
76:24, 77:5, 77:25,
78:14, 78:15, 79:13,
79:14, 82:4, 82:5,
82:16, 83:4, 83:5,
83:6, 83:8, 83:15,
85:14, 86:10, 90:16,
91:4, 91:7, 91:12,
91:17, 91:19, 92:9,
94:17, 94:19, 95:13,
95:19, 97:12, 97:14,
97:16, 98:1, 104:19,
104:21, 105:9,
105:13, 105:17,
105:22, 106:6,
106:22, 107:18,
107:19, 110:9,
111:16, 111:20,
112:12, 112:19,
113:12, 113:13,
113:14, 114:5,
115:25, 116:2,
116:17, 117:6,
117:7, 117:19,
117:23, 118:25,
119:4, 119:7,
119:17, 121:10,
123:4, 123:5,
143:13, 145:21,
145:23, 146:2,
151:23, 152:3,
152:7, 159:10,
160:25, 161:8,
162:20, 163:2,
163:6, 163:15,
163:17, 163:18,
163:19, 163:20,
163:21, 163:24,
175:13, 175:16,
175:18, 176:10,
177:23, 179:7,
182:11, 182:16,
183:6, 183:13,
184:3, 187:19,
188:1, 188:3, 188:7,

188:8, 188:21, 189:9, 189:10, 191:10, 191:18, 192:22
**address'** [1] - 113:2
**address-to-address** [1] - 23:6
**addresses** [157] - 23:9, 23:11, 23:13, 23:15, 24:1, 24:3, 40:13, 40:16, 40:24, 41:23, 43:23, 44:18, 48:13, 48:25, 49:2, 49:9, 50:2, 53:19, 58:8, 60:7, 60:11, 60:12, 70:15, 78:1, 78:2, 78:4, 82:25, 84:13, 84:23, 85:9, 87:6, 87:9, 88:1, 88:7, 89:17, 89:25, 90:5, 90:8, 90:14, 90:18, 92:2, 92:6, 92:9, 92:11, 92:12, 95:6, 95:8, 96:7, 96:8, 98:1, 98:8, 99:15, 100:11, 100:15, 104:25, 105:16, 106:8, 106:10, 106:12, 106:13, 106:21, 106:24, 108:17, 108:23, 109:20, 112:19, 115:5, 116:15, 116:21, 116:25, 117:8, 117:22, 117:25, 118:23, 119:22, 120:6, 120:8, 120:23, 121:8, 122:20, 146:5, 147:12, 148:17, 148:18, 151:8, 151:21, 152:6, 157:2, 157:9, 160:23, 163:5, 163:9, 163:14, 163:25, 164:1, 166:3, 166:14, 172:14, 172:15, 172:16, 174:5, 174:8, 175:11, 176:3, 176:13, 176:14, 176:16, 176:20, 177:1, 177:6, 177:12, 177:16, 177:22, 177:25, 178:12, 179:18, 179:20, 179:23, 179:24, 180:11, 180:16, 181:12, 182:2,

182:6, 184:6, 184:25, 185:4, 185:8, 185:11, 185:13, 185:22, 186:22, 186:24, 187:6, 187:19, 188:1, 188:6, 188:12, 188:17, 188:20, 189:1, 189:3, 189:7, 189:14, 189:20, 189:21, 190:1, 190:2, 190:8, 190:11, 190:25, 191:23, 192:5, 192:8, 192:17, 192:18
**adept** [1] - 28:3
**adjourn** [1] - 195:9
**adjourned** [1] - 195:24
**administration** [1] - 22:10
**administrative** [1] - 79:22
**admit** [5] - 149:21, 158:8, 164:10, 167:18, 187:10
**ADMITTED** [1] - 2:9
**admitted** [19] - 37:17, 37:18, 38:5, 38:7, 38:25, 39:3, 137:22, 141:24, 149:25, 150:1, 158:12, 158:13, 164:17, 164:19, 165:2, 167:22, 167:23, 187:13, 187:14
**advance** [4] - 102:7, 102:25, 103:23, 168:4
**advertisement** [1] - 48:18
**advocated** [1] - 172:25
**affect** [3] - 22:8, 26:13, 48:17
**affidavit** [10] - 158:18, 158:20, 158:21, 159:6, 159:8, 160:8, 160:17, 161:23, 161:25, 162:8
**affidavits** [6] - 146:24, 146:25, 159:9, 160:10, 160:12, 160:15
**afternoon** [1] - 137:20
**agencies** [3] - 36:20, 36:23, 154:17
**agenda** [1] - 3:21
**agent** [1] - 86:15

**Agent** [2] - 94:13, 94:16
**aggregate** [2] - 147:17, 148:22
**ago** [8] - 15:3, 15:4, 18:10, 29:4, 50:15, 72:10, 73:6, 123:3
**Agora** [4] - 156:18, 157:1, 157:9, 173:13
**agree** [23] - 13:16, 23:18, 56:7, 87:4, 91:8, 107:23, 117:19, 138:10, 145:25, 147:20, 150:16, 154:24, 171:20, 171:24, 173:4, 173:12, 173:18, 174:8, 177:2, 190:1, 190:7, 190:10, 193:5
**agreed** [2] - 122:8, 142:13
**agreeing** [1] - 107:17
**agreement** [3] - 21:6, 56:4, 170:19
**ahead** [2] - 46:11, 79:16
**aiding** [1] - 103:15
**airport** [1] - 80:9
**AI** [10] - 48:7, 48:19, 48:21, 49:10, 50:5, 50:24, 50:25, 51:3, 51:9, 52:21
**Al-Qassam** [10] - 48:7, 48:19, 48:21, 49:10, 50:5, 50:24, 50:25, 51:3, 51:9, 52:21
**alacrity** [1] - 10:1
**Alden** [1] - 3:6
**ALDEN** [1] - 1:13
**alerted** [1] - 52:24
**Alexander** [2] - 96:19, 96:20
**algorithm** [8] - 43:6, 112:12, 112:14, 114:1, 148:10, 151:23, 152:5, 152:9
**algorithms** [12] - 12:22, 20:1, 20:3, 39:25, 112:23, 147:17, 147:22, 148:2, 148:4, 148:22, 149:19, 152:12
**allegations** [1] - 32:14
**allow** [7] - 64:22, 67:14, 67:15, 88:5, 90:3, 103:25, 133:9
**allowed** [5] - 4:8, 6:17, 16:17, 119:1, 132:15

**allowing** [1] - 109:6
**almost** [8] - 17:21, 59:14, 101:5, 111:10, 120:19, 177:5, 187:6, 189:3
**alone** [1] - 25:20
**aloud** [3] - 162:23, 163:24, 180:25
**AlphaBay** [12] - 118:24, 119:2, 119:6, 119:8, 119:11, 122:18, 122:22, 123:2, 123:3, 123:5, 123:6, 173:13
**alternative** [1] - 133:3
**amateur** [1] - 146:12
**amenable** [2] - 101:23, 101:24
**amend** [2] - 138:12, 138:18
**AMERICA** [1] - 1:2
**America** [1] - 3:3
**American** [2] - 36:18, 36:22
**AML** [2] - 149:5, 167:14
**amount** [11] - 25:2, 55:2, 55:5, 55:22, 75:2, 75:3, 78:16, 78:24, 83:9, 100:19, 188:14
**amounts** [5] - 53:20, 58:12, 78:11, 78:21, 78:22
**amplified** [1] - 8:19
**anachronistic** [2] - 129:21, 134:3
**analogy** [2] - 88:12, 88:24
**analyses** [1] - 163:3
**analysis** [32] - 17:5, 22:18, 22:21, 22:22, 22:23, 22:24, 23:3, 31:13, 31:19, 62:23, 67:5, 69:18, 99:24, 138:23, 150:3, 151:22, 152:3, 153:7, 153:12, 153:18, 153:25, 156:4, 158:2, 161:10, 162:20, 163:1, 163:12, 169:9, 178:14, 181:3, 187:6, 194:5
**analytics** [15] - 40:3, 40:5, 40:20, 41:23, 42:20, 51:5, 56:2, 169:14, 169:17, 169:18, 170:1,

170:4, 170:8, 170:10
**analyze** [1] - 20:1
**anchor** [1] - 164:3
**animal** [1] - 97:18
**announcement** [1] - 157:19
**anonymity** [3] - 54:7, 55:8
**anonymizes** [1] - 149:15
**anonymizing** [2] - 63:10, 63:17
**anonymous** [1] - 55:5
**answer** [8] - 12:19, 24:14, 51:15, 64:10, 94:8, 102:6, 179:2, 179:3
**anti** [1] - 167:3
**anti-money** [1] - 167:3
**anticipate** [3] - 7:4, 143:8, 144:6
**anyhow** [1] - 115:6
**apart** [2] - 61:9, 100:23
**API** [3] - 41:22, 92:10, 121:24
**apologies** [1] - 105:16
**apologize** [2] - 72:8, 182:18
**appear** [1] - 160:1
**appearance** [1] - 22:3
**appendix** [4] - 183:15, 183:18, 183:20, 183:22
**applicability** [1] - 134:25
**application** [4] - 30:20, 31:10, 43:8, 113:25
**applications** [1] - 30:13
**applied** [12] - 7:1, 17:4, 21:14, 26:21, 27:12, 43:6, 111:18, 112:11, 112:22, 114:2, 185:18
**apply** [1] - 24:15
**applying** [1] - 149:14
**appreciate** [5] - 80:3, 80:11, 109:11, 120:17, 140:1
**appreciation** [1] - 131:7
**approach** [4] - 3:4, 31:17, 34:7, 124:8
**approaches** [1] - 44:11
**appropriate** [15] - 18:14, 18:22, 18:23, 20:22, 22:4, 30:9,

68:17, 68:19, 68:22, 70:11, 102:23, 109:11, 127:21, 137:3
**approval** [2] - 6:18, 7:17
**approved** [2] - 19:12, 145:1
**Arabic** [1] - 34:21
**arcing** [1] - 105:19
**area** [2] - 85:1, 134:21
**arguably** [1] - 17:14
**argue** [1] - 131:11
**arguing** [1] - 88:25
**argument** [5] - 11:22, 128:7, 128:20, 132:10, 135:1
**arm** [2] - 36:4
**arrangement** [1] - 145:8
**arrest** [2] - 10:9, 96:21
**arrested** [2] - 96:21, 97:2
**arrow** [2] - 83:14, 86:9
**arrows** [1] - 75:12
**articles** [1] - 5:18
**assessment** [2] - 152:19, 158:1
**assessments** [1] - 152:13
**Asset** [1] - 149:16
**assets** [2] - 30:5, 149:7
**assign** [4] - 87:16, 166:4, 166:13, 166:21
**assist** [1] - 165:8
**assistance** [1] - 15:7
**associate's** [1] - 34:17
**associated** [11] - 10:10, 23:16, 50:3, 50:9, 90:14, 92:6, 166:14, 179:19, 188:12, 190:1, 190:11
**assume** [2] - 13:9, 74:10
**assuming** [1] - 109:22
**assumption** [3] - 50:17, 86:5, 109:21
**assumptions** [11] - 13:11, 14:9, 17:4, 20:10, 20:11, 21:14, 23:2, 24:12, 26:4, 47:16, 132:5
**assurances** [1] - 13:18
**attached** [3] - 38:15, 85:15, 169:17
**attachment** [3] -

175:25, 176:1
**attachments** [2] - 175:7, 175:11
**attempt** [3] - 152:7, 152:10, 152:12
**attempted** [3] - 92:16, 96:3, 97:4
**attempting** [1] - 98:7
**attention** [37] - 6:7, 37:1, 38:12, 69:1, 70:25, 74:7, 74:24, 76:21, 78:7, 79:5, 82:20, 112:25, 116:12, 118:8, 120:21, 121:6, 121:13, 137:21, 147:5, 148:11, 148:25, 156:11, 156:15, 158:22, 160:19, 167:2, 167:7, 175:23, 180:5, 180:19, 181:25, 183:8, 183:20, 184:10, 187:16, 188:11, 190:14
**attorney** [2] - 4:2, 4:4
**attributable** [2] - 97:7, 108:20
**attribute** [2] - 101:3, 178:20
**attributed** [17] - 49:9, 71:5, 90:5, 90:10, 98:1, 100:15, 106:20, 108:17, 108:24, 120:24, 122:11, 123:9, 176:21, 185:13, 189:7, 189:15, 192:16
**attributing** [1] - 119:8
**Attribution** [2] - 147:10, 148:15
**attribution** [47] - 39:24, 40:10, 40:18, 41:4, 41:6, 42:14, 43:22, 44:1, 44:5, 44:9, 47:13, 48:4, 48:5, 48:10, 48:12, 48:17, 53:3, 60:17, 87:15, 95:3, 106:10, 118:25, 119:22, 121:1, 122:15, 122:17, 122:21, 123:24, 123:25, 147:21, 148:16, 149:10, 150:8, 150:17, 150:19, 151:7, 151:18, 152:3, 152:4,

152:14, 154:25, 161:7, 161:15, 166:23, 180:14, 189:4, 189:22
**attributions** [4] - 119:3, 122:13, 122:24
**audiences** [1] - 155:11
**audit** [5] - 41:4, 43:13, 43:19, 44:5, 152:19
**auditable** [1] - 43:13
**audited** [1] - 48:11
**auditing** [1] - 44:24
**August** [7] - 1:5, 48:7, 95:13, 117:14, 195:24, 195:25, 196:7
**AUSA** [1] - 3:9
**authority** [1] - 32:3
**authorize** [6] - 9:8, 10:11, 30:9, 31:7, 33:4, 33:8
**authorized** [2] - 30:15, 30:17
**automates** [1] - 149:11
**automatic** [1] - 43:2
**availability** [1] - 186:8
**available** [12] - 19:9, 30:3, 44:17, 58:9, 72:2, 77:12, 83:17, 84:22, 104:23, 105:3, 159:24, 164:16
**Ave** [1] - 1:17
**Avenue** [3] - 1:14, 1:23, 196:11
**avoid** [1] - 32:13
**awarded** [1] - 98:25
**aware** [39] - 4:14, 32:11, 41:24, 42:22, 42:24, 43:1, 43:16, 43:19, 49:13, 54:1, 65:11, 134:1, 139:10, 139:14, 141:16, 141:23, 142:2, 146:20, 152:15, 152:16, 152:22, 154:19, 156:8, 157:14, 160:17, 165:13, 167:25, 171:14, 171:16, 172:23, 173:9, 173:21, 173:24, 175:13, 185:10, 185:21, 186:22, 187:5, 191:19
**awkward** [1] - 117:13

## B

**bachelor's** [1] - 34:18
**back-to-back** [1] - 55:22
**background** [3] - 12:1, 34:13, 39:6
**backing** [1] - 69:17
**backwards** [3] - 76:18, 93:11, 94:12
**baffling** [1] - 25:11
**balance** [1] - 57:4
**Bank** [1] - 135:12
**bank** [1] - 127:15
**base** [2] - 139:22, 140:7
**based** [18] - 14:8, 18:3, 20:10, 24:24, 24:25, 46:5, 46:8, 51:5, 91:25, 124:2, 136:22, 136:25, 151:4, 151:10, 160:24, 161:11, 179:21, 181:20
**baseline** [2] - 119:17, 123:4
**bases** [1] - 111:17
**basics** [1] - 57:15
**basis** [6] - 18:6, 100:12, 102:22, 132:14, 137:1, 137:5
**battle** [1] - 24:6
**BCF** [1] - 86:7
**Beckett** [3] - 94:15, 94:16
**becomes** [1] - 125:10
**BEFORE** [1] - 1:8
**began** [2] - 35:5, 36:2
**begging** [1] - 125:12
**beginning** [7] - 35:12, 48:9, 98:13, 140:20, 150:12, 156:15, 156:21
**begins** [2] - 104:16, 113:2
**behalf** [3] - 43:1, 95:17, 193:3
**behave** [3] - 91:7, 94:22, 107:23
**behaves** [4] - 27:3, 91:10, 107:18, 189:10
**behaving** [1] - 27:7
**behavior** [7] - 26:11, 26:12, 26:25, 119:18, 123:5, 123:6
**behavioral** [12] - 24:21, 26:6, 26:8, 26:17, 26:18, 26:20, 26:24, 26:25, 27:11,

120:25, 177:13, 177:15
**behind** [5] - 37:1, 37:20, 38:12, 38:18, 69:3
**belaboring** [1] - 133:18
**belong** [4] - 44:21, 88:1, 88:7, 161:17
**belonging** [1] - 40:17
**belongs** [1] - 178:22
**below** [6] - 48:9, 55:7, 56:14, 58:10, 82:5, 189:25
**bench** [1] - 164:19
**beneath** [1] - 158:23
**beside** [1] - 105:23
**best** [8] - 28:2, 56:1, 80:17, 84:4, 104:10, 171:22, 193:21, 196:6
**beta** [3] - 86:1, 87:2, 87:21
**Beta** [1] - 86:7
**better** [4] - 28:6, 80:19, 87:17, 194:22
**between** [18] - 29:13, 31:7, 47:5, 47:9, 49:14, 82:25, 87:23, 116:9, 116:22, 123:10, 124:7, 142:20, 143:9, 149:12, 169:17, 170:19, 172:6, 181:19
**beyond** [4] - 7:1, 17:16, 65:11, 104:2
**biased** [1] - 31:14
**big** [2] - 112:15, 116:6
**bigger** [1] - 17:15
**bill** [2] - 85:16, 85:17
**Binance** [21] - 41:8, 41:9, 41:11, 41:14, 42:4, 190:24, 191:3, 191:5, 191:11, 191:15, 191:24, 192:2, 192:6, 192:10, 192:17, 192:18, 192:24, 193:2, 193:4
**binder** [7] - 34:5, 37:2, 99:12, 137:13, 137:21, 175:24, 182:1
**Bisbee** [11] - 11:18, 26:5, 27:1, 27:5, 27:10, 27:24, 61:22, 63:12, 67:2, 105:12, 111:6
**Bisbee's** [10] - 24:19,

25:2, 26:23, 110:4, 110:20, 111:1, 118:12, 150:24, 175:7, 179:14
**bit** [31] - 12:18, 35:10, 35:13, 43:3, 50:1, 53:14, 68:23, 70:24, 71:12, 73:23, 90:12, 92:15, 94:18, 96:1, 104:14, 104:16, 116:9, 127:2, 129:1, 129:21, 135:5, 139:9, 155:25, 161:12, 183:9, 190:15, 190:16, 190:22, 191:25, 193:13, 193:16
**Bitaps** [1] - 113:15
**bitaps.com** [1] - 118:5
**bitcoin** [2] - 157:2, 166:18
**Bitcoin** [175] - 23:9, 23:12, 23:14, 24:3, 24:5, 27:4, 27:7, 36:10, 40:12, 40:21, 43:25, 51:8, 52:1, 52:7, 52:13, 52:16, 52:18, 52:19, 52:20, 53:10, 53:18, 55:4, 55:7, 55:18, 56:17, 56:19, 57:3, 57:4, 57:8, 57:16, 57:17, 57:20, 57:22, 58:5, 58:13, 59:22, 62:7, 66:24, 67:5, 67:10, 67:24, 68:1, 71:1, 71:4, 71:5, 74:8, 75:2, 75:16, 79:3, 79:4, 83:6, 84:18, 85:4, 86:6, 87:3, 87:5, 87:7, 87:13, 87:24, 90:11, 91:1, 91:7, 91:10, 91:20, 92:1, 92:16, 92:18, 92:24, 93:14, 93:17, 93:23, 94:3, 94:4, 94:5, 95:4, 95:9, 95:11, 95:14, 96:4, 96:17, 97:3, 97:7, 97:10, 97:15, 97:17, 98:15, 99:16, 106:14, 106:19, 106:20, 107:19, 108:4, 108:18, 108:19, 108:20, 108:24, 109:4, 109:19, 109:20, 112:3, 114:10, 116:24, 117:5, 118:20, 121:2,

121:9, 122:11, 123:7, 126:21, 127:12, 128:8, 128:15, 128:23, 129:3, 129:7, 129:11, 129:22, 130:12, 131:10, 131:14, 131:19, 132:1, 132:11, 132:21, 133:25, 134:24, 156:18, 160:24, 161:13, 162:9, 166:14, 166:17, 166:21, 166:24, 171:9, 171:12, 171:20, 171:25, 172:4, 172:6, 172:10, 172:11, 172:25, 173:19, 174:1, 174:9, 175:2, 175:14, 176:4, 176:8, 176:18, 177:23, 177:24, 178:1, 178:22, 179:8, 179:22, 180:22, 180:25, 181:5, 181:7, 181:8, 181:12, 181:19, 188:18, 189:5, 189:8, 189:15, 189:22, 190:2, 190:7
**Bitcoin's** [1] - 131:6
**Bitcoinfog.eth** [1] - 110:7
**Bitcointalk** [3] - 87:9, 97:23, 98:17
**bits** [8] - 111:25, 112:1, 112:15, 114:2, 114:3, 115:11, 115:14, 116:7
**black** [11] - 12:19, 20:15, 30:2, 40:2, 40:3, 41:1, 41:16, 41:20, 42:22, 42:25, 169:18
**BlackBank** [1] - 173:13
**blame** [1] - 32:20
**blanket** [1] - 139:25
**block** [9] - 59:12, 59:13, 60:5, 63:25, 98:25, 113:7, 113:10, 117:6
**blockchain** [42] - 17:22, 20:5, 20:7, 36:10, 40:13, 41:23, 42:20, 51:4, 52:10, 56:1, 57:19, 57:21,

62:6, 62:23, 69:18, 71:1, 75:16, 80:21, 84:9, 86:23, 103:12, 146:1, 146:2, 146:11, 149:6, 149:10, 150:3, 153:7, 153:25, 155:20, 156:4, 158:2, 161:3, 163:1, 163:11, 164:2, 164:4, 164:6, 164:7, 169:9, 170:8, 181:3
**Blockchain** [1] - 156:2
**blockchain.com** [1] - 58:10
**blockchair.com** [1] - 58:10
**blocks** [1] - 59:11
**Bloomberg** [1] - 132:2
**blue** [1] - 149:4
**body** [2] - 55:25, 56:2
**boggles** [1] - 6:4
**bono** [3] - 36:3, 36:4, 142:14
**booklet** [2] - 82:19, 99:10
**boss** [1] - 35:22
**bots** [1] - 8:19
**bottom** [15] - 23:21, 26:13, 31:18, 45:21, 71:1, 81:23, 82:2, 82:11, 128:25, 129:2, 182:5, 182:17, 182:25, 183:24, 189:11
**bounce** [1] - 115:9
**box** [13] - 12:19, 20:15, 30:2, 40:2, 40:3, 41:1, 41:16, 41:20, 42:22, 42:25, 58:24, 75:6, 169:18
**boxes** [2] - 58:24, 61:5
**brand** [1] - 145:7
**breadth** [1] - 194:5
**break** [15] - 33:13, 62:3, 68:20, 79:17, 88:24, 90:12, 124:20, 125:5, 137:7, 154:6, 155:24, 186:2, 186:7, 193:11, 195:1
**breaking** [1] - 93:9
**briefing** [1] - 8:15
**briefly** [17] - 34:12, 46:23, 54:8, 81:22, 82:1, 83:1, 86:20, 107:15, 108:7, 108:15, 111:13, 118:11, 120:1, 121:15, 122:1,

122:14, 145:13
**Brigades** [10] - 48:7, 48:19, 48:21, 49:10, 50:5, 50:24, 50:25, 51:3, 51:9, 52:21
**bring** [1] - 4:10
**bringing** [1] - 29:1
**broached** [1] - 101:21
**broken** [1] - 55:1
**broker** [2] - 61:7, 61:14
**brought** [2] - 79:22, 136:10
**BROWN** [13] - 1:10, 3:9, 4:23, 8:2, 8:9, 8:22, 9:2, 9:6, 9:13, 9:15, 9:24, 11:12, 135:11
**Brown** [5] - 3:10, 7:25, 64:4, 65:7, 135:8
**browser** [1] - 71:21
**BTC** [12] - 92:7, 92:9, 92:11, 92:14, 96:5, 96:6, 96:15, 96:19, 96:21, 97:5, 97:10, 98:8
**BTC-e** [11] - 92:7, 92:9, 92:11, 92:14, 96:5, 96:6, 96:15, 96:21, 97:5, 97:10, 98:8
**buggy** [1] - 17:24
**build** [1] - 91:13
**building** [1] - 23:7
**builds** [1] - 101:9
**bulk** [1] - 25:14
**bullet** [6] - 112:25, 113:21, 116:13, 116:14, 117:2, 117:4
**bunch** [4] - 41:22, 73:6, 119:2, 176:14
**buried** [1] - 16:20
**business** [1] - 95:25
**busy** [1] - 130:7
**buy** [2] - 25:22, 85:16
**buyers** [2] - 173:2, 173:18
**BY** [47] - 34:4, 34:11, 37:19, 38:8, 39:4, 39:16, 42:16, 46:22, 49:18, 51:10, 64:17, 66:4, 66:16, 67:21, 69:12, 72:17, 75:22, 77:17, 81:18, 85:22, 89:16, 93:3, 94:14, 104:6, 108:6, 108:14, 109:17, 110:25, 116:11, 119:15, 124:11, 137:19, 138:5,

139:1, 150:2, 158:14, 165:3, 167:24, 171:1, 177:14, 179:6, 179:12, 180:9, 182:21, 186:20, 187:15, 190:21
**byte** [3] - 112:1, 116:10
**bytes** [5] - 112:15, 114:3, 114:4, 115:14, 116:7

---

# C

**calculate** [2] - 172:7, 172:13
**calculated** [3] - 173:7, 181:15, 181:24
**calculation** [3] - 181:18, 183:11, 185:7
**calculations** [1] - 181:17
**California** [1] - 159:17
**campaign** [1] - 50:13
**Canada** [1] - 156:9
**Canadian** [2] - 158:1, 158:5
**cannot** [12] - 11:17, 55:19, 63:5, 63:6, 87:21, 88:7, 90:6, 91:19, 105:23, 119:21, 170:3, 175:4
**capability** [1] - 101:13
**capable** [1] - 136:8
**capture** [1] - 102:19
**captured** [1] - 120:8
**career** [2] - 35:5, 35:13
**carefully** [2] - 179:1, 179:3
**caret** [1] - 114:21
**carry** [1] - 117:13
**case** [78] - 5:15, 5:19, 5:22, 6:7, 6:11, 7:2, 10:15, 10:16, 16:12, 17:20, 18:6, 20:13, 22:11, 26:21, 27:19, 27:21, 27:22, 30:8, 30:20, 32:1, 32:22, 38:10, 47:15, 47:18, 47:19, 50:22, 58:4, 60:9, 64:12, 64:16, 65:8, 65:13, 66:18, 67:9, 67:23, 88:14, 114:9, 122:6, 130:4, 130:5, 130:15, 130:19, 133:21, 134:3, 136:1,

138:13, 139:2, 139:3, 139:6, 140:22, 142:14, 142:17, 142:21, 143:9, 143:19, 144:2, 144:6, 144:11, 144:20, 145:12, 145:16, 145:19, 146:20, 153:22, 160:11, 160:13, 161:10, 161:11, 162:8, 168:15, 171:2, 171:8, 174:14, 175:5, 178:23, 194:6
**Case** [2] - 3:2, 56:13
**cases** [5] - 30:17, 36:6, 36:8, 154:20, 154:22
**catch** [1] - 79:25
**categorize** [2] - 169:25, 170:6
**causing** [1] - 100:6
**caution** [1] - 126:4
**caveat** [1] - 131:24
**cease** [1] - 8:21
**central** [3] - 27:20, 30:8, 32:21
**CEO** [5] - 96:20, 144:24, 145:4, 146:18, 156:8
**CEPOL** [1] - 36:16
**certain** [11] - 40:17, 40:23, 51:4, 60:16, 65:5, 97:18, 143:10, 146:21, 161:17, 161:18, 189:10
**certainly** [3] - 67:13, 132:15, 139:19
**certainty** [1] - 94:10
**CERTIFICATE** [1] - 196:1
**Certified** [1] - 35:20
**certify** [2] - 6:23, 196:3
**cetera** [3] - 36:7, 40:13, 107:6
**chain** [24] - 40:11, 43:2, 44:16, 44:22, 49:17, 52:14, 54:18, 54:20, 54:23, 59:2, 61:11, 63:7, 64:22, 67:25, 75:14, 78:12, 83:19, 83:21, 84:5, 86:16, 99:24, 110:9, 120:24, 121:4
**Chainalysis** [79] - 11:16, 11:20, 12:4, 12:13, 13:19, 15:5, 17:7, 19:21, 20:3,

20:22, 21:4, 21:10, 21:15, 21:20, 22:2, 22:12, 25:10, 25:19, 26:1, 28:19, 31:8, 31:24, 43:17, 43:20, 45:18, 46:1, 46:2, 46:16, 46:24, 47:1, 47:3, 53:4, 61:20, 91:9, 108:10, 108:17, 108:20, 108:24, 111:8, 111:11, 111:15, 112:4, 119:2, 121:18, 122:11, 122:13, 123:14, 139:12, 139:15, 139:17, 139:22, 139:24, 140:8, 140:16, 150:16, 151:14, 151:18, 169:11, 170:17, 174:16, 175:15, 175:18, 176:13, 177:1, 177:7, 179:23, 180:11, 182:2, 182:11, 183:4, 183:16, 185:20, 187:19, 187:25, 188:3, 188:15, 188:21, 189:1, 189:4
**Chainalysis's** [6] - 11:18, 79:23, 140:5, 180:2, 184:5, 189:22
**chains** [2] - 36:11, 61:13, 152:10
**chair** [1] - 36:3
**challenge** [1] - 125:23
**challenging** [1] - 125:8
**chambers** [1] - 164:20
**chance** [2] - 8:1, 33:14
**change** [25] - 35:13, 44:8, 65:10, 65:23, 74:17, 74:19, 85:17, 117:5, 121:19, 129:23, 151:21, 151:23, 151:25, 152:2, 152:6, 152:7, 160:23, 162:19, 163:13, 163:17, 163:18, 163:20, 163:21, 163:24, 187:6
**changed** [3] - 44:6, 116:25, 146:6
**changes** [1] - 48:19
**channels** [1] - 48:19
**characteristic** [1] - 24:18

**characterization** [1] - 18:19
**characterize** [2] - 15:10, 73:22
**characterized** [1] - 16:16
**charge** [1] - 33:2
**charged** [1] - 50:4
**charges** [1] - 20:12
**chart** [13] - 88:9, 167:9, 182:4, 182:9, 182:14, 182:15, 183:4, 187:17, 187:18, 187:25, 188:12, 189:25, 190:5
**charts** [2] - 50:19, 50:20
**chat** [1] - 145:20
**chats** [1] - 145:15
**Chaumians** [1] - 63:14
**cheaper** [1] - 113:11
**check** [5] - 132:22, 146:21, 166:22, 186:7, 189:24
**checking** [2] - 20:17, 110:22
**checks** [1] - 43:8
**child** [2] - 173:22, 174:10
**childcare** [1] - 194:18
**China** [1] - 159:14
**choice** [1] - 29:8
**choose** [4] - 29:19, 115:21, 140:15, 140:16
**chooses** [1] - 54:10
**chose** [2] - 117:16, 133:1
**chosen** [1] - 25:18
**Chris** [1] - 3:9
**CHRISTOPHER** [1] - 1:10
**CI** [1] - 86:14
**CipherTrace** [123] - 23:9, 33:21, 34:23, 34:24, 35:1, 35:4, 35:5, 35:8, 35:18, 35:24, 36:1, 36:4, 36:9, 40:6, 46:24, 51:20, 56:17, 61:3, 71:4, 83:17, 91:9, 95:2, 104:24, 106:10, 121:18, 121:24, 122:10, 122:13, 122:17, 123:15, 139:11, 139:15, 139:23, 140:7, 140:15, 143:15, 143:16,

143:20, 143:21, 144:1, 144:7, 144:18, 144:19, 144:23, 145:4, 145:6, 145:10, 146:8, 146:14, 147:2, 147:6, 147:7, 147:11, 147:16, 148:1, 148:12, 148:21, 149:1, 149:5, 150:6, 150:10, 150:20, 151:3, 151:17, 151:21, 152:2, 153:4, 153:8, 153:20, 153:23, 154:16, 155:1, 155:3, 155:4, 155:12, 156:5, 156:12, 157:22, 157:24, 158:15, 160:22, 161:6, 163:24, 164:1, 164:5, 165:19, 165:23, 166:4, 166:13, 166:16, 166:20, 167:3, 167:8, 167:12, 167:14, 169:8, 169:22, 170:9, 170:14, 170:15, 170:16, 171:15, 172:10, 173:16, 174:15, 175:2, 177:2, 177:21, 178:19, 179:13, 179:23, 180:12, 188:6, 188:12, 188:17, 188:23, 189:4, 189:7, 189:15, 190:7, 190:11
**CipherTrace's** [24] - 23:11, 54:4, 145:25, 146:18, 147:12, 147:16, 147:21, 148:16, 148:21, 149:17, 150:3, 152:16, 153:1, 153:12, 153:24, 154:3, 154:8, 154:24, 156:8, 157:10, 157:23, 180:1, 181:20, 189:22
**circle** [1] - 75:1
**circles** [2] - 60:5, 60:6
**circulate** [1] - 164:24
**citing** [1] - 111:8
**civil** [8] - 16:18, 48:6,

48:11, 48:15, 130:4, 130:9, 130:15, 130:19
**CJA** [29] - 6:14, 6:15, 6:17, 6:19, 6:23, 6:24, 7:3, 7:6, 7:8, 7:9, 7:12, 19:9, 19:12, 19:13, 19:18, 25:24, 29:21, 29:22, 30:7, 30:11, 30:12, 30:16, 30:25, 33:8, 33:9, 33:10
**claims** [1] - 40:22
**Clane** [2] - 170:2, 170:9
**clarify** [1] - 182:2
**clarifying** [1] - 133:14
**clarity** [1] - 147:24
**classic** [2] - 24:6, 129:5
**cleaned** [1] - 165:11
**clear** [26] - 4:24, 4:25, 5:25, 10:17, 12:6, 16:14, 28:19, 29:3, 36:1, 63:11, 69:8, 78:13, 78:14, 84:2, 95:7, 102:11, 102:13, 109:10, 134:19, 142:1, 145:9, 157:17, 177:25, 183:11, 185:3
**clearly** [2] - 11:18, 103:14
**Clegg** [3] - 35:22, 144:22, 145:1
**clerk** [1] - 21:8
**client** [6] - 4:4, 4:12, 4:16, 14:21, 56:17, 56:20
**client's** [1] - 13:23
**clients** [5] - 140:11, 142:25, 155:9, 155:12, 155:16
**clock** [2] - 8:16, 137:8
**close** [3] - 15:3, 29:4, 34:16
**closed** [2] - 147:14, 148:19
**closed-source** [2] - 147:14, 148:19
**closer** [2] - 6:6, 34:15
**cluster** [48] - 23:7, 24:21, 27:7, 44:12, 44:18, 45:2, 46:19, 48:6, 49:1, 49:9, 49:11, 52:21, 61:9, 69:24, 89:3, 89:5, 95:1, 104:20, 106:19, 107:23,

108:19, 108:24,
121:9, 121:10,
121:11, 121:17,
121:19, 121:20,
122:4, 122:6, 122:7,
122:8, 152:8,
163:25, 174:16,
175:14, 175:17,
177:13, 177:15,
179:20, 180:3,
184:3, 188:9, 190:1,
190:6, 190:10,
190:11, 192:15
**clustered** [6] - 120:23,
157:10, 177:12,
180:12, 182:6
**clustering** [57] -
26:24, 26:25, 39:25,
41:17, 43:2, 44:10,
45:1, 45:18, 45:20,
45:23, 46:4, 46:5,
46:8, 46:11, 46:12,
46:13, 47:6, 47:7,
48:17, 49:8, 49:14,
49:15, 50:17, 51:6,
53:5, 54:25, 58:16,
61:8, 62:1, 62:3,
62:4, 86:9, 86:13,
119:7, 119:23,
147:17, 147:21,
147:22, 148:2,
148:4, 148:21,
149:14, 149:19,
150:3, 150:7,
151:11, 151:17,
152:17, 154:3,
154:4, 154:8,
155:22, 163:3,
163:13, 181:20,
192:14
**clusters** [32] - 44:15,
44:21, 45:1, 45:9,
47:6, 47:23, 47:24,
47:25, 48:22, 49:4,
54:1, 87:25, 88:1,
88:6, 89:4, 91:8,
91:10, 91:12, 94:23,
119:23, 122:3,
122:10, 151:12,
151:13, 163:2,
172:9, 179:13,
179:16, 179:18,
180:1, 180:13
**Clusters** [1] - 121:24
**co** [73] - 36:3, 44:18,
44:19, 44:20, 46:6,
46:9, 46:15, 47:25,
48:13, 48:14, 48:22,
49:5, 58:7, 60:3,
60:4, 60:10, 75:9,

75:10, 75:17, 76:24,
77:4, 77:21, 78:1,
82:5, 82:7, 82:10,
83:5, 87:8, 87:24,
95:7, 95:8, 96:23,
106:21, 120:24,
123:20, 123:25,
152:13, 162:19,
163:6, 163:7,
163:10, 163:24,
176:11, 177:12,
177:19, 178:1,
178:21, 179:21,
182:5, 182:7,
182:10, 182:16,
183:1, 183:6,
183:10, 183:25,
184:1, 184:4, 184:8,
184:20, 184:21,
185:1, 185:5, 185:8,
185:11, 185:15,
185:17, 185:21,
187:22
**co-chair** [1] - 36:3
**co-founders** [1] -
96:23
**co-spend** [53] - 44:19,
46:6, 46:9, 46:15,
47:25, 48:14, 49:5,
60:3, 60:10, 75:9,
75:10, 75:17, 76:24,
77:4, 77:21, 78:1,
82:5, 82:7, 82:10,
83:5, 95:8, 120:24,
123:20, 123:25,
162:19, 163:6,
163:7, 163:10,
163:24, 176:11,
177:12, 178:1,
178:21, 179:21,
182:5, 182:7,
182:10, 182:16,
183:1, 183:6,
183:10, 184:4,
184:20, 184:21,
185:1, 185:5, 185:8,
185:11, 185:15,
185:17, 185:21,
187:22
**co-spending** [8] -
44:18, 58:7, 95:7,
152:13, 183:25,
184:1, 184:8
**co-spends** [5] - 48:13,
60:4, 87:24, 177:19
**co-spent** [5] - 44:20,
48:22, 60:10, 87:8,
106:21
**co_spend_flag** [10] -
183:12, 183:23,

184:6, 184:19,
185:1, 185:4,
185:11, 185:16,
186:23, 187:2
**co_spend_flags** [1] -
184:7
**co_spend_root_
address** [4] - 176:10,
183:24, 184:2,
184:21
**code** [44] - 12:10,
12:15, 13:10, 14:6,
14:7, 14:8, 14:9,
15:16, 16:12, 16:15,
16:21, 16:22, 16:23,
17:10, 17:14, 18:16,
18:21, 19:1, 19:3,
19:21, 19:22, 19:23,
20:1, 21:3, 21:16,
21:21, 24:16, 25:4,
25:5, 28:4, 28:5,
28:10, 32:18, 98:23,
153:5, 153:9,
153:12, 153:18,
154:1
**coder** [2] - 24:11,
28:22
**coding** [3] - 12:8,
28:3, 28:7
**coffee** [2] - 65:20,
85:16
**coffees** [2] - 65:21,
65:22
**Coinbase** [1] - 98:25
**CoinJoin** [22] - 54:7,
55:2, 55:17, 62:2,
62:7, 62:22, 62:25,
63:13, 64:1, 64:9,
64:14, 64:19, 65:6,
65:13, 65:14, 65:15,
65:17, 95:11, 95:18
**CoinJoins** [13] - 54:7,
55:22, 63:10, 63:17,
63:21, 64:15, 64:22,
64:24, 65:4, 95:15,
154:6, 155:24,
155:25
**coins** [3] - 54:10, 85:3,
86:22
**Coke** [1] - 13:19
**cold** [1] - 72:10
**colleagues** [1] -
171:14
**collected** [3] - 39:24,
41:24, 61:13
**collecting** [2] - 112:5,
151:8
**collection** [3] - 41:5,
42:1, 149:11
**colloquial** [1] - 191:21

color [1] - 122:10
**COLUMBIA** [1] - 1:1
**column** [5] - 176:9,
183:5, 183:6, 183:8,
188:3
**columns** [2] - 73:11,
73:14
**combination** [2] -
124:2, 143:22
**combine** [2] - 65:16,
65:22
**combined** [4] - 49:8,
73:8, 141:14, 195:4
**combines** [1] - 45:1
**comfortable** [5] -
21:20, 22:5, 41:19,
78:16, 178:24
**coming** [12] - 17:18,
24:7, 28:20, 59:23,
62:24, 64:13, 80:8,
97:22, 105:20,
165:21, 178:7,
191:11
**commensurate** [1] -
88:16
**Comment** [1] - 110:13
**comment** [1] - 110:19
**commentary** [2] -
5:15, 5:18
**comments** [1] - 70:19
**commercial** [2] -
163:11, 169:14
**commingled** [1] - 87:8
**committed** [1] - 88:16
**common** [6] - 160:22,
162:24, 163:1,
163:2, 163:3, 163:20
**communicate** [2] -
22:2, 172:18
**communication** [1] -
10:13
**communications** [1] -
100:11
**companies** [10] - 41:1,
42:21, 43:11,
140:15, 140:16,
165:19, 169:25,
170:5, 170:8, 170:10
**company** [7] - 14:12,
45:11, 45:14, 191:8,
192:10, 192:24,
193:3
**company's** [1] - 154:9
**compare** [4] - 99:4,
101:10, 104:11,
121:1
**compared** [3] - 90:7,
122:15, 189:21
**comparing** [1] -
122:21

**comparison** [1] -
122:12
**compete** [1] - 13:17
**competed** [1] - 140:2
**competition** [1] -
140:8
**competitive** [2] -
14:13, 14:19
**competitor** [6] -
13:20, 14:6, 139:11,
139:15, 139:17,
139:23
**complaint** [4] - 48:7,
48:11, 48:15, 86:1
**Complete** [1] - 148:15
**complete** [9] - 13:24,
20:15, 41:4, 70:5,
70:12, 76:23,
111:18, 112:9, 196:5
**completed** [1] - 35:21
**completely** [5] - 8:7,
74:21, 91:6, 105:16,
109:10
**complicated** [1] -
129:9
**complying** [2] - 10:7,
18:8
**compress** [1] - 115:22
**compressed** [13] -
105:9, 111:24,
112:16, 112:20,
113:23, 114:3,
115:16, 115:21,
116:16, 116:22,
116:25, 117:1
**compression/
uncompression** [1] -
116:21
**computer** [6] - 14:7,
14:8, 27:24, 28:11,
125:17, 126:15
**concern** [8] - 6:4,
7:20, 8:4, 17:3,
28:17, 29:4, 29:5,
134:6
**concerned** [5] - 8:10,
28:25, 80:24,
101:22, 103:19
**concerning** [1] - 10:13
**concerns** [4] - 3:24,
8:8, 12:13, 14:19
**conclude** [4] - 30:8,
30:9, 103:21, 132:18
**concluded** [1] - 23:16
**conclusion** [4] -
69:17, 87:12, 88:13,
156:1
**conclusions** [4] -
24:8, 74:18, 99:23,
102:16

**condense** [2] - 54:18, 68:18
**conditions** [1] - 21:23
**conduct** [2] - 153:7, 153:25
**conducting** [1] - 183:16
**confer** [4] - 3:23, 27:15, 195:13, 195:19
**conference** [1] - 9:19
**conferred** [1] - 145:12
**confidence** [1] - 47:2
**confident** [1] - 178:19
**confirm** [19] - 70:12, 90:6, 90:22, 91:20, 93:21, 94:21, 99:17, 107:22, 109:3, 109:19, 112:21, 119:21, 140:17, 162:1, 170:3, 171:23, 174:21, 181:13, 181:14
**confirmed** [1] - 29:14
**confuse** [1] - 134:8
**confused** [4] - 61:8, 86:13, 106:2, 115:14
**confusing** [1] - 86:2
**confusion** [1] - 78:14
**congratulatory** [1] - 145:17
**connect** [3] - 79:23, 86:21, 188:21
**connected** [5] - 59:12, 107:1, 107:3, 187:19, 187:25
**connection** [1] - 82:8
**connections** [1] - 97:22
**consensus** [1] - 56:9
**consent** [1] - 81:14
**consequence** [1] - 47:11
**conservative** [1] - 124:8
**consider** [2] - 139:23, 166:12
**consideration** [1] - 112:13
**considerations** [2] - 104:8, 155:21
**considered** [6] - 95:10, 117:17, 143:19, 148:9, 166:9, 166:11
**considering** [2] - 95:2, 138:23
**considers** [1] - 166:16
**consolidate** [1] - 107:20

**consolidating** [1] - 163:6
**consolidation** [1] - 91:19
**constantly** [1] - 125:12
**constitutes** [1] - 196:4
**Constitution** [2] - 1:23, 196:11
**constitutional** [2] - 13:23, 32:11
**consult** [1] - 81:9
**consulted** [1] - 132:24
**contact** [1] - 32:25
**contacted** [1] - 51:4
**contacting** [1] - 42:5
**contagious** [1] - 72:12
**contained** [10] - 57:11, 58:13, 59:10, 71:6, 90:1, 93:23, 105:1, 109:23, 118:6, 121:11
**contains** [3] - 10:23, 59:13, 73:11
**contempt** [2] - 8:13, 10:5
**contents** [2] - 68:9, 68:12
**context** [4] - 49:20, 103:17, 135:14, 154:6
**continue** [16] - 10:25, 60:15, 72:16, 79:18, 85:23, 94:9, 116:5, 116:8, 125:13, 143:11, 144:14, 159:19, 186:9, 193:18, 194:25
**continued** [1] - 5:1
**continues** [2] - 5:2, 145:7
**continuing** [4] - 8:18, 143:23, 188:25
**contract** [2] - 25:15, 140:3
**contracted** [1] - 155:1
**contracts** [4] - 25:14, 140:8, 161:16, 161:17
**Control** [1] - 92:3
**control** [14] - 52:3, 71:4, 84:14, 88:6, 89:18, 89:24, 106:11, 146:5, 163:2, 164:1, 192:2, 192:4, 192:21, 193:4
**controlled** [12] - 89:19, 92:10, 97:25, 157:9, 161:18, 163:10, 163:17,

176:4, 178:1, 188:18, 191:23, 192:17
**controlling** [3] - 52:9, 163:19, 192:22
**controls** [5] - 52:6, 52:7, 76:5, 163:20, 192:18
**convention** [1] - 93:9
**conversation** [5] - 15:5, 15:8, 15:13, 56:11, 153:14
**coordinate** [1] - 115:10
**coordinates** [1] - 115:11
**copied** [1] - 74:16
**copy** [3] - 96:7, 158:20, 182:13
**corner** [1] - 49:1
**corporate** [2] - 159:12, 191:12
**corporation** [1] - 191:13
**correct** [51] - 30:21, 37:6, 38:10, 42:3, 42:13, 42:19, 46:9, 50:7, 52:10, 52:15, 55:13, 58:3, 61:10, 61:21, 67:3, 67:16, 68:13, 68:20, 72:20, 74:4, 76:6, 76:7, 76:8, 77:14, 78:15, 79:11, 79:13, 84:10, 85:4, 85:20, 89:14, 90:18, 101:5, 107:6, 107:25, 109:25, 110:18, 124:3, 134:17, 138:20, 140:9, 140:11, 141:19, 150:8, 156:10, 158:24, 162:24, 165:22, 181:1, 192:12
**correctly** [20] - 47:12, 49:19, 64:21, 73:20, 78:20, 81:20, 82:10, 83:11, 90:13, 90:17, 92:17, 92:20, 96:4, 109:1, 109:18, 119:10, 136:3, 176:20, 185:10, 186:23
**correlate** [2] - 147:18, 148:22
**corresponding** [1] - 69:10
**corroborating** [1] - 20:14
**cost** [8] - 25:12, 25:20,

31:11, 31:17, 31:21, 31:23, 31:25, 143:3
**cost-effective** [4] - 31:11, 31:17, 31:21, 31:23
**costs** [2] - 29:12, 33:3
**cough** [1] - 72:11
**counsel** [20] - 3:4, 3:5, 5:1, 6:14, 10:22, 17:7, 21:9, 22:2, 23:5, 24:22, 25:22, 25:24, 30:19, 79:23, 102:14, 116:5, 125:22, 134:24, 160:14
**Counsel** [1] - 20:23
**count** [10] - 49:3, 49:6, 49:7, 135:23, 182:11, 184:25, 185:7, 185:14, 187:9, 188:4
**counted** [3] - 65:11, 182:2, 182:6
**counter** [1] - 155:19
**counterterrorism** [1] - 149:6
**counting** [1] - 157:4
**countries** [1] - 36:13
**country** [1] - 49:3
**counts** [3] - 26:12, 26:13, 49:4
**County** [1] - 79:25
**county** [1] - 159:17
**couple** [5] - 40:12, 90:18, 115:25, 124:23, 160:10
**course** [2] - 20:9, 160:3
**courses** [3] - 35:18, 35:25, 36:1
**COURT** [231] - 1:1, 3:8, 3:11, 3:14, 3:17, 3:20, 4:13, 4:18, 5:3, 5:10, 5:20, 5:24, 7:7, 7:15, 7:21, 7:25, 8:7, 8:20, 8:24, 9:4, 9:12, 9:14, 9:21, 10:3, 11:14, 11:22, 11:24, 13:6, 14:2, 15:2, 15:13, 15:17, 15:23, 16:7, 16:13, 18:8, 18:24, 19:8, 19:24, 20:21, 20:25, 22:5, 22:15, 22:24, 23:15, 24:9, 25:5, 25:12, 26:3, 27:8, 28:14, 29:2, 29:10, 29:16, 29:23, 30:6, 30:14, 31:3, 31:9, 32:3, 32:9, 32:17, 33:7,

33:12, 33:18, 34:1, 34:8, 34:10, 37:17, 38:5, 38:25, 39:13, 42:4, 42:12, 42:15, 46:3, 46:8, 46:11, 46:15, 46:21, 47:21, 48:2, 49:24, 50:7, 50:14, 50:19, 50:23, 51:1, 62:5, 62:11, 62:14, 62:20, 63:19, 64:1, 64:6, 65:14, 66:2, 66:12, 66:15, 66:25, 67:13, 67:19, 72:14, 72:16, 77:16, 79:16, 80:2, 80:6, 80:8, 80:13, 80:16, 80:19, 80:22, 81:1, 81:4, 81:13, 81:16, 84:25, 85:6, 85:18, 85:21, 88:11, 88:25, 89:7, 89:9, 89:15, 92:22, 93:16, 94:9, 101:19, 102:3, 102:13, 103:4, 103:18, 107:24, 108:5, 108:12, 109:8, 110:24, 116:9, 119:13, 122:22, 123:7, 123:11, 123:14, 123:18, 123:22, 123:25, 124:4, 124:7, 124:10, 124:16, 124:20, 125:1, 125:4, 125:15, 125:20, 126:9, 126:16, 126:24, 127:2, 127:6, 127:9, 127:13, 127:16, 127:19, 128:2, 128:11, 128:18, 128:21, 128:25, 129:9, 129:25, 130:17, 130:23, 131:13, 131:18, 131:21, 132:15, 133:5, 133:13, 133:16, 134:12, 135:5, 135:9, 135:24, 136:20, 137:6, 137:11, 137:15, 138:1, 138:15, 138:22, 149:23, 149:25, 158:10, 158:12, 164:12, 164:17, 165:1, 167:20, 167:22, 170:16, 170:21, 170:25, 177:10, 178:25,

180:7, 182:19, 186:1, 186:6, 186:12, 186:15, 187:11, 187:13, 190:19, 193:11, 193:20, 193:23, 194:1, 194:7, 194:10, 194:13, 194:16, 194:21, 194:24, 195:9, 195:11, 195:18, 195:23, 196:1
**court** [14] - 3:16, 66:12, 79:24, 108:12, 125:7, 143:2, 146:25, 154:13, 156:6, 158:1, 158:5, 159:25, 160:5, 160:13
**Court** [53] - 1:22, 1:22, 4:25, 7:17, 8:11, 9:4, 9:10, 9:25, 14:15, 14:23, 14:25, 16:5, 17:6, 17:9, 18:21, 19:21, 20:9, 28:18, 31:6, 32:9, 32:10, 33:8, 34:13, 39:5, 54:8, 66:10, 72:9, 72:11, 80:1, 93:4, 96:15, 103:8, 107:15, 108:15, 112:10, 113:4, 117:11, 120:21, 121:8, 122:2, 122:14, 125:24, 133:23, 134:20, 135:7, 136:8, 136:17, 138:16, 138:19, 138:24, 145:2, 186:11, 196:10
**Court's** [8] - 7:20, 16:10, 18:8, 18:15, 121:5, 121:12, 134:16, 137:13
**Courthouse** [1] - 1:23
**courtroom** [2] - 65:2, 71:21
**COURTROOM** [6] - 3:2, 33:22, 33:25, 39:14, 80:4, 80:18
**courts** [2] - 17:21, 68:25
**cover** [3] - 47:15, 162:5, 162:6
**covered** [5] - 44:11, 79:7, 111:17, 141:4, 162:5
**covering** [1] - 149:10

**COVID** [2] - 35:12, 35:16
**craft** [1] - 18:23
**CRC** [2] - 1:22, 196:9
**create** [2] - 114:12, 119:17
**creation** [1] - 51:19
**credible** [7] - 40:5, 169:17, 169:18, 170:1, 170:4, 170:6, 170:10
**crime** - 88:16
**Crimes** [2] - 126:18, 126:19
**crimes** [1] - 34:21
**criminal** [14] - 18:13, 50:8, 50:9, 86:1, 130:18, 154:20, 154:22, 166:10, 166:11, 166:12, 166:16, 167:9, 171:6, 173:17
**Criminal** [2] - 1:2, 3:2
**criminalized** [1] - 135:16
**criminals** [5] - 165:13, 171:5, 171:11, 171:25, 172:17
**critical** [9] - 41:3, 43:11, 43:25, 44:3, 53:10, 69:22, 77:6, 118:24, 152:21
**CRM** [1] - 1:16
**cross** [12] - 24:9, 24:23, 130:1, 130:14, 130:21, 132:25, 194:7, 195:13, 195:15, 195:19, 195:20
**CROSS** [1] - 137:17
**Cross** [1] - 2:6
**cross-examination** [6] - 24:23, 130:1, 130:14, 195:13, 195:15, 195:19
**CROSS-EXAMINATION** [1] - 137:17
**Cross-Examination** [1] - 2:6
**cross-examine** [3] - 24:9, 130:1, 132:25
**CRR** [2] - 1:22, 196:9
**crypto** [6] - 8:19, 147:12, 147:16, 148:17, 148:20, 149:7
**cryptocurrency** [14] - 35:20, 40:23, 76:23, 127:14, 149:5,

149:9, 160:24, 161:4, 163:7, 163:14, 165:7, 169:6, 169:7, 171:20
**cryptographically** [1] - 59:12
**cryptography** - 114:8
**CSV** [6] - 73:11, 73:19, 100:3, 100:13, 120:22, 175:10
**CTCE** [1] - 35:18
**CTF** [1] - 149:6
**curated** [1] - 149:9
**curious** [8] - 52:17, 62:10, 62:17, 75:13, 91:21, 106:2, 119:6, 145:22
**curiously** [1] - 56:19, 94:22
**currency** [2] - 86:22, 165:14
**current** [4] - 16:3, 35:22, 37:24, 134:4
**currents** [1] - 64:23
**curve** [7] - 114:9, 114:11, 114:18, 115:3, 115:8, 115:12, 115:19
**custodial** [1] - 106:5
**custody** [5] - 52:2, 52:20, 56:14, 56:15, 75:25
**custodying** [1] - 106:7
**customer** [13] - 41:16, 41:21, 42:2, 47:1, 52:24, 68:1, 98:11, 139:22, 140:7, 165:17, 191:17, 191:24, 192:6
**customer's** [1] - 42:2
**customers** [12] - 42:20, 42:24, 46:1, 46:24, 95:18, 139:21, 140:6, 154:24, 168:2, 169:22
**customized** [1] - 24:21
**cutting** [2] - 68:15, 193:17
**CV** [2] - 37:22, 37:23
**cycle** [1] - 94:2

# D

**D.C** [4] - 1:5, 99:25, 144:16, 196:11
**dark** [9] - 40:11, 43:25, 67:4, 122:13,

157:1, 166:19, 167:10, 172:2, 176:7
**darknet** [4] - 156:17, 157:15, 166:4, 172:6, 172:18, 172:20, 172:21, 172:24, 172:25, 173:4, 173:12, 173:14, 173:16, 173:21
**data** [57] - 12:24, 20:2, 23:25, 24:7, 39:23, 39:24, 40:19, 40:24, 41:2, 41:16, 41:21, 41:24, 42:2, 43:8, 43:12, 43:14, 43:21, 44:11, 45:16, 46:17, 71:3, 73:14, 73:20, 73:23, 92:6, 111:25, 113:13, 113:16, 113:23, 117:8, 117:24, 118:7, 121:1, 121:2, 122:4, 122:15, 122:21, 129:15, 147:11, 147:12, 147:14, 147:18, 148:5, 148:16, 148:18, 148:23, 148:24, 149:13, 149:15, 152:18, 153:20, 153:23, 161:7, 164:3, 185:19, 185:20
**database** [2] - 132:20, 164:2
**databases** [2] - 40:20, 133:6
**date** [9] - 21:11, 69:15, 74:7, 94:19, 99:17, 100:19, 110:10, 128:4, 141:14
**Dated** [1] - 196:7
**dates** [3] - 69:14, 119:5, 156:10
**Daubert** [21] - 64:3, 90:20, 102:1, 102:4, 125:22, 127:20, 130:5, 130:21, 132:17, 133:9, 133:17, 133:19, 134:11, 134:13, 134:17, 137:1, 159:23, 164:18, 193:17, 194:4, 195:6
**Dave** [7] - 144:22, 144:24, 145:1, 145:3, 146:18, 146:20, 156:8
**daycare** [1] - 72:10

**days** [4] - 9:22, 9:23, 28:23, 73:6
**DC** [4] - 1:12, 1:14, 1:17, 1:24
**de** [4] - 125:17, 126:14, 149:15, 194:5
**de-anonymizes** [1] - 149:15
**deal** [2] - 112:15, 116:7
**dealt** [1] - 16:21
**debates** [1] - 56:6
**decide** [6] - 7:12, 10:25, 11:1, 33:7, 103:25
**decisions** [2] - 42:25, 43:1
**declaration** [1] - 111:6
**declarations** [1] - 146:15
**declare** [1] - 158:23
**dedicating** [1] - 144:6
**deep** [2] - 40:11, 40:13
**deeper** [1] - 59:20
**deeply** [1] - 14:20
**defend** [1] - 18:1
**defendant** [3] - 10:24, 79:21, 88:13
**Defendant** [4] - 1:6, 1:18, 3:16, 3:19
**Defendant's** [3] - 37:14, 38:3, 38:23
**defendant's** [5] - 5:9, 5:11, 30:5, 67:12, 156:18
**defender's** [1] - 30:25
**Defenders** [1] - 36:3
**defenders** [1] - 19:18
**defending** [1] - 14:21
**defense** [61] - 4:21, 5:1, 5:3, 9:17, 9:22, 10:10, 10:22, 11:7, 11:8, 13:4, 13:24, 14:25, 15:11, 17:25, 18:4, 19:7, 19:20, 22:15, 23:5, 23:16, 23:22, 24:18, 24:22, 25:9, 25:22, 25:24, 26:4, 26:15, 27:9, 27:16, 27:19, 28:9, 28:20, 28:24, 30:3, 31:6, 31:22, 32:8, 32:20, 33:20, 38:2, 38:22, 101:21, 102:6, 116:5, 116:6, 125:21, 128:7, 128:20, 130:20, 132:25, 133:6, 133:9, 133:18,

134:24, 139:10, 139:14, 145:12, 160:14
**Defense** [9] - 2:10, 2:11, 2:12, 2:13, 37:18, 38:7, 39:3, 69:2, 137:22
**defense's** [5] - 15:20, 29:18, 29:25, 32:13, 139:5
**define** [2] - 141:25, 150:15
**defined** [1] - 167:9
**definitely** [10] - 28:16, 45:25, 50:8, 64:16, 72:12, 155:19, 176:4, 176:5, 176:6, 178:14
**definition** [2] - 57:15, 184:23
**definitions** [1] - 56:7
**definitively** [2] - 129:22, 179:8
**degree** [5] - 34:14, 34:17, 34:18, 109:7, 109:8
**degrees** [1] - 34:19
**delay** [1] - 18:11
**delete** [1] - 60:25
**delivers** [1] - 149:5
**delta** [1] - 177:6
**delve** [1] - 131:11
**demo** [1] - 155:13
**demonstrate** [4] - 50:22, 84:3, 85:1, 106:18
**demonstrates** [2] - 66:23, 192:1
**demonstrating** [3] - 82:4, 118:7, 163:20
**demonstration** [1] - 76:23
**demonstrative** [1] - 103:11
**demonstratively** [1] - 102:16
**deny** [1] - 16:6
**denying** [1] - 16:9
**Department** [5] - 1:13, 1:16, 35:15, 126:19, 134:23
**deposit** [42] - 41:7, 55:6, 77:5, 77:25, 82:4, 83:5, 83:15, 87:5, 87:13, 87:23, 91:8, 91:10, 92:1, 93:14, 94:2, 94:17, 94:19, 94:23, 94:25, 95:6, 95:9, 96:7, 100:15, 104:19,

106:19, 106:22, 107:23, 108:17, 108:22, 121:8, 121:10, 121:17, 121:19, 122:4, 122:7, 151:12, 165:11, 190:2, 190:8, 191:9
**deposited** [5] - 52:21, 91:25, 105:22, 106:5, 181:12
**depositions** [2] - 130:5, 130:9
**deposits** [16] - 91:17, 91:24, 92:18, 93:10, 94:1, 94:12, 95:5, 97:21, 97:22, 108:11, 108:18, 108:21, 110:1, 120:9, 121:17, 174:1
**DEPUTY** [6] - 3:2, 33:22, 33:25, 39:14, 80:4, 80:18
**deputy** [1] - 21:8
**derivation** [1] - 70:9
**derive** [1] - 114:13
**derived** [4] - 57:7, 57:8, 147:14, 148:18
**describe** [8] - 24:12, 34:12, 47:2, 86:3, 98:7, 116:23, 150:17, 162:19
**described** [2] - 72:19, 116:3
**describing** [10] - 55:15, 120:10, 126:11, 134:13, 136:23, 148:12, 149:18, 161:23, 161:25, 167:8
**description** [4] - 73:10, 87:14, 147:20, 161:19
**descriptions** [1] - 73:14
**descriptive** [1] - 149:17
**designated** [1] - 163:16
**desire** [1] - 109:12
**desk** [2] - 56:20, 60:23
**despicable** [1] - 8:17
**despite** [1] - 185:1
**destination** [1] - 161:8
**destinations** [1] - 161:1
**destroyed** [1] - 85:13
**detail** [5] - 24:18, 25:3, 49:15, 50:4, 68:10
**detailed** [3] - 24:20,

27:5, 111:16
**details** [3] - 105:5, 105:6, 161:3
**detected** [3] - 184:20, 185:16, 185:22
**determinations** [1] - 78:17
**determine** [13] - 47:8, 49:16, 62:24, 64:23, 73:9, 77:6, 89:24, 115:20, 138:24, 143:1, 160:25, 161:7, 178:5
**determined** [4] - 106:11, 177:17, 179:8, 179:21
**determining** [3] - 43:5, 58:17, 131:8
**develop** [2] - 36:1, 103:17
**development** [1] - 34:20
**Devon** [2] - 94:13, 94:15
**diagnostic** [4] - 45:7, 47:8, 53:9, 53:13
**diagnostics** [1] - 58:22
**diagram** [8] - 77:19, 81:23, 82:2, 84:12, 85:23, 99:1, 121:15, 121:21
**differ** [1] - 48:5
**difference** [10] - 23:21, 47:5, 116:9, 122:3, 123:10, 124:7, 160:7, 172:14, 174:16, 174:25
**differences** [1] - 49:14
**different** [48] - 24:7, 25:3, 26:23, 48:21, 49:4, 50:10, 54:4, 55:15, 59:5, 65:3, 65:16, 65:17, 68:21, 71:8, 74:6, 74:21, 87:25, 88:1, 88:2, 89:3, 89:5, 92:8, 95:21, 95:22, 97:16, 100:18, 105:13, 105:15, 111:20, 112:19, 116:1, 122:6, 122:10, 127:4, 140:2, 142:2, 142:4, 149:18, 150:21, 160:10, 161:12, 170:13, 176:12, 178:3, 179:16, 181:22, 191:7

**differently** [6] - 47:24, 91:11, 107:18, 161:15, 179:17, 189:10
**difficult** [13] - 12:19, 45:10, 68:10, 68:23, 73:25, 99:19, 100:22, 101:7, 143:1, 177:19, 178:16, 183:9, 193:18
**difficulties** [1] - 4:14
**difficulty** [1] - 100:7
**digital** [1] - 137:24
**diplomacy** [1] - 34:19
**direct** [17] - 10:22, 11:1, 31:20, 32:23, 39:20, 123:23, 123:25, 133:5, 137:20, 150:17, 150:19, 151:4, 151:7, 180:5, 183:8, 190:23, 195:13
**Direct** [1] - 2:4
**DIRECT** [1] - 34:2
**directed** [1] - 138:18
**directing** [17] - 38:12, 69:1, 82:20, 112:25, 116:12, 147:5, 148:11, 156:11, 156:15, 158:22, 160:19, 167:2, 175:23, 180:19, 184:10, 188:11, 190:14
**direction** [5] - 4:25, 5:2, 15:9, 18:9, 18:16
**directions** [1] - 17:2
**directly** [7] - 18:16, 56:22, 56:23, 60:20, 134:24, 181:4, 181:8
**director** [3] - 34:25, 35:3, 35:8
**disadvantage** [1] - 14:13
**disagree** [5] - 18:18, 24:1, 26:16, 91:6, 181:10
**disagreement** [1] - 125:21
**disagrees** [2] - 23:17, 23:20
**disclaimer** [1] - 84:1
**disclose** [1] - 133:6
**disclosure** [2] - 159:7, 160:14
**disclosures** [1] - 128:6
**discovery** [49] - 4:5,

16:18, 17:12, 17:20, 17:24, 18:12, 23:24, 25:4, 32:13, 66:20, 67:9, 67:22, 68:11, 70:16, 72:24, 73:6, 76:19, 79:1, 86:7, 90:1, 90:4, 90:15, 90:21, 92:3, 96:8, 96:9, 96:11, 96:13, 97:6, 98:2, 100:3, 130:6, 130:18, 131:4, 138:14, 140:20, 141:2, 141:22, 142:3, 142:6, 143:4, 143:12, 144:15, 168:15, 172:24, 174:4, 174:5
**discrediting** [2] - 139:11, 139:15
**discrepancy** [2] - 122:16, 180:16
**discuss** [11] - 21:4, 21:6, 21:18, 46:25, 101:15, 107:11, 108:7, 123:3, 124:25, 125:24
**discussed** [1] - 111:3
**discusses** [1] - 98:6
**discussing** [5] - 69:11, 81:24, 84:11, 111:3, 121:8
**Discussion** [1] - 66:14
**discussion** [2] - 111:13, 145:19
**disparity** [1] - 123:2
**display** [1] - 49:11
**displayed** [1] - 58:9
**displays** [1] - 164:2
**disputed** [1] - 128:12
**disrupt** [2] - 54:13
**disseminated** [1] - 10:12
**distance** [2] - 87:22, 88:17
**distinct** [1] - 65:6
**distinguish** [1] - 169:16
**DISTRICT** [3] - 1:1, 1:1, 1:8
**district** [2] - 5:7, 79:24
**docket** [2] - 159:25, 164:22
**docketing** [1] - 160:18
**document** [2] - 82:12, 148:12
**documentation** [1] - 55:6
**documented** [3] - 18:5, 43:12, 82:14

documents [3] - 142:5, 142:12, 164:18
DOJ [4] - 1:11, 1:16, 20:17, 48:6
DOJ-CRM [1] - 1:16
dollar [2] - 181:14, 181:17
dollars [1] - 173:5
dollars' [1] - 172:11
donating [2] - 48:20, 144:1
donation [3] - 48:20, 50:13, 51:8
done [23] - 6:3, 17:19, 30:15, 31:21, 31:23, 37:3, 37:21, 45:10, 50:20, 68:24, 92:5, 95:19, 102:20, 117:13, 139:8, 146:8, 171:15, 178:14, 181:18, 195:1, 195:5, 195:15, 195:20
double [2] - 26:12, 146:21
double-check [1] - 146:21
double-counts [1] - 26:12
doubt [4] - 6:6, 21:13, 130:25, 133:7
down [37] - 8:20, 8:25, 9:3, 9:9, 11:3, 15:4, 16:10, 21:2, 28:7, 35:17, 45:17, 45:21, 48:9, 52:20, 54:18, 54:20, 56:20, 60:15, 68:18, 68:20, 70:23, 71:9, 78:8, 82:11, 83:15, 88:24, 90:12, 105:20, 108:13, 116:5, 118:11, 120:1, 159:25, 162:18, 183:24, 188:25, 189:2
draft [1] - 140:20
drafting [1] - 140:22
dramatically [1] - 74:18
draw [6] - 59:24, 70:25, 74:7, 74:24, 115:4
drive [2] - 4:7, 88:17
due [2] - 49:5, 184:4
dull [1] - 96:18
duly [4] - 7:6, 7:14, 7:19, 33:6
during [7] - 35:16, 119:5, 131:19,
143:14, 143:23, 155:4, 171:24
duty [1] - 9:7

E

early [12] - 16:4, 17:10, 18:20, 18:22, 19:20, 105:11, 129:13, 129:20, 129:22, 131:10, 131:14, 195:3
earned [2] - 128:15
easier [2] - 44:24, 104:15
easy [2] - 68:23, 170:22
economic [1] - 34:19
economy [2] - 147:16, 148:20
education [1] - 45:14
educational [1] - 34:12
effect [1] - 98:4
effective [4] - 31:11, 31:17, 31:21, 31:23
efficient [1] - 114:8
eight [2] - 43:24, 111:25
either [11] - 6:15, 25:25, 102:13, 102:24, 105:7, 117:24, 127:21, 148:7, 154:11, 164:19, 173:7
EKELAND [124] - 1:18, 3:15, 3:25, 4:17, 5:5, 5:13, 5:22, 7:1, 7:14, 7:18, 7:23, 11:15, 11:23, 12:18, 13:21, 14:14, 15:10, 15:15, 15:20, 16:2, 16:11, 17:9, 18:18, 19:5, 19:17, 19:25, 29:13, 29:18, 29:25, 30:10, 30:24, 31:5, 31:22, 32:8, 32:10, 33:6, 33:11, 33:20, 34:4, 34:7, 34:9, 34:11, 37:13, 37:19, 38:1, 38:6, 38:8, 38:21, 39:2, 39:4, 39:10, 39:16, 42:16, 46:22, 49:18, 51:10, 64:17, 66:4, 66:9, 66:16, 67:7, 67:17, 67:20, 67:21, 69:8, 69:12, 72:17, 75:22, 77:17, 79:19, 80:14, 80:20, 81:2, 81:11, 81:15,
81:17, 81:18, 85:22, 89:16, 93:3, 94:14, 101:14, 103:6, 104:5, 104:6, 108:6, 108:14, 109:14, 109:17, 110:22, 110:25, 116:11, 119:15, 124:11, 124:15, 127:17, 127:24, 128:5, 128:16, 128:19, 128:22, 129:6, 129:13, 130:15, 130:20, 131:5, 131:17, 131:20, 131:23, 133:18, 135:25, 137:4, 149:24, 158:11, 164:13, 164:23, 167:21, 177:9, 187:12, 193:25, 194:8, 194:15, 195:16, 195:21
Ekeland [22] - 1:19, 2:5, 3:15, 3:23, 11:14, 14:3, 27:15, 29:3, 29:11, 33:18, 50:15, 80:13, 80:19, 81:6, 103:4, 109:9, 127:16, 135:24, 137:1, 164:14, 193:23, 194:7
Ekeland's [1] - 27:16
elaborate [2] - 53:14, 113:4
element [1] - 134:3
Elizabeth [1] - 11:18
Elliptic [7] - 114:9, 114:11, 115:11, 115:19, 169:13, 170:2, 170:9
email [8] - 4:2, 4:11, 92:11, 92:12, 145:15, 145:17, 145:20, 159:10
emails [1] - 159:14
employees [1] - 146:14
employing [1] - 53:4
enabled [1] - 117:14
encode [2] - 115:24, 115:25
encourage [3] - 27:14, 27:15, 110:24
end [12] - 6:9, 30:20, 45:10, 66:6, 66:7, 115:9, 116:1, 116:14, 120:19, 124:18, 142:16, 164:15

Endpoint [1] - 63:7
enforce [2] - 8:12, 9:11
enforceable [1] - 10:5
enforcement [16] - 36:12, 36:13, 36:14, 36:19, 36:22, 42:9, 46:2, 56:21, 140:4, 146:9, 154:17, 154:19, 157:16, 167:25, 168:7, 168:9
Enforcement [2] - 126:18, 126:19
engage [1] - 151:17
engaged [3] - 47:16, 109:2, 138:23
engaging [1] - 145:19
English [1] - 5:20
enhancing [1] - 63:10
enormous [2] - 114:23, 114:24
enrichment [1] - 43:8
ENS [3] - 110:6, 110:10
enter [2] - 8:12
entire [8] - 27:22, 44:5, 68:19, 84:19, 96:23, 116:3, 119:24, 194:6
entirely [1] - 89:18
entirety [2] - 13:9, 138:8
entities [12] - 16:22, 25:17, 45:7, 47:9, 54:6, 61:14, 135:19, 135:20, 147:13, 148:18, 166:1, 179:13
entitled [6] - 21:14, 31:18, 130:21, 131:8, 131:11, 132:13
entitles [1] - 13:4
entity [42] - 27:1, 27:2, 27:3, 40:17, 41:12, 44:22, 45:1, 45:5, 45:20, 45:22, 46:4, 46:12, 46:13, 47:6, 47:7, 47:16, 47:24, 49:8, 50:9, 50:17, 51:6, 52:3, 52:9, 53:5, 53:9, 55:16, 58:16, 61:8, 86:9, 86:13, 106:5, 106:25, 161:7, 161:17, 161:18, 175:19, 179:19, 179:22, 182:14, 191:7, 191:9, 192:22
Entity [3] - 52:16,
52:19, 147:9
entries [2] - 183:23, 184:18
environment [3] - 133:25, 134:2, 136:18
equals [1] - 114:16
equipment [1] - 126:11
equivalent [2] - 55:11, 130:8
ERC [1] - 110:12
ERC-721 [1] - 110:12
erroneous [1] - 61:18
erroneously [1] - 177:17
error [16] - 11:21, 13:1, 54:17, 55:15, 55:19, 55:20, 152:16, 152:22, 176:24, 177:8, 178:4, 178:7, 178:8, 192:14, 192:16
errors [16] - 41:17, 41:18, 41:19, 45:24, 47:12, 47:13, 47:14, 54:16, 55:21, 69:24, 71:11, 100:6, 100:23, 119:23, 176:22, 177:16
especially [5] - 8:16, 17:18, 65:12, 83:14, 143:12
essentially [15] - 15:21, 27:2, 40:10, 42:9, 54:22, 57:9, 57:10, 59:11, 62:2, 73:16, 73:19, 73:23, 74:23, 127:5, 144:1
establish [1] - 130:24
established [1] - 129:14
estimate [5] - 142:24, 143:3, 144:12, 193:21, 194:8
estimates [2] - 122:19, 142:25
et [3] - 36:7, 40:13, 107:6
Ethereum [6] - 110:7, 110:12, 110:15, 161:11, 161:14, 161:16
Ethereum-based [1] - 161:11
ethical [1] - 155:20
Europol [1] - 36:16
evaluating [1] - 55:23
Evaluation [1] - 111:11

**evaluation** [1] - 68:7
**evenings** [1] - 143:17
**events** [2] - 147:13, 148:18
**evidence** [22] - 10:15, 11:16, 13:2, 18:5, 20:14, 37:15, 38:3, 38:23, 39:1, 40:18, 54:24, 67:25, 69:2, 86:16, 88:21, 89:11, 95:14, 106:8, 107:1, 107:2, 131:13, 131:18
**Evolution** [3] - 156:18, 157:2, 157:9
**exact** [9] - 55:19, 77:9, 174:15, 178:16, 180:10, 180:11, 180:16, 188:15, 189:4
**exactly** [21] - 15:7, 24:12, 24:15, 27:20, 57:12, 63:6, 75:11, 78:13, 79:2, 85:5, 91:5, 97:18, 102:20, 116:23, 122:25, 141:4, 144:10, 148:6, 148:9, 177:20, 180:1
**Examination** [2] - 2:4, 2:6
**examination** [8] - 24:23, 130:1, 130:14, 190:23, 195:6, 195:13, 195:15, 195:19
**EXAMINATION** [2] - 34:2, 137:17
**examine** [5] - 24:9, 130:1, 132:13, 132:16, 132:25
**Examiner** [1] - 35:20
**example** [20] - 16:16, 40:15, 40:21, 41:7, 41:22, 43:2, 48:4, 49:20, 50:24, 51:3, 62:2, 62:19, 63:5, 65:20, 71:24, 79:12, 98:21, 151:9, 179:23, 192:10
**Example** [1] - 71:12
**Excel** [2] - 68:21, 175:10
**excerpt** [2] - 108:8, 183:4
**exchange** [25] - 41:7, 41:13, 41:14, 51:4, 51:18, 51:21, 52:1, 57:13, 76:19, 92:7, 100:9, 127:14,

131:25, 132:23, 151:9, 151:11, 165:11, 168:1, 190:25, 191:6, 191:20, 191:24, 192:12, 193:7, 193:8
**Exchange** [1] - 158:16
**exchange's** [1] - 192:15
**exchanges** [15] - 40:7, 40:8, 40:9, 60:23, 117:15, 129:14, 133:1, 145:16, 165:14, 168:1, 190:23, 191:4, 191:19, 191:20
**exclude** [2] - 130:11, 131:1
**excluded** [1] - 11:10
**exclusion** [2] - 133:8
**exculpatory** [1] - 17:14
**excuse** [2] - 34:16, 127:8
**executed** [2] - 169:2, 169:3
**Exhibit** [41] - 2:10, 2:11, 2:12, 2:13, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 37:15, 37:17, 37:18, 38:3, 38:5, 38:7, 69:3, 137:23, 147:5, 148:11, 148:25, 156:11, 158:9, 158:12, 158:13, 158:20, 164:11, 165:2, 167:2, 167:19, 167:23, 175:23, 180:19, 180:24, 182:1, 183:20, 184:13, 187:10, 187:13, 187:14
**exhibit** [5] - 137:13, 159:21, 167:4, 167:5, 167:22
**exhibits** [3] - 149:25, 159:23, 175:9
**EXHIBITS** [1] - 2:9
**Exhibits** [5] - 38:23, 38:25, 39:3, 149:22, 150:1
**exist** [4] - 56:2, 63:17, 89:13, 145:7
**exists** [1] - 42:23
**expand** [1] - 105:5
**expect** [8] - 8:11, 10:12, 30:12, 100:8, 100:15, 142:17,

142:21, 195:1
**expenses** [1] - 144:16
**experience** [7] - 19:15, 25:19, 30:11, 35:11, 84:4, 136:23, 169:9
**Expert** [1] - 111:11
**expert** [97] - 8:5, 12:8, 12:14, 14:4, 14:6, 14:15, 14:16, 14:25, 15:7, 17:11, 18:22, 18:25, 19:1, 19:3, 19:23, 19:24, 21:2, 21:3, 22:19, 23:16, 24:1, 24:2, 24:4, 24:10, 25:18, 26:1, 27:5, 28:8, 29:17, 37:6, 38:9, 38:13, 38:15, 39:6, 63:16, 66:10, 66:17, 66:23, 67:8, 67:9, 67:12, 67:22, 67:23, 68:2, 70:3, 71:9, 79:8, 82:13, 82:14, 86:25, 87:14, 88:10, 89:19, 101:8, 101:16, 102:8, 102:9, 102:16, 102:22, 103:10, 104:2, 104:4, 104:12, 105:12, 107:10, 108:8, 110:5, 111:4, 124:13, 127:18, 127:19, 128:6, 130:22, 132:9, 136:21, 137:22, 139:4, 140:24, 141:1, 142:13, 142:19, 145:11, 148:7, 156:9, 159:7, 160:14, 169:17, 174:24, 175:8, 177:4, 177:7, 194:1, 194:2
**expertise** [1] - 28:23
**experts** [12] - 19:13, 24:6, 24:7, 25:16, 28:24, 29:19, 30:17, 30:22, 64:16, 145:12, 158:16, 193:17
**explain** [23] - 49:24, 49:25, 54:8, 81:23, 83:3, 84:15, 85:6, 91:3, 92:23, 93:4, 96:15, 102:16, 107:15, 108:15, 113:4, 113:24, 116:18, 117:10, 121:15, 122:1,

126:18, 156:16
**explained** [1] - 27:1
**explaining** [5] - 39:6, 85:23, 134:22, 135:22, 136:9
**explanation** [3] - 73:10, 73:14, 102:9
**explorer** [13] - 20:5, 46:18, 49:12, 53:1, 71:18, 71:20, 71:24, 79:15, 82:24, 84:23, 105:3, 113:14, 164:7
**explorers** [1] - 72:2
**exponent** [1] - 114:22
**export** [1] - 71:9
**exported** [1] - 70:10
**exports** [1] - 35:14
**exposes** [1] - 147:11
**exposures** [1] - 166:1
**expressed** [1] - 138:11
**expression** [1] - 191:21
**extended** [4] - 70:8, 88:4, 90:2, 173:2
**extensive** [3] - 17:20, 147:14, 148:19
**extent** [10] - 22:10, 46:23, 47:1, 102:15, 104:8, 126:5, 133:24, 136:7, 160:2, 164:15
**external** [1] - 43:14
**extortion** [1] - 167:10
**extrajudicial** [1] - 10:11
**extremely** [4] - 16:15, 29:20, 62:10, 125:7
**eye** [1] - 79:25

## F

**facilitate** [1] - 15:8
**facilitated** [1] - 173:5
**Fact** [1] - 147:6
**fact** [37] - 14:21, 17:1, 23:19, 32:20, 49:23, 55:20, 58:18, 63:24, 69:19, 85:13, 89:12, 106:9, 116:7, 117:20, 126:3, 126:23, 146:14, 147:6, 149:18, 161:9, 162:1, 172:3, 172:5, 180:15, 184:25, 185:16, 185:22, 186:24, 187:2, 189:25, 190:2, 191:23, 192:5, 192:12,

192:14, 192:17, 195:12
**failure** [1] - 135:15
**fair** [17] - 5:9, 5:11, 5:12, 9:24, 17:4, 24:18, 25:2, 26:15, 27:16, 42:1, 56:8, 61:16, 64:8, 74:20, 88:12, 125:15, 165:1
**fairly** [3] - 23:10, 24:20, 130:6
**fairness** [1] - 104:3
**fall** [1] - 177:20
**false** [4] - 41:17, 45:23, 62:1, 113:3
**falsely** [3] - 49:21, 50:15, 53:6
**familiar** [6] - 147:2, 165:4, 171:3, 171:8, 172:17, 172:20
**familiarize** [1] - 10:6
**far** [23] - 17:13, 30:11, 30:22, 43:16, 43:19, 61:6, 61:15, 61:23, 65:11, 87:4, 93:6, 102:23, 104:15, 107:25, 108:3, 132:23, 134:1, 134:9, 134:20, 136:7, 170:5, 185:20, 188:11
**fascinating** [1] - 97:14
**fashion** [1] - 133:8
**fast** [1] - 108:13
**faucet** [1] - 86:21
**favor** [1] - 31:15
**FBI** [3] - 36:24, 91:9, 121:18
**federal** [3] - 17:21, 19:18, 30:25
**fee** [1] - 105:10
**Fee** [2] - 118:14, 118:19
**feedback** [3] - 40:15, 41:17, 44:7
**fees** [2] - 113:8, 132:11
**few** [4] - 53:13, 73:6, 122:24, 186:2
**few-minute** [1] - 186:2
**Fiat** [1] - 127:15
**field** [7] - 13:18, 56:3, 114:7, 128:1, 128:2, 136:23
**fifth** [1] - 37:8
**figure** [3] - 42:8, 148:6, 193:20
**figured** [2] - 101:21, 186:13
**file** [17] - 5:5, 6:24,

7:21, 8:16, 9:18, 9:23, 16:4, 30:20, 73:11, 86:7, 120:22, 135:20, 141:5, 141:7, 175:10
**filed** [4] - 7:24, 18:20, 160:12, 160:15
**files** [2] - 100:13, 141:5
**filing** [1] - 7:23
**filter** [3] - 186:23, 187:2, 187:4
**filtered** [2] - 185:10, 187:5
**filtering** [1] - 183:5
**final** [3] - 57:4, 117:2, 117:3
**finance** [3] - 47:17, 51:8, 52:25
**Finance** [1] - 132:2
**financial** [5] - 34:21, 135:13, 135:22, 139:21, 165:20
**Financial** [2] - 126:17, 126:19
**financials** [3] - 126:2, 127:1, 127:2
**financing** [5] - 49:21, 50:16, 53:6, 149:6, 167:11
**FinCEN** [4] - 126:3, 134:19, 135:16, 135:19
**findings** [1] - 138:10
**fine** [11] - 6:17, 7:9, 11:14, 19:10, 19:14, 19:15, 39:13, 72:14, 133:12, 135:9, 137:6
**fingerprint** [3] - 27:2, 63:12, 112:6
**fingers** [2] - 112:7, 118:15
**finished** [1] - 19:11
**finishing** [1] - 186:4
**firm** [5] - 10:9, 10:22, 28:2, 51:5, 51:11
**firms** [2] - 41:23, 170:19
**first** [36] - 3:22, 5:16, 11:8, 17:22, 18:13, 25:6, 39:7, 45:12, 60:10, 87:5, 87:13, 90:12, 90:16, 92:1, 93:17, 93:19, 94:1, 94:7, 95:5, 96:14, 103:4, 104:18, 108:21, 117:3, 117:5, 118:20, 134:16, 155:1, 163:23, 175:24,

180:21, 182:4, 182:10, 182:25, 184:15, 184:18
**first-known** [4] - 87:5, 92:1, 94:1, 117:5
**first-year** [1] - 18:13
**fit** [2] - 113:9, 121:11
**five** [6] - 13:17, 60:23, 64:9, 64:10, 95:8, 186:7
**five-minute** [1] - 186:7
**flag** [3] - 183:10, 187:4, 187:5
**Floor** [1] - 1:20
**flow** [2] - 54:12, 160:25
**focus** [6] - 18:16, 34:20, 139:10, 139:14, 139:19, 140:1
**focused** [4] - 4:15, 5:10, 5:11, 35:14
**Fog** [109] - 23:9, 23:12, 23:14, 24:3, 24:6, 27:4, 27:7, 43:25, 66:24, 67:5, 67:10, 67:24, 68:1, 71:1, 71:4, 71:5, 86:6, 87:3, 87:5, 87:8, 87:13, 87:24, 90:11, 91:1, 91:7, 91:10, 91:20, 92:1, 92:16, 92:18, 92:24, 93:17, 93:23, 95:4, 95:9, 95:12, 95:14, 96:4, 97:3, 97:7, 97:10, 97:16, 97:17, 98:16, 106:19, 106:20, 107:19, 108:4, 108:18, 108:19, 108:20, 108:24, 109:4, 109:19, 109:20, 116:24, 117:5, 118:20, 121:2, 121:9, 122:11, 123:7, 126:21, 127:12, 132:11, 133:25, 134:24, 166:14, 166:17, 166:18, 166:21, 166:24, 171:9, 171:12, 171:20, 171:25, 172:4, 172:6, 172:10, 172:12, 172:25, 173:19, 174:9, 175:3, 175:14, 176:4, 176:8, 176:18, 177:23,

177:24, 178:2, 178:14, 178:22, 179:8, 179:22, 180:22, 180:25, 181:5, 181:9, 181:13, 181:19, 188:18, 189:5, 189:8, 189:15, 189:22, 190:2, 190:7
**folder** [1] - 96:11
**follow** [8] - 12:7, 32:23, 68:10, 68:23, 73:25, 105:21, 146:1, 191:16
**follow-up** [1] - 191:16
**followed** [2] - 49:2
**followers** [2] - 5:14, 6:5
**following** [1] - 17:2
**FOR** [1] - 1:1
**foregoing** [2] - 158:24, 196:4
**foremost** [1] - 134:16
**forensic** [6] - 74:12, 80:20, 99:22, 125:25, 129:5, 160:22
**forensically** [4] - 68:16, 70:4, 70:5, 79:9
**forensics** [4] - 17:23, 100:24, 149:6, 156:2
**forgiveness** [1] - 125:13
**fork** [1] - 117:17
**form** [3] - 31:3, 31:4, 155:9
**former** [2] - 88:13, 146:18
**formula** [2] - 13:19, 114:12
**forth** [2] - 21:23, 160:4
**forum** [3] - 40:21, 44:8, 194:4
**forums** [2] - 40:21, 172:20
**forward** [7] - 8:21, 10:9, 10:18, 103:19, 105:15, 133:3, 193:18
**foundation** [1] - 21:16
**founders** [1] - 96:23
**four** [6] - 60:11, 65:8, 68:14, 100:17, 123:3, 170:19
**framework** [1] - 136:15
**frankly** [7] - 6:2, 6:4, 6:13, 8:4, 8:17, 25:10, 32:19

**fraud** [2] - 36:7, 40:23
**free** [2] - 32:4, 83:18
**freeze** [1] - 56:21
**frentzen** [1] - 80:23
**Friday** [1] - 7:24
**front** [16] - 19:10, 28:10, 37:2, 39:17, 67:14, 67:16, 102:14, 103:1, 109:11, 109:15, 128:13, 137:21, 157:12, 175:24, 182:1, 195:7
**frozen** [3] - 127:6, 127:9, 127:10
**frustration** [2] - 17:1, 29:2
**full** [8] - 4:3, 4:12, 8:15, 18:1, 40:11, 176:1, 176:3, 196:5
**fully** [2] - 43:12, 90:6
**function** [1] - 103:10
**fund** [1] - 71:12
**fundamental** [1] - 20:11
**funding** [5] - 7:16, 7:19, 29:20, 163:5, 163:7
**fundraised** [1] - 25:25
**funds** [70] - 6:19, 6:22, 6:24, 25:24, 25:25, 49:16, 52:5, 53:12, 54:12, 55:2, 56:14, 56:21, 56:22, 57:11, 57:17, 58:2, 58:7, 58:8, 58:18, 58:19, 60:10, 60:14, 60:16, 60:17, 60:19, 61:10, 65:16, 65:22, 69:25, 71:15, 71:17, 74:10, 75:2, 75:14, 77:7, 79:3, 82:17, 83:8, 85:15, 93:13, 96:22, 104:18, 105:15, 105:18, 105:22, 106:4, 106:6, 122:5, 127:12, 142:16, 146:1, 146:5, 146:10, 146:11, 157:15, 160:25, 161:8, 163:15, 165:11, 165:21, 171:11, 171:25, 173:19, 175:2, 176:7, 180:21, 180:25, 181:4, 181:18
**funnel** [1] - 95:23
**funny** [1] - 51:13
**future** [1] - 9:1

## G

**gain** [5] - 40:10, 40:15, 43:22, 76:14, 95:3
**gained** [2] - 35:11, 44:4
**gaining** [1] - 94:4
**gather** [1] - 168:1
**gathering** [6] - 45:4, 53:8, 53:16, 147:15, 148:19, 151:6
**genealogy** [2] - 59:14, 146:7
**general** [6] - 24:13, 56:4, 56:9, 66:22, 135:14
**generally** [9] - 26:17, 68:7, 134:23, 139:25, 146:3, 146:11, 159:24, 165:6, 172:19
**generate** [4] - 114:5, 114:9, 115:5, 156:3
**generated** [2] - 112:18, 114:7
**generator** [3] - 114:17, 115:2
**gentleman's** [1] - 170:19
**giant** [2] - 45:2, 46:19
**given** [12] - 8:3, 8:16, 17:13, 18:1, 23:13, 23:15, 28:24, 89:12, 129:17, 155:8, 179:22, 195:12
**Glave** [12] - 125:23, 125:25, 126:25, 127:18, 127:25, 128:6, 131:5, 132:13, 132:19, 132:23, 133:10, 133:15
**Glenda** [1] - 80:17
**Global** [1] - 11:20
**global** [3] - 51:4, 51:18, 52:1
**globally** [1] - 149:8
**gobbles** [1] - 54:22
**Google** [1] - 132:6
**governing** [1] - 17:11
**government** [71] - 3:5, 3:10, 3:12, 4:20, 9:25, 11:16, 12:5, 13:22, 15:5, 15:12, 15:23, 15:25, 16:1, 17:7, 19:2, 20:16, 21:5, 21:9, 22:1, 22:9, 22:13, 24:4, 25:21, 27:8, 27:18, 28:17, 28:19, 30:1,

30:4, 31:15, 31:24, 32:12, 36:20, 70:17, 78:23, 80:7, 90:8, 90:15, 96:9, 98:2, 101:23, 102:21, 103:2, 103:11, 103:22, 104:3, 108:1, 119:25, 127:17, 130:22, 133:6, 135:1, 136:1, 136:3, 140:8, 141:16, 143:5, 149:21, 153:11, 153:17, 153:20, 153:22, 158:8, 160:13, 164:10, 167:18, 173:9, 173:24, 187:10, 187:14
**Government** [11] - 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 150:1, 158:13, 165:2, 167:23
**Government's** [9] - 147:5, 148:11, 149:21, 156:11, 158:9, 164:11, 167:2, 167:19, 175:23
**government's** [17] - 4:19, 5:6, 8:4, 12:13, 20:11, 22:7, 22:19, 24:10, 27:20, 66:17, 87:12, 125:17, 166:5, 172:8, 173:13, 194:2
**Gox** [19] - 75:6, 75:10, 75:15, 84:17, 87:7, 87:20, 90:16, 96:22, 96:25, 98:12, 99:17, 100:2, 101:2, 101:3, 141:9, 141:24, 142:3, 142:5, 142:12
**grand** [4] - 168:16, 168:24, 168:25, 169:1
**grant** [1] - 31:25
**graph** [4] - 68:19, 84:1, 104:13, 164:2
**graphical** [5] - 46:18, 49:11, 53:1, 53:21, 84:23
**graphs** [2] - 68:16, 68:18
**gray** [2] - 58:24, 61:5
**great** [7] - 45:3, 53:8, 61:2, 104:17, 120:6, 146:13
**greater** [2] - 25:21,

27:10
**Greek** [1] - 36:17
**green** [2] - 182:22, 182:23
**grossly** [1] - 134:25
**ground** [1] - 130:13
**grounds** [2] - 130:12, 131:1
**group** [3] - 52:3, 98:24, 145:15
**guess** [15] - 13:13, 16:25, 31:10, 47:18, 51:12, 67:15, 83:24, 94:7, 141:6, 141:25, 143:18, 144:3, 144:9, 184:7, 194:2
**guessed** [1] - 56:24
**guessing** [4] - 94:6, 94:11, 95:16, 170:7
**guilt** [1] - 10:14
**guilty** [1] - 135:3

**H**

**hacks** [1] - 96:22
**half** [5] - 9:16, 55:13, 125:10, 133:11, 195:4
**halfway** [1] - 163:23
**Hamas** [1] - 48:8
**hamper** [1] - 17:25
**hand** [22] - 33:23, 44:14, 44:25, 45:20, 48:6, 48:18, 49:1, 49:7, 50:12, 51:18, 61:6, 61:14, 69:8, 69:10, 71:16, 83:4, 83:7, 83:16, 84:16, 99:8, 176:9, 188:11
**handling** [1] - 135:8
**handprint** [4] - 63:12, 112:7, 118:15, 119:1
**happy** [7] - 11:6, 19:22, 72:12, 103:6, 103:16, 160:3, 186:10
**hard** [7] - 4:7, 125:10, 190:17, 194:16, 194:19, 194:21, 194:22
**hardened** [1] - 70:9
**harm** [1] - 67:15
**hash** [17] - 58:23, 58:25, 59:1, 59:6, 59:13, 69:25, 70:1, 74:17, 78:25, 79:13, 79:14, 98:22, 104:19, 116:17, 117:22, 117:23, 118:6

**Hash** [1] - 111:22
**hashes** [6] - 53:19, 53:25, 59:10, 79:11, 105:2, 105:4
**hashing** [1] - 59:16
**HASSARD** [3] - 1:19, 3:18, 69:6
**Hassard** [15] - 3:19, 5:18, 6:2, 9:3, 9:6, 39:11, 39:20, 39:21, 56:12, 69:4, 70:23, 71:7, 75:8, 99:14, 104:13
**Hassard's** [1] - 5:17
**head** [2] - 11:19, 18:25
**header** [2] - 111:10, 182:10
**headers** [1] - 182:23
**hear** [12] - 5:3, 11:6, 11:7, 22:12, 33:13, 64:21, 73:20, 76:8, 96:4, 125:4, 131:17, 195:16
**heard** [6] - 4:21, 8:2, 11:22, 29:13, 46:23, 136:25
**HEARING** [2] - 1:4, 1:7
**hearing** [15] - 8:10, 39:1, 64:3, 90:20, 103:5, 103:24, 128:14, 130:6, 137:1, 144:16, 159:23, 164:18, 190:24, 193:17, 195:24
**hearings** [1] - 195:6
**heart** [1] - 149:8
**held** [1] - 163:15
**help** [8] - 23:8, 29:8, 61:1, 73:12, 115:4, 117:13, 135:17, 165:20
**helped** [1] - 35:25, 168:12
**helpful** [3] - 14:3, 39:5, 135:9
**hereby** [1] - 196:3
**herself** [1] - 11:19
**heuristic** [67] - 13:11, 13:12, 20:15, 23:20, 24:20, 24:21, 24:24, 25:1, 25:3, 26:6, 26:21, 43:3, 46:16, 47:25, 49:5, 54:16, 54:17, 54:19, 54:20, 54:22, 54:25, 61:12, 61:16, 61:17, 61:20, 62:3, 71:6, 111:9, 111:18, 112:5,

112:11, 112:23, 114:1, 120:24, 120:25, 121:3, 121:4, 123:10, 123:19, 123:22, 124:2, 150:7, 150:8, 150:11, 150:18, 150:20, 150:24, 151:5, 151:15, 151:19, 154:7, 155:24, 176:21, 177:13, 178:17, 178:20, 178:21, 182:3, 184:20, 185:12, 185:23, 186:22, 186:24
**heuristics** [38] - 12:23, 20:2, 20:8, 20:9, 22:25, 23:5, 23:6, 23:8, 23:10, 23:11, 23:24, 24:14, 26:5, 26:17, 26:18, 27:11, 46:14, 46:18, 49:10, 54:13, 54:15, 62:3, 150:10, 150:16, 152:17, 153:1, 155:22, 160:23, 162:20, 163:25, 184:4, 184:22, 185:6, 185:14, 185:17
**hide** [1] - 171:5
**high** [6] - 45:3, 45:6, 59:19, 123:1, 123:2, 149:10
**high-level** [1] - 45:3
**high-quality** [1] - 149:10
**higher** [2] - 45:23, 53:16
**higher-level** [1] - 53:16
**highlights** [1] - 23:22
**highly** [4] - 55:20, 60:19, 132:12, 163:10
**hinder** [1] - 40:3
**hire** [2] - 25:18, 26:1
**hired** [1] - 28:24
**historical** [2] - 129:15
**history** [6] - 17:21, 70:15, 76:23, 91:17, 96:16, 96:23
**hold** [2] - 165:13, 188:25
**holder** [2] - 100:16, 192:23
**Holland** [6] - 158:15, 159:12, 160:4, 161:21, 161:22,

162:8
**home** [1] - 72:10
**honestly** [6] - 100:23, 106:2, 153:13, 157:17, 160:9, 167:1
**Honor** [120] - 3:6, 3:9, 3:13, 3:15, 3:18, 3:25, 4:17, 4:23, 5:5, 5:13, 5:23, 7:3, 7:6, 7:14, 7:18, 8:2, 8:3, 8:9, 8:22, 9:13, 9:15, 9:24, 11:12, 11:15, 11:23, 12:18, 14:14, 15:11, 15:20, 16:2, 16:11, 17:9, 18:18, 19:5, 19:17, 19:19, 20:19, 22:1, 22:14, 24:17, 25:13, 28:13, 29:9, 29:14, 29:25, 30:10, 30:24, 31:5, 31:22, 32:10, 33:6, 33:11, 33:20, 34:7, 34:9, 37:13, 37:16, 38:1, 38:21, 38:24, 39:2, 39:10, 46:7, 46:10, 66:9, 67:7, 67:11, 67:18, 67:20, 72:8, 79:19, 79:21, 81:11, 81:15, 89:2, 101:14, 101:20, 102:11, 104:5, 109:5, 109:14, 110:22, 116:4, 119:12, 124:9, 124:15, 124:19, 124:23, 125:13, 125:16, 127:17, 130:15, 131:5, 133:12, 135:11, 136:19, 137:4, 137:5, 137:12, 138:2, 149:24, 158:11, 164:13, 167:21, 179:5, 179:11, 180:8, 186:5, 186:10, 186:19, 187:12, 190:17, 193:16, 193:22, 194:4, 194:15, 195:8, 195:10, 195:16, 195:22
**Honor's** [1] - 65:5
**HONORABLE** [1] - 1:8
**hood** [5] - 12:20, 13:5, 20:20, 27:17, 27:23
**hop** [2] - 61:4, 105:15
**hope** [1] - 81:5
**hoped** [1] - 125:18
**hopefully** [1] - 93:23

**hops** [5] - 61:3, 76:18, 77:25, 87:6
**horse** [1] - 17:24
**horse-and-buggy** [1] - 17:24
**hosted** [1] - 106:6
**hot** [6] - 40:9, 95:24, 121:20, 122:7, 151:13, 190:12
**hotels** [1] - 143:4
**hour** [6] - 124:21, 125:10, 133:11, 142:20, 193:15, 194:15
**hours** [17] - 28:10, 28:14, 140:19, 140:21, 142:21, 143:1, 143:8, 143:10, 143:14, 143:16, 143:18, 143:19, 143:20, 144:2, 144:11, 194:9, 195:4
**housekeeping** [2] - 124:24, 125:4
**human** [2] - 112:18, 116:16
**hundred** [1] - 40:12
**hundreds** [3] - 19:12, 19:13, 30:15
**hunting** [1] - 40:14

---

**I**

**ice** [1] - 5:24
**ID** [10] - 49:1, 59:1, 60:6, 72:22, 72:23, 73:1, 74:6, 179:20, 188:9
**idea** [4] - 29:23, 63:4, 102:25, 113:8
**ideal** [1] - 194:24
**Identification** [1] - 147:9
**identification** [3] - 37:14, 38:3, 38:23
**identified** [17] - 68:14, 71:15, 75:17, 92:4, 104:21, 118:25, 119:5, 122:7, 122:10, 123:5, 176:16, 176:17, 176:22, 181:3, 185:11, 186:22, 186:24
**identifier** [5] - 59:6, 89:5, 104:20, 121:9, 151:25
**identifiers** [4] - 79:11, 89:3, 98:20, 105:11

**identifies** [2] - 26:6, 114:8
**identify** [27] - 12:9, 60:15, 65:25, 69:25, 76:1, 82:8, 92:13, 93:12, 97:25, 98:23, 118:16, 119:2, 121:18, 123:4, 151:23, 152:7, 152:10, 157:8, 163:2, 163:13, 163:25, 165:20, 167:12, 177:16, 179:16, 179:20, 188:17
**identifying** [7] - 69:22, 69:23, 123:14, 123:15, 132:21, 163:4, 163:18
**identities** [1] - 107:3
**identity** [3] - 52:9, 76:5, 106:11
**IDs** [1] - 73:8
**ignore** [2] - 5:1, 18:17
**ignored** [1] - 15:9
**ignoring** [4] - 15:10, 16:8, 16:10, 18:9
**illegal** [1] - 135:21
**illicit** [5] - 165:21, 172:4, 172:5, 173:5, 173:15
**illustrating** [1] - 103:13
**image** [1] - 83:1
**images** [1] - 118:1
**imagine** [1] - 16:19
**immediately** [1] - 59:23
**immense** [2] - 147:12, 148:16
**immutable** [2] - 59:15, 146:4
**implement** [3] - 12:23, 20:2, 20:3
**implicated** [1] - 191:4
**implication** [5] - 49:20, 76:11, 76:12, 87:12, 87:19
**import** [2] - 88:5, 90:3
**importance** [1] - 136:17
**important** [9] - 27:19, 27:21, 48:16, 68:12, 96:16, 120:5, 135:21, 136:16, 153:21
**impression** [1] - 15:21
**improper** [2] - 53:3, 67:11
**improperly** [4] - 52:25,

53:7, 58:17, 192:16
**IN** [1] - 1:1
**inaccurate** [3] - 56:24, 119:7, 119:20
**include** [20] - 40:5, 40:24, 41:1, 46:13, 68:19, 84:4, 120:11, 120:17, 143:3, 144:22, 146:18, 150:17, 151:14, 155:11, 160:14, 177:21, 183:11, 184:5, 184:9, 188:23
**included** [12] - 48:14, 116:24, 133:2, 142:8, 151:18, 167:14, 169:21, 175:14, 175:16, 175:18, 177:7, 177:17
**includes** [6] - 143:17, 147:15, 148:20, 150:3, 151:14, 165:16
**including** [10] - 19:13, 58:24, 108:21, 120:22, 142:24, 147:23, 155:4, 158:1, 173:25, 185:15
**incoming** [1] - 93:1
**incorrect** [4] - 69:14, 74:17, 111:25, 117:25
**incorrectly** [2] - 77:3, 123:6
**increase** [1] - 113:9
**increases** [3] - 41:18, 41:19, 185:12
**incredibly** [1] - 7:3
**indefinitely** [1] - 176:6
**independent** [1] - 43:14
**index** [1] - 132:23
**indexes** [2] - 132:23, 133:1
**indicate** [2] - 85:9, 183:4
**indicated** [3] - 21:17, 22:6, 62:15
**indicates** [5] - 27:24, 142:13, 187:18, 187:25, 191:8
**indicating** [4] - 40:2, 42:5, 184:19, 184:22
**indication** [1] - 63:7
**indicators** [2] - 147:18, 148:22
**indicted** [1] - 96:24
**individual** [1] - 107:6

**individuals** [2] - 65:25, 192:19
**industry** [3] - 56:4, 56:7, 56:8
**inefficient** [1] - 7:3
**infer** [2] - 163:9, 172:2
**inference** [1] - 88:20
**inferential** [2] - 89:11, 89:12
**inform** [1] - 23:8
**information** [40] - 23:23, 23:24, 40:13, 40:15, 48:23, 52:14, 59:15, 61:18, 64:22, 69:18, 74:4, 74:5, 76:14, 89:24, 90:1, 90:21, 96:9, 96:10, 98:3, 100:10, 103:12, 104:25, 105:14, 108:4, 111:16, 112:6, 112:22, 114:1, 119:25, 141:13, 149:1, 149:10, 151:4, 151:5, 159:20, 160:6, 164:5, 165:17, 168:4
**informed** [2] - 4:9, 51:7
**initiate** [1] - 65:4
**innocence** [2] - 10:15, 67:12
**input** [10] - 41:22, 54:25, 62:4, 75:20, 76:9, 76:13, 76:17, 150:7, 154:4, 155:22
**inputs** [6] - 55:9, 64:2, 64:9, 65:8, 83:2, 91:24
**inputting** [1] - 12:24
**inquire** [1] - 131:8
**inquiry** [3] - 102:1, 102:4, 194:4
**inside** [1] - 191:9
**Inspector** [10] - 54:4, 82:3, 83:17, 104:24, 147:3, 148:12, 153:15, 163:24, 164:1, 164:5
**instances** [1] - 180:1
**Instawallet** [6] - 87:9, 97:23, 97:24, 98:2, 98:3, 98:17
**instead** [6] - 15:25, 79:3, 87:18, 112:15, 114:2, 114:4
**institutions** [3] - 135:13, 139:21, 165:20
**instructions** [1] -

32:23
**integration** [2] - 165:5, 165:10
**intellectual** [1] - 148:7
**intelligence** [11] - 34:25, 45:4, 53:8, 53:16, 147:15, 148:19, 149:9, 149:12, 149:15, 151:4, 151:6
**intelligence-based** [1] - 151:4
**intelligent** [1] - 150:23
**intend** [1] - 102:7
**intended** [2] - 12:6, 67:4
**interact** [1] - 45:8
**interaction** [1] - 53:12
**interactions** [3] - 45:5, 47:8, 53:9
**interest** [4] - 83:5, 96:6, 116:8, 162:13
**interesting** [7] - 13:21, 92:2, 92:6, 96:17, 96:19, 145:22, 145:23
**interfere** [3] - 5:8, 17:2, 22:10
**interim** [1] - 30:20
**intermediary** [6] - 84:13, 85:24, 89:17, 91:6, 106:12, 106:24
**intern** [3] - 35:5, 35:7, 36:2
**internal** [5] - 91:7, 91:19, 107:19, 109:3, 109:20
**internally** [1] - 139:21
**international** [2] - 34:19, 34:20
**internet** [4] - 71:21, 129:11, 159:13, 160:6
**Interpol** [1] - 36:16
**interpret** [1] - 122:16
**interrupt** [3] - 72:9, 72:15, 116:4
**intersected** [1] - 44:22
**intimidation** [2] - 8:5, 10:2
**introduce** [1] - 23:21
**invade** [1] - 134:20
**investigation** [2] - 13:23, 168:5
**investigations** [4] - 11:19, 34:25, 35:3, 35:8
**Investigations** [1] - 11:20
**investigator** [16] -

39:22, 40:4, 45:12, 47:7, 49:13, 52:18, 52:22, 52:24, 53:7, 58:16, 61:9, 74:18, 76:16, 86:14, 104:22
**investigators** [4] - 30:18, 45:17, 84:2, 146:12
**investigatory** [1] - 156:3
**involved** [3] - 28:7, 49:22, 65:25
**involvement** [1] - 67:25
**involves** [3] - 114:14, 136:21, 163:4
**involving** [3] - 50:24, 62:7, 188:6
**IP** [8] - 13:25, 92:9, 100:11, 145:21, 145:23, 148:7, 148:18, 194:5
**irrelevant** [1] - 136:7
**IRS** [5] - 36:20, 46:19, 86:14, 91:8, 121:18
**issue** [19] - 4:14, 4:22, 5:4, 10:1, 11:10, 22:9, 24:2, 25:4, 32:11, 85:18, 101:18, 101:21, 102:22, 103:17, 116:21, 126:22, 128:12, 134:13, 134:17
**issued** [2] - 168:11, 168:14
**issues** [8] - 17:15, 103:7, 104:3, 133:17, 134:14, 138:23, 167:25, 192:1
**issuing** [1] - 168:13
**items** [3] - 16:13, 111:19, 183:12
**itself** [16] - 43:7, 43:9, 49:11, 50:13, 85:14, 93:22, 104:4, 104:21, 106:7, 114:18, 115:12, 115:25, 119:4, 128:12, 149:19, 166:22

## J

**jail** [3] - 4:6, 18:3, 18:7
**Jeff** [1] - 3:12
**JEFFREY** [1] - 1:15
**Jevans** [14] - 144:22, 144:24, 145:1,

145:3, 146:19, 146:20, 156:8, 156:16, 156:22, 156:25, 157:8, 157:18, 157:22, 158:4
**Jevans'** [1] - 156:12
**job** [1] - 125:7
**join** [1] - 54:10
**joining** [1] - 169:8
**JONELLE** [3] - 2:3, 34:3, 137:18
**Jonelle** [1] - 33:21
**Journal** [1] - 132:3
**journey** [2] - 35:10, 35:11
**JUDGE** [2] - 1:8, 1:8
**Judge** [1] - 15:25
**judge** [1] - 130:4
**July** [1] - 139:3
**jumbled** [2] - 73:25, 99:18
**June** [2] - 4:25, 8:10
**junk** [1] - 18:4
**jury** [30] - 6:10, 8:4, 8:18, 8:23, 9:19, 9:20, 10:2, 67:14, 67:16, 102:24, 103:1, 103:14, 109:11, 109:15, 126:23, 131:3, 133:11, 134:8, 134:20, 134:22, 135:2, 135:14, 135:17, 135:22, 136:9, 168:16, 168:24, 168:25, 169:1, 195:7
**Justice** [2] - 1:13, 1:16
**justifying** [1] - 71:3

## K

**keep** [6] - 44:22, 48:23, 97:24, 98:4, 110:2, 125:11
**kept** [1] - 110:1
**key** [28] - 52:7, 52:10, 57:7, 57:8, 57:13, 57:21, 57:22, 57:24, 57:25, 70:8, 88:4, 90:2, 105:8, 111:24, 112:17, 112:20, 114:13, 114:16, 114:17, 114:25, 115:7, 115:18, 116:2, 183:15, 183:21, 183:22
**Key** [1] - 111:21
**keys** [14] - 52:4, 76:5,

88:2, 88:3, 92:10, 95:22, 112:16, 113:23, 114:3, 114:6, 114:9, 114:11, 192:21, 193:4
**kid** [1] - 72:9
**kind** [30] - 13:2, 14:18, 17:22, 17:23, 45:16, 45:22, 54:20, 68:12, 86:9, 86:11, 94:5, 94:19, 94:23, 95:2, 95:23, 95:25, 98:23, 100:20, 101:17, 105:19, 106:24, 107:17, 111:17, 114:12, 115:22, 117:13, 140:23, 143:17, 146:4, 192:1
**kinds** [1] - 132:8
**Knight** [6] - 158:15, 159:12, 160:5, 161:21, 161:22, 162:8
**knowing** [3] - 63:9, 65:12, 89:23
**knowledge** [9] - 12:9, 42:2, 98:18, 128:24, 136:1, 136:13, 151:20, 189:16, 189:19
**known** [7] - 11:20, 87:5, 90:14, 92:1, 94:1, 117:3, 117:5
**knows** [8] - 14:6, 20:10, 23:1, 26:2, 26:4, 41:14, 62:18, 97:4
**Korea** [1] - 159:15
**KYC** [5] - 98:10, 98:13, 98:18, 98:19, 100:10

## L

**labeled** [2] - 47:24, 183:10
**labels** [1] - 75:16
**lack** [1] - 85:1
**lacking** [1] - 90:7
**LaGuardia** [1] - 36:16
**laid** [2] - 21:16, 21:17
**lake** [1] - 147:12
**large** [7] - 24:7, 53:9, 54:7, 55:1, 68:18, 114:6, 114:14
**large-entity** [1] - 53:9
**last** [10] - 6:1, 6:3, 15:2, 15:24, 21:1, 116:12, 140:2,

142:11, 147:25, 182:8
**late** [4] - 32:18, 32:20, 138:24, 186:11
**launder** [2] - 171:25, 172:25
**laundering** [6] - 20:12, 96:22, 165:4, 167:3, 167:11, 173:19
**Law** [1] - 1:19
**law** [22] - 10:9, 10:22, 36:12, 36:13, 36:14, 36:19, 36:22, 42:9, 46:2, 56:21, 133:22, 134:25, 136:4, 136:9, 140:4, 146:8, 154:16, 154:19, 157:16, 167:25, 168:7, 168:9
**lawyer** [2] - 10:9, 19:10
**lawyers** [1] - 159:12
**layering** [2] - 165:5, 165:8
**LCX** [1] - 158:16
**lead** [5] - 45:17, 47:14, 47:15, 69:23, 74:21
**leadership** [1] - 144:23
**leading** [2] - 109:7, 144:5
**leads** [3] - 47:12, 61:18, 156:3
**League** [1] - 36:3
**learn** [3] - 125:6, 139:2, 139:3
**learned** [1] - 17:13
**least** [12] - 22:16, 23:17, 28:1, 64:9, 67:1, 87:23, 88:1, 88:2, 96:6, 119:19, 195:14
**leave** [6] - 64:22, 81:4, 81:8, 103:18, 138:17, 186:2
**led** [3] - 50:15, 50:18, 53:5
**ledger** [13] - 57:20, 57:22, 59:3, 59:11, 59:15, 91:20, 91:21, 93:22, 109:20, 109:23, 109:25, 161:13, 171:23
**ledgers** [2] - 108:4, 109:4
**left** [14] - 44:14, 48:6, 49:1, 51:18, 69:6, 69:8, 81:19, 83:4, 83:16, 84:16, 85:3, 85:17, 104:14, 183:9

**left-hand** [8] - 44:14, 48:6, 49:1, 51:18, 69:8, 83:4, 83:16, 84:16
**leftover** [1] - 83:8
**legal** [4] - 134:7, 136:15, 136:18, 145:8
**legitimate** [1] - 17:3
**less** [1] - 93:14
**level** [13] - 26:6, 26:7, 45:3, 45:6, 45:7, 47:8, 49:15, 53:10, 53:13, 53:16, 58:22, 59:19, 84:20
**liaison** [1] - 30:25
**liberty** [2] - 14:1, 130:16
**license** [18] - 22:16, 25:7, 25:10, 25:12, 25:19, 25:21, 25:25, 29:12, 29:17, 31:8, 31:13, 31:16, 32:1, 32:5, 32:24, 32:25, 33:1, 170:16
**licenses** [1] - 25:17
**life** [1] - 168:17
**lifetime** [1] - 57:2
**light** [2] - 6:3, 137:3
**likely** [4] - 55:21, 60:19, 101:24, 125:18
**limit** [1] - 55:3
**limited** [5] - 19:6, 19:8, 29:20, 32:1, 130:18
**line** [17] - 23:21, 26:14, 31:18, 104:16, 105:21, 128:25, 129:2, 182:4, 182:10, 187:18, 187:21, 187:23, 188:20, 188:25, 189:2, 190:3
**lines** [8] - 21:16, 28:4, 28:5, 28:12, 105:17, 165:19, 184:15, 191:17
**lingering** [1] - 72:11
**LinkedIn** [1] - 159:11
**links** [1] - 68:12
**liquid** [3] - 129:18, 132:4, 132:5
**liquidity** [1] - 41:12
**list** [32] - 16:13, 16:16, 23:8, 23:13, 23:15, 24:20, 69:20, 100:9, 105:4, 127:5, 175:13, 176:3, 176:13, 176:15,

176:17, 176:20, 176:23, 177:1, 177:2, 177:24, 179:7, 179:18, 179:23, 179:24, 180:10, 183:12, 188:6, 189:8, 189:11, 189:14, 189:20, 189:21
**listed** [6] - 78:21, 159:7, 166:5, 173:12, 175:11, 175:18
**listen** [2] - 179:1, 179:3
**listened** [1] - 139:4
**listening** [1] - 14:2
**listing** [1] - 185:21
**lists** [4] - 23:11, 26:23, 69:19, 90:4
**literature** [1] - 153:2
**live** [8] - 14:11, 40:5, 91:14, 101:10, 101:17, 101:24, 102:12, 102:20
**lived** [1] - 159:16
**local** [3] - 9:7, 9:10, 9:11
**lockdowns** [1] - 35:12
**locked** [2] - 18:3, 35:17
**log** [1] - 100:11
**log-ins** [1] - 100:11
**loggerheads** [1] - 15:12
**logs** [2] - 98:4, 100:11
**look** [63] - 6:7, 6:8, 7:15, 10:22, 12:16, 13:5, 13:7, 13:14, 14:5, 14:7, 14:10, 15:7, 19:24, 19:25, 20:19, 21:3, 21:22, 23:25, 27:2, 27:17, 27:23, 28:4, 37:2, 37:3, 37:21, 38:18, 53:18, 60:10, 63:23, 70:21, 71:16, 71:18, 71:20, 71:22, 74:8, 75:14, 77:11, 78:2, 79:15, 86:6, 92:16, 93:10, 97:14, 99:1, 106:9, 110:5, 112:8, 129:2, 129:3, 129:14, 129:22, 132:20, 146:12, 150:16, 157:11, 160:9, 172:7, 174:13, 175:5, 176:9, 177:11, 190:4
**looked** [10] - 27:6,

51:24, 91:23, 93:12, 93:13, 97:5, 120:9, 174:12, 189:17, 189:18
**looking** [39] - 12:17, 13:8, 24:1, 24:7, 28:4, 37:3, 37:21, 52:23, 53:8, 77:3, 81:20, 83:3, 84:16, 86:25, 87:19, 92:25, 95:5, 97:19, 99:10, 122:21, 128:9, 129:16, 129:19, 129:24, 140:21, 144:8, 162:18, 170:22, 172:10, 176:5, 180:6, 180:10, 180:20, 182:4, 182:8, 182:25, 184:15, 187:16, 188:2
**looks** [15] - 54:3, 58:21, 75:5, 75:9, 84:19, 94:16, 98:15, 105:17, 107:11, 107:12, 111:14, 121:25, 156:14, 156:6, 158:21
**lost** [1] - 35:16
**low** [3] - 87:16, 152:23
**lower** [1] - 113:8
**lumped** [1] - 45:16
**lunch** [4] - 79:17, 79:20, 79:23, 195:3

## M

**M-e-m-pool** [1] - 72:3
**ma'am** [4] - 138:4, 138:7, 138:9, 138:12
**magnitude** [1] - 63:1
**main** [2] - 139:10, 139:14
**major** [1] - 17:17
**majority** [1] - 93:12
**malware** [1] - 167:10
**Man** [5] - 54:19, 61:12, 61:17, 61:23, 121:4
**management** [1] - 144:19
**manner** [3] - 10:20, 27:25, 193:19
**March** [2] - 35:2, 110:17
**marching** [1] - 32:17
**mark** [1] - 177:3
**marked** [3] - 37:14, 38:2, 38:22
**markers** [1] - 63:11
**market** [13] - 40:11,

122:13, 129:17, 132:4, 132:5, 132:23, 155:3, 166:19, 167:10, 172:20, 172:21, 172:24, 180:4
**marketed** [2] - 20:16, 155:6
**marketplaces** [2] - 175:15, 181:19
**markets** [14] - 43:25, 156:17, 157:1, 157:15, 166:5, 172:2, 172:6, 172:10, 172:11, 173:5, 173:12, 173:14, 173:16, 176:7
**marshal** [1] - 4:14
**Marshals** [3] - 3:24, 4:1, 4:9
**mask** [2] - 72:11, 72:13
**massive** [1] - 149:9
**master** [3] - 70:8, 88:4, 90:2
**master's** [1] - 34:18
**Mastercard** [12] - 34:23, 35:6, 139:18, 139:20, 144:25, 145:5, 145:6, 145:7, 145:10, 155:4, 155:7, 159:11
**match** [13] - 73:1, 74:6, 78:12, 78:21, 79:15, 91:24, 94:25, 129:4, 180:1, 180:11, 181:16, 185:19, 185:20
**matches** [1] - 97:15
**material** [5] - 10:19, 10:23, 11:2, 173:22, 174:11
**mathematical** [1] - 58:1
**matter** [13] - 10:13, 74:12, 74:15, 79:24, 128:9, 128:23, 129:24, 136:18, 158:16, 158:18, 168:24, 168:25
**matters** [8] - 124:24, 125:4, 126:5, 133:22, 134:7, 135:13, 136:15
**Mazarin** [5] - 125:17, 126:14, 194:5, 194:8, 194:18
**Mazars** [3] - 125:17, 126:14, 194:5

**mean** [44] - 13:6, 17:13, 17:14, 20:13, 21:15, 29:23, 41:11, 41:21, 42:24, 44:13, 46:5, 53:14, 55:8, 61:4, 62:14, 67:1, 72:8, 75:24, 76:1, 83:24, 89:9, 91:3, 95:24, 97:11, 103:11, 113:5, 113:25, 120:14, 122:23, 123:8, 124:4, 128:11, 128:12, 132:4, 136:21, 142:4, 146:10, 155:10, 162:15, 176:2, 179:16, 182:17, 184:7, 195:5
**meaning** [2] - 82:7, 87:25
**meaningfully** [2] - 29:6, 29:7
**means** [17] - 10:12, 44:19, 75:25, 76:4, 96:21, 107:13, 112:5, 113:16, 114:20, 114:21, 117:10, 118:14, 122:1, 122:25, 124:5, 130:12, 169:5
**meant** [2] - 83:25, 116:24
**measuring** [2] - 26:11, 26:12
**meet** [2] - 14:16, 89:4
**Meiklejohn's** [1] - 178:8
**members** [1] - 154:15
**mempool.space** [9] - 72:1, 72:2, 82:23, 83:2, 84:22, 98:22, 105:3, 113:15, 118:5
**mentioned** [11] - 46:23, 58:21, 63:13, 90:25, 94:13, 105:25, 113:21, 146:7, 159:6, 180:10, 190:23
**mentioning** [1] - 58:22
**mentions** [1] - 128:6
**merely** [1] - 5:15
**merits** [1] - 10:15
**Merkle** [2] - 59:8, 59:17
**message** [1] - 41:13
**messages** [1] - 8:17
**messy** [2] - 73:24, 100:5
**met** [2] - 89:4, 93:11

**metadata** [3] - 57:23, 105:1, 118:6
**method** [3] - 68:21, 166:2, 181:16
**Methodologies** [1] - 160:21
**methodologies** [8] - 129:7, 131:8, 161:9, 161:20, 161:25, 162:2, 162:7, 162:13
**methodology** [5] - 126:8, 127:23, 132:14, 132:17, 161:23
**metric** [1] - 163:11
**MICHAEL** [1] - 1:19
**Michael** [1] - 3:18
**microphone** [1] - 34:15
**middle** [7] - 61:4, 84:13, 93:11, 110:15, 110:16, 195:12, 195:18
**midst** [1] - 103:24
**might** [10] - 26:13, 31:9, 47:24, 65:16, 77:7, 88:24, 94:6, 119:23, 132:18, 153:20
**military** [1] - 48:8
**million** [3] - 122:20, 149:13
**millions** [4] - 147:18, 148:23, 172:11, 173:5
**millionth** [1] - 93:20
**mind** [2] - 6:4, 104:8
**mined** [1] - 98:24
**miner** [2] - 98:24, 113:10
**mineral** [1] - 97:18
**mining** [4] - 87:10, 98:16, 98:21, 98:24
**minor** [1] - 68:10
**minus** [1] - 123:11
**minute** [4] - 39:15, 186:1, 186:2, 186:7
**minutes** [7] - 66:15, 124:21, 186:16, 193:15, 193:21, 193:22, 194:3
**mischaracterization** [1] - 178:10
**mischaracterizing** [1] - 109:6
**misclustering** [2] - 24:24, 24:25
**misconstruing** [1] - 23:4
**misleading** [1] - 152:1

214

**miss** [2] - 76:13, 76:14
**missed** [2] - 83:12, 161:5
**missing** [11] - 69:18, 69:20, 70:2, 76:9, 105:14, 111:19, 112:7, 112:24, 118:22, 120:3, 122:17
**misstating** [1] - 134:25
**mistake** [3] - 26:13, 47:4, 47:5
**mistaken** [1] - 178:3
**mistakenly** [3] - 47:7, 49:14, 177:7
**mix** [1] - 94:2
**mixed** [3] - 73:24, 100:18, 141:11
**mixer** [5] - 92:25, 166:19, 166:22, 171:20
**mixer/tumbler/
  money** - 167:10
**mixers** [3] - 165:7, 171:3, 171:5
**model** [11] - 42:21, 42:22, 42:25, 43:5, 43:6, 43:9, 43:16, 111:8, 152:18, 193:7, 193:8
**models** [1] - 43:15
**modify** [1] - 10:25
**moment** [13] - 14:17, 33:14, 50:15, 59:19, 70:21, 85:19, 101:15, 160:17, 162:3, 162:10, 162:21, 172:17, 178:11
**Monday** [5] - 21:7, 21:9, 21:25, 33:3, 79:25
**money** [14] - 6:13, 20:11, 29:24, 30:12, 32:2, 40:8, 85:3, 86:24, 128:3, 129:3, 165:4, 167:3, 174:9
**monitoring** [1] - 149:7
**month** [4] - 72:10, 74:9, 144:5, 149:14
**months** [3] - 94:20, 142:11, 177:5
**morning** [14] - 3:6, 3:8, 3:9, 3:11, 3:13, 3:14, 3:15, 3:17, 3:18, 3:20, 34:5, 186:17, 195:1, 195:11
**MOSS** [1] - 1:8

**most** [14] - 7:5, 15:22, 25:16, 31:11, 31:21, 31:23, 36:13, 55:5, 55:20, 155:2, 163:11, 166:9, 183:5
**most-used** [1] - 163:11
**motion** [8] - 4:19, 7:22, 8:12, 9:25, 11:5, 11:7, 11:25, 21:11
**motions** [1] - 16:4
**MOTIONS** [2] - 1:4, 1:7
**mouth** [1] - 106:18
**move** [27] - 37:13, 38:2, 38:22, 39:20, 47:21, 51:17, 70:19, 70:22, 103:6, 104:13, 107:8, 107:9, 109:7, 109:12, 109:15, 110:4, 110:20, 110:23, 115:7, 116:10, 141:1, 151:1, 158:8, 164:10, 167:18, 179:12, 179:4
**moved** [1] - 106:6
**movements** [1] - 71:13
**moves** [2] - 30:11, 187:10
**moving** [7] - 49:25, 84:11, 103:19, 104:18, 105:18, 173:19, 193:18
**MR** [137] - 3:9, 3:12, 3:15, 3:18, 3:25, 4:17, 4:23, 5:5, 5:13, 5:22, 7:1, 7:14, 7:18, 7:23, 8:2, 8:9, 8:22, 9:2, 9:6, 9:13, 9:15, 9:24, 11:12, 11:15, 11:23, 12:18, 13:21, 14:14, 15:10, 15:15, 15:20, 16:2, 16:11, 16:19, 18:18, 19:5, 19:17, 19:25, 29:13, 29:18, 29:25, 30:10, 30:24, 31:5, 31:22, 32:8, 32:10, 33:6, 33:11, 33:20, 34:4, 34:7, 34:9, 34:11, 37:13, 37:19, 38:1, 38:6, 38:8, 38:21, 39:2, 39:4, 39:10, 39:16, 42:16, 46:22, 49:18, 51:10, 64:17, 66:4, 66:9, 66:16,

67:7, 67:17, 67:20, 67:21, 69:6, 69:8, 69:12, 72:17, 75:22, 77:17, 79:19, 80:14, 80:20, 81:2, 81:11, 81:15, 81:17, 81:18, 85:22, 89:16, 93:3, 94:14, 101:14, 103:6, 104:5, 104:6, 108:6, 108:14, 109:14, 109:17, 110:22, 110:25, 116:11, 119:15, 124:11, 124:15, 127:17, 127:24, 128:5, 128:16, 128:19, 129:6, 129:13, 130:15, 130:20, 131:5, 131:17, 131:20, 131:23, 133:18, 135:11, 135:25, 137:4, 149:24, 158:11, 164:13, 164:23, 167:21, 177:9, 187:12, 193:25, 194:8, 194:15, 195:16, 195:21
**MS** [94] - 3:6, 20:24, 22:1, 22:14, 22:20, 23:4, 23:22, 24:17, 25:9, 25:13, 26:22, 28:13, 28:16, 29:9, 37:16, 38:4, 38:24, 67:11, 72:8, 72:15, 79:21, 80:7, 80:10, 80:23, 101:20, 102:10, 102:18, 109:5, 116:4, 119:12, 124:18, 124:23, 125:2, 125:12, 125:16, 125:21, 126:14, 126:17, 126:25, 127:4, 127:8, 127:10, 127:14, 132:22, 133:12, 133:14, 134:16, 135:7, 137:12, 137:16, 137:19, 138:2, 138:5, 139:1, 149:21, 150:2, 158:8, 158:14, 159:22, 164:10, 164:14, 165:3, 167:18, 167:24, 170:18, 170:23, 171:1, 177:14, 179:5, 179:6, 179:11, 179:12,

180:8, 180:9, 182:21, 186:4, 186:10, 186:13, 186:19, 186:20, 187:10, 187:15, 190:17, 190:21, 193:10, 193:15, 193:22, 194:3, 194:11, 194:18, 194:23, 195:8, 195:10, 195:22
**Mt** [19] - 75:6, 75:10, 75:15, 84:17, 87:7, 87:20, 90:16, 96:22, 96:25, 98:12, 99:17, 100:2, 101:2, 101:3, 141:9, 141:24, 142:3, 142:5, 142:12
**multi** [5] - 54:25, 62:4, 150:7, 154:4, 155:22
**multi-input** [5] - 54:25, 62:4, 150:7, 154:4, 155:22
**multiple** [11] - 25:17, 55:10, 64:2, 141:11, 141:12, 142:5, 157:1, 163:4, 184:4, 184:22, 185:6
**multiplied** [1] - 114:17
**multiply** [2] - 115:2, 115:6
**multiplying** [1] - 114:20
**Multisig** [1] - 111:22
**must** [7] - 19:11, 54:1, 57:17, 62:20, 74:10, 104:22, 118:17
**Mycelium** [4] - 70:6, 70:13, 90:5, 90:9

## N

**N.W** [1] - 196:11
**name** [9] - 3:5, 17:10, 19:23, 36:14, 48:8, 51:11, 110:6, 127:11, 145:4
**Name** [2] - 110:7, 110:15
**named** [2] - 14:25, 179:14
**names** [1] - 62:13
**narcotic** [1] - 173:6
**narcotics** [2] - 173:8, 173:15
**narrow** [1] - 130:6
**national** [1] - 36:17
**native** [1] - 86:22
**natives** [1] - 99:22
**naturally** [1] - 86:18

**nature** [2] - 127:1, 177:18
**neatly** [1] - 191:14
**necessarily** [8] - 55:11, 95:18, 102:22, 129:17, 144:12, 148:3, 150:15, 192:10
**necessary** [5] - 11:13, 49:16, 104:24, 153:11, 153:17
**need** [67] - 4:10, 7:7, 8:15, 12:1, 12:4, 12:7, 12:10, 13:13, 14:10, 15:7, 15:18, 17:6, 18:1, 18:17, 20:25, 21:5, 21:6, 21:22, 22:12, 28:9, 28:24, 29:21, 30:7, 31:9, 31:10, 32:5, 33:4, 33:7, 39:23, 44:4, 44:11, 51:24, 59:18, 68:17, 84:6, 88:23, 95:21, 102:1, 102:4, 103:24, 104:3, 104:4, 107:22, 107:24, 115:19, 124:17, 133:15, 143:5, 144:10, 144:13, 151:1, 152:20, 152:24, 152:25, 154:24, 157:11, 157:12, 174:23, 176:6, 181:15, 186:18, 187:8, 190:19, 193:14
**needed** [2] - 194:14, 194:23
**needs** [7] - 4:9, 19:1, 21:3, 21:17, 34:16, 84:1, 164:21
**negotiation** [1] - 155:7
**nested** [9] - 190:23, 190:25, 191:4, 191:6, 191:19, 191:24, 192:12, 193:7, 193:8
**Network** [2] - 126:18, 126:19
**network** [1] - 161:14
**never** [25] - 14:17, 17:19, 44:20, 44:22, 48:22, 58:19, 71:19, 72:5, 72:19, 83:16, 101:25, 146:23, 168:9, 168:11, 168:13, 168:14, 168:24, 168:25, 169:2, 169:3, 169:4,

169:6, 169:7,
169:11, 171:11
**New** [3] - 1:17, 1:20,
159:25
**new** [9] - 10:4, 17:18,
56:3, 56:8, 73:4,
86:17, 95:19, 102:8,
104:2
**next** [31] - 28:23,
39:20, 39:21, 40:4,
42:19, 44:10, 47:22,
48:3, 49:23, 51:2,
54:3, 55:13, 56:12,
56:25, 58:6, 58:20,
60:14, 60:25, 61:25,
122:9, 141:1, 144:5,
146:2, 161:2,
163:22, 179:4,
187:23, 188:20,
190:10, 190:16,
195:4
**Next** [1] - 48:24
**NFT** [2] - 110:11
**nine** [2] - 19:11, 94:20
**nine-week** [1] - 19:11
**node** [1] - 117:18
**nodes** [3] - 40:11,
40:12, 117:16
**nondirect** [1] - 150:8
**none** [6] - 20:14,
60:22, 78:4, 90:8,
96:17, 155:17
**nonfungible** [1] -
110:11
**noon** [1] - 195:2
**normal** [2] - 143:14,
143:16
**normally** [1] - 143:21
**North** [1] - 159:15
**notable** [5] - 119:9,
119:10, 119:14,
119:16, 123:1
**notably** [1] - 122:18
**notarized** [1] - 159:18
**note** [3] - 79:22,
121:7, 138:17
**notebook** [1] - 38:13
**noted** [6] - 7:6, 7:14,
7:19, 12:5, 32:15,
33:6
**notes** [1] - 196:5
**nothing** [7] - 10:4,
31:25, 76:19, 97:15,
127:1, 145:13
**notice** [4] - 5:6, 49:3,
52:17, 159:10
**noticed** [6] - 72:11,
126:4, 127:17,
128:20, 130:21,
130:22

**notices** [1] - 9:20
**novel** [2] - 128:1,
128:2
**November** [4] - 74:8,
118:19, 118:21,
132:1
**nuance** [1] - 191:25
**Nucleus** [1] - 173:14
**Number** [1] - 68:15
**number** [50] - 3:21,
29:15, 35:25, 55:9,
55:12, 57:10, 57:16,
57:18, 57:19, 60:22,
63:17, 65:3, 68:6,
68:9, 71:11, 74:23,
76:17, 77:9, 77:25,
87:22, 87:24, 92:2,
96:16, 101:3, 112:2,
113:9, 114:20,
114:21, 114:23,
115:19, 118:9,
123:1, 139:16,
140:4, 146:13,
159:9, 159:11,
159:14, 160:11,
172:1, 173:7,
174:22, 182:6,
183:5, 185:11,
185:24, 186:21,
188:15, 188:24
**numbers** [9] - 114:6,
114:15, 132:11,
152:20, 152:22,
172:8, 172:16,
181:10, 181:22
**NW** [4] - 1:11, 1:14,
1:17, 1:23
**NY** [1] - 1:20

## O

**obfuscate** [1] - 54:11
**object** [6] - 32:9,
134:10, 136:19,
137:4, 137:5, 164:24
**objection** [13] - 38:4,
38:24, 119:12,
149:23, 149:24,
158:10, 158:11,
164:12, 167:20,
167:21, 177:9,
187:11, 187:12
**objections** [2] - 37:16,
137:2
**objects** [1] - 32:8
**obligation** [2] - 10:6,
194:19
**obligations** [3] -
126:20, 134:23,
135:13

**obtained** [1] - 60:18
**obviously** [1] - 101:23
**occur** [4] - 15:6,
15:13, 44:16, 72:6
**occurred** [22] - 55:16,
56:11, 59:2, 63:8,
72:5, 72:19, 78:12,
79:4, 82:25, 83:16,
83:18, 83:21, 84:5,
84:8, 86:12, 86:15,
94:6, 94:12, 96:22,
118:20, 119:23,
181:5
**occurring** [1] - 61:24
**occurs** [3] - 57:13,
62:18, 85:19
**odd** [1] - 115:1
**OF** [6] - 1:1, 1:2, 1:7,
34:2, 137:17, 196:1
**OFAC** [1] - 50:6
**off-chain** [1] - 52:14
**offense** [1] - 135:15
**offer** [7] - 83:24,
128:16, 131:13,
131:18, 131:23,
154:16, 170:10
**offering** [5] - 25:16,
102:8, 107:18,
126:6, 134:18
**offerings** [1] - 54:17
**offers** [1] - 165:23
**office** [1] - 30:25
**officer** [1] - 168:7
**OFFICIAL** [1] - 196:1
**Official** [2] - 1:22,
196:10
**officially** [1] - 144:19
**often** [4] - 41:8,
142:25, 163:6,
167:25
**oftentimes** [2] - 40:24,
42:20
**on-chain** [15] - 44:16,
44:22, 49:17, 59:2,
63:7, 64:22, 67:25,
75:14, 78:12, 83:19,
83:21, 84:5, 86:16,
99:24, 110:9
**one** [102] - 16:8, 16:12,
18:13, 25:11, 29:12,
34:19, 41:23, 42:10,
45:2, 45:8, 46:19,
47:14, 47:15, 48:19,
49:10, 50:2, 50:3,
50:21, 52:6, 54:1,
54:2, 54:10, 55:4,
55:5, 58:23, 59:12,
60:5, 60:11, 60:12,
62:18, 63:14, 63:15,
63:18, 63:24, 64:2,

64:19, 65:19, 65:23,
68:9, 69:24, 74:9,
75:23, 79:2, 79:22,
87:4, 87:9, 88:19,
88:25, 91:12, 91:13,
92:12, 92:25, 93:19,
93:20, 97:2, 101:3,
105:4, 107:25,
108:22, 118:15,
119:20, 123:4,
126:6, 128:5, 133:3,
140:12, 140:14,
140:24, 141:14,
143:12, 146:1,
146:20, 156:21,
158:21, 159:7,
163:5, 163:8, 163:9,
163:18, 168:13,
168:19, 168:20,
168:23, 170:7,
174:15, 174:25,
177:20, 178:5,
178:13, 180:3,
181:1, 182:25,
183:8, 184:19,
188:3, 189:1,
192:18, 193:2,
193:8, 194:8
**one-time** [1] - 29:12
**ones** [1] - 184:8
**ongoing** [2] - 10:1,
138:13
**onion** [2] - 118:23,
120:6
**online** [1] - 31:3
**Ontario** [2] - 156:22,
156:25
**open** [10] - 12:20,
20:4, 40:20, 92:13,
147:14, 148:19,
155:9, 161:6, 161:11
**open-source** [1] -
20:4
**operate** [2] - 170:13,
191:19
**operated** [4] - 66:24,
67:10, 67:24, 171:21
**operates** [2] - 58:17,
170:12
**operating** [3] - 96:21,
171:25, 191:9
**opine** [1] - 126:21
**opining** [1] - 133:24
**opinion** [32] - 10:14,
24:3, 32:13, 66:23,
67:8, 67:10, 67:12,
67:23, 68:5, 70:3,
79:8, 84:3, 86:25,
87:14, 89:19, 99:4,
102:8, 102:9, 126:1,

126:9, 128:9,
128:17, 128:24,
132:14, 134:18,
136:14, 136:18,
136:20, 138:13,
154:3, 176:3, 177:7
**opinions** [2] - 126:6,
136:3
**opportunity** [5] - 3:23,
26:16, 32:22, 76:14,
124:25
**opposed** [1] - 53:15
**opposite** [2] - 19:4,
130:18
**opts** [1] - 63:22
**Orange** [1] - 79:24
**order** [29] - 8:12, 9:4,
10:4, 10:5, 10:18,
10:25, 13:16, 14:10,
14:12, 14:18, 14:23,
17:11, 21:1, 21:21,
28:8, 32:4, 49:16,
54:11, 57:17, 70:11,
86:18, 100:17,
100:18, 107:22,
153:12, 153:18,
190:15, 191:13,
194:23
**orders** [5] - 16:10,
17:9, 18:22, 19:22,
32:17
**ordinarily** [1] - 30:19
**organization** [1] -
36:22
**organizations** [5] -
36:12, 36:15, 36:19,
147:13, 148:17
**organized** [2] - 96:24,
141:14
**organizing** [1] - 36:2
**original** [4] - 16:24,
51:24, 51:25, 73:17
**OTC** [4] - 56:20,
60:23, 61:7, 61:14
**otherwise** [1] - 53:24
**ought** [4] - 31:16,
33:13, 131:2, 195:5
**ourselves** [3] - 40:12,
151:8, 155:6
**outgoing** [1] - 93:1
**outlined** [1] - 145:23
**output** [8] - 53:22,
60:9, 63:24, 64:2,
82:16, 116:16,
160:24
**output-based** [1] -
160:24
**outputs** [9] - 47:9,
60:22, 64:10, 65:9,
65:17, 83:2, 91:24,

121:20
**outside** [7] - 20:14, 60:4, 102:1, 102:3, 103:17, 133:10, 189:23
**overinclusive** [1] - 61:17
**overlap** [2] - 23:17, 189:23
**overlapping** [1] - 140:7
**overruled** [1] - 177:10
**oversight** [1] - 56:1
**overstates** [1] - 27:20
**overview** [2] - 45:3, 45:7
**own** [10] - 23:9, 86:24, 104:4, 131:23, 141:18, 159:13, 178:14, 179:13, 179:18, 181:18
**owner** [4] - 49:2, 58:2, 58:3, 161:18
**owners** [1] - 88:3
**ownership** [9] - 76:15, 77:6, 84:14, 89:18, 89:24, 106:11, 161:7, 163:21, 192:7
**owns** [1] - 92:14

## P

**p-a-s** [1] - 77:8
**p.m** [4] - 79:20, 194:17, 195:24
**P2MS** [1] - 111:22
**P2PK** [1] - 111:21
**P2SH** [2] - 113:2, 117:6
**P2SH-WPKH** [1] - 117:6
**Pac** [5] - 54:19, 61:12, 61:17, 61:23, 121:4
**Pac-Man** [5] - 54:19, 61:12, 61:17, 61:23, 121:4
**pace** [1] - 30:11
**page** [118] - 37:8, 69:1, 69:6, 69:9, 69:10, 69:14, 69:16, 70:19, 70:20, 70:22, 71:2, 71:3, 71:8, 71:9, 71:10, 71:11, 74:2, 74:25, 76:22, 77:19, 78:6, 78:21, 79:6, 79:9, 81:20, 81:21, 81:24, 82:12, 82:18, 82:20, 83:14, 83:23, 84:11, 84:12, 87:2, 88:9, 98:6, 99:2,

99:3, 99:5, 99:6, 99:7, 104:9, 104:12, 105:12, 106:16, 107:10, 107:11, 108:7, 108:8, 110:5, 110:16, 111:4, 111:9, 111:10, 111:14, 113:1, 116:13, 116:18, 117:2, 117:4, 118:1, 118:8, 118:10, 118:13, 118:22, 120:1, 120:9, 120:20, 121:6, 121:7, 121:12, 121:16, 121:23, 121:25, 122:9, 122:12, 128:6, 137:24, 138:1, 149:3, 149:4, 150:6, 156:1, 158:22, 159:10, 159:17, 160:19, 162:4, 162:18, 163:22, 167:7, 167:8, 174:18, 174:19, 174:24, 175:24, 180:6, 180:8, 180:20, 180:24, 181:25, 182:1, 182:5, 182:9, 182:12, 182:17, 182:20, 182:22, 184:10, 184:15, 190:4, 190:15
**PAGE** [2] - 2:2, 2:9
**pages** [3] - 123:3, 175:25, 187:17
**paid** [7] - 6:18, 7:5, 30:18, 30:19, 30:21, 142:17, 143:23
**Pamela** [3] - 35:22, 144:22, 145:1
**Pandora** [1] - 173:14
**paper** [1] - 178:8
**papers** [4] - 4:8, 32:16, 61:19, 111:8
**paragraph** [17] - 119:24, 147:9, 148:14, 149:3, 156:16, 156:19, 156:20, 156:21, 157:4, 161:2, 161:5, 163:23, 180:21, 182:8, 189:25, 190:4
**paragraphs** [4] - 160:20, 162:18, 162:19, 162:23
**parameters** [3] - 14:14, 14:16, 26:24

**paraphrasing** [1] - 64:8
**parasite** [1] - 41:13
**parasites** [1] - 8:6
**part** [22] - 8:3, 9:15, 25:14, 26:24, 27:19, 27:21, 29:2, 36:9, 54:17, 59:13, 68:2, 90:12, 93:16, 93:25, 118:15, 122:19, 130:14, 143:19, 154:25, 155:7, 155:8, 165:10
**participate** [2] - 81:6, 84:24
**participated** [3] - 65:18, 67:4, 145:15
**participates** [1] - 63:22
**participating** [1] - 117:9
**participation** [2] - 147:15, 148:20
**particular** [68] - 12:3, 26:8, 27:3, 40:16, 40:22, 43:6, 43:23, 47:9, 47:16, 50:24, 52:24, 53:12, 54:16, 55:10, 58:13, 59:6, 63:14, 64:12, 69:17, 70:13, 71:14, 73:11, 75:20, 76:13, 76:15, 78:14, 79:13, 86:14, 86:23, 88:14, 91:4, 92:14, 94:1, 97:11, 98:1, 98:25, 100:16, 100:17, 101:9, 105:6, 105:24, 110:10, 112:5, 112:23, 113:12, 115:10, 115:23, 116:24, 117:19, 117:23, 118:6, 118:25, 123:4, 128:3, 128:4, 129:12, 133:1, 138:18, 143:12, 145:21, 151:25, 176:8, 177:18, 178:20, 178:23, 191:9, 192:19, 192:22
**particularly** [4] - 26:19, 30:4, 129:20, 132:9
**partner** [2] - 140:12, 140:14
**party** [1] - 44:7
**PAS** [2] - 72:22, 74:5
**pas** [5] - 73:1, 74:5,

74:6, 74:9
**pass** [2] - 124:15, 137:13
**Passat** [5] - 88:14, 88:15, 88:22, 89:11
**Passats** [2] - 88:18, 88:19
**past** [4] - 28:25, 30:15, 79:17, 132:20
**pasted** [2] - 74:17, 96:7
**pasting** [1] - 68:15
**path** [1] - 45:17
**paths** [1] - 70:9
**pattern** [1] - 65:6
**patterns** [1] - 65:5
**pause** [2] - 92:22, 186:1
**paused** [1] - 36:5
**pay** [4] - 32:5, 32:6, 40:7, 65:22
**Pay** [1] - 63:7, 111:21, 111:22, 111:23
**Pay-to-Endpoint** [1] - 63:7
**Pay-to-Multisig** [1] - 111:22
**Pay-to-Public-Key** [1] - 111:21
**Pay-to-Taproot** [1] - 111:23
**Pay-to-Witness-Script-Hash** [1] - 111:22
**paying** [3] - 32:9, 65:19, 144:16
**PayJoin** [7] - 62:2, 62:18, 62:19, 63:6, 63:7, 65:14, 65:19
**payJoins** [1] - 154:7
**PayJoins** [2] - 62:17, 65:13
**payment** [4] - 30:9, 30:21, 33:4, 33:8
**payments** [3] - 30:16, 63:21, 156:17
**PDF** [1] - 138:3
**Pearlman** [1] - 3:12
**PEARLMAN** [2] - 1:15, 3:12
**peel** [8] - 43:2, 54:18, 54:20, 61:11, 61:13, 120:24, 121:4, 152:10
**peer** [1] - 153:1
**peer-reviewed** [1] - 153:1
**Pelker** [2] - 2:6, 3:6, 101:19, 124:17, 132:19, 134:15,

137:11
**PELKER** [95] - 1:13, 3:6, 20:24, 22:1, 22:14, 22:20, 23:4, 23:22, 24:17, 25:9, 25:13, 26:22, 28:13, 28:16, 29:9, 37:16, 38:4, 38:24, 67:11, 72:8, 72:15, 79:21, 80:7, 80:10, 80:23, 101:20, 102:10, 102:18, 109:5, 116:4, 119:12, 124:18, 124:23, 125:2, 125:12, 125:16, 125:21, 126:14, 126:17, 126:25, 127:4, 127:8, 127:10, 127:14, 132:22, 133:12, 133:14, 134:16, 135:7, 137:12, 137:16, 137:19, 138:2, 138:5, 139:1, 149:21, 150:2, 158:8, 158:14, 159:22, 164:10, 164:14, 165:3, 167:18, 167:24, 170:18, 170:23, 171:1, 177:14, 179:5, 179:6, 179:11, 179:12, 180:8, 180:9, 182:21, 186:4, 186:10, 186:13, 186:19, 186:20, 187:10, 187:15, 190:17, 190:21, 193:10, 193:15, 193:22, 194:3, 194:11, 194:18, 194:23, 195:8, 195:10, 195:22
**Pelker's** [3] - 29:16, 111:15, 179:1
**penalty** [1] - 158:23
**pencil** [1] - 60:1
**Pennsylvania** [1] - 1:14
**penny** [1] - 30:6
**people** [10] - 5:23, 7:5, 29:15, 40:22, 64:25, 71:24, 89:20, 138:15, 165:7, 165:10
**per** [5] - 63:25, 100:12, 144:9, 186:25

**per-user** [1] - 100:12
**perceived** [1] - 134:5
**percent** [24] - 23:18, 23:21, 63:2, 97:17, 109:10, 122:17, 122:19, 122:22, 122:23, 122:24, 123:8, 123:17, 123:18, 124:1, 154:11, 174:15, 174:25, 178:9, 178:16, 178:18, 180:15, 187:7
**percentage** [5] - 62:6, 122:16, 124:5, 144:5, 144:8
**percipient** [1] - 136:12
**perfect** [2] - 71:13, 104:15
**performance** [1] - 43:9
**perhaps** [8] - 12:25, 19:5, 27:19, 45:10, 64:14, 97:16, 116:24, 145:4
**period** [4] - 13:17, 131:19, 133:3, 171:24
**perjury** [1] - 158:23
**permission** [4] - 51:12, 51:25, 57:11, 137:13
**permit** [1] - 133:8
**permits** [1] - 138:19
**person** [8] - 10:12, 12:9, 22:3, 31:14, 52:9, 57:10, 65:19
**personal** [5] - 128:24, 136:1, 136:12, 159:20, 160:6
**personally** [1] - 153:4
**persons** [1] - 52:3
**perspective** [2] - 99:22, 100:24
**Phan's** [1] - 157:2
**phone** [4] - 3:25, 19:19, 31:1, 159:10
**photo** [2] - 40:2, 95:8
**phrase** [5] - 53:13, 70:13, 90:2, 90:7, 107:5
**pick** [1] - 28:4
**picture** [1] - 88:13
**pieces** [1] - 149:13
**PII** [2] - 52:11, 164:25
**pivot** [1] - 190:15
**pivoting** [1] - 190:22
**place** [6] - 12:6, 21:19, 63:3, 86:21, 95:23, 155:1

**placement** [1] - 165:5
**Plaintiff** [2] - 1:3, 1:10
**plan** [2] - 21:4, 193:20
**planning** [1] - 7:23
**platform** [1] - 165:21
**played** [1] - 119:7
**pleading** [1] - 9:18
**pleadings** [1] - 4:23
**PLLC** [1] - 1:19
**plus** [2] - 65:10, 123:11
**pocket** [1] - 65:21
**podium** [1] - 3:4
**point** [57] - 5:6, 8:21, 9:19, 9:22, 10:4, 10:8, 11:1, 11:15, 13:7, 26:22, 38:1, 38:21, 41:5, 47:14, 52:6, 55:1, 58:12, 63:9, 64:1, 65:5, 89:9, 89:10, 92:24, 93:2, 93:16, 97:9, 101:15, 103:8, 104:1, 110:6, 111:15, 112:25, 113:19, 113:21, 114:17, 114:18, 114:19, 115:2, 115:7, 115:9, 115:10, 115:23, 116:13, 116:15, 117:2, 117:4, 124:5, 129:10, 130:17, 133:19, 135:18, 145:9, 146:4, 159:10, 176:23, 177:23, 178:13
**pointing** [3] - 10:21, 86:9, 182:20
**points** [8] - 15:22, 115:18, 118:9, 118:12, 121:2, 139:16, 147:18, 148:23
**police** [2] - 36:17
**policy** [1] - 34:20
**polite** [1] - 145:5
**politely** [1] - 159:19
**pool** [8] - 6:10, 8:4, 8:18, 8:23, 10:2, 72:3, 149:9, 149:13
**pop** [1] - 105:4
**popular** [1] - 36:6
**portion** [5] - 13:10, 14:9, 21:21, 23:25, 85:3
**position** [6] - 13:3, 22:17, 29:18, 30:1, 35:16, 128:11
**positive** [1] - 41:17

**positives** [2] - 45:23, 62:1
**possession** [1] - 126:12
**possibilities** [1] - 89:13
**possibility** [2] - 95:10, 131:1
**possible** [15] - 31:21, 53:25, 88:19, 89:18, 93:21, 95:11, 99:25, 101:10, 107:21, 110:1, 141:7, 155:2, 159:15, 170:2, 189:9
**possibly** [11] - 16:18, 16:20, 18:14, 55:9, 58:5, 82:7, 92:14, 94:4, 106:19, 107:19, 172:3
**post** [1] - 40:24
**posted** [3] - 8:25, 10:4, 11:2
**potential** [1] - 165:20
**potentially** [3] - 24:25, 93:5, 128:19
**pound** [1] - 15:21
**PowerPoint** [9] - 38:15, 38:19, 38:20, 39:7, 39:11, 39:12, 39:17, 39:19, 68:20
**practicality** [1] - 95:19
**practically** [1] - 9:20
**practice** [1] - 84:4
**practices** [1] - 56:1
**precise** [1] - 24:14
**precisely** [3] - 23:2, 120:13, 146:15
**preexisting** [1] - 9:7
**prefer** [4] - 68:21, 69:19, 73:13, 99:21
**prejudice** [1] - 6:11
**prejudicial** [3] - 134:9, 136:8, 136:10
**prepare** [3] - 138:6, 158:18, 162:14
**prepared** [3] - 14:11, 159:8, 159:9
**preparing** [3] - 145:11, 161:20, 162:7
**present** [6] - 3:16, 21:11, 83:25, 91:5, 98:20, 118:18
**presentation** [2] - 154:13, 169:16
**presentations** [3] - 155:8, 155:11, 169:21
**presented** [5] - 90:15, 100:3, 131:2,

168:24, 168:25
**presenting** [2] - 101:25, 158:5
**presently** [1] - 90:22
**preserve** [1] - 137:1
**press** [6] - 6:7, 6:9, 8:19, 156:12, 158:1
**pretrial** [1] - 9:19
**pretty** [7] - 10:17, 12:6, 22:17, 29:3, 114:18, 180:3, 186:2
**preventing** [1] - 135:21
**previewed** [1] - 125:24
**previous** [2] - 49:1, 64:3
**previously** [6] - 4:6, 16:16, 111:5, 125:24, 137:22, 157:16
**price** [1] - 129:16
**primary** [2] - 64:14, 150:7
**prime** [1] - 114:7, 114:14, 115:1
**principal** [1] - 14:5
**printout** [1] - 183:9
**privacy** [1] - 54:12
**private** [35] - 13:22, 17:18, 25:17, 30:2, 32:4, 32:12, 32:14, 40:14, 52:4, 52:7, 52:10, 55:5, 57:8, 57:24, 57:25, 76:5, 88:2, 88:3, 95:22, 112:17, 114:6, 114:9, 114:11, 114:13, 114:17, 114:25, 115:7, 140:11, 140:12, 140:14, 140:15, 146:9, 192:21, 193:4
**privately** [1] - 29:24
**pro** [3] - 36:3, 36:4, 142:14
**probabilistic** [1] - 20:10
**probability** [6] - 45:23, 60:19, 87:16, 87:17, 130:11, 130:25
**probative** [2] - 134:9, 136:8
**problem** [5] - 13:22, 17:17, 58:15, 61:11, 65:1
**problems** [1] - 46:25
**procedure** [3] - 16:7, 16:8, 18:14
**proceed** [3] - 34:1, 34:9, 81:16

**proceeding** [2] - 7:8, 33:9
**proceedings** [1] - 196:6
**proceeds** [4] - 128:7, 128:8, 128:22, 172:25
**process** [16] - 6:20, 12:6, 15:19, 19:14, 19:15, 22:8, 44:5, 59:16, 85:14, 116:3, 147:21, 151:24, 152:9, 155:7, 165:8, 191:3
**processes** [1] - 43:12
**produce** [4] - 11:16, 11:17, 19:23, 32:15
**produced** [9] - 70:16, 72:24, 78:22, 90:8, 141:16, 142:9, 142:10, 142:12, 143:5
**produces** [2] - 164:5, 177:15
**product** [4] - 153:24, 154:9, 154:12, 157:10
**production** [6] - 14:23, 16:4, 17:10, 19:22, 100:9
**products** [5] - 149:18, 154:16, 155:3, 165:20, 165:24
**Professor** [2] - 64:4, 145:18
**professor** [1] - 35:17
**proffer** [4] - 102:7, 103:17, 103:21, 135:8
**profits** [4] - 128:8, 128:14, 128:23
**program** [2] - 36:5, 54:11
**progressing** [1] - 4:3
**projection** [1] - 134:4
**promptly** [1] - 32:24
**proof** [1] - 58:1
**proper** [4] - 69:16, 73:22, 100:24, 106:5
**property** [1] - 148:8
**proposed** [1] - 8:12
**proprietary** [12] - 13:25, 30:2, 147:17, 147:22, 148:1, 148:4, 148:6, 148:9, 148:21, 149:14, 149:19, 161:7
**prosecute** [1] - 30:1
**prosecution** [2] - 10:10, 64:15

218

**prospective** [4] - 155:8, 155:12, 155:16, 169:22
**protect** [1] - 54:12
**protective** [7] - 13:16, 14:11, 14:18, 17:11, 21:21, 28:8, 125:7
**protocol** [1] - 86:18
**protocols** [1] - 117:15
**provide** [15] - 12:8, 13:18, 22:15, 27:9, 51:25, 55:19, 56:1, 57:15, 62:21, 63:10, 135:14, 144:12, 145:21, 153:21, 189:20
**provided** [13] - 16:22, 23:23, 51:19, 56:17, 73:2, 99:18, 111:6, 111:16, 113:12, 120:22, 146:23, 146:25, 183:15
**Providers** [1] - 149:16
**provides** [3] - 45:14, 61:24, 62:25
**providing** [2] - 148:23, 169:25
**province** [2] - 133:23, 134:20
**prudent** [1] - 9:2
**Public** [1] - 111:21
**public** [31] - 5:15, 5:18, 5:22, 6:8, 10:13, 10:19, 57:7, 57:21, 57:22, 70:8, 71:18, 71:20, 71:24, 74:22, 79:15, 82:23, 88:4, 90:2, 105:8, 113:14, 114:5, 114:13, 114:16, 115:18, 116:2, 139:5, 164:2, 164:6, 168:21, 168:22
**public's** [1] - 5:12
**publicly** [10] - 44:17, 58:9, 72:2, 77:12, 83:17, 84:21, 104:23, 105:3, 159:24, 164:15
**publishing** [1] - 164:22
**pull** [23] - 53:11, 61:9, 75:19, 77:11, 78:25, 79:1, 86:8, 91:16, 96:13, 98:22, 100:22, 107:3, 127:5, 141:3, 141:20, 141:25, 142:1, 150:23, 151:12, 151:25,

152:25, 174:6, 175:5
**pulled** [3] - 93:14, 159:25, 174:21
**pulling** [1] - 122:4
**pulls** [2] - 141:17, 141:23
**Pulls** [1] - 121:24
**purchased** [1] - 174:10
**purchasing** [1] - 85:4
**purely** [1] - 136:10
**purports** [1] - 67:1
**purpose** [4] - 6:21, 130:5, 130:6, 159:23
**purposes** [8] - 6:21, 32:1, 39:1, 125:6, 132:17, 136:10, 164:17, 193:17
**pursuant** [1] - 33:10
**pushing** [2] - 80:24, 151:24
**put** [14] - 13:2, 13:24, 18:7, 22:17, 34:15, 39:12, 40:22, 98:21, 105:12, 106:17, 113:14, 125:18, 133:3, 154:5
**puts** [1] - 25:2
**putting** [3] - 72:11, 113:10, 157:22

## Q

**Qassam** [10] - 48:7, 48:19, 48:21, 49:10, 50:5, 50:24, 50:25, 51:3, 51:9, 52:21
**quadrillion** [2] - 115:1, 115:8
**qualifications** [3] - 37:5, 37:11, 126:8
**qualified** [1] - 127:22
**quality** [1] - 149:10
**quantify** [1] - 62:6
**quarter** [1] - 79:17
**questions** [9] - 22:7, 22:13, 22:20, 24:15, 109:10, 109:15, 129:6, 136:4, 150:25
**quick** [2] - 45:3, 79:22
**quicker** [1] - 16:3
**quickly** [6] - 36:2, 57:5, 81:5, 104:7, 118:13, 125:8
**quite** [12] - 32:19, 68:18, 86:2, 114:14, 115:17, 119:9, 121:11, 130:7, 136:8, 143:1, 155:20, 159:15

**quote** [5] - 107:12, 107:20, 156:21, 156:23
**quoting** [2] - 107:16, 108:16

## R

**R1** [1] - 114:10
**radiologic** [2] - 34:14, 34:17
**raise** [6] - 8:8, 22:9, 33:22, 125:1, 125:2, 137:2
**raised** [2] - 29:24, 125:22
**raises** [2] - 104:2, 133:17
**raising** [2] - 6:13, 6:22
**ran** [1] - 24:11
**RANDOLPH** [1] - 1:8
**randomly** [1] - 114:6
**range** [1] - 193:25
**ransomware** [1] - 167:11
**rapidly** [2] - 147:17, 148:22
**rate** [10] - 11:21, 55:19, 122:16, 132:1, 142:19, 152:16, 152:22, 178:7, 178:8, 180:16
**rates** [3] - 11:21, 13:1, 132:24
**rather** [2] - 151:5, 186:24
**rats** [1] - 8:5
**raw** [2] - 149:15, 169:4
**RBF** [2] - 118:14
**re** [1] - 51:19
**re-creation** [1] - 51:19
**reach** [2] - 21:5, 81:12
**reaching** [1] - 80:3
**Reactor** [31] - 11:16, 17:5, 20:3, 22:16, 22:25, 24:11, 25:10, 25:19, 25:21, 26:2, 31:8, 31:20, 43:17, 43:20, 45:18, 45:20, 47:3, 53:1, 53:4, 53:7, 53:16, 53:22, 53:23, 61:20, 77:10, 77:11, 108:11, 108:17, 112:4
**Reactor's** [1] - 54:17
**read** [34] - 5:21, 6:14, 14:7, 16:14, 45:21, 55:6, 62:8, 62:11, 75:3, 98:2, 99:10, 105:16, 105:23,

108:13, 108:25, 109:22, 112:1, 139:5, 147:9, 148:14, 149:3, 150:24, 160:20, 162:3, 162:10, 162:21, 162:23, 163:22, 163:23, 167:15, 180:20, 180:25, 183:9, 183:23
**readable** [2] - 112:18, 116:17
**reading** [3] - 14:8, 153:8, 153:10
**ready** [1] - 33:12
**real** [8] - 6:10, 30:18, 57:5, 104:7, 126:7, 147:13, 148:17, 168:17
**real-world** [2] - 147:13, 148:17
**realize** [1] - 32:21
**realizing** [1] - 109:22
**really** [34] - 5:25, 11:24, 13:21, 14:20, 24:14, 25:4, 26:11, 32:19, 34:16, 39:22, 45:6, 63:11, 63:25, 65:24, 72:22, 94:25, 97:15, 103:8, 115:15, 130:8, 134:22, 144:10, 145:13, 145:22, 151:1, 152:23, 153:23, 157:17, 157:20, 178:23, 181:13, 191:25, 192:1, 193:16
**reason** [7] - 7:2, 7:5, 20:6, 31:14, 130:24, 133:7, 154:25
**reasonable** [5] - 10:12, 127:23, 130:10, 130:13, 130:25
**reasonably** [1] - 5:8
**reasons** [1] - 87:22
**rebuild** [3] - 70:14, 84:21, 104:22
**rebuilt** [1] - 51:23
**rebut** [2] - 128:7, 128:20
**receive** [3] - 6:20, 70:18, 73:4
**received** [10] - 56:21, 56:22, 57:3, 58:18, 58:19, 60:23, 73:6, 82:17, 100:17, 161:8
**receiving** [7] - 6:24,

78:2, 92:18, 127:12, 159:14, 163:6, 163:15
**recently** [3] - 96:24, 142:8, 142:10
**recess** [4] - 33:17, 79:20, 137:10, 186:14
**recipient** [1] - 70:1
**recipients** [2] - 70:2, 83:7
**recognize** [1] - 125:9
**recollection** [1] - 16:21
**record** [10] - 3:5, 66:14, 70:12, 78:25, 91:16, 100:25, 120:11, 122:5, 146:4
**recorded** [8] - 57:20, 57:21, 57:22, 57:24, 57:25, 59:3, 59:10, 119:18
**records** [37] - 73:2, 73:5, 73:7, 73:15, 73:16, 73:17, 78:9, 78:18, 78:22, 91:23, 92:9, 93:23, 97:24, 99:18, 99:19, 99:21, 99:23, 100:2, 100:17, 107:22, 107:24, 108:1, 110:1, 110:2, 141:9, 141:24, 142:3, 168:1, 173:10, 173:25, 174:2, 174:3, 191:13
**recreate** [1] - 102:20
**red** [1] - 79:25
**red-eye** [1] - 79:25
**redact** [3] - 160:3, 164:13, 164:16
**redacted** [2] - 164:21, 164:25
**redirect** [1] - 194:14
**reduced** [2] - 52:19, 56:20
**refer** [1] - 61:16
**reference** [3] - 108:23, 110:11, 175:14
**referenced** [2] - 118:24, 150:13
**references** [5] - 64:12, 81:21, 90:19, 111:5, 111:7
**referencing** [1] - 110:15
**referred** [1] - 42:4
**referring** [10] - 47:23, 55:25, 59:16, 65:7, 77:1, 77:20, 94:15,

113:23, 151:7,
191:11
**refers** [2] - 46:16,
98:10
**reflects** [1] - 13:10
**refresh** [1] - 57:5
**regarding** [12] - 4:2,
46:2, 56:7, 78:17,
96:10, 99:23,
111:16, 118:24,
120:23, 124:24,
156:12, 192:14
**regardless** [2] - 54:23,
157:21
**regards** [1] - 71:2
**register** [2] - 126:21,
135:15
**registered** [3] - 110:6,
110:9, 110:17
**registration** [2] -
126:20, 135:18
**regulate** [1] - 135:19
**regulated** [1] - 135:20
**regulations** [1] - 135:1
**regulatory** [7] -
133:25, 134:2,
134:7, 136:5,
136:15, 136:18,
149:7
**reimburse** [1] - 6:19
**reimbursement** [1] -
7:10
**reiterate** [1] - 72:18
**reiterated** [1] - 28:19
**reiterates** [1] - 28:17
**reject** [1] - 191:8
**related** [13] - 6:12,
40:23, 48:7, 51:7,
90:22, 92:7, 99:24,
104:25, 105:6,
111:7, 118:2,
158:16, 181:11
**relates** [1] - 152:6
**relating** [5] - 10:13,
111:8, 117:12,
142:5, 195:14
**relation** [5] - 38:9,
131:6, 133:25,
183:25, 184:7
**relationships** [1] -
164:3
**relative** [1] - 144:6
**relatively** [1] - 56:3
**release** [7] - 9:8,
10:10, 10:11,
156:12, 156:16,
157:6, 158:1
**released** [2] - 10:19,
142:16
**relevance** [2] - 133:21,

134:10
**relevant** [8] - 12:9,
13:18, 134:8, 136:6,
136:7, 136:11,
147:11, 153:13
**reliability** [2] - 133:7,
158:2
**reliable** [11] - 26:18,
153:25, 154:3,
154:5, 154:9,
154:13, 154:24,
155:4, 155:18,
156:6, 163:11
**reliably** [1] - 131:16
**rely** [2] - 27:18, 42:18
**relying** [2] - 153:20,
153:22
**remaining** [1] - 97:20
**remember** [4] - 62:17,
81:20, 96:11, 96:14
**remind** [3] - 81:19,
82:1, 120:4
**remotely** [1] - 81:6
**remove** [4] - 40:8,
159:13, 159:20,
160:5
**RenVM** [1] - 161:12
**repeat** [1] - 185:2
**repeated** [1] - 47:4
**repeatedly** [4] - 15:15,
21:13, 30:24, 103:11
**rephrase** [1] - 158:3
**replace** [1] - 105:10
**Replace** [2] - 118:14,
118:19
**replace-by-fee** [1] -
105:10
**Replace-by-Fee** [2] -
118:14, 118:19
**reply** [5] - 5:6, 8:16,
9:18, 193:24, 194:10
**report** [143] - 12:12,
22:22, 24:19, 25:2,
26:5, 26:23, 27:5,
38:9, 38:13, 38:15,
39:6, 60:21, 63:16,
66:10, 67:2, 67:3,
67:4, 68:2, 68:3,
68:5, 68:14, 68:17,
69:2, 69:5, 69:6,
69:9, 69:11, 69:21,
71:9, 71:10, 72:25,
73:3, 73:4, 74:2,
74:3, 75:18, 76:22,
77:1, 77:3, 77:19,
77:20, 78:5, 78:10,
79:6, 81:20, 81:21,
81:25, 82:13, 82:14,
82:15, 82:18, 82:21,
83:12, 83:14, 83:23,

84:11, 84:12, 84:17,
87:2, 87:20, 88:10,
90:19, 98:5, 98:7,
99:2, 99:3, 99:6,
99:7, 101:8, 101:11,
102:17, 102:22,
103:10, 104:2,
104:10, 104:12,
105:12, 106:1,
106:13, 106:16,
107:10, 107:11,
107:12, 108:7,
108:9, 110:4, 110:5,
110:20, 111:1,
111:4, 111:6,
116:18, 117:3,
117:4, 118:12,
124:13, 137:22,
137:25, 138:6,
138:11, 140:20,
140:22, 140:24,
140:25, 141:1,
142:13, 145:2,
145:3, 145:11,
145:17, 145:24,
150:6, 150:13,
150:24, 152:19,
156:1, 157:11,
157:12, 157:18,
157:20, 157:21,
162:14, 166:5,
167:3, 167:14,
167:15, 169:17,
174:24, 177:4,
180:5, 180:20,
181:25, 182:9,
182:13, 184:10,
186:25, 187:16,
190:14
**reporter** [3] - 66:12,
108:12, 125:7
**REPORTER** [1] -
196:1
**Reporter** [3] - 1:22,
1:22, 196:10
**reporter's** [1] - 125:13
**reporters** [1] - 5:21
**Reports** [1] - 111:11
**reports** [15] - 12:14,
36:6, 62:8, 62:11,
62:14, 66:17, 67:8,
67:23, 68:11,
135:20, 144:13,
173:13, 175:8,
175:10, 179:14
**repository** [1] - 148:16
**represent** [2] - 116:6,
157:20
**representation** [12] -
44:23, 56:16, 58:7,

58:11, 75:9, 75:13,
83:20, 83:23, 84:8,
99:5, 104:9, 112:9
**representations** [1] -
132:8
**representative** [1] -
82:16
**represented** [6] - 72:6,
72:24, 78:24, 79:14,
84:24, 106:14
**Request** [1] - 110:12
**request** [7] - 7:9,
16:20, 16:24, 56:21,
70:18, 138:17,
159:20
**requested** [2] - 98:3,
159:12
**requesting** [1] -
119:25
**requests** [3] - 17:20,
18:12, 45:25
**require** [1] - 133:8
**required** [2] - 126:21,
135:20
**requiring** [1] - 191:15
**reschedule** [1] - 80:15
**research** [1] - 178:11
**researchers** [3] -
147:16, 148:21,
149:11
**reserve** [3] - 138:12,
138:15, 138:16
**reserving** [1] - 7:12
**residence** [1] - 88:15
**resources** [3] - 19:6,
19:8
**respect** [13] - 3:24,
4:19, 11:1, 14:11,
23:19, 67:6, 102:5,
131:14, 131:19,
134:14, 146:10,
148:10, 157:19
**respectfully** [1] -
18:18
**respond** [5] - 45:25,
103:5, 104:4,
153:12, 190:25
**responded** [1] - 64:10
**response** [3] - 7:21,
10:24, 191:15
**responses** [1] - 12:5
**responsibilities** [1] -
144:7
**responsible** [2] -
18:11, 155:20
**rest** [4] - 33:14, 66:5,
94:22, 120:1
**resubmit** [1] - 42:10
**result** [1] - 31:19
**results** [2] - 25:8,

61:18
**retain** [1] - 31:12
**retained** [4] - 139:4,
158:15, 161:21,
171:8
**retraced** [1] - 55:16
**return** [5] - 18:21,
18:22, 19:18, 19:20,
31:1
**returning** [1] - 186:21
**returns** [1] - 169:4
**retweeting** [2] - 5:15,
5:18
**reveal** [2] - 12:11,
12:15
**revealing** [1] - 47:1
**reveals** [1] - 117:8
**review** [18] - 19:23,
28:23, 66:17,
100:25, 143:12,
144:13, 145:3,
153:11, 153:18,
157:18, 172:23,
176:1, 176:2, 177:5,
183:15, 183:16,
183:18, 183:19
**Review** [1] - 148:15
**reviewed** [21] - 12:12,
66:20, 68:2, 70:17,
111:1, 141:2,
141:10, 141:18,
141:22, 142:5,
142:12, 145:1,
153:1, 153:4, 154:1,
169:4, 174:3, 174:5,
174:8, 175:7, 175:12
**Reviewing** [1] - 117:7
**reviewing** [9] - 14:15,
67:8, 67:22, 68:11,
138:13, 140:19,
168:15, 174:6, 177:4
**RF** [2] - 118:13
**right-hand** [13] -
44:25, 45:20, 48:18,
49:7, 50:12, 61:6,
61:14, 69:10, 71:16,
83:7, 99:8, 176:9,
188:11
**right-most** [1] - 183:5
**rights** [4] - 13:25,
16:5, 192:7
**risk** [9] - 6:10, 165:23,
165:25, 166:1,
166:4, 166:13,
166:20, 166:24
**risky** [2] - 166:9,
166:11
**RMR** [1] - 1:22, 196:9
**Road** [32] - 23:14,
71:16, 73:2, 73:5,

73:7, 73:13, 73:16, 73:17, 74:9, 75:1, 77:5, 77:8, 77:23, 77:25, 78:9, 78:18, 78:22, 78:25, 79:12, 82:5, 83:5, 83:15, 99:19, 173:4, 180:15, 180:21, 180:24, 181:4, 181:8, 181:11
**road** [2] - 88:18, 116:5
**role** [2] - 36:9, 119:7
**Roman** [6] - 3:3, 3:16, 3:19, 66:23, 67:10, 89:20
**ROMAN** [1] - 1:5
**Room** [2] - 1:23, 196:10
**room** [2] - 4:5, 11:9
**root** [12] - 53:24, 176:10, 182:16, 183:6, 183:13, 184:3, 187:19, 188:1, 188:7, 188:8, 188:21, 189:1
**roughly** [1] - 110:16
**rounds** [1] - 55:18
**row** [2] - 55:16, 182:25
**rule** [5] - 9:25, 10:17, 10:24, 117:18, 192:11
**Rule** [11] - 4:19, 4:25, 5:2, 7:22, 10:6, 10:8, 10:20, 11:5, 16:17, 18:13, 18:20
**rules** [9] - 6:15, 6:23, 7:15, 9:7, 9:10, 9:11, 14:10, 17:24
**run** [14] - 22:16, 22:18, 22:19, 22:21, 22:22, 22:24, 25:7, 29:17, 31:13, 31:19, 40:11, 176:2, 181:12
**running** [2] - 13:23, 151:9
**Russia** [1] - 159:14

## S

**safe** [2] - 55:5, 149:7
**safety** [1] - 159:13
**sake** [1] - 178:25
**salary** [1] - 143:23
**sales** [3] - 128:9, 128:23, 173:6
**Samourai** [2] - 63:18, 63:20
**sanctioned** [5] - 50:5, 50:10, 144:19, 147:13, 148:17

**sand** [1] - 15:21
**Sarah** [1] - 178:8
**save** [1] - 113:7
**saved** [2] - 174:14, 175:5
**saw** [3] - 48:25, 91:2, 92:2
**scam** [1] - 36:7
**scams** [1] - 40:23
**schedule** [1] - 16:3
**scheduled** [1] - 80:14
**Scholl** [20] - 27:6, 63:13, 74:2, 75:11, 75:18, 79:8, 82:12, 83:11, 88:8, 90:19, 92:4, 98:5, 99:1, 99:9, 101:11, 104:10, 105:25, 106:17, 107:17, 109:2
**Scholl's** [36] - 68:2, 68:5, 69:11, 70:3, 71:10, 71:15, 72:7, 76:22, 78:4, 78:6, 79:6, 81:21, 81:25, 82:15, 83:13, 83:20, 83:22, 84:12, 87:2, 87:11, 94:24, 99:4, 99:6, 104:9, 106:13, 106:15, 107:11, 108:8, 110:3, 110:20, 150:13, 175:8, 179:14, 180:20, 181:23, 190:14
**school** [1] - 35:17
**science** [1] - 18:4
**scientific** [6] - 11:17, 13:2, 18:5, 61:19, 111:8, 153:2
**scientist** [3] - 125:18, 126:15, 148:5
**scooch** [1] - 99:15
**scope** [2] - 102:17, 104:2
**scoring** [8] - 165:23, 165:25, 166:1, 166:2, 166:4, 166:13, 166:20, 166:24
**scrape** [1] - 40:12
**screen** [10] - 44:13, 61:1, 69:5, 69:9, 69:10, 99:9, 102:19, 141:3, 141:4, 174:7
**screens** [1] - 59:24
**screenshot** [3] - 51:21, 51:22, 120:8
**screenshots** [5] - 118:22, 118:23,

120:1, 120:4, 120:16
**script** [1] - 176:2
**Script** [1] - 111:22
**scroll** [4] - 70:23, 71:9, 71:11, 78:8
**search** [7] - 92:3, 96:8, 132:6, 169:2, 169:3, 169:4
**seasoned** [1] - 52:22
**seated** [1] - 33:25
**second** [12] - 23:20, 29:11, 37:3, 71:8, 88:11, 92:23, 112:25, 116:12, 149:3, 160:20, 187:18, 187:22
**second-to-last** [1] - 116:12
**secondly** [1] - 86:16
**SECP256K1** [1] - 114:10
**Secrecy** [1] - 135:12
**Secret** [1] - 36:20
**section** [5] - 71:1, 119:5, 119:19, 147:25, 184:12
**Section** [3] - 116:14, 118:10, 123:6
**sections** [2] - 68:13, 68:14
**sector** [4] - 140:11, 140:12, 140:15, 146:9
**security** [1] - 159:12
**see** [128] - 7:25, 12:20, 12:21, 12:22, 13:5, 13:11, 18:6, 19:1, 25:7, 26:10, 30:12, 31:10, 32:2, 33:1, 33:15, 37:7, 39:17, 42:12, 44:18, 45:2, 46:15, 46:19, 47:4, 48:9, 51:18, 53:18, 53:19, 53:20, 53:21, 54:6, 56:12, 56:13, 57:1, 58:4, 58:21, 59:22, 59:23, 60:1, 60:10, 60:12, 60:22, 61:3, 61:6, 61:23, 65:9, 65:16, 66:1, 66:10, 67:25, 68:1, 69:7, 72:22, 75:1, 75:7, 75:20, 77:9, 77:12, 77:25, 78:3, 78:24, 79:14, 80:2, 80:22, 81:4, 82:5, 83:4, 83:8, 84:17, 84:23, 85:18, 86:8, 88:9, 88:12, 91:17, 91:18, 91:25, 92:3,

93:19, 94:7, 95:6, 95:7, 95:14, 96:8, 97:22, 100:8, 100:15, 101:7, 103:2, 103:22, 104:14, 104:18, 105:5, 105:15, 105:17, 107:1, 107:2, 109:25, 110:9, 110:10, 111:10, 111:20, 112:19, 113:14, 118:18, 120:16, 122:9, 128:21, 134:10, 136:11, 138:18, 141:20, 156:24, 159:16, 166:23, 172:1, 174:24, 175:5, 182:24, 183:17, 186:4, 186:8, 188:2, 188:5, 189:22, 195:11, 195:23
**seed** [5] - 70:13, 90:2, 90:7, 107:5, 112:17
**seeing** [4] - 20:7, 100:8, 118:4, 168:19
**seek** [1] - 104:20
**seeking** [3] - 7:10, 7:16, 7:18
**seeks** [2] - 19:20, 149:21
**seem** [5] - 12:7, 13:25, 22:17, 102:17, 136:21
**SEFRANEK** [1] - 196:3
**Sefranek** [3] - 1:22, 196:9, 196:9
**segregated** [3] - 95:12, 113:6, 113:15
**SegWit** [9] - 95:12, 113:6, 113:13, 113:17, 117:6, 117:12, 117:14, 117:17, 117:23
**seize** [1] - 173:9
**seized** [5] - 30:4, 157:16, 169:6, 169:7, 173:24
**selected** [1] - 9:20
**self** [7] - 52:2, 52:20, 56:14, 56:15, 75:25, 106:6, 106:7
**self-custody** [5] - 52:2, 52:20, 56:14, 56:15, 75:25
**self-custodying** [1] - 106:7
**self-hosted** [1] - 106:6

**sell** [1] - 32:5
**selling** [1] - 62:22
**send** [4] - 4:2, 57:17, 71:15, 120:18
**sender** [2] - 70:1, 163:17
**senders** [1] - 70:1
**sending** [8] - 58:8, 75:2, 163:5, 163:9, 163:14, 163:15, 163:19, 163:21
**senior** [1] - 171:14
**sense** [21] - 26:8, 28:1, 62:20, 62:25, 63:1, 77:7, 77:14, 91:14, 91:21, 93:11, 99:22, 101:5, 103:1, 112:7, 112:10, 115:13, 119:8, 120:10, 140:3, 141:21, 152:24
**senses** [2] - 52:18, 94:24
**sent** [10] - 4:11, 52:2, 57:17, 74:8, 74:10, 77:25, 174:9, 180:21, 180:25, 181:4
**sentence** [2] - 116:14, 190:10
**Sentry** [5] - 121:24, 147:2, 147:6, 147:7, 147:11
**separate** [17] - 41:12, 44:23, 45:11, 47:23, 48:23, 48:24, 53:25, 67:5, 78:4, 100:10, 100:12, 100:13, 113:13, 133:20, 141:17, 142:9
**separated** [3] - 44:14, 46:5, 47:6
**separately** [2] - 6:18, 53:11
**separating** [1] - 45:9
**serious** [2] - 129:6, 131:24
**serve** [1] - 158:16
**servers** [2] - 91:21, 171:23
**service** [9] - 54:11, 62:22, 62:24, 63:15, 86:17, 106:5, 106:7, 117:19, 132:10
**Service** [6] - 3:24, 4:1, 36:21, 110:7, 110:15, 149:16
**services** [9] - 25:17, 60:24, 62:21, 63:9, 63:17, 106:8, 117:16, 118:23,

142:19
**servicing** [1] - 139:20
**serving** [2] - 18:12,
193:2
**set** [12] - 20:2, 23:25,
24:7, 40:16, 54:7,
55:8, 55:10, 184:19,
185:1, 185:4, 185:16
**sets** [2] - 12:24, 95:22
**several** [3] - 28:23,
142:11, 163:3
**severely** [1] - 17:24
**Seville** [1] - 36:17
**sexual** [2] - 173:22,
174:10
**shall** [1] - 10:10
**share** [6] - 29:4, 29:5,
51:16, 140:5,
140:13, 140:14
**shared** [2] - 46:1,
149:8
**Sheep** [3] - 173:14,
180:4, 180:10
**Sheet** [1] - 147:6
**sheet** [2] - 147:6,
149:1
**sheets** [2] - 100:13,
149:18
**shell** [2] - 30:5, 32:2
**shelling** [1] - 30:6
**shifted** [1] - 139:19
**shocking** [1] - 20:16
**short** [1] - 68:9
**shotgun** [1] - 63:23
**show** [12] - 28:11,
46:18, 66:7, 67:1,
67:4, 79:1, 91:15,
101:9, 102:11,
120:7, 141:4, 163:18
**showing** [8] - 50:20,
78:6, 88:15, 102:24,
121:17, 122:3,
132:17, 158:20
**shown** [1] - 102:25
**shows** [3] - 22:22,
83:14, 124:1
**sic** [1] - 5:8
**sic)** [1] - 124:22
**side** [36] - 44:14,
44:25, 45:20, 48:6,
48:18, 49:7, 50:12,
51:18, 58:9, 61:6,
61:14, 65:10, 69:8,
69:10, 71:16, 78:2,
83:4, 83:7, 83:16,
84:16, 90:10, 91:1,
91:22, 92:17, 92:19,
94:3, 96:3, 97:3,
97:6, 98:15, 99:8,
102:24, 102:25,

176:9, 188:11
**sign** [4] - 4:9, 15:1,
17:11, 40:7
**signature** [4] - 37:8,
58:1, 137:24, 158:22
**significance** [3] -
110:8, 112:2, 113:24
**significant** [3] - 8:3,
14:12, 172:5
**signing** [2] - 41:14,
151:9
**Silk** [32] - 23:14,
71:16, 73:2, 73:5,
73:7, 73:13, 73:16,
73:17, 74:9, 75:1,
77:5, 77:8, 77:22,
77:25, 78:9, 78:17,
78:22, 78:25, 79:12,
82:5, 83:5, 83:15,
99:19, 173:4,
180:15, 180:21,
180:24, 181:4,
181:8, 181:11
**similar** [2] - 23:10,
71:12
**simple** [3] - 20:6,
114:14, 132:6
**simply** [13] - 16:3,
21:15, 22:15, 31:23,
31:25, 32:14, 47:24,
89:10, 103:13,
129:2, 134:17,
136:14, 159:24
**single** [28] - 41:5,
45:1, 45:20, 45:22,
46:4, 46:12, 46:13,
47:6, 47:7, 47:24,
49:8, 49:15, 50:17,
51:6, 53:5, 53:11,
58:16, 61:8, 68:22,
86:9, 86:13, 141:7,
141:10, 141:12,
177:23, 178:13,
179:7, 189:1
**single-clustering** [1] -
49:15
**single-entity** [17] -
45:1, 45:20, 45:22,
46:4, 46:12, 46:13,
47:6, 47:7, 47:24,
49:8, 50:17, 51:6,
53:5, 58:16, 61:8,
86:9, 86:13
**sit** [3] - 15:4, 28:7,
164:19
**site** [5] - 167:10,
167:11, 173:21,
174:1, 174:10
**sites** [2] - 173:10,
173:18

**sitting** [5] - 28:10,
94:5, 130:4, 130:8,
192:6
**situation** [1] - 17:25
**six** [3] - 88:1, 88:2
**sizes** [1] - 111:25
**skating** [1] - 5:24
**skip** [1] - 162:22
**skipped** [1] - 109:21
**slide** [24] - 39:20,
39:21, 40:4, 42:19,
44:10, 45:22, 47:22,
48:3, 48:24, 49:1,
49:23, 51:2, 53:18,
54:3, 55:13, 56:12,
56:25, 58:6, 58:20,
59:21, 60:25, 61:25,
66:7
**slides** [3] - 65:8,
169:21, 170:4
**slightly** [2] - 113:22,
161:15
**slowing** [1] - 16:10
**small** [2] - 78:3,
172:13
**smaller** [2] - 83:9,
172:9
**smart** [3] - 64:25,
161:16, 161:17
**smooth** [1] - 22:10
**snapshot** [1] - 82:3
**so-called** [1] - 165:11
**soft** [1] - 117:17
**software** [13] - 12:24,
13:4, 14:24, 18:6,
20:15, 27:24, 30:2,
31:25, 53:22, 54:11,
63:22, 115:20,
117:15
**solid** [1] - 131:9
**solutions** [2] - 149:7,
149:8
**someone** [16] - 13:14,
14:5, 21:19, 28:3,
31:15, 41:22, 42:5,
50:15, 52:22, 53:4,
62:20, 86:17, 92:5,
92:13, 110:6, 120:7
**sometimes** [4] - 31:1,
45:17, 46:1, 115:21
**somewhere** [2] - 31:7,
142:20
**soon** [1] - 186:3
**sophistication** [1] -
85:1
**sorry** [34] - 18:10,
53:2, 66:25, 72:15,
72:18, 76:24, 77:1,
78:19, 88:9, 88:11,
99:6, 123:13,

130:17, 137:8,
146:3, 152:4,
155:10, 156:19,
156:20, 156:24,
157:3, 161:6,
166:17, 167:4,
170:4, 175:21,
176:24, 179:18,
180:23, 183:2,
184:11, 184:12,
185:2, 194:13
**sort** [23] - 6:4, 28:20,
53:15, 84:1, 85:9,
85:19, 91:6, 93:9,
119:1, 119:17,
126:1, 129:4, 129:5,
135:22, 140:23,
146:7, 147:25,
150:12, 152:9,
160:13, 166:1,
170:19, 191:20
**sorts** [1] - 135:20
**sound** [4] - 70:4, 70:5,
79:9, 131:9
**sounds** [2] - 29:21,
158:6
**source** [52] - 12:15,
15:15, 16:12, 16:15,
16:21, 16:23, 17:10,
17:14, 18:16, 18:21,
19:1, 19:21, 19:22,
19:23, 20:1, 20:4,
21:3, 21:16, 21:21,
25:4, 25:5, 39:23,
41:3, 43:21, 43:22,
44:1, 48:5, 48:10,
48:12, 48:14, 50:12,
56:14, 60:20, 64:14,
76:17, 87:9, 87:10,
92:13, 98:16,
119:22, 147:14,
148:19, 153:4,
153:8, 153:12,
153:18, 154:1,
161:6, 161:11, 176:7
**source-code** [1] - 25:4
**sources** [8] - 6:25,
7:16, 46:17, 48:23,
50:11, 127:12,
167:9, 172:24
**space** [7] - 17:18,
96:18, 113:7, 136:5,
165:7, 170:5, 170:9
**Spanish** [1] - 36:17
**spanning** [1] - 187:17
**speaking** [8] - 18:10,
68:7, 134:24, 140:1,
146:3, 165:6, 170:3,
172:19
**special** [2] - 6:18,

65:13
**specialized** [2] -
126:5, 136:23
**specific** [8] - 97:13,
114:8, 141:23,
160:18, 172:16,
176:16, 176:22,
194:4
**specifically** [9] -
53:10, 63:13, 70:6,
91:25, 92:7, 137:21,
161:22, 166:25,
176:17
**specificity** [2] - 26:7,
28:21
**speculation** [1] -
109:3
**speculative** [3] -
131:7, 132:12, 134:1
**speeding** [1] - 16:9
**spend** [68] - 19:6,
28:10, 44:19, 46:6,
46:9, 46:15, 47:25,
48:14, 49:5, 52:4,
57:11, 58:2, 60:3,
60:10, 75:9, 75:10,
75:17, 76:24, 77:4,
77:21, 78:1, 82:5,
82:7, 82:10, 83:5,
85:9, 85:11, 95:8,
97:11, 120:24,
123:20, 123:25,
130:7, 140:19,
142:21, 143:2,
143:11, 144:11,
160:23, 162:19,
163:6, 163:7,
163:10, 163:24,
176:11, 177:12,
178:1, 178:21,
179:21, 182:5,
182:7, 182:10,
182:16, 183:1,
183:6, 183:10,
184:4, 184:20,
184:21, 185:1,
185:5, 185:8,
185:11, 185:15,
185:17, 185:21,
187:22
**spending** [13] - 44:18,
58:2, 58:7, 68:21,
79:3, 86:23, 95:7,
143:9, 152:13,
183:25, 184:1, 184:8
**spends** [6] - 48:13,
60:4, 71:17, 87:24,
177:19
**spent** [18] - 44:20,
48:22, 49:16, 52:16,

222

53:12, 56:18, 57:2,
57:3, 60:10, 61:10,
69:24, 75:14, 85:7,
85:11, 85:14, 87:8,
106:21, 140:21
**spidey** [2] - 52:18,
94:23
**split** [1] - 60:15
**spoken** [1] - 168:25
**spot** [1] - 103:20
**spreadsheet** [5] -
100:3, 100:6,
141:10, 141:12,
175:10
**spreadsheets** [4] -
73:19, 141:13,
141:18, 142:8
**squishy** [2] - 95:25,
96:1
**staff** [3] - 36:8, 186:7,
186:12
**stake** [1] - 130:16
**stand** [9] - 9:11, 9:14,
24:2, 25:20, 33:15,
35:19, 101:17,
101:22, 102:20
**stand-alone** [1] -
25:20
**standard** [4] - 5:7,
55:25, 114:18,
115:22
**standards** [7] - 55:23,
56:5, 56:9, 114:8,
134:4, 160:22, 170:1
**standing** [3] - 18:24,
22:7, 22:9
**stands** [2] - 113:6,
152:2
**start** [9] - 18:12, 35:3,
35:4, 71:10, 71:14,
111:3, 114:16,
194:17, 194:25
**started** [1] - 132:7
**starting** [12] - 3:5,
101:2, 108:10,
111:14, 118:9,
118:10, 129:20,
162:24, 163:22,
180:21, 186:17,
187:20
**State** [2] - 35:14,
159:25
**state** [7] - 3:4, 84:6,
138:20, 150:6,
156:2, 177:25,
178:16
**statement** [5] - 10:11,
12:8, 37:10, 139:25,
159:2
**statements** [4] - 9:8,

10:19, 139:5
**STATES** [3] - 1:1, 1:2,
1:8
**states** [5] - 113:2,
117:3, 117:4,
158:23, 185:19
**States** [4] - 1:23, 3:3,
3:7, 36:18
**stating** [3] - 56:21,
117:21, 139:17
**statistic** [1] - 65:3
**statistical** [1] - 64:23
**statistics** [1] - 55:19
**status** [1] - 6:17
**stay** [1] - 186:10
**stenographic** [1] -
196:5
**step** [3] - 42:10, 81:7,
165:10
**steps** [4] - 85:24,
114:6, 165:4, 165:6
**STERLINGOV** [1] - 1:5
**Sterlingov** [28] - 3:3,
3:16, 3:19, 6:16, 7:8,
18:2, 20:12, 33:9,
66:24, 67:6, 67:10,
67:24, 81:8, 81:14,
87:13, 89:20, 90:5,
90:10, 90:15, 90:23,
97:7, 101:4, 106:25,
107:2, 126:12,
128:13, 132:10,
135:2
**Sterlingov's** [9] - 16:5,
84:17, 87:7, 90:9,
98:12, 127:11,
128:22, 130:16,
142:16
**STILL** [3] - 2:3, 34:3,
137:18
**Still** [5] - 33:21, 67:22,
89:17, 138:6, 190:22
**still** [60] - 4:1, 4:3, 4:5,
4:12, 12:14, 13:6,
16:25, 23:1, 23:19,
24:24, 26:7, 33:13,
33:14, 33:19, 34:5,
34:12, 37:20, 38:9,
39:5, 39:11, 39:17,
64:18, 66:17, 68:24,
69:13, 81:19, 85:15,
93:4, 103:14, 104:7,
106:21, 112:16,
116:12, 116:16,
117:20, 124:12,
137:20, 138:10,
138:13, 138:23,
139:2, 140:19,
141:9, 145:11,
145:25, 147:20,

149:17, 153:7,
154:15, 157:3,
158:15, 160:1,
164:21, 165:4,
167:25, 169:16,
171:2, 186:21
**still's** [4] - 12:12,
22:21, 69:9, 69:11
**stock** [1] - 129:17
**stolen** [1] - 56:18
**stop** [6] - 8:11,
190:17, 194:16,
194:19, 194:21,
194:22
**stopped** [2] - 61:4,
76:20
**stopping** [1] - 25:9
**stores** [1] - 161:3
**stories** [1] - 96:17
**straight** [1] - 162:22
**Street** [3] - 1:11, 1:20,
132:3
**stretch** [1] - 8:15
**strike** [1] - 134:12
**struck** [1] - 68:8
**structure** [1] - 63:21
**structuring** [1] - 65:9
**studies** [3] - 47:15,
50:22, 62:6
**Study** [1] - 56:13
**study** [5] - 47:19, 58:4,
65:8, 167:8, 167:9
**stuff** [3] - 17:23, 20:5,
54:1
**subcustomer** [1] -
192:19
**subheader** [2] - 113:1,
116:13
**subject** [5] - 13:15,
14:18, 21:20, 28:8,
138:19
**submit** [10] - 7:4, 31:3,
31:4, 31:22, 40:18,
131:6, 136:6,
136:17, 159:21,
159:22
**submits** [1] - 130:21
**submitted** [4] -
119:24, 145:2,
146:14, 160:8
**subpoena** [11] - 18:20,
19:21, 40:16, 41:10,
42:10, 60:23,
168:11, 168:12,
168:13, 168:16,
191:8
**subpoenas** [2] -
168:1, 190:24
**subreddit** [1] - 172:21
**subsequent** [1] -

160:7
**substance** [2] - 11:25,
145:14
**substantive** [2] -
145:19, 160:7
**sufficient** [1] - 132:17
**sufficiently** [5] -
125:22, 131:15,
154:12, 155:17,
156:5
**suggest** [2] - 50:19,
102:18
**suggested** [5] - 15:2,
15:4, 35:17
**suggestion** [1] - 29:16
**sum** [2] - 83:10,
106:23
**summaries** [1] - 126:2
**summarize** [1] -
122:14
**summary** [3] - 37:5,
37:10, 128:10
**summing** [1] - 83:11
**Superior** [2] - 147:10,
148:14
**supplemental** [4] -
37:5, 111:6, 144:13,
183:22
**support** [3] - 154:20,
154:21, 154:22
**supporting** [1] - 18:5
**suppose** [2] - 102:13,
104:1
**supposed** [1] - 43:9
**surprised** [2] - 102:5,
102:21
**suspect** [1] - 130:12
**suspending** [1] -
85:10
**suspicion** [1] - 96:24
**sustain** [1] - 14:12
**sustained** [1] - 119:13
**sweep** [3] - 106:1,
106:3, 106:4
**switch** [2] - 116:22,
194:23
**switched** [1] - 116:15
**swore** [1] - 159:1
**sworn** [7] - 33:24,
146:14, 146:25,
157:25, 158:4,
158:6, 168:7
**symbol** [1] - 106:14
**system** [1] - 135:22

**T**

**Tab** [6] - 37:1, 37:20,
38:12, 38:18, 69:3,
137:21

**Table** [2] - 111:14,
113:1
**table** [10] - 68:9, 68:12,
111:18, 113:1,
113:22, 183:3,
184:18
**tables** [1] - 182:22
**tailored** [1] - 26:25
**taint** [2] - 6:10, 8:18
**tainting** [3] - 8:4, 8:23,
10:2
**talks** [1] - 63:12
**Tamara** [1] - 1:22,
196:9, 196:9
**TAMARA** [1] - 196:3
**Taproot** [1] - 111:23
**targeting** [1] - 40:14
**teach** [2] - 155:23
**technical** [2] - 57:14,
57:15
**technique** [5] - 95:17,
163:1, 163:4,
163:10, 163:13
**techniques** [1] - 63:11
**technology** [2] -
34:14, 34:18
**teed** [1] - 32:21
**Telegram** [1] - 48:19
**temporal** [1] - 85:18
**ten** [9] - 87:23, 94:20,
166:6, 166:7, 166:8,
166:15, 166:16,
173:17, 186:16
**term** [6] - 41:13, 85:8,
86:2, 86:3, 106:2,
112:6
**termed** [5] - 47:10,
53:24, 85:25, 87:21,
188:9
**terming** [1] - 59:2
**terminology** [1] -
150:14
**terms** [12] - 4:4, 11:15,
14:19, 29:20,
106:23, 111:17,
117:18, 144:8,
151:6, 154:5,
155:20, 155:21
**territory** [1] - 134:1
**terrorism** [8] - 47:16,
49:21, 50:3, 50:16,
51:8, 52:25, 53:6
**terrorist** [1] - 167:11
**test** [8] - 26:10, 26:16,
27:13, 86:6, 86:11,
86:17, 86:23

**testified** [11] - 43:18, 89:22, 141:9, 146:15, 146:22, 146:23, 156:9, 156:17, 156:25, 157:22, 158:6
**testify** [8] - 126:25, 128:13, 133:10, 135:6, 136:14, 146:20, 150:19, 191:3
**testifying** [14] - 109:12, 126:1, 133:22, 134:7, 135:4, 135:12, 136:2, 136:4, 136:22, 143:2, 143:8, 154:8, 154:12, 157:14
**testimony** [50] - 47:12, 49:19, 53:2, 61:22, 63:16, 64:18, 64:21, 72:4, 72:18, 73:23, 76:8, 78:20, 82:10, 83:10, 84:7, 89:22, 90:20, 96:4, 105:25, 106:23, 109:6, 109:18, 111:7, 126:1, 126:5, 126:10, 126:23, 127:19, 127:21, 131:1, 132:24, 133:2, 133:21, 134:21, 135:8, 135:17, 136:11, 136:22, 137:3, 142:24, 144:17, 150:13, 156:4, 156:6, 156:13, 157:25, 158:4, 158:7, 162:8, 195:14
**testing** [1] - 87:3
**testnet** [3] - 86:18, 86:20, 86:22
**texts** [1] - 159:14
**THE** [289] - 1:1, 1:1, 1:8, 3:2, 3:8, 3:11, 3:14, 3:17, 3:20, 4:13, 4:18, 5:3, 5:10, 5:20, 5:24, 7:7, 7:15, 7:21, 7:25, 8:7, 8:20, 8:24, 9:4, 9:12, 9:14, 9:21, 10:3, 11:14, 11:22, 11:24, 13:6, 14:2, 15:2, 15:13, 15:17, 15:23, 16:7, 16:13, 18:8, 18:24, 19:8, 19:24, 20:21, 20:25, 22:5, 22:15, 22:24, 23:15, 24:9,

25:5, 25:12, 26:3, 27:8, 28:14, 29:2, 29:10, 29:16, 29:23, 30:6, 30:14, 31:3, 31:9, 32:3, 32:9, 32:17, 33:7, 33:12, 33:18, 33:22, 33:25, 34:1, 34:8, 34:10, 37:17, 38:5, 38:25, 39:13, 39:14, 42:4, 42:8, 42:12, 42:13, 42:15, 46:3, 46:7, 46:8, 46:10, 46:11, 46:13, 46:15, 46:17, 46:21, 47:21, 48:1, 48:2, 48:3, 49:24, 50:5, 50:7, 50:8, 50:14, 50:17, 50:19, 50:21, 50:23, 50:25, 51:1, 51:2, 62:5, 62:8, 62:11, 62:13, 62:14, 62:16, 62:20, 63:5, 63:19, 63:20, 64:1, 64:3, 64:6, 64:7, 65:14, 65:15, 66:2, 66:3, 66:12, 66:15, 66:25, 67:13, 67:19, 69:4, 69:7, 70:23, 72:14, 72:16, 75:8, 77:16, 79:16, 80:2, 80:4, 80:6, 80:8, 80:13, 80:16, 80:18, 80:19, 80:22, 81:1, 81:4, 81:13, 81:16, 84:25, 85:5, 85:6, 85:8, 85:18, 85:20, 85:21, 88:11, 88:22, 88:25, 89:2, 89:7, 89:8, 89:9, 89:14, 89:15, 92:22, 93:16, 93:21, 94:9, 94:10, 101:19, 102:3, 102:13, 103:4, 103:18, 107:24, 108:3, 108:5, 108:12, 109:8, 110:24, 116:9, 119:13, 122:22, 122:25, 123:7, 123:9, 123:11, 123:13, 123:14, 123:17, 123:18, 123:21, 123:22, 123:23, 123:25, 124:3, 124:4, 124:6, 124:7, 124:9, 124:10, 124:16, 124:20, 125:1, 125:4, 125:15, 125:20, 126:9, 126:16,

126:24, 127:2, 127:6, 127:9, 127:13, 127:16, 127:19, 128:2, 128:11, 128:18, 128:21, 128:22, 128:25, 129:9, 129:25, 130:17, 130:23, 131:13, 131:18, 131:21, 132:15, 133:5, 133:13, 133:16, 134:12, 135:5, 135:9, 135:24, 136:20, 137:6, 137:11, 137:15, 138:1, 138:4, 138:15, 138:20, 138:22, 138:25, 149:23, 149:25, 158:10, 158:12, 164:12, 164:17, 165:1, 167:20, 167:22, 170:16, 170:21, 170:25, 177:10, 177:11, 178:25, 180:7, 182:19, 186:1, 186:6, 186:12, 186:15, 187:11, 187:13, 190:19, 193:11, 193:20, 193:23, 194:1, 194:7, 194:10, 194:13, 194:16, 194:21, 194:24, 195:9, 195:11, 195:18, 195:23
**theft** [11] - 36:6, 56:15, 56:22, 56:23, 58:18, 58:19, 58:21, 59:23, 60:12, 60:20, 96:25
**thefts** [1] - 40:23
**theirs** [1] - 7:24
**themselves** [7] - 4:24, 25:23, 26:1, 60:7, 175:10, 180:13, 192:23
**then-CEO** [1] - 156:8
**therefore** [5] - 42:14, 48:22, 52:2, 68:19, 163:9
**they've** [7] - 13:2, 30:16, 44:22, 48:22, 74:16, 111:17, 112:21
**thin** [1] - 5:24
**thinking** [4] - 14:20, 43:24, 62:17, 95:17
**thinks** [1] - 170:9

**third** [3] - 44:7, 113:21, 160:20
**third-party** [1] - 44:7
**thoughts** [1] - 68:6
**thousand** [2] - 5:14, 6:5
**thousands** [3] - 36:6, 141:5, 175:25
**three** [15] - 9:16, 9:21, 9:22, 19:17, 28:18, 31:1, 57:2, 60:11, 65:17, 68:8, 92:8, 105:17, 124:2, 143:7, 165:6
**threshold** [3] - 55:7, 55:22, 130:24
**throughout** [1] - 44:4
**thrown** [1] - 100:20
**ticking** [1] - 8:16
**tickled** [1] - 94:23
**tied** [4] - 52:5, 78:11, 166:14, 192:22
**ties** [4] - 52:25, 70:1, 147:12, 148:16
**timeline** [1] - 8:10
**timely** [1] - 193:19
**timing** [2] - 9:16, 101:23
**titled** [1] - 147:9
**today** [14] - 3:21, 11:5, 65:2, 83:25, 103:17, 103:19, 103:20, 109:13, 125:18, 152:20, 162:5, 162:6, 186:4, 194:20
**today's** [1] - 39:1
**together** [14] - 44:18, 44:20, 45:16, 48:22, 54:10, 65:16, 65:22, 68:7, 95:7, 95:9, 106:21, 141:11, 150:24, 163:25
**token** [2] - 110:12
**tokens** [1] - 149:11
**tomorrow** [14] - 99:25, 124:24, 125:16, 125:19, 133:15, 186:9, 186:17, 193:13, 193:21, 194:1, 194:17, 194:22, 195:1, 195:23
**tonight** [2] - 186:8, 186:16
**took** [4] - 19:17, 36:2, 72:9, 96:7
**tool** [23] - 39:25, 41:20, 43:7, 44:17, 45:11, 50:10, 50:18, 53:8, 54:4, 54:5,

58:9, 58:17, 77:12, 83:18, 84:22, 101:9, 104:23, 106:10, 140:5, 147:23, 170:12
**tools** [5] - 44:12, 140:5, 163:12, 169:14, 170:13
**top** [17] - 44:20, 49:1, 56:13, 71:7, 71:12, 75:1, 82:20, 111:10, 118:9, 121:23, 149:4, 157:4, 159:11, 181:1, 182:13, 184:18, 190:3
**topic** [1] - 179:4
**tor** [1] - 3:15
**TOR** [1] - 1:18
**Tor** [1] - 1:19
**total** [8] - 49:3, 57:2, 57:3, 61:3, 83:6, 140:21, 181:6, 182:17
**totally** [3] - 91:22, 140:17, 142:1
**touch** [5] - 44:21, 52:6, 141:7, 141:8, 160:5
**trace** [66] - 40:9, 42:10, 51:19, 51:21, 53:1, 54:3, 54:16, 55:13, 55:21, 56:16, 58:20, 60:15, 61:7, 68:20, 69:17, 70:3, 71:16, 72:7, 74:19, 74:21, 76:9, 77:21, 78:5, 78:7, 79:8, 79:10, 79:11, 82:6, 82:8, 82:15, 83:21, 84:19, 84:21, 85:12, 87:1, 90:18, 91:13, 91:22, 92:12, 92:16, 93:5, 93:10, 96:3, 97:4, 97:7, 97:10, 98:8, 98:13, 99:5, 99:9, 101:1, 101:7, 101:11, 101:24, 102:12, 104:11, 105:14, 106:16, 107:7, 143:12, 156:17, 157:1, 157:15, 159:16, 160:10, 160:24
**trace-through** [2] - 97:7, 97:10
**traceable** [2] - 56:23, 60:20
**traced** [9] - 55:18, 60:11, 76:16, 96:2,

97:4, 97:20, 99:3, 99:7, 171:11
**traces** [7] - 46:20, 55:24, 76:20, 104:23, 140:25, 174:14, 175:4
**Tracing** [1] - 35:20
**tracing** [21] - 23:6, 36:10, 46:2, 51:5, 55:17, 69:23, 76:23, 94:12, 95:25, 101:17, 103:9, 103:16, 146:10, 146:11, 146:16, 152:5, 154:16, 154:19, 154:25, 155:21, 171:15
**track** [1] - 62:23
**tracking** [1] - 85:7
**trade** [1] - 34:19
**trafficking** [2] - 173:15, 173:22
**trail** [4] - 41:4, 43:13, 43:19, 44:5
**train** [2] - 36:12, 36:13
**training** [10] - 35:21, 35:24, 36:15, 36:16, 36:18, 36:24, 45:14, 80:20, 81:2, 81:7
**trainings** [1] - 155:9
**transacted** [1] - 94:20
**transaction** [87] - 47:9, 53:19, 53:25, 58:13, 58:14, 58:23, 58:25, 59:1, 59:2, 59:7, 59:22, 60:5, 60:6, 60:9, 60:14, 61:4, 68:22, 69:20, 71:19, 71:22, 72:5, 72:6, 72:19, 74:17, 75:15, 75:20, 75:21, 76:13, 76:15, 78:21, 78:22, 79:6, 82:11, 82:12, 82:17, 82:21, 82:25, 83:11, 83:13, 83:16, 83:18, 85:19, 86:1, 86:6, 87:3, 87:21, 90:11, 90:16, 91:1, 92:19, 93:6, 93:17, 94:17, 98:6, 98:16, 98:21, 98:22, 99:2, 100:19, 101:8, 101:11, 104:19, 105:2, 105:6, 105:24, 106:1, 106:3, 106:4, 107:13, 108:22, 113:8, 117:5, 117:7, 117:22, 118:20, 149:15, 160:24,

163:8, 164:4, 164:5, 184:1
**transactional** [4] - 68:16, 76:18, 84:1, 91:16
**transactions** [58] - 36:10, 44:15, 61:11, 62:6, 62:24, 63:2, 63:3, 65:4, 69:19, 70:15, 77:9, 78:11, 78:12, 84:5, 84:8, 84:24, 86:17, 87:23, 93:1, 93:7, 93:18, 95:12, 97:14, 97:20, 97:21, 99:24, 109:23, 113:7, 113:9, 118:16, 119:6, 122:5, 122:20, 123:15, 124:1, 128:15, 151:10, 151:11, 157:1, 161:12, 163:4, 163:5, 163:7, 164:3, 165:23, 165:25, 166:9, 166:13, 172:1, 172:4, 172:6, 181:4, 181:5, 181:7, 181:11, 183:25, 184:8
**transcript** [2] - 196:4, 196:6
**TRANSCRIPT** [1] - 1:7
**transcripts** [2] - 7:2, 7:11
**transfer** [1] - 163:16
**transferred** [5] - 163:8, 163:14, 163:16, 181:7, 181:19
**transforms** [1] - 149:14
**translating** [1] - 5:20
**translators** [1] - 30:17
**transparency** [1] - 27:10
**travel** [1] - 143:4
**traveled** [2] - 156:22, 156:25
**Treasury** [2] - 126:20, 134:23
**tree** [2] - 59:8, 59:17
**trial** [35] - 5:9, 5:11, 5:12, 6:6, 7:5, 9:17, 15:3, 19:11, 22:8, 28:18, 29:5, 30:13, 101:24, 102:5, 102:7, 103:21, 103:24, 125:6, 125:13, 132:15,

132:25, 141:16, 141:23, 141:24, 141:25, 142:1, 142:22, 142:24, 143:7, 143:9, 144:6, 144:17, 146:22, 146:23, 160:2
**trials** [1] - 146:15
**tried** [2] - 30:22, 93:12
**triggered** [2] - 185:5, 185:21
**triple** [1] - 26:13
**triple-counts** [1] - 26:13
**TRM** [1] - 169:13
**troubling** [1] - 26:19
**true** [34] - 30:14, 30:18, 47:8, 58:3, 70:14, 71:22, 73:15, 75:13, 82:13, 82:17, 82:25, 83:18, 83:21, 84:1, 84:4, 84:8, 91:9, 94:25, 99:21, 99:23, 100:25, 109:12, 109:21, 130:23, 139:17, 139:18, 149:17, 164:18, 171:5, 184:24, 188:25, 196:4, 196:5
**truest** [1] - 44:15
**trumping** [1] - 14:1
**trusted** [1] - 149:13
**truth** [3] - 158:24, 159:1, 159:3
**try** [4] - 9:14, 88:24, 91:24, 95:23
**trying** [13] - 14:3, 63:1, 75:11, 84:3, 89:10, 106:18, 109:15, 115:4, 116:23, 141:21, 144:9, 161:19, 193:20
**Tuesday** [7] - 21:7, 21:9, 80:11, 80:24, 80:11, 80:16, 81:3
**turn** [4] - 11:5, 37:20, 149:3, 190:24
**turned** [1] - 25:5
**turning** [13] - 21:15, 118:1, 118:8, 130:3, 131:25, 137:24, 145:25, 148:25, 163:22, 167:7, 181:25, 183:20, 187:16
**turns** [1] - 52:17
**tweets** [1] - 10:21
**twice** [1] - 55:16
**Twitter** [7] - 5:14, 6:5,

6:8, 8:18, 8:19, 48:19, 146:12
**two** [49] - 3:22, 19:17, 22:20, 24:6, 28:10, 28:14, 31:1, 33:3, 34:18, 39:22, 48:25, 49:8, 49:14, 50:3, 54:16, 55:18, 55:21, 58:8, 60:11, 60:15, 60:23, 61:8, 65:15, 65:16, 68:8, 75:23, 78:1, 78:4, 84:18, 92:8, 93:13, 93:14, 96:6, 96:10, 96:23, 99:4, 99:16, 108:21, 112:19, 114:6, 119:6, 170:7, 177:5, 182:22, 184:15, 184:18, 194:9, 195:4
**two-Bitcoin** [1] - 93:14
**Tx10** [1] - 107:13
**tying** [1] - 87:20
**type** [16] - 42:21, 45:18, 47:4, 49:2, 55:25, 57:13, 59:16, 64:19, 67:25, 74:12, 95:19, 110:12, 115:25, 117:20, 117:24, 146:15
**types** [13] - 55:23, 64:23, 65:3, 95:13, 98:19, 105:11, 105:13, 111:16, 111:20, 112:3, 112:12, 142:25, 163:3
**typical** [2] - 47:2, 100:8
**typically** [4] - 53:21, 86:2, 98:24, 150:18
**typo** [7] - 74:10, 74:11, 74:20, 114:3, 116:6, 116:7, 118:17
**typos** [1] - 74:12

# U

**U.S** [6] - 1:13, 4:9, 5:21, 35:14, 36:20, 181:17
**u.S** [1] - 1:16
**ultimate** [2] - 160:25, 161:8
**ultimately** [4] - 52:21, 126:22, 191:23, 192:18
**unable** [1] - 73:8
**unattributed** [1] - 106:21

**unauthorized** [2] - 41:16, 41:21
**unclear** [3] - 16:22, 43:21, 142:23
**uncluster** [1] - 184:3
**unclustered** [12] - 176:11, 177:11, 177:19, 178:1, 178:20, 182:5, 182:10, 183:1, 184:21, 184:25, 185:5, 187:22
**uncompressed** [11] - 105:9, 111:24, 112:16, 112:20, 113:23, 115:16, 115:21, 116:16, 116:22, 117:1
**under** [32] - 9:7, 13:5, 16:4, 16:17, 18:13, 20:20, 21:23, 23:11, 27:17, 27:23, 55:22, 71:4, 96:20, 113:1, 116:13, 127:20, 133:9, 144:24, 145:7, 148:14, 150:18, 151:15, 151:18, 158:23, 160:20, 163:2, 164:1, 170:1, 180:24, 182:10, 183:23, 188:3
**underestimate** [1] - 28:14
**underlying** [1] - 153:8
**underneath** [2] - 187:22, 190:4
**understandable** [1] - 174:23
**understatement** [1] - 109:8
**understood** [5] - 28:13, 33:11, 77:18, 109:1, 186:19
**unfair** [1] - 22:17
**unfortunately** [3] - 36:5, 73:7, 79:24, 186:15
**unhosted** [6] - 75:17, 75:23, 76:2, 76:4, 106:7, 106:9
**unique** [4] - 59:6, 101:18, 101:20, 149:13
**unit** [2] - 111:25, 113:22
**UNITED** [3] - 1:1, 1:2, 1:8
**United** [4] - 1:23, 3:3, 3:7, 36:18

**unknown** [3] - 52:4, 84:14, 89:18
**unless** [6] - 26:20, 30:20, 49:24, 65:24, 91:20, 170:11
**unlike** [1] - 17:20
**unlikely** [1] - 55:20
**unnamed** [1] - 46:18
**unpack** [2] - 92:15, 139:16
**unpaid** [3] - 35:5, 35:7, 36:2
**unprofessional** [1] - 8:7
**unreasonable** [1] - 88:20
**unreliable** [4] - 131:2, 131:15, 132:18
**unsafe** [1] - 159:15
**unspent** [6] - 47:9, 60:8, 60:9, 85:2, 85:7, 160:23
**unverified** [3] - 40:20, 41:16, 44:7
**up** [83] - 4:18, 6:9, 6:17, 7:25, 8:17, 8:22, 11:4, 11:11, 12:20, 13:19, 16:9, 17:23, 21:3, 21:10, 23:10, 28:4, 29:11, 29:23, 32:21, 34:5, 37:3, 37:21, 39:12, 40:7, 41:14, 42:10, 44:13, 46:18, 52:19, 54:21, 54:22, 55:4, 56:19, 59:20, 69:4, 69:17, 71:7, 71:11, 71:18, 71:20, 71:22, 73:24, 75:19, 77:11, 78:14, 78:25, 79:1, 81:8, 83:10, 83:11, 86:8, 88:11, 88:15, 91:16, 94:18, 96:13, 97:5, 98:6, 105:18, 106:23, 107:18, 114:6, 115:9, 116:1, 121:23, 127:5, 129:4, 129:16, 132:11, 137:13, 141:3, 141:20, 150:23, 151:9, 152:25, 164:15, 174:6, 174:21, 175:5, 181:16, 191:16, 194:11, 194:23
**update** [2] - 117:16, 160:14
**updated** [1] - 40:19
**upwards** [1] - 178:9

**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**useful** [5] - 68:6, 104:22, 115:3, 153:14, 153:16
**User** [1] - 72:22
**user** [29] - 40:14, 41:17, 42:2, 44:7, 52:3, 54:10, 63:22, 72:22, 72:23, 73:1, 73:8, 74:1, 74:4, 74:5, 74:6, 74:9, 77:8, 79:13, 95:24, 100:12, 100:20, 109:25, 141:15, 163:9, 163:10, 163:19
**user's** [1] - 141:17
**users** [18] - 45:15, 52:3, 55:9, 55:10, 55:12, 65:15, 65:18, 92:10, 100:9, 100:14, 113:11, 141:14, 148:23, 172:24, 173:10, 173:25, 174:3, 174:9
**users'** [1] - 73:8
**uses** [10] - 45:20, 59:8, 61:20, 113:22, 114:10, 148:1, 150:7, 154:19, 163:24, 164:2
**usual** [3] - 130:1, 142:19, 143:23
**utilized** [7] - 51:5, 52:25, 53:7, 92:10, 95:17, 160:22, 161:6
**utilizes** [1] - 45:19
**utilizing** [2] - 41:23, 95:14
**UTXO** [8] - 58:22, 60:8, 68:21, 77:11, 84:20, 85:2, 85:8, 85:15
**UTXOs** [6] - 47:10, 49:16, 53:10, 60:7, 61:10, 85:13

### V

**V1V2** [1] - 120:6
**validate** [1] - 167:12
**validates** [1] - 149:12
**validation** [3] - 43:5, 43:16, 152:18
**validity** [1] - 11:17
**valuation** [4] - 131:19, 131:25, 132:8, 133:2
**valuations** [2] - 131:6, 131:24

**value** [10] - 129:3, 129:11, 129:14, 129:15, 129:22, 129:23, 132:21, 152:23, 181:14, 181:17
**values** [1] - 131:9
**valuing** [4] - 129:7, 130:12, 131:9, 131:14
**various** [5] - 127:4, 147:18, 148:22, 149:18, 181:19
**VASP** [1] - 61:7
**VASPs** [1] - 149:16
**vegetable** [1] - 97:18
**vendor** [3] - 32:4, 32:14, 44:7
**vendors** [5] - 13:22, 17:18, 32:12, 173:2, 173:18
**venture** [1] - 132:12
**veracity** [1] - 149:12
**verification** [1] - 43:14
**verified** [3] - 40:14, 164:6, 176:15
**verifies** [1] - 58:1
**verify** [13] - 27:23, 41:2, 41:3, 42:17, 43:7, 53:11, 62:9, 70:14, 82:24, 83:17, 88:6, 93:24, 165:16
**Verret** [3] - 64:4, 64:10, 145:18
**Verret's** [1] - 133:2
**versions** [2] - 142:2, 142:4
**versus** [4] - 62:7, 65:14, 85:7, 88:12
**via** [13] - 40:15, 44:19, 48:14, 48:15, 51:8, 54:10, 68:20, 120:24, 121:3, 171:23, 176:21, 177:12, 179:20
**video** [1] - 102:19
**Video** [6] - 173:21, 173:25, 174:3, 174:9, 174:16, 175:3
**view** [7] - 28:2, 44:9, 77:11, 104:24, 122:23, 122:24, 144:4
**viewing** [1] - 150:11
**Vinnik** [2] - 96:20
**violate** [1] - 5:2
**violated** [1] - 10:17
**violates** [1] - 10:20
**violation** [4] - 6:23, 9:10, 10:23, 135:3

**Virtual** [1] - 149:16
**virtual** [1] - 165:13
**Virwox** [9] - 76:19, 76:25, 77:4, 77:7, 77:13, 77:22, 77:24, 82:9
**visit** [1] - 4:4
**visits** [1] - 4:2
**visual** [3] - 61:24, 68:24, 115:4
**visualize** [1] - 84:19
**Vlahakis** [15] - 125:23, 126:2, 126:17, 127:18, 127:25, 133:14, 133:15, 133:16, 133:19, 134:6, 134:18, 135:3, 135:11, 135:25, 136:9
**Vlahakis's** [1] - 135:17
**Volkswagen** [1] - 88:14
**volume** [1] - 172:5
**vouchers** [5] - 6:24, 19:12, 19:13
**vs** [1] - 1:4

### W

**wait** [4] - 9:17, 10:24, 31:1, 184:16
**walk** [5] - 27:5, 28:9, 46:3, 101:7, 102:19
**walk-through** [1] - 27:5
**walker** [1] - 81:12
**Wall** [2] - 1:20, 132:3
**wallet** [20] - 51:5, 54:11, 57:8, 63:15, 63:22, 70:14, 88:8, 90:3, 95:22, 95:24, 115:20, 117:15, 121:20, 122:7, 156:18, 188:9, 188:13, 188:23, 190:12, 192:6
**Wallet** [9] - 56:18, 56:19, 63:18, 63:20, 70:7, 70:13, 90:6, 90:9, 106:18
**wallet-based** [1] - 51:5
**WalletExplorer** [1] - 44:17
**wallets** [5] - 40:10, 88:5, 90:9, 107:6, 151:13
**wants** [5] - 6:16, 7:8, 19:25, 67:14, 102:20
**warrant** [3] - 169:2,

169:3, 169:4
**Wasabi** [9] - 55:3, 55:4, 55:6, 55:18, 63:13, 63:14, 64:13, 64:14, 65:5
**Washington** [6] - 1:5, 1:12, 1:14, 1:17, 1:24, 196:11
**watching** [1] - 65:25
**ways** [5] - 5:20, 6:9, 116:1, 130:7, 172:17
**weapons** [1] - 35:14
**wear** [1] - 72:12
**web** [5] - 40:11, 40:13, 71:21, 120:9, 157:1
**website** [4] - 10:22, 40:22, 157:23, 157:24
**websites** [4] - 6:8, 6:9, 67:4, 120:15
**Wednesday** [2] - 80:23, 81:3
**week** [5] - 7:24, 9:17, 19:11, 36:25, 144:9
**weekends** [1] - 143:17
**weekly** [2] - 147:19, 148:23
**weeks** [10] - 9:16, 15:3, 15:4, 18:10, 18:15, 19:18, 28:18, 29:4, 31:1, 143:7
**weighted** [1] - 23:2
**weighting** [1] - 26:8
**Welcome** [6] - 173:21, 173:24, 174:3, 174:9, 174:16, 175:3
**welcome** [5] - 66:3, 116:8, 132:25, 133:4, 138:17
**well-documented** [2] - 18:5, 43:12
**whatsoever** [2] - 20:14, 126:7
**whereas** [1] - 150:18
**whole** [6] - 4:7, 6:21, 92:24, 93:2, 165:19, 176:14
**willing** [2] - 15:1, 17:11
**wish** [1] - 93:21
**wishes** [1] - 14:15
**withdraw** [2] - 7:9, 29:22
**withdrawal** [11] - 77:13, 77:24, 78:15, 79:12, 84:17, 84:18, 87:7, 99:16, 151:13, 190:12
**withdrawals** [5] - 91:18, 91:24, 95:24,

97:21, 120:10
**witness** [34] - 8:5,
10:2, 11:9, 11:10,
33:24, 37:6, 92:23,
95:13, 101:22,
109:13, 113:6,
113:13, 113:16,
116:5, 117:8,
117:24, 118:7,
124:15, 126:3,
130:2, 130:11,
134:10, 135:25,
136:12, 137:14,
142:19, 156:9,
195:2, 195:5,
195:12, 195:19
**WITNESS** [51] - 2:2,
42:8, 42:13, 46:7,
46:10, 46:13, 46:17,
48:1, 48:3, 50:5,
50:8, 50:17, 50:21,
50:25, 51:2, 62:8,
62:13, 62:16, 63:5,
63:20, 64:3, 64:7,
65:15, 66:3, 69:4,
69:7, 70:23, 75:8,
85:5, 85:8, 85:20,
88:22, 89:2, 89:8,
89:14, 93:21, 94:10,
108:3, 122:25,
123:9, 123:13,
123:17, 123:21,
123:23, 124:3,
124:6, 124:9, 138:4,
138:20, 138:25,
177:11
**Witness** [1] - 111:22
**witness's** [1] - 109:6
**witnesses** [10] - 3:22,
11:5, 12:14, 101:16,
124:24, 126:11,
127:18, 127:20,
129:1, 130:22
**wonder** [1] - 53:14
**Word** [1] - 51:23
**word** [6] - 9:14, 27:11,
72:14, 75:23,
150:11, 174:23
**worded** [1] - 191:14
**words** [3] - 9:11,
27:16, 106:17
**workbooks** [1] -
100:13
**works** [13] - 19:10,
19:15, 32:7, 39:25,
43:7, 48:17, 80:7,
80:24, 93:18,
136:24, 143:16,
147:23, 161:15
**world** [2] - 147:13,

148:17
**worried** [1] - 130:3
**worry** [1] - 129:1
**worth** [2] - 172:11,
181:7
**WPKH** [1] - 117:6
**wrapped** [2] - 117:12,
117:23
**write** [7] - 21:2, 24:16,
138:8, 162:15,
162:16, 164:8,
168:12
**writing** [2] - 72:25,
73:2
**written** [3] - 60:21,
118:18, 167:16
**wrote** [4] - 38:9, 73:4,
74:3, 78:9

## Y

**Yahoo** [1] - 132:2
**year** [2] - 18:13, 139:3
**years** [2] - 13:17, 89:6
**yellow** [1] - 58:24
**yellow/orange** [1] -
104:16
**York** [3] - 1:17, 1:20,
159:25
**you-all** [1] - 11:11
**yourself** [2] - 10:6,
138:6

## Z

**zero** [3] - 57:4, 180:15,
183:25
**zeros** [2] - 114:22,
184:8
**zoom** [1] - 72:23
**Zoom** [1] - 22:3