```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2
        UNITED STATES OF AMERICA,      ) Criminal Action
 3                                     ) No. 1:21-CR-0399
                        Plaintiff,     )
 4                                     ) CONTINUED MOTIONS
        vs.                            ) HEARING
 5                                     )
        ROMAN STERLINGOV,              ) Washington, D.C.
 6                                     ) August 23, 2023
                        Defendant.     ) Time:  10:05 A.M.
 7
                TRANSCRIPT OF CONTINUED MOTIONS HEARING
 8           BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                    UNITED STATES DISTRICT JUDGE
 9
                      A P P E A R A N C E S
10
        For the Plaintiff:      CHRISTOPHER BROWN
11                              USAO-DOJ
                                601 D Street, NW
12                              Washington, DC 20001

13                              ALDEN PELKER
                                U.S. Department of Justice
14                              950 Pennsylvania Avenue, NW
                                Washington, DC 20530
15
                                JEFFREY PEARLMAN
16                              DOJ-CRM
                                U.S. Department of Justice
17                              1301 New York Ave. NW
                                Washington, DC 20005
18
        For the Defendant:      TOR EKELAND
19                              Tor Ekeland Law, PLLC
                                30 Wall Street, 8th Floor
20                              New York, NY 10005

21
        Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
22                              Official Court Reporter
                                United States Courthouse, Room 6714
23                              333 Constitution Avenue, NW
                                Washington, DC  20001
24                              202-354-3246

25
```

1                              <u>I N D E X</u>

2

**WITNESS**                                                  **PAGE**

3

        **JONELLE STILL (CONTINUED)**

4

        Cross-Examination - Continued

5        By Ms. Pelker                                        230

6        Redirect Examination
         By Mr. Ekeland                                       294

7

8        **VALERIE MAZARS de MAZARIN**

9        Direct Examination
         By Ms. Pelker                                        317

10

         Cross-Examination

11       By Mr. Ekeland                                       345

12

         **EXHIBITS ADMITTED**                               **PAGE**

13

14       Government Exhibit 22                                263

15       Government Exhibit 23                                263

16       Government Exhibit 24                                263

17       Government Exhibit 25                                263

18       Government Exhibit 26                                263

19       Government Exhibit 27                                293

20       Government Exhibit 1                                 324

21       Government Exhibit 2                                 342

22

23

24

25

```
 1                    P R O C E E D I N G S

 2          THE COURTROOM DEPUTY:  Criminal Case No. 21-399,

 3   United States of America v. Roman Sterlingov.

 4          Would counsel please approach the podium, state their

 5   name for the record, starting with government counsel.

 6          MS. PELKER:  Good morning, Your Honor.  Alden Pelker

 7   for the United States.

 8          THE COURT:  Good morning.

 9          MR. BROWN:  Good morning.  Christopher Brown for the

10   United States.

11          THE COURT:  Good morning.

12          MR. PEARLMAN:  And Jeff Pearlman from the United

13   States.  Good morning, Your Honor.

14          THE COURT:  Good morning.

15          MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland

16   for Defendant Roman Sterlingov, who is present in court.

17          THE COURT:  All right.  Good morning to both of you

18   as well.

19          So let's continue.  I did want to mention one thing

20   just for your time management today, which is that I have a

21   2:00 matter, which shouldn't take terribly long, but I'll need

22   15 or 20 minutes for another matter at 2:00 today.

23          All right.  The witness can take the stand again.

24   Ms. Pelker, you may continue.

25          MS. PELKER:  Thank you, Your Honor.
```

```
 1                    CROSS-EXAMINATION CONTINUED OF

 2                             JONELLE STILL

 3    BY MS. PELKER:

 4    Q.  Good morning, Ms. Still.

 5    A.  Good morning, Ms. Pelker.

 6    Q.  I'd like to direct your attention to Mr. Scholl's report,

 7    which is Exhibit 19 in the binder in front of you.  Can you

 8    turn to page 49.

 9              Is that the tracing that you criticized yesterday

10    showing the transfer of funds from Mr. Sterlingov's account

11    into Bitcoin Fog.

12    A.  May I have one moment.  The binder is kind of coming apart

13    here.

14    Q.  No problem.  Let us know if you need help with the binder.

15    A.  Okay.  Page 49?

16    Q.  Page 49 of Exhibit 19.

17    A.  We're not able to pull this up on the video at all?

18    Q.  We don't have it hooked up on the screen.

19              I'm just asking whether this is the chart that you

20    were talking about yesterday.

21    A.  This is the deposit into the -- well, the first-known

22    deposit to Bitcoin Fog, yes.

23    Q.  And on pages 50, 51, 52 of Mr. Scholl's report, in addition

24    to the chart, he includes the details of each transaction with

25    the hash, the input, the output, the amount; is that right?
```

1    A.  He does.

2    Q.  Turning back to page 49, at the bottom right-hand side of

3    the chart -- and I know that this is small here -- does it show

4    a deposit on November 10th of 2011 into what Mr. Scholl labels

5    as a Bitcoin Fog address 1YZJKa?

6    A.  I think you're referring to Transaction 10.

7    Q.  Yes, that would be correct.

8    A.  So I'm going to just flip over here, if you don't mind.

9    Okay.

10          So the question is, is there a deposit into Bitcoin

11   Fog on -- he doesn't have a date in his.

12   Q.  But he has a block.

13   A.  He didn't include the dates in here.  Hang on one second.

14   I think that says November 10, 2011.  Sorry.  It's like -- it's

15   small.

16   Q.  I understand.  I know that you had the chance to review

17   this on -- in a larger PDF when you did your report, correct?

18   A.  (Nodding head.)

19   Q.  Going back to now page 28 of your report -- that's

20   Exhibit 10 -- the last entry in the chart --

21   A.  Sorry.  Where -- where am I?

22   Q.  Exhibit 10.

23   A.  Exhibit 10.

24   Q.  Page 28.

25   A.  Yes, I am here.

1    Q.  In the last full line of that chart -- so not the line with

2    total, but the last one with the Bitcoin address in it -- is

3    that showing an address 1YZJKa?

4    A.  Yes.

5    Q.  And is that the same address from the deposit in

6    Mr. Scholl's chart?

7    A.  Yes.

8    Q.  And how does CipherTrace categorize that address, according

9    to your chart in your report?

10   A.  Bitcoin Fog.

11   Q.  You testified yesterday that you agree that the deposit

12   into 1YZJKa is the first-known Bitcoin Fog deposit; is that

13   right?

14   A.  As earliest as I could determine.

15   Q.  Do you agree that Bitcoin Fog did use consolidation

16   addresses to collect and then subsequently commingle user

17   deposits?

18   A.  We would call these -- I believe deposit addresses is the

19   term.

20   Q.  So you would have deposit addresses.  Did they then use

21   consolidation addresses to group user deposit --

22   A.  This is a different -- this is different than that.  No,

23   ma'am.

24   Q.  I'm not asking about this address specifically.  I'm just

25   asking, isn't it true that Bitcoin Fog did use consolidation

```
 1    addresses as part --

 2    A.  Deposit addresses.

 3            THE COURT REPORTER:  Can you please wait until the

 4    question is finished before you respond.  Thank you.

 5            THE WITNESS:  Yeah.  Sorry.

 6    BY MS. PELKER:

 7    Q.  They use deposit addresses.  Didn't they also, in fact, use

 8    consolidation addresses?

 9    A.  Can you please define what you mean by consolidation

10    address.

11    Q.  Well, why don't we turn to the bottom of page 38 of your

12    report.

13    A.  Here it says, "CipherTrace compiled the following chart

14    showing all received transactions for the likely internal

15    consolidation address for Bitcoin Fog 1YZJKa."

16            Is that what you wrote in your report?

17    A.  I believe that was a quote from Mr. Scholl, yes.  Sorry, I

18    don't think that was quoted properly.

19            But that's referring to Mr. Scholl's report.  In his

20    determination this could be an internal consolidation address,

21    which I don't necessarily disagree with, but I have no way of

22    verifying.

23    Q.  So you're saying you don't -- it could be a consolidation

24    address, but you haven't made your assessment?

25    A.  I really need those internal records from Bitcoin Fog in
```

1    order to properly determine that.

2    Q.  We would love for the defendant to turn over the ledgers

3    for Bitcoin Fog servers, but the government doesn't have them

4    either.

5                MR. EKELAND:  Objection.  Objection.

6                THE COURT:  I think both sides are doing this,

7    frankly.  I think the witness is being argumentative about

8    this, and the question was argumentative.

9                So I think the fault lies on both sides.  You're both

10    playing the same game.

11                MS. PELKER:  Withdrawn, Your Honor.

12                THE COURT:  I understand the point, though.

13    BY MS. PELKER:

14    Q.  Did CipherTrace, in fact, compile a chart showing those

15    transactions as described?

16    A.  If you mean the Inspector trace?

17    Q.  The -- so on the bottom of page 38, it says, "CipherTrace

18    compiled the following chart showing the transactions for the

19    likely internal consolidation address for Bitcoin Fog 1YZJKa."

20    A.  Yes.

21    Q.  Did you create a chart showing those transfers?

22    A.  I exported the chart from Inspector.

23    Q.  And is that somewhere in this report?

24    A.  No.

25    Q.  Has it been provided to the government in discovery?

1    A.   Have I provided this to you prior?

2    Q.   In discovery.  Have you provided it -- this is a chart that

3    you created as part of your report.

4            Is it somewhere else in this report or separately

5    provided to the government?

6    A.   No.

7    Q.   Now, you testified yesterday that testing a server can

8    involve testing on testnet; is that right?

9    A.   Yes.

10   Q.   And that's, essentially, moving Bitcoin in sort of a

11   simulated environment that's meant to mirror the Bitcoin

12   protocol?

13   A.   Yes.

14   Q.   But that's not the same as actually running a test on the

15   live Bitcoin network, is it?

16   A.   I can't say.

17   Q.   And have you personally run tests on testnet?

18   A.   Yes.

19   Q.   I'd like to direct your attention now to page 35 of your

20   report discussing tracing through Silk Road.

21           Are you familiar with how custodial services handle

22   user funds?

23   A.   Generally.

24   Q.   And are you aware that Silk Road did take custody of user

25   funds?

1    A.   Yes.

2    Q.   And for most custodial services -- or at least many -- if a

3    user deposits funds into an account with that service and then

4    withdraws the funds, isn't it true that the withdrawal will

5    come from a different address than the deposit?

6    A.   That's possible.

7    Q.   And wasn't that, in fact, the case with Silk Road?

8    A.   The Silk Road records, I'm not able to confirm that from

9    the -- what I was provided from before.  I'm trying to match

10   the user IDs to the users to the Philadelphia records to the

11   different -- I think they're referencing different FBI records,

12   and different pulls, and this is what I was provided before I

13   wrote this report.

14   Q.   And -- so I'm asking about Silk Road, generally.  You're

15   familiar with Silk Road, correct?

16   A.   Yes.

17   Q.   It was one of the largest and most widely used darknet

18   markets for the rel- -- significant portion of the relevant

19   time period in this case, right?

20   A.   It's infamous.

21   Q.   Infamous.  And have you never reviewed records for other

22   Silk Road users?

23   A.   I don't believe I've ever had access to Silk Road before.

24   Q.   So in your work doing tracing for darknet market cases,

25   you've never reviewed records for other Silk Road users?

1    A.  I've never reviewed records for other Silk Road users that

2    came from Silk Road.

3    Q.  Have you reviewed the records coming from other darknet

4    markets for any other darknet market user?

5    A.  Directly from the market itself, the actual natives --

6    Q.  Correct.

7    A.  -- or the actual real copies?

8    Q.  Correct.

9    A.  No.

10    Q.  Now, according to your report, don't you, in fact, agree in

11    your report that on November 27th of 2011, there was a transfer

12    of 60.8 Bitcoin from the address 14gbjpk to the address 1C7kW?

13    A.  Yes.

14    Q.  And do you agree that that corresponds to a withdrawal from

15    Silk Road?

16    A.  Yes.

17    Q.  And directing your attention now back to Exhibit 19 and

18    Mr. Scholl's report on page 46, is this the chart showing the

19    transaction through the pas Silk Road account?

20    A.  On the right-hand side.

21    Q.  And you see the blue box with the user pas at the top?

22    A.  Under Silk Road, yes.

23    Q.  Yes.  So there's the larger box that says Silk Road; red

24    box, Silk Road; and then within that Silk Road box, there's a

25    blue box that says pas; is that right?

1    A.  Yes.

2    Q.  And that charted deposit from 1Pf address, that shows an

3    arrow directly into the pas account and pointing to the address

4    1MDVJ [sic]; is that right?

5    A.  Yes.

6    Q.  But for the arrow for the withdrawal from Silk Road, the

7    address -- the arrow starts at the edge of that blue pas box,

8    doesn't it?

9    A.  Yes.

10   Q.  And isn't that because, as you just testified, a withdrawal

11   from a service like Silk Road would not have come --

12   necessarily come from the deposit address?

13   A.  No.

14   Q.  But Silk Road was, in fact, a custodial service, correct?

15   A.  Yes.

16   Q.  And so if you have a withdrawal -- and Silk Road offered

17   deposit addresses for its customers; is that right?

18   A.  Yes.

19   Q.  And when a Silk Road user would withdraw funds from the

20   service, those withdrawals wouldn't come from the deposit

21   address because it's a withdrawal, not a deposit; isn't that

22   correct?

23   A.  Correct.

24   Q.  And so didn't you, in fact, in this chart see a withdrawal

25   from the pas account into the 1C7k address?

```
 1    A.  No.

 2    Q.  But you don't disagree that on that exact date and time,

 3    there was a 60.8 Bitcoin withdrawal associated with the pas

 4    account going from the Silk Road at controlled addresses to

 5    1C7K?

 6    A.  No.

 7    Q.  You don't agree that that was the case?

 8    A.  No.  I wasn't able to confirm in the records I was

 9    provided.

10    Q.  But you do agree that it was a withdrawal from Silk Road?

11    A.  I see a withdrawal from Silk Road going back to my report,

12    page 36, November 27th, 2011, from 14gb21C7K.

13    Q.  And you do agree that's a Silk Road withdrawal?

14    A.  Yes.

15    Q.  And you're just saying you don't -- you can't tell which

16    Silk Road user that was a withdrawal from?

17    A.  Correct.

18    Q.  But you did see in the Silk Road pas records that there was

19    a withdrawal of that exact amount at that exact date and time?

20    A.  I did not.

21    Q.  Have you reviewed the Silk Road records?

22    A.  Yes, I have.

23    Q.  Turning your attention to page 35 of your report, now, in

24    Exhibit 10, you're discussing a co-spend with that 1MDV [sic]

25    address; is that right?
```

1   A.  Sorry.  35 of the Scholl report or my report?

2   Q.  No.  Of your report.  So this is Exhibit 10.

3   A.  Okay.

4   Q.  Now, you're saying that MDV -- 12MDV received funds one

5   time in a co-spend; is that right?

6   A.  Correct.

7   Q.  But in your chart below here, what you show is actually

8   that it's spending funds in a co-spend; isn't that right?

9   A.  It is spending funds in a co-spend.

10  Q.  So to be clear, the transfer from 1Pfk that we were just

11  talking about into 12MDV is not a co-spend; it's this chart

12  here that's the co-spend?

13  A.  This is the co-spend.

14  Q.  And when 12MDV does transfer the funds, it co-spends with

15  1MBrU; is that right?

16  A.  Yes.

17  Q.  And 1MBrU, that's the address that you identified as

18  possibly having received funds tied to a Virwox account?

19  A.  Correct.

20  Q.  And you testified yesterday that you had reviewed the

21  attachments to Mr. Scholl's and Ms. Bisbee's reports; isn't

22  that right?

23  A.  Yes.

24  Q.  Are you aware that both 12MDV and 1MBrU are both addresses

25  controlled by Silk Road?

1  A.  No.

2  Q.  Are you aware that the government has included them in the

3  list of addresses controlled by Silk Road?

4  A.  No.

5  Q.  But you did review the attachments?

6  A.  Yes.

7  Q.  Did you look in the attachments for those addresses being

8  listed?

9  A.  Yes.

10  Q.  And, in fact, do you agree that 12MDV is in that list?

11  A.  Which list?

12  Q.  The list of addresses controlled by Silk Road.

13  A.  I will have to look.  CipherTrace does not have this

14  attributed to Silk Road.  So I will have to confirm.  If we

15  could pull that up, I will take a look at it.

16  Q.  So you're saying CipherTrace doesn't.  I'm asking you about

17  the attachments to Mr. Scholl's and Ms. Bisbee's report.

18  A.  I can't recall that from memory.

19  Q.  But do you remember looking at, within those attachments,

20  whether 12MDV and 1MBrU were, in fact, both controlled by Silk

21  Road?

22  A.  Yes.

23  Q.  And you're saying that you don't believe that they were

24  controlled by Silk Road?

25  A.  I'm saying I can't recall.  And according to CipherTrace

1    here, they're not controlled by Silk Road.

2    Q.  So CipherTrace doesn't believe that they're controlled by

3    Silk Road, but did you not review records from the Silk Road

4    returns that included 12MDV as a Silk Road deposit address for

5    the pas account?

6    A.  I will need to pull up those records to confirm.

7    Q.  Let's turn to page 18 of your report.  Here this says,

8    "CoinJoins break heuristic 1," and we had testimony about that

9    yesterday.

10              Is that still your testimony?

11   A.  Yes.

12   Q.  Isn't it also true, though, that many CoinJoins are

13   performed through services such as the ones listed in your

14   report?

15   A.  True.

16   Q.  And that many of those services transact with some

17   identifiable patterns?

18   A.  True.

19   Q.  And are you familiar with some of the academic literature

20   on CoinJoin detection?

21   A.  No.

22   Q.  So you're not aware that academic research has found many

23   CoinJoin implementations to be highly reliable?

24   A.  I'm aware, but I've not read the literature myself.

25   Q.  So you are aware that academic researchers looking at

1    CoinJoin have been able to effectively and reliably detect it

2    from many implementations?

3    A.  I will have to review that myself.

4    Q.  You understand that there's a difference between detecting

5    a CoinJoin and tracing through a CoinJoin?

6    A.  Can you explain what you mean?

7    Q.  Well, you can -- even if you cannot trace through a

8    CoinJoin, that is, connect an input to an output, you may be

9    able to detect that a CoinJoin is happening; is that right?

10    A.  Yes.

11    Q.  And if you can detect a CoinJoin, it may be possible to

12    control for it to avoid misclustering?

13    A.  Yes.

14    Q.  And are you aware that blockchain analytics companies use

15    those patterns to control for CoinJoin in order to avoid

16    mistaken clustering?

17    A.  Yes.

18    Q.  And, for example, is Wasabi one of now the most common

19    CoinJoin implementations?

20    A.  Yes.

21    Q.  And can't most blockchain analytics companies identify

22    transactions that occur through Wasabi?

23    A.  Yes.

24    Q.  And they would identify that and not include it in a

25    co-spend cluster?

1    A.   Ideally.

2    Q.   Directing your attention to the graph on page 16 of your

3    report, is this an example of a CoinJoin transaction?

4    A.   Yes.

5    Q.   And is CipherTrace able to detect this as a CoinJoin?

6    A.   We did not.

7    Q.   Are you aware that Chainalysis does flag this as a CoinJoin

8    and, therefore, does not cluster the inputs together?

9    A.   No.

10   Q.   Turning your attention to the following page, is this

11   another example of a CoinJoin transaction?

12   A.   Yes.

13   Q.   And is CipherTrace able to detect this as a CoinJoin?

14   A.   Looks like no.

15   Q.   And so CipherTrace would have mistakenly clustered this

16   using co-spend?

17   A.   Yes.

18   Q.   Are you aware that Chainalysis does identify this as a

19   CoinJoin and does not cluster the inputs together?

20   A.   No.

21   Q.   So given that CipherTrace uses co-spend analysis and that

22   both CipherTrace and Chainalysis attempt to control for

23   CoinJoin, isn't it, in fact, possible for blockchain analytics

24   to detect and control for CoinJoin in many instances?

25   A.   That is difficult for me to say.  I've been provided with

1    two examples.

2    Q.  When you say you've been provided with two examples, who

3    provided the examples to you?

4    A.  You did, ma'am.

5    Q.  Well, these are examples from your report that you had

6    pulled out.  Is that what you're saying?

7    A.  Ma'am, you asked if I was aware that companies could

8    control for CoinJoins like these, but you gave me the example

9    that Chainalysis has control for these two CoinJoins.

10   Q.  Oh, I'm talking about CoinJoins writ large.  You had

11   testified previously that CipherTrace controls for Wasabi and

12   that other CoinJoin implementations may be detectable.

13            I'm now asking, isn't it, in fact, true that often

14   blockchain analytics companies detect and control for many

15   CoinJoin implementations?

16   A.  I can't speak to all companies, and I did not testify that

17   CipherTrace controls for these.

18   Q.  Not for these.  But they do control for Wasabi; is that

19   right?

20   A.  I will have to check with engineering.

21   Q.  They may, in fact, also control for other co-spends?

22   A.  I do not know.

23   Q.  Now, you considered -- you testified yesterday that you

24   still considered the clusters in CipherTrace to be reliable

25   even though they rely on heuristic 1; is that right?

1                  THE COURT:  Can we just back up for a second.  I just

2      want to make sure I understand the witness's testimony here.

3                  I understand what the witness has testified is that

4      CoinJoins break co-spend as a useful tool for clustering or as

5      a heuristic, but that you're not aware whether your own company

6      controls for CoinJoins in any way?

7                  THE WITNESS:  I've been made aware that there may be

8      some implementation, but I cannot confirm it, and I need to

9      speak with engineering.

10                 MS. PELKER:  I can --

11                 THE COURT:  I'm just trying to understand -- I mean,

12     as I understand your testimony, if I'm getting it right, you

13     actually don't think that this sort of blockchain analysis is

14     useful because of CoinJoins and that it breaks the one

15     heuristic that your company uses, yet you don't know whether

16     your company actually does anything to control for it.  That

17     surprises me about your testimony.

18                 THE WITNESS:  Okay.

19                 THE COURT:  I mean, I want to make sure I'm

20     understanding that correctly.  The one thing you say is the

21     problem that destroys the usefulness of the tool, you don't

22     know whether they control for that one problem?

23                 THE WITNESS:  For example, as we spoke yesterday, the

24     case -- the special case of a CoinJoin called a PayJoin, no one

25     can look at, no one can know.  It is not detectable.  It is

1    indistinguishable from any other transaction.

2           Additionally, there are a number of privacy services

3    and options.

4           THE COURT:  Right.  I guess my question -- I didn't

5    understand Ms. Pelker's question to be categorically whether

6    they control for every -- whether you control for every

7    CoinJoin, but the question -- at least my question -- I'll

8    leave it for Ms. Pelker to ask her own question.

9           My question is, to your knowledge, does your company

10   do anything to control for CoinJoins?

11          THE WITNESS:  We can refer back to the PowerPoint

12   presentation I provided yesterday.  There is an example of this

13   in there.

14          THE COURT:  What's the answer to my question, though?

15          THE WITNESS:  I'm sorry, Your Honor, but I really do

16   need to confirm with engineering before I actually offer this

17   testimony in court.

18          THE COURT:  Okay.  So your testimony today, then, is

19   you just don't know whether they control for CoinJoins?

20          THE WITNESS:  I don't know to what extent, I don't

21   know to which level, I don't know which CoinJoins.  I have been

22   informed that we do, but I have not confirmed with engineering.

23   The person who told me does not work for engineering.

24          THE COURT:  Okay.  All right.  Thank you.

25   BY MS. PELKER:

1    Q.  As a follow-up, are you aware -- you testified previously

2    that Wasabi is one of the most common current CoinJoin

3    services; is that right?

4    A.  Yes.

5    Q.  And if you're using CipherTrace, doesn't CipherTrace, in

6    fact, identify a large number of addresses that it believes are

7    Wasabi-related addresses?

8    A.  I cannot give you the exact number there.

9    Q.  I'm not asking for the exact number.  I'm just asking

10   whether, if you're doing your trace in all of the cases that

11   you're tracing for, if you see funds going to Wasabi Wallet,

12   are you able in CipherTrace to see that CipherTrace knows that

13   that is Wasabi Wallet?

14   A.  Yes.

15   Q.  And so in order to do that, wouldn't they necessarily have

16   to be able to detect when something is a Wasabi Wallet

17   CoinJoin?

18   A.  I do need to confirm with engineering, ma'am.

19   Q.  You do, in fact, have a group of addresses in CipherTrace

20   that are Wasabi Wallet identified, yes?

21   A.  Yes.

22   Q.  In your testimony yesterday -- in your testimony yesterday,

23   you described the peel chain heuristic as sort of a Pac-Man; is

24   that right?

25   A.  Yes.

1    Q.  And are you aware that Chainalysis includes a co-spend

2    requirement within its peel chain heuristic to ensure the

3    cluster remains conservative?

4    A.  Can you describe that again.

5    Q.  Well, directing your attention to Exhibit 20 -- that's

6    Ms. Bisbee's report.  This is page 8 where she's describing the

7    peel chain behavior within heuristic 2.  And this isn't a

8    blanket peel chain definition.

9         Instead, it reads, "It does so by identifying long

10   sequences of transactions in which there is no clear indication

11   of which address is change and which is payment.  It then finds

12   the end of the chain and finds a co-spend with an address that

13   appeared at the beginning of the chain.  This demonstrates that

14   the full peel chain is controlled by the same wallet."

15        Did I read that correctly?

16   A.  I'm reading now.  I see.

17   Q.  Wouldn't that co-spending requirement exclude from this

18   cluster many, what's traditionally thought of as, peel chain

19   instances?

20   A.  I do not know how many peel chains exist.

21   Q.  I'm not asking that question.  I'm saying that you have

22   many peel chains that don't have a co-spend from the end to the

23   beginning; is that right?

24   A.  It's possible.

25   Q.  How many cases have you done tracing on?

1    A.  Thousands.

2    Q.  And aren't peel chains a pretty common occurrence?

3    A.  I don't trace all the way through every single peel chain.

4    Q.  That's, again, not my question.

5            Haven't you, in fact, encountered numerous peel

6    chains in your tracings?

7    A.  Yes.

8    Q.  And do some of them often not include a co-spend between

9    the end of a chain and the beginning?

10   A.  Well, I would have to trace all the way to the end to say

11   for sure.  It depends.

12   Q.  So some may; some may not?

13   A.  It's possible, yes.

14   Q.  And this heuristic would only cluster something together if

15   there were a co-spend at the end and the beginning; isn't that

16   correct?

17   A.  That's how I am interpreting this, but it also says that

18   the peel refers to these smaller spending transactions.  Is

19   that where you began reading?  Sorry.  Just for reference.

20   Q.  I started with, "It does so."  But the peel begins -- that

21   entire paragraph is the description of the peel chain behavior.

22           Ms. Still, there are many peel chains throughout the

23   graphs in Mr. Scholl's report that are not shown as a single

24   cluster; isn't that right?

25   A.  I can think of one peel chain that is not shown as a single

1    cluster, but, instead, is cut and pasted together.  But if you

2    have one in mind, please reference that.

3    Q.  So we can turn to Mr. Scholl's report, which is, I believe,

4    on page 19 -- sorry, Exhibit 19.  And if you'd turn to page 59.

5    A.  Sorry.  Exhibit 19?

6    Q.  Exhibit 19, page 59.  These peel chains are described as

7    peel chains, not as single clusters; isn't that right?

8    A.  I see the word peel chain.  I disagree.

9    Q.  You may disagree, but there's no representation in the

10   government's chart here that these are single clusters,

11   correct?  They're just described as peel chains?

12   A.  They are described as peel chains; however, there are

13   missing transactions in this trace.

14   Q.  That's, again, not what I'm asking.  I'm just trying to

15   make the point that these -- in this peel chain, they were not

16   clustered together as single entities; they were continued to

17   be described as peel chains --

18   A.  That is the --

19   Q.  -- is that correct?

20   A.  -- representation here.

21   Q.  That's all I am asking.

22        Looking back to your report or, actually,

23   Ms. Bisbee's report on Exhibit 20, page 8, is this the chart

24   that you were discussing?  I guess it actually starts at the

25   bottom of page 7 going into page 8.

1    Is this the chart that you were discussing yesterday

2    as missing address types?

3    A.  It starts on page 6 on my --

4    Q.  I believe you've got transaction features starting

5    on page --

6    A.  Oh, I see on page 8, yes.

7    Q.  Are any of the missing address types present in any of the

8    clusters used or introduced by the government in this case?

9    A.  I saw the Pay-to-Public-Key.

10    Q.  I'm saying, are the missing address types?

11    A.  Pay-to-Public-Key.  That's P2PK.

12    Q.  And these are, again --

13    THE COURT:  I'm just -- is a P2PK different than a

14    P2PKH?

15    THE WITNESS:  Yes, sir.  A Pay-to-Public-Key is,

16    essentially, an exposed public key.  It's not hashed.

17    THE COURT:  Okay.  Thank you.

18    BY MS. PELKER:

19    Q.  And those are within the Chainalysis clusters here.

20    Do you disagree with the description?  Again, aside

21    from the bits versus bytes -- otherwise with the description

22    of -- I guess you have a disagreement about SegWit, about

23    Pay-to-Script-Hash -- with the general description of the other

24    addresses?

25    A.  Sorry.  I'm still looking at this chart going back to your

1    previous question.

2              I believe there are more address types missing from

3    this chart.

4    Q.  But you don't know whether those were address types that

5    were used; in fact, they were not necessarily address types

6    that were used in Chainalysis's clustering; is that correct?

7    A.  As I recall, they actually mentioned one of the address

8    types, and it was one of the wrapped -- what's termed a wrapped

9    SegWit.  And, in fact, there was no witness data attached, and

10   they relate this directly to Bitcoin Fog; so that address type

11   is missing.

12   Q.  Well, let's turn to that in just a minute.  I guess my

13   point here is that this may, in fact, just be a table

14   describing the address types that were actually fed into --

15   that were actually used for the behavioral clustering, not a

16   list of -- this may be a chart of the address types used in the

17   behavioral clustering for this case, not a list of every single

18   address type that could potentially exist?

19   A.  I don't know.

20   Q.  You mentioned SegWit.  Can we turn your attention to your

21   report that's Exhibit 10, page 24; the last bullet on that

22   page.

23              This is what you were just discussing, disputing

24   Ms. Bisbee's characterization of a transaction involving a

25   SegWit address; is that right?

1    A.   Which page?

2    Q.   The bottom of page 24.

3    A.   Yes.

4            THE COURT:  Remind me what SegWit stands for.

5            MS. PELKER:  Segregated witness.  The witness can

6    answer.

7            THE WITNESS:  I'll answer.  Segregated witness

8    address is a more -- I guess, a better way of performing

9    certain transactions on the Bitcoin ledger.  It's going to save

10   end fees.  It's going to create the smaller block sizes; you

11   can fit more transactions in.

12           THE COURT:  It's coming back now.  Thank you.

13           THE WITNESS:  Yes.

14   BY MS. PELKER:

15   Q.   Now, you looked at this transaction with the hash starting

16   in 9a7e, and you saw that SegWit was not enabled; is that

17   right?

18   A.   Yes.

19   Q.   Isn't it true, though, that an observer would see a

20   Pay-to-Script-Hash address as SegWit-enabled when the address

21   sends funds?

22   A.   Can you repeat that.

23   Q.   Wouldn't an observer looking at a transaction see that it's

24   SegWit-enabled when that address sends the funds as opposed to

25   receives them?

1    A.  Must send the funds.

2    Q.  Must send the funds.  And reading Ms. Bisbee's report --

3    and it's quoted right here -- "The first-known Bitcoin Fog

4    transaction where the change is a SegWit address in block

5    534129."

6            Did I read that correctly?

7    A.  Yes.

8    Q.  And so isn't she saying that the SegWit address is the

9    output of that transaction?

10   A.  Yes.

11   Q.  So if you look at the next transaction where that address

12   then spends in a transaction, can't you then see that that is,

13   in fact, a SegWit address?

14   A.  Can I pull that up and trace it?

15   Q.  Not live here on the stand.  Did you not do that as part of

16   your report?

17   A.  I need to actually look at the address.  But, yes, the way

18   that this is, if you look at the 9a7e transaction hash --

19   Q.  Well, I think that we -- my point here is that you looked

20   at that transaction hash, and the address mentioned by

21   Ms. Bisbee is in the change.

22            Did you not look at the transaction where that

23   address was actually as an input?

24   A.  I can't recall.

25   Q.  It's not in your report.

1    A.  Which address exactly are you pointing to?  There are two

2    outputs here.

3    Q.  I would have to go back and look.  But you didn't look at

4    the subsequent tracing of the change addresses from that

5    transaction to see whether they were, in fact, SegWit?

6    A.  I can't recall.

7    Q.  Turning to page 20 of your report -- well, I guess, first,

8    just recalling from yesterday, in your sworn affidavit in the

9    LCX matter, didn't you describe co-spend clustering as "highly

10   reliable"?

11   A.  That is what it says.

12   Q.  And in your testimony yesterday regarding CipherTrace's

13   clustering, which uses co-spend, you testified, I believe, that

14   while you were not sure what the exact P value was, the error

15   rate, when CipherTrace's clustering was assessed, was extremely

16   low; is that right?

17   A.  As I recall.

18   Q.  Now, looking at page 20 of your report and discussing

19   heuristic 2, you acknowledge that the accuracy rate of

20   heuristic 2 may depend on its specific implementation; is that

21   right?

22   A.  Can you point to the paragraph, or you mean just generally

23   speaking?

24   Q.  So if you read the last sentence under the first paragraph

25   of "Evaluation of the Application of Heuristic 2 to

1    Chainalysis's Model," it reads, "Which subcategories of

2    assumptions that are applied impact the accuracy of

3    heuristic 2?"

4    A.  Subcategories.  So this would be those fingerprints.

5    Q.  Correct.  So some of them may be accurate, and you're

6    saying that some may be less accurate?

7    A.  I can't say how it's implemented here.

8    Q.  But with proper implementation -- and implementation,

9    you're saying, could be more or less accurate, depending on how

10   it's applied?

11   A.  It's possible.

12   Q.  Your paper -- your report includes a discussion of some of

13   the academic literature in blockchain analysis.

14           Are you familiar with the academic research in the

15   field?

16   A.  I read this.

17   Q.  You read the reports that were referenced?

18   A.  Yes.

19   Q.  So turning your attention to Exhibit 22, is this the paper

20   by Dr. Meiklejohn and her colleagues that was discussed?

21   A.  Yes.

22   Q.  And you read this in preparation of your report?

23   A.  Yes.

24   Q.  Were you previously familiar with it as well?

25   A.  No.

1    Q.  Does this report also reference a number of other studies

2    that -- does this article also reference a number of other

3    studies listed in your report?

4    A.  Yes.

5    Q.  And did you read those papers as well?

6    A.  Yes.

7    Q.  So turning to Exhibit 23, this is evaluating user privacy

8    in Bitcoin.  The lead author is Androulaki.

9            Is this one of the papers that you read?

10   A.  Yes.

11   Q.  Could you point to where in this paper they profess a

12   64.19 percent error rate for this heuristic?

13   A.  I'm going to need a Control F.

14   Q.  I'm happy to save you time and represent that there's no

15   error rate listed in -- that that error rate is not listed in

16   this paper.

17   A.  Okay.

18   Q.  Turning your attention now to page 20- -- to Exhibit 24, "A

19   Fistful of Bitcoins:  Characterizing Payments Among Men with No

20   Names"; this is Dr. Meiklejohn's earlier paper.

21           Is this another paper that you reference in your

22   report?

23   A.  As referenced by Ms. Meiklejohn in "How to Peel a Million,"

24   yes.

25   Q.  And did you read this paper?

1    A.  Yes.

2    Q.  Could you point to where in this paper they profess a

3    51.64 percent error rate?

4    A.  Again, I will need that Control F.

5    Q.  Isn't it, in fact, true that -- and you may not know --

6    that nowhere in this paper do they profess a 51.64

7    percent error rate?

8    A.  I do not know that.

9    Q.  Turning your attention now to Exhibit 25, "When the Cookie

10    Meets the Blockchain," lead author Goldfeder.

11           Is this the third paper that you referenced?

12    A.  This was referenced by Ms. Meiklejohn, which I then

13    subsequently referenced.

14    Q.  And did you read this paper?

15    A.  No.

16    Q.  You did not read this paper.  So you're not aware that

17    nowhere in this paper do they, in fact, profess a 48.7 percent

18    error rate?

19    A.  I cannot say that.

20    Q.  Because you didn't read it?

21    A.  I did not read this paper.

22    Q.  Pointing your attention now to Exhibit 26, is this the

23    "Automatic Bitcoin Address Clustering" paper with lead author

24    Ermilov?

25    A.  Yes.

1    Q.  And is this the fourth paper that was referenced?

2    A.  Where is Ms. Meiklejohn's -- can you point me back to that

3    section so I just can confirm?

4    Q.  Sure.

5    A.  The name is familiar, yes, but I just want to confirm.

6    Q.  So Ms. Meiklejohn's paper is Exhibit 22.

7    A.  Thank you.

8    Q.  But the Ermilov paper is cited repeatedly in your report,

9    or referenced repeatedly in your report.

10   A.  Sorry.  Can you just repeat the question.

11   Q.  I'm just asking, isn't this, in fact, the Ermilov paper

12   that's cited in your report?

13   A.  I'm not sure that it is.  I'm -- so I'm doing this

14   secondary source citing directly from Ms. Meiklejohn's "How to

15   Peel a Million."

16   Q.  So you didn't actually read the source reports for that?

17   A.  I read some of these reports.

18   Q.  This is the -- this is the journal article that had the

19   lowest false detection rate according to your report before

20   Dr. Meiklejohn's new paper.

21           You're testifying that you did not actually read this

22   paper?

23   A.  This "Automatic Bitcoin Address Clustering"?  I have not

24   read this paper.

25           THE COURT:  Is there somewhere in the -- what we're

1    referring to as the Meiklejohn paper -- which I think the first

2    author is, actually, Kappos -- in Exhibit 22, is there

3    somewhere in that paper that lists the error rates that you

4    then rely upon?

5            THE WITNESS:  That Ms. Meiklejohn is referring to?

6            THE COURT:  Yes.  Can you take a look at Exhibit 22

7    and maybe point to me where it is that the error rates are

8    listed in that paper.

9            MS. PELKER:  And I think we'll get to that shortly,

10   Your Honor.

11           THE COURT:  Okay.  That's fine.

12           MR. EKELAND:  I can direct the Court to it.

13           THE COURT:  I'd rather you not.  But I'll let you

14   continue, Ms. Pelker.

15   BY MS. PELKER:

16   Q.  Ms. Still, turning your attention back to your report on --

17   that's Exhibit 10 on page 22 -- doesn't this list off in bold:

18   Androulaki, et al.; Meiklejohn, et al.; Goldfeder, et al.; and

19   Ermilov, et al.; and that Ermilov quote is the Ermilov

20   "Automatic Bitcoin Address Clustering" article?

21   A.  I couldn't find the reference, and I'm still flipping

22   through the pages.

23   Q.  This is your report.  So Exhibit 10 on page 22.

24   A.  The Ermilov was where?  24, 25?  Or 26, 27?  Where did you

25   have it?

1    Q.  If you could turn to your report that's Exhibit 10,

2    page 22.

3    A.  Page 22?

4    Q.  Yes.

5    A.  Yes.

6    Q.  And these list off a number of different studies, including

7    the Ermilov study; is that correct?

8    A.  Yes.

9    Q.  But your testimony is that you did not actually read the

10   Goldfeder or Ermilov study when preparing your report?

11   A.  Correct.

12   Q.  And so you're not aware that nowhere in the Ermilov paper

13   do they profess the 12.7 percent error rate?

14   A.  The references come from "A Fistful of Bitcoins."

15   Q.  They're not actually in the source documents?

16   A.  I'm referencing a secondary source --

17   Q.  Correct.

18   A.  --- via Ms. Meiklejohn.

19   Q.  So you didn't read the source documents and you don't know

20   that there, in fact, are no calculated error rates within the

21   source documents?

22   A.  I did not read Goldfeder or Ermilov.

23            MS. PELKER:  Government moves to admit Exhibits 22

24   through 26.

25            THE COURT:  Any objection?

```
1              MR. EKELAND:  No objection, Your Honor.

2              THE COURT:  Exhibits 22 through 26 are admitted.

3              (Government Exhibits 22, 23, 24, 25, and 26 were

4       admitted.)

5       BY MS. PELKER:

6       Q.  Now, Ms. Still, the FDR numbers in your report are based on

7       the subsequent work by Dr. Meiklejohn and her colleagues; is

8       that right?

9       A.  The -- can you repeat that.

10      Q.  The FDR numbers in your report are actually based on the

11      subsequent work by Dr. Meiklejohn and her colleagues?

12      A.  Yes.

13      Q.  And they were conducting their own evaluation of those

14      heuristics; is that right?

15      A.  Yes.

16      Q.  And she -- Dr. Meiklejohn explains the different heuristics

17      used by those prior researchers, correct?

18      A.  Can you point out where she's explaining that?  It's been a

19      while since I've read this report.

20      Q.  Well, you just started work on this case in July; is that

21      right?

22      A.  Uh-huh.

23      Q.  Would you consider this a significant academic article

24      relevant to your field?

25      A.  It is important to the field.
```

1    Q.  Turning your attention back to your report, Exhibit 10,

2    page 22, you said that this was derived from Dr. Meiklejohn's

3    report or study.

4              Doesn't this, in fact, show the different researchers

5    all applying different parameters and their versions of various

6    heuristics?

7    A.  They are applying their own -- I can't really say exactly

8    how they applied it other than to read directly from each of

9    these.

10    Q.  Right.  And I'm not asking that.  I'm just asking you to

11    confirm that these different researchers each had their own

12    specific heuristics; is that correct?

13    A.  I'll need to read each of these again.

14    Q.  I'm really just asking that -- you've listed in your report

15    the specific characteristics for each one of these researchers'

16    heuristics; is that right?

17    A.  Yes.

18    Q.  And they are -- in fact, each researcher has their own set

19    of heuristics as set out in your report?

20    A.  That is how it is here.  But I need to read that to be able

21    to confirm what you've just said.  And as I mentioned, it's

22    been a while.

23    Q.  In your report, that's how you set it out.  In your report,

24    you wrote that each one of these researchers had different sets

25    of heuristics; is that correct?

1    A.  Can you point to that paragraph, please.

2    Q.  That would be on page 22 after Androulaki, et al., you list

3    out:  Identify the change output in a transaction if one, two;

4    and then you go through for Meiklejohn, if one, two, three,

5    with the specific qualifications; for Goldfeder that -- you

6    have one, two, three for Meiklejohn and then adding another

7    qualification; and then Ermilov, a different set, one, two,

8    three, four, five.  Is that right?

9    A.  They are additive.

10    Q.  And at the time that these articles are each written, if

11    you know, are these all, in fact, new proposals for new

12    heuristics being put forward by members of academia?

13    A.  By members of aca- --

14    Q.  Academia.

15    A.  New proposals for new heuristics?

16    Q.  That's what all these papers are -- right? -- new proposals

17    for new heuristics?

18    A.  That is what Ms. Meiklejohn's research is about.

19    Q.  Directing your attention to Ms. Bisbee's report -- that's

20    Government Exhibit 20 -- could you turn now to the bottom of

21    page 19 and read the description of the heuristic 2 parameters

22    for the Agora cluster in Footnote 15.

23    A.  "The change detection will, given a transaction, return the

24    change address.  It only allows a single address to be the

25    change, and if multiple addresses are matching the criteria, it

1    will consider that none of them is the change.  The criteria

2    for an address to be the change are:  It should be of type

3    Start1.PK.Compressed or Start1.PK.Uncompressed.

4          "The change value should be like 0.01 BTC.  The

5    address should only be involved in two transactions.

6    Transaction fees for both transactions should be the same."

7    Q.  And so you agree that this heuristic includes a requirement

8    for the change value, the transaction fee, and the address

9    type?

10   A.  What about the address did you say?

11   Q.  The address type.

12   A.  The address type and the number of transactions.

13   Q.  But you agree that those are all requirements within the

14   Chainalysis cluster heuristic for this cluster?

15   A.  I'm reading the reference on 15.  I do not know how they've

16   applied it.

17   Q.  You're agreeing that in this footnote on page 15 they are

18   explaining that there is a requirement for address type, change

19   value, and transaction fee?

20   A.  Yes.

21   Q.  Turning now back to page 22 of your report -- that's

22   Exhibit 10 -- and directing your attention to the description

23   of the Ermilov heuristic from your report, this is the one with

24   the lowest FDR, 12.7 percent FDR; is that right?

25   A.  That was the run rate, yes.

1    Q.  Does the Ermilov heuristic have any requirements about

2    matching the types of addresses involved?

3    A.  I don't believe so.

4    Q.  Does it place any restrictions on the change value?

5    A.  Yes.

6    Q.  Does it have the same type of -- the same restriction on

7    the change value that the Chainalysis heuristic does?

8    A.  Can you repeat that last one.

9    Q.  Does it have the same restriction on the change value that

10   Chainalysis placed for the Agora cluster?

11   A.  It says the output value is significant.  So we're talking

12   sig digs to at least the fourth decimal place.

13   Q.  I believe Chainalysis's is a specific value that is placed

14   rather than a significance; is that correct?

15   A.  That's what I interpret.

16   Q.  So Chainalysis has a different requirement for the change

17   value; is that correct?

18   A.  As compared to these two, it appears so.

19   Q.  And does the Ermilov heuristic have any requirement about

20   the transaction fees?

21   A.  No, not that I see here.  But, again, I have not read that

22   paper.

23   Q.  In fact, based on what you wrote in your report and what

24   Ms. Bisbee described in hers about the heuristics used for

25   Agora, doesn't the Chainalysis heuristic have different

1    requirements than the Ermilov heuristic?

2    A.  Without having read the full paper according to this little

3    section, they do appear different, but --

4            THE COURT:  I'm sorry.  One at a time.

5    BY MS. PELKER:

6    Q.  This is the little section that you chose to put in your

7    report; isn't that correct?

8    A.  Yes.

9    Q.  And when you put it in your report, you believed that it

10   was an accurate description of the heuristics used by Ermilov?

11   A.  Yes.

12   Q.  And, in fact, aren't the Chainalysis heuristics set forth

13   in Ms. Bisbee's report different than the other heuristics set

14   forth by each of the other researchers above?

15   A.  Can we go through them?

16   Q.  You are welcome to take a look.  I'm asking, do the

17   Chainalysis heuristics exactly match any of the researchers'

18   heuristics set forth above?

19   A.  I don't see an exact match.

20   Q.  And, in fact, isn't it true that, by design, Chainalysis's

21   behavioral heuristics incorporate the behavior of the

22   particular entity that's being clustered?

23   A.  As I understand.

24   Q.  Would you consider the Bitcoin Fog cluster and the darknet

25   market clusters to be large clusters?

1    A.  It depends.  There were, in total, 6 million addresses,

2    925,000 of which or so belong to Bitcoin Fog.  Of those

3    6 million addresses, 20 million about, transactions.

4    Q.  So in the grand scheme of clusters, some may be bigger,

5    some may be smaller, but this is a relatively large cluster?

6    A.  Possibly.

7    Q.  Directing your attention to back to Exhibit 22,

8    Dr. Meiklejohn's paper, on page 11.

9         In the bottom of this paragraph below the graph,

10   doesn't Dr. Meiklejohn observe that "Bigger clusters tend to be

11   more predictable in terms of their behavior, which is perhaps

12   not surprising if we consider that the operators of these big

13   clusters use automated scripts in order to form their

14   transactions"?

15   A.  Well, I trust that you read the right area.  I'm sorry.  I

16   didn't catch where you were.

17   Q.  The paragraph -- if you look on page 11, there's the

18   colored charts.  Not the caption, but the paragraph below it,

19   about halfway through toward the end.

20        Isn't that what Dr. Meiklejohn wrote?

21   A.  Yes.

22   Q.  Your expert report claims that the heuristic that

23   Dr. Meiklejohn and her colleagues propose in this paper fail to

24   validate the government's tracing; is that right?

25   A.  With respect to Bitcoin Fog?

1    Q.  Correct.

2    A.  Yes.

3    Q.  Directing your attention to page 2 of the paper, could you

4    read -- so if you see the paragraph -- you see the bullet

5    pointed list; there's a paragraph above that.

6         Could you read from -- starting about halfway up,

7    starting with "As compared with previous change heuristics."

8    A.  "As compared with previous change heuristics 2, 10, 14, 31,

9    we demonstrate using our ground truth data set that our change

10   heuristic achieves a false discovery rate of only 0.02 percent.

11   The next best heuristic achieves a false discovery rate of

12   12.7 percent."

13   Q.  You can keep reading.

14   A.  "We then apply this expansion heuristic to investigate

15   ransomware addresses and to track the funds withdrawn from an

16   exchange account associated with Roman Sterlingov to their

17   deposit into the Bitcoin Fog mixing service.  Showing that, our

18   heuristic is able to link these two transactions; whereas, all

19   previous heuristics would be unable to do so."

20   Q.  Directing your attention to page 13 of the paper, under the

21   Bitcoin Fog case study, does this describe the researchers

22   using information from the government's publicly filed

23   complaint affidavit to review the transfer from

24   Mr. Sterlingov's Mt. Gox account into Bitcoin Fog?

25   A.  Ma'am, I'm going to have to ask you to repeat that, as I

1    was turning the page.

2    Q.  Looking at the -- you did read this paper, correct?

3    A.  Yes.

4    Q.  And the case study that's set out on Bitcoin Fog on

5    page 13, does that describe the researchers using the

6    information from the government's publicly filed complaint

7    affidavit to review the transfer from Mr. Sterlingov's Mt. Gox

8    account into Bitcoin Fog?

9    A.  Did this come from the public filing?  I don't know.

10   Q.  If you read in the beginning of paragraph -- the first

11   paragraph under the case study, it says, "According to the

12   affidavit of an IRS special agent," and the cite there for

13   No. 4 is the statement of facts with a cite to *CourtListener*.

14   A.  Sorry.  Where is that citation?

15   Q.  Page 13.

16   A.  Yes.

17   Q.  You see the cite 4?

18   A.  I see it.

19   Q.  And then at the end, that's the cite to the public docket,

20   but from -- pulled down on *CourtListener*.

21   A.  Sorry?

22   Q.  But pulled down on *CourtListener*; is that correct?

23   A.  Yes.

24   Q.  And looking at page 14, is this a chart that the

25   researchers put together showing that trace -- showing their

1    version of that trace?

2    A.  Yes.

3    Q.  I'd like to just direct your attention briefly to

4    Exhibit 19 -- that's Mr. Scholl's report -- on page 49.  This

5    is the small chart on the PDF.

6              Does this show Mr. Scholl -- this chart and the

7    subsequent pages show Mr. Scholl tracing the funds manually

8    from address to address to address?

9    A.  While I cannot confirm he traced manually, I do see the

10   trace represented here.

11   Q.  You see, looking at page 50, 51, 52, that he did trace from

12   address to address to address; is that correct?

13   A.  This is a description of the transactions.  It does not say

14   manually tracing or how he accomplished his trace.  But --

15   Q.  It does set them out step by step, correct?

16   A.  Yes.

17   Q.  And nowhere in Mr. Scholl's report does he say that he used

18   these -- that these intermediary addresses were somehow all

19   clustered together using Chainalysis's heuristic, does he?

20   A.  No.

21   Q.  Has the government ever said that it was relying on

22   Chainalysis's clustering heuristic for this address-to-address

23   tracing?

24   A.  I can't answer that.

25   Q.  Have you ever seen anywhere in discovery in your review

1    where the government has said it was relying on Chainalysis's

2    clustering heuristics for this address-to-address tracing?

3    A.  I can't answer that.

4    Q.  Do you recall ever seeing that in discovery?

5                MR. EKELAND:  Objection.

6                THE COURT:  Overruled.

7                THE WITNESS:  I'm sorry.  I can't recall.

8                THE COURT:  Okay.  That's an answer to the question.

9    That's fine.

10   BY MS. PELKER:

11   Q.  That's an answer.  Returning now back to the Meiklejohn

12   paper -- so this is 22 -- isn't it, in fact, true that the

13   researchers' find backwards heuristic would have automatically

14   connected the defendant's Mt. Gox account to the initial Fog

15   deposit?

16   A.  No.

17   Q.  So we're talking about the find backwards heuristic; isn't

18   that correct?

19   A.  I believe that's what you are referencing.

20   Q.  And that when we are looking at the case study under

21   Bitcoin Fog, don't they, in fact, say that their find backwards

22   heuristic did connect the defendant's Mt. Gox account to the

23   initial Fog deposit?

24   A.  It says, "While the same analysis was likely done manually

25   by the IRS agent, this would quickly become infeasible if there

1    were more intermediate hops for" --

2    Q.  I'm, again, not asking that question.  I'm just --

3              MR. EKELAND:  Objection, Your Honor.

4              THE COURT:  Overruled.

5    BY MS. PELKER:

6    Q.  You can read to yourself starting at the beginning of the

7    paragraph.

8              Didn't the researchers, in fact, trace from the --

9    using their heuristic find backwards, connect the defendant's

10   Mt. Gox account to that initial Fog deposit?

11   A.  Yes.

12   Q.  Ms. Still, did your review include tracing the funds

13   through the defendant's burner accounts at Liberty Reserve and

14   Mt. Gox?

15   A.  What do you mean by burner accounts?

16   Q.  The Kolbasa account, the Volfprius account, the Nfs9000

17   account.

18   A.  As far as I'm aware, those did not have PII associated with

19   them.  Can you pull them up, please?

20   Q.  They would not have had PII associaters with them.  I'm

21   asking whether you did any tracing of funds through those

22   accounts.

23   A.  Ma'am, you referenced them as belonging to Mr. Sterlingov

24   as burner accounts.  This is not an --

25   Q.  Did you do any tracing related to those accounts?

1    A.  Yes.

2    Q.  Is that anywhere in your report?

3    A.  No.

4    Q.  Did you produce any sort of work product regarding the

5    tracing on those accounts?

6    A.  To the government?

7    Q.  In general.

8    A.  I've done it, yes.

9    Q.  You've done it.  And what did your tracing on those

10   accounts show?

11   A.  I'd have to pull them up in the tool to go through them

12   with you.

13   Q.  You didn't write up any sort of summary on your work on

14   those accounts?

15   A.  I have it, maybe, in my notes file.

16   Q.  Now, in your work at CipherTrace, do you routinely review

17   account records for financial institutions that are not

18   cryptocurrency exchanges?

19   A.  No.

20   Q.  And how many times prior to this case had you reviewed

21   actual records from Mt. Gox?

22   A.  I've never seen actual records from Mt. Gox.

23   Q.  What about Liberty Reserve?

24   A.  No.

25   Q.  BTC-e?

1    A.  True records?

2    Q.  True records from BTC-e.

3    A.  Not that I recall.

4    Q.  And these are all very significant common services at the

5    time that Mr. -- that Bitcoin Fog was operating; isn't that

6    correct?

7    A.  What were the two accounts?  Liberty Reserve, BTC-e.  What

8    did you say --

9    Q.  And Mt. Gox.

10   A.  And Mt. Gox.  Around 2011, 2012, 2014.  Mt. Gox stops

11   around 2014.

12   Q.  But my question is, those are common services around that

13   time?

14   A.  You could say that.

15   Q.  And prior to this case, you've never reviewed any records

16   from any of those services?

17   A.  I've reviewed records.  I do not believe that they were the

18   true records or the natives related to those services.

19   Q.  So you've never reviewed the actual records for a case?

20   A.  I believe we're saying -- in terms of actual, defining that

21   as the natives provided from the exchange itself?

22   Q.  So I'm saying that you're aware that the government has the

23   records from the backends of Mt. Gox, from Liberty Reserve, and

24   BTC-e prior to this case.  Have you ever reviewed any of those

25   types of records in that format?

 1    A.  In the -- in the native format, directly from the exchange

 2    itself?

 3    Q.  In the way that the government would provide the records as

 4    part of a criminal case.

 5    A.  I've never seen these before in any criminal case.

 6    Q.  Do you agree that most of the funds in the defendant's

 7    Kraken account can be traced back to Bitcoin Fog?

 8    A.  I would have to check my notes and my traces in the tool.

 9    Q.  Did you do traces from the defendant's Kraken account back

10    to Bitcoin Fog?

11    A.  I did.

12    Q.  Is that anywhere in your report?

13    A.  No.

14    Q.  Did you do traces from the defendant's LocalBitcoins

15    account back to Bitcoin Fog?

16    A.  I believe so.  But I really need to get into the tool to

17    review my notes.

18    Q.  Well, is that anywhere in your report?

19    A.  No.

20    Q.  What about traces from the defendant's Binance, Bitfinex,

21    Bitstamp, Poloniex accounts?

22    A.  I don't recall the defendant having a Binance, but I have

23    to refer to my records and my traces in the tool.

24    Q.  What about Bitfinex, Bitstamp, and Poloniex?

25    A.  Bitfinex, Bitstamp; unclear about Poloniex; I will have to

1    look at it.

2    Q.  And LocalBitcoins?

3    A.  And LocalBitcoins, yes.

4    Q.  Did you do traces from the defendant's accounts back to

5    Bitcoin Fog for those services?

6    A.  Not all of those services.  I do have to reference my notes

7    to confirm.  Generally speaking, yes, I was able to trace back

8    to Bitcoin Fog.

9    Q.  And is that anywhere in your report?

10   A.  No.

11   Q.  You're aware that the administrator of Bitcoin Fog took

12   numerous steps to avoid being identified by law enforcement; is

13   that correct?

14   A.  I'm not clear on that at all.

15   Q.  You don't believe that the administrator of the Bitcoin Fog

16   darknet mixing service was trying to avoid being identified by

17   law enforcement?

18   A.  It's not been made clear to me, no.

19   Q.  You've reviewed the discovery in this case, correct?

20   A.  Yes.

21   Q.  In your experience looking at criminal cryptocurrency

22   services and transactions, would the administrator of a darknet

23   service try to avoid withdrawals that would stand out as

24   obvious administrator payouts?

25   A.  I've not necessarily seen that to be the case.  I can think

```
 1    of two examples.

 2    Q.  And are those examples that involve very sophisticated

 3    operators of Bitcoin mixing services?

 4    A.  I suppose that's true.

 5    Q.  It's true that an administrator would avoid withdrawals

 6    that would stand out as obvious payouts?

 7    A.  I don't know.

 8    Q.  Are you aware that administrators of criminal services can

 9    try to conceal the withdrawals of their profits by making them

10    look like user withdrawals?

11    A.  I've read the Larry Harmon interview; Larry Dean Harmon.

12    Q.  I'm just asking whether you're aware that administrators of

13    criminal services can try to conceal the withdrawals of their

14    profits by making them look like user withdrawals?

15    A.  I only have that one data point, ma'am; Larry Dean Harmon

16    from his interview, which I read.

17    Q.  And are you aware that that is, in fact, something that

18    administrators of criminal services can do?

19    A.  I think there is an assumption here.  We tend to think it's

20    reasonable that if one is running a mixer or some kind of dark

21    web service that one would not want to be identified.  That is

22    an assumption.

23              THE COURT:  I think the question asked about criminal

24    services.  I think the question was people who are running

25    criminal services, whether, in your view, they would obscure
```

1    their withdrawals or obscure who they are.

2             THE WITNESS:  Well, I guess I have to ask a follow-up

3    question here just to clarify, if that's okay with you.

4    BY MS. PELKER:

5    Q.  I really am just trying to ask, do administrators of

6    criminal services, can they try to conceal their withdrawals of

7    profits?

8             Administrators of criminal services, they are earning

9    a profit in many instances, correct?

10   A.  I assume so, yes.

11   Q.  And they at some point want to withdraw their profits from

12   the criminal service; isn't that right?

13   A.  Sometimes.

14   Q.  Sometimes.  And when they do that withdrawal, they don't

15   want law enforcement to be able to use that withdrawal to

16   identify them as the administrator; isn't that right?

17   A.  I could agree with that.

18   Q.  And if they're trying to avoid law enforcement flagging

19   this withdrawal, isn't one thing that they could do, to try and

20   mask it as a user withdrawal?

21   A.  It's possible.

22   Q.  On page 9 of your report -- so this is Tab 10, page 9 --

23   you refer to CipherTrace collecting IP addresses by operating a

24   Bitcoin node; is that accurate?

25   A.  Yes.

1    Q.  Could you describe the process through which CipherTrace

2    associates particular Bitcoin addresses with the IP address

3    ending in .123.

4    A.  So, generally -- did you say page 10 on my report?

5            THE COURT:  I thought it was 9; 9 of Exhibit 10.

6    BY MS. PELKER:

7    Q.  Page 9, the second bullet down.

8    A.  I see, yes.  And the question is?  You want a general -- I

9    think I understand.  You want a general description of how we

10   collect these IP addresses?

11   Q.  Correct.

12   A.  So we run our own nodes, and those nodes are set up in such

13   a way to collect IP addresses; that is, if you are to connect

14   to your wallet, let's say, on your phone, for example, and you

15   want to check your balance.

16           Your wallet software is not running a full node or a

17   half node.  It actually has to communicate with a node

18   running -- a full node or a half node -- right? -- with, like,

19   the full ledger copy.  So it can actually tell you what your

20   balance is and history of transactions and all of that.

21           If that interaction touches one of our nodes, we are

22   then, therefore, able to collect that IP data.

23   Q.  Was CipherTrace running these nodes back in 2011?

24   A.  Unclear.

25   Q.  Do you know when they started running the nodes?

1    A.  I would think after they began as a company.

2    Q.  But you don't have any more specific time frame other than

3    that?

4    A.  No.  I have to check with the engineers.

5    Q.  And how many Bitcoin addresses does CipherTrace link to

6    that .123 address?

7    A.  I will have to go into Inspector to count.  It's about 16

8    or so.

9    Q.  And are any of those from that October of 2011 time frame?

10   A.  I need to go into Inspector to confirm.  My suspicion is

11   probably not.

12   Q.  Probably not.  So that, in fact, none of these observations

13   may have been around the relevant time period?

14   A.  There was a nuance here with the way we collect IP

15   addresses.  That is, the dates are not necessarily

16   representative of the date of the touchpoints for each of the

17   individual addresses.

18   Q.  So does CipherTrace not, actually, necessarily log the date

19   of each touchpoint?

20   A.  We do log them, but I don't see them represented.

21   Q.  And as part of your work on this case, when you were

22   putting together this section describing the possibility of

23   other users of this IP, you did consult CipherTrace's tool; is

24   that correct?

25   A.  Yes.

1    Q.  And you reviewed these different IP addresses -- the

2    different IP addresses that were associated with this .123

3    address?

4    A.  I reviewed other IP addresses?

5    Q.  Sorry.  Other Bitcoin addresses that were associated with

6    the .123.

7    A.  I did.

8    Q.  All different types of addresses.

9          And you didn't include any further detail on those IP

10   addresses in your report, did you?

11   A.  No.

12   Q.  And you don't recall whether any of them were even from the

13   time period that pertained to the transfers at issue here?

14   A.  Ma'am, are you referring to the Bitcoin addresses and their

15   transaction histories?

16   Q.  I'm referring to the .123 IP address and asking whether you

17   saw any other observations around the October 2011 time frame.

18   A.  Not that I recall.

19   Q.  And has any additional information regarding CipherTrace's

20   attribution on that -- CipherTrace's linking of addresses to

21   that IP address been provided to the government?

22   A.  No.

23   Q.  Now, you claim that none of the Bitcoin addresses

24   associated with IP address 212 -- the IP address ending in .123

25   ever interacted with a Bitcoin Fog address.

1              Could you point to where in the government's reports
2     it claims that they did?
3     A.  No.
4     Q.  And that's because the government never makes that claim,
5     do we?
6     A.  I don't know.
7     Q.  You don't know.  You've reviewed the discovery, you've --
8     you're not aware or recollecting any time when the government
9     has made that claim?
10    A.  My review of the discovery is ongoing.
11    Q.  But based on your review thus far, you're not aware of any
12    time that the government has made that claim?
13    A.  I cannot recall.
14    Q.  And, in fact, you testified that you're not sure whether
15    CipherTrace even has collection around the October 2011 time
16    frame; isn't that correct?
17    A.  No.
18    Q.  No, you can't recall, or no, it does not?
19    A.  I need to check with the engineers.
20    Q.  So as you're testifying today, you cannot recall whether
21    CipherTrace even has collection around that October 2011 time
22    frame?
23    A.  Yes.  Specific to the IP, I assume, you're mentioning.
24    Q.  Correct.  And, in fact, what the government has shown is
25    that this IP address was used to log into accounts at Mt. Gox

1    and Liberty Reserve; isn't that right?

2    A.  Something like that.

3    Q.  None of your data disproves that the IP address was used to

4    log into accounts at Mt. Gox and Liberty Reserve; isn't that

5    right?

6    A.  No.

7    Q.  No.  You believe that your data does disprove that that IP

8    address logged into accounts at Mt. Gox and Liberty Reserve?

9    A.  I can't confirm.  I have to go back and look in my notes.

10   Q.  So nothing in your report, nothing that you brought to the

11   attention of the government would disprove that the accounts at

12   Mt. Gox and Liberty Reserve that have that IP address in their

13   logs were accessed from that IP address?

14   A.  Can you repeat that.

15   Q.  Nothing in your report would disprove that that IP address

16   logged into the Mt. Gox and Liberty Reserve accounts?

17   A.  Or prove it, I think.

18   Q.  Right.  I'm just asking that nothing in your report would

19   disprove that?

20   A.  No.

21   Q.  And are you familiar with CryptoVPN?

22   A.  I think I saw a reference to this in discovery or a

23   different service related to CryptoVPN.  I can't recall.

24   Q.  Are you aware then that the government, in its discovery

25   and its report, specifically identifies that .123 address as a

1    VPN address?

2    A.  Ms. Mazarin does.

3    Q.  Ms. Still, turning your attention to page 10 of your

4    report -- so this is Exhibit 10, page 10 -- regarding the wire

5    fraud charge.

6          Your report reads, "The superseding indictment does

7    not include a wire fraud charge.  Therefore, the fiat sources

8    were not determined to be illicit."

9          Did I read that correctly?

10   A.  Are we on page 10, or are we on page 11?

11   Q.  On page 10 at the very top; first two sentences, top of the

12   page.

13   A.  Ah, I see.  Yes.

14   Q.  Is it your intention to offer an expert opinion that the

15   lack of substantive wire fraud counts in the indictment is some

16   indication that Mr. Sterlingov's purchases are more likely to

17   be legitimate?

18   A.  No.

19   Q.  No.  But you are suggesting here that, because the

20   superseding indictment does not include a wire fraud charge,

21   that the fiat sources were not determined to be illicit; isn't

22   that right?

23   A.  I am making a connection to previous indictments that I've

24   read involving cryptocurrency where they typically involve some

25   type of wire fraud charge.

1          THE COURT:  Can I -- just to speed things along here,

2     I don't think that this witness is qualified to testify about

3     Teslas or Lamborghinis or wire fraud charges or any of that.

4     So I won't allow any of that testimony on any of those topics.

5          MS. PELKER:  Thank you, Your Honor.  That will help

6     us skip things over a bit.

7          Does Your Honor have a position already about

8     sanctions and the relevance of whether Bitcoin Fog was or was

9     not sanctioned?  I believe there's a suggestion --

10          THE COURT:  You want to point to something in the

11     report?

12          MS. PELKER:  This is page 18 of the report where

13     Ms. Still writes that "It is important to note here that

14     Bitcoin Fog is not and has never been sanctioned."

15          THE COURT:  You mean -- OFAC sanctions, I can't --

16     unless you have something else to offer on that.

17          MR. EKELAND:  What page was that?

18          THE COURT:  18.  I wouldn't see any basis based on

19     what you've done on the direct or in the report, Mr. Ekeland,

20     to believe that this witness has any expertise on OFAC

21     sanctions or anything along those lines.

22          It seems to me she's much more of a technical expert

23     rather than that type of expert.

24          MR. EKELAND:  Your Honor, I think I'm inclined to

25     agree with you.  Could you point me to where --

```
1                    THE COURT:  Page 18.

2                    MS. PELKER:  18.  It's in the PayJoin section, the

3       second paragraph.

4                    MR. EKELAND:  Oh, okay.  On the OFAC.  We agree, Your

5       Honor.

6                    THE COURT:  All right.  So you don't need to get into

7       that.

8       BY MS. PELKER:

9       Q.  In your testimony yesterday, you discussed funds tied to

10      the terrorist group Al-Qassam Brigades; is that right?

11      A.  Yes.

12      Q.  I'm going to direct your attention now back to the defense

13      binder, Exhibit --

14                   THE COURT:  How much more time do you think you're

15      going to need?  We've been going for close to an hour and a

16      half, I think.  Maybe we started a little after 9:00.

17                   MS. PELKER:  Probably maybe 15 -- 10 minutes, Your

18      Honor.

19                   THE COURT:  Why don't we finish that up, and then

20      we'll take a break and come back for the redirect.

21                   MS. PELKER:  Yes, Your Honor.

22      BY MS. PELKER:

23      Q.  This is Defense Exhibit D.  Turning to page 7, this is a

24      screenshot of the -- I guess there's no page numbers on here,

25      but it's the screenshot of the government's complaint.
```

1    A.   Section Bravo or Delta?

2    Q.   D, Delta.

3    A.   In the defense?

4    Q.   This is Exhibit D in the defense binder.  This is the

5    PowerPoint.

6    A.   Which page are we looking at?

7    Q.   Page 7, the screenshot of the government's complaint.

8    A.   Oh, I believe you're referring to the United States

9    District Court for the District of Columbia Civil Forfeiture.

10   Q.   Yes.  You're aware that that's a civil forfeiture

11   complaint?

12   A.   Yes.

13   Q.   You're not disagreeing that the addresses and accounts set

14   out in that complaint are tied to Al-Qassam Brigades, are you?

15   A.   No.

16   Q.   And you testified yesterday that CipherTrace and

17   Chainalysis and other blockchain analytics companies offer risk

18   flagging for their exchange customers monitoring funds into and

19   out of the platforms; is that right?

20   A.   Risk rating?

21   Q.   Risk flagging; risk alerts, flagging.

22   A.   Yes.

23   Q.   Isn't it true that for terrorism financing, sanctioned

24   entities, many exchanges are very risk averse because of the

25   criminal liability that could attach with moving those funds?

1    A.   Yes.

2    Q.   And isn't it true that an exchange may want to be alerted

3    to transfers even several steps removed from a sanctioned

4    entity or entity tied to terrorism?

5    A.   Depends on the exchange.

6    Q.   But some may?

7    A.   Some may, yes.

8    Q.   Now, turning to the next page, page 9, you didn't testify

9    yesterday and you're not suggesting that someone from the

10   Al-Qassam Brigades law enforcement prosecution team looked at

11   this and concluded that a customer was funding -- was sending

12   funds to Al-Qassam Brigades, are you?

13   A.   No.

14   Q.   And looking at this chart -- in fact, isn't one of the very

15   first things taught in every basic blockchain tracing course

16   that you don't trace through a service on-chain?

17   A.   That is what we teach.

18   Q.   And any trained investigator looking at this would pause at

19   Entity 1 if they could determine that it was a service?

20   A.   I don't know.

21   Q.   Wouldn't you teach in your classes that investigators

22   should pause at Entity 1 because you can't trace through a

23   service?

24   A.   This is not a representation of a custodial or noncustodial

25   service.

1    Q.  Again, not what I'm asking.  Wouldn't you -- Entity 1,

2    wouldn't that cause many investigators to pause, in part,

3    because you can't trace through a service?

4    A.  I would hope so.

5    Q.  Now, you criticized Chainalysis yesterday as just showing

6    things as big circles; is that right?

7    A.  I demonstrated that these are circles.

8    Q.  But one of your critiques was that you say that that

9    doesn't provide as much detail as you want to see in a tracing

10   product; is that right?

11   A.  I'm referring to single-entity tracing.

12   Q.  And you've never used Chainalysis, right?

13   A.  Right.

14   Q.  Are you aware, though, that if you click on those big

15   circles or the lines connecting them, then you can see all of

16   the addresses, all of the transactions, all of the transaction

17   hashes?

18   A.  Yes.

19   Q.  You understand, in submitting a sworn declaration to the

20   Court, it's important to accurately characterize the reports

21   you're using, right?

22   A.  Yes.

23   Q.  Now, turning your attention to Exhibit 10 in the

24   government's binders, on page 8 of your report, you write,

25   "Recently, a federal judge dismissed the testimony of a witness

1    who relied upon data which had not been verified within a

2    two-year time frame, as it violated DOJ guidelines."

3             Is that reading accurately?

4    A.  You said page 10 or --

5             THE COURT:  I think she said page 8.

6             MR. EKELAND:  It was page 8.

7             THE COURT:  Page 8 of Exhibit 10.

8    BY MS. PELKER:

9    Q.  It's under lack of data integrity, the second bullet point.

10   A.  Yes.

11   Q.  And you cite to a news article which links to those

12   guidelines; is that right?

13   A.  Courthouse News.

14   Q.  And did you read the article before citing it?

15   A.  Yes.

16   Q.  You're aware that the article is about an antitrust case?

17   A.  Yes.

18   Q.  And directing your attention to Exhibit 27, are those the

19   guidelines cited in the article?

20   A.  This looks familiar, yes.

21   Q.  And are you aware that these are the 1997 horizontal merger

22   guidelines for merger-specific efficiencies modeling in

23   antitrust matters?

24   A.  I can read the date and the front page; horizontal merger

25   guidelines.

1    Q.  You're aware that this case has nothing to do with market

2    efficiencies modeling for mergers?

3    A.  No.

4                MS. PELKER:  Government moves to admit Exhibit 27.

5                THE COURT:  Any objection?

6                MR. EKELAND:  No objection.

7                THE COURT:  Exhibit 27 is admitted.

8                (Government Exhibit 27 was admitted.)

9                MS. PELKER:  Just a moment, Your Honor.  I think I

10   may be done.

11               THE COURT:  Okay.

12               MS. PELKER:  No further questions, Your Honor.

13               THE COURT:  All right.  Is the other witness

14   available to start before lunch today if we get to that point?

15   I just want to make sure we have enough time this afternoon

16   since I have that hearing.

17               MS. PELKER:  I believe so, Your Honor.  We'll

18   confirm.  We had told her around 11:00.

19               THE COURT:  Okay.  Great.  Why don't we -- let me

20   look at my watch since the clock is incorrect.  It's 10:37.

21   Why don't we take a break until 10:50; come back and,

22   Mr. Ekeland, you can do your redirect.  And then we'll move on

23   to the next witness.

24               MS. PELKER:  Thank you, Your Honor.

25               (Recess taken.)

```
1              THE COURT:  Mr. Ekeland, you may proceed.
2              MR. EKELAND:  Thank you, Your Honor.
3                        REDIRECT EXAMINATION OF
4                             JONELLE STILL
5    BY MR. EKELAND:
6    Q.  Ms. Still, do you still have the government's exhibit
7    binder up there with you?
8    A.  Yes.
9    Q.  Do you still have the defense exhibit binder up there with
10   you?
11   A.  Yes.
12   Q.  If I could ask you to turn to what's in evidence as Defense
13   Exhibit C, which is your defense expert report in the defense
14   binder, and just let me know when you've got that.
15   A.  I'm here.
16   Q.  If you could also go to the government's exhibit binder and
17   go to what's in as evidence as, I believe, Government
18   Exhibit 22, which is "How to Peel a Million:  Validating and
19   Expanding Bitcoin Clusters."
20   A.  Yes.
21   Q.  And if I could ask you to turn to page 12 of
22   Ms. Meiklejohn's article, and then to page 22 of your expert
23   report.
24   A.  Page 12 of the article and what page?
25   Q.  So page 12 of Ms. Meiklejohn's report; that's Government
```

1    Exhibit 22; and then page 22 of your expert report, which is

2    Defense Exhibit C; should be behind Tab C.

3            THE COURT:  If you're answering my question about

4    where the figures were in the report, I found that on my own.

5            MR. EKELAND:  Thank you, Your Honor.  In part, I am,

6    but I would like to question the witness about this a little

7    bit.

8            THE COURT:  Okay.

9    BY MR. EKELAND:

10   Q.  So, Ms. Still, just turning to your expert report on

11   page 22, could you just read on page -- top of 22, those first

12   two paragraphs there.

13   A.  At the top?

14   Q.  Yes, the first -- the one starting Section 7.31 of "How to

15   Peel a Million," if you could just read that paragraph and the

16   following paragraph.

17   A.  Yes.  "Section 731 of 'How to Peel a Million' attempts to

18   find a link between a withdrawal from Mt. Gox and a deposit to

19   Bitcoin Fog.  Both forward tracing heuristics, find next and

20   find next 2, failed after the first transaction hop.  They were

21   able to produce a trace using a backward tracing heuristic, but

22   they say this heuristic produces more errors.

23            "The academic cited in 'How to Peel a Million' lists

24   a wide range of error rates for various heuristics ranging from

25   12.7 percent to 64.19 percent.  Notably, the heuristics with

 1    the highest claimed accuracy rate, find next and find next 2,

 2    were the heuristics that failed to find a link between the

 3    Mt. Gox transactions and Bitcoin Fog."

 4    Q.  And then just turning your attention to page 12 of

 5    Government Exhibit 22, Ms. Meiklejohn's article, Section 7.2

 6    entitled "Evaluating the Heuristic," if you could just take a

 7    look at that real quick and just look up when you're done

 8    examining it.

 9            Do you see the table on top of page 12, the top

10    header to it says "Heuristic" -- there's a column for

11    heuristic, there's a column for Expsn, which I think means

12    expansion, and then FDR; do you see that?

13    A.  Yes.

14    Q.  Is that where you got the error rates for your expert

15    report?

16    A.  Yes.

17    Q.  And could you just briefly take us through the error rates

18    as listed here and as discussed in your report.

19    A.  Sure.  So the error rates find next, find next 2, that

20    would be Sarah Meiklejohn's new research relating to the peel

21    chain identification.

22    Q.  And just to be clear, these are error rates related to

23    heuristics, correct?

24    A.  Correct.

25    Q.  Okay.

 1    A.   FDR, false discovery rate, expansion factor; if we look at

 2    Androulaki, Meiklejohn, Goldfeder, Ermilov, you can see a

 3    number of different false discovery rates, FDR, ranging from

 4    12.7 to about 64.

 5         In addition, we can view the expansion rates ranging

 6    from 28.6 to 93.03.

 7    Q.   And just -- if you could explain what an expansion rate is.

 8    A.   As I understand the expansion rate, as we expand -- as she

 9    expands her trace, that is representing higher error.  Does

10    that make sense?

11         THE COURT:  Not to me.

12    BY MR. EKELAND:

13    Q.   If you could maybe explain that to the Court a little more.

14    A.   So we can see the expansion rate; for example, with

15    Ermilov, 28.6, the FDR is 12.7.  Now we can compare that to

16    find next and find next 2; the expansion rate 147.43, with the

17    FDR being really low of .62.

18         THE COURT:  I understand what FDR is.  That's fairly

19    self-explanatory.  But what I don't understand is what the

20    expansion rate is.

21         THE WITNESS:  Like, the accuracy or the risk of

22    ingesting, like, false positives.

23         THE COURT:  Isn't that what a false discovery rate

24    is; that's a false positive?

25         THE WITNESS:  It's more like the more that you

1    ingest, like, the higher the risk of that particular trace will

2    be, if that makes sense.

3             So false discovery rate, expansion rate, basically,

4    the larger this thing gets, it depends on which heuristic is

5    used that that rate will adjust to.

6             THE COURT:  I guess I'm still not understanding what

7    expansion rate is or the expansion factor.

8             THE WITNESS:  Okay.  So is there -- let me look for

9    the actual explanation, and I'll read it.  I know we don't want

10    to sit here all day; I appreciate that.  But I am looking for

11    this to be able to explain that better.

12             THE COURT:  That's fine.

13             THE WITNESS:  Okay.

14    BY MR. EKELAND:

15    Q.  Just turning your attention to page 11, Section 7.1, in the

16    first paragraph, last sentence.  Is that where it says, "Our

17    expansion heuristic," is that where they're --

18    A.  The transaction's transaction expansion and backward

19    transaction transaction expansion.

20             So, "After defining this heuristic, our goal was to

21    identify its accuracy and effectiveness.  To measure

22    effectiveness, we defined the expansion factor at Expsn as the

23    increase of a cluster's coverage in terms of its transactions

24    (100 multiplied by expansion sub CC, sub tx).  To measure

25    accuracy, we treated as ground truth the set of tags provided

1       to us in the Chainalysis Reactor tool, which are tags that are

2       gathered internally by Chainalysis and from public websites and

3       documents."

4               Shall I keep reading?

5               THE COURT:  I think that you're now on to the FDR.

6       If I'm understanding this correctly, the expansion factor

7       doesn't measure the accuracy, but measures the effectiveness,

8       and that is how many transactions are captured.

9               THE WITNESS:  The effectiveness is the correct word.

10              THE COURT:  Okay.  So the number of transactions that

11      are captured versus the accuracy.

12              FDR measures accuracy, and the expansion factor is,

13      at least as defined here, is the effectiveness measured in

14      terms of the number of transactions that are captured.  Is that

15      fair?

16              THE WITNESS:  Yes.

17              THE COURT:  Okay.  Thank you.

18              MR. EKELAND:  Just for the record, Ms. Still was

19      reading from page 11 of Government Exhibit 22 on the right-hand

20      side, the second full paragraph under Section 7.1, defining the

21      heuristic.

22      BY MR. EKELAND:

23      Q.  Ms. Still, turning your attention back to the FDR table at

24      the top of page 12 of Ms. Meiklejohn's report, you would --

25      would you agree that the find next and the find next 2

1    heuristics are the ones with the lowest FDR rate?

2    A.  Lowest FDR rate, yes.

3    Q.  And is it your understanding that that -- when that

4    heuristic was run on a trace of -- in relation to

5    Mr. Sterlingov and Bitcoin Fog, it did not verify the trace?

6    A.  They ran it forward, find next and find next 2, ran it

7    forward from Mr. Sterlingov's Mt. Gox account, and it did fail

8    on that first transaction.

9    Q.  And just directing your attention to page 13 of

10   Ms. Meiklejohn's, et al.'s paper in Section 7.3.1 with the

11   header "Bitcoin Fog," and directing your attention to the third

12   paragraph in that section starting, "We then followed the

13   funds," could you just read that paragraph for us.

14   A.  Yes.  "We then followed the funds from Mt. Gox withdrawal

15   forwards using follow forward to see if we would reach the

16   deposit to Bitcoin Fog.  Both find next and find next 2 failed

17   after only one hop.

18          "However, as the two outputs in transaction 2, TX2,

19   had the same address features and were spent in transactions

20   with the same features, our algorithms were, thus, unable to

21   isolate the change output.  These outputs were both,

22   furthermore, fresh, meaning it was their first appearance in

23   the blockchain.  So the other change heuristics described in

24   Section 7.2 also would have been unable to follow the

25   transaction forward."

1    Q.  And then I believe you discussed in your expert report how

2    Ms. -- Professor Meiklejohn, et al., traced backwards to

3    attempt to confirm the trace; is that right?

4    A.  Yes.

5    Q.  And I think you also reference in your expert report that

6    the follow backward tracing heuristic is more prone to error

7    than the heuristic, the find next and find next 2 heuristic; is

8    that right?

9    A.  Yes.

10   Q.  So directing your attention down to the last paragraph on

11   the left-hand side under Section 7.3.1, "Bitcoin Fog," where

12   you were just reading, starting with the -- where it says,

13   "While successful in this case," could you just read the first

14   couple sentences there.

15   A.  "While successful in this case, it is important to remember

16   our discussion in Section 5.2; that follow backward is more

17   prone to false positives than follow forward.  Indeed, in 2011,

18   all transactions had these same features, as the ones we used

19   were not introduced until years later.

20            "Meaning, follow backward could continue backwards

21   indefinitely without ever registering a change in the entity

22   performing the transactions."

23   Q.  Do you agree with that?

24   A.  Do I agree with her research?

25   Q.  With what she's saying there.

1    A.  I understand it.  I haven't applied this follow forward or

2    follow backward myself.

3    Q.  So why, in your opinion -- if you have one -- is there such

4    a wide range of error rates between these different heuristics?

5    A.  Well, these -- so you're referring to Table 4 of page 12?

6    Q.  Yes.

7    A.  Okay.  These heuristics, in part, are additive.  So we may

8    think of them as perhaps -- and we can flip to confirm.  But

9    for argument's sake, Androulaki, et al., their definition,

10   their heuristic, the characteristics that they are taking into

11   consideration for their peel chains will not be the same as

12   Ms. Meiklejohn's; however, she will add something to that,

13   Goldfeder will add something to that, Ermilov will add

14   something to that.  So they're all organized in that way.

15          So for these to then -- I mean, this is extremely

16   difficult research; extremely difficult research.  It does need

17   to be peer-reviewed here.

18          But what they are discovering, essentially, is that

19   as -- the more that Pac-Man -- I'm just -- that heuristic 2 --

20   right? -- is moving along that chain, the problem here is if we

21   refer back to -- and this is not confirmed here.  But if we

22   refer back to Ms. Bisbee's expert testimony, she talks about

23   the smaller chain, the smaller peel coming off of that chain,

24   and that is defined as the change address; that's not

25   necessarily true.

1    Q.  Why isn't that necessarily true?

2    A.  Peel chains can be bigger or larger depending on however

3    that entity in particular is using them.  They're not

4    necessarily the smaller output.  They're not necessarily the

5    larger output.

6    Q.  And when it comes to Chainalysis Reactor and its

7    heuristics, are you aware of any statistical analysis of its

8    error rates?

9    A.  No.

10    Q.  Are you aware of any scientific paper assessing its

11    accuracy?

12    A.  No.

13    Q.  And you reviewed Ms. Bisbee's testimony at the *Daubert*

14    hearing, correct?

15    A.  Yes.

16    Q.  And did she testify as to her knowledge of any error rates?

17    A.  She testified, I believe, in her testimony that she was not

18    aware of any error rates.

19    Q.  And just -- now, returning your attention to page 14 of

20    Ms. Meiklejohn, et al.'s, report in Government Exhibit 22, and

21    directing your attention to Section 8 where it says,

22    "Limitations and countermeasures"; do you see that paragraph?

23    A.  Yes.

24    Q.  Could you just read the first full paragraph right there

25    for us.

1    A.   "Both our heuristics and our classifier could be made

2    significantly less effective by a motivated party randomizing

3    the features of their transactions and addresses.  Performing

4    this randomization requires a relatively high level of

5    technological sophistication and familiarity with Bitcoin, but

6    does not incur any computational or monetary costs and would be

7    effective in making it either impossible to follow hops in a

8    peel chain because their features would be randomized and,

9    thus, not match the expected behavior, or make the features

10   associated with the cluster so varied that any attempts to

11   follow its transactions would" likely -- "would be likely to

12   result in a false positive.

13          "Transactions that are private and internal to the

14   ledger of some large entity, like an exchange, would also make

15   it impossible for our heuristics, which rely on public

16   blockchain data, to work.  Given this, investigators should not

17   rely on the output of either of our heuristics or our

18   classifier as definitive evidence."

19   Q.  Do you agree with that last sentence?

20   A.  I do.

21   Q.  And can you just explain briefly why you agree with that

22   last sentence.

23   A.  Briefly.  For any given transaction, there are a number of

24   indicators of the transaction type, which Ms. Bisbee refers to

25   as a fingerprint in her report.  This is what I would term the

1    metadata or the raw data of the transaction itself.  Any one of

2    these can change in every single transaction and oftentimes

3    they do.

4            This can signal a change in ownership of that

5    particular Bitcoin address.  So it is possible, and there are

6    certain wallet softwares and companies out there designing

7    these services specifically to evade these heuristics.

8            For example, Samourai Wallet.  Samourai's actually a

9    company.  Samourai has a number of different techniques that

10   they employ, including using the onion router in order to evade

11   any IP detection or any of these heuristics.

12           I'm sorry.  I know you said be brief.  I'm doing my

13   best.

14           One such service they offer is something -- offer is

15   something called shotgun.  And you can look that up on your own

16   and read about it, of course.  This type of service, you will

17   go through a mixer.  It's going to randomize your inputs and

18   outputs, and then it will pay you out in single output

19   transactions, not in the same block, but in different blocks.

20   That is one example.

21   Q.  So would it be fair to say -- am I understanding your

22   testimony correctly, that there are a number of ways to

23   obfuscate your transactions and, sort of, foil the heuristics

24   at play in any of these blockchain forensic analytic tools?

25   A.  In fact, that is the goal.

1  Q.  That is the goal.  And so I think you mentioned that you

2  train law enforcement.

3          And when you train law enforcement, do you tell them

4  to rely on the heuristics as definitive evidence?

5  A.  No.

6  Q.  Are you aware of how any courts in other countries treat

7  this kind of blockchain forensics at issue in this case?

8  A.  Yes.  In Canada and in certain courts in Spain -- and I

9  cannot tell you specifically who I've spoken with regarding law

10 enforcement, but you may infer this from this testimony, I

11 suppose -- these courts are requiring that any traces produced

12 to the court be made with publicly available tools.

13 Q.  And is Chainalysis Reactor a publicly available tool?

14 A.  No.

15 Q.  And have you had access to it for purposes of your expert

16 report?

17 A.  No.

18          THE COURT:  As I've said, if someone just asks me to

19 authorize funding for a license or finds a way to grant a

20 license, I'm prepared to do that.

21          MR. EKELAND:  Understood, Your Honor.  But we haven't

22 had it to that point.  That, I think, was the point up until

23 now.  That we've had to ask for it, too, is another issue.

24 Because if this was FBI cyber that was doing this and not a

25 private proprietary company --

```
 1                    THE COURT:  Move on.
 2                    MR. EKELAND:  -- we wouldn't have this issue.
 3        BY MR. EKELAND:
 4        Q.  Ms. Still, the government asked you a series of questions
 5        about, I believe it was like the Mt. Gox records and the Silk
 6        Road records, and they asked you if you had ever examined the
 7        true records in any of your cases.
 8                    Do you recall that line of questioning?
 9        A.  Yes.
10        Q.  In relation to the discovery in this case, anything in the
11        discovery, have you had access to the true records to Mt. Gox?
12        A.  No.
13        Q.  And when I say true, does -- do you understand me to say
14        the records in native form?
15        A.  Yes.
16        Q.  And have you had access anywhere in the discovery to the
17        true records of Silk Road?
18                    THE COURT:  I think this was asked and answered,
19        wasn't this?  I thought they -- the prosecution asked exactly
20        the same questions.
21                    MR. EKELAND:  I don't believe they did, Your Honor,
22        but --
23                    THE COURT:  Okay.
24                    MR. EKELAND:  -- I could be wrong.  I'd have to look.
25        BY MR. EKELAND:
```

1    Q.  Essentially, anywhere in the discovery provided by

2    government in relation to any of the darknet marketplaces or

3    any of the exchanges, have you had access to any of the native

4    data?

5    A.  It's not clear to me that I have received the native data.

6    Q.  And you've looked for it?

7    A.  I see indicators that some may be natives.  I'm thinking

8    specifically LocalBitcoins.  However, I do need to understand,

9    I think, from the government, if they could please confirm

10   which are true and which are natives, I would appreciate that

11   greatly.  It would enhance my ability to do my job.

12           I say LocalBitcoin specifically because I did notice

13   a number of what I believe are missing transactions from that

14   table provided.

15   Q.  Do you recall the government asking you questions about how

16   it might be possible for an administrator of a, quote-unquote,

17   criminal darknet site to disguise their withdrawals as normal

18   user withdrawals?

19   A.  Was your question do I recall?

20   Q.  Do you recall that line of questioning by the government?

21   A.  Yes.

22   Q.  In your expert opinion, if you saw a pattern of

23   transactions that looked like normal user withdrawals without

24   any more evidence, would you conclude that those user

25   withdrawals were evidence of someone being an administrator of

1    a criminal dark website?

2    A.  No.

3    Q.  And are there other reasons for people to use mixers

4    besides money laundering?

5    A.  Yes.  People would use mixers to preserve their privacy

6    on-chain.

7    Q.  Two related questions.  First, why would people need to

8    preserve their privacy on-chain when --

9         MS. PELKER:  Objection, Your Honor.  I think we're

10    getting well outside the scope of the government's cross here.

11         MR. EKELAND:  Your Honor, they asked multiple

12    questions about mixers and criminal administrators and implied

13    that the only usage for these mixers and these darknet sites

14    was criminal activity.

15         So what I'm exploring here is an alternative line of

16    questioning related directly to the government's questioning

17    about mixers and their legitimate use.

18         THE COURT:  My only question at this point is one of

19    timing.  I really think that all of this is going way beyond

20    what I need for purposes of making a *Daubert* determination.  It

21    sounds more like the examinations you actually want to make in

22    front of the jury, which you will have your opportunity to do.

23    How much time do you think you're going to need?

24         MR. EKELAND:  I can wrap this up in another five, ten

25    minutes, tops.

 1              THE COURT:  Okay.  That's fine.

 2     BY MR. EKELAND:

 3     Q.  So briefly, Ms. Still, could you just explain why somebody

 4     would use something like a mixer for privacy purposes when the

 5     blockchain itself is supposed to be anonymous?

 6     A.  So the blockchain, if you're referring to cryptographic

 7     ledgers specifically related to transactional data, people

 8     would want to preserve their privacy for any number of reasons.

 9     One, they may be privacy-conscious, and they would prefer to

10     remain, quote-unquote, anonymous.

11              However, I must disagree that the blockchain ledger,

12     if we're referring to the cryptographic ledger that keeps the

13     record of transactions, is not anonymous.  It is considered

14     pseudo-anonymous.  Therefore, the address, the transaction

15     hash, the amounts, the dates, the times, the types of addresses

16     utilized by the person and the clustering provided by

17     open-source explorers like Wallet Explorer may reveal that

18     person's identity via a chain of transactions.

19              It is also possible that someone, for example, a

20     high-net-worth individual, may want to preserve their privacy

21     related to their finances, including cryptocurrency, so they

22     may protect themselves from any physical harm, what is termed

23     in the industry a wrench attack.

24              THE COURT:  Maybe I spoke too quickly on this.  I am

25     actually not sure this witness is qualified or you've laid a

1    foundation to say that she's qualified to testify about why

2    people engage in particular behavior.

3            I understand she has expertise and experience

4    relating to Bitcoin tracing.  I don't know that -- I haven't

5    heard testimony that she's gone out and done studies or read

6    studies or has any expertise on the motivations of people who

7    are using mixers, for example.

8            MR. EKELAND:  I could follow up on that.

9            THE COURT:  It's up to you.  It's not in the expert

10   report either, I don't think.  If it is, maybe you want to

11   point me to it.

12           I don't see that she's an expert on why people --

13   didn't come in today and yesterday thinking that she was being

14   offered as an expert on the motivations of people who are using

15   mixers.  Is it in the expert report?

16           MR. EKELAND:  In the interest of time, Your Honor,

17   I'm going to reserve that issue.  I think she could testify to

18   it.  But in the interest of time today, I'm going to move on,

19   on that.

20           MS. PELKER:  The government is going to note its

21   objection for the record to Ms. Still testifying to anything

22   beyond what's been disclosed at this point in her report.

23           THE COURT:  Fair enough.  We're three weeks away from

24   trial.  I think that's a fair point, and I've also given you

25   several bites at the apple on this.

1          MR. EKELAND:  I believe Mr. Verret is noticed that in

2    his expert testimony, so I don't think this is something to die

3    on, Your Honor.

4          THE COURT:  Okay.  That's fine.

5    BY MR. EKELAND:

6    Q.  Ms. Still, just one final thing.  If you could go back to

7    your expert report, which is on Defense Exhibit C, and turn to

8    page 3.  And then if you could just look at -- it's the second

9    paragraph up from the bottom.  It's just a single sentence.

10   And if you could just read that for us.

11   A.  "Three primary factors which limited this expert report are

12   as follows:  The integrity of Chainalysis's data, access to the

13   pertinent data, and time.

14   Q.  And I'm just interested in you discussing that last factor,

15   time, in terms of preparation of report.  Did you -- well, why

16   are you saying that there?

17         MS. PELKER:  Objection, Your Honor.  This is beyond

18   the scope of the cross.  And if defense is trying to use this

19   as a way to shotgun in an argument about a continuance, I don't

20   think this is the appropriate vehicle for it.

21         MR. EKELAND:  That's incorrect, Your Honor.  If I may

22   connect --

23         THE COURT:  I'm just not sure that I see what this

24   has to do with whether she's qualified as an expert, but I'll

25   give you another two minutes, and we can wrap it up.

1              MR. EKELAND:  This is directly related to the

2     government's cross.

3              THE COURT:  Okay.  Go ahead.

4     BY MR. EKELAND:

5     Q.  Okay.  Ms. Still, can you just discuss why you mentioned

6     that time was a factor here.

7     A.  Yes.  I did have two weeks to review thousands of documents

8     produced by the government, millions of transactions and

9     addresses.

10    Q.  And do you recall that the government asked you about

11    certain notes and things that you had that didn't make it into

12    your expert report?

13    A.  Yes.

14    Q.  And would you be willing to produce those to the government

15    if they asked?

16    A.  Definitely.

17              MR. EKELAND:  No further questions, Your Honor.

18              THE COURT:  All right.  Thank you.  I will say,

19    though, as you know, I've given the defense multiple bites at

20    the apple and extended the expert deadline on multiple times.

21    I do think that three weeks from trial, we're -- absent,

22    really, truly extraordinary circumstances -- done at this

23    point.  And we shouldn't be offering any new expert opinions or

24    new bases for expert opinions because the bases have to be

25    disclosed in the reports.  And we are, as I said, three weeks

1    away from trial, and I've given the defense a huge amount of

2    leeway on this already.

3              MR. EKELAND:  Your Honor, we're not -- we're simply

4    saying that what the government was asking for, that they can

5    have on that, that's all.  We weren't trying to add anything

6    new to the expert report.

7              We do note for the record that the government's

8    expert witness, I believe, from Chainalysis produced a

9    supplemental declaration, and I believe one or two other

10   documents related to their expert report.

11             But understood, Your Honor.

12             THE COURT:  All right.  The witness is excused.

13   Thank you for being here.

14             THE WITNESS:  Thank you.

15             THE COURT:  Before we call the next witness, I have

16   one question.  I'm not sure whether you'll have the answers to

17   this today, but I think it needs to be on the radar to think

18   about.

19             This witness and the witness's expert report relies

20   heavily on what I'm calling the Kappos article, but you've been

21   referring to as the Meiklejohn article, "How to Peel a

22   Million."

23             And I'm not quite sure how we're going to deal with

24   this at trial because there is information in this report and

25   analysis in this report which is inculpatory to Mr. Sterlingov.

1    I don't know that it's fair to introduce and rely on part of

2    the report which casts doubt on the government's analysis and

3    not rely on other portions of it which say that, actually, the

4    government's analysis is correct with respect to at least the

5    connection of Mr. Sterlingov with the initial deposits into

6    Bitcoin Fog.

7            I just flag this as an issue to think about at this

8    point in time.  I don't know that I have the right answers of

9    how to deal with that, but there is material that's helpful to

10   the defense in this article, and there's also information that

11   is damaging to the defense in the article.  And we'll have to

12   figure out how to address that issue.

13           MS. PELKER:  Yes, Your Honor.  I am not entirely

14   clear on what the grounds for this actually being admitted into

15   evidence in the defense case --

16           THE COURT:  It may not be admitted as an exhibit in

17   the defense case.  But, for example, if Ms. Still is going to

18   testify to the false positives from the three or four studies

19   that were done on the -- using behavioral heuristics, her only

20   knowledge of that comes from this article.

21           And so even though the article itself may not be

22   introduced as an exhibit, the witness is relying on the

23   article.  And maybe you're not -- you wouldn't plan to cross

24   and then say to the witness, didn't the article also say and

25   conclude, rely on their heuristics that Mr. Sterlingov, in

1    fact, was the person who made the initial deposits into Bitcoin

2    Fog.

3            If you're not going to ask that question and not

4    object to the defense asking the question about the FDRs in the

5    report, that's fine, and we won't have an issue.  But if you

6    object -- either object to the reliance on the FDRs coming in

7    through Ms. Still or you yourself want to cross on this, then

8    I'm going to have to figure out the answers to the questions

9    about what the right balance is.

10           MS. PELKER:  And I think that if Ms. Still is

11   intending to testify to anything regarding her reliance on this

12   report or this report in forming her assessment that the

13   clustering is not accurate, we would want to cross on that.

14           But, Your Honor, I think we also just heard testimony

15   that the heuristics that are set out in this research are not

16   Chainalysis's heuristics.

17           THE COURT:  I know.  Right.

18           MS. PELKER:  I think it's incredibly misleading to

19   put before the jury a study that says there's a 60 percent

20   error rate on something that's a totally different heuristic

21   than anything that's actually being presented in evidence here.

22           THE COURT:  Okay.  Fair enough.  Yes, Mr. Ekeland?

23           MR. EKELAND:  I would disagree with the

24   characterization that that would be misleading to the jury.  I

25   think it would be very informative to the jury to know that

1    there's a wide range of error rates across all these different

2    heuristics and that Chainalysis, you know -- combine that with

3    the fact that Chainalysis, had they been bothered to do an

4    internal analysis of its error rates, I think that would be

5    highly informative to the jury and very helpful to them in

6    their analysis of what's happening here.

7            THE COURT:  All right.  Well, I'm just flagging these

8    as issues that we're going to have to deal with.  We'll have to

9    figure out time for argument and analysis on how these -- how

10   and whether these can be used.

11           All right.  So you want to call your next witness?

12           MS. PELKER:  Yes, Your Honor.  Government calls

13   Ms. Mazars de Mazarin.

14           THE COURTROOM DEPUTY:  Would you please raise your

15   right hand.

16           (Witness sworn.)

17           THE COURTROOM DEPUTY:  Thank you.  Please be seated.

18                       DIRECT EXAMINATION OF

19                    VALERIE MAZARS de MAZARIN

20   BY MS. PELKER:

21   Q.  Good morning, Ms. Mazars de Mazarin.  Could you spell your

22   name for the court reporter.

23   A.  My first name is Valerie, V-a-l-e-r-i-e.  And my last name

24   is spelled M-a-z-a-r-s d-e M-a-z-a-r-i-n.

25   Q.  Ms. Mazars de Mazarin, if you'd like, you can move the

1    microphone, if that's easier for you.  Where do you work?

2    A.  I work at the U.S. Department of Health and Human Services

3    in the Office of the Inspector General.

4    Q.  How long have you worked in that office?

5    A.  Since April this year.

6    Q.  Where did you work prior to joining the Office of the

7    Inspector General?

8    A.  At the FBI.

9    Q.  What was your position when you were with the FBI?

10   A.  I was a computer scientist.

11   Q.  While at the FBI, were you assigned to work on the Bitcoin

12   Fog and Roman Sterlingov investigation?

13   A.  Yes.

14   Q.  In your new role with the OIG, are you still working with

15   the FBI?

16   A.  Yes.

17   Q.  What does that work look like?

18   A.  I'm a member of the Washington Field Office Cyber Task

19   Force.  HHS-OIG has a memorandum of understanding, which means

20   that I can work freely on any of their cyber cases and provide

21   support, forensics, and analysis.

22   Q.  And has OIG agreed to allow you to continue working on this

23   case through the continued trial date?

24   A.  Yes, they have.

25   Q.  Taking a step back, could you summarize your educational

1    background.

2    A.  I have a bachelor of science in computer science from

3    Georgetown University.

4    Q.  Did you work in the computer science field after graduating

5    from Georgetown?

6    A.  Yes.

7    Q.  Where did you first work?

8    A.  I first worked at Honeywell International -- I worked at

9    Honeywell International, which is an international conglomerate

10   of manufacturing companies, in an IT department for their

11   chemical company.

12   Q.  What did your work at Honeywell entail?

13   A.  I was a solutions architect, which involved prototyping and

14   designing IT solutions to fit into their current collection of

15   applications, and doing testing and code review of potential IT

16   solutions.

17   Q.  Did that also involve things like setting up servers?

18   A.  Yes.

19   Q.  Where did you work after your time at Honeywell?

20   A.  I worked at Booz Allen Hamilton.

21   Q.  What did your work at Booz Allen involve?

22   A.  I was an analytical tool developer.  So a JavaScript,

23   dashboard, and analytics programmer, as well as a consultant.

24   Q.  When did you join the FBI?

25   A.  In January of 2018.

1    Q.  And what were your job responsibilities at FBI?

2    A.  My job role was a combination of digital forensics, data

3    analysis, online undercover support, network administration,

4    and other analyses of novel technologies.

5    Q.  What did your work specifically in digital forensics

6    involve?

7    A.  It spanned creating forensic images and capturing digital

8    evidence live, making forensically sound copies, and using

9    tools and running custom analyses, scripts to look for

10   artifacts on this digital evidence, and to pull off items of

11   interest and explain them to the case team.

12   Q.  What did your -- what sort of data analysis work did you

13   do?

14   A.  Typically, this would involve analyzing web logs and other

15   data collected via search warrants and subpoenas, IP log-ins,

16   user agent strings, and searching for patterns and key

17   information.

18   Q.  Did you also write and develop tools to help review that

19   type of evidence?

20   A.  Yes.

21   Q.  While at the FBI, was part of your responsibilities also

22   case support?

23   A.  Yes, it was.

24   Q.  And what would that sort of case support entail?

25   A.  That would range from assisting on victim interviews,

1    operational activities like searches, doing additional

2    research, and explanation of technologies unfamiliar to the

3    case team to try to determine how to analyze them and pull data

4    off of them.

5    Q.   What are some of the types of cases that you worked on?

6    A.   Typically, they would be computer intrusion cases, wire

7    fraud, cyberstalking, and money laundering.

8    Q.   Are you familiar with the term operational security?

9    A.   Yes.

10   Q.   Could you explain in your own words what that is.

11   A.   To me, it's the practice of protecting one's identity,

12   usually online; to create separation between online activities

13   and one's real-world identifiers.

14   Q.   Could you give some examples of things people do for

15   operational security reasons?

16   A.   The classic example to me is buying a second phone that you

17   intend to use for a short period of time to have a new number

18   to sign up for services with and to receive texts from.

19   Q.   Did your work at the FBI involve trying to pierce cyber

20   criminals' operational security or OPSEC?

21   A.   Yes.

22   Q.   Did your work also involve supporting FBI online undercover

23   operations?

24   A.   Yes.

25   Q.   Without getting into anything sensitive, just at a high

1    level, what did that work entail?

2    A.  It was primarily setting up websites, servers, and profiles

3    in an operationally safe way to provide distance between my

4    identity in real life and the personas online.

5    Q.  Have you completed any relevant professional trainings and

6    certifications?

7    A.  Yes.  I completed two SAMS certifications, and I attended

8    the FBI's computer scientist field operations training.

9    Q.  What were the two SAMS certifications?

10   A.  There was the GREM, which was the GIAC Reverse Engineering

11   Malware; and the GSEC, the GIAC Security Essentials.

12   Q.  Related to the GREM, is analyzing malware something that

13   you also have experience in doing?

14   A.  Yes.

15   Q.  Have you received other trainings in digital forensics or

16   related topics?

17   A.  Yes.

18   Q.  What are some of the topics and areas that those trainings

19   have covered?

20   A.  Red teaming, which is penetration testing or hacking;

21   network traffic analysis; scripting; and automating queries and

22   searches against data and mobile forensics, phones.

23   Q.  Are you familiar with any particular computer programming

24   languages?

25   A.  Yes.  I've written code in a number of languages, including

```
 1    CE, C++ --
 2    Q.  Could you list off --
 3    A.  -- Java --
 4    Q.  Could you list off a few of the programming languages that
 5    you've used.
 6    A.  Yes.  CE and C++, Java, Python, JavaScript, PHP.
 7    Q.  Are you also trained in conducting forensic analysis of
 8    digital evidence?
 9    A.  Yes.
10    Q.  And are your qualifications and credentials further
11    summarized in your curriculum vitae?
12    A.  Yes, they are.
13    Q.  Directing your attention to the binder in front of you to
14    Exhibit No. 1, do you recognize this?  There's two binders.
15    It's the big binder.
16    A.  It's the other binder.  Yes.
17    Q.  Is that your CV?
18    A.  Yes, it is.
19    Q.  Does this accurately relay and summarize your credentials
20    and experience?
21    A.  Yes.
22              MS. PELKER:  Government moves to admit Exhibit 1.
23              THE COURT:  Any objection?
24              MR. EKELAND:  No objection, Your Honor.
25              THE COURT:  Exhibit 1 is admitted.
```

```
 1                    (Government Exhibit 1 was admitted.)

 2     BY MS. PELKER:

 3     Q.  Ms. Mazars de Mazarin, did you do a few areas of work in

 4     the Bitcoin Fog investigation?

 5     A.  Yes.

 6     Q.  Do you understand your testimony for the Daubert hearing

 7     today pertains to the IP address analysis that you did?

 8     A.  Yes.

 9     Q.  And did part of your work in the Bitcoin Fog case involve

10     looking at IP addresses that were used to access different

11     accounts?

12     A.  Yes.

13     Q.  Can you explain what is an IP address.

14     A.  An IP address is an identifier that a computer connected to

15     the internet uses so that the rest of the internet can find it.

16     Q.  And what's the role of the IP address in routing

17     communications over the internet?

18     A.  Typically, communications are directed to a domain name,

19     which then gets translated to an actual IP address, which is a

20     number, much in the way someone might look up a phone number in

21     an address book.  And then the relevant traffic that that

22     server accepts is sent onward to that IP address.

23     Q.  And even if you're not running a website or a server, would

24     your computer still be using an IP address to communicate?

25     A.  Yes.
```

1    Q.  Can a computer access the internet without an IP address?

2    A.  No.

3    Q.  Are IP addresses just randomly generated?

4    A.  No, they're not.

5    Q.  So who controls and assigns the IP addresses?

6    A.  An organization called IANA allocates them out in groups.

7    Q.  And how are they allocated in groups by IANA?

8    A.  Typically, blocks of IP space are reserved for the

9    different Regional Internet Registries.

10   Q.  And is there a Regional Internet Registry that controls the

11   IP addresses for the North America region?

12   A.  Yes.

13   Q.  Which Regional Internet Registry is that?

14   A.  It's ARIN.

15   Q.  If I want to connect to -- my computer in North America to

16   the internet, do I have to go to ARIN to get my IP address?

17   A.  No.  Typically, it would come from your internet service

18   provider.

19   Q.  And how do those internet service providers get their IPs

20   from ARIN?

21   A.  They, typically, tell ARIN if they need more space, they

22   have a block of IPs they have to work with, and they'll work

23   with the registry if they need to expand that.

24   Q.  So can you just summarize, walking us through the hierarchy

25   of the IP address allocation starting from IANA.

1              THE COURT:  Can you spell those out just to make sure

2       the record is clear.

3              MS. PELKER:  Yes.  I did give a term sheet to the

4       court reporter previously.

5              THE COURT:  Okay.  Thank you.

6              MS. PELKER:  IANA is I-A-N-A, the Internet Assigned

7       Numbers Agency; the RIRs, R-I-R-s, are the Regional Internet

8       Registries; and ARIN is A-R-I-N.

9              THE COURT:  Thank you.

10      BY MS. PELKER:

11      Q.  So can you summarize and walk through starting with IANA.

12      A.  So the greater pool of IP addresses is controlled by IANA,

13      and they are then allocated to the RIRs, who then will

14      suballocate those to internet service providers and

15      organizations, who then have their end users or further

16      customers.

17      Q.  Does ARIN and the other regional registries keep track of

18      which companies control which sets of IPs at different times?

19      A.  Yes.

20      Q.  Is there a way to look up that information?

21      A.  Typically, that's done using the WhoIs protocol.

22      Q.  And how do you do lookup using the WhoIs protocol?

23      A.  There are numerous online tools that let you do it.  You

24      can run the WhoIs command in a -- in terminal or command prompt

25      and those to be pre- -- prestaged to do direct connection to

1    some of those consolidated databases.  But other providers,

2    like GoDaddy, will also offer those lookup services in a more

3    user-friendly format on their websites.

4    Q.  Is doing this sort of WhoIs lookup or query something that

5    you and other members of the cybersecurity field often do?

6    A.  Yes.  It's very standard.

7    Q.  What sort of information is included in that WhoIs record?

8    A.  Typically, it's information about the organizations using

9    each IP or block of IPs, including a technical point of

10   contact, an address, email addresses, and phone numbers.

11   Q.  Is there a way to look at historical WhoIs information to

12   determine what the WhoIs information was for an IP on a past

13   date?

14   A.  Yes.  Some companies do record and save that information

15   and make it searchable.

16   Q.  So you're able to do, sort of, a live WhoIs query to give

17   you the real-time information or use a service that's cataloged

18   past queries; is that right?

19   A.  Yes.  Some of those exist.

20   Q.  Do some of those services also record what's called Passive

21   DNS information?

22   A.  Yes.

23   Q.  What is Passive DNS?

24   A.  Passive DNS is a historic record of occurrences of when an

25   IP -- when a domain name resolves to an IP address.  And,

1    typically, it looks like a record storing -- what was the full

2    domain name accessed with subdomain, the IP address that

3    resulted from it, and the date stamp or sometimes time stamp.

4    Q.  And is that sort of Passive DNS information also available

5    for querying and commonly queried by members of the

6    cybersecurity community?

7    A.  Yes.  There are some companies that host that and make it

8    searchable.

9    Q.  Are these WhoIs and Passive DNS directories generally used

10    and relied on by members of the cybersecurity community?

11    A.  Yes.

12    Q.  How did you use that information in your analysis in this

13    case?

14    A.  Primarily, I used those sources to get more background

15    information about how the IP addresses I saw in the logs might

16    have been used specifically, if they seemed to appear to be a

17    residential or business connection versus if they appeared to

18    be used as part of an anonymity network.

19    Q.  And what are some of the tools that you used specifically

20    for this case's analysis?

21    A.  Primarily I used DomainTools and Farsight.

22    Q.  And those are some of the standard tools that you

23    referenced, used and relied on by members of the cybersecurity

24    community?

25    A.  Yes.

1   Q.  Why is it valuable to law enforcement to know who controls

2   a particular IP address of interest in their case?

3   A.  For purposes of further pursuing attribution and for

4   looking up other accounts created or other logs generated from

5   the same machine around the same time.  It can be useful for

6   pivoting.

7   Q.  And the WhoIs record for a particular IP controlled by an

8   ISP, will that record necessarily show the true identity of the

9   end user?

10  A.  No.

11  Q.  And is that information still helpful to law enforcement

12  insofar as they may be able to send a subpoena for additional

13  follow-up?

14  A.  Yes, exactly.

15  Q.  Is it possible for someone to hide the IP address that

16  they're using on the internet?

17  A.  Yes.

18  Q.  Does law enforcement often connect IP addresses with other

19  information or information-gathering tools that they have

20  available to them?

21  A.  Yes.

22  Q.  Could you explain in your own words what a proxy is.

23  A.  A proxy is a server that acts as an intermediary between

24  the end user and the internet sites they want to visit.

25  Q.  Are there companies that offer proxies as a service?

1    A.   Yes.

2    Q.   How do those companies work?

3    A.   Typically, they're a subscription model where you would pay

4    the company for use -- often monthly, for use of a server as a

5    proxy.

6    Q.   And where are the companies getting all these servers?

7    A.   They -- from all different hosting provider companies.

8    They're often hosted all over the world.

9    Q.   What is a VPN?

10   A.   A virtual private network is a service that hosts a

11   collection of, essentially, proxy servers to provide users

12   privacy by giving them rotating options of which server and,

13   therefore, which IP address they access the internet from.

14   Q.   Can people also hide their true IP address by using Tor?

15   A.   Yes.

16   Q.   Can you explain what is Tor.

17   A.   Tor stands for The Onion Router, and they are a network

18   similar to VPNs of servers that are networked together in order

19   to provide internet privacy by routing the traffic through

20   multiple of these computers and servers before they're accessed

21   to the internet.

22   Q.   And who runs Tor?

23   A.   The Tor Project.

24   Q.   What is the Tor Project, just generally?

25   A.   It's a not-for-profit organization.

1    Q.  And is their main responsibility dedicated to running the

2    Tor network?

3    A.  Yes.

4    Q.  Who controls all of these nodes in the Tor network?

5    A.  They're volunteers.  So it ranges from companies to

6    individuals to organizations.

7    Q.  And where are those computers located?

8    A.  They could be located anywhere; almost any country, in a

9    server, or at home, or at a business.

10   Q.  So if I wanted to, could I go home and become a Tor node?

11   A.  Yes.

12   Q.  And if I did that, would lots of different people's

13   internet traffic be routing through my home IP address?

14   A.  Yes.

15   Q.  How does someone use Tor?

16   A.  Someone can use Tor to access regular websites.  Typically,

17   they would download the Tor browser and install it; then they

18   would click a button to start the connection to the internet.

19   They would be assigned their Tor exit IP, and then they

20   could -- their traffic would then be encrypted through the Tor

21   network for HTTPS, and their IP would be the exit node IP.

22   Q.  Can you also connect to Tor through the command line?

23   A.  Yes.  Typically, you can install a set of tools called

24   proxy chains, and then you can just type Tor -- install some

25   Torsocks tools, and then you can use the Torsocks command to

1    then do your other website-visiting type commands.

2    Q.  Are there -- is a Tor user's internet traffic routed

3    through just one Tor node, like a proxy?

4    A.  No.  It's routed through at least three.

5    Q.  Are there also special hidden sites that you can only

6    access using Tor?

7    A.  Yes.

8    Q.  But you can also use Tor to just access regular websites,

9    like Google.com?

10    A.  Yes.

11    Q.  I'd like to have you walk through a couple of scenarios.

12    First, if someone who is not using any of the services that you

13    just talked about, any sort of anonymizing service, sits down

14    at their home computer and logs in to their Google Gmail

15    account, what IP address would Google see logging in?

16    A.  Their home IP address from their router.

17    Q.  And when I say Google would see it, where would that IP

18    address be collected?

19    A.  Likely in their web logs.

20    Q.  Google's web logs?

21    A.  Yes.

22    Q.  And how -- how could law enforcement go about trying to

23    figure out who is logging into that account?

24    A.  Given the IP address, law enforcement can go back to Google

25    and issue legal process, such as a subpoena or a search

1    warrant.

2    Q.  Now, what if the person is using a proxy, how would that

3    person connect from their home computer to the Google servers?

4    A.  At a high level, they would set up the proxy, often in

5    their browser, so that all their traffic from their home

6    network is routed through that proxy server and then goes

7    onward to Google.

8    Q.  So what IP address in that case would show up in the Google

9    account logs?

10    A.  The proxy server's IP.

11    Q.  And going back to our example, what if the person is using

12    Tor, how would that person connect to the Google account?

13    A.  Much the same way.  They would often do it through the

14    browser, if not through their command line.  And once they

15    established the Tor circuit, they would visit Google.com, and

16    the traffic would go through the Tor network and out of a Tor

17    exit node.

18    Q.  What IP address would show up in the -- in Google's logs

19    relating to that account access?

20    A.  The given Tor exit node.

21    Q.  If law enforcement were trying to figure out what was going

22    on with this account access, how would they know that this is a

23    Tor exit node?

24    A.  They would likely check the Tor Project's official

25    holdings, known as ExoneraTor.

1    Q.  And what is ExoneraTor?

2    A.  It's a database of all the servers by IP address and names

3    that were used as Tor exit nodes and the dates in which they

4    functioned as such.

5    Q.  And that's maintained by the Tor Project itself?

6    A.  Yes.

7    Q.  Is that a list that's regularly relied on by members of the

8    cybersecurity community?

9    A.  Yes.

10   Q.  What's the distinction between a Tor exit node and an

11   otherwise regular Tor node?

12   A.  Not all of the computers that make up the Tor network are

13   designated to be the outermost node or the last hop.  There are

14   many reasons why users that want to contribute to the Tor

15   Project might not be -- might not want to have their IP exposed

16   to the internet, and so there are other ways to participate in

17   the project, including running a bridge to get onto the

18   network, or a relay node which moves traffic around in the

19   middle, or other types of servers.

20   Q.  And does ExoneraTor list off all of the nodes or just the

21   exit nodes?

22   A.  It has a field for if it's a Tor exit node.  So it checks

23   if it's a Tor node, I believe, with the distinction of whether

24   or not it's an exit node as a yes/no value.

25   Q.  As part of your work on this case, did you review -- even

1    though a criminal might use Tor or proxies, do you and law

2    enforcement still look at and consider their IP address?

3    A.  Yes.

4    Q.  And why is that?

5    A.  Usually, it's to characterize the way the subject of

6    interest accesses the internet.  It provides information about

7    the tools they like to use and the way they go about things,

8    and sometimes I'll still look at them to see if there are any

9    close commonalities between it.  But it's just another

10    descriptor of how they use the internet.

11    Q.  As part of your work on this case, did you review account

12    login records for a number of different accounts tied to the

13    defendant and the Bitcoin Fog service?

14    A.  Yes.

15    Q.  Did that include looking at the IP addresses that were used

16    to log in to those accounts?

17    A.  Yes.

18    Q.  Is that sort of analysis of IP logins something that you

19    often do in cases?

20    A.  Yes.

21    Q.  As you were looking at the IPs used to access the various

22    accounts, did you notice any common types of access?

23    A.  Yes.

24    Q.  And what was that?

25    A.  I saw some IPs that were part of the Tor Project, some IPs

1    that appeared to me from some background research to be

2    possibly VPN IPs or proxy IPs, and very few that appeared

3    possibly residential.

4    Q.  Did you identify any instances in which the same IP address

5    was used to access multiple accounts?

6    A.  Yes.

7    Q.  And, in fact, were there numerous instances where that was

8    the case?

9    A.  Yes.

10   Q.  For your analysis, did you then take steps to filter that

11   larger list or data set?

12   A.  Yes.

13   Q.  How did you set out filtering down the information?

14   A.  I decided to look at this data set within a smaller level

15   of time to perform more of a microanalysis.  There were quite a

16   lot of records, and I wanted to reduce the amount of overall

17   data points to look at and focus on the connections that were

18   closest in time and, therefore, most interesting to me to

19   follow up on.

20          And so I set some time cutoffs that I could apply

21   across the data set to filter it down.

22   Q.  And this was work that you were doing last fall in

23   anticipation of the January trial date; is that right?

24   A.  Yes, that's right.

25   Q.  What were the different types of IPs that you categorized?

1    A.  It was November.  I think it was still fall.

2          The different types of IPs defined as possible

3    residential or other otherwise fixed, you know, residential,

4    business, organizational, were its own category.  And then I

5    considered IPs that appeared to be Tor exit nodes, Tor IPs, and

6    VPN services, along with anything I couldn't definitively

7    identify.  And then I made a third category for IPs that

8    appeared as -- to be proxy servers.

9    Q.  And how are you making your determination of what type of

10   IP address it likely was?

11   A.  I looked through Passive DNS a lot to see what sorts of

12   domains resolved to these IPs based on -- on or around the

13   period of time I looked at some historic holdings and did some

14   identification tools, but many of them were very old, before

15   services could automatically identify them.

16         So the majority -- unless I saw them in online

17   holdings or in the case file as known proxy servers, advertised

18   as such, then I primarily looked to see if any domains I knew

19   to be VPN services called back -- resolved to those IPs, and I

20   looked at the nature of how they were worded, if they were

21   named; like virtual private servers were usually named versus

22   if they had something like Comcast in the name.

23   Q.  In addition to that sort of Passive DNS, did you also look

24   at WhoIs information and the ExoneraTor of lists that you had

25   mentioned?

1    A.   Yes.

2    Q.   What did you do specifically to further filter down the IPs

3    after you categorized them?

4    A.   To filter out the data points that I didn't look at in that

5    analysis to create the final subset, I chose to look at, for

6    all the identified Tor IPs, any accesses between accounts,

7    meaning a login to one account and then a login to a different

8    account.  For those, I focused only on the logins that occurred

9    within five minutes.

10             For proxy servers, I chose ten minutes.  And for

11   anything that appeared residential, I cut it off after 12

12   months.

13   Q.   Starting from the last one first, for a residential IP, why

14   did you choose 12 months?

15   A.   Those IPs tend to be more fixed.  So I thought there might

16   be relevant data within a wider window of time than when using

17   the tool that's meant to rotate traffic more quickly.

18   Q.   And, again, this cutoff is for you to do the filtering down

19   of what you're going to focus on for this particular report; is

20   that right?

21   A.   That's right.

22   Q.   And for a proxy service, what time window did you focus on?

23   A.   For the ones that appeared to be proxies, to me, I chose

24   ten minutes.

25   Q.   Why ten minutes?

1    A.  I modeled this mostly after my own online habits and those

2    of people I know and work with.  If I use a proxy server,

3    usually I want a dedicated IP.  Usually it's for a specific

4    reason to get onto sites where my IP needs to look more normal

5    and is less known to be from a security tool.  So I tend to

6    stay on it a little longer, to have longer browsing sessions.

7    Q.  If someone logs in to their preferred proxy one day and

8    then again a week later, without changing their settings, would

9    there IP address be the same?

10   A.  Yes.

11   Q.  So in setting this ten-minute window, you're not saying

12   that something outside of the ten-minute window is definitely

13   not the same person or definitely excluded?

14   A.  No.  This isn't generalized to internet traffic as a whole.

15   Q.  And so is it -- in this particular analysis, did you focus

16   on assessing anything either way outside of the ten-minute

17   window?

18   A.  No.

19   Q.  For a VPN, what time window did you focus on?

20   A.  Five minutes.

21   Q.  Why five minutes?

22   A.  VPN -- as opposed to proxy servers, VPNs are able to cycle

23   more quickly.  There tends to be just a button you can press if

24   you wanted to generate a new IP.  And sometimes, even within

25   the same online activity website visit I'm doing, if I find an

1    IP is too slow or the connection is not working, I might change

2    it within the same sitting, so to speak.

3             And so I wanted to filter down to anything closer

4    co-occurrence for those.

5    Q.  You're talking about, kind of, your experiences, your

6    colleagues' experiences in setting these windows.

7             Fair to say you're setting these windows based on

8    your experience working in the computer science field but also

9    doing criminal investigations at the FBI?

10   A.  Yes.

11   Q.  For Tor node, what time window did you focus on?

12   A.  Also five minutes.

13   Q.  Why five minutes for the Tor node?

14   A.  For very similar reasons.  The network lets you alternate

15   between a variety of exit nodes, and it's just a button press

16   to change them if you want to.

17   Q.  At the same time -- if you're looking at a target who is

18   connecting to Tor and using a particular Tor exit node, at the

19   same time could there also be other people also using that same

20   Tor exit node to access other sites?

21   A.  Yes.

22   Q.  And is that the same for proxies?

23   A.  Yes.

24   Q.  And why were you still comfortable using these particular

25   time cutoffs, five minutes in the instance of Tor, for your

1    analysis here?

2    A.  Because I wanted to look at a smaller set of data points

3    and then review them individually to see how much time had

4    passed between them.  I didn't feel the need to consider

5    anything outside of that window and wanted just a smaller set

6    to focus on.

7    Q.  So was there anything magic about the particular time

8    cutoffs you selected for your analysis?

9    A.  No, not at all.

10   Q.  So you're not saying that if something happened within four

11   minutes, it was definitely the same person, but if it happens

12   six minutes apart, it definitely wasn't?

13   A.  No.

14   Q.  That just wasn't part of your analysis?

15   A.  No.  That wasn't what I was saying.

16   Q.  Did you prepare a report in fall of 2022 summarizing this

17   analysis?

18   A.  Yes.

19   Q.  Directing your attention to Exhibit 2, is that the report

20   that you prepared?

21   A.  Yes.

22   Q.  And does that summarize this portion of your work at the

23   time and the conclusions?

24   A.  Yes.

25              MS. PELKER:  Government moves to admit Government's

1    Exhibit 2.

2                THE COURT:  Any objection?

3                MR. EKELAND:  No objection.

4                THE COURT:  Exhibit 2 is admitted for purposes of the

5    *Daubert* hearing.

6                (Government Exhibit 2 was admitted.)

7    BY MS. PELKER:

8    Q.  Ms. Mazars de Mazarin, turning your attention to page 5 and

9    to page 6 -- and there are no numbers here, but it's related to

10   the .123 address.

11   A.  Yes.  With the table?

12   Q.  Yes.  Was the IP address ending in .123 one of the IP

13   addresses that came up in your analysis?

14   A.  Yes.

15   Q.  Where did that IP appear in the records?

16   A.  It appeared within the Liberty Reserve returns for the

17   PlasmaDivision email and within the Mt. Gox records for the

18   Volfprius account.

19   Q.  And several days before and after the accesses pulled out

20   in this report here, was that IP address also used to access

21   the Liberty Reserve Shormint account, the Mt. Gox Nfs9000

22   account, and the Mt. Gox Kolbasa99 account?

23   A.  It was used to access those accounts.  I don't remember

24   exactly when.

25   Q.  And you looked at those in other work on this case but not

1    for this particular analysis; is that correct?

2    A.  That's correct.

3    Q.  Did you determine who controlled that .123 IP address?

4    A.  Not definitively, but I believe it may have been used by

5    CryptoVPN.com.

6    Q.  And what was that based on?

7    A.  In this case, a Passive DNS result where a CryptoVPN domain

8    resolved to that IP within about a year of these logins.

9    Q.  And what was CryptoVPN?

10   A.  It appeared to be a virtual private network company.

11   Q.  Did you also review common logins from other IP addresses?

12   A.  Yes.

13   Q.  And some of them that were particularly close in time are

14   set out elsewhere in this report?

15   A.  Yes.

16   Q.  To emphasize, does this report list out all of the IP

17   address connections in the records?

18   A.  No.

19   Q.  And based on your micro-level IP analysis for this report,

20   were you able to make some assessment about the likely control

21   over certain accounts?

22   A.  Yes, I did.

23   Q.  Directing your attention to the bottom of page 7 of your

24   report -- that's the last page -- is that your conclusion

25   there?

1    A.  Yes, it is.

2    Q.  And what accounts were you able -- did you conclude were

3    likely accessed by the same user?

4    A.  In my first conclusion, the accounts I grouped together as

5    likely accessed by the same user were the Mt. Gox Volfprius and

6    Roso accounts; Liberty Reserve U7489869 linked to

7    plasma@plasmadivision; Bitstamp 52443 listed under the name

8    Roman Sterlingov; Twitter account Craykilldozer and Bitcointalk

9    account Killdozer.

10            And in a different group, I believed that the same

11   user who accessed the Mt. Gox Kolbasa account also accessed the

12   PeterNFS Mt. Gox account and the Liberty Reserve account

13   U0845692 tied to shormint@hotmail.com.

14   Q.  And these were the conclusions that were drawn specifically

15   through your micro-level IP analysis; is that right?

16   A.  Right, in this context.

17   Q.  Did that micro-level IP analysis draw conclusions one way

18   or the other about anything outside of the specific windows

19   that you set here?

20   A.  No.

21            MS. PELKER:  No further questions, Your Honor.

22            THE COURT:  All right.  Why don't we go ahead and

23   take the lunch break now.  It is 12:16.  Why don't we come back

24   at 1:30 and continue.

25            It seems to me we probably won't have any difficulty

1    completing things.  I do -- I am going to have to take a break

2    at 2:00.  Maybe we'll be done by 2:00, but if not, I'll take a

3    break for another hearing at 2:00 and then we'll continue.  I

4    don't think that will take very long.

5           All right.  So I will see you all back here at 1:30.

6    Thank you.

7           (Lunch recess from 12:16 p.m. to 1:30 p.m.)

8           THE COURT:  The witness can return to the witness

9    box.

10          THE COURT:  Mr. Ekeland, you may start.

11          MR. EKELAND:  Thank you, Your Honor.

12          THE WITNESS:  Hi.

13                    CROSS-EXAMINATION OF

14                 VALERIE MAZARS de MAZARIN

15   BY MR. EKELAND:

16   Q.  Hi.  Ms. Mazars, you testified, I believe, earlier today

17   about operational security.

18   A.  Yes.

19   Q.  And people abbreviate that OPSEC, correct?

20   A.  Yes.

21   Q.  Do you practice OPSEC?

22   A.  Yes.  I always try to.

23   Q.  And what kind of OPSEC do you practice?

24   A.  I use VPNs and Tor and temporary servers, temporary phone

25   numbers.

1    Q.  And when you use a temporary server, do you do that because

2    it gives you a different IP address?

3    A.  Yes.

4    Q.  And why do you use VPN?

5    A.  To protect against types of online tracking, like cookies,

6    and also to protect the IP address.

7    Q.  So, essentially, there's a lot of legitimate reasons to

8    practice OPSEC?

9    A.  Yes.

10   Q.  Okay.  You recall testifying about the Tor network, right?

11   A.  Yes.

12   Q.  I think you said that the Tor network is currently

13   administrated by the Tor Project, correct?

14   A.  Well, every node is run by different people, but as a

15   whole, yes.

16   Q.  And are you aware that the -- the Tor browser and the Tor

17   network were created by the United States Navy?

18   A.  Yes.

19   Q.  And the reason that the United States Navy created the Tor

20   network was so that the United States Navy could conceal its

21   signal traffic, correct?

22   A.  I believe so.

23   Q.  You have no reason to doubt that?

24   A.  I have no reason to doubt that.

25   Q.  And the United States Navy is still a user of the Tor

```
 1   network, correct?

 2   A.  I believe so.

 3           THE COURT:  I'm not sure what this has to do with the

 4   witness's qualifications to testify on the issue that she's

 5   indicated in her report.

 6           MR. EKELAND:  I'm testing her knowledge of the Tor

 7   network, and she --

 8           THE COURT:  I'm going to -- I think this is beyond

 9   the scope of the Daubert hearing.

10           MR. EKELAND:  I will move on, Your Honor.

11           THE COURT:  Okay.

12   BY MR. EKELAND:

13   Q.  So you testified about IP addresses?

14   A.  Yes.

15   Q.  Which are short for internet protocol addresses, right?

16   A.  Yes.

17   Q.  And there's dynamic IP addresses, correct?

18   A.  I'm sorry.  What do you mean?  In this analysis?

19   Q.  Do you know the difference between a dynamic and a static

20   IP address?

21   A.  Yes.  It depends on how it's allocated by your router.

22   Q.  Yes.  Could you please explain to the Court the difference

23   between a dynamic and static IP address.

24   A.  When your computer connects to the internet, depending on

25   how they give a range of IP addresses it has to choose from
```

1    that your router would provide -- and this is at a very high

2    level -- you can configure it so that you come out of the same

3    IP every time or that a server called the DHCP can sort of pick

4    it for you from a range.

5    Q.  In essence, would a -- a dynamic IP address can change

6    every time that it's used, correct?

7    A.  Yes.

8    Q.  And a static IP address is one that doesn't change every

9    time that it's used, correct?

10   A.  Right.

11   Q.  And it's possible for residential addresses to have a

12   dynamic or static IP address, correct?

13   A.  Yes.

14   Q.  And are you aware of -- do you know what IP address

15   spoofing is?

16   A.  Yes.

17   Q.  Could you explain to the Court what IP address spoofing is.

18   A.  Well, I'm not sure exactly how it's implemented.  Most

19   commonly, it would be the idea that you could create traffic

20   from your computer over the network that would conceal your IP

21   address by making it look like another IP address.

22   Q.  Would it be fair to say that there's a number of ways to

23   conceal an IP address?

24   A.  Yes.

25   Q.  And that it's entirely possible to -- withdrawn.

1          So you've discussed -- you've testified about proxy

2     servers, correct?

3     A.   Yes.

4     Q.   And a proxy server is one of those ways of masking a user's

5     IP address, correct?

6     A.   Yes.

7     Q.   And would you agree with me that numerous people can share

8     the same IP address through a proxy server?

9     A.   Yes.

10    Q.   And that number could be in the thousands?

11    A.   Yes.

12    Q.   It could be in the hundreds of thousands?

13    A.   Yes.

14    Q.   And depending on the server capacity, it could actually be

15    in the millions?

16    A.   Right.  I'd agree.  It depends on the server capacity.

17    But, theoretically, yes.

18    Q.   But assuming proper server capacity, millions of people

19    could share the same IP address through a proxy server?

20    A.   For their -- for their respective sites they're visiting,

21    yes.

22    Q.   And, likewise, you're familiar -- you testified about the

23    VPN, I believe, virtual private network?

24    A.   Yes.

25    Q.   And you, I think, just testified that you use a VPN; is

1    that correct?

2    A.  Yes, I do.

3    Q.  VPN is another way of masking your originating IP address,

4    correct?

5    A.  Yes.

6    Q.  And, likewise, numerous people can share an IP address

7    through a common VPN, correct?

8    A.  Yes.

9    Q.  As a matter of fact, there are a number of ways that people

10   can share a common IP address, whether through a VPN, a proxy

11   server, or just simply logging into, say, the court's Wi-Fi?

12   A.  Yes.

13   Q.  And I believe I heard you testify that an IP address is not

14   a unique personal identifier in terms that it doesn't contain

15   any individual's name?

16           MS. PELKER:  Objection, Your Honor.  I don't believe

17   that the witness has testified to that one way or the other.

18           MR. EKELAND:  I was asking her if she had testified

19   to that.

20           THE COURT:  Why don't you just ask her the question.

21   BY MR. EKELAND:

22   Q.  Do you consider an IP address to be a unique personal

23   identifier?

24   A.  On its own individually, no.

25   Q.  Right.  When did you start working on the Roman Sterlingov

1    investigation?

2    A.  I believe it was 2020 or 2021.  It began with some very

3    small asks.  It began with one-off questions that, I believe,

4    started around 2020, but I'm not completely sure.

5    Q.  When you started on Mr. Sterlingov -- this case,

6    investigating this case, were you told Roman Sterlingov was the

7    suspect?

8              MS. PELKER:  Objection, Your Honor.  This goes well

9    beyond the scope of the IP analysis, which is the subject of

10   this *Daubert* inquiry.

11             MR. EKELAND:  Your Honor, the IP address analysis

12   here is a probability-based analysis.  There's words like

13   highly likely and possible.  This goes directly to any kind of

14   confirmation bias or cognitive bias going in here.

15             If this report was stated with a 100 percent

16   certainty, I would perhaps agree with counsel's representation.

17             THE COURT:  I'm not saying that this isn't a relevant

18   question that you could ask at trial, but I don't see how that

19   goes to her competency to testify on whether, as a matter of

20   *Daubert*, she's qualified to offer the expert testimony.

21             I'm not saying I wouldn't allow that question at

22   trial, depending on what I end up doing with respect to the

23   Dror testimony.

24             MR. EKELAND:  Dr. Dror, yes, sir.

25             THE COURT:  But for present purposes, I don't think

1    it's necessary to get into this for me to make a determination

2    under *Daubert* as to whether she's qualified to offer testimony.

3            MR. EKELAND:  Understood, Your Honor.

4    BY MR. EKELAND:

5    Q.  Ms. Mazars -- am I saying that right?

6    A.  Yes.

7    Q.  Okay.  Directing -- do you still have the government's

8    defense -- exhibit binder in front of you?

9    A.  Yes.

10   Q.  And could you just please turn to your IP overlap analysis.

11   A.  Yes.  I'm there.

12   Q.  And let's just start with page 1.  Let me know when you are

13   looking at page 1.

14   A.  I'm on page 1.

15   Q.  Okay.  Could you just explain to me -- I'm just not quite

16   clear on what you mean by IP address overlap.  So could you

17   just explain to me what -- what you mean by that.

18   A.  By using the phrase IP address overlap, I meant to say

19   within the files reviewed seeing the same IP address appear in

20   the logs from one account to another account.

21   Q.  So when you say logs, are you referring to server logs?

22   A.  Sorry.  To be more specific, I'm -- I'm referring to the

23   IRS-provided data, which was mostly legal-process obtained, but

24   it appeared to me that some of the information in it were

25   logins.  So I think they came from server logs, but it was

1    overall legal process returns.

2    Q.  So you didn't actually examine any native server logs for

3    any servers?

4    A.  No, I don't believe so.

5    Q.  Did you examine any traffic logs for any of the servers

6    involved with the IP addresses in this case?

7    A.  No, not for any of these.

8    Q.  And can you tell me -- are you familiar with the phrase in

9    and out points in terms of logging in and logging out to a

10   server?

11   A.  Not as a term, but I think I understand what you mean.

12   Q.  Well, for instance, I notice that you've got login times

13   for certain IP addresses.  Do you have the logout times as

14   well?

15   A.  In some cases there may have been logouts, but I treated

16   them all the same; just occurrences of IPs in the logs.

17   Q.  And so when you're -- in your report when you're going

18   through these IP address analyses, you haven't anywhere put

19   when there was a logout from a particular IP address?

20   A.  Correct.  It was agnostic of the actual action taken, in

21   and out.

22   Q.  I'm sorry.  I spoke over you.  You said it was agnostic; is

23   that what you --

24   A.  I didn't consider whether it was a login, a logout, a check

25   transaction.  I only considered whether the IP appeared in each

1    document I looked at.

2    Q.  So your entire IP overlap analysis is purely based on

3    whether or not the IP address appeared in the documents that

4    you were provided by the IRS?

5    A.  Yes.

6    Q.  And then -- so you say here on the data summary -- the last

7    sentence of that paragraph there -- "The data summary contained

8    entries from 29 data sources."

9         So it's your testimony that none of those 29 data

10   sources were native server logs for any of the servers involved

11   with any of the IP addresses in your IP overlap analysis?

12   A.  I'm not sure whether they were or not.

13   Q.  But you don't recall looking at a native server log for any

14   of the IP addresses?

15   A.  I don't know if they were native or not.  But, no, I

16   don't -- I don't specifically remember seeing something I

17   recognized as an Apache log or anything like that.

18   Q.  And then, if you see up at the top, going back to the

19   background section, do you see there's an email there; it's in

20   red.  It's shormint@hotmail.com?

21   A.  Yes.

22   Q.  Did you -- are you aware that the government executed a

23   search warrant on -- in relation to that particular email

24   address?

25              MS. PELKER:  Objection, Your Honor.  This is going

1    beyond -- anything related to the search warrant is going

2    beyond the scope of the IP analysis.

3            MR. EKELAND:  Your Honor, I wholeheartedly disagree.

4    First, there's a reason that that email address is at the top

5    of this.  They're trying to link it at one point in the

6    criminal complaint to Mr. Sterlingov, and I think it's

7    completely relevant whether or not the expert considered the

8    search warrant returns for this email address because this is

9    the one that they use to claim that Mr. Sterlingov registered

10   the Akemashite Omedetou BitcoinTalk forum post.

11           It's A-k-e-m-i-s-h-i-t-e [sic] -- I may have spelled

12   that wrong -- and Omedetou is spelled O-m-e-d-e-t-o-u.

13           And, Your Honor, that is the BitcoinTalk forum

14   account that the government prominently features in their

15   criminal complaint where they tried to tie Mr. Sterlingov to

16   being the administrator of Bitcoin Fog.

17           THE COURT:  So I guess I'm still not quite sure,

18   though, why that's relevant to her expert testimony or whether

19   she's qualified to testify as an expert, presumably, with

20   respect to whether that email account or any Bitcoin Fog

21   administrator-related moniker could then be tied to IP

22   addresses -- in particular, IP addresses.

23           MR. EKELAND:  Your Honor, I'm trying to find out the

24   basis for her opinion and to what extent she actually looked at

25   the information underlying her conclusions about this email

 1    account.

 2                THE COURT:  You can ask her if the search warrant

 3    return was part of the basis for her conclusion in this report.

 4                MR. EKELAND:  Okay.

 5    BY MR. EKELAND:

 6    Q.  Ms. Mazars, was the search warrant return for the

 7    shormint@hotmail.com email account part of the basis for your

 8    opinions in this report?

 9    A.  Yes.

10    Q.  And did you review -- so you reviewed the search warrant

11    returns?

12    A.  Yes.

13    Q.  And when you reviewed those search warrant returns, did you

14    see that they led to a backup email that led to somebody named

15    Andrew White?

16                MS. PELKER:  Objection, Your Honor.  This is

17    definitely -- first of all, that's mischaracterizing the

18    evidence, but also it is outside the scope of the IP analysis.

19                THE COURT:  Why don't you ask her instead to what

20    extent -- in what way she relied on that search warrant return

21    for purposes of the opinions that she expresses in the IP

22    overlap analysis.

23                MR. EKELAND:  Yes, Your Honor.

24    BY MR. EKELAND:

25    Q.  Ms. Mazars, did you hear Judge Moss's question?

1    A.  Yes.  So I didn't use any of the additional registration

2    data to come to these conclusions except in the cases of in 4.3

3    under background, those associated with Roman Sterlingov.

4         If there were accounts that were registered in true

5    name to Mr. Sterlingov or to email accounts that were known

6    associated, such as the heavydist moniker, and there were IP

7    occurrences between those accounts, I did not focus on those

8    because that was already known.

9         That's the extent to which registry -- user

10   registration data figured into this.

11   Q.  And did I hear your testimony correctly to say that you

12   didn't -- when you looked at the search warrant return for

13   shormint@hotmail.com, you didn't see anything there tying it to

14   Mr. Sterlingov?

15        MS. PELKER:  Objection.  That's not at all what the

16   witness has testified to or what the question was or that's

17   relevant to this analysis.

18        MR. EKELAND:  Your Honor --

19        THE COURT:  I think that's a fair objection.  But I

20   think, for purposes of today, we're just going to try and

21   understand -- or I need to understand what the witness's basis

22   was for her analysis.  And so you're welcome to ask her about

23   anything that she relied upon in her analysis.

24        MR. EKELAND:  Well, Your Honor, it's my understanding

25   that she did say, if I understood her correctly -- and this is

1    what I was asking for clarification on.  She did say that she

2    did rely on the search warrant return for shormint@hotmail.com.

3    And then, if I understood her correctly, she said that she

4    looked at it to see if there was any real-name attribution with

5    that registration of that account and that that -- there was

6    nothing related to that account that -- named Roman Sterlingov.

7         THE COURT:  I don't think that's what I heard her say

8    either.  But why don't we just back up a second, and you can

9    just ask her what -- I think the witness did say that she did

10   make a determination with respect to email addresses that were

11   known Roman Sterlingov email addresses.  I think that's all I

12   heard her say.

13        And that she didn't bother tracing those because she

14   knew already, or they knew already that they were registered in

15   Mr. Sterlingov's name.  That's what I had understood her to

16   say.

17   BY MR. EKELAND:

18   Q.  Ms. Mazars, is that correct, that you made a determination

19   of what email addresses were registered in Mr. Sterlingov's

20   name and weren't?

21   A.  To some degree, yes.

22   Q.  And did you determine that the shormint@hotmail.com email

23   address was registered to Mr. Sterlingov's name?

24   A.  No, that was not something that I determined.

25   Q.  Thank you.  Turning your attention to page 2 of your

1    report, it says here you used a program called Maltego.

2           Does that -- can you briefly explain what that

3    program does for the Court.

4    A.  Maltego, as an offering, has a few different products.  The

5    one I used here was Maltego CaseFile, which is, essentially, a

6    graphing tool where you can read in a CSV file and some sort of

7    Excel file of data, and it will automatically plot the points

8    for you.  And from there, you can move the arrows around; you

9    can group the dots together or spread them apart.

10          Maltego, as a product, has other offerings, but

11   CaseFile was the one I used for this.

12   Q.  Do I understand it correctly that CaseFile is a -- I think

13   you described it as a graphing tool, and that it's not an

14   analytic tool in the sense that it's analyzing the data and

15   arriving at certain conclusions?

16   A.  Right.  I didn't use it as any analytic tool.  I know

17   Maltego has other offerings that assist with analysis, but that

18   wasn't -- I didn't use any of those features.

19   Q.  So it's fair to say that the graphs or the visual

20   representations in your report are graphs that you,

21   essentially, drew using Maltego?

22   A.  Yes.

23   Q.  Turning to page 3 of your report --

24          MR. EKELAND:  Your Honor, I'm aware that the Court

25   has a 2:00.

```
1                    THE COURT:  We do, yeah.

2                    MR. EKELAND:  Should we pause?

3                    THE COURT:  You can continue.  It's not 2:00 yet.

4                    MR. EKELAND:  Okay.  Yes, Your Honor.

5       BY MR. EKELAND:

6       Q.  Turning to page 3 of your report, we see the header that

7       says "Overlap Analysis"?

8       A.  Yes.

9       Q.  Just directing your attention to the last sentence in the

10      first paragraph there where you say, "Time zones were not

11      specified by convention; they were understood to be in UTC" --

12      A.  Yes.

13      Q.  -- could you just explain to the Court what UTC is.

14                    THE COURT:  I understand what UTC is.

15      BY MR. EKELAND:

16      Q.  For the record, could you just say what UTC is.

17      A.  UTC is the universal time zone convention and, by default,

18      it's in Greenwich Meantime.

19      Q.  And am I correct to understand here that none of the data

20      set that you looked at specified what time zones were used to

21      record the IP address login?

22      A.  I'm not sure that none of them did, but not all of them

23      did.

24      Q.  And so you have no definitive way of knowing what time zone

25      was recorded -- was being used for a particular login that you
```

1    saw?

2    A.   For some of the sources, that's correct.

3    Q.   And can you name the sources where you did know that it was

4    UTC?

5    A.   I don't remember.

6    Q.   Okay.  But it's -- I mean, that -- it's entirely possible

7    that if it wasn't UTC, your analysis could be off by hours?

8    A.   Yes.

9    Q.   Okay.  Just directing your attention to that -- on about

10   the middle of the page, that 61.19.252.148 IP address --

11   A.   Yes.

12   Q.   -- there you say that is a -- appears not to be a Tor node?

13   A.   Correct.

14   Q.   And you checked that with -- I'm assuming with the Tor

15   Project records, ExoneraTor?

16   A.   Yes.

17   Q.   And that it was owned by Thai provider CAT Telecom?

18   A.   Yes.

19   Q.   And then you say, "According to FBI holdings."  Can you

20   explain to me what you mean by -- what FBI holdings?  Can you

21   be more particular about that?

22   A.   I searched an FBI database that they don't publicly name

23   and saw an archive post from a criminal forum advertising proxy

24   servers to connect to, and that's where I saw the reference to

25   that IP.

1    Q.  But you're not testifying that CAT Telecom is a criminal

2    enterprise?

3    A.  No, not CAT Telecom.

4    Q.  You're just testifying that you searched the FBI database,

5    and you saw that this particular proxy server was mentioned in

6    the forum?

7    A.  Right, exactly.  I'm not asserting anything about the

8    provider; just about how I saw a reference to the IP being

9    used.

10   Q.  And then -- so you, essentially, maintain that this was a

11   proxy server?

12   A.  I believe it could have been a proxy server.

13   Q.  And do you know the traffic volume on that proxy server?

14   A.  No.

15   Q.  Okay.  And you say you assigned it a probable overlap of

16   ten minutes; is that right?

17   A.  Yes.

18   Q.  If I recall your testimony on direct correctly, that was

19   just the amount of time that you arbitrarily picked to assign

20   for commercial servers; is that right?

21           MS. PELKER:  Objection.  I don't believe the witness

22   testified that it was arbitrarily picked.

23           MR. EKELAND:  I'm asking her --

24           THE COURT:  There's a difference between asking her

25   that and saying she testified to that.  Why don't you just ask

1    the question.

2    BY MR. EKELAND:

3    Q.  It states that you got a probable overlap on your IP

4    overlap analysis for IP address 61.19.252.148.

5    A.  A window of probable overlap of ten minutes was assigned

6    for that.

7    Q.  And why do you use the word probable?

8    A.  In choosing the term window of probable overlap, I was

9    intending to create a space for, if overlap between the two IPs

10   that would be meaningful to me occurred, I would most commonly

11   see it in the first ten minutes.

12          It was not arbitrary, but this isn't a statistical

13   term about -- that anything within ten minutes is overlap.  It

14   was when I expected to see overlap if it existed.

15   Q.  So when you use the word probable, you're not referring to

16   any statistical probability; did I understand you?

17   A.  Right.  Not in that sense outside of a professional guess,

18   a professional opinion.

19   Q.  And then just turning your attention to the last IP address

20   on that page, the 70.90.169.13, that -- and it's your testimony

21   that that's another commercial server by U.S. provider Comcast?

22   A.  Yes.

23   Q.  And do you know the traffic volume on that server for the

24   period of time for the logins that you're writing about?

25   A.  No.

1    Q.  Do you know the logout times for that IP address in

2    relation to what you're writing about there on the bottom of

3    page 3?

4    A.  No, I don't remember if I saw them.

5    Q.  And, again -- and for everything in your report, when you

6    say probable overlap, again, you're not talking about any kind

7    of statistical probability, but just based on your judgment or

8    your guess; is that correct?

9    A.  That's correct.

10        THE COURT:  Can I ask -- I just want to make sure I

11   understand this.  When you say that you assigned a window of

12   probable overlap of ten minutes -- I understand this.  You're

13   not describing what you actually saw there, but that you're --

14   you're describing what your assumption is in general given the

15   type of server, whether it's a proxy or a VPN, and that's what

16   you talked about on your direct and that you were just assuming

17   ten minutes, or is that something you observed?

18        THE WITNESS:  What I assigned was a cutoff of IP

19   occurrences that I would stop looking at.  So what I

20   assigned -- I wanted to be consistent across every IP I looked

21   at.

22        THE COURT:  Right.

23        THE WITNESS:  So when I calculated the amount of time

24   between connections of some sort between one account and the

25   next, if that amount of time was greater than, in this case,

1    ten minutes, I excluded it from the whole analysis.

2         THE COURT:  So the first sentence, the sentence --

3    the first portion where it says you assigned a window of

4    probable overlap is your methodology, and the second sentence

5    is then what you observed, it says two events occurred within

6    ten minutes; is that right?

7         THE WITNESS:  Right.  Within ten minutes.  I didn't,

8    for brevity in these paragraphs, say exactly the number of

9    seconds.  But what I'm saying is for each IP I look at what

10   kind of IP I thought it was, then assigned or decided what the

11   cutoff of time deltas would be for it.  So in that case, I

12   assigned it ten minutes.

13        After ten minutes, I'm not considering it in this

14   analysis.  And then from all the points here whose time delta

15   was within ten minutes, I logged them in the table.

16        THE COURT:  That's helpful.  Thank you.

17   BY MR. EKELAND:

18   Q.  In that methodology that you just described to the Court,

19   is that a methodology that you've made up?

20   A.  This is my first time doing that specific methodology.

21   Q.  This is the first time that you've ever done this

22   methodology.  Can you -- is that correct?  I heard you right

23   there?

24        THE COURT:  That's what I -- I heard it.  The clock

25   is running.

```
 1              MR. EKELAND:  Your Honor, I apologize.

 2              THE WITNESS:  I put the time deltas before in cases,

 3     but doing it this specific way with different ones for

 4     different IPs in the same analysis, yes.

 5     BY MR. EKELAND:

 6     Q.  Can you cite me any scientific peer-reviewed papers

 7     supporting your methodology that you're using here?

 8     A.  No.  It's not a scientific construct.  There wouldn't be

 9     any way to -- to study it that way.

10     Q.  Can you cite me any academic white paper supporting your

11     methodology that you used in this IP overlap analysis report?

12     A.  No.

13              THE COURT:  Is this a good breaking point?

14              MR. EKELAND:  Yes, Your Honor.

15              THE COURT:  Well, why don't we break for my other

16     matter now, and we'll let you know as soon as we're done, and

17     you can come back and we'll continue.

18              (Recess taken at 2:05 p.m. until 2:30 p.m., after

19     which the following further proceedings were had:)

20              MS. PELKER:  Your Honor, I spoke to Mr. Ekeland about

21     this on the break.  The witness just had a change in her

22     childcare schedule.  Unfortunately, now we need to wrap up by

23     3:00.  We're going to try and wrap up by 3:00, if at all

24     possible.

25              THE COURT:  Good.  All right.  We'll do our best.
```

```
 1    You may proceed.

 2              MR. EKELAND:  Thank you, Your Honor.

 3    BY MR. EKELAND:

 4    Q.  Ms. Mazars, are you ready?

 5    A.  Yes.

 6    Q.  I'm just going to jump ahead to page 5 of your expert

 7    report.  Do you still have that in front of you?

 8    A.  Beginning with 95?

 9    Q.  On page 5 up at the top there, the IP address that starts

10    with 95.

11    A.  Yes.

12    Q.  You see that?  Again, that's -- you've written that it's

13    not a Tor node?

14    A.  Correct.

15    Q.  And that it is a German provider called Leaseweb?

16    A.  Yes.

17    Q.  And you could not figure out whether or not it was a

18    dedicated VPS or a VPN?

19    A.  That's correct.

20    Q.  Did you -- do you know the traffic volume on that server

21    for the times that you've got recorded here?

22    A.  No, I don't.

23    Q.  Okay.  And then do you know the traffic volume for any of

24    the servers for any of the IP addresses that you've listed in

25    your expert report?
```

1    A.  No.

2    Q.  Just going down to the IP address at the bottom of the

3    page, the one that starts 212 and it ends in 123.

4    A.  Yes.

5    Q.  And that, you say, was likely a VPN?

6    A.  Yes.

7    Q.  And that -- if I'm understanding you correctly, that it's

8    possibly from a company known as CryptoVPN.com?

9    A.  Yes, I believe it could have been a CryptoVPN.com IP.

10   Q.  And when you say a "Luxembourgish VPS provider, Root S.A.,"

11   am I correct to read that, that that's a company in Luxembourg?

12   A.  The company, yes, from what I could tell.

13   Q.  Directing your attention to page 6, this is -- what is

14   that? -- the second-to-the-last page in your expert report, and

15   turning your attention to the diagrams down on the bottom.

16   A.  Yes.

17   Q.  I was a little unclear.  The top and the bottom image, the

18   bottom image being the one where there's the Shormint email

19   address on the left, and then you've got three IP addresses

20   beside that; are those two separate graphical images, or are

21   they meant --

22   A.  Yes, they're two separate graphs.

23   Q.  Am I correct to interpret that, that that's sort of the

24   graphical correlation to what you state in your conclusion in

25   Points 1 and 2?

1    A.  Yes.

2    Q.  So it would be fair to associate the top graphic on page 6

3    with Bullet Point 1 in your conclusion?

4    A.  Yes.

5    Q.  And it would be fair to associate the second graphical

6    representation on the bottom of page 6 with Point 2 in your

7    conclusion?

8    A.  Yes.

9    Q.  And in Point 1 of your conclusion on page 7, you say that

10   the same user most likely accessed, and then you list the

11   number of the accounts.

12            But that most likely, that's not a -- you don't have

13   any statistical probability that you could give me for the

14   accuracy of that most likely it is; is that just a guess on

15   your part?

16   A.  It's correct that I don't have -- it was not a

17   statistically computed probably, and I didn't intend it in that

18   way.

19   Q.  Okay.  You're also not identifying anywhere there in the

20   conclusion or anywhere in your expert report the identity of

21   the user that you're referring to in Bullet Point 1, are you?

22   A.  That's correct what you said.

23   Q.  And same question for Point Number 2; again, you say likely

24   accessed, and it's fair to say that you're not actually -- you

25   can't assign any kind of statistical probability as to the

1    accuracy of your statement in Bullet Point Number 2, correct?

2    A.  That was not something I attempted to compute here.

3    Q.  And in Bullet Point 2, you're not -- or anywhere else in

4    this expert report -- identifying any particular user?  You're

5    just speculating that the same user most likely accessed the

6    Mt. Gox accounts for Kolbasa and PeterNFS and the Liberty

7    Reserve account; is that correct?

8    A.  I did not attempt to attribute the user; just provide an

9    observation on the relatedness of the accounts.

10              MR. EKELAND:  I pass the witness, Your Honor.

11              THE COURT:  Okay.  Thank you.

12              MS. PELKER:  Nothing further, Your Honor.

13              THE COURT:  All right.  You're excused.  Thank you.

14              THE WITNESS:  Thank you.

15              THE COURT:  Thank you.  We probably should talk about

16    next steps a bit and process here.

17              MS. PELKER:  Yes, Your Honor.

18              THE COURT:  We're scheduled for next week to address

19    the Rule 17(c) issues.  I have a big stack of *Daubert* motions

20    in front of me where I've heard quite a bit of testimony,

21    probably more than was necessary from those witnesses.  I also

22    have the motion to dismiss, which, among other things, raises

23    the venue issue.  I can tell you that I'm working on an opinion

24    on that, and I will get that to you as soon as I can.

25              What I would propose doing with respect to the

1    *Daubert* motions is I can set aside virtually the entire day

2    that we have for the pretrial conference, and one way to handle

3    this is I can give you some preliminary views today just so you

4    can be moving on with your trial prep.  I don't want to

5    interfere with your trial prep.  But I'm not going to know for

6    sure until we go through this process.

7         But what I propose is going witness by witness at the

8    pretrial, and I can give you ten minutes a side, might be

9    convinced to 15 minutes a side, to sum up or make any key

10   points you want to make.  And then I can just give you my

11   rulings from the bench with respect to the *Daubert* issues so

12   that you can have that as soon as possible for your final trial

13   prep.

14        I'm also sometime probably early next week going to

15   post my proposed preliminary jury instructions and my proposed

16   voir dire, and you can review that and then give me any

17   comments on either of those two at the pretrial.  I can tell

18   you that my current inclination -- and I haven't heard

19   your argument -- I mean, I've read your briefs and I've heard

20   the witnesses at length, but I haven't heard your argument.  I

21   don't want to put anything in stone until I have because, quite

22   frankly, you both made some points worthy of my consideration,

23   and I don't want to foreclose that.

24        But my inclination is to allow, perhaps with some

25   possible trimming of the sails that we can discuss at the

 1    pretrial, to allow testimony of what I regard to be the

 2    principal or the core expert witnesses, and that would mean

 3    Bisbee, Scholl, and Still.

 4         And as I was discussing just earlier today, I think,

 5    just by way of example, some of Ms. Still's testimony goes

 6    beyond her expertise.  I don't think that was her proposed

 7    testimony, and I don't think that was contested.  But I think

 8    that those witnesses are at the core of the case, and I can

 9    explain in greater detail what my reasoning is at the pretrial

10    with respect to those witnesses.

11         Just at the most general level, my sense of it is, is

12    that this is a forensic case.  It's not terribly different to

13    my mind than a case in which you might have accountants who had

14    spreadsheets on their desks and offered different views of

15    tracing financial transactions on those spreadsheets and came

16    and testified about it.

17         But since you're dealing with a blockchain and the,

18    at times, probably millions of lines that are in ledgers and

19    the difficulty in -- or just the sheer volume of the tracing,

20    that computers are needed in doing that, and there are

21    assumptions that go into the computer analysis, and there are

22    assumptions that go into the pen-and-paper analysis of any

23    forensic witness who is tracking things.  And I think it's

24    fair, as I've indicated before, for both sides to understand

25    what the assumptions are that the other side is applying and to

1    be able to delve into that and to question that.

2            But I didn't see anything or hear anything in the

3    testimony that made me think that what they were doing was

4    scientifically unsound.  And I use the word scientifically

5    somewhat guardedly here because I do think, as I said before,

6    this is really a forensics case where there are certain

7    assumptions that were applied regarding the forensics, and I

8    think both sides are entitled to explore those forensics.

9            I can get into greater detail and, as I said, that's

10   not cast in stone because I do want to hear from you more

11   before I give you a final ruling.  I also don't want to delay

12   your preparation for trial.

13           I'm also inclined to allow Ms. Mazars' testimony, but

14   we can also -- that's also just a preliminary view.  I'm open

15   to hearing from you.

16           With respect to some of the other witnesses, I really

17   do want to hear more about Dr. Dror.  I think that's a close

18   question in my mind as to whether I allow some testimony, and

19   the question also will be as to the scope of the testimony that

20   I allow from Dr. Dror.

21           And then with respect to Mr. Verret and

22   Mr. Fischbach, again, just my very preliminary view is that

23   some of their testimony is really not -- is not supported by

24   any particular expertise, but some of it was quite possibly

25   okay.  And it's going to be a question of just figuring out

1     where I draw the lines with respect to their testimony.

2          And then, again, very preliminarily -- and I do want

3     to hear more argument on this -- I'm skeptical about

4     Mr. Cabanas.  I didn't really have a sense that he offered any

5     expertise other than being a smart guy who, as a physicist,

6     knows something about statistics.  But I didn't see that he

7     brought any particular expertise here.  But I will be open to

8     hearing more from the parties on that end.

9          I really do want to caution you all that those are

10    very preliminary reviews.  I do want to give you all a chance

11    to be heard and, quite frankly, I want to go back -- it's been

12    some time on some of this testimony.  I want to go back and

13    look at the testimony again and look at the reports again.  I'm

14    probably going to have to, in some of the cases, go line by

15    line or close to line by line for the reports and tell you what

16    I think is permissible and what isn't.

17         So that will maybe help you a little bit in your

18    preparation.  You'll have my preliminary jury instructions and

19    voir dire no later than early next week to look at and then be

20    ready to give me any comments on that for the pretrial.

21         And as I said, as soon as I can, I will get you an

22    opinion.  I know you-all may know that I came to this case

23    coming off of a nine-week terrorism trial that was

24    all-consuming for about four months, five months.  And so I

25    apologize for not having that opinion to you yet, but I will

1      get it to you as soon as I can.

2              I'm happy to answer any questions you-all have either

3      today or at the pretrial with respect to trial procedures.  I

4      guess one question for now is how many weeks you think trial

5      is -- or days you think trial is going to last, which may

6      affect my decision about how many alternates to seat.

7              I can tell you that in this courtroom, ideally -- if

8      you just look at the jury box, it's ideally two alternates.

9      But we could go beyond that, but it means putting chairs in

10     front of the jury box to do that.  I think it's only necessary

11     if we think it's going to be a particularly lengthy trial.

12             Ms. Pelker, what is your current estimate?

13             MS. PELKER:  Your Honor, we're still waiting to hear

14     back from the defense on stipulations for translations and

15     awaiting pretrial rulings on authentication.  Assuming we're

16     able to resolve all of that, we're looking at two full weeks

17     going through September 28th, understanding that the Court may

18     sit on Friday, the 15th, but otherwise will not sit on Fridays.

19     Possibly into early the week of the 2 nd.

20             THE COURT:  Okay.  Mr. Ekeland, what's your view on

21     your case at this point?  I understand it's hard to say with

22     certainty, but if you can just give me your best estimate.

23             MR. EKELAND:  My best estimate would be one to two

24     weeks, probably closer to two weeks.  But that depends on what

25     expert witnesses the Court qualifies and how we resolve the

1    certification issue with the government in relation to the

2    translations and other stuff.

3         THE COURT:  Okay.  Are you going to have things that

4    need to be translated as well; is that what you mean?

5         MR. EKELAND:  I'm sorry.  I just didn't hear you.

6         THE COURT:  Are you going to have things that need to

7    be translated as well?

8         MR. EKELAND:  Well, I mean, Mr. Sterlingov speaks

9    Russian, but --

10        THE COURT:  His English was awfully good when he

11   testified in front of me.  And I've been operating under the

12   assumption that he's fluent in English.

13        MR. EKELAND:  He is fluent in -- no, no.  We don't

14   need a translator at trial.  I'm sorry.  I thought you were

15   talking in reference of Russian documents.

16        THE COURT:  Oh, yes, I was talking in terms of

17   documents.

18        MR. EKELAND:  I need to look closely at that, because

19   we do have issues with some of the government translations

20   and --

21        THE COURT:  Oh, so you mean in your case -- in your

22   case need to offer rebuttal translations, is that what you're

23   suggesting, or rebuttal testimony about the translations?

24        MR. EKELAND:  Yeah.  I don't know, honestly, right

25   now if we're willing to certify the government's translations.

1    But I don't want to take a position on that before I look

2    really, really closely at it.

3              THE COURT:  If you're unable to work it out amongst

4    yourselves, one way to streamline things might be to see if

5    there was a court-certified translator in Russian -- I don't

6    know if there is -- who can look at it, and you can just agree

7    to abide by whatever the court-certified translator comes up

8    with.

9              MR. EKELAND:  Potentially.  I think what's -- one of

10   the issues that we're running into is a certain -- depending

11   on -- there's a lot of ways to translate particular phrases and

12   words, and what words are chosen can have certain nuances and

13   implications, as the Court understands.  That's really what

14   it's about.

15             THE COURT:  All right.

16             MS. PELKER:  Your Honor, this is the first time that

17   the government is hearing that the defense has specific issues

18   with the translations.  Defense has been telling us since June

19   that he will likely stipulate to it, and he just needs time to

20   review and officially get back to us.

21             Given that we don't even know what their objections

22   are, I think at this point we just need to plan to have the

23   government put on its translators, the defense will put on its,

24   and we will have translators dispute the -- I'm happy to have a

25   court translator, if that's an option too.

1            THE COURT:  I'm sympathetic to your frustration, but

2    what I say is that we all ought to be careful, particularly as

3    we get closer to trial, everyone's frustration levels go up.  I

4    just want to make sure frustration doesn't interfere with the

5    efficient and just proceeding of the trial and -- even if

6    you're frustrated, I get it.  As long as you can reach an

7    agreement before trial, that may not spare you and Mr. Ekeland

8    a lot of work going back and forth, but it's going to spare 14

9    or 16 citizens from the District of Columbia sitting here for

10   an extra couple of days they don't have to sit here for, if you

11   can do it.

12           MS. PELKER:  We certainly have remained very

13   committed to trying to work with defense counsel toward some

14   sort of resolution here.

15           THE COURT:  All right.  So how many jurors do you

16   propose that we have?

17           MS. PELKER:  I would defer on the Court's expertise.

18   This is, obviously, not the same as the Trabelsi matter, but

19   how many alternates did you have there?

20           THE COURT:  We had four alternates in that case.  We

21   were quite lucky, actually.  We ended up, I think, having at

22   least two of those alternates up until the very end of the

23   trial still who were there.  So we had some cushion, but every

24   jury is different, so you never know.

25           MS. PELKER:  I think it probably makes sense, Your

1    Honor, given that this is potentially a month-long trial, to

2    push it to 15, so having three, splitting the difference there.

3              THE COURT:  The only -- it just means one person is

4    sitting there by themselves out in front, but we can do that.

5              Mr. Ekeland, what's your view?

6              MR. EKELAND:  That's fine with us, Your Honor.  We'll

7    defer to the judgment of the Court on that.

8              THE COURT:  All right.  I mean, I understand the

9    concern.  I think the last thing in the world we want to do is

10   get to week three and a half of a trial and run out of jurors.

11   So let me think about it.

12             It's probably going to be 15 or 16 that we end up

13   using under the circumstances.  I'll let you know that at the

14   pretrial.

15             And then the other thing, which you're welcome to do

16   now or we can do at the pretrial, is if you each want to give

17   me two numbers chosen at random to be the alternate seats, and

18   we'll keep that secret.  I'll direct everyone to keep that

19   secret.  When we do the voir dire, you need to make sure you

20   don't inadvertently allow it to slip.

21             Ms. Pelker, you want to just give me two numbers

22   between 1 and -- well, I guess it's between 1 and what?  Let's

23   assume 16.

24             MS. PELKER:  6 and 11.

25             THE COURT:  Between 1 and 16.

```
 1                MS. PELKER:  6 and 11.

 2                THE COURT:  Mr. Ekeland?

 3                MR. EKELAND:  Do 3 and 14.

 4                THE COURT:  Okay.  So that, actually, means if we

 5      decide to go with 15, we'd be okay still, too.  Those will be

 6      the alternate seats.

 7                And just so you know, while we have a little time

 8      right now, we might as well use it.  The way I do jury

 9      selection is close to how other judges in this court do it, but

10      not identical.

11                First of all, Glenda, do we know if we have the

12      ceremonial courtroom?

13                THE COURTROOM DEPUTY:  Nobody else is starting on the

14      day that we are starting because it's on a Thursday.

15                THE COURT:  Hopefully, we'll have the ceremonial

16      courtroom.  I think we'll be able to get enough prospective

17      jurors in the ceremonial courtroom.  I will read them all the

18      voir dire.  Each of them will have a white note card.  I will

19      tell them to write down the numbers of only my yes -- only

20      where they have a yes answer to my questions.

21                Inevitably, someone will put down all their answers

22      to all the questions, because it happens every time.  I will

23      say just write down the number of a yes.  We will then bring a

24      group of prospective jurors down here, 20 or so, and we'll just

25      call them one by one in order.
```

1          I will ask follow-up questions.  We, hopefully, will

2     have the wireless telephones.  So if we need to have a bench

3     conference, we can just do that, and you can let me know.  I

4     will give you a chance to ask any follow-up questions.

5          This does raise -- I know there's a -- I can't

6     remember if I ruled on this or not already, but there was a

7     motion for a counsel-directed voir dire.

8          MR. EKELAND:  You did, Your Honor.  You denied it.

9          THE COURT:  Well, I knew in my head I had.  So

10    that's -- that request is denied.  But I will allow you to ask

11    any appropriate follow-up questions.

12         I just ask that you, in doing so, not use the

13    voir dire as an opportunity to begin your opening statements or

14    to engage in advocacy through the voir dire and not use it as

15    an opportunity to try and build rapport with particular jurors.

16    I've had lawyers who say, I see you went to such-and-such

17    college; that's where I went to college.  No.  That will get me

18    very upset if you do that.  None of that sort of thing.

19         And then I'll have to do the math.  I will tell you

20    the number of jurors that we need to qualify in order for

21    you-all to exercise the strikes that you're entitled to under

22    Rule 24, I think, is the rule; whatever the Federal Rule of

23    Criminal Procedure is.  But the number of strikes, that's what

24    we'll do.

25         I will tell you how many you have to qualify.  I

1    probably will add two or so on to that just to make sure that

2    we don't run into a problem.  I will then bring -- I think

3    probably we can get all the qualified jurors into this

4    courtroom here; that won't be a problem.

5         And we will have a strike sheet which we'll pass back

6    and forth between the two of you.  Typically, what happens is

7    that the defense will do two and the government will do one and

8    then the defense will do two and the government will do one

9    just because the defense gets more strikes.

10        You need to record, to the extent you can perceive,

11   the race and sex or gender of anyone you're striking for *Batson*

12   purposes and so we can make sure we have a record if there is a

13   *Batson* issue that arises.

14        The one thing, though -- and this is where I differ

15   maybe a little bit from how some other judges do this.  You may

16   not during your -- that first back-and-forth when you're doing

17   your first principal strikes, you may not strike anybody in

18   Chair 6, 11, 3, or 14.  They just -- they're in another

19   universe.  Just pretend that they're not there at the moment

20   when you're doing your initial strikes and do -- we'll do your

21   initial strikes, and then we'll figure out who the principal or

22   the actual serving jurors will be, or the nonalternate jurors

23   will be at that point in time.

24        Before I actually announce to the jury anything --

25   because I don't want to, obviously, give away who the

1    alternates are, but the sheet will get passed up to me, I'll

2    verify that it's all been done correctly.  And then at that

3    point you can exercise your strikes for the alternates.

4         And I think if we have 16, it's maybe two a side.

5    I'll have to look at the rule again, and you'll have to look at

6    the rule on that and go back and forth on that.  As to that,

7    you can only strike anybody who is in seat 6, 11, 13 [sic] or

8    14.  And we will fill those seats from the remaining pool, and

9    you can strike into the pool if you want to.

10        So if it's someone who is next up to be seated, you

11   can strike that person if you want to if you don't want that

12   person to then fill a seat that the other side might -- a

13   vacancy the other side might create through the exercise of a

14   strike.  And then we will have our jury.

15        Hopefully, we can get that done in a day.  Usually, I

16   find we can.  Although it's a long day, and we have to work

17   hard to get through it.  But usually we're able to do that.

18        Any questions about the jury selection process?

19   Which seats did you say you wanted the alternates to be?

20        MS. PELKER:  6 and 11.  It doesn't matter.

21        (Off the record discussion between Court and the

22   courtroom deputy.)

23        THE COURT:  6, 11, and then 3 and 14; correct,

24   Mr. Ekeland?

25        MR. EKELAND:  Yes.

1          THE COURT:  I just want to make sure all our numbers

2     match up.

3          MR. PEARLMAN:  Your Honor, just a couple of questions

4     real quick.

5          THE COURT:  Of course.

6          MR. PEARLMAN:  Can you strike into the panel -- to

7     the voir dire panel during your strikes, and if nobody strikes

8     people in the seats, does that mean that you have concluded

9     that everyone is happy with that initial group, and there will

10    be no more strikes?

11         THE COURT:  You can strike into the panel, I think,

12    as well if you want to during your initial rounds of strikes.

13    And I realize, I guess it's possible that there could be some

14    overlap to that if you're very strategic about it with respect

15    to the alternates.  But I think that's okay.

16         MR. PEARLMAN:  Have you -- you are still considering

17    how many strikes to give both sides?

18         THE COURT:  Well, I think -- my inclination is to

19    give you what the rules provide.  Why don't I just look at the

20    rule right now.

21         So the government gets 6 peremptory challenges and

22    the defense gets 10.

23         MR. PEARLMAN:  And that includes alternates?

24         THE COURT:  No.  And then for alternates -- so each

25    side will have two alternate strikes as well; two for the

1    defense and two for the government.  That applies regardless of

2    whether I have 15 or 16 jurors.  So anything more than 14, each

3    side gets two.

4             MR. PEARLMAN:  Okay.  So we'll get first strike of

5    our one and then defense will get their two and then we finish

6    with one strike?

7             THE COURT:  I always have to write this out.  If the

8    government gets 6 and the defense has 10 -- if the government

9    goes first, then the defense gets 2, then the government goes,

10   defense 2, government 2.  So the government will go first and

11   last --

12            MR. PEARLMAN:  Right.

13            THE COURT:  -- which is what gets you to 6.  But then

14   I'll flip the order for the alternates, if you remind me of

15   this.  And the defense can go -- will go first for the

16   alternate.  And so that will be 1, 1, 1, 1.

17            MR. PEARLMAN:  Okay.  Oh, so it's 1, 1, 1, 1; not 2,

18   2?

19            THE COURT:  Correct.

20            MR. PEARLMAN:  Okay.  I think those are my questions.

21            THE COURT:  Okay.  At the pretrial, you-all can let

22   me know if there's more on that.

23            And then I will issue a pretrial order which

24   addresses issues like excluding witnesses.  Is the government

25   having a case agent who is going to be at the table?

1          MS. PELKER:  We are still trying to sort that out,

2     Your Honor, since we had multiple -- we had a case agent from

3     IRS and a case agent from FBI.  We're still working on sorting

4     that out, who will actually be at counsel's table.

5          THE COURT:  Ideally -- I mean, I don't think it has

6     to be a nonwitness but, ideally, it would be a nonwitness.

7          MS. PELKER:  Understood, Your Honor.  If we have

8     someone at counsel table, we may be asking for that -- it would

9     likely be a witness, and we may be asking for permission for

10    that person --

11         THE COURT:  I have in the past allowed the government

12    to have the case agent at the table even when the case agent is

13    the witness.  I, obviously, would hear from Mr. Ekeland about

14    that if you had an objection.

15         MS. PELKER:  Understood, Your Honor.

16         THE COURT:  If you want a tutorial on any of the

17    technology in the courtroom, the deputy clerk can help you

18    arrange that with Mr. Cramer, who is a gift to all of us and is

19    wonderful and will be able to explain all the technology to

20    you.  I encourage you to do that.  I will tell you that when

21    you switch back and forth between different media, it takes

22    more than a few seconds for the system to switch over, and you

23    can let the deputy clerk know.  But you're going to find that

24    there's boot-up time when you're switching over between the

25    media that you're using to do that, and you need to let her

1    know.

2          You need to make sure that the deputy clerk has your

3    exhibit lists before trial with -- obviously, if there are

4    exhibits that you can't anticipate or don't anticipate in front

5    of -- before trial, there's nothing you can do about that, but

6    she needs to be able to keep track of what's admitted into

7    evidence and what's not.  If you don't give her the exhibit

8    list, she can't do that.  She needs it.

9          Oh, the other thing is at the pretrial, I will need a

10   list from each of you -- and I'll order that you actually file

11   it the night before the pretrial conference -- a list of all

12   the witnesses that you anticipate calling, and you can be

13   overly expansive with this.  And I'm not trying to use this as

14   a vehicle of discovery.

15         It's just I need to make sure that none of the

16   prospective jurors know anyone who may be a witness.  And the

17   last thing we want is to have a witness take the stand and have

18   a juror raise his or her hand and say, you know, this person

19   lives next door to me; what do we do?

20         So you can give me lists that are overexpansive, but

21   I need those lists in order to tell the jurors all the names.

22   I will not attribute the witnesses to one side or the other, so

23   you don't need to worry about giving me a name, and then the

24   jury is going to be disappointed if you don't call that person

25   because they're not going to know where that name came from.

1          I'm just going to say, here are the people who may be

2     witnesses or whose names you might hear in the course of the

3     trial.  If they're names that we should ask about, put those on

4     the list as well.  I'll include that in the voir dire.

5          We've done our best -- I don't think we actually got

6     a neutral statement of the case from the parties, so we've done

7     our best to come up with our own neutral statement of the case.

8     If you think it needs to be tweaked, obviously, we can take

9     that up at the pretrial.

10          It would be helpful for me to have binders of the

11     exhibits just as we go, I can -- particularly, if there's a

12     question with respect to admission, I can have it in front of

13     me as we're proceeding.  If those are numbered, it's going to

14     make life so much easier because we'll all know exactly what it

15     is we're talking about as we proceed.

16          MS. PELKER:  Does the Court prefer the standard four

17     copies of the binders for government, defense --

18          THE COURT:  The defense certainly needs a copy and

19     vice versa.  Well, let me ask the deputy clerk.  Do you want a

20     copy as well?

21          THE COURTROOM DEPUTY:  No, Your Honor.

22          THE COURT:  I need one copy for me and one copy for

23     my clerk and a copy for the defense.  And the same for the

24     defense, to have a copy for the government and then a copy for

25     me and a copy for my clerk.

1          The other thing -- I very much appreciate the fact

2     that Ms. Pelker gave the court reporter a list of unusual

3     names, acronyms and things she maybe heard.  You're going to

4     make the court reporter's life much easier and your life much

5     easier if you can give her that in advance.  So a good way to

6     earn brownie points is to get that list to the court reporter.

7          MS. PELKER:  Earning brownie points in advance and

8     then losing it when we speak too quickly during trial.

9          THE COURT:  Exactly.  You just don't want to hit a

10    deficit.

11         MS. PELKER:  Your Honor, on the exhibit list binders,

12    the government has a number of Excel spreadsheets that are

13    extremely voluminous, and we've been talking about the best way

14    to do that.  We can print them.  They are -- we're going to

15    have 100,000 pages of printed --

16         THE COURT:  I don't want 100,000 pages.  I assume

17    you've turned those over, the 100,000 pages to the defense, and

18    they're probably in electronic format?

19         MS. PELKER:  Yes.

20         THE COURT:  I don't want -- you can put a placeholder

21    in the binder for that.  That would be helpful.

22         MS. PELKER:  That sounds great to us as well; I'm

23    sure for our printers and paralegals as well.

24         THE COURT:  All right.  Any other questions from the

25    government before I give Mr. Ekeland a chance to ask any

1    questions?

2            MS. PELKER:  Does Your Honor intend for us to do

3    openings on Friday, the 15th, or Monday, the 18th?

4            THE COURT:  So I think that if we're successful in

5    choosing the jury on the 14th, I would like to start with

6    openings on the 15th, just because I always worry about trials

7    taking longer than you think and then jurors having conflicts,

8    and it becomes a mess.

9            That also is another issue.  What should I tell the

10   jury or prospective jurors in the voir dire about when the

11   presentation of evidence is likely to end?  I can just pick a

12   date that's four weeks from the 18th, which gives us -- that

13   gives us a day of cushion.  Say, by the 9th of October?

14           And the balancing trick here is the later out we tell

15   the jury the evidence is going to end, the harder it is going

16   to be to pick a jury.  The counterbalance to that is that we

17   don't want to get to the 10th or 11th or 12th or whatever it

18   might be and still be presenting evidence and having jurors get

19   fidgety, but, more importantly, have conflicts and we run the

20   risk of losing jurors.

21           MR. EKELAND:  I just didn't hear.  Did you say you

22   anticipated starting the trial and openings on the 18th?

23           THE COURT:  No.  I'm hopeful we can start on the

24   15th, assuming we can pick the jury on the 14th.  I was

25   building in a day of cushion.  And on the 15th, maybe it's

1    possible that we'll -- I'll do the preliminary instructions and

2    the openings, maybe even call the first witness that day.  I

3    don't know for sure.

4              I was -- just, as a matter of being conservative, I

5    said let's just assume for telling the jury how many --

6    counting the number of days to tell the jury, let's start

7    counting ourselves on the 18th.  If I counted out four weeks,

8    that would take me to October 9th, but I'm still --

9              MS. PELKER:  I think that might take us, actually, to

10   October 13th, doesn't it?

11             THE COURT:  Let's see.  No.  It's the 16th.  It

12   would take us -- assuming I start counting on the 18th, it

13   would take us to the 16th.

14             MS. PELKER:  Yes.  Thank you, Your Honor.

15             THE COURT:  Whenever you're talking about a trial

16   that could be five weeks long by the time they deliberate, it

17   becomes trickier to choose a jury and becomes more burdensome

18   for folks.  But I want to be honest with them about how much

19   time it's going to take.

20             MS. PELKER:  Mr. Brown had a point to make about the

21   scheduling for the ancillary forfeiture proceeding as well.

22             MR. BROWN:  I just want to make sure, Your Honor,

23   that the Court is also tracking on the fact that we do have

24   certain specific properties noticed for forfeiture.

25             Under Rule 32.2, assuming there is one or more

1    convictions in the case, there may be a post-trial ancillary

2    forfeiture proceeding.

3         THE COURT:  I see.

4         MR. BROWN:  The government -- I mean, we can tell you

5    right now, we will not ask for a jury determination of the

6    forfeiture in this case.  It's very often just done on the

7    papers, or we could schedule, you know, some sort of proceeding

8    later on.

9         The defense, however, under 32.2, does have a right

10   to ask to retain the jury for that ancillary proceeding.  It

11   would be helpful, I think, all around if we had a -- maybe not

12   at this moment, but if the defense could tell us and the Court

13   whether they plan to ask the jury to be retained in the event

14   that there is a --

15        THE COURT:  Some of these issues I think we can take

16   up at the pretrial.  Mr. Ekeland, if you want to think about

17   that and let me know at the pretrial, that's fine.

18        By the time we leave the room from the pretrial, I'm

19   going to need to know what to tell the prospective jurors about

20   how long the trial is going to last.  As I said, folks should

21   make a realistic estimate, understanding that we're not going

22   to be sitting on Fridays, which helps somewhat, I think, in

23   choosing a jury to the extent that people have obligations that

24   they may need to take care of as jurors, they have a day of the

25   week they can do that as well.  Not everyone can sit for four

1    days a week, but more people can sit four days a week than five

2    days a week.

3           MS. PELKER:  One other point on scheduling, Your

4    Honor.  We're certainly fine arguing the specific witness

5    issues on the *Daubert* matter at the pretrial conference.  We're

6    also happy to do that next Tuesday to the extent we're all

7    going to be back here for the Chainalysis discussion anyway, or

8    if there's anything else that the Court wants to address on

9    Tuesday, we are happy to handle some of that that day.

10          THE COURT:  Let me see.  Unfortunately, my day is

11   fairly packed already.  I don't think we're going to have a lot

12   of time for that, that day.

13          MS. PELKER:  That's fine, Your Honor.  We just wanted

14   to offer that.

15          THE COURT:  I appreciate that.  Anything we can find

16   to be efficient, I'm all in favor of.

17          MS. PELKER:  Thank you, Your Honor.

18          THE COURT:  Mr. Ekeland, any questions you want to

19   ask about trial process?

20          MR. EKELAND:  I've been asked by my client to just

21   raise the issue of his detention.  We are working with the U.S.

22   Marshals.  But he is wondering if there's any possibility of

23   maybe transferring him to Alexandria or another facility.

24          Right now he's on lockdown roughly 23 hours a day,

25   give or take, a couple hours.  Whenever he's got a day where

1    he's going to court, he's unable to call me.  I don't want to

2    belabor the Court; the Court is well aware of it.  We're

3    talking to the U.S. Marshals, but it has been a significant

4    impediment to the defense.

5            One of the reasons I can't -- I've been unable to get

6    through these Russian translations is that there's a large

7    volume of stuff, and actually finding the time where I can

8    actually sit down with Mr. Sterlingov -- I understand now we're

9    working on getting video conferencing.  But if there's anything

10   better in this district that's closer to this court that isn't

11   going to have these kinds of problems that these rent-a-state

12   jails are imposing by, essentially, just imposing these

13   punitive conditions that they're using for their entire

14   population.  And then when we come in, we just get sandbagged.

15           I will keep the Court updated on that.  I'm speaking

16   to the U.S. Marshals, but if there's anything --

17           THE COURT:  It is true that -- when I spoke to the

18   marshall about this when you made your original concerns, he

19   said to me, you know, if they had just called me about this, I

20   could have resolved it or addressed these issues weeks ago.  I

21   do think the most efficient way is to address it with the

22   marshals.  If you reach a dead end with him, I'm happy to do

23   something.  I'm also happy when I get off the bench to send an

24   email to the marshal who is responsible for this just to let

25   him know that we're getting close to trial and that, to the

1    extent that Mr. Sterlingov can be as close as possible, that

2    would be appreciated.  I'm happy to do that.

3            I will tell you that there are substantial restraints

4    on just availability at the Alexandria Jail, and my

5    recollection is, I don't know if -- I think it may still be the

6    case.  But the Marshals Service actually concluded that

7    conditions were not up to the Marshals Service's standard at

8    one significant portion of the D.C. Jail, which is the reason

9    that so many individuals who are on pretrial detention are

10   being held outside of the district, is because of the concerns

11   you're raising.

12           The Marshals Service is being extremely responsible

13   and making sure that the conditions are actually up to the

14   Marshals Service's standards where people are being held.

15           MR. EKELAND:  Understood, Your Honor.  I think

16   there's just a bigger problem here where it seems that the

17   district doesn't have, actually, adequate constitutional

18   facilities to hold people pretrial, and then that is --

19           THE COURT:  I will agree with you, with everything

20   there except for the constitutional piece of that.  I'm not

21   sure that it violates -- I don't think it violates the

22   Constitution.  But I am sympathetic to your concerns, and I

23   wish we had, frankly, our own federal facility here.

24           There was plans years ago to build one, and it was

25   blocked, and it's too bad.  It would be good if we had a

1    federal facility here.  But unless you're very good friends

2    with the appropriators on the Hill and can convince them to

3    appropriate funds to build a jail -- a federal prison in D.C.,

4    we are where we are.

5         MR. EKELAND:  Thank you, Your Honor.  We'll just keep

6    the Court updated on that.

7         THE COURT:  Okay.  That sounds good.

8         MS. PELKER:  Your Honor, just one other point on

9    Friday -- for next Tuesday -- we still have to do a *Missouri v.*

10   *Frye* inquiry.  We may be able -- that should be short, and we

11   can tack that on on Tuesday rather than pushing it to the

12   pretrial conference.

13        THE COURT:  That's fine.  That's fine to do that.

14   Anything else before we adjourn for the day?

15        MS. PELKER:  Nothing from the government, Your Honor.

16        MR. EKELAND:  Nothing from the defense, Your Honor.

17        THE COURT:  Well, thank you.  This was helpful.

18        (The hearing adjourned at 3:20 p.m.)

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, TAMARA M. SEFRANEK, do hereby certify that the

4    above and foregoing constitutes a true and accurate transcript

5    of my stenographic notes and is a full, true and complete

6    transcript of the proceedings to the best of my ability.

7              Dated this 29th day of August, 2023.

8

9                        /s/ Tamara M. Sefranek_____
                         Tamara M. Sefranek, RMR, CRR, CRC
10                       Official Court Reporter
                         Room 6714
11                       333 Constitution Avenue, N.W.
                         Washington, D.C.  20001

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'How** [2] - 295:17, 295:23

**/**

**/s** [1] - 397:9

**0**

**0.01** [1] - 266:4
**0.02** [1] - 270:10

**1**

**1** [28] - 228:20, 242:8, 245:25, 290:19, 290:22, 291:1, 323:14, 323:22, 323:25, 324:1, 352:12, 352:13, 352:14, 368:25, 369:3, 369:9, 369:21, 379:22, 379:25, 385:16, 385:17
**10** [28] - 231:6, 231:14, 231:20, 231:22, 231:23, 239:24, 240:2, 253:21, 261:17, 261:23, 262:1, 264:1, 266:22, 270:8, 280:22, 281:4, 281:5, 286:3, 286:4, 286:10, 286:11, 288:17, 291:23, 292:4, 292:7, 384:22, 385:8
**100** [2] - 298:24, 351:15
**100,000** [3] - 389:15, 389:16, 389:17
**10005** [1] - 227:20
**10:05** [1] - 227:6
**10:37** [1] - 293:20
**10:50** [1] - 293:21
**10th** [2] - 231:4, 390:17
**11** [11] - 269:8, 269:17, 286:10, 298:15, 299:19, 379:24, 380:1, 382:18, 383:7, 383:20, 383:23
**11:00** [1] - 293:18
**11th** [1] - 390:17
**12** [9] - 294:21, 294:24, 294:25,

296:4, 296:9, 299:24, 302:5, 338:11, 338:14
**12.7** [6] - 262:13, 266:24, 270:12, 295:25, 297:4, 297:15
**123** [11] - 281:3, 282:6, 283:2, 283:6, 283:16, 283:24, 285:25, 342:10, 342:12, 343:3, 368:3
**12:16** [2] - 344:23, 345:7
**12MDV** [7] - 240:4, 240:11, 240:14, 240:24, 241:10, 241:20, 242:4
**12th** [1] - 390:17
**13** [5] - 270:20, 271:5, 271:15, 300:9, 383:7
**1301** [1] - 227:17
**13th** [1] - 391:10
**14** [9] - 270:8, 271:24, 303:19, 378:8, 380:3, 382:18, 383:8, 383:23, 385:2
**147.43** [1] - 297:16
**14gb21C7K** [1] - 239:12
**14gbjpk** [1] - 237:12
**14th** [2] - 390:5, 390:24
**15** [10] - 229:22, 265:22, 266:15, 266:17, 288:17, 371:9, 379:2, 379:12, 380:5, 385:2
**15th** [5] - 375:18, 390:3, 390:6, 390:24, 390:25
**16** [8] - 244:2, 282:7, 378:9, 379:12, 379:23, 379:25, 383:4, 385:2
**16th** [2] - 391:11, 391:13
**17(c** [1] - 370:19
**18** [5] - 242:7, 287:12, 287:18, 288:1, 288:2
**18th** [5] - 390:3, 390:12, 390:22, 391:7, 391:12
**19** [9] - 230:7, 230:16, 237:17, 251:4, 251:5, 251:6, 265:21, 272:4
**1997** [1] - 292:21
**1:21-CR-0399** [1] - 227:3

**1:30** [3] - 344:24, 345:5, 345:7
**1C7k** [1] - 238:25
**1C7K** [1] - 239:5
**1C7kW** [1] - 237:12
**1MBrU** [4] - 240:15, 240:17, 240:24, 241:20
**1MDV** [1] - 239:24
**1MDVJ** [1] - 238:4
**1Pf** [1] - 238:2
**1Pfk** [1] - 240:10
**1YZJKa** [5] - 231:5, 232:3, 232:12, 233:15, 234:19

**2**

**2** [35] - 228:21, 249:7, 256:19, 256:20, 256:25, 257:3, 265:21, 270:3, 270:8, 295:20, 296:1, 296:19, 297:16, 299:25, 300:6, 300:16, 300:18, 301:7, 302:19, 341:19, 342:1, 342:4, 342:6, 358:25, 368:25, 369:6, 369:23, 370:1, 370:3, 375:19, 385:9, 385:10, 385:17, 385:18
**20** [9] - 229:22, 249:5, 251:23, 256:7, 256:18, 258:18, 265:20, 269:3, 380:24
**20001** [3] - 227:12, 227:23, 397:11
**20005** [1] - 227:17
**2011** [11] - 231:4, 231:14, 231:11, 239:12, 276:10, 281:23, 282:9, 283:17, 284:15, 284:21, 301:17
**2012** [1] - 276:10
**2014** [2] - 276:10, 276:11
**2018** [1] - 319:25
**202-354-3246** [1] - 227:24
**2020** [2] - 351:2, 351:4
**2021** [1] - 351:2
**2022** [1] - 341:16
**2023** [2] - 227:6, 397:7
**20530** [1] - 227:14

**21-399** [1] - 229:2
**212** [2] - 283:24, 368:3
**22** [26] - 228:14, 257:19, 260:6, 261:2, 261:6, 261:17, 261:23, 262:2, 262:3, 262:23, 263:2, 263:3, 264:2, 265:2, 266:21, 269:7, 273:12, 294:18, 294:22, 295:1, 295:11, 296:5, 299:19, 303:20
**23** [5] - 227:6, 228:15, 258:7, 263:3, 393:24
**230** [1] - 228:5
**24** [7] - 228:16, 253:21, 254:2, 258:18, 261:24, 263:3, 381:22
**25** [4] - 228:17, 259:9, 261:24, 263:3
**26** [6] - 228:18, 259:22, 261:24, 262:24, 263:2, 263:3
**263** [5] - 228:14, 228:15, 228:16, 228:17, 228:18
**27** [6] - 228:19, 261:24, 292:18, 293:4, 293:7, 293:8
**27th** [2] - 237:11, 239:12
**28** [2] - 231:19, 231:24
**28.6** [2] - 297:6, 297:15
**28th** [1] - 375:17
**29** [2] - 354:8, 354:9
**293** [1] - 228:19
**294** [1] - 228:6
**29th** [1] - 397:7
**2:00** [7] - 229:21, 229:22, 345:2, 345:3, 359:25, 360:3
**2:05** [1] - 366:18
**2:30** [1] - 366:18

**3**

**3** [7] - 312:8, 359:23, 360:6, 364:3, 380:3, 382:18, 383:23
**30** [1] - 227:19
**31** [1] - 270:8
**317** [1] - 228:9
**32.2** [2] - 391:25, 392:9
**324** [1] - 228:20
**333** [2] - 227:23,

397:11
**342** [1] - 228:21
**345** [1] - 228:11
**35** [3] - 235:19, 239:23, 240:1
**36** [1] - 239:12
**38** [2] - 233:11, 234:17
**3:00** [2] - 366:23
**3:20** [1] - 396:18

**4**

**4** [3] - 271:13, 271:17, 302:5
**4.3** [1] - 357:2
**46** [1] - 237:18
**48.7** [1] - 259:17
**49** [5] - 230:8, 230:15, 230:16, 231:2, 272:4

**5**

**5** [3] - 342:8, 367:6, 367:9
**5.2** [1] - 301:16
**50** [2] - 230:23, 272:11
**51** [2] - 230:23, 272:11
**51.64** [2] - 259:3, 259:6
**52** [2] - 230:23, 272:11
**52443** [1] - 344:7
**534129** [1] - 255:5
**59** [2] - 251:4, 251:6

**6**

**6** [16] - 252:3, 269:1, 269:3, 342:9, 368:13, 369:2, 369:6, 379:24, 380:1, 382:18, 383:7, 383:20, 383:23, 384:21, 385:8, 385:13
**60** [1] - 316:19
**60.8** [2] - 237:12, 239:3
**601** [1] - 227:11
**61.19.252.148** [2] - 361:10, 363:4
**62** [1] - 297:17
**64** [1] - 297:4
**64.19** [2] - 258:12, 295:25
**6714** [2] - 227:22, 397:10

**7**

**7** [5] - 251:25, 288:23,

289:7, 343:23, 369:9
**7.1** [2] - 298:15,
299:20
**7.2** [2] - 296:5, 300:24
**7.3.1** [2] - 300:10,
301:11
**7.31** [1] - 295:14
**70.90.169.13** [1] -
363:20
**731** [1] - 295:17

---

**8**

**8** [9] - 249:6, 251:23,
251:25, 252:6,
291:24, 292:5,
292:6, 292:7, 303:21
**8th** [1] - 227:19

---

**9**

**9** [6] - 280:22, 281:5,
281:7, 290:8
**925,000** [1] - 269:2
**93.03** [1] - 297:6
**95** [2] - 367:8, 367:10
**950** [1] - 227:14
**9:00** [1] - 288:16
**9a7e** [2] - 254:16,
255:18
**9th** [2] - 390:13, 391:8

---

**A**

**A-R-I-N** [1] - 326:8
**A.M** [1] - 227:6
**abbreviate** [1] -
345:19
**abide** [1] - 377:7
**ability** [2] - 308:11,
397:6
**able** [28] - 230:17,
236:8, 239:8, 243:1,
243:9, 244:5,
244:13, 248:12,
248:16, 264:20,
270:18, 278:7,
280:15, 281:22,
295:21, 298:11,
327:16, 329:12,
339:22, 343:20,
344:2, 373:1,
375:16, 380:16,
383:17, 386:19,
387:6, 396:10
**absent** [1] - 313:21
**aca** [1] - 265:13
**academia** [2] - 265:12,
265:14
**academic** [8] - 242:19,

242:22, 242:25,
257:13, 257:14,
263:23, 295:23,
366:10
**accepts** [1] - 324:22
**access** [20] - 236:23,
306:15, 307:11,
307:16, 308:3,
312:12, 324:10,
325:1, 330:13,
331:16, 332:6,
332:8, 333:19,
333:22, 335:21,
335:22, 336:5,
340:20, 342:20,
342:23
**accessed** [10] -
285:13, 328:2,
330:20, 344:3,
344:5, 344:11,
369:10, 369:24,
370:5
**accesses** [3] - 335:6,
338:6, 342:19
**accomplished** [1] -
272:14
**According** [2] -
271:11, 361:19
**according** [5] - 232:8,
237:10, 241:25,
260:19, 268:2
**account** [50] - 230:10,
236:3, 237:19,
238:3, 238:25,
239:4, 240:18,
242:5, 270:16,
270:24, 271:8,
273:14, 273:22,
274:10, 274:16,
274:17, 275:17,
277:7, 277:9,
277:15, 300:7,
332:15, 332:23,
333:9, 333:12,
333:19, 333:22,
335:11, 338:7,
338:8, 342:18,
342:21, 342:22,
344:8, 344:9,
344:11, 344:12,
352:20, 355:14,
355:20, 356:1,
356:7, 358:5, 358:6,
364:24, 370:7
**accountants** [1] -
372:13
**accounts** [35] -
274:13, 274:15,
274:22, 274:24,
274:25, 275:5,

275:10, 275:14,
276:7, 277:21,
278:4, 284:25,
285:4, 285:8,
285:11, 285:16,
289:13, 324:11,
329:4, 335:12,
335:16, 335:22,
336:5, 338:6,
342:23, 343:21,
344:2, 344:4, 344:6,
357:4, 357:5, 357:7,
369:11, 370:6, 370:9
**accuracy** [12] -
256:19, 257:2,
296:1, 297:21,
298:21, 298:25,
299:7, 299:11,
299:12, 303:11,
369:14, 370:1
**accurate** [7] - 257:5,
257:6, 257:9,
268:10, 280:24,
316:13, 397:4
**accurately** [3] -
291:20, 292:3,
323:19
**achieves** [2] - 270:10,
270:11
**acknowledge** [1] -
256:19
**acronyms** [1] - 389:3
**action** [1] - 353:20
**Action** [1] - 227:2
**activities** [2] - 321:1,
321:12
**activity** [2] - 309:14,
339:25
**acts** [1] - 329:23
**actual** [10] - 237:5,
237:7, 275:21,
275:22, 276:19,
276:20, 298:9,
324:19, 353:20,
382:22
**add** [5] - 302:12,
302:13, 314:5, 382:1
**adding** [1] - 265:6
**addition** [3] - 230:23,
297:5, 337:23
**additional** [4] -
283:19, 321:1,
329:12, 357:1
**additionally** [1] -
247:2
**additive** [2] - 265:9,
302:7
**Address** [3] - 259:23,
260:23, 261:20
**address** [166] - 231:5,

232:2, 232:3, 232:5,
232:8, 232:24,
233:10, 233:15,
233:20, 233:24,
234:19, 236:5,
237:12, 238:2,
238:3, 238:7,
238:12, 238:21,
238:25, 239:25,
240:17, 242:4,
249:11, 249:12,
252:2, 252:7,
252:10, 253:2,
253:4, 253:5, 253:7,
253:10, 253:14,
253:16, 253:18,
253:25, 254:8,
254:20, 254:24,
255:4, 255:8,
255:11, 255:13,
255:17, 255:20,
255:23, 256:1,
265:24, 266:2,
266:5, 266:8,
266:10, 266:11,
266:12, 266:18,
272:8, 272:12,
272:22, 273:2,
281:2, 282:6, 283:3,
283:16, 283:21,
283:24, 283:25,
284:25, 285:3,
285:8, 285:12,
285:13, 285:15,
285:25, 286:1,
300:19, 302:24,
305:5, 310:14,
315:12, 324:7,
324:13, 324:14,
324:16, 324:19,
324:21, 324:22,
324:24, 325:1,
325:16, 325:25,
327:10, 327:25,
328:2, 329:2,
329:15, 330:13,
330:14, 331:13,
332:15, 332:16,
332:18, 332:24,
333:8, 333:18,
334:2, 335:2, 336:4,
337:10, 339:9,
342:10, 342:12,
342:20, 343:3,
343:17, 346:2,
346:6, 347:20,
347:23, 348:5,
348:8, 348:12,
348:14, 348:17,
348:21, 348:23,
349:5, 349:8,

349:19, 350:3,
350:6, 350:10,
350:13, 350:22,
351:11, 352:16,
352:18, 352:19,
353:18, 353:19,
354:3, 354:24,
355:4, 355:8,
358:23, 360:21,
361:10, 363:4,
363:19, 364:1,
367:9, 368:2,
368:19, 370:18,
393:8, 394:21
**address-to-address**
[2] - 272:22, 273:2
**addressed** [1] -
394:20
**addresses** [74] -
232:16, 232:18,
232:20, 232:21,
233:1, 233:2, 233:7,
233:8, 238:17,
239:4, 240:24,
241:3, 241:7,
241:12, 248:6,
248:7, 248:19,
252:24, 256:4,
265:25, 267:2,
269:1, 269:3,
270:15, 272:18,
280:23, 281:2,
281:10, 281:13,
282:5, 282:15,
282:17, 283:1,
283:2, 283:4, 283:5,
283:8, 283:10,
283:14, 283:20,
283:23, 289:13,
291:16, 304:3,
310:15, 313:9,
324:10, 325:3,
325:5, 325:11,
326:12, 327:10,
328:15, 329:18,
335:15, 342:13,
343:11, 347:13,
347:15, 347:17,
347:25, 348:11,
353:6, 353:13,
354:11, 354:14,
355:22, 358:10,
358:11, 358:19,
367:24, 368:19,
385:24
**adequate** [1] - 395:17
**adjourn** [1] - 396:14
**adjourned** [1] - 396:18
**adjust** [1] - 298:5
**administrated** [1] -

400

346:13
**administration** [1] -
320:3
**administrator** [10] -
278:11, 278:15,
278:22, 278:24,
279:5, 280:16,
308:16, 308:25,
355:16, 355:21
**administrator-
related** [1] - 355:11
**administrators** [6] -
279:8, 279:12,
279:18, 280:5,
280:8, 309:12
**admission** [1] -
388:12
**admit** [4] - 262:23,
293:4, 323:22,
341:25
**ADMITTED** [1] -
228:12
**admitted** [11] - 263:2,
263:4, 293:7, 293:8,
315:14, 315:16,
323:25, 324:1,
342:4, 342:6, 387:6
**advance** [2] - 389:5,
389:7
**advertised** [1] -
337:17
**advertising** [1] -
361:23
**advocacy** [1] - 381:14
**affect** [1] - 375:6
**affidavit** [4] - 256:8,
270:23, 271:7,
271:12
**afternoon** [1] - 293:15
**Agency** [1] - 326:7
**agent** [8] - 271:12,
273:25, 320:16,
385:25, 386:2,
386:3, 386:12
**agnostic** [2] - 353:20,
353:22
**ago** [2] - 394:20,
395:24
**Agora** [3] - 265:22,
267:10, 267:25
**agree** [24] - 232:11,
232:15, 237:10,
237:14, 239:7,
239:10, 239:13,
241:10, 266:7,
266:13, 277:6,
280:17, 287:25,
288:4, 299:25,
301:23, 301:24,
304:19, 304:21,

349:7, 349:16,
351:16, 377:6,
395:19
**agreed** [1] - 318:22
**agreeing** [1] - 266:17
**agreement** [1] - 378:7
**ahead** [3] - 313:3,
344:22, 367:6
**Akemashite** [1] -
355:10
**AKEMISHITE** [1] -
355:11
**al** [7] - 261:18, 261:19,
265:2, 301:2, 302:9
**AI** [4] - 288:10, 289:14,
290:10, 290:12
**Al-Qassam** [4] -
288:10, 289:14,
290:10, 290:12
**al.'s** [2] - 300:10,
303:20
**Alden** [1] - 229:6
**ALDEN** [1] - 227:13
**alerted** [1] - 290:2
**alerts** [1] - 289:21
**Alexandria** [1] -
393:23, 395:4
**algorithms** [1] -
300:20
**all-consuming** [1] -
374:24
**Allen** [2] - 319:20,
319:21
**allocated** [3] - 325:7,
326:13, 347:21
**allocates** [1] - 325:6
**allocation** [1] - 325:25
**allow** [10] - 287:4,
318:22, 351:21,
371:24, 372:1,
373:13, 373:18,
373:20, 379:20,
381:10
**allowed** [1] - 386:11
**allows** [1] - 265:24
**almost** [1] - 331:8
**alternate** [5] - 340:14,
379:17, 380:6,
384:25, 385:16
**alternates** [12] - 375:6,
375:8, 378:19,
378:20, 378:22,
383:1, 383:3,
383:19, 384:15,
384:23, 384:24,
385:14
**alternative** [1] -
309:15
**AMERICA** [1] - 227:2
**America** [3] - 229:3,

325:11, 325:15
**amount** [7] - 230:25,
239:19, 314:1,
336:16, 362:19,
364:23, 364:25
**amounts** [1] - 310:15
**analyses** [3] - 320:4,
320:9, 353:18
**Analysis** [1] - 360:7
**analysis** [54] - 244:21,
246:13, 257:13,
273:24, 303:7,
314:25, 315:2,
315:4, 317:4, 317:6,
317:9, 318:21,
320:3, 320:12,
322:21, 323:7,
324:7, 328:12,
328:20, 335:18,
336:10, 338:5,
339:15, 341:1,
341:8, 341:14,
341:17, 342:13,
343:1, 343:19,
344:15, 344:17,
347:18, 351:9,
351:11, 351:12,
352:10, 354:2,
354:11, 355:2,
356:18, 356:22,
357:17, 357:22,
357:23, 359:17,
361:7, 363:4, 365:1,
365:14, 366:4,
366:11, 372:21,
372:22
**analytic** [3] - 305:24,
359:14, 359:16
**analytical** [1] - 319:22
**analytics** [6] - 243:14,
243:21, 244:23,
245:14, 289:17,
319:23
**analyze** [1] - 321:3
**analyzing** [3] - 320:14,
322:12, 359:14
**ancillary** [3] - 391:21,
392:1, 392:10
**Andrew** [1] - 356:15
**Androulaki** [5] -
258:8, 261:18,
265:2, 297:2, 302:9
**announce** [1] - 382:24
**anonymity** [1] -
328:18
**anonymizing** [1] -
332:13
**anonymous** [4] -
310:5, 310:10,
310:13, 310:14

**answer** [9] - 247:14,
254:6, 254:7,
272:24, 273:3,
273:8, 273:11,
375:2, 380:20
**answered** [1] - 307:18
**answering** [1] - 295:3
**answers** [4] - 314:16,
315:8, 316:8, 380:21
**anticipate** [3] - 387:4,
387:12
**anticipated** [1] -
390:22
**anticipation** [1] -
336:23
**antitrust** [2] - 292:16,
292:23
**anyway** [1] - 393:7
**Apache** [1] - 354:17
**apart** [3] - 230:12,
341:12, 359:9
**apologize** [2] - 366:1,
374:25
**appear** [4] - 268:3,
328:16, 342:15,
352:19
**appearance** [1] -
300:22
**appeared** [13] -
249:13, 328:17,
336:1, 336:2, 337:5,
337:8, 338:11,
338:23, 342:16,
343:10, 352:24,
353:25, 354:3
**apple** [2] - 311:25,
313:20
**Application** [1] -
256:25
**applications** [1] -
319:15
**applied** [6] - 257:2,
257:10, 264:8,
266:16, 302:1, 373:7
**applies** [1] - 385:1
**apply** [2] - 270:14,
336:20
**applying** [3] - 264:5,
264:7, 372:25
**appreciate** [4] -
298:10, 308:10,
389:1, 393:15
**appreciated** [1] -
395:2
**approach** [1] - 229:4
**appropriate** [3] -
312:20, 381:11,
396:3
**appropriators** [1] -
396:2

**April** [1] - 318:5
**arbitrarily** [2] - 362:19,
362:22
**arbitrary** [1] - 363:12
**architect** [1] - 319:13
**archive** [1] - 361:23
**area** [1] - 269:15
**areas** [2] - 322:18,
324:3
**arguing** [1] - 393:4
**argument** [5] - 312:19,
317:9, 371:19,
371:20, 374:3
**argument's** [1] - 302:9
**argumentative** [2] -
234:7, 234:8
**ARIN** [6] - 325:14,
325:16, 325:20,
325:21, 326:8,
326:17
**arises** [1] - 382:13
**arrange** [1] - 386:18
**arriving** [1] - 359:15
**arrow** [3] - 238:3,
238:6, 238:7
**arrows** [1] - 359:8
**article** [19] - 258:2,
260:18, 261:20,
263:23, 292:11,
292:14, 292:16,
292:19, 294:22,
294:24, 296:5,
314:20, 314:21,
315:10, 315:11,
315:20, 315:21,
315:23, 315:24
**articles** [1] - 265:10
**artifacts** [1] - 320:10
**aside** [2] - 252:20,
371:1
**asserting** [1] - 362:7
**assessed** [1] - 256:15
**assessing** [2] -
303:10, 339:16
**assessment** [3] -
233:24, 316:12,
343:20
**assign** [2] - 362:19,
369:25
**Assigned** [1] - 326:6
**assigned** [10] -
318:11, 331:19,
362:15, 363:5,
364:11, 364:18,
364:20, 365:3,
365:10, 365:12
**assigns** [1] - 325:5
**assist** [1] - 359:17
**assisting** [1] - 320:25
**associate** [2] - 369:2,

369:5
**associated** [9] -
239:3, 270:16,
274:18, 283:2,
283:5, 283:24,
304:10, 357:3, 357:6
**associaters** [1] -
274:20
**associates** [1] - 281:2
**assume** [5] - 280:10,
284:23, 379:23,
389:16, 391:5
**assuming** [6] -
349:18, 361:14,
364:16, 390:24,
391:12, 391:25
**Assuming** [1] - 375:15
**assumption** [4] -
279:19, 279:22,
364:14, 376:12
**assumptions** [5] -
257:2, 372:21,
372:22, 372:25,
373:7
**attach** [1] - 289:25
**attached** [1] - 253:9
**attachments** [5] -
240:21, 241:5,
241:7, 241:17,
241:19
**attack** [1] - 310:23
**attempt** [3] - 244:22,
301:3, 370:8
**attempted** [1] - 370:2
**attempts** [2] - 295:17,
304:10
**attended** [1] - 322:7
**attention** [43] - 230:6,
235:19, 237:17,
239:23, 244:2,
244:10, 249:5,
253:20, 257:19,
258:18, 259:9,
259:22, 261:16,
264:1, 265:19,
266:22, 269:7,
270:3, 270:20,
272:3, 285:11,
286:3, 288:12,
291:23, 292:18,
296:4, 298:15,
299:23, 300:9,
300:11, 301:10,
303:19, 303:21,
323:13, 341:19,
342:8, 343:23,
358:25, 360:9,
361:9, 363:19,
368:13, 368:15
**attribute** [2] - 370:8,

387:22
**attributed** [1] - 241:14
**attribution** [3] -
283:20, 329:3, 358:4
**August** [2] - 227:6,
397:7
**authentication** [1] -
375:15
**author** [4] - 258:8,
259:10, 259:23,
261:2
**authorize** [1] - 306:19
**automated** [1] -
269:13
**Automatic** [3] -
259:23, 260:23,
261:20
**automatically** [3] -
273:13, 337:15,
359:7
**automating** [1] -
322:21
**availability** [1] - 395:4
**available** [5] - 293:14,
306:12, 306:13,
328:4, 329:20
**Ave** [1] - 227:17
**Avenue** [3] - 227:14,
227:23, 397:11
**averse** [1] - 289:24
**avoid** [7] - 243:12,
243:15, 278:12,
278:16, 278:23,
279:5, 280:18
**awaiting** [1] - 375:15
**aware** [39] - 235:24,
240:24, 241:2,
242:22, 242:24,
242:25, 243:14,
244:7, 244:18,
245:7, 246:5, 246:7,
248:1, 249:1,
259:16, 262:12,
274:18, 276:22,
278:11, 279:8,
279:12, 279:17,
284:8, 284:11,
285:24, 289:10,
291:14, 292:16,
292:21, 293:1,
303:7, 303:10,
303:18, 306:6,
346:16, 348:14,
354:22, 359:24,
394:2
**awfully** [1] - 376:10

**B**

**bachelor** [1] - 319:2

back-and-forth [1] -
382:16
**backends** [1] - 276:23
**background** [5] -
319:1, 328:14,
336:1, 354:19, 357:3
**backup** [1] - 356:14
**backward** [6] -
295:21, 298:18,
301:6, 301:16,
301:20, 302:2
**backwards** [6] -
273:13, 273:17,
273:21, 274:9,
301:2, 301:20
**bad** [1] - 395:25
**balance** [3] - 281:15,
281:20, 316:9
**balancing** [1] - 390:14
**based** [12] - 263:6,
263:10, 267:23,
284:11, 287:18,
337:12, 340:7,
343:6, 343:19,
351:12, 354:2, 364:7
**bases** [2] - 313:24
**basic** [1] - 290:15
**basis** [5] - 287:18,
355:24, 356:3,
356:7, 357:21
**Batson** [2] - 382:11,
382:13
**become** [2] - 273:25,
331:10
**becomes** [3] - 390:8,
391:17
**BEFORE** [1] - 227:8
**began** [4] - 250:19,
282:1, 351:2, 351:3
**begin** [1] - 381:13
**beginning** [7] -
249:13, 249:23,
250:9, 250:15,
271:10, 274:6, 367:8
**begins** [1] - 250:20
**behavior** [6] - 249:7,
250:21, 268:21,
269:11, 304:9, 311:2
**behavioral** [4] -
253:15, 253:17,
268:21, 315:19
**behind** [1] - 295:2
**belabor** [1] - 394:2
**believes** [1] - 248:6
**belong** [1] - 269:2
**belonging** [1] - 274:23
**below** [3] - 240:7,
269:9, 269:18
**bench** [3] - 371:11,
381:2, 394:23

**beside** [1] - 368:20
**best** [9] - 270:11,
305:13, 366:25,
375:22, 375:23,
388:5, 388:7,
389:13, 397:6
**better** [3] - 254:8,
298:11, 394:10
**between** [27] - 243:4,
250:8, 295:18,
296:2, 302:4,
321:12, 322:3,
329:23, 334:10,
335:9, 338:6,
340:15, 341:4,
347:19, 347:23,
357:7, 362:24,
363:9, 364:24,
379:22, 379:25,
382:6, 383:21,
386:21, 386:24
**beyond** [9] - 309:19,
311:22, 312:17,
347:8, 351:9, 355:1,
355:2, 372:6, 375:9
**bias** [2] - 351:14
**big** [5] - 269:12, 291:6,
291:14, 323:15,
370:19
**bigger** [3] - 269:4,
303:2, 395:16
**Bigger** [1] - 269:10
**Binance** [2] - 277:20,
277:22
**binder** [14] - 230:7,
230:12, 230:14,
288:13, 289:4,
294:7, 294:9,
294:14, 294:16,
323:13, 323:15,
323:16, 352:8,
389:21
**binders** [5] - 291:24,
323:14, 388:10,
388:17, 389:11
**Bisbee** [4] - 255:21,
267:24, 304:24,
372:3
**Bisbee's** [10] - 240:21,
241:17, 249:6,
251:23, 253:24,
255:2, 265:19,
268:13, 302:22,
303:13
**bit** [6] - 287:6, 295:7,
370:16, 370:20,
374:17, 382:15
**Bitcoin** [70] - 230:11,
230:22, 231:5,
231:10, 232:2,

232:10, 232:12,
232:15, 232:25,
233:15, 233:25,
234:3, 234:19,
235:10, 235:11,
235:15, 237:12,
239:3, 253:10,
254:9, 255:3, 258:8,
259:23, 260:23,
261:20, 268:24,
269:2, 269:25,
270:17, 270:21,
270:24, 271:4,
271:8, 273:21,
276:5, 277:7,
277:10, 277:15,
278:5, 278:8,
278:11, 278:15,
279:3, 280:24,
281:2, 282:5, 283:5,
283:14, 283:23,
283:25, 287:8,
287:14, 294:19,
295:19, 296:3,
300:5, 300:11,
300:16, 301:11,
304:5, 305:5, 311:4,
315:6, 316:1,
318:11, 324:4,
324:9, 335:13,
355:16, 355:20
**Bitcoins** [2] - 258:19,
262:14
**Bitcointalk** [3] - 344:8,
355:10, 355:13
**bites** [2] - 311:25,
313:19
**Bitfinex** [3] - 277:20,
277:24, 277:25
**bits** [1] - 252:21
**Bitstamp** [4] - 277:21,
277:24, 277:25,
344:7
**blanket** [1] - 249:8
**block** [6] - 231:12,
254:10, 255:4,
305:19, 325:22,
327:9
**blockchain** [16] -
243:14, 243:21,
244:23, 245:14,
246:13, 257:13,
289:17, 290:15,
300:23, 304:16,
305:24, 306:7,
310:5, 310:6,
310:11, 372:17
**Blockchain** [1] -
259:10
**blocked** [1] - 395:25

402

**blocks** [2] - 305:19, 325:8
**blue** [3] - 237:21, 237:25, 238:7
**bold** [1] - 261:17
**book** [1] - 324:21
**boot** [1] - 386:24
**boot-up** [1] - 386:24
**Booz** [2] - 319:20, 319:21
**bother** [1] - 358:13
**bothered** [1] - 317:3
**bottom** [15] - 231:2, 233:11, 234:17, 251:25, 254:2, 265:20, 269:9, 312:9, 343:23, 364:2, 368:2, 368:15, 368:17, 368:18, 369:6
**box** [9] - 237:21, 237:23, 237:24, 237:25, 238:7, 345:9, 375:8, 375:10
**Bravo** [1] - 289:1
**break** [9] - 242:8, 246:4, 288:20, 293:21, 344:23, 345:1, 345:3, 366:15, 366:21
**breaking** [1] - 366:13
**breaks** [1] - 246:14
**brevity** [1] - 365:8
**bridge** [1] - 334:17
**brief** [1] - 305:12
**briefly** [6] - 272:3, 296:17, 304:21, 304:23, 310:3, 359:2
**briefs** [1] - 371:19
**Brigades** [4] - 288:10, 289:14, 290:10, 290:12
**bring** [2] - 380:23, 382:2
**brought** [2] - 285:10, 374:7
**BROWN** [4] - 227:10, 229:9, 391:22, 392:4
**Brown** [2] - 229:9, 391:20
**brownie** [2] - 389:6, 389:7
**browser** [4] - 331:17, 333:5, 333:14, 346:16
**browsing** [1] - 339:6
**BTC** [5] - 266:4, 275:25, 276:2, 276:7, 276:24
**BTC-e** [4] - 275:25,

276:2, 276:7, 276:24
**build** [3] - 381:15, 395:24, 396:3
**building** [1] - 390:25
**Bullet** [4] - 369:3, 369:21, 370:1, 370:3
**bullet** [2] - 253:21, 270:4, 281:7, 292:9
**burdensome** [1] - 391:17
**burner** [3] - 274:13, 274:15, 274:24
**business** [3] - 328:17, 331:9, 337:4
**button** [3] - 331:18, 339:23, 340:15
**buying** [1] - 321:16
**BY** [43] - 230:3, 233:6, 234:13, 247:25, 252:18, 254:14, 261:15, 263:5, 268:5, 273:10, 274:5, 280:4, 281:6, 288:8, 288:22, 292:8, 294:5, 295:9, 297:12, 298:14, 299:22, 307:3, 307:25, 310:2, 312:5, 313:4, 317:20, 324:2, 326:10, 342:7, 345:15, 347:12, 350:21, 352:4, 356:5, 356:24, 358:17, 360:5, 360:15, 363:2, 365:17, 366:5, 367:3
**bytes** [1] - 252:21

---

**C**

**Cabanas** [1] - 374:4
**calculated** [2] - 262:20, 364:23
**Canada** [1] - 306:8
**cannot** [8] - 243:7, 246:8, 248:8, 259:19, 272:9, 284:13, 284:20, 306:9
**capacity** [3] - 349:14, 349:16, 349:18
**caption** [1] - 269:18
**captured** [3] - 299:8, 299:11, 299:14
**capturing** [1] - 320:7
**card** [1] - 380:18
**care** [1] - 392:24
**careful** [1] - 378:2
**case** [68] - 236:7,

236:19, 239:7, 246:24, 252:8, 253:17, 263:20, 270:21, 271:4, 271:11, 273:20, 275:20, 276:15, 276:19, 276:24, 277:4, 277:5, 278:19, 278:25, 282:21, 292:16, 293:1, 301:13, 301:15, 306:7, 307:10, 315:15, 315:17, 318:23, 320:11, 320:22, 320:24, 321:3, 324:9, 328:13, 329:2, 333:8, 334:25, 335:11, 336:8, 337:17, 342:25, 343:7, 351:5, 351:6, 353:6, 364:25, 365:11, 372:8, 372:12, 372:13, 373:6, 374:22, 375:21, 376:21, 376:22, 378:20, 385:25, 386:2, 386:3, 386:12, 388:6, 388:7, 392:1, 392:6, 395:6
**Case** [1] - 229:2
**case's** [1] - 328:20
**CaseFile** [3] - 359:5, 359:11, 359:12
**cases** [12] - 236:24, 248:10, 249:25, 307:7, 318:20, 321:5, 321:6, 335:19, 353:15, 357:2, 366:2, 374:14
**cast** [1] - 373:10
**casts** [1] - 315:2
**CAT** [3] - 361:17, 362:1, 362:3
**cataloged** [1] - 327:17
**catch** [1] - 269:16
**categorically** [1] - 247:5
**categorize** [1] - 232:8
**categorized** [2] - 336:25, 338:3
**category** [2] - 337:4, 337:7
**caution** [1] - 374:9
**CC** [1] - 298:24
**CE** [2] - 323:1, 323:6
**ceremonial** [3] - 380:12, 380:15,

380:17
**certain** [11] - 254:9, 305:6, 306:8, 313:11, 343:21, 353:13, 359:15, 373:6, 377:10, 377:12, 391:24
**certainly** [3] - 378:12, 388:18, 393:4
**certainty** [2] - 351:16, 375:22
**CERTIFICATE** [1] - 397:1
**certification** [1] - 376:1
**certifications** [3] - 322:6, 322:7, 322:9
**certified** [2] - 377:5, 377:7
**certify** [2] - 376:25, 397:3
**chain** [23] - 248:23, 249:2, 249:7, 249:8, 249:12, 249:13, 249:14, 249:18, 250:3, 250:9, 250:21, 250:25, 251:8, 251:15, 290:16, 296:21, 302:20, 302:23, 304:8, 309:6, 309:8, 310:18
**Chainalysis** [24] - 244:7, 244:18, 244:22, 245:9, 249:1, 252:19, 266:14, 267:7, 267:10, 267:16, 267:25, 268:12, 268:17, 289:17, 291:5, 291:12, 299:1, 299:2, 303:6, 306:13, 314:8, 317:2, 317:3, 393:7
**Chainalysis's** [9] - 253:6, 257:1, 267:13, 268:20, 272:19, 272:22, 273:1, 312:12, 316:16
**chains** [13] - 249:20, 249:22, 250:2, 250:6, 250:22, 251:6, 251:7, 251:11, 251:12, 251:17, 302:11, 303:2, 331:24
**Chair** [1] - 382:18
**chairs** [1] - 375:9
**challenges** [1] -

384:21
**chance** [4] - 231:16, 374:10, 381:4, 389:25
**change** [31] - 249:11, 255:4, 255:21, 256:4, 265:3, 265:23, 265:24, 265:25, 266:1, 266:2, 266:4, 266:8, 266:18, 267:4, 267:7, 267:9, 267:16, 270:7, 270:8, 270:9, 300:21, 300:23, 301:21, 302:24, 305:2, 305:4, 340:1, 340:16, 348:5, 348:8, 366:21
**changing** [1] - 339:8
**characteristics** [2] - 264:15, 302:10
**characterization** [2] - 253:24, 316:24
**characterize** [2] - 291:20, 335:5
**characterizing** [1] - 258:19
**charge** [4] - 286:5, 286:7, 286:20, 286:25
**charges** [1] - 287:3
**chart** [27] - 230:19, 230:24, 231:3, 231:20, 232:1, 232:6, 232:9, 233:13, 234:14, 234:18, 234:21, 234:22, 235:2, 237:18, 238:24, 240:7, 240:11, 251:10, 251:23, 252:1, 252:25, 253:3, 253:16, 271:24, 272:5, 272:6, 290:14
**charted** [1] - 238:2
**charts** [1] - 269:18
**check** [7] - 245:20, 277:8, 281:15, 282:4, 284:19, 333:24, 353:24
**checked** [1] - 361:14
**checks** [1] - 334:22
**chemical** [1] - 319:11
**childcare** [1] - 366:22
**choose** [3] - 338:14, 347:25, 391:17
**choosing** [1] - 363:8, 390:5, 392:23

**chose** [4] - 268:6, 338:5, 338:10, 338:23
**chosen** [2] - 377:12, 379:17
**Christopher** [1] - 229:9
**CHRISTOPHER** [1] - 227:10
**CipherTrace** [30] - 232:8, 233:13, 234:14, 234:17, 241:13, 241:16, 241:25, 242:2, 244:5, 244:13, 244:15, 244:21, 244:22, 245:11, 245:17, 245:24, 248:5, 248:12, 248:19, 275:16, 280:23, 281:1, 281:23, 282:5, 282:18, 284:15, 284:21, 289:16
**CipherTrace's** [5] - 256:12, 256:15, 282:23, 283:19, 283:20
**circles** [3] - 291:6, 291:7, 291:15
**circuit** [1] - 333:15
**circumstances** [2] - 313:22, 379:13
**citation** [1] - 271:14
**cite** [7] - 271:12, 271:13, 271:17, 271:19, 292:11, 366:6, 366:10
**cited** [4] - 260:8, 260:12, 292:19, 295:23
**citing** [2] - 260:14, 292:14
**citizens** [1] - 378:9
**Civil** [1] - 289:9
**civil** [1] - 289:10
**claim** [5] - 283:23, 284:4, 284:9, 284:12, 355:9
**claimed** [1] - 296:1
**claims** [2] - 269:22, 284:2
**clarification** [1] - 358:1
**clarify** [1] - 280:3
**classes** [1] - 290:21
**classic** [1] - 321:16
**classifier** [2] - 304:1, 304:18
**clear** [9] - 240:10,

249:10, 278:14, 278:18, 296:22, 308:5, 315:14, 326:2, 352:16
**clerk** [6] - 386:17, 386:23, 387:2, 388:19, 388:23, 388:25
**click** [2] - 291:14, 331:18
**client** [1] - 393:20
**clock** [2] - 293:20, 365:24
**close** [8] - 288:15, 335:9, 343:13, 373:17, 374:15, 380:9, 394:25, 395:1
**closely** [2] - 376:18, 377:2
**closer** [4] - 340:3, 375:24, 378:3, 394:10
**closest** [1] - 336:18
**cluster** [15] - 243:25, 244:8, 244:19, 249:3, 249:18, 250:14, 250:24, 251:1, 265:22, 266:14, 267:10, 268:24, 269:5, 304:10
**cluster's** [1] - 298:23
**clustered** [4] - 244:15, 251:16, 268:22, 272:19
**clustering** [12] - 243:16, 246:4, 253:6, 253:15, 253:17, 256:9, 256:13, 256:15, 272:22, 273:2, 310:16, 316:13
**Clustering** [3] - 259:23, 260:23, 261:20
**Clusters** [1] - 294:19
**clusters** [10] - 245:24, 251:7, 251:10, 252:8, 252:19, 268:25, 269:4, 269:10, 269:13
**co** [22] - 239:24, 240:5, 240:8, 240:9, 240:11, 240:12, 240:13, 240:14, 243:25, 244:16, 244:21, 245:21, 246:4, 249:1, 249:12, 249:17, 249:22, 250:8,

250:15, 256:9, 256:13, 340:4
**co-occurrence** [1] - 340:4
**co-spend** [18] - 239:24, 240:5, 240:8, 240:9, 240:11, 240:12, 240:13, 243:25, 244:16, 244:21, 246:4, 249:1, 249:12, 249:22, 250:8, 250:15, 256:9, 256:13
**co-spending** [1] - 249:17
**co-spends** [2] - 240:14, 245:21
**code** [2] - 319:15, 322:25
**cognitive** [1] - 351:14
**CoinJoin** [24] - 242:20, 242:23, 243:1, 243:5, 243:8, 243:9, 243:11, 243:15, 243:19, 244:3, 244:5, 244:7, 244:11, 244:13, 244:19, 244:23, 244:24, 245:12, 245:15, 246:24, 247:7, 248:2, 248:17
**CoinJoins** [11] - 242:8, 242:12, 245:8, 245:9, 245:10, 246:4, 246:6, 246:14, 247:10, 247:19, 247:21
**colleagues** [4] - 257:20, 263:7, 263:11, 269:23
**colleagues'** [1] - 340:6
**collect** [5] - 232:16, 281:10, 281:13, 281:22, 282:14
**collected** [2] - 320:15, 332:18
**collecting** [1] - 280:23
**collection** [4] - 284:15, 284:21, 319:14, 330:11
**college** [2] - 381:17
**colored** [1] - 269:18
**Columbia** [2] - 289:9, 378:9
**COLUMBIA** [1] - 227:1
**column** [2] - 296:10, 296:11
**combination** [1] -

320:2
**combine** [1] - 317:2
**Comcast** [2] - 337:22, 363:21
**comfortable** [1] - 340:24
**coming** [6] - 230:12, 237:3, 254:12, 302:23, 316:6, 374:23
**command** [5] - 326:24, 331:22, 331:25, 333:14
**commands** [1] - 332:1
**comments** [2] - 371:17, 374:20
**commercial** [2] - 362:20, 363:21
**commingle** [1] - 232:16
**committed** [1] - 378:13
**common** [9] - 243:18, 248:2, 250:2, 276:4, 276:12, 335:22, 343:11, 350:7, 350:10
**commonalities** [1] - 335:9
**commonly** [3] - 328:5, 348:19, 363:10
**communicate** [2] - 281:17, 324:24
**communications** [2] - 324:17, 324:18
**community** [4] - 328:6, 328:10, 328:24, 334:8
**companies** [16] - 243:14, 243:21, 245:7, 245:14, 245:16, 289:17, 305:6, 319:10, 326:18, 327:14, 328:7, 329:25, 330:2, 330:6, 330:7, 331:5
**company** [13] - 246:5, 246:15, 246:16, 247:9, 282:1, 305:9, 306:25, 319:11, 330:4, 343:10, 368:8, 368:11, 368:12
**compare** [1] - 297:15
**compared** [3] - 267:18, 270:7, 270:8
**competency** [1] - 351:19
**compile** [1] - 234:14

**compiled** [2] - 233:13, 234:18
**complaint** [8] - 270:23, 271:6, 288:25, 289:7, 289:11, 289:14, 355:6, 355:15
**complete** [1] - 397:5
**completed** [2] - 322:5, 322:7
**completely** [2] - 351:4, 355:7
**completing** [1] - 345:1
**computational** [1] - 304:6
**compute** [1] - 370:2
**computed** [1] - 369:17
**computer** [16] - 318:10, 319:2, 319:4, 321:6, 322:8, 322:23, 324:14, 324:24, 325:1, 325:15, 332:14, 333:3, 340:8, 347:24, 348:20, 372:21
**computers** [4] - 330:20, 331:7, 334:12, 372:20
**conceal** [6] - 279:9, 279:13, 280:6, 346:20, 348:20, 348:23
**concern** [1] - 379:9
**concerns** [3] - 394:18, 395:10, 395:22
**conclude** [3] - 308:24, 315:25, 344:2
**concluded** [3] - 290:11, 384:8, 395:6
**conclusion** [8] - 343:24, 344:4, 356:3, 368:24, 369:3, 369:7, 369:9, 369:20
**conclusions** [6] - 341:23, 344:14, 344:17, 355:25, 357:2, 359:15
**conditions** [3] - 394:13, 395:7, 395:13
**conducting** [2] - 263:13, 323:7
**conference** [5] - 371:2, 381:3, 387:11, 393:5, 396:12
**conferencing** [1] - 394:9

configure [1] - 348:2
confirm [19] - 236:8,
239:8, 241:14,
242:6, 246:8,
247:16, 248:18,
260:3, 260:5,
264:11, 264:21,
272:9, 278:7,
282:10, 285:9,
293:18, 301:3,
302:8, 308:9
confirmation [1] -
351:14
confirmed [2] -
247:22, 302:21
conflicts [2] - 390:7,
390:19
conglomerate [1] -
319:9
connect [11] - 243:8,
273:22, 274:9,
281:13, 312:22,
325:15, 329:18,
331:22, 333:3,
333:12, 361:24
connected [2] -
273:14, 324:14
connecting [2] -
291:15, 340:18
connection [6] -
286:23, 315:5,
326:25, 328:17,
331:18, 340:1
connections [3] -
336:17, 343:17,
364:24
connects [1] - 347:24
conscious [1] - 310:9
conservative [2] -
249:3, 391:4
consider [8] - 263:23,
266:1, 268:24,
269:12, 335:2,
341:4, 350:22,
353:24
consideration [2] -
302:11, 371:22
considered [6] -
245:23, 245:24,
310:13, 337:5,
353:25, 355:7
considering [2] -
365:13, 384:16
consistent [1] -
364:20
consolidated [1] -
327:1
consolidation [9] -
232:15, 232:21,
232:25, 233:8,

233:9, 233:15,
233:20, 233:23,
234:19
constitutes [1] - 397:4
Constitution [3] -
227:23, 395:22,
397:11
constitutional [2] -
395:17, 395:20
construct [1] - 366:8
consult [1] - 282:23
consultant [1] -
319:23
consuming [1] -
374:24
contact [1] - 327:10
contain [1] - 350:14
contained [1] - 354:7
contested [1] - 372:7
context [1] - 344:16
continuance [1] -
312:19
continue [9] - 229:19,
229:24, 261:14,
301:20, 318:22,
344:24, 345:3,
360:3, 366:17
continued [2] -
251:16, 318:23
CONTINUED [4] -
227:4, 227:7, 228:3,
230:1
Continued [1] - 228:4
contribute [1] -
334:14
control [17] - 243:12,
243:15, 244:22,
244:24, 245:8,
245:9, 245:14,
245:18, 245:21,
246:16, 246:22,
247:6, 247:10,
247:19, 326:18,
343:20
Control [2] - 258:13,
259:4
controlled [12] -
239:4, 240:25,
241:3, 241:12,
241:20, 241:24,
242:1, 242:2,
249:14, 326:12,
329:7, 343:3
controls [7] - 245:11,
245:17, 246:6,
325:5, 325:10,
329:1, 331:4
convention [2] -
360:11, 360:17
convictions [1] -

392:1
convince [1] - 396:2
convinced [1] - 371:9
Cookie [1] - 259:9
cookies [1] - 346:5
copies [3] - 237:7,
320:8, 388:17
copy [9] - 281:19,
388:18, 388:20,
388:22, 388:23,
388:24, 388:25
core [2] - 372:2, 372:8
correct [77] - 231:7,
231:17, 236:15,
237:6, 237:8,
238:14, 238:22,
238:23, 239:17,
240:6, 240:19,
250:16, 251:11,
251:19, 253:6,
257:5, 262:7,
262:11, 262:17,
263:17, 264:12,
264:25, 267:14,
267:17, 268:7,
270:1, 271:2,
271:22, 272:12,
272:15, 273:18,
276:6, 278:13,
278:19, 280:9,
281:11, 282:24,
284:16, 284:24,
296:23, 296:24,
299:9, 303:14,
315:4, 343:1, 343:2,
345:19, 346:13,
346:21, 347:1,
347:17, 348:6,
348:9, 348:12,
349:2, 349:5, 350:1,
350:4, 350:7,
353:20, 358:18,
360:19, 361:2,
361:13, 364:8,
364:9, 365:22,
367:14, 367:19,
368:11, 368:23,
369:16, 369:22,
370:1, 370:7,
383:23, 385:19
correctly [13] - 246:20,
249:15, 255:6,
286:9, 299:6,
305:22, 357:11,
357:25, 358:3,
359:12, 362:18,
368:7, 383:2
correlation [1] -
368:24
corresponds [1] -

237:14
costs [1] - 304:6
counsel [5] - 229:4,
229:5, 378:13,
381:7, 386:8
counsel's [2] - 351:16,
386:4
counsel-directed [1] -
381:7
count [1] - 282:7
counted [1] - 391:7
counterbalance [1] -
390:16
countermeasures [1]
- 303:22
counting [3] - 391:6,
391:7, 391:12
countries [1] - 306:6
country [1] - 331:8
counts [1] - 286:15
couple [5] - 301:14,
332:11, 378:10,
384:3, 393:25
course [4] - 290:15,
305:16, 384:5, 388:2
Court [26] - 227:21,
227:22, 261:12,
289:9, 291:20,
297:13, 347:22,
348:17, 359:3,
359:24, 360:13,
365:18, 375:17,
375:25, 377:13,
379:7, 383:21,
388:16, 391:23,
392:12, 393:8,
394:2, 394:15,
396:6, 397:10
COURT [165] - 227:1,
229:8, 229:11,
229:14, 229:17,
233:3, 234:6,
234:12, 246:1,
246:11, 246:19,
247:4, 247:14,
247:18, 247:24,
252:13, 252:17,
254:4, 254:12,
260:25, 261:6,
261:11, 261:13,
262:25, 263:2,
268:4, 273:6, 273:8,
274:4, 279:23,
281:5, 287:1,
287:10, 287:15,
287:18, 288:1,
288:6, 288:14,
288:19, 292:5,
292:7, 293:5, 293:7,
293:11, 293:13,

293:19, 294:1,
295:3, 295:8,
297:11, 297:18,
297:23, 298:6,
298:12, 299:5,
299:10, 299:17,
306:18, 307:1,
307:18, 307:23,
309:18, 310:1,
310:24, 311:9,
311:23, 312:4,
312:23, 313:3,
313:18, 314:12,
314:15, 315:16,
316:17, 316:22,
317:7, 323:23,
323:25, 326:1,
326:5, 326:9, 342:2,
342:4, 344:22,
345:8, 345:10,
347:3, 347:8,
347:11, 350:20,
351:17, 351:25,
355:17, 356:2,
356:19, 357:19,
358:7, 360:1, 360:3,
360:14, 362:24,
364:10, 364:22,
365:2, 365:16,
365:24, 366:13,
366:15, 366:25,
370:11, 370:13,
370:15, 370:18,
375:20, 376:3,
376:6, 376:10,
376:16, 376:21,
377:3, 377:15,
378:1, 378:15,
378:20, 379:3,
379:8, 379:25,
380:2, 380:4,
380:15, 381:9,
383:23, 384:1,
384:5, 384:11,
384:18, 384:24,
385:7, 385:13,
385:19, 385:21,
386:5, 386:11,
386:16, 388:18,
388:22, 389:9,
389:16, 389:20,
389:24, 390:4,
390:23, 391:11,
391:15, 392:3,
392:15, 393:10,
393:15, 393:18,
394:17, 395:19,
396:7, 396:13,
396:17, 397:1
court [14] - 229:16,
247:17, 306:12,

317:22, 326:4,
377:5, 377:7,
377:25, 380:9,
389:2, 389:4, 389:6,
394:1, 394:10
**court's** [1] - 350:11
**Court's** [1] - 378:17
**court-certified** [1] -
377:5, 377:7
**Courthouse** [1] -
227:22
**courthouse** [1] -
292:13
**CourtListener** [3] -
271:13, 271:20,
271:22
**courtroom** [7] - 375:7,
380:12, 380:16,
380:17, 382:4,
383:22, 386:17
**COURTROOM** [5] -
229:2, 317:14,
317:17, 380:13,
388:21
**courts** [3] - 306:6,
306:8, 306:11
**coverage** [1] - 298:23
**covered** [1] - 322:19
**cramer** [1] - 386:18
**Craykilldozer** [1] -
344:8
**CRC** [2] - 227:21,
397:9
**create** [7] - 234:21,
254:10, 321:12,
338:5, 348:19,
363:9, 383:13
**created** [4] - 235:3,
329:4, 346:17,
346:19
**creating** [1] - 320:7
**credentials** [2] -
323:10, 323:19
**Criminal** [2] - 227:2,
381:23
**criminal** [23] - 229:2,
277:4, 277:5,
278:21, 279:8,
279:13, 279:18,
279:23, 279:25,
280:6, 280:8,
280:12, 289:25,
308:17, 309:1,
309:12, 309:14,
335:1, 340:9, 355:6,
355:15, 361:23,
362:1
**criminals'** [1] - 321:20
**criteria** [2] - 265:25,
266:1

**criticized** [2] - 230:9,
291:5
**critiques** [1] - 291:8
**CRM** [1] - 227:16
**cross** [6] - 309:10,
312:18, 313:2,
315:23, 316:7,
316:13
**CROSS** [2] - 230:1,
345:13
**Cross** [2] - 228:4,
228:10
**CROSS-
EXAMINATION** [2] -
230:1, 345:13
**Cross-Examination**
[2] - 228:4, 228:10
**CRR** [2] - 227:21,
397:9
**cryptocurrency** [4] -
275:18, 278:21,
286:24, 310:21
**cryptographic** [2] -
310:6, 310:12
**CryptoVPN** [4] -
285:21, 285:23,
343:7, 343:9
**CryptoVPN.com** [3] -
343:5, 368:8, 368:9
**CSV** [1] - 359:6
**current** [4] - 248:2,
319:14, 371:18,
375:12
**curriculum** [1] -
323:11
**cushion** [3] - 378:23,
390:13, 390:25
**custodial** [4] - 235:21,
236:2, 238:14,
290:24
**custody** [1] - 235:24
**custom** [1] - 320:9
**customer** [1] - 290:11
**customers** [3] -
238:17, 289:18,
326:16
**cut** [2] - 251:1, 338:11
**cutoff** [3] - 338:18,
364:18, 365:11
**cutoffs** [3] - 336:20,
340:25, 341:8
**CV** [1] - 323:17
**Cyber** [1] - 318:18
**cyber** [3] - 306:24,
318:20, 321:19
**cybersecurity** [5] -
327:5, 328:6,
328:10, 328:23,
334:8
**cyberstalking** [1] -

321:7
**cycle** [1] - 339:22

# D

**D.C** [4] - 227:5, 395:8,
396:3, 397:11
**damaging** [1] - 315:11
**dark** [2] - 279:20,
309:1
**darknet** [10] - 236:17,
236:24, 237:3,
237:4, 268:24,
278:16, 278:22,
308:2, 308:17,
309:13
**dashboard** [1] -
319:23
**data** [37] - 253:9,
270:9, 279:15,
281:22, 285:3,
285:7, 292:1, 292:9,
304:16, 305:1,
308:4, 308:5, 310:7,
312:12, 312:13,
320:2, 320:12,
320:15, 321:3,
322:22, 336:11,
336:14, 336:17,
336:21, 338:4,
338:16, 341:2,
352:23, 354:6,
354:7, 354:8, 354:9,
357:2, 357:10,
359:7, 359:14,
360:19
**database** [3] - 334:2,
361:22, 362:4
**databases** [1] - 327:1
**date** [11] - 231:11,
239:2, 239:19,
282:16, 282:18,
292:24, 318:23,
327:13, 328:3,
336:23, 390:12
**Dated** [1] - 397:7
**dates** [4] - 231:13,
282:15, 310:15,
334:3
**Daubert** [12] - 303:13,
309:20, 324:6,
342:5, 347:9,
351:10, 351:20,
352:2, 370:19,
371:1, 371:11, 393:5
**days** [7] - 342:19,
375:5, 378:10,
391:6, 393:1, 393:2
**DC** [4] - 227:12,
227:14, 227:17,

227:23
**de** [8] - 228:8, 317:13,
317:19, 317:21,
317:25, 324:3,
342:8, 345:14
**DE** [1] - 317:24
**dead** [1] - 394:22
**deadline** [1] - 313:20
**deal** [3] - 314:23,
315:9, 317:8
**dealing** [1] - 372:17
**Dean** [2] - 279:11,
279:15
**decide** [1] - 380:5
**decided** [2] - 336:14,
365:10
**decimal** [1] - 267:12
**decision** [1] - 375:6
**declaration** [2] -
291:19, 314:9
**dedicated** [3] - 331:1,
339:3, 367:18
**default** [1] - 360:17
**defendant** [4] - 234:2,
277:22, 335:13
**Defendant** [2] - 227:6,
227:18, 229:16
**defendant's** [9] -
273:14, 273:22,
274:9, 274:13,
277:6, 277:9,
277:14, 277:20,
278:4
**defense** [39] - 288:12,
289:3, 289:4, 294:9,
294:13, 312:18,
313:19, 314:1,
315:10, 315:11,
315:15, 315:17,
316:4, 352:8,
375:14, 377:17,
377:18, 377:23,
378:13, 382:7,
382:8, 382:9,
384:22, 385:1,
385:5, 385:8, 385:9,
385:10, 385:15,
388:17, 388:18,
388:23, 388:24,
389:17, 392:9,
392:12, 394:4,
396:16
**Defense** [4] - 288:23,
294:12, 295:2, 312:7
**defer** [2] - 378:17,
379:7
**deficit** [1] - 389:10
**define** [1] - 233:9
**defined** [4] - 298:22,
299:13, 302:24,

337:2
**defining** [3] - 276:20,
298:20, 299:20
**definitely** [6] - 313:16,
339:12, 339:13,
341:11, 341:12,
356:17
**definition** [2] - 249:8,
302:9
**definitive** [3] - 304:18,
306:4, 360:24
**definitively** [2] -
337:6, 343:4
**degree** [1] - 358:21
**delay** [1] - 373:11
**deliberate** [1] - 391:16
**delta** [1] - 365:14
**Delta** [2] - 289:1,
289:2
**deltas** [2] - 365:11,
366:2
**delve** [1] - 373:1
**demonstrate** [1] -
270:9
**demonstrated** [1] -
291:7
**demonstrates** [1] -
249:13
**denied** [2] - 381:8,
381:10
**department** [1] -
319:10
**Department** [3] -
227:13, 227:16,
318:2
**deposit** [25] - 230:21,
230:22, 231:4,
231:10, 232:5,
232:11, 232:12,
232:18, 232:20,
232:21, 233:2,
233:7, 236:5, 238:2,
238:12, 238:17,
238:20, 238:21,
242:4, 270:17,
273:15, 273:23,
274:10, 295:18,
300:16
**deposits** [4] - 232:17,
236:3, 315:5, 316:1
**DEPUTY** [5] - 229:2,
317:14, 317:17,
380:13, 388:21
**deputy** [5] - 383:22,
386:17, 386:23,
387:2, 388:19
**derived** [1] - 264:2
**describe** [5] - 249:4,
256:9, 270:21,
271:5, 281:1

**described** [10] - 234:15, 248:23, 251:6, 251:11, 251:12, 251:17, 267:24, 300:23, 359:13, 365:18

**describing** [5] - 249:6, 253:14, 282:22, 364:13, 364:14

**description** [9] - 250:21, 252:20, 252:21, 252:23, 265:21, 266:22, 268:10, 272:13, 281:9

**descriptor** [1] - 335:10

**design** [1] - 268:20

**designated** [1] - 334:13

**designing** [2] - 305:6, 319:14

**desks** [1] - 372:14

**destroys** [1] - 246:21

**detail** [4] - 283:9, 291:9, 372:9, 373:9

**details** [1] - 230:24

**detect** [8] - 243:1, 243:9, 243:11, 244:5, 244:13, 244:24, 245:14, 248:16

**detectable** [2] - 245:12, 246:25

**detecting** [1] - 243:4

**detection** [4] - 242:20, 260:19, 265:23, 305:11

**detention** [2] - 393:21, 395:9

**determination** [7] - 233:20, 309:20, 337:9, 352:1, 358:10, 358:18, 392:5

**determine** [7] - 232:14, 234:1, 290:19, 321:3, 327:12, 343:3, 358:22

**determined** [3] - 286:8, 286:21, 358:24

**develop** [1] - 320:18

**developer** [1] - 319:22

**DHCP** [1] - 348:3

**diagrams** [1] - 368:15

**die** [1] - 312:2

**differ** [1] - 382:14

**difference** [5] - 243:4, 347:19, 347:22,

362:24, 379:2

**different** [47] - 232:22, 236:5, 236:11, 236:12, 252:13, 262:6, 263:16, 264:4, 264:5, 264:11, 264:24, 265:7, 267:16, 267:25, 268:3, 268:13, 283:1, 283:2, 283:8, 285:23, 297:3, 302:4, 305:9, 305:19, 316:20, 317:1, 324:10, 325:9, 326:18, 330:7, 331:12, 335:12, 336:25, 337:2, 338:7, 344:10, 346:2, 346:14, 359:4, 366:3, 366:4, 372:12, 372:14, 378:24, 386:21

**difficult** [3] - 244:25, 302:16

**difficulty** [2] - 344:25, 372:19

**digital** [6] - 320:2, 320:5, 320:7, 320:10, 322:15, 323:8

**digs** [1] - 267:12

**dire** [10] - 371:16, 374:19, 379:19, 380:18, 381:7, 381:13, 381:14, 384:7, 388:4, 390:10

**DIRECT** [1] - 317:18

**direct** [10] - 230:6, 235:19, 261:12, 272:3, 287:19, 288:12, 326:25, 362:18, 364:16, 379:18

**Direct** [1] - 228:9

**directed** [2] - 324:18, 381:7

**directing** [20] - 237:17, 244:2, 249:5, 265:19, 266:22, 269:7, 270:3, 270:20, 292:18, 300:9, 300:11, 301:10, 303:21, 323:13, 341:19, 343:23, 352:7, 360:9, 361:9, 368:13

**directly** [9] - 237:5,

238:3, 253:10, 260:14, 264:8, 277:1, 309:16, 313:1, 351:13

**directories** [1] - 328:9

**disagree** [8] - 233:21, 239:2, 251:8, 251:9, 252:20, 310:11, 316:23, 355:3

**disagreeing** [1] - 289:13

**disagreement** [1] - 252:22

**disappointed** [1] - 387:24

**disclosed** [2] - 311:22, 313:25

**discovering** [1] - 302:18

**discovery** [20] - 234:25, 235:2, 270:10, 270:11, 272:25, 273:4, 278:19, 284:7, 284:10, 285:22, 285:24, 297:1, 297:3, 297:23, 298:3, 307:10, 307:11, 307:16, 308:1, 387:14

**discuss** [2] - 313:5, 371:25

**discussed** [5] - 257:20, 288:9, 296:18, 301:1, 349:1

**discussing** [4] - 235:20, 239:24, 251:24, 252:1, 253:23, 256:18, 312:14, 372:4

**discussion** [4] - 257:12, 301:16, 383:21, 393:7

**disguise** [1] - 308:17

**dismiss** [1] - 370:22

**dismissed** [1] - 291:25

**disprove** [4] - 285:7, 285:11, 285:15, 285:19

**disproves** [1] - 285:3

**dispute** [1] - 377:24

**disputing** [1] - 253:23

**distance** [1] - 322:3

**distinction** [2] - 334:10, 334:23

**District** [3] - 289:9, 378:9

**DISTRICT** [3] - 227:1, 227:1, 227:8

**district** [3] - 394:10, 395:10, 395:17

**DNS** [8] - 327:21, 327:23, 327:24, 328:4, 328:9, 337:11, 337:23, 343:7

**docket** [1] - 271:19

**document** [1] - 354:1

**documents** [9] - 262:15, 262:19, 262:21, 299:3, 313:7, 314:10, 354:3, 376:15, 376:17

**DOJ** [3] - 227:11, 227:16, 292:2

**DOJ-CRM** [1] - 227:16

**domain** [4] - 324:18, 327:25, 328:2, 343:7

**domains** [2] - 337:12, 337:18

**DomainTools** [1] - 328:21

**done** [19] - 249:25, 273:24, 275:8, 275:9, 287:19, 293:10, 296:7, 311:5, 313:22, 315:19, 326:21, 345:2, 365:21, 366:16, 383:2, 383:15, 388:5, 388:6, 392:6

**door** [1] - 387:19

**dots** [1] - 359:9

**doubt** [3] - 315:2, 346:23, 346:24

**down** [17] - 271:20, 271:22, 281:7, 301:10, 332:13, 336:13, 336:21, 338:2, 338:18, 340:3, 368:2, 368:15, 380:19, 380:21, 380:23, 380:24, 394:8

**download** [1] - 331:17

**Dr** [14] - 257:20, 258:20, 260:20, 263:7, 263:11, 263:16, 264:2, 269:8, 269:10, 269:20, 269:23, 351:24, 373:17, 373:20

**draw** [2] - 344:17, 374:1

**drawn** [1] - 344:14

**drew** [1] - 359:21

**Dror** [4] - 351:23, 351:24, 373:17, 373:20

**during** [4] - 382:16, 384:7, 384:12, 389:8

**dynamic** [5] - 347:17, 347:19, 347:23, 348:5, 348:12

# E

**earliest** [1] - 232:14

**early** [3] - 371:14, 374:19, 375:19

**earn** [1] - 389:6

**earning** [2] - 280:8, 389:7

**easier** [4] - 318:1, 388:14, 389:4, 389:5

**edge** [1] - 238:7

**educational** [1] - 318:25

**effective** [2] - 304:2, 304:7

**effectively** [1] - 243:1

**effectiveness** [5] - 298:21, 298:22, 299:7, 299:9, 299:13

**efficiencies** [2] - 292:22, 293:2

**efficient** [3] - 378:5, 393:16, 394:21

**either** [9] - 234:4, 304:7, 304:17, 311:10, 316:6, 339:16, 358:8, 371:17, 375:2

**EKELAND** [91] - 227:18, 229:15, 234:5, 261:12, 263:1, 273:5, 274:3, 287:17, 287:24, 288:4, 292:6, 293:6, 294:2, 294:5, 295:5, 295:9, 297:12, 298:14, 299:18, 299:22, 306:21, 307:2, 307:3, 307:21, 307:24, 307:25, 309:11, 309:24, 310:2, 311:8, 311:16, 312:1, 312:5, 312:21, 313:1, 313:4, 313:17, 314:3, 316:23, 323:24, 342:3, 345:11, 345:15, 347:6, 347:10, 347:12, 350:18,

350:21, 351:11,
351:24, 352:3,
352:4, 355:3,
355:23, 356:4,
356:5, 356:23,
356:24, 357:18,
357:24, 358:17,
359:24, 360:2,
360:4, 360:5,
360:15, 362:23,
363:2, 365:17,
366:1, 366:5,
366:14, 367:2,
367:3, 370:10,
375:23, 376:5,
376:8, 376:13,
376:18, 376:24,
377:9, 379:6, 380:3,
381:8, 383:25,
390:21, 393:20,
395:15, 396:5,
396:16
**Ekeland** [19] - 227:19,
228:6, 228:11,
229:15, 287:19,
293:22, 294:1,
316:22, 345:10,
366:20, 375:20,
378:7, 379:5, 380:2,
383:24, 386:13,
389:25, 392:16,
393:18
**electronic** [1] - 389:18
**elsewhere** [1] - 343:14
**email** [17] - 327:10,
342:17, 354:19,
354:23, 355:4,
355:8, 355:20,
355:25, 356:7,
356:14, 357:5,
358:10, 358:11,
358:19, 358:22,
368:18, 394:24
**emphasize** [1] -
343:16
**employ** [1] - 305:10
**enabled** [3] - 254:16,
254:20, 254:24
**encountered** [1] -
250:5
**encourage** [1] -
386:20
**encrypted** [1] - 331:20
**end** [18] - 249:12,
249:22, 250:9,
250:10, 250:15,
254:10, 269:19,
271:19, 326:15,
329:9, 329:24,
351:22, 374:8,

378:22, 379:12,
390:11, 390:15,
394:22
**ended** [1] - 378:21
**ending** [3] - 281:3,
283:24, 342:12
**ends** [1] - 368:3
**enforcement** [15] -
278:12, 278:17,
280:15, 280:18,
290:10, 306:2,
306:3, 306:10,
329:1, 329:11,
329:18, 332:22,
332:24, 333:21,
335:2
**engage** [2] - 311:2,
381:14
**Engineering** [1] -
322:10
**engineering** [6] -
245:20, 246:9,
247:16, 247:22,
247:23, 248:18
**engineers** [2] - 282:4,
284:19
**English** [2] - 376:10,
376:12
**enhance** [1] - 308:11
**ensure** [1] - 249:2
**entail** [3] - 319:12,
320:24, 322:1
**enterprise** [1] - 362:2
**entire** [4] - 250:21,
354:2, 371:1, 394:13
**entirely** [3] - 315:13,
348:25, 361:6
**entities** [2] - 251:16,
289:24
**entitled** [3] - 296:6,
373:8, 381:21
**Entity** [3] - 290:19,
290:22, 291:1
**entity** [7] - 268:22,
290:4, 291:11,
301:21, 303:3,
304:14
**entries** [1] - 354:8
**entry** [1] - 231:20
**environment** [1] -
235:11
**Ermilov** [20] - 259:24,
260:8, 260:11,
261:19, 261:24,
262:7, 262:10,
262:12, 262:22,
265:7, 266:23,
267:1, 267:19,
268:1, 268:10,
297:2, 297:15,

302:13
**error** [25] - 256:14,
258:12, 258:15,
259:3, 259:7,
259:18, 261:3,
261:7, 262:13,
262:20, 295:24,
296:14, 296:17,
296:19, 296:22,
297:9, 301:6, 302:4,
303:8, 303:16,
303:18, 316:20,
317:1, 317:4
**errors** [1] - 295:22
**essence** [1] - 348:5
**essentially** [10] -
235:10, 252:16,
302:18, 308:1,
330:11, 346:7,
359:5, 359:21,
362:10, 394:12
**Essentials** [1] -
322:11
**established** [1] -
333:15
**estimate** [4] - 375:12,
375:22, 375:23,
392:21
**et** [9] - 261:18, 261:19,
265:2, 300:10,
301:2, 302:9, 303:20
**evade** [2] - 305:7,
305:10
**evaluating** [1] - 258:7
**Evaluating** [1] - 296:6
**evaluation** [1] -
263:13
**Evaluation** [1] -
256:25
**event** [1] - 392:13
**events** [1] - 365:5
**evidence** [17] -
294:12, 294:17,
304:18, 306:4,
308:24, 308:25,
315:15, 316:21,
320:8, 320:10,
320:19, 323:8,
356:18, 387:7,
390:11, 390:15,
390:18
**exact** [7] - 239:2,
239:19, 248:8,
248:9, 256:14,
268:19
**exactly** [11] - 256:1,
264:7, 268:17,
307:19, 329:14,
342:24, 348:18,
362:7, 365:8,

388:14, 389:9
**Examination** [4] -
228:4, 228:6, 228:9,
228:10
**EXAMINATION** [4] -
230:1, 294:3,
317:18, 345:13
**examinations** [1] -
309:21
**examine** [2] - 353:2,
353:5
**examined** [1] - 307:6
**examining** [1] - 296:8
**example** [16] - 243:18,
244:3, 244:11,
245:8, 246:23,
247:12, 281:14,
297:14, 305:8,
305:20, 310:19,
311:7, 315:17,
321:16, 333:11,
372:5
**examples** [7] - 245:1,
245:2, 245:3, 245:5,
279:1, 279:2, 321:14
**Excel** [2] - 359:7,
389:12
**except** [2] - 357:2,
395:20
**exchange** [7] -
270:16, 276:21,
277:1, 289:18,
290:2, 290:5, 304:14
**exchanges** [3] -
275:18, 289:24,
308:3
**exclude** [1] - 249:17
**excluded** [2] - 339:13,
365:1
**excluding** [1] - 385:24
**excused** [2] - 314:12,
370:13
**executed** [1] - 354:22
**exercise** [3] - 381:21,
383:3, 383:13
**exhibit** [12] - 231:22,
231:23, 293:7,
294:6, 294:9,
294:16, 315:16,
315:22, 352:8,
387:3, 387:7, 389:11
**Exhibit** [62] - 228:14,
228:15, 228:16,
228:17, 228:18,
228:19, 228:20,
228:21, 230:7,
230:16, 231:20,
237:17, 239:24,
240:2, 249:5, 251:4,
251:5, 251:6,

251:23, 253:21,
257:19, 258:7,
258:18, 259:9,
259:22, 260:6,
261:2, 261:6,
261:17, 261:23,
262:1, 264:1,
265:20, 266:22,
269:7, 272:4, 281:5,
286:4, 288:13,
288:23, 289:4,
291:23, 292:7,
292:18, 293:4,
293:8, 294:13,
294:18, 295:1,
295:2, 296:5,
299:19, 303:20,
312:7, 323:14,
323:22, 323:25,
324:1, 341:19,
342:1, 342:4, 342:6
**Exhibits** [2] - 262:23,
263:3
**EXHIBITS** [1] - 228:12
**exhibits** [3] - 263:2,
387:4, 388:11
**exist** [3] - 249:20,
253:18, 327:19
**existed** [1] - 363:14
**exit** [14] - 331:19,
331:21, 333:17,
333:20, 333:23,
334:3, 334:10,
334:21, 334:22,
334:24, 337:5,
340:15, 340:18,
340:20
**ExoneraTor** [5] -
333:25, 334:1,
334:20, 337:24,
361:15
**expand** [2] - 297:8,
325:23
**Expanding** [1] -
294:19
**expands** [1] - 297:9
**expansion** [19] -
270:14, 296:12,
297:1, 297:5, 297:7,
297:8, 297:14,
297:16, 297:20,
298:3, 298:7,
298:17, 298:18,
298:19, 298:22,
298:24, 299:6,
299:12
**expansive** [1] - 387:13
**expected** [2] - 304:9,
363:14
**experience** [5] -

278:21, 311:3,
322:13, 323:20,
340:8
**experiences** [2] -
340:5, 340:6
**expert** [41] - 269:22,
286:14, 287:22,
287:23, 294:13,
294:22, 295:1,
295:10, 296:14,
301:1, 301:5,
302:22, 306:15,
308:22, 311:9,
311:12, 311:14,
311:15, 312:2,
312:7, 312:11,
312:24, 313:12,
313:20, 313:23,
313:24, 314:6,
314:8, 314:10,
314:19, 351:20,
355:7, 355:18,
355:19, 367:6,
367:25, 368:14,
369:20, 370:4,
372:2, 375:25
**expertise** [8] - 287:20,
311:3, 311:6, 372:6,
373:24, 374:5,
374:7, 378:17
**explain** [20] - 243:6,
297:7, 297:13,
298:11, 304:21,
310:3, 320:11,
321:10, 324:13,
329:22, 330:16,
347:22, 348:17,
352:15, 352:17,
359:2, 360:13,
361:20, 372:9,
386:19
**explaining** [2] -
263:18, 266:18
**explains** [1] - 263:16
**explanation** [2] -
298:9, 321:2
**explanatory** [1] -
297:19
**explore** [1] - 373:8
**Explorer** [1] - 310:17
**explorers** [1] - 310:17
**exploring** [1] - 309:15
**exported** [1] - 234:22
**exposed** [2] - 252:16,
334:15
**expresses** [1] - 356:21
**Expsn** [2] - 296:11,
298:22
**extended** [1] - 313:20
**extent** [8] - 247:20,

355:24, 356:20,
357:9, 382:10,
392:23, 393:6, 395:1
**extra** [1] - 378:10
**extraordinary** [1] -
313:22
**extremely** [5] -
256:15, 302:15,
302:16, 389:13,
395:12

---

**F**

**facilities** [1] - 395:18
**facility** [3] - 393:23,
395:23, 396:1
**fact** [44] - 233:7,
234:14, 236:7,
237:10, 238:14,
238:24, 241:10,
241:20, 244:23,
245:13, 245:21,
248:6, 248:19,
250:5, 253:5, 253:9,
253:13, 255:13,
256:5, 259:5,
259:17, 260:11,
262:20, 264:4,
264:18, 265:11,
267:23, 268:12,
268:20, 273:12,
273:21, 274:8,
279:17, 282:12,
284:14, 284:24,
290:14, 305:25,
316:1, 317:3, 336:7,
350:9, 389:1, 391:23
**factor** [7] - 297:1,
298:7, 298:22,
299:6, 299:12,
312:14, 313:6
**factors** [1] - 312:11
**facts** [1] - 271:13
**fail** [2] - 269:23, 300:7
**failed** [3] - 295:20,
296:2, 300:16
**fair** [14] - 299:15,
305:21, 311:23,
311:24, 315:1,
316:22, 340:7,
348:22, 357:19,
359:19, 369:2,
369:5, 369:24,
372:24
**fairly** [2] - 297:18,
393:11
**fall** [3] - 336:22, 337:1,
341:16
**false** [12] - 260:19,
270:10, 270:11,

297:1, 297:3,
297:22, 297:23,
297:24, 298:3,
301:17, 304:12,
315:18
**familiar** [12] - 235:21,
236:15, 242:19,
257:14, 257:24,
260:5, 285:21,
292:20, 321:8,
322:23, 349:22,
353:8
**familiarity** [1] - 304:5
**far** [2] - 274:18, 284:11
**Farsight** [1] - 328:21
**fault** [1] - 234:9
**favor** [1] - 393:16
**FBI** [17] - 236:11,
306:24, 318:8,
318:9, 318:11,
318:15, 319:24,
320:1, 320:21,
321:19, 321:22,
340:9, 361:19,
361:20, 361:22,
362:4, 386:3
**FBI's** [1] - 322:8
**FDR** [15] - 263:6,
263:10, 266:24,
296:12, 297:1,
297:3, 297:15,
297:17, 297:18,
299:5, 299:12,
299:23, 300:1, 300:2
**FDRs** [2] - 316:4,
316:6
**features** [9] - 252:4,
300:19, 300:20,
301:18, 304:3,
304:8, 304:9,
355:14, 359:18
**fed** [1] - 253:14
**Federal** [1] - 381:22
**federal** [4] - 291:25,
395:23, 396:1, 396:3
**fee** [2] - 266:8, 266:19
**fees** [3] - 254:10,
266:6, 267:20
**few** [5] - 323:4, 324:3,
336:2, 359:4, 386:22
**Fi** [1] - 350:11
**fiat** [2] - 286:7, 286:21
**fidgety** [1] - 390:19
**field** [8] - 257:15,
263:24, 263:25,
319:4, 322:8, 327:5,
334:22, 340:8
**Field** [1] - 318:18
**figure** [7] - 315:12,
316:8, 317:9,

332:23, 333:21,
367:17, 382:21
**figured** [1] - 357:10
**figures** [1] - 295:4
**figuring** [1] - 373:25
**file** [5] - 275:15,
337:17, 359:6,
359:7, 387:10
**filed** [2] - 270:22,
271:6
**files** [1] - 352:19
**filing** [1] - 271:9
**fill** [2] - 383:8, 383:12
**filter** [5] - 336:10,
336:21, 338:2,
338:4, 340:3
**filtering** [2] - 336:13,
338:18
**final** [4] - 312:6, 338:5,
371:12, 373:11
**finances** [1] - 310:21
**financial** [2] - 275:17,
372:15
**financing** [1] - 289:23
**fine** [12] - 261:11,
273:9, 298:12,
310:1, 312:4, 316:5,
379:6, 392:17,
393:4, 393:13,
396:13
**fingerprint** [1] -
304:25
**fingerprints** [1] -
257:4
**finish** [2] - 288:19,
385:5
**finished** [1] - 233:4
**first** [41] - 230:21,
232:12, 255:3,
256:7, 256:24,
261:1, 271:10,
286:11, 290:15,
295:11, 295:14,
295:20, 298:16,
300:8, 300:22,
301:13, 303:24,
309:7, 317:23,
319:7, 319:8,
332:12, 338:13,
344:4, 355:4,
356:17, 360:10,
363:11, 365:2,
365:3, 365:20,
365:21, 377:16,
380:11, 382:16,
382:17, 385:4,
385:9, 385:10,
385:15, 391:3
**first-known** [3] -
230:21, 232:12,

255:3
**Fischbach** [1] -
373:22
**Fistful** [2] - 258:19,
262:14
**fit** [2] - 254:11, 319:14
**five** [11] - 265:8,
309:24, 338:9,
339:20, 339:21,
340:12, 340:13,
340:25, 374:24,
391:16, 393:1
**fixed** [2] - 337:3,
338:15
**flag** [2] - 244:7, 315:7
**flagging** [5] - 280:18,
289:18, 289:21,
317:7
**flip** [3] - 231:8, 302:8,
385:14
**flipping** [1] - 261:21
**Floor** [1] - 227:19
**fluent** [2] - 376:12,
376:13
**focus** [8] - 336:17,
338:19, 338:22,
339:15, 339:19,
340:11, 341:6, 357:7
**focused** [1] - 338:8
**Fog** [51] - 230:11,
230:22, 231:5,
231:11, 232:10,
232:12, 232:15,
232:25, 233:15,
233:25, 234:3,
234:19, 253:10,
255:3, 268:24,
269:2, 269:25,
270:17, 270:21,
270:24, 271:4,
271:8, 273:14,
273:21, 273:23,
274:10, 276:5,
277:7, 277:10,
277:15, 278:5,
278:8, 278:11,
278:15, 283:25,
287:8, 287:14,
295:19, 296:3,
300:5, 300:11,
300:16, 301:11,
315:6, 316:2,
318:12, 324:4,
324:9, 335:13,
355:16, 355:20
**foil** [1] - 305:23
**folks** [2] - 391:18,
392:20
**follow** [18] - 248:1,
280:2, 300:15,

409

300:24, 301:6,
301:16, 301:17,
301:20, 302:1,
302:2, 304:7,
304:11, 311:8,
329:13, 336:19,
381:1, 381:4, 381:11
**follow-up** [6] - 248:1,
280:2, 329:13,
381:1, 381:4, 381:11
**followed** [1] - 300:12,
300:14
**following** [5] - 233:13,
234:18, 244:10,
295:16, 366:19
**follows** [1] - 312:12
**Footnote** [1] - 265:22
**footnote** [1] - 266:17
**FOR** [1] - 227:1
**Force** [1] - 318:19
**foreclose** [1] - 371:23
**foregoing** [1] - 397:4
**forensic** [5] - 305:24,
320:7, 323:7,
372:12, 372:23
**forensically** [1] -
320:8
**forensics** [9] - 306:7,
318:21, 320:2,
320:5, 322:15,
322:22, 373:6,
373:7, 373:8
**Forfeiture** [1] - 289:9
**forfeiture** [5] - 289:10,
391:21, 391:24,
392:2, 392:6
**form** [2] - 269:13,
307:14
**format** [4] - 276:25,
277:1, 327:3, 389:18
**forming** [1] - 316:12
**forth** [8] - 268:12,
268:14, 268:18,
378:8, 382:6,
382:16, 383:6,
386:21
**forum** [4] - 355:10,
355:13, 361:23,
362:6
**forward** [8] - 265:12,
295:19, 300:6,
300:7, 300:15,
300:25, 301:17,
302:1
**forwards** [1] - 300:15
**foundation** [1] - 311:1
**four** [10] - 265:8,
315:18, 341:10,
374:24, 378:20,
388:16, 390:12,

391:7, 392:25, 393:1
**fourth** [2] - 260:1,
267:12
**frame** [6] - 282:2,
282:9, 283:17,
284:16, 284:22,
292:2
**frankly** [4] - 234:7,
371:22, 374:11,
395:23
**fraud** [7] - 286:5,
286:7, 286:15,
286:20, 286:25,
287:3, 321:7
**freely** [1] - 318:20
**fresh** [1] - 300:22
**Friday** [3] - 375:18,
390:3, 396:9
**Fridays** [2] - 375:18,
392:22
**friendly** [1] - 327:3
**friends** [1] - 396:1
**front** [12] - 230:7,
292:24, 309:22,
323:13, 352:8,
367:7, 370:20,
375:10, 376:11,
379:4, 387:4, 388:12
**frustrated** [1] - 378:6
**frustration** [3] - 378:1,
378:3, 378:4
**Frye** [1] - 396:10
**full** [11] - 232:1,
249:14, 268:2,
281:16, 281:18,
281:19, 299:20,
303:24, 328:1,
375:16, 397:5
**functioned** [1] - 334:4
**funding** [2] - 290:11,
306:19
**funds** [28] - 230:10,
235:22, 235:25,
236:3, 236:4,
238:19, 240:4,
240:8, 240:9,
240:14, 240:18,
248:11, 254:21,
254:24, 255:1,
255:2, 270:15,
272:7, 274:12,
274:21, 277:6,
288:9, 289:18,
289:25, 290:12,
300:13, 300:14,
396:3
**furthermore** [1] -
300:22

## G

**game** [1] - 234:10
**gathered** [1] - 299:2
**gathering** [1] - 329:19
**gender** [1] - 382:11
**General** [2] - 318:3,
318:7
**general** [6] - 252:23,
275:7, 281:8, 281:9,
364:14, 372:11
**generalized** [1] -
339:14
**generally** [7] - 235:23,
236:14, 256:22,
278:7, 281:4, 328:9,
330:24
**generate** [1] - 339:24
**generated** [2] - 325:3,
329:4
**Georgetown** [2] -
319:3, 319:5
**German** [1] - 367:15
**GIAC** [2] - 322:10,
322:11
**gift** [1] - 386:18
**given** [12] - 244:21,
265:23, 304:16,
304:23, 311:24,
313:19, 314:1,
332:24, 333:20,
364:14, 377:21,
379:1
**Glenda** [1] - 380:11
**Gmail** [1] - 332:14
**goal** [3] - 298:20,
305:25, 306:1
**GoDaddy** [1] - 327:2
**Goldfeder** [7] -
259:10, 261:18,
262:10, 262:22,
265:5, 297:2, 302:13
**Google** [8] - 332:14,
332:15, 332:17,
332:24, 333:3,
333:7, 333:8, 333:12
**Google's** [2] - 332:20,
333:18
**Google.com** [2] -
332:9, 333:15
**government** [56] -
229:5, 234:3,
234:25, 235:5,
241:2, 252:8,
262:23, 272:21,
273:1, 275:6,
276:22, 277:3,
283:21, 284:4,
284:8, 284:12,
284:24, 285:11,

285:24, 293:4,
307:4, 308:2, 308:9,
308:15, 308:20,
311:20, 313:8,
313:10, 313:14,
314:4, 317:12,
323:22, 341:25,
354:22, 355:14,
376:1, 376:19,
377:17, 377:23,
382:7, 382:8,
384:21, 385:1,
385:8, 385:9,
385:10, 385:24,
386:11, 388:17,
388:24, 389:12,
389:25, 392:4,
396:15
**Government** [18] -
228:14, 228:15,
228:16, 228:17,
228:18, 228:19,
228:20, 228:21,
263:3, 265:20,
293:8, 294:17,
294:25, 296:5,
299:19, 303:20,
324:1, 342:6
**government's** [18] -
251:10, 269:24,
270:22, 271:6,
284:1, 288:25,
289:7, 291:24,
294:6, 294:16,
309:10, 309:16,
313:2, 314:7, 315:2,
315:4, 352:7, 376:25
**Government's** [1] -
341:25
**Gox** [30] - 270:24,
271:7, 273:14,
273:22, 274:10,
274:14, 275:21,
275:22, 276:9,
276:10, 276:23,
284:25, 285:4,
285:8, 285:12,
285:16, 295:18,
296:3, 300:7,
300:14, 307:5,
307:11, 342:17,
342:21, 342:22,
344:5, 344:11,
344:12, 370:6
**graduating** [1] - 319:4
**grand** [1] - 269:4
**grant** [1] - 306:19
**graph** [2] - 244:2,
269:9
**graphic** [1] - 369:2

**graphical** [3] - 368:20,
368:24, 369:5
**graphing** [2] - 359:6,
359:13
**graphs** [4] - 250:23,
359:19, 359:20,
368:22
**great** [2] - 293:19,
389:22
**greater** [4] - 326:12,
364:25, 372:9, 373:9
**greatly** [1] - 308:11
**Greenwich** [1] -
360:18
**GREM** [2] - 322:10,
322:12
**ground** [2] - 270:9,
298:25
**grounds** [1] - 315:14
**group** [7] - 232:21,
248:19, 288:10,
344:10, 359:9,
380:24, 384:9
**grouped** [1] - 344:4
**groups** [2] - 325:6,
325:7
**GSEC** [1] - 322:11
**guardedly** [1] - 373:5
**guess** [16] - 247:4,
251:24, 252:22,
253:12, 254:8,
256:7, 280:2,
288:24, 298:6,
355:17, 363:17,
364:8, 369:14,
375:4, 379:22,
384:13
**guidelines** [5] - 292:2,
292:12, 292:19,
292:22, 292:25
**guy** [1] - 374:5

## H

**habits** [1] - 339:1
**hacking** [1] - 322:20
**half** [4] - 281:17,
281:18, 288:16,
379:10
**halfway** [2] - 269:19,
270:6
**Hamilton** [1] - 319:20
**hand** [6] - 231:2,
237:20, 299:19,
301:11, 317:15,
387:18
**handle** [3] - 235:21,
371:2, 393:9
**hang** [1] - 231:13
**happy** [9] - 258:14,

375:2, 377:24, 384:9, 393:6, 393:9, 394:22, 394:23, 395:2

**hard** [2] - 375:21, 383:17

**harder** [1] - 390:15

**harm** [1] - 310:22

**Harmon** [3] - 279:11, 279:15

**Hash** [2] - 252:23, 254:20

**hash** [5] - 230:25, 254:15, 255:18, 255:20, 310:15

**hashed** [1] - 252:16

**hashes** [1] - 291:17

**head** [2] - 231:18, 381:9

**header** [3] - 296:10, 300:11, 360:6

**Health** [1] - 318:2

**hear** [11] - 356:25, 357:11, 373:2, 373:10, 373:17, 374:3, 375:13, 376:5, 386:13, 388:2, 390:21

**heard** [13] - 311:5, 316:14, 350:13, 358:7, 358:12, 365:22, 365:24, 370:20, 371:18, 371:19, 371:20, 374:11, 389:3

**HEARING** [2] - 227:4, 227:7

**hearing** [10] - 293:16, 303:14, 324:6, 342:5, 345:3, 347:9, 373:15, 374:8, 377:17, 396:18

**heavily** [1] - 314:20

**heavydist** [1] - 357:6

**held** [2] - 395:10, 395:14

**help** [5] - 230:14, 287:5, 320:18, 374:17, 386:17

**helpful** [8] - 315:9, 317:5, 329:11, 365:16, 388:10, 389:21, 392:11, 396:17

**helps** [1] - 392:22

**hereby** [1] - 397:3

**Heuristic** [3] - 256:25, 296:6, 296:10

**heuristic** [46] - 242:8, 245:25, 246:5,

246:15, 248:23, 249:2, 249:7, 250:14, 256:19, 256:20, 257:3, 258:12, 265:21, 266:7, 266:14, 266:23, 267:1, 267:7, 267:19, 267:25, 268:1, 269:22, 270:10, 270:11, 270:14, 270:18, 272:19, 272:22, 273:13, 273:17, 273:22, 274:9, 295:21, 295:22, 296:11, 298:4, 298:17, 298:20, 299:21, 300:4, 301:6, 301:7, 302:10, 302:19, 316:20

**heuristics** [43] - 263:14, 263:16, 264:6, 264:12, 264:16, 264:19, 264:25, 265:12, 265:15, 265:17, 267:24, 268:10, 268:12, 268:13, 268:17, 268:18, 268:21, 270:7, 270:8, 270:19, 273:2, 295:19, 295:24, 295:25, 296:2, 296:23, 300:1, 300:23, 302:4, 302:7, 303:7, 304:1, 304:15, 304:17, 305:7, 305:11, 305:23, 306:4, 315:19, 315:25, 316:15, 316:16, 317:2

**HHS** [1] - 318:19

**HHS-OIG** [1] - 318:19

**hi** [2] - 345:12, 345:16

**hidden** [1] - 332:5

**hide** [2] - 329:15, 330:14

**hierarchy** [1] - 325:24

**high** [5] - 304:4, 310:20, 321:25, 333:4, 348:1

**high-net-worth** [1] - 310:20

**higher** [2] - 297:9, 298:1

**highest** [1] - 296:1

**highly** [4] - 242:23, 256:9, 317:5, 351:13

**Hill** [1] - 396:2

**historic** [2] - 327:24, 337:13

**historical** [1] - 327:11

**histories** [1] - 283:15

**history** [1] - 281:20

**hit** [1] - 389:9

**hold** [1] - 395:18

**holdings** [5] - 333:25, 337:13, 337:17, 361:19, 361:20

**home** [7] - 331:9, 331:10, 331:13, 332:14, 332:16, 333:3, 333:5

**honest** [1] - 391:18

**honestly** [1] - 376:24

**Honeywell** [4] - 319:8, 319:9, 319:12, 319:19

**Honor** [82] - 229:6, 229:13, 229:15, 229:25, 234:11, 247:15, 261:10, 263:1, 274:3, 287:5, 287:7, 287:24, 288:5, 288:18, 288:21, 293:9, 293:12, 293:17, 293:24, 294:2, 295:5, 306:21, 307:21, 309:9, 309:11, 311:16, 312:3, 312:17, 312:21, 313:17, 314:3, 314:11, 315:13, 316:14, 317:12, 323:24, 344:21, 345:11, 347:10, 350:16, 351:8, 351:11, 352:3, 354:25, 355:3, 355:13, 355:23, 356:16, 356:23, 357:18, 357:24, 359:24, 360:4, 366:1, 366:14, 366:20, 367:2, 370:10, 370:12, 370:17, 375:13, 377:16, 379:1, 379:6, 381:8, 384:3, 386:2, 386:7, 386:15, 388:21, 389:11, 390:2, 391:14, 391:22, 393:4, 393:13, 393:17, 395:15, 396:5, 396:8, 396:15, 396:16

**HONORABLE** [1] - 227:8

**hooked** [1] - 230:18

**hop** [3] - 295:20, 300:17, 334:13

**hope** [1] - 291:4

**hopeful** [1] - 390:23

**hopefully** [3] - 380:15, 381:1, 383:15

**hops** [2] - 274:1, 304:7

**horizontal** [2] - 292:21, 292:24

**host** [1] - 328:7

**hosted** [1] - 330:8

**hosting** [1] - 330:7

**hosts** [1] - 330:10

**hour** [1] - 288:15

**hours** [3] - 361:7, 393:24, 393:25

**HTTPS** [1] - 331:21

**huge** [1] - 314:1

**Human** [1] - 318:2

**hundreds** [1] - 349:12

**IANA** [7] - 325:6, 325:7, 325:25, 326:6, 326:11, 326:12

**idea** [1] - 348:19

**ideally** [5] - 244:1, 375:7, 375:8, 386:5, 386:6

**identical** [1] - 380:10

**identifiable** [1] - 242:17

**identification** [2] - 296:21, 337:14

**identified** [6] - 240:17, 248:20, 278:12, 278:16, 279:21, 338:6

**identifier** [3] - 324:14, 350:14, 350:23

**identifiers** [1] - 321:13

**identifies** [1] - 285:25

**identify** [10] - 243:21, 243:24, 244:18, 248:6, 265:3, 280:16, 298:21, 336:4, 337:7, 337:15

**identifying** [3] - 249:9, 369:19, 370:4

**identity** [5] - 310:18, 321:11, 322:4, 329:8, 369:20

**IDs** [1] - 236:10

**illicit** [2] - 286:8,

286:21

**image** [2] - 368:17, 368:18

**images** [2] - 320:7, 368:20

**impact** [1] - 257:2

**impediment** [1] - 394:4

**implementation** [4] - 246:8, 256:20, 257:8

**implementations** [5] - 242:23, 243:2, 243:19, 245:12, 245:15

**implemented** [2] - 257:7, 348:18

**implications** [1] - 377:13

**implied** [1] - 309:12

**important** [4] - 263:25, 287:13, 291:20, 301:15

**importantly** [1] - 390:19

**imposing** [2] - 394:12

**impossible** [2] - 304:7, 304:15

**IN** [1] - 227:1

**inadvertently** [1] - 379:20

**inclination** [3] - 371:18, 371:24, 384:18

**inclined** [2] - 287:24, 373:13

**include** [9] - 231:13, 243:24, 250:8, 274:12, 283:9, 286:7, 286:20, 335:15, 388:4

**included** [3] - 241:2, 242:4, 327:7

**includes** [5] - 230:24, 249:1, 257:12, 266:7, 384:23

**including** [6] - 262:6, 305:10, 310:21, 322:25, 327:9, 334:17

**incorporate** [1] - 268:21

**incorrect** [2] - 293:20, 312:21

**increase** [1] - 298:23

**incredibly** [1] - 316:18

**inculpatory** [1] - 314:25

**incur** [1] - 304:6

**indeed** [1] - 301:17

**indefinitely** [1] -

411

301:21
**indicated** [2] - 347:5,
372:24
**indication** [2] -
249:10, 286:16
**indicators** [2] -
304:24, 308:7
**indictment** [3] - 286:6,
286:15, 286:20
**indictments** [1] -
286:23
**indistinguishable** [1]
- 247:1
**individual** [2] -
282:17, 310:20
**individual's** [1] -
350:15
**individually** [2] -
341:3, 350:24
**individuals** [2] -
331:6, 395:9
**industry** [1] - 310:23
**inevitably** [1] - 380:21
**infamous** [2] - 236:20,
236:21
**infeasible** [1] - 273:25
**infer** [1] - 306:10
**information** [25] -
270:22, 271:6,
283:19, 314:24,
315:10, 320:17,
326:20, 327:7,
327:8, 327:11,
327:12, 327:14,
327:17, 327:21,
328:4, 328:12,
328:15, 329:11,
329:19, 335:6,
336:13, 337:24,
352:24, 355:25
**information-
gathering** [1] -
329:19
**informative** [2] -
316:25, 317:5
**informed** [1] - 247:22
**ingest** [1] - 298:1
**ingesting** [1] - 297:22
**initial** [9] - 273:14,
273:23, 274:10,
315:5, 316:1,
382:20, 382:21,
384:9, 384:12
**input** [3] - 230:25,
243:8, 255:23
**inputs** [3] - 244:8,
244:19, 305:17
**inquiry** [2] - 351:10,
396:10
**insofar** [1] - 329:12

**Inspector** [6] - 234:16,
234:22, 282:7,
282:10, 318:3, 318:7
**install** [3] - 331:17,
331:23, 331:24
**instance** [2] - 340:25,
353:12
**instances** [5] -
244:24, 249:19,
280:9, 336:4, 336:7
**instead** [3] - 249:9,
251:1, 356:19
**institutions** [1] -
275:17
**instructions** [3] -
371:15, 374:18,
391:1
**integrity** [2] - 292:9,
312:12
**intend** [3] - 321:17,
369:17, 390:2
**intending** [2] - 316:11,
363:9
**intention** [1] - 286:14
**interacted** [1] - 283:25
**interaction** [1] -
281:21
**interest** [5] - 311:16,
311:18, 320:11,
329:2, 335:6
**interested** [1] - 312:14
**interesting** [1] -
336:18
**interfere** [2] - 371:5,
378:4
**intermediary** [2] -
272:18, 329:23
**intermediate** [1] -
274:1
**internal** [6] - 233:14,
233:20, 233:25,
234:19, 304:13,
317:4
**internally** [1] - 299:2
**International** [2] -
319:8, 319:9
**international** [1] -
319:9
**internet** [22] - 324:15,
324:17, 325:1,
325:16, 325:17,
325:19, 326:14,
329:16, 329:24,
330:13, 330:19,
330:21, 331:13,
331:18, 332:2,
334:16, 335:6,
335:10, 339:14,
347:15, 347:24
**Internet** [5] - 325:9,

325:10, 325:13,
326:6, 326:7
**interpret** [2] - 267:15,
368:23
**interpreting** [1] -
250:17
**interview** [2] - 279:11,
279:16
**interviews** [1] - 320:25
**introduce** [1] - 315:1
**introduced** [3] -
252:8, 301:19,
315:22
**intrusion** [1] - 321:6
**investigate** [1] -
270:14
**investigating** [1] -
351:6
**investigation** [3] -
318:12, 324:4, 351:1
**investigations** [1] -
340:9
**investigator** [1] -
290:18
**investigators** [3] -
290:21, 291:2,
304:16
**involve** [10] - 235:8,
279:2, 286:24,
319:17, 319:21,
320:6, 320:14,
321:19, 321:22,
324:9
**involved** [5] - 266:5,
267:2, 319:13,
353:6, 354:10
**involving** [2] - 253:24,
286:24
**IP** [151] - 280:23,
281:2, 281:10,
281:13, 281:22,
282:14, 282:23,
283:1, 283:2, 283:4,
283:9, 283:16,
283:21, 283:24,
284:23, 284:25,
285:3, 285:7,
285:12, 285:13,
285:15, 305:11,
320:15, 324:7,
324:10, 324:13,
324:14, 324:16,
324:19, 324:22,
324:24, 325:1,
325:3, 325:5, 325:8,
325:11, 325:16,
325:25, 326:12,
327:9, 327:12,
327:25, 328:2,
328:15, 329:2,

329:7, 329:15,
329:18, 330:13,
330:14, 331:13,
331:19, 331:21,
332:15, 332:16,
332:17, 332:24,
333:8, 333:10,
333:18, 334:2,
334:15, 335:2,
335:15, 335:18,
336:4, 337:10,
338:13, 339:3,
339:4, 339:9,
339:24, 340:1,
342:12, 342:15,
342:20, 343:3,
343:8, 343:11,
343:16, 343:19,
344:15, 344:17,
346:2, 346:6,
347:13, 347:17,
347:20, 347:23,
347:25, 348:3,
348:5, 348:8,
348:12, 348:14,
348:17, 348:20,
348:21, 348:23,
349:5, 349:8,
349:19, 350:3,
350:6, 350:10,
350:13, 350:22,
351:9, 351:11,
352:10, 352:16,
352:18, 352:19,
353:6, 353:13,
353:18, 353:19,
353:25, 354:2,
354:3, 354:11,
354:14, 355:2,
355:21, 355:22,
356:18, 356:21,
357:6, 360:21,
361:10, 361:25,
362:8, 363:3, 363:4,
363:19, 364:1,
364:18, 364:20,
365:9, 365:10,
366:11, 367:9,
367:24, 368:2,
368:9, 368:19
**IPs** [22] - 325:19,
325:22, 326:18,
327:9, 335:21,
335:25, 336:2,
336:25, 337:2,
337:5, 337:7,
337:12, 337:19,
338:2, 338:6,
338:15, 353:16,
363:9, 366:4
**IRS** [5] - 271:12,

273:25, 352:23,
354:4, 386:3
**IRS-provided** [1] -
352:23
**isolate** [1] - 300:21
**ISP** [1] - 329:8
**issue** [16] - 283:13,
306:7, 306:23,
307:2, 311:17,
315:7, 315:12,
316:5, 332:25,
347:4, 370:23,
376:1, 382:13,
385:23, 390:9,
393:21
**issues** [10] - 317:8,
370:19, 371:11,
376:19, 377:10,
377:17, 385:24,
392:15, 393:5,
394:20
**IT** [3] - 319:10, 319:14,
319:15
**items** [1] - 320:10
**itself** [7] - 237:5,
276:21, 277:2,
305:1, 310:5,
315:21, 334:5

# J

**Jail** [2] - 395:4, 395:8
**jail** [1] - 396:3
**jails** [1] - 394:12
**January** [2] - 319:25,
336:23
**Java** [2] - 323:3, 323:6
**JavaScript** [1] -
319:22, 323:6
**Jeff** [1] - 229:12
**JEFFREY** [1] - 227:15
**job** [3] - 308:11, 320:1,
320:2
**join** [1] - 319:24
**joining** [1] - 318:6
**JONELLE** [3] - 228:3,
230:2, 294:4
**journal** [1] - 260:18
**Judge** [1] - 356:25
**judge** [1] - 291:25
**JUDGE** [1] - 227:8,
227:8
**judges** [2] - 380:9,
382:15
**judgment** [2] - 364:7,
379:7
**July** [1] - 263:20
**jump** [1] - 367:6
**June** [1] - 377:18
**juror** [1] - 387:18

412

**jurors** [18] - 378:15, 379:10, 380:17, 380:24, 381:15, 381:20, 382:3, 382:22, 385:2, 387:16, 387:21, 390:7, 390:10, 390:18, 390:20, 392:19, 392:24

**jury** [27] - 309:22, 316:19, 316:24, 316:25, 317:5, 371:15, 374:18, 375:8, 375:10, 378:24, 380:8, 382:24, 383:14, 383:18, 387:24, 390:5, 390:10, 390:15, 390:16, 390:24, 391:5, 391:6, 391:17, 392:5, 392:10, 392:13, 392:23

**Justice** [2] - 227:13, 227:16

## K

**Kappos** [2] - 261:2, 314:20

**keep** [8] - 270:13, 299:4, 326:17, 379:18, 387:6, 394:15, 396:5

**keeps** [1] - 310:12

**Key** [3] - 252:9, 252:11, 252:15

**key** [3] - 252:16, 320:16, 371:9

**Killdozer** [1] - 344:9

**kind** [9] - 230:12, 279:20, 306:7, 340:5, 345:23, 351:13, 364:6, 365:10, 369:25

**kinds** [1] - 394:11

**knowing** [1] - 360:24

**knowledge** [4] - 247:9, 303:16, 315:20, 347:6

**known** [10] - 230:21, 232:12, 255:3, 333:25, 337:17, 339:5, 357:5, 357:8, 358:11, 368:8

**knows** [2] - 248:12, 374:6

**Kolbasa** [3] - 274:16, 344:11, 370:6

**Kolbasa99** [1] -

342:22

**Kraken** [2] - 277:7, 277:9

## L

**labels** [1] - 231:4

**lack** [2] - 286:15, 292:9

**laid** [1] - 310:25

**Lamborghinis** [1] - 287:3

**languages** [3] - 322:24, 322:25, 323:4

**large** [6] - 245:10, 248:6, 268:25, 269:5, 304:14, 394:6

**larger** [6] - 231:17, 237:23, 298:4, 303:2, 303:5, 336:11

**largest** [1] - 236:17

**Larry** [3] - 279:11, 279:15

**last** [25] - 231:20, 232:1, 232:2, 253:21, 256:24, 267:8, 298:16, 301:10, 304:19, 304:22, 312:14, 317:23, 334:13, 336:22, 338:13, 343:24, 354:6, 360:9, 363:19, 368:14, 375:5, 379:9, 385:11, 387:17, 392:20

**laundering** [2] - 309:4, 321:7

**Law** [1] - 227:19

**law** [15] - 278:12, 278:17, 280:15, 280:18, 290:10, 306:2, 306:3, 306:9, 329:1, 329:11, 329:18, 332:22, 332:24, 333:21, 335:1

**lawyers** [1] - 381:16

**LCX** [1] - 256:9

**lead** [3] - 258:8, 259:10, 259:23

**Leaseweb** [1] - 367:15

**least** [7] - 236:2, 247:7, 267:12, 299:13, 315:4, 332:4, 378:22

**leave** [2] - 247:8, 392:18

**led** [2] - 356:14

**ledger** [5] - 254:9, 281:19, 304:14, 310:11, 310:12

**ledgers** [3] - 234:2, 310:7, 372:18

**leeway** [1] - 314:2

**left** [2] - 301:11, 368:19

**left-hand** [1] - 301:11

**legal** [3] - 332:25, 352:23, 353:1

**legal-process** [1] - 352:23

**legitimate** [3] - 286:17, 309:17, 346:7

**length** [1] - 371:20

**lengthy** [1] - 375:11

**less** [4] - 257:6, 257:9, 304:2, 339:5

**level** [10] - 247:21, 304:4, 322:1, 333:4, 336:14, 343:19, 344:15, 344:17, 348:2, 372:11

**levels** [1] - 378:3

**liability** [1] - 289:25

**Liberty** [14] - 274:13, 275:23, 276:7, 276:23, 285:1, 285:4, 285:8, 285:12, 285:16, 342:16, 342:21, 344:6, 344:12, 370:6

**license** [2] - 306:19, 306:20

**lies** [1] - 234:9

**life** [4] - 322:4, 388:14, 389:4

**likely** [22] - 233:14, 234:19, 273:24, 286:16, 304:11, 332:19, 333:24, 337:10, 343:20, 344:3, 344:5, 351:13, 368:5, 369:10, 369:12, 369:14, 369:23, 370:5, 377:19, 386:9, 390:11

**likewise** [2] - 349:22, 350:6

**Limitations** [1] - 303:22

**limited** [1] - 312:11

**line** [11] - 232:1, 307:8, 308:20, 309:15, 331:22, 333:14, 374:14, 374:15

**lines** [4] - 287:21, 291:15, 372:18, 374:1

**link** [5] - 270:18, 282:5, 295:18, 296:2, 355:5

**linked** [1] - 344:6

**linking** [1] - 283:20

**links** [1] - 292:11

**list** [24] - 241:3, 241:10, 241:11, 241:12, 253:16, 253:17, 261:17, 262:6, 265:2, 270:5, 323:2, 323:4, 334:7, 334:20, 336:11, 343:16, 369:10, 387:8, 387:10, 387:11, 388:4, 389:2, 389:6, 389:11

**listed** [10] - 241:8, 242:13, 258:3, 258:15, 261:8, 264:14, 296:18, 344:7, 367:24

**lists** [6] - 261:3, 295:23, 337:24, 387:3, 387:20, 387:21

**literature** [3] - 242:19, 242:24, 257:13

**live** [4] - 235:15, 255:15, 320:8, 327:16

**lives** [1] - 387:19

**LocalBitcoin** [1] - 308:12

**LocalBitcoins** [4] - 277:14, 278:2, 278:3, 308:8

**located** [2] - 331:7, 331:8

**lockdown** [1] - 393:24

**log** [8] - 282:18, 282:20, 284:25, 285:4, 320:15, 335:16, 354:13, 354:17

**log-ins** [1] - 320:15

**logged** [3] - 285:8, 285:16, 365:15

**logging** [5] - 332:15, 332:23, 350:11, 353:9

**login** [7] - 335:12, 338:7, 353:12, 353:24, 360:21, 360:25

**logins** [6] - 335:18, 338:8, 343:8,

343:11, 352:25, 363:24

**logout** [4] - 353:13, 353:19, 353:24, 364:1

**logouts** [1] - 353:15

**logs** [18] - 285:13, 320:14, 328:15, 329:4, 332:14, 332:19, 332:20, 333:9, 333:18, 339:7, 352:20, 352:21, 352:25, 353:2, 353:5, 353:16, 354:10

**look** [51] - 241:7, 241:13, 241:15, 246:25, 255:11, 255:17, 255:18, 255:22, 256:3, 261:6, 268:16, 269:17, 278:1, 279:10, 279:14, 285:9, 293:20, 296:7, 297:1, 298:8, 305:15, 307:24, 312:8, 318:17, 320:9, 324:20, 326:20, 327:11, 335:2, 335:8, 336:14, 336:17, 337:23, 338:4, 338:5, 339:4, 341:2, 348:21, 365:9, 374:13, 374:19, 375:8, 376:18, 377:1, 377:6, 383:5, 384:19

**looked** [16] - 254:15, 255:19, 290:10, 308:6, 308:23, 337:11, 337:13, 337:18, 337:20, 342:25, 354:1, 355:24, 357:12, 358:4, 360:20, 364:20

**looking** [24] - 241:19, 242:25, 251:22, 252:25, 254:23, 256:18, 271:2, 271:24, 272:11, 273:20, 278:21, 289:6, 290:14, 290:18, 298:10, 324:10, 329:4, 335:15, 335:21, 340:17, 352:13, 354:13, 364:19, 375:16

**looks** [3] - 244:14, 292:20, 328:1
**lookup** [3] - 326:22, 327:2, 327:4
**losing** [2] - 389:8, 390:20
**love** [1] - 234:2
**low** [2] - 256:16, 297:17
**lowest** [4] - 260:19, 266:24, 300:1, 300:2
**lucky** [1] - 378:21
**lunch** [2] - 293:14, 344:23, 345:7
**Luxembourg** [1] - 368:11
**Luxembourgish** [1] - 368:10

# M

**M-a-z-a-r-i-n** [1] - 317:24
**ma'am** [8] - 232:23, 245:4, 245:7, 248:18, 270:25, 274:23, 279:15, 283:14
**machine** [1] - 329:5
**magic** [1] - 341:7
**main** [1] - 331:1
**maintain** [1] - 362:10
**maintained** [1] - 334:5
**majority** [1] - 337:16
**Maltego** [6] - 359:1, 359:4, 359:5, 359:10, 359:17, 359:21
**Malware** [1] - 322:11
**malware** [1] - 322:12
**Man** [2] - 248:23, 302:19
**management** [1] - 229:20
**manually** [4] - 272:7, 272:9, 272:14, 273:24
**manufacturing** [1] - 319:10
**market** [5] - 236:24, 237:4, 237:5, 268:25, 293:1
**marketplaces** [1] - 308:2
**markets** [2] - 236:18, 237:4
**marshal** [1] - 394:24
**marshall** [1] - 394:18
**Marshals** [7] - 393:22, 394:3, 394:16,

395:6, 395:7, 395:12, 395:14
**marshals** [1] - 394:22
**mask** [1] - 280:20
**masking** [2] - 349:4, 350:3
**match** [5] - 236:9, 268:17, 268:19, 304:9, 384:2
**matching** [2] - 265:25, 267:2
**material** [1] - 315:9
**math** [1] - 381:19
**matter** [10] - 229:21, 229:22, 256:9, 350:9, 351:19, 366:16, 378:18, 383:20, 391:4, 393:5
**matters** [1] - 292:23
**MAZARIN** [3] - 228:8, 317:19, 345:14
**Mazarin** [6] - 286:2, 317:13, 317:21, 317:25, 324:3, 342:8
**Mazars** [11] - 317:13, 317:21, 317:25, 324:3, 342:8, 345:16, 352:5, 356:6, 356:25, 358:18, 367:4
**MAZARS** [4] - 228:8, 317:19, 317:24, 345:14
**Mazars'** [1] - 373:13
**MDV** [1] - 240:4
**mean** [24] - 233:9, 234:16, 243:6, 246:11, 246:19, 256:22, 274:15, 287:15, 302:15, 347:18, 352:16, 352:17, 353:11, 361:6, 361:20, 371:19, 372:2, 376:4, 376:8, 376:21, 379:8, 384:8, 386:5, 392:4
**meaning** [3] - 300:22, 301:20, 338:7
**meaningful** [1] - 363:10
**means** [5] - 296:11, 318:19, 375:9, 379:3, 380:4
**meant** [4] - 235:11, 338:17, 352:18, 368:21
**Meantime** [1] - 360:18
**measure** [3] - 298:21, 298:24, 299:7

**measured** [1] - 299:13
**measures** [2] - 299:7, 299:12
**media** [2] - 386:21, 386:25
**Meets** [1] - 259:10
**Meiklejohn** [20] - 257:20, 258:23, 259:12, 261:1, 261:5, 261:18, 262:18, 263:7, 263:11, 263:16, 265:4, 265:6, 269:10, 269:20, 269:23, 273:11, 297:2, 301:2, 303:20, 314:21
**Meiklejohn's** [15] - 258:20, 260:2, 260:6, 260:14, 260:20, 264:2, 265:18, 269:8, 294:22, 294:25, 296:5, 296:20, 299:24, 300:10, 302:12
**member** [1] - 318:18
**members** [5] - 265:12, 265:13, 327:5, 328:5, 328:10, 328:23, 334:7
**memorandum** [1] - 318:19
**memory** [1] - 241:18
**Men** [1] - 258:19
**mention** [1] - 229:19
**mentioned** [8] - 253:7, 253:20, 255:20, 264:21, 306:1, 313:5, 337:25, 362:5
**mentioning** [1] - 284:23
**merger** [3] - 292:21, 292:22, 292:24
**merger-specific** [1] - 292:22
**mergers** [1] - 293:2
**mess** [1] - 390:8
**metadata** [1] - 305:1
**methodology** [7] - 365:4, 365:18, 365:19, 365:20, 365:22, 366:7, 366:11
**micro** [3] - 343:19, 344:15, 344:17
**micro-level** [3] - 343:19, 344:15, 344:17
**microanalysis** [1] -

336:15
**microphone** [1] - 318:1
**middle** [2] - 334:19, 361:10
**might** [17] - 308:16, 324:20, 328:15, 334:15, 335:1, 338:15, 340:1, 371:8, 372:13, 377:4, 380:8, 383:12, 383:13, 388:2, 390:18, 391:9
**Million** [5] - 258:23, 260:15, 294:18, 295:15, 314:22
**million** [3] - 269:1, 269:3
**Million'** [2] - 295:17, 295:23
**millions** [4] - 313:8, 349:15, 349:18, 372:18
**mind** [4] - 231:8, 251:2, 372:13, 373:18
**minute** [4] - 253:12, 339:11, 339:12, 339:16
**minutes** [29] - 229:22, 288:17, 309:25, 312:25, 338:9, 338:10, 338:24, 338:25, 339:20, 339:21, 340:12, 340:13, 340:25, 341:11, 341:12, 362:16, 363:5, 363:11, 363:13, 364:12, 364:17, 365:1, 365:6, 365:7, 365:12, 365:13, 365:15, 371:8, 371:9
**mirror** [1] - 235:11
**mischaracterizing** [1] - 356:17
**misclustering** [1] - 243:12
**misleading** [2] - 316:18, 316:24
**missing** [7] - 251:13, 252:2, 252:7, 252:10, 252:3, 253:11, 308:13
**Missouri** [1] - 396:9
**mistaken** [1] - 243:16
**mistakenly** [1] - 244:15
**mixer** [3] - 279:20, 305:17, 310:4

**mixers** [7] - 309:3, 309:5, 309:12, 309:13, 309:17, 311:7, 311:15
**mixing** [3] - 270:17, 278:16, 279:3
**mobile** [1] - 322:22
**Model** [1] - 257:1
**model** [1] - 330:3
**modeled** [1] - 339:1
**modeling** [2] - 292:22, 293:2
**moment** [4] - 230:12, 293:9, 382:19, 392:12
**Monday** [1] - 390:3
**monetary** [1] - 304:6
**money** [2] - 309:4, 321:7
**moniker** [2] - 355:21, 357:6
**monitoring** [1] - 289:18
**month** [1] - 379:1
**month-long** [1] - 379:1
**monthly** [1] - 330:4
**months** [4] - 338:12, 338:14, 374:24
**morning** [11] - 229:6, 229:8, 229:9, 229:11, 229:13, 229:14, 229:15, 229:17, 230:4, 230:5, 317:21
**MOSS** [1] - 227:8
**Moss's** [1] - 356:25
**most** [15] - 236:2, 236:17, 243:18, 243:21, 248:2, 277:6, 336:18, 348:18, 363:10, 369:10, 369:12, 369:14, 370:5, 372:11, 394:21
**mostly** [2] - 339:1, 352:23
**motion** [2] - 370:22, 381:7
**MOTIONS** [2] - 227:4, 227:7
**motions** [2] - 370:19, 371:1
**motivated** [1] - 304:2
**motivations** [2] - 311:6, 311:14
**move** [6] - 293:22, 307:1, 311:18, 317:25, 347:10, 359:8

414

**moves** [5] - 262:23, 293:4, 323:22, 334:18, 341:25
**moving** [4] - 235:10, 289:25, 302:20, 371:4
**MR** [102] - 229:9, 229:12, 229:15, 234:5, 261:12, 263:1, 273:5, 274:3, 287:17, 287:24, 288:4, 292:6, 293:6, 294:2, 294:5, 295:5, 295:9, 297:12, 298:14, 299:18, 299:22, 306:21, 307:2, 307:3, 307:21, 307:24, 307:25, 309:11, 309:24, 310:2, 311:8, 311:16, 312:1, 312:5, 312:21, 313:1, 313:4, 313:17, 314:3, 316:23, 323:24, 342:3, 345:11, 345:15, 347:6, 347:10, 347:12, 350:18, 350:21, 351:11, 351:24, 352:3, 352:4, 355:3, 355:23, 356:4, 356:5, 356:23, 356:24, 357:18, 357:24, 358:17, 359:24, 360:2, 360:4, 360:5, 360:15, 362:23, 363:2, 365:17, 366:1, 366:5, 366:14, 367:2, 367:3, 370:10, 375:23, 376:5, 376:8, 376:13, 376:18, 376:24, 377:9, 379:6, 380:3, 381:8, 383:25, 384:3, 384:6, 384:16, 384:23, 385:4, 385:12, 385:17, 385:20, 390:21, 391:22, 392:4, 393:20, 395:15, 396:5, 396:16
**MS** [83] - 229:6, 229:25, 230:3, 233:6, 234:11, 234:13, 246:10, 247:25, 252:18,

254:5, 254:14, 261:9, 261:15, 262:23, 263:5, 268:5, 273:10, 274:5, 280:4, 281:6, 287:5, 287:12, 288:2, 288:8, 288:17, 288:21, 288:22, 292:8, 293:4, 293:9, 293:12, 293:17, 293:24, 309:9, 311:20, 312:17, 315:13, 316:10, 316:18, 317:12, 317:20, 323:22, 324:2, 326:3, 326:6, 326:10, 341:25, 342:7, 344:21, 350:16, 351:8, 354:25, 356:16, 357:15, 362:21, 366:20, 370:12, 370:17, 375:13, 377:16, 378:12, 378:17, 378:25, 379:24, 380:1, 383:20, 386:1, 386:7, 386:15, 388:16, 389:7, 389:11, 389:19, 389:22, 390:2, 391:9, 391:14, 391:20, 393:3, 393:13, 393:17, 396:8, 396:15
**Mt** [30] - 270:24, 271:7, 273:14, 273:22, 274:10, 274:14, 275:21, 275:22, 276:9, 276:10, 276:23, 284:25, 285:4, 285:8, 285:12, 285:16, 295:18, 296:3, 300:7, 300:14, 307:5, 307:11, 342:17, 342:21, 342:22, 344:5, 344:11, 344:12, 370:6
**multiple** [7] - 265:25, 309:11, 313:19, 313:20, 330:20, 336:5, 386:2
**multiplied** [1] - 298:24
**must** [3] - 255:1, 255:2, 310:11

# N

**N.W** [1] - 397:11
**name** [20] - 229:5, 260:5, 317:22, 317:23, 324:18, 327:25, 328:2, 337:22, 344:7, 350:15, 357:5, 358:4, 358:15, 358:20, 358:23, 361:3, 361:22, 387:23, 387:25
**named** [4] - 337:21, 356:14, 358:6
**Names** [1] - 258:20
**names** [5] - 334:2, 387:21, 388:2, 388:3, 389:3
**native** [8] - 277:1, 307:14, 308:3, 308:5, 353:2, 354:10, 354:13, 354:15
**natives** [5] - 237:5, 276:18, 276:21, 308:7, 308:10
**nature** [1] - 337:20
**Navy** [4] - 346:17, 346:19, 346:20, 346:25
**nd** [1] - 375:19
**necessarily** [12] - 233:21, 238:12, 248:15, 253:5, 278:25, 282:15, 282:18, 302:25, 303:1, 303:4, 329:8
**necessary** [3] - 352:1, 370:21, 375:10
**need** [46] - 229:21, 230:14, 233:25, 242:6, 246:8, 247:16, 248:18, 255:17, 258:13, 259:4, 264:13, 264:20, 277:16, 282:10, 284:19, 288:6, 288:15, 302:16, 308:8, 309:7, 309:20, 309:23, 325:21, 325:23, 341:4, 357:21, 366:22, 376:4, 376:6, 376:14, 376:18, 376:22, 377:22, 379:19, 381:2, 381:20, 382:10, 386:25, 387:2,

387:9, 387:15, 387:21, 387:23, 388:22, 392:19, 392:24
**needed** [1] - 372:20
**needs** [7] - 314:17, 339:4, 377:19, 387:6, 387:8, 388:8, 388:18
**net** [1] - 310:20
**network** [23] - 235:15, 320:3, 322:21, 328:18, 330:10, 330:17, 331:2, 331:4, 331:21, 333:6, 333:16, 334:12, 334:18, 340:14, 343:10, 346:10, 346:12, 346:17, 346:20, 347:1, 347:7, 348:20, 349:23
**networked** [1] - 330:18
**neutral** [2] - 388:6, 388:7
**never** [11] - 236:21, 236:25, 237:1, 275:22, 276:15, 276:19, 277:5, 284:4, 287:14, 291:12, 378:24
**new** [14] - 260:20, 265:11, 265:15, 265:16, 265:17, 296:20, 313:23, 313:24, 314:6, 318:14, 321:17, 339:24
**New** [2] - 227:17, 227:20
**news** [1] - 292:11
**News** [1] - 292:13
**next** [31] - 255:11, 270:11, 290:8, 293:23, 295:19, 295:20, 296:1, 296:19, 297:16, 299:25, 300:6, 300:16, 301:7, 314:15, 317:11, 364:25, 370:16, 370:18, 371:14, 374:19, 383:10, 387:19, 393:6, 396:9
**Nfs9000** [2] - 274:16, 342:21
**night** [1] - 387:11
**nine** [1] - 374:23
**nine-week** [1] - 374:23

**nobody** [2] - 380:13, 384:7
**node** [26] - 280:24, 281:16, 281:17, 281:18, 331:10, 331:21, 332:3, 333:17, 333:20, 333:23, 334:10, 334:11, 334:13, 334:18, 334:22, 334:23, 334:24, 340:11, 340:13, 340:18, 340:20, 346:14, 361:12, 367:13
**nodes** [11] - 281:12, 281:21, 281:23, 281:25, 331:4, 334:3, 334:20, 334:21, 337:5, 340:15
**nonalternate** [1] - 382:22
**noncustodial** [1] - 290:24
**none** [9] - 266:1, 282:12, 283:23, 285:3, 354:9, 360:19, 360:22, 381:18, 387:15
**nonwitness** [2] - 386:6
**normal** [3] - 308:17, 308:23, 339:4
**North** [2] - 325:11, 325:15
**not-for-profit** [1] - 330:25
**notably** [1] - 295:25
**note** [4] - 287:13, 311:20, 314:7, 380:18
**notes** [7] - 275:15, 277:8, 277:17, 278:6, 285:9, 313:11, 397:5
**nothing** [10] - 285:10, 285:15, 285:18, 293:1, 358:6, 370:12, 387:5, 396:15, 396:16
**notice** [3] - 308:12, 335:22, 353:12
**noticed** [2] - 312:1, 391:24
**novel** [1] - 320:4
**November** [5] - 231:4, 231:14, 237:11, 239:12, 337:1
**nowhere** [4] - 259:6,

415

259:17, 262:12,
272:17
**nuance** [1] - 282:14
**nuances** [1] - 377:12
**Number** [2] - 369:23,
370:1
**number** [31] - 247:2,
248:6, 248:8, 248:9,
258:1, 258:2, 262:6,
266:12, 297:3,
299:10, 299:14,
304:23, 305:9,
305:22, 308:13,
310:8, 321:17,
322:25, 324:20,
335:12, 348:22,
349:10, 350:9,
365:8, 369:11,
380:23, 381:20,
381:23, 389:12,
391:6
**numbered** [1] - 388:13
**numbers** [10] - 263:6,
263:10, 288:24,
327:10, 342:9,
345:25, 379:17,
379:21, 380:19,
384:1
**Numbers** [1] - 326:7
**numerous** [6] - 250:5,
278:12, 326:23,
336:7, 349:7, 350:6
**NW** [4] - 227:11,
227:14, 227:17,
227:23
**NY** [1] - 227:20

## O

**O-m-e-d-e-t-o-u** [1] -
355:12
**obfuscate** [1] - 305:23
**object** [3] - 316:4,
316:6
**objection** [23] - 234:5,
262:25, 263:1,
273:5, 274:3, 293:5,
293:6, 309:9,
311:21, 312:17,
323:23, 323:24,
342:2, 342:3,
350:16, 351:8,
354:25, 356:16,
357:15, 357:19,
362:21, 386:14
**objections** [1] -
377:21
**obligations** [1] -
392:23
**obscure** [2] - 279:25,

280:1
**observation** [1] -
370:9
**observations** [2] -
282:12, 283:17
**observe** [1] - 269:10
**observed** [2] - 364:17,
365:5
**observer** [2] - 254:19,
254:23
**obtained** [1] - 352:23
**obvious** [2] - 278:24,
279:6
**obviously** [5] -
378:18, 382:25,
386:13, 387:3, 388:8
**occur** [1] - 243:22
**occurred** [3] - 338:8,
363:10, 365:5
**occurrence** [2] -
250:2, 340:4
**occurrences** [4] -
327:24, 353:16,
357:7, 364:19
**October** [7] - 282:9,
283:17, 284:15,
284:21, 390:13,
391:8, 391:10
**OF** [8] - 227:1, 227:2,
227:7, 230:1, 294:3,
317:18, 345:13,
397:1
**OFAC** [3] - 287:15,
287:20, 288:4
**offer** [12] - 247:16,
286:14, 287:16,
289:17, 305:14,
327:2, 329:25,
351:20, 352:2,
376:22, 393:14
**offered** [4] - 238:16,
311:14, 372:14,
374:4
**offering** [2] - 313:23,
359:4
**offerings** [2] - 359:10,
359:17
**Office** [3] - 318:3,
318:6, 318:18
**office** [1] - 318:4
**OFFICIAL** [1] - 397:1
**Official** [2] - 227:22,
397:10
**official** [1] - 333:24
**officially** [1] - 377:20
**often** [10] - 245:13,
250:8, 327:5,
329:18, 330:4,
330:8, 333:4,
333:13, 335:19,

392:6
**oftentimes** [1] - 305:2
**OIG** [3] - 318:14,
318:19, 318:22
**old** [1] - 337:14
**Omedetou** [2] -
355:10, 355:12
**on-chain** [3] - 290:16,
309:6, 309:8
**once** [1] - 333:14
**one** [85] - 229:19,
230:12, 231:13,
232:2, 236:17,
240:4, 243:18,
246:14, 246:20,
246:22, 246:24,
246:25, 248:2,
250:25, 251:2,
253:7, 253:8, 258:9,
264:15, 264:24,
265:3, 265:4, 265:6,
265:7, 266:23,
267:8, 268:4,
279:15, 279:20,
279:21, 290:14,
291:8, 295:14,
300:17, 302:3,
305:1, 305:14,
305:20, 309:18,
310:9, 312:6, 314:9,
314:16, 332:3,
338:7, 338:13,
339:7, 342:12,
344:17, 348:8,
349:4, 350:17,
351:3, 352:20,
355:5, 355:9, 359:5,
359:11, 364:24,
368:3, 368:18,
371:2, 375:4,
375:23, 377:4,
377:9, 379:3,
380:25, 382:7,
382:8, 382:14,
385:5, 385:6,
387:22, 388:22,
391:25, 393:3,
394:5, 395:8,
395:24, 396:8
**one's** [2] - 321:11,
321:13
**one-off** [1] - 351:3
**ones** [5] - 242:13,
300:1, 301:18,
338:23, 366:3
**ongoing** [1] - 284:10
**onion** [1] - 305:10
**Onion** [1] - 330:17
**online** [10] - 320:3,

321:12, 321:22,
322:4, 326:23,
337:16, 339:1,
339:25, 346:5
**onward** [2] - 324:22,
333:7
**open** [3] - 310:17,
373:14, 374:7
**open-source** [1] -
310:17
**opening** [1] - 381:13
**openings** [4] - 390:3,
390:6, 390:22, 391:2
**operating** [2] - 276:5,
280:23, 376:11
**operational** [5] -
321:1, 321:8,
321:15, 321:20,
345:17
**operationally** [1] -
322:3
**operations** [2] -
321:23, 322:8
**operators** [2] - 269:12,
279:3
**opinion** [8] - 286:14,
302:3, 308:22,
355:24, 363:18,
370:23, 374:22,
374:25
**opinions** [4] - 313:23,
313:24, 356:8,
356:21
**opportunity** [3] -
309:22, 381:13,
381:15
**opposed** [2] - 254:24,
339:22
**OPSEC** [5] - 321:20,
345:19, 345:21,
345:23, 346:8
**option** [1] - 377:25
**options** [2] - 247:3,
330:12
**order** [12] - 234:1,
243:15, 248:15,
269:13, 305:10,
330:18, 380:25,
381:20, 385:14,
385:23, 387:10,
387:21
**organization** [2] -
325:6, 330:25
**organizational** [1] -
337:4
**organizations** [3] -
326:15, 327:8, 331:6
**organized** [1] - 302:14
**original** [1] - 394:18
**originating** [1] - 350:3

**otherwise** [4] -
252:21, 334:11,
337:3, 375:18
**ought** [1] - 378:2
**ourselves** [1] - 391:7
**outermost** [1] - 334:13
**output** [10] - 230:25,
243:8, 255:9, 265:3,
267:11, 300:21,
303:4, 303:5,
304:17, 305:18
**outputs** [4] - 256:2,
300:18, 300:21,
305:18
**outside** [8] - 309:10,
339:12, 339:16,
341:5, 344:18,
356:18, 363:17,
395:10
**overall** [2] - 336:16,
353:1
**overexpansive** [1] -
387:20
**Overlap** [1] - 360:7
**overlap** [19] - 352:10,
352:16, 352:18,
354:2, 354:11,
356:22, 362:15,
363:3, 363:4, 363:5,
363:8, 363:9,
363:13, 363:14,
364:6, 364:12,
365:4, 366:11,
384:14
**overly** [1] - 387:13
**overruled** [2] - 273:6,
274:4
**own** [16] - 246:5,
247:8, 263:13,
264:7, 264:11,
264:18, 281:12,
295:4, 305:15,
321:10, 329:22,
337:4, 339:1,
350:24, 388:7,
395:23
**owned** [1] - 361:17
**ownership** [1] - 305:4

## P

**p.m** [5] - 345:7,
366:18, 396:18
**P2PK** [2] - 252:11,
252:13
**P2PKH** [1] - 252:14
**Pac** [2] - 248:23,
302:19
**Pac-Man** [2] - 248:23,
302:19

416

**packed** [1] - 393:11
**page** [113] - 230:8,
230:15, 230:16,
231:2, 231:19,
231:24, 233:11,
234:17, 235:19,
237:18, 239:12,
239:23, 242:7,
244:2, 244:10,
249:6, 251:4, 251:6,
251:23, 251:25,
252:3, 252:5, 252:6,
253:21, 253:22,
254:1, 254:2, 256:7,
256:18, 258:18,
261:17, 261:23,
262:2, 262:3, 264:2,
265:2, 265:21,
266:17, 266:21,
269:8, 269:17,
270:3, 270:20,
271:1, 271:5,
271:15, 271:24,
272:4, 272:11,
280:22, 281:4,
281:7, 286:3, 286:4,
286:10, 286:11,
286:12, 287:12,
287:17, 288:1,
288:23, 288:24,
289:6, 289:7, 290:8,
291:24, 292:4,
292:5, 292:6,
292:24, 294:21,
294:22, 294:24,
294:25, 295:1,
295:11, 296:4,
296:9, 298:15,
299:19, 299:24,
300:9, 302:5,
303:19, 312:8,
342:8, 342:9,
343:23, 343:24,
352:12, 352:13,
352:14, 358:25,
359:23, 360:6,
361:10, 363:20,
364:3, 367:6, 367:9,
368:3, 368:13,
368:14, 369:2,
369:6, 369:9
**PAGE** [2] - 228:2,
228:12
**Page** [1] - 292:7
**pages** [6] - 230:23,
261:22, 272:7,
389:15, 389:16,
389:17
**panel** [3] - 384:6,
384:7, 384:11

**paper** [38] - 257:12,
257:19, 258:11,
258:16, 258:20,
258:21, 258:25,
259:2, 259:6,
259:11, 259:14,
259:16, 259:17,
259:21, 259:23,
260:1, 260:6, 260:8,
260:11, 260:20,
260:22, 260:24,
261:1, 261:3, 261:8,
262:12, 267:22,
268:2, 269:8,
269:23, 270:3,
270:20, 271:2,
273:12, 300:10,
303:10, 366:10,
372:22
**papers** [5] - 258:5,
258:9, 265:16,
366:6, 392:7
**paragraph** [25] -
250:21, 256:22,
256:24, 265:1,
269:9, 269:17,
269:18, 270:4,
270:5, 271:10,
271:11, 274:7,
288:3, 295:15,
295:16, 298:16,
299:20, 300:12,
300:13, 301:10,
303:22, 303:24,
312:9, 354:7, 360:10
**paragraphs** [2] -
295:12, 365:8
**paralegals** [1] -
389:23
**parameters** [2] -
264:5, 265:21
**part** [19] - 233:1,
235:3, 255:15,
277:4, 282:21,
291:2, 295:5, 302:7,
315:1, 320:21,
324:9, 328:18,
334:25, 335:11,
335:25, 341:14,
356:3, 356:7, 369:15
**participate** [1] -
334:16
**particular** [26] -
268:22, 281:2,
298:1, 303:3, 305:5,
311:2, 322:23,
329:2, 329:7,
338:19, 339:15,
340:18, 340:24,
341:7, 343:1,

353:19, 354:23,
355:22, 360:25,
361:21, 362:5,
370:4, 373:24,
374:7, 377:11,
381:15
**particularly** [4] -
343:13, 375:11,
378:2, 388:11
**parties** [2] - 374:8,
388:6
**party** [1] - 304:2
**pas** [9] - 237:19,
237:21, 237:25,
238:3, 238:7,
238:25, 239:3,
239:18, 242:5
**pass** [2] - 370:10,
382:5
**passed** [2] - 341:4,
383:1
**Passive** [7] - 327:20,
327:23, 328:4,
328:9, 337:11,
337:23, 343:7
**passive** [1] - 327:24
**past** [3] - 327:12,
327:18, 386:11
**pasted** [1] - 251:1
**pattern** [1] - 308:22
**patterns** [3] - 242:17,
243:15, 320:16
**pause** [4] - 290:18,
290:22, 291:2, 360:2
**pay** [2] - 305:18, 330:3
**Pay** [5] - 252:9,
252:11, 252:15,
252:23, 254:20
**Pay-to-Public-Key** [3]
- 252:9, 252:11,
252:15
**Pay-to-Script-Hash**
[2] - 252:23, 254:20
**PayJoin** [2] - 246:24,
288:2
**payment** [1] - 249:11
**Payments** [1] - 258:19
**payouts** [2] - 278:24,
279:6
**PDF** [2] - 231:17,
272:5
**Pearlman** [1] - 229:12
**PEARLMAN** [10] -
227:15, 229:12,
384:3, 384:6,
384:16, 384:23,
385:4, 385:12,
385:17, 385:20
**Peel** [7] - 258:23,
260:15, 294:18,

295:15, 295:17,
295:23, 314:21
**peel** [28] - 248:23,
249:2, 249:7, 249:8,
249:14, 249:18,
249:20, 249:22,
250:2, 250:3, 250:5,
250:18, 250:20,
250:21, 250:22,
250:25, 251:6,
251:7, 251:8,
251:11, 251:12,
251:15, 251:17,
296:20, 302:11,
302:23, 303:2, 304:8
**peer** [2] - 302:17,
366:6
**peer-reviewed** [2] -
302:17, 366:6
**PELKER** [84] - 227:13,
229:6, 229:25,
230:3, 233:6,
234:11, 234:13,
246:10, 247:25,
252:18, 254:5,
254:14, 261:9,
261:15, 262:23,
263:5, 268:5,
273:10, 274:5,
280:4, 281:6, 287:5,
287:12, 288:2,
288:8, 288:17,
288:21, 288:22,
292:8, 293:4, 293:9,
293:12, 293:17,
293:24, 309:9,
311:20, 312:17,
315:13, 316:10,
316:18, 317:12,
317:20, 323:22,
324:2, 326:3, 326:6,
326:10, 341:25,
342:7, 344:21,
350:16, 351:8,
354:25, 356:16,
357:15, 362:21,
366:20, 370:12,
370:17, 375:13,
377:16, 378:12,
378:17, 378:25,
379:24, 380:1,
383:20, 386:1,
386:7, 386:15,
388:16, 389:7,
389:11, 389:19,
389:22, 390:2,
391:9, 391:14,
391:20, 393:3,
393:13, 393:17,
396:8, 396:15

**Pelker** [10] - 228:5,
228:9, 229:6,
229:24, 230:5,
247:8, 261:14,
375:12, 379:21,
389:2
**Pelker's** [1] - 247:5
**pen** [1] - 372:22
**pen-and-paper** [1] -
372:22
**penetration** [1] -
322:20
**Pennsylvania** [1] -
227:14
**people** [25] - 279:24,
309:3, 309:5, 309:7,
310:7, 311:2, 311:6,
311:12, 311:14,
321:14, 330:14,
339:2, 340:19,
345:19, 346:14,
349:7, 349:18,
350:6, 350:9, 384:8,
388:1, 392:23,
393:1, 395:14,
395:18
**people's** [1] - 331:12
**perceive** [1] - 382:10
**percent** [12] - 258:12,
259:3, 259:7,
259:17, 262:13,
266:24, 270:10,
270:12, 295:25,
316:19, 351:15
**peremptory** [1] -
384:21
**perform** [1] - 336:15
**performed** [1] -
242:13
**performing** [3] -
254:8, 301:22, 304:3
**perhaps** [4] - 269:11,
302:8, 351:16,
371:24
**period** [6] - 236:19,
282:13, 283:13,
321:17, 337:13,
363:24
**permissible** [1] -
374:16
**permission** [1] - 386:9
**person** [15] - 247:23,
310:16, 316:1,
333:2, 333:3,
333:11, 333:12,
339:13, 341:11,
379:3, 383:11,
383:12, 386:10,
387:18, 387:24
**person's** [1] - 310:18

**personal** [2] - 350:14, 350:22
**personally** [1] - 235:17
**personas** [1] - 322:4
**pertained** [1] - 283:13
**pertains** [1] - 324:7
**pertinent** [1] - 312:13
**PeterNFS** [2] - 344:12, 370:6
**Philadelphia** [1] - 236:10
**phone** [5] - 281:14, 321:16, 324:20, 327:10, 345:24
**phones** [1] - 322:22
**PHP** [1] - 323:6
**phrase** [2] - 352:18, 353:8
**phrases** [1] - 377:11
**physical** [1] - 310:22
**physicist** [1] - 374:5
**pick** [4] - 348:3, 390:11, 390:16, 390:24
**picked** [2] - 362:19, 362:22
**piece** [1] - 395:20
**pierce** [1] - 321:19
**PII** [2] - 274:18, 274:20
**pivoting** [1] - 329:6
**place** [2] - 267:4, 267:12
**placed** [2] - 267:10, 267:13
**placeholder** [1] - 389:20
**Plaintiff** [2] - 227:3, 227:10
**plan** [3] - 315:23, 377:22, 392:13
**plans** [1] - 395:24
**plasma@**
   **plasmadivision** [1] - 344:7
**PlasmaDivision** [1] - 342:17
**platforms** [1] - 289:19
**play** [1] - 305:24
**playing** [1] - 234:10
**PLLC** [1] - 227:19
**plot** [1] - 359:7
**podium** [1] - 229:4
**Point** [7] - 369:3, 369:6, 369:9, 369:21, 369:23, 370:1, 370:3
**point** [36] - 234:12, 251:15, 253:13, 255:19, 256:22,

258:11, 259:2, 260:2, 261:7, 263:18, 265:1, 279:15, 280:11, 284:1, 287:10, 287:25, 292:9, 293:14, 306:22, 309:18, 311:11, 311:22, 311:24, 313:23, 315:8, 327:9, 355:5, 366:13, 375:21, 377:22, 382:23, 383:3, 391:20, 393:3, 396:8
**pointed** [1] - 270:5
**pointing** [3] - 238:3, 256:1, 259:22
**points** [10] - 336:17, 338:4, 341:2, 353:9, 359:7, 365:14, 371:10, 371:22, 389:6, 389:7
**Points** [1] - 368:25
**Poloniex** [3] - 277:21, 277:24, 277:25
**pool** [3] - 326:12, 383:8, 383:9
**population** [1] - 394:14
**portion** [4] - 236:18, 341:22, 365:3, 395:8
**portions** [1] - 315:3
**position** [3] - 287:7, 318:9, 377:1
**positive** [2] - 297:24, 304:12
**positives** [3] - 297:22, 301:17, 315:18
**possibility** [2] - 282:22, 393:22
**possible** [22] - 236:6, 243:11, 244:23, 249:24, 250:13, 257:11, 280:21, 305:5, 308:16, 310:19, 329:15, 337:2, 348:11, 348:25, 351:13, 361:6, 366:24, 371:12, 371:25, 384:13, 391:1, 395:1
**possibly** [7] - 240:18, 269:6, 336:2, 336:3, 368:8, 373:24, 375:19
**post** [4] - 355:10, 361:23, 371:15, 392:1
**post-trial** [1] - 392:1

**potential** [1] - 319:15
**potentially** [3] - 253:18, 377:9, 379:1
**PowerPoint** [2] - 247:11, 289:5
**practice** [4] - 321:11, 345:21, 345:23, 346:8
**pre** [1] - 326:25
**predictable** [1] - 269:11
**prefer** [2] - 310:9, 388:16
**preferred** [1] - 339:7
**preliminarily** [1] - 374:2
**preliminary** [7] - 371:3, 371:15, 373:14, 373:22, 374:10, 374:18, 391:1
**prep** [3] - 371:4, 371:5, 371:13
**preparation** [4] - 257:22, 312:15, 373:12, 374:18
**prepare** [1] - 341:16
**prepared** [2] - 306:20, 341:20
**preparing** [1] - 262:10
**present** [3] - 229:16, 252:7, 351:25
**presentation** [2] - 247:12, 390:11
**presented** [1] - 316:21
**presenting** [1] - 390:18
**preserve** [4] - 309:5, 309:8, 310:8, 310:20
**press** [2] - 339:23, 340:15
**prestaged** [1] - 326:25
**presumably** [1] - 355:19
**pretend** [1] - 382:19
**pretrial** [22] - 371:2, 371:8, 371:17, 372:1, 372:9, 374:20, 375:3, 375:15, 379:14, 379:16, 385:21, 385:23, 387:9, 387:11, 388:9, 392:16, 392:17, 392:18, 393:5, 395:9, 395:18, 396:12
**pretty** [1] - 250:2
**previous** [5] - 253:1, 270:7, 270:8,

270:19, 286:23
**previously** [4] - 245:11, 248:1, 257:24, 326:4
**primarily** [4] - 322:2, 328:14, 328:21, 337:18
**primary** [1] - 312:11
**principal** [3] - 372:2, 382:17, 382:21
**print** [1] - 389:14
**printed** [1] - 389:15
**printers** [1] - 389:23
**prison** [1] - 396:3
**privacy** [10] - 247:2, 258:7, 309:5, 309:8, 310:4, 310:8, 310:9, 310:20, 330:12, 330:19
**privacy-conscious** [1] - 310:9
**private** [6] - 304:13, 306:25, 330:10, 337:21, 343:10, 349:23
**probability** [5] - 351:12, 363:16, 364:7, 369:13, 369:25
**probability-based** [1] - 351:12
**probable** [9] - 362:15, 363:3, 363:5, 363:7, 363:8, 363:15, 364:6, 364:12, 365:4
**problem** [7] - 230:14, 246:21, 246:22, 302:20, 382:2, 382:4, 395:16
**problems** [1] - 394:11
**Procedure** [1] - 381:23
**procedures** [1] - 375:3
**proceed** [3] - 294:1, 367:1, 388:15
**proceeding** [6] - 378:5, 388:13, 391:21, 392:2, 392:7, 392:10
**proceedings** [2] - 366:19, 397:6
**process** [8] - 281:1, 332:25, 352:23, 353:1, 370:16, 371:6, 383:18, 393:19
**produce** [3] - 275:4, 295:21, 313:14
**produced** [3] - 306:11, 313:8, 314:8

**produces** [1] - 295:22
**product** [3] - 275:4, 291:10, 359:10
**products** [1] - 359:4
**profess** [5] - 258:11, 259:2, 259:6, 259:17, 262:13
**professional** [3] - 322:5, 363:17, 363:18
**Professor** [1] - 301:2
**profiles** [1] - 322:2
**profit** [2] - 280:9, 330:25
**profits** [4] - 279:9, 279:14, 280:7, 280:11
**program** [2] - 359:1, 359:3
**programmer** [1] - 319:23
**programming** [2] - 322:23, 323:4
**Project** [7] - 330:23, 330:24, 334:5, 334:15, 335:25, 346:13, 361:15
**project** [1] - 334:17
**Project's** [1] - 333:24
**prominently** [1] - 355:14
**prompt** [1] - 326:24
**prone** [2] - 301:6, 301:17
**proper** [2] - 257:8, 349:18
**properly** [2] - 233:18, 234:1
**properties** [1] - 391:24
**proposals** [3] - 265:11, 265:15, 265:16
**propose** [4] - 269:23, 370:25, 371:7, 378:16
**proposed** [3] - 371:15, 372:6
**proprietary** [1] - 306:25
**prosecution** [2] - 290:10, 307:19
**prospective** [5] - 380:16, 380:24, 387:16, 390:10, 392:19
**protect** [3] - 310:22, 346:5, 346:6
**protecting** [1] - 321:11
**protocol** [4] - 235:12,

418

326:21, 326:22,
347:15
**prototyping** [1] -
319:13
**prove** [1] - 285:17
**provide** [9] - 277:3,
291:9, 318:20,
322:3, 330:11,
330:19, 348:1,
370:8, 384:19
**provided** [19] -
234:25, 235:1,
235:2, 235:5, 236:9,
236:12, 239:9,
244:25, 245:2,
245:3, 247:12,
276:21, 283:21,
298:25, 308:1,
308:14, 310:16,
352:23, 354:4
**provider** [7] - 325:18,
330:7, 361:17,
362:8, 363:21,
367:15, 368:10
**providers** [3] - 325:19,
326:14, 327:1
**provides** [1] - 335:6
**proxies** [4] - 329:25,
335:1, 338:23,
340:22
**proxy** [29] - 329:22,
329:23, 330:5,
330:11, 331:24,
332:3, 333:2, 333:4,
333:6, 333:10,
336:2, 337:8,
337:17, 338:10,
338:22, 339:2,
339:7, 339:22,
349:1, 349:4, 349:8,
349:19, 350:10,
361:23, 362:5,
362:11, 362:12,
362:13, 364:15
**pseudo** [1] - 310:14
**pseudo-anonymous**
[1] - 310:14
**Public** [3] - 252:9,
252:11, 252:15
**public** [5] - 252:16,
271:9, 271:19,
299:2, 304:15
**publicly** [5] - 270:22,
271:6, 306:12,
306:13, 361:22
**pull** [8] - 230:17,
241:15, 242:6,
255:14, 274:19,
275:11, 320:10,
321:3

**pulled** [4] - 245:6,
271:20, 271:22,
342:19
**pulls** [1] - 236:12
**punitive** [1] - 394:13
**purchases** [1] -
286:16
**purely** [1] - 354:2
**purposes** [9] - 306:15,
309:20, 310:4,
329:3, 342:4,
351:25, 356:21,
357:20, 382:12
**pursuing** [1] - 329:3
**push** [1] - 379:2
**pushing** [1] - 396:11
**put** [13] - 265:12,
268:6, 268:9,
271:25, 316:19,
353:18, 366:2,
371:21, 377:23,
380:21, 388:3,
389:20
**putting** [2] - 282:22,
375:9
**Python** [1] - 323:6

## Q

**Qassam** [4] - 288:10,
289:14, 290:10,
290:12
**qualification** [1] -
265:7
**qualifications** [3] -
265:5, 323:10, 347:4
**qualified** [8] - 287:2,
310:25, 311:1,
312:24, 351:20,
352:2, 355:19, 382:3
**qualifies** [1] - 375:25
**qualify** [2] - 381:20,
381:25
**queried** [1] - 328:5
**queries** [2] - 322:21,
327:18
**query** [2] - 327:4,
327:16
**querying** [1] - 328:5
**questioning** [4] -
307:8, 308:20,
309:16
**questions** [22] -
293:12, 307:4,
307:20, 308:15,
309:7, 309:12,
313:17, 316:8,
344:21, 351:3,
375:2, 380:20,
380:22, 381:1,

381:4, 381:11,
383:18, 384:3,
385:20, 389:24,
390:1, 393:18
**quick** [2] - 296:7,
384:4
**quickly** [5] - 273:25,
310:24, 338:17,
339:23, 389:8
**quite** [9] - 314:23,
336:15, 352:15,
355:17, 370:20,
371:21, 373:24,
374:11, 378:21
**quote** [4] - 233:17,
261:19, 308:16,
310:10
**quote-unquote** [2] -
308:16, 310:10
**quoted** [2] - 233:18,
255:3

## R

**race** [1] - 382:11
**radar** [1] - 314:17
**raise** [4] - 317:14,
381:5, 387:18,
393:21
**raises** [1] - 370:22
**raising** [1] - 395:11
**ran** [2] - 300:6
**RANDOLPH** [1] -
227:8
**random** [1] - 379:17
**randomization** [1] -
304:4
**randomize** [1] -
305:17
**randomized** [1] -
304:8
**randomizing** [1] -
304:2
**randomly** [1] - 325:3
**range** [6] - 295:24,
302:4, 317:1,
320:25, 347:25,
348:4
**ranges** [1] - 331:5
**ranging** [3] - 295:24,
297:3, 297:5
**ransomware** [1] -
270:15
**rapport** [1] - 381:15
**rate** [28] - 256:15,
256:19, 258:12,
258:15, 259:3,
259:7, 259:18,
260:19, 262:13,
266:25, 270:10,

270:11, 296:1,
297:1, 297:7, 297:8,
297:14, 297:16,
297:20, 297:23,
298:3, 298:5, 298:7,
300:1, 300:2, 316:20
**rates** [16] - 261:3,
261:7, 262:20,
295:24, 296:14,
296:17, 296:19,
296:22, 297:3,
297:5, 302:4, 303:8,
303:16, 303:18,
317:1, 317:4
**rather** [4] - 261:13,
267:14, 287:23,
396:11
**rating** [1] - 289:20
**raw** [1] - 305:1
**reach** [3] - 300:15,
378:6, 394:22
**Reactor** [3] - 299:1,
303:6, 306:13
**read** [53] - 242:24,
249:15, 255:6,
256:24, 257:16,
257:17, 257:22,
258:5, 258:9,
258:25, 259:14,
259:16, 259:20,
259:21, 260:16,
260:17, 260:21,
260:24, 262:9,
262:19, 262:22,
263:19, 264:8,
264:13, 264:20,
265:21, 267:21,
268:2, 269:15,
270:4, 270:6, 271:2,
271:10, 274:6,
279:11, 279:16,
286:9, 286:24,
292:14, 292:24,
295:11, 295:15,
298:9, 300:13,
301:13, 303:24,
305:16, 311:5,
312:10, 359:6,
368:11, 371:19,
380:17
**reading** [9] - 249:16,
250:19, 255:2,
266:15, 270:13,
292:3, 299:4,
299:19, 301:12
**reads** [3] - 249:9,
257:1, 286:6
**ready** [2] - 367:4,
374:20
**real** [7] - 237:7, 296:7,

321:13, 322:4,
327:17, 358:4, 384:4
**real-name** [1] - 358:4
**real-time** [1] - 327:17
**real-world** [1] - 321:13
**realistic** [1] - 392:21
**realize** [1] - 384:13
**really** [17] - 233:25,
247:15, 264:7,
264:14, 277:16,
280:5, 297:17,
309:19, 313:22,
373:6, 373:16,
373:23, 374:4,
374:9, 377:2, 377:13
**reason** [6] - 339:4,
346:19, 346:23,
346:24, 355:4, 395:8
**reasonable** [1] -
279:20
**reasoning** [1] - 372:9
**reasons** [7] - 309:3,
310:8, 321:15,
334:14, 340:14,
346:7, 394:5
**rebuttal** [2] - 376:22,
376:23
**recalling** [1] - 256:8
**receive** [1] - 321:18
**received** [5] - 233:14,
240:4, 240:18,
308:5, 322:15
**receives** [1] - 254:25
**Recently** [1] - 291:25
**Recess** [1] - 366:18
**recess** [2] - 293:25,
345:7
**recognize** [1] - 323:14
**recognized** [1] -
354:17
**recollecting** [1] -
284:8
**recollection** [1] -
395:5
**record** [18] - 229:5,
299:18, 310:13,
311:21, 314:7,
326:2, 327:7,
327:14, 327:20,
327:24, 328:1,
329:7, 329:8,
360:16, 360:21,
382:10, 382:12,
383:21
**recorded** [2] - 360:25,
367:21
**records** [38] - 233:25,
236:8, 236:10,
236:11, 236:21,
236:25, 237:1,

419

237:3, 239:8,
239:18, 239:21,
242:3, 242:6,
275:17, 275:21,
275:22, 276:1,
276:2, 276:15,
276:17, 276:18,
276:19, 276:23,
276:25, 277:3,
277:23, 307:5,
307:6, 307:7,
307:11, 307:14,
307:17, 335:12,
336:16, 342:15,
342:17, 343:17,
361:15
**red** [3] - 237:23,
322:20, 354:20
**redirect** [2] - 288:20,
293:22
**REDIRECT** [1] - 294:3
**Redirect** [1] - 228:6
**reduce** [1] - 336:16
**refer** [5] - 247:11,
277:23, 280:23,
302:21, 302:22
**reference** [13] -
250:19, 251:2,
258:1, 258:2,
258:21, 261:21,
266:15, 278:6,
285:22, 301:5,
361:24, 362:8,
376:15
**referenced** [9] -
257:17, 258:23,
259:11, 259:12,
259:13, 260:1,
260:9, 274:23,
328:23
**references** [1] -
262:14
**referencing** [3] -
236:11, 262:16,
273:19
**referring** [16] - 231:6,
233:19, 261:1,
261:5, 283:14,
283:16, 289:8,
291:11, 302:5,
310:6, 310:12,
314:21, 352:21,
352:22, 363:15,
369:21
**refers** [2] - 250:18,
304:24
**regard** [1] - 372:1
**regarding** [7] -
256:12, 275:4,
283:19, 286:4,

306:9, 316:11, 373:7
**regardless** [1] - 385:1
**region** [1] - 325:11
**regional** [1] - 326:17
**Regional** [4] - 325:9,
325:10, 325:13,
326:7
**registered** [5] - 355:9,
357:4, 358:14,
358:19, 358:23
**registering** [1] -
301:21
**registration** [3] -
357:1, 357:10, 358:5
**registries** [1] - 326:17
**Registries** [2] - 325:9,
326:8
**Registry** [2] - 325:10,
325:13
**registry** [2] - 325:23,
357:9
**regular** [3] - 331:16,
332:8, 334:11
**regularly** [1] - 334:7
**rel** [1] - 236:18
**relate** [1] - 253:10
**related** [17] - 248:7,
274:25, 276:18,
285:23, 296:22,
309:7, 309:16,
310:7, 310:21,
313:1, 314:10,
322:12, 322:16,
342:9, 355:1,
355:21, 358:6
**relatedness** [1] -
370:9
**relating** [3] - 296:20,
311:4, 333:19
**relation** [6] - 300:4,
307:10, 308:2,
354:23, 364:2, 376:1
**relatively** [2] - 269:5,
304:4
**relay** [2] - 323:19,
334:18
**relevance** [1] - 287:8
**relevant** [10] - 236:18,
263:24, 282:13,
322:5, 324:21,
338:16, 351:17,
355:7, 355:18,
357:17
**reliable** [3] - 242:23,
245:24, 256:10
**reliably** [1] - 243:1
**reliance** [2] - 316:6,
316:11
**relied** [6] - 292:1,
328:10, 328:23,

334:7, 356:20,
357:23
**relies** [1] - 314:19
**rely** [9] - 245:25,
261:4, 304:15,
304:17, 306:4,
315:1, 315:3,
315:25, 358:2
**relying** [3] - 272:21,
273:1, 315:22
**remain** [1] - 310:10
**remained** [1] - 378:12
**remaining** [1] - 383:8
**remains** [1] - 249:3
**remember** [7] -
241:19, 301:15,
342:23, 354:16,
361:5, 364:4, 381:6
**remind** [1] - 254:4,
385:14
**removed** [1] - 290:3
**rent** [1] - 394:11
**rent-a-state** [1] -
394:11
**repeat** [6] - 254:22,
260:10, 263:9,
267:8, 270:25,
285:14
**repeatedly** [2] - 260:8,
260:9
**report** [140] - 230:6,
230:23, 231:17,
231:19, 232:9,
233:12, 233:16,
233:19, 234:23,
235:3, 235:4,
235:20, 236:13,
237:10, 237:11,
237:18, 239:11,
239:23, 240:1,
240:2, 241:17,
242:7, 242:14,
244:3, 245:5, 249:6,
250:23, 251:3,
251:22, 251:23,
253:21, 255:2,
255:16, 255:25,
256:7, 256:18,
257:12, 257:22,
258:1, 258:3,
258:22, 260:8,
260:9, 260:12,
260:19, 261:16,
261:23, 262:1,
262:10, 263:6,
263:10, 263:19,
264:1, 264:3,
264:14, 264:19,
264:23, 265:19,
266:21, 266:23,

267:23, 268:7,
268:9, 268:13,
269:22, 272:4,
272:17, 275:2,
277:12, 277:18,
278:9, 280:22,
281:4, 283:10,
285:10, 285:15,
285:18, 285:25,
286:4, 286:6,
287:11, 287:12,
287:19, 291:24,
294:13, 294:23,
294:25, 295:1,
295:4, 295:10,
296:15, 296:18,
299:24, 301:1,
301:5, 303:20,
304:25, 306:16,
311:10, 311:15,
311:22, 312:7,
312:11, 312:15,
313:12, 314:6,
314:10, 314:19,
314:24, 314:25,
315:2, 316:5,
316:12, 338:19,
341:16, 341:19,
342:20, 343:14,
343:16, 343:19,
343:24, 347:5,
351:15, 353:17,
356:3, 356:8, 359:1,
359:20, 359:23,
360:6, 364:5,
366:11, 367:7,
367:25, 368:14,
369:20, 370:4
**reporter** [4] - 317:22,
326:4, 389:2, 389:6
**Reporter** [3] - 227:21,
227:22, 397:10
**REPORTER** [2] -
233:3, 397:1
**reporter's** [1] - 389:4
**reports** [9] - 240:21,
257:17, 260:16,
260:17, 284:1,
291:20, 313:25,
374:13, 374:15
**represent** [1] - 258:14
**representation** [5] -
251:9, 251:20,
290:24, 351:16,
369:6
**representations** [1] -
359:20
**representative** [1] -
282:16
**represented** [2] -

272:10, 282:20
**representing** [1] -
297:9
**request** [1] - 381:10
**requirement** [6] -
249:2, 249:17,
266:7, 266:18,
267:16, 267:19
**requirements** [3] -
266:13, 267:1, 268:1
**requires** [1] - 304:4
**requiring** [1] - 306:11
**research** [10] - 242:22,
257:14, 265:18,
296:20, 301:24,
302:16, 316:15,
321:2, 336:1
**researcher** [1] -
264:18
**researchers** [10] -
242:25, 263:17,
264:4, 264:11,
264:24, 268:14,
270:21, 271:5,
271:25, 274:8
**researchers'** [3] -
264:15, 268:17,
273:13
**reserve** [1] - 311:17
**Reserve** [14] - 274:13,
275:23, 276:7,
276:23, 285:1,
285:4, 285:8,
285:12, 285:16,
342:16, 342:21,
344:6, 344:12, 370:7
**reserved** [1] - 325:8
**residential** [7] -
328:17, 336:3,
337:3, 338:11,
338:13, 348:11
**resolution** [1] - 378:14
**resolve** [2] - 375:16,
375:25
**resolved** [4] - 337:12,
337:19, 343:8,
394:20
**resolves** [1] - 327:25
**respect** [14] - 269:25,
315:4, 351:22,
355:20, 358:10,
370:25, 371:11,
372:10, 373:16,
373:21, 374:1,
375:3, 384:14,
388:12
**respective** [1] -
349:20
**respond** [1] - 233:4
**responsibilities** [2] -

320:1, 320:21
**responsibility** [1] -
331:1
**responsible** [2] -
394:24, 395:12
**rest** [1] - 324:15
**restraints** [1] - 395:3
**restriction** [2] - 267:6,
267:9
**restrictions** [1] - 267:4
**result** [2] - 304:12,
343:7
**resulted** [1] - 328:3
**retain** [1] - 392:10
**retained** [1] - 392:13
**return** [7] - 265:23,
345:8, 356:3, 356:6,
356:20, 357:12,
358:2
**returning** [2] - 273:11,
303:19
**returns** [6] - 242:4,
342:16, 353:1,
355:8, 356:11,
356:13
**reveal** [1] - 310:17
**Reverse** [1] - 322:10
**review** [22] - 231:16,
241:5, 242:3, 243:3,
270:23, 271:7,
272:25, 274:12,
275:16, 277:17,
284:10, 284:11,
313:7, 319:15,
320:18, 334:25,
335:11, 341:3,
343:11, 356:10,
371:16, 377:20
**reviewed** [21] -
236:21, 236:25,
237:1, 237:3,
239:21, 240:20,
275:20, 276:15,
276:17, 276:19,
276:24, 278:19,
283:1, 283:4, 284:7,
302:17, 303:13,
352:19, 356:10,
356:13, 366:6
**reviews** [1] - 374:10
**right-hand** [3] - 231:2,
237:20, 299:19
**RIRs** [2] - 326:7,
326:13
**RIRS** [1] - 326:7
**risk** [8] - 289:17,
289:20, 289:21,
289:24, 297:21,
298:1, 390:20
**RMR** [2] - 227:21,

397:9
**Road** [41] - 235:20,
235:24, 236:7,
236:8, 236:14,
236:15, 236:22,
236:23, 236:25,
237:1, 237:2,
237:15, 237:19,
237:22, 237:23,
237:24, 238:6,
238:11, 238:14,
238:16, 238:19,
239:4, 239:10,
239:11, 239:13,
239:16, 239:18,
239:21, 240:25,
241:3, 241:12,
241:14, 241:21,
241:24, 242:1,
242:3, 242:4, 307:6,
307:17
**role** [3] - 318:14,
320:2, 324:16
**Roman** [10] - 229:3,
229:16, 270:16,
318:12, 344:8,
350:25, 351:6,
357:3, 358:6, 358:11
**ROMAN** [1] - 227:5
**room** [1] - 392:18
**Room** [2] - 227:22,
397:10
**Root** [1] - 368:10
**Roso** [1] - 344:6
**rotate** [1] - 338:17
**rotating** [1] - 330:12
**roughly** [1] - 393:24
**rounds** [1] - 384:12
**routed** [3] - 332:2,
332:4, 333:6
**router** [4] - 305:10,
332:16, 347:21,
348:1
**Router** [1] - 330:17
**routinely** [1] - 275:16
**routing** [4] - 324:16,
330:19, 331:13
**rule** [4] - 381:22,
383:5, 383:6, 384:20
**Rule** [4] - 370:19,
381:22, 391:25
**ruled** [1] - 381:6
**rules** [1] - 384:19
**ruling** [1] - 373:11
**rulings** [2] - 371:11,
375:15
**run** [9] - 235:17,
266:25, 281:12,
300:4, 326:24,
346:14, 379:10,

382:2, 390:19
**running** [13] - 235:14,
279:20, 279:24,
281:16, 281:18,
281:23, 281:25,
320:9, 324:23,
331:1, 334:17,
365:25, 377:10
**runs** [1] - 330:22
**Russian** [4] - 376:9,
376:15, 377:5, 394:6

# S

**S.A** [1] - 368:10
**safe** [1] - 322:3
**sails** [1] - 371:25
**sake** [1] - 302:9
**Samourai** [2] - 305:8,
305:9
**samourai's** [1] - 305:8
**SAMS** [2] - 322:7,
322:9
**sanctioned** [4] -
287:9, 287:14,
289:23, 290:3
**sanctions** [3] - 287:8,
287:15, 287:21
**sandbagged** [1] -
394:14
**Sarah** [1] - 296:20
**save** [3] - 254:9,
258:14, 327:14
**saw** [15] - 252:9,
254:16, 283:17,
285:22, 308:22,
328:15, 335:25,
337:16, 361:1,
361:23, 361:24,
362:5, 362:8, 364:4,
364:13
**scenarios** [1] - 332:11
**schedule** [2] - 366:22,
392:7
**scheduled** [1] -
370:18
**scheduling** [2] -
391:21, 393:3
**scheme** [1] - 269:4
**Scholl** [6] - 231:4,
233:17, 240:1,
272:6, 272:7, 372:3
**Scholl's** [11] - 230:6,
230:23, 232:6,
233:19, 237:18,
240:21, 241:17,
250:23, 251:3,
272:4, 272:17
**science** [4] - 319:2,
319:4, 340:8

**scientific** [3] - 303:10,
366:6, 366:8
**scientifically** [2] -
373:4
**scientist** [1] - 318:10,
322:8
**scope** [7] - 309:10,
312:18, 347:9,
351:9, 355:2,
356:18, 373:19
**screen** [1] - 230:18
**screenshot** [3] -
288:24, 288:25,
289:7
**Script** [2] - 252:23,
254:20
**scripting** [1] - 322:21
**scripts** [2] - 269:13,
320:9
**search** [12] - 320:15,
332:25, 354:23,
355:1, 355:8, 356:2,
356:6, 356:10,
356:13, 356:20,
357:12, 358:2
**searchable** [2] -
327:15, 328:8
**searched** [2] - 361:22,
362:4
**searches** [2] - 321:1,
322:22
**searching** [1] - 320:16
**seat** [3] - 375:6, 383:7,
383:12
**seated** [2] - 317:17,
383:10
**seats** [5] - 379:17,
380:6, 383:8,
383:19, 384:8
**second** [12] - 231:13,
246:1, 281:7, 288:3,
292:9, 299:20,
312:8, 321:16,
358:8, 365:4,
368:14, 369:5
**second-to-the-last** [1]
- 368:14
**secondary** [2] -
260:14, 262:16
**seconds** [2] - 365:9,
386:22
**secret** [2] - 379:18,
379:19
**Section** [9] - 295:14,
296:5, 298:15,
299:20, 300:10,
300:24, 301:11,
301:16, 303:21
**section** [9] - 260:3,
268:3, 268:6,

282:22, 288:2,
289:1, 295:17,
300:12, 354:19
**security** [5] - 321:8,
321:15, 321:20,
339:5, 345:17
**Security** [1] - 322:11
**see** [60] - 237:21,
238:24, 239:11,
239:18, 248:11,
248:12, 249:16,
251:8, 252:6,
254:19, 254:23,
255:12, 256:5,
267:21, 268:19,
270:4, 271:17,
271:18, 272:9,
272:11, 281:8,
282:20, 286:13,
287:18, 291:9,
291:15, 296:9,
296:12, 297:2,
297:14, 300:15,
303:22, 308:7,
311:12, 312:23,
332:15, 332:17,
335:8, 337:11,
337:18, 341:3,
345:5, 351:18,
354:18, 354:19,
356:14, 357:13,
358:4, 360:6,
363:11, 363:14,
367:12, 373:2,
374:6, 377:4,
381:16, 391:11,
392:3, 393:10
**seeing** [3] - 273:4,
352:19, 354:16
**Sefranek** [3] - 227:21,
397:9, 397:9
**SEFRANEK** [1] -
397:3
**segregated** [2] -
254:5, 254:7
**SegWit** [12] - 252:22,
253:9, 253:20,
253:25, 254:4,
254:16, 254:20,
254:24, 255:4,
255:8, 255:13, 256:5
**SegWit-enabled** [2] -
254:20, 254:24
**selected** [1] - 341:8
**selection** [2] - 380:9,
383:18
**self** [1] - 297:19
**self-explanatory** [1] -
297:19
**send** [4] - 255:1,

255:2, 329:12, 394:23
**sending** [1] - 290:11
**sends** [2] - 254:21, 254:24
**sense** [7] - 297:10, 298:2, 359:14, 363:17, 372:11, 374:4, 378:25
**sensitive** [1] - 321:25
**sent** [1] - 324:22
**sentence** [10] - 256:24, 298:16, 304:19, 304:22, 312:9, 354:7, 360:9, 365:2, 365:4
**sentences** [2] - 286:11, 301:14
**separate** [2] - 368:20, 368:22
**separately** [1] - 235:4
**separation** [1] - 321:12
**September** [1] - 375:17
**sequences** [1] - 249:10
**series** [1] - 307:4
**server** [32] - 235:7, 324:22, 324:23, 329:23, 330:4, 330:12, 331:9, 333:6, 339:2, 346:1, 348:3, 349:4, 349:8, 349:14, 349:16, 349:18, 349:19, 350:11, 352:21, 352:25, 353:2, 353:10, 354:10, 354:13, 362:5, 362:11, 362:12, 362:13, 363:21, 363:23, 364:15, 367:20
**server's** [1] - 333:10
**servers** [23] - 234:3, 319:17, 322:2, 330:6, 330:11, 330:18, 330:20, 333:3, 334:2, 334:19, 337:8, 337:17, 337:21, 338:10, 339:22, 345:24, 349:2, 353:3, 353:5, 354:10, 361:24, 362:20, 367:24
**Service** [2] - 395:6, 395:12
**service** [26] - 236:3,

238:11, 238:14, 238:20, 270:17, 278:16, 278:23, 279:21, 280:12, 285:23, 290:16, 290:19, 290:23, 290:25, 291:3, 305:14, 305:16, 325:17, 325:19, 326:14, 327:17, 329:25, 330:10, 332:13, 335:13, 338:22
**Service's** [2] - 395:7, 395:14
**Services** [1] - 318:2
**services** [29] - 235:21, 236:2, 242:13, 242:16, 247:2, 248:3, 276:4, 276:12, 276:16, 276:18, 278:5, 278:6, 278:22, 279:3, 279:8, 279:13, 279:18, 279:24, 279:25, 280:6, 280:8, 305:7, 321:18, 327:2, 327:20, 332:12, 337:6, 337:15, 337:19
**serving** [1] - 382:22
**sessions** [1] - 339:6
**set** [27] - 264:18, 264:19, 264:23, 265:7, 268:12, 268:13, 268:18, 270:9, 271:4, 272:15, 281:12, 289:13, 298:25, 316:15, 331:23, 333:4, 336:11, 336:13, 336:14, 336:20, 336:21, 341:2, 341:5, 343:14, 344:19, 360:20, 371:1
**sets** [2] - 264:24, 326:18
**setting** [5] - 319:17, 322:2, 339:11, 340:6, 340:7
**settings** [1] - 339:8
**several** [3] - 290:3, 311:25, 342:19
**sex** [1] - 382:11
**shall** [1] - 299:4
**share** [4] - 349:7, 349:19, 350:6, 350:10

**sheer** [1] - 372:19
**sheet** [3] - 326:3, 382:5, 383:1
**Shormint** [2] - 342:21, 368:18
**shormint@hotmail. com** [6] - 344:13, 354:20, 356:7, 357:13, 358:2, 358:22
**short** [3] - 321:17, 347:15, 396:10
**shortly** [1] - 261:9
**shotgun** [2] - 305:15, 312:19
**show** [9] - 231:3, 240:7, 264:4, 272:6, 272:7, 275:10, 329:8, 333:8, 333:18
**showing** [11] - 230:10, 232:3, 233:14, 234:14, 234:18, 234:21, 237:18, 270:17, 271:25, 291:5
**shown** [3] - 250:23, 250:25, 284:24
**shows** [1] - 238:2
**sic** [4] - 238:4, 239:24, 355:11, 383:7
**side** [13] - 231:2, 237:20, 299:20, 301:11, 371:8, 371:9, 372:25, 383:4, 383:12, 383:13, 384:25, 385:3, 387:22
**sides** [5] - 234:6, 234:9, 372:24, 373:8, 384:17
**sig** [1] - 267:12
**sign** [1] - 321:18
**signal** [2] - 305:4, 346:21
**significance** [1] - 267:14
**significant** [6] - 236:18, 263:23, 267:11, 276:4, 394:3, 395:8
**significantly** [1] - 304:2
**Silk** [41] - 235:20, 235:24, 236:7, 236:8, 236:14, 236:15, 236:22, 236:23, 236:25, 237:1, 237:2, 237:15, 237:19, 237:22, 237:23,

237:24, 238:6, 238:11, 238:14, 238:16, 238:19, 239:4, 239:10, 239:11, 239:13, 239:16, 239:18, 239:21, 240:25, 241:3, 241:12, 241:14, 241:20, 241:24, 242:1, 242:3, 242:4, 307:5, 307:17
**similar** [2] - 330:18, 340:14
**simply** [2] - 314:3, 350:11
**simulated** [1] - 235:11
**single** [12] - 250:3, 250:23, 250:25, 251:7, 251:10, 251:16, 253:17, 265:24, 291:11, 305:2, 305:18, 312:9
**single-entity** [1] - 291:11
**sit** [7] - 298:10, 375:18, 378:10, 392:25, 393:1, 394:8
**site** [1] - 308:17
**sites** [6] - 309:13, 329:24, 332:5, 339:4, 340:20, 349:20
**sits** [1] - 332:13
**sitting** [4] - 340:2, 378:9, 379:4, 392:22
**six** [1] - 341:12
**sizes** [1] - 254:10
**skeptical** [1] - 374:3
**skip** [1] - 287:6
**slip** [1] - 379:20
**slow** [1] - 340:1
**small** [4] - 231:3, 231:15, 272:5, 351:3
**smaller** [9] - 250:18, 254:10, 269:5, 302:23, 303:4, 336:14, 341:2, 341:5
**smart** [1] - 374:5
**software** [1] - 281:16
**softwares** [1] - 305:6
**solutions** [3] - 319:13, 319:14, 319:16
**someone** [13] - 290:9, 306:18, 308:25, 310:19, 324:20, 329:15, 331:15, 331:16, 332:12, 339:7, 380:21, 383:10, 386:8

**sometime** [1] - 371:14
**sometimes** [5] - 280:13, 280:14, 328:3, 335:8, 339:24
**somewhat** [2] - 373:5, 392:22
**somewhere** [4] - 234:23, 235:4, 260:25, 261:3
**soon** [5] - 366:16, 370:24, 371:12, 374:21, 375:1
**sophisticated** [1] - 279:2
**sophistication** [1] - 304:5
**sorry** [23] - 231:14, 231:21, 233:5, 233:17, 240:1, 247:15, 250:19, 251:4, 251:5, 252:25, 260:10, 268:4, 269:15, 271:14, 271:21, 273:7, 283:5, 305:12, 347:18, 352:22, 353:22, 376:5, 376:14
**sort** [23] - 235:10, 246:13, 248:23, 275:4, 275:13, 305:23, 320:12, 320:24, 327:4, 327:7, 327:16, 331:22, 333:12, 335:18, 337:23, 348:3, 359:6, 364:24, 368:23, 378:14, 381:18, 386:1, 392:7
**sorting** [1] - 386:3
**sorts** [1] - 337:11
**sound** [1] - 320:8
**sounds** [3] - 309:21, 389:22, 396:7
**source** [7] - 260:14, 260:16, 262:15, 262:16, 262:19, 262:21, 310:17
**sources** [7] - 286:7, 286:21, 328:14, 354:8, 354:10, 361:2, 361:3
**space** [3] - 325:8, 325:21, 363:9
**Spain** [1] - 306:8
**spanned** [1] - 320:7
**spare** [2] - 378:7, 378:8
**speaking** [3] - 256:23,

278:7, 394:15
**speaks** [1] - 376:8
**special** [2] - 246:24,
271:12, 332:5
**specific** [16] - 256:20,
264:12, 264:15,
265:5, 267:13,
282:2, 284:23,
292:22, 339:3,
344:18, 352:22,
365:20, 366:3,
377:17, 391:24,
393:4
**specifically** [13] -
232:24, 285:25,
305:7, 306:9, 308:8,
308:12, 310:7,
320:5, 328:16,
328:19, 338:2,
344:14, 354:16
**specified** [2] - 360:11,
360:20
**speculating** [1] -
370:5
**speed** [1] - 287:1
**spell** [2] - 317:21,
326:1
**spelled** [3] - 317:24,
355:11, 355:12
**spend** [18] - 239:24,
240:5, 240:8, 240:9,
240:11, 240:12,
240:13, 243:25,
244:16, 244:21,
246:4, 249:1,
249:12, 249:22,
250:8, 250:15,
256:9, 256:13
**spending** [4] - 240:8,
240:9, 249:17,
250:18
**spends** [3] - 240:14,
245:21, 255:12
**spent** [1] - 300:19
**splitting** [1] - 379:2
**spoken** [1] - 306:9
**spoofing** [2] - 348:15,
348:17
**spread** [1] - 359:9
**spreadsheets** [3] -
372:14, 372:15,
389:12
**stack** [1] - 370:19
**stamp** [2] - 328:3
**stand** [5] - 229:23,
255:15, 278:23,
279:6, 387:17
**standard** [4] - 327:6,
328:22, 388:16,
395:7

**standards** [1] - 395:14
**stands** [2] - 254:4,
330:17
**start** [9] - 293:14,
331:18, 345:10,
350:25, 352:12,
390:5, 390:23,
391:6, 391:12
**Start1.PK.**
**Compressed** [1] -
266:3
**Start1.PK.**
**Uncompressed** [1] -
266:3
**started** [6] - 250:20,
263:20, 281:25,
288:16, 351:4, 351:5
**starting** [15] - 229:5,
252:4, 254:15,
270:6, 270:7, 274:6,
295:14, 300:12,
301:12, 325:25,
326:11, 338:13,
380:13, 380:14,
390:22
**starts** [5] - 238:7,
251:24, 252:3,
367:9, 368:3
**state** [3] - 229:4,
368:24, 394:11
**statement** [4] -
271:13, 370:1,
388:6, 388:7
**statements** [1] -
381:13
**States** [10] - 227:22,
229:3, 229:7,
229:10, 229:13,
289:8, 346:17,
346:19, 346:20,
346:25
**STATES** [3] - 227:1,
227:2, 227:8
**states** [1] - 363:3
**static** [4] - 347:19,
347:23, 348:8,
348:12
**statistical** [6] - 303:7,
363:12, 363:16,
364:7, 369:13,
369:25
**statistically** [1] -
369:17
**statistics** [1] - 374:6
**stay** [1] - 339:6
**stenographic** [1] -
397:5
**step** [3] - 272:15,
318:25
**steps** [4] - 278:12,

290:3, 336:10,
370:16
**Sterlingov** [24] -
229:3, 229:16,
270:16, 274:23,
300:5, 314:25,
315:5, 315:25,
318:12, 344:8,
350:25, 351:5,
351:6, 355:6, 355:9,
355:15, 357:3,
357:5, 357:14,
358:6, 358:11,
376:8, 394:8, 395:1
**STERLINGOV** [1] -
227:5
**Sterlingov's** [8] -
230:10, 270:24,
271:7, 286:16,
300:7, 358:15,
358:19, 358:23
**STILL** [3] - 228:3,
230:2, 294:4
**Still** [1] - 372:3
**still** [47] - 230:4,
242:10, 245:24,
250:22, 252:25,
261:16, 261:21,
263:6, 274:12,
286:3, 287:13,
294:6, 294:9,
295:10, 298:6,
299:18, 299:23,
307:4, 310:3,
311:21, 312:6,
313:5, 315:17,
316:7, 316:10,
318:14, 324:24,
329:11, 335:2,
335:8, 337:1,
340:24, 346:25,
352:7, 355:17,
367:7, 375:13,
378:23, 380:5,
384:16, 386:1,
386:3, 390:18,
391:8, 395:5, 396:9
**still's** [1] - 372:5
**stipulate** [1] - 377:19
**stipulations** [1] -
375:14
**stone** [2] - 371:21,
373:10
**stop** [1] - 364:19
**stops** [1] - 276:10
**storing** [1] - 328:1
**strategic** [1] - 384:14
**streamline** [1] - 377:4
**Street** [2] - 227:11,
227:19

**strike** [10] - 382:5,
382:17, 383:7,
383:9, 383:11,
383:14, 384:6,
384:11, 385:4, 385:6
**strikes** [13] - 381:21,
381:23, 382:9,
382:17, 382:20,
382:21, 383:3,
384:7, 384:10,
384:12, 384:17,
384:25
**striking** [1] - 382:11
**strings** [1] - 320:16
**studies** [6] - 258:1,
258:3, 262:6, 311:5,
311:6, 315:18
**study** [9] - 262:7,
262:10, 264:3,
270:21, 271:4,
271:11, 273:20,
316:19, 366:9
**stuff** [2] - 376:2, 394:7
**sub** [2] - 298:24
**suballocate** [1] -
326:14
**subcategories** [2] -
257:1, 257:4
**subdomain** [1] - 328:2
**subject** [2] - 335:5,
351:9
**submitting** [1] -
291:19
**subpoena** [2] -
329:12, 332:25
**subpoenas** [1] -
320:15
**subscription** [1] -
330:3
**subsequent** [4] -
256:4, 263:7,
263:11, 272:7
**subsequently** [2] -
232:16, 259:13
**subset** [1] - 338:5
**substantial** [1] - 395:3
**substantive** [1] -
286:15
**successful** [3] -
301:13, 301:15,
390:4
**such-and-such** [1] -
381:16
**suggesting** [3] -
286:19, 290:9,
376:23
**suggestion** [1] - 287:9
**sum** [1] - 371:9
**summarize** [5] -
318:25, 323:19,

325:24, 326:11,
341:22
**summarized** [1] -
323:11
**summarizing** [1] -
341:16
**summary** [3] - 275:13,
354:6, 354:7
**superseding** [2] -
286:6, 286:20
**supplemental** [1] -
314:9
**support** [4] - 318:21,
320:3, 320:22,
320:24
**supported** [1] -
373:23
**supporting** [3] -
321:22, 366:7,
366:10
**suppose** [2] - 279:4,
306:11
**supposed** [1] - 310:5
**surprises** [1] - 246:17
**surprising** [1] -
269:12
**suspect** [1] - 351:7
**suspicion** [1] - 282:10
**switch** [2] - 386:21,
386:22
**switching** [1] - 386:24
**sworn** [3] - 256:8,
291:19, 317:16
**sympathetic** [2] -
378:1, 395:22
**system** [1] - 386:22

## T

**Tab** [2] - 280:22, 295:2
**Table** [1] - 302:5
**table** [10] - 253:13,
296:9, 299:23,
308:14, 342:11,
365:15, 385:25,
386:4, 386:8, 386:12
**tack** [1] - 396:11
**tags** [2] - 298:25,
299:1
**talks** [1] - 302:22
**Tamara** [3] - 227:21,
397:9, 397:9
**TAMARA** [1] - 397:3
**target** [1] - 340:17
**Task** [1] - 318:18
**taught** [1] - 290:15
**teach** [2] - 290:17,
290:21
**team** [3] - 290:10,
320:11, 321:3

**teaming** [1] - 322:20
**technical** [2] - 287:22, 327:9
**techniques** [1] - 305:9
**technological** [1] - 304:5
**technologies** [2] - 320:4, 321:2
**technology** [2] - 386:17, 386:19
**Telecom** [3] - 361:17, 362:1, 362:3
**telephones** [1] - 381:2
**temporary** [3] - 345:24, 346:1
**ten** [20] - 309:24, 338:10, 338:24, 338:25, 339:11, 339:12, 339:16, 362:16, 363:5, 363:11, 363:13, 364:12, 364:17, 365:1, 365:6, 365:7, 365:12, 365:13, 365:15, 371:8
**ten-minute** [3] - 339:11, 339:12, 339:16
**tend** [4] - 269:10, 279:19, 338:15, 339:5
**tends** [1] - 339:23
**term** [7] - 232:19, 304:25, 321:8, 326:3, 353:11, 363:8, 363:13
**termed** [2] - 253:8, 310:22
**terminal** [1] - 326:24
**terms** [8] - 269:11, 276:20, 298:23, 299:14, 312:15, 350:14, 353:9, 376:16
**terribly** [2] - 229:21, 372:12
**terrorism** [3] - 289:23, 290:4, 374:23
**terrorist** [1] - 288:10
**Teslas** [1] - 287:3
**test** [1] - 235:14
**testified** [24] - 232:11, 235:7, 238:10, 240:20, 245:11, 245:23, 246:3, 248:1, 256:13, 284:14, 289:16, 303:17, 345:16, 347:13, 349:1, 349:22, 349:25,

350:17, 350:18, 357:16, 362:22, 362:25, 372:16, 376:11
**testify** [12] - 245:16, 287:2, 290:8, 303:16, 311:1, 311:17, 315:18, 316:11, 347:4, 350:13, 351:19, 355:19
**testifying** [6] - 260:21, 284:20, 311:21, 346:10, 362:1, 362:4
**testimony** [44] - 242:8, 242:10, 246:2, 246:12, 246:17, 247:17, 247:18, 248:22, 256:12, 262:9, 287:4, 288:9, 291:25, 302:22, 303:13, 303:17, 305:22, 306:10, 311:5, 312:2, 316:14, 324:6, 351:20, 351:23, 352:2, 354:9, 355:18, 357:11, 362:18, 363:20, 370:20, 372:1, 372:5, 372:7, 373:3, 373:13, 373:18, 373:19, 373:23, 374:1, 374:12, 374:13, 376:23
**testing** [5] - 235:7, 235:8, 319:15, 322:20, 347:6
**testnet** [2] - 235:8, 235:17
**tests** [1] - 235:17
**texts** [1] - 321:18
**Thai** [1] - 361:17
**THE** [197] - 227:1, 227:1, 227:8, 229:2, 229:8, 229:11, 229:14, 229:17, 233:3, 233:5, 234:6, 234:12, 246:1, 246:7, 246:11, 246:18, 246:19, 246:23, 247:4, 247:11, 247:14, 247:15, 247:18, 247:20, 247:24, 252:13, 252:15, 252:17, 254:4, 254:7, 254:12, 254:13, 260:25, 261:5, 261:6,

261:11, 261:13, 262:25, 263:2, 268:4, 273:6, 273:7, 273:8, 274:4, 279:23, 280:2, 281:5, 287:1, 287:10, 287:15, 287:18, 288:1, 288:6, 288:14, 288:19, 292:5, 292:7, 293:5, 293:7, 293:11, 293:13, 293:19, 294:1, 295:3, 295:8, 297:11, 297:18, 297:21, 297:23, 297:25, 298:6, 298:8, 298:12, 298:13, 299:5, 299:9, 299:10, 299:16, 299:17, 306:18, 307:1, 307:18, 307:23, 309:18, 310:1, 310:24, 311:9, 311:23, 312:4, 312:23, 313:3, 313:18, 314:12, 314:14, 314:15, 315:16, 316:17, 316:22, 317:7, 317:14, 317:17, 323:23, 323:25, 326:1, 326:5, 326:9, 342:2, 342:4, 344:22, 345:8, 345:10, 345:12, 347:3, 347:8, 347:11, 350:20, 351:17, 351:25, 355:17, 356:2, 356:19, 357:19, 358:7, 360:1, 360:3, 360:14, 362:24, 364:10, 364:18, 364:22, 364:23, 365:2, 365:7, 365:16, 365:24, 366:2, 366:13, 366:15, 366:25, 370:11, 370:13, 370:14, 370:15, 370:18, 375:20, 376:3, 376:6, 376:10, 376:16, 376:21, 377:3, 377:15, 378:1, 378:15, 378:20, 379:3, 379:8, 379:25, 380:2, 380:4, 380:13,

380:15, 381:9, 383:23, 384:1, 384:5, 384:11, 384:18, 384:24, 385:7, 385:13, 385:19, 385:21, 386:5, 386:11, 386:16, 388:18, 388:21, 388:22, 389:9, 389:16, 389:20, 389:24, 390:4, 390:23, 391:11, 391:15, 392:3, 392:15, 393:10, 393:15, 393:18, 394:17, 395:19, 396:7, 396:13, 396:17
**themselves** [2] - 310:22, 379:4
**theoretically** [1] - 349:17
**therefore** [6] - 244:8, 281:22, 286:7, 310:14, 330:13, 336:18
**they've** [1] - 266:15
**thinking** [2] - 308:7, 311:13
**third** [3] - 259:11, 300:11, 337:7
**thousands** [4] - 250:1, 313:7, 349:10, 349:12
**three** [12] - 265:4, 265:6, 265:8, 311:23, 312:11, 313:21, 313:25, 315:18, 332:4, 368:19, 379:2, 379:10
**throughout** [1] - 250:22
**Thursday** [1] - 380:14
**tie** [1] - 355:15
**tied** [7] - 240:18, 288:9, 289:14, 290:4, 335:12, 344:13, 355:21
**timing** [1] - 309:19
**today** [14] - 229:20, 229:22, 247:18, 284:20, 293:14, 311:13, 311:18, 314:17, 324:7, 345:16, 357:20, 371:3, 372:4, 375:3
**together** [11] - 244:8, 244:19, 250:14, 251:1, 251:16,

271:25, 272:19, 282:22, 330:18, 344:4, 359:9
**took** [1] - 278:11
**tool** [16] - 246:4, 246:21, 275:11, 277:8, 277:16, 277:23, 282:23, 299:1, 306:13, 319:22, 338:17, 339:5, 359:6, 359:13, 359:14, 359:16
**tools** [12] - 305:24, 306:12, 320:9, 320:18, 326:23, 328:19, 328:22, 329:19, 331:23, 331:25, 335:7, 337:14
**top** [13] - 237:21, 286:11, 295:11, 295:13, 296:9, 299:24, 354:18, 355:4, 367:9, 368:17, 369:2
**topics** [3] - 287:4, 322:16, 322:18
**tops** [1] - 309:25
**Tor** [59] - 227:19, 330:14, 330:16, 330:17, 330:22, 330:23, 330:24, 331:2, 331:4, 331:10, 331:15, 331:16, 331:17, 331:19, 331:20, 331:22, 331:24, 332:2, 332:3, 332:6, 332:8, 333:12, 333:15, 333:16, 333:20, 333:23, 333:24, 334:3, 334:5, 334:10, 334:11, 334:12, 334:14, 334:22, 334:23, 335:1, 335:25, 337:5, 338:6, 340:11, 340:13, 340:18, 340:20, 340:25, 345:24, 346:10, 346:12, 346:13, 346:16, 346:19, 346:25, 347:6, 361:12, 361:14, 367:13
**TOR** [1] - 227:18
**tor** [1] - 229:15
**Torsocks** [2] - 331:25

424

**total** [2] - 232:2, 269:1
**totally** [1] - 316:20
**touches** [1] - 281:21
**touchpoint** [1] - 282:19
**touchpoints** [1] - 282:16
**toward** [2] - 269:19, 378:13
**Trabelsi** [1] - 378:18
**trace** [23] - 234:16, 243:7, 248:10, 250:3, 250:10, 251:13, 255:14, 271:25, 272:1, 272:10, 272:11, 272:14, 274:8, 278:7, 290:16, 290:22, 291:3, 295:21, 297:9, 298:1, 300:4, 300:5, 301:3
**traced** [3] - 272:9, 277:7, 301:2
**traces** [7] - 277:8, 277:9, 277:14, 277:20, 277:23, 278:4, 306:11
**tracing** [27] - 230:9, 235:20, 236:24, 243:5, 248:11, 249:25, 256:4, 269:24, 272:7, 272:14, 272:23, 273:2, 274:12, 274:21, 274:25, 275:5, 275:9, 290:15, 291:9, 291:11, 295:19, 295:21, 301:6, 311:4, 358:13, 372:15, 372:19
**tracings** [1] - 250:6
**track** [3] - 270:15, 326:17, 387:6
**tracking** [3] - 346:5, 372:23, 391:23
**traditionally** [1] - 249:18
**traffic** [18] - 322:21, 324:21, 330:19, 331:13, 331:20, 332:2, 333:5, 333:16, 334:18, 338:17, 339:14, 346:21, 348:19, 353:5, 362:13, 363:23, 367:20, 367:23
**train** [2] - 306:2, 306:3

**trained** [2] - 290:18, 323:7
**training** [1] - 322:8
**trainings** [3] - 322:5, 322:15, 322:18
**transact** [1] - 242:16
**transaction** [38] - 230:24, 237:19, 244:3, 244:11, 247:1, 252:4, 253:24, 254:15, 254:23, 255:4, 255:9, 255:11, 255:12, 255:18, 255:20, 255:22, 256:5, 265:3, 265:23, 266:6, 266:8, 266:19, 267:20, 283:15, 291:16, 295:20, 298:18, 298:19, 300:8, 300:18, 300:25, 304:23, 304:24, 305:1, 305:2, 310:14, 353:25
**Transaction** [1] - 231:6
**transaction's** [1] - 298:18
**transactional** [1] - 310:7
**transactions** [38] - 233:14, 234:15, 234:18, 243:22, 249:10, 250:18, 251:13, 254:9, 254:11, 266:5, 266:6, 266:12, 269:3, 269:14, 270:18, 272:13, 278:22, 281:20, 291:16, 296:3, 298:23, 299:8, 299:10, 299:14, 300:19, 301:18, 301:22, 304:3, 304:11, 304:13, 305:19, 305:23, 308:13, 308:23, 310:13, 310:18, 313:8, 372:15
**transcript** [2] - 397:4, 397:6
**TRANSCRIPT** [1] - 227:7
**transfer** [6] - 230:10, 237:11, 240:10, 240:14, 270:23, 271:7

**transferring** [1] - 393:23
**transfers** [3] - 234:21, 283:13, 290:3
**translate** [1] - 377:11
**translated** [3] - 324:19, 376:4, 376:7
**translations** [8] - 375:14, 376:2, 376:19, 376:22, 376:23, 376:25, 377:18, 394:6
**translator** [4] - 376:14, 377:5, 377:7, 377:25
**translators** [2] - 377:23, 377:24
**treat** [1] - 306:6
**treated** [2] - 298:25, 353:15
**trial** [34] - 311:24, 313:21, 314:1, 314:24, 318:23, 336:23, 351:18, 351:22, 371:4, 371:5, 371:12, 373:12, 374:23, 375:3, 375:4, 375:5, 375:11, 376:14, 378:3, 378:5, 378:7, 378:23, 379:1, 379:10, 387:3, 387:5, 388:3, 389:8, 390:22, 391:15, 392:1, 392:20, 393:19, 394:25
**trials** [1] - 390:6
**trick** [1] - 390:14
**trickier** [1] - 391:17
**tried** [1] - 355:15
**trimming** [1] - 371:25
**true** [30] - 232:25, 236:4, 242:12, 242:15, 242:18, 245:13, 254:19, 259:5, 268:20, 273:12, 276:1, 276:2, 276:18, 279:4, 279:5, 289:23, 290:2, 302:25, 303:1, 307:7, 307:11, 307:13, 307:17, 308:10, 329:8, 330:14, 357:4, 394:17, 397:4, 397:5
**truly** [1] - 313:22
**trust** [1] - 269:15
**truth** [2] - 270:9, 298:25
**try** [10] - 278:23,

279:9, 279:13, 280:6, 280:19, 321:3, 345:22, 357:20, 366:23, 381:15
**trying** [16] - 236:9, 246:11, 251:14, 278:16, 280:5, 280:18, 312:18, 314:5, 321:19, 332:22, 333:21, 355:5, 355:23, 378:13, 386:1, 387:13
**Tuesday** [4] - 393:6, 393:9, 396:9, 396:11
**turn** [14] - 230:8, 233:11, 234:2, 242:7, 251:3, 251:4, 253:12, 253:20, 262:1, 265:20, 294:12, 294:21, 312:7, 352:10
**turned** [1] - 389:17
**turning** [26] - 231:2, 239:23, 244:10, 256:7, 257:19, 258:7, 258:18, 259:9, 261:16, 264:1, 266:21, 271:1, 286:3, 288:23, 290:8, 291:23, 295:10, 296:4, 298:15, 299:23, 342:8, 358:25, 359:23, 360:6, 363:19, 368:15
**tutorial** [1] - 386:16
**tweaked** [1] - 388:8
**Twitter** [1] - 344:8
**two** [46] - 245:1, 245:2, 245:9, 256:1, 265:3, 265:4, 265:6, 265:7, 266:5, 267:18, 270:18, 276:7, 279:1, 286:11, 292:2, 295:12, 300:18, 309:7, 312:25, 313:7, 314:9, 322:7, 322:9, 323:14, 363:9, 365:5, 368:20, 368:22, 371:17, 375:8, 375:16, 375:23, 375:24, 378:22, 379:17, 379:21, 382:1, 382:6, 382:7, 382:8, 383:4,

384:25, 385:1, 385:3, 385:5
**two-year** [1] - 292:2
**tx)** [1] - 298:24
**TX2** [1] - 300:18
**tying** [1] - 357:13
**type** [17] - 253:10, 253:18, 266:2, 266:9, 266:11, 266:12, 266:18, 267:6, 286:25, 287:23, 304:24, 305:16, 320:19, 331:24, 332:1, 337:9, 364:15
**types** [19] - 252:2, 252:7, 252:10, 253:2, 253:4, 253:5, 253:8, 253:14, 253:16, 267:2, 276:25, 283:8, 310:15, 321:5, 334:19, 335:22, 336:25, 337:2, 346:5
**typically** [14] - 286:24, 320:14, 321:6, 324:18, 325:8, 325:17, 325:21, 326:21, 327:8, 328:1, 330:3, 331:16, 331:23, 382:6

## U

**U.S** [6] - 227:13, 318:2, 363:21, 393:21, 394:3, 394:16
**u.S** [1] - 227:16
**U0845692** [1] - 344:13
**U7489869** [1] - 344:6
**unable** [6] - 270:19, 300:20, 300:24, 377:3, 394:1, 394:5
**unclear** [3] - 277:25, 281:24, 368:17
**under** [16] - 237:22, 256:24, 270:20, 271:11, 273:20, 292:9, 299:20, 301:11, 344:7, 352:2, 357:3, 376:11, 379:13, 381:21, 391:25, 392:9
**undercover** [2] - 320:3, 321:22
**underlying** [1] - 355:25

425

**understood** [10] - 306:21, 314:11, 352:3, 357:25, 358:3, 358:15, 360:11, 386:7, 386:15, 395:15
**unfamiliar** [1] - 321:2
**unfortunately** [2] - 366:22, 393:10
**unique** [2] - 350:14, 350:22
**UNITED** [3] - 227:1, 227:2, 227:8
**United** [10] - 227:22, 229:3, 229:7, 229:10, 229:12, 289:8, 346:17, 346:19, 346:20, 346:25
**universal** [1] - 360:17
**universe** [1] - 382:19
**University** [1] - 319:3
**unless** [3] - 287:16, 337:16, 396:1
**unquote** [2] - 308:16, 310:10
**unsound** [1] - 373:4
**unusual** [1] - 389:2
**up** [62] - 230:17, 230:18, 241:15, 242:6, 246:1, 248:1, 255:14, 270:6, 274:19, 275:11, 275:13, 280:2, 281:12, 288:19, 294:7, 294:9, 296:7, 305:15, 306:22, 309:24, 311:8, 311:9, 312:9, 312:25, 319:17, 321:18, 322:2, 324:20, 326:20, 329:4, 329:13, 333:4, 333:8, 333:18, 334:12, 336:19, 342:13, 351:22, 354:18, 358:8, 365:19, 366:22, 366:23, 367:9, 371:9, 377:7, 378:3, 378:21, 378:22, 379:12, 381:1, 381:4, 381:11, 383:1, 383:10, 384:2, 386:24, 388:7, 388:9, 392:16, 395:7, 395:13
**updated** [2] - 394:15, 396:6

**upset** [1] - 381:18
**usage** [1] - 309:13
**USAO** [1] - 227:11
**USAO-DOJ** [1] - 227:11
**useful** [3] - 246:4, 246:14, 329:5
**usefulness** [1] - 246:21
**user** [31] - 232:16, 232:21, 235:22, 235:24, 236:3, 236:10, 237:4, 237:21, 238:19, 239:16, 258:7, 279:10, 279:14, 280:20, 308:18, 308:23, 308:24, 320:16, 327:3, 329:9, 329:24, 344:3, 344:5, 344:11, 346:25, 357:9, 369:10, 369:21, 370:4, 370:5, 370:8
**user's** [2] - 332:2, 349:4
**user-friendly** [1] - 327:3
**users** [8] - 236:10, 236:22, 236:25, 237:1, 282:23, 326:15, 330:11, 334:14
**uses** [4] - 244:21, 246:15, 256:13, 324:15
**UTC** [7] - 360:11, 360:13, 360:14, 360:16, 360:17, 361:4, 361:7
**utilized** [1] - 310:16

---

**V**

---

**V-a-l-e-r-i-e** [1] - 317:23
**vacancy** [1] - 383:13
**VALERIE** [3] - 228:8, 317:19, 345:14
**Valerie** [1] - 317:23
**validate** [1] - 269:24
**validating** [1] - 294:18
**valuable** [1] - 329:1
**value** [11] - 256:14, 266:4, 266:8, 266:19, 267:4, 267:7, 267:9, 267:11, 267:13, 267:17, 334:24

**varied** [1] - 304:10
**variety** [1] - 340:15
**various** [3] - 264:5, 295:24, 335:21
**vehicle** [2] - 312:20, 387:14
**venue** [1] - 370:23
**verified** [1] - 292:1
**verify** [2] - 300:5, 383:2
**verifying** [1] - 233:22
**Verret** [2] - 312:1, 373:21
**versa** [1] - 388:19
**version** [1] - 272:1
**versions** [1] - 264:5
**versus** [4] - 252:21, 299:11, 328:17, 337:21
**via** [3] - 262:18, 310:18, 320:15
**vice** [1] - 388:19
**victim** [1] - 320:25
**video** [2] - 230:17, 394:9
**view** [6] - 279:25, 297:5, 373:14, 373:22, 375:20, 379:5
**views** [2] - 371:3, 372:14
**violated** [1] - 292:2
**violates** [2] - 395:21
**virtual** [4] - 330:10, 337:21, 343:10, 349:23
**virtually** [1] - 371:1
**Virwox** [1] - 240:18
**visit** [3] - 329:24, 333:15, 339:25
**visiting** [2] - 332:1, 349:20
**visual** [1] - 359:19
**vitae** [1] - 323:11
**voir** [10] - 371:16, 374:19, 379:19, 380:18, 381:7, 381:13, 381:14, 384:7, 388:4, 390:10
**Volfprius** [3] - 274:16, 342:18, 344:5
**volume** [6] - 362:13, 363:23, 367:20, 367:23, 372:19, 394:7
**voluminous** [1] - 389:13
**volunteers** [1] - 331:5
**VPN** [16] - 286:1, 330:9, 336:2, 337:6,

337:19, 339:19, 339:22, 346:4, 349:23, 349:25, 350:3, 350:7, 350:10, 364:15, 367:18, 368:5
**VPNs** [3] - 330:18, 339:22, 345:24
**VPS** [2] - 367:18, 368:10
**vs** [1] - 227:4

---

**W**

---

**wait** [1] - 233:3
**waiting** [1] - 375:13
**walk** [2] - 326:11, 332:11
**walking** [1] - 325:24
**Wall** [1] - 227:19
**Wallet** [6] - 248:11, 248:13, 248:16, 248:20, 305:8, 310:17
**wallet** [4] - 249:14, 281:14, 281:16, 305:6
**wants** [1] - 393:8
**warrant** [11] - 333:1, 354:23, 355:1, 355:8, 356:2, 356:6, 356:10, 356:13, 356:20, 357:12, 358:2
**warrants** [1] - 320:15
**Wasabi** [10] - 243:18, 243:22, 245:11, 245:18, 248:2, 248:7, 248:11, 248:13, 248:16, 248:20
**Wasabi-related** [1] - 248:7
**Washington** [7] - 227:5, 227:12, 227:14, 227:17, 227:23, 318:18, 397:11
**watch** [1] - 293:20
**ways** [6] - 305:22, 334:16, 348:22, 349:4, 350:9, 377:11
**web** [4] - 279:21, 320:14, 332:19, 332:20
**website** [4] - 309:1, 324:23, 332:1, 339:25
**website-visiting** [1] - 332:1

**websites** [5] - 299:2, 322:2, 327:3, 331:16, 332:8
**week** [11] - 339:8, 370:18, 371:14, 374:19, 374:23, 375:19, 379:10, 392:25, 393:1, 393:2
**weeks** [7] - 311:23, 313:7, 313:21, 313:25, 375:4, 375:16, 375:24, 390:12, 391:7, 391:16, 394:20
**welcome** [3] - 268:16, 357:22, 379:15
**whereas** [1] - 270:18
**white** [2] - 366:10, 380:18
**White** [1] - 356:15
**WhoIs** [11] - 326:21, 326:22, 326:24, 327:4, 327:7, 327:11, 327:12, 327:16, 328:9, 329:7, 337:24
**whole** [3] - 339:14, 346:15, 365:1
**wholeheartedly** [1] - 355:3
**Wi** [1] - 350:11
**Wi-Fi** [1] - 350:11
**wide** [3] - 295:24, 302:4, 317:1
**widely** [1] - 236:17
**wider** [1] - 338:16
**willing** [2] - 313:14, 376:25
**window** [12] - 338:16, 338:22, 339:11, 339:12, 339:17, 339:19, 340:11, 341:5, 363:5, 363:8, 364:11, 365:3
**windows** [3] - 340:6, 340:7, 344:18
**wire** [7] - 286:4, 286:7, 286:15, 286:20, 286:25, 287:3, 321:6
**wireless** [1] - 381:2
**wish** [1] - 395:23
**withdraw** [2] - 238:19, 280:11
**withdrawal** [19] - 236:4, 237:14, 238:6, 238:10, 238:16, 238:21, 238:24, 239:3, 239:10, 239:11, 239:13, 239:16,

426

239:19, 280:14, 280:15, 280:19, 280:20, 295:18, 300:14

**withdrawals** [13] - 238:20, 278:23, 279:5, 279:9, 279:10, 279:13, 279:14, 280:1, 280:6, 308:17, 308:18, 308:23, 308:25

**withdrawn** [3] - 234:11, 270:15, 348:25

**withdraws** [1] - 236:4

**witness** [39] - 229:23, 234:7, 246:3, 253:9, 254:5, 254:7, 287:2, 287:20, 291:25, 293:13, 293:23, 295:6, 310:25, 314:8, 314:12, 314:15, 314:19, 315:22, 315:24, 317:11, 317:16, 345:8, 350:17, 357:16, 358:9, 362:21, 366:21, 370:10, 371:7, 372:23, 386:9, 386:13, 387:16, 387:17, 391:2, 393:4

**WITNESS** [27] - 228:2, 233:5, 246:7, 246:18, 246:23, 247:11, 247:15, 247:20, 252:15, 254:7, 254:13, 261:5, 273:7, 280:2, 297:21, 297:25, 298:8, 298:13, 299:9, 299:16, 314:14, 345:12, 364:18, 364:23, 365:7, 366:2, 370:14

**witness's** [4] - 246:2, 314:19, 347:4, 357:21

**witnesses** [11] - 370:21, 371:20, 372:2, 372:8, 372:10, 373:16, 375:25, 385:24, 387:12, 387:22, 388:2

**wonderful** [1] - 386:19

**wondering** [1] - 393:22

**word** [5] - 251:8,

299:9, 363:7, 363:15, 373:4

**worded** [1] - 337:20

**words** [5] - 321:10, 329:22, 351:12, 377:12

**world** [3] - 321:13, 330:8, 379:9

**worry** [2] - 387:23, 390:6

**worth** [1] - 310:20

**worthy** [1] - 371:22

**wrap** [4] - 309:24, 312:25, 366:22, 366:23

**wrapped** [2] - 253:8

**wrench** [1] - 310:23

**writ** [1] - 245:10

**write** [6] - 275:13, 291:24, 320:18, 380:19, 380:23, 385:7

**writes** [1] - 287:13

**writing** [2] - 363:24, 364:2

**written** [3] - 265:10, 322:25, 367:12

**wrote** [5] - 233:16, 236:13, 264:24, 267:23, 269:20

## Y

**year** [3] - 292:2, 318:5, 343:8

**years** [2] - 301:19, 395:24

**yes/no** [1] - 334:24

**yesterday** [19] - 230:9, 230:20, 232:11, 235:7, 240:20, 242:9, 245:23, 246:23, 247:12, 248:22, 252:1, 256:8, 256:12, 288:9, 289:16, 290:9, 291:5, 311:13

**York** [2] - 227:17, 227:20

**you-all** [4] - 374:22, 375:2, 381:21, 385:21

**yourself** [2] - 274:6, 316:7

**yourselves** [1] - 377:4

## Z

**zone** [2] - 360:17, 360:24

**zones** [2] - 360:10, 360:20