```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
       UNITED STATES OF AMERICA,      ) Criminal Action
 3                                    ) No. 1:21-CR-0399
                      Plaintiff,      )
 4                                    ) PRETRIAL CONFERENCE
       vs.                            )
 5                                    ) Washington, D.C.
       ROMAN STERLINGOV,              ) September 7, 2023
 6                                    ) Time:  10:10 A.M.
                      Defendant.      )
 7
                 TRANSCRIPT OF PRETRIAL CONFERENCE
 8          BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                   UNITED STATES DISTRICT JUDGE
 9
                       A P P E A R A N C E S
10
       For the Plaintiff:      CHRISTOPHER BROWN
11                             USAO-DOJ
                               601 D Street, NW
12                             Washington, DC 20001

13                             ALDEN PELKER
                               U.S. Department of Justice
14                             950 Pennsylvania Avenue, NW
                               Washington, DC 20530
15
                               JEFFREY PEARLMAN
16                             DOJ-CRM
                               U.S. Department of Justice
17                             1301 New York Ave. NW
                               Washington, DC 20005
18
       For the Defendant:      TOR EKELAND
19                             MICHAEL HASSARD
                               Tor Ekeland Law, PLLC
20                             30 Wall Street, 8th Floor
                               New York, NY 10005
21

22     Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
                               Official Court Reporter
23                             United States Courthouse, Room 6714
                               333 Constitution Avenue, NW
24                             Washington, DC  20001
                               202-354-3246
25
```

```
 1                    P R O C E E D I N G S

 2            THE COURTROOM DEPUTY:  Criminal Case No. 21-399,

 3     United States of America v. Roman Sterlingov.

 4            Would counsel state their name for the record,

 5     starting with government counsel.

 6            MS. PELKER:  Good morning, Your Honor.  Alden Pelker

 7     for the United States.

 8            THE COURT:  Good morning.

 9            MR. BROWN:  Good morning.  AUSA Christopher Brown for

10     the government.

11            THE COURT:  Good morning.

12            MR. PEARLMAN:  Jeff Pearlman for the United States.

13     Good morning, Your Honor.

14            THE COURT:  Good morning.

15            MR. EKELAND:  Good morning, Your Honor, Tor Ekeland

16     for Defendant Roman Sterlingov, who is present in court.

17            THE COURT:  Good morning.

18            MR. HASSARD:  Good morning, Your Honor.  Michael

19     Hassard for Defendant Roman Sterlingov, who is present in

20     court.

21            THE COURT:  Good morning to you as well.

22            All right.  So we're here for a pretrial conference,

23     as well as an opportunity for final argument on the various

24     Daubert motions that are pending and anything else that we need

25     to address pretrial.
```

1          I have gotten to you the draft voir dire.  I did not

2     provide you with copies of the proposed preliminary jury

3     instructions because I was waiting to get the defense's

4     memorandum relating to the applicability or inapplicability of

5     the D.C. licensing statute and the relevant rules under the

6     Treasury Department regulations with respect to licensing,

7     which just came in last night.  And I've looked at that

8     quickly, but I need to look at that a little bit more

9     carefully.  I will, hopefully, this evening -- and if not this

10    evening, early tomorrow -- get you my proposed preliminary jury

11    instructions.

12          Why don't we go ahead and start with the voir dire,

13    though, and just see if there are any comments or suggestions

14    with respect to the proposed voir dire that I've provided to

15    the parties.  Mr. Pearlman?

16          MR. PEARLMAN:  Yes.  And good morning again, Your

17    Honor.

18          THE COURT:  Good morning.

19          MR. PEARLMAN:  Generally speaking, we're satisfied

20    with the Court's proposed instructions.  I think it balances

21    both what the government and the defense requested.

22          We remain concerned about the publicity in this case

23    through social media and appreciate the introduction of

24    Question No. 2.  We might seek, depending on the particular yes

25    response, to follow up, but we'll do that -- we'll make that

1    request with the Court for a particular individual.

2          THE COURT:  I will allow the parties to ask follow-up

3    questions, as appropriate, while we're conducting the voir

4    dire.  So if somebody says they've heard something about the

5    case, I'll ask some follow-up questions.  And if you feel I

6    haven't adequately addressed the topic, you're welcome to do so

7    as well.

8          MR. PEARLMAN:  You included some brackets.

9          THE COURT:  Yes.  The brackets were -- I don't know

10   enough about the case to know what No. 4 was about and why you

11   were suggesting No. 4.  And also No. 18, I didn't know whether

12   there was -- the government is anticipating, actually, calling

13   a cooperating witness.  I just hadn't heard anything about that

14   previously.

15         MR. PEARLMAN:  I wasn't able to pull up the actual --

16   is No. 4 Larry Harmon --

17         THE COURT:  I can read it to you.

18         MR. PEARLMAN:  -- Helix?

19         THE COURT:  That's No. 5.  No. 4 is Bitfinex and

20   Ilya "Dutch" Lichtenstein and Heather Morgan.

21         MR. PEARLMAN:  So the issue there is we may be

22   calling Mr. Lichtenstein as a cooperating witness.

23   Mr. Lichtenstein stole a whole bunch of money from Bitfinex and

24   attempted to launder it and use Bitcoin Fog as part of his

25   laundering process.  So he may be called as a cooperating

1    witness.

2              While the name Ilya Lichtenstein might not mean

3    anything, it did get some publicity, and so perhaps that might

4    trigger some yes responses.

5              THE COURT:  Okay.  I just wanted to make sure.  So

6    for both of those, the answer is you may actually have a

7    cooperating witness.  And that No. 4 are names that could come

8    up in the course of the trial?

9              MR. PEARLMAN:  Yes.  One more thing, Your Honor.  I

10   am now with the Department of Justice, not with the U.S.

11   Attorney's Office.  I think there was a minor typo there

12             THE COURT:  I didn't realize that you had moved.

13             MR. PEARLMAN:  I just wanted to make sure it was

14   accurate.

15             THE COURT:  No, I appreciate that.  So we will change

16   that.  Let me just make a notation to that effect.

17             MR. PEARLMAN:  And we have a new paralegal who is

18   Angela De Falco, D-e --

19             THE COURT:  I'm sorry.  Give me one more second here.

20             MR. PEARLMAN:  Sure.

21             THE COURT:  Okay.  Yes.  Go ahead.

22             MR. PEARLMAN:  Angela De Falco is the new paralegal,

23   D-e F-a-l-c-o, two words.

24             THE COURT:  Okay.  And is that in place of one of the

25   others?

```
 1                  MR. PEARLMAN:  It is.  It's in place of the other

 2      paralegal.

 3                  THE COURT:  Well, there are two paralegals in mine,

 4      right?

 5                  MR. PEARLMAN:  Oh, replacing Michon.

 6                  THE COURT:  Divya will stay on the team?

 7                  MR. PEARLMAN:  Divya is going to stay on the team.

 8                  THE COURT:  That is fine.  What about your list of

 9      witnesses or names that could come up in the course of the

10      trial?

11                  MR. PEARLMAN:  We have a list of witnesses.

12                  THE COURT:  Have you provided that to the defense?

13      You are doing so now.

14                  MR. PEARLMAN:  We are.  Can I hand this up?

15                  THE COURT:  Thank you.  Okay.  We'll insert this list

16      of names then.  Anything else?

17                  MR. PEARLMAN:  Not from the government.

18                  THE COURT:  Let me hear then from the defense.

19      Mr. Ekeland.

20                  MR. EKELAND:  Your Honor, we're generally fine with

21      the voir dire; just a couple of minor things.

22                  I defer to the Court on this first one.  As the Court

23      knows, my name is Tor Ekeland.  That's my given name.  Both my

24      parents were from Norway.  And I've in the past encountered

25      confusion by people who think that somehow I changed my name
```

 1    just to do that because I work in computer law, and that is a

 2    complete coincidence.

 3              THE COURT:  Just a coincidence, okay.

 4              MR. EKELAND:  I'm happy to show my birth certificate

 5    to the Court.

 6              THE COURT:  No.  I take your word for it.

 7              MR. EKELAND:  If we could just maybe inform the panel

 8    or the Court could inform the panel that it's my given name so

 9    people don't wonder about that or think that I'm trying to be

10    cute in some way.

11              I've had that come up in a couple of cases.  I defer

12    to the Court on that because I, honestly, don't know the best

13    way to deal with that.

14              We do have some names -- I'm sorry.

15              THE COURT:  I'm thinking through the best way to do

16    that because it just -- many of the prospective jurors may not

17    know the word Tor.  So if I just single you out and say yes,

18    that really is his given name, that may strike them as odd.

19              So I'm just trying to figure out if there's some way

20    where Tor comes up -- I think I may in here, actually -- is

21    there a question where I mention the --

22              MR. EKELAND:  The Tor browser.

23              THE COURT:  -- whether someone is familiar with the

24    Tor browser in here?

25              MR. EKELAND:  Yes.  If I recall correctly, there is.

1    And the Tor browser will be coming up.

2             THE COURT:  Oh, I know it will.

3             MR. EKELAND:  The Court understands the issue.

4             THE COURT:  Let me see if I can find that in here.

5    No. 22.

6             So No. 22 says, "Have you ever used the Tor browser

7    or any similar technology for your online activities?"

8             If you want, I can say at that point, "And, by the

9    way, even though Mr. Ekeland's first name is Tor, that's just a

10   coincidence."

11            MR. EKELAND:  The defense is okay with that if the

12   government is.

13            THE COURT:  Whatever you want.  This is for your

14   sake.

15            MR. EKELAND:  That's okay.  If you could also let

16   them know it's my given name and my parents are from Norway.

17            THE COURT:  So what if I say, "By the way,

18   Mr. Ekeland's given name is Tor, but that is just a

19   coincidence."  Does that do it for you?

20            MR. EKELAND:  Yes, Your Honor.

21            THE COURT:  That seems fair.

22            MR. EKELAND:  We do have some names just to fill in

23   for who will be at counsel table.  We anticipate having a young

24   lawyer who will put in his pro hac vice application to the

25   Court.  I expect him just to -- to just sit at the table.  His

```
 1    name is Tauseef.  That's spelled T-a-u-s-e-e-f; and his last

 2    name is Ahmed, A-h-m-e-d.

 3              THE COURT:  Is he from your firm as well?

 4              MR. EKELAND:  He's of counsel, yes.

 5              THE COURT:  But I can say --

 6              MR. EKELAND:  Yes, you may.  You can say he's with

 7    Tor Ekeland Law, PLLC.

 8              THE COURT:  Okay.  So I can just say the attorneys

 9    representing the defendant are Tor Ekeland, Michael Hassard,

10    and Tauseef Ahmed of Tor Ekeland?

11              MR. EKELAND:  Yes, Your Honor.

12              THE COURT:  Okay.

13              MR. EKELAND:  And I don't think these legal

14    assistants will be present in court, but they are working on

15    the case.  There's a chance they may show up.

16              The first one is Courtney, C-o-u-r-t-n-e-y, and her

17    last name is Goliwas.  That's spelled G-o-l-i-w-a-s.

18              THE COURT:  Okay.

19              MR. EKELAND:  And then the other legal assistant is

20    Stephanie, S-t-e-p-h-a-n-i-e, and last name Norman,

21    N-o-r-m-a-n.

22              Then just one line of concern.  This is something,

23    again, I don't know if there's -- the best way to deal with

24    this, if there is any good way to deal with it at all, is that

25    the phrase darknet tends to have what the defense views as some
```

1    sort of prejudicial overtones, and we'd prefer the phrase deep

2    web.  However, darknet, I think, has become such a

3    colloquialism, it's hard to avoid.  I don't know if there's any

4    way --

5            THE COURT:  Do you want to point me to where it is in

6    here.

7            MR. EKELAND:  I don't have the --

8            MS. PELKER:  I believe it's No. 23, Your Honor.  We

9    could simply -- I think it is significant.

10           THE COURT:  What if I say, "The darknet or sometimes

11   referred to" --

12           MR. EKELAND:  As the deep web.  And maybe ask them if

13   they associate the darknet with criminality.

14           THE COURT:  "Or sometimes referred to as the deep

15   web."  Any objection from the government to that?

16           MS. PELKER:  Yes, Your Honor.  I think there is a bit

17   of a distinction there --

18           THE COURT:  There is?

19           MS. PELKER:  -- and it may just be easier if you can

20   say, "Have you ever accessed part of the internet called the

21   darknet or the deep web," and then leave it somewhat ambiguous.

22           THE COURT:  Any objection to doing it that way?

23           MR. EKELAND:  No.  And maybe we can just ask them if

24   they have any opinions about either the darknet or the deep

25   web.

```
1            THE COURT:  Do you have any opinions about either; is
2     that -- just add that at the end there?
3            MS. PELKER:  Could it possibly, Your Honor, just be
4     phrased as a parallel with No. 24, which says, "Do you have any
5     strong feelings or opinions about the use of cryptocurrency?"
6            We could also just say, "Do you have any strong
7     feelings or opinions about the use of the darknet or the deep
8     web?"
9            THE COURT:  Can I just say "or the deep" -- just add
10    it to that sentence, "or the darknet or deep web"?
11           MS. PELKER:  That sounds fine.
12           THE COURT:  Is that okay?
13           MR. EKELAND:  Yes, Your Honor.
14           THE COURT:  Any objection to that from the
15    government?
16           MS. PELKER:  No.
17           THE COURT:  "Do you have any strong feelings or
18    opinions about the use of cryptocurrency or about the darknet
19    or deep web?"  Okay.  All right.
20           MR. EKELAND:  And, Your Honor, I don't know whether
21    the Court wants to deal with this.  We do have housekeeping
22    issues related to this case that we'd like to discuss with the
23    Court at some point.
24           THE COURT:  That's fine.  Anything else on the
25    proposed voir dire?
```

 1              MR. EKELAND:  No, Your Honor.

 2              THE COURT:  Okay.  So I will make those changes as

 3      discussed.

 4              What about your list of names that may --

 5              MR. EKELAND:  We have our witnesses ready.  We can

 6      email it to the government and the Court.

 7              On that note, the government made a substantial

 8      production last night of discovery to the defense and,

 9      obviously, we haven't been able to review it in-depth.  Some of

10      that is *Jencks*.  Some of it is substantive, like updates to

11      Mr. Scholl's tracing.  There's a TRM report in there.  And we

12      haven't been able to wade through it fully.

13              I just want to note that for the Court because it may

14      require us, after we review it over the weekend, to update our

15      witness list or raise some objections based on what we're

16      seeing.

17              THE COURT:  Well, why don't you send me now what you

18      have, and if you need to update it, you can just let me know

19      before jury selection.

20              MR. EKELAND:  Mr. Hassard will email that to the

21      Court and to the government right now.

22              THE COURT:  Perfect.  Thank you.

23              What were the housekeeping matters you wanted to

24      raise?

25              MR. EKELAND:  The first thing is we're having trouble

1    accessing Mr. Sterlingov in the jail.  We were told this

2    morning that we could not visit him over the weekend, which

3    is -- our understanding is a violation of the jail's contract

4    with the federal government.

5            We've asked for video access and conferencing from

6    the jail numerous times.  They've made the representation

7    multiple times that they were sending me a temporary password

8    and link to access the video conferencing.

9            After I hadn't received that multiple times,

10   Ms. Goliwas, our legal assistant, got in contact with them

11   again this morning, and they finally sent us the access link,

12   and so we'll see how that works.

13           Also, we have contacted the U.S. Marshals now two to

14   three times about getting Mr. Sterlingov access to the hard

15   drive and the laptop and all the discovery that he previously

16   had at the --

17           THE COURT:  Right.

18           MR. EKELAND:  -- in Warsaw, Northern Neck Regional

19   Jail.

20           THE COURT:  Correct.

21           MR. EKELAND:  As of this morning, we haven't gotten a

22   response back from the U.S. Marshals regarding that.  They know

23   how important it is, but, essentially, Mr. Sterlingov has not

24   been able to review the discovery in this case.

25           And this is -- part of the reasons that we had to

14

1    object to the certification of the Russian translations is we

2    just haven't had full access to our client to prepare for this

3    case.  I just want to note that for the record.  And if there's

4    anything that the Court can do --

5              THE COURT:  Well, let's just not note it for the

6    record.  Let's do something about it.

7              MR. EKELAND:  Yes, Your Honor.  If the Court could --

8    I think if the Court could communicate to the marshals and have

9    the marshals communicate to the jail that we need full access

10   to our client.

11             THE COURT:  So since Mr. Sterlingov has been

12   transferred, he's not had access to the hard drive of the

13   computer?

14             MR. EKELAND:  That's correct.  And what they've told

15   us --

16             THE COURT:  Has he had a computer at all?

17             MR. EKELAND:  No, he hasn't, Your Honor.

18             THE COURT:  Okay.

19             MR. EKELAND:  I mean, he had it at the Northern Neck

20   Regional Jail.  Then they told us, oh, he has to sign it out.

21   Then we emailed the marshals a couple times about facilitating

22   this.

23             We haven't heard back, and we just recently sent out

24   another email.  But --

25             THE COURT:  I'll call the marshal as soon as we have

1    a break and ask about that because Mr. Sterlingov needs access

2    to his computer in a case like this.

3                MR. EKELAND:  We also just need weekend access to

4    him.

5                THE COURT:  Have you raised that with the marshal?

6    Any concerns about the jail providing access?  All I can do is

7    the same thing you can do, is ask the marshal to contact the

8    jail and say, no, he really needs access.

9                MR. EKELAND:  The denial -- the jail this morning

10   told us that they would not provide weekend access to him.  I

11   need to check to see what Ms. Goliwas sent to the

12   U.S. Marshals, but I did instruct her to contact the

13   U.S. Marshals and tell them we're having problems with that.

14               THE COURT:  I will ask about both of those things.

15               MR. EKELAND:  And then I just have a couple other

16   minor things.

17               THE COURT:  Okay. Go ahead.

18               MR. EKELAND:  We, potentially, may be calling as

19   witnesses Mr. Sterlingov's friends from Sweden.

20               THE COURT:  Okay.

21               MR. EKELAND:  We're wondering if that testimony can

22   be done via Zoom from Sweden?

23               THE COURT:  I think that's an issue you should

24   discuss first with the government, if you haven't done so

25   already.  And if the parties consent, that's going to be fine

```
 1              with me.

 2                      If there's not consent, then I may need argument or

 3              briefing on that question.  But if the parties consent, I have

 4              no objection to that.

 5                      MR. EKELAND:  Understood, Your Honor.

 6                      And then one other question is, we've been asked by

 7              Mr. Sterlingov's family and friends in Sweden whether or not

 8              they'll be able to watch this trial via Zoom if it's --

 9                      THE COURT:  I think the answer to that is -- as much

10              as I'd like to do that, I think it's prohibited by the Federal

11              Rules, which do not allow the broadcasting of criminal

12              proceedings.

13                      MR. EKELAND:  Understood, Your Honor.

14                      THE COURT:  If there's -- I would very much want to

15              accommodate his family.  I'm just not sure how I could do it

16              consistent with that rule.

17                      MR. EKELAND:  Understood, Your Honor.  And then, I

18              think when we discuss the expert and witnesses, we can discuss

19              the defense -- some of the defense's anticipated objections.

20                      THE COURT:  Okay.  That's fine.  You brought up the

21              translation issues.  Maybe we should touch on that briefly now

22              as well.

23                      After getting your filing on this, I had my law clerk

24              reach out to the head of the court interpreters, and the Court

25              can make interpreters available in court, although I think it's
```

1    not going to be terribly hard to find a Russian interpreter.

2    It may be a little bit harder to find a Romanian or a Swedish

3    interpreter, but we can do that in court.

4         The court interpreters told me they don't make court

5    translators available.  And if it's a question of just

6    translating the documents, the question is what we do about

7    that.

8         We have done a little bit of research on the

9    question, and there is a fairly helpful decision from the

10   Fourth Circuit -- I'm sorry, from the First Circuit about how

11   to handle this in a case called *United States v. Morales-Madera*

12   at 352 F.3d 1 from 2003.

13        And, quite sensibly, what the First Circuit holds is

14   that the first thing the Court ought to do is encourage the

15   parties to try and work things out to the extent there are

16   differences.  If, ultimately, there are differences that just

17   cannot be worked out between the parties with respect to

18   translation, I think what both sides need to do is offer expert

19   witnesses on the translation, and I'll let the jury decide if

20   there are differences in opinion with respect to the

21   translation.

22        And so what I will ask -- and I understand you may

23   need to have some additional access to Mr. Sterlingov to

24   complete this task, but I would ask you to tell me precisely

25   where there are differences of position with respect to

1    particular words or phrases in the translation, and then we can

2    see if we can work it out.  If we can't, then I think both

3    sides are just going to have to call witnesses and let the jury

4    decide the question.

5          MR. EKELAND:  And towards that end, Your Honor, it

6    would be helpful to the defense if we knew specifically what

7    translations the government seeks to admit, and if they could

8    match their translations with the actual Russian -- part of

9    what's slowing us down is there's translations, then there

10   seems to be summaries of the translations, and then there's

11   investigator notes on top of stuff, and it's in different

12   places, and there's a lot of stuff here.

13         If we knew what the concrete universe was, what the

14   translation was, and it was matched with its actual Russian or

15   Swedish or Romanian counterpart, and then we were able to take

16   that to Mr. Sterlingov to review, that would expedite things

17   because this is -- I don't want to -- I'm not trying to sandbag

18   the proceedings.  It's just there's a big universe there, and

19   we might be able to come to agreement on many stuff [sic] if we

20   could just get some specifics about it.

21         THE COURT:  Ms. Pelker or Mr. Pearlman?

22         MR. PEARLMAN:  So if I may, Your Honor, first, we

23   have noticed as experts our translators, not specifically

24   because we didn't have the names at the time of the notice, but

25   we have made that request, and we're prepared to seek to put on

1    those translations.

2         With respect to matching particular translations with

3    original source documents, we are happy to sit down with

4    Mr. Ekeland and make sure that the defense team is able to

5    match up specific original source documents with the

6    translations.

7         When we talk about the summaries, just to be clear,

8    Mr. Sterlingov took copious notes about a lot of different

9    subjects, some germane to this trial, some not relevant,

10    really, at all, but perhaps to identity.  But not really

11    relevant and not things that we would be able to substantively

12    want introduced.

13         So at times the translators do summarize these things

14    because we're sort of wrestling with the rule of completeness

15    as well.  So we want there to be some understanding, but we're

16    not seeking to read those portions in court.  Again --

17         THE COURT:  I'm not sure what the evidentiary basis

18    would be, in any event, for having a summary by a translator

19    going into evidence versus the actual document.  So I

20    understand your point.

21         MR. PEARLMAN:  So, look, we're happy to work with the

22    defense, but we just -- I think we found out two days ago that

23    they have all these substantive objections.  Some of it was an

24    argument about words, but they only had one word, putting

25    versus, I think, deposit.

```
1              THE COURT:  Yes.
2              MR. PEARLMAN:  We're not working with a lot here in
3     terms of feedback from the defense about what they need.
4     Again, happy to sit down with them and go over things and
5     perhaps redact portions from our proposed translations.  But
6     absent that, we are just prepared to go forward and seek to
7     admit.
8              THE COURT:  Okay.  Well, that is fine.  But I will
9     ask that you meet with Mr. Ekeland or Mr. Hassard, indicate
10    which translations the government is going to seek to admit at
11    trial; and then point them towards the corresponding original
12    text so they can then look at it, show it to Mr. Sterlingov,
13    make sure that he agrees with the translation and, if not, they
14    can get back to you with the specifics, and the
15    put-versus-deposit is a good example.
16              That strikes me as one where I'd be surprised if the
17    parties couldn't reach agreement with respect to that
18    translation issue.  And, hopefully, if there are others, they
19    won't be terribly complicated, and the parties can reach
20    agreement.
21              If you can't, then I think the answer is the parties
22    put on their experts, and the jury can decide who they believe.
23    Okay?
24              MR. EKELAND:  Yes, Your Honor.
25              THE COURT:  What about timing on this, Mr. Pearlman?
```

```
 1    When can you sit down with Mr. Ekeland and do what you just

 2    suggested?

 3              MR. PEARLMAN:  Perhaps tomorrow afternoon?

 4              THE COURT:  Mr. Ekeland, are you going to be in town?

 5    Can you do that?

 6              MR. EKELAND:  Tomorrow afternoon, I'm in a meeting

 7    for, like, four hours.  But, I mean, we can email back and

 8    forth and --

 9              MR. PEARLMAN:  We'll find a time in the next few

10    days.

11              THE COURT:  Okay.  I mean, it may be that there's a

12    break today where you could at least get started.  I have no

13    idea the volume of what we're talking about.

14              MR. EKELAND:  I mean, also -- I mean, this could --

15    we're happy to talk with the government on this, but we could

16    also probably just email potentially back and forth, and if

17    they just -- again, I think if we get specifics, and then we

18    can show it to Mr. Sterlingov, I think that will solve a lot of

19    this.

20              THE COURT:  Okay.

21              MR. EKELAND:  I mean, part of it, again, goes back to

22    the access issue.  And from what Mr. Sterlingov reviewed, he

23    asked us to object on this basis because of just what he saw,

24    but we're -- we haven't been able to sit down with him and

25    fully review this with him.
```

```
 1              THE COURT:  Hopefully, you can do that during the
 2    week if you can't do it on the weekend, but I will raise the
 3    question about the weekend as well.
 4              MR. EKELAND:  Thank you, Your Honor.
 5              THE COURT:  Were there any other preliminary matters
 6    that you wanted to raise, Mr. Ekeland?
 7              MR. EKELAND:  No.  I think the rest have to do with
 8    the witnesses and the Daubert like we're going to be
 9    discussing.
10              THE COURT:  Okay.  Do the parties want to say
11    anything further about the question of authentication?  As I
12    understand it, the only dispute with respect to authentication
13    at this point relates to the Mt. Gox material?
14              MR. EKELAND:  That's correct, Your Honor.
15              THE COURT:  So why don't we take that one up, and
16    then we can turn to other issues.
17              MS. PELKER:  Yes, Your Honor.  I think that we've
18    briefed the issue fairly extensively, pointing to ECF 62, our
19    original motion in limine; our reply in support at ECF 78; our
20    supplemental motion in limine specifically dealing with Mt. Gox
21    at 140; and then our reply in support at 146.
22              So I'm happy to take any of the Court's questions.
23    But here we have records that came from a virtual currency
24    exchange that was doing business back in 2011 through 2014.  It
25    did go into bankruptcy, like many different businesses do.  Its
```

1    assets, including its data, was transferred to a trustee in

2    Japan.  The government submitted an official request to the

3    Japanese government to get copies of those records.  They were

4    transferred here.  We've retrieved the records from the version

5    that was transmitted to us.

6            As I understand the defense objection, there's really

7    no question that the records that we have and have produced to

8    the defense and intend to admit at trial are the account

9    records as they existed in the possession of the Mt. Gox

10   trustee.  The defense argument is really one about potential

11   manipulation of the underlying data before it ever came into

12   the trustee's possession.

13           And here we have records that we have certified as

14   self-authenticating under 902, but also have put forward in our

15   filing extensive corroborating evidence under 901, just by

16   being the distinctive characteristics, comparison to other

17   evidence.  We've lined up the matches from the Mt. Gox accounts

18   from one to the next, from the Mt. Gox transfers out to the

19   blockchain; from emails within Mr. Sterlingov's account.

20           I think that we have extensive corroborating evidence

21   of why these are trustworthy.  But, ultimately, all of that

22   really is an issue on weight versus admissibility.

23           THE COURT:  Why is it you're not relying on 3505?

24           MS. PELKER:  I believe that we did cite that, in

25   part, Your Honor, but that the 902 -- so we have the 902(13),

1       which is based on the retrieval from the copy that came over to

2       the U.S. Government, and then I believe that we did cite, in

3       part, to 3505 alongside 902(11) in one of our filings.

4               Let me point to that, Your Honor.  In short, we do

5       believe that there are a host of different potential -- on

6       page 6 of ECF 140, we cite to 902(11) and 18 U.S.C. 3553.

7               THE COURT:  I take it that the government still will

8       need to demonstrate to the jury, even if I admit the evidence,

9       that the documents are what they purport to be.  I'm looking at

10      *Khatallah* from the D.C. Circuit where the D.C. Circuit says,

11      "But in deciding the telephone records' admissibility, the

12      question is not whether the government conclusively approved

13      their authenticity; it's only whether the government's showing

14      permitted a reasonable jury to find that the evidence is" --

15      "its proponents" -- "what its proponent claims."

16              So you would still have to then show that to the jury

17      as well.

18              MS. PELKER:  Yes, Your Honor.  I think that it's very

19      clear from the records when we present testimony, did you

20      review the Mt. Gox records on the Mt. Gox account; yes.  Here's

21      the record of the Mt. Gox account -- and we walk through how

22      those transactions line up -- that it's very clear to the jury

23      just looking at the records that these are records from the

24      Mt. Gox exchange.

25              THE COURT:  And is there corroboration that the

1      records that the government says, are those relating to

2      transactions involving Mr. Sterlingov, is there other

3      corroboration that those records are accurate?

4               MS. PELKER:  That they -- yes.  Within his -- within

5      Mr. Sterlingov's email accounts, there are confirmations for

6      the account that is in his true name.

7               There are also -- because there were a number of

8      different Mt. Gox accounts, we, essentially, have all of these

9      transfers from Account 1 out to the blockchain, back to

10     Account 2, from Account 2 to Account 3, from Account 3 onward;

11     for each one of those.

12              And as part of the government's testimony, we can

13     match up the withdrawals from the account on a particular date

14     and time and amount.  And then C, either in a different Mt. Gox

15     account or on the blockchain or for money going through a

16     different service, the corresponding deposit on the other side.

17     Or, similarly, where we have deposits into the Mt. Gox account,

18     we then can see the withdrawals from additional places.

19              So we go through this in, I think, a fair amount of

20     detail in our filing at ECF 140.  Starting on page 10, we talk

21     about the corroboration through the email records.  And then

22     continuing onward, on page 14 we look -- and 15 we look at

23     additional corroboration from the blockchain.  And then we also

24     discuss that there's corroboration from account to account.

25              And Mr. Scholl's testimony at the hearing back in

1    June discussed that as well, Your Honor.  And we do expect

2    there to be significant testimony at trial about those Mt. Gox

3    records in granular detail that will allow the jurors to see

4    how each transaction matches up with the other.

5         THE COURT:  Okay.  Let me hear from Mr. Ekeland then.

6    Thank you.

7         MR. EKELAND:  As the government said, this issue has

8    been extensively briefed.  But just to sum up our position, we

9    take the position that the records not only are inaccurate,

10   they're inauthentic.  And that the Japanese bankruptcy trustee

11   is not in a position to certify them as business records

12   because the trustee has no knowledge of how those records were

13   generated.

14        There's extensive public record indicating that the

15   primary custodian of that data was convicted in Japan for

16   forging -- for data fraud involving the Mt. Gox data.  Its

17   documented in Mr. Green- -- Andy Greenberg's book that when

18   Michael Gronager from Chainalysis received the thumb drive of

19   the data that there were deletions in it.

20        The Mt. Gox database was hacked multiple times, and

21   it's not clear to me at all that what has been produced to the

22   defense -- which is not the files in their native form.  We've

23   simply been given spreadsheets that are the purported search

24   results from a query into the database which we have not been

25   given access to.

1          The government said we could access it at the FBI

2     office in, I think, Manassas, Virginia, which the defense has

3     rejected because we don't believe that's full access that we

4     actually --

5          THE COURT:  I'd say, I think you ought to get in your

6     car and drive there.  If you want to take a break right now to

7     go do this.  If you want access to it, just go do it.  Manassas

8     is not far away.  You can be there in a half an hour.  Just go

9     look at it.

10          MR. EKELAND:  Your Honor, our expert, Mr. Fischbach,

11     is in California.

12          THE COURT:  That's your -- hiring an expert in

13     California is your issue.  Get him on a plane, get him and go

14     to Manassas and go look at it.  You can be there in a half hour

15     outside of D.C., maybe less than that to get to Manassas.

16          MR. EKELAND:  Your Honor, Mr. Fischbach's equipment

17     is in his lab in California.  So I'm not going to belabor the

18     point, Your Honor.

19          THE COURT:  You should belabor it.  If this is

20     something you're attempting to preserve for appeal, you need to

21     do a heck of a lot more.  Just go there and look at it.  If

22     there's a problem with him having access to it and actually

23     getting into the building to look at it or bringing equipment

24     into the building, let me know; but he should go there, and he

25     should look at it if he needs to.  I mean, it's really not very

1    far from here.

2         MR. EKELAND:  Understood, Your Honor.  So I'm just

3    returning to the point that we don't consider the Japanese

4    bankruptcy trustee to have the requisite knowledge to certify

5    these as business records, as the Japanese bankruptcy trustee

6    was simply not there when these alleged business records were

7    generated.

8         There's substantial public record that we have

9    briefed showing that Mt. Gox was repeatedly hacked and that --

10         THE COURT:  But isn't that true of every --

11    virtually, every bank in the United States?  And so, I mean,

12    are you saying then that records from virtually any bank in the

13    United States can't be authenticated under 902 because

14    virtually every bank in the United States has been hacked?

15         MR. EKELAND:  No, Your Honor.  But Jamie Dimon from

16    Chase Manhattan Bank hasn't been convicted in a court of law

17    and sentenced to four years in prison.

18         THE COURT:  That's a different point.

19         MR. EKELAND:  Well, if it's -- if he was convicted of

20    falsifying the data at the Chase Manhattan Bank, particularly

21    as to its business records, I think there would be a question

22    as to its authenticity.

23         THE COURT:  No, no.  My point is it's just a

24    different argument than hacking.  If there's an argument that

25    the -- that the bank was falsifying its records, maybe there's

1    a different issue or a different argument there.  That's not

2    the same thing as hacking.

3         There are numerous federal agencies that have been

4    hacked.  Probably most federal agencies have been hacked one

5    way or the other.  And we wouldn't say all the records are

6    inauthentic.

7         MR. EKELAND:  Mr. Karpeles himself, according to

8    Mr. Greenberg's book, said that the servers were physically

9    accessed, right?

10        And, again, we have no record of anyone -- how come

11   no one from Mt. Gox is signing any certification?  How come

12   nobody who actually was involved in the generation of the

13   business records is certifying the business records?  That's a

14   central question here.

15        THE COURT:  But doesn't a trustee stand in the shoes

16   of the entity?  The trustee takes over for the entity when it's

17   in bankruptcy and speaks on behalf of the business when a

18   business goes into bankruptcy.  That's what a trustee does.

19   They assume the role of managing the entity itself.

20        MR. EKELAND:  But by the time the Japanese bankruptcy

21   trustee took over, the generation of any alleged business

22   records was over.  So the Japanese bankruptcy trustee can

23   attest to the fact that what they received from the business is

24   what they received and stored, but they can't testify as to the

25   authenticity of the generation of the records.

1          And the rule requires that somebody with knowledge of
2     the actual generation of the business records certify it.  And
3     what we're arguing is that the bankruptcy trustee doesn't stand
4     in that position.  They can say that this is what we stored at
5     the bankruptcy court and gave to the federal government.  But
6     there is nobody here that was involved in the generation of the
7     actual records when they were supposedly generated that is
8     certifying these records.
9          So that's, essentially, why we say they're
10    inauthentic.  We don't even know if those are the actual
11    business records of Mt. Gox.  There is nobody being proffered
12    to testify or certify to that.  That's why we reject them as
13    inauthentic on top of them being inaccurate.
14         I mean, there's just too much stuff in the record --
15    the public record involving, you know, Mr. Mark Karpeles's two
16    convictions for data fraud, Mark Karpeles himself saying that
17    the servers to Mt. Gox were physically accessed.  And the fact
18    that when we go through and we are working from the
19    spreadsheets, our experts are finding errors, missing
20    transaction hashes, wrong dates on transactions, and things
21    that just don't add up.
22         That's what initially led us to question this, not --
23    this isn't just a fishing expedition.  It's the fact that the
24    people I'm working with came back to me and said this stuff is
25    a mess.  And I believe Ms. Still even testified to that from

1    the stand.  I'm not going to belabor the point, Your Honor.

2    It's the defense's position that the Mt. Gox data is not only

3    inauthentic, it's inaccurate.

4          THE COURT:  Okay.  I have a follow-up question for

5    the government on this.  Go ahead.

6          MS. PELKER:  Your Honor, we can discuss this more

7    when we get to the *Daubert* issue.  But the defense continues to

8    say their experts have found all of these errors and have yet

9    to identify a single error that -- actual error that their

10   experts have supposedly found in any of this data.  The time

11   for noticing that is long past.

12         THE COURT:  Okay.  I had a question, which is what

13   about Mr. Ekeland's point about the fact that the individuals

14   who certified or offered the certifications were not involved

15   in the business at the time it was operating; and at least for

16   purposes of 902(13), the rule requires a record generated by an

17   electronic process or system that produces an accurate result

18   as shown by certification of a qualified person that complies

19   with the certification requirements?

20         So how is the trustee in a position to certify as to

21   the accuracy of the electronic records?

22         MS. PELKER:  So -- and this is sort of a chain of

23   certifications here, Your Honor.  The 902(13) for the system or

24   process is for the retrieval of the records from -- so we get,

25   essentially, the full server from Japan.

1          The system or process that produces the accurate

2    result is the certification from the FBI who accesses that

3    server and pulls off the records that are specific to

4    Mr. Sterlingov and the accounts in question.

5          The additional certification that we have is the

6    transmission from Japan, and that's complying with Japanese law

7    of how they've acquired this from the trustee; and with the

8    Japanese government saying we went to the trustee, we got these

9    records from them, we transmitted it over through official

10   channels to the U.S. Government.

11         There's no requirement within the -- within the rules

12   that say that the person who is making a certification has to

13   be the one who made the original records, and I think that

14   there's pretty extensive case law that that is not, in fact,

15   required.

16         THE COURT:  That may be a stronger argument under

17   902(14) than under (13).

18         MS. PELKER:  So for (13), Your Honor, the (13)

19   certification is specific to the FBI retrieving the records

20   from the server that came over.

21         THE COURT:  And is there a rule that would subject

22   those in Japan who have issued the certifications to perjury or

23   false statements or something of the equivalent?

24         MS. PELKER:  Yes.  I believe that that is set out in

25   the certification, but yes, that these are subject to penalty

1    of perjury under Japanese law, I believe, as set out in the

2    certification.

3              THE COURT:  Okay.  Thank you.

4              MS. PELKER:  And for what it's worth, the Japanese

5    take this process very seriously; have a set process in Japan.

6    It is very formal and regimented as far as how they do the

7    certifications on those.  This is evidence we're obtaining from

8    overseas.  They follow their procedures, but they absolutely

9    followed that to a T.

10             To Mr. Ekeland's point about the conviction of fraud,

11   again, I think that there's a lot of hearsay and re-reporting

12   of what's been reported in books or articles as opposed to

13   actual records from the trial, which -- again, I wasn't there.

14   As I understand it, it was that Mr. Karpeles tried to make his

15   exchange continue to appear solvent.

16             There's never, as I'm aware, been any allegation that

17   Mr. Karpeles was going in and manufacturing or creating records

18   in any individual user's account --

19             THE COURT:  Transactions, yeah.

20             MS. PELKER:  -- much less any connection to

21   Mr. Sterlingov and the idea that simply because an executive

22   has been accused or even convicted of fraud means that all of

23   the records from their businesses can't be authenticated.

24             THE COURT:  There are also quite a few banks in this

25   country, unfortunately, where executives have been convicted of

1    fraud as well.

2            MS. PELKER:  Yes, Your Honor.

3            THE COURT:  Okay.  I'll give you a second to respond.

4    Mr. Ekeland, anything else you want to add?

5            MR. EKELAND:  Yes, Your Honor.  Mr. Karpeles's

6    conviction is a matter of judicial record in Japan.  I believe

7    we cited to that in our papers, as well as his conviction --

8            THE COURT:  What was he convicted --

9            MR. EKELAND:  He admitted to a Japanese court that he

10   manipulated Mt. Gox records and he received a suspended

11   four-year sentence.

12           THE COURT:  What records?  There's a difference

13   between -- let me finish -- manipulating your financial

14   statements or financial documents and a way to make it look

15   like you're solvent when you're not versus manipulating

16   individual account transactions or matters, which it's kind of

17   hard to imagine what the incentive would be to do that.

18           MR. EKELAND:  Well, the record is not entirely clear

19   on that.  That's the level -- we don't have that level of

20   granularity.

21           You know, I do think it raises a serious question,

22   particularly in this case where the government maintains that

23   Akemashite Omedetou, which means Happy New Year's in Japanese,

24   is the person who was running Bitcoin Fog and Mt. Gox is

25   located in Japan.

1          But I think we've made our point there that it's a

2     matter of public judicial record about Japan.  And in France,

3     that Mr. Karpeles, who ran Mt. Gox, was convicted of data

4     fraud.  The level of granularity on that, we don't know, Your

5     Honor.  I'm not going to represent what that particularly was

6     to the Court without knowing.

7          But to return to the point about whether or not a

8     person who is certifying has to be the original person that was

9     present at the generation of the business records being

10    certified, we don't take that position.  But we do take the

11    position that they either have to have been there and have

12    knowledge of how they were originally generated or have some

13    knowledge of how they actually were generated, and that's what

14    I think is missing here from everything that the government is

15    presenting; because the FBI is simply taking it for granted

16    that these are authentic business records.

17         And everyone is just assuming, but nobody who is

18    certifying here either was there when they were originally

19    generated or has sufficient knowledge of how they were

20    generated.

21         THE COURT:  But I didn't think that was the law.  So,

22    for example, I thought that if there was a business that was

23    engaged in some nefarious activity and the FBI goes in and

24    seizes all of their computers and an FBI technician then

25    downloads the records off of those computers and there is other

1    indicia that those actually are the transaction records of the

2    business, that at least under 902(14) that those can come in as

3    business records.

4          And that you don't need, for example, the defendant

5    to take the stand in a case in which that defendant's business

6    was seized; just come in and say, oh, yes, this is how we

7    generated these business records. But if you can look at them

8    and there's other indicia that they are what they appear to be,

9    and there's somebody who can testify to that, that that's

10   sufficient. That was my understanding of the law for -- at

11   least for purposes of 902(14).

12         MR. EKELAND: Yes, Your Honor. That's not clear to

13   me that that's the case here. That indicia seems, at least to

14   the defense, to be absent. And when you have facts that

15   Mr. Karpeles apparently added one million dollars to his

16   account to misrepresent his solvency and factors like that, I

17   think there's serious questions as to the authenticity and the

18   accuracy of the record. And I'm not going to belabor the

19   point.

20         THE COURT: Okay. That's fair enough. I appreciate

21   that.

22         So I will, hopefully, later today just issue an order

23   on this. I'll give you something in writing on this one as

24   well.

25         All right. Anything else that we should take up?

1          I also, at least, hopefully, before trial will get

2    you an opinion on the venue.  But I can tell you, as I've

3    indicated before, I don't really see the issues as ones that

4    really materially relate to venue.  I think that there are some

5    arguments with respect to whether each of the statutes at issue

6    applies here.  Some of that may be a question for the jury;

7    some of it may be a question for me.

8          I don't see this as a significant venue issue, but I

9    will get you an opinion on that as well.  Just for purposes of

10   your trial prep, I want to let you know my take on it is that

11   it's not venue so much as the applicability of the statutes.

12   I've raised the questions that I have about the D.C. statute in

13   particular and at least the issues under section -- under 1960B

14   that I raised before.  I just want to study that a little bit

15   further.

16         It may be that this is even an issue in which,

17   depending on what happens at trial, there may be a need for

18   some post-trial briefing on the issue because it was not an

19   issue that was really developed or even raised by the defense

20   pretrial.  But we can come back to that later.

21         All right.  So on *Daubert*, I told you I'll give you

22   all 10 minutes, 15 if you need it in some cases, per side for

23   each expert.  Give me one second, here.

24         Why don't we go ahead and start with Mr. Scholl now,

25   and then maybe after addressing Mr. Scholl, we'll go ahead and

1          take a break.

2                    MS. PELKER:  Yes, Your Honor.  I'm happy to proceed

3          however the Court finds most useful.  I do think that the

4          defense critique of Mr. Scholl and Ms. Bisbee somewhat run into

5          one another and that my understanding is really -- maybe I'm

6          misunderstanding, but they don't really object to their

7          qualifications, per se, or even the specific individual

8          findings insofar as -- beyond the fact that they don't believe

9          the blockchain analysis is sufficiently reliable.

10                   THE COURT:  The particular blockchain analysis.

11         Although, isn't there a difference between Mr. Scholl and

12         Ms. Bisbee?  Because my understanding is that Mr. Scholl is not

13         relying on the Reactor and probably actually was -- you know,

14         if one can say, doing it by hand; was doing it by hand versus

15         using a computer model.

16                   MS. PELKER:  That's true for a significant portion of

17         Mr. Scholl's testimony.  There is a portion of it that does

18         rely on the Chainalysis clustering that is tied into

19         Ms. Bisbee.

20                   THE COURT:  Right.

21                   MS. PELKER:  On the portion that doesn't rely on

22         Chainalysis clustering, there, I think that this is simple --

23         well, complex, but a complex version of traditional financial

24         accounting practices and tracing that simply has been moved

25         into the cryptocurrency sphere.

1          We have Mr. Scholl discussing and explaining to the

2     jury how financial transactions can be traced.  Some of that

3     includes looking at the blockchain and then explaining, as he's

4     looking at these transactions, what he, as an  expert, based on

5     all of his work in this field, is able to do as far as tracing

6     from one transaction to another.

7          He's going to provide some additional insight to the

8     jury explaining these key concepts and terms; the same way that

9     we expect that the defense proposed witness, Ms. Still, is

10    going to do.

11         THE COURT:  So let me just look at his report here.

12    I don't know if you have the report in front of you.

13         MS. PELKER:  I do, Your Honor.

14         THE COURT:  Should I start on page 4 with the

15    specifics of what he's going to testify as to?

16         MS. PELKER:  Yes, Your Honor.  So if we start on

17    page 4, he's going to talk through just explaining key terms

18    here.  So we talk through examples of how funds are moved on

19    the blockchain from co-spend, confirmation; what exchanges are,

20    what keys are, what peel chains are, generally; transaction

21    structures; and different types of wallets.  So 4 through 7 are

22    really background terms and concepts.

23         THE COURT:  Well, let's take these --

24         MS. PELKER:  You want to go through each one?

25         THE COURT:  I do.  I'm going to need to rule on each

1    one.  First, he just explains how the blockchain works.  I get

2    the jury is going to need to hear that from both sides, and

3    they're going to need to be educated on that question.

4              Then Bitcoin pricing and how prices fluctuate over

5    time?

6              MS. PELKER:  Oh, I apologize, Your Honor.  I was

7    looking at his actual report.

8              THE COURT:  I'm happy to do it that way, whichever

9    you prefer.

10             MS. PELKER:  Whatever is easier for the --

11             THE COURT:  So why don't we do it with your summary.

12   So then for -- 1 is terms on how the blockchain works.  2 is

13   pricing?

14             MS. PELKER:  Yes.  Just a moment, Your Honor.  I had

15   the report with the binders.

16             Okay.  Yes, 2 is the general pricing; explaining how

17   he calculates Bitcoin pricing including coin market cap, the

18   prices into Chainalysis Reactor, and the exchange rates from

19   different -- different exchanges.

20             THE COURT:  Okay.  Then 3?  This is just Monero and

21   the other cryptocurrency and, I suppose, how they differ from

22   Bitcoin?

23             MS. PELKER:  That's right, Your Honor.

24             THE COURT:  Okay.  4.

25             MS. PELKER:  For 4, this is him explaining the --

1    basically, serving as sort of a translator from the defendant's

2    notes and files.  He has a lot of different references to

3    cryptocurrency systems.  This is, again, essentially,

4    background-type explanatory testimony.

5        THE COURT:  Okay.  Common terms of -- I'm on top of

6    page 5.

7        MS. PELKER:  Yes, Your Honor.

8        THE COURT:  Common terms and jargon used in

9    cryptocurrency.  That's more of the same.  BitcoinTalk?

10       MS. PELKER:  Yes, Your Honor.  Simply explaining that

11   BitcoinTalk was a popular Bitcoin forum, which I don't know is

12   really expert witness area so much as simply saying what it is,

13   but we did include that in the notice.

14       THE COURT:  Okay.  And then the wallets.

15       MS. PELKER:  Then he'll explain wallets.  This is,

16   again, mostly background terms.

17       THE COURT:  And then this is -- this is just not

18   actually doing any blockchain analysis, but just explaining

19   what blockchain analysis is.  And the next paragraph?

20       MS. PELKER:  Yes.  That's correct, Your Honor.  This

21   is at least -- yes.  This -- he does, as you've seen, go on in

22   his report to apply these concepts in his analysis, but this is

23   discussing him explaining what they are.

24       THE COURT:  Right.  Then he turns to describing the

25   modus operandi in the darknet.

1          MS. PELKER:  Yes.  Your Honor, just in that preceding

2    paragraph on the top of the page, that does start to get into

3    how he applied that blockchain analysis to this particular

4    case.

5          THE COURT:  Okay.  Does this involve Reactor at this

6    point or this is just at this point his, as I would say, by

7    hand, which is probably not quite by hand.

8          MS. PELKER:  This, in part, involves -- it talks

9    about how he verifies certain information in Reactor.  So, for

10   example, it says that the undercover transactions sent to

11   Bitcoin Fog were recorded in the blockchain analysis tools and

12   that Chainalysis had identified the receiving addresses as

13   belonging to the Bitcoin Fog cluster.

14         THE COURT:  Okay.

15         MS. PELKER:  The next paragraph is modus operandi and

16   the use of mixers to conceal activity on the darknet.

17         THE COURT:  Okay.

18         MS. PELKER:  The next gets into his -- the substance

19   of his report, which -- and particularly the attachments, as

20   far as the addresses that are held by Bitcoin Fog and different

21   darknet markets, including the direct and indirect fund flows.

22   That analysis is, in part, based on his use of the Chainalysis

23   Reactor tool.

24         THE COURT:  Okay.

25         MS. PELKER:  The next -- sorry, Your Honor.

1          THE COURT:  Go ahead.

2          MS. PELKER:  The next paragraph about his blockchain

3     analysis performed in support of the investigation, that is his

4     analysis that we have memorialized in his reports and his

5     testimony.  That includes a significant amount of tracing by

6     hand and includes the financial analysis, not just from the

7     blockchain itself but looking at account records at a variety

8     of financial institutions.

9          A portion of this, as Mr. Scholl testified, did

10    involve the use of Chainalysis Reactor.

11         THE COURT:  Okay.

12         MS. PELKER:  And the next paragraph just notes that

13    the details are in his expert report, in his declaration, in

14    the additional discovery provided to the defense.  And since

15    this was filed, he also -- he had testified at the *Monsanto*

16    hearing; he also testified at the *Daubert* hearing.

17         THE COURT:  Can you explain to me a little bit more

18    just the breakdown of what Mr. Scholl did by hand versus where

19    he used Reactor?

20         Because there were the transactions that we went

21    through in some detail and that Ms. Still was critical of.  I

22    was under the impression that at least that tracing was what I

23    was referring to him as doing by hand.  Is that not correct?

24         MS. PELKER:  So, Your Honor, I believe that -- it

25    might be -- if the Court has Mr. Scholl's report in front of

```
 1    him --
 2                THE COURT:  I do, yes.  Let's see here.
 3                MS. PELKER:  So I believe that -- so most of those
 4    charts are by hand and don't involve Reactor at all.  So we
 5    have page 35, which is the chart, and the transactions are
 6    detailed in the pages that follow.  But the chart shows
 7    activity from Mt. Gox, Account 1 to the blockchain to Account 2
 8    to Account 3 to a room exchange to Liberty Reserve.  That is
 9    not based on Chainalysis.
10                At page 41 --
11                THE COURT:  Give me a second.  Just one second.
12                MS. PELKER:  Sorry.  I believe we admitted this at
13    the Daubert hearing on June 23rd, and it may also have been
14    possibly an exhibit in Ms. Still's testimony a few weeks ago.
15                THE COURT:  I'm just looking for the right binder.
16    Got it.  Okay.  Thanks.  So I have his report in front of me.
17                MS. PELKER:  Yes, Your Honor.  So maybe starting at
18    the beginning, we have -- so on page 10, there's the summary of
19    the undercover transactions.  This is based on Mr. Scholl's
20    review of the undercover transactions, but that he then viewed
21    it in Chainalysis Reactor to verify the cluster in Reactor to
22    determine that the Chainalysis Reactor was appropriately
23    clustering the Bitcoin Fog deposit addresses.
24                THE COURT:  So he did it both ways with respect to
25    this?
```

```
 1                    MS. PELKER:  Yes, Your Honor.

 2                    THE COURT:  Okay.

 3                    MS. PELKER:  The -- so pages 12 through 17 -- or 12

 4          through 18, this is the darknet market exposure that's the

 5          aggregate fund flows between the darknet markets and

 6          Bitcoin Fog.

 7                    This has significant overlap with Ms. Bisbee.  So

 8          they are -- they're a bit different insofar as the different

 9          work that they did and the purposes for which they're

10          testifying, but this is based on Chainalysis.  There also will

11          be testimony from Mr. Scholl about individual -- about

12          individual transactions within the transfers between

13          Bitcoin Fog and Silk Road, Silk Road 2 and Welcome to Video

14          where he will, basically, pull out from his report the

15          individual transactions, and we'll have further testimony about

16          what that user was from the data that was pulled from those

17          sites.

18                    THE COURT:  Okay.

19                    MS. PELKER:  But the aggregate fund flows are based

20          on Chainalysis.

21                    The Sterlingov accounts, the beginning section there

22          is just discussing the different accounts that he looked at.

23          The fund flows from Fog into the various Sterlingov accounts.

24                    So this is -- it was originally done, I believe, in

25          Chainalysis Reactor.  He then recreated it to verify everything
```

1    on the -- using public block explorers.  So the charts here are

2    not based on Chainalysis Reactor except that the attribution of

3    the original starting point as Bitcoin Fog was based, in part,

4    on -- that Mr. Scholl, as an expert, consulted Chainalysis; and

5    using what he knows about Chainalysis and how addresses are

6    tagged, determined that that is Bitcoin Fog.

7         And that was, again, further corroborated by the

8    defendant's own testimony about that source.  And that goes

9    through LocalBitcoins and Kraken.

10        And as a note -- and we did note this in Mr. Scholl's

11   testimony, but this tracing was done before the government was

12   able to fully access the transaction history for the

13   defendant's Mycelium wallet so that these peel chains where

14   Mr. Scholl said that, based on his experience, he's looking at

15   these and would -- and believes that these peel chains all are

16   contained in the same wallet.

17        He then, after examining -- getting access to

18   Mr. Sterlingov's Mycelium wallet, was able to confirm that all

19   those peel chains are in the same wallet so that they would --

20   the tracing would, actually, just be from Bitcoin Fog; all

21   those peel chain addresses in one wallet to the removal.

22        The other account descriptions are just going through

23   his review of financial analysis.  Same for the transactions --

24             THE COURT:  Which page are you on?

25             MS. PELKER:  I've gone through pages 30 and 31 and

1    now -- up through 33, these relate to transactions from the

2    Bitcoin blockchain.  There's -- the way that Chainalysis plays

3    in here is, again, that when we're looking at the sourcing of

4    these transactions, determining that original source of the

5    address it came from is a Bitcoin Fog address.

6         When we get into the actual payments, page 35, this

7    is the transfer from the defendant's true name Mt. Gox account

8    into the payment for the Bitcoin Fog domain that is not based

9    on Chainalysis; same for -- and that -- the description of that

10    continues through page 40.

11         THE COURT:  Okay.

12         MS. PELKER:  Then page 41, similarly, that is not

13    based on Chainalysis.  This is Mr. Scholl reviewing the records

14    on the Bitcoin blockchain without any further clustering

15    applied and the records from these various different financial

16    institutions and the defendant's email account.

17         THE COURT:  Okay.

18         MS. PELKER:  Page 45, similarly, the bulk of this is

19    not based on Chainalysis, that deposit into the -- the final

20    deposit into 1LZvk.  The deposit into that address is viewable

21    on the blockchain.  Mr. Scholl is using his expert

22    determination in consultation with Chainalysis and looking at

23    the transactions to say that 1LZ is controlled by Bitcoin Fog.

24         THE COURT:  So what do you mean by "in consultation

25    with Chainalysis"?  Is it confirming?

1          MS. PELKER:  Just the software --  sorry -- not

2     the -- not any other sort of --

3          THE COURT:  What I mean, though, is he relying on

4     Reactor or is he verifying through Reactor?

5          MS. PELKER:  He'd be relying, in part, on Reactor.

6          THE COURT:  Okay.

7          MS. PELKER:  And that is the same on page 46, where

8     those fund flows through the accounts are not based on anything

9     in Chainalysis.  The Silk Road --

10          THE COURT:  I'm sorry.  So this is not based on

11     Reactor or is?

12          MS. PELKER:  I had not finished my thought, Your

13     Honor.  The fund flows through the accounts are not based on

14     Reactor, but that deposit into the -- in the bottom corner, the

15     16mT deposit into Bitcoin Fog, that transaction is viewable on

16     the blockchain.  The fact that 16 -- yes, 16mT is a Bitcoin Fog

17     address, that is, in part, relying on Chainalysis Reactor.

18          THE COURT:  Okay.

19          MS. PELKER:  And, Your Honor, the defense had

20     referenced additional uploads from the government last night.

21     That is Mr. -- so in Mr. Scholl's report, he referenced also

22     that he had -- I'm trying to find the page.  I'll find the page

23     for Your Honor.

24          He had also cross-referenced significant addresses of

25     interest with TRM, a competing blockchain analysis product, to

1    confirm whether they also had it clustered as Bitcoin Fog.  So

2    we have that -- the report of that list of addresses, that's

3    what was uploaded, as well as the kind of visual --

4              THE COURT:  So he used another tool that's a

5    competitor of Chainalysis or Reactor to verify the results from

6    Reactor?

7              MS. PELKER:  Yes, for the specific addresses that

8    were kind of key in the analysis here.

9              I will -- apologies, Your Honor.  Here it is.  On

10   page 11 of the report, he notes TRM Labs' confirmation of the

11   Bitcoin Fog cluster and says the second reputable blockchain

12   analysis tool, TRM Labs, was used to corroborate the

13   Chainalysis Bitcoin Fog cluster to a limited extent, and he

14   discusses 43 transactions within the report.  This does say 148

15   unique sending addresses.  That was a typo.  It's 144 unique

16   sending addresses.

17             THE COURT:  Okay.

18             MS. PELKER:  I believe that's, actually, the

19   withdrawals from -- that then are fed into the defendant's

20   different accounts.

21             THE COURT:  Okay.

22             MS. PELKER:  Then on page 49 we have another chart

23   that shows a transfer from the defendant's Mt. Gox account into

24   Bitcoin Fog, and that's the 1YZJKa address.  He's relying, in

25   part, that Chainalysis says that that is Bitcoin Fog.

1          It is worth noting, Your Honor, that CipherTrace,

2    actually, the defendant's own expert, also agrees that many of

3    these addresses are Bitcoin Fog.

4          And Mr. Scholl's analysis here is actually that

5    everything boxed in Wallet 2 -- because of the spending

6    transfers as he's looking at it manually -- that those are, in

7    fact, likely all Bitcoin Fog addresses.  So that portion of his

8    analysis and conclusion is not because of anything that

9    Chainalysis Reactor has said other than that the 1YZJKa address

10   is controlled by Bitcoin Fog.

11         THE COURT:  Okay.

12         MS. PELKER:  And then he set out the transactions in

13   detail.  This information is just the raw information of

14   records about the transactions, not Chainalysis clustering.

15         Then again on page 57, talking about Mr. Sterlingov's

16   purchases at Expedia, these -- the transfers themselves are

17   either from the blockchain or, actually, from the business

18   records of Expedia and Coinbase.  But the -- that the sending

19   address was a Bitcoin Fog sending address or an address

20   controlled by Bitcoin Fog is based, in part, on the Chainalysis

21   Reactor as one of the sources he consulted as an expert.

22         THE COURT:  Okay.

23         MS. PELKER:  So that's shown again on page 59.  And

24   these are also more of those peel chains that can now be

25   consolidated after viewing the defendant's Mycelium wallet

 1    contents.

 2              THE COURT:  Confirmed by the wallet?

 3              MS. PELKER:  Yes, for the peel chains.

 4         We then have pages 61, 62, 63, through the end,

 5    through 65.  These are, again, individual transactions.  He's

 6    looking at them on the blockchain.

 7         Those -- the screenshots -- to the extent it helps

 8    the Court, the screenshots here are screenshots from

 9    mempool.space.  That's a public block explorer that's just

10    showing the information from the blockchain.  That's not

11    Chainalysis Reactor.

12              There is a consultation of Chainalysis Reactor in

13    assessing that the input address for the transactions is --

14    belongs to particular entities.  In particular, on page 63 he

15    talks about, according to Chainalysis Reactor, 1Kfu was

16    contained in the Bitcoin Fog cluster; and for page 62, that the

17    Bitcoin address 1PG belonged to Instawallet.

18              THE COURT:  Okay.

19              MS. PELKER:  And the follow-on tracing provided for,

20    kind of, the additional discrete items follow in similar vein

21    of -- the tracing itself is done based on the publicly

22    available Bitcoin blockchain and Mr. Scholl looking at the way

23    transactions are occurring and, based on his expertise,

24    determining the appropriate way of following the funds.  Where

25    there is an attribution to a particular service like Bitcoin

1   Fog, like one of the darknet markets, that is based, in part,

2   on Chainalysis Reactor.

3           THE COURT:  Okay.  Is that it?

4           MS. PELKER:  I believe -- I'm happy to answer any

5   questions for Mr. Scholl here.  I think that -- just to

6   emphasize, I think that the case law is very clear that experts

7   do not need to have an in-depth understanding of the

8   proprietary algorithms that may go into technology that they're

9   using and that that's not something new or particularly unique

10  to blockchain analysis.

11          And that Mr. Scholl testified about how he has used

12  this extensively in many different cases, why he finds it to be

13  reliable, and the government has put in its briefings and also

14  through Mr. Scholl's and Ms. Bisbee's testimony extensive

15  evidence about how the blockchain analysis has been tested in

16  real cases and been found to be reliable.

17          THE COURT:  So I was going to come to that in a

18  second.  Let me ask you, though.  Do you know where things

19  stand with respect to getting the more detailed information

20  relating to the heuristics to the defense?

21          MS. PELKER:  I spoke with counsel for Chainalysis

22  last night.  They assured me that they're working very

23  diligently on it and hope to have something tomorrow.  I did

24  speak with them earlier in the week as well about exactly what

25  that would look like, and I do believe, based on what we

1  discussed on the call, that it is going to really address the

2  question of -- for each address, the defense will be able to

3  look at what they're providing, and for all 930,000 -- for

4  Bitcoin Fog, for example -- go and look and say, okay, how

5  did -- what specific heuristic was used to add this address to

6  the cluster, how exactly did we get there.  And they would be

7  able to, with their own expert, take that information and say,

8  okay, let's apply this heuristic in the exact same way and make

9  sure that we get to the same address to test it; or say, we

10 don't think that this is a good heuristic to use, for whatever

11 reason.

12        THE COURT:  Okay.  All right.  Why don't we go ahead

13 and take a break now.  What I would like to do, though, is

14 before I hear from Mr. Ekeland regarding Mr. Scholl, I think it

15 would be helpful for me to just walk through the 702/*Daubert*

16 questions or findings that I need to make with respect to

17 Reactor; and the D.C. Circuit's decision in *United States v.*

18 *Morgan* is pretty helpful because I find it to be just a fairly

19 analogous circumstance.

20        But applying *Morgan*, first, is the question of just

21 the qualification of the expert and whether the testimony would

22 be helpful to the trier of fact; second would be whether the

23 testimony was based on sufficient facts or data.  And

24 encompassed within that is whether it actually accounted for

25 all of the relevant facts and data or whether it omitted

1    important facts or data and, more generally, to the soundness

2    of the methodology employed.

3            Third is whether the analysis was the product of

4    reliable principles and methods.  It doesn't necessarily need

5    to be peer-reviewed under that portion of the analysis, but I

6    do need to be able to determine whether it was a reliable

7    methodology and understanding what measures are in place to

8    check or confirm that the results are reliable is helpful.

9            I know that Mr. Ekeland has now on many, many

10    occasions brought up the response that I think was evoked from

11    a question the Court asked where Ms. Bisbee indicated that

12    there was no known error rate, for example.  But me

13    understanding what has been done to confirm the accuracy or

14    inaccuracy of results from Reactor would be helpful.

15            You're right that under the analysis under *Morgan*,

16    the D.C. Circuit says we've never held that Rule 702 requires

17    an expert to have a sophisticated understanding of the software

18    underlying or technological tools, but in a case like this, I

19    think I need to understand whether that software is reliable.

20            You don't need to understand how well the code works,

21    but you need to know have we gone and checked it, and when we

22    do a comparison by hand, does it come out the same way that it

23    does using Reactor.

24            And then, fourth, I need to consider whether the

25    witness reliably applied the principles and methods to the

1    facts in the case.  So it would be helpful just to walk through

2    that in more detail so I can make the appropriate findings one

3    way or the other.

4         Let's go ahead and take a 15-minute break and come

5    back at five minutes before 12:00, and then we'll go to 12:30;

6    maybe finish up -- I'll, hopefully, have enough time to hear

7    from Mr. Ekeland.  But if not, I'll let him come back after

8    lunch to continue.  Thank you.

9         MS. PELKER:  I apologize, Your Honor.  One scheduling

10    point.  I know Your Honor has a revocation at 2:00.

11         THE COURT:  Yes.

12         MS. PELKER:  Are we going to come back right after

13    that; just for planning purposes?

14         THE COURT:  Yes.

15         MS. PELKER:  Thank you, Your Honor.

16         THE COURT:  So we'll do that.  Also, today if we also

17    want to hear from Mr. Sterlingov with respect to whether any

18    plea offer was conveyed to him and whether he's made a decision

19    of how he wants to proceed with that, we can do that as well.

20         MS. PELKER:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22         (Recess taken.)

23         THE COURT:  All right.  Ms. Pelker?

24         MS. PELKER:  Yes, Your Honor.  I am happy to go

25    through one by one the factors that the Court laid out, if

1    that's what's going to be most helpful, but can take any

2    questions.

3              THE COURT:  Let's walk through them one by one.

4              MS. PELKER:  I believe the first was qualification of

5    the expert and whether the testimony would be helpful to the

6    jury.

7              Here, for Mr. Scholl, we have his qualifications set

8    out in his curriculum vitae and also described at the *Daubert*

9    hearing and the transcript starting at pages 41.  Mr. Scholl is

10   a cryptocurrency and blockchain analysis expert with extensive

11   experience doing tracing in various investigations for the FBI.

12   He is a member of the Virtual Currency Response Team for the

13   FBI, where he's responsible for assisting in investigations

14   involving virtual currency all around the country and was

15   selected for that team because of his expertise.

16             He's been working virtual currency matters for the

17   FBI since 2015.  He has certifications and training in

18   blockchain analysis and additional cryptocurrency-related

19   topics; has delivered those trainings as well; and because of

20   his expertise, also was selected to work on the National

21   Cryptocurrency Enforcement Team for DOJ.

22             THE COURT:  Okay.

23             MS. PELKER:  I think that it's clear that his

24   testimony will help the jury understand the blockchain analysis

25   evidence at issue in this case.  It is complex financial

1      analysis and tracing.  It's not going to be in the province or

2      understanding of a lay juror, and they will be significantly

3      aided by Mr. Scholl's testimony.

4                  THE COURT:  Okay.  2?

5                  MS. PELKER:  That's sufficient facts and data to

6      underlie the analysis.  Here we have voluminous data, really

7      extensive, extensive financial records.  The government's

8      discovery in this case insofar as just the attachments to

9      Mr. Scholl's report alone, I think, exceed 100,000 pages of

10     Excel spreadsheets of just raw Bitcoin address information.

11     There's massive quantities of transactional information that's

12     being analyzed here.

13                 I think, too, the question of sufficient facts and

14     data gets to just the methodology -- whether there's sufficient

15     data and facts for this case and also for the practice of

16     blockchain analysis generally, and it's helpful to note that

17     this is not an outlier.

18                 That even though blockchain analysis may be a more

19     novel field generally, it has been used extensively by law

20     enforcement in the United States, by law enforcement all around

21     the world, by private sector, by financial institutions, by

22     consulting firms, by incident response firms, by regulators who

23     use this blockchain analysis, and that there's a great amount

24     of information about the tracing and the ability of tracing

25     transactions on the blockchain.

1          THE COURT:  All right.  And what about use of Reactor

2     or a similar tool, actually, in a judicial proceeding?

3          MS. PELKER:  So here, Your Honor, I would point the

4     Court to the government's filing at ECF 73.  This is our

5     opposition to the defendant's omnibus motion in limine where

6     they first raised a challenge to the blockchain analysis.

7          And from pages 1 through 25, our discussion focuses

8     on a *Daubert* analysis of blockchain analysis.  This includes

9     the use of blockchain analysis to support law enforcement

10    investigations, including courts finding blockchain analysis

11    reliable, starting on page 21.

12         So the defense is correct that this is -- that

13    blockchain analysis has not been through this sort of rigorous

14    *Daubert* examination previously, but it has been presented in

15    courts numerous times in the form of tracing that goes from one

16    address to another.  Courts, including Judge Faruqui in this

17    district, have looked at blockchain analysis, including

18    clustering specifically, in evaluating search warrants and

19    finding it to be extremely reliable.

20         So this is not something that's necessarily new or

21    novel for the court system to look at blockchain analysis,

22    including clustering.

23         THE COURT:  But am I right from what you say that

24    clustering has never been approved through a *Daubert* process in

25    the past?

1          MS. PELKER:  I'm not aware, no, Your Honor.  I just

2     don't think that it -- clustering has definitely been presented

3     at trial insofar as there's been testimony that various darknet

4     market vendors received funds from various darknet

5     marketplaces, and that has been presented at trial.

6          I don't believe any defense attorney has done what

7     Mr. Ekeland has done, which is what he's entitled to do, if,

8     say, we want to raise a *Daubert* challenge about whether -- how

9     you know that those funds are sourced from this darknet market.

10    But, certainly, there's been testimony that, in part, relies on

11    that for the attribution of the darknet market.

12         THE COURT:  Is that cited in one of the pages that

13    you pointed me to?

14         MS. PELKER:  I don't believe so, Your Honor, insofar

15    as most of that testimony would be just not specifically

16    dealing with clustering.

17         But we do note that from pages 21 through 23 that

18    there's been -- blockchain analysis has been used in hundreds

19    of successful criminal investigations and prosecutions.  We

20    cite to Judge Faruqui's opinion.  We also give an example of

21    *United States v. Dove* where there was a *Franks* challenge, in

22    part, based on blockchain analysis.  We also note in

23    *Gratkowski*, a fourth amendment challenge to the use of

24    Chainalysis Reactor, described as a powerful and sophisticated

25    software to analyze the Bitcoin blockchain.

1    That was not a *Daubert*-specific issue but did come up in that

2    case in the appeal up to the Fourth Circuit.

3          And in Judge Faruqui's opinion, he discusses the

4    extensive corroboration that had been -- had been offered

5    relating to the blockchain analysis software.  And then in the

6    footnote at the bottom of page 19, the government also

7    collected a number of cases in which blockchain analysis had

8    been presented at trial in testimony, just as a sample.

9          THE COURT:  Okay.  Third?

10         MS. PELKER:  Would be whether the expert applied

11   reliable principles and methods.

12         Here, we have Mr. Scholl explaining exactly how he

13   did his blockchain analysis.  A lot of this, again, is just

14   really, kind of, following funds from one address to the next,

15   looking at the activity on the blockchain and just seeing this

16   address spent funds from one to the next.

17         There is then the additional assessment as he's

18   looking at these transactions where he's saying, based on my

19   expertise, I -- as I'm following these funds, here's where I

20   know where to go next, or here's why I think that all of these

21   addresses in a peel chain are likely controlled by the same

22   entity, because I know a lot about peel chains, I follow them a

23   lot, I look at the transaction structure, and I believe that

24   they're likely in the same wallet.

25         And in this case, that was then validated from

1    multiple peel chains when they were able to get access to the

2    defendant's wallet and say, yes, in fact, all these addresses

3    are here.

4              THE COURT:  But I'm more concerned with whether

5    Reactor is a reliable method.  And as I indicated before,

6    Mr. Ekeland has repeatedly noted that Ms. Bisbee conceded that

7    she was unaware of any known error rate, and so I suppose the

8    question is, what can you point me to to validate or verify or

9    confirm the results from Reactor?

10             MS. PELKER:  So, Your Honor, I think that a specific

11   numerical figure for an error rate is certainly one factor that

12   can be significant in a *Daubert* analysis.  But as the Court has

13   found in the case of tool-mark identification and others, it's

14   one factor to consider.  It is not dispositive.  The fact that

15   something doesn't have a single error rate doesn't mean that it

16   shouldn't be considered.

17             I think that, through Ms. Bisbee's testimony, you can

18   understand how, because Chainalysis, trying to avoid any

19   possibility of false positives, is tailoring its behavioral

20   heuristics to the behavior of any individual cluster, of

21   looking at the different factors that would go into it and

22   really customizing it for each cluster, that it would be very

23   difficult to calculate an error rate.

24             Again, I'm not a statistician.  My understanding is

25   that because of the various variables that go into play and how

1    they customize it, that's a part of how they -- why there

2    really hasn't been a way to calculate an error rate for the

3    product --

4          THE COURT:  I get that.  So there's no known error

5    rate, then the question is okay, how else do I verify that

6    what's going on in the black box actually corresponds to the

7    real world.

8          MS. PELKER:  I would say it's really not a black box,

9    but that what you have is a lot of data and clustering that is

10   repeatedly tested and shown to be reliable in the real world

11   time and time again through the users.

12         So there are thousands of Chainalysis users around

13   the world, including extensive users in law enforcement,

14   Ms. Bisbee's team, all of the investigations she has been

15   involved in and overseen, all of the investigations that

16   Mr. Scholl has been involved in, including this one; and that

17   what you have is repeated corroboration and verification

18   throughout an investigation.

19         So that you have -- every time an investigator goes

20   into Chainalysis, traces funds to a virtual currency exchange,

21   they say, I know that this transfer must be controlled by this

22   virtual currency exchange because Chainalysis has clustered it

23   as such, I'm going to send a subpoena to that virtual currency

24   exchange and get the records.  And when they do, and the

25   virtual currency exchange says, yep, these are our addresses,

1    here are the records for this customer, that is a validation

2    that Chainalysis has correctly clustered that address as

3    associated with that exchange.

4         And that happens every day all around the world based

5    on the users of Chainalysis.

6         THE COURT:  So how many times do you think that's

7    happened?

8         MS. PELKER:  I believe that there was some testimony

9    on this, Your Honor.  I can attempt to try to pull it up with

10   the exact site.  I apologize, Your Honor.  I can pull up the

11   exact site.

12        THE COURT:  You can just give me that after lunch if

13   you want.  Has there ever been an occasion in which they used

14   Chainalysis to issue a subpoena and then someone has come back

15   and said, I don't know what you're talking about, this isn't --

16   in fact, this person has nothing to do with our site?

17        MS. PELKER:  I -- honestly, Your Honor, I'm sure that

18   there has been.  We don't have any sort of information or

19   figures on that.

20        I will say that often, especially in the earlier

21   days, an investigator may identify a particular set of

22   addresses that Chainalysis says are clustered with an exchange.

23   And then when they send the subpoena, the investigator says,

24   and also, do you have information about these addresses because

25   we don't know who controls them.  And the exchange may come

1    back and say we have information about these; we don't have

2    information about this other subset.

3         So it would be very difficult to just base an

4    assessment on exchanges receiving requests for addresses that

5    aren't held at that particular exchange.  But I don't have

6    information --

7         THE COURT:  I guess what I'm getting at is I do need

8    some indicia of reliability.  And I'm asking you for the

9    indicia of reliability, and it's not, I guess, probably enough

10   to say every day Chainalysis is used for issuance of subpoenas,

11   and those subpoenas come back with information that confirms

12   what Chainalysis told us; unless you can tell me something

13   about -- and say -- 99 percent of the time they come back and

14   they say we don't know what you're talking about versus .001

15   percent of the time they come back and tell us they don't know

16   what we're talking about.

17        MS. PELKER:  Your Honor, I don't think that the

18   government needs to have collected statistics on the -- when

19   they come back.  But I do think that -- and I will find this

20   in, I believe, Mr. Scholl's testimony where he's talking about

21   sending subpoenas to different exchanges and how that also

22   corroborates the blockchain analysis and that he's done that

23   many times and found it to be reliable.

24        THE COURT:  Okay.

25        MS. PELKER:  And I think that you also have that same

 1    activity in -- when we're looking at different -- clustering

 2    for the different darknet marketplaces.  So within this case

 3    you have, in part, Chainalysis or others saying this is a

 4    darknet marketplace address.  And then when we go and we see

 5    the seized records from, say, Silk Road for the individual

 6    customers or Welcome to Video for the individual customers, you

 7    can pull out the transaction records and say, yes, Chainalysis

 8    said that the transaction on this date into the, for example,

 9    the pas account, that that was a transfer into Silk Road.

10            That wasn't what Mr. Scholl was relying on, but that

11    you can then look at the Silk Road records for pas and see a

12    corresponding transaction record on that date.  And that plays

13    out time and time again.

14            THE COURT:  So, again, I just want to be as concrete

15    as I can possibly be about this.  First, form of confirmation

16    is subpoenas are issued and, often at least, those subpoenas

17    come back and confirm that the information sought was there.

18            Two, you've got that Mr. Scholl, in fact, did some of

19    his analysis by hand, and then that corresponded to what

20    Chainalysis came up with as well, right?

21            MS. PELKER:  Yes, Your Honor.

22            THE COURT:  Okay.  What else do you have for me

23    for -- just by way of confirmation that it is, in fact,

24    accurate?

25            MS. PELKER:  I think we have the use in thousands of

1    criminal investigations around the country where what has borne

2    out in the ultimate search and arrest of various defendants has

3    corroborated what is present on the blockchain.

4            THE COURT:  Is that different from the subpoena

5    point?

6            MS. PELKER:  Yes, Your Honor.  So the subpoena point

7    is that we go to exchanges and we say, do you have records

8    about this individual.

9            THE COURT:  Okay.

10           MS. PELKER:  For the search and execution arrest is

11   that, after we've done this -- these investigations, in part,

12   based upon blockchain analysis, and we say, based on the

13   blockchain analysis and other things, we've identified that

14   this individual is, for example, uploading or downloading child

15   sexual abuse materials.

16           THE COURT:  Right.

17           MS. PELKER:  We go and execute a search of that

18   individual's residence; we arrest them; they confess and say,

19   yes, it was me, or they find child sexual abuse materials on

20   the device.

21           Same for various darknet market users.  And

22   Judge Faruqui discusses one example of a particular child

23   sexual abuse material site and how that was found to be highly

24   reliable because in over 200 different search warrants that

25   they executed, every single one of them then turned up

1    corroborating evidence confirming what the blockchain analysis

2    had shown about the user doing those --

3            THE COURT:  That's more of the type of thing I'm

4    talking about where you have 200 different searches that are

5    based on the blockchain -- or based on Reactor -- is it based

6    on Reactor or just blockchain analysis?

7            MS. PELKER:  I'm not sure what's publicly in the

8    record there, Your Honor, but it was based on Chainalysis

9    Reactor.

10           THE COURT:  So you've got 200 searches, and every

11   single one of them confirmed what Chainalysis Reactor predicted

12   they would find?

13           MS. PELKER:  That's correct, Your Honor.

14           THE COURT:  Okay.

15           MS. PELKER:  I'd say that was one example from one

16   significant case, and we have the citations for that because

17   Judge Faruqui wrote the opinion, but that that plays out time

18   and time again in law enforcement investigations around the

19   country.  And we do have --

20           THE COURT:  Mr. Scholl can testify to that?

21           MS. PELKER:  Yes.  And I believe that both he and

22   Ms. Bisbee -- certainly, Mr. Scholl testified -- when he was

23   discussing why he finds Chainalysis Reactor to be reliable,

24   that it is, in part, based on in his work he has been able to

25   successfully use blockchain analysis in the investigation of

 1    criminal cases.

 2              THE COURT:  And it's my understanding that Mr. Scholl

 3    was able to use more traditional methods, as I was referring to

 4    it, by hand, tracing particular transactions.  But when it came

 5    to identifying particular sites and say, yes, we think that

 6    this is Bitcoin Fog or we think that this is Silk Road, that is

 7    where you have to rely on clustering and you have to rely on

 8    Reactor for that.  Is that a fair summary?

 9              MS. PELKER:  Yes, Your Honor.  With some caveats of

10    Mr. Scholl then did do validation testing, which is another

11    point for looking at undercover transactions, looking at known

12    data points that he can say, I know from a source outside of

13    Chainalysis Reactor that this is an address controlled by

14    Bitcoin Fog, for example, with the undercover transactions.

15    Because we have the records from the undercover, I know these

16    addresses are controlled by Bitcoin Fog.  Does Chainalysis have

17    them clustered as Bitcoin Fog?  Yes, they do.

18              THE COURT:  I see.  So they did that as well as a

19    form of confirmation?

20              MS. PELKER:  Yes.  Again, that plays out not just in

21    this case but in undercover transactions that are done by law

22    enforcement around the world every single day, where part of

23    their process is that they do the undercover transaction, and

24    they check it online.  And for many law enforcement agencies,

25    that involves checking it in Chainalysis Reactor.

1          Now, because the clustering is intentionally

2     underinclusive, it may not be that it is always clustered with

3     that entity, but they use that as a significant form of

4     validation, verification, and vetting.

5          THE COURT:  Here, there's some verification or

6     validation that where Bitcoin -- where Chainalysis Reactor said

7     that particular site was Bitcoin Fog, that when it was -- where

8     there was a means of verifying that, for example, of having

9     particular transactions where Mr. Scholl knew it was

10    Bitcoin Fog, he was able to say, yes, it came out the same, and

11    it confirms that it was accurate.

12         MS. PELKER:  Yes.  That's right, Your Honor.

13         THE COURT:  What about with Silk Road or some of the

14    other darknet sites?

15         MS. PELKER:  So for many of the sites, that is also

16    possible for --

17         THE COURT:  I guess not so much -- my question isn't

18    whether it's possible, but whether Mr. Scholl or anyone else

19    has done it in this case to verify that Chainalysis Reactor,

20    actually, correctly identified Silk Road or other darknet sites

21    through clustering.

22         MS. PELKER:  So I'd say that we have that information

23    for the specific users that we'll present at trial for Silk

24    Road 1, Silk Road 2, and Welcome to Video.  The other sites

25    were not seized by law enforcement so we are not presenting

 1    vendor records.

 2            Mr. Scholl did not rely on for his analysis any sort

 3    of additional undercover transactions that were done into those

 4    sites by any member of the FBI or other law enforcement.  I do

 5    know that those undercover transactions are done extensively.

 6    These are big marketplaces and that they've been verified, but

 7    Mr. Scholl is not relying on any of those -- those aspects for

 8    the specific purposes of this case.

 9            He is, however, informed in his analysis by the fact

10    that this is something that FBI does, and he knows that this

11    has been done and validated.

12            THE COURT:  He knows that where Chainalysis Reactor

13    says it's Silk Road and they actually then seize records, that

14    those records confirm that Chainalysis Reactor called it right?

15            MS. PELKER:  Yes.  For the seized data sets for the

16    individual users.  For the -- for the records where the

17    marketplaces have not been seized, he's looking at the -- well,

18    he's aware that FBI and others do undercover transactions on

19    those sites.  Part of doing the undercover transactions is

20    tracing using Chainalysis Reactor.

21            Also, a big aspect of the proof in many darknet

22    market cases for vendors relates to both at trial and then at

23    sentencing how much money the vendor was getting withdrawing

24    from a darknet marketplace.  And so in that aspect, even though

25    it's not generally raised as a clustering challenge, I know

1    there's been a fair amount of litigation recently in the

2    Eastern District of Virginia about the individual vendor's

3    records.  Mr. Brown just passed me up a transcript reference as

4    well.

5              THE COURT:  Okay.

6              MS. PELKER:  But individual vendor's records where

7    the vendor was identified through a number of different

8    methods, including blockchain analysis.  Ultimately, at

9    sentencing, there's a dispute about the amounts or volumes

10    used, and that there may be ledger information found on the

11    vendors' devices -- and in many cases there are -- that can be

12    used to kind of match up with information on the blockchain

13    about how much the vendor was receiving.

14              So there are lots of opportunities -- there have been

15    many different instances of this sort of additional validation

16    and verification from different data sets.

17              THE COURT:  Mr. Scholl will be able to testify about

18    that, or Ms. Bisbee?

19              MS. PELKER:  Yes, Your Honor.  I would say that

20    Mr. Scholl's -- his analysis and expertise is informed by his

21    prior work and experience.  We are not planning to get into any

22    sensitive details of any of the individual cases Mr. Scholl has

23    worked on.

24              As he testified, he does a lot of work on ransomware

25    cases, on cases all across the country.  While that has

1    informed his testimony, we aren't planning to really delve into

2    anything, especially for ongoing cases, about his work on those

3    cases beyond --

4         THE COURT:  Well, I understand there can be sensitive

5    law enforcement reasons why you don't want to talk about at

6    least, certainly, ongoing investigations, but the question I

7    really had is whether he'll be able to testify and say -- and I

8    know there was some of this.  I'd have to go back and look at

9    the transcripts.  I'm not sure how deeply we got into this.

10        But whether he'd be able to say, I use Chainalysis

11   Reactor on almost a daily basis for tracing; we use it for

12   issuing subpoenas; we use it to issue -- for arrest warrants.

13   I can't say every single time, but in the vast majority, the

14   overwhelming majority of cases, it matches up.  And when we

15   seize the wallet or we seize the individual or seize the

16   person's phone, yes, Chainalysis Reactor called it correctly;

17   something along those lines.

18        MS. PELKER:  Yes.  I think -- absolutely, Your Honor.

19   I think that he did provide some testimony regarding that in

20   his *Daubert* hearing.  We could definitely expand upon that at

21   trial.

22        THE COURT:  Okay.

23        MS. PELKER:  And the citation to the discussion about

24   the subpoenas starts on page 55 of the transcript.  And --

25        THE COURT:  From his *Daubert* hearing?

1          MS. PELKER:  Yes, from his *Daubert* hearing.  I had

2     asked, "In your work have you also had the occasion to validate

3     the clusters and attribution in Chainalysis?"

4          And he explains that he does so very frequently.

5     Every time we send a subpoena to an exchange to get back

6     account information, we have the opportunity to check that

7     those Bitcoin addresses that belong to this account at this

8     exchange were properly attributed by Chainalysis.

9          And we discuss that a bit more, and he explains that

10    this is something that he and his colleagues do every day, and

11    he estimated a thousand times a day throughout the FBI.

12         THE COURT:  And does he say anything about how

13    consistently he gets the results he would expect?

14         MS. PELKER:  I believe -- and it was within the

15    question.  I said, "Is it your testimony that the response back

16    from the exchange verifying with records from that address that

17    the exchange does control that address a validation of

18    Chainalysis's clustering?"

19         And he said, "Yes, ma'am, I believe it is."

20         THE COURT:  All right.  And then I guess another

21    category of potential confirmation is -- at least with respect

22    to Heuristic 1 is that Ms. Still and her analysis actually

23    confirms, at least with respect to Heuristic 1, that it is

24    fairly predictive?

25         MS. PELKER:  Yes, Your Honor.  And I think that

1    that's very significant in that it was -- I thought it really

2    very powerful confirmation that Ms. Still, with a completely

3    different product, was running that same heuristic and came up

4    with the exact same set of addresses to the tune of over -- at

5    least over 311,000 different addresses where it was an exact

6    match for every single one.  And for many of the other

7    services, they were either exactly the same or very, very

8    close.

9            And here we also have additional verification from

10   Mr. Scholl checking with the TRM tool, as well as --

11           THE COURT:  I was going to ask you about that as

12   well.

13           MS. PELKER:  -- for key addresses.  That is, he was

14   checking key addresses as -- whether TRM had associated them as

15   Bitcoin Fog, which I think is a verification and validation of

16   Chainalysis's clustering for those addresses.

17           THE COURT:  And what happened -- what did he find?

18           MS. PELKER:  That for all of the 144 addresses that

19   he had pulled out as particularly significant from his analysis

20   and tracing, that those addresses TRM also had clustered as

21   Bitcoin Fog.  And that we have in this case Mr. Scholl's

22   looking at different activities on the blockchain, and then

23   when he goes and follows up with the records from, say, the

24   defendant's Mycelium wallet, he's able to then say yes, I'm

25   looking at this in my expertise through peel chain, and I

1    determined that this is, in fact, all controlled by the same

2    wallet.

3          I think that that, actually, is -- is pertinent to

4    whether this is a reliable method because it cements the idea

5    that Chainalysis is being intentionally underinclusive; that

6    we're looking at this as a peel chain.

7          Mr. Scholl can look at it and say, based on my

8    experience, I am quite confident that this is a peel chain, but

9    because Chainalysis has heightened requirements for what it

10    would add as a peel chain clustered together, it's not

11    clustered in Chainalysis.

12          THE COURT:  Okay.

13          MS. PELKER:  I believe that then that gets us to

14    whether the witness reliably applied the methods, unless the

15    Court has -- did I miss --

16          THE COURT:  No.  That was it.  Thank you.

17          MS. PELKER:  I think we discussed this.  The witness

18    has gone through extensive trainings, has delivered trainings,

19    has certifications from Chainalysis, TRM, and others, and that

20    he applied those practices here.  And that Ms. Still testified

21    to many of the same practices.

22          THE COURT:  Can I ask you to put on paper for me what

23    we just went through with respect to the confirmation with

24    record citations either to testimony or to the expert reports.

25    I think it would be helpful for me to have whatever the

1    government points to as confirmation that Reactor is, in fact,

2    accurate.

3              MS. PELKER:  Yes, Your Honor.

4              THE COURT:  And what is a realistic time frame?  I

5    know you've got a lot of work you're doing.

6              MS. PELKER:  I know we have the other Chainalysis

7    filing due at 5:00 tomorrow.

8              THE COURT:  If you want to wait until -- Monday is

9    okay.  If you want to get that to me by Monday at 5:00 p.m.; is

10   that okay?

11             MS. PELKER:  Yes, Your Honor.

12             THE COURT:  That would be helpful to have.  Well, I'm

13   not going to start with you, Mr. Ekeland, because I don't want

14   to -- I want to give you plenty of time to respond on this.

15   Why don't we come back after lunch.

16             Since I have a break at 2:00 for the other matter,

17   maybe rather than -- I assume, Mr. Ekeland -- well, let me ask

18   you, how much time do you think you want on the issues that

19   I've just been discussing with Ms. Pelker, which I think is a

20   combination of Mr. Scholl, as well as the Chainalysis Reactor?

21             MR. EKELAND:  That's tough.  Probably 15 to 30

22   minutes.

23             THE COURT:  Okay.  Why don't we come back, then, at

24   1:30, and if you can get it done before the 2:00, great.  If

25   you need some time after the 2:00, we can do that then, too.

1          I'm not putting pressure on you.  I understand this

2     is important.  We'll see you-all back at 1:30 then.

3          MS. PELKER:  Thank you, Your Honor.

4          (Whereupon, a lunch recess was taken, after which the

5     following further proceedings were had:)

6          THE COURT:  All right.  Mr. Ekeland, you may proceed.

7          MR. EKELAND:  Yes.  Thank you, Your Honor.  I think

8     we start with, I think, what seems to me to be the threshold

9     issue here, and that's whether or not Chainalysis Reactor meets

10    the *Daubert* standards.

11         THE COURT:  Before you turn back, can I ask you for

12    purposes of clarification, are you challenging Mr. Scholl's

13    qualifications or the sufficiency of the data, or is it -- is

14    your challenge focused on Reactor?

15         MR. EKELAND:  No, Your Honor.  I am -- we will be

16    challenging Mr. Scholl's qualifications as an expert.

17         THE COURT:  Okay.  Make sure -- I have not seen any

18    basis for doing that, so make sure before you sit down you tell

19    me why that's the case.

20         MR. EKELAND:  Understood, Your Honor.  I was hoping

21    we could start --

22         THE COURT:  No, no.  You're welcome to start where

23    you want.

24         MR. EKELAND:  As to Chainalysis Reactor, I was struck

25    when I cross-examined both Ms. Bisbee and Mr. Scholl, and I

1    just went down the list of the *Daubert* factors, and they

2    answered in the negative when it came to every one.

3        I asked them whether or not there was any scientific

4    peer-reviewed papers attesting to the accuracy of Chainalysis

5    Reactor.  They both answered no.  I asked them if they could

6    tell me the rate of false positives for Chainalysis Reactor.

7    They answered no.  I asked them if they could tell me the rate

8    of false negatives for Chainalysis Reactor.  They answered no.

9    I asked them if they could tell me the statistical error rate

10    for Chainalysis Reactor, and they said no.

11        Ms. Bisbee testified, additionally, that Chainalysis

12    has no internal data as to the error rates of Chainalysis

13    Reactor, and I think the fact that all those questions were

14    answered in the negative raises a real problem because you can

15    never know the accuracy of this software.

16        And I'm struck by the use of anecdotal hearsay

17    evidence based on cases that are -- haven't been produced, that

18    aren't -- we don't know whether or not they actually relied on

19    Chainalysis Reactor, and the fact that the only thing that the

20    government can attest to as to the supposed accuracy of

21    Chainalysis Reactor is purely anecdotal hearsay evidence, is

22    extremely problematic.

23        Because, you know, I can hit a ball -- a baseball a

24    hundred times, but if I strike out 10,000 times, I'm missing

25    most of the time.  Or just like that broken clock on the wall

1    right there tells time accurately twice a day; that does not

2    make it an accurate clock.

3         The problem is we have no data set, no scientific

4    data set with which we can measure the reliability and the

5    accuracy of this software.  Instead, we're being told to trust

6    purely anecdotes from law enforcement, which the defense would

7    submit is a biased viewpoint, and there is no data set because

8    Chainalysis has said they have not bothered to collect it of

9    the times it was wrong.

10        THE COURT:  But don't you, in fact, have that

11   yourself already?  You have your own expert.  You have the same

12   data out there.  You have the results from Chainalysis, and you

13   can compare.

14        So, for example, with respect to Heuristic 1, there

15   seems to be a fairly close correlation between what your expert

16   said and what Chainalysis said.  So at least with respect to

17   that heuristic, there seems to be some validation in your own

18   expert report.

19        MR. EKELAND:  Well, in our own expert report, one of

20   the first things that Ms. Still from CipherTrace says is that

21   this type of heuristic tracing that Chainalysis uses in

22   Chainalysis Reactor is unreliable and should not be used in

23   federal court.

24        THE COURT:  That's not the answer to my question.  My

25   question was, don't you have a means of validating one way or

1    the other?  The blockchain is out there.  You have the

2    blockchain, and you have your own experts, and they can do

3    their own analysis, and they can agree or disagree with what

4    Chainalysis has done.

5           So it's either verifiable or unverifiable --

6    unverifiable or subject to dispute based on the publicly

7    available data and your own experts.

8           MR. EKELAND:  That's not correct.  I think we need to

9    make a distinction here between the public blockchain that's

10   accessible from a blockchain explorer and the closed-source

11   proprietary software, like Chainalysis, that utilizes

12   heuristics.  And where the heuristics come into play in this

13   case is when it comes to the money laundering charges where

14   they're alleging X amount of dollars are being laundered

15   through Bitcoin Fog.

16          And I'll give you what I think is a striking example

17   of how problematic this heuristic analysis is.  As you look at

18   Ms. Bisbee's report -- which she, by the way, testified she's

19   not attributing anything to Mr. Sterlingov on, so I think

20   there's questions as to its relevancy there.

21          But in her report she says that the flow of funds, I

22   think, to and from Bitcoin Fog from, quote-unquote, darknet

23   markets is approximately $33 million; I think, roughly,

24   $10 million of it was indirect and 22 direct, something like

25   that.  Right?  That's using supposedly Chainalysis Reactor.

1          You compare that number to what Mr. Scholl comes up

2     with in his report, supposedly using Chainalysis Reactor, and

3     his number is somewhere, I think, around $100 million.  Then

4     you look at the press release in the initial criminal complaint

5     in this case, I think, where that number is $334 million.  If

6     this --

7          THE COURT:  I don't care about a press release.  It's

8     not evidence.

9          MR. EKELAND:  It's, I believe, in the criminal

10    complaint as well.

11         The issue being is now the software is being deployed

12    three times, and we're getting three different numbers as to

13    the inflow and outflow of funds to Bitcoin Fog.  That's highly

14    problematic.

15         These heuristics that they're using and these

16    algorithms, as far as we can tell, they're experimental.  They

17    have no known error rates and, yes, sometimes they're bound to

18    be right.  But the question is, are they reliable under *Daubert*

19    for a federal criminal proceeding.

20         And there is no evidence -- there is no scientific

21    evidence whatsoever in anecdotal hearsay from cases where we

22    don't know the facts, we don't know whether or not Chainalysis

23    Reactor was behind the trace, whether the heuristic clustering

24    was, or it was a simple blockchain trace.  We don't know.

25         And what's astonishing to me, the more I think about

1    it, is how much the software is actually based on hearsay.

2    Heuristic No. 2, the behavioral, quote-unquote, heuristic,

3    that's based on hearsay inputs, judgments about what kind of

4    data should go --

5           THE COURT:  Just for clarification, I think you're

6    using hearsay not in the legal sense.  Hearsay is a statement

7    offered in court by a declarant who is not present.  I think

8    what you simply mean, if I'm understanding you correctly, is

9    that heuristic is based on input that you can't verify in some

10   way?

11          MR. EKELAND:  Yes, Your Honor.

12          THE COURT:  I'm not sure you actually mean it in

13   hearsay --

14          MR. EKELAND:  Correct.  I'm not using -- I'm using

15   hearsay broadly here and not -- essentially, in the sense that

16   we're being told to trust external data that we can't verify.

17   This is why we've been asking for the source code and the data

18   inputs.

19          And what's astonishing to me is that Chainalysis

20   admitted on the stand that they've never bothered to collect

21   the data on the error rates.  So you have no way of evaluating

22   the accuracy of the software based purely on anecdotes about

23   when it was accurate because you don't know if, for every time

24   it was accurate, if it was inaccurate for a million times.

25          And the problem is that it's too late to collect that

1    data.  And you can't point to case law to verify the scientific

2    validity of something that is being presented to the jury and

3    is being presented to the courts as, quote-unquote,

4    deterministic.  I was struck by Ms. Bisbee's declarations,

5    well, we don't know the error rate, but it's deterministic.

6    It's scientific, but I can't cite you any scientific

7    peer-reviewed paper establishing that fact.

8          Now, what's happening -- and I think this is going to

9    be confusing to the jury, and this is why *Daubert* is so

10    important in its gatekeeping function -- is we are being

11    presented with something that is essentially art, that is

12    primarily based on a number of assumptions and guessing.  We

13    don't know anything as to its accuracy rate, and it's being

14    presented as science.  I think that's highly problematic.

15          And, yes, this is the first time this has -- I'm

16    astonished that this is the first time that this software

17    that's so heavily marketed and so many people are using, that

18    this is the first time it's facing a *Daubert* challenge and

19    that when -- the first time it faces a *Daubert* challenge, all

20    the *Daubert* factors, when they're asked, they're answered in

21    the negative; every single one.

22          And that's to say nothing of the fact that there is

23    no -- there are no standards, zero standards when it comes to

24    blockchain forensics right now.  There's no MIS standards,

25    there's no governing body.  And you can see the fact that

84

1    there's not even acceptance in the community by the very fact

2    that CipherTrace came in and is disputing everything that

3    Chainalysis Reactor is saying.

4          Now, again, I want to distinguish between simple

5    blockchain tracing using the explorer -- we're not arguing

6    against that because the public blockchain is accessible

7    through publicly accessible explorers.  But what the problem

8    here is, is we're sticking heuristics on top of this.

9          And then we're using those heuristics to calculate

10   huge sums of money that Mr. Sterlingov is being accused of

11   laundering.  Yet, there's not a shred -- not a shred of

12   scientific evidence showing that these heuristics are accurate,

13   and we're being told completely to depend on anecdotes, and

14   that is the antithesis of *Daubert*.  I don't know what more to

15   say, you know.

16         This company makes hundreds of millions of dollars

17   from the United States Government, and nobody ever bothered to

18   check the accuracy of the software?  They never bothered to

19   check the internal error rates?  They marketed this software

20   and they said, this software is great; we'll be able to trace

21   everything and put you in compliance.  Uh, do you have your

22   error rates?  Do you know how accurate it is?  No, we don't.

23         Okay.  Well, it's too late for that because you can't

24   collect that data set now.  You have to somehow -- you can't go

25   back in the past and look up every time it made a mistake.

1    That's impossible.

2            So they can cite a hundred cases, but you don't know

3    if there's 100,000 cases where there was an error out there.

4    This is junk science and doesn't belong in federal court.  This

5    is the underlying software for the majority -- well, I think

6    for almost all of Ms. Bisbee's report and for a large majority

7    of Mr. Scholl's report.

8            It has no place in a federal criminal trial because

9    it meets none of the *Daubert* standards; and anecdotes and

10   referring to things where we don't have all the facts, where

11   there's been no control group, there's no scientific

12   statistical analysis.  There's been no independent audit of

13   this software.  There's been no model validation.  Instead,

14   we're given a bunch of jargon.  Trust us; it's scientific.

15           But you can't tell me its error rate, you know.  What

16   are we supposed to do with this?  I mean, if *Daubert* means

17   anything, I think, Your Honor, it means that this software

18   doesn't come in.  I mean, that's the gatekeeping function of

19   *Daubert*.  Not a single one of those factors is dispositive, but

20   all of those factors are answered in the negative.

21           And the only thing being offered as proof of the

22   accuracy is anecdotal evidence when you don't know the false

23   positive rate or the false negative rate or the error rate or

24   anything at all.

25           And I want to say something, too, about the fact that

1    Chainalysis Reactor and the government keeps on saying that

2    these heuristics are underinclusive or that they're

3    conservative.  We completely disagree with that.  That's why

4    Ms. Still testified that Heuristic No. 2 -- she calls it the

5    Pac-Man heuristic because it's just going out and it's just

6    gobbling up all sorts of information and throwing it in there.

7            You know, it's just -- it doesn't meet any of the

8    *Daubert* factors, and it's fundamental to the government's case.

9    And I just don't -- I don't see how this -- how this comes in

10   under *Daubert*.

11           THE COURT:  All right.  Anything else?

12           MR. EKELAND:  I just will note, Your Honor, that

13   people are citing to Judge Faruqui's case law, which is

14   anecdotal as well.  I just want to note for the record that he

15   was a prosecutor on this case.  And, again, I don't think this

16   type of anecdotal evidence is sufficient to establish the

17   reliability of the software.

18           I mean, I think I've made my point on Chainalysis

19   Reactor, and I think Ms. Still's CipherTrace report makes it as

20   well, and that's -- and I think the government -- I think

21   Mr. Brown and Ms. Pelker, in an article that they wrote for the

22   DOJ law journal that Mr. Verret cites in his expert disclosure,

23   also said in their article that you should use this for

24   generating leads, but then you need corroborating evidence.

25   And the problem is, that just doesn't exist here.

1          You know, how do you go from $334 million to

2     $33 million to the $100 million in the Scholl report if this

3     stuff is scientific and it's accurate every time?  Why are the

4     traces in the criminal complaint and everything that's being

5     done in the criminal complaint not being disregarded by

6     Mr. Scholl, whose errors are documented in the Still

7     CipherTrace report?

8          Like, what am I supposed to be looking at here?  If

9     it's scientific, it should be working the same way every time.

10    And if you start to look around at this evidence, you start to

11    see, well, actually, no, they're not getting the same results,

12    and people are saying different things, you know.

13         I think I've made my point on the Chainalysis

14    Reactor, Your Honor.  Do you have any questions you want to ask

15    on that?

16         THE COURT:  Did you want to address the other

17    factors; qualification or any of the other 702 issues?

18         MR. EKELAND:  So in relation to Mr. Scholl and his

19    qualifications --

20         THE COURT:  Yes.

21         MR. EKELAND:  -- I think Ms. Still's report starting

22    on -- Mr. Hassard, if you can just bring it up.  I think it's

23    on page 34.  She documents the errors in his reports.

24         THE COURT:  I don't think it goes to his

25    qualification, though.  I mean, that's a separate inquiry.

1          MR. EKELAND:  I think it does because I think it

2    shows -- well, it shows -- actually, more properly it goes to

3    the soundness and reliability of his methodology.

4          THE COURT:  Okay.  So you're not challenging the

5    qualification then?

6          MR. EKELAND:  I challenge his qualifications in terms

7    of being able to testify to financial forensics.  I think

8    that's very problematic.

9          If I have heard the government correctly -- and I

10   don't recall seeing this in his expert disclosure, but I

11   haven't reread it this morning -- they said that he was going

12   to testify as to valuations, the market value of Bitcoin, the

13   flow of funds.

14         I don't think he's qualified as a forensic financial

15   analyst to make those -- that kind of testimony, particularly

16   with the market, like, Bitcoin in 2011, 2010, 2012, which

17   wasn't a liquid market.  I think the notion that you can just

18   go look and calculate prices and value in this market that's

19   not really liquid and that I think the valuations are

20   arbitrary, it's not like looking up the price of the

21   U.S. dollar in 2010 where we've got an expansive market and

22   there's lots of buyers and sellers and there's readily

23   available data.

24         I think the idea -- I think there's a little bit --

25   one of the problems with this case is that there's a little bit

1    of anachronistic projection from 2023 into 2010.  So we object

2    to his qualifications in terms of any kind of testimony related

3    to financial issues.

4         I think, in terms of him -- I think in terms of

5    simple blockchain explorer tracing, I don't object; but I do

6    object in terms of the soundness and reliability of his

7    methodologies, which is a separate question.

8         THE COURT:  So getting back to Reactor and your

9    challenge to Reactor, it's fairly common in at least civil

10   litigation to have economists build econometric models that are

11   not peer-reviewed, and it's just an issue that's submitted to

12   the jury as to whether the model is an accurate model or not.

13        Why is this different than the thousands of cases in

14   which economists have built econometric models and one side or

15   the other can challenge the analysis that the economist is

16   offering?

17        MR. EKELAND:  Well, I think, first, that these models

18   that you're speaking of are designed just for the case.  And

19   this Chainalysis Reactor software is being presented as

20   scientific and deterministic, something that works all the time

21   based on anecdote.  And we're supposed to trust -- and the

22   evidence that I'm hearing that's being put forward, we're

23   supposed to trust its reliability and accuracy because it's

24   been used before and supposedly been accurate.  So I think

25   that's a big difference.

1          The economist model is being designed just for the

2     case and the jury isn't being told, here's some scientific

3     thing that's being used by the SEC, by the FBI, that's been

4     used in all these cases that, you know, we don't have data sets

5     for or can't examine.  I think that's a big difference.

6          I think the -- I think that's actually a dispositive

7     difference.  And this is also a criminal case.  It's not a

8     civil case.  Someone's liberty is at stake.  So it's not just a

9     matter of an economic model determining --

10         THE COURT:  I'm not aware of any case law that says

11    that Rule 702 applies differently in criminal cases than in

12    civil cases.  Maybe there are such cases, but no one has cited

13    that to me if there is such a case.

14         MR. EKELAND:  No.  I -- I don't doubt that, Your

15    Honor.  But I do think that it is at least constitutionally

16    significant that someone's liberty is at stake, and it's not

17    just a simple matter of dollar signs.

18         And here is something that is being -- is the primary

19    evidence without any corroborating evidence at all that I've

20    seen anywhere, Mr. Sterlingov operating Bitcoin Fog, being used

21    in an attempt to take away his liberty.  And I think that

22    constitutionally, whether or not there is case law out there,

23    at least to me, that's constitutionally significant.

24         And because someone's liberty is at stake -- I

25    believe the saying is life, liberty, and property, not

1  property, life, and liberty -- then I do think it warrants a

2  higher standard of scrutiny.  I think that's what the

3  constitution demands is that in a criminal case a defendant be

4  given, you know, the highest accord.

5        THE COURT:  I think you're probably wrong about that

6  because I think that there are states that don't apply *Daubert*

7  at all, and I don't think the Supreme Court has ever even

8  hinted at a suggestion that that violates due process for a

9  state not to apply *Daubert* and that -- I'm not disagreeing -- I

10  mean, I agree with you that you raise significant questions

11  under *Daubert*, but I think you're probably wrong in suggesting

12  that *Daubert* is constitutionally mandated.

13        MR. EKELAND:  I'm not trying -- Your Honor, I'm not

14  trying to -- well, let me preserve that issue should it go up.

15  I'm not trying to -- that's not the crux of my argument here.

16        I mean, essentially -- what I'm saying -- whether or

17  not *Daubert* is constitutionally mandated, Chainalysis Reactor

18  doesn't meet any of the *Daubert* factors, not one.  And that's

19  not just coming from me.  That's coming from Ms. Bisbee, that's

20  coming from Mr. Scholl, and I even believe Mr. Scholl testified

21  that -- you know, I heard some testimony in reference to his

22  testimony about how he checked it with subpoenas.  But I also

23  recall when I -- on recross asking him, have you ever bothered

24  to check the accuracy of Chainalysis Reactor before he used it.

25  And if I recall correctly, he said no.

1    So, you know, that goes directly to the soundness and

2    reliability of his methodology.  You know, if you're going to

3    go -- that's like using a radar gun that you haven't

4    calibrated, right?  There's a number of ways -- and I think you

5    saw in Bryan Bishop's expert disclosure how complicated this

6    software is.  It's not some simple thing.

7    Like, a blockchain explorer, a publicly available --

8    and that's pretty -- relatively straightforward.  You're

9    looking at the blockchain, you're looking at the information on

10   each block, right?

11   But that's not what's going on with Reactor.  With

12   Reactor, you've got all sorts of data inputs, heuristics.  I

13   won't belabor the point because the Court knows, but there's a

14   big difference.  And I think there's a danger here I'm seeing

15   when we talk about these issues.

16   It's very easy to conflate simple blockchain tracing

17   and what's going on with Reactor.  I think it's important to

18   remember that with Reactor -- what I take to be the crux with

19   Reactor is the issue with clustering and what they're

20   attributing to Mr. Sterlingov in terms of money laundering.

21   I don't even know what that number is because I can't

22   tell it because, again, there's three different versions of it

23   so far.  Maybe they're going to come out with another one.  I

24   think that, in and of itself, shows you the reliability of the

25   software.  One person uses it, they get one number; another

1    person uses it, they get a different number.  What's going to

2    happen when we get to trial?

3        THE COURT:  I know you may disagree with this, but I

4    heard your witness -- your own witness say that at least

5    $33 million of it was confirmed by your own witness's model.

6    And laundering $33 million is laundering $33 million.  Whether

7    it's 100 million or 33 million may not be materially different

8    for what the jury has to decide.

9        It might be, if we ever reach the point of

10   sentencing, different for what I would have to decide.  But why

11   is that -- why couldn't the government simply say, fine, we'll

12   take the $33 million number?

13       MR. EKELAND:  Because I don't know if that's

14   accurate.

15       THE COURT:  Your witness said so.

16       MR. EKELAND:  I'd have to go back and check that,

17   Your Honor.  I'm not doubting you.  But, okay.  Well, then why

18   is it $300 million less than when he was initially arrested?

19   Why is that, roughly, $70 million different from what

20   Mr. Scholl says?  So how do we discriminate?

21       THE COURT:  All I'm saying is -- I'm not saying that

22   the government is necessarily wrong about $100 million.  I'm

23   just saying that at least as to $33 million, it seems that the

24   defense concedes that $33 million of the amount attributable to

25   Bitcoin Fog came from the darknet.

1        MR. EKELAND:  No, I'm not conceding that.  I'll go

2   back and look at my witness's testimony.  But let me ask a

3   question related to that.

4        THE COURT:  Right.

5        MR. EKELAND:  With what reliable criteria do we have

6   that anybody can cite to me how we distinguish between those

7   three numbers?  The problem is -- and this goes to the

8   scientific validity and the supposedly deterministic nature of

9   this software.  You don't.

10       So we arbitrarily pick that number.  So say

11  CipherTrace did say that.  How do we know that that's reliable

12  there?  How do you distinguish between them?  The problem is,

13  there is no reliable methodology to distinguish.  There is no

14  metric because there are no standards in this field.  This is a

15  completely newly emerging field without any standards.  And

16  these metrics are arbitrary.  These heuristics are arbitrary.

17  And now they're being used in an attempt to take a man's

18  liberty away.

19       It just -- it doesn't meet *Daubert*, Your Honor.  I

20  think the defense's position is obvious there.

21       THE COURT:  You've mentioned that.  Anything else you

22  wanted to add?

23       MR. EKELAND:  In terms of Mr. Scholl, I question the

24  soundness of his methodology as put forward in his report.  I'm

25  not going to reread Ms. Still's report, but starting on page 34

1    of her report, she documents the errors and assumptions.

2              THE COURT:  By the same rationale, Ms. Still clearly

3    made a substantial error in her report.  Do I throw her out?

4    Because she made a very significant error in her report.

5              MR. EKELAND:  What error is that, Your Honor?

6              THE COURT:  That she treated transactions that were

7    based purely on -- that were based on Heuristic 1 as though

8    they were based on Heuristic 2 or 3.

9              MR. EKELAND:  Your Honor, it's my understanding --

10   and I can't recall exactly what she said about that, but she

11   does have an explanation about that.  And that that's not an

12   error.  She will come and testify about that.

13             But then again, even if she did make an error,

14   doesn't that show you how error-prone this space is?

15             THE COURT:  Well, I don't think --

16             MR. EKELAND:  Who -- Your Honor, who is right?

17             THE COURT:  You need to let the Court speak when the

18   Court is speaking.

19             MR. EKELAND:  Sorry.

20             THE COURT:  What I was going to say is I don't think

21   that I've ever seen a case involving complicated forensics in

22   which one side or the other isn't saying the other side made

23   some errors along the way.

24             In fact -- the fact that you can point them out is

25   some evidence that it's verifiable one way or the other.  One

1    of you is right or wrong about whether these errors were

2    committed or not, and it can be submitted to the jury.

3              MR. EKELAND:  There's, I think, a difference between

4    a field that has standards like, say, DNA evidence -- right? --

5    or whether there's well-developed science and peer-reviewed

6    papers behind something and a newly emerging forensic field

7    that's lacking all standards.

8              One thing that strikes me, Your Honor, about this

9    space is that everybody I talked to in this space, on this

10   journey of this case, they have -- they'll give you a different

11   answer, right?  I think that's highly problematic.  And, again,

12   I think that goes to *Daubert*.

13             THE COURT:  I guess -- I see your point about

14   Reactor.  On the other aspects of this, it just seems to me

15   that it's forensics.  Someone is right and someone is wrong

16   about it.  Either someone made a mistake or someone didn't make

17   a mistake.

18             You're just tracing the blockchain, and it may be

19   that there's some points in that trace in which there's

20   uncertainty and someone makes an assumption one way or the

21   other, and that is subject to challenge and saying, well, why

22   did you assume that in that CoinJoin that there was a -- that

23   the portion of the CoinJoin that was then traceable to some

24   illegal activity came from one source versus the other source.

25   Perfectly fine cross-examination.  But that's just forensics.

1    I mean, that happens all the time in trials.  It

2    doesn't mean that it lacks science.  In fact, it means it does

3    have science.  It's not terribly different from math.  Either

4    you made a mathematical error or you didn't.

5    MR. EKELAND:  First of all, Your Honor, I'm inclined

6    to partially agree with you, with the caveat -- I mean, I

7    understand what the Court is saying.

8    THE COURT:  Right.

9    MR. EKELAND:  I think the point more what I'm trying

10    to get at is this is a standardless field in terms of

11    forensics.  And, say, with mathematics, if we used an analogy

12    to mathematics like, whatever, formats theorem or basic

13    addition -- right? -- there are readily appliable rules that

14    the community accepts.  And there are standards.  And if you

15    try to say two plus two equals five, everybody in the community

16    is going to reject you.

17    Those standards are lacking here.  I think it's

18    important to keep in mind, Your Honor, that when it comes to

19    forensics, there are forensics in well-developed fields that

20    have standards, and then there are newly emerging fields of

21    forensics that lack all standards.

22    And I think something like 51 percent of wrongful

23    convictions in the United States come from junk science from

24    newly emerging forensic fields.  I think that's a real risk.

25    And so I don't think it's as simple as just saying,

1    oh, it's forensics and -- because forensics can mean lots of

2    things, Your Honor

3            THE COURT:  Although, I have to say, to my mind,

4    there is a -- one of the differences is -- and this is

5    something that has been addressed where the Department of

6    Justice has had to amend, I think it's the U.S. Attorney's

7    manual and its guidelines like this.

8            So when someone comes into court and -- they used to

9    come into court and they would say, this DNA proves that that

10   was the person; can't say that anymore.  They can say, this DNA

11   shows that there's a one-in-a-trillion likelihood that it's

12   somebody else when it comes to ballistics.  They can't come in

13   anymore and say, this proves that that was the gun.  They can

14   say, here's the likelihood that it's the gun.

15           One of the things, to my mind, that makes this case

16   somewhat different is the government isn't submitting and

17   doesn't need to submit and say -- at least as to large portions

18   of this -- here is a certainty that this transaction from -- at

19   Bitcoin was Silk Road.  They're dealing with things in a much

20   grosser level.  They're saying we think there were tens of

21   thousands of transactions involving Silk Road.

22           Turns out if they're wrong on 5 percent of those,

23   it's immaterial; the same way that it's not -- in the way it's

24   not immaterial wherein the government in the cases will come in

25   and say, you know, we tested that hair and we can tell you to a

1    certainty that that is the defendant's hair from this case.

2          MR. EKELAND:  Your Honor, I agree with that.  I think

3    one of the issues here is that they can't even tell you how

4    accurate this is.  It could be 99 percent accurate or

5    99 percent inaccurate.  And there is no way of knowing, and I

6    think that's what's highly problematic.

7          Like, with DNA testing -- what astonishes me with DNA

8    testing was to learn that it matters what you tell the DNA

9    forensic analyst about the DNA sample they're getting.  That

10   actually affects the output of who they're going to say did it.

11   That astonishes me.

12         There's, apparently, a great deal of writing on this

13   point; that confirmation bias and cognitive bias affects even

14   DNA analysis.  When you've got a software here that is based on

15   heuristics, on algorithms, on assumptions, on behavioral

16   inputs, on hearsay, I think it compounds the issue.

17         I'm not saying the software is zero percent accurate,

18   but I'm saying we don't know.  And for *Daubert* purposes, it's

19   not reliable, it's not scientific, and it doesn't belong in a

20   federal criminal court because the jury is going to get

21   confused, I think, into thinking that this is scientific.

22         They're going to think it's a computer program that's

23   deterministic, that doesn't involve all this kind of guessing.

24   And, I think, because of the complicated nature of things here,

25   the jury is just going to throw up its hands and say it must be

1    right, it's a big $8.5 billion company.  They use it all the

2    time, so it must be working.  I think that's what *Daubert* is

3    meant to prevent.

4            THE COURT:  Okay.  Anything else?

5            MR. EKELAND:  I think we've made our point on

6    Mr. Scholl and Chainalysis Reactor.

7            THE COURT:  All right.  I need to handle this other

8    matter, so let me take a break.  We'll get set up with the

9    other matter.  As soon as we're done, we'll come back.

10           MR. EKELAND:  Thank you, Your Honor.

11           (Recess taken at 2:10 p.m. until 2:50 p.m. this same

12   date as follows:)

13           THE COURT:  All right.  I have not yet heard back

14   from the marshal about Mr. Sterlingov's computer and access.

15   I'll let you know if I hear anything before we finish today.

16           I do have from the court interpreter's office the

17   names of some interpreters/translators for Romanian and Russian

18   and one Swedish.  If you want to check with my clerk for advice

19   about that, she can probably help point you in the right

20   direction or provide you with some assistance in that regard.

21           I think we do need to pick up our pace a little bit,

22   but I want to give Ms. Pelker an opportunity for a couple of

23   more words with respect to the Chainalysis Reactor in

24   particular.

25           MS. PELKER:  Yes, Your Honor.  I'm mindful of the

1    time, but I did want to respond to a few points that the

2    defense brought up.

3              First, I did not hear the defense ask or the

4    government witnesses respond in the negative to a list of all

5    of the different *Daubert* factors.  I heard extensive testimony

6    about why the government experts, in their expertise and their

7    experience and use of Reactor, have found it to be extremely

8    reliable.

9              It's true that there are no peer-reviewed academic

10   papers or specific error rates that are specifically tailored

11   to these heuristics, but that, again, is one factor, not

12   dispositive.  We did hear extensive expert -- a fair amount of

13   testimony, including through Ms. Still, that there is a lot of

14   academic interest and research in this area.  That's, we

15   understand, not the same as a peer review of Chainalysis's

16   specific implementation, but it is still significant and we

17   think appropriate to consider.

18             THE COURT:  Can you remind me what the Meiklejohn

19   paper said on this issue.

20             MS. PELKER:  So there are, actually, a couple of even

21   different Meiklejohn papers, but the one that Ms. Still cited

22   to was, essentially, they were proposing a new heuristic that

23   they said would improve upon previous heuristics, and they were

24   actually trying to do a version of a subset of a different

25   implementation of a Heuristic 2 for peel chains and change, and

1    they came up with this new heuristic, compared it to previous

2    ones and said that it's, essentially, an improvement on these

3    previous ones, here's why.

4         We applied it to some test approaches that are

5    available in the public record, including what the government

6    had put out in the complaint about this case.  They're

7    heuristic on two parts, a follow forward, follow backwards.

8    When they applied follow forward, it didn't pick -- it wasn't

9    able to do the trace, which is the manual trace that Mr. Scholl

10   did.  They were, essentially, trying to automate what was done

11   manually.  It wasn't a cluster in Chainalysis that preexisted

12   anyway.

13        But when they did the follow backwards -- and I want

14   to make sure I'm not mixing up the two.  But when they did the

15   follow backwards, they were actually able to automate and

16   confirm what Mr. Scholl had done manually and which was not

17   clustered in Chainalysis Reactor.

18        THE COURT:  Wasn't there something about the

19   percentages of different tools and how effective they were?

20        MS. PELKER:  Yes, Your Honor.  There was a section

21   where -- not on the tools, but they went through prior research

22   on the topic.  And, basically, took Chainalysis data as ground

23   truth and compared that data to what the researchers at the

24   time applying their heuristics to the blockchain would have

25   found.

1          So they found that, actually, when there was a 60

2     percent error rate, it's a 60 percent error rate off of

3     Chainalysis ground truth data.  So showing that it is different

4     than what is in Chainalysis Reactor is my understanding of the

5     study, understanding I'm not an academic expert in the field.

6     But that's my understanding of what was done.

7          THE COURT:  Okay.  So there was a -- was there a

8     60 percent difference between what they predicted and what

9     Chainalysis predicted?

10          MS. PELKER:  They applied the heuristic, and they

11     said that there would be a -- there's all of these different

12     academic papers that they cite from, 2013 down to a more recent

13     one.  I think the one that defense keeps citing is the

14     60 percent error rate.

15          THE COURT:  Right.

16          MS. PELKER:  What they did was looked at this

17     heuristic and said back in -- if we apply this heuristic that

18     was developed in 2013, it would have a 60 percent false

19     positive rate.  But they're calculating that false positive

20     rate, as I understand it, based off of Chainalysis's ground

21     truth.

22          They're saying that it's 60 percent false positive,

23     because they're saying that what Chainalysis has is accurate.

24          THE COURT:  What that might well show is that

25     Chainalysis is just more conservative than what they're doing

1    and that they were getting more hits than Chainalysis is

2    getting.  Does that seem right?

3            MS. PELKER:  It's possible, Your Honor.  I believe

4    that there was also -- I would have to go back and do an

5    in-depth reading and consult with our experts.

6            It's possible that there was also some evaluation

7    when they were looking at the data as to why they were

8    confident that there wasn't more in the way of false negatives

9    in the Chainalysis data that were getting picked up by the

10   heuristic.  I'm just not sure.

11           THE COURT:  I'm going to have to go back and look at

12   that further as well.  Okay.

13           MS. PELKER:  We did -- I believe those papers did get

14   admitted into the record.

15           THE COURT:  I think so.

16           MS. PELKER:  As far as the different figures that

17   the defense brought up, the complaint has a figure that is the

18   total amount of money that was moved through Bitcoin Fog.  We

19   say that that is property that's certainly the value for the

20   1960 money transmission and is relevant as the property

21   involved in the money laundering offense.

22           Within that, there is the subset of funds that

23   Mr. Scholl identified as specifically tied to the particular

24   darknet markets that he did the tracing for; both direct and

25   indirect.  And then within that, there's a subset --

1          THE COURT:  Is that 100 million, roughly?

2          MS. PELKER:  I would have to pull up the actual

3    chart, but he has it broken out from direct into indirect.  I

4    believe that's what the defense is referring to is the

5    $100 million number.  But it's actually split out in a few

6    different ways.  But it's specific figures.

7          And then a subset of that is that Ms. Bisbee looked

8    at direct.  And then when she did indirect -- and this is set

9    out in the reports -- she, basically, took a subset of the

10   indirect to only look at the transfers that were restricted to

11   one hop in between.

12         THE COURT:  I see.

13         MS. PELKER:  Basically, a withdrawal from a

14   marketplace to an intermediate address, then to be deposited;

15   whereas, Mr. Scholl -- essentially, the default is to not have

16   that sort of restriction.

17         The direct spend numbers are the exact same from

18   Mr. Scholl's to Ms. Bisbee's.  This is where the difference in

19   numbers comes in.  There's no difference in what the software

20   is exporting.

21         THE COURT:  Okay.

22         MS. PELKER:  And it's the same addresses that are

23   exported, et cetera.

24         A minor point on the article simply because defense

25   keeps bringing it up.  Mr. Brown and I wrote an article for the

1    DOJ journal talking about blockchain admission at trial.  We

2    have a section where we talk about how blockchain evidence is

3    commonly used as lead purposes.

4         We in no way say or meant to suggest that that means

5    that it's not appropriate for trial.  In fact, a whole portion

6    of the article goes on to explain how we submit that you would

7    go through the exact exercise that we're going through here.

8    There's no Department of Justice policy or suggestion that

9    blockchain analysis is not appropriate for trial.

10        I'm happy to take any further questions, but I know

11   we have a lot of other experts to get to.

12        THE COURT:  That's helpful.  The only thing I would

13   just say is I do think that the *Daubert* motion, at least with

14   respect to Reactor, is a substantial motion.  So I just

15   encourage you, when you give me the evidence that can be used

16   to confirm the accuracy of the tool, make sure that you just

17   are as thorough as you can be in that because I do think that

18   this is a substantial motion.

19        MS. PELKER:  Yes, Your Honor.  As far as that, we

20   intend to submit kind of specific examples beyond what we've

21   already done in our prior briefing.  But if there's anything

22   else that would be particularly helpful or useful to the Court,

23   understanding that there's already been extensive briefing --

24        THE COURT:  Yes.  I guess I'd appreciate it if both

25   of you can cover what's already out there and I've already

1    heard just so it's all in one place and I can find it easily.

2    And then if there's anything that you want to point out that

3    has not been previously identified for me, I'd appreciate that

4    as well.

5         MS. PELKER:  Understood, Your Honor.

6         THE COURT:  Thank you.  Should we move on then to the

7    next witness, which -- I guess what we can do is Ms. Bisbee;

8    and I don't think we need to do -- go through the entire

9    Chainalysis Reactor analysis again, unless there's something

10   more that comes up with respect to her, and I'd be happy to

11   hear that.

12        So I have her report in front of me.  Why don't we

13   just do the same exercise and make sure I understand exactly

14   what it is she's going to be testifying to or you want her to

15   testify to, and then we can run through that.

16        MS. PELKER:  Yes, Your Honor.  So for her report,

17   again, it's quite limited of, really, just these are the list

18   of addresses that are associated with each of these different

19   entities.  And she explains again, clustering based on

20   Heuristic 1, Heuristic 2.  Heuristic 3 is only applicable for

21   AlphaBay and relates to information that was provided by the

22   government following the seizure in that case.  But that would

23   also be part of the testimony.

24        She gives -- if we're looking at pages 3 through 5,

25   she explains background concepts for virtual currency; so

1    what -- how virtual currency is stored in a wallet, how

2    transactions occur.

3            Starting on page 5, she then introduces the concepts

4    of clustering and talks about the different aspects that go

5    into co-spend clustering and then the features that Chainalysis

6    looks at for their behavioral clustering for Heuristic 2.

7            And she talks about here and then also in her

8    testimony about how, essentially, they try and take a handprint

9    of a particular service.  Services all act differently on the

10   blockchain, and they're observing that -- patterns of behavior

11   for a particular service to model it.

12           Then it explains different transaction patterns; so

13   peel chain behavior, service-specific behavior.  And then

14   starting on page 9, discusses the specific addresses that are

15   associated with Bitcoin Fog and why Chainalysis has determined

16   that those are appropriate -- those are clustered together and

17   that they're controlled by Bitcoin Fog.

18              She then does the same for the various other

19   marketplaces that are covered in the government's expert report

20   through page 26.  And this is all supplemented by attachments

21   to her report.

22           THE COURT:  Do I have the attachments, or are those

23   too voluminous?

24           MS. PELKER:  I believe you have in the next exhibit

25   in that binder, you see a file structure that is BF receiving,

1    BF direct, Abraxas market with co-spend.  We, basically,

2    screenshotted the Excel spreadsheets.

3              We're happy to provide those Excel spreadsheets.

4    Those will be the trial exhibits.  We can send them to the

5    Court.

6              THE COURT:  How extensive are they?

7              MS. PELKER:  20,000 pages each.  So it is a list of

8    900,000 -- 930-some-odd-thousand addresses for Bitcoin Fog;

9    similar large numbers for all of the different darknet markets.

10   You see that for AlphaBay, I believe, possibly in the

11   supplemental, actually, it gets split into two different Excel

12   files because Excel couldn't take more than a million

13   addresses.  And we on the U.S. Attorney's Office side needed to

14   have it in Excel.  So it's voluminous.  We're happy to send it

15   over, though.

16             THE COURT:  I think I probably can live without that.

17             MS. PELKER:  And then starting on page 27, there is

18   the explanation of the flow of funds, and that is just the

19   spend from Bitcoin Fog to the different darknet marketplaces

20   and vice versa.

21             So a flow of funds analysis of just looking at these

22   two different entities, how much money is moving between them.

23   And most of that is included in those attachments, and she

24   lists off the attachments on page 28.

25             There was then the supplemental report that was filed

1    that just was responsive to the Court's question, and then an

2    update to the attachments from the filing on ECF 153.

3               THE COURT:  Okay.  Anything else then?

4               MS. PELKER:  No, Your Honor.

5               THE COURT:  Mr. Ekeland, anything you want to raise

6    other than the issues that we've been over with respect to

7    Reactor?

8               MR. EKELAND:  No.  I do -- if I understand

9    Ms. Bisbee's report correctly, it's entirely dependent on

10   Chainalysis Reactor.

11              I do want to mention one thing we looked up in the

12   break.  That's, actually, when it comes to Heuristic No. 1,

13   CipherTrace -- and this is on page 7 of Ms. Still's report --

14   found it had a 60 percent discrepancy rate between their use of

15   Heuristic No. 1 and Chainalysis Reactor's use.

16              THE COURT:  But I think that was because of that

17   misunderstanding about it, wasn't it?

18              MR. EKELAND:  I'm going to -- I'm not going to

19   represent what she will come back in here and can testify as to

20   the misunderstanding, and that I think she blanked out a little

21   bit on the stand.  I don't want to misrepresent it.

22              It's my understanding that it wasn't an error on her

23   part, but I can't -- I'm not going to make a misrepresentation

24   to the Court by trying to explain it.

25              I think, besides the fact that the entire report is

1    dependent on Chainalysis Reactor, I just do want to point out

2    to the Court that most of these darknet markets ceased

3    operations outside the statute of limitations.  These are

4    markets that go down in, like, 2014 -- 2014.

5            There's some things in the Bisbee report I just don't

6    understand where I can -- I take it to be they're trying to get

7    around the statute of limitation issues by saying, even though

8    the government seized this darknet market outside the statute

9    of limitations, we somehow saw a transaction in whatever --

10   2022 or whatever.

11           And I just -- in terms of the statute of limitations

12   issue, I do want to point that out.  And I just --

13           THE COURT:  So with respect to that issue, let me ask

14   you, assuming we get to this at trial and this comes in at

15   trial and that comes up as an issue, if there is an instruction

16   you want me to give the jury, you're welcome to propose that at

17   the relevant time.

18           It may be that if there is activity that is outside

19   the statute of limitations, it might be relevant to intent,

20   state of mind, modus operandi, whatever it might be, but where

21   the actions itself are not what are charged here, what would be

22   criminal in this case.  So it may be that a limiting

23   instruction would be appropriate.

24           MR. EKELAND:  I think -- if I can remember, I think

25   we did ask for a jury instruction.  I just wanted to point that

1    out.

2              THE COURT:  As the evidence comes in, if there's

3    something you want me to offer, you need to remind me at the

4    time and give me language and show it to the government in

5    advance and talk about it and then we can consider that.

6              MR. EKELAND:  Absolutely.  One thing on the peel

7    chains, it's my understanding that Chainalysis, in its peel

8    chains, it skips transactions.  It hops when it's got a long

9    peel chain.

10              This is according to what Ms. Still is telling me.

11    It's not looking at each step, so to speak, in a peel chain

12    transaction.  It will skip hundreds of transactions.  I think

13    that's another issue with the reliability of Chainalysis's peel

14    chain analysis.  And also --

15              THE COURT:  I'm sorry.  How does it do that?

16              MR. EKELAND:  I don't know the technical aspect of

17    it, and I'm just going by what Ms. Still tells me.  She says,

18    essentially -- say you've got a really complicated long peel

19    chain --

20              THE COURT:  Right.

21              MR. EKELAND:  -- apparently, it's my understanding

22    that the algorithm or whatever, the software will skip sections

23    of that peel chain to the point sometimes it will skip hundreds

24    of transaction points on the peel chain.

25              It's my understanding that that affects the accuracy

1    of the trace.  I mean, Ms. Still can add to that.  I can't

2    remember if she actually put that in her report.

3          And then I think just as a final point -- because I

4    know we're pressed for time -- I will point out that Ms. Bisbee

5    did testify that, if I recall correctly, that CoinJoins -- can

6    disrupt Heuristic No. 1.  I do believe she testified that there

7    is some sort of algorithm that Chainalysis Reactor uses, but

8    she couldn't describe it.  And also I believe the --

9          THE COURT:  With respect to that, I do think that the

10   law is pretty clear that the witness doesn't have to be the

11   software expert themselves or understand necessarily how a

12   computer program works, but I do think that, consistent with

13   what I've already directed, that if there is something built

14   into the heuristic in a way that accounts for or doesn't

15   account for CoinJoins, you're entitled to know what that is.

16         MR. EKELAND:  Absolutely, Your Honor.  I don't

17   dispute your point on that.

18         I do think on the issue of her qualifications that

19   she didn't have -- whereas, I don't think the expert has to

20   have an in-depth knowledge of the software.  I didn't think

21   that she had -- I was surprised by her lack of understanding of

22   the software and being unable to --

23         THE COURT:  Although, my recollection is that

24   Ms. Still couldn't even remember whether her software had a

25   correction for CoinJoin or not; just didn't know one way or the

 1    other on that.  She said I'd have to check with the engineer.

 2              MR. EKELAND:  That's correct.

 3              THE COURT:  So if that's a question of qualification,

 4    then Ms. Still would be out on the same theory.

 5              MR. EKELAND:  Well, then maybe neither of them come

 6    in, right?  If that's -- again, you see the problem here with

 7    how complicated the software is.

 8              I think there's a -- part of the problem here with

 9    the software is it's way more complicated than people think.

10    And, again, I think the issue of jury confusion is acute, you

11    know.

12              You have somebody like Ms. Bisbee coming up who is,

13    you know, being presented as an authority on the software and

14    she's speaking --

15              THE COURT:  I don't think she's being offered as an

16    authority on the software.

17              MR. EKELAND:  Well, she is testifying as to the

18    attributions -- the darknet attributions made by the

19    software -- and I understand, Your Honor, that we're limited on

20    time.

21              THE COURT:  All my point is, we don't have anyone

22    here who is one of the software engineers who is offering --

23    testifying for either side in this case.

24              MR. EKELAND:  That is correct, unless maybe Bryan

25    Bishop comes in.  Then I'd have to check.

1          The final point I'd just make about this report, and

2     this is more of a relevancy issue, I think, than a *Daubert* one.

3     She did testify that this report doesn't make a single

4     attribution to Mr. Sterlingov, and the only place that

5     Mr. Sterlingov's name appears in the entire report is on the

6     title page.  So I question its relevancy in this proceeding.

7     And even if it is relevant, I think it's far more prejudicial

8     than probative.

9          THE COURT:  All right.  Ms. Pelker, anything else you

10    wanted to say?  You look like you wanted to say something about

11    the skipping transactions before.

12         MS. PELKER:  I believe that -- I might be

13    misunderstanding Ms. Still's concern, but Chainalysis skips

14    insofar as it will look at the -- it will try to find the end

15    of the peel chain and then look at whether it co-spends with

16    something earlier on to then determine whether it's appropriate

17    to cluster it together.

18         That's not really skipping the transaction.  It's

19    just how it does its clustering analysis.

20         THE COURT:  Okay.  All right.  Shall we move on then

21    to the next witness, which I have as Matthew St. Jean.

22         MS. PELKER:  Yes, Your Honor.  I do not believe there

23    was any *Daubert* challenge to Mr. St. Jean.

24         THE COURT:  Anything to add there, Mr. Ekeland?

25         MR. EKELAND:  We're talking -- well, we crossed, I

1    believe, Ms. Mazarin -- Mazars de Mazarin, and I think the way

2    that the government noticed these expert witnesses is they

3    noticed them -- you can correct me if I'm wrong -- St. Jean and

4    Ms. Mazars de Mazarin as interchangeable.

5         I'm assuming that Ms. Mazars is the one who is going

6    to testify at trial, although I noticed that the government

7    noticed St. Jean as a witness.

8         THE COURT:  Let me just confirm that one way or the

9    other.  Is Mr. St. Jean a witness or not?

10        MS. PELKER:  We're still making a determination as to

11   his testimony.  His testimony would not be for the IP analysis,

12   which, as I understand it, is what defense had challenged with

13   regard to Ms. Mazars.

14        But if there's anything about -- we're happy to -- if

15   there's any challenge to Mr. St. Jean's qualifications;

16   otherwise, he's just really a forensic fact witness, if needed.

17        MR. EKELAND:  Your Honor, we object to that.  I think

18   one of my concerns here is -- looking at the government's

19   witness list is that they're going to be trying to backdoor in

20   expert opinion through what they're presenting as lay fact

21   witnesses.

22        I'm looking at their witness list and I don't really

23   see a single fact witness.  I see a lot of cooperating

24   witnesses; people who are in jail, people who I think they're

25   going to put forth as purported users of Bitcoin Fog.  My

1    concern here is that the government's trying to back door in

2    expert testimony.

3         If Mr. St. Jean is going to testify, he's been

4    noticed as an expert.  I believe the expert disclosure says

5    either/or.  Then we're going to want a *Daubert* hearing and know

6    what the subject matter of his testimony is.

7         THE COURT:  Well, you have the subject matter

8    because it's here in the expert report.

9         MR. EKELAND:  I believe, if I heard them correctly,

10   they said he would be testifying to separate things than

11   Ms. Mazars.  And then we would like to *Daubert* him on that.

12   And just to remind the Court of --

13        THE COURT:  *Daubert* -- we've run a little bit off the

14   rails on this.

15        *Daubert* is not a civil court deposition.  I mean, you

16   need to identify for me and say, here is something in this

17   report that we have reason to believe could not satisfy the

18   *Daubert* standard.  You have his expert report and you have what

19   he's indicated he's going to testify about.

20        So the question is whether there's something in here

21   where there's reason to believe that it wouldn't satisfy

22   *Daubert*.

23        MR. EKELAND:  Is he testifying to the same things

24   that Ms. Mazars -- I'm just a little confused as to what the

25   nature of his testimony is going to be.  Because the expert

1    disclosure, when we crossed Ms. Mazars, we focused on her

2    report.  We were pressed for time.

3            We don't have an expert report from St. Jean unless

4    he's adopting that IP address overlap.  I think I just heard

5    the government say that he wasn't going to speak to the IP

6    address overlap.

7            As for the rest of the expert disclosure, as I recall

8    it, it's, basically, full of vagaries, saying, oh, we're going

9    to talk about the devices seized; we're going to translate the

10   meaning of -- I don't know if I'm using the right word of

11   stuff.  It's not clear at all what that testimony is going to

12   consist of.

13           I thought it was going to be focused primarily on

14   what was disclosed in the expert report, which, as the Court

15   recalls, Ms. Mazars said this is the first time I've ever

16   written this report, there's no scientific methodology

17   underlying it, and I'm essentially guessing, right?

18           THE COURT:  If she said that, I'll give you a dollar.

19           MR. EKELAND:  She did say that.  She said, Your

20   Honor, if I recall correctly, that she had no scientific

21   methodology or papers that she could cite, that it was the

22   first time that she had written this type of report; and I

23   believe, because it struck me when she said it, that when it

24   came to her IP address overlap, she was, essentially, guessing.

25   That really struck me when she said that word.  I'm happy to --

```
 1    maybe I'm wrong.

 2             THE COURT:  I'll pay you the dollar.

 3             MR. EKELAND:  Well, I'm happy to go look --

 4             THE COURT:  It would have struck me if a witness took

 5    the stand and said those things.

 6             MR. EKELAND:  That's what struck me about her IP

 7    address overlap.  Essentially, it's an arbitrary methodology,

 8    just like she chose the times of ten-minute overlap time,

 9    one-month overlap time, and a year.

10             THE COURT:  I'm sorry.  I just want to -- given the

11    limits of time -- make sure we stay in order here.  We're now

12    talking about a different witness.

13             Let's talk about Mr. St. Jean, and perhaps Ms. Pelker

14    can clarify for us as to what he's going to testify about, and

15    you can let me know whether you object under Daubert and, if

16    so, on what basis.

17             MS. PELKER:  Mr. St. Jean was one of the forensic

18    examiners who didn't do the original imaging, but then looked

19    at what the -- was on the defendant's devices and pulled off

20    the files, in addition to Ms. Mazars.

21             In light of the defense's decision not to challenge

22    the authenticity of the imaging, we likely are not going to end

23    up needing to call him to testify, but we still have not made

24    that determination.  The axiom forensic or magnet exports were

25    what Mr. St. Jean's work product was, and those were all turned
```

1    over to the defense.

2                Mr. St. Jean did not do the additional IP analysis

3    for Ms. Mazars.  His testimony would, essentially, be I looked

4    at these devices; here are the files that I found on them; and

5    kind of explain where they were found.

6                And then, to the extent that we would have him

7    testify about any of Mr. Sterlingov's notes, it's similar to

8    what's described in the expert witness disclosure of,

9    basically, saying this is what a static IP is, reading some of

10   the defendant's notes and being able to explain them to the

11   jury.

12               THE COURT:  All right.  Mr. Ekeland, what about those

13   issues?

14               MR. EKELAND:  I think if Mr. St. Jean comes in just

15   as a fact witness to describe what was the forensic imaging,

16   we're okay.  I think --

17               THE COURT:  I think the government is perhaps just

18   being a little bit careful so they don't run into an objection

19   that, well, it's actually expert testimony if he's saying I

20   found it on this part of the hard drive; whereas, a layperson

21   might not know what the different portions of the hard drive

22   were, for example.

23               MR. EKELAND:  Yes.  I believe that, Your Honor.

24   Where I'm concerned more about is where they're interpreting

25   the notes and the meaning of notes.  I think there you can go

 1     either way.

 2             You can go in the direction of, okay, well, here's

 3     whatever -- what a VPN means.  If opinion testimony starts to

 4     get offered about, oh, this particular configuration means that

 5     the defendant was engaged in behavior X, Y, and Z, something

 6     that goes beyond the facts, that's what we're concerned with.

 7             I just -- I don't want to belabor the point, but I

 8     just want to reserve my ability to object on that point.

 9             THE COURT:  I will allow that.  I will just defer to,

10     if he testifies and those issues come up, you can just raise an

11     objection, as appropriate, at the time.

12             Otherwise, I'm going to allow Mr. St. Jean's

13     testimony as it was just outlined by Ms. Pelker, but with the

14     understanding that Mr. Ekeland is reserving the right to raise

15     objections to particular questions or answers.

16             So then does that mean we should turn to Ms. Mazars

17     de Mazarin?

18             MS. PELKER:  Yes.  I think, similarly, the bulk of

19     her testimony is going to be what we had just described, and

20     then she also will discuss the IP analysis; that is, the IP

21     analysis that she testified to, but also simply that when she

22     reviewed these different records, this particular IP address

23     was present in these different records.  When she looked at

24     what time the IP addresses were accessing the different

25     accounts, she noticed that they were close in time, explaining

1    the significance of that.

2         She will explain to the jury how she determined who

3    was controlling a particular -- who likely was controlling a

4    particular IP address at a given time insofar as a company and

5    then giving, as set forth in the disclosure, essentially,

6    background concepts.  You know, what is Tor; how does Tor work;

7    what's the clearnet; what are proxies; what are VPNs.  And then

8    explaining the meaning of the defendant's notes.

9         I don't think that it's opinion testimony about what

10   a note -- of the definitions of terms within a defendant's

11   notes.  We still -- we do think it's technical expertise that's

12   outside of the province of a lay juror; that it would be

13   helpful to have this testimony.  And that's why we included it

14   within our expert notice.

15        To the extent that Mr. Fischbach is going to get up

16   and say that he read these notes and he thinks that they have

17   some other type of meaning, I think that's best dealt with for

18   cross.  It's really not a *Daubert* issue.

19             THE COURT:  All right.  Mr. Ekeland?

20             MR. EKELAND:  Couple minor things.  One, I think, in

21   terms of -- was it the *Morgan* factors and 702 factor, whether

22   or not a report is based on sufficient facts of data, I do want

23   to point out that she did testify that in terms of her IP

24   address analysis, she did not analyze any native logs.

25        In other words, she didn't have server logs when she

1    did her analysis, and I don't think that that is a sufficient

2    basis to do an IP address analysis.

3          If I recall correctly, she couldn't identify -- she

4    had times for when people logged in, but she didn't have times

5    when people logged out, and she actually didn't examine the

6    original data because the -- she just didn't have access to the

7    server logs.

8          And we were -- so that's, I think, problematic in

9    terms of her IP address analysis.  And also, I think, on a

10   deeper level, you don't have, say, what are known as MAC

11   addresses, which are unique identifiers for computers that

12   often server logs will record when they log in.  Which is like

13   a unique -- it's a machine access code; I think that's what it

14   stands for.  That's a unique identifier on a computer, and

15   quite often server logs will record that.

16         We don't have that here.  And she did say -- we were

17   just looking at her transcript -- that she was, essentially,

18   making a professional guess in terms of her IP address overlap

19   analysis, and I think that segues into the soundness of her

20   methodology.

21         If I do recall correctly, she said she had no

22   peer-reviewed papers or any kind of academic papers that she

23   could cite for her methodology, and that this was the first

24   time she had ever written a report like this.

25         But besides those objections --

1          THE COURT:  Give me just a second.  I just want to

2     look at her materials.

3          MR. EKELAND:  Using the phrase "professional guess"

4     is on page 363 from the transcript on August 23rd, 2023.

5          THE COURT:  Okay.  Give me just a second.  I may have

6     to come back to this in a few minutes.  I'm just trying to put

7     my hands on the transcript.

8          Okay.  Anything else with respect to Ms. Mazars?

9          MR. EKELAND:  I have the transcript in front of me,

10    and I can just read to you what I'm talking about.

11         THE COURT:  That's fine.

12         MR. EKELAND:  So it starts off -- this is on

13    page 36- -- it's 368 of the transcript, and beginning in the

14    middle of the page at line 9, it says, question, "In Point 1 of

15    your conclusion" --

16         THE COURT:  I'm sorry.  You're going to have to go

17    slower for the court reporter.

18         MR. EKELAND:  I apologize.  "And in Point 1 of your

19    conclusion on page 7, you say that the same user most likely

20    accessed, and then you list the number of the accounts.  But

21    that" -- this is choppy.  "That most likely that's not a -- you

22    don't have any statistical probability that you could give me

23    for the accuracy of that most likely; is that just a guess on

24    your part?"

25         This is skipping around on me.  "It's correct that I

1     don't have -- it was not a statistically computed probability,

2     and I didn't intend it in that way."

3              "Okay.  You're also not identifying anywhere there in

4     the conclusion or anywhere in your expert report the identity

5     of the user that you're referring to in Bullet Point 1."

6              THE COURT:  I can go look this up if it's easier.

7              MR. EKELAND:  The point is made, Your Honor.  I think

8     that her cross-examination shows that she didn't have any

9     scientific basis for her methodology, and this was the first

10    time she had ever wrote the report.

11             She didn't rely on native server logs, and so that

12    calls into question the sufficiency of the data that she's

13    using, and we think that the entire IP address overlap analysis

14    should be excluded.

15             THE COURT:  Okay.  I'll take a look.  Ms. Pelker?

16             MS. PELKER:  Your Honor, just to point out that I

17    think that Ms. -- the excerpt from the transcript, as Your

18    Honor will see, is that Mr. Ekeland is crossing Ms. Mazars

19    de Mazarin repeatedly about whether there's any statistical

20    basis for this.  She maintained that, no, this is not a

21    statistical assessment.  That's not what she was basing her

22    determination of those time windows on.

23             And then she said that it was a professional guess, a

24    professional opinion.  I think it's clear from the transcript

25    that she basically -- she corrected herself to say a

1    professional opinion.  That's what she's intending to convey.

2         And it's regarding the concept of, is this a

3    statistical analysis where you ran different models to come up

4    with your windows, or were you looking, based on your

5    experience, and came up with these windows which, again, were

6    to narrow down the time focus as one step in her analysis.

7         THE COURT:  I'll go back and take a look at this one

8    as well.  If she testifies, I'm confident that we'll hear about

9    this on cross-examination.

10         MS. PELKER:  I am very sure, and I think she knew

11    that as soon as she said it -- or misspoke.

12         The other thing is just the native server logs.  To

13    the extent that it keeps coming up -- to the extent that the

14    native server logs keep coming up, again, the government would

15    love to have the native server logs for the Bitcoin Fog server.

16    We don't -- it simply cannot be the case that in any case where

17    a cybercriminal is successful in hiding his server that any of

18    the government's analysis and work cannot be reliable because

19    we don't have access to those logs.

20         THE COURT:  Okay.

21         MR. EKELAND:  Briefly on the server logs point, Your

22    Honor.  We're not talking about the Bitcoin Fog server for the

23    IP address analysis.  We're talking about the servers.  There

24    was one in Luxembourg.  And any number of other servers that

25    the IP addresses are supposedly coming from, and the Court may

1    recall these were identified, many of them as proxy servers.

2    And Ms. Mazars testified that thousands, if not tens of

3    thousands, of people could all be sharing the same IP address

4    at the same time.  We're not talking about the Bitcoin Fog

5    server logs.

6              THE COURT:  All right.  Ms. Pelker, anything further?

7              MS. PELKER:  No, Your Honor.  Just that, again, if we

8    had the server logs for that proxy server, we would love that

9    because then we could, in fact, match up the inputs to the --

10             THE COURT:  Is there some reason that you couldn't

11   have, I guess, through some international process obtained them

12   from the proxy server?

13             MS. PELKER:  The defendant intentionally chose proxy

14   servers that don't keep logs.  So there is no -- there would

15   have -- even if we had been aware of his access at the time

16   that they were occurring back in 2011, they wouldn't have been

17   there by the time we went to get them, which is not -- is not

18   atypical of a variety of different cybercriminal cases.

19             THE COURT:  Okay.  Final word on this?

20             MR. EKELAND:  It's an assumption, a conclusory

21   statement that the defendant intentionally chose proxy servers

22   that didn't keep logs.

23             THE COURT:  I understand that's an argument.

24             MR. EKELAND:  It's quite common for proxy servers not

25   to keep logs.  It's --

1          THE COURT:  But the point is, if they don't exist,

2     the government can't have them.

3          MR. EKELAND:  If they don't exist, then that goes to

4     the sufficiency of the data.  They're just not there.

5          THE COURT:  All right.  Anything else with respect to

6     the government's witnesses?  Anyone else we should talk about?

7          MS. PELKER:  Nothing from the government, Your Honor.

8          MR. EKELAND:  Nothing further from the defendant,

9     Your Honor.

10          THE COURT:  Let's turn then to the defense experts.

11     Give me a second here.  Go ahead.

12          MR. EKELAND:  We mentioned this before.  I'll just be

13     brief on this.  I think the government noticed Mr. Vlahakis as

14     an expert in FinCEN regulations and money laundering law, and

15     we'd just renew our objection on him testifying on matters of

16     law and regulation at all.  We think that's exclusively the

17     province of the Court.  Oh, and we also left out Sarah Glave.

18          THE COURT:  Is there something you want to raise with

19     her?

20          MR. EKELAND:  Well, I wanted to make sure that her --

21     she didn't issue an expert report.  We've gotten demonstratives

22     from the government in terms of summaries that we're still

23     looking at.  We're concerned that she may offer and express an

24     opinion that is not in her disclosure, something to the effect

25     that there's no way that Mr. Sterlingov could have accumulated

1    all of this money from Bitcoin appreciation based on his

2    assets.  So we just want to make sure that her testimony is

3    limited to what was disclosed.

4           THE COURT:  All right.  Ms. Pelker?  Mr. Brown?

5           MR. BROWN:  Your Honor, I think the government has no

6    objection to limiting Ms. Glave's testimony to what was in her

7    disclosure.  We had discussed Ms. Glave, as well as

8    Mr. Vlahakis, I think, at our last hearing.

9           THE COURT:  Right.

10          MR. BROWN:  There's been no other, I mean, real

11    challenge to her qualifications or anything that she plans to

12    testify about.  It's, basically, just she is going to go

13    through the financial analysis of -- and we have produced the

14    summary charts, and just last night we produced her work

15    product --

16          THE COURT:  Right.

17          MR. BROWN:  -- for all of that financial analysis.

18          THE COURT:  Okay.  Do you want to address the point

19    about whether it's appropriate for a witness to testify just

20    about what regulatory requirements are, if that's appropriate

21    expert testimony or fact testimony?

22          MR. BROWN:  Your Honor, with respect to Mr. Vlahakis,

23    he is absolutely not going to opine about making a judgment of

24    was Bitcoin Fog, was Roman Sterlingov a money-transmitting

25    business that was required to register as such with FinCEN.

1    That is not what his testimony is going to be.

2         He is an expert in banking regulation and the Bank

3    Secrecy Act, and this is important contextual information.  It

4    will be helpful to the jury to understand what it means to be a

5    registered money-transmitting business; what are the

6    requirements; why do those regulations exist; how does that

7    play a role in law enforcement's ability to, you know, review

8    reports that are of particular importance to criminal, tax, and

9    regulatory investigations.

10        This is -- as I said the last time we discussed Mr.

11   Vlahakis, this really goes to the "so what?" of the 1960

12   offense, which I think would be particularly helpful for the

13   1960 offense because most jurors are probably not familiar with

14   money-transmitting regulations and just the fact that we have

15   money-transmitting regulations.

16        But he will not -- there's no part of his testimony

17   that I think will overlap with what we contemplate being the

18   jury instructions or any area of law on which the jury is

19   instructed in order for them to arrive at their verdict.

20        And, Your Honor, one other point.  It provides

21   context for the defendant's own statements.  For example, under

22   his killdozer moniker, the defendant posted on BitcoinTalk

23   about how FinCEN regulates Bitcoin, and this was in 2013 or

24   2012.  I don't remember exactly.

25             THE COURT:  Right.

```
1              MR. BROWN:  But he does reference awareness that --

2      we have the defendant's statements where he's referencing

3      awareness of the fact that FinCEN regulates and that anti-money

4      laundering regulations exist.  And so Mr. Vlahakis's testimony

5      will also be important for that.

6              THE COURT:  Has any -- have you briefed at all -- I

7      can't recall -- or anyone pointed me to any case law on the

8      question of what the rules are with respect to the

9      admissibility of legal or regulatory background or context

10     through offering that through a witness?

11             MR. BROWN:  We have not briefed it because the

12     defense has never filed any challenge to Mr. Vlahakis.

13             THE COURT:  I see.  Okay.

14             MR. BROWN:  And there may be case law out there.

15             THE COURT:  I'm sure there is in some sense.  I know

16     there is with respect to when expert testimony on the law is

17     permissible or not.  It would be helpful if you-all could get

18     me started on the research by pointing me to a case or two.

19             MR. BROWN:  We can certainly add that to our

20     submission --

21             THE COURT:  Okay.

22             MR. BROWN:  -- on Monday.

23             THE COURT:  That would be helpful.

24             MR. BROWN:  I mean, don't expect a whole long brief,

25     but we can certainly find a few case citations.
```

1          I would also add that Mr. Vlahakis has testified, as

2     has been disclosed, at numerous trials without objection.  And

3     he's typically testified -- as here, he's noticed out of an

4     abundance of caution as an expert.

5          The testimony, to my knowledge, has never been

6     challenged on *Daubert* grounds and has never not been accepted.

7     Again, let me just emphasize -- and Mr. Vlahakis is extremely

8     clear on this -- he will not make an opinion about whether in

9     this particular case Bitcoin Fog was a money-transmitting

10    business.  He will not opine about if Sterlingov was required

11    to register, because that is an ultimate question for the jury.

12          THE COURT:  Right.

13          MR. BROWN:  But, generally speaking, there's nothing

14    necessarily wrong with an expert testifying about matters that

15    implicate an ultimate issue for the jury.

16          I don't think in this case he would actually be

17    invading the province of the Court and instructing the jury

18    about the law.  He's just providing background investigation

19    that these regulations exist.  This is why the regulations

20    exist.  That's not something that the Court would ever instruct

21    the jury about.  So it really does provide contextual

22    information.

23          THE COURT:  Well, it's certainly my intuition at

24    least that someone can testify, for example, what FinCEN is,

25    what FinCEN does, something to provide some context for the

1    jury on this.  It would just be helpful to be able to put my

2    hands easily on the case law so I know what the parameters are.

3            MR. BROWN:  Yes, Your Honor.  Another example just

4    occurred to me.

5            A few years ago, I tried a case involving bulk cash

6    smuggling.  We brought in an expert from CBP who testified

7    about a specific report -- testified about the fact that there

8    is a regulation on carrying cash across the border, requiring

9    it to file a currency monetary instrument report, a CMIR.  He

10    was accepted as an expert in front of Judge McFadden to testify

11    about this and about why CBP enforces the CMIR regulations.  I

12    think that's fairly analogous to this case.

13            THE COURT:  Okay.  Thank you.  Mr. Ekeland, anything

14    else on this?  Do you have a case for me?

15            MR. EKELAND:  I'm happy to look one up.  I just will

16    briefly -- we did, I think, stipulate that Bitcoin Fog didn't

17    register in D.C., so --

18            THE COURT:  You indicated that you will stipulate or

19    maybe the document you filed uses the words "and we stipulate

20    to this."

21            It would be helpful, I think, to have those

22    stipulations, actually, in the format of a stipulation so that

23    they actually go to the jury as evidence in the case.  And so

24    anything that the parties have stipulated to, I think you ought

25    to put on -- the caption of the case on it, stipulation,

1    indicate the parties hereby stipulate that, indicate what it is

2    you stipulate.  And then when that comes into evidence, I will

3    turn to the jury, and I will say, the stipulation is an issue

4    in which the parties agree.  You should treat this as

5    undisputed evidence, or whatever the usual language is on a

6    stipulation.  That way when it comes in, the jury knows what it

7    is, and it can go back to the jury as well.

8         MR. EKELAND:  I'm happy to talk to the government

9    about that.

10        We just think his testimony is more prejudicial than

11   probative in the sense that it's sort of, I think, a little

12   theatrical, and it's unnecessary, and it's cumulative.  The

13   question is whether or not Bitcoin Fog was required to

14   register.  We will stipulate to the fact that they didn't

15   register, and it's a simple question of law, I think, that the

16   Court can instruct the jury on.  I'm not going to belabor the

17   point, Your Honor.

18        THE COURT:  Okay.  Thank you.  Why don't we go ahead

19   and, actually, take our break now then.

20        It's a quarter of 4:00.  Let's come back at 4:00, and

21   I'll start with Mr. Fischbach at that time.  We can just take

22   this and follow this in that process.

23        (Recess taken.)

24        THE COURT:  All right.  Mr. Ekeland, why don't we

25   start with you.  We'll go through the same exercise and start

1    with Mr. Fischbach.

2    MR. EKELAND:  Yes, Your Honor.  I think we've

3    submitted Mr. Fischbach's CV to the Court and his expert

4    disclosure.  He also testified briefly.  I know we're pressed

5    for time.

6    I mean, I think we see Mr. Fischbach coming in

7    primarily to testify regarding the IP address analysis by the

8    government; their testimony regarding Mr. Sterlingov's devices

9    seized at the airport and the chain of custody involved there;

10   the Mt. Gox -- the nature of the Mt. Gox data; and, as I

11   believe the government mentioned, the interpretation of

12   Mr. Sterlingov's notes, as they mentioned, I think, Ms. Mazars

13   and Mr. St. Michael [sic] might testify as to the meaning of

14   the notes.

15   Mr. Fischbach, I think, essentially, functions as

16   sort of our version of Ms. Mazars and Mr. St. Michael [sic],

17   and also just functions as a rebuttal witness on general

18   forensics.  He's got 20 years of experience, as documented in

19   his CV.  He's qualified as an expert numerous times and,

20   actually, one of the problems I have with him is getting ahold

21   of him because he's always in federal court.

22   With that being said, I welcome any questions from

23   the Court regarding him.

24   THE COURT:  Well, I just want to make sure we've

25   covered the -- each of the categories that he's going to

1    testify about.

2         So I have IP address analysis by the government.

3    Mr. Sterlingov's devices and chain of custody.  I'm a little

4    confused about what he would know about chain of custody.

5         MR. EKELAND:  What we've seen in terms of what

6    Ms. Mazars analyzed as her list of devices from Mr. Sterlingov

7    doesn't match exactly the list of devices that were listed when

8    Mr. Sterlingov was arrested at the airport.

9         So I think there's, potentially, some chain of

10   custody issues there and questions that were raised that I

11   think the jury --

12        THE COURT:  There are more or fewer devices that were

13   analyzed than were seized?

14        MR. EKELAND:  I think there is a hard drive that

15   Ms. Mazars has listed in the devices that they say she analyzed

16   belonged to Mr. Sterlingov that isn't Mr. Sterlingov's.  It's a

17   six-terabyte drive that's apparently encrypted by BitLocker,

18   and there is no such device that's listed on the seizure of his

19   assets at the airport.  So there's a discrepancy there.

20        I think Mr. Fischbach did testify that this kind of

21   stuff happens in cases.  So one thing he will testify to is any

22   kind of discrepancies between what was seized at the airport

23   and what the government experts are analyzing, as well as what

24   was found on those devices.

25        THE COURT:  Why isn't that just completely within the

1    capacity of the jury?  If three items were seized and the

2    government now says we analyzed four items, and one of the

3    items is not on the list of the seized items, why do you need

4    an expert on that?  Why isn't that just entirely within the

5    competence of the jury?

6         MR. EKELAND:  Because Mr. Fischbach can testify as to

7    what type of forensic techniques should have been followed, how

8    that might have compromised the evidence.

9         THE COURT:  You do this to me sometimes, Mr. Ekeland,

10   when you just shift to a different topic from what I'm asking

11   about.

12        The point you were arguing -- making to me is that he

13   wants to testify that there's a question with respect to chain

14   of custody because there were, hypothetically, three items that

15   were seized or identified as seized at the airport, yet the

16   government claims now to have four items, and one of the items

17   doesn't show up on the list.  That's what I'm asking about.

18        MR. EKELAND:  In hypothetical?

19        THE COURT:  No.  The only thing that's hypothetical

20   is the number I'm using because I don't know the exact number.

21   I thought you told me that he was going to testify about the

22   devices that were seized and chain of custody.  Correct?

23        MR. EKELAND:  Yes.  I guess there's really two

24   separate things.

25        There's -- one, there's the contents of the devices

1    and what he will say about them; essentially, that there's

2    nothing on there that shows any evidence of Mr. Sterlingov

3    operating Bitcoin Fog.  He will also testify in rebuttal, as

4    necessary, to what the government's witnesses, Ms. Mazars and

5    Mr. St. Michael [sic] will testify about those devices.

6         And then there's the separate issue, the fact that

7    there appears to be a discrepancy in what's listed in the

8    devices that Ms. Mazars said Mr. Sterlingov has -- and what was

9    listed on the devices seized at the airport.  And he can help

10   clarify for the jury and help them understand what the standard

11   chain of custody procedures are with the FBI and the government

12   that should have been followed and what the possible

13   indications are of the mixing up of evidence.

14        Because what we don't know if that is -- what that

15   raises as the possibility.  I don't know what happened there.

16   Maybe it's a simple incident or maybe they're mixing up

17   evidence from another case, which would be significant in

18   relation to any evidence being used against Mr. Sterlingov.

19        THE COURT:  Well, maybe I need to hear from, I guess,

20   the government as to what happened with respect to that device,

21   and I'll come back to you, Mr. Ekeland.  It may make a

22   difference as to what the government's explanation is.

23        MS. PELKER:  Your Honor, the government is going to

24   follow up on this because part of the issue is that we don't

25   have any expert report from Mr. Fischbach.  None of this is set

1    out in his supplemental filing, which came belatedly.

2            What I believe has occurred is simply that

3    something -- they didn't know, when it was seized, that it was

4    a six-terabyte encrypted hard drive.  It may have been entered

5    differently on the -- how it was noted as the seized device

6    versus what Ms. Mazars analyzed.  It should be easy enough for

7    us to go back and check and match the evidence number to the

8    evidence information from the IRS seizure.

9            This is exactly the purpose of why it's important to

10   have an expert report, because it's clear that what defense has

11   tried to do here is sandbag us with this at trial after our

12   case had closed and when we didn't have an opportunity to

13   explain.  That's generally our concern with Mr. Fischbach's

14   report.

15           THE COURT:  Before you -- I cut Mr. Ekeland off, so

16   let me let him go first.  I'll come back to you.

17           MS. PELKER:  We may, just in the next five minutes,

18   be able to run this down, Your Honor.

19           THE COURT:  Okay.  So, Mr. Ekeland, is there an

20   expert report from Mr. Fischbach?  And, if so -- if there's

21   not, why would I consider it -- consider him as an expert at

22   this point?

23           MR. EKELAND:  I'm sorry, Your Honor.  I just didn't

24   hear your question.

25           THE COURT:  Do I have an expert report from

```
 1        Mr. Fischbach?

 2              MR. EKELAND:  No, you don't.

 3              THE COURT:  How can I possibly consider him as an

 4        expert at this point?  It's long past the due date for that.

 5              MR. EKELAND:  Because we've disclosed his expert

 6        disclosure, what he's going to testify to, and he can also

 7        serve as a rebuttal expert to rebut the government's testimony

 8        in terms of what they're going to say about the interpretation

 9        of Mr. Sterlingov's notes, about -- I believe we disclosed that

10        he'll testify about the Mt. Gox data.

11              And the same question would apply to Sarah Glave and

12        Theodore Vlahakis.  We have no expert report from Ms. Glave.

13        We have no expert report from Theodore Vlahakis.  So on that

14        basis, if it's the lack of an expert report and he's not coming

15        in as an expert, then the Court should exclude those proffered

16        expert witnesses by the government.

17              His disclosure is fulsome.  He's been -- he's

18        testified in this court, he's made himself available, I think,

19        like two or three times.

20              THE COURT:  Show me then -- I have the expert

21        disclosure in front of me, which is Docket 122.  Show me in it

22        where it says in here that he's going to testify about the

23        chain of custody and the fact that there were different items

24        listed.

25              MS. PELKER:  And, Your Honor, just one point.  There
```

1    was a supplemental disclosure at ECF 166.

2            THE COURT:  I think that may actually be sitting back

3    on my desk.

4            MR. EKELAND:  I just have to get it up in front of

5    me, Your Honor.

6            THE COURT:  Just a second.

7            MR. EKELAND:  It's my understanding the only expert

8    reports we have are from Scholl and Bisbee.

9            THE COURT:  I'm sorry?

10           MR. EKELAND:  The only expert reports that are in the

11   record are from Mr. Scholl, Ms. Bisbee, Ms. Still and

12   Mr. Verret.

13           THE COURT:  Okay.

14           MR. EKELAND:  And Mr. Hassard is looking up the --

15   Mr. Fischbach's disclosure.

16           THE COURT:  Okay.

17           MR. EKELAND:  That's -- Mt. Gox is Point No. 2.

18           THE COURT:  I'm sorry?

19           MR. EKELAND:  I'm sorry, Your Honor.  Withdrawn.

20           No. 15 is where the defense expects Mr. Fischbach to

21   testify to the use --

22           THE COURT:  You need to slow down.

23           MR. EKELAND:  I'm sorry.  Mr. Fischbach will be

24   testifying about the use and application of the hardware

25   Mr. Sterlingov had in his possession at the time of his arrest;

1     this is Document 166.

2              THE COURT:  That's what my clerk is getting for me.

3     Give me one second.

4              MR. EKELAND:  Paragraph 15.  No. 16 covers --

5              THE COURT:  I'm sorry.  Give me just a minute.  My

6     clerk is getting that off my desk for you.

7              MR. EKELAND:  I'm sorry.  I didn't hear you.

8              THE COURT:  Give me a second here.  My clerk is

9     getting it off my desk for me.

10             So No. 15.  Okay.

11             MR. EKELAND:  That goes to him testifying about the

12    devices.  It doesn't go to his chain of custody.

13             I think -- not seeing it explicitly in here, I think

14    the catchall for that would be paragraph 24 where the defense

15    expects Mr. Fischbach to testify in rebuttal to the

16    government's expert testimony; in particular, the expert

17    testimony of --

18             THE COURT:  That doesn't fly.  I'm sorry.  That's not

19    an adequate notice.

20             I mean, you're aware of what the government's

21    testimony was going to be, and you've had plenty of time on

22    this.  I don't think this is really expert testimony anyway

23    because I think the jury can reasonably on its own understand

24    that if there were different devices that were seized that were

25    analyzed later, then that can be argued to the jury.

1          We're not going to be -- particularly where I've

2    given tremendous leeway about filing late expert reports.  I'm

3    not going to just say there's a catchall in which we can do

4    anything we want.

5          MR. EKELAND:  No, I'm not saying it's a catchall.

6    Where he says he'll testify in rebuttal to Ms. Mazars who

7    relies on that and explicitly discloses all the devices as a --

8          THE COURT:  But that's not -- I mean, Ms. Mazars

9    de Mazarin is not the one who is testifying about what was -- I

10   don't think is testifying about chain of custody and what was

11   seized at the airport.  You're aware of this issue.  You were

12   aware.  You're making this up now or afterward.

13         MR. EKELAND:  Understood, Your Honor.

14         THE COURT:  This is not anything that was on your

15   radar when you filed this report, and it's not on the

16   government's radar.  I don't think it's appropriate to get into

17   it now.

18         Let's walk through these paragraph by paragraph.  I

19   think that's the easiest way to do this.

20         MR. EKELAND:  Paragraph No. 1 says the defense

21   expects Mr. Fischbach to testify that the government has failed

22   to produce any sound forensics evidence that demonstrates

23   Mr. Sterlingov created or operated the Bitcoin Fog onion

24   Bitcoin mixing site.

25         That's just based on his review of the evidence.  And

 1    as far as we've seen, we haven't seen anything that shows that.

 2    And we expect -- as a matter fact, when looking at the

 3    government's witness list, we see a lot of witnesses who appear

 4    to be users of Bitcoin Fog, and I think there's going to be

 5    issues; we're going to object to their relevance.

 6            But we have yet to see anything anywhere in the

 7    discovery on the devices that were seized at the airport or on

 8    the, quote-unquote, Romanian servers that show anything

 9    involving Mr. Sterlingov operating Bitcoin Fog.

10            THE COURT:  So why isn't this, particularly as

11    characterized here, an ultimate question for the jury of the

12    merits of this case?  He's going to testify that he didn't

13    commit a crime here versus -- I mean, versus saying, you know,

14    I reviewed this device, and there's no evidence on this device

15    of Mr. Sterlingov communicating with such and such or -- more

16    specifically, this just seems to be like he's going to testify

17    as to one of the ultimate questions for the jury; did

18    Mr. Sterlingov operate Bitcoin Fog or not.

19            MR. EKELAND:  No.  We intend to do that through the

20    context of just like the government is saying.  They're going

21    to talk about Mr. Sterlingov's seized devices.  He will talk

22    about how on those seized devices that he reviewed, there's

23    nothing on there indicating that Mr. Sterlingov ever operated

24    Bitcoin Fog.

25            It won't be presented as a question of him arguing

1    Mr. Sterlingov's ultimate guilt or innocence.  But just based

2    on what he's seen and reviewed from the evidence, he just

3    hasn't seen anything.

4         And one of the things that we're concerned with here

5    is that the government is going to be taking -- because there

6    is no hard evidence, they're going to be trying to take notes

7    and VPN and UDP, and, like they say, interpreting

8    Mr. Sterlingov's handwritten notes in a way that appears

9    sinister or attempts to prejudice the jury into thinking that

10   somehow what is normal computer-user behavior is somehow

11   criminal.

12        THE COURT:  This seems very general to me.  I mean,

13   it at one level seems to go to the ultimate question in the

14   case, which I take it that's really what the question for the

15   jury is going to be; did Mr. Sterlingov operate Bitcoin Fog or

16   not.

17        But also, it doesn't offer any specifics -- and maybe

18   this comes later.  But No. 1 doesn't really offer any specifics

19   about what his testimony is going to be that would allow the

20   government to contest that testimony or to challenge it in any

21   way.

22        MR. EKELAND:  Well, they could contest it by coming

23   up with some sound forensic evidence that demonstrates --

24        THE COURT:  That's not responsive to my question.

25        MR. EKELAND:  In a certain sense, you're asking him

1    to prove a negative because he --

2            THE COURT:  I'm sorry.  But you know what the

3    evidence is in the case.  You know what the evidence is that

4    the government is going to offer.

5            And if Mr. Fischbach thinks that there's problems

6    with that evidence, his expert report or the expert notice

7    could have said he's going to testify that the government --

8    where the government has done some tracing that is wrong for

9    the following reasons or something like that, rather than

10   simply, he's going to testify that it wasn't him; it was some

11   other guy.

12           MR. EKELAND:  But that's not what he's testifying to.

13   He's saying that he's reviewed the evidence in the case, and

14   he's seen nothing --

15           THE COURT:  That's the jury.  I've reviewed the

16   evidence in the case, and I see nothing that would suggest he's

17   guilty.  I mean, that can't possibly be what an expert does.

18           MR. EKELAND:  He can say that he received the

19   forensic images from the government of the hard drive seized at

20   the airport or the Cellebrite extractions from the phone which

21   he has, and nothing on there in his expert opinion is sound

22   forensic evidence of Mr. Sterlingov operating Bitcoin Fog.

23           I mean, it -- maybe there was a situation where the

24   government presented something and they said here's evidence of

25   Mr. Sterlingov operating Bitcoin Fog; then he could analyze

1    that and rebut that.  But the problem is there's nothing like

2    that in this case.

3         So we're stuck in this land of speculation where

4    everything we have to rebut is just pure speculation by the

5    government.  The fact is, when they seized all his assets at

6    the airport, his computers, his Raspberry Pi, the cell phone

7    that they're trying to make out to be some sinister spyware,

8    there was nothing on there.

9         That's what he's going to testify to, is that he

10   looked at all of this, and he didn't see a single thing on

11   there.  What else are we supposed to say about that?  I mean,

12   this is based on his review of the discovery, and in his expert

13   forensic opinion in the --

14        THE COURT:  I'm pretty sure it would not be

15   inadequate expert disclosure in any case for the defense to

16   come in with a witness and to say, the witness has reviewed all

17   the evidence in the case, and there's no evidence that

18   Mr. Jones was a heroin distributor.

19        MR. EKELAND:  But he can go in and say, I looked at

20   the laptop or the imaging of the laptop, and there was nothing

21   on there.

22        THE COURT:  You're getting closer to what an expert

23   disclosure should say.  I reviewed the information that is on

24   the laptop, all the files -- I can testify that all the files

25   on the laptop are of this nature.  I can indicate that there

1    were none of the files on the laptop that reflected X, Y, and

2    Z.

3         But that's just very different from saying, I

4    reviewed all the evidence in the case, and there's nothing that

5    leads me to think that he did it.

6         MR. EKELAND:  Well, then, we can limit his expert

7    testimony to concrete pieces of hardware seized at the airport

8    and other concrete pieces of evidence, and he could state what

9    he's seen on them, or the lack thereof.

10        THE COURT:  Why don't we -- as I said, I'm dubious

11   about 1, but let's go to 2.

12        MR. EKELAND:  2 just deals with the chain of custody

13   that the Mt. Gox data is unreliable, cannot be authenticated as

14   a business record, and that the public record demonstrates that

15   the Mt. Gox data is corrupt.

16        THE COURT:  Certainly, it's not a question for the

17   jury whether it should be excluded from evidence or not.  It

18   might be a question for the jury as to whether it is not what

19   it purports to be.  But it's not a question for the jury as to

20   whether I should admit it or not into evidence.

21        MR. EKELAND:  No, it's not, Your Honor.  It is a

22   question of whether, in his 20 years of experience as a

23   forensic technologist and somebody who, I believe, trains FBI

24   agents and trains people on forensics, whether it's

25   forensically sound to rely on that data.

1          THE COURT:  Okay.  The next one.  You agree that it

2    should not be about whether the evidence should be excluded or

3    not?

4          MR. EKELAND:  No.  That is the ultimate province of

5    the Court, Your Honor.

6          THE COURT:  Okay.

7          MR. EKELAND:  Then this is the -- Point 3 is related

8    to Point 2.  This is regarding Mark Karpeles's conviction for

9    manipulation of the Mt. Gox data, the errors in the data, and

10   the hacks of the data.

11         THE COURT:  Is he going to able to say -- tell us

12   anything more about the conviction than you have here today?

13   If he can't tell you anything more than you've told me today, I

14   don't see how that comes in, because we don't actually know

15   what he was convicted of.

16         MR. EKELAND:  What he was convicted of is, I believe,

17   on the public record and something that the Court can take

18   judicial notice of.

19         That is a factor in determining whether or not it's

20   forensically sound to rely on the data.  And as somebody,

21   again, who is routinely used as a forensic technologist by both

22   law enforcement and the defense, he can testify as to whether

23   in his expert opinion it is forensically sound to use data that

24   was in the custody of somebody who was convicted for data

25   fraud.

1          I mean, I think that's a relevant consideration for

2     anybody who is analyzing data doing any kind of --

3          THE COURT:  That, again, feels to me more like

4     perhaps an argument to the jury.  I'm dubious about this

5     proposition based on just what you've told me here today; that

6     he was convicted for manipulation of the Mt. Gox data.

7          What you told me today is you, actually, don't know

8     what it was that he was manipulating, whether it was financials

9     or whether it was the data that's at issue in this case or not.

10         MR. EKELAND:  No, that's correct.  We don't know the

11    particulars, but we do know that he was in some way convicted

12    in a Japanese court and sentenced to four years in prison for

13    falsifying or engaging in some kind of data fraud involving

14    Mt. Gox data, which could be --

15         THE COURT:  You say data fraud.  I mean, was it data

16    fraud, or was it fraud of financials?  Do we know?

17         MR. EKELAND:  No, we don't.  But if the head of the

18    company is manipulating data, I think that calls into question

19    that all data that the head of the company has his hands on

20    and --

21         THE COURT:  Well, you keep saying he was manipulating

22    data, but do we even know he was manipulating data versus

23    financial statements, for example?

24         MR. EKELAND:  No, I don't know.  But what I'm saying

25    is --

```
 1            THE COURT:  If you don't know, someone cannot come
 2    into the court and testify to this.
 3            MR. EKELAND:  I think it's --
 4            THE COURT:  I mean, I will instruct the jury that
 5    what he just said is completely without any basis whatsoever if
 6    you want me to do that.  But you can't possibly put someone on
 7    the stand and ask him to testify that it was based on
 8    manipulation of data when --
 9            MR. EKELAND:  I'm not.
10            THE COURT:  -- you have no basis to -- I'm speaking.
11            MR. EKELAND:  Yes, Your Honor.
12            THE COURT:  And the court reporter can only take down
13    one of us at a time.
14            You can't come in here and have a witness testify
15    that he was manipulating the Mt. Gox data unless there's some
16    foundation for that.  By the data, I take it you're meaning the
17    data that's at issue in this case?
18            MR. EKELAND:  I don't think it -- does it say that --
19    where is it said?  Did we use the word manipulated there?
20            THE COURT:  For manipulation of the Mt. Gox data.
21            MR. EKELAND:  So then -- maybe then we just change --
22    I think what the point is here, Your Honor, is that it's
23    relevant that the owner of Mt. Gox was convicted for some kind
24    of data fraud in Japan.  And that that is a consideration that
25    somebody who is forensically analyzing data should take into
```

1    consideration, whether or not the data that they have is

2    forensically sound.

3          And that's not, Your Honor, a hill I need to die on

4    because that's not the only issue with the Mt. Gox data.  The

5    Mt. Gox data servers were hacked multiple times.  I think,

6    really, this is becoming a bigger point than it needs to be.

7    It's simply that there are a number of facts in the public

8    record that call into question whether it is forensically sound

9    to use the Mt. Gox data.

10          THE COURT:  Okay.  4?

11          MR. EKELAND:  Here, what this is talking about is the

12    data that's been produced to the government -- I'm sorry, to

13    the defense is derivative, and it's our understanding that

14    there's no original server logs or any original native data

15    that can be independently verified.

16          Again, this just goes to the reliability of the

17    Mt. Gox data.

18          THE COURT:  Okay.

19          MR. EKELAND:  5, I think, is the point you already

20    made about the authenticity.

21          6 is more, I think -- is an important one because

22    it's -- that, essentially, IP addresses aren't a form of

23    personally identifiable information; using IP addresses to

24    identify specific users is forensically unsound.  I think

25    there's a misconception.  I think this would be helpful to

1    clarify to the jury that an IP address is not a form of

2    personal identification.

3              THE COURT:  Okay.  That seems fair.

4              MR. EKELAND:  No. 7, I think, is also a point that

5    thousands of people can share the same IP address.  This is

6    something Ms. Mazars testified to as well.  I think, again,

7    this goes to help clarify for the jury that you can't just

8    assume one person is using an IP address.

9              THE COURT:  These things seem closer to expert

10   testimony than some of the other stuff.  That seems okay.

11             MR. EKELAND:  No. 8 is on the same point.  IP --

12   similar point, IP address matches are an unreliable means of

13   identifying an individual.  And, essentially, this goes

14   directly to Ms. Mazars' IP address overlap.

15             THE COURT:  Isn't this just redundant to what's

16   above?

17             MR. EKELAND:  Yeah.  I think it's the same point,

18   Your Honor; just a variation.  Essentially, we wanted to bring

19   him in to talk about IP addresses and help the jury understand

20   them and help them understand that it's not a form of

21   personally identifiable information.

22             THE COURT:  Okay.

23             MR. EKELAND:  No. 10 is just him testifying about the

24   forensic methodologies used in this case and how he considers

25   them forensically unsound.

1          THE COURT:  That strikes me as just -- that's not a

2     real disclosure there.

3          MR. EKELAND:  I'm sorry?

4          THE COURT:  That is not a disclosure, simply saying

5     what they did is unsound.  You've got to tell them why it's

6     unsound.  You can't simply say what they did was unsound.

7          MR. EKELAND:  Yeah.  I mean, if that's the standard

8     for the expert disclosure, I would then -- I would ask the

9     Court to go look back at St. Jean's disclosures and Ms. Mazars'

10    because they've got a level of generality at the same level.

11    If we need -- same with Ms. Glave.

12         So if this kind of generality is something that the

13    Court doesn't want, that's all fine and good.  Well, then let's

14    apply it to everybody.

15         THE COURT:  I'm fine with that.  But I don't recall

16    them being that general.  But you can point me to anything they

17    said that was that general.

18         MR. EKELAND:  I can't tell, when you say you're going

19    to interpret notes, what that means.  What's the interpretation

20    of Mr. Sterlingov's notes?  What notes are you referring to?

21    What kind of interpretations are you going to use?

22         THE COURT:  The government can clarify.  But what I

23    understood them to be saying is that they're going to explain

24    what the terminology means in those notes.  And so if it

25    refers -- if the notes say -- there's a reference to the -- in

1    the notes to iOS, what is iOS, and they can say this is what

2    iOS is.  That's what I understood them to be saying.

3            MR. EKELAND:  Then I ask that the Court limit their

4    testimony to those kinds of factual descriptions because the

5    impression that I got and the concern that I have when I read

6    their disclosures, I think, is similar to the concern that the

7    Court is expressing here.  That there's a certain level of

8    ambiguity that can give rise to sort of backdoor expert

9    opinions that may not have been disclosed that doesn't give the

10   party an opportunity to fully respond.

11           THE COURT:  That's fair enough.  If either side

12   engages in surprise, I'm going to exclude it.

13           MR. EKELAND:  Understood, Your Honor.  Yes.  So I

14   don't think I need to belabor that point.

15           There's No. 11.  No. 11 is really just him explaining

16   to the jury and helping the jury understand what's involved in

17   operating a Tor network site and, by extension, a custodial

18   mixer like Bitcoin Fog.

19           THE COURT:  Okay.

20           MR. EKELAND:  So I think that's fairly

21   straightforward.

22           No. 12 is related to No. 11.  He'll explain the need

23   for constant maintenance of the site.

24           THE COURT:  What do you mean by that?

25           MR. EKELAND:  It just doesn't -- it doesn't run by

 1    itself.

 2              THE COURT:  Right.

 3              MR. EKELAND:  I think that's relevant because there's

 4    times that -- there's a period of time where Mr. Sterlingov was

 5    in Miami for three months.

 6              THE COURT:  All right.  Does Mr. Fischbach have

 7    expertise on running mixers or running sites versus forensics?

 8    I didn't realize that was an area of his expertise.

 9              MR. EKELAND:  I don't know if he's ever run a mixer,

10    but he does have extensive computer coding experience.  He's

11    run a bunch of websites, and he's very experienced when it

12    comes to types of computer coding.

13              THE COURT:  When you say he's run a bunch of

14    websites, I guess I'm not quite sure what that means because

15    there are a lot of websites that do just run themselves.  Your

16    law firm has a website, and there's probably not a need for

17    someone to go in there every day to do server maintenance on

18    that versus, I suspect, whoever runs the website for

19    Amazon.com, that there's a team of a thousand people who are

20    doing that.  So saying he ran a website doesn't tell me a lot.

21              MR. EKELAND:  Your Honor, I merely submit to you that

22    he's got 20 years of experience with computers, computer

23    forensics, computer coding, and that he has the expertise and

24    knowledge base to testify even if he hasn't run a Tor onion

25    site as to what is required to run the site.

1        I think it would be helpful to the jury to hear, and

2    the government can rebut anything that they think is incorrect

3    with their witnesses.

4        THE COURT:  I think the point is a fair point for

5    someone to make.  I'm just not sure whether he's the one with

6    the expertise to make it.

7        MR. EKELAND:  We disagree with the Court.

8        THE COURT:  Well, I mean, you can convince me that he

9    actually has the expertise.  There may be a need to, you know,

10    continue to voir dire the witness, but I just don't see and

11    hear -- I mean, I'm looking at his expert disclosures.  I just

12    don't see anything in here that says that he has expertise on

13    running anything like Bitcoin Fog.  Maybe I'm wrong about that.

14        I'm not sure why knowing how to write code or how you

15    read or review code would mean that you understand what it

16    means to keep the servers operating on a site that is

17    processing thousands of transactions a day; that sort of thing.

18        MR. EKELAND:  Understood, Your Honor.

19        THE COURT:  Okay.  13?

20        MR. EKELAND:  13.  Here, he will explain the high

21    level of information security required for a Tor network site

22    like Bitcoin Fog that is subject to continual hacking attempts.

23        This is related, I think, to the prior points, and

24    that this is just -- it's not -- it's not a self-running

25    enterprise; and, particularly, a site like Bitcoin Fog that is

1    mixing funds is constantly going to be under attack by people

2    trying to steal the funds, just like Mt. Gox.

3              THE COURT:  For this one and for the next one, my

4    only question is whether he has relevant expertise.

5              MR. EKELAND:  I would submit he does.  I'm not saying

6    that he's run these sites, and I -- if I recall correctly, we

7    never did finish Mr. Fischbach's voir dire just because of all

8    the scheduling problems.  And maybe if he does come in, we take

9    some time to finish the voir dire on it.

10             You know what, even better, maybe we get back to the

11   Court with supplemental briefing on this point rather than

12   engaging in additional voir dire, but we're happy to do

13   either/or.

14             THE COURT:  Okay.  15?

15             MR. EKELAND:  This goes to the point, just testifying

16   to the use and application of the hardware Mr. Sterlingov had

17   in his possession at the time of his arrest.

18             This is similar to what the government is saying

19   Ms. Mazars de Mazarin and St. Jean will do.  Particularly, I

20   think the one thing that's been singled out by the government

21   is they think that Mr. Sterlingov had a particularly exotic

22   cell phone, which he will explain and demystify for the jury.

23   I think what the government is going to attempt to do at trial

24   is somehow portray the computer equipment that Mr. Sterlingov

25   was traveling with is somehow sinister.

1          THE COURT:  Okay.

2          MR. EKELAND:  That goes to Point 16 where he will

3   explain the equipment that Mr. Sterlingov is traveling with is

4   quite common in the computer world and what each piece of

5   hardware is legitimately used for.

6          17 goes to the same point; identifying the purpose

7   and function of each device Mr. Sterlingov had in his

8   possession at the time of his arrest.

9          And 18 goes to what we were discussing before.  This

10  is, I think, a little more particular.  The -- I think it's

11  phrased wrong in terms of the sufficiency of the proof, but I

12  think more properly what should be said is that he will testify

13  to, basically, how he didn't see anything on these devices that

14  involved the operation of Bitcoin Fog.

15         And then No. 19 is just -- he'll testify about

16  Ms. Mazars de Mazarin's IP overlap analysis, and I think this

17  touches on the, I think, IP address points that we made before;

18  and testify that it's forensically unsound to rely on the

19  Mt. Gox records to make attributions.  I think that's a bit

20  redundant with the other Mt. Gox attributions.

21         He'll testify --

22         THE COURT:  Can I ask you a question?  When he says

23  it's forensically unsound, that sounds like he's saying there

24  are industry standards or government standards that this

25  doesn't live up to versus just his opinion, and I'm not sure

1    which of those two you mean to be suggesting here.

2         MR. EKELAND:  Excellent question.  It's my

3    understanding that he has trained law enforcement before,

4    including the FBI, and that he instructs, if I'm recalling

5    correctly, judges and law enforcement and lawyers on

6    forensically sound techniques.

7         I think what -- to answer your question is that he

8    will testify to -- and what his opinions are -- are the sound

9    forensic standards that should be followed and why in his

10   experience -- his 20 years of experience as a forensic

11   technologist, what he's seeing here in his expert opinion is

12   forensically unsound.  As to whether or not there's some --

13        THE COURT:  I have to say, I'm much more comfortable

14   with testimony that says -- expert testimony that says there

15   are difficulties and problems with using IP addresses for

16   purposes of making an attribution because an IP address is not

17   assigned to a person; it's assigned to a router, and there are

18   lots of people who can use a router.

19        In fact, there also are times in which you can use a

20   proxy in a way in which you're using -- either sharing a router

21   or using someone else's router.  It may be that when using a

22   VPN, there may be multiple people who are using the same VPN.

23        And, therefore, you can't tell with any certainty --

24   and, in fact, there may be substantial uncertainty as to who is

25   actually using it because in some cases there might be a

1    thousand people who are using the same proxy server or a

2    thousand people who are using the same VPN; in other cases it

3    may be three people who are doing that.

4           And without knowing that information, it's very

5    difficult to make any conclusions.

6           That strikes me as more appropriate than saying it's

7    just -- in my opinion, it's forensically unsound.  Unless, he

8    can point to some standard other than the fact that that's not

9    the way I would do it or that's not the way I teach people.  It

10   may just be too loaded a phrase.  And it suggests that there is

11   some standard that it's not living up to versus here's the

12   reason why it's problematic.

13          MR. EKELAND:  I think that's an excellent point, Your

14   Honor.  If I'm understanding the Court correctly, you prefer

15   this to proceed by concrete, particularized -- I don't know if

16   the word examples is right -- reference to the evidence; and we

17   are happy to take that approach and limit it to that rather

18   than -- and, again, of course, this will apply to both sides.

19          If I understand you correctly, you just want to avoid

20   this kind of ambiguity and this kind of -- these generalized

21   statements, and you want to base it on concrete examples like

22   you said.  No disagreement from the defense.

23          THE COURT:  I think the experts on both sides

24   shouldn't be testifying to ultimate conclusions or their

25   opinions except to the extent their opinions are based on

1    something that it can be measured against where you can look to

2    some industry standard or something where you can actually

3    point to something and say this is what satisfies it here.

4            MR. EKELAND:  A concrete metric.

5            THE COURT:  Just explaining, you know.  If there's a

6    reasonable question, you ought to explain to the jury that

7    here's the problem.  Here's the problem with using proxy

8    servers or VPNs or IP addresses.  It's entirely appropriate.

9            MR. EKELAND:  The defense agrees, Your Honor.  And

10   we'll tailor our direct and Mr. Fischbach's testimony should

11   the Court admit him towards those ends and do everything we can

12   to avoid these generalized ambiguities.

13           THE COURT:  Okay.

14           MR. EKELAND:  Going to the VPN, you see there on 19C,

15   again, we've got the ambiguous phrase forensically unsound.

16   Basically, the point is that you shouldn't be making

17   attributions from IP addresses that may be VPNs or proxy

18   servers.  And that goes to the IP address, VPN attribution

19   because they're used to mask.  And that goes --

20           THE COURT:  I'm sorry.  Just to interrupt you for a

21   second.  To put it a little bit differently, because when you

22   say you shouldn't be, I think probably the better way to do it

23   is to say, here's the problem.  If you use a VPN, there can be

24   ten people, a hundred people, a thousand people using the same

25   VPN.  It doesn't tell you who the person is if you know what

1    the IP address that's associated with the VPN.

2           MR. EKELAND:  I think that's a really good point.

3           THE COURT:  Then the parties can argue to the jury

4    what conclusions to draw from that type of evidence.

5           MR. EKELAND:  Understood, Your Honor.

6           THE COURT:  Okay.

7           MR. EKELAND:  Item 20, testifying about the

8    Mazars de Mazarin device report and the related documentation

9    produced by the government.  I think that relates -- again,

10   that relates back to the --

11          THE COURT:  Is this just what the devices are used

12   for and whether the -- is this just redundant with the point

13   above?

14          MR. EKELAND:  I think what we're trying to capture is

15   what I was getting at with the six-terabyte drive and the

16   discrepancies between -- then maybe the government has an

17   explanation for.

18          It's not clear to me when I look at Ms. Mazars'

19   report why -- they list the devices in there that I said -- you

20   know, there's a differentiation -- there's a difference between

21   what's listed in her device report and what was seized at the

22   airport; what she actually is going to testify about in

23   relation to those devices because it's a little, I think,

24   generalized and ambiguous in her disclosure.

25          So what this is, this is a point, sort of, in

1    response to what she's going to be saying about those devices.

2    And, again, it goes back to they found some 4G modems, cables,

3    two Raspberry Pi's, a battery pack and things that the

4    government -- they continually refer to as cell phone -- I

5    can't remember the exact word -- exotic or there's something in

6    the discovery where they refer to it as, like, a spy phone.

7    It's actually just quite an innocent device.

8             This is where Mr. -- one of the spaces where

9    Mr. Fischbach will testify about those particular devices and

10   how they've got perfectly legitimate uses.

11            THE COURT:  Okay.  21?

12            MR. EKELAND:  This is just a point about the DNS

13   registration for the clearnet site, www.bitcoinfog.com, somehow

14   implicating Mr. Sterlingov as the operator of Bitcoin Fog.

15   Mr. Fischbach, I know, has purchased -- like many people in the

16   computer space -- hundreds of domain name registrations for

17   sites that he never ran.  It's quite a common thing to do for

18   clients.  He's set up a number of websites.  This is something

19   he has direct experience on.

20            And he can just simply testify that the mere fact

21   that you purchase a DNS registration does not mean you're

22   operating the website; you create the website, and it's quite a

23   common thing in the industry to do.  And he can also testify

24   about the registration renewal on the DNS websites.

25            THE COURT:  I don't see a problem with him testifying

1   regarding DNS registrations and how that works; I suppose even

2   if he has a basis what common practice is.  Although, again, I

3   wouldn't want him to testify sort of to the ultimate conclusion

4   to say that it's a flawed hypothesis.

5          I mean, he can testify and say, in my experience this

6   is the way it works with DNS registration, and you can register

7   a -- you can obtain a DNS registration on someone else's

8   behalf, for example.  There's not a requirement that you

9   certify that you are the only person who is going to then use

10  that registration, that type of thing.  It goes to an actual

11  fact.

12         You know, based on his experience rather than his

13  opinion as to whether -- the ultimate question of whether

14  Mr. Sterlingov was the one who operated Bitcoin Fog.

15         MR. EKELAND:  Correct.  Understood, Your Honor.

16  Testify it's common to do DNS registrations for people.

17         THE COURT:  If that's true and he has a basis and the

18  sufficient expertise to do so, I don't see a problem with it.

19         MR. EKELAND:  Thank you, Your Honor.

20         THE COURT:  This is all subject to my having heard

21  from the government on these things.  But I'm giving you at

22  least my preliminary views.

23         MR. EKELAND:  And then No. 24 is just --

24         THE COURT:  You skipped 22 and 23.

25         MR. EKELAND:  My computer is acting up here.  I think

1    we'll just -- we don't need 22 because we have Ms. Still.

2            THE COURT:  Okay.

3            MR. EKELAND:  23, he does have expertise in DNS

4    registrations, how they work, how they need to be renewed, and

5    how the DNS identified in the criminal complaint was renewed.

6    And that's just a matter of public record, and it can be looked

7    up.

8            24 is just him testifying in rebuttal to the

9    government's experts.

10           THE COURT:  I would say, with respect to that, if it

11   turns out that the government's experts go off-script, then

12   it's fair game for the defense to go off-script.  If you now

13   know what the government experts are going to testify to,

14   there's not -- you should be disclosing what Mr. Fischbach is

15   going to testify to, and you shouldn't simply say rebuttal.  I

16   don't think that's an adequate disclosure.

17           Obviously, if the government goes beyond what's in

18   the expert disclosures, perhaps in light of some

19   cross-examination, then that might open the door.

20           MR. EKELAND:  Understood, Your Honor.  That's all of

21   the defense --

22           THE COURT:  So let me hear from the government then

23   with respect to these same items.

24           MS. PELKER:  Yes, Your Honor.  Mr. Brown just raised

25   a scheduling question.  We're fine to stay late.  I know that

 1    we're hitting up against time.

 2            THE COURT:  Let's see if we can at least get through

 3    Mr. Fischbach, and then we'll see where we are.

 4            MS. PELKER:  As far as Item No. 1, this just appears

 5    to be sort of a catchall impermissible opinion.  It's a blanket

 6    opinion about the case.

 7            Items 2 through 5 dealing with Mt. Gox, at this point

 8    the defense has had numerous opportunities to identify any

 9    specific issues or errors that Mr. Fischbach or anyone else has

10    found with the Mt. Gox data and records, and we do want to make

11    clear for the record here that after the June -- I believe it

12    was the June hearing and then possibly again in July, the

13    government again offered to make the data available at the FBI

14    NVRA, then offered to make it available out at the FBI in

15    Orange County or in L.A. near where Mr. Fischbach lives.

16            We offered if they wanted to give us specific files

17    that they would like that was a subset that wasn't thousands of

18    people's sensitive financial details, we could give it to the

19    defense.  That if Mr. Fischbach wanted to come in and spend a

20    day doing a triage review, explain what it was he wanted to

21    take home with him and take a subset of files that weren't

22    sensitive, that we'd be fine with that as well.

23            The government's tried to make accommodations for the

24    defense here.  I understand that they're trying to preserve

25    their issues on appeal, but at this point there's no -- the

1    defense has not actually articulated any sort of error or issue

2    that they have with the Mt. Gox records.

3         We think this whole line of testimony and critique

4    from Mr. Fischbach is just without any basis and has not been

5    appropriately disclosed.

6         THE COURT:  Can you say anything about the hacks?  I

7    know the hacks keep coming up.  Were they -- I don't know

8    anything about the nature of them, how extensive they were.

9         As I said, I think virtually every business in the

10   country has been hacked at times, but there may be a difference

11   between that versus some circumstance where someone has gone in

12   and fundamentally rewritten transactions and transaction

13   histories in a way that is designed to just disrupt a business.

14        MS. PELKER:  So, Your Honor, as I understand it, the

15   Southern District of New York in June unsealed their indictment

16   charging two Russians with the -- with the large hack of

17   Mt. Gox; so what everyone thinks of as "the" hack.  And that

18   indictment explains how these individuals gained access to

19   Mt. Gox's wallets and funneled the money out of the wallets

20   starting in 2011.

21        THE COURT:  Any evidence that -- in doing so that

22   they actually altered the underlying -- the data or the

23   transaction records that existed other than they created new

24   transactions which they stole the money out of the accounts?

25        MS. PELKER:  Again, I'm not privy to all of the SDNY

 1    case file.  I do have another case that somewhat relates to it,

 2    so I want to be very careful on the representations I'm making

 3    to the Court.

 4            There are -- certainly, the way that a hack would

 5    occur would relate to -- and this type of hack in particular --

 6    would be the access to the Mt. Gox hot wallet that someone

 7    would, essentially, drain and not going in and, say,

 8    manipulating records to make it look like Mr. Sterlingov

 9    controls an account that he doesn't control.

10            And that, certainly, if the -- if the government had

11    any evidence that Mr. Sterlingov's accounts had been accessed

12    or modified or that that was something that we were aware

13    occurred, we certainly would have disclosed that.

14            THE COURT:  Okay.

15            MS. PELKER:  The defense -- again, they've had the

16    opportunity to look at the records for these specific accounts,

17    and they keep coming back and saying that they have missing

18    transaction hashes, that they have missing information, but

19    they have yet to identify any of that.

20            That's not at all what the government -- Mr. Scholl

21    sees when he is looking at the reports.  Mr. Scholl is not a

22    computer scientist, he's not an incident response professional,

23    but when he's doing the financial tracing, he's able to look at

24    these accounts and say that this is all lining up.

25            THE COURT:  Okay.

1          MS. PELKER:  Items 6 through 9 on the IP analysis and

2     the use of VPNs seems appropriate here.

3          THE COURT:  I'm going to allow Items 6 through 9 at

4     this point.

5          MS. PELKER:  Item No. 10, Mr. Fischbach has no

6     experience in Chainalysis; he's not an expert in blockchain

7     analysis.  There's no basis for him to opine about Chainalysis

8     forensic methodology.

9          THE COURT:  I indicated earlier preliminarily my view

10    was to not allow that.  I'm not going to allow 10 for the

11    reasons you've given as well, and I also think that it's too

12    conclusory and doesn't actually -- the disclosure doesn't

13    actually identify the basis for an opinion.

14         MS. PELKER:  Items 11 through 14 regarding setting

15    up -- what it would take to operate a custodial mixer like

16    Bitcoin Fog, this is something that I also probed Mr. Fischbach

17    on, on his hearing testimony starting at page 281 of the

18    transcript.

19         I think that Mr. Fischbach can explain how Tor works

20    and how the internet works.  I don't think that he has

21    sufficient expertise, and he didn't testify that he did, to

22    explain how a Bitcoin mixer operates, and I don't think that

23    he's set out a sufficient basis here.

24         I think that he at the time described the defense

25    disclosure as optimistic on that point.

1          THE COURT:  Okay.  So I will allow -- I'll allow

2     Mr. Fischbach to testify about how Tor works then.

3          MS. PELKER:  I think that's appropriate.

4          THE COURT:  I will reserve judgment at this point

5     about whether he can also testify about how mixers work.  I

6     just have to go back and look at the transcript on that.

7          MS. PELKER:  Items 15 and 16 regarding use of the

8     hardware is fine.

9          THE COURT:  I'm sorry.  Before you get to those, I

10    expressed some skepticism about need of constant maintenance.

11    I may need to look at the transcript on that.

12         MS. PELKER:  I think that he just doesn't have the

13    expertise to opine about what it takes to run a mixing site

14    like Bitcoin Fog.

15         THE COURT:  Okay.  I'll look at those a little bit

16    more carefully.  I've expressed my preliminary view, but I'll

17    look at that more carefully.  So 15?

18         MS. PELKER:  15 and 16 are, I think, are appropriate.

19    Item 18 --

20         THE COURT:  What about 17?

21         MS. PELKER:  Oh, that's fine as well.  I think we

22    thought that was duplicative.

23         THE COURT:  I'm going to allow 15 through 17 then.

24         MS. PELKER:  Yes, Your Honor.  And then Item 18, this

25    is, again, one of lack of any forensic evidence.  The

1    government thinks it's just an impermissible summary,

2    conclusion without explaining a basis.

3            THE COURT:  I mean, as Mr. Ekeland says, his basis is

4    that there's no basis.  It's not like he can point to and say

5    here's -- I've looked at this here, and here's the errors.  His

6    point is, I've looked at it, and I just don't see any evidence

7    of operating Bitcoin Fog on these devices.

8            MS. PELKER:  He can find that there's no artifacts

9    relating to Bitcoin Fog on whatever the different devices are.

10           THE COURT:  So are you okay with that?

11           MS. PELKER:  Yes.  This, to me, I think -- and

12   similar to No. 1 -- just seems quite different; of opining

13   about what is sufficient to prove that Mr. Sterlingov is guilty

14   about forensically sound evidence.

15           THE COURT:  I agree with that.  I think Mr. Ekeland

16   was agreeing with me when we were going through this before

17   that he has to -- Mr. Fischbach has to make his evidence or his

18   testimony concrete.  And if he wants to testify, I looked at

19   this particular device and there was no signature of

20   Bitcoin Fog on that device based on my review, that's okay.

21           You're in agreement with that?

22           MS. PELKER:  Yes, Your Honor.

23           THE COURT:  All right.

24           MS. PELKER:  Regarding Item 19, I think part of this

25   is fine.  So 19B about why he thinks that the 12-month window

1     is not appropriate; Item 19C about -- that he would not rely on

2     attributions related to VPNs or proxies.

3          Item 19A has the same issue that we had previously

4     raised.  We would object for the same reasons.  And we would

5     just note that it's not clear from this drafting whether the

6     issues are fully intended to be fully set out as A, B, C.  But

7     that at this point, the only issues that they've disclosed are

8     A, B, C and now the issue with the hard drive reference that

9     we're going to follow up on.

10         THE COURT:  Okay.  So I'll allow B and C, and the A

11    is tied up in the question about is the Mt. Gox data

12    generally -- and I have to say my concern without more here,

13    there's just a 403 problem in that coming in and saying they

14    were hacked and the CEO was a crook strikes me as at least,

15    potentially, more prejudicial than probative unless someone can

16    show me some connection to this case.

17         And that the hacking could have actually had an

18    effect on the data here rather than someone went into the

19    wallet and stole money from Mt. Gox in a way that would not

20    have had any effect on the data that we're talking about here;

21    or showing me that the CEO, actually, was convicted of a crime

22    relating to the manipulation of the data or data of the type

23    here where a jury could reasonably infer that he actually

24    monkeyed with the data in this case versus that he was trying

25    to keep his company afloat when it was heading towards

1    bankruptcy and he was, for example, trying to take out loans

2    and was making it look like they were making more money than

3    they were on their financials.

4        So I have a significant 403 issue with respect to the

5    Mt. Gox data.  And also, I think it's sort of revealed from the

6    expert report and our discussion at this point, it's not at all

7    clear to me that Mr. Fischbach knows the answers to the

8    questions I'm asking him, that he has any expertise in a way in

9    which he would know whether the data was monkeyed with anyway.

10       I do have at least at this point a 403 concern, as

11   well as just a question about whether Mr. Fischbach has

12   expertise with respect to Mt. Gox versus expertise which seems

13   almost fairly obvious and maybe in the domain of the jury

14   anyway.  If somebody has monkeyed with the data, the data is

15   not reliable.  The key point here is really the former one

16   about whether someone has monkeyed with the data that's

17   relevant in this case.  I haven't seen anything to support that

18   at this point.

19       So at this point, my leaning would be to exclude

20   those arguments under 403, absent some further showing there

21   really is reason to doubt the integrity of the data at issue

22   here.  So that takes us to 20.

23       MS. PELKER:  Item 20, again, same, the issues with

24   the device report.  The only issue that we are aware of is what

25   they have disclosed today.

1          Mr. Ekeland suggested that Mr. Fischbach has some

2     qualifications in understanding law enforcement procedures and

3     chain of custody.  Mr. Fischbach, as far as I'm aware, while he

4     touts that he gives these trainings to law enforcement and the

5     FBI, I think it was one training back in the early '90s.

6     Mr. Fischbach has been an outspoken defense expert.

7          To the extent that he says that he works for the

8     government, that is military courts who on the defense side are

9     hiring him as an expert witness.  He is not someone who is

10     delivering trainings to law enforcement, and he's not worked in

11     law enforcement.

12          THE COURT:  Again, here, maybe there could be a

13     witness who could explain what, for example, a -- a log of

14     seized items is and how that process works, and maybe there's

15     somebody who is an expert who could testify as to that and what

16     would go onto the log.

17          To the extent that he's just testifying to saying,

18     look, there are three items here and there are four here, that

19     just strikes me as in the province of the jury.

20          Okay.  So I'm at least tentatively in agreement with

21     you with respect to that as well at this point.  21?

22          MS. PELKER:  21, so it was not clear to us until --

23     I'm still not sure it's completely clear as to what this was

24     actually noticing.  So there is no Chainalysis hypothesis about

25     the DNS registration.  Chainalysis had nothing to do with

1    attributing a DNS registration to Mr. Sterlingov.

2            If this is now, as I understand it, going to be

3    Mr. Fischbach testifying that individuals set up websites for

4    other people, I don't think that that is what is noticed in

5    No. 21, but I think that that's --

6            THE COURT:  I'll allow that testimony on that narrow

7    topic.

8            MS. PELKER:  But just to the extent we're going down

9    the list, we would object to 21 as written, if that's not what

10   they actually meant by 21.

11           THE COURT:  Based on Mr. Ekeland's explanation, I do

12   think that he's offering the more narrow testimony, and I will

13   allow that.

14           MS. PELKER:  I believe the defense conceded that item

15   22 is not going to be covered by Mr. Fischbach.

16           THE COURT:  Yes.  So I will not allow that.

17           MS. PELKER:  No. 23 about how DNS registration and

18   renewal works is fine.

19           THE COURT:  I'll allow that.

20           MS. PELKER:  And then the rebuttal testimony -- and

21   we have this concern for all of the defense disclosures -- is

22   just that the defense is trying to shoehorn in the possibility

23   of "and anything else the defense wants to testify to" without

24   providing disclosure.

25           THE COURT:  Right.  I'll put everyone on both sides

1    on notice that I'm going to hold you to what is in your

2    disclosures unless the door is opened in some way.

3            So if in the government's case you end up going

4    beyond the scope of your reports, perhaps not because that was

5    your plan, but in light of some cross-examination and the

6    witness says, well, actually, I went off and did three other

7    studies and this is what I found, then the defense should be

8    entitled to respond to that.

9            MS. PELKER:  Understood, Your Honor.

10           THE COURT:  All right.  I think I've given you at

11   least my tentative rulings and my conclusions with respect to

12   most of this.  I've told you what comes in.  I told you a

13   couple things that I want to go back and look at a little bit

14   more.

15           And so by way of summary, I don't think 1 is a proper

16   topic.  On 2 through 5 on the Mt. Gox, I do have a significant

17   403 concern, absent something more to let me know that there's

18   reason to think that any of this evidence relates to whether

19   the data in this case was tampered with or even there's any

20   plausible inference that it was tampered with and whether

21   there's any evidence that Mr. Karpeles was involved in

22   manipulation of the underlying data in the system versus

23   manipulating financials and things of that nature.

24           And at this point -- I remember from when

25   Mr. Fischbach testified, he didn't seem to have any particular

1    knowledge of this.  He had seen some stories in the press or

2    seen a YouTube video or something that touched on this.  So I'm

3    not convinced that he has the relevant expertise to dig down

4    deeper on it.

5           In any event, as currently presented, I have a 403

6    concern, so I'm not inclined to allow that.  I will leave that

7    open to be convinced -- you can convince me otherwise on that.

8           No. 10, I've concluded, doesn't -- is not

9    appropriate.

10          With respect to 11, we've agreed that, to the extent

11   that Mr. Fischbach just wants to talk about how Tor works,

12   that's okay.  I'm going to take a further look as to whether he

13   has adequate expertise with respect to how mixers work, and

14   I'll take a further look as to whether he has any expertise on

15   maintaining websites like mixers.  I'm doubtful about that, but

16   I'll take a further look at that.

17          The same goes with 13 and 14 where I'm doubtful about

18   it, but I will look further.

19          15, 16, and 17 are okay.

20          18 is okay to the extent it's made concrete with

21   respect to review of particular devices and what was or wasn't

22   on those particular devices, but not to the extent it's

23   testimony as to the ultimate question in the case.

24          19 we discussed both with Mr. Ekeland and with

25   Ms. Pelker.  I'm okay with 19B and 19C, but I do think that all

1    of this should be made concrete in a way that I discussed with

2    Mr. Ekeland.

3            And with 20, I guess I still have a question as to

4    exactly what it is that Mr. Fischbach would testify to.  I'm

5    not convinced, at least at this point, that he does have sort

6    of expertise on how the FBI usually goes about inventorying

7    material at a time of arrest.  And to the extent that he's

8    simply saying that there were three devices that were seized

9    and four that show up all of a sudden, that strikes me as

10   something that is in the core competence of the jury.

11           With respect to 21 and 23, I think it's permissible

12   for Mr. Fischbach to testify about just how the DNS

13   registration process works and about the fact that you can

14   obtain a DNS registration on behalf of somebody else.

15           22 is withdrawn.  And I've expressed my concerns

16   about 24.  And I think it's just -- it doesn't provide

17   sufficient notice, but I do recognize that if the door is

18   opened, that Mr. Fischbach may be entitled to respond to

19   testimony that has not been noticed at this point by the

20   government.

21           So those are my rulings with respect to

22   Mr. Fischbach.

23           It is a little after 5:00.  I'm available to come

24   back tomorrow if the parties want to or if you're available to

25   continue with this tomorrow, or we can find some other date to

1    do so.

2             Glenda, what's the calendar look like tomorrow?

3    Thank you.  So I have four proceedings tomorrow, but only one

4    of them -- or two of them are likely to take a chunk of time,

5    but I'm sure I can carve out at least a couple of hours for us

6    tomorrow if we need it.

7             MR. EKELAND:  If possible, we'd prefer another day

8    than tomorrow, but --

9             THE COURT:  I'm just not sure of when that would be.

10   If you want to -- I'm getting some additional filings on

11   Monday, I know.  I am still going to have to figure out what to

12   do with respect to the source code.

13            I'm happy to finish this up tomorrow, or we can look

14   for and see if I have time on Tuesday, but we are getting very

15   close to the beginning of the trial.  I guess my preference

16   would be to try and finish this up tomorrow if we can.  We may

17   need to schedule some hearings next week as well.  I want to

18   make sure we have time to do that.

19            MS. PELKER:  I would agree that if there's a way that

20   we can do this tomorrow, that would be the government's strong

21   preference.

22            MR. EKELAND:  I'm sorry.  Can we do it via Zoom?

23            THE COURT:  I think the jail -- Mr. Sterlingov, I

24   believe, can only participate in the afternoon; is that

25   correct?

```
 1                 THE COURTROOM DEPUTY:  Yes, Your Honor.

 2                 THE COURT:  I have to check to see if that can be

 3      scheduled.  I suppose he could waive his appearance if he

 4      wanted to.  But I want to make sure he's doing that in an

 5      informed way.

 6                 I have a 2:00 and a 2:30.  My 2:30 will probably run

 7      until 3:00.

 8                 MS. PELKER:  Your Honor, we do still have to do the

 9      Missouri v. Frye.  I'm not sure whether that -- I guess it

10      could be done virtually, but --

11                 THE COURT:  With the indulgence of the court staff,

12      maybe we should just do that right now.  I don't think it's

13      going to take very long.  Is that okay with you both?

14                 MS. PELKER:  That's fine.

15                 THE COURT:  I know it's late.  Why don't we do that

16      now.

17                 Is there an objection to just doing the rest of this

18      virtually from 3:00 until 5:00 tomorrow?  I'm not sure the jail

19      goes until 5:00 or not.  Glenda, do you know?  The jail has a

20      hard stop at 4:00.  What we could do is we can do 1:00 to 2:00

21      and 3:00 to 4:00.

22                 MS. PELKER:  That's fine, Your Honor.  Could we

23      possibly get our 5:00 p.m. filing deadline extended even until

24      Saturday morning?

25                 THE COURT:  That's fine.  Is noon on Saturday okay?
```

1          MS. PELKER:  That would be great, Your Honor.

2          THE COURT:  Since you're going to be here, that's

3    understandable.

4          Does that work for all of you to do from 1:00 until

5    2:00 and then 3:00 until 4:00 tomorrow?

6          MR. EKELAND:  Yes, Your Honor.

7          THE COURT:  Mr. Sterlingov, is it okay with you to do

8    this that way, you and your counsel will be appearing

9    virtually?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Mr. Sterlingov, you understand you have a

12    right to be physically present at every stage of your

13    proceeding?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Mr. Sterlingov, in the possibility that

16    things may not work out with the jail -- we'll do our best to

17    get you on the line, but if you're unavailable, would you

18    consent to go forward without your being on the line?  We'll do

19    our best, but I haven't communicated with the jail yet, so I

20    don't know for sure if they're able to accommodate.

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  So we'll do our best to have you here,

23    but if we can't, we can go forward without you on this issue?

24          THE DEFENDANT:  Yes.  Thank you for trying.

25          THE COURT:  Yes, we will.

1          So in that case, Ms. Pelker, do you want to put on

2     the record whatever plea offer, if any, was made; or Mr. Brown?

3          MR. BROWN:  Yes, Your Honor.  On May 2nd, 2023, the

4     government transmitted a plea offer to defense counsel.  The

5     deadline for that was two weeks later on May 16th, 2023.  The

6     government never received a response to the plea offer.

7          The terms of the plea were as follows:  The

8     government offered a plea to two counts; one count of

9     conspiracy to launder monetary instruments in violation of

10    18 U.S.C. Section 371, and one count of operating an unlicensed

11    money transmitting business, in violation of 18 U.S.C. Section

12    1960A.

13         The maximum sentencing exposure for those two counts

14    would be no more than ten years.  The adjusted guidelines were

15    calculated to be Offense Level 43, Criminal History Category I.

16    The guidelines range goes up to life, but that would be limited

17    by the statutory caps to two five-year terms for no more than

18    ten years.

19         And the defendant would be able to apply, if

20    eligible, for international prisoner transfer program, which

21    would allow him to transfer to Sweden, if eligible.

22         THE COURT:  Okay.  Mr. Sterlingov, you're welcome to

23    come up to the microphone or just turn the microphone to

24    yourself, whichever you prefer.  You want to just do it from

25    there?

```
 1              Mr. Sterlingov, I just want to make sure that you
 2    understand that plea offer was extended to you?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  Did you have an adequate opportunity to
 5    discuss it with your lawyers?
 6              THE DEFENDANT:  Yes, I believe so.
 7              THE COURT:  Are you sure?  Did you have enough time
 8    to talk with your lawyers about it?
 9              THE DEFENDANT:  Yes.
10              THE COURT:  Would you like any further time to
11    discuss it or talk with your lawyers about it?
12              THE DEFENDANT:  I believe the timeline was -- there
13    was a time limit?
14              THE COURT:  Right.  I just want to make sure you've
15    had enough time to consider it is the main thing.
16              THE DEFENDANT:  Yes.
17              THE COURT:  I suppose -- I'm not involved in any way
18    in plea negotiations, but if you felt as though you hadn't had
19    enough time, you could convey that to the government and they
20    could, I guess, decide what to do about that.
21              THE DEFENDANT:  Yes.  Are you asking if I --
22              THE COURT:  The main question, you expressed a little
23    bit of hesitation as to whether you had had enough time to
24    discuss the plea offer with your lawyers.  I just wasn't sure
25    if that was hesitation about it or whether you feel as though
```

1    you had adequate time to discuss it with your lawyers and made

2    a decision and you wanted to reject it?

3                THE DEFENDANT:  I feel that I've had enough time to

4    discuss it with my attorneys.

5                THE COURT:  Okay.  And after having discussed it with

6    your attorneys, have you made a decision that you would like to

7    reject that offer?

8                THE DEFENDANT:  That's -- that's what happened, yes.

9                THE COURT:  Okay.  And so you had enough time to

10   discuss it, you thought about it, and you made a decision to

11   reject the offer; is that a fair summary?

12               THE DEFENDANT:  Yes.  Except, as I understand it, the

13   offer also ran out.  There was a time limit on the offer.

14               THE COURT:  Right.

15               THE DEFENDANT:  So by virtue of not answering to it,

16   it was rejected.

17               THE COURT:  Okay.

18               THE DEFENDANT:  That's the only clarification.

19               THE COURT:  Fair enough.  Did you let that time run

20   out because you wanted to reject it, or did you run it out

21   because you didn't have enough time to talk to your lawyers

22   before the time ran out?

23               THE DEFENDANT:  We've made a decision together.

24               THE COURT:  Okay.  You made a decision to reject the

25   offer together?

```
 1                THE DEFENDANT:  Yes.

 2                THE COURT:  You understand that's your decision;

 3      that's not your lawyers' decision; do you understand that?

 4                THE DEFENDANT:  Yes, of course.

 5                THE COURT:  Okay.  And just for clarity of the

 6      record, you understand the offer was made to you, you had

 7      enough time to talk with your lawyers about it, and you

 8      rejected it by simply not responding; is that correct?

 9                THE DEFENDANT:  As I understood, that was a

10      legitimate way of responding.

11                THE COURT:  Yes.  I don't mean to criticize you.  I

12      don't think that Mr. Brown was criticizing you for that.  I

13      want to make sure you really intentionally rejected it rather

14      than just the clock running out on you.

15                THE DEFENDANT:  Yes.

16                THE COURT:  Okay.  Anything further that either side

17      thinks I should inquire about?

18                MR. BROWN:  No, Your Honor.

19                THE COURT:  Okay.  Mr. Ekeland?

20                MR. EKELAND:  No, Your Honor.

21                THE COURT:  Well, thank you.  So I will see some of

22      you in person and the rest of you virtually -- hopefully,

23      Mr. Sterlingov, but if not, I have his waiver on the record --

24      at 1:00 tomorrow.

25                Thank you.  This was helpful for me.  I made some
```

1    progress today.

2              (The hearing adjourned September 7, 2023, at 5:20 p.m.

3              until 1:00 p.m. September 8, 2023.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   CERTIFICATE OF OFFICIAL COURT REPORTER

2

3             I, TAMARA M. SEFRANEK, do hereby certify that the

4      above and foregoing constitutes a true and accurate transcript

5      of my stenographic notes and is a full, true and complete

6      transcript of the proceedings to the best of my ability.

7                   Dated this 11th day of September, 2023.

8

9                              /s/ Tamara M. Sefranek_____
                               Tamara M. Sefranek, RMR, CRR, CRC
10                             Official Court Reporter
                               Room 6714
11                             333 Constitution Avenue, N.W.
                               Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$10** [1] - 80:24
**$100** [4] - 81:3, 87:2, 93:22, 105:5
**$300** [1] - 93:18
**$33** [8] - 80:23, 87:2, 93:5, 93:6, 93:12, 93:23, 93:24
**$334** [2] - 81:5, 87:1
**$70** [1] - 93:19

**'**

**'90s** [1] - 175:5

**/**

**/s** [1] - 188:9

**0**

**001** [1] - 64:14

**1**

**1** [23] - 17:12, 25:9, 40:12, 44:7, 58:7, 69:24, 73:22, 73:23, 79:14, 95:7, 107:20, 110:12, 110:15, 113:6, 124:14, 124:18, 125:5, 143:20, 145:18, 148:11, 167:4, 172:12, 177:15
**10** [7] - 25:20, 37:22, 44:18, 153:23, 170:5, 170:10, 178:8
**10,000** [1] - 78:24
**100** [2] - 93:7, 105:1
**100,000** [2] - 57:9, 85:3
**10005** [1] - 1:20
**10:10** [1] - 1:6
**11** [6] - 49:10, 155:15, 155:22, 170:14, 178:10
**11th** [1] - 188:7
**12** [3] - 45:3, 155:22
**12-month** [1] - 172:25
**122** [1] - 140:21
**12:00** [1] - 55:5
**12:30** [1] - 55:5
**13** [5] - 32:18, 157:19, 157:20, 178:17
**13)** [1] - 32:17
**1301** [1] - 1:17
**14** [3] - 25:22, 170:14, 178:17

**140** [3] - 22:21, 24:6, 25:20
**144** [2] - 49:15, 74:18
**146** [1] - 22:21
**148** [1] - 49:14
**15** [12] - 25:22, 37:22, 76:21, 141:20, 142:4, 142:10, 158:14, 171:7, 171:17, 171:18, 171:23, 178:19
**15-minute** [1] - 55:4
**153** [1] - 110:2
**16** [6] - 48:16, 142:4, 159:2, 171:7, 171:18, 178:19
**166** [2] - 141:1, 142:1
**16mT** [2] - 48:15, 48:16
**16th** [1] - 183:5
**17** [5] - 45:3, 159:6, 171:20, 171:23, 178:19
**18** [9] - 4:11, 24:6, 45:4, 159:9, 171:19, 171:24, 178:20, 183:10, 183:11
**19** [4] - 60:6, 159:15, 172:24, 178:24
**1960** [3] - 104:20, 130:11, 130:13
**1960A** [1] - 183:12
**1960B** [1] - 37:13
**19A** [1] - 173:3
**19B** [2] - 172:25, 178:25
**19C** [3] - 162:14, 178:25
**1:00** [4] - 181:20, 182:4, 186:24, 187:3
**1:21-CR-0399** [1] - 1:3
**1:30** [2] - 76:24, 77:2
**1Kfu** [1] - 51:15
**1LZ** [1] - 47:23
**1LZvk** [1] - 47:20
**1PG** [1] - 51:17
**1YZJKa** [2] - 49:24, 50:9

**2**

**2** [22] - 3:24, 25:10, 40:12, 40:16, 44:7, 45:13, 50:5, 57:4, 69:24, 82:2, 86:4, 95:8, 101:25, 107:20, 108:6, 141:17, 148:11, 148:12, 149:8, 167:7, 177:16

**20** [8] - 135:18, 148:22, 156:22, 160:10, 163:7, 174:22, 174:23, 179:3
**20,000** [1] - 109:7
**200** [3] - 66:24, 67:4, 67:10
**20001** [3] - 1:12, 1:24, 188:11
**20005** [1] - 1:17
**2003** [1] - 17:12
**2010** [3] - 88:16, 88:21, 89:1
**2011** [4] - 22:24, 88:16, 127:16, 168:20
**2012** [2] - 88:16, 130:24
**2013** [3] - 103:12, 103:18, 130:23
**2014** [3] - 22:24, 111:4
**2015** [1] - 56:17
**202-354-3246** [1] - 1:24
**2022** [1] - 111:10
**2023** [8] - 1:5, 89:1, 124:4, 183:3, 183:5, 187:2, 187:3, 188:7
**20530** [1] - 1:14
**21** [9] - 58:11, 59:17, 164:11, 175:21, 175:22, 176:5, 176:9, 176:10, 179:11
**21-399** [1] - 2:2
**22** [7] - 8:5, 8:6, 80:24, 165:24, 166:1, 176:15, 179:15
**23** [6] - 10:8, 59:17, 165:24, 166:3, 176:17, 179:11
**23rd** [2] - 44:13, 124:4
**24** [5] - 11:4, 142:14, 165:23, 166:8, 179:16
**25** [1] - 58:7
**26** [1] - 108:20
**27** [1] - 109:17
**28** [1] - 109:24
**281** [1] - 170:17
**2:00** [7] - 55:10, 76:16, 76:24, 76:25, 181:6, 181:20, 182:5
**2:10** [1] - 100:11
**2:30** [2] - 181:6
**2:50** [1] - 100:11
**2nd** [1] - 183:3

**3**

**3** [8] - 25:10, 40:20, 44:8, 95:8, 107:20, 107:24, 149:7
**30** [3] - 1:20, 46:25, 76:21
**31** [1] - 46:25
**311,000** [1] - 74:5
**33** [2] - 47:1, 93:7
**333** [2] - 1:23, 188:11
**34** [2] - 87:23, 94:25
**35** [2] - 44:5, 47:6
**3505** [2] - 23:23, 24:3
**352** [1] - 17:12
**3553** [1] - 24:6
**36** [1] - 124:13
**363** [1] - 124:4
**368** [1] - 124:13
**371** [1] - 183:10
**3:00** [4] - 181:7, 181:18, 181:21, 182:5

**4**

**4** [11] - 4:10, 4:11, 4:16, 4:19, 5:7, 39:14, 39:17, 39:21, 40:24, 40:25, 152:10
**40** [1] - 47:10
**403** [6] - 173:13, 174:4, 174:10, 174:20, 177:17, 178:5
**41** [3] - 44:10, 47:12, 56:9
**43** [2] - 49:14, 183:15
**45** [1] - 47:18
**46** [1] - 48:7
**49** [1] - 49:22
**4:00** [5] - 134:20, 181:20, 181:21, 182:5
**4G** [1] - 164:2

**5**

**5** [8] - 4:19, 41:6, 98:22, 107:24, 108:3, 152:19, 167:7, 177:16
**51** [1] - 97:22
**55** [1] - 72:24
**57** [1] - 50:15
**59** [1] - 50:23
**5:00** [6] - 76:7, 76:9, 179:23, 181:18, 181:19, 181:23
**5:20** [1] - 187:2

**6**

**6** [4] - 24:6, 152:21, 170:1, 170:3
**60** [7] - 103:1, 103:2, 103:8, 103:14, 103:18, 103:22, 110:14
**601** [1] - 1:11
**61** [1] - 51:4
**62** [3] - 22:18, 51:4, 51:16
**63** [2] - 51:4, 51:14
**65** [1] - 51:5
**6714** [2] - 1:23, 188:10

**7**

**7** [6] - 1:5, 39:21, 110:13, 124:19, 153:4, 187:2
**702** [4] - 54:16, 87:17, 90:11, 122:21
**702/Daubert** [1] - 53:15
**73** [1] - 58:4
**78** [1] - 22:19

**8**

**8** [2] - 153:11, 187:3
**8.5** [1] - 100:1
**8th** [1] - 1:20

**9**

**9** [4] - 108:14, 124:14, 170:1, 170:3
**900,000** [1] - 109:8
**901** [1] - 23:15
**902** [3] - 23:14, 23:25, 28:13
**902(11** [2] - 24:3, 24:6
**902(13** [3] - 23:25, 31:16, 31:23
**902(14** [2] - 32:17, 36:2
**902(14)** [1] - 36:11
**930,000** [1] - 53:3
**930-some-odd-thousand** [1] - 109:8
**950** [1] - 1:14
**99** [3] - 64:13, 99:4, 99:5

**A**

**A-h-m-e-d** [1] - 9:2
**A.M** [1] - 1:6
**ability** [4] - 57:24,

121:8, 130:7, 188:6
**able** [35] - 4:15, 12:9,
12:12, 13:24, 16:8,
18:15, 18:19, 19:4,
19:11, 21:24, 39:5,
46:12, 46:18, 53:2,
53:7, 54:6, 61:1,
67:24, 68:3, 69:10,
71:17, 72:7, 72:10,
74:24, 84:20, 88:7,
102:9, 102:15,
120:10, 133:1,
139:18, 149:11,
169:23, 182:20,
183:19
**Abraxas** [1] - 109:1
**absent** [4] - 20:6,
36:14, 174:20,
177:17
**absolutely** [5] - 33:8,
72:18, 112:6,
113:16, 129:23
**abundance** [1] - 132:4
**abuse** [3] - 66:15,
66:19, 66:23
**academic** [5] - 101:9,
101:14, 103:5,
103:12, 123:22
**acceptance** [1] - 84:1
**accepted** [2] - 132:6,
133:10
**accepts** [1] - 97:14
**access** [29] - 13:5,
13:8, 13:11, 13:14,
14:2, 14:9, 14:12,
15:1, 15:3, 15:6,
15:8, 15:10, 17:23,
21:22, 26:25, 27:1,
27:3, 27:7, 27:22,
46:12, 46:17, 61:1,
100:14, 123:6,
123:13, 126:19,
127:15, 168:18,
169:6
**accessed** [5] - 10:20,
29:9, 30:17, 124:20,
169:11
**accesses** [1] - 32:2
**accessible** [3] - 80:10,
84:6, 84:7
**accessing** [2] - 13:1,
121:24
**accommodate** [2] -
16:15, 182:20
**accommodations** [1]
- 167:23
**accord** [1] - 91:4
**according** [3] - 29:7,
51:15, 112:10
**account** [23] - 23:8,

23:19, 24:20, 24:21,
25:6, 25:13, 25:15,
25:17, 25:24, 33:18,
34:16, 36:16, 43:7,
46:22, 47:7, 47:16,
49:23, 65:9, 73:6,
73:7, 113:15, 169:9
**Account** [8] - 25:9,
25:10, 44:7, 44:8
**accounted** [1] - 53:24
**accounting** [1] - 38:24
**accounts** [17] - 23:17,
25:5, 25:8, 32:4,
45:21, 45:22, 45:23,
48:8, 48:13, 49:20,
113:14, 121:25,
124:20, 168:24,
169:11, 169:16,
169:24
**accumulated** [1] -
128:25
**accuracy** [16] - 31:21,
36:18, 54:13, 78:4,
78:15, 78:20, 79:5,
82:22, 83:13, 84:18,
85:22, 89:23, 91:24,
106:16, 112:25,
123:24
**accurate** [21] - 5:14,
25:3, 31:17, 32:1,
65:24, 69:11, 76:2,
79:2, 82:23, 82:24,
84:12, 84:22, 87:3,
89:12, 89:24, 93:14,
99:4, 99:17, 103:23,
188:4
**accurately** [1] - 79:1
**accused** [2] - 33:22,
84:10
**acquired** [1] - 32:7
**act** [1] - 108:9
**Act** [1] - 130:3
**acting** [1] - 165:25
**Action** [1] - 1:2
**actions** [1] - 111:21
**activities** [2] - 8:7,
74:22
**activity** [7] - 35:23,
42:16, 44:7, 60:15,
65:1, 96:24, 111:18
**actual** [13] - 4:15,
18:8, 18:14, 19:19,
30:2, 30:7, 30:10,
31:9, 33:13, 40:7,
47:6, 105:2, 165:10
**acute** [1] - 114:10
**add** [11] - 11:2, 11:9,
30:21, 34:4, 53:5,
75:10, 94:22, 113:1,
115:24, 131:19,

132:1
**added** [1] - 36:15
**addition** [2] - 97:13,
119:20
**additional** [16] -
17:23, 25:18, 25:23,
32:5, 39:7, 43:14,
48:20, 51:20, 56:18,
60:17, 70:3, 71:15,
74:9, 120:2, 158:12,
180:10
**additionally** [1] -
78:11
**address** [52] - 2:25,
47:5, 47:20, 48:17,
49:24, 50:9, 50:19,
51:13, 51:17, 53:1,
53:2, 53:5, 53:9,
57:10, 58:16, 60:14,
60:16, 63:2, 65:4,
68:13, 73:16, 73:17,
87:16, 105:14,
118:4, 118:6,
118:24, 119:7,
121:22, 122:4,
122:24, 123:2,
123:9, 123:18,
125:13, 126:23,
127:3, 129:18,
135:7, 136:2, 153:1,
153:5, 153:8,
153:12, 153:14,
159:17, 160:16,
162:18, 163:1
**addressed** [2] - 4:6,
98:5
**addresses** [41] -
42:12, 42:20, 44:23,
46:5, 46:21, 48:24,
49:2, 49:7, 49:15,
49:16, 50:3, 50:7,
60:21, 61:2, 62:25,
63:22, 63:24, 64:4,
68:16, 73:7, 74:4,
74:5, 74:13, 74:14,
74:16, 74:18, 74:20,
105:22, 107:18,
108:14, 109:8,
109:13, 121:24,
123:11, 126:25,
152:22, 152:23,
153:19, 160:15,
162:8, 162:17
**addressing** [1] - 37:25
**adequate** [5] - 142:19,
166:16, 178:13,
184:4, 185:1
**adequately** [1] - 4:6
**adjourned** [1] - 187:2
**adjusted** [1] - 183:14

**admissibility** [3] -
23:22, 24:11, 131:9
**admission** [1] - 106:1
**admit** [7] - 18:7, 20:7,
20:10, 23:8, 24:8,
148:20, 162:11
**admitted** [4] - 34:9,
44:12, 82:20, 104:14
**adopting** [1] - 118:4
**advance** [1] - 112:5
**advice** [1] - 100:18
**affects** [3] - 99:10,
99:13, 112:25
**afloat** [1] - 173:25
**afternoon** [3] - 21:3,
21:6, 180:24
**agencies** [3] - 29:3,
29:4, 68:24
**agents** [1] - 148:24
**aggregate** [2] - 45:5,
45:19
**ago** [3] - 19:22, 44:14,
133:5
**agree** [8] - 80:3,
91:10, 97:6, 99:2,
134:4, 149:1,
172:15, 180:19
**agreed** [1] - 178:10
**agreeing** [1] - 172:16
**agreement** [5] - 18:19,
20:17, 20:20,
172:21, 175:20
**agrees** [2] - 20:13,
50:2, 162:9
**ahead** [11] - 3:12,
5:21, 15:17, 31:5,
37:24, 37:25, 43:1,
53:12, 55:4, 128:11,
134:18
**Ahmed** [2] - 9:2, 9:10
**ahold** [1] - 135:20
**aided** [1] - 57:3
**airport** [12] - 135:9,
136:8, 136:19,
136:22, 137:15,
138:9, 143:11,
144:7, 146:20,
147:6, 148:7, 163:22
**Akemashite** [1] -
34:23
**Alden** [1] - 2:6
**ALDEN** [1] - 1:13
**algorithm** [2] - 112:22,
113:7
**algorithms** [3] - 52:8,
81:16, 99:15
**allegation** [1] - 33:16
**alleged** [2] - 28:6,
29:21
**alleging** [1] - 80:14

**admissibility** (cont.)
**allow** [19] - 4:2, 16:11,
26:3, 121:9, 121:12,
145:19, 170:3,
170:10, 171:1,
171:23, 173:10,
176:6, 176:13,
176:16, 176:19,
178:6, 183:21
**almost** [3] - 72:11,
85:6, 174:13
**alone** [1] - 57:9
**alongside** [1] - 24:3
**AlphaBay** [2] - 107:21,
109:10
**altered** [1] - 168:22
**Amazon.com** [1] -
156:19
**ambiguities** [1] -
162:12
**ambiguity** [2] - 155:8,
161:20
**ambiguous** [3] -
10:21, 162:15,
163:24
**amend** [1] - 98:6
**amendment** [1] -
59:23
**AMERICA** [1] - 1:2
**America** [1] - 2:3
**amount** [9] - 25:14,
25:19, 43:5, 57:23,
71:1, 80:14, 93:24,
101:12, 104:18
**amounts** [1] - 71:9
**anachronistic** [1] -
89:1
**analogous** [2] - 53:19,
133:12
**analogy** [1] - 97:11
**analysis** [88] - 38:9,
38:10, 41:18, 41:19,
41:22, 42:3, 42:11,
42:22, 43:3, 43:4,
43:6, 46:23, 48:25,
49:8, 49:12, 50:4,
50:8, 52:10, 52:15,
54:3, 54:5, 54:15,
56:10, 56:18, 56:24,
57:1, 57:6, 57:16,
57:18, 57:23, 58:6,
58:8, 58:9, 58:10,
58:13, 58:17, 58:21,
59:18, 59:22, 60:5,
60:7, 60:13, 61:12,
64:22, 65:19, 66:12,
66:13, 67:1, 67:6,
67:25, 70:2, 70:9,
71:8, 71:20, 73:22,
74:19, 80:3, 80:17,
85:12, 89:15, 99:14,

106:9, 107:9, 109:21, 112:14, 115:19, 116:11, 120:2, 121:20, 121:21, 122:24, 123:1, 123:2, 123:9, 123:19, 125:13, 126:3, 126:6, 126:18, 126:23, 129:13, 129:17, 135:7, 136:2, 159:16, 170:1, 170:7
**analyst** [2] - 88:15, 99:9
**analyze** [3] - 59:25, 122:24, 146:25
**analyzed** [7] - 57:12, 136:6, 136:13, 136:15, 137:2, 139:6, 142:25
**analyzing** [3] - 136:23, 150:2, 151:25
**Andy** [1] - 26:17
**anecdotal** [6] - 78:16, 78:21, 81:21, 85:22, 86:14, 86:16
**anecdote** [1] - 89:21
**anecdotes** [4] - 79:6, 82:22, 84:13, 85:9
**Angela** [2] - 5:18, 5:22
**answer** [7] - 5:6, 16:9, 20:21, 52:4, 79:24, 96:11, 160:7
**answered** [7] - 78:2, 78:5, 78:7, 78:8, 78:14, 83:20, 85:20
**answering** [1] - 185:15
**answers** [2] - 121:15, 174:7
**anti** [1] - 131:3
**anti-money** [1] - 131:3
**anticipate** [1] - 8:23
**anticipated** [1] - 16:19
**anticipating** [1] - 4:12
**antithesis** [1] - 84:14
**anyway** [4] - 102:12, 142:22, 174:9, 174:14
**apologies** [1] - 49:9
**apologize** [4] - 40:6, 55:9, 63:10, 124:18
**appeal** [3] - 27:20, 60:2, 167:25
**appear** [3] - 33:15, 36:8, 144:3
**appearance** [1] - 181:3
**appearing** [1] - 182:8
**appliable** [1] - 97:13

**applicability** [2] - 3:4, 37:11
**applicable** [1] - 107:20
**application** [3] - 8:24, 141:24, 158:16
**applied** [9] - 42:3, 47:15, 54:25, 60:10, 75:14, 75:20, 102:4, 102:8, 103:10
**applies** [2] - 37:6, 90:11
**apply** [9] - 41:22, 53:8, 91:6, 91:9, 103:17, 140:11, 154:14, 161:18, 183:19
**applying** [2] - 53:20, 102:24
**appreciate** [5] - 3:23, 5:15, 36:20, 106:24, 107:3
**appreciation** [1] - 129:1
**approach** [1] - 161:17
**approaches** [1] - 102:4
**appropriate** [20] - 4:3, 51:24, 55:2, 101:17, 106:5, 106:9, 108:16, 111:23, 115:16, 121:11, 129:19, 129:20, 143:16, 161:6, 162:8, 170:2, 171:3, 171:18, 173:1, 178:9
**appropriately** [2] - 44:22, 168:5
**approved** [2] - 24:12, 58:24
**arbitrarily** [1] - 94:10
**arbitrary** [4] - 88:20, 94:16, 119:7
**area** [4] - 41:12, 101:14, 130:18, 156:8
**argue** [1] - 163:3
**argued** [1] - 142:25
**arguing** [4] - 30:3, 84:5, 137:12, 144:25
**argument** [7] - 2:23, 16:2, 19:24, 23:10, 28:24, 29:1, 32:16, 91:15, 127:23, 150:4
**arguments** [2] - 37:5, 174:20
**arrest** [8] - 66:2, 66:10, 66:18, 72:12, 141:25, 158:17, 159:8, 179:7
**arrested** [2] - 93:18,

136:8
**arrive** [1] - 130:19
**art** [1] - 83:11
**article** [5] - 86:21, 86:23, 105:24, 105:25, 106:6
**articles** [1] - 33:12
**articulated** [1] - 168:1
**artifacts** [1] - 172:8
**aspect** [3] - 70:21, 70:24, 112:16
**aspects** [3] - 70:7, 96:14, 108:4
**assessing** [1] - 51:13
**assessment** [3] - 60:17, 64:4, 125:21
**assets** [4] - 23:1, 129:2, 136:19, 147:5
**assigned** [2] - 160:17
**assistance** [1] - 100:20
**assistant** [2] - 9:19, 13:10
**assistants** [1] - 9:14
**assisting** [1] - 56:13
**associate** [1] - 10:13
**associated** [5] - 63:3, 74:14, 107:18, 108:15, 163:1
**assume** [4] - 29:19, 76:17, 96:22, 153:8
**assuming** [3] - 35:17, 111:14, 116:5
**assumption** [2] - 96:20, 127:20
**assumptions** [3] - 83:12, 95:1, 99:15
**assured** [1] - 52:22
**astonished** [1] - 83:16
**astonishes** [2] - 99:7, 99:11
**astonishing** [2] - 81:25, 82:19
**attachments** [7] - 42:19, 57:8, 108:20, 108:22, 109:23, 109:24, 110:2
**attack** [1] - 158:1
**attempt** [4] - 63:9, 90:21, 94:17, 158:23
**attempted** [1] - 4:24
**attempting** [1] - 27:20
**attempts** [2] - 145:9, 157:22
**attest** [2] - 29:23, 78:20
**attesting** [1] - 78:4
**attorney** [1] - 59:6
**Attorney's** [3] - 5:11, 98:6, 109:13

**attorneys** [3] - 9:8, 185:4, 185:6
**attributable** [1] - 93:24
**attributed** [1] - 73:8
**attributing** [3] - 80:19, 92:20, 176:1
**attribution** [7] - 46:2, 51:25, 59:11, 73:3, 115:4, 160:16, 162:18
**attributions** [6] - 114:18, 159:19, 159:20, 162:17, 173:2
**atypical** [1] - 127:18
**audit** [1] - 85:12
**August** [1] - 124:4
**AUSA** [1] - 2:9
**authentic** [1] - 35:16
**authenticated** [3] - 28:13, 33:23, 148:13
**authenticating** [1] - 23:14
**authentication** [2] - 22:11, 22:12
**authenticity** [6] - 24:13, 28:22, 29:25, 36:17, 119:22, 152:20
**authority** [2] - 114:13, 114:16
**automate** [2] - 102:10, 102:15
**available** [12] - 16:25, 17:5, 51:22, 80:7, 88:23, 92:7, 102:5, 140:18, 167:13, 167:14, 179:23, 179:24
**Ave** [1] - 1:17
**Avenue** [3] - 1:14, 1:23, 188:11
**avoid** [4] - 10:3, 61:18, 161:19, 162:12
**aware** [11] - 33:16, 59:1, 70:18, 90:10, 127:15, 142:20, 143:11, 143:12, 169:12, 174:24, 175:3
**awareness** [2] - 131:1, 131:3
**axiom** [1] - 119:24

# B

**backdoor** [2] - 116:19, 155:8
**background** [7] -

39:22, 41:4, 41:16, 107:25, 122:6, 131:9, 132:18
**background-type** [1] - 41:4
**backwards** [3] - 102:7, 102:13, 102:15
**balances** [1] - 3:20
**ball** [1] - 78:23
**ballistics** [1] - 98:12
**bank** [4] - 28:11, 28:12, 28:14, 28:25
**Bank** [3] - 28:16, 28:20, 130:2
**banking** [1] - 130:2
**bankruptcy** [11] - 22:25, 26:10, 28:4, 28:5, 29:17, 29:18, 29:20, 29:22, 30:3, 30:5, 174:1
**banks** [1] - 33:24
**base** [3] - 64:3, 156:24, 161:21
**baseball** [1] - 78:23
**based** [60] - 12:15, 24:1, 39:4, 42:22, 44:9, 44:19, 45:10, 45:19, 46:2, 46:3, 46:14, 47:8, 47:13, 47:19, 48:8, 48:10, 48:13, 50:20, 51:21, 51:23, 52:1, 52:25, 53:23, 59:22, 60:18, 63:4, 66:12, 67:5, 67:8, 67:24, 75:7, 78:17, 80:6, 82:1, 82:3, 82:9, 82:22, 83:12, 89:21, 95:7, 95:8, 99:14, 103:20, 107:19, 122:22, 126:4, 129:1, 143:25, 145:1, 147:12, 150:5, 151:7, 161:25, 165:12, 172:20, 176:11
**basic** [1] - 97:12
**basing** [1] - 125:21
**basis** [20] - 19:17, 21:23, 72:11, 77:18, 119:16, 123:2, 125:9, 125:20, 140:14, 151:5, 151:10, 165:2, 165:17, 168:4, 170:7, 170:13, 170:23, 172:2, 172:3, 172:4
**battery** [1] - 164:3

**become** [1] - 10:2
**becoming** [1] - 152:6
**BEFORE** [1] - 1:8
**beginning** [4] - 44:18, 45:21, 124:13, 180:15
**behalf** [2] - 29:17, 165:8, 179:14
**behavior** [6] - 61:20, 108:10, 108:13, 121:5, 145:10
**behavioral** [4] - 61:19, 82:2, 99:15, 108:9
**behind** [2] - 81:23, 96:6
**belabor** [8] - 27:17, 27:19, 31:1, 36:18, 92:13, 121:7, 134:16, 155:14
**belatedly** [1] - 139:1
**believes** [1] - 46:15
**belong** [3] - 73:7, 85:4, 99:19
**belonged** [2] - 51:17, 136:16
**belonging** [1] - 42:13
**belongs** [1] - 51:14
**best** [8] - 7:12, 7:15, 9:23, 122:17, 182:16, 182:19, 182:22, 188:6
**better** [2] - 158:10, 162:22
**between** [19] - 17:17, 34:13, 38:11, 45:5, 45:12, 79:15, 80:9, 84:4, 94:6, 94:12, 96:3, 103:8, 105:11, 109:22, 110:14, 136:22, 163:16, 163:20, 168:11
**beyond** [6] - 38:8, 72:3, 106:20, 121:6, 166:17, 177:4
**BF** [2] - 108:25, 109:1
**bias** [2] - 99:13
**biased** [1] - 79:7
**big** [7] - 18:18, 70:6, 70:21, 89:25, 90:5, 92:14, 100:1
**bigger** [1] - 152:6
**billion** [1] - 100:1
**binder** [2] - 44:15, 108:25
**binders** [1] - 40:15
**birth** [1] - 7:4
**Bisbee** [18] - 38:4, 38:12, 38:19, 45:7, 54:11, 61:6, 67:22, 71:18, 77:25, 78:11,

91:19, 105:7, 107:7, 111:5, 113:4, 114:12, 141:8, 141:11
**Bisbee's** [8] - 52:14, 61:17, 62:14, 80:18, 83:4, 85:6, 105:18, 110:9
**Bishop** [1] - 114:25
**Bishop's** [1] - 92:5
**bit** [19] - 3:8, 10:16, 17:2, 17:8, 37:14, 43:17, 45:8, 73:9, 88:24, 88:25, 100:21, 110:21, 117:13, 120:18, 159:19, 162:21, 171:15, 177:13, 184:23
**Bitcoin** [95] - 4:24, 34:24, 40:4, 40:17, 40:22, 41:11, 42:11, 42:13, 42:20, 44:23, 45:6, 45:13, 46:3, 46:6, 46:20, 47:2, 47:5, 47:8, 47:14, 47:23, 48:15, 48:16, 49:1, 49:11, 49:13, 49:24, 49:25, 50:3, 50:7, 50:10, 50:19, 50:20, 51:16, 51:17, 51:22, 51:25, 53:4, 57:10, 59:25, 68:6, 68:14, 68:16, 68:17, 69:6, 69:7, 69:10, 73:7, 74:15, 74:21, 80:15, 80:22, 81:13, 88:12, 88:16, 90:20, 93:25, 98:19, 104:18, 108:15, 108:17, 109:8, 109:19, 116:25, 126:15, 126:22, 127:4, 129:1, 129:24, 130:23, 132:9, 133:16, 134:13, 138:3, 143:23, 143:24, 144:4, 144:9, 144:18, 144:24, 145:15, 146:22, 146:25, 155:18, 157:13, 157:22, 157:25, 159:14, 164:14, 165:14, 170:16, 170:22, 171:14, 172:7, 172:9, 172:20
**BitcoinTalk** [3] - 41:9, 41:11, 130:22

**Bitfinex** [2] - 4:19, 4:23
**BitLocker** [1] - 136:17
**black** [2] - 62:6, 62:8
**blanked** [1] - 110:20
**blanket** [1] - 167:5
**block** [3] - 46:1, 51:9, 92:10
**blockchain** [80] - 23:19, 25:9, 25:15, 25:23, 38:9, 38:10, 39:3, 39:19, 40:1, 40:12, 41:18, 41:19, 42:3, 42:11, 43:2, 43:7, 44:7, 47:2, 47:14, 47:21, 48:16, 48:25, 49:11, 50:17, 51:6, 51:10, 51:22, 52:10, 52:15, 56:10, 56:18, 56:24, 57:16, 57:18, 57:23, 57:25, 58:6, 58:8, 58:9, 58:10, 58:13, 58:17, 58:21, 59:18, 59:22, 59:25, 60:5, 60:7, 60:13, 60:15, 64:22, 66:3, 66:12, 66:13, 67:1, 67:5, 67:6, 67:25, 71:8, 71:12, 74:22, 80:1, 80:2, 80:9, 80:10, 81:24, 83:24, 84:5, 84:6, 89:5, 92:7, 92:9, 92:16, 96:18, 102:24, 106:1, 106:2, 106:9, 108:10, 170:6
**body** [1] - 83:25
**book** [2] - 26:17, 29:8
**books** [1] - 33:12
**border** [1] - 133:8
**borne** [1] - 66:1
**bothered** [5] - 79:8, 82:20, 84:17, 84:18, 91:23
**bottom** [2] - 48:14, 60:6
**bound** [1] - 81:17
**box** [2] - 62:6, 62:8
**boxed** [1] - 50:5
**brackets** [2] - 4:8, 4:9
**break** [10] - 15:1, 21:12, 27:6, 38:1, 53:13, 55:4, 76:16, 100:8, 110:12, 134:19
**breakdown** [1] - 43:18
**brief** [2] - 128:13, 131:24
**briefed** [5] - 22:18,

26:8, 28:9, 131:6, 131:11
**briefing** [5] - 16:3, 37:18, 106:21, 106:23, 158:11
**briefings** [1] - 52:13
**briefly** [4] - 16:21, 126:21, 133:16, 135:4
**bring** [2] - 87:22, 153:18
**bringing** [1] - 27:23, 105:25
**broadcasting** [1] - 16:11
**broadly** [1] - 82:15
**broken** [2] - 78:25, 105:3
**brought** [5] - 16:20, 54:10, 101:2, 104:17, 133:6
**BROWN** [16] - 1:10, 2:9, 129:5, 129:10, 129:17, 129:22, 131:1, 131:11, 131:14, 131:19, 131:22, 131:24, 132:13, 133:3, 183:3, 186:18
**Brown** [8] - 2:9, 71:3, 86:21, 105:25, 129:4, 166:24, 183:2, 186:12
**browser** [4] - 7:22, 7:24, 8:1, 8:6
**Bryan** [2] - 92:5, 114:24
**build** [1] - 89:10
**building** [2] - 27:23, 27:24
**built** [2] - 89:14, 113:13
**bulk** [3] - 47:18, 121:18, 133:5
**Bullet** [1] - 125:5
**bunch** [4] - 4:23, 85:14, 156:11, 156:13
**business** [29] - 22:24, 26:11, 28:5, 28:6, 28:21, 29:13, 29:17, 29:18, 29:21, 29:23, 30:2, 30:11, 31:15, 35:9, 35:16, 35:22, 36:2, 36:3, 36:5, 36:7, 50:17, 129:25, 130:5, 132:10, 148:14, 168:9, 168:13, 183:11
**businesses** [2] -

22:25, 33:23
**buyers** [1] - 88:22

**C**

**cables** [1] - 164:2
**calculate** [4] - 61:23, 62:2, 84:9, 88:18
**calculated** [1] - 183:15
**calculates** [1] - 40:17
**calculating** [1] - 103:19
**calendar** [1] - 180:2
**calibrated** [1] - 92:4
**California** [3] - 27:11, 27:13, 27:17
**cannot** [5] - 17:17, 126:16, 126:18, 148:13, 151:1
**cap** [1] - 40:4
**capacity** [1] - 137:1
**caps** [1] - 183:17
**caption** [1] - 133:25
**capture** [1] - 163:14
**car** [1] - 27:6
**care** [1] - 81:7
**careful** [2] - 120:18, 169:2
**carefully** [3] - 3:9, 171:16, 171:17
**carrying** [1] - 133:8
**carve** [1] - 180:5
**case** [91] - 3:22, 4:5, 4:10, 9:15, 11:22, 13:24, 14:3, 15:2, 17:11, 32:14, 34:22, 36:5, 36:13, 42:4, 52:6, 54:18, 55:1, 56:25, 57:8, 57:15, 60:2, 60:25, 61:13, 65:2, 67:16, 68:21, 69:19, 70:8, 74:21, 77:19, 80:13, 81:5, 83:1, 86:8, 86:13, 86:15, 88:25, 89:18, 90:2, 90:7, 90:8, 90:10, 90:13, 90:22, 91:3, 95:21, 96:10, 98:15, 99:1, 102:6, 107:22, 111:22, 114:23, 126:16, 131:7, 131:14, 131:18, 131:25, 132:9, 132:16, 133:2, 133:5, 133:12, 133:14, 133:23, 133:25, 138:17, 139:12, 144:12, 145:14,

146:3, 146:13, 146:16, 147:2, 147:15, 147:17, 148:4, 150:9, 151:17, 153:24, 167:6, 169:1, 173:16, 173:24, 174:17, 177:3, 177:19, 178:23, 183:1
**Case** [1] - 2:2
**cases** [28] - 7:11, 37:22, 52:12, 52:16, 60:7, 68:1, 70:22, 71:11, 71:22, 71:25, 72:2, 72:3, 72:14, 78:17, 81:21, 85:2, 85:3, 89:13, 90:4, 90:11, 90:12, 98:24, 127:18, 136:21, 160:25, 161:2
**cash** [2] - 133:5, 133:8
**catchall** [4] - 142:14, 143:3, 143:5, 167:5
**categories** [1] - 135:25
**Category** [1] - 183:15
**category** [1] - 73:21
**caution** [1] - 132:4
**caveat** [1] - 97:6
**caveats** [1] - 68:9
**CBP** [2] - 133:6, 133:11
**ceased** [1] - 111:2
**cell** [3] - 147:6, 158:22, 164:4
**Cellebrite** [1] - 146:20
**cements** [1] - 75:4
**central** [1] - 29:14
**CEO** [2] - 173:14, 173:21
**certain** [3] - 42:9, 145:25, 155:7
**certainly** [12] - 59:10, 61:11, 67:22, 72:6, 104:19, 131:19, 131:25, 132:23, 148:16, 169:4, 169:10, 169:13
**certainty** [3] - 98:18, 99:1, 160:23
**CERTIFICATE** [1] - 188:1
**certificate** [1] - 7:4
**certification** [10] - 14:1, 29:11, 31:18, 31:19, 32:2, 32:5, 32:12, 32:19, 32:25, 33:2
**certifications** [6] -

31:14, 31:23, 32:22, 33:7, 56:17, 75:19
**certified** [3] - 23:13, 31:14, 35:10
**certify** [7] - 26:11, 28:4, 30:2, 30:12, 31:20, 165:9, 188:3
**certifying** [4] - 29:13, 30:8, 35:8, 35:18
**cetera** [1] - 105:23
**chain** [27] - 31:22, 46:21, 60:21, 74:25, 75:6, 75:8, 75:10, 108:13, 112:9, 112:11, 112:14, 112:19, 112:23, 112:24, 115:15, 135:9, 136:3, 136:4, 136:9, 137:13, 137:22, 138:11, 140:23, 142:12, 143:10, 148:12, 175:3
**Chainalysis** [123] - 26:18, 38:18, 38:22, 40:18, 42:12, 42:22, 43:10, 44:9, 44:21, 44:22, 45:10, 45:20, 45:25, 46:2, 46:4, 46:5, 47:2, 47:9, 47:13, 47:19, 47:22, 47:25, 48:9, 48:17, 49:5, 49:13, 49:25, 50:9, 50:14, 50:20, 51:11, 51:12, 51:15, 52:2, 52:21, 59:24, 61:18, 62:12, 62:20, 62:22, 63:2, 63:5, 63:14, 63:22, 64:10, 64:12, 65:3, 65:7, 65:20, 67:8, 67:11, 67:23, 68:13, 68:16, 68:25, 69:6, 69:19, 70:12, 70:14, 70:20, 72:10, 72:16, 73:3, 73:8, 75:5, 75:9, 75:11, 75:19, 76:6, 76:20, 77:9, 77:24, 78:4, 78:6, 78:8, 78:10, 78:11, 78:12, 78:19, 78:21, 79:8, 79:12, 79:16, 79:21, 79:22, 80:4, 80:11, 80:25, 81:2, 81:22, 82:19, 84:3, 86:1, 86:18, 87:13, 89:19, 91:17, 91:24, 100:6, 100:23, 102:11, 102:17, 102:22, 103:3, 103:4, 103:9,

103:23, 103:25, 104:1, 104:9, 107:9, 108:5, 108:15, 110:10, 110:15, 111:1, 112:7, 113:7, 115:13, 170:6, 170:7, 175:24, 175:25
**Chainalysis's** [5] - 73:18, 74:16, 101:15, 103:20, 112:13
**chains** [11] - 39:20, 46:13, 46:15, 46:19, 50:24, 51:3, 60:22, 61:1, 101:25, 112:7, 112:8
**challenge** [18] - 58:6, 59:8, 59:21, 59:23, 70:25, 77:14, 83:18, 83:19, 88:6, 89:9, 89:15, 96:21, 115:23, 116:15, 119:21, 129:11, 131:12, 145:20
**challenged** [2] - 116:12, 132:6
**challenging** [3] - 77:12, 77:16, 88:4
**chance** [1] - 9:15
**change** [3] - 5:15, 101:25, 151:21
**changed** [1] - 6:25
**changes** [1] - 12:2
**channels** [1] - 32:10
**characteristics** [1] - 23:16
**characterized** [1] - 144:11
**charged** [1] - 111:21
**charges** [1] - 80:13
**charging** [1] - 168:16
**chart** [4] - 44:5, 44:6, 49:22, 105:3
**charts** [3] - 44:4, 46:1, 129:14
**Chase** [2] - 28:16, 28:20
**check** [13] - 15:11, 54:8, 68:24, 73:6, 84:18, 84:19, 91:24, 93:16, 100:18, 114:1, 114:25, 139:7, 181:2
**checked** [2] - 54:21, 91:22
**checking** [3] - 68:25, 74:10, 74:14
**child** [3] - 66:14, 66:19, 66:22

**choppy** [1] - 124:21
**chose** [3] - 119:8, 127:13, 127:21
**Christopher** [1] - 2:9
**CHRISTOPHER** [1] - 1:10
**chunk** [1] - 180:4
**CipherTrace** [7] - 50:1, 79:20, 84:2, 86:19, 87:7, 94:11, 110:13
**Circuit** [7] - 17:10, 17:13, 24:10, 54:16, 60:2
**Circuit's** [1] - 53:17
**circumstance** [2] - 53:19, 168:11
**citation** [1] - 72:23
**citations** [3] - 67:16, 75:24, 131:25
**cite** [10] - 23:24, 24:2, 24:6, 59:20, 83:6, 85:2, 94:6, 103:12, 118:21, 123:23
**cited** [4] - 34:7, 59:12, 90:12, 101:21
**cites** [1] - 86:22
**citing** [2] - 86:13, 103:13
**civil** [4] - 89:9, 90:8, 90:12, 117:15
**claims** [2] - 24:15, 137:16
**clarification** [3] - 77:12, 82:5, 185:18
**clarify** [5] - 119:14, 138:10, 153:1, 153:7, 154:22
**clarity** [1] - 186:5
**clear** [19] - 19:7, 24:19, 24:22, 26:21, 34:18, 36:12, 52:6, 56:23, 113:10, 118:11, 125:24, 132:8, 139:10, 163:18, 167:11, 173:5, 174:7, 175:22, 175:23
**clearly** [1] - 95:2
**clearnet** [2] - 122:7, 164:13
**clerk** [5] - 16:23, 100:18, 142:2, 142:6, 142:8
**client** [3] - 14:2, 14:10
**clients** [1] - 164:18
**clock** [3] - 78:25, 79:2, 186:14
**close** [4] - 74:8, 79:15, 121:25, 180:15

**closed** [2] - 80:10, 139:12
**closed-source** [1] - 80:10
**closer** [2] - 147:22, 153:9
**cluster** [10] - 42:13, 44:21, 49:11, 49:13, 51:16, 53:6, 61:20, 61:22, 102:11, 115:17
**clustered** [11] - 49:1, 62:22, 63:2, 63:22, 68:17, 69:2, 74:20, 75:10, 75:11, 102:17, 108:16
**clustering** [25] - 38:18, 38:22, 44:23, 47:14, 50:14, 58:18, 58:22, 58:24, 59:2, 59:16, 62:9, 65:1, 68:7, 69:1, 69:21, 70:25, 73:18, 74:16, 81:23, 92:19, 107:19, 108:4, 108:5, 108:6, 115:19
**clusters** [1] - 73:3
**CMIR** [2] - 133:9, 133:11
**co** [4] - 39:19, 108:5, 109:1, 115:15
**co-spend** [3] - 39:19, 108:5, 109:1
**co-spends** [1] - 115:15
**code** [6] - 54:20, 82:17, 123:13, 157:14, 157:15, 180:12
**coding** [3] - 156:10, 156:12, 156:23
**cognitive** [1] - 99:13
**coin** [1] - 40:17
**Coinbase** [1] - 50:18
**coincidence** [4] - 7:2, 7:3, 8:10, 8:19
**CoinJoin** [3] - 96:22, 96:23, 113:25
**CoinJoins** [2] - 113:5, 113:15
**colleagues** [1] - 73:10
**collect** [4] - 79:8, 82:20, 82:25, 84:24
**collected** [2] - 60:7, 64:18
**colloquialism** [1] - 10:3
**COLUMBIA** [1] - 1:1
**combination** [1] - 76:20

**comfortable** [1] - 160:13

**coming** [14] - 8:1, 91:19, 91:20, 114:12, 126:13, 126:14, 126:25, 135:6, 140:14, 145:22, 168:7, 169:17, 173:13

**comments** [1] - 3:13

**commit** [1] - 144:13

**committed** [1] - 96:2

**common** [9] - 41:5, 41:8, 89:9, 127:24, 159:4, 164:17, 164:23, 165:2, 165:16

**commonly** [1] - 106:3

**communicate** [2] - 14:8, 14:9

**communicated** [1] - 182:19

**communicating** [1] - 144:15

**community** [3] - 84:1, 97:14, 97:15

**company** [6] - 84:16, 100:1, 122:4, 150:18, 150:19, 173:25

**compare** [2] - 79:13, 81:1

**compared** [2] - 102:1, 102:23

**comparison** [2] - 23:16, 54:22

**competence** [2] - 137:5, 179:10

**competing** [1] - 48:25

**competitor** [1] - 49:5

**complaint** [7] - 81:4, 81:10, 87:4, 87:5, 102:6, 104:17, 166:5

**complete** [3] - 7:2, 17:24, 188:5

**completely** [7] - 74:2, 84:13, 86:3, 94:15, 136:25, 151:5, 175:23

**completeness** [1] - 19:14

**complex** [3] - 38:23, 56:25

**compliance** [1] - 84:21

**complicated** [7] - 20:19, 92:5, 95:21, 99:24, 112:18, 114:7, 114:9

**complies** [1] - 31:18

**complying** [1] - 32:6

**compounds** [1] - 99:16

**compromised** [1] - 137:8

**computed** [1] - 125:1

**computer** [19] - 7:1, 14:13, 14:16, 15:2, 38:15, 99:22, 100:14, 113:12, 123:14, 145:10, 156:10, 156:12, 156:22, 156:23, 158:24, 159:4, 164:16, 165:25, 169:22

**computer-user** [1] - 145:10

**computers** [5] - 35:24, 35:25, 123:11, 147:6, 156:22

**conceal** [1] - 42:16

**conceded** [2] - 61:6, 176:14

**concedes** [1] - 93:24

**conceding** [1] - 94:1

**concept** [1] - 126:2

**concepts** [6] - 39:8, 39:22, 41:22, 107:25, 108:3, 122:6

**concern** [11] - 9:22, 115:13, 117:1, 139:13, 155:5, 155:6, 173:12, 174:10, 176:21, 177:17, 178:6

**concerned** [6] - 3:22, 61:4, 120:24, 121:6, 128:23, 145:4

**concerns** [3] - 15:6, 116:18, 179:15

**concluded** [1] - 178:8

**conclusion** [6] - 50:8, 124:15, 124:19, 125:4, 165:3, 172:2

**conclusions** [4] - 161:5, 161:24, 163:4, 177:11

**conclusively** [1] - 24:12

**conclusory** [2] - 127:20, 170:12

**concrete** [10] - 18:13, 65:14, 148:7, 148:8, 161:15, 161:21, 162:4, 172:18, 178:20, 179:1

**conducting** [1] - 4:3

**CONFERENCE** [2] - 1:4, 1:7

**conference** [1] - 2:22

**conferencing** [2] - 13:5, 13:8

**confess** [1] - 66:18

**confident** [3] - 75:8, 104:8, 126:8

**configuration** [1] - 121:4

**confirm** [10] - 46:18, 49:1, 54:8, 54:13, 61:9, 65:17, 70:14, 102:16, 106:16, 116:8

**confirmation** [10] - 39:19, 49:10, 65:15, 65:23, 68:19, 73:21, 74:2, 75:23, 76:1, 99:13

**confirmations** [1] - 25:5

**confirmed** [3] - 51:2, 67:11, 93:5

**confirming** [2] - 47:25, 67:1

**confirms** [3] - 64:11, 69:11, 73:23

**conflate** [1] - 92:16

**confused** [3] - 99:21, 117:24, 136:4

**confusing** [1] - 83:9

**confusion** [2] - 6:25, 114:10

**connection** [2] - 33:20, 173:16

**consent** [4] - 15:25, 16:2, 16:3, 182:18

**conservative** [2] - 86:3, 103:25

**consider** [9] - 28:3, 54:24, 61:14, 101:17, 112:5, 139:21, 140:3, 184:15

**consideration** [3] - 150:1, 151:24, 152:1

**considered** [1] - 61:16

**considers** [1] - 153:24

**consist** [1] - 118:12

**consistent** [2] - 16:16, 113:12

**consistently** [1] - 73:13

**consolidated** [1] - 50:25

**conspiracy** [1] - 183:9

**constant** [2] - 155:23, 171:10

**constantly** [1] - 158:1

**constitutes** [1] - 188:4

**Constitution** [2] -

1:23, 188:11

**constitution** [1] - 91:3

**constitutionally** [5] - 90:15, 90:22, 90:23, 91:12, 91:17

**consult** [1] - 104:5

**consultation** [3] - 47:22, 47:24, 51:12

**consulted** [2] - 46:4, 50:21

**consulting** [1] - 57:22

**contact** [3] - 13:10, 15:7, 15:12

**contacted** [1] - 13:13

**contained** [2] - 46:16, 51:16

**contemplate** [1] - 130:17

**contents** [2] - 51:1, 137:25

**contest** [2] - 145:20, 145:22

**context** [4] - 130:21, 131:9, 132:25, 144:20

**contextual** [2] - 130:3, 132:21

**continual** [1] - 157:22

**continually** [1] - 164:4

**continue** [4] - 33:15, 55:8, 157:10, 179:25

**continues** [2] - 31:7, 47:10

**continuing** [1] - 25:22

**contract** [1] - 13:3

**control** [3] - 73:17, 85:11, 169:9

**controlled** [9] - 47:23, 50:10, 50:20, 60:21, 62:21, 68:13, 68:16, 75:1, 108:17

**controlling** [2] - 122:3

**controls** [2] - 63:25, 169:9

**convey** [2] - 126:1, 184:19

**conveyed** [1] - 55:18

**convicted** [14] - 26:15, 28:16, 28:19, 33:22, 33:25, 34:8, 35:3, 149:15, 149:16, 149:24, 150:6, 150:11, 151:23, 173:21

**conviction** [5] - 33:10, 34:6, 34:7, 149:8, 149:12

**convictions** [2] - 30:16, 97:23

**convince** [2] - 157:8,

178:7

**convinced** [3] - 178:3, 178:7, 179:5

**cooperating** [5] - 4:13, 4:22, 4:25, 5:7, 116:23

**copies** [2] - 3:2, 23:3

**copious** [1] - 19:8

**copy** [1] - 24:1

**core** [1] - 179:10

**corner** [1] - 48:14

**correct** [18] - 13:20, 14:14, 22:14, 41:20, 43:23, 58:12, 67:13, 80:8, 82:14, 114:2, 114:24, 116:3, 124:25, 137:22, 150:10, 165:15, 180:25, 186:8

**corrected** [1] - 125:25

**correction** [1] - 113:25

**correctly** [17] - 7:25, 63:2, 69:20, 72:16, 82:8, 88:9, 91:25, 110:9, 113:5, 117:9, 118:20, 123:3, 123:21, 158:6, 160:5, 161:14, 161:19

**correlation** [1] - 79:15

**corresponded** [1] - 65:19

**corresponding** [3] - 20:11, 25:16, 65:12

**corresponds** [1] - 62:6

**corroborate** [1] - 49:12

**corroborated** [2] - 46:7, 66:3

**corroborates** [1] - 64:22

**corroborating** [5] - 23:15, 23:20, 67:1, 86:24, 90:19

**corroboration** [7] - 24:25, 25:3, 25:21, 25:23, 25:24, 60:4, 62:17

**corrupt** [1] - 148:15

**counsel** [7] - 2:4, 2:5, 8:23, 9:4, 52:21, 182:8, 183:4

**count** [2] - 183:8, 183:10

**counterpart** [1] - 18:15

**country** [6] - 33:25, 56:14, 66:1, 67:19, 71:25, 168:10

**counts** [2] - 183:8, 183:13
**County** [1] - 167:15
**couple** [9] - 6:21, 7:11, 14:21, 15:15, 100:22, 101:20, 122:20, 177:13, 180:5
**course** [4] - 5:8, 6:9, 161:18, 186:4
**Court** [60] - 1:22, 1:22, 4:1, 6:22, 7:5, 7:8, 7:12, 8:3, 8:25, 11:21, 11:23, 12:6, 12:13, 12:21, 14:4, 14:7, 14:8, 16:24, 17:14, 35:6, 38:3, 43:25, 51:8, 54:11, 55:25, 58:4, 61:12, 75:15, 91:7, 92:13, 95:17, 95:18, 97:7, 106:22, 109:5, 110:24, 111:2, 117:12, 118:14, 126:25, 128:17, 132:17, 132:20, 134:16, 135:3, 135:23, 140:15, 149:5, 149:17, 154:9, 154:13, 155:3, 155:7, 157:7, 158:11, 161:14, 162:11, 169:3, 188:10
**COURT** [443] - 1:1, 2:8, 2:11, 2:14, 2:17, 2:21, 3:18, 4:2, 4:9, 4:17, 4:19, 5:5, 5:12, 5:15, 5:19, 5:21, 5:24, 6:3, 6:6, 6:8, 6:12, 6:15, 6:18, 7:3, 7:6, 7:15, 7:23, 8:2, 8:4, 8:13, 8:17, 8:21, 9:3, 9:5, 9:8, 9:12, 9:18, 10:5, 10:10, 10:14, 10:18, 10:22, 11:1, 11:9, 11:12, 11:14, 11:17, 11:24, 12:2, 12:17, 12:22, 13:17, 13:20, 14:5, 14:11, 14:16, 14:18, 14:25, 15:5, 15:14, 15:17, 15:20, 15:23, 16:9, 16:14, 16:20, 18:21, 19:17, 20:1, 20:8, 20:25, 21:4, 21:11, 21:20, 22:1, 22:5, 22:10, 22:15, 23:23, 24:7, 24:25, 26:5, 27:5, 27:12,

27:19, 28:10, 28:18, 28:23, 29:15, 31:4, 31:12, 32:16, 32:21, 33:3, 33:19, 33:24, 34:3, 34:8, 34:12, 35:21, 36:20, 38:10, 38:20, 39:11, 39:14, 39:23, 39:25, 40:8, 40:11, 40:20, 40:24, 41:5, 41:8, 41:14, 41:17, 41:24, 42:5, 42:14, 42:17, 42:24, 43:1, 43:11, 43:17, 44:2, 44:11, 44:15, 44:24, 45:2, 45:18, 46:24, 47:11, 47:17, 47:24, 48:3, 48:6, 48:10, 48:18, 49:4, 49:17, 49:21, 50:11, 50:22, 51:2, 51:18, 52:3, 52:17, 53:12, 55:11, 55:14, 55:16, 55:21, 55:23, 56:3, 56:22, 57:4, 58:1, 58:23, 59:12, 60:9, 61:4, 62:4, 63:6, 63:12, 64:7, 64:24, 65:14, 65:22, 66:4, 66:9, 66:16, 67:3, 67:10, 67:14, 67:20, 68:2, 68:18, 69:5, 69:13, 69:17, 70:12, 71:5, 71:17, 72:4, 72:22, 72:25, 73:12, 73:20, 74:11, 74:17, 75:12, 75:16, 75:22, 76:4, 76:8, 76:12, 76:23, 77:6, 77:11, 77:17, 77:22, 79:10, 79:24, 81:7, 82:5, 82:12, 86:11, 87:16, 87:20, 87:24, 88:4, 89:8, 90:10, 91:5, 93:3, 93:15, 93:21, 94:4, 94:21, 95:2, 95:6, 95:15, 95:17, 95:20, 96:13, 97:8, 98:3, 100:4, 100:7, 100:13, 101:18, 102:18, 103:7, 103:15, 103:24, 104:11, 104:15, 105:1, 105:12, 105:21, 106:12, 106:24, 107:6, 108:22, 109:6, 109:16, 110:3, 110:5, 110:16, 111:13, 112:2, 112:15, 112:20, 113:9, 113:23,

114:3, 114:15, 114:21, 115:9, 115:20, 115:24, 116:8, 117:7, 117:13, 118:18, 119:2, 119:4, 119:10, 120:12, 120:17, 121:9, 122:19, 124:1, 124:5, 124:11, 124:16, 125:6, 125:15, 126:7, 126:20, 127:6, 127:10, 127:19, 127:23, 128:1, 128:5, 128:10, 128:18, 129:4, 129:9, 129:16, 129:18, 130:25, 131:6, 131:13, 131:15, 131:21, 131:23, 132:12, 132:23, 133:13, 133:18, 134:18, 134:24, 135:24, 136:12, 136:25, 137:9, 137:19, 138:19, 139:15, 139:19, 139:25, 140:3, 140:20, 141:2, 141:6, 141:9, 141:13, 141:16, 141:18, 141:22, 142:2, 142:5, 142:8, 142:18, 143:8, 143:14, 144:10, 145:12, 145:24, 146:2, 146:15, 147:14, 147:22, 148:10, 148:16, 149:1, 149:6, 149:11, 150:3, 150:15, 150:21, 151:1, 151:4, 151:10, 151:12, 151:20, 152:10, 152:18, 153:3, 153:9, 153:15, 153:22, 154:1, 154:4, 154:15, 154:22, 155:11, 155:19, 155:24, 156:2, 156:6, 156:13, 157:4, 157:8, 157:19, 158:3, 158:14, 159:1, 159:22, 160:13, 161:23, 162:5, 162:13, 162:20, 163:3, 163:6, 163:11,

164:11, 164:25, 165:17, 165:20, 165:24, 166:2, 166:10, 166:22, 167:2, 168:6, 168:21, 169:14, 169:25, 170:3, 170:9, 171:1, 171:4, 171:9, 171:15, 171:20, 171:23, 172:3, 172:10, 172:15, 172:23, 173:10, 175:12, 176:6, 176:11, 176:16, 176:19, 176:25, 177:10, 180:9, 180:23, 181:2, 181:11, 181:15, 181:25, 182:2, 182:7, 182:11, 182:15, 182:22, 182:25, 183:22, 184:4, 184:7, 184:10, 184:14, 184:17, 184:22, 185:5, 185:9, 185:14, 185:17, 185:19, 185:24, 186:2, 186:5, 186:11, 186:16, 186:19, 186:21, 188:1
**court** [28] - 2:16, 2:20, 9:14, 16:24, 16:25, 17:3, 17:4, 19:16, 28:16, 30:5, 34:9, 58:21, 79:23, 82:7, 85:4, 98:8, 98:9, 99:20, 100:16, 117:15, 124:17, 135:21, 140:18, 150:12, 151:2, 151:12, 181:11
**Court's** [3] - 3:20, 22:22, 110:1
**Courthouse** [1] - 1:23
**Courtney** [1] - 9:16
**COURTNEY** [1] - 9:16
**COURTROOM** [2] - 2:2, 181:1
**courts** [5] - 58:10, 58:15, 58:16, 83:3, 175:8
**cover** [1] - 106:25
**covered** [3] - 108:19, 135:25, 176:15
**covers** [1] - 142:4
**CRC** [2] - 1:22, 188:9
**create** [1] - 164:22
**created** [2] - 143:23,

168:23
**creating** [1] - 33:17
**crime** [2] - 144:13, 173:21
**criminal** [19] - 2:2, 16:11, 59:19, 66:1, 68:1, 81:4, 81:9, 81:19, 85:8, 87:4, 87:5, 90:7, 90:11, 91:3, 99:20, 111:22, 130:8, 145:11, 166:5
**Criminal** [2] - 1:2, 183:15
**criminality** [1] - 10:13
**criteria** [1] - 94:5
**critical** [1] - 43:21
**criticize** [1] - 186:11
**criticizing** [1] - 186:12
**critique** [2] - 38:4, 168:3
**CRM** [1] - 1:16
**crook** [1] - 173:14
**cross** [8] - 48:24, 77:25, 96:25, 122:18, 125:8, 126:9, 166:19, 177:5
**cross-examination** [5] - 96:25, 125:8, 126:9, 166:19, 177:5
**cross-examined** [1] - 77:25
**cross-referenced** [1] - 48:24
**crossed** [2] - 115:25, 118:1
**crossing** [1] - 125:18
**CRR** [2] - 1:22, 188:9
**crux** [2] - 91:15, 92:18
**cryptocurrency** [8] - 11:5, 11:18, 38:25, 40:21, 41:3, 41:9, 56:10, 56:18
**Cryptocurrency** [1] - 56:21
**cryptocurrency-related** [1] - 56:18
**cumulative** [1] - 134:12
**Currency** [1] - 56:12
**currency** [10] - 22:23, 56:14, 56:16, 62:20, 62:22, 62:23, 62:25, 107:25, 108:1, 133:9
**curriculum** [1] - 56:8
**custodial** [2] - 155:17, 170:15
**custodian** [1] - 26:15
**custody** [13] - 135:9, 136:3, 136:4, 136:10, 137:14,

137:22, 138:11,
140:23, 142:12,
143:10, 148:12,
149:24, 175:3
**customer** [1] - 63:1
**customers** [2] - 65:6
**customize** [1] - 62:1
**customizing** [1] -
61:22
**cut** [1] - 139:15
**cute** [1] - 7:10
**CV** [2] - 135:3, 135:19
**cybercriminal** [2] -
126:17, 127:18

**D**

**D.C** [10] - 1:5, 3:5,
24:10, 27:15, 37:12,
53:17, 54:16,
133:17, 188:11
**daily** [1] - 72:11
**danger** [1] - 92:14
**darknet** [34] - 9:25,
10:2, 10:10, 10:13,
10:21, 10:24, 11:7,
11:10, 11:18, 41:25,
42:16, 42:21, 45:4,
45:5, 52:1, 59:3,
59:4, 59:9, 59:11,
65:2, 65:4, 66:21,
69:14, 69:20, 70:21,
70:24, 80:22, 93:25,
104:24, 109:9,
109:19, 111:2,
111:8, 114:18
**data** [101] - 23:1,
23:11, 26:15, 26:16,
26:19, 28:20, 30:16,
31:2, 31:10, 35:3,
45:16, 53:23, 53:25,
54:1, 57:5, 57:6,
57:14, 57:15, 62:9,
68:12, 70:15, 71:16,
77:13, 78:12, 79:3,
79:4, 79:7, 79:12,
80:7, 82:4, 82:16,
82:17, 82:21, 83:1,
84:24, 88:23, 90:4,
92:12, 102:22,
102:23, 103:3,
104:7, 104:9,
122:22, 123:6,
125:12, 128:4,
135:10, 140:10,
148:13, 148:15,
148:25, 149:9,
149:10, 149:20,
149:23, 149:24,
150:2, 150:6, 150:9,

150:13, 150:14,
150:15, 150:18,
150:19, 150:22,
151:8, 151:15,
151:16, 151:17,
151:20, 151:24,
151:25, 152:1,
152:4, 152:5, 152:9,
152:12, 152:14,
152:17, 167:10,
167:13, 168:22,
173:11, 173:18,
173:20, 173:22,
173:24, 174:5,
174:9, 174:14,
174:16, 174:21,
177:19, 177:22
**database** [2] - 26:20,
26:24
**date** [6] - 25:13, 65:8,
65:12, 100:12,
140:4, 179:25
**Dated** [1] - 188:7
**dates** [1] - 30:20
**Daubert** [52] - 2:24,
22:8, 31:7, 37:21,
43:16, 44:13, 56:8,
58:8, 58:14, 58:24,
59:8, 60:1, 61:12,
72:20, 72:25, 73:1,
77:10, 78:1, 81:18,
83:9, 83:18, 83:19,
83:20, 84:14, 85:9,
85:16, 85:19, 86:8,
86:10, 91:6, 91:9,
91:11, 91:12, 91:17,
91:18, 94:19, 96:12,
99:18, 100:2, 101:5,
106:13, 115:2,
115:23, 117:5,
117:11, 117:13,
117:15, 117:18,
117:22, 119:15,
122:18, 132:6
**Daubert-specific** [1] -
60:1
**days** [3] - 19:22,
21:10, 63:21
**DC** [4] - 1:12, 1:14,
1:17, 1:24
**de** [8] - 116:1, 116:4,
121:17, 125:19,
143:9, 158:19,
159:16, 163:8
**De** [2] - 5:18, 5:22
**DE** [2] - 5:18, 5:23
**deadline** [2] - 181:23,
183:5
**deal** [5] - 7:13, 9:23,
9:24, 11:21, 99:12

**dealing** [4] - 22:20,
59:16, 98:19, 167:7
**deals** [1] - 148:12
**dealt** [1] - 122:17
**decide** [6] - 17:19,
18:4, 20:22, 93:8,
93:10, 184:20
**deciding** [1] - 24:11
**decision** [11] - 17:9,
53:17, 55:18,
119:21, 185:2,
185:6, 185:10,
185:23, 185:24,
186:2, 186:3
**declarant** [1] - 82:7
**declaration** [1] - 43:13
**declarations** [1] - 83:4
**deep** [9] - 10:1, 10:12,
10:14, 10:21, 10:24,
11:7, 11:9, 11:10,
11:19
**deeper** [2] - 123:10,
178:4
**deeply** [1] - 72:9
**default** [1] - 105:15
**DEFENDANT** [20] -
182:10, 182:14,
182:21, 182:24,
184:3, 184:6, 184:9,
184:12, 184:16,
184:21, 185:3,
185:8, 185:12,
185:15, 185:18,
185:23, 186:1,
186:4, 186:9, 186:15
**Defendant** [4] - 1:6,
1:18, 2:16, 2:19
**defendant** [9] - 9:9,
36:4, 91:3, 121:5,
127:13, 127:21,
128:8, 130:22,
183:19
**defendant's** [20] -
36:5, 41:1, 46:8,
46:13, 47:7, 47:16,
49:19, 49:23, 50:2,
50:25, 58:5, 61:2,
74:24, 99:1, 119:19,
120:10, 122:8,
122:10, 130:21,
131:2
**defendants** [1] - 66:2
**defense** [64] - 3:21,
6:12, 6:18, 8:11,
9:25, 12:8, 16:19,
18:6, 19:4, 19:22,
20:3, 23:6, 23:8,
23:10, 26:22, 27:2,
31:7, 36:14, 37:19,
38:4, 39:9, 43:14,

48:19, 52:20, 53:2,
58:12, 59:6, 79:6,
93:24, 101:2, 101:3,
103:13, 104:17,
105:4, 105:24,
116:12, 120:1,
128:10, 131:12,
139:10, 141:20,
142:14, 143:20,
147:15, 149:22,
152:13, 161:22,
162:9, 166:12,
166:21, 167:8,
167:19, 167:24,
168:1, 169:15,
170:24, 175:6,
175:8, 176:14,
176:21, 176:22,
176:23, 177:7, 183:4
**defense's** [5] - 3:3,
16:19, 31:2, 94:20,
119:21
**defer** [3] - 6:22, 7:11,
121:9
**definitely** [2] - 59:2,
72:20
**definitions** [1] -
122:10
**deletions** [1] - 26:19
**delivered** [2] - 56:19,
75:18
**delivering** [1] - 175:10
**delve** [1] - 72:1
**demands** [1] - 91:3
**demonstrate** [1] - 24:8
**demonstrates** [3] -
143:22, 145:23,
148:14
**demonstratives** [1] -
128:21
**demystify** [1] - 158:22
**denial** [1] - 15:9
**Department** [6] - 1:13,
1:16, 3:6, 5:10, 98:5,
106:8
**dependent** [2] - 110:9,
111:1
**deployed** [1] - 81:11
**deposit** [9] - 19:25,
20:15, 25:16, 44:23,
47:19, 47:20, 48:14,
48:15
**deposited** [1] - 105:14
**deposition** [1] -
117:15
**deposits** [1] - 25:17
**depth** [4] - 12:9, 52:7,
104:5, 113:20
**DEPUTY** [2] - 2:2,
181:1

**derivative** [1] - 152:13
**describe** [2] - 113:8,
120:15
**described** [5] - 56:8,
59:24, 120:8,
121:19, 170:24
**describing** [1] - 41:24
**description** [1] - 47:9
**descriptions** [2] -
46:22, 155:4
**designed** [3] - 89:18,
90:1, 168:13
**desk** [3] - 141:3,
142:6, 142:9
**detail** [5] - 25:20, 26:3,
43:21, 50:13, 55:2
**detailed** [4] - 44:6,
52:19
**details** [3] - 43:13,
71:22, 167:18
**determination** [4] -
47:22, 116:10,
119:24, 125:22
**determine** [3] - 44:22,
54:6, 115:16
**determined** [4] - 46:6,
75:1, 108:15, 122:2
**determining** [4] -
47:4, 51:24, 90:9,
149:19
**deterministic** [5] -
83:4, 83:5, 89:20,
94:8, 99:23
**developed** [4] - 37:19,
96:5, 97:19, 103:18
**device** [13] - 66:20,
136:18, 138:20,
139:5, 144:14,
159:7, 163:8,
163:21, 164:7,
172:19, 172:20,
174:24
**devices** [33] - 71:11,
118:9, 119:19,
120:4, 135:8, 136:3,
136:6, 136:7,
136:12, 136:15,
136:24, 137:22,
137:25, 138:5,
138:8, 138:9,
142:12, 142:24,
143:7, 144:7,
144:21, 144:22,
159:13, 163:11,
163:19, 163:23,
164:1, 164:9, 172:7,
172:9, 178:21,
178:22, 179:8
**die** [1] - 152:3
**differ** [1] - 40:21

**difference** [13] - 34:12, 38:11, 89:25, 90:5, 90:7, 92:14, 96:3, 103:8, 105:18, 105:19, 138:22, 163:20, 168:10
**differences** [5] - 17:16, 17:20, 17:25, 98:4
**different** [74] - 18:11, 19:8, 22:25, 24:5, 25:8, 25:14, 25:16, 28:18, 28:24, 29:1, 39:21, 40:19, 41:2, 42:20, 45:8, 45:22, 47:15, 49:20, 52:12, 61:21, 64:21, 65:1, 65:2, 66:4, 66:24, 67:4, 71:7, 71:15, 71:16, 74:3, 74:5, 74:22, 81:12, 87:12, 89:13, 92:22, 93:1, 93:7, 93:10, 93:19, 96:10, 97:3, 98:16, 101:5, 101:21, 101:24, 102:19, 103:3, 103:11, 104:16, 105:6, 107:18, 108:4, 108:12, 109:9, 109:11, 109:19, 109:22, 119:12, 120:21, 121:22, 121:23, 121:24, 126:3, 127:18, 137:10, 140:23, 142:24, 148:3, 172:9, 172:12
**differentiation** [1] - 163:20
**differently** [4] - 90:11, 108:9, 139:5, 162:21
**difficult** [3] - 61:23, 64:3, 161:5
**difficulties** [1] - 160:15
**dig** [1] - 178:3
**diligently** [1] - 52:23
**Dimon** [1] - 28:15
**dire** [10] - 3:1, 3:12, 3:14, 4:4, 6:21, 11:25, 157:10, 158:7, 158:9, 158:12
**direct** [9] - 42:21, 80:24, 104:24, 105:3, 105:8, 105:17, 109:1, 162:10, 164:19
**directed** [1] - 113:13
**direction** [2] - 100:20,

121:2
**directly** [2] - 92:1, 153:14
**disagree** [4] - 80:3, 86:3, 93:3, 157:7
**disagreeing** [1] - 91:9
**disagreement** [1] - 161:22
**disclosed** [10] - 118:14, 129:3, 132:2, 140:5, 140:9, 155:9, 168:5, 169:13, 173:7, 174:25
**discloses** [1] - 143:7
**disclosing** [1] - 166:14
**disclosure** [26] - 86:22, 88:10, 92:5, 117:4, 118:1, 118:7, 120:8, 122:5, 128:24, 129:7, 135:4, 140:6, 140:17, 140:21, 141:1, 141:15, 147:15, 147:23, 154:2, 154:4, 154:8, 163:24, 166:16, 170:12, 170:25, 176:24
**disclosures** [6] - 154:9, 155:6, 157:11, 166:18, 176:21, 177:2
**discovery** [8] - 12:8, 13:15, 13:24, 43:14, 57:8, 144:7, 147:12, 164:6
**discrepancies** [2] - 136:22, 163:16
**discrepancy** [3] - 110:14, 136:19, 138:7
**discrete** [1] - 51:20
**discriminate** [1] - 93:20
**discuss** [14] - 11:22, 15:24, 16:18, 25:24, 31:6, 73:9, 121:20, 184:5, 184:11, 184:24, 185:1, 185:4, 185:10
**discussed** [9] - 12:3, 26:1, 53:1, 75:17, 129:7, 130:10, 178:24, 179:1, 185:5
**discusses** [4] - 49:14, 60:3, 66:22, 108:14
**discussing** [7] - 22:9, 39:1, 41:23, 45:22,

67:23, 76:19, 159:9
**discussion** [3] - 58:7, 72:23, 174:6
**dispositive** [4] - 61:14, 85:19, 90:6, 101:12
**dispute** [4] - 22:12, 71:9, 80:6, 113:17
**disputing** [1] - 84:2
**disregarded** [1] - 87:5
**disrupt** [2] - 113:6, 168:13
**distinction** [2] - 10:17, 80:9
**distinctive** [1] - 23:16
**distinguish** [4] - 84:4, 94:6, 94:12, 94:13
**distributor** [1] - 147:18
**District** [2] - 71:2, 168:15
**DISTRICT** [3] - 1:1, 1:1, 1:8
**district** [1] - 58:17
**Divya** [2] - 6:6, 6:7
**DNA** [8] - 96:4, 98:9, 98:10, 99:7, 99:8, 99:9, 99:14
**DNS** [14] - 164:12, 164:21, 164:24, 165:1, 165:6, 165:7, 165:16, 166:3, 166:5, 175:25, 176:1, 176:17, 179:12, 179:14
**Docket** [1] - 140:21
**document** [2] - 19:19, 133:19
**Document** [1] - 142:1
**documentation** [1] - 163:8
**documented** [3] - 26:17, 87:6, 135:18
**documents** [7] - 17:6, 19:3, 19:5, 24:9, 34:14, 87:23, 95:1
**DOJ** [5] - 1:11, 1:16, 56:21, 86:22, 106:1
**DOJ-CRM** [1] - 1:16
**dollar** [4] - 88:21, 90:17, 118:18, 119:2
**dollars** [3] - 36:15, 80:14, 84:16
**domain** [3] - 47:8, 164:16, 174:13
**done** [26] - 15:22, 15:24, 17:8, 45:24, 46:11, 51:21, 54:13, 59:6, 59:7, 64:22, 66:11, 68:21, 69:19,

70:3, 70:5, 70:11, 76:24, 80:4, 87:5, 100:9, 102:10, 102:16, 103:6, 106:21, 146:8, 181:10
**door** [4] - 117:1, 166:19, 177:2, 179:17
**doubt** [2] - 90:14, 174:21
**doubtful** [2] - 178:15, 178:17
**doubting** [1] - 93:17
**dove** [1] - 59:21
**down** [15] - 18:9, 19:3, 20:4, 21:1, 21:24, 77:18, 78:1, 103:12, 111:4, 126:6, 139:18, 141:22, 151:12, 176:8, 178:3
**downloading** [1] - 66:14
**downloads** [1] - 35:25
**draft** [1] - 3:1
**drafting** [1] - 173:5
**drain** [1] - 169:7
**draw** [1] - 163:4
**drive** [12] - 13:15, 14:12, 26:18, 27:6, 120:20, 120:21, 136:14, 136:17, 139:4, 146:19, 163:15, 173:8
**dubious** [2] - 148:10, 150:4
**due** [3] - 76:7, 91:8, 140:4
**duplicative** [1] - 171:22
**during** [1] - 22:1
**Dutch** [1] - 4:20

**E**

**early** [2] - 3:10, 175:5
**easier** [3] - 10:19, 40:10, 125:6
**easiest** [1] - 143:19
**easily** [2] - 107:1, 133:2
**Eastern** [1] - 71:2
**easy** [2] - 92:16, 139:6
**ECF** [7] - 22:18, 22:19, 24:6, 25:20, 58:4, 110:2, 141:1
**econometric** [2] - 89:10, 89:14
**economic** [1] - 90:9
**economist** [2] - 89:15,

90:1
**economists** [2] - 89:10, 89:14
**educated** [1] - 40:3
**effect** [4] - 5:16, 128:24, 173:18, 173:20
**effective** [1] - 102:19
**either** [16] - 10:24, 11:1, 25:14, 35:11, 35:18, 50:17, 74:7, 75:24, 80:5, 96:16, 97:3, 114:23, 121:1, 155:11, 160:20, 186:16
**either/or** [2] - 117:5, 158:13
**Ekeland** [40] - 1:19, 2:15, 6:19, 6:23, 9:7, 9:9, 9:10, 19:4, 20:9, 21:1, 21:4, 22:6, 26:5, 34:4, 53:14, 54:9, 55:7, 59:7, 61:6, 76:13, 76:17, 77:6, 110:5, 115:24, 120:12, 121:14, 122:19, 125:18, 133:13, 134:24, 137:9, 138:21, 139:15, 139:19, 172:3, 172:15, 175:1, 178:24, 179:2, 186:19
**EKELAND** [212] - 1:18, 2:15, 6:20, 7:4, 7:7, 7:22, 7:25, 8:3, 8:11, 8:15, 8:20, 8:22, 9:4, 9:6, 9:11, 9:13, 9:19, 10:7, 10:12, 10:23, 11:13, 11:20, 12:1, 12:5, 12:20, 12:25, 13:18, 13:21, 14:7, 14:14, 14:17, 14:19, 15:3, 15:9, 15:15, 15:18, 15:21, 16:5, 16:13, 16:17, 18:5, 20:24, 21:6, 21:14, 21:21, 22:4, 22:7, 22:14, 26:7, 27:10, 27:16, 28:2, 28:15, 28:19, 29:7, 29:20, 34:5, 34:9, 34:18, 36:12, 76:21, 77:7, 77:15, 77:20, 77:24, 79:19, 80:8, 81:9, 82:11, 82:14, 86:12, 87:18, 87:21, 88:1, 88:6, 89:17, 90:14, 91:13, 93:13, 93:16, 94:1, 94:5, 94:23,

95:5, 95:9, 95:16,
95:19, 96:3, 97:5,
97:9, 99:2, 100:5,
100:10, 110:8,
110:18, 111:24,
112:6, 112:16,
112:21, 113:16,
114:2, 114:5,
114:17, 114:24,
115:25, 116:17,
117:9, 117:23,
118:19, 119:3,
119:6, 120:14,
120:23, 122:20,
124:3, 124:9,
124:12, 124:18,
125:7, 126:21,
127:20, 127:24,
128:3, 128:8,
128:12, 128:20,
133:15, 134:8,
135:2, 136:5,
136:14, 137:6,
137:18, 137:23,
139:23, 140:2,
140:5, 141:4, 141:7,
141:10, 141:14,
141:17, 141:19,
141:23, 142:4,
142:7, 142:11,
143:5, 143:13,
143:20, 144:19,
145:22, 145:25,
146:12, 146:18,
147:19, 148:6,
148:12, 148:21,
149:4, 149:7,
149:16, 150:10,
150:17, 150:24,
151:3, 151:9,
151:11, 151:18,
151:21, 152:11,
152:19, 153:4,
153:11, 153:17,
153:23, 154:3,
154:7, 154:18,
155:3, 155:13,
155:20, 155:25,
156:3, 156:9,
156:21, 157:7,
157:18, 157:20,
158:5, 158:15,
159:2, 160:2,
161:13, 162:4,
162:9, 162:14,
163:2, 163:5, 163:7,
163:14, 164:12,
165:15, 165:19,
165:23, 165:25,
166:3, 166:20,
180:7, 180:22,

182:6, 186:20
**Ekeland's** [5] - 8:9,
8:18, 31:13, 33:10,
176:11
**electronic** [2] - 31:17,
31:21
**eligible** [2] - 183:20,
183:21
**email** [8] - 12:6, 12:20,
14:24, 21:7, 21:16,
25:5, 25:21, 47:16
**emailed** [1] - 14:21
**emails** [1] - 23:19
**emerging** [4] - 94:15,
96:6, 97:20, 97:24
**emphasize** [2] - 52:6,
132:7
**employed** [1] - 54:2
**encompassed** [1] -
53:24
**encountered** [1] -
6:24
**encourage** [2] - 17:14,
106:15
**encrypted** [2] -
136:17, 139:4
**end** [6] - 11:2, 18:5,
51:4, 115:14,
119:22, 177:3
**ends** [1] - 162:11
**enforcement** [18] -
57:20, 58:9, 62:13,
67:18, 68:22, 68:24,
69:25, 70:4, 72:5,
79:6, 149:22, 160:3,
160:5, 175:2, 175:4,
175:10, 175:11
**Enforcement** [1] -
56:21
**enforcement's** [1] -
130:7
**enforces** [1] - 133:11
**engaged** [2] - 35:23,
121:5
**engages** [1] - 155:12
**engaging** [2] - 150:13,
158:12
**engineer** [1] - 114:1
**engineers** [1] - 114:22
**entered** [1] - 139:4
**enterprise** [1] - 157:25
**entire** [4] - 107:8,
110:25, 115:5,
125:13
**entirely** [4] - 34:18,
110:9, 137:4, 162:8
**entities** [3] - 51:14,
107:19, 109:22
**entitled** [4] - 59:7,
113:15, 177:8,

179:18
**entity** [5] - 29:16,
29:19, 60:22, 69:3
**equals** [1] - 97:15
**equipment** [4] - 27:16,
27:23, 158:24, 159:3
**equivalent** [1] - 32:23
**error** [32] - 31:9,
54:12, 61:7, 61:11,
61:15, 61:23, 62:2,
62:4, 78:9, 78:12,
81:17, 82:21, 83:5,
84:19, 84:22, 85:3,
85:15, 85:23, 95:3,
95:4, 95:5, 95:12,
95:13, 95:14, 97:4,
101:10, 103:2,
103:14, 110:22,
168:1
**error-prone** [1] - 95:14
**errors** [10] - 30:19,
31:8, 87:6, 87:23,
95:1, 95:23, 96:1,
149:9, 167:9, 172:5
**especially** [2] - 63:20,
72:2
**essentially** [26] -
13:23, 25:8, 30:9,
31:25, 41:3, 82:15,
83:11, 91:16,
101:22, 102:2,
102:10, 105:15,
108:8, 112:18,
118:17, 118:24,
119:7, 120:3, 122:5,
123:17, 135:15,
138:1, 152:22,
153:13, 153:18,
169:7
**establish** [1] - 86:16
**establishing** [1] - 83:7
**estimated** [1] - 73:11
**et** [1] - 105:23
**evaluating** [2] - 58:18,
82:21
**evaluation** [1] - 104:6
**evening** [2] - 3:9, 3:10
**event** [2] - 19:18,
178:5
**evidence** [68] - 19:19,
23:15, 23:17, 23:20,
24:8, 24:14, 33:7,
52:15, 56:25, 67:1,
78:17, 78:21, 81:8,
81:20, 81:21, 84:12,
85:22, 86:16, 86:24,
87:10, 89:22, 90:19,
95:25, 96:4, 106:2,
106:15, 112:2,
133:23, 134:2,

134:5, 137:8, 138:2,
138:13, 138:17,
138:18, 139:7,
139:8, 143:22,
143:25, 144:14,
145:2, 145:6,
145:23, 146:3,
146:6, 146:13,
146:16, 146:22,
146:24, 147:17,
148:4, 148:8,
148:17, 148:20,
149:2, 161:16,
163:4, 168:21,
169:11, 171:25,
172:6, 172:14,
172:17, 177:18,
177:21
**evidentiary** [1] - 19:17
**evoked** [1] - 54:10
**exact** [9] - 53:8, 63:10,
63:11, 74:4, 74:5,
105:17, 106:7,
137:20, 164:5
**exactly** [10] - 52:24,
53:6, 60:12, 74:7,
95:10, 107:13,
130:24, 136:7,
139:9, 179:4
**examination** [6] -
58:14, 96:25, 125:8,
126:9, 166:19, 177:5
**examine** [2] - 90:5,
123:5
**examined** [1] - 77:25
**examiners** [1] -
119:18
**examining** [1] - 46:17
**example** [23] - 20:15,
35:22, 36:4, 42:10,
53:4, 54:12, 59:20,
65:8, 66:14, 66:22,
67:15, 68:14, 69:8,
79:14, 80:16,
120:22, 130:21,
132:24, 133:3,
150:23, 165:8,
174:1, 175:13
**examples** [4] - 39:18,
106:20, 161:16,
161:21
**exceed** [1] - 57:9
**Excel** [6] - 57:10,
109:2, 109:3,
109:11, 109:12,
109:14
**excellent** [2] - 160:2,
161:13
**except** [3] - 46:2,
161:25, 185:12

**excerpt** [1] - 125:17
**exchange** [17] - 22:24,
24:24, 33:15, 40:18,
44:8, 62:20, 62:22,
62:24, 62:25, 63:3,
63:22, 63:25, 64:5,
73:5, 73:8, 73:16,
73:17
**exchanges** [5] -
39:19, 40:19, 64:4,
64:21, 66:7
**exclude** [3] - 140:15,
155:12, 174:19
**excluded** [1] - 125:14,
148:17, 149:2
**exclusively** [1] -
128:16
**execute** [1] - 66:17
**executed** [1] - 66:25
**execution** [1] - 66:10
**executive** [1] - 33:21
**executives** [1] - 33:25
**exercise** [3] - 106:7,
107:13, 134:25
**exhibit** [2] - 44:14,
108:24
**exhibits** [1] - 109:4
**exist** [7] - 86:25,
128:1, 128:3, 130:6,
131:4, 132:19,
132:20
**existed** [2] - 23:9,
168:23
**exotic** [2] - 158:21,
164:5
**expand** [1] - 72:20
**expansive** [1] - 88:21
**expect** [6] - 8:25, 26:1,
39:9, 73:13, 131:24,
144:2
**expects** [3] - 141:20,
142:15, 143:21
**Expedia** [2] - 50:16,
50:18
**expedite** [1] - 18:16
**expedition** [1] - 30:23
**experience** [16] -
46:14, 56:11, 71:21,
75:8, 101:7, 126:5,
135:18, 148:22,
156:10, 156:22,
160:10, 164:19,
165:5, 165:12, 170:6
**experienced** [1] -
156:11
**experimental** [1] -
81:16
**expert** [100] - 16:18,
17:18, 27:10, 27:12,
37:23, 39:4, 41:12,

43:13, 46:4, 47:21, 50:2, 50:21, 53:7, 53:21, 54:17, 56:5, 56:10, 60:10, 75:24, 77:16, 79:11, 79:15, 79:18, 79:19, 86:22, 88:10, 92:5, 101:12, 103:5, 108:19, 113:11, 113:19, 116:2, 116:20, 117:2, 117:4, 117:8, 117:18, 117:25, 118:3, 118:7, 118:14, 120:8, 120:19, 122:14, 125:4, 128:14, 128:21, 129:21, 130:2, 131:16, 132:4, 132:14, 133:6, 133:10, 135:3, 135:19, 137:4, 138:25, 139:10, 139:20, 139:21, 139:25, 140:4, 140:5, 140:7, 140:12, 140:13, 140:14, 140:15, 140:16, 140:20, 141:7, 141:10, 142:16, 142:22, 143:2, 146:6, 146:17, 146:21, 147:12, 147:15, 147:22, 148:6, 149:23, 153:9, 154:8, 155:8, 157:11, 160:11, 160:14, 166:18, 170:6, 174:6, 175:6, 175:9, 175:15

**expertise** [26] - 51:23, 56:15, 56:20, 60:19, 71:20, 74:25, 101:6, 122:11, 156:7, 156:8, 156:23, 157:6, 157:9, 157:12, 158:4, 165:18, 166:3, 170:21, 171:13, 174:8, 174:12, 178:3, 178:13, 178:14, 179:6

**experts** [17] - 18:23, 20:22, 30:19, 31:8, 31:10, 52:6, 80:2, 80:7, 101:6, 104:5, 106:11, 128:10, 136:23, 161:23, 166:9, 166:11, 166:13

**explain** [18] - 41:15,

**explaining** [15] - 39:1, 39:3, 39:8, 39:17, 40:16, 40:25, 41:10, 41:18, 41:23, 60:12, 121:25, 122:8, 155:15, 162:5, 172:2

**explains** [7] - 40:1, 73:4, 73:9, 107:19, 107:25, 108:12, 168:18

**explanation** [5] - 95:11, 109:18, 138:22, 163:17, 176:11

**explanatory** [1] - 41:4

**explicitly** [2] - 142:13, 143:7

**explorer** [5] - 51:9, 80:10, 84:5, 89:5, 92:7

**explorers** [2] - 46:1, 84:7

**exported** [1] - 105:23

**exporting** [1] - 105:20

**exports** [1] - 119:24

**exposure** [2] - 45:4, 183:13

**express** [1] - 128:23

**expressed** [4] - 171:10, 171:16, 179:15, 184:22

**expressing** [1] - 155:7

**extended** [2] - 181:23, 184:2

**extension** [1] - 155:17

**extensive** [17] - 23:15, 23:20, 26:14, 32:14, 52:14, 56:10, 57:7, 60:4, 62:13, 75:18, 101:5, 101:12, 106:23, 109:6, 156:10, 168:8

**extensively** [5] - 22:18, 26:8, 52:12, 57:19, 70:5

**extent** [15] - 17:15, 49:13, 51:7, 120:6, 122:15, 126:13, 161:25, 175:7, 175:17, 176:8, 178:10, 178:20,

178:22, 179:7

**external** [1] - 82:16

**extractions** [1] - 146:20

**extremely** [4] - 58:19, 78:22, 101:7, 132:7

---

## F

**F.3d** [1] - 17:12

**faces** [1] - 83:19

**facilitating** [1] - 14:21

**facing** [1] - 83:18

**fact** [50] - 29:23, 30:17, 30:23, 31:13, 32:14, 38:8, 48:16, 50:7, 53:22, 61:2, 61:14, 63:16, 65:18, 65:23, 70:9, 75:1, 76:1, 78:13, 78:19, 79:10, 83:7, 83:22, 83:25, 84:1, 85:25, 95:24, 97:2, 106:5, 110:25, 116:16, 116:20, 116:23, 120:15, 127:9, 129:21, 130:14, 131:3, 133:7, 134:14, 138:6, 140:23, 144:2, 147:5, 160:19, 160:24, 161:8, 164:20, 165:11, 179:13

**factor** [5] - 61:11, 61:14, 101:11, 122:21, 149:19

**factors** [12] - 36:16, 55:25, 61:21, 78:1, 83:20, 85:19, 85:20, 86:8, 87:17, 91:18, 101:5, 122:21

**facts** [13] - 36:14, 53:23, 53:25, 54:1, 55:1, 57:5, 57:13, 57:15, 81:22, 85:10, 121:6, 122:22, 152:7

**factual** [1] - 155:4

**failed** [1] - 143:21

**fair** [12] - 8:21, 25:19, 36:20, 68:8, 71:1, 101:12, 153:3, 155:11, 157:4, 166:12, 185:11, 185:19

**fairly** [9] - 17:9, 22:18, 53:18, 73:24, 79:15, 89:9, 133:12, 155:20, 174:13

**Falco** [2] - 5:18, 5:22

**FALCO** [1] - 5:23

**false** [10] - 32:23, 61:19, 78:6, 78:8, 85:22, 85:23, 103:18, 103:19, 103:22, 104:8

**falsifying** [3] - 28:20, 28:25, 150:13

**familiar** [2] - 7:23, 130:13

**family** [2] - 16:7, 16:15

**far** [13] - 27:8, 28:1, 33:6, 39:5, 42:20, 81:16, 92:23, 104:16, 106:19, 115:7, 144:1, 167:4, 175:3

**Faruqui** [3] - 58:16, 66:22, 67:17

**Faruqui's** [3] - 59:20, 60:3, 86:13

**FBI** [21] - 27:1, 32:2, 32:19, 35:15, 35:23, 35:24, 56:11, 56:13, 56:17, 70:4, 70:10, 70:18, 73:11, 90:3, 138:11, 148:23, 160:4, 167:13, 167:14, 175:5, 179:6

**features** [1] - 108:5

**fed** [1] - 49:19

**federal** [10] - 13:4, 29:3, 29:4, 30:5, 79:23, 81:19, 85:4, 85:8, 99:20, 135:21

**Federal** [1] - 16:10

**feedback** [1] - 20:3

**feelings** [3] - 11:5, 11:7, 11:17

**felt** [1] - 184:18

**few** [8] - 21:9, 33:24, 44:14, 101:1, 105:5, 124:6, 131:25, 133:5

**fewer** [1] - 136:12

**field** [8] - 39:5, 57:19, 94:14, 94:15, 96:4, 96:6, 97:10, 103:5

**fields** [3] - 97:19, 97:20, 97:24

**figure** [4] - 7:19, 61:11, 104:17, 180:11

**figures** [3] - 63:19, 104:16, 105:6

**file** [3] - 108:25, 133:9, 169:1

**filed** [5] - 43:15, 109:25, 131:12, 133:19, 143:15

**files** [10] - 26:22, 41:2,

109:12, 119:20, 120:4, 147:24, 148:1, 167:16, 167:21

**filing** [9] - 16:23, 23:15, 25:20, 58:4, 76:7, 110:2, 139:1, 143:2, 181:23

**filings** [2] - 24:3, 180:10

**fill** [1] - 8:22

**final** [5] - 2:23, 47:19, 113:3, 115:1, 127:19

**finally** [1] - 13:11

**financial** [19] - 34:13, 34:14, 38:23, 39:2, 43:6, 43:8, 46:23, 47:15, 56:25, 57:7, 57:21, 88:7, 88:14, 89:3, 129:13, 129:17, 150:23, 167:18, 169:23

**financials** [4] - 150:8, 150:16, 174:3, 177:23

**FinCEN** [6] - 128:14, 129:25, 130:23, 131:3, 132:24, 132:25

**findings** [3] - 38:8, 53:16, 55:2

**fine** [21] - 6:8, 6:20, 11:11, 11:24, 15:25, 16:20, 20:8, 93:11, 96:25, 124:11, 154:13, 154:15, 166:25, 167:22, 171:8, 171:21, 172:25, 176:18, 181:14, 181:22, 181:25

**finish** [7] - 34:13, 55:6, 100:15, 158:7, 158:9, 180:13, 180:16

**finished** [1] - 48:12

**firm** [2] - 9:3, 156:16

**firms** [2] - 57:22

**first** [25] - 6:22, 8:9, 9:16, 12:25, 15:24, 17:14, 18:22, 40:1, 53:20, 56:4, 58:6, 65:15, 79:20, 83:15, 83:16, 83:18, 83:19, 89:17, 97:5, 101:3, 118:15, 118:22, 123:23, 125:9, 139:16

**First** [2] - 17:10, 17:13

**Fischbach** [43] -

27:10, 122:15,
134:21, 135:1,
135:6, 135:15,
136:20, 137:6,
138:25, 139:20,
140:1, 141:20,
141:23, 142:15,
143:21, 146:5,
156:6, 164:9,
164:15, 166:14,
167:3, 167:9,
167:15, 167:19,
168:4, 170:5,
170:16, 170:19,
171:2, 172:17,
174:7, 174:11,
175:1, 175:3, 175:6,
176:3, 176:15,
177:25, 178:11,
179:4, 179:12,
179:18, 179:22
**Fischbach's** [6] -
27:16, 135:3,
139:13, 141:15,
158:7, 162:10
**fishing** [1] - 30:23
**five** [4] - 55:5, 97:15,
139:17, 183:17
**five-year** [1] - 183:17
**flawed** [1] - 165:4
**Floor** [1] - 1:20
**flow** [4] - 80:21, 88:13,
109:18, 109:21
**flows** [6] - 42:21, 45:5,
45:19, 45:23, 48:8,
48:13
**fluctuate** [1] - 40:4
**fly** [1] - 142:18
**focus** [1] - 126:6
**focused** [3] - 77:14,
118:1, 118:13
**focuses** [1] - 58:7
**Fog** [77] - 4:24, 34:24,
42:11, 42:13, 42:20,
44:23, 45:6, 45:13,
45:23, 46:3, 46:6,
46:20, 47:5, 47:8,
47:23, 48:15, 48:16,
49:1, 49:11, 49:13,
49:24, 49:25, 50:3,
50:7, 50:10, 50:19,
50:20, 51:16, 52:1,
53:4, 68:6, 68:14,
68:16, 68:17, 69:7,
69:10, 74:15, 74:21,
80:15, 80:22, 81:13,
90:20, 93:25,
104:18, 108:15,
108:17, 109:8,
109:19, 116:25,

126:15, 126:22,
127:4, 129:24,
132:9, 133:16,
134:13, 138:3,
143:23, 144:4,
144:9, 144:18,
144:24, 145:15,
146:22, 146:25,
155:18, 157:13,
157:22, 157:25,
159:14, 164:14,
165:14, 170:16,
171:14, 172:7,
172:9, 172:20
**follow** [17] - 3:25, 4:2,
4:5, 31:4, 33:8, 44:6,
51:19, 51:20, 60:22,
102:7, 102:8,
102:13, 102:15,
134:22, 138:24,
173:9
**follow-on** [1] - 51:19
**follow-up** [3] - 4:2,
4:5, 31:4
**followed** [4] - 33:9,
137:7, 138:12, 160:9
**following** [6] - 51:24,
60:14, 60:19, 77:5,
107:22, 146:9
**follows** [3] - 74:23,
100:12, 183:7
**footnote** [1] - 60:6
**FOR** [1] - 1:1
**foregoing** [1] - 184:4
**forensic** [20] - 88:14,
96:6, 97:24, 99:9,
116:16, 119:17,
119:24, 120:15,
137:7, 145:23,
146:19, 146:22,
147:13, 148:23,
149:21, 153:24,
160:9, 160:10,
170:8, 171:25
**forensically** [15] -
148:25, 149:20,
149:23, 151:25,
152:2, 152:8,
152:24, 153:25,
159:18, 159:23,
160:6, 160:12,
161:7, 162:15,
172:14
**forensics** [16] - 83:24,
88:7, 95:21, 96:15,
96:25, 97:11, 97:19,
97:21, 98:1, 135:18,
143:22, 148:24,
156:7, 156:23
**forging** [1] - 26:16

**form** [8] - 26:22,
58:15, 65:15, 68:19,
69:3, 152:22, 153:1,
153:20
**formal** [1] - 33:6
**format** [1] - 133:22
**formats** [1] - 97:12
**former** [1] - 174:15
**forth** [4] - 21:8, 21:16,
116:25, 122:5
**forum** [1] - 41:11
**forward** [8] - 20:6,
23:14, 89:22, 94:24,
102:7, 102:8,
182:18, 182:23
**foundation** [1] -
151:16
**four** [9] - 21:7, 28:17,
34:11, 137:2,
137:16, 150:12,
175:18, 179:9, 180:3
**four-year** [1] - 34:11
**fourth** [2] - 54:24,
59:23
**Fourth** [2] - 17:10,
60:2
**frame** [1] - 76:4
**France** [1] - 35:2
**Franks** [1] - 59:21
**fraud** [12] - 26:16,
30:16, 33:10, 33:22,
34:1, 35:4, 149:25,
150:13, 150:15,
150:16, 151:24
**frequently** [1] - 73:4
**friends** [2] - 15:19,
16:7
**front** [8] - 39:12,
43:25, 44:16,
107:12, 124:9,
133:10, 140:21,
141:4
**Frye** [1] - 181:9
**full** [6] - 14:2, 14:9,
27:3, 31:25, 118:8,
188:5
**fully** [6] - 12:12, 21:25,
46:12, 155:10, 173:6
**fulsome** [1] - 140:17
**function** [3] - 83:10,
85:18, 159:7
**functions** [2] - 135:15,
135:17
**fund** [4] - 42:21, 45:5,
45:19, 45:23, 48:8,
48:13
**fundamental** [1] - 86:8
**fundamentally** [1] -
168:12
**funds** [16] - 39:18,

51:24, 59:4, 59:9,
60:14, 60:16, 60:19,
62:20, 80:21, 81:13,
88:13, 104:22,
109:18, 109:21,
158:1, 158:2
**funneled** [1] - 168:19

# G

**G-o-l-i-w-a-s** [1] - 9:17
**gained** [1] - 168:18
**game** [1] - 166:12
**gatekeeping** [2] -
83:10, 85:18
**general** [5] - 40:16,
135:17, 145:12,
154:16, 154:17
**generality** [2] -
154:10, 154:12
**generalized** [3] -
161:20, 162:12,
163:24
**generally** [10] - 3:19,
6:20, 39:20, 54:1,
57:16, 57:19, 70:25,
132:13, 139:13,
173:12
**generated** [9] - 26:13,
28:7, 30:7, 31:16,
35:12, 35:13, 35:19,
35:20, 36:7
**generating** [1] - 86:24
**generation** [6] - 29:12,
29:21, 29:25, 30:2,
30:6, 35:9
**germane** [1] - 19:9
**given** [14] - 6:23, 7:8,
7:18, 8:16, 8:18,
26:23, 26:25, 35:4,
91:4, 119:10, 122:4,
143:2, 170:11,
177:10
**Glave** [5] - 128:17,
129:7, 140:11,
140:12, 154:11
**Glave's** [1] - 129:6
**Glenda** [2] - 180:2,
181:19
**gobbling** [1] - 86:6
**Goliwas** [6] - 9:17,
13:10, 15:11
**governing** [1] - 83:25
**Government** [3] -
24:2, 32:10, 84:17
**government** [103] -
2:5, 2:10, 3:21, 4:12,
6:17, 8:12, 10:15,
11:15, 12:6, 12:7,
12:21, 13:4, 15:24,

18:7, 20:10, 21:15,
23:2, 23:3, 24:7,
24:12, 25:1, 26:7,
27:1, 30:5, 31:5,
32:8, 34:22, 35:14,
46:11, 48:20, 52:13,
60:6, 64:18, 76:1,
78:20, 86:1, 86:20,
88:9, 93:11, 93:22,
98:16, 98:24, 101:4,
101:6, 102:5,
107:22, 111:8,
112:4, 116:2, 116:6,
118:5, 120:17,
126:14, 128:2,
128:7, 128:13,
128:22, 129:5,
134:8, 135:8,
135:11, 136:2,
136:23, 137:2,
137:16, 138:11,
138:20, 138:23,
140:16, 143:21,
144:20, 145:5,
145:20, 146:4,
146:7, 146:8,
146:19, 146:24,
147:5, 152:12,
154:22, 157:2,
158:18, 158:20,
158:23, 159:24,
163:9, 163:16,
164:4, 165:21,
166:13, 166:17,
166:22, 167:13,
169:10, 169:20,
172:1, 175:8,
179:20, 183:4,
183:6, 183:8, 184:19
**government's** [22] -
24:13, 25:12, 57:7,
58:4, 86:8, 108:19,
116:18, 117:1,
126:18, 128:6,
138:4, 138:22,
140:7, 142:16,
142:20, 143:16,
144:3, 166:9,
166:11, 167:23,
177:3, 180:20
**Gox** [55] - 22:13,
22:20, 23:9, 23:17,
23:18, 24:20, 24:21,
24:24, 25:8, 25:14,
25:17, 26:2, 26:16,
26:20, 28:9, 29:11,
30:11, 30:17, 31:2,
34:10, 34:24, 35:3,
44:7, 47:7, 49:23,
135:10, 140:10,
141:17, 148:13,

148:15, 149:9,
150:6, 150:14,
151:15, 151:20,
151:23, 152:4,
152:5, 152:9,
152:17, 158:2,
159:19, 159:20,
167:7, 167:10,
168:2, 168:17,
169:6, 173:11,
173:19, 174:5,
174:12, 177:16
**Gox's** [1] - 168:19
**granted** [1] - 35:15
**granular** [1] - 26:3
**granularity** [2] - 34:20,
35:4
**Gratkowski** [1] - 59:23
**great** [5] - 57:23,
76:24, 84:20, 99:12,
182:1
**green** [1] - 26:17
**Greenberg's** [2] -
26:17, 29:8
**Gronager** [1] - 26:18
**grosser** [1] - 98:20
**ground** [3] - 102:22,
103:3, 103:20
**grounds** [1] - 132:6
**group** [1] - 85:11
**guess** [19] - 64:7,
64:9, 69:17, 73:20,
96:13, 106:24,
107:7, 123:18,
124:3, 124:23,
125:23, 127:11,
137:23, 138:19,
156:14, 179:3,
180:15, 181:9,
184:20
**guessing** [4] - 83:12,
99:23, 118:17,
118:24
**guidelines** [3] - 98:7,
183:14, 183:16
**guilt** [1] - 145:1
**guilty** [2] - 146:17,
172:13
**gun** [3] - 92:3, 98:13,
98:14
**guy** [1] - 146:11

# H

**hac** [1] - 8:24
**hack** [4] - 168:16,
168:17, 169:4, 169:5
**hacked** [8] - 26:20,
28:9, 28:14, 29:4,
152:5, 168:10,

173:14
**hacking** [4] - 28:24,
29:2, 157:22, 173:17
**hacks** [3] - 149:10,
168:6, 168:7
**hair** [2] - 98:25, 99:1
**half** [2] - 27:8, 27:14
**hand** [12] - 6:14,
38:14, 42:7, 43:6,
43:18, 43:23, 44:4,
54:22, 65:19, 68:4
**handle** [2] - 17:11,
100:7
**handprint** [1] - 108:8
**hands** [4] - 99:25,
124:7, 133:2, 150:19
**handwritten** [1] -
145:8
**Happy** [1] - 34:23
**happy** [22] - 7:4, 19:3,
19:21, 20:4, 21:15,
22:22, 38:2, 40:8,
52:4, 55:24, 106:10,
107:10, 109:3,
109:14, 116:14,
118:25, 119:3,
133:15, 134:8,
158:12, 161:17,
180:13
**hard** [13] - 10:3, 13:14,
14:12, 17:1, 34:17,
120:20, 120:21,
136:14, 139:4,
145:6, 146:19,
173:8, 181:20
**harder** [1] - 17:2
**hardware** [5] - 141:24,
148:7, 158:16,
159:5, 171:8
**Harmon** [1] - 4:16
**hashes** [2] - 30:20,
169:18
**HASSARD** [2] - 1:19,
2:18
**Hassard** [6] - 2:19,
9:9, 12:20, 20:9,
87:22, 141:14
**head** [3] - 16:24,
150:17, 150:19
**heading** [1] - 173:25
**hear** [17] - 6:18, 26:5,
40:2, 53:14, 55:6,
55:17, 100:15,
101:3, 101:12,
107:11, 126:8,
138:19, 139:24,
142:7, 157:1,
157:11, 166:22
**heard** [12] - 4:4, 4:13,
14:23, 88:9, 91:21,

93:4, 100:13, 101:5,
107:1, 117:9, 118:4,
165:20
**hearing** [14] - 25:25,
43:16, 44:13, 56:9,
72:20, 72:25, 73:1,
89:22, 117:5, 129:8,
167:12, 170:17,
187:2
**hearings** [1] - 180:17
**hearsay** [1] - 33:11,
78:16, 78:21, 81:21,
82:1, 82:3, 82:6,
82:13, 82:15, 99:16
**Heather** [1] - 4:20
**heavily** [1] - 83:17
**heck** [1] - 27:21
**heightened** [1] - 75:9
**held** [3] - 42:20, 54:16,
64:5
**Helix** [1] - 4:18
**help** [7] - 56:24,
100:19, 138:9,
138:10, 153:7,
153:19, 153:20
**helpful** [25] - 17:9,
18:6, 53:15, 53:18,
53:22, 54:8, 54:14,
55:1, 56:1, 56:5,
57:16, 75:25, 76:12,
106:12, 106:22,
122:13, 130:4,
130:12, 131:17,
131:23, 133:1,
133:21, 152:25,
157:1, 186:25
**helping** [1] - 155:16
**helps** [1] - 51:7
**hereby** [2] - 134:1,
188:3
**heroin** [1] - 147:18
**herself** [1] - 125:25
**hesitation** [2] -
184:23, 184:25
**Heuristic** [13] - 73:22,
73:23, 79:14, 86:4,
95:7, 95:8, 101:25,
107:20, 108:6,
110:12, 110:15,
113:6
**heuristic** [21] - 53:5,
53:8, 53:10, 74:3,
79:17, 79:21, 80:17,
81:23, 82:2, 82:9,
86:5, 101:22, 102:1,
102:7, 103:10,
103:17, 104:10,
107:20, 113:14
**heuristics** [15] - 52:20,
61:20, 80:12, 81:15,

84:8, 84:9, 84:12,
86:2, 92:12, 94:16,
99:15, 101:11,
101:23, 102:24
**hiding** [1] - 126:17
**high** [1] - 157:20
**higher** [1] - 91:2
**highest** [1] - 91:4
**highly** [5] - 66:23,
81:13, 83:14, 96:11,
99:6
**hill** [1] - 152:3
**himself** [3] - 29:7,
30:16, 140:18
**hinted** [1] - 91:8
**hiring** [2] - 27:12,
175:9
**histories** [1] - 168:13
**History** [1] - 183:15
**history** [1] - 46:12
**hit** [1] - 78:23
**hits** [1] - 104:1
**hitting** [1] - 167:1
**hold** [1] - 177:1
**holds** [1] - 17:13
**home** [1] - 167:21
**honestly** [2] - 7:12,
63:17
**Honor** [170] - 2:6,
2:13, 2:15, 2:18,
3:17, 5:9, 6:20, 8:20,
9:11, 10:8, 10:16,
11:3, 11:13, 11:20,
12:1, 14:7, 14:17,
16:5, 16:13, 16:17,
18:5, 18:22, 20:24,
22:4, 22:14, 22:17,
23:25, 24:4, 24:18,
26:1, 27:10, 27:16,
27:18, 28:2, 28:15,
31:1, 31:6, 31:23,
32:18, 34:2, 34:5,
35:5, 36:12, 38:2,
39:13, 39:16, 40:6,
40:14, 40:23, 41:7,
41:10, 41:20, 42:1,
42:25, 43:24, 44:17,
45:1, 48:13, 48:19,
48:23, 49:9, 50:1,
55:9, 55:10, 55:15,
55:20, 55:24, 58:3,
59:1, 59:14, 61:10,
63:9, 63:10, 63:17,
64:17, 65:21, 66:6,
67:8, 67:13, 68:9,
69:12, 71:19, 72:18,
73:25, 76:3, 76:11,
77:3, 77:7, 77:15,
77:20, 82:11, 85:17,
86:12, 87:14, 90:15,

91:13, 93:17, 94:19,
95:5, 95:9, 95:16,
96:8, 97:5, 97:18,
98:2, 99:2, 100:10,
100:25, 102:20,
104:3, 106:19,
107:5, 107:16,
110:4, 113:16,
114:19, 115:22,
116:17, 118:20,
120:23, 125:7,
125:16, 125:18,
126:22, 127:7,
128:7, 128:9, 129:5,
129:22, 130:20,
133:3, 134:17,
135:2, 138:23,
139:18, 139:23,
140:25, 141:5,
141:19, 143:13,
148:21, 149:5,
151:11, 151:22,
152:3, 153:18,
155:13, 156:21,
157:18, 161:14,
162:9, 163:5,
165:15, 165:19,
166:20, 166:24,
168:14, 171:24,
172:22, 177:9,
181:1, 181:8,
181:22, 182:1,
182:6, 182:10,
182:21, 183:3,
186:18, 186:20
**HONORABLE** [1] - 1:8
**hop** [1] - 105:11
**hope** [1] - 52:23
**hopefully** [7] - 3:9,
20:18, 22:1, 36:22,
37:1, 55:6, 186:22
**hoping** [1] - 77:20
**hops** [1] - 112:8
**host** [1] - 24:5
**hot** [1] - 169:6
**hour** [2] - 27:8, 27:14
**hours** [2] - 21:7, 180:5
**housekeeping** [2] -
11:21, 12:23
**huge** [1] - 84:10
**hundred** [3] - 78:24,
85:2, 162:24
**hundreds** [5] - 59:18,
84:16, 112:12,
112:23, 164:16
**hypothesis** [2] -
165:4, 175:24
**hypothetical** [2] -
137:18, 137:19
**hypothetically** [1] -

137:14

# I

**idea** [4] - 21:13, 33:21, 75:4, 88:24
**identifiable** [2] - 152:23, 153:21
**identification** [2] - 61:13, 153:2
**identified** [9] - 42:12, 66:13, 69:20, 71:7, 104:23, 107:3, 127:1, 137:15, 166:5
**identifier** [1] - 123:14
**identifiers** [1] - 123:11
**identify** [8] - 31:9, 63:21, 117:16, 123:3, 152:24, 167:8, 169:19, 170:13
**identifying** [4] - 68:5, 125:3, 153:13, 159:6
**identity** [2] - 19:10, 125:4
**illegal** [1] - 96:24
**Ilya** [2] - 4:20, 5:2
**images** [1] - 146:19
**imagine** [1] - 34:17
**imaging** [4] - 119:18, 119:22, 120:15, 147:20
**immaterial** [2] - 98:23, 98:24
**impermissible** [2] - 167:5, 172:1
**implementation** [2] - 101:16, 101:25
**implicate** [1] - 132:15
**implicating** [1] - 164:14
**importance** [1] - 130:8
**important** [10] - 13:23, 54:1, 77:2, 83:10, 92:17, 97:18, 130:3, 131:5, 139:9, 152:21
**impossible** [1] - 85:1
**impression** [2] - 43:22, 155:5
**improve** [1] - 101:23
**improvement** [1] - 102:2
**IN** [1] - 1:1
**in-depth** [4] - 12:9, 52:7, 104:5, 113:20
**inaccuracy** [1] - 54:14
**inaccurate** [5] - 26:9, 30:13, 31:3, 82:24, 99:5
**inadequate** [1] -

**137:14**

**inapplicability** [1] - 3:4
**inauthentic** [5] - 26:10, 29:6, 30:10, 30:13, 31:3
**incentive** [1] - 34:17
**incident** [3] - 57:22, 138:16, 169:22
**inclined** [2] - 97:5, 178:6
**include** [1] - 41:13
**included** [3] - 4:8, 109:23, 122:13
**includes** [4] - 39:3, 43:5, 43:6, 58:8
**including** [13] - 23:1, 40:17, 42:21, 58:10, 58:16, 58:17, 58:22, 62:13, 62:16, 71:8, 101:13, 102:5, 160:4
**incorrect** [1] - 157:2
**independent** [1] - 85:12
**independently** [1] - 152:15
**indicate** [4] - 20:9, 134:1, 147:25
**indicated** [6] - 37:3, 54:11, 61:5, 117:19, 133:18, 170:9
**indicating** [2] - 26:14, 144:23
**indications** [1] - 138:13
**indicia** [5] - 36:1, 36:8, 36:13, 64:8, 64:9
**indictment** [2] - 168:15, 168:18
**indirect** [6] - 42:21, 80:24, 104:25, 105:3, 105:8, 105:10
**individual** [19] - 4:1, 33:18, 34:16, 38:7, 45:11, 45:12, 45:15, 51:5, 61:20, 65:5, 65:6, 66:8, 66:14, 70:16, 71:2, 71:6, 71:22, 72:15, 153:13
**individual's** [1] - 66:18
**individuals** [3] - 31:13, 168:18, 176:3
**indulgence** [1] - 181:11
**industry** [3] - 159:24, 162:2, 164:23
**infer** [1] - 173:23
**inference** [1] - 177:20
**inflow** [1] - 81:13

**inform** [2] - 7:7, 7:8
**information** [32] - 42:9, 50:13, 51:10, 52:19, 53:7, 57:10, 57:11, 57:24, 63:18, 63:24, 64:1, 64:2, 64:6, 64:11, 65:17, 69:22, 71:10, 71:12, 73:6, 86:6, 92:9, 107:21, 130:3, 132:22, 139:8, 147:23, 152:23, 153:21, 157:21, 161:4, 169:18
**informed** [4] - 70:9, 71:20, 72:1, 181:5
**initial** [1] - 81:4
**innocence** [1] - 145:1
**innocent** [1] - 164:7
**input** [2] - 51:13, 82:9
**inputs** [5] - 82:3, 82:18, 92:12, 99:16, 127:9
**inquire** [1] - 186:17
**inquiry** [1] - 87:25
**insert** [1] - 6:15
**insight** [1] - 39:7
**insofar** [7] - 38:8, 45:8, 57:8, 59:3, 59:14, 115:14, 122:4
**instances** [1] - 71:15
**Instawallet** [1] - 51:17
**instead** [2] - 79:5, 85:13
**institutions** [3] - 43:8, 47:16, 57:21
**instruct** [4] - 15:12, 132:20, 134:16, 151:4
**instructed** [1] - 130:19
**instructing** [1] - 132:17
**instruction** [3] - 111:15, 111:23, 111:25
**instructions** [4] - 3:3, 3:11, 3:20, 130:18
**instructs** [1] - 160:4
**instrument** [1] - 133:9
**instruments** [1] - 183:9
**integrity** [1] - 174:21
**intend** [4] - 23:8, 106:20, 125:2, 144:19
**intended** [1] - 173:6
**intending** [1] - 126:1
**intent** [1] - 111:19
**intentionally** [5] - 69:1, 75:5, 127:13,

127:21, 186:13
**interchangeable** [1] - 116:4
**interest** [2] - 48:25, 101:14
**intermediate** [1] - 105:14
**internal** [2] - 78:12, 84:19
**international** [2] - 127:11, 183:20
**internet** [2] - 10:20, 170:20
**interpret** [1] - 154:19
**interpretation** [3] - 135:11, 140:8, 154:19
**interpretations** [1] - 154:21
**interpreter** [2] - 17:1, 17:3
**interpreter's** [1] - 100:16
**interpreters** [3] - 16:24, 16:25, 17:4
**interpreters/ translators** [1] - 100:17
**interpreting** [2] - 120:24, 145:7
**interrupt** [1] - 162:20
**introduced** [1] - 19:12
**introduces** [1] - 108:3
**introduction** [1] - 3:23
**intuition** [1] - 132:23
**invading** [1] - 132:17
**inventorying** [1] - 179:6
**investigation** [4] - 43:3, 62:18, 67:25, 132:18
**investigations** [11] - 56:11, 56:13, 58:10, 59:19, 62:14, 62:15, 66:1, 66:11, 67:18, 72:6, 130:9
**investigator** [4] - 18:11, 62:19, 63:21, 63:23
**involve** [4] - 42:5, 43:10, 44:4, 99:23
**involved** [11] - 29:12, 30:6, 31:14, 62:15, 62:16, 104:21, 135:9, 155:16, 159:14, 177:21, 184:17
**involves** [2] - 42:8, 68:25
**involving** [9] - 25:2,

26:16, 30:15, 56:14, 95:21, 98:21, 133:5, 144:9, 150:13
**iOS** [3] - 155:1, 155:2
**IP** [40] - 116:11, 118:4, 118:5, 118:24, 119:6, 120:2, 120:9, 121:20, 121:22, 121:24, 122:4, 122:23, 123:2, 123:9, 123:18, 125:13, 126:23, 126:25, 127:3, 135:7, 136:2, 152:22, 152:23, 153:1, 153:5, 153:8, 153:11, 153:12, 153:14, 153:19, 159:16, 159:17, 160:15, 160:16, 162:8, 162:17, 162:18, 163:1, 170:1
**IRS** [1] - 139:8
**issuance** [1] - 64:10
**issue** [52] - 4:21, 8:3, 15:23, 20:18, 21:22, 22:18, 23:22, 26:7, 27:13, 29:1, 31:7, 36:22, 37:5, 37:8, 37:16, 37:18, 37:19, 56:25, 60:1, 63:14, 72:12, 77:9, 81:11, 89:11, 91:14, 92:19, 99:16, 101:19, 111:12, 111:13, 111:15, 112:13, 113:18, 114:10, 115:2, 122:18, 128:21, 132:15, 134:3, 138:6, 138:24, 143:11, 150:9, 151:17, 152:4, 168:1, 173:3, 173:8, 174:4, 174:21, 174:24, 182:23
**issued** [2] - 32:22, 65:16
**issues** [21] - 11:22, 16:21, 22:16, 37:3, 37:13, 76:18, 87:17, 89:3, 92:15, 99:3, 110:6, 111:7, 120:13, 121:10, 136:10, 144:5, 167:9, 167:25, 173:6, 173:7, 174:23
**issuing** [1] - 72:12
**item** [6] - 163:7, 170:5, 171:19, 173:3,

174:23, 176:14
**Item** [4] - 167:4,
171:24, 172:24,
173:1
**Items** [1] - 170:3
**items** [16] - 51:20,
137:1, 137:2, 137:3,
137:14, 137:16,
140:23, 166:23,
167:7, 170:1,
170:14, 171:7,
175:14, 175:18
**itself** [6] - 29:19, 43:7,
51:21, 92:24,
111:21, 156:1

## J

**jail** [12] - 13:1, 13:6,
14:9, 15:6, 15:8,
15:9, 116:24,
180:23, 181:18,
181:19, 182:16,
182:19
**Jail** [2] - 13:19, 14:20
**jail's** [1] - 13:3
**Jamie** [1] - 28:15
**Japan** [10] - 23:2,
26:15, 31:25, 32:6,
32:22, 33:5, 34:6,
34:25, 35:2, 151:24
**Japanese** [13] - 23:3,
26:10, 28:3, 28:5,
29:20, 29:22, 32:6,
32:8, 33:1, 33:4,
34:9, 34:23, 150:12
**jargon** [2] - 41:8,
85:14
**Jean** [1] - 115:21
**jean** [11] - 115:23,
116:3, 116:7, 116:9,
117:3, 118:3,
119:13, 119:17,
120:2, 120:14,
158:19
**jean's** [4] - 116:15,
119:25, 121:12,
154:9
**Jeff** [1] - 2:12
**JEFFREY** [1] - 1:15
**Jencks** [1] - 12:10
**Jones** [1] - 147:18
**journal** [2] - 86:22,
106:1
**journey** [1] - 96:10
**JUDGE** [2] - 1:8, 1:8
**Judge** [7] - 58:16,
59:20, 60:3, 66:22,
67:17, 86:13, 133:10
**judges** [1] - 160:5

**judgment** [2] - 129:23,
171:4
**judgments** [1] - 82:3
**judicial** [4] - 34:6,
35:2, 58:2, 149:18
**July** [1] - 167:12
**June** [5] - 26:1, 44:13,
167:11, 167:12,
168:15
**junk** [2] - 85:4, 97:23
**juror** [2] - 57:2, 122:12
**jurors** [3] - 7:16, 26:3,
130:13
**jury** [71] - 3:2, 3:10,
12:19, 17:19, 18:3,
20:22, 24:8, 24:14,
24:16, 24:22, 37:6,
39:2, 39:8, 40:2,
56:6, 56:24, 83:2,
83:9, 89:12, 90:2,
93:8, 96:2, 99:20,
99:25, 111:16,
111:25, 114:10,
120:11, 122:2,
130:4, 130:18,
132:11, 132:15,
132:17, 132:21,
133:1, 133:23,
134:3, 134:6, 134:7,
134:16, 136:11,
137:1, 137:5,
138:10, 142:23,
142:25, 144:11,
144:17, 145:9,
145:15, 146:15,
148:17, 148:18,
148:19, 150:4,
151:4, 153:1, 153:7,
153:19, 155:16,
157:1, 158:22,
162:6, 163:3,
173:23, 174:13,
175:19, 179:10
**Justice** [5] - 1:13,
1:16, 5:10, 98:6,
106:8

## K

**Karpeles** [7] - 29:7,
30:16, 33:14, 33:17,
35:3, 36:15, 177:21
**Karpeles's** [3] - 30:15,
34:5, 149:8
**keep** [10] - 97:18,
126:14, 127:14,
127:22, 127:25,
150:21, 157:16,
168:7, 169:17,
173:25

**keeps** [4] - 86:1,
103:13, 105:25,
126:13
**key** [6] - 39:8, 39:17,
49:8, 74:13, 74:14,
174:15
**keys** [1] - 39:20
**Khatallah** [1] - 24:10
**killdozer** [1] - 130:22
**kind** [22] - 34:16, 49:3,
49:8, 51:20, 60:14,
71:12, 82:3, 88:15,
89:2, 99:23, 106:20,
120:5, 123:22,
136:20, 136:22,
150:2, 150:13,
151:23, 154:12,
154:21, 161:20
**kinds** [1] - 155:4
**knowing** [4] - 35:6,
99:5, 157:14, 161:4
**knowledge** [10] -
26:12, 28:4, 30:1,
35:12, 35:13, 35:19,
113:20, 132:5,
156:24, 178:1
**known** [6] - 54:12,
61:7, 62:4, 68:11,
81:17, 123:10
**knows** [7] - 6:23, 46:5,
70:10, 70:12, 92:13,
134:6, 174:7
**Kraken** [1] - 46:9

## L

**L.A** [1] - 167:15
**lab** [1] - 27:17
**Labs** [1] - 49:12
**Labs'** [1] - 49:10
**lack** [5] - 97:21,
113:21, 140:14,
148:9, 171:25
**lacking** [2] - 96:7,
97:17
**lacks** [1] - 97:2
**laid** [1] - 55:25
**land** [1] - 147:3
**language** [2] - 112:4,
134:5
**laptop** [6] - 13:15,
147:20, 147:24,
147:25, 148:1
**large** [4] - 85:6, 98:17,
109:9, 168:16
**Larry** [1] - 4:16
**last** [10] - 3:7, 9:1,
9:17, 9:20, 12:8,
48:20, 52:22, 129:8,
129:14, 130:10

**late** [5] - 82:25, 84:23,
143:2, 166:25,
181:15
**launder** [2] - 4:24,
183:9
**laundered** [1] - 80:14
**laundering** [9] - 4:25,
80:13, 84:11, 92:20,
93:6, 104:21,
128:14, 131:4
**Law** [2] - 1:19, 9:7
**law** [44] - 7:1, 16:23,
28:16, 32:6, 32:14,
33:1, 35:21, 36:10,
52:6, 57:19, 57:20,
58:9, 62:13, 67:18,
68:21, 68:24, 69:25,
70:4, 72:5, 79:6,
83:1, 86:13, 86:22,
90:10, 90:22,
113:10, 128:14,
128:16, 130:7,
130:18, 131:7,
131:14, 131:16,
132:18, 133:2,
134:15, 149:22,
156:16, 160:3,
160:5, 175:2, 175:4,
175:10, 175:11
**lawyer** [1] - 8:24
**lawyers** [8] - 160:5,
184:5, 184:8,
184:11, 184:24,
185:1, 185:21, 186:7
**lawyers'** [1] - 184:4
**lay** [3] - 57:2, 116:20,
122:12
**layperson** [1] - 120:20
**lead** [1] - 106:3
**leads** [2] - 86:24,
148:5
**leaning** [1] - 174:19
**learn** [1] - 99:8
**least** [31] - 21:12,
31:15, 36:2, 36:11,
36:13, 37:1, 37:13,
41:21, 43:22, 65:16,
72:6, 73:21, 73:23,
74:5, 79:16, 89:9,
90:15, 90:23, 93:4,
93:23, 98:17,
106:13, 132:24,
165:22, 167:2,
173:14, 174:10,
175:20, 177:11,
179:5, 180:5
**leave** [2] - 10:21,
178:6
**led** [1] - 30:22
**ledger** [1] - 71:10

**leeway** [1] - 143:2
**left** [1] - 128:17
**legal** [5] - 9:13, 9:19,
13:10, 82:6, 131:9
**legitimate** [2] -
164:10, 186:10
**legitimately** [1] -
159:5
**less** [3] - 27:15, 33:20,
93:18
**level** [10] - 34:19, 35:4,
98:20, 123:10,
145:13, 154:10,
155:7, 157:21
**Level** [1] - 183:15
**liberty** [7] - 90:8,
90:16, 90:21, 90:24,
90:25, 91:1, 94:18
**Liberty** [1] - 44:8
**licensing** [2] - 3:5, 3:6
**Lichtenstein** [4] -
4:20, 4:22, 4:23, 5:2
**life** [3] - 90:25, 91:1,
183:16
**light** [3] - 119:21,
166:18, 177:5
**likelihood** [2] - 98:11,
98:14
**likely** [9] - 50:7, 60:21,
60:24, 119:22,
122:3, 124:19,
124:21, 124:23,
180:4
**limine** [3] - 22:19,
22:20, 58:5
**limit** [5] - 148:6, 155:3,
161:17, 184:13,
185:13
**limitation** [1] - 111:7
**limitations** [4] - 111:3,
111:9, 111:11,
111:19
**limited** [5] - 49:13,
107:17, 114:19,
129:3, 183:16
**limiting** [2] - 111:22,
129:6
**limits** [1] - 119:11
**line** [6] - 9:22, 24:22,
124:14, 168:3,
182:17, 182:18
**lined** [1] - 23:17
**lines** [1] - 72:17
**lining** [1] - 169:24
**link** [2] - 13:8, 13:11
**liquid** [2] - 88:17,
88:19
**list** [20] - 6:8, 6:11,
6:15, 12:4, 12:15,
49:2, 78:1, 101:4,

107:17, 109:7,
116:19, 116:22,
124:20, 136:6,
136:7, 137:3,
137:17, 144:3,
163:19, 176:9
listed [7] - 136:7,
136:15, 136:18,
138:7, 138:9,
140:24, 163:21
lists [1] - 109:24
litigation [2] - 71:1,
89:10
live [2] - 109:16,
159:25
lives [1] - 167:15
living [1] - 161:11
loaded [1] - 161:10
loans [1] - 174:1
LocalBitcoins [1] -
46:9
located [1] - 34:25
log [3] - 123:12,
175:13, 175:16
logged [2] - 123:4,
123:5
logs [17] - 122:24,
122:25, 123:7,
123:12, 123:15,
125:11, 126:12,
126:14, 126:15,
126:19, 126:21,
127:5, 127:8,
127:14, 127:22,
127:25, 152:14
look [57] - 3:8, 19:21,
20:12, 25:22, 27:9,
27:14, 27:21, 27:23,
27:25, 34:14, 36:7,
39:11, 52:25, 53:3,
53:4, 58:21, 60:23,
65:11, 72:8, 75:7,
80:17, 81:4, 84:25,
87:10, 88:18, 94:2,
104:11, 105:10,
115:10, 115:14,
115:15, 119:3,
124:2, 125:6,
125:15, 126:7,
133:15, 154:9,
162:1, 163:18,
169:8, 169:16,
169:23, 171:6,
171:11, 171:15,
171:17, 174:2,
175:18, 177:13,
178:12, 178:14,
178:16, 178:18,
180:2, 180:13
looked [15] - 3:7,

45:22, 58:17,
103:16, 105:7,
110:11, 119:18,
120:3, 121:23,
147:10, 147:19,
166:6, 172:5, 172:6,
172:18
looking [40] - 24:9,
24:23, 39:3, 39:4,
40:7, 43:7, 44:15,
46:14, 47:3, 47:22,
50:6, 51:6, 51:22,
60:15, 60:18, 61:21,
65:1, 68:11, 70:17,
74:22, 74:25, 75:6,
87:8, 88:20, 92:9,
104:7, 107:24,
109:21, 112:11,
116:18, 116:22,
123:17, 126:4,
128:23, 141:14,
144:2, 157:11,
169:21
looks [1] - 108:6
love [2] - 126:15,
127:8
lunch [4] - 55:8,
63:12, 76:15, 77:4
Luxembourg [1] -
126:24

## M

ma'am [1] - 73:19
MAC [1] - 123:10
machine [1] - 123:13
Madera [1] - 17:11
magnet [1] - 119:24
main [2] - 184:15,
184:22
maintained [1] -
125:20
maintaining [1] -
178:15
maintains [1] - 34:22
maintenance [3] -
155:23, 156:17,
171:10
majority [4] - 72:13,
72:14, 85:5, 85:6
Man [1] - 86:5
man's [1] - 94:17
managing [1] - 29:19
Manassas [4] - 27:2,
27:7, 27:14, 27:15
mandated [2] - 91:12,
91:17
Manhattan [2] - 28:16,
28:20
manipulated [2] -

34:10, 151:19
manipulating [9] -
34:13, 34:15, 150:8,
150:18, 150:21,
150:22, 151:15,
169:8, 177:23
manipulation [7] -
23:11, 149:9, 150:6,
151:8, 151:20,
173:22, 177:22
manual [2] - 98:7,
102:9
manually [3] - 50:6,
102:11, 102:16
manufacturing [1] -
33:17
mark [2] - 30:15, 61:13
Mark [2] - 30:16, 149:8
market [14] - 40:17,
45:4, 59:4, 59:9,
59:11, 66:21, 70:22,
88:12, 88:16, 88:17,
88:18, 88:21, 109:1,
111:8
marketed [2] - 83:17,
84:19
marketplace [3] -
65:4, 70:24, 105:14
marketplaces [6] -
59:5, 65:2, 70:6,
70:17, 108:19,
109:19
markets [8] - 42:21,
45:5, 52:1, 80:23,
104:24, 109:9,
111:2, 111:4
marshal [4] - 14:25,
15:5, 15:7, 100:14
Marshals [3] - 13:13,
13:22, 15:12, 15:13
marshals [3] - 14:8,
14:9, 14:21
mask [1] - 162:19
massive [1] - 57:11
match [8] - 18:8, 19:5,
25:13, 71:12, 74:6,
127:9, 136:7, 139:7
matched [1] - 18:14
matches [4] - 23:17,
26:4, 72:14, 153:12
matching [1] - 19:2
material [3] - 22:13,
66:23, 179:7
materially [2] - 37:4,
93:7
materials [3] - 66:15,
66:19, 124:2
math [1] - 97:3
mathematical [1] -
97:4

mathematics [2] -
97:11, 97:12
matter [11] - 34:6,
35:2, 76:16, 90:9,
90:17, 100:8, 100:9,
117:6, 117:7, 144:2,
166:6
matters [7] - 12:23,
22:5, 34:16, 56:16,
99:8, 128:15, 132:14
Matthew [1] - 115:21
maximum [1] - 183:13
Mazarin [8] - 116:1,
116:4, 121:17,
125:19, 143:9,
158:19, 163:8
Mazarin's [1] - 159:16
Mazars [26] - 116:1,
116:4, 116:5,
116:13, 117:11,
117:24, 118:15,
119:20, 120:3,
121:16, 124:8,
125:18, 127:2,
135:12, 135:16,
136:6, 136:15,
138:4, 138:8, 139:6,
143:6, 143:8, 153:6,
158:19, 159:16,
163:8
mazars [1] - 118:1
Mazars' [3] - 153:14,
154:9, 163:18
McFadden [1] -
133:10
mean [51] - 5:2, 14:19,
21:7, 21:11, 21:14,
21:21, 27:25, 28:11,
30:14, 47:24, 48:3,
61:15, 82:8, 82:12,
85:16, 85:18, 86:18,
87:25, 91:10, 91:16,
97:1, 97:2, 97:6,
98:1, 113:1, 117:15,
121:16, 129:10,
131:24, 135:6,
142:20, 143:8,
144:13, 145:12,
146:17, 146:23,
147:11, 150:1,
150:15, 151:4,
154:7, 155:24,
157:8, 157:11,
157:15, 160:1,
164:21, 165:5,
172:3, 186:11
meaning [6] - 118:10,
120:25, 122:8,
122:17, 135:13,
151:16

means [16] - 33:22,
34:23, 69:8, 79:25,
85:16, 85:17, 97:2,
106:4, 121:3, 121:4,
130:4, 153:12,
154:19, 154:24,
156:14, 157:16
meant [3] - 100:3,
106:4, 176:10
measure [1] - 79:4
measured [1] - 162:1
measures [1] - 54:7
media [1] - 3:23
meet [4] - 20:9, 86:7,
91:18, 94:19
meeting [1] - 21:6
meets [2] - 77:9, 85:9
Meiklejohn [2] -
101:18, 101:21
member [2] - 56:12,
70:4
memorandum [1] -
3:4
memorialized [1] -
43:4
mempool.space [1] -
51:9
mention [2] - 7:21,
110:11
mentioned [4] - 94:21,
128:12, 135:11,
135:12
mere [1] - 164:20
merely [1] - 156:21
merits [1] - 144:12
mess [1] - 30:25
method [2] - 61:5,
75:4
methodologies [2] -
89:7, 153:24
methodology [14] -
54:2, 54:7, 57:14,
88:3, 92:2, 94:13,
94:24, 118:16,
118:21, 119:7,
123:20, 123:23,
125:9, 170:8
methods [6] - 54:4,
54:25, 60:11, 68:3,
71:8, 75:14
metric [2] - 94:14,
162:4
metrics [1] - 94:16
Miami [1] - 156:5
MICHAEL [1] - 1:19
Michael [6] - 2:18, 9:9,
26:18, 135:13,
135:16, 138:5
Michon [1] - 6:5
microphone [2] -

183:23
**middle** [1] - 124:14
**might** [16] - 3:24, 5:2,
5:3, 18:19, 43:25,
93:9, 103:24,
111:19, 111:20,
115:12, 120:21,
135:13, 137:8,
148:18, 160:25,
166:19
**military** [1] - 175:8
**million** [23] - 36:15,
80:23, 80:24, 81:3,
81:5, 82:24, 87:1,
87:2, 93:5, 93:6,
93:7, 93:12, 93:18,
93:19, 93:22, 93:23,
93:24, 105:1, 105:5,
109:12
**millions** [1] - 84:16
**mind** [4] - 97:18, 98:3,
98:15, 111:20
**mindful** [1] - 100:25
**mine** [1] - 6:3
**minor** [5] - 5:11, 6:21,
15:16, 105:24,
122:20
**minute** [2] - 119:8,
142:5
**minutes** [5] - 37:22,
55:5, 76:22, 124:6,
139:17
**MIS** [1] - 83:24
**misconception** [1] -
152:25
**misrepresent** [2] -
36:16, 110:21
**misrepresentation** [1]
- 110:23
**miss** [1] - 75:15
**missing** [5] - 30:19,
35:14, 78:24,
169:17, 169:18
**Missouri** [1] - 181:9
**misspoke** [1] - 126:11
**mistake** [3] - 84:25,
96:16, 96:17
**misunderstanding** [4]
- 38:6, 110:17,
110:20, 115:13
**mixer** [4] - 155:18,
156:9, 170:15,
170:22
**mixers** [5] - 42:16,
156:7, 171:5,
178:13, 178:15
**mixing** [6] - 102:14,
138:13, 138:16,
143:24, 158:1,
171:13

**model** [8] - 38:15,
85:13, 89:12, 90:1,
90:9, 93:5, 108:11
**models** [4] - 89:10,
89:14, 89:17, 126:3
**modems** [1] - 164:2
**modified** [1] - 169:12
**modus** [3] - 41:25,
42:15, 111:20
**moment** [1] - 40:14
**Monday** [4] - 76:8,
76:9, 131:22, 180:11
**Monero** [1] - 40:20
**monetary** [2] - 133:9,
183:9
**money** [23] - 4:23,
25:15, 70:23, 80:13,
84:10, 92:20,
104:18, 104:20,
104:21, 109:22,
128:14, 129:1,
129:24, 130:5,
130:14, 130:15,
131:3, 132:9,
168:19, 168:24,
173:19, 174:2,
183:11
**money-transmitting**
[5] - 129:24, 130:5,
130:14, 130:15,
132:9
**moniker** [1] - 130:22
**monkeyed** [4] -
173:24, 174:9,
174:14, 174:16
**Monsanto** [1] - 43:15
**month** [1] - 119:9
**months** [1] - 156:5
**Morales** [1] - 17:11
**Morales-Madera** [1] -
17:11
**Morgan** [5] - 4:20,
53:18, 53:20, 54:15,
122:21
**morning** [18] - 2:6,
2:8, 2:9, 2:11, 2:13,
2:14, 2:15, 2:17,
2:18, 2:21, 3:16,
3:18, 13:2, 13:11,
13:21, 15:9, 88:11,
181:24
**MOSS** [1] - 1:8
**most** [13] - 29:4, 38:3,
44:3, 56:1, 59:15,
78:25, 109:23,
111:2, 124:19,
124:21, 124:23,
130:13, 177:12
**mostly** [1] - 41:16
**motion** [6] - 22:19,

22:20, 58:5, 106:13,
106:14, 106:18
**motions** [1] - 2:24
**move** [2] - 107:6,
115:20
**moved** [4] - 5:12,
38:24, 39:18, 104:18
**moving** [1] - 109:22
**MR** [250] - 2:9, 2:12,
2:15, 2:18, 3:16,
3:19, 4:8, 4:15, 4:18,
4:21, 5:9, 5:13, 5:17,
5:20, 5:22, 6:1, 6:5,
6:7, 6:11, 6:14, 6:17,
6:20, 7:4, 7:7, 7:22,
7:25, 8:3, 8:11, 8:15,
8:20, 8:22, 9:4, 9:6,
9:11, 9:13, 9:19,
10:7, 10:12, 10:23,
11:13, 11:20, 12:1,
12:5, 12:20, 12:25,
13:18, 13:21, 14:7,
14:14, 14:17, 14:19,
15:3, 15:9, 15:15,
15:18, 15:21, 16:5,
16:13, 16:17, 18:5,
18:22, 19:21, 20:2,
20:24, 21:3, 21:6,
21:9, 21:14, 21:21,
22:4, 22:7, 22:14,
26:7, 27:10, 27:16,
28:2, 28:15, 28:19,
29:7, 29:20, 34:5,
34:9, 34:18, 36:12,
76:21, 77:7, 77:15,
77:20, 77:24, 79:19,
80:8, 81:9, 82:11,
82:14, 86:12, 87:18,
87:21, 88:1, 88:6,
89:17, 90:14, 91:13,
93:13, 93:16, 94:1,
94:5, 94:23, 95:5,
95:9, 95:16, 95:19,
96:3, 97:5, 97:9,
99:2, 100:5, 100:10,
110:8, 110:18,
111:24, 112:6,
112:16, 112:21,
113:16, 114:2,
114:5, 114:17,
114:24, 115:25,
116:17, 117:9,
117:23, 118:19,
119:3, 119:6,
120:14, 120:23,
122:20, 124:3,
124:9, 124:12,
124:18, 125:7,
126:21, 127:20,
127:24, 128:3,

128:8, 128:12,
128:20, 129:5,
129:10, 129:17,
129:22, 131:1,
131:11, 131:14,
131:19, 131:22,
131:24, 132:13,
133:3, 133:15,
134:8, 135:2, 136:5,
136:14, 137:6,
137:18, 137:23,
139:23, 140:2,
140:5, 141:4, 141:7,
141:10, 141:14,
141:17, 141:19,
141:23, 142:4,
142:7, 142:11,
143:5, 143:13,
143:20, 144:19,
145:22, 145:25,
146:12, 146:18,
147:19, 148:6,
148:12, 148:21,
149:4, 149:7,
149:16, 150:10,
150:17, 150:24,
151:3, 151:9,
151:11, 151:18,
151:21, 152:11,
152:19, 153:4,
153:11, 153:17,
153:23, 154:3,
154:7, 154:18,
155:3, 155:13,
155:20, 155:25,
156:3, 156:9,
156:21, 157:7,
157:18, 157:20,
158:5, 158:15,
159:2, 160:2,
161:13, 162:4,
162:9, 162:14,
163:2, 163:5, 163:7,
163:14, 164:12,
165:15, 165:19,
165:23, 165:25,
166:3, 166:20,
180:7, 180:22,
182:6, 183:3,
186:18, 186:20
**MS** [173] - 2:6, 10:8,
10:16, 10:19, 11:3,
11:11, 11:16, 22:17,
23:24, 24:18, 25:4,
31:6, 31:22, 32:18,
32:24, 33:4, 33:20,
34:2, 38:2, 38:16,
38:21, 39:13, 39:16,
39:24, 40:6, 40:10,
40:14, 40:23, 40:25,
41:7, 41:10, 41:15,

41:20, 42:1, 42:8,
42:15, 42:18, 42:25,
43:2, 43:12, 43:24,
44:3, 44:12, 44:17,
45:1, 45:3, 45:19,
46:25, 47:12, 47:18,
48:1, 48:5, 48:7,
48:12, 48:19, 49:7,
49:18, 49:22, 50:12,
50:23, 51:3, 51:19,
52:4, 52:21, 55:9,
55:12, 55:15, 55:20,
55:24, 56:4, 56:23,
57:5, 58:3, 59:1,
59:14, 60:10, 61:10,
62:8, 63:8, 63:17,
64:17, 64:25, 65:21,
65:25, 66:6, 66:10,
66:17, 67:7, 67:13,
67:15, 67:21, 68:9,
68:20, 69:12, 69:15,
69:22, 70:15, 71:6,
71:19, 72:18, 72:23,
73:1, 73:14, 73:25,
74:13, 74:18, 75:13,
75:17, 76:3, 76:6,
76:11, 77:3, 100:25,
101:20, 102:20,
103:10, 103:16,
104:3, 104:13,
104:16, 105:2,
105:13, 105:22,
106:19, 107:5,
107:16, 108:24,
109:7, 109:17,
110:4, 115:12,
115:22, 116:10,
119:17, 121:18,
125:16, 126:10,
127:7, 127:13,
128:7, 138:23,
139:17, 140:25,
166:24, 167:4,
168:14, 168:25,
169:15, 170:1,
170:5, 170:14,
171:3, 171:7,
171:12, 171:18,
171:21, 171:24,
172:8, 172:11,
172:22, 172:24,
174:23, 175:22,
176:8, 176:14,
176:17, 176:20,
177:9, 180:19,
181:8, 181:14,
181:22, 182:1
**Mt** [56] - 22:13, 22:20,
23:9, 23:17, 23:18,
24:20, 24:21, 24:24,
25:8, 25:14, 25:17,

26:2, 26:16, 26:20, 28:9, 29:11, 30:11, 30:17, 31:2, 34:10, 34:24, 35:3, 44:7, 47:7, 49:23, 135:10, 140:10, 141:17, 148:13, 148:15, 149:9, 150:6, 150:14, 151:15, 151:20, 151:23, 152:4, 152:5, 152:9, 152:17, 158:2, 159:19, 159:20, 167:7, 167:10, 168:2, 168:17, 168:19, 169:6, 173:11, 173:19, 174:5, 174:12, 177:16
**multiple** [6] - 13:7, 13:9, 26:20, 61:1, 152:5, 160:22
**must** [3] - 62:21, 99:25, 100:2
**Mycelium** [4] - 46:13, 46:18, 50:25, 74:24

**N**

**N-o-r-m-a-n** [1] - 9:21
**N.W** [1] - 188:11
**name** [18] - 2:4, 5:2, 6:23, 6:25, 7:8, 7:18, 8:9, 8:16, 8:18, 9:1, 9:2, 9:17, 9:20, 25:6, 47:7, 115:5, 164:16
**names** [8] - 5:7, 6:9, 6:16, 7:14, 8:22, 12:4, 18:24, 100:17
**narrow** [3] - 126:6, 176:6, 176:12
**National** [1] - 56:20
**native** [7] - 26:22, 122:24, 125:11, 126:12, 126:14, 126:15, 152:14
**nature** [7] - 94:8, 99:24, 117:25, 135:10, 147:25, 168:8, 177:23
**near** [1] - 167:15
**necessarily** [5] - 54:4, 58:20, 93:22, 113:11, 132:14
**necessary** [1] - 138:4
**Neck** [2] - 13:18, 14:19
**need** [52] - 2:24, 3:8, 12:18, 14:9, 15:3, 15:11, 16:2, 17:18, 17:23, 20:3, 24:8,

27:20, 36:4, 37:17, 37:22, 39:25, 40:2, 40:3, 52:7, 53:16, 54:4, 54:6, 54:19, 54:20, 54:21, 54:24, 64:7, 76:25, 80:8, 86:24, 95:17, 98:17, 100:7, 100:21, 107:8, 112:3, 117:16, 137:3, 138:19, 141:22, 152:3, 154:11, 155:14, 155:22, 156:16, 157:9, 166:1, 166:4, 171:10, 171:11, 180:6, 180:17
**needed** [2] - 109:13, 116:16
**needing** [1] - 119:23
**needs** [5] - 15:1, 15:8, 27:25, 64:18, 152:6
**nefarious** [1] - 35:23
**negative** [7] - 78:2, 78:14, 83:21, 85:20, 85:23, 101:4, 146:1
**negatives** [2] - 78:8, 104:8
**negotiations** [1] - 184:18
**network** [2] - 155:17, 157:21
**never** [12] - 33:16, 54:16, 58:24, 78:15, 82:20, 84:18, 131:12, 132:5, 132:6, 158:7, 164:17, 183:6
**new** [7] - 5:17, 5:22, 52:9, 58:20, 101:22, 102:1, 168:23
**New** [4] - 1:17, 1:20, 34:23, 168:15
**newly** [4] - 94:15, 96:6, 97:20, 97:24
**next** [18] - 21:9, 23:18, 41:19, 42:15, 42:18, 42:25, 43:2, 43:12, 60:14, 60:16, 60:20, 107:7, 108:24, 115:21, 139:17, 149:1, 158:3, 180:17
**night** [5] - 3:7, 12:8, 48:20, 52:22, 129:14
**nobody** [5] - 29:12, 30:6, 30:11, 35:17, 84:17
**none** [3] - 85:9, 138:25, 148:1
**noon** [1] - 181:25

**normal** [1] - 145:10
**Norman** [1] - 9:20
**Northern** [2] - 13:18, 14:19
**Norway** [2] - 6:24, 8:16
**notation** [1] - 5:16
**note** [13] - 12:7, 12:13, 14:3, 14:5, 46:10, 57:16, 59:17, 59:22, 86:12, 86:14, 122:10, 173:5
**noted** [2] - 61:6, 139:5
**notes** [24] - 18:11, 19:8, 41:2, 43:12, 49:10, 120:7, 120:10, 120:25, 122:8, 122:11, 122:16, 135:12, 135:14, 140:9, 145:6, 145:8, 154:19, 154:20, 154:24, 154:25, 155:1, 188:5
**nothing** [15] - 63:16, 83:22, 128:7, 128:8, 132:13, 138:2, 144:23, 146:14, 146:16, 146:21, 147:1, 147:8, 147:20, 148:4, 175:25
**notice** [8] - 18:24, 41:13, 122:14, 142:19, 146:6, 149:18, 177:1, 179:17
**noticed** [11] - 18:23, 116:2, 116:3, 116:6, 116:7, 117:4, 121:25, 128:13, 132:3, 176:4, 179:19
**noticing** [2] - 31:11, 175:24
**noting** [1] - 50:1
**notion** [1] - 88:17
**novel** [2] - 57:19, 58:21
**number** [21] - 25:7, 60:7, 71:7, 81:1, 81:3, 81:5, 83:12, 92:4, 92:21, 92:25, 93:1, 93:12, 94:10, 105:5, 124:20, 126:24, 137:20, 139:7, 152:7, 164:18
**numbers** [5] - 81:12, 94:7, 105:17, 105:19, 109:9
**numerical** [1] - 61:11

**numerous** [6] - 13:6, 29:3, 58:15, 132:2, 135:19, 167:8
**NVRA** [1] - 167:14
**NW** [4] - 1:11, 1:14, 1:17, 1:23
**NY** [1] - 1:20

**O**

**object** [12] - 14:1, 21:23, 38:6, 89:1, 89:5, 89:6, 116:17, 119:15, 121:8, 144:5, 173:4, 176:9
**objection** [11] - 10:15, 10:22, 11:14, 16:4, 23:6, 120:18, 121:11, 128:15, 129:6, 132:2, 181:17
**objections** [5] - 12:15, 16:19, 19:23, 121:15, 123:25
**observing** [1] - 108:10
**obtain** [2] - 165:7, 179:14
**obtained** [1] - 127:11
**obtaining** [1] - 33:7
**obvious** [2] - 94:20, 174:13
**obviously** [2] - 12:9, 166:17
**occasion** [2] - 63:13, 73:2
**occasions** [1] - 54:10
**occur** [2] - 108:2, 169:5
**occurred** [3] - 133:4, 139:2, 169:13
**occurring** [2] - 51:23, 127:16
**odd** [1] - 7:18
**OF** [4] - 1:1, 1:2, 1:7, 188:1
**off-script** [2] - 166:11, 166:12
**Offense** [1] - 183:15
**offense** [3] - 104:21, 130:12, 130:13
**offer** [18] - 17:18, 55:18, 112:3, 128:23, 145:17, 145:18, 146:4, 183:2, 183:4, 183:6, 184:2, 184:24, 185:7, 185:11, 185:13, 185:25, 186:6
**offered** [10] - 31:14, 60:4, 82:7, 85:21,

114:15, 121:4, 167:13, 167:14, 167:16, 183:8
**offering** [4] - 89:16, 114:22, 131:10, 176:12
**office** [2] - 27:2, 100:16
**Office** [2] - 5:11, 109:13
**official** [2] - 23:2, 32:9
**Official** [2] - 1:22, 188:10
**OFFICIAL** [1] - 188:1
**often** [4] - 63:20, 65:16, 123:12, 123:15
**Omedetou** [1] - 34:23
**omitted** [1] - 53:25
**omnibus** [1] - 58:5
**one** [120] - 5:9, 5:19, 5:24, 6:22, 9:16, 9:22, 16:6, 19:24, 20:16, 22:15, 23:10, 23:18, 24:3, 25:11, 29:4, 29:11, 32:13, 36:15, 36:23, 37:23, 38:5, 38:14, 39:6, 39:24, 40:1, 44:11, 46:21, 50:21, 52:1, 55:2, 55:9, 55:25, 56:3, 58:15, 59:12, 60:14, 60:16, 61:11, 61:14, 62:16, 66:22, 66:25, 67:11, 67:15, 74:6, 78:2, 79:19, 79:25, 83:21, 85:19, 88:25, 89:14, 90:12, 91:18, 92:23, 92:25, 95:22, 95:25, 96:8, 96:20, 96:24, 98:4, 98:11, 98:15, 99:3, 100:18, 101:11, 101:21, 103:13, 105:11, 107:1, 110:11, 112:6, 113:25, 114:22, 115:2, 116:5, 116:8, 116:18, 119:9, 119:17, 122:20, 126:6, 126:7, 126:24, 130:20, 133:15, 135:20, 136:21, 137:2, 137:16, 137:25, 140:25, 142:3, 143:9, 144:17, 145:4, 145:13, 149:1, 151:13, 152:21, 153:8,

157:5, 158:3,
158:20, 164:8,
165:14, 171:25,
174:15, 175:5,
180:3, 183:8, 183:10
**one-in-a-trillion** [1] -
98:11
**one-month** [1] - 119:9
**ones** [3] - 37:3, 102:2,
102:3
**ongoing** [2] - 72:2,
72:6
**onion** [2] - 143:23,
156:24
**online** [2] - 8:7, 68:24
**onward** [2] - 25:10,
25:22
**open** [2] - 166:19,
178:7
**opened** [2] - 177:2,
179:18
**operandi** [3] - 41:25,
42:15, 111:20
**operate** [3] - 144:18,
145:15, 170:15
**operated** [3] - 143:23,
144:23, 165:14
**operates** [1] - 170:22
**operating** [11] - 31:15,
90:20, 138:3, 144:9,
146:22, 146:25,
155:17, 157:16,
164:22, 172:7,
183:10
**operation** [1] - 159:14
**operations** [1] - 111:3
**operator** [1] - 164:14
**opine** [4] - 129:23,
132:10, 170:7,
171:13
**opining** [1] - 172:12
**opinion** [23] - 17:20,
37:2, 37:9, 59:20,
60:3, 67:17, 116:20,
121:3, 122:9,
125:24, 126:1,
128:24, 132:8,
146:21, 147:13,
149:23, 159:25,
160:11, 161:7,
165:13, 167:5,
167:6, 170:13
**opinions** [9] - 10:24,
11:1, 11:5, 11:7,
11:18, 155:9, 160:8,
161:25
**opportunities** [2] -
71:14, 167:8
**opportunity** [7] - 2:23,
73:6, 100:22,

139:12, 155:10,
169:16, 184:4
**opposed** [1] - 33:12
**opposition** [1] - 58:5
**optimistic** [1] - 170:25
**Orange** [1] - 167:15
**order** [3] - 36:22,
119:11, 130:19
**original** [12] - 19:3,
19:5, 20:11, 22:19,
32:13, 35:8, 46:3,
47:4, 119:18, 123:6,
152:14
**originally** [3] - 35:12,
35:18, 45:24
**otherwise** [3] -
116:16, 121:12,
178:7
**ought** [4] - 17:14,
27:5, 133:24, 162:6
**outflow** [1] - 81:13
**outlier** [1] - 57:17
**outlined** [1] - 121:13
**output** [1] - 99:10
**outside** [6] - 27:15,
68:12, 111:3, 111:8,
111:18, 122:12
**outspoken** [1] - 175:6
**overlap** [12] - 45:7,
118:4, 118:6,
118:24, 119:7,
119:8, 119:9,
123:18, 125:13,
130:17, 153:14,
159:16
**overseas** [1] - 33:8
**overseen** [1] - 62:15
**overtones** [1] - 10:1
**overwhelming** [1] -
72:14
**own** [13] - 46:8, 50:2,
53:7, 79:11, 79:17,
79:19, 80:2, 80:3,
80:7, 93:4, 93:5,
130:21, 142:23
**owner** [1] - 151:23

## P

**p.m** [6] - 76:9, 100:11,
181:23, 187:2, 187:3
**Pac** [1] - 86:5
**Pac-Man** [1] - 86:5
**pace** [1] - 100:21
**pack** [1] - 164:3
**page** [41] - 24:6,
25:20, 25:22, 39:14,
39:17, 41:6, 42:2,
44:5, 44:10, 44:18,
46:24, 47:6, 47:10,

47:12, 47:18, 48:7,
48:22, 49:10, 49:22,
50:15, 50:23, 51:14,
51:16, 58:11, 60:6,
72:24, 87:23, 94:25,
108:3, 108:14,
108:20, 109:17,
109:24, 110:13,
115:6, 124:4,
124:13, 124:14,
124:19, 170:17
**pages** [11] - 44:6,
45:3, 46:25, 51:4,
56:9, 57:9, 58:7,
59:12, 59:17,
107:24, 109:7
**panel** [2] - 7:7, 7:8
**paper** [3] - 75:22,
83:7, 101:19
**papers** [10] - 34:7,
78:4, 96:6, 101:10,
101:21, 103:12,
104:13, 118:21,
123:22
**paragraph** [10] -
41:19, 42:2, 42:15,
43:2, 43:12, 142:4,
142:14, 143:18,
143:20
**paralegal** [3] - 5:17,
5:22, 6:2
**paralegals** [1] - 6:3
**parallel** [1] - 11:4
**parameters** [1] - 133:2
**parents** [2] - 6:24,
8:16
**part** [32] - 4:24, 10:20,
13:25, 18:8, 21:21,
23:25, 24:3, 25:12,
42:8, 42:22, 46:3,
48:5, 48:17, 49:25,
50:20, 52:1, 59:10,
59:22, 62:1, 65:3,
66:11, 67:24, 68:22,
70:19, 107:23,
110:23, 114:8,
120:20, 124:24,
130:16, 138:24,
172:24
**partially** [1] - 97:6
**participate** [1] -
180:24
**particular** [37] - 3:24,
4:1, 18:1, 19:2,
25:13, 37:13, 38:10,
42:3, 51:14, 51:25,
63:21, 64:5, 66:22,
68:4, 68:5, 69:7,
69:9, 100:24,
104:23, 108:9,

108:11, 121:4,
121:15, 121:22,
122:3, 122:4, 130:8,
132:9, 142:16,
159:10, 164:9,
169:5, 172:19,
177:25, 178:21,
178:22
**particularized** [1] -
161:15
**particularly** [14] -
28:20, 34:22, 35:5,
42:19, 52:9, 74:19,
88:15, 106:22,
130:12, 143:1,
144:10, 157:25,
158:19, 158:21
**particulars** [1] -
150:11
**parties** [15] - 3:15, 4:2,
15:25, 16:3, 17:15,
17:17, 20:17, 20:19,
20:21, 22:10,
133:24, 134:1,
134:4, 163:3, 179:24
**parts** [1] - 102:7
**party** [1] - 155:10
**pas** [2] - 65:9, 65:11
**passed** [1] - 71:3
**password** [1] - 13:7
**past** [6] - 6:24, 31:11,
58:25, 84:25, 140:4
**patterns** [2] - 108:10,
108:12
**pay** [1] - 119:2
**payment** [1] - 47:8
**payments** [1] - 47:6
**PEARLMAN** [24] -
1:15, 2:12, 3:16,
3:19, 4:8, 4:15, 4:18,
4:21, 5:9, 5:13, 5:17,
5:20, 5:22, 6:1, 6:5,
6:7, 6:11, 6:14, 6:17,
18:22, 19:21, 20:2,
21:3, 21:9
**Pearlman** [4] - 2:12,
3:15, 18:21, 20:25
**peel** [25] - 39:20,
46:13, 46:15, 46:19,
46:21, 50:24, 51:3,
60:21, 60:22, 61:1,
74:25, 75:6, 75:8,
75:10, 101:25,
108:13, 112:6,
112:7, 112:9,
112:11, 112:13,
112:18, 112:23,
112:24, 115:19
**peer** [8] - 54:5, 78:4,
83:7, 89:11, 96:5,

101:9, 101:15,
123:22
**peer-reviewed** [7] -
54:5, 78:4, 83:7,
89:11, 96:5, 101:9,
123:22
**PELKER** [174] - 1:13,
2:6, 10:8, 10:16,
10:19, 11:3, 11:11,
11:16, 22:17, 23:24,
24:18, 25:4, 31:6,
31:22, 32:18, 32:24,
33:4, 33:20, 34:2,
38:2, 38:16, 38:21,
39:13, 39:16, 39:24,
40:6, 40:10, 40:14,
40:23, 40:25, 41:7,
41:10, 41:15, 41:20,
42:1, 42:8, 42:15,
42:18, 42:25, 43:2,
43:12, 43:24, 44:3,
44:12, 44:17, 45:1,
45:3, 45:19, 46:25,
47:12, 47:18, 48:1,
48:5, 48:7, 48:12,
48:19, 49:7, 49:18,
49:22, 50:12, 50:23,
51:3, 51:19, 52:4,
52:21, 55:9, 55:12,
55:15, 55:20, 55:24,
56:4, 56:23, 57:5,
58:3, 59:1, 59:14,
60:10, 61:10, 62:8,
63:8, 63:17, 64:17,
64:25, 65:21, 65:25,
66:6, 66:10, 66:17,
67:7, 67:13, 67:15,
67:21, 68:9, 68:20,
69:12, 69:15, 69:22,
70:15, 71:6, 71:19,
72:18, 72:23, 73:1,
73:14, 73:25, 74:13,
74:18, 75:13, 75:17,
76:3, 76:6, 76:11,
77:3, 100:25,
101:20, 102:20,
103:10, 103:16,
104:3, 104:13,
104:16, 105:2,
105:13, 105:22,
106:19, 107:5,
107:16, 108:24,
109:7, 109:17,
110:4, 115:12,
115:22, 116:10,
119:17, 121:18,
125:16, 126:10,
127:7, 127:13,
128:7, 138:23,
139:17, 140:25,
166:24, 167:4,

168:14, 168:25, 169:15, 170:1, 170:5, 170:14, 171:3, 171:7, 171:12, 171:18, 171:21, 171:24, 172:8, 172:11, 172:22, 172:24, 174:23, 175:22, 176:8, 176:14, 176:17, 176:20, 177:9, 180:19, 181:8, 181:14, 181:22, 182:1
**Pelker** [14] - 2:6, 18:21, 55:23, 76:19, 86:21, 100:22, 115:9, 119:13, 121:13, 125:15, 127:6, 129:4, 178:25, 183:1
**penalty** [1] - 32:25
**pending** [1] - 2:24
**Pennsylvania** [1] - 1:14
**people** [28] - 6:25, 7:9, 30:24, 83:17, 86:13, 87:12, 114:9, 116:24, 123:4, 123:5, 127:3, 148:24, 153:5, 156:19, 158:1, 160:18, 160:22, 161:1, 161:2, 161:3, 161:9, 162:24, 164:15, 165:16, 176:4
**people's** [1] - 167:18
**per** [2] - 37:22, 38:7
**percent** [14] - 64:13, 64:15, 97:22, 98:22, 99:4, 99:5, 99:17, 103:2, 103:8, 103:14, 103:18, 103:22, 110:14
**percentages** [1] - 102:19
**perfect** [1] - 12:22
**perfectly** [2] - 96:25, 164:10
**performed** [1] - 43:3
**perhaps** [9] - 5:3, 19:10, 20:5, 21:3, 119:13, 120:17, 150:4, 166:18, 177:4
**period** [1] - 156:4
**perjury** [2] - 32:22, 33:1
**permissible** [2] - 131:17, 179:11

**permitted** [1] - 24:14
**person** [14] - 31:18, 32:12, 34:24, 35:8, 63:16, 92:25, 93:1, 98:10, 153:8, 160:17, 162:25, 165:9, 186:22
**person's** [1] - 72:16
**personal** [1] - 153:2
**personally** [2] - 152:23, 153:21
**pertinent** [1] - 75:3
**phone** [6] - 72:16, 146:20, 147:6, 158:22, 164:4, 164:6
**phrase** [5] - 9:25, 10:1, 124:3, 161:10, 162:15
**phrased** [2] - 11:4, 159:11
**phrases** [1] - 18:1
**physically** [3] - 29:8, 30:17, 182:12
**Pi** [1] - 147:6
**Pi's** [1] - 164:3
**pick** [3] - 94:10, 100:21, 102:8
**picked** [1] - 104:9
**piece** [1] - 159:4
**pieces** [2] - 148:7, 148:8
**place** [6] - 5:24, 6:1, 54:7, 85:8, 107:1, 115:4
**places** [2] - 18:12, 25:18
**Plaintiff** [2] - 1:3, 1:10
**plan** [1] - 177:5
**plane** [1] - 27:13
**planning** [3] - 55:13, 71:21, 72:1
**plans** [1] - 129:11
**plausible** [1] - 177:20
**play** [3] - 61:25, 80:12, 130:7
**plays** [4] - 47:2, 65:12, 67:17, 68:20
**plea** [9] - 55:18, 183:2, 183:4, 183:6, 183:7, 183:8, 184:2, 184:18, 184:24
**plenty** [2] - 76:14, 142:21
**PLLC** [2] - 1:19, 9:7
**plus** [1] - 97:15
**Point** [7] - 124:14, 124:18, 125:5, 141:17, 149:7, 149:8, 159:2
**point** [101] - 8:8, 10:5,

11:23, 19:20, 20:11, 22:13, 24:4, 27:18, 28:3, 28:18, 28:23, 31:1, 31:13, 33:10, 35:1, 35:7, 36:19, 42:6, 46:3, 55:10, 58:3, 61:8, 66:5, 66:6, 68:11, 83:1, 86:18, 87:13, 92:13, 93:9, 95:24, 96:13, 97:9, 99:13, 100:5, 100:19, 105:24, 107:2, 111:1, 111:12, 111:25, 112:23, 113:3, 113:4, 113:17, 114:21, 115:1, 121:7, 121:8, 122:23, 125:7, 125:16, 126:21, 128:1, 129:18, 130:20, 134:17, 137:12, 139:22, 140:4, 140:25, 151:22, 152:6, 152:19, 153:4, 153:11, 153:12, 153:17, 154:16, 155:14, 157:4, 158:11, 158:15, 159:6, 161:8, 161:13, 162:3, 162:16, 163:2, 163:12, 163:25, 164:12, 167:7, 167:25, 170:4, 170:25, 171:4, 172:4, 172:6, 173:7, 174:6, 174:10, 174:15, 174:18, 174:19, 175:21, 177:24, 179:5, 179:19
**pointed** [2] - 59:13, 131:7
**pointing** [2] - 22:18, 131:18
**points** [7] - 68:12, 76:1, 96:19, 101:1, 112:24, 157:23, 159:17
**policy** [1] - 106:8
**popular** [1] - 41:11
**portion** [8] - 38:16, 38:17, 38:21, 43:9, 50:7, 54:5, 96:23, 106:5
**portions** [4] - 19:16, 20:5, 98:17, 120:21
**portray** [1] - 158:24

**position** [10] - 17:25, 26:8, 26:9, 26:11, 30:4, 31:2, 31:20, 35:10, 35:11, 94:20
**positive** [4] - 85:23, 103:19, 103:22
**positives** [2] - 61:19, 78:6
**possession** [5] - 23:9, 23:12, 141:25, 158:17, 159:8
**possibility** [4] - 61:19, 138:15, 176:22, 182:15
**possible** [6] - 69:16, 69:18, 104:3, 104:6, 138:12, 180:7
**possibly** [9] - 11:3, 44:14, 65:15, 109:10, 140:3, 146:17, 151:6, 167:12, 181:23
**post** [1] - 37:18
**post-trial** [1] - 37:18
**posted** [1] - 130:22
**potential** [3] - 23:10, 24:5, 73:21
**potentially** [4] - 15:18, 21:16, 136:9, 173:15
**powerful** [2] - 59:24, 74:2
**practice** [2] - 57:15, 165:2
**practices** [3] - 38:24, 75:20, 75:21
**preceding** [1] - 42:1
**precisely** [1] - 17:24
**predicted** [3] - 67:11, 103:8, 103:9
**predictive** [1] - 73:24
**preexisted** [1] - 102:11
**prefer** [5] - 10:1, 40:9, 161:14, 180:7, 183:24
**preference** [2] - 180:15, 180:21
**prejudice** [1] - 145:9
**prejudicial** [4] - 10:1, 115:7, 134:10, 173:15
**preliminarily** [1] - 170:9
**preliminary** [5] - 3:2, 3:10, 22:5, 165:22, 171:16
**prep** [1] - 37:10
**prepare** [1] - 14:2
**prepared** [2] - 18:25, 20:6

**present** [10] - 2:16, 2:19, 9:14, 24:19, 35:9, 66:3, 69:23, 82:7, 121:23, 182:12
**presented** [13] - 58:14, 59:2, 59:5, 60:8, 83:2, 83:3, 83:11, 83:14, 89:19, 114:13, 144:25, 146:24, 178:5
**presenting** [3] - 35:15, 69:25, 116:20
**preserve** [3] - 27:20, 91:14, 167:24
**press** [3] - 81:4, 81:7, 178:1
**pressed** [3] - 113:4, 118:2, 135:4
**pressure** [1] - 77:1
**pretrial** [3] - 2:22, 2:25, 37:20
**PRETRIAL** [2] - 1:4, 1:7
**pretty** [5] - 32:14, 53:18, 92:8, 113:10, 147:14
**prevent** [1] - 100:3
**previous** [3] - 101:23, 102:1, 102:3
**previously** [5] - 4:14, 13:15, 58:14, 107:3, 173:3
**price** [1] - 88:20
**prices** [3] - 40:4, 40:18, 88:18
**pricing** [4] - 40:4, 40:13, 40:16, 40:17
**primarily** [3] - 83:12, 118:13, 135:7
**primary** [2] - 26:15, 90:18
**principles** [3] - 54:4, 54:25, 60:11
**prison** [2] - 28:17, 150:12
**prisoner** [1] - 183:20
**private** [1] - 57:21
**privy** [1] - 168:25
**pro** [1] - 8:24
**probability** [2] - 124:22, 125:1
**probative** [3] - 115:8, 134:11, 173:15
**probed** [1] - 170:16
**problem** [17] - 27:22, 78:14, 79:3, 82:25, 84:7, 86:25, 94:7, 94:12, 114:6, 114:8, 147:1, 162:7, 162:23, 164:25,

165:18, 173:13
**problematic** [9] -
78:22, 80:17, 81:14,
83:14, 88:8, 96:11,
99:6, 123:8, 161:12
**problems** [6] - 15:13,
88:25, 135:20,
146:5, 158:8, 160:15
**procedures** [3] - 33:8,
138:11, 175:2
**proceed** [4] - 38:2,
55:19, 77:6, 161:15
**proceeding** [4] - 58:2,
81:19, 115:6, 182:13
**proceedings** [5] -
16:12, 18:18, 77:5,
180:3, 188:6
**process** [13] - 4:25,
31:17, 31:24, 32:1,
33:5, 58:24, 68:23,
91:8, 127:11,
134:22, 175:14,
179:13
**processing** [1] -
157:17
**produce** [1] - 143:22
**produced** [7] - 23:7,
26:21, 78:17,
129:13, 129:14,
152:12, 163:9
**produces** [2] - 31:17,
32:1
**product** [6] - 48:25,
54:3, 62:3, 74:3,
119:25, 129:15
**production** [1] - 12:8
**professional** [6] -
123:18, 124:3,
125:23, 125:24,
126:1, 169:22
**proffered** [2] - 30:11,
140:15
**program** [3] - 99:22,
113:12, 183:20
**progress** [1] - 187:1
**prohibited** [1] - 16:10
**projection** [1] - 89:1
**prone** [1] - 95:14
**proof** [3] - 70:21,
85:21, 159:11
**proper** [1] - 177:15
**properly** [3] - 73:8,
88:2, 159:12
**property** [4] - 90:25,
91:1, 104:19, 104:20
**proponent** [1] - 24:15
**proponents** [1] -
24:15
**propose** [1] - 111:16
**proposed** [7] - 3:2,

3:10, 3:14, 3:20,
11:25, 20:5, 39:9
**proposing** [1] -
101:22
**proposition** [1] -
150:5
**proprietary** [2] - 52:8,
80:11
**prosecutions** [1] -
59:19
**prosecutor** [1] - 86:15
**prospective** [1] - 7:16
**prove** [2] - 146:1,
172:13
**proves** [2] - 98:9,
98:13
**provide** [9] - 3:2,
15:10, 39:7, 72:19,
100:20, 109:3,
132:21, 132:25,
179:16
**provided** [5] - 3:14,
6:12, 43:14, 51:19,
107:21
**provides** [1] - 130:20
**providing** [4] - 15:6,
53:3, 132:18, 176:24
**province** [6] - 57:1,
122:12, 128:17,
132:17, 149:4,
175:19
**proxies** [2] - 122:7,
173:2
**proxy** [10] - 127:1,
127:8, 127:12,
127:13, 127:21,
127:24, 160:20,
161:1, 162:7, 162:17
**public** [13] - 26:14,
28:8, 30:15, 35:2,
46:1, 51:9, 80:9,
84:6, 102:5, 148:14,
149:17, 152:7, 166:6
**publicity** [2] - 3:22,
5:3
**publicly** [5] - 51:21,
67:7, 80:6, 84:7,
92:7
**pull** [6] - 4:15, 45:14,
63:9, 63:10, 65:7,
105:2
**pulled** [3] - 45:16,
74:19, 119:19
**pulls** [1] - 32:3
**purchase** [1] - 164:21
**purchased** [1] -
164:15
**purchases** [1] - 50:16
**pure** [1] - 147:4
**purely** [1] - 78:21,

79:6, 82:22, 95:7
**purport** [1] - 24:9
**purported** [2] - 26:23,
116:25
**purports** [1] - 148:19
**purpose** [2] - 139:9,
159:6
**purposes** [10] - 31:16,
36:11, 37:9, 45:9,
55:13, 70:8, 77:12,
99:18, 106:3, 160:16
**put** [20] - 8:24, 18:25,
20:15, 20:22, 23:14,
52:13, 75:22, 84:21,
89:22, 94:24, 102:6,
113:2, 116:25,
124:6, 133:1,
133:25, 151:6,
162:21, 176:25,
183:1
**put-versus-deposit**
[1] - 20:15
**putting** [2] - 19:24,
77:1

# Q

**qualification** [6] -
53:21, 56:4, 87:17,
87:25, 88:5, 114:3
**qualifications** [11] -
38:7, 56:7, 77:13,
77:16, 87:19, 88:6,
89:2, 113:18,
116:15, 129:11,
175:2
**qualified** [3] - 31:18,
88:14, 135:19
**quantities** [1] - 57:11
**quarter** [1] - 134:20
**query** [1] - 26:24
**questions** [18] - 4:3,
4:5, 22:22, 36:17,
37:12, 52:5, 53:16,
56:2, 78:13, 80:20,
87:14, 91:10,
106:10, 121:15,
135:22, 136:10,
144:17, 174:8
**quickly** [1] - 3:8
**quite** [13] - 17:13,
33:24, 42:7, 75:8,
107:17, 123:15,
127:24, 156:14,
159:4, 164:7,
164:17, 164:22,
172:12
**quote** [4] - 80:22,
82:2, 83:3, 144:8
**quote-unquote** [4] -

80:22, 82:2, 83:3,
144:8

# R

**radar** [3] - 92:3,
143:15, 143:16
**rails** [1] - 117:14
**raise** [10] - 12:15,
12:24, 22:2, 22:6,
59:8, 91:10, 110:5,
121:10, 121:14,
128:18
**raised** [9] - 15:5,
37:12, 37:14, 37:19,
58:6, 70:25, 136:10,
166:24, 173:4
**raises** [3] - 34:21,
78:14, 138:15
**ran** [6] - 35:3, 126:3,
156:20, 164:17,
185:13, 185:22
**RANDOLPH** [1] - 1:8
**range** [1] - 183:16
**ransomware** [1] -
71:24
**Raspberry** [2] - 147:6,
164:3
**rate** [22] - 54:12, 61:7,
61:11, 61:15, 61:23,
62:2, 62:5, 78:6,
78:7, 78:9, 83:5,
83:13, 85:15, 85:23,
103:2, 103:14,
103:19, 103:20,
110:14
**rates** [7] - 40:18,
78:12, 81:17, 82:21,
84:19, 84:22, 101:10
**rather** [7] - 76:17,
146:9, 158:11,
161:17, 165:12,
173:18, 186:13
**rationale** [1] - 95:2
**raw** [2] - 50:13, 57:10
**re** [1] - 33:11
**re-reporting** [1] -
33:11
**reach** [4] - 16:24,
20:17, 20:19, 93:9
**Reactor** [91] - 38:13,
40:18, 42:5, 42:9,
42:23, 43:10, 43:19,
44:4, 44:21, 44:22,
45:25, 46:2, 48:4,
48:5, 48:11, 48:14,
48:17, 49:5, 49:6,
50:9, 50:21, 51:11,
51:12, 51:15, 52:2,
53:17, 54:14, 54:23,

80:22, 82:2, 83:3,
144:8

**Reactor's** [1] - 110:15
**read** [4] - 4:17, 19:16,
122:16, 124:10,
155:5, 157:15
**readily** [2] - 88:22,
97:13
**reading** [2] - 104:5,
120:9
**ready** [1] - 12:5
**real** [7] - 52:16, 62:7,
62:10, 78:14, 97:24,
129:10, 154:2
**realistic** [1] - 76:4
**realize** [2] - 5:12,
156:8
**really** [44] - 7:18, 15:8,
19:10, 23:6, 23:10,
23:22, 27:25, 37:3,
37:4, 37:19, 38:5,
38:6, 39:22, 41:12,
53:1, 57:6, 60:14,
61:22, 62:2, 62:8,
72:1, 72:7, 74:1,
88:19, 107:17,
112:18, 115:18,
116:16, 116:22,
118:25, 122:18,
130:11, 132:21,
137:23, 142:22,
145:14, 145:18,
152:6, 155:15,
163:2, 174:15,
174:21, 186:13
**reason** [7] - 53:11,
117:17, 117:21,
127:10, 161:12,
174:21, 177:18
**reasonable** [2] -

24:14, 162:6
**reasonably** [2] -
142:23, 173:23
**reasons** [5] - 13:25,
72:5, 146:9, 170:11,
173:4
**rebut** [4] - 140:7,
147:1, 147:4, 157:2
**rebuttal** [8] - 135:17,
138:3, 140:7,
142:15, 143:6,
166:8, 166:15,
176:20
**recalling** [1] - 160:4
**received** [8] - 13:9,
26:18, 29:23, 29:24,
34:10, 59:4, 146:18,
183:6
**receiving** [4] - 42:12,
64:4, 71:13, 108:25
**recent** [1] - 103:12
**recently** [2] - 14:23,
71:1
**recess** [3] - 55:22,
77:4, 134:23
**Recess** [1] - 100:11
**recognize** [1] - 179:17
**recollection** [1] -
113:23
**record** [32] - 2:4, 14:3,
14:6, 24:21, 26:14,
28:8, 29:10, 30:14,
30:15, 31:16, 34:6,
34:18, 35:2, 36:18,
65:12, 67:8, 75:24,
86:14, 102:5,
104:14, 123:12,
123:15, 141:11,
148:14, 149:17,
152:8, 166:6,
167:11, 183:2,
186:6, 186:23
**recorded** [1] - 42:11
**records** [77] - 22:23,
23:3, 23:4, 23:7,
23:9, 23:13, 24:19,
24:20, 24:23, 25:1,
25:3, 25:21, 26:3,
26:9, 26:11, 26:12,
28:5, 28:6, 28:12,
28:21, 28:25, 29:5,
29:13, 29:22, 29:25,
30:2, 30:7, 30:8,
30:11, 31:21, 31:24,
32:3, 32:9, 32:13,
32:19, 33:13, 33:17,
33:23, 34:10, 34:12,
35:9, 35:16, 35:25,
36:1, 36:3, 36:7,
43:7, 47:13, 47:15,

50:14, 50:18, 57:7,
62:24, 63:1, 65:5,
65:7, 65:11, 66:7,
68:15, 70:1, 70:13,
70:14, 70:16, 71:3,
71:6, 73:16, 74:23,
121:22, 121:23,
159:19, 167:10,
168:2, 168:23,
169:8, 169:16
**records'** [1] - 24:11
**recreated** [1] - 45:25
**recross** [1] - 91:23
**redact** [1] - 20:5
**redundant** [3] -
153:15, 159:20,
163:12
**refer** [2] - 164:4, 164:6
**reference** [6] - 71:3,
91:21, 131:1,
154:25, 161:16,
173:8
**referenced** [3] - 48:20,
48:21, 48:24
**references** [1] - 41:2
**referencing** [1] - 131:2
**referred** [2] - 10:11,
10:14
**referring** [6] - 43:23,
68:3, 85:10, 105:4,
125:5, 154:20
**refers** [1] - 154:25
**reflected** [1] - 148:1
**regard** [2] - 100:20,
116:13
**regarding** [12] - 13:22,
53:14, 72:19, 126:2,
135:7, 135:8,
135:23, 149:8,
165:1, 170:14,
171:7, 172:24
**regimented** [1] - 33:6
**Regional** [2] - 13:18,
14:20
**register** [6] - 129:25,
132:11, 133:17,
134:14, 134:15,
165:6
**registered** [1] - 130:5
**registration** [11] -
164:13, 164:21,
164:24, 165:6,
165:7, 165:10,
175:25, 176:1,
176:17, 179:13,
179:14
**registrations** [4] -
164:16, 165:1,
165:16, 166:4
**regulates** [2] - 130:23,

131:3
**regulation** [3] -
128:16, 130:2, 133:8
**regulations** [9] - 3:6,
128:14, 130:6,
130:14, 130:15,
131:4, 132:19,
133:11
**regulators** [1] - 57:22
**regulatory** [3] -
129:20, 130:9, 131:9
**reject** [7] - 30:12,
97:16, 185:2, 185:7,
185:11, 185:20,
185:24
**rejected** [4] - 27:3,
185:16, 186:8,
186:13
**relate** [3] - 37:4, 47:1,
169:5
**related** [9] - 11:22,
56:18, 89:2, 94:3,
149:7, 155:22,
157:23, 163:8, 173:2
**relates** [7] - 22:13,
70:22, 107:21,
163:9, 163:10,
169:1, 177:18
**relating** [6] - 3:4, 25:1,
52:20, 60:5, 172:9,
173:22
**relation** [3] - 87:18,
138:18, 163:23
**relatively** [1] - 92:8
**release** [2] - 81:4, 81:7
**relevance** [1] - 144:5
**relevancy** [3] - 80:20,
115:2, 115:6
**relevant** [14] - 3:5,
19:9, 19:11, 53:25,
104:20, 111:17,
111:19, 115:7,
150:1, 151:23,
156:3, 158:4,
174:17, 178:3
**reliability** [11] - 64:8,
64:9, 79:4, 86:17,
88:3, 89:6, 89:23,
92:2, 92:24, 112:13,
152:16
**reliable** [24] - 38:9,
52:13, 52:16, 54:4,
54:6, 54:8, 54:19,
58:11, 58:19, 60:11,
61:5, 62:10, 64:23,
66:24, 67:23, 75:4,
81:18, 94:5, 94:11,
94:13, 99:19, 101:8,
126:18, 174:15
**reliably** [2] - 54:25,

75:14
**relied** [1] - 78:18
**relies** [2] - 59:10,
143:7
**rely** [10] - 38:18,
38:21, 68:7, 70:2,
125:11, 148:25,
149:20, 159:18,
173:1
**relying** [8] - 23:23,
38:13, 48:3, 48:5,
48:17, 49:24, 65:10,
70:7
**remain** [1] - 3:22
**remember** [7] - 92:18,
111:24, 113:2,
113:24, 130:24,
164:5, 177:24
**remind** [3] - 101:18,
112:3, 117:12
**removal** [1] - 46:21
**renew** [1] - 128:15
**renewal** [2] - 164:24,
176:18
**renewed** [2] - 166:4,
166:5
**repeated** [1] - 62:17
**repeatedly** [4] - 28:9,
61:6, 62:10, 125:19
**replacing** [1] - 6:5
**reply** [2] - 22:19, 22:21
**report** [75] - 12:11,
39:11, 39:12, 40:7,
40:15, 41:22, 42:19,
43:13, 43:25, 44:16,
45:14, 48:21, 49:2,
49:10, 49:14, 57:9,
79:18, 79:19, 80:18,
80:21, 81:2, 85:6,
85:7, 86:19, 87:2,
87:7, 87:21, 94:24,
94:25, 95:1, 95:3,
95:4, 107:12,
107:16, 108:19,
108:21, 109:25,
110:9, 110:13,
110:25, 111:5,
113:2, 115:1, 115:3,
115:5, 117:8,
117:17, 117:18,
118:2, 118:3,
118:14, 118:16,
118:22, 122:22,
123:24, 125:4,
125:10, 128:21,
133:7, 133:9,
138:25, 139:10,
139:14, 139:20,
139:25, 140:12,
140:13, 140:14,

143:15, 146:6,
163:8, 163:19,
163:21, 174:6,
174:24
**reported** [1] - 33:12
**REPORTER** [1] -
188:1
**reporter** [2] - 124:17,
151:12
**Reporter** [3] - 1:22,
1:22, 188:10
**reporting** [1] - 33:11
**reports** [10] - 43:4,
75:24, 87:23, 105:9,
130:8, 141:8,
141:10, 143:2,
169:21, 177:4
**represent** [2] - 35:5,
110:19
**representation** [1] -
13:6
**representations** [1] -
169:2
**representing** [1] - 9:9
**reputable** [1] - 49:11
**request** [3] - 4:1,
18:25, 23:2
**requested** [1] - 3:21
**requests** [1] - 64:4
**require** [1] - 12:14
**required** [6] - 32:15,
129:25, 132:10,
134:13, 156:25,
157:21
**requirement** [2] -
32:11, 165:8
**requirements** [4] -
31:19, 75:9, 129:20,
130:6
**requires** [3] - 30:1,
31:16, 54:16
**requiring** [1] - 133:8
**requisite** [1] - 28:4
**reread** [2] - 88:11,
94:25
**research** [4] - 17:8,
101:14, 102:21,
131:18
**researchers** [1] -
102:23
**Reserve** [1] - 44:8
**reserve** [2] - 121:8,
171:4
**reserving** [1] - 121:14
**residence** [1] - 66:18
**respect** [43] - 3:6,
3:14, 17:17, 17:20,
17:25, 19:2, 20:17,
22:12, 37:5, 44:24,
52:19, 53:16, 55:17,

73:21, 73:23, 75:23, 79:14, 79:16, 100:23, 106:14, 107:10, 110:6, 111:13, 113:9, 124:8, 128:5, 129:22, 131:8, 131:16, 137:13, 138:20, 166:10, 166:23, 174:4, 174:12, 175:21, 177:11, 178:10, 178:13, 178:21, 179:11, 179:21, 180:12
**respond** [7] - 34:3, 76:14, 101:1, 101:4, 155:10, 177:8, 179:18
**responding** [2] - 186:8, 186:10
**response** [8] - 3:25, 13:22, 54:10, 57:22, 73:15, 164:1, 169:22, 183:6
**Response** [1] - 56:12
**responses** [1] - 5:4
**responsible** [1] - 56:13
**responsive** [2] - 110:1, 145:24
**rest** [4] - 22:7, 118:7, 181:17, 186:22
**restricted** [1] - 105:10
**restriction** [1] - 105:16
**result** [2] - 31:17, 32:2
**results** [8] - 26:24, 49:5, 54:8, 54:14, 61:9, 73:13, 79:12, 87:11
**retrieval** [2] - 24:1, 31:24
**retrieved** [1] - 23:4
**retrieving** [1] - 32:19
**return** [1] - 35:7
**returning** [1] - 28:3
**revealed** [1] - 174:5
**review** [16] - 12:9, 12:14, 13:24, 18:16, 21:25, 24:20, 44:20, 46:23, 101:15, 130:7, 143:25, 147:12, 157:15, 167:20, 172:20, 178:21
**reviewed** [17] - 21:22, 54:5, 78:4, 83:7, 89:11, 96:5, 101:9, 121:22, 123:22, 144:14, 144:22,

145:2, 146:13, 146:15, 147:16, 147:23, 148:4
**reviewing** [1] - 47:13
**revocation** [1] - 55:10
**rewritten** [1] - 168:12
**rigorous** [1] - 58:13
**rise** [1] - 155:8
**risk** [1] - 97:24
**RMR** [2] - 1:22, 188:9
**Road** [4] - 43:13, 48:9, 65:5, 65:9, 65:11, 68:6, 69:13, 69:20, 69:24, 70:13, 98:19, 98:21
**role** [2] - 29:19, 130:7
**ROMAN** [1] - 1:5
**Roman** [4] - 2:3, 2:16, 2:19, 129:24
**Romanian** [4] - 17:2, 18:15, 100:17, 144:8
**room** [1] - 44:8
**Room** [2] - 1:23, 188:10
**roughly** [3] - 80:23, 93:19, 105:1
**router** [4] - 160:17, 160:18, 160:20, 160:21
**routinely** [1] - 149:21
**Rule** [2] - 54:16, 90:11
**rule** [6] - 16:16, 19:14, 30:1, 31:16, 32:21, 39:25
**rules** [4] - 3:5, 32:11, 32:12, 34:13
**Rules** [1] - 16:11
**rulings** [2] - 177:11, 179:21
**run** [17] - 38:4, 107:15, 117:13, 120:18, 139:18, 155:25, 156:9, 156:11, 156:13, 156:15, 156:24, 156:25, 158:6, 171:13, 181:6, 185:19, 185:20
**running** [7] - 34:24, 74:3, 156:7, 157:13, 157:24, 186:14
**runs** [1] - 156:18
**Russian** [5] - 14:1, 17:1, 18:8, 18:14, 100:17
**Russians** [1] - 168:16

### S

**sake** [1] - 8:14

**sample** [2] - 60:8, 99:9
**sandbag** [2] - 18:17, 139:11
**Sarah** [2] - 128:17, 140:11
**satisfied** [1] - 3:19
**satisfies** [1] - 162:3
**satisfy** [2] - 117:17, 117:21
**Saturday** [2] - 181:24, 181:25
**saw** [3] - 21:23, 92:5, 111:9
**schedule** [1] - 180:17
**scheduled** [1] - 181:3
**scheduling** [3] - 55:9, 158:8, 166:25
**Scholl** [54] - 37:24, 37:25, 38:4, 38:11, 38:12, 39:1, 43:9, 43:18, 45:11, 46:4, 46:14, 47:13, 47:21, 51:22, 52:5, 52:11, 53:14, 56:7, 56:9, 60:12, 62:16, 65:10, 65:18, 67:20, 67:22, 68:2, 68:10, 69:9, 69:18, 70:2, 70:7, 71:17, 71:22, 74:10, 75:7, 76:20, 77:25, 81:1, 87:2, 87:6, 87:18, 91:20, 93:20, 94:23, 100:6, 102:9, 102:16, 104:23, 105:15, 141:8, 141:11, 169:20, 169:21
**Scholl's** [18] - 12:11, 25:25, 38:17, 43:25, 44:19, 46:10, 48:21, 50:4, 52:14, 57:3, 57:9, 64:20, 71:20, 74:21, 77:12, 77:16, 85:7, 105:18
**science** [6] - 83:14, 85:4, 96:5, 97:2, 97:3, 97:23
**scientific** [19] - 78:3, 79:3, 81:20, 83:1, 83:6, 84:12, 85:11, 85:14, 87:3, 87:9, 89:20, 90:2, 94:8, 99:19, 99:21, 118:16, 118:20, 125:9
**scientist** [1] - 169:22
**scope** [1] - 177:4
**screenshots** [3] - 51:7, 51:8
**screenshotted** [1] -

109:2
**script** [2] - 166:11, 166:12
**scrutiny** [1] - 91:2
**SDNY** [1] - 168:25
**se** [1] - 38:7
**search** [6] - 26:23, 58:18, 66:2, 66:10, 66:17, 66:24
**searches** [2] - 67:4, 67:10
**SEC** [1] - 90:3
**second** [15] - 5:19, 34:3, 37:23, 44:11, 49:11, 52:18, 53:22, 124:1, 124:5, 128:11, 141:6, 142:3, 142:8, 162:21
**Secrecy** [1] - 130:3
**Section** [2] - 183:10, 183:11
**section** [4] - 37:13, 45:21, 102:20, 106:2
**sections** [1] - 112:22
**sector** [1] - 57:21
**security** [1] - 157:21
**see** [44] - 3:13, 8:4, 13:12, 15:11, 18:2, 25:18, 26:3, 37:3, 37:8, 44:2, 65:4, 65:11, 68:18, 77:2, 83:25, 86:9, 87:11, 96:13, 105:12, 108:25, 109:10, 114:6, 116:23, 125:18, 131:13, 135:6, 144:3, 144:6, 146:16, 147:10, 149:14, 157:10, 157:12, 159:13, 162:14, 164:25, 165:18, 167:2, 167:3, 172:6, 180:14, 181:2, 186:21
**seeing** [6] - 12:16, 60:15, 88:10, 92:14, 142:13, 160:11
**seek** [4] - 3:24, 18:25, 20:6, 20:10
**seeking** [1] - 19:16
**seeks** [1] - 18:7
**seem** [3] - 104:2, 153:9, 177:25
**sees** [1] - 169:21
**Sefranek** [3] - 1:22, 188:9, 188:9
**SEFRANEK** [1] - 188:3
**segues** [1] - 123:19

**seize** [4] - 70:13, 72:15
**seized** [29] - 36:6, 65:5, 69:25, 70:15, 70:17, 111:8, 118:9, 135:9, 136:13, 136:22, 137:1, 137:3, 137:15, 137:22, 138:9, 139:3, 139:5, 142:24, 143:11, 144:7, 144:21, 144:22, 146:19, 147:5, 148:7, 163:21, 175:14, 179:8
**seizes** [1] - 35:24
**seizure** [2] - 107:22, 136:18, 139:8
**selected** [2] - 56:15, 56:20
**selection** [1] - 12:19
**self** [2] - 23:14, 157:24
**self-authenticating** [1] - 23:14
**self-running** [1] - 157:24
**sellers** [1] - 88:22
**send** [6] - 12:17, 62:23, 63:23, 73:5, 109:4, 109:14
**sending** [6] - 13:7, 49:15, 49:16, 50:18, 50:19, 64:21
**sense** [5] - 82:6, 82:15, 131:15, 134:11, 145:25
**sensibly** [1] - 17:13
**sensitive** [4] - 71:22, 72:4, 167:18, 167:22
**sent** [4] - 13:11, 14:23, 15:11, 42:10
**sentence** [2] - 11:10, 34:11
**sentenced** [2] - 28:17, 150:12
**sentencing** [4] - 70:23, 71:9, 93:10, 183:13
**separate** [5] - 87:25, 89:7, 117:10, 137:24, 138:6
**September** [4] - 1:5, 187:2, 187:3, 188:7
**serious** [2] - 34:21, 36:17
**seriously** [1] - 33:5
**serve** [1] - 140:7
**server** [22] - 31:25, 32:3, 32:20, 122:25,

123:7, 123:12,
123:15, 125:11,
126:12, 126:14,
126:15, 126:17,
126:21, 126:22,
127:5, 127:8,
127:12, 152:14,
156:17, 161:1
**servers** [13] - 29:8,
30:17, 126:23,
126:24, 127:1,
127:14, 127:21,
127:24, 144:8,
152:5, 157:16,
162:8, 162:18
**service** [5] - 25:16,
51:25, 108:9,
108:11, 108:13
**service-specific** [1] -
108:13
**services** [2] - 74:7,
108:9
**serving** [1] - 41:1
**set** [19] - 32:24, 33:1,
33:5, 50:12, 56:7,
63:21, 74:4, 79:3,
79:4, 79:7, 84:24,
100:8, 105:8, 122:5,
138:25, 164:18,
170:23, 173:6, 176:3
**sets** [3] - 70:15, 71:16,
90:4
**setting** [1] - 170:14
**sexual** [3] - 66:15,
66:19, 66:23
**shall** [1] - 115:20
**share** [1] - 153:5
**sharing** [2] - 127:3,
160:20
**shift** [1] - 137:10
**shoehorn** [1] - 176:22
**shoes** [1] - 29:15
**short** [1] - 24:4
**show** [14] - 7:4, 9:15,
20:12, 21:18, 24:16,
95:14, 103:24,
112:4, 137:17,
140:20, 140:21,
144:8, 173:16, 179:9
**showing** [7] - 24:13,
28:9, 51:10, 84:12,
103:3, 173:21,
174:20
**shown** [4] - 31:18,
50:23, 62:10, 67:2
**shows** [9] - 44:6,
49:23, 88:2, 92:24,
98:11, 125:8, 138:2,
144:1
**shred** [2] - 84:11

**sic** [4] - 18:19, 135:13,
135:16, 138:5
**side** [10] - 25:16,
37:22, 89:14, 95:22,
109:13, 114:23,
155:11, 175:8,
186:16
**sides** [6] - 17:18, 18:3,
40:2, 161:18,
161:23, 176:25
**sign** [1] - 14:20
**signature** [1] - 172:19
**significance** [1] -
122:1
**significant** [20] - 10:9,
26:2, 37:8, 38:16,
43:5, 45:7, 48:24,
61:12, 67:16, 69:3,
74:1, 74:19, 90:16,
90:23, 91:10, 95:4,
101:16, 138:17,
174:4, 177:16
**significantly** [1] - 57:2
**signing** [1] - 29:11
**signs** [1] - 90:17
**Silk** [14] - 45:13, 48:9,
65:5, 65:9, 65:11,
68:6, 69:13, 69:20,
69:23, 69:24, 70:13,
98:19, 98:21
**simple** [9] - 8:7,
51:20, 58:2, 109:9,
120:7, 153:12,
155:6, 158:18,
172:12
**similarly** [4] - 25:17,
47:12, 47:18, 121:18
**simple** [10] - 38:22,
81:24, 84:4, 89:5,
90:17, 92:6, 92:16,
97:25, 134:15,
138:16
**simply** [22] - 10:9,
26:23, 28:6, 33:21,
35:15, 38:24, 41:10,
41:12, 82:8, 93:11,
105:24, 121:21,
126:16, 139:2,
146:10, 152:7,
154:4, 154:6,
164:20, 166:15,
179:8, 186:8
**single** [13] - 7:17,
31:9, 61:15, 66:25,
67:11, 68:22, 72:13,
74:6, 83:21, 85:19,
115:3, 116:23,
147:10
**singled** [1] - 158:20
**sinister** [3] - 145:9,

147:7, 158:25
**sit** [6] - 8:25, 19:3,
20:4, 21:1, 21:24,
77:18
**site** [15] - 63:10,
63:11, 63:16, 66:23,
69:7, 143:24,
155:17, 155:23,
156:25, 157:16,
157:21, 157:25,
164:13, 171:13
**sites** [11] - 45:17,
68:5, 69:14, 69:15,
69:20, 69:24, 70:4,
70:19, 156:7, 158:6,
164:17
**sitting** [1] - 141:2
**situation** [1] - 146:23
**six** [3] - 136:17, 139:4,
163:15
**six-terabyte** [2] -
136:17, 139:4,
163:15
**skepticism** [1] -
171:10
**skip** [3] - 112:12,
112:22, 112:23
**skipped** [1] - 165:24
**skipping** [3] - 115:11,
115:18, 124:25
**skips** [2] - 112:8,
115:13
**slow** [1] - 141:22
**slower** [1] - 124:17
**slowing** [1] - 18:9
**smuggling** [1] - 133:6
**social** [1] - 3:23
**software** [37] - 48:1,
54:17, 54:19, 59:25,
60:5, 78:15, 79:5,
80:11, 81:11, 82:1,
82:22, 83:16, 84:18,
84:19, 84:20, 85:5,
85:13, 85:17, 86:17,
89:19, 92:6, 92:25,
94:9, 99:14, 99:17,
105:19, 112:22,
113:11, 113:20,
113:22, 113:24,
114:7, 114:9,
114:13, 114:16,
114:19, 114:22
**solve** [1] - 21:18
**solvency** [1] - 36:16
**solvent** [2] - 33:15,
34:15
**someone** [21] - 7:23,
63:14, 96:15, 96:16,
96:20, 98:8, 132:24,
151:1, 151:6,

156:17, 157:5,
160:21, 165:7,
168:11, 169:6,
173:15, 173:18,
174:16, 175:9
**sometimes** [5] -
10:10, 10:14, 81:17,
112:23, 137:9
**somewhat** [4] - 10:21,
38:4, 98:16, 169:1
**somewhere** [1] - 81:3
**soon** [3] - 14:25,
100:9, 126:11
**sophisticated** [2] -
54:17, 59:24
**sorry** [25] - 5:19, 7:14,
17:10, 42:25, 44:12,
48:1, 48:10, 95:19,
112:15, 119:10,
124:16, 139:23,
141:9, 141:18,
141:19, 141:23,
142:5, 142:7,
142:18, 146:2,
152:12, 154:3,
162:20, 171:9,
180:22
**sort** [21] - 10:1, 19:14,
31:22, 41:1, 48:2,
58:13, 63:18, 70:2,
71:15, 105:16,
113:7, 134:11,
135:16, 155:8,
157:17, 163:25,
165:3, 167:5, 168:1,
174:5, 179:5
**sorts** [2] - 86:6, 92:12
**sought** [1] - 65:17
**sound** [11] - 143:22,
145:23, 146:21,
148:25, 149:20,
149:23, 152:2,
152:8, 160:6, 160:8,
172:14
**soundness** [6] - 54:1,
88:3, 89:6, 92:1,
94:24, 123:19
**sounds** [2] - 11:11,
159:23
**source** [10] - 19:3,
19:5, 46:8, 47:4,
68:12, 80:10, 82:17,
96:24, 180:12
**sourced** [1] - 59:9
**sources** [1] - 50:21
**sourcing** [1] - 47:3
**Southern** [1] - 168:15
**space** [4] - 95:14,
96:9, 164:16
**spaces** [1] - 164:8

**speaking** [6] - 3:19,
89:18, 95:18,
114:14, 132:13,
151:10
**speaks** [1] - 29:17
**specific** [21] - 19:5,
32:3, 32:19, 38:7,
49:7, 53:5, 60:1,
61:10, 69:23, 70:8,
101:10, 101:16,
105:6, 106:20,
108:13, 108:14,
133:7, 152:24,
167:9, 167:16,
169:16
**specifically** [8] - 18:6,
18:23, 22:20, 58:18,
59:15, 101:10,
104:23, 144:16
**specifics** [6] - 18:20,
20:14, 21:17, 39:15,
145:17, 145:18
**speculation** [2] -
147:3, 147:4
**spelled** [2] - 9:1, 9:17
**spend** [6] - 39:19,
105:17, 108:5,
109:1, 109:19,
167:19
**spending** [1] - 50:5
**spends** [1] - 115:15
**spent** [1] - 60:16
**sphere** [1] - 38:25
**split** [2] - 105:5,
109:11
**spreadsheets** [5] -
26:23, 30:19, 57:10,
109:2, 109:3
**spy** [1] - 164:6
**spyware** [1] - 147:7
**St** [19] - 115:21,
115:23, 116:3,
116:7, 116:9,
116:15, 117:3,
118:3, 119:13,
119:17, 119:25,
120:2, 120:14,
121:12, 135:13,
135:16, 138:5,
154:9, 158:19
**staff** [1] - 181:11
**stage** [1] - 182:12
**stake** [3] - 90:8, 90:16,
90:24
**stand** [9] - 29:15,
30:3, 31:1, 36:5,
52:19, 82:20,
110:21, 119:5, 151:7
**standard** [7] - 91:2,
117:18, 138:10,

154:7, 161:8, 161:11, 162:2
**standardless** [1] - 97:10
**standards** [16] - 77:10, 83:23, 83:24, 85:9, 94:14, 94:15, 96:4, 96:7, 97:14, 97:17, 97:20, 97:21, 159:24, 160:9
**stands** [1] - 123:14
**start** [14] - 3:12, 37:24, 39:14, 39:16, 42:2, 76:13, 77:8, 77:21, 77:22, 87:10, 134:21, 134:25
**started** [2] - 21:12, 131:18
**starting** [13] - 2:5, 25:20, 44:17, 46:3, 56:9, 58:11, 87:21, 94:25, 108:3, 108:14, 109:17, 168:20, 170:17
**starts** [3] - 72:24, 121:3, 124:12
**state** [4] - 2:4, 91:9, 111:20, 148:8
**statement** [2] - 82:6, 127:21
**statements** [6] - 32:23, 34:14, 130:21, 131:2, 150:23, 161:21
**states** [1] - 91:6
**STATES** [3] - 1:1, 1:2, 1:8
**States** [13] - 1:23, 2:3, 2:7, 2:12, 17:11, 28:11, 28:13, 28:14, 53:17, 57:20, 59:21, 84:17, 97:23
**static** [1] - 120:9
**statistical** [6] - 78:9, 85:12, 124:22, 125:19, 125:21, 126:3
**statistically** [1] - 125:1
**statistician** [1] - 61:24
**statistics** [1] - 64:18
**statute** [7] - 3:5, 37:12, 111:3, 111:7, 111:8, 111:11, 111:19
**statutes** [2] - 37:5, 37:11
**statutory** [1] - 183:17
**stay** [4] - 6:6, 6:7, 119:11, 166:25
**steal** [1] - 158:2

**stenographic** [1] - 188:5
**step** [2] - 112:11, 126:6
**Stephanie** [1] - 9:20
**STEPHANIE** [1] - 9:20
**Sterlingov** [60] - 2:3, 2:16, 2:19, 13:1, 13:14, 13:23, 14:11, 15:1, 17:23, 18:16, 19:8, 20:12, 21:18, 21:22, 25:2, 32:4, 33:21, 45:21, 45:23, 55:17, 80:19, 84:10, 90:20, 92:20, 115:4, 128:25, 129:24, 132:10, 136:6, 136:8, 136:16, 138:2, 138:8, 138:18, 141:25, 143:23, 144:9, 144:15, 144:18, 144:23, 145:15, 146:22, 146:25, 156:4, 158:16, 158:21, 158:24, 159:3, 159:7, 164:14, 165:14, 169:8, 172:13, 176:1, 180:23, 182:7, 182:11, 182:15, 183:22, 186:23
**sterlingov** [1] - 184:1
**STERLINGOV** [1] - 1:5
**Sterlingov's** [19] - 15:19, 16:7, 23:19, 25:5, 46:18, 50:15, 100:14, 115:5, 120:7, 135:8, 135:12, 136:3, 136:16, 140:9, 144:21, 145:1, 145:8, 154:20, 169:11
**sticking** [1] - 84:8
**Still** [1] - 87:6
**still** [29] - 24:7, 24:16, 30:25, 39:9, 43:21, 73:22, 74:2, 75:20, 79:20, 86:4, 95:2, 101:13, 101:16, 101:21, 112:10, 112:17, 113:1, 113:24, 114:4, 116:10, 119:23, 122:11, 128:22, 141:11, 166:1, 175:23, 179:3, 180:11, 181:8

**still's** [6] - 44:14, 86:19, 87:21, 94:25, 110:13, 115:13
**stipulate** [6] - 133:16, 133:18, 133:19, 134:1, 134:2, 134:14
**stipulated** [1] - 133:24
**stipulation** [4] - 133:22, 133:25, 134:3, 134:6
**stipulations** [1] - 133:22
**stole** [3] - 4:23, 168:24, 173:19
**stop** [1] - 181:20
**stored** [3] - 29:24, 30:4, 108:1
**stories** [1] - 178:1
**straightforward** [2] - 92:8, 155:21
**Street** [2] - 1:11, 1:20
**strike** [2] - 7:18, 78:24
**strikes** [7] - 20:16, 96:8, 154:1, 161:6, 173:14, 175:19, 179:9
**striking** [1] - 80:16
**strong** [4] - 11:5, 11:6, 11:17, 180:20
**stronger** [1] - 32:16
**struck** [7] - 77:24, 78:16, 83:4, 118:23, 118:25, 119:4, 119:6
**structure** [2] - 60:23, 108:25
**structures** [1] - 39:21
**stuck** [1] - 147:3
**studies** [1] - 177:7
**study** [2] - 37:14, 103:5
**stuff** [9] - 18:11, 18:12, 18:19, 30:14, 30:24, 87:3, 118:11, 136:21, 153:10
**subject** [8] - 32:21, 32:25, 80:6, 96:21, 117:6, 117:7, 157:22, 165:20
**subjects** [1] - 19:9
**submission** [1] - 131:20
**submit** [6] - 79:7, 98:17, 106:6, 106:20, 156:21, 158:5
**submitted** [4] - 23:2, 89:11, 96:2, 135:3
**submitting** [1] - 98:16
**subpoena** [6] - 62:23, 63:14, 63:23, 66:4,

66:6, 73:5
**subpoenas** [8] - 64:10, 64:11, 64:21, 65:16, 72:12, 72:24, 91:22
**subset** [8] - 64:2, 101:24, 104:22, 104:25, 105:7, 105:9, 167:17, 167:21
**substance** [1] - 42:18
**substantial** [6] - 12:7, 28:8, 95:3, 106:14, 106:18, 160:24
**substantive** [2] - 12:10, 19:23
**substantively** [1] - 19:11
**successful** [2] - 59:19, 126:17
**successfully** [1] - 67:25
**sudden** [1] - 179:9
**sufficiency** [4] - 77:13, 125:12, 128:4, 159:11
**sufficient** [14] - 35:19, 36:10, 53:23, 57:5, 57:13, 57:14, 86:16, 122:22, 123:1, 165:18, 170:21, 170:23, 172:13, 179:17
**sufficiently** [1] - 38:9
**suggest** [2] - 106:4, 146:16
**suggested** [2] - 21:2, 175:1
**suggesting** [3] - 4:11, 91:11, 160:1
**suggestion** [2] - 91:8, 106:8
**suggestions** [1] - 3:13
**suggests** [1] - 161:10
**sum** [1] - 26:8
**summaries** [3] - 18:10, 19:7, 128:22
**summarize** [1] - 19:13
**summary** [8] - 19:18, 40:11, 44:18, 68:8, 129:14, 172:1, 177:15, 185:11
**sums** [1] - 84:10
**supplemental** [6] - 22:20, 109:11, 109:25, 139:1, 141:1, 158:11
**supplemented** [1] - 108:20
**support** [5] - 22:19,

22:21, 43:3, 58:9, 174:17
**suppose** [5] - 40:21, 61:7, 165:1, 181:3, 184:17
**supposed** [6] - 78:20, 85:16, 87:8, 89:21, 89:23, 147:11
**supposedly** [7] - 30:7, 31:10, 80:25, 81:2, 89:24, 94:8, 126:25
**Supreme** [1] - 91:7
**surprise** [1] - 155:12
**surprised** [2] - 20:16, 113:21
**suspect** [1] - 156:18
**suspended** [1] - 34:10
**Sweden** [4] - 15:19, 15:22, 16:7, 183:21
**Swedish** [3] - 17:2, 18:15, 100:18
**system** [5] - 31:17, 31:23, 32:1, 58:21, 177:22
**systems** [1] - 41:3

## T

**table** [2] - 8:23, 8:25
**tagged** [1] - 46:6
**tailor** [1] - 162:10
**tailored** [1] - 101:10
**tailoring** [1] - 61:19
**talks** [4] - 42:8, 51:15, 108:4, 108:7
**Tamara** [3] - 1:22, 188:9, 188:9
**TAMARA** [1] - 188:3
**tampered** [2] - 177:19, 177:20
**task** [1] - 17:24
**Tauseef** [2] - 9:1, 9:10
**TAUSEEF** [1] - 9:1
**tax** [1] - 130:8
**teach** [1] - 161:9
**Team** [2] - 56:12, 56:21
**team** [6] - 6:6, 6:7, 19:4, 56:15, 62:14, 156:19
**technical** [2] - 112:16, 122:11
**technician** [1] - 35:24
**techniques** [2] - 137:7, 160:6
**technological** [1] - 54:18
**technologist** [3] - 148:23, 149:21, 160:11

**technology** [2] - 8:7, 52:8
**telephone** [1] - 24:11
**temporary** [1] - 13:7
**ten** [4] - 119:8, 162:24, 183:14, 183:18
**ten-minute** [1] - 119:8
**tends** [1] - 9:25
**tens** [2] - 98:20, 127:2
**tentative** [1] - 177:11
**tentatively** [1] - 175:20
**terabyte** [3] - 136:17, 139:4, 163:15
**terminology** [1] - 154:24
**terms** [28] - 20:3, 39:8, 39:17, 39:22, 40:12, 41:5, 41:8, 41:16, 88:6, 89:2, 89:4, 89:6, 92:20, 94:23, 97:10, 111:11, 122:10, 122:21, 122:23, 123:9, 123:18, 128:22, 136:5, 140:8, 159:11, 183:7, 183:17
**terribly** [3] - 17:1, 20:19, 97:3
**test** [2] - 53:9, 102:4
**tested** [3] - 52:15, 62:10, 98:25
**testified** [23] - 30:25, 43:9, 43:15, 43:16, 52:11, 67:22, 71:24, 75:20, 78:11, 80:18, 86:4, 91:20, 113:6, 121:21, 127:2, 132:1, 132:3, 133:6, 133:7, 135:4, 140:18, 153:6, 177:25
**testifies** [2] - 121:10, 126:8
**testify** [75] - 29:24, 30:12, 36:9, 39:15, 67:20, 71:17, 72:7, 88:7, 88:12, 95:12, 107:15, 110:19, 113:5, 115:3, 116:6, 117:3, 117:19, 119:14, 119:23, 120:7, 122:23, 129:12, 129:19, 132:24, 133:10, 135:7, 135:13, 136:1, 136:20, 136:21, 137:6, 137:13, 137:21,

138:3, 138:5, 140:6, 140:10, 140:22, 141:21, 142:15, 143:6, 143:21, 144:12, 144:16, 146:7, 146:10, 147:9, 147:24, 149:22, 151:2, 151:7, 151:14, 156:24, 159:12, 159:15, 159:18, 159:21, 160:8, 163:22, 164:9, 164:20, 164:23, 165:3, 165:5, 165:16, 166:13, 166:15, 170:21, 171:2, 171:5, 172:18, 175:15, 176:23, 179:4, 179:12
**testifying** [21] - 45:10, 107:14, 114:17, 114:23, 117:10, 117:23, 128:15, 132:14, 141:24, 142:11, 143:9, 143:10, 146:12, 153:23, 158:15, 161:24, 163:7, 164:25, 166:8, 175:17, 176:3
**testimony** [84] - 15:21, 24:19, 25:12, 25:25, 26:2, 38:17, 41:4, 43:5, 44:14, 45:11, 45:15, 46:8, 46:11, 52:14, 53:21, 53:23, 56:5, 56:24, 57:3, 59:3, 59:10, 59:15, 60:8, 61:17, 63:8, 64:20, 72:1, 72:19, 73:15, 75:24, 88:15, 89:2, 91:21, 91:22, 94:2, 101:5, 101:13, 107:23, 108:8, 116:11, 117:2, 117:6, 117:25, 118:11, 120:3, 120:19, 121:3, 121:13, 121:19, 122:9, 122:13, 129:2, 129:6, 129:21, 130:1, 130:16, 131:4, 131:16, 132:5, 134:10, 135:8, 140:7, 142:16, 142:17, 142:21, 142:22, 145:19, 145:20, 148:7,

153:10, 155:4, 160:14, 162:10, 168:3, 170:17, 172:18, 176:6, 176:12, 176:20, 178:23, 179:9
**testing** [3] - 68:10, 99:7, 99:8
**text** [1] - 20:12
**THE** [466] - 1:1, 1:1, 1:8, 2:2, 2:8, 2:11, 2:14, 2:17, 2:21, 3:18, 4:2, 4:9, 4:17, 4:19, 5:5, 5:12, 5:15, 5:19, 5:21, 5:24, 6:3, 6:6, 6:8, 6:12, 6:15, 6:18, 7:3, 7:6, 7:15, 7:23, 8:2, 8:4, 8:13, 8:17, 8:21, 9:3, 9:5, 9:8, 9:12, 9:18, 10:5, 10:10, 10:14, 10:18, 10:22, 11:1, 11:9, 11:12, 11:14, 11:17, 11:24, 12:2, 12:17, 12:22, 13:17, 13:20, 14:5, 14:11, 14:16, 14:18, 14:25, 15:5, 15:14, 15:17, 15:20, 15:23, 16:9, 16:14, 16:20, 18:21, 19:17, 20:1, 20:8, 20:25, 21:4, 21:11, 21:20, 22:1, 22:5, 22:10, 22:15, 23:23, 24:7, 24:25, 26:5, 27:5, 27:12, 27:19, 28:10, 28:18, 28:23, 29:15, 31:4, 31:12, 32:16, 32:21, 33:3, 33:19, 33:24, 34:3, 34:8, 34:12, 35:21, 36:20, 38:10, 38:20, 39:11, 39:14, 39:23, 39:25, 40:8, 40:11, 40:20, 40:24, 41:5, 41:8, 41:14, 41:17, 41:24, 42:5, 42:14, 42:17, 42:24, 43:1, 43:11, 43:17, 44:2, 44:11, 44:15, 44:24, 45:2, 45:18, 46:24, 47:11, 47:17, 47:24, 48:3, 48:6, 48:10, 48:18, 49:4, 49:17, 49:21, 50:11, 50:22, 51:2, 51:18, 52:3, 52:17, 53:12, 55:11, 55:14, 55:16, 55:21, 55:23, 56:3, 56:22, 57:4, 58:1, 58:23, 59:12, 60:9, 61:4, 62:4,

63:6, 63:12, 64:7, 64:24, 65:14, 65:22, 66:4, 66:9, 66:16, 67:3, 67:10, 67:14, 67:20, 68:2, 68:18, 69:5, 69:13, 69:17, 70:12, 71:5, 71:17, 72:4, 72:22, 72:25, 73:12, 73:20, 74:11, 74:17, 75:12, 75:16, 75:22, 76:4, 76:8, 76:12, 76:23, 77:6, 77:11, 77:17, 77:22, 79:10, 79:24, 81:7, 82:5, 82:12, 86:11, 87:16, 87:20, 87:24, 88:4, 89:8, 90:10, 91:5, 93:3, 93:15, 93:21, 94:4, 94:21, 95:2, 95:6, 95:15, 95:17, 95:20, 96:13, 97:8, 98:3, 100:4, 100:7, 100:13, 101:18, 102:18, 103:7, 103:15, 103:24, 104:11, 104:15, 105:1, 105:12, 105:21, 106:12, 106:24, 107:6, 108:22, 109:6, 109:16, 110:3, 110:5, 110:16, 111:13, 112:2, 112:15, 112:20, 113:9, 113:23, 114:3, 114:15, 114:21, 115:9, 115:20, 115:24, 116:8, 117:7, 117:13, 118:18, 119:2, 119:4, 119:10, 120:12, 120:17, 121:9, 122:19, 124:1, 124:5, 124:11, 124:16, 125:6, 125:15, 126:7, 126:20, 127:6, 127:10, 127:19, 127:23, 128:1, 128:5, 128:10, 128:18, 129:4, 129:9, 129:16, 129:18, 130:25, 131:6, 131:13, 131:15, 131:21, 131:23, 132:12, 132:23, 133:13, 133:18, 134:18, 134:24, 135:24, 136:12,

136:25, 137:9, 137:19, 138:19, 139:15, 139:19, 139:25, 140:3, 140:20, 141:2, 141:6, 141:9, 141:13, 141:16, 141:18, 141:22, 142:2, 142:5, 142:8, 142:18, 143:8, 143:14, 144:10, 145:12, 145:24, 146:2, 146:15, 147:14, 147:22, 148:10, 148:16, 149:1, 149:6, 149:11, 150:3, 150:15, 150:21, 151:1, 151:4, 151:10, 151:12, 151:20, 152:10, 152:18, 153:3, 153:9, 153:15, 153:22, 154:1, 154:4, 154:15, 154:22, 155:11, 155:19, 155:24, 156:2, 156:6, 156:13, 157:4, 157:8, 157:19, 158:3, 158:14, 159:1, 159:22, 160:13, 161:23, 162:5, 162:13, 162:20, 163:3, 163:6, 163:11, 164:11, 164:25, 165:17, 165:20, 165:24, 166:2, 166:10, 166:22, 167:2, 168:6, 168:21, 169:14, 169:25, 170:3, 170:9, 171:1, 171:4, 171:9, 171:15, 171:20, 171:23, 172:3, 172:10, 172:15, 172:23, 173:10, 175:12, 176:6, 176:11, 176:16, 176:19, 176:25, 177:10, 180:9, 180:23, 181:1, 181:2, 181:11, 181:15, 181:25, 182:2, 182:7, 182:10, 182:11, 182:14, 182:15, 182:21, 182:22, 182:24, 182:25, 183:22,

184:3, 184:4, 184:6,
184:7, 184:9,
184:10, 184:12,
184:14, 184:16,
184:17, 184:21,
184:22, 185:3,
185:5, 185:8, 185:9,
185:12, 185:14,
185:15, 185:17,
185:18, 185:19,
185:23, 185:24,
186:1, 186:2, 186:4,
186:5, 186:9,
186:11, 186:15,
186:16, 186:19,
186:21
**theatrical** [1] - 134:12
**themselves** [3] -
50:16, 113:11,
156:15
**Theodore** [2] - 140:12,
140:13
**theorem** [1] - 97:12
**theory** [1] - 114:4
**therefore** [1] - 160:23
**thereof** [1] - 148:9
**they've** [10] - 4:4,
13:6, 14:14, 32:7,
70:6, 82:20, 154:10,
164:10, 169:15,
173:7
**thinking** [3] - 7:15,
99:21, 145:9
**thinks** [6] - 122:16,
146:5, 168:17,
172:1, 172:25,
186:17
**third** [2] - 54:3, 60:9
**thorough** [1] - 106:17
**thousand** [5] - 73:11,
156:19, 161:1,
161:2, 162:24
**thousands** [9] - 62:12,
65:25, 89:13, 98:21,
127:2, 127:3, 153:5,
157:17, 167:17
**three** [13] - 13:14,
81:12, 92:22, 94:7,
137:1, 137:14,
140:19, 156:5,
161:3, 175:18,
177:6, 179:8
**threshold** [1] - 77:8
**throughout** [2] -
62:18, 73:11
**throw** [2] - 95:3, 99:25
**throwing** [1] - 86:6
**thumb** [1] - 26:18
**tied** [3] - 38:18,
104:23, 173:11

**timeline** [1] - 184:12
**timing** [1] - 20:25
**title** [1] - 115:6
**today** [10] - 21:12,
36:22, 55:16,
100:15, 149:12,
149:13, 150:5,
150:7, 174:25, 187:1
**together** [5] - 75:10,
108:16, 115:17,
185:23, 185:25
**tomorrow** [17] - 3:10,
21:3, 21:6, 52:23,
76:7, 179:24,
179:25, 180:2,
180:3, 180:6, 180:8,
180:13, 180:16,
180:20, 181:18,
182:5, 186:24
**took** [5] - 19:8, 29:21,
102:22, 105:9, 119:4
**tool** [7] - 42:23, 49:4,
49:12, 58:2, 61:13,
74:10, 106:16
**tool-mark** [1] - 61:13
**tools** [4] - 42:11,
54:18, 102:19,
102:21
**top** [5] - 18:11, 30:13,
41:5, 42:2, 84:8
**topic** [5] - 4:6, 102:22,
137:10, 176:7,
177:16
**topics** [1] - 56:19
**TOR** [1] - 1:18
**Tor** [22] - 1:19, 2:15,
6:23, 7:17, 7:20,
7:22, 7:24, 8:1, 8:6,
8:9, 8:18, 9:7, 9:9,
9:10, 122:6, 155:17,
156:24, 157:21,
170:19, 171:2,
178:11
**total** [1] - 104:18
**touch** [1] - 16:21
**touched** [1] - 178:2
**touches** [1] - 159:17
**tough** [1] - 76:21
**touts** [1] - 175:4
**towards** [4] - 18:5,
20:11, 162:11,
173:25
**town** [1] - 21:4
**trace** [7] - 81:23,
81:24, 84:20, 96:19,
102:9, 113:1
**traceable** [1] - 96:23
**traced** [1] - 39:2
**traces** [2] - 62:20, 87:4
**tracing** [26] - 12:11,

38:24, 39:5, 43:5,
43:22, 46:11, 46:20,
51:19, 51:21, 56:11,
57:1, 57:24, 58:15,
68:4, 70:20, 72:11,
74:20, 79:21, 84:5,
89:5, 92:16, 96:18,
104:24, 146:8,
169:23
**traditional** [2] - 38:23,
68:3
**trained** [1] - 160:3
**training** [2] - 56:17,
175:5
**trainings** [5] - 56:19,
75:18, 175:4, 175:10
**trains** [2] - 148:23,
148:24
**transaction** [21] -
26:4, 30:20, 36:1,
39:6, 39:20, 46:12,
48:15, 60:23, 65:7,
65:8, 65:12, 68:23,
98:18, 108:12,
111:9, 112:12,
112:24, 115:18,
168:12, 168:23,
169:18
**transactional** [1] -
57:11
**transactions** [44] -
24:22, 25:2, 30:20,
33:19, 34:16, 39:2,
39:4, 42:10, 43:20,
44:5, 44:19, 44:20,
45:12, 45:15, 46:23,
47:1, 47:4, 47:23,
49:14, 50:12, 50:14,
51:5, 51:13, 51:23,
57:25, 60:18, 68:4,
68:11, 68:14, 68:21,
69:9, 70:3, 70:5,
70:18, 70:19, 95:6,
98:21, 108:2, 112:8,
112:12, 115:11,
157:17, 168:12,
168:24
**transcript** [15] - 56:9,
71:3, 72:24, 123:17,
124:4, 124:7, 124:9,
124:13, 125:17,
125:24, 170:18,
171:6, 171:11,
188:4, 188:6
**TRANSCRIPT** [1] - 1:7
**transcripts** [1] - 72:9
**transfer** [6] - 47:7,
49:23, 62:21, 65:9,
183:20, 183:21
**transferred** [3] -

14:12, 23:1, 23:4
**transfers** [6] - 23:18,
25:9, 45:12, 50:6,
50:16, 105:10
**translate** [1] - 118:9
**translating** [1] - 17:6
**translation** [8] - 16:21,
17:18, 17:19, 17:21,
18:1, 18:14, 20:13,
20:18
**translations** [10] -
14:1, 18:7, 18:8,
18:9, 18:10, 19:1,
19:2, 19:6, 20:5,
20:10
**translator** [2] - 19:18,
41:1
**translators** [3] - 17:5,
18:23, 19:13
**transmission** [2] -
32:6, 104:20
**transmitted** [3] - 23:5,
32:9, 183:4
**transmitting** [6] -
129:24, 130:5,
130:14, 130:15,
132:9, 183:11
**traveling** [2] - 158:25,
159:3
**Treasury** [1] - 3:6
**treat** [1] - 134:4
**treated** [1] - 95:6
**tremendous** [1] -
143:2
**triage** [1] - 167:20
**trial** [30] - 5:8, 6:10,
16:8, 19:9, 20:11,
23:8, 26:2, 33:13,
37:1, 37:10, 37:17,
37:18, 59:3, 59:5,
60:8, 69:23, 70:22,
72:21, 85:8, 93:2,
106:1, 106:5, 106:9,
109:4, 111:14,
111:15, 116:6,
139:11, 158:23,
180:15
**trials** [2] - 97:1, 132:2
**tried** [4] - 33:14,
133:5, 139:11,
167:23
**trier** [1] - 53:22
**trigger** [1] - 5:4
**trillion** [1] - 98:11
**TRM** [8] - 12:11,
48:25, 49:10, 49:12,
74:10, 74:14, 74:20,
75:19
**trouble** [1] - 12:25
**true** [8] - 25:6, 28:10,

38:16, 47:7, 101:9,
165:17, 188:4, 188:5
**trust** [5] - 79:5, 82:16,
85:14, 89:21, 89:23
**trustee** [15] - 23:1,
23:10, 26:10, 26:12,
28:4, 28:5, 29:15,
29:16, 29:18, 29:21,
29:22, 30:3, 31:20,
32:7, 32:8
**trustee's** [1] - 23:12
**trustworthy** [1] -
23:21
**truth** [3] - 102:23,
103:3, 103:21
**try** [6] - 17:15, 63:9,
97:15, 108:8,
115:14, 180:16
**trying** [25] - 7:9, 7:19,
18:17, 48:22, 61:18,
91:13, 91:14, 91:15,
97:9, 101:24,
102:10, 110:24,
111:6, 116:19,
117:1, 124:6, 145:6,
147:7, 158:2,
163:14, 167:24,
173:24, 174:1,
176:22, 182:24
**Tuesday** [1] - 180:14
**tune** [1] - 74:4
**turn** [6] - 22:16, 77:11,
121:16, 128:10,
134:3, 183:23
**turned** [2] - 66:25,
119:25
**turns** [3] - 41:24,
98:22, 166:11
**twice** [1] - 79:1
**two** [23] - 5:23, 6:3,
13:13, 19:22, 30:15,
65:18, 97:15, 102:7,
102:14, 109:11,
109:22, 131:18,
137:23, 140:19,
160:1, 164:3,
168:16, 180:4,
183:5, 183:8,
183:13, 183:17
**type** [11] - 41:4, 67:3,
79:21, 86:16,
118:22, 122:17,
137:7, 163:4,
165:10, 169:5,
173:22
**types** [2] - 39:21,
156:12
**typically** [1] - 132:3
**typo** [2] - 5:11, 49:15

## U

**U.S** [11] - 1:13, 5:10, 13:13, 13:22, 15:12, 15:13, 24:2, 32:10, 88:21, 98:6, 109:13
**u.S** [1] - 1:16
**U.S.C** [3] - 24:6, 183:10, 183:11
**UDP** [1] - 145:7
**ultimate** [12] - 66:2, 132:11, 132:15, 144:11, 144:17, 145:1, 145:13, 149:4, 161:24, 165:3, 165:13, 178:23
**ultimately** [3] - 17:16, 23:21, 71:8
**unable** [1] - 113:22
**unavailable** [1] - 182:17
**unaware** [1] - 61:7
**uncertainty** [2] - 96:20, 160:24
**under** [21] - 3:5, 23:14, 23:15, 28:13, 32:16, 32:17, 33:1, 36:2, 37:13, 43:22, 54:5, 54:15, 81:18, 86:10, 91:11, 119:15, 130:21, 158:1, 174:20
**undercover** [12] - 42:10, 44:19, 44:20, 68:11, 68:14, 68:15, 68:21, 68:23, 70:3, 70:5, 70:18, 70:19
**underinclusive** [3] - 69:2, 75:5, 86:2
**underlie** [1] - 57:6
**underlying** [6] - 23:11, 54:18, 85:5, 118:17, 168:22, 177:22
**understandable** [1] - 182:3
**understood** [16] - 16:5, 16:13, 16:17, 28:2, 77:20, 107:5, 143:13, 154:23, 155:2, 155:13, 157:18, 163:5, 165:15, 166:20, 177:9, 186:9
**undisputed** [1] - 134:5
**unfortunately** [1] - 33:25
**unique** [6] - 49:15, 52:9, 123:11, 123:13, 123:14

**UNITED** [3] - 1:1, 1:2, 1:8
**United** [13] - 1:23, 2:3, 2:7, 2:12, 17:11, 28:11, 28:13, 28:14, 53:17, 57:20, 59:21, 84:17, 97:23
**universe** [2] - 18:13, 18:18
**unless** [9] - 64:12, 75:14, 107:9, 114:24, 118:3, 151:15, 161:7, 173:15, 177:2
**unlicensed** [1] - 183:10
**unnecessary** [1] - 134:12
**unquote** [4] - 80:22, 82:2, 83:3, 144:8
**unreliable** [1] - 79:22, 148:13, 153:12
**unsealed** [1] - 168:15
**unsound** [10] - 152:24, 153:25, 154:5, 154:6, 159:18, 159:23, 160:12, 161:7, 162:15
**unverifiable** [2] - 80:5, 80:6
**up** [92] - 3:25, 4:2, 4:5, 4:15, 5:8, 6:9, 6:14, 7:11, 7:20, 8:1, 9:15, 16:20, 19:5, 22:15, 23:17, 24:22, 25:13, 26:4, 26:8, 30:21, 31:4, 36:25, 47:1, 54:10, 55:6, 60:1, 60:2, 63:9, 63:10, 65:20, 66:25, 71:3, 71:12, 72:14, 74:3, 74:23, 81:1, 84:25, 86:6, 87:22, 88:20, 91:14, 99:25, 100:8, 100:21, 101:2, 102:1, 102:14, 104:9, 104:17, 105:2, 105:25, 107:10, 110:11, 111:15, 114:12, 119:23, 121:10, 122:15, 125:6, 126:3, 126:5, 126:13, 126:14, 127:9, 133:15, 137:17, 138:13, 138:16, 138:24, 141:4, 141:14, 143:12, 145:23,

159:25, 161:11, 164:18, 165:25, 166:7, 167:1, 168:7, 169:24, 170:15, 173:9, 173:11, 176:3, 177:3, 179:9, 180:13, 180:16, 183:16, 183:23
**update** [3] - 12:14, 12:18, 110:2
**updates** [1] - 12:10
**uploaded** [1] - 49:3
**uploading** [1] - 66:14
**uploads** [1] - 48:20
**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**useful** [2] - 38:3, 106:22
**user** [5] - 45:16, 67:2, 124:19, 125:5, 145:10
**user's** [1] - 33:18
**users** [10] - 62:11, 62:12, 62:13, 63:5, 66:21, 69:23, 70:16, 116:25, 144:4, 152:24
**uses** [6] - 79:21, 92:25, 93:1, 113:7, 133:19, 164:10
**usual** [1] - 134:5
**utilizes** [1] - 80:11

## V

**vagaries** [1] - 118:8
**validate** [2] - 61:8, 73:2
**validated** [2] - 60:25, 70:11
**validating** [1] - 79:25
**validation** [9] - 63:1, 68:10, 69:4, 69:6, 71:15, 73:17, 74:15, 79:17, 85:13
**validity** [2] - 83:2, 94:8
**valuations** [2] - 88:12, 88:19
**value** [3] - 88:12, 88:18, 104:19
**variables** [1] - 61:25
**variation** [1] - 153:18
**variety** [2] - 43:7, 127:18
**various** [10] - 2:23, 45:23, 47:15, 56:11, 59:3, 59:4, 61:25, 66:2, 66:21, 108:18
**vast** [1] - 72:13
**vein** [1] - 51:20

**vendor** [4] - 70:1, 70:23, 71:7, 71:13
**vendor's** [2] - 71:2, 71:6
**vendors** [2] - 59:4, 70:22
**vendors'** [1] - 71:11
**venue** [4] - 37:2, 37:4, 37:8, 37:11
**verdict** [1] - 130:19
**verifiable** [2] - 80:5, 95:25
**verification** [6] - 62:17, 69:4, 69:5, 71:16, 74:9, 74:15
**verified** [2] - 70:6, 152:15
**verifies** [1] - 42:9
**verify** [9] - 44:21, 45:25, 49:5, 61:8, 62:5, 69:19, 82:9, 82:16, 83:1
**verifying** [4] - 48:4, 69:8, 73:16
**Verret** [2] - 86:22, 141:12
**versa** [1] - 109:20
**version** [4] - 23:4, 38:23, 101:24, 135:16
**versions** [1] - 92:22
**versus** [21] - 19:19, 19:25, 20:15, 23:22, 34:15, 38:14, 43:18, 64:14, 96:24, 139:6, 144:13, 150:22, 156:7, 156:18, 159:25, 161:11, 168:11, 173:24, 174:12, 177:22
**vetting** [1] - 69:4
**via** [3] - 15:22, 16:8, 180:22
**vice** [2] - 8:24, 109:20
**video** [3] - 13:5, 13:8, 178:2
**Video** [3] - 45:13, 65:6, 69:24
**view** [2] - 170:9, 171:16
**viewable** [2] - 47:20, 48:15
**viewed** [1] - 44:20
**viewing** [1] - 50:25
**viewpoint** [1] - 79:7
**views** [2] - 9:25, 165:22
**violates** [1] - 91:8
**violation** [3] - 13:3, 183:9, 183:11

**Virginia** [2] - 27:2, 71:2
**virtual** [9] - 22:23, 56:14, 56:16, 62:20, 62:22, 62:23, 62:25, 107:25, 108:1
**Virtual** [1] - 56:12
**virtually** [8] - 28:11, 28:12, 28:14, 168:9, 181:10, 181:18, 182:9, 186:22
**virtue** [1] - 185:15
**visit** [1] - 13:2
**visual** [1] - 49:3
**vitae** [1] - 56:8
**Vlahakis** [9] - 128:13, 129:8, 129:22, 130:11, 131:12, 132:1, 132:7, 140:12, 140:13
**Vlahakis's** [1] - 131:4
**voir** [10] - 3:1, 3:12, 3:14, 4:3, 6:21, 11:25, 157:10, 158:7, 158:9, 158:12
**volume** [1] - 21:13
**volumes** [1] - 71:9
**voluminous** [3] - 57:6, 108:23, 109:14
**VPN** [10] - 121:3, 145:7, 160:22, 161:2, 162:14, 162:18, 162:23, 162:25, 163:1
**VPNs** [5] - 122:7, 162:8, 162:17, 170:2, 173:2
**vs** [1] - 1:4

## W

**wade** [1] - 12:12
**wait** [1] - 76:8
**waiting** [1] - 3:3
**waive** [1] - 181:3
**waiver** [1] - 186:23
**walk** [5] - 24:21, 53:15, 55:1, 56:3, 143:18
**wall** [1] - 78:25
**Wall** [1] - 1:20
**wallet** [15] - 46:13, 46:16, 46:18, 46:19, 46:21, 50:25, 51:2, 60:24, 61:2, 72:15, 74:24, 75:2, 108:1, 169:6, 173:19
**Wallet** [1] - 50:5
**wallets** [5] - 39:21, 41:14, 41:15, 168:19

**wants** [6] - 11:21, 55:19, 137:13, 172:18, 176:23, 178:11
**warrants** [4] - 58:18, 66:24, 72:12, 91:1
**Warsaw** [1] - 13:18
**Washington** [6] - 1:5, 1:12, 1:14, 1:17, 1:24, 188:11
**watch** [1] - 16:8
**ways** [3] - 44:24, 92:4, 105:6
**web** [8] - 10:2, 10:12, 10:15, 10:21, 10:25, 11:8, 11:10, 11:19
**website** [5] - 156:16, 156:18, 156:20, 164:22
**websites** [7] - 156:11, 156:14, 156:15, 164:18, 164:24, 176:3, 178:15
**week** [3] - 22:2, 52:24, 180:17
**weekend** [6] - 12:14, 13:2, 15:3, 15:10, 22:2, 22:3
**weeks** [2] - 44:14, 183:5
**weight** [1] - 23:22
**welcome** [5] - 4:6, 77:22, 111:16, 135:22, 183:22
**Welcome** [3] - 45:13, 65:6, 69:24
**well-developed** [2] - 96:5, 97:19
**whatsoever** [2] - 81:21, 151:5
**whereas** [3] - 105:15, 113:19, 120:20
**wherein** [1] - 98:24
**whichever** [2] - 40:8, 183:24
**whole** [4] - 4:23, 106:5, 131:24, 168:3
**window** [1] - 172:25
**windows** [3] - 125:22, 126:4, 126:5
**withdrawal** [1] - 105:13
**withdrawals** [3] - 25:13, 25:18, 49:19
**withdrawing** [1] - 70:23
**withdrawn** [2] - 141:19, 179:15
**witness** [37] - 4:13, 4:22, 5:1, 5:7, 12:15,

39:9, 41:12, 54:25, 75:14, 75:17, 93:4, 93:15, 107:7, 113:10, 115:21, 116:7, 116:9, 116:16, 116:19, 116:22, 116:23, 119:4, 119:12, 120:8, 120:15, 129:19, 131:10, 135:17, 144:3, 147:16, 151:14, 157:10, 175:9, 175:13, 177:6
**witness's** [2] - 93:5, 94:2
**witnesses** [17] - 6:9, 6:11, 12:5, 15:19, 16:18, 17:19, 18:3, 22:8, 101:4, 116:2, 116:21, 116:24, 128:6, 138:4, 140:16, 144:3, 157:3
**wonder** [1] - 7:9
**wondering** [1] - 15:21
**word** [9] - 7:6, 7:17, 19:24, 118:10, 118:25, 127:19, 151:19, 161:16, 164:5
**words** [6] - 5:23, 18:1, 19:24, 100:23, 122:25, 133:19
**works** [16] - 13:12, 40:1, 40:12, 54:20, 89:20, 113:12, 165:1, 165:6, 170:19, 170:20, 171:2, 175:7, 175:14, 176:18, 178:11, 179:13
**world** [7] - 57:21, 62:7, 62:10, 62:13, 63:4, 68:22, 159:4
**worth** [2] - 33:4, 50:1
**wrestling** [1] - 19:14
**write** [1] - 157:14
**writing** [2] - 36:23, 99:12
**written** [4] - 118:16, 118:22, 123:24, 176:9
**wrongful** [1] - 97:22
**wrote** [4] - 67:17, 86:21, 105:25, 125:10
**www.bitcoinfog.com** [1] - 164:13

**Y**

**year** [3] - 34:11, 119:9, 183:17
**Year's** [1] - 34:23
**years** [9] - 28:17, 133:5, 135:18, 148:22, 150:12, 156:22, 160:10, 183:14, 183:18
**York** [3] - 1:17, 1:20, 168:15
**you-all** [2] - 77:2, 131:17
**young** [1] - 8:23
**yourself** [2] - 79:11, 183:24
**YouTube** [1] - 178:2

**Z**

**zero** [2] - 83:23, 99:17
**Zoom** [3] - 15:22, 16:8, 180:22