```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
       UNITED STATES OF AMERICA,       ) Criminal Action
 3                                      ) No. 1:21-CR-0399
                          Plaintiff,    )
 4                                      ) PRETRIAL CONFERENCE
       vs.                              )
 5                                      ) Washington, D.C.
       ROMAN STERLINGOV,                )
 6                                      ) September 13, 2023
                          Defendant.    ) Time:  9:30 A.M.
 7

 8            TRANSCRIPT OF PRETRIAL CONFERENCE
         BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
 9                UNITED STATES DISTRICT JUDGE

10
                       A P P E A R A N C E S
11

12     For the Plaintiff:      CHRISTOPHER BROWN
                                USAO-DOJ
13                              601 D Street, NW
                                Washington, DC 20001
14
                                ALDEN PELKER
15                              U.S. DEPARTMENT OF JUSTICE
                                950 Pennsylvania Avenue, NW
16                              Washington, DC 20530

17                              JEFFREY PEARLMAN
                                DOJ-CRM
18                              U.S. Department of Justice
                                1301 New York Ave. NW
19                              Washington, DC 20005

20     For the Defendant:      TOR EKELAND
                                MICHAEL HASSARD
21                              TAUSEEF AHMED
                                Tor Ekeland Law, PLLC
22                              30 Wall Street, 8th Floor
                                New York, NY 10005
23

24

25
```

```
1              A P P E A R A N C E S (Cont'd.)

2

    For Chainalysis:        WILLIAM FRENTZEN
3                           MORRISON & FOERSTER, LLP
                            425 Market Street
4                           San Francisco, CA 94105

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   Court Reporter:        Tamara M. Sefranek, RMR, CRR, CRC
                            Official Court Reporter
22                          United States Courthouse, Room 6714
                            333 Constitution Avenue, NW
23                          Washington, DC  20001
                            202-354-3246
24

25
```

```
 1                    P R O C E E D I N G S
 2          THE COURTROOM DEPUTY:  Calling Criminal Case 21-399,
 3   United States of America v. Roman Sterlingov.
 4          Would counsel please approach the podium and state
 5   their names for the record, starting with government counsel.
 6          MS. PELKER:  Good morning, Your Honor.  Alden Pelker,
 7   Chris Brown, and Jeff Pearlman for the United States.
 8          THE COURT:  All right.  Good morning to all of you.
 9          MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland,
10   Michael Hassard, and Tauseef Ahmed -- who will be submitting
11   his pro hac vice application to the Court shortly -- for
12   Defendant Roman Sterlingov, who is present in court.
13          THE COURT:  Okay.  Thank you.  Good morning to all of
14   you as well.
15          Does counsel for Chainalysis want to enter your
16   appearance as well?
17          MR. FRENTZEN:  Sure.  Of course, Your Honor.  I
18   apologize.  William Frentzen of Morrison Foerster for
19   Chainalysis.
20          THE COURT:  Good morning to you.  Thank you.
21          All right.  So we're going to have a further pretrial
22   hearing on Friday, in which we can take up a number of the open
23   issues, but there are several that are just more pressing that
24   I wanted to get to today.  I appreciate everyone making time
25   for this in the midst of your trial preparation or, in
```

 1      Mr. Frentzen's case, I assume flying across the country.

 2              Ms. Pelker, any update on the Mt. Gox records and the

 3      authentication?

 4              MS. PELKER:  Yes, Your Honor.  I have -- I apologize

 5      for passing to defense now -- an update on the documents that

 6      the Court had requested as far as the transmission letter back

 7      from the Japanese government, paired with our initial request.

 8      They're still working on seeing whether they can obtain an

 9      actual signed business record certification from the trustee.

10              My understanding is that the Japanese government has

11      been in touch with him.  There is a process in Japan that they

12      have to go through; they're undertaking it now.  We've

13      emphasized the urgency and hope to have an update on Friday.

14              THE COURT:  Okay.

15              MS. PELKER:  But that the government, again, would

16      submit that we've provided sufficient additional information

17      through our supplemental briefings to properly authenticate the

18      records.

19              THE COURT:  All right.  Thank you for getting what

20      you've gotten.  If you can just keep us updated as things

21      progress.  Feel free to share with the Japanese government that

22      the Court does thank them, but also does see some urgency given

23      the approaching trial date.

24              MS. PELKER:  Yes, Your Honor.

25              THE COURT:  All right.  Thank you.  And then -- I'm

1      just thinking about the best order to take things up here.

2      Maybe the next thing to take up is just the protective order

3      with respect to the material that Chainalysis has at this point

4      produced to the government.

5              Quite frankly, it's a little bit hard for us to have

6      the conversation about Rule 17(c) and the subpoena where I take

7      it at this point in time Mr. Ekeland hasn't even reviewed the

8      materials because he declined to agree to the proposed

9      protective order and also declined, as I understand it, even to

10     agree to an interim protective order that would allow

11     disclosure to him and his colleagues at the law firm.

12             So I guess I'd like to address that to make sure that

13     Mr. Ekeland can actually see what is there because I think it

14     does provide some important context for the Rule 17(c) motion.

15             MS. PELKER:  Yes, Your Honor.  The government agrees.

16     We had a call with Chainalysis counsel and Mr. Ekeland and

17     Mr. Hassard yesterday.  We are continuing to urge them to

18     consider just agreeing to an interim protective order while

19     they work through their ongoing discussions.

20             They expressed a concern yesterday that the

21     noncompete could be viewed as applying to counsel.

22     Mr. Frentzen followed up to clarify and provide an updated

23     version of the protective order that I believe he filed with

24     the Court last night that we think would make very clear that

25     there is no restriction on counsel taking another blockchain

1    analysis client on in the future or another case regarding

2    blockchain analysis.

3         I think that the proposed protective order, Your

4    Honor, all it does is restrict Ms. Still from taking what she's

5    getting in the discovery and using it for CipherTrace's

6    commercial purposes.

7         The government would view that as improper under the

8    existing protective order, and so I don't see this as that much

9    more restrictive.  And that the small additional terms here are

10    to provide Chainalysis assurances about how that information is

11    going to be handled on -- not on CipherTrace's systems.  But we

12    did not view this as a controversial step.

13         THE COURT:  Okay.  Well, let me hear from Mr. Ekeland

14    on this, then.

15         So, Mr. Ekeland, what can I do to get this in your

16    hands as quickly as possible?

17         MR. EKELAND:  To the extent that -- we think that the

18    current protective order, in terms of defense counsel, is

19    adequate.  And the issue that I had when I was -- first saw the

20    protective order that we were being asked to sign to view the

21    heuristics -- which I didn't expect that we were going to be

22    asked to sign -- it had a five-year noncompete clause in it,

23    and there was a bunch of vague language that I wouldn't counsel

24    any of my clients ever to sign.  It wasn't clear to me the

25    scope of it.

1           I hesitate -- I think there's a fundamental problem

2    here in that competitive concerns are being brought in in a

3    federal criminal trial to -- and limiting our ability to choose

4    experts and how the experts do their analysis, and we are being

5    prevented or being limited in our use of particular kinds of

6    experts, like we had Laurent Salah.  I understand the Court's

7    concerns expressed about enforcing a contempt order.

8           We're hearing objections to Bryan Bishop.  These are

9    top people in the field.

10          THE COURT:  Mr. Ekeland, I apologize for

11   interrupting.  You have a little bit of a habit of, when I ask

12   a question on one thing, just going off and talking about

13   something else.  In the interest of really getting to the heart

14   of the matter, as we're getting closer to trial, my question is

15   just what do you need in the protective order both with respect

16   to Ms. Still's ability to review the material and your

17   ability -- because I want this to happen in the next 45

18   minutes.  I want you looking at this, and we need to know what

19   it is.

20          If there's something in there that Ms. Still can't

21   live with -- first of all, you're not Ms. Still's lawyer.  I

22   want to know what Ms. Still -- not what you would advise your

23   clients, but what she says she can and can't live with.  If she

24   says, I can't live with this, I can't do it, I need to know

25   that.  I need to know specifically what it is, and we can, if

1    necessary, revise the protective order to address those

2    concerns.

3         MR. EKELAND:  Your Honor, she ran it by her, I

4    believe, superiors at CipherTrace.  They told her not to sign

5    it.  She told me last night that she needs to run the heuristic

6    through CipherTrace's software, that they don't have an

7    interest in what they believe Chainalysis's concern is, which

8    is their database, which I think is the most valuable thing.

9         The limitations -- what was told to me is that the

10   limitations on how we can review the data won't work for them

11   because they need to take the data and use CipherTrace's

12   systems to evaluate the stuff.  I think that gets at what I was

13   getting at before; these competitive limitations here are

14   affecting the defense's ability to actually evaluate the data

15   because we're being told that -- by our adversaries that --

16   essentially, our adversaries are telling us how we can review

17   the data.  And that's very problematic.

18        We need to be able to take the data and the

19   heuristics and run them through CipherTrace's systems, Your

20   Honor.

21        THE COURT:  So it's a little hard for me to know how

22   you or Ms. Still know that because you haven't seen the data

23   yet.  So you actually don't know what it is and whether it's

24   something they can run through their system or whether you need

25   to run it through your system because you haven't seen it yet.

1          So can we at least figure out something so that you

2      and Ms. Still can at least look at it and tell us -- and I may

3      need to get Ms. Still on the line and under oath to tell me

4      what she can and can't do under the circumstances -- and that

5      would be fine -- to pin this down.

6          We're picking a jury tomorrow, and time is running

7      out.  As I've said before, I think that this is -- the defense

8      is largely to blame for this for not following my directions in

9      a timely manner about how to proceed here, but I'm giving you

10     every break I possibly can.

11         But you have to not be doing everything you can

12     possibly to get to a no answer.  You have to be looking at how

13     to get to the yes answer and find ways to actually make this

14     work rather than -- quite frankly, it feels at times that

15     you're more concerned with just having an appellate issue than

16     actually getting what you need in the case.

17         Every time I try and accommodate you in some way, you

18     don't accept that; and you don't accept the Court's invitations

19     to do things that will actually get you what you need.  So all

20     I'm trying to do right now is get you what you need.

21         Tell me what you need at least for you and Ms. Still

22     to be able to look at what Chainalysis has provided so you then

23     can figure out if there's any analysis that needs to be run.

24     We can talk about whether that can be done in some way, some

25     segregated portion of a computer system or someone can verify

1      it's erased afterwards or something along those lines.  I need

2      to figure out how to get to yes rather than how to get to no

3      here.

4            MR. EKELAND:  Understood, Your Honor.  I think this

5      is why some jurisdictions only allow open-source public

6      blockchain explorers and --

7            THE COURT:  We've talked about this for months now.

8      You have yet to show me a case where a court has said we only

9      allow open source in this jurisdiction.

10           MR. EKELAND:  I'm not saying this jurisdiction, but I

11     believe Ms. Still talked about international jurisdictions.  It

12     may have been Spain, it might have been Canada.  Regardless,

13     Your Honor, I mean, the government voluntarily used a

14     private --

15           THE COURT:  No, no, no.  We're going off on a tangent

16     again.  What is it you need so you can look at this and

17     Ms. Still can look at it?

18           MR. EKELAND:  Perhaps we can craft a protective order

19     that's just temporary that doesn't have these stringent

20     noncompete provisions in them, like the five-year noncompete

21     like there was, that allows us --

22           THE COURT:  I don't think the current version that

23     Chainalysis has proposed includes the five-year noncompete.  It

24     says that she cannot use this information for any purposes

25     other than this case.

1              MR. EKELAND:  I believe it has vague language like

2      you can't use your thoughts and impressions based on the

3      information.

4              THE COURT:  That seems reasonable to me.  If you

5      learn something from this information that could cause

6      competitive damage to Chainalysis, she ought not be able to use

7      that one way or the other.

8              MR. EKELAND:  Well, I think that gets at the core of

9      the issue.  I think the concern from their side -- and maybe we

10     need to get her in to speak -- is that -- if I'm looking at

11     that for a client and that's getting submitted to them

12     transactionally, I would instantly flag the vagueness of that

13     language in the sense that that's a potential trigger for

14     future litigation.  And that's all from these competitive

15     concerns.

16             And I'm not trying to flag an appellate issue here

17     inasmuch as I'm trying to avoid future liability.  And also,

18     just to be able to get the experts to agree to look at this and

19     if there's some way that we can address that -- you know, the

20     anti-competitive language and the risk of future litigation

21     from an adversary that allows us to look at it, evaluate it,

22     whether -- and then determine how we need to proceed based on

23     what we can see.

24             Because I think there's a little bit of a catch-22

25     here; like we can't tell you exactly what we need to do without

1    looking at it, but, like, we can't say that we're not -- we

2    don't need to use this stuff and --

3              THE COURT:  So let me do this then.  I am entering

4    hereby on the record right now an order saying that you can

5    review this and your colleagues from your law firm can review

6    it as well.  I order that you not disclose it to anybody else

7    without any -- without prior authorization from the Court; that

8    you not use it for any purpose other than this litigation

9    without prior authorization from the Court.

10              And that you -- for present purposes, you can just

11    review it right here in the courtroom.  I've got the thumb

12    drive I can give you, and you can just put it on a thumb drive

13    right here and look at it.  At least we can have a more

14    informed conversation once you've looked at it.

15              So on pain of contempt, I'm ordering that you can

16    look at it, that your colleagues from your law firm can look at

17    it; that they may not disclose it or discuss it, the contents

18    of it with anybody else, absent further order of the Court.

19    But we can at least have a little bit more informed discussion

20    after you do that.  Does that make sense?

21              MR. EKELAND:  Yes, it does.  I just want to get clear

22    because the one concern I have -- and I understand why the

23    Court is making this -- is that we can't discuss it at all,

24    even in general terms, with any of our experts or anything like

25    that?

1          THE COURT:  Let's just take it one step at a time.  I

2     think -- my goal is to get to the point which you can do that.

3     I just need to do it one step at a time to get there.  You're

4     telling me that it's not useful to you unless your experts can

5     run it through a computer, but you don't even know what the

6     "it" is yet.

7          MR. EKELAND:  Your Honor, so we can be clear, what

8     we're talking about -- because I was initially surprised about

9     the protective order issue with the heuristics, that the

10    information -- we're just talking about the heuristics and

11    we're not -- this is a separate issue from the source code

12    production and -- for Mr. Bishop; is that right?

13         THE COURT:  I can't get to the source code issue

14    until we can have a discussion with respect to whether what

15    you've been provided sufficiently addresses the concerns that

16    you've raised.  If you don't know what you've been provided,

17    you don't know whether it sufficiently addresses the concerns

18    you've raised to date.

19         MR. EKELAND:  Of course, we're going to honor the

20    order of the Court, and we will go look at this as soon as

21    possible today and tell you --

22         THE COURT:  I'm going to break and I'm going to hand

23    the drive to counsel, who can share it with you, and you can

24    privately sit here in the courtroom and go through it.

25         MR. EKELAND:  We'll do our best to the extent that

1    we're able to determine anything from it based on our review.

2    We'll do our best.

3              THE COURT:  Let me ask, Mr. Frentzen.  Anything that

4    I should add to my oral order to ensure that the interests of

5    your client are adequately protected at this point just as a

6    preliminary step?

7              MR. FRENTZEN:  No, Your Honor.  I appreciate that.

8    My only, I guess, specification would be colleagues from the

9    law firm means the lawyers right here rather than any -- I

10   don't know who else is associated with his law firm, et cetera,

11   et cetera.

12             THE COURT:  That is what I meant.

13             MR. FRENTZEN:  Thank you, Your Honor.

14             THE COURT:  All right.  Thank you.  So I'm going to

15   provide my copy of the thumb drive.  I have to exit out of

16   here.  I've brought multiple computers today to address these

17   issues.

18             I will hand it to my clerk, who can provide it to

19   you.  I assume that you have a computer with you, and you can

20   take a look at it here.  Okay?  Here's the pass code as well.

21   I will give you some time to look at it, and I'll come back out

22   and we'll figure out the next steps.  We'll do this one step at

23   a time.

24             (Recess taken.)

25             THE COURT:  All right.  Any developments in light of

 1    the fact that, Mr. Ekeland, you've now had a chance to look at

 2    what was provided?

 3            MR. EKELAND:  Your Honor, this is a difficult issue.

 4    I spoke with Mr. Frentzen.

 5            THE COURT:  Yes.

 6            MR. EKELAND:  And the defense -- and, obviously, I

 7    can't speak for Ms. Still without speaking to her.  We're

 8    reviewing what we were shown.  It looks like to us, like,

 9    essentially, more expert reports.  It's hard to tell what's

10    proprietary, what's not in it.  We would --

11            THE COURT:  I'm sorry.  You were speaking fast.  I

12    missed what you said.

13            MR. EKELAND:  I'm sorry.  It's a little difficult to

14    tell what is proprietary in it, what would constitute a trade

15    secret in it.  But putting that aside for the moment, if we

16    could -- we would agree to asking Ms. Still to review it

17    without discussing it or disclosing it or using any of

18    CipherTrace's -- running the data through CipherTrace's systems

19    beyond taking, like, a wallet address to confirm it, like,

20    independently.

21            THE COURT:  Right.

22            MR. EKELAND:  Have her then come to us and say, well,

23    I think I need to use a team to review this or we need to take

24    these steps.

25            So I think if I -- Mr. Frentzen can speak for

1    himself.  I think Chainalysis and the defense are in agreement

2    on that.

3          What there is -- I honestly don't have an answer to

4    this next point that I'm raising.  The concern with, for lack

5    of a better phrase, the noncompete language, the competitive

6    language, we understand there are concerns, but generally, in

7    my experience with these kinds of clauses in business law and

8    transactional law, the law tends to disfavor them and put a

9    time limit on them.

10          It's not -- we're not saying, oh, Ms. Still or

11   somebody is going to go out and intentionally use this for

12   competitive advantage.  What the concern is -- and it's always

13   the concern with these kinds of clauses -- is that something

14   happens, and there's unintentional litigation, and that's

15   really the main concern.

16          It's not -- because we're not -- we're here to

17   attempt to get Mr. Sterlingov an acquittal, not to compete with

18   Chainalysis.  And so if there's some way of addressing that,

19   even just like putting a time limit on it, like I know New York

20   State disfavors ones over a year.  But, honestly, we're open to

21   whatever the Court says.

22          THE COURT:  Although, I think what you're talking

23   about with the law disfavoring noncompetes, what you're talking

24   about is there's law that says if you work for a particular

25   company and the company says, if you want to leave the company,

1    you can't go work for one of our competitors -- and I know New

2    York disfavors and a lot of jurisdictions disfavor are rules

3    that say you can never go work for one of our competitors

4    because it precludes somebody from changing jobs or being able

5    to just move in the workplace.

6            I'm not aware of any principle that applies just

7    where information from one company is shared with another

8    company that says that there's that same disfavor.  Because

9    what it's really -- what that law that you're citing to is

10   really about is that it allows employers to exert economic

11   coercion with respect to their employees and say, we're not

12   going to pay you what you would earn in the marketplace, for

13   example, because we've got a noncompete here.  And if you

14   leave, you can't get another job anyway, so we're going to pay

15   you half of what you would get in the marketplace.  I think

16   that's what the concern of that law is about.

17           MR. EKELAND:  Without having briefed it and

18   researched it, my understanding is part of the concern is that

19   employee takes their knowledge of the company --

20           THE COURT:  Correct.  And that is right.

21           MR. EKELAND:  I searched for case law in the criminal

22   context for protective orders with noncompete clauses in them,

23   and I couldn't find anything.  Maybe I missed something.

24           Long story short, we're willing to -- assuming

25   Ms. Still agrees to it -- agree to just have her review this

1    without discussing with anybody, to get back to us and let us

2    know what we can do.  I think we've expressed our concern about

3    the noncompetitive language.

4         THE COURT:  Where you ended up is fairly close to

5    what I was going to propose anyway.  I'll hear from

6    Mr. Frentzen on this as well.

7         What I was going to propose is that I enter the

8    protective order, Version B as proposed by Chainalysis, with

9    one change.  And the one change I would make is both to the

10   addendum, as well as the document -- the protective order

11   itself.

12        And I would simply say in the portion that says that

13   Ms. Still can -- Ms. Still may not use any -- or may not use

14   CipherTrace's computer systems and may not download to

15   CipherTrace's computer systems and so forth; just add a clause

16   that says "without prior leave of Court" to that.

17        And then if she looks at it and says, you know, I do

18   conclude I have to run some programs here to figure out what

19   the effect of this heuristic is, and the only equipment I have

20   to do it on are CipherTrace's computers, then what I would say

21   is talk to Mr. Frentzen about it -- I'm glad that you-all are

22   finally talking more constructively about things like this --

23   and see what you can come up with, and whether there's some way

24   that he can verify that it's been erased from the system after

25   she runs whatever she needs to run or something along those

1    lines, if that turns out to be necessary.

2         But for now, I will enter the protective order with

3    that one proviso and, obviously, the entire protective order is

4    subject to change by the Court at some subsequent date.  But in

5    particular, with respect to the use of the Chainalysis [sic]

6    computer systems, come back to me, if that's an issue.

7         MR. EKELAND:  Your Honor, I would just add -- I think

8    this is a simple thing, hopefully.  And that, if need be, if

9    she needs her team members, then we come back to the Court and

10   say, can we extend this protective order to them?

11        THE COURT:  Yes.  I have to say, one of the things

12   that I find encouraging about the fact that it's Ms. Still here

13   is I actually think that she's not going to face the same

14   challenge that other people might face in segregating in her

15   own head the heuristics that are applied here because, as I

16   understand it, she's not somebody who works at Chainalysis -- I

17   mean, at CipherTrace who is actually designing the structure of

18   the systems in which she's going to be sitting there at her

19   desk one day saying, I have this great idea, but is that -- is

20   it my idea or this an idea that I got from what I read from

21   Chainalysis?  Because, as I understand it, that's just not what

22   she does.

23        If she shares the information with somebody who is a

24   software engineer or somebody who is designing the algorithms,

25   that person may find it harder to segregate in their own head

1    what it is that they've learned from the source versus their

2    own creative instinct.

3         MR. EKELAND:  Understood.  That's my understanding as

4    well, Your Honor.

5         THE COURT:  Okay.  So that's what I will do with

6    respect to the protective order.

7         I don't know how easy it is -- frankly, I can just

8    handwrite in that addition to it and just get one of my clerks

9    maybe to print out without the header Exhibit B, and I can give

10   you the right version here.  I'll just sign that to get that

11   done and get that in working order.

12        I have to say, one question I have for you,

13   Mr. Ekeland, about this -- if you want to come up.  And this

14   relates both to this issue and also to the source code issue.

15   We're, obviously, very late in the day with respect to this.

16        What is it you're proposing to do with this?  Is it

17   to prepare Ms. Still for purposes of cross-examination?  I am

18   interested in how you are proposing to use the information that

19   you're gaining at this late stage in the process.

20        MR. EKELAND:  Excellent question.  Again, to the

21   extent I can answer it without seeing it and knowing it, the --

22   I believe it was, I want to say, Docket No. 194, where the

23   government submitted a bunch of information, I think mainly

24   anecdotal, about attesting -- alleging -- attesting to the

25   accuracy of the software.

1           THE COURT:  They did that at my request when I was

2     asking them to really collect what was in the record.

3           MR. EKELAND:  Absolutely.  There was, I believe, also

4     sealed filing as well.  And when I was reviewing it, it

5     occurred -- that was with a -- about a cooperating witness.

6           THE COURT:  I read that, yes.

7           MR. EKELAND:  It occurred to me, well, how can we

8     check this for accuracy and know that this is accurate if

9     that -- and it seems to me I would need to see the -- have an

10    expert look at the source code.  I think it would -- yeah.  I

11    would -- I think, to the extent we could, where there wasn't

12    protective order concerns about the noncompetes, because I

13    think the source code and the heuristic information are,

14    although related, are two separate things that we talked about.

15          I think, to that extent, we -- if these accuracy

16    issues come to the fore, we might just see if -- maybe we might

17    have to bring Mr. Bishop in if the Court is open to that and

18    voir dire that.  To be honest with you, I don't 100 percent

19    know without seeing it.  And it may -- you know, it may be that

20    we -- I just don't know without seeing it.  I know --

21          THE COURT:  I mean, the problem is that we're picking

22    a jury tomorrow.  What I don't want to do is -- I think it

23    would be -- I want to be fair to everyone here.

24          The reason we're exploring this is I'm really bending

25    over backwards to make sure that Mr. Sterlingov receives due

1    process and a fair trial here.  By the same token, I think it

2    would be unfair to the government to be in a position in which

3    the government opens, puts on its case, and then all of a

4    sudden there's another expert report that the government has

5    never even seen pretrial that's way out of time from the

6    defense where it's something that could have affected how the

7    government opened or how it put on its case.

8            I don't want to do that to either side here, and so

9    that was really the reason why I was asking.  If it's something

10   you want to use for cross-examination, that's one thing.  If

11   you're talking about additional expert reports or an additional

12   expert report -- singular -- here, then I think we need to talk

13   about that and understand if that's what's going on and whether

14   there's a basis for it at this point in the process.

15           I just don't want to barrel into trial and then find

16   halfway through trial that the case is about something

17   different than everyone thought it was when we started.

18           MR. EKELAND:  Understood.  And neither do I.  And I

19   think I share everyone's concern in this courtroom at just

20   wanting to focus on the trial.  And, again, as the Court has

21   indicated, this is -- it's the source code, it's the primary

22   software that's been used in the investigation against

23   Mr. Sterlingov.

24           I think to the -- I would -- at this point, honestly,

25   I would probably seek to avoid -- I don't want to waive

1    anything here but avoid introducing any kind of new expert

2    report or expert testimony and try to limit it to cross.

3              For instance, maybe -- and I'm engaging in

4    hypotheticals here.  Maybe we see the source code and we say,

5    oh, what they said about Heuristic 1 and 2, that can't be

6    accurate because of X, Y, and Z.  And I don't know how we would

7    handle that with the Court.

8              Obviously -- I wouldn't -- certainly wouldn't spring

9    that out of nowhere -- I would have to -- we'd have to come to

10   court in the morning or whatever, well beforehand, and give

11   notice to everybody about that, so I don't -- so much of this

12   is matters of first impression, it's hard to know what -- how

13   to proceed.

14             THE COURT:  Well, I have to say, I'm -- we'll get to

15   the source code in greater detail in a minute.  I have to say,

16   I'm not yet persuaded on that, but I can -- we can talk more

17   about that.

18             But you now have seen the heuristic information.

19   That's significant, important information that tells you what

20   Chainalysis did here.

21             And I guess my question for you is, with that now --

22   and I understand you haven't spoken to Ms. Still yet -- what

23   are you proposing to do?  Are you proposing just to have that

24   available for cross-examination?  I take it, from what you've

25   told me, that you're not asking for a continuance in order --

1        MR. EKELAND:  No.  I'm sorry, Your Honor.  I spoke

2   over you.

3        No, we're not asking for a continuance.  We'd like to

4   just go forward.  We'd like, obviously -- obviously, have

5   Ms. Still read the information and then being able to use it on

6   cross.  If she comes and reads it and says, oh, my gosh, X, Y,

7   and Z, we'll come to the Court.

8        But, honestly, I hope it doesn't come to that.  We do

9   want to go to trial and just get to the end of this one way or

10   the other.

11        THE COURT:  I understand that.  But I do want to be,

12   sort of, clear with Mr. Sterlingov about this and also make

13   sure you've had a chance to confer with him about this.  And

14   just be clear that Mr. Sterlingov has decided he does want to

15   proceed to trial, notwithstanding the fact that we're doing a

16   lot of this at the last minute and that he is not requesting a

17   continuance, wants to get to trial and understands that there

18   could be repercussions, including that I might conclude that

19   it's too late for a further expert -- or expert report at this

20   time.

21        But if you want to talk to him about that and make

22   sure, because I want to make sure he understands that and that

23   is his decision.

24        MR. EKELAND:  I would love to talk to him about that.

25   Would you like me to do that right now?

```
 1              THE COURT:  If you wouldn't mind.
 2              MR. EKELAND:  No, not at all, Your Honor.
 3              THE COURT:  Okay.  Thanks.  While you're doing that,
 4    I'm just going to take the moment to amend the protective order
 5    so I can get that signed as well.  I'll put the husher on.
 6              (Recess taken; Court stayed on the bench.)
 7              THE COURT:  So I have an arraignment.  I want to give
 8    you plenty of time to discuss this, and I have an arraignment.
 9    I was going to suggest why don't I do the arraignment, and if
10    you want to talk further with Mr. Sterlingov while I'm doing
11    the arraignment, that's fine with me.
12              MR. EKELAND:  I think we actually came -- when you
13    turned the husher off, he came --
14              THE COURT:  Why don't you come up and let us know.
15              MR. EKELAND:  I think, obviously, the Court should
16    talk to Mr. Sterlingov, too.  The way I understand it is he's
17    okay with going forward with the trial.
18              What he would like to keep open, if there is a
19    verdict, that we could say we didn't feel like we had all the
20    time we needed with the source code in relation to the
21    attributions or the clustering --
22              THE COURT:  So that's the reason I was asking the
23    question, was to avoid that issue.  I think that
24    Mr. Sterlingov -- and you're welcome while I do the
25    arraignment -- he needs to make that decision himself about
```

1    whether he wants to ask me to put the trial off now, in which

2    case I'll hear from the government and decide what to do about

3    that; or whether it's his preference, notwithstanding the fact

4    that some of this information is coming late and I still

5    haven't decided the source code question, that he wants to go

6    forward.  And that's his decision to make.  But I don't think

7    he can have it both ways.

8         He has to either decide to go forward and give up the

9    issue of any unfairness in getting information late, or he has

10   to say, no, it's not fair that I'm getting this late, and I

11   want to put the trial off.

12        MR. EKELAND:  His concern -- understood, Your Honor.

13   I think his concern was that if there is a guilty verdict and

14   there's sentencing, he'd want to be able to challenge the -- in

15   terms of the sentencing, the amount of money that's being

16   alleged that he money laundered, which goes to the attributions

17   and the source code.  I understand what the Court is saying

18   and --

19        THE COURT:  Right.  Well, you know, we're talking in

20   hypotheticals here.  I'm happy to hear from the government.

21        If what you're saying is that at sentencing he wants

22   to be able to argue to me with respect to the guidelines and

23   how they apply in light of the dollar figures, I don't think --

24   I'm not anticipating, unless someone has a different view of

25   it, the jury would make a finding with respect to the dollar

1      figure here.

2              Therefore, that would be a decision for me at -- if

3      we got to that point, if there were a conviction, at sentencing

4      to decide that.  I would decide that by a preponderance of the

5      evidence, and the parties would be free at that time to offer

6      evidence with respect to that issue, if it is an issue.

7              Frankly, I don't remember off the top of my head what

8      the chart looks like, but there's a top end of the chart.  Some

9      differences don't make a difference because you're at the top

10     end of the chart anyway.  I don't have it in front of me at the

11     moment.

12             Subject to the government agreeing with what I've

13     just said, that's my take on that issue.  But maybe -- we can

14     see if the government just agrees with me, that the jury is not

15     going to make that finding, I'm going to make the finding if

16     there is a conviction.  And then I'll give you a further chance

17     to chat with Mr. Sterlingov while I take the arraignment, and

18     then you can let us know what he wants to do.

19             MS. PELKER:  Your Honor, as to the specific amounts

20     in question, the jury -- the defense may or may not ask the

21     jury to make the finding as to the forfeiture, which is a

22     different matter than sentencing, and we would not view the

23     jury making a determination about the specific amounts

24     involved.

25             That said, the government strongly opposes another

1      continuance here.  I just want to make that very clear.

2              THE COURT:  Yes.

3              MS. PELKER:  I am concerned about some of the hedging

4      in the language from defense counsel about wanting to make

5      arguments about them not having sufficient time to challenge

6      certain things right now.  And I just -- I think maybe we break

7      for your hearing and come back and just, if -- the government

8      very much wants to go forward tomorrow.  We're prepared to go

9      forward.

10             But we want it very clear on the record that

11     Mr. Sterlingov understands that if an expert comes in with some

12     grand finding that they spring on the government next week,

13     that it's going to be too late to introduce that at trial.

14             THE COURT:  It is that clarity that I'm searching for

15     now.  And I do -- I think it makes sense for the -- Mr. Ekeland

16     to have a chance to confer further with Mr. Sterlingov about

17     this.

18             I understand the government's desire to go forward.

19     I, frankly, understand Mr. Sterlingov's desire to go forward,

20     and the Court wants to go forward as well.  But I want to go

21     forward in a way that is fair to everybody involved and also,

22     quite frankly, it means we're going to do this trial once

23     rather than twice.  Whether it's issues coming up on a 2255 or

24     on appeal or whatever it be, I want to make sure we're doing

25     this the right way.

1          So I understand the desire to go forward.  I also

2     want to go forward.  But I also want to make sure, if we are

3     going forward, we're doing it the right way.  That's why I want

4     Mr. Sterlingov to have a chance to confer with Mr. Ekeland

5     about this and to make a decision about what he wants to do.

6     If he decides that he wants more time, then I'll have to

7     consider that request.

8          But the one thing is not -- I'm not going to allow is

9     the hedging of saying, well, I do -- I really want to go

10    forward, I want to try the case, but I also want to reserve the

11    ability to argue that I didn't have time to prepare.  That

12    doesn't strike me as fair to the government.

13          MS. PELKER:  Yes, Your Honor.

14          THE COURT:  All right.  Let's go ahead and take a

15    break in this matter.  I'll do the arraignment.

16          Mr. Ekeland and Mr. Sterlingov, you can talk further,

17    and then I'll come back to this issue after the arraignment.

18          (Whereupon, a recess was taken at 11:07 a.m., after

19    which the following further proceedings were had at

20    11:25 a.m.:)

21          THE COURT:  All right.  Mr. Ekeland?

22          MR. EKELAND:  Your Honor, we have discussed it with

23    Mr. Sterlingov, and he has asked us to request a short

24    continuance of between two and four weeks, and he said to us

25    that if it's going to be longer than that -- assuming the Court

1    agrees to any continuance -- that he would like to discuss it

2    with us further.

3              THE COURT:  I'll hear from the government on this as

4    well, but I will tell you that I have another trial that is

5    starting --

6              MS. PELKER:  I believe it's October 16th, Your Honor.

7              THE COURT:  Yes.  There's another trial that I have

8    that is starting the 16th of October.  And so if we delayed

9    this for two or three weeks, I don't know how -- I mean, we're

10   going to run into that other trial.

11             MS. PELKER:  I believe Your Honor then has a short

12   civil trial, a trial that's set in December that potentially

13   has -- the last item on the docket is a competency issue, and

14   then there's a trial with DOJ fraud, I believe, that they

15   expect to go.

16             THE COURT:  You've done your homework.

17             MS. PELKER:  We've looked, Your Honor.

18             THE COURT:  If it were a matter of a civil trial, if

19   there were a window, I would put off the civil trial to do it.

20   Let's see here.

21             What is the government's best estimate of how long

22   the trial is going to last here?

23             MS. PELKER:  We're looking at a full month, Your

24   Honor.  We do understand from colleagues that there's a

25   possibility, if we want to set a status for Monday, there may

 1    be a matter on Your Honor's calendar that may create a window

 2    in that time, but we just -- if we're setting a trial date

 3    right now -- and the government would like to be heard on that.

 4              THE COURT:  Of course.  I'm not making a decision on

 5    this.  I'm just really answering the question from counsel

 6    about what this would mean timing-wise.

 7              MS. PELKER:  There's a possibility we could fit it in

 8    in December, right up until Christmas, if the Court is not

 9    planning to take any Christmas holiday; otherwise, I think

10    we're looking at 2024.

11              That's based on the government's reading of the

12    Court's calendar.  The government doesn't mean to be

13    presumptuous about what the Court's calendar --

14              THE COURT:  No.  I appreciate this.  I have another

15    criminal trial, it looks like.  It looks to me like what's on

16    my calendar here is this trial I reserved time, I think, up

17    until the 11th of October, and then I have a trial starting on

18    the 16th, a long-pending criminal matter, which is -- it's a

19    three-defendant case, which is likely to take a couple of

20    weeks.

21              Then the last week of October is free, but it's just

22    a week; and then I've got another criminal trial.  I don't know

23    if this is one of the ones you're referring to.  I have a

24    two-week criminal trial starting on the 6th of November, which

25    lasts two weeks; and then I have some availability the last

1    couple of weeks of November -- but that is Thanksgiving -- and

2    it's only two weeks.  And then I start another criminal trial

3    in a long-pending case on December 4th.

4            And then counsel is correct -- well, interesting.

5    I've got this hold for a criminal trial, which I'm not sure

6    what the status is on it.  Maybe that's one that could move --

7    maybe that's the one you were thinking of in December that

8    could move, Ms. Pelker?

9            MS. PELKER:  Your Honor, I think colleagues --

10    there's a chance that there's a window within that time that

11    may end up freeing up --

12            THE COURT:  The only thing -- the only reason I'm

13    asking you that is I see it's twice on my calendar.

14            MS. PELKER:  It is not that case, Your Honor.

15            THE COURT:  Oh, it's not that case.  It's on there

16    twice.  I think that -- I'm happy to do everything in my power

17    to move things that can be moved without being unfair to other

18    defendants in cases.

19            But I think before I can tell you with assurance that

20    I have time, it's probably February before I can tell you that

21    I would certainly have time, and I'm happy to move things

22    around.  I'm also happy, if need be, to ask one of my

23    colleagues if they can try this case, maybe a senior judge or

24    someone who might have more time on their calendar, if that's

25    what the alternative would be.

1          But what I can tell you now -- what I can tell you if

2     you say no, we want you as the judge in the case and we want an

3     assurance of when we can go, it would be February.  It's

4     possible, as I said, that I might be able to work things out to

5     do it earlier.

6          MR. EKELAND:  I think I understood you.  I just want

7     to state it so I make sure I tell my client correctly.

8          The only one that you could guarantee would be

9     February, with the understanding that you would be willing to

10    go earlier if something cleared off of your calendar.

11         THE COURT:  Cleared off my calendar or if I can move

12    something.  As I said, I'm happy to cancel or postpone a civil

13    case.  I, obviously, can't do the same thing in a criminal

14    case.  I'm also happy to consult with colleagues to see if

15    there's another judge in the court who can try the case to try

16    it earlier as well.

17         It's not so simple as saying let's push it back two

18    weeks, because then I run at least into another criminal trial

19    that I've had long-scheduled.

20         MR. EKELAND:  Understood, Your Honor.  Obviously, I

21    would need to talk to my client.

22         THE COURT:  Okay.  Do you want to do that now?

23         MR. EKELAND:  Yes, sir.  Thanks.

24         THE COURT:  Okay.  To the extent it's helpful, I

25    think there's a pretty good chance that I could try the case --

1    it's going to require a jury to come back after the holidays,

2    but starting on December 11th and then take a break over the

3    holidays and come back in early January and finish the case, if

4    that's a consideration.

5          Also, we have two nominees for the court whose

6    nominations are pending who will, hopefully, be confirmed.

7    They're both experienced trial judges from the Superior Court

8    or the D.C. Court of Appeals.  And they, presumably, are going

9    to have fairly free dockets and can try the case, if confirmed,

10   as well.  I wanted to let you know all the options.

11         (Recess taken; Court stayed on the bench.)

12         THE COURT:  Mr. Ekeland?

13         MR. EKELAND:  Mr. Sterlingov agrees to the later

14   dates -- the February date with the understanding that we try

15   to get an earlier date.

16         THE COURT:  Okay.  Well, let me hear from Ms. Pelker

17   then.

18         MS. PELKER:  Your Honor, I understand that we kind of

19   are where we are.  The government does want to be on the record

20   as strongly opposing this continuance, and I do think it's

21   worth making a clear record here that the government was

22   prepared to go forward with trial in January.

23         THE COURT:  I understand.

24         MS. PELKER:  The government asked -- and I know the

25   Court understands, but just to make the record very clear here.

1           THE COURT:  Of course.

2           MS. PELKER:  The defense asked for a continuance for

3     nine months so that they could go out and find these experts.

4     They didn't do what they needed to do.  We were back here in

5     June; they continued to not do what they needed to do.

6           We're now at this eleventh-hour point where defense

7     is asking for a further continuance.  I do think that the Court

8     could potentially moot the issue entirely if we could get a

9     clear ruling on the 17(c) with regard to the source code, but I

10    understand --

11          THE COURT:  I'm going to turn to that in a minute.

12    I'll tell you what is motivating me here more than that issue.

13    I actually -- as I hinted earlier, I still think that, despite

14    numerous warnings and cautions and directions from the Court,

15    that the defense hasn't done what I directed with respect to

16    the source code issue.  And we'll get to that issue in a

17    moment.  I don't want to pre-judge that, but I'm skeptical for

18    the reasons I've previously given.

19          What is motivating me here, though -- and Mr. Ekeland

20    only made, sort of, glancing reference to this.  But he said

21    that -- I think that the heuristic disclosure that was just

22    made today, although with greater cooperation from the defense,

23    it could have certainly been made a few days ago, but is being

24    made very late.  He said it's a new expert report.

25          I don't think it's a new expert report.  But I do

1    wonder whether it is something that should have been disclosed

2    in Ms. Bisbee's report as a basis for her expert opinion, and I

3    do think that, although the defense has, I think, vastly

4    overstated the centrality of the Reactor analysis to this case

5    and suggested that it's the entire case -- and I don't agree

6    with that -- it is, nonetheless, an important piece of evidence

7    in the case.

8            And if the defense is just learning now what the

9    specific conditions were of the behavioral heuristic, I'm just

10   concerned that they have enough time to do something with that.

11   That was the reason I was asking the questions earlier about

12   what you want to do with it.

13           And if they want to just use it for

14   cross-examination, that's fine.  But my concern is we're going

15   to get into trial and it's going to morph into Ms. Still using

16   it in her testimony in ways in which the government will not

17   have had the benefit of an expert report from the defense

18   relating to what may be key aspects of the methodology that was

19   employed by Chainalysis for purposes of doing what is really

20   the disputed portion of the tracing here.

21           Because I don't think there's, to my mind, a huge

22   dispute, frankly, about the Heuristic 1 and that the co-spend

23   heuristic is sound to the extent that one can either control

24   for CoinJoin or can read the results with the understanding

25   that there could be some CoinJoin that could have affected it.

1          So that -- but with respect to Heuristic 2, it's been

2     a little bit more of a black box until now for the defense.

3     And I'm not pointing fingers at anybody with respect to whether

4     the defense certainly could have been a lot more clear and

5     targeted about what they were asking for, and it wasn't really

6     until I pressed Mr. Ekeland -- I think it may have been our

7     last hearing -- and said, tell me specifically what you want,

8     and then Chainalysis delivered that.

9          So I don't doubt that the defense isn't partly to

10    blame for the fact that that wasn't teed up and that they had

11    these overly expansive requests and never really explained what

12    they were looking for.  But on the other hand, to the extent it

13    was part of what Ms. Bisbee was relying on, even if she's not a

14    computer analyst herself or a coder herself, it was a part of

15    it.

16          I think it's just a close enough question that I

17    would be more comfortable going to trial with the defense

18    having the opportunity to look at that at least before trial

19    and, if need be, to give the government the benefit of an

20    amended or updated expert report on that and giving the

21    government the opportunity to respond to anything that may come

22    up in that regard.

23          So that's the reason -- if we were just faced with

24    the question of the code on this, I do think the record on that

25    is 100 percent clear to my mind that the defense didn't do what

1    it needed to do in a prompt enough fashion.  I would -- I don't

2    think I would continue in light of that.

3            It's more the disclosure with respect to the

4    specifics of the heuristics, just to explain my reason for

5    thinking that -- and I understand that this is a burden on the

6    government and that you have witnesses that are ready to go and

7    people who have reserved time on their schedules to do this.

8            But as I said before, I also want to make sure that

9    we're doing this case once and not twice.  I think that's

10   probably another concern and a reason why we ought to give them

11   a little bit more time to do it.

12           But what I'm inclined to do -- and I want to hear

13   from the parties on this issue -- inclined to direct that -- so

14   we're not back in the same situation again -- to give Ms. Still

15   two weeks or something of that nature to file any update with

16   the understanding that we're done with the ever-evolving

17   out-of-time expert reports.

18           But if she wants to update it within two weeks, and

19   then I would give the government two weeks to file anything --

20   any report that is responsive either from a current expert or

21   another expert to say that she's mistaken about whatever she

22   might -- conclusions she might draw.

23           And then my view, absent compelling argument to the

24   contrary, is we're done at that point.  And then it may be that

25   within the next -- it may be before the end of the year we can

 1    find a trial date.  If we can't, then we're just going to go in

 2    February and get it done.

 3            I, frankly, apologize to the parties.  I feel as

 4    though, had this come on to my radar sooner, I could have

 5    avoided it as well.  I hate putting you all in the position in

 6    which you're on the eve of trial, but I also want to make sure

 7    it's a fair process.

 8            MS. PELKER:  Understood, Your Honor.  Just one point

 9    on the sufficiency of the government's Rule 16 disclosures.  I

10    do think it's important to note that Ms. Bisbee did not rely on

11    the information that's in this supplemental production because

12    it didn't exist at the time.  This was not something that

13    Chainalysis just pulled off of the shelf to provide.  They

14    compiled it --

15            THE COURT:  Right.

16            MS. PELKER:  -- in response to the Court's order.

17    It's honestly, essentially, like an interrogatory to a forensic

18    accountant of you have these lists of addresses or accounts,

19    exactly why do you think each one is here.  And Ms. Bisbee did

20    include in her report and testify about peel chains, about the

21    different observed behaviors.

22            I understand that this is much more specific and

23    granular, but I don't think that a court has ever held -- and

24    there's good case law that you don't have to have an expert who

25    has an in-depth understanding of the proprietary technology

1    that's being used or of the technology that's being used in

2    order to be qualified as an expert.

3         The same way that when we put on drive test experts,

4    they don't need to be able to include in their disclosure

5    details of the source code of how the drive test hardware

6    works; or when we put on cell site experts, they don't need to

7    have in their disclosure a detailed breakdown of exactly how

8    that software tech is working.

9         Again, I understand that this is where we are.  But I

10   just want to state for the record the government views its

11   Rule 16 disclosures for its experts very seriously, and we do

12   think that what we provided satisfied --

13        THE COURT:  I appreciate that.  I don't mean to be,

14   as I said, pointing the finger as much as doing what I can to

15   manage the case in a way that I think is fair to everyone

16   involved.  That's why I'm doing what I'm doing here without

17   casting any aspersions on the government for any failure on

18   your part.

19        I will say that -- and we'll get to this with respect

20   to the source code issue -- this case is somewhat different

21   than other cases where it does seem that this case is going to

22   be, in large part, a battle of experts, and experts that are

23   relying on methodologies that I just think the jury will

24   benefit from understanding what those methodologies are.

25        Quite frankly, I don't know how this comes out.  It

1    may actually, in some sense, make the government's case

2    stronger or it could make it weaker.  But it may make the

3    government's case stronger to be in a position in which the

4    witnesses can actually explain what the actual specifics were

5    of the assumptions that were applied.

6         Whether it makes the government's case stronger or

7    the defense's case stronger, we're going to have a jury that --

8    this is going to be a challenging case for the jury and I think

9    having that additional information -- I will say, one case that

10   neither side has pointed me to at this point, understandably,

11   because it's a state court case, but that I found illuminating

12   in thinking about these issues, was the New Jersey Supreme

13   Court's decision in *State of New Jersey v. Pickett*.

14        You know what, it's actually the -- it's a decision

15   from the Superior Court.  I think it's the intermediate.  Yes,

16   the Appellate Division from New Jersey.  And it's at

17   466 N.J. Super. 270.

18        I thought it was a very thoughtful analysis of a

19   similar type of circumstance dealing with a computer program

20   that was used to make probabilistic genotyping as to DNA, where

21   it was -- as in this case, it was a third-party vendor that was

22   doing it.  And there was a *Frye* issue in the case, and the

23   court did grant access there.

24        The showing that was made in that case was very

25   different from in this case, in which -- much more substantial

 1    in that case.  I did think that that was, at least in my own

 2    thinking about these issues, helpful.

 3              Any objection to that schedule, Mr. Ekeland?

 4              MR. EKELAND:  No, Your Honor.

 5              THE COURT:  I have everyone's agreement at this point

 6    that, subject to anything that may come up with the source

 7    code, but we're done at this point and we're not going to be

 8    otherwise amending expert reports or expanding the case.  The

 9    goal is to get us to trial.

10              Is that agreeable to everybody?

11              MS. PELKER:  Yes, Your Honor.

12              MR. EKELAND:  Yes, Your Honor, what you just said

13    about Ms. Still's report.

14              THE COURT:  But her amendment ought to be focused

15    just on what's in the disclosure, not on new issues at this

16    point.

17              MR. EKELAND:  Yes.

18              MS. PELKER:  Yes, Your Honor.  The government would

19    just ask for the record that we have a very clear colloquy

20    about Mr. Sterlingov not wanting to go to trial tomorrow and

21    asking for the continuance.  We also are very concerned about

22    the continued -- any continued pretrial publicity.

23              Defense counsel continues to -- has made a lot of

24    arguments about how the government is holding Mr. Sterlingov in

25    jail for these extended periods of time pretrial as an aspect

1   of their fundraising for this case.  We just want to be very

2   clear on the record that this is Mr. Sterlingov's decision to

3   go this way.

4            THE COURT:  All right.  Let me ask that question.

5   Mr. Sterlingov, do you have the microphone there?  Can you turn

6   that towards you.

7            Mr. Sterlingov, just for the record, you heard what

8   Mr. Ekeland said.  And did he, in fact, accurately represent

9   your views about how you want to proceed?

10           THE DEFENDANT:  Your Honor, I know that it's

11  probably, ultimately, my decision.  That's just how the courts

12  work.  But I do have to listen to my attorneys because a lot of

13  these issues, I'm really not an expert on these issues.  I

14  haven't seen these -- I haven't been able to see this report.

15  I don't know how the source code works.  I don't really know

16  exactly what it means for my case, honestly.

17           But I do have to rely on my attorneys.  And with that

18  information, yes, that's what we came to decide.

19           THE COURT:  Part of your making a decision yourself

20  is your choice to rely on the advice from your attorneys.

21  There's no problem with your relying on the advice from your

22  attorneys.

23           I just want to make sure, though, that it is your

24  decision based on the advice you've received from your lawyers?

25           THE DEFENDANT:  Yes, yes.

1          THE COURT:  You understand that this will result in

2    your continued incarceration pending trial?

3          THE DEFENDANT:  Yes.

4          THE COURT:  But weighing the various concerns, that's

5    a choice that you would like to make, to do that?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  All right.  Mr. Ekeland, if you want to

8    come up -- anything else you want me to ask of Mr. Sterlingov?

9          MS. PELKER:  I believe the defendant just made the

10   comment that he wasn't aware of what this means for his case or

11   he didn't understand what this means for his case, and I just

12   want it to be very clear that he understands the ramifications,

13   but also the potential trade-offs of going forward.

14         THE COURT:  Well, let me ask further.  Have you had

15   enough time to confer with your lawyers about the various

16   trade-offs and considerations in making your decision about how

17   you want to proceed?

18         THE DEFENDANT:  I believe I've had enough time to

19   confer with my attorneys.

20         THE COURT:  Okay.  Based on the advice that you've

21   received from your attorneys -- I understand you're not a

22   lawyer or an expert on the law -- but do you understand, based

23   on the advice you've received from your attorneys about what

24   the ramifications and the consequences are with respect to your

25   decision of how you want to proceed?

1          THE DEFENDANT:  I understand that I will have to

2     spend more time locked up pretrial.

3          THE COURT:  Right.

4          THE DEFENDANT:  Is that what you're asking?

5          THE COURT:  Well, that's a big part of it.  But also,

6     every time you continue a case, there are issues that could

7     arise with respect to availability of witnesses.  I don't know

8     who your witnesses might be or what their availability are.

9     There are lots of considerations when you continue a case.

10          I just want to make sure that you and your lawyers

11     have had enough time to think about that.  You don't want to go

12     tomorrow?  I'm prepared to start tomorrow, and you're the one

13     who is requesting that we not do that.

14          I just want to make sure that you have made a

15     considered and knowing decision that that's what you want to

16     do.  That's all I'm trying to pin down.

17          THE DEFENDANT:  I think so, Your Honor.  I don't know

18     how much time is typically required.  But from the

19     conversations we've had, I get the impression that this is how

20     we want to proceed.

21          THE COURT:  It is how you want to proceed?

22          THE DEFENDANT:  And how I want to proceed, yes.

23          THE COURT:  All right.  Ms. Pelker?

24          MS. PELKER:  Can we just have the defendant clearly

25     state on the record that he -- the whole "I get the impression

 1    that this is how we want to proceed," again, we just want a

 2    clear record here, Your Honor.

 3           THE COURT:  All right.  I think that's fair.  Let me

 4    put it just in the form of a question.

 5           Mr. Sterlingov, having had the opportunity -- first

 6    of all, I think you've said this already, but have you had

 7    enough time to talk with your lawyer about what you want to do?

 8           THE DEFENDANT:  Yes.

 9           THE COURT:  And you've received advice from your

10    counsel about how to proceed?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Have you considered that advice from your

13    counsel?

14           THE DEFENDANT:  Yes.

15           THE COURT:  Okay.  Any other questions you have for

16    your counsel before you make a decision about what you want to

17    do?

18           THE DEFENDANT:  No.

19           THE COURT:  Any other questions you want to ask me

20    before you make a decision about what you want to do?

21           THE DEFENDANT:  No.

22           THE COURT:  What is your decision about whether you

23    want to go to trial tomorrow and pick the jury tomorrow or

24    whether you want to postpone the case, potentially, to as late

25    as February of 2024?

1          THE DEFENDANT:  I would like to postpone the case.  I

2    would also like to ask you, if you have any opportunity to make

3    sure this happens quicker --

4          THE COURT:  If I can, consistent with other

5    obligations on my calendar, I will do that.

6          THE DEFENDANT:  Thank you.

7          THE COURT:  Ms. Pelker?

8          MS. PELKER:  Thank you, Your Honor.

9          THE COURT:  All right.  I did have some follow-up

10   questions for Mr. Ekeland.  This was on the list of things I

11   wanted to ask you about anyway.

12          I asked you several weeks ago whether you are, in

13   fact, proceeding as appointed counsel under the Criminal

14   Justice Act and being compensated in that fashion or whether

15   you're actually proceeding just as retained counsel who is

16   raising money and is being privately funded.

17          I do think you have to make a decision one way or the

18   other on that.  I'm somewhat concerned if you're out there

19   still raising funds if you are proceeding as CJA counsel.  If

20   you're not proceeding as CJA counsel, then there's no reason

21   that there can't be some appropriate fundraising effort to pay

22   your bills, but it has to be one or the other, I think.

23          MR. EKELAND:  I think we should just withdraw as the

24   CJA counsel and stay on this case if we can just as retained

25   counsel, Your Honor.

1              THE COURT:  So you're not proceeding CJA at this

2     point?

3              MR. EKELAND:  Not at this point, Your Honor, no.

4              THE COURT:  Well, I will just caution you with

5     respect to your fundraising that I've already issued my order

6     with respect to publicity and potential tainting of the jury.

7     I would just urge you to be very careful about what you're

8     posting and saying about the case.

9              MR. EKELAND:  Your Honor, we -- I mean, if there's

10    something the Court objects to, let us know.  I stripped down

11    our website, and we haven't made any public statements

12    regarding this case since the Court's order.

13             But we're more than happy -- if the Court has

14    anything they want to point out to us, we're happy to

15    accommodate the Court.  We're not addressing this case publicly

16    at all.

17             THE COURT:  Well, Ms. Pelker, if there are particular

18    things that you see you think should be taken down, if you can

19    raise that at least initially with Mr. Ekeland and then if you

20    need to raise it with the Court, you're welcome to do so.

21             I do worry about if the jury pool were to hear

22    reporting about Mr. Sterlingov being treated almost like a

23    political prisoner, being detained or something like that, that

24    that could be tainting to a jury.

25             MR. EKELAND:  Understood, Your Honor.

1          THE COURT:  Okay.  All right.  Anything else before

2    we turn to the source code issue?

3          MR. EKELAND:  No, not from the defense, Your Honor.

4          THE COURT:  I'm not sure we'll finish it up in a half

5    an hour.  Why don't we go ahead and start.  I'm happy to hear

6    from whoever wants to go first.

7          Why don't I start with Mr. Frentzen, and then I can

8    hear from Mr. Ekeland and the government, if you want to add

9    anything, although I think the government's principal interest

10   in this issue is trial management.

11         But go ahead, Mr. Frentzen.

12         MR. FRENTZEN:  Thank you, Your Honor.  Again, I

13   appreciate the opportunity as a nonparty to come here and

14   address the Court.

15         THE COURT:  Before you get started, I should say that

16   I do very much appreciate what you've provided thus far, and it

17   was obvious to me that there was some substantial effort that

18   went into what was prepared and provided to the Court and to

19   the defense at this point.

20         I think it was appropriate to provide it, and I think

21   the defense was entitled to it, but I know it was not something

22   that was done easily.  So I appreciate that.

23         MR. FRENTZEN:  I appreciate that, Your Honor.  The

24   folks who took the laboring oar -- and it was a substantial

25   amount of work that went into putting all that together, so we

1    appreciate that.

2            A lot of what I've heard, again, sort of, relates to

3    this notion that -- and we discussed it some the last time I

4    was here, about things not being done.  And I think it's more

5    fundamental than that, in our view, Your Honor, to say that

6    what hasn't been done, in our view, is because it's missing the

7    point, and that's because the source code is not an issue here.

8            And the 17(c) that originally was issued and now, in

9    the course of iterations of pleadings, has been effectively

10   expanded rather than contracted is, again -- I mean, the Court

11   denied the motion originally as, I think, the very definition

12   of a fishing expedition, and I may have gotten that a little

13   wrong, but that was the core of it.

14           And this somehow has actually gotten worse and more

15   expansive and fundamentally less specified or substantiated in

16   the paperwork to the point where we're not even in a 17(c)

17   realm, if that makes sense.  I mean, 17(c) is not an

18   investigatory subpoena.  It's not a, "we want to take a look at

19   this and test this."  It is an exacting standard which requires

20   relevance, admissibility, and specificity.

21           And at this point we're so far away from that, but,

22   again, this is not a function of just a failure on somebody's

23   part.  This is because they've had months and months and months

24   and a credible expert will not say I need to see this and

25   here's why I need to see this.  And it's, in our judgment, Your

1    Honor, come time to finally close the door.

2         THE COURT:  Can I ask you a question about the 17(c)

3    standard as it applies here?

4         MR. FRENTZEN:  Sure.

5         THE COURT:  Mr. Ekeland has argued in various

6    different manners that this case is different.  And his take on

7    it, at least initially -- and maybe this has been his principal

8    take -- is that somehow the government is avoiding its

9    disclosure obligations by having an independent contractor run

10   the analysis or that you really stand in the shoes or your

11   client stands in the shoes of the government and this ought to

12   be treated more like a *Brady* and Rule 16 issue.

13         I have to say, I'm not persuaded by that formulation

14   of the argument, but I do scratch my head a little bit and am

15   unsure whether the usual 17(c) standards apply somewhat

16   differently in this context where your client has entered into

17   a contract with the government to do analysis on behalf of the

18   government in a criminal case; has agreed to appear as an

19   expert witness in that case and either -- as a matter of either

20   due process or as a matter of reading 17(c) in light of the

21   particular context, it would be appropriate to relax the

22   standards somewhat.  I'm not saying that that means that

23   everything that has ever touched a computer at Chainalysis is

24   open game.

25         But that, on the other hand, if the work of

1    Chainalysis is going to be offered in the government's

2    affirmative case against the defendant, isn't the fair thing to

3    do is to provide enough information to the defense that the

4    defense can, in essence, confront and cross-examine the

5    witnesses against the defense in a fair and fulsome way?

6            MR. FRENTZEN:  Sure.  So, first of all, I think the

7    direct answer to the Court's question is probably no.

8            I mean, in other words, if the Court's asking me a

9    hypothetical about whether or not Rule 17(c) gets modified by

10    certain other factors, I'm not aware of any law to that effect.

11    And I think, in fact, it would be improper just in the sense

12    that 17(c) is 17(c) and Rule 16 is Rule 16.

13            THE COURT:  Right.  Although, the factors that you

14    specified about 17(c) are just the gloss that the Supreme Court

15    in *Nixon* put on 17(c).  Those words don't appear in 17(c)

16    itself.  And in *Nixon*, it was actually the prosecution that was

17    seeking the tapes.

18            And there are some courts that have suggested that --

19    where it's the defense that the standard is perhaps not quite

20    as demanding as *Nixon*.  I'm not sure, by any means, that's the

21    majority view, but there's some courts that have hinted at

22    that.

23            My real point is we're talking about a judicial gloss

24    one way or the other on 17(c) itself, and should that judicial

25    gloss take into consideration the nature of the evidence and

1    the role of the contractor.

2            You know, it would be a different thing -- or it

3    might be a different thing if you were representing Bank of

4    America and had nothing whatsoever to do with this case and you

5    got a subpoena -- your client, Bank of America, got a subpoena

6    saying, you know, we want the account balances for the

7    following hundred people because it's possible that one of

8    those people was actually the real administrator of Bitcoin

9    Fog, and we want to show that that person made a lot of money.

10            There you'd say, well, wait a second, that's a

11    complete fishing expedition.  Somewhat different where your

12    client is one of the main witnesses in the case.

13            MR. FRENTZEN:  So, first of all, I think -- again, I

14    think we're sort of arguing about hypotheticals here.  But I

15    don't take the *Nixon* decision from the Supreme Court -- which

16    is actually based in *Bowman Dairy*, which is an earlier case --

17            THE COURT:  Right.

18            MR. FRENTZEN:  -- that said the same.  And that has

19    fundamentally been repeated and upheld in pretty much every

20    17(c) case I'm aware of to be less than the controlling law.

21            THE COURT:  Right.  But is there any case that you

22    can point me to that has applied 17(c) in the manner it was

23    applied in *Nixon* to a government expert that was offering

24    testimony where the defendant was seeking information relating

25    to the basis for that testimony?

1    MR. FRENTZEN:  I have not looked for that, Your

2  Honor, except to say that I don't -- again, I think this goes

3  back to the Court's original question.  I'm not aware of a

4  basis to modify 17(c) on that adjustment when Rule 16 exists

5  for expert disclosures.

6    In other words -- and 17(c) expressly, according to

7  all of the case law, is also not a tool to be employed in order

8  to, you know, effectuate an end run on Rule 16.  That is also

9  part of the pretty rock-solid -- in my humble judgment, just

10  based on having litigated this a lot, these types of subpoenas,

11  both as an issuer and now as a recipient -- that that's sort of

12  also another bedrock of it, is that you don't utilize 17(c) to

13  get around -- and so the relationship of an expert, a

14  testifying expert, if you will, is one that triggers 16(g) and

15  those rules there.  And so that puts us in a different

16  category.

17    But at the end of the day, Your Honor --

18    THE COURT:  Does anyone know -- I apologize for

19  interrupting.  But one of the things I've thought about in

20  thinking about this issue is, I assume it comes up in large

21  antitrust cases.  I don't know whether the government retains

22  the big economic consulting firms in antitrust cases, including

23  criminal antitrust cases, where you have Economists, Inc., for

24  example, that are doing analyses.

25    I certainly know what comes up in just civil

1    litigation between parties, but that's not a good analog here

2    because 17(c) is different.  But I was wondering whether there

3    are cases in which the government is using independent experts

4    who are doing things, arguably, analogous to what was done

5    here, where they're running models; and to the extent -- what

6    the disclosure obligations are and the discovery obligations

7    are where you're running those types of models; maybe even in

8    the civil context.

9         I suppose that it's probably not the case that in

10   every big antitrust case that Economists, Inc., has to turn

11   over all of its source code, although I'm sure that they're

12   disclosing what all the parameters of the models are they're

13   using in those cases.

14        MR. FRENTZEN:  I don't know the specific answer to

15   that, Your Honor.  As I'm sitting here trying to think of other

16   instances, I mean, I have been involved in cases in which we

17   used large accounting firms and those large accounting firms

18   testified.

19        THE COURT:  Right.

20        MR. FRENTZEN:  And I don't recall turning over their

21   software on which they performed the accounting functions.

22   And, in fact, I think, much as here, where we have provided the

23   information about what was done, it would be a ludicrous

24   endeavor.

25        And so I think that, again, this is, at its core, an

1    effort to try to threaten the business of my client in the form

2    of allegedly getting information which they have.  And so,

3    again, what we tried to do, we've come back here again and

4    again and we've been responsive to the Court, and with what

5    we've now provided to the Court and to the defense is

6    sufficient here.

7         And I know the Court had an opportunity to look at

8    it.  We appreciate the Court looking at it.  It's a lot of

9    information.

10         THE COURT:  I was going to ask you about it.  I had

11    an opportunity to look at it, which I think is the proper

12    phrase to use.  I'm not sure that I have the technical capacity

13    to fully grasp the extent to which the disclosure answers all

14    the questions --

15         MR. FRENTZEN:  Sure.

16         THE COURT:  -- that were posed.  And that was one of

17    the reasons I brought the second computer on the bench with me

18    here.

19         There is, obviously, a fair amount of detail in

20    there.  I couldn't quite tell the extent to which the

21    spreadsheet -- which is quite large -- captures additional

22    information.  For me, it's -- I look at it, and I just see a

23    lot of addresses.

24         I don't know if you can walk me through that and help

25    me understand exactly what's captured in the spreadsheets and

1    how that helps understand exactly what it is that your client

2    did.

3            MR. FRENTZEN:  Sorry.  I'll walk the Court through in

4    a larger view.  If the Court needs to get really granular, it

5    may want to ask Ms. Pelker, with my apologies for volunteering

6    her to pinch-hit for me, since she has a stronger background in

7    the fundamentals of this than I do.

8            But what's here, first of all, is the response to the

9    question about Heuristic 2, the behavioral heuristic.  And so

10   what was done there was to -- and this is part of the reason

11   why we view this as proprietary -- is to take each of the

12   various clusters and to effectively describe -- each of those

13   are behavioral, right?

14           So they begin with sort of a ground truth, which

15   means there's been some interaction with the exchange so we can

16   identify certain behaviors by the exchange because that conduct

17   has taken place.

18           THE COURT:  To make sure that I understand what that

19   means is, hypothetically, it might mean, for example, that your

20   client might engage in a straw transaction just to see if the

21   site -- or an address is associated with who they think the

22   address is associated with.  Once they have that, quote, ground

23   truth, they can then use that ground truth and look at it and

24   say, okay, that is the address that we thought it was based on

25   that straw test or straw transaction.

1          And we now can go back and look at the chain

2     involving that address in ways in which we can see

3     characteristics, including the way the peel works.  And so, for

4     example, it may be that you look at it and every time -- it's

5     good that I'm asking these questions because I'm not giving

6     anything away because it's all made up.  I don't actually

7     know what -- precisely what it's doing here.  I'm not

8     disclosing anything.

9          But imagine a world in which the peel in each

10    circumstance is .65 percent of the amount in that wallet, and

11    then it's .65, .65, .65.  And you look at that enough, and you

12    say, well, that's sort of a fingerprint.  And then you also

13    look at it, and there are other markers that you can look at

14    and say, once you have enough of those markers, you can

15    determine to a pretty high level of certainty that transactions

16    that have those markers came from that address.

17          Is that a fair summary of what -- the way it's

18    working?

19          MR. FRENTZEN:  That's an example of the type of

20    analysis that is included within the report, without saying too

21    much about what is in the report on the open record, Your

22    Honor.  But that's correct.

23          THE COURT:  If I said something you think I shouldn't

24    say -- I don't think I have because I was making it up -- but

25    I'm happy to seal the proceeding.

 1          MR. FRENTZEN:  No.  I'm simply saying there are

 2     varieties of ways in which the -- and those are what's been

 3     described.

 4          THE COURT:  Right.

 5          MR. FRENTZEN:  And so for the different exchanges, if

 6     you will, or markets, there are different behavioral

 7     characteristics, if you will, and there are parameters, and

 8     there are also potential efforts to avoid, if you will,

 9     misclustering.  And so those are parameters that are described

10     in what's been provided to the Court in one instance.

11          Within that instance, there is also a response to

12     what was, effectively, the third question that was asked, which

13     was regarding manual alterations.

14          THE COURT:  I was going to ask you about that.  Is

15     there something that was provided that addresses the manual

16     alteration?

17          MR. FRENTZEN:  That's correct, Your Honor.  The

18     answer is that there was not a manual alteration.  But that is

19     within the heuristic for that particular exchange that was

20     asked about.  There's a reference to it within the -- that

21     document.

22          THE COURT:  And for purposes of Heuristic 3, to the

23     extent it's based on intelligence -- and maybe this is a

24     question for the government as much as it is for you -- how

25     much has been disclosed to the defense about what information

1    and the sources of the information that were used for purposes

2    of Heuristic 3?

3            In other words, if it's -- we know that this is a

4    transaction with Pandora because we had somebody associated

5    with Pandora who told us X, Y, and Z.  I'm not asking for the

6    specifics for the disclosure because we're on the public

7    record, but just whether that type of information has been

8    disclosed.

9            MS. PELKER:  Your Honor, I think that that was in the

10   prior report.  That is only present here for AlphaBay and

11   relates to information tied to the AlphaBay takedown.  There

12   isn't additional detail about --

13           THE COURT:  It's just that one cluster, and at least

14   the nature of the information has been provided to the defense?

15           MS. PELKER:  Yes.  Your Honor, just one point of

16   clarification on Mr. Frentzen's comment.

17           The manual manipulation, there is in the report a

18   note about the information relating to AlphaBay because of how

19   it came in that there were a set of addresses that were

20   manually -- there was a manual processing aspect of it that's

21   set out in the supplement, without getting into more detail.

22           THE COURT:  I understand that.  There also was a

23   reference to Heuristic 4, which just came to light.  Is this

24   ringing a bell with you?

25           I guess I'm trying to remember what that heuristic

 1    was, Heuristic 4 was.  But it was something, I think you just

 2    discovered or your client discovered when they went back and

 3    looked at this?

 4            MR. FRENTZEN:  That's correct, Your Honor.

 5            THE COURT:  Which cluster did that apply to?

 6            MR. FRENTZEN:  I forget, as I'm standing here, Your

 7    Honor.

 8            MS. PELKER:  I can check that for the Court.  I

 9    believe it may also have just been the cluster that was just

10    referenced with a small number of addresses.  It is definitely

11    not the Bitcoin Fog cluster.

12            THE COURT:  Fair enough.

13            MS. PELKER:  And we're going back -- to the extent

14    that Ms. Bisbee's report did not include any reference to that

15    heuristic, it's a small number of additional addresses.  We

16    don't think it would impact the finding.

17            We also recognize that it's too late to -- was too

18    late to amend the expert report, so --

19            THE COURT:  It may be that you should, when you have

20    your opportunity; if there's something that needs to be

21    updated, do that.

22            I do have to say, I understand, for the reasons that

23    Mr. Sterlingov raised earlier in his question to me through

24    Mr. Ekeland about sentencing, if we ever got to this point or

25    perhaps forfeiture, if we ever got to this point, the precise

1       dollar figures there, arguably, could matter.

2               But I do think that this is different from a DNA

3       case, for example, where there's a greater risk that any error

4       where something -- where you're presenting information at an

5       extremely high level of certainty and specificity, and this is

6       different in that even if -- as I've said before, even if there

7       were a one or two or three percent error here and, conceivably,

8       even higher, it's not clear to me that that's material with

9       respect to the government's case.

10              MR. FRENTZEN:  To take it a step further, Your Honor,

11      what the Court now has and what the defense has is -- with

12      regard to the tables, is the ability to take -- and we also

13      provided kind of a workflow, which is a step-by-step sort of --

14      so to be able to take an input address, to be able to apply the

15      parameters, the heuristics that are identified, to check that

16      -- and it doesn't need to be run on CipherTrace.  We're talking

17      about, you know, public records, blockchain records -- and to

18      be able to achieve the same result as was achieved by

19      Ms. Bisbee, was achieved by Reactor.

20              THE COURT:  And so that's what the spreadsheets will

21      allow somebody to do is to recreate and, thus, either verify or

22      contest the results that were generated by Chainalysis Reactor?

23      If you have these addresses in this spreadsheet, you can go,

24      and without the source code you can say -- using the public

25      blockchain and say, we've applied the same heuristic, and it

1    either leads to that result or it doesn't lead to the result?

2         MR. FRENTZEN:  Correct, Your Honor.  It's, therefore,

3    entirely independently verifiable.

4         Some expert may argue about whether or not a

5    particular heuristic should or should not be applied, but

6    there's no reason to go look at software when you can do it

7    yourself.  And so that we now should be past the point, again,

8    in the government's view -- I'm sorry -- in Chainalysis's view

9    of needing to examine any source code.

10        Again, we think that this -- we were here, we still

11   had gotten no specificity from any qualified expert.  The Court

12   had questions, the defense had questions.  We took those

13   questions.  Those were the questions supposedly needed to be

14   responded to.

15        And we've now responded to them in a way that is, as

16   we've said, independently verifiable.  And so we should move on

17   from this supposed source code issue.

18        And so, again, we've laid out in the papers our views

19   on the lack of need, along with the lack of specificity, along

20   with the lack of anything looking like a 17(c) -- an

21   appropriate 17(c) subpoena.  And it's still this, let us see

22   everything so that we can figure out whether or not there is

23   some issue, which is the very definition of a fishing

24   expedition.

25        We remain concerned with regard to the proposed

1    experts.  We spelled that out in the paperwork.  I'm happy to

2    get in the weeds about that.  But unless the Court has specific

3    questions on any particular experts, we don't view Mr. Bishop

4    as an appropriate expert either.

5         I will add one thing.  And that is, Your Honor, for

6    the record is, with the benefit of additional time, I want to

7    clarify our argument regarding Mr. Bishop's experience at

8    Custodia Bank.

9         THE COURT:  Okay.

10        MR. FRENTZEN:  We recognized Custodia Bank as a

11   viable and legitimate project with a multitude of interested

12   backers.  We do not have reason to doubt its commitment to

13   compliance in AML, and it's now been able to open in several

14   states.

15        Our point about this, however, you know, and we -- we

16   had to file what we had to file promptly.

17        THE COURT:  I know.

18        MR. FRENTZEN:  I want to be clear with the Court.

19   Our point with regard to Mr. Bishop remains, though, we're not

20   sure from the paperwork we've received exactly what he did

21   while he was there.  We understand he's no longer there.

22        But, more importantly, as having spent time there and

23   as a self-described rent-a-CTO, he's clearly aware of potential

24   benefits of this technology not only to other tracing services,

25   but kind of to a wide variety of different businesses that need

1    to try to monitor some of the same transactions that

2    Chainalysis's software assists people in trying to monitor.

3            And so, you know, again, that places Mr. Bishop as a

4    problematic candidate.  I can get into other details about him

5    if the Court wants, but since we don't think any expert needs

6    to review any source code, I don't need to belabor the point,

7    and we filed a relatively lengthy pleading about that.

8            So, again, if the Court has additional questions,

9    we've tried to answer the questions.  We've provided

10   information that we believe can put this issue finally to rest.

11   I hear what the Court is saying about, you know, something

12   further, but I can only, sort of, respond to what's directly in

13   front of me.

14           And at this point, that's 17(c).  This is nowhere

15   close, and the actual request was -- effectively, set up

16   another business that's Chainalysis 2 and let us run it for a

17   little while and see if it works out, which was bizarre to say

18   the least.

19           And if that came from the defense, then it came from

20   the defense.  If it came from Mr. Bishop, it's clearly

21   concerning because it demonstrates, A, no ability to specify

22   why you need to look at anything, but it also -- it's

23   preposterous on its face that they would turn over not only

24   source code but other software and infrastructure and send an

25   advisor over to tell them how to do it.  So, you know, we don't

1    view any of that as appropriate.

2          I'm happy to answer other questions about that

3    particular motion or anything else the Court wants.  But at the

4    risk of maybe this is my last time up here, I just had a couple

5    of housekeeping things.  But I can wait until later for those.

6          THE COURT:  Well, you're welcome to raise them now.

7    I apologize for keeping you here because I know you're from out

8    of town.  What I was going to do was take the lunch break and

9    hear from Mr. Ekeland and Ms. Pelker after the lunch break.

10   But if there's something you want to raise now, that's fine, or

11   later.

12         MR. FRENTZEN:  I don't want to keep anybody from

13   lunch, so I'll just say the two things.

14         THE COURT:  Okay.

15         MR. FRENTZEN:  One is there was an outstanding

16   subpoena to Youli Lee.  I had heard she didn't perhaps show up

17   on the witness list.  I just wanted to make sure it was, in

18   fact, rescinded or dropped, the subpoena to her.

19         THE COURT:  Let me ask Mr. Ekeland to respond.

20         MR. EKELAND:  Your Honor, we mentioned this to

21   the government -- we mentioned this to the government.  But we

22   are withdrawing the subpoenas for Michael Gronager, Jonathan

23   Levin, and Youli Lee.

24         MR. FRENTZEN:  I knew about the first two, but not

25   the third, so I appreciate that.  Thank you.

1          THE COURT:  Okay.  Thank you.

2          MR. FRENTZEN:  The only other thing is I just want to

3    make sure --

4          THE COURT:  I will deny the motion as to, I think it

5    was just Ms. Lee as moot at this point since the subpoena has

6    been withdrawn.

7          MR. FRENTZEN:  Because they had reissued them before

8    and withdrawn them, we also ask that they not be permitted to

9    keep reissuing them, but I'll -- the same subpoenas to the same

10   witnesses, because it had already happened earlier and been

11   quashed.  Anyway, I just raise that.

12         THE COURT:  Mr. Ekeland, do you have any interest in

13   reissuing them?

14         MR. EKELAND:  Not at this point, Your Honor.  If

15   something changes, I'll come to the Court, but I'm not

16   envisioning reissuing them at this point.

17         THE COURT:  I will grant the motion to quash then in

18   light of that without prejudice.  But with the understanding

19   that the defense has represented that they have no interest in

20   reissuing them, and they would have to come in with some

21   substantial showing at this point.

22         MR. FRENTZEN:  I appreciate that, Your Honor.

23         THE COURT:  I should say, based on my review, I

24   didn't see the relevance to this case of any of the witnesses.

25   I believe you represented in all of your papers that none of

1    them actually had anything to do with the investigation in this

2    case.

3                MR. FRENTZEN:  Thank you, Your Honor.  I appreciate

4    that.  Finally, just -- we don't need to deal with this now;

5    I'll just raise it.  I'd like to get the protective order forms

6    from counsel just so I know that it is just counsel and then

7    the one from Ms. Still, but we can iron that out later.

8                THE COURT:  If you need any assistance from the

9    Court, since you're not in your offices, of just printing out

10   the form here, we can print it for you in the courtroom so you

11   can have it here and get it signed.

12               MR. FRENTZEN:  I think they're supposed to be lodged

13   with the Court, sent to the government and to me.  I just want

14   to make sure we know the universe of the people, the lawyers

15   and the one expert.

16               THE COURT:  That's fine.  Thank you.  One thing I

17   will also mention before we take our lunch break is nothing is

18   going to happen in a manner of time that will affect this case.

19   But the New York City Bar Association has requested that the

20   Criminal Rules Committee consider amending Rule 17 in a manner

21   that would provide for more expansive discovery and actually

22   would supersede the *Nixon* decision.

23               That's an issue that is pending before the Criminal

24   Rules Committee, and I know how that process works.  If they

25   decide to take some action -- and I don't know whether they

1   will -- if they take some action, it will be many months from

2   now, if not years.

3           MR. FRENTZEN:  That's fortunate for us then, Your

4   Honor.

5           THE COURT:  Okay.  Thank you.  So let's go ahead and

6   take a lunch break.  Does 1:30 work for everyone to come back?

7           MS. PELKER:  Yes, Your Honor.

8           MR. EKELAND:  Yes, Your Honor.

9           THE COURT:  You might think also about, in light of

10  the change in schedule, what our next steps should be, whether

11  we want to come back for a status conference.  We can come on

12  Friday, and I'm happy to clean up as much on the docket as

13  possible so we're as set to go -- I really am in a position, if

14  something frees up, I will do my best to accommodate

15  Mr. Sterlingov's request.

16          And I may only be able to provide you with a week or

17  two of notice and say something freed up and we're ready to go.

18  That's why I want us all to be set and get as much done as

19  possible so we're ready to go.

20          MS. PELKER:  Your Honor, the government would ask

21  that we continue to come back on Friday, try and get as much

22  lined up.  We would note that, while we would very much

23  appreciate being able to be fit in, we are also -- we're

24  writting [sic] in individuals and flying them in from various

25  places, so we just need some lead time for witnesses.  We will

1    do our absolute best to make it work, even if we just get short

2    notice.

3             THE COURT:  And I will do my best to provide you with

4    as much notice as I can.

5             Okay.  Let's take a lunch break and we'll come back

6    and finish this up.

7             (Whereupon, a lunch recess was taken at 12:38 p.m.

8    until 2:00 p.m., after which the following further proceedings

9    were had:)

10            THE COURT:  All right.  Mr. Ekeland, your turn.

11            MR. EKELAND:  May I proceed?

12            THE COURT:  You may.

13            MR. EKELAND:  Thank you, Your Honor.

14            So in *United States v. Nixon*, the technology in

15   question was a reel-to-reel tape recorder.  The technology

16   wasn't really in question.  The question was whether or not the

17   United States Government could get tape recordings of President

18   Nixon.

19            Here the technology is in question.  In *Nixon*,

20   they're not actually asking, is that really President Nixon's

21   voice on the tape, which would be a possibility in this day and

22   age with deep fakes.

23            So I think when the Court highlights the issue of the

24   difference between *Nixon* and the issues now, I think there is a

25   very, very big difference.  And the reason we're asking for

1    this source code and the reason we asked for it again was after

2    the *Daubert* hearings where Ms. Bisbee from Chainalysis

3    testified -- and I still think that up until this moment,

4    Chainalysis still says that they do not have any error rates,

5    that they didn't keep any of the internal data on error rates,

6    there's been no independent model validation; there's been no

7    independent audit.

8          What little I've seen in the few moments that I had

9    to look at what was produced in relation to Heuristic No. 1, 2,

10    3, and now No. 4 is being presented to this Court as if it's

11    information that allows us to independently verify the

12    attribution -- clustering attributions at issue here.

13          And I don't think that that's entirely accurate.  I

14    suspect it's not.  And the reason for that is they made mention

15    of AlphaBay.  Now, the way my understanding that the owner, so

16    to speak, of AlphaBay was caught was not because of any kind of

17    heuristics or anything.  He was caught because he sent a

18    welcome email that was linked to one of his personal accounts.

19          And so what -- that raises the issue when you say,

20    oh, well, we validated, you know, our information; AlphaBay.

21    Well, is that because you got what I guess would, essentially,

22    would be Heuristic 3 information, you know, external

23    intelligence on something, and then you went back and you

24    created your clusters from that, or did you create your

25    clusters and then find out that they were valid?

1          I think that goes to the core of what we need to see

2     in terms of being able to independently validate the clustering

3     attributions in this case.  It may be that they had -- I

4     think -- again, I think I saw when I was flipping through the

5     information in Heuristic 1, 2, and 3, or somewhere else in the

6     latest disclosures, that there's still no scientific

7     peer-reviewed validation as to the accuracy of this

8     information.

9          So the reason we're seeking this source code, and I

10    think for a lot of the reasons expressed in Mr. Bishop's

11    disclosure -- which was at Docket 179 -- is we need to

12    independently verify the assertions of our adversaries.

13         I think what has been frustrating, as the Court is

14    aware, for the defense is I've never had a case where my

15    adversary has been able to, sort of, dictate the expert that we

16    can use and how we look at the information, not based on

17    whether or not that expert qualifies under Rule 16, but purely

18    on competitive concerns.

19         And our concern here, and I think this is a matter of

20    first impression, is why the Court is -- when we're looking at

21    things here, we're referring to an intermediate appellate court

22    in New Jersey is -- what you have here is the government can

23    effectively prevent the defense from using the experts of their

24    own choice by simply using a private vendor that may be a

25    competitor.

1          And what we're seeking to do here by getting the

2     source code and the related information is getting the

3     information so that we can actually independently verify these

4     numerous anecdotal claims that are being made and being put

5     forward to the Court; saying we got this subpoena information,

6     we've got Judge Faruqui saying this.  Well, I don't know what

7     the data set is there.  Is that scientific?  What's the control

8     group?  What's -- no one has collected any information, as far

9     as I understand the record, as to the whole universe.

10          Yes, maybe it was accurate a hundred times, but was

11     it wrong a million times?  That information is missing.

12          So unlike *Nixon*, where the technology wasn't in

13     question -- they were merely asking for recordings of President

14     Nixon's voice -- here we're asking for what we consider to be

15     relevant, admissible, and specific evidence -- the source code

16     and related items -- that Mr. Bishop -- we outlined in his

17     disclosure so that we can go and do that independent

18     verification by Chainalysis -- and the government's own

19     admission has never been done.

20          It would be a different scenario --

21          THE COURT:  You're not proposing to use the source

22     code to generate an error rate, are you?

23          MR. EKELAND:  I don't know if that's possible.  But

24     we certainly know -- need to know how this machine and

25     technology works in understanding -- in order to understand

1    what kind of tests we would need to do in order to generate the

2    error rate.  I don't --

3            THE COURT:  Can't you do it right now with what you

4    have?  You have heuristics; you have the spreadsheets, which

5    contain thousands of lines of data; you have the blockchain.

6    Can't you, if you want to, go through and just recreate however

7    you want with your experts tracing, and if you think there are

8    errors, you can bring those to the attention of the jury --

9    your expert can bring those to the attention of the jury with

10   what you have already.

11           MR. EKELAND:  First of all, I haven't looked closely

12   at what's been produced, but I don't know the honest answer to

13   that.

14           It's selective data from our adversary.  And what

15   we're asking for -- this wouldn't be a problem if this was

16   coming from FBI cyber.  The whole reason that this data is

17   being withheld from us is -- my understanding is purely

18   competitive and trade secret concerns.

19           And that, to us, to the defense, doesn't seem as a

20   matter of due process proper when we feel like we're entitled

21   to see how this technology actually works and so that we can

22   challenge it and without, so to speak, looking under the --

23           THE COURT:  I'm not sure you're right about this.  I

24   don't know if it's ever come up, but the FBI has lots of

25   sophisticated computer systems that they use.  No one has

1    brought to my attention, at least, that there are cases that

2    say that the FBI has to turn over its source code without some

3    showing of why there's an issue or question with respect to the

4    source code and just say the FBI has got, you know, lots of

5    sophisticated computers that do various things, and we want to

6    see all the FBI's source code, because we don't really know.

7    There may be something in there that may bear on this case.

8              MR. EKELAND:  Well, we were unable to find a case.

9    Maybe there is.  When I looked, I was unable to find a single

10   case in the criminal context where there is a noncompete or

11   competitive concerns are cited in a protective order.

12             THE COURT:  Have you found a case where the FBI or

13   another law enforcement agency has been required to turn over

14   its source code?

15             MR. EKELAND:  I looked for some source code cases.  I

16   haven't done a comprehensive search.

17             THE COURT:  That's surprising at this point.

18             MR. EKELAND:  Your Honor, if -- maybe if this

19   technology was established, but it's not.

20             THE COURT:  No.  But I'm questioning whether anyone,

21   you or the government or anyone, can bring to my attention any

22   case that deals with or requests -- putting aside a private

23   vendor -- where the government is requested to turn over its

24   source code for some computer program that it's used in an

25   investigation.

1          MR. EKELAND:  I'm not aware of that.  I think that

2     highlights the numerous matters of first impression in this

3     case.  I think we're in -- I mean, as the government admitted,

4     this is the first time that Chainalysis Reactor has been

5     subject to a *Daubert* challenge, which surprised me.

6          And it also surprised me -- I mean, it's been no

7     secret what -- how we feel about this technology, that when we

8     went into the *Daubert* hearing, and I just asked the -- you

9     know, I based my cross on the basic *Daubert* factors, and I was

10    surprised to hear that they couldn't name their error rates or

11    the rates of false positives or the rates of false negatives or

12    any kind of scientific peer-reviewed paper.

13         We're being presented with a lot of stuff from the

14    government that says, look, this stuff works great anecdotally.

15    How are we going to check that without looking at how the

16    software works?

17         THE COURT:  Well, I actually sort of wonder just the

18    opposite.  I can see how you can check it with what you've been

19    given recently, which is one of the reasons that I agreed to

20    the defense's request to continue the case.

21         Quite frankly, I don't see how you're going to be

22    able to check the error rate or peer review or whatever other

23    things you've criticized with respect to Chainalysis with the

24    code, and I've given you multiple occasions to kind of bring

25    that to my attention, and you haven't done so.  I understand

1    what you can do with what you have now and, in fact, even

2    without what you have now, Ms. Still went through and did her

3    own analysis and reached disagreement.

4         But with what you have now, you can do this based on

5    the individual heuristics that were applied and go back and --

6    if you want to generate an error rate on it and argue that to

7    the jury, I think you have the information you need to do that,

8    or your experts do at this point.

9         MR. EKELAND:  Your Honor, that is not clear to me.

10   So then -- just because, A, I haven't been able to look closely

11   at it.  The Court may be right.

12        But then, what I would ask is can we reserve the

13   issue so that if we go back and we look at this information on

14   Heuristic 1, 2, 3, and 4, and we come to the opinion that that

15   isn't true, that we can't, that we then come back to the Court

16   and say, here are the reasons why we can't do this without the

17   source code, and here's why we need it.

18        Because I feel like it's very difficult to say that

19   without knowing, again, what we're looking at, what's under the

20   hood.  We're being told, look, this is accurate, you don't need

21   to look under the hood.  We've given you information X, Y, and

22   Z.  But, of course, this is from my adversary.  Maybe that's

23   accurate, but maybe it's not.

24        And the one thing I think we've all learned during

25   this case is how complicated this is.  I think Mr. Bishop's

1    notice and disclosure goes to that.

2          So if the Court is of the opinion that we have

3    everything we need to check the accuracy of Chainalysis

4    Reactor, then I also ask, how come Chainalysis has never done

5    that yet?

6          THE COURT:  You're veering off into -- once again

7    into something that's just not what is before me now.  I mean,

8    I understand your arguments about the reliability of what

9    Chainalysis has done, and you've made that point to me.

10          The question just before me now is whether the

11    subpoena is enforceable at this point or not or whether you

12    should be allowed to issue a pretrial Rule 17 subpoena and

13    whether -- the question of why Chainalysis has or hasn't done

14    it, I don't see how that's relevant to that question.

15          MR. EKELAND:  For me, the reason I'm saying that is I

16    just think that if that information was sufficient, then it's

17    likely that they would have done it.  But I understand your

18    point, Your Honor.  What I guess I'm asking --

19          THE COURT:  They've also had the code, and they could

20    have done it with the code, too.

21          MR. EKELAND:  I'm a little, honestly, baffled by

22    that, why -- I didn't expect that.

23          THE COURT:  I've heard you on that point.  I mean, I

24    think quite literally, you've probably made that point 30 or 40

25    times to me already.  I'm not thick.  I get it.

1          MR. EKELAND:  Your Honor, we ask then that we be

2      allowed to reserve the issue to examine this heuristic

3      information, which I just scanned this morning very quickly,

4      five to ten minutes at the table there.  If that's true, that

5      we can get some sort of accurate assessment and independently

6      verify their data, then we're off and running.

7          But then we ask that we be able to, if we come to a

8      contrary conclusion, come to the Court and say, well, we looked

9      at this, Your Honor, and for these reasons we don't think it's

10     adequate.  I mean, which is, I think, sort of -- one of the

11     points behind having the continuance is to be able -- for us to

12     be able to look at this and analyze it properly, because I

13     just -- I can't say.  I can't say after looking at it for five

14     minutes whether I can calculate the error rate from it, and I

15     need to get Ms. Still's expert opinion on that.

16          THE COURT:  All right.  Anything else?

17          MR. EKELAND:  Not unless the Court has any questions.

18          THE COURT:  All right.  Ms. Pelker?

19          MS. PELKER:  Yes, Your Honor, a few points.  So I

20     think that somewhat, understandably, the lines here between

21     *Daubert* and Rule 16 and what qualifies under Rule 17(c) are

22     really getting blurred here.  And one does impact, certainly,

23     the relevance assessment under 17(c).

24          But we really have the assessment of -- the

25     government's put forward two experts who are going to testify

1    to what their determination is.  They have relied on their use

2    of the software, which that information has been disclosed to

3    the defense.  The defense is entitled to probe that.

4         None of our experts have used -- are familiar with

5    the Chainalysis source code; they are not relying on the

6    formulation of their expert, to the extent that they even are

7    opinions, but in their expert determinations, on their expert

8    reports to anything that they've perceived related to this last

9    round of production.

10        And to the extent that we're now looking at peeling

11   the layers down several layers below, I think that the Court in

12   *Morgan* and really across the board has been clear that experts

13   are not going to be held to a technical understanding of every

14   software that they use.  They need to be able to explain how

15   they used it and why, in their determination, it's reliable.

16        I understand that under 17(c) the defense wants to

17   obtain additional information that they may be able to use on

18   cross-examination for impeachment, but it's not clear to us how

19   they intend to impeach, say, Ms. Bisbee with anything from the

20   Chainalysis source code that is not going to be relevant to her

21   testimony.

22        If you give her a piece of code and try and

23   cross-examine her on it, the answer is going to be, I didn't

24   code the Chainalysis source code here.  And to the extent that

25   they're trying to use it to then develop some additional new

1    opinion for their own expert, I think it's really clear by the

2    defense repeatedly saying that we don't know what we're going

3    to find, we don't know how we're going to use it, we don't

4    know, we don't know, that this is simply a fishing expedition.

5            There is a fair amount of case law regarding

6    discovery of sensitive software limited on the source code

7    front, but sensitive law enforcement-developed software in the

8    child sexual abuse material front, so the government cited

9    several of those cases in its original opposition to the

10    defense motions in limine at ECF 73.

11            The discussion starts at page 32, but on page 34 we

12    cite to what we viewed as kind of two cases that look at the

13    two different positions from two different circuits.  That's

14    *U.S. v. Pirosko* from the Sixth Circuit and *U.S. v. Budziak* in

15    the Ninth.

16            The Ninth in Budziak was really the exception in

17    which the Court did grant a defense request for more extensive

18    discovery relating to a sensitive law enforcement tool, but

19    pointed to the very specific showing there where the defense

20    had actually had an expert come in and give a very specific

21    accounting of exactly what they thought had gone wrong and how,

22    when they looked at evidence on the defendant's computer and

23    their understanding of how the government's software worked,

24    how a very specific thing happened and what specifically they

25    needed to look for relating to the government's software.

1          When the Court in *Pirosko* looked at that issue, they

2     determined that the defense could not meet that sort of

3     exacting standard that had been set out in *Budziak*.  There are

4     a number of district court cases that examine similar issues.

5          The issue of source code discovery is, actually,

6     fairly rare -- specifically, because in most of those cases the

7     defense says we don't need to see the source code; we just want

8     access to the software to do the testing -- and seems to

9     recognize that they really don't have a way to articulate a

10    need for the software.

11         And the government -- we had done a fair amount of

12    research back last fall that didn't end up, ultimately, making

13    it into the brief at the district court level.  We do think

14    that those two circuit cases sum things up well.  But to the

15    extent that the Court is looking for additional case law, most

16    of them discuss the specific tools.

17         So if you look at -- Roundup, EP2P, and Torrential

18    Downpour are some of the names of the tools, and there's a lot

19    of litigation, including a fair amount by Mr. Fischbach, who

20    often comes in and talks about how he needs access, not

21    necessarily to the source code, but to the software.

22         And the government recently cited in one of its

23    filings where Mr. Fischbach is on a webinar with defense

24    counsel talking about how they use these discovery demands for

25    a tactical advantage even though they don't know exactly what

1    they're going to find.

2            THE COURT:  So when you're referring to the software,

3    I take it what you're referring to is just Reactor, and I've

4    already told Mr. Ekeland multiple times that he can obtain a

5    license or find somebody with a license and run the software.

6    And although he withdrew from CJA today, before that I had

7    already told him that I would approve a CJA voucher which he

8    never filed with respect to seeking a license for the Reactor

9    software.

10            MS. PELKER:  Yes, Your Honor.  And the government

11    would point out that that would put the defense in the exact

12    same position as the government experts here of using the

13    software.

14            The government's experts have used the software and

15    determined that it is very reliable for the reasons set out in

16    their reports, in their testimony and then as noted in the

17    government's supplemental finding.  The defense experts can run

18    all of their own tests, they can go and run and see how

19    Chainalysis clusters in their software certain entities and try

20    and find examples where an address was misclustered.

21            Ms. Still tried to do that.  And the two examples

22    that she pulled out as thinking that Chainalysis would

23    miscluster, it turns out are not misclustered in Chainalysis.

24    But the defense has the ability to do that.

25            The source code -- the only thing the source code,

1    potentially -- having not actually seen the source code or

2    would necessarily be able to do anything with it even if I had,

3    but the source code is just going to say, is this heuristic

4    running the way that's described in this report.  They can just

5    look at the spreadsheet and say, you know, here's the starting

6    point, they apply this heuristic as described, it gives us the

7    end point.

8         And if it turns out that they apply the heuristic as

9    described, it never gets to 50 percent of the end points,

10   10 percent to any of the end points, they can put their expert

11   on and say that there are issues, they can come back and ask

12   for additional clarification on that point.  That's not what

13   they're seeking to do here.

14        Again, on that point, I think that -- I know that the

15   Court may not have reviewed all of the attachments to the

16   original expert report, but it did -- and then Ms. Bisbee's --

17   the breakdown from May or June --

18        THE COURT:  I'm not sure I have all the original

19   attachments.

20        MS. PELKER:  There were many, many voluminous

21   attachments.  This one absolutely does provide more detail.

22   But the government has, since last December, provided to the

23   defense these long spreadsheets with all of the different

24   addresses.

25        We heard testimony from Ms. Still that she was able

1    to verify almost 400,000 -- or determine that almost 400,000 of

2    them she concurred with.  She didn't agree with these others.

3    She could articulate generally why she did not agree with them.

4            That's really what the defense is entitled to  and

5    what they've already been able to do with the government's

6    discovery and what they certainly will be able to do even

7    further now.

8            The government would also point out that this request

9    is massively broad.  For each time we come back here and say

10    that we need to narrow it, we get this request where they're

11    saying no, we don't just need the source code; in fact, we need

12    detailed records of every single log activity by any

13    Chainalysis user, every single graph that any government

14    investigator has ever made for any case, any -- they wanted

15    images of all of the -- all of Chainalysis's computers.  They

16    wanted to set up a mini Chainalysis setup.

17            And for all the reasons set forth in the government's

18    opposition, we just are so far afield, and it really highlights

19    what a fishing expedition this is; and, frankly, suggests that

20    this is not a good faith effort relating to a true discovery

21    issue.  But, rather, an attempt by the defense to continue

22    harassing and intimidating and not necessarily out of any sort

23    of animus towards Chainalysis but as a defense tactic, to try

24    to dissuade Chainalysis or other blockchain analytics companies

25    from being an expert for the government.

1          And I think the fact that Ms. Still from CipherTrace

2     is donating, by her account, $100,000 to $200,000 worth of her

3     time from CipherTrace at the same time that CipherTrace has

4     shut down its voluntary response business to help real fraud

5     victims really highlights some of the concerns about what the

6     purpose of these discovery requests are getting at.

7          THE COURT:  All right.  Thank you.  Mr. Frentzen,

8     anything else you wanted to add?

9          MR. FRENTZEN:  Your Honor, just very briefly, just to

10    add -- well, first, just to tell the Court I took a quick look

11    at *New Jersey v. Pickett*, and while I don't think it's a 17(c)

12    case, obviously -- it's in New Jersey, and it's just sort of --

13    I would still take a look at that case and say that we're in a

14    very different situation than that situation, and that the

15    factors that that court took under consideration weigh heavily

16    in favor as well of Chainalysis's view that this source code in

17    this particular instance is totally irrelevant.

18          Number one, they said a rational basis.  I'm

19    paraphrasing because I took some notes, but, obviously, it's in

20    the opinion.

21          That there be a rational basis for disclosure, the

22    extent to which expert testimony supports a claim for

23    disclosure.  Here, as the Court has seen repeatedly,

24    repeatedly, there is not -- no expert has provided any

25    justification for it.

1          Number 2, the specificity of the information sought.

2     Again, we have zero specificity on this record, you know, just

3     couldn't be granted whether it's in *Pickett* or 17(c).

4          Number 3, the available means of protecting the

5     intellectual property.  And here, I'd just address again, we

6     have an absolutely clear record, which we've spelled out, of an

7     intent to harass here and to try to impugn and harm the

8     business for showing up as a witness; including counsel saying

9     we're going to sue the crap out of them, and repeated almost

10    nonstop negative public statements, and being, effectively,

11    outed as feeding news stories.

12         And so what are the available means of protecting the

13    intellectual property when that's what we're dealing with here.

14         And then, 4, any other factors.  And I would just

15    point out in that regard in terms of any other factors, the

16    *Pickett* case involved, I think it was called TrueAllele, but a

17    DNA mixture which I've spent a lot of time in homicide cases

18    dealing with.

19         And, you know, the statistical machinations involved

20    in that kind of probabilistic determinations which can,

21    frankly, skyrocket on the basis of particular factors is a far,

22    far cry from, you know, something that is predicated

23    fundamentally on a public source, which is the blockchain.

24         And so here, in terms of any other factors, I think,

25    again, it weighs heavily -- the *Pickett* case, even if it were

1    the law -- which, obviously, it's not -- would weigh heavily

2    against disclosure.

3            And just to Mr. Ekeland's point, I would ask the

4    Court, you know, the time for ruling is now.  This has gotten

5    to the point where it's like Whac-A-Mole of perpetually being

6    presented with another expert who has got their own animus,

7    their own inability to be noncompetitive, their own, you

8    know -- let's just say issues, if you will.  And, again, three,

9    four times now not any further specificity, but rather going in

10   the other direction.

11           And, you know, we feel like, obviously, we keep

12   dealing with the exact same issue and the time has come.  What

13   we fear -- you know, I know as a trial lawyer, that litigation

14   will expand like gas in a room when you give it time.  And my

15   hope is that -- you know, we were here I don't remember how

16   long ago originally, and the Court said, that's a great idea,

17   Mr. Ekeland, why don't you do that.

18           THE COURT:  I think I had the idea.  Mr. Ekeland said

19   it was the great idea.

20           MR. FRENTZEN:  There you go.  Your memory is better

21   than mine, Your Honor.  Exactly.  But it's been long enough

22   that I've forgotten the exact sequence, Your Honor.

23           So the point is, I don't want to be back here in

24   January.  I don't want to be back -- no offense.  I used to

25   live here; it's great.  I don't think that this should continue

1    to kind of painfully repeat itself.

2              So with that, Your Honor, I'll sit down.  Thank you.

3              THE COURT:  Thank you.  Mr. Ekeland, any final words?

4              MR. FRENTZEN:  Your Honor, I apologize.  One

5    additional point, which is actually just a slightly different

6    thing.

7              THE COURT:  Sure.

8              MR. FRENTZEN:  On the Court's modification of the

9    protective order --

10             THE COURT:  Yes.

11             MR. FRENTZEN:  -- which, obviously, we didn't object.

12   My only request would be, it says, "unless further order of the

13   Court."  If the Court could just orally -- we would like an

14   opportunity to be heard in the event that there were a petition

15   to modify that protective order.

16             THE COURT:  I think that's implicit.  If there is a

17   request to modify it, you certainly should be served with that

18   request and have an opportunity to be heard on it.

19             MR. FRENTZEN:  Thank you, Your Honor.

20             THE COURT:  Okay.  Thank you.

21             MS. PELKER:  Your Honor, just to the extent it's

22   helpful for the Court, I did find a number of other cites

23   relating to TrueAllele where the local courts determined that

24   they did not warrant disclosure.  I'm happy to give the cites

25   if those are helpful.

1          THE COURT:  After Mr. Ekeland, you can read me the

2    cites.  Go ahead, Mr. Ekeland.

3          MR. EKELAND:  In relation to the DNA evidence, DNA is

4    a well-established forensic science.  It's been around for,

5    what, almost 60, 70 years since Crick and Watson in the '50s

6    discovered the double helix and got the Nobel prize for it.

7    This technology and question here is nothing like that.

8          In terms of the source code, I mean, the defense

9    maintains we are specifically asking for the source code.  What

10   we want to see is what inputs and outputs it's asking for

11   because the government and Chainalysis have made the claim that

12   this software is deterministic.  Well, in order for us to

13   validate that claim, we need to see the source code.

14         There just isn't any kind of standards for scientific

15   evidence for this technology like there is for DNA.  So we

16   would argue that, sort of, comparisons to DNA technologies is

17   inapposite.  DNA forensics is a well-established science.

18         You know, unless -- I think we've made our point

19   there.  Unless the Court has further questions, I'm done.

20         THE COURT:  Okay.  Thank you.  Ms. Pelker?

21         MS. PELKER:  Yes, Your Honor.  With the caveat that

22   we had opted not to include this in our prior briefing because

23   they were local and not federal, and so I did --

24         THE COURT:  Those are state court decisions?

25         MS. PELKER:  These are state court decisions.  I have

1    not looked at them since we pulled -- I pulled them out into a

2    local cases file on my computer.

3    It's very possible that there are other local cases

4    out there, that they're more on point.  I just don't --

5    THE COURT:  If they're local cases, I guess I'm less

6    interested.  I thought maybe there were some federal cases

7    dealing with access to the source code that underlies various

8    FBI or other law enforcement software programs that are used in

9    litigation.

10    MS. PELKER:  So there's *United States v. Chiaradio*,

11    C-h-i-a-r-a-d-i-o, from the First Circuit.  That's 684 F.3d at

12    278 is the pin cite.

13    And then it's a number of state cases dealing with

14    TrueAllele specifically, similar to New Jersey, in which the

15    various states determined that the source code for TrueAllele

16    was not material to the defense and that the discovery request

17    relating to discovery of the source code for TrueAllele was

18    rejected on a number of different cases.

19    THE COURT:  Okay.  So let me -- I just want to go

20    take a look at least at a couple of these cases that were just

21    cited, and I'll come out and give you my ruling.

22    (Recess taken.)

23    THE COURT:  All right.  Thank you.  I've now had the

24    opportunity to review those additional cases that were

25    mentioned, and I'm going to deny the defense's motion for leave

1    to issue a pretrial Rule 17(c) subpoena for the source code

2    and, I think it was, the change logs.  Give me a second here.

3         So I'm denying the motion at Docket 155, which is the

4    motion to authorize issuance and pretrial return of subpoena

5    duces tecum to Chainalysis, Inc., under Federal Rule of

6    Criminal Procedure 17(c), which seeks leave to file a Rule 17

7    pretrial subpoena seeking the source code for Reactor and the

8    change logs for Reactor as well.

9         And the version of the source code that was sought

10   was the version that was used by the government when conducting

11   their investigation.  And then they also -- the defense also

12   seeks the change logs for Chainalysis Reactor documenting the

13   changes made to the software during the pendency of this

14   investigation.  And that is all that was sought in the motion

15   that is actually in front of me at Docket 155.

16        I want to provide a fair amount of background and

17   discussion relating to my ruling.  In some sense this dispute

18   dates back almost a year ago when the defense, in its omnibus

19   motions in limine, among many other things, sought access from

20   the government to the software source code, object codes,

21   complete input and output databases, relevant native computer

22   logs, and original sources underlying the government's

23   allegations in the case, and the government responds to that

24   motion correctly by observing that the software and source code

25   and object codes are not in the government's possession,

1    custody, or control.  They belong to Chainalysis.

2            It's been represented to me that the government does

3    not have those materials; in fact, I think has not even

4    reviewed those materials.  But in any event, seeking those

5    materials from the government under Rule 16 is the incorrect

6    procedural vehicle because it's the property of -- all of that

7    is the property of Chainalysis.

8            I think perhaps recognizing that difficulty in

9    November of last year, the defense issued a Rule 17(c) subpoena

10    directly to Chainalysis, along with subpoenas to various

11    Chainalysis employees.  The subpoena that was served on

12    Chainalysis, as I have previously observed, was extraordinarily

13    overbroad under Rule 17.

14            It looked more like the type of document request one

15    might seek -- see in a very hotly contested civil litigation.

16    And the Supreme Court has made clear that 17(c) is not a

17    vehicle for discovery in the same way that it is in a civil

18    case.

19            The subpoena that was served, in any event, back in

20    November was extremely overbroad and burdensome.  Among other

21    things, it sought all documents, records, and communications

22    regarding the purchase of Excygent by Chainalysis, including

23    due diligence documents, the price paid, any memorandum of

24    understanding, sales agreements, negotiations, contracts, and

25    records of payment via cash, equity, options, or any other form

1    of consideration; sought any documents and records and

2    communications, including individual notes to one's self

3    exchanged between Chainalysis and *Wired* magazine, Andy

4    Greenberg or any other reporter related to blockchain analysis

5    or Andy Greenberg's book, *Tracers in the Dark:  The Global Hunt*

6    *for the Crime Lords of Cryptocurrency*, released on November 15,

7    2022.

8        There were 21 -- or 20 overall requests for documents

9    under the subpoena.  And as I previously held, the request

10   failed to satisfy Rule 17(c) or the *Nixon* standard; and, in

11   fact, was just the type of fishing expedition that may be

12   appropriate, at least at times, in civil litigation, but is not

13   appropriate in a criminal case, at least as the rule is

14   currently drafted.

15       Most strikingly, is that, as I've previously

16   observed, I don't read the subpoena from last November --

17   November 30th, I think -- I don't read it to, actually, request

18   the source code.  I guess it's dated November 18, but it was

19   filed with the Court on November 30th.

20       I don't actually read it to request the source code

21   that was used for purposes of the expert analysis that the

22   government proposes to offer in this case.  And if it does, it

23   does so in the most obscure fashion that has never been

24   explained to the Court or justified to the Court.  And the

25   closest it actually came was saying, any documents, records,

1   and communications, including individual notes to one's self

2   exchanged between Chainalysis and any researcher from the

3   University College London IC3, the Austrian Institute of

4   Technology, or the Complexity Science Hub Vienna, including,

5   but not limited to George Kappos, Haaroon Yousaf, Rainer Stutz,

6   Sofia Rollet, Bernhard Haslhofer, or Sarah Meiklejohn related

7   to the presentation of the white paper at the USENIX Security

8   Symposium and the investigation that led to the prosecution in

9   this case.

10          This includes data sets, draft versions of white

11   papers, source code, object code, algorithms, heuristics,

12   methodologies, and Chainalysis research sent to researchers, as

13   well as all software editions with complete code in native file

14   format.

15          So the Court denied -- agreed to quash that subpoena

16   under the *Nixon* standard.  At the time that I denied -- strike

17   that.

18          At the time that I quashed the subpoena as improper

19   under the *Nixon* standard and Rule 17(c), it was at that hearing

20   that the defense raised with me an interest in obtaining access

21   to the Reactor source code.  And I noted at that time "that I

22   was sympathetic to the notion that the defense needed specific

23   information in order to put on its case here."

24          But what I directed was that if the defense wanted

25   access to the Reactor source code, it would have to identify an

1    expert for the Court, and that expert would have to prepare a

2    statement for the Court which would specify and explain with

3    some precision what the expert needed and why the expert needed

4    it.

5         I told Mr. Ekeland, "I understand why you may need

6    this before trial.  If you then need the opportunity for

7    someone to do complicated analysis and they need time to do

8    that analysis, I would recommend moving quickly in doing that.

9    But I think you need to get down to that level of

10   specificity" -- which I had previously described -- "in order

11   to satisfy the Rule 17 standard.  Does that make sense?"

12        And Mr. Ekeland responded back in June, "I think

13   that's an excellent idea.  We're happy to do that, Your Honor."

14        I, on several occasions, have made clear to the

15   defense that, in order to satisfy the dictates of Rule 17, the

16   defense has to make some showing to me of a specific need and

17   some showing of relevance.  And that the way to do that is to

18   have an expert on source code or on coding explain to me what

19   it is that the expert needs to look for and why the expert

20   needs to look for that, and how it could be relevant to this

21   case.

22        I advised the parties, "I would just encourage you

23   all to get your heads together quickly relating to this issue

24   and for you to get the specificity you need, Mr. Ekeland, to

25   the government and Chainalysis because I don't want to put you

1    in the position in which we're back here in another month and a

2    half, and then by the time you actually get what you need, you

3    can't prepare in time for trial."

4          I added, "If you need to come back or even have a --

5    if you need to get me on the telephone at some point to try and

6    resolve these issues to move quickly, I'd like to do that

7    because I don't want to be in a position in which we're on the

8    eve of trial and you're telling me, Judge, we just got the code

9    last Thursday and my expert is telling me they need 60 days to

10   review it."

11         Defense counsel didn't follow through on the Court's

12   instructions that that information be provided, that those

13   discussions occur with Chainalysis and the government, and that

14   some specificity be provided with respect to what was needed to

15   be reviewed and why.

16         Over a month later, at a *Daubert* hearing that was

17   held over the course of July 19th and 20th, Mr. Ekeland

18   reiterated defense's desire for the source code, and I reminded

19   him again that he needed to comply with my direction to provide

20   a targeted request, and to meet and confer with the government

21   and Chainalysis, and to identify an expert and to have that

22   expert prepare a statement explaining with some precision what

23   the expert would need to review and why the expert would need

24   to do so.

25         Following that, again, we just didn't hear anything

1    from the defense with respect to this issue.  And it was more

2    than six weeks later, after the June hearing, that the defense

3    filed a motion for leave to issue a Rule 17(c) subpoena.  And

4    as I mentioned, that subpoena sought access -- or that motion

5    sought access to the Reactor source code and the change logs

6    and internal Chainalysis study.

7            The motion ignored the Court's direction that the

8    defense identify an expert and that the expert specify and

9    explain to the Court why the source code was necessary and what

10   the expert would need to review in the source code and how that

11   was, potentially, relevant to the case.

12           And the motion itself didn't provide any explanation

13   for why the source code was needed for purposes of preparation.

14   For example, with respect to Heuristic 1, the defense simply

15   said, "The heuristic is unreliable because simple obfuscation

16   techniques regularly used throughout the blockchain community,

17   such as CoinJoins, invalidate the assumption that underlies

18   Heuristic 1."

19           But that's an issue that is addressed by the

20   specifics that the government had previously disclosed to the

21   defense and, certainly, as of today, has now disclosed with

22   respect to how Heuristic 1 operates and how CoinJoins are

23   handled.  It says nothing about the source code and how a

24   review of the source code is necessary to make those

25   determinations.

 1          Similarly, with respect to Heuristic 2, the motion

 2     simply said, "Heuristic 2 is unreliable because of its

 3     indiscriminate automated clustering of peel chains."  That

 4     critique is not about the source code.  It's about the

 5     heuristic.  And, again, at least as of today, the defense has

 6     received additional, quite specific, detail with respect to how

 7     the heuristic works.

 8          With respect to Heuristic 3, the motion simply says,

 9     "Reliance on open-source data raises significant questions as

10     to the accuracy and verifiability of that data that could only

11     be answered through the analysis of the Reactor source code and

12     the sources used to generate that code."  And, again, there's

13     no explanation to me, and no explanation is apparent to me, of

14     why the source code is needed to make those types of

15     determinations.

16          On August 22nd, after receiving responses from the

17     government and Chainalysis, I heard from the parties on the

18     defendant's pending motion.  And at the hearing the Court again

19     instructed defense counsel that they had failed to articulate

20     with any specificity why the defense needed the Reactor source

21     code, and the defense had been directed to file a statement

22     from an expert regarding the need to examine the source code

23     and the scope of any such examination.

24          I explained, "The question is just what in particular

25     is it that you need and why you need it?  As I think about --

1    as I think both Chainalysis and the government noted in their

2    responses, I was pretty clear about the process that I intended

3    to take place and you didn't seem to follow that.  Where I said

4    what I need is for you to provide me with some statement by a

5    coding expert or other person with the relevant knowledge to

6    identify to me what it is in the code that you need to look at

7    and what the code will reveal.

8         "I reviewed Ms. Still's report, and I understand her

9    concerns with Chainalysis and the government's other witnesses

10   and their expert reports, but what I still haven't seen is what

11   is it that the source code is going to reveal?  What is

12   going -- who is going to look at that and be able to tell us

13   something from looking at it?"

14        Despite the fact that I had provided the defense,

15   with every opportunity, time to comply with the Court's

16   direction and even though the defense failed to do so, the

17   Court again gave the defense tremendous leeway, and I granted

18   another opportunity for the defense to satisfy Rule 17(c) by

19   identifying an expert and having the expert prepare a statement

20   specifying with precision what the expert would need to

21   determine the accuracy of the Reactor software.

22        I said, "I'm saying give me an expert who can tell me

23   what the expert wants to look at and someone who is not

24   their" -- that is Chainalysis's -- "principal competitor who is

25   an expert in code, who knows and can tell me, I can look at

1    code and I can read computer code and I can tell you, based on

2    reading the computer code, what the assumptions were and this

3    is the portion of the code I would need to look at in order to

4    do that, and here are the rules that I'm prepared to live by

5    with respect to a protective order to make sure the company

6    doesn't sustain significant competitive disadvantage."

7            So in response, Mr. Ekeland sought to flip things a

8    little bit and said if I order the production, then the layman

9    expert is willing to sign a protective order, and I said that

10   was not the direction that I had provided.

11           And I said, "That's why I suggested last time many

12   weeks ago -- we're getting very, very close to trial now, but

13   why I suggested many weeks ago that you sit down and have a

14   conversation with the government and Chainalysis, which

15   apparently didn't occur, and that you tell them, with the

16   assistance of an expert, exactly what it is you need to look at

17   and have a conversation about how to facilitate that, and you

18   just ignored that direction."

19           On August 27th, 2023, the defense for the first time

20   complied in part, but only in part, with the Court's order.

21   And on that day, the defense counsel sent Mr. Salah's resume to

22   the government and Chainalysis.  And it was emailed to the

23   Court on the evening of August 28th.

24           On August 29th, I heard from the defense, counsel for

25   Chainalysis, and the government on Mr. Salah.  And at that

1    hearing I asked defense counsel what exactly they needed to

2    know and hoped to glean from the source code.  And I was quite

3    clear that this was the opportunity for Mr. Ekeland to

4    articulate with specificity exactly what it was that they

5    needed the source code for and what they needed to --

6    Chainalysis to disclose in order to prepare for the defense.

7          And in response -- I want to get the actual language

8    in front of me.  Mr. Ekeland, given this opportunity said,

9    "First we would like to, in relation to Heuristic 1, which is

10   the co-spend heuristic, Ms. Bisbee testified that Chainalysis

11   has particular algorithms to detect CoinJoins, so we'd like to

12   see the source code and any information that relates to

13   Heuristic 1."

14         And then he says -- Mr. Ekeland says, "We would like

15   to see, as well as information on Heuristic 1, Heuristic 2, of

16   course, which Ms. Still called the Pac-Man overinclusive

17   behavioral heuristic.  And more interestingly, something that

18   was raised by Mr. Salah with Heuristic 3, which is the

19   intelligence heuristic, what we're unclear on here is whether

20   or not Heuristic 3 involves actually manual -- actual manual

21   modification."

22         And then he goes on and says, "What we're asking for

23   is information and source code related to Heuristic 1,

24   Heuristic 2, and Heuristic 3; in particular, any kind of manual

25   manipulation and corrections."

1           And then the Court notes that "I just want to stay
2    focused on narrowing things in a way that provides specificity
3    with respect to what the defense is seeking."  I say, "I'm
4    trying to give you the specificity now by telling you exactly
5    as of today what it is, period.  That's the end of the matter.
6    I'm going to hold him to it."  By that I meant I'm going to
7    hold Mr. Ekeland to what he tells us he needs at the end.

8           He identified these matters.  And that is then, as I
9    understand it, what then prompted Chainalysis to agree to
10   provide answers to those materials and information that was
11   answering -- answers to those questions and material that was
12   responsive to those questions that I was very careful about
13   giving Mr. Ekeland the opportunity to be as specific as
14   possible about and made clear that was the end of the matter.

15          Then the Court on August 30th at -- while Chainalysis
16   was in the process of making the production that it made a few
17   days ago and that was turned over to the defense today, the
18   Court issued an order with respect to Mr. Salah, and I held in
19   my order that the defense had not provided the statement that I
20   required that Mr. Salah to provide that told us why it was he
21   had to look at the source code and what he sought to identify
22   in the source code.

23          I also concluded that Mr. Salah founded a competing
24   company whose business model was highly antagonistic to
25   Chainalysis's business model, and that he resided outside the

1    United States, was not a U.S. citizen, and was beyond the

2    contempt power of the Court.  And that for those reasons, he

3    was not an appropriate expert.

4         But before even reaching whether he was an

5    appropriate expert, the defense still had not complied with my

6    requirement and direction that was now weeks and weeks old,

7    that they provide the Court and the government and Chainalysis

8    with a detailed explanation of what it was they were looking

9    for in the source code and why they needed to examine that

10   source code.

11        On September 5th the defense proposed another expert,

12   Bryan Bishop.  And to this day, I still have not received a

13   statement from Mr. Bishop indicating what it is that Mr. Bishop

14   was looking for.

15        I have a filing by the defense, which goes into far

16   greater detail than any of the prior filings by the defense,

17   but there's nothing that purports to be a statement of

18   Mr. Bishop to the Court or to Chainalysis and the government.

19   It may be that Mr. Bishop spoke to the defense and provided

20   input, but that's not the way it's represented, and it still is

21   not compliant with the Court's direction.

22        In addition, at the same time, I think, perhaps

23   demonstrating some lack of good faith here in trying to reach a

24   resolution with respect to these issues, the request becomes

25   massively broader.  And I think, as Ms. Pelker put it to me, I

1    think not inaccurately earlier today, literally the request

2    seems to touch on everything that touches on a computer or

3    almost to that extent at Chainalysis.  It's extraordinarily

4    broad.

5             But, again, it provides virtually no explanation of

6    why it is that the defense needs access to the source code in

7    light of all the other disclosures that have been made in this

8    case.

9             And in the 17-page filing from the defense in

10   which -- what I was just looking for is some expert as -- and

11   the cases that have actually allowed disclosures of this type,

12   some explanation by an expert of here's where I think there's a

13   potential problem, here's what I need to look at to see if it's

14   a problem, and here's why I think it might be a problem in this

15   case.  None of that.

16            And, instead, with respect to the source code request

17   under a section which says "Justification," it says, "source

18   code" refers to the set of human-readable instructions that

19   gets transformed into the machine for a particular software

20   project -- work product.  While machine code itself is

21   important to study and examine to see what the machine was told

22   to do at the time the software was executed, source code is

23   itself valuable because it shows high-level extractions,

24   concepts in the intentions of the programmers which can be

25   compared to the machine code.  It includes details such as

1    comments, versions -- version history and human-readable

2    documentation.  As to the purpose and different function calls,

3    libraries, and dependencies.

4            I suspect that that paragraph there could have come

5    out of any textbook definition of what source code is used in

6    any context having no nexus whatsoever to this case.

7            The filing under justification then goes on and

8    there's one more paragraph that says, "This source code request

9    includes software beyond Chainalysis Reactor because it is

10   possible the Reactor product itself is only a visualization and

11   query interfaced to other Chainalysis systems.  And that

12   meaningful computations do not occur within Chainalysis

13   Reactor.

14           "Without having overview of the Chainalysis system

15   and not having previously reviewed Chainalysis architecture and

16   source code, it is difficult to determine whether Chainalysis

17   Reactor itself will encompass the material sufficient to draw

18   conclusions as to the accuracy of Chainalysis's clustering

19   methods.  Software related to data collection, annotation, and

20   other data functions is also requested because data and

21   processing data is the basis of the product's supposed value."

22           And if you compare this to anything in any other

23   case, it doesn't come close to satisfying the standard in any

24   case in which a court has authorized disclosure, even -- and

25   I'll come to this in a minute -- under Rule 16, much less under

1    Rule 17(c).

2          It's largely just a definition of source code,

3    largely just repeating the conclusion that we'd like to look at

4    it, but then adding, and there's a lot of other things we would

5    like to look at, but never responding in any way -- in any way

6    to the Court's request for some statement by an expert

7    explaining why it is the expert needs to look at the source

8    code and what the expert would be looking for in the source

9    code; and how that could be potentially relevant to this case

10    other than just a fishing expedition of extraordinary breadth

11    here of saying we want to just see everything in the

12    Chainalysis computer arsenal so we can determine what

13    Chainalysis may have used here, what it didn't use here,

14    understand the architecture of the systems.  And then it's

15    possible we're going to find something that is useful in the

16    case.

17          But I'm not even clear that the filings rise to that

18    level because the justifications -- in each of the

19    justifications that the defense offers for why it needs to look

20    at the code don't, in fact, involve code.  Actually, I think

21    the defense's filings, if anything, undermine a contention that

22    the defense has a need to review the source code because what

23    the defense does at every turn is simply say we need to

24    identify the source code because we think that there are

25    problems with this heuristic and, in particular, that CoinJoin

1    is a problem; and because the Heuristic 2 is overly expansive,

2    it's the Pac-Man analogy, it gobbles everything up; there's

3    been a lack of peer review; there's no error rate here.

4        And I asked Mr. Ekeland earlier about the error rate,

5    I said, "How is it that the source code is going to help you

6    determine what the error rate is or not?" And there was no

7    response to that.

8        So given opportunity after opportunity to explain to

9    me what it is the defense needs to actually review the source

10   code for, if anything, on reviewing those filings, I'm less

11   convinced now than I was before that the defense has some

12   articulable basis to review the source code. Because whenever

13   they are asked to do it, they point to things in which the

14   source code, as far as I understand it, is not the means of

15   discovering what the defense wants to discover.

16       And with respect to the error rate and understanding

17   how the software operates, for weeks and weeks I have -- and I

18   encouraged the defense to obtain a license to have access to

19   the software, which differs, obviously, from the underlying

20   source code, but it's the software that you can then run and

21   see what results you get with that software and compare it to

22   other software.

23       And up until today, Mr. Sterlingov was proceeding

24   pursuant to the Criminal Justice Act, and I indicated that the

25   Court would, if necessary, provide the funding for obtaining a

 1   license.  Today Mr. Ekeland told me that Mr. Sterlingov no

 2   longer wants to proceed under the Criminal Justice Act.  I do

 3   think at some point I should come back to that, and I just want

 4   to make sure that that is, in fact, Mr. Sterlingov's decision

 5   and not Mr. Ekeland's decision.

 6          But in any event, the software has been available.

 7   The defense has made no gestures to obtain access to that,

 8   which I think does provide some support for Chainalysis's

 9   argument and the government's argument that either the defense

10   has been looking for an answer of no here and has been

11   constantly shifting its demands and not complying with the

12   Court's order in just the hopes it will be denied access to the

13   source code and can make an issue out of it, or perhaps some

14   lack of good faith with respect to this, because I've given

15   clear directions of what needs to be done.  It's been ignored.

16          Also, the defense -- I've invited the defense to have

17   access to the software, and the defense, as far as I can tell,

18   has done nothing whatsoever about that.

19          I do think, for the reasons that I've previously

20   provided, that the defense's request fails under Rule 17(c) and

21   the *Nixon* standard which requires a showing of relevancy,

22   admissibility, and specificity, and provides that the search

23   can't be a general fishing expedition.  But, nonetheless, the

24   party seeking the information does carry the burden of meeting

25   the exacting standards of each of those prongs.

1          That's citing to *Cheney v. United States District*

2    *Court*, 542 U.S. 367, 387 to -- 386 to 87.

3          I, again, am somewhat sympathetic, as some of my

4    questioning might have suggested, to Mr. Ekeland's view that a

5    case like this may be somewhat different than *Nixon* because

6    here it's the government that is offering the expert testimony.

7    The expert testimony is based, at least in part, on the

8    analysis done by the Reactor program, and that it may be that

9    the *Nixon* standard should be relaxed somewhat in this context.

10          But even relaxing the *Nixon* standard, I'm still

11   unpersuaded that the defense has made any showing with respect

12   to why it needs the source code.  And that's particularly so in

13   light of the disclosure that Chainalysis has now made, which is

14   extremely extensive, and I wouldn't purport to be able to add

15   up the number of lines of data that are provided.

16          But the explanations are detailed, and there's an

17   enormous amount of information that, as I understand it, would

18   allow, to the extent that the defense wasn't able to do so

19   already based on all the publicly available data on the

20   blockchain, run the particular heuristics at issue here and

21   make determinations as to the defense's view as to the accuracy

22   or not of those heuristics, which is what the challenge has

23   been and the only thing that's ever been identified to me as a

24   basis for needing access to the code itself.

25          And when you add those -- that disclosure, the reams

1    and reams of data and information that have been disclosed in

2    this case and the availability which the defense has not

3    availed itself of, of the program itself, I'm left convinced

4    that the defense has failed to carry its burden under

5    Rule 17(c).

6          As I have previously indicated, I did find the

7    decision from the intermediate court in *New Jersey* and the

8    *United States v. Pirosko* helpful, but that is a case which cuts

9    both ways.  It does highlight the need and the importance at

10   times of providing access to the defense of computer code and

11   software to allow the defense to prepare itself.

12         But it also shows what the defense needs to do in

13   order to obtain that, and it's simply not enough to say this is

14   a criminal case, this is being used against us in this way and,

15   therefore, we need to see everything and anything without any

16   specification by an expert explaining why in particular that

17   information is needed.

18         And it may be that the showing that was made in

19   *Pirosko* is more than is necessary in a garden-variety case.  In

20   there, there was quite a detailed showing that was made.  But

21   even if *Pirosko* was a particularly compelling case -- I'm

22   sorry.  I was saying *Pirosko*.  I had the wrong case in front of

23   me.  I meant to be referring to *Pickett*.  I apologize.

24   Wrong case name.  *Pickett* from the New Jersey intermediate

25   court.  I'm getting ahead of myself with *Pirosko*.  I was

1    talking about *Pickett* there.

2            And it gives you some idea of the type of showing

3    that can be made if someone applies one's self to it and gets

4    an expert and has an expert do what the expert needs to do.

5    That just hasn't been done here.

6            And the two cases that Ms. Pelker pointed me to a

7    little while ago, I think, are indicative of this.  Both of

8    those cases were not even 17(c) cases.  They were Rule 16

9    cases.  And in the Ninth Circuit case, *Budziak*, which is at

10   697 F.3d 1105, the Ninth Circuit did hold that the defendant

11   was entitled to the computer software that was at issue there.

12           But the Court stressed that in support of his first

13   two motions to compel, *Budziak* presented evidence suggesting

14   that "The FBI may have only downloaded fragments of child

15   pornography files from his "incomplete" folder making it "more

16   likely" that he did not knowingly distribute any complete child

17   pornography files to Agents Lane or Whisman."

18           And the Court also notes in support of his third

19   motion to compel, *Budziak* submitted evidence suggesting that

20   "The FBI agents could have used the EP2P software to override

21   his share settings."

22           And then the Court goes on and quotes the Third

23   Circuit as holding "A party seeking to impeach the reliability

24   of computer evidence should have sufficient opportunity to

25   ascertain by pretrial discovery whether both the machine and

1    those who supply it with data input and information have

2    performed their tasks accurately."

3            But ultimately concludes that in that case it was

4    required because of the showing that the defendant made through

5    the defendant's experts.

6            Here I will say that there are numerous means that

7    have been offered to the defense to verify or impeach the

8    reliability of the computer evidence the government seeks to

9    input here.  There's a very lengthy and detailed report already

10   from Ms. Still which seeks to do that.

11           But now there's been another enormous production of

12   information, as well as the fact that the software itself, as

13   I've said numerous times now, was or could have been available

14   to the defense, and what has not been shown to me is why the

15   code itself is even, arguably, necessary for purposes of

16   impeaching the reliability of the computer evidence.

17           This point, I think, is highlighted by the Sixth

18   Circuit's decision in *United States v. Pirosko* at 787 F.3d 358,

19   where the Third Circuit distinguishes *Budziak* and stresses the

20   fact that in *Budziak* there was evidence that was offered by

21   experts that raised questions about the FBI software, the EP2P

22   software in that case.

23           And the Third Circuit, in coming out the other way,

24   including that there wasn't sufficient evidence in that case

25   as, tellingly, in *Budziak*, the Ninth Circuit also noted that,

1    "Although the government argued that the computer logs it

2    provided *Budziak* demonstrated that he would not uncover any

3    helpful information through discovery of the software, the

4    declarations of *Budziak's* computer forensic experts stated

5    otherwise."

6         And here, that just has never happened.  I haven't

7    been provided with that type of evidence despite numerous

8    invitations to the defense to do that.

9         And so for all of those reasons, the Court will deny

10   the defense motion for leave to issue a Rule 17(c) subpoena at

11   Docket 155.

12        And just for clarification, I think that the motion

13   fails both procedurally on the grounds that the defense has

14   repeatedly failed to follow the Court's directions, has failed

15   to do so in a timely manner, and even to this date has not

16   complied with the Court's directions with respect to how to

17   support such a motion.

18        And, two, on the substance, the showing has not been

19   made to me that's necessary to satisfy Rule 17(c).

20        And I suppose, three, the requests are not getting

21   more targeted but are becoming less targeted and more, again,

22   of a fishing expedition.

23        And then a final note is Chainalysis and the

24   government have suggested that the requests here are abusive,

25   intended to intimidate, and are ultimately harassing.  And I

1    will note that I do have questions about what the purpose was

2    that's been served by this entire exercise given the fact that

3    the defense has filed numerous filings and has fought hard on

4    this issue but has never done the work of actually finding an

5    expert to explain to the Court why the code is necessary or

6    useful.

7         But in addition to that, this case strikes me as

8    highly unusual in that in the cover letter to the November 2022

9    subpoenas, Mr. Ekeland alluded to bringing a malicious

10   prosecution case against Chainalysis, which, as I've previously

11   indicated, I can't imagine what the basis would be for that

12   based on what I've seen.

13        He and Mr. Hassard have repeatedly referred to

14   Chainalysis as "The Theranos of blockchain analysis."  On a

15   podcast, defendant's counsel threatened to "Sue the crap out of

16   Chainalysis after defendant's trial concludes."

17        And I think that does support somewhat the --

18   Chainalysis's contention and the government's contention that

19   the requests here are intended to dissuade Chainalysis from

20   participating in this case in particular, but perhaps other

21   cases more generally, and at least, arguably, constitute a form

22   of harassment.

23        I don't think I need to go that far for purposes of

24   my ruling today other than to say that I think that the

25   statements by defense counsel do provide important context with

1    respect to the history here and at least the concerns that I

2    think Chainalysis has legitimately raised in light of those

3    threats.

4            So that's my ruling with respect to 17(c) and, in

5    particular, Docket 155.  I don't know if there's anything else

6    you want to take up today or if we should just come back on

7    Friday?

8            MS. PELKER:  I don't think anything else from the

9    government today.  Just coming back Friday -- we can also come

10   back tomorrow if that's better for the Court's schedule.

11           THE COURT:  Well, I am free tomorrow.  I don't know

12   whether -- can we get Mr. Sterlingov here tomorrow?  Is that --

13   I guess he was going to be here tomorrow anyway.

14           Do the parties prefer that?  I'm happy to do it

15   tomorrow if you prefer.  That way maybe you get the weekend.

16   And you're in town already, Mr. Ekeland, so you don't have to

17   travel back and forth.  Whatever you prefer.

18           MR. EKELAND:  We would just prefer Friday.

19           MS. PELKER:  Either way is fine with the government.

20   We didn't --

21           MR. EKELAND:  We would just prefer Friday because on

22   the way down Mr. Hassard's car hit something on the I-95 and

23   both his tires blew out, so they got in at, like, 3:30 in the

24   morning last night.  So we'd just like to be able to deal with

25   that.

 1          THE COURT:  That's scary.  I hope everyone was okay?

 2          MR. EKELAND:  Yeah, fortunately.  It was slow.

 3          THE COURT:  A friend of mine within the past two

 4    weeks or so, I would say, had the same experience on 95.  I

 5    think it was in New Jersey.  He was driving his car and there

 6    was a board across the road; he hit the board and blew out at

 7    least two of his tires.  I'm not sure if it was two or four.

 8    So that's concerning.

 9          MR. EKELAND:  It was.  It was scary.  I'm glad --

10          THE COURT:  That's all beside the point.  Friday is

11    fine.

12          MR. EKELAND:  Thank you, Your Honor.

13          THE COURT:  What time?  10:00 a.m.?

14          MR. EKELAND:  10:00, Your Honor?

15          THE COURT:  Okay.  Let's do it at 10:00 a.m. on

16    Friday.

17          You know what would be helpful to me, though, would

18    be -- I don't care whether you do it in a filing or just in an

19    email that you copy each other on, but if you can let me know

20    what it is that you'd like me to take up on Friday -- maybe

21    just do that by midday tomorrow -- that way at least I have

22    some things on my radar.

23          But if I don't have the same things on my radar that

24    you do, I'll at least know what you want me to get to.

25          MR. EKELAND:  Certainly.

1           THE COURT:  Okay.  Thank you all.  Have a good

2    evening.

3               (The hearing adjourned at 3:50 p.m.)

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, TAMARA M. SEFRANEK, do hereby certify that the

4    above and foregoing constitutes a true and accurate transcript

5    of my stenographic notes and is a full, true and complete

6    transcript of the proceedings to the best of my ability.

7          Dated this 18th day of September, 2023.

8

9                         /s/ Tamara M. Sefranek_____
                         Tamara M. Sefranek, RMR, CRR, CRC
10                        Official Court Reporter
                         Room 6714
11                        333 Constitution Avenue, N.W.
                         Washington, D.C.  20001

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100,000** [1] - 86:2
**$200,000** [1] - 86:2

## '

**'50s** [1] - 90:5

## /

**/s** [1] - 119:9

## 1

**1** [12] - 23:5, 36:22, 71:9, 72:5, 77:14, 98:14, 98:18, 98:22, 102:9, 102:13, 102:15, 102:23
**10** [1] - 84:10
**100** [2] - 21:18, 37:25
**10005** [1] - 1:22
**10:00** [3] - 117:13, 117:14, 117:15
**1105** [1] - 112:10
**11:07** [1] - 29:18
**11:25** [1] - 29:20
**11th** [2] - 31:17, 34:2
**12:38** [1] - 70:7
**13** [1] - 1:6
**1301** [1] - 1:18
**15** [1] - 94:6
**155** [4] - 92:3, 92:15, 114:11, 116:5
**16** [12] - 39:9, 40:11, 51:12, 52:12, 54:4, 54:8, 72:17, 79:21, 93:5, 106:25, 112:8
**16(g** [1] - 54:14
**16th** [1] - 30:6, 30:8, 31:18
**17** [6] - 68:20, 78:12, 92:6, 93:13, 96:11, 96:15
**17(c** [38] - 5:6, 5:14, 35:9, 50:8, 50:16, 50:17, 51:2, 51:15, 51:20, 52:9, 52:12, 52:14, 52:15, 52:24, 53:20, 53:22, 54:4, 54:6, 54:12, 55:2, 63:20, 63:21, 79:21, 80:16, 86:11, 92:1, 92:6, 93:9, 93:16, 94:10, 95:19, 98:3, 100:18, 109:20, 112:8, 114:10, 116:4
**17(c)** [7] - 52:15, 65:14, 79:23, 87:3,

107:1, 111:5, 114:19
**17-page** [1] - 105:9
**179** [1] - 72:11
**18** [1] - 94:18
**18th** [1] - 119:7
**194** [1] - 20:22
**19th** [1] - 97:17
**1:21-CR-0399** [1] - 1:3
**1:30** [1] - 69:6

## 2

**2** [13] - 23:5, 37:1, 57:9, 65:16, 71:9, 72:5, 77:14, 87:1, 99:1, 99:2, 102:15, 102:24, 108:1
**20** [1] - 94:8
**20001** [3] - 1:13, 2:23, 119:11
**20005** [1] - 1:19
**202-354-3246** [1] - 2:23
**2022** [1] - 94:7, 115:8
**2023** [3] - 1:6, 101:19, 119:7
**2024** [2] - 31:10, 46:25
**20530** [1] - 1:16
**20th** [1] - 97:17
**21** [1] - 94:8
**21-399** [1] - 3:2
**2255** [1] - 28:23
**22nd** [1] - 99:16
**270** [1] - 41:17
**278** [1] - 91:12
**27th** [1] - 101:19
**28th** [1] - 101:23
**29th** [1] - 101:24
**2:00** [1] - 70:8

## 3

**3** [11] - 59:22, 60:2, 71:10, 71:22, 72:5, 77:14, 87:4, 99:8, 102:18, 102:20, 102:24
**30** [2] - 1:22, 78:24
**30th** [3] - 94:17, 94:19, 103:15
**32** [1] - 81:11
**333** [2] - 2:22, 119:11
**34** [1] - 81:11
**358** [1] - 113:18
**367** [1] - 110:2
**386** [1] - 110:2
**387** [1] - 110:2
**3:30** [1] - 116:23
**3:50** [1] - 118:3

## 4

**4** [5] - 60:23, 61:1, 71:10, 77:14, 87:14
**40** [1] - 78:24
**400,000** [2] - 85:1
**425** [1] - 2:3
**45** [1] - 7:17
**466** [1] - 41:17
**4th** [1] - 32:3

## 5

**50** [1] - 84:9
**542** [1] - 110:2
**5th** [1] - 104:11

## 6

**60** [2] - 90:5, 97:9
**601** [1] - 1:13
**65** [4] - 58:10, 58:11
**6714** [2] - 2:22, 119:10
**684** [1] - 91:11
**697** [1] - 112:10
**6th** [1] - 31:24

## 7

**70** [1] - 90:5
**73** [1] - 81:10
**787** [1] - 113:18

## 8

**87** [1] - 110:2
**8th** [1] - 1:22

## 9

**94105** [1] - 2:4
**95** [1] - 117:4
**950** [1] - 1:15
**9:30** [1] - 1:6

## A

**a.m** [4] - 29:18, 29:20, 117:13, 117:15
**A.M** [1] - 1:6
**ability** [9] - 7:3, 7:16, 7:17, 8:14, 29:11, 62:12, 65:21, 83:24, 119:6
**able** [35] - 8:18, 9:22, 11:6, 11:18, 14:1, 17:4, 24:5, 26:14, 26:22, 33:4, 40:4, 43:14, 62:14, 62:18, 64:13, 69:16, 69:23,

72:2, 72:15, 76:22, 77:10, 79:7, 79:11, 79:12, 80:14, 80:17, 84:2, 84:25, 85:5, 85:6, 100:12, 110:14, 110:18, 116:24
**absent** [2] - 12:18, 38:23
**absolute** [1] - 70:1
**absolutely** [3] - 21:3, 84:21, 87:6
**abuse** [1] - 81:8
**abusive** [1] - 114:24
**accept** [2] - 9:18
**access** [16] - 41:23, 82:8, 82:20, 91:7, 92:19, 95:20, 95:25, 98:4, 98:5, 105:6, 108:18, 109:7, 109:12, 109:17, 110:24, 111:10
**accommodate** [3] - 9:17, 48:15, 69:14
**according** [1] - 54:6
**account** [2] - 53:6, 86:2
**accountant** [1] - 39:18
**accounting** [4] - 55:17, 55:21, 81:21
**accounts** [2] - 39:18, 71:18
**accuracy** [9] - 20:25, 21:8, 21:15, 72:7, 78:3, 99:10, 100:21, 106:18, 110:21
**accurate** [8] - 21:8, 23:6, 71:13, 73:10, 77:20, 77:23, 79:5, 119:4
**accurately** [2] - 43:8, 113:2
**achieve** [1] - 62:18
**achieved** [2] - 62:18, 62:19
**acquittal** [1] - 16:17
**Act** [3] - 47:14, 108:24, 109:2
**Action** [1] - 1:2
**action** [2] - 68:25, 69:1
**activity** [1] - 85:12
**actual** [5] - 4:9, 41:4, 65:15, 102:7, 102:20
**add** [9] - 14:4, 18:15, 19:7, 49:8, 64:5, 86:8, 86:10, 110:14, 110:25
**added** [1] - 97:4
**addendum** [1] - 18:10

**adding** [1] - 107:4
**addition** [3] - 20:8, 104:22, 115:7
**additional** [17] - 4:16, 6:9, 22:11, 41:9, 56:21, 60:12, 61:15, 64:6, 65:8, 80:17, 80:25, 82:15, 84:12, 89:5, 91:24, 99:6
**address** [14] - 5:12, 8:1, 11:19, 14:16, 15:19, 49:14, 57:21, 57:22, 57:24, 58:2, 58:16, 62:14, 83:20, 87:5
**addressed** [1] - 98:19
**addresses** [10] - 13:15, 13:17, 39:18, 56:23, 59:15, 60:19, 61:10, 61:15, 62:23, 84:24
**addressing** [2] - 16:18, 48:15
**adequate** [2] - 6:19, 79:10
**adequately** [1] - 14:5
**adjourned** [1] - 118:3
**adjustment** [1] - 54:4
**administrator** [1] - 53:8
**admissibility** [2] - 50:20, 109:22
**admissible** [1] - 73:15
**admission** [1] - 73:19
**admitted** [1] - 76:3
**advantage** [2] - 16:12, 82:25
**adversaries** [3] - 8:15, 8:16, 72:12
**adversary** [4] - 11:21, 72:15, 74:14, 77:22
**advice** [7] - 43:20, 43:21, 43:24, 44:20, 44:23, 46:9, 46:12
**advise** [1] - 7:22
**advised** [1] - 96:22
**advisor** [1] - 65:25
**affect** [1] - 68:18
**affected** [2] - 22:6, 36:25
**affecting** [1] - 8:14
**afield** [1] - 85:18
**afterwards** [1] - 10:1
**age** [1] - 70:22
**agency** [1] - 75:13
**Agents** [1] - 112:17
**agents** [1] - 112:20
**ago** [8] - 35:23, 47:12, 88:16, 92:18, 101:12, 101:13,

103:17, 112:7
**agree** [9] - 5:8, 5:10, 11:18, 15:16, 17:25, 36:5, 85:2, 85:3, 103:9
**agreeable** [1] - 42:10
**agreed** [3] - 51:18, 76:19, 95:15
**agreeing** [2] - 5:18, 27:12
**agreement** [2] - 16:1, 42:5
**agreements** [1] - 93:24
**agrees** [5] - 5:15, 17:25, 27:14, 30:1, 34:13
**ahead** [6] - 29:14, 49:5, 49:11, 69:5, 90:2, 111:25
**Ahmed** [1] - 3:10
**AHMED** [1] - 1:21
**ALDEN** [1] - 1:14
**Alden** [1] - 3:6
**algorithms** [3] - 19:24, 95:11, 102:11
**allegations** [1] - 92:23
**alleged** [1] - 26:16
**allegedly** [1] - 56:2
**alleging** [1] - 20:24
**allow** [7] - 5:10, 10:5, 10:9, 29:8, 62:21, 110:18, 111:11
**allowed** [3] - 78:12, 79:2, 105:11
**allows** [4] - 10:21, 11:21, 17:10, 71:11
**alluded** [1] - 115:9
**almost** [7] - 48:22, 85:1, 87:9, 90:5, 92:18, 105:3
**AlphaBay** [6] - 60:10, 60:11, 60:18, 71:15, 71:16, 71:20
**alteration** [2] - 59:16, 59:18
**alterations** [1] - 59:13
**alternative** [1] - 32:25
**amend** [2] - 25:4, 61:18
**amended** [1] - 37:20
**amending** [2] - 42:8, 68:20
**amendment** [1] - 42:14
**America** [3] - 3:3, 53:4, 53:5
**AMERICA** [1] - 1:2
**AML** [1] - 64:13
**amount** [9] - 26:15,

49:25, 56:19, 58:10, 81:5, 82:11, 82:19, 92:16, 110:17
**amounts** [2] - 27:19, 27:23
**analog** [1] - 55:1
**analogous** [1] - 55:4
**analogy** [1] - 108:2
**analyses** [1] - 54:24
**analysis** [17] - 6:1, 6:2, 7:4, 9:23, 36:4, 41:18, 51:10, 51:17, 58:20, 77:3, 94:4, 94:21, 96:7, 96:8, 99:11, 110:8, 115:14
**analyst** [1] - 37:14
**analytics** [1] - 85:24
**analyze** [1] - 79:12
**Andy** [2] - 94:3, 94:5
**anecdotal** [2] - 20:24, 73:4
**anecdotally** [1] - 76:14
**animus** [2] - 85:23, 88:6
**annotation** [1] - 106:19
**answer** [12] - 9:12, 9:13, 16:3, 20:21, 52:7, 55:14, 59:18, 65:9, 66:2, 74:12, 80:23, 109:10
**answered** [1] - 99:11
**answering** [2] - 31:5, 103:11
**answers** [3] - 56:13, 103:10, 103:11
**antagonistic** [1] - 103:24
**anti** [1] - 11:20
**anti-competitive** [1] - 11:20
**anticipating** [1] - 26:24
**antitrust** [4] - 54:21, 54:22, 54:23, 55:10
**anyway** [6] - 17:14, 18:5, 27:10, 47:11, 67:11, 116:13
**apologies** [1] - 57:5
**apologize** [8] - 3:18, 4:4, 7:10, 39:3, 54:18, 66:7, 89:4, 111:23
**apparent** [1] - 99:13
**appeal** [1] - 28:24
**Appeals** [1] - 34:8
**appear** [2] - 51:18, 52:15
**appearance** [1] - 3:16

**Appellate** [1] - 41:16
**appellate** [3] - 9:15, 11:16, 72:21
**application** [1] - 3:11
**applied** [7] - 19:15, 41:5, 53:22, 53:23, 62:25, 63:5, 77:5
**applies** [3] - 17:6, 51:3, 112:3
**apply** [6] - 26:23, 51:15, 61:5, 62:14, 84:6, 84:8
**applying** [1] - 5:21
**appointed** [1] - 47:13
**appreciate** [14] - 3:24, 14:7, 31:14, 40:13, 49:13, 49:16, 49:22, 49:23, 50:1, 56:8, 66:25, 67:22, 68:3, 69:23
**approach** [1] - 3:4
**approaching** [1] - 4:23
**appropriate** [10] - 47:21, 49:20, 51:21, 63:21, 64:4, 66:1, 94:12, 94:13, 104:3, 104:5
**approve** [1] - 83:7
**architecture** [2] - 106:15, 107:14
**arguably** [4] - 55:4, 62:1, 113:15, 115:21
**argue** [5] - 26:22, 29:11, 63:4, 77:6, 90:16
**argued** [2] - 51:5, 114:1
**arguing** [1] - 53:14
**argument** [5] - 38:23, 51:14, 64:7, 109:9
**arguments** [3] - 28:5, 42:24, 78:8
**arise** [1] - 45:7
**arraignment** [8] - 25:7, 25:8, 25:9, 25:11, 25:25, 27:17, 29:15, 29:17
**arsenal** [1] - 107:12
**articulable** [1] - 108:12
**articulate** [4] - 82:9, 85:3, 99:19, 102:4
**ascertain** [1] - 112:25
**aside** [2] - 15:15, 75:22
**aspect** [2] - 42:25, 60:20
**aspects** [1] - 36:18
**aspersions** [1] - 40:17

**assertions** [1] - 72:12
**assessment** [3] - 79:5, 79:23, 79:24
**assistance** [2] - 68:8, 101:16
**assists** [1] - 65:2
**associated** [4] - 14:10, 57:21, 57:22, 60:4
**Association** [1] - 68:19
**assume** [3] - 4:1, 14:19, 54:20
**assuming** [2] - 17:24, 29:25
**assumption** [1] - 98:17
**assumptions** [2] - 41:5, 101:2
**assurance** [2] - 32:19, 33:3
**assurances** [1] - 6:10
**attachments** [3] - 84:15, 84:19, 84:21
**attempt** [2] - 16:17, 85:21
**attention** [5] - 74:8, 74:9, 75:1, 75:21, 76:25
**attesting** [2] - 20:24
**attorneys** [7] - 43:12, 43:17, 43:20, 43:22, 44:19, 44:21, 44:23
**attribution** [1] - 71:12
**attributions** [4] - 25:21, 26:16, 71:12, 72:3
**audit** [1] - 71:7
**August** [5] - 99:16, 101:19, 101:23, 101:24, 103:15
**Austrian** [1] - 95:3
**authenticate** [1] - 4:17
**authentication** [1] - 4:3
**authorization** [2] - 12:7, 12:9
**authorize** [1] - 92:4
**authorized** [1] - 106:24
**automated** [1] - 99:3
**availability** [4] - 31:25, 45:7, 45:8, 111:2
**available** [6] - 23:24, 87:4, 87:12, 109:6, 110:19, 113:13
**availed** [1] - 111:3
**Ave** [1] - 1:18
**Avenue** [3] - 1:15, 2:22, 119:11

**avoid** [5] - 11:17, 22:25, 23:1, 25:23, 59:8
**avoided** [1] - 39:5
**avoiding** [1] - 51:8
**aware** [8] - 17:6, 44:10, 52:10, 53:20, 54:3, 64:23, 72:14, 76:1

## B

**backers** [1] - 64:12
**background** [2] - 57:6, 92:16
**backwards** [1] - 21:25
**baffled** [1] - 78:21
**balances** [1] - 53:6
**Bank** [4] - 53:3, 53:5, 64:8, 64:10
**Bar** [1] - 68:19
**barrel** [1] - 22:15
**based** [19] - 11:2, 11:22, 14:1, 31:11, 43:24, 44:20, 44:22, 53:16, 54:10, 57:24, 59:23, 67:23, 72:16, 76:9, 77:4, 101:1, 110:7, 110:19, 115:12
**basic** [1] - 76:9
**basis** [11] - 22:14, 36:2, 53:25, 54:4, 86:18, 86:21, 87:21, 106:21, 108:12, 110:24, 115:11
**battle** [1] - 40:22
**bear** [1] - 75:7
**becomes** [1] - 104:24
**becoming** [1] - 114:21
**bedrock** [1] - 54:12
**BEFORE** [1] - 1:8
**beforehand** [1] - 23:10
**begin** [1] - 57:14
**behalf** [1] - 51:17
**behavioral** [5] - 36:9, 57:9, 57:13, 59:6, 102:17
**behaviors** [2] - 39:21, 57:16
**behind** [1] - 79:11
**belabor** [1] - 65:6
**bell** [1] - 60:24
**belong** [1] - 93:1
**below** [1] - 80:11
**bench** [3] - 25:6, 34:11, 56:17
**bending** [1] - 21:24
**benefit** [4] - 36:17,

37:19, 40:24, 64:6
**benefits** [1] - 64:24
**Bernhard** [1] - 95:6
**beside** [1] - 117:10
**best** [8] - 5:1, 13:25, 14:2, 30:21, 69:14, 70:1, 70:3, 119:6
**better** [3] - 16:5, 88:20, 116:10
**between** [6] - 29:24, 55:1, 70:24, 79:20, 94:3, 95:2
**beyond** [3] - 19:19, 104:1, 106:9
**big** [4] - 45:5, 54:22, 55:10, 70:25
**bills** [1] - 47:22
**Bisbee** [7] - 37:13, 39:10, 39:19, 62:19, 71:2, 80:19, 102:10
**Bisbee's** [3] - 36:2, 61:14, 84:16
**Bishop** [7] - 7:8, 13:12, 21:17, 64:3, 64:19, 65:3, 65:20, 73:16, 104:12, 104:13, 104:18, 104:19
**Bishop's** [3] - 64:7, 72:10, 77:25
**bit** [8] - 5:5, 7:11, 11:24, 12:19, 37:2, 38:11, 51:14, 101:8
**Bitcoin** [2] - 53:8, 61:11
**bizarre** [1] - 65:17
**black** [1] - 37:2
**blame** [2] - 9:8, 37:10
**blew** [2] - 116:23, 117:6
**blockchain** [12] - 5:25, 6:2, 10:6, 62:17, 62:25, 74:5, 85:24, 87:23, 94:4, 98:16, 110:20, 115:14
**blurred** [1] - 79:22
**board** [3] - 80:12, 117:6
**book** [1] - 94:5
**Bowman** [1] - 53:16
**box** [1] - 37:2
**Brady** [1] - 51:12
**breadth** [1] - 107:10
**break** [10] - 9:10, 13:22, 28:6, 29:15, 34:2, 66:8, 66:9, 68:17, 69:6, 70:5
**breakdown** [2] - 40:7, 84:17
**brief** [1] - 82:13

**briefed** [1] - 17:17
**briefing** [1] - 90:22
**briefings** [1] - 4:17
**briefly** [1] - 86:9
**bring** [5] - 21:17, 74:8, 74:9, 75:21, 76:24
**bringing** [1] - 115:9
**broad** [2] - 85:9, 105:4
**broader** [1] - 104:25
**brought** [4] - 7:2, 14:16, 56:17, 75:1
**Brown** [1] - 3:7
**BROWN** [1] - 1:12
**Bryan** [2] - 7:8, 104:12
**Budziak** [10] - 81:14, 81:16, 82:3, 112:9, 112:13, 112:19, 113:19, 113:20, 113:25, 114:2
**Budziak's** [1] - 114:4
**bunch** [2] - 6:23, 20:23
**burden** [3] - 38:5, 109:24, 111:4
**burdensome** [1] - 93:20
**business** [8] - 4:9, 16:7, 56:1, 65:16, 86:4, 87:8, 103:24, 103:25
**businesses** [1] - 64:25

## C

**CA** [1] - 2:4
**calculate** [1] - 79:14
**calendar** [9] - 31:1, 31:12, 31:13, 31:16, 32:13, 32:24, 33:10, 33:11, 47:5
**Canada** [1] - 10:12
**cancel** [1] - 33:12
**candidate** [1] - 65:4
**cannot** [1] - 10:24
**capacity** [1] - 56:12
**captured** [1] - 56:25
**captures** [1] - 56:21
**car** [2] - 116:22, 117:5
**care** [1] - 117:18
**careful** [2] - 48:7, 103:12
**carry** [2] - 109:24, 111:4
**case** [120] - 4:1, 6:1, 9:16, 10:8, 10:25, 17:21, 22:3, 22:7, 22:16, 26:2, 29:10, 31:19, 32:3, 32:14, 32:15, 32:23, 33:2,

33:13, 33:14, 33:15, 33:25, 34:3, 34:9, 36:4, 36:5, 36:7, 38:9, 39:24, 40:15, 40:20, 40:21, 41:1, 41:3, 41:6, 41:7, 41:8, 41:9, 41:11, 41:21, 41:22, 41:24, 41:25, 42:1, 42:8, 43:1, 43:16, 44:10, 44:11, 45:6, 45:9, 46:24, 47:1, 47:24, 48:8, 48:12, 48:15, 51:6, 51:18, 51:19, 52:2, 53:4, 53:12, 53:16, 53:20, 53:21, 54:7, 55:9, 55:10, 62:3, 62:9, 67:24, 68:2, 68:18, 72:3, 72:14, 75:7, 75:8, 75:10, 75:12, 75:22, 76:3, 76:20, 77:25, 81:5, 82:15, 85:14, 86:12, 86:13, 87:16, 87:25, 92:23, 93:18, 94:13, 94:22, 95:9, 95:23, 96:21, 98:11, 105:8, 105:15, 106:6, 106:23, 106:24, 107:9, 107:16, 110:5, 111:2, 111:8, 111:14, 111:19, 111:21, 111:22, 111:24, 112:9, 113:3, 113:22, 113:24, 115:7, 115:10, 115:20
**Case** [1] - 3:2
**cases** [30] - 32:18, 40:21, 54:21, 54:22, 54:23, 55:3, 55:13, 55:16, 75:1, 75:15, 81:9, 81:12, 82:4, 82:6, 82:14, 87:17, 91:2, 91:3, 91:5, 91:6, 91:13, 91:18, 91:20, 91:24, 105:11, 112:6, 112:8, 112:9, 115:21
**cash** [1] - 93:25
**casting** [1] - 40:17
**catch-22** [1] - 11:24
**category** [1] - 54:16
**caught** [2] - 71:16, 71:17
**caution** [1] - 48:4
**cautions** [1] - 35:14
**caveat** [1] - 90:21
**cell** [1] - 40:6

**centrality** [1] - 36:4
**certain** [4] - 28:6, 52:10, 57:16, 83:19
**certainly** [11] - 23:8, 32:21, 35:23, 37:4, 54:25, 73:24, 79:22, 85:6, 89:17, 98:21, 117:25
**certainty** [2] - 58:15, 62:5
**CERTIFICATE** [1] - 119:1
**certification** [1] - 4:9
**certify** [1] - 119:3
**cetera** [2] - 14:10, 14:11
**chain** [1] - 58:1
**Chainalysis** [86] - 2:2, 3:15, 3:19, 5:3, 5:16, 6:10, 9:22, 10:23, 11:6, 16:1, 16:18, 18:8, 19:5, 19:16, 19:21, 23:20, 36:19, 37:8, 39:13, 51:23, 52:1, 62:22, 65:16, 71:2, 71:4, 73:18, 76:4, 76:23, 78:3, 78:4, 78:9, 78:13, 80:5, 80:20, 80:24, 83:19, 83:22, 83:23, 85:13, 85:16, 85:23, 85:24, 90:11, 92:5, 92:12, 93:1, 93:7, 93:10, 93:11, 93:12, 93:22, 94:3, 95:2, 95:12, 96:25, 97:13, 97:21, 98:6, 99:17, 100:1, 100:9, 101:14, 101:22, 101:25, 102:6, 102:10, 103:9, 103:15, 104:7, 104:18, 105:3, 106:9, 106:11, 106:12, 106:14, 106:15, 106:16, 107:12, 107:13, 110:13, 114:23, 115:10, 115:14, 115:16, 115:19, 116:2
**Chainalysis's** [10] - 8:7, 63:8, 65:2, 85:15, 86:16, 100:24, 103:25, 106:18, 109:8, 115:18
**chains** [2] - 39:20, 99:3
**challenge** [6] - 19:14,

26:14, 28:5, 74:22, 76:5, 110:22
**challenging** [1] - 41:8
**chance** [7] - 15:1, 24:13, 27:16, 28:16, 29:4, 32:10, 33:25
**change** [8] - 18:9, 19:4, 69:10, 92:2, 92:8, 92:12, 98:5
**changes** [2] - 67:15, 92:13
**changing** [1] - 17:4
**characteristics** [2] - 58:3, 59:7
**chart** [3] - 27:8, 27:10
**chat** [1] - 27:17
**check** [7] - 21:8, 61:8, 62:15, 76:15, 76:18, 76:22, 78:3
**Cheney** [1] - 110:1
**Chiaradio** [1] - 91:10
**CHIARADIO** [1] - 91:11
**child** [3] - 81:8, 112:14, 112:16
**choice** [3] - 43:20, 44:5, 72:24
**choose** [1] - 7:3
**Chris** [1] - 3:7
**Christmas** [2] - 31:8, 31:9
**CHRISTOPHER** [1] - 1:12
**CipherTrace** [6] - 8:4, 19:17, 62:16, 86:1, 86:3
**CipherTrace's** [10] - 6:5, 6:11, 8:6, 8:11, 8:19, 15:18, 18:14, 18:15, 18:20
**Circuit** [8] - 81:14, 91:11, 112:9, 112:10, 112:23, 113:19, 113:23, 113:25
**circuit** [1] - 82:14
**Circuit's** [1] - 113:18
**circuits** [1] - 81:13
**circumstance** [2] - 41:19, 58:10
**circumstances** [1] - 9:4
**cite** [2] - 81:12, 91:12
**cited** [4] - 75:11, 81:8, 82:22, 91:21
**cites** [3] - 89:22, 89:24, 90:2
**citing** [2] - 17:9, 110:1
**citizen** [1] - 104:1
**City** [1] - 68:19

123

**civil** [9] - 30:12, 30:18, 30:19, 33:12, 54:25, 55:8, 93:15, 93:17, 94:12
**CJA** [6] - 47:19, 47:20, 47:24, 48:1, 83:6, 83:7
**claim** [3] - 86:22, 90:11, 90:13
**claims** [1] - 73:4
**clarification** [3] - 60:16, 84:12, 114:12
**clarify** [2] - 5:22, 64:7
**clarity** [1] - 28:14
**clause** [2] - 6:22, 18:15
**clauses** [3] - 16:7, 16:13, 17:22
**clean** [1] - 69:12
**clear** [31] - 5:24, 6:24, 12:21, 13:7, 24:12, 24:14, 28:1, 28:10, 34:21, 34:25, 35:9, 37:4, 37:25, 42:19, 43:2, 44:12, 46:2, 62:8, 64:18, 77:9, 80:12, 80:18, 81:1, 87:6, 93:16, 96:14, 100:2, 102:3, 103:14, 107:17, 109:15
**cleared** [2] - 33:10, 33:11
**clearly** [3] - 45:24, 64:23, 65:20
**clerk** [1] - 14:18
**clerks** [1] - 20:8
**client** [13] - 6:1, 11:11, 14:5, 33:7, 33:21, 51:11, 51:16, 53:5, 53:12, 56:1, 57:1, 57:20, 61:2
**clients** [2] - 6:24, 7:23
**close** [6] - 18:4, 37:16, 51:1, 65:15, 101:12, 106:23
**closely** [2] - 74:11, 77:10
**closer** [1] - 7:14
**closest** [1] - 94:25
**cluster** [4] - 60:13, 61:5, 61:9, 61:11
**clustering** [5] - 25:21, 71:12, 72:2, 99:3, 106:18
**clusters** [4] - 57:12, 71:24, 71:25, 83:19
**co** [2] - 36:22, 102:10
**co-spend** [2] - 36:22, 102:10

**code** [133] - 13:11, 13:13, 14:20, 20:14, 21:10, 21:13, 22:21, 23:4, 23:15, 25:20, 26:5, 26:17, 35:9, 35:16, 37:24, 40:5, 40:20, 42:7, 43:15, 49:2, 50:7, 55:11, 62:24, 63:9, 63:17, 65:6, 65:24, 71:1, 72:9, 73:2, 73:15, 73:22, 75:2, 75:4, 75:6, 75:14, 75:15, 75:24, 76:24, 77:17, 78:19, 78:20, 80:5, 80:20, 80:22, 80:24, 81:6, 82:5, 82:7, 82:21, 83:25, 84:1, 84:3, 85:11, 86:16, 90:8, 90:9, 90:13, 91:7, 91:15, 91:17, 92:1, 92:7, 92:9, 92:20, 92:24, 94:18, 94:20, 95:11, 95:13, 95:21, 95:25, 96:18, 97:8, 97:18, 98:5, 98:9, 98:10, 98:13, 98:23, 98:24, 99:4, 99:11, 99:12, 99:14, 99:21, 99:22, 100:6, 100:7, 100:11, 100:25, 101:1, 101:2, 101:3, 102:2, 102:5, 102:12, 102:23, 103:21, 103:22, 104:9, 104:10, 105:6, 105:16, 105:18, 105:20, 105:22, 105:25, 106:5, 106:8, 106:16, 107:2, 107:8, 107:9, 107:20, 107:22, 107:24, 108:5, 108:10, 108:12, 108:14, 108:20, 109:13, 110:12, 110:24, 111:10, 113:15, 115:5
**coder** [1] - 37:14
**codes** [2] - 92:20, 92:25
**coding** [2] - 96:18, 100:5
**coercion** [1] - 17:11
**CoinJoin** [3] - 36:24, 36:25, 107:25
**CoinJoins** [3] - 98:17, 98:22, 102:11
**colleagues** [8] - 5:11,

12:5, 12:16, 14:8, 30:24, 32:9, 32:23, 33:14
**collect** [1] - 21:2
**collected** [1] - 73:8
**collection** [1] - 106:19
**College** [1] - 95:3
**colloquy** [1] - 42:19
**COLUMBIA** [1] - 1:1
**comfortable** [1] - 37:17
**coming** [5] - 26:4, 28:23, 74:16, 113:23, 116:9
**comment** [2] - 44:10, 60:16
**comments** [1] - 106:1
**commercial** [1] - 6:6
**commitment** [1] - 64:12
**Committee** [2] - 68:20, 68:24
**communications** [3] - 93:21, 94:2, 95:1
**community** [1] - 98:16
**companies** [1] - 85:24
**company** [8] - 16:25, 17:7, 17:8, 17:19, 101:5, 103:24
**compare** [2] - 106:22, 108:21
**compared** [1] - 105:25
**comparisons** [1] - 90:16
**compel** [2] - 112:13, 112:19
**compelling** [2] - 38:23, 111:21
**compensated** [1] - 47:14
**compete** [1] - 16:17
**competency** [1] - 30:13
**competing** [1] - 103:23
**competitive** [11] - 7:2, 8:13, 11:6, 11:14, 11:20, 16:5, 16:12, 72:18, 74:18, 75:11, 101:6
**competitor** [2] - 72:25, 100:24
**competitors** [2] - 17:1, 17:3
**compiled** [1] - 39:14
**complete** [5] - 53:11, 92:21, 95:13, 112:16, 119:5
**Complexity** [1] - 95:4
**compliance** [1] -

64:13
**compliant** [1] - 104:21
**complicated** [2] - 77:25, 96:7
**complied** [3] - 101:20, 104:5, 114:16
**comply** [2] - 97:19, 100:15
**complying** [1] - 109:11
**comprehensive** [1] - 75:16
**computations** [1] - 106:12
**computer** [26] - 9:25, 13:5, 14:19, 18:14, 18:15, 19:6, 37:14, 41:19, 51:23, 56:17, 74:25, 75:24, 81:22, 91:2, 92:21, 101:1, 101:2, 105:2, 107:12, 111:10, 112:11, 112:24, 113:8, 113:16, 114:1, 114:4
**computers** [4] - 14:16, 18:20, 75:5, 85:15
**conceivably** [1] - 62:7
**concepts** [1] - 105:24
**concern** [17] - 5:20, 8:7, 11:9, 12:22, 16:4, 16:12, 16:13, 16:15, 17:16, 17:18, 18:2, 22:19, 26:12, 26:13, 36:14, 38:10, 72:19
**concerned** [6] - 9:15, 28:3, 36:10, 42:21, 47:18, 63:25
**concerning** [2] - 65:21, 117:8
**concerns** [15] - 7:2, 7:7, 8:2, 11:15, 13:15, 13:17, 16:6, 21:12, 44:4, 72:18, 74:18, 75:11, 86:5, 100:9, 116:1
**conclude** [2] - 18:18, 24:18
**concluded** [1] - 103:23
**concludes** [2] - 113:3, 115:16
**conclusion** [2] - 79:8, 107:3
**conclusions** [2] - 38:22, 106:18
**concurred** [1] - 85:2
**conditions** [1] - 36:9
**conduct** [1] - 57:16

**conducting** [1] - 92:10
**confer** [6] - 24:13, 28:16, 29:4, 44:15, 44:19, 97:20
**CONFERENCE** [2] - 1:4, 1:8
**conference** [1] - 69:11
**confirm** [1] - 15:19
**confirmed** [2] - 34:6, 34:9
**confront** [1] - 52:4
**consequences** [1] - 44:24
**consider** [4] - 5:18, 29:7, 68:20, 73:14
**consideration** [4] - 34:4, 52:25, 86:15, 94:1
**considerations** [2] - 44:16, 45:9
**considered** [2] - 45:15, 46:12
**consistent** [1] - 47:4
**constantly** [1] - 109:11
**constitute** [2] - 15:14, 115:21
**constitutes** [1] - 119:4
**Constitution** [2] - 2:22, 119:11
**constructively** [1] - 18:22
**consult** [1] - 33:14
**consulting** [1] - 54:22
**Cont'd** [1] - 2:1
**contain** [1] - 74:5
**contempt** [3] - 7:7, 12:15, 104:2
**contention** [3] - 107:21, 115:18
**contents** [1] - 12:17
**contest** [1] - 62:22
**contested** [1] - 93:15
**context** [9] - 5:14, 17:22, 51:16, 51:21, 55:8, 75:10, 106:6, 110:9, 115:25
**continuance** [11] - 23:25, 24:3, 24:17, 28:1, 29:24, 30:1, 34:20, 35:2, 35:7, 42:21, 79:11
**continue** [7] - 38:2, 45:6, 45:9, 69:21, 76:20, 85:21, 88:25
**continued** [4] - 35:5, 42:22, 44:2
**continues** [1] - 42:23
**continuing** [1] - 5:17
**contract** [1] - 51:17

contracted [1] - 50:10
contractor [2] - 51:9, 53:1
contracts [1] - 93:24
contrary [2] - 38:24, 79:8
control [3] - 36:23, 73:7, 93:1
controlling [1] - 53:20
controversial [1] - 6:12
conversation [4] - 5:6, 12:14, 101:14, 101:17
conversations [1] - 45:19
conviction [2] - 27:3, 27:16
convinced [2] - 108:11, 111:3
cooperating [1] - 21:5
cooperation [1] - 35:22
copy [2] - 14:15, 117:19
core [4] - 11:8, 50:13, 55:25, 72:1
correct [6] - 17:20, 32:4, 58:22, 59:17, 61:4, 63:2
corrections [1] - 102:25
correctly [2] - 33:7, 92:24
counsel [33] - 3:4, 3:5, 3:15, 5:16, 5:21, 5:25, 6:18, 6:23, 13:23, 28:4, 31:5, 32:4, 42:23, 46:10, 46:13, 46:16, 47:13, 47:15, 47:19, 47:20, 47:24, 47:25, 68:6, 82:24, 87:8, 97:11, 99:19, 101:21, 101:24, 102:1, 115:15, 115:25
country [1] - 4:1
couple [4] - 31:19, 32:1, 66:4, 91:20
course [8] - 3:17, 13:19, 31:4, 35:1, 50:9, 77:22, 97:17, 102:16
COURT [163] - 1:1, 3:8, 3:13, 3:20, 4:14, 4:19, 4:25, 6:13, 7:10, 8:21, 10:7, 10:15, 10:22, 11:4, 12:3, 13:1, 13:13, 13:22, 14:3, 14:12,

14:14, 14:25, 15:5, 15:11, 15:21, 16:22, 17:20, 18:4, 19:11, 20:5, 21:1, 21:6, 21:21, 23:14, 24:11, 25:1, 25:3, 25:7, 25:14, 25:22, 26:19, 28:2, 28:14, 29:14, 29:21, 30:3, 30:7, 30:16, 30:18, 31:4, 31:14, 32:12, 32:15, 33:11, 33:22, 33:24, 34:12, 34:16, 34:23, 35:1, 35:11, 39:15, 40:13, 42:5, 42:14, 43:4, 43:19, 44:1, 44:4, 44:7, 44:14, 44:20, 45:3, 45:5, 45:21, 45:23, 46:3, 46:9, 46:12, 46:15, 46:19, 46:22, 47:4, 47:7, 47:9, 48:1, 48:4, 48:17, 49:1, 49:4, 49:15, 51:2, 51:5, 52:13, 53:17, 53:21, 54:18, 55:19, 56:10, 56:16, 57:18, 58:23, 59:4, 59:14, 59:22, 60:13, 60:22, 61:5, 61:12, 61:19, 62:20, 64:9, 64:17, 66:6, 66:14, 66:19, 67:1, 67:4, 67:12, 67:17, 67:23, 68:8, 68:16, 69:5, 69:9, 70:3, 70:10, 70:12, 73:21, 74:3, 74:23, 75:12, 75:17, 75:20, 76:17, 78:6, 78:19, 78:23, 79:16, 79:18, 83:2, 84:18, 86:7, 88:18, 89:3, 89:7, 89:10, 89:16, 89:20, 90:1, 90:20, 90:24, 91:5, 91:19, 91:23, 116:11, 117:1, 117:3, 117:10, 117:13, 117:15, 118:1, 119:1
court [17] - 3:12, 10:8, 23:10, 33:15, 34:5, 39:23, 41:11, 41:23, 72:21, 82:4, 82:13, 86:15, 90:24, 90:25, 106:24, 111:7, 111:25
Court [108] - 2:21, 2:21, 3:11, 4:6, 4:22, 5:24, 12:7, 12:9, 12:18, 12:23, 13:20, 16:21, 18:16, 19:4,

19:9, 21:17, 22:20, 23:7, 24:7, 25:6, 25:15, 26:17, 28:20, 29:25, 31:8, 34:7, 34:8, 34:11, 34:25, 35:7, 35:14, 41:15, 48:10, 48:13, 48:15, 48:20, 49:14, 49:18, 50:10, 52:14, 53:15, 56:4, 56:5, 56:7, 56:8, 57:3, 57:4, 59:10, 61:8, 62:11, 63:11, 64:2, 64:18, 65:5, 65:8, 65:11, 66:3, 67:15, 68:9, 68:13, 70:23, 71:10, 72:13, 72:20, 73:5, 77:11, 77:15, 78:2, 79:8, 79:17, 80:11, 81:17, 82:1, 82:15, 84:15, 86:10, 86:23, 88:4, 88:16, 89:13, 89:22, 90:19, 93:16, 94:19, 94:24, 95:15, 96:1, 96:2, 98:9, 99:18, 100:17, 101:23, 103:1, 103:15, 103:18, 104:2, 104:7, 104:18, 108:25, 110:2, 112:12, 112:18, 112:22, 114:9, 115:5, 119:10
Court's [21] - 7:6, 9:18, 31:12, 31:13, 39:16, 41:13, 48:12, 52:7, 52:8, 54:3, 89:8, 97:11, 98:7, 100:15, 101:20, 104:21, 107:6, 109:12, 114:14, 114:16, 116:10
Courthouse [1] - 2:22
courtroom [4] - 12:11, 13:24, 22:19, 68:10
COURTROOM [1] - 3:2
courts [4] - 43:11, 52:18, 52:21, 89:23
cover [1] - 115:8
craft [1] - 10:18
crap [2] - 87:9, 115:15
CRC [2] - 2:21, 119:9
create [2] - 31:1, 71:24
created [1] - 71:24
creative [1] - 20:2
credible [1] - 50:24
Crick [1] - 90:5
Crime [1] - 94:6
Criminal [8] - 1:2, 3:2,

47:13, 68:20, 68:23, 92:6, 108:24, 109:2
criminal [15] - 7:3, 17:21, 31:15, 31:18, 31:22, 31:24, 32:2, 32:5, 33:13, 33:18, 51:18, 54:23, 75:10, 94:13, 111:14
criticized [1] - 76:23
critique [1] - 99:4
CRM [1] - 1:17
cross [10] - 20:17, 22:10, 23:2, 23:24, 24:6, 36:14, 52:4, 76:9, 80:18, 80:23
cross-examination [5] - 20:17, 22:10, 23:24, 36:14, 80:18
cross-examine [2] - 52:4, 80:23
CRR [2] - 2:21, 119:9
cry [1] - 87:22
Cryptocurrency [1] - 94:6
CTO [1] - 64:23
current [3] - 6:18, 10:22, 38:20
Custodia [2] - 64:8, 64:10
custody [1] - 93:1
cuts [1] - 111:8
cyber [1] - 74:16

## D

D.C [3] - 1:5, 34:8, 119:11
Dairy [1] - 53:16
damage [1] - 11:6
Dark [1] - 94:5
data [24] - 8:10, 8:11, 8:14, 8:17, 8:18, 8:22, 15:18, 71:5, 73:7, 74:5, 74:14, 74:16, 79:6, 95:10, 99:9, 99:10, 106:19, 106:20, 106:21, 110:15, 110:19, 111:1, 113:1
database [1] - 8:8
databases [1] - 92:21
date [8] - 4:23, 13:18, 19:4, 31:2, 34:14, 34:15, 39:1, 114:15
dated [1] - 94:18
Dated [1] - 119:7
dates [2] - 34:14, 92:18
Daubert [6] - 71:2, 76:5, 76:8, 76:9,

79:21, 97:16
days [3] - 35:23, 97:9, 103:17
DC [4] - 1:13, 1:16, 1:19, 2:23
deal [2] - 68:4, 116:24
dealing [6] - 41:19, 87:13, 87:18, 88:12, 91:7, 91:13
deals [1] - 75:22
December [6] - 30:12, 31:8, 32:3, 32:7, 34:2, 84:22
decide [6] - 26:2, 26:8, 27:4, 43:18, 68:25
decided [2] - 24:14, 26:5
decides [1] - 29:6
decision [5] - 24:23, 25:25, 26:6, 27:2, 29:5, 31:4, 41:13, 41:14, 43:2, 43:11, 43:19, 43:24, 44:16, 44:25, 45:15, 46:16, 46:20, 46:22, 47:17, 53:15, 68:22, 109:4, 109:5, 111:7, 113:18
decisions [2] - 90:24, 90:25
declarations [1] - 114:4
declined [2] - 5:8, 5:9
deep [1] - 70:22
Defendant [3] - 1:6, 1:20, 3:12
DEFENDANT [16] - 43:10, 43:25, 44:3, 44:6, 44:18, 45:1, 45:4, 45:17, 45:22, 46:8, 46:11, 46:14, 46:18, 46:21, 47:1, 47:6
defendant [7] - 31:19, 44:9, 45:24, 52:2, 53:24, 112:10, 113:4
defendant's [5] - 81:22, 99:18, 113:5, 115:15, 115:16
defendants [1] - 32:18
defense [121] - 4:5, 6:18, 9:7, 15:6, 16:1, 22:6, 27:20, 28:4, 35:2, 35:6, 35:15, 35:22, 36:3, 36:8, 36:17, 37:2, 37:4, 37:9, 37:17, 37:25, 42:23, 49:3, 49:19, 49:21, 52:3, 52:4, 52:5, 52:19, 56:5, 59:25, 60:14, 62:11,

63:12, 65:19, 65:20, 67:19, 72:14, 72:23, 74:19, 80:3, 80:16, 81:2, 81:10, 81:17, 81:19, 82:2, 82:7, 82:23, 83:11, 83:17, 83:24, 84:23, 85:4, 85:21, 85:23, 90:8, 91:16, 92:11, 92:18, 93:9, 95:20, 95:22, 95:24, 96:15, 96:16, 97:11, 98:1, 98:2, 98:8, 98:14, 98:21, 99:5, 99:19, 99:20, 99:21, 100:14, 100:16, 100:17, 100:18, 101:19, 101:21, 101:24, 102:1, 102:6, 103:3, 103:17, 103:19, 104:5, 104:11, 104:15, 104:16, 104:19, 105:6, 105:9, 107:19, 107:22, 107:23, 108:9, 108:11, 108:15, 108:18, 109:7, 109:9, 109:16, 109:17, 110:11, 110:18, 111:2, 111:4, 111:10, 111:11, 111:12, 113:7, 113:14, 114:8, 114:10, 114:13, 115:3, 115:25

**defense's** [8] - 8:14, 41:7, 76:20, 91:25, 97:18, 107:21, 109:20, 110:21

**definitely** [1] - 61:10

**definition** [4] - 50:11, 63:23, 106:5, 107:2

**delayed** [1] - 30:8

**delivered** [1] - 37:8

**demanding** [1] - 52:20

**demands** [2] - 82:24, 109:11

**demonstrated** [1] - 114:2

**demonstrates** [1] - 65:21

**demonstrating** [1] - 104:23

**denied** [4] - 50:11, 95:15, 95:16, 109:12

**deny** [3] - 67:4, 91:25, 114:9

**denying** [1] - 92:3

**DEPARTMENT** [1] -

1:15

**Department** [1] - 1:18

**dependencies** [1] - 106:3

**depth** [1] - 39:25

**DEPUTY** [1] - 3:2

**describe** [1] - 57:12

**described** [7] - 59:3, 59:9, 64:23, 84:4, 84:6, 84:9, 96:10

**designing** [2] - 19:17, 19:24

**desire** [4] - 28:18, 28:19, 29:1, 97:18

**desk** [1] - 19:19

**despite** [3] - 35:13, 100:14, 114:7

**detail** [7] - 23:15, 56:19, 60:12, 60:21, 84:21, 99:6, 104:16

**detailed** [6] - 40:7, 85:12, 104:8, 110:16, 111:20, 113:9

**details** [3] - 40:5, 65:4, 105:25

**detained** [1] - 48:23

**detect** [1] - 102:11

**determination** [3] - 27:23, 80:1, 80:15

**determinations** [5] - 80:7, 87:20, 98:25, 99:15, 110:21

**determine** [8] - 11:22, 14:1, 58:15, 85:1, 100:21, 106:16, 107:12, 108:6

**determined** [4] - 82:2, 83:15, 89:23, 91:15

**deterministic** [1] - 90:12

**develop** [1] - 80:25

**developed** [1] - 81:7

**developments** [1] - 14:25

**dictate** [1] - 72:15

**dictates** [1] - 96:15

**difference** [3] - 27:9, 70:24, 70:25

**differences** [1] - 27:9

**different** [27] - 22:17, 26:24, 27:22, 39:21, 40:20, 41:25, 51:6, 53:2, 53:3, 53:11, 54:15, 55:2, 59:5, 59:6, 62:2, 62:6, 64:25, 73:20, 81:13, 84:23, 86:14, 89:5, 91:18, 106:2, 110:5

**differently** [1] - 51:16

**differs** [1] - 108:19

**difficult** [4] - 15:3, 15:13, 77:18, 106:16

**difficulty** [1] - 93:8

**diligence** [1] - 93:23

**dire** [1] - 21:18

**direct** [2] - 38:13, 52:7

**directed** [3] - 35:15, 95:24, 99:21

**direction** [8] - 88:10, 97:19, 98:7, 100:16, 101:10, 101:18, 104:6, 104:21

**directions** [5] - 9:8, 35:14, 109:15, 114:14, 114:16

**directly** [2] - 65:12, 93:10

**disadvantage** [1] - 101:6

**disagreement** [1] - 77:3

**disclose** [3] - 12:6, 12:17, 102:6

**disclosed** [7] - 36:1, 59:25, 60:8, 80:2, 98:20, 98:21, 111:1

**disclosing** [3] - 15:17, 55:12, 58:8

**disclosure** [20] - 5:11, 35:21, 38:3, 40:4, 40:7, 42:15, 51:9, 55:6, 56:13, 60:6, 72:11, 73:17, 78:1, 86:21, 86:23, 88:2, 89:24, 106:24, 110:13, 110:25

**disclosures** [6] - 39:9, 40:11, 54:5, 72:6, 105:7, 105:11

**discover** [1] - 108:15

**discovered** [3] - 61:2, 90:6

**discovering** [1] - 108:15

**discovery** [15] - 6:5, 55:6, 68:21, 81:6, 81:18, 82:5, 82:24, 85:6, 85:20, 86:6, 91:16, 91:17, 93:17, 112:25, 114:3

**discuss** [5] - 12:17, 12:23, 25:8, 30:1, 82:16

**discussed** [2] - 29:22, 50:3

**discussing** [2] - 15:17, 18:1

**discussion** [4] - 12:19, 13:14, 81:11,

92:17

**discussions** [2] - 5:19, 97:13

**disfavor** [3] - 16:8, 17:2, 17:8

**disfavoring** [1] - 16:23

**disfavors** [2] - 16:20, 17:2

**dispute** [2] - 36:22, 92:17

**disputed** [1] - 36:20

**dissuade** [2] - 85:24, 115:19

**distinguishes** [1] - 113:19

**distribute** [1] - 112:16

**district** [2] - 82:4, 82:13

**DISTRICT** [3] - 1:1, 1:1, 1:9

**District** [1] - 110:1

**Division** [1] - 41:16

**DNA** [8] - 41:20, 62:2, 87:17, 90:3, 90:15, 90:16, 90:17

**docket** [2] - 30:13, 69:12

**Docket** [6] - 20:22, 72:11, 92:3, 92:15, 114:11, 116:5

**dockets** [1] - 34:9

**document** [3] - 18:10, 59:21, 93:14

**documentation** [1] - 106:2

**documenting** [1] - 92:12

**documents** [6] - 4:5, 93:21, 93:23, 94:1, 94:8, 94:25

**DOJ** [3] - 1:12, 1:17, 30:14

**DOJ-CRM** [1] - 1:17

**dollar** [3] - 26:23, 26:25, 62:1

**donating** [1] - 86:2

**done** [30] - 9:24, 20:11, 30:16, 35:15, 38:16, 38:24, 39:2, 42:7, 49:22, 50:4, 50:6, 55:4, 55:23, 57:10, 69:18, 73:19, 75:16, 76:25, 78:4, 78:9, 78:13, 78:17, 78:20, 82:11, 90:19, 109:15, 109:18, 110:8, 112:5, 115:4

**door** [1] - 51:1

**double** [1] - 90:6

**doubt** [2] - 37:9, 64:12

**down** [10] - 9:5, 45:16, 48:10, 48:18, 80:11, 86:4, 89:2, 96:9, 101:13, 116:22

**download** [1] - 18:14

**downloaded** [1] - 112:14

**Downpour** [1] - 82:18

**draft** [1] - 95:10

**drafted** [1] - 94:14

**draw** [2] - 38:22, 106:17

**drive** [4] - 12:12, 13:23, 14:15, 40:3, 40:5

**driving** [1] - 117:5

**dropped** [1] - 66:18

**duces** [1] - 92:5

**due** [4] - 21:25, 51:20, 74:20, 93:23

**during** [2] - 77:24, 92:13

## E

**early** [1] - 34:3

**earn** [1] - 17:12

**easily** [1] - 49:22

**easy** [1] - 20:7

**ECF** [1] - 81:10

**economic** [2] - 17:10, 54:22

**Economists** [2] - 54:23, 55:10

**editions** [1] - 95:13

**effect** [2] - 18:19, 52:10

**effectively** [6] - 50:9, 57:12, 59:12, 65:15, 72:23, 87:10

**effectuate** [1] - 54:8

**effort** [4] - 47:21, 49:17, 56:1, 85:20

**efforts** [1] - 59:8

**either** [11] - 22:8, 26:8, 36:23, 38:20, 51:19, 62:21, 63:1, 64:4, 109:9, 116:19

**EKELAND** [68] - 1:20, 3:9, 6:17, 8:3, 10:4, 10:10, 10:18, 11:1, 11:8, 12:21, 13:7, 13:19, 13:25, 15:3, 15:6, 15:13, 15:22, 17:17, 17:21, 19:7, 20:3, 20:20, 21:3, 21:7, 22:18, 24:1, 24:24, 25:2, 25:12, 25:15, 26:12, 29:22, 33:6, 33:20, 33:23,

34:13, 42:4, 42:12, 42:17, 47:23, 48:3, 48:9, 48:25, 49:3, 66:20, 67:14, 69:8, 70:11, 70:13, 73:23, 74:11, 75:8, 75:15, 75:18, 76:1, 77:9, 78:15, 78:21, 79:1, 79:17, 90:3, 116:18, 116:21, 117:2, 117:9, 117:12, 117:14, 117:25

**Ekeland** [49] - 1:21, 3:9, 5:7, 5:13, 5:16, 6:13, 6:15, 7:10, 15:1, 20:13, 28:15, 29:4, 29:16, 29:21, 34:12, 35:19, 37:6, 42:3, 43:8, 44:7, 47:10, 48:19, 49:8, 51:5, 61:24, 66:9, 66:19, 67:12, 70:10, 83:4, 88:17, 88:18, 89:3, 90:1, 90:2, 96:5, 96:12, 96:24, 97:17, 101:7, 102:3, 102:8, 102:14, 103:7, 103:13, 108:4, 109:1, 115:9, 116:16

**Ekeland's** [3] - 88:3, 109:5, 110:4
**eleventh** [1] - 35:6
**eleventh-hour** [1] - 35:6
**email** [2] - 71:18, 117:19
**emailed** [1] - 101:22
**emphasized** [1] - 4:13
**employed** [2] - 36:19, 54:7
**employee** [1] - 17:19
**employees** [2] - 17:11, 93:11
**employers** [1] - 17:10
**encompass** [1] - 106:17
**encourage** [1] - 96:22
**encouraged** [1] - 108:18
**encouraging** [1] - 19:12
**end** [14] - 24:9, 27:8, 27:10, 32:11, 38:25, 54:8, 54:17, 82:12, 84:7, 84:9, 84:10, 103:5, 103:7, 103:14
**endeavor** [1] - 55:24
**ended** [1] - 18:4
**enforceable** [1] -

78:11
**enforcement** [4] - 75:13, 81:7, 81:18, 91:8
**enforcement-developed** [1] - 81:7
**enforcing** [1] - 7:7
**engage** [1] - 57:20
**engaging** [1] - 23:3
**engineer** [1] - 19:24
**enormous** [2] - 110:17, 113:11
**ensure** [1] - 14:4
**enter** [3] - 3:15, 18:7, 19:2
**entered** [1] - 51:16
**entering** [1] - 12:3
**entire** [3] - 19:3, 36:5, 115:2
**entirely** [3] - 35:8, 63:3, 71:13
**entities** [1] - 83:19
**entitled** [5] - 49:21, 74:20, 80:3, 85:4, 112:11
**envisioning** [1] - 67:16
**EP2P** [3] - 82:17, 112:20, 113:21
**equipment** [1] - 18:19
**equity** [1] - 93:25
**erased** [2] - 10:1, 18:24
**error** [14] - 62:3, 62:7, 71:4, 71:5, 73:22, 74:2, 76:10, 76:22, 77:6, 79:14, 108:3, 108:4, 108:6, 108:16
**errors** [1] - 74:8
**essence** [1] - 52:4
**essentially** [4] - 8:16, 15:9, 39:17, 71:21
**established** [3] - 75:19, 90:4, 90:17
**estimate** [1] - 30:21
**et** [2] - 14:10, 14:11
**evaluate** [3] - 8:12, 8:14, 11:21
**eve** [1] - 39:6, 97:8
**evening** [2] - 101:23, 118:2
**event** [4] - 89:14, 93:4, 93:19, 109:6
**ever-evolving** [1] - 38:16
**evidence** [16] - 27:5, 27:6, 36:6, 52:25, 73:15, 81:22, 90:3, 90:15, 112:13, 112:19, 112:24,

113:8, 113:16, 113:20, 113:24, 114:7
**evolving** [1] - 38:16
**exact** [3] - 83:11, 88:12, 88:22
**exacting** [3] - 50:19, 82:3, 109:25
**exactly** [14] - 11:25, 39:19, 40:7, 43:16, 56:25, 57:1, 64:20, 81:21, 82:25, 88:21, 101:16, 102:1, 102:4, 103:4
**examination** [6] - 20:17, 22:10, 23:24, 36:14, 80:18, 99:23
**examine** [8] - 52:4, 63:9, 79:2, 80:23, 82:4, 99:22, 104:9, 105:21
**example** [7] - 17:13, 54:24, 57:19, 58:4, 58:19, 62:3, 98:14
**examples** [2] - 83:20, 83:21
**excellent** [2] - 20:20, 96:13
**except** [1] - 54:2
**exception** [1] - 81:16
**exchange** [3] - 57:15, 57:16, 59:19
**exchanged** [2] - 94:3, 95:2
**exchanges** [1] - 59:5
**Excygent** [1] - 93:22
**executed** [1] - 105:22
**exercise** [1] - 115:2
**exert** [1] - 17:10
**Exhibit** [1] - 20:9
**exist** [1] - 39:12
**existing** [1] - 6:8
**exists** [1] - 54:4
**exit** [1] - 14:15
**expand** [1] - 88:14
**expanded** [1] - 50:10
**expanding** [1] - 42:8
**expansive** [4] - 37:11, 50:15, 68:21, 108:1
**expect** [3] - 6:21, 30:15, 78:22
**expedition** [9] - 50:12, 53:11, 63:24, 81:4, 85:19, 94:11, 107:10, 109:23, 114:22
**experience** [3] - 16:7, 64:7, 117:4
**experienced** [1] - 34:7
**expert** [92] - 15:9,

21:10, 22:4, 22:11, 22:12, 23:1, 23:2, 24:19, 28:11, 35:24, 35:25, 36:2, 36:17, 37:20, 38:17, 38:20, 38:21, 39:24, 40:2, 42:8, 43:13, 44:22, 50:24, 51:19, 53:23, 54:5, 54:13, 54:14, 61:18, 63:4, 63:11, 64:4, 65:5, 68:15, 72:15, 72:17, 74:9, 79:15, 80:6, 80:7, 81:1, 81:20, 84:10, 84:16, 85:25, 86:22, 86:24, 88:6, 94:21, 96:1, 96:3, 96:18, 96:19, 97:9, 97:21, 97:22, 97:23, 98:8, 98:10, 99:22, 100:5, 100:10, 100:19, 100:20, 100:22, 100:23, 100:25, 101:9, 101:16, 104:3, 104:5, 104:11, 105:10, 105:12, 107:6, 107:7, 107:8, 110:6, 110:7, 111:16, 112:4, 115:5
**experts** [27] - 7:4, 7:6, 11:18, 12:24, 13:4, 35:3, 40:3, 40:6, 40:11, 40:22, 55:3, 64:1, 64:3, 72:23, 74:7, 77:8, 79:25, 80:4, 80:12, 83:12, 83:14, 83:17, 113:5, 113:21, 114:4
**explain** [8] - 38:4, 41:4, 80:14, 96:2, 96:18, 98:9, 108:8, 115:5
**explained** [3] - 37:11, 94:24, 99:24
**explaining** [1] - 97:22, 107:7, 111:16
**explanation** [6] - 98:12, 99:13, 104:8, 105:5, 105:12
**explanations** [1] - 110:16
**explorers** [1] - 10:6
**exploring** [1] - 21:24
**expressed** [4] - 5:20, 7:7, 18:2, 72:10
**expressly** [1] - 54:6
**extend** [1] - 19:10
**extended** [1] - 42:25
**extensive** [2] - 81:17,

110:14
**extent** [21] - 6:17, 13:25, 20:21, 21:11, 21:15, 33:24, 36:23, 37:12, 55:5, 56:13, 56:20, 59:23, 61:13, 80:6, 80:10, 80:24, 82:15, 86:22, 89:21, 105:3, 110:18
**external** [1] - 71:22
**extractions** [1] - 105:23
**extraordinarily** [2] - 93:12, 105:3
**extraordinary** [1] - 107:10
**extremely** [3] - 62:5, 93:20, 110:14

## F

**F.3d** [3] - 91:11, 112:10, 113:18
**face** [3] - 19:13, 19:14, 65:23
**faced** [1] - 37:23
**facilitate** [1] - 101:17
**fact** [21] - 15:1, 19:12, 24:15, 26:3, 37:10, 43:8, 47:13, 52:11, 55:22, 66:18, 77:1, 85:11, 86:1, 93:3, 94:11, 100:14, 107:20, 109:4, 113:12, 113:20, 115:2
**factors** [8] - 52:10, 52:13, 76:9, 86:15, 87:14, 87:15, 87:21, 87:24
**failed** [6] - 94:10, 99:19, 100:16, 111:4, 114:14
**fails** [2] - 109:20, 114:13
**failure** [2] - 40:17, 50:22
**fair** [17] - 21:23, 22:1, 26:10, 28:21, 29:12, 39:7, 40:15, 46:3, 52:2, 52:5, 56:19, 58:17, 61:12, 81:5, 82:11, 82:19, 92:16
**fairly** [3] - 18:4, 34:9, 82:6
**faith** [3] - 85:20, 104:23, 109:14
**fakes** [1] - 70:22
**fall** [1] - 82:12
**false** [2] - 76:11

**familiar** [1] - 80:4
**far** [11] - 4:6, 49:16,
50:21, 73:8, 85:18,
87:21, 87:22,
104:15, 108:14,
109:17, 115:23
**Faruqui** [1] - 73:6
**fashion** [3] - 38:1,
47:14, 94:23
**fast** [1] - 15:11
**favor** [1] - 86:16
**FBI** [9] - 74:16, 74:24,
75:2, 75:4, 75:12,
91:8, 112:14,
112:20, 113:21
**FBI's** [1] - 75:6
**fear** [1] - 88:13
**February** [6] - 32:20,
33:3, 33:9, 34:14,
39:2, 46:25
**Federal** [1] - 92:5
**federal** [3] - 7:3,
90:23, 91:6
**feeding** [1] - 87:11
**few** [4] - 35:23, 71:8,
79:19, 103:16
**field** [1] - 7:9
**figure** [7] - 9:1, 9:23,
10:2, 14:22, 18:18,
27:1, 63:22
**figures** [2] - 26:23,
62:1
**file** [8] - 38:15, 38:19,
64:16, 91:2, 92:6,
95:13, 99:21
**filed** [6] - 5:23, 65:7,
83:8, 94:19, 98:3,
115:3
**files** [2] - 112:15,
112:17
**filing** [5] - 21:4,
104:15, 105:9,
106:7, 117:18
**filings** [6] - 82:23,
104:16, 107:17,
107:21, 108:10,
115:3
**final** [2] - 89:3, 114:23
**finally** [4] - 18:22,
51:1, 65:10, 68:4
**fine** [7] - 9:5, 25:11,
36:14, 66:10, 68:16,
116:19, 117:11
**finger** [1] - 40:14
**fingerprint** [1] - 58:12
**fingers** [1] - 37:3
**finish** [3] - 34:3, 49:4,
70:6
**firm** [5] - 5:11, 12:5,
12:16, 14:9, 14:10

**firms** [3] - 54:22,
55:17
**First** [2] - 91:11, 102:9
**first** [16] - 6:19, 7:21,
23:12, 46:5, 49:6,
52:6, 53:13, 57:8,
66:24, 72:20, 74:11,
76:2, 76:4, 86:10,
101:19, 112:12
**Fischbach** [2] - 82:19,
82:23
**fishing** [9] - 50:12,
53:11, 63:23, 81:4,
85:19, 94:11,
107:10, 109:23,
114:22
**fit** [2] - 31:7, 69:23
**five** [5] - 6:22, 10:20,
10:23, 79:4, 79:13
**five-year** [3] - 6:22,
10:20, 10:23
**flag** [2] - 11:12, 11:16
**flip** [1] - 101:7
**flipping** [1] - 72:4
**Floor** [1] - 1:22
**flying** [2] - 4:1, 69:24
**focus** [1] - 22:20
**focused** [2] - 42:14,
103:2
**FOERSTER** [1] - 2:3
**Foerster** [1] - 3:18
**Fog** [2] - 53:9, 61:11
**folder** [1] - 112:15
**folks** [1] - 49:24
**follow** [4] - 47:9,
97:11, 100:3, 114:14
**follow-up** [1] - 47:9
**followed** [1] - 5:22
**following** [5] - 9:8,
29:19, 53:7, 70:8,
97:25
**FOR** [1] - 1:1
**fore** [1] - 21:16
**foregoing** [1] - 119:4
**forensic** [3] - 39:17,
90:4, 114:4
**forensics** [1] - 90:17
**forfeiture** [2] - 27:21,
61:25
**forget** [1] - 61:6
**forgotten** [1] - 88:22
**form** [5] - 46:4, 56:1,
68:10, 93:25, 115:21
**format** [1] - 95:14
**forms** [1] - 68:5
**formulation** [2] -
51:13, 80:6
**forth** [3] - 18:15,
85:17, 116:17
**fortunate** [1] - 69:3

**fortunately** [1] - 117:2
**forward** [18] - 24:4,
25:17, 26:6, 26:8,
28:8, 28:9, 28:18,
28:19, 28:20, 28:21,
29:1, 29:2, 29:3,
29:10, 34:22, 44:13,
73:5, 79:25
**fought** [1] - 115:3
**founded** [1] - 103:23
**four** [3] - 29:24, 88:9,
117:7
**fragments** [1] - 112:14
**Francisco** [1] - 2:4
**frankly** [12] - 5:5, 9:14,
20:7, 27:7, 28:19,
28:22, 36:22, 39:3,
40:25, 76:21, 85:19,
87:21
**fraud** [2] - 30:14, 86:4
**free** [5] - 4:21, 27:5,
31:21, 34:9, 116:11
**freed** [1] - 69:17
**freeing** [1] - 32:11
**frees** [1] - 69:14
**Frentzen** [10] - 3:18,
5:22, 14:3, 15:4,
15:25, 18:6, 18:21,
49:7, 49:11, 86:7
**FRENTZEN** [40] - 2:2,
3:17, 14:7, 14:13,
49:12, 49:23, 51:4,
52:6, 53:13, 53:18,
54:1, 55:14, 55:20,
56:15, 57:3, 58:19,
59:1, 59:5, 59:17,
61:4, 61:6, 62:10,
63:2, 64:10, 64:18,
66:12, 66:15, 66:24,
67:2, 67:7, 67:22,
68:3, 68:12, 69:3,
86:9, 88:20, 89:4,
89:8, 89:11, 89:19
**Frentzen's** [2] - 4:1,
60:16
**Friday** [11] - 3:22,
4:13, 69:12, 69:21,
116:7, 116:9,
116:18, 116:21,
117:10, 117:16,
117:20
**friend** [1] - 117:3
**front** [7] - 27:10,
65:13, 81:7, 81:8,
92:15, 102:8, 111:22
**frustrating** [1] - 72:13
**Frye** [1] - 41:22
**full** [2] - 30:23, 119:5
**fully** [1] - 56:13
**fulsome** [1] - 52:5

**function** [2] - 50:22,
106:2
**functions** [2] - 55:21,
106:20
**fundamental** [2] - 7:1,
50:5
**fundamentally** [3] -
50:15, 53:19, 87:23
**fundamentals** [1] -
57:7
**funded** [1] - 47:16
**funding** [1] - 108:25
**fundraising** [3] - 43:1,
47:21, 48:5
**funds** [1] - 47:19
**future** [4] - 6:1, 11:14,
11:17, 11:20

**G**

**gaining** [1] - 20:19
**game** [1] - 51:24
**garden** [1] - 111:19
**garden-variety** [1] -
111:19
**gas** [1] - 88:14
**general** [2] - 12:24,
109:23
**generally** [3] - 16:6,
85:3, 115:21
**generate** [4] - 73:22,
74:1, 77:6, 99:12
**generated** [1] - 62:22
**genotyping** [1] - 41:20
**George** [1] - 95:5
**gestures** [1] - 109:7
**given** [9] - 4:22, 35:18,
76:19, 76:24, 77:21,
102:8, 108:8,
109:14, 115:2
**glad** [2] - 18:21, 117:9
**glancing** [1] - 35:20
**glean** [1] - 102:2
**Global** [1] - 94:5
**gloss** [3] - 52:14,
52:23, 52:25
**goal** [2] - 13:2, 42:9
**gobbles** [1] - 108:2
**gosh** [1] - 24:6
**Government** [1] -
70:17
**government** [88] - 3:5,
4:7, 4:10, 4:15, 4:21,
5:4, 5:15, 6:7, 10:13,
20:23, 22:2, 22:3,
22:4, 22:7, 26:4,
26:20, 27:12, 27:14,
27:25, 28:7, 28:12,
29:12, 30:3, 31:3,
31:12, 34:19, 34:21,

34:24, 36:16, 37:19,
37:21, 38:6, 38:19,
40:10, 40:17, 42:18,
42:24, 49:8, 51:8,
51:11, 51:17, 51:18,
53:23, 54:21, 55:3,
59:24, 66:21, 68:13,
69:20, 72:22, 75:21,
75:23, 76:3, 76:14,
81:8, 82:11, 82:22,
83:10, 83:12, 84:22,
85:8, 85:13, 85:25,
90:11, 92:10, 92:20,
92:23, 93:2, 93:5,
94:22, 96:25, 97:13,
97:20, 98:20, 99:17,
100:1, 101:14,
101:22, 101:25,
104:7, 104:18,
110:6, 113:8, 114:1,
114:24, 116:9,
116:19
**government's** [24] -
28:18, 30:21, 31:11,
39:9, 41:1, 41:3,
41:6, 49:9, 52:1,
62:9, 63:8, 73:18,
79:25, 81:23, 81:25,
83:14, 83:17, 85:5,
85:17, 92:22, 92:25,
100:9, 109:9, 115:18
**Gox** [1] - 4:2
**grand** [1] - 28:12
**grant** [3] - 41:23,
67:17, 81:17
**granted** [2] - 87:3,
100:17
**granular** [2] - 39:23,
57:4
**graph** [1] - 85:13
**grasp** [1] - 56:13
**great** [5] - 19:19,
76:14, 88:16, 88:19,
88:25
**greater** [4] - 23:15,
35:22, 62:3, 104:16
**Greenberg** [1] - 94:4
**Greenberg's** [1] - 94:5
**Gronager** [1] - 66:22
**ground** [3] - 57:14,
57:22, 57:23
**grounds** [1] - 114:13
**group** [1] - 73:8
**guarantee** [1] - 33:8
**guess** [9] - 5:12, 14:8,
23:21, 60:25, 71:21,
78:18, 91:5, 94:18,
116:13
**guidelines** [1] - 26:22
**guilty** [1] - 26:13

## H

**Haaroon** [1] - 95:5
**habit** [1] - 7:11
**hac** [1] - 3:11
**half** [3] - 17:15, 49:4, 97:2
**halfway** [1] - 22:16
**hand** [4] - 13:22, 14:18, 37:12, 51:25
**handle** [1] - 23:7
**handled** [2] - 6:11, 98:23
**hands** [1] - 6:16
**handwrite** [1] - 20:8
**happy** [16] - 26:20, 32:16, 32:21, 32:22, 33:12, 33:14, 48:13, 48:14, 49:5, 58:25, 64:1, 66:2, 69:12, 89:24, 96:13, 116:14
**harass** [1] - 87:7
**harassing** [2] - 85:22, 114:25
**harassment** [1] - 115:22
**hard** [5] - 5:5, 8:21, 15:9, 23:12, 115:3
**harder** [1] - 19:25
**hardware** [1] - 40:5
**harm** [1] - 87:7
**Haslhofer** [1] - 95:6
**HASSARD** [1] - 1:20
**Hassard** [3] - 3:10, 5:17, 115:13
**hassard's** [1] - 116:22
**hate** [1] - 39:5
**head** [4] - 19:15, 19:25, 27:7, 51:14
**header** [1] - 20:9
**heads** [1] - 96:23
**hear** [14] - 6:13, 18:5, 26:2, 26:20, 30:3, 34:16, 38:12, 48:21, 49:5, 49:8, 65:11, 66:9, 76:10, 97:25
**heard** [10] - 31:3, 43:7, 50:2, 66:16, 78:23, 84:25, 89:14, 89:18, 99:17, 101:24
**hearing** [11] - 3:22, 7:8, 28:7, 37:7, 76:8, 95:19, 97:16, 98:2, 99:18, 102:1, 118:3
**hearings** [1] - 71:2
**heart** [1] - 7:13
**heavily** [3] - 86:15, 87:25, 88:1
**hedging** [1] - 28:3, 29:9

**held** [5] - 39:23, 80:13, 94:9, 97:17, 103:18
**helix** [1] - 90:6
**help** [3] - 56:24, 86:4, 108:5
**helpful** [7] - 33:24, 42:2, 89:22, 89:25, 111:8, 114:3, 117:17
**helps** [1] - 57:1
**hereby** [2] - 12:4, 119:3
**herself** [1] - 37:14
**hesitate** [1] - 7:1
**Heuristic** [28] - 23:5, 36:22, 37:1, 57:9, 59:22, 60:2, 60:23, 61:1, 71:9, 71:22, 72:5, 77:14, 98:14, 98:18, 98:22, 99:1, 99:2, 99:8, 102:9, 102:13, 102:15, 102:18, 102:20, 102:23, 102:24, 108:1
**heuristic** [24] - 8:5, 18:19, 21:13, 23:18, 35:21, 36:9, 36:23, 57:9, 59:19, 60:25, 61:15, 62:25, 63:5, 79:2, 84:3, 84:6, 84:8, 98:15, 99:5, 99:7, 102:10, 102:17, 102:19, 107:25
**heuristics** [13] - 6:21, 8:19, 13:9, 13:10, 19:15, 38:4, 62:15, 71:17, 74:4, 77:5, 95:11, 110:20, 110:22
**high** [3] - 58:15, 62:5, 105:23
**high-level** [1] - 105:23
**higher** [1] - 62:8
**highlight** [1] - 111:9
**highlighted** [1] - 113:17
**highlights** [4] - 70:23, 76:2, 85:18, 86:5
**highly** [2] - 103:24, 115:8
**himself** [2] - 16:1, 25:25
**hinted** [2] - 35:13, 52:21
**history** [2] - 106:1, 116:1
**hit** [3] - 57:6, 116:22, 117:6
**hold** [4] - 32:5, 103:6,

103:7, 112:10
**holding** [2] - 42:24, 112:23
**holiday** [1] - 31:9
**holidays** [2] - 34:1, 34:3
**homework** [1] - 30:16
**homicide** [1] - 87:17
**honest** [2] - 21:18, 74:12
**honestly** [7] - 16:3, 16:20, 22:24, 24:8, 39:17, 43:16, 78:21
**Honor** [89] - 3:6, 3:9, 3:17, 4:4, 4:24, 5:15, 6:4, 8:3, 8:20, 10:4, 10:13, 13:7, 14:7, 14:13, 15:3, 19:7, 20:4, 24:1, 25:2, 26:12, 27:19, 29:13, 29:22, 30:6, 30:11, 30:17, 30:24, 32:9, 32:14, 33:20, 34:18, 39:8, 42:4, 42:11, 42:12, 42:18, 43:10, 44:6, 45:17, 46:2, 47:8, 47:25, 48:3, 48:9, 48:25, 49:3, 49:12, 49:23, 50:5, 51:1, 54:2, 54:17, 55:15, 58:22, 59:17, 60:9, 60:15, 61:4, 61:7, 62:10, 63:2, 64:5, 66:20, 67:14, 67:22, 68:3, 69:4, 69:7, 69:8, 69:20, 70:13, 75:18, 77:9, 78:18, 79:1, 79:9, 79:19, 83:10, 86:9, 88:21, 88:22, 89:2, 89:4, 89:19, 89:21, 90:21, 96:13, 117:12, 117:14
**honor** [1] - 13:19
**Honor's** [1] - 31:1
**HONORABLE** [1] - 1:8
**hood** [2] - 77:20, 77:21
**hope** [4] - 4:13, 24:8, 88:15, 117:1
**hoped** [1] - 102:2
**hopefully** [2] - 19:8, 34:6
**hopes** [1] - 109:12
**hotly** [1] - 93:15
**hour** [2] - 35:6, 49:5
**housekeeping** [1] - 66:5
**Hub** [1] - 95:4
**huge** [1] - 36:21

**human** [2] - 105:18, 106:1
**human-readable** [2] - 105:18, 106:1
**humble** [1] - 54:9
**hundred** [2] - 53:7, 73:10
**Hunt** [1] - 94:5
**husher** [2] - 25:5, 25:13
**hypothetical** [1] - 52:9
**hypothetically** [1] - 57:19
**hypotheticals** [3] - 23:4, 26:20, 53:14

## I

**I-95** [1] - 116:22
**IC3** [1] - 95:3
**idea** [8] - 19:19, 19:20, 88:16, 88:18, 88:19, 96:13, 112:2
**identified** [3] - 62:15, 103:8, 110:23
**identify** [7] - 57:16, 95:25, 97:21, 98:8, 100:6, 103:21, 107:24
**identifying** [1] - 100:19
**ignored** [3] - 98:7, 101:18, 109:15
**illuminating** [1] - 41:11
**images** [1] - 85:15
**imagine** [2] - 58:9, 115:11
**impact** [2] - 61:16, 79:22
**impeach** [3] - 80:19, 112:23, 113:7
**impeaching** [1] - 113:16
**impeachment** [1] - 80:18
**implicit** [1] - 89:16
**importance** [1] - 111:9
**important** [6] - 5:14, 23:19, 36:6, 39:10, 105:21, 115:25
**importantly** [1] - 64:22
**impression** [5] - 23:12, 45:19, 45:25, 72:20, 76:2
**impressions** [1] - 11:2
**improper** [3] - 6:7, 52:11, 95:18
**impugn** [1] - 87:7
**IN** [1] - 1:1

**in-depth** [1] - 39:25
**inability** [1] - 88:7
**inaccurately** [1] - 105:1
**inapposite** [1] - 90:17
**inasmuch** [1] - 11:17
**Inc** [3] - 54:23, 55:10, 92:5
**incarceration** [1] - 44:2
**inclined** [2] - 38:12, 38:13
**include** [4] - 39:20, 40:4, 61:14, 90:22
**included** [1] - 58:20
**includes** [4] - 10:23, 95:10, 105:25, 106:9
**including** [10] - 24:18, 54:22, 58:3, 82:19, 87:8, 93:22, 94:2, 95:1, 95:4, 113:24
**incomplete** [1] - 112:15
**incorrect** [1] - 93:5
**independent** [5] - 51:9, 55:3, 71:6, 71:7, 73:17
**independently** [8] - 15:20, 63:3, 63:16, 71:11, 72:2, 72:12, 73:3, 79:5
**indicated** [4] - 22:21, 108:24, 111:6, 115:11
**indicating** [1] - 104:13
**indicative** [1] - 112:7
**indiscriminate** [1] - 99:3
**individual** [3] - 77:5, 94:2, 95:1
**individuals** [1] - 69:24
**information** [65] - 4:16, 6:10, 10:24, 11:3, 11:5, 13:10, 17:7, 19:23, 20:18, 20:23, 21:13, 23:18, 23:19, 24:5, 26:4, 26:9, 39:11, 41:9, 43:18, 52:3, 53:24, 55:23, 56:2, 56:9, 56:22, 59:25, 60:1, 60:7, 60:11, 60:14, 60:18, 62:4, 65:10, 71:11, 71:20, 71:22, 72:5, 72:8, 72:16, 73:2, 73:3, 73:5, 73:8, 73:11, 77:7, 77:13, 77:21, 78:16, 79:3, 80:2, 80:17, 87:1, 95:23, 97:12,

102:12, 102:15,
102:23, 103:10,
109:24, 110:17,
111:1, 111:17,
113:1, 113:12, 114:3
**informed** [2] - 12:14,
12:19
**infrastructure** [1] -
65:24
**initial** [1] - 4:7
**input** [2] - 62:14,
92:21, 104:20,
113:1, 113:9
**inputs** [1] - 90:10
**instance** [4] - 23:3,
59:10, 59:11, 86:17
**instances** [1] - 55:16
**instantly** [1] - 11:12
**instead** [1] - 105:16
**instinct** [1] - 20:2
**Institute** [1] - 95:3
**instructed** [1] - 99:19
**instructions** [2] -
97:12, 105:18
**intellectual** [2] - 87:5,
87:13
**intelligence** [3] -
59:23, 71:23, 102:19
**intend** [1] - 80:19
**intended** [3] - 100:2,
114:25, 115:19
**intent** [1] - 87:7
**intentionally** [1] -
16:11
**intentions** [1] - 105:24
**interaction** [1] - 57:15
**interest** [6] - 7:13, 8:7,
49:9, 67:12, 67:19,
95:20
**interested** [3] - 20:18,
64:11, 91:6
**interesting** [1] - 32:4
**interestingly** [1] -
102:17
**interests** [1] - 14:4
**interfaced** [1] - 106:11
**interim** [2] - 5:10, 5:18
**intermediate** [4] -
41:15, 72:21, 111:7,
111:24
**internal** [2] - 71:5,
98:6
**international** [1] -
10:11
**interrogatory** [1] -
39:17
**interrupting** [2] - 7:11,
54:19
**intimidate** [1] - 114:25
**intimidating** [1] -

85:22
**introduce** [1] - 28:13
**introducing** [1] - 23:1
**invalidate** [1] - 98:17
**investigation** [6] -
22:22, 68:1, 75:25,
92:11, 92:14, 95:8
**investigator** [1] -
85:14
**investigatory** [1] -
50:18
**invitations** [2] - 9:18,
114:8
**invited** [1] - 109:16
**involve** [1] - 107:20
**involved** [6] - 27:24,
28:21, 40:16, 55:16,
87:16, 87:19
**involves** [1] - 102:20
**involving** [1] - 58:2
**iron** [1] - 68:7
**irrelevant** [1] - 86:17
**issuance** [1] - 92:4
**issue** [55] - 6:19, 9:15,
11:9, 11:16, 13:9,
13:11, 13:13, 15:3,
19:6, 20:14, 25:23,
26:9, 27:6, 27:13,
29:17, 30:13, 35:8,
35:12, 35:16, 38:13,
40:20, 41:22, 49:2,
49:10, 50:7, 51:12,
54:20, 63:17, 63:23,
65:10, 68:23, 70:23,
71:12, 71:19, 75:3,
77:13, 78:12, 79:2,
82:1, 82:5, 85:21,
88:12, 92:1, 96:23,
98:1, 98:3, 98:19,
109:13, 110:20,
112:11, 114:10,
115:4
**issued** [4] - 48:5, 50:8,
93:9, 103:18
**issuer** [1] - 54:11
**issues** [16] - 3:23,
14:17, 21:16, 28:23,
41:12, 42:2, 42:15,
43:13, 45:6, 70:24,
82:4, 84:11, 88:8,
97:6, 104:24
**item** [1] - 30:13
**items** [1] - 73:16
**iterations** [1] - 50:9
**itself** [15] - 18:11,
52:16, 52:24, 89:1,
98:12, 105:20,
105:23, 106:10,
106:17, 110:24,
111:3, 111:11,

113:12, 113:15

## J

**jail** [1] - 42:25
**January** [3] - 34:3,
34:22, 88:24
**Japan** [1] - 4:11
**Japanese** [3] - 4:7,
4:10, 4:21
**Jeff** [1] - 3:7
**JEFFREY** [1] - 1:17
**Jersey** [10] - 41:12,
41:13, 41:16, 72:22,
86:11, 86:12, 91:14,
111:7, 111:24, 117:5
**job** [1] - 17:14
**jobs** [1] - 17:4
**Jonathan** [1] - 66:22
**judge** [4] - 32:23,
33:2, 33:15, 35:17
**Judge** [2] - 73:6, 97:8
**JUDGE** [2] - 1:8, 1:9
**judges** [1] - 34:7
**judgment** [2] - 50:25,
54:9
**judicial** [2] - 52:23,
52:24
**July** [1] - 97:17
**June** [4] - 35:5, 84:17,
96:12, 98:2
**jurisdiction** [2] - 10:9,
10:10
**jurisdictions** [3] -
10:5, 10:11, 17:2
**jury** [18] - 9:6, 21:22,
26:25, 27:14, 27:20,
27:21, 27:23, 34:1,
40:23, 41:7, 41:8,
46:23, 48:6, 48:21,
48:24, 74:8, 74:9,
77:7
**JUSTICE** [1] - 1:15
**Justice** [4] - 1:18,
47:14, 108:24, 109:2
**Justification** [1] -
105:17
**justification** [2] -
86:25, 106:7
**justifications** [2] -
107:18, 107:19
**justified** [1] - 94:24

## K

**Kappos** [1] - 95:5
**keep** [6] - 4:20, 25:18,
66:12, 67:9, 71:5,
88:11
**keeping** [1] - 66:7

**key** [1] - 36:18
**kind** [13] - 23:1, 34:18,
62:13, 64:25, 71:16,
74:1, 76:12, 76:24,
81:12, 87:20, 89:1,
90:14, 102:24
**kinds** [3] - 7:5, 16:7,
16:13
**knowing** [3] - 20:21,
45:15, 77:19
**knowingly** [1] -
112:16
**knowledge** [2] -
17:19, 100:5
**knows** [1] - 100:25

## L

**laboring** [1] - 49:24
**lack** [7] - 16:4, 63:19,
63:20, 104:23,
108:3, 109:14
**laid** [1] - 63:18
**Lane** [1] - 112:17
**language** [9] - 6:23,
11:1, 11:13, 11:20,
16:5, 16:6, 18:3,
28:4, 102:7
**large** [5] - 40:22,
54:20, 55:17, 56:21
**largely** [3] - 9:8, 107:2,
107:3
**larger** [1] - 57:4
**last** [18] - 5:24, 8:5,
24:16, 30:13, 30:22,
31:21, 31:25, 37:7,
50:3, 66:4, 80:8,
82:12, 84:22, 93:9,
94:16, 97:9, 101:11,
116:24
**lasts** [1] - 31:25
**late** [11] - 20:15,
20:19, 24:19, 26:4,
26:9, 26:10, 28:13,
35:24, 46:24, 61:17,
61:18
**latest** [1] - 72:6
**laundered** [1] - 26:16
**Laurent** [1] - 7:6
**Law** [1] - 1:21
**law** [25] - 5:11, 12:5,
12:16, 14:9, 14:10,
16:7, 16:8, 16:23,
16:24, 17:9, 17:16,
17:21, 39:24, 44:22,
52:10, 53:20, 54:7,
75:13, 81:5, 81:7,
81:18, 82:15, 88:1,
91:8
**lawyer** [4] - 7:21,

44:22, 46:7, 88:13
**lawyers** [5] - 14:9,
43:24, 44:15, 45:10,
68:14
**layers** [2] - 80:11
**layman** [1] - 101:8
**lead** [2] - 63:1, 69:25
**leads** [1] - 63:1
**learn** [1] - 11:5
**learned** [2] - 20:1,
77:24
**learning** [1] - 36:8
**least** [23] - 9:1, 9:2,
9:21, 12:13, 12:19,
33:18, 37:18, 42:1,
48:19, 51:7, 60:13,
65:18, 75:1, 91:20,
94:12, 94:13, 99:5,
110:7, 115:21,
116:1, 117:7,
117:21, 117:24
**leave** [7] - 16:25,
17:14, 18:16, 91:25,
92:6, 98:3, 114:10
**led** [1] - 95:8
**Lee** [3] - 66:16, 66:23,
67:5
**leeway** [1] - 100:17
**left** [1] - 111:3
**legitimate** [1] - 64:11
**legitimately** [1] -
116:2
**lengthy** [2] - 65:7,
113:9
**less** [6] - 50:15, 53:20,
91:5, 106:25,
108:10, 114:21
**letter** [2] - 4:6, 115:8
**level** [6] - 58:15, 62:5,
82:13, 96:9, 105:23,
107:18
**Levin** [1] - 66:23
**liability** [1] - 11:17
**libraries** [1] - 106:3
**license** [5] - 83:5,
83:8, 108:18, 109:1
**light** [10] - 14:25,
26:23, 38:2, 51:20,
60:23, 67:18, 69:9,
105:7, 110:13, 116:2
**likely** [3] - 31:19,
78:17, 112:16
**limine** [2] - 81:10,
92:19
**limit** [3] - 16:9, 16:19,
23:2
**limitations** [3] - 8:9,
8:10, 8:13
**limited** [3] - 7:5, 81:6,
95:5

**limiting** [1] - 7:3
**line** [1] - 9:3
**lined** [1] - 69:22
**lines** [5] - 10:1, 19:1,
74:5, 79:20, 110:15
**linked** [1] - 71:18
**list** [2] - 47:10, 66:17
**listen** [1] - 43:12
**lists** [1] - 39:18
**literally** [2] - 78:24,
105:1
**litigated** [1] - 54:10
**litigation** [10] - 11:14,
11:20, 12:8, 16:14,
55:1, 82:19, 88:13,
91:9, 93:15, 94:12
**live** [5] - 7:21, 7:23,
7:24, 88:25, 101:4
**LLP** [1] - 2:3
**local** [5] - 89:23,
90:23, 91:2, 91:3,
91:5
**locked** [1] - 45:2
**lodged** [1] - 68:12
**log** [1] - 85:12
**logs** [6] - 92:2, 92:8,
92:12, 92:22, 98:5,
114:1
**London** [1] - 95:3
**long-pending** [2] -
31:18, 32:3
**long-scheduled** [1] -
33:19
**look** [56] - 9:2, 9:22,
10:16, 10:17, 11:18,
11:21, 12:13, 12:16,
13:20, 14:20, 14:21,
15:1, 21:10, 37:18,
50:18, 56:7, 56:11,
56:22, 57:23, 58:1,
58:4, 58:11, 58:13,
63:6, 65:22, 71:9,
72:16, 76:14, 77:10,
77:13, 77:20, 77:21,
79:12, 81:12, 81:25,
82:17, 84:5, 86:10,
86:13, 91:20, 96:19,
96:20, 100:6,
100:12, 100:23,
100:25, 101:3,
101:16, 103:21,
105:13, 107:3,
107:5, 107:7, 107:19
**looked** [12] - 12:14,
30:17, 54:1, 61:3,
74:11, 75:9, 75:15,
79:8, 81:22, 82:1,
91:1, 93:14
**looking** [22] - 7:18,
9:12, 11:10, 12:1,

30:23, 31:10, 37:12,
56:8, 63:20, 72:20,
74:22, 76:15, 77:19,
79:13, 80:10, 82:15,
100:13, 104:8,
104:14, 105:10,
107:8, 109:10
**looks** [5] - 15:8, 18:17,
27:8, 31:15
**Lords** [1] - 94:6
**love** [1] - 24:24
**ludicrous** [1] - 55:23
**lunch** [7] - 66:8, 66:9,
66:13, 68:17, 69:6,
70:5, 70:7

## M

**machinations** [1] -
87:19
**machine** [6] - 73:24,
105:19, 105:20,
105:21, 105:25,
112:25
**magazine** [1] - 94:3
**main** [2] - 16:15, 53:12
**maintains** [1] - 90:9
**majority** [1] - 52:21
**malicious** [1] - 115:9
**Man** [2] - 102:16,
108:2
**manage** [1] - 40:15
**management** [1] -
49:10
**manipulation** [2] -
60:17, 102:25
**manner** [5] - 9:9,
53:22, 68:18, 68:20,
114:15
**manners** [1] - 51:6
**manual** [8] - 59:13,
59:15, 59:18, 60:17,
60:20, 102:20,
102:24
**manually** [1] - 60:20
**markers** [3] - 58:13,
58:14, 58:16
**Market** [1] - 2:3
**marketplace** [2] -
17:12, 17:15
**markets** [1] - 59:6
**massively** [2] - 85:9,
104:25
**material** [7] - 5:3,
7:16, 62:8, 81:8,
91:16, 103:11,
106:17
**materials** [5] - 5:8,
93:3, 93:4, 93:5,
103:10

**matter** [13] - 7:14,
27:22, 29:15, 30:18,
31:1, 31:18, 51:19,
51:20, 62:1, 72:19,
74:20, 103:5, 103:14
**matters** [3] - 23:12,
76:2, 103:8
**mean** [19] - 10:13,
19:17, 21:21, 30:9,
31:6, 31:12, 40:13,
48:9, 50:10, 50:17,
52:8, 55:16, 57:19,
76:3, 76:6, 78:7,
78:23, 79:10, 90:8
**meaningful** [1] -
106:12
**means** [13] - 14:9,
28:22, 43:16, 44:10,
44:11, 51:22, 52:20,
57:15, 57:19, 87:4,
87:12, 108:14, 113:6
**meant** [3] - 14:12,
13:6, 111:23
**meet** [2] - 82:2, 97:20
**meeting** [1] - 109:24
**Meiklejohn** [1] - 95:6
**members** [1] - 19:9
**memorandum** [1] -
93:23
**memory** [1] - 88:20
**mention** [2] - 68:17,
71:14
**mentioned** [4] - 66:20,
66:21, 91:25, 98:4
**merely** [1] - 73:13
**methodologies** [3] -
40:23, 40:24, 95:12
**methodology** [1] -
36:18
**methods** [1] - 106:19
**MICHAEL** [1] - 1:20
**Michael** [2] - 3:10,
66:22
**microphone** [1] - 43:5
**midday** [1] - 117:21
**midst** [1] - 3:25
**might** [17] - 10:12,
19:14, 21:16, 24:18,
32:24, 33:4, 38:22,
45:8, 53:3, 57:19,
57:20, 69:9, 93:15,
105:14, 110:4
**million** [1] - 73:11
**mind** [3] - 25:1, 36:21,
37:25
**mine** [2] - 88:21, 117:3
**mini** [1] - 85:16
**minute** [4] - 23:15,
24:16, 35:11, 106:25
**minutes** [3] - 7:18,

79:4, 79:14
**miscluster** [1] - 83:23
**misclustered** [2] -
83:20, 83:23
**misclustering** [1] -
59:9
**missed** [2] - 15:12,
17:23
**missing** [2] - 50:6,
73:11
**mistaken** [1] - 38:21
**mixture** [1] - 87:17
**model** [3] - 71:6,
103:24, 103:25
**models** [3] - 55:5,
55:7, 55:12
**modification** [2] -
89:8, 102:21
**modified** [1] - 52:9
**modify** [3] - 54:4,
89:15, 89:17
**Mole** [1] - 88:5
**moment** [5] - 15:15,
25:4, 27:11, 35:17,
71:3
**moments** [1] - 71:8
**Monday** [1] - 30:25
**money** [4] - 26:15,
26:16, 47:16, 53:9
**monitor** [2] - 65:1,
65:2
**month** [3] - 30:23,
97:1, 97:16
**months** [6] - 10:7,
35:3, 50:23, 69:1
**moot** [2] - 35:8, 67:5
**Morgan** [1] - 80:12
**morning** [8] - 3:6, 3:8,
3:9, 3:13, 3:20,
23:10, 79:3, 116:24
**morph** [1] - 36:15
**Morrison** [1] - 3:18
**MORRISON** [1] - 2:3
**MOSS** [1] - 1:8
**most** [4] - 8:8, 82:6,
82:15, 94:23
**Most** [1] - 94:15
**motion** [21] - 5:14,
50:11, 66:3, 67:4,
67:17, 91:25, 92:3,
92:4, 92:14, 92:24,
98:3, 98:4, 98:7,
98:12, 99:1, 99:8,
99:18, 112:19,
114:10, 114:12,
114:17
**motions** [3] - 81:10,
92:19, 112:13
**motivating** [2] - 35:12,
35:19

**move** [8] - 17:5, 32:6,
32:8, 32:17, 32:21,
33:11, 63:16, 97:6
**moved** [1] - 32:17
**moving** [1] - 96:8
**MR** [106] - 3:9, 3:17,
6:17, 8:3, 10:4,
10:10, 10:18, 11:1,
11:8, 12:21, 13:7,
13:19, 13:25, 14:7,
14:13, 15:3, 15:6,
15:13, 15:22, 17:17,
17:21, 19:7, 20:3,
20:20, 21:3, 21:7,
22:18, 24:1, 24:24,
25:2, 25:12, 25:15,
26:12, 29:22, 33:6,
33:20, 33:23, 34:13,
42:4, 42:12, 42:17,
47:23, 48:3, 48:9,
48:25, 49:3, 49:12,
49:23, 51:4, 52:6,
53:13, 53:18, 54:1,
55:14, 55:20, 56:15,
57:3, 58:19, 59:1,
59:5, 59:17, 61:4,
61:6, 62:10, 63:2,
64:10, 64:18, 66:12,
66:15, 66:20, 66:24,
67:2, 67:7, 67:14,
67:22, 68:3, 68:12,
69:3, 69:8, 70:11,
70:13, 73:23, 74:11,
75:8, 75:15, 75:18,
76:1, 77:9, 78:15,
78:21, 79:1, 79:17,
86:9, 88:20, 89:4,
89:8, 89:11, 89:19,
90:3, 116:18,
116:21, 117:2,
117:9, 117:12,
117:14, 117:25
**MS** [40] - 3:6, 4:4,
4:15, 4:24, 5:15,
27:19, 28:3, 29:13,
30:6, 30:11, 30:17,
30:23, 31:7, 32:9,
32:14, 34:18, 34:24,
35:2, 39:8, 39:16,
42:11, 42:18, 44:9,
45:24, 47:8, 60:9,
60:15, 61:8, 61:13,
69:7, 69:20, 79:19,
83:10, 84:20, 89:21,
90:21, 90:25, 91:10,
116:8, 116:19
**Mt** [1] - 4:2
**multiple** [3] - 14:16,
76:24, 83:4
**multitude** [1] - 64:11

# N

**N.J** [1] - 41:17
**N.W** [1] - 119:11
**name** [2] - 76:10, 111:24
**names** [3] - 3:5, 82:18
**narrow** [1] - 85:10
**narrowing** [1] - 103:2
**native** [2] - 92:21, 95:13
**nature** [3] - 38:15, 52:25, 60:14
**necessarily** [3] - 82:21, 84:2, 85:22
**necessary** [9] - 8:1, 19:1, 98:9, 98:24, 108:25, 111:19, 113:15, 114:19, 115:5
**need** [83] - 7:15, 7:18, 7:24, 7:25, 8:11, 8:18, 8:24, 9:3, 9:16, 9:19, 9:20, 9:21, 10:1, 10:16, 11:10, 11:22, 11:25, 12:2, 13:3, 15:23, 19:8, 21:9, 22:12, 32:22, 33:21, 37:19, 40:4, 40:6, 48:20, 50:24, 50:25, 62:16, 63:19, 64:25, 65:6, 65:22, 68:4, 68:8, 69:25, 72:1, 72:11, 73:24, 74:1, 77:7, 77:17, 77:20, 78:3, 79:15, 80:14, 82:7, 82:10, 85:10, 85:11, 90:13, 96:5, 96:6, 96:7, 96:9, 96:16, 96:24, 97:2, 97:4, 97:5, 97:9, 97:23, 98:10, 99:22, 99:25, 100:4, 100:6, 100:20, 101:3, 101:16, 105:13, 107:22, 107:23, 111:9, 111:15, 115:23
**needed** [19] - 25:20, 35:4, 35:5, 38:1, 63:13, 81:25, 95:22, 96:3, 97:14, 97:19, 98:13, 99:14, 99:20, 102:1, 102:5, 104:9, 111:17
**needing** [2] - 63:9, 110:24
**needs** [20] - 8:5, 9:23, 18:25, 19:9, 25:25, 57:4, 61:20, 65:5,

82:20, 96:19, 96:20, 103:7, 105:6, 107:7, 107:19, 108:9, 109:15, 110:12, 111:12, 112:4
**negative** [1] - 87:10
**negatives** [1] - 76:11
**negotiations** [1] - 93:24
**never** [12] - 17:3, 22:5, 37:11, 72:14, 73:19, 78:4, 83:8, 84:9, 94:23, 107:5, 114:6, 115:4
**new** [5] - 23:1, 35:24, 35:25, 42:15, 80:25
**New** [15] - 1:18, 1:22, 16:19, 17:1, 41:12, 41:13, 41:16, 68:19, 72:22, 86:11, 86:12, 91:14, 111:7, 111:24, 117:5
**news** [1] - 87:11
**next** [7] - 5:2, 7:17, 14:22, 16:4, 28:12, 38:25, 69:10
**nexus** [1] - 106:6
**night** [3] - 5:24, 8:5, 116:24
**nine** [1] - 35:3
**Ninth** [5] - 81:15, 81:16, 112:9, 112:10, 113:25
**Nixon** [18] - 52:15, 52:16, 52:20, 53:15, 53:23, 68:22, 70:14, 70:18, 70:19, 70:24, 73:12, 94:10, 95:16, 95:19, 109:21, 110:5, 110:9, 110:10
**Nixon's** [2] - 70:20, 73:14
**Nobel** [1] - 90:6
**nominations** [1] - 34:6
**nominees** [1] - 34:5
**noncompete** [9] - 5:21, 6:22, 10:20, 10:23, 16:5, 17:13, 17:22, 75:10
**noncompetes** [2] - 16:23, 21:12
**noncompetitive** [2] - 18:3, 88:7
**none** [3] - 67:25, 80:4, 105:15
**nonetheless** [2] - 36:6, 109:23
**nonparty** [1] - 49:13
**nonstop** [1] - 87:10
**note** [5] - 39:10,

60:18, 69:22, 114:23, 115:1
**noted** [4] - 83:16, 95:21, 100:1, 113:25
**notes** [6] - 86:19, 94:2, 95:1, 103:1, 112:18, 119:5
**nothing** [6] - 53:4, 68:17, 90:7, 98:23, 104:17, 109:18
**notice** [5] - 23:11, 69:17, 70:2, 70:4, 78:1
**notion** [2] - 50:3, 95:22
**notwithstanding** [2] - 24:15, 26:3
**November** [10] - 31:24, 32:1, 93:9, 93:20, 94:6, 94:16, 94:17, 94:18, 94:19, 115:8
**nowhere** [2] - 23:9, 65:14
**number** [9] - 3:22, 61:10, 61:15, 82:4, 86:18, 89:22, 91:13, 91:18, 110:15
**Number** [2] - 87:1, 87:4
**numerous** [7] - 35:14, 73:4, 76:2, 113:6, 113:13, 114:7, 115:3
**NW** [4] - 1:13, 1:15, 1:18, 2:22
**NY** [1] - 1:22

# O

**oar** [1] - 49:24
**oath** [1] - 9:3
**obfuscation** [1] - 98:15
**object** [4] - 89:11, 92:20, 92:25, 95:11
**objection** [1] - 42:3
**objections** [1] - 7:8
**objects** [1] - 48:10
**obligations** [4] - 47:5, 51:9, 55:6
**obscure** [1] - 94:23
**observed** [3] - 39:21, 93:12, 94:16
**observing** [1] - 92:24
**obtain** [6] - 4:8, 80:17, 83:4, 108:18, 109:7, 111:13
**obtaining** [2] - 95:20, 108:25
**obvious** [1] - 49:17

**obviously** [16] - 15:6, 19:3, 20:15, 23:8, 24:4, 25:15, 33:13, 33:20, 56:19, 86:12, 86:19, 88:1, 88:11, 89:11, 108:19
**occasions** [2] - 76:24, 96:14
**occur** [3] - 97:13, 101:15, 106:12
**occurred** [2] - 21:5, 21:7
**October** [4] - 30:6, 30:8, 31:17, 31:21
**OF** [5] - 1:1, 1:2, 1:8, 1:15, 119:1
**offense** [1] - 88:24
**offer** [2] - 27:5, 94:22
**offered** [2] - 52:1, 113:7, 113:20
**offering** [2] - 53:23, 110:6
**offers** [1] - 107:19
**offices** [1] - 68:9
**OFFICIAL** [1] - 119:1
**Official** [2] - 2:21, 119:10
**offs** [2] - 44:13, 44:16
**often** [1] - 82:20
**old** [1] - 104:6
**omnibus** [1] - 92:18
**once** [6] - 12:14, 28:22, 38:9, 57:22, 58:14, 78:6
**one** [59] - 7:12, 11:7, 12:22, 13:1, 13:3, 14:22, 17:1, 17:3, 17:7, 18:9, 19:3, 19:11, 19:19, 20:8, 20:12, 22:10, 24:9, 29:8, 31:23, 32:6, 32:7, 32:22, 33:8, 36:23, 39:8, 39:19, 41:9, 45:12, 47:17, 47:22, 52:24, 53:7, 53:12, 54:14, 54:19, 56:16, 59:10, 60:13, 60:15, 62:7, 64:5, 66:15, 68:7, 68:15, 68:16, 71:18, 73:8, 74:25, 76:19, 77:24, 79:10, 79:22, 82:22, 84:21, 86:18, 89:4, 93:14, 106:8
**one's** [3] - 94:2, 95:1, 112:3
**ones** [2] - 16:20, 31:23
**ongoing** [1] - 5:19
**open** [10] - 3:22, 10:5, 10:9, 16:20, 21:17,

25:18, 51:24, 58:21, 64:13, 99:9
**open-source** [2] - 10:5, 99:9
**opened** [1] - 22:7
**opens** [1] - 22:3
**operates** [2] - 98:22, 108:17
**opinion** [6] - 36:2, 77:14, 78:2, 79:15, 81:1, 86:20
**opinions** [1] - 80:7
**opportunity** [20] - 37:18, 37:21, 46:5, 47:2, 49:13, 56:7, 56:11, 61:20, 89:14, 89:18, 91:24, 96:6, 100:15, 100:18, 102:3, 102:8, 103:13, 108:8, 112:24
**opposes** [1] - 27:25
**opposing** [1] - 34:20
**opposite** [1] - 76:18
**opposition** [2] - 81:9, 85:18
**opted** [1] - 90:22
**options** [2] - 34:10, 93:25
**oral** [1] - 14:4
**orally** [1] - 89:13
**order** [56] - 5:1, 5:2, 5:9, 5:10, 5:18, 5:23, 6:3, 6:8, 6:18, 6:20, 7:7, 7:15, 8:1, 10:18, 12:4, 12:6, 12:18, 13:9, 13:20, 14:4, 18:8, 18:10, 19:2, 19:3, 19:10, 20:6, 20:11, 21:12, 23:25, 25:4, 39:16, 40:2, 48:5, 48:12, 54:7, 68:5, 73:25, 74:1, 75:11, 89:9, 89:12, 89:15, 90:12, 95:23, 96:10, 96:15, 101:3, 101:5, 101:8, 101:9, 101:20, 102:6, 103:18, 103:19, 109:12, 111:13
**ordering** [1] - 12:15
**orders** [1] - 17:22
**original** [5] - 54:3, 81:9, 84:16, 84:18, 92:22
**originally** [3] - 50:8, 50:11, 88:16
**otherwise** [3] - 31:9, 42:8, 114:5
**ought** [4] - 11:6,

38:10, 42:14, 51:11
**out-of-time** [1] - 38:17
**outed** [1] - 87:11
**outlined** [1] - 73:16
**output** [1] - 92:21
**outputs** [1] - 90:10
**outside** [1] - 103:25
**outstanding** [1] -
66:15
**overall** [1] - 94:8
**overbroad** [2] - 93:13,
93:20
**overinclusive** [1] -
102:16
**overly** [2] - 37:11,
108:1
**override** [1] - 112:20
**overstated** [1] - 36:4
**overview** [1] - 106:14
**own** [12] - 19:15,
19:25, 20:2, 42:1,
72:24, 73:18, 77:3,
81:1, 83:18, 88:6,
88:7
**owner** [1] - 71:15

## P

**p.m** [3] - 70:7, 70:8,
118:3
**Pac** [2] - 102:16, 108:2
**Pac-Man** [2] - 102:16,
108:2
**page** [2] - 81:11
**paid** [1] - 93:23
**pain** [1] - 12:15
**painfully** [1] - 89:1
**paired** [1] - 4:7
**Pandora** [2] - 60:4,
60:5
**paper** [2] - 76:12, 95:7
**papers** [3] - 63:18,
67:25, 95:11
**paperwork** [3] - 50:16,
64:1, 64:20
**paragraph** [2] - 106:4,
106:8
**parameters** [4] -
55:12, 59:7, 59:9,
62:15
**paraphrasing** [1] -
86:19
**part** [13] - 17:18,
37:13, 37:14, 40:18,
40:22, 43:19, 45:5,
50:23, 54:9, 57:10,
101:20, 110:7
**participating** [1] -
115:20
**particular** [20] - 7:5,

16:24, 19:5, 48:17,
51:21, 59:19, 63:5,
64:3, 66:3, 86:17,
87:21, 99:24,
102:11, 102:24,
105:19, 107:25,
110:20, 111:16,
115:20, 116:5
**particularly** [2] -
110:12, 111:21
**parties** [7] - 27:5,
38:13, 39:3, 55:1,
96:22, 99:17, 116:14
**partly** [1] - 37:9
**party** [3] - 41:21,
109:24, 112:23
**pass** [1] - 14:20
**passing** [1] - 4:5
**past** [2] - 63:7, 117:3
**pay** [3] - 17:12, 17:14,
47:21
**payment** [1] - 93:25
**Pearlman** [1] - 3:7
**PEARLMAN** [1] - 1:17
**peel** [4] - 39:20, 58:3,
58:9, 99:3
**peeling** [1] - 80:10
**peer** [4] - 72:7, 76:12,
76:22, 108:3
**peer-reviewed** [2] -
72:7, 76:12
**PELKER** [41] - 1:14,
3:6, 4:4, 4:15, 4:24,
5:15, 27:19, 28:3,
29:13, 30:6, 30:11,
30:17, 30:23, 31:7,
32:9, 32:14, 34:18,
34:24, 35:2, 39:8,
39:16, 42:11, 42:18,
44:9, 45:24, 47:8,
60:9, 60:15, 61:8,
61:13, 69:7, 69:20,
79:19, 83:10, 84:20,
89:21, 90:21, 90:25,
91:10, 116:8, 116:19
**Pelker** [13] - 3:6, 4:2,
32:8, 34:16, 45:23,
47:7, 48:17, 57:5,
66:9, 79:18, 90:20,
104:25, 112:6
**pendency** [1] - 92:13
**pending** [6] - 31:18,
32:3, 34:6, 44:2,
68:23, 99:18
**Pennsylvania** [1] -
1:15
**people** [7] - 7:9,
19:14, 38:7, 53:7,
53:8, 65:2, 68:14
**perceived** [1] - 80:8

**percent** [6] - 21:18,
37:25, 58:10, 62:7,
84:9, 84:10
**performed** [2] - 55:21,
113:2
**perhaps** [8] - 10:18,
52:19, 61:25, 66:16,
93:8, 104:22,
109:13, 115:20
**period** [1] - 103:5
**periods** [1] - 42:25
**permitted** [1] - 67:8
**perpetually** [1] - 88:5
**person** [3] - 19:25,
53:9, 100:5
**personal** [1] - 71:18
**persuaded** [2] - 23:16,
51:13
**petition** [1] - 89:14
**phrase** [2] - 16:5,
56:12
**pick** [1] - 46:23
**Pickett** [8] - 41:13,
86:11, 87:3, 87:16,
87:25, 111:23,
111:24, 112:1
**picking** [2] - 9:6,
21:21
**piece** [2] - 36:6, 80:22
**pin** [3] - 9:5, 45:16,
91:12
**pinch** [1] - 57:6
**pinch-hit** [1] - 57:6
**Pirosko** [8] - 81:14,
82:1, 111:8, 111:19,
111:21, 111:22,
111:25, 113:18
**place** [2] - 57:17,
100:3
**places** [2] - 65:3,
69:25
**Plaintiff** [2] - 1:3, 1:12
**planning** [1] - 31:9
**pleading** [1] - 65:7
**pleadings** [1] - 50:9
**plenty** [1] - 25:8
**PLLC** [1] - 1:21
**podcast** [1] - 115:15
**podium** [1] - 3:4
**point** [61] - 5:3, 5:7,
13:2, 14:5, 16:4,
22:14, 22:24, 27:3,
35:6, 38:24, 39:8,
41:10, 42:5, 42:7,
42:16, 48:2, 48:3,
48:14, 49:19, 50:7,
50:16, 50:21, 52:23,
53:22, 60:15, 61:24,
61:25, 63:7, 64:15,
64:19, 65:6, 65:14,

67:5, 67:14, 67:16,
67:21, 75:17, 77:8,
78:9, 78:11, 78:18,
78:23, 78:24, 83:11,
84:6, 84:7, 84:12,
84:14, 85:8, 87:15,
88:3, 88:5, 88:23,
89:5, 90:18, 91:4,
97:5, 108:13, 109:3,
113:17, 117:10
**pointed** [3] - 41:10,
81:19, 112:6
**pointing** [2] - 37:3,
40:14
**points** [4] - 79:11,
79:19, 84:9, 84:10
**political** [1] - 48:23
**pool** [1] - 48:21
**pornography** [2] -
112:15, 112:17
**portion** [4] - 9:25,
18:12, 36:20, 101:3
**posed** [1] - 56:16
**position** [7] - 22:2,
39:5, 41:3, 69:13,
83:12, 97:1, 97:7
**positions** [1] - 81:13
**positives** [1] - 76:11
**possession** [1] -
92:25
**possibility** [3] - 30:25,
31:7, 70:21
**possible** [11] - 6:16,
13:21, 33:4, 53:7,
69:13, 69:19, 73:23,
91:3, 103:14,
106:10, 107:15
**possibly** [2] - 9:10,
9:12
**posting** [1] - 48:8
**postpone** [3] - 33:12,
46:24, 47:1
**potential** [6] - 11:13,
44:13, 48:6, 59:8,
64:23, 105:13
**potentially** [6] - 30:12,
35:8, 46:24, 84:1,
98:11, 107:9
**power** [2] - 32:16,
104:2
**pre** [1] - 35:17
**pre-judge** [1] - 35:17
**precise** [1] - 61:25
**precisely** [1] - 58:7
**precision** [3] - 96:3,
97:22, 100:20
**precludes** [1] - 17:4
**predicated** [1] - 87:22
**prefer** [5] - 116:14,
116:15, 116:17,

116:18, 116:21
**preference** [1] - 26:3
**prejudice** [1] - 67:18
**preliminary** [1] - 14:6
**preparation** [2] - 3:25,
98:13
**prepare** [8] - 20:17,
29:11, 96:1, 97:3,
97:22, 100:19,
102:6, 111:11
**prepared** [5] - 28:8,
34:22, 45:12, 49:18,
101:4
**preponderance** [1] -
27:4
**preposterous** [1] -
65:23
**present** [3] - 3:12,
12:10, 60:10
**presentation** [1] -
95:7
**presented** [4] - 71:10,
76:13, 88:6, 112:13
**presenting** [1] - 62:4
**President** [3] - 70:17,
70:20, 73:13
**pressed** [1] - 37:6
**pressing** [1] - 3:23
**presumably** [1] - 34:8
**presumptuous** [1] -
31:13
**PRETRIAL** [2] - 1:4,
1:8
**pretrial** [10] - 3:21,
22:5, 42:22, 42:25,
45:2, 78:12, 92:1,
92:4, 92:7, 112:25
**pretty** [5] - 33:25,
53:19, 54:9, 58:15,
100:2
**prevent** [1] - 72:23
**prevented** [1] - 7:5
**previously** [10] -
35:18, 93:12, 94:9,
94:15, 96:10, 98:20,
106:15, 109:19,
111:6, 115:10
**price** [1] - 93:23
**primary** [1] - 22:21
**principal** [3] - 49:9,
51:7, 100:24
**principle** [1] - 17:6
**print** [2] - 20:9, 68:10
**printing** [1] - 68:9
**prisoner** [1] - 48:23
**private** [3] - 10:14,
72:24, 75:22
**privately** [2] - 13:24,
47:16
**prize** [1] - 90:6

**pro** [1] - 3:11
**probabilistic** [2] - 41:20, 87:20
**probe** [1] - 80:3
**problem** [8] - 7:1, 21:21, 43:21, 74:15, 105:13, 105:14, 108:1
**problematic** [2] - 8:17, 65:4
**problems** [1] - 107:25
**procedural** [1] - 93:6
**procedurally** [1] - 114:13
**Procedure** [1] - 92:6
**proceed** [14] - 9:9, 11:22, 23:13, 24:15, 43:9, 44:17, 44:25, 45:20, 45:21, 45:22, 46:1, 46:10, 70:11, 109:2
**proceeding** [7] - 47:13, 47:15, 47:19, 47:20, 48:1, 58:25, 108:23
**proceedings** [3] - 29:19, 70:8, 119:6
**process** [10] - 4:11, 20:19, 22:1, 22:14, 39:7, 51:20, 68:24, 74:20, 100:2, 103:16
**processing** [2] - 60:20, 106:21
**produced** [3] - 5:4, 71:9, 74:12
**product** [2] - 105:20, 106:10
**product's** [1] - 106:21
**production** [6] - 13:12, 39:11, 80:9, 101:8, 103:16, 113:11
**program** [4] - 41:19, 75:24, 110:8, 111:3
**programmers** [1] - 105:24
**programs** [2] - 18:18, 91:8
**progress** [1] - 4:21
**project** [2] - 64:11, 105:20
**prompt** [1] - 38:1
**prompted** [1] - 103:9
**promptly** [1] - 64:16
**prongs** [1] - 109:25
**proper** [2] - 56:11, 74:20
**properly** [2] - 4:17, 79:12
**property** [4] - 87:5,

87:13, 93:6, 93:7
**propose** [2] - 18:5, 18:7
**proposed** [6] - 5:8, 6:3, 10:23, 18:8, 63:25, 104:11
**proposes** [1] - 94:22
**proposing** [5] - 20:16, 20:18, 23:23, 73:21
**proprietary** [4] - 15:10, 15:14, 39:25, 57:11
**prosecution** [3] - 52:16, 95:8, 115:10
**protected** [1] - 14:5
**protecting** [2] - 87:4, 87:12
**protective** [2] - 5:2, 5:9, 5:10, 5:18, 5:23, 6:3, 6:8, 6:18, 6:20, 7:15, 8:1, 10:18, 13:9, 17:22, 18:8, 18:10, 19:2, 19:3, 19:10, 20:6, 21:12, 25:4, 68:5, 75:11, 89:9, 89:15, 101:5, 101:9
**provide** [22] - 5:14, 5:22, 6:10, 14:15, 14:18, 39:13, 49:20, 52:3, 68:21, 69:16, 70:3, 84:21, 92:16, 97:19, 98:12, 100:4, 103:10, 103:20, 104:7, 108:25, 109:8, 115:25
**provided** [27] - 4:16, 9:22, 13:15, 13:16, 15:2, 40:12, 49:16, 49:18, 55:22, 56:5, 59:10, 59:15, 60:14, 62:13, 65:9, 84:22, 86:24, 97:12, 97:14, 100:14, 101:10, 103:19, 104:19, 109:20, 110:15, 114:2, 114:7
**provides** [3] - 103:2, 105:5, 109:22
**providing** [1] - 111:10
**provisions** [1] - 10:20
**proviso** [1] - 19:3
**public** [7] - 10:5, 48:11, 60:6, 62:17, 62:24, 87:10, 87:23
**publicity** [2] - 42:22, 48:6
**publicly** [2] - 48:15, 110:19
**pulled** [4] - 39:13,

83:22, 91:1
**purchase** [1] - 93:22
**purely** [2] - 72:17, 74:17
**purport** [1] - 110:14
**purports** [1] - 104:17
**purpose** [4] - 12:8, 86:6, 106:2, 115:1
**purposes** [11] - 6:6, 10:24, 12:10, 20:17, 36:19, 59:22, 60:1, 94:21, 98:13, 113:15, 115:23
**pursuant** [1] - 108:24
**push** [1] - 33:17
**put** [19] - 12:12, 16:8, 22:7, 25:5, 26:1, 26:11, 30:19, 40:3, 40:6, 46:4, 52:15, 65:10, 73:4, 79:25, 83:11, 84:10, 95:23, 96:25, 104:25
**puts** [2] - 22:3, 54:15
**putting** [5] - 15:15, 16:19, 39:5, 49:25, 75:22

## Q

**qualified** [2] - 40:2, 63:11
**qualifies** [1] - 72:17, 79:21
**quash** [2] - 67:17, 95:15
**quashed** [2] - 67:11, 95:18
**query** [1] - 106:11
**questioning** [2] - 75:20, 110:4
**questions** [21] - 36:11, 46:15, 46:19, 47:10, 56:14, 58:5, 63:12, 63:13, 64:3, 65:8, 65:9, 66:2, 79:17, 90:19, 99:9, 103:11, 103:12, 113:21, 115:1
**quick** [1] - 86:10
**quicker** [1] - 47:3
**quickly** [5] - 6:16, 79:3, 96:8, 96:23, 97:6
**quite** [12] - 5:5, 9:14, 28:22, 40:25, 52:19, 56:20, 56:21, 76:21, 78:24, 99:6, 102:2, 111:20
**quote** [1] - 57:22
**quotes** [1] - 112:22

## R

**radar** [3] - 39:4, 117:22, 117:23
**Rainer** [1] - 95:5
**raise** [6] - 48:19, 48:20, 66:6, 66:10, 67:11, 68:5
**raised** [7] - 13:16, 13:18, 61:23, 95:20, 102:18, 113:21, 116:2
**raises** [2] - 71:19, 99:9
**raising** [3] - 16:4, 47:16, 47:19
**ramifications** [2] - 44:12, 44:24
**ran** [1] - 8:3
**RANDOLPH** [1] - 1:8
**rare** [1] - 82:6
**rate** [9] - 73:22, 74:2, 76:22, 77:6, 79:14, 108:3, 108:4, 108:6, 108:16
**rates** [5] - 71:4, 71:5, 76:10, 76:11
**rather** [7] - 9:14, 10:2, 14:9, 28:23, 50:10, 85:21, 88:9
**rational** [2] - 86:18, 86:21
**reach** [1] - 104:23
**reached** [1] - 77:3
**reaching** [1] - 104:4
**Reactor** [21] - 36:4, 62:19, 62:22, 76:4, 78:4, 83:3, 83:8, 92:7, 92:8, 92:12, 95:21, 95:25, 98:5, 99:11, 99:20, 100:21, 106:9, 106:10, 106:13, 106:17, 110:8
**read** [9] - 19:20, 21:6, 24:5, 36:24, 90:1, 94:16, 94:17, 94:20, 101:1
**readable** [2] - 105:18, 106:1
**reading** [3] - 31:11, 51:20, 101:2
**reads** [1] - 24:6
**ready** [3] - 38:6, 69:17, 69:19
**real** [3] - 52:23, 53:8, 86:4
**really** [29] - 7:13, 16:15, 17:9, 17:10, 21:2, 21:24, 22:9, 29:9, 31:5, 36:19,

37:5, 37:11, 43:13, 43:15, 51:10, 57:4, 69:13, 70:16, 70:20, 75:6, 79:22, 79:24, 80:12, 81:1, 81:16, 82:9, 85:4, 85:18, 86:5
**realm** [1] - 50:17
**reams** [2] - 110:25, 111:1
**reason** [18] - 21:24, 22:9, 25:22, 32:12, 36:11, 37:23, 38:4, 38:10, 47:20, 57:10, 63:6, 64:12, 70:25, 71:1, 71:14, 72:9, 74:16, 78:15
**reasonable** [1] - 11:4
**reasons** [12] - 35:18, 56:17, 61:22, 72:10, 76:19, 77:16, 79:9, 83:15, 85:17, 104:2, 109:19, 114:9
**received** [7] - 43:24, 44:21, 44:23, 46:9, 64:20, 99:6, 104:12
**receives** [1] - 21:25
**receiving** [1] - 99:16
**recently** [2] - 76:19, 82:22
**Recess** [3] - 25:6, 34:11, 91:22
**recess** [3] - 14:24, 29:18, 70:7
**recipient** [1] - 54:11
**recognize** [2] - 61:17, 82:9
**recognized** [1] - 64:10
**recognizing** [1] - 93:8
**recommend** [1] - 96:8
**record** [21] - 3:5, 4:9, 12:4, 21:2, 28:10, 34:19, 34:21, 34:25, 37:24, 40:10, 42:19, 43:2, 43:7, 45:25, 46:2, 58:21, 60:7, 64:6, 73:9, 87:2, 87:6
**recorder** [1] - 70:15
**recordings** [2] - 70:17, 73:13
**records** [9] - 4:2, 4:18, 62:17, 85:12, 93:21, 93:25, 94:1, 94:25
**recreate** [2] - 62:21, 74:6
**reel** [2] - 70:15
**reel-to-reel** [1] - 70:15
**reference** [4] - 35:20, 59:20, 60:23, 61:14

**referenced** [1] - 61:10
**referred** [1] - 115:13
**referring** [5] - 31:23, 72:21, 83:2, 83:3, 111:23
**refers** [1] - 105:18
**regard** [4] - 35:9, 37:22, 62:12, 63:25, 64:19, 87:15
**regarding** [7] - 6:1, 48:12, 59:13, 64:7, 81:5, 93:22, 99:22
**regardless** [1] - 10:12
**regularly** [1] - 98:16
**reissued** [1] - 67:7
**reissuing** [4] - 67:9, 67:13, 67:16, 67:20
**reiterated** [1] - 97:18
**rejected** [1] - 91:18
**related** [8] - 21:14, 73:2, 73:16, 80:8, 94:4, 95:6, 102:23, 106:19
**relates** [4] - 20:14, 50:2, 60:11, 102:12
**relating** [10] - 36:18, 53:24, 60:18, 81:18, 81:25, 85:20, 89:23, 91:17, 92:17, 96:23
**relation** [4] - 25:20, 71:9, 90:3, 102:9
**relationship** [1] - 54:13
**relatively** [1] - 65:7
**relax** [1] - 51:21
**relaxed** [1] - 110:9
**relaxing** [1] - 110:10
**released** [1] - 94:6
**relevance** [4] - 50:20, 67:24, 79:23, 96:17
**relevancy** [1] - 109:21
**relevant** [8] - 73:15, 78:14, 80:20, 92:21, 96:20, 98:11, 100:5, 107:9
**reliability** [4] - 78:8, 112:23, 113:8, 113:16
**reliable** [2] - 80:15, 83:15
**Reliance** [1] - 99:9
**relied** [1] - 80:1
**rely** [3] - 39:10, 43:17, 43:20
**relying** [4] - 37:13, 40:23, 43:21, 80:5
**remain** [1] - 63:25
**remains** [1] - 64:19
**remember** [3] - 27:7, 60:25, 88:15

**reminded** [1] - 97:18
**rent** [1] - 64:23
**rent-a-CTO** [1] - 64:23
**repeat** [1] - 89:1
**repeated** [2] - 53:19, 87:9
**repeatedly** [5] - 81:2, 86:23, 86:24, 114:14, 115:13
**repeating** [1] - 107:3
**repercussions** [1] - 24:18
**report** [23] - 22:4, 22:12, 23:2, 24:19, 35:24, 35:25, 36:2, 36:17, 37:20, 38:20, 39:20, 42:13, 43:14, 58:20, 58:21, 60:10, 60:17, 61:14, 61:18, 84:4, 84:16, 100:8, 113:9
**Reporter** [3] - 2:21, 2:21, 119:10
**reporter** [1] - 94:4
**REPORTER** [1] - 119:1
**reporting** [1] - 48:22
**reports** [7] - 15:9, 22:11, 38:17, 42:8, 80:8, 83:16, 100:10
**represent** [1] - 43:8
**represented** [4] - 67:19, 67:25, 93:2, 104:20
**representing** [1] - 53:3
**request** [25] - 4:7, 21:1, 29:7, 29:23, 65:15, 69:15, 76:20, 81:17, 85:8, 85:10, 89:12, 89:17, 89:18, 91:16, 93:14, 94:9, 94:17, 94:20, 97:20, 104:24, 105:1, 105:16, 106:8, 107:6, 109:20
**requested** [4] - 4:6, 68:19, 75:23, 106:20
**requesting** [2] - 24:16, 45:13
**requests** [7] - 37:11, 75:22, 86:6, 94:8, 114:20, 114:24, 115:19
**require** [1] - 34:1
**required** [4] - 45:18, 75:13, 103:20, 113:4
**requirement** [1] - 104:6
**requires** [2] - 50:19,

109:21
**rescinded** [1] - 66:18
**research** [2] - 82:12, 95:12
**researched** [1] - 17:18
**researcher** [1] - 95:2
**researchers** [1] - 95:12
**reserve** [3] - 29:10, 77:12, 79:2
**reserved** [2] - 31:16, 38:7
**resided** [1] - 103:25
**resolution** [1] - 104:24
**resolve** [1] - 97:6
**respect** [41] - 5:3, 7:15, 13:14, 17:11, 19:5, 20:6, 20:15, 26:22, 26:25, 27:6, 35:15, 37:1, 37:3, 38:3, 40:19, 44:24, 45:7, 48:5, 48:6, 62:9, 75:3, 76:23, 83:8, 97:14, 98:1, 98:14, 98:22, 99:1, 99:6, 99:8, 101:5, 103:3, 103:18, 104:24, 105:16, 108:16, 109:14, 110:11, 114:16, 116:1, 116:4
**respond** [3] - 37:21, 65:12, 66:19
**responded** [3] - 63:14, 63:15, 96:12
**responding** [1] - 107:5
**responds** [1] - 92:23
**response** [7] - 39:16, 57:8, 59:11, 86:4, 101:7, 102:7, 108:7
**responses** [2] - 99:16, 100:2
**responsive** [3] - 38:20, 56:4, 103:12
**rest** [1] - 65:10
**restrict** [1] - 6:4
**restriction** [1] - 5:25
**restrictive** [1] - 6:9
**result** [4] - 44:1, 62:18, 63:1
**results** [3] - 36:24, 62:22, 108:21
**resume** [1] - 101:21
**retained** [2] - 47:15, 47:24
**retains** [1] - 54:21
**return** [1] - 92:4
**reveal** [2] - 100:7, 100:11

**review** [22] - 7:16, 8:10, 8:16, 12:5, 12:11, 14:1, 15:16, 15:23, 17:25, 65:6, 67:23, 76:22, 91:24, 97:10, 97:23, 98:10, 98:24, 107:22, 108:3, 108:9, 108:12
**reviewed** [6] - 5:7, 72:7, 76:12, 84:15, 93:4, 97:15, 100:8, 106:15
**reviewing** [3] - 15:8, 21:4, 108:10
**revise** [1] - 8:1
**ringing** [1] - 60:24
**rise** [1] - 107:17
**risk** [3] - 11:20, 62:3, 66:4
**RMR** [2] - 2:21, 119:9
**road** [1] - 117:6
**rock** [1] - 54:9
**rock-solid** [1] - 54:9
**role** [1] - 53:1
**Rollet** [1] - 95:6
**ROMAN** [1] - 1:5
**Roman** [2] - 3:3, 3:12
**room** [1] - 88:14
**Room** [2] - 2:22, 119:10
**round** [1] - 80:9
**Roundup** [1] - 82:17
**rule** [1] - 94:13
**Rule** [20] - 5:6, 5:14, 39:9, 40:11, 51:12, 52:9, 52:12, 54:4, 54:8, 68:20, 72:17, 78:12, 79:21, 92:1, 92:5, 92:6, 93:5, 93:9, 93:13, 94:10, 95:19, 96:11, 96:15, 98:3, 100:18, 106:25, 107:1, 109:20, 111:5, 112:8, 114:10, 114:19
**rules** [3] - 17:2, 54:15, 101:4
**Rules** [2] - 68:20, 68:24
**ruling** [6] - 35:9, 88:4, 91:21, 92:17, 115:24, 116:4
**run** [19] - 8:5, 8:19, 8:24, 8:25, 9:23, 13:5, 18:18, 18:25, 30:10, 33:18, 51:9, 54:8, 62:16, 65:16, 83:5, 83:17, 83:18, 108:20, 110:20

**running** [6] - 9:6, 15:18, 55:5, 55:7, 79:6, 84:4
**runs** [1] - 18:25

**S**

**Salah** [6] - 7:6, 101:25, 102:18, 103:18, 103:20, 103:23
**Salah's** [1] - 101:21
**sales** [1] - 93:24
**San** [1] - 2:4
**Sarah** [1] - 95:6
**satisfied** [1] - 40:12
**satisfy** [5] - 94:10, 96:11, 96:15, 100:18, 114:19
**satisfying** [1] - 106:23
**saw** [2] - 6:19, 72:4
**scanned** [1] - 79:3
**scary** [2] - 117:1, 117:9
**scenario** [1] - 73:20
**schedule** [3] - 42:3, 69:10, 116:10
**scheduled** [1] - 33:19
**schedules** [1] - 38:7
**Science** [1] - 95:4
**science** [2] - 90:4, 90:17
**scientific** [4] - 72:6, 73:7, 76:12, 90:14
**scope** [2] - 6:25, 99:23
**scratch** [1] - 51:14
**seal** [1] - 58:25
**sealed** [1] - 21:4
**search** [2] - 75:16, 109:22
**searched** [1] - 17:21
**searching** [1] - 28:14
**second** [3] - 53:10, 56:17, 92:2
**secret** [3] - 15:15, 74:18, 76:7
**section** [1] - 105:17
**Security** [1] - 95:7
**see** [40] - 4:22, 5:13, 6:8, 11:23, 18:23, 21:9, 21:16, 23:4, 27:14, 30:20, 32:13, 33:14, 43:14, 48:18, 50:24, 50:25, 56:22, 57:20, 58:2, 63:21, 65:17, 67:24, 72:1, 74:21, 75:6, 76:18, 76:21, 78:14, 82:7, 83:18, 90:10, 90:13, 93:15, 102:12,

102:15, 105:13,
105:21, 107:11,
108:21, 111:15
**seeing** [4] - 4:8, 20:21,
21:19, 21:20
**seek** [2] - 22:25, 93:15
**seeking** [11] - 52:17,
53:24, 72:9, 73:1,
83:8, 84:13, 92:7,
93:4, 103:3, 109:24,
112:23
**seeks** [4] - 92:6,
92:12, 113:8, 113:10
**seem** [3] - 40:21,
74:19, 100:3
**SEFRANEK** [1] -
119:3
**Sefranek** [3] - 2:21,
119:9, 119:9
**segregate** [1] - 19:25
**segregated** [1] - 9:25
**segregating** [1] -
19:14
**selective** [1] - 74:14
**self** [4] - 64:23, 94:2,
95:1, 112:3
**self-described** [1] -
64:23
**send** [1] - 65:24
**senior** [1] - 32:23
**sense** [8] - 11:13,
12:20, 28:15, 41:1,
50:17, 52:11, 92:17,
96:11
**sensitive** [3] - 81:6,
81:7, 81:18
**sent** [4] - 68:13, 71:17,
95:12, 101:21
**sentencing** [6] -
26:14, 26:15, 26:21,
27:3, 27:22, 61:24
**separate** [2] - 13:11,
21:14
**September** [3] - 1:6,
104:11, 119:7
**sequence** [1] - 88:22
**seriously** [1] - 40:11
**served** [4] - 89:17,
93:11, 93:19, 115:2
**services** [1] - 64:24
**set** [13] - 30:12, 30:25,
60:19, 60:21, 65:15,
69:13, 69:18, 73:7,
82:3, 83:15, 85:16,
85:17, 105:18
**sets** [1] - 95:10
**setting** [1] - 31:2
**settings** [1] - 112:21
**setup** [1] - 85:16
**several** [6] - 3:23,

47:12, 64:13, 80:11,
81:9, 96:14
**sexual** [1] - 81:8
**share** [4] - 4:21,
13:23, 22:19, 112:21
**shared** [1] - 17:7
**shares** [1] - 19:23
**shelf** [1] - 39:13
**shifting** [1] - 109:11
**shoes** [2] - 51:10,
51:11
**short** [4] - 17:24,
29:23, 30:11, 70:1
**shortly** [1] - 3:11
**show** [3] - 10:8, 53:9,
66:16
**showing** [14] - 41:24,
67:21, 75:3, 81:19,
87:8, 96:16, 96:17,
109:21, 110:11,
111:18, 111:20,
112:2, 113:4, 114:18
**shown** [2] - 15:8,
113:14
**shows** [2] - 105:23,
111:12
**shut** [1] - 86:4
**sic** [2] - 19:5, 69:24
**side** [3] - 11:9, 22:8,
41:10
**sign** [6] - 6:20, 6:22,
6:24, 8:4, 20:10,
101:9
**signed** [3] - 4:9, 25:5,
68:11
**significant** [3] - 23:19,
99:9, 101:6
**similar** [3] - 41:19,
82:4, 91:14
**similarly** [1] - 99:1
**simple** [3] - 19:8,
33:17, 98:15
**simply** [9] - 18:12,
59:1, 72:24, 81:4,
98:14, 99:2, 99:8,
107:23, 111:13
**single** [3] - 75:9,
85:12, 85:13
**singular** [1] - 22:12
**sit** [3] - 13:24, 89:2,
101:13
**site** [2] - 40:6, 57:21
**sitting** [2] - 19:18,
55:15
**situation** [3] - 38:14,
86:14
**six** [1] - 98:2
**Sixth** [2] - 81:14,
113:17
**skeptical** [1] - 35:17

**skyrocket** [1] - 87:21
**slightly** [1] - 89:5
**slow** [1] - 117:2
**small** [3] - 6:9, 61:10,
61:15
**Sofia** [1] - 95:6
**software** [50] - 8:6,
19:24, 20:25, 22:22,
40:8, 55:21, 63:6,
65:2, 65:24, 76:16,
80:2, 80:14, 81:6,
81:7, 81:23, 81:25,
82:8, 82:10, 82:21,
83:2, 83:5, 83:9,
83:13, 83:14, 83:19,
90:12, 91:8, 92:13,
92:20, 92:24, 95:13,
100:21, 105:19,
105:22, 106:9,
106:19, 108:17,
108:19, 108:20,
108:21, 108:22,
109:6, 109:17,
111:11, 112:11,
112:20, 113:12,
113:21, 113:22,
114:3
**solid** [1] - 54:9
**someone** [6] - 9:25,
26:24, 32:24, 96:7,
100:23, 112:3
**somewhat** [10] -
40:20, 47:18, 51:15,
51:22, 53:11, 79:20,
110:3, 110:5, 110:9,
115:17
**somewhere** [1] - 72:5
**soon** [1] - 13:20
**sooner** [1] - 39:4
**sophisticated** [2] -
74:25, 75:5
**sorry** [6] - 15:11,
15:13, 24:1, 57:3,
63:8, 111:22
**sort** [17] - 24:12,
35:20, 50:2, 53:14,
54:11, 57:14, 58:12,
62:13, 65:12, 72:15,
76:17, 79:5, 79:10,
82:2, 85:22, 86:12,
90:16
**sought** [10] - 87:1,
92:9, 92:14, 92:19,
93:21, 94:1, 98:4,
98:5, 101:7, 103:21
**sound** [1] - 36:23
**source** [112] - 10:5,
10:9, 13:11, 13:13,
20:1, 20:14, 21:10,
21:13, 22:21, 23:4,

23:15, 25:20, 26:5,
26:17, 35:9, 35:16,
40:5, 40:20, 42:6,
43:15, 49:2, 50:7,
55:11, 62:24, 63:9,
63:17, 65:6, 65:24,
71:1, 72:9, 73:2,
73:15, 73:21, 75:2,
75:4, 75:6, 75:14,
75:15, 75:24, 77:17,
80:5, 80:20, 80:24,
81:6, 82:5, 82:7,
82:21, 83:25, 84:1,
84:3, 85:11, 86:16,
87:23, 90:8, 90:9,
90:13, 91:7, 91:15,
91:17, 92:1, 92:7,
92:9, 92:20, 92:24,
94:18, 94:20, 95:11,
95:21, 95:25, 96:18,
97:18, 98:5, 98:9,
98:10, 98:13, 98:23,
98:24, 99:4, 99:9,
99:11, 99:14, 99:20,
99:22, 100:11,
102:2, 102:5,
102:12, 102:23,
103:21, 103:22,
104:9, 104:10,
105:6, 105:16,
105:17, 105:22,
106:5, 106:8,
106:16, 107:2,
107:7, 107:8,
107:22, 107:24,
108:5, 108:9,
108:12, 108:14,
108:20, 109:13,
110:12
**sources** [3] - 60:1,
92:22, 99:12
**Spain** [1] - 10:12
**speaking** [2] - 15:7,
15:11
**specific** [15] - 27:19,
27:23, 36:9, 39:22,
55:14, 64:2, 73:15,
81:19, 81:20, 81:24,
82:16, 95:22, 96:16,
99:6, 103:13
**specifically** [6] - 7:25,
37:7, 81:24, 82:6,
90:9, 91:14
**specification** [2] -
14:8, 111:16
**specificity** [15] -
50:20, 62:5, 63:11,
63:19, 87:1, 87:2,
88:9, 96:10, 96:24,
97:14, 99:20, 102:4,

103:2, 103:4, 109:22
**specifics** [4] - 38:4,
41:4, 60:6, 98:20
**specified** [2] - 50:15,
52:14
**specify** [3] - 65:21,
96:2, 98:8
**specifying** [1] -
100:20
**spelled** [2] - 64:1, 87:6
**spend** [3] - 36:22,
45:2, 102:10
**spent** [2] - 64:22,
87:17
**spoken** [1] - 23:22
**spreadsheet** [3] -
56:21, 62:23, 84:5
**spreadsheets** [4] -
56:25, 62:20, 74:4,
84:23
**spring** [2] - 23:8,
28:12
**stage** [1] - 20:19
**stand** [1] - 51:10
**standard** [12] - 50:19,
51:3, 52:19, 82:3,
94:10, 95:16, 95:19,
96:11, 106:23,
109:21, 110:9,
110:10
**standards** [4] - 51:15,
51:22, 90:14, 109:25
**standing** [1] - 61:6
**stands** [1] - 51:11
**start** [4] - 32:2, 45:12,
49:5, 49:7
**started** [2] - 22:17,
49:15
**starting** [7] - 3:5, 30:5,
30:8, 31:17, 31:24,
34:2, 84:5
**starts** [1] - 81:11
**State** [2] - 16:20,
41:13
**state** [8] - 3:4, 33:7,
40:10, 41:11, 45:25,
90:24, 90:25, 91:13
**statement** [9] - 96:2,
97:22, 99:21, 100:4,
100:19, 103:19,
104:13, 104:17,
107:6
**statements** [3] -
48:11, 87:10, 115:25
**States** [10] - 2:22, 3:3,
3:7, 70:14, 70:17,
91:10, 104:1, 110:1,
111:8, 113:18
**STATES** [3] - 1:1, 1:2,
1:9

**states** [2] - 64:14, 91:15
**statistical** [1] - 87:19
**status** [3] - 30:25, 32:6, 69:11
**stay** [2] - 47:24, 103:1
**stayed** [2] - 25:6, 34:11
**stenographic** [1] - 119:5
**step** [8] - 6:12, 13:1, 13:3, 14:6, 14:22, 62:10, 62:13
**step-by-step** [1] - 62:13
**steps** [3] - 14:22, 15:24, 69:10
**Sterlingov** [28] - 3:3, 3:12, 16:17, 21:25, 22:23, 24:12, 24:14, 25:10, 25:16, 25:24, 27:17, 28:11, 28:16, 29:4, 29:16, 29:23, 34:13, 42:20, 42:24, 43:5, 43:7, 44:8, 46:5, 48:22, 61:23, 108:23, 109:1, 116:12
**STERLINGOV** [1] - 1:5
**Sterlingov's** [4] - 28:19, 43:2, 69:15, 109:4
**still** [43] - 4:8, 6:4, 7:20, 7:22, 8:22, 9:2, 9:3, 9:21, 10:11, 10:17, 15:7, 15:16, 16:10, 17:25, 18:13, 19:12, 20:17, 23:22, 24:5, 26:4, 35:13, 36:15, 38:14, 47:19, 63:10, 63:21, 68:7, 71:3, 71:4, 72:6, 77:2, 83:21, 84:25, 86:1, 86:13, 100:10, 102:16, 104:5, 104:12, 104:20, 110:10, 113:10
**still's** [4] - 7:16, 42:13, 79:15, 100:8
**Still's** [1] - 7:21
**stories** [1] - 87:11
**story** [1] - 17:24
**straw** [3] - 57:20, 57:25
**Street** [3] - 1:13, 1:22, 2:3
**stressed** [1] - 112:12
**stresses** [1] - 113:19
**strike** [2] - 29:12, 95:16

**strikes** [1] - 115:7
**strikingly** [1] - 94:15
**stringent** [1] - 10:19
**stripped** [1] - 48:10
**stronger** [5] - 41:2, 41:3, 41:6, 41:7, 57:6
**strongly** [2] - 27:25, 34:20
**structure** [1] - 19:17
**study** [2] - 98:6, 105:21
**stuff** [4] - 8:12, 12:2, 76:13, 76:14
**Stutz** [1] - 95:5
**subject** [4] - 19:4, 27:12, 42:6, 76:5
**submit** [1] - 4:16
**submitted** [3] - 11:11, 20:23, 112:19
**submitting** [1] - 3:10
**subpoena** [24] - 5:6, 50:18, 53:5, 63:21, 66:16, 66:18, 67:5, 73:5, 78:11, 78:12, 92:1, 92:4, 92:7, 93:9, 93:11, 93:19, 94:9, 94:16, 95:15, 95:18, 98:3, 98:4, 114:10
**subpoenas** [5] - 54:10, 66:22, 67:9, 93:10, 115:9
**subsequent** [1] - 19:4
**substance** [1] - 114:18
**substantial** [4] - 41:25, 49:17, 49:24, 67:21
**substantiated** [1] - 50:15
**sudden** [1] - 22:4
**Sue** [1] - 115:15
**sue** [1] - 87:9
**sufficiency** [1] - 39:9
**sufficient** [7] - 4:16, 28:5, 56:6, 78:16, 106:17, 112:24, 113:24
**sufficiently** [2] - 13:15, 13:17
**suggest** [1] - 25:9
**suggested** [6] - 36:5, 52:18, 101:11, 101:13, 110:4, 114:24
**suggesting** [2] - 112:13, 112:19
**suggests** [1] - 85:19
**sum** [1] - 82:14

**summary** [1] - 58:17
**Super** [1] - 41:17
**Superior** [2] - 34:7, 41:15
**superiors** [1] - 8:4
**supersede** [1] - 68:22
**supplement** [1] - 60:21
**supplemental** [3] - 4:17, 39:11, 83:17
**supply** [1] - 113:1
**support** [5] - 109:8, 112:12, 112:18, 114:17, 115:17
**supports** [1] - 86:22
**suppose** [2] - 55:9, 114:20
**supposed** [3] - 63:17, 68:12, 106:21
**supposedly** [1] - 63:13
**Supreme** [4] - 41:12, 52:14, 53:15, 93:16
**surprised** [4] - 13:8, 76:5, 76:6, 76:10
**surprising** [1] - 75:17
**suspect** [2] - 71:14, 106:4
**sustain** [1] - 101:6
**sympathetic** [2] - 95:22, 110:3
**Symposium** [1] - 95:8
**system** [5] - 8:24, 8:25, 9:25, 18:24, 106:14
**systems** [11] - 6:11, 8:12, 8:19, 15:18, 18:14, 18:15, 19:6, 19:18, 74:25, 106:11, 107:14

**T**

**table** [1] - 79:4
**tables** [1] - 62:12
**tactic** [1] - 85:23
**tactical** [1] - 82:25
**tainting** [2] - 48:6, 48:24
**takedown** [1] - 60:11
**talks** [1] - 82:20
**TAMARA** [1] - 119:3
**Tamara** [3] - 2:21, 119:9, 119:9
**tangent** [1] - 10:15
**tape** [3] - 70:15, 70:17, 70:21
**tapes** [1] - 52:17
**targeted** [4] - 37:5, 97:20, 114:21

**tasks** [1] - 113:2
**TAUSEEF** [1] - 1:21
**Tauseef** [1] - 3:10
**team** [2] - 15:23, 19:9
**tech** [1] - 40:8
**technical** [2] - 56:12, 80:13
**techniques** [1] - 98:16
**technologies** [1] - 90:16
**technology** [13] - 39:25, 40:1, 64:24, 70:14, 70:15, 70:19, 73:12, 73:25, 74:21, 75:19, 76:7, 90:7, 90:15
**Technology** [1] - 95:4
**tecum** [1] - 92:5
**teed** [1] - 37:10
**telephone** [1] - 97:5
**tellingly** [1] - 113:25
**temporary** [1] - 10:19
**ten** [1] - 79:4
**tends** [1] - 16:8
**terms** [8] - 6:9, 6:18, 12:24, 26:15, 72:2, 87:15, 87:24, 90:8
**test** [4] - 40:3, 40:5, 50:19, 57:25
**testified** [3] - 55:18, 71:3, 102:10
**testify** [2] - 39:20, 79:25
**testifying** [1] - 54:14
**testimony** [10] - 23:2, 36:16, 53:24, 53:25, 80:21, 83:16, 84:25, 86:22, 110:6, 110:7
**testing** [1] - 82:8
**tests** [2] - 74:1, 83:18
**textbook** [1] - 106:5
**Thanksgiving** [1] - 32:1
**THE** [181] - 1:1, 1:1, 1:8, 3:2, 3:8, 3:13, 3:20, 4:14, 4:19, 4:25, 6:13, 7:10, 8:21, 10:7, 10:15, 10:22, 11:4, 12:3, 13:1, 13:13, 13:22, 14:3, 14:12, 14:14, 14:25, 15:5, 15:11, 15:21, 16:22, 17:20, 18:4, 19:11, 20:5, 21:1, 21:6, 21:21, 23:14, 24:11, 25:1, 25:3, 25:7, 25:14, 25:22, 26:19, 28:2, 28:14, 29:14, 29:21, 30:3, 30:7, 30:16,

30:18, 31:4, 31:14, 32:12, 32:15, 33:11, 33:22, 33:24, 34:12, 34:16, 34:23, 35:1, 35:11, 39:15, 40:13, 42:5, 42:14, 43:4, 43:10, 43:19, 43:25, 44:1, 44:3, 44:4, 44:6, 44:7, 44:14, 44:18, 44:20, 45:1, 45:3, 45:4, 45:5, 45:17, 45:21, 45:22, 45:23, 46:3, 46:8, 46:9, 46:11, 46:12, 46:14, 46:15, 46:18, 46:19, 46:21, 46:22, 47:1, 47:4, 47:6, 47:7, 47:9, 48:1, 48:4, 48:17, 49:1, 49:4, 49:15, 51:2, 51:5, 52:13, 53:17, 53:21, 54:18, 55:19, 56:10, 56:16, 57:18, 58:23, 59:4, 59:14, 59:22, 60:13, 60:22, 61:5, 61:12, 61:19, 62:20, 64:9, 64:17, 66:6, 66:14, 66:19, 67:1, 67:4, 67:12, 67:17, 67:23, 68:8, 68:16, 69:5, 69:9, 70:3, 70:10, 70:12, 73:21, 74:3, 74:23, 75:12, 75:17, 75:20, 76:17, 78:6, 78:19, 78:23, 79:16, 79:18, 83:2, 84:18, 86:7, 88:18, 89:3, 89:7, 89:10, 89:16, 89:20, 90:1, 90:20, 90:24, 91:5, 91:19, 91:23, 116:11, 117:1, 117:3, 117:10, 117:13, 117:15, 118:1
**Theranos** [1] - 115:14
**therefore** [3] - 27:2, 63:2, 111:15
**they've** [5] - 20:1, 50:23, 78:19, 80:8, 85:5
**thick** [1] - 78:25
**thinking** [7] - 5:1, 32:7, 38:5, 41:12, 42:2, 54:20, 83:22
**Third** [3] - 112:22, 113:19, 113:23
**third** [4] - 41:21, 59:12, 66:25, 112:18
**third-party** [1] - 41:21

thoughtful [1] - 41:18
thoughts [1] - 11:2
thousands [1] - 74:5
threaten [1] - 56:1
threatened [1] - 115:15
threats [1] - 116:3
three [5] - 30:9, 31:19, 62:7, 88:8, 114:20
three-defendant [1] - 31:19
throughout [1] - 98:16
thumb [3] - 12:11, 12:12, 14:15
Thursday [1] - 97:9
tied [1] - 60:11
timely [2] - 9:9, 114:15
timing [1] - 31:6
timing-wise [1] - 31:6
tires [2] - 116:23, 117:7
today [15] - 3:24, 13:21, 14:16, 35:22, 83:6, 98:21, 99:5, 103:5, 103:17, 105:1, 108:23, 109:1, 115:24, 116:6, 116:9
together [2] - 49:25, 96:23
token [1] - 22:1
tomorrow [14] - 9:6, 21:22, 28:8, 42:20, 45:12, 46:23, 116:10, 116:11, 116:12, 116:13, 116:15, 117:21
took [5] - 49:24, 63:12, 86:10, 86:15, 86:19
tool [2] - 54:7, 81:18
tools [2] - 82:16, 82:18
top [4] - 7:9, 27:7, 27:8, 27:9
TOR [1] - 1:20
Tor [2] - 1:21, 3:9
Torrential [1] - 82:17
totally [1] - 86:17
touch [2] - 4:11, 105:2
touched [1] - 51:23
touches [1] - 105:2
towards [2] - 43:6, 85:23
town [2] - 66:8, 116:16
Tracers [1] - 94:5
tracing [3] - 36:20, 64:24, 74:7
trade [4] - 15:14, 44:13, 44:16, 74:18

trade-offs [2] - 44:13, 44:16
transaction [3] - 57:20, 57:25, 60:4
transactional [1] - 16:8
transactionally [1] - 11:12
transactions [2] - 58:15, 65:1
transcript [2] - 119:4, 119:6
TRANSCRIPT [1] - 1:8
transformed [1] - 105:19
transmission [1] - 4:6
travel [1] - 116:17
treated [2] - 48:22, 51:12
tremendous [1] - 100:17
trial [52] - 3:25, 4:23, 7:3, 7:14, 22:1, 22:15, 22:16, 22:20, 24:9, 24:15, 24:17, 25:17, 26:1, 26:11, 28:13, 28:22, 30:4, 30:7, 30:10, 30:12, 30:14, 30:18, 30:19, 30:22, 31:2, 31:15, 31:16, 31:17, 31:22, 31:24, 32:2, 32:5, 33:18, 34:7, 34:22, 36:15, 37:17, 37:18, 39:1, 39:6, 42:9, 42:20, 44:2, 46:23, 49:10, 88:13, 96:6, 97:3, 97:8, 101:12, 115:16
tried [3] - 56:3, 65:9, 83:21
trigger [1] - 11:13
triggers [1] - 54:14
true [5] - 77:15, 79:4, 85:20, 119:4, 119:5
TrueAllele [5] - 87:16, 89:23, 91:14, 91:15, 91:17
trustee [1] - 4:9
truth [3] - 57:14, 57:23
try [17] - 9:17, 23:2, 29:10, 32:23, 33:15, 33:25, 34:9, 34:14, 56:1, 65:1, 69:21, 80:22, 83:19, 85:23, 87:7, 97:5
trying [10] - 9:20, 11:16, 11:17, 45:16, 55:15, 60:25, 65:2, 80:25, 103:4, 104:23

turn [10] - 35:11, 43:5, 49:2, 55:10, 65:23, 70:10, 75:2, 75:13, 75:23, 107:23
turned [2] - 25:13, 103:17
turning [1] - 55:20
turns [3] - 19:1, 83:23, 84:8
twice [4] - 28:23, 32:13, 32:16, 38:9
two [27] - 21:14, 29:24, 30:9, 31:24, 31:25, 32:2, 33:17, 34:5, 38:15, 38:18, 38:19, 62:7, 66:13, 66:24, 69:17, 79:25, 81:12, 81:13, 82:14, 83:21, 112:6, 112:13, 114:18, 117:3, 117:7
two-week [1] - 31:24
type [8] - 41:19, 58:19, 60:7, 93:14, 94:11, 105:11, 112:2, 114:7
types [3] - 54:10, 55:7, 99:14
typically [1] - 45:18

## U

U.S [5] - 1:15, 81:14, 110:1, 110:2
u.S [1] - 1:18
ultimately [4] - 43:11, 82:12, 113:3, 114:25
unable [2] - 75:8, 75:9
unclear [1] - 102:19
uncover [1] - 114:2
under [25] - 6:7, 9:3, 9:4, 47:13, 72:17, 74:22, 77:19, 77:21, 79:21, 79:23, 80:16, 86:15, 92:5, 93:5, 93:13, 94:9, 95:16, 95:19, 105:17, 106:7, 106:25, 109:2, 109:20, 111:4
underlies [2] - 91:7, 98:17
underlying [2] - 92:22, 108:19
undermine [1] - 107:21
understandably [2] - 41:10, 79:20
understood [8] - 10:4, 20:3, 22:18, 26:12, 33:6, 33:20, 39:8, 48:25

undertaking [1] - 4:12
unfair [2] - 22:2, 32:17
unfairness [1] - 26:9
unintentional [1] - 16:14
United [10] - 2:22, 3:3, 3:7, 70:14, 70:17, 91:10, 104:1, 110:1, 111:8, 113:18
UNITED [3] - 1:1, 1:2, 1:9
universe [2] - 68:14, 73:9
University [1] - 95:3
unless [7] - 13:4, 26:24, 64:2, 79:17, 89:12, 90:18, 90:19
unlike [1] - 73:12
unpersuaded [1] - 110:11
unreliable [2] - 98:15, 99:2
unsure [1] - 51:15
unusual [1] - 115:8
up [44] - 3:22, 5:1, 5:2, 5:22, 18:4, 18:23, 20:13, 25:14, 26:8, 28:23, 31:8, 31:16, 32:11, 37:10, 37:22, 42:6, 44:8, 45:2, 47:9, 49:4, 54:20, 54:25, 58:6, 58:24, 65:15, 66:4, 66:16, 69:12, 69:14, 69:17, 69:22, 70:6, 71:3, 74:24, 82:12, 82:14, 85:16, 87:8, 108:2, 108:23, 110:15, 116:6, 117:20
update [5] - 4:2, 4:5, 4:13, 38:15, 38:18
updated [4] - 4:20, 5:22, 37:20, 61:21
upheld [1] - 53:19
urge [2] - 5:17, 48:7
urgency [2] - 4:13, 4:22
USAO [1] - 1:12
USAO-DOJ [1] - 1:12
useful [3] - 13:4, 107:15, 115:16
USENIX [1] - 95:7
user [1] - 85:13
usual [1] - 51:15
utilize [1] - 54:12

## V

vague [2] - 6:23, 11:1
vagueness [1] - 11:12

valid [1] - 71:25
validate [2] - 72:2, 90:13
validated [1] - 71:20
validation [2] - 71:6, 72:7
valuable [2] - 8:8, 105:23
value [1] - 106:21
varieties [1] - 59:2
variety [2] - 64:25, 111:19
various [4] - 44:4, 44:15, 51:5, 57:12, 69:24, 75:5, 91:7, 91:15, 93:10
vastly [1] - 36:3
veering [1] - 78:6
vehicle [2] - 93:6, 93:17
vendor [3] - 41:21, 72:24, 75:23
verdict [2] - 25:19, 26:13
verifiability [1] - 99:10
verifiable [2] - 63:3, 63:16
verification [1] - 73:18
verify [9] - 9:25, 18:24, 62:21, 71:11, 72:12, 73:3, 79:6, 85:1, 113:7
Version [1] - 18:8
version [5] - 5:23, 10:22, 20:10, 92:9, 92:10, 106:1
versions [2] - 95:10, 106:1
versus [1] - 20:1
via [1] - 93:25
viable [1] - 64:11
vice [1] - 3:11
victims [1] - 86:5
Vienna [1] - 95:4
view [18] - 6:7, 6:12, 6:20, 26:24, 27:22, 38:23, 50:5, 50:6, 52:21, 57:4, 57:11, 63:8, 64:3, 66:1, 86:16, 110:4, 110:21
viewed [2] - 5:21, 81:12
views [3] - 40:10, 43:9, 63:18
virtually [1] - 105:5
visualization [1] - 106:10
voice [2] - 70:21, 73:14
voir [1] - 21:18

**voluminous** [1] - 84:20
**voluntarily** [1] - 10:13
**voluntary** [1] - 86:4
**volunteering** [1] - 57:5
**voucher** [1] - 83:7
**vs** [1] - 1:4

## W

**wait** [2] - 53:10, 66:5
**waive** [1] - 22:25
**walk** [2] - 56:24, 57:3
**Wall** [1] - 1:22
**wallet** [2] - 15:19, 58:10
**wants** [17] - 24:17, 26:1, 26:5, 26:21, 27:18, 28:8, 28:20, 29:5, 29:6, 38:18, 49:6, 65:5, 66:3, 80:16, 100:23, 108:15, 109:2
**warnings** [1] - 35:14
**warrant** [1] - 89:24
**Washington** [6] - 1:5, 1:13, 1:16, 1:19, 2:23, 119:11
**Watson** [1] - 90:5
**ways** [6] - 9:13, 26:7, 36:16, 58:2, 59:2, 111:9
**weaker** [1] - 41:2
**webinar** [1] - 82:23
**website** [1] - 48:11
**weeds** [1] - 64:2
**week** [5] - 28:12, 31:21, 31:22, 31:24, 69:16
**weekend** [1] - 116:15
**weeks** [19] - 29:24, 30:9, 31:20, 31:25, 32:1, 32:2, 33:18, 38:15, 38:18, 38:19, 47:12, 98:2, 101:12, 101:13, 104:6, 108:17, 117:4
**weigh** [2] - 86:15, 88:1
**weighing** [1] - 44:4
**weighs** [1] - 87:25
**welcome** [4] - 25:24, 48:20, 66:6, 71:18
**well-established** [2] - 90:4, 90:17
**Whac** [1] - 88:5
**Whac-A-Mole** [1] - 88:5
**whatsoever** [3] - 53:4, 106:6, 109:18

**Whisman** [1] - 112:17
**white** [2] - 95:7, 95:10
**whole** [3] - 45:25, 73:9, 74:16
**wide** [1] - 64:25
**WILLIAM** [1] - 2:2
**William** [1] - 3:18
**willing** [3] - 17:24, 33:9, 101:9
**window** [3] - 30:19, 31:1, 32:10
**Wired** [1] - 94:3
**wise** [1] - 31:6
**withdraw** [1] - 47:23
**withdrawing** [1] - 66:22
**withdrawn** [2] - 67:6, 67:8
**withdrew** [1] - 83:6
**withheld** [1] - 74:17
**witness** [4] - 21:5, 51:19, 66:17, 87:8
**witnesses** [10] - 38:6, 41:4, 45:7, 45:8, 52:5, 53:12, 67:10, 67:24, 69:25, 100:9
**wonder** [2] - 36:1, 76:17
**wondering** [1] - 55:2
**words** [5] - 52:8, 52:15, 54:6, 60:3, 89:3
**workflow** [1] - 62:13
**workplace** [1] - 17:5
**works** [11] - 19:16, 40:6, 43:15, 58:3, 65:17, 68:24, 73:25, 74:21, 76:14, 76:16, 99:7
**world** [1] - 58:9
**worry** [1] - 48:21
**worse** [1] - 50:14
**worth** [2] - 34:21, 86:2
**writting** [1] - 69:24

## Y

**year** [7] - 6:22, 10:20, 10:23, 16:20, 38:25, 92:18, 93:9
**years** [2] - 69:2, 90:5
**yesterday** [2] - 5:17, 5:20
**York** [5] - 1:18, 1:22, 16:19, 17:2, 68:19
**you-all** [1] - 18:21
**Youli** [2] - 66:16, 66:23
**yourself** [2] - 43:19, 63:7

**Yousaf** [1] - 95:5

## Z

**zero** [1] - 87:2