1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2
     UNITED STATES OF AMERICA,      ) Criminal Action
3                                   ) No. 1:21-CR-0399
                       Plaintiff,   )
4                                   ) **PRETRIAL CONFERENCE**
     vs.                            )
5                                   ) Washington, D.C.
     ROMAN STERLINGOV,              )
6                                   ) **September 15, 2023**
                       Defendant.   ) **Time:  10:08 A.M.**
7
              **TRANSCRIPT OF PRETRIAL CONFERENCE**
8         BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                UNITED STATES DISTRICT JUDGE
9
                  **A P P E A R A N C E S**
10
     For the Plaintiff:      CHRISTOPHER BROWN
11                           USAO-DOJ
                             601 D Street, NW
12                           Washington, DC 20001

13                           ALDEN PELKER
                             U.S. DEPARTMENT OF JUSTICE
14                           950 Pennsylvania Avenue, NW
                             Washington, DC 20530
15
                             JEFFREY PEARLMAN
16                           DOJ-CRM
                             U.S. Department of Justice
17                           1301 New York Ave. NW
                             Washington, DC 20005
18
     For the Defendant:      TOR EKELAND
19                           MICHAEL HASSARD
                             TAUSEEF AHMED
20                           Tor Ekeland Law, PLLC
                             30 Wall Street, 8th Floor
21                           New York, NY 10005

22
     Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
23                           Official Court Reporter
                             United States Courthouse, Room 6714
24                           333 Constitution Avenue, NW
                             Washington, DC  20001
25                           202-354-3246

2

```
 1                   P R O C E E D I N G S

 2            THE COURTROOM DEPUTY:  Criminal Case No. 21-399,

 3    United States of America v. Roman Sterlingov.

 4            Would counsel please state their name for the record,

 5    starting with government counsel.

 6            MS. PELKER:  Good morning, Your Honor.

 7    Alden Pelker, Christopher Brown, and Jeffrey Pearlman for the

 8    United States.

 9            THE COURT:  Good morning to all of you.

10            MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland,

11    Michael Hassard, and Tauseef Ahmed, whose pro hac vice

12    application is pending before this Court for Defendant Roman

13    Sterlingov, who is present in court.

14            THE COURT:  All right.  Good morning to you.  Why

15    don't I start, actually, with what you just mentioned about the

16    pro hac vice motion.

17            I looked at the motion, and I noted that there was no

18    sponsor for the motion.  Usually, when I have a pro hac vice

19    motion, there is some sponsor who is a member of the bar of

20    this court who sponsors the person.

21            MR. EKELAND:  Maybe we made a mistake in the filing,

22    but Jesselyn Radack, I believe, is the sponsor.  And we meant

23    to attach her form and signature, which I thought was on the

24    motion.  And if we didn't, then we made a mistake, and we can

25    resubmit it to the Court.
```

```
 1              THE COURT:  We can all check on it.  That's good.
 2    Thank you.
 3              And then, while you're at the podium, the other thing
 4    is, I think it is actually now possible that I may be able to
 5    try this case in October, if that's what the parties would want
 6    to do.  It would require shortening slightly the period of time
 7    for the expert -- or any supplemental expert disclosures.
 8              But I received a motion late last night in another
 9    case seeking a continuance of one of my -- the criminal case
10    that I had scheduled for two to -- I think it was going to last
11    two to three weeks in October.  And assuming that I end up
12    granting that motion, it could be that I could actually try
13    this case in October.
14              It's going to be a little tight, but I think I can
15    provide four weeks for the trial.  If we did it this way, we
16    would start on October 10th and run through November 3rd.  I
17    can't -- I can't start on October 9th, which is the Monday,
18    because it's a federal holiday.
19              My plan would be -- I'm not currently planning on
20    sitting on Fridays.  I wasn't planning on sitting on Fridays,
21    but if we did run short on time, I could sit on Fridays as
22    well.  I'd have to just move all of the status conference
23    matters that I had put on the Fridays that, ordinarily, I would
24    have done during the week.
25              So I wanted to see what the parties think about that.
```

1    And if I did that, I think that -- as I said, I don't think I

2    would have to make a significant change to the deadlines for

3    the supplemental reports, but just modest -- a modest change.

4    Currently, your supplemental expert report would be due on

5    September 28th, and I think if we just moved that up to the

6    23rd; and the government's is due on October 12th, and I move

7    that up to October 5th; that would mean that you both have an

8    opportunity to review any supplemental expert reports five days

9    before trial would begin.

10    And if there's anything that you need to argue to the

11    Court with respect to how those reports in any way affect any

12    of the *Daubert* issues, that would give you a few days to do

13    that before trial commenced.

14    I know that Mr. Sterlingov had expressed an interest

15    in going to trial earlier, and I said I would keep my eyes out

16    for the opportunity.  And here is an opportunity.

17    MR. EKELAND:  We are going to be, I think, finally

18    getting full access to him tomorrow.  I was hoping maybe we

19    could talk with him tomorrow about this, unless, of course, he

20    has a decision right now.  Because he's finally getting settled

21    at the Alexandria state jail.

22    And then I think what I would prefer -- but I'm going

23    to, obviously, defer to the Court and Mr. Sterlingov -- is that

24    we have an opportunity to talk with him on Saturday and then

25    have an answer for -- to the Court on Monday.  And this --

1            THE COURT:  I'm sorry, an answer for the --

2            MR. EKELAND:  I'm sorry.  Respond to tell the Court

3    whether or not Mr. Sterlingov wants to go with the earlier

4    October date because there's another issue here with the

5    supplemental expert report, and that is we shared the

6    protective order with Ms. Still, who showed it to CipherTrace

7    and Mastercard, and they have told her that she cannot review

8    the material because what their concern is -- my understanding

9    is that they are concerned that they may already be working on

10   similar methodologies, regardless of what's in the heuristic

11   disclosures, and that if they then read and review the

12   heuristic disclosures, they'll be prevented from doing whatever

13   work they may be doing.

14           THE COURT:  Right.  But she's not the one who is

15   doing that.  And if she's the one who reviews it, I don't see

16   why that would be a problem.

17           MR. EKELAND:  I understand the Court's position.

18   This is what has been relayed to me, and she was told, as an

19   employee of CipherTrace, that she cannot review the --

20           THE COURT:  Can you arrange for their general counsel

21   to appear in front of me later today.  We can do it by Zoom if

22   we need to.  I'd like to talk to them about this.

23           I understand the concerns, but I think the concerns

24   can be easily allayed, and Mr. Sterlingov and the public have a

25   right to a speedy trial.  I just want to make sure that people

1   are not over-lawyering things in ways that they're interfering

2   with Mr. Sterlingov's ability to go to trial; and he wants to

3   go to trial.

4           MR. EKELAND:  Understood, Your Honor.  This is not

5   our --

6           THE COURT:  No.  I understand.  That's why I

7   suggested let's get their general counsel on Zoom, and I'll

8   have them at a hearing, and I'll ask them about it.

9           MR. EKELAND:  We will reach out.

10          THE COURT:  If they need me to make modifications, I

11  can consider that.  These things tend to drag out when they're

12  easily resolved.  I just would rather -- as we did with the

13  protective order before, rather than letting it fester and

14  delay the trial, let's just get them in here and resolve it

15  right away.

16          MR. EKELAND:  Absolutely, Your Honor.  So we're going

17  to reach out right now and do our best to make that happen.

18          THE COURT:  Okay.  I appreciate that.

19          MR. EKELAND:  I think that was it on that.  We are

20  also looking to see -- reaching out to other experts.  We're at

21  a loss of what to do.

22          THE COURT:  I just don't see how this should be a

23  problem with Ms. Still.  She's just not -- I heard her

24  testimony.  She's not, by any means, the person who is doing

25  the programming or designing the methodology for all these

1    things.  As long as she's segregated from that, I just don't

2    see why this would be a problem.

3            MR. EKELAND:  Yes.  I'm merely relaying what I was

4    told.

5            THE COURT:  I'm not holding you responsible for that.

6    I just think that if we can get them here, we ought to be able

7    to resolve this issue.

8            MR. EKELAND:  Understood, Your Honor.  We'll reach

9    right out now.

10            THE COURT:  Also, if you need more time to talk to

11    Mr. Sterlingov about that, I'm willing to accommodate that.

12    But there's things that people are going to need to do to start

13    getting ready for trial if we're going to move it.  I'd like to

14    do it sooner rather than later.

15            We have the better part of the day reserved here

16    today.  If you need some time to meet privately with

17    Mr. Sterlingov over the lunch break or otherwise, we can

18    accommodate that.  If talking with him for an hour is not

19    sufficient, we'll find some other opportunity for you to talk

20    to him.

21            MR. EKELAND:  Understood.

22            THE COURT:  That conversation should be able to begin

23    sooner rather than later.

24            MR. EKELAND:  Should we just maybe take that time

25    now?

1          THE COURT:  Let me just see if there are any other

2    preliminary matters that I have, and then maybe it does make

3    sense.  I didn't get any agenda items from the parties.

4          The one thing that I had on my agenda that I thought

5    we could talk about that we never got to was Mr. Cabanas.  If

6    you wanted to offer any argument with respect to Mr. Cabanas,

7    we can continue with that.  I think I was giving you 10 or 15

8    minutes a side to argue with respect to the experts.  So we can

9    do that.

10          Most everything else I had was really in the nature

11    of a check-in.  I can tell you the things I wanted to check in

12    about as well.

13          You had raised concerns about -- or potential

14    concerns at least, about the translations.  I just wanted to

15    see if you had a chance to confer with Mr. Sterlingov about

16    that.

17          MR. EKELAND:  Yes.  We've been talking to

18    Mr. Pearlman, and both sides have been working on it.  There's

19    a stack of manila folders right there where we've printed out

20    everything that we've gotten from the government that we could

21    match the original translation in.  We're just working with the

22    government, because in some of the files there wasn't the

23    original language thing.  But we're all working together on

24    that.

25          We've also now, finally -- we've got a hard drive of

1    the discovery that we're hoping to be able to give to

2    Mr. Sterlingov today so he can take it back -- my understanding

3    is that, now that he's been transferred, there's sort of a

4    period where he's getting settled in the state jail, and he's

5    been in a holding cell.  He still can't call us, but it's my

6    understanding they're getting him a tablet so they can do it,

7    and we'll be able to visit him.

8            I think one of the things that's been good about this

9    continuance is that now we're really getting access to him that

10   we haven't had before.  The translations have been moving

11   forward, and we're working with Mr. Pearlman to just get all

12   those in.

13           THE COURT:  Okay.  I appreciate that.  The one thing

14   is, you ought to just confirm with the marshal that you can

15   hand the hard drive to Mr. Sterlingov here, and he can be

16   allowed to bring it back with him versus what I've been told is

17   you're supposed to bring the hard drive to the jail.  It may be

18   that it's fine.  But whoever is doing the transporting, I just

19   don't know what their rules are about bringing things back in

20   themselves versus having you deliver it.  It's, obviously, not

21   terribly far if you have to drop it off yourself.

22           MR. EKELAND:  We're planning on visiting him tomorrow

23   morning.  We'll just take the hard drive then.

24           THE COURT:  All I'm saying is I would confer with the

25   Marshals Service to figure out what the correct procedure is.

1          MR. EKELAND:  Understood.

2          THE COURT:  Okay.  And then the other thing that I

3    had on a list of preliminary matters to discuss is, when we

4    were last together, you indicated when I asked about whether

5    Mr. Sterlingov was proceeding CJA or whether you were retained

6    and receiving private funding, you thought about it and said,

7    let's go with the private funding and not the CJA.

8          Thinking about it overnight, it occurred to me that

9    it really is Mr. Sterlingov's choice and not yours.  So I think

10   I should confer with Mr. Sterlingov and make sure that

11   Mr. Sterlingov is making a choice and -- making the choice

12   about whether he wants to proceed under the Criminal Justice

13   Act in which the judiciary provides the funding both to pay the

14   lawyers on an hourly rate which, admittedly, is well below the

15   hourly rate that they charge their private clients, but also

16   provides funding for things like transcripts, translation

17   services, experts, and all of that.

18         And if Mr. Sterlingov makes a decision that he

19   doesn't want to proceed as an indigent defendant and receiving

20   funding from the judicial branch in that manner, that's fine,

21   but then he loses all of that.  You just can't pick and choose

22   and say, well, I'm retained, and I'm being paid, but he's

23   indigent and, therefore, the Court should be paying for all the

24   transcripts and the experts and the translation services.

25         I have no dog in this fight.  Whatever Mr. Sterlingov

1    wants to do is completely fine with me.  My point is just he

2    has to elect one or the other.  If you want to confer with him

3    about that and then I can get his views on the record about

4    what he wants to do rather than it being counsel's choice;

5    because it really is his choice about how he wants to proceed.

6            MR. EKELAND:  Perhaps we can confer with him on that

7    and the CJA matter and then come back.

8            THE COURT:  That's fine.  Is there anything else

9    preliminary that either party thinks we should take up or

10   anything other than hearing arguments about Mr. Cabanas that

11   you wanted to address today?

12           MR. EKELAND:  Not from the defense, Your Honor.  But

13   I'll let the government speak to their --

14           THE COURT:  All right.  Ms. Pelker.

15           MS. PELKER:  Yes, Your Honor.  Other than the

16   scheduling -- and the government would very much like to go

17   forward with the October 10th date -- I believe that we didn't

18   actually finish Mr. Verret's -- the review of Mr. Verret's

19   proposed testimony.  So we would propose continuing that --

20           THE COURT:  Okay.

21           MS. PELKER:  -- pivoting to Mr. Cabanas.

22           On the Mt. Gox authentication, if the Court has any

23   further questions following the receipt of that business record

24   certification, we're happy to address that.

25           THE COURT:  Right.  I think the only other question I

1    would have is whether at this point, given the fact that you've

2    provided, I think, at this point a certification with each step

3    in the chain, whether I'm correct in understanding that the

4    defense's objection is not with respect to those

5    certifications, but is the objection that I've really

6    understood the defense principally making all along, which is,

7    in its view, the Mt. Gox document -- or data was tampered with

8    and, therefore, it's inauthentic.  That way I just know what I

9    need to focus on, but I'm working on that issue.

10          It would be helpful for me to pin it down and make

11   sure I am correct in understanding that, given the

12   certifications, that's the only issue that remains at this

13   point.

14          MS. PELKER:  That's the government's understanding.

15          THE COURT:  Is that correct, Mr. Ekeland?

16          MR. EKELAND:  I'm sorry, Your Honor.  Can you just

17   restate.

18          THE COURT:  Yes.  The question I had is, now that the

19   government has provided what I believe to be the final

20   certification in the process with respect to the Mt. Gox

21   documents, I want to make sure that I'm correct in

22   understanding that the defense's objection is not with respect

23   to those certifications, but, rather, is an objection on the

24   authenticity of the Mt. Gox documents because of the hacking

25   incident or incidents and because of any questions with respect

1    to the credibility of the CEO of Mt. Gox and questions as to

2    whether he may have tampered with the data.  That's the

3    objection that you're raising.

4            MR. EKELAND:  I think that's half of it.  The

5    objection on the authentication, I think -- which is in our

6    papers -- and I'm not changing, if I'm remembering it correctly

7    off the cuff here -- is that the people offering the

8    certification don't have the requisite knowledge of the

9    generation of the business records to say that they're

10   authentic.  Does that make sense to the Court?

11           THE COURT:  Okay.  So those are the two arguments

12   then.  But we now do have the certification from the trustee

13   that these are, in fact, the records that were maintained by

14   Mt. Gox, and it may be that your argument is just, but the

15   trustee wasn't involved in the generation of the materials; is

16   that correct?

17           MR. EKELAND:  It not only wasn't -- because I think

18   the rule says you cannot be involved in the generation of the

19   materials, but if you've got some sort of sufficient basis to

20   know how they were generated, it's okay.

21           We're not changing our objection, but that's

22   essentially it.

23           THE COURT:  Okay.  Fair enough.  Okay.  Thanks.

24           MS. PELKER:  And then the government does think that

25   it would be helpful for the Court to address the motions in

1    limine, specifically the ones that would assist us in

2    streamlining trial as well as, potentially, impact openings;

3    the ones that -- in which the government moves to preclude the

4    defense from making impermissible arguments.

5         So the government's motion is at ECF 65; the defense

6    opposition is at ECF 69; government reply in support at 81.

7    And then the briefing on willful blindness, to a lesser extent,

8    government's motion at 66; defense opposition at 68; government

9    reply in support at 82.  That's just depending on how much time

10   we have today.

11        THE COURT:  All right.  That sounds fine.  Why don't

12   we do this then.  Why don't we go ahead and break for a little

13   bit so that, one -- and perhaps most pressing of all -- is that

14   Mr. Ekeland can reach out to CipherTrace and see if we can

15   either get their lawyer or someone who can speak on behalf of

16   the company available, even by Zoom, so we can just talk about

17   this protective order and get any issues resolved on that so

18   that they can -- and, particularly, Ms. Still can -- promptly

19   review the material and that doesn't delay us.

20        And then, also, you can have the conversation, or at

21   least start the conversation, with Mr. Sterlingov, one, about

22   whether he does want to proceed under the Criminal Justice Act

23   or whether he wants to simply have privately retained counsel

24   and experts.

25        And two, at least start the conversation about trial

1    dates and whether he would like to begin the trial on

2    October 10th.  Okay?

3                So I'll just let the clerk let me know when you're

4    all ready for me to come back out.

5                (Recess taken from 10:30 a.m. until 12:10 p.m.)

6                THE COURT:  All right.  Where are we?

7                MR. EKELAND:  So on the low-hanging fruit, we have an

8    answer for you on the CJA.  We've spoken to Mr. Sterlingov and,

9    of course, he will speak for himself on the CJA.  He's okay

10   with our withdrawal from the CJA and us proceeding as retained

11   counsel, I guess, it would be.

12               THE COURT:  Mr. Sterlingov, that's how you would like

13   to proceed?  Can you pull the microphone towards you.

14               THE DEFENDANT:  Yes, Your Honor.

15               THE COURT:  Okay.  And you've had enough time to

16   confer with Mr. Ekeland about the consequences of that

17   decision?

18               THE DEFENDANT:  Yes.

19               THE COURT:  Okay.  All right.  Thank you.  That's how

20   we'll proceed then.  I'll enter an order indicating that

21   Mr. Sterlingov has withdrawn his request to proceed in forma

22   pauperis and for CJA funding and that he will proceed

23   henceforth with retained counsel.  Okay.

24               MR. EKELAND:  And then we've reached out to

25   Ms. Still.  We've talked to her.  She's been reaching out to

1    lawyers at Mastercard.  Apparently, the general counsel is out.

2    They're trying to find somebody who can speak to this issue.

3           She said she's going to get back to me.  I told her I

4    would check in again shortly; I guess, during the lunch break.

5           THE COURT:  Okay.

6           MR. EKELAND:  Just so the Court knows, the defense

7    is -- we did rent a house down here.  We will be in D.C. for

8    the next few weeks.  We're available for in-person hearings

9    early next week or whenever, if necessary, on any of this.

10          THE COURT:  Okay.  Well, that's good to know.

11   Hopefully, we can resolve this issue today.

12          MR. EKELAND:  I hope so.  And then one thing we -- in

13   terms of whether or not to go with the October 10th date, we

14   would ask the Court if we could have the weekend and maybe get

15   back to the Court Sunday night or first thing Monday morning so

16   we can discuss this more with Mr. Sterlingov.

17          And one issue that came up in relation to the

18   protective order is the defense and the government need

19   clarification from the Court on the scope of it, because this

20   came up when I was talking to the government about us maybe

21   wanting to go review the heuristic information with

22   Mr. Sterlingov, and the government is taking -- and they can

23   speak for themselves, but my understanding of the government's

24   position is that it's, effectively, an attorneys' eyes only

25   protective order, and Mr. Sterlingov cannot review the

1    heuristic.

2              In paragraph 6 of the protective order, it does say

3    the defendant, defense counsel, and the expert shouldn't

4    distribute the information in any way.  So if it is an

5    attorneys' eyes only protective order in relation to the

6    heuristics, of course -- we haven't shown this to

7    Mr. Sterlingov.  We'll respect that -- note our objection in

8    the record that we believe Mr. Sterlingov should see it, but

9    what we just want is clarification so we don't inadvertently

10   violate that protective order.

11             THE COURT:  We probably ought to let Mr. Frentzen

12   weigh in on that as well if he has a view, too.

13             Ms. Pelker, do you want to address that?

14             MS. PELKER:  Yes, Your Honor.  I believe it's the

15   government and Chainalysis's view that it is a protective order

16   that restricts the disclosure of the materials to defense

17   counsel, specifically Mr. Ekeland and Mr. Hassard, and

18   Ms. Still, the named expert.

19             There's a reference to -- later on in the protective

20   order that's, sort of, blanket no one can disclose the

21   information.  But in all of the different subparagraphs, it's

22   very clear about the restriction on the limitations of the

23   disclosure to defense counsel and Ms. Still.

24             And I think that when we were in court earlier this

25   week and the whole issue came up, defense counsel had

1    approached the government and asked whether Mr. Sterlingov

2    could review -- because there was a question as they were

3    reviewing it at counsel's table -- and everyone's understanding

4    was that this was not for Mr. Sterlingov's review.

5         THE COURT:  So, in candor, that was my understanding

6    as well.  So if you're -- to the extent you're seeking

7    clarification of what I had understood at the time, that is

8    what I understood at the time.

9         I think there is a fair question, though -- and I'm

10   always reluctant to express a definitive view without looking

11   at the law on this and giving you-all a chance to look at the

12   law on the question, and I understand why there is good reason

13   why the information might not be disclosed to Mr. Sterlingov

14   out of a concern that it is information that he might use to

15   evade detection, assuming that the government's allegations

16   are, at least in part, correct.

17        On the other hand, in general, it's a good idea and

18   there's good reason for defendant to have access to as much

19   information about the case that involves him as much as

20   possible.

21        And so, I guess, the way I'd like to leave it on this

22   is my understanding is that, as drafted, it was limited to

23   counsel and Ms. Still, with the ability to come back to me to

24   seek leave to disclose to others.  And that I would invite

25   Mr. Ekeland, if he thinks it's appropriate and there's law out

1      there that supports it, just to file something with the Court

2      seeking a modification to permit disclosure to Mr. Sterlingov.

3              I'm going to need the parties to point me to what the

4      relevant law is.  I do know that I -- it's not infrequent that

5      I sign protective orders that do preclude a defendant from

6      having access to certain information, but I think there are

7      also good reasons to limit that and only do that under

8      extraordinary circumstances.

9              So for present purposes, it doesn't include

10     Mr. Sterlingov.  But, Mr. Ekeland, I do welcome you to file

11     something with me and explain to me why Mr. Sterlingov should

12     have access to it and just point me to the relevant law, and

13     then that will provide an opportunity for Chainalysis's counsel

14     and the government to file a response if and when you file

15     anything that makes that case, Mr. Ekeland.

16             MR. EKELAND:  Understood, Your Honor.  Just for

17     clarification, why this came up is we were hoping, and I --

18     we're totally going to respect the protective order as the

19     Court has so clarified it now, and we've put our objection on

20     the record and will move on, but what --

21             THE COURT:  Don't just put your objection on the

22     record and move on.  If there's some reason that Mr. Sterlingov

23     should have access to it and the law supports that, just tell

24     me that and point me to the relevant law.  I don't have the law

25     in front of me now, so I can't resolve that question, but I'm

1    inviting you to raise that with me.

2         MR. EKELAND:  Understood.  And we will do that.  I

3    don't have the law in front of me either.  I don't want to

4    argue from ignorance, so to speak.  But what we were hoping to

5    do -- just so the Court understands and to inform the

6    discussion of whether or not he should ask for a continuance --

7    was to have him give his input on the heuristics so he could

8    weigh in on whether or not -- how important it is to the case

9    or what he thinks.  That was just the thinking there.

10        But I will look at the law, and if I think there is

11   some sufficient basis to argue to the Court, I will.

12        THE COURT:  And I also think that -- I don't think

13   the protective order precludes you from having a discussion

14   with your client about the nature of the heuristics, without

15   disclosing the particulars of it, and much of that is already

16   disclosed in the government's expert reports.

17        This is just adding a level of greater specificity.

18   And, I mean, I can tell Mr. Sterlingov that that's largely what

19   is there, is just going entity by entity or cluster by cluster

20   and indicating what the specific behavioral heuristics were

21   that were applied as to each of them, and they're not the same

22   as to each; they differ.  And it provides just greater

23   specificity with respect to what those heuristics are.

24        And so to the extent that that's helpful for you in

25   making a decision, Mr. Sterlingov, about how you want to

1    proceed, I'm happy to have disclosed that.  I'm also happy to

2    have the government and Mr. Ekeland talk a little bit about

3    whether it's possible to provide even greater detail without

4    getting into the specifics.

5          I take it what -- my understanding of what

6    Chainalysis is concerned about is twofold.  One is it is,

7    understandably, concerned about revealing the heuristics that

8    it applies because it then just invites those who are trying to

9    avoid detection on the blockchain to engineer around those

10   specific heuristics.

11         And two, it's proprietary, and it's of great

12   financial value to them.  And I think the discussion that we

13   just had about the fact that CipherTrace is considering or

14   planning to develop its own heuristics is evidence of the

15   proprietary value of that specific information.

16         Because if CipherTrace could simply say, oh, we'll

17   just take this and we'll use it, that would, one, invite

18   another competitor directly offering, essentially, the same

19   product in the market in ways that would cause, presumably,

20   extraordinary financial harm to Chainalysis.  It would also

21   allow the competitor to do so without incurring the expense

22   that Chainalysis incurred in developing the heuristics, which

23   would then provide that competitor with even an advantage over

24   Chainalysis.  So those are the reasons.

25         But in light of those reasons, you can also say there

1    are things that you can disclose that are not going to risk

2    either of those two things in describing the nature of the

3    heuristics.  And I was even on the record, when we were talking

4    about this a little bit, giving some sense of the type of

5    information we were talking about.  Like peel chain information

6    and, sort of, looking at distinct characteristics of particular

7    peel chains.

8                MR. EKELAND:  I think it's those core concerns that

9    the Court just elucidated that are generating the concern from

10   CipherTrace and Ms. Still.

11               And one of the comments that was relayed to me -- and

12   I share this with the Court in the hopes that we could try to

13   solve this, I think, difficult problem here; we tried to find a

14   way to address this.  And that, essentially, what she said is

15   this is a career killer in the sense that it's the perception

16   of the threat.

17               Whether or not it's real, being sued or being held in

18   contempt of court because of an action by Chainalysis will stop

19   her from -- eliminate future career prospects from -- for her,

20   because what she's afraid is going to happen is that someone is

21   just going to look at this -- and she says, well, that's really

22   not going to happen, don't worry about it, and they're just

23   going to say, we're not even going to take that risk because

24   it's even probable, and it's sort of a reality versus

25   perception thing.

1          That's, obviously, not the only thing.  But that was

2     one thing that was relayed to me that struck me; is that it's

3     the fear generated by the fact that, as you say, there's IP and

4     proprietary interests at stake.

5          THE COURT:  But, you know, the thing is, if we were

6     in the Northern District of California, 15 minutes wouldn't

7     pass in which this question wouldn't come up in that

8     courthouse.  I mean, this comes up all the time in litigation;

9     certainly, in patent litigation or in litigation involving

10    companies with sophisticated IP.  And it happens all the time

11    and people sign protective orders all the time.  You wall

12    people off.  It's just not that unusual.

13         Since she is not somebody who is involved in writing

14    code or, as I understand it, even designing algorithms or

15    conferring with what should or shouldn't be in the algorithm, I

16    just don't see it as a problem.  I think she can be walled off

17    on it.

18         And I understand that, if you're completely

19    risk-averse, you say to yourself, well, somebody someday might

20    say that because CipherTrace came up with a similar idea, it

21    must have come from her.  But that's certainly not going to be

22    enough to file a lawsuit in good faith, and it's not going to

23    be enough to come to me and seek a contempt sanction if all

24    they have is Ms. Still prepared to sign a declaration under the

25    penalty of perjury saying I did not have any discussions with

1    anybody at CipherTrace about this; I did not disclose it to

2    anyone at CipherTrace; I kept it under lock and key in my

3    office, and I was the only one with a key.

4           I just don't think that it's a real-world risk under

5    those circumstances.  And, quite frankly, there are ways also,

6    if she wants to protect against the risk, that I'm sure would

7    make Chainalysis even happier.  I now, I think, understand that

8    Chainalysis and CipherTrace are both located in California; is

9    that right?  I know that's where Mr. Frentzen is.  I don't know

10   if that's where CipherTrace is.

11          MS. PELKER:  I believe that they're both global

12   companies that are mostly remote.

13          THE COURT:  In any event, what -- that doesn't really

14   matter.  What I was going to say is, if she's more comfortable

15   going to a conference room at Chainalysis and looking at it,

16   the material, there and bringing a laptop with her there that

17   can then be wiped afterwards, I'm sure that would make

18   Chainalysis very happy to do it that way, and it would minimize

19   any risk that anyone would ever, even improperly or without

20   foundation, accuse her of any wrongdoing.

21          MR. EKELAND:  I'm not disagreeing with you on the

22   reality that you just described.  I think the difference here

23   is there's the reality and there's the perception.

24          And what is being conveyed to me is that everything

25   you just said could be said to a potential employer, and they

1    can still just be, like, we're not taking the risk.  And that

2    is, I think, the sort of problem that we face with -- like --

3              THE COURT:  Rather than having you and me have this

4    conversation, why don't we wait until we get someone from

5    CipherTrace, because we're just going to have to have the same

6    conversation again with them.

7              MR. EKELAND:  Understood, Your Honor.

8              MS. PELKER:  Can I ask one question for point of

9    clarification?

10             THE COURT:  Okay.

11             MS. PELKER:  It's just not clear to me, listening to

12   defense counsel's articulation of the concerns here, if it's

13   just a concern about the protective order or if CipherTrace's

14   counsel is objecting to Ms. Still viewing these trade secrets

15   in their entirety under the prior existing protective order?

16             THE COURT:  That's a fair question.  Or even,

17   frankly, even without a protective order at all in the case,

18   the company still -- if someone thought they had stolen

19   Chainalysis's IP or had appropriated what they had done, they

20   might be subject to suit, I guess, in some hypothetical world

21   anyway.  So it's a fair question.

22             Do you know, Mr. Ekeland?

23             MR. EKELAND:  I don't -- I can't speak for

24   CipherTrace's lawyer.  I'm just working with secondhand

25   information.  The way I understand it, it's this particular --

1    the new protective order, which is, presumably, different than

2    the original one, which has heightened concerns that the Court

3    just expressed, the proprietary concern, the IP concerns --

4            THE COURT:  Right.

5            MR. EKELAND:  -- and even though it doesn't have an

6    explicit noncompete clause, it has sort of language about using

7    it for, like, images or impressions or thoughts for competitive

8    purposes.

9            What everyone is worried about, whether it's rational

10   or not, Your Honor, in the sense, is the word about Chainalysis

11   going after them and they -- and that, I think, anybody who has

12   ever worked in corporate law knows that corporations and

13   companies tend to be very, very risk-averse.

14           From my understanding -- and I don't want to put

15   words in their mouths -- they're simply looking at this and

16   they're saying, we just don't even want to take the risk.

17           THE COURT:  If that's what their bottom line is --

18   and I think I can provide them with whatever assurances I can,

19   and we can put in measures to try and minimize that risk; for

20   example, as I said, by having Ms. Still go to Chainalysis and

21   look at it there.

22           But if there's still the view that they just can't

23   live with that, then we may be in a world in which you need

24   another expert, which, obviously, is a problem timing-wise in

25   the case.  And, quite frankly, I would be a little surprised if

1    you can find somebody who actually understands blockchain

2    tracing in a meaningful way who is not going to face a similar

3    question.

4            MR. EKELAND:  I think that's one of the core issues

5    here with the use of this kind of proprietary software.

6            THE COURT:  It is what it is with that.  I mean, I

7    think that we've struck the right balance here with the

8    protective order.  And turning information over, I think the

9    defense is entitled to the information.

10           But it needs to find somebody who is not going to

11   steal Chainalysis's IP in order to -- in doing its analysis.  I

12   think the protective order protects from that.  I think it's

13   reasonable and, as I said before, we're wasting our time a

14   little bit; this is CipherTrace's issue and not yours.

15           But in the world of IP, in general, I mean, there

16   are, I'm confident, thousands of protective orders like this in

17   place and thousands of cases and circumstances in which people

18   who are potentially competitors who run those risks receive the

19   IP.

20           I mean, every significant patent case in the history

21   of this country has raised this issue.  People deal with it.

22   You need to actually have somebody in patent cases who are

23   sophisticated and can look at the IP and understand it and

24   testify as experts in the cases, and they're walled off.  You

25   find ways to deal with that.

1          MR. EKELAND:  Understood, Your Honor.  This is an

2     honest question because I haven't been able to find this in the

3     context of a criminal case.

4          THE COURT:  I pointed you yesterday to the case from

5     New Jersey.  One of the criteria from the case from New Jersey

6     was that there be an appropriate protective order in place.

7          MR. EKELAND:  There's nothing in the federal context

8     that we're aware of.

9          THE COURT:  In any event, we are where we are on

10    this.  I can tell you that the answer to this is I'm not going

11    to simply dismiss the indictment on the grounds that your

12    expert refuses to look at the information that's provided and

13    it's subject to a protective order.

14         MR. EKELAND:  We weren't asking for that.

15         THE COURT:  I know.  But, I mean, that's kind of the

16    import of what your argument is, that we can't get anybody to

17    sign a protective order who is knowledgeable on this.  And you

18    have to do that.  They just have to be prepared to do it.

19         I'm happy to accommodate their concerns and come up

20    with ways in which their risk is extremely minimal in doing it,

21    but there just has to be some way in which some knowledgeable

22    person can look at this information in a way that doesn't

23    threaten the core value of Chainalysis.

24         I think the same thing, quite frankly, comes up --

25    you say this is all a product of the fact that it's a

```
1    third-party vendor here.  I'm confident the same issue comes up

2    when the government has sophisticated tools that it's using, as

3    we were talking about yesterday.  I know I sign -- I sign

4    protective orders in criminal cases all the time about what can

5    and can't be disclosed.

6         And it just can't be that, even if the Court

7    concludes that whatever fancy machine the FBI is using, that

8    somebody has to sign a protective order saying, I'm not going

9    to disclose how this machine works and how it tracks criminal

10   activity because it will allow people to evade those actions.

11        I mean, in all the January 6th cases, people have to

12   sign protective orders saying they're not disclosing all of the

13   camera angles from the Capitol because there are security

14   reasons where we don't want everyone to know where every camera

15   is located at the Capitol Building.

16        MR. EKELAND:  Agreed, Your Honor.  There's a

17   distinction, I think -- the defense would submit there's a

18   distinction to be made between the nondisclosure of information

19   and competitive concerns.

20        But that being said, we will -- hopefully, we can get

21   ahold of CipherTrace's counsel and get some sort of solution to

22   this.  We'd just ask the Court, again, that we have the weekend

23   to contemplate this and get back to the Court by, like, late

24   Sunday night or first thing Monday morning, if that's amenable

25   to the Court.
```

1          THE COURT:  Let me hear from the government on that.

2   What is your best sense of when we're going to hear back from

3   Ms. Still?  I would like to do that today.

4          MR. EKELAND:  I told her I would call her during

5   lunch again.  The last time I spoke with her, probably about,

6   like, half an hour ago, she said she'd been reaching out and

7   trying to get hold of people and that the general counsel was

8   out, and they were trying to find somebody.  I said, okay; I'll

9   check in with you during lunch.

10         THE COURT:  I suppose the other answer here is, if

11  Ms. Still doesn't want to look at this, she doesn't want to

12  look at it, and that's fine too.  We can just proceed without

13  her looking at it.

14         MR. EKELAND:  We have started looking for other

15  experts as well, Your Honor.  We would just ask, I guess --

16  with some accommodation, I guess we'd have to to get something

17  early -- to the Court early next week on that.

18         THE COURT:  I mean, I set a deadline for when any

19  supplemental expert report was due.  If anything, I was trying

20  to shorten that today so we could actually accommodate

21  Mr. Sterlingov's request to go to trial earlier than February.

22         MR. EKELAND:  Understood.

23         THE COURT:  Let me hear from the government on this.

24  Before you sit down, though, on Mr. Ahmed's pro hac motion, I

25  took a look at it.  What's unusual about this, it's usually --

1    I think this was actually done when you were admitted pro hac

2    in this case.

3            I get a motion signed by a member of a bar of this

4    court moving someone's admission and then a declaration from

5    the person who is seeking admission saying, here are all the

6    factors that I'm supposed to address, and I've addressed them.

7    Here, the motion seems to be from Mr. Ahmed himself, and it's

8    on a form that I've never seen before with a DocuSign.

9            At the very bottom of the DocuSign, it simply says,

10   sponsoring attorney, Jesselyn Radack; with an e-signature from

11   Ms. Radack with no indication that Ms. Radack is a member of

12   the bar of this court or that she's actually moving the

13   admission of Mr. Ahmed.  So I just --

14           MR. EKELAND:  We are happy --

15           THE COURT:  I don't know who she is or what this is.

16           MR. EKELAND:  We are happy to resubmit it.  Mr. Ahmed

17   can address more particulars, but it may just be easier for us

18   to resubmit it --

19           THE COURT:  That's probably the easiest thing to do.

20           MR. EKELAND:  -- in the correct format.  No problem,

21   Your Honor.

22           THE COURT:  Okay.  That sounds good.  Thank you.

23           MS. PELKER:  Your Honor, I'm happy to address any of

24   the substance of Mr. Ekeland's points raised, but I think the

25   most immediate question is just the timing.  And the government

1    would suggest that we just come back here on Monday morning

2    and -- I don't think we're going to get through this afternoon

3    everything that we had hoped over the course of the day.  So we

4    can come back Monday morning -- hopefully, first thing Monday

5    morning -- determine whether we're going forward on the 10th,

6    and then either way continue it to address the remaining

7    outstanding pretrial issues.

8         THE COURT:  That is fine with me.  Let me ask the

9    deputy clerk about our availability Monday morning.  I'm sure

10   we are because we were planning on being on trial.  10:30

11   Monday morning?

12        MS. PELKER:  Yes, Your Honor.

13        THE COURT:  All right.  I guess what I would still

14   like to do is come back this afternoon to see if we can get

15   Ms. Still and/or a general counsel or a lawyer for CipherTrace

16   to work through the issue.

17        Quite frankly, I would like -- particularly, if we're

18   going to be starting trial in October, I would like Ms. Still

19   to be able to begin her analysis this weekend and get going on

20   any review that she wants to do or any analysis that she wants

21   to do.  So I'm happy to come back this afternoon at whatever

22   time the parties think is appropriate, or maybe we should just

23   ask Mr. Ekeland to let us know.

24        I have a 3:00, but otherwise am available.  If you

25   wanted to, we could also go through some of the other stuff

1    this afternoon.  I'm happy to do any of this.

2         MS. PELKER:  Your Honor, the government would

3    suggest, because of the volume of issues that we still have, we

4    can come back this afternoon, we can start with Mr. Verret, go

5    through Mr. Cabanas, wait to hear from Ms. Still.

6         On the possibility of Ms. Still not actually doing

7    this review and retaining a new expert, the government would

8    just note for the record, the government had previously made a

9    fulsome disclosure that was very detailed spreadsheets with

10   hundreds of thousands of addresses explaining the heuristic

11   basis.  Ms. Still looked at those, and the defense has insisted

12   they wanted more, they wanted more.

13        Chainalysis went to great lengths to assemble more,

14   and now we have defense saying that they're not willing to do

15   that review.  They just -- again, we've given them what they

16   asked for.  If Ms. Still now is saying that she can't actually

17   review what she testified that she actually needed to do her

18   review, at that point this is really on the defense.

19        We've had multiple continuances for them to find new

20   experts.  They've gone through multiple iterations.  Ms. Still

21   went through a whole *Daubert* hearing.  We're prepared to go

22   forward with trial.  The government would strongly oppose a

23   continuance from October to February where we're looking at an

24   extra four months for the defense to, essentially, go out and

25   find new experts that was the basis of the continuance a year

1    ago.

2              THE COURT:  I think it's a fair point that where the

3    defense was asking for this information and where I made

4    crystal clear from day one on this that it had to be subject to

5    a protective order, if it was being provided at all, that it is

6    a little surprising to have the defense then dealing with the

7    protective order issues.

8              I mean, this is information the defense asked for and

9    had to have known that it would be subject to a protective

10   order.  And then to ask for the information, go through

11   everything we've gone through, and then say now we can't look

12   at the information that we asked for -- and there's nothing

13   unusual at all about the protective order.

14             And, in fact, the protective order, I think, is about

15   as unonerous -- if that's a word -- it is less onerous than

16   anything else I think you might expect -- or you wouldn't

17   expect -- it's hard for me to imagine a less onerous protective

18   order under the circumstances like this here.

19             I think the defense had to have known that was

20   coming.  The fact that they're just dealing with this now is

21   troubling.

22             MS. PELKER:  Yes, Your Honor.

23             THE COURT:  Mr. Ekeland.

24             MR. EKELAND:  As we noted before, it's really the

25   anti-competitive language.

1          THE COURT:  I know.  But I made clear, I mean, weeks

2     and weeks ago, that that would be a necessary component of what

3     you were seeking.

4          MR. EKELAND:  Yes, Your Honor.  What we couldn't

5     predict was our expert's reactions to it and it creating

6     difficulties --

7          THE COURT:  That's why I said you should talk to your

8     experts, get your experts to file statements indicating what

9     they were asking for, and be working with the experts

10    beforehand rather than afterwards saying we, as the lawyers,

11    want this information and then go to the experts and say now we

12    have the information, can you look at it, and them saying, no,

13    we can't look at that.

14         MR. EKELAND:  We could not predict CipherTrace's

15    counsel's reaction to this, and --

16         THE COURT:  You should have.  They've been your

17    expert.  You were the ones asking for this information, and I

18    made clear it would be subject to a protective order.

19         MR. EKELAND:  And they agreed to the previous

20    protective order.

21         THE COURT:  So that's the answer to Ms. Pelker's

22    question, I think.  There was a previous protective order in

23    place.  And, quite frankly, I think the current one is just

24    more explicit, but I'm not sure anything is different.

25         If they come in and say we'll agree to the prior

1    protective order, that may be a different matter.

2            MR. EKELAND:  Well, if it's not different, why is

3    there a new one?

4            THE COURT:  I think it's more specific.  It

5    clarifies.  But I think the prior protective order says you can

6    only use the information for the case.  Anything disclosed, you

7    can't otherwise disclose it.

8            MR. EKELAND:  Right.  And nobody is disclosing it.

9    Again, I think what's additionally new and what we've said

10   before -- and I don't think we need to repeat ourselves on this

11   point -- it's the anti-competitive language and the fear that

12   people are going to get sued by Chainalysis and held in

13   contempt of court inadvertently, or one of the concerns that

14   was expressed to me was that what if CipherTrace is already

15   working on similar or analogous heuristics and methodologies

16   and they don't want to -- my understanding is they don't even

17   want to take the chance of looking at this stuff and then

18   running the risk of litigation or contempt of court because --

19           THE COURT:  I agree.  Nobody who is involved in

20   preparing or developing any of that should look at this.  I

21   agree completely with that.

22           But if it's different people and Ms. Still can sign a

23   declaration under the penalty of perjury or sit in the witness

24   box under the penalty of perjury and tell me that she did not

25   disclose it to anybody, did not discuss it with anybody else,

1    she was the only person at the company who looked at it, she

2    kept it under lock or key or she went to Chainalysis to look at

3    it, I am not going to hold her in contempt or anyone in

4    contempt for that.

5         MR. EKELAND:  That's understood, Your Honor.  That's

6    the reality.  But the perception is -- I think what the

7    pushback is, they don't want to create the situation, have any

8    kind of possibility that Ms. Still or anybody from the company

9    is ever going to end up in that witness box.  That's just --

10        THE COURT:  Just to respond to that, I think that

11   that is sort of an unreasonable demand by your expert, which is

12   your problem and not the government's or Chainalysis's or the

13   Court's problem.

14        MR. EKELAND:  We respectfully disagree, and I think

15   we've made our objection.

16        In terms of the information that was disclosed, it

17   just wasn't more of the same.  There was an entirely new

18   heuristic disclosed in Heuristic No. 4.

19        THE COURT:  But that is like -- that is the flea on

20   the tail of the dog.  I mean, that is extremely minor.  It's

21   only as to one of the clusters at issue.  And, quite frankly, I

22   suspect, if that were really an issue, the government could say

23   even, we'll exclude that from our case, we don't even need

24   that; that is the most minor of issues in the case.

25        MR. EKELAND:  Well, can I say -- I don't know -- I'm

1   not even sure what I can talk about -- in open court about this

2   heuristic and what that clustering is in relation to because

3   I've heard certain things -- rumors in relation to how that

4   heuristic, that cluster in relation to that market was

5   generated.  Essentially, that it wasn't -- that data wasn't --

6   and that cluster wasn't generated by the heuristic from

7   Chainalysis, but Chainalysis, essentially, exfiltrated the data

8   from the DEA, and that's how they came to that.  I don't know

9   if that's true or not, but that's disturbing.

10          And it goes to, I think, a point in relation to

11  Chainalysis Reactor, which makes the defense actually not want

12  to work with it.  They slurp data.  And it's my understanding

13  that part of their terms of service is that they can collect

14  your searches, your data, and that's one of the ways that they

15  get their database.

16          And it's my understanding that, in relation to that

17  darknet market, that the DEA was using Chainalysis Reactor and

18  Chainalysis Reactor slurped the data, and that's how they got

19  the information.

20          THE COURT:  Let me say this.  What we're talking

21  about here is the protective order and whether this information

22  can be disclosed to Ms. Still.  If this is as ludicrous and out

23  there as you're suggesting, I can't imagine a world in which

24  CipherTrace would be recreating this product in some way and

25  saying, oh, my goodness, we had this idea of working with the

1    DEA and now we're going to have to throw that out because

2    someone is going to think that we got that idea of working with

3    the DEA and acquiring data from the DEA from Chainalysis.

4         If your view is that that is completely either

5    unreliable or improper, I can't imagine that your expert would

6    be wanting to do that anyway.

7         MR. EKELAND:  No, Your Honor.  What I thought we were

8    addressing -- if I understood the Court correctly in the

9    heuristic disclosures, it's my understanding that the Court was

10   saying that this is just, basically, more of the same

11   information that we asked for and what --

12        THE COURT:  I'm saying it's greater detail.

13        MR. EKELAND:  And it's the defense's position that it

14   looks like new information was disclosed; that some of it,

15   based on information I believe that I've been unable to

16   actually confirm and maybe the government or Chainalysis expert

17   can confirm, it reveals certain things about the data

18   collection process from Chainalysis that I need to look closer

19   at this and research it, but it may reveal inaccuracies in what

20   they disclosed.

21        I don't think -- I'm just going to put this on the

22   record; that it is just simply a matter of us getting more

23   information with more specificity.  I think there's certain

24   things in there that are, at least on initial review, very

25   problematic in relation to representations that have been made;

 1    and I will leave it at that.

 2                THE COURT:  That's fine.  I mean, I directed that

 3    disclosure be made.  I thought you were entitled to the

 4    disclosure.  If there's something there that's useful to

 5    Mr. Sterlingov in the case, terrific.  That's the way the

 6    system is supposed to work.

 7                But I still am just a little baffled by why we have a

 8    problem with your expert actually reviewing the information.

 9    And if -- as I said, if we do, I think it's something, as

10    Ms. Pelker indicated, that you could have certainly anticipated

11    weeks and weeks ago in this case instead of arguing and putting

12    everyone through the hoops that we went through to obtain that

13    information for you where your own expert is not willing to

14    look at it in ways in which I think does not impose any

15    material risk to your expert.

16                But that's your expert's decision, and if that's what

17    their decision is, that's their decision.  They can choose not

18    to look at, and that's their decision, if that's what they want

19    to do.

20                But why don't we adjourn now.  It's a quarter of

21    1:00.  Should we come back at 2:00?  Does that make sense?

22    Hopefully, you can have an update for us about the availability

23    of Ms. Still or somebody from CipherTrace who can address this

24    issue and -- because I do want to get it resolved.

25                Quite frankly, I want your expert to be able to look

1    at this and to be able to do any analysis, any supplemental

2    report they want to file and be in a position in which we can

3    go to trial.  That's what my goal is here.  And if they're not

4    willing to do it, then we'll have to figure out what to do

5    about that.

6                 MR. EKELAND:  Thank you, Your Honor.

7                 (Lunch recess from 12:50 p.m. until 2:05 p.m.)

8                 THE COURT:  All right.  Any success in scheduling

9    with Ms. Still or someone from her office?

10                MR. EKELAND:  No, Your Honor.  I spoke with her about

11   20 minutes ago, right before I came in.  She said that she

12   had -- nobody from her office has gotten back to her in terms

13   of availability for this afternoon.

14                THE COURT:  Okay.  Well, let's keep trying.

15                MR. EKELAND:  I will, Your Honor.

16                THE COURT:  Okay.  Ms. Pelker.

17                MS. PELKER:  Your Honor, just to the extent it's

18   helpful, the government was able to just find the contact

19   information for Ms. Jennifer Lorentz from the New York State

20   bar system, and I believe that Ms. Lorentz would be the -- she

21   is of counsel at Mastercard and deals with blockchain-related

22   issues, including CipherTrace.

23                We're happy to give her phone number over if the

24   Court would like to call or see if defense counsel wants to

25   call her directly; to the extent it's helpful.

1          THE COURT:  Do you know what the -- what the problem

2     is and whether Ms. Still is trying to figure out who the right

3     person is to call or she's just not hearing back from them?

4          MR. EKELAND:  Well, I don't know exactly what's going

5     on, but I know she told me she reached out to the lawyers and

6     that the general counsel wasn't in and that she was waiting to

7     hear back.

8          I checked in at the top of lunch, and I checked in --

9     besides the times I checked in this morning, I checked in at

10    the top of lunch, and I checked in right before I came into the

11    building.  She said she hadn't heard back from anybody in terms

12    of availability.

13         THE COURT:  All right.  Well, can you pass along to

14    her that the Court requests that somebody be available at 3:30

15    by Zoom.  That is my request, and she can pass that along to

16    the lawyers.

17         Maybe they're trying to figure out what their view is

18    on this, and that's fine.  But at least somebody ought to be

19    able to show up just to tell me that.

20         MR. EKELAND:  We can send that --

21         THE COURT:  If you want to send a text to let her

22    know that the Court has requested that somebody be available at

23    3:30 by Zoom today.

24         MR. EKELAND:  We'll do that immediately.

25         THE COURT:  All right.  Anything else, or should we

1  just turn to picking up where we had been with Mr. Verret?

2           MS. PELKER:  I think the government is prepared to

3  turn to Mr. Verret.

4           THE COURT:  Okay.

5           MR. EKELAND:  Likewise.

6           THE COURT:  I know we were working our way through,

7  but I can't remember who was up.

8           MR. BROWN:  Your Honor, I think we were doing, kind

9  of, seriatim on a point-by-point review of Mr. Verret's

10  disclosure.

11           THE COURT:  Okay.  Let me get the correct version in

12  front of me.  I'm at Docket 145-5, which is what, I think, we

13  were working off of.

14           MR. EKELAND:  Yes, Your Honor.

15           THE COURT:  It looks to me, by my own notes, we were

16  up to at least 15; is that right?

17           MR. EKELAND:  I think that's right, Your Honor.

18           THE COURT:  Okay.  So why don't we start with 15.

19           MR. EKELAND:  Paragraph 15, Document 145-5,

20  Mr. Verret will testify that tracing methods utilized by the

21  government and Chainalysis threaten user privacy because they

22  rely upon probabilistic determinations to attribute

23  cryptocurrency accounts to specific individuals.

24           THE COURT:  Why is that relevant even in a case or

25  just not obvious that tracing methods threaten user privacy?

1    That's the whole point.  You're trying to trace who it is, and

2    to the extent people are trying to obscure who they are,

3    efforts to figure out -- to break through that obfuscation

4    are -- I don't mean to assign it pejorative one way or the

5    other, but that are at odds with their interest in maintaining

6    their anonymity.

7         MR. EKELAND:  I think the point Mr. Verret may be

8    getting at is that users have privacy concerns, and I think the

9    general point is that there's legitimate privacy concerns.

10        So inasmuch as -- I think I understand what the Court

11   is concerned with there about the tracing.  But I think the

12   main point is that he wants to speak, and I think it's

13   elsewhere in the disclosure as well that privacy is a concern

14   for all users of cryptocurrency.

15        THE COURT:  That's not what this one says.  Maybe

16   it's somewhere else in here.  I have some vague recollection of

17   that as well.  I do, I think, recall talking about this last

18   time; that he wasn't in a position necessarily where he could

19   talk about what people's personal motivations were because he

20   just hadn't studied personal motivations.

21        But if he wanted to just at a, sort of, very generic

22   level say there are multiple reasons why someone might use

23   cryptocurrency, that that would be okay.  I don't recall

24   anything that would suggest that he's done any study or any

25   analysis of whether 90 percent of the users are trying to hide

1    criminal activity or 5 percent are trying to hide criminal

2    activity.

3          I don't think there was anything -- it borders on the

4    sort of thing that is within the competence of the jury.  But I

5    guess I don't think I would have a problem -- although I want

6    to hear from the government -- with either him or some other

7    witness simply testifying that in his experience, if he has the

8    relevant experience or based on conversations he's had, if he's

9    had those conversations, that people use cryptocurrencies in

10   the blockchain to maintain privacy for various reasons.

11         I do remember this because I remember saying in

12   response to this that, of course, then the government can on

13   cross-examination say and isn't it one of the reasons to hide

14   illegal activity.

15         MR. EKELAND:  I think also, just to that point,

16   before we -- I think if I'm recalling correctly, we discussed

17   the Chainalysis report that said 90 percent of users of mixers

18   do it for legitimate privacy reasons.  And he's also on the

19   Zcash Foundation, which is a cryptocurrency very much concerned

20   with privacy.

21         I think the general point is that he does have

22   experience in that realm in relation to privacy concerns with

23   cryptocurrency

24         THE COURT:  To the extent he wants to actually

25   quantify it in any way, though, he would need to have evidence

1    that would -- and studies that would satisfy a *Daubert*-type

2    analysis, or surveys or something that would provide some

3    indication of the allocation.  If Chainalysis has a report that

4    says something, I suppose that he can point to what the

5    Chainalysis report says.  If Chainalysis disagrees with that's

6    what the report says, they can say that in their testimony as

7    well --

8            MR. EKELAND:  Yes.

9            THE COURT:  -- Ms. Bisbee.  Go ahead.

10            MR. EKELAND:  I believe he does reference the

11    Chainalysis report in this disclosure.  I can't remember if

12    we've already --

13            THE COURT:  We went through this last time.  I don't

14    want be repeating or second-guessing what I had said about this

15    last time, so for present purposes, I'm going to say no as to

16    15.  I think we did discuss this previously, and 15 is just

17    about a different point.  I don't see the relevance of the fact

18    that people don't like the government or Chainalysis to be

19    tracing them.

20            MR. EKELAND:  Understood.  No. 16?

21            THE COURT:  Yes.

22            MR. EKELAND:  Mr. Verret will testify that the

23    tracing methodologies utilized by the government and

24    Chainalysis are probabilistic, not determinative, and that they

25    should only be used to generate leads, not to attribute

1    conduct.

2              THE COURT:  On this one, again, I'd have to go back

3    and refresh my recollection, but I thought what I had already

4    concluded was that Mr. Verret didn't appear to have any

5    expertise in blockchain tracing.  You have other experts who

6    can testify with respect to the Chainalysis tracing methods and

7    whether they're probabilistic or determinative.

8              So I don't really see that Mr. Verret has particular

9    expertise on this question and there are other experts who do.

10             MR. EKELAND:  Assuming that -- I think the Court is

11   referring to Ms. Still on that point.  And we're happy to agree

12   with the Court on that.  As long as Ms. Still can speak to that

13   point, there's no need for redundancy.

14             THE COURT:  Okay.  17.

15             MR. EKELAND:  Mr. Verret will testify that the

16   tracing methodologies utilized by the government and

17   Chainalysis may be used to commence an investigation and

18   generate leads but should not substitute for empirical

19   confirmation of traces.

20             As part of this line of testimony, Mr. Verret will

21   rely upon publicly available documents produced by Chainalysis

22   and available at -- and then there's an HTTPS, www.coindesk.com

23   hyperlink.  I'm leaving out the rest of it.

24             THE COURT:  Isn't this the same point we just

25   discussed?

1          MR. EKELAND:  I agree with the Court on that.  As

2    long as the Court is okay with Ms. Still testifying on this

3    point, which I think the Court just said they were, then yes,

4    we're in agreement with the Court.

5          THE COURT:  Okay.

6          MR. BROWN:  Your Honor, may I be heard?

7          THE COURT:  Yes.

8          MR. BROWN:  On 17, just to remind the Court, I don't

9    think Ms. Still was qualified to testify as to the particular

10   assertion here, which is that blockchain analysis may be used

11   to commence an investigation and generate leads, but should not

12   substitute for empirical confirmation of traces.

13         I think that's a normative assertion about how law

14   enforcement investigations are supposed to be run.  She --

15   neither Ms. Still, and certainly not Mr. Verret, neither of

16   them have any expertise or basis to render that opinion.

17         THE COURT:  Mr. Ekeland.

18         MR. EKELAND:  I disagree.  I can't remember her exact

19   title, but I believe she's a lead investigator or head

20   investigator for CipherTrace.  She works with law enforcement

21   agencies, not only in the United States, but globally.  Every

22   time I --

23         THE COURT:  That strikes me as a 403 problem, if

24   she's relying on -- she's saying, well, in Germany this is the

25   way they do it and, therefore, that's what we should be doing

1    here.  I think that, to the extent that she's suggesting that

2    the law enforcement here acted in a manner that was at odds

3    with U.S. law enforcement norms or something like that, that's

4    different than saying, well, in Europe this is how they do it.

5           MR. EKELAND:  I think she does reference -- if we're

6    going back to Ms. Still for a moment, I think she does

7    reference in her report that --

8           THE COURT:  Just to cut short here, I mean, it's

9    going to be too challenging for me to go back and forth.  I

10   think I've done what I did with Ms. Still, and we've been

11   through that.  I don't want to -- I can go back and look at

12   exactly what I said on that.

13          I hear your point on this, but I don't think it's

14   really a Verret issue.  So let's leave that for Ms. Still.  If

15   there's an issue that's still unsettled with respect to

16   Ms. Still, we can address that.  I don't think we need to

17   address it in the context of Mr. Verret's.  Let's keep moving

18   through these because we have a lot of them.

19          MR. EKELAND:  Understood, Your Honor.  Number 18?

20          THE COURT:  Yes.

21          MR. EKELAND:  Mr. Verret will testify that the word

22   heuristic is -- there was a typo there -- is synonymous with

23   the words "assumption" or "guess."  He will emphasize that the

24   heuristics employed by Chainalysis in this investigation, such

25   as the common ownership heuristic and the peel chain heuristic,

1    are a novel approach in a nascent area of forensics and that

2    they have not been empirically tested or peer-reviewed.

3              As part of this line of testimony, Mr. Verret will

4    rely upon literature indicating that heuristics are

5    probabilistic, not determinative, and then he's got a reference

6    to "See Stockinger."  That's S-t-o-c-k-i-n-g-e-r.

7              THE COURT:  I've got it in front of me.  You don't

8    need to read the whole citation there.

9              MR. EKELAND:  There's a number of papers listed.

10             THE COURT:  18, 19, 20, 21, 22, and 23, again, it

11   seems to me are all expert testimony with respect to blockchain

12   tracing, where my recollection was that Mr. Verret had no

13   personal experience or training doing that.

14             I just wonder if he's the wrong expert on the whole

15   series of issues here for the next group.

16             MR. EKELAND:  I think that -- I'm inclined to agree

17   with the Court.  I think this is covered by Ms. Still.  This

18   may be a product of an earlier time when we didn't know who was

19   qualifying and coming in.

20             Not to, like you said, to go back to Ms. Still, I'm

21   comfortable that with what the Court has qualified Ms. Still

22   for, that this would be covered on that.  I think we can just

23   skip ahead to 24.

24             THE COURT:  Okay.

25             MR. EKELAND:  Just keep -- I think it would be

 1    redundant, I agree with the Court, assuming that Ms. Still --

 2              THE COURT:  That is why I brought it in.  Let me put

 3    it this way.

 4              I don't know exactly what Ms. Still will be able to

 5    testify about as to each of these topics, but that if she

 6    can't, Mr. Verret certainly can't.  If she can, then it's

 7    redundant.

 8              MR. EKELAND:  I agree.  I think 24 gets to, really,

 9    the core reason we're bringing in Mr. Verret.  24.

10              THE COURT:  Yeah.

11              MR. EKELAND:  Mr. Verret will testify that it would

12    violate core tenets of forensic accounting and financial

13    forensics principles to use Chainalysis's heuristic

14    assumptions -- and I think it's missing the word to -- to

15    attribute blockchain activity to a specific individual.

16              He will explain that without something more, like

17    hard evidence on a server with a list of private keys

18    associated with those addresses, there's no way to attribute

19    ownership or activity to a specific individual.

20              THE COURT:  So let me ask before we just go further

21    with this -- I can ask the government.

22              Is the government actually -- will the government be

23    attempting to be using blockchain analysis to attribute any

24    particular activity to a specific individual?  I thought that

25    the blockchain analysis was being used more to attribute

1    clusters rather than particular individuals.

2            MR. BROWN:  Your Honor, to the extent that there's an

3    instance where it's not necessarily, say, determining the

4    cluster for blockchain analysis, but if you're just tracing

5    funds from Point A to Point Z through certain intermediaries,

6    there is some judgment about attributing that to sort of --

7    there's a common ownership or control through that chain of

8    transactions, but that's different from, kind of, the

9    Chainalysis heuristics that we've been -- as we've been

10   discussing them in this case.

11           It's really more -- I mean, this is more like -- it's

12   not even a Chainalysis issue.  It's more like a forensic

13   accountant saying drug money was deposited in this bank

14   account, and then there was a wire transfer to an offshore bank

15   account, and then there was a withdrawal of cash, and then the

16   cash was deposited.  That's not really a Chainalysis issue, and

17   it's not really a Chainalysis heuristics issue, which is

18   also -- even if it were, that would be outside the ken of Mr.

19   Verret who was quite definitive that he has no understanding of

20   how Chainalysis works, or he hasn't ever used it.  It's just

21   somebody a few doors down told him a rumor that it was

22   unreliable, which is not an expert-level basis.

23           THE COURT:  Right.  So I guess the question is, do I

24   even need to reach the substance of this?  There's not any

25   testimony that this is going to be pertinent to.

1          MR. BROWN:  Your Honor, it is true that the

2     government will be arguing based on blockchain evidence, that

3     you can tell -- that you can trace.

4          THE COURT:  Of course.

5          MR. BROWN:  Kind of a single intelligence moving

6     funds through multiple hops.  That is different from, I think,

7     the meat of the defense challenge.

8          THE COURT:  But you're not using Reactor for that?

9          MR. BROWN:  Well, you can.  It's not a necessary --

10     it's not a necessary step in that analysis.

11          THE COURT:  Are you using heuristics for that?

12          MR. BROWN:  Heuristics in the sense of -- and maybe

13     Ms. Pelker can help you.  I think when we're distinguishing

14     between, say, there's one input and two outputs, you might make

15     a judgment that one is the change and one is the true spend.

16          THE COURT:  Right.

17          MR. BROWN:  I mean, there are very clear-cut patterns

18     to be able to identify that.  That is, I think, something that

19     Chainalysis can help with.

20          MS. PELKER:  Your Honor, to the extent it's helpful

21     to have some concrete examples, I think we went through this in

22     detail with Mr. Scholl's report.

23          THE COURT:  Yes.

24          MS. PELKER:  So that we have, for example, the

25     payment from Sterlingov's Mt. Gox account in his true name

1    through a series of transactions, including one on the

2    blockchain unrelated to any clustering, unrelated to any

3    heuristics, to pay for the domain; as one example where there's

4    no heuristics coming into play.  There's no clustering.

5         Then we have also transactions from Mr. Sterlingov

6    into the -- what Ms. Still agrees is the first-known

7    transaction or deposit into the Bitcoin Fog cluster --

8         THE COURT:  Right.

9         MS. PELKER:  -- and that is traced back to

10   Mr. Sterlingov.  The government does intend to argue that,

11   because these are transactions traced from the initial deposit

12   into the Bitcoin Fog cluster back to Mr. Sterlingov's accounts,

13   that that is definitely part of the evidence the government is

14   going to put on in its case.

15        THE COURT:  Remind me.  The tracing there, I know

16   that -- my recollection is that Mr. Scholl did principally the

17   tracing -- I was using the shorthand of by hand, but that -- in

18   more traditional forensic senses of it, but then also I guess

19   there was some element of use of Chainalysis.  I can't remember

20   if it was to verify some portion of it, but you didn't disavow

21   the use of Chainalysis entirely.

22        MS. PELKER:  Correct.  So it really is a question of

23   how does -- and everyone agrees, including the defense expert,

24   that where the funds end up is a Bitcoin Fog-controlled

25   address.  That is, in part, based on Chainalysis and

1    CipherTrace and Mr. Scholl looking at these transactions.

2        THE COURT:  Right.

3        MS. PELKER:  All looking at it and saying, yes, this

4    is a Bitcoin Fog clustered address based on the co-spend

5    heuristic, the pattern of transactions of how that initial

6    address kind of -- it consolidates addresses within the Bitcoin

7    Fog cluster.

8        I don't think there's actually disagreement between

9    the defense expert, at least, and the government on the fact

10   that these funds do end up in Bitcoin Fog.

11       THE COURT:  Right.

12       MS. PELKER:  But that is, in part, a heuristic in

13   forming this analysis that the ultimate destination is Bitcoin

14   Fog.  Defense, potentially, could have found an expert who -- I

15   don't know what their basis would be, but say, nope, this is --

16   the entire Bitcoin Fog cluster is all wrong.  None of these are

17   Bitcoin Fog addresses.  They can't be clustered together at

18   all.  That's not the defense argument.

19       THE COURT:  No.  But my recollection is that

20   Ms. Still did disagree with a portion of Mr. Scholl's tracing.

21       MS. PELKER:  Yes.  She disagrees with the -- well,

22   she disagrees that the intermediate transactions between

23   Mr. Sterlingov's Mt. Gox true name account and Bitcoin Fog,

24   basically everyone agrees on the starting point, everyone

25   agrees on the ending point.  That is on the blockchain.

1          THE COURT:  She says there are too many hops that are

2     ignored.

3          MS. PELKER:  Exactly.  Ms. Still says there are too

4     many hops.  Mr. Scholl testifies that he traced through these

5     hops, and based on his analysis, they would be consistent with

6     a transfer by Mr. Sterlingov.

7          THE COURT:  And was Reactor used for those hops?

8          MS. PELKER:  Reactor shows those hops.  But the hops

9     in Mr. Scholl's report were done by hand.

10          THE COURT:  Okay.

11          MR. EKELAND:  Your Honor, may I address that?

12          THE COURT:  Yes, please.

13          MR. EKELAND:  I think that actual trace goes to

14     exactly the core of what No. 24 is about.  I don't think it's

15     disputed, as the government just said, that the Bitcoin Fog

16     cluster is based on heuristics.  And there is -- I believe, if

17     I recall this trace correctly, there's 19 transactions between

18     what they're identifying as Mr. Sterlingov's account and what

19     the heuristics are identifying as the Bitcoin Fog cluster.  And

20     I believe Ms. Still testified that she traced through the

21     Bitcoin Fog cluster because it's an early transaction to a

22     BTC-e account.

23          What Mr. Verret is getting at here, as a certified

24     fraud examiner and a forensics accountant -- which he is --

25     he's saying that it violates standards of forensic accounting

1    to make attributions, like Mr. Scholl is doing, on each stat

2    there on those transactions because you don't know who has the

3    private key.

4         So every step of that trace, every hop in that

5    transaction, that could be just somebody else or another

6    entity.  So what I take Mr. Verret to be saying here in No. 24

7    is that it's not forensically sound from a forensic accounting

8    approach under the standards -- and he's certified as a CPA,

9    he's a CFF, he's a CFE.  It's not forensically sound from

10   accounting purposes to make those kinds of attributions to say

11   that, oh, over here, here's Mr. Sterlingov's Bitcoin, you've

12   got 19 stacks, and then you've got an Instawallet account going

13   in, you've got a Bitcoin miner going in, and then you're going

14   to the heuristically identified Bitcoin Fog cluster.

15        And then through it, it's not forensically sound for

16   forensic accounting purposes to make the attribution through

17   that entire chain to Mr. Sterlingov because you can't make it

18   in any deterministic way.  You have to make assumptions.  You

19   have to assume that ownership of the private keys never changed

20   hands.

21        That's not on the blockchain.  That can be off-chain.

22   And so that's what he's getting at here.  It's not forensically

23   sound from an accounting viewpoint to make those kinds of

24   attributions in his expert opinion.

25        THE COURT:  Mr. Brown?

1          MR. BROWN:  Your Honor, Mr. Verret just doesn't have

2     any basis to opine upon the forensic soundness of how

3     Chainalysis works because he has no understanding of how it

4     works or experience how Chainalysis works.  He was very clear

5     on that in his testimony.

6          So to the extent that this is framed as using

7     Chainalysis heuristic assumptions, he just -- that is

8     inconsistent with his testimony saying that he had no insight,

9     he had no understanding, he did not know -- he has no

10    independent knowledge of the reliability of Chainalysis's

11    various measures.

12         I'd refer the Court to the discussion, for example,

13    on 158, speaking specifically about measures to control for

14    CoinJoins.  He says, I don't have any independent knowledge of

15    its reliability, meaning Chainalysis.  It is one thing if he

16    just says -- and I'm not sure this is true -- that using the

17    principles of financial accounting, you can never -- without

18    mentioning blockchain analysis.

19         Maybe he could say, based on my expertise about the

20    principles of financial accounting, you can never definitively

21    prove the ownership of any asset without seeing, like, a deed

22    of title.  That's probably wrong.  But he may have the

23    expertise to opine on that.

24         But when he's talking about this sort of assertion

25    and trying to shoehorn it into a criticism of Chainalysis, that

1    goes far outside his area of expertise.

2        THE COURT:  So is there -- if we had Mr. Verret here,

3    would he be able to pull up his copy of the equivalent of GAAP,

4    or whatever it might be, for financial accounting and point to

5    paragraphs X, Y, Z that will say that it's improper for a

6    forensic accountant to make any attribution of ownership

7    unless, you know, X, Y, or Q?

8        MR. EKELAND:  It's my understanding that the -- I

9    think it's the CFF.  I get the two confused.  The CFE, which

10   Ms. Glave has.  There's one that's a short course, and I think

11   it's the CFF is quite extensive, and that there's a very large

12   set of standards.

13       And I think what he's getting at here is that a core

14   financial forensic standard is the identification of the asset

15   and being able to attribute it to a particular individual.  And

16   what he's taking is, I think, his forensic accounting

17   experience and his extensive certification in that area and

18   applying that principle to a blockchain trace and saying, look,

19   you've got 19 transactions here, and you don't have anything

20   definitive to show who is controlling that transaction.  A

21   private key can be handed to somebody else off-chain; you're

22   never going to see that on-chain.  It can be a sale of Bitcoin.

23   You've got other inputs into this trace.  And I don't think

24   that's complicated.

25       Then you're getting to this heuristically attributed

1    cluster at the end.  And what he's saying is it's not

2    forensically sound from a forensic accounting viewpoint to say

3    you've got somebody over here, and now you've got 19

4    transactions ending up in Bitcoin Fog to then say that's

5    Mr. Sterlingov or anybody's money going into Bitcoin Fog.

6           THE COURT:  So the one -- two things here.  I don't

7    think that he is qualified to testify about Chainalysis and how

8    Chainalysis works.

9           Two, I think under 403 and, really, 401, I have

10   problems with him saying it's not forensically sound.  Also, I

11   think he's stepping into the role of the jury and saying

12   that -- making some normative judgment.

13          To the extent that he can make the points that you're

14   making, sort of, intermediate points, I think that's -- having

15   him somewhat make those points is fine and the jury can do with

16   it what they want, and you can argue what you want.

17          I mean, there's no problem with a proper witness or

18   someone who is qualified saying that, as part of this analysis,

19   you have the public address, but you don't have the private

20   key, and private keys can be transferred, and you don't know

21   who controls the private key.  Not a problem with that.

22          And, therefore -- cross-examining a witness or

23   putting your own witness on; and, therefore, unless you have

24   the private key, you don't know with certainty -- do you? --

25   who the owner is of that public account?  Unless you have some

1    other verification in some way, all you really know is that it

2    was this account number from this -- from the ledger.  It tells

3    you what the public account number is.  It doesn't tell you who

4    holds the private key.  That seems completely fine to with me.

5         I worry a little bit that it's either misleading to

6    the jury or stepping into the shoes of the jury to say, look,

7    I'm telling you just, forensically, it is just unsound to do

8    this here; because it really is for the jury to decide for

9    itself whether there is sufficient uncertainty that it calls

10   into question the results, and sort of labeling it as

11   forensically unsound in a case which is not about forensic

12   accounting.

13        This isn't a case in which there's an allegation that

14   someone violated the CFF standards and, therefore, they're

15   liable for violating the CFF standards, and we need to know

16   what those standards are.

17        But I think saying to the jury or arguing to the

18   jury, this violates these standards is misleading to the extent

19   that it suggests to the jury that the inferences are wrong

20   simply because it violates that standard -- which I don't even

21   have the standard in front of me, so I don't know whether it

22   violates the standard or not.

23        I just think -- I think that under 401 and 403, as

24   well as questions just of the witness's own area of expertise,

25   that the question is, where are the areas of uncertainty which

1    can be brought to the jury's attention, and the jury can decide

2    what inferences to draw from that or what conclusions to draw

3    from that.

4              MR. EKELAND:  Your Honor, just to get some

5    clarification on that.

6              THE COURT:  Sure.

7              MR. EKELAND:  So what I think he would testify to or

8    what -- sort of, proffering here, is that it violates the

9    forensic accounting standards, as in what he was trained on and

10    certified to make asset attributions to an individual without

11    definitive evidence.  And, sure, he could go back and find --

12              THE COURT:  But that's the problem I have.  That

13    seems to me to be a 403 problem, and it may be a 401 problem.

14    The question for the jury isn't whether it violates the

15    forensic accounting standards and whether a forensic accountant

16    would be subject to sanction from the CFF, or whatever it might

17    be, for saying I know that this is who it is.  And I don't

18    think the government here is saying that you know from the

19    public address with 100 percent certainty who it is.

20              There may be a disagreement on the range of

21    uncertainty, but I don't think there's any disagreement with

22    the notion that there is a difference between the public

23    address and the private key, and the private key can be

24    transferred to somebody else, and you don't know.  I think the

25    government's position would be, yes, that's possible, it might

1    happen rarely, but that's not material here.  And your argument

2    will be, no, it is material and it can happen all the time.

3    That's all for the jury to decide.

4          Other than simply saying to the jury, as a matter of

5    forensic accounting, it's improper, ignore it, you may not draw

6    any conclusions from this because I'm telling you, I'm the

7    expert on this, and it is improper to conclude that this is who

8    it is; versus saying, this is what the evidence is, and here

9    are the uncertainties and you, jury, decide what to do with

10   that.

11         MR. EKELAND:  If I may, just two points on this.

12   This is an interesting question.

13         My understanding of what they're saying from that,

14   what they're saying is Mr. Sterlingov made one of the first

15   known deposits into Bitcoin Fog.

16         THE COURT:  Right.

17         MR. EKELAND:  What I think Mr. Verret is getting at

18   here is that that is an unsound attribution to make from a

19   forensic accounting viewpoint because you can't -- you have no

20   evidence to verify ownership of the Bitcoin asset across those

21   19 transactions.  That's the first point.

22         And that is something that it seems like is helpful

23   for the jury to understand.

24         THE COURT:  As I think I've said, I'm not sure

25   whether Mr. Verret is the expert to do this.  I don't have a

1    problem with the second part of what you said.  It was just the

2    first part of it.

3            Saying to the jury that that violates, sort of,

4    fundamental norms -- violates core tenets of forensic

5    accounting and financial forensic principles.  Because it --

6    under 403 and, as I said, also under 401, I think it is

7    suggesting to the jury that it is somehow improper for them to

8    rely on that, and I don't think the question of what the core

9    standards of the CFF are is what's relevant in the case.

10           The question that's relevant in the case is can

11    you -- did the government properly identify Mr. Sterlingov, and

12    you're entitled to make any, sort of, factual argument with

13    respect to that to reach that conclusion.

14           I would have the same problem if the government were

15    to do the same thing.  If the government would come in and say,

16    as a matter of core tenets of forensic accounting, this is

17    Mr. Sterlingov, or you can draw this conclusion.  I don't think

18    that's the question that's in front of the jury.

19           The question in front of the jury is not what those

20    tenets of forensic accounting say.

21           MR. EKELAND:  So I just want to -- I want a

22    clarification to make sure we're not bogged down in this in

23    trial.

24           THE COURT:  Yes.

25           MR. EKELAND:  So it's not -- it would be improper for

1    him to say, in my expert opinion, this doesn't follow forensic

2    accounting standards to make this kind of attribution of --

3    that the Bitcoin on -- saying coming from Mt. Gox account,

4    number one, then going through these 19 transaction hops to the

5    Bitcoin Fog cluster, is Mr. Sterlingov making the first deposit

6    into Bitcoin Fog.

7            THE COURT:  I think it's right.  I think what's

8    relevant for the jury is each point of uncertainty in the

9    process, and they may need some expert testimony to understand

10   where there are points of uncertainty and the nature and extent

11   of that uncertainty.

12           What I don't think is proper is to testify to the

13   jury about whether it violates some professional norm to make

14   an attribution where you, in essence, don't have the deed in

15   hand, to borrow the analogy from Mr. Brown.

16           For example, if this were a case in which there were

17   multiple witnesses who saw the defendant get in the car, drive

18   up to the bank, rob the bank, drive away.  There was also

19   evidence that the -- it was in a green Chevy, and there was

20   evidence that the defendant in the case owned a green Chevy.

21   And the witnesses also saw that the license plate was 1234 but

22   couldn't see the last digit of the license plate.

23           I think it would be improper to have a witness come

24   in and say, as a matter of sound, sort of, forensic analysis,

25   it is -- it would violate core tenets to assume that that last

1      digit in the license plate was a 7 if you didn't actually know

2      that it was a 7.  It would violate core tenets of forensic

3      methodology to conclude that that green Chevy with five of the

4      six digits on the license plate was the defendant's unless you

5      had a title showing that it was his car.

6              That seems to me that those questions are in the

7      realm for the jury to decide based on the evidence whether they

8      think it's sufficient, not whether the CFF thinks it

9      sufficient.

10             MR. EKELAND:  I'm finding this helpful, Your Honor.

11     So then, likewise, for the government, they can't come in and

12     say, this is Mr. Sterlingov making the first deposit into

13     Bitcoin Fog.

14             They have to say, here's this transaction, here's

15     Mr. Sterlingov's -- there's this account over here, here's 19

16     hops; here's the Bitcoin Fog cluster, because the attribution

17     is a form of opinion.  It's not 100 percent clear to me.

18             THE COURT:  I think you're raising a different point

19     about what the government can argue.  It's different for the

20     question of, sort of, invoking the name of some society and

21     concluding that under some society norms that are not at issue

22     in the case that something is proper or improper.  That's the

23     concern I'm raising here.

24             I think that both sides are entitled to argue to the

25     jury that the evidence will show -- and I think the government

1    is entitled to say, assuming they have the evidence to back it

2    up, the evidence will show that this first deposit was

3    Mr. Sterlingov, and here's what the evidence is.  It's X, Y, Z,

4    Q, and Z.  And the government submits that.

5            And you're free to argue and say to the jury -- or

6    this is probably better for, frankly, closing arguments than

7    for openings.  You're free to argue and say, it doesn't show

8    that it's Mr. Sterlingov by any means.  In fact, our position

9    is that it's not Mr. Sterlingov.  Here's the evidence that

10   shows it's not Mr. Sterlingov.

11           But it's always the case when a jury is making a

12   determination that there is -- 90 percent of the cases, there's

13   some uncertainty and the parties argue to the jury about the

14   evidence and they say, I think that it's sufficiently certain

15   that you can conclude that it was, and the government has the

16   burden of proof beyond a reasonable doubt, and they think that

17   the evidence is sufficiently certain, and you think it's not

18   sufficiently certain.  That's what you do as lawyers in the

19   case.

20           But that's different than having a witness take the

21   stand and say, what the government did here violates the tenets

22   of some organization, where that's just not the question that's

23   before the jury.

24           MR. EKELAND:  I understand that clearly for a lay

25   witness or a fact witness.

1          So I guess what I'm just trying to get a little --

2     and every court I've been in has been different about this,

3     Your Honor, but to some degree, in the ballpark.

4          That seems to me expert opinion, whether or not

5     something met financial forensic standards as somebody's

6     trained in, in relation to attributing an asset to somebody.

7     That's not a fact question.  And the Court --

8          THE COURT:  Just to interrupt, that may be a question

9     of opinion -- expert opinion.  I don't disagree with you about

10    that.  That's not a question properly before the jury.  To the

11    extent that it is, I think it's more prejudicial than probative

12    because if the point is that a forensic accountant will never

13    attribute a transaction to somebody without, in essence, having

14    the private key in hand, I think that's misleading to the jury

15    because I think a reasonable jury could find beyond a

16    reasonable doubt that it was Mr. Sterlingov without knowing

17    whether the private key had traded hands.

18          So I think that's the -- the question of whether it

19    violates the standards in some cases might be a relevant

20    question in front of a jury.  If this was a malpractice case

21    involving a forensic accountant and that was the standard of

22    care, that would be entirely appropriate expert testimony.

23          But the jury here is not being asked to decide

24    whether what the government did was consistent with or not

25    consistent with the standards -- the CFF standards.

1          MR. EKELAND:  I don't want to belabor this point.  I

2     will just submit that we do think it would be helpful to the

3     jury to know that there's forensic accounting standards related

4     to attributing ownership of an asset that in his expert opinion

5     weren't being followed, but I'm happy to --

6          THE COURT:  I think you've heard my ruling on this.

7     If you want to bring me any case law that shows I'm wrong, I'm

8     happy to consider it.

9          MR. EKELAND:  Could I get a clarification on 704?

10    I'm not clear on how the Court reads 704.  My understanding of

11    704 is it abrogates the ultimate conclusion rule with the

12    exception for criminal cases that an expert can't testify to

13    ultimate conclusions about the mental state or condition of a

14    defendant in relation to an element of the crime.

15         So I just want to make sure I'm understanding that

16    correctly as I read it the other day and that -- and as I

17    believe the committee notes state.  My understanding is the

18    rule was changed in order to allow experts to opine to ultimate

19    conclusions with that one exception for a criminal case.  I

20    want to make sure I've got that right.

21         THE COURT:  I think -- maybe it's a question of using

22    the language correctly.

23         I think that the expert can't substitute himself for

24    the jury or step into the role of the jury.  So I would be very

25    surprised if the expert was allowed to testify -- and I'd have

1    to look at this more carefully -- allowed to testify, it is my

2    expert opinion that he is not guilty.

3           MR. EKELAND:  That's why I'm asking you for

4    clarification.  I reread the rule, and I hadn't read it in a

5    while.  I read the committee notes to it.  If I'm recalling it

6    correctly -- I think I read it last night -- the committee

7    notes say that they're abrogating the ultimate conclusion rule,

8    and then there's an exception for criminal cases where you

9    can't offer -- an expert can't offer an ultimate conclusion as

10   to the mental state or condition related to an element of the

11   crime.

12          But that it's -- actually, 704's meant to be more

13   permissive for experts in what they can state as opinions;

14   because I think, if I recall the committee notes correctly,

15   there was all sorts of stuff that defense attorneys and

16   everybody were doing to twist the wording to get around the

17   rule.

18          THE COURT:  I will take a look at that more

19   carefully.  I'm happy to hear from the government on this.  I

20   don't think my ruling depends on that, in any event.  I think

21   it's a 403 relevance issue, is what I've really been focusing

22   on anyway.

23          And whether it's an ultimate issue or not is not

24   really central to my conclusion that -- the issue before the

25   jury isn't the professional standards and whether the

1    professional standards were violated or not and implicating

2    them is more prejudicial than probative.

3              MR. EKELAND:  Okay.  We'll move on, Your Honor.

4              THE COURT:  Mr. Brown, did you have anything else on

5    this ultimate issue question you want to clarify for us?

6              MR. BROWN:  Your Honor, the government agrees that

7    it's a 401, 403, and a 702 issue; that it's just not helpful

8    for the jury or relevant what a witness's personal opinion is

9    of the evidence in the case.  That's the jury's job; it's not

10   the expert's.

11             THE COURT:  Okay.

12             MR. BROWN:  Just to clarify on No. 24, I want to make

13   sure that the government believes any testimony by Mr. Verret

14   where he's claiming to have walked through blockchain analysis

15   should be excluded because he testified he did not do that.

16             He said -- I asked him on cross-examination, "Could

17   you identify the blockchain analysis you've done in this case?"

18             And he said, "So I believe what Mr. Brown is getting

19   at is he wants to say that the only blockchain analysis that

20   counts is tracing done in the way that Chainalysis does

21   tracing.  I have not done Chainalysis-level tracing."

22             He was very unequivocal about that.  To the extent

23   the defense wants to put him up and have him walk through, say,

24   a series of hops and then opine about the uncertainties and

25   that, that's a disclosure issue, as well as a lack of expertise

1    or reliable methods issue.

2         THE COURT:  I actually -- when I was talking about

3    this, I think the way I put it was if there was an appropriate

4    witness, the witness could testify about this.  I think it's a

5    fair point.

6         Mr. Ekeland, is Mr. Verret really the person to be

7    testifying?  I would have thought this was Ms. Still.

8         MR. EKELAND:  He's -- the government is sort of

9    presenting Mr. Verret as he's got no experience with

10    cryptocurrencies at all.  That's --

11         THE COURT:  No, no.  I think he's saying with

12    tracing; blockchain tracing.

13         MR. EKELAND:  The blockchain tracing, in terms --

14    let's just go back to that example of what they're alleging is

15    the first -- the first-known deposits into Bitcoin Fog.

16         That's not complicated tracing to do.  You can do

17    just the straight-up trace with a public blockchain.

18         THE COURT:  But does Mr. Verret have experience with

19    that or expertise?

20         MR. EKELAND:  I believe he has used public blockchain

21    explorers.  He's also done the CipherTrace certification

22    course.  He's got a certification from Wharton in

23    cryptocurrency.  He sits on the Zcash Foundation.

24         THE COURT:  That's not -- I understand he has certain

25    credentials.  I guess my question is, does he have experience

1    actually doing blockchain tracing?

2        MR. EKELAND:  I would have to go back and ask him

3    because what level -- I think what Mr. Brown just said is

4    Chainalysis-level, right?  I don't think Mr. Verret said, I

5    have none.  I could be wrong.

6        Again, just to look at it -- you can look at

7    Mr. Scholl's trace on that piece of paper, and assuming just

8    arguendo that that trace is correct, you can come to

9    conclusions looking at that piece of paper without even looking

10   at the blockchain explorer.  And I think that is where this

11   comes in, in terms of whether or not he considers it

12   forensically sound from an accounting --

13       THE COURT:  Do you really want Mr. Verret to be the

14   one who is going to be subject to cross-examination on whether

15   he's done the tracing?  It seems to me Ms. Still is much more

16   knowledgeable on this topic.

17       In addition to my questioning whether he really -- as

18   you sit here now, I think you weren't sure whether he had any

19   tracing experience.  Do you really want to put someone on the

20   stand where you're not sure whether they've had tracing

21   experience, putting aside even the disclosure issues, and let

22   them be subject to cross-examination, which would not be

23   helpful, obviously, to your case?

24       MR. EKELAND:  I think this is a little bit of a

25   different point.  What he's not opining on is, are those traces

1    accurate, did you follow the right tracing methodology; that's

2    not what his opinion is being offered for.

3            What it's being offered for is to say that at any

4    point in this trace, it's forensically unsound to make an

5    attribution of ownership on the asset, and that is something I

6    think he is very much qualified to do because it's a very basic

7    principle.

8            And then he's taking that notion of the inability to

9    attribute ownership and saying, this doesn't accord in my

10   expert opinion in what I was trained in as a financial fraud

11   examiner; they wouldn't allow it.

12           THE COURT:  Right.  I think your description there is

13   helpful for me in crystalizing it.  I do think that, to the

14   extent that you are kind of falling back into just forensically

15   unsound, I think I've already expressed my view with respect to

16   that.

17           To the extent that he wants to say, I don't really --

18   I didn't do the tracing here, but I heard Ms. Still testify.

19   Ms. Still testified and she explained that at each step in this

20   transaction, you know the public address, but you don't know

21   the private address.  And as she explained to you, when you

22   don't know the private address, you don't know for sure who it

23   is.  All you know is what the public address is, and you don't

24   know who actually accessed the public address.

25           And, therefore, it would be improper for you to

1    conclude that it was Mr. Sterlingov because it could have been

2    anyone else.  I think that is actually what the point Mr. Brown

3    was making to me about 702, which I now understand better and I

4    think he's correct about, which is it may not be a question of

5    whether it's ultimately a question for the jury or not.  The

6    question is whether it's helpful for the jury or not.

7        It's not helpful in having the jury understand

8    something they can't otherwise understand to have a witness

9    come in and say, Ms. Still just explained to you that you don't

10   know who these people are, and because you don't know who these

11   people are, then you don't know that it was Mr. Sterlingov.

12       That's not helpful, in an expert sense, to a jury.

13   You know, what may be helpful would be the testimony that, in

14   fact, from these transactions, you can't tell who the actual

15   owner is.  That's my point.

16       I think that's entirely appropriate and fine, but you

17   need somebody who has some expertise in that.  And I'm not sure

18   that Mr. Verret is the right person on that.  I think you've

19   indicated you don't even know if he has done any blockchain

20   tracing himself.

21       And, again, this feels to me like more of a Still

22   question than a Verret question at this point.

23       MR. EKELAND:  Understood, Your Honor.  I mean, I

24   don't want to belabor this point.  I think we can move on.

25       I did just get an explanation of why we are having

 1    such a hard time getting ahold of the lawyers at CipherTrace,

 2    and that is, it's my understanding, it's Rosh Hashanah.  People

 3    are, apparently, out on religious holiday.  Is that correct?

 4          THE COURT:  I'm looking at my calendar.

 5          MR. BROWN:  Your Honor, we understand it's the eve of

 6    Rosh Hashanah.

 7          THE COURT:  That may not explain why they were

 8    unavailable earlier today but by 5:00, they may be unavailable.

 9    But by 3:30, I'd still hope they would be available.  The

10    holiday doesn't start until the sun sets.

11          MR. EKELAND:  I can't speak to that, and I'm not

12    going to speak to it.  I'm just repeating what I've been told.

13    Would you like us to continue?

14          THE COURT:  Yes, please.

15          MR. EKELAND:  We're on 25 now.  I think this goes

16    back to what the discussion was we just had.  Mr. Verret will

17    testify that the heuristics cannot definitively prove ownership

18    of cryptocurrency.  Mr. Verret will --

19          THE COURT:  Did Mr. Verret draft this, or did you

20    draft this?

21          MR. EKELAND:  I'm sorry, what?

22          THE COURT:  Did Mr. Verret draft this document or did

23    you?

24          MR. EKELAND:  I think what we did is we would do an

25    initial draft, send it to him, and he, obviously, participated

1    in the drafting of it and signed off on it.  I can't remember

2    how the --

3            THE COURT:  The reason I'm asking is it doesn't sound

4    like the types of things where he has expertise.  Earlier

5    stuff, maybe.  But this, again, heuristics cannot definitively

6    prove ownership of cryptocurrency; again, Ms. Still or some

7    other person might be the right expert on this.

8            I didn't believe that Mr. Verret had any particular

9    experience or expertise on those issues.

10           MR. EKELAND:  Is that even a principle that's in

11   dispute?  I don't even think that's in --

12           THE COURT:  If it's not in dispute, then we don't

13   need an expert either.

14           MR. EKELAND:  Point taken.  Just because the word

15   heuristic is being used doesn't mean that an expert can't use

16   it in their analysis without having some sort of blockchain

17   tracing.  I think that's -- just like the Court can

18   theoretically understand stuff and was discussing --

19           THE COURT:  I wouldn't purport to go down the hall to

20   Judge Kelly's courtroom and testify as an expert on this stuff.

21           MR. EKELAND:  The Court is reading the stuff,

22   obviously, on heuristics that was disclosed and understanding

23   at least on a certain theoretical level, right?

24           I think the notion -- and I'm not saying this is what

25   the Court is asserting, but just to take it to an extreme --

1    the notion that you have to have had some kind of blockchain

2    training experience to step back and look at things

3    theoretically and understand it and opine about it.

4              THE COURT:  No, no.  I completely understand that.  I

5    just think, if you want to testify as an expert in a case on a

6    particular topic, you need something more than the type of

7    knowledge that anyone might have if they picked up a primer and

8    read through the primer and then said, okay.  I don't get the

9    sense -- maybe I'm wrong about this.  I don't get the sense --

10   and I think Mr. Verret in his testimony -- he doesn't know what

11   the heuristics are that Chainalysis uses.  And I think anyone

12   would say that some heuristics are more predictive than others.

13             Your own expert, Ms. Still, indicated that some

14   heuristics are more predictive than others.  If you can control

15   for CoinJoin, for example, co-spend may be extremely

16   predictive.

17             But I don't get the sense that Mr. Verret has, sort

18   of, that type of expertise other than, perhaps, he understands

19   what the word heuristic means, and he understands that a

20   heuristic is -- I don't think a guess is quite the right word

21   for it, frankly, but that it is a --

22             MR. EKELAND:  Assumption?

23             THE COURT:  Well, I'm not even sure an assumption is

24   the right word.  It's a tool that is used, perhaps perfectly,

25   perhaps imperfectly, to identify particular types of

 1    transactions.

 2           There may be a dispute about how perfect that tool is

 3    in identifying.  I'm not sure you would say it's a guess, for

 4    example, if you had a heuristic that said that people standing

 5    with -- at the bank teller with a gun pointed at the bank

 6    teller are robbing the bank.  And you know what?  Maybe not

 7    always the case; maybe it's Halloween and someone is making a

 8    really bad joke.  We're going down, I think, an alley that's

 9    probably not super helpful here.

10           The question is whether Mr. Verret has, sort of,

11    relevant expertise.  I'm persuaded, as I've indicated before,

12    that Ms. Still does have the expertise on blockchain tracing

13    and heuristics and how they work, but I don't have any sense

14    that he actually has any basis to say heuristics are guesses,

15    for example.

16           MR. EKELAND:  I understand what the Court is driving

17    at.  I think the Court understands the defense's position, that

18    he's applying his forensic examiner, forensic fraud experience

19    to what is being presented with these heuristic methodologies.

20           Maybe I'll just read through the rest of 25 and

21    then -- because he says, Mr. Verret will explain that

22    heuristics are guesses.  We just discussed that, guesses.

23    Based in part on the assumption that most Bitcoin transactions

24    take place between public addresses owned by the same --

25           THE COURT:  Slow down for the court reporter.

1          MR. EKELAND:  On an assumption that most Bitcoin

2    transactions take place between public addresses owned by the

3    same individual.  Definitive assessments of identity-linking

4    non-KYC public keys with individuals based on these heuristics

5    are inconsistent with the standards of the AICPA, and then in

6    parentheses, it says for CPA/CFF designations, and ASCFE, in

7    parentheses, for CFE designation.

8          And then he says see -- like the word see, like, look

9    at -- AICPA statement on standards for forensic services.  And

10   then he's got a hyperlink and then semicolon, another site,

11   Association of Certified Fraud Examiners, CFE Code of

12   Professional Standards available at, and then he's got the

13   hyperlink.

14         THE COURT:  Let me ask the government.  The

15   government has its own standards in this regard as well.  I

16   know that sort of grew up out of some of the DNA and

17   fingerprint analysis.  I think it's in the U.S. Attorney's

18   manual with respect to the extent to which the government can

19   argue that the evidence definitively proves something where

20   it's in some sense probabilistic, even if it's probabilistic in

21   the way that DNA is where it's one in a trillion.

22         So what is the government's view?  I'm not so much

23   asking about Mr. Verret's testimony, but I suppose the question

24   is, is there something for Mr. Verret to be responding to?  If

25   the government is not going to argue that it's definitive using

1    that word, proof, then this may not be an issue one way or the

2    other.

3              MR. BROWN:  Your Honor, I don't think Mr. Scholl will

4    argue that his analysis definitively proves anything, really,

5    that Mr. Sterlingov is guilty -- I mean, that's not what his

6    testimony is.

7              He's presenting evidence; and we will certainly argue

8    to the jury that the jury can use their common sense, they can

9    draw reasonable inferences based on that and other items of

10   evidence in front of them.

11             THE COURT:  Right.

12             MR. BROWN:  But by the same token, we certainly will

13   not be arguing, based on the DOJ justice manual, that this

14   evidence is sufficient to prove that Mr. Sterlingov is guilty.

15   We won't be resorting to reliance on any certain standard.

16             THE COURT:  In some sense, I just think this is

17   perhaps a nonissue.  This is maybe what is motivating my notion

18   that it's a 403 issue.

19             You know, it would not surprise me in the slightest

20   that various forensic standards say that where your

21   determination is made on an assumption or even if it's an

22   assumption where there is an extremely high likelihood that

23   that assumption is correct, but if it's based on inference in

24   some way, you ought not conclude definitively, that is, without

25   any doubt whatsoever, that the car in my hypothetical belonged

1    to the defendant.

2           But I would also be very surprised if, as a matter of

3    forensics, you couldn't say it is relevant and somebody who is

4    trying to figure out what happened certainly can consider the

5    fact that the defendant did own a green -- or was seen in a

6    green Chevrolet with License No. 12345, we didn't see the sixth

7    digit; and I can't tell you absolutely, positively that it was

8    his car, but I'm also not going to tell you that that's

9    irrelevant to your determination.

10          If forensics and if Mr. Verret were of the view that

11   that's something that cannot be considered in any way, I would

12   be pretty surprised.

13          I think maybe we're just -- I think we're arguing

14   about nothing here, and that is my -- is what is driving my 403

15   concern.  To the extent that it is suggesting that, absent

16   absolute definitive proof that someone actually saw

17   Mr. Sterlingov entering the private code into the computer, you

18   can't draw any conclusions.  But I don't think that's what

19   Mr. Verret is saying.

20          I just worry, though, that the way he's putting it in

21   the air and the descriptions of it about these -- violating

22   these various standards would suggest to the jury that that

23   is requiring.

24          MR. EKELAND:  I understand the Court's point on that

25   point.  I think the defense's 403 concern is that this

1    Chainalysis Reactor and these heuristics are being presented as

2    scientific and as deterministic.

3        I don't think it's disputed that there are no

4    standards in this industry.  There is no standard manual,

5    there's nothing like NIST or anything like that.  I do think it

6    would be helpful to the jury to be given some kind of

7    standards, not -- I understand the Court's concern with the

8    jury being told, while if you don't absolutely follow this

9    standard, it can't be true.  That is heard and understood.

10        What I think would be useful, though, is in his

11    province in relation to the financial assertions and

12    attributions that are being made is to say, look, there's a set

13    of standards here, and I think at one point the Court said at

14    one of our hearings, this is a little similar, it's not

15    dissimilar from a normal, like, financial fraud case with the

16    tracing.

17        And that these standards could be useful to you in

18    evaluating and making your own determination, and in my expert

19    opinion, based on what you're seeing here, the fact that you --

20    whatever, had the private key problem or you don't have --

21    there's nothing in the blockchain or block that attributes any

22    identity to anybody or any entity; that that from the standards

23    that we use in normal financial cases would be considered

24    forensically unsound; and you can make your own judgment.

25        The 403 concern is that this is so new, and it's

1    getting presented like it's science.  It's getting

2    deterministic.

3            THE COURT:  I have no doubt, by the time you've

4    finished your cross-examination, that it will not be -- the

5    jury will not have a one-sided view of this as scientific

6    certainty.

7            MR. EKELAND:  I hope so.  I think I've made my point.

8            THE COURT:  I think I've made my point on this.  If

9    it turns out I'm wrong and there's some case law out there that

10   says that, notwithstanding 403 and 702 and 401, it's

11   appropriate in a criminal case to offer testimony with respect

12   to forensic standards, you can come back to me and point me to

13   that case law.

14           MR. EKELAND:  Thank you, Your Honor.  No. 26?

15           THE COURT:  Yes.  I think we're going to have to move

16   a little faster than this.  We've still got quite a bit to do

17   even on Mr. Verret.

18           MR. EKELAND:  If I could take one second and glance

19   at it.  This could be redundant or we may have already covered

20   it.

21           I think 26 is just a similar point on ownership

22   attribution.  27.  May I go ahead on 27?

23           THE COURT:  Yes.

24           MR. EKELAND:  Mr. Verret will testify that there are

25   multiple situations that could have been misinterpreted by the

1    government and Chainalysis in their investigation into Bitcoin

2    Fog.  Mr. Verret will explain that a reasonable explanation for

3    the misattributions in the Bitcoin Fog investigation may be

4    that the defendant transferred Bitcoin to an individual in an

5    exchange, and that individual or another in a chain of

6    individuals was the ultimate purchaser of the Clearnet domain.

7         Mr. Verret will further explain that another

8    reasonable explanation is that whoever hacked Mt. Gox also

9    hacked the defendant's account and used it to facilitate

10   external transfers.

11        THE COURT:  This all strikes me as so speculative;

12   either arguments that a lawyer can make or just entirely

13   speculative.

14        We talked about the Mt. Gox hack before.  I still

15   haven't seen any evidence or reason to think that Mt. Gox was

16   hacked in any way relevant to the integrity of the data in this

17   case.

18        Again, if it's out there, you need to bring it to me.

19   Quite frankly, we've passed most of the deadlines long ago in

20   this case.  But it's just too speculative to say, it's possible

21   that Mt. Gox was hacked, and it's possible that it was -- that

22   these accounts were hacked, and it's possible that someone went

23   in and changed a transaction involving Mr. Sterlingov or

24   involving somebody else to make it look like it involved

25   Mr. Sterlingov.

1          That just strikes me as so speculative as to be

2     unhelpful to the jury and also more prejudicial than probative,

3     absent some evidence that, in fact, the Mt. Gox hack had

4     something to do with the type of information or data that we're

5     talking about here.

6          MR. EKELAND:  Removing Mt. Gox from the equation on

7     No. 27, is it appropriate for him to testify that there's

8     perfectly reasonable explanations in terms of these

9     transactions and who they're being attributed to?

10          Because, again, to -- there is no way beyond where

11     there's some sort of definitive corroborating evidence which

12     the government says they have for, like, the Mt. Gox account,

13     number one, to attribute transactions to Mr. Sterlingov from

14     the blockchain.

15          Everything, in a certain sense, in relation to that

16     is a form of argument and opinion.  We would submit that, from

17     his perspective of a financial forensic examiner and fraud,

18     that part of what you should do is consider reasonable

19     alternatives or explanations to these types of financial

20     transactions and not say, oh, it's definitively this, but it's

21     entirely reasonable, and this is entirely consistent with, say,

22     whatever, private key transfer, off-chain or this.

23          And that it's helpful to the jury to know, again,

24     that there's perfectly reasonable alternatives to what's being

25     put forth.

 1          THE COURT:  Give me just a second here.  I need to go

 2    attend to something just for a few minutes off the bench, and I

 3    will come back.

 4          (Recess taken.)

 5          MR. EKELAND:  May I proceed, Your Honor?

 6          THE COURT:  You may proceed.  Any further word from

 7    CipherTrace?

 8          MR. EKELAND:  Your Honor, may I look at my phone for

 9    one second to check?

10          THE COURT:  Of course.

11          MR. EKELAND:  No, not beyond what I just told you

12    about the Rosh Hashanah, Your Honor.

13          THE COURT:  Are they in California?

14          MR. EKELAND:  Ms. Still is in California.  I don't --

15    I think when I asked her this morning where the lawyers were,

16    she said all over.  I'm not sure.  I don't know.

17          MR. BROWN:  Mr. Brown?

18          MR. BROWN:  Your Honor, the general counsel whose

19    information we found on the New York Bar website, she is on the

20    board of directors of a Jesuit organization.  I don't know her

21    from Adam, but I'm not sure if Rosh Hashanah is the reason

22    for --

23          THE COURT:  I have to say, I'm a little surprised

24    that a company that large can't get somebody to respond to a

25    request from a court to have a lawyer who can show up.  I

1    suspect -- although I don't know, I suspect what's going on is

2    that they're trying to figure out what they want to do or what

3    their position is here.  But that's not what I asked.

4         What I wanted to know is at least, sort of, what

5    their process was and what was going on.  I wasn't going to put

6    them in a position in which they had to definitively tell me

7    their answer if they were still thinking about it and debating

8    what to do.

9         It does feel a little bit like they are not being

10   particularly responsive to the Court here, not to have any

11   lawyer who can show up and just tell us, Judge, we're thinking

12   about it or, Judge, here are the issues.  That's what it is.

13        MR. EKELAND:  I agree with you, Your Honor.  I don't

14   know what to say.

15        THE COURT:  Let's return to --

16        MR. EKELAND:  No. 28.  Mr. Verret will testify that

17   attribution of asset ownership can be a difficult problem in

18   financial forensics, generally.  He will explain that forensic

19   techniques are more settled in traditional financial

20   investigations than in the blockchain context.

21        Mr. Verret will explain that the extensive KYC

22   measures implemented in traditional finance make it easier for

23   investigators to attribute custody and control over assets in

24   ways that are not necessarily applicable in the blockchain

25   context.

1          Mr. Verret will explain that, despite recent efforts

2     to incorporate KYC protocols in the blockchain space, these

3     developments are not yet complete, and there are many ways

4     users can avoid KYC protocols in blockchain finance.

5          THE COURT:  Mr. Brown, what are your thoughts on this

6     one?

7          MR. BROWN:  Your Honor, I am struggling to understand

8     the relevance of any of this.  It just seems very generic.  And

9     to the extent that there's some application in this case, it's

10    just a lawyer argument.

11         THE COURT:  I suppose the point which may, again, be

12    conveyed by others or may not be rocket science at this point

13    is that it's harder to track transactions in the blockchain

14    context than in the traditional banking context, which I

15    suppose at some level is more or less true.  Again, maybe it's

16    a question of cross-examination.

17         But in some sense, it's easier because there's

18    actually a public ledger.  And in some sense, it's harder

19    because the banks do have strict KYC requirements that are

20    required under the bank secrecy rules and other fairly

21    extensive federal regulations.

22         So, I mean, I agree with you this is not the core of

23    the case in any respect, Mr. Brown.  I guess the question is,

24    is there any objection to Mr. Verret simply testifying that,

25    I'm usually doing pen-and-paper transactions and it's harder to

1    do it on the blockchain because even if you know what the

2    public addresses are, you don't know what the private addresses

3    are and, therefore, it makes attribution more difficult

4             MR. BROWN:  Yes, Your Honor.  I think that's fair.

5             THE COURT:  Is that what he's getting at here?

6             MR. EKELAND:  Yes, Your Honor.  I think there's -- it

7    would be helpful for the jury to have some discussion about

8    KYC, which is going to come up in this case.  I think the

9    Mt. Gox 1 account was a KYC account; the Kraken account is a

10   KYC account.

11            I think it would be helpful for them to have some

12   sort of grounding in not only KYC in the traditional financial

13   setting, brick and mortar, so to speak, and then how that's

14   playing out in the digital space.  I do think it is, at least

15   to the defense's case, an important issue that Mr. Sterlingov

16   was using KYC accounts, when in this space there are a lot of

17   ways to just not use them.

18            THE COURT:  So the only thing that concerns me about

19   what you just said was that he should be able to speak about

20   how they're playing out in the digital space.  I'm a little

21   worried about disclosure issues, and I don't really know what

22   you mean by that.

23            I think if all you mean is that not everyone on the

24   blockchain is employing KYC protocols, fine.

25            MR. EKELAND:  Yes.  I think that's in that sentence

1    there.  I think it's, like, the last sentence.

2            Mr. Verret will explain that, despite recent efforts

3    to incorporate KYC protocols in the blockchain space, these

4    developments are not yet complete.

5            THE COURT:  Okay.  I just -- what you were saying to

6    me sounded more open-ended than that.  If that's what it is, I

7    think that seems okay.

8            MR. EKELAND:  It was a little more open-ended than

9    that the way it was phrased.  I agree with the Court's concern

10   there, and I don't intend it to be that open-ended.

11           THE COURT:  Let's go on to 29 then.

12           MR. EKELAND:  Mr. Verret will testify that there is

13   no way to definitively determine who controls a blockchain

14   asset because the KYC regime lags that of traditional finance.

15   Mr. Verret will explain the challenges associated with

16   determining where a digital asset exists, who possesses

17   custodial control of a digital asset, and even whether a

18   digital asset exists.

19           THE COURT:  Mr. Brown?  This seems to me to be

20   similar, at least to the extent that there's information there

21   to what we just discussed, and that if Mr. Verret wants to say

22   that there's not universal KYC for the blockchain and it's, at

23   times, difficult on the blockchain to determine who the actual

24   custodian is of the asset, that seems okay.

25           MR. BROWN:  Yes, Your Honor.  The government doesn't

1    object to that.  I mean, certain parts of this, the assertion

2    of the online KYC regime lags that of traditional finance, that

3    may not be factually accurate.  But the government doesn't

4    object as a matter of 702.

5            THE COURT:  All right.  If it's not factually

6    accurate, you can cross on that.

7            MR. BROWN:  Yes, Your Honor.

8            MR. EKELAND:  No. 30.  Mr. Verret will testify that

9    the nature of the blockchain has fundamentally altered the

10   notion of property ownership itself, and that the nature of the

11   blockchain makes it difficult to confirm ownership or control

12   over digital assets.

13           Mr. Verret will explain how he teaches his students

14   that obtaining some physical representation of the seed phrase

15   or private key on a suspect's hard drive is key to establishing

16   an individual's connection to the public keys used to attribute

17   ownership or control over digital assets.

18           Mr. Verret will further explain that even the DOJ's

19   own criminal practice journal emphasizes the importance of

20   identifying seed phrases or private keys associated with

21   digital assets to attribute custody or control.  Then he cites,

22   see Michael R. Korver.

23           THE COURT:  You don't need to read that.  Mr. Brown?

24           MR. BROWN:  Your Honor, this -- first of all, that

25   first sentence, I have no idea what that even is supposed to

1    mean.

2              THE COURT:  I don't understand what it means either.

3              MR. BROWN:  It seems to me some sort of metaphysical

4    point, which --  it's just not, I think, a proper area of

5    testimony in front of a jury in a criminal trial.  This is not

6    helpful to a jury, this sort of metaphysical nature of property

7    and the blockchain space.

8              And the rest of this --

9              THE COURT:  I also think it's -- there's no reason to

10   think it's true.  I mean, it's not -- the property is not

11   communal, it's not shared property.  It's just the question of

12   proof of ownership has changed in some respects.

13             MR. BROWN:  Yes, Your Honor.  We just don't think

14   it's relevant or proper testimony.

15             THE COURT:  Okay.  And then the remainder?

16             MR. BROWN:  Well, the same goes for the remainder.

17   How Mr. Verret teaches his students is not particularly helpful

18   to the jury.

19             And, again, this just doesn't strike us as true;

20   obtaining some physical representation of the seed phrase or

21   private key on a suspect's hard drive is key to establish an

22   individual's connection to the public keys.

23             This seems like what he's really arguing about is,

24   can the jury make an inference about control over -- about

25   control over Bitcoins that have been transacted in this case,

1    and there's no basis for that sort of opinion.

2         THE COURT:  It seems to me here -- I agree with you

3    that what he teaches his students is not relevant.

4         MR. BROWN:  Sorry, Your Honor.

5         THE COURT:  What I do think is probably -- it may be

6    captured by what we already discussed above.  There's a fair

7    amount of redundancy in these disclosures.

8         But to the extent he simply wants to testify that

9    there's a difference between the public key and the private

10   key, and the public key isn't definitively tied to someone and

11   that it's only through the private key that you maintain

12   ownership and that private keys can be transferred and knowing

13   who owns the private key is -- if you know someone who has a

14   private key, you can then determine from that, I may be a

15   little bit concerned if you were to go further and say that

16   without that information, you can't know.

17        That may not be fair and that may be misleading to

18   the jury to put it that strongly.  But to make just the factual

19   explanations which might, for lay jurors who don't understand

20   this stuff -- and I will admit that I am closer to that

21   category than the rest of you are, but I'm doing my best to

22   learn it.

23        But it's helpful to understand the difference between

24   a private and a public key, and that it is the private key that

25   is, sort of, the essential element of ownership.

1          MR. BROWN:  Yes, Your Honor.  We don't disagree with

2     that.  I think where the Court is drawing the line makes sense,

3     which is he can testify about questions about how you determine

4     ownership.  But we don't think that there's a basis or that

5     it's fair for him to testify you can't determine ownership

6     without X, whatever X may be.

7          THE COURT:  All right.  And what about the article?

8          MR. BROWN:  The article is -- well, first of all,

9     that's just not what -- I'm not sure if he even read this

10    article.  That's just not what the article has to do with.

11         It has to do with, as I recall, seizing -- how you

12    seize cryptocurrency assets that are subject to seizure and

13    forfeiture.  That is a totally separate question.  That's a

14    procedural question.  It's a totally separate question from

15    attribution of ownership in a criminal sense.

16         To the extent -- I think the effort with a lot of

17    these citations to articles published by my co-counsel or

18    myself, I think the implication is that they're trying to do

19    some sort of gotcha with a very challenged-level reading

20    comprehension of those articles.

21         I think that that's -- we should not be talking about

22    what AUSA Chris Brown or Trial Attorney Alden Pelker has

23    written.  We should be talking about the evidence in the case.

24         MR. EKELAND:  Your Honor, I think it's relevant to a

25    blockchain prosecution what is -- what the standards being

1    discussed in one of DOJ's own criminal practice journals says.

2    I don't think that's a game of gotcha.

3         I think, you know, Mr. Brown and Ms. Pelker are the

4    top prosecutors in this space, and they have written about

5    their practice and what they think about it; and I think it's

6    entirely appropriate for the defense to look at a DOJ criminal

7    practice journal that is discussing things directly on point to

8    this case.

9         THE COURT:  What is the point that the journal

10   establishes?

11        MR. EKELAND:  I think what Mr. Verret is talking

12   about here is that it's important to identify seed phrases and

13   private keys related to digital assets when you're going to

14   attribute custody or control.

15        THE COURT:  Maybe I need to go read the article.  But

16   I don't think anyone here doubts that that is important when

17   you can do it, just like you might -- there might be an article

18   by a prosecutor that says, it's important to catch the bank

19   robber red-handed while he has the cash in his hand and is

20   fleeing the bank.

21        But to suggest to a jury that that's somehow the

22   standard -- unless you do that, you can't charge somebody with

23   bank robbery -- would, obviously, be grossly misleading.

24        MR. EKELAND:  I think what this is getting at is

25   that, in relation to digital assets, there are certain indicia

1    of ownership, and it would be helpful to the jury to know that.

2         THE COURT:  That's fine.  But I don't think you need

3    to use this article here.  To the -- again, I think we're

4    talking about stuff that is not controverted.  But if you want

5    to explain it to the jury, that's fine.  There's a difference

6    between the private key and the public key.  It's the private

7    key that is necessary to assert control over the Bitcoin that

8    are in the wallet.  That's all fine.

9         I just -- to the extent, though, that you're

10   suggesting here that there is some standard and that, without

11   that, you cannot make that attribution, I think that is under

12   403 more prejudicial than probative and misleading.  I don't

13   see a need to use the article.

14        I'll take a look at it.  If I have a different view

15   after looking at the article, I'll let you know.

16        MR. EKELAND:  Again, on the 403 point, the defense's

17   concern is, again, just that this -- and I feel like we've been

18   fighting this since the beginning of the case, so to speak,

19   that there's this perception again that this stuff is

20   scientific, that it's -- these heuristics and all this stuff is

21   some kind of magic that definitively makes an attribution.

22   That's why we're emphasizing these points.

23        THE COURT:  I don't think the government is in any

24   way suggesting that through clustering or through the use of

25   Reactor that they're then able to use that to definitively

1    associate a public key with a particular individual.

2              MR. EKELAND:  What I'm more concerned with here in

3    terms of the 403 thing is really the CSI effect in the sense

4    that the jury is going to come in with these notions that,

5    okay, here's this really fancy expensive software, it's --

6    there's all these fancy terms around it, it's being said it's

7    scientific, it's deterministic; and that I think it really --

8    it helps the jury in terms of the defense's 403 concerns to

9    emphasize these points, that there's all these things, and that

10   we're just not making up the standards or what we're talking

11   about here.  These are things that the DOJ agrees with.

12             THE COURT:  Again, I'll read it.  I would be very

13   surprised if that article said that you cannot make a

14   conclusion without that information, which is the way I think

15   you're trying to suggest what it means.  I don't think there's

16   any dispute about the proposition that it's extremely helpful

17   in making that type of association.

18             MR. EKELAND:  I don't believe Mr. Verret is saying

19   that you cannot make that conclusion without the evidence.  I

20   think what he says here is -- the DOJ's own criminal practice

21   journal emphasizes the importance of identifying seed phrases

22   or private keys.  That's not --

23             THE COURT:  That's just not -- I don't think that's a

24   matter of dispute here.  I mean, it may be a dispute about how

25   you characterize it.

1          But, yes, if you catch the bank robber leaving the

2     bank with the money in his or her hands, that's really good and

3     helpful evidence, but -- so I don't think -- if you have the

4     private key, that's extremely relevant and valuable.  But to

5     the extent -- a suggestion that that is an essential or

6     necessary condition, I think, is more misleading than

7     probative.

8          I don't think that -- I'll look at the article, but

9     I'll be very surprised if that's what Ms. Pelker said in the

10    article.

11         MR. EKELAND:  Your Honor, you can read it and let us

12    know, but I do think it's -- again, not saying that it's

13    definitive, but that it is important.

14         THE COURT:  It is.  I don't think the government is

15    going to dispute that.

16         MR. BROWN:  Your Honor, I always highly recommend

17    reading anything that Ms. Pelker writes.

18         But Mr. Verret did also testify just, unequivocally,

19    the internal policies of Department of Justice, no, I wouldn't

20    hold myself out as an expert in DOJ policy.  Page 133.

21         This may -- you should still read the article, but

22    this may just be outside of his expertise.

23         THE COURT:  Okay.  Fair enough.  That's actually a

24    ground for keeping it out as well.  Let's move on.

25         MR. EKELAND:  Number 31.  Mr. Verret will testify

1    that there's a high risk of misidentification when relying upon

2    heuristics in blockchain forensics.  Mr. Verret will explain

3    that the government's characterization of Bitcoin transactions

4    as beta transactions is not reasonable and that it is unlikely

5    the identified transactions were, in fact, beta transactions.

6          Mr. Verret will explain that the evidence is

7    consistent with these transactions being mundane transactions

8    that any user could have done.  Mr. Verret will explain that

9    the pattern of activity identified by the government as beta

10   transactions could have simply been something as simple as a

11   user testing a new wallet or a user onboarding new users to a

12   crypto platform.

13         Mr. Verret will emphasize that such mundane activity

14   would appear identical to the evidence purported by the

15   government to be beta transactions.

16         THE COURT:  All right.  Mr. Brown?

17         MR. BROWN:  Your Honor, three quick points.

18   Number one, Mr. Verret testified that he's not a blockchain

19   expert.  Number two --

20         THE COURT:  I'm not sure that this is a blockchain

21   question.  I mean, I think, if I'm understanding this

22   correctly, it's very early transactions involving Bitcoin Fog,

23   and the government's position -- that the government ties this

24   to Mr. Sterlingov, and the government's contention is that this

25   early transaction involving Bitcoin Fog is best understood as

1    him testing the software to make sure it worked, which provides

2    some evidence that he, in fact, was the administrator because,

3    look, here he is testing it.

4           I think what Mr. Ekeland is saying is, even assuming

5    that that was Mr. Sterlingov, it could have been someone

6    testing it, but it equally could have been him just testing the

7    wallet or him seeing whether he liked Bitcoin Fog and wanted to

8    use Bitcoin Fog.  And to conclude that it was a beta test,

9    there's not a foundation for that.

10          MR. BROWN:  Yes, Your Honor.  I think that that is,

11   essentially, a closing argument.  It's to say these are the

12   facts out there and the defense -- as the government has one

13   interpretation of those facts and the inferences to be drawn

14   from them, the defense has a different interpretation of those

15   facts.  That's it.  That's a matter of argument.  It's not a

16   matter of --

17          THE COURT:  Is the government, when it puts on its

18   case, going to treat this -- or in its opening treat it as a

19   beta transaction or simply put on a witness who is going to

20   testify we were able to track this early transaction to

21   Mr. Sterlingov, and it was very early in the process.  How

22   early?  It was this early.  What were the characteristics of

23   the transaction?  And then in closing, you'll say, look, this

24   must have been a beta.

25          MR. BROWN:  Yes, Your Honor.  We will have testimony

1       suggesting that this is consistent with one, sort of, common

2       director of these transactions, and that's consistent with the

3       process of manually mixing and unmixing a transaction.

4               The other point that I wanted to make is

5       Mr. Verret -- and this may be a proper area of testimony for

6       Ms. Still, perhaps, but Mr. Verret also testified in that other

7       passage that I cited earlier that he has done no transaction --

8       he calls it Chainalysis-level analysis.  But he's done no

9       transaction-level analysis in this case.  And if he has, it has

10      not been disclosed to the government.

11              THE COURT:  I guess I'm -- I mean, as was probably

12      evident from my questioning, I think if the government is going

13      to argue and put on expert testimony that there are

14      characteristics of the transaction that are consistent with it

15      being a beta transaction, it's fair game for the defense to put

16      on an expert and testimony that there is evidence that it is

17      consistent with other types of transactions which are not beta

18      transactions.

19              I do think -- I guess it's not clear to me that

20      Mr. Verret has expertise, and this disclosure here is not

21      terribly detailed.  I don't really know exactly -- sort of what

22      indicia he's going to point to or what sort of study he's going

23      to rely upon, what his basis is going to be to say that this

24      transaction is consistent with other types of transactions that

25      someone might have been engaging in early in the use of Bitcoin

1    Fog.

2          MR. EKELAND:  I think in 31 there's two examples.  In

3    the second-to-last sentence where he's just saying, it could

4    have simply been something such as a user testing a new wallet

5    or a user onboarding new users to a crypto platform.

6          THE COURT:  I understand that's what he's saying.

7    But I guess the question I had is, what are the indicia for;

8    like, knowing one way or the other which it is?  You know, why

9    do the indicia point to the fact that it might be someone just

10    testing a new wallet, and too, and more importantly, is it

11    something that Mr. Verret has studied, and does he have any

12    expertise with respect to how people test new wallets and what

13    the indicia are, where he can look at this transaction and say,

14    I can point to X, Y, and Z here and show you, based on my

15    expertise and experience, that this is exactly what someone

16    would do when they're testing a new wallet?

17          MR. EKELAND:  I'm fairly confident he has set up his

18    own wallets given his experience with Zcash and my

19    conversations with him.  I think, actually, the point is

20    that -- if I understand this correctly, is that there is no

21    indicia differentiating what the government is going to argue

22    is a beta transaction from somebody setting up a wallet and

23    that's the issue.

24          THE COURT:  That's the question.

25          MR. EKELAND:  Yeah.  It's not, is there indicia that

1    shows you this was definitively a wallet.  It's that there is

2    no indicia on what's being argued as a beta transaction that

3    can distinguish it from somebody setting up a wallet.

4            THE COURT:  Correct.  That's the question.  The

5    question is just whether Mr. Verret has the experience with

6    respect to this particular set of conditions or elements of the

7    transaction in which he could make the -- be engaged in that

8    type of analysis based on his expertise or experience.

9            MR. EKELAND:  I would submit that he does.  Just that

10   in my understanding, like, setting up a wallet is not a

11   difficult thing to do.  It's -- if I'm recalling my

12   conversations with him correctly, that's something that he has

13   done.  It's a very common thing for people to do in the

14   crypto space.

15           Again, he's certified by Wharton, he teaches

16   cryptocurrency at George Mason University.  He's an active user

17   of cryptocurrency.  I guess --

18           THE COURT:  Which currency does he use?  Does he use

19   Bitcoin?

20           MR. EKELAND:  From my understanding, he uses Bitcoin.

21   He's on the Zcash Foundation board, if I'm remembering

22   correctly.  He's somebody who is in the space.

23           I don't think what we're talking about here is

24   complex in the sense of -- I guess the phrase we're using a lot

25   today is Chainalysis-level tracing.  This is a very basic

1    notion and basic things that I'm confident -- you can maybe

2    voir dire him more, but that he's got the expertise.

3                THE COURT:  Mr. Brown, anything else on this?

4                MR. BROWN:  No, Your Honor.  Nothing further.

5                THE COURT:  I'm tentatively going to say this is

6    okay.  But if, as Mr. Verret is testifying and in laying out

7    his qualifications it's not clear to me that he's established a

8    foundation on this, then I can revisit the question.

9                MR. EKELAND:  Understood, Your Honor.

10               THE COURT:  So make sure, when you're qualifying him

11   in front of the jury, that you lay a foundation with respect to

12   his expertise or knowledge as to these topics.

13               MR. EKELAND:  Understood, Your Honor.

14               THE COURT:  If that's not done, the government can

15   renew its motion as to him.  All right.  32.

16               MR. EKELAND:  32.  Mr. Verret will testify that there

17   is not sufficient evidence in the record to determine the

18   amount of illicit funds flowing from Tor-based --

19               THE COURT:  We already know this one is not -- maybe

20   this wasn't something he drafted, but it already fails the test

21   if he wants to testify there's not sufficient evidence in the

22   record.

23               MR. EKELAND:  I'll change the phrase sufficient

24   evidence.  To say that -- I mean, I think -- should I read it?

25               THE COURT:  I'm sorry?

1          MR. EKELAND:  I hear the Court.  I'm just going to

2     start from the top with the understanding of what you just

3     said.

4          Mr. Verret will testify that there is not sufficient

5     evidence in the record to determine the amount of illicit funds

6     flowing from Tor-based marketplaces to what the government

7     purports is the Bitcoin Fog cluster.  Mr. Verret will explain

8     that there are legal products offered on the darknet

9     marketplaces and that it would be inaccurate to propose that

10    all the funds flowing from Tor-based marketplaces constitute

11    illicit funds.

12         Mr. Verret will explain that there are many legal

13    products and services available for purchase on Tor-based

14    marketplaces that would not constitute illegal activity.

15    Mr. Verret will testify that the government has wrongfully

16    categorized all funds originating from Tor-based marketplaces

17    as illicit, and that the government has failed to present a

18    breakdown of which funds are related to illegal products and

19    purposes and which funds are associated with completely illegal

20    activity.

21         THE COURT:  Mr. Brown?

22         MR. BROWN:  Your Honor, the government has no issue

23    with -- I think it's the second and third sentences there.  If

24    Mr. Verret just wants to testify based on his knowledge or

25    expertise that there are legal goods and services available on

1    Tor-based markets, we will certainly cross him as a matter of

2    fact on that.

3         THE COURT:  Right.

4         MR. BROWN:  But we don't dispute that.

5         THE COURT:  Okay.

6         MR. BROWN:  What we have a problem with are the first

7    and last sentences, which seem more like commentary on the

8    sufficiency of the government's evidence, which is just that's

9    not his job as an expert to say there's enough evidence or not

10   enough evidence.

11        THE COURT:  I certainly agree with that as I hinted

12   before Mr. Ekeland even finished reading the first sentence.  I

13   don't think he should testify with respect to the sufficiency

14   of the evidence.

15        I also think that, to the extent that he's testifying

16   with respect to the government's quantification of the portion

17   of the business of Bitcoin Fog that came from, in the

18   government's view, illicit marketplaces, that that is, again,

19   an area that is more in Ms. Still's expertise than it is in

20   Mr. Verret's.

21        The question is just whether the clustering

22   methodology the government applied is sound or not.

23        MR. BROWN:  Yes, Your Honor.

24        THE COURT:  So I will allow Mr. Verret to testify

25   with respect to, I think, the second and third sentences, and

1    the remainder of it I will exclude either on the grounds that

2    it is commenting on the sufficiency of the evidence, which is

3    not his role, or that it's an area that is not in his expertise

4    but is more likely in Ms. Still's expertise.

5           So 33?

6           MR. EKELAND:  33.  I don't --

7           THE COURT:  We'll say no to that.

8           MR. EKELAND:  We'll say no to that.

9           I would ask, Your Honor -- I don't know if today is

10   the day to do it -- that we -- the government has offered their

11   own financial expert from KPMG, Sarah Glave.  I was hoping to

12   read through her disclosure as well.

13          I just want to make sure we're all on the same page

14   when it comes to the financial forensics.

15          THE COURT:  That's fair enough.  We can do that.

16   Although it's 4:00 tonight, so we're reconvening at 10:30 on

17   Monday.  If there are a handful of odds and ends, I'm happy to

18   clear them up tonight, but I don't think we should start with a

19   whole area of expert testimony.

20          I have Mr. Cabanas with me here.  You know, I don't

21   know if you want to talk a little bit about the motions in

22   limine.  I'm happy to talk about those if that's the most

23   efficient use.

24          I'd like to finish up by 4:30 since it's a Friday

25   night, and some people actually might be going to temple.

1          MR. EKELAND:  I'm fine knocking off now or I'm fine

2     staying until 4:30, Your Honor.

3          THE COURT:  Can you convey to Ms. Still and/or

4     CipherTrace that the Court urges somebody who can speak on

5     behalf of the company, if they have concerns about the

6     protective order or how to -- whether they can comply with it

7     to be here.  And if they're participating from California, they

8     don't necessarily need to be here at 10:30.  We can handle

9     other issues.

10          Maybe what I should say is by 11:30 I expect somebody

11     to either be in my courtroom or to be available on Zoom to

12     discuss those issues.

13          MR. EKELAND:  I will work on that diligently, Your

14     Honor.  You have my word.

15          THE COURT:  That gives them the weekend to try and

16     figure out what they want to do.  I'm not terribly pleased by

17     their failure to make any efforts, as far as I can tell, to

18     appear today at my request.

19          MR. EKELAND:  Absolutely understood, Your Honor.

20          THE COURT:  Thank you.  Any thoughts on whether we

21     should try to take anything else up today or whether we should

22     just let everyone get going on the weekend?

23          MR. BROWN:  Your Honor, we're happy to power through

24     these two motions in limine.

25          THE COURT:  Why don't we take up just the -- why

1    don't we split the difference and do the motion in limine that

2    addresses the jury nullification issues.

3         MR. BROWN:  Yes, Your Honor.  With respect to the

4    jury nullification issues, the government thinks that it would

5    be prudent to address this now, as it may help -- especially if

6    we're looking at a compressed time for trial -- that it would

7    be helpful to get clear guidance from the Court about what is

8    relevant and what is not relevant argument and evidence.

9         In our motion we outlined several categories.  I want

10    to highlight just a few.  The references to potential

11    punishment -- and I think some of this in the interim between

12    when we briefed the motions in limine and today, we have

13    additional context in the form of defense counsel's public

14    statements.

15         Potential punishment is something that they have

16    frequently brought up, including in front of this Court, and

17    actually made some factually inaccurate representations that

18    Mr. Sterlingov is facing 50 to life.

19         THE COURT:  I was puzzled by that.  I went back and

20    looked at the statute.  I was puzzled.

21         MR. BROWN:  Yes, Your Honor.  Should that come up in

22    an opening statement or in argument or testimony, not only

23    would we want that stricken, but we would have to have a

24    corrected instruction to the jury that that is not what

25    Mr. Sterlingov is facing.  So that's potential punishment.

1          Golden rule arguments.  This is a Kafkaesque

2     prosecution, et cetera, et cetera, claims of government

3     misconduct, expenditures of government resources, reference to

4     discovery disputes, I think, will be -- I think that may come

5     up, the government's charging decision.

6          In addition to what is, sort of, listed out in our

7     motion, some additional concerns would include, kind of, policy

8     arguments, which are really jury nullification arguments about,

9     if you accept the government's theory of venue, this would

10     provide universal criminal jurisdiction over anything that

11     happens on the internet.  That's a policy issue that's inviting

12     the jury to nullify based on a finding of lack of venue.

13          The Court is going to instruct the jury on the legal

14     requirements for venue in this case.  The defense should not be

15     allowed to argue that those legal requirements should be

16     disregarded.

17          Allegations of anti-Russian animus.  First of all,

18     there's absolutely no basis whatsoever.  They should not be

19     allowed to accuse the government -- they can cross-examine

20     witnesses for sure to uncover sources of bias, but they should

21     not be allowed to argue that the prosecution is somehow

22     motivated by ethnic bias or national origin bias.

23          And, finally, something that came up with the -- in

24     the litigation over the subpoena to my co-counsel.  We are very

25     concerned that the defense would make an issue of Ms. Pelker's

1    prior pre-law career as an FBI analyst, and if they do, that

2    would actually -- that would introduce some of the concerns

3    about the advocate witness rule, that that would create jury

4    confusion about whether Ms. Pelker is acting in her capacity as

5    an advocate, which is 100 percent what is happening in this

6    trial, versus should the jury have some question about whether

7    she has some sort of personal knowledge.

8         We think that that can be avoided by a clear order

9    that the defense -- I can say, the government will not bring

10   this up.  But the defense should also not be allowed to bring

11   up -- it's totally irrelevant any more than it's relevant where

12   I used to work or where any defense counsel used to work.

13        We should not be talking about the advocates in this

14   case.  We should be talking about the evidence.

15        THE COURT:  All right.  Mr. Ekeland?

16        MR. EKELAND:  We're not intending to in any way

17   attempt any kind of jury nullification.  I don't think we've

18   really got issues with what the government is discussing here.

19        I will point out for the Court and, actually, I think

20   it would be helpful to have clarification on this, is that the

21   government is bringing in some cooperating witnesses who are

22   facing, I believe, similar -- I need to look and get the

23   details -- deals on similar charges.

24        And we feel, as is practiced in many courts -- and I

25   don't know what it is in this court -- that it's entirely

1    appropriate to cross-examine the cooperating witnesses about

2    the punishments that they're facing because it goes directly to

3    their potential bias.  And in that sense, the government is

4    opening the door to the jury inferring, oh, okay, corroborating

5    witnesses facing this, facing that, and that's serious.  That's

6    my one comment on that.

7         THE COURT:  Let me just pause there for a second.

8    Any disagreement with that, Mr. Brown?

9         MR. BROWN:  Your Honor, we will be -- our intention

10   is to have testimony from cooperating witnesses.  As part of

11   that testimony, it is -- we will likely introduce this

12   ourselves.

13        It is fair game for the defense to elicit testimony

14   about potential sources of bias.  It is commonplace for

15   questions to be asked about the potential criminal punishment

16   facing a cooperating defendant.  We don't deny that.

17        THE COURT:  Right.

18        MR. BROWN:  Our concern is not -- so we understand

19   that.  That's a risk that the government takes in presenting

20   that testimony.

21        That's different from saying, oh, all bets are off

22   and the jury should be able to base its verdict on

23   potential punishment.

24        THE COURT:  So I think we're in agreement with

25   respect to this topic and that it's fair game for

1    cross-examination.

2         The one thing that I will ask, though, Mr. Ekeland --

3    and, unfortunately, I have actually seen this -- is I don't

4    want you to say to the witness, so you were facing 20 years in

5    jail just like Mr. Sterlingov is.  Now, keep it focused on the

6    witness.

7         MR. EKELAND:  Understood.  I have no intention of

8    doing that.  As the government said, it's a pretty standard --

9         THE COURT:  I think it goes to the veracity of the

10   witness's testimony.  That's fine.

11        MR. EKELAND:  I mean, any more than we're holding the

12   government to their public statements, the stuff that -- these

13   old press releases or whatever, I'm not --

14        THE COURT:  You're mumbling a little bit there.

15        MR. EKELAND:  Essentially, we're not -- the stuff

16   about -- we're not intending at all -- certainly not in a

17   federal criminal case, any kind of policy arguments about there

18   will be universal venue or whatever.  That's completely

19   inappropriate.

20        THE COURT:  Okay.

21        MR. EKELAND:  I'm trying to -- this has been a --

22   this case has changed a lot since those initial things.

23        And I do think the issue, unless something changes

24   and the door gets opened -- and I can't even imagine -- I have

25   a hard time imagining how it would be open after the Court's

1    ruling on Ms. Pelker's subpoena.  We're not interested in

2    raising that issue unless something crazy happens, right?

3            What is --

4            THE COURT:  I would just ask -- I don't anticipate

5    this happening -- and I would be surprised if it happened --

6    but I certainly ask that if for some reason you think the door

7    has been opened, you raise it with me outside the presence of

8    the jury before going through that door.

9            MR. EKELAND:  I think that's a definite sidebar.  I

10   wouldn't -- it's not where -- it's not -- I think we're done

11   with that, barring some unforeseen circumstances.

12           THE COURT:  I appreciate that.

13           MR. EKELAND:  I think one area where I do have some

14   question is the confirmation bias and cognitive bias area given

15   what we're seeing in -- what we are seeing in the *Jencks*,

16   what -- you know, our view of the heuristics and the

17   assumptions in this case.

18           And I think that's important in the sense that one of

19   the reasons -- one of the things the jury is going to be

20   asking, and everybody asks when I talk generally about this

21   case, is, well, how did this happen.  I do think that -- I

22   think within proper limitations that we want to explore or make

23   that argument evidentiary-wise in terms of -- I want to avoid

24   -- I want to be able to argue in closing confirmation bias.  I

25   don't know where the Court is at on Dr. Dror.

```
 1              THE COURT:  Nor do I.  I'm still working on that.
 2              MR. EKELAND:  Even if, like, we take the approach
 3      with Dr. Dror that he just testifies generally about the
 4      principles to give the jury the tool, we don't want to before
 5      close say -- and I've never taken this approach in a case
 6      before, so I'm just talking openly with the Court.  Say,
 7      putting on evidence from one of the agents who is really,
 8      really hot to trot to -- and is, like, laser-focused on
 9      Mr. Sterlingov and is 100 percent convinced it's him kind of
10      thing.
11              Like, I don't want to -- I don't feel like it's a
12      hill to die on, so to speak.  But I do think that it is a
13      critical aspect of this case because, from the defense's
14      viewpoint, this is a -- whether accurate or not from the
15      defense's viewpoint, this is a case that is rooted in
16      confirmation bias and that is baked in, in a certain sense, to
17      the very nature of the heuristics.  I think that's the most
18      complex issue.
19              THE COURT:  I think -- I'll let Mr. Brown respond on
20      this.  It's hard for me to rule on that question in the
21      abstract.
22              MR. EKELAND:  Agreed.
23              THE COURT:  If you want to, in examining Ms. Bisbee
24      about tracing or Mr. Scholl about what he did, say, isn't it
25      true that before you even started that process that you were
```

1    working from the premise that it was Mr. Sterlingov; my sense

2    is that seems within bounds to me.

3              On the other hand, if you want to start saying that

4    the prosecutors in this case are looking to get rich on this or

5    that the investigators brought this case because of some desire

6    to become famous in some way -- maybe the one way to think

7    about drawing the line here -- and I throw this out for

8    consideration rather than being a ruling -- is I'm not sure

9    that the government's motivation in bringing the case is

10   relevant or the motivation of the individuals who are involved

11   in that process is relevant.

12             But what was in the head of the witnesses at the

13   times that they engaged in particular analyses is relevant.

14   And so, you know, arguing that people who actually aren't even

15   involved in this case anymore initiated the case because they

16   thought it was going to make them famous in some way or because

17   they anticipated that they might get a job from Chainalysis

18   someday -- you know, the grand jury is the one that decides to

19   return the indictment.

20             Quite frankly, there are never in this jurisdiction,

21   but there are probably are prosecutions out there where

22   prosecutors bring cases because they think they're going to

23   make a name for themselves in bringing the case.  I don't think

24   that makes it relevant for the question before the jury.  Once

25   there's an indictment, they're charged, and the question is

1    just whether the allegations in the indictment are true or not.

2            But if there's some bias in the analysis being put on

3    that you want to bring to the attention of the jury, that

4    strikes me as fair game.

5            MR. EKELAND:  That's helpful.  I'm conscious of

6    running over time here.  I guess this is where it gets -- as I

7    think about this -- and, again, it's not -- I don't see this as

8    a -- in a sense, like the primary evidence, primary thing in

9    this case.

10           But going to the instance where, say, I'm looking at

11   something in discovery and I'm thinking of a concrete

12   example -- but I'm not going to name names or anything right

13   now -- where you've got an investigator who, potentially, does

14   have a financial interest in making a decision related to a

15   piece of evidence in a certain way that's being used in the

16   investigation and that's going to get maybe -- I don't know

17   what was put in front of the grand jury, right?

18           And you see them, actually, being presented with a

19   piece of evidence that could contradict the view that it's

20   Mr. Sterlingov and then they say, oh, no -- okay, no, I'm going

21   to look away from that, right?

22           Then in this hypothetical, is that potential evidence

23   of their financial interest or later payoffs from, say, a

24   company relevant?  And that's where I don't have -- I think

25   it's difficult -- I don't have a clear sense of whether or not

1    that's -- I mean, I, obviously, think --

2         THE COURT:  I instruct the jury in every case that an

3    indictment is just the way the case is commenced.  It's just

4    the allegations that are presented, and the jury should not in

5    any way infer that the defendant is guilty simply because he's

6    been indicted.

7         I think it's sort of a two-way street.  If there's

8    something that tainted the evidence that's being presented to

9    the jury, I think you're entitled to raise that.  If there were

10   people who were involved in the investigation where you think

11   that they may have been operating for inappropriate reasons,

12   I'm not sure that's relevant to the question that is in front

13   of the jury unless there's a reason to believe that it actually

14   tainted the evidence that's being presented to the jury.

15        MR. EKELAND:  I think Dr. Dror made a good point on

16   this issue.  And, of course, I'm going to respect whatever the

17   Court rules on this.  I think you can see I'm struggling with

18   it.

19        It's not so much that, oh, people are consciously

20   being unethical or blahaha [sic], or it's that -- it's sort of

21   operating in the background.  And one thing, at least that

22   strikes me about this case, is the singular focus on

23   Mr. Sterlingov, and from the -- from very early on, from very,

24   very early on.

25        I think the jury is going to be in some sense

1    wondering about that or asking or -- when I talk about the

2    general nature of this case to people, they ask, well, why?

3    And that, in a certain sense, is a very, I think, important

4    thing for them to have information on.

5          And I do, rightly or wrongly, from my viewpoint --

6    and it's for the jury to decide -- I do think part that of is

7    confirmation bias and cognitive bias by agents doing honest,

8    diligent work but with all these factors affecting them.

9          THE COURT:  I think for present purposes, you need as

10   confirmation bias by the witnesses or those who are offering

11   testimony or those whose analysis or evidence is going to be

12   offered to the jury.

13         The fact that there's somebody who works in the FBI

14   has nothing to do with this case and thought for sure it must

15   be Mr. Sterlingov.  If it's -- if his evidence -- and maybe he

16   wrote some letter or report that they threw in the garbage.  If

17   it's not anything that's going to be evidence in the case, I

18   don't see why that's relevant.

19         But if you can tie it in some way to the evidence in

20   the case and show that the evidence is slanted in some way,

21   then that's fair game.  But this is all fairly abstract because

22   you're being abstract with me as well.

23         What I would ask, though, is just to be cautious

24   about this.  And if there's anything that you want to raise

25   with me on the sidebar before going down the road, it's better

1    to do that because I don't want to be correcting things in

2    front of the jury rather than making sure that the evidence

3    comes in correctly to start with.  When you correct things in

4    front of the jury, nobody is happy when that happens.

5            MR. EKELAND:  Nobody is happy.

6            THE COURT:  It's better to raise it in advance.  I

7    don't know if you've seen this yet, but we're going to have

8    telephones in here at counsel table that are wireless.  And the

9    way we'll do the bench conferences is you can just stay at

10   counsel table, and I'll just put on the husher and we can pick

11   up the telephone, and we can all have a conversation.

12           MR. EKELAND:  Okay.  That's a new one for me.

13           THE COURT:  It was a COVID innovation, but it's been

14   a good one.

15           MR. EKELAND:  Okay.

16           THE COURT:  In light of this, I'm going to grant the

17   government's motion in limine at Docket 65, but with the

18   understanding that -- I think that this was implicit in the

19   motion itself.  The government is not trying to exclude any

20   legitimate cross-examination of witnesses with respect to

21   biases or anything that may have affected their testimony or

22   analysis in the case.

23           MR. EKELAND:  Understood.

24           THE COURT:  All right.  Since it's almost 4:30, why

25   don't we adjourn.  We'll reconvene at 10:30 on Monday.

1           Please do everything you can to make sure that we

2     have an answer from CipherTrace and someone here to tell us

3     what's going on at that point; and convey to them as well that

4     the goal here is not to put them in a gotcha situation.  The

5     goal is to make sure that, consistent with the proprietary

6     interests and the law enforcement interests that are at stake

7     in this case, that Ms. Still can review the material and that

8     we put up a wall in a way to make sure there's not any concern

9     for anyone involved.

10          MR. EKELAND:  Understood.

11          THE COURT:  Have a nice weekend and Happy Rosh

12    Hashanah everyone.

13          (The hearing adjourned at 4:25 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3           I, TAMARA M. SEFRANEK, do hereby certify that the

 4      above and foregoing constitutes a true and accurate transcript

 5      of my stenographic notes and is a full, true and complete

 6      transcript of the proceedings to the best of my ability.

 7               Dated this 3rd day of December, 2023.

 8

 9                         /s/ Tamara M. Sefranek_____
                           Tamara M. Sefranek, RMR, CRR, CRC
10                         Official Court Reporter
                           Room 6714
11                         333 Constitution Avenue, N.W.
                           Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**/**

**/s** [1] - 123:9

**1**

**1** [1] - 90:9
**10** [1] - 8:7
**100** [4] - 62:19, 66:17, 112:5, 116:9
**10005** [1] - 1:21
**10:08** [1] - 1:6
**10:30** [5] - 15:5, 32:10, 108:16, 109:8, 121:25
**10th** [5] - 3:16, 11:17, 15:2, 16:13, 32:5
**11:30** [1] - 109:10
**1234** [1] - 65:21
**12345** [1] - 82:6
**12:10** [1] - 15:5
**12:50** [1] - 41:7
**12th** [1] - 4:6
**1301** [1] - 1:17
**133** [1] - 99:20
**145-5** [2] - 43:12, 43:19
**15** [8] - 1:6, 8:7, 23:6, 43:16, 43:18, 43:19, 46:16
**158** [1] - 58:13
**16** [1] - 46:20
**17** [2] - 47:14, 48:8
**18** [2] - 49:19, 50:10
**19** [8] - 50:10, 56:17, 57:12, 59:19, 60:3, 63:21, 65:4, 66:15
**1:00** [1] - 40:21
**1:21-CR-0399** [1] - 1:3

**2**

**20** [3] - 41:11, 50:10, 114:4
**20001** [3] - 1:12, 1:24, 123:11
**20005** [1] - 1:17
**202-354-3246** [1] - 1:25
**2023** [2] - 1:6, 123:7
**20530** [1] - 1:14
**21** [1] - 50:10
**21-399** [1] - 2:2
**22** [1] - 50:10
**23** [1] - 50:10
**23rd** [1] - 4:6
**24** [6] - 50:23, 51:8, 51:9, 56:14, 57:6, 71:12
**25** [2] - 76:15, 79:20

**26** [2] - 84:14, 84:21
**27** [3] - 84:22, 86:7
**28** [1] - 88:16
**28th** [1] - 4:5
**29** [1] - 91:11
**2:00** [1] - 40:21
**2:05** [1] - 41:7

**3**

**30** [2] - 1:20, 92:8
**31** [2] - 99:25, 103:2
**32** [2] - 105:15, 105:16
**33** [2] - 108:5, 108:6
**333** [2] - 1:24, 123:11
**3:00** [1] - 32:24
**3:30** [3] - 42:14, 42:23, 76:9
**3rd** [2] - 3:16, 123:7

**4**

**4** [1] - 37:18
**401** [6] - 60:9, 61:23, 62:13, 64:6, 71:7, 84:10
**403** [16] - 48:23, 60:9, 61:23, 62:13, 64:6, 70:21, 71:7, 81:18, 82:14, 82:25, 83:25, 84:10, 97:12, 97:16, 98:3, 98:8
**4:00** [1] - 108:16
**4:25** [1] - 122:13
**4:30** [3] - 108:24, 109:2, 121:24

**5**

**5** [1] - 45:1
**50** [1] - 110:18
**5:00** [1] - 76:8
**5th** [1] - 4:7

**6**

**6** [1] - 17:2
**601** [1] - 1:11
**65** [2] - 14:5, 121:17
**66** [1] - 14:8
**6714** [2] - 1:23, 123:10
**68** [1] - 14:8
**69** [1] - 14:6
**6th** [1] - 29:11

**7**

**7** [2] - 66:1, 66:2
**702** [4] - 71:7, 75:3, 84:10, 92:4

**704** [3] - 69:9, 69:10, 69:11
**704's** [1] - 70:12

**8**

**81** [1] - 14:6
**82** [1] - 14:9
**8th** [1] - 1:20

**9**

**90** [3] - 44:25, 45:17, 67:12
**950** [1] - 1:14
**9th** [1] - 3:17

**A**

**a.m** [1] - 15:5
**A.M** [1] - 1:6
**ability** [3] - 6:2, 18:23, 123:6
**able** [20] - 3:4, 7:6, 7:22, 9:1, 9:7, 28:2, 32:19, 40:25, 41:1, 41:18, 42:19, 51:4, 53:18, 59:3, 59:15, 90:19, 97:25, 101:20, 113:22, 115:24
**abrogates** [1] - 69:11
**abrogating** [1] - 70:7
**absent** [2] - 82:15, 86:3
**absolute** [1] - 82:16
**absolutely** [5] - 6:16, 82:7, 83:8, 109:19, 111:18
**abstract** [3] - 116:21, 120:21, 120:22
**accept** [1] - 111:9
**access** [6] - 4:18, 9:9, 18:18, 19:6, 19:12, 19:23
**accessed** [1] - 74:24
**accommodate** [4] - 7:11, 7:18, 28:19, 30:20
**accommodation** [1] - 30:16
**accord** [1] - 74:9
**account** [18] - 52:14, 52:15, 53:25, 55:23, 56:18, 56:22, 57:12, 60:25, 61:2, 61:3, 65:3, 66:15, 85:9, 86:12, 90:9, 90:10
**accountant** [6] - 52:13, 56:24, 59:6,

62:15, 68:12, 68:21
**accounting** [22] - 51:12, 56:25, 57:7, 57:10, 57:16, 57:23, 58:17, 58:20, 59:4, 59:16, 60:2, 61:12, 62:9, 62:15, 63:5, 63:19, 64:5, 64:16, 64:20, 65:2, 69:3, 73:12
**accounts** [4] - 43:23, 54:12, 85:22, 90:16
**accurate** [5] - 74:1, 92:3, 92:6, 116:14, 123:4
**accuse** [2] - 24:20, 111:19
**acquiring** [1] - 39:3
**Act** [2] - 10:13, 14:22
**acted** [1] - 49:2
**acting** [1] - 112:4
**Action** [1] - 1:2
**action** [1] - 22:18
**actions** [1] - 29:10
**active** [1] - 104:16
**activity** [11] - 29:10, 45:1, 45:2, 45:14, 51:15, 51:19, 51:24, 100:9, 100:13, 106:14, 106:20
**actual** [3] - 56:13, 75:14, 91:23
**Adam** [1] - 87:21
**adding** [1] - 20:17
**addition** [2] - 73:17, 111:6
**additional** [2] - 110:13, 111:7
**additionally** [1] - 36:9
**address** [25] - 11:11, 11:24, 13:25, 17:13, 22:14, 31:6, 31:17, 31:23, 32:6, 40:23, 49:16, 49:17, 54:25, 55:4, 55:6, 56:11, 60:19, 62:19, 62:23, 74:20, 74:21, 74:22, 74:23, 74:24, 110:5
**addressed** [1] - 31:6
**addresses** [9] - 33:10, 51:18, 55:6, 55:17, 79:24, 80:2, 90:2, 110:2
**addressing** [1] - 39:8
**adjourn** [2] - 40:20, 121:25
**adjourned** [1] - 122:13
**administrator** [1] - 101:2
**admission** [1] - 31:4,

31:5, 31:13
**admit** [1] - 94:20
**admitted** [1] - 31:1
**admittedly** [1] - 10:14
**advance** [1] - 121:6
**advantage** [1] - 21:23
**advocate** [2] - 112:3, 112:5
**advocates** [1] - 112:13
**affect** [1] - 4:11
**affected** [1] - 121:21
**affecting** [1] - 120:8
**afraid** [1] - 22:20
**afternoon** [6] - 32:2, 32:14, 32:21, 33:1, 33:4, 41:13
**afterwards** [2] - 24:17, 35:10
**agencies** [1] - 48:21
**agenda** [2] - 8:3, 8:4
**agents** [2] - 116:7, 120:7
**ago** [6] - 30:6, 34:1, 35:2, 40:11, 41:11, 85:19
**agree** [13] - 35:25, 36:19, 36:21, 47:11, 48:1, 50:16, 51:1, 51:8, 88:13, 89:22, 91:9, 94:2, 107:11
**agreed** [3] - 29:16, 35:19, 116:22
**agreement** [2] - 48:4, 113:24
**agrees** [6] - 54:6, 54:23, 55:24, 55:25, 71:6, 98:11
**ahead** [4] - 14:12, 46:9, 50:23, 84:22
**AHMED** [1] - 1:19
**Ahmed** [4] - 2:11, 31:7, 31:13, 31:16
**Ahmed's** [1] - 30:24
**ahold** [2] - 29:21, 76:1
**AICPA** [2] - 80:5, 80:9
**air** [1] - 82:21
**Alden** [2] - 2:7, 95:22
**ALDEN** [1] - 1:13
**Alexandria** [1] - 4:21
**algorithm** [1] - 23:15
**algorithms** [1] - 23:14
**allayed** [1] - 5:24
**allegation** [1] - 61:13
**allegations** [4] - 18:15, 111:17, 118:1, 119:4
**alleging** [1] - 72:14
**alley** [1] - 79:8
**allocation** [1] - 46:3
**allow** [5] - 21:21,

29:10, 69:18, 74:11, 107:24
**allowed** [7] - 9:16, 69:25, 70:1, 111:15, 111:19, 111:21, 112:10
**almost** [1] - 121:24
**altered** [1] - 92:9
**alternatives** [2] - 86:19, 86:24
**amenable** [1] - 29:24
**America** [1] - 2:3
**AMERICA** [1] - 1:2
**amount** [3] - 94:7, 105:18, 106:5
**analogous** [1] - 36:15
**analogy** [1] - 65:15
**analyses** [1] - 117:13
**analysis** [28] - 27:11, 32:19, 32:20, 41:1, 44:25, 46:2, 48:10, 51:23, 51:25, 52:4, 53:10, 55:13, 56:5, 58:18, 60:18, 65:24, 71:14, 71:17, 71:19, 77:16, 80:17, 81:4, 102:8, 102:9, 104:8, 118:2, 120:11, 121:22
**analyst** [1] - 112:1
**angles** [1] - 29:13
**animus** [1] - 111:17
**anonymity** [1] - 44:6
**answer** [8] - 4:25, 5:1, 15:8, 28:10, 30:10, 35:21, 88:7, 122:2
**anti** [3] - 34:25, 36:11, 111:17
**anti-competitive** [1] - 34:25, 36:11
**anti-Russian** [1] - 111:17
**anticipate** [1] - 115:4
**anticipated** [2] - 40:10, 117:17
**anyway** [3] - 25:21, 39:6, 70:22
**appear** [4] - 5:21, 47:4, 100:14, 109:18
**applicable** [1] - 88:24
**application** [2] - 2:12, 89:9
**applied** [2] - 20:21, 107:22
**applies** [1] - 21:8
**applying** [2] - 59:18, 79:18
**appreciate** [3] - 6:18, 9:13, 115:12
**approach** [4] - 50:1,

57:8, 116:2, 116:5
**approached** [1] - 18:1
**appropriate** [10] - 18:25, 28:6, 32:22, 68:22, 72:3, 75:16, 84:11, 86:7, 96:6, 113:1
**appropriated** [1] - 25:19
**area** [11] - 50:1, 59:1, 59:17, 61:24, 93:4, 102:5, 107:19, 108:3, 108:19, 115:13, 115:14
**areas** [1] - 61:25
**argue** [20] - 4:10, 8:8, 20:4, 20:11, 54:10, 60:16, 66:19, 66:24, 67:5, 67:7, 67:13, 80:19, 80:25, 81:4, 81:7, 102:13, 103:21, 111:15, 111:21, 115:24
**argued** [1] - 104:2
**arguendo** [1] - 73:8
**arguing** [7] - 40:11, 53:2, 61:17, 81:13, 82:13, 93:23, 117:14
**argument** [13] - 8:6, 13:14, 28:16, 55:18, 63:1, 64:12, 86:16, 89:10, 101:11, 101:15, 110:8, 110:22, 115:23
**arguments** [9] - 11:10, 13:11, 14:4, 67:6, 85:12, 111:1, 111:8, 114:17
**arrange** [1] - 5:20
**article** [13] - 95:7, 95:8, 95:10, 96:15, 96:17, 97:3, 97:13, 97:15, 98:13, 99:8, 99:10, 99:21
**articles** [2] - 95:17, 95:20
**articulation** [1] - 25:12
**ASCFE** [1] - 80:6
**aside** [1] - 73:21
**aspect** [1] - 116:13
**assemble** [1] - 33:13
**assert** [1] - 97:7
**asserting** [1] - 77:25
**assertion** [4] - 48:10, 48:13, 58:24, 92:1
**assertions** [1] - 83:11
**assessments** [1] - 80:3
**asset** [13] - 58:21, 59:14, 62:10, 63:20,

68:6, 69:4, 74:5, 88:17, 91:14, 91:16, 91:17, 91:18, 91:24
**assets** [7] - 88:23, 92:12, 92:17, 92:21, 95:12, 96:13, 96:25
**assign** [1] - 44:4
**assist** [1] - 14:1
**associate** [1] - 98:1
**associated** [4] - 51:18, 91:15, 92:20, 106:19
**Association** [1] - 80:11
**association** [1] - 98:17
**assume** [2] - 57:19, 65:25
**assuming** [7] - 3:11, 18:15, 47:10, 51:1, 67:1, 73:7, 101:4
**assumption** [8] - 49:23, 78:22, 78:23, 79:23, 80:1, 81:21, 81:22, 81:23
**assumptions** [4] - 51:14, 57:18, 58:7, 115:17
**assurances** [1] - 26:18
**attach** [1] - 2:23
**attempt** [1] - 112:17
**attempting** [1] - 51:23
**attend** [1] - 87:2
**attention** [2] - 62:1, 118:3
**attorney** [1] - 31:10
**Attorney** [1] - 95:22
**Attorney's** [1] - 80:17
**attorneys** [1] - 70:15
**attorneys'** [2] - 16:24, 17:5
**attribute** [14] - 43:22, 46:25, 51:15, 51:18, 51:23, 51:25, 59:15, 68:13, 74:9, 86:13, 88:23, 92:16, 92:21, 96:14
**attributed** [2] - 59:25, 86:9
**attributes** [1] - 83:21
**attributing** [3] - 52:6, 68:6, 69:4
**attribution** [13] - 57:16, 59:6, 63:18, 65:2, 65:14, 66:16, 74:5, 84:22, 88:17, 90:3, 95:15, 97:11, 97:21
**attributions** [5] - 57:1,

57:10, 57:24, 62:10, 83:12
**AUSA** [1] - 95:22
**authentic** [1] - 13:10
**authentication** [2] - 11:22, 13:5
**authenticity** [1] - 12:24
**availability** [4] - 32:9, 40:22, 41:13, 42:12
**available** [12] - 14:16, 16:8, 32:24, 42:14, 42:22, 47:21, 47:22, 76:9, 80:12, 106:13, 106:25, 109:11
**Ave** [1] - 1:17
**Avenue** [3] - 1:14, 1:24, 123:11
**averse** [2] - 23:19, 26:13
**avoid** [3] - 21:9, 89:4, 115:23
**avoided** [1] - 112:8
**aware** [1] - 28:8

## B

**background** [1] - 119:21
**bad** [1] - 79:8
**baffled** [1] - 40:7
**baked** [1] - 116:16
**balance** [1] - 27:7
**ballpark** [1] - 68:3
**bank** [13] - 52:13, 52:14, 65:18, 79:5, 79:6, 89:20, 96:18, 96:20, 96:23, 99:1, 99:2
**banking** [1] - 89:14
**banks** [1] - 89:19
**bar** [4] - 2:19, 31:3, 31:12, 41:20
**Bar** [1] - 87:19
**barring** [1] - 115:11
**base** [1] - 113:22
**based** [25] - 39:15, 45:8, 53:2, 54:25, 55:4, 56:5, 56:16, 58:19, 66:7, 79:23, 80:4, 81:9, 81:13, 81:23, 83:19, 103:14, 104:8, 105:18, 106:6, 106:10, 106:13, 106:16, 106:24, 107:1, 111:12
**basic** [3] - 74:6, 104:25, 105:1
**basis** [13] - 13:19,

20:11, 33:11, 33:25, 48:16, 52:22, 55:15, 58:2, 79:14, 94:1, 95:4, 102:23, 111:18
**become** [1] - 117:6
**BEFORE** [1] - 1:8
**beforehand** [1] - 35:10
**begin** [4] - 4:9, 7:22, 15:1, 32:19
**beginning** [1] - 97:18
**behalf** [2] - 14:15, 109:5
**behavioral** [1] - 20:20
**belabor** [2] - 69:1, 75:24
**believes** [1] - 71:13
**belonged** [1] - 81:25
**below** [1] - 10:14
**bench** [2] - 87:2, 121:9
**best** [5] - 6:17, 30:2, 94:21, 100:25, 123:6
**beta** [11] - 100:4, 100:5, 100:9, 100:15, 101:8, 101:19, 101:24, 102:15, 102:17, 103:22, 104:2
**bets** [1] - 113:21
**better** [5] - 7:15, 67:6, 75:3, 120:25, 121:6
**between** [12] - 29:18, 53:14, 55:8, 55:22, 56:17, 62:22, 79:24, 80:2, 94:9, 94:23, 97:6, 110:11
**beyond** [4] - 67:16, 68:15, 86:10, 87:11
**bias** [13] - 111:20, 111:22, 113:3, 113:14, 115:14, 115:24, 116:16, 118:2, 120:7, 120:10
**biases** [1] - 121:21
**Bisbee** [2] - 46:9, 116:23
**bit** [11] - 14:13, 21:2, 22:4, 27:14, 61:5, 73:24, 84:16, 88:9, 94:15, 108:21, 114:14
**Bitcoin** [43] - 54:7, 54:12, 54:24, 55:4, 55:6, 55:10, 55:13, 55:16, 55:17, 55:23, 56:15, 56:19, 56:21, 57:11, 57:13, 57:14, 59:22, 60:4, 60:5, 63:15, 63:20, 65:3,

65:5, 65:6, 66:13, 66:16, 72:15, 79:23, 80:1, 85:1, 85:3, 85:4, 97:7, 100:3, 100:22, 100:25, 101:7, 101:8, 102:25, 104:19, 104:20, 106:7, 107:17
**Bitcoins** [1] - 93:25
**blahaha** [1] - 119:20
**blanket** [1] - 17:20
**blindness** [1] - 14:7
**block** [1] - 83:21
**blockchain** [50] - 21:9, 27:1, 41:21, 45:10, 47:5, 48:10, 50:11, 51:15, 51:23, 51:25, 52:4, 53:2, 54:2, 55:25, 57:21, 58:18, 59:18, 71:14, 71:17, 71:19, 72:12, 72:13, 72:17, 72:20, 73:1, 73:10, 75:19, 77:16, 78:1, 79:12, 83:21, 86:14, 88:20, 88:24, 89:2, 89:4, 89:13, 90:1, 90:24, 91:3, 91:13, 91:22, 91:23, 92:9, 92:11, 93:7, 95:25, 100:2, 100:18, 100:20
**blockchain-related** [1] - 41:21
**board** [2] - 87:20, 104:21
**bogged** [1] - 64:22
**borders** [1] - 45:3
**borrow** [1] - 65:15
**bottom** [2] - 26:17, 31:9
**bounds** [1] - 117:2
**box** [2] - 36:24, 37:9
**branch** [1] - 10:20
**break** [4] - 7:17, 14:12, 16:4, 44:3
**breakdown** [1] - 106:18
**brick** [1] - 90:13
**briefed** [1] - 110:12
**briefing** [1] - 14:7
**bring** [8] - 9:16, 9:17, 69:7, 85:18, 112:9, 112:10, 117:22, 118:3
**bringing** [6] - 9:19, 24:16, 51:9, 112:21, 117:9, 117:23
**brought** [4] - 51:2, 62:1, 110:16, 117:5

**brown** [1] - 100:16
**BROWN** [43] - 1:10, 43:8, 48:6, 48:8, 52:2, 53:1, 53:5, 53:9, 53:12, 53:17, 58:1, 71:6, 71:12, 76:5, 81:3, 81:12, 87:17, 87:18, 89:7, 90:4, 91:25, 92:7, 92:24, 93:3, 93:13, 93:16, 94:4, 95:1, 95:8, 99:16, 100:17, 101:10, 101:25, 105:4, 106:22, 107:4, 107:6, 107:23, 109:23, 110:3, 110:21, 113:9, 113:18
**Brown** [18] - 2:7, 57:25, 65:15, 71:4, 71:18, 73:3, 75:2, 87:17, 89:5, 89:23, 91:19, 92:23, 95:22, 96:3, 105:3, 106:21, 113:8, 116:19
**BTC** [1] - 56:22
**BTC-e** [1] - 56:22
**Building** [1] - 29:15
**building** [1] - 42:11
**burden** [1] - 67:16
**business** [3] - 11:23, 13:9, 107:17

## C

**Cabanas** [6] - 8:5, 8:6, 11:10, 11:21, 33:5, 108:20
**calendar** [1] - 76:4
**California** [5] - 23:6, 24:8, 87:13, 87:14, 109:7
**camera** [2] - 29:13, 29:14
**candor** [1] - 18:5
**cannot** [10] - 5:7, 5:19, 13:18, 16:25, 76:17, 77:5, 82:11, 97:11, 98:13, 98:19
**capacity** [1] - 112:4
**Capitol** [2] - 29:13, 29:15
**captured** [1] - 94:6
**car** [4] - 65:17, 66:5, 81:25, 82:8
**care** [1] - 68:22
**career** [3] - 22:15, 22:19, 112:1
**carefully** [2] - 70:1, 70:19

**Case** [1] - 2:2
**case** [80] - 3:5, 3:9, 3:13, 18:19, 19:15, 20:8, 25:17, 26:25, 27:20, 28:3, 28:4, 28:5, 31:2, 36:6, 37:23, 37:24, 40:5, 40:11, 43:24, 52:10, 54:14, 61:11, 61:13, 64:9, 64:10, 65:16, 65:20, 66:22, 67:11, 67:19, 68:20, 69:7, 69:19, 71:9, 71:17, 73:23, 78:5, 79:7, 83:15, 84:9, 84:11, 84:13, 85:17, 85:20, 89:9, 89:23, 90:8, 90:15, 93:25, 95:23, 96:8, 97:18, 101:18, 102:9, 111:14, 112:14, 114:17, 114:22, 115:17, 115:21, 116:5, 116:13, 116:15, 117:4, 117:5, 117:9, 117:15, 117:23, 118:9, 119:2, 119:3, 119:22, 120:2, 120:14, 120:17, 120:20, 121:22, 122:7
**cases** [11] - 27:17, 27:22, 27:24, 29:4, 29:11, 67:12, 68:19, 69:12, 70:8, 83:23, 117:22
**cash** [3] - 52:15, 52:16, 96:19
**catch** [2] - 96:18, 99:1
**categories** [1] - 110:9
**categorized** [1] - 106:16
**category** [1] - 94:21
**cautious** [1] - 120:23
**cell** [1] - 9:5
**central** [1] - 70:24
**CEO** [1] - 13:1
**certain** [17] - 19:6, 38:3, 39:17, 39:23, 52:5, 67:14, 67:17, 67:18, 72:24, 77:23, 81:15, 86:15, 92:1, 96:25, 116:16, 118:15, 120:3
**certainly** [12] - 23:9, 23:21, 40:10, 48:15, 51:6, 81:7, 81:12, 82:4, 107:1, 107:11, 114:16, 115:6
**certainty** [3] - 60:24,

62:19, 84:6
**CERTIFICATE** [1] - 123:1
**certification** [8] - 11:24, 12:2, 12:20, 13:8, 13:12, 59:17, 72:21, 72:22
**certifications** [3] - 12:5, 12:12, 12:23
**certified** [4] - 56:23, 57:8, 62:10, 104:15
**Certified** [1] - 80:11
**certify** [1] - 123:3
**cetera** [2] - 111:2
**CFE** [4] - 57:9, 59:9, 80:7, 80:11
**CFF** [9] - 57:9, 59:9, 59:11, 61:14, 61:15, 62:16, 64:9, 66:8, 68:25
**chain** [10] - 12:3, 22:5, 49:25, 52:7, 57:17, 57:21, 59:21, 59:22, 85:5, 86:22
**Chainalysis** [60] - 21:6, 21:20, 21:22, 21:24, 22:18, 24:7, 24:8, 24:15, 24:18, 26:10, 26:20, 28:23, 33:13, 36:12, 37:2, 38:7, 38:11, 38:17, 38:18, 39:3, 39:16, 39:18, 43:21, 45:17, 46:3, 46:5, 46:11, 46:18, 46:24, 47:6, 47:17, 47:21, 49:24, 52:9, 52:12, 52:16, 52:17, 52:20, 53:19, 54:19, 54:21, 54:25, 58:3, 58:4, 58:7, 58:15, 58:25, 60:7, 60:8, 71:20, 71:21, 73:4, 78:11, 83:1, 85:1, 102:8, 104:25, 117:17
**Chainalysis's** [7] - 17:15, 19:13, 25:19, 27:11, 37:12, 51:13, 58:10
**Chainalysis-level** [4] - 71:21, 73:4, 102:8, 104:25
**chains** [1] - 22:7
**challenge** [1] - 53:7
**challenged** [1] - 95:19
**challenged-level** [1] - 95:19
**challenges** [1] - 91:15
**challenging** [1] - 49:9
**chance** [3] - 8:15,

18:11, 36:17
**change** [4] - 4:2, 4:3, 53:15, 105:23
**changed** [5] - 57:19, 69:18, 85:23, 93:12, 114:22
**changes** [1] - 114:23
**changing** [2] - 13:6, 13:21
**characteristics** [3] - 22:6, 101:22, 102:14
**characterization** [1] - 100:3
**characterize** [1] - 98:25
**charge** [2] - 10:15, 96:22
**charged** [1] - 117:25
**charges** [1] - 112:23
**charging** [1] - 111:5
**check** [6] - 3:1, 8:11, 16:4, 30:9, 87:9
**check-in** [1] - 8:11
**checked** [5] - 42:8, 42:9, 42:10
**Chevrolet** [1] - 82:6
**Chevy** [3] - 65:19, 65:20, 66:3
**choice** [5] - 10:9, 10:11, 11:4, 11:5
**choose** [2] - 10:21, 40:17
**Chris** [1] - 95:22
**CHRISTOPHER** [1] - 1:10
**Christopher** [1] - 2:7
**CipherTrace** [24] - 5:6, 5:19, 14:14, 21:13, 21:16, 22:10, 23:20, 24:1, 24:2, 24:8, 24:10, 25:5, 32:15, 36:14, 38:24, 40:23, 41:22, 48:20, 55:1, 72:21, 76:1, 87:7, 109:4, 122:2
**CipherTrace's** [5] - 25:13, 25:24, 27:14, 29:21, 35:14
**circumstances** [5] - 19:8, 24:5, 27:17, 34:18, 115:11
**citation** [1] - 50:8
**citations** [1] - 95:17
**cited** [1] - 102:7
**cites** [1] - 92:21
**CJA** [7] - 10:5, 10:7, 11:7, 15:8, 15:9, 15:10, 15:22
**claiming** [1] - 71:14
**claims** [1] - 111:2

**clarification** [10] - 16:19, 17:9, 18:7, 19:17, 25:9, 62:5, 64:22, 69:9, 70:4, 112:20
**clarified** [1] - 19:19
**clarifies** [1] - 36:5
**clarify** [2] - 71:5, 71:12
**clause** [1] - 26:6
**clear** [15] - 17:22, 25:11, 34:4, 35:1, 35:18, 53:17, 58:4, 66:17, 69:10, 102:19, 105:7, 108:18, 110:7, 112:8, 118:25
**clear-cut** [1] - 53:17
**clearly** [1] - 67:24
**Clearnet** [1] - 85:6
**clerk** [2] - 15:3, 32:9
**client** [1] - 20:14
**clients** [1] - 10:15
**close** [1] - 116:5
**closer** [2] - 39:18, 94:20
**closing** [4] - 67:6, 101:11, 101:23, 115:24
**cluster** [17] - 20:19, 38:4, 38:6, 52:4, 54:7, 54:12, 55:7, 55:16, 56:16, 56:19, 56:21, 57:14, 60:1, 65:5, 66:16, 106:7
**clustered** [2] - 55:4, 55:17
**clustering** [5] - 38:2, 54:2, 54:4, 97:24, 107:21
**clusters** [2] - 37:21, 52:1
**co** [4] - 55:4, 78:15, 95:17, 111:24
**co-counsel** [2] - 95:17, 111:24
**co-spend** [2] - 55:4, 78:15
**Code** [1] - 80:11
**code** [2] - 23:14, 82:17
**cognitive** [2] - 115:14, 120:7
**CoinJoin** [1] - 78:15
**CoinJoins** [1] - 58:14
**collect** [1] - 38:13
**collection** [1] - 39:18
**COLUMBIA** [1] - 1:1
**comfortable** [2] - 24:14, 50:21
**coming** [4] - 34:20, 50:19, 54:4, 65:3

**commence** [2] - 47:17, 48:11
**commenced** [2] - 4:13, 119:3
**comment** [1] - 113:6
**commentary** [1] - 107:7
**commenting** [1] - 108:2
**comments** [1] - 22:11
**committee** [4] - 19:17, 70:5, 70:6, 70:14
**common** [5] - 49:25, 52:7, 81:8, 102:1, 104:13
**commonplace** [1] - 113:14
**communal** [1] - 93:11
**companies** [3] - 23:10, 24:12, 26:13
**company** [7] - 14:16, 25:18, 37:1, 37:8, 87:24, 109:5, 118:24
**competence** [1] - 45:4
**competitive** [4] - 26:7, 29:19, 34:25, 36:11
**competitor** [3] - 21:18, 21:21, 21:23
**competitors** [1] - 27:18
**complete** [3] - 89:3, 91:4, 123:5
**completely** [8] - 11:1, 23:18, 36:21, 39:4, 61:4, 78:4, 106:19, 114:18
**complex** [2] - 104:24, 116:18
**complicated** [2] - 59:24, 72:16
**comply** [1] - 109:6
**component** [1] - 35:2
**comprehension** [1] - 95:20
**compressed** [1] - 110:6
**computer** [1] - 82:17
**concern** [15] - 5:8, 18:14, 22:9, 25:13, 26:3, 44:13, 66:23, 82:15, 82:25, 83:7, 83:25, 91:9, 97:17, 113:18, 122:8
**concerned** [8] - 5:9, 21:6, 21:7, 44:11, 45:19, 94:15, 98:2, 111:25
**concerns** [19] - 5:23, 8:13, 8:14, 22:8, 25:12, 26:2, 26:3,

28:19, 29:19, 36:13, 44:8, 44:9, 45:22, 90:18, 98:8, 109:5, 111:7, 112:2
**conclude** [6] - 63:7, 66:3, 67:15, 75:1, 81:24, 101:8
**concluded** [1] - 47:4
**concludes** [1] - 29:7
**concluding** [1] - 66:21
**conclusion** [8] - 64:13, 64:17, 69:11, 70:7, 70:9, 70:24, 98:14, 98:19
**conclusions** [6] - 62:2, 63:6, 69:13, 69:19, 73:9, 82:18
**concrete** [2] - 53:21, 118:11
**condition** [3] - 69:13, 70:10, 99:6
**conditions** [1] - 104:6
**conduct** [1] - 47:1
**confer** [6] - 8:15, 9:24, 10:10, 11:2, 11:6, 15:16
**conference** [2] - 3:22, 24:15
**CONFERENCE** [2] - 1:4, 1:7
**conferences** [1] - 121:9
**conferring** [1] - 23:15
**confident** [4] - 27:16, 29:1, 103:17, 105:1
**confirm** [4] - 9:14, 39:16, 39:17, 92:11
**confirmation** [7] - 47:19, 48:12, 115:14, 115:24, 116:16, 120:7, 120:10
**confused** [1] - 59:9
**confusion** [1] - 112:4
**connection** [2] - 92:16, 93:22
**conscious** [1] - 118:5
**consciously** [1] - 119:19
**consequences** [1] - 15:16
**consider** [4] - 6:11, 69:8, 82:4, 86:18
**consideration** [1] - 117:8
**considered** [2] - 82:11, 83:23
**considering** [1] - 21:13
**considers** [1] - 73:11

**consistent** [11] - 56:5, 68:24, 68:25, 86:21, 100:7, 102:1, 102:2, 102:14, 102:17, 102:24, 122:5
**consolidates** [1] - 55:6
**constitute** [2] - 106:10, 106:14
**constitutes** [1] - 123:4
**Constitution** [2] - 1:24, 123:11
**contact** [1] - 41:18
**contemplate** [1] - 29:23
**contempt** [6] - 22:18, 23:23, 36:13, 36:18, 37:3, 37:4
**contention** [1] - 100:24
**context** [8] - 28:3, 28:7, 49:17, 88:20, 88:25, 89:14, 110:13
**continuance** [5] - 3:9, 9:9, 20:6, 33:23, 33:25
**continuances** [1] - 33:19
**continue** [3] - 8:7, 32:6, 76:13
**continuing** [1] - 11:19
**contradict** [1] - 118:19
**control** [12] - 52:7, 58:13, 78:14, 88:23, 91:17, 92:11, 92:17, 92:21, 93:24, 93:25, 96:14, 97:7
**controlled** [1] - 54:24
**controlling** [1] - 59:20
**controls** [2] - 60:21, 91:13
**controverted** [1] - 97:4
**conversation** [7] - 7:22, 14:20, 14:21, 14:25, 25:4, 25:6, 121:11
**conversations** [4] - 45:8, 45:9, 103:19, 104:12
**convey** [2] - 109:3, 122:3
**conveyed** [2] - 24:24, 89:12
**convinced** [1] - 116:9
**cooperating** [4] - 112:21, 113:1, 113:10, 113:16
**copy** [1] - 59:3
**core** [13] - 22:8, 27:4,

28:23, 51:9, 51:12, 56:14, 59:13, 64:4, 64:8, 64:16, 65:25, 66:2, 89:22
**corporate** [1] - 26:12
**corporations** [1] - 26:12
**correct** [16] - 9:25, 12:3, 12:11, 12:15, 12:21, 13:16, 18:16, 31:20, 43:11, 54:22, 73:8, 75:4, 76:3, 81:23, 104:4, 121:3
**corrected** [1] - 110:24
**correcting** [1] - 121:1
**correctly** [13] - 13:6, 39:8, 45:16, 56:17, 69:16, 69:22, 70:6, 70:14, 100:22, 103:20, 104:12, 104:22, 121:3
**corroborating** [2] - 86:11, 113:4
**counsel** [27] - 2:4, 2:5, 5:20, 6:7, 14:23, 15:11, 15:23, 16:1, 17:3, 17:17, 17:23, 17:25, 18:23, 19:13, 25:14, 29:21, 30:7, 32:15, 41:21, 41:24, 42:6, 87:18, 95:17, 111:24, 112:12, 121:8, 121:10
**counsel's** [5] - 11:4, 18:3, 25:12, 35:15, 110:13
**country** [1] - 27:21
**counts** [1] - 71:20
**course** [10] - 4:19, 15:9, 17:6, 32:3, 45:12, 53:4, 59:10, 72:22, 87:10, 119:16
**court** [13] - 2:13, 2:20, 17:24, 22:18, 31:4, 31:12, 36:13, 36:18, 38:1, 68:2, 79:25, 87:25, 112:25
**COURT** [234] - 1:1, 2:9, 2:14, 3:1, 5:1, 5:14, 5:20, 6:6, 6:10, 6:18, 6:22, 7:5, 7:10, 7:22, 8:1, 9:13, 9:24, 10:2, 11:8, 11:14, 11:20, 11:25, 12:15, 12:18, 13:11, 13:23, 14:11, 15:6, 15:12, 15:15, 15:19, 16:5, 16:10, 17:11, 18:5, 19:21, 20:12, 23:5, 24:13, 25:3, 25:10,

25:16, 26:4, 26:17, 27:6, 28:4, 28:9, 28:15, 30:1, 30:10, 30:18, 30:23, 31:15, 31:19, 31:22, 32:8, 32:13, 34:2, 34:23, 35:1, 35:7, 35:16, 35:21, 36:4, 36:19, 37:10, 37:19, 38:20, 39:12, 40:2, 41:8, 41:14, 41:16, 42:1, 42:13, 42:21, 42:25, 43:4, 43:6, 43:11, 43:15, 43:18, 43:24, 44:15, 45:24, 46:9, 46:13, 46:21, 47:2, 47:14, 47:24, 48:5, 48:7, 48:17, 48:23, 49:8, 49:20, 50:7, 50:10, 50:24, 51:2, 51:10, 51:20, 52:23, 53:4, 53:8, 53:11, 53:16, 53:23, 54:8, 54:15, 55:2, 55:11, 55:19, 56:1, 56:7, 56:10, 56:12, 57:25, 59:2, 60:6, 62:6, 62:12, 63:16, 63:24, 64:24, 65:7, 66:18, 68:8, 69:6, 69:21, 70:18, 71:4, 71:11, 72:2, 72:11, 72:18, 72:24, 73:13, 74:12, 76:4, 76:7, 76:14, 76:19, 76:22, 77:3, 77:12, 77:19, 78:4, 78:23, 79:25, 80:14, 81:11, 81:16, 84:3, 84:8, 84:15, 84:23, 85:11, 87:1, 87:6, 87:10, 87:13, 87:23, 88:15, 89:5, 89:11, 90:5, 90:18, 91:5, 91:11, 91:19, 92:5, 92:23, 93:2, 93:9, 93:15, 94:2, 94:5, 95:7, 96:9, 96:15, 97:2, 97:23, 98:12, 98:23, 99:14, 99:23, 100:16, 100:20, 101:17, 102:11, 103:6, 103:24, 104:4, 104:18, 105:3, 105:5, 105:10, 105:14, 105:19, 105:25, 106:21, 107:3, 107:5, 107:11, 107:24, 108:7, 108:15, 109:3, 109:15, 109:20,

109:25, 110:19, 112:15, 113:7, 113:17, 113:24, 114:9, 114:14, 114:20, 115:4, 115:12, 116:1, 116:19, 116:23, 119:2, 120:9, 121:6, 121:13, 121:16, 121:24, 122:11, 123:1
**Court** [65] - 1:22, 1:23, 2:12, 2:25, 4:11, 4:23, 4:25, 5:2, 10:23, 11:22, 13:10, 13:25, 16:6, 16:14, 16:15, 16:19, 19:1, 19:19, 20:5, 20:11, 22:9, 22:12, 26:2, 29:6, 29:22, 29:23, 29:25, 30:17, 39:8, 39:9, 41:24, 42:14, 42:22, 44:10, 47:10, 47:12, 48:1, 48:2, 48:3, 48:4, 48:8, 50:17, 50:21, 51:1, 58:12, 68:7, 69:10, 77:17, 77:21, 77:25, 79:16, 79:17, 83:13, 88:10, 95:2, 106:1, 109:4, 110:7, 110:16, 111:13, 112:19, 115:25, 116:6, 119:17, 123:10
**Court's** [6] - 5:17, 37:13, 82:24, 83:7, 91:9, 114:25
**Courthouse** [1] - 1:23
**courthouse** [1] - 23:8
**courtroom** [2] - 77:20, 109:11
**COURTROOM** [1] - 2:2
**courts** [1] - 112:24
**covered** [3] - 50:17, 50:22, 84:19
**COVID** [1] - 121:13
**CPA** [1] - 57:8
**CPA/CFF** [1] - 80:6
**crazy** [1] - 115:2
**CRC** [2] - 1:22, 123:9
**create** [2] - 37:7, 112:3
**creating** [1] - 35:5
**credentials** [1] - 72:25
**credibility** [1] - 13:1
**crime** [2] - 69:14, 70:11
**Criminal** [3] - 1:2, 10:12, 14:22

**criminal** [20] - 2:2, 3:9, 28:3, 29:4, 29:9, 45:1, 69:12, 69:19, 70:8, 84:11, 92:19, 93:5, 95:15, 96:1, 96:6, 98:20, 111:10, 113:15, 114:17
**criteria** [1] - 28:5
**critical** [1] - 116:13
**criticism** [1] - 58:25
**CRM** [1] - 1:16
**cross** [13] - 45:13, 60:22, 71:16, 73:14, 73:22, 84:4, 89:16, 92:6, 107:1, 111:19, 113:1, 114:1, 121:20
**cross-examination** [8] - 45:13, 71:16, 73:14, 73:22, 84:4, 89:16, 114:1, 121:20
**cross-examine** [2] - 111:19, 113:1
**cross-examining** [1] - 60:22
**CRR** [2] - 1:22, 123:9
**crypto** [3] - 100:12, 103:5, 104:14
**cryptocurrencies** [2] - 45:9, 72:10
**cryptocurrency** [11] - 43:23, 44:14, 44:23, 45:19, 45:23, 72:23, 76:18, 77:6, 95:12, 104:16, 104:17
**crystal** [1] - 34:4
**crystalizing** [1] - 74:13
**CSI** [1] - 98:3
**cuff** [1] - 13:7
**currency** [1] - 104:18
**current** [1] - 35:23
**custodial** [1] - 91:17
**custodian** [1] - 91:24
**custody** [3] - 88:23, 92:21, 96:14
**cut** [2] - 49:8, 53:17

---

**D**

**D.C** [3] - 1:5, 16:7, 123:11
**darknet** [2] - 38:17, 106:8
**data** [11] - 12:7, 13:2, 38:5, 38:7, 38:12, 38:14, 38:18, 39:3, 39:17, 85:16, 86:4
**database** [1] - 38:15
**date** [3] - 5:4, 11:17, 16:13

**Dated** [1] - 123:7
**dates** [1] - 15:1
**Daubert** [3] - 4:12, 33:21, 46:1
**Daubert-type** [1] - 46:1
**days** [2] - 4:8, 4:12
**DC** [4] - 1:12, 1:14, 1:17, 1:24
**DEA** [5] - 38:8, 38:17, 39:1, 39:3
**deadline** [1] - 30:18
**deadlines** [2] - 4:2, 85:19
**deal** [2] - 27:21, 27:25
**dealing** [2] - 34:6, 34:20
**deals** [2] - 41:21, 112:23
**debating** [1] - 88:7
**December** [1] - 123:7
**decide** [7] - 61:8, 62:1, 63:3, 63:9, 66:7, 68:23, 120:6
**decides** [1] - 117:18
**decision** [10] - 4:20, 10:18, 15:17, 20:25, 40:16, 40:17, 40:18, 111:5, 118:14
**declaration** [3] - 23:24, 31:4, 36:23
**deed** [2] - 58:21, 65:14
**DEFENDANT** [2] - 15:14, 15:18
**Defendant** [3] - 1:6, 1:18, 2:12
**defendant** [12] - 10:19, 17:3, 18:18, 19:5, 65:17, 65:20, 69:14, 82:1, 82:5, 85:4, 113:16, 119:5
**defendant's** [2] - 66:4, 85:9
**defense** [42] - 11:12, 12:6, 14:4, 14:5, 14:8, 16:6, 16:18, 17:3, 17:16, 17:23, 17:25, 25:12, 27:9, 29:17, 33:11, 33:14, 33:18, 33:24, 34:3, 34:6, 34:8, 34:19, 38:11, 41:24, 53:7, 54:23, 55:9, 55:14, 55:18, 70:15, 71:23, 96:6, 101:12, 101:14, 102:15, 110:13, 111:14, 111:25, 112:9, 112:10, 112:12, 113:13

**defense's** [10] - 12:4, 12:22, 39:13, 79:17, 82:25, 90:15, 97:16, 98:8, 116:13, 116:15
**defer** [1] - 4:23
**definite** [1] - 115:9
**definitely** [1] - 54:13
**definitive** [9] - 18:10, 52:19, 59:20, 62:11, 80:3, 80:25, 82:16, 86:11, 99:13
**definitively** [13] - 58:20, 76:17, 77:5, 80:19, 81:4, 81:24, 86:20, 88:6, 91:13, 94:10, 97:21, 97:25, 104:1
**degree** [1] - 68:3
**delay** [2] - 6:14, 14:19
**deliver** [1] - 9:20
**demand** [1] - 37:11
**deny** [1] - 113:16
**DEPARTMENT** [1] - 1:13
**Department** [2] - 1:16, 99:19
**deposit** [5] - 54:7, 54:11, 65:5, 66:12, 67:2
**deposited** [2] - 52:13, 52:16
**deposits** [2] - 63:15, 72:15
**DEPUTY** [1] - 2:2
**deputy** [1] - 32:9
**described** [1] - 24:22
**describing** [1] - 22:2
**description** [1] - 74:12
**descriptions** [1] - 82:21
**designation** [1] - 80:7
**designations** [1] - 80:6
**designing** [2] - 6:25, 23:14
**desire** [1] - 117:5
**despite** [2] - 89:1, 91:2
**destination** [1] - 55:13
**detail** [3] - 21:3, 39:12, 53:22
**detailed** [1] - 33:9, 102:21
**details** [1] - 112:23
**detection** [2] - 18:15, 21:9
**determination** [4] - 67:12, 81:21, 82:9, 83:18
**determinations** [1] -

43:22
**determinative** [3] - 46:24, 47:7, 50:5
**determine** [8] - 32:5, 91:13, 91:23, 94:14, 95:3, 95:5, 105:17, 106:5
**determining** [2] - 52:3, 91:16
**deterministic** [4] - 57:18, 83:2, 84:2, 98:7
**develop** [1] - 21:14
**developing** [2] - 21:22, 36:20
**developments** [2] - 89:3, 91:4
**die** [1] - 116:12
**differ** [1] - 20:22
**difference** [6] - 24:22, 62:22, 94:9, 94:23, 97:5, 110:1
**different** [18] - 17:21, 26:1, 35:24, 36:1, 36:2, 36:22, 46:17, 49:4, 52:8, 53:6, 66:18, 66:19, 67:20, 68:2, 73:25, 97:14, 101:14, 113:21
**differentiating** [1] - 103:21
**difficult** [7] - 22:13, 88:17, 90:3, 91:23, 92:11, 104:11, 118:25
**difficulties** [1] - 35:6
**digit** [3] - 65:22, 66:1, 82:7
**digital** [10] - 90:14, 90:20, 91:16, 91:17, 91:18, 92:12, 92:17, 92:21, 96:13, 96:25
**digits** [1] - 66:4
**diligent** [1] - 120:8
**diligently** [1] - 109:13
**dire** [1] - 105:2
**directed** [1] - 40:2
**directly** [4] - 21:18, 41:25, 96:7, 113:2
**director** [1] - 102:2
**directors** [1] - 87:20
**disagree** [5] - 37:14, 48:18, 55:20, 68:9, 95:1
**disagreeing** [1] - 24:21
**disagreement** [4] - 55:8, 62:20, 62:21, 113:8
**disagrees** [3] - 46:5,

55:21, 55:22
**disavow** [1] - 54:20
**disclose** [7] - 17:20, 18:24, 22:1, 24:1, 29:9, 36:7, 36:25
**disclosed** [12] - 18:13, 20:16, 21:1, 29:5, 36:6, 37:16, 37:18, 38:22, 39:14, 39:20, 77:22, 102:10
**disclosing** [3] - 20:15, 29:12, 36:8
**disclosure** [14] - 17:16, 17:23, 19:2, 33:9, 40:3, 40:4, 43:10, 44:13, 46:11, 71:25, 73:21, 90:21, 102:20, 108:12
**disclosures** [5] - 3:7, 5:11, 5:12, 39:9, 94:7
**discovery** [3] - 9:1, 111:4, 118:11
**discuss** [5] - 10:3, 16:16, 36:25, 46:16, 109:12
**discussed** [6] - 45:16, 47:25, 79:22, 91:21, 94:6, 96:1
**discussing** [4] - 52:10, 77:18, 96:7, 112:18
**discussion** [6] - 20:6, 20:13, 21:12, 58:12, 76:16, 90:7
**discussions** [1] - 23:25
**dismiss** [1] - 28:11
**dispute** [8] - 77:11, 77:12, 79:2, 98:16, 98:24, 99:15, 107:4
**disputed** [2] - 56:15, 83:3
**disputes** [1] - 111:4
**disregarded** [1] - 111:16
**dissimilar** [1] - 83:15
**distinct** [1] - 22:6
**distinction** [2] - 29:17, 29:18
**distinguish** [1] - 104:3
**distinguishing** [1] - 53:13
**distribute** [1] - 17:4
**District** [3] - 1:1, 1:1, 1:8
**DISTRICT** [3] - 1:1, 1:1, 1:8
**disturbing** [1] - 38:9
**DNA** [2] - 80:16, 80:21
**Docket** [2] - 43:12,

121:17
**document** [2] - 12:7, 76:22
**Document** [1] - 43:19
**documents** [3] - 12:21, 12:24, 47:21
**DocuSign** [2] - 31:8, 31:9
**dog** [2] - 10:25, 37:20
**DOJ** [6] - 1:11, 1:16, 81:13, 96:6, 98:11, 99:20
**DOJ's** [3] - 92:18, 96:1, 98:20
**DOJ-CRM** [1] - 1:16
**domain** [2] - 54:3, 85:6
**done** [18] - 3:24, 25:19, 31:1, 44:24, 49:10, 56:9, 71:17, 71:20, 71:21, 72:21, 73:15, 75:19, 100:8, 102:7, 102:8, 104:13, 105:14, 115:10
**door** [4] - 113:4, 114:24, 115:6, 115:8
**doors** [1] - 52:21
**doubt** [4] - 67:16, 68:16, 81:25, 84:3
**doubts** [1] - 96:16
**down** [9] - 12:10, 16:7, 30:24, 52:21, 64:22, 77:19, 79:8, 79:25, 120:25
**Dr** [3] - 115:25, 116:3, 119:15
**draft** [4] - 76:19, 76:20, 76:22, 76:25
**drafted** [2] - 18:22, 105:20
**drafting** [1] - 77:1
**drag** [1] - 6:11
**draw** [6] - 62:2, 63:5, 64:17, 81:9, 82:18
**drawing** [2] - 95:2, 117:7
**drawn** [1] - 101:13
**drive** [8] - 8:25, 9:15, 9:17, 9:23, 65:17, 65:18, 92:15, 93:21
**driving** [2] - 79:16, 82:14
**drop** [1] - 9:21
**Dror** [2] - 115:25, 116:3, 119:15
**drug** [1] - 52:13
**due** [4] - 4:4, 4:6, 30:19
**during** [4] - 3:24, 16:4,

30:4, 30:9

# E

**e-signature** [1] - 31:10
**early** [13] - 16:9, 30:17, 56:21, 100:22, 100:25, 101:20, 101:21, 101:22, 102:25, 119:23, 119:24
**easier** [3] - 31:17, 88:22, 89:17
**easiest** [1] - 31:19
**easily** [2] - 5:24, 6:12
**ECF** [2] - 14:5, 14:6
**effect** [1] - 98:3
**effectively** [1] - 16:24
**efficient** [1] - 108:23
**effort** [1] - 95:16
**efforts** [4] - 44:3, 89:1, 91:2, 109:17
**either** [13] - 11:9, 14:15, 20:3, 22:2, 32:6, 39:4, 45:6, 61:5, 77:13, 85:12, 93:2, 108:1, 109:11
**EKELAND** [170] - 1:18, 2:10, 2:21, 4:17, 5:2, 5:17, 6:4, 6:9, 6:16, 6:19, 7:3, 7:8, 7:21, 7:24, 8:17, 9:22, 10:1, 11:6, 11:12, 12:16, 13:4, 13:17, 15:7, 15:24, 16:6, 16:12, 19:16, 20:2, 22:8, 24:21, 25:7, 25:23, 26:5, 27:4, 28:1, 28:7, 28:14, 29:16, 30:4, 30:14, 30:22, 31:14, 31:16, 31:20, 34:24, 35:4, 35:14, 35:19, 36:2, 36:8, 37:5, 37:14, 37:25, 39:7, 39:13, 41:6, 41:10, 41:15, 42:4, 42:20, 42:24, 43:5, 43:14, 43:17, 43:19, 44:7, 45:15, 46:8, 46:10, 46:20, 46:22, 47:10, 47:15, 48:1, 48:18, 49:5, 49:19, 49:21, 50:9, 50:16, 50:25, 51:8, 51:11, 56:11, 56:13, 59:8, 62:4, 62:7, 63:11, 63:17, 64:21, 64:25, 66:10, 67:24, 69:1, 69:9, 70:3, 71:3, 72:8, 72:13,

72:20, 73:2, 73:24, 75:23, 76:11, 76:15, 76:21, 76:24, 77:10, 77:14, 77:21, 78:22, 79:16, 80:1, 82:24, 84:7, 84:14, 84:18, 84:24, 86:6, 87:5, 87:8, 87:11, 87:14, 88:13, 88:16, 90:6, 90:25, 91:8, 91:12, 92:8, 95:24, 96:11, 96:24, 97:16, 98:2, 98:18, 99:11, 99:25, 103:2, 103:17, 103:25, 104:9, 104:20, 105:9, 105:13, 105:16, 105:23, 106:1, 108:6, 108:8, 109:1, 109:13, 109:19, 112:16, 114:7, 114:11, 114:15, 114:21, 115:9, 115:13, 116:2, 116:22, 118:5, 119:15, 121:5, 121:12, 121:15, 121:23, 122:10
**Ekeland** [19] - 1:20, 2:10, 12:15, 14:14, 15:16, 17:17, 18:25, 19:10, 19:15, 21:2, 25:22, 32:23, 34:23, 48:17, 72:6, 101:4, 107:12, 112:15, 114:2
**Ekeland's** [1] - 31:24
**elect** [1] - 11:2
**element** [4] - 54:19, 69:14, 70:10, 94:25
**elements** [1] - 104:6
**elicit** [1] - 113:13
**eliminate** [1] - 22:19
**elsewhere** [1] - 44:13
**elucidated** [1] - 22:9
**emphasize** [3] - 49:23, 98:9, 100:13
**emphasizes** [2] - 92:19, 98:21
**emphasizing** [1] - 97:22
**empirical** [2] - 47:18, 48:12
**empirically** [1] - 50:2
**employed** [1] - 49:24
**employee** [1] - 5:19
**employer** [1] - 24:25
**employing** [1] - 90:24
**end** [5] - 3:11, 37:9, 54:24, 55:10, 60:1

**ended** [3] - 91:6, 91:8, 91:10
**ending** [2] - 55:25, 60:4
**ends** [1] - 108:17
**enforcement** [5] - 48:14, 48:20, 49:2, 49:3, 122:6
**engaged** [2] - 104:7, 117:13
**engaging** [1] - 102:25
**engineer** [1] - 21:9
**enter** [1] - 15:20
**entering** [1] - 82:17
**entire** [2] - 55:16, 57:17
**entirely** [9] - 37:17, 54:21, 68:22, 75:16, 85:12, 86:21, 96:6, 112:25
**entirety** [1] - 25:15
**entitled** [6] - 27:9, 40:3, 64:12, 66:24, 67:1, 119:9
**entity** [4] - 20:19, 57:6, 83:22
**equally** [1] - 101:6
**equation** [1] - 86:6
**equivalent** [1] - 59:3
**especially** [1] - 110:5
**essence** [2] - 65:14, 68:13
**essential** [2] - 94:25, 99:5
**essentially** [8] - 13:22, 21:18, 22:14, 33:24, 38:5, 38:7, 101:11, 114:15
**establish** [1] - 93:21
**established** [1] - 105:7
**establishes** [1] - 96:10
**establishing** [1] - 92:15
**et** [2] - 111:2
**ethnic** [1] - 111:22
**Europe** [1] - 49:4
**evade** [2] - 18:15, 29:10
**evaluating** [1] - 83:18
**eve** [1] - 76:5
**event** [3] - 24:13, 28:9, 70:20
**evidence** [57] - 21:14, 45:25, 51:17, 53:2, 54:13, 62:11, 63:8, 63:20, 65:19, 65:20, 66:7, 66:25, 67:1, 67:2, 67:3, 67:9,

67:14, 67:17, 71:9, 80:19, 81:7, 81:10, 81:14, 85:15, 86:3, 86:11, 95:23, 98:19, 99:3, 100:6, 100:14, 101:2, 102:16, 105:17, 105:21, 105:24, 106:5, 107:8, 107:9, 107:10, 107:14, 108:2, 110:8, 112:14, 116:7, 118:8, 118:15, 118:19, 118:22, 119:8, 119:14, 120:11, 120:15, 120:17, 120:19, 120:20, 121:2
**evident** [1] - 102:12
**evidentiary** [1] - 115:23
**evidentiary-wise** [1] - 115:23
**exact** [1] - 48:18
**exactly** [7] - 42:4, 49:12, 51:4, 56:3, 56:14, 102:21, 103:15
**examination** [8] - 45:13, 71:16, 73:14, 73:22, 84:4, 89:16, 114:1, 121:20
**examine** [2] - 111:19, 113:1
**examiner** [4] - 56:24, 74:11, 79:18, 86:17
**Examiners** [1] - 80:11
**examining** [2] - 60:22, 116:23
**example** [10] - 26:20, 53:24, 54:3, 58:12, 65:16, 72:14, 78:15, 79:4, 79:15, 118:12
**examples** [2] - 53:21, 103:2
**exception** [3] - 69:12, 69:19, 70:8
**exchange** [1] - 85:5
**exclude** [3] - 37:23, 108:1, 121:19
**excluded** [1] - 71:15
**exfiltrated** [1] - 38:7
**existing** [1] - 25:15
**exists** [2] - 91:16, 91:18
**expect** [3] - 34:16, 34:17, 109:10
**expenditures** [1] - 111:3
**expense** [1] - 21:21

**expensive** [1] - 98:5
**experience** [18] - 45:7, 45:8, 45:22, 50:13, 58:4, 59:17, 72:9, 72:18, 72:25, 73:19, 73:21, 77:9, 78:2, 79:18, 103:15, 103:18, 104:5, 104:8
**expert** [56] - 3:7, 4:4, 4:8, 5:5, 17:3, 17:18, 20:16, 26:24, 28:12, 30:19, 33:7, 35:17, 37:11, 39:5, 39:16, 40:8, 40:13, 40:15, 40:25, 50:11, 50:14, 52:22, 54:23, 55:9, 55:14, 57:24, 63:7, 63:25, 65:1, 65:9, 68:4, 68:9, 68:22, 69:4, 69:12, 69:23, 69:25, 70:2, 70:9, 74:10, 75:12, 77:7, 77:13, 77:15, 77:20, 78:5, 78:13, 83:18, 99:20, 100:19, 102:13, 102:16, 107:9, 108:11, 108:19
**expert's** [3] - 35:5, 40:16, 71:10
**expert-level** [1] - 52:22
**expertise** [26] - 47:5, 47:9, 48:16, 58:19, 58:23, 59:1, 61:24, 71:25, 72:19, 75:17, 77:4, 77:9, 78:18, 79:11, 79:12, 99:22, 102:20, 103:12, 103:15, 104:8, 105:2, 105:12, 106:25, 107:19, 108:3, 108:4
**experts** [17] - 6:20, 8:8, 10:17, 10:24, 14:24, 27:24, 30:15, 33:20, 33:25, 35:8, 35:9, 35:11, 47:5, 47:9, 69:18, 70:13
**explain** [19] - 19:11, 51:16, 76:7, 79:21, 85:2, 85:7, 88:18, 88:21, 89:1, 91:2, 91:15, 92:13, 92:18, 97:5, 100:2, 100:6, 100:8, 106:7, 106:12
**explained** [3] - 74:19, 74:21, 75:9
**explaining** [1] - 33:10
**explanation** [3] -

75:25, 85:2, 85:8
**explanations** [3] - 86:8, 86:19, 94:19
**explicit** [2] - 26:6, 35:24
**explore** [1] - 115:22
**explorer** [1] - 73:10
**explorers** [1] - 72:21
**express** [1] - 18:10
**expressed** [4] - 4:14, 26:3, 36:14, 74:15
**extensive** [4] - 59:11, 59:17, 88:21, 89:21
**extent** [27] - 14:7, 18:6, 20:24, 41:17, 41:25, 44:2, 45:24, 49:1, 52:2, 53:20, 58:6, 60:13, 61:18, 65:10, 68:11, 71:22, 74:14, 74:17, 80:18, 82:15, 89:9, 91:20, 94:8, 95:16, 97:9, 99:5, 107:15
**external** [1] - 85:10
**extra** [1] - 33:24
**extraordinary** [2] - 19:8, 21:20
**extreme** [1] - 77:25
**extremely** [6] - 28:20, 37:20, 78:15, 81:22, 98:16, 99:4
**eyes** [3] - 4:15, 16:24, 17:5

## F

**face** [2] - 25:2, 27:2
**facilitate** [1] - 85:9
**facing** [8] - 110:18, 110:25, 112:22, 113:2, 113:5, 113:16, 114:4
**fact** [21] - 12:1, 13:13, 21:13, 23:3, 28:25, 34:14, 34:20, 46:17, 55:9, 67:8, 67:25, 68:7, 75:14, 82:5, 83:19, 86:3, 100:5, 101:2, 103:9, 107:2, 120:13
**factors** [2] - 31:6, 120:8
**facts** [3] - 101:12, 101:13, 101:15
**factual** [2] - 64:12, 94:18
**factually** [3] - 92:3, 92:5, 110:17
**failed** [1] - 106:17
**fails** [1] - 105:20

**failure** [1] - 109:17
**fair** [17] - 13:23, 18:9, 25:16, 25:21, 34:2, 72:5, 90:4, 94:6, 94:17, 95:5, 99:23, 102:15, 108:15, 113:13, 113:25, 118:4, 120:21
**fairly** [3] - 89:20, 103:17, 120:21
**faith** [1] - 23:22
**falling** [1] - 74:14
**famous** [2] - 117:6, 117:16
**fancy** [3] - 29:7, 98:5, 98:6
**far** [3] - 9:21, 59:1, 109:17
**faster** [1] - 84:16
**FBI** [3] - 29:7, 112:1, 120:13
**fear** [2] - 23:3, 36:11
**February** [2] - 30:21, 33:23
**federal** [4] - 3:18, 28:7, 89:21, 114:17
**fester** [1] - 6:13
**few** [4] - 4:12, 16:8, 52:21, 87:2, 110:10
**fight** [1] - 10:25
**fighting** [1] - 97:18
**figure** [8] - 9:25, 41:4, 42:2, 42:17, 44:3, 82:4, 88:2, 109:16
**file** [7] - 19:1, 19:10, 19:14, 23:22, 35:8, 41:2
**files** [1] - 8:22
**filing** [1] - 2:21
**final** [1] - 12:19
**finally** [4] - 4:17, 4:20, 8:25, 111:23
**finance** [4] - 88:22, 89:4, 91:14, 92:2
**financial** [22] - 21:12, 21:20, 51:12, 58:17, 58:20, 59:4, 59:14, 64:5, 68:5, 74:10, 83:11, 83:15, 83:23, 86:17, 86:19, 88:18, 88:19, 90:12, 108:11, 108:14, 118:14, 118:23
**fine** [19] - 9:18, 10:20, 11:1, 11:8, 14:11, 30:12, 32:8, 40:2, 42:18, 60:15, 61:4, 75:16, 90:24, 97:2, 97:5, 97:8, 109:1, 114:10

**fingerprint** [1] - 80:17
**finish** [2] - 11:18, 108:24
**finished** [2] - 84:4, 107:12
**first** [18] - 16:15, 29:24, 32:4, 54:6, 63:14, 63:21, 64:2, 65:5, 66:12, 67:2, 72:15, 92:24, 92:25, 95:8, 107:6, 107:12, 111:17
**first-known** [2] - 54:6, 72:15
**five** [2] - 4:8, 66:3
**flea** [1] - 37:19
**fleeing** [1] - 96:20
**Floor** [1] - 1:20
**flowing** [3] - 105:18, 106:6, 106:10
**focus** [2] - 12:9, 119:22
**focused** [2] - 114:5, 116:8
**focusing** [1] - 70:21
**Fog** [31] - 54:7, 54:12, 54:24, 55:4, 55:7, 55:10, 55:14, 55:16, 55:17, 55:23, 56:15, 56:19, 56:21, 57:14, 60:4, 60:5, 63:15, 65:5, 65:6, 66:13, 66:16, 72:15, 85:2, 85:3, 100:22, 100:25, 101:7, 101:8, 103:1, 106:7, 107:17
**Fog-controlled** [1] - 54:24
**folders** [1] - 8:19
**follow** [3] - 65:1, 74:1, 83:8
**followed** [1] - 69:5
**following** [1] - 11:23
**FOR** [1] - 1:1
**foregoing** [1] - 123:4
**forensic** [35] - 51:12, 52:12, 54:18, 56:25, 57:7, 57:16, 58:2, 59:6, 59:14, 59:16, 60:2, 61:11, 62:9, 62:15, 63:5, 63:19, 64:4, 64:5, 64:16, 64:20, 65:1, 65:24, 66:2, 68:5, 68:12, 68:21, 69:3, 79:18, 80:9, 81:20, 84:12, 86:17, 88:18
**forensically** [12] - 57:7, 57:9, 57:15,

57:22, 60:2, 60:10, 61:7, 61:11, 73:12, 74:4, 74:14, 83:24
**forensics** [8] - 50:1, 51:13, 56:24, 82:3, 82:10, 88:18, 100:2, 108:14
**forfeiture** [1] - 95:13
**form** [5] - 2:23, 31:8, 66:17, 86:16, 110:13
**forma** [1] - 15:21
**format** [1] - 31:20
**forming** [1] - 55:13
**forth** [2] - 49:9, 86:25
**forward** [4] - 9:11, 11:17, 32:5, 33:22
**Foundation** [3] - 45:19, 72:23, 104:21
**foundation** [4] - 24:20, 101:9, 105:8, 105:11
**four** [2] - 3:15, 33:24
**framed** [1] - 58:6
**frankly** [12] - 24:5, 25:17, 26:25, 28:24, 32:17, 35:23, 37:21, 40:25, 67:6, 78:21, 85:19, 117:20
**fraud** [5] - 56:24, 74:10, 79:18, 83:15, 86:17
**Fraud** [1] - 80:11
**free** [2] - 67:5, 67:7
**Frentzen** [2] - 17:11, 24:9
**frequently** [1] - 110:16
**Friday** [1] - 108:24
**Fridays** [4] - 3:20, 3:21, 3:23
**front** [17] - 5:21, 19:25, 20:3, 43:12, 50:7, 61:21, 64:18, 64:19, 68:20, 81:10, 93:5, 105:11, 110:16, 118:17, 119:12, 121:2, 121:4
**fruit** [1] - 15:7
**full** [2] - 4:18, 123:5
**fulsome** [1] - 33:9
**fundamental** [1] - 64:4
**fundamentally** [1] - 92:9
**funding** [6] - 10:6, 10:7, 10:13, 10:16, 10:20, 15:22
**funds** [11] - 52:5, 53:6, 54:24, 55:10, 105:18, 106:5, 106:10, 106:11, 106:16, 106:18,

106:19
**future** [1] - 22:19

## G

**GAAP** [1] - 59:3
**game** [6] - 96:2, 102:15, 113:13, 113:25, 118:4, 120:21
**garbage** [1] - 120:16
**general** [12] - 5:20, 6:7, 16:1, 18:17, 27:15, 30:7, 32:15, 42:6, 44:9, 45:21, 87:18, 120:2
**generally** [3] - 88:18, 115:20, 116:3
**generate** [3] - 46:25, 47:18, 48:11
**generated** [4] - 13:20, 23:3, 38:5, 38:6
**generating** [1] - 22:9
**generation** [3] - 13:9, 13:15, 13:18
**generic** [2] - 44:21, 89:8
**George** [1] - 104:16
**Germany** [1] - 48:24
**given** [6] - 12:1, 12:11, 33:15, 83:6, 103:18, 115:14
**glance** [1] - 84:18
**Glave** [2] - 59:10, 108:11
**global** [1] - 24:11
**globally** [1] - 48:21
**goal** [3] - 41:3, 122:4, 122:5
**golden** [1] - 111:1
**goodness** [1] - 38:25
**goods** [1] - 106:25
**gotcha** [3] - 95:19, 96:2, 122:4
**government** [95] - 2:5, 8:20, 8:22, 11:13, 11:16, 12:19, 13:24, 14:3, 14:6, 14:8, 16:18, 16:20, 16:22, 17:15, 18:1, 19:14, 21:2, 29:2, 30:1, 30:23, 31:25, 33:2, 33:7, 33:8, 33:22, 37:22, 39:16, 41:18, 43:2, 43:21, 45:6, 45:12, 46:18, 46:23, 47:16, 51:21, 51:22, 53:2, 54:10, 54:13, 55:9, 56:15, 62:18, 64:11, 64:14, 64:15,

66:11, 66:19, 66:25, 67:4, 67:15, 67:21, 68:24, 70:19, 71:6, 71:13, 72:8, 80:14, 80:15, 80:18, 80:25, 85:1, 86:12, 91:25, 92:3, 97:23, 99:14, 100:9, 100:15, 100:23, 101:12, 101:17, 102:10, 102:12, 103:21, 105:14, 106:6, 106:15, 106:17, 106:22, 107:22, 108:10, 110:4, 111:2, 111:3, 111:19, 112:9, 112:18, 112:21, 113:3, 113:19, 114:8, 114:12, 121:19
**government's** [20] - 4:6, 12:14, 14:5, 14:8, 16:23, 18:15, 20:16, 37:12, 62:25, 80:22, 100:3, 100:23, 100:24, 107:8, 107:16, 107:18, 111:5, 111:9, 117:9, 121:17
**Gox** [17] - 11:22, 12:7, 12:20, 12:24, 13:1, 13:14, 53:25, 55:23, 65:3, 85:8, 85:14, 85:15, 85:21, 86:3, 86:6, 86:12, 90:9
**grand** [2] - 117:18, 118:17
**grant** [1] - 121:16
**granting** [1] - 3:12
**great** [2] - 21:11, 33:13
**greater** [4] - 20:17, 20:22, 21:3, 39:12
**green** [5] - 65:19, 65:20, 66:3, 82:5, 82:6
**grew** [1] - 80:16
**grossly** [1] - 96:23
**ground** [1] - 99:24
**grounding** [1] - 90:12
**grounds** [2] - 28:11, 108:1
**group** [1] - 50:15
**guess** [22] - 15:11, 16:4, 18:21, 25:20, 30:15, 30:16, 32:13, 45:5, 49:23, 52:23, 54:18, 68:1, 72:25, 78:20, 79:3, 89:23,

102:11, 102:19, 103:7, 104:17, 104:24, 118:6
**guesses** [2] - 79:14, 79:22
**guessing** [1] - 46:14
**guidance** [1] - 110:7
**guilty** [4] - 70:2, 81:5, 81:14, 119:5
**gun** [1] - 79:5

## H

**hac** [5] - 2:11, 2:16, 2:18, 30:24, 31:1
**hack** [2] - 85:14, 86:3
**hacked** [5] - 85:8, 85:9, 85:16, 85:21, 85:22
**hacking** [1] - 12:24
**half** [2] - 13:4, 30:6
**hall** [1] - 77:19
**Halloween** [1] - 79:7
**hand** [8] - 9:15, 18:17, 54:17, 56:9, 65:15, 68:14, 96:19, 117:3
**handed** [2] - 59:21, 96:19
**handful** [1] - 108:17
**handle** [1] - 109:8
**hands** [3] - 57:20, 68:17, 99:2
**hanging** [1] - 15:7
**happier** [1] - 24:7
**Happy** [1] - 122:11
**happy** [20] - 11:24, 21:1, 24:18, 28:19, 31:14, 31:16, 31:23, 32:21, 33:1, 41:23, 47:11, 69:5, 69:8, 70:19, 108:17, 108:22, 109:23, 121:4, 121:5
**hard** [11] - 8:25, 9:15, 9:17, 9:23, 34:17, 51:17, 76:1, 92:15, 93:21, 114:25, 116:20
**harder** [3] - 89:13, 89:18, 89:25
**harm** [1] - 21:20
**Hashanah** [5] - 76:2, 76:6, 87:12, 87:21, 122:12
**HASSARD** [1] - 1:19
**Hassard** [2] - 2:11, 17:17
**head** [2] - 48:19, 117:12
**hear** [9] - 30:1, 30:2,

30:23, 33:5, 42:7, 45:6, 49:13, 70:19, 106:1

**heard** [7] - 6:23, 38:3, 42:11, 48:6, 69:6, 74:18, 83:9

**hearing** [5] - 6:8, 11:10, 33:21, 42:3, 122:13

**hearings** [2] - 16:8, 83:14

**heightened** [1] - 26:2

**held** [2] - 22:17, 36:12

**help** [3] - 53:13, 53:19, 110:5

**helpful** [30] - 12:10, 13:25, 20:24, 41:18, 41:25, 53:20, 63:22, 66:10, 69:2, 71:7, 73:23, 74:13, 75:6, 75:7, 75:12, 75:13, 79:9, 83:6, 86:23, 90:7, 90:11, 93:6, 93:17, 94:23, 97:1, 98:16, 99:3, 110:7, 112:20, 118:5

**helps** [1] - 98:8

**henceforth** [1] - 15:23

**hereby** [1] - 123:3

**Heuristic** [1] - 37:18

**heuristic** [22] - 5:10, 5:12, 16:21, 17:1, 33:10, 37:18, 38:2, 38:4, 38:6, 39:9, 49:22, 49:25, 51:13, 55:5, 55:12, 58:7, 77:15, 78:19, 78:20, 79:4, 79:19

**heuristically** [2] - 57:14, 59:25

**heuristics** [36] - 17:6, 20:7, 20:14, 20:20, 20:23, 21:7, 21:10, 21:14, 21:22, 22:3, 36:15, 49:24, 50:4, 52:9, 52:17, 53:11, 53:12, 54:3, 54:4, 56:16, 56:19, 76:17, 77:5, 77:22, 78:11, 78:12, 78:14, 79:13, 79:14, 79:22, 80:4, 83:1, 97:20, 100:2, 115:16, 116:17

**hide** [3] - 44:25, 45:1, 45:13

**high** [2] - 81:22, 100:1

**highlight** [1] - 110:10

**highly** [1] - 99:16

**hill** [1] - 116:12

**himself** [4] - 15:9,

31:7, 69:23, 75:20

**hinted** [1] - 107:11

**history** [1] - 27:20

**hold** [3] - 30:7, 37:3, 99:20

**holding** [3] - 7:5, 9:5, 114:11

**holds** [1] - 61:4

**holiday** [3] - 3:18, 76:3, 76:10

**honest** [2] - 28:2, 120:7

**Honor** [80] - 2:6, 2:10, 6:4, 6:16, 7:8, 11:12, 11:15, 12:16, 15:14, 17:14, 19:16, 25:7, 26:10, 28:1, 29:16, 30:15, 31:21, 31:23, 32:12, 33:2, 34:22, 35:4, 37:5, 39:7, 41:6, 41:10, 41:15, 41:17, 43:8, 43:14, 43:17, 48:6, 49:19, 52:2, 53:1, 53:20, 56:11, 58:1, 62:4, 66:10, 68:3, 71:3, 71:6, 75:23, 76:5, 81:3, 84:14, 87:5, 87:8, 87:12, 87:18, 88:13, 89:7, 90:4, 90:6, 91:25, 92:7, 92:24, 93:13, 94:4, 95:1, 95:24, 99:11, 99:16, 100:17, 101:10, 101:25, 105:4, 105:9, 105:13, 106:22, 107:23, 108:9, 109:2, 109:14, 109:19, 109:23, 110:3, 110:21, 113:9

**HONORABLE** [1] - 1:8

**hoops** [1] - 40:12

**hop** [1] - 57:4

**hope** [3] - 16:12, 76:9, 84:7

**hoped** [1] - 32:3

**hopefully** [4] - 16:11, 29:20, 32:4, 40:22

**hopes** [1] - 22:12

**hoping** [5] - 4:18, 9:1, 19:17, 20:4, 108:11

**hops** [10] - 53:6, 56:1, 56:4, 56:5, 56:7, 56:8, 65:4, 66:16, 71:24

**hot** [1] - 116:8

**hour** [2] - 7:18, 30:6

**hourly** [2] - 10:14, 10:15

**house** [1] - 16:7

**HTTPS** [1] - 47:22

**hundreds** [1] - 33:10

**husher** [1] - 121:10

**hyperlink** [3] - 47:23, 80:10, 80:13

**hypothetical** [3] - 25:20, 81:25, 118:22

**I**

**idea** [5] - 18:17, 23:20, 38:25, 39:2, 92:25

**identical** [1] - 100:14

**identification** [1] - 59:14

**identified** [3] - 57:14, 100:5, 100:9

**identify** [5] - 53:18, 64:11, 71:17, 78:25, 96:12

**identifying** [5] - 56:18, 56:19, 79:3, 92:20, 98:21

**identity** [2] - 80:3, 83:22

**identity-linking** [1] - 80:3

**ignorance** [1] - 20:4

**ignore** [1] - 63:5

**ignored** [1] - 56:2

**illegal** [4] - 45:14, 106:14, 106:18, 106:19

**illicit** [5] - 105:18, 106:5, 106:11, 106:17, 107:18

**images** [1] - 26:7

**imagine** [4] - 34:17, 38:23, 39:5, 114:24

**imagining** [1] - 114:25

**immediate** [1] - 31:25

**immediately** [1] - 42:24

**impact** [1] - 14:2

**imperfectly** [1] - 78:25

**impermissible** [1] - 14:4

**implemented** [1] - 88:22

**implicating** [1] - 71:1

**implication** [1] - 95:18

**implicit** [1] - 121:18

**import** [1] - 28:16

**importance** [2] - 92:19, 98:21

**important** [8] - 20:8, 90:15, 96:12, 96:16, 96:18, 99:13, 115:18, 120:3

**importantly** [1] - 103:10

**impose** [1] - 40:14

**impressions** [1] - 26:7

**improper** [9] - 39:5, 59:5, 63:5, 63:7, 64:7, 64:25, 65:23, 66:22, 74:25

**improperly** [1] - 24:19

**IN** [1] - 1:1

**in-person** [1] - 16:8

**inability** [1] - 74:8

**inaccuracies** [1] - 39:19

**inaccurate** [2] - 106:9, 110:17

**inadvertently** [2] - 17:9, 36:13

**inappropriate** [2] - 114:19, 119:11

**inasmuch** [1] - 44:10

**inauthentic** [1] - 12:8

**incident** [1] - 12:25

**incidents** [1] - 12:25

**inclined** [1] - 50:16

**include** [2] - 19:9, 111:7

**including** [4] - 41:22, 54:1, 54:23, 110:16

**inconsistent** [2] - 58:8, 80:5

**incorporate** [2] - 89:2, 91:3

**incurred** [1] - 21:22

**incurring** [1] - 21:21

**independent** [2] - 58:10, 58:14

**indicated** [5] - 10:4, 40:10, 75:19, 78:13, 79:11

**indicating** [4] - 15:20, 20:20, 35:8, 50:4

**indication** [2] - 31:11, 46:3

**indicia** [8] - 96:25, 102:22, 103:7, 103:9, 103:13, 103:21, 103:25, 104:2

**indicted** [1] - 119:6

**indictment** [5] - 28:11, 117:19, 117:25, 118:1, 119:3

**indigent** [2] - 10:19, 10:23

**individual** [9] - 51:15, 51:19, 51:24, 59:15, 62:10, 80:3, 85:4, 85:5, 98:1

**individual's** [2] -

92:16, 93:22

**individuals** [5] - 43:23, 52:1, 80:4, 85:6, 117:10

**industry** [1] - 83:4

**infer** [1] - 119:5

**inference** [2] - 81:23, 93:24

**inferences** [4] - 61:19, 62:2, 81:9, 101:13

**inferring** [1] - 113:4

**inform** [1] - 20:5

**information** [40] - 16:21, 17:4, 17:21, 18:13, 18:14, 18:19, 19:6, 21:15, 22:5, 25:25, 27:8, 27:9, 28:12, 28:22, 29:18, 34:3, 34:8, 34:10, 34:12, 35:11, 35:12, 35:17, 36:6, 37:16, 38:19, 38:21, 39:11, 39:14, 39:15, 39:23, 40:8, 40:13, 41:19, 86:4, 87:19, 91:20, 94:16, 98:14, 120:4

**infrequent** [1] - 19:4

**initial** [5] - 39:24, 54:11, 55:5, 76:25, 114:22

**initiated** [1] - 117:15

**innovation** [1] - 121:13

**input** [2] - 20:7, 53:14

**inputs** [1] - 59:23

**insight** [1] - 58:8

**insisted** [1] - 33:11

**instance** [2] - 52:3, 118:10

**Instawallet** [1] - 57:12

**instead** [1] - 40:11

**instruct** [2] - 111:13, 119:2

**instruction** [1] - 110:24

**integrity** [1] - 85:16

**intelligence** [1] - 53:5

**intend** [2] - 54:10, 91:10

**intending** [2] - 112:16, 114:16

**intention** [2] - 113:9, 114:7

**interest** [4] - 4:14, 44:5, 118:14, 118:23

**interested** [1] - 115:1

**interesting** [1] - 63:12

**interests** [3] - 23:4, 122:6

**interfering** [1] - 6:1

**interim** [1] - 110:11
**intermediaries** [1] - 52:5
**intermediate** [2] - 55:22, 60:14
**internal** [1] - 99:19
**internet** [1] - 111:11
**interpretation** [2] - 101:13, 101:14
**interrupt** [1] - 68:8
**introduce** [2] - 112:2, 113:11
**investigation** [7] - 47:17, 48:11, 49:24, 85:1, 85:3, 118:16, 119:10
**investigations** [2] - 48:14, 88:20
**investigator** [3] - 48:19, 48:20, 118:13
**investigators** [2] - 88:23, 117:5
**invite** [2] - 18:24, 21:17
**invites** [1] - 21:8
**inviting** [2] - 20:1, 111:11
**invoking** [1] - 66:20
**involved** [9] - 13:15, 13:18, 23:13, 36:19, 85:24, 117:10, 117:15, 119:10, 122:9
**involves** [1] - 18:19
**involving** [6] - 23:9, 68:21, 85:23, 85:24, 100:22, 100:25
**IP** [8] - 23:3, 23:10, 25:19, 26:3, 27:11, 27:15, 27:19, 27:23
**irrelevant** [2] - 82:9, 112:11
**issue** [39] - 5:4, 7:7, 12:9, 12:12, 16:2, 16:11, 16:17, 17:25, 27:14, 27:21, 29:1, 32:16, 37:21, 37:22, 40:24, 49:14, 49:15, 52:12, 52:16, 52:17, 66:21, 70:21, 70:23, 70:24, 71:5, 71:7, 71:25, 72:1, 81:1, 81:18, 90:15, 103:23, 106:22, 111:11, 111:25, 114:23, 115:2, 116:18, 119:16
**issues** [18] - 4:12, 14:17, 27:4, 32:7, 33:3, 34:7, 37:24,

41:22, 50:15, 73:21, 77:9, 88:12, 90:21, 109:9, 109:12, 110:2, 110:4, 112:18
**items** [2] - 8:3, 81:9
**iterations** [1] - 33:20
**itself** [3] - 61:9, 92:10, 121:19

## J

**jail** [4] - 4:21, 9:4, 9:17, 114:5
**January** [1] - 29:11
**JEFFREY** [1] - 1:15
**Jeffrey** [1] - 2:7
**Jencks** [1] - 115:15
**Jennifer** [1] - 41:19
**Jersey** [2] - 28:5
**Jesselyn** [2] - 2:22, 31:10
**Jesuit** [1] - 87:20
**job** [3] - 71:9, 107:9, 117:17
**joke** [1] - 79:8
**journal** [4] - 92:19, 96:7, 96:9, 98:21
**journals** [1] - 96:12
**JUDGE** [2] - 1:8, 1:8
**Judge** [3] - 77:20, 88:11, 88:12
**judgment** [4] - 52:6, 53:15, 60:12, 83:24
**judicial** [1] - 10:20
**judiciary** [1] - 10:13
**jurisdiction** [2] - 111:10, 117:20
**jurors** [1] - 94:19
**jury** [89] - 45:4, 60:11, 60:15, 61:6, 61:8, 61:17, 61:18, 61:19, 62:1, 62:14, 63:3, 63:4, 63:9, 63:23, 64:3, 64:7, 64:18, 64:19, 65:8, 65:13, 66:7, 66:25, 67:5, 67:11, 67:13, 67:23, 68:10, 68:14, 68:15, 68:20, 68:23, 69:3, 69:24, 70:25, 71:8, 75:5, 75:6, 75:7, 75:12, 81:8, 82:22, 83:6, 83:8, 84:5, 86:2, 86:23, 90:7, 93:5, 93:6, 93:18, 93:24, 94:18, 96:21, 97:1, 97:5, 98:4, 98:8, 105:11, 110:2, 110:4, 110:24, 111:8, 111:12,

111:13, 112:3, 112:6, 112:17, 113:4, 113:22, 115:8, 115:19, 116:4, 117:18, 117:24, 118:3, 118:17, 119:2, 119:4, 119:9, 119:13, 119:14, 119:25, 120:6, 120:12, 121:2, 121:4
**jury's** [2] - 62:1, 71:9
**JUSTICE** [1] - 1:13
**justice** [1] - 81:13
**Justice** [4] - 1:16, 10:12, 14:22, 99:19

## K

**Kafkaesque** [1] - 111:1
**keep** [5] - 4:15, 41:14, 49:17, 50:25, 114:5
**keeping** [1] - 99:24
**Kelly's** [1] - 77:20
**ken** [1] - 52:18
**kept** [2] - 24:2, 37:2
**key** [32] - 24:2, 24:3, 37:2, 57:3, 59:21, 60:20, 60:21, 60:24, 61:4, 62:23, 68:14, 68:17, 83:20, 86:22, 92:15, 93:21, 94:9, 94:10, 94:11, 94:13, 94:14, 94:24, 97:6, 97:7, 98:1, 99:4
**keys** [10] - 51:17, 57:19, 60:20, 80:4, 92:16, 92:20, 93:22, 94:12, 96:13, 98:22
**killer** [1] - 22:15
**kind** [15] - 27:5, 28:15, 37:8, 43:8, 52:8, 55:6, 65:2, 74:14, 78:1, 83:6, 97:21, 111:7, 112:17, 114:17, 116:9
**Kind** [1] - 53:5
**kinds** [2] - 57:10, 57:23
**knocking** [1] - 109:1
**knowing** [3] - 68:16, 94:12, 103:8
**knowledge** [7] - 13:8, 58:10, 58:14, 78:7, 105:12, 106:24, 112:7
**knowledgeable** [3] - 28:17, 28:21, 73:16
**known** [5] - 34:9,

34:19, 54:6, 63:15, 72:15
**knows** [2] - 16:6, 26:12
**Korver** [1] - 92:22
**KPMG** [1] - 108:11
**Kraken** [1] - 90:9
**KYC** [15] - 80:4, 88:21, 89:2, 89:4, 89:19, 90:8, 90:9, 90:10, 90:12, 90:16, 90:24, 91:3, 91:14, 91:22, 92:2

## L

**labeling** [1] - 61:10
**lack** [2] - 71:25, 111:12
**lags** [2] - 91:14, 92:2
**language** [5] - 8:23, 26:6, 34:25, 36:11, 69:22
**laptop** [1] - 24:16
**large** [2] - 59:11, 87:24
**largely** [1] - 20:18
**laser** [1] - 116:8
**laser-focused** [1] - 116:8
**last** [13] - 3:8, 3:10, 10:4, 30:5, 44:17, 46:13, 46:15, 65:22, 65:25, 70:6, 91:1, 103:3, 107:7
**late** [2] - 3:8, 29:23
**Law** [1] - 1:20
**law** [20] - 18:11, 18:12, 18:25, 19:4, 19:12, 19:23, 19:24, 20:3, 20:10, 26:12, 48:13, 48:20, 49:2, 49:3, 69:7, 84:9, 84:13, 112:1, 122:6
**lawsuit** [1] - 23:22
**lawyer** [7] - 14:15, 25:24, 32:15, 85:12, 87:25, 88:11, 89:10
**lawyering** [1] - 6:1
**lawyers** [8] - 10:14, 16:1, 35:10, 42:5, 42:16, 67:18, 76:1, 87:15
**lay** [3] - 67:24, 94:19, 105:11
**laying** [1] - 105:6
**lead** [1] - 48:19
**leads** [4] - 46:25, 47:18, 48:11
**learn** [1] - 94:22

**least** [13] - 8:14, 14:21, 14:25, 18:16, 39:24, 42:18, 43:16, 55:9, 77:23, 88:4, 90:14, 91:20, 119:21
**leave** [4] - 18:21, 18:24, 40:1, 49:14
**leaving** [2] - 47:23, 99:1
**ledger** [2] - 61:2, 89:18
**legal** [5] - 106:8, 106:12, 106:25, 111:13, 111:15
**legitimate** [3] - 44:9, 45:18, 121:20
**lengths** [1] - 33:13
**less** [3] - 34:15, 34:17, 89:15
**lesser** [1] - 14:7
**letter** [1] - 120:16
**letting** [1] - 6:13
**level** [12] - 20:17, 44:22, 52:22, 71:21, 73:3, 73:4, 77:23, 89:15, 95:19, 102:8, 102:9, 104:25
**liable** [1] - 61:15
**license** [4] - 65:21, 65:22, 66:1, 66:4
**License** [1] - 82:6
**life** [1] - 110:18
**light** [2] - 21:25, 121:16
**likelihood** [1] - 81:22
**likely** [2] - 108:4, 113:11
**likewise** [2] - 43:5, 66:11
**limine** [6] - 14:1, 108:22, 109:24, 110:1, 110:12, 121:17
**limit** [1] - 19:7
**limitations** [2] - 17:22, 115:22
**limited** [1] - 18:22
**line** [5] - 26:17, 47:20, 50:3, 95:2, 117:7
**linking** [1] - 80:3
**list** [2] - 10:3, 51:17
**listed** [2] - 50:9, 111:6
**listening** [1] - 25:11
**literature** [1] - 50:4
**litigation** [5] - 23:8, 23:9, 36:18, 111:24
**live** [1] - 26:23
**located** [2] - 24:8, 29:15
**lock** [2] - 24:2, 37:2

**look** [39] - 18:11, 20:10, 22:21, 26:21, 27:23, 28:12, 28:22, 30:11, 30:12, 30:25, 34:11, 35:12, 35:13, 36:20, 37:2, 39:18, 40:14, 40:18, 40:25, 49:11, 59:18, 61:6, 70:1, 70:18, 73:6, 78:2, 80:8, 83:12, 85:24, 87:8, 96:6, 97:14, 99:8, 101:3, 101:23, 103:13, 112:22, 118:21
**looked** [4] - 2:17, 33:11, 37:1, 110:20
**looking** [18] - 6:20, 18:10, 22:6, 24:15, 26:15, 30:13, 30:14, 33:23, 36:17, 55:1, 55:3, 73:9, 76:4, 97:15, 110:6, 117:4, 118:10
**looks** [2] - 39:14, 43:15
**Lorentz** [2] - 41:19, 41:20
**loses** [1] - 10:21
**loss** [1] - 6:21
**low** [1] - 15:7
**low-hanging** [1] - 15:7
**ludicrous** [1] - 38:22
**lunch** [7] - 7:17, 16:4, 30:5, 30:9, 41:7, 42:8, 42:10

## M

**machine** [2] - 29:7, 29:9
**magic** [1] - 97:21
**main** [1] - 44:12
**maintain** [2] - 45:10, 94:11
**maintained** [1] - 13:13
**maintaining** [1] - 44:5
**malpractice** [1] - 68:20
**manila** [1] - 8:19
**manner** [2] - 10:20, 49:2
**manual** [3] - 80:18, 81:13, 83:4
**manually** [1] - 102:3
**market** [3] - 21:19, 38:4, 38:17
**marketplaces** [6] - 106:6, 106:9, 106:10, 106:14, 106:16, 107:18

**markets** [1] - 107:1
**marshal** [1] - 9:14
**Marshals** [1] - 9:25
**Mason** [1] - 104:16
**Mastercard** [3] - 5:7, 16:1, 41:21
**match** [1] - 8:21
**material** [7] - 5:8, 14:19, 24:16, 40:15, 63:1, 63:2, 122:7
**materials** [3] - 13:15, 13:19, 17:16
**matter** [13] - 11:7, 24:14, 36:1, 39:22, 63:4, 64:16, 65:24, 82:2, 92:4, 98:24, 101:15, 101:16, 107:1
**matters** [3] - 3:23, 8:2, 10:3
**mean** [33] - 4:7, 20:18, 23:8, 27:6, 27:15, 27:20, 28:15, 29:11, 30:18, 34:8, 35:1, 37:20, 40:2, 44:4, 49:8, 52:11, 53:17, 60:17, 75:23, 77:15, 81:5, 89:22, 90:22, 90:23, 92:1, 93:1, 93:10, 98:24, 100:21, 102:11, 105:24, 114:11, 119:1
**meaning** [1] - 58:15
**meaningful** [1] - 27:2
**means** [5] - 6:24, 67:8, 78:19, 93:2, 98:15
**meant** [2] - 2:22, 70:12
**measures** [4] - 26:19, 58:11, 58:13, 88:22
**meat** [1] - 53:7
**meet** [1] - 7:16
**member** [2] - 2:19, 31:3, 31:11
**mental** [2] - 69:13, 70:10
**mentioned** [1] - 2:15
**mentioning** [1] - 58:18
**merely** [1] - 7:3
**met** [1] - 68:5
**metaphysical** [2] - 93:3, 93:6
**methodologies** [5] - 5:10, 36:15, 46:23, 47:16, 79:19
**methodology** [4] - 6:25, 66:3, 74:1, 107:22
**methods** [4] - 43:20,

43:25, 47:6, 72:1
**MICHAEL** [1] - 1:19
**Michael** [2] - 2:11, 92:22
**microphone** [1] - 15:13
**might** [20] - 18:13, 18:14, 23:19, 25:20, 34:16, 44:22, 53:14, 59:4, 62:16, 62:25, 68:19, 77:7, 78:7, 94:19, 96:17, 102:25, 103:9, 108:25, 117:17
**miner** [1] - 57:13
**minimal** [1] - 28:20
**minimize** [2] - 24:18, 26:19
**minor** [2] - 37:20, 37:24
**minutes** [4] - 8:8, 23:6, 41:11, 87:2
**misattributions** [1] - 85:3
**misconduct** [1] - 111:3
**misidentification** [1] - 100:1
**misinterpreted** [1] - 84:25
**misleading** [7] - 61:5, 61:18, 68:14, 94:17, 96:23, 97:12, 99:6
**missing** [1] - 51:14
**mistake** [2] - 2:21, 2:24
**mixers** [1] - 45:17
**mixing** [1] - 102:3
**modest** [2] - 4:3
**modification** [1] - 19:2
**modifications** [1] - 6:10
**moment** [1] - 49:6
**Monday** [11] - 3:17, 4:25, 16:15, 29:24, 32:1, 32:4, 32:9, 32:11, 108:17, 121:25
**money** [3] - 52:13, 60:5, 99:2
**months** [1] - 33:24
**morning** [14] - 2:6, 2:9, 2:10, 2:14, 9:23, 16:15, 29:24, 32:1, 32:4, 32:5, 32:9, 32:11, 42:9, 87:15
**mortar** [1] - 90:13
**MOSS** [1] - 1:8
**most** [9] - 8:10, 14:13, 31:25, 37:24, 79:23,

80:1, 85:19, 108:22, 116:17
**mostly** [1] - 24:12
**motion** [18] - 2:16, 2:17, 2:18, 2:19, 2:24, 3:8, 3:12, 14:5, 14:8, 30:24, 31:3, 31:7, 105:15, 110:1, 110:9, 111:7, 121:17, 121:19
**motions** [4] - 13:25, 108:21, 109:24, 110:12
**motivated** [1] - 111:22
**motivating** [1] - 81:17
**motivation** [2] - 117:9, 117:10
**motivations** [2] - 44:19, 44:20
**mouths** [1] - 26:15
**move** [9] - 3:22, 4:6, 7:13, 19:20, 19:22, 71:3, 75:24, 84:15, 99:24
**moved** [1] - 4:5
**moves** [1] - 14:3
**moving** [5] - 9:10, 31:4, 31:12, 49:17, 53:5
**MR** [211] - 2:10, 2:21, 4:17, 5:2, 5:17, 6:4, 6:9, 6:16, 6:19, 7:3, 7:8, 7:21, 7:24, 8:17, 9:22, 10:1, 11:6, 11:12, 12:16, 13:4, 13:17, 15:7, 15:24, 16:6, 16:12, 19:16, 20:2, 22:8, 24:21, 25:7, 25:23, 26:5, 27:4, 28:1, 28:7, 28:14, 29:16, 30:4, 30:14, 30:22, 31:14, 31:16, 31:20, 34:24, 35:4, 35:14, 35:19, 36:2, 36:8, 37:5, 37:14, 37:25, 39:7, 39:13, 41:6, 41:10, 41:15, 42:4, 42:20, 42:24, 43:5, 43:8, 43:14, 43:17, 43:19, 44:7, 45:15, 46:8, 46:10, 46:20, 46:22, 47:10, 47:15, 48:1, 48:6, 48:8, 48:18, 49:5, 49:19, 49:21, 50:9, 50:16, 50:25, 51:8, 51:11, 52:2, 53:1, 53:5, 53:9, 53:12, 53:17, 56:11, 56:13, 58:1, 59:8,

62:4, 62:7, 63:11, 63:17, 64:21, 64:25, 66:10, 67:24, 69:1, 69:9, 70:3, 71:3, 71:6, 71:12, 72:8, 72:13, 72:20, 73:2, 73:24, 75:23, 76:5, 76:11, 76:15, 76:21, 76:24, 77:10, 77:14, 77:21, 78:22, 79:16, 80:1, 81:3, 81:12, 82:24, 84:7, 84:14, 84:18, 84:24, 86:6, 87:5, 87:8, 87:11, 87:14, 87:17, 87:18, 88:13, 88:16, 89:7, 90:4, 90:6, 90:25, 91:8, 91:12, 91:25, 92:7, 92:8, 92:24, 93:3, 93:13, 93:16, 94:4, 95:1, 95:8, 95:24, 96:11, 96:24, 97:16, 98:2, 98:18, 99:11, 99:16, 99:25, 100:17, 101:10, 101:25, 103:2, 103:17, 103:25, 104:9, 104:20, 105:4, 105:9, 105:13, 105:16, 105:23, 106:1, 106:22, 107:4, 107:6, 107:23, 108:6, 108:8, 109:1, 109:13, 109:19, 109:23, 110:3, 110:21, 112:16, 113:9, 113:18, 114:7, 114:11, 114:15, 114:21, 115:9, 115:13, 116:2, 116:22, 118:5, 119:15, 121:5, 121:12, 121:15, 121:23, 122:10
**MS** [24] - 2:6, 11:15, 11:21, 12:14, 13:24, 17:14, 24:11, 25:8, 25:11, 31:23, 32:12, 33:2, 34:22, 41:17, 43:2, 53:20, 53:24, 54:9, 54:22, 55:3, 55:12, 55:21, 56:3, 56:8
**Mt** [17] - 11:22, 12:7, 12:20, 12:24, 13:1, 13:14, 53:25, 55:23, 65:3, 85:8, 85:14, 85:15, 85:21, 86:3, 86:6, 86:12, 90:9

**multiple** [6] - 33:19,
33:20, 44:22, 53:6,
65:17, 84:25
**mumbling** [1] - 114:14
**mundane** [2] - 100:7,
100:13
**must** [3] - 23:21,
101:24, 120:14

## N

**N.W** [1] - 123:11
**name** [6] - 2:4, 53:25,
55:23, 66:20,
117:23, 118:12
**named** [1] - 17:18
**names** [1] - 118:12
**nascent** [1] - 50:1
**national** [1] - 111:22
**nature** [9] - 8:10,
20:14, 22:2, 65:10,
92:9, 92:10, 93:6,
116:17, 120:2
**necessarily** [4] -
44:18, 52:3, 88:24,
109:8
**necessary** [6] - 16:9,
35:2, 53:9, 53:10,
97:7, 99:6
**need** [33] - 4:10, 5:22,
6:10, 7:10, 7:12,
7:16, 12:9, 16:18,
19:3, 26:23, 27:22,
36:10, 37:23, 39:18,
45:25, 47:13, 49:16,
50:8, 52:24, 61:15,
65:9, 75:17, 77:13,
78:6, 85:18, 87:1,
92:23, 96:15, 97:2,
97:13, 109:8,
112:22, 120:9
**needed** [1] - 33:17
**needs** [1] - 27:10
**never** [9] - 8:5, 31:8,
57:19, 58:17, 58:20,
59:22, 68:12, 116:5,
117:20
**new** [17] - 26:1, 33:7,
33:19, 33:25, 36:3,
36:9, 37:17, 39:14,
83:25, 100:11,
103:4, 103:5,
103:10, 103:12,
103:16, 121:12
**New** [6] - 1:17, 1:21,
28:5, 41:19, 87:19
**next** [4] - 16:8, 16:9,
30:17, 50:15
**nice** [1] - 122:11
**night** [5] - 3:8, 16:15,

29:24, 70:6, 108:25
**NIST** [1] - 83:5
**nobody** [5] - 36:8,
36:19, 41:12, 121:4,
121:5
**non** [1] - 80:4
**non-KYC** [1] - 80:4
**noncompete** [1] - 26:6
**nondisclosure** [1] -
29:18
**none** [2] - 55:16, 73:5
**nonissue** [1] - 81:17
**norm** [1] - 65:13
**normal** [2] - 83:15,
83:23
**normative** [2] - 48:13,
60:12
**norms** [3] - 49:3, 64:4,
66:21
**Northern** [1] - 23:6
**note** [2] - 17:7, 33:8
**noted** [2] - 2:17, 34:24
**notes** [6] - 43:15,
69:17, 70:5, 70:7,
70:14, 123:5
**nothing** [7] - 28:7,
34:12, 82:14, 83:5,
83:21, 105:4, 120:14
**notion** [7] - 62:22,
74:8, 77:24, 78:1,
81:17, 92:10, 105:1
**notions** [1] - 98:4
**notwithstanding** [1] -
84:10
**novel** [1] - 50:1
**November** [1] - 3:16
**nullification** [4] -
110:2, 110:4, 111:8,
112:17
**nullify** [1] - 111:12
**Number** [2] - 49:19,
99:25
**number** [8] - 41:23,
50:9, 61:2, 61:3,
65:4, 86:13, 100:18,
100:19
**NW** [4] - 1:11, 1:14,
1:17, 1:24
**NY** [1] - 1:21

## O

**obfuscation** [1] - 44:3
**object** [2] - 92:1, 92:4
**objecting** [1] - 25:14
**objection** [12] - 12:4,
12:5, 12:22, 12:23,
13:3, 13:5, 13:21,
17:7, 19:19, 19:21,
37:15, 89:24

**obscure** [1] - 44:2
**obtain** [1] - 40:12
**obtaining** [2] - 92:14,
93:20
**obvious** [1] - 43:25
**obviously** [9] - 4:23,
9:20, 23:1, 26:24,
73:23, 76:25, 77:22,
96:23, 119:1
**occurred** [1] - 10:8
**October** [13] - 3:5,
3:11, 3:13, 3:16,
3:17, 4:6, 4:7, 5:4,
11:17, 15:2, 16:13,
32:18, 33:23
**odds** [3] - 44:5, 49:2,
108:17
**OF** [5] - 1:1, 1:2, 1:7,
1:13, 123:1
**off-chain** [3] - 57:21,
59:21, 86:22
**offer** [4] - 8:6, 70:9,
84:11
**offered** [5] - 74:2,
74:3, 106:8, 108:10,
120:12
**offering** [3] - 13:7,
21:18, 120:10
**office** [3] - 24:3, 41:9,
41:12
**OFFICIAL** [1] - 123:1
**Official** [2] - 1:23,
123:10
**offshore** [1] - 52:14
**old** [1] - 114:13
**on-chain** [1] - 59:22
**onboarding** [2] -
100:11, 103:5
**once** [1] - 117:24
**one** [69] - 3:9, 5:14,
5:15, 8:4, 9:8, 9:13,
11:2, 14:13, 14:21,
16:12, 16:17, 17:20,
21:6, 21:17, 22:11,
23:2, 24:3, 25:8,
26:2, 27:4, 28:5,
34:4, 35:23, 36:3,
36:13, 37:21, 38:14,
44:4, 44:15, 45:13,
47:2, 53:14, 53:15,
54:1, 54:3, 58:15,
59:10, 60:6, 63:14,
65:4, 69:19, 73:14,
80:21, 81:1, 83:13,
83:14, 84:5, 84:18,
86:13, 87:9, 89:6,
96:1, 100:18,
101:12, 102:1,
103:8, 105:19,
113:6, 114:2,

115:13, 115:18,
115:19, 116:7,
117:6, 117:18,
119:21, 121:12,
121:14
**one-sided** [1] - 84:5
**onerous** [2] - 34:15,
34:17
**ones** [3] - 14:1, 14:3,
35:17
**online** [1] - 92:2
**open** [5] - 38:1, 91:6,
91:8, 91:10, 114:25
**open-ended** [3] - 91:6,
91:8, 91:10
**opened** [2] - 114:24,
115:7
**opening** [3] - 101:18,
110:22, 113:4
**openings** [1] - 14:2,
67:7
**openly** [1] - 116:6
**operating** [2] - 119:11,
119:21
**opine** [5] - 58:2,
58:23, 69:18, 71:24,
78:3
**opining** [1] - 73:25
**opinion** [15] - 48:16,
57:24, 65:1, 66:17,
68:4, 68:9, 69:4,
70:2, 71:8, 74:2,
74:10, 83:19, 86:16,
94:1
**opinions** [1] - 70:13
**opportunity** [6] - 4:8,
4:16, 4:24, 7:19,
19:13
**oppose** [1] - 33:22
**opposition** [2] - 14:6,
14:8
**order** [39] - 5:6, 6:13,
14:17, 15:20, 16:18,
16:25, 17:2, 17:5,
17:10, 17:15, 17:20,
19:18, 20:13, 25:13,
25:15, 25:17, 26:1,
27:8, 27:11, 27:12,
28:6, 28:13, 28:17,
29:8, 34:5, 34:7,
34:10, 34:13, 34:14,
34:18, 35:18, 35:20,
35:22, 36:1, 36:5,
38:21, 69:18, 109:6,
112:8
**orders** [5] - 19:5,
23:11, 27:16, 29:4,
29:12
**ordinarily** [1] - 3:23
**organization** [2] -

67:22, 87:20
**origin** [1] - 111:22
**original** [3] - 8:21,
8:23, 26:2
**originating** [1] -
106:16
**otherwise** [4] - 7:17,
32:24, 36:7, 75:8
**ought** [5] - 7:6, 9:14,
17:11, 42:18, 81:24
**ourselves** [2] - 36:10,
113:12
**outlined** [1] - 110:9
**outputs** [1] - 53:14
**outside** [4] - 52:18,
59:1, 99:22, 115:7
**outstanding** [1] - 32:7
**over-lawyering** [1] -
6:1
**overnight** [1] - 10:8
**own** [15] - 21:14,
40:13, 43:15, 60:23,
61:24, 78:13, 80:15,
82:5, 83:18, 83:24,
92:19, 96:1, 98:20,
103:18, 108:11
**owned** [3] - 65:20,
79:24, 80:2
**owner** [2] - 60:25,
75:15
**ownership** [24] -
49:25, 51:19, 52:7,
57:19, 58:21, 59:6,
63:20, 69:4, 74:5,
74:9, 76:17, 77:6,
84:21, 88:17, 92:10,
92:11, 92:17, 93:12,
94:12, 94:25, 95:4,
95:5, 95:15, 97:1
**owns** [1] - 94:13

## P

**p.m** [4] - 15:5, 41:7,
122:13
**page** [2] - 99:20,
108:13
**paid** [1] - 10:22
**paper** [3] - 73:7, 73:9,
89:25
**papers** [2] - 13:6, 50:9
**paragraph** [2] - 17:2,
43:19
**paragraphs** [1] - 59:5
**parentheses** [2] -
80:6, 80:7
**part** [15] - 7:15, 18:16,
38:13, 47:20, 50:3,
54:13, 54:25, 55:12,
60:18, 64:1, 64:2,

79:23, 86:18,
113:10, 120:6
**participated** [1] -
76:25
**participating** [1] -
109:7
**particular** [13] - 22:6,
25:25, 47:8, 48:9,
51:24, 52:1, 59:15,
77:8, 78:6, 78:25,
98:1, 104:6, 117:13
**particularly** [4] -
14:18, 32:17, 88:10,
93:17
**particulars** [2] - 20:15,
31:17
**parties** [6] - 3:5, 3:25,
8:3, 19:3, 32:22,
67:13
**parts** [1] - 92:1
**party** [2] - 11:9, 29:1
**pass** [3] - 23:7, 42:13,
42:15
**passage** [1] - 102:7
**passed** [1] - 85:19
**patent** [3] - 23:9,
27:20, 27:22
**pattern** [2] - 55:5,
100:9
**patterns** [1] - 53:17
**pauperis** [1] - 15:22
**pause** [1] - 113:7
**pay** [2] - 10:13, 54:3
**paying** [1] - 10:23
**payment** [1] - 53:25
**payoffs** [1] - 118:23
**PEARLMAN** [1] - 1:15
**Pearlman** [3] - 2:7,
8:18, 9:11
**peel** [3] - 22:5, 22:7,
49:25
**peer** [1] - 50:2
**peer-reviewed** [1] -
50:2
**pejorative** [1] - 44:4
**Pelker** [11] - 2:7,
11:14, 17:13, 40:10,
41:16, 53:13, 95:22,
96:3, 99:9, 99:17,
112:4
**PELKER** [25] - 1:13,
2:6, 11:15, 11:21,
12:14, 13:24, 17:14,
24:11, 25:8, 25:11,
31:23, 32:12, 33:2,
34:22, 41:17, 43:2,
53:20, 53:24, 54:9,
54:22, 55:3, 55:12,
55:21, 56:3, 56:8
**Pelker's** [3] - 35:21,

111:25, 115:1
**pen** [1] - 89:25
**pen-and-paper** [1] -
89:25
**penalty** [3] - 23:25,
36:23, 36:24
**pending** [1] - 2:12
**Pennsylvania** [1] -
1:14
**people** [26] - 5:25,
7:12, 13:7, 23:11,
23:12, 27:17, 27:21,
29:10, 29:11, 30:7,
36:12, 36:22, 44:2,
45:9, 46:18, 75:10,
75:11, 76:2, 79:4,
103:12, 104:13,
108:25, 117:14,
119:10, 119:19,
120:2
**people's** [1] - 44:19
**percent** [8] - 44:25,
45:1, 45:17, 62:19,
66:17, 67:12, 112:5,
116:9
**perception** [5] - 22:15,
22:25, 24:23, 37:6,
97:19
**perfect** [1] - 79:2
**perfectly** [3] - 78:24,
86:8, 86:24
**perhaps** [7] - 11:6,
14:13, 78:18, 78:24,
78:25, 81:17, 102:6
**period** [2] - 3:6, 9:4
**perjury** [3] - 23:25,
36:23, 36:24
**permissive** [1] - 70:13
**permit** [1] - 19:2
**person** [10] - 2:20,
6:24, 16:8, 28:22,
31:5, 37:1, 42:3,
72:6, 75:18, 77:7
**personal** [5] - 44:19,
44:20, 50:13, 71:8,
112:7
**perspective** [1] -
86:17
**persuaded** [1] - 79:11
**pertinent** [1] - 52:25
**phone** [2] - 41:23,
87:8
**phrase** [4] - 92:14,
93:20, 104:24,
105:23
**phrased** [1] - 91:9
**phrases** [3] - 92:20,
96:12, 98:21
**physical** [2] - 92:14,
93:20

**pick** [2] - 10:21,
121:10
**picked** [1] - 78:7
**picking** [1] - 43:1
**piece** [4] - 73:7, 73:9,
118:15, 118:19
**pin** [1] - 12:10
**pivoting** [1] - 11:21
**place** [5] - 27:17, 28:6,
35:23, 79:24, 80:2
**Plaintiff** [2] - 1:3, 1:10
**plan** [1] - 3:19
**planning** [5] - 3:19,
3:20, 9:22, 21:14,
32:10
**plate** [4] - 65:21,
65:22, 66:1, 66:4
**platform** [1] - 100:12,
103:5
**play** [1] - 54:4
**playing** [2] - 90:14,
90:20
**pleased** [1] - 109:16
**PLLC** [1] - 1:20
**podium** [1] - 3:3
**point** [64] - 11:1, 12:1,
12:2, 12:13, 19:3,
19:12, 19:24, 25:8,
33:18, 34:2, 36:11,
38:10, 43:9, 44:1,
44:7, 44:9, 44:12,
45:15, 45:21, 46:4,
46:17, 47:11, 47:13,
47:24, 48:3, 49:13,
55:24, 55:25, 59:4,
63:21, 65:8, 66:18,
68:12, 69:1, 72:5,
73:25, 74:4, 75:2,
75:15, 75:22, 75:24,
77:14, 82:24, 82:25,
83:13, 84:7, 84:8,
84:12, 84:21, 89:11,
89:12, 93:4, 96:7,
96:9, 97:16, 102:4,
102:22, 103:9,
103:14, 103:19,
112:19, 119:15,
122:3
**Point** [2] - 52:5
**point-by-point** [1] -
43:9
**pointed** [2] - 28:4,
79:5
**points** [9] - 31:24,
60:13, 60:14, 60:15,
63:11, 65:10, 97:22,
98:9, 100:17
**policies** [1] - 99:19
**policy** [4] - 99:20,
111:7, 111:11,

114:17
**portion** [3] - 54:20,
55:20, 107:16
**position** [11] - 5:17,
16:24, 39:13, 41:2,
44:18, 62:25, 67:8,
79:17, 88:3, 88:6,
100:23
**positively** [1] - 82:7
**possesses** [1] - 91:16
**possibility** [2] - 33:6,
37:8
**possible** [7] - 3:4,
18:20, 21:3, 62:25,
85:20, 85:21, 85:22
**potential** [10] - 8:13,
24:25, 110:10,
110:15, 110:25,
113:3, 113:14,
113:15, 113:23,
118:22
**potentially** [4] - 14:2,
27:18, 55:14, 118:13
**power** [1] - 109:23
**practice** [5] - 92:19,
96:1, 96:5, 96:7,
98:20
**practiced** [1] - 112:24
**pre** [1] - 112:1
**pre-law** [1] - 112:1
**preclude** [2] - 14:3,
19:5
**precludes** [1] - 20:13
**predict** [2] - 35:5,
35:14
**predictive** [3] - 78:12,
78:14, 78:16
**prefer** [1] - 4:22
**prejudicial** [4] - 68:11,
71:2, 86:2, 97:12
**preliminary** [3] - 8:2,
10:3, 11:9
**premise** [1] - 117:1
**prepared** [4] - 23:24,
28:18, 33:21, 43:2
**preparing** [1] - 36:20
**presence** [1] - 115:7
**present** [5] - 2:13,
19:9, 46:15, 106:17,
120:9
**presented** [7] - 79:19,
83:1, 84:1, 118:18,
119:4, 119:8, 119:14
**presenting** [2] - 72:9,
81:7, 113:19
**press** [1] - 14:13
**pressing** [1] - 14:13
**presumably** [2] -
21:19, 26:1
**pretrial** [1] - 32:7

**PRETRIAL** [2] - 1:4,
1:7
**pretty** [2] - 82:12,
114:8
**prevented** [1] - 5:12
**previous** [2] - 35:19,
35:22
**previously** [2] - 33:8,
46:16
**primary** [2] - 118:8
**primer** [2] - 78:7, 78:8
**principally** [2] - 12:6,
54:16
**principle** [3] - 59:18,
74:7, 77:10
**principles** [5] - 51:13,
58:17, 58:20, 64:5,
116:4
**printed** [1] - 8:19
**privacy** [9] - 43:21,
43:25, 44:8, 44:9,
44:13, 45:10, 45:18,
45:20, 45:22
**private** [37] - 10:6,
10:7, 10:15, 51:17,
57:3, 57:19, 59:21,
60:19, 60:20, 60:21,
60:24, 61:4, 62:23,
68:14, 68:17, 74:21,
74:22, 82:17, 83:20,
86:22, 90:2, 92:15,
92:20, 93:21, 94:9,
94:11, 94:12, 94:13,
94:14, 94:24, 96:13,
97:6, 98:22, 99:4
**privately** [2] - 7:16,
14:23
**pro** [5] - 2:11, 2:16,
2:18, 30:24, 31:1
**probabilistic** [6] -
43:22, 46:24, 47:7,
50:5, 80:20
**probable** [1] - 22:24
**probative** [6] - 68:11,
71:2, 86:2, 97:12,
99:7
**problem** [24] - 5:16,
6:23, 7:2, 22:13,
23:16, 25:2, 26:24,
31:20, 37:12, 37:13,
40:8, 42:1, 45:5,
48:23, 60:17, 60:21,
62:12, 62:13, 64:1,
64:14, 83:20, 88:17,
107:6
**problematic** [1] -
39:25
**problems** [1] - 60:10
**procedural** [1] - 95:14
**procedure** [1] - 9:25

**proceed** [12] - 10:12, 10:19, 11:5, 14:22, 15:13, 15:20, 15:21, 15:22, 21:1, 30:12, 87:5, 87:6
**proceeding** [2] - 10:5, 15:10
**proceedings** [1] - 123:6
**process** [8] - 12:20, 39:18, 65:9, 88:5, 101:21, 102:3, 116:25, 117:11
**produced** [1] - 47:21
**product** [4] - 21:19, 28:25, 38:24, 50:18
**products** [3] - 106:8, 106:13, 106:18
**Professional** [1] - 80:12
**professional** [3] - 65:13, 70:25, 71:1
**proffering** [1] - 62:8
**programming** [1] - 6:25
**promptly** [1] - 14:18
**proof** [4] - 67:16, 81:1, 82:16, 93:12
**proper** [7] - 60:17, 65:12, 66:22, 93:4, 93:14, 102:5, 115:22
**properly** [2] - 64:11, 68:10
**property** [4] - 92:10, 93:6, 93:10, 93:11
**propose** [2] - 11:19, 106:9
**proposed** [1] - 11:19
**proposition** [1] - 98:16
**proprietary** [6] - 21:11, 21:15, 23:4, 26:3, 27:5, 122:5
**prosecution** [3] - 95:25, 111:2, 111:21
**prosecutions** [1] - 117:21
**prosecutor** [1] - 96:18
**prosecutors** [3] - 96:4, 117:4, 117:22
**prospects** [1] - 22:19
**protect** [1] - 24:6
**protective** [40] - 5:6, 6:13, 14:17, 16:18, 16:25, 17:2, 17:5, 17:10, 17:15, 17:19, 19:5, 19:18, 20:13, 23:11, 25:13, 25:15, 25:17, 26:1, 27:8, 27:12, 27:16, 28:6,

28:13, 28:17, 29:4, 29:8, 29:12, 34:5, 34:7, 34:9, 34:13, 34:14, 34:17, 35:18, 35:20, 35:22, 36:1, 36:5, 38:21, 109:6
**protects** [1] - 27:12
**protocols** [4] - 89:2, 89:4, 90:24, 91:3
**prove** [4] - 58:21, 76:17, 77:6, 81:14
**proves** [2] - 80:19, 81:4
**provide** [7] - 3:15, 19:13, 21:3, 21:23, 26:18, 46:2, 111:10
**provided** [4] - 12:2, 12:19, 28:12, 34:5
**provides** [4] - 10:13, 10:16, 20:22, 101:1
**province** [1] - 83:11
**prudent** [1] - 110:5
**public** [25] - 5:24, 60:19, 60:25, 61:3, 62:19, 62:22, 72:17, 72:20, 74:20, 74:23, 74:24, 79:24, 80:2, 80:4, 89:18, 90:2, 92:16, 93:22, 94:9, 94:10, 94:24, 97:6, 98:1, 110:13, 114:12
**publicly** [1] - 47:21
**published** [1] - 95:17
**pull** [2] - 15:13, 59:3
**punishment** [5] - 110:11, 110:15, 110:25, 113:15, 113:23
**punishments** [1] - 113:2
**purchase** [1] - 106:13
**purchaser** [1] - 85:6
**purport** [1] - 77:19
**purported** [1] - 100:14
**purports** [1] - 106:7
**purposes** [7] - 19:9, 26:8, 46:15, 57:10, 57:16, 106:19, 120:9
**pushback** [1] - 37:7
**put** [22] - 3:23, 19:19, 19:21, 26:14, 26:19, 39:21, 51:2, 54:14, 71:23, 72:3, 73:19, 86:25, 88:5, 94:18, 101:19, 102:13, 102:15, 118:2, 118:17, 121:10, 122:4, 122:8
**puts** [1] - 101:17
**putting** [5] - 40:11,

60:23, 73:21, 82:20, 116:7
**puzzled** [2] - 110:19, 110:20

**Q**

**qualifications** [1] - 105:7
**qualified** [5] - 48:9, 50:21, 60:7, 60:18, 74:6
**qualifying** [2] - 50:19, 105:10
**quantification** [1] - 107:16
**quantify** [1] - 45:25
**quarter** [1] - 40:20
**questioning** [2] - 73:17, 102:12
**questions** [11] - 11:23, 12:25, 13:1, 61:24, 66:6, 95:3, 113:15
**quick** [1] - 100:17
**quite** [13] - 24:5, 26:25, 28:24, 32:17, 35:23, 37:21, 40:25, 52:19, 59:11, 78:20, 84:16, 85:19, 117:20

**R**

**Radack** [4] - 2:22, 31:10, 31:11
**raise** [5] - 20:1, 115:7, 119:9, 120:24, 121:6
**raised** [3] - 8:13, 27:21, 31:24
**raising** [4] - 13:3, 66:18, 66:23, 115:2
**RANDOLPH** [1] - 1:8
**range** [1] - 62:20
**rarely** [1] - 63:1
**rate** [2] - 10:14, 10:15
**rather** [11] - 6:12, 6:13, 7:14, 7:23, 11:4, 12:23, 25:3, 35:10, 52:1, 117:8, 121:2
**rational** [1] - 26:9
**reach** [6] - 6:9, 6:17, 7:8, 14:14, 52:24, 64:13
**reached** [2] - 15:24, 42:5
**reaching** [3] - 6:20, 15:25, 30:6
**reaction** [1] - 35:15
**reactions** [1] - 35:5
**Reactor** [8] - 38:11,

38:17, 38:18, 53:8, 56:7, 56:8, 83:1, 97:25
**read** [16] - 5:11, 50:8, 69:16, 70:4, 70:5, 70:6, 78:8, 79:20, 92:23, 95:9, 96:15, 98:12, 99:11, 99:21, 105:24, 108:12
**reading** [4] - 77:21, 95:19, 99:17, 107:12
**reads** [1] - 69:10
**ready** [2] - 7:13, 15:4
**real** [2] - 22:17, 24:4
**real-world** [1] - 24:4
**reality** [4] - 22:24, 24:22, 24:23, 37:6
**really** [40] - 8:10, 9:9, 10:9, 11:5, 12:5, 22:21, 24:13, 33:18, 34:24, 37:22, 47:8, 49:14, 51:8, 52:11, 52:16, 52:17, 54:22, 60:9, 61:1, 61:8, 70:21, 70:24, 72:6, 73:13, 73:17, 73:19, 74:17, 79:8, 81:4, 90:21, 93:23, 98:3, 98:5, 98:7, 99:2, 102:21, 111:8, 112:18, 116:7, 116:8
**realm** [2] - 45:22, 66:7
**reason** [10] - 18:12, 18:18, 19:22, 51:9, 77:3, 85:15, 87:21, 93:9, 115:6, 119:13
**reasonable** [12] - 27:13, 67:16, 68:15, 68:16, 81:9, 85:2, 85:8, 86:8, 86:18, 86:21, 86:24, 100:4
**reasons** [10] - 19:7, 21:24, 21:25, 29:14, 44:22, 45:10, 45:13, 45:18, 115:19, 119:11
**recalling** [3] - 45:16, 70:5, 104:11
**receipt** [1] - 11:23
**receive** [1] - 27:18
**received** [1] - 3:8
**receiving** [2] - 10:6, 10:19
**recent** [2] - 89:1, 91:2
**recess** [2] - 41:7, 87:4
**Recess** [1] - 15:5
**recollection** [5] - 44:16, 47:3, 50:12, 54:16, 55:19
**recommend** [1] -

99:16
**reconvene** [1] - 121:25
**reconvening** [1] - 108:16
**record** [12] - 2:4, 11:3, 11:23, 17:8, 19:20, 19:22, 22:3, 33:8, 39:22, 105:17, 105:22, 106:5
**records** [2] - 13:9, 13:13
**recreating** [1] - 38:24
**red** [1] - 96:19
**red-handed** [1] - 96:19
**redundancy** [2] - 47:13, 94:7
**redundant** [3] - 51:1, 51:7, 84:19
**refer** [1] - 58:12
**reference** [6] - 17:19, 46:10, 49:5, 49:7, 50:5, 111:3
**references** [1] - 110:10
**referring** [1] - 47:11
**refresh** [1] - 47:3
**refuses** [1] - 28:12
**regard** [1] - 80:15
**regardless** [1] - 5:10
**regime** [2] - 91:14, 92:2
**regulations** [1] - 89:21
**related** [6] - 41:21, 69:3, 70:10, 96:13, 106:18, 118:14
**relation** [14] - 16:17, 17:5, 38:2, 38:3, 38:4, 38:10, 38:16, 39:25, 45:22, 68:6, 69:14, 83:11, 86:15, 96:25
**relayed** [3] - 5:18, 22:11, 23:2
**relaying** [1] - 7:3
**releases** [1] - 114:13
**relevance** [2] - 46:17, 70:21, 89:8
**relevant** [27] - 19:4, 19:12, 19:24, 43:24, 45:8, 64:9, 64:10, 65:8, 68:19, 71:8, 79:11, 82:3, 85:16, 93:14, 94:3, 95:24, 99:4, 110:8, 112:11, 117:10, 117:11, 117:13, 117:24, 118:24, 119:12, 120:18

reliability [2] - 58:10, 58:15
reliable [1] - 72:1
reliance [1] - 81:15
religious [1] - 76:3
reluctant [1] - 18:10
rely [5] - 43:22, 47:21, 50:4, 64:8, 102:23
relying [2] - 48:24, 100:1
remainder [3] - 93:15, 93:16, 108:1
remaining [1] - 32:6
remains [1] - 12:12
remember [7] - 43:7, 45:11, 46:11, 48:18, 54:19, 77:1
remembering [2] - 13:6, 104:21
remind [2] - 48:8, 54:15
remote [1] - 24:12
removing [1] - 86:6
render [1] - 48:16
renew [1] - 105:15
rent [1] - 16:7
repeat [1] - 36:10
repeating [2] - 46:14, 76:12
reply [2] - 14:6, 14:9
report [13] - 4:4, 5:5, 30:19, 41:2, 45:17, 46:3, 46:5, 46:6, 46:11, 49:7, 53:22, 56:9, 120:16
Reporter [3] - 1:22, 1:23, 123:10
reporter [1] - 79:25
REPORTER [1] - 123:1
reports [4] - 4:3, 4:8, 4:11, 20:16
representation [2] - 92:14, 93:20
representations [2] - 39:25, 110:17
request [5] - 15:21, 30:21, 42:15, 87:25, 109:18
requested [1] - 42:22
requests [1] - 42:14
require [1] - 3:6
required [1] - 89:20
requirements [3] - 89:19, 111:14, 111:15
requiring [1] - 82:23
requisite [1] - 13:8
reread [1] - 70:4
research [1] - 39:19

reserved [1] - 7:15
resolve [4] - 6:14, 7:7, 16:11, 19:25
resolved [3] - 6:12, 14:17, 40:24
resorting [1] - 81:15
resources [1] - 111:3
respect [28] - 4:11, 8:6, 8:8, 12:4, 12:20, 12:22, 12:25, 17:7, 19:18, 20:23, 47:6, 49:15, 50:11, 64:13, 74:15, 80:18, 84:11, 89:23, 103:12, 104:6, 105:11, 107:13, 107:16, 107:25, 110:3, 113:25, 119:16, 121:20
respectfully [1] - 37:14
respects [1] - 93:12
respond [5] - 5:2, 37:10, 87:24, 116:19
responding [1] - 80:24
response [2] - 19:14, 45:12
responsible [1] - 7:5
responsive [1] - 88:10
rest [4] - 47:23, 79:20, 93:8, 94:21
restate [1] - 12:17
restriction [1] - 17:22
restricts [1] - 17:16
resubmit [3] - 2:25, 31:16, 31:18
results [1] - 61:10
retained [1] - 10:5, 10:22, 14:23, 15:10, 15:23
retaining [1] - 33:7
return [2] - 88:15, 117:19
reveal [1] - 39:19
revealing [1] - 21:7
reveals [1] - 39:17
review [18] - 4:8, 5:7, 5:11, 5:19, 11:18, 14:19, 16:21, 16:25, 18:2, 18:4, 32:20, 33:7, 33:15, 33:17, 33:18, 39:24, 43:9, 122:7
reviewed [1] - 50:2
reviewing [2] - 18:3, 40:8
reviews [1] - 5:15
revisit [1] - 105:8
rich [1] - 117:4

rightly [1] - 120:5
risk [15] - 22:1, 22:23, 23:19, 24:4, 24:6, 24:19, 25:1, 26:13, 26:16, 26:19, 28:20, 36:18, 40:15, 100:1, 113:19
risk-averse [2] - 23:19, 26:13
risks [1] - 27:18
RMR [1] - 1:22, 123:9
road [1] - 120:25
rob [1] - 65:18
robber [1] - 96:19, 99:1
robbery [1] - 96:23
robbing [1] - 79:6
rocket [1] - 89:12
role [3] - 60:11, 69:24, 108:3
Roman [2] - 2:3, 2:12
ROMAN [1] - 1:5
room [1] - 24:15
Room [2] - 1:23, 123:10
rooted [1] - 116:15
Rosh [5] - 76:2, 76:6, 87:12, 87:21, 122:11
rule [9] - 13:18, 69:11, 69:18, 70:4, 70:7, 70:17, 111:1, 112:3, 116:20
rules [3] - 9:19, 89:20, 119:17
ruling [4] - 69:6, 70:20, 115:1, 117:8
rumor [1] - 52:21
rumors [1] - 38:3
run [4] - 3:16, 3:21, 27:18, 48:14
running [2] - 36:18, 118:6
Russian [1] - 111:17

## S

S-t-o-c-k-i-n-g-e-r [1] - 50:6
sale [1] - 59:22
sanction [2] - 23:23, 62:16
Sarah [1] - 108:11
satisfy [1] - 46:1
Saturday [1] - 4:24
saw [3] - 65:17, 65:21, 82:16
scheduled [1] - 3:10
scheduling [2] - 11:16, 41:8
Scholl [6] - 54:16,

55:1, 56:4, 57:1, 81:3, 116:24
Scholl's [4] - 53:22, 55:20, 56:9, 73:7
science [2] - 84:1, 89:12
scientific [4] - 83:2, 84:5, 97:20, 98:7
scope [1] - 16:19
searches [1] - 38:14
second [9] - 46:14, 64:1, 84:18, 87:1, 87:9, 103:3, 106:23, 107:25, 113:7
second-guessing [1] - 46:14
second-to-last [1] - 103:3
secondhand [1] - 25:24
secrecy [1] - 89:20
secrets [1] - 25:14
security [1] - 29:13
see [25] - 3:25, 5:15, 6:20, 6:22, 7:2, 8:1, 8:15, 14:14, 17:8, 23:16, 32:14, 41:24, 46:17, 47:8, 59:22, 65:22, 80:8, 82:6, 92:22, 97:13, 118:7, 118:18, 119:17, 120:18
See [1] - 50:6
seed [5] - 92:14, 92:20, 93:20, 96:12, 98:21
seeing [5] - 58:21, 83:19, 101:7, 115:15
seek [2] - 18:24, 23:23
seeking [5] - 3:9, 18:6, 19:2, 31:5, 35:3
seem [1] - 107:7
Sefranek [3] - 1:22, 123:9, 123:9
SEFRANEK [1] - 123:3
segregated [1] - 7:1
seize [1] - 95:12
seizing [1] - 95:11
seizure [1] - 95:12
semicolon [1] - 80:10
send [1] - 42:20, 42:21, 76:25
sense [31] - 8:3, 13:10, 22:4, 22:15, 26:10, 30:2, 40:21, 53:12, 75:12, 78:9, 78:17, 79:13, 80:20, 81:8, 81:16, 86:15, 89:17, 89:18, 95:2,

95:15, 98:3, 104:24, 113:3, 115:18, 116:16, 117:1, 118:8, 118:25, 119:25, 120:3
senses [1] - 54:18
sentence [5] - 90:25, 91:1, 92:25, 103:3, 107:12
sentences [3] - 106:23, 107:7, 107:25
separate [2] - 95:13, 95:14
September [2] - 1:6, 4:5
seriatim [1] - 43:9
series [3] - 50:15, 54:1, 71:24
serious [1] - 113:5
server [1] - 51:17
Service [1] - 9:25
service [1] - 38:13
services [5] - 10:17, 10:24, 80:9, 106:13, 106:25
set [5] - 30:18, 59:12, 83:12, 103:17, 104:6
sets [1] - 76:10
setting [4] - 90:13, 103:22, 104:3, 104:10
settled [3] - 4:20, 9:4, 88:19
several [1] - 110:9
share [1] - 22:12
shared [2] - 5:5, 93:11
shoehorn [1] - 58:25
shoes [1] - 61:6
short [3] - 3:21, 49:8, 59:10
shorten [1] - 30:20
shortening [1] - 3:6
shorthand [1] - 54:17
shortly [1] - 16:4
show [9] - 42:19, 59:20, 66:25, 67:2, 67:7, 87:25, 88:11, 103:14, 120:20
showed [1] - 5:6
showing [1] - 66:5
shown [1] - 17:6
shows [4] - 56:8, 67:10, 69:7, 104:1
sic [1] - 119:20
side [1] - 8:8
sidebar [2] - 115:9, 120:25
sided [1] - 84:5
sides [2] - 8:18, 66:24

**sign** [9] - 19:5, 23:11, 23:24, 28:17, 29:3, 29:8, 29:12, 36:22
**signature** [2] - 2:23, 31:10
**signed** [2] - 31:3, 77:1
**significant** [2] - 4:2, 27:20
**similar** [9] - 5:10, 23:20, 27:2, 36:15, 83:14, 84:21, 91:20, 112:22, 112:23
**simple** [1] - 100:10
**simply** [15] - 14:23, 21:16, 26:15, 28:11, 31:9, 39:22, 45:7, 61:20, 63:4, 89:24, 94:8, 100:10, 101:19, 103:4, 119:5
**single** [1] - 53:5
**singular** [1] - 119:22
**sit** [4] - 3:21, 30:24, 36:23, 73:18
**site** [1] - 80:10
**sits** [1] - 72:23
**sitting** [1] - 3:20
**situation** [2] - 37:7, 122:4
**situations** [1] - 84:25
**six** [1] - 66:4
**sixth** [1] - 82:6
**skip** [1] - 50:23
**slanted** [1] - 120:20
**slightest** [1] - 81:19
**slightly** [1] - 3:6
**slow** [1] - 79:25
**slurp** [1] - 38:12
**slurped** [1] - 38:13
**society** [2] - 66:20, 66:21
**software** [3] - 27:5, 98:5, 101:1
**solution** [1] - 29:21
**solve** [1] - 22:13
**someday** [2] - 23:19, 117:18
**someone** [20] - 14:15, 22:20, 25:4, 25:18, 39:2, 41:9, 44:22, 60:18, 61:14, 73:19, 79:7, 82:16, 85:22, 94:10, 94:13, 101:5, 102:25, 103:9, 103:15, 122:2
**somewhat** [1] - 60:15
**somewhere** [1] - 44:16
**sooner** [2] - 7:14, 7:23
**sophisticated** [3] - 23:10, 27:23, 29:2

**sorry** [6] - 5:1, 5:2, 12:16, 76:21, 94:4, 105:25
**sort** [40] - 9:3, 13:19, 17:20, 22:6, 22:24, 25:2, 26:6, 29:21, 37:11, 44:21, 45:4, 52:6, 58:24, 60:14, 61:10, 62:8, 64:3, 64:12, 65:24, 66:20, 72:8, 77:16, 78:17, 79:10, 80:16, 86:11, 88:4, 90:12, 93:3, 93:6, 94:1, 94:25, 95:19, 102:1, 102:21, 102:22, 111:6, 112:7, 119:7, 119:20
**sorts** [1] - 70:15
**sound** [10] - 57:7, 57:9, 57:15, 57:23, 60:2, 60:10, 65:24, 73:12, 77:3, 107:22
**sounded** [1] - 91:6
**soundness** [1] - 58:2
**sounds** [2] - 14:11, 31:22
**sources** [2] - 111:20, 113:14
**space** [9] - 89:2, 90:14, 90:16, 90:20, 91:3, 93:7, 96:4, 104:14, 104:22
**speaking** [1] - 58:13
**specific** [8] - 20:20, 21:10, 21:15, 36:4, 43:23, 51:15, 51:19, 51:24
**specifically** [3] - 14:1, 17:17, 58:13
**specificity** [3] - 20:17, 20:23, 39:23
**specifics** [1] - 21:4
**speculative** [4] - 85:11, 85:13, 85:20, 86:1
**speedy** [1] - 5:25
**spend** [3] - 53:15, 55:4, 78:15
**split** [1] - 110:1
**spoken** [1] - 15:8
**sponsor** [3] - 2:18, 2:19, 2:22
**sponsoring** [1] - 31:10
**sponsors** [1] - 2:20
**spreadsheets** [1] - 33:9
**stack** [1] - 8:19
**stacks** [1] - 57:12

**stake** [2] - 23:4, 122:6
**stand** [2] - 67:21, 73:20
**standard** [11] - 59:14, 61:20, 61:21, 61:22, 68:21, 81:15, 83:4, 83:9, 96:22, 97:10, 114:8
**Standards** [1] - 80:12
**standards** [31] - 56:25, 57:8, 59:12, 61:14, 61:15, 61:16, 61:18, 62:9, 62:15, 64:9, 65:2, 68:5, 68:19, 68:25, 69:3, 70:25, 71:1, 80:5, 80:9, 80:15, 81:20, 82:22, 83:4, 83:7, 83:13, 83:17, 83:22, 84:12, 95:25, 98:10
**standing** [1] - 79:4
**start** [13] - 2:15, 3:16, 3:17, 7:12, 14:21, 14:25, 33:4, 43:18, 76:10, 106:2, 108:18, 117:3, 121:3
**started** [2] - 30:14, 116:25
**starting** [3] - 2:5, 32:18, 55:24
**stat** [1] - 57:1
**State** [1] - 41:19
**state** [7] - 2:4, 4:21, 9:4, 69:13, 69:17, 70:10, 70:13
**statement** [2] - 80:9, 110:22
**statements** [3] - 35:8, 110:14, 114:12
**States** [4] - 1:23, 2:3, 2:8, 48:21
**STATES** [3] - 1:1, 1:2, 1:8
**status** [1] - 3:22
**statute** [1] - 110:20
**stay** [1] - 121:9
**staying** [1] - 109:2
**steal** [1] - 27:11
**stenographic** [1] - 123:5
**step** [6] - 12:2, 53:10, 57:4, 69:24, 74:19, 78:2
**stepping** [2] - 60:11, 61:6
**Sterlingov** [69] - 2:3, 2:13, 4:14, 4:23, 5:3, 5:24, 7:11, 7:17, 8:15, 9:2, 9:15, 10:5, 10:10, 10:11, 10:18,

10:25, 14:21, 15:8, 15:12, 15:21, 16:16, 16:22, 16:25, 17:7, 17:8, 18:1, 18:13, 19:2, 19:10, 19:11, 19:22, 20:18, 20:25, 40:5, 54:5, 54:10, 56:6, 57:17, 60:5, 63:14, 64:11, 64:17, 65:5, 66:12, 67:3, 67:8, 67:9, 67:10, 68:16, 75:1, 75:11, 81:5, 81:14, 82:17, 85:23, 85:25, 86:13, 90:15, 100:24, 101:5, 101:21, 110:18, 110:25, 114:5, 116:9, 117:1, 118:20, 119:23, 120:15
**STERLINGOV** [1] - 1:5
**Sterlingov's** [10] - 6:2, 10:9, 18:4, 30:21, 53:25, 54:12, 55:23, 56:18, 57:11, 66:15
**Still** [1] - 75:21
**still** [70] - 5:6, 6:23, 9:5, 14:18, 15:25, 17:18, 17:23, 18:23, 22:10, 23:24, 25:1, 25:14, 25:18, 26:20, 26:22, 30:3, 30:11, 32:13, 32:15, 32:18, 33:3, 33:5, 33:6, 33:11, 33:16, 33:20, 36:22, 37:8, 38:22, 42:2, 47:11, 47:12, 48:2, 48:9, 48:15, 49:6, 49:10, 49:14, 49:15, 49:16, 50:17, 50:20, 50:21, 51:1, 51:4, 54:6, 55:20, 56:3, 56:20, 72:7, 73:15, 74:18, 74:19, 75:9, 76:9, 77:6, 78:13, 79:12, 84:16, 85:14, 87:14, 88:7, 99:21, 102:6, 109:3, 116:1, 122:7
**still's** [2] - 107:19, 108:4
**Stockinger** [1] - 50:6
**stolen** [1] - 25:18
**stop** [1] - 22:18
**straight** [1] - 72:17
**straight-up** [1] - 72:17
**streamlining** [1] - 14:2
**street** [1] - 119:7
**Street** [2] - 1:11, 1:20

**stricken** [1] - 110:23
**strict** [1] - 89:19
**strike** [1] - 93:19
**strikes** [5] - 48:23, 85:11, 86:1, 118:4, 119:22
**strongly** [2] - 33:22, 94:18
**struck** [2] - 23:2, 27:7
**struggling** [2] - 89:7, 119:17
**students** [3] - 92:13, 93:17, 94:3
**studied** [2] - 44:20, 103:11
**studies** [1] - 46:1
**study** [2] - 44:24, 102:22
**stuff** [13] - 32:25, 36:17, 70:15, 77:5, 77:18, 77:20, 77:21, 94:20, 97:4, 97:19, 97:20, 114:12, 114:15
**subject** [9] - 25:20, 28:13, 34:4, 34:9, 35:18, 62:16, 73:14, 73:22, 95:12
**submit** [4] - 29:17, 69:2, 86:16, 104:9
**submits** [1] - 67:4
**subparagraphs** [1] - 17:21
**subpoena** [2] - 111:24, 115:1
**substance** [2] - 31:24, 52:24
**substitute** [3] - 47:18, 48:12, 69:23
**success** [1] - 41:8
**sued** [2] - 22:17, 36:12
**sufficiency** [3] - 107:8, 107:13, 108:2
**sufficient** [11] - 7:19, 13:19, 20:11, 61:9, 66:8, 66:9, 81:14, 105:17, 105:21, 105:23, 106:4
**sufficiently** [3] - 67:14, 67:17, 67:18
**suggest** [6] - 32:1, 33:3, 44:24, 82:22, 96:21, 98:15
**suggested** [1] - 6:7
**suggesting** [7] - 38:23, 49:1, 64:7, 82:15, 97:10, 97:24, 102:1
**suggestion** [1] - 99:5
**suggests** [1] - 61:19

**suit** [1] - 25:20
**sun** [1] - 76:10
**Sunday** [2] - 16:15, 29:24
**super** [1] - 79:9
**supplemental** [7] - 3:7, 4:3, 4:4, 4:8, 5:5, 30:19, 41:1
**support** [2] - 14:6, 14:9
**supports** [2] - 19:1, 19:23
**suppose** [5] - 30:10, 46:4, 80:23, 89:11, 89:15
**supposed** [5] - 9:17, 31:6, 40:6, 48:14, 92:25
**surprise** [1] - 81:19
**surprised** [8] - 26:25, 69:25, 82:2, 82:12, 87:23, 98:13, 99:9, 115:5
**surprising** [1] - 34:6
**surveys** [1] - 46:2
**suspect** [3] - 37:22, 88:1
**suspect's** [2] - 92:15, 93:21
**synonymous** [1] - 49:22
**system** [2] - 40:6, 41:20

## T

**table** [3] - 18:3, 121:8, 121:10
**tablet** [1] - 9:6
**tail** [1] - 37:20
**tainted** [2] - 119:8, 119:14
**Tamara** [3] - 1:22, 123:9, 123:9
**TAMARA** [1] - 123:3
**tampered** [2] - 12:7, 13:2
**TAUSEEF** [1] - 1:19
**Tauseef** [1] - 2:11
**teaches** [4] - 92:13, 93:17, 94:3, 104:15
**techniques** [1] - 88:19
**telephone** [1] - 121:11
**telephones** [1] - 121:8
**teller** [2] - 79:5, 79:6
**temple** [1] - 108:25
**tend** [2] - 6:11, 26:13
**tenets** [7] - 51:12, 64:4, 64:16, 64:20, 65:25, 66:2, 67:21

**tentatively** [1] - 105:5
**terms** [12] - 16:13, 37:16, 38:13, 41:12, 42:11, 72:13, 73:11, 86:8, 98:3, 98:6, 98:8, 115:23
**terribly** [3] - 9:21, 102:21, 109:16
**terrific** [1] - 40:5
**test** [3] - 101:8, 103:12, 105:20
**tested** [1] - 50:2
**testified** [6] - 33:17, 56:20, 71:15, 74:19, 100:18, 102:6
**testifies** [2] - 56:4, 116:3
**testify** [38] - 27:24, 43:20, 46:22, 47:6, 47:15, 48:9, 49:21, 51:5, 51:11, 60:7, 62:7, 65:12, 69:12, 69:25, 70:1, 72:4, 74:18, 76:17, 77:20, 78:5, 84:24, 86:7, 88:16, 91:12, 92:8, 94:8, 95:3, 95:5, 99:18, 99:25, 101:20, 105:16, 105:21, 106:4, 106:15, 106:24, 107:13, 107:24
**testifying** [6] - 45:7, 48:2, 72:7, 89:24, 105:6, 107:15
**testimony** [32] - 6:24, 11:19, 46:6, 47:20, 50:3, 50:11, 52:25, 58:5, 58:8, 65:9, 68:22, 71:13, 75:13, 78:10, 80:23, 81:6, 84:11, 93:5, 93:14, 101:25, 102:5, 102:13, 102:16, 108:19, 110:22, 113:10, 113:11, 113:13, 113:20, 114:10, 120:11, 121:21
**testing** [8] - 100:11, 101:1, 101:3, 101:6, 103:4, 103:10, 103:16
**text** [1] - 42:21
**THE** [238] - 1:1, 1:1, 1:8, 2:2, 2:9, 2:14, 3:1, 5:1, 5:14, 5:20, 6:6, 6:10, 6:18, 6:22, 7:5, 7:10, 7:22, 8:1, 9:13, 9:24, 10:2,

11:8, 11:14, 11:20, 11:25, 12:15, 12:18, 13:11, 13:23, 14:11, 15:6, 15:12, 15:14, 15:15, 15:18, 15:19, 16:5, 16:10, 17:11, 18:5, 19:21, 20:12, 23:5, 24:13, 25:3, 25:10, 25:16, 26:4, 26:17, 27:6, 28:4, 28:9, 28:15, 30:1, 30:10, 30:18, 30:23, 31:15, 31:19, 31:22, 32:8, 32:13, 34:2, 34:23, 35:1, 35:7, 35:16, 35:21, 36:4, 36:19, 37:10, 37:19, 38:20, 39:12, 40:2, 41:8, 41:14, 41:16, 42:1, 42:13, 42:21, 42:25, 43:4, 43:6, 43:11, 43:15, 43:18, 43:24, 44:15, 45:24, 46:9, 46:13, 46:21, 47:2, 47:14, 47:24, 48:5, 48:7, 48:17, 48:23, 49:8, 49:20, 50:7, 50:10, 50:24, 51:2, 51:10, 51:20, 52:23, 53:4, 53:8, 53:11, 53:16, 53:23, 54:8, 54:15, 55:2, 55:11, 55:19, 56:1, 56:7, 56:10, 56:12, 57:25, 59:2, 60:6, 62:6, 62:12, 63:16, 63:24, 64:24, 65:7, 66:18, 68:8, 69:6, 69:21, 70:18, 71:4, 71:11, 72:2, 72:11, 72:18, 72:24, 73:13, 74:12, 76:4, 76:7, 76:14, 76:19, 76:22, 77:3, 77:12, 77:19, 78:4, 78:23, 79:25, 80:14, 81:11, 81:16, 84:3, 84:8, 84:15, 84:23, 85:11, 87:1, 87:6, 87:10, 87:13, 87:23, 88:15, 89:5, 89:11, 90:5, 90:18, 91:5, 91:11, 91:19, 92:5, 92:23, 93:2, 93:9, 93:15, 94:2, 94:5, 95:7, 96:9, 96:15, 97:2, 97:23, 98:12, 98:23, 99:14, 99:23, 100:16, 100:20, 101:17, 102:11, 103:6, 103:24, 104:4,

104:18, 105:3, 105:5, 105:10, 105:14, 105:19, 105:25, 106:21, 107:3, 107:5, 107:11, 107:24, 108:7, 108:15, 109:3, 109:15, 109:20, 109:25, 110:19, 112:15, 113:7, 113:17, 113:24, 114:9, 114:14, 114:20, 115:4, 115:12, 116:1, 116:19, 116:23, 119:2, 120:9, 121:6, 121:13, 121:16, 121:24, 122:11
**themselves** [3] - 9:20, 16:23, 117:23
**theoretical** [1] - 77:23
**theoretically** [2] - 77:18, 78:3
**theory** [1] - 111:9
**therefore** [8] - 10:23, 12:8, 48:25, 60:22, 60:23, 61:14, 74:25, 90:3
**they've** [3] - 33:20, 35:16, 73:20
**thinking** [5] - 10:8, 20:9, 88:7, 88:11, 118:11
**thinks** [5] - 11:9, 18:25, 20:9, 66:8, 110:4
**third** [3] - 29:1, 106:23, 107:25
**third-party** [1] - 29:1
**thoughts** [3] - 26:7, 89:5, 109:20
**thousands** [3] - 27:16, 27:17, 33:10
**threat** [1] - 22:16
**threaten** [3] - 28:23, 43:21, 43:25
**three** [2] - 3:11, 100:17
**threw** [1] - 120:16
**throw** [2] - 39:1, 117:7
**tie** [1] - 120:19
**tied** [1] - 94:10
**ties** [1] - 100:23
**tight** [1] - 3:14
**timing** [2] - 26:24, 31:25
**timing-wise** [1] - 26:24
**title** [3] - 48:19, 58:22,

66:5
**today** [15] - 5:21, 7:16, 9:2, 11:11, 14:10, 16:11, 30:3, 30:20, 42:23, 76:8, 104:25, 108:9, 109:18, 109:21, 110:12
**together** [3] - 8:23, 10:4, 55:17
**token** [1] - 81:12
**tomorrow** [3] - 4:18, 4:19, 9:22
**tonight** [2] - 108:16, 108:18
**took** [1] - 30:25
**tool** [3] - 78:24, 79:2, 116:4
**tools** [1] - 29:2
**top** [4] - 42:8, 42:10, 96:4, 106:2
**topic** [3] - 73:16, 78:6, 113:25
**topics** [2] - 51:5, 105:12
**TOR** [1] - 1:18
**Tor** [8] - 1:20, 2:10, 105:18, 106:6, 106:10, 106:13, 106:16, 107:1
**Tor-based** [6] - 105:18, 106:6, 106:10, 106:13, 106:16, 107:1
**totally** [4] - 19:18, 95:13, 95:14, 112:11
**towards** [1] - 15:13
**trace** [11] - 44:1, 53:3, 56:13, 56:17, 57:4, 59:18, 59:23, 72:17, 73:7, 73:8, 74:4
**traced** [4] - 54:9, 54:11, 56:4, 56:20
**traces** [3] - 47:19, 48:12, 73:25
**tracing** [33] - 27:2, 43:20, 43:25, 44:11, 46:19, 46:23, 47:5, 47:6, 47:16, 50:12, 52:4, 54:15, 54:17, 55:20, 71:20, 71:21, 72:12, 72:13, 72:16, 73:1, 73:15, 73:19, 73:20, 74:1, 74:18, 75:20, 77:17, 79:12, 83:16, 104:25, 116:24
**track** [2] - 89:13, 101:20
**tracks** [1] - 29:9
**trade** [1] - 25:14

**traded** [1] - 68:17
**traditional** [7] - 54:18, 88:19, 88:22, 89:14, 90:12, 91:14, 92:2
**trained** [3] - 62:9, 68:6, 74:10
**training** [2] - 50:13, 78:2
**transacted** [1] - 93:25
**transaction** [23] - 54:7, 56:21, 57:5, 59:20, 65:4, 66:14, 68:13, 74:20, 85:23, 100:25, 101:19, 101:20, 101:23, 102:3, 102:7, 102:9, 102:14, 102:15, 102:24, 103:13, 103:22, 104:2, 104:7
**transaction-level** [1] - 102:9
**transactions** [34] - 52:8, 54:1, 54:5, 54:11, 55:1, 55:5, 55:22, 56:17, 57:2, 59:19, 60:4, 63:21, 75:14, 79:1, 79:23, 80:2, 86:9, 86:13, 86:20, 89:13, 89:25, 100:3, 100:4, 100:5, 100:7, 100:10, 100:15, 100:22, 102:2, 102:17, 102:18, 102:24
**TRANSCRIPT** [1] - 1:7
**transcript** [2] - 123:4, 123:6
**transcripts** [2] - 10:16, 10:24
**transfer** [3] - 52:14, 56:6, 86:22
**transferred** [5] - 9:3, 60:20, 62:24, 85:4, 94:12
**transfers** [1] - 85:10
**translation** [3] - 8:21, 10:16, 10:24
**translations** [2] - 8:14, 9:10
**transporting** [1] - 9:18
**treat** [2] - 101:18
**trial** [21] - 3:15, 4:9, 4:13, 4:15, 5:25, 6:2, 6:3, 6:14, 7:13, 14:2, 14:25, 15:1, 30:21, 32:10, 32:18, 33:22, 41:3, 64:23, 93:5, 110:6, 112:6
**Trial** [1] - 95:22
**tried** [1] - 22:13

**trillion** [1] - 80:21
**trot** [1] - 116:8
**troubling** [1] - 34:21
**true** [14] - 38:9, 53:1, 53:15, 53:25, 55:23, 58:16, 83:9, 89:15, 93:10, 93:19, 116:25, 118:1, 123:4, 123:5
**trustee** [2] - 13:12, 13:15
**try** [6] - 3:5, 3:12, 22:12, 26:19, 109:15, 109:21
**trying** [20] - 16:2, 21:8, 30:7, 30:8, 30:19, 41:14, 42:2, 42:17, 44:1, 44:2, 44:25, 45:1, 58:25, 68:1, 82:4, 88:2, 95:18, 98:15, 114:21, 121:19
**turn** [2] - 43:1, 43:3
**turning** [1] - 27:8
**turns** [1] - 84:9
**twist** [1] - 70:16
**two** [15] - 3:10, 3:11, 13:11, 14:25, 21:11, 22:2, 53:14, 59:9, 60:6, 60:9, 63:11, 100:19, 103:2, 109:24, 119:7
**two-way** [1] - 119:7
**twofold** [1] - 21:6
**type** [7] - 22:4, 46:1, 78:6, 78:18, 86:4, 98:17, 104:8
**types** [5] - 77:4, 78:25, 86:19, 102:17, 102:24
**typo** [1] - 49:22

**U**

**U.S** [1] - 1:13, 49:3, 80:17
**u.S** [1] - 1:16
**ultimate** [9] - 55:13, 69:11, 69:13, 69:18, 70:7, 70:9, 70:23, 71:5, 85:6
**ultimately** [1] - 75:5
**unable** [1] - 39:15
**unavailable** [2] - 76:8
**uncertainties** [2] - 63:9, 71:24
**uncertainty** [7] - 61:9, 61:25, 62:21, 65:8, 65:10, 65:11, 67:13
**uncover** [1] - 111:20

**under** [19] - 10:12, 14:22, 19:7, 23:24, 24:2, 24:4, 25:15, 34:18, 36:23, 36:24, 37:2, 57:8, 60:9, 61:23, 64:6, 66:21, 89:20, 97:11
**understandably** [1] - 21:7
**Understood** [2] - 46:20, 49:19
**understood** [23] - 6:4, 7:8, 7:21, 10:1, 12:6, 18:7, 18:8, 19:16, 20:2, 25:7, 28:1, 30:22, 37:5, 39:8, 75:23, 83:9, 100:25, 105:9, 105:13, 109:19, 114:7, 121:23, 122:10
**unequivocal** [1] - 71:22
**unequivocally** [1] - 99:18
**unethical** [1] - 119:20
**unforeseen** [1] - 115:11
**unfortunately** [1] - 114:3
**unhelpful** [1] - 86:2
**United** [4] - 1:23, 2:3, 2:8, 48:21
**UNITED** [3] - 1:1, 1:2, 1:8
**universal** [1] - 91:22, 111:10, 114:18
**University** [1] - 104:16
**unless** [9] - 4:19, 59:7, 60:23, 60:25, 66:4, 96:22, 114:23, 115:2, 119:13
**unlikely** [1] - 100:4
**unmixing** [1] - 102:3
**unonerous** [1] - 34:15
**unreasonable** [1] - 37:11
**unrelated** [2] - 54:2
**unreliable** [2] - 39:5, 52:22
**unsettled** [1] - 49:15
**unsound** [6] - 61:7, 61:11, 63:18, 74:4, 74:15, 83:24
**unusual** [3] - 23:12, 30:25, 34:13
**up** [49] - 3:11, 4:5, 4:7, 11:9, 16:17, 16:20, 17:25, 19:17, 23:7, 23:8, 23:20, 28:19, 28:24, 29:1, 37:9,

42:19, 43:1, 43:7, 43:16, 54:24, 55:10, 59:3, 60:4, 65:18, 67:2, 71:23, 72:17, 78:7, 80:16, 87:25, 88:11, 90:8, 98:10, 103:17, 103:22, 104:3, 104:10, 108:18, 108:24, 109:21, 109:25, 110:16, 110:21, 111:5, 111:23, 112:10, 112:11, 121:11, 122:8
**update** [1] - 40:22
**urges** [1] - 109:4
**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**useful** [3] - 40:4, 83:10, 83:17
**user** [8] - 43:21, 43:25, 100:8, 100:11, 103:4, 103:5, 104:16
**users** [7] - 44:8, 44:14, 44:25, 45:17, 89:4, 100:11, 103:5
**uses** [2] - 78:11, 104:20
**utilized** [3] - 43:20, 46:23, 47:16

**V**

**vague** [1] - 44:16
**valuable** [1] - 99:4
**value** [3] - 21:12, 21:15, 28:23
**various** [4] - 45:10, 58:11, 81:20, 82:22
**vendor** [1] - 29:1
**venue** [4] - 111:9, 111:12, 111:14, 114:18
**veracity** [1] - 114:9
**verdict** [1] - 113:22
**verification** [1] - 61:1
**verify** [2] - 54:20, 63:20
**Verret** [83] - 33:4, 43:1, 43:3, 43:20, 44:7, 46:22, 47:4, 47:8, 47:15, 47:20, 48:15, 49:14, 49:21, 50:3, 50:12, 51:6, 51:9, 51:11, 52:19, 56:23, 57:6, 58:1, 59:2, 63:17, 63:25, 71:13, 72:6, 72:9, 72:18, 73:4, 73:13,

75:18, 75:22, 76:16, 76:18, 76:19, 76:22, 77:8, 78:10, 78:17, 79:10, 79:21, 80:24, 82:10, 82:19, 84:17, 84:24, 85:2, 85:7, 88:16, 88:21, 89:1, 89:24, 91:2, 91:12, 91:15, 91:21, 92:8, 92:13, 92:18, 93:17, 96:11, 98:18, 99:18, 99:25, 100:2, 100:6, 100:8, 100:13, 100:18, 102:5, 102:6, 102:20, 103:11, 104:5, 105:6, 105:16, 106:4, 106:7, 106:12, 106:15, 106:24, 107:24
**Verret's** [6] - 11:18, 43:9, 49:17, 80:23, 107:20
**version** [1] - 43:11
**versus** [5] - 9:16, 9:20, 22:24, 63:8, 112:6
**vice** [3] - 2:11, 2:16, 2:18
**view** [15] - 12:7, 17:12, 17:15, 18:10, 26:22, 39:4, 42:17, 74:15, 80:22, 82:10, 84:5, 97:14, 107:18, 115:16, 118:19
**viewing** [1] - 25:14
**viewpoint** [6] - 57:23, 60:2, 63:19, 116:14, 116:15, 120:5
**views** [1] - 11:3
**violate** [4] - 17:10, 51:12, 65:25, 66:2
**violated** [2] - 61:14, 71:1
**violates** [11] - 56:25, 61:18, 61:20, 61:22, 62:8, 62:14, 64:3, 64:4, 65:13, 67:21, 68:19
**violating** [2] - 61:15, 82:21
**visit** [1] - 9:7
**visiting** [1] - 9:22
**voir** [1] - 105:2
**volume** [1] - 33:3
**vs** [1] - 1:4

**W**

**wait** [2] - 25:4, 33:5
**waiting** [1] - 42:6

**walk** [1] - 71:23
**walked** [1] - 71:14
**Wall** [1] - 1:20
**wall** [2] - 23:11, 122:8
**walled** [2] - 23:16, 27:24
**wallet** [10] - 97:8, 100:11, 101:7, 103:4, 103:10, 103:16, 103:22, 104:1, 104:3, 104:10
**wallets** [2] - 103:12, 103:18
**wants** [20] - 5:3, 6:2, 10:12, 11:1, 11:4, 11:5, 14:23, 24:6, 32:20, 41:24, 44:12, 45:24, 71:19, 71:23, 74:17, 91:21, 94:8, 105:21, 106:24
**Washington** [6] - 1:5, 1:12, 1:14, 1:17, 1:24, 123:11
**wasting** [1] - 27:13
**ways** [10] - 6:1, 21:19, 24:5, 27:25, 28:20, 38:14, 40:14, 88:24, 89:3, 90:17
**website** [1] - 87:19
**week** [4] - 3:24, 16:9, 17:25, 30:17
**weekend** [6] - 16:14, 29:22, 32:19, 109:15, 109:22, 122:11
**weeks** [7] - 3:11, 3:15, 16:8, 35:1, 35:2, 40:11
**weigh** [2] - 17:12, 20:8
**welcome** [1] - 19:10
**Wharton** [2] - 72:22, 104:15
**whatsoever** [2] - 81:25, 111:18
**whole** [6] - 17:25, 33:21, 44:1, 50:8, 50:14, 108:19
**willful** [1] - 14:7
**willing** [4] - 7:11, 33:14, 40:13, 41:4
**wiped** [1] - 24:17
**wire** [1] - 52:14
**wireless** [1] - 121:8
**wise** [2] - 26:24, 115:23
**withdrawal** [2] - 15:10, 52:15
**withdrawn** [1] - 15:21
**witness** [17] - 36:23, 37:9, 45:7, 60:17,

60:22, 60:23, 65:23, 67:20, 67:25, 72:4, 75:8, 101:19, 112:3, 114:4, 114:6
**witness's** [3] - 61:24, 71:8, 114:10
**witnesses** [10] - 65:17, 65:21, 111:20, 112:21, 113:1, 113:5, 113:10, 117:12, 120:10, 121:20
**wonder** [1] - 50:14
**wondering** [1] - 120:1
**word** [12] - 26:10, 34:15, 49:21, 51:14, 77:14, 78:19, 78:20, 78:24, 80:8, 81:1, 87:6, 109:14
**wording** [1] - 70:16
**words** [2] - 26:15, 49:23
**works** [8] - 29:9, 48:20, 52:20, 58:3, 58:4, 60:8, 120:13
**world** [5] - 24:4, 25:20, 26:23, 27:15, 38:23
**worried** [2] - 26:9, 90:21
**worry** [3] - 22:22, 61:5, 82:20
**writes** [1] - 99:17
**writing** [1] - 23:13
**written** [2] - 95:23, 96:4
**wrongdoing** [1] - 24:20
**wrongfully** [1] - 106:15
**wrongly** [1] - 120:5
**wrote** [1] - 120:16
**www.coindesk.com** [1] - 47:22

---

## Y

**year** [1] - 33:25
**years** [1] - 114:4
**yesterday** [2] - 28:4, 29:3
**York** [4] - 1:17, 1:21, 41:19, 87:19
**you-all** [1] - 18:11
**yourself** [2] - 9:21, 23:19

---

## Z

**Zcash** [4] - 45:19,

72:23, 103:18, 104:21
**Zoom** [6] - 5:21, 6:7, 14:16, 42:15, 42:23, 109:11