```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
      UNITED STATES OF AMERICA,      ) Criminal Action
 3                                   ) No. 1:21-CR-0399
                        Plaintiff,   )
 4                                   ) MOTION CONFERENCE
      vs.                            )
 5                                   ) Washington, D.C.
      ROMAN STERLINGOV,              )
 6                                   ) November 13, 2023
                        Defendant.   ) Time:  1:35 P.M.
 7
                TRANSCRIPT OF MOTION CONFERENCE
 8          BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                  UNITED STATES DISTRICT JUDGE
 9
                      A P P E A R A N C E S
10
      For the Plaintiff:      CHRISTOPHER BROWN
11                            USAO-DOJ
                              601 D Street, NW
12                            Washington, DC 20001

13                            ALDEN PELKER
                              U.S. DEPARTMENT OF JUSTICE
14                            950 Pennsylvania Avenue, NW
                              Washington, DC 20530
15
                              JEFFREY PEARLMAN
16                            DOJ-CRM
                              U.S. Department of Justice
17                            1301 New York Ave. NW
                              Washington, DC 20005
18
      For the Defendant:      TOR EKELAND
19                            MICHAEL HASSARD
                              Tor Ekeland Law, PLLC
20                            30 Wall Street, 8th Floor
                              New York, NY 10005
21

22
      Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
23                            Official Court Reporter
                              United States Courthouse, Room 6714
24                            333 Constitution Avenue, NW
                              Washington, DC  20001
25                            202-354-3246
```

```
1                        P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Criminal Case 21-399, the

3    United States v. Roman Sterlingov.

4              Counsel, would you please identify yourself for the

5    record, starting with the government.

6              MS. PELKER:  Good afternoon, Your Honor.  Alden

7    Pelker for the United States, joined at counsel table by

8    Christopher Brown and Jeffrey Pearlman.

9              THE COURT:  Good afternoon to all of you.

10             MR. EKELAND:  Good afternoon, Your Honor.  Tor

11   Ekeland, along with Michael Hassard, for defendant, Roman

12   Sterlingov, who is present in court.

13             THE COURT:  Good afternoon to all of you as well.

14   Thank you for being here.

15             As I'm sure you gathered from reading my opinion, I

16   just have some questions that you-all could help me with that

17   will help me resolve the pending motion for access by the

18   defendant to the material that was produced by Chainalysis

19   relating to the detailed heuristics.  So, Ms. Pelker.

20             MS. PELKER:  Yes, Your Honor.  So the Court's

21   memorandum opinion and order raised a number of factual and

22   legal questions.  And to the extent -- unless the Court would

23   find something else more helpful, the government thought we

24   would address the factual questions one by one and then pivot

25   to the legal questions unless --
```

 1            THE COURT:  No.  That's fine.  Thank you.

 2            MS. PELKER:  One of the questions that the Court

 3    raised was regarding the extent to which the information in the

 4    sensitive supplemental heuristics discovery would be admitted

 5    at trial.  The government does not intend to admit that, that

 6    additional report or the attachments.  It's not evidence.  It's

 7    not evidence that's being used against the defendant in any way

 8    which we think is significant for an evaluation of, really, the

 9    discoverability of this material in the first place.

10            THE COURT:  My question really was -- and I saw you

11    made that point in your papers, I think.

12            Buy my question was, what is the likelihood that it

13    is going to, nonetheless, come out at trial, either through

14    direct or more likely perhaps through cross-examination?  And

15    maybe that's more of a question for the other side than for

16    you.

17            But if it's going to come out at trial, then that,

18    obviously, diminishes any prejudice that would be caused by

19    showing it to Mr. Sterlingov now.

20            MS. PELKER:  Your Honor, we think, to the extent that

21    it would come out at trial, it would be the defense -- to the

22    extent the defense would seek to use the materials to

23    cross-examine Ms. Bisbee, the use of that material would be

24    extremely limited.

25            Ms. Bisbee did not rely on the materials in putting

1    together her expert report because they didn't exist at the

2    time, and we don't expect her to testify to anything that's

3    inconsistent in the report, so the impeachment value, really,

4    is very, very limited.

5           We are considering -- and it wouldn't be appropriate

6    for the defense to try and, essentially, read this into the

7    record as a way of making a point of some sort to publicize

8    this.  And the government may seek a protective order for trial

9    that's been consistent with what is sometimes implemented in

10   this District regarding the, sort of, sensitive materials that

11   could allow for appropriate use for cross-examination to the

12   extent that there is anything particular within the materials

13   that the defense has a true good faith basis to confront

14   Ms. Bisbee with.  We're not sure what that would be.

15          But if they did, to still allow that

16   cross-examination without it being outed publicly in a way that

17   would jeopardize the law enforcement and Chainalysis's

18   interests in keeping its materials --

19          THE COURT:  I suppose one way that I could walk that

20   line is -- there, obviously, is some sensitivity in the Court

21   closing a trial at any time during the course of the trial,

22   given the right to an open-in-public trial, but I suppose one

23   way to navigate that issue would be to require a proffer or

24   perhaps even an examination outside the presence of the jury

25   with the courtroom closed to determine whether it actually is

1    even relevant or is being offered for a proper purpose.  And

2    then I can decide that and then only offer or permit it in the

3    open courtroom if it turned out that it was an appropriate

4    subject of examination.

5            MS. PELKER:  We think that that could be appropriate,

6    Your Honor.  And that, sort of, proffer outside the presence of

7    the jury may be what works best for this type of evidence or

8    information.

9            As you know, the Department of Justice has a number

10   of policies.  We actually need to -- I would have to go back to

11   our management and seek approval to not, actually, oppose a

12   closing of the courtroom.  That's something that we will go and

13   circle back to.

14           What we were actually thinking, Your Honor, is that

15   in other cases in this District, including in trade secrets

16   cases, there are certain procedures that may be implemented

17   with cross-examination where you don't read the text of the

18   concerning material into the record.  You can point to it with

19   your finger, et cetera.

20           And we will work with defense counsel to put forward

21   some proposed parameters to the Court if we take that back and

22   think it's appropriate.

23           We also just are not at all clear how this would

24   really come up in any, sort of, proper impeachment of

25   Ms. Bisbee or of any of the other witnesses.

1          THE COURT:  Okay.

2          MS. PELKER:  Also, that it's -- it is very different

3     from confronting a witness with specific excerpts of this more

4     voluminous material at trial than giving the defendant or

5     others access to it in a way that would allow for them to

6     really meaningfully review it and study it, copy it down for

7     really impermissible purposes that don't relate to the

8     cross-examination of a witness.

9          THE COURT:  Right.  Your comments there do highlight

10    the fact that I think there are a continuum of questions, and

11    today I don't need to decide what happens at trial.  We'll have

12    to deal with all of that.

13          And one of the things that I do want to hear from the

14    parties about is whether there are compromised positions that

15    accommodate the interests of both sides with respect to the

16    issue that's just in front of me with respect to

17    Mr. Sterlingov's access.

18          And if one of the things that the government would

19    request is that Mr. Sterlingov, if allowed to view the

20    material, not be allowed to keep a copy of it, that's the sort

21    of thing that the Court would be open to considering.

22          MS. PELKER:  One of the other questions that the

23    Court raised was the difference between the original

24    disclosures and then the sensitive supplemental information.

25          So the government had produced to the defense an

1    original report from Ms. Bisbee back in December of 2022 which

2    contained voluminous attachments, as well as a supplemental

3    report which contained even more detailed attachments but that

4    were still part of what we're going to refer to here as the

5    Bisbee report and attachments as opposed to the sensitive

6    heuristic supplement.

7           THE COURT:  Okay.

8           MS. PELKER:  The defendant has been able to review

9    Ms. Bisbee's reports and those extensive detailed attachments.

10   We're talking hundreds of thousands of different addresses

11   listed row by row.  The report itself describes the heuristics.

12   It explains co-spend; it explains and describes how Chainalysis

13   uses behavioral heuristics.

14           It walks through the composition of the various

15   clusters that the government will be introducing at trial and

16   that are relevant to Mr. Sterlingov's case.  It describes each

17   of the different heuristics; co-spending and behavioral.  And

18   it describes how Chainalysis investigates a service's

19   particular transaction patterns to develop the clustering

20   algorithms that are specific to the service.  And that it uses

21   those transactions and address features to, essentially,

22   provide a fingerprint.

23           And Ms. Bisbee's report that the defendant has been

24   able to review has the tables that list off the different

25   features that Chainalysis is looking for when it's doing its

1    behavioral heuristic analysis.  And Ms. Still was able to

2    review that in detail and provide critique and commentary in

3    her expert report and then in testimony regarding the -- at the

4    *Daubert* hearing.

5         So the Bisbee report is already quite detailed.  The

6    government has provided that to the defendant.  He and his

7    experts and counsel have been able to review that.

8         THE COURT:  Can I ask you about that, though.  That's

9    getting to the point that I -- maybe you were getting ready to

10   turn to this.

11        When you say that it describes the behavioral

12   heuristics, does it say, generically, that we applied -- that

13   Chainalysis applied behavioral heuristics, and this is the type

14   of thing or this is what a behavioral heuristic is, or does it

15   actually get down to a more granular analysis and say, in this

16   particular analysis here's what the specific behavioral

17   heuristics were, or is that something that only appears in the

18   more sensitive disclosure?

19        MS. PELKER:  So it's a little bit between the two.

20   So it does list off in kind of the tables of looking at the

21   different properties, it lists off the specific things that

22   Chainalysis is looking at for the behavioral heuristics that

23   were implemented for these clusters.

24        What is different in the more granular, the sensitive

25   heuristics supplement, is really the formula of exactly how the

1      different features were put together and weighted to come up

2      with the individual fingerprint.

3              So it's almost like the difference between having the

4      list of ingredients and instructions versus -- in the Bisbee

5      report versus the really precise formulas of exactly how they

6      were used to build the cluster for each one of the clusters.

7      And that's the difference between the two.

8              So that the information -- the granularity of the

9      detail in that sensitive heuristics disclosure has negligible,

10     if any, value.  We don't think it really has -- it has no value

11     to the defense.

12             Even for someone who was trying to really do an

13     assessment of the clustering, it is extremely, extremely

14     technical and not going to bear on anything that would come in

15     at trial.  But is highly, highly sensitive, and the disclosure

16     of which would be concerning both to the government and to

17     Chainalysis.  And part of it --

18             THE COURT:  Okay.  This is what I wanted to drill

19     down more on.

20             I take it the government's concern here is that

21     either Mr. Sterlingov will tell somebody else what this highly

22     technical information is or that he someday will make use of

23     that himself in ways that it will allow him to evade tracing or

24     allow others to avoid -- evade tracing, assuming the

25     government's allegations that he's actually involved in money

 1    laundering and the like.

 2         And one of the questions I had is just how long these

 3    behavioral heuristics actually are of great investigative

 4    value.  And I can imagine a world in which this is a constantly

 5    ongoing battle of whack-a-mole in which the investigators

 6    figure out how to trace transactions that people are doing

 7    their best to hide, and those who are doing their best to hide

 8    figure out how the government is tracing them, and they come up

 9    with a different approach, and the government figures out how

10    to trace that and so forth.

11         So that over a period of months, or in this case

12    years, it may be that things become antiquated fairly quickly.

13    So what I'm interested in is whether the granular heuristics

14    here even today are what Chainalysis would likely be using or

15    whether they'd actually become dated because those who are

16    trying to evade Chainalysis have evolved.

17         MS. PELKER:  So, Your Honor, I think that's an astute

18    point, and we definitely do see very close attention by

19    criminals and nation-state actors in looking at exactly what

20    the government is doing with its tracing and figuring out how

21    to circumvent those particular measures, and Chainalysis's

22    fingerprinting is service-specific.  But how they do the

23    fingerprinting is really what we're most concerned about

24    protecting here.

25         So that if -- it's less exactly what the fingerprint

1    was for Bitcoin Fog but, rather, what parts of Bitcoin Fog's

2    activity in the behavioral clustering did Chainalysis pull

3    out -- and that's information that was disclosed to the

4    defendant -- but exactly how they got implemented and weighed.

5    And one of the real concerns here is that in the supplemental

6    heuristics disclosure, it also includes information about the

7    kickouts; basically, of what behavior would cause Chainalysis

8    not to cluster something.

9          There's been a lot of discussion about how

10   Chainalysis goes to great lengths to be underinclusive and

11   avoid false positives.

12         THE COURT:  Right, right.

13         MS. PELKER:  But if an adversary were able to

14   understand what causes Chainalysis to kick something out of its

15   clustering algorithm, it would be able to, potentially, use

16   that information to then defeat the clustering.

17         Now, certainly, because of service-specific, what

18   would cause a kickout from Bitcoin Fog may be different than

19   what would cause a kickout from something else.  But

20   understanding here -- it's not just Bitcoin Fog.  We've got ten

21   different services looking at exactly how Chainalysis developed

22   the behavioral heuristic across those ten services; how they

23   were customized; what features Chainalysis thought was

24   important; how they would do the kickout would be significant

25   for an adversary.

1          And the building blocks that were used for the

2    behavioral heuristics for these clusters are still used for

3    clusters that are being actively built and tested by

4    Chainalysis now, and that are relied on by the government in

5    very significant criminal cases and significant national

6    security cases where there's a very important and compelling

7    interest that we not allow adversaries to be able to contravene

8    those measures.

9          THE COURT:  Are any of the ten services at issue

10    still in operation?

11          MS. PELKER:  I believe -- I'd have to go back through

12    the list.  But I believe no, that these are all static clusters

13    that are not operating, which was, in part -- to the extent we

14    expect a list of addresses for those services to be admitted at

15    trial that was an attachment to the original report, and so

16    that was one of the factors weighing in that as well; that

17    these are static lists.

18          THE COURT:  All right.  Given the fact that there are

19    particular portions of the report that -- or supplemental,

20    sensitive report that may be particularly concerning, ones

21    where some of the information really may be dated by now;

22    obviously, not dated with respect to the analysis that

23    Chainalysis did for purposes of this case, but dated just

24    because we live in a world in which technical evolution occurs

25    very quickly.

1          Are there portions of this supplemental report where

2     the government and Chainalysis may not be entirely comfortable,

3     more comfortable sharing with Mr. Sterlingov and others where

4     you'd say, this is something where, one, we really don't see

5     how this is particularly relevant to any issues that are likely

6     to be litigated in this case, and this really is something here

7     that is extremely sensitive and we're still using and,

8     therefore, we would request that you slice things a little

9     finer here?

10          MS. PELKER:  So, Your Honor, we did review in the

11     Court's opinion and order the suggestion that we look at

12     whether there's things that may be less sensitive.  What we

13     found was that, really, anything that was less sensitive was

14     really in the prior report.  And if we went through to try and

15     redact out what would be considered active and sensitive, we

16     would, essentially, from the attachments, be eliminating the

17     additional columns that were added to this report.  So it would

18     put defense pretty much back at what the original attachments

19     were.

20          And then with the report itself, we would -- it would

21     look like a series of black boxes without anything really in

22     the way of substantive information that would be of any, sort

23     of, use to the defendant.

24          THE COURT:  I'm trying to make sure I understand the

25     distinction between what it is that Mr. Sterlingov currently

 1    has access to and what's at issue here.

 2            I'll just speak hypothetically, both because I don't

 3    recall or may not have ever entirely understood exactly what

 4    the behavioral heuristics were or the specifics of them, and --

 5    in any event, rather than, potentially, disclosing something

 6    here on the public record.

 7            But I mean, assume, for example, that a behavioral

 8    heuristic is that people who rob banks will very frequently

 9    open accounts in those banks which gives them the opportunity

10    to be in the bank.  And that they will very frequently open

11    accounts using shell corporations where they can put their

12    proceeds after they rob the bank.

13            Assuming -- I realize that those are not quite on

14    point, but if that was the type of heuristic that you were

15    applying, what would be in the disclosure that's made to date

16    and then what would not be?

17            MS. PELKER:  I think that what you just stated would

18    be in the disclosure that's made to date and say that, as one

19    of the -- something that Chainalysis does is to look for

20    accounts that are opened and shell companies meeting some

21    parameters and deposited within a certain time period.  And

22    then in the supplemental disclosure would be that they

23    specifically look for shell companies that are open to the

24    accounts within 48 hours prior to a robbery and then have no

25    activity until 48 hours -- until 48 hours after the activity.

1    That's the extent of the activity.

2              And the concern there is that if you disclose that

3    information, then a -- the robber is going to know, well, I'll

4    just make a deposit earlier on.

5              THE COURT:  49 hours.

6              MS. PELKER:  Right.  And that even if it's -- maybe

7    it's for this particular bank, it's 48 hours, but for the bank

8    down the street it's 7 days, but the robbers would understand

9    that someone is looking at -- this is how the pattern is being

10   implemented.

11             So even though what was in the original disclosure

12   would have allowed them to have some attempt at

13   countermeasures, it's not nearly as sensitive or provides for

14   the right countermeasure -- the amount of effective

15   countermeasures as what the sensitive heuristics would be.

16             THE COURT:  Okay.  Anything else before I hear from

17   Mr. Ekeland?

18             MS. PELKER:  No, Your Honor.

19             THE COURT:  Do you want to turn to the law now or do

20   you want to come back and do that after I hear from Mr. Ekeland

21   on the facts?

22             MS. PELKER:  I think, just emphasizing that, as we've

23   briefed up, there is -- the Supreme Court has been very clear.

24   There's no constitutional right to the disclosure of discovery

25   to the defendant here.  We think that there would be a more

1    than laid out good cause and the Court has very broad

2    discretion to craft an appropriate protective order regarding

3    discovery.

4           Attorneys' eyes only protective orders are not an

5    anomaly.  And even though the particular nature of this

6    material is somewhat unique in courts, courts are used to

7    handling very sensitive information and crafting protective

8    orders appropriately, and attorneys' eyes only protective

9    orders are one way to do so.

10           THE COURT:  Right.  So I don't disagree with that

11    statement of the law.  I suppose that the question that I have

12    here, though, is, is there, potentially, just a due process

13    issue here if -- perhaps because of its own failings, but if

14    the defense doesn't have or hasn't to this point come forward

15    with a -- even a nontestifying expert who can help them look at

16    the stuff and educate Mr. Ekeland so he knows how to conduct

17    the best cross-examinations he can possibly conduct and if,

18    hypothetically, it turned out the case that, in fact,

19    Mr. Sterlingov is uniquely well-situated to evaluate that type

20    of information and to assist the defense, is there a due

21    process issue analogous to a situation in which -- I don't

22    think there would be any problem in saying someone who is

23    accused of having been in the Capitol on January 6th doesn't

24    need to know where every camera is located and every security

25    camera is located because there are security reasons to keep

 1    that information secret.

 2         But that may be different from a circumstance in

 3    which it's a case against a biochemist alleging that the

 4    biochemist had manufactured some chemical that was capable of

 5    causing people grave injury.  And it turns out that that

 6    biochemist is one of the few people who can actually look at

 7    the government's expert report with respect to the contents and

 8    lethality of the compound that was found and actually

 9    understand that and explain that it is what the government says

10    it is.

11         In that case it's different than knowing where the

12    cameras are because this is one of the few people who can

13    really explain to the defense and to his lawyers why the

14    compound the government found isn't nearly as dangerous as the

15    government thought it was; hypothetically, obviously

16         MS. PELKER:  So I think -- a few things there.  One,

17    significantly, this is not evidence that the government is

18    seeking to use against the defendant.  And if this were

19    evidence that the government were using against the defendant

20    or something that were actually part of the government's expert

21    reports, maybe we'd be in a different posture.  But we're not.

22         Even there, absent this being *Brady* material, I think

23    that the Courts have been fairly clear -- you can look to Mejia

24    in the CIPA context that the defendant doesn't have an absolute

25    right to himself view those materials.

1          And here, we're in a bit of an unusual posture in

2     that, for the defendant to say that he's uniquely situated to

3     view and advise on these materials would confirm the very real

4     concerns that the government has of this particular individual

5     viewing -- this particular defendant viewing the materials.

6     But he's not uniquely situated.

7          They had a defense expert who insisted -- and we are

8     not looking to reopen this issue -- but who insisted at great

9     lengths that they needed access to these particular materials.

10     We had lengthy litigation over the 17(c) subpoena issue about

11     whether there was sufficient specificity, about whether -- how

12     the defense intended to use the materials that they were

13     seeking, and that was contingent on an expert that they stated

14     had told them that they needed these materials to do a review.

15          THE COURT:  All right.  And I know that the parties

16     have agreed and the Court has ordered that we're not going to

17     have any new testifying experts at this point in the

18     proceeding.  And that that would simply derail the schedule

19     that we're -- that this Court is very much committed to at this

20     point.

21          But would the government have any objection if the

22     defense were to come forward and identify a nontestifying

23     expert who was sufficiently trustworthy and, as I've said in

24     the past, the computer scientist from the University of

25     Maryland, hypothetically, who can simply advise Mr. Ekeland and

1    look at the material subject to a protective order and if

2    Ms. Still isn't prepared to do it and where she could actually

3    testify, but at least this person, hypothetically, could help

4    Mr. -- walk Mr. Ekeland and his colleagues through the material

5    so they could better understand it and that they could be in a

6    position to conduct better examinations and cross-examinations?

7            MS. PELKER:  Your Honor, I think our concern there is

8    just that -- while trial was continued, we are coming up on

9    needing to do a real preparation for trial again.  The defense

10   had multiple opportunities to bring in such an individual,

11   testifying or nontestifying.

12           THE COURT:  Right.

13           MS. PELKER:  And time and time again kept proposing

14   just outlandishly inappropriate experts who were not experts

15   and who had real axes to grind against Chainalysis and the

16   government and were very outspoken as such.

17           And just with the time frame that we are on -- it is

18   already mid-November -- we're not looking for a continuation

19   past February.

20           THE COURT:  I am completely with you on this.  There

21   is not going to be another continuance in this case.

22           But all I'm saying -- and I think it's the defense's

23   responsibility, and they haven't come forward and identified a

24   nontestifying expert to me and made this request at this point.

25   I'm just looking for ways to try and ensure in every way I can

1    that Mr. Sterlingov has a fair defense in the case.  But at the

2    same time, sensitive to the law enforcement concerns that

3    you've raised.

4        And I suppose I don't at least see a reason why, if

5    the defense came forward and said, yeah, I know we don't have

6    as much time as we would have liked, but we were doing other

7    things or whatever, and we didn't bother bringing this to your

8    attention, Judge, but here we have somebody who is a qualified

9    computer scientist or somebody who comes from academia or

10   somewhere else that doesn't have an ax to grind with them --

11   Chainalysis or, more significantly, somebody who is actually

12   subject to the contempt power of the Court who actually can

13   meaningfully look at this and actually has the skill set to

14   look at this, and we just would like that person to have access

15   to it even though we understand this person is not going to be

16   a testifying expert.  It's just simply to help Mr. Ekeland get

17   ready for trial.

18       I suppose -- I mean, he has -- there are other

19   experts that the Court has not excluded to this point,

20   including -- I'm blanking on his name now -- but the gentleman

21   who Mr. Ekeland was very insistent had to sit at his side

22   during trial.

23       MS. PELKER:  Fischbach.

24       THE COURT:  Mr. Fischbach, who -- if Mr. Fischbach

25   has any expertise on this and wanted to look at the material

 1    and sign an appropriate nondisclosure agreement, that way he

 2    could look at the material and advise Mr. Ekeland with respect

 3    to his examinations.

 4         MS. PELKER:  The government would have particular

 5    concerns with Mr. Fischbach's both lack of expertise and

 6    concerns about adherence to Court-issued protective orders.

 7    But we certainly -- if the defense identified an expert -- we

 8    did have -- in the lead-up to the protective order that was

 9    ultimately tailored to Ms. Still, there was the other

10    protective order that had the noncompete within it that may be

11    an appropriate basis.

12         We're happy to have that discussion with defense

13    counsel and the Court and Chainalysis to the extent that they

14    have particular concerns about particular individuals that we

15    would want to at least hear out.

16         THE COURT:  Okay.  Thank you.  Let me hear from

17    Mr. Ekeland, and I'll give you a chance to respond.

18    Mr. Ekeland.

19         MR. EKELAND:  Just a few points.  I'm happy to answer

20    whatever questions the Court has because I think we made our

21    main points in our paper.

22         But this supplemental disclosure is a result of the

23    *Daubert* hearings where we challenged the accuracy of the

24    software and --

25         THE COURT:  I don't think that's quite accurate.  I

1   mean, I think that the supplemental disclosures were really --

2   I was the one who, I think, perhaps didn't order it because it

3   was volunteered.  But it was because I just wanted to make sure

4   that the defense had access to important information in the

5   case and that I thought that -- understanding the heuristics

6   and assumptions that underlied Chainalysis's application of

7   Reactor in this case was something that appropriately defense

8   should have access to, and I sort of anticipated that Ms. Still

9   would be the person to make use of it.

10         But I don't think it was -- it didn't grow out of --

11   just to be clear for the record, it didn't grow out of the

12   Court's concerns with respect to the admissibility of the

13   government's witnesses for *Daubert* purposes.  It really just

14   grew out of a desire and a need to make sure that the defense

15   had access to all relevant information for purposes of being

16   able to put on the best possible defense for Mr. Sterlingov.

17         MR. EKELAND:  If I just remember correctly, after the

18   testimony of Ms. Bisbee, when she testified that Chainalysis

19   had no internal analysis of the error rates or couldn't provide

20   any scientific peer-reviewed paper, I recall the Court outside

21   of just saying the government and Ms. Bisbee that they need to

22   come up with something more and --

23         THE COURT:  No.  That was a different point.  I did

24   ask the government to present to me any -- because you had

25   raised that point, and you've done it many times now.

1          The Court just simply asks that the government

2     present to the Court what it had and the Court then made a

3     supplemental production, which just included a couple of

4     additional academic pieces.  But I think this is just a

5     separate -- a separate point with respect to just making sure

6     that you understand the way Reactor works so that you're able

7     to engage in an appropriate cross-examination; or if Ms. Still

8     would want to testify, she could have testified herself about

9     the flaws, if any, that she believed existed in Chainalysis.

10    That was what I was thinking about.

11          MR. EKELAND:  Understood, Your Honor.  It still

12    goes -- this supplemental production still goes to the core

13    accuracy of the software, which is in question.

14          I mean, I think we've made it clear to the Court that

15    we do consider this material evidence and, of course, that the

16    defendant is entitled, as a matter of due process, to review.

17          THE COURT:  I'm sorry.  Can you point me to a case

18    that says that?

19          MR. EKELAND:  No.  I will point to the Fifth

20    Amendment.  I think it's just a background principle that in

21    general defendants in a federal criminal case should be able to

22    review the evidence against them, excepting compelling

23    circumstances.

24          And I don't think here that the government has

25    clearly identified a compelling law enforcement interest when

```
1    all the services that -- and I believe, as Ms. Pelker

2    mentioned, the ten services that are involved in this

3    supplemental production all were either seized or put out of

4    business by the government; most of them before Chainalysis

5    even existed.  So --

6            THE COURT:  But that doesn't mean, though, that

7    Chainalysis isn't applying similar techniques to go after other

8    darknet vendors or sites that are still operating.

9            MR. EKELAND:  That's not clear to me.  From what I've

10   seen, maybe they are; maybe they aren't, but --

11           THE COURT:  That was one of my questions for the

12   government.  I thought the answer was, it does still involve

13   information that is still sensitive that Chainalysis and the

14   government is using in other investigations is what I

15   understood Ms. Pelker to tell me.

16           MR. EKELAND:  I'm sorry, Your Honor.

17           THE COURT:  No.  Go ahead.

18           MR. EKELAND:  I heard that statement.  But beyond

19   that sort of superficial statement that they are using it, it's

20   not clear to me what they are using.

21           And in regards to -- the government says that this

22   supplemental production is of little use or of no use to the

23   defense in the case.  Well, of course the government is going

24   to say that, and of course the defense is going to take a

25   contrary position.  The mere fact that Ms. Bisbee doesn't have
```

1      knowledge of the information in the supplemental production, I

2      think, is relevant.  She's the noticed expert from the

3      government about Chainalysis Reactor.

4              Something else --

5              THE COURT:  I'm not sure that's quite accurate

6      either.  I'm not sure she's the -- I mean, this is a fine

7      point.  I don't think she was offered as an expert on

8      Chainalysis Reactor itself, on the software or the program.

9              MR. EKELAND:  I think it's certainly relevant to what

10     she's testifying about, whether or not she knows how accurate

11     it is, and she doesn't seem to have an in-depth knowledge of

12     how the software operates.

13             She even testified -- and here's something else --

14             THE COURT:  I apologize for interrupting.  I'm not

15     fighting you on that.  The only thing I was disagreeing with is

16     I think you said she was the noticed expert witness on

17     Chainalysis Reactor.

18             You may want to cross-examine her and say she's not

19     an expert on Chainalysis Reactor, and she probably is not going

20     to resist you on that.  That's fine; you're entitled to do

21     that.  I was just making, maybe, a fairly technical point.

22             MR. EKELAND:  Understood, Your Honor.  I think

23     something just for clarity's sake on this, when we talk about

24     the tracing, the Court may recall that Ms. Bisbee said that

25     nothing in her report or any of her work identifies

1    Mr. Sterlingov or traces anything back to Mr. Sterlingov.

2            She said the only place that Mr. Sterlingov's name

3    appears anywhere in her report is on the title page.  I just

4    want to make sure that we're clear on what we're talking about

5    here.  What we're talking about is how Chainalysis Reactor

6    comes up with its clustering based on its different types of

7    heuristics to say, okay, this is the Agora darknet market, and

8    X amount of money goes from the Agora darknet market to Bitcoin

9    Fog.

10           Nothing in what Chainalysis Reactor has done goes to

11   tracing which, as the government has said repeatedly in this

12   matter, can just simply be done by a blockchain explorer.  In

13   terms of this revealing some sort of secret sauce about -- that

14   criminals are going to be able to use to prevent themselves

15   from being traced, I don't quite see that point.

16           What's at issue here and the reason we requested this

17   information and we've been pushing so hard on it in the *Daubert*

18   is the accuracy of this software, and I do think that's

19   relevant for the defense to bring up at trial.

20           I do think -- obviously, we disagree with the Court

21   on what's happened with the experts.  The problem we're having

22   with finding experts is that Chainalysis has come out of the

23   gate very clearly signaling that they're willing to engage in

24   intellectual property litigation over any of this information.

25   So when I'm going out and I'm looking for people who I say to,

1    hey, can you look at this, they don't want to touch this

2    because of --

3              THE COURT:  I think, in fairness, the only person who

4    has threatened litigation so far has been you, who threatened

5    to sue Chainalysis.

6              MR. EKELAND:  That's not accurate.  Because I don't

7    think Chainalysis would have come out and asked for a five-year

8    noncompete and a protective order without that concern.

9              THE COURT:  I don't doubt that this is sensitive

10   information.  That's the reason we're here talking about this

11   today.  I don't doubt that it's proprietary and sensitive, and

12   I don't doubt that it's law enforcement sensitive.

13             MR. EKELAND:  And there's certainly the perception

14   out there and the experts that I've talked to that nobody wants

15   to touch this case because of the fear of litigation from

16   Chainalysis.  Whether that's the reality or that's a perception

17   that they have, that perception is pervasive.  And this is --

18             THE COURT:  I apologize for interrupting again.  My

19   concern here is that maybe part of the problem here is you're

20   asking the wrong people.

21             MR. EKELAND:  Well --

22             THE COURT:  I'm sorry.  Let me just finish.

23             And that I've sort of seen this with some of the

24   experts that you've identified thus far, in that there are

25   people who are interested in this case and approach this as a

1    matter of their own advocacy and views with respect to whether

2    there should be privacy or shouldn't be privacy on the

3    internet.  And rather than just going to people who might be

4    able to approach this more objectively, where I think there's

5    less likelihood you're going to run into those types of

6    problems -- and there probably aren't that many competitors.

7    There's CipherTrace.  I don't know other than CipherTrace,

8    there's probably one or two other real competitors for

9    Chainalysis out there.

10            You maybe -- may find it hard to find one of the true

11   competitors who are willing to look at this for the same reason

12   that CipherTrace was unwilling to look at it; because they want

13   to market their own version.

14            But if you put aside people who don't seem to have a

15   lot of expertise but more political passion about this and,

16   instead, just look for people who are objective.  If you want

17   me to, I'm happy to call the University of Maryland or any of

18   the local universities and just see if they have experts who

19   could testify as court-appointed experts or -- I don't want

20   another testifying expert.  Let me take that back.  But

21   consult.

22            If you want help finding a consultant, the Federal

23   Public Defender here in D.C., I'm sure, could help you reach

24   out and find people.  I mean, there are people who just do have

25   expertise in algorithms and things like that, people in

1    mathematics departments or whatever else it might be who could

2    help you understand this and look at this, but aren't

3    necessarily coming at it either as one of the few competitors

4    for Chainalysis out there or as those who are strong advocates

5    or are coming up in a, sort of, highly politically charged way

6    where maybe CipherTrace -- or Chainalysis might have greater

7    concerns.

8            MR. EKELAND:  I think there's a couple of points

9    there.  One is the political views of the experts don't go to

10   their expertise, and that's a matter for impeachment and

11   potential bias.

12           THE COURT:  No, no, no.  Fair enough.  I want to be

13   clear about what I was saying.  I wasn't suggesting that.

14           What I was really thinking about is the one expert

15   who you identified from outside the United States at one point

16   in time who did seem to be extremely adverse to Chainalysis and

17   what Chainalysis is trying to do by tracing.

18           And I think that's part of what caused Chainalysis's

19   concern; not that they were going to prove that Chainalysis was

20   making a mistake, but that they just thought that the entire

21   process of trying to trace what someone is doing on the

22   internet is something that is evil in some respect and that

23   people should be shut down from doing that in ways that, I

24   think, is part of what was feeding some of the distrust in that

25   particular individual, and particularly given the fact that he

1    wasn't somebody who was subject to the contempt power of the

2    Court.

3              MR. EKELAND:  Yes.  And he also is one of the top

4    experts in the world in this area.  Even just assume that as a

5    hypothetical, but the issue is in an adversarial proceeding, a

6    competitor is now saying, no, we don't want that expert in.  I

7    think you're talking about Laurent, right?

8              THE COURT:  I just wrote a very lengthy opinion, and

9    I think every word in that opinion refutes what you just said.

10   I don't think that's what happened here.

11             MR. EKELAND:  Well, we respectfully disagree, Your

12   Honor.  And we also had Bryan Bishop, who is a core developer

13   or in terms of the blockchain software.  He, out of fear for

14   litigation with Chainalysis, won't do this.

15             Again, we're being told, in a sense -- we don't need

16   to belabor this again, but we just object to competitive

17   concerns being brought in and limiting the defense in terms of

18   what we can see as an expert.

19             But what we're here for today is the question of

20   whether or not Mr. Sterlingov can review material evidence

21   being used against him.  If the government -- if the government

22   all of a sudden is saying that this evidence is somehow

23   irrelevant, then why was it produced in the first place?  It's

24   being brought forward --

25             THE COURT:  At your request.

1           MR. EKELAND:  At our request.  Because we want

2      information about the accuracy of the software.  And then

3      there's this, sort of, theater of secrecy that I feel like is

4      being invoked here that's trying to legitimate [sic] the

5      government's concerns when it's not even clear that what's

6      being produced is that accurate at all.

7           At least what we're asking, if we're not going to be

8      able to have the experts for whatever reason that the defense

9      chooses, we're just asking that Mr. Sterlingov be able to

10     review it.  That's all.  We're not attributing any secret

11     skills to him.

12          Of course, we're up here arguing that he's innocent,

13     and he's not the supervillain that he's being made out to be.

14          THE COURT:  So two thoughts about what you just said

15     here.  One is that the purpose for this hearing is for me to

16     weigh exactly these types of issues that you raised, and there

17     are, in my mind, multiple factors that come into that.  One is

18     the sensitivity of the information.

19          The government has represented to me that it does

20     remain highly sensitive information, both from a law

21     enforcement perspective and, I assume, as well from a

22     proprietary perspective.

23          You've had a chance to look at the information, and

24     you haven't, sort of, come back to me and explained why that's

25     not the case after having -- reviewing the information.

1      Two, though, the question is, I do think you need

2   help preparing the case.  And I take you at your word and you

3   say that you may be knowledgeable about cryptocurrency and the

4   blockchain, but you lack sufficient expertise to do this on

5   your own and you need help.

6      That's what then leads me to the question of, are

7   there any other sources of help that you can get, someone who

8   can advise you as a nontestifying expert?  I just continue to

9   think that there are people out there, and you're just not

10   talking to the right people about that.  You've mentioned

11   Mr. Bishop to me, and you've mentioned CipherTrace to me.

12      But I've got to believe that there are a lot of other

13   people out there who have expertise and who could assist you

14   without raising the concerns that the government has subject to

15   a protective order.

16      And then there's also just the question of, what does

17   Mr. Sterlingov, if anything, add to this that you don't already

18   have or that some of your other testifying or nontestifying

19   experts can't already bring to you to assist in this case?

20      MR. EKELAND:  Well, in terms of Mr. Sterlingov, I

21   don't know what he's going to think if he sees this stuff.  I

22   think he needs to be given the opportunity as a defendant to

23   review it and add his input because this is not some ancillary

24   thing.  This is the whole crux when it comes to the amount of

25   money they're claiming he somehow laundered.

1          THE COURT:  Although, I have to say, it's kind of

2     interesting to me that you say it's not some ancillary thing

3     because I thought you started off by saying it is some

4     ancillary thing and --

5          MR. EKELAND:  If --

6          THE COURT:  I'm sorry.  Just let me finish, and then

7     I'll let you respond to it.

8          I thought you started off by saying to me that this

9     isn't about showing that Mr. Sterlingov himself was involved.

10    What this is about is showing how much business Bitcoin Fog,

11    whoever was administering it, how much business Bitcoin Fog was

12    doing for darknet sites that were engaged in illicit activity.

13         And your own expert, I think, will concede, based on

14    what I've heard from the *Daubert* hearing, that there was a

15    substantial amount.  And maybe this is a question which -- if

16    there were ever a conviction here -- which would get down to a

17    question of sentencing.

18         But to the extent that there are bases for

19    challenging the application of Chainalysis Reactor here, I take

20    it what you're talking about is showing that Chainalysis

21    Reactor has, in your view, overstated the amount of business

22    that Bitcoin Fog was doing for illicit darknet sites by some

23    factor.  They were 5 percent off, maybe 10 percent off, maybe

24    15 percent off.

25         It's not really as super fundamental or core to the

1    case.  It's important.  And I'm not suggesting that it's not

2    important.  But I think, by your own telling, it's not the most

3    important evidence in the case.

4              MR. EKELAND:  It's not relevant to whether or not

5    Mr. Sterlingov operated Bitcoin Fog because that's what

6    Ms. Bisbee testified to herself.  There's nothing that -- in

7    relation to that that identifies Mr. Sterlingov anywhere.

8              As a matter of fact, I don't see that anywhere in

9    this case.  Regardless, where it does come in --

10             THE COURT:  Right.

11             MR. EKELAND:  -- is the -- first of all, you get all

12   these darknet markets and all these amounts of money that

13   they're claiming, right?  That goes -- when I say the core,

14   that goes to the money laundering and how much money they're

15   saying has been laundered.

16             And that number has changed from what the government

17   initially said to what's in the Shaw report to the Bisbee

18   report, and the government has got different --

19             THE COURT:  But the jury is not going to even be

20   asked to decide that question other than having to decide, I

21   suppose, whether there was reason for whoever was the

22   administrator of Bitcoin Fog to know that Bitcoin Fog was, in

23   fact, involved in laundering illicit funds.  But the quantity,

24   whether it was 50, 60, 70, 80 percent of the business of

25   Bitcoin Fog, I don't think, is a question that the jury needs

1    to decide except to the extent that it might inform the jury's

2    judgment about whether the administrator must have known that

3    Bitcoin Fog was involved in money laundering.

4         MR. EKELAND:  Well, I mean, again, if Chainalysis --

5    we don't know what the accuracy of Chainalysis Reactor was,

6    so I --

7         THE COURT:  I think your own witness, Ms. Still, said

8    just by -- through using just straight-out CoinJoin, that she

9    was willing to -- I thought she agreed with at least a

10   substantial portion of Chainalysis's analysis.  But there was

11   another big chunk where she wasn't willing to agree because

12   CipherTrace doesn't use Heuristic 2 and, therefore, they were

13   only using Heuristic 1.

14        And so based on CipherTrace's analysis, the number

15   would have been lower, but not that it was anything close to

16   zero.

17        MR. EKELAND:  Even if -- first of all, the alleged

18   darknet markets weren't just dealing in illegal stuff.  But

19   the -- point taken, Your Honor.  But there is a question as to

20   the accuracy and the amount, and nothing in Chainalysis

21   Reactor, in my understanding, identifies anything as an illicit

22   fund.

23        The assumption is, well, this is a darknet market, so

24   it must be -- everything is illicit.  Point taken.  But what --

25   I think the defense has made its point.

1          THE COURT:  That's what I want to drill down on,

2     though.

3          So the point you've just made to me is, just as a

4     matter of principle, Mr. Sterlingov should be allowed to

5     examine anything that has a bearing on the accuracy or

6     inaccuracy of the evidence in the case against him.  I take

7     that.  I will definitely consider that point.

8          Is there anything more than just that, sort of,

9     general notion that, as a matter of principle, a defendant in

10    the case ought to have access to anything that might or might

11    not reflect on the accuracy of evidence that's being offered?

12         MR. EKELAND:  No, Your Honor.  I think that's been

13    our central point.  As we said, we think it's about the Fifth

14    Amendment and the Sixth Amendment issue.

15         THE COURT:  That's helpful for me to understand.

16    I've been raising these issues about whether there are other

17    individuals that you could have to consult with you.  And if

18    that's not the argument you're making, that's helpful for me to

19    understand.

20         MR. EKELAND:  Your Honor, I do want to say that,

21    sitting here today, I don't know what -- you know, if I'm going

22    to use this for impeachment or how I'm going to use this on

23    cross.  A lot of that also depends on how the direct goes.

24         THE COURT:  Right.

25         MR. EKELAND:  But to the extent that the government

1    is maintaining that it's not important to the defense, we just

2    disagree with that, and I think the reasons are obvious.

3           THE COURT:  So having had a chance to look at the

4    material yourself, do you have some sense of how much use

5    you're going to need to make of it at trial and whether I'm

6    going to need to have some sort of proffer beforehand or how we

7    handle things?

8           Have you had a chance to get a sense whether there is

9    actually something useful in that information?

10          MR. EKELAND:  I don't have a good sense, and I don't

11   want to make a representation to the Court that's incorrect.

12   Because, for me, a lot -- the way I prepare for trial is I like

13   to, obviously, review the evidence, and then I listen to the

14   witnesses, and it's a very fluid process.

15          Do I have some grand plan today to bring in this

16   supplemental disclosure that I think is going to win the case?

17   No.  I'd be lying to the Court if I said that.

18          But might I use it at trial?  Absolutely.  And if --

19   as I work on it or I work my way through this, if I see

20   something that I think, oh, my gosh, this is a big issue, let's

21   try and resolve this beforehand, I'll say something to the

22   Court.

23          THE COURT:  I appreciate that, just because I think

24   it may be disruptive with a jury trial if you start to ask a

25   question and the government says, Your Honor, can we have a

1    sidebar?  And then I have to say, okay, let's send the jury

2    back, and we have to have a proffer mid-trial.  I'd much rather

3    resolve those issues pretrial and figure out how we're going to

4    handle them.

5              MR. EKELAND:  Again, without limiting myself, I have

6    no interest in that.  I think that's not a good way to have a

7    trial go.  I think that hurts the defense as much as it --

8              THE COURT:  It will break up your examination.

9              MR. EKELAND:  It's not -- and it just annoys the

10   jury, I think, too.  But, again, I don't want to box myself in

11   because, for me, a lot of this is very -- a very fluid

12   process --

13             THE COURT:  Okay.

14             MR. EKELAND:  -- honestly.

15             THE COURT:  Another question, different topic.  In my

16   order I directed that the defense, by the 10th of November,

17   provide me with the signed declarations.

18             MR. EKELAND:  Yes.  They were filed on Friday around

19   3:00, ex parte.  Mr. Hassard filed them.  It's -- my

20   understanding, it's docket number -- we just noticed, Your

21   Honor, that it wasn't -- we didn't see it.  We just checked.

22   It was filed; I think it's Docket No. 211.

23             THE COURT:  Okay.  Thank you.

24             MR. EKELAND:  We have them all.  And if the Court

25   doesn't have them, we're happy to send them to you.

1          THE COURT:  Okay.  Thank you.  I will take a look at

2    that.

3          All right.  Anything else?

4          MR. EKELAND:  No, Your Honor.

5          THE COURT:  Ms. Pelker, anything you want to add?

6          MS. PELKER:  No, nothing else from the government,

7    Your Honor.

8          THE COURT:  Ms. Pelker, before we adjourn, I want to

9    make sure that I understand your representation to the Court,

10   as an officer of the court, that you have reviewed the material

11   in the sensitive supplemental production and that you can

12   represent to the Court that this is information that remains to

13   this day law enforcement sensitive; and that if it were

14   disclosed, that it could be used for purposes of evading

15   ongoing investigations?

16         MS. PELKER:  Yes, Your Honor.  I've reviewed it, and

17   in consultation with other experts from the government, have

18   made that determination and can make that representation to the

19   Court.

20         THE COURT:  Okay.  Well, thank you all.  I will give

21   you a -- I will issue an order on this promptly.  Thank you.

22         (The hearing adjourned at 2:35 p.m.)

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, TAMARA M. SEFRANEK, do hereby certify that the

4    above and foregoing constitutes a true and accurate transcript

5    of my stenographic notes and is a full, true and complete

6    transcript of the proceedings to the best of my ability.

7          Dated this 22nd day of November, 2023.

8

9                         /s/ Tamara M. Sefranek_____
                          Tamara M. Sefranek, RMR, CRR, CRC
10                        Official Court Reporter
                          Room 6714
11                        333 Constitution Avenue, N.W.
                          Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**/**

**/s** [1] - 40:9

**1**

**1** [1] - 35:13
**10** [1] - 33:23
**10005** [1] - 1:20
**10th** [1] - 38:16
**13** [1] - 1:6
**1301** [1] - 1:17
**15** [1] - 33:24
**17(c** [1] - 18:10
**1:21-CR-0399** [1] - 1:3
**1:35** [1] - 1:6

**2**

**2** [1] - 35:12
**20001** [3] - 1:12, 1:24, 40:11
**20005** [1] - 1:17
**202-354-3246** [1] - 1:25
**2022** [1] - 7:1
**2023** [2] - 1:6, 40:7
**20530** [1] - 1:14
**21-399** [1] - 2:2
**211** [1] - 38:22
**22nd** [1] - 40:7
**2:35** [1] - 39:22

**3**

**30** [1] - 1:20
**333** [2] - 1:24, 40:11
**3:00** [1] - 38:19

**4**

**48** [4] - 14:24, 14:25, 15:7
**49** [1] - 15:5

**5**

**5** [1] - 33:23
**50** [1] - 34:24

**6**

**60** [1] - 34:24
**601** [1] - 1:11
**6714** [2] - 1:23, 40:10
**6th** [1] - 16:23

**7**

**7** [1] - 15:8

**70** [1] - 34:24

**8**

**80** [1] - 34:24
**8th** [1] - 1:20

**9**

**950** [1] - 1:14

**A**

**ability** [1] - 40:6
**able** [14] - 7:8, 7:24, 8:1, 8:7, 11:13, 11:15, 12:7, 22:16, 23:6, 23:21, 26:14, 28:4, 31:8, 31:9
**absent** [1] - 17:22
**absolute** [1] - 17:24
**absolutely** [1] - 37:18
**academia** [1] - 20:9
**academic** [1] - 23:4
**access** [10] - 2:17, 6:5, 6:17, 14:1, 18:9, 20:14, 22:4, 22:8, 22:15, 36:10
**accommodate** [1] - 6:15
**accounts** [4] - 14:9, 14:11, 14:20, 14:24
**accuracy** [8] - 21:23, 23:13, 26:18, 31:2, 35:5, 35:20, 36:5, 36:11
**accurate** [6] - 21:25, 25:5, 25:10, 27:6, 31:6, 40:4
**accused** [1] - 16:23
**Action** [1] - 1:2
**active** [1] - 13:15
**actively** [1] - 12:3
**activity** [5] - 11:2, 14:25, 15:1, 33:12
**actors** [1] - 10:19
**add** [3] - 32:17, 32:23, 39:5
**added** [1] - 13:17
**additional** [3] - 3:6, 13:17, 23:4
**address** [2] - 2:24, 7:21
**addresses** [2] - 7:10, 12:14
**adherence** [1] - 21:6
**adjourn** [1] - 39:8
**adjourned** [1] - 39:22
**administering** [1] - 33:11

**administrator** [2] - 34:22, 35:2
**admissibility** [1] - 22:12
**admit** [1] - 3:5
**admitted** [2] - 3:4, 12:14
**adversarial** [1] - 30:5
**adversaries** [1] - 12:7
**adversary** [2] - 11:13, 11:25
**adverse** [1] - 29:16
**advise** [4] - 18:3, 18:25, 21:2, 32:8
**advocacy** [1] - 28:1
**advocates** [1] - 29:4
**afternoon** [4] - 2:6, 2:9, 2:10, 2:13
**Agora** [2] - 26:7, 26:8
**agree** [1] - 35:11
**agreed** [2] - 18:16, 35:9
**agreement** [1] - 21:1
**ahead** [1] - 24:17
**ALDEN** [1] - 1:13
**Alden** [1] - 2:6
**algorithm** [1] - 11:15
**algorithms** [2] - 7:20, 28:25
**allegations** [1] - 9:25
**alleged** [1] - 35:17
**alleging** [1] - 17:3
**allow** [6] - 4:11, 4:15, 6:5, 9:23, 9:24, 12:7
**allowed** [4] - 6:19, 6:20, 15:12, 36:4
**almost** [1] - 9:3
**Amendment** [3] - 23:20, 36:14
**AMERICA** [1] - 1:2
**amount** [6] - 15:14, 26:8, 32:24, 33:15, 33:21, 35:20
**amounts** [1] - 34:12
**analogous** [1] - 16:21
**analysis** [7] - 8:1, 8:15, 8:16, 12:22, 22:19, 35:10, 35:14
**ancillary** [3] - 32:23, 33:2, 33:4
**annoys** [1] - 38:9
**anomaly** [1] - 16:5
**answer** [2] - 21:19, 24:12
**anticipated** [1] - 22:8
**antiquated** [1] - 10:12
**apologize** [2] - 25:14, 27:18
**application** [2] - 22:6,

33:19
**applied** [2] - 8:12, 8:13
**applying** [2] - 14:15, 24:7
**appointed** [1] - 28:19
**appreciate** [1] - 37:23
**approach** [3] - 10:9, 27:25, 28:4
**appropriate** [9] - 4:5, 4:11, 5:3, 5:5, 5:22, 16:2, 21:1, 21:11, 23:7
**appropriately** [2] - 16:8, 22:7
**approval** [1] - 5:11
**area** [1] - 30:4
**arguing** [1] - 31:12
**argument** [1] - 36:18
**aside** [1] - 28:14
**assessment** [1] - 9:13
**assist** [3] - 16:20, 32:13, 32:19
**assume** [1] - 14:7, 30:4, 31:21
**assuming** [2] - 9:24, 14:13
**assumption** [1] - 35:23
**assumptions** [1] - 22:6
**astute** [1] - 10:17
**attachment** [1] - 12:15
**attachments** [7] - 3:6, 7:2, 7:3, 7:5, 7:9, 13:16, 13:18
**attempt** [1] - 15:12
**attention** [2] - 10:18, 20:8
**attorneys'** [2] - 16:4, 16:8
**attributing** [1] - 31:10
**Ave** [1] - 1:17
**Avenue** [3] - 1:14, 1:24, 40:11
**avoid** [2] - 9:24, 11:11
**ax** [1] - 20:10
**axes** [1] - 19:15

**B**

**background** [1] - 23:20
**bank** [4] - 14:10, 14:12, 15:7
**banks** [2] - 14:8, 14:9
**based** [2] - 26:6, 33:13, 35:14
**bases** [1] - 33:18
**basis** [2] - 4:13, 21:11

**battle** [1] - 10:5
**bear** [1] - 9:14
**bearing** [1] - 36:5
**become** [2] - 10:12, 10:15
**BEFORE** [1] - 1:8
**beforehand** [2] - 37:6, 37:21
**behavior** [1] - 11:7
**behavioral** [14] - 7:13, 7:17, 8:1, 8:11, 8:13, 8:14, 8:16, 8:22, 10:3, 11:2, 11:22, 12:2, 14:4, 14:7
**belabor** [1] - 30:16
**best** [6] - 5:7, 10:7, 16:17, 22:16, 40:6
**better** [2] - 19:5, 19:6
**between** [6] - 6:23, 8:19, 9:3, 9:7, 13:25
**beyond** [1] - 24:18
**bias** [1] - 29:11
**big** [2] - 35:11, 37:20
**biochemist** [3] - 17:3, 17:4, 17:6
**Bisbee** [14] - 3:23, 3:25, 4:14, 5:25, 7:1, 7:5, 8:5, 9:4, 22:18, 22:21, 24:25, 25:24, 34:6, 34:17
**Bisbee's** [2] - 7:9, 7:23
**Bishop** [2] - 30:12, 32:11
**bit** [2] - 8:19, 18:1
**Bitcoin** [13] - 11:1, 11:18, 11:20, 26:8, 33:10, 33:11, 33:22, 34:5, 34:22, 34:25, 35:3
**black** [1] - 13:21
**blanking** [1] - 20:20
**blockchain** [3] - 26:12, 30:13, 32:4
**blocks** [1] - 12:1
**bother** [1] - 20:7
**box** [1] - 38:10
**boxes** [1] - 13:21
**Brady** [1] - 17:22
**break** [1] - 38:8
**briefed** [1] - 15:23
**bring** [4] - 19:10, 26:19, 32:19, 37:15
**bringing** [1] - 20:7
**broad** [1] - 16:1
**brought** [2] - 30:17, 30:24
**BROWN** [1] - 1:10
**Brown** [1] - 2:8
**Bryan** [1] - 30:12

**build** [1] - 9:6
**building** [1] - 12:1
**built** [1] - 12:3
**business** [5] - 24:4, 33:10, 33:11, 33:21, 34:24
**buy** [1] - 3:12

## C

**camera** [2] - 16:24, 16:25
**cameras** [1] - 17:12
**capable** [1] - 17:4
**Capitol** [1] - 16:23
**case** [25] - 7:16, 10:11, 12:23, 13:6, 16:18, 17:3, 17:11, 19:21, 20:1, 22:5, 22:7, 23:17, 23:21, 24:23, 27:15, 27:25, 31:25, 32:2, 32:19, 34:1, 34:3, 34:9, 36:6, 36:10, 37:16
**Case** [1] - 2:2
**cases** [4] - 5:15, 5:16, 12:5, 12:6
**caused** [2] - 3:18, 29:18
**causes** [1] - 11:14
**causing** [1] - 17:5
**central** [1] - 36:13
**certain** [2] - 5:16, 14:21
**certainly** [4] - 11:17, 21:7, 25:9, 27:13
**CERTIFICATE** [1] - 40:1
**certify** [1] - 40:3
**cetera** [1] - 5:19
**Chainalysis** [49] - 2:18, 7:12, 7:18, 7:25, 8:13, 8:22, 9:17, 10:14, 10:16, 11:2, 11:7, 11:10, 11:14, 11:21, 11:23, 12:4, 12:23, 13:2, 14:19, 19:15, 20:11, 21:13, 22:18, 23:9, 24:4, 24:7, 24:13, 25:3, 25:8, 25:17, 25:19, 26:5, 26:10, 26:22, 27:5, 27:7, 27:16, 28:9, 29:4, 29:6, 29:16, 29:17, 29:19, 30:14, 33:19, 33:20, 35:4, 35:5, 35:20
**Chainalysis's** [5] - 4:17, 10:21, 22:6,

29:18, 35:10
**challenged** [1] - 21:23
**challenging** [1] - 33:19
**chance** [4] - 21:17, 31:23, 37:3, 37:8
**changed** [1] - 34:16
**charged** [1] - 29:5
**checked** [1] - 38:21
**chemical** [1] - 17:4
**chooses** [1] - 31:9
**Christopher** [1] - 2:8
**CHRISTOPHER** [1] - 1:10
**chunk** [1] - 35:11
**CIPA** [1] - 17:24
**CipherTrace** [6] - 28:7, 28:12, 29:6, 32:11, 35:12
**CipherTrace's** [1] - 35:14
**circle** [1] - 5:13
**circumstance** [1] - 17:2
**circumstances** [1] - 23:23
**circumvent** [1] - 10:21
**claiming** [2] - 32:25, 34:13
**clarity's** [1] - 25:23
**clear** [10] - 5:23, 15:23, 17:23, 22:11, 23:14, 24:9, 24:20, 26:4, 29:13, 31:5
**clearly** [2] - 23:25, 26:23
**close** [2] - 10:18, 35:15
**closed** [1] - 4:25
**closing** [2] - 4:21, 5:12
**cluster** [2] - 9:6, 11:8
**clustering** [6] - 7:19, 9:13, 11:2, 11:15, 11:16, 26:6
**clusters** [6] - 7:15, 8:23, 9:6, 12:2, 12:3, 12:12
**co** [2] - 7:12, 7:17
**co-spend** [1] - 7:12
**co-spending** [1] - 7:17
**CoinJoin** [1] - 35:8
**colleagues** [1] - 19:4
**COLUMBIA** [1] - 1:1
**columns** [1] - 13:17
**comfortable** [2] - 13:2, 13:3
**coming** [3] - 19:8, 29:3, 29:5
**commentary** [1] - 8:2

**comments** [1] - 6:9
**committed** [1] - 18:19
**companies** [2] - 14:20, 14:23
**compelling** [3] - 12:6, 23:22, 23:25
**competitive** [1] - 30:16
**competitor** [1] - 30:6
**competitors** [4] - 28:6, 28:8, 28:11, 29:3
**complete** [1] - 40:5
**completely** [1] - 19:20
**composition** [1] - 7:14
**compound** [2] - 17:8, 17:14
**compromised** [1] - 6:14
**computer** [2] - 18:24, 20:9
**concede** [1] - 33:13
**concern** [6] - 9:20, 15:2, 19:7, 27:8, 27:19, 29:19
**concerned** [1] - 10:23
**concerning** [3] - 5:18, 9:16, 12:20
**concerns** [11] - 11:5, 18:4, 20:2, 21:5, 21:6, 21:14, 22:12, 29:7, 30:17, 31:5, 32:14
**conduct** [3] - 16:16, 16:17, 19:6
**CONFERENCE** [2] - 1:4, 1:7
**confirm** [1] - 18:3
**confront** [1] - 4:13
**confronting** [1] - 6:3
**consider** [2] - 23:15, 36:7
**considered** [1] - 13:15
**considering** [2] - 4:5, 6:21
**consistent** [1] - 4:9
**constantly** [1] - 10:4
**constitutes** [1] - 40:4
**Constitution** [2] - 1:24, 40:11
**constitutional** [1] - 15:24
**consult** [2] - 28:21, 36:17
**consultant** [1] - 28:22
**consultation** [1] - 39:17
**contained** [2] - 7:2, 7:3
**contempt** [2] - 20:12,

30:1
**contents** [1] - 17:7
**context** [1] - 17:24
**contingent** [1] - 18:13
**continuance** [1] - 19:21
**continuation** [1] - 19:18
**continue** [1] - 32:8
**continued** [1] - 19:8
**continuum** [1] - 6:10
**contrary** [1] - 24:25
**contravene** [1] - 12:7
**conviction** [1] - 33:16
**copy** [2] - 6:6, 6:20
**core** [4] - 23:12, 30:12, 33:25, 34:13
**corporations** [1] - 14:11
**correctly** [1] - 22:17
**counsel** [6] - 2:4, 2:7, 5:20, 8:7, 21:13
**countermeasure** [1] - 15:14
**countermeasures** [2] - 15:13, 15:15
**couple** [2] - 23:3, 29:8
**course** [5] - 4:21, 23:15, 24:23, 24:24, 31:12
**COURT** [59] - 1:1, 2:9, 2:13, 3:1, 3:10, 4:19, 6:1, 6:9, 7:7, 8:8, 9:18, 11:12, 12:9, 12:18, 13:24, 15:5, 15:16, 15:19, 16:10, 18:15, 19:12, 19:20, 20:24, 21:16, 21:25, 22:23, 23:17, 24:6, 24:11, 24:17, 25:5, 25:14, 27:3, 27:9, 27:18, 27:22, 29:12, 30:8, 30:25, 31:14, 33:1, 33:6, 34:10, 34:19, 35:7, 36:1, 36:15, 36:24, 37:3, 37:23, 38:8, 38:13, 38:15, 38:23, 39:1, 39:5, 39:8, 39:20, 40:1
**Court** [33] - 1:22, 1:23, 2:22, 3:2, 4:20, 5:21, 6:21, 6:23, 15:23, 16:1, 18:16, 18:19, 20:12, 20:19, 21:6, 21:13, 21:20, 22:20, 23:1, 23:2, 23:14, 25:24, 26:20, 30:2, 37:11, 37:17, 37:22, 38:24, 39:9, 39:12,

39:19, 40:10
**court** [3] - 2:12, 28:19, 39:10
**Court's** [3] - 2:20, 13:11, 22:12
**court-appointed** [1] - 28:19
**Court-issued** [1] - 21:6
**Courthouse** [1] - 1:23
**courtroom** [3] - 4:25, 5:3, 5:12
**COURTROOM** [1] - 2:2
**courts** [2] - 16:6
**Courts** [1] - 17:23
**craft** [1] - 16:2
**crafting** [1] - 16:7
**CRC** [2] - 1:22, 40:9
**Criminal** [1] - 1:2
**criminal** [3] - 2:2, 12:5, 33:21
**criminals** [2] - 10:19, 26:14
**critique** [1] - 8:2
**CRM** [1] - 1:16
**cross** [11] - 3:14, 3:23, 4:11, 4:16, 5:17, 6:8, 16:17, 19:6, 23:7, 25:18, 36:23
**cross-examination** [6] - 3:14, 4:11, 4:16, 5:17, 6:8, 23:7
**cross-examinations** [2] - 16:17, 19:6
**cross-examine** [2] - 3:23, 25:18
**CRR** [2] - 1:22, 40:9
**crux** [1] - 32:24
**cryptocurrency** [1] - 32:3
**customized** [1] - 11:23

## D

**D.C** [3] - 1:5, 28:23, 40:11
**dangerous** [1] - 17:14
**darknet** [8] - 24:8, 26:7, 26:8, 33:12, 33:22, 34:12, 35:18, 35:23
**date** [2] - 14:15, 14:18
**Dated** [1] - 40:7
**dated** [4] - 10:15, 12:21, 12:22, 12:23
**Daubert** [5] - 8:4, 21:23, 22:13, 26:17, 33:14

**days** [1] - 15:8
**DC** [4] - 1:12, 1:14, 1:17, 1:24
**deal** [1] - 6:12
**dealing** [1] - 35:18
**December** [1] - 7:1
**decide** [5] - 5:2, 6:11, 34:20, 35:1
**declarations** [1] - 38:17
**defeat** [1] - 11:16
**Defendant** [2] - 1:6, 1:18
**defendant** [18] - 2:11, 2:18, 3:7, 6:4, 7:8, 7:23, 8:6, 11:4, 13:23, 15:25, 17:18, 17:19, 17:24, 18:2, 18:5, 23:16, 32:22, 36:9
**defendants** [1] - 23:21
**Defender** [1] - 28:23
**defense** [32] - 3:21, 3:22, 4:6, 4:13, 5:20, 6:25, 9:11, 13:18, 16:14, 16:20, 17:13, 18:7, 18:12, 18:22, 19:9, 20:1, 20:5, 21:7, 21:12, 22:4, 22:7, 22:14, 22:16, 24:23, 24:24, 26:19, 30:17, 31:8, 35:25, 37:1, 38:7, 38:16
**defense's** [1] - 19:22
**definitely** [2] - 10:18, 36:7
**DEPARTMENT** [1] - 1:13
**Department** [2] - 1:16, 5:9
**departments** [1] - 29:1
**deposit** [1] - 15:4
**deposited** [1] - 14:21
**depth** [1] - 25:11
**DEPUTY** [1] - 2:2
**derail** [1] - 18:18
**describes** [5] - 7:11, 7:12, 7:16, 7:18, 8:11
**desire** [1] - 22:14
**detail** [2] - 8:2, 9:9
**detailed** [4] - 2:19, 7:3, 7:9, 8:5
**determination** [1] - 39:18
**determine** [1] - 4:25
**develop** [1] - 7:19
**developed** [1] - 11:21
**developer** [1] - 30:12
**difference** [3] - 6:23,

9:3, 9:7
**different** [17] - 6:2, 7:10, 7:17, 7:24, 8:21, 8:24, 9:1, 10:9, 11:18, 11:21, 17:2, 17:11, 17:21, 22:23, 26:6, 34:18, 38:15
**diminishes** [1] - 3:18
**direct** [2] - 3:14, 36:23
**directed** [1] - 38:16
**disagree** [4] - 16:10, 26:20, 30:11, 37:2
**disagreeing** [1] - 25:15
**disclose** [1] - 15:2
**disclosed** [2] - 11:3, 39:14
**disclosing** [1] - 14:5
**disclosure** [11] - 8:18, 9:9, 9:15, 11:6, 14:15, 14:18, 14:22, 15:11, 15:24, 21:22, 37:16
**disclosures** [2] - 6:24, 22:1
**discoverability** [1] - 3:9
**discovery** [3] - 3:4, 15:24, 16:3
**discretion** [1] - 16:2
**discussion** [2] - 11:9, 21:12
**disruptive** [1] - 37:24
**distinction** [1] - 13:25
**DISTRICT** [3] - 1:1, 1:1, 1:8
**District** [2] - 4:10, 5:15
**distrust** [1] - 29:24
**docket** [1] - 38:20
**Docket** [1] - 38:22
**DOJ** [2] - 1:11, 1:16
**DOJ-CRM** [1] - 1:16
**done** [3] - 22:25, 26:10, 26:12
**doubt** [3] - 27:9, 27:11, 27:12
**down** [7] - 6:6, 8:15, 9:19, 15:8, 29:23, 33:16, 36:1
**drill** [2] - 9:18, 36:1
**due** [3] - 16:12, 16:20, 23:16
**during** [2] - 4:21, 20:22

### E

**educate** [1] - 16:16
**effective** [1] - 15:14
**either** [5] - 3:13, 9:21,

24:3, 25:6, 29:3
**EKELAND** [34] - 1:18, 2:10, 21:19, 22:17, 23:11, 23:19, 24:9, 24:16, 24:18, 25:9, 25:22, 27:6, 27:13, 27:21, 29:8, 30:3, 30:11, 31:1, 32:20, 33:5, 34:4, 34:11, 35:4, 35:17, 36:12, 36:20, 36:25, 37:10, 38:5, 38:9, 38:14, 38:18, 38:24, 39:4
**Ekeland** [12] - 1:19, 2:11, 15:17, 15:20, 16:16, 18:25, 19:4, 20:16, 20:21, 21:2, 21:17, 21:18
**eliminating** [1] - 13:16
**emphasizing** [1] - 15:22
**enforcement** [6] - 4:17, 20:2, 23:25, 27:12, 31:21, 39:13
**engage** [2] - 23:7, 26:23
**engaged** [1] - 33:12
**ensure** [1] - 19:25
**entire** [1] - 29:20
**entirely** [2] - 13:2, 14:3
**entitled** [2] - 23:16, 25:20
**error** [1] - 22:19
**essentially** [3] - 4:6, 7:21, 13:16
**et** [1] - 5:19
**evade** [3] - 9:23, 9:24, 10:16
**evading** [1] - 39:14
**evaluate** [1] - 16:19
**evaluation** [1] - 3:8
**event** [1] - 14:6
**evidence** [13] - 3:6, 3:7, 5:7, 17:17, 17:19, 23:15, 23:22, 30:20, 30:22, 34:3, 36:6, 36:11, 37:13
**evil** [1] - 29:22
**evolution** [1] - 12:24
**evolved** [1] - 10:16
**ex** [1] - 38:19
**exactly** [8] - 8:25, 9:5, 10:19, 10:25, 11:4, 11:21, 14:3, 31:16
**examination** [9] - 3:14, 4:11, 4:16, 4:24, 5:4, 5:17, 6:8, 23:7, 38:8
**examinations** [4] -

16:17, 19:6, 21:3
**examine** [3] - 3:23, 25:18, 36:5
**example** [1] - 14:7
**except** [1] - 35:1
**excepting** [1] - 23:22
**excerpts** [1] - 6:3
**excluded** [1] - 20:19
**exist** [1] - 4:1
**existed** [2] - 23:9, 24:5
**expect** [2] - 4:2, 12:14
**expert** [21] - 4:1, 8:3, 16:15, 17:7, 17:20, 18:7, 18:13, 18:23, 19:24, 20:16, 21:7, 25:2, 25:7, 25:16, 25:19, 28:20, 29:14, 30:6, 30:18, 32:8, 33:13
**expertise** [7] - 20:25, 21:5, 28:15, 28:25, 29:10, 32:4, 32:13
**experts** [16] - 8:7, 18:17, 19:14, 20:19, 26:21, 26:22, 27:14, 27:24, 28:18, 28:19, 29:9, 30:4, 31:8, 32:19, 39:17
**explain** [2] - 17:9, 17:13
**explained** [1] - 31:24
**explains** [2] - 7:12
**explorer** [1] - 26:12
**extensive** [1] - 7:9
**extent** [11] - 2:22, 3:3, 3:20, 3:22, 4:12, 12:13, 15:1, 21:13, 33:18, 35:1, 36:25
**extremely** [5] - 3:24, 9:13, 13:7, 29:16
**eyes** [2] - 16:4, 16:8

### F

**fact** [7] - 6:10, 12:18, 16:18, 24:25, 29:25, 34:8, 34:23
**factor** [1] - 33:23
**factors** [2] - 12:16, 31:17
**facts** [1] - 15:21
**factual** [2] - 2:21, 2:24
**failings** [1] - 16:13
**fair** [2] - 20:1, 29:12
**fairly** [3] - 10:12, 17:23, 25:21
**fairness** [1] - 27:3
**faith** [1] - 4:13
**false** [1] - 11:11
**far** [2] - 27:4, 27:24

**fear** [2] - 27:15, 30:13
**features** [4] - 7:21, 7:25, 9:1, 11:23
**February** [1] - 19:19
**federal** [1] - 23:21
**Federal** [1] - 28:22
**feeding** [1] - 29:24
**few** [5] - 17:6, 17:12, 17:16, 21:19, 29:3
**Fifth** [2] - 23:19, 36:13
**fighting** [1] - 25:15
**figure** [3] - 10:6, 10:8, 38:3
**figures** [1] - 10:9
**figuring** [1] - 10:20
**filed** [3] - 38:18, 38:19, 38:22
**fine** [3] - 3:1, 25:6, 25:20
**finer** [1] - 13:9
**finger** [1] - 5:19
**fingerprint** [3] - 7:22, 9:2, 10:25
**fingerprinting** [2] - 10:22, 10:23
**finish** [2] - 27:22, 33:6
**first** [4] - 3:9, 30:23, 34:11, 35:17
**Fischbach** [3] - 20:23, 20:24
**Fischbach's** [1] - 21:5
**five** [1] - 27:7
**five-year** [1] - 27:7
**flaws** [1] - 23:9
**Floor** [1] - 1:20
**fluid** [2] - 37:14, 38:11
**Fog** [12] - 11:1, 11:18, 11:20, 26:9, 33:10, 33:11, 33:22, 34:5, 34:22, 34:25, 35:3
**Fog's** [1] - 11:1
**FOR** [1] - 1:1
**foregoing** [1] - 40:4
**formula** [1] - 8:25
**formulas** [1] - 9:5
**forth** [1] - 10:10
**forward** [5] - 5:20, 16:14, 18:22, 19:23, 20:5, 30:24
**frame** [1] - 19:17
**frequently** [2] - 14:8, 14:10
**Friday** [1] - 38:18
**front** [1] - 6:16
**full** [1] - 40:5
**fund** [1] - 35:22
**fundamental** [1] - 33:25
**funds** [1] - 34:23

44

## G

**gate** [1] - 26:23
**gathered** [1] - 2:15
**general** [2] - 23:21, 36:9
**generically** [1] - 8:12
**gentleman** [1] - 20:20
**given** [4] - 4:22, 12:18, 29:25, 32:22
**gosh** [1] - 37:20
**government** [44] - 2:5, 2:23, 3:5, 4:8, 6:18, 6:25, 7:15, 8:6, 9:16, 10:8, 10:9, 10:20, 12:4, 13:2, 17:9, 17:14, 17:15, 17:17, 17:19, 18:4, 18:21, 19:16, 21:4, 22:21, 22:24, 23:1, 23:24, 24:4, 24:12, 24:14, 24:21, 24:23, 25:3, 26:11, 30:21, 31:19, 32:14, 34:16, 34:18, 36:25, 37:25, 39:6, 39:17
**government's** [6] - 9:20, 9:25, 17:7, 17:20, 22:13, 31:5
**grand** [1] - 37:15
**granular** [3] - 8:15, 8:24, 10:13
**granularity** [1] - 8:12
**grave** [1] - 17:5
**great** [3] - 10:3, 11:10, 18:8
**greater** [1] - 29:6
**grew** [1] - 22:14
**grind** [2] - 19:15, 20:10
**grow** [2] - 22:10, 22:11

## H

**handle** [2] - 37:7, 38:4
**handling** [1] - 16:7
**happy** [4] - 21:12, 21:19, 28:17, 38:25
**hard** [2] - 26:17, 28:10
**HASSARD** [1] - 1:19
**Hassard** [2] - 2:11, 38:19
**hear** [5] - 6:13, 15:16, 15:20, 21:15, 21:16
**heard** [2] - 24:18, 33:14
**hearing** [4] - 8:4, 31:15, 33:14, 39:22
**hearings** [1] - 21:23

**help** [11] - 2:16, 2:17, 16:15, 19:3, 20:16, 28:22, 28:23, 29:2, 32:2, 32:5, 32:7
**helpful** [3] - 2:23, 36:15, 36:18
**hereby** [1] - 40:3
**herself** [2] - 23:8, 34:6
**Heuristic** [2] - 35:12, 35:13
**heuristic** [6] - 7:6, 8:1, 8:14, 11:22, 14:8, 14:14
**heuristics** [19] - 2:19, 3:4, 7:11, 7:13, 7:17, 8:12, 8:13, 8:17, 8:22, 8:25, 9:9, 10:3, 10:13, 11:6, 12:2, 14:4, 15:15, 22:5, 26:7
**hide** [2] - 10:7
**highlight** [1] - 6:9
**highly** [5] - 9:15, 9:21, 29:5, 31:20
**himself** [3] - 9:23, 17:25, 33:9
**honestly** [1] - 38:14
**Honor** [22] - 2:6, 2:10, 2:20, 3:20, 5:6, 5:14, 10:17, 13:10, 15:18, 19:7, 23:11, 24:16, 25:22, 30:12, 35:19, 36:12, 36:20, 37:25, 38:21, 39:4, 39:7, 39:16
**HONORABLE** [1] - 1:8
**hours** [5] - 14:24, 14:25, 15:5, 15:7
**hundreds** [1] - 7:10
**hurts** [1] - 38:7
**hypothetical** [1] - 30:5
**hypothetically** [5] - 14:2, 16:18, 17:15, 18:25, 19:3

## I

**identified** [5] - 19:23, 21:7, 23:25, 27:24, 29:15
**identifies** [3] - 25:25, 34:7, 35:21
**identify** [2] - 2:4, 18:22
**illegal** [1] - 35:18
**illicit** [5] - 33:12, 33:22, 34:23, 35:21, 35:24
**imagine** [1] - 10:4
**impeachment** [4] -

4:3, 5:24, 29:10, 36:22
**impermissible** [1] - 6:7
**implemented** [5] - 4:9, 5:16, 8:23, 11:4, 15:10
**important** [7] - 11:24, 12:6, 22:4, 34:1, 34:2, 34:3, 37:1
**IN** [1] - 1:1
**in-depth** [1] - 25:11
**inaccuracy** [1] - 36:6
**inappropriate** [1] - 19:14
**included** [1] - 23:3
**includes** [1] - 11:6
**including** [4] - 5:15, 20:20
**inconsistent** [1] - 4:3
**incorrect** [1] - 37:11
**individual** [4] - 9:2, 18:4, 19:10, 29:25
**individuals** [2] - 21:14, 36:17
**inform** [1] - 35:1
**information** [28] - 3:3, 5:8, 6:24, 9:8, 9:22, 11:3, 11:6, 11:16, 12:21, 13:22, 15:3, 16:7, 16:20, 17:1, 22:4, 22:15, 24:13, 25:1, 26:17, 26:24, 27:10, 31:2, 31:18, 31:20, 31:23, 31:25, 37:9, 39:12
**ingredients** [1] - 9:4
**injury** [1] - 17:5
**innocent** [1] - 31:12
**input** [1] - 32:23
**insisted** [1] - 18:7, 18:8
**insistent** [1] - 20:21
**instead** [1] - 28:16
**instructions** [1] - 9:4
**intellectual** [1] - 26:24
**intend** [1] - 3:5
**intended** [1] - 18:12
**interest** [3] - 12:7, 23:25, 38:6
**interested** [2] - 10:13, 27:25
**interesting** [1] - 33:2
**interests** [2] - 4:18, 6:15
**internal** [1] - 22:19
**internet** [2] - 28:3, 29:22
**interrupting** [2] - 25:14, 27:18

**introducing** [1] - 7:15
**investigates** [1] - 7:18
**investigations** [2] - 24:14, 39:15
**investigative** [1] - 10:3
**investigators** [1] - 10:5
**invoked** [1] - 31:4
**involve** [1] - 24:12
**involved** [9] - 9:25, 24:2, 33:9, 34:23, 35:3
**irrelevant** [1] - 30:23
**issue** [13] - 4:23, 6:16, 12:9, 14:1, 16:13, 16:21, 18:8, 18:10, 26:16, 30:5, 36:14, 37:20, 39:21
**issued** [1] - 21:6
**issues** [4] - 13:5, 31:16, 36:16, 38:3
**itself** [3] - 7:11, 13:20, 25:8

## J

**January** [1] - 16:23
**JEFFREY** [1] - 1:15
**Jeffrey** [1] - 2:8
**jeopardize** [1] - 4:17
**joined** [1] - 2:7
**Judge** [1] - 20:8
**JUDGE** [2] - 1:8, 1:8
**judgment** [1] - 35:2
**jury** [7] - 4:24, 5:7, 34:19, 34:25, 37:24, 38:1, 38:10
**jury's** [1] - 35:1
**JUSTICE** [1] - 1:13
**Justice** [2] - 1:16, 5:9

## K

**keep** [2] - 6:20, 16:25
**keeping** [1] - 4:18
**kept** [1] - 19:13
**kick** [1] - 11:14
**kickout** [3] - 11:18, 11:19, 11:24
**kickouts** [1] - 11:7
**kind** [2] - 8:20, 33:1
**knowing** [1] - 17:11
**knowledge** [2] - 25:1, 25:11
**knowledgeable** [1] - 32:3
**known** [1] - 35:2
**knows** [2] - 16:16, 25:10

## L

**lack** [2] - 21:5, 32:4
**laid** [1] - 16:1
**laundered** [2] - 32:25, 34:15
**laundering** [4] - 10:1, 34:14, 34:23, 35:3
**Laurent** [1] - 30:7
**Law** [1] - 1:19
**law** [4] - 4:17, 15:19, 16:11, 20:2, 23:25, 27:12, 31:20, 39:13
**lawyers** [1] - 17:13
**lead** [1] - 21:8
**lead-up** [1] - 21:8
**leads** [1] - 32:6
**least** [5] - 19:3, 20:4, 21:15, 31:7, 35:9
**legal** [2] - 2:22, 2:25
**legitimate** [1] - 31:4
**lengths** [1] - 11:10, 18:9
**lengthy** [2] - 18:10, 30:8
**less** [4] - 10:25, 13:12, 13:13, 28:5
**lethality** [1] - 17:8
**likelihood** [2] - 3:12, 28:5
**likely** [3] - 3:14, 10:14, 13:5
**limited** [2] - 3:24, 4:4
**limiting** [2] - 30:17, 38:5
**line** [1] - 4:20
**list** [5] - 7:24, 8:20, 9:4, 12:12, 12:14
**listed** [1] - 7:11
**listen** [1] - 37:13
**lists** [2] - 8:21, 12:17
**litigated** [1] - 13:6
**litigation** [5] - 18:10, 26:24, 27:4, 27:15, 30:14
**live** [1] - 12:24
**local** [1] - 28:18
**located** [2] - 16:24, 16:25
**look** [20] - 13:11, 13:21, 14:19, 14:23, 16:15, 17:6, 17:23, 19:1, 20:13, 20:14, 20:25, 21:2, 27:1, 28:11, 28:12, 28:16, 29:2, 31:23, 37:3, 39:1
**looking** [10] - 7:25, 8:20, 8:22, 10:19, 11:21, 15:9, 18:8,

19:18, 19:25, 26:25
**lower** [1] - 35:15
**lying** [1] - 37:17

## M

**main** [1] - 21:21
**maintaining** [1] - 37:1
**management** [1] -
5:11
**manufactured** [1] -
17:4
**market** [4] - 26:7,
26:8, 28:13, 35:23
**markets** [2] - 34:12,
35:18
**Maryland** [2] - 18:25,
28:17
**material** [16] - 2:18,
3:9, 3:23, 5:18, 6:4,
6:20, 16:6, 17:22,
19:1, 19:4, 20:25,
21:2, 23:15, 30:20,
37:4, 39:10
**materials** [11] - 3:22,
3:25, 4:10, 4:12,
4:18, 17:25, 18:3,
18:5, 18:9, 18:12,
18:14
**mathematics** [1] -
29:1
**matter** [7] - 23:16,
26:12, 28:1, 29:10,
34:8, 36:4, 36:9
**mean** [8] - 14:7, 20:18,
22:1, 23:14, 24:6,
25:6, 28:24, 35:4
**meaningfully** [2] - 6:6,
20:13
**measures** [2] - 10:21,
12:8
**meeting** [1] - 14:20
**Mejia** [1] - 17:23
**memorandum** [1] -
2:21
**mentioned** [3] - 24:2,
32:10, 32:11
**mere** [1] - 24:25
**MICHAEL** [1] - 1:19
**Michael** [1] - 2:11
**mid** [2] - 19:18, 38:2
**mid-November** [1] -
19:18
**mid-trial** [1] - 38:2
**might** [7] - 28:3, 29:1,
29:6, 35:1, 36:10,
37:18
**mind** [1] - 31:17
**mistake** [1] - 29:20
**mole** [1] - 10:5

**money** [7] - 9:25, 26:8,
32:25, 34:12, 34:14,
35:3
**months** [1] - 10:11
**MOSS** [1] - 1:8
**most** [3] - 10:23, 24:4,
34:2
**motion** [1] - 2:17
**MOTION** [2] - 1:4, 1:7
**MR** [33] - 2:10, 21:19,
22:17, 23:11, 23:19,
24:9, 24:16, 24:18,
25:9, 25:22, 27:6,
27:13, 27:21, 29:8,
30:3, 30:11, 31:1,
32:20, 33:5, 34:4,
34:11, 35:4, 35:17,
36:12, 36:20, 36:25,
37:10, 38:5, 38:9,
38:14, 38:18, 38:24,
39:4
**MS** [24] - 2:6, 2:20,
3:2, 3:20, 5:5, 6:2,
6:22, 7:8, 8:19,
10:17, 11:13, 12:11,
13:10, 14:17, 15:6,
15:18, 15:22, 17:16,
19:7, 19:13, 20:23,
21:4, 39:6, 39:16
**multiple** [2] - 19:10,
31:17
**must** [2] - 35:2, 35:24

## N

**N.W** [1] - 40:11
**name** [2] - 20:20, 26:2
**nation** [1] - 10:19
**nation-state** [1] -
10:19
**national** [1] - 12:5
**nature** [1] - 16:5
**navigate** [1] - 4:23
**nearly** [2] - 15:13,
17:14
**necessarily** [1] - 29:3
**need** [10] - 5:10, 6:11,
16:24, 22:14, 22:21,
30:15, 32:1, 32:5,
37:5, 37:6
**needed** [2] - 18:9,
18:14
**needing** [1] - 19:9
**needs** [2] - 32:22,
34:25
**negligible** [1] - 9:9
**New** [2] - 1:17, 1:20
**new** [1] - 18:17
**nobody** [1] - 27:14
**noncompete** [2] -

21:10, 27:8
**nondisclosure** [1] -
21:1
**nonetheless** [1] - 3:13
**nontestifying** [6] -
16:15, 18:22, 19:11,
19:24, 32:8, 32:18
**notes** [1] - 40:5
**nothing** [5] - 25:25,
26:10, 34:6, 35:20,
39:6
**noticed** [3] - 25:2,
25:16, 38:20
**notion** [1] - 36:9
**November** [4] - 1:6,
19:18, 38:16, 40:7
**number** [5] - 2:21, 5:9,
34:16, 35:14, 38:20
**NW** [4] - 1:11, 1:14,
1:17, 1:24
**NY** [1] - 1:20

## O

**object** [1] - 30:16
**objection** [1] - 18:21
**objective** [1] - 28:16
**objectively** [1] - 28:4
**obvious** [1] - 37:2
**obviously** [6] - 3:18,
4:20, 12:22, 17:15,
26:20, 37:13
**occurs** [1] - 12:24
**OF** [5] - 1:1, 1:2, 1:7,
1:13, 40:1
**offer** [1] - 5:2
**offered** [3] - 5:1, 25:7,
36:11
**officer** [1] - 39:10
**Official** [2] - 1:23,
40:10
**OFFICIAL** [1] - 40:1
**one** [29] - 2:24, 3:2,
4:19, 4:22, 6:13,
6:18, 6:22, 9:6, 10:2,
11:5, 12:16, 13:4,
14:18, 16:9, 17:6,
17:12, 17:16, 22:2,
24:11, 28:8, 28:10,
29:3, 29:9, 29:14,
29:15, 30:3, 31:15,
31:17
**ones** [1] - 12:20
**ongoing** [2] - 10:5,
39:15
**open** [6] - 4:22, 5:3,
6:21, 14:9, 14:10,
14:23
**open-in-public** [1] -
4:22

**opened** [1] - 14:20
**operated** [1] - 34:5
**operates** [1] - 25:12
**operating** [2] - 12:13,
24:8
**operation** [1] - 12:10
**opinion** [5] - 2:15,
2:21, 13:11, 30:8,
30:9
**opportunities** [1] -
19:10
**opportunity** [2] - 14:9,
32:22
**oppose** [1] - 5:11
**opposed** [1] - 7:5
**order** [12] - 2:21, 4:8,
13:11, 16:2, 19:1,
21:8, 21:10, 22:2,
27:8, 32:15, 38:16,
39:21
**ordered** [1] - 18:16
**orders** [4] - 16:4, 16:8,
16:9, 21:6
**original** [5] - 6:23, 7:1,
12:15, 13:18, 15:11
**ought** [1] - 36:10
**outed** [1] - 4:16
**outlandishly** [1] -
19:14
**outside** [4] - 4:24, 5:6,
22:20, 29:15
**outspoken** [1] - 19:16
**overstated** [1] - 33:21
**own** [7] - 16:13, 28:1,
28:13, 32:5, 33:13,
34:2, 35:7

## P

**p.m** [1] - 39:22
**P.M** [1] - 1:6
**page** [1] - 26:3
**paper** [2] - 21:21,
22:20
**papers** [1] - 3:11
**parameters** [2] - 5:21,
14:21
**part** [7] - 7:4, 9:17,
12:13, 17:20, 27:19,
29:18, 29:24
**parte** [1] - 38:19
**particular** [14] - 4:12,
7:19, 8:16, 10:21,
12:19, 15:7, 16:5,
18:4, 18:5, 18:9,
21:4, 21:14, 29:25
**particularly** [3] -
12:20, 13:5, 29:25
**parties** [2] - 6:14,
18:15

**parts** [1] - 11:1
**passion** [1] - 28:15
**past** [2] - 18:24, 19:19
**pattern** [1] - 15:9
**patterns** [1] - 7:19
**Pearlman** [1] - 2:8
**PEARLMAN** [1] - 1:15
**peer** [1] - 22:20
**peer-reviewed** [1] -
22:20
**Pelker** [6] - 2:7, 2:19,
24:1, 24:15, 39:5,
39:8
**PELKER** [25] - 1:13,
2:6, 2:20, 3:2, 3:20,
5:5, 6:2, 6:22, 7:8,
8:19, 10:17, 11:13,
12:11, 13:10, 14:17,
15:6, 15:18, 15:22,
17:16, 19:7, 19:13,
20:23, 21:4, 39:6,
39:16
**pending** [1] - 2:17
**Pennsylvania** [1] -
1:14
**people** [18] - 10:6,
14:8, 17:5, 17:6,
17:12, 26:5, 27:20,
27:25, 28:3, 28:14,
28:16, 28:24, 28:25,
29:23, 32:9, 32:10,
32:13
**percent** [3] - 33:23,
33:24, 34:24
**perception** [3] - 27:13,
27:16, 27:17
**perhaps** [4] - 3:14,
4:24, 16:13, 22:2
**period** [2] - 10:11,
14:21
**permit** [1] - 5:2
**person** [5] - 19:3,
20:14, 20:15, 22:9,
27:3
**perspective** [2] -
31:21, 31:22
**pervasive** [1] - 27:17
**pieces** [1] - 23:4
**pivot** [1] - 2:24
**place** [3] - 3:9, 26:2,
30:23
**Plaintiff** [2] - 1:3, 1:10
**plan** [1] - 37:15
**PLLC** [1] - 1:19
**point** [26] - 3:11, 4:7,
5:18, 8:9, 10:18,
14:14, 16:14, 18:17,
18:20, 19:24, 20:19,
22:23, 22:25, 23:5,
23:17, 23:19, 25:7,

25:21, 26:15, 29:15, 35:19, 35:24, 35:25, 36:3, 36:7, 36:13
**points** [3] - 21:19, 21:21, 29:8
**policies** [1] - 5:10
**political** [2] - 28:15, 29:9
**politically** [1] - 29:5
**portion** [1] - 35:10
**portions** [2] - 12:19, 13:1
**position** [2] - 19:6, 24:25
**positions** [1] - 6:14
**positives** [1] - 11:11
**possible** [1] - 22:16
**possibly** [1] - 16:17
**posture** [2] - 17:21, 18:1
**potential** [1] - 29:11
**potentially** [3] - 11:15, 14:5, 16:12
**power** [2] - 20:12, 30:1
**precise** [1] - 9:5
**prejudice** [1] - 3:18
**preparation** [1] - 19:9
**prepare** [1] - 37:12
**prepared** [1] - 19:2
**preparing** [1] - 32:2
**presence** [2] - 4:24, 5:6
**present** [3] - 2:12, 22:24, 23:2
**pretrial** [1] - 38:3
**pretty** [1] - 13:18
**prevent** [1] - 26:14
**principle** [3] - 23:20, 36:4, 36:9
**privacy** [2] - 28:2
**problem** [3] - 16:22, 26:21, 27:19
**problems** [1] - 28:6
**procedures** [1] - 5:16
**proceeding** [2] - 18:18, 30:5
**proceedings** [1] - 40:6
**proceeds** [1] - 14:12
**process** [6] - 16:12, 16:21, 23:16, 29:21, 37:14, 38:12
**produced** [4] - 2:18, 6:25, 30:23, 31:6
**production** [6] - 23:3, 23:12, 24:3, 24:22, 25:1, 39:11
**proffer** [4] - 4:23, 5:6, 37:6, 38:2
**program** [1] - 25:8

**promptly** [1] - 39:21
**proper** [2] - 5:1, 5:24
**properties** [1] - 8:21
**property** [1] - 26:24
**proposed** [1] - 5:21
**proposing** [1] - 19:13
**proprietary** [2] - 27:11, 31:22
**protecting** [1] - 10:24
**protective** [11] - 4:8, 16:2, 16:4, 16:7, 16:8, 19:1, 21:6, 21:8, 21:10, 27:8, 32:15
**prove** [1] - 29:19
**provide** [4] - 7:22, 8:2, 22:19, 38:17
**provided** [1] - 8:6
**provides** [1] - 15:13
**public** [2] - 4:22, 14:6
**Public** [1] - 28:23
**publicize** [1] - 4:7
**publicly** [1] - 4:16
**pull** [1] - 11:2
**purpose** [2] - 5:1, 31:15
**purposes** [5] - 6:7, 12:23, 22:13, 22:15, 39:14
**pushing** [1] - 26:17
**put** [7] - 5:20, 9:1, 13:18, 14:11, 22:16, 24:3, 28:14
**putting** [1] - 3:25

### Q

**qualified** [1] - 20:8
**quantity** [1] - 34:23
**questions** [10] - 2:16, 2:22, 2:24, 2:25, 3:2, 6:10, 6:22, 10:2, 21:20, 24:11
**quickly** [2] - 10:12, 12:25
**quite** [5] - 8:5, 14:13, 21:25, 25:5, 26:15

### R

**raised** [6] - 2:21, 3:3, 6:23, 20:3, 22:25, 31:16
**raising** [2] - 32:14, 36:16
**RANDOLPH** [1] - 1:8
**rates** [1] - 22:19
**rather** [4] - 11:1, 14:5, 28:3, 38:2
**reach** [1] - 28:23

**Reactor** [12] - 22:7, 23:6, 25:3, 25:8, 25:17, 25:19, 26:5, 26:10, 33:19, 33:21, 35:5, 35:21
**read** [2] - 4:6, 5:17
**reading** [1] - 2:15
**ready** [2] - 8:9, 20:17
**real** [5] - 11:5, 18:3, 19:9, 19:15, 28:8
**reality** [1] - 27:16
**realize** [1] - 14:13
**really** [22] - 3:8, 3:10, 4:3, 5:24, 6:6, 6:7, 8:25, 9:5, 9:10, 9:12, 10:23, 12:21, 13:4, 13:6, 13:13, 13:14, 13:21, 17:13, 22:1, 22:13, 29:14, 33:25
**reason** [6] - 20:4, 26:16, 27:10, 28:11, 31:8, 34:21
**reasons** [2] - 16:25, 37:2
**record** [5] - 2:5, 4:7, 5:18, 14:6, 22:11
**redact** [1] - 13:15
**refer** [1] - 7:4
**reflect** [1] - 36:11
**refutes** [1] - 30:9
**regarding** [4] - 3:3, 4:10, 8:3, 16:2
**regardless** [1] - 34:9
**regards** [1] - 24:21
**relate** [1] - 6:7
**relating** [1] - 2:19
**relation** [1] - 34:7
**relevant** [8] - 5:1, 7:16, 13:5, 22:15, 25:2, 25:9, 26:19, 34:4
**relied** [1] - 12:4
**rely** [1] - 3:25
**remain** [1] - 31:20
**remains** [1] - 39:12
**remember** [1] - 22:17
**reopen** [1] - 18:8
**repeatedly** [1] - 26:11
**report** [23] - 3:6, 4:1, 4:3, 7:1, 7:3, 7:5, 7:11, 7:23, 8:3, 8:5, 9:5, 12:15, 12:19, 12:20, 13:1, 13:14, 13:17, 13:20, 17:7, 25:25, 26:3, 34:17, 34:18
**REPORTER** [1] - 40:1
**Reporter** [3] - 1:22, 1:23, 40:10
**reports** [2] - 7:9, 17:21

**represent** [1] - 39:12
**representation** [3] - 37:11, 39:9, 39:18
**represented** [1] - 31:19
**request** [5] - 6:19, 13:8, 19:24, 30:25, 31:1
**requested** [1] - 26:16
**require** [1] - 4:23
**resist** [1] - 25:20
**resolve** [3] - 2:17, 37:21, 38:3
**respect** [9] - 6:15, 6:16, 12:22, 17:7, 21:2, 22:12, 23:5, 28:1, 29:22
**respectfully** [1] - 30:11
**respond** [2] - 21:17, 33:7
**responsibility** [1] - 19:23
**result** [1] - 21:22
**revealing** [1] - 26:13
**review** [13] - 6:6, 7:8, 7:24, 8:2, 8:7, 13:10, 18:14, 23:16, 23:22, 30:20, 31:10, 32:23, 37:13
**reviewed** [3] - 22:20, 39:10, 39:16
**reviewing** [1] - 31:25
**RMR** [2] - 1:22, 40:9
**rob** [2] - 14:8, 14:12
**robber** [1] - 15:3
**robbers** [1] - 15:8
**robbery** [1] - 14:24
**ROMAN** [1] - 1:5
**Roman** [2] - 2:3, 2:11
**Room** [2] - 1:23, 40:10
**row** [2] - 7:11
**run** [1] - 28:5

### S

**sake** [1] - 25:23
**sauce** [1] - 26:13
**saw** [1] - 3:10
**schedule** [1] - 18:18
**scientific** [1] - 22:20
**scientist** [2] - 18:24, 20:9
**secrecy** [1] - 31:3
**secret** [3] - 17:1, 26:13, 31:10
**secrets** [1] - 5:15
**security** [2] - 12:6, 16:24, 16:25
**see** [9] - 10:18, 13:4,

20:4, 26:15, 28:18, 30:18, 34:8, 37:19, 38:21
**seek** [3] - 3:22, 4:8, 5:11
**seeking** [2] - 17:18, 18:13
**seem** [3] - 25:11, 28:14, 29:16
**sees** [1] - 32:21
**SEFRANEK** [1] - 40:3
**Sefranek** [3] - 1:22, 40:9, 40:9
**seized** [1] - 24:3
**send** [2] - 38:1, 38:25
**sense** [4] - 30:15, 37:4, 37:8, 37:10
**sensitive** [24] - 3:4, 4:10, 6:24, 7:5, 8:18, 8:24, 9:9, 9:15, 12:20, 13:7, 13:12, 13:13, 13:15, 15:13, 15:15, 16:7, 20:2, 24:13, 27:9, 27:11, 27:12, 31:20, 39:11, 39:13
**sensitivity** [2] - 4:20, 31:18
**sentencing** [1] - 33:17
**separate** [2] - 23:5
**series** [1] - 13:21
**service** [3] - 7:20, 10:22, 11:17
**service's** [1] - 7:18
**service-specific** [2] - 10:22, 11:17
**services** [6] - 11:21, 11:22, 12:9, 12:14, 24:1, 24:2
**set** [1] - 20:13
**sharing** [1] - 13:3
**Shaw** [1] - 34:17
**shell** [3] - 4:11, 14:20, 14:23
**showing** [4] - 3:19, 33:9, 33:10, 33:20
**shut** [1] - 29:23
**sic** [1] - 31:4
**side** [2] - 3:15, 20:21
**sidebar** [1] - 38:1
**sides** [1] - 6:15
**sign** [1] - 21:1
**signaling** [1] - 26:23
**signed** [1] - 38:17
**significant** [4] - 3:8, 11:24, 12:5
**significantly** [2] - 17:17, 20:11
**similar** [1] - 24:7
**simply** [5] - 18:18,

18:25, 20:16, 23:1,
26:12
**sit** [1] - 20:21
**sites** [3] - 24:8, 33:12,
33:22
**sitting** [1] - 36:21
**situated** [3] - 16:19,
18:2, 18:6
**situation** [1] - 16:21
**Sixth** [1] - 36:14
**skill** [1] - 20:13
**skills** [1] - 31:11
**slice** [1] - 13:8
**software** [7] - 21:24,
23:13, 25:8, 25:12,
26:18, 30:13, 31:2
**someday** [1] - 9:22
**someone** [5] - 9:12,
15:9, 16:22, 29:21,
32:7
**sometimes** [1] - 4:9
**somewhat** [1] - 16:6
**somewhere** [1] -
20:10
**sorry** [4] - 23:17,
24:16, 27:22, 33:6
**sort** [15] - 4:7, 4:10,
5:6, 5:24, 6:20,
13:22, 22:8, 24:19,
26:13, 27:23, 29:5,
31:3, 31:24, 36:8,
37:6
**sources** [1] - 32:7
**specific** [6] - 6:3, 7:20,
8:16, 8:21, 10:22,
11:17
**specifically** [1] - 14:23
**specificity** [1] - 18:11
**specifics** [1] - 14:4
**spend** [1] - 7:12
**spending** [1] - 7:17
**start** [1] - 37:24
**started** [2] - 33:3, 33:8
**starting** [1] - 2:5
**state** [1] - 10:19
**statement** [3] - 16:11,
24:18, 24:19
**States** [4] - 1:23, 2:3,
2:7, 29:15
**STATES** [3] - 1:1, 1:2,
1:8
**static** [2] - 12:12,
12:17
**stenographic** [1] -
40:5
**Sterlingov** [19] - 2:3,
2:12, 3:19, 6:19,
9:21, 13:3, 16:19,
20:1, 22:16, 26:1,
30:20, 31:9, 32:17,

32:20, 33:9, 34:5,
34:7, 36:4
**sterlingov** [1] - 13:25
**STERLINGOV** [1] - 1:5
**Sterlingov's** [3] - 6:17,
7:16, 26:2
**still** [16] - 4:15, 7:4,
8:1, 12:2, 12:10,
13:7, 19:2, 21:9,
22:8, 23:7, 23:11,
23:12, 24:8, 24:12,
24:13, 35:7
**straight** [1] - 35:8
**straight-out** [1] - 35:8
**street** [1] - 15:8
**Street** [2] - 1:11, 1:20
**strong** [1] - 29:4
**study** [1] - 6:6
**stuff** [3] - 16:16,
32:21, 35:18
**subject** [5] - 5:4, 19:1,
20:12, 30:1, 32:14
**subpoena** [1] - 18:10
**substantial** [2] -
33:15, 35:10
**substantive** [1] -
13:22
**sudden** [1] - 30:22
**sue** [1] - 27:5
**sufficient** [2] - 18:11,
32:4
**sufficiently** [1] - 18:23
**suggesting** [2] -
29:13, 34:1
**suggestion** [1] - 13:11
**super** [1] - 33:25
**superficial** [1] - 24:19
**supervillain** [1] -
31:13
**supplement** [2] - 7:6,
8:25
**supplemental** [16] -
3:4, 6:24, 7:2, 11:5,
12:19, 13:1, 14:22,
21:22, 22:1, 23:3,
23:12, 24:3, 24:22,
25:1, 37:16, 39:11
**suppose** [6] - 4:19,
4:22, 16:11, 20:4,
20:18, 34:21
**Supreme** [1] - 15:23

**T**

**table** [1] - 2:7
**tables** [2] - 7:24, 8:20
**tailored** [1] - 21:9
**TAMARA** [1] - 40:3
**Tamara** [3] - 1:22,
40:9, 40:9

**technical** [4] - 9:14,
9:22, 12:24, 25:21
**techniques** [1] - 24:7
**ten** [4] - 11:20, 11:22,
12:9, 24:2
**terms** [4] - 26:13,
30:13, 30:17, 32:20
**tested** [1] - 12:3
**testified** [4] - 22:18,
23:8, 25:13, 34:6
**testify** [4] - 4:2, 19:3,
23:8, 28:19
**testifying** [6] - 18:17,
19:11, 20:16, 25:10,
28:20, 32:18
**testimony** [2] - 8:3,
22:18
**text** [1] - 5:17
**THE** [61] - 1:1, 1:1,
1:8, 2:2, 2:9, 2:13,
3:1, 3:10, 4:19, 6:1,
6:9, 7:7, 8:8, 9:18,
11:12, 12:9, 13:18,
13:24, 15:5, 15:16,
15:19, 16:10, 18:15,
19:12, 19:20, 20:24,
21:16, 21:25, 22:23,
23:17, 24:6, 24:11,
24:17, 25:5, 25:14,
27:3, 27:9, 27:18,
27:22, 29:12, 30:8,
30:25, 31:14, 33:1,
33:6, 34:10, 34:19,
35:7, 36:1, 36:15,
36:24, 37:3, 37:23,
38:8, 38:13, 38:15,
38:23, 39:1, 39:5,
39:8, 39:20
**theater** [1] - 31:3
**themselves** [1] - 26:14
**therefore** [2] - 13:8,
35:12
**thinking** [3] - 5:14,
23:10, 29:14
**thoughts** [1] - 31:14
**thousands** [1] - 7:10
**threatened** [2] - 27:4
**title** [1] - 26:3
**today** [6] - 6:11, 10:14,
27:11, 30:19, 36:21,
37:15
**together** [2] - 4:1, 9:1
**top** [1] - 30:3
**topic** [1] - 38:15
**TOR** [1] - 1:18
**Tor** [1] - 1:19
**tor** [1] - 2:10
**touch** [2] - 27:1, 27:15
**trace** [3] - 10:6, 10:10,
29:21

**traced** [1] - 26:15
**traces** [1] - 26:1
**tracing** [7] - 9:23,
9:24, 10:8, 10:20,
25:24, 26:11, 29:17
**trade** [1] - 5:15
**transaction** [1] - 7:19
**transactions** [2] -
7:21, 10:6
**TRANSCRIPT** [1] - 1:7
**transcript** [2] - 40:4,
40:6
**trial** [24] - 3:5, 3:13,
3:17, 3:21, 4:8, 4:21,
4:22, 6:4, 6:11, 7:15,
9:15, 12:15, 19:8,
19:9, 20:17, 20:22,
26:19, 37:5, 37:12,
37:18, 37:24, 38:2,
38:7
**true** [4] - 4:13, 28:10,
40:4, 40:5
**trustworthy** [1] -
18:23
**try** [4] - 4:6, 13:14,
19:25, 37:21
**trying** [6] - 9:12,
10:16, 13:24, 29:17,
29:21, 31:4
**turn** [2] - 8:10, 15:19
**turned** [2] - 5:3, 16:18
**turns** [1] - 17:5
**two** [5] - 8:19, 9:7,
28:8, 31:14, 32:1
**type** [4] - 5:7, 8:13,
14:14, 16:19
**types** [3] - 26:6, 28:5,
31:16

**U**

**U.S** [1] - 1:13
**u.S** [1] - 1:16
**ultimately** [1] - 21:9
**underinclusive** [1] -
11:10
**underlied** [1] - 22:6
**understood** [4] - 14:3,
23:11, 24:15, 25:22
**unique** [1] - 16:6
**uniquely** [3] - 16:19,
18:2, 18:6
**UNITED** [3] - 1:1, 1:2,
1:8
**United** [4] - 1:23, 2:3,
2:7, 29:15
**universities** [1] -
28:18
**University** [2] - 18:24,
28:17

**unless** [2] - 2:22, 2:25
**unusual** [1] - 18:1
**unwilling** [1] - 28:12
**up** [12] - 5:24, 9:1,
10:8, 15:23, 19:8,
21:8, 22:22, 26:6,
26:19, 29:5, 31:12,
38:8
**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**useful** [1] - 37:9
**uses** [2] - 7:13, 7:20

**V**

**value** [4] - 4:3, 9:10,
10:4
**various** [1] - 7:14
**vendors** [1] - 24:8
**version** [1] - 28:13
**versus** [2] - 9:4, 9:5
**view** [4] - 6:19, 17:25,
18:3, 33:21
**viewing** [1] - 18:5
**views** [2] - 28:1, 29:9
**voluminous** [2] - 6:4,
7:2
**volunteered** [1] - 22:3
**vs** [1] - 1:4

**W**

**walk** [2] - 4:19, 19:4
**walks** [1] - 7:14
**Wall** [1] - 1:20
**wants** [1] - 27:14
**Washington** [6] - 1:5,
1:12, 1:14, 1:17,
1:24, 40:11
**ways** [3] - 9:23, 19:25,
29:23
**weigh** [1] - 31:16
**weighed** [1] - 11:4
**weighing** [1] - 12:16
**weighted** [1] - 9:1
**well-situated** [1] -
16:19
**whack** [1] - 10:5
**whack-a-mole** [1] -
10:5
**whole** [1] - 32:24
**willing** [4] - 26:23,
28:11, 35:9, 35:11
**win** [1] - 37:16
**witness** [4] - 6:3, 6:8,
25:16, 35:7
**witnesses** [3] - 5:25,
22:13, 37:14
**word** [2] - 30:9, 32:2
**works** [2] - 5:7, 23:6

**world** [3] - 10:4,
12:24, 30:4
**wrote** [1] - 30:8

## Y

**year** [1] - 27:7
**years** [1] - 10:12
**York** [2] - 1:17, 1:20
**you-all** [1] - 2:16
**yourself** [2] - 2:4, 37:4

## Z

**zero** [1] - 35:16