**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MOTION TO EXCLUDE**
**"SUPPLEMENTAL" EXPERT TESTIMONY BY PROFESSOR**
**VERRET FIRST DISCLOSED IN THE MIDDLE OF TRIAL**

The United States of America respectfully moves the Court to exclude proposed defense expert testimony by Professor J.W. Verret that was disclosed for the first time on Friday, February 24, 2024, immediately after the government's blockchain tracing expert had finished his direct testimony. Professor Verret sat in Court on Thursday, February 23, 2024 to observe the testimony of FBI Staff Operations Specialist Luke Scholl—even requesting to work on his laptop from the gallery while watching Mr. Scholl testify. At 8:51 a.m. on the following morning, February 24, 2024, the defense emailed government counsel a so-called "supplemental expert report of JW Verret," attached as Ex. 1. The new "supplemental expert report" (a series of PowerPoint slides) sweeps far beyond the substance of Professor Verret's expert disclosures, *see* ECF Nos. 122, 145-5, 158; its cryptic language inadequately discloses Professor Verret's new "opinions," let alone discovery of his "bases and reasons," Fed. R. Crim. P. 16(b)(1)(C)(iii); and it blatantly ignores the Court's specific and detailed *Daubert* rulings limiting the scope of Professor Verret's expert testimony, *see* 9/8/23 Pretrial Conf. Tr. at 2-95; 9/15/23 Pretrial Conf. Tr. at 43-108. The subject matter of this opportunistically-timed "supplemental expert report" should be excluded for failure to comply with the plain text of Rule 16's timing and substantive requirements, *see* Fed. R. Crim.

P. 16(d)(2)(C), as well as the parties' commitment not to introduce new expert testimony following the September 2023 continuance.

**ARGUMENT**

**1.  The "Supplemental Expert Report" Violates Rule 16's Mandate that Expert Disclosures Be Made "Before Trial"**

First, the late disclosure of Professor Verret's "Supplemental Expert Report" blatantly violates Rule 16, which was specifically amended in 2022 to prevent just this sort of opportunistic disclosure in the middle of trial.  The plain text of Rule 16 requires disclosure of all defense expert opinions and bases "sufficiently *before trial*" in order "to provide a fair opportunity for the government to meet the defendant's evidence." Fed. R. Crim. P. 16(b)(1)(C)(ii) (emphasis added). This requirement was put in place in order to create an "enforceable deadline for disclosure." Fed. R. Crim. P. 16, Advisory Committee Notes to 2022 Amendments.  As the Advisory Committee emphasized, the purpose of timely *pretrial* disclosure is "to facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed."  *Id.*

Here, the mid-trial unveiling of Professor Verret's "Supplemental" report violates not just the plain mandate of Rule 16, but also the explicit understanding among the Court, defense counsel, and the government that there would be no new expert disclosures following the September 2023 trial continuance.  When the Court granted that second trial continuance—over the government's objection—it did so on the explicit understanding that neither party would seek to introduce new expert testimony.  *See* 9/21/23 Pretrial Conf. Morning Tr. at 40:1-7 (Mr. Ekeland: "I would just ask the same of the government, that they don't—we'd just ask for the record the same of the government, that there's no new experts coming." The Court: "I'm happy to have a rule. If you all are in agreement on this, I'm happy to categorically say no new experts." Mr. Ekeland: "Yes, Your

2

Honor." The Court: "Okay. That's adopted then. No new experts with the consent of the parties—at the request of the parties."); 9/21/23 Pretrial Conf. Afternoon Tr. at 44:9-13 (The Court: "I want you to make sure that you understand that the government has represented to the Court and Mr. Ekeland has represented to the Court, no new experts at this point. So this time is not going to be used looking for new experts or seeking to offer any new experts in the case."); Sept. 22, 2023 Minute Order (confirming that defense "will not seek leave to designate any additional expert witnesses at this late date (which is long past the date for identifying experts)"). Set against this background—in which the defense specifically sought a commitment from the government not to introduce new expert testimony and promised to abide by the same rule—the mid-trial disclosure of Professor Verret's "supplemental" report is particularly shocking.

Indeed, it appears that the defense deliberately timed the unveiling of Professor Verret's new material—halfway through the government's case, and immediately after the direct examination of the government's blockchain tracing expert—in order to deprive the government of a "fair opportunity . . . to meet the defendant's evidence." Fed. R. Crim. P. 16(b)(1)(C)(ii). Much of the new material appears intended to be responsive to the testimony of FBI Staff Operations Specialist Scholl and other government witnesses[1]—including assertions about the use of so-called "privacy tools like Bitcoin Fog," the defendant's "Failed Business" running To the Moon VPN service, his Codereactor invoices, the "Common Practice" of shuffling money from Mt. Gox to AurumXchange to Liberty Reserve, and the "Private Key Problem." Ex. 1. In fact, defense counsel referred to many of these topics in his opening statement on February 13, 2024—suggesting that the defense not only anticipated these new topics at the start of trial, but deliberately

---

[1] The defense has been on notice of Mr. Scholl's expert testimony (as well as that of the other government experts) for months through the government's pretrial disclosures and extensive Daubert proceedings. The defense can hardly claim to be surprised by any of it.

planned the timing of Professor Verret's new "supplemental" report in the middle of trial for maximum advantage.    The Court should deny this transparent attempt to circumvent the requirements of Rule 16 and defense counsel's own prior representations to this Court.

## 2. The "Supplemental Expert Report" Fails To Disclose Professor Verret's New Opinions and the Bases and Reasons for Them as Required by Rule 16

Second, the bare-bones PowerPoint slides produced by the defense provide no disclosure of Professor Verret's "opinions," let alone the "bases and reasons" for them.  Fed. R. Crim. P. 16(b)(1)(C)(iii).  The cryptic language of many of the slides leaves considerable doubt about what Professor Verret intends to say at all.  One slide is labeled "Assets" and contains just two words, "Blocket" and "Travel."  Another slide is labeled "Personal Privacy" and contains bullet points referring to "Mixing Report" and "Professional Responsibility."  Yet another slide—alarmingly labeled "Assessing Credibility," suggesting Professor Verret intends to invade the province of the jury by commenting about the "credibility" of witnesses and evidence in this case—contains entries referring to "Gift Cards," "XBT vs. BTC," and "Co-operators."  No further explanation is provided for what Professor Verret plans to say about these and other previously-undisclosed topics.  This is patently insufficient under Rule 16.[2]

## 3. The "Supplemental Expert Report" Violates the Court's Detailed *Daubert* Rulings Limiting the Scope of Professor Verret's Testimony

Third, Professor Verret's new slides appear to sweep well beyond the specific and detailed *Daubert* rulings by this Court on the permissible scope and subject matter of his testimony.  The

---

[2] The government emphasizes that the defense has provided no discovery of *any* work product or materials prepared by Professor Verret other than the slides and the previously-filed defense pleadings.  *See generally* 9/8/23 Pretrial Conf. Tr. at 62:1-4 (The Court: "I recall being very surprised that he said he hadn't actually put anything on paper and done any math.  So I'm not sure how he can say some of this.").  The defense has also failed to produce any Rule 26.2 statements by Professor Verret, even though Professor Verret testified that he participated in email

defense provided its initial expert disclosure of Professor Verret's testimony on May 19, 2023, ECF No. 122, and provided a supplemental disclosure on July 7, 2023, ECF No. 145-5. Professor Verret testified and was cross-examined over two days of *Daubert* hearings on July 19 and 20, 2023. The defense filed another "Supplemental" expert disclosure on August 7, 2023, ECF No. 158. Over two days of pretrial hearings on September 8 and 15, 2023, the Court painstakingly walked through each of the 33 numbered paragraphs of Professor Verret's expert disclosure and issued detailed rulings on each—allowing some, limiting others, and excluding several topics that either fell outside Professor Verret's qualified expertise or would raise Rule 401, 403, or 702 problems. *See* 9/8/23 Pretrial Conf. Tr. at 2-95; 9/15/23 Pretrial Conf. Tr. at 43-108.

In making these rulings, the Court placed responsibility onto defense counsel to ensure Professor Verret stays within the limits set by the Court on the scope of his expert testimony:

> The Court:   I do worry—and I think, Mr. Ekeland, this is going to be your responsibility to make sure that the witness doesn't stray into this stuff because the last thing I want to be doing in front of the jury is myself being the one to have to restrain the witness and saying—say to the jury—saying to the witness, that's not appropriate testimony, I'm going to strike it and direct that the jury disregard anything, perhaps even say that there's not an adequate foundation for that testimony.
>
>   So I don't want to be in a position in which he's blurting things out, and then I'm trying to do cleanup afterwards. That's going to be your responsibility to make sure we don't have to do that.
>
> Mr. Ekeland:   Understood, Your Honor.

9/8/23 Tr. at 83:17-84:5.

---

conversations about the case with the other defense experts, and he has posted on his Twitter/X account (now set to private) commenting about his *Daubert* testimony. *See* 7/19/23 *Daubert* Hr'g Tr. at 141:2-4 (Prof. Verret) ("We have had discussions with the experts [about blockchain analysis]. Memorialized—I mean, we've had emails. We have an email chain discussion among the experts.").

Professor Verret's new slides, however, blatantly disregard the Court's rulings on his originally disclosed testimony, and they introduce a considerable amount of new (and obviously impermissible) topics that have never previously been disclosed.

For example, Professor Verret's new concluding slide asserts: "No forensic evidence that Mr. Sterlingov operated Bitcoin Fog."  But the Court was clear that Professor Verret could not testify about the sufficiency of the government's evidence, nor could he dress up such conclusory assertions with jargon about "forensic" soundness, without running afoul of Rules 401 and 403:

Mr. Ekeland:  . . . . And what he's saying is it's not forensically sound from a forensic accounting viewpoint to say you've got somebody over here, and now you've got 19 transactions ending up in Bitcoin Fog to then say that's Mr. Sterlingov or anybody's money going into Bitcoin Fog.

The Court:  So the one—two things here.  I don't think that he is qualified to testify about Chainalysis and how Chainalysis works.

Two, I think under 403 and, really, 401, I have problems with him saying it's not forensically sound. Also, I think he's stepping into the role of the jury and saying that—making some normative judgment.

\* \* \*

I worry a little bit that it's either misleading to the jury or stepping into the shoes of the jury to say, look, I'm telling you just, forensically, it is just unsound to do this here; because it really is for the jury to decide for itself whether there is sufficient uncertainty that it calls into question the results, and sort of labeling it as forensically unsound in a case which is not about forensic accounting.

This isn't a case in which there's an allegation that someone violated the CFF standards and, therefore, they're liable for violating the CFF standards, and we need to know what those standards are.

But I think saying to the jury or arguing to the jury, this violates these standards is misleading to the extent that it suggests to the jury that the inferences are wrong simply because it violates that standard—which I don't even have the standard in front of me, so I don't know whether it violates the standard or not.

I just think—I think that under 401 and 403, as well as questions just of the witness's own area of expertise, that the question is, where are the areas of uncertainty which can be brought

to the jury's attention, and the jury can decide what inferences to draw from that or what conclusions to draw from that.

9/15/23 Tr. at 60:1-62:3; *see also id.* at 107:12-14 ("I don't think he should testify with respect to the sufficiency of the evidence."), 108:2-3 (excluding testimony that is "commenting on the sufficiency of the evidence, which is not his role").

Other areas in which Professor Verret's new slides ignore the Court's rulings include (but are not limited to) the following:

- One slide refers to a "Lack of Pattern Correlation Between BTC Fog fees and Sterlingov Bitcoin activity." But the Court found Professor Verret was unqualified to testify about the presence or absence of any "pattern" linking Bitcoin Fog fees to deposits into the defendant's accounts.[3]

- One slide claims that "Most mixing is for Personal Privacy." While the Court allowed Professor Verret to testify *generally* about motivations for using mixers, the Court specifically barred Professor Verret from attempting to quantify that assertion (*e.g.*, "most") without a reliable evidentiary foundation, which to date has not been disclosed.[4]

- One slide is entitled "Bitcoin Tracing Unreliable." It includes references to "Private Key Problem" and "Tracing is an unreliable attribution method." These statements appear to go well beyond the Court's carefully laid guardrails, which allow Professor Verret to testify generally about how private keys can show ownership, but preclude him from opining that, without private keys, ownership cannot be determined.[5]

---

[3] *See* 9/8/23 Tr. at 74:20-75:4 ("That just strikes me as so ill-informed as to suggest a lack of expertise . . . I don't know if you know what he means by the recognizable pattern, but if that's what he means, it just doesn't seem like there's much of a basis for that assertion.")

[4] *See* 9/15/23 Tr. at 45:24-46:3 ("To the extent he wants to actually quantify it in any way, though, he would need to have evidence that would—and studies that would satisfy a *Daubert*-type analysis, or surveys or something that would provide some indication of the allocation.")

[5] *See* 9/15/23 Tr. at 77:5-9 ("But this, again, heuristics cannot definitively prove ownership of cryptocurrency; again, Ms. Still or some other person might be the right expert on this. I didn't believe that Mr. Verret had any particular experience or expertise on those issues."); 94:8-18 ("But to the extent he simply wants to testify that there's a difference between the public key and the private key, and the public key isn't definitively tied to someone and that it's only through the private key that you maintain ownership and that private keys can be transferred and knowing who

- The same slide contains an (unexplained) citation to an academic paper about "Bitcoin Clustering Heuristics," but the Court repeatedly found that Professor Verret was not an expert in Bitcoin clustering, tracing, or heuristics.[6]

Also of concern are slides indicating that Professor Verret intends to veer into new subject areas that are inappropriate for expert testimony. One slide is entitled "Forensic Interviews," and appears to be nothing more than a vehicle for Professor Verret to repeat hearsay statements from the defendant (and perhaps other individuals; the lack of disclosure leaves the government and the Court in the dark) without risking cross-examination. To be sure, hearsay may sometimes be a permissible basis for an expert's opinion, but that is only if relying on a certain kind of hearsay— such as academic research—is part of an expert's reliable application of reliable principles and methods (which would still have to be disclosed and subjected to *Daubert* scrutiny). *See* Fed. R. Evid. 702. Simply adding the word "forensic" does not transform inadmissible hearsay into expert testimony.

---

owns the private key is—if you know someone who has a private key, you can then determine from that, I may be a little bit concerned if you were to go further and say that without that information, you can't know. That may not be fair and that may be misleading to the jury to put it that strongly.").

[6] *See, e.g.*, 9/8/23 Tr. at 76:5-7 ("So to the extent that he's purporting to express opinions with respect to blockchain tracing, I don't see any basis to conclude that he has expertise in the area."); 9/15/23 Tr. at 47:3-5 ("I thought what I had already concluded was that Mr. Verret didn't appear to have any expertise in blockchain tracing."), 50:10-13 ("18, 19, 20, 21, 22, and 23, again, it seems to me are all expert testimony with respect to blockchain tracing, where my recollection was that Mr. Verret had no personal experience or training doing that."), 60:6-8 ("I don't think that he is qualified to testify about Chainalysis and how Chainalysis works."), 77:5-9 ("But this, again, heuristics cannot definitively prove ownership of cryptocurrency; again, Ms. Still or some other person might be the right expert on this. I didn't believe that Mr. Verret had any particular experience or expertise on those issues."), 78:9-20 ("I don't get the sense—and I think Mr. Verret in his testimony—he doesn't know what the heuristics are that Chainalysis uses. . . . But I don't get the sense that Mr. Verret has, sort of, that type of experience other than, perhaps, he understands what the word heuristic means . . . ."), 79:13-15 ("[B]ut I don't have any sense that he actually has any basis to say heuristics are guesses, for example.").

Another slide is labeled "Assessing Credibility."  Whatever that means, it invades the province of the jury and is not an appropriate area for expert testimony.  *See, e.g.*, *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) (describing expert testimony about credibility of government witnesses as a "gross invasion of the province of the jury" and reiterating that "expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony," because "[t]he credibility of witnesses is exclusively for the determination by the jury"); *United States v. Hill*, 749 F.3d 1250, 1258 (10th Cir. 2014) (finding expert testimony on credibility of another person was "plain error," explaining that "the subject matter of his testimony—the credibility of another person—may not be addressed by an expert testifying under Rule 702" because it "usurps a critical function of the jury," is not helpful to the jury, and "is prejudicial and unduly influences the jury").  Of particular concern is the heading "Co-operators," which indicates that Professor Verret intends to testify (vastly beyond his field of his experience) about the credibility of the government's cooperating witnesses.  Such testimony would be impermissible under Rule 702.  *See, e.g.*, *United States v. Noze*, 255 F. Supp. 3d 352 (D. Conn. 2017) (precluding expert testimony about credibility of cooperating witnesses).

Any one of these new slides raises significant *Daubert* concerns (in addition to the disclosure and discovery defects noted above) and would potentially require reopening Professor Verret's *Daubert* proceeding.  The difficulties of interrupting an already lengthy and delayed trial to do so are obvious, and it would be profoundly unfair to the government and to the jury.  The Court should reject the defense's opportunistic gambit.  The Court should enforce the plain terms of Rule 16 and the parties' prior agreement foreswearing additional expert testimony by excluding any testimony relating to Professor Verret's February 24, 2024 "Supplemental Expert Report."  The Court should also require defense counsel to confirm that he has discussed this matter with

9

Professor Verret and will ensure Professor Verret will not testify outside the parameters set by the Court's rulings on September 8 and 15, 2023.

## <u>CONCLUSION</u>

Pursuant to Fed. R. Crim. P. 16(d)(2)(C), the Court should exclude any testimony relating to the subject matter of Professor Verret's February 24, 2024 "Supplemental Expert Report," and order that Professor Verret's testimony be limited to his prior disclosures as ruled upon by the Court during the September 8 and 15, 2023 hearings.  The government further requests that defense counsel be required to confer with Professor Verret and confirm that Professor Verret will not testify outside of the parameters set by the Court's rulings on September 8 and 15, 2023.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
*/s/ Jeffrey Pearlman*
C. Alden Pelker, Maryland Bar
Jeff Pearlman, D.C. Bar No. 466901
Trial Attorneys, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007 (Pelker)
(202) 579-6543 (Pearlman)
Catherine.Pelker@usdoj.gov
Jeffrey.Pearlman2@usdoj.gov