**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ROMAN STERLINGOV,

      Defendant.

**21-CR-399 (RDM**)

**SENTENCING MEMORANDUM**
**ON BEHALF OF ROMAN STERLINGOV**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................3

ARGUMENT .............................................................................................................3

I.    THE § 3553(A) ANALYSIS WARRANTS AN UNDER-GUIDELINES

SENTENCE ....................................................................................................4

    A.    Counts Three and Four Are Multiplicitous.............................................5

    B.    Mr. Sterlingov's History and Character...................................................5

        1.    No Criminal History .......................................................................9

        2.    Letters in Support of Mr. Sterlingov............................................9

    C.    The Nature and Circumstances of the Offense .......................................9

II.    THE GUIDELINES, DRIVEN BY DOLLAR AMOUNTS, DO NOT

ACCURATELY REFLECT CULPABILITY, A DICHOTOMY COMPOUNDED

BY CUMULATIVE AND OVERLAPPING ENHANCEMENTS. ...............................11

III.    THE VALUE OF THE LAUNDERED FUNDS DOES NOT EXCEED $47

MILLION......................................................................................................15

IV.    THE PROPOSED ENHANCEMENT FOR REGISTERING A FALSE DOMAIN

NAME IS UNCONSTITUTIONAL AS APPLIED ........................................................21

V.    CAGING STERLINGOV FOR 30 YEARS – ESSENTIALLY THE REST OF

HIS NATURAL LIFE – WOULD STOKE UNWARRANTED SENTENCING

DISPARITIES ................................................................................................22

VI.    SPECIFIC AND GENERAL DETERRENCE DO NOT NECESSITATE A

LENGTHY SENTENCE ...................................................................................29

VII.   EXCESSIVE INCARCERATION IS NEEDLESSLY PUNITIVE GIVEN BOP

POLICIES TOWARD NONCITIZEN DEFENDANTS ....................................................31

VIII.   DEFENSE IDEOLOGY ...................................................................................................33

CONCLUSION.........................................................................................................................34

Defendant Roman Sterlingov submits this memorandum ahead of his upcoming sentencing.

## INTRODUCTION

The 30- and 20-year prison terms recommended by the government and Probation vastly exceed those imposed in comparable cases. They are disproportionately inflated by the cumulative effect of overlapping enhancements that address different aspects of the same essential offense conduct – running a large-scale money laundering operation – in technically distinct but substantially redundant ways. A far lower sentence – informed by Mr. Sterlingov's future, past and unselfish commitment to the wellbeing of his family and friends – is therefore appropriate.[1]

## ARGUMENT

Urging the Court to forgo the independent disparity analysis that 18 USC § 3553(a)(6) requires, the government claims that "[a] sentence within the Guidelines range is 'presumptively reasonable.'"[2] That take overreaches.

As the Supreme Court made clear some 17 years ago, the reasonableness presumption is "nonbinding," and it "applies *only* on appellate review."[3] Conversely, the "sentencing court does *not* enjoy the benefit of a legal presumption that the Guidelines sentence should apply."[4] Instead, the "*sentencing judge*" must conduct their own evaluation of the factors enumerated in § 3553(a) – including, as relevant here:

---

[1] *See* 18 U.S.C. § 3553; This Sentencing Memorandum incorporates by reference the objections in Defendant's Objections to Draft Presentence Investigation Report (Dkt. 312).

[2] Gov. Mem. in Aid of Sentencing at p. 40 (Dkt. 314) (citation omitted).

[3] *Rita v. U.S.*, 551 U.S. 338, 351, 353 (2007) (emphasis supplied); *see also id.* at 351 (stressing that the presumption "is an *appellate* court presumption").

[4] *Id.* (emphasis added).

- the history and characteristics of the defendant and the nature and circumstances of the offense

- the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct

- the need for the sentence imposed – including general and specific deterrence

- the kinds of sentence and sentencing range under the USSG

- imposing a penalty "'sufficient, but not greater than necessary, to comply with'" sentencing's "aims."[5]

For the reasons set out below, this is one of those cases in which it is necessary to vary downward from the guidelines "in light of concerns reflected in 18 U.S.C. § 3553(a)."[6] Those factors counsel a sentence well below the Guidelines range calculated by the Probation Office and the government.

## I.     The § 3553(a) Analysis Warrants an Under-Guidelines Sentence

"At sentencing, the court first looks to the sentencing range the Guidelines establish."[7] The Probation Office calculated Mr. Sterlingov's Guidelines Offense Level to be 43, which corresponds to a Guidelines' maximum recommendation of life imprisonment.[8] Probation recommends a custodial sentence of 20 years.[9] The Government asks for a custodial sentence of 30 years.[10] The unique circumstances of this case, Mr. Sterlingov's history and character, his lack

---

[5] *See* 18 USC § 3553; *Rita.*, 551 U.S. at 347-48, 351.

[6] *U.S. v. Ahmed Salim Faraj Abu Khatallah*, 314 F. Supp. 3d 179, 185 (D.D.C. 2018).

[7] 18 U.S.C. § 3553(a)(4); *U.S. v. Stevens*, No. 23-3046, at *3 (D.C. Cir. June 28, 2024).

[8] Probation Sentencing Recommendation (Dkt. 319).

[9] *Id.*

[10] Gov. Mem. in Aid of Sentencing at p. 29 (Dkt. 314).

of a criminal record, a comparison to the sentences in other cases, the lack of any individual victims, the absence of restitution, and the reasons argued below warrant a below-Guidelines sentence.

### A.    Counts Three and Four Are Multiplicitous

Counts Three and Four appear multiplicitous, so they merge for sentencing purposes, capping the maximum penalty authorized by the statutes of conviction at 45 years.[11]

### B.    Mr. Sterlingov's History and Character.

On August 14, 1988, Roman Sterlingov (age 35) was born in Leningrad, USSR to Michael and Tatiana Sterlingov.[12] Mr. Sterlingov barely knew his father, who abandoned the family when Mr. Sterlingov was about three years old.[13] His father was an alcoholic who cultivated a chaotic and disturbing environment for young Mr. Sterlingov.[14] Mr. Sterlingov and his mother moved to Voronezh, Russia when he was around four years old.

Mr. Sterlingov's mother worked various jobs as a teacher, a seamstress, and any other work she could find to support him and his maternal grandfather, who lived with them for most of his childhood and who was physically and emotionally abusive to Mr. Sterlingov and his mother.[15]

---

[11] *See, e.g., Rutledge v. U.S.*, 517 U.S. 292 (1996); *Ball v. U.S.*, 470 U.S. 856 (1985); *U.S. v. Platter*, 514 F.3d 782, 785-87 (CA8 2008); *U.S. v. Throneburg*, 921 F.2d 654, 657 (CA6 1990); *U.S. v. Ahmed*, 94 F. Supp. 3d 394, 433-34 (EDNY 2015).

[12] *See* Final PSR ¶ 85 (Dkt. 318) (Aug. 14, 2024); Ex. A (Letter to Court from T. Sterlingov).

[13] *Id.*

[14] *See id.* ¶ 106.

[15] *Id.* ¶ 87.

In 1991 the USSR dissolved. Before the USSR collapsed there were food shortages; afterwards things weren't that much better.[16]  Growing up in the turmoil of the post-Soviet Union impacted Mr. Sterlingov's upbringing, particularly his mental health. Walking down the street and attending school were not safe. He was exposed to significant violence from a young age. He was assaulted while walking down the street and robbed multiple times. The schools he attended were violent. Mr. Sterlingov's mother dreamed of a better life for her and her son.

At age 14, Mr. Sterlingov and his mother, immigrated to Jönköping Sweden where in 2006 he graduated from Per-Brahe high school.[17] Mr. Sterlingov's mother had entered into a relationship with a man who was a Swedish citizen. Within months of living with him in Sweden, the man's alcoholism became apparent. The man drank heavily, acting aggressively towards him and his mother. Mr. Sterlingov's mother had to go to the police to remove herself and Mr. Sterlingov from the horrible situation. Despite this, life in Sweden was far more peaceful than in Russia or the Soviet Union. The opportunities in Sweden were far greater. The family stayed in Sweden and Mr. Sterlingov's mother eventually met Mr. Karlsson, who became a role model and father figure to Mr. Sterlingov, and who helped the family both financially, emotionally, and physically.[18]

Mr. Karlsson suffered from an autoimmune disease, had to have a kidney removed, and was helped by trips to warmer climates, including Spain, as part of his treatment regimen. Following 2019, government funding for Mr. Karlsson's trips ceased and Mr. Sterlingov, following his arrest, was unable to help Mr. Karlsson's continued efforts to treat his incurable

---

[16] *Id.* ¶ 87.

[17] *Id.* ¶ 108.

[18] *See id.* ¶ 86; Ex. A (Letter to Court from A. Karlsson).

disease. They planned trips shortly before Mr. Sterlingov's arrest, yet they never saw each other again. Mr. Karlsson passed away approximately two years ago while Mr. Sterlingov was incarcerated pretrial.[19] This left Mr. Sterlingov feeling helpless because he could not help his mother and depressed at feeling he had let Mr. Karlsson down. Mr. Karlsson had always helped Mr. Sterlingov and his mother and will forever be a father figure to him.[20]

At school in Sweden, Mr. Sterlingov was a good student, smart and hard-working.[21] His interests were in mathematics, physics, and chemistry. An avid learner, he read books and studied technology. As a student, he was open minded and assisted those in need, even tutoring other students.[22] Mr. Sterlingov took his first job as a teenager, and he would send money to his grandmother still living in Russia.[23] He struggled with depression at a young age due to the violence around him. His depression made it difficult to connect with people as he learned the Swedish language.[24] He enjoyed technology and computers. While in high school he took a job as a data entry clerk, and eventually, as a web designer with the Swedish internet marketing firm Capo Marknadskommunikation, making roughly $2,300 USD per month.[25]

Mr. Sterlingov started socializing through internet forums with others who had similar interests. He eventually joined meetup groups to make friends and socialize. He would meet others to talk about technology, computers, and eventually, bitcoin. The meetup groups

---

[19] *See* Final PSR ¶ 86 (Dkt. 318) (Aug. 14, 2024).

[20] *See* Ex. A (Letter to Court from A. Karlsson).

[21] *See id.* (Letter to Court from A. Gustafsson).

[22] *See id.* (Letter to Court from T. Sterlingov).

[23] *See id.*

[24] *See id.* (Letter to Court from A. Gustafsson).

[25] *See* Final PSR ¶ 115 (Dkt. 318) (Aug. 14, 2024). The Final PSR erroneously states Mr. Sterlingov worked at Capo from 2015 through 2018. He actually left Capo sometime in 2014. *See* Tr. Mot. Hr. pp. 10-11, Jan. 31, 2023; *see also* Ex. A (Letter to Court from T. Sterlingov).

introduced him to cryptocurrency for the first time, and he started buying bitcoin sometime in 2010. The first time Mr. Sterlingov bought bitcoin, he did so in person. He also traded and sold bitcoin peer-to-peer.

Mr. Sterlingov participated in self-help groups for men that focused on shared experiences and self-improvement.[26] He was an active, insightful member. Many of his friends describe him as having a significant positive influence on their life. Mr. Sterlingov was a mentor to many young men in-person and started a YouTube channel to help others.

From roughly 2010-2021, Mr. Sterlingov rented the same modest studio apartment in Gothenburg, Sweden.[27] In the last few years preceding his arrest, he spent about half the year travelling and the other half either at this apartment or at his mother's home while he helped her. He visited his mother monthly, sometimes staying for a few weeks at a time to help her with the house and other things. Because Mr. Sterlingov's mother is an immigrant to Sweden, she does not have a complete pension and relies on Mr. Sterlingov's support. Since his arrest and incarceration, he has not seen his mother.

Following his arrest at Los Angeles International Airport on April 27, 2021, Mr. Sterlingov has been held at various federal, state, and municipal detention centers.  At the Northern Neck Regional Jail in Warsaw, Virginia, where was held for more than two years, he slept in cramped quarters with 60 other inmates. The environment was noisy, with 2 televisions blaring 24 hours a day, along with the screams and yells of the inmates. He developed tinnitus and had difficulty accessing Defense counsel. The facility did not provide books for over a year

---

[26] *See* Ex. A (Letter to Court from T. Suomalainen).

[27] *See* Final PSR ¶ 86 (Dkt. 318) (Aug. 13, 2024).

and there were no educational programs available for Mr. Sterlingov. He is currently under better conditions at the municipal District of Columbia Central Detention Center.

### 1.    *No Criminal History*

Mr. Sterlingov has no criminal history. Before being prosecuted for this offense, Mr. Sterlingov had never been accused or arrested for any crime. He is a true first-time offender and has otherwise lived an exemplary life.

### 2.    *Letters in Support of Mr. Sterlingov*

The dozen letters attached as Exhibit A attest to Mr. Sterlingov's humanity and love for his family and friends. They include a letter from Mr. Karlsson previously sent to the Court before he passed away. Additional letters come from Mr. Sterlingov's mother, and his friends. They attest that he is an intelligent, talented, peaceful, and resilient young man.[28]

### C.    **The Nature and Circumstances of the Offense**

The Final Presentence Report notes that there are no identifiable victims, and that restitution is inapplicable here.[29] Mr. Sterlingov's conviction is consistent with willful blindness because the government requested, and received, a jury instruction on this point.[30] His verdict is also consistent with aiding and abetting and not actually operating Bitcoin Fog, or ever possessing the Bitcoin Fog servers.[31]

---

[28] *See* Ex. A (Letters from family and friends).

[29] *See* Final PSR ¶ 50 (Dkt. 318) ("There are no identifiable victims in this offense."); Probation Sentencing Recommendation at p. 1 (Dkt. 319) (stating restitution is not applicable).

[30] *See* Final Jury Instructions p. 32 (Dkt. 268).

[31] *See id.* at p. 62 ("You may find the defendant guilty of any of the crimes charged in the indictment without finding that he personally committed each of the acts that make up the crime or that he was present while the crime was being committed."); 3/7/2024 Tr 11:1-4 ("Even if the only thing Roman Sterlingov had done was register the Bitcoin Fog domain, if he did that to help the conspiracy, knowing what Bitcoin Fog was, he is guilty of conspiring to commit money laundering and he is guilty of aiding and abetting").

Most of the evidence at trial was circumstantial and neither the Bitcoin Fog server, server logs, private keys or ledger were ever entered into evidence. The government argues in its Sentencing Memorandum that Mr. Sterlingov "ran servers for his scheme in other countries and then deleted their contents before they could be located by law enforcement."[32] But no evidence of multiple servers, or evidence of Mr. Sterlingov operating multiple servers, came in at trial. Their claim that server contents were deleted appears based on the fact that a hard drive from Mr. Sterlingov's Romanian business server contained no data and was all zeros. This leads the government to misleadingly suggest that Mr. Sterlingov zeroed out the hard drive. But this is consistent simply with the hard drive being new and unused.[33] Much of the government's assertions about the evidence at trial are of this nature.

The government makes much of the fact that less than $1000 in funds were sent post-mix by a handful of Welcome to Video ("W2V") users out of Bitcoin Fog to W2V. However, Bitcoin Fog's connection to W2V is minimal, even including funds the government says are indirectly traceable. There is no evidence that Bitcoin Fog laundered any proceeds from W2V.

Nothing, *i.e.,* 0 BTC, went from W2V into Bitcoin Fog.[34] The government bases its persistent claim that Mr. Sterlingov was involved with CSAM solely on $989.00 being withdrawn post-mix from Bitcoin Fog and then being sent to W2V.[35] This is 0.0000025 % of the

---

[32] Gov. Mem. in Aid of Sentencing at p. 11 (Dkt. 314).

[33] *See* Supp. Decl. of J. Fischbach (attached as Ex. B).

[34] Gov't. Ex. 601.

[35] *Id*. (the government also alleges that $846 was indirectly received from BTCF, but the undefined term "indirect" is ambiguous, involves one or more hops between BTCF and W2V with the attributive error rate increasing along with the number of hops between BTCF and W2V. In any event, the amount is insignificant in the face of the total volume of funds spent through BTCF as alleged by the government).

$395,501,956 of Bitcoin Fog's volume as calculated by the government.[36] If the $846 "indirectly received" by W2V from Bitcoin Fog is included in this calculation, the percentage is 0.00000464% of $395,501,956.[37]

There is no evidence anywhere of Mr. Sterlingov ever being involved in CSAM or having any knowledge of CSAM. The Government argues that a forum post it attributes to Mr. Sterlingov shows he knew that buyers and sellers of CSAM would use Bitcoin Fog. The post makes the general observation – discussing the Tor network and not mixers - that "unfortunately [CSAM] was distributed" through the Tor network.[38] This is a sentence, prior to the launch of Bitcoin Fog, condemning CSAM, not condoning it. The government essentially claims that anyone who knows that CSAM exists on the internet is complicit with it.

## II.      The Guidelines, Driven by Dollar Amounts, Do Not Accurately Reflect Culpability, a Dichotomy Compounded by Cumulative and Overlapping Enhancements.

"Imposing a sentence on a fellow human being is a formidable responsibility," so "a court [must] consider, with great care and sensitivity, a large complex of facts and factors" rather than just focusing on dollar-values involved.[39] The guideline applicable here, U.S.S.G § 2S1.1, is largely driven by the "value of laundered funds." "By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, and, by contrast,

---

[36] Gov. Mem. in Aid of Sentencing at p. 3 (Dkt. 314) ("…the Bitcoin Fog site took in cryptocurrency valued at the time of deposit at approximately $395,501,956").

[37] *See* Gov't Ex. 601.

[38] Gov't Ex. 55(a) at 34.

[39] *U.S. v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).

effectively guaranteed that many such sentences would be irrational on their face."[40] As Judge

Rakoff has trenchantly explained:

> The notion that this complicated analysis, and moral responsibility,
> can be reduced to the mechanical adding-up of a small set of
> numbers artificially assigned to a few arbitrarily-selected variables
> wars with common sense.  Whereas apples and oranges may have
> but a few salient qualities, human beings in their interactions with
> society are too complicated to be treated like commodities, and the
> attempt to do so can only lead to bizarre results.[41]

Beyond the general concern about "sentencing by numbers," several jurists have criticized

the § 2B1.1 loss table (which § 2S1.1 incorporates) on the ground that the astronomical sentencing

increases it calls for utterly lack empirical support. Indeed:

> the numbers assigned by the Sentencing Commission to various
> sentencing factors appear to be more the product of speculation,
> whim, or abstract number-crunching than of any rigorous
> methodology—thus maximizing the risk of injustice. . . .  The
> Guidelines' calculations for this offense are no longer tied to the
> mean of what federal judges had previously imposed for such
> crimes, but instead reflect an ever more draconian approach to white
> collar crime, unsupported by any empirical data.[42]

The disagreement with the Sentencing Commission's "unusual[]" approach to white-collar

offenses "is a circumstance that a sentencing court is entitled to consider" in imposing a variant

sentence.[43]  And in practice, courts have repeatedly varied downward from large guideline

sentencing ranges driven by dollar figures. In doing so, several courts have sharply denounced

---

[40] *Gupta*, 904 F. Supp. 2d at 351; *see* 18 U.S.C. § 3553(a).

[41] *Id*. at 350.

[42] *Id*. at 351; *see also U.S. v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, [they are] particularly appropriate for variances.").

[43] *U.S. v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (citing *Kimbrough v. U.S.*, 552 U.S. 85, 101 (2007)).

these guidelines.[44] In short:

> Where . . . the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.[45]

Relying on the loss table in this case intuitively strikes the wrong chord. Because the table is designed to apply in fraud cases where a defendant caused real or intended loss to victims by defrauding them of their money. From that perspective, the loss table serves a useful function in recognizing that a greater loss causes greater harm, meriting a concomitantly greater guidelines sentence. In this case, however, there are no identifiable victims, and Mr. Sterlingov was not involved in the "specified unlawful activity." Transactions through Bitcoin Fog flowed anonymously across various Bitcoin wallets, their amounts, destinations, and purposes entirely beyond Mr. Sterlingov's control.[46] In other words, the guidelines in this case are based on decisions of others – *e.g.,* decisions about whether to send criminal proceeds to Bitcoin Fog and how much to send if so – rather than Mr. Sterlingov's individual culpability. Moreover, it is unclear whether

---

[44] *See U.S. v. Johnson*, No. 16-CR-457, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) (imposing 24-month sentence despite GSR of 87-108 months and observing, "[a]s far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *Gupta*, 904 F. Supp. 2d at 355 (varying downward from GSR of 78-97 months to impose 24-month sentence); *U.S. v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (sentencing defendant to three and one-half years despite guideline range of life imprisonment and noting "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (varying downward from GSR of 360 months to impose 60-month sentence and observing, "it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance"); *see also* Mark H. Allenbaugh, *Drawn from Nowhere: A Review of the U.S. Sentencing Commission's White–Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 23 (2013) ("It appears that in practice, loss has very little correlation to the ultimate sentence imposed, regardless of how it determines the advisory guideline range.").

[45] *Adelson*, 441 F. Supp. 2d at 515.

[46] Bitcoin Fog was neither an exchange nor a marketplace, one could neither cash out their gains on it nor buy anything illicit.

Bitcoin Fog's existence significantly contributed to criminal activity.[47] Its primary function – anonymizing transactions by mixing Bitcoin – was already independently incorporated into darknet marketplaces like Silk Road.[48]

Compounding the problem are the multiple guideline enhancements urged by the government (*i.e.,* knowledge of underlying illegality, laundering business/sophisticated means, false domain registration) on top of the 28-level increase it seeks (or the 22-level increase the defense believes applicable) under the loss table incorporated in § 2S1.1(a)(2). Together, these enhancements add an extra 12 points, literally pushing the Guideline Sentencing Recommendation off the chart. Yet they all hinge on the same essential factor: the magnitude of the Bitcoin Fog enterprise. The "cumulative effect" of these "substantial[ly] overlap[ping] … enhancements" "has a significant effect upon the applicable sentencing range," arguing strongly for a "downward departure" or variance.[49]

---

[47] Government co-operating witness Ilya Lichtenstein testified that he found Bitcoin Fog inconvenient, that it couldn't handle the volume he needed to mix, and that he only used it 5-10 times for small amounts of bitcoin. *See e.g.* 02/27/2024 Tr. 19:15-20:16.

[48] For example, a government affidavit supporting Ulbricht's arrest said this:

> Silk Road uses a so-called "tumbler" to process Bitcoin transactions in a manner designed to frustrate the tracking of individual transactions through the Blockchain. According to the Silk Road wiki, Silk Road's tumbler "sends all payments through a complex, semi-random series of dummy transactions, . . . making it nearly impossible to link your payment with any coins leaving the site." In other words, if a buyer makes a payment on Silk Road, the tumbler obscures any link between the buyer's Bitcoin address and the vendor's Bitcoin address where the Bitcoins end up — making it fruitless to use the Blockchain to follow the money trail involved in the transaction, even if the buyer's and vendor's Bitcoin addresses are both known.

*U.S. v. Ulbricht*, Docket No. 13-mg-2328 (S.D.N.Y 2013), Dkt. 1 at 14; *United States v. Ulbricht*, Docket No. 15-cr-1815 (CA2 2015), Dkt. 31-1 at 72.

[49] *U.S. v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003) (finding 13-level increase under loss table and four-level increase for affecting a financial institution and deriving more than $1 million in gross proceeds overlapped under the sentencing guidelines).

The defense respectfully submits that, for the reasons herein, the Court can and should disregard the guideline sentencing range and impose an individualized sentence based on the particular facts and circumstances of this case. But even for the purpose of correctly calculating the Guideline, the government's calculated "value of laundered funds" is incorrect in several respects.

## III.        The Value of the Laundered Funds Does Not Exceed $47 Million

Sentencing Guideline 2S1.1(a)(2) pegs the base offense level for money laundering to "the value of the laundered funds." And in cases like this one involving layering,[50] that phrase – "value of the laundered funds" – means the "amount originally derived from criminal activity and then laundered, not the aggregate total of the funds involved in each layer."[51] Put more succinctly, the "value of the laundered funds" is "limited" to the amount of criminal proceeds or dirty money "originally injected or infused into the money-laundering scheme."[52]

This conclusion makes sense because the "definition of 'laundered funds,'" as relevant here, "corresponds with" an actual "violation of 18 U.S.C. § 1956."[53] And in turn, the money

---

[50] *See, e.g.*, Gov. Mem. in Aid of Sentencing at p. 27 (Dkt. 314) (dubbing Bitcoin Fog the "ultimate layering machine").

[51] *U.S. v. Paley*, 442 F.3d 1273, 1278 (CA11 2006) (quoting *U.S. v. Pizano*, 421 F.3d 707, 727 (CA8 2005)).

[52] *Paley*, 442 F.3d at 1278 (quoting *Pizano*, 421 F.3d at 707); accord, e.g., *Paley*, 442 F.3d at 1278 (funds to be considered for sentencing purposes are "those that were actually laundered"); *U.S. v. Stanford*, 823 F.3d 814, 848 n.47 (CA5 2016) (base offense level rests on actual amounts laundered); *U.S. v. Pratt*, 728 F.3d 463, 481 (CA5 2013) (§ 2S1.1 "unambiguous[ly]" requires court to determine the "amount of funds actually laundered"); *U.S. v. Hosseini*, No. 05 CR 254, 2007 WL 2904015, at *2 (N.D. Ill. Oct. 1, 2007) (equating value of laundered funds with "deposits … ascribable to drug dealer customers").

[53] *U.S. v. Jordan*, 447 F. App'x 574, 576 (CA5 2011); accord, e.g., *U.S. v. Van Alstyne*, 584 F.3d 803, 817 (CA9 2009) (recognizing that the "Guidelines impose enhancements based on the amount of funds that were laundered within the meaning of the statute," and stressing that they "do not contemplate a base level enhancement on account of transactions that do *not* constitute money laundering within the meaning of the statute").

laundering statute focuses on the initial "transaction by which one receives illicit funds" – not on how they are disposed of afterward.[54]

As the Fifth Circuit has explained:

> Stanford's argument focuses on what he did *after* he received the payments, not the transactions by which he received payment in the first place. The statute does not require that one receive proceeds from illicit activity and then funnel them back into the activity; it merely requires that one conduct (or attempt to conduct) "a financial transaction which in fact involves the proceeds of specified unlawful activity ... with the intent to promote the carrying on of specified unlawful activity." § 1956(a)(1)(A)(i). In other words, if the transaction by which one receives illicit funds is made with the intent to promote unlawful activity, the statute can be violated. Thus, by being paid to help further the Mr. Miyagi scheme with proceeds from the sales of Mr. Miyagi, Stanford engaged in promotional money laundering. It does not matter how he spent the tainted funds after receiving them.[55]

This focus – on the transactions by which tainted funds are received in the first place – contrasts with that of the criminal forfeiture statute, 18 USC § 982.[56] For the latter, unlike the applicable sentencing guideline, "prevents the launderer and his criminal client from keeping the profits of the [overall] money laundering operation," covering both laundering instrumentalities and any property traceable to them.[57]

---

[54] *Stanford*, 823 F.3d at 850.

[55] *Id.* (footnote omitted); *see also id.* (noting that both "concealment and promotional money-laundering require a 'financial transaction,' which 'involves the proceeds of specified unlawful activity'") (quoting 18 USC § 1956(a)(1)).

[56] *See, e.g., Paley*, 442 F.3d at 1278 (distinguishing USSG § 2S1.1(a)(2) and the "forfeiture provision applicable to money laundering cases"); *U.S. v. Gross*, 661 F. App'x 1007, 1026 (CA11 2016) (holding that forfeiture amount doesn't resolve criminal liability for purposes of calculating sentencing guidelines range for money laundering conspiracy); *U.S. v. Aguasvivas-Castillo*, No. 07-0111CCC, 2010 WL 883719, at *2 n.4 (D. P.R. Mar. 5, 2010) (though commingling "legitimate funds with illegally-obtained funds" may "taint[] the entire amount" for forfeiture purposes, "sources of authority interpreting in similar fashion the relevant Guideline section have not been provided by the government"), *aff'd*, 668 F.3d 7 (CA1 2012).

[57] *Paley*, 442 F.3d at 1278.

Here, by the government's own account, the tainted funds "originally injected or infused into the money-laundering scheme"[58] – the "amount[s] originally derived from criminal activity and then laundered"[59] – top out at no more than just over $47 million.[60] Conversely, the roughly $31 million "Indirectly Sent to BITCOIN FOG" through layers of "intermediaries" is properly excluded from the value of the laundered funds.[61]

First, the government offers no evidence that these funds were actually "laundered" by Sterlingov or Bitcoin Fog "within the meaning of" 18 USC § 1956.[62]

Second, even assuming actual laundering by Sterlingov or Bitcoin Fog, the funds were not "*originally* injected or infused into the[ir] money-laundering scheme" – i.e., "*originally* derived from criminal activity and then laundered" by them.[63] Rather, the funds were received by Bitcoin Fog, at most, via "downstream transaction[s]," only after passing through layers of intermediaries.[64] And in that scenario, as we have seen, § 2S1.1(a)(2) does "not … aggregate [the] total of the funds involved in each layer."[65] Under USSG §§ 2S1.1(a)(2) and 2B1.1(b)(1)(L), the $47 million figure adds a maximum of 22 points to Sterlingov's base offense level.

---

[58] *Pizano*, 421 F.3d at 727.

[59] *Id.*

[60] *See* Gov. Mem. in Aid of Sentencing at p. 4 (Dkt. 314) (total amount "Directly Sent to BITCOIN FOG" by "vendors from established Darknet sites selling illegal narcotics and other illegal goods").

[61] 6/23/23 Tr. 132-33.

[62] *Van Alstyne*, 584 F.3d at 817.

[63] *Pizano*, 421 F.3d at 707 (emphasis added).

[64] *See Stanford*, 823 F.3d at 850.

[65] *Pizano*, 421 F.3d at 727.

Resisting this straightforward application of the money laundering guideline, the government seeks to tag Sterlingov with every dollar that ever passed through Bitcoin Fog – in essence, "all money associated with the scheme,"[66] the "total amount of funds … involved in the course of criminal conduct" or otherwise "used by the defendant in an unlawful … transaction."[67] The government thus tries to saddle Sterlingov with an eye-watering $400 million and 28 points – a tenfold increase in funds and a six-point jump in offense levels, translating to decades more prison time.[68]

But the trio of stale cases the government cites to support this extravagant approach[69] all address a long obsolete and "drastically different"[70] version of the money laundering guideline, superseded some 23 years ago and replaced with the prevailing edition we have discussed.[71] Indeed, one of the government's own cases – *Martin* – "specifically recognized" as much, prominently warning: "[A]lthough the district court properly aggregated the funds from layered transactions … under … the 1998 Guidelines, it might be improper … to do so … under … the 2001 Guidelines …."[72] The court that decided *Martin*, the Eleventh Circuit, went on to certify

---

[66] *Van Alstyne*, 584 F.3d at 816.

[67] *Paley*, 442 F.3d at 1276 (citations and internal quotation marks omitted).

[68] Gov. Mem. in Aid of Sentencing at pp. 19-20 (Dkt. 314). This is despite, as this Honorable Court recently observed, "a large portion of those transaction involved licit funds." Dkt. 320 at 1.

[69] *U.S. v. Braxtonbrown-Smith*, 278 F.3d 1348 (CADC 2002); *U.S. v. Owens*, 159 F.3d 221 (CA6 1998); *U.S. v. Martin*, 320 F.3d 1223 (CA11 2003).

[70] *U.S. v. Orlando*, 363 F.3d 596, 599 (CA6 2004) (citation and internal quotation marks omitted).

[71] *See*, e.g., *Paley*, 442 F.3d at 1277 (distinguishing cases "involv[ing] the old version of § 2S1.1, not the amended version").

[72] *U.S. v. Martin*, 320 F.3d 1223, 1227 n.3 (11th Cir. 2003); *see also id.* (cautioning that 2001 amendment "substantial[ly] change[d] … the [Guidelines'] money laundering provisions" and could affect the laundering calculation); *id.* (admonishing that "our holding today does not apply to the 'value of the laundered funds' in § 2S1.1(a)(2) of the 2001 Guidelines").

the impropriety in *Paley*, and every other court we are aware of has followed suit; none, to our knowledge, has taken a contrary view.

More particularly, the Sentencing Commission "extensively"[73] and "substantially amended"[74] the money laundering guidelines in 2001, "substantively"[75] if not "completely chang[ing]"[76] the offense level calculation to produce "dramatically" varied "results."[77] Most striking, as *Martin* itself observed[78] but the government oddly overlooks, the "revised" and still-operative 2001 version dropped the phrase "value of the funds" – a "specific offense characteristic" in the "former" edition – and substituted the phrase "value of the *laundered* funds," also making it a determinant of the base offense level.[79]

Though perhaps a subtle insertion, the addition of the "laundered" modifier was both considered and consequential. In the "pre-amended version of § 2S1.1," the Eighth Circuit thus elaborated, the "value of the funds" simpliciter served as "an indicator of the magnitude of the criminal enterprise, and the extent to which the defendant aided" it.[80] So aggregating layered transactions – considering all "acts and omissions … during the commission of the offense"[81]

---

[73] *Pizano*, 421 F.3d at 727.

[74] *U.S. v. Martinelli*, 265 F. App'x 784, 786 (CA11 2008); see *Martin*, 320 F.3d at 1227 n.3 ("On November 1, 2001, the Sentencing Guidelines for money laundering were amended substantially.").

[75] *U.S. v. King*, 280 F.3d 886, 891 (CA8 2002).

[76] *U.S. v. Caplinger*, 339 F.3d 226, 234 (CA4 2004).

[77] *Orlando*, 363 F.3d at 602.

[78] *See* 320 F.3d at 1227 n.3.

[79] *Paley*, 442 F.3d at 1276-77; accord *id.* at 1277 ("as we recognized in *Martin*, the 2001 revisions to § 2S1.1 changed the relevant term for sentence calculation purposes from 'the value of the funds' to 'the value of the laundered funds'"); *Martinelli*, 265 F. App'x at 786 (emphasizing that in applying earlier "version of the Guidelines," now superseded, "the court was required to determine the 'value of the funds,' not the amount of 'laundered funds'").

[80] *Pizano*, 421 F.3d at 727-28 (citation and internal quotation marks omitted).

[81] *Martinelli*, 265 F. App'x at 786.

and all amounts "involved in the course of the criminal conduct"[82] – to "determine the value of the funds … accurately reflect[ed]" the enterprise's "scope" and the "harm that befalls society when law enforcement's efforts to track the ill-gotten gains are impeded."[83]

Alongside the insertion of "laundered," meanwhile, the 2001 amendments also created a new "enhancement for 'sophisticated laundering.'"[84] And that enhancement imposes "additional punishment" because "complex or intricate" laundering "offenses are more difficult and time consuming for law enforcement to detect than less sophisticated laundering" conduct.[85]

The bottom line? As the Eighth Circuit concluded, and other courts seem to unanimously agree, fund value is:

> no longer the only factor reflecting the magnitude of the criminal enterprise. Magnitude also is reflected in the specific offense characteristics that were added to the guideline. Specifically, the sophisticated-laundering enhancement now accounts for the harm that befalls society when law enforcement's efforts to track the ill-gotten gains are impeded by layering. Aggregation is no longer necessary to account for that harm. *See Martin,* 320 F.3d at 1227 n. 3 ("[A]lthough the district court properly aggregated the funds from layered transactions in determining the 'value of the funds' under § 2S1.1(b)(2) of the 1998 Guidelines, it might be improper for a district court to do so when determining the 'value of the laundered funds' under § 2S1.1(a)(2) of the 2001 Guidelines because § 2S1.1(b)(3) of the 2001 Guidelines provides for a two level increase for 'sophisticated laundering.' ").[86]

---

[82] *Id.*

[83] *Id.* at 728 (citing *Martin*, 320 F.3d at 1227).

[84] *Pizano*, 421 F.3d at 728.

[85] *Id.* (citations and internal quotation marks omitted).

[86] *Pizano*, 421 F.3d at 728-29. Indeed, more than just "no longer necessary," "[a]ggregation" might well constitute impermissible double-counting where, as here, the government also seeks a sophistication enhancement; *See* Gov. Mem. in Aid of Sentencing at pp. 25-27 (Dkt. 314).

In short, because the "value of the laundered funds"[87] under the 2001 amendments to § 2S1.1 is "limited to [tainted] funds originally injected or infused into the money-laundering scheme,"[88] the government's maximalist position – its $400 million, 28-point demand – distills to an elaborate ruse premised on a legal fallacy. As demonstrated, the appropriate value instead amounts to a small fraction of that bloated sum – no more than $47 million – adding 22 points at most.[89] At minimum, the government's inflated figures severely overstate the seriousness of the offense, counseling a substantially below-guideline sentence.[90]

## IV.      The Proposed Enhancement for Registering a False Domain Name is Unconstitutional as Applied

Absent a jury determination that Sterlingov violated 18 USC § 3559(g)(1) – that, to quote USSG § 3C1.4, the statute "applies" – adding two points to his offense level on this basis would produce a "substantively unreasonable" sentence.[91]

Under the Fifth and Sixth amendments, as relevant here, any fact "necessary to support a sentence exceeding the maximum authorized by the facts established by a … jury verdict" – including any fact "*required* to increase a defendant's sentence under the Guidelines"[92] – must be "proved to a jury beyond a reasonable doubt."[93] Put more pointedly, the Constitution

---

[87] *Pizano*, 421 F.3d at 728.

[88] *Id.* In fact, it appears that at least one circuit – the Fourth – limited the value of the funds to criminal proceeds actually laundered even under the defunct 1998 guideline on which the government effectively relies. *See, e.g., U.S. v. Rockson*, Nos. 95-5116, -5098, 104 F.3d 360, 1996 WL 733945, at *8-*9 (CA4 Dec. 24, 1996); *U.S. v. Sobral*, No. 96-4770, 149 F.3d 1172, 1998 WL 276263, at *5 (CA4 May 29, 1998).

[89] Even the $47 million is likely an overstatement of the illicit funds originating from darknet marketplaces, because, among other reasons, the marketplaces also sold legal goods. *See* Tr. 3/4/2024 22:22-23:2.

[90] *See* 18 USC § 3553(a); PSR ¶¶ 162, 164; *cf. U.S. v. Huber*, 462 F.3d 945, 952 (CA8 2006).

[91] *Jones v. U.S.*, 574 U.S. 948 (2014) (Scalia, J., joined by Thomas and Ginsburg, JJ., dissenting from *cert.* denial).

[92] *U.S. v. Booker*, 543 U.S. 220, 284-85 (2005) (Stevens, Souter and Scalia, JJ., partially dissenting).

[93] *Booker*, 543 U.S. at 244.

"requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury."[94]

Failing a jury determination that Sterlingov violated § 3559(g)(1) by "knowingly falsely register[ing] a domain name and knowingly falsely us[ing it] in the course of th[e] offense," raising his sentence based on a judicial finding to that effect would thus be "substantively unreasonable."[95] In turn, "any fact necessary to prevent a sentence from being substantively unreasonable" – thereby "increas[ing] the penalty to which a defendant is exposed" – is an "element that must be … found by the jury. It *may not* be found by a judge."[96] The government cannot circumvent the requirements of jury trial and proof beyond a reasonable doubt by alleging a hypothetical violation of a federal statute as grounds for a sentence bump.

## V.   Caging Sterlingov for 30 Years – Essentially the Rest of His Natural Life – Would Stoke Unwarranted Sentencing Disparities

Section 3553(a) directs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[97] To back its bid for a *de facto* life sentence, the government relies solely on Ross Ulbricht's case.

But Ulbricht, who got a life sentence for running Silk Road, is only superficially comparable to Mr. Sterlingov because the government buries the lede: Ulbricht undisputedly "commissioned at least five murders," displaying "unnerving" cruelty in "callously," "casually"

---

[94] *Id.* at 319 n.6 (Thomas, J., partially dissenting).

[95] *Jones*, 574 U.S. at 948 (Scalia, J., joined by Thomas and Ginsburg, JJ., dissenting from *cert.* denial).

[96] *Id.* (rejecting proposition that Constitution permits "otherwise unreasonable sentences supported by judicial factfinding, so long as they are within the statutory range").

[97] 18 U.S.C. § 3553(a)(6).

and "confident[ly]" negotiating prices with – and delivering "instruct[ions]" to – "hired assassin[s]."[98] On top of that, Ulbricht, unlike Mr. Sterlingov, was charged with and convicted of narcotics "trafficking."[99] And his "drug [crimes] alone" drove the sentence, "yield[ing] a calculated offense level of 50."[100] Still, as the Second Circuit elaborated, the "attempted murders for hire separate this case from that of an ordinary drug dealer, regardless of the quantity of drugs involved," bespeaking "exceptionally destructive" "conduct and character" and "significantly justif[ying] the life sentence."[101] Far from similarly situated, Ulbricht and Mr. Sterlingov are thus demonstrably different.

Just weeks after the government shut down Silk Road and arrested Ulbricht, Brian Farrell and Blake Benthall launched Silk Road 2.0.[102] Farrell, who admitted to "approving and suspending vendors, dealing with help tickets, providing technical support, serving as a forum moderator, and promoting staff members," was sentenced to 96 months' imprisonment.[103] His sentence was ultimately reduced by approximately 25% pursuant to a successful compassionate release petition.[104] For his part, Benthall cooperated with the government, served approximately "eight

---

[98] *U.S. v. Ulbricht*, 858 F.3d 71, 130-31 & n.68 (CA2 2017).

[99] *Id.* at 82.

[100] *Id.* at 130.

[101] *Id.* at 131 & n.68.

[102] *U.S. v. Farrell*, Dkt. 15-cr-00029, Dkt. 1 (WDWA) ("Later that year [following Silk Road's closure in October 2013], in the wake of these developments, Silk Road 2.0 ("SR2") was launched. SR2 also operated on the TOR network…[and] contained a user-friendly interface with links to various categories of items for sale on the site, including drugs such as MDMA (Ecstasy), LSD, cannabis, hashish, methamphetamine, cocaine, and heroin. The site offered illegal items aside from drugs, including weapons, fake identification cards, drug paraphernalia, counterfeit merchandise, stolen identity/credit cards, and malicious software and computer equipment.").

[103] *Id.*, Gov. Sentencing Mem., Dkt. 66 at 4; Judgment, Dkt. 74 at 1.

[104] *Id.*, Order on Motion for Compassionate Release, Dkt. 100 at 9.

months of incarceration" and is now a crypto entrepreneur.[105] Taking Farrell and Bethall into account, Ulbricht's operation of Silk Road had little to do with the life sentence that he ultimately received.

Beyond its inapt comparison to Ulbricht, the government's sentencing recommendation also omits and overlooks comparable cases where defendants received significantly lower sentences than what the guidelines provide, or the government or Probation recommend.

Of relevance is the case involving the founders of Tornado Cash, a mixing service like Bitcoin Fog that, according to the U.S. Treasury, "launder[ed] more than $7 billion worth of virtual currency" including "over $455 million stolen by the Lazarus Group, a Democratic People's Republic of Korea (DPRK) state-sponsored hacking group…."[106] While Storm, a co-founder, has yet to be convicted or sentenced, his partner in the Netherlands, Alexey Pertsev, was convicted at trial in the Netherlands and sentenced to 64 months imprisonment (a sentence that would likely confine him to a correctional facility for a little over three years).[107]

In this District, Judge Rosemary M. Collyer imposed noncustodial sentences on the founders and operators of "E-gold," a "digital currency" that allowed users to open "accounts with

---

[105] Ryan Mac & Kashmir Hill, He was an online drug lord. now he's a crypto entrepreneur. The New York Times (2024), https://www.nytimes.com/2024/07/24/business/blake-benthall-silk-road-crypto.html?searchResultPosition=1#after-bottom (last visited Aug 6, 2024).

[106] U.S. Treasury sanctions notorious virtual currency mixer Tornado cash, U.S. Department of the Treasury (2022), https://home.treasury.gov/news/press-releases/jy0916 (last visited Aug 6, 2024); *see also U.S. v. Storm*, Dkt. 23-cr-00430-KPF, Dkt. 53 at 11 (SDNY) ("The Indictment in this case alleges that … the Tornado Cash service operated as a large-scale money laundering enterprise… laundered[ing] at least $1 billion in criminal proceeds for a host of cyber criminals, including … hundreds of millions of dollars' worth of cryptocurrency for North Korea's weapons of mass destruction program.").

[107] Notably, defendants in the Netherlands are eligible for release during the last two years of their sentence. *See* Ministerie van Justitie en Veiligheid, Voorwaardelijke invrijheidstelling (V.I). Openbaar Ministerie (2022), https://www.om.nl/onderwerpen/voorwaardelijke-invrijheidstelling (last visited Aug 6, 2024); Sarah Jacob, Tornado cash developer convicted of money laundering Bloomberg Law (2024), https://news.bloomberglaw.com/litigation/tornado-cash-developer-pertsev-found-guilty-of-money-laundering (last visited Aug 6, 2024).

obviously bogus and false contact information" – including accounts in the name of Mickey Mouse. E-gold was a "highly-favored method of payment for [fraudsters and] sellers of child pornography … [and i]n some instances… the only method of payment available on websites offering child pornography for sale[.]"[108] The defendants knew "E-gold" was being used by child pornographers and other fraudsters but continued running the operation.[109] For his conduct, principal owner Douglas Jackson was sentenced to time served following a plea and cooperation with the government.[110] Meanwhile, co-owners Barry Downey and Reid Jackson received 180-day suspended sentences.[111]

Likewise, Binance founder and CEO Changpeng Zhao, one of the richest men in the world, was recently sentenced to four months imprisonment for similar conduct.[112] Zhao permitted Binance "to open accounts and deposit, trade, and withdraw cryptocurrency by providing only an email address."[113] As a result:

> [I]llicit actors used Binance's exchange in various ways, including operating mixing services that hid the source and ownership of cryptocurrency; transacting in illicit proceeds from ransomware attacks; and moving proceeds of darknet market transactions, exchange hacks, and various internet-related scams. For example, between August 2017 and April 2022, there were direct transfers of about $106 million in bitcoin to Binance.com wallets from Hydra, the world's then-largest darknet marketplace used by criminals to facilitate the sale of illegal goods and services. These transfers occurred over time to a relatively small number of unique

---

[108] *U.S. v. E-Gold, LTD, et. al.* Docket No. 07-cr-00109, Indictment, Dkt. 1 at 6, 7, and 8 (DDC).

[109] *Id.*, Government Sentencing Memorandum, Dkt. 174 at 2-3 ("When agents executed a search warrant at E-gold's business office in December 2005, they found internal records showing that E-gold had identified more than 3,000 accounts involved in buying or selling child pornography, more than 13,000 accounts involved in various types of investment scams, and more than 3,000 accounts involved in credit card fraud.").

[110] *Id.*, Judgment, Dkt.189 at 2.

[111] *Id.*, Judgments, Dkt.184 and 186.

[112] *See U.S. v. Zhao*, Dkt. 23-cr-00179 (WDWA).

[113] *U.S. v. Zhao* Government Sentencing Memorandum, Dkt. 78 at 5.

addresses—reflecting "cash out" activity by repeat Hydra users, such as vendors selling illicit goods or services. Similarly, from February 2018 to May 2019, Binance processed more than $275 million in deposits and more than $273 million in withdrawals from BestMixer—one of the largest cryptocurrency mixers in the world until it was shut down by Dutch authorities in May 2019.[114]

\*\*\*

Binance critically undermined the effectiveness of U.S. sanctions against Iran by providing its Iranian customers the ability to transact with the U.S. customers that Binance depended on to provide liquidity on the exchange. Zhao and other Binance senior leaders knew that Binance served customers both in the United States and in jurisdictions subject to comprehensive U.S. sanctions; that U.S. sanctions laws generally prohibited U.S. persons from transacting with persons in jurisdictions subject to comprehensive U.S. sanctions; that Binance's proprietary "matching engine" would necessarily cause U.S. persons to transact with persons in jurisdictions subject to comprehensive U.S. sanctions; and that Binance did not have controls in place to prevent such violations of U.S. law—because Binance chose not to collect KYC information from most of its user base or implement effective blocks based on internet protocol (IP) addresses. Because Binance chose not to implement comprehensive controls blocking transactions that violated U.S. sanctions, between in or about January 2018 through May 2022, Binance caused at least 1.1 million transactions in violation of U.S. sanctions between customers in the United States and customers ordinarily resident in Iran, with an aggregate transaction value of at least $898,618,825. Binance also caused millions of dollars in trades between U.S. customers and customers in other comprehensively sanctioned jurisdictions, including Cuba, Syria, and the Ukrainian regions of Crimea, Donetsk, and Luhansk.[115]

Binance – which not only anonymized transactions but also profited by allowing users to convert their cryptocurrency into U.S. dollars or other fiat currency (which Bitcoin Fog did not do, because it was not an exchange) – made "more than $1.6 billion" from the scheme.[116] To keep

---

[114] *Id.* at 5-6.

[115] *Id.* at 5-8.

[116] *Id.* at 9.

Binance's profits flowing, "Zhao directed Binance employees in a sophisticated scheme to disguise their customers' locations in an effort to deceive regulators about Binance's client base."[117] Despite the government's request for a 36-month custodial sentence, Zhao was sentenced to four months imprisonment.[118] Mr. Sterlingov has already spent ten times this sentence incarcerated pre- and post-trial.

The largest relevant custodial sentence the defense located involved Liberty Reserve defendants Arthur Budovksy and Vladimir Kats. Both, however, were serial recidivists, ***who after probationary sentences*** for the same conduct created a money laundering business that "had more than 5.5 million user accounts worldwide and had processed more than 78 million financial transactions with a combined value of more than $8 billion."[119]

As early as 1999, Budovsky and Kats started laundering funds through "a fake charity" cashing checks and providing "a fraudulent tax write-off" for "a commission that Budovsky and Kats kept for themselves."[120] The two subsequently "laundered money for medical clinics in Brooklyn and Queens involved in no-fault auto insurance fraud" by depositing and cashing checks through shell-companies.[121] A couple of years later, the defendants acquired "GoldAge," a digital

---

[117] *Id.* at 2.

[118] *Id.* at 16; Judgment at Dkt. 90; *see also U.S. v. Hayes et. al.*, Dkt. 20-cr-500, Dkt. 334 at 1 and 5 (SDNY) (probationary sentences for owners and operators of BitMEX, one of the largest cryptocurrency derivatives platforms in the world for enabling "its users [which included criminals] to transact trillions of dollars anonymously…"). BitMEX allowed customers to register accounts with "only an email address" enabling them to anonymously conduct "at least $209 million worth of transactions with known darknet markets or unregistered money services businesses providing mixing services." FinCEN announces $100 million enforcement action against Unregistered Futures Commission merchant BitMEX for Willful Violations of the bank secrecy act, FinCEN.gov (2021), https://www.fincen.gov/news/news-releases/fincen-announces-100-million-enforcement-action-against-unregistered-futures (last visited Aug 7, 2024). "[S]enior leadership" later covered up the conduct by altering "U.S. customer information."

[119] *See U.S. v. Kats*, Dkt. 13-cr-00368 Government Sentencing Submission, Dkt. 359 at 3 (SDNY).

[120] *Id.* at 8.

[121] *Id.*

currency exchange, through which clients illicitly transmitted "at least $30 million."[122] Both were arrested, charged in New York state and ultimately sentenced to five years' probation.[123] "Immediately after" their conviction and while still on probation, the defendants "returned to the exact same type of criminal activity by running Liberty Reserve."[124] To obfuscate their dealings, "Budovsky and Kats [] incorporated Liberty Reserve in Costa Rica and opened several offshore bank accounts."[125] Budovsky even "moved to Costa Rica and renounced his U.S. citizenship."[126] Both pled guilty. Kats, who was arrested in possession of "hundreds of images of child pornography," cooperated with the government.[127] In recognition of the strong need for specific deterrence, Budovsky and Kats were sentenced to 240 and 120 months, respectively. Their coconspirators Mark Marmilev, Maxim Chukharev, and Azzeddome El Amine were respectively sentenced to 60 months, 36 months, and time-served (after cooperation). As the *Kats* case demonstrates, serial recidivists, undeterred by prior convictions, who spent a lifetime laundering funds and illicitly transmitted more than $8 billion received sentences far below what the government recommends here.

Even the government would agree that Mr. Sterlingov is not a murderer or a serial recidivist. Moreover, the $400 million sent through Bitcoin Fog (or the much smaller amount of funds "laundered") pales in comparison to the billions of dollars sent through other services.

---

[122] *Id.* at 9; Press Release (2006), https://web.archive.org/web/20070312035759/http://www.manhattanda.org/whatsnew/press/206-07-27.html (last visited Aug 6, 2024).

[123] *See Kats*, Dkt. 13-cr-00368, Government Sentencing Submission, Dkt. 359 at 3 and 37-38 (SDNY).

[124] *Id.* at 38.

[125] *Id.*

[126] *Id.*

[127] *See id*, Budovsky Sentencing Submission, Dkt. 343 at 56

Certainly Mr. Sterlingov's crimes are not worse than the defendants above or those who commit gruesome acts of violence, prey on the weak and poor, or bilk elderly victims' retirement savings and extend their working lives for years.[128] While some of the above cases were resolved through pleas (including to Bank Secrecy Act violations that implicate § 2S1.3(a)(1), a guideline that does not increase based on the value of relevant funds), the conduct is substantially similar and there is no reason why Mr. Sterlingov deserves a grossly disproportionate sentence. These reasons alone warrant a sentence substantially below both the guidelines and the two recommendations.

### VI.        Specific and General Deterrence Do Not Necessitate a Lengthy Sentence

"Deterrence, incapacitation, and rehabilitation are prospective and societal—each looks forward and asks: What amount and kind of punishment will help make society safe? In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community?"[129] A lengthy period of confinement in this case would do little, if anything, to advance these societal interests. Indeed, numerous studies have shown there is "no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."[130] These findings reflect the commonsense conclusion that no jail sentence is "short" to the person who must spend his time confined to a correctional facility, separated from friends and loved ones.

---

[128] *See U.S. v. Harrigan*, Dkt. 22-cr-00104-RBW (DCD) (sentencing defendant to 210 months for approximately three dozen armed robberies and attempted robberies of various businesses); *See U.S. v. Merrill*, Dkt. 14-cr-40028-TSH (D. Mass) (sentencing cofounder and operator of TelexFree to 72 months for a worldwide pyramid scheme with almost two million participants that lost over $3 billion and cost victims their life savings, homes, and even marriages).

[129] *U.S. v. Cole*, 622 F. Supp. 2d 632, 637 (N.D. Ohio 2008).

[130] Zvi D. Gabbay, Restorative Justice and White Collar Crime, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007); Michael Tonry, Purposes and Functions of Sentencing, 34 CRIME &JUST. 1, 28 (2006) ("[I]ncreases in severity of punishment do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels . . . reached that conclusion as has every major survey of the evidence.").

As for Mr. Sterlingov, having never previously been in contact with the criminal justice system, much less arrested or convicted of a crime, he is a true first-time offender. From a sentencing perspective, this fact is important. There is "a demonstrable difference in the recidivism rates of real first-time offenders as compared to other defendants in Criminal History Category I."[131] There is simply no need to subject Mr. Sterlingov to additional years of incarceration. He has already spent 1206 days – three years, three months and 19 days – locked up in a foreign country. Except for his cousin, Mr. Sterlingov has not seen his family or closest friends in almost three-and-a-half years. He missed birthdays, funerals, and other significant milestones. He was unable to support his loved ones, including Anders Karlsson, a father figure that passed away while Mr. Sterlingov was incarcerated, in their time of need. In short, no rational human being – including Mr. Sterlingov – would ever knowingly and intentionally choose to endure what he has experienced over the past several years.

To the extent there is any need for general, as opposed to specific, deterrence, it has long been satisfied by the publicity attending this case and similar ones, including Helix,[132] Samurai

---

[131] *U.S. v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (citation omitted); *see also* Amendments to the Sentencing Guidelines at 52, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-textamendments/202305_Amendments.pdf ("Recidivism data analyzed by the Commission shows, however, that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point.").

[132] *See* Ohio Resident Pleads Guilty to Operating Darknet-Based Bitcoin 'Mixer' That Laundered Over $300 Million, United States Department of Justice (Aug. 18, 2021), https://www.justice.gov/opa/pr/ohio-resident-pleads-guilty-operating-darknet-based-bitcoin-mixer-laundered-over-300-million.

Wallet,[133] Tornado Cash,[134] BTC-e,[135] and Binance.[136] These cases have reached national and international audiences. As studies have shown, "it is the '*certainty of apprehension* and not the severity of the legal consequence ensuing from apprehension' that is a more effective deterrent."[137] Thus, "general deterrence comes from better visibility of policing, which increases certainty of punishment, rather than increasing the severity of punishment on the back end."[138] Given the extensive publicity surrounding the prosecutions mentioned above, anyone paying even an iota of attention knows the government will vigorously pursue similar conduct, by domestic and foreign actors alike. Anyone who could be deterred already has been deterred.

## VII.     Excessive Incarceration Is Needlessly Punitive Given BOP Policies Toward Noncitizen Defendants

Section 3553 requires courts to consider "the kinds of sentences available" and "the need for the sentence imposed . . . to provide the defendant with . . . correctional treatment in the most effective manner."[139] The extent to which a particular sentence comports with these dictates depends not only on whether and for how long a defendant is sent to prison, but also on the type

---

[133] *See* Founders and CEO of cryptocurrency mixing service arrested and charged with money laundering and unlicensed money transmitting offenses, Southern District of New York (2024), https://www.justice.gov/usao-sdny/pr/founders-and-ceo-cryptocurrency-mixing-service-arrested-and-charged-money-laundering.

[134] *See* U.S. Treasury sanctions notorious virtual currency mixer Tornado cash, U.S. Department of the Treasury (2022), https://home.treasury.gov/news/press-releases/jy0916.

[135] *See* BTC-e operator pleads guilty to money laundering conspiracy, United States Department of Justice (2024), https://www.justice.gov/usao-ndca/pr/btc-e-operator-pleads-guilty-money-laundering-conspiracy.

[136] *See* Binance and CEO plead guilty to federal charges in $4B resolution, United States Department of Justice (2023), https://www.justice.gov/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.

[137] *U.S. v. Walker*, 252 F. Supp. 3d 1269, 1297 (D. Utah 2017), *aff'd*, 918 F.3d 1134 (10th Cir. 2019) (quoting Daniel S. Nagin, *Deterrence in the Twenty–First Century*, Crime and Justice in America: 1975–2025, at 202 (2013)) (emphasis in original).

[138] *Id*; *see also U.S. v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (highlighting considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders") (internal citations omitted).

[139] 18 U.S.C. §§ 3553(a)(3), (a)(2)(D); *see also id*. § 3553(a) (mandating sentence "sufficient, but not greater than necessary, to comply with" punishment's "purposes").

of prison the person is sent to – a year in a minimum-security Federal Prison Camp ("FPC") is a very different punishment than a year in a higher security institution. Reflecting this fact and the adage that punishment should fit both offender and crime, the bulk of first-time, nonviolent offenders are sent to minimum security FPCs.

But Mr. Sterlingov, a foreign national, will not be permitted to serve his time at an FPC.[140] Rather, based on his classification as a noncitizen, he will automatically be imprisoned at a Federal Correctional Institution ("FCI"), a facility far more restrictive and hazardous than otherwise required.[141] Adding to the harsher living conditions, he will be incarcerated with a more hardened and dangerous prison population, which "may be of particular concern to Mr. Sterlingov who is only 5'7" and a slight 130 pounds."[142]

Mr. Sterlingov also faces further incarceration after his criminal sentence ends while he is transferred to ICE custody and awaits arrangements between the United States and Sweden to process his deportation, which could take many months and confine him to "[p]rivately-run and operated prisons [that] have consistently been under investigation over previous decades for poor management, lack of programming, lower-level of medical care and heightened rates of assaults."[143]

Finally, because of his immigration status, Mr. Sterlingov will be ineligible for early release to home confinement or a residential reentry center for the last 10% of his sentence. He is also ineligible for RDAP credit. Nor will he receive any benefit for participating in First Step Act

---

[140] *See* Decl. of J. Sickler, attached as Ex. C, at ¶ 6.

[141] *See id.* at ¶¶ 6-20 (comparing FCP and FCI facilities).

[142] *Id.* at ¶ 18 ("Statistically, there is a 143 percent greater chance of being assaulted at an FCI as opposed to a camp… the rate of 'serious assault' is 553 percent higher in low-security institutions than minimum-security camps.").

[143] *Id.* at ¶ 27.

programming.[144] The net effect of Mr. Sterlingov's immigration status is that "he will serve a significantly higher percentage of his sentence than a US citizen" in conditions that are "more hostile" and "unsanitary," placing him at "unnecessary risk."[145]

No evidence exists that the Sentencing Commission took the conditions of a defendant's confinement into account in creating the Guidelines. To the contrary, "the guidelines did *not* take into account the possibility that a defendant's alienage might significantly transform the severity of the entire length of his sentence, especially if the sentence is for an offense that is in no way intrinsically related to immigration."[146] To account for this inequity and additional punishment, courts have imposed sentences far below what the guidelines recommend.[147]

For these further reasons, the defense respectfully contends that a substantial downward departure or variance – and a sentence significantly below those recommended – is appropriate.[148]

## VIII.    Defense Ideology

Finally, dredging up everything but the kitchen sink, the government accuses "defendant's counsel and defense team" of "attempt[ing] to frame the defendant's crimes in ideological terms, falsely portraying Bitcoin Fog as a misunderstood privacy service while

---

[144] *Id.* at ¶¶ 21-22.

[145] *Id.* at ¶ 40.

[146] *U.S. v. Bakeas*, 987 F. Supp. 44, 50 (D. Mass. 1997) ("Both the inappropriate severity of the sentence, and the fact that it is due solely to Bakeas' non-citizenship, make a downward departure proper in this case.") (emphasis added).

[147] *See e.g., U.S. v. Connolly et. al.*, Docket No. 16-cr-370 (SDNY 2019), Dkt. 451, at 91 and 95 (sentencing fraud defendant to "time served, plus three years of supervision, to include a term of nine months' home confinement to be served in the United Kingdom" despite a Guideline range of 57-71 months' imprisonment based on ineligibility "to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve …").

[148] *See U.S. v. Smith,* 27 F.3d 649, 655 (D.C. Cir. 1994) ("a downward departure may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence…"); U.S.S.G. § 5K2.0(a)(2) (allowing sentencing court to depart if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.").

ignoring mountains" of what it calls incriminating "evidence."[149] The government attacks a straw man – defense counsel. But defense attorneys, no less than prosecutors, are entitled to try cases as they see fit.[150] That government lawyers disapprove of strategies they impute to adversaries has no plausible bearing on any sentencing factor enunciated in 18 USC § 3553(a), and the prosecutors suggest none.

Likewise, the government misleadingly suggests that counsel's acceptance of funds in July was concurrent with the defendant's submission of financial statements in April.[151] Yet as experience attests, defendants often secure assets to hire private counsel after charges have been filed. The Court should discount these red herrings for what they are: rhetorical bluster designed solely to inflame.

## CONCLUSION

For the foregoing reasons, Defendant Roman Sterlingov requests that this Court impose a sentence substantially below both those recommended by the government and Probation.

---

[149] Gov. Mem. in Aid of Sentencing at pp. 39-40 (Dkt. 314).

[150] *See*, e.g., *McCoy v. La.*, 584 U.S. 414, 422 (2018) (reaffirming maxim that "[t]rial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence") (citation and internal quotation marks omitted).

[151] Gov. Mem. in Aid of Sentencing at pp. 43-44 (Dkt. 314).

Dated: August 15, 2024
New York, New York

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NY Bar No. 4493631)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY 10005
t:  (718) 737 - 7264
f:  (718) 504 - 5417
tor@torekeland.com

/s/ Michael Hassard
Michael Hassard (NY Bar No. 5824768)
*Pro Hac Vice*
Tor Ekeland Law, PLLC
30 Wall Street, 8th Floor
New York, NY 10005
t:  (718) 737 - 7264
f:  (718) 504 - 5417
michael@torekeland.com

 /s/  Maksim Nemtsev
Maksim Nemtsev (MA Bar No. 690826)
*Pro Hac Vice*
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
t:  (617) 227-3700
f:  (718) 701-5922
max@mnpc.law

*Counsel for Defendant Roman Sterlingov*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of August 2024, the forgoing document was filed with the Clerk of Court using the CM/ECF System. I also certify that a true and correct copy of the foregoing was sent to the following individuals via e-mail:

<u>s/ Michael Hassard</u>

U.S. Department of Justice
District of Columbia
555 Fourth St. N.W.
Washington, D.C. 20530

Catherine Pelker
Catherine.Pelker@usdoj.gov

Christopher Brown
Christopher.Brown6@usdoj.gov

Jeffrey Pearlman
Jeffrey.pearlman@usdoj.gov