```
1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
2

3     * * * * * * * * * * * * * * *    )
     UNITED STATES OF AMERICA,         )    Criminal Action
4                                      )     No. 21-00399
                    Plaintiff,         )
5                                      )
      vs.                              )    AFTERNOON SESSION
6                                      )
     ROMAN STERLINGOV,                 )    Washington, D.C.
7                                      )    February 14, 2024
                    Defendant.         )    2:04 p.m.
8     * * * * * * * * * * * * * * *    )

9

10
                    TRANSCRIPT OF JURY TRIAL
11          BEFORE THE HONORABLE RANDOLPH D. MOSS
                UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14   FOR THE PLAINTIFF:       CHRISTOPHER BROWN, ESQ.
                              UNITED STATES ATTORNEY'S OFFICE FOR
15                              THE DISTRICT OF COLUMBIA
                              601 D Street, Northwest
16                            Suite 5.1527
                              Washington, D.C. 20530
17
                              CATHERINE PELKER, ESQ.
18                            U.S. DEPARTMENT OF JUSTICE
                              950 Pennsylvania Avenue, Northwest
19                            Washington, D.C. 20530

20                            JEFFREY PEARLMAN, ESQ.
                              U.S. DEPARTMENT OF JUSTICE
21                            1301 New York Avenue, Northwest
                              Washington, D.C. 2005
22

23   FOR THE DEFENDANT:       TOR EKELAND, ESQ.
                              MICHAEL HASSARD, ESQ.
24                            TOR EKELAND LAW, PLLC
                              30 Wall Street
25                            Eighth Floor
                              Brooklyn, New York 10005
```

1     REPORTED BY:              LISA EDWARDS, RDR, CRR
                                Official Court Reporter
2                               United States District Court for the
                                  District of Columbia
3                               333 Constitution Avenue, Northwest
                                Room 6706
4                               Washington, D.C. 20001
                                (202) 354-3269
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2     WITNESS                                                        PAGE

3
      MATTHEW PRICE
4
         Continued Direct Examination By Mr. Brown              71
5        Cross-Examination By Mr. Ekeland                       82

6

7

8                           E X H I B I T S

9
      Exhibit No.                                          Received
10

11       137                                                    71

12       132                                                    71

13       127                                                    71

14       128-A, B and C                                         71

15       131 and 131-A                                          71

16       130-A, B, C and D                                      71

17       134 and 134-A through S                                71

18       116                                                    71

19       123                                                    71

20       122-A and 122-B                                        71

21       124                                                    71

22       117 and 118                                            71

23       117-A                                                  71

24       120                                                    71

25       120-A                                                  71

1    119                                              71

2    119-A                                            71

3    121                                              71

4    121-D                                            71

5    121-A                                            71

6    35-C                                             74

7    36-A                                             78

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  I spent a little bit of time over the

2     break looking at the *Miranda* issue.  And I think my bottom

3     line on this -- and I suspect maybe this is the conclusion

4     that you've probably all independently reached -- is if the

5     Government decides that this is something that's important

6     that the Government wants to pursue, I think I'm going to

7     need to have actually a hearing on the question.

8          I can't decide it based on what's in front of me

9     now.  And I would have to decide based on whether, based on

10    the objective circumstances of the interrogation, a

11    reasonable person would have felt that he or she was not at

12    liberty to both terminate the interrogation and leave.

13         MR. BROWN:  Your Honor, there may be -- setting

14    aside the substantive question, I realized why I felt sort

15    of unfairly surprised by this.  And that's because Rule 12

16    mandates that a motion to suppress be made before trial --

17         THE COURT:  Right.

18         MR. BROWN:  -- unless there's good cause shown.

19         The defense cannot show good cause.  So on a

20    procedural level, to begin with, this is just -- I mean, and

21    the reason why is exactly what we're here for.

22         THE COURT:  Yes.

23         MR. BROWN:  Are we going to have a suppression

24    hearing in the middle of a trial?

25         That's what Rule 12 is designed to avoid.  And

1    there's -- the defense has been on notice of this statement

2    for a long, long time.  They've been focused on statements

3    that the Defendant may or may not have made.

4          Your Honor, I think, you know, yes, there is a

5    *Miranda* inquiry, although I think that if you look at some

6    other case law, including *United States versus Gupta*, 183

7    F.3d 615, Seventh Circuit, Judge Easterbrook basically says

8    *Miranda* is a mismatch for the immigration process, that any

9    persons entering the United States, they are required to

10   answer certain questions about their identity, nationality,

11   business, claim of entitlement to enter.

12          That's no more --

13   THE COURT:  I think I get you there with respect

14   to maybe, "What is your business?  Why are you here?"

15          I'm not sure how that gets to the, "What is your

16   email address?"

17   MR. BROWN:  Well, if the Government does not ask

18   that question, the other questions -- and I had an

19   opportunity to refresh my recollection.  Maybe with the

20   witness here -- but I don't want to sort of --

21   THE COURT:  Fair enough.

22   MR. BROWN:  -- discard that.  And I'm happy to do

23   that with the witness out of the courtroom.

24          But I think, you know, more to the point, Rule 12

25   is categorical, that these objections must be raised by

1    pretrial motion if the basis for the motion is then

2    reasonably available.  And, again, the reason why is so we

3    don't have suppression hearings in the middle of trial.

4            THE COURT:  Right.

5            MR. BROWN:  The D.C. Circuit has upheld -- and

6    then the burden is on the proponent of the motion to show

7    good cause for waiting until the middle of trial to raise a

8    suppression motion.

9            And the D.C. Circuit in *United States versus*

10   *Redman*, 311 F.3d 982, says --

11           THE COURT:  I'm sorry.  Slow down for the court

12   reporter.

13           MR. BROWN:  Sorry.  *United States versus Redman*,

14   311 F.3d 982, D.C. Circuit, 2003, that the failure to make a

15   motion to suppress before trial shall constitute a waiver

16   thereof unless they show good cause for failure to move

17   earlier.  That is categorical forfeiture of their right to

18   challenge the statement.

19           THE COURT:  Well, let me just hear from

20   Mr. Ekeland on that point as to whether he can satisfy that

21   standard.

22           MR. EKELAND:  Your Honor, just looking at the rule

23   briefly, I think under 12(b)(4), the Government is required

24   to give notice to the defense of its intent to use this

25   evidence.

1                We would take the position that --

2                THE COURT:  I'm sorry.  12(b) what?

3                MR. EKELAND:  I think it's 12(b)(4), I think is

4      what -- hold on.  Let me go pull that up.

5                THE COURT:  I see the language.  Okay.  But I

6      mean, I do not recall references to this in the past.

7                MR. EKELAND:  We just assumed the Government

8      wouldn't use this because in our -- in the defense's view,

9      Mr. Sterlingov was in custody because when the --

10               THE COURT:  No, no, no, no.  You don't get to do

11     that.  That is -- that borders on the absurd to say, We

12     don't have to comply with our obligations under 12(b)(3) to

13     file a motion because we just assumed the Government's going

14     to not use any evidence that we think could be suppressed,

15     where there's actually a very substantial argument that it

16     shouldn't be suppressed here.

17               MR. EKELAND:  Well, your Honor, the defense's

18     argument is that we weren't on notice that the Government

19     was intending to use it.

20               THE COURT:  If I put you under oath, are you going

21     to tell me that?  Because I don't believe you, frankly, as

22     you sit here today, because of other things I've heard in

23     this case.

24               MR. EKELAND:  Your Honor, I --

25               THE COURT:  You really didn't think the Government

1   was going to do that, was going to mention this?  Because

2   I've heard reference to it previously in this case myself.

3          MR. EKELAND:  That the Government was going to

4   disclose the conversation that Mr. Sterlingov had when he

5   talked to Customs and Border Patrol?

6          THE COURT:  Let me ask you this:  You yourself

7   drew the line in your opening and you said they never asked

8   him anything before he was arrested.  This all occurred

9   before he was arrested.  And so you were drawing that very

10  line yourself in anticipating this coming in when you said

11  that.

12         MR. EKELAND:  No, your Honor.  What I was saying

13  was making a truthful statement that the Government never

14  bothered to talk to Mr. Sterlingov before he was arrested,

15  which was very true.

16         I did not say --

17         THE COURT:  But they did.  I mean, this is

18  evidence they did talk to him beforehand.

19         MR. EKELAND:  Well, your Honor, I was honestly

20  taking the view that the arrest and his detention was from

21  the moment that he landed at LAX because that's when the

22  arrest warrant was in place.  Customs and Border Patrol were

23  speaking to Mr. Sterlingov fully aware that there was an

24  arrest warrant.

25         Agent Price was standing by and listening.  It's

 1     not like a situation where Customs and Border Patrol was

 2     completely unaware and, you know, Agent Price came up and

 3     said, Oh, hey, there's Mr. Sterlingov.  We have an arrest

 4     warrant for him.

 5          THE COURT:  But law enforcement all the time take

 6     steps before they arrest somebody even where there's an

 7     arrest warrant in cases.  It happens all the time.

 8          MR. EKELAND:  Your Honor, I think the defense has

 9     made its objection for the record.  It's our position that

10     Mr. Sterlingov was basically in custody of law enforcement

11     from the moment that CPB, Customs and Border Patrol, took

12     him to start interrogating him and that he wasn't given his

13     *Miranda* rights.  And I think we've made our record on that.

14          THE COURT:  Well, let me ask you this, then:  What

15     about the opening of the door?  You said in your opening

16     statement that law enforcement did not talk to him before he

17     was arrested.

18          MR. EKELAND:  I'm sorry.  I didn't hear you.

19          THE COURT:  You said law enforcement did not talk

20     to him before he was arrested.  You said that in your

21     opening.

22          MR. EKELAND:  That's correct, your Honor.

23          THE COURT:  If I determine that he was not

24     arrested at the time, does that mean you've opened the door

25     with this at least?  Because this is a conversation they had

```
 1        with him before his arrest.
 2               MR. EKELAND:  Your Honor, if you make that
 3        determination, we merely note our objection for the record.
 4               THE COURT:  That's my -- my question for you is:
 5        Do you agree that if I conclude that he was not arrested at
 6        the time, that that resolves the issue?
 7               MR. EKELAND:  At the district court level, yes,
 8        your Honor.
 9               THE COURT:  No, no.
10               MR. EKELAND:  I --
11               THE COURT:  All the way to the Supreme Court of
12        the United States.  Come on.  Not gamesmanship.  I just want
13        to know what you agree to so I can decide how to proceed
14        here.
15               MR. EKELAND:  Your Honor, if Mr. Sterlingov wasn't
16        arrested until Mr. Price or the government agent came in at
17        the point, then I agree with the Court.  But again, I note
18        my objection for the record.
19               THE COURT:  I just want to make sure we're clear
20        about that, that you don't have an objection.  I take it
21        from what you're saying is that if I conclude that it
22        occurred before his arrest, that you're not objecting to it.
23        You're maybe objecting to when I think the arrest occurred,
24        but otherwise you're not objecting.
25               MR. EKELAND:  I think that's an accurate
```

1    assessment, your Honor.

2            THE COURT:  All right.  Let's bring the jury in

3    and we can come back to this after the next break.

4            THE COURTROOM DEPUTY:  All rise.

5            (Whereupon, the jury entered the courtroom at 2:14

6    p.m. and the following proceedings were had:)

7            THE COURTROOM DEPUTY:  The jury is present.  You

8    may be seated and come to order.

9            THE COURT:  All right.  You may continue.

10        (MATTHEW PRICE, GOVERNMENT WITNESS, PREVIOUSLY SWORN.)

11                CONTINUED DIRECT EXAMINATION

12   BY MR. BROWN:

13   Q.  Mr. Price, I'd ask that we pass you up Exhibit 1, which

14   is marked as 1B-21.

15           THE COURTROOM DEPUTY:  I'm sorry.  Which one?

16           MR. BROWN:  It's Exhibit 137.

17           THE COURTROOM DEPUTY:  137.

18           MR. BROWN:  The other number is to help us locate

19   the document.

20           THE COURTROOM DEPUTY:  Got it.

21   BY MR. BROWN:

22   Q.  Mr. Price, go ahead and open that envelope.  Without

23   showing the jury, examine what the contents are.

24   A.  (Witness complies.)

25   Q.  Do you recognize the contents of that envelope?

```
1    A.  I do.

2    Q.  And are those items that you recall recovering during

3    the search of Mr. Sterlingov's luggage?

4    A.  Yes, they are.

5    Q.  Are those -- is that item or items in substantially the

6    same condition as they were when you recovered them?

7    A.  They are.

8             MR. BROWN:  The Government moves to admit and

9    publish Exhibit 137.

10             THE COURT:  Any objection?

11             MR. EKELAND:  No objection, your Honor.

12             THE COURT:  Exhibit 137 -- B?

13             MR. BROWN:  Sorry, your Honor.  Just Exhibit 137.

14             THE COURT:  I'm sorry.  137 is admitted.

15             (Whereupon, Government's Exhibit No. 137 was

16    entered into evidence.)

17             MR. BROWN:  For the record, if I'm referring to

18    another number, it's just to help us locate the right

19    envelope.

20             THE COURT:  I see.

21    BY MR. BROWN:

22    Q.  Mr. Price, could you please show the jury and the

23    defense what was contained in that envelope.

24    A.  (Witness complies.)

25    Q.  Mr. Price, what are those?
```

1    A.  These are prepaid SIM cards, some with English writing,

2    some with what appears to be Swedish, and one with what

3    appears to be Cyrillic text on it.

4    Q.  Go ahead and put those back in the envelope and we'll

5    move on to the next exhibit, Exhibit 132.

6              If you can examine the contents of that without

7    showing the jury.

8    A.  (Witness complies.)

9    Q.  Do you recognize that item?

10   A.  I do.

11   Q.  And was that one of the items you recovered from the

12   search of Mr. Sterlingov's luggage?

13   A.  Yes, it is.

14   Q.  Is it in substantially the same condition as it was when

15   you recovered it?

16   A.  Yes.

17             MR. BROWN:  The Government moves to admit and

18   publish Exhibit 132.

19             THE COURT:  Any objection?

20             MR. EKELAND:  No objection, your Honor.

21             THE COURT:  Exhibit 132 is admitted and may be

22   published to the jury.

23             (Whereupon, Government's Exhibit No. 132 was

24   entered into evidence.)

25

1    BY MR. BROWN:

2    Q.  Mr. Price, could you show the jury and the defense what

3    was inside that box.

4    A.  (Witness complies.)

5    Q.  Could you describe what those items are?

6    A.  Yes.  It's a laptop computer with the tag MSI and the

7    emblem Workstation on it, a power device, charging cable and

8    a laptop sleeve, protector.

9    Q.  You can put those back in the envelope.

10   A.  (Witness complies.)

11   Q.  We'll move on to Exhibit 127.

12          Mr. Price, if you could open that envelope and

13   examine the contents without showing the jury.

14   A.  (Witness complies.)

15   Q.  Do you recognize the contents of that envelope?

16   A.  I do.

17   Q.  And are those items -- is that an item or items that you

18   recovered during the search of Mr. Sterlingov's luggage?

19   A.  It is.

20   Q.  Are those items -- is that item or items in

21   substantially the same condition as it was or they were when

22   you recovered them from the search?

23   A.  Yes.

24          MR. BROWN:  The Government moves to admit and

25   publish Exhibit 127.

1          THE COURT:  Any objection?

2          MR. EKELAND:  No objection, your Honor.

3          THE COURT:  Exhibit 127 is admitted.

4          (Whereupon, Government's Exhibit No. 127 was

5      entered into evidence.)

6      BY MR. BROWN:

7      Q.  Mr. Price, could you please take that out and show the

8      jury.

9      A.  (Witness complies.)

10     Q.  Mr. Price, what is that item?

11     A.  This is a Books brand, appears to be e-reader with a

12     stylus pen attached to it.

13     Q.  You can put that back in its container.

14     A.  (Witness complies.)

15     Q.  And moving to Exhibits 128-A, 128-B and 128-C, could you

16     open that envelope and examine the contents.

17     A.  (Witness complies.)

18     Q.  And do you recognize those items?

19     A.  I do.

20     Q.  Were those items that you recovered during the search of

21     the Defendant's luggage?

22     A.  Yes, they are.

23     Q.  Are those items in substantially the same condition as

24     they were when you recovered them from the Defendant's

25     luggage?

```
 1   A.  Yes, they are.

 2              MR. BROWN:  The Government moves to admit Exhibits

 3   128-A -- admit and publish Exhibits 128-A, B and C.

 4              THE COURT:  Any objection?

 5              MR. EKELAND:  No objection, your Honor.

 6              THE COURT:  Exhibits 128-A, B and C are admitted

 7   and may be published.

 8              (Whereupon, Government's Exhibit Nos. 128-A, B and

 9   C were entered into evidence.)

10   BY MR. BROWN:

11   Q.  And could you pull those items out and show them to the

12   jury and the defense.

13   A.  (Witness complies.)

14   Q.  And what are those items, Mr. Price?

15   A.  They appear to be three computer hard drives made by

16   Samsung.

17   Q.  Go ahead and put those back.

18   A.  (Witness complies.)

19   Q.  Moving on to Exhibits 131 and 131-A, go ahead and open

20   and examine the contents of that envelope.

21   A.  (Witness complies.)

22   Q.  Do you recognize those items?

23   A.  I do.

24   Q.  And are those items that you recovered during the search

25   of Mr. Sterlingov's luggage?
```

 1    A.  They are.

 2    Q.  And are those items in substantially the same condition

 3    as they were when they were recovered from Mr. Sterlingov's

 4    luggage?

 5    A.  They are.

 6            MR. BROWN:  The Government moves to admit and

 7    publish Exhibits 131 and 131-A.

 8            THE COURT:  Any objection?

 9            MR. EKELAND:  No objection, your Honor.

10            THE COURT:  Exhibit 131 and 131-A are admitted and

11    may be published.

12            (Whereupon, Government's Exhibit Nos. 131 and

13    131-A were entered into evidence.)

14    BY MR. BROWN:

15    Q.  Mr. Price, go ahead and show the jury and the defense

16    what those items are.

17    A.  (Witness complies.)

18    Q.  And, Mr. Price, do you recognize what these items are?

19    A.  I do.

20    Q.  And what are they?

21    A.  Exhibit 131 appears to be a Raspberry Pi mini-computer

22    with -- it looks like LEGO bricks attached to it.

23            And Exhibit 131-A appears to be a micro SD storage

24    card, I believe.

25    Q.  Go ahead and place those exhibits back.

```
 1    A.   (Witness complies.)

 2    Q.   We'll move on now to Exhibit 130-A, B, C and D.

 3              THE COURTROOM DEPUTY:  I'm sorry.  What number?

 4              MR. BROWN:  130-A, B, C and D.

 5    BY MR. BROWN:

 6    Q.   Go ahead and examine the contents.

 7    A.   (Witness complies.)

 8    Q.   Do you recognize those items?

 9    A.   I do.

10    Q.   Were those items that you recovered during the search of

11    Mr. Sterlingov's luggage?

12    A.   They are.

13    Q.   Are those items in substantially the same condition as

14    they were when you recovered them?

15    A.   Yes, they are.

16              MR. BROWN:  The Government moves to admit and

17    publish Exhibits 130-A, B, C and D.

18              THE COURT:  Any objection?

19              MR. EKELAND:  No objection, your Honor.

20              THE COURT:  Exhibits 130-A through D are admitted

21    and may be published to the jury.

22              (Whereupon, Government's Exhibit Nos. 130-A, B, C

23    and D were entered into evidence.)

24    BY MR. BROWN:

25    Q.   Mr. Price, could you go ahead and show the jury what is
```

Price - DIRECT - By Mr. Brown

1    contained there.

2    A.  (Witness complies.)

3    Q.  As well as show the defense, please.

4    A.  (Witness complies.)

5    Q.  Mr. Price, what is in the contents of those -- it looks

6    like four plastic bags?

7    A.  Exhibits 130-A and 130-B contain portions of a paper

8    IKEA-branded tape measure and what appear to be two mobile

9    phone SIM cards.

10                   And Exhibits --

11   Q.  Mr. -- I'm sorry.  Continue.

12   A.  Exhibits 130-C and 130-D contain similar portions of

13   IKEA tape measures and what appear to be two micro SD

14   storage devices.

15   Q.  Mr. Price, were these some of the SD cards or other

16   cards that were wrapped with the tape measures?

17   A.  Yes.

18   Q.  You can go ahead and place those back.

19   A.  (Witness complies.)

20   Q.  Showing you Exhibit 134 and -- there are several

21   subexhibits.  I believe that should contain Exhibits 134-A

22   through S, as in Sierra.

23   A.  It appears to, yes.

24   Q.  And do you recognize the items in that envelope?

25   A.  I do.

1    Q.  And are those items that you recall recovering during

2    the search of Mr. Sterlingov's luggage?

3    A.  Yes, they are.

4    Q.  Are those items in substantially the same condition as

5    they were when you recovered them?

6    A.  Yes.

7    Q.  Mr. Price --

8             MR. BROWN:  The Government moves to admit and

9    publish Exhibits 134 and 134-A through S.

10            THE COURT:  Any objection?

11            MR. EKELAND:  Can I just look at them real quick?

12   I can't see them.

13            THE COURT:  Yes.

14            MR. EKELAND:  May I approach?

15            THE COURT:  Yes, you may.

16            MR. EKELAND:  Thank you.

17            (Examines items.)

18            No objection, your Honor.

19            THE COURT:  Exhibits 134 and 134-A through S are

20   admitted and may be published.

21            (Whereupon, Government's Exhibit Nos. 134 and

22   134-A through S were entered into evidence.)

23   BY MR. BROWN:

24   Q.  Mr. Price, could you take those items out, maybe one by

25   one or a few at a time, or if you can divide them by

Price - DIRECT - By Mr. Brown

1    categories and describe them for the jury and hold them up

2    for the jury and the defense, please.

3    A.  Beginning with Exhibit 134, it's a small leather pouch

4    that is currently empty.

5    Q.  Mr. Price, when you conducted this search, did that

6    leather pouch contain any items?

7    A.  It did.

8    Q.  And what items were contained in it?

9    A.  Numerous electronic storage devices, SD drives and

10    mobile phone SIM cards.

11    Q.  And were exhibits -- Subexhibits 134-A through S -- are

12    those items -- if you could quickly review -- are those

13    items that were contained in that small leather pouch?

14    A.  Yes, they are.

15    Q.  And what are those other items that were contained in

16    the pouch?

17    A.  Exhibits 134-A through E are -- appear to be mobile

18    phone SIM cards.

19         Exhibits 134-F, 134-G appear to be micro SD

20    storage cards with adapters to fit into an SD drive.

21         And -- can you see?  I'm sorry.  134-H, 134-I,

22    134-J and 134-K all appear to be SD drive storage devices.

23         134-L appears to be an encryption device or a

24    password device manufactured by Kobil, K-O-B-I-L.

25    Q.  Mr. Price, could you pause there?  What do you mean that

1    that's an encryption device?

2    A.  It appears similar to, like, an SAP token, like a log-in

3    token that generates random log-in characters.

4    Q.  How is that used for, say, a log-in?

5    A.  It's used sometimes for additional authentication to log

6    in to a computer device.

7    Q.  Okay.  Carry on with the other exhibits, please.

8    A.  Exhibits 134-M and 134-N appear to be two SanDisk USB

9    storage drives.

10           Exhibits 134-O and 134-P appear to be USB-C to

11   USB-B adapter ports.

12   Q.  Mr. Price, what is a USB-C and USB-B?

13   A.  B as in bravo.  USB-C is a series of different adapters

14   on a computer that can be attached.  USB-C is kind of the

15   latest version that, like, an iPhone charger would use.

16   USB-C is an older version.

17   Q.  And then please continue.

18   A.  Sure.  Exhibit 134-Q appears to be a micro SD drive

19   adapter.

20           The remaining exhibits, 134-R and 134-S, appear to

21   be either Bluetooth dongles or some sort of USB device to

22   plug into a computer.

23   Q.  Thank you, Mr. Price.  Go ahead and place those items

24   back in the envelope.

25   A.  (Witness complies.)

```
 1    Q.  Now, during the execution of the search, did you also
 2    recover some written materials or papers?
 3    A.  Yes.
 4    Q.  So directing your attention to Exhibit 116, is that what
 5    you have in front of you?
 6    A.  It is.
 7    Q.  Could you go ahead and open that and examine it.
 8    A.  (Witness complies.)
 9    Q.  Do you recognize that item?
10    A.  I do.
11    Q.  And was that an item that you recovered during the
12    search of the Defendant's luggage?
13    A.  It is.
14    Q.  Is it in substantially the same condition as it was when
15    you recovered it?
16    A.  Yes, it is.
17              MR. BROWN:  The Government moves to admit and
18    publish Exhibit 116.
19              THE COURT:  Any objection?
20              MR. EKELAND:  We would just like to look at it
21    first.
22              THE COURT:  You're welcome to.  That's fine.
23              MR. EKELAND:  Can we approach, your Honor?
24              THE COURT:  You may.
25              (Mr. Ekeland and the Defendant examine items.)
```

```
 1              MR. EKELAND:  No objection, your Honor.
 2              THE COURT:  Exhibit 116 is admitted and may be
 3     published to the jury.
 4              (Whereupon, Government's Exhibit No. 116 was
 5     entered into evidence.)
 6     BY MR. BROWN:
 7     Q.  Mr. Price, could you hold that up and display it for the
 8     jury and defense.
 9     A.  (Witness complies.)
10     Q.  Could you explain what that is?
11     A.  Yes.  It's a small -- appears to be a printed photo of a
12     number of backup codes for a Google gmail account,
13     heavydist@gmail.com.
14     Q.  And what kind of paper is that?
15     A.  It appears to be like photo paper.
16     Q.  And does the photo -- does it appear that it was -- how
17     does it appear that it was printed?
18     A.  It looks like a screenshot that was then printed perhaps
19     on a photo printer.
20     Q.  Now, earlier, we saw a photograph of account recovery
21     codes for the heavydist@gmail.com address.
22              Is this the item that was in that photograph?
23     A.  It is.
24     Q.  Go ahead and put that back in the envelope.
25     A.  (Witness complies.)
```

Price - DIRECT - By Mr. Brown

1    Q.  Directing your attention to Exhibit 123, could you

2    examine the contents of 123, please.

3    A.  Yes.

4    Q.  And do you -- are those items that you recall recovering

5    during the search of the Defendant's luggage?

6    A.  They are.

7    Q.  Are they in substantially the same condition as they

8    were when they were recovered during the search?

9    A.  Yes.

10            MR. BROWN:  The Government moves to admit and

11   publish Exhibit 123.

12            THE COURT:  Any objection?

13            MR. EKELAND:  Your Honor, we'd just like to look

14   at it just to confirm.

15            THE COURT:  All right.

16            MR. EKELAND:  May I approach?

17            THE COURT:  You may.

18            (Mr. Ekeland and the Defendant examine items.)

19            MR. EKELAND:  No objection, your Honor.

20            THE COURT:  Exhibit 123 is admitted and may be

21   published.

22            (Whereupon, Government's Exhibit No. 123 was

23   entered into evidence.)

24   BY MR. BROWN:

25   Q.  Mr. Price, could you take out the contents of

1   Exhibit 123 and one by one show them to the jury and to the

2   defense, and let's take a closer look.

3   A.  Sure.

4           The first item is a black -- appears to be a debit

5   card with a MasterCard logo, and it says "global cash" on

6   the top.

7   Q.  Is there any other information on that card?

8   A.  There is an account number, an expiration date and the

9   words "global cash" where there would be a name.

10  Q.  Is there no name of a person or entity on that card?

11  A.  This card only says "global cash."  It does not have a

12  name on it.

13  Q.  And then moving on to the next item.

14  A.  The next item appears to be a debit card with the Nordea

15  Bank logo on the top left, the Visa logo on the top right,

16  card number, expiration date, and the name Roman Sterlingov

17  on the bottom.

18  Q.  Could you examine the next and I believe last item?  Or

19  are there more items?

20  A.  There are five items in total.

21  Q.  Could you please show the jury the next item, the jury

22  and the defense, please.

23  A.  Yes.  The next item is a clear debit -- appears to be a

24  debit card with a black stripe, the logo N26, a MasterCard

25  logo, account number, expiration date and the name Roman

1    Sterlingov with a number below.

2    Q.  Are there other items there?

3    A.  Yes.  There's one remaining card, a debit or credit card

4    and what appears to be a business card, a gold-plated

5    business card.

6    Q.  Why don't we finish the debit card first and then we'll

7    move on to the other.  Could you show that to the jury and

8    defense and explain if there are any identifying marks on

9    it.

10   A.  This is a black and green debit or credit card with a

11   Visa logo on the bottom right, an account number, expiration

12   date, the name Roman Sterlingov and the abbreviation EUR

13   underneath the name Roman.

14   Q.  What's that last item there?

15   A.  The last item is a gold-colored metal -- what appears to

16   be business card.  On the front side it says, "Bitcoaster

17   Ventures, Max Roman Sterlingov, president."

18               The backside has a phone number, a web address and

19   an email address.

20   Q.  And going back to the front, what was the name on the

21   card?

22   A.  Of the company or the person?

23   Q.  The person.

24   A.  The person's name is Max Roman Sterlingov.

25   Q.  On the back of the card, what was the email address

1    there?

2    A.  Max@bitcoaster, B-I-T-C-O-A-S-T-E-R, .com.

3    Q.  You can go ahead and put those items back.

4    A.  (Witness complies.)

5    Q.  Moving on to the envelope containing Exhibits 122-A and

6    122-B, could you examine the contents of the envelope

7    without showing the jury, please.

8    A.  Just to clarify, you said 122-A?

9    Q.  I believe there have been exhibits premarked as 122-A

10   and B within envelope 1-B26.

11   A.  Yes.  Sorry.

12   Q.  And do you recognize the items inside the envelope?

13   A.  I do.

14   Q.  Are these items that you recall recovering during the

15   search of the Defendant's luggage?

16   A.  They are.

17   Q.  Are they in substantially the same condition as they

18   were when you recovered them?

19   A.  Yes.

20   Q.  There are two items in there, and I think there's some

21   other items that we do not intend to introduce into

22   evidence.  Could you just look at exhibits -- the items

23   premarked Exhibits 122-A and 122-B.

24   A.  Okay.

25   Q.  Are those also items that you recall recovering during

 1    the search of the Defendant's luggage?

 2    A.  They are.

 3    Q.  Are they in substantially the same condition?

 4    A.  Yes, they are.

 5            MR. BROWN:  The Government moves to admit and

 6    publish just the items that are premarked 122-A and 122-B.

 7            THE COURT:  Any objection?

 8            MR. EKELAND:  Your Honor, we'd just like to look

 9    at them for a moment.

10            THE COURT:  Okay.

11            MR. EKELAND:  May I approach?

12            THE COURT:  You may.

13            (Mr. Ekeland and the Defendant examine items.)

14            MR. EKELAND:  No objection, your Honor.

15            THE COURT:  122-A and 122-B are admitted and may

16    be published to the jury.

17            (Whereupon, Government's Exhibit Nos. 122-A and

18    122-B were entered into evidence.)

19    BY MR. BROWN:

20    Q.  Mr. Price, could you show the jury Exhibits 122-A and

21    122-B and also show the defense, please.

22    A.  122-A and 122-B.

23    Q.  And what are those two items?

24    A.  Item 122-A is a black business card that says Bitcoaster

25    Ventures, Max Roman Sterlingov, president, on one side.

1          The second side has a website and an email

2     address.

3     Q.  And what is the email address on that?

4     A.  Max@bitcoaster, B-I-T-C-O-A-S-T-E-R, .com.

5     Q.  Is that the same email address as we saw on the metallic

6     business card?

7     A.  It is.

8     Q.  And what's the other item there?

9     A.  It is a business card for what appears to be Nordea

10    Bank, a bank in Sweden, with a name of a banker and some

11    telephone numbers and an email address on it.

12    Q.  Thank you, Mr. Price.

13          Could you please separate out the two admitted

14    items, and if there's some way to put them back in the

15    envelope, but separately, so we can return to the two

16    admitted items but not the others.

17    A.  Got you.

18    Q.  Moving on to Exhibit 124, do you have that in front of

19    you?

20    A.  I do.

21    Q.  Go ahead and examine the contents without showing the

22    jury, please.

23    A.  (Witness complies.)

24    Q.  And do you recognize those items?

25    A.  I do.

```
1   Q.  Are those items that you recall recovering during the

2   search of the Defendant's luggage?

3   A.  They are.

4   Q.  Are they in substantially the same condition as they

5   were when you recovered them during the search?

6   A.  Yes, they are.

7           MR. BROWN:  The Government moves to admit and

8   publish exhibit -- the contents of Exhibit 124.

9           THE COURT:  Any objection?

10          MR. EKELAND:  We'd just like to look at it

11  quickly, your Honor.  May I approach?

12          THE COURT:  You may approach.

13          MR. BROWN:  Your Honor, if this would streamline

14  things, the Government has no objection to defense counsel

15  and the Defendant just staying there.

16          THE COURT:  Whatever you want to do.  If you want

17  to stay over there, you're welcome to; or if you want to go

18  back and forth, that's fine.

19          MR. EKELAND:  How much more is there?

20          MR. BROWN:  About five more items.

21          MR. EKELAND:  Five more?  We'll just stand up

22  there --

23          THE COURT:  That's fine.

24          MR. EKELAND:  -- if that's okay with the Court.

25          THE COURT:  So we're on Exhibit 124.
```

1          Just make sure you're sort of off to the side so

2     you're not blocking the jury's view of the witness.

3               MR. EKELAND:  Absolutely.

4               (Mr. Ekeland and the Defendant examine items.)

5               MR. EKELAND:  No objection, your Honor.

6               THE COURT:  Exhibit 124 is admitted and may be

7     published to the jury.

8               (Whereupon, Government's Exhibit No. 124 was

9     entered into evidence.)

10              THE COURT:  You can step forward and look at the

11    exhibits as they come in and just step back when he's

12    testifying so the jury can see.  Thanks.

13              MR. BROWN:  It's getting crowded back there.

14              THE COURT:  Yes.

15    BY MR. BROWN:

16    Q.  Mr. Price, could you go through those items one by one

17    and just show them to the jury and the defense.

18    A.  The first item appears to be a passport from the Russian

19    Federation.

20    Q.  Is there a photo inside that passport?

21    A.  There is.

22    Q.  And whose photo does that appear to be?

23    A.  It appears to be Mr. Sterlingov's.

24    Q.  Is there an issuance date for that passport?

25    A.  There is.

1    Q.  And what's that date?

2    A.  It appears to be July 21st of 2017.

3    Q.  Okay.  And then moving on to the next item, what does

4    that item appear to be?

5    A.  It appears to be a travel identity or passport document

6    of some sort with Cyrillic writing on the front.

7    Q.  And is there a photo inside of that?

8    A.  There is on the last page, yes.

9    Q.  Whose photo does that appear to be?

10   A.  Mr. Sterlingov's.

11   Q.  And is there an issuance date for that document?

12   A.  It appears to be October 13th of 2011.

13   Q.  We can move on to the next one.

14   A.  It's another maroon passport or travel book or a

15   document of that type with Cyrillic writing on the cover.

16   Q.  Is there a photo inside of that document?

17   A.  There is.

18   Q.  And whose photo does that appear to be?

19   A.  It appears to be Mr. Sterlingov.

20   Q.  Is there an issuance date for that document?

21   A.  There is a date on here.  Unfortunately, I don't read

22   Cyrillic, so I'm not sure if that says "issue date," but the

23   date on here is October 17th, 2020.

24   Q.  But for the record, you're not sure what that date is

25   exactly?

1    A.  I'm not, no.

2    Q.  And is there -- are there other documents or items

3    there?

4    A.  Yes.  Another maroon document that appears to be a

5    passport for Sweden.

6    Q.  Is there a photo inside?

7    A.  There is.

8    Q.  Whose photo does that appear to be?

9    A.  Mr. Sterlingov.

10   Q.  Is there a name indicated?

11   A.  Yes.

12   Q.  And what name is that?

13   A.  Roman Sterlingov.

14   Q.  And moving on, I think -- is there one more item or two

15   more items?

16   A.  There are two more items.  Next is what appears to be

17   another Swedish passport.

18   Q.  Is there a photo and/or a name inside?

19   A.  There is.

20   Q.  And whose photo or name is indicated there?

21   A.  Roman Sterlingov.

22   Q.  And then are we finally down to the last item there?

23   A.  There's one more item.

24   Q.  Okay.  And what does that item appear to be?

25   A.  It is a green document with the word CCP and what

1    appears to be an old logo of the Soviet Union on the front.

2    Q.  Is there any identifying information that you can read

3    on the inside?

4    A.  No.  It is all in Cyrillic.  I can't read it.

5    Q.  Could you go ahead and place those back in the envelope.

6    A.  (Witness complies.)

7    Q.  We'll move on to Exhibits 117 and 118, which are

8    contained in a single envelope.

9    A.  Okay.

10   Q.  Go ahead and open that envelope without showing the

11   jury, please.

12   A.  (Witness complies.)

13   Q.  Do you recognize the contents of that envelope?

14   A.  I do.

15   Q.  Are these items that you recall recovering during the

16   search of the Defendant's luggage?

17   A.  They are.

18   Q.  Are these items in substantially the same condition as

19   they were when they were recovered from the search?

20   A.  Yes.

21   Q.  I'd like you to pull out specifically the items

22   premarked Exhibits 117 and 118.

23   A.  (Witness complies.)

24           MR. BROWN:  The Government moves to admit the

25   items premarked Exhibits 117 and 118.

```
1              THE COURT:  Mr. Ekeland, you can examine them if

2     you'd like.

3                  (Mr. Ekeland and the Defendant examine items.)

4              MR. EKELAND:  No objection, your Honor.

5              THE COURT:  Exhibits 117 and 118 are admitted and

6     may be published to the jury.

7                  (Whereupon, Government's Exhibit Nos. 117 and 118

8     were entered into evidence.)

9     BY MR. BROWN:

10    Q.  Mr. Price, could you hold up -- start with Exhibit 117.

11    What do those appear to be?

12    A.  This appears to be a series of handwritten notes on

13    graph paper using various colors of ink.

14    Q.  And can you tell from looking at those notes what

15    language or languages are used in the notes?

16    A.  It appears it may be Russian.

17    Q.  Did IRS make scanned copies of those notes?

18    A.  Yes.

19             MR. BROWN:  I'd like to on the computer pull up

20    Exhibit 117-A.

21    BY MR. BROWN:

22    Q.  Do you see what's shown there on 117-A?

23    A.  I do.

24    Q.  Do you recognize this exhibit?

25    A.  I do.
```

```
1    Q.  And what is it?
2    A.  It appears to be a scanned copy of the document I'm
3    holding in my left hand.
4    Q.  Does this scanned copy fairly and accurately show the
5    same document that you're holding in your hand?
6    A.  Yes.
7            MR. BROWN:  The Government moves to admit and
8    publish Exhibit 117-A.
9            THE COURT:  Any objection?
10           MR. EKELAND:  No objection, your Honor.
11           THE COURT:  Exhibit 117-A is admitted and may be
12   published.
13           (Whereupon, Government's Exhibit No. 117-A was
14   entered into evidence.)
15   BY MR. BROWN:
16   Q.  And, Mr. Price, if you could just --
17           MR. BROWN:  Why don't we scroll through this
18   document, please.
19   BY MR. BROWN:
20   Q.  What does this appear to consist of?
21   A.  Again, similar to the document in my hand, handwritten
22   notes in various colors of ink with various different -- it
23   appears to be Russian language.
24   Q.  All right.
25           MR. BROWN:  We can close that out.
```

1    BY MR. BROWN:

2    Q.  You can go ahead and put the contents of that envelope

3    back and maybe separate out the two admitted exhibits.  Oh,

4    sorry.

5            Before we move on -- my apologies -- could you

6    pull out Exhibit 118 that was previously admitted and

7    published.  What does Exhibit 118 appear to be?

8    A.  It's a hotel invoice for the Intercontinental Hotel in

9    Moscow, Tverskaya, T-V-E-R-S-K-A-Y-A.

10   Q.  And can you tell from looking at that document what the

11   dates were of the stay?

12   A.  Yes.  It has an arrival and departure date.

13   Q.  What are those dates?

14   A.  The arrival date appears to be April 11th, 2021; the

15   departure date, April 26th of 2021.

16   Q.  And did that precede Mr. Sterlingov's flight to Los

17   Angeles International Airport?

18   A.  Yes, it did.

19   Q.  Now you can go ahead and place those contents back,

20   keeping the two admitted exhibits on top, I guess.

21   A.  (Witness complies.)

22   Q.  And please examine Exhibits 120 and 120-A and the

23   contents of that envelope.  Go ahead and open it and examine

24   the contents without showing the jury, please.

25   A.  (Witness complies.)

1    Q.  Do you recognize the contents of that envelope?

2    A.  I do.

3    Q.  And are those items that you recall recovering during

4    the search of the Defendant's luggage?

5    A.  Yes, they are.

6    Q.  Are those items in substantially the same condition as

7    they were when you recovered them during the search?

8    A.  Yes.

9             MR. BROWN:  The Government moves --

10   BY MR. BROWN:

11   Q.  Could you separate out -- I believe there're Exhibits

12   premarked 120 and 120-A.

13   A.  (Witness complies.)

14   Q.  It may be Exhibit 120.

15   A.  Yes.  I don't see a 120-A.  It might just be 120.

16   Q.  My apologies.

17             MR. BROWN:  So separately looking at Exhibit 120,

18   the Government moves to admit and publish Exhibit 120.

19             THE COURT:  Any objection?

20             MR. EKELAND:  I have no objection, your Honor.

21             May I ask a question very quickly?

22             Mr. Brown, the exhibit range in that envelope you

23   said was from Exhibit 120 to 120-A?

24             MR. BROWN:  I'm sorry.  I may have misspoke.

25             The only exhibit in this envelope that we want to

```
 1        admit is just Exhibit 120.

 2                   MR. EKELAND:  My question is just, what's the

 3        range of exhibits in the envelope?

 4                   MR. BROWN:  The other items have not been marked

 5        as exhibits --

 6                   MR. EKELAND:  Oh, okay.

 7                   MR. BROWN:  -- and we do not intend to admit them.

 8                   MR. EKELAND:  So if we want to get them later, do

 9        we just refer to what was in Exhibit 120?

10                   THE COURT:  Yes.

11                   MR. BROWN:  Yes.

12                   MR. EKELAND:  So all the exhibits or items that

13        you're not admitting that you've got in these folders would

14        be [indiscernible] --

15                   THE COURT REPORTER:  Counsel, could you please use

16        the microphone?

17                   MR. BROWN:  Your Honor, could we step onto the

18        phones?

19                   THE COURT:  Yes.

20                   So let me just see if I can just cut through this

21        for now.  If we need to get on the phone, we can.

22                   My understanding is there's just one item that is

23        Exhibit 120.  There may be other items in the envelope.

24        You're welcome to confer with counsel afterward.  If there's

25        anything that you want to later admit in the case, you're
```

```
 1    welcome to do that.
 2             Is that a fair statement of where we are?
 3             MR. BROWN:  Yes, your Honor.
 4             THE COURT:  Is there a need to get on the phone
 5    still or does that address it?
 6             MR. BROWN:  I think that addresses it.  Yes, your
 7    Honor.
 8             THE COURT:  Does that clarify things?
 9             MR. EKELAND:  My question was that they would just
10    stay in the same envelope that you're using now.  Is that
11    correct?
12             MR. BROWN:  We can do that, yes.
13             MR. EKELAND:  Thank you.
14             THE COURT:  So without objection, Exhibit 120 is
15    admitted and may be published to the jury.
16             (Whereupon, Government's Exhibit No. 120 was
17    entered into evidence.)
18    BY MR. BROWN:
19    Q.  Mr. Price, could you hold up what has just been -- could
20    you hold up for the jury and the defense what has just been
21    admitted as Exhibit 120.
22    A.  (Witness complies.)
23    Q.  What does 120 appear to be?
24    A.  It appears to be three pages, double-sided, of
25    handwritten notes on graph paper.
```

Price - DIRECT - By Mr. Brown

 1    Q.  And on your screen, I'd like to direct your attention to

 2    Exhibit 120-A, as in alpha.  I apologize for the confusion.

 3              Mr. Price, did IRS scan copies of Exhibit 120?

 4    A.  Yes, they did.

 5    Q.  And what -- do you recognize the exhibit shown at

 6    Exhibit 120-A?

 7    A.  I do.

 8    Q.  And what is Exhibit 120-A?

 9    A.  It is a scanned copy of the notes I held up in

10    Exhibit 120.

11              MR. BROWN:  The Government moves to admit and

12    publish Exhibit 120-A.

13              THE COURT:  Any objection?

14              MR. EKELAND:  No objection, your Honor.

15              THE COURT:  Exhibit 120-A is admitted and may be

16    published to the jury.

17              (Whereupon, Government's Exhibit No. 120-A was

18    entered into evidence.)

19    BY MR. BROWN:

20    Q.  Mr. Price, let's just scroll through this document.

21    Describe what you see on this document.

22    A.  Again, I see handwritten notes in several different

23    colors of ink with some of them crossed out and what appears

24    to be Russian language-text, handwritten.

25              MR. BROWN:  If I could ask -- ask us to go back up

```
 1    to the previous page, please.  Stop there.
 2    BY MR. BROWN:
 3    Q.  Do you see any English -- a little further down -- do
 4    you see any English text?
 5              MR. BROWN:  A little further down, please.
 6    BY MR. BROWN:
 7    Q.  Towards the top of the page.
 8    A.  I do.
 9    Q.  What English text do you see?
10    A.  It appears to say "ETH staking."
11    Q.  Do you recognize "ETH" as an acronym for anything?
12    A.  Yes.
13    Q.  What is it?
14    A.  It's the commonly used shortened version of Ethereum,
15    which is another cryptocurrency.
16              MR. BROWN:  We can put that away.
17    BY MR. BROWN:
18    Q.  Moving on to Exhibit 119, could you examine the contents
19    of that envelope without showing the jury, please.
20    A.  It was Exhibit 119, correct?
21    Q.  Yes.
22    A.  Okay.
23    Q.  Do you recognize those items?
24    A.  I do.
25    Q.  Are those items you recall recovering during the search
```

1    of the Defendant's luggage?

2    A.  They are.

3    Q.  Are those items in substantially the same condition as

4    they were when you recovered them?

5    A.  Yes.

6            MR. BROWN:  The Government moves to admit

7    Exhibit 119.

8            THE COURT:  Any objection?

9            MR. EKELAND:  No objection, your Honor.

10           THE COURT:  Exhibit 119 is admitted and may be

11   published to the jury.

12           (Whereupon, Government's Exhibit No. 119 was

13   entered into evidence.)

14   BY MR. BROWN:

15   Q.  Mr. Price, could you hold those up for the jury and the

16   defense and briefly describe what they are.

17   A.  They are multiple pages of handwritten notes in

18   multicolored ink on primarily graph paper.  Most of the

19   pages are identical.  The one has an orange border on it and

20   holes punched in it.

21   Q.  Now, directing your attention on the screen to

22   Exhibit 119-A, do you see that exhibit?

23   A.  Not yet.

24           MR. BROWN:  The Court's indulgence.

25           THE WITNESS:  Yes, I do.

```
 1                  MR. BROWN:  Briefly scroll through, please.

 2     BY MR. BROWN:

 3     Q.  Do you recognize Exhibit 119-A?

 4     A.  I do.

 5     Q.  And what do you recognize it to be?

 6     A.  Scanned copies of the documents I held up from

 7     Exhibit 119.

 8     Q.  And do these scanned copies -- are they true -- is it a

 9     fair and accurate re-creation of Exhibit 119?

10     A.  Yes.

11                  MR. BROWN:  The Government moves to admit and

12     publish Exhibit 119-A.

13                  THE COURT:  Any objection?

14                  MR. EKELAND:  No objection, your Honor.

15                  THE COURT:  Exhibit 119-A is admitted and may be

16     published to the jury.

17                  (Whereupon, Government's Exhibit No. 119-A was

18     entered into evidence.)

19     BY MR. BROWN:

20     Q.  Mr. Price, could you just generally describe what is

21     shown on these pages.

22     A.  Yes.  Scanned copies of the document I recently showed

23     that have handwritten text in multiple colors in what

24     appears to be the Russian language.

25                  MR. BROWN:  Could we make sure that's published
```

1    for the jury, please.  I'm sorry.

2    BY MR. BROWN:

3    Q.  Could you repeat your answer.

4    A.  Certainly.

5            Again, it appears to be scanned copies of the

6    documents in Exhibit 119, consisting of handwritten text in

7    numerous ink colors in what appears to be the Russian

8    language.

9            MR. BROWN:  We can close that out.

10   BY MR. BROWN:

11   Q.  Then I believe this is our last envelope.  Could you

12   examine the contents of Exhibit 121.

13   A.  Yes.

14   Q.  Without showing the jury, please.

15   A.  (Witness complies.)

16   Q.  And I believe there's an exhibit premarked Exhibit 121.

17   A.  I apologize.  The marking may have fell off.

18   Q.  Is there a document of notes in that group of papers?

19   A.  I'm sorry.  Document -- handwritten notes?

20   Q.  Yes.

21           THE COURT:  You can approach as well if you'd

22   like.

23           MR. BROWN:  (Assists the witness.)

24           MR. EKELAND:  May Mr. Sterlingov have a look at

25   the exhibit?

 1                THE COURT:  He may.

 2                MR. EKELAND:  No objection, your Honor.

 3                THE COURT:  What exhibit number was that?  Or are

 4     we adding one or putting one on it?

 5                MR. BROWN:  This has now been postmarked, not

 6     premarked, as Exhibit 121.

 7                THE COURT:  Exhibit 121 is admitted and may be

 8     published to the jury.

 9                (Whereupon, Government's Exhibit No. 121 was

10     entered into evidence.)

11     BY MR. BROWN:

12     Q.  Mr. Price, could you show that to the jury, please.

13     A.  (Witness complies.)

14     Q.  Directing your attention to Exhibit 121-A on your

15     screen, does this appear to be the same document?

16     A.  This may be the previous exhibit.  I'm not sure.

17                MR. BROWN:  The Court's indulgence, your Honor.

18                THE WITNESS:  My apologies.  I think I pulled the

19     wrong document.  It was stuck in the envelope.

20     BY MR. BROWN:

21     Q.  Why don't we do it this way:  Could you examine on your

22     screen Exhibit 121-A, which appears to be two pages?

23     A.  Yes.  I see that.

24                MR. BROWN:  Then we will re-mark -- your Honor,

25     may I approach?

```
 1                THE COURT:  You may approach.

 2                MR. BROWN:  (Assists the witness.)

 3                MR. EKELAND:  Your Honor, just for clarification,

 4     because what was marked as 121 and that Government counsel

 5     just removed the exhibit number from was moved into

 6     evidence.  So that right there is in evidence.  So perhaps

 7     we should either renumber, or are we taking this out of

 8     evidence?  I just want the record to be clear.

 9                THE COURT:  I appreciate that.

10                MR. BROWN:  Yes, your Honor.

11                Thank you, Mr. Ekeland.

12                The Government moves to withdraw what has

13     previously been marked as Exhibit 121.

14                THE COURT:  121 is withdrawn?

15                MR. BROWN:  If the Court will bear with me, let's

16     re-mark it.

17                THE COURT:  You may admit it, I suppose.  But just

18     for clarity, I'll withdraw it for now.  If you want to

19     readmit it, you can.

20                MR. BROWN:  Why don't I re-mark this to avoid

21     confusion.

22                THE COURT:  All right.

23                MR. BROWN:  We want to make sure we're keeping

24     track of everything.

25                Your Honor, may I approach?
```

```
1              THE COURT:  You may.

2              MR. BROWN:  (Assists the witness.)

3    BY MR. BROWN:

4    Q.  Mr. Price, so in your hand are you holding what has now

5    been marked as Exhibit 121-D, as in delta?

6    A.  Yes.

7    Q.  And does Exhibit 121 appear to match what's shown on

8    your screen, which is Exhibit 121-A?

9    A.  It does.

10             THE COURT REPORTER:  I don't know if that was

11   clear.  Did you say number 121 matches 121-A or 121-D?

12             MR. BROWN:  What I meant to say -- I'm not sure if

13   that's what I said was --

14   BY MR. BROWN:

15   Q.  Does Exhibit 121-D appear to match Exhibit 121-A?

16   A.  Yes, it does.

17             MR. BROWN:  The Government moves to admit

18   Exhibit 121-D.

19             THE COURT:  Any objection?

20             MR. EKELAND:  No objection, your Honor.

21             THE COURT:  121-D is admitted and may be published

22   to the jury.

23             (Whereupon, Government's Exhibit No. 121-D was

24   entered into evidence.)

25
```

Price - DIRECT - By Mr. Brown

```
 1      BY MR. BROWN:

 2      Q.  Mr. Price, could you show the jury the physical item,

 3      Exhibit 121-D.

 4      A.  (Witness complies.)

 5      Q.  And go ahead -- you can place that back in the envelope.

 6      A.  (Witness complies.)

 7      Q.  That should conclude the envelope items.

 8                  MR. EKELAND:  Is that all of the envelopes?

 9                  MR. BROWN:  Yes, it is.

10                  MR. EKELAND:  Thank you.

11                  May we go back?

12                  THE COURT:  You may retake your seats.

13                  (Mr. Ekeland and the Defendant retake their

14      seats.)

15                  MR. BROWN:  Just to make sure that it's published

16      for the jury, could we examine what's been previously

17      admitted as Exhibit 121-A.

18      BY MR. BROWN:

19      Q.  Mr. Price, could you just describe what is shown on

20      Exhibit 121-A?

21      A.  Yes.  This is a scanned copy of the previous document I

22      showed with handwritten notes.

23      Q.  Thank you.

24                  Moving on --

25                  THE COURT:  Is 121-A in evidence?  I just want to
```

1    make sure we're doing this right.

2            MR. BROWN:  If it's not, I will move it into

3    evidence.

4            THE COURT:  Any objection?

5            MR. EKELAND:  I don't think so, but I've lost

6    track.

7            THE COURT:  It's on the screen in front of you.

8            MR. EKELAND:  Oh, no objection.

9            THE COURT:  121-A is admitted and may be published

10    to the jury.

11            (Whereupon, Government's Exhibit No. 121-A was

12    entered into evidence.)

13            MR. BROWN:  Thank you, your Honor.

14    BY MR. BROWN:

15    Q.  Now, Mr. Price, are you familiar with the registration

16    requirements for money services businesses under the Bank

17    Secrecy Act?

18            MR. EKELAND:  Objection, your Honor.

19            THE COURT:  Well, this is just a foundational

20    question.  We'll see what the next question is.  This one's

21    okay.

22    BY MR. BROWN:

23    Q.  Are you familiar with the registration requirements for

24    money services businesses under the Bank Secrecy Act?

25    A.  Yes, I am.

1    Q.  How are you familiar with that?

2    A.  Part of my duties as a special agent with IRS-Criminal

3    Investigation was enforcing Bank Secrecy Act violations.  I

4    received specialized training in BSA violations and

5    investigations of the violations of the Bank Secrecy Act.

6    Q.  And what agency with the Federal Government are you

7    required to register with, if you're operating a money

8    services business?

9            MR. EKELAND:  Objection, your Honor.

10           THE COURT:  Overruled.

11           THE WITNESS:  The Bureau of the United States --

12    it's the Bureau of the U.S. Department of Treasury.  It's

13    the Financial Crimes Enforcement Network.

14    BY MR. BROWN:

15    Q.  And during the course of your investigation, did you

16    check whether Bitcoin Fog or Roman Sterlingov submitted a

17    money services business registration with FinCEN?

18    A.  Yes, I did.

19    Q.  And how did you check?

20    A.  Both searching the FinCEN portal, which is a database

21    law enforcement can access, as well as submitting an

22    official request to FinCEN for a search of those records.

23    Q.  And what did that search reveal?

24    A.  It revealed there were no licenses or applications from

25    Mr. Sterlingov.

1    Q.  Does FinCEN also provide official certified records

2    regarding money services business registration?

3    A.  Yes, they do.

4              MR. BROWN:  Now, your Honor, may I approach?

5              THE COURT:  You may.

6    BY MR. BROWN:

7    Q.  Mr. Price, do you recognize these documents?

8    A.  Yes, I do.

9    Q.  Are these official certified records from FinCEN?

10   A.  Yes, they are.

11             MR. BROWN:  The Government moves to admit Exhibit

12   35-A.

13             THE COURT:  Any objection?

14             MR. EKELAND:  Yes, your Honor.  Could we pick up

15   the phone on this one?

16             THE COURT:  Yes.

17             (Whereupon, the following bench conference was

18   held:)

19             MR. EKELAND:  I'm sorry, your Honor.

20             So Exhibit 35-A, if the Court has it in front of

21   them --

22             THE COURT REPORTER:  I'm sorry.  Counsel, could

23   you speak a little louder.

24             THE COURT:  She can't hear you.

25             MR. EKELAND:  Can you hear me?

```
 1                    THE COURT REPORTER:  Barely.

 2                    THE COURT:  She wants you to speak up.

 3                    MR. EKELAND:  I know.  I just wanted to make sure

 4        the jury couldn't hear.

 5                    Exhibit 35-A says that Roman Sterlingov is a/k/a

 6        Akemashite Omedetou.  There's been -- A, obviously the

 7        defense disputes that.  There's been no function for that.

 8        This is not the proper witness for that.  I think the Court

 9        is acknowledging that there's a number of objections here,

10        particularly 403, lack of foundation.  It's hearsay, a whole

11        number of things.  So we object on that ground.

12                    THE COURT:  Mr. Brown, "a/k/a" does strike me as a

13        fair objection.  We haven't established that, and I'm not

14        sure how this document does that.  Do you want to do that

15        later in the case?  Maybe there's a way just to redact this

16        document and admit it without the a/k/a.

17                    MR. BROWN:  Your Honor, these are official

18        certified government records from FinCEN.  They're

19        self-authenticating records.

20                    THE COURT:  It's not a question of authentication.

21        I think it's a question of whether this is -- it's a very --

22        as I understand it, it's a central question of fact in this

23        case.  And the question is whether this is a proper way of

24        moving that issue and whether a limiting instruction would

25        be adequate under these circumstances.
```

 1              I don't doubt the authenticity.  The rest of the

 2      document is admissible.  I just think that one sentence,

 3      that one line, may be a problem.

 4              MR. BROWN:  Well --

 5              MR. EKELAND:  Your Honor --

 6              I'm sorry, Mr. Brown.

 7              MR. BROWN:  Your Honor, so I mean, these are

 8      official certified records.  I don't --

 9              THE COURT:  If you had an official certified

10      record that, Oh, by the way, he's guilty, that wouldn't make

11      it admissible.

12              MR. BROWN:  Your Honor, the a/k/a simply refers to

13      search terms by which FinCEN was searching for positive

14      responses.  It's not intended to be an accusatory document.

15      This simply shows that neither Roman Sterlingov nor somebody

16      by the name of Akemashite Omedetou has registered with

17      FinCEN.

18              You know, if you want, I can -- your Honor, I

19      mean, at worst I think we could redact just the a/k/a field.

20              THE COURT:  That's all I was suggesting.

21              MR. EKELAND:  Your Honor, we would even object to

22      that, because then the jury is going to wonder what's in the

23      redaction.  There's nothing stopping the Government from

24      simply getting a new certificate that doesn't have the a/k/a

25      Akemashite Omedetou.  As the Court says, just because

1    something has been certified as authentic doesn't make it

2    admissible.  It's such an issue in this case.  It's

3    argumentative.  It lacks a foundation.

4            THE COURT:  No, no.  I'm with you on that point.

5    I disagree with you about the redaction, because there's

6    going to be lots of material that's redacted in this case.

7    And in every case there's material that's redacted.

8            And I always instruct the jury -- and I believe

9    they follow my instruction -- that they shouldn't speculate

10    about what's redacted, that they shouldn't speculate about

11    it.  So I think as long as it's redacted, it doesn't strike

12    me as a problem.

13            MR. EKELAND:  Just for the record, your Honor,

14    understood.  We just for the record want to object to it as

15    a redacted document as well.

16            THE COURT:  That's fine.

17            Can you do that?  We can take our afternoon break

18    right now, Mr. Brown, if you want to try and adjust the

19    document.

20            MR. BROWN:  Your Honor, I am a little bit

21    concerned about the effect of redacting this, this being an

22    official government document.  But if it does appear as

23    redacted, is that going to somehow affect the way the jury

24    considers the force of this in proving, you know, literally

25    one element of our case, which, by the way, the defense has

 1    stipulated to?

 2              THE COURT:  I'm sorry.  They stipulated that

 3    Mr. Sterlingov is Akemashite Omedetou?

 4              MR. BROWN:  No, your Honor.  They stipulated to --

 5              THE COURT:  I understand.  I understand.

 6              But that gets back then to Mr. Ekeland -- if you

 7    want to, you could get a different version of it without

 8    this, or you could even redact it in a way probably where it

 9    is not terribly obvious.  If you redact it here, it's just

10    white under that, that portion, without a black redaction.

11    If you used white tape and make a copy of it and scan it

12    back in, we can provide you with some materials if you need

13    it.  You can then just enter it.  There would be a space,

14    but that's about it.

15              MR. BROWN:  Okay, your Honor.  We can certainly

16    follow the redaction rule.

17              I do want to just register my objection that the

18    defense waited until we were in trial to sandbag us on this

19    discovery, which has been in their possession.  They could

20    have moved to exclude it.  They knew that this was going to

21    come up.  And they waited until trial to bring this up.  And

22    again, the Government, you know, believes this is unfair

23    gamesmanship and an unfair surprise.

24              MR. EKELAND:  Your Honor, the defense certainly is

25    allowed to make evidentiary objections at trial.  There is a

 1    gigantic volume of discovery in this case.  We had -- this

 2    is very surprising to me.

 3              THE COURT:  I understand that it's trial and we're

 4    all tired and being a bit short.  But I think we're wasting

 5    our time with this.  I think if you want to proceed, let's

 6    redact it out.  We can take our afternoon break now, which

 7    is probably a good time anyway, and you can redact it and

 8    then we'll come back.

 9              MR. BROWN:  Yes, your Honor.

10              THE COURT:  Thank you.

11              MR. EKELAND:  Thank you, your Honor.

12              (Whereupon, the following proceedings were had in

13    open court:)

14              THE COURT:  Members of the jury, we're just going

15    to take our afternoon break now.  It's 3:20.  Why don't we

16    come back at 20 minutes before 4:00.

17              Don't discuss the case, even amongst yourselves.

18    Don't conduct any type of research.  I'll see you back here

19    shortly.

20              (Whereupon, the jury exited the courtroom at 3:18

21    p.m. and the following proceedings were had:)

22              THE COURTROOM DEPUTY:  You may be seated.

23              THE COURT:  You're welcome to take your break as

24    well.

25              THE WITNESS:  Thank you, your Honor.

Price - DIRECT - By Mr. Brown

 1          (Thereupon, Matthew Price retired from the

 2    courtroom and the following proceedings were had:)

 3          THE COURT:  When I referred to us as being tired

 4    and perhaps being too short at times, I should include

 5    myself in that.

 6          I apologize to Mr. Ekeland for my comments before

 7    the jury was present expressing disbelief about his

 8    position.  I shouldn't have done that and, in fact, I don't

 9    know one way or the other what your belief is.  So I

10    apologize to you for that.

11          I have looked at the rule a little bit more here,

12    more carefully.  And it actually appears that the rule was

13    amended, perhaps not in substantive effect, since the *Redman*

14    decision, and it no longer actually contains the language of

15    waiver in it.  But what it does say is that a motion to

16    suppress must be raised pretrial.  And then in 12(c), it

17    indicates that if a party does not meet the deadline for

18    making a Rule 12(b)(3) motion, the motion is untimely.

19          So I think the question is one of untimeliness,

20    where the question then is whether there's good cause, which

21    is the usual approach to questions of untimeliness.  And

22    that also mirrors, I think, the language of the rule which

23    then goes on and says, "but a court may consider a defense

24    objection or request if the party shows good cause."

25          So as I read the rule here -- and this is one of

1    the disadvantages of doing things like this mid-trial,

2    because I don't have the chance to do as much research as I

3    would like.  But as I read the rule, the first question is

4    whether this was a motion that was required to be raised

5    pretrial.  It certainly is on the list as a

6    suppression-of-evidence motion based on an alleged *Miranda*

7    violation.

8         And the only exception to that in the rule itself

9    is if the basis for the motion -- the basis for the motion

10   is not then reasonably available.  And I don't have any

11   reason to think that the basis for the motion was not

12   reasonably available.

13        And then I think Mr. Ekeland may have pointed me

14   to Rule 12(a)(4), which says:  At an arraignment or as soon

15   after as practical, the Government may notify the Defendant

16   of its intent to use specified evidence at trial in order to

17   afford the Defendant an opportunity to object under

18   12(b)(3)(C).

19        That is notably a "may."  And presumably, it's

20   there to give the Government some greater assurance that

21   they're not going to face surprise at trial.

22        But to my mind, it's actually the next portion

23   which is perhaps most relevant here, is Rule 12(b)(4)(B),

24   which says:  At the arraignment or as soon afterwards as

25   practical, the Defendant may, in order to have the

1    opportunity to move to suppress evidence under Rule

2    12(b)(3)(C), request notice of the Government's intent to

3    use in its evidence in chief at trial any evidence the

4    Defendant may be entitled to discover under Rule 16.

5          And so the defense, I think, had the opportunity

6    to request the information from the Government in order to

7    facilitate its opportunity to bring the motion.

8          So I guess in light of all that, the question then

9    is whether the defense can show good cause for having failed

10   to bring the motion pretrial.

11         But if anyone thinks I'm misreading this or have

12   this wrong, you should let me know.

13         MR. EKELAND:  No, your Honor.

14         But I just need to go -- I honestly can't

15   remember -- this case has been going on for so long, I

16   honestly can't remember if we actually asked for that

17   because I think we -- I have some vague memory of filing

18   that, but I can't remember.  So I just would like the

19   opportunity to check.

20         THE COURT:  I'll -- over the break you can take a

21   look.

22         MR. BROWN:  Your Honor, so the defense -- and I

23   think it may have been the former local counsel who was

24   previously on this case -- they filed what was styled as a

25   motion under 12(b)(4)(B).

```
 1                   THE COURT:  Okay.  That's what I'm talking about.

 2                   MR. BROWN:  However -- and we opposed it based on

 3        the idea that this was procedurally improper.

 4                   You can't just ask for a blanket notice months in

 5        advance of trial, you know, for all of the Government's

 6        evidence.

 7                   THE COURT:  Right.  And I don't --

 8                   MR. BROWN:  Chief Judge Howell has explained this

 9        in her decision in --

10                   THE COURT:  I don't disagree with that

11        proposition.  I think that this is presumably much more

12        targeted to my mind --

13                   MR. BROWN:  Yes.

14                   THE COURT:  -- where a defense lawyer says, I know

15        my client made a statement to law enforcement.

16                   I would move to suppress that if I thought you

17        were using it, tell me where to use it.  That type of thing.

18                   But where they have some basis to think that they

19        would -- might want to file a motion and want to know

20        whether the Government intends to use it in its case in

21        chief, assuming that they know of the evidence -- and here,

22        they presumably knew of the evidence.

23                   If they don't know of the evidence, that's a

24        different matter entirely.  And where if comes to them as a

25        complete surprise at trial, obviously, that would either not
```

1    violate the rule because they couldn't -- it wasn't

2    reasonably available to them or there would be good cause.

3         So here, this is a circumstance where you need to

4    tell me if I'm wrong about this. But my assumption is that

5    the defense had the evidence. It was produced to the

6    defense. The defense was aware of it. And the question is

7    just whether the defense should have said to the Government,

8    Do you plan to use this at trial, if they had any question

9    about that.

10        MR. BROWN: Yes, your Honor. That's fine.

11        THE COURT: Mr. Ekeland?

12        MR. EKELAND: I do think it was produced to us,

13   unless I go back and I look and I see somehow I made some

14   mistake. But I think the Court's correct on that.

15        And I honestly can't remember what's in our

16   12(b)(4) motion. I need to look at that, too.

17        THE COURT: That's fine.

18        MR. EKELAND: I'm a little bit hesitant about my

19   argument.

20        THE COURT: We can just come back to this.

21        MR. EKELAND: Yeah. I would appreciate that, if I

22   could just maybe take a look at this overnight so I can give

23   an honest answer to the Court.

24        THE COURT: Well, I don't know -- is

25   Mr. Price going to still be on the stand tomorrow?

```
 1                    MR. BROWN:  No, your Honor.

 2                    THE COURT:  So I think you may need to look at it

 3        at the break now.  Hopefully, you have access to your

 4        motions materials.  If you need a little additional time, we

 5        can do that.  But otherwise, he's not going to be on the

 6        stand anymore.

 7                    MR. EKELAND:  I may be still crossing him tomorrow

 8        if we're breaking at 4:30.

 9                    THE COURT:  Right.

10                    MR. EKELAND:  So then the Government could address

11        this on redirect.

12                    MR. BROWN:  Well, it would --

13                    THE COURT:  Assuming you're waiving any objection

14        to it being outside the scope of your cross?

15                    MR. EKELAND:  For this purpose, that's fine.  Yes.

16        Yes.

17                    THE COURT:  Mr. Brown, is that acceptable to you?

18                    MR. BROWN:  That's acceptable to us --

19                    THE COURT:  Okay.

20                    MR. BROWN:  -- if the Court isn't going to make a

21        decision today.  We would prefer to do it on direct just

22        because we -- this is direct and this is --

23                    THE COURT:  I understand that.  I just want to

24        make sure that I'm getting this right.

25                    The other thing I will say is -- and I'm doing
```

1    research while I'm on the bench here -- but I'm doubtful

2    that Mr. Sterlingov actually had been arrested within the

3    legal meaning of arrest at the time.  And given the fact

4    that Mr. Ekeland did open by saying before his arrest the

5    Government did not ask him anything -- I'd have to go back

6    and look at that and remind us exactly what the phrasing was

7    and what Mr. Ekeland said in his opening.

8            But my understanding of what constitutes an arrest

9    is it's on the continuum from a *Terry* stop, you know, on

10   forward.  There are various forms of seizures, and the

11   arrest is the stage at which the restraint on liberty as an

12   objective matter becomes most severe or extreme.  And it

13   doesn't require using the words "You're under arrest."  It

14   might be, you know, "Spread 'em" or throwing somebody up,

15   you know, on the wall and putting a handcuff on them or

16   something like that and it's clear they're under arrest at

17   that stage.

18           I think a conversation with somebody -- a Customs

19   officer at the airport is unlikely to constitute an arrest

20   even if there was an arrest warrant that a different law

21   enforcement agency had at the time.  But that's just

22   something else that is a potential issue for us to get our

23   heads around.

24           And the first step in this may be going back and

25   seeing exactly what it was that Mr. Ekeland said in his

1    opening.

2            MR. BROWN:  Yes, your Honor.

3            THE COURT:  All right.  But it may be we don't

4    even reach that under Rule 12.  But we'll see.

5            MR. BROWN:  Yes, your Honor.

6            So, your Honor, to be clear, in terms of -- is

7    there a work product -- does the Court want -- we could

8    provide written briefing or simply come back and, you know,

9    resolve this?

10           THE COURT:  I'm not sure there's time for briefing

11   on this.  I don't want to have to bring Mr. Price back on

12   this.  I think, frankly, it highlights it more than it

13   deserves.  And my impression of this is that it's not the

14   most critical evidence in the case, at least the way it's

15   been described to me, and probably not worth highlighting my

16   bringing a witness back just to offer this testimony.

17           So I'd like to resolve it today.  But both teams

18   have more than one lawyer; and if you can do some quick

19   research and find anything that can help inform my decision

20   and make sure I don't make a mistake, I would be

21   appreciative.  And I want to make sure Mr. Ekeland does have

22   a chance to go back and at least look at the filing.

23           And, Mr. Brown, if you can point him to it, that

24   might expedite things, too, or someone on the Government

25   team can point Mr. Ekeland just to the docket number of the

1    motion so he can look at that.  That's easy enough.

2              MR. BROWN:  Yes, your Honor.

3              And to be clear, I don't think that there's much

4    more that we would want to put in front of the Court other

5    than just the plain text of the rule and, you know, the lack

6    of, you know, a showing of good cause for the untimely --

7              THE COURT:  Does everyone agree with my

8    interpretation of the rule?

9              MR. BROWN:  The Government does, your Honor.

10             THE COURT:  Mr. Ekeland?

11             MR. EKELAND:  Yes.  Right now.  Without having

12   done the research, it doesn't strike me at all as

13   unreasonable.  If I see something tonight that changes my

14   opinion, of course, I'll say something to the Court.

15             I would just like to add, your Honor, I'm under

16   the understanding that Mr. Sterlingov was not in a position

17   to leave anywhere.  He's landing on a plane at LAX I think

18   like around 10:30, 11:00 at night.  It was made very clear

19   to him by the circumstances that he wasn't in a position to

20   leave; and the nature of the questioning that I'm

21   understanding that he was asked gave him the distinct

22   impression that leaving was not an option.

23             THE COURT:  Well, I think that there's lots of

24   case law that uses that language, whether someone feels free

25   to leave.  And there's even more case law that says that

Price - DIRECT - By Mr. Brown

1    that is actually not really a fairly accurate description of

2    the test.

3              And the reason for that is, if you're in a traffic

4    stop, you're not free to leave.  But it doesn't necessarily

5    constitute being in custody when you're pulled over by a

6    police officer on the side of the road.

7              If you're in jail on other charges, you're not

8    free to leave.  But it doesn't necessarily mean if the

9    police officer is saying, We'd like to talk with you about a

10   different case, that you're necessarily in custody for those

11   purposes and that there's a test that turns on all the

12   circumstances.

13             And I think the same thing is true -- and there's

14   also a fair amount of law on this -- in particular, in the

15   airport.  And not every person who is standing in line

16   having arrived on a foreign flight and standing in line

17   waiting to get through Customs is in custody when they do

18   so, even though there may not be another plane back to

19   wherever they came from for hours or days.  And they're not

20   free to certainly enter the United States without clearing

21   Customs.

22             So even if he didn't feel like he had a great

23   option of getting back on a plane and going back to Russia

24   at that point in time, it's not clear to me that that means

25   that he was in custody.

1          But that is getting to the merits of the dispute.

2     And I think the first question is just whether it was -- it

3     should have been raised pretrial.

4          And I will tell you that the D.C. Circuit, quoting

5     from *Miranda* itself, notes that what the Court has to ask is

6     whether the -- as an objective matter the person was not at

7     liberty to terminate the interrogation and leave.

8          And I think even if somebody is in an airport

9     where Customs is asking the questions, they may well be in a

10    position at which they can say, you know, I don't need this.

11    I'm getting back on a plane and going back to where I came

12    from.

13         So I don't know the answer to the question.  I

14    think that question -- that's the reason for the problem

15    here, because I think to answer to the question fully, I

16    would have to have a hearing, which would potentially take a

17    couple of hours in the middle of trial.  And I think that's

18    the reason for the Rule 12 issue.

19         So I think that's the first hurdle for us to

20    clear.

21         All right?  So I'll give you at least a few

22    minutes for your break now and maybe you can point

23    Mr. Ekeland to the exhibit if you can.  If we can resolve

24    this today and do it on direct, great.  But if we need to do

25    it on redirect in the morning, I'm amenable to that.

```
 1                    MR. BROWN:  Thank you, your Honor.

 2                    THE COURT:  Thank you.

 3                    MR. EKELAND:  Thank you, your Honor.

 4                    How long is the break?  I'm sorry.

 5                    THE COURT:  I'm sorry?

 6                    MR. EKELAND:  What are we back?

 7                    THE COURT:  We were supposed to be back in five

 8      minutes.  But if you need ten minutes to run to the

 9      restroom, that's fine.

10                    MR. EKELAND:  Thank you, your Honor.

11                    (Thereupon a recess was taken, after which the

12      following proceedings were had:)

13                    THE COURTROOM DEPUTY:  Judge, are we ready for the

14      jury?

15                    THE COURT:  We are.  We'll come back to this other

16      issue afterwards.  I just don't want to keep the jury.

17                    MR. BROWN:  Your Honor, I think we do have a

18      proposed accommodation here.

19                    THE COURTROOM DEPUTY:  You may be seated.

20                    THE COURT:  You have a proposed resolution?

21                    MR. BROWN:  Yes, your Honor.  So on the screen

22      here -- so the proposed resolution is two parts.  So one

23      part is redacting the line that would have said a/k/a

24      Akemashite Omedetou.

25                    THE COURT:  That looks good.
```

1          MR. BROWN:  Just if we could show the second page

2     of this.

3          Just so the Court understands, what FinCEN --

4     these are basically search terms that FinCEN searched, the

5     different identifiers, and then certified that there was no

6     responsive record.

7          So Part 1 would be redacting the a/k/a to address

8     that we're not -- that there's no implication of association

9     necessarily.

10          THE COURT:  Right.

11          MR. BROWN:  And Part 2 would be that we would

12     stipulate -- and I can read it into the record, I think --

13     that the parties stipulate and agree that FinCEN also

14     conducted a search for any MSB registration in the name of

15     Akemashite Omedetou and found no responsive records.

16          THE COURT:  Okay.  That's fine.

17          MR. EKELAND:  That's correct, your Honor.

18          THE COURT:  Okay.  Then on the other issue that we

19     were talking about, rather than keeping the jury waiting,

20     let's just talk about that after we're done.

21          MR. EKELAND:  We have a quick resolution for that.

22          THE COURT:  Excellent.  That's perfect.

23          MR. EKELAND:  It's very simple.  We're just going

24     to withdraw the objection.

25          THE COURT:  Okay.

```
1              MR. EKELAND:  There you go.

2              THE COURTROOM DEPUTY:  All rise.

3              (Whereupon, the jury entered the courtroom at 3:56

4    p.m. and the following proceedings were had:)

5              THE COURTROOM DEPUTY:  You may be seated and come

6    to order.

7              THE COURT:  You may continue.

8    BY MR. BROWN:

9    Q.  Mr. Price, on the screen in front of you, we have an

10   exhibit that has been marked as 35-C, as in Charlie.

11             Do you see that in front of you?

12   A.  Yes, I do.

13   Q.  And do you recognize -- it's two pages.  Just take a

14   look at both of these pages.

15             Do you recognize this exhibit?

16   A.  Yes, I do.

17   Q.  And is this an official certified record from FinCEN?

18   A.  It is.

19   Q.  On the first page, could you read -- are there -- could

20   you read that first paragraph and then pause?

21   A.  Yes.  "As the federal government agency with primary

22   responsibility for maintaining reports filed pursuant to the

23   Bank Secrecy Act, 31 United States Code Section 5311, the

24   Financial Crimes Enforcement Network has conducted a

25   diligent search for any FinCEN Form 107, registration of
```

1    money services business, under its control that relate

2    to..."

3    Q.  And then beneath that text, are there a series of

4    identifiers visible there?

5    A.  There are.

6    Q.  Okay.  And --

7            MR. BROWN:  Your Honor, move to admit and publish

8    Exhibit 35-C.

9            THE COURT:  Any objection?

10           MR. EKELAND:  No objection, your Honor.

11           THE COURT:  Exhibit 35-C is admitted and may be

12   published to the jury.

13           (Whereupon, Government's Exhibit No. 35-C was

14   entered into evidence.)

15   BY MR. BROWN:

16   Q.  And sorry, Mr. Price.  Could you just -- with your

17   finger, could you just indicate the text that you just read

18   on this exhibit.

19   A.  Yes.  The paragraph here in the center that I just

20   circled.

21   Q.  Beneath that text, are there a series of identifiers

22   visible there?

23   A.  There are.

24   Q.  And could you read those identifiers?

25   A.  It states:  Subject:  Roman Sterlingov.  Date of birth:

1    August 14, 1988.  And what appears to be a passport number

2    from Sweden.

3    Q.  And then what does it say beneath there?

4    A.  "The above search of our records found no forms filed by

5    or on behalf of the above-listed individual from January

6    1st, 2011, through April 27th, 2021."

7            MR. BROWN:  Could you clear that off the screen?

8    And then let's look at Page 2.

9    BY MR. BROWN:

10   Q.  Could you read the block of text starting, "As the

11   federal government"?

12   A.  "As the federal government agency with primary

13   responsibility for maintaining reports filed pursuant to the

14   Bank Secrecy Act, 31 United States Code Section 5311, the

15   Financial Crimes Enforcement Network has conducted a

16   diligent search for any FinCEN Form 107, registration of

17   money services business, under its control that relate

18   to..."

19   Q.  And then is there an identifier beneath?

20   A.  There is.

21   Q.  And what is that identifier?

22   A.  It says:  Subject:  Bitcoin Fog.

23   Q.  And then what is printed below?

24   A.  "The above search of our records found no such forms

25   filed by or on behalf of the above-listed entity from

 1    January 1, 2011, through April 27, 2021."

 2              MR. BROWN:  We can close that out.

 3    BY MR. BROWN:

 4    Q.  Moving on to the next topic:  Mr. Price, are you

 5    familiar with the licensing requirements for money

 6    transmitters under the D.C. Money Transmitters Act?

 7    A.  Yes, I am.

 8    Q.  And do most states have licensing requirements for

 9    money-transmitting businesses?

10              MR. EKELAND:  Objection, your Honor.

11              THE COURT:  I'll allow this one.

12    BY MR. BROWN:

13    Q.  If you know, do most states have licensing requirements

14    for money-transmitting businesses?

15    A.  To the best of my knowledge, yes, they do.

16    Q.  And in the District of Columbia, what agency are you

17    required to obtain a license from if you're operating a

18    money-transmitting business?

19    A.  The Department of Insurance, Securities and Banking.

20    Q.  Is that sometimes referred to as DISB?

21    A.  Yes, it is.

22    Q.  During the course of your investigation, did you check

23    whether Bitcoin Fog or Roman Sterlingov obtained a money

24    transmitter's license from DISB?

25    A.  Yes, I did.

```
1    Q.  How did you check?

2    A.  I searched the DISB database of registrants and also

3    submitted an official request for a records search.

4    Q.  Can DISB also provide an official certification

5    regarding money-transmitter licensing in the District of

6    Columbia?

7    A.  Yes, they can.

8              MR. BROWN:  The Court's indulgence.

9    BY MR. BROWN:

10   Q.  Mr. Price, could you look on your screen at Exhibit

11   36-A?

12   A.  I see it.

13   Q.  And do you recognize this document?

14   A.  I do.

15   Q.  And what do you recognize it to be?

16   A.  It appears to be a certified record from the Department

17   of Insurance, Securities and Banking, money-transmitter

18   license verification, and several screenshots that appear to

19   be database searches related to this document.

20   Q.  Is this electronic copy a fair and accurate copy of the

21   official government record provided by DISB?

22   A.  Yes.

23             MR. BROWN:  The Government moves to admit and

24   publish Exhibit 36-A.

25             THE COURT:  Any objection?
```

```
1              MR. EKELAND:  No objection, your Honor.

2              THE COURT:  Exhibit 36-A is admitted and may be

3    published to the jury.

4              (Whereupon, Government's Exhibit No. 36-A was

5    entered into evidence.)

6    BY MR. BROWN:

7    Q.  Looking at the first page there, could you read what it

8    says in that second full paragraph starting, "I certify

9    that"?

10   A.  "I certify that, after a search, no record or entry

11   exists in the official records of DISB that indicate Roman

12   Sterlingov or Bitcoin Fog had a money-transmitter license

13   during the time period from October 1, 2011, through April

14   30, 2021."

15   Q.  And what does the next paragraph state?

16   A.  "I certify that the annexed record is a true and

17   accurate copy of an official record of DISB.  I certify that

18   the records described above and attached are an accurate

19   reflection of the records in the possession of the DISB."

20             MR. BROWN:  And if we could scroll down.

21   BY MR. BROWN:

22   Q.  Who is the author of this letter?

23   A.  Monique Kerr.  Her title is licensing manager.

24   Q.  If we could go just one by one through each of the

25   subsequent pages.  What is shown on the second page here?
```

1    A.  This appears to be a screenshot of a database records

2    search.

3    Q.  And what identifier was searched here?

4    A.  In the box titled "Company Name," it states "Bitcoin

5    Fog."

6    Q.  And turning to the next page, are there results for that

7    search?

8    A.  Yes.

9    Q.  What are those results?

10   A.  In bold red text it states:  There are no companies that

11   meet your search criteria.

12   Q.  And then looking at the next page, what is shown here?

13   A.  Another screenshot of a records search.

14   Q.  And what identifiers were searched here?

15   A.  In the box, first name, Bitcoin; last name, Fog.

16   Q.  And then moving to the next page, were there any results

17   for that search?

18   A.  There were none.

19   Q.  And then moving to the page after that, are there

20   identifiers listed here?

21   A.  Yes, there are.

22   Q.  And what identifiers were searched for?

23   A.  In the box company name, Roman Sterlingov.

24   Q.  And then turning to the next page, are there results for

25   that search?

1    A.  It states there are no companies that meet your search

2    criteria.

3    Q.  And then moving to the next page, is there another

4    search?

5    A.  Yes.

6    Q.  And what are the identifiers searched for here?

7    A.  First name is Roman; last name is Sterlingov.

8    Q.  And then turning to the last page, what is shown there?

9    A.  The text states:  There are no individuals that meet

10   your search criteria.

11            MR. BROWN:  We can close that out.

12   BY MR. BROWN:

13   Q.  One last topic:  So going back to the secondary

14   screening by Customs and Border Patrol of Roman Sterlingov,

15   do you have a full recollection of that event?

16   A.  Yes.

17   Q.  And again, during -- so -- sorry.

18            Start from the beginning.  What happened when CBP

19   took Mr. Sterlingov into secondary screening?

20   A.  Mr. Sterlingov was escorted to the secondary screening

21   room at Los Angeles International Airport, and two Customs

22   officers brought him to an examination table.  They had him

23   place his luggage on the table and they proceeded to search

24   his luggage while asking him questions about his travel and

25   plans in the United States.

1    Q.  And where were you when this was happening?

2    A.  I was seated approximately five to seven feet away at an

3    adjoining examination table, along with another special

4    agent and a CBP officer.

5    Q.  Could you hear what was being said between

6    Mr. Sterlingov and the CBP officers?

7    A.  Yes.

8    Q.  What, if anything, did Mr. Sterlingov say about the

9    purpose of his travel?

10   A.  He provided several answers.  I recall him stating that

11   he had planned to travel to Florida to perhaps visit some

12   family and maybe go to Playa del Carmen, Mexico.

13   Q.  And what, if anything, did he say about his employment?

14   A.  I recall him stating that he was a web developer.

15   Q.  Did the topic of flight training come up during the

16   conversation?

17   A.  At one point, yes, it did.

18   Q.  How did it come up?

19   A.  To the best of my recollection, the CBP officers located

20   some sort of document or flight manual and asked

21   Mr. Sterlingov what that was.

22          And he made a comment that he was attending some

23   sort of flight training.

24          MR. BROWN:  Your Honor, the Government passes the

25   witness.

```
 1                THE COURT:  Mr. Ekeland.

 2                MR. EKELAND:  Are we going to 4:30?  I'm happy to

 3       start, but if possible, your Honor, I would just like to --

 4       if we're just going to 4:30, I would prefer just to start

 5       the cross first thing in the morning.  But I will start it

 6       now if the Court --

 7                THE COURT:  I actually think we can go a little

 8       past 4:30.  I'm happy to go until a quarter to 5:00 or

 9       something like that, too.

10                MR. EKELAND:  Okay.

11                          CROSS-EXAMINATION

12       BY MR. EKELAND:

13       Q.  Are you ready, Mr. Price?

14       A.  Yes.

15       Q.  You're not a computer forensics expert.  Correct?

16       A.  I am not a computer investigative specialist.

17       Q.  Right.

18                So all the devices and everything that we just

19       looked at and put out in front of the jury, you didn't do

20       any of the computer forensics examination on them, did you?

21       A.  No.  I gave those devices to the IRS-Criminal

22       Investigation forensics lab for examination.

23       Q.  And you said that -- I believe you said you started this

24       investigation in -- you started -- excuse me.

25                You said that you started on this investigation in
```

1    early 2019?

2    A.  Yes.

3    Q.  And when you joined this investigation, you reviewed the

4    case file?

5    A.  I did.

6    Q.  And when you reviewed the case file, you discovered that

7    this investigation started in early 2015.  Correct?

8    A.  That sounds accurate.

9    Q.  You reviewed everything in the case file?

10   A.  To the best of my recollection, yes.

11   Q.  And you saw the names of other suspects when you

12   reviewed the case file?

13   A.  The name I recall seeing was Roman Sterlingov.

14   Q.  Did you see Andrew White's name?

15   A.  I do recall seeing some reference to that name.  Yes.

16   Q.  And did you also interview someone via the phone who

17   told you about investors into Bitcoin Fog?

18   A.  Yes.

19   Q.  And they didn't tell you Roman Sterlingov's name, did

20   they?

21   A.  No.

22   Q.  And so are you familiar with the NCFTA report?

23   A.  Would you remind me what you're referring --

24   Q.  NCFTA is --

25   A.  -- to with --

```
 1                    THE COURT:  One at a time.

 2                    MR. EKELAND:  I'm sorry, your Honor.

 3                    THE WITNESS:  Again, just confirm for me.  With

 4       NCFTA, what are you referring to?

 5       BY MR. EKELAND:

 6       Q.  I think it's the National Cyber Forensics Training

 7       Association.

 8       A.  I am familiar with that organization.  Yes.

 9       Q.  And Andrew White's name is mentioned prominently in that

10       report.  Correct?

11       A.  I'm not certain what report you're referring to.  I

12       don't recall that report.

13       Q.  So you don't remember one way or the other.

14                    And when you reviewed the case file for this case,

15       you saw that Mr. Sterlingov had been under surveillance in

16       Miami in 2017.  Correct?

17       A.  I do believe a surveillance operation was undertaken,

18       yes.

19       Q.  And you reviewed the records of that surveillance.

20       Correct?

21       A.  I recall reviewing the memo documenting it and speaking

22       to the agents involved.

23       Q.  Right.

24                    And Mr. Sterlingov stayed in Miami for roughly

25       about three months.  Correct?
```

1    A.  I don't recall specifics.  It was before I had returned

2    to IRS.

3    Q.  But you have no reason to disbelieve that he may have

4    stayed in Miami for about three months in 2017?

5    A.  Yeah.  I don't have any knowledge.

6    Q.  And -- but you do recall reading that he was under

7    surveillance?

8    A.  Vaguely, yes.  I don't recall details at this point.

9    Q.  And you don't recall looking at photos of him picking up

10   his girlfriend and his girlfriend's mother from a mini

11   cruise?

12   A.  I don't recall seeing that.

13   Q.  And you don't recall records of search warrants for the

14   IP address for the router at the apartment that he was

15   staying at?

16   A.  I vaguely recall those.  I don't remember specifics at

17   this point.

18   Q.  But you did -- you have worked with Special Agent Devon

19   Beckett?

20   A.  Yes.  I worked with Agent Beckett.

21   Q.  And you are aware that Special Agent Devon Beckett was

22   working on the surveillance of Mr. Sterlingov while he was

23   in Miami.  Correct?

24   A.  Yes.  I was aware she was working on it.

25            THE COURT REPORTER:  I'm sorry, counsel.  Could I

1    get a first name on Agent Beckett?

2                MR. EKELAND:  Devon, D-E-V-O-N.

3                THE COURT REPORTER:  Thank you so much.

4                MR. EKELAND:  Thank you.

5    BY MR. EKELAND:

6    Q.  So as part of your investigatory work on this case, you

7    worked closely with the Swedish police.  Correct?

8    A.  I worked with the Swedish economic crimes authority.  I

9    would attempt to say that name, but I would probably butcher

10    the pronunciation.

11    Q.  You worked with Swedish law enforcement authorities.  Is

12    that fair to say?

13    A.  Yes.  That's correct.

14    Q.  And there was an MLAT request, M-L-A-T request, to the

15    Swedish government.  Is that correct?

16    A.  Yes.

17    Q.  And as part of -- could you just explain to the jury, if

18    you know, what an MLAT is?

19    A.  Yes.  MLAT stands for Mutual Legal Assistance Treaty.

20    And it is a framework agreed to by a number of nations party

21    to a treaty that allows law enforcement to request

22    assistance, officially request assistance from foreign law

23    enforcement agencies.

24    Q.  Thank you.

25                And then what year did you begin working with the

 1    Swedish law enforcement or the economic authority, as you

 2    say?

 3    A.  I believe it was in 2019.  I don't remember the specific

 4    date.

 5    Q.  And do you recall that as part of the investigation the

 6    United States government asked the Swedish authorities to

 7    put Mr. Sterlingov under physical surveillance?

 8    A.  I don't recall the specifics of the MLAT.  I'd have to

 9    look at it to recall, but I do remember at least discussing

10    that.

11    Q.  And did the Swedish authorities put Mr. Sterlingov under

12    physical surveillance?

13    A.  I believe they did.

14    Q.  And did -- as part of the investigation, did the United

15    States government also ask that the Swedish authorities

16    essentially put Mr. Sterlingov's bank accounts under

17    surveillance?

18    A.  As I recall, we requested bank records.

19    Q.  And you got those bank records.  Right?

20    A.  Yes.

21    Q.  And then I'd just like to direct your attention to -- if

22    you could look in the notebook, it is the -- which I think

23    is at your feet.  I think it's Defense Exhibits Volume

24    No. 2, Exhibit 63.

25    A.  This?

1    Q.  Yeah.  That should be it.  And then if you could look at

2    Exhibit 63.

3    A.  Okay.

4    Q.  And as part of your job as an investigator, you

5    regularly sent emails to the people you were working with.

6    Correct?

7    A.  Yes.

8    Q.  And when you sent those emails, what you often did was

9    report on the status of the investigation.  Correct?

10   A.  Yes.

11   Q.  And that was part of your job?

12   A.  Yes.

13   Q.  And then just taking a look at what's been marked for

14   identification as Defense Exhibit No. 63, do you recognize

15   that?

16   A.  It appears to be an email that I sent.

17   Q.  All right.

18        MR. EKELAND:  Your Honor, at this point in time,

19   the defense would like to offer what's been marked for

20   identification as Defense 63 into evidence.

21        THE COURT:  Any objection?

22        MR. BROWN:  What is the relevance?  This seems to

23   be hearsay.  And relevance.

24        THE COURT:  I'm sorry.  Give me a second to read

25   it.

Price - CROSS - By Mr. Ekeland

1          Yes.  I agree it's hearsay.

2          MR. EKELAND:  Your Honor, we would respond that

3     under 803(6), we've laid the foundation that this is a

4     business record and that it comes in under that exception to

5     the hearsay record.

6          It is, as Mr. Price testified, something that he

7     did in the regular course of his business, where he

8     communicated with his colleagues about the state of the

9     investigation.

10          THE COURT:  Mr. Brown?

11          MR. BROWN:  Your Honor, number one, I'm not sure

12     it's an -- emails are records made -- well --

13          THE COURT:  I mean, I have to say, I'm somewhat

14     skeptical that all email that is sent by law enforcement

15     agents is nonhearsay as a business record.  I don't think

16     you would want a situation in which anything that law

17     enforcement sent in an email would come in as hearsay -- I

18     mean, despite hearsay.

19          And, you know, I'm happy -- we can address this

20     maybe a little bit later today.  But I'm skeptical of the

21     notion that all email that is sent by law enforcement

22     officials regarding ongoing investigations is nonhearsay

23     simply because it's sent in the course of their usual

24     duties.

25          MR. EKELAND:  Your Honor, I'm happy to point the

Price - CROSS - By Mr. Ekeland

```
1     Court to case law on this issue tomorrow.
2                THE COURT:  That's fine.
3                MR. EKELAND:  If I can --
4                THE COURT:  That's fine.  Why don't you come back.
5                MR. EKELAND:  We can revisit it tomorrow.
6                THE COURT:  That's fine.
7     BY MR. EKELAND:
8     Q.  Mr. Price, you also asked -- or the United States
9     government as part of its investigation also asked the
10    Swedish economic authorities to query Swedish internet
11    providers.  Is that correct?
12    A.  I do recall requesting internet service provider
13    records.  Yes.
14    Q.  And to your knowledge, the Swedish police never arrested
15    Mr. Sterlingov, did they?
16    A.  I don't believe they did.
17    Q.  Now, turning your attention to I think what you said
18    were -- you discussed with the jury were the number of -- I
19    think you said you did ten transactions with Bitcoin Fog,
20    roughly?
21    A.  No.  I don't think I stated that.  I think I may have
22    visited the site ten -- approximately ten times.  I don't
23    think I did that many transactions.
24    Q.  And then how many transactions did you do?
25    A.  I recall doing at least two.  That's the best of my
```

1    recollection.

2    Q.  And that one was that September 11, 2019, transaction?

3    A.  The first one was around that --

4    Q.  And --

5    A.  -- date, yes.

6    Q.  I'm sorry.  I spoke over you.  Were you finished?

7            On that September 11th, 2019, transaction, did you

8    send a message to the Bitcoin Fog -- I think it was the

9    support portal that you were shown while you were

10   testifying?

11   A.  No.  I did not on the first time.

12   Q.  And the second time, I think it was -- that was November

13   11th, 2019, roughly?  You did send a message?

14   A.  Yeah.  I think it might have been later in November.

15   But I did send a message that time.  Yes.

16   Q.  And that was the message with the grammatical mistake in

17   it and where you were saying that you were selling -- you

18   wanted to launder money from Molly, essentially.  Is that

19   right?

20   A.  Yeah.  I stated I was attempting to send -- or I had

21   sent Bitcoin from a darknet market and I was stating that it

22   was from the proceeds from the sale of ectasy.

23   Q.  And you didn't get any response to that message.

24   Correct?

25   A.  No.

Price - CROSS - By Mr. Ekeland

1    Q.  And you were in Washington, D.C., when you sent that

2    message?

3    A.  I was.

4    Q.  And you don't know where the Bitcoin Fog servers were?

5    A.  No.  At that time, again, it was a Tor hidden services

6    site, so it was not broadcasting a public IP.

7    Q.  And when you did that transaction -- well, when you did

8    your two transactions, one in September 11th, I think, 2019,

9    you were charged a 2.5 percent fee.  Is that correct?

10    A.  I don't recall exactly the amount because that was about

11    five years ago.

12    Q.  Do you recall testifying in front of the grand jury in

13    this matter?

14    A.  I do recall testifying.  I don't know that I remember

15    specific statements.

16    Q.  If I could direct your attention to in the binder there

17    Exhibit 51.  And then if you could go to Page 52.

18    A.  Page 52 of this exhibit?

19    Q.  Of that exhibit.

20    A.  Okay.

21    Q.  And let me find it.  Directing your attention to Line 6.

22    A.  I see that.

23    Q.  Does that refresh your recollection whether the --

24            MR. BROWN:  Your Honor, this is improper

25    refreshing of recollection.

 1          THE COURT:  Do you want to pick up?

 2          (Whereupon, the following bench conference was

 3     held:)

 4          MR. BROWN:  Your Honor, my understanding is when

 5     you're refreshing a witness's recollection, you would show

 6     them the document and review it silently.  You wouldn't just

 7     put the document in front of them and ask them -- and

 8     cross-examine them on that document.

 9          THE COURT:  Well, I agree entirely.  But I wasn't

10     sure if he was doing that.  He certainly shouldn't be

11     reading from the document.

12          I guess -- maybe the way for you to do it is

13     rather than say, Does that refresh your recollection that X,

14     say, Does that refresh your recollection?  Then, What's your

15     recollection?

16          Does that work, Mr. Brown?

17          MR. BROWN:  Yes, your Honor.

18          And maybe to move on to the next point, I think

19     Mr. Ekeland is moving towards an attempted impeachment, but

20     there's no -- there's no real statement to be impeached.

21     Mr. Price just testified he didn't remember exactly what fee

22     was charged in that first transaction.

23          THE COURT:  This is being used to not impeach but

24     solely to refresh his recollection.

25          MR. EKELAND:  I'm not seeking to impeach him, your

```
1    Honor.  I'm happy just to ask him if that refreshes his
2    recollection and just look to get that -- the service fee.
3               THE COURT:  That's fine.
4               (Whereupon, the following proceedings were had in
5    open court:)
6               THE COURT:  Mr. Ekeland?
7    BY MR. EKELAND:
8    Q.  Mr. Price, did you have a chance to review Page 52
9    there, Lines 6 through 10?
10   A.  Apologies.  I only looked at 6.  I'm just finishing it.
11   Q.  Uh-huh.
12   A.  Okay.
13   Q.  Does that refresh your recollection?
14   A.  Yes.
15   Q.  And what was the service fee for Bitcoin Fog in your
16   September 11th, 2019, transaction?
17   A.  2.5 percent.
18   Q.  And then in November 11th -- or the November
19   transaction, do you recall what the service fee was for
20   that?
21   A.  I don't off the top of my head.  My apologies.
22   Q.  That's okay.
23               If I could just direct your attention to Page 55
24   of the same document.  And I believe it's Line 25.
25   A.  Yes.  I see that.
```

1    Q.  Does that refresh your recollection?

2    A.  Yes.

3    Q.  And what was the service fee for that Bitcoin charge --

4    excuse me -- that Bitcoin Fog charge for that transaction?

5    A.  I believe it was approximately 2.32 percent.

6    Q.  As part of your investigation, you were also speaking to

7    Romanian authorities.  Is that true?

8    A.  Yes.

9    Q.  And the United States government availed themselves of

10   their MLAT with Romania in relation to this investigation.

11   Correct?

12   A.  You'd have to define what you mean by "availed

13   themselves."

14   Q.  Well, for instance, the United States government asked

15   the Romanian authorities to conduct a pen register trap on

16   Mr. Sterlingov's To the Moon server in Romania.  Is that

17   correct?

18   A.  I think I'm a bit confused.  Are you asking me if an

19   MLAT was sent?

20   Q.  Yes.  Was an MLAT sent?

21   A.  Yes.  To the best of my recollection, there was a Mutual

22   Legal Assistance Treaty request prepared from Romania.

23   Q.  And as part of your request for help from the Romanian

24   authorities, the United States government asked the Romanian

25   authorities to execute a pen register and trap?

1    A.  I recall the MLAT requesting net flow data, which is

2    essentially collecting, like, IP flow in and out.

3    Q.  And the Romanian authorities did that.  Correct?

4    A.  To the best of my recollection, yes.

5    Q.  And what other data did you ask, if any, the Romanian

6    authorities to collect in relation to Mr. Sterlingov's To

7    the Moon server in Romania?

8    A.  I apologize.  I'm doing this from memory.  To the best

9    of my recollection, net flow data, subscriber information,

10   like who was paying for the server; it might have been specs

11   of the server, like, what it looked like, what kind of

12   server it was, things of that nature.

13   Q.  And do you recall viewing daily traffic logs for the

14   server?

15   A.  I may have viewed some of them.  However, my expertise

16   was not computer forensics, so I relied on experts for that.

17   Q.  But you do recall seeing them?

18   A.  I can't remember specifically if I reviewed that or I

19   relied on the experts to do that.

20   Q.  If I could just direct your attention to Exhibit 65 in

21   the binder.  And when you're done reading that, if you could

22   just look up at me.

23   A.  Okay.

24   Q.  Does that refresh your recollection -- does that refresh

25   your recollection?

1    A.  You'd have to remind me again of the question you're

2    asking.  I mean, I see the email.  Just remind me again what

3    you're asking me.  I apologize.

4    Q.  No problem.

5            You viewed daily traffic logs of the server

6    traffic for the To the Moon server in Romania.  Is that

7    correct?

8    A.  I don't know that I personally did.  I do recall that as

9    an investigative team, at least some members did, yes.

10   Q.  The United States government had access to daily traffic

11   logs for the server?

12   A.  I think that's a correct characterization.  Yes.

13   Q.  And then as of -- now, Mr. Sterlingov was arrested, I

14   believe you said, on April 27, 2021?

15   A.  Yes.

16   Q.  And that To the Moon server was still functioning on May

17   4th, 2021?

18   A.  I don't recall specifically.

19   Q.  If I could direct your attention to Exhibit No. 67.

20   A.  Okay.

21   Q.  Does that refresh your recollection?

22   A.  Yes.

23   Q.  Was the To the Moon Server still operating on May 4th,

24   2021?

25   A.  It appears that at least at the time this email was

 1    sent --

 2              THE COURT:  I'm sorry.  You shouldn't be

 3    testifying based sort of on your reading of the email.  This

 4    is just to refresh your recollection.  So you should just

 5    testify as to what your recollection is, but not sort of

 6    reading from the document.  So if you recall, you can

 7    testify.  Otherwise, you shouldn't.

 8              THE WITNESS:  My apologies, your Honor.

 9              THE COURT:  That's fine.

10              THE WITNESS:  Based on the recollection, I don't

11    remember specifics.  It's possible.  I don't recall.

12    BY MR. EKELAND:

13    Q.  But you've got -- so it's your testimony that you can't

14    recall whether or not the servers were operating on May 4th,

15    2021?

16    A.  I recall sending an email about it.  Again, it's

17    possible.  I just -- I don't remember specifically that

18    date.

19    Q.  But the United States authorities didn't obtain the To

20    the Moon server until after Mr. Sterlingov was arrested.

21    Correct?

22    A.  I believe that's correct.  Yes.

23    Q.  And at one point, you thought that the To the Moon

24    server was the Bitcoin Fog server.  Correct?

25    A.  I believe we had developed some evidence indicating that

1    possibly Bitcoin Fog was hosted on that device and we were

2    taking investigative steps to try to confirm if that was the

3    case.

4    Q.  And you actually traveled to Romania at one point in the

5    hopes of imaging that server.  Is that correct?

6    A.  No.  I never traveled to Romania.

7    Q.  But did you make plans to travel to -- so you never

8    traveled to Romania?

9    A.  I did not.

10   Q.  Did you ever travel to Sweden?

11   A.  I did.

12   Q.  How many times did you travel to Sweden?

13   A.  Twice.

14   Q.  And what did you do when you were in Sweden?

15   A.  On which occasion?

16   Q.  The first time.

17   A.  The first occasion, I traveled to Stockholm, Sweden, and

18   I met with prosecutors and representatives of the economic

19   crimes unit to discuss this case and collaboration in the

20   investigation.

21   Q.  Did you ever interview Mr. Sterlingov when you were in

22   Sweden?

23   A.  I did not.

24   Q.  Did you ever interview any family members of

25   Mr. Sterlingov when you were in Sweden?

1    A.  No.  I do not have any law enforcement authority in

2    Sweden, so that's not something I could have done on that

3    trip.

4    Q.  Did you ever interview his employer while you were in

5    Sweden?

6    A.  Again, that's not something I had authority to do as a

7    U.S. law enforcement officer.  I couldn't do that on Swedish

8    soil.

9    Q.  Can you name me who his employer was from -- in 2010?

10   A.  In 2010?

11   Q.  Yes.

12   A.  I don't recall.

13   Q.  Can you name me who his employer was in 2011?

14   A.  Off the top of my head, I don't recall.

15   Q.  Can you name me who his employer was in 2012?

16   A.  Again, I don't recall specific dates.  I know he had

17   various business ventures.  I just don't recall off the top

18   of my head what his employer was at that point.

19   Q.  Can you name me one of his business ventures?

20   A.  Several I'm familiar with.  One was Bitcoaster Ventures.

21   Q.  Can you name me any others?

22   A.  Another one I was familiar with is Moon VPN.

23   Q.  Can you name me any others?

24   A.  At one point he was involved in a recording studio,

25   though I can't recall the name specifically what that was.

```
1    Q.  Can you name me any of his other ventures?

2    A.  I don't recall the specific names.  I know he had at one

3    point some sort of web development business.  He was

4    involved in many different ventures.  So I just don't

5    remember specific names of all of them at this juncture.

6    Q.  It's correct.  It's your testimony that he was involved

7    in a lot of business ventures?

8    A.  To the best of my knowledge, he had several different --

9    I would say irons in the fire.

10   Q.  And can you name me who his primary employer was in

11   2013?

12   A.  I don't recall.

13   Q.  And can you name me who his primary employer was in

14   2014?

15   A.  I don't recall.

16   Q.  Do you know what he made -- how much he made income-wise

17   from his employers or his jobs?

18   A.  I reviewed bank records and did some financial analysis,

19   along with my investigative colleagues.  I don't remember

20   the specific numbers right now.

21   Q.  Now I'd like to just turn your attention to what is in

22   evidence as Government's Exhibit No. 1.

23            MR. EKELAND:  Ms. Wilkins, if we could get that

24   up.

25            THE COURTROOM DEPUTY:  Do you have it up?
```

Price - CROSS - By Mr. Ekeland

 1              MR. HASSARD:  Can I see if mine is working?  I

 2      think it's on the Government's computer now.

 3              THE COURTROOM DEPUTY:  Yes.  The computer is on,

 4      but there's nothing on it.

 5              MR. EKELAND:  I'm also at a good stopping point,

 6      your Honor.

 7              THE COURT:  I want to keep us moving a little bit

 8      further, if we can.

 9              MS. PELKER:  It's just Exhibit 1.  We can pull it

10      up.

11              THE COURT:  Do you want to just have the

12      Government pull it up?

13              MR. EKELAND:  I'm fine with the Government putting

14      it up.  It's in evidence, right?

15              THE COURT:  It is.

16              MS. PELKER:  Yes.  Exhibit 1.

17              MR. BROWN:  Yes.  Exhibit 1.

18              MR. EKELAND:  Thank you.

19              THE COURT:  There we go.

20              MR. EKELAND:  Could we zoom out a little bit just

21      so I can see the whole thing?  Thank you.

22              This is published to the jury right now.  Thank

23      you.  If we could go to what would be the second page.  I'll

24      just show you.  There we go.  Right there.  Thank you.

25

                    Price - CROSS - By Mr. Ekeland

1    BY MR. EKELAND:

2    Q.  So, Mr. Price, could you just read that sentence that I

3    just underlined?

4    A.  The one beginning with "you"?

5    Q.  Yes, sir.

6    A.  "You will still have plausible deniability, since nobody

7    else has access to our servers and can actually prove that

8    those Bitcoins."

9           Continue?

10   Q.  That's fine.  The point being is that's Akemashite

11   Omedetou, whoever that is, that is saying that there's more

12   than one server behind Bitcoin Fog.  Correct?

13   A.  It does say servers.

14   Q.  Servers, plural.  And there was only one server in

15   Romania.  Correct?

16   A.  I don't remember specifically how many boxes there were,

17   were in the rack.  I don't remember.

18   Q.  It's your testimony that you don't remember whether or

19   not there was one server in Romania or not?

20   A.  I remember there being servers in Romania.  I don't

21   remember how many actually came in.  I think I was off the

22   investigation at that point.

23   Q.  So you don't remember?

24   A.  Again, I know there were servers.  I just don't remember

25   the exact number.

1    Q.  You know there were servers, plural, coming in from

2    Romania or you just don't know how many -- if there was one

3    server or more than one server in Romania?

4              MR. BROWN:  Your Honor, asked and answered.

5              MR. EKELAND:  No, it's not, your Honor.

6              THE COURT:  I'll allow this one last question.

7    Then we should move on.

8              THE WITNESS:  Again, to the best of my

9    recollection, there was a server or servers in Romania.  I

10   don't remember after or when the servers came to the United

11   States because I believe I was already no longer a federal

12   employee at that point.

13   BY MR. EKELAND:

14   Q.  Just directing your attention to what I just underlined,

15   that sentence that starts with "Our," could you just read

16   that complete sentence.

17   A.  "Our team consists of professional secure web

18   application developers with five to ten years' experience,

19   and we have built this solution from scratch with security

20   being our number one concern."

21   Q.  And are you aware of any communications anywhere from

22   Mr. Sterlingov with this team being referenced here?

23   A.  I have not seen any.

24   Q.  Okay.  And I just want to scroll down a little bit more

25   on that page.

1          Do you see the paragraph that says, "Do you keep

2    logs"?

3    A.  I do.

4    Q.  Could you explain, if you know, to the jury what a log

5    is?

6    A.  In this specific instance or in general?

7    Q.  Well, let's start with -- let's start with in general.

8    A.  If we're referring to a computer log or server, it would

9    be records of interactions with IP addresses, transactions,

10   anything of that nature.

11   Q.  And then can you describe, if it's any different in this

12   particular situation, what the log would be?

13   A.  I don't believe it's different based on this text.

14   Q.  And then could you just read the first sentence right

15   under, "Do you keep logs," with a question mark.

16   A.  "We keep logs for one week for debugging and

17   troubleshooting purposes."

18   Q.  And then you're not aware of any Bitcoin Fog logs on any

19   of Mr. Sterlingov's devices, are you?

20   A.  I'm not -- I have not seen any, no.

21   Q.  As a matter of fact, the Government just doesn't have

22   the Bitcoin Fog logs, do they?

23   A.  I actually don't know.

24   Q.  You don't know.  But you haven't seen them anywhere?

25   A.  No.  Again, I stopped working on this case in September

1    of 2021, so I'm not aware of what happened after I left.

2    Q.  But you -- as far as you know, all of those devices and

3    everything that you were just showing to the jury and

4    testifying to, there weren't any Bitcoin Fog logs on any of

5    that.  Correct?

6    A.  I don't have the knowledge to answer that.  I apologize.

7          MR. EKELAND:  If I could have the paragraph that

8    starts with "That is unfortunate," and if you could blow

9    that up a little bit.  Thank you.  That is perfect.

10    BY MR. EKELAND:

11    Q.  I'm going to underline a sentence, Mr. Price.  And if

12    you could just read that sentence.

13    A.  "It is also *possible* that a lightening strikes our

14    servers and all the backup locations, which will be

15    unfortunate as well."

16    Q.  And do you understand backup locations to mean that

17    Bitcoin Fog had backup servers?

18    A.  I understand that this text states backup locations.

19    Q.  Yes.  And it's your understanding that this text is

20    written by Akemashite Omedetou?

21    A.  Could you scroll back up, please?

22          It does appear that it was.  Yes.

23    Q.  And it's your understanding or I believe -- correct me

24    if I'm wrong -- it was your testimony that Akemashite

25    Omedetou is one of the founders of Bitcoin Fog.  Is that

1    correct?

2    A.  It is the moniker used in these announcements, yes.

3    Q.  Correct.  And -- thank you.

4         And now I would just like to go to -- do you see

5    where I just drew a line, that paragraph?

6    A.  Yes.

7    Q.  If you could just read that paragraph, I would

8    appreciate it.

9    A.  "Both servers are running secure OSs with proper

10   settings, are updated regularly and are behind a NAT.  We

11   also did manual port scans on them even from within the NAT

12   to check the security."

13   Q.  And do you know what is meant by running secure OSs?

14   A.  I believe that is a reference to operating systems.

15   Q.  And then do you know what a NAT is?

16   A.  I'm not certain in this context what that means.

17   Q.  Do you know what a NAT is in other contexts?

18   A.  I don't recall the acronym off the top of my head.  I

19   apologize.

20   Q.  But are you aware that Mr. Sterlingov's Romanian server

21   didn't operate behind a NAT?

22   A.  I don't know.  That occurred after I left the

23   government.

24        MR. EKELAND:  Your Honor, I'm at a good stopping

25   point.  Or would you like me to continue?

Price - CROSS - By Mr. Ekeland

1          THE COURT:  If you'd like.  I just want to make

2     sure we're moving along with the case.  But if this works

3     with you, it's okay with me.

4          MR. EKELAND:  I'd prefer to break now and then

5     finish this in the morning.

6          THE COURT:  I just want -- for everyone involved,

7     I just want to make sure -- we promised the jury we're going

8     to get this case done on time.

9          MR. EKELAND:  I think we're moving at a reasonable

10    pace.

11         THE COURT:  All right.  So, members of the jury,

12    we're going to adjourn for the evening, then.  It's about 20

13    minutes of 5:00.  And we'll generally adjourn between 4:30

14    and 5:00.

15         And is 9:00 tomorrow morning okay with everyone?

16    Or do you want -- is 9:30 better?

17         UNIDENTIFIED JUROR:  9:30.

18         THE COURT:  We'll make it 9:30 tomorrow morning.

19    Just don't discuss the case with anybody and don't conduct

20    any research.  And I'll see you all back here at 9:30.

21         THE COURTROOM DEPUTY:  All rise.

22         (Whereupon, the jury exited the courtroom at 4:42

23    p.m. and the following proceedings were had:)

24         THE COURTROOM DEPUTY:  You may be seated.

25         THE COURT:  Mr. Price, you can step down.  I'd

1   just ask that you not discuss your testimony with anybody

2   until it's complete.

3               THE WITNESS:  Certainly.  9:30 tomorrow, your

4   Honor?

5               THE COURT:  9:30 tomorrow.  Thank you.

6               THE WITNESS:  Thank you.

7               (Thereupon, Matthew Price retired from the

8   courtroom and the following proceedings were had:)

9               THE COURT:  The last lengthy case I had, I think

10  perhaps it was because it was long that people thought they

11  were sort of at greater liberty perhaps not to move things

12  along.  And I really do want to make absolutely sure we're

13  done in a month with this case.  So I expect we're going to

14  have our next witnesses available.  I don't want to be

15  breaking at 3:00 because the witness isn't here and that

16  sort of thing.

17              I do think I want to go as close to 5:00 as we

18  can, at least until I'm confident we're really moving the

19  case along quickly.  It sounds to me like we are probably

20  not going to be able to sit on Friday because we have that

21  one juror who has a funeral to attend.  But we'll wait and

22  see, I guess, tomorrow exactly what he says.  But assuming

23  he's still on the jury, he was pretty firm in the conclusion

24  that he really needed to be there.  So I think that means we

25  probably can't sit on Friday.

1          Anything else that folks want to raise tonight

2    before we adjourn?

3          MR. BROWN:  No, your Honor.

4          MR. EKELAND:  No, your Honor.

5          THE COURT:  I'll just ask all counsel also just in

6    asking your questions, just make sure that you're not --

7    there's no commentary included in your questions.  When you

8    get an answer that you like, you know, not saying "thank

9    you" or  "correct" in response.  Just pose the questions and

10   avoid any commentary along the way.

11          All right.  I will see you all tomorrow at 9:30.

12          (Proceedings concluded.)

1                            **CERTIFICATE**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                   Dated this 14th day of February, 2024.

11

12                   /s/ Lisa Edwards, RDR, CRR
                     Official Court Reporter
13                   United States District Court for the
                        District of Columbia
14                   333 Constitution Avenue, Northwest
                     Washington, D.C. 20001
15                   (202) 354-3269

16

17

18

19

20

21

22

23

24

25

**'**

**'em** [1] - 66:14

**/**

**/s** [1] - 111:12

**1**

**1** [8] - 12:13, 72:7, 76:1, 78:13, 101:22, 102:9, 102:16, 102:17
**1-B26** [1] - 29:10
**10** [1] - 94:9
**10005** [1] - 1:25
**107** [2] - 73:25, 75:16
**10:30** [1] - 68:18
**11** [1] - 91:2
**116** [5] - 3:18, 24:4, 24:18, 25:2, 25:4
**117** [7] - 3:22, 36:7, 36:22, 36:25, 37:5, 37:7, 37:10
**117-A** [6] - 3:23, 37:20, 37:22, 38:8, 38:11, 38:13
**118** [8] - 3:22, 36:7, 36:22, 36:25, 37:5, 37:7, 39:6, 39:7
**119** [9] - 4:1, 44:18, 44:20, 45:7, 45:10, 45:12, 46:7, 46:9, 47:6
**119-A** [6] - 4:2, 45:22, 46:3, 46:12, 46:15, 46:17
**11:00** [1] - 68:18
**11th** [6] - 39:14, 91:7, 91:13, 92:8, 94:16, 94:18
**12** [5] - 5:15, 5:25, 6:24, 67:4, 70:18
**12(a)(4** [1] - 61:14
**12(b** [1] - 8:2
**12(b)(3** [2] - 8:12, 60:18
**12(b)(3)(C** [1] - 62:2
**12(b)(3)(C)** [1] - 61:18
**12(b)(4** [3] - 7:23, 8:3, 64:16
**12(b)(4)(B** [1] - 61:23
**12(b)(4)(B)** [1] - 62:25
**12(c** [1] - 60:16
**120** [17] - 3:24, 39:22, 40:12, 40:14,

40:15, 40:17, 40:18, 40:23, 41:1, 41:9, 41:23, 42:14, 42:16, 42:21, 42:23, 43:3, 43:10
**120-A** [11] - 3:25, 39:22, 40:12, 40:15, 40:23, 43:2, 43:6, 43:8, 43:12, 43:15, 43:17
**121** [11] - 4:3, 47:12, 47:16, 48:6, 48:7, 48:9, 49:4, 49:13, 49:14, 50:7, 50:11
**121-A** [11] - 4:5, 48:14, 48:22, 50:8, 50:11, 50:15, 51:17, 51:20, 51:25, 52:9, 52:11
**121-D** [8] - 4:4, 50:5, 50:11, 50:15, 50:18, 50:21, 50:23, 51:3
**122-A** [11] - 3:20, 29:5, 29:8, 29:9, 29:23, 30:6, 30:15, 30:17, 30:20, 30:22, 30:24
**122-B** [8] - 3:20, 29:6, 29:23, 30:6, 30:15, 30:18, 30:21, 30:22
**123** [7] - 3:19, 26:1, 26:2, 26:11, 26:20, 26:22, 27:1
**124** [6] - 3:21, 31:18, 32:8, 32:25, 33:6, 33:8
**127** [5] - 3:13, 15:11, 15:25, 16:3, 16:4
**128-A** [3] - 3:14, 16:15, 17:3, 17:6, 17:8
**128-B** [1] - 16:15
**128-C** [1] - 16:15
**130-A** [7] - 3:16, 19:2, 19:4, 19:17, 19:20, 19:22, 20:7
**130-B** [1] - 20:7
**130-C** [1] - 20:12
**130-D** [1] - 20:12
**1301** [1] - 1:21
**131** [6] - 3:15, 17:19, 18:7, 18:10, 18:12, 18:21
**131-A** [6] - 3:15, 17:19, 18:7, 18:10, 18:13, 18:23
**132** [5] - 3:12, 14:5, 14:18, 14:21, 14:23
**134** [6] - 3:17, 20:20,

21:9, 21:19, 21:21, 22:3
**134-A** [7] - 3:17, 20:21, 21:9, 21:19, 21:22, 22:11, 22:17
**134-F** [1] - 22:19
**134-G** [1] - 22:19
**134-H** [1] - 22:21
**134-I** [1] - 22:21
**134-J** [1] - 22:22
**134-K** [1] - 22:22
**134-L** [1] - 22:23
**134-M** [1] - 23:8
**134-N** [1] - 23:8
**134-O** [1] - 23:10
**134-P** [1] - 23:10
**134-Q** [1] - 23:18
**134-R** [1] - 23:20
**134-S** [1] - 23:20
**137** [3] - 3:11, 12:16, 12:17, 13:9, 13:12, 13:13, 13:14, 13:15
**13th** [1] - 34:12
**14** [2] - 1:7, 75:1
**14th** [1] - 111:10
**16** [1] - 62:4
**17th** [1] - 34:23
**183** [1] - 6:6
**1988** [1] - 75:1
**1B-21** [1] - 12:14
**1st** [1] - 75:6

**2**

**2** [3] - 72:11, 75:8, 87:24
**2.32** [1] - 95:5
**2.5** [2] - 92:9, 94:17
**20** [2] - 59:16, 108:12
**20001** [2] - 2:4, 111:14
**2003** [1] - 7:14
**2005** [1] - 1:21
**2010** [2] - 100:9, 100:10
**2011** [5] - 34:12, 75:6, 76:1, 78:13, 100:13
**2012** [1] - 100:15
**2013** [1] - 101:11
**2014** [1] - 101:14
**2015** [1] - 83:7
**2017** [3] - 34:2, 84:16, 85:4
**2019** [7] - 83:1, 87:3, 91:2, 91:7, 91:13, 92:8, 94:16
**202** [2] - 2:4, 111:15
**2020** [1] - 34:23

**2021** [10] - 39:14, 39:15, 75:6, 76:1, 78:14, 97:14, 97:17, 97:24, 98:15, 106:1
**2024** [2] - 1:7, 111:10
**20530** [2] - 1:16, 1:19
**21-00399** [1] - 1:4
**21st** [1] - 34:2
**25** [1] - 94:24
**26th** [1] - 39:15
**27** [2] - 76:1, 97:14
**27th** [1] - 75:6
**2:04** [1] - 1:7
**2:14** [1] - 12:5

**3**

**30** [2] - 1:24, 78:14
**31** [2] - 73:23, 75:14
**311** [2] - 7:10, 7:14
**333** [2] - 2:3, 111:14
**35-A** [3] - 54:12, 54:20, 55:5
**35-C** [5] - 4:6, 73:10, 74:8, 74:11, 74:13
**354-3269** [2] - 2:4, 111:15
**36-A** [5] - 4:7, 77:11, 77:24, 78:2, 78:4
**3:00** [1] - 109:15
**3:18** [1] - 59:20
**3:20** [1] - 59:15
**3:56** [1] - 73:3

**4**

**403** [1] - 55:10
**4:00** [1] - 59:16
**4:30** [5] - 65:8, 82:2, 82:4, 82:8, 108:13
**4:42** [1] - 108:22
**4th** [3] - 97:17, 97:23, 98:14

**5**

**5.1527** [1] - 1:16
**51** [1] - 92:17
**52** [3] - 92:17, 92:18, 94:8
**5311** [2] - 73:23, 75:14
**55** [1] - 94:23
**5:00** [4] - 82:8, 108:13, 108:14, 109:17

**6**

**6** [3] - 92:21, 94:9, 94:10
**601** [1] - 1:15
**615** [1] - 6:7
**63** [4] - 87:24, 88:2, 88:14, 88:20
**65** [1] - 96:20
**67** [1] - 97:19
**6706** [1] - 2:3

**7**

**71** [21] - 3:4, 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 3:17, 3:18, 3:19, 3:20, 3:21, 3:22, 3:23, 3:24, 3:25, 4:1, 4:2, 4:3, 4:4, 4:5
**74** [1] - 4:6
**78** [1] - 4:7

**8**

**803(6** [1] - 89:3
**82** [1] - 3:5

**9**

**950** [1] - 1:18
**982** [2] - 7:10, 7:14
**9:00** [1] - 108:15
**9:30** [7] - 108:16, 108:17, 108:18, 108:20, 109:3, 109:5, 110:11

**A**

**a/k/a** [8] - 55:5, 55:12, 55:16, 56:12, 56:19, 56:24, 71:23, 72:7
**abbreviation** [1] - 28:12
**ability** [1] - 111:7
**able** [1] - 109:20
**above-listed** [2] - 75:5, 75:25
**absolutely** [2] - 33:3, 109:12
**absurd** [1] - 8:11
**acceptable** [2] - 65:17, 65:18
**access** [4] - 53:21,

65:3, 97:10, 103:7
**accommodation** [1] - 71:18
**account** [5] - 25:12, 25:20, 27:8, 27:25, 28:11
**accounts** [1] - 87:16
**accurate** [8] - 11:25, 46:9, 69:1, 77:20, 78:17, 78:18, 83:8, 111:4
**accurately** [1] - 38:4
**accusatory** [1] - 56:14
**acknowledging** [1] - 55:9
**acronym** [2] - 44:11, 107:18
**Act** [7] - 52:17, 52:24, 53:3, 53:5, 73:23, 75:14, 76:6
**Action** [1] - 1:3
**adapter** [2] - 23:11, 23:19
**adapters** [2] - 22:20, 23:13
**add** [1] - 68:15
**adding** [1] - 48:4
**additional** [2] - 23:5, 65:4
**address** [14] - 6:16, 25:21, 28:18, 28:19, 28:25, 31:2, 31:3, 31:5, 31:11, 42:5, 65:10, 72:7, 85:14, 89:19
**addresses** [2] - 42:6, 105:9
**adequate** [1] - 55:25
**adjoining** [1] - 81:3
**adjourn** [3] - 108:12, 108:13, 110:2
**adjust** [1] - 57:18
**admissible** [3] - 56:2, 56:11, 57:2
**admit** [27] - 13:8, 14:17, 15:24, 17:2, 17:3, 18:6, 19:16, 21:8, 24:17, 26:10, 30:5, 32:7, 36:24, 38:7, 40:18, 41:1, 41:7, 41:25, 43:11, 45:6, 46:11, 49:17, 50:17, 54:11, 55:16, 74:7, 77:23
**admitted** [29] - 13:14, 14:21, 16:3, 17:6, 18:10, 19:20, 21:20, 25:2, 26:20, 30:15, 31:13, 31:16,

33:6, 37:5, 38:11, 39:3, 39:6, 39:20, 42:15, 42:21, 43:15, 45:10, 46:15, 48:7, 50:21, 51:17, 52:9, 74:11, 78:2
**admitting** [1] - 41:13
**advance** [1] - 63:5
**affect** [1] - 57:23
**afford** [1] - 61:17
**AFTERNOON** [1] - 1:5
**afternoon** [3] - 57:17, 59:6, 59:15
**afterwards** [2] - 61:24, 71:16
**agencies** [1] - 86:23
**agency** [5] - 53:6, 66:21, 73:21, 75:12, 76:16
**agent** [4] - 9:25, 11:16, 53:2, 81:4
**Agent** [5] - 10:2, 85:18, 85:20, 85:21, 86:1
**agents** [2] - 84:22, 89:15
**ago** [1] - 92:11
**agree** [7] - 11:5, 11:13, 11:17, 68:7, 72:13, 89:1, 93:9
**agreed** [1] - 86:20
**ahead** [20] - 12:22, 14:4, 17:17, 17:19, 18:15, 18:25, 19:6, 19:25, 20:18, 23:23, 24:7, 25:24, 29:3, 31:21, 36:5, 36:10, 39:2, 39:19, 39:23, 51:5
**Airport** [2] - 39:17, 80:21
**airport** [3] - 66:19, 69:15, 70:8
**Akemashite** [9] - 55:6, 56:16, 56:25, 58:3, 71:24, 72:15, 103:10, 106:20, 106:24
**alleged** [1] - 61:6
**allow** [2] - 76:11, 104:6
**allowed** [1] - 58:25
**allows** [1] - 86:21
**alpha** [1] - 43:2
**amenable** [1] - 70:25
**amended** [1] - 60:13
**AMERICA** [1] - 1:3
**amount** [2] - 69:14, 92:10

**analysis** [1] - 101:18
**Andrew** [2] - 83:14, 84:9
**Angeles** [2] - 39:17, 80:21
**annexed** [1] - 78:16
**announcements** [1] - 107:2
**answer** [7] - 6:10, 47:3, 64:23, 70:13, 70:15, 106:6, 110:8
**answered** [1] - 104:4
**answers** [1] - 81:10
**anticipating** [1] - 9:10
**anyway** [1] - 59:7
**apartment** [1] - 85:14
**apologies** [6] - 39:5, 40:16, 48:18, 94:10, 94:21, 98:8
**apologize** [8] - 43:2, 47:17, 60:6, 60:10, 96:8, 97:3, 106:6, 107:19
**appear** [27] - 17:15, 20:8, 20:13, 22:17, 22:19, 22:22, 23:8, 23:10, 23:20, 25:16, 25:17, 33:22, 34:4, 34:9, 34:18, 35:8, 35:24, 37:11, 38:20, 39:7, 42:23, 48:15, 50:7, 50:15, 57:22, 77:18, 106:22
**aPPEARANCES** [1] - 1:13
**application** [1] - 104:18
**applications** [1] - 53:24
**appreciate** [3] - 49:9, 64:21, 107:8
**appreciative** [1] - 67:21
**approach** [12] - 21:14, 24:23, 26:16, 30:11, 32:11, 32:12, 47:21, 48:25, 49:1, 49:25, 54:4, 60:21
**April** [6] - 39:14, 39:15, 75:6, 76:1, 78:13, 97:14
**argument** [3] - 8:15, 8:18, 64:19
**argumentative** [1] - 57:3
**arraignment** [2] - 61:14, 61:24
**arrest** [17] - 9:20,

9:22, 9:24, 10:3, 10:6, 10:7, 11:1, 11:22, 11:23, 66:3, 66:4, 66:8, 66:11, 66:13, 66:16, 66:19, 66:20
**arrested** [12] - 9:8, 9:9, 9:14, 10:17, 10:20, 10:24, 11:5, 11:16, 66:2, 90:14, 97:13, 98:20
**arrival** [2] - 39:12, 39:14
**arrived** [1] - 69:16
**aside** [1] - 5:14
**assessment** [1] - 12:1
**Assistance** [2] - 86:19, 95:22
**assistance** [2] - 86:22
**assists** [3] - 47:23, 49:2, 50:2
**Association** [1] - 84:7
**association** [1] - 72:8
**assumed** [2] - 8:7, 8:13
**assuming** [3] - 63:21, 65:13, 109:22
**assumption** [1] - 64:4
**assurance** [1] - 61:20
**attached** [4] - 16:12, 18:22, 23:14, 78:18
**attempt** [1] - 86:9
**attempted** [1] - 93:19
**attempting** [1] - 91:20
**attend** [1] - 109:21
**attending** [1] - 81:22
**attention** [14] - 24:4, 26:1, 43:1, 45:21, 48:14, 87:21, 90:17, 92:16, 92:21, 94:23, 96:20, 97:19, 101:21, 104:14
**ATTORNEY'S** [1] - 1:14
**August** [1] - 75:1
**authentic** [1] - 57:1
**authenticating** [1] - 55:19
**authentication** [2] - 23:5, 55:20
**authenticity** [1] - 56:1
**author** [1] - 78:22
**authorities** [12] -

86:11, 87:6, 87:11, 87:15, 90:10, 95:7, 95:15, 95:24, 95:25, 96:3, 96:6, 98:19
**authority** [4] - 86:8, 87:1, 100:1, 100:6
**available** [5] - 7:2, 61:10, 61:12, 64:2, 109:14
**availed** [2] - 95:9, 95:12
**Avenue** [4] - 1:18, 1:21, 2:3, 111:14
**avoid** [3] - 5:25, 49:20, 110:10
**aware** [8] - 9:23, 64:6, 85:21, 85:24, 104:21, 105:18, 106:1, 107:20

**B**

**backside** [1] - 28:18
**backup** [5] - 25:12, 106:14, 106:16, 106:17, 106:18
**bags** [1] - 20:6
**Bank** [8] - 27:15, 31:10, 52:16, 52:24, 53:3, 53:5, 73:23, 75:14
**bank** [5] - 31:10, 87:16, 87:18, 87:19, 101:18
**banker** [1] - 31:10
**Banking** [2] - 76:19, 77:17
**Barely** [1] - 55:1
**based** [8] - 5:8, 5:9, 61:6, 63:2, 98:3, 98:10, 105:13
**basis** [5] - 7:1, 61:9, 61:11, 63:18
**bear** [1] - 49:15
**Beckett** [4] - 85:19, 85:20, 85:21, 86:1
**becomes** [1] - 66:12
**BEFORE** [1] - 1:11
**beforehand** [1] - 9:18
**begin** [2] - 5:20, 86:25
**beginning** [3] - 22:3, 80:18, 103:4
**behalf** [2] - 75:5, 75:25
**behind** [3] - 103:12, 107:10, 107:21
**belief** [1] - 60:9

believes [1] - 58:22
below [2] - 28:1, 75:23
bench [3] - 54:17, 66:1, 93:2
beneath [4] - 74:3, 74:21, 75:3, 75:19
best [10] - 76:15, 81:19, 83:10, 90:25, 95:21, 96:4, 96:8, 101:8, 104:8, 111:7
better [1] - 108:16
between [2] - 81:5, 108:13
binder [2] - 92:16, 96:21
birth [1] - 74:25
bit [11] - 5:1, 57:20, 59:4, 60:11, 64:18, 89:20, 95:18, 102:7, 102:20, 104:24, 106:9
Bitcoaster [3] - 28:16, 30:24, 100:20
BITCOASTER [2] - 29:2, 31:4
Bitcoin [22] - 53:16, 75:22, 76:23, 78:12, 79:4, 79:15, 83:17, 90:19, 91:8, 91:21, 92:4, 94:15, 95:3, 95:4, 98:24, 99:1, 103:12, 105:18, 105:22, 106:4, 106:17, 106:25
Bitcoins [1] - 103:8
black [5] - 27:4, 27:24, 28:10, 30:24, 58:10
blanket [1] - 63:4
block [1] - 75:10
blocking [1] - 33:2
blow [1] - 106:8
Bluetooth [1] - 23:21
bold [1] - 79:10
book [1] - 34:14
Books [1] - 16:11
border [1] - 45:19
Border [5] - 9:5, 9:22, 10:1, 10:11, 80:14
borders [1] - 8:11
bothered [1] - 9:14
bottom [3] - 5:2, 27:17, 28:11
box [4] - 15:3, 79:4, 79:15, 79:23
boxes [1] - 103:16
brand [1] - 16:11
branded [1] - 20:8
bravo [1] - 23:13

break [11] - 5:2, 12:3, 57:17, 59:6, 59:15, 59:23, 62:20, 65:3, 70:22, 71:4, 108:4
breaking [2] - 65:8, 109:15
bricks [1] - 18:22
briefing [2] - 67:8, 67:10
briefly [3] - 7:23, 45:16, 46:1
bring [5] - 12:2, 58:21, 62:7, 62:10, 67:11
bringing [1] - 67:16
broadcasting [1] - 92:6
Brooklyn [1] - 1:25
brought [1] - 80:22
BROWN [161] - 1:14, 5:13, 5:18, 5:23, 6:17, 6:22, 7:5, 7:13, 12:12, 12:16, 12:18, 12:21, 13:8, 13:13, 13:17, 13:21, 14:17, 15:1, 15:24, 16:6, 17:2, 17:10, 18:6, 18:14, 19:4, 19:5, 19:16, 19:24, 21:8, 21:23, 24:17, 25:6, 26:10, 26:24, 30:5, 30:19, 32:7, 32:13, 32:20, 33:13, 33:15, 36:24, 37:9, 37:19, 37:21, 38:7, 38:15, 38:17, 38:19, 38:25, 39:1, 40:9, 40:10, 40:17, 40:24, 41:4, 41:7, 41:11, 41:17, 42:3, 42:6, 42:12, 42:18, 43:11, 43:19, 43:25, 44:2, 44:5, 44:6, 44:16, 44:17, 45:6, 45:14, 45:24, 46:1, 46:2, 46:11, 46:19, 46:25, 47:2, 47:9, 47:10, 47:23, 48:5, 48:11, 48:17, 48:20, 48:24, 49:2, 49:10, 49:15, 49:20, 49:23, 50:2, 50:3, 50:12, 50:14, 50:17, 51:1, 51:9, 51:15, 51:18, 52:2, 52:13, 52:14, 52:22, 53:14, 54:4, 54:6, 54:11, 55:17, 56:4, 56:7, 56:12, 57:20, 58:4, 58:15, 59:9, 62:22, 63:2, 63:8, 63:13, 64:10,

65:1, 65:12, 65:18, 65:20, 67:2, 67:5, 68:2, 68:9, 71:1, 71:17, 71:21, 72:1, 72:11, 73:8, 74:7, 74:15, 75:7, 75:9, 76:2, 76:3, 76:12, 77:8, 77:9, 77:23, 78:6, 78:20, 78:21, 80:11, 80:12, 81:24, 88:22, 89:11, 92:24, 93:4, 93:17, 102:17, 104:4, 110:3
Brown [9] - 3:4, 40:22, 55:12, 56:6, 57:15, 56:17, 67:23, 89:10, 93:16
BSA [1] - 53:4
built [1] - 104:19
burden [1] - 7:6
Bureau [2] - 53:11, 53:12
business [21] - 6:11, 6:14, 28:4, 28:5, 28:16, 30:24, 31:6, 31:9, 53:8, 53:17, 54:2, 74:1, 75:17, 76:18, 89:4, 89:7, 89:15, 100:17, 100:19, 101:3, 101:7
businesses [4] - 52:16, 52:24, 76:9, 76:14
butcher [1] - 86:9
BY [59] - 2:1, 12:12, 12:21, 13:21, 15:1, 16:6, 17:10, 18:14, 19:5, 19:24, 21:23, 25:6, 26:24, 30:19, 33:15, 37:9, 37:21, 38:15, 38:19, 39:1, 40:10, 42:18, 43:19, 44:2, 44:6, 44:17, 45:14, 46:2, 46:19, 47:2, 47:10, 48:11, 48:20, 50:3, 50:14, 51:1, 51:18, 52:14, 52:22, 53:14, 54:6, 73:8, 74:15, 75:9, 76:3, 76:12, 77:9, 78:6, 78:21, 80:12, 82:12, 84:5, 86:5, 90:7, 94:7, 98:12, 103:1, 104:13, 106:10

━━━━ C ━━━━

cable [1] - 15:7
cannot [1] - 5:19
card [20] - 18:24,

27:5, 27:7, 27:10, 27:11, 27:14, 27:16, 27:24, 28:3, 28:4, 28:5, 28:6, 28:10, 28:16, 28:21, 28:25, 30:24, 31:6, 31:9
cards [7] - 14:1, 20:9, 20:15, 20:16, 22:10, 22:18, 22:20
carefully [1] - 60:12
Carmen [1] - 81:12
carry [1] - 23:7
case [36] - 6:6, 8:23, 9:2, 41:25, 55:15, 55:23, 57:2, 57:6, 57:7, 57:25, 59:1, 59:17, 62:15, 62:24, 63:20, 67:14, 68:24, 68:25, 69:10, 83:4, 83:6, 83:9, 83:12, 84:14, 86:6, 90:1, 99:3, 99:19, 105:25, 108:2, 108:8, 108:19, 109:9, 109:13, 109:19
cases [1] - 10:7
cash [3] - 27:5, 27:9, 27:11
categorical [2] - 6:25, 7:17
categories [1] - 22:1
CATHERINE [1] - 1:17
CBP [4] - 80:18, 81:4, 81:6, 81:19
CCP [1] - 35:25
center [1] - 74:19
central [3] - 6:10, 84:11, 107:16
certain [7] - 47:4, 58:15, 58:24, 61:5, 69:20, 93:10, 109:3
CERTIFICATE [1] - 111:1
certificate [1] - 56:24
certification [1] - 77:4
certified [9] - 54:1, 54:9, 55:18, 56:8, 56:9, 57:1, 72:5, 73:17, 77:16
certify [5] - 78:8, 78:10, 78:16, 78:17, 111:4
challenge [1] - 7:18
chance [3] - 61:2, 67:22, 94:8
changes [1] - 68:13
characterization [1] - 97:12

characters [1] - 23:3
charge [2] - 95:3, 95:4
charged [2] - 92:9, 93:22
charger [1] - 23:15
charges [1] - 69:7
charging [1] - 15:7
Charlie [1] - 73:10
check [6] - 53:16, 53:19, 62:19, 76:22, 77:1, 107:12
chief [2] - 62:3, 63:21
Chief [1] - 63:8
CHRISTOPHER [1] - 1:14
circled [1] - 74:20
Circuit [5] - 6:7, 7:5, 7:9, 7:14, 70:4
circumstance [1] - 64:3
circumstances [4] - 5:10, 55:25, 68:19, 69:12
claim [1] - 6:11
clarification [1] - 49:3
clarify [2] - 29:8, 42:8
clarity [1] - 49:18
clear [11] - 11:19, 27:23, 49:8, 50:11, 66:16, 67:6, 68:3, 68:18, 69:24, 70:20, 75:7
clearing [1] - 69:20
client [1] - 63:15
close [5] - 38:25, 47:9, 76:2, 80:11, 109:17
closely [1] - 86:7
closer [1] - 27:2
Code [2] - 73:23, 75:14
codes [2] - 25:12, 25:21
collaboration [1] - 99:19
colleagues [2] - 89:8, 101:19
collect [1] - 96:6
collecting [1] - 96:2
colored [1] - 28:15
colors [5] - 37:13, 38:22, 43:23, 46:23, 47:7
COLUMBIA [2] - 1:1, 1:15
Columbia [4] - 2:2,

76:16, 77:6, 111:13
**com** [2] - 29:2, 31:4
**coming** [2] - 9:10, 104:1
**comment** [1] - 81:22
**commentary** [2] - 110:7, 110:10
**comments** [1] - 60:6
**commonly** [1] - 44:14
**communicated** [1] - 89:8
**communications** [1] - 104:21
**companies** [2] - 79:10, 80:1
**company** [2] - 28:22, 79:23
**Company** [1] - 79:4
**complete** [4] - 63:25, 104:16, 109:2, 111:6
**completely** [1] - 10:2
**complies** [35] - 12:24, 13:24, 14:8, 15:4, 15:10, 15:14, 16:9, 16:14, 16:17, 17:13, 17:18, 17:21, 18:17, 19:1, 19:7, 20:2, 20:4, 20:19, 23:25, 24:8, 25:9, 25:25, 29:4, 31:23, 36:6, 36:12, 36:23, 39:21, 39:25, 40:13, 42:22, 47:15, 48:13, 51:4, 51:6
**comply** [1] - 8:12
**computer** [14] - 15:6, 17:15, 18:21, 23:6, 23:14, 23:22, 37:19, 82:15, 82:16, 82:20, 96:16, 102:2, 102:3, 105:8
**concern** [1] - 104:20
**concerned** [1] - 57:21
**conclude** [3] - 11:5, 11:21, 51:7
**concluded** [1] - 110:12
**conclusion** [2] - 5:3, 109:23
**condition** [15] - 13:6, 14:14, 15:21, 16:23, 18:2, 19:13, 21:4, 24:14, 26:7, 29:17, 30:3, 32:4, 36:18, 40:6, 45:3
**conduct** [3] - 59:18, 95:15, 108:19
**conducted** [4] - 22:5,

72:14, 73:24, 75:15
**confer** [1] - 41:24
**conference** [2] - 54:17, 93:2
**confident** [1] - 109:18
**confirm** [3] - 26:14, 84:3, 99:2
**confused** [1] - 95:18
**confusion** [2] - 43:2, 49:21
**consider** [1] - 60:23
**considers** [1] - 57:24
**consist** [1] - 38:20
**consisting** [1] - 47:6
**consists** [1] - 104:17
**constitute** [3] - 7:15, 66:19, 69:5
**constitutes** [2] - 66:8, 111:4
**Constitution** [2] - 2:3, 111:14
**contain** [4] - 20:7, 20:12, 20:21, 22:6
**contained** [6] - 13:23, 20:1, 22:8, 22:13, 22:15, 36:8
**container** [1] - 16:13
**containing** [1] - 29:5
**contains** [1] - 60:14
**contents** [22] - 12:23, 12:25, 14:6, 15:13, 15:15, 16:16, 17:20, 19:6, 20:5, 26:2, 26:25, 29:6, 31:21, 32:8, 36:13, 39:2, 39:19, 39:23, 39:24, 40:1, 44:18, 47:12
**context** [1] - 107:16
**contexts** [1] - 107:17
**continue** [6] - 12:9, 20:11, 23:17, 73:7, 103:9, 107:25
**Continued** [1] - 3:4
**CONTINUED** [1] - 12:11
**continuum** [1] - 66:9
**control** [2] - 74:1, 75:17
**conversation** [4] - 9:4, 10:25, 66:18, 81:16
**copies** [6] - 37:17, 43:3, 46:6, 46:8, 46:22, 47:5
**copy** [8] - 38:2, 38:4, 43:9, 51:21, 58:11, 77:20, 78:17
**correct** [37] - 10:22,

42:11, 44:20, 64:14, 72:17, 82:15, 83:7, 84:10, 84:16, 84:20, 84:25, 85:23, 86:7, 86:13, 86:15, 88:6, 88:9, 90:11, 91:24, 92:9, 95:11, 95:17, 96:3, 97:7, 97:12, 98:21, 98:22, 98:24, 99:5, 101:6, 103:12, 103:15, 106:5, 106:23, 107:1, 107:3, 110:9
**counsel** [8] - 32:14, 41:15, 41:24, 49:4, 54:22, 62:23, 85:25, 110:5
**couple** [1] - 70:17
**course** [5] - 53:15, 68:14, 76:22, 89:7, 89:23
**COURT** [190] - 1:1, 5:1, 5:17, 5:22, 6:13, 6:21, 7:4, 7:11, 7:19, 8:2, 8:5, 8:10, 8:20, 8:25, 9:6, 9:17, 10:5, 10:14, 10:19, 10:23, 11:4, 11:9, 11:11, 11:19, 12:2, 12:9, 13:10, 13:12, 13:14, 13:20, 14:19, 14:21, 16:1, 16:3, 17:4, 17:6, 18:8, 18:10, 19:18, 19:20, 21:10, 21:13, 21:15, 21:19, 24:19, 24:22, 24:24, 25:2, 26:12, 26:15, 26:17, 26:20, 30:7, 30:10, 30:12, 30:15, 32:9, 32:12, 32:16, 32:23, 32:25, 33:6, 33:10, 33:14, 37:1, 37:5, 38:9, 38:11, 40:19, 41:10, 41:15, 41:19, 42:4, 42:8, 42:14, 43:13, 43:15, 45:8, 45:10, 46:13, 46:15, 47:21, 48:1, 48:3, 48:7, 49:1, 49:9, 49:14, 49:17, 49:22, 50:1, 50:10, 50:19, 50:21, 51:12, 51:25, 52:4, 52:7, 52:9, 52:19, 53:10, 54:5, 54:13, 54:16, 54:22, 54:24, 55:1, 55:2, 55:12, 55:20, 56:9, 56:20, 57:4, 57:16, 58:2, 58:5, 59:3, 59:10, 59:14, 59:23, 60:3, 62:20, 63:1,

63:7, 63:10, 63:14, 64:11, 64:17, 64:20, 64:24, 65:2, 65:9, 65:13, 65:17, 65:19, 65:23, 67:3, 67:10, 68:7, 68:10, 68:23, 71:2, 71:5, 71:7, 71:15, 71:20, 71:25, 72:10, 72:16, 72:18, 72:22, 72:25, 73:7, 74:9, 74:11, 76:11, 77:25, 78:2, 82:1, 82:7, 84:1, 85:25, 86:3, 88:21, 88:24, 89:10, 89:13, 90:2, 90:4, 90:6, 93:1, 93:9, 93:23, 94:3, 94:6, 98:2, 98:9, 102:7, 102:11, 102:15, 102:19, 104:6, 108:1, 108:6, 108:11, 108:18, 108:25, 109:5, 109:9, 110:5
**Court** [20] - 2:1, 2:2, 11:11, 11:17, 32:24, 49:15, 54:20, 55:8, 56:25, 64:23, 65:20, 67:7, 68:4, 68:14, 70:5, 72:3, 82:6, 90:1, 111:12, 111:13
**court** [5] - 7:11, 11:7, 59:13, 60:23, 94:5
**Court's** [4] - 45:24, 48:17, 64:14, 77:8
**courtroom** [7] - 6:23, 12:5, 59:20, 60:2, 73:3, 108:22, 109:8
**COURTROOM** [15] - 12:4, 12:7, 12:15, 12:17, 12:20, 19:3, 59:22, 71:13, 71:19, 73:2, 73:5, 101:25, 102:3, 108:21, 108:24
**cover** [1] - 34:15
**CPB** [1] - 10:11
**creation** [1] - 46:9
**credit** [2] - 28:3, 28:10
**Crimes** [1] - 53:13, 73:24, 75:15
**crimes** [2] - 86:8, 99:19
**Criminal** [3] - 1:3, 53:2, 82:21
**criteria** [3] - 79:11, 80:2, 80:10
**critical** [1] - 67:14
**cross** [3] - 65:14, 82:5, 93:8
**Cross** [1] - 3:5

**CROSS** [1] - 82:11
**Cross-Examination** [1] - 3:5
**CROSS-EXAMINATION** [1] - 82:11
**cross-examine** [1] - 93:8
**crossed** [1] - 43:23
**crossing** [1] - 65:7
**crowded** [1] - 33:13
**CRR** [3] - 2:1, 111:3, 111:12
**cruise** [1] - 85:11
**cryptocurrency** [1] - 44:15
**custody** [6] - 8:9, 10:10, 69:5, 69:10, 69:17, 69:25
**Customs** [10] - 9:5, 9:22, 10:1, 10:11, 66:18, 69:17, 69:21, 70:9, 80:14, 80:21
**cut** [1] - 41:20
**Cyber** [1] - 84:6
**Cyrillic** [5] - 14:3, 34:6, 34:15, 34:22, 36:4

# D

**D-E-V-O-N** [1] - 86:2
**D.C** [12] - 1:6, 1:16, 1:19, 1:21, 2:4, 7:5, 7:9, 7:14, 70:4, 76:6, 92:1, 111:14
**daily** [3] - 96:13, 97:5, 97:10
**darknet** [1] - 91:21
**data** [3] - 96:1, 96:5, 96:9
**database** [4] - 53:20, 77:2, 77:19, 79:1
**date** [19] - 27:8, 27:16, 27:25, 28:12, 33:24, 34:1, 34:11, 34:20, 34:21, 34:22, 34:23, 34:24, 39:12, 39:14, 39:15, 74:25, 87:4, 91:5, 98:18
**Dated** [1] - 111:10
**dates** [3] - 39:11, 39:13, 100:16
**days** [1] - 69:19
**deadline** [1] - 60:17
**debit** [7] - 27:4, 27:14, 27:23, 27:24, 28:3, 28:6, 28:10
**debugging** [1] -

105:16
**decide** [3] - 5:8, 5:9, 11:13
**decides** [1] - 5:5
**decision** [4] - 60:14, 63:9, 65:21, 67:19
**Defendant** [13] - 1:7, 6:3, 24:25, 26:18, 30:13, 32:15, 33:4, 37:3, 51:13, 61:15, 61:17, 61:25, 62:4
**DEFENDANT** [1] - 1:23
**Defendant's** [10] - 16:21, 16:24, 24:12, 26:5, 29:15, 30:1, 32:2, 36:16, 40:4, 45:1
**Defense** [3] - 87:23, 88:14, 88:20
**defense** [33] - 5:19, 6:1, 7:24, 10:8, 13:23, 15:2, 17:12, 18:15, 20:3, 22:2, 25:8, 27:2, 27:22, 28:8, 30:21, 32:14, 33:17, 42:20, 45:16, 55:7, 57:25, 58:18, 58:24, 60:23, 62:5, 62:9, 62:22, 63:14, 64:5, 64:6, 64:7, 88:19
**defense's** [2] - 8:8, 8:17
**define** [1] - 95:12
**del** [1] - 81:12
**delta** [1] - 50:5
**deniability** [1] - 103:6
**DEPARTMENT** [2] - 1:18, 1:20
**Department** [3] - 53:12, 76:19, 77:16
**departure** [2] - 39:12, 39:15
**DEPUTY** [15] - 12:4, 12:7, 12:15, 12:17, 12:20, 19:3, 59:22, 71:13, 71:19, 73:2, 73:5, 101:25, 102:3, 108:21, 108:24
**describe** [7] - 15:5, 22:1, 43:21, 45:16, 46:20, 51:19, 105:11
**described** [2] - 67:15, 78:18
**description** [1] - 69:1
**deserves** [1] - 67:13
**designed** [1] - 5:25
**despite** [1] - 89:18

**details** [1] - 85:8
**detention** [1] - 9:20
**determination** [1] - 11:3
**determine** [1] - 10:23
**developed** [1] - 98:25
**developer** [1] - 81:14
**developers** [1] - 104:18
**development** [1] - 101:3
**device** [7] - 15:7, 22:23, 22:24, 23:1, 23:6, 23:21, 99:1
**devices** [7] - 20:14, 22:9, 22:22, 82:18, 82:21, 105:19, 106:2
**Devon** [3] - 85:18, 85:21, 86:2
**different** [12] - 23:13, 38:22, 43:22, 58:7, 63:24, 66:20, 69:10, 72:5, 101:4, 101:8, 105:11, 105:13
**diligent** [2] - 73:25, 75:16
**Direct** [1] - 3:4
**DIRECT** [1] - 12:11
**direct** [9] - 43:1, 65:21, 65:22, 70:24, 87:21, 92:16, 94:23, 96:20, 97:19
**directing** [6] - 24:4, 26:1, 45:21, 48:14, 92:21, 104:14
**disadvantages** [1] - 61:1
**disagree** [2] - 57:5, 63:10
**DISB** [8] - 76:20, 76:24, 77:2, 77:4, 77:21, 78:11, 78:17, 78:19
**disbelief** [1] - 60:7
**disbelieve** [1] - 85:3
**discard** [1] - 6:22
**disclose** [1] - 9:4
**discover** [1] - 62:4
**discovered** [1] - 83:6
**discovery** [2] - 58:19, 59:1
**discuss** [4] - 59:17, 99:19, 108:19, 109:1
**discussed** [1] - 90:18
**discussing** [1] - 87:9
**display** [1] - 75:7
**dispute** [1] - 70:1
**disputes** [1] - 55:7

**distinct** [1] - 68:21
**District** [5] - 2:2, 2:2, 76:16, 77:5, 111:13
**district** [2] - 11:7, 111:13
**DISTRICT** [4] - 1:1, 1:1, 1:11, 1:15
**divide** [1] - 21:25
**docket** [1] - 67:25
**document** [37] - 12:19, 34:5, 34:11, 34:15, 34:16, 34:20, 35:4, 35:25, 38:2, 38:5, 38:18, 38:21, 39:10, 43:20, 43:21, 46:22, 47:18, 47:19, 48:15, 48:19, 51:21, 55:14, 55:16, 56:2, 56:14, 57:15, 57:19, 57:22, 77:13, 77:19, 81:20, 93:6, 93:7, 93:8, 93:11, 94:24, 98:6
**documenting** [1] - 84:21
**documents** [4] - 35:2, 46:6, 47:6, 54:7
**done** [7] - 60:8, 68:12, 72:20, 96:21, 100:2, 108:8, 109:13
**dongles** [1] - 23:21
**door** [2] - 10:15, 10:24
**double** [1] - 42:24
**double-sided** [1] - 42:24
**doubt** [1] - 56:1
**doubtful** [1] - 66:1
**down** [7] - 7:11, 35:22, 44:3, 44:5, 78:20, 104:24, 108:25
**drawing** [1] - 9:9
**drew** [2] - 9:7, 107:5
**drive** [3] - 22:20, 22:22, 23:18
**drives** [3] - 17:15, 22:9, 23:9
**during** [23] - 13:2, 15:18, 16:20, 17:24, 19:10, 21:1, 24:1, 24:11, 26:5, 26:8, 29:14, 29:25, 32:1, 32:5, 36:15, 40:3, 40:7, 44:25, 53:15, 76:22, 78:13, 80:17, 81:15
**duties** [2] - 53:2, 89:24

**E**

**e-reader** [1] - 16:11
**early** [2] - 83:1, 83:7
**Easterbrook** [1] - 6:7
**easy** [1] - 68:1
**economic** [4] - 86:8, 87:1, 90:10, 99:18
**ectasy** [1] - 91:22
**EDWARDS** [2] - 2:1, 111:3
**Edwards** [1] - 111:12
**effect** [2] - 57:21, 60:13
**Eighth** [1] - 1:25
**either** [3] - 23:21, 49:7, 63:25
**ekeland** [1] - 49:11
**EKELAND** [122] - 1:23, 1:24, 7:22, 8:3, 8:7, 8:17, 8:24, 9:3, 9:12, 9:19, 10:8, 10:18, 10:22, 11:2, 11:7, 11:10, 11:15, 11:25, 13:11, 14:20, 16:2, 17:5, 18:9, 19:19, 21:11, 21:14, 21:16, 24:20, 24:23, 25:1, 26:13, 26:16, 26:19, 30:8, 30:11, 30:14, 32:10, 32:19, 32:21, 32:24, 33:3, 33:5, 37:4, 38:10, 40:20, 41:2, 41:6, 41:8, 41:12, 42:9, 42:13, 43:14, 45:9, 46:14, 47:24, 48:2, 49:3, 50:20, 51:8, 51:10, 52:5, 52:8, 52:18, 53:9, 54:14, 54:19, 54:25, 55:3, 56:5, 56:21, 57:13, 58:24, 59:11, 62:13, 64:12, 64:18, 64:21, 65:7, 65:10, 65:15, 68:11, 71:3, 71:6, 71:10, 72:17, 72:21, 72:23, 73:1, 74:10, 76:10, 78:1, 82:2, 82:10, 82:12, 84:2, 84:5, 86:2, 86:4, 86:5, 88:18, 89:2, 89:25, 90:3, 90:5, 90:7, 93:25, 94:7, 98:12, 101:23, 102:5, 102:13, 102:18, 102:20, 103:1, 104:5, 104:13, 106:7, 106:10, 107:24,

108:4, 108:9, 110:4
**Ekeland** [23] - 3:5, 7:20, 24:25, 26:18, 30:13, 33:4, 37:1, 37:3, 51:13, 58:6, 60:6, 61:13, 64:11, 66:4, 66:7, 66:25, 67:21, 67:25, 68:10, 70:23, 82:1, 93:19, 94:6
**electronic** [2] - 22:9, 77:20
**element** [1] - 57:25
**email** [15] - 6:16, 28:19, 28:25, 31:1, 31:3, 31:5, 31:11, 88:16, 89:14, 89:17, 89:21, 97:2, 97:25, 98:3, 98:16
**emails** [3] - 88:5, 88:8, 89:12
**emblem** [1] - 15:7
**employee** [1] - 104:12
**employer** [7] - 100:4, 100:9, 100:13, 100:15, 100:18, 101:10, 101:13
**employers** [1] - 101:17
**employment** [1] - 81:13
**empty** [1] - 22:4
**encryption** [2] - 22:23, 23:1
**enforcement** [16] - 10:5, 10:10, 10:16, 10:19, 53:21, 63:15, 66:21, 86:11, 86:21, 86:23, 87:1, 89:14, 89:17, 89:21, 100:1, 100:7
**Enforcement** [3] - 53:13, 73:24, 75:15
**enforcing** [1] - 53:3
**English** [4] - 14:1, 44:3, 44:4, 44:9
**enter** [3] - 6:11, 58:13, 69:20
**entered** [24] - 12:5, 13:16, 14:24, 16:5, 17:9, 18:13, 19:23, 21:22, 25:5, 26:23, 30:18, 33:9, 37:8, 38:14, 42:17, 43:18, 45:13, 46:18, 48:10, 50:24, 52:12, 73:3, 74:14, 78:5
**entering** [1] - 6:9
**entirely** [2] - 63:24,

93:9
**entitled** [1] - 62:4
**entitlement** [1] - 6:11
**entity** [2] - 27:10,
75:25
**entry** [1] - 78:10
**envelope** [35] -
12:22, 12:25, 13:19,
13:23, 14:4, 15:9,
15:12, 15:15, 16:16,
17:20, 20:24, 23:24,
25:24, 29:5, 29:6,
29:10, 29:12, 31:15,
36:5, 36:8, 36:10,
36:13, 39:2, 39:23,
40:1, 40:22, 40:25,
41:3, 41:23, 42:10,
44:19, 47:11, 48:19,
51:5, 51:7
**envelopes** [1] - 51:8
**escorted** [1] - 80:20
**ESQ** [5] - 1:14, 1:17,
1:20, 1:23, 1:23
**essentially** [3] -
87:16, 91:18, 96:2
**established** [1] -
55:13
**ETH** [2] - 44:10,
44:11
**Ethereum** [1] - 44:14
**EUR** [1] - 28:12
**evening** [1] - 108:12
**event** [1] - 80:15
**evidence** [46] - 7:25,
8:14, 9:18, 13:16,
14:24, 16:5, 17:9,
18:13, 19:23, 21:22,
25:5, 26:23, 29:22,
30:18, 33:9, 37:8,
38:14, 42:17, 43:18,
45:13, 46:18, 48:10,
49:6, 49:8, 50:24,
51:25, 52:3, 52:12,
61:6, 61:16, 62:1,
62:3, 63:6, 63:21,
63:22, 63:23, 64:5,
67:14, 74:14, 78:5,
88:20, 98:25, 101:22,
102:14
**evidentiary** [1] -
58:25
**exact** [1] - 103:25
**exactly** [7] - 5:21,
34:25, 66:6, 66:25,
92:10, 93:21, 109:22
**EXAMINATION** [2] -
12:11, 82:11
**Examination** [2] -
3:4, 3:5
**examination** [4] -

80:22, 81:3, 82:20,
82:22
**examine** [24] - 12:23,
14:6, 15:13, 16:16,
17:20, 19:6, 24:7,
24:25, 26:2, 26:18,
27:18, 29:6, 30:13,
31:21, 33:4, 37:1,
37:3, 39:22, 39:23,
44:18, 47:12, 48:21,
51:16, 93:8
**examines** [1] - 21:17
**excellent** [1] - 72:22
**exception** [2] - 61:8,
89:4
**exclude** [1] - 58:20
**excuse** [2] - 82:24,
95:4
**execute** [1] - 95:25
**execution** [1] - 24:1
**exhibit** [18] - 14:5,
32:8, 37:24, 40:22,
40:25, 43:5, 45:22,
47:16, 47:25, 48:3,
48:16, 49:5, 70:23,
73:10, 73:15, 74:18,
92:18, 92:19
**Exhibit** [119] - 3:9,
12:13, 12:16, 13:9,
13:12, 13:13, 13:15,
14:5, 14:18, 14:21,
14:23, 15:11, 15:25,
16:3, 16:4, 17:8,
18:10, 18:12, 18:21,
18:23, 19:2, 19:22,
20:20, 21:21, 22:3,
23:18, 24:4, 24:18,
25:2, 25:4, 26:1,
26:11, 26:20, 26:22,
27:1, 30:17, 31:18,
32:8, 32:25, 33:6,
33:8, 37:7, 37:10,
37:20, 38:8, 38:11,
38:13, 39:6, 39:7,
40:14, 40:17, 40:18,
40:23, 41:1, 41:9,
41:23, 42:14, 42:16,
42:21, 43:2, 43:3,
43:6, 43:8, 43:10,
43:12, 43:15, 43:17,
44:18, 44:20, 45:7,
45:10, 45:12, 45:22,
46:3, 46:7, 46:9,
46:12, 46:15, 46:17,
47:6, 47:12, 47:16,
48:6, 48:7, 48:9,
48:14, 48:22, 49:13,
50:5, 50:7, 50:8,
50:15, 50:18, 50:23,
51:3, 51:17, 51:20,

52:11, 54:11, 54:20,
55:5, 74:8, 74:11,
74:13, 77:10, 77:24,
78:2, 78:4, 87:24,
88:2, 88:14, 92:17,
96:20, 97:19, 101:22,
102:9, 102:16, 102:17
**Exhibits** [28] - 16:15,
17:2, 17:3, 17:6,
17:19, 18:7, 19:17,
19:20, 20:7, 20:10,
20:12, 20:21, 21:9,
21:19, 22:17, 22:19,
23:8, 23:10, 29:5,
29:23, 30:20, 36:7,
36:22, 36:25, 37:5,
39:22, 40:11, 87:23
**exhibits** [12] - 18:25,
22:11, 23:7, 23:20,
29:9, 29:22, 33:11,
39:3, 39:20, 41:3,
41:5, 41:12
**exists** [1] - 78:11
**exited** [2] - 59:20,
108:22
**expect** [1] - 109:13
**expedite** [1] - 67:24
**experience** [1] -
104:18
**expert** [1] - 82:15
**expertise** [1] - 96:15
**experts** [2] - 96:16,
96:19
**expiration** [4] - 27:8,
27:16, 27:25, 28:11
**explain** [4] - 25:10,
28:8, 86:17, 105:4
**explained** [1] - 63:8
**expressing** [1] - 60:7
**extreme** [1] - 66:12

## F

**F.3d** [3] - 6:7, 7:10,
7:14
**face** [1] - 61:21
**facilitate** [1] - 62:7
**fact** [4] - 55:22, 60:8,
66:3, 105:21
**failed** [1] - 62:9
**failure** [2] - 7:14,
7:16
**fair** [7] - 6:21, 42:2,
46:9, 55:13, 69:14,
77:20, 86:12
**fairly** [2] - 38:4, 69:1
**familiar** [8] - 52:15,
52:23, 53:1, 76:5,
83:22, 84:8, 100:20,

100:22
**family** [2] - 81:12,
99:24
**far** [1] - 106:2
**February** [2] - 1:7,
111:10
**federal** [4] - 73:21,
75:11, 75:12, 104:11
**Federal** [1] - 53:6
**Federation** [1] -
33:19
**fee** [6] - 92:9, 93:21,
94:2, 94:15, 94:19,
95:3
**feet** [2] - 81:2, 87:23
**fell** [1] - 47:17
**felt** [2] - 5:11, 5:14
**few** [2] - 21:25, 70:21
**field** [1] - 56:19
**file** [7] - 8:13, 63:19,
83:4, 83:6, 83:9,
83:12, 84:14
**filed** [2] - 62:24,
73:22, 75:4, 75:13,
75:25
**filing** [2] - 62:17,
67:22
**finally** [1] - 35:22
**Financial** [3] - 53:13,
73:24, 75:15
**financial** [1] - 101:18
**FinCEN** [14] - 53:17,
53:20, 53:22, 54:1,
54:9, 55:18, 56:13,
56:17, 72:3, 72:4,
72:13, 73:17, 73:25,
75:16
**fine** [16] - 24:22,
32:18, 32:23, 57:16,
64:10, 64:17, 65:15,
71:9, 72:16, 90:2,
90:4, 90:6, 94:3, 98:9,
102:13, 103:10
**finger** [1] - 74:17
**finish** [2] - 28:6,
108:5
**finished** [1] - 91:6
**finishing** [1] - 94:10
**fire** [1] - 101:9
**firm** [1] - 109:23
**first** [21] - 24:21,
27:4, 28:6, 33:18,
61:3, 66:24, 70:2,
70:19, 73:19, 73:20,
78:7, 79:15, 80:7,
82:5, 86:1, 91:3,
91:11, 93:22, 99:16,
99:17, 105:14
**fit** [1] - 22:20
**five** [7] - 27:20,

32:20, 32:21, 71:7,
81:2, 92:11, 104:18
**flight** [5] - 39:16,
69:16, 81:15, 81:20,
81:23
**Floor** [1] - 1:25
**Florida** [1] - 81:11
**flow** [3] - 96:1, 96:2,
96:9
**focused** [1] - 6:2
**Fog** [20] - 53:16,
75:22, 76:23, 78:12,
79:5, 79:15, 83:17,
90:19, 91:8, 92:4,
94:15, 95:4, 98:24,
99:1, 103:12, 105:18,
105:22, 106:4,
106:17, 106:25
**folders** [1] - 41:13
**folks** [1] - 110:1
**follow** [2] - 57:9,
58:16
**following** [11] - 12:6,
54:17, 59:12, 59:21,
60:2, 71:12, 73:4,
93:2, 94:4, 108:23,
109:8
**FOR** [4] - 1:1, 1:14,
1:14, 1:23
**force** [1] - 57:24
**foregoing** [1] - 111:4
**foreign** [2] - 69:16,
86:22
**forensics** [4] - 82:15,
82:20, 82:22, 96:16
**Forensics** [1] - 84:6
**forfeiture** [1] - 7:17
**Form** [2] - 73:25,
75:16
**former** [1] - 62:23
**forms** [3] - 66:10,
75:4, 75:24
**forth** [1] - 32:18
**forward** [2] - 33:10,
66:10
**foundation** [3] -
55:10, 57:3, 89:3
**foundational** [1] -
52:19
**founders** [1] -
106:25
**four** [1] - 20:6
**framework** [1] -
86:20
**frankly** [2] - 8:21,
67:12
**free** [4] - 68:24, 69:4,
69:8, 69:20
**Friday** [2] - 109:20,
109:25

**front** [15] - 5:8, 24:5, 28:16, 28:20, 31:18, 34:6, 36:1, 52:7, 54:20, 68:4, 73:9, 73:11, 82:19, 92:12, 93:7
**full** [3] - 78:8, 80:15, 111:5
**fully** [1] - 9:23, 70:15
**function** [1] - 55:7
**functioning** [1] - 97:16
**funeral** [1] - 109:21

### G

**gamesmanship** [2] - 11:12, 58:23
**general** [2] - 105:6, 105:7
**generally** [2] - 46:20, 108:13
**generates** [1] - 23:3
**gigantic** [1] - 59:1
**girlfriend** [1] - 85:10
**girlfriend's** [1] - 85:10
**given** [2] - 10:12, 66:3
**global** [3] - 27:5, 27:9, 27:11
**gmail** [1] - 25:12
**gold** [2] - 28:4, 28:15
**gold-colored** [1] - 28:15
**gold-plated** [1] - 28:4
**Google** [1] - 25:12
**government** [16] - 11:16, 55:18, 57:22, 73:21, 75:11, 75:12, 77:21, 86:15, 87:6, 87:15, 90:9, 95:9, 95:14, 95:24, 97:10, 107:23
**Government** [49] - 5:5, 5:6, 6:17, 7:23, 8:7, 8:18, 8:25, 9:3, 9:13, 13:8, 14:17, 15:24, 17:2, 18:6, 19:16, 21:8, 24:17, 26:10, 30:5, 32:7, 32:14, 36:24, 38:7, 40:9, 40:18, 43:11, 45:6, 46:11, 49:4, 49:12, 50:17, 53:6, 54:11, 56:23, 58:22, 61:15, 61:20, 62:6, 63:20, 64:7, 65:10,

66:5, 67:24, 68:9, 77:23, 81:24, 102:12, 102:13, 105:21
**GOVERNMENT** [1] - 12:10
**Government's** [27] - 8:13, 13:15, 14:23, 16:4, 17:8, 18:12, 19:22, 21:21, 25:4, 26:22, 30:17, 33:8, 37:7, 38:13, 42:16, 43:17, 45:12, 46:17, 48:9, 50:23, 52:11, 62:2, 63:5, 74:13, 78:4, 101:22, 102:2
**grammatical** [1] - 91:16
**grand** [1] - 92:12
**graph** [3] - 37:13, 42:25, 45:18
**great** [2] - 69:22, 70:24
**greater** [2] - 61:20, 109:11
**green** [2] - 28:10, 35:25
**ground** [1] - 55:11
**group** [1] - 47:18
**guess** [4] - 39:20, 62:8, 93:12, 109:22
**guilty** [1] - 56:10
**Gupta** [1] - 6:6

### H

**hand** [4] - 38:3, 38:5, 38:21, 50:4
**handcuff** [1] - 66:15
**handwritten** [10] - 37:12, 38:21, 42:25, 43:22, 43:24, 45:17, 46:23, 47:6, 47:19, 51:22
**happy** [6] - 6:22, 82:2, 82:8, 89:19, 89:25, 94:1
**hard** [1] - 17:15
**HASSARD** [2] - 1:23, 102:1
**head** [4] - 94:21, 100:14, 100:18, 107:18
**heads** [1] - 66:23
**hear** [6] - 7:19, 10:18, 54:24, 54:25, 55:4, 81:5
**heard** [2] - 8:22, 9:2
**hearing** [3] - 5:7, 5:24, 70:16

**hearings** [1] - 7:3
**hearsay** [6] - 55:10, 88:23, 89:1, 89:5, 89:17, 89:18
**heavydist@gmail.com** [2] - 25:13, 25:21
**held** [4] - 43:9, 46:6, 54:18, 93:3
**help** [4] - 12:18, 13:18, 67:19, 95:23
**hereby** [1] - 111:3
**hesitant** [1] - 64:18
**hidden** [1] - 92:5
**highlighting** [1] - 67:15
**highlights** [1] - 67:12
**hold** [7] - 8:4, 22:1, 25:7, 37:10, 42:19, 42:20, 45:15
**holding** [3] - 38:3, 38:5, 50:4
**holes** [1] - 45:20
**honest** [1] - 64:23
**honestly** [4] - 9:19, 62:14, 62:16, 64:15
**Honor** [105] - 5:13, 6:4, 7:22, 8:17, 8:24, 9:12, 9:19, 10:8, 10:22, 11:2, 11:8, 11:15, 12:1, 13:11, 13:13, 14:20, 16:2, 17:5, 18:9, 19:19, 21:18, 24:23, 25:1, 26:13, 26:19, 30:8, 30:14, 32:11, 32:13, 33:5, 37:4, 38:10, 40:20, 41:17, 42:3, 42:7, 43:14, 45:9, 46:14, 48:2, 48:17, 48:24, 49:3, 49:10, 49:25, 50:20, 52:13, 52:18, 53:9, 54:4, 54:14, 54:19, 55:17, 56:5, 56:7, 56:12, 56:18, 56:21, 57:13, 57:20, 58:4, 58:15, 58:24, 59:9, 59:11, 59:25, 62:13, 62:22, 64:10, 65:1, 67:2, 67:5, 67:6, 68:2, 68:9, 68:15, 71:1, 71:3, 71:10, 71:17, 71:21, 72:17, 74:7, 74:10, 76:10, 78:1, 81:24, 82:3, 84:2, 88:18, 89:2, 89:11, 89:25, 92:24, 93:4, 93:17, 94:1, 98:8, 102:6, 104:4, 104:5, 107:24, 109:4, 110:3, 110:4

**HONORABLE** [1] - 1:11
**hopefully** [1] - 65:3
**hopes** [1] - 99:5
**hosted** [1] - 99:1
**hotel** [1] - 39:8
**Hotel** [1] - 39:8
**hours** [2] - 69:19, 70:17
**Howell** [1] - 63:8
**hurdle** [1] - 70:19

### I

**idea** [1] - 63:3
**identical** [1] - 45:19
**identification** [2] - 88:14, 88:20
**identifier** [3] - 75:19, 75:21, 79:3
**identifiers** [8] - 72:5, 74:4, 74:21, 74:24, 79:14, 79:20, 79:22, 80:6
**identifying** [2] - 28:8, 36:2
**identity** [2] - 6:10, 34:5
**IKEA** [2] - 20:8, 20:13
**IKEA-branded** [1] - 20:8
**imaging** [1] - 99:5
**immigration** [1] - 6:8
**impeach** [2] - 93:23, 93:25
**impeached** [1] - 93:20
**impeachment** [1] - 93:19
**implication** [1] - 72:8
**important** [1] - 5:5
**impression** [2] - 67:13, 68:22
**improper** [2] - 63:3, 92:24
**include** [1] - 60:4
**included** [1] - 110:7
**including** [1] - 6:6
**income** [1] - 101:16
**income-wise** [1] - 101:16
**independently** [1] - 5:4
**INDEX** [1] - 3:1
**indicate** [2] - 74:17, 78:11
**indicated** [2] - 35:10, 35:20

**indicates** [1] - 60:17
**indicating** [1] - 98:25
**indiscernible** [1] - 41:14
**individual** [1] - 75:5
**individuals** [1] - 80:9
**indulgence** [3] - 45:24, 48:17, 77:8
**inform** [1] - 67:19
**information** [4] - 27:7, 36:2, 62:6, 96:9
**ink** [5] - 37:13, 38:22, 43:23, 45:18, 47:7
**inquiry** [1] - 6:5
**inside** [8] - 15:3, 29:12, 33:20, 34:7, 34:16, 35:6, 35:18, 36:3
**instance** [2] - 95:14, 105:6
**instruct** [1] - 57:8
**instruction** [2] - 55:24, 57:9
**Insurance** [2] - 76:19, 77:17
**intend** [2] - 29:21, 41:7
**intended** [1] - 56:14
**intending** [1] - 8:19
**intends** [1] - 63:20
**intent** [3] - 7:24, 61:16, 62:2
**interactions** [1] - 105:9
**Intercontinental** [1] - 39:8
**International** [2] - 39:17, 80:21
**internet** [2] - 90:10, 90:12
**interpretation** [1] - 68:8
**interrogating** [1] - 10:12
**interrogation** [3] - 5:10, 5:12, 70:7
**interview** [4] - 83:16, 99:21, 99:24, 100:4
**introduce** [1] - 29:21
**Investigation** [2] - 53:3, 82:22
**investigation** [15] - 53:15, 76:22, 82:24, 82:25, 83:3, 83:7, 87:5, 87:14, 88:9, 88:9, 90:9, 95:6, 95:10, 99:20, 103:22
**investigations** [2] - 53:5, 89:22
**investigative** [4] -

82:16, 97:9, 99:2, 101:19

**investigator** [1] - 88:4

**investigatory** [1] - 86:6

**investors** [1] - 83:17

**invoice** [1] - 39:8

**involved** [5] - 84:22, 100:24, 101:4, 101:6, 108:6

**IP** [4] - 85:14, 92:6, 96:2, 105:9

**iPhone** [1] - 23:15

**irons** [1] - 101:9

**IRS** [5] - 37:17, 43:3, 53:2, 82:21, 85:2

**IRS-Criminal** [2] - 53:2, 82:21

**issuance** [3] - 33:24, 34:11, 34:20

**issue** [10] - 5:2, 11:6, 34:22, 55:24, 57:2, 66:22, 70:18, 71:16, 72:18, 90:1

**Item** [1] - 30:24

**item** [26] - 13:5, 14:9, 15:17, 15:20, 16:10, 24:9, 24:11, 25:22, 27:4, 27:13, 27:14, 27:18, 27:21, 27:23, 28:14, 28:15, 31:8, 33:18, 34:3, 34:4, 35:14, 35:22, 35:23, 35:24, 41:22, 51:2

**items** [72] - 13:2, 13:5, 14:11, 15:5, 15:17, 15:20, 16:18, 16:20, 16:23, 17:11, 17:14, 17:22, 17:24, 18:2, 18:16, 18:18, 19:8, 19:10, 19:13, 20:24, 21:1, 21:4, 21:17, 21:24, 22:6, 22:8, 22:12, 22:13, 22:15, 23:23, 24:25, 26:4, 26:18, 27:19, 27:20, 28:2, 29:3, 29:12, 29:14, 29:20, 29:21, 29:22, 29:25, 30:6, 30:13, 30:23, 31:14, 31:16, 31:24, 32:1, 32:20, 33:4, 33:16, 35:2, 35:15, 35:16, 36:15, 36:18, 36:21, 36:25, 37:3, 40:3, 40:6, 41:4, 41:12, 41:23, 44:23, 44:25, 45:3, 51:7

**itself** [2] - 61:8, 70:5

## J

**jail** [1] - 69:7

**January** [2] - 75:5, 76:1

**JEFFREY** [1] - 1:20

**job** [2] - 88:4, 88:11

**jobs** [1] - 101:17

**joined** [1] - 83:3

**judge** [1] - 71:13

**JUDGE** [1] - 1:11

**Judge** [2] - 6:7, 63:8

**July** [1] - 34:2

**juncture** [1] - 101:5

**JUROR** [1] - 108:17

**juror** [1] - 109:21

**jury** [71] - 12:2, 12:5, 12:7, 12:23, 13:22, 14:7, 14:22, 15:2, 15:13, 16:8, 17:12, 18:15, 19:21, 19:25, 22:1, 22:2, 25:3, 25:8, 27:1, 27:21, 28:7, 29:7, 30:16, 30:20, 31:22, 33:7, 33:12, 33:17, 36:11, 37:6, 39:24, 42:15, 42:20, 43:16, 44:19, 45:11, 45:15, 46:16, 47:1, 47:14, 48:8, 48:12, 50:22, 51:2, 51:16, 52:10, 55:4, 56:22, 57:8, 57:23, 59:14, 59:20, 60:7, 71:14, 71:16, 72:19, 73:3, 74:12, 78:3, 82:19, 86:17, 90:18, 92:12, 102:22, 105:4, 106:3, 108:7, 108:11, 108:22, 109:23

**JURY** [1] - 1:10

**jury's** [1] - 33:2

**JUSTICE** [2] - 1:18, 1:20

## K

**K-O-B-I-L** [1] - 22:24

**keep** [5] - 71:16, 102:7, 105:1, 105:15, 105:16

**keeping** [3] - 39:20, 49:23, 72:19

**Kerr** [1] - 78:23

**kind** [3] - 23:14, 25:14, 96:11

**knowledge** [5] - 76:15, 85:5, 90:14,

101:8, 106:6

**Kobil** [1] - 22:24

## L

**lab** [1] - 82:22

**lack** [2] - 55:10, 68:5

**lacks** [1] - 57:3

**laid** [1] - 89:3

**landed** [1] - 9:21

**landing** [1] - 68:17

**language** [9] - 8:5, 37:15, 38:23, 43:24, 46:24, 47:8, 60:14, 60:22, 68:24

**language-text** [1] - 43:24

**languages** [1] - 37:15

**laptop** [2] - 15:6, 15:8

**last** [12] - 27:18, 28:14, 28:15, 34:8, 35:22, 47:11, 79:15, 80:7, 80:8, 80:13, 104:6, 109:9

**latest** [1] - 23:15

**launder** [1] - 91:18

**law** [21] - 6:6, 10:5, 10:10, 10:16, 10:19, 53:21, 63:15, 66:20, 68:24, 68:25, 69:14, 86:11, 86:21, 86:22, 87:1, 89:14, 89:16, 89:21, 90:1, 100:1, 100:7

**LAW** [1] - 1:24

**lawyer** [2] - 63:14, 67:18

**LAX** [2] - 9:21, 68:17

**least** [9] - 10:25, 67:14, 67:22, 70:21, 87:9, 90:25, 97:9, 97:25, 109:18

**leather** [3] - 22:3, 22:6, 22:13

**leave** [7] - 5:12, 68:17, 68:20, 68:25, 69:4, 69:8, 70:7

**leaving** [1] - 68:22

**left** [4] - 27:15, 38:3, 106:1, 107:22

**Legal** [2] - 86:19, 95:22

**legal** [1] - 66:3

**LEGO** [1] - 18:22

**lengthy** [1] - 109:9

**letter** [1] - 78:22

**level** [2] - 5:20, 11:7

**liberty** [4] - 5:12, 66:11, 70:7, 109:11

**license** [4] - 76:17, 76:24, 77:18, 78:12

**licenses** [1] - 53:24

**licensing** [5] - 76:5, 76:8, 76:13, 77:5, 78:23

**light** [1] - 62:8

**lightening** [1] - 106:13

**limiting** [1] - 55:24

**Line** [2] - 92:21, 94:24

**line** [8] - 5:3, 9:7, 9:10, 56:3, 69:15, 69:16, 71:23, 107:5

**Lines** [1] - 94:9

**Lisa** [1] - 111:12

**LISA** [2] - 2:1, 111:3

**list** [1] - 61:5

**listed** [3] - 75:5, 75:25, 79:20

**listening** [1] - 9:25

**literally** [1] - 57:24

**local** [1] - 62:23

**locate** [2] - 12:18, 13:18

**located** [1] - 81:19

**locations** [3] - 106:14, 106:16, 106:18

**log** [7] - 23:2, 23:3, 23:4, 23:5, 105:4, 105:8, 105:12

**log-in** [3] - 23:2, 23:3, 23:4

**logo** [7] - 27:5, 27:15, 27:24, 27:25, 28:11, 36:1

**logs** [9] - 96:13, 97:5, 97:11, 105:2, 105:15, 105:16, 105:18, 105:22, 106:4

**look** [27] - 6:5, 21:11, 24:20, 26:13, 27:2, 29:22, 30:8, 32:10, 33:10, 47:24, 62:21, 64:13, 64:16, 64:22, 65:2, 66:6, 67:22, 68:1, 73:14, 75:8, 77:10, 87:9, 87:22, 88:1, 88:13, 94:2, 96:22

**looked** [4] - 60:11, 82:19, 94:10, 96:11

**looking** [8] - 5:2, 7:22, 37:14, 39:10, 40:17, 78:7, 79:12, 85:9

**looks** [4] - 18:22, 20:5, 25:18, 71:25

**Los** [2] - 39:16, 80:21

**lost** [1] - 52:5

**louder** [1] - 54:23

**luggage** [19] - 13:3, 14:12, 15:18, 16:21, 16:25, 17:25, 18:4, 19:11, 21:2, 24:12, 26:5, 29:15, 30:1, 32:2, 36:16, 40:4, 45:1, 80:23, 80:24

## M

**maintaining** [2] - 73:22, 75:13

**manager** [1] - 78:23

**mandates** [1] - 5:16

**manual** [2] - 81:20, 107:11

**manufactured** [1] - 22:24

**mark** [4] - 48:24, 49:16, 49:20, 105:15

**marked** [8] - 12:14, 41:4, 49:4, 49:13, 50:5, 73:10, 88:13, 88:19

**market** [1] - 91:21

**marking** [1] - 47:17

**marks** [1] - 28:8

**maroon** [2] - 34:14, 35:4

**MasterCard** [2] - 27:5, 27:24

**match** [2] - 50:7, 50:15

**matches** [1] - 50:11

**material** [2] - 57:6, 57:7

**materials** [3] - 24:2, 58:12, 65:4

**matter** [5] - 63:24, 66:12, 70:6, 92:13, 105:21

**Matthew** [2] - 60:1, 109:7

**MATTHEW** [2] - 3:3, 12:10

**Max** [3] - 28:17, 28:24, 30:25

**max@bitcoaster** [2] - 29:2, 31:4

**mean** [13] - 5:20, 8:6, 9:17, 10:24, 22:25, 56:7, 56:19, 69:8, 89:13, 89:18, 95:12,

97:2, 106:16

**meaning** [1] - 66:3
**means** [3] - 69:24, 107:16, 109:24
**meant** [2] - 50:12, 107:13
**measure** [1] - 20:8
**measures** [2] - 20:13, 20:16
**meet** [4] - 60:17, 79:11, 80:1, 80:9
**members** [4] - 59:14, 97:9, 99:24, 108:11
**memo** [1] - 84:21
**memory** [2] - 62:17, 96:8
**mention** [1] - 9:1
**mentioned** [1] - 84:9
**merely** [1] - 11:3
**merits** [1] - 70:1
**message** [6] - 91:8, 91:13, 91:15, 91:16, 91:23, 92:2
**met** [1] - 99:18
**metal** [1] - 28:15
**metallic** [1] - 31:5
**Mexico** [1] - 81:12
**Miami** [4] - 84:16, 84:24, 85:4, 85:23
**MICHAEL** [1] - 1:23
**micro** [4] - 18:23, 20:13, 22:19, 23:18
**microphone** [1] - 41:16
**mid** [1] - 61:1
**mid-trial** [1] - 61:1
**middle** [4] - 5:24, 7:3, 7:7, 70:17
**might** [6] - 40:15, 63:19, 66:14, 67:24, 91:14, 96:10
**mind** [2] - 61:22, 63:12
**mine** [1] - 102:1
**mini** [2] - 18:21, 85:10
**mini-computer** [1] - 18:21
**minutes** [5] - 59:16, 70:22, 71:8, 108:13
**Miranda** [6] - 5:2, 6:5, 6:8, 10:13, 61:6, 70:5
**mirrors** [1] - 60:22
**mismatch** [1] - 6:8
**misreading** [1] - 62:11
**misspoke** [1] - 40:24
**mistake** [3] - 64:14, 67:20, 91:16

**MLAT** [9] - 86:14, 86:18, 86:19, 87:8, 95:10, 95:19, 95:20, 96:1
**mobile** [3] - 20:8, 22:10, 22:17
**Molly** [1] - 91:18
**moment** [3] - 9:21, 10:11, 30:9
**money** [16] - 52:16, 52:24, 53:7, 53:17, 54:2, 74:1, 75:17, 76:5, 76:9, 76:14, 76:18, 76:23, 77:5, 77:17, 78:12, 91:18
**Money** [1] - 76:6
**money-transmitter** [3] - 77:5, 77:17, 78:12
**money-transmitting** [3] - 76:9, 76:14, 76:18
**moniker** [1] - 107:2
**Monique** [1] - 78:23
**month** [1] - 109:13
**months** [3] - 63:4, 84:25, 85:4
**Moon** [8] - 95:16, 96:7, 97:6, 97:16, 97:23, 98:20, 98:23, 100:22
**morning** [5] - 70:25, 82:5, 108:5, 108:15, 108:18
**Moscow** [1] - 39:9
**MOSS** [1] - 1:11
**most** [6] - 45:18, 61:23, 66:12, 67:14, 76:8, 76:13
**mother** [1] - 85:10
**motion** [21] - 5:16, 7:1, 7:6, 7:8, 7:15, 8:13, 60:15, 60:18, 61:4, 61:6, 61:9, 61:11, 62:7, 62:10, 62:25, 63:19, 64:16, 68:1
**motions** [1] - 65:4
**move** [15] - 7:16, 14:5, 15:11, 19:2, 28:7, 34:13, 36:7, 39:5, 52:2, 62:1, 63:16, 74:7, 93:18, 104:7, 109:11
**moved** [2] - 49:5, 58:20
**moves** [22] - 13:8, 14:17, 15:24, 17:2, 18:6, 19:16, 21:8, 24:17, 26:10, 30:5, 32:7, 36:24, 38:7,

40:9, 40:18, 43:11, 45:6, 46:11, 49:12, 50:17, 54:11, 77:23
**moving** [19] - 16:15, 17:19, 27:13, 29:5, 31:18, 34:3, 35:14, 44:18, 51:24, 55:24, 76:4, 79:16, 79:19, 80:3, 93:19, 102:7, 108:2, 108:9, 109:18
**MR** [281] - 5:13, 5:18, 5:23, 6:17, 6:22, 7:5, 7:13, 7:22, 8:3, 8:7, 8:17, 8:24, 9:3, 9:12, 9:19, 10:8, 10:18, 10:22, 11:2, 11:7, 11:10, 11:15, 11:25, 12:12, 12:16, 12:18, 12:21, 13:8, 13:11, 13:13, 13:17, 13:21, 14:17, 14:20, 15:1, 15:24, 16:2, 16:6, 17:2, 17:5, 17:10, 18:6, 18:9, 18:14, 19:4, 19:5, 19:16, 19:19, 19:24, 21:8, 21:11, 21:14, 21:16, 21:23, 24:17, 24:20, 24:23, 25:1, 25:6, 26:10, 26:13, 26:16, 26:19, 26:24, 30:5, 30:8, 30:11, 30:14, 30:19, 32:7, 32:10, 32:13, 32:19, 32:20, 32:21, 32:24, 33:3, 33:5, 33:13, 33:15, 36:24, 37:4, 37:9, 37:19, 37:21, 38:7, 38:10, 38:15, 38:17, 38:19, 38:25, 39:1, 40:9, 40:10, 40:17, 40:20, 40:24, 41:2, 41:4, 41:6, 41:7, 41:8, 41:11, 41:12, 41:17, 42:3, 42:6, 42:9, 42:12, 42:13, 42:18, 43:11, 43:14, 43:19, 43:25, 44:2, 44:5, 44:6, 44:16, 44:17, 45:6, 45:9, 45:14, 45:24, 46:1, 46:2, 46:11, 46:14, 46:19, 46:25, 47:2, 47:9, 47:10, 47:23, 47:24, 48:2, 48:5, 48:11, 48:17, 48:20, 48:24, 49:2, 49:3, 49:10, 49:15, 49:20, 49:23, 50:2, 50:3, 50:12, 50:14, 50:17, 50:20, 51:1, 51:8, 51:9,

51:10, 51:15, 51:18, 52:2, 52:5, 52:8, 52:13, 52:14, 52:18, 52:22, 53:9, 53:14, 54:4, 54:6, 54:11, 54:14, 54:19, 54:25, 55:3, 55:17, 56:4, 56:5, 56:7, 56:12, 56:21, 57:13, 57:20, 58:4, 58:15, 58:24, 59:9, 59:11, 62:13, 62:22, 63:2, 63:8, 63:13, 64:10, 64:12, 64:18, 64:21, 65:1, 65:7, 65:10, 65:12, 65:15, 65:18, 65:20, 67:2, 67:5, 68:2, 68:9, 68:11, 71:1, 71:3, 71:6, 71:10, 71:17, 71:21, 72:1, 72:11, 72:17, 72:21, 72:23, 73:1, 73:8, 74:7, 74:10, 74:15, 75:7, 75:9, 76:2, 76:3, 76:10, 76:12, 77:8, 77:9, 77:23, 78:1, 78:6, 78:20, 78:21, 80:11, 80:12, 81:24, 82:2, 82:10, 82:12, 84:2, 84:5, 86:2, 86:4, 86:5, 88:18, 88:22, 89:2, 89:11, 89:25, 90:3, 90:5, 90:7, 92:24, 93:4, 93:17, 93:25, 94:7, 98:12, 101:23, 102:1, 102:5, 102:13, 102:17, 102:18, 102:20, 103:1, 104:4, 104:5, 104:13, 106:7, 106:10, 107:24, 108:4, 108:9, 110:3, 110:4
**MS** [2] - 102:9, 102:16
**MSB** [1] - 72:14
**MSI** [1] - 15:6
**multicolored** [1] - 45:18
**multiple** [2] - 45:17, 46:23
**must** [2] - 6:25, 60:16
**Mutual** [2] - 86:19, 95:21

**N**

**N26** [1] - 27:24
**name** [38] - 27:9,

27:10, 27:12, 27:16, 27:25, 28:12, 28:13, 28:20, 28:24, 31:10, 35:10, 35:12, 35:18, 35:20, 56:16, 72:14, 79:15, 79:23, 80:7, 83:13, 83:14, 83:15, 83:19, 84:9, 86:1, 86:9, 100:9, 100:13, 100:15, 100:19, 100:21, 100:23, 100:25, 101:1, 101:10, 101:13
**Name** [1] - 79:4
**names** [3] - 83:11, 101:2, 101:5
**NAT** [5] - 107:10, 107:11, 107:15, 107:17, 107:21
**National** [1] - 84:6
**nationality** [1] - 6:10
**nations** [2] - 86:20
**nature** [3] - 68:20, 96:12, 105:10
**NCFTA** [3] - 83:22, 83:24, 84:4
**necessarily** [4] - 69:4, 69:8, 69:10, 72:9
**need** [12] - 5:7, 41:21, 42:4, 58:12, 62:14, 64:3, 64:16, 65:2, 65:4, 70:10, 70:24, 71:8
**needed** [1] - 109:24
**net** [2] - 96:1, 96:9
**Network** [3] - 53:13, 73:24, 75:15
**never** [5] - 9:7, 9:13, 90:14, 99:6, 99:7
**new** [1] - 56:24
**New** [2] - 1:21, 1:25
**next** [21] - 12:3, 14:5, 27:13, 27:14, 27:18, 27:21, 27:23, 34:3, 34:13, 35:16, 52:20, 61:22, 76:4, 78:15, 79:6, 79:12, 79:16, 79:24, 80:3, 93:18, 109:14
**night** [1] - 68:18
**nobody** [1] - 103:6
**none** [1] - 79:18
**nonhearsay** [2] - 89:15, 89:22
**Nordea** [2] - 27:14, 31:9
**Northwest** [5] - 1:15, 1:18, 1:21, 2:3, 111:14

**Nos** [6] - 17:8, 18:12, 19:22, 21:21, 30:17, 37:7

notably [1] - 61:19
note [2] - 11:3, 11:17
notebook [1] - 87:22
notes [14] - 37:12, 37:14, 37:15, 37:17, 38:22, 42:25, 43:9, 43:22, 45:17, 47:18, 47:19, 51:22, 70:5, 111:5
nothing [2] - 56:23, 102:4
notice [5] - 6:1, 7:24, 8:18, 62:2, 63:4
notify [1] - 61:15
notion [1] - 89:21
November [4] - 91:12, 91:14, 94:18
number [22] - 12:18, 13:18, 19:3, 25:12, 27:8, 27:16, 27:25, 28:1, 28:11, 28:18, 48:3, 49:5, 50:11, 55:9, 55:11, 67:25, 75:1, 86:20, 89:11, 90:18, 103:25, 104:20
numbers [2] - 31:11, 101:20
numerous [2] - 22:9, 47:7

**O**

oath [1] - 8:20
object [4] - 55:11, 56:21, 57:14, 61:17
objecting [3] - 11:22, 11:23, 11:24
objection [58] - 10:9, 11:3, 11:18, 11:20, 13:10, 13:11, 14:19, 14:20, 16:1, 16:2, 17:4, 17:5, 18:8, 18:9, 19:18, 19:19, 21:10, 21:18, 24:19, 25:1, 26:12, 26:19, 30:7, 30:14, 32:9, 32:14, 33:5, 37:4, 38:9, 38:10, 40:19, 40:20, 42:14, 43:13, 43:14, 45:8, 45:9, 46:13, 46:14, 48:2, 50:19, 50:20, 52:4, 52:8, 52:18, 53:9, 54:13, 55:13, 58:17, 60:24, 65:13, 72:24, 74:9, 74:10, 76:10, 77:25,

78:1, 88:21
objections [3] - 6:25, 55:9, 58:25
objective [3] - 5:10, 66:12, 70:6
obligations [1] - 8:12
obtain [2] - 76:17, 98:19
obtained [1] - 76:23
obvious [1] - 58:9
obviously [2] - 55:6, 63:25
occasion [2] - 99:15, 99:17
occurred [4] - 9:8, 11:22, 11:23, 107:22
October [3] - 34:12, 34:23, 78:13
OF [6] - 1:1, 1:3, 1:10, 1:15, 1:18, 1:20
offer [2] - 67:16, 88:19
OFFICE [1] - 1:14
officer [5] - 66:19, 69:6, 69:9, 81:4, 100:7
officers [3] - 80:22, 81:6, 81:19
Official [2] - 2:1
official [14] - 53:22, 54:1, 54:9, 55:17, 56:8, 56:9, 57:22, 73:17, 77:3, 77:4, 77:21, 78:11, 78:17, 111:12
officially [1] - 86:22
officials [1] - 89:22
often [1] - 88:8
old [1] - 36:1
older [1] - 23:16
Omedetou [9] - 55:6, 56:16, 56:25, 58:3, 71:24, 72:15, 103:11, 106:20, 106:25
one [56] - 12:15, 14:2, 14:11, 21:24, 21:25, 27:1, 28:3, 30:25, 33:16, 34:13, 35:14, 35:23, 41:22, 45:19, 48:4, 54:15, 56:2, 56:3, 57:25, 60:9, 60:19, 60:25, 67:18, 71:22, 76:11, 78:24, 80:13, 81:17, 84:1, 84:13, 89:11, 91:2, 91:3, 92:8, 98:23, 99:4, 100:19, 100:20, 100:22, 100:24, 101:2, 103:4, 103:12, 103:14,

103:19, 104:2, 104:3, 104:6, 104:20, 105:16, 106:25, 109:21
one's [1] - 52:20
ongoing [1] - 89:22
open [10] - 12:22, 15:12, 16:16, 17:19, 24:7, 36:10, 39:23, 59:13, 66:4, 94:5
opened [1] - 10:24
opening [6] - 9:7, 10:15, 10:21, 66:7, 67:1
operate [1] - 107:21
operating [5] - 53:7, 76:17, 97:23, 98:14, 107:14
operation [1] - 84:17
opinion [1] - 68:14
opportunity [6] - 6:19, 61:17, 62:1, 62:5, 62:7, 62:19
opposed [1] - 63:2
option [2] - 68:22, 69:23
orange [1] - 45:19
order [5] - 12:8, 61:16, 61:25, 62:6, 73:6
organization [1] - 84:8
OSs [2] - 107:9, 107:13
otherwise [3] - 11:24, 65:5, 98:7
outside [1] - 65:14
overnight [1] - 64:22
overruled [1] - 53:10

**P**

p.m [5] - 1:7, 12:6, 59:21, 73:4, 108:23
pace [1] - 108:10
page [16] - 34:8, 44:1, 44:7, 72:1, 73:19, 78:7, 78:25, 79:6, 79:12, 79:16, 79:19, 79:24, 80:3, 80:8, 102:23, 104:25
PAGE [1] - 3:2
Page [5] - 75:8, 92:17, 92:18, 94:8, 94:23
pages [6] - 42:24, 45:17, 45:19, 46:21, 48:22, 73:13, 73:14, 78:25

paper [6] - 20:7, 25:14, 25:15, 37:13, 42:25, 45:18
papers [2] - 24:2, 47:18
paragraph [8] - 73:20, 74:19, 78:8, 78:15, 105:1, 106:7, 107:5, 107:7
part [11] - 53:2, 71:23, 86:6, 86:17, 87:5, 87:14, 88:4, 88:11, 90:9, 95:6, 95:23
Part [2] - 72:7, 72:11
particular [2] - 69:14, 105:12
particularly [1] - 55:10
parties [1] - 72:13
parts [1] - 71:22
party [3] - 60:17, 60:24, 86:20
pass [1] - 12:13
passes [1] - 81:24
passport [8] - 33:18, 33:20, 33:24, 34:5, 34:14, 35:5, 35:17, 75:1
password [1] - 22:24
past [2] - 8:6, 82:8
Patrol [5] - 9:5, 9:22, 10:1, 10:11, 80:14
pause [2] - 22:25, 73:20
paying [1] - 96:10
PEARLMAN [1] - 1:20
PELKER [3] - 1:17, 102:9, 102:16
pen [3] - 16:12, 95:15, 95:25
Pennsylvania [1] - 1:18
people [2] - 88:5, 109:10
percent [3] - 92:9, 94:17, 95:5
perfect [2] - 72:22, 106:9
perhaps [8] - 25:18, 49:6, 60:4, 60:13, 61:23, 81:11, 109:10, 109:11
period [1] - 78:13
person [6] - 5:11, 27:10, 28:22, 28:23, 69:15, 70:6
person's [1] - 28:24
personally [1] - 97:8

persons [1] - 6:9
phone [8] - 20:9, 22:10, 22:18, 28:18, 41:21, 42:4, 54:15, 83:16
phones [1] - 41:18
photo [14] - 25:11, 25:15, 25:16, 25:19, 33:20, 33:22, 34:7, 34:9, 34:16, 34:18, 35:6, 35:8, 35:18, 35:20
photograph [2] - 25:20, 25:22
photos [1] - 85:9
phrasing [1] - 66:6
physical [3] - 51:2, 87:7, 87:12
Pi [1] - 18:21
pick [2] - 54:14, 93:1
picking [1] - 85:9
place [8] - 9:22, 18:25, 20:18, 23:23, 36:5, 39:19, 51:5, 80:23
plain [1] - 68:5
Plaintiff [1] - 1:4
PLAINTIFF [1] - 1:14
plan [1] - 64:8
plane [4] - 68:17, 69:18, 69:23, 70:11
planned [1] - 81:11
plans [2] - 80:25, 99:7
plastic [1] - 20:6
plated [1] - 28:4
plausible [1] - 103:6
Playa [1] - 81:12
PLLC [1] - 1:24
plug [1] - 23:22
plural [2] - 103:14, 104:1
point [24] - 6:24, 7:20, 11:17, 57:4, 67:23, 67:25, 69:24, 70:22, 81:17, 85:8, 85:17, 88:18, 89:25, 93:18, 98:23, 99:4, 100:18, 100:24, 101:3, 102:5, 103:10, 103:22, 104:12, 107:25
pointed [1] - 61:13
police [4] - 69:6, 69:9, 86:7, 90:14
port [1] - 107:11
portal [2] - 53:20, 91:9
portion [2] - 58:10, 61:22

**portions** [2] - 20:7, 20:12
**ports** [1] - 23:11
**pose** [1] - 110:9
**position** [6] - 8:1, 10:9, 60:8, 68:16, 68:19, 70:10
**positive** [1] - 56:13
**possession** [2] - 58:19, 78:19
**possible** [4] - 82:3, 98:11, 98:17, 106:13
**possibly** [1] - 99:1
**postmarked** [1] - 48:5
**potential** [1] - 66:22
**potentially** [1] - 70:16
**pouch** [4] - 22:3, 22:6, 22:13, 22:16
**power** [1] - 15:7
**practical** [2] - 61:15, 61:25
**precede** [1] - 39:16
**prefer** [3] - 65:21, 82:4, 108:4
**premarked** [8] - 29:9, 29:23, 30:6, 36:22, 36:25, 40:12, 47:16, 48:6
**prepaid** [1] - 14:1
**prepared** [1] - 95:22
**present** [2] - 12:7, 60:7
**president** [2] - 28:17, 30:25
**presumably** [3] - 61:19, 63:11, 63:22
**pretrial** [5] - 7:1, 60:16, 61:5, 62:10, 70:3
**pretty** [1] - 109:23
**previous** [3] - 44:1, 48:16, 51:21
**PREVIOUSLY** [1] - 12:10
**previously** [5] - 9:2, 39:6, 49:13, 51:16, 62:24
**PRICE** [2] - 3:3, 12:10
**Price** [10] - 9:25, 10:2, 11:16, 12:13, 23:12, 25:7, 46:20, 60:1, 93:21, 109:7
**price** [47] - 12:22, 13:22, 13:25, 15:2, 15:12, 16:7, 16:10, 17:14, 18:15, 18:18, 19:25, 20:5, 20:15,

21:7, 21:24, 22:5, 22:25, 23:23, 26:25, 30:20, 31:12, 33:16, 37:10, 38:16, 42:19, 43:3, 43:20, 45:15, 48:12, 50:4, 51:2, 51:19, 52:15, 54:7, 64:25, 67:11, 73:9, 74:16, 76:4, 77:10, 82:13, 89:6, 90:8, 94:8, 103:2, 106:11, 108:25
**primarily** [1] - 45:18
**primary** [4] - 73:21, 75:12, 101:10, 101:13
**printed** [4] - 25:11, 25:17, 25:18, 75:23
**printer** [1] - 25:19
**problem** [4] - 56:3, 57:12, 70:14, 97:4
**procedural** [1] - 5:20
**procedurally** [1] - 63:3
**proceed** [2] - 11:13, 59:5
**proceeded** [1] - 80:23
**proceedings** [1] - 12:6, 59:12, 59:21, 60:2, 71:12, 73:4, 94:4, 108:23, 109:8, 110:12, 111:6
**proceeds** [1] - 91:22
**process** [1] - 6:8
**produced** [3] - 64:5, 64:12, 111:6
**product** [1] - 67:7
**professional** [1] - 104:17
**prominently** [1] - 84:9
**promised** [1] - 108:7
**pronunciation** [1] - 86:10
**proper** [3] - 55:8, 55:23, 107:9
**proponent** [1] - 7:6
**proposed** [3] - 71:18, 71:20, 71:22
**proposition** [1] - 63:11
**prosecutors** [1] - 99:18
**protector** [1] - 15:8
**prove** [1] - 103:7
**provide** [4] - 54:1, 58:12, 67:8, 77:4
**provided** [2] - 77:21, 81:10
**provider** [1] - 90:12

**providers** [1] - 90:11
**proving** [1] - 57:24
**public** [1] - 92:6
**publish** [17] - 13:9, 14:18, 15:25, 17:3, 18:7, 19:17, 21:9, 24:18, 26:11, 30:6, 32:8, 38:8, 40:18, 43:12, 46:12, 74:7, 77:24
**published** [24] - 14:22, 17:7, 18:11, 19:21, 21:20, 25:3, 26:21, 30:16, 33:7, 37:6, 38:12, 39:7, 42:15, 43:16, 45:11, 46:16, 46:25, 48:8, 50:21, 51:15, 52:9, 74:12, 78:3, 102:22
**pull** [7] - 8:4, 17:11, 36:21, 37:19, 39:6, 102:9, 102:12
**pulled** [2] - 48:18, 69:5
**punched** [1] - 45:20
**purpose** [2] - 65:15, 81:9
**purposes** [2] - 69:11, 105:17
**pursuant** [2] - 73:22, 75:13
**pursue** [1] - 5:6
**put** [16] - 8:20, 14:4, 15:9, 16:13, 17:17, 25:24, 29:3, 31:14, 39:2, 44:16, 68:4, 82:19, 87:7, 87:11, 87:16, 93:7
**putting** [3] - 48:4, 66:15, 102:13

## Q

**quarter** [1] - 82:8
**query** [1] - 90:10
**questioning** [1] - 68:20
**questions** [8] - 6:10, 6:18, 60:21, 70:9, 80:24, 110:6, 110:7, 110:9
**quick** [3] - 21:11, 67:18, 72:21
**quickly** [4] - 22:12, 32:11, 40:21, 109:19
**quoting** [1] - 70:4

## R

**rack** [1] - 103:17
**raise** [2] - 7:7, 110:1
**raised** [4] - 6:25, 60:16, 61:4, 70:3
**RANDOLPH** [1] - 1:11
**random** [1] - 23:3
**range** [2] - 40:22, 41:3
**Raspberry** [1] - 18:21
**rather** [2] - 72:19, 93:13
**RDR** [3] - 2:1, 111:3, 111:12
**re** [4] - 46:9, 48:24, 49:16, 49:20
**re-creation** [1] - 46:9
**re-mark** [3] - 48:24, 49:16, 49:20
**reach** [1] - 67:4
**reached** [1] - 5:4
**read** [18] - 34:21, 36:2, 36:4, 60:25, 61:3, 72:12, 73:19, 73:20, 74:17, 74:24, 75:10, 78:7, 88:24, 103:2, 104:15, 105:14, 106:12, 107:7
**reader** [1] - 16:11
**reading** [5] - 85:6, 93:11, 96:21, 98:3, 98:6
**readmit** [1] - 49:19
**ready** [2] - 71:13, 82:13
**real** [2] - 21:11, 93:20
**realized** [1] - 5:14
**really** [5] - 8:25, 69:1, 109:12, 109:18, 109:24
**reason** [7] - 5:21, 7:2, 61:11, 69:3, 70:14, 70:18, 85:3
**reasonable** [2] - 5:11, 108:9
**reasonably** [4] - 7:2, 61:10, 61:12, 64:2
**received** [1] - 53:4
**Received** [1] - 3:9
**recently** [1] - 46:22
**recess** [1] - 71:11
**recognize** [25] - 12:25, 14:9, 15:15, 16:18, 17:22, 18:18, 19:8, 20:24, 24:9,

29:12, 31:24, 36:13, 37:24, 40:1, 43:5, 44:11, 44:23, 46:3, 46:5, 54:7, 73:13, 73:15, 77:13, 77:15, 88:14
**recollection** [25] - 6:19, 80:15, 81:19, 83:10, 91:1, 92:23, 92:25, 93:5, 93:13, 93:14, 93:15, 93:24, 94:2, 94:13, 95:1, 95:21, 96:4, 96:9, 96:24, 96:25, 97:21, 98:4, 98:5, 98:10, 104:9
**record** [21] - 10:9, 10:13, 11:3, 11:18, 13:17, 34:24, 49:8, 56:10, 57:13, 57:14, 72:6, 72:12, 73:17, 77:16, 77:21, 78:10, 78:16, 78:17, 89:4, 89:5, 89:15
**recording** [1] - 100:24
**records** [23] - 53:22, 54:1, 54:9, 55:18, 55:19, 56:8, 72:15, 75:4, 75:24, 77:3, 78:11, 78:18, 78:19, 79:1, 79:13, 84:19, 85:13, 87:18, 87:19, 89:12, 90:13, 101:18, 105:9
**recover** [1] - 24:2
**recovered** [20] - 13:6, 14:11, 14:15, 15:18, 15:22, 16:20, 16:24, 17:24, 18:3, 19:10, 19:14, 21:5, 24:11, 24:15, 26:8, 29:18, 32:5, 36:19, 40:7, 45:4
**recovering** [9] - 13:2, 21:1, 26:4, 29:14, 29:25, 32:1, 36:15, 40:3, 44:25
**recovery** [1] - 25:20
**red** [1] - 79:10
**redact** [6] - 55:15, 56:19, 58:8, 58:9, 59:6, 59:7
**redacted** [6] - 57:6, 57:7, 57:10, 57:11, 57:15, 57:23
**redacting** [3] - 57:21, 71:23, 72:7
**redaction** [4] - 56:23, 57:5, 58:10, 58:16

**redirect** [2] - 65:11, 70:25
**Redman** [3] - 7:10, 7:13, 60:13
**refer** [1] - 41:9
**reference** [3] - 9:2, 83:15, 107:14
**referenced** [1] - 104:22
**references** [1] - 8:6
**referred** [2] - 60:3, 76:20
**referring** [5] - 13:17, 83:23, 84:4, 84:11, 105:8
**refers** [1] - 56:12
**reflection** [1] - 78:19
**refresh** [11] - 6:19, 92:23, 93:13, 93:14, 93:24, 94:13, 95:1, 96:24, 97:21, 98:4
**refreshes** [1] - 94:1
**refreshing** [2] - 92:25, 93:5
**regarding** [3] - 54:2, 77:5, 89:22
**register** [4] - 53:7, 58:17, 95:15, 95:25
**registered** [1] - 56:16
**registrants** [1] - 77:2
**registration** [7] - 52:15, 52:23, 53:17, 54:2, 72:14, 73:25, 75:16
**regular** [1] - 89:7
**regularly** [2] - 88:5, 107:10
**relate** [2] - 74:1, 75:17
**related** [1] - 77:19
**relation** [2] - 95:10, 96:6
**relevance** [2] - 88:22, 88:23
**relevant** [1] - 61:23
**relied** [2] - 96:16, 96:19
**remaining** [2] - 23:20, 28:3
**remember** [23] - 62:15, 62:16, 62:18, 64:15, 84:13, 85:16, 87:3, 87:9, 92:14, 93:21, 96:18, 98:11, 98:17, 101:5, 101:19, 103:16, 103:17, 103:18, 103:20, 103:21, 103:23, 103:24, 104:10

**remind** [4] - 66:6, 83:23, 97:1, 97:2
**removed** [1] - 49:5
**renumber** [1] - 49:7
**repeat** [1] - 47:3
**report** [5] - 83:22, 84:10, 84:11, 84:12, 88:9
**REPORTED** [1] - 2:1
**REPORTER** [6] - 41:15, 50:10, 54:22, 55:1, 85:25, 86:3
**reporter** [1] - 7:12
**Reporter** [2] - 2:1, 111:12
**reports** [2] - 73:22, 75:13
**representatives** [1] - 99:18
**request** [11] - 53:22, 60:24, 62:2, 62:6, 77:3, 86:14, 86:21, 86:22, 95:22, 95:23
**requested** [1] - 87:18
**requesting** [2] - 90:12, 96:1
**require** [1] - 66:13
**required** [5] - 6:9, 7:23, 53:7, 61:4, 76:17
**requirements** [5] - 52:16, 52:23, 76:5, 76:8, 76:13
**research** [6] - 59:18, 61:2, 66:1, 67:19, 68:12, 108:20
**resolution** [3] - 71:20, 71:22, 72:21
**resolve** [3] - 67:9, 67:17, 70:23
**resolves** [1] - 11:6
**respect** [1] - 6:13
**respond** [1] - 89:2
**response** [2] - 91:23, 110:9
**responses** [1] - 56:14
**responsibility** [2] - 73:22, 75:13
**responsive** [2] - 72:6, 72:15
**rest** [1] - 56:1
**restraint** [1] - 66:11
**restroom** [1] - 71:9
**results** [4] - 79:6, 79:9, 79:16, 79:24
**retake** [2] - 51:12, 51:13
**retired** [2] - 60:1, 109:7

**return** [1] - 31:15
**returned** [1] - 85:1
**reveal** [1] - 53:23
**revealed** [1] - 53:24
**review** [3] - 22:12, 93:6, 94:8
**reviewed** [8] - 83:3, 83:6, 83:9, 83:12, 84:14, 84:19, 96:18, 101:18
**reviewing** [1] - 84:21
**revisit** [1] - 90:5
**rights** [1] - 10:13
**rise** [2] - 12:4, 73:2, 108:21
**road** [1] - 69:6
**Roman** [20] - 27:16, 27:25, 28:12, 28:13, 28:17, 28:24, 30:25, 35:13, 35:21, 53:16, 55:5, 56:15, 74:25, 76:23, 78:11, 79:23, 80:7, 80:14, 83:13, 83:19
**ROMAN** [1] - 1:6
**Romania** [14] - 95:10, 95:16, 95:22, 96:7, 97:6, 99:4, 99:6, 99:8, 103:15, 103:19, 103:20, 104:2, 104:3, 104:9
**Romanian** [7] - 95:7, 95:15, 95:23, 95:24, 96:3, 96:5, 107:20
**room** [1] - 80:21
**Room** [1] - 2:3
**roughly** [3] - 84:24, 90:20, 91:13
**router** [1] - 85:14
**rule** [11] - 7:22, 58:16, 60:11, 60:12, 60:22, 60:25, 61:3, 61:8, 64:1, 68:5, 68:8
**Rule** [10] - 5:15, 5:25, 6:24, 60:18, 61:14, 61:23, 62:1, 62:4, 67:4, 70:18
**run** [1] - 71:8
**running** [2] - 107:9, 107:13
**Russia** [1] - 69:23
**Russian** [6] - 33:18, 37:16, 38:23, 43:24, 46:24, 47:7

## S

**sale** [1] - 91:22
**Samsung** [1] - 17:16

**sandbag** [1] - 58:18
**SanDisk** [1] - 23:8
**SAP** [1] - 23:2
**satisfy** [1] - 7:20
**saw** [4] - 25:20, 31:5, 83:11, 84:15
**scan** [2] - 43:3, 58:11
**scanned** [9] - 37:17, 38:2, 38:4, 43:9, 46:6, 46:8, 46:22, 47:5, 51:21
**scans** [1] - 107:11
**scope** [1] - 65:14
**scratch** [1] - 104:19
**screen** [10] - 43:1, 45:21, 48:15, 48:22, 50:8, 52:7, 71:21, 73:9, 75:7, 77:10
**screening** [3] - 80:14, 80:19, 80:20
**screenshot** [3] - 25:18, 79:1, 79:13
**screenshots** [1] - 77:18
**scroll** [6] - 38:17, 43:20, 46:1, 78:20, 104:24, 106:21
**SD** [8] - 18:23, 20:13, 20:15, 22:9, 22:19, 22:20, 22:22, 23:18
**search** [44] - 13:3, 14:12, 15:18, 15:22, 16:20, 17:24, 19:10, 21:2, 22:5, 24:1, 24:12, 26:5, 26:8, 29:15, 30:1, 32:2, 32:5, 36:16, 36:19, 40:4, 40:7, 44:25, 53:22, 53:23, 56:13, 72:4, 72:14, 73:25, 75:4, 75:16, 75:24, 77:3, 78:10, 79:2, 79:7, 79:11, 79:13, 79:17, 79:25, 80:1, 80:4, 80:10, 80:23, 85:13
**searched** [6] - 72:4, 77:2, 79:3, 79:14, 79:22, 80:6
**searches** [1] - 77:19
**searching** [2] - 53:20, 56:13
**seated** [6] - 12:8, 59:22, 71:19, 73:5, 81:2, 108:24
**seats** [2] - 51:12, 51:14
**second** [7] - 31:1, 72:1, 78:8, 78:25, 88:24, 91:12, 102:23

**secondary** [3] - 80:13, 80:19, 80:20
**Secrecy** [6] - 52:17, 52:24, 53:3, 53:5, 73:23, 75:14
**Section** [2] - 73:23, 75:14
**secure** [3] - 104:17, 107:9, 107:13
**Securities** [2] - 76:19, 77:17
**security** [2] - 104:19, 107:12
**see** [33] - 8:5, 13:20, 21:12, 22:21, 33:12, 37:22, 40:15, 41:20, 43:21, 43:22, 44:3, 44:4, 44:9, 45:22, 48:23, 52:20, 59:18, 64:13, 67:4, 68:13, 73:11, 77:12, 83:14, 92:22, 94:25, 97:2, 102:1, 102:21, 105:1, 107:4, 108:20, 109:22, 110:11
**seeing** [5] - 66:25, 83:13, 83:15, 85:12, 96:17
**seeking** [1] - 93:25
**seizures** [1] - 66:10
**self** [1] - 55:19
**self-authenticating** [1] - 55:19
**selling** [1] - 91:17
**send** [4] - 91:8, 91:13, 91:15, 91:20
**sending** [1] - 98:16
**sent** [12] - 88:5, 88:8, 88:16, 89:14, 89:17, 89:21, 89:23, 91:21, 92:1, 95:19, 95:20, 98:1
**sentence** [7] - 56:2, 103:2, 104:15, 104:16, 105:14, 106:11, 106:12
**separate** [3] - 31:13, 39:3, 40:11
**separately** [2] - 31:15, 40:17
**September** [5] - 91:2, 91:7, 92:8, 94:16, 105:25
**series** [2] - 23:13, 37:12, 74:3, 74:21
**server** [22] - 95:16, 96:7, 96:10, 96:11, 96:12, 96:14, 97:5, 97:6, 97:11, 97:16, 98:20, 98:24, 99:5,

103:12, 103:14, 103:19, 104:3, 104:9, 105:8, 107:20
**Server** [1] - 97:23
**servers** [13] - 92:4, 98:14, 103:7, 103:13, 103:14, 103:20, 103:24, 104:1, 104:9, 104:10, 106:14, 106:17, 107:9
**service** [5] - 90:12, 94:2, 94:15, 94:19, 95:3
**services** [8] - 52:16, 52:24, 53:8, 53:17, 54:2, 74:1, 75:17, 92:5
**SESSION** [1] - 1:5
**setting** [1] - 5:13
**settings** [1] - 107:10
**seven** [1] - 81:2
**Seventh** [1] - 6:7
**several** [6] - 20:20, 43:22, 77:18, 81:10, 100:20, 101:8
**severe** [1] - 66:12
**shall** [1] - 7:15
**short** [2] - 59:4, 60:4
**shortened** [1] - 44:14
**shortly** [1] - 59:19
**show** [23] - 5:19, 7:6, 7:16, 13:22, 15:2, 16:7, 17:11, 18:15, 19:25, 20:3, 27:1, 27:21, 28:7, 30:20, 30:21, 33:17, 38:4, 48:12, 51:2, 62:9, 72:1, 93:5, 102:24
**showed** [2] - 46:22, 51:22
**showing** [12] - 12:23, 14:7, 15:13, 20:20, 29:7, 31:21, 36:10, 39:24, 44:19, 47:14, 68:6, 106:3
**shown** [10] - 5:18, 37:22, 43:5, 46:21, 50:7, 51:19, 78:25, 79:12, 80:8, 91:9
**shows** [2] - 56:15, 60:24
**side** [5] - 28:16, 30:25, 31:1, 33:1, 69:6
**sided** [1] - 42:24
**Sierra** [1] - 20:22
**silently** [1] - 93:6
**SIM** [4] - 14:1, 20:9, 22:10, 22:18

**similar** [3] - 20:12, 23:2, 38:21
**simple** [1] - 72:23
**simply** [5] - 56:12, 56:15, 56:24, 67:8, 89:23
**single** [1] - 36:8
**sit** [3] - 8:22, 109:20, 109:25
**site** [2] - 90:22, 92:6
**situation** [3] - 10:1, 89:16, 105:12
**skeptical** [2] - 89:14, 89:20
**sleeve** [1] - 15:8
**slow** [1] - 7:11
**small** [3] - 22:3, 22:13, 25:11
**soil** [1] - 100:8
**solely** [1] - 93:24
**solution** [1] - 104:19
**someone** [3] - 67:24, 68:24, 83:16
**sometimes** [2] - 23:5, 76:20
**somewhat** [1] - 89:13
**soon** [2] - 61:14, 61:24
**sorry** [28] - 7:11, 7:13, 8:2, 10:18, 12:15, 13:13, 13:14, 19:3, 20:11, 22:21, 29:11, 39:4, 40:24, 47:1, 47:19, 54:19, 54:22, 56:6, 58:2, 71:4, 71:5, 74:16, 80:17, 84:2, 85:25, 88:24, 91:6, 98:2
**sort** [12] - 5:14, 6:20, 23:21, 33:1, 34:6, 81:20, 81:23, 98:3, 98:5, 101:3, 109:11, 109:16
**sounds** [2] - 83:8, 109:19
**Soviet** [1] - 36:1
**space** [1] - 58:13
**speaking** [3] - 9:23, 84:21, 95:6
**Special** [2] - 85:18, 85:21
**special** [2] - 53:2, 81:3
**specialist** [1] - 82:16
**specialized** [1] - 53:4
**specific** [7] - 87:3, 92:15, 100:16, 101:2, 101:5, 101:20, 105:6
**specifically** [6] -

36:21, 96:18, 97:18, 98:17, 100:25, 103:16
**specifics** [4] - 85:1, 85:16, 87:8, 98:11
**specified** [1] - 61:16
**specs** [1] - 96:10
**speculate** [2] - 57:9, 57:10
**spent** [1] - 5:1
**spread** [1] - 66:14
**stage** [2] - 66:11, 66:17
**staking** [1] - 44:10
**stand** [3] - 32:21, 64:25, 65:6
**standard** [1] - 7:21
**standing** [3] - 9:25, 69:15, 69:16
**stands** [1] - 86:19
**start** [8] - 10:12, 37:10, 80:18, 82:3, 82:4, 82:5, 105:7
**started** [4] - 82:23, 82:24, 82:25, 83:7
**starting** [2] - 75:10, 78:8
**starts** [2] - 104:15, 106:8
**state** [2] - 78:15, 89:8
**statement** [7] - 6:1, 7:18, 9:13, 10:16, 42:2, 63:15, 93:20
**statements** [2] - 6:2, 92:15
**STATES** [4] - 1:1, 1:3, 1:11, 1:14
**States** [21] - 2:2, 6:6, 6:9, 7:9, 7:13, 11:12, 53:11, 69:20, 73:23, 75:14, 80:25, 87:6, 87:15, 90:8, 95:9, 95:14, 95:24, 97:10, 98:19, 104:11, 111:13
**states** [8] - 74:25, 76:8, 76:13, 79:4, 79:10, 80:1, 80:9, 106:18
**stating** [3] - 81:10, 81:14, 91:21
**status** [1] - 88:9
**stay** [3] - 32:17, 39:11, 42:10
**stayed** [2] - 84:24, 85:4
**staying** [2] - 32:15, 85:15
**stenographic** [1] - 111:5
**step** [5] - 33:10,

33:11, 41:17, 66:24, 108:25
**steps** [2] - 10:6, 99:2
**Sterlingov** [48] - 8:9, 9:4, 9:14, 9:23, 10:3, 10:10, 11:15, 27:16, 28:1, 28:12, 28:17, 28:24, 30:25, 34:19, 35:9, 35:13, 35:21, 47:24, 53:16, 53:25, 55:5, 56:15, 58:3, 66:2, 68:16, 74:25, 76:23, 78:12, 79:23, 80:7, 80:14, 80:19, 80:20, 81:6, 81:8, 81:21, 83:13, 84:15, 84:24, 85:22, 87:7, 87:11, 90:15, 97:13, 98:20, 99:21, 99:25, 104:22
**STERLINGOV** [1] - 1:6
**Sterlingov's** [16] - 13:3, 14:12, 15:18, 17:25, 18:3, 19:11, 21:2, 33:23, 34:10, 39:16, 83:19, 87:16, 95:16, 96:6, 105:19, 107:20
**still** [7] - 42:5, 64:25, 65:7, 97:16, 97:23, 103:6, 109:23
**stipulate** [2] - 72:12, 72:13
**stipulated** [3] - 58:1, 58:2, 58:4
**Stockholm** [1] - 99:17
**stop** [3] - 44:1, 66:9, 69:4
**stopped** [1] - 105:25
**stopping** [3] - 56:23, 102:5, 107:24
**storage** [6] - 18:23, 20:14, 22:9, 22:20, 22:22, 23:9
**streamline** [1] - 32:13
**Street** [2] - 1:15, 1:24
**strike** [3] - 55:12, 57:11, 68:12
**strikes** [1] - 106:13
**stripe** [1] - 27:24
**stuck** [1] - 48:19
**studio** [1] - 100:24
**styled** [1] - 62:24
**stylus** [1] - 16:12
**subexhibits** [1] - 20:21
**Subexhibits** [1] -

22:11
**subject** [2] - 74:25, 75:22
**submitted** [2] - 53:16, 77:3
**submitting** [1] - 53:21
**subscriber** [1] - 96:9
**subsequent** [1] - 78:25
**substantial** [1] - 8:15
**substantially** [15] - 13:5, 14:14, 15:21, 16:23, 18:2, 19:13, 21:4, 24:14, 26:7, 29:17, 30:3, 32:4, 36:18, 40:6, 45:3
**substantive** [2] - 5:14, 60:13
**suggesting** [1] - 56:20
**Suite** [1] - 1:16
**support** [1] - 91:9
**suppose** [1] - 49:17
**supposed** [1] - 71:7
**suppress** [5] - 5:16, 7:15, 60:16, 62:1, 63:16
**suppressed** [2] - 8:14, 8:16
**suppression** [4] - 5:23, 7:3, 7:8, 61:6
**suppression-of-evidence** [1] - 61:6
**Supreme** [1] - 11:11
**surprise** [3] - 58:23, 61:21, 63:25
**surprised** [1] - 59:2
**surprising** [1] - 59:2
**surveillance** [8] - 84:15, 84:17, 84:19, 85:7, 85:22, 87:7, 87:12, 87:17
**suspect** [1] - 5:3
**suspects** [1] - 83:11
**Sweden** [11] - 31:10, 35:5, 75:2, 99:10, 99:12, 99:14, 99:17, 99:22, 99:25, 100:2, 100:5
**Swedish** [14] - 14:2, 35:17, 86:7, 86:8, 86:11, 86:15, 87:1, 87:6, 87:11, 87:15, 90:10, 90:14, 100:7
**SWORN** [1] - 12:10
**systems** [1] - 107:14

## T

**T-V-E-R-S-K-A-Y-A**
[1] - 39:9
**table** [3] - 80:22, 80:23, 81:3
**tag** [1] - 15:6
**tape** [4] - 20:8, 20:13, 20:16, 58:11
**targeted** [1] - 63:12
**team** [4] - 67:25, 97:9, 104:17, 104:22
**teams** [1] - 67:17
**telephone** [1] - 31:11
**ten** [5] - 71:8, 90:19, 90:22, 104:18
**terminate** [2] - 5:12, 70:7
**terms** [3] - 56:13, 67:6, 72:4
**terribly** [1] - 58:9
**Terry** [1] - 66:9
**test** [2] - 69:2, 69:11
**testified** [2] - 89:6, 93:21
**testify** [2] - 98:5, 98:7
**testifying** [6] - 33:12, 91:10, 92:12, 92:14, 98:3, 106:4
**testimony** [6] - 67:16, 98:13, 101:6, 103:18, 106:24, 109:1
**text** [16] - 14:3, 43:24, 44:4, 44:9, 46:23, 47:6, 68:5, 74:3, 74:17, 74:21, 75:10, 79:10, 80:9, 105:13, 106:18, 106:19
**THE** [219] - 1:1, 1:11, 1:14, 1:15, 1:23, 5:1, 5:17, 5:22, 6:13, 6:21, 7:4, 7:11, 7:19, 8:2, 8:5, 8:10, 8:20, 8:25, 9:6, 9:17, 10:5, 10:14, 10:19, 10:23, 11:4, 11:9, 11:11, 11:19, 12:2, 12:4, 12:7, 12:9, 12:15, 12:17, 12:20, 13:10, 13:12, 13:14, 13:20, 14:19, 14:21, 16:1, 16:3, 17:4, 17:6, 18:8, 18:10, 19:3, 19:18, 19:20, 21:10, 21:13, 21:15, 21:19, 24:19, 24:22, 24:24, 25:2, 26:12, 26:15, 26:17, 26:20, 30:7,

30:10, 30:12, 30:15, 32:9, 32:12, 32:16, 32:23, 32:25, 33:6, 33:10, 33:14, 37:1, 37:5, 38:9, 38:11, 40:19, 41:10, 41:15, 41:19, 42:4, 42:8, 42:14, 43:13, 43:15, 45:8, 45:10, 45:25, 46:13, 46:15, 47:21, 48:1, 48:3, 48:7, 48:18, 49:1, 49:9, 49:14, 49:17, 49:22, 50:1, 50:10, 50:19, 50:21, 51:12, 51:25, 52:4, 52:7, 52:9, 52:19, 53:10, 53:11, 54:5, 54:13, 54:16, 54:22, 54:24, 55:1, 55:2, 55:12, 55:20, 56:9, 56:20, 57:4, 57:16, 58:2, 58:5, 59:10, 59:14, 59:22, 59:23, 59:25, 60:3, 62:20, 63:1, 63:7, 63:10, 63:14, 64:11, 64:17, 64:20, 64:24, 65:2, 65:9, 65:13, 65:17, 65:19, 65:23, 67:3, 67:10, 68:7, 68:10, 68:23, 71:2, 71:5, 71:7, 71:13, 71:15, 71:19, 71:20, 71:25, 72:10, 72:16, 72:18, 72:22, 72:25, 73:2, 73:5, 73:7, 74:9, 74:11, 76:11, 77:25, 78:2, 82:1, 82:7, 84:1, 84:3, 85:25, 86:3, 88:21, 88:24, 89:10, 89:13, 90:2, 90:4, 90:6, 93:1, 93:9, 93:23, 94:3, 94:6, 98:2, 98:8, 98:9, 98:10, 101:25, 102:3, 102:7, 102:11, 102:15, 102:19, 104:6, 104:8, 108:1, 108:6, 108:11, 108:18, 108:21, 108:24, 108:25, 109:3, 109:5, 109:6, 109:9, 110:5
**themselves** [2] - 95:9, 95:13
**there're** [1] - 40:11
**thereof** [1] - 7:16
**Thereupon** [3] - 60:1, 71:11, 109:7
**they've** [1] - 6:2

**thinks** [1] - 62:11
**three** [4] - 17:15, 42:24, 84:25, 85:4
**throwing** [1] - 66:14
**tired** [2] - 59:4, 60:3
**title** [1] - 78:23
**titled** [1] - 79:4
**to..** [2] - 74:2, 75:18
**today** [5] - 8:22, 65:21, 67:17, 70:24, 89:20
**token** [2] - 23:2, 23:3
**tomorrow** [10] - 64:25, 65:7, 90:1, 90:5, 108:15, 108:18, 109:3, 109:5, 109:22, 110:11
**tonight** [2] - 68:13, 110:1
**took** [2] - 10:11, 80:19
**top** [9] - 27:6, 27:15, 39:20, 44:7, 94:21, 100:14, 100:17, 107:18
**topic** [3] - 76:4, 80:13, 81:15
**Tor** [1] - 92:5
**TOR** [2] - 1:23, 1:24
**total** [1] - 27:20
**towards** [2] - 44:7, 93:19
**track** [2] - 49:24, 52:6
**traffic** [5] - 69:3, 96:13, 97:5, 97:6, 97:10
**training** [3] - 53:4, 81:15, 81:23
**Training** [1] - 84:6
**transaction** [7] - 91:2, 91:7, 92:7, 93:22, 94:16, 94:19, 95:4
**transactions** [5] - 90:19, 90:23, 90:24, 92:8, 105:9
**transcript** [2] - 111:5, 111:6
**TRANSCRIPT** [1] - 1:10
**transmitter** [3] - 77:5, 77:17, 78:12
**transmitter's** [1] - 76:24
**transmitters** [1] - 76:6
**Transmitters** [1] - 76:6
**transmitting** [3] -

76:9, 76:14, 76:18
**trap** [2] - 95:15, 95:25
**travel** [8] - 34:5, 34:14, 80:24, 81:9, 81:11, 99:7, 99:10, 99:12
**traveled** [4] - 99:4, 99:6, 99:8, 99:17
**Treasury** [1] - 53:12
**Treaty** [2] - 86:19, 95:22
**treaty** [1] - 86:21
**trial** [17] - 5:16, 5:24, 7:3, 7:7, 7:15, 58:18, 58:21, 58:25, 59:3, 61:1, 61:16, 61:21, 62:3, 63:5, 63:25, 64:8, 70:17
**TRIAL** [1] - 1:10
**trip** [1] - 100:3
**troubleshooting** [1] - 105:17
**true** [9] - 9:15, 46:8, 69:13, 78:16, 95:7, 111:4, 111:5
**truthful** [1] - 9:13
**try** [2] - 57:18, 99:2
**turn** [1] - 101:21
**turning** [4] - 79:6, 79:24, 80:8, 90:17
**turns** [1] - 69:11
**Tverskaya** [1] - 39:9
**twice** [1] - 99:13
**two** [17] - 20:8, 20:13, 23:8, 29:20, 30:23, 31:13, 31:15, 35:14, 35:16, 39:3, 39:20, 48:22, 71:22, 73:13, 80:21, 90:25, 92:8
**type** [3] - 34:15, 59:18, 63:17

## U

**U.S** [4] - 1:18, 1:20, 53:12, 100:7
**unaware** [1] - 10:2
**under** [26] - 7:23, 8:12, 8:20, 52:16, 52:24, 55:25, 58:10, 61:17, 62:1, 62:4, 62:25, 66:13, 66:16, 67:4, 68:15, 74:1, 75:17, 76:6, 84:15, 85:6, 87:7, 87:11, 87:16, 89:3, 89:4, 105:15

**underline** [1] - 106:11
**underlined** [2] - 103:3, 104:14
**underneath** [1] - 28:13
**understood** [1] - 57:14
**undertaken** [1] - 84:17
**unfair** [2] - 58:22, 58:23
**unfairly** [1] - 5:15
**unfortunate** [2] - 106:8, 106:15
**unfortunately** [1] - 34:21
**UNIDENTIFIED** [1] - 108:17
**Union** [1] - 36:1
**unit** [1] - 99:19
**UNITED** [4] - 1:1, 1:3, 1:11, 1:14
**united** [1] - 2:2
**United** [20] - 6:6, 6:9, 7:9, 7:13, 11:12, 53:11, 69:20, 73:23, 75:14, 80:25, 87:6, 87:14, 90:8, 95:9, 95:14, 95:24, 97:10, 98:19, 104:10, 111:13
**unless** [3] - 5:18, 7:16, 64:13
**unlikely** [1] - 66:19
**unreasonable** [1] - 68:13
**untimeliness** [2] - 60:19, 60:21
**untimely** [2] - 60:18, 68:6
**up** [31] - 8:4, 10:2, 12:13, 22:1, 25:7, 32:21, 37:10, 37:19, 42:19, 42:20, 43:9, 43:25, 45:15, 46:6, 54:14, 55:2, 58:21, 66:14, 81:15, 81:18, 85:9, 93:1, 96:22, 101:24, 101:25, 102:10, 102:12, 102:14, 106:9, 106:21
**updated** [1] - 107:10
**upheld** [1] - 7:5
**USB** [9] - 23:8, 23:10, 23:11, 23:12, 23:13, 23:14, 23:16, 23:21
**USB-B** [2] - 23:11, 23:12
**USB-C** [5] - 23:10,

23:12, 23:13, 23:14, 23:16
**uses** [1] - 68:24
**usual** [2] - 60:21, 89:23

## V

**vague** [1] - 62:17
**vaguely** [2] - 85:8, 85:16
**various** [5] - 37:13, 38:22, 66:10, 100:17
**ventures** [5] - 100:17, 100:19, 101:1, 101:4, 101:7
**Ventures** [3] - 28:17, 30:25, 100:20
**verification** [1] - 77:18
**version** [4] - 23:15, 23:16, 44:14, 58:7
**versus** [3] - 6:6, 7:9, 7:13
**via** [1] - 83:16
**view** [3] - 8:8, 9:20, 33:2
**viewed** [2] - 96:15, 97:5
**viewing** [1] - 96:13
**violate** [1] - 64:1
**violation** [1] - 61:7
**violations** [3] - 53:3, 53:4, 53:5
**Visa** [2] - 27:15, 28:11
**visible** [2] - 74:4, 74:22
**visit** [1] - 81:11
**visited** [1] - 90:22
**volume** [1] - 59:1
**Volume** [1] - 87:23
**VPN** [1] - 100:22
**vs** [1] - 1:5

## W

**wait** [1] - 109:21
**waited** [2] - 58:18, 58:21
**waiting** [3] - 7:7, 69:17, 72:19
**waiver** [2] - 7:15, 60:15
**waiving** [1] - 65:13
**Wall** [1] - 1:24
**wall** [1] - 66:15
**wants** [2] - 5:6, 55:2

**warrant** [5] - 9:22, 9:24, 10:4, 10:7, 66:20
**warrants** [1] - 85:13
**Washington** [7] - 1:6, 1:16, 1:19, 1:21, 2:4, 92:1, 111:14
**wasting** [1] - 59:4
**web** [4] - 28:18, 81:14, 101:3, 104:17
**website** [1] - 31:1
**week** [1] - 105:16
**welcome** [5] - 24:22, 32:17, 41:24, 42:1, 59:23
**white** [2] - 58:10, 58:11
**White's** [2] - 83:14, 84:9
**whole** [2] - 55:10, 102:21
**Wilkins** [1] - 101:23
**wise** [1] - 101:16
**withdraw** [3] - 49:12, 49:18, 72:24
**withdrawn** [1] - 49:14
**Witness** [34] - 12:24, 13:24, 14:8, 15:4, 15:10, 15:14, 16:9, 16:14, 16:17, 17:13, 17:18, 17:21, 18:17, 19:1, 20:2, 20:4, 20:19, 23:25, 24:8, 25:9, 25:25, 29:4, 31:23, 36:6, 36:12, 36:23, 39:21, 39:25, 40:13, 42:22, 47:15, 48:13, 51:4, 51:6
**WITNESS** [12] - 3:2, 12:10, 45:25, 48:18, 53:11, 59:25, 84:3, 98:8, 98:10, 104:8, 109:3, 109:6
**witness** [11] - 6:20, 6:23, 19:7, 33:2, 47:23, 49:2, 50:2, 55:8, 67:16, 81:25, 109:15
**witness's** [1] - 93:5
**witnesses** [1] - 109:14
**wonder** [1] - 56:22
**word** [1] - 35:25
**words** [2] - 27:9, 66:13
**works** [1] - 108:2
**Workstation** [1] - 15:7
**worst** [1] - 56:19

**worth** [1] - 67:15
**wrapped** [1] - 20:16
**writing** [3] - 14:1, 34:6, 34:15
**written** [3] - 24:2, 67:8, 106:20

## Y

**year** [1] - 86:25
**years** [1] - 92:11
**years'** [1] - 104:18
**York** [2] - 1:21, 1:25
**yourself** [2] - 9:6, 9:10
**yourselves** [1] - 59:17

## Z

**zoom** [1] - 102:20