```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    * * * * * * * * * * * * * *    )
     UNITED STATES OF AMERICA,      )    Criminal Action
4                                   )     No. 21-00399
                    Plaintiff,      )
5                                   )
        vs.                         )
6                                   )
     ROMAN STERLINGOV,              )    Washington, D.C.
7                                   )    February 23, 2024
                    Defendant.      )    10:07 a.m.
8                                   )
     * * * * * * * * * * * * * *    )
9

10
                         TRANSCRIPT OF JURY TRIAL
11           BEFORE THE HONORABLE RANDOLPH D. MOSS
                    UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14   FOR THE PLAINTIFF:        CHRISTOPHER BROWN, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE FOR
15                               THE DISTRICT OF COLUMBIA
                               601 D Street, Northwest
16                             Suite 5.1527
                               Washington, D.C. 20530
17
                               CATHERINE PELKER, ESQ.
18                             U.S. DEPARTMENT OF JUSTICE
                               950 Pennsylvania Avenue, Northwest
19                             Washington, D.C. 20530

20                             JEFFREY PEARLMAN, ESQ.
                               U.S. DEPARTMENT OF JUSTICE
21                             1301 New York Avenue, Northwest
                               Washington, D.C. 2005
22

23   FOR THE DEFENDANT:        TOR EKELAND, ESQ.
                               MICHAEL HASSARD, ESQ.
24                             TOR EKELAND LAW, PLLC
                               30 Wall Street
25                             Eighth Floor
                               Brooklyn, New York 10005
```

```
 1    REPORTED BY:              LISA EDWARDS, RDR, CRR
                                Official Court Reporter
 2                              United States District Court for the
                                  District of Columbia
 3                              333 Constitution Avenue, Northwest
                                Room 6706
 4                              Washington, D.C. 20001
                                (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                    INDEX

2

3    WITNESS                                                      PAGE

4

     LUKE SCHOLL

5

       Cross-Examination By Mr. Ekeland                            6

6

7

8                              E X H I B I T S

9

     Exhibit No.                                              Received

10

11                       No exhibits marked

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Anything we need to address before

2     bringing the jury in?

3          MR. BROWN:  I think we're still waiting for the

4     Defendant.

5          THE COURT:  Let's wait for him, then.

6          (Thereupon, the Defendant entered the courtroom

7     and the following proceedings were had:)

8          THE COURT:  Mr. Brown?

9          MR. BROWN:  Yes, your Honor.

10         Before we get started, the Government would like

11    to be heard on the Rule 403 issue.

12         THE COURT:  Do we need to do that now?  The jury

13    is lined up outside.  Could we do that --

14         MR. BROWN:  Your Honor, I guess the question is

15    whether we should be able to ask the witness here a question

16    about material that was omitted from view to the jury

17    yesterday.  I mean, we do have another witness who could

18    present that same material.  But at some point we would like

19    to be heard on the Rule 403 issue.

20         THE COURT:  You actually want to ask about the

21    particular names of the videos?

22         MR. BROWN:  We would like to present that evidence

23    to the jury.  Yes, your Honor.  We could do it either now or

24    with a different witness.  I mean, we do have another

25    witness.

1          THE COURT:  We can do it if you want to now.  But

2    you should know the jurors are standing in the hallway lined

3    up, waiting to come in.

4          MR. BROWN:  Yes, your Honor.  We just want to make

5    sure this is addressed.

6          THE COURT:  If you think we need to do it now, I'm

7    happy to do it.  If you want to do it later, we can do that,

8    too.

9          MR. BROWN:  We can do it with a different witness,

10   your Honor.

11         THE COURT:  Anything else before we bring the jury

12   in?

13         MS. PELKER:  No, your Honor.

14         THE COURT:  The witness can come back.  The

15   witness can retake the stand.

16         (The witness retakes the witness stand.)

17         THE COURT:  And we can get the jury.

18         THE COURTROOM DEPUTY:  All rise.

19         (Whereupon, the jury entered the courtroom at

20   10:10 a.m. and the following proceedings were had:)

21         THE COURTROOM DEPUTY:  The jury is present.

22         You may be seated and come to order.

23         Criminal Case 21-399, the United States of America

24   versus Roman Sterlingov.

25         Would counsel please approach the podium and state

```
 1    their name for the record, starting with Government counsel.

 2              MS. PELKER:  Good morning, your Honor.  Alden

 3    Pelker for the United States, joined at counsel table by

 4    Christopher Brown and Jeff Pearlman.

 5              THE COURT:  Good morning.

 6              MR. EKELAND:  Good morning, your Honor.  Tor

 7    Ekeland for Defendant Roman Sterlingov, who is present in

 8    court.  Joining me at counsel table is Mr. Michael Hassard.

 9              THE COURT:  Good morning to you as well.

10              Ms. Pelker, any further questions?

11              MS. PELKER:  No, your Honor.  The Government

12    passes the witness.

13              THE COURT:  Mr. Ekeland, you may proceed when

14    you're ready.

15              MR. EKELAND:  Thank you, your Honor.

16         (LUKE SCHOLL, GOVERNMENT WITNESS, PREVIOUSLY SWORN.)

17                        CROSS-EXAMINATION

18    BY MR. EKELAND:

19    Q.  Good morning, Mr. Scholl.  Are you ready?

20    A.  Good morning, sir.  Yes.

21    Q.  You only came into this investigation after

22    Mr. Sterlingov was arrested?

23    A.  Yes, sir.  That's correct.

24    Q.  You weren't asked to discover if Mr. Sterlingov was

25    innocent?
```

```
 1                    MS. PELKER:  Objection, your Honor.
 2                    THE COURT:  Sustained.
 3       BY MR. EKELAND:
 4       Q.  You were asked to confirm prior traces done by previous
 5       investigators?
 6       A.  I would say that I was asked to analyze certain data
 7       sets.
 8       Q.  Did you review the criminal complaint in this case?
 9       A.  Yes, sir.  I believe I did.
10       Q.  And you saw in that criminal complaint a prior trace?
11       A.  Yes, sir.
12       Q.  And the traces that you've done aren't the same as that
13       trace.  Is that correct?
14       A.  The traces that I've done are similar to that trace.  I
15       did my tracing before I actually saw the trace that was in
16       the criminal complaint, sir.
17       Q.  The trace that you did before you saw the trace in the
18       criminal complaint wasn't the same as the trace in the
19       criminal complaint?
20       A.  They're very similar, but I acknowledge that there are
21       differences between the two.  It might be just because of
22       how we chose to represent information in those two different
23       traces.
24       Q.  But there are differences?
25       A.  They're not identical, no, sir.
```

1    Q.  I'm sorry?  You said they're not identical?  I just

2    didn't hear you.

3    A.  They're not identical, no.

4    Q.  Thank you.

5              And you haven't interviewed any eyewitnesses

6    related to this matter?

7    A.  No, sir, I have not.

8    Q.  And you haven't gone to Sweden?

9    A.  No, sir, I have not.

10   Q.  And you haven't gone to Romania?

11   A.  No, sir, I have not.

12   Q.  And you are from the Newark FBI office?

13   A.  Yes, sir, I am.

14   Q.  And would it be fair to say that most of the

15   investigation that you've done in this case has been from

16   sitting in front of a computer?

17   A.  Yes, sir, that's correct.

18   Q.  Now I'm just going to ask you some questions about

19   Chainalysis and blockchain tracing.  Do you understand?

20   A.  Yes, sir, I do.

21   Q.  And just to begin, the National Institute for -- what is

22   it? -- Science Standards and Technology, that's a government

23   agency that issues standards for different fields.  Correct?

24   A.  That's my understanding.  Yes, sir.

25   Q.  And that government agency hasn't issued any standards

1    at all related to blockchain tracing?

2    A.  Not to my knowledge.  No, sir.

3    Q.  And that government agency hasn't issued any standards

4    at all when it comes to blockchain tracing software that

5    clusters like Chainalysis Reactor?

6    A.  I'm not aware of any, sir.

7    Q.  And there's no scientific body that regulates the field

8    of blockchain analysis?

9    A.  Not to my knowledge.  No, sir.

10    Q.  And you can't name me one scientific peer-reviewed paper

11    attesting to the accuracy of the blockchain tracing

12    methodologies that you have used in this case?

13    A.  No, sir, I cannot.

14    Q.  And you can't name me one scientific peer-reviewed paper

15    attesting to the accuracy of the methodologies that

16    Chainalysis Reactor uses?

17    A.  No, sir, I cannot.  I can only testify to my years of

18    experience using the tool.

19    Q.  And Chainalysis makes a lot of money from government

20    contracts?

21              MS. PELKER:  Objection, your Honor.

22              THE COURT:  Why don't you lay a foundation and see

23    if this witness knows anything about that.

24              MR. EKELAND:  I can move on.

25

```
 1    BY MR. EKELAND:

 2    Q.  You're not claiming that all your blockchain tracing is

 3    100 percent accurate, are you?

 4    A.  I'm -- there are approximations in the analysis.  But

 5    the tracing is accurate, sir.

 6    Q.  Is it 100 percent accurate?

 7    A.  Can you define that, sir?

 8    Q.  Yes.  100 percent accurate, no mistakes ever.

 9    A.  No.  I've made mistakes in my previous analysis; and

10    those mistakes have been corrected and were not, in my

11    opinion, changing the outcome of that analysis in any way.

12    Q.  And those mistakes included typos in Bitcoin wallet

13    addresses.  Correct?

14    A.  I don't recall a typo in a Bitcoin wallet address.  I

15    recall a typo in a date in a transaction and there were

16    other typographical errors in the initial analysis.  Yes,

17    sir.

18    Q.  And you recall having to correct some of those errors

19    in -- I believe it was in your January pretrial testimony in

20    this case.  Correct?

21    A.  Yes, sir.  That's correct.

22    Q.  And --

23    A.  I would testify that I didn't -- I don't believe that

24    those minor typographical errors affected the outcome of the

25    analysis.
```

1    Q.  But you would agree with me that if you made a typo in a

2    Bitcoin wallet address and, say, you just got one letter

3    off, that that would affect your tracing?

4    A.  I don't recall a typographical error in a Bitcoin wallet

5    address, sir.

6    Q.  I'm sorry.  Maybe you didn't understand my question.

7         My question was:  If there is -- if you had made a

8    typo in a Bitcoin wallet address, that that would affect the

9    accuracy of your tracing?

10   A.  No.  I don't believe it would, sir.  There might have

11   been a typographical error, but the underlying address is

12   the intended address that I meant to put in there.  Again, I

13   don't recall there being a typographical error in a Bitcoin

14   address, but that would still just be a typographical error.

15   The analysis is accurate.

16   Q.  That's not the question I asked.

17        The question I'm asking you is:  If you have a

18   Bitcoin wallet address, what, they're somewhere between 36

19   and 42 characters or something like that.  Is that correct?

20   A.  26 to 35 for the [indiscernible] addresses --

21        THE COURT REPORTER:  I'm sorry.  26 to 35 for the

22   what?

23        THE WITNESS:  I think it suffices to say that

24   there are different lengths, sir, depending on the type of

25   Bitcoin address.

```
1     BY MR. EKELAND:

2     Q.  And in that Bitcoin address, there's letters?

3     A.  Yes, sir.

4     Q.  And there's numbers?

5     A.  Yes, sir.

6     Q.  And is it your testimony that if you -- in your expert

7     opinion, that if you get one of those letters wrong, that it

8     doesn't affect the accuracy of your blockchain tracing?

9     A.  If there was a typographical error in my report and

10    there was an address that was -- that included an error,

11    that would be wrong.  But the underlying address that I

12    intended to type would be correct.

13            Furthermore, it is very unlikely that the error

14    would result in a valid Bitcoin address.  It's not like I

15    could make an error in a Bitcoin address in the written

16    report that would result in a change to the analysis.

17            There might be -- if there was -- and I don't

18    believe there is an error in an address in the report -- it

19    is unlikely that that error would result in a valid Bitcoin

20    address that someone else could interpret as a mistake in

21    the analysis.

22    Q.  Is it your testimony that if you have a letter or a

23    number wrong in a Bitcoin address that you use in a tracing,

24    that that won't affect the validity of your trace?

25            MS. PELKER:  Your Honor, I think this is asked and
```

1     answered at this point.

2               MR. EKELAND:  Your Honor, I don't think he's

3     answered this question.

4               THE COURT:  I'll allow this once and then let's

5     move on.

6               THE WITNESS:  Can you repeat the question, please,

7     sir?

8     BY MR. EKELAND:

9     Q.  Yes.

10              My -- it's -- my simple question is whether if

11    there is an incorrect letter or number, just one, in a

12    Bitcoin wallet address that you use in a trace, is it your

13    testimony that that wouldn't affect the accuracy of your

14    trace?

15    A.  You're asking me if there was a typographical error in

16    the report, where there was a single character typographical

17    error, that that would affect the analysis in the report?

18    Q.  No.  I'm not asking you even about your report.

19              I'm asking you if there was -- I'm asking you a

20    hypothetical question.  In your expert opinion as a

21    cryptocurrency expert in tracing, as you qualified in this

22    court, I'm asking you whether if there's a typographical

23    error, either just one letter or one number, in a Bitcoin

24    wallet address, and that you then go and use that wallet

25    address with that typographical error in it to do a tracing,

1    I'm asking you if that would affect the accuracy of your

2    trace.

3    A.  My answer, sir, would be that if I was doing a trace

4    based on an address with a typographical error, it would

5    show up in Chainalysis and on block explorers as an invalid

6    Bitcoin address.  I would go back and realize that there was

7    a typographical error in the address that I was trying to

8    analyze.

9    Q.  But isn't it true that it could show up as an invalid

10   Bitcoin address or it could show up as somebody else's

11   Bitcoin address?  There's two possibilities there.  It just

12   doesn't necessarily end up as invalid.  Isn't that true?

13   A.  Sir, the amount of entropy in a Bitcoin address is high.

14   It is exceptionally unlikely that a single typographical

15   error would result in a Bitcoin address that was used by

16   someone else, much less that would fit into the tracing that

17   I was conducting during this analysis.

18   Q.  And you said it was exceptionally unlikely.  Can you

19   give me a statistical number on the probability of that

20   unlikeliness?

21   A.  It is extremely small.  Bitcoin addresses are generated

22   randomly.  And generally, wallets don't even check to see if

23   that random Bitcoin address had been generated before.

24   There's so many characters and numbers in an address that is

25   so long, you don't have collisions like that.

Scholl - CROSS - By Mr. Ekeland

```
 1              THE COURT:  Let's move on.  Let's move on.
 2    BY MR. EKELAND:
 3    Q.  But it's not impossible?
 4              THE COURT:  I --
 5              THE WITNESS:  It is beyond a reasonable doubt that
 6    that would happen.
 7              THE COURT:  Let's move on.
 8    BY MR. EKELAND:
 9    Q.  You've never had any independent audit of any of your
10    blockchain tracing, have you?
11    A.  No, sir.  I would say that in a way I have, although it
12    wasn't intended to be an external audit.  I testified to the
13    trainings that I've taken with Chainalysis and TRM.  Many of
14    my cases that I've worked previously in my career were
15    presented as case studies in those trainings.  So in effect,
16    there was an audit of my blockchain analysis.
17    Q.  But that wasn't an independent audit?  It wasn't an
18    independent audit?
19    A.  It was conducted independently.  I didn't provide any of
20    my analysis to Chainalysis or TRM when they created case
21    studies for their training of my cases.
22    Q.  But that data set was just purely limited to --
23              MS. PELKER:  Objection, your Honor.
24    BY MR. EKELAND:
25    Q.  -- just a small set --
```

```
1                    MS. PELKER:  Asked and answered.

2      BY MR. EKELAND:

3      Q.  -- of your cases?

4                    THE COURT:  You can answer.  Go ahead.

5                    THE WITNESS:  Admittedly, it was a small subset of

6      my cases.  But yes, sir.

7      BY MR. EKELAND:

8      Q.  And you can't tell me any statistical error rate in

9      relation to your blockchain tracing, can you?

10     A.  No, sir.  I can only tell you that, as I stated before

11     today, I cannot recall a time that I reviewed a subpoena

12     where Chainalysis attribution wasn't correct.

13     Q.  But all you have is stories about the accuracy of your

14     tracing?

15                   MS. PELKER:  Objection.  Misstating the witness's

16     answer and what's in evidence.

17                   MR. EKELAND:  Your Honor, he can --

18                   THE COURT:  I just think that it's asked and

19     answered.

20     BY MR. EKELAND:

21     Q.  You can't tell me the statistical error rate for

22     Chainalysis Reactor, can you?

23     A.  No, sir, I cannot.

24     Q.  And you're aware that Chainalysis doesn't collect

25     internal data on its error rate.  Correct?
```

1    A.  I'm not aware of that.  No, sir.  I can't testify to

2    what Chainalysis does for analyzing error rates.

3    Q.  And you can't tell me your rate of false positives when

4    it comes to your blockchain tracing, can you?

5    A.  Can you define "false positive" in this instance, sir?

6    Q.  Yes.  It's an instance where you come up and you do a

7    tracing and you think somebody did it, but you were wrong.

8    A.  I'd say that definition is vague.  But we did some

9    analysis to provide to the Court when the Court inquired

10   about error rates, and we had -- where we analyzed all of

11   the subpoena returns that I used in my analysis for this

12   case and found no false positives.

13   Q.  But as you sit here -- so you're telling me your false

14   positive rate is zero?

15   A.  That's not what I'm saying.  No, sir.

16   Q.  Okay.  As you sit here, you cannot tell me your false

17   positive rate when it comes to your blockchain tracing, can

18   you?

19   A.  I can't quantify the false positive rate.  I can only

20   qualify, sir, in my experience Chainalysis has been

21   extremely reliable.

22   Q.  I was asking about your blockchain tracing.  And it's

23   your testimony that you can't quantify it, the false

24   positive rate?

25   A.  The error rate?  I don't -- your definition of the error

Scholl - CROSS - By Mr. Ekeland

1    rate is hard to quantify, sir.

2    Q.  How about, what's your definition of the error rate?

3              MS. PELKER:  Objection, your Honor.

4              MR. EKELAND:  Your Honor, he's an expert and he

5    brought up -- he raised the issue.

6              MS. PELKER:  He did not raise the issue.  Defense

7    counsel -- we're allowing some leeway to go down this area,

8    but --

9              THE COURT:  Why don't you just ask him -- maybe

10   perhaps you can rephrase your question.  If he's having

11   difficulty understanding your question, perhaps you can

12   rephrase it.

13             MR. EKELAND:  I'll move on.

14   BY MR. EKELAND:

15   Q.  Can you tell me Chainalysis Reactor's rate of false

16   positives?

17   A.  No, sir, I cannot.

18   Q.  And can you tell me in relation to your blockchain

19   tracing your rate of -- statistical rate of false negatives?

20   A.  Can you define a false negative in this case, sir?

21   Q.  Yes.  It's a trace where you think somebody wasn't

22   involved in a particular activity but they actually were.

23   It's the opposite of a false positive.  Does that make sense

24   to you?

25             MS. PELKER:  Your Honor, objection.  I just don't

 1    think that that's what a false negative is.

 2              MR. EKELAND:  That's what --

 3              THE COURT:  I'm confused by the question as well.

 4    Perhaps if you could rephrase it.

 5    BY MR. EKELAND:

 6    Q.  Well, let me just ask this:  Under any understanding of

 7    a false negative, can you tell me your false negative rate

 8    in relation to your blockchain tracing?

 9    A.  Again, I don't understand the question, sir.

10              THE COURT:  Just to make sure that I'm

11    understanding, are you asking him whether there are cases in

12    which, in essence, they miss something or he misses

13    something where somebody is engaged in some wrongdoing --

14              MR. EKELAND:  Well --

15              THE COURT:  -- and they don't identify it?  Is

16    that the question?

17              MR. EKELAND:  Well, yes.  The false negative where

18    you come to the conclusion that somebody or some entity

19    wasn't involved in something, but they actually were.  Come

20    to a negative conclusion about a proposition and you were

21    wrong.

22              THE COURT:  So I guess the problem I'm having, I

23    think, the confusion I'm having with the question is, you're

24    sort of shifting -- the question shifts between asking about

25    a particular blockchain tracing and more abstractly about

```
 1    whether you think somebody did something wrong or not.

 2            Maybe if you just phrased the question in terms

 3    of -- are the cases in which, for example, there was an

 4    address that was in a cluster and you missed it, if that's

 5    what you were asking, that would be clearer for me.

 6            MR. EKELAND:  Your Honor, it's my understanding

 7    these are fairly common things in error analysis.  But I'll

 8    just ask another -- a real simple question and I'll move on.

 9            THE COURT:  I just -- I'm having a heard time

10    understanding the question.  And so I just want to make sure

11    that it's clear.

12            MR. EKELAND:  I understand, your Honor.

13            THE COURT:  Okay.

14    BY MR. EKELAND:

15    Q.  Just, Mr. Scholl, you can't tell me your rate of false

16    negatives when it comes to your blockchain tracing analysis?

17    A.  Again, sir, I don't understand the question.

18    Q.  And you can't tell me the rate of false negatives when

19    it comes to -- for Chainalysis Reactor, can you?

20    A.  Again, I don't believe you've defined what a false

21    negative means when it comes to Chainalysis Reactor.

22    Q.  But you don't have any --

23            MS. PELKER:  Objection, your Honor.  Asked and

24    answered.

25            MR. EKELAND:  I haven't even asked my question.
```

Scholl - CROSS - By Mr. Ekeland

1          THE COURT:  Go ahead.

2          MR. EKELAND:  Thank you.  I'm going to move on.

3    BY MR. EKELAND:

4    Q.  And you spoke of -- you testified a lot in the last day

5    or so about clustering.  Correct?  Do you recall that?

6    A.  Yes, sir.

7    Q.  And you're not aware of a single scientific

8    peer-reviewed paper attesting to the accuracy of Chainalysis

9    Reactor's clustering methodologies, are you?

10   A.  No, sir.  I'm not aware of one.

11   Q.  And you testified that you've used different blockchain

12   analytic platforms like Chainalysis Reactor, I think TRM and

13   CipherTrace.  Is that correct?

14   A.  I've used more than that, sir.  But that did come up in

15   testimony.

16   Q.  Are you aware that those different platforms often give

17   different attributions to different clusters?

18   A.  I'm aware that those platforms often have different

19   attributions.  Most commonly, one will have an attribution

20   and one won't have an attribution, but it's possible that

21   those platforms disagree.  In my experience, Chainalysis is

22   extremely reliable, and that is the clustering that was

23   relied on during my analysis.

24   Q.  But you can't give me any kind of statistical or

25   scientific numbers as to the accuracy of Chainalysis

Scholl - CROSS - By Mr. Ekeland

1    Reactor?

2    A.  I can tell you that I checked addresses from Bitcoin

3    Fog, the Bitcoin Fog cluster in Chainalysis that made direct

4    transactions to Mr. Sterlingov's accounts and I checked

5    those against TRM.  And they matched 100 percent.  TRM also

6    clustered all of those addresses at Bitcoin Fog.

7    Q.  But you haven't done any -- you can't cite me any

8    statistical accuracy rate for Chainalysis Reactor's

9    clustering?

10   A.  I can only tell you that in my experience it's extremely

11   reliable.

12   Q.  And your experience is purely anecdotal?

13   A.  It's based on my experience using Chainalysis since 2015

14   in multiple investigations.

15   Q.  And Chainalysis Reactor's clustering -- correct me if

16   I'm wrong -- it doesn't contain any geographical data, does

17   it?

18   A.  I'm not aware of Chainalysis using geographical data in

19   clustering.

20   Q.  And it doesn't contain any jurisdictional data, does it?

21   A.  The clustering heuristics, sir?

22   Q.  Yes.

23   A.  I'm not aware of Chainalysis using jurisdictional

24   information in clustering.

25   Q.  So when you look at clustering data from Chainalysis,

```
1    you don't know where any particular transaction occurred?
2    A.   Just looking at clustering information, no, sir.  Like,
3    which addresses belong to a cluster, no, I don't.
4    Q.   And you would agree with me that different jurisdictions
5    have different laws?
6              MS. PELKER:  Objection, your Honor.  This is
7    beyond the scope of the witness's testimony.
8              MR. EKELAND:  No, it's not, your Honor.
9              THE COURT:  I'll allow it.
10             THE WITNESS:  I would agree that different
11   jurisdictions have different laws.
12   BY MR. EKELAND:
13   Q.   So you don't have any way of confirming through
14   Chainalysis clustering whether or not a particular
15   transaction was illegal in a particular jurisdiction?
16             MS. PELKER:  Objection, your Honor.  This calls
17   for a legal conclusion.
18             MR. EKELAND:  Your Honor, he's -- it's not a legal
19   conclusion.  I'm asking for the -- he has repeatedly said
20   that Chainalysis Reactor is identifying illicit funds
21   flowing into darknet markets; and I am asking him for the
22   basis of that opinion, and what I have just been told is
23   that there is nothing in Chainalysis Reactor clustering that
24   does anything to analyze whether or not --
25             THE COURT:  I'm sorry.  You're making an argument
```

```
1    now rather than an objection, rather than responding to an

2    objection.

3              MR. EKELAND:  I'm not objecting.

4              THE COURT:  I know.  But you're arguing your case

5    rather than responding to the objection.

6              I'll allow this one question, but then I think we

7    should move on.

8              THE WITNESS:  I'm sorry.  Can you repeat the

9    question, please, sir?

10   BY MR. EKELAND:

11   Q.  Yeah.  Sure.

12              There's no way, from looking at Chainalysis

13   Reactor's clustering, to know whether or not the transaction

14   was legal in any particular jurisdiction?

15   A.  Chainalysis doesn't have legal advice in the cluster.

16   But when I characterize funds as illicit, what I'm talking

17   about is funds going to darknet markets, where the primary

18   product is drugs.

19   Q.  Is it your testimony that drugs are illegal in every

20   jurisdiction in the world?

21   A.  No, sir, it's not.

22   Q.  Are you an expert in the laws of Sweden?

23              THE COURT:  All right.  He's not.  So let's move

24   on.

25
```

1    BY MR. EKELAND:

2    Q.  Do you recall testifying about indirect and direct

3    paths?

4    A.  Yes, sir, I do.

5    Q.  Could you just remind the jury what you consider to be

6    an indirect path?

7    A.  An indirect path between one entity, like Bitcoin Fog,

8    and another entity, like Mr. Sterlingov's -- one of

9    Mr. Sterlingov's accounts would be a path where funds are

10   moved from Bitcoin Fog and went to one or more intermediary

11   addresses, but those funds are provably moving into

12   Mr. Sterlingov's account.  All it means is there's two

13   clusters and there's at least one or more intermediary

14   between those two clusters.

15   Q.  And in order to do your indirect tracing, you have to

16   make certain assumptions about those intermediary addresses?

17   A.  I suppose it's true.  So we assume that those

18   intermediary addresses are not part of another service.

19   Q.  You assume?  That's the word you used.  Correct?

20   A.  Let me be clear:  It is a fact that those indirect funds

21   moved through addresses and then went into one of the

22   accounts that I was talking about.  That's a fact on the

23   blockchain.  Those are the funds moved.

24           We don't know -- I can't say with absolute

25   certainty that there wasn't, like, a change in control

1    there.  It's possible that one of those intermediary

2    addresses belonged to a different service and those funds

3    now aren't necessarily related to a path intended to move

4    from Bitcoin Fog into one of Mr. Sterlingov's accounts.

5    Q.  You have to make certain assumptions in your trace.

6    A.  It's not an assumption, I wouldn't say, sir.  Again, it

7    is a fact that funds moved through those Bitcoin addresses.

8    That part is factual.

9    Q.  Right.  But you said, if I heard you correctly, that you

10   have to assume certain things about control of those

11   addresses.

12   A.  When you're making conclusions about what that means,

13   you have to make assessments about the information in the

14   intermediary path.

15   Q.  For instance, would you consider a peel chain to be an

16   indirect path?  If there was a peel chain from, say, Bitcoin

17   Fog going to Mr. Sterlingov's account, would you consider

18   that peel chain to be an indirect or a direct path?

19   A.  That would be an indirect path.

20   Q.  So when you do a peel chain analysis, you have to make a

21   choice as to what is the spend address.  Correct?

22   A.  That's correct.

23   Q.  And then you have to make an assumption about what the

24   chain address -- change, like change, change address is.

25   Correct?

1    A.  When I initially did this analysis, sir, I did make

2    assessments about which address was a payment address and

3    which address was a change address.  All of the peel chains

4    that were specifically discussed in my initial analysis

5    proved accurate, that all of those assessments were accurate

6    through dozens and dozens of addresses in the peel chain.

7           When we reviewed Mr. Sterlingov's Mycelium wallet,

8    all of the peel chains in my analysis were in -- were

9    addresses in Mr. Sterlingov's Mycelium wallet, and it was

10   proved to be accurate, all of the assessments.

11   Q.  I'm sorry.  My question was just whether when you're

12   doing a peel chain analysis you have to make a guess or an

13   assumption about what the change address is.

14   A.  Generally, I would say that's correct.  I would call it

15   an assessment.  It's based on data and information.  It's

16   not like flipping a coin.

17   Q.  Well, you can't give me the statistical accuracy rate

18   for your peel chain analysis?

19   A.  That's correct.

20   Q.  Okay.  Can you explain to the jury again what a change

21   address is in a peel chain?

22   A.  A change address, again, is when you have a transaction

23   with two outputs where one output is the intended payment

24   and the other is change coming back into the wallet because

25   the wallet didn't have an input to spend that was the

 1    precise amount of money that it wanted to spend.

 2              There was the coffee example that we talked about

 3    where you're trying to buy a $4 coffee with a $5 bill.  So

 4    you would send an output of four Bitcoin, in this case, with

 5    one Bitcoin output being the change coming back to your

 6    wallet.

 7    Q.  Could you explain to the jury again what a spend address

 8    is?

 9    A.  In that transaction, the coffee payment of four Bitcoin,

10    the address that that payment went to would be the payment

11    address.  Mr. Ekeland is referring to it as a spend address,

12    but it's the same.

13    Q.  And if you are wrong in any of your assumptions about

14    the spend or change address, that would dramatically change

15    the results of your tracing, wouldn't it?

16    A.  In certain situations, hypothetically, it could.

17    However, again, the analysis focuses on multiple paths that

18    largely were confirmed by Mr. Sterlingov's Mycelium wallet

19    analysis.

20    Q.  That was a yes?

21              MS. PELKER:  Objection, your Honor.

22              THE WITNESS:  Yes.

23              MS. PELKER:  The witness has --

24              THE COURT:  He's answered the question.

25

1    BY MR. EKELAND:

2    Q.   In terms of the intermediary addresses in your peel

3    chain analysis, did you have the private keys for any of

4    those addresses?

5    A.   When I initially did the analysis, no.  After we

6    received the Mycelium wallet pneumonic or seed phrase, I

7    did.  That's how I confirmed that the initial analysis that

8    I conducted without those private keys was accurate.

9    Q.   You'd agree with me, though, that you'd need a private

10   key to confirm whether or not somebody controls a Bitcoin

11   address?

12   A.   No, sir.  I would not agree with you.  I would say that

13   generally that's the most concrete way to determine if

14   someone controls a Bitcoin address.  But there's plenty of

15   other ways that we would determine that someone controls a

16   Bitcoin address.

17   Q.   If somebody --

18   A.   If you said you were going to pay me from this Bitcoin

19   address and then sent me the amount of money that you were

20   going to send and it came from that Bitcoin address, I would

21   determine that you controlled the Bitcoin address that was

22   sending those funds.

23   Q.   Sure.  That's circumstantial evidence.

24              But you would agree with me that if you knew that

25   I had -- you saw that I had the private key to a wallet

1    address, you would be 100 percent certain that I controlled

2    it?

3    A.  Yes, sir.  You'd have the ability to control it.

4    Q.  And if you didn't find a private key on me after you had

5    searched everything that I had everywhere, all my devices,

6    my diary, my notes and everything, you couldn't be 100

7    percent certain that I controlled that address, could you?

8    A.  If there was no evidence in all of the things that I

9    reviewed?

10   Q.  Uh-huh.

11   A.  If there was no evidence, which I don't think is the

12   case in most -- in most of the analysis discussed here, then

13   it would be difficult to make that assessment.

14   Q.  So you'd agree with me that having corraborating [sic]

15   evidence --

16           THE COURT REPORTER:  Corroborating or --

17           MR. EKELAND:  Corraborating, c-o-r-r-o-b-o-r-a --

18   like corroboration.

19           THE COURT:  "Corroborating."

20   BY MR. EKELAND:

21   Q.  So you would agree with me that having verifying or

22   corraborating -- "corroborating"; I can't speak this

23   morning -- evidence is crucial to confirming who controls a

24   Bitcoin address?

25   A.  No, sir.  I would not agree that that's the only way to

 1   determine who controls a Bitcoin address.

 2   Q.  That would -- maybe you didn't hear my question.

 3        I said --

 4        MS. PELKER:  Objection, your Honor.  Can

 5   Mr. Ekeland please stop commenting and laughing on the

 6   witness's answers?

 7        THE COURT:  Sustained.

 8        MR. EKELAND:  Okay.

 9   BY MR. EKELAND:

10   Q.  So would you agree with me that it's important to have

11   corroborating and verifying information about who controls a

12   Bitcoin address?

13   A.  I'd say that's the ideal case.  But there are other ways

14   to prove custody of a Bitcoin address.

15   Q.  And that's not an ideal case, is what you're testifying?

16        MS. PELKER:  Objection, your Honor.  Misstating

17   the witness's answer.

18        THE COURT:  Sustained.  I mean, he gave his

19   answer.

20   BY MR. EKELAND:

21   Q.  And you'd agree with me that long peel chains are not

22   inherently illicit?

23   A.  I would agree with that.  I would say that a peel chain

24   could be a normal wallet behavior when that wallet receives

25   a large input and then spends it in subsequent small

Scholl - CROSS - By Mr. Ekeland

1   payments, sending large change forward.  I would agree that

2   peel chains are not inherently illicit, but peel chains can

3   be illicit.

4   Q.  But not necessarily?

5   A.  Not necessarily.  Yes, sir.

6   Q.  And Bitcoin Fog is a mixer?  Is Bitcoin Fog a mixer?

7   A.  Yes.  Bitcoin Fog is a mixer.

8   Q.  And what a mixer is is it's basically somebody sends

9   funds through the mixer and the funds come out on the other

10  side?

11  A.  Yes, sir.

12  Q.  And the mixer -- the mixing breaks law enforcement's

13  ability to trace those funds through the mixer and back to

14  those funds' original source.  Is that correct?

15  A.  Yes, sir.  Generally.

16  Q.  And have you ever been able to trace through Bitcoin

17  Fog?

18          MS. PELKER:  Objection, your Honor.  Can we pick

19  up the phone?

20          THE COURT:  Yes.

21          (Whereupon, the following bench conference was

22  held:)

23          MR. EKELAND:  Can you hear me?

24          THE COURT:  I can.

25          MR. EKELAND:  Can you guys hear me?

 1                    MR. BROWN:  Yes.

 2                    THE COURT:  We can hear you.

 3                    MS. PELKER:  I just want to be cognizant of where

 4      Mr. Ekeland is going here.

 5                    I think the question is about whether Bitcoin Fog

 6      is an effective mixer; but to the extent that Mr. Ekeland

 7      intends to probe Mr. Scholl about sensitive investigations

 8      that are ongoing and tracing through Fog, we would just

 9      object to that as not at all relevant here and simply trying

10      to use this as an avenue for bringing out sensitive work on

11      other cases.  To the extent it's simply a question of

12      whether Bitcoin Fog was an effective mixer, we think that's

13      fine.

14                    But I just wanted to preview this for the Court if

15      it goes too far down talking about specific traces or

16      efforts that Mr. Scholl has done for other cases.

17                    THE COURT:  Mr. Ekeland?

18                    MR. EKELAND:  I think this involves

19      Mr. Sterlingov's Sixth Amendment confrontation clause right.

20      And it's my understanding that there's a possibility that

21      Mr. Scholl may have traced through the Bitcoin Fog mixer and

22      that when he traced through it on the initial reaction --

23      sorry -- the initial deposit, I think the one that we were

24      talking about in December, that there's a lot to trot on,

25      that he may have traced through to certain accounts that

1   were related to BTCE that have nothing to do with

2   Mr. Sterlingov.

3          So what this question is is I'm seeking to find

4   out from the witness if we have gotten the full extent of

5   the traces that he's done on this case.  And if he has

6   traced through, then I think that's important to know for a

7   number of reasons.

8          Not only the fact that he traced through to other

9   suspects who have nothing to do with Mr. Sterlingov, but I

10  think it raises the legitimate question that if he can trace

11  through Fog, then how come he hasn't traced through to the

12  original source of funds when yesterday he spend a whole

13  bunch of testimony testifying about how Bitcoin Fog was the

14  source of funds when what I'm getting at is it's not,

15  because it's a mixer.

16         If he can't trace through, then I would like to

17  cross him on why he hasn't traced all the way through to see

18  that the funds that Mr. Sterlingov, as a user of Bitcoin

19  Fog, took and then deposited in his accounts came from

20  completely legitimate sources.

21         MS. PELKER:  And I think Mr. Ekeland just

22  misunderstands the work that's been done.  And I think that

23  he certainly can ask Mr. Scholl about whether he was able to

24  trace the deposit that we've attributed to Mr. Sterlingov

25  through -- the Government's just concerned about getting

1    into -- Mr. Scholl testified about mistakes that users can

2    make yesterday, that -- whether Mr. Ekeland was looking at

3    getting into mistakes subjects of completely unrelated

4    investigations had made and tracing.

5              MR. EKELAND:  Your Honor, the Government should

6    have raised this issue before cross-examination.  I was not

7    aware that -- I was not at all probing that Mr. Scholl is

8    somehow involved in some other secret investigations.

9    That's an issue that should have been made beforehand.  If

10    we need to clear the courtroom and conduct this portion of

11    the hearing under seal, I mean, I think this implicates --

12    the scope and the ability of the Government's tracing

13    expert, I think, is directly relevant to --

14              THE COURT:  I mean, I think we're probably wasting

15    a lot of time on nothing here.

16              I'm -- you can ask the questions.  If it starts

17    getting into questions relating to subjects of other

18    investigations, I may ask -- or if the Government raises an

19    objection, I may ask that he not mention the other entity by

20    name but just refer to it as something that's unrelated to

21    Mr. Sterlingov and involved in another investigation in a

22    way that doesn't present a problem.

23              MR. EKELAND:  Your Honor, I have no interest in

24    the names or identities of any other investigation.

25              THE COURT:  All right.

```
 1                    MR. EKELAND:  I am interested in probing --
 2                    THE COURT:  Let's move on.
 3                    (Whereupon, the following proceedings were had in
 4          open court:)
 5                    THE COURT:  When you're ready.
 6                    MR. EKELAND:  May I proceed, your Honor?
 7                    THE COURT:  You may.
 8          BY MR. EKELAND:
 9          Q.  Mr. Scholl, have you ever traced through Bitcoin Fog?
10          A.  I traced through Bitcoin Fog following the transactions
11          that were made by the undercovers in this case, the FBI
12          undercover and the IRS undercover, based on external
13          information.  I have not traced funds through Bitcoin Fog
14          based solely on blockchain analysis.
15          Q.  And have you traced any other funds through Bitcoin Fog
16          in relation to this case?
17          A.  No, sir.  I don't believe I have.
18          Q.  You're aware that according to Chainalysis, 90 percent
19          of users of mixers use them for privacy reasons?
20          A.  No, sir.  I'm not aware of that.
21          Q.  And are you familiar -- well, are you aware of the fact
22          that only .24 percent of crypto transactions in 2022
23          involved illegal transactions?
24          A.  No, sir.  I don't know where that data is coming from.
25          Q.  Have you ever read the Chainalysis 2023 Crypto Crime
```

1    Report?

2    A.  I probably have, but I don't recall as I sit here today.

3    Q.  And isn't it true that more fiat money is used for

4    illegal activities than crypto?

5            MS. PELKER:  Objection.  Relevance.

6            THE COURT:  I'll allow it, although you may want

7    to define that for the jury, because you may have to define

8    for me what you mean by "fiat money."

9            MR. EKELAND:  Understood.

10   BY MR. EKELAND:

11   Q.  Mr. Scholl, could you explain to the jury what fiat

12   money is as opposed to crypto?

13   A.  Fiat currency is just currency that's backed by

14   government.  So we're talking about dollars, euros, kronors.

15   I would say that those markets are much larger than

16   cryptocurrency markets, even today.

17            I would expect that more crime would be done with

18   fiat currency.

19   Q.  And people regularly launder money through banks?

20   A.  Yes, sir.  That's accurate.

21   Q.  Now, I just want to ask some basic questions about the

22   sale -- different types of sales of Bitcoin just to clarify

23   I think for the jury what's kind of a very confusing

24   subject.  We're throwing around a lot of terms.

25            Do you know what a peer-to-peer transaction is?

1    A.  Yes, sir, I do.

2    Q.  Could you just explain again for the jury what a

3    peer-to-peer transaction is with crypto?

4    A.  A peer-to-peer transaction is when you're making a

5    transfer of funds between two individuals directly.  We

6    talked about local Bitcoins being a peer-to-peer platform

7    where they arrange buyers and sellers to meet on their

8    platform and make exchanges between themselves.

9          So instead of exchanging with the exchange itself,

10   like at an exchange like Kraken, which also came up in this

11   case, where you're exchanging funds with the exchange, and

12   they handle that exchange for you, local Bitcoins is a

13   peer-to-peer exchange where they just match you up with

14   other local Bitcoin customers that want to make some -- the

15   opposite deal that you want to make.

16   Q.  Do you know the difference between on-chain and

17   off-chain transactions?

18   A.  Yes, sir, I do.

19   Q.  Could you explain to the jury what an on-chain

20   transaction is?

21   A.  An on-chain transaction is a transaction that's

22   broadcast in the Bitcoin blockchain and is recorded in the

23   Bitcoin blockchain.  So when I make a deposit to the Kraken

24   account, that transaction is broadcast to the Bitcoin

25   network and those funds are sent to Kraken; and everyone can

1   see that on the blockchain.

2          Then Kraken -- I can make internal transfers at

3   Kraken where I say, I want to buy ETH for Bitcoin and

4   they'll just change that on their external ledger, not on

5   the Bitcoin blockchain, not on the Ethereum block.  They'll

6   just credit my account for ETH and subtract a balance that

7   they're tracking for my Bitcoin.  That would be an off-chain

8   transaction.

9          THE COURT REPORTER:  I'm sorry.  Could you spell

10  ETH for me?

11         THE WITNESS:  E-T-H is the abbreviation that I was

12  referring to.  The currency name is Ether, spelled

13  E-T-H-E-R.

14  BY MR. EKELAND:

15  Q.  One way to do an off-chain transaction is if I have a

16  private key, I can just give you my private key and there

17  wouldn't be anything recorded on the blockchain that there

18  was -- that I had transferred my private key to you.

19  Correct?

20  A.  That is possible.  However, it's not generally done

21  because it would involve an extreme level of trust between

22  the two individuals.  If you gave me your private key and

23  said, Here's the Bitcoin; here's the private key, I would

24  have to trust that you're not going to try to spend that one

25  Bitcoin before I spend that one Bitcoin.  That's generally

1    very uncommon.  There are examples of services that use this

2    kind of method.

3    Q.  You can't give me any statistical data related to the

4    occurrence of off-chain private key transfers, can you?

5    A.  No, sir.  I cannot provide you with statistical data on

6    that.

7    Q.  Because that's not recorded anywhere on the blockchain.

8    A.  Is that a question, sir?

9    Q.  Yes.  My question is that the transfer of private keys

10   peer-to-peer between individuals is not recorded on the

11   blockchain?

12   A.  That would not be recorded on the blockchain.  But if

13   you're referring to Mr. Sterlingov's activity at

14   LocalBitcoins, I don't believe that the evidence suggests

15   that's what happened.

16   Q.  One way you can transfer a private key is that you can

17   just have it written down on a piece of paper.  Correct?

18   A.  Yes, sir.  That's correct.

19   Q.  And another way that you could transfer a private key is

20   you could put it on a thumb drive and hand it to somebody?

21   A.  One could do that.  It's just not very common, sir.

22   Q.  But you can't cite me any data on the frequency of the

23   occurrences of off-chain private --

24   A.  Again, it would just -- sorry.  It just requires that

25   two people trust each other inherently.  We don't -- the

1    Bitcoin network wasn't designed to operate that way because

2    the Bitcoin network was designed to operate without trust.

3    It defeats the purpose of using the Bitcoin network.

4    Q.  Is it your testimony that no one ever pays cash in

5    person for someone's private key, that no one ever exchanges

6    cash for a private key peer-to-peer?  Is that your

7    testimony?

8    A.  It's not my testimony that that's never happened.  It is

9    my testimony that would be very unlikely.

10   Q.  But you're just guessing as to the frequency?

11          THE COURT:  Asked and answered.

12   BY MR. EKELAND:

13   Q.  And do you recall testifying about Mt. Gox redemption

14   codes?

15   A.  Yes, sir, I do.

16   Q.  Could you explain to the jury one more time what Mt. Gox

17   redemption codes are?

18   A.  Mr. Gox redemption codes are a way to move funds between

19   accounts on Mt. Gox.  I believe I explained that they're

20   kind of like gift cards where there's a unique identifier,

21   and you can provide that unique identifier to another

22   Mt. Gox user who can redeem that on their account.  So there

23   would be a withdrawal for creating that redeem code on one

24   account and then a deposit for redeeming that redeem code on

25   the other account.

1    Q.  And there's two types of Mt. Gox redemption codes,

2    correct?

3    A.  In this case.  I don't know how many types there were in

4    general.  But in this case, two types came up.  Yes, sir.

5    Q.  One's for U.S. dollars?

6    A.  Yes, sir.

7    Q.  And one is for Bitcoin?

8    A.  Yes.

9    Q.  People could transfer those redemption codes off-chain,

10   so to speak, in person.  Correct?

11   A.  Hypothetically, yes, sir.

12   Q.  So I could buy -- I could come up to you with $100 and I

13   could buy your Mt. Gox redemption code, take it and redeem

14   it.  Correct?

15   A.  I think that's theoretically possible.  Yes, sir.

16   Q.  I'd like to now just ask you some questions about

17   Akemashite Omedetou, referring to his quotes.

18            MR. EKELAND:  So, Mr. Hassard, if we could get

19   what's in evidence as Government's Exhibit No. 1 up.  And if

20   I could get just post 1 and -- scroll back up, Mr. Hassard.

21   I want to go to the second paragraph.

22   BY MR. EKELAND:

23   Q.  Can you see that, Mr. Scholl?

24   A.  I see it.  Yes, sir.

25   Q.  Just starting at -- do you see -- if you can just read

1    those two paragraphs to the jury, please.

2    A.  Yes, sir.  "The Bitcoin network might be anonymous in

3    terms of single-handedly revealing your IP address, but the

4    transaction history is recorded in the blockchain and is

5    publicly available, which makes your anonymity very

6    vulnerable.

7            "Once the interested parties, be it authorities or

8    just interested researchers" -- and there's a link to a

9    blogspot page -- "have acquired any one of your addresses or

10   transactions, they could easily track your money around the

11   network.

12           "And knowing your transaction history, connecting

13   your Bitcoin addresses to real you is possible, because you

14   will at some point need to exchange your Bitcoins to or from

15   a fiat currency using a bank account number, a credit card,

16   LR account or similar service which is much less anonymous

17   than the Bitcoin network."

18   Q.  Do you have an understanding what Akemashite Omedetou is

19   referring to when she or he says "LR account"?

20   A.  Yes, sir.  My understanding is that that's Liberty

21   Reserve.

22   Q.  And the date of this post is October 27th, 2011?

23   A.  Yes, sir.

24   Q.  And would you agree with me that whomever wrote this

25   post has a relatively sophisticated understanding of tracing

 1    when it comes to blockchain transactions?

 2    A.  Yes, sir.  I would agree.

 3    Q.  I'd like to move now to post No. 2.  It's starting --

 4            MR. EKELAND:  Mr. Hassard, it's under the header,

 5    "Do I get the same Bitcoins back or other Bitcoins?"  There

 6    is a paragraph that starts "Another thing to consider" in

 7    post No. 2.  Keep going up.  "Another thing to consider."

 8    There you go.

 9    BY MR. EKELAND:

10    Q.  Mr. Scholl, if you could, if you could just read that

11    paragraph right there.

12    A.  Yes, sir.  "Another thing to consider is the amount of

13    your withdrawal" --

14            THE COURT:  Slow down, please.

15            THE WITNESS:  Yes, your Honor.

16            "Another thing to consider is the amount of your

17    withdrawal.  If you transfer 1.382 to us and the next day

18    you withdraw about 1.38 Bitcoins to another account, those

19    amounts will be visible in the blockchain.

20            "And unless there were ten other people that day

21    that also withdrew just 1.38 Bitcoins, the link between your

22    deposit and your withdrawal will be pretty obvious.  You

23    will still have plausible deniability, since nobody else has

24    access to our servers and can actually prove that those

25    Bitcoins came from your account, but the link will be found

1    nevertheless."

2    BY MR. EKELAND:

3    Q.  And could you just continue and just read the next

4    paragraph.

5    A.  Yes, sir.  "This is why you should ideally never

6    withdraw the same amount as you have deposited.  We are

7    already helping you to do this by transferring your money to

8    you in multiple randomized payouts at randomized times (and

9    optionally to different addresses), but to be sure you

10   should withdraw to multiple addresses and different amounts

11   than the one you have deposited.  Also, make sure to change

12   your deposit address every now and then to further anonymize

13   your payments."

14   Q.  And this is also on, I believe, October 27th, 2011.  Is

15   that right?

16   A.  Yes, sir.

17   Q.  And would you agree with me that whomever wrote that

18   understood that if you deposit and withdraw similar amounts,

19   that that could lead to people tracing your transaction more

20   easily?

21   A.  That's what he's saying here.

22           MR. EKELAND:  Now I'd like to move on to post

23   No. 35.  Excuse me for one moment while I find it.

24           Mr. Hassard, I'm looking for the quote that starts

25   "It eliminates all sorts of timing analysis."  Oh, well,

1    let's go to the section here on --

2    BY MR. EKELAND:

3    Q.  First, post 35 is from November 11, 2011; is that

4    correct?  You'd agree with me, Mr. Scholl?

5    A.  Yes, sir.  November 11, 2011.

6            MR. EKELAND:  And scrolling down a little bit,

7    Mr. Hassard, under one of the box quotes there's a sentence

8    that says "The database engine."  Yes.  That's it.

9    BY MR. EKELAND:

10   Q.  Mr. Scholl, could you just read that paragraph.

11   A.  Yes, sir.

12           THE COURT:  Slowly, please.

13           THE WITNESS:  Thank you, your Honor.

14           "The Bitcoind service is run on a different

15   machine than the front end.  They communicate by the means

16   of a database.  The database engine is not run on the same

17   machine as the front end either.  The front end does not

18   have access to the private keys."

19   BY MR. EKELAND:

20   Q.  And would it be fair to say that based on that quote

21   that there's more than one machine involved in operating

22   Bitcoin Fog?

23   A.  Yes, sir.  Based on this description, I would agree.

24           MR. EKELAND:  Mr. Hassard, could you search for --

25   it's on the next page, but it's a sentence that starts, "It

1    is a no-brainer."

2    BY MR. EKELAND:

3    Q.  Mr. Scholl, if you could just read the next -- that

4    paragraph there, "It is a no-brainer" all the way through

5    that third paragraph there that starts with "Randomizing the

6    fee."

7    A.  Yes, sir.  "It is a no-brainer that no matter which

8    transactions, if the total adds up to the same value,

9    statistical analysis will be possible.

10          "However, we cannot force our users to withdraw

11    smaller amounts than they have deposited and keep more money

12    on our service.  We do not recommend this, however.  An

13    exact mechanism of this, once again, is described in the

14    first post.

15          "Randomizing the fee is a great idea and we will

16    implement it, but there are two problems:  If the spread is

17    too big, it is unfair to users.  If it is too small, the

18    effect of it is also small, and any good statistical

19    analyzer will see through these tiny manipulations if no

20    caution is taken.  Still, this will at least help against

21    users blindly withdrawing the exact amount they have put

22    in."

23    Q.  And would you agree with me that, again, Akemashite

24    Omedetou is showing a concern of users withdrawing the same

25    amount that they deposit?

1    A.  Yes, sir.

2    Q.  And just a little bit lower down, I think, on this same

3    page, it says as far -- let me clear it.

4         MR. EKELAND:  Stop right there, Mr. Hassard.

5    Thank you.  I will --

6    BY MR. EKELAND:

7    Q.  Actually, Mr. Scholl, do you see the sentence that

8    starts "As for using the powers of 2"?  Could you read that

9    sentence?

10   A.  Yes, sir.  "As for using the powers of 2, I will check

11   with our mathematician, but what exactly does make this."

12   Q.  And would you agree with me that there, whomever

13   Akemashite Omedetou is talking about, he or she is talking

14   about somebody on the team that's running Bitcoin Fog?

15   A.  I'm sorry.  Can you repeat the question?

16   Q.  Yes.  So would you agree with me that whomever

17   Akemashite Omedetou is talking about is not him- or herself,

18   that he or she is talking about somebody else?

19   A.  That's what he's intimated here.  But based on my

20   experience, often small organizations in cryptocurrency try

21   to make themselves appear legitimate by having a larger

22   group of people working for them.

23   Q.  But you would agree with me that Akemashite Omedetou has

24   also spoken elsewhere in these posts about having a team of

25   software engineers?

1    A.  He references that.  Yes, sir.

2    Q.  And as far as you're aware, you haven't seen a single

3    communication anywhere in Mr. Sterlingov's devices, hard

4    drives, thumb drives, notes, diaries or anywhere where

5    there's any communication between Mr. Sterlingov and anybody

6    working on Bitcoin Fog.  Correct?

7    A.  I have not reviewed any, sir.  But I would point out

8    that I believe computer scientist Mazars is going to testify

9    that there are encrypted portions on those devices that the

10    Government hasn't analyzed.

11    Q.  You're not sure what she's going to testify to, though,

12    are you?

13    A.  No, sir.  But it's my understanding -- I didn't review

14    this.  I didn't analyze the devices myself.  It's my

15    understanding there are encrypted portions of those devices

16    that weren't analyzed by the Government.

17    Q.  Have you discussed her testimony with her?

18    A.  I have not discussed my testimony with Ms. Mazars.

19    Q.  But you haven't reviewed the devices as part of your

20    analysis?

21    A.  I was provided evidence off of the devices.  I did not

22    review the devices myself.

23    Q.  Did you review the evidence provided off the devices?

24    A.  Yes, sir, I did.

25    Q.  And did you see any communications between

1    Mr. Sterlingov and anybody operating Bitcoin Fog?

2    A.  I'd like to be clear that I didn't review all of the

3    evidence on those devices.  But in the evidence that I was

4    provided to review, I did not identify any communications

5    regarding Mr. Sterlingov communicating about Bitcoin Fog.

6            MS. PELKER:  Your Honor, could Mr. Ekeland please

7    stop turning to the jury and smirking.

8            MR. EKELAND:  I'm not smirking, your Honor.  I'm

9    merely looking at the jury.  I am not smirking at all.

10            THE COURT:  Well, let's just proceed.  Ask your

11    questions.

12    BY MR. EKELAND:

13    Q.  And so when you talk about devices, you're including his

14    computers in that?

15    A.  Yes, sir.

16    Q.  And you're including his three terabytes with the hard

17    drives in that?

18    A.  I'm including the evidence that I reviewed that was

19    provided [indiscernible] by the case team.  I did not,

20    again --

21            THE COURT REPORTER:  That was provided...?

22            THE WITNESS:  To me by the case team.

23            THE COURT REPORTER:  I need you to slow down,

24    please.

25            THE WITNESS:  Yes, ma'am.

1    BY MR. EKELAND:

2    Q.  Off the top of your head, can you tell me the evidence

3    that you did review from the case team?

4    A.  The evidence that came up in my direct testimony, sir.

5    Q.  And nothing else?

6    A.  No.  I certainly was provided other documents that

7    didn't come up in my direct testimony.  But, sir, I don't

8    know how to summarize for you the information that was

9    provided to me by the case team.

10   Q.  Just one more question and we'll move on.

11          In all that that you reviewed, you didn't see any

12   communications between Mr. Sterlingov and anybody operating

13   Bitcoin Fog?

14   A.  I didn't see any reference to Bitcoin Fog.

15   Q.  You didn't see any reference to Bitcoin Fog at all?

16   A.  I didn't see any reference to communications about

17   operating Bitcoin Fog.

18   Q.  Did you see any reference to Bitcoin Fog?

19   A.  No, sir, I don't believe I did.

20   Q.  Continuing on post 35.

21          MR. EKELAND:  Mr. Hassard, I think there's a quote

22   that starts "Both are pretty easy to analyze."  Let me clear

23   my screen here.  Sorry.

24   BY MR. EKELAND:

25   Q.  Mr. Scholl, could you just read that sentence?

1    A.  Yes, sir.  "Both are pretty easy to analyze.  That is

2    why we always suggest to our users to never withdraw the

3    same amount that they have put in."

4    Q.  And you would agree with me, again, Akemashite Omedetou

5    is expressing a concern about depositing and withdrawing the

6    same amounts?

7    A.  Yes, sir.

8    Q.  And the reason that she or he is expressing that concern

9    is because she or he is concerned with the fact that doing

10   so makes it easy to trace the transaction?

11   A.  That's my understanding.  Yes, sir.

12             MR. EKELAND:  If we could move on to post 41.

13             Your Honor, just let me know when you would like

14   to take the morning break.

15             THE COURT:  Okay.  I think we can continue for a

16   little bit.

17             MR. EKELAND:  I'm sorry?  I didn't hear that.

18             THE COURT:  We can continue for a little bit.

19             MR. EKELAND:  Thank you.

20             THE COURT:  We've been going for about an hour so

21   far, just for your sense of timing.

22             MR. EKELAND:  I wanted to make sure I wasn't

23   running over.

24   BY MR. EKELAND:

25   Q.  Now, this post 41, this is from November 13th, 2011.  I

 1        think that's right up there.

 2                  MR. EKELAND:  And then, Mr. Hassard, there's a box

 3        quote and under that it starts, "No one that -- no, that

 4        would not be the same thing."  If we could find that real

 5        quick.

 6        BY MR. EKELAND:

 7        Q.  If you could just read that to the jury, Mr. Scholl.

 8        A.  Yes, sir.  "No, that would not be the same thing,

 9        because in that case their money would go through just

10        another address, one input, one output, completely

11        transparent."

12        Q.  And would you agree with me that what Akemashite

13        Omedetou is saying there in essence is that if you just are

14        using one input and one output to a transaction, that it's

15        very easy to trace?

16        A.  Can I review the quote above, sir?

17        Q.  Yes.  Certainly.

18        A.  Mr. Hassard, could you move the cursor?  Thank you.

19                  Can you repeat the question, please, sir?

20        Q.  Yeah.  The question was:  Would you agree with me that

21        what Akemashite Omedetou is expressing a concern about is if

22        you use one input and one output in a particular

23        transaction, it makes it very easy to trace?

24        A.  No, sir.  I don't believe that's what he's saying.

25        Q.  What do you think he's saying or she's saying?

1    A.  Sorry.  I don't believe that's what they're saying.  I

2    apologize.

3    Q.  Uh-huh.

4    A.  If you read the quote, sir, if I may --

5    Q.  Certainly.

6    A.  It says, "If all you are doing is breaking their

7    transaction into three pieces."  So I don't believe he's

8    talking about a transaction with one input and one output.

9    Q.  Well, what do you think he or she is saying in reference

10   to that, "No, that would not be the thing because in that

11   case the money would go through just another address, one

12   input, one output, completely transparent"?  What's your

13   understanding of what's being said there?

14   A.  I'm not totally sure.  But based on the quote, it sounds

15   like the person that he's responding to is talking about a

16   multi-output -- here's the quote -- Sendmany transaction.

17   And Mr. -- or Akemashite Omedetou is saying it's still just

18   going through one other address.  But I don't think he's

19   talking about a transaction with only one output.  There's

20   one intermediary address, is my understanding, and I'm not

21   sure what this actually means.  But my understanding of that

22   would be that there's one -- a single intermediary address,

23   but we're not talking about a transaction with one input,

24   one output.

25   Q.  But you would agree with me that a transaction with one

1    input and one output would be fairly easy to trace?

2    A.  I mean, yes.  The funds went from the input to the

3    output.  That would be fairly easy to trace.

4            MR. EKELAND:  Mr. Hassard, later in that post I

5    think there's a sentence that starts, "Yet the difference is

6    than in the first case."  There it is right there.

7    BY MR. EKELAND:

8    Q.  And, Mr. Scholl, if you could please read that to the

9    jury.

10   A.  Starting with "yet"?

11   Q.  Yes.

12   A.  "Yet the difference is that in first case you have nine

13   outputs in one case and 28 in the second case, the second

14   one obviously being harder to analyze."

15   Q.  And you would agree with me there that what Akemashite

16   Omedetou is saying is that it's harder to analyze and trace

17   a transaction with more outputs?

18   A.  Again, sir, I would have to review what he's responding

19   to to better understand what he's saying.

20   Q.  Okay.

21   A.  Generally I would say, generally, that a transaction

22   with more outputs is harder to analyze.  But I'm not sure

23   exactly what he's referring to here without reviewing the

24   thread above.

25   Q.  But would you also agree with me that, say, like in a

1    peel chain transaction where you do have numerous outputs --

2    and I believe you testified before that you have to make

3    certain assumptions as to what the change in the spend

4    address is -- that -- would you agree with me that the

5    potential for error in relation to those assumptions that

6    you have to make with a peel chain increases the longer that

7    peel chain gets?

8    A.  So I call them assessments, not assumptions.  However,

9    the longer the peel chain gets, if you didn't have the

10   Mycelium wallet, as is the case in the peel chains discussed

11   in my report, it -- yeah, it compounds the opportunity for

12   an error.

13   Q.  So the error --

14   A.  I would point out that there are peel chains 95

15   addresses long in the Mycelium wallet that I analyzed in

16   this case accurately before I had the Mycelium wallet files.

17   Having the Mycelium wallet files proved that that analysis

18   was accurate.

19   Q.  But you would agree with me, if I understood you

20   correctly, that the potential error rate increases the

21   longer a peel chain gets?

22   A.  I would say there are more opportunities to make a

23   mistake in your assessment.

24   Q.  There are more opportunities to make a mistake in your

25   assessment.

1           And I think you just testified that you used the

2     word "assessment" and not "assumption"?

3     A.  Yes, sir.  That's what I testified.

4     Q.  What's the difference between an assessment and an

5     assumption?

6     A.  Again, it's based on data.  I'm looking at information

7     in the transaction and other information, contextual

8     information, in the case.  There's more than just making a

9     guess at this; it's data-driven.

10    Q.  But there is a guess involved?

11          MS. PELKER:  Objection, your Honor.  Misstating

12    the witness's testimony.

13          MR. EKELAND:  I'm asking him to clarify his

14    testimony.

15          THE COURT:  Well, you can ask if there is a guess

16    involved.

17    BY MR. EKELAND:

18    Q.  In your assessments -- do your assessments involve

19    guessing?

20    A.  I wouldn't call them guesses, sir.  I wouldn't

21    characterize them that way.

22    Q.  How --

23    A.  I would say, just to be clear to the jury, it is a fact

24    that those funds moved down the peel chain.  What we're

25    talking about -- or moved down those addresses.  What we're

1    talking about is assessing if there was a change in control

2    in the middle of the peel chain.

3            So when I lay out those peel chains, you know, it

4    is a fact that funds moved that way.  That is a fact.  What

5    I'm trying to assess is which one was a payment and which

6    one was the change address.

7            So if you could repeat the question, sir.

8    Q.  Isn't it a fact that the flow of funds is not the same

9    as the flow of control of the funds?

10   A.  Yes, sir.

11   Q.  And you said that you wouldn't characterize what you do

12   in assessments as guessing.  Did I -- do I recall that

13   correctly?

14   A.  I said I characterized them as assessments.  Yes, sir.

15   Q.  And -- but if I recall correctly, when I asked you if

16   you used guesses in your assessments, you said you wouldn't

17   characterize that as guessing.  Do you use guesses in your

18   assessments?

19   A.  I think we're just debating the meaning of a word.  I

20   make assessments.  So I don't know with certainty that this

21   is the change and this is the payment until, in the cases

22   where we had the Mycelium wallet files where I do know with

23   certainty -- and I'd like to say again, it is a fact that

24   funds moved down that peel chain, and it would not change

25   the amount of indirect exposure between Bitcoin Fog and

1    Mr. Sterlingov's accounts.  It's where the peel chains

2    primarily came up in my testimony.

3    Q.  Am I understanding your testimony correctly that in

4    order to have certainty that -- am I understanding your

5    testimony correctly that in order to have certainty about a

6    trace, you need some kind of corroborating or verifying

7    information?

8    A.  Again, the flow of funds is factual.  It is a fact that

9    those funds moved down that peel chain between those

10   addresses.  So again, in the calculations about the amount

11   of money we're talking about, the answer is no.  But for

12   attribution, other evidence may be required.

13   Q.  May be required.  But not always?  Are there situations

14   where you don't need any external empirical evidence to make

15   the attribution?

16   A.  You were referring to private keys before.  There were

17   instances before where we had -- I had the private keys for

18   Mr. Sterlingov's Mycelium wallet file.  I had a wallet file

19   in export from account 15.  That would -- for my analysis,

20   that would be attribution.  These came from Mr. Sterlingov's

21   Mycelium wallet, even though I did not yet have the private

22   keys.

23   Q.  But --

24   A.  There's other kinds of circumstantial evidence that

25   could lead to attribution that don't involve private keys.

1    Q.  But you knew that that export -- what did you say? --

2    from wallet 15?  You knew already that that belonged to

3    Mr. Sterlingov?

4    A.  Right.  I didn't have the private keys, was the point I

5    was trying to make.

6    Q.  But you were relying on the representation that wallet

7    15 belonged to Mr. Sterlingov?

8    A.  Again, I made those assessments about those peel chains

9    before having any information from the Mycelium wallet.  The

10   Mycelium wallet corroborated that my assessments were

11   accurate.

12   Q.  And that was corroborating evidence?  That was

13   corroborating evidence?

14   A.  Yes, sir.

15             MR. EKELAND:  Your Honor, are we still okay on

16   time?

17             THE COURT:  It's up to you.

18             MR. EKELAND:  Now is a good time.  I'd love to get

19   some water.

20             THE COURT:  I'm sorry?

21             MR. EKELAND:  I would love to get some water, and

22   I'm sure everybody else would.

23             THE COURT:  Why don't we take our morning break

24   now.  It's 11:25.  Let's come back at 20 of 12:00.  I'll

25   remind you don't discuss the case, even among yourselves,

```
 1    and don't conduct any type of research.  I will see you
 2    shortly.
 3                THE COURTROOM DEPUTY:  All rise.
 4                (Whereupon, the jury exited the courtroom at 11:25
 5    a.m. and the following proceedings were had:)
 6                THE COURTROOM DEPUTY:  You may be seated.
 7                THE COURT:  The witness can take his break as
 8    well.  Don't discuss your testimony with anyone.
 9                THE WITNESS:  Of course, your Honor.
10                (Thereupon, Luke Scholl retired from the courtroom
11    and the following proceedings were had:)
12                THE COURT:  The deputy clerk heard from one of the
13    jurors that on Monday she has a doctor's appointment dealing
14    with an emergent issue.  It's something that's not
15    scheduled, but it's something that requires current
16    attention.  She has it at 12:30 on Monday, and indicated
17    that she didn't think she could get there and get back.  She
18    hasn't said -- it's somewhat of a distance from the
19    courthouse, she said.
20                What I'd like to do is ask the deputy clerk to get
21    a little bit more information as to exactly where the
22    appointment is, because I'd hate to lose half a day or more
23    than half a day of testimony based on this.  We're talking
24    about -- this is Juror No. 7.
25                So I'll ask the deputy clerk to see if we can get
```

Scholl - CROSS - By Mr. Ekeland

1    a little bit more information about exactly how much the

2    person has to travel; and we can make an assessment about

3    what we want to do in light of that.

4            I will see you after the break.

5            THE COURTROOM DEPUTY:  All rise.

6            (Thereupon a recess was taken, after which the

7    following proceedings were had:)

8            THE COURT:  Just before we get the jury, it turns

9    out I was -- my information wasn't quite right about the

10    juror that was talking.  It's Juror 13, not Juror 9.  I

11    think it's a question of which side of the bench -- or the

12    jury box you count from.  But we've now received complaints

13    from I think four jurors about this, and so I guess I'm

14    interested in what your thoughts are on it.

15            I probably should at least say something with all

16    the jurors in here and just say that we -- just ask the

17    jurors to make sure they refrain themselves from saying

18    anything or talking as the evidence is coming in.  But if

19    anyone thinks that I should do something different or more

20    than that, please let me know.

21            MR. EKELAND:  May I just consult with my team?

22            THE COURT:  Yes.

23            MR. EKELAND:  Thank you, your Honor.

24            (Discussion had off the record amongst counsel.)

25            THE COURT:  You can come back up.

1            (The witness retakes the witness stand.)

2            MS. PELKER:  Your Honor, the Government's

3    suggestion at this point would be for the Court to consider

4    speaking with her --

5            THE COURT:  Privately?

6            MS. PELKER:  -- privately and see if it resolves,

7    and then circle back next week if there's still an issue.

8            THE COURT:  Yes.  That's okay with me.

9            My only concern about it is that -- is creating

10   some dissension in the jury.  And I suppose I don't have to

11   say, Your fellow jurors are complaining about you.  I can

12   just simply say that someone has noticed that or something

13   like that.

14           I'm not sure I can say I've noticed it.  I'll

15   watch and see if she does it.  If I notice it, I can say I

16   have noticed.

17           Mr. Ekeland, any thoughts?

18           MR. EKELAND:  It's -- that's a tough one, your

19   Honor.

20           You said, I think, four jurors have now --

21           THE COURT:  Well, I think there were two jurors

22   who sent text messages to the deputy clerk.  There was one

23   juror who complained yesterday, but while she was

24   complaining another juror was standing there nodding her

25   head yes.

```
 1                    MR. EKELAND:  And do we -- I don't --
 2                    THE COURT:  And they've only characterized it as
 3       distracting.  They've not said that they think it's
 4       improper, nor have they suggested that it's favoring one
 5       side or the other.
 6                    MR. EKELAND:  I think that for the moment maybe if
 7       the Court gives some kind of instruction as the Court feels
 8       is appropriate; and then if it continues, maybe we address
 9       it again.  I don't have an honest --
10                    THE COURT:  Well, I think maybe the thing for me
11       to do is just start by saying something to the jurors.  The
12       jurors who are complaining will know why I'm saying this.
13       They're not going to think I'm saying it about them.
14                    And this juror may know as well I'm talking about
15       her, but it makes it a little less personal if I say it to
16       the jurors more generally.  So maybe that's the best place
17       to start and see what happens.  If it continues to be a
18       problem, we may get to a point in which we have to remove
19       that juror.  But let's see if it continues as a problem.
20                    MR. EKELAND:  Understood.
21                    THE COURT:  The other thing is, the juror on
22       Monday who has the appointment, she's been wonderful and has
23       tried to change the appointment.  The deputy clerk was on
24       the phone with her medical provider.  The last appointment
25       of the day for the juror is at 1:30 on Monday.  And so we
```

1    would have to adjourn I think no later than 1:00 on Monday

2    if we're going to keep this juror.  I don't think I'm in a

3    position to tell her to cancel her medical appointment.  I

4    think she needs it.

5            MR. EKELAND:  No objection from the defense, your

6    Honor.

7            THE COURT:  All right.

8            MS. PELKER:  That's fine with the Government, your

9    Honor.

10           Is sitting next Friday a possibility?

11           THE COURT:  There was some reason why we couldn't

12   sit next Friday.  I'm trying to remember what it was.  Give

13   me a second.

14           It's an issue of a scheduling conflicts I have on

15   my calendar where if it were absolutely necessary, I could

16   do it.  It would pose some burdens on other people in the

17   process, but I could do it if I had to.

18           MS. PELKER:  I think we are still okay within the

19   Government's initial eight- to 11-day window.  But just

20   depending --

21           THE COURT:  We can keep an eye on that.  If we

22   have to -- this, quite frankly, is the number one item as

23   far as I'm concerned.  If it means canceling other things,

24   I'll do it.

25           MR. EKELAND:  I think the defense's best estimate

Scholl - CROSS - By Mr. Ekeland

1    right now is no more than a week on our case.

2             THE COURT:  Let's keep moving, then.

3             MR. EKELAND:  12:30?

4             THE COURT:  I think it depends on how much time

5    you have.  If we could finish this witness up today, I'm

6    happy to go until 1:00 or something like that.  It just

7    depends on how much we have.

8             MR. EKELAND:  I don't think that would be

9    possible.

10            THE COURT:  Let's see how we do.  Given the fact

11   we started late, I'm fine with going until 1:00 and having a

12   little bit later lunch today.

13            MR. EKELAND:  Okay.

14            THE COURTROOM DEPUTY:  All rise.

15            (Whereupon, the jury entered the courtroom at

16   11:58 a.m. and the following proceedings were had:)

17            THE COURTROOM DEPUTY:  The jury is present.

18            You may be seated and come to order.

19            THE COURT:  Just before we get started, I just

20   wanted to ask the jurors to make sure that as you're

21   listening to the testimony that you're not commenting or

22   verbalizing anything yourself in ways that could just be

23   distracting to other jurors.  So I just want to make sure

24   we're keeping things as quiet as possible in the courtroom

25   so everyone can hear as the evidence is coming in.

1          Also, I'm going to, once again, just reinforce to

2    counsel and the witness to make sure we're not talking over

3    each other, because that also makes it harder for the jurors

4    to understand and hear the testimony.

5          You may proceed.

6          MR. EKELAND:  Thank you, your Honor.

7    BY MR. EKELAND:

8    Q.  Mr. Scholl, are you ready?

9    A.  Ready, sir.

10          MR. EKELAND:  Mr. Hassard, if we could get

11    Government's Exhibit No. 1 back up.  Thank you.  If we could

12    go to post No. 50.  Scrolling down a little bit, there's a

13    quote that starts "For this particular example."  There it

14    is right there.

15    BY MR. EKELAND:

16    Q.  Mr. Scholl, if you could just please read that quote.

17    A.  Yes, sir.  "As for this particular example, if you have

18    three addresses that money went, it's easier to trace than

19    28 addresses, any of which could be the ones you were

20    looking for.

21          "And more importantly, in a case with 28

22    addresses, you have more addresses that you know are not the

23    ones you are looking for, but you don't know which ones."

24    Q.  And would you agree with me that Akemashite Omedetou

25    here is expressing the same concern that they expressed

 1    earlier that it's easier -- it's harder to trace the more

 2    addresses that are involved in a trace?

 3    A.  I think he's talking about a transaction.  But I'm not

 4    sure based on the context.

 5    Q.  But you don't -- you're not sure.

 6             And could -- the date of this post is --

 7             MR. EKELAND:  Mr. Hassard, if we could just go to

 8    the top.

 9    BY MR. EKELAND:

10    Q.  The date of this post is November 15th, 2011.  Do you

11    agree with that, Mr. Scholl?

12    A.  Yes, sir, I would.

13             MR. EKELAND:  Mr. Hassard, a little bit later in

14    this post there's a post that starts, "This is the way it

15    works now."  I'll clear the screen.

16    BY MR. EKELAND:

17    Q.  Mr. Scholl, could you just read that quote.

18    A.  Yes, sir.  "This is the way it works now.  Of course, it

19    is the recipient that can provide multiple addresses.  Who

20    else?

21             "And then he should think about not combining the

22    funds.  Because a user could, for example, take funds

23    through our service and then output them to the same amount.

24    That wouldn't be anonymous at all either, and yet we can't

25    really do anything about that.

Scholl - CROSS - By Mr. Ekeland

1          "Users must be aware of how the Bitcoin anonymity

2    works.  We have tried to help them with that by explaining

3    things on our page, but that could be done even better, I

4    suppose."

5    Q.  And once again, it's fair to say that she or he is

6    expressing a concern with depositing and withdrawing the

7    same amounts?

8    A.  In this case, he's talking about if they, after

9    withdrawing them in different amounts, then combine them

10   subsequently in another transaction.  I don't think he's

11   talking about withdrawing the same amount in this example.

12   Q.  I'm sorry.  And their concern is that that would just

13   make it easier to trace?

14   A.  Yes.  That statistical analysis might reveal what output

15   came from which input.

16          MR. EKELAND:  Mr. Hassard, if we could scroll down

17   a little bit.  There's a paragraph right there.  If we could

18   scroll up just a little bit.

19   BY MR. EKELAND:

20   Q.  Mr. Scholl, could you read that paragraph to the jury.

21   It starts right here.

22   A.  Yes, sir.  "Oh, but there is a big difference here.

23   Mt. Gox is an official company with official owners,

24   addresses, taxes.  They were never nor ever said they would

25   be anonymous.  If any problem with the law ever comes up,

1   all their logs will be in the hands of, well, you know.

2   Japan is probably as far from the offshore mentality as it

3   gets.

4           "But apart from that, if you would deposit your

5   money to Mt. Gox and then manually pay out it to your other

6   addresses, manually randomizing all the transactions, then,

7   sure, it would be like our service.  We do this

8   automatically, anonymously and without any persisting logs."

9   Q.  And in regards to the sentence where she or he says, "If

10  any problem with the law ever comes up," do you understand

11  that to mean that the Mt. Gox logs would end up in the hands

12  of law enforcement?

13  A.  Yes, sir.  That is my understanding.

14  Q.  And that's what happened in this case.  Correct?

15  A.  That the Mt. Gox logs ended up in the hands of law

16  enforcement?

17  Q.  Yes, sir.

18  A.  Yes, sir.  The difference being that it wasn't a

19  subpoena for a particular account.  The Mt. Gox logs were

20  obtained by the United States government in their

21  entirety --

22  Q.  And then --

23  A.  -- as I understand it.

24  Q.  I'm sorry?

25  A.  As I understand it.

1    Q.  In the paragraph that starts there, it says, "But apart

2    from that, if you were to deposit your money to Mt. Gox and

3    then manually pay it to your other addresses, manually

4    randomizing all the transactions," what do you understand

5    that to mean?

6    A.  Again, I think he's talking about withdrawing funds in

7    different value amounts.

8    Q.  And do you recall testifying -- I think it was yesterday

9    and the day before -- about the five traces that you did of

10    transactions in October and November of 2011?

11    A.  Yes, sir, I do.

12    Q.  And those transactions involved Mt. Gox accounts?

13    A.  Yes, sir, they did.

14    Q.  Were those transactions manually randomized?

15    A.  I mean, in some cases, there was an example where $25,

16    $25 and $80 left the account.

17    Q.  But those are similar amounts?

18    A.  But they could have easily been withdrawn in one

19    transaction.  They all went ultimately to Mr. Sterlingov's

20    Liberty Reserve account.

21    Q.  And you would consider that manually randomizing?

22    A.  I mean, it's abnormal and it was done manually.

23    Q.  Do you consider that manually randomizing?

24    A.  I think that, yes, those withdrawal amounts were

25    different than the deposit amount.  It was done manually.

Scholl - CROSS - By Mr. Ekeland

1    And I don't know how those values were selected.  All of the

2    funds were sent to Mr. Sterlingov's Liberty Reserve account.

3    I would call that manually and randomized.

4    Q.  Now, if we could take a look at post 59.

5          MR. EKELAND:  If you could go there, Mr. Hassard.

6    BY MR. EKELAND:

7    Q.  Mr. Scholl, you'd agree with me this post is from

8    January 10th, 2012?

9    A.  Yes, sir.

10    Q.  And just in relation to the alleged start of Bitcoin

11    Fog, how far off are we from its initial start date?

12    A.  A little more than a month.

13    Q.  I'm sorry.  I just didn't hear you.

14    A.  It started October, so I guess two months.  October 27th

15    is when Bitcoin Fog was announced, 2011.  This is January

16    10th.  So it's two months.

17    Q.  And then all the other posts we were reading were all

18    around the time that Bitcoin Fog started?

19    A.  I mean, we've read the dates into the record.  I don't

20    recall.  But yes, they were closer.

21    Q.  October and November of 2011?

22    A.  Generally.

23          MR. EKELAND:  If we could go, Mr. Hassard,

24    there's a -- it's right there.  It's the paragraph that

25    starts, "We respect your choice."

1    BY MR. EKELAND:

2    Q.  Could you just read that to the jury?

3    A.  Yes, sir.  "We respect your choice, but about this,"

4    quote, "'my own coins back'" thing, please consider looking

5    through the section we have about this on bitcoinfog.com.

6    There is no concept of," quote, "'somebody's coins,'" end

7    quote, "in the blockchain and it is impossible to get,"

8    quote, "'your own,'" end quote, "coins back.

9           "For example, consider if you put coins on a

10   Bitcoin address and get your private key to someone else so

11   he will be able to use the money.  Are they still your

12   coins?

13          "On the contrary, if you transfer some Bitcoins

14   between different addresses a couple of times, they would

15   logically still be your coins, but to an outsider that could

16   easily look like you have bought something with them and

17   they went to somebody else's possession."

18   Q.  And what's your understanding of any of what Akemashite

19   Omedetou is saying there?

20   A.  He's talking about the fungibility of Bitcoin.

21   Q.  And would you agree that she's also talking about the

22   fact that you could transfer your private key off-chain?

23   A.  Yeah.  That's -- that comes up.  Not off-chain, but that

24   you could transfer your private key to someone else, moving

25   value off-chain.  Yes, sir.

1    Q.  As you testified earlier, you could transfer your

2    private key both on-chain and off-chain?

3    A.  I don't know how you would transfer your private key

4    on-chain.  I suppose it's possible you can embed data in the

5    Bitcoin blockchain.  But yeah.

6    Q.  Your point being is that private keys aren't recorded on

7    the blockchain?

8    A.  No.  Only their signatures.

9    Q.  Right.  So the blockchain never reflects whether or not

10    a private key has been transferred to someone else?

11    A.  No, sir, it does not.

12    Q.  And again, in your review of Mr. Sterlingov's devices,

13    you haven't seen Mr. Sterlingov with any of the private keys

14    to Bitcoin Fog?

15    A.  No, sir, I have not.

16    Q.  Moving on to post 61.

17         MR. EKELAND:  If we could go there, please.

18    BY MR. EKELAND:

19    Q.  This, you would agree with me, looking up at the top

20    here, is from February 7th, 2012?

21    A.  Yes, sir.

22         MR. EKELAND:  If we could, Mr. Hassard -- here.  I

23    found it.  Thank you.

24    BY MR. EKELAND:

25    Q.  If you could just read that paragraph starting, "The

1    good thing is."

2    A.  Yes, sir.  "The good thing is that we see that a

3    substantial amount of users actually do follow our advice

4    about not blindly inserting/removing too-similar amounts,

5    but instead are leaving a buffer of funds in the fog and

6    withdrawing it at a later time so that no two input/output

7    pairs do show a similar amount.  This greatly increases

8    obscurity for all the users, even the ones not following the

9    advice."

10    Q.  You would agree with me that, once again, Akemashite

11    Omedetou is expressing a concern about the use of similar

12    amounts and that making it easy to trace a transaction?

13    A.  Yes, sir.

14            MR. EKELAND:  If we could now move to post 70.

15    BY MR. EKELAND:

16    Q.  You'd agree with me that the date of this is February

17    16, 2012?

18    A.  Yes, sir, I would.

19    Q.  Could you just read that paragraph to the jury.

20    A.  Yes, sir.  "Yes.  After all this time, we got the news

21    today that the hoster is stopping delivering the kind of

22    hosting we were using.  And they tell us this after they

23    have shut down the site without any warnings.  Now we are

24    just waiting on them to give us domain transfer codes so we

25    can get/move the site to another company."

1    Q.  And would you agree with me that Akemashite Omedetou

2    there is talking about moving the hosting of the Bitcoin

3    Fog -- well, clearnet site to another host?

4    A.  It's not clear if he's talking about the clearnet site,

5    sir.

6    Q.  What's your understanding of that paragraph?

7    A.  He's talking about moving hosting.  I'm not sure which

8    hosting he's talking about.

9    Q.  So that could be moving the hosting for the Onion site?

10   A.  I'm not sure which hosting he's referring to.

11   Q.  But it could -- it's possible he or she could be

12   referring to moving either the hosting of the clearnet site

13   or the Onion site?

14   A.  The Government has other evidence about the changing in

15   the hosting of the clearnet site that somebody else might be

16   able to testify to.  I don't recall on February 16, 2012,

17   which hosting may have been moving.  So from my perspective,

18   because I'm not aware of those changes to the hosting, it's

19   possible that he was talking about either one.

20   Q.  And you just testified that you're aware of the evidence

21   related to the clearnet site changing its hosting site?

22   A.  Yes, sir.  I'm aware that there were different hosting

23   providers.

24   Q.  And in your review of all of Mr. Sterlingov's devices

25   and everything that you reviewed in this case, you didn't

Scholl - CROSS - By Mr. Ekeland

1    see any evidence of Mr. Sterlingov being involved in moving

2    the hosting for either the clearnet site or the Onion site?

3    A.  I'm aware of payments to Orange website that I don't

4    remember the details about.  I don't recall other than that.

5    Q.  Those payments to the Orange website were not in

6    Mr. Sterlingov's name, were they?

7    A.  I don't recall.

8         MR. EKELAND:  If we could go to post 102, please,

9    Mr. Hassard.  I'm looking for the sentence that starts --

10   there it is on the bottom -- "I imagine."  If you could

11   bring that up just a little bit.

12   BY MR. EKELAND:

13   Q.  Mr. Scholl, if you could please just read that to the

14   jury.

15   A.  Just this paragraph, sir?

16   Q.  Yes, please.  Yes, sir.

17   A.  "I imagine that by now, someone somewhere has sniffed

18   enough information about fog addresses for being able to

19   tell when a transaction goes in or out of the fog.  For a

20   deposit transaction this is harder, since an address can be

21   completely new and unseen on the network, but it would be

22   possible to make that connect afterwards."

23   Q.  If you could just actually read next paragraph, too.

24   A.  Yes, sir.  "So it is not only a question of which

25   addresses do transactions go to and come out of; it is also

1    about timing.

2              "If someone sees two transactions in and out of

3    the fog, approximately for the same amount at the same time,

4    there the connection can be made as well.  It is still

5    difficult and they couldn't prove it was your transaction

6    without finding us anyway, but the simple truth is that

7    timing gives a lot of information.

8              "Of course in some way, we already combat this by

9    having the lowest withdrawal time period of six hours,

10   which, given the current deposit rate at around ten X per

11   hour, gives enough obscurity for small deposits."

12   Q.  And would you agree with me that Akemashite Omedetou has

13   a sophisticated knowledge of how timing analysis can be used

14   to trace transactions?

15   A.  He has knowledge of it.  The sophistication is not,

16   based on these comments, very sophisticated.  But he's more

17   aware.  And I think that, given the timeframe here, that

18   these are -- we're talking about 2011 and 2012 -- that is a

19   level of sophistication higher than most Bitcoin users at

20   that time.

21             I wasn't investigating things at that time, but in

22   general cybercriminals such as Akemashite Omedetou were less

23   cognizant than they are today about the ability for the

24   government to trace funds.

25   Q.  Would you agree with me that even in 2011 and, say,

1    2012, that Bitcoin Fog was fairly sophisticated about how it

2    timed its output transactions?

3    A.  I don't think that the mixing inside of Bitcoin Fog was

4    very sophisticated.  Having a delay is an increased level of

5    sophistication over not having one.

6    Q.  You haven't examined the Bitcoin Fog servers, have you?

7    A.  The service or the servers?

8    Q.  The servers.

9    A.  No, sir, I have not.

10   Q.  And you haven't examined the Bitcoin Fog source code,

11   have you?

12   A.  No, sir, I have not.

13   Q.  And you haven't examined the Bitcoin Fog ledger, have

14   you?

15   A.  No, sir, I have not.

16   Q.  And that's because the Government doesn't have any of

17   that?

18   A.  Yes, sir, that's correct.

19   Q.  In terms of these posts from Akemashite Omedetou, have

20   you or are you aware of anybody in the government who has

21   done any kind of linguistic analysis comparing the

22   syntactical patterns in the posts by Omedetou and what are

23   known to be Mr. Sterlingov's writings?

24   A.  What kind of analysis, sir?

25   Q.  Comparing syntax, a linguistic analysis to see if there

1    are syntactical patterns that match the language in

2    Akemashite Omedetou's posts and those in, say,

3    Mr. Sterlingov's notes.

4    A.  I'm not aware of anyone doing that, sir.  But that would

5    not have been my role on this case team.

6    Q.  Do you remember testifying to the jury about your coffee

7    cup example?

8    A.  Yes, sir.

9    Q.  I'd like to ask you your expert opinion on a similar

10   coffee shop example.  And in this hypothetical, I buy a cup

11   of coffee for $5 and I give a $5 bill to the cashier at

12   Starbucks.

13          Now, that cashier gives that $5 bill to another

14   customer that I've never met in my life, I've never talked

15   to in my life, I have no contact with.

16          That customer goes and buys drugs with that $5

17   bill.  In your expert opinion, have I bought drugs?

18   A.  No, sir.  Not in that example.

19   Q.  And that's because the flow of funds is different than

20   the flow of the control of the funds.  Correct?

21   A.  Yes, sir.  That's correct.

22   Q.  So I'd like to go through some of the, I think, five

23   traces that you did from 13 years ago in October and

24   November of 2011 -- not that you did the traces 13 years

25   ago, but these --

Scholl - CROSS - By Mr. Ekeland

1    A.  I understand, sir.

2    Q.  You understand.

3         And just in relation to those transactions, you're

4    not aware of any eyewitnesses to any of those transactions?

5    A.  No, sir, I'm not.

6    Q.  And your entire analysis of those transactions is being

7    done from in front of your computer?

8    A.  Yes, sir.  That's correct.

9    Q.  And as part of your analysis, you looked at something

10   from Mr. Sterlingov's notes that you've been calling the

11   putting or deposit money?

12   A.  Yes, sir.

13         MR. EKELAND:  Mr. Hassard, if we could get what's

14   been admitted into evidence as Government's Exhibits 818-B,

15   as in boy, up on the screen.

16         THE COURTROOM DEPUTY:  Did you say 815?

17         MR. EKELAND:  818-B.  It should be in evidence.

18   You'll tell me if it's not.

19         Can we publish this to the jury?

20         THE COURTROOM DEPUTY:  It is.

21         MR. EKELAND:  Oh.  Now I see it.  Thank you.

22   BY MR. EKELAND:

23   Q.  And this is the document you testified about previously.

24   Correct?

25   A.  Yes, sir, it is.

1    Q.  And it's fair to say that this document is discussing

2    transferring money from a European bank into a Mt. Gox

3    account?

4    A.  Yes, sir, it is.

5    Q.  And then it's talking about selling euros in exchange

6    for Bitcoins and then Bitcoins in exchange for dollars?

7    A.  Yes, sir, it is.

8    Q.  And then it's talking about transferring to Liberty

9    Reserve through AurumXChange?

10   A.  Yes, sir, it is.

11   Q.  And are you aware that this was a very common practice

12   in the Bitcoin community in 2011 and 2012?

13   A.  No, sir.  I'm not aware of that.

14   Q.  And are you aware that if you searched Bitcoin Talk, you

15   would find numerous messages talking about this process?

16   A.  I'm not aware of that.  No, sir.

17   Q.  And this is the document that you used to testify that

18   Mr. Sterlingov was somehow layering his transaction in the

19   manner of money laundering.  Correct?

20   A.  Yes, sir.  It's one of the pieces of evidence that

21   supports that --

22   Q.  Right.

23   A.  -- conclusion.

24   Q.  And this is in relation to those five traces that you

25   made of transactions in October and November of 2011.

1    A.  I understand, sir.

2    Q.  But you haven't actually identified any illicit funds

3    involved with any of those traces, have you?

4    A.  I'm not sure what you mean.  Identified that those --

5    that those funds purchased in one example -- the

6    bitcoinfog.com clearnet domain name.

7    Q.  Is it your testimony that it's illegal to buy a DNS

8    registration?

9    A.  No, sir, it is not.  So it depends what you mean by

10   illicit funds.

11   Q.  I mean funds involved in any type of crime.

12   A.  I mean, it seems like a legal question.  If buying the

13   bitcoinfog.com domain was a part of running bitcoinfog.com,

14   then I would say that that may be illegal.  I'm not a

15   lawyer, but that's my understanding.

16   Q.  You haven't traced any of the funds used in any of those

17   five traces that you did of transactions in October and

18   November of 2011 to any crime?

19           MS. PELKER:  Objection, your Honor.  Misstating

20   the witness's testimony and the evidence.

21           MR. EKELAND:  I'm not stating his testimony.  I'm

22   asking if he traced back the funds, the flow of funds, to

23   any crime.

24           THE WITNESS:  No.  The funds were traced from

25   Mr. Sterlingov's account to the purchase of the

Scholl - CROSS - By Mr. Ekeland

1    bitcoinfog.com clearnet domain name.

2    BY MR. EKELAND:

3    Q.  And you lack any corroborating evidence for the

4    assertion that the funds in those traces are related to any

5    crime whatsoever?

6    A.  Again, I'm not a lawyer.  I'm not going to comment about

7    the legality of purchasing the bitcoinfog.com domain name.

8    Q.  So then you can't tell me that those transactions were

9    money laundering?

10          MS. PELKER:  Objection, your Honor.  Calls for a

11   legal conclusion, and I think --

12          THE COURT:  Sustained.

13          MS. PELKER:  -- the witness has --

14          THE COURT:  I think the witness has answered the

15   question.

16          MR. EKELAND:  Could we get what's in evidence as

17   Government's Exhibit 313-A up?  Can we publish it to the

18   jury?

19          Mr. Hassard, can we scroll down on that a little

20   bit, if possible.  All right.  There is good.  Thank you.

21   BY MR. EKELAND:

22   Q.  Mr. Scholl, you recall testifying about this trace?

23   A.  Yes, sir, I do.

24   Q.  And this is a trace that -- it looks like the first

25   transaction is -- what is that?  October -- I'm having a

1    hard time reading that -- 29, 2011.  Would you agree with

2    that?

3    A.  I think it's the 19th, sir.

4    Q.  19th.  Thank you.  I need new glasses.

5         MR. EKELAND:  Mr. Hassard, if we could go back to

6    where it says "Mt. Gox account No. 1" and zoom in on that so

7    everyone can see it clearly.  And can we bring it over a

8    little bit.  It's getting cutting off on my screen.  If you

9    could take it to the other way, I would love it.  Or zoom it

10   out a little bit.  Right there.

11   BY MR. EKELAND:

12   Q.  So now you've got this red box drawn around these three

13   Mt. Gox accounts.  But that doesn't occur anywhere on the

14   internet or the blockchain.  Right?

15   A.  You're asking if red boxes occur on the --

16   Q.  Yeah.  That red box there, that's just the Government

17   making an exhibit -- drawing a box around three accounts.

18   Right?

19   A.  I drew the box.  I drew the box to signify that all

20   three of those accounts belonged to one entity, Mt. Gox.

21   They're --

22   Q.   To Mt. Gox.  But you're not making a claim that they all

23   belong to Mr. Sterlingov, are you?

24   A.  The box is labeled Mt. Gox.  The claim was that these

25   are Mt. Gox accounts.  That's factual information.

 1    Q.  That there's three Mt. Gox accounts there.  And that's

 2    why you drew the box around it, just to say that all three

 3    accounts just belong to Mt. Gox?

 4    A.  That's what the box is to signify, yes, sir.

 5    Q.  So let's talk about that Mt. Gox account No. 1.  That,

 6    you'd agree with me, is Mr. Sterlingov's Mt. Gox account?

 7    A.  In his true name.  Yes, sir.

 8    Q.  And that is associated with his plasma@plasmadivision

 9    email.  Correct?

10    A.  Yes, ma'am -- yes, sir.  Sorry.  Yes, sir.  That's

11    correct.

12    Q.  I don't mind.

13         And that plasma@plasmadivision email is readily

14    associated with Mr. Sterlingov.  There's no dispute that

15    that's his email.

16    A.  Yes, sir.

17    Q.  And Mr. Sterlingov KYC'd that Mt. Gox account.  Correct?

18    A.  He provided KYC documents.  Yes, sir.

19    Q.  Could you explain to the jury or just remind the jury

20    again what KYC is?

21    A.  Yes, sir.  KYC is an acronym that stands for Know Your

22    Customer.  It relates to financial institutions' anti-money

23    laundering programs.  They have obligations to collect

24    information about their customers.

25    Q.  And in this instance, Mr. Sterlingov provided a photo ID

1    for his Mt. Gox account in 2011?

2    A.  Yes, sir, that's correct.

3    Q.  And are you aware that KYC-ing your Mt. Gox account was

4    optional in 2011?

5    A.  I wasn't explicitly aware of that, but that makes sense

6    to me.

7    Q.  It wouldn't surprise you to learn that Mt. Gox didn't

8    ask users to KYC their accounts until 2013?

9    A.  There was no KYC documents in NSF 9000 or Kolbasa 99 in

10   this graph.

11   Q.  Right.  We can see it.  Those two accounts are not KYC'd

12   and you can't trace them back to anybody based on any KYC

13   information?

14   A.  There's no KYC information associated with those two

15   accounts.

16   Q.  So Mr. Sterlingov voluntarily KYC'd his Mt. Gox account

17   in 2011?

18   A.  I suspect that that might be related to making bank

19   transfers connected to the traditional financial system.

20   But I don't know what Mt. Gox's policies were at that time.

21   Q.  But you wouldn't dispute that Mr. Sterlingov had KYC'd

22   his account at the time?

23   A.  No, sir, I would not.

24   Q.  And you recall all those Akemashite Omedetou posts that

25   we just reviewed, particularly the one discussing Mt. Gox

1   and how the Mt. Gox logs could end up in the hands of law

2   enforcement?

3   A.  Yes, sir, I do.

4   Q.  Is it your testimony that in 2011, Akemashite Omedetou

5   KYC'd her Mt. Gox account?

6   A.  I'm sorry.  I don't understand the question, sir.

7   Q.  Is it your testimony that this Mt. Gox account No. 1

8   belongs to Akemashite Omedetou?

9   A.  Are you asking if I believe Mr. Sterlingov is Akemashite

10  Omedetou?

11  Q.  Yes.

12  A.  Yes, sir, I do.

13  Q.  And so it's your testimony that in 2011, Akemashite

14  Omedetou KYC'd their Mt. Gox account?

15  A.  Yes, sir.

16  Q.  And you see how 89.87 euros goes into Akemashite

17  Omedetou's KYC'd Mt. Gox account?

18  A.  Yes, sir.

19  Q.  All right.  Now, you don't have any evidence at all that

20  that 89.87 euros is related to any crime whatsoever?

21  A.  I didn't trace funds backward from that point, sir.  I

22  don't -- I am not aware of any.

23  Q.  And then those euros are transferred into Bitcoin; is

24  that right?

25  A.  That's correct, sir.

Scholl - CROSS - By Mr. Ekeland

1  Q.  Do you know what the exchange rate for Bitcoin was on

2  that day?

3  A.  I don't.  But you could look in the log and calculate

4  it.

5  Q.  You did the calculation on that?

6  A.  I looked at what was in the logs.  The logs showed how

7  many Bitcoin were purchased.

8  Q.  But you didn't check the math on the logs?

9  A.  No, sir, I did not.

10  Q.  And then -- so now we've got a transfer, or

11  Mr. Sterlingov's Mt. Gox account sends -- I think -- what is

12  that? -- 36 Bitcoin to this wallet address.  Correct?

13  A.  Yes, sir.

14  Q.  And that wallet address isn't in the Bitcoin Fog

15  cluster?

16  A.  No, sir, it is not.

17  Q.  And you don't have the private keys to that wallet

18  address, do you?

19  A.  No, sir, I don't.

20  Q.  You don't have any information related to that wallet

21  address besides the fact that you saw 36 Bitcoin be sent to

22  it and whatever you could see on the blockchain.  Correct?

23  A.  Yes, sir, that's correct.

24  Q.  You have no information whatsoever about who may have

25  controlled that wallet address?

1   A.  I wouldn't say that.  No, sir.

2   Q.  What is your information as to who controls that wallet

3   address?

4   A.  I mean, it's the Government's case, the evidence in the

5   totality of the Government's case.

6   Q.  So you're making an assessment that that wallet

7   address --

8   A.  Right.  We don't have any specific attribution

9   information for that specific wallet address.

10  Q.  And you don't have the private key?

11  A.  We don't have the private key.  But I would say that we

12  don't always require a private key to have attribution on an

13  address.

14  Q.  But in this instance, you don't have the private key.

15  You've got no specific corroborating evidence that you can

16  point to that identifies anybody controlling that address,

17  but you're telling me in your testimony that it's just the

18  totality of the circumstances?

19  A.  The timing, the pattern, that these transactions and

20  similar transactions happened between these multiple

21  accounts multiple times.  The putting-money document, the

22  depositing-money document, whatever you would like to call

23  it, describing this flow of funds immediately before we

24  observed the flow of funds through that process.  Yes, sir.

25  I'd say that's strong circumstantial evidence.

 1    Q.  Circumstantial.

 2         But this transaction is entirely consistent with

 3    Mr. Sterlingov's selling Bitcoin to somebody, isn't it?

 4    A.  Could it be consistent with that?  It --

 5    Q.  It's entirely consistent --

 6         THE COURT:  I'm sorry.  Let the witness finish and

 7    then ask the next question.

 8         THE WITNESS:  You're asking me if it's possible

 9    that Mr. Sterlingov was selling Bitcoin from his Mt. Gox

10    account.  And that was the reason for the transfer?

11    BY MR. EKELAND:

12    Q.  I'm asking a different -- slightly different question.

13    I'm saying that this first hop right here is entirely

14    consistent with Mr. Sterlingov selling Bitcoin to somebody.

15    A.  That's possible.

16    Q.  Now, between that first Bitcoin address and the next

17    Bitcoin address, the two that you put a box around --

18    A.  Yes, sir.

19    Q.  -- about eight hours passed?

20    A.  I can't read this screen now with the marking on it,

21    sir.  But I don't know the timing of the transaction.

22    Q.  I don't think the timing is on it.  I can remove the

23    marking for you if you'd like.

24    A.  Based on this graph -- there is exhibits in evidence for

25    the timestamps on these transactions.  But they're on the

 1   same date, is what I can tell you.  I don't recall the time

 2   between those two transactions.

 3   Q.  But you'd have no reason to disagree with me that eight

 4   hours elapsed between these two transactions?

 5            MS. PELKER:  Your Honor, I'm going to object to

 6   the crossing out on the screen.  This is not closing

 7   argument.

 8            THE COURT:  Well --

 9            MR. EKELAND:  I'm just moving along the hops in

10   the transaction that Mr. Scholl testifies he doesn't have --

11            THE COURT:  Well, I think you went back and did

12   this after the testimony.

13            So the objection is sustained.

14            MR. EKELAND:  I'll remove it.

15            THE COURT:  If you need to make marks to make

16   clear to the jury what you're pointing to or what you're

17   asking about, that's fine.

18            MR. EKELAND:  Understood, your Honor.

19   BY MR. EKELAND:

20   Q.  And so now this next Bitcoin address, the one 14RZ, is

21   the only reason that you have got this orange box between

22   these two Bitcoin addresses is because 1JZBU up at the top

23   sent Bitcoin to 14RZ?  Is that the only reason that box is

24   between there?

25   A.  And they didn't belong to a service or an exchange that

1    was on the graph.  Yes.

2    Q.  You see there that the amount transferred is 35.9995

3    Bitcoin?

4    A.  Yes, sir, I do.

5    Q.  Do you see that?

6    A.  Yes, sir.

7    Q.  And the reason for that is that the miners took out

8    their fees?

9    A.  Not the miners took out the fees.  The sender paid the

10   miner a fee.

11   Q.  Yeah.  The sender.

12   A.  Yes, sir.

13   Q.  I stand corrected.

14          But otherwise, it's a similar amount to the 36

15   Bitcoin?

16   A.  Yes, sir.

17   Q.  And so we've got similar amounts and similar timing,

18   just like Akemashite Omedetou said would make your

19   transaction easily traceable?

20   A.  I don't think that this transaction is what Akemashite

21   Omedetou was talking about here, sir.  This is a publicly

22   available transaction on the Bitcoin blockchain.  Anyone can

23   see that 1JZBUK is connected -- sorry, ma'am; I was going

24   fast again -- was connected to 14RZFW.

25   Q.  And anybody could see on the public blockchain the

1    temporal proximity of these transactions.  Correct?

2    A.  Yes.  But Bitcoin Fog and the conversation about making

3    outputs and the inputs different, that's so they can't be

4    traced through the mixing service.  There's no mixing

5    service here.  This is just a Bitcoin transaction.  This is

6    not what Akemashite Omedetou was talking about.

7    Q.  Akemashite Omedetou was talking about the need to change

8    your inputs, your outputs, your amounts and your timing so

9    that you couldn't be traced.  Correct?

10   A.  Within Bitcoin Fog, yes, sir.  Not on a random

11   transaction.  Not on this specific transaction on the

12   Bitcoin blockchain.

13   Q.  And is it your testimony that -- and is it your

14   testimony that Akemashite Omedetou wouldn't apply those

15   principles outside the Bitcoin Fog mixer?

16   A.  I'm not sure that I understand the question.  But again,

17   this is a public transaction.  This is a single transaction.

18   That's not what happens inside of Bitcoin Fog.  I just think

19   that the analogy you're trying to make doesn't make sense in

20   this case.

21   Q.  I'm not asking about the Bitcoin Fog mixer.  I am asking

22   you whether, in your expert opinion, you would think that

23   Akemashite Omedetou would consider the timing and the

24   amounts of any transaction on the public blockchain relevant

25   to the traceability of that transaction.

1    A.  Yes.  But Akemashite Omedetou was talking about

2    transfers into and out of the fog, not a transfer between

3    two addresses directly.  I don't think that the analogy

4    applies, is all I'm saying, sir.

5    Q.  Looking at that 14RZFWF9F-and-so-on Bitcoin address, the

6    Government doesn't have the private keys to that address

7    either, do they?

8    A.  No, sir.  But again, I would say that the Government

9    does not need a private key necessarily to attribute a

10    Bitcoin address.

11    Q.  What identifying information do you have associated with

12    that Bitcoin address?

13    A.  We have the Government's case, the evidence in the

14    totality.

15    Q.  The totality of the Government's case.

16          Do you have the IP address associated with that

17    transaction, the 14RZ?  Do you have the IP address

18    associated with that?

19    A.  No, sir.

20    Q.  Do you have the IP address associated with the Bitcoin

21    address above that, the 1JZBUKK?

22    A.  I don't have an IP address associated with 1JZBUKK.  But

23    I would like to point out that that's not really how the

24    Bitcoin network works.  It's not like there's a single IP

25    address associated with a Bitcoin address.

1    Q.  As a matter of fact, the blockchain doesn't record IP

2    addresses.  Correct?

3    A.  That's correct.  The blockchain does not record IP

4    addresses.

5    Q.  You would need server logs related to the servers that

6    did that transaction to know what the IP addresses were?

7    A.  That's one way you could obtain that information.  Yes,

8    sir.

9    Q.  The Government doesn't have any server logs related to

10   these transactions?

11   A.  No, sir.  The Government does not, to my knowledge, have

12   that information.

13   Q.  As a matter of fact, for all the -- there's an IP

14   address listed down at the bottom of this trace.  The

15   Government doesn't actually have the native server log for

16   that IP address?

17   A.  I'm not aware of the Government having that in their

18   possession either, sir.

19   Q.  When you talk about the totality of the Government's

20   case in terms of identifying Mr. Sterlingov as Akemashite

21   Omedetou, what you're really just talking about is an IP

22   address analysis that says because Mr. Sterlingov used an IP

23   address at a time close to another email associated -- the

24   shormint@hotmail.com email, therefore, Mr. Sterlingov is

25   Akemashite Omedetou.  That's what you're talking about as

1    the totality of your case.  Correct?

2    A.  I have not done the IP analysis on those things, sir, so

3    I'm not aware of what you're talking about.

4              But no.  It's not -- the Government's been

5    presenting a case for two weeks now, sir.

6    Q.  Yes.  And tell me in that case where you have identified

7    Mr. Sterlingov with clear evidence as being --

8              MS. PELKER:  Your Honor --

9    Q.  -- Akemashite Omedetou.

10             THE COURT:  I'm sorry.  I just think this is

11   argument rather than a question.

12   BY MR. EKELAND:

13   Q.  Can you point to any evidence in all the -- you've been

14   watching the testimony in this case --

15             MS. PELKER:  Objection, your Honor.

16   BY MR. EKELAND:

17   Q.  -- for the last two weeks?

18             THE COURT:  Yes.  Sustained.  I think this is --

19   it's more in the nature of argument.

20   BY MR. EKELAND:

21   Q.  Can you point to any specific evidence -- well,

22   withdrawn.

23             In the last -- you've watched the testimony in

24   this courtroom the last two weeks?

25   A.  Not all of it, but most of it.  Yes, sir.

1    Q.  And in that testimony that you've listened to, can you

2    identify for me the specific pieces of evidence --

3              MS. PELKER:  Objection, your Honor.

4              MR. EKELAND:  I'm asking for his opinion.  He has

5    told me that Mr. Sterlingov is Akemashite Omedetou.  And I

6    am asking for the evidentiary basis for that opinion.

7              THE COURT:  He's -- I'm not sure he's being

8    offered as the expert witness for that final conclusion in

9    the case.  And so I just think it's beyond the scope.

10              I also think you're basically asking him to

11    present the Government's closing argument, and I think that

12    that's really for counsel to do rather than asking a witness

13    to present their arguments with respect to what the evidence

14    shows in the case.

15              MR. EKELAND:  We object, your Honor.  But we'll

16    move on.

17              THE COURT:  Okay.

18              MR. EKELAND:  I lost my screen there.  If I could

19    get 313-A back up.  Thank you.

20              Would you like to continue to 1:00?

21              THE COURT:  Yes.

22              MR. EKELAND:  I can go on.

23    BY MR. EKELAND:

24    Q.  Looking at these -- if we can zoom out a little bit,

25    Mr. Hassard -- so following the flow of funds, which you

```
 1    have, I believe, testified isn't necessarily the same as
 2    flow of control of the funds --
 3              THE COURT:  That's not a question.  That's --
 4    you're --
 5              MS. PELKER:  Yeah.
 6              MR. EKELAND:  I'm trying to get to my question.
 7              THE COURT:  But you're not supposed to summarize;
 8    you're just supposed to ask a question.
 9              MR. EKELAND:  That's fine.
10    BY MR. EKELAND:
11    Q.  So the first hop in this transaction going from Mt. Gox
12    account No. 1 to that first Bitcoin address, you testified,
13    is consistent with Mr. Sterlingov selling Bitcoin to
14    somebody else?
15              MS. PELKER:  Objection, your Honor.  Misstating
16    the witness's answer.
17              THE COURT:  That's asked and answered in any
18    event.
19              So let's move on.  Next question.
20    BY MR. EKELAND:
21    Q.  And you'd agree with me that the second hop in this
22    transaction going from this Bitcoin address right here to
23    this Bitcoin address is consistent with someone selling
24    Bitcoin to yet another person?
25    A.  It could be consistent.
```

 1    Q.  And are you aware -- well, could you explain to the

 2    jury -- do you know what a confirmation is?

 3    A.  On the Bitcoin blockchain?

 4    Q.  Yes.

 5    A.  Yes, sir, I do.

 6    Q.  Could you explain to the jury what a confirmation is on

 7    the Bitcoin blockchain?

 8    A.  Yes, sir.  A confirmation is when the transaction is

 9    included in a block.  So that would be one confirmation, the

10    first time the transaction is included in a block.  Then

11    every time a new block is added onto the block that that

12    transaction was in, that would be another confirmation.

13    Q.  And when you go -- I think you used -- you showed the

14    jury exhibits from the Mempool blockchain explorer?

15    A.  Yes, sir.

16    Q.  Up in the -- I think in the upper right-hand corner, if

17    I'm remembering correctly, of the Mempool blockchain

18    explorer, you can see the number of confirmations and the

19    amount of time it took for those confirmations?

20    A.  Generally, it displays the number of confirmations.  I

21    can't recall if it says anything about the timing of those

22    confirmations.  But...

23    Q.  So do you recall that the confirmation time between this

24    bottom Bitcoin address --

25             MR. EKELAND:  Mr. Hassard, if we can zoom it up a

```
 1    little bit so I can read it --
 2              MS. PELKER:  Your Honor, I may have misheard the
 3    witness's testimony.  But I think he just said he doesn't
 4    recall the specific confirmation that was on that particular
 5    shot.
 6              MR. EKELAND:  I -- did I --
 7              THE COURT:  Well, go ahead and ask your question.
 8    We'll see where it goes.
 9              MR. EKELAND:  Was that an objection?  I got a
10    little lost on that.
11              THE COURT:  Why don't you just ask your question
12    again.  I've lost where we are, too.
13    BY MR. EKELAND:
14    Q.  To go to -- now, the next hop in this transaction going
15    from 14RZFW to Mt. Gox account No. 2 here, that transaction
16    happened after four confirmations in about 35 minutes.
17    Correct?
18    A.  I don't remember how many confirmations and how many
19    minutes, sir.
20    Q.  But --
21    A.  There's an exhibit that could be pulled up.  This is in
22    evidence.
23    Q.  But you don't remember?
24              So the --
25    A.  No, sir, I don't.
```

Scholl - CROSS - By Mr. Ekeland

1    Q.  This transaction here, that's again entirely consistent

2    with a sale to another person?

3    A.  The individual transaction is consistent with a Bitcoin

4    transaction.  It's a payment.  There's funds moving.  It

5    could be consistent with somebody purchasing Bitcoin.  It

6    could be consistent with that.  Yes, sir.

7    Q.  It could be consistent with those funds being sent to

8    yet another person?

9    A.  Yes, sir.  It could also be consistent with layering

10   transactions in a money-laundering scheme.

11   Q.  But you don't know that for sure?  You don't know that

12   this is layering of a money-laundering transaction for sure?

13   A.  Given the pattern, that this happened multiple times,

14   funds moving out of plasmadivision and through the Bitcoin

15   blockchain through accounts that were just recently created

16   and then never used again shortly after the Bitcoin Fog was

17   created, there's considerable evidence to suggest that this

18   is not somebody simply buying Bitcoin.

19   Q.  You're guessing?

20        MS. PELKER:  Objection, your Honor.

21        THE COURT:  Yes.  Sustained.

22   BY MR. EKELAND:

23   Q.  Now, that Mt. Gox account No. 2 is not a KYC account?

24   A.  No.  There were no government identification photos

25   associated with that account.

1    Q.  And in your expert opinion as a blockchain tracing

2    expert, if I wanted to hide the source of funds for the DNS

3    registration for my bitcoinfog.com clearnet site, I could

4    have just started my payment to the DNS registration from

5    that nontraceable Mt. Gox account.  Correct?

6    A.  Could that have been done?  Yes.  It's possible that

7    that Bitcoin could have been converted to U.S. dollars in

8    the NSF 9000 account and then moved through the AurumXChange

9    the same way.

10   Q.  Because in 2011, it was entirely possible to fund a

11   Mt. Gox account in a nontraceable way?

12   A.  You mean funding it with Bitcoin?

13   Q.  Funding it with Bitcoin, buying a redemption code in

14   cash from somebody.  There's more than one way to

15   anonymously fund a transaction into a Mt. Gox account in

16   2011.  Correct?

17   A.  Yes, sir.

18   Q.  But it's your testimony that Akemashite Omedetou paid

19   for the DNS registration to the bitcoinfog.com clearnet site

20   through his KYC account?

21   A.  Is that my testimony?

22   Q.  Is that your testimony?

23   A.  That's the Government's case, I think.

24   Q.  That is the Government's case, isn't it?

25            MS. PELKER:  Objection, your Honor.

Scholl - CROSS - By Mr. Ekeland

```
 1                  THE COURT:  Yes.  Now --

 2                  MR. EKELAND:  Moving on --

 3                  THE COURT:  Mr. Ekeland, you need to really make

 4       sure you just ask questions.  That's all you're supposed to

 5       be doing.

 6                  MR. EKELAND:  Understood, your Honor.

 7                  THE COURT:  I hope so.

 8                  MR. EKELAND:  Moving on?

 9                  THE COURT:  Yes.

10       BY MR. EKELAND:

11       Q.  Now, following this flow of funds, the amount has stayed

12       essentially the same minus the fees paid to miners so far.

13       Would you agree with that?

14       A.  Yes, sir.

15       Q.  And --

16       A.  There were -- I don't recall specifically, but fees

17       associated with the conversions of funds in Mt. Gox account

18       1, Mr. Sterlingov's Mt. Gox account.  So in addition to the

19       mining fees, there were fees in converting euros to Bitcoin,

20       potentially.

21       Q.  And so the -- in the first hop of the transaction, for

22       instance, we've got 36 Bitcoin?

23       A.  Right.

24       Q.  And then in the second hop, we've got 35.9995 Bitcoin?

25       A.  Yes, sir.
```

1    Q.  And then in the next hop, it's 35.999 going to Mt. Gox?

2    A.  Yes, sir.

3    Q.  And then there's a Mt. Gox Bitcoin redemption code

4    generated, and that was for 35 BTC?

5    A.  Yes, sir, that's correct.

6          MR. EKELAND:  And then if we could scroll down a

7    bit.  Thank you, Mr. Hassard.

8    BY MR. EKELAND:

9    Q.  And then that -- so these initial hops in this

10   transaction, they all happen on the same day, October 19th,

11   2011?

12   A.  Yes, sir, that's correct.

13   Q.  So that's the same day and the same amount, roughly?

14   A.  Yes, sir.

15          MR. EKELAND:  Now if we could scroll down a little

16   bit.

17   BY MR. EKELAND:

18   Q.  Now we've got the 35 Bitcoin Mt. Gox redemption code,

19   and that is redeemed on October 20th in Mt. Gox account

20   No. 3.  Is that -- would you agree with that?

21   A.  Yes, sir.

22   Q.  And Mt. Gox account No. 3 again is not a KYC account, is

23   it?

24   A.  No, sir, it's not.

25   Q.  And that account is associated with the email

Scholl - CROSS - By Mr. Ekeland

1    kolbasa999@rambler.ru?

2    A.  Yes, sir.

3    Q.  Besides that, the Government doesn't have any other

4    information save for the Mt. Gox logs related to this

5    account?

6    A.  And the transfers through the AurumXChange.  But yes,

7    sir.

8    Q.  And the transfers through AurumXChange.

9          And you reviewed Mr. Sterlingov's password list?

10   A.  Yes, sir, I did.  The file we've called the P-save file.

11   Q.  And that had passwords going back to 2008?

12   A.  I don't recall how far back the dates went.

13   Q.  It had a Silk Road personal account password in there?

14   A.  Yes, sir, I believe it did.

15   Q.  It had all sorts of passwords in there, didn't it?  It

16   had a lot of passwords in there.  Correct?

17   A.  Correct, sir.

18   Q.  The password and the username for Mt. Gox account No. 3

19   wasn't in there?

20   A.  No, sir, it was not.

21   Q.  And neither was the password or the username for Mt. Gox

22   account No. 2?

23   A.  No, sir, it was not.

24   Q.  As a matter of fact, in all of Mr. Sterlingov's devices,

25   all of his notes, his diary, everything that's been seized

1    from him, everything that's been -- a search --

2              MS. PELKER:  Your Honor, is there a question here?

3              MR. EKELAND:  Yes.  I'm listing all the things the

4    Government searched and seized from Mr. Sterlingov.

5    BY MR. EKELAND:

6    Q.  I'm asking you, Mr. Scholl, whether anywhere, in any of

7    that, you saw any information related to Mt. Gox account

8    No. 2 or Mt. Gox account No. 3.

9    A.  In the information that I reviewed, I did not see any

10   information about Mt. Gox account No. 2 or Mt. Gox account

11   No. 3.

12             I would point out that I haven't reviewed all of

13   the information in this case.  I reviewed what was provided

14   to me.  To my understanding, there are encrypted portions in

15   those devices that haven't been able to be reviewed.

16   Q.  But you don't know for sure, actually, if there's

17   encrypted portions of Mr. Sterlingov's devices.  Is it --

18   withdrawn.

19             Is it your testimony that some of Mr. Sterlingov's

20   devices are still encrypted and the Government hasn't

21   reviewed them?

22   A.  Partitions of them.  That's my understanding.

23   Q.  That's your understanding?

24   A.  Yes, sir.

25   Q.  Moving on.

1          MR. EKELAND:  Going down, Mt. Gox account No. 3,

2     if we could scroll up a little bit.  I'm sorry.  Down.  If I

3     could just get to the bottom.

4     BY MR. EKELAND:

5     Q.  Now, down here in Mt. Gox account No. 3 in the box, the

6     35 Bitcoin is redeemed into -- is that $80.50?

7     A.  It was redeemed as Bitcoin and then converted in

8     multiple transactions to 80.50 U.S. dollars.  That's

9     correct, sir.

10    Q.  And those multiple transactions, that was just a normal

11    thing that Mt. Gox did in redeeming codes?

12    A.  No, sir.  The redeem code is separate from the

13    transactions that involved converting those funds into

14    dollars.

15    Q.  Is it your testimony that the conversion there is some

16    kind of layering?

17    A.  No, sir.  I think that the account wanted dollars

18    instead of Bitcoin.

19    Q.  And then --

20    A.  I'm just saying that it was separate from redeeming the

21    code.  You can redeem the code and keep the Bitcoin in your

22    account.  Then there are separate transactions that convert

23    it to U.S. dollars.

24          THE COURT REPORTER:  I'm sorry.  I didn't quite

25    understand that.

Scholl - CROSS - By Mr. Ekeland

 1                    THE WITNESS:  Yes, ma'am.  I was just trying to be

 2      clear that redeeming the redeem code was separate from

 3      converting the Bitcoin that were on the redeem code into

 4      U.S. dollars.  They were separate transactions.

 5      BY MR. EKELAND:

 6      Q.  And then the $80, I'm a little -- if you could actually

 7      explain to me exactly what's happening.  The $80 is then

 8      generated into an $80 Mt. Gox redemption code?

 9      A.  Yes, sir.

10      Q.  And then that redemption code is sent to AurumXChange.

11      Is that correct?

12      A.  Yes, sir.

13      Q.  And one of the things that AurumXChange did is it

14      specialized back then in converting Mt. Gox redemption codes

15      into Liberty Reserve dollars.

16      A.  That's --

17      Q.  Is that correct?  I'm asking you.

18      A.  That's one of the services they offered.  Yes, sir.

19      Q.  Right.  Because that was -- it was -- back in 2011, it

20      was not as easy as it is in --

21                    MS. PELKER:  Objection, your Honor.  Is counsel

22      testifying or asking a question?

23                    MR. EKELAND:  I'm asking a question.  If I could

24      get through it, you would see that.

25                    THE COURT:  Go ahead and ask your question.

```
1    BY MR. EKELAND:

2    Q.  In 2011, it wasn't as easy as in 2024 to take your money

3    off the blockchain and convert it into U.S. dollars?

4    A.  I'd say that the ecosystem has grown significantly.

5    Yes, sir.

6    Q.  And so one of the things that AurumXChange did back in

7    2011 is it made it easy for -- or easier for people to

8    exchange Bitcoin for dollars?

9    A.  (No response.)

10   Q.  I can rephrase that.

11   A.  Please.

12          MS. PELKER:  Your Honor, I don't think it's clear

13   that defense counsel is asking a question.

14          THE COURT:  Well, why don't you go ahead and ask

15   the question.

16   BY MR. EKELAND:

17   Q.  One of the services that AurumXChange provided is it

18   allowed people to take Mt. Gox redemption codes and convert

19   them into Liberty Reserve dollars?

20   A.  Yes, sir.

21   Q.  And then people could take those Liberty Reserve dollars

22   to Liberty and use them at Liberty Reserve, which was

23   another exchange?

24   A.  Yes, sir.

25   Q.  And at the Liberty Reserve exchange, you could pay for
```

```
 1     goods and services?

 2     A.  Any merchant that had a Liberty Reserve account.

 3               MR. EKELAND:  Your Honor, would you like --

 4               THE COURT:  This is a good time to break?

 5               MR. EKELAND:  This is a good time to break.

 6               THE COURT:  Why don't we break for the day.  It's

 7     getting late for your lunch and your weekend.

 8               Just for your planning purposes, on Monday we're

 9     only going to be able to sit until 1:00.  There's someone

10     who has an appointment that we can't move.  And so 1:00.

11     We'll have to break at 1:00 on Monday.  That way, if you

12     have appointments or things you want to schedule for the

13     afternoon, you can do that.

14               I'll remind you over the weekend, please don't

15     discuss the case with anybody.  If people ask you about the

16     case, you can say it's a criminal case.  Don't say anything

17     else about the case.  As soon as you say anything more,

18     they're going to want to talk with you about it; and they

19     can't do that and you can't let them do that.  If anybody

20     does try to talk to you about the case, just say, I'm not

21     allowed -- the judge told me I'm not allowed to talk about

22     the case.  When you're done, you can talk about the case.

23     But until then, you can't.

24               And don't conduct any type of research on the

25     internet or otherwise relating to anything in any way
```

 1    related to this case.

 2            And other than that, just have a really nice

 3    weekend.  I'll see you back here on Monday.  Yeah.  9:00

 4    a.m. on Monday.  We'll get in as much time on Monday as we

 5    can, since we're breaking at 1:00.

 6            THE COURTROOM DEPUTY:  All rise.

 7            (Whereupon, the jury exited the courtroom at 1:02

 8    p.m. and the following proceedings were had:)

 9            THE COURTROOM DEPUTY:  You may be seated.

10            THE COURT:  The witness is excused for the day.

11    We'll see you back here on Monday.  I'll just remind you not

12    to discuss your testimony with anybody until it's complete.

13            THE WITNESS:  Of course, your Honor.

14            THE COURT:  Thank you.

15            (Thereupon, Luke Scholl retired from the courtroom

16    and the following proceedings were had:)

17            THE COURT:  Anything we want to take up now?  I'm

18    sure people want to get their lunch, and I know the court

19    reporter has been going for a long time.  But if there's

20    something you want to raise now, let me know.

21            MS. PELKER:  Nothing from the Government, your

22    Honor.

23            THE COURT:  At some point we'll have to come back

24    to the 403 issue, which I'm happy to do whenever you all

25    think is appropriate.

1          And on Monday, if there's anything -- maybe that's

2     a good time, but Monday afternoon after the jury is let go

3     on Monday, if that's something after lunch on Monday that we

4     want to address, that would be a good time to do it.  So

5     make sure you think about that and let me know if there's

6     anything that we should address, particularly if there's

7     anything I need to be prepared for.

8          Have a nice weekend.  Thank you.

9          (Proceedings concluded.)

1                    **<u>CERTIFICATE</u>**

2

3              I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10             Dated this 23rd day of February, 2024.

11

12             <u>/s/ Lisa Edwards, RDR, CRR</u>
               Official Court Reporter
13             United States District Court for the
                 District of Columbia
14             333 Constitution Avenue, Northwest
               Washington, D.C. 20001
15             (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$100** [1] - 42:12
**$25** [2] - 71:15, 71:16
**$80** [4] - 71:16,
109:6, 109:7, 109:8
**$80.50** [1] - 108:6

## '

**'my** [1] - 73:4
**'somebody's** [1] -
73:6
**'your** [1] - 73:8

## /

**/s** [1] - 114:12

## 1

**1** [8] - 42:19, 42:20,
67:11, 85:6, 86:5,
88:7, 99:12, 104:18
**1.38** [2] - 44:18,
44:21
**1.382** [1] - 44:17
**100** [6] - 10:3, 10:6,
10:8, 22:5, 30:1, 30:6
**10005** [1] - 1:25
**102** [1] - 77:8
**10:07** [1] - 1:7
**10:10** [1] - 5:20
**10th** [2] - 72:8, 72:16
**11** [2] - 46:3, 46:5
**11-day** [1] - 65:19
**11:25** [2] - 60:24,
61:4
**11:58** [1] - 66:16
**12:00** [1] - 60:24
**12:30** [2] - 61:16,
66:3
**13** [3] - 62:10, 80:23,
80:24
**1301** [1] - 1:21
**13th** [1] - 52:25
**14RZ** [3] - 92:20,
92:23, 95:17
**14RZFW** [2] - 93:24,
101:15
**14RZFWF9F** [1] -
95:5
**14RZFWF9F-and-
so-on** [1] - 95:5
**15** [3] - 59:19, 60:2,
60:7
**15th** [1] - 68:10

**16** [2] - 75:17, 76:16
**19th** [3] - 85:3, 85:4,
105:10
**1:00** [8] - 65:1, 66:6,
66:11, 98:20, 111:9,
111:10, 111:11, 112:5
**1:02** [1] - 112:7
**1:30** [1] - 64:25
**1JZBU** [1] - 92:22
**1JZBUK** [1] - 93:23
**1JZBUKK** [2] -
95:21, 95:22

## 2

**2** [9] - 44:3, 44:7,
48:8, 48:10, 101:15,
102:23, 106:22,
107:8, 107:10
**20** [1] - 60:24
**20001** [2] - 2:4,
114:14
**2005** [1] - 1:21
**2008** [1] - 106:11
**2011** [27] - 43:22,
45:14, 46:3, 46:5,
52:25, 68:10, 71:10,
72:15, 72:21, 78:18,
78:25, 80:24, 82:12,
82:25, 83:18, 85:1,
87:1, 87:4, 87:17,
88:4, 88:13, 103:10,
103:16, 105:11,
109:19, 110:2, 110:7
**2012** [7] - 72:8,
74:20, 75:17, 76:16,
78:18, 79:1, 82:12
**2013** [1] - 87:8
**2015** [1] - 22:13
**202** [2] - 2:4, 114:15
**2022** [1] - 36:22
**2023** [1] - 36:25
**2024** [3] - 1:7, 110:2,
114:10
**20530** [2] - 1:16, 1:19
**20th** [1] - 105:19
**21-00399** [1] - 1:4
**21-399** [1] - 5:23
**23** [1] - 1:7
**23rd** [1] - 114:10
**24** [1] - 36:22
**26** [2] - 11:20, 11:21
**27th** [3] - 43:22,
45:14, 72:14
**28** [3] - 55:13, 67:19,
67:21
**29** [1] - 85:1

## 3

**3** [7] - 105:20,
105:22, 106:18,
107:8, 107:11, 108:1,
108:5
**30** [1] - 1:24
**313-A** [2] - 84:17,
98:19
**333** [2] - 2:3, 114:14
**35** [9] - 11:20, 11:21,
45:23, 46:3, 51:20,
101:16, 105:4,
105:18, 108:6
**35.999** [1] - 105:1
**35.9995** [2] - 93:2,
104:24
**354-3269** [2] - 2:4,
114:15
**36** [5] - 11:18, 89:12,
89:21, 93:14, 104:22

## 4

**4** [1] - 28:3
**403** [3] - 4:11, 4:19,
112:24
**41** [2] - 52:12, 52:25
**42** [1] - 11:19

## 5

**5** [5] - 28:3, 80:11,
80:13, 80:16
**5.1527** [1] - 1:16
**50** [1] - 67:12
**59** [1] - 72:4

## 6

**6** [1] - 3:5
**601** [1] - 1:15
**61** [1] - 74:16
**6706** [1] - 2:3

## 7

**7** [1] - 61:24
**70** [1] - 75:14
**7th** [1] - 74:20

## 8

**80.50** [1] - 108:8
**815** [1] - 81:16
**818-B** [2] - 81:14,

81:17
**89.87** [2] - 88:16,
88:20

## 9

**9** [1] - 62:10
**90** [1] - 36:18
**9000** [2] - 87:9, 103:8
**95** [1] - 56:14
**950** [1] - 1:18
**99** [1] - 87:9
**9:00** [1] - 112:3

## A

**a.m** [5] - 1:7, 5:20,
61:5, 66:16, 112:4
**abbreviation** [1] -
39:11
**ability** [5] - 30:3,
32:13, 35:12, 78:23,
114:7
**able** [8] - 4:15, 32:16,
34:23, 73:11, 76:16,
77:18, 107:15, 111:9
**abnormal** [1] - 71:22
**absolute** [1] - 25:24
**absolutely** [1] -
65:15
**abstractly** [1] - 19:25
**access** [2] - 44:24,
46:18
**according** [1] - 36:18
**account** [62] - 25:12,
26:17, 38:24, 39:6,
41:22, 41:24, 41:25,
43:15, 43:16, 43:19,
44:18, 44:25, 59:19,
70:19, 71:16, 71:20,
72:2, 82:3, 83:25,
85:6, 86:5, 86:6,
86:17, 87:1, 87:3,
87:16, 87:22, 88:5,
88:7, 88:14, 88:17,
89:11, 91:10, 99:12,
101:15, 102:23,
102:25, 103:5, 103:8,
103:11, 103:15,
103:20, 104:17,
104:18, 105:19,
105:22, 105:25,
106:5, 106:13,
106:18, 106:22,
107:7, 107:8, 107:10,
108:1, 108:5, 108:17,
108:22, 111:2
**accounts** [20] - 22:4,
25:9, 25:22, 26:4,

33:25, 34:19, 41:19,
59:1, 71:12, 85:13,
85:17, 85:20, 85:25,
86:1, 86:3, 87:8,
87:11, 87:15, 90:21,
102:15
**accuracy** [11] - 9:11,
9:15, 11:9, 12:8,
13:13, 14:1, 16:13,
21:8, 21:25, 22:8,
27:17
**accurate** [13] - 10:3,
10:5, 10:6, 10:8,
11:15, 27:5, 27:10,
29:8, 37:20, 56:18,
60:11, 114:4
**accurately** [1] -
56:16
**acknowledge** [1] -
7:20
**acquired** [1] - 43:9
**acronym** [1] - 86:21
**Action** [1] - 1:3
**activities** [1] - 37:4
**activity** [2] - 18:22,
40:13
**added** [1] - 100:11
**addition** [1] - 104:18
**address** [104] - 4:1,
10:14, 11:2, 11:5,
11:8, 11:11, 11:12,
11:14, 11:18, 11:25,
12:2, 12:10, 12:11,
12:14, 12:15, 12:18,
12:20, 12:23, 13:12,
13:24, 13:25, 14:4,
14:6, 14:7, 14:10,
14:11, 14:13, 14:15,
14:23, 14:24, 20:4,
26:21, 26:24, 27:2,
27:3, 27:13, 27:21,
27:22, 28:7, 28:10,
28:11, 28:14, 29:11,
29:14, 29:16, 29:19,
29:20, 29:21, 30:1,
30:7, 30:24, 31:1,
31:12, 31:14, 43:3,
45:12, 53:10, 54:11,
54:18, 54:20, 54:22,
56:4, 58:6, 64:8,
73:10, 77:20, 89:12,
89:14, 89:18, 89:21,
89:25, 90:3, 90:7,
90:9, 90:13, 90:16,
91:16, 91:17, 92:20,
95:5, 95:6, 95:10,
95:12, 95:16, 95:17,
95:20, 95:21, 95:22,
95:25, 96:14, 96:16,
96:22, 96:23, 99:12,

99:22, 99:23, 100:24, 113:4, 113:6
**addressed** [1] - 5:5
**addresses** [41] - 10:13, 11:20, 14:21, 22:2, 22:6, 23:3, 25:11, 25:16, 25:18, 25:21, 26:2, 26:7, 26:11, 27:6, 27:9, 29:2, 29:4, 43:9, 43:13, 45:9, 45:10, 56:15, 57:25, 59:10, 67:18, 67:19, 67:22, 68:2, 68:19, 69:24, 70:6, 71:3, 73:14, 77:18, 77:25, 92:22, 95:3, 96:2, 96:4, 96:6
**adds** [1] - 47:8
**adjourn** [1] - 65:1
**admitted** [1] - 81:14
**admittedly** [1] - 16:5
**advice** [3] - 24:15, 75:3, 75:9
**affect** [7] - 11:3, 11:8, 12:8, 12:24, 13:13, 13:17, 14:1
**affected** [1] - 10:24
**afternoon** [2] - 111:13, 113:2
**afterwards** [1] - 77:22
**agency** [3] - 8:23, 8:25, 9:3
**ago** [2] - 80:23, 80:25
**agree** [45] - 11:1, 23:4, 23:10, 29:9, 29:12, 29:24, 30:14, 30:21, 30:25, 31:10, 31:21, 31:23, 32:1, 43:24, 44:2, 45:17, 46:4, 46:23, 47:23, 48:12, 48:16, 48:23, 52:4, 53:12, 53:20, 54:25, 55:15, 55:25, 56:4, 56:19, 67:24, 68:11, 72:7, 73:21, 74:19, 75:10, 75:16, 76:1, 78:12, 78:25, 85:1, 86:6, 99:21, 104:13, 105:20
**ahead** [5] - 16:4, 21:1, 101:7, 109:25, 110:14
**Akemashite** [37] - 42:17, 43:18, 47:23, 48:13, 48:17, 48:23, 52:4, 53:12, 53:21, 54:17, 55:15, 67:24, 73:18, 75:10, 76:1,

78:12, 78:22, 79:19, 80:2, 87:24, 88:4, 88:8, 88:9, 88:13, 88:16, 93:18, 93:20, 94:6, 94:7, 94:14, 94:23, 95:1, 96:20, 96:25, 97:9, 98:5, 103:18
**Alden** [1] - 6:2
**alleged** [1] - 72:10
**allow** [4] - 13:4, 23:9, 24:6, 37:6
**allowed** [3] - 110:18, 111:21
**allowing** [1] - 18:7
**Amendment** [1] - 33:19
**AMERICA** [1] - 1:3
**America** [1] - 5:23
**amount** [22] - 14:13, 28:1, 29:19, 44:12, 44:16, 45:6, 47:21, 47:25, 52:3, 58:25, 59:10, 68:23, 69:11, 71:25, 75:3, 75:7, 78:3, 93:2, 93:14, 100:19, 104:11, 105:13
**amounts** [15] - 44:19, 45:10, 45:18, 47:11, 52:6, 69:7, 69:9, 71:7, 71:17, 71:24, 75:4, 75:12, 93:17, 94:8, 94:24
**analogy** [2] - 94:19, 95:3
**analysis** [45] - 9:8, 10:4, 10:9, 10:11, 10:16, 10:25, 11:15, 12:16, 12:21, 13:17, 14:17, 15:16, 15:20, 17:9, 17:11, 20:7, 20:16, 21:23, 26:20, 27:1, 27:4, 27:8, 27:12, 27:18, 28:17, 28:19, 29:3, 29:5, 29:7, 30:12, 36:14, 45:25, 47:9, 49:20, 56:17, 59:19, 69:14, 78:13, 79:21, 79:24, 79:25, 81:6, 81:9, 96:22, 97:2
**analytic** [1] - 21:12
**analyze** [9] - 7:6, 14:8, 23:24, 49:14, 51:22, 52:1, 55:14, 55:16, 55:22
**analyzed** [4] - 17:10, 49:10, 49:16, 56:15
**analyzer** [1] - 47:19

**analyzing** [1] - 17:2
**anecdotal** [1] - 22:12
**announced** [1] - 72:15
**anonymity** [2] - 43:5, 69:1
**anonymize** [1] - 45:12
**anonymous** [4] - 43:2, 43:16, 68:24, 69:25
**anonymously** [2] - 70:8, 103:15
**answer** [7] - 14:3, 16:4, 16:16, 31:17, 31:19, 59:11, 99:16
**answered** [9] - 13:1, 13:3, 16:1, 16:19, 20:24, 28:24, 41:11, 84:14, 99:17
**answers** [1] - 31:6
**anti** [1] - 86:22
**anti-money** [1] - 86:22
**anyway** [1] - 78:6
**apart** [2] - 70:4, 71:1
**apologize** [1] - 54:2
**appear** [1] - 48:21
**aPPEARANCES** [1] - 1:13
**applies** [1] - 95:4
**apply** [1] - 94:14
**appointment** [7] - 61:13, 61:22, 64:22, 64:23, 64:24, 65:3, 111:10
**appointments** [1] - 111:12
**approach** [1] - 5:25
**appropriate** [2] - 64:8, 112:25
**approximations** [1] - 10:4
**area** [1] - 18:7
**arguing** [1] - 24:4
**argument** [5] - 23:25, 92:7, 97:11, 97:19, 98:11
**arguments** [1] - 98:13
**arrange** [1] - 38:7
**arrested** [1] - 6:22
**assertion** [1] - 84:4
**assess** [1] - 58:5
**assessing** [1] - 58:1
**assessment** [8] - 27:15, 30:13, 56:23, 56:25, 57:2, 57:4, 62:2, 90:6
**assessments** [14] -

26:13, 27:2, 27:5, 27:10, 56:8, 57:18, 58:12, 58:14, 58:16, 58:18, 58:20, 60:8, 60:10
**associated** [13] - 86:8, 86:14, 87:14, 95:11, 95:16, 95:18, 95:20, 95:22, 95:25, 96:23, 102:25, 104:17, 105:25
**assume** [3] - 25:17, 25:19, 26:10
**assumption** [5] - 26:6, 26:23, 27:13, 57:2, 57:5
**assumptions** [6] - 25:16, 26:5, 28:13, 56:3, 56:5, 56:8
**attention** [1] - 61:16
**attesting** [3] - 9:11, 9:15, 21:8
**ATTORNEY'S** [1] - 1:14
**attribute** [1] - 95:9
**attributed** [1] - 34:24
**attribution** [9] - 16:12, 21:19, 21:20, 59:12, 59:15, 59:20, 59:25, 90:8, 90:12
**attributions** [2] - 21:17, 21:19
**audit** [5] - 15:9, 15:12, 15:16, 15:17, 15:18
**AurumXChange** [8] - 82:9, 103:8, 106:6, 106:8, 109:10, 109:13, 110:6, 110:17
**authorities** [1] - 43:7
**automatically** [1] - 70:8
**available** [2] - 43:5, 93:22
**avenue** [1] - 33:10
**Avenue** [4] - 1:18, 1:21, 2:3, 114:14
**aware** [33] - 9:6, 16:24, 17:1, 21:7, 21:10, 21:16, 21:18, 22:18, 22:23, 35:7, 36:18, 36:20, 36:21, 49:2, 69:1, 76:18, 76:20, 76:22, 77:3, 78:17, 79:20, 80:4, 81:4, 82:11, 82:13, 82:14, 82:16, 87:3, 87:5, 88:22, 96:17, 97:3, 100:1

**B**

**back'** [1] - 73:4
**backed** [1] - 37:13
**backward** [1] - 88:21
**balance** [1] - 39:6
**bank** [3] - 43:15, 82:2, 87:18
**banks** [1] - 37:19
**based** [15] - 14:4, 22:13, 27:15, 36:12, 36:14, 46:20, 46:23, 48:19, 54:14, 57:6, 61:23, 68:4, 78:16, 87:12, 91:24
**basic** [1] - 37:21
**basis** [2] - 23:22, 98:6
**BEFORE** [1] - 1:11
**beforehand** [1] - 35:9
**begin** [1] - 8:21
**behavior** [1] - 31:24
**belong** [4] - 23:3, 85:23, 86:3, 92:25
**belonged** [4] - 26:2, 60:2, 60:7, 85:20
**belongs** [1] - 88:8
**bench** [2] - 32:21, 62:11
**best** [3] - 64:16, 65:25, 114:7
**better** [2] - 55:19, 69:3
**between** [27] - 7:21, 11:18, 19:24, 25:7, 25:14, 38:5, 38:8, 38:16, 39:21, 40:10, 41:18, 44:21, 49:5, 49:25, 51:12, 57:4, 58:25, 59:9, 73:14, 90:20, 91:16, 92:2, 92:4, 92:21, 92:24, 95:2, 100:23
**beyond** [3] - 15:5, 23:7, 98:9
**big** [2] - 47:17, 69:22
**bill** [4] - 28:3, 80:11, 80:13, 80:17
**bit** [20] - 46:6, 48:2, 52:16, 52:18, 61:21, 62:1, 66:12, 67:12, 68:13, 69:17, 69:18, 77:11, 84:20, 85:8, 85:10, 98:24, 101:1, 105:7, 105:16, 108:2
**Bitcoin** [159] - 10:12, 10:14, 11:2, 11:4, 11:8, 11:13, 11:18,

11:25, 12:2, 12:14,
12:15, 12:19, 12:23,
13:12, 13:23, 14:6,
14:10, 14:11, 14:13,
14:15, 14:21, 14:23,
22:2, 22:3, 22:6, 25:7,
25:10, 26:4, 26:7,
26:16, 28:4, 28:5,
28:9, 29:10, 29:14,
29:16, 29:18, 29:20,
29:21, 30:24, 31:1,
31:12, 31:14, 32:6,
32:7, 32:16, 33:5,
33:12, 33:21, 34:13,
34:18, 36:9, 36:10,
36:13, 36:15, 37:22,
38:14, 38:22, 38:23,
38:24, 39:3, 39:5,
39:7, 39:23, 39:25,
41:1, 41:2, 41:3, 42:7,
43:2, 43:13, 43:17,
46:22, 48:14, 49:6,
50:1, 50:5, 51:13,
51:14, 51:15, 51:17,
51:18, 58:25, 69:1,
72:10, 72:15, 72:18,
73:10, 73:20, 74:5,
74:14, 76:2, 78:19,
79:1, 79:3, 79:6,
79:10, 79:13, 82:12,
82:14, 88:23, 89:1,
89:7, 89:12, 89:14,
89:21, 91:3, 91:9,
91:14, 91:16, 91:17,
92:20, 92:22, 92:23,
93:3, 93:15, 93:22,
94:2, 94:5, 94:10,
94:12, 94:15, 94:18,
94:21, 95:5, 95:10,
95:12, 95:20, 95:24,
95:25, 99:12, 99:13,
99:22, 99:23, 99:24,
100:3, 100:7, 100:24,
102:3, 102:5, 102:14,
102:16, 102:18,
103:7, 103:12,
103:13, 104:19,
104:22, 104:24,
105:3, 105:18, 108:6,
108:7, 108:18,
108:21, 109:3, 110:8
    **Bitcoind** [1] - 46:14
    **bitcoinfog.com** [8] -
73:5, 83:6, 83:13,
84:1, 84:7, 103:3,
103:19
    **Bitcoins** [11] - 38:6,
38:12, 43:14, 44:5,
44:18, 44:21, 44:25,
73:13, 82:6
    **blindly** [1] - 47:21,

75:4
    **block** [6] - 14:5,
39:5, 100:9, 100:10,
100:11
    **blockchain** [50] -
8:19, 9:1, 9:4, 9:8,
9:11, 10:2, 12:8,
15:10, 15:16, 16:9,
17:4, 17:17, 17:22,
18:18, 19:8, 19:25,
20:16, 21:11, 25:23,
36:14, 38:22, 38:23,
39:1, 39:5, 39:17,
40:7, 40:11, 40:12,
43:4, 44:1, 44:19,
73:7, 74:5, 74:7, 74:9,
85:14, 89:22, 93:22,
93:25, 94:12, 94:24,
96:1, 96:3, 100:3,
100:7, 100:14,
100:17, 102:15,
103:1, 110:3
    **blogspot** [1] - 43:9
    **body** [1] - 9:7
    **bottom** [4] - 77:10,
96:14, 100:24, 108:3
    **bought** [2] - 73:16,
80:17
    **box** [15] - 46:7, 53:2,
62:12, 85:12, 85:16,
85:17, 85:19, 85:24,
86:2, 86:4, 91:17,
92:21, 92:23, 108:5
    **boxes** [1] - 85:15
    **boy** [1] - 81:15
    **brainer** [3] - 47:1,
47:4, 47:7
    **break** [8] - 52:14,
60:23, 61:7, 62:4,
111:4, 111:5, 111:6,
111:11
    **breaking** [2] - 54:6,
112:5
    **breaks** [1] - 32:12
    **bring** [3] - 5:11,
77:11, 85:7
    **bringing** [2] - 4:2,
33:10
    **broadcast** [2] -
38:22, 38:24
    **Brooklyn** [1] - 1:25
    **brought** [1] - 18:5
    **Brown** [2] - 4:8, 6:4
    **BROWN** [8] - 1:14,
4:3, 4:9, 4:14, 4:22,
5:4, 5:9, 33:1
    **BTC** [1] - 105:4
    **BTCE** [1] - 34:1
    **buffer** [1] - 75:5
    **bunch** [1] - 34:13

    **burdens** [1] - 65:16
    **but..** [1] - 100:22
    **buy** [6] - 28:3, 39:3,
42:12, 42:13, 80:10,
83:7
    **buyers** [1] - 38:7
    **buying** [3] - 83:12,
102:18, 103:13
    **buys** [1] - 80:16
    **BY** [75] - 2:1, 6:18,
7:3, 10:1, 12:1, 13:8,
15:2, 15:8, 15:24,
16:2, 16:7, 16:20,
18:14, 19:5, 20:14,
21:3, 23:12, 24:10,
25:1, 29:1, 30:20,
31:9, 31:20, 36:8,
37:10, 39:14, 41:12,
42:22, 44:9, 45:2,
46:2, 46:9, 46:19,
47:2, 48:6, 50:12,
51:1, 51:24, 52:24,
53:6, 55:7, 57:17,
67:7, 67:15, 68:9,
68:16, 69:19, 72:6,
73:1, 74:18, 74:24,
75:15, 77:12, 81:22,
84:2, 84:21, 85:11,
91:11, 92:19, 97:12,
97:16, 97:20, 98:23,
99:10, 99:20, 101:13,
102:22, 104:10,
105:8, 105:17, 107:5,
108:4, 109:5, 110:1,
110:16

## C

    **calculate** [1] - 89:3
    **calculation** [1] - 89:5
    **calculations** [1] -
59:10
    **calendar** [1] - 65:15
    **cancel** [1] - 65:3
    **canceling** [1] - 65:23
    **cannot** [8] - 9:13,
9:17, 16:11, 16:23,
17:16, 18:17, 40:5,
47:10
    **card** [1] - 43:15
    **cards** [1] - 41:20
    **career** [1] - 15:14
    **Case** [1] - 5:23
    **case** [62] - 7:8, 8:15,
9:12, 10:20, 15:15,
15:20, 17:12, 18:20,
24:4, 28:4, 30:12,
31:13, 31:15, 34:5,
36:11, 36:16, 38:11,

42:3, 42:4, 50:19,
50:22, 51:3, 51:9,
53:9, 54:11, 55:6,
55:12, 55:13, 56:10,
56:16, 57:8, 60:25,
66:1, 67:21, 69:8,
70:14, 76:25, 80:5,
90:4, 90:5, 94:20,
95:13, 95:15, 96:20,
97:1, 97:5, 97:6,
97:14, 98:9, 98:14,
103:23, 103:24,
107:13, 111:15,
111:16, 111:17,
111:20, 111:22, 112:1
    **cases** [10] - 15:14,
15:21, 16:3, 16:6,
19:11, 20:3, 33:11,
33:16, 58:21, 71:15
    **cash** [3] - 41:4, 41:6,
103:14
    **cashier** [2] - 80:11,
80:13
    **CATHERINE** [1] -
1:17
    **caution** [1] - 47:20
    **certain** [9] - 7:6,
25:16, 26:5, 26:10,
28:16, 30:1, 30:7,
33:25, 56:3
    **certainly** [4] - 34:23,
51:6, 53:17, 54:5
    **certainty** [5] - 25:25,
58:20, 58:23, 59:4,
59:5
    **CERTIFICATE** [1] -
114:1
    **certify** [1] - 114:4
    **chain** [35] - 26:15,
26:16, 26:18, 26:20,
26:24, 27:6, 27:12,
27:18, 27:21, 29:3,
31:23, 38:16, 38:17,
38:19, 38:21, 39:7,
39:15, 40:4, 40:23,
42:9, 56:1, 56:6, 56:7,
56:9, 56:21, 57:24,
58:2, 58:24, 59:9,
73:22, 73:23, 73:25,
74:2, 74:4
    **Chainalysis** [33] -
8:19, 9:5, 9:16, 9:19,
14:5, 15:13, 15:20,
16:12, 16:22, 16:24,
17:2, 17:20, 18:15,
20:19, 20:21, 21:8,
21:12, 21:21, 21:25,
22:3, 22:8, 22:13,
22:15, 22:18, 22:23,
22:25, 23:14, 23:20,

23:23, 24:12, 24:15,
36:18, 36:25
    **chains** [10] - 27:3,
27:8, 31:21, 32:2,
56:10, 56:14, 58:3,
59:1, 60:8
    **change** [23] - 12:16,
25:25, 26:24, 27:3,
27:13, 27:20, 27:22,
27:24, 28:5, 28:14,
32:1, 39:4, 45:11,
56:3, 58:1, 58:6,
58:21, 58:24, 64:23,
94:7
    **changes** [1] - 76:18
    **changing** [3] - 10:11,
76:14, 76:21
    **character** [1] - 13:16
    **characterize** [4] -
24:16, 57:21, 58:11,
58:17
    **characterized** [2] -
58:14, 64:2
    **characters** [2] -
11:19, 14:24
    **check** [3] - 14:22,
48:10, 89:8
    **checked** [2] - 22:2,
22:4
    **choice** [3] - 26:21,
72:25, 73:3
    **chose** [1] - 7:22
    **CHRISTOPHER** [1] -
1:14
    **Christopher** [1] - 6:4
    **CipherTrace** [1] -
21:13
    **circle** [1] - 63:7
    **circumstances** [1] -
90:18
    **circumstantial** [4] -
29:23, 59:24, 90:25,
91:1
    **cite** [2] - 22:7, 40:22
    **claim** [2] - 85:22,
85:24
    **claiming** [1] - 10:2
    **clarify** [2] - 37:22,
57:13
    **clause** [1] - 33:19
    **clear** [13] - 20:11,
25:20, 35:10, 48:3,
50:2, 51:22, 57:23,
68:15, 76:4, 92:16,
97:7, 109:2, 110:12
    **clearer** [1] - 20:5
    **clearly** [1] - 85:7
    **clearnet** [10] - 76:3,
76:4, 76:12, 76:15,
76:21, 77:2, 83:6,

84:1, 103:3, 103:19
**clerk** [5] - 61:12,
61:20, 61:25, 63:22,
64:23
**close** [1] - 96:23
**closer** [1] - 72:20
**closing** [2] - 92:6,
98:11
**cluster** [5] - 20:4,
22:3, 23:3, 24:15,
89:15
**clustered** [1] - 22:6
**clustering** [13] -
21:5, 21:9, 21:22,
22:9, 22:15, 22:19,
22:21, 22:24, 22:25,
23:2, 23:14, 23:23,
24:13
**clusters** [4] - 9:5,
21:17, 25:13, 25:14
**code** [14] - 41:23,
41:24, 42:13, 79:10,
103:13, 105:3,
105:18, 108:12,
108:21, 109:2, 109:3,
109:8, 109:10
**codes** [9] - 41:14,
41:17, 41:18, 42:1,
42:9, 75:24, 108:11,
109:14, 110:18
**coffee** [6] - 28:2,
28:3, 28:9, 80:6,
80:10, 80:11
**cognizant** [2] - 33:3,
78:23
**coin** [1] - 27:16
**coins** [6] - 73:4,
73:6, 73:8, 73:9,
73:12, 73:15
**collect** [2] - 16:24,
86:23
**collisions** [1] - 14:25
**Columbia** [2] - 2:2,
114:13
**COLUMBIA** [2] - 1:1,
1:15
**combat** [1] - 78:8
**combine** [1] - 69:9
**combining** [1] -
68:21
**coming** [5] - 27:24,
28:5, 36:24, 62:18,
66:25
**comment** [1] - 84:6
**commenting** [2] -
31:5, 66:21
**comments** [1] -
78:16
**common** [3] - 20:7,
40:21, 82:11

**commonly** [1] -
21:19
**communicate** [1] -
46:15
**communicating** [1] -
50:5
**communication** [2] -
49:3, 49:5
**communications** [4]
- 49:25, 50:4, 51:12,
51:16
**community** [1] -
82:12
**company** [2] - 69:23,
75:25
**comparing** [2] -
79:21, 79:25
**complained** [1] -
63:23
**complaining** [3] -
63:11, 63:24, 64:12
**complaint** [5] - 7:8,
7:10, 7:16, 7:18, 7:19
**complaints** [1] -
62:12
**complete** [2] -
112:12, 114:6
**completely** [5] -
34:20, 35:3, 53:10,
54:12, 77:21
**compounds** [1] -
56:11
**computer** [3] - 8:16,
49:8, 81:7
**computers** [1] -
50:14
**concept** [1] - 73:6
**concern** [9] - 47:24,
52:5, 52:8, 53:21,
63:9, 67:25, 69:6,
69:12, 75:11
**concerned** [3] -
34:25, 52:9, 65:23
**concluded** [1] -
113:9
**conclusion** [7] -
19:18, 19:20, 23:17,
23:19, 82:23, 84:11,
98:8
**conclusions** [1] -
26:12
**concrete** [1] - 29:13
**conduct** [3] - 35:10,
61:1, 111:24
**conducted** [2] -
15:19, 29:8
**conducting** [1] -
14:17
**conference** [1] -
32:21

**confirm** [2] - 7:4,
29:10
**confirmation** [7] -
100:2, 100:6, 100:8,
100:9, 100:12,
100:23, 101:4
**confirmations** [6] -
100:18, 100:19,
100:20, 100:22,
101:16, 101:18
**confirmed** [2] -
28:18, 29:7
**confirming** [2] -
23:13, 30:23
**conflicts** [1] - 65:14
**confrontation** [1] -
33:19
**confused** [1] - 19:3
**confusing** [1] - 37:23
**confusion** [1] - 19:23
**connect** [1] - 77:22
**connected** [3] -
87:19, 93:23, 93:24
**connecting** [1] -
43:12
**connection** [1] - 78:4
**consider** [13] - 25:5,
26:15, 26:17, 44:6,
44:7, 44:12, 44:16,
63:3, 71:21, 71:23,
73:4, 73:9, 94:23
**considerable** [1] -
102:17
**consistent** [13] -
91:2, 91:4, 91:5,
91:14, 99:13, 99:23,
99:25, 102:1, 102:3,
102:5, 102:6, 102:7,
102:9
**constitutes** [1] -
114:4
**Constitution** [2] -
2:3, 114:14
**consult** [1] - 62:21
**contact** [1] - 80:15
**contain** [2] - 22:16,
22:20
**context** [1] - 68:4
**contextual** [1] - 57:7
**continue** [4] - 45:3,
52:15, 52:18, 98:20
**continues** [3] - 64:8,
64:17, 64:19
**continuing** [1] -
51:20
**contracts** [1] - 9:20
**contrary** [1] - 73:13
**control** [7] - 25:25,
26:10, 30:3, 58:1,
58:9, 80:20, 99:2

**controlled** [4] -
29:21, 30:1, 30:7,
89:25
**controlling** [1] -
90:16
**controls** [7] - 29:10,
29:14, 29:15, 30:23,
31:1, 31:11, 90:2
**conversation** [1] -
94:2
**conversion** [1] -
108:15
**conversions** [1] -
104:17
**convert** [3] - 108:22,
110:3, 110:18
**converted** [2] -
103:7, 108:7
**converting** [4] -
104:19, 108:13,
109:3, 109:14
**corner** [1] - 100:16
**corraborating** [3] -
30:14, 30:17, 30:22
**correct** [60] - 6:23,
7:13, 8:17, 8:23,
10:13, 10:18, 10:20,
10:21, 11:19, 12:12,
16:12, 16:25, 21:5,
21:13, 22:15, 25:19,
26:21, 26:22, 26:25,
27:14, 27:19, 32:14,
39:19, 40:17, 40:18,
42:2, 42:10, 42:14,
46:4, 49:6, 70:14,
79:18, 80:20, 80:21,
81:8, 81:24, 82:19,
86:9, 86:11, 86:17,
87:2, 88:25, 89:12,
89:22, 89:23, 94:1,
94:9, 96:2, 96:3, 97:1,
101:17, 103:5,
103:16, 105:5,
105:12, 106:16,
106:17, 108:9,
109:11, 109:17
**corrected** [2] -
10:10, 93:13
**correctly** [7] - 26:9,
56:20, 58:13, 58:15,
59:3, 59:5, 100:17
**CORROBORA** [1] -
30:17
**corroborated** [1] -
60:10
**corroborating** [9] -
30:16, 30:19, 30:22,
31:11, 59:6, 60:12,
60:13, 84:3, 90:15
**corroboration** [1] -

30:18
**counsel** [10] - 5:25,
6:1, 6:3, 6:8, 18:7,
62:24, 67:2, 98:12,
109:21, 110:13
**count** [1] - 62:12
**couple** [1] - 73:14
**course** [4] - 61:9,
68:18, 78:8, 112:13
**Court** [1] - 2:1, 2:2,
17:9, 33:14, 63:3,
64:7, 114:12, 114:13
**court** [4] - 6:8, 13:22,
36:4, 112:18
**COURT** [112] - 1:1,
4:1, 4:5, 4:8, 4:12,
4:20, 5:1, 5:6, 5:11,
5:14, 5:17, 6:5, 6:9,
6:13, 7:2, 9:22, 11:21,
13:4, 15:1, 15:4, 15:7,
16:4, 16:18, 18:9,
19:3, 19:10, 19:15,
19:22, 20:9, 20:13,
21:1, 23:9, 23:25,
24:4, 24:23, 28:24,
30:16, 30:19, 31:7,
31:18, 32:20, 32:24,
33:2, 33:17, 35:14,
35:25, 36:2, 36:5,
36:7, 37:6, 39:9,
41:11, 44:14, 46:12,
50:10, 50:21, 50:23,
52:15, 52:18, 52:20,
57:15, 60:17, 60:20,
60:23, 61:7, 61:12,
62:8, 62:22, 62:25,
63:5, 63:8, 63:21,
64:2, 64:10, 64:21,
65:7, 65:11, 65:21,
66:2, 66:4, 66:10,
66:19, 84:12, 84:14,
91:6, 92:8, 92:11,
92:15, 97:10, 97:18,
98:7, 98:17, 98:21,
99:3, 99:7, 99:17,
101:7, 101:11,
102:21, 104:1, 104:3,
104:7, 104:9, 108:24,
109:25, 110:14,
111:4, 111:6, 112:10,
112:14, 112:17,
112:23
**courthouse** [1] -
61:19
**courtroom** [10] - 4:6,
5:19, 35:10, 61:4,
61:10, 66:15, 66:24,
97:24, 112:7, 112:15
**COURTROOM** [11] -
5:18, 5:21, 61:3, 61:6,

62:5, 66:14, 66:17, 81:16, 81:20, 112:6, 112:9
**created** [3] - 15:20, 102:15, 102:17
**creating** [2] - 41:23, 63:9
**credit** [2] - 39:6, 43:15
**Crime** [1] - 36:25
**crime** [6] - 37:17, 83:11, 83:18, 83:23, 84:5, 88:20
**Criminal** [1] - 1:3
**criminal** [7] - 5:23, 7:8, 7:10, 7:16, 7:18, 7:19, 111:16
**CROSS** [1] - 6:17
**cross** [2] - 34:17, 35:6
**Cross** [1] - 3:5
**CROSS-EXAMINATION** [1] - 6:17
**Cross-Examination** [1] - 3:5
**cross-examination** [1] - 35:6
**crossing** [1] - 92:6
**CRR** [3] - 2:1, 114:3, 114:12
**crucial** [1] - 30:23
**crypto** [4] - 36:22, 37:4, 37:12, 38:3
**Crypto** [1] - 36:25
**cryptocurrency** [2] - 13:21, 37:16, 48:20
**cup** [2] - 80:7, 80:10
**currency** [5] - 37:13, 37:18, 39:12, 43:15
**current** [2] - 61:15, 78:10
**cursor** [1] - 53:18
**custody** [1] - 31:14
**customer** [2] - 80:14, 80:16
**Customer** [1] - 86:22
**customers** [2] - 38:14, 86:24
**cutting** [1] - 85:8
**cybercriminals** [1] - 78:22

---

**D**

**D.C** [6] - 1:6, 1:16, 1:19, 1:21, 2:4, 114:14
**darknet** [2] - 23:21,

24:17
**data** [15] - 7:6, 15:22, 16:25, 22:16, 22:18, 22:20, 22:25, 27:15, 36:24, 40:3, 40:5, 40:22, 57:6, 57:9, 74:4
**data-driven** [1] - 57:9
**database** [3] - 46:8, 46:16
**date** [7] - 10:15, 43:22, 68:6, 68:10, 72:11, 75:16, 92:1
**Dated** [1] - 114:10
**dates** [2] - 72:19, 106:12
**deal** [1] - 38:15
**dealing** [1] - 61:13
**debating** [1] - 58:19
**December** [1] - 33:24
**defeats** [1] - 41:3
**Defendant** [4] - 1:7, 4:4, 4:6, 6:7
**DEFENDANT** [1] - 1:23
**defense** [3] - 18:6, 65:5, 110:13
**defense's** [1] - 65:25
**define** [5] - 10:7, 17:5, 18:20, 37:7
**defined** [1] - 20:20
**definition** [3] - 17:8, 17:25, 18:2
**delay** [1] - 79:4
**delivering** [1] - 75:21
**deniability** [1] - 44:23
**DEPARTMENT** [2] - 1:18, 1:20
**deposit** [14] - 33:23, 34:24, 38:23, 41:24, 44:22, 45:12, 45:18, 47:25, 70:4, 71:2, 71:25, 77:20, 78:10, 81:11
**deposited** [4] - 34:19, 45:6, 45:11, 47:11
**depositing** [3] - 52:5, 69:6, 90:22
**depositing-money** [1] - 90:22
**deposits** [1] - 78:11
**DEPUTY** [11] - 5:18, 5:21, 61:3, 61:6, 62:5, 66:14, 66:17, 81:16, 81:20, 112:6, 112:9
**deputy** [5] - 61:12,

61:20, 61:25, 63:22, 64:23
**described** [1] - 47:13
**describing** [1] - 90:23
**description** [1] - 46:23
**designed** [2] - 41:1, 41:2
**details** [1] - 77:4
**determine** [4] - 29:13, 29:15, 29:21, 31:1
**devices** [17] - 30:5, 49:3, 49:9, 49:14, 49:15, 49:19, 49:21, 49:22, 49:23, 50:3, 50:13, 74:12, 76:24, 106:24, 107:15, 107:17, 107:20
**diaries** [1] - 49:4
**diary** [2] - 30:6, 106:25
**difference** [6] - 38:16, 55:5, 55:12, 57:4, 69:22, 70:18
**differences** [2] - 7:21, 7:24
**different** [29] - 4:24, 5:9, 7:22, 8:23, 11:24, 21:11, 21:16, 21:17, 21:18, 23:4, 23:5, 23:10, 23:11, 26:2, 37:22, 45:9, 45:10, 46:14, 62:19, 69:9, 71:7, 71:25, 73:14, 76:22, 80:19, 91:12, 94:3
**difficult** [2] - 30:13, 78:5
**difficulty** [1] - 18:11
**direct** [5] - 22:3, 25:2, 26:18, 51:4, 51:7
**directly** [3] - 35:13, 38:5, 95:3
**disagree** [2] - 21:21, 92:3
**discover** [1] - 6:24
**discuss** [4] - 60:25, 61:8, 111:15, 112:12
**discussed** [5] - 27:4, 30:12, 49:17, 49:18, 56:10
**discussing** [2] - 82:1, 87:25
**discussion** [1] - 62:24
**displays** [1] - 100:20
**dispute** [2] - 86:14,

87:21
**dissension** [1] - 63:10
**distance** [1] - 61:18
**distracting** [2] - 64:3, 66:23
**DISTRICT** [4] - 1:1, 1:1, 1:11, 1:15
**District** [3] - 2:2, 2:2, 114:13
**district** [1] - 114:13
**DNS** [4] - 83:7, 103:2, 103:4, 103:19
**doctor's** [1] - 61:13
**document** [5] - 81:23, 82:1, 82:17, 90:21, 90:22
**documents** [3] - 51:6, 86:18, 87:9
**dollars** [14] - 37:14, 42:5, 82:6, 103:7, 108:8, 108:14, 108:17, 108:23, 109:4, 109:15, 110:3, 110:8, 110:19, 110:21
**domain** [5] - 75:24, 83:6, 83:13, 84:1, 84:7
**done** [18] - 7:4, 7:12, 7:14, 8:15, 22:7, 33:16, 34:5, 34:22, 37:17, 39:20, 69:3, 71:22, 71:25, 79:21, 81:7, 97:2, 103:6, 111:22
**doubt** [1] - 15:5
**down** [21] - 18:7, 33:15, 40:17, 44:14, 46:6, 48:2, 50:23, 57:24, 57:25, 58:24, 59:9, 67:12, 69:16, 75:23, 84:19, 96:14, 105:6, 105:15, 108:1, 108:2, 108:5
**dozens** [2] - 27:6
**dramatically** [1] - 28:14
**drawing** [1] - 85:17
**drawn** [1] - 85:12
**drew** [3] - 85:19, 86:2
**drive** [1] - 40:20
**driven** [1] - 57:9
**drives** [3] - 49:4, 50:17
**drugs** [4] - 24:18, 24:19, 80:16, 80:17
**during** [2] - 14:17, 21:23

---

**E**

**E-T-H-E-R** [1] - 39:13
**easier** [4] - 67:18, 68:1, 69:13, 110:7
**easily** [5] - 43:10, 45:20, 71:18, 73:16, 93:19
**easy** [11] - 51:22, 52:1, 52:10, 53:15, 53:23, 55:1, 55:3, 75:12, 109:20, 110:2, 110:7
**ecosystem** [1] - 110:4
**EDWARDS** [2] - 2:1, 114:3
**Edwards** [1] - 114:12
**effect** [2] - 15:15, 47:18
**effective** [2] - 33:6, 33:12
**efforts** [1] - 33:16
**eight** [3] - 65:19, 91:19, 92:3
**Eighth** [1] - 1:25
**either** [9] - 4:23, 13:23, 46:17, 68:24, 76:12, 76:19, 77:2, 95:7, 96:18
**EKELAND** [171] - 1:23, 1:24, 6:6, 6:15, 6:18, 7:3, 9:24, 10:1, 12:1, 13:2, 13:8, 15:2, 15:8, 15:24, 16:2, 16:7, 16:17, 16:20, 18:4, 18:13, 18:14, 19:2, 19:5, 19:14, 19:17, 20:6, 20:12, 20:14, 20:25, 21:2, 21:3, 23:8, 23:12, 23:18, 24:3, 24:10, 25:1, 29:1, 30:17, 30:20, 31:8, 31:9, 31:20, 32:23, 32:25, 33:18, 35:5, 35:23, 36:1, 36:6, 36:8, 37:9, 37:10, 39:14, 41:12, 42:18, 42:22, 44:4, 44:9, 45:2, 45:22, 46:2, 46:6, 46:9, 46:19, 46:24, 47:2, 48:4, 48:6, 50:8, 50:12, 51:1, 51:21, 51:24, 52:12, 52:17, 52:19, 52:22, 52:24, 53:2, 53:6, 55:4, 55:7, 57:13, 57:17, 60:15, 60:18, 60:21, 62:21,

62:23, 63:18, 64:1,
64:6, 64:20, 65:5,
65:25, 66:3, 66:8,
66:13, 67:6, 67:7,
67:10, 67:15, 68:7,
68:9, 68:13, 68:16,
69:16, 69:19, 72:5,
72:6, 72:23, 73:1,
74:17, 74:18, 74:22,
74:24, 75:14, 75:15,
77:8, 77:12, 81:13,
81:17, 81:21, 81:22,
83:21, 84:2, 84:16,
84:21, 85:5, 85:11,
91:11, 92:9, 92:14,
92:18, 92:19, 97:12,
97:16, 97:20, 98:4,
98:15, 98:18, 98:22,
98:23, 99:6, 99:9,
99:10, 99:20, 100:25,
101:6, 101:9, 101:13,
102:22, 104:2, 104:6,
104:8, 104:10, 105:6,
105:8, 105:15,
105:17, 107:3, 107:5,
108:1, 108:4, 109:5,
109:23, 110:1,
110:16, 111:3, 111:5
  **Ekeland** [13] - 3:5,
6:7, 6:13, 28:11, 31:5,
33:4, 33:6, 33:17,
34:21, 35:2, 50:6,
63:17, 104:3
  **elapsed** [1] - 92:4
  **eliminates** [1] -
45:25
  **elsewhere** [1] -
48:24
  **email** [6] - 86:9,
86:13, 86:15, 96:23,
96:24, 105:25
  **embed** [1] - 74:4
  **emergent** [1] - 61:14
  **empirical** [1] - 59:14
  **encrypted** [5] - 49:9,
49:15, 107:14,
107:17, 107:20
  **end** [8] - 14:12,
46:15, 46:17, 70:11,
73:6, 73:8, 88:1
  **ended** [1] - 70:15
  **enforcement** [3] -
70:12, 70:16, 88:2
  **enforcement's** [1] -
32:12
  **engaged** [1] - 19:13
  **engine** [2] - 46:8,
46:16
  **engineers** [1] - 48:25
  **entered** [3] - 4:6,

5:19, 66:15
  **entire** [1] - 81:6
  **entirely** [5] - 91:2,
91:5, 91:13, 102:1,
103:10
  **entirety** [1] - 70:21
  **entity** [5] - 19:18,
25:7, 25:8, 35:19,
85:20
  **entropy** [1] - 14:13
  **error** [30] - 11:4,
11:11, 11:13, 11:14,
12:9, 12:10, 12:13,
12:15, 12:18, 12:19,
13:15, 13:17, 13:23,
13:25, 14:4, 14:7,
14:15, 16:8, 16:21,
16:25, 17:2, 17:10,
17:25, 18:2, 20:7,
56:5, 56:12, 56:13,
56:20
  **errors** [3] - 10:16,
10:18, 10:24
  **ESQ** [5] - 1:14, 1:17,
1:20, 1:23, 1:23
  **essence** [2] - 19:12,
53:13
  **essentially** [1] -
104:12
  **estimate** [1] - 65:25
  **ETH** [4] - 39:3, 39:6,
39:10, 39:11
  **Ether** [1] - 39:12
  **Ethereum** [1] - 39:5
  **European** [1] - 82:2
  **euros** [6] - 37:14,
82:5, 88:16, 88:20,
88:23, 104:19
  **event** [1] - 99:18
  **everywhere** [1] -
30:5
  **evidence** [45] - 4:22,
16:16, 29:23, 30:8,
30:11, 30:15, 30:23,
40:14, 42:19, 49:21,
49:23, 50:3, 50:18,
51:2, 51:4, 59:12,
59:14, 59:24, 60:12,
60:13, 62:18, 66:25,
76:14, 76:20, 77:1,
81:14, 81:17, 82:20,
83:20, 84:3, 84:16,
88:19, 90:4, 90:15,
90:25, 91:24, 95:13,
97:7, 97:13, 97:21,
98:2, 98:13, 101:22,
102:17
  **evidentiary** [1] - 98:6
  **exact** [2] - 47:13,
47:21

**exactly** [5] - 48:11,
55:23, 61:21, 62:1,
109:7
  **examination** [1] -
35:6
  **Examination** [1] -
3:5
  **EXAMINATION** [1] -
6:17
  **examined** [3] - 79:6,
79:10, 79:13
  **example** [12] - 20:3,
28:2, 67:13, 67:17,
68:22, 69:11, 71:15,
73:9, 80:7, 80:10,
80:18, 83:5
  **examples** [1] - 40:1
  **exceptionally** [2] -
14:14, 14:18
  **exchange** [13] - 38:9,
38:10, 38:11, 38:12,
38:13, 43:14, 82:5,
82:6, 89:1, 92:25,
110:8, 110:23, 110:25
  **exchanges** [2] -
38:8, 41:5
  **exchanging** [2] -
38:9, 38:11
  **Excuse** [1] - 45:23
  **excused** [1] - 112:10
  **exhibit** [2] - 85:17,
101:21
  **Exhibit** [4] - 3:9,
42:19, 67:11, 84:17
  **Exhibits** [1] - 81:14
  **exhibits** [3] - 3:11,
91:24, 100:14
  **exited** [2] - 61:4,
112:7
  **expect** [1] - 37:17
  **experience** [7] -
9:18, 17:20, 21:21,
22:10, 22:12, 22:13,
48:20
  **expert** [12] - 12:6,
13:20, 13:21, 18:4,
24:22, 35:13, 80:9,
80:17, 94:22, 98:8,
103:1, 103:2
  **explain** [10] - 27:20,
28:7, 37:11, 38:2,
38:19, 41:16, 86:19,
100:1, 100:6, 109:7
  **explained** [1] - 41:19
  **explaining** [1] - 69:2
  **explicitly** [1] - 87:5
  **explorer** [2] - 100:14,
100:18
  **explorers** [1] - 14:5
  **export** [2] - 59:19,

60:1
  **exposure** [1] - 58:25
  **expressed** [1] -
67:25
  **expressing** [6] -
52:5, 52:8, 53:21,
67:25, 69:6, 75:11
  **extent** [3] - 33:6,
33:11, 34:4
  **external** [4] - 15:12,
36:12, 39:4, 59:14
  **extreme** [1] - 39:21
  **extremely** [4] -
14:21, 17:21, 21:22,
22:10
  **eye** [1] - 65:21
  **eyewitnesses** [2] -
8:5, 81:4

## F

  **fact** [18] - 25:20,
25:22, 26:7, 34:8,
36:21, 52:9, 57:23,
58:4, 58:8, 58:23,
59:8, 66:10, 73:22,
89:21, 96:1, 96:13,
106:24
  **factual** [3] - 26:8,
59:8, 85:25
  **fair** [4] - 8:14, 46:20,
69:5, 82:1
  **fairly** [4] - 20:7, 55:1,
55:3, 79:1
  **false** [18] - 17:3,
17:5, 17:12, 17:13,
17:16, 17:19, 17:23,
18:15, 18:19, 18:20,
18:23, 19:1, 19:7,
19:17, 20:15, 20:18,
20:20
  **familiar** [1] - 36:21
  **far** [9] - 33:15, 48:3,
49:2, 52:21, 65:23,
70:2, 72:11, 104:12,
106:12
  **fast** [1] - 93:24
  **favoring** [1] - 64:4
  **FBI** [2] - 8:12, 36:11
  **February** [5] - 1:7,
74:20, 75:16, 76:16,
114:10
  **fee** [3] - 47:6, 47:15,
93:10
  **fees** [6] - 93:8, 93:9,
104:12, 104:16,
104:19
  **fellow** [1] - 63:11
  **fiat** [6] - 37:3, 37:8,

37:11, 37:13, 37:18,
43:15
  **field** [1] - 9:7
  **fields** [1] - 8:23
  **file** [4] - 59:18,
106:10
  **files** [3] - 56:16,
56:17, 58:22
  **final** [1] - 98:8
  **financial** [2] - 86:22,
87:19
  **fine** [5] - 33:13, 65:8,
66:11, 92:17, 99:9
  **finish** [2] - 66:5, 91:6
  **first** [11] - 46:3,
47:14, 55:6, 55:12,
84:24, 91:13, 91:16,
99:11, 99:12, 100:10,
104:21
  **fit** [1] - 14:16
  **five** [4] - 71:9, 80:22,
82:24, 83:17
  **flipping** [1] - 27:16
  **Floor** [1] - 1:25
  **flow** [11] - 58:8, 58:9,
59:8, 80:19, 80:20,
83:22, 90:23, 90:24,
98:25, 99:2, 104:11
  **flowing** [1] - 23:21
  **focuses** [1] - 28:17
  **fog** [5] - 75:5, 77:18,
77:19, 78:3, 95:2
  **Fog** [50] - 22:3, 22:6,
25:7, 25:10, 26:4,
26:17, 32:6, 32:7,
32:17, 33:5, 33:8,
33:12, 33:21, 34:11,
34:13, 34:19, 36:9,
36:10, 36:13, 36:15,
46:22, 48:14, 49:6,
50:1, 50:5, 51:13,
51:14, 51:15, 51:17,
51:18, 58:25, 72:11,
72:15, 72:18, 74:14,
76:3, 79:1, 79:3, 79:6,
79:10, 79:13, 89:14,
94:2, 94:10, 94:15,
94:18, 94:21, 102:16
  **follow** [1] - 75:3
  **following** [14] - 4:7,
5:20, 32:21, 36:3,
36:10, 61:5, 61:11,
62:7, 66:16, 75:8,
98:25, 104:11, 112:8,
112:16
  **FOR** [4] - 1:1, 1:14,
1:14, 1:23
  **force** [1] - 47:10
  **foregoing** [1] - 114:4
  **forward** [1] - 32:1

**foundation** [1] - 9:22
**four** [5] - 28:4, 28:9, 62:13, 63:20, 101:16
**frankly** [1] - 65:22
**frequency** [2] - 40:22, 41:10
**Friday** [2] - 65:10, 65:12
**front** [5] - 8:16, 46:15, 46:17, 81:7
**full** [2] - 34:4, 114:5
**fund** [2] - 103:10, 103:15
**funding** [2] - 103:12, 103:13
**funds** [59] - 23:20, 24:16, 24:17, 25:9, 25:11, 25:20, 25:23, 26:2, 26:7, 29:22, 32:9, 32:13, 34:12, 34:14, 34:18, 36:13, 36:15, 38:5, 38:11, 38:25, 41:18, 55:2, 57:24, 58:4, 58:8, 58:9, 58:24, 59:8, 59:9, 68:22, 71:6, 72:2, 75:5, 78:24, 80:19, 80:20, 83:2, 83:5, 83:10, 83:11, 83:16, 83:22, 83:24, 84:4, 88:21, 90:23, 90:24, 98:25, 99:2, 102:4, 102:7, 102:14, 103:2, 104:11, 104:17, 108:13
**funds'** [1] - 32:14
**fungibility** [1] - 73:20
**furthermore** [1] - 12:13

### G

**general** [2] - 42:4, 78:22
**generally** [11] - 14:22, 27:14, 29:13, 32:15, 39:20, 39:25, 55:21, 64:16, 72:22, 100:20
**generated** [4] - 14:21, 14:23, 105:4, 109:8
**geographical** [2] - 22:16, 22:18
**get/move** [1] - 75:25
**gift** [1] - 41:20
**given** [4] - 66:10, 78:10, 78:17, 102:13
**glasses** [1] - 85:4

**goods** [1] - 111:1
**GOVERNMENT** [1] - 6:16
**Government** [21] - 4:10, 6:1, 6:11, 35:5, 35:18, 49:10, 49:16, 65:8, 76:14, 79:16, 85:16, 95:6, 95:8, 96:9, 96:11, 96:15, 96:17, 106:3, 107:4, 107:20, 112:21
**government** [9] - 8:22, 8:25, 9:3, 9:19, 37:14, 70:20, 78:24, 79:20, 102:24
**Government's** [17] - 34:25, 35:12, 42:19, 63:2, 65:19, 67:11, 81:14, 84:17, 90:4, 90:5, 95:13, 95:15, 96:19, 97:4, 98:11, 103:23, 103:24
**Gox** [64] - 41:13, 41:16, 41:18, 41:19, 41:22, 42:1, 42:13, 69:23, 70:5, 70:11, 70:15, 70:19, 71:2, 71:12, 82:2, 85:6, 85:13, 85:20, 85:22, 85:24, 85:25, 86:1, 86:3, 86:5, 86:6, 86:17, 87:1, 87:3, 87:7, 87:16, 87:25, 88:1, 88:5, 88:7, 88:14, 88:17, 89:11, 91:9, 99:11, 101:15, 102:23, 103:5, 103:11, 103:15, 104:17, 104:18, 105:1, 105:3, 105:18, 105:19, 105:22, 106:4, 106:18, 106:21, 107:7, 107:8, 107:10, 108:1, 108:5, 108:11, 109:8, 109:14, 110:18
**Gox's** [1] - 87:20
**graph** [3] - 87:10, 91:24, 93:1
**great** [1] - 47:15
**greatly** [1] - 75:7
**group** [1] - 48:22
**grown** [1] - 110:4
**guess** [8] - 4:14, 19:22, 27:12, 57:9, 57:10, 57:15, 62:13, 72:14
**guesses** [1] - 57:20, 58:16, 58:17
**guessing** [5] - 41:10,

57:19, 58:12, 58:17, 102:19
**guys** [1] - 32:25

### H

**half** [2] - 61:22, 61:23
**hallway** [1] - 5:2
**hand** [2] - 40:20, 100:16
**handedly** [1] - 43:3
**handle** [1] - 38:12
**hands** [4] - 70:1, 70:11, 70:15, 88:1
**happy** [3] - 5:7, 66:6, 112:24
**hard** [4] - 18:1, 49:3, 50:16, 85:1
**harder** [6] - 55:14, 55:16, 55:22, 67:3, 68:1, 77:20
**HASSARD** [1] - 1:23
**Hassard** [26] - 6:8, 42:18, 42:20, 44:4, 45:24, 46:7, 46:24, 48:4, 51:21, 53:2, 53:18, 55:4, 67:10, 68:7, 68:13, 69:16, 72:5, 72:23, 74:22, 77:9, 81:13, 84:19, 85:5, 98:25, 100:25, 105:7
**hate** [1] - 61:22
**head** [2] - 51:2, 63:25
**header** [1] - 44:4
**hear** [9] - 8:2, 31:2, 32:23, 32:25, 33:2, 52:17, 66:25, 67:4, 72:13
**heard** [5] - 4:11, 4:19, 20:9, 26:9, 61:12
**hearing** [1] - 35:11
**held** [1] - 32:22
**help** [2] - 47:20, 69:2
**helping** [1] - 45:7
**hereby** [1] - 114:3
**herself** [1] - 48:17
**heuristics** [1] - 22:21
**hide** [1] - 103:2
**high** [1] - 14:13
**higher** [1] - 78:19
**history** [2] - 43:4, 43:12
**honest** [1] - 64:9
**Honor** [66] - 4:9, 4:14, 4:23, 5:4, 5:10,

5:13, 6:2, 6:6, 6:11, 6:15, 7:1, 9:21, 12:25, 13:2, 15:23, 16:17, 18:3, 18:4, 18:25, 20:6, 20:12, 20:23, 23:6, 23:8, 23:16, 23:18, 28:21, 31:4, 31:16, 32:18, 35:5, 35:23, 36:6, 44:15, 46:13, 50:6, 50:8, 52:13, 57:11, 60:15, 61:9, 62:23, 63:2, 63:19, 65:6, 65:9, 67:6, 83:19, 84:10, 92:5, 92:18, 97:8, 97:15, 98:3, 98:15, 99:15, 101:2, 102:20, 103:25, 104:6, 107:2, 109:21, 110:12, 111:3, 112:13, 112:22
**HONORABLE** [1] - 1:11
**hop** [7] - 91:13, 99:11, 99:21, 101:14, 104:21, 104:24, 105:1
**hope** [1] - 104:7
**hops** [2] - 92:9, 105:9
**host** [1] - 76:3
**hoster** [1] - 75:21
**hosting** [13] - 75:22, 76:2, 76:7, 76:8, 76:9, 76:10, 76:12, 76:15, 76:17, 76:18, 76:21, 76:22, 77:2
**hour** [2] - 52:20, 78:11
**hours** [3] - 78:9, 91:19, 92:4
**hypothetical** [2] - 13:20, 80:10
**hypothetically** [2] - 28:16, 42:11

### I

**ID** [1] - 86:25
**idea** [1] - 47:15
**ideal** [2] - 31:13, 31:15
**ideally** [1] - 45:5
**identical** [3] - 7:25, 8:1, 8:3
**identification** [1] - 102:24
**identified** [3] - 83:2, 83:4, 97:6
**identifier** [2] - 41:20, 41:21

**identifies** [1] - 90:16
**identify** [3] - 19:15, 50:4, 90:2
**identifying** [3] - 23:20, 95:11, 96:20
**identities** [1] - 35:24
**illegal** [6] - 23:15, 24:19, 36:23, 37:4, 83:7, 83:14
**illicit** [7] - 23:20, 24:16, 31:22, 32:2, 32:3, 83:2, 83:10
**imagine** [2] - 77:10, 77:17
**immediately** [1] - 90:23
**implement** [1] - 47:16
**implicates** [1] - 35:11
**important** [2] - 31:10, 34:6
**importantly** [1] - 67:21
**impossible** [2] - 15:3, 73:7
**improper** [1] - 64:4
**included** [4] - 10:12, 12:10, 100:9, 100:10
**including** [3] - 50:13, 50:16, 50:18
**incorrect** [1] - 13:11
**increased** [1] - 79:4
**increases** [3] - 56:6, 56:20, 75:7
**independent** [3] - 15:9, 15:17, 15:18
**independently** [1] - 15:19
**INDEX** [1] - 3:1
**indicated** [1] - 61:16
**indirect** [9] - 25:2, 25:6, 25:7, 25:15, 25:20, 26:16, 26:18, 26:19, 58:25
**indiscernible** [2] - 11:20, 50:19
**individual** [1] - 102:3
**individuals** [3] - 38:5, 39:22, 40:10
**information** [34] - 7:22, 22:24, 23:2, 26:13, 27:15, 31:11, 36:13, 51:8, 57:6, 57:7, 57:8, 59:7, 60:9, 61:21, 62:1, 62:9, 77:18, 78:7, 85:25, 86:24, 87:13, 87:14, 89:20, 89:24, 90:2, 90:9, 95:11, 96:7,

96:12, 106:4, 107:7,
107:9, 107:10, 107:13
**ing** [1] - 87:3
**inherently** [3] -
31:22, 32:2, 40:25
**initial** [8] - 10:16,
27:4, 29:7, 33:22,
33:23, 65:19, 72:11,
105:9
**innocent** [1] - 6:25
**input** [11] - 27:25,
31:25, 53:10, 53:14,
53:22, 54:8, 54:12,
54:23, 55:1, 55:2,
69:15
**input/output** [1] -
75:6
**inputs** [2] - 94:3,
94:8
**inquired** [1] - 17:9
**inserting/removing**
[1] - 75:4
**inside** [2] - 79:3,
94:18
**instance** [6] - 17:5,
17:6, 26:15, 86:25,
90:14, 104:22
**instances** [1] - 59:17
**instead** [3] - 38:9,
75:5, 108:18
**Institute** [1] - 8:21
**institutions'** [1] -
86:22
**instruction** [1] - 64:7
**intended** [5] - 11:12,
12:12, 15:12, 26:3,
27:23
**intends** [1] - 33:7
**interest** [1] - 35:23
**interested** [4] - 36:1,
43:7, 43:8, 62:14
**intermediary** [9] -
25:10, 25:13, 25:16,
25:18, 26:1, 26:14,
29:2, 54:20, 54:22
**internal** [2] - 16:25,
39:2
**internet** [2] - 85:14,
111:25
**interpret** [1] - 12:20
**interviewed** [1] - 8:5
**intimated** [1] - 48:19
**invalid** [3] - 14:5,
14:9, 14:12
**investigating** [1] -
78:21
**investigation** [4] -
6:21, 8:15, 35:21,
35:24
**investigations** [5] -

22:14, 33:7, 35:4,
35:8, 35:18
**investigators** [1] -
7:5
**involve** [3] - 39:21,
57:18, 59:25
**involved** [14] - 18:22,
19:19, 35:8, 35:21,
36:23, 46:21, 57:10,
57:16, 68:2, 71:12,
77:1, 83:3, 83:11,
108:13
**involves** [1] - 33:18
**IP** [14] - 43:3, 95:16,
95:17, 95:20, 95:22,
95:24, 96:1, 96:3,
96:6, 96:13, 96:16,
96:21, 96:22, 97:2
**IRS** [1] - 36:12
**issue** [10] - 4:11,
4:19, 18:5, 18:6, 35:6,
35:9, 61:14, 63:7,
65:14, 112:24
**issued** [2] - 8:25, 9:3
**issues** [1] - 8:23
**item** [1] - 65:22
**itself** [1] - 38:9

**J**

**January** [3] - 10:19,
72:8, 72:15
**Japan** [1] - 70:2
**Jeff** [1] - 6:4
**JEFFREY** [1] - 1:20
**joined** [1] - 6:3
**joining** [1] - 6:8
**judge** [1] - 111:21
**JUDGE** [1] - 1:11
**jurisdiction** [3] -
23:15, 24:14, 24:20
**jurisdictional** [2] -
22:20, 22:23
**jurisdictions** [2] -
23:4, 23:11
**Juror** [3] - 61:24,
62:10
**juror** [8] - 62:10,
63:23, 63:24, 64:14,
64:19, 64:21, 64:25,
65:2
**jurors** [14] - 5:2,
61:13, 62:13, 62:16,
62:17, 63:11, 63:20,
63:21, 64:11, 64:12,
64:16, 66:20, 66:23,
67:3
**jury** [14] - 4:2, 4:12,
4:16, 4:23, 5:11, 5:17,

5:19, 5:21, 25:5,
27:20, 28:7, 37:7,
37:11, 37:23, 38:2,
38:19, 41:16, 43:1,
50:7, 50:9, 53:7, 55:9,
57:23, 61:4, 62:8,
62:12, 63:10, 66:15,
66:17, 69:20, 73:2,
75:19, 77:14, 80:6,
81:19, 84:18, 86:19,
92:16, 100:2, 100:6,
100:14, 112:7, 113:2
**JURY** [1] - 1:10
**JUSTICE** [2] - 1:18,
1:20

**K**

**keep** [6] - 44:7,
47:11, 65:2, 65:21,
66:2, 108:21
**keeping** [1] - 66:24
**key** [24] - 29:10,
29:25, 30:4, 39:16,
39:18, 39:22, 39:23,
40:4, 40:16, 40:19,
41:5, 41:6, 73:10,
73:22, 73:24, 74:2,
74:3, 74:10, 90:10,
90:11, 90:12, 90:14,
95:9
**keys** [13] - 29:3,
29:8, 40:9, 46:18,
59:16, 59:17, 59:22,
59:25, 60:4, 74:6,
74:13, 89:17, 95:6
**kind** [10] - 21:24,
37:23, 40:2, 41:20,
59:6, 64:7, 75:21,
79:21, 79:24, 108:16
**kinds** [1] - 59:24
**knowing** [1] - 43:12
**knowledge** [5] - 9:2,
9:9, 78:13, 78:15,
96:11
**known** [1] - 79:23
**knows** [1] - 9:23
**Kolbasa** [1] - 87:9
**kolbasa999@
rambler.ru** [1] - 106:1
**Kraken** [5] - 38:10,
38:23, 38:25, 39:2,
39:3
**kronors** [1] - 37:14
**KYC** [11] - 86:18,
86:20, 86:21, 87:3,
87:8, 87:9, 87:12,
87:14, 102:23,
103:20, 105:22

**KYC'd** [7] - 86:17,
87:11, 87:16, 87:21,
88:5, 88:14, 88:17
**KYC-ing** [1] - 87:3

**L**

**labeled** [1] - 85:24
**lack** [1] - 84:3
**language** [1] - 80:1
**large** [2] - 31:25,
32:1
**largely** [1] - 28:18
**larger** [2] - 37:15,
48:21
**last** [5] - 21:4, 64:24,
97:17, 97:23, 97:24
**late** [2] - 66:11, 111:7
**laughing** [1] - 31:5
**launder** [1] - 37:19
**laundering** [5] -
82:19, 84:9, 86:23,
102:10, 102:12
**law** [4] - 32:12,
69:25, 70:10, 70:12,
70:15, 88:1
**LAW** [1] - 1:24
**laws** [3] - 23:5,
23:11, 24:22
**lawyer** [2] - 83:15,
84:6
**lay** [2] - 9:22, 58:3
**layering** [4] - 82:18,
102:9, 102:12, 108:16
**lead** [2] - 45:19,
59:25
**learn** [1] - 87:7
**least** [3] - 25:13,
47:20, 62:15
**leaving** [1] - 75:5
**ledger** [2] - 39:4,
79:13
**leeway** [1] - 18:7
**left** [1] - 71:16
**legal** [6] - 23:17,
23:18, 24:14, 24:15,
83:12, 84:11
**legality** [1] - 84:7
**legitimate** [3] -
34:10, 34:20, 48:21
**lengths** [1] - 11:24
**less** [4] - 14:16,
43:16, 64:15, 78:22
**letter** [4] - 11:2,
12:22, 13:11, 13:23
**letters** [2] - 12:2,
12:7
**level** [3] - 39:21,
78:19, 79:4

**Liberty** [11] - 43:20,
71:20, 72:2, 82:8,
109:15, 110:19,
110:21, 110:22,
110:25, 111:2
**life** [2] - 80:14, 80:15
**light** [1] - 62:3
**limited** [1] - 15:22
**lined** [2] - 4:13, 5:2
**linguistic** [2] - 79:21,
79:25
**link** [3] - 43:8, 44:21,
44:25
**Lisa** [1] - 114:12
**LISA** [2] - 2:1, 114:3
**list** [1] - 106:9
**listed** [1] - 96:14
**listened** [1] - 98:1
**listening** [1] - 66:21
**listing** [1] - 107:3
**local** [3] - 38:6,
38:12, 38:14
**LocalBitcoins** [1] -
40:14
**log** [2] - 89:3, 96:15
**logically** [1] - 73:15
**logs** [12] - 70:1, 70:8,
70:11, 70:15, 70:19,
88:1, 89:6, 89:8, 96:5,
96:9, 106:4
**look** [4] - 22:25,
72:4, 73:16, 89:3
**looked** [2] - 81:9,
89:6
**looking** [13] - 23:2,
24:12, 35:2, 45:24,
50:9, 57:6, 67:20,
67:23, 73:4, 74:19,
77:9, 95:5, 98:24
**looks** [1] - 84:24
**lose** [1] - 61:22
**lost** [3] - 98:18,
101:10, 101:12
**love** [3] - 60:18,
60:21, 85:9
**lower** [1] - 48:2
**lowest** [1] - 78:9
**LR** [2] - 43:16, 43:19
**Luke** [2] - 61:10,
112:15
**LUKE** [2] - 3:4, 6:16
**lunch** [2] - 66:12,
111:7, 112:18, 113:3

**M**

**ma'am** [4] - 50:25,
86:10, 93:23, 109:1
**machine** [3] - 46:15,

46:17, 46:21
  **manipulations** [1] - 47:19
  **manner** [1] - 82:19
  **manually** [10] - 70:5, 70:6, 71:3, 71:14, 71:21, 71:22, 71:23, 71:25, 72:3
  **marked** [1] - 3:11
  **markets** [4] - 23:21, 24:17, 37:15, 37:16
  **marking** [2] - 91:20, 91:23
  **marks** [1] - 92:15
  **match** [2] - 38:13, 80:1
  **matched** [1] - 22:5
  **material** [2] - 4:16, 4:18
  **math** [1] - 89:8
  **mathematician** [1] - 48:11
  **matter** [5] - 8:6, 47:7, 96:1, 96:13, 106:24
  **Mazars** [2] - 49:8, 49:18
  **mean** [18] - 4:17, 4:24, 31:18, 35:11, 35:14, 37:8, 55:2, 70:11, 71:5, 71:15, 71:22, 72:19, 83:4, 83:9, 83:11, 83:12, 90:4, 103:12
  **meaning** [1] - 58:19
  **means** [6] - 20:21, 25:12, 26:12, 46:15, 54:21, 65:23
  **meant** [1] - 11:12
  **mechanism** [1] - 47:13
  **medical** [2] - 64:24, 65:3
  **meet** [1] - 38:7
  **Mempool** [2] - 100:14, 100:17
  **mentality** [1] - 70:2
  **mention** [1] - 35:19
  **merchant** [1] - 111:2
  **merely** [1] - 50:9
  **messages** [2] - 63:22, 82:15
  **met** [1] - 80:14
  **method** [1] - 40:2
  **methodologies** [3] - 9:12, 9:15, 21:9
  **MICHAEL** [1] - 1:23
  **Michael** [1] - 6:8
  **middle** [1] - 58:2
  **might** [7] - 7:21, 11:10, 12:17, 43:2,

69:14, 76:15, 87:18
  **mind** [1] - 86:12
  **miner** [1] - 93:10
  **miners** [3] - 93:7, 93:9, 104:12
  **mining** [1] - 104:19
  **minor** [1] - 10:24
  **minus** [1] - 104:12
  **minutes** [2] - 101:16, 101:19
  **misheard** [1] - 101:2
  **miss** [1] - 19:12
  **missed** [1] - 20:4
  **misses** [1] - 19:12
  **misstating** [4] - 16:15, 57:11, 83:19, 99:15
  **Misstating** [1] - 31:16
  **mistake** [3] - 12:20, 56:23, 56:24
  **mistakes** [6] - 10:8, 10:9, 10:10, 10:12, 35:1, 35:3
  **misunderstands** [1] - 34:22
  **mixer** [13] - 32:6, 32:7, 32:8, 32:9, 32:12, 32:13, 33:6, 33:12, 33:21, 34:15, 94:15, 94:21
  **mixers** [1] - 36:19
  **mixing** [4] - 32:12, 79:3, 94:4
  **moment** [2] - 45:23, 64:6
  **Monday** [15] - 61:13, 61:16, 64:22, 64:25, 65:1, 111:8, 111:11, 112:3, 112:4, 112:11, 113:1, 113:2, 113:3
  **money** [27] - 9:19, 28:1, 29:19, 37:3, 37:8, 37:12, 37:19, 43:10, 45:7, 47:11, 53:9, 54:11, 59:11, 67:18, 70:5, 71:2, 73:11, 81:11, 82:2, 82:19, 84:9, 86:22, 90:21, 90:22, 102:10, 102:12, 110:2
  **money-laundering** [2] - 102:10, 102:12
  **month** [1] - 72:12
  **months** [2] - 72:14, 72:16
  **morning** [9] - 6:2, 6:5, 6:6, 6:9, 6:19, 6:20, 30:23, 52:14, 60:23

**MOSS** [1] - 1:11
  **most** [7] - 8:14, 21:19, 29:13, 30:12, 78:19, 97:25
  **move** [22] - 9:24, 13:5, 15:1, 15:7, 18:13, 20:8, 21:2, 24:7, 24:23, 26:3, 36:2, 41:18, 44:3, 45:22, 51:10, 52:12, 53:18, 75:14, 98:16, 99:19, 111:10
  **moved** [10] - 25:10, 25:21, 25:23, 26:7, 57:24, 57:25, 58:4, 58:24, 59:9, 103:8
  **moving** [16] - 25:11, 66:2, 73:24, 74:16, 76:2, 76:7, 76:9, 76:12, 76:17, 77:1, 92:9, 102:4, 102:14, 104:2, 104:8, 107:25
  **MR** [176] - 4:3, 4:9, 4:14, 4:22, 5:4, 5:9, 6:6, 6:15, 6:18, 7:3, 9:24, 10:1, 12:1, 13:2, 13:8, 15:2, 15:8, 15:24, 16:2, 16:7, 16:17, 16:20, 18:4, 18:13, 18:14, 19:2, 19:5, 19:14, 19:17, 20:6, 20:12, 20:14, 20:25, 21:2, 21:3, 23:8, 23:12, 23:18, 24:3, 24:10, 25:1, 29:1, 30:17, 30:20, 31:8, 31:9, 31:20, 32:23, 32:25, 33:1, 33:18, 35:5, 35:23, 36:1, 36:6, 36:8, 37:9, 37:10, 39:14, 41:12, 42:18, 42:22, 44:4, 44:9, 45:2, 45:22, 46:2, 46:6, 46:9, 46:19, 46:24, 47:2, 48:4, 48:6, 50:8, 50:12, 51:1, 51:21, 51:24, 52:12, 52:17, 52:19, 52:22, 52:24, 53:2, 53:6, 55:4, 55:7, 57:13, 57:17, 60:15, 60:18, 60:21, 62:21, 62:23, 63:18, 64:1, 64:6, 64:20, 65:5, 65:25, 66:3, 66:8, 66:13, 67:6, 67:7, 67:10, 67:15, 68:7, 68:9, 68:13, 68:16, 69:16, 69:19, 72:5, 72:6, 72:23, 73:1,

74:17, 74:18, 74:22, 74:24, 75:14, 75:15, 77:8, 77:12, 81:13, 81:17, 81:21, 81:22, 83:21, 84:2, 84:16, 84:21, 85:5, 85:11, 91:11, 92:9, 92:14, 92:18, 92:19, 97:12, 97:16, 97:20, 98:4, 98:15, 98:18, 98:22, 98:23, 99:6, 99:9, 99:10, 99:20, 100:25, 101:6, 101:9, 101:13, 102:22, 104:2, 104:6, 104:8, 104:10, 105:6, 105:8, 105:15, 105:17, 107:3, 107:5, 108:1, 108:4, 109:5, 109:23, 110:1, 110:16, 111:3, 111:5
  **MS** [45] - 5:13, 6:2, 6:11, 7:1, 9:21, 12:25, 15:23, 16:1, 16:15, 18:3, 18:6, 18:25, 20:23, 23:6, 23:16, 28:21, 28:23, 31:4, 31:16, 32:18, 33:3, 34:21, 37:5, 50:6, 57:11, 63:2, 63:6, 65:8, 65:18, 83:19, 84:10, 84:13, 92:5, 97:8, 97:15, 98:3, 99:5, 99:15, 101:2, 102:20, 103:25, 107:2, 109:21, 110:12, 112:21
  **Mt** [64] - 41:13, 41:16, 41:19, 41:22, 42:1, 42:13, 69:23, 70:5, 70:11, 70:15, 70:19, 71:2, 71:12, 82:2, 85:6, 85:13, 85:20, 85:22, 85:24, 85:25, 86:1, 86:3, 86:5, 86:6, 86:17, 87:1, 87:3, 87:7, 87:16, 87:20, 87:25, 88:1, 88:5, 88:7, 88:14, 88:17, 89:11, 91:9, 99:11, 101:15, 102:23, 103:5, 103:11, 103:15, 104:17, 104:18, 105:1, 105:3, 105:18, 105:19, 105:22, 106:4, 106:18, 106:21, 107:7, 107:8, 107:10, 108:1, 108:5, 108:11, 109:8, 109:14, 110:18
  **multi** [1] - 54:16

  **multi-output** [1] - 54:16
  **multiple** [10] - 22:14, 28:17, 45:8, 45:10, 68:19, 90:20, 90:21, 102:13, 108:8, 108:10
  **must** [1] - 69:1
  **Mycelium** [13] - 27:7, 27:9, 28:18, 29:6, 56:10, 56:15, 56:16, 56:17, 58:22, 59:18, 59:21, 60:9, 60:10

## N

  **name** [10] - 6:1, 9:10, 9:14, 35:20, 39:12, 77:6, 83:6, 84:1, 84:7, 86:7
  **names** [2] - 4:21, 35:24
  **National** [1] - 8:21
  **native** [1] - 96:15
  **nature** [1] - 97:19
  **necessarily** [6] - 14:12, 26:3, 32:4, 32:5, 95:9, 99:1
  **necessary** [1] - 65:15
  **need** [16] - 4:1, 4:12, 5:6, 29:9, 35:10, 43:14, 50:23, 59:6, 59:14, 85:4, 92:15, 94:7, 95:9, 96:5, 104:3, 113:7
  **needs** [1] - 65:4
  **negative** [7] - 18:20, 19:1, 19:7, 19:17, 19:20, 20:21
  **negatives** [3] - 18:19, 20:16, 20:18
  **network** [9] - 38:25, 41:1, 41:2, 41:3, 43:2, 43:11, 43:17, 77:21, 95:24
  **never** [9] - 15:9, 41:8, 45:5, 52:2, 69:24, 74:9, 80:14, 102:16
  **nevertheless** [1] - 45:1
  **New** [2] - 1:21, 1:25
  **new** [3] - 77:21, 85:4, 100:11
  **Newark** [1] - 8:12
  **news** [1] - 75:20
  **next** [14] - 44:17, 45:3, 46:25, 47:3, 63:7, 65:10, 65:12,

77:23, 91:7, 91:16, 92:20, 99:19, 101:14, 105:1
**nice** [2] - 112:2, 113:8
**nine** [1] - 55:12
**no-brainer** [3] - 47:1, 47:4, 47:7
**nobody** [1] - 44:23
**nontraceable** [2] - 103:5, 103:11
**normal** [2] - 31:24, 108:10
**Northwest** [5] - 1:15, 1:18, 1:21, 2:3, 114:14
**notes** [6] - 30:6, 49:4, 80:3, 81:10, 106:25, 114:5
**nothing** [6] - 23:23, 34:1, 34:9, 35:15, 51:5, 112:21
**notice** [1] - 63:15
**noticed** [3] - 63:12, 63:14, 63:16
**November** [9] - 46:3, 46:5, 52:25, 68:10, 71:10, 72:21, 80:24, 82:25, 83:18
**NSF** [2] - 87:9, 103:8
**number** [9] - 12:23, 13:11, 13:23, 14:19, 34:7, 43:15, 65:22, 100:18, 100:20
**numbers** [3] - 12:4, 14:24, 21:25
**numerous** [2] - 56:1, 82:15

**O**

**object** [3] - 33:9, 92:5, 98:15
**objecting** [1] - 24:3
**objection** [30] - 7:1, 9:21, 15:23, 16:15, 18:3, 18:25, 20:23, 23:6, 23:16, 24:1, 24:2, 24:5, 28:21, 31:4, 31:16, 32:18, 35:19, 37:5, 57:11, 65:5, 83:19, 84:10, 92:13, 97:15, 98:3, 99:15, 101:9, 102:20, 103:25, 109:21
**obligations** [1] - 86:23
**obscurity** [2] - 75:8, 78:11

**observed** [1] - 90:24
**obtain** [1] - 96:7
**obtained** [1] - 70:20
**obvious** [1] - 44:22
**obviously** [1] - 55:14
**occur** [2] - 85:13, 85:15
**occurred** [1] - 23:1
**occurrence** [1] - 40:4
**occurrences** [1] - 40:23
**October** [12] - 43:22, 45:14, 71:10, 72:14, 72:21, 80:23, 82:25, 83:17, 84:25, 105:10, 105:19
**OF** [6] - 1:1, 1:3, 1:10, 1:15, 1:18, 1:20
**off-chain** [10] - 38:17, 39:7, 39:15, 40:4, 40:23, 42:9, 73:22, 73:23, 73:25, 74:2
**offered** [2] - 98:8, 109:18
**office** [1] - 8:12
**OFFICE** [1] - 1:14
**official** [2] - 69:23, 114:12
**Official** [1] - 2:1
**offshore** [1] - 70:2
**often** [3] - 21:16, 21:18, 48:20
**Omedetou** [36] - 42:17, 43:18, 47:24, 48:13, 48:17, 48:23, 52:4, 53:13, 53:21, 54:17, 55:16, 67:24, 73:19, 75:11, 76:1, 78:12, 78:22, 79:19, 79:22, 87:24, 88:4, 88:8, 88:10, 88:14, 93:18, 93:21, 94:6, 94:7, 94:14, 94:23, 95:1, 96:21, 96:25, 97:9, 98:5, 103:18
**Omedetou's** [2] - 80:2, 88:17
**omitted** [1] - 4:16
**on-chain** [5] - 38:16, 38:19, 38:21, 74:2, 74:4
**once** [6] - 13:4, 43:7, 47:13, 67:1, 69:5, 75:10
**one** [80] - 9:10, 9:14, 11:2, 12:7, 13:11, 13:23, 21:10, 21:19, 21:20, 24:6, 25:7,

25:8, 25:10, 25:13, 25:21, 26:1, 26:4, 27:23, 28:5, 33:23, 39:15, 39:24, 39:25, 40:16, 40:21, 41:4, 41:5, 41:16, 41:23, 42:7, 43:9, 45:11, 45:23, 46:7, 46:21, 51:10, 53:3, 53:10, 53:14, 53:22, 54:8, 54:11, 54:12, 54:18, 54:19, 54:20, 54:22, 54:23, 54:24, 54:25, 55:1, 55:13, 55:14, 58:5, 58:6, 61:12, 63:18, 63:22, 64:4, 65:22, 71:18, 76:19, 79:5, 82:20, 83:5, 85:20, 87:25, 92:20, 96:7, 100:9, 103:14, 109:13, 109:18, 110:6, 110:17
**one's** [1] - 42:5
**ones** [4] - 67:19, 67:23, 75:8
**ongoing** [1] - 33:8
**Onion** [3] - 76:9, 76:13, 77:2
**open** [1] - 36:4
**operate** [2] - 41:1, 41:2
**operating** [4] - 46:21, 50:1, 51:12, 51:17
**opinion** [10] - 10:11, 12:7, 13:20, 23:22, 80:9, 80:17, 94:22, 98:4, 98:6, 103:1
**opportunities** [2] - 56:22, 56:24
**opportunity** [1] - 56:11
**opposed** [1] - 37:12
**opposite** [2] - 18:23, 38:15
**optional** [1] - 87:4
**optionally** [1] - 45:9
**orange** [1] - 92:21
**Orange** [2] - 77:3, 77:5
**order** [5] - 5:22, 25:15, 59:4, 59:5, 66:18
**organizations** [1] - 48:20
**original** [2] - 32:14, 34:12
**otherwise** [2] - 93:14, 111:25
**outcome** [2] - 10:11,

10:24
**output** [16] - 27:23, 28:4, 28:5, 53:10, 53:14, 53:22, 54:8, 54:12, 54:16, 54:19, 54:24, 55:1, 55:3, 68:23, 69:14, 79:2
**outputs** [7] - 27:23, 55:13, 55:17, 55:22, 56:1, 94:3, 94:8
**outside** [2] - 4:13, 94:15
**outsider** [1] - 73:15
**own** [2] - 73:4, 73:8
**owners** [1] - 69:23

**P**

**P-save** [1] - 106:10
**p.m** [1] - 112:8
**page** [4] - 43:9, 46:25, 48:3, 69:3
**PAGE** [1] - 3:3
**paid** [3] - 93:9, 103:18, 104:12
**pairs** [1] - 75:7
**paper** [4] - 9:10, 9:14, 21:8, 40:17
**paragraph** [16] - 42:21, 44:6, 44:11, 45:4, 46:10, 47:4, 47:5, 69:17, 69:20, 71:1, 72:24, 74:25, 75:19, 76:6, 77:15, 77:23
**paragraphs** [1] - 43:1
**part** [5] - 25:18, 26:8, 49:19, 81:9, 83:13
**particular** [12] - 4:21, 18:22, 19:25, 23:1, 23:14, 23:15, 24:14, 53:22, 67:13, 67:17, 70:19, 101:4
**particularly** [2] - 87:25, 113:6
**parties** [1] - 43:7
**partitions** [1] - 107:22
**passed** [1] - 91:19
**passes** [1] - 6:12
**password** [4] - 106:9, 106:13, 106:18, 106:21
**passwords** [3] - 106:11, 106:15, 106:16
**path** [8] - 25:6, 25:7, 25:9, 26:3, 26:14,

26:16, 26:18, 26:19
**paths** [2] - 25:3, 28:17
**pattern** [2] - 90:19, 102:13
**patterns** [2] - 79:22, 80:1
**pay** [4] - 29:18, 70:5, 71:3, 110:25
**payment** [9] - 27:2, 27:23, 28:9, 28:10, 58:5, 58:21, 102:4, 103:4
**payments** [4] - 32:1, 45:13, 77:3, 77:5
**payouts** [1] - 45:8
**pays** [1] - 41:4
**PEARLMAN** [1] - 1:20
**Pearlman** [1] - 6:4
**peel** [29] - 26:15, 26:16, 26:18, 26:20, 27:3, 27:6, 27:8, 27:12, 27:18, 27:21, 29:2, 31:21, 31:23, 32:2, 56:1, 56:6, 56:7, 56:9, 56:10, 56:14, 56:21, 57:24, 58:2, 58:3, 58:24, 59:1, 59:9, 60:8
**peer** [17] - 9:10, 9:14, 21:8, 37:25, 38:3, 38:4, 38:6, 38:13, 40:10, 41:6
**peer-reviewed** [3] - 9:10, 9:14, 21:8
**peer-to-peer** [7] - 37:25, 38:3, 38:4, 38:6, 38:13, 40:10, 41:6
**PELKER** [46] - 1:17, 5:13, 6:2, 6:11, 7:1, 9:21, 12:25, 15:23, 16:1, 16:15, 18:3, 18:6, 18:25, 20:23, 23:6, 23:16, 28:21, 28:23, 31:4, 31:16, 32:18, 33:3, 34:21, 37:5, 50:6, 57:11, 63:2, 63:6, 65:8, 65:18, 83:19, 84:10, 84:13, 92:5, 97:8, 97:15, 98:3, 99:5, 99:15, 101:2, 102:20, 103:25, 107:2, 109:21, 110:12, 112:21
**Pelker** [2] - 6:3, 6:10
**Pennsylvania** [1] - 1:18

**people** [12] - 37:19, 40:25, 42:9, 44:20, 45:19, 48:22, 65:16, 110:7, 110:18, 110:21, 111:15, 112:18
**per** [1] - 78:10
**percent** [8] - 10:3, 10:6, 10:8, 22:5, 30:1, 30:7, 36:18, 36:22
**perhaps** [3] - 18:10, 18:11, 19:4
**period** [1] - 78:9
**persisting** [1] - 70:8
**person** [7] - 41:5, 42:10, 54:15, 62:2, 99:24, 102:2, 102:8
**personal** [2] - 64:15, 106:13
**perspective** [1] - 76:17
**phone** [2] - 32:19, 64:24
**photo** [1] - 86:25
**photos** [1] - 102:24
**phrase** [1] - 29:6
**phrased** [1] - 20:2
**pick** [1] - 32:18
**piece** [1] - 40:17
**pieces** [3] - 54:7, 82:20, 98:2
**place** [1] - 64:16
**Plaintiff** [1] - 1:4
**PLAINTIFF** [1] - 1:14
**planning** [1] - 111:8
**plasma@ plasmadivision** [2] - 86:8, 86:13
**plasmadivision** [1] - 102:14
**platform** [2] - 38:6, 38:8
**platforms** [4] - 21:12, 21:16, 21:18, 21:21
**plausible** [1] - 44:23
**plenty** [1] - 29:14
**PLLC** [1] - 1:24
**pneumonic** [1] - 29:6
**podium** [1] - 5:25
**point** [16] - 4:18, 13:1, 43:14, 49:7, 56:14, 60:4, 63:3, 64:18, 74:6, 88:21, 90:16, 95:23, 97:13, 97:21, 107:12, 112:23
**pointing** [1] - 92:16
**policies** [1] - 87:20
**portion** [1] - 35:10
**portions** [4] - 49:9,

49:15, 107:14, 107:17
**pose** [1] - 65:16
**position** [1] - 65:3
**positive** [6] - 17:5, 17:14, 17:17, 17:19, 17:24, 18:23
**positives** [3] - 17:3, 17:12, 18:16
**possession** [2] - 73:17, 96:18
**possibilities** [1] - 14:11
**possibility** [2] - 33:20, 65:10
**possible** [17] - 21:20, 26:1, 39:20, 42:15, 43:13, 47:9, 66:9, 66:24, 74:4, 76:11, 76:19, 77:22, 84:20, 91:8, 91:15, 103:6, 103:10
**post** [22] - 42:20, 43:22, 43:25, 44:3, 44:7, 45:22, 46:3, 47:14, 51:20, 52:12, 52:25, 55:4, 67:12, 68:6, 68:10, 68:14, 72:4, 72:7, 74:16, 75:14, 77:8
**posts** [6] - 48:24, 72:17, 79:19, 79:22, 80:2, 87:24
**potential** [2] - 56:5, 56:20
**potentially** [1] - 104:20
**powers** [2] - 48:8, 48:10
**practice** [1] - 82:11
**precise** [1] - 28:1
**prepared** [1] - 113:7
**present** [8] - 4:18, 4:22, 5:21, 6:7, 35:22, 66:17, 98:11, 98:13
**presented** [1] - 15:15
**presenting** [1] - 97:5
**pretrial** [1] - 10:19
**pretty** [3] - 44:22, 51:22, 52:1
**preview** [1] - 33:14
**previous** [2] - 7:4, 10:9
**previously** [2] - 15:14, 81:23
**PREVIOUSLY** [1] - 6:16
**primarily** [1] - 59:2
**primary** [1] - 24:17
**principles** [1] - 94:15
**privacy** [1] - 36:19

**private** [38] - 29:3, 29:8, 29:9, 29:25, 30:4, 39:16, 39:18, 39:22, 39:23, 40:4, 40:9, 40:16, 40:19, 40:23, 41:5, 41:6, 46:18, 59:16, 59:17, 59:21, 59:25, 60:4, 73:10, 73:22, 73:24, 74:2, 74:3, 74:6, 74:10, 74:13, 89:17, 90:10, 90:11, 90:12, 90:14, 95:6, 95:9
**privately** [2] - 63:5, 63:6
**probability** [1] - 14:19
**probe** [1] - 33:7
**probing** [2] - 35:7, 36:1
**problem** [6] - 19:22, 35:22, 64:18, 64:19, 69:25, 70:10
**problems** [1] - 47:16
**proceed** [4] - 6:13, 36:6, 50:10, 67:5
**proceedings** [11] - 4:7, 5:20, 36:3, 61:5, 61:11, 62:7, 66:16, 112:8, 112:16, 113:9, 114:6
**process** [3] - 65:17, 82:15, 90:24
**produced** [1] - 114:6
**product** [1] - 24:18
**programs** [1] - 86:23
**proposition** [1] - 19:20
**provably** [1] - 25:11
**prove** [3] - 31:14, 44:24, 78:5
**proved** [3] - 27:5, 27:10, 56:17
**provide** [5] - 15:19, 17:9, 40:5, 41:21, 68:19
**provided** [10] - 49:21, 49:23, 50:4, 50:19, 51:6, 51:9, 86:18, 86:25, 107:13, 110:17
**provided..** [1] - 50:21
**provider** [1] - 64:24
**providers** [1] - 76:23
**proximity** [1] - 94:1
**public** [3] - 93:25, 94:17, 94:24
**publicly** [2] - 43:5, 93:21
**publish** [2] - 81:19,

84:17
**pulled** [1] - 101:21
**purchase** [1] - 83:25
**purchased** [2] - 83:5, 89:7
**purchasing** [2] - 84:7, 102:5
**purely** [2] - 15:22, 22:12
**purpose** [1] - 41:3
**purposes** [1] - 111:8
**put** [6] - 11:12, 40:20, 47:21, 52:3, 73:9, 91:17
**putting** [2] - 81:11, 90:21
**putting-money** [1] - 90:21

## Q

**qualified** [1] - 13:21
**qualify** [1] - 17:20
**quantify** [3] - 17:19, 17:23, 18:1
**questions** [8] - 6:10, 8:18, 35:16, 35:17, 37:21, 42:16, 50:11, 104:4
**quick** [1] - 53:5
**quiet** [1] - 66:24
**quite** [3] - 62:9, 65:22, 108:24
**quote** [16] - 45:24, 46:20, 51:21, 53:3, 53:16, 54:4, 54:14, 54:16, 67:13, 67:16, 68:17, 73:4, 73:6, 73:7, 73:8
**quotes** [2] - 42:17, 46:7

## R

**raise** [2] - 18:6, 112:20
**raised** [2] - 18:5, 35:6
**raises** [2] - 34:10, 35:18
**RANDOLPH** [1] - 1:11
**random** [2] - 14:23, 94:10
**randomized** [4] - 45:8, 71:14, 72:3
**randomizing** [6] - 47:5, 47:15, 70:6, 71:4, 71:21, 71:23

**randomly** [1] - 14:22
**rate** [22] - 16:8, 16:21, 16:25, 17:3, 17:14, 17:17, 17:19, 17:24, 17:25, 18:1, 18:2, 18:15, 18:19, 19:7, 20:15, 20:18, 22:8, 27:17, 56:20, 78:10, 89:1
**rates** [2] - 17:2, 17:10
**rather** [5] - 24:1, 24:5, 97:11, 98:12
**RDR** [3] - 2:1, 114:3, 114:12
**reaction** [1] - 33:22
**Reactor** [9] - 9:5, 9:16, 16:22, 20:19, 20:21, 21:12, 22:1, 23:20, 23:23
**Reactor's** [5] - 18:15, 21:9, 22:8, 22:15, 24:13
**read** [22] - 36:25, 42:25, 44:10, 45:3, 46:10, 47:3, 48:8, 51:25, 53:7, 54:4, 55:8, 67:16, 68:17, 69:20, 72:19, 73:2, 74:25, 75:19, 77:13, 77:23, 91:20, 101:11
**readily** [1] - 86:13
**reading** [2] - 72:17, 85:1
**ready** [5] - 6:14, 6:19, 36:5, 67:8, 67:9
**real** [3] - 20:8, 43:13, 53:4
**realize** [1] - 14:6
**really** [6] - 68:25, 95:23, 96:21, 98:12, 104:3, 112:2
**reason** [7] - 52:8, 65:11, 91:10, 92:3, 92:21, 92:23, 93:7
**reasonable** [1] - 15:5
**reasons** [2] - 34:7, 36:19
**Received** [1] - 3:9
**received** [2] - 29:6, 62:12
**receives** [1] - 31:24
**recently** [1] - 102:15
**recess** [1] - 62:6
**recipient** [1] - 68:19
**recommend** [1] - 47:12
**record** [5] - 6:1, 62:24, 72:19, 96:1, 96:3

**recorded** [7] - 38:22, 39:17, 40:7, 40:10, 40:12, 43:4, 74:6
**red** [3] - 85:12, 85:15, 85:16
**redeem** [8] - 41:22, 41:23, 41:24, 42:13, 108:12, 108:21, 109:2, 109:3
**redeemed** [3] - 105:19, 108:6, 108:7
**redeeming** [4] - 41:24, 108:11, 108:20, 109:2
**redemption** [13] - 41:13, 41:17, 41:18, 42:1, 42:9, 42:13, 103:13, 105:3, 105:18, 109:8, 109:10, 109:14, 110:18
**refer** [1] - 35:20
**reference** [5] - 51:14, 51:15, 51:16, 51:18, 54:9
**references** [1] - 49:1
**referring** [9] - 28:11, 39:12, 40:13, 42:17, 43:19, 55:23, 59:16, 76:10, 76:12
**reflects** [1] - 74:9
**refrain** [1] - 62:17
**regarding** [1] - 50:5
**regards** [1] - 70:9
**registration** [4] - 83:8, 103:3, 103:4, 103:19
**regularly** [1] - 37:19
**regulates** [1] - 9:7
**reinforce** [1] - 67:1
**related** [15] - 8:6, 9:1, 26:3, 34:1, 40:3, 76:21, 84:4, 87:18, 88:20, 89:20, 96:5, 96:9, 106:4, 107:7, 112:1
**relates** [1] - 86:22
**relating** [2] - 35:17, 111:25
**relation** [8] - 16:9, 18:18, 19:8, 36:16, 56:5, 72:10, 81:3, 82:24
**relatively** [1] - 43:25
**relevance** [1] - 37:5
**relevant** [3] - 33:9, 35:13, 94:24
**reliable** [3] - 17:21, 21:22, 22:11
**relied** [1] - 21:23

**relying** [1] - 60:6
**remember** [5] - 65:12, 77:4, 80:6, 101:18, 101:23
**remembering** [1] - 100:17
**remind** [5] - 25:5, 60:25, 86:19, 111:14, 112:11
**remove** [3] - 64:18, 91:22, 92:14
**repeat** [2] - 13:6, 24:8, 48:15, 53:19, 58:7
**repeatedly** [1] - 23:19
**rephrase** [4] - 18:10, 18:12, 19:4, 110:10
**Report** [1] - 37:1
**report** [7] - 12:9, 12:16, 12:18, 13:16, 13:17, 13:18, 56:11
**REPORTED** [1] - 2:1
**reporter** [1] - 112:19
**Reporter** [2] - 2:1, 114:12
**REPORTER** [6] - 11:21, 30:16, 39:9, 50:21, 50:23, 108:24
**represent** [1] - 7:22
**representation** [1] - 60:6
**require** [1] - 90:12
**required** [2] - 59:12, 59:13
**requires** [2] - 40:24, 61:15
**research** [2] - 61:1, 111:24
**researchers** [1] - 43:8
**Reserve** [10] - 43:21, 71:20, 72:2, 82:9, 109:15, 110:19, 110:21, 110:22, 110:25, 111:2
**resolves** [1] - 63:6
**respect** [3] - 72:25, 73:3, 98:13
**responding** [4] - 24:1, 24:5, 54:15, 55:18
**response** [1] - 110:9
**result** [4] - 12:14, 12:16, 12:19, 14:15
**results** [1] - 28:15
**retake** [1] - 5:15
**retakes** [2] - 5:16, 63:1
**retired** [2] - 61:10,

112:15
**returns** [1] - 17:11
**reveal** [1] - 69:14
**revealing** [1] - 43:3
**review** [11] - 7:8, 49:13, 49:22, 49:23, 50:2, 50:4, 51:3, 53:16, 55:18, 74:12, 76:24
**reviewed** [18] - 9:10, 9:14, 16:11, 21:8, 27:7, 30:9, 49:7, 49:19, 50:18, 51:11, 76:25, 87:25, 106:9, 107:9, 107:12, 107:13, 107:15, 107:21
**reviewing** [1] - 55:23
**right-hand** [1] - 100:16
**rise** [5] - 5:18, 61:3, 62:5, 66:14, 112:6
**Road** [1] - 106:13
**role** [1] - 80:5
**Roman** [2] - 5:24, 6:7
**ROMAN** [1] - 1:6
**Romania** [1] - 8:10
**Room** [1] - 2:3
**roughly** [1] - 105:13
**Rule** [2] - 4:11, 4:19
**run** [2] - 46:14, 46:16
**running** [3] - 48:14, 52:23, 83:13

## S

**sale** [2] - 37:22, 102:2
**sales** [1] - 37:22
**save** [2] - 106:4, 106:10
**saw** [6] - 7:10, 7:15, 7:17, 29:25, 89:21, 107:7
**schedule** [1] - 111:12
**scheduled** [1] - 61:15
**scheduling** [1] - 65:14
**scheme** [1] - 102:10
**SCHOLL** [2] - 3:4, 6:16
**Scholl** [31] - 6:19, 20:15, 33:7, 33:16, 33:21, 34:23, 35:1, 35:7, 36:9, 37:11, 42:23, 44:10, 46:4, 46:10, 47:3, 48:7,

51:25, 53:7, 55:8, 61:10, 67:8, 67:16, 68:11, 68:17, 69:20, 72:7, 77:13, 84:22, 92:10, 107:6, 112:15
**Science** [1] - 8:22
**scientific** [5] - 9:7, 9:10, 9:14, 21:7, 21:25
**scientist** [1] - 49:8
**scope** [3] - 23:7, 35:12, 98:9
**screen** [7] - 51:23, 68:15, 81:15, 85:8, 91:20, 92:6, 98:18
**scroll** [7] - 42:20, 69:16, 69:18, 84:19, 105:6, 105:15, 108:2
**scrolling** [2] - 46:6, 67:12
**seal** [1] - 35:11
**search** [2] - 46:24, 107:1
**searched** [3] - 30:5, 82:14, 107:4
**seated** [4] - 5:22, 61:6, 66:18, 112:9
**second** [6] - 42:21, 55:13, 65:13, 99:21, 104:24
**secret** [1] - 35:8
**section** [2] - 46:1, 73:5
**see** [41] - 9:22, 14:22, 34:17, 39:1, 42:23, 42:24, 42:25, 47:19, 48:7, 49:25, 51:11, 51:14, 51:15, 51:16, 51:18, 61:1, 61:25, 62:4, 63:6, 63:15, 64:17, 64:19, 66:10, 75:2, 77:1, 79:25, 81:21, 85:7, 87:11, 88:16, 89:22, 93:2, 93:5, 93:23, 93:25, 100:18, 101:8, 107:9, 109:24, 112:3, 112:11
**seed** [1] - 29:6
**seeking** [1] - 34:3
**sees** [1] - 78:2
**seized** [2] - 106:25, 107:4
**selected** [1] - 72:1
**sellers** [1] - 38:7
**selling** [6] - 82:5, 91:3, 91:9, 91:14, 99:13, 99:23
**send** [2] - 28:4, 29:20

**sender** [2] - 93:9, 93:11
**sending** [2] - 29:22, 32:1
**Sendmany** [1] - 54:16
**sends** [2] - 32:8, 89:11
**sense** [4] - 18:23, 52:21, 87:5, 94:19
**sensitive** [2] - 33:7, 33:10
**sent** [8] - 29:19, 38:25, 63:22, 72:2, 89:21, 92:23, 102:7, 109:10
**sentence** [8] - 46:7, 46:25, 48:7, 48:9, 51:25, 55:5, 70:9, 77:9
**separate** [5] - 108:12, 108:20, 108:22, 109:2, 109:4
**server** [3] - 96:5, 96:9, 96:15
**servers** [5] - 44:24, 79:6, 79:7, 79:8, 96:5
**service** [11] - 25:18, 26:2, 43:16, 46:14, 47:12, 68:23, 70:7, 79:7, 92:25, 94:4, 94:5
**services** [4] - 40:1, 109:18, 110:17, 111:1
**set** [2] - 15:22, 15:25
**sets** [1] - 7:7
**shifting** [1] - 19:24
**shifts** [1] - 19:24
**shop** [1] - 80:10
**shormint@hotmail. com** [1] - 96:24
**shortly** [2] - 61:2, 102:16
**shot** [1] - 101:5
**show** [4] - 14:5, 14:9, 14:10, 75:7
**showed** [2] - 89:6, 100:13
**showing** [1] - 47:24
**shows** [1] - 98:14
**shut** [1] - 75:23
**sic** [1] - 30:14
**side** [3] - 32:10, 62:11, 64:5
**signatures** [1] - 74:8
**significantly** [1] - 110:4
**signify** [2] - 85:19, 86:4
**Silk** [1] - 106:13

**similar** [13] - 7:14, 7:20, 43:16, 45:18, 71:17, 75:4, 75:7, 75:11, 80:9, 90:20, 93:14, 93:17
**simple** [3] - 13:10, 20:8, 78:6
**simply** [4] - 33:9, 33:11, 63:12, 102:18
**single** [8] - 13:16, 14:14, 21:7, 43:3, 49:2, 54:22, 94:17, 95:24
**single-handedly** [1] - 43:3
**sit** [5] - 17:13, 17:16, 37:2, 65:12, 111:9
**site** [14] - 75:23, 75:25, 76:3, 76:4, 76:9, 76:12, 76:13, 76:15, 76:21, 77:2, 103:3, 103:19
**sitting** [2] - 8:16, 65:10
**situations** [2] - 28:16, 59:13
**six** [1] - 78:9
**Sixth** [1] - 33:19
**slightly** [1] - 91:12
**slow** [2] - 44:14, 50:23
**slowly** [1] - 46:12
**small** [8] - 14:21, 15:25, 16:5, 31:25, 47:17, 47:18, 48:20, 78:11
**smaller** [1] - 47:11
**smirking** [1] - 50:7, 50:8, 50:9
**sniffed** [1] - 77:17
**software** [2] - 9:4, 48:25
**solely** [1] - 36:14
**someone** [12] - 12:20, 14:16, 29:14, 29:15, 63:12, 73:10, 73:24, 74:10, 77:17, 78:2, 99:23, 111:9
**somewhat** [1] - 61:18
**somewhere** [2] - 11:18, 77:17
**soon** [1] - 111:17
**sophisticated** [5] - 43:25, 78:13, 78:16, 79:1, 79:4
**sophistication** [3] - 78:15, 78:19, 79:5
**sorry** [24] - 8:1, 11:6, 11:21, 23:25, 24:8,

27:11, 33:23, 39:9, 40:24, 48:15, 51:23, 52:17, 54:1, 60:20, 69:12, 70:24, 72:13, 86:10, 88:6, 91:6, 93:23, 97:10, 108:2, 108:24
**sort** [1] - 19:24
**sorts** [2] - 45:25, 106:15
**sounds** [1] - 54:14
**source** [5] - 32:14, 34:12, 34:14, 79:10, 103:2
**sources** [1] - 34:20
**speaking** [1] - 63:4
**specialized** [1] - 109:14
**specific** [8] - 33:15, 90:8, 90:9, 90:15, 94:11, 97:21, 98:2, 101:4
**specifically** [2] - 27:4, 104:16
**spell** [1] - 39:9
**spelled** [1] - 39:12
**spend** [10] - 26:21, 27:25, 28:1, 28:7, 28:11, 28:14, 34:12, 39:24, 39:25, 56:3
**spends** [1] - 31:25
**spoken** [1] - 48:24
**spread** [1] - 47:16
**stand** [4] - 5:15, 5:16, 63:1, 93:13
**standards** [3] - 8:23, 8:25, 9:3
**Standards** [1] - 8:22
**standing** [2] - 5:2, 63:24
**stands** [1] - 86:21
**Starbucks** [1] - 80:12
**start** [4] - 64:11, 64:17, 72:10, 72:11
**started** [6] - 4:10, 66:11, 66:19, 72:14, 72:18, 103:4
**starting** [5] - 6:1, 42:25, 44:3, 55:10, 74:25
**starts** [15] - 35:16, 44:6, 45:24, 46:25, 47:5, 48:8, 51:22, 53:3, 55:5, 67:13, 68:14, 69:21, 71:1, 72:25, 77:9
**state** [1] - 5:25
**STATES** [4] - 1:1, 1:3, 1:11, 1:14

**States** [5] - 2:2, 5:23, 6:3, 70:20, 114:13
**stating** [1] - 83:21
**statistical** [12] - 14:19, 16:8, 16:21, 18:19, 21:24, 22:8, 27:17, 40:3, 40:5, 47:9, 47:18, 69:14
**stayed** [1] - 104:11
**stenographic** [1] - 114:5
**Sterlingov** [34] - 5:24, 6:7, 6:22, 6:24, 34:2, 34:9, 34:18, 34:24, 35:21, 49:5, 50:1, 50:5, 51:12, 60:3, 60:7, 74:13, 77:1, 82:18, 85:23, 86:14, 86:17, 86:25, 87:16, 87:21, 88:9, 91:9, 91:14, 96:20, 96:22, 96:24, 97:7, 98:5, 99:13, 107:4
**STERLINGOV** [1] - 1:6
**Sterlingov's** [32] - 22:4, 25:8, 25:9, 25:12, 26:4, 26:17, 27:7, 27:9, 28:18, 33:19, 40:13, 49:3, 59:1, 59:18, 59:20, 71:19, 72:2, 74:12, 76:24, 77:6, 79:23, 80:3, 81:10, 83:25, 86:6, 89:11, 91:3, 104:18, 106:9, 106:24, 107:17, 107:19
**still** [12] - 4:3, 11:14, 44:23, 47:20, 54:17, 60:15, 63:7, 65:18, 73:11, 73:15, 78:4, 107:20
**stop** [3] - 31:5, 48:4, 50:7
**stopping** [1] - 75:21
**stories** [1] - 16:13
**Street** [2] - 1:15, 1:24
**strong** [1] - 90:25
**studies** [2] - 15:15, 15:21
**subject** [1] - 37:24
**subjects** [2] - 35:3, 35:17
**subpoena** [3] - 16:11, 17:11, 70:19
**subsequent** [1] - 31:25
**subsequently** [1] - 69:10

**subset** [1] - 16:5
**substantial** [1] - 75:3
**subtract** [1] - 39:6
**suffices** [1] - 11:23
**suggest** [2] - 52:2, 102:17
**suggested** [1] - 64:4
**suggestion** [1] - 63:3
**suggests** [1] - 40:14
**Suite** [1] - 1:16
**summarize** [2] - 51:8, 99:7
**supports** [1] - 82:21
**suppose** [4] - 25:17, 63:10, 69:4, 74:4
**supposed** [3] - 99:7, 99:8, 104:4
**surprise** [1] - 87:7
**suspect** [1] - 87:18
**suspects** [1] - 34:9
**sustained** [7] - 7:2, 31:7, 31:18, 84:12, 92:13, 97:18, 102:21
**Sweden** [2] - 8:8, 24:22
**SWORN** [1] - 6:16
**syntactical** [2] - 79:22, 80:1
**syntax** [1] - 79:25
**system** [1] - 87:19

**T**

**table** [2] - 6:3, 6:8
**taxes** [1] - 69:24
**team** [8] - 48:14, 48:24, 50:19, 50:22, 51:3, 51:9, 62:21, 80:5
**Technology** [1] - 8:22
**temporal** [1] - 94:1
**ten** [2] - 44:20, 78:10
**terabytes** [1] - 50:16
**terms** [6] - 20:2, 29:2, 37:24, 43:3, 79:19, 96:20
**testified** [12] - 15:12, 21:4, 21:11, 35:1, 56:2, 57:1, 57:3, 74:1, 76:20, 81:23, 99:1, 99:12
**testifies** [1] - 92:10
**testify** [7] - 9:17, 10:23, 17:1, 49:8, 49:11, 76:16, 82:17
**testifying** [8] - 25:2, 31:15, 34:13, 41:13, 71:8, 80:6, 84:22,

109:22
**testimony** [46] - 10:19, 12:6, 12:22, 13:13, 17:23, 21:15, 23:7, 24:19, 34:13, 41:4, 41:7, 41:8, 41:9, 49:17, 49:18, 51:4, 51:7, 57:12, 57:14, 59:2, 59:3, 59:5, 61:8, 61:23, 66:21, 67:4, 83:7, 83:20, 83:21, 88:4, 88:7, 88:13, 90:17, 92:12, 94:13, 94:14, 97:14, 97:23, 98:1, 101:3, 103:18, 103:21, 103:22, 107:19, 108:15, 112:12
**text** [1] - 63:22
**THE** [144] - 1:1, 1:11, 1:14, 1:15, 1:23, 4:1, 4:5, 4:8, 4:12, 4:20, 5:1, 5:6, 5:11, 5:14, 5:17, 5:18, 5:21, 6:5, 6:9, 6:13, 7:2, 9:22, 11:21, 11:23, 13:4, 13:6, 15:1, 15:4, 15:5, 15:7, 16:4, 16:5, 16:18, 18:9, 19:3, 19:10, 19:15, 19:22, 20:9, 20:13, 21:1, 23:9, 23:10, 23:25, 24:4, 24:8, 24:23, 28:22, 28:24, 30:16, 30:19, 31:7, 31:18, 32:20, 32:24, 33:2, 33:17, 35:14, 35:25, 36:2, 36:5, 36:7, 37:6, 39:9, 39:11, 41:11, 44:14, 44:15, 46:12, 46:13, 50:10, 50:21, 50:22, 50:23, 50:25, 52:15, 52:18, 52:20, 57:15, 60:17, 60:20, 60:23, 61:3, 61:6, 61:7, 61:9, 61:12, 62:5, 62:8, 62:22, 62:25, 63:5, 63:8, 63:21, 64:2, 64:10, 64:21, 65:7, 65:11, 65:21, 66:2, 66:4, 66:10, 66:14, 66:17, 66:19, 81:16, 81:20, 83:24, 84:12, 84:14, 91:6, 91:8, 92:8, 92:11, 92:15, 97:10, 97:18, 98:7, 98:17, 98:21, 99:3, 99:7, 99:17, 101:7, 101:11, 102:21, 104:1, 104:3, 104:7, 104:9, 108:24,

109:1, 109:25, 110:14, 111:4, 111:6, 112:6, 112:9, 112:10, 112:13, 112:14, 112:17, 112:23

**themselves** [3] - 38:8, 48:21, 62:17

**theoretically** [1] - 42:15

**therefore** [1] - 96:24

**Thereupon** [4] - 4:6, 61:10, 62:6, 112:15

**they've** [2] - 64:2, 64:3

**thinks** [1] - 62:19

**third** [1] - 47:5

**thoughts** [2] - 62:14, 63:17

**thread** [1] - 55:24

**three** [8] - 50:16, 54:7, 67:18, 85:12, 85:17, 85:20, 86:1, 86:2

**throwing** [1] - 37:24

**thumb** [2] - 40:20, 49:4

**timed** [1] - 79:2

**timeframe** [1] - 78:17

**timestamps** [1] - 91:25

**timing** [12] - 45:25, 52:21, 78:1, 78:7, 78:13, 90:19, 91:21, 91:22, 93:17, 94:8, 94:23, 100:21

**tiny** [1] - 47:19

**today** [7] - 16:11, 37:2, 37:16, 66:5, 66:12, 75:21, 78:23

**too-similar** [1] - 75:4

**took** [4] - 34:19, 93:7, 93:9, 100:19

**tool** [1] - 9:18

**top** [4] - 51:2, 68:8, 74:19, 92:22

**TOR** [2] - 1:23, 1:24

**Tor** [1] - 6:6

**total** [1] - 47:8

**totality** [6] - 90:5, 90:18, 95:14, 95:15, 96:19, 97:1

**totally** [1] - 54:14

**tough** [1] - 63:18

**trace** [38] - 7:10, 7:13, 7:14, 7:15, 7:17, 7:18, 12:24, 13:12, 13:14, 14:2, 14:3, 18:21, 26:5, 32:13, 32:16, 34:10, 34:16, 34:24, 52:10, 53:15,

53:23, 55:1, 55:3, 55:16, 59:6, 67:18, 68:1, 68:2, 69:13, 75:12, 78:14, 78:24, 84:22, 84:24, 87:12, 88:21, 96:14

**traceability** [1] - 94:25

**traceable** [1] - 93:19

**traced** [16] - 33:21, 33:22, 33:25, 34:6, 34:8, 34:11, 34:17, 36:9, 36:10, 36:13, 36:15, 83:16, 83:22, 83:24, 94:4, 94:9

**traces** [3] - 7:4, 7:12, 7:14, 7:23, 33:15, 34:5, 71:9, 80:23, 80:24, 82:24, 83:3, 83:17, 84:4

**tracing** [33] - 7:15, 8:19, 9:1, 9:4, 9:11, 10:2, 10:5, 11:3, 11:9, 12:8, 12:23, 13:21, 13:25, 14:16, 15:10, 16:9, 16:14, 17:4, 17:7, 17:17, 17:22, 18:19, 19:8, 19:25, 20:16, 25:15, 28:15, 33:8, 35:4, 35:12, 43:25, 45:19, 103:1

**track** [1] - 43:10

**tracking** [1] - 39:7

**traditional** [1] - 87:19

**training** [1] - 15:21

**trainings** [2] - 15:13, 15:15

**transaction** [69] - 10:15, 23:1, 23:15, 24:13, 27:22, 28:9, 37:25, 38:3, 38:4, 38:20, 38:21, 38:24, 39:8, 39:15, 43:4, 43:12, 45:19, 52:10, 53:14, 53:23, 54:7, 54:8, 54:16, 54:19, 54:23, 54:25, 55:17, 55:21, 56:1, 57:7, 68:3, 69:10, 71:19, 75:12, 77:19, 77:20, 78:5, 82:18, 84:25, 91:2, 91:21, 92:10, 93:19, 93:20, 93:22, 94:5, 94:11, 94:17, 94:24, 94:25, 95:17, 96:6, 99:11, 99:22, 100:8, 100:10, 100:12, 101:14, 101:15, 102:1, 102:3,

102:4, 102:12, 103:15, 104:21, 105:10

**transactions** [36] - 22:4, 36:10, 36:22, 36:23, 38:17, 43:10, 44:1, 47:8, 70:6, 71:4, 71:10, 71:12, 71:14, 77:25, 78:2, 78:14, 79:2, 81:3, 81:4, 81:6, 82:25, 83:17, 84:8, 90:19, 90:20, 91:25, 92:2, 92:4, 94:1, 96:10, 102:10, 108:8, 108:10, 108:13, 108:22, 109:4

**TRANSCRIPT** [1] - 1:10

**transcript** [2] - 114:5, 114:6

**transfer** [15] - 38:5, 40:9, 40:16, 40:19, 42:9, 44:17, 73:13, 73:22, 73:24, 74:1, 74:3, 75:24, 89:10, 91:10, 95:2

**transferred** [4] - 39:18, 74:10, 88:23, 93:2

**transferring** [3] - 45:7, 82:2, 82:8

**transfers** [6] - 39:2, 40:4, 87:19, 95:2, 106:6, 106:8

**transparent** [2] - 53:11, 54:12

**travel** [1] - 62:2

**TRIAL** [1] - 1:10

**tried** [2] - 64:23, 69:2

**TRM** [5] - 15:13, 15:20, 21:12, 22:5

**trot** [1] - 33:24

**true** [7] - 14:9, 14:12, 25:17, 37:3, 86:7, 114:4, 114:5

**trust** [4] - 39:21, 39:24, 40:25, 41:2

**truth** [1] - 78:6

**try** [3] - 39:24, 48:20, 111:20

**trying** [9] - 14:7, 28:3, 33:9, 58:5, 60:5, 65:12, 94:19, 99:6, 109:1

**turning** [1] - 50:7

**turns** [1] - 62:8

**two** [28] - 7:21, 7:22, 14:11, 25:12, 25:14, 27:23, 38:5, 39:22, 40:25, 42:1, 42:4,

43:1, 47:16, 63:21, 72:14, 72:16, 75:6, 78:2, 87:11, 87:14, 91:17, 92:2, 92:4, 92:22, 95:3, 97:5, 97:17, 97:24

**type** [5] - 11:24, 12:12, 61:1, 83:11, 111:24

**types** [4] - 37:22, 42:1, 42:3, 42:4

**typo** [4] - 10:14, 10:15, 11:1, 11:8

**typographical** [14] - 10:16, 10:24, 11:4, 11:11, 11:13, 11:14, 12:9, 13:15, 13:16, 13:22, 13:25, 14:4, 14:7, 14:14

**typos** [1] - 10:12

## U

**U.S** [8] - 1:18, 1:20, 42:5, 103:7, 108:8, 108:23, 109:4, 110:3

**ultimately** [1] - 71:19

**uncommon** [1] - 40:1

**under** [5] - 19:6, 35:11, 44:4, 46:7, 53:3

**undercover** [2] - 36:12

**undercovers** [1] - 36:11

**underlying** [2] - 11:11, 12:11

**understood** [6] - 37:9, 45:18, 56:19, 64:20, 92:18, 104:6

**unfair** [1] - 47:17

**unique** [2] - 41:20, 41:21

**United** [4] - 5:23, 6:3, 70:20, 114:13

**united** [1] - 2:2

**UNITED** [4] - 1:1, 1:3, 1:11, 1:14

**unless** [1] - 44:20

**unlikeliness** [1] - 14:20

**unlikely** [5] - 12:13, 12:19, 14:14, 14:18, 41:9

**unrelated** [2] - 35:3, 35:20

**unseen** [1] - 77:21

**up** [44] - 4:13, 5:3,

14:5, 14:9, 14:10, 14:12, 17:6, 18:5, 21:14, 32:19, 38:10, 38:13, 42:4, 42:12, 42:19, 42:20, 44:7, 47:8, 51:4, 51:7, 53:1, 59:2, 60:17, 62:25, 66:5, 67:11, 69:18, 69:25, 70:10, 70:11, 70:15, 73:23, 74:19, 77:11, 81:15, 84:17, 88:1, 92:22, 98:19, 100:16, 100:25, 101:21, 108:2, 112:17

**upper** [1] - 100:16

**user** [3] - 34:18, 41:22, 68:22

**username** [2] - 106:18, 106:21

**users** [12] - 35:1, 36:19, 47:10, 47:17, 47:21, 47:24, 52:2, 69:1, 75:3, 75:8, 78:19, 87:8

**uses** [1] - 9:16

## V

**vague** [1] - 17:8

**valid** [2] - 12:14, 12:19

**validity** [1] - 12:24

**value** [3] - 47:8, 71:7, 73:25

**values** [1] - 72:1

**verbalizing** [1] - 66:22

**verifying** [3] - 30:21, 31:11, 59:6

**versus** [1] - 5:24

**videos** [1] - 4:21

**view** [1] - 4:16

**visible** [1] - 44:19

**voluntarily** [1] - 87:16

**vs** [1] - 1:5

**vulnerable** [1] - 43:6

## W

**wait** [1] - 4:5

**waiting** [3] - 4:3, 5:3, 75:24

**Wall** [1] - 1:24

**wallet** [39] - 10:12, 10:14, 11:2, 11:4, 11:8, 11:18, 13:12, 13:24, 27:7, 27:9, 27:24, 27:25, 28:6,

28:18, 29:6, 29:25,
31:24, 56:10, 56:15,
56:16, 56:17, 58:22,
59:18, 59:21, 60:2,
60:6, 60:9, 60:10,
89:12, 89:14, 89:17,
89:20, 89:25, 90:2,
90:6, 90:9

**wallets** [1] - 14:22
**warnings** [1] - 75:23
**Washington** [6] -
1:6, 1:16, 1:19, 1:21,
2:4, 114:14
**wasting** [1] - 35:14
**watch** [1] - 63:15
**watched** [1] - 97:23
**watching** [1] - 97:14
**water** [2] - 60:19,
60:21
**ways** [3] - 29:15,
31:13, 66:22
**website** [2] - 77:3,
77:5
**week** [2] - 63:7, 66:1
**weekend** [4] - 111:7,
111:14, 112:3, 113:8
**weeks** [3] - 97:5,
97:17, 97:24
**whatsoever** [3] -
84:5, 88:20, 89:24
**whole** [1] - 34:12
**window** [1] - 65:19
**withdraw** [6] - 44:18,
45:6, 45:10, 45:18,
47:10, 52:2
**withdrawal** [6] -
41:23, 44:13, 44:17,
44:22, 71:24, 78:9
**withdrawing** [8] -
47:21, 47:24, 52:5,
69:6, 69:9, 69:11,
71:6, 75:6
**withdrawn** [3] -
71:18, 97:22, 107:18
**withdrew** [1] - 44:21
**witness** [24] - 4:15,
4:17, 4:24, 4:25, 5:9,
5:14, 5:15, 5:16, 6:12,
9:23, 28:23, 34:4,
61:7, 63:1, 66:5, 67:2,
84:13, 84:14, 91:6,
98:8, 98:12, 112:10
**WITNESS** [19] - 3:3,
6:16, 11:23, 13:6,
15:5, 16:5, 23:10,
24:8, 28:22, 39:11,
44:15, 46:13, 50:22,
50:25, 61:9, 83:24,
91:8, 109:1, 112:13
**witness's** [8] - 16:15,

23:7, 31:6, 31:17,
57:12, 83:20, 99:16,
101:3
**wonderful** [1] - 64:22
**word** [3] - 25:19,
57:2, 58:19
**works** [4] - 68:15,
68:18, 69:2, 95:24
**world** [1] - 24:20
**writings** [1] - 79:23
**written** [2] - 12:15,
40:17
**wrongdoing** [1] -
19:13
**wrote** [2] - 43:24,
45:17

## Y

**years** [3] - 9:17,
80:23, 80:24
**yesterday** [5] - 4:17,
34:12, 35:2, 63:23,
71:8
**York** [2] - 1:21, 1:25
**yourself** [1] - 66:22
**yourselves** [1] -
60:25

## Z

**zero** [1] - 17:14
**zoom** [4] - 85:6,
85:9, 98:24, 100:25