```
1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3      * * * * * * * * * * * * * * *    )
       UNITED STATES OF AMERICA,        )    Criminal Action
4                                       )     No. 21-00399
                    Plaintiff,          )
5                                       )
         vs.                            )    AFTERNOON SESSION
6                                       )
       ROMAN STERLINGOV,                )    Washington, D.C.
7                                       )    February 27, 2024
                    Defendant.          )    3:00 p.m.
8                                       )
       * * * * * * * * * * * * * * *    )
9

10

                    TRANSCRIPT OF JURY TRIAL
11         BEFORE THE HONORABLE RANDOLPH D. MOSS
                 UNITED STATES DISTRICT JUDGE
12

13     APPEARANCES:

14     FOR THE PLAINTIFF:       CHRISTOPHER BROWN, ESQ.
                                UNITED STATES ATTORNEY'S OFFICE FOR
15                                THE DISTRICT OF COLUMBIA
                                601 D Street, Northwest
16                              Suite 5.1527
                                Washington, D.C. 20530
17
                                CATHERINE PELKER, ESQ.
18                              U.S. DEPARTMENT OF JUSTICE
                                950 Pennsylvania Avenue, Northwest
19                              Washington, D.C. 20530

20                              JEFFREY PEARLMAN, ESQ.
                                U.S. DEPARTMENT OF JUSTICE
21                              1301 New York Avenue, Northwest
                                Washington, D.C. 2005
22

23     FOR THE DEFENDANT:       TOR EKELAND, ESQ.
                                MICHAEL HASSARD, ESQ.
24                              TOR EKELAND LAW, PLLC
                                30 Wall Street
25                              Eighth Floor
                                Brooklyn, New York 10005
```

```
 1      REPORTED BY:                LISA EDWARDS, RDR, CRR
                                    Official Court Reporter
 2                                  United States District Court for the
                                      District of Columbia
 3                                  333 Constitution Avenue, Northwest
                                    Room 6706
 4                                  Washington, D.C. 20001
                                    (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURTROOM DEPUTY:  Criminal Case 21-399, the
 2   United States of America versus Roman Sterlingov.
 3              Would counsel please approach the podium and state
 4   their name for the record, starting with Government counsel.
 5              MR. PEARLMAN:  For the Government, Jeffrey
 6   Pearlman, C. Alden Pelker, and Mr. Brown.  Ms. Pelker just
 7   stepped out for a moment.
 8              THE COURT:  Okay.  Good afternoon.
 9              MR. EKELAND:  Good afternoon, your Honor.  Tor
10   Ekeland for Defendant Roman Sterlingov, who is present in
11   court.  And joining me at counsel table is Michael Hassard.
12              THE COURT:  Good afternoon.
13              We have a couple of issues to address this
14   afternoon.  The one that I know about is the question
15   regarding the scope of Mr. Vlahakis's testimony.  I have
16   gone back and reread my notes on this as well as the cases.
17   I'm happy to hear anything else that any other party wants
18   to add on the question, though.
19              MR. PEARLMAN:  Your Honor?
20              THE COURT:  Yes.  I'm listening.
21              MR. PEARLMAN:  Okay.  So after the Court's hearing
22   in September concerning Mr. Vlahakis and FinCEN testimony,
23   we did brief this issue with your Honor, as did the
24   Defendant.
25              The defense merely cites to three cases saying
```

1    that expert testimony on issues of law is inadmissible.  And

2    nowhere in those cases does it actually say that a witness

3    who testifies about what the legal rules are should not be

4    permitted to do so.  So those citations are not on point at

5    any level.

6         So the real issue is whether the Government can

7    offer competent testimony by a lay witness who day in and

8    day out works at FinCEN, is familiar with the rules and

9    regulations that FinCEN has, is familiar with the fact that

10   FinCEN publicizes those rules, should be able to testify

11   about what those rules are.  And that's all we're seeking to

12   do in a nonexpert capacity, to talk about FinCEN's role with

13   respect to anti-money laundering provisions and Know Your

14   Customer.

15        THE COURT:  Was he noticed as an expert?

16        MR. PEARLMAN:  He was noticed as an expert out of

17   an abundance of caution.  We don't wish to have him testify

18   as an expert.  We would rather have him testify as a lay

19   witness.

20        THE COURT:  I'm just wondering whether some of

21   this testimony does involve expert testimony, just with

22   respect to what rules are.  I mean, what is a currency

23   transaction report?  What is a suspicious activity report?

24        MR. PEARLMAN:  Again, these are things that, you

25   know, FinCEN makes it its mission to publicly communicate

1    these issues to all the money-service businesses and banks

2    and money transmitters and so forth so that the rules are

3    clear so that they don't get broken.

4           So in fact, I think that this is more akin to

5    testimony from a witness who has some specialized knowledge

6    but is not anything that a juror couldn't understand.  In

7    fact, we've had testimony from several nonexperts about the

8    general nature of Know Your Customer laws, for example, or

9    generally what money laundering is.

10          And so I don't think that the witness needs to be

11   formally qualified as an expert to essentially be reading

12   off what a website might communicate to the general public

13   and which happens to be true at the same time.

14          THE COURT:  All right.  I take it from what you're

15   saying you would not be seeking any testimony with respect

16   to applying any legal rules to the facts as they relate to

17   Mr. Sterlingov personally or to Bitcoin Fog?

18          MR. PEARLMAN:  That's correct.  We want to stay as

19   far away from that as possible.

20          Whether or not Mr. Sterlingov was operating a

21   money-transmitter business is not a question; it's:  What is

22   a money-transmitter business?

23          And the jurors as guided by the Court can make

24   that determination for themselves.  We're not seeking to go

25   into that realm.

1           THE COURT:  So on -- you actually touched on the

2    one issue where I may have some greater pause, which is, it

3    does strike me as one potential way to draw the line here,

4    is to say no conclusions or applications to Mr. Sterlingov

5    or to Bitcoin Fog; and, two, nothing on which I would in the

6    ordinary course instruct the jury, because it's the province

7    of the Court to tell the jury what the law is.

8           And if the jury has to make a finding about

9    whether Mr. Sterlingov or the administrator of Bitcoin Fog

10    was running a money-transmitting business, why not with

11    respect to that submit your relevant views on that question

12    of -- or that legal standard to the Court, and then when it

13    comes time to instruct the jury, I say, you know:  There are

14    three provisions that apply with respect to money

15    laundering.  One of them involves a question of whether

16    someone was operating a money-transmitting business for

17    purposes of the FinCEN regulations and making that

18    determination.  Now, here's what the law is and this is what

19    you should apply.

20           MR. PEARLMAN:  Sure.

21           So what I hear the Court saying is you're drawing

22    the line at defining certain terms that the jury might be

23    required to make a factual determination about whether the

24    Defendant meets those terms; for example, money transmitter.

25           THE COURT:  Yeah.  Well, I think that's probably

1     another way of saying what I was saying, is if it's

2     something I'm going to instruct the jury on, I'm not quite

3     sure why it's necessary or helpful to have an expert witness

4     on that.

5              But there's also a lot here that I'm not going to

6     instruct the jury on, which I could understand is relevant

7     background.  For example, what a currency transaction report

8     is.  Why they're filed.  How they're used by law

9     enforcement.  What is a suspicious activity report?  What

10    are the requirements for filing suspicious activity reports?

11    How those are used by law enforcement.

12             That type of stuff I don't think I would

13    ordinarily be instructing the jury on in this case because

14    there's not an allegation that somebody violated the law

15    here, or at least it's not one of the charges in the case,

16    that somebody failed to file a currency transaction report

17    or that somebody failed to file a suspicious activity

18    report.

19             And so that seems to me at least notionally to be

20    on the side of things where expert or lay expert testimony

21    could be helpful for the jury in understanding the testimony

22    and the facts in the case.

23             But where I get more nervous is anything that

24    touches on what Mr. Sterlingov personally did and whether he

25    violated the law in some way or that touches on the province

1    of what I need to do, which is instruct the jury on the law

2    that the jury should apply in rendering its verdict in the

3    case.

4        MR. PEARLMAN:  This is very helpful, and the

5    Government appreciates it.

6        Just to clarify, we would want to offer testimony

7    that if one registers as a money transmitter, this is the

8    steps that they would take; these are the forms that they

9    would fill out, and things that they would tell FinCEN about

10   themselves.  We would still seek to get that in.

11       THE COURT:  That strikes me as a different

12   question.  And this is all obviously subject to me hearing

13   from Mr. Ekeland.

14       But that would -- as long as it's -- assuming that

15   someone was required to register, this is how they would go

16   about doing it, and this is the information they would

17   provide, that strikes me as more factual in nature, or at

18   least to the extent it involves legal questions.  There's

19   nothing that I would otherwise instruct the jury on in the

20   case, nor is it, I think, raising a danger of perhaps unduly

21   influencing the jury with respect to the verdict they should

22   reach by expert testimony or testimony from a knowledgeable

23   person in a way that may be seen by the jury as dictating

24   their result on one of the ultimate questions in the case.

25       And I realize that under 704, it's not a bright

1  line, but it does strike me that, even being conservative

2  here, that maybe it will be best to stay away from anything

3  that involves expert testimony or testimony by a

4  knowledgeable person with respect to whether Mr. Sterlingov

5  did something here that was unlawful.

6      And I'm thinking of the D.C. Circuit cases in,

7  like, *Burkhart v. Lamotta*, which came up in a context and

8  it's where you have an expert witness in an ADA case and the

9  expert witness comes in and testifies, Yes, this is an

10  appropriate accommodation in a way that that's the ultimate

11  question the jury is supposed to be deciding.  And that's

12  problematic.

13      But where it's background information that is not

14  otherwise actually, I think, something that every juror

15  would know about, it strikes me as potentially appropriate.

16      MR. PEARLMAN:  Okay.  I mean, I think that

17  provides the Government sufficient guidance, and subject

18  obviously to your decision, that is something that --

19      THE COURT:  I do want to hear what Mr. Ekeland has

20  to say about this.

21      MR. PEARLMAN:  Of course.

22      THE COURT:  So, Mr. Ekeland, you have some sense

23  of where I at least notionally think might be a reasonable

24  place to draw the line.

25      MR. EKELAND:  Yes, your Honor.

1          Just briefly, the Government did notice him as an

2     expert.  Mr. Vlahakis is obviously not a fact witness to

3     anything that Mr. Sterlingov did.  And I take it that the

4     Court is contemplating having him come in as sort of a --

5     giving lay opinion or testifying to facts about -- very

6     generally things about the filing --

7          THE COURT:  Well --

8          MR. EKELAND:  -- process.

9          THE COURT:  Just to clarify, I would have thought

10    he actually was an expert, coming in as an expert witness on

11    the Bank Secrecy Act and government regulation relating to

12    the Bank Secrecy Act.  And what I'm suggesting is that I

13    think one -- I can explain my view of the law in a moment.

14         But one, I think, reasonable place to draw the

15    line would be to say background relating to things like the

16    requirement of filing a currency transaction report, the

17    requirement that banks file suspicious activity reports, how

18    the suspicious activity reports are used, what information

19    goes into a suspicious activity report.  That strikes me as

20    the type of information that could be helpful for the jury

21    in understanding the testimony that has been offered in this

22    case, and is helpful background, and also I think probably

23    not terribly controversial or subject to dispute, but would

24    help jurors understand.

25         There's been talk about currency transaction

1    reports -- about suspicious activity reports.  If I were a

2    juror and not trained in the law, I'd want to know what a

3    suspicious activity report is.

4         And it's not that that's what the ultimate issues

5    in the case are about, but it then explains and helps the

6    jury understand the facts because it helps the jury

7    understand why someone might want to use a service that

8    doesn't file suspicious activity reports, because they don't

9    want the Department of Treasury to know about what they're

10   doing.

11        And so I don't think it's anything that goes to

12   the ultimate issues in the case or anything that -- any

13   application of the law or the facts the jury has to really

14   make in the case itself even, but is just useful background

15   in understanding the allegations and the testimony that have

16   been raised in the case.

17        That's where I'm talking about drawing the line,

18   but not anything where I would ordinarily instruct the jury,

19   because that's my province, nor anything that would

20   constitute a legal conclusion with respect to one of the

21   elements or facts in the case itself.

22        MR. EKELAND:  And I think that is -- the Court

23   there is addressing our main concern, that the jury just

24   somehow gets confused or thinks that this expert is standing

25   in place of the Court's jury charges and explication of the

```
 1    law.  So I think we're in agreement with the Court on that.

 2             In terms of sort of the SARs stuff and all this

 3    background stuff, the only thing I would note on that point,

 4    just briefly, is I do -- at least from the defense's

 5    viewpoint, there's a little bit, A, of a relevance concern

 6    because it doesn't really seem to be a central issue in this

 7    case.  The question is whether or not -- well, whether or

 8    not Mr. Sterlingov is the operator of Bitcoin Fog, and if

 9    there was a requirement to, you know, register as -- with

10    the various agencies, you know.

11             The other issue is I think just like time, you

12    know.  We've told the jurors that they would be out, you

13    know, sometime like March 7, March 10, whatever.  And now I

14    think with the Government saying the case is -- maybe

15    they're going to end their case in chief on Monday, and we

16    might be able to get our case done by the end of the week,

17    depending on how things go and what witnesses we call.

18             But that's the only other concern.  I'm not going

19    to belabor this with the Court.

20             THE COURT:  I appreciate that.

21             And just -- so that is where I'm going to draw the

22    line.  To the extent that there are questions that come up

23    as the testimony is coming in, let me know.

24             Just by way of explanation for the record, there

25    certainly are cases that in a fairly categorical way say
```

1    that legal conclusions are inadmissible, but I think that

2    those are cases in which this type of nuance is just not at

3    issue.

4         And there are cases like the ones that I described

5    where the testimony at issue really goes to applying the law

6    to the facts in a way that is the province of the jury or

7    describing the law in a way that is the province of the

8    Court.

9         And I thought that Judge Saylor in the *Adams*

10   decision, which I believe the Government cited to, but in

11   any event is from the District Court in Massachusetts at 215

12   Westlaw 9412518, did an excellent job of just cataloging and

13   explaining how in fact testimony comes in all the time with

14   respect to the law.

15        And I've read through the numerous cases, and

16   there are many cases in which courts have allowed expert

17   testimony relating to the Bank Secrecy Act and money

18   laundering.  There's *U.S. versus Caro* from the Eleventh

19   Circuit, 2012.  There's *U.S. versus $61,900* from the Eastern

20   District of New York, and that's 802 F.Supp.2d 451 at 459 in

21   Note 15.  There's *U.S. versus Campbell* from the Fourth

22   Circuit.  There's *U.S. versus Nektalov* from the Southern

23   District of New York.  There's *U.S. versus Monaco* from the

24   Second Circuit; *U.S. versus Ortiz* from the Second Circuit.

25   And also I thought a helpful opinion in *United States versus*

1      *Ventura* from the Eastern District of Kentucky.

2              And as Judge Forster observed in the *Ventura* case,

3      courts have allowed expert testimony to explain the BSA, its

4      obligations on financial institutions to file currency

5      transaction reports and structuring deposits in general,

6      citing to numerous cases; moreover, currency structuring and

7      the many methods criminals employ to accomplish it are

8      beyond the realm of the knowledge -- general knowledge of

9      the average juror.  And so the Court concluded that it was

10     permissible under 702 to offer that type of testimony.

11             And then in *Campbell*, the Second Circuit -- I'm

12     sorry -- the Fourth Circuit in *Campbell* observed that

13     generally expert testimony is admissible if it will assist

14     the trier of fact to understand the evidence to determine

15     the facts in issue.  Conversely, such testimony is

16     inadmissible if it does not aid the trier of fact.

17             And though Rule 704(a) provides for admissibility

18     of expert testimony that reaches the ultimate issue to be

19     decided by the jury, quote, "Testimony that merely states a

20     legal conclusion is less likely to assist the jury in its

21     determination.  Such testimony is admissible even if it

22     reaches the ultimate issue to be decided by the trier of

23     fact," citing to Rule 704.

24             The Court goes on to explain that in that case the

25     Defendant's or appellant's argument hinged on his assertion

1    that the Government's expert witness testified largely to

2    legal conclusions that were unhelpful to the jury.  However,

3    the Court wrote:  The record reflects the testimony

4    presented by the FBI agent was likely very helpful to the

5    jury.  The agent explained the Bank Secrecy Act and its

6    requirement that a financial institution must submit a

7    currency transaction report whenever an individual made a

8    transaction with more than $2,000 in cash.

9         Additionally, the agent testified that the Bank

10   Secrecy Act made it a crime to attempt to structure a

11   transaction in order to evade filing the CTR.  The agent

12   gave hypothetical examples of illegal structuring in order

13   for the jury to better understand the types of actions that

14   would be consistent with structuring.

15        And it goes on from there.  But I won't -- rather

16   than reading it all into the record.

17        So that's my ruling with respect to the Vlahakis

18   testimony.

19        What is the other issue that you wanted to raise

20   today?

21        MR. EKELAND:  Your Honor, this is related to

22   discovery.  And Mr. Fischbach's been discussing this with

23   the Government, and I'm just hoping that we can just address

24   this with the Court because I'm not trying to stop this

25   trial at all, and I don't know how big of an issue this is.

1           But this relates to some of the server images and

2    whatnot.  And Mr. Fischbach, who's been talking to the

3    Government about it, can tell you his side and the

4    Government can tell you their side and hopefully we can find

5    some solution to this quickly.

6           THE COURT:  You know, I guess I'd rather -- I

7    don't mean to put you in the position of being the

8    middleman, but I'm not accustomed to having the nonlawyers

9    argue motions to me.

10          MR. EKELAND:  I understand, Your Honor.  Because

11   I've been working on other stuff, he's been emailing with

12   the Government.  And essentially what my understanding is is

13   that there's some of the discovery that's involved with

14   Ms. Mazarin and the pcaps, which are packet capture

15   information, images for an image of the server that was in

16   Romania that we can't find in our discovery.

17          The Government has said that they sent one hard

18   drive, and they gave us an inventory.  But on that

19   inventory, if my understanding is correct -- I want to be

20   careful here -- the image for the server is not there.

21          And I'm told -- my understanding is that what

22   Mr. Fischbach did was ask the Government for it, and then

23   we've been told that it's in storage or somewhere at FBI.

24   And that -- again, I'm repeating the stuff secondhand; I

25   want to be careful here because I'm not making

1    accusations -- that it is going to take the Government -- it

2    would take the Government 60 days to access it.

3              We don't totally understand why that would be the

4    case when it's evidence from a witness who's testifying in

5    this case.

6              And that's my basic understanding of it at the

7    moment.

8              And what I'm just hoping is to get the result so

9    we can keep rolling with Mazarin tomorrow, is my main

10   purpose.

11             THE COURT:  Let me hear from Ms. Pelker about

12   this.

13             MS. PELKER:  I think it would be helpful for

14   Mr. Ekeland to speak with Mr. Hassard and Mr. Fischbach,

15   because I think that there's a game of telephone and some

16   confusion.

17             The Government produced over the course of this

18   case four hard drives to defense counsel.  There were three

19   hard drives that were provided with the images of the

20   Defendant's devices.  Those were shipped from IRS in April

21   of 2022.  There was a back-and-forth email chain with

22   defense counsel about these drives in which defense had to

23   arrange to ship hard drives to IRS for IRS to then copy the

24   images onto and ship back to defense counsel.

25             The drives that they sent weren't large enough, so

1    IRS provided a third drive of their own drive.  We emailed

2    back instructions for how to access the different drives.

3           Those three drives were sent to defense counsel in

4    April of 2022.

5           And we reminded defense counsel that the Romania

6    server evidence, if they wanted that, they needed to send us

7    another drive.

8           We had additional email conversations.  They then

9    sent that drive to FBI, who had the Romania server evidence,

10   in September -- they sent the drive August of 2022.  FBI

11   then provided the images and shipped it back to defense

12   counsel in September of 2022.

13          We emailed with defense counsel, providing them

14   the tracking information for the drive.

15          Defense said:  Thanks.

16          Our understanding was Mr. Fischbach has earlier in

17   this case indicated that he may not have seen all of the

18   images from the IRS drives.  And we directed him -- he sent

19   screenshots of what he was looking at.  We directed him to

20   the discovery log if he was looking at one drive.  There

21   were actually three different drives with the log provided.

22          That seemed to get resolved.

23          Then there was the issue of where the Romania

24   server evidence was because Mr. Fischbach appeared to be

25   looking on the IRS drives.  We explained that, no, it was on

1    the FBI drive.

2            Mr. Hassard then indicated that they had located

3    the FBI drive in their evidence storage up in New York but

4    that they asked whether we could make an additional copy

5    available to Mr. Fischbach here.

6            We explained that the amount of -- with the amount

7    of time it would take for us to get this drive out of

8    evidence storage in FBI, the backlog that CART, C-A-R-T,

9    has, would take to do the imaging, and our witnesses are

10   here for trial, that it would be much faster for defense to

11   simply have someone retrieve their drive from the evidence

12   storage that they represented was in up in New York and ship

13   it down.

14           And that was the last we heard.  And we're not

15   actually clear what the issue is now.

16           THE COURT:  Mr. Hassard, do you have anything to

17   add to that?

18           MR. HASSARD:  I do not.

19           THE COURT:  Okay.

20           MR. EKELAND:  May I for one moment, your Honor?

21           The only thing I would add to that is my

22   understanding is when we went to go check the inventory

23   list, that we were told by the Government:  Okay, here's

24   everything that was sent.

25           And I haven't looked at this personally, but what

1    I've been told is that the image of the Romanian server is

2    not on that inventory list.  So it's not on the list that

3    we've been given saying, Here's what you've gotten.

4        What I've been told is that the Romanian -- the

5    image of the Romanian server is not on that list.  And so --

6        MS. PELKER:  Just to clarify, it's an inventory

7    list that was sent with the IRS drives that's an inventory

8    of what's on the IRS drives.  Then there was the FBI drive

9    which had the Romanian server evidence.

10        THE COURT:  Did you hear that, Mr. Ekeland?

11        MR. EKELAND:  No.  I'm sorry, your Honor, I

12    didn't.

13        THE COURT:  Ms. Pelker said the inventory list

14    you're referencing is the inventory list for what was sent

15    from the IRS.  It's not the inventory list of what was sent

16    from the FBI, and that's why the drive that was sent from

17    the FBI is not on that list.

18        MS. PELKER:  If you look at the inventory list, it

19    clearly says what drive it's on.  And it refers to the IRS

20    drive number.  That's why it's 1, 2, 3, and was sent with

21    the IRS drives which predated the FBI drives.

22        MR. EKELAND:  Is that the 1B15SSDSamsung.E01?

23        MS. PELKER:  I can --

24        MR. EKELAND:  That's what I have.

25        MS. PELKER:  I can pass this.  This was -- if you

1    look at the screenshot from Mr. Fischbach of what he sent to

2    us when he was looking for the information, this file is

3    pretty clearly visible.  He has this file.  It's what was

4    provided by the IRS.  It's just the list of the different

5    image files --

6           THE COURT:  Right.

7           MS. PELKER:  -- with the IRS drive that is

8    separate from the FBI drive.

9           THE COURT:  All right.

10           MR. EKELAND:  Your Honor, Mr. Fischbach is telling

11    me that we found all of this stuff and this is unrelated to

12    this inventory that I'm looking at, which lists two terabyte

13    Western Digital hard drive provided by Romanian authorities.

14    And that's what we think we haven't received.

15           And so --

16           THE COURT:  Do you really think you haven't

17    received that, or do you think that just it's not on the

18    inventory list that you're looking at?  Because Ms. Pelker

19    has represented that there was back-and-forth about it and

20    other emails confirming its receipt.

21           MR. EKELAND:  We got sent a drive.  But normally,

22    I have everything in discovery and my people, you know,

23    either upload it or I get it in some way, shape or form.

24    I'm not going to make a representation to the Court that I

25    know 100 percent one way or the other, because the only way

1    I would be able to 100 percent confirm that would be just to

2    go to New York, and that's obviously not something that's --

3            THE COURT:  Well, is there anyone in New York who

4    can go retrieve it?

5            MR. EKELAND:  Our entire office is down here right

6    now.  And so that's why we were hoping what we could do is

7    just get an image of it, and we're just -- don't understand

8    why that's --

9            THE COURT:  How many people do you have down here?

10   I know who's in the courtroom.  Do you have any assistants

11   or paralegals or folks who are not with you?

12           MR. EKELAND:  I do have -- what do I have?  I have

13   one legal -- Ms. Wilkins is at the house.

14           THE COURT:  It sounds like maybe that someone has

15   to get in a car and drive to New York or get on the train

16   and go to New York and take a look for this.

17           MR. EKELAND:  It's either in New York City or it's

18   three hours outside of New York City in the Catskills.  I

19   mean, usually what happens in all our cases is all the stuff

20   is uploaded and we have it.

21           So I mean, I don't -- I honestly don't know what

22   happened here, so I don't want to make a representation.

23   But what I'm trying to do is solve this problem because

24   Mr. Sterlingov asked us to look into it.

25           THE COURT:  I understand why he would want to look

```
 1        into that.

 2                  MR. EKELAND:  Yeah.

 3                  THE COURT:  But, you know, based on what I've

 4        heard from Ms. Pelker, the Government seems pretty confident

 5        that they sent it, and they did provide it.

 6                  Now, obviously, the Government's running a risk if

 7        it ever turns out that that's a mistake and they're wrong

 8        about that.  That could provide a basis for a post-trial

 9        motion of some type.  But that's -- they seem pretty

10        confident that they sent it.  And I don't have a basis for

11        saying -- I don't have a basis for ordering them to go

12        retrieve something from their storage which they represent

13        is even more burdensome than your going and retrieving

14        something from your storage.

15                  MR. EKELAND:  Well, I mean, perhaps -- I'm just

16        looking for a solution here.  Maybe if it -- I'm sorry.  Was

17        somebody saying something?

18                  THE COURT:  May someone may have just hit a

19        microphone.  I don't know.

20                  MR. EKELAND:  So maybe that is the solution,

21        because maybe it's a non-issue.  Right?  Maybe I can get

22        somebody up over the weekend or whatever, because obviously

23        I don't know --

24                  THE COURT:  If you get someone over the weekend up

25        there and they find it and there's a need to recall the
```

1    witness, we'll recall the witness.

2              MR. EKELAND:  Okay.  And the other question we

3    had -- I just got this note -- is whether -- and the

4    Government may have already answered this.  Again, I don't

5    know.  There's the packet capture data which is on the pcap

6    on the Romanian server.  I got asked if the Government is

7    able to produce that or not.  I guess Ms. Pelker can speak

8    to that.

9              MS. PELKER:  That's on the same drive.  We have

10   the same issue.

11             I mean, I would like to pass up to the Court our

12   email correspondence with defense on this issue, just so

13   it's in the record; and we can provide it to your Honor and

14   defense counsel.

15             THE COURT:  My clerk will get that from you.

16             MR. EKELAND:  No.  We're not disputing the emails.

17             THE COURT:  I'm sorry?

18             MR. EKELAND:  I'm not disputing the email

19   correspondence.

20             THE COURT:  Okay.

21             MS. PELKER:  Well, I do think, though, there is an

22   email chain of back-and-forth with defense counsel about

23   these drives where we're reminding them that if they want

24   the drives, they need to send us a hard drive.  Then they do

25   send us the hard drive.  They follow up on the status of it.

1    We let them know it's going out.  We send them the FedEx

2    information.

3              They say thanks.

4              FedEx's shown that it's received.

5              This comes up earlier, and Mr. Hassard indicates

6    that it's in storage in New York.

7              Also, defense -- I'm not questioning anyone's

8    representation here.  But the issue of the Romania drives

9    and what's on it has absolutely been an issue.

10             So if defense is now actually claiming that

11   they've potentially never seen these drives before and never

12   received it, I don't see how that possibly squares with

13   where we are at this point in the history and trajectory of

14   this case, and that defense is now potentially raising

15   mid-trial that they claim that they didn't receive this hard

16   drive, that there's all this back-and-forth specifically

17   about it; and that has been a clear issue.

18             I think it's difficult to square.  And there is,

19   to the -- I really have a hard time, one, thinking that

20   there's a realistic way in which this drive did not get to

21   defense, and certainly that they didn't notice it until now.

22             MR. EKELAND:  Actually, the fact, your Honor --

23   I'm going to leave it at this -- is that the fact that there

24   is so much email back and forth about it tells me that my

25   office was on top of it, was getting the hard drives,

1    cataloging the stuff when it came in and uploading it.

2           So that's why I'm a little -- I mean, I'm

3    surprised that I can't find this.  So -- and again, I'm

4    not -- I can't -- I'm not going to say one way or the other

5    without going and checking.  But that's what, you know,

6    makes me wonder:  Did I get it?  I'm not doubting I got the

7    hard drives, but I have to go now -- I just don't know what

8    was on them.

9           So I don't want to --

10           THE COURT:  I will say that the email does say

11    that the hard drives containing data related to the Romania

12    server were sent on a particular date.  And then you

13    respond:  Thanks.

14           MR. EKELAND:  But that's not -- I'm sorry.

15           THE COURT:  Well, I would think at that point in

16    time, which was a year and a half ago, that if there wasn't

17    something there -- on there that you thought should have

18    been there, that you had plenty of time to look at it and

19    say:  Oh, wait a second; this isn't what you said it was.

20           MR. EKELAND:  I'm assuming it all got uploaded and

21    so -- but the fact that we said thank you doesn't mean that,

22    you know, we got it.

23           And the other thing I just don't -- I'm a little

24    bit at a loss is why the Government doesn't have a copy of

25    this.  I mean, I'm guessing they're not going to use it as

1    evidence at trial or what.  And maybe this is a nonissue.

2         If it takes them 60 days to retrieve and if all of

3    a sudden we see the pcap come into evidence tomorrow or an

4    image of the Romanian server, then I think we have grounds

5    obviously to object.

6         What I'm taking from this by the fact that the

7    Government is saying that it takes 60 days to pull this

8    stuff is that we're not going to see any of it at trial.

9         THE COURT:  Ms. Pelker?

10         MS. PELKER:  So Ms. Mazars will testify to her

11    analysis.  That's different than providing an imaged copy of

12    the entirety of the server to defense.

13         MR. EKELAND:  So then she won't be testifying

14    based on her view of something that the Government won't be

15    able to produce as evidence in court?

16         MS. PELKER:  We did produce it.

17         THE COURT:  It was given to you.  I mean, I just

18    think that, you know, I can say as much to you as to the

19    Government in this regard.  And you both have it in storage.

20    And -- at least hopefully you both have it in storage.  And

21    I don't know why the Government would have a greater burden

22    to bring it to court than you would if you received it in

23    discovery.

24         MR. EKELAND:  I'm talking about things coming into

25    evidence.  But what I've just heard from the Government is

1    that they're not planning on introducing the server or the

2    pcap stuff that they're representing is 60 days away into

3    evidence, and so I take them at their word on that.

4              MS. PELKER:  Again, I do not have a server that

5    has an evidentiary copy of this on it at hand to give to

6    defense counsel.

7              MR. EKELAND:  Okay.

8              MS. PELKER:  Our expert has reviewed that.  She

9    provided her report of that.  That's been gone -- that's

10   gone separately in discovery to defense.  She will testify

11   to her review of the server.

12             MR. EKELAND:  Based on her expert report.

13             I think we've made our record on this, your Honor,

14   unless your Honor has any other questions.

15             THE COURT:  No.

16             But I would say with respect to making a record

17   that if the Government wants to make sure that their emails

18   are part of the record, you can just lodge them on the

19   docket, just so that they're there, if you'd like to.

20             MS. PELKER:  Thank you, your Honor.

21             THE COURT:  Anything else before we adjourn today?

22             MR. EKELAND:  No, your Honor.

23             We're back at 9:30 tomorrow?

24             THE COURT:  Well, 9:15, I would say.  I've told

25   the jury to be here at 9:00.  I have a matter which is only

 1    going to take me ten minutes at 9:00 tomorrow morning.  And

 2    so by 9:15, we should be fully ready to go.  But I'd like

 3    everyone to be here by 9:00 a.m. so we can really get going.

 4          MR. EKELAND:  And we're a full day tomorrow, a

 5    full day Thursday, and then Friday morning?

 6          THE COURT:  Yeah.  Thursday, there is a juror who

 7    can't start until 10:00 and has to stop at 4:00.

 8          MR. EKELAND:  Oh.

 9          THE COURT:  And I'm all open to -- if anyone at

10    any point thinks that we have to excuse any of these jurors,

11    just let me know.

12          And then on Friday, we're a half day.

13          MR. EKELAND:  I think we may be -- the defense may

14    be streamlining its case.  I don't want to --

15          THE COURT:  I'm sorry?

16          MR. EKELAND:  I think the defense may be

17    streamlining its case a little bit.  So I think -- I don't

18    want to, you know, nail us down to anything just right now

19    because I want to see what obviously happens with the

20    Government's case in chief.

21          But I think if the Government can finish on

22    Monday, which of course, you know, there are variables

23    there, we might be able to finish it next week, you know --

24          THE COURT:  Okay.

25          MR. EKELAND:  -- give or take the normal trial

1    variables.

2            THE COURT:  Okay.  Well, I appreciate everyone

3    doing the best they can on this.

4            I will see you all tomorrow morning, then.

5            MR. EKELAND:  Thank you, your Honor.

6            THE COURTROOM DEPUTY:  All rise.

7            (Proceedings concluded at 3:37 p.m.)

1                          **CERTIFICATE**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4        certify that the foregoing constitutes a true and accurate

5        transcript of my stenographic notes, and is a full, true,

6        and complete transcript of the proceedings produced to the

7        best of my ability.

8

9

10                   Dated this 27th day of February, 2024.

11

12                  /s/ Lisa Edwards, RDR, CRR
                    Official Court Reporter
13                  United States District Court for the
                      District of Columbia
14                  333 Constitution Avenue, Northwest
                    Washington, D.C. 20001
15                  (202) 354-3269

16

17

18

19

20

21

22

23

24

25