UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 21-399 (RDM) |
| ROMAN STERLINGOV, | |
| *Defendant*. | |

**MEMORANDUM OPINION**

Before the Court is the government's motion for a preliminary order of forfeiture, Dkts. 297, 310, which Defendant Roman Sterlingov opposes, Dkt. 305. The government seeks a $395 million money judgment against Sterlingov, as well as forfeiture of six specific properties and substitute properties to be credited towards that money judgment. Dkt. 297 at 5–10.

The Court issued an Order on August 14, 2024, setting forth its preliminary view that the government's proposed order of forfeiture should be entered. Dkt. 320. The Court noted that, in prior rulings, it had previously rejected many of the arguments Sterlingov raised in his opposition. *Id.* at 2–5. The Court, however, concluded that two of Sterlingov's arguments warranted further consideration: (1) "whether the amount of any forfeiture judgment should be reduced by amounts, if any, that the government has already received (or will receive)" from forfeiture judgments against other defendants or from prior seizures of funds from darknet marketplaces; and (2) "whether the amount of the proposed forfeiture is excessive in violation of the Eighth Amendment prohibition on 'excessive fines.'" *Id.* at 1. On August 21, 2024, the Court held a hearing and heard argument from the parties regarding these two issues.

For the reasons that follow, the Court concludes that none of Sterlingov's arguments

1

provides a basis for denying or reducing the government's proposed forfeiture order. The Court will, accordingly, **GRANT** the government's motion for a preliminary order of forfeiture. Because this order is preliminary, however, the parties may still "suggest revisions or modifications before the order becomes final as to the defendant" at sentencing. Fed. R. Crim. P. 32.2(b)(2)(B).

## I. BACKGROUND

The Court has previously set forth the factual and procedural history of the case, *see, e.g.*, Dkts. 116, 259, 307, and the history relevant to the instant motion, *see* Dkt. 320, and the Court will not repeat that background here. After a month-long jury trial, Sterlingov was convicted of four counts: money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count One); money laundering, in violation of 18 U.S.C. § 1956(a)(3)(A) (Count Two); operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a) (Count Three); and operating an unlicensed money transmitting business, in violation of D.C. Code § 26-1023(c) (Count Four). Dkt. 271. As part of Sterlingov's sentence, the government seeks forfeiture of property pursuant to the "Forfeiture Allegations" set forth in the Superseding Indictment. Dkt. 43; *see* Fed. R. Crim. P. 32.2. In particular, the government seeks: (1) a "forfeiture money judgment for a sum of money equal to the value of any property, real or personal, involved in Courts One, Two, and Three, and any property traceable thereto;" (2) forfeiture of six "specific propert[ies] upon conviction of the offenses alleged in Counts One, Two, and Three;" and (3) if any of this property "cannot be located upon the exercise of due diligence," "has been transferred [to] a third party," or "has been placed beyond the jurisdiction of the Court," forfeiture of substitute property "up to the value" of the money judgment. Dkt. 43 at 5–6.

At Sterlingov's request, the Court submitted the question of forfeiture of the six specific properties to the jury after it returned its decision on the substantive charges. The jury

unanimously found, by a preponderance of the evidence, that each of the six specific properties—cryptocurrency maintained in specified accounts or held in a specified "Bitcoin Fog wallet"—was subject to forfeiture. Dkt. 274.

A.  **Statutory Framework**

Criminal forfeiture is "an aspect of punishment imposed following conviction of a substantive criminal offense." *Libretti v. United States*, 516 U.S. 29, 39 (1995). In contrast to restitution, which focuses on making the victim whole, forfeiture focuses on punishing the defendant. "Forfeitures help to ensure that crime does not pay: They at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises." *Kaley v. United States*, 571 U.S. 320, 323 (2014) (citation omitted).

Criminal forfeiture is governed by Federal Rule of Criminal Procedure 32.2. After a guilty verdict, "the court must determine what property is subject to forfeiture under the applicable [forfeiture] statute." Fed. R. Crim. P. 32.2(b)(1)(A). Rule 32.2 further provides that "[t]he court's determination may be based on evidence already in the record" and "any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). Because criminal forfeiture is an aspect of sentencing, rather than a substantive offense, the government need only "prove its forfeiture allegations by a preponderance of the evidence." *United States v. DeFries*, 129 F.3d 1293, 1312 (D.C. Cir. 1997).

Here, the government relies on a criminal forfeiture statute, 18 U.S.C. § 982(a)(1), which applies to Counts One, Two, and Three (the money laundering conspiracy, "sting" money laundering, and operation of an unlicensed money transmitting business counts). Dkt. 43 at 6. The forfeiture statute does not apply to Count Four (the D.C. unlicensed money transmitting business count). Section 982(a) provides in relevant part:

> The court, in imposing sentence on a person convicted of an offense in violation

3

>of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

18 U.S.C. § 982(a)(1).

Section 982 also incorporates the substitute property provisions of 21 U.S.C. § 853(p). *See id.* § 982(b). Under those provisions, the government may seek forfeiture of substitute property where, "as a result of any act or omission of the defendant," it cannot obtain the actual property involved in the offense. 21 U.S.C. § 853(p)(1)–(2). Section 982(b)(2), however, contains an exception: the substitute property provision "shall not be used" where a defendant convicted of money laundering "acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense." 18 U.S.C. § 982(b)(2). But it then provides an exception to this exception: even where the defendant acted as a mere "intermediary," a court must nonetheless order forfeiture if the defendant conducted "three or more separate transactions involving a total of $100,000 or more in any twelve month period." *Id.*

Forfeiture is mandatory if the statutory criteria are satisfied. *See United States v. Monsanto*, 491 U.S. 600, 607 (1989). "If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property" when applicable. Fed. R. Crim. P. 32.2(b)(2)(A).

**B.    Constitutional Framework**

Although forfeiture is statutorily mandated, the Court's authority to order forfeiture is limited by the Eighth Amendment's Excessive Fines Clause. "The Excessive Fines Clause [] 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.'" *United States v. Bikundi*, 926 F.3d 761, 795 (D.C. Cir. 2019) (quoting *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019)). The Clause applies to "punitive" forfeitures, such as *in*

4

*personam* forfeiture orders pursuant to § 982(a)(1). *United States v. Bajakajian*, 524 U.S. 321, 332 (1998).

The "test for [constitutional] excessiveness" rests on "the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 332–34. In other words, "[a] punitive forfeiture violates the Excessive Fines Clause 'if it is grossly disproportional to the gravity of a defendant's offense.'" *Bikundi*, 926 F.3d at 795 (quoting *Bajakajian*, 524 U.S. at 334). In *Bajakajian*, "the Supreme Court discussed four factors" to consider in assessing proportionality: "(1) the essence of the crime; (2 whether the defendant fit into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct." *Id.* at 795. "[T]he four factors derived from *Bajakajian* hardly establish a discrete analytic process," but they nonetheless guide the Court's constitutional inquiry and indicate "danger signals." *Collins v. S.E.C.*, 736 F.3d 521, 527 (D.C. Cir. 2013).

## II.  ANALYSIS

### A.  Property Subject to Forfeiture

The government alleges that the money judgment and six specific properties are directly forfeitable under § 982(a)(1) because these properties were "involved in" the offenses charged in Counts One, Two, and Three of the Indictment, and Sterlingov was convicted of those offenses. Dkt. 297 at 2 (quoting 18 U.S.C. § 982(a)(1)). Starting with its request for a money judgment, the government argues that "all deposits" made into Bitcoin Fog over the course of its operation were "involved in" Sterlingov's offenses, and accordingly seeks "the total value" of those deposits—a money judgment totaling $395,563,025.39. *Id.* at 3, 6. And as for the six specific properties, the government argues that forfeiture is required because the jury found, by Special Verdict, that these properties bore the requisite "nexus" to Sterlingov's offenses and

5

were thus "involved in" those offenses. *Id.* at 7. The government also seeks substitute property—namely, 10.25623378 bitcoin "seized from the defendant's Mycelium wallets"—because some of the properties subject to direct forfeiture "ha[ve] been transferred or sold to, or deposited with, a third party," and "cannot be located upon the exercise of due diligence." *Id.* at 8–10 (quoting 21 U.S.C. § 853(p)(1)). To the extent the government obtains the six specific properties and any substitute property, the value of those assets will be credited against the money judgment. *Id.* at 10.

Sterlingov resists the proposed forfeiture on several grounds. As explained below and in the Court's August 14, 2024 Order, Dkt. 320, the Court has previously rejected many of Sterlingov's arguments, and his new arguments fare no better.

*First*, Sterlingov contends that the $395 million money judgment is unwarranted because "most of the funds" deposited into Bitcoin Fog "were [not] illicit." Dkt. 305 at 3. This argument misapprehends the reach of § 982(a), which does not limit forfeiture to illicit funds. Rather, the statute reaches all funds "involved in" the covered offenses. 18 U.S.C. § 982(a)(1). As the Court has previously explained, the words "involved in" "sweep[] broadly" to include licit funds that are commingled with illicit funds in order to "conceal the nature and source" of the illicit funds. Dkt. 320; Dkt. 116 at 11 (quoting *Bikundi*, 926 F.3d at 793) (alterations omitted).

At trial, the government adduced evidence that roughly 1,284,251 bitcoin ("BTC") was deposited into Bitcoin Fog over the course of its operation, valued at approximately $395 million "as of the time the funds were received."[1] Dkt. 297 at 4. Bitcoin Fog commingled (or "tumbled") licit deposits with illicit ones, thereby allowing criminal users to deposit proceeds from unlawful activities and to withdraw untraceable, clean funds. *See* Dkt. 106-1 at 2

---

[1] Sterlingov does not dispute that the correct time to value the bitcoin was at the time of deposit. *See generally* Dkt. 305.

6

(advertising that Bitcoin Fog "mak[es] it impossible to prove any connection between a deposit and a withdraw[al] inside our service"). Thus, because the licit funds deposited into Bitcoin Fog were used in the money laundering service, those funds were "involved in" Sterlingov's offenses and are thus directly forfeitable. *See* Dkt. 116 at 11.

At oral argument, counsel for Sterlingov argued that the licit funds are not forfeitable because they were not strictly "necessary" to "the functioning of Bitcoin Fog." Dkt. 323 at 53. True enough—Bitcoin Fog could, in theory, have operated by mixing only illicit deposits. But forfeiture is not limited to funds that are strictly "necessary" to carry out the scheme. Forfeiture is mandatory so long as the licit funds "facilitated" the scheme, as they did here. Dkt. 297 at 2. Bitcoin Fog did not advertise that it could provide users with "somebody else's illegal proceeds;" it advertised that it could provide users with clean proceeds. Dkt. 323 at 5.

*Second*, Sterlingov argues that the money judgment is unwarranted because "the majority" of illicit funds were "sent through Bitcoin Fog [] outside the statute of limitations." Dkt. 305 at 15. But as the Court instructed the jury, the money-laundering conspiracy and unlicensed money transmitting business offenses are "continuing offenses" and, thus, the statute of limitations only began to run after the final day of the offense. Dkt. 268 at 66. Sterlingov has failed to identify any reason to question—or any reason why the Court should reconsider—that conclusion.

*Third*, Sterlingov objects to forfeiture of one of the six specific properties that the jury found forfeitable in the Special Verdict—namely, the 1,354 BTC held in a Bitcoin Fog wallet identified as 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw. Sterlingov opposes forfeiture of this bitcoin on the grounds that the wallet currently contains no bitcoin. But even assuming that the 1,354 BTC was transferred out of that wallet, Sterlingov's argument is unavailing. If the wallet is now empty, the government may recover the 1,354 BTC through substitute property

7

pursuant to 21 U.S.C. § 853(p), and, in any event, the government may still seek to enforce the $395 million money judgment, which includes all funds deposited in Bitcoin Fog.

*Fourth*, the Court is also unpersuaded by Sterlingov's argument that the statutory criteria for substitute property under 21 U.S.C. § 853(p) have not been satisfied. Dkt. 305 at 14. The evidence at trial showed, and Sterlingov does not meaningfully dispute, that the Bitcoin Fog deposits "were forwarded to destination addresses designated by Bitcoin Fog users" and are no longer contained in Bitcoin Fog. Dkt. 297 at 9. In other words, the deposits "ha[ve] been transferred or sold to, or deposited with, a third party," and they "cannot be located upon the exercise of due diligence." *Id.* at 8–10 (quoting 21 U.S.C. § 853(p)(1)(A), (B)). At oral argument, counsel for Sterlingov raised the additional objection that the substitute asset that the government now seeks—10.25623378 BTC seized from Sterlingov's Mycelium wallets—is improper because those wallets contain funds traceable to Bitcoin Fog and are thus directly forfeitable. Dkt. 323 at 44–45. Relying on *United States v. Bornfield*, 145 F.3d 1123, 1139 (10th Cir. 1998), counsel argued that "you cannot seek substitute forfeiture on something that is . . . subject to direct forfeiture." *Id.* But *Bornfield* merely held that the district court could not logically order forfeiture of the same asset under both § 982(a)(1) (direct forfeiture) and § 853(p) (substitute assets). *Bornfield*, 145 F.3d at 1139. That circumstance is not present here. *See* Dkt. 297-1 (Proposed Order of Forfeiture).

*Finally*, the Court is unpersuaded by Sterlingov's argument that the proposed order of forfeiture impermissibly imposes "joint and several liability" on him, Dkt. 305 at 13, because "joint and several liability 'applies when there has been a judgment against multiple defendants,'" *Honeycutt v. United States*, 581 U.S. 443, 447 (2017) (quoting *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994)). The forfeiture order imposes liability on Sterlingov alone, and he has no co-defendants. *See Bikundi*, 926 F.3d at 794; Dkt. 297-1.

8

The Court's August 14, 2024 Order addressed these arguments, but left two issues unresolved: whether the money judgment should be "offset" by the amount the government collects through other seizures or forfeitures, and whether the forfeiture here would be an unconstitutional excessive fine. *See* Dkt. 320. The Court will now address each in turn.

1. *Offsetting*

Sterlingov argues that the government's proposed forfeiture order relies on impermissible "double counting." Dkt. 305 at 11. According to Sterlingov, the government "has already recovered" many, "if not all," of the funds deposited into Bitcoin Fog through other forfeiture orders and asset seizures. *Id.* at 11–12. As a result, Sterlingov contends that the proposed forfeiture is flawed because it "fails to subtract the amounts already forfeited" from other individuals or entities. *Id.* at 12. By way of example, Sterlingov points to Ilya Lichenstein, who admitted to "using Bitcoin Fog to launder illicit funds" and who "forfeited $72,618,825.60 to the [g]overnment" as part of his plea agreement. *Id.* at 13. He also notes, more generally, that the government has already seized assets from "[m]any of the darknet markets" that, according to the government, "sent funds through Bitcoin Fog." *Id.* at 12.

Sterlingov's "double counting" objection turns on two related contentions: First, he argues that it is improper to require him to forfeit assets that belong to third parties. As the operator of Bitcoin Fog, Sterlingov was an intermediary who (at least arguably) never "possess[ed]" the deposits nor otherwise had any proprietary interest in them. *Id.* at 13; Dkt. 323 at 49. Second, he argues that the proposed forfeiture would allow the government to obtain the same money more than once from separate defendants, resulting in an unjust "double recovery" for the government. Dkt. 323 at 43; Dkt. 305 at 11–12. Sterlingov does not point to any statutory text to support his arguments but, instead, invokes equitable principles and argues that the law has not sufficiently "evolved" in this "novel" context. Dkt. 323 at 51.

The government offers two responses: First, the text of § 982(a)(1) does not a recognize statutory offset—or create a defense to the required forfeiture—based on other forfeitures or seizures, and the Court should not create an equitable exception to the statutory mandate. Second, even if there were some statutory basis for offsetting forfeiture orders when doing so would serve the interests of equity, neither the government nor the Court could apply such a principle in the present context "with[] any level of certainty." Dkt 323 at 29. Because the Court agrees with the government's first argument—that is, that creating an equitable offset for amounts laundered through Bitcoin Fog by criminal enterprises that were themselves required to forfeit their ill-gotten gains cannot be squared with the text of § 982(a)(1)—the Court need not reach the government's alternative argument.

The text of § 982(a)(1) provides a simple mandate: the Court "shall order" forfeiture of "any property, real or personal, involved in [an] offense [under Sections 1956, 1957, or 1960]." 18 U.S.C. § 982(a)(1). As explained above, the statute mandates forfeiture of commingled licit and illicit funds when the licit funds were used in the money laundering offense. *See* Dkt. 116 at 15; *see also Bikundi*, 926 F.3d at 793 (citing cases). Section 982(a)(1) does not so much as hint that a defendant is entitled to an offset where the government has already obtained the property "involved in" the offense from another individual or entity. Indeed, some courts have held that a defendant who is subject to multiple orders of forfeiture under § 982(a)(1) for the *same* funds may not obtain an offset from his *own* forfeitures, let alone an offset from others' forfeitures. *See United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (upholding "the forfeiture of certain funds twice—once as proceeds of mail and wire fraud and once as property involved in money laundering"); Dkt. 310 at 13–14 (citing cases).

Notably, when Congress intends to create a statutory right to an offset, it does so explicitly. For example, for civil forfeitures arising from loans obtained by fraud, the relevant

forfeiture statute, 18 U.S.C. § 981, provides that "the court shall allow the claimant a deduction from the forfeiture to the extent that the loan was repaid." 18 U.S.C. § 981(a)(2)(C). Similarly, for forfeitures relating to the proceeds of certain drug offenses, the relevant criminal forfeiture statute, 21 U.S.C. § 853, limits a defendant's forfeiture liability to property that he personally "obtained" as a result of the offense, 21 U.S.C. § 853(a)(1) ("any proceeds *the person obtained*") (emphasis added), and to the defendant's personal property used to commit the offense, *id.* § 853(a)(2) ("any of *the person's* property used") (emphasis added). As the Supreme Court has explained, it is the statutory text of § 853(a)—rather than any implied equitable principle—that limits the mandated "forfeiture to tainted property acquired or sued by the defendant" and thus "foreclose[s] joint and several liability for co-conspirators." *See Honeycutt v. United States*, 581 U.S. 443, 449–50 (2017).

     Section 982(a)(1), in contrast, is devoid of any similar language that would authorize the Court to offset the forfeiture amount or that limits forfeiture liability to the defendant's personal gain or personal property. But that is precisely the result Sterlingov seeks here. At oral argument, counsel referred to "a number of cases" in which the courts purportedly "offset what the government ha[d] seized" or in which the courts otherwise "refuse[d]" to "double count." Dkt. 323 at 41. None of those cases, however, involved forfeiture under § 982(a)(1), and because the meaning of each forfeiture statute necessarily turns on the specific language that Congress employed, those cases—which dealt with different forfeiture provisions, which contain different language—offer no meaningful guidance here. *See United States v. Thompson*, 990 F.3d 680, 689 (9th Cir. 2021) (interpreting 18 U.S.C. § 981(a)(1)(C)); *United States v. Young*, 330 F. Supp. 3d 424, 431 (D.D.C. 2018) (interpreting 21 U.S.C. § 853(a)). Counsel provided no explanation for why the Court should import these textual limits into § 982(a)(1), other than it would be "common sense" to do so. Dkt. 323 at 41. It is not the Court's role,

11

however, to rewrite the laws that Congress enacted—even if the Court were persuaded (and the Court expresses no view on the question) that it would make sense to recognize an exception to the otherwise-sweeping statutory mandate.

Section 982(a)(1)'s silence regarding offsets provides ample basis to reject Sterlingov's offset argument. But, even beyond that silence, a "wider look at the statute's structure gives [the Court] even more reason for pause." *Romag Fasteners, Inc v. Fossil, Inc.*, 590 U.S. 212, 215 (2020). Sterlingov argues that applying an offset is warranted because he never "possess[ed]" the funds in question. Dkt. 305 at 12. In pressing that argument, however, he fails to account for the "intermediary" exception under § 982(b)(2). Under that provision, the Court may not order a defendant convicted of money laundering to forfeit substitute property "in place of the actual property laundered" where he acted "merely as an intermediary who handled but did not retain the property." 18 U.S.C. § 982(b)(2). In other words, intermediaries are relieved of the obligation to forfeit money they laundered for third parties. Congress, however, limited the reach of that exception; the exception is unavailable if the intermediary "conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period." *Id.* Given the volume of deposits into Bitcoin Fog—over $395 million over the course of a decade—Sterlingov does not even suggest that this exception applies to him. *See* Dkt. 323 at 51–52. Against this backdrop, it would snap credulity to conclude that the exception does not apply, only to then "read into [the] statute[]" an additional (and, indeed, similar) exception that "[isn't] there." *Fossil, Inc.*, 590 U.S. at 215.

The text of Federal Rule of Criminal Procedure 32.2 further bolsters the conclusion that Sterlingov's proprietary interest in the deposits (or lack thereof) is irrelevant to the money judgment in particular. Under Rule 32.2, before entering a final order of forfeiture, a court must provide third parties with the opportunity to "assert[] an interest in the property to be forfeited."

12

Fed. R. Crim. P. 32.2(c)(1). "If no third party files a timely petition, the [court's] preliminary order becomes the final order of forfeiture *if* [it] finds that the defendant . . . had an interest in the property that is forfeitable under the applicable statute." *Id.* 32.2(c)(2) (emphasis added). That is, a defendant cannot be ordered to forfeit property in which he has no interest that is forfeitable. But—critically—this provision does not apply "to the extent that the forfeiture consists of a money judgment." *Id.* 32.2(c)(1). Rule 32.2 therefore contemplates money judgment forfeitures even when the defendant has no proprietary interest in the property. As a result, Sterlingov may not object to the money judgment on the grounds that the Bitcoin Fog deposits never belonged to him or that the funds have been withdrawn from Bitcoin Fog by third parties.

Finally, reading such an exception into § 982(a)(1) is difficult to reconcile with the punitive—as opposed to compensatory—purposes of forfeiture. For instance, imagine Defendant A gives $100 in drug sale proceeds to Defendant B, and Defendant B launders those proceeds and, in return, gives Defendant A $100 in clean funds. If both defendants are convicted of money laundering, both defendants must forfeit $100 under § 982(a)(1) because $100 was "involved in" each defendant's offense. According to Sterlingov's theory, however, the government must place a "red mark" on the bills—after the $100 has been forfeited once, those funds may not be forfeited again. *See* Dkt. 323 at 49. Sterlingov would allow one defendant to avoid forfeiture—and to profit from his illegal activity—simply because the other defendant has already paid, in essence giving him a "get out of jail free card." *Id.* at 50. At oral argument, Sterlingov's counsel was unable to articulate a limiting principle for his theory. In every case involving money laundering and multiple defendants, as soon as one defendant is able to pay, the remaining defendants would enjoy a windfall, even if they used the funds to commit some unrelated crime "17 transactions later." *Id.* at 49–50.

For the same reasons, the Court is not persuaded by Sterlingov's "double recovery" argument. At oral argument, counsel emphasized that offsets are necessary because, without them, the government would be "unjustly enriched" through multiple forfeitures. *Id.* at 49. Not only is this argument unmoored from the statutory text, but it misapprehends the nature of criminal forfeiture. Criminal forfeiture is "an aspect of punishment." *Libretti v. United States*, 516 U.S. 29, 39 (1995). It is not imposed for the purpose of making the government whole. That is the difference between forfeiture and restitution.

The Court, accordingly, concludes that "Congress has spoken clearly" and "in mandatory terms," leaving the Court with "[no] discretion to depart from the plain text of 982(a)(1)." Dkt. 323 at 21. Even assuming an appropriate offset could be calculated in this case, the statute does not permit the Court to reduce Sterlingov's forfeiture by amounts recovered from other defendants in cases involving other offenses.

2. *Excessive Fines Clause*

Finally, Sterlingov argues that the proposed forfeiture order violates the Eighth Amendment as an "excessive fine." Dkt. 305 at 5. As explained above, the Eighth Amendment's Excessive Fines Clause prohibits forfeitures that are "grossly disproportional to the gravity of the crime." *Id.* at 7; *see Bajakajian*, 524 U.S. at 334. The parties agree that the Excessive Fines Clause applies here, *see* Dkt. 323 at 35, and that the constitutional inquiry is governed by the Supreme Court's decision in *United States v. Bajakajian*, 524 U.S. 321 (1998), *id.* at 30, 53. The Court must, accordingly, consider—among other things—"(1) the essence of the crime; (2) whether the defendant fit into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct." *Bikundi*, 926 F.3d at 795.

Sterlingov contends that all four factors weigh in his favor. At oral argument, his counsel

14

argued that the first, second, and fourth factors demonstrate that the proposed forfeiture amount is disproportionate to his wrongdoing.  *See* Dkt. 323 at 53–60.  Among other things, Sterlingov stresses that he did not launder $395 million in illicit funds, he never had a proprietary interest over anywhere near $395 million in bitcoin, and he obtained only a small fraction of that sum based on the service fee (the size of which varied over time) that he charged for using Bitcoin Fog.  Dkt. 305 at 6.  He also argues that the "nature of the harm" is limited, given that "there is [not] a single identifiable [] victim."  Dkt. 323 at 60.

At the outset, the Court notes that Sterlingov's counsel was unable to point to Court to any authority holding that forfeiture of commingled funds in a money laundering offense violated the Excessive Fines Clause.  The Court located only one such decision, and it involved substantially different circumstances from the ones presented here.[2]  And although the Court recognizes that a $395 million forfeiture judgment is jaw dropping in size, it is far from the largest money judgment ordered this year, *see United States v. Bankman-Fried*, 2024 WL 1506561, at *2 (S.D.N.Y. Mar. 29, 2024) (ordering $11 billion forfeiture), and it is so large because that is, in fact, the amount of money that Sterlingov processed through Bitcoin Fog and that was used in the money laundering offense that the jury found that he committed.

Turning to the four factors that the Supreme Court considered in *Bajakajian*, the Court is unpersuaded that "the amount of the [proposed] forfeiture is grossly disproportional to the gravity of the defendant's offense."  524 U.S. at 328.  To start, as the government observes, Sterlingov was not a small-time money launderer.  Dkt. 310 at 3–5.  Instead, "Sterlingov operated [] one of the Darknet's largest and most significant Bitcoin money laundering services

---

[2] *United States v. Stanford*, 2014 WL 7013987, at *5–6 (W.D. La. Dec. 12, 2014) (holding that forfeiture of the defendant's house under 18 U.S.C. § 982(a)(1) would violate the Excessive Fines Clause where the defendant used some illegal proceeds to pay his mortgage but did so incidentally and not "for the purpose of disguising the nature and source of his scheme").

15

for nearly ten years," and he laundered tens of millions in illicit funds. *Id.* at 4. Sterlingov promoted Bitcoin Fog, moreover, for this precise purpose: he promised users that the service would make it "impossible" for anyone—including "authorities"—to trace proceeds back to the user, providing cover for a staggering amount of unlawful conduct. Dkt. 106-1 at 2. The fact that Sterlingov was an intermediary—laundering money for third parties for his own financial gain—does not reduce his culpability. To the contrary, he "fall[s] squarely within the class of criminals targeted by the relevant forfeiture statutes." *Bikundi*, 926 F.3d at 795-96.

Nor is the Court persuaded that any difficulty in identifying specific victims of Sterlingov's offenses means that he did not cause enormous harm. "[T]he greater harm from money laundering is usually obvious: criminals launder money to cover up their criminal conduct, and society suffers 'when criminally derived funds are laundered to allow the criminal unfettered, unashamed and camouflaged access to the fruits of those ill-gotten gains.'" *United States v. Waked Hatum*, 969 F.3d 1156, 1169 (11th Cir. 2020) (quoting *United States v. O'Kane*, 155 F.3d 969, 972–73 (8th Cir. 1998)). The difficulty in identifying specific victims, moreover, is a product of the obfuscation inherent in the crime. The jury found that Sterlingov knowingly conducted financial transactions; that he knew that the funds involved in those transactions were the proceeds of illegal activity; that the funds, in fact, came from unlawful drug dealing; and that he "acted with intent to promote" that unlawful activity. Dkt. 268 at 42 (jury instructions). The government need not identify a particular overdose or other injury to demonstrate that the money laundering caused significant harm.

Sterlingov further argues that the proposed forfeiture far exceeds the maximum fine that the Court could impose. Dkt. 323 at 54. Section 1956(a)(1) authorizes "a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater." 18 U.S.C. § 1956(a)(1). On Sterlingov's view, the Court should assume that "the value of

16

property involved in the transaction" is limited to the amount of illicit funds, which the government estimates to be at least $67 million. Dkts. 323 at 55; 310 at 4. That would result in a maximum fine of roughly $134 million, which is less than the $395 million money judgment that the government seeks. *See* Dkt. 323 at 55. Sterlingov argues that the disparity between these sums supports his view that the proposed forfeiture is constitutionally excessive.

Sterlingov offers little support for his contention that a fine, if imposed, would be limited to twice the value of *illicit* funds laundered through Bitcoin Fog, and D.C. Circuit precedent suggests otherwise. In *Bikundi*, the defendants were ordered to forfeit $80 million for health care fraud and money laundering. *Bikundi*, 926 F.3d at 792–93. On appeal, the defendants argued that only $2.61 million was "actually laundered" and that they should not be forced to forfeit funds they obtained in exchange for "legitimate [healthcare] services." *Id.* The D,C, Circuit rejected the defendants' constitutional challenge, however, in part because the statute authorized a maximum fine of "twice the value of the property involved in the money laundering transaction." *Id.* at 796. That conclusion finds support in § 1956(a)(1), which provides as follows:

> For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

18 U.S.C. § 1956(a)(1). That statutory text seems to fit Bitcoin Fog to a tee.

But even if it did not, a maximum fine of approximately $135 million (twice the low end of the government's estimate of the quantity of illicit funds laundered through Bitcoin Fog) is not so "grossly disproportional" to a $395 million forfeiture as to render the forfeiture constitutionally excessive. *Bajakajian*, 524 U.S. at 334. As the *Bajakajian* decision stresses, "judgments about the appropriate punishment for an offense belong in the first instance to the legislature," *id.* at 336,

and, here, Congress has mandated that all property "involved in" a money laundering offense—including both illicit funds and licit funds used in "tumbling" those illicit funds—is subject to forfeiture, 18 U.S.C. § 982(a)(1). To the extent the Supreme Court considered the "maximum fine" in *Bajakajian*, moreover, it did not do so to set a strict measure of proportionality. 524 U.S. at 338. Rather, it merely looked to the maximum fine as an indicium of the "level of culpability" that Congress assigned to the underlying offense. *Id.* Here, there is no doubt that "[t]he essence of [Sterlingov's money laundering] crime was grave." *Bikundi*, 926 F.3d at 795. Indeed, given the nature of the crime—which involved concealing illicit bitcoin transactions from "authorities" for roughly a decade—it seems safe to assume that the government's estimates of illicit transactions are, if anything, underinclusive.

Finally, Sterlingov contends that the proposed forfeiture amount is excessive in light of his financial condition. Sterlingov argues that his assets amount to "roughly 2 million," Dkt. 323 at 60, and that this "astronomical" forfeiture order would affect his "future earnings for the remainder of his life," Dkt. 305 at 12. As an initial matter, the Court notes that it is far from clear that a defendant's ability to pay is a relevant consideration for purposes of the Excessive Fines Clause. To be sure, some circuits do consider the defendant's financial circumstances. *See Bikundi*, 926 F.3d at 796 n.5 (citing cases). But in *Bajakajian*, the Supreme Court declined to consider whether the defendant's "wealth or income are relevant to the proportionality determination." 524 U.S. at 340 n.15. Similarly, in *Bikundi*, the defendants argued that the forfeiture order entered in their case was excessive in light of their inability to pay, but the D.C. Circuit declined to hold that courts must consider this factor, merely noting that "most circuits assess proportionality without considering a defendant's ability to pay." *Bikundi*, 926 F.3d at 796 n.5.

Even if the Court were to consider this factor, however, it would not weigh so heavily as

18

to tip the balance in Sterlingov's favor. As an initial matter, the government disputes that Sterlingov possesses only a few million dollars, contending that one of the six specific properties subject to forfeiture is the Bitcoin Fog cluster containing (or which contained) 1,354 BTC, valued (at the time of the August 2024 hearing) at between $80 million and $95 million. Dkt. 323 at 33. According to the government, Sterlingov will someday be able to access this cluster and to "wipe away perhaps as much as a quarter of that $395 million in the blink of an eye." *Id.* But even assuming that Sterlingov possesses only a few million dollars in assets, the Court doubts that "a defendant's inability to satisfy a forfeiture at the time of conviction, in and of itself, is . . . sufficient to render a forfeiture unconstitutional," *United States v. Levesque*, 546 F.3d 78, 85 (1st Cir. 2008). "[E]ven if there is 'no sign' that the defendant could satisfy the forfeiture in the future, there is always a possibility that she might be fortunate enough 'to legitimately come into money.'" *Id.* Given the volatility of cryptocurrency, Sterlingov may well "come into" extraordinary wealth at some point in the future. One purpose of the proposed forfeiture order is to ensure that he does not profit from his unlawful activity.

To be sure, whether the proposed order of forfeiture violates the Excessive Fines Clause presents a much closer question than Sterlingov's statutory arguments. A $395 million money judgment is unquestionably an enormous sum. But, most fundamentally, this figure reflects the sheer scale of Bitcoin Fog and the length of time it operated. If the facts of this case were slightly different, a money judgment of that size might exceed constitutional limits. It would likely be excessive, for example, if Sterlingov had been convicted only of operating an unlicensed money transmitting business or if the illicit funds comprised only a negligible fraction of the total deposits into Bitcoin Fog. But that is because, under those circumstances, the size of the forfeiture would be "grossly disproportional to the gravity of the . . . offense." *Bajakajian*, 524 U.S. at 334. Before the Court can reach such a conclusion it must exercise

19

appropriate deference to the judgment of "the legislature," *id.* at 336, and the jury's verdict, and it must consider the harm that the defendant caused, the gravity and duration of the offense, and the defendant's culpability. Viewed in this light, the Court cannot conclude that the proposed forfeiture order oversteps constitutional bounds.

## CONCLUSION

The Court will, accordingly, enter the government's preliminary order of forfeiture but—consistent with Rule 32.2—will permit the parties to propose any revisions or modifications at sentencing.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: November 4, 2024