```
1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,      )  Criminal Action
                                    )  No. 21-cr-399
4                    Plaintiff,     )
                                    )  JURY TRIAL
5    vs.                            )  AFTERNOON SESSION
                                    )
6    Roman Sterlingov,              )  Washington, DC
                                    )  February 26, 2024
7                    Defendant.     )  Time:  2:00 p.m.
     _____

8
                        TRANSCRIPT OF JURY TRIAL
9                            HELD BEFORE
                 THE HONORABLE JUDGE RANDOLPH D. MOSS
10                   UNITED STATES DISTRICT JUDGE
     _____

11
                        A P P E A R A N C E S
12

13   For Plaintiff:      Christopher Brown
                         DOJ-USAO
14                       601 D Street, NW, Suite 5.1527
                         Washington, DC  20530
15                       Email:  Christopher.brown6@usdoj.gov
                         Catherine Pelker
16                       US DOJ
                         950 Pennsylvania Avenue NW
17                       Washington, DC  20530
                         Email:  Catherine.pelker@usdoj.gov
18                       Jeffrey Pearlman
                         DOJ-CRM
19                       1301 New York Avenue NW
                         Washington, DC  20005
20                       Email:  Jeffrey.pearlman@usdoj.gov

21   For Defendant:      Tor Ekeland
                         Michael Hassard
22                       Tor Ekeland Law PLLC
                         30 Wall Street, 8th Floor
23                       Brooklyn, NY  10005
                         Email:  Tor@torekeland.com
24                       Email:  Michael@torekeland.com

25   Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                         Email:  Janice_e_dickman@dcd.uscourts.gov
```

```
1        *   *   *   *   *   *   *P R O C E E D I N G S*   *   *   *   *   *   *
```

2            THE COURTROOM DEPUTY:  Criminal case number 21-299,

3    *United States of America versus Roman Sterlingov*.

4            Would counsel please approach the podium, state your

5    name for the record, starting with government counsel.

6            MR. PEARLMAN:  Jeff Pearlman for the government.

7    With me is AUSA Chris Brown and DOJ attorney C. Alden Pelker.

8            THE COURT:  Good afternoon.

9            MR. EKELAND:  Good afternoon, Your Honor.  Tor

10   Ekeland for defendant Roman Sterlingov, who is present in

11   court.  And joining me at counsel table is Michael Hassard.

12           THE COURT:  Okay.  Good afternoon to you as well.

13           So with respect to the objection regarding

14   Mr. Lichtenstein, I did get back and look at the sealed

15   transcript on that, and it does appear I've already ruled on

16   that objection.  So I just don't know if there's anything else

17   to add.

18           Mr. Ekeland?

19           MR. EKELAND:  Just briefly, your Honor.  I mean, the

20   main reason I objected was that -- because I hadn't seen it

21   before or heard it before, and I was just struck at how similar

22   he looks to Mr. Sterlingov.  So this is -- I'm going to cut it

23   short here and just say it's 403 objection.  And I've already

24   argued the other points.  And if the government just keeps it

25   to the fact testimony, I'm just essentially making a 403

```
 1    objection.

 2          THE COURT:  Well, with respect to the 403 issue, I

 3    will say -- I may be wrong about this, but I personally don't

 4    associate a name like Lichtenstein with someone of Russian

 5    heritage, so I don't see that connection at all.  Maybe Ilya, I

 6    don't know if that's a common Russian name or not, but I don't

 7    see any sort of connection there.  And quite frankly, although,

 8    both the witness and the defendant are white men with dark

 9    brown hair who are probably somewhere within the five, six,

10    seven years of age of each other, I'm not sure I see much, if

11    any, resemblance, and certainly nothing that would give rise to

12    a 403 issue.

13          All right.  Does the government want to be heard on

14    the question about the references to the particular names of

15    the films involving abuse of children?

16          MR. BROWN:  Yes, Your Honor.  And I think the core

17    point here is the government bears the burden of proof, and one

18    of the elements on which we bear a burden of proof on the

19    1960(b)(1)(C) prong is the transmission to funds that are known

20    to the defendant to have been derived from a criminal offense

21    or are intended to be used to promote or support unlawful

22    activity.

23          And the fact of the matter is, this is direct

24    evidence -- the fact that these users who are users of Bitcoin

25    Fog, you know, had activity on Welcome to Video that
```

1    constitutes an offense under, you know, potentially 18 U.S.C.

2    1466(a) or other child pornography offenses, that is direct

3    evidence of an element on which we bear the burden of proof.

4            Rule 403 talks about unfair prejudice, and unfair

5    prejudice is not just bad prejudice.  Unfair prejudice has a

6    definition, and the definition of unfair prejudice is having an

7    undue tendency to suggest a decision on an improper basis.  And

8    as the Supreme Court has explained, that means a ground other

9    than proof specific to the offense alleged.

10           Here, there is no undue -- there's no improper basis.

11   And I think it's helpful to think -- you know, think in terms

12   of a limiting instruction.  What would a limiting instruction

13   here say to the jury?  You cannot view this -- you cannot take

14   this evidence as proof of anything other than that these users,

15   you know, committed child pornography offenses.

16           That's the only purpose for which it's being entered.

17   There's no 404(b) issue.  There's no propensity or character

18   evidence issue.  And I think, as the defense can point out, you

19   know, this is not Mr. Sterlingov's activity.  We're not

20   claiming it's Mr. Sterlingov's activity.  We're claiming that

21   this is part of the offense on which we bear the burden of

22   proof.

23           You know, I do --

24           THE COURT:  You, yourself, would agree, for example,

25   that exhibiting the films in the courtroom would be unnecessary

1    and, perhaps, more prejudicial than probative because people

2    would be so deeply offended by the films that it might make

3    them more prone to rendering an emotional, rather than a

4    rational, decision in the case, right?

5         MR. BROWN:  Your Honor, I would agree that it would

6    provoke an emotional reaction.  But the question is:  Does that

7    emotional reaction tend to influence the decisionmaker to make

8    a decision on guilt on an improper basis?  And I think if --

9    you know, for example, if this were truly ancillary, if this

10   were -- and this is not the case here, but if there were child

11   pornography found on the defendant's computer and the

12   government just, you know, gratuitously wanted to exhibit that,

13   that would be improper --

14        THE COURT:  Does somebody have the exhibit that they

15   can put up for me?

16        MR. BROWN:  Yes, Your Honor.  I think it's --

17        And, Your Honor, I think our concern is, you know,

18   there was some discussion during the hearing that we could just

19   black out that column.  And there's another column that says,

20   you know, words like "Child Porn" --

21        THE COURT:  Right.

22        MR. BROWN:  -- "Boys," some other words.  Our concern

23   is:  Does that leave any ambiguity that the defense could

24   exploit after securing the redaction of this evidence?  Does

25   that leave any ambiguity for the defense to argue, well, it

1    says child porn, but that could be anything.  Is that really a

2    federal criminal offense?

3         And so I think, you know, if we are to -- you know,

4    to not exhibit that specific evidence to the jury, I think what

5    we would want is a jury instruction similar to the sort of jury

6    instruction we would get in a 922(g) case where we are -- you

7    know, where there's a stipulation or some sort of jury

8    instruction that the defendant has previously been convicted

9    of, you know, a federal offense.

10        I think we would want a jury instruction that says,

11   you know, ladies and gentlemen of the jury, what is in column

12   G -- what is not being shown to you in column G, that

13   establishes -- you know, I will instruct you, ladies and

14   gentlemen of the jury, that the information in column G

15   establishes that these users were committing a federal child

16   pornography offense under 1466(a) or another statute.

17        And I think that would be acceptable to the jury.

18   But what I don't -- that would be acceptable to the government.

19   But what is not acceptable is just blacking that out and

20   allowing the defense to sort of exploit the ambiguity, where we

21   only have column F, you know uploaded videos, "Boys."  You

22   know, the defense could argue, well, you know -- and the

23   defense can argue, well, you know, it wasn't a lot of money,

24   and, you know, you can't tell, some of these just say "Videos,"

25   you know, how much of that money was really, you know, for a

1     child pornography offense.

2             THE COURT:  Who created this chart?

3             MR. BROWN:  Your Honor, I believe this chart was

4     extracted from the Welcome to Video service.  It was created by

5     law enforcement as an extraction for these specific users.  And

6     Ms. Pelker may have more information, but -- yes, this was --

7             THE COURT:  I guess one of the issues I'm thinking

8     about is that the titles are -- many of them, at least, not all

9     of them, are in English, and there has been some argument made

10    that, you know, what's the connection to the United States?

11    You can do all sorts of things in different parts of the world.

12    And I frankly don't know whether there are countries in the

13    world where the most horrific abuse of children is not a crime.

14    And maybe it is, but maybe there's somewhere in the world where

15    it is not.  And I think, perhaps, the fact it's in English is

16    somewhat probative as well for that reason, I suppose.

17            MR. BROWN:  Yes, Your Honor.  And that's why I think,

18    you know, the only available acceptable substitute for allowing

19    us to introduce relevant and admissible evidence on an element

20    that we bear the burden of proof is a jury instruction that the

21    jury is instructed to find that a federal child pornography

22    offense was committed by these listed users in this series -- I

23    think it's ten accounts that Mr. Scholl analyzed.  And the

24    defendant can argue about, you know, was it really Bitcoin Fog

25    that did this?  Was it really the defendant?

1          You know, part of our proof is proving that there was

2     a federal offense that was being promoted or facilitated by

3     Bitcoin Fog.  And frankly, I think the jury does deserve to see

4     the kinds of activity that Bitcoin Fog helped to promote and

5     that the defendant helped to promote.

6          THE COURT:  What is in column H, which I believe

7     Mr. Hassard raised as an issue?

8          MR. BROWN:  It's further description.

9          THE COURT:  Further description.  I see.  Okay.  So

10    it is similar.

11         I suppose there's certainly no reason to have both

12    columns, right?

13         MR. BROWN:  No, Your Honor.  One or the other.

14         THE COURT:  All right.  Let me hear from Mr. Ekeland,

15    then.

16         MR. EKELAND:  First, Your Honor, as the Court knows,

17    no money from Welcome to Video was deposited into Bitcoin Fog.

18    What we are discussing here is, I believe, a little under

19    $1,000, I think it was, like, 989, somewhere, of funds that

20    users ran through Bitcoin Fog and then sent to Welcome to

21    Video.  There's no evidence anywhere that I'm aware of that the

22    administrator of Bitcoin Fog knew what these funds were going

23    to be used for.

24         Additionally, it's my understanding that this

25    spreadsheet is just a spreadsheet for one particular user.

1    I've been told you can look at column B, and that this is a

2    spreadsheet for one user of Bitcoin Fog -- not Bitcoin Fog --

3    of Welcome to Video, and it's not clear to me that there's

4    actually any evidence linking this user to funds that they ran

5    through Bitcoin Fog.

6              THE COURT:  I'm sorry.  Back up and explain that to

7    me.

8              MR. EKELAND:  Could we see column B?

9              This was a note I was handed.  Somebody was looking

10   at this.  So, it's my understanding that, yes, you can see the

11   user name in column B.

12             THE COURT:  Right.  I guess what I'm curious more

13   about is whether the Bitcoin address is associated with output

14   from Bitcoin Fog.

15             MR. EKELAND:  The government is going to have to

16   answer that.  I'm not 100 percent positive on that.

17             THE COURT:  Isn't that all that matters for present

18   purposes?  Because we don't have user names of Bitcoin Fog.

19             MR. EKELAND:  No, you don't.  But I think the main

20   point here is -- I mean, the money laundering statutes matches

21   the word "proceeds" 13 times.  It's not proceeds -- there's no

22   evidence there's any proceeds from any crime for the funds that

23   are coming out of Bitcoin Fog.

24             I think the point number 2 is that this is probative

25   of nothing because it's already in the record, and the jury has

1    already heard that Welcome to Video is a CSAM site.  So to the

2    extent that this evidence is -- is relevant, it's on an issue

3    that the jury has already received evidence on.  I don't think

4    anybody is disputing that Welcome to Video is a CSAM site.

5    What the dispute is, do these highly inflammatory and

6    prejudicial titles listed in G and H, and I would even argue

7    column F, do they get, you know, put in front of the jury?

8             I mean, if -- I don't even want to read these lines

9    into the record because I think they're -- I mean, it's pretty

10   heinous and it proves nothing because it's going to a point

11   that's already been made to the jury.

12            THE COURT:  So what do you say to Mr. Brown's

13   suggestion, then, that there at least be an instruction to the

14   jury, if we do redact this, in which I say that we've redacted

15   the names of the videos because the jury doesn't need to know

16   those, but they do -- everyone agrees that they reflect

17   that these funds were used for purposes of engaging in criminal

18   behavior involving the abuse of children, or whatever the right

19   language is?

20            MR. EKELAND:  I think that's unnecessary because the

21   jury already knows and has been told, and it has -- I don't

22   think it's been disputed that Welcome to Video is a CSAM site,

23   and that goes to the --

24            THE COURT:  But knowing that's maybe a little bit

25   different from knowing that these particular funds that went

1    from Bitcoin Fog were then used for purposes of committing a

2    violation of the U.S. criminal law.

3            MR. EKELAND:  Well, there's a third point here that

4    Mr. Fischbach has pointed out for me, because he does work CSAM

5    cases, and that's -- my understanding is that in CSAM cases,

6    the -- when it comes to videos and their titles like this, the

7    National Center for Exploited and Missing Children runs,

8    basically -- if I'm understanding this, he can speak better

9    than me to it -- they basically authenticate the titles because

10    a high degree of the time it's not accurate, these titles,

11    because what they're being used for is SEL purposes.  And it's

12    my understanding that the National Center For Exploited and

13    Missing Children hasn't verified the accuracy of any of these

14    titles.

15            So I think -- I don't want to take up too much of the

16    Court's time, but I think our three points, essentially, are:

17    There is no evidence of money laundering, you don't have any

18    evidence of the intent, and all of these funds, the small

19    amount, $989, are going post-mix from Bitcoin Fog into Welcome

20    to Video.

21            Number two, it's probative of nothing because

22    that's -- it's already in evidence that Welcome to Video is a

23    CSAM site.

24            And number three --

25            THE COURT:  As I said before, it's not in evidence

1    that these particular funds were then used for a purpose that

2    violated U.S. criminal law.

3              MR. EKELAND:  In terms of what --

4              THE COURT:  Maybe a child abuse site, but there may

5    be videos on that site that don't violate the statute, and you

6    don't know whether the funds are going for that purpose or not,

7    right?  I mean, it could be the site, 99.9 percent of what the

8    site does is a crime and .1 percent is not.

9              MR. EKELAND:  And that these funds could go and being

10   used for innocent purposes?

11             THE COURT:  Well, yeah.  Maybe not even innocent, but

12   not something that violates the U.S. criminal law.  If it was,

13   for example, you know, videos of children that don't qualify

14   under the statutory definition, for example.

15             MR. EKELAND:  I would be a little surprised if that's

16   what the jury -- anybody on the jury would think that the

17   Welcome to --

18             THE COURT:  But then why not stipulate to the fact

19   that these are titles --

20             MR. EKELAND:  I'm happy to stipulate that Welcome to

21   Video was a CSAM site.

22             THE COURT:  But what -- that -- what you've already

23   said is in the record.  But I guess the question I have,

24   though, is what about stipulating to the fact that the funds in

25   these accounts that are listed for -- addresses column A, that

1    those Bitcoin were then used on the site to purchase videos,

2    you know, involving the sexual abuse of children in a manner

3    that violates U.S. law?

4             MR. EKELAND:  My concern there is that it might be

5    confusing to the jury in that they're going to then take the

6    additional step to saying that the Bitcoin Fog administrator

7    knew that this was going to be the use of funds post-mix, and

8    there's nothing in the record that supports that proposition.

9             I think -- I mean --

10            THE COURT:  No, I take that point.  But, I take it

11   that the government's argument more generally is that -- and I

12   know you disagree with this characterization, but their

13   argument is, is that the site was a money laundering site --

14   that Bitcoin Fog was a money laundering site, intended to allow

15   people to engage in criminal activity, whatever it might be.

16            And, you know, it may be that, for example, there

17   were drug transactions involving the purchase of fentanyl that

18   were done with this site.  You could make the point that, you

19   know, Mr. Sterlingov had no idea that people were purchasing

20   fentanyl.  But the government would be entitled to argue, well,

21   when you set up a site that launders money on the dark web,

22   people know, and you can reasonably infer that it's going to be

23   used for purposes like that.

24            And that's just sort of your differences in the

25   arguments.  Your argument here is this is largely a privacy

1   site, and the government's argument is that this was a site for

2   laundering funds for illegal purposes.  And the government's

3   argument is that Mr. Sterlingov may not have known what each

4   transaction was, but he knew and intended to profit from the

5   fact that people were laundering funds for engaging in conduct

6   of this type, and that it's not a big surprise that people are

7   laundering money through an .onion site for the purposes of

8   purchasing child pornography.

9        MR. EKELAND:  But there's no money coming into

10  Bitcoin Fog from Welcome to Video.  This is all --

11       THE COURT:  But there is money coming in from people

12  who are allegedly laundering their money through the site and

13  paying a fee to launder the money through their site and that,

14  allegedly, Mr. Sterlingov is profiting from people who might

15  not be going to those sites to purchase the child porn if they

16  thought they could be traced.  But they say, Ah, I can't

17  untrace because I can use Bitcoin Fog and, therefore, I can --

18  and, therefore, he's thus facilitating, allegedly, the

19  transactions.

20       MR. EKELAND:  I guess I'm just confused under the

21  theory of money laundering here because there's no evidence of

22  any money laundering, of money going through Bitcoin Fog.  What

23  you have is post-mix use of the funds, and under this type of

24  legal theory, you're implicating just everyday, you know,

25  brick-and-mortar banks in the criminal acts of people

1    withdrawing money from the banks and then using it to buy drugs

2    or commit any kind of crime.

3         I just -- the -- you know, I think what's lacking

4    here is any kind of evidence that there is any kind of money

5    laundering gone on here and that there's any kind of intent.

6    And I don't see how, you know, if you just look at Bitcoin Fog

7    like it was a bank that someone was passing money through and

8    just taking money out of, I don't see how you can attribute the

9    intent to say, whatever, Chase Bank, if somebody takes $40 out

10   and then buys child porn.  I think you need something more

11   there.

12        THE COURT:  Right.  But the analogy to a bank doesn't

13   quite hold.  You know, the analogy might, you know, hold better

14   if, you know, when we're dealing with a money laundering

15   operation, and there were allegedly cartels in Mexico that were

16   then sending money to a money laundering site and some of that

17   money was being then used for financing the continued

18   operations of the cartels, right?

19        MR. EKELAND:  No.  I think the issue --

20        THE COURT:  The whole point of a bank is that you can

21   trace what's going on.  And the whole point of this is to avoid

22   tracing it, right?

23        MR. EKELAND:  The point being that it's where you

24   attribute the intent and what evidence there is for intent and

25   the use of these funds.  And there are legitimate uses for

1    mixers, as the Court knows, and I think the Court has

2    acknowledged.

3              THE COURT:  Right.

4              MR. EKELAND:  And I don't want to belabor the point,

5    Your Honor, because I think the Court understands it, is that

6    you've got post-mix funds here.  You've got no premixed funds.

7    And I think that's one thing that stands out in these charts,

8    is that in all the other markets, you've got some kind of, you

9    know, deposit into Bitcoin Fog.  And, you know, here, this is

10    the one market where there are no deposits from it.  And I

11    think you have to take a leap to get to the intention of the

12    money laundering.

13              And I'm going to stop right there.

14              THE COURT:  Leap to get to what?

15              MR. EKELAND:  A leap to get to the intentionality or

16    the intent to money launder upon the operator of Bitcoin Fog.

17              THE COURT:  Right.  I guess I'm not persuaded by that

18    argument.  But I'm still coming back to the question that I had

19    before, just whether these titles are so inflammatory that

20    there ought to be some way of addressing it.  And I don't know

21    if you have anything more you want to add on that point.

22              MR. EKELAND:  I just would submit that if the Court

23    looks at line 26 and in column G and -- just -- I don't want to

24    even read that into the record, but I think --

25              THE COURT:  They're horrible.  I agree.

1          MR. EKELAND:  Yeah, it's horrible.  So, I mean, I

2     think, you know, the defense's point is made, unless the Court

3     has any other -- I'm happy to answer any other questions.

4          THE COURT:  All right.  Let me hear again from

5     Mr. Brown.

6          MR. BROWN:  Your Honor, I have to say I'm a little

7     bit surprised and a little disturbed that Mr. Ekeland seems to

8     be disputing that these videos establish child pornography

9     offenses.  I heard that during -- when he brought up that maybe

10     these aren't authenticated by NCMEC, that is factually untrue.

11     But if this is all going to be disputed by the defense, an

12     element of proof on which the government bears the burden, then

13     we are entitled to present relevant and admissible evidence on

14     that element.

15          If they're willing to stipulate that there is -- and,

16     Your Honor, I would direct you to Exhibit 623, which was

17     introduced into evidence during Mr. Scholl's testimony, he

18     looked at ten different Welcome to Video users and the

19     addresses associated with them.  Each of these ten users is a

20     known Welcome to Video user and, also, had funds coming

21     from Bitcoin -- used Bitcoin Fog.  If we can stipulate --

22          THE COURT:  Am I correct in my assumption or

23     understanding that the -- there was actually tracing of funds

24     coming out of Bitcoin Fog, and maybe through some intermediate

25     steps, but eventually then going to expenditures on Welcome to

1    Video?

2        MR. BROWN:  Yes, Your Honor.  And to defense

3    counsel's point, there wasn't any money coming out.  That's not

4    how Welcome to Video worked.  It wasn't like a drug market

5    where you might upload funds and store funds and bring them --

6    and then, you know, withdraw funds.  It was a one-way buy-in

7    sort of server idea, that you paid a nominal amount of Bitcoin

8    to buy into the service.

9        And I think Mr. Scholl testified this is not big

10   money business, the way that drugs are.  It's a different

11   model.  And, so, it's not at all surprising that there are no

12   funds coming out of Welcome to Video.  And if the argument is

13   that there's some de minimis exception for facilitating child

14   pornography offenses, you know, he can make that argument to

15   the jury, but I don't think that's a legally defensible

16   argument.

17       Your Honor, the point here is for each of these

18   corresponding users listed in 623, there is a spreadsheet like

19   we were just looking at listing the user's activity on Welcome

20   to Video.  And we would just ask -- and, again, like, I don't

21   know why the defense is disputing that this is child

22   pornography, because if that is an issue in dispute, then maybe

23   we need to show that to the jury, and none of us wants to do

24   that.  But if they are willing to stipulate that each of these

25   users committed child pornography offenses, that is part of the

1    element.

2         Defense counsel is talking about other elements.  The

3    defendant's knowledge, his *mens rea*, those are separate

4    elements that may be in dispute.  We believe we have our

5    evidence for that.  But, solely the evidence that Bitcoin Fog

6    transmitted funds that were known to the defendant -- that may

7    be in dispute -- to have been -- that were, quote, "intended to

8    be used to promote or support unlawful activity," intended to

9    be used to promote or support unlawful activity.  If you are

10   mixing funds to buy into Welcome to Video, you are trying to

11   promote or support unlawful activity.  That's the movement of

12   funds.

13        THE COURT:  Right.

14        MR. BROWN:  And so if the defendant knowingly

15   operated an unlicensed money transmitting business that did

16   that activity, that is an element of the offense.  So if they

17   are willing to stipulate that each of these ten users committed

18   child pornography offenses in violation of a specific federal

19   statute, then I think that we can --

20        THE COURT:  With the funds associated with those

21   addresses.

22        MR. BROWN:  Yes.  Yes, Your Honor -- then I think

23   that we can go ahead and redact columns G and H.  But, short of

24   that, it sounds like the defense intends to dispute this

25   element, in which case we are entitled to put our proof to the

1    jury.

2              THE COURT:  I understand.

3              Anything else, Mr. Ekeland, on this?

4              MR. EKELAND:  I would just note that I'm not aware of

5    any evidence in the record that any of these listed users were

6    ever convicted of child pornography.  I think the --

7              THE COURT:  But I think we've argued -- and I hate to

8    go down this road, is that we would actually have to show these

9    videos to the jury so the jury could conclude that the person

10   did violate the statute.

11             MR. EKELAND:  I don't think it's in dispute that the

12   Welcome to Video sold child pornography.

13             THE COURT:  The question is:  Were the videos

14   purchased with the funds associated with the addresses listed

15   in the chart?  Were those -- did those videos constitute a

16   child pornography offense for purposes of the federal statute?

17   I think that's the question.  And --

18             MR. EKELAND:  Again --

19             THE COURT:  -- if that's in dispute, I think it's

20   fair for the government to prove its case up, one way or the

21   other.

22             MR. EKELAND:  And so then what the Court is

23   suggesting is that we simply redact G and H and instruct the

24   jury with -- I just would like to hear the instruction again.

25             THE COURT:  I'm not saying anything in this regard.

1    I think what Mr. Brown said is that they would be willing to

2    withdraw their reliance on those two columns if the defense

3    were willing to stipulate.  And that's not my -- I don't make

4    anyone stipulate one way or the other on something.

5         And so the question is whether the parties can reach

6    an agreement on this issue.  If they can, that's all the

7    better, from my perspective.  And if they can't, then I think I

8    have to allow in at least some of this evidence so the

9    government can carry its burden.

10        MR. EKELAND:  And if I understand the Court

11   correctly, the Court is saying you would screen child

12   pornography for the jury?

13        THE COURT:  You know, it happens -- if we had to, if

14   it got to that point, I don't know.  If it really is disputed

15   that these sites were actually child porn -- and I think

16   Mr. Brown is right, you did yourself just a second ago say it

17   hasn't been authenticated as child porn, so if that's disputed

18   in the case, then I suppose that's the case.  It's horrific,

19   but it happens in cases.  And, you know, I feel horrible for

20   the jury to have to put them through that.  But if it is a

21   disputed fact, the government is entitled to carry its burden

22   on that.

23        MR. EKELAND:  Then I would suggest that what we

24   simply do is stipulate to the fact that Welcome to Video sold

25   child pornography.

1          THE COURT:  You and I are sort of going around in

2     circles on this because you've said that a couple times, and

3     each time you say it I say that's not what I think is at issue

4     here.  What's at issue is whether these particular addresses

5     that are in the chart the government has produced, which the

6     government contends -- I don't know whether it's true or not,

7     but the government contends could be tied back to outputs from

8     Bitcoin Fog, whether those addresses, the funds -- the Bitcoin

9     in those addresses were used for purposes of purchasing child

10     pornography.

11          MR. EKELAND:  We'll stipulate to that --

12          THE COURT:  All right.  So --

13          MR. EKELAND:  -- under the assumption that G and H

14     are redacted.  And also, I think we would like to see column F

15     redacted as well.

16          THE COURT:  Which is F?  Oh, no.  F is the one that

17     just says "Child Porn," right?

18          MR. EKELAND:  Uh-huh.

19          THE COURT:  I don't see why that would need to be

20     redacted.

21          MR. EKELAND:  And then, you know, in that, also

22     just -- it's my understanding that these addresses are also

23     just tied back through Chainalysis clustering, and that we

24     would still be able to argue that clustering point.

25          THE COURT:  Of course.  Sure.

1          MR. EKELAND:  I think that's a solution the defense

2     can live with, if that's acceptable.

3          THE COURT:  I will let the parties sit down and see

4     if they can work something out because, as I said, I don't tell

5     anyone to stipulate to something.  And so if you can work out a

6     stipulation that's acceptable to both parties, that's great as

7     far as I'm concerned.  And if you can't, then we'll just come

8     back to this issue.

9          MR. EKELAND:  Okay.  Yes, Your Honor.

10          THE COURT:  Anything else to raise while we have some

11     time without the jury today?

12          MR. EKELAND:  No.  I think the Court gave us until

13     tomorrow to respond to the government's latest motion in

14     limine.

15          THE COURT:  Yes.

16          MR. EKELAND:  And then we're sitting Friday morning,

17     right?

18          THE COURT:  Correct.

19          MR. EKELAND:  And then tomorrow is until 1?

20          THE COURT:  I'm sorry?

21          MR. EKELAND:  Tomorrow we're stopping at 1 p.m.?

22          THE COURT:  Correct.

23          MR. EKELAND:  And then Wednesday and Thursday are

24     full days, and then we sit Friday morning?

25          THE COURT:  Correct.

```
 1              MR. EKELAND:  No other questions, Your Honor.

 2              THE COURT:  All right.  Thank you.

 3              Anything else from the government while we're here?

 4              MR. BROWN:  No.  Just that we are concerned about

 5    getting through the case, and if there's any way -- I mean, we

 6    understand the earlier stop times are necessary.  If there's

 7    any way we could start at 8:30 or tell the jury to start at

 8    8:30?

 9              THE COURT:  Well, I can tell the jury to be here by

10    8:30.  I'm happy to do that, so we can start promptly at 9.

11    And I can tell you, we have two persistently late jurors, and

12    if at some point if it continues, we could discuss whether

13    those jurors should be dismissed because they're consistently

14    20 to 30 minutes late every day.

15              MR. BROWN:  Yes, Your Honor.

16              THE COURT:  I tried to address that today.  And the

17    deputy clerk has also not singled them out, but has told the

18    jury how important it is that they all arrive on time.

19              MR. BROWN:  Yes, Your Honor.

20              THE COURT:  If there's anything else we can do

21    time-wise, I'm all in favor of that.  And I also just ask the

22    parties to do your best to ask questions once, rather than

23    twice, and be as streamlined as you can in your presentations.

24              Okay.  All right.  Well, thank you.  I will see you

25    all at 9 a.m. tomorrow morning.
                                *   *   *
```

1                   CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, JANICE DICKMAN, do hereby certify that the above and

4      foregoing constitutes a true and accurate transcript of my

5      stenographic notes and is a full, true and complete transcript

6      of the proceedings to the best of my ability.

7                           Dated this 26th day of February, 2024

8

9

10                            _____

11                            Janice E. Dickman, CRR, CMR, CCR
                              Official Court Reporter
12                            Room 6523
                              333 Constitution Avenue, N.W.
13                            Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25