```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,      ) Criminal Action
                                     ) No. 21-cr-399
 4                   Plaintiff,      )
                                     ) JURY TRIAL
 5    vs.                            )
                                     ) Washington, DC
 6    Roman Sterlingov,             ) March 4, 2024
                                     ) Time:  1:45 p.m.
 7                   Defendant.      )
      _____
 8
                      TRANSCRIPT OF JURY TRIAL
 9                        HELD BEFORE
             THE HONORABLE JUDGE RANDOLPH D. MOSS
10                UNITED STATES DISTRICT JUDGE
      _____
11
                       A P P E A R A N C E S
12
13    For Plaintiff:      Christopher Brown
                          DOJ-USAO
14                        601 D Street, NW, Suite 5.1527
                          Washington, DC  20530
15                        Email:  Christopher.brown6@usdoj.gov
                          Catherine Pelker
16                        US DOJ
                          950 Pennsylvania Avenue NW
17                        Washington, DC  20530
                          Email:  Catherine.pelker@usdoj.gov
18                        Jeffrey Pearlman
                          DOJ-CRM
19                        1301 New York Avenue NW
                          Washington, DC  20005
20                        Email:  Jeffrey.pearlman@usdoj.gov

21    For Defendant:      Tor Ekeland
                          Michael Hassard
22                        Tor Ekeland Law PLLC
                          30 Wall Street, 8th Floor
23                        Brooklyn, NY  10005
                          Email:  Tor@torekeland.com
24                        Email:  Michael@torekeland.com

25    Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                          Email:  Janice_e_dickman@dcd.uscourts.gov
```

```
1     *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

2               THE COURT:  Ready to get the jury?

3               MR. BROWN:  Yes, Your Honor.

4               THE COURT:  Okay.  Get the jury.

5               And the witness can come back to the witness box.

6               THE COURT:  We're just waiting on one juror.

7               (Whereupon, the jury returns to the courtroom.)

8               THE COURTROOM DEPUTY:  Jury is present.

9               You may be seated and come to order.

10              THE COURT:  Mr. Ekeland, you can continue.

11              MR. EKELAND:  Thank you, Your Honor.

12              Mr. Hassard, if we could get up into what is in

13    evidence as Government's Exhibit Number 305.

14              THE COURTROOM DEPUTY:  Okay.

15                        J.W. VERRET,

16                 DIRECT EXAMINATION (Cont.)

17    BY MR. EKELAND:

18    Q.  And, Professor Verret, do you recognize this slide deck?

19    A.  I do.  This is the same exhibit we've been talking about.

20    Q.  And I would just like you to -- I'd just like to go through

21    this slide deck with you, and if you could just tell us, as we

22    go through slide by slide, your understanding of Ms. Glave's

23    slide deck.

24              MR. EKELAND:  So, Mr. Hassard, if we could have the

25    second slide in this deck.
```

1            MR. BROWN:  Your Honor, could we get on the phone for

2     a second?

3            (Bench conference:)

4            MR. BROWN:  This is different than what I thought

5     Mr. Ekeland was going to do, which was to cover certain

6     additional material on Mr. Verret's slides.  It looks like now

7     he's going to sort of walk slide by slide through the

8     government's accountant's slide deck, and I'm not sure -- I

9     mean, if he's just commenting on this, this seems like

10     undisclosed expert testimony.

11            The defense has had this for ages.  Professor Verret

12     could have prepared a pretrial disclosure rebutting this or

13     addressing this and he hasn't, and Rule 16 is clear.

14            MR. EKELAND:  Your Honor, I think we're perfectly

15     entitled to have Professor Verret go through the slide deck

16     that the government disclosed and simply tell us his

17     understanding of the slide deck.  And this just goes to his

18     general conclusions.  And we did disclose that he was going to

19     testify in rebuttal and this should come as no surprise to the

20     government.

21            THE COURT:  I guess I'm still a little bit at a loss

22     what he is doing.

23            Why is his understanding of the evidence relevant?

24            MR. EKELAND:  Because the government objected to, I

25     believe, the 2707 number for bit count and I believe that's in

1    the deck.  He's going to go through the analysis.  The current

2    related Tor invoices are in this slide deck as well.

3             THE COURT:  That's fine.

4             The government's objection, as I understood and the

5    reason I sustained it, was not that it referred to the 2707

6    figure.  I think the way the witness answered the question is

7    he said that Ms. Glave's could be concluded that it basically

8    was the sum total of Mr. Sterlingov's earnings.

9             Whereas, I think what it should -- that's not what

10   she testified to and there's a difference between saying this

11   is the total of everything that's out there that was earned

12   versus saying this is what we could -- we were able to trace.

13            MR. EKELAND:  That's why I think it would be helpful

14   if Professor Verret goes through the slide deck and shares with

15   the jury his understanding of it, so they can understand how

16   he's reaching his conclusion about Ms. Glave's report.

17            THE COURT:  I'll allow it, but I'll just have to

18   police this as we go.  As I said, I don't think that what is

19   relevant here is how he understands another witness's

20   testimony.

21            To the extent that he can point to something that he

22   relied upon in his testimony for purposes of forming his

23   opinions, I think that's permissible.  But, you know, I don't

24   think it's really relevant in the case as how he understood

25   another witness -- what the witness -- that's a question for

```
 1        the jury.

 2                But to the extent that he's just drawing attention to

 3        the premises or information that he drew on, I think that's

 4        permissible.

 5                MR. EKELAND:  Thank you, Your Honor.

 6                THE COURT:  All right.

 7                (Open court:)

 8        BY MR. EKELAND:

 9        Q.  If you could just take us through the slide deck and just

10        point out to the jury what information that you relied on or

11        you used to arrive at your conclusions?

12                THE COURT:  Is this up for the jury now?

13                THE JURORS:  (Shake heads.)

14        BY MR. EKELAND:

15        Q.  And if there's nothing on the particular slide, you can ask

16        Mr. Hassard to move on to the next slide.

17        A.  There is a list of accounts.

18                THE COURT:  Is this up for the jury?

19                I don't see it on my screen.

20                THE JURORS:  (Nod heads.)

21                THE COURT:  It's not on my screen.

22                All right.  It's up.  Thank you.

23                All right.

24                THE COURTROOM DEPUTY:  Jury has it?

25                THE JURORS:  (Nod heads.)
```

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  This is a list of accounts.  The first

 3     one, Binance, is an exchange, as is Bitnex.  BitPay accounts

 4     were associated with spending of Bitcoin.  BitPay -- I don't

 5     know which ones were directly involved with BitPay or sometimes

 6     when you buy something with Bitcoin online, on the back end

 7     BitPay is associated.  Either way, they're associated with

 8     spending Bitcoin.  BTC-e is an exchange, as is Linux, Coinbase,

 9     the MAIN.  Most of the funds involve these two Kraken accounts,

10     one for Mr. Sterlingov, one for To the Moon.

11              Most of the Bitcoin was there -- or, for the early

12     days in Mt. Gox and to some extent BTC-e and Bitstamp.

13     LocalBitcoins was peer-to-peer website that helped to

14     facilitate peer-to-peer transactions for people who wanted to

15     find someone to interact with peer to peer -- who didn't have

16     somebody to interact with peer to peer on their own.  You

17     didn't have to use local BitCoins to interact peer to peer.

18              Nordea was his personal personal bank account.  As I

19     understand Optical, PayPal, Prepaid Financial Services, and

20     XMLGold were all prepaid accounts for spending Bitcoin.

21     BY MR. EKELAND:

22     Q.  And are these all accounts that you reviewed information on

23     the government's discovery?

24     A.  That's correct.

25     Q.  And what, if any, conclusions did you come to based on your
```

1    review of Mr. Sterlingov's accounts that are listed here?

2    A.   Number one, that the prepaid or debit cards listed mostly

3    toward the bottom, except for, to some extent, BitPay, the

4    prepaid or debit cards listed here were done under his own

5    name, for his own spending.  That was one thing.

6         We've already talked about my perspective on the To

7    the Moon account with Kracken, but this is my analysis of that

8    account.  In addition, I -- with respect to the Kraken accounts

9    that receive funds from Bitcoin Fog, I believe I observed

10    earlier that if you wanted to hide that from Kraken, you would

11    not have sent it straight to Kraken, you would have unloaded

12    that.

13         If you wanted to hide the post-Fog, transfer from a

14    KYC account connected to you, you would have sent it to a

15    non-KYC exchange or executed peer to peer some other way.  You

16    would not have executed on a KYC exchange and violated the

17    rules that were laid out on the front page of the Bitcoin Fog

18    website.

19    Q.   Is there anything else you would like to share with the

20    jury about your conclusions based on your review of the

21    accounts on this slide?

22         MR. BROWN:  Your Honor, this is just not a question,

23    "Is there anything else you would like to share?"

24         THE COURT:  Yeah.  Sustained.

25         MR. EKELAND:  Can we move on to the next slide?

1           THE WITNESS:  Sure.

2           MR. EKELAND:  Mr. Hassard, if we could go to the next

3    slide.

4    BY MR. EKELAND:

5    Q.  Is there anything on this slide that you utilized in your

6    review in coming to your conclusions that you did?

7    A.  At the bottom of the left, number 2707, is a number -- a

8    number of adjustments that I understand Ms. Glave has used to

9    put the number -- 2707 is the count of Bitcoin Mr. Sterlingov

10   owned, according to her exhibit.

11   Q.  Is that -- that's the 2707 number that you used in your

12   analysis?

13   A.  That's correct.

14   Q.  Is there anything else on this page that you used in coming

15   to your conclusions?

16   A.  No.

17   Q.  So we can go to the next slide, if that's okay.

18   A.  Okay.

19   Q.  Looking at slide number 4, is there anything on slide

20   number 4 that you utilized in coming to your conclusions?

21   A.  It showed some timing for activity that Mr. Sterlingov used

22   to transfer from Fog to KYC accounts.  The -- a good deal of

23   the amount here, I know in the Mt. Gox account, was lost in the

24   Mt. Gox hack.

25           Otherwise, one can observe here, I observed from this

1   that this pattern of transfers would be consistent with moving

2   Bitcoin to a KYC account to take advantage of the increase in

3   Bitcoin price around 2013, 2014 to sell it.

4   Q.  Is it okay if we move on to slide number 5?

5   A.  Yes.  Yes.

6   Q.  And then what, if anything, did you rely on from slide

7   number 5 in coming to your conclusions?

8   A.  This is a slide consistent with the information in the last

9   few slides, just presents it in graphic form.

10  Q.  Can we move on to the next slide?

11  A.  Yes.  Slide number 6.

12  Q.  And what, if anything, did you utilize from this slide in

13  coming to your conclusions?

14  A.  Same answer as the last slide.

15  Q.  So can we move on to slide number 7?

16  A.  Yes.

17  Q.  What, if anything, in slide number 7 did you use to come to

18  your conclusions?

19  A.  This was something that supported Ms. Glave's effort to get

20  to the 2707 number that I utilized in my slide.

21  Q.  That 2707 number being the number of Bitcoin she concluded

22  Mr. Sterlingov had?

23  A.  That's correct.

24  Q.  And can we move on to the next slide?

25  A.  Yes.

1          MR. EKELAND:  Could we get slide number 8,

2    Mr. Hassard?

3    BY MR. EKELAND:

4    Q.  And what, if anything, did you rely on in slide number 8 in

5    reaching your conclusions?

6    A.  There's a line called "Expenses."

7    Q.  Where is that line?

8    A.  On the left.  A line naming it right where the cursor is,

9    yes, "Expenses."

10   Q.  Is that it (indicating)?

11   A.  That's correct.

12   Q.  So if you see subtotal on that?

13   A.  That's right.  The subtotal adds up either expenses using

14   his bank outflows and his debit card associated with his bank

15   or his Bitcoin spending using these KYC prepaid cards, they get

16   to that subtotal at the bottom.

17          And when I observed earlier today that -- when I

18   observed that, the Glave exhibit tells me Mr. Sterlingov never

19   spent more than 50, 60,000 in a year.  I think that was the

20   word I used.  Other than -- I don't know if I observed -- but

21   other than a purchase of a Tesla, that I'm aware that he

22   purchased.  But other than that expenditure, when I observed

23   that he didn't spend more than 50 or 60,000 in a year, I was

24   referring to every subtotal there.  And you see they go from 9,

25   44, 25, 59, and 66, 63, 57, 41, and 40 --

1          THE COURT REPORTER:  Would you repeat that?

2          THE WITNESS:  Sorry.  I can start over.  Nine -- in

3     rough numbers -- the exact numbers are there -- roughly, 2011,

4     9,000; 2012, roughly 44,000; 2013, roughly 25,000; 2014,

5     roughly 59,000; 2015, roughly 66,000, or rounded up to 67,000;

6     2016, round up to 63,000; 2017, 57,000, roughly; 2018, round up

7     to 42,000; 2019, roughly 40,000; 2020, roughly 24,000; 2021,

8     round up to 16,000; 2022, round up to 3,000, for a total

9     expenditures tracked during that 12-year period of $450,000.

10    BY MR. EKELAND:

11    Q.  And did you do your on independent calculations of

12    Mr. Sterlingov's expenses?

13    A.  No.

14    Q.  You relied on this -- these calculations for your

15    conclusions?

16    A.  Correct.

17    Q.  Can we move on to slide number 9?

18    A.  Yes.

19    Q.  And then what, if anything -- I think we looked at slide

20    number 9 again, but can you just give the jury a reminder of

21    what, if anything, you relied on in your analysis that's in

22    slide number 9?

23          MR. BROWN:  Object to the extent that this calls for

24    testimony that's already been given before lunch.

25          THE COURT:  Is there anything that's not repetitive

1    here?

2    BY MR. EKELAND:

3    Q.  Professor Verret, is there anything you would like to add

4    to your testimony regarding slide number 9 that you haven't

5    already said?

6    A.  We talked about it quite a bit.  I don't remember whether I

7    said this is consistent with the observation -- consistent with

8    the pattern of sending prior client funds through a mixer to a

9    new destination.  I may or may not have said that.  But in any

10   event, I think we've covered this slide.

11   Q.  So we can move on to slide number 10?

12   A.  Correct.

13   Q.  What, if anything, in slide number 10 did you rely on in

14   your analysis?

15   A.  This compares two invoices.  They ended up having the same

16   address.  There were errors in the address.  I know this was

17   related to some testimony about an error in the invoice number.

18   And I used that and my awareness that people, including myself,

19   make mistakes in invoices to make the determination that I

20   testified to this morning.

21           MR. BROWN:  Objection.  This is not at all close to

22   what the testimony about these invoices was.

23           MR. EKELAND:  He's merely making an observation about

24   the errors in the invoices.

25           THE COURT:  Why don't -- well, why don't you just

1    move on.

2              MR. EKELAND:  I'm sorry, Your Honor.  I just didn't

3    hear you.

4              THE COURT:  Why don't you move on.

5              MR. EKELAND:  Moving on to slide number 11.

6    BY MR. EKELAND:

7    Q.  What, if anything, did you rely on in slide number 11 in

8    conducting your analysis?

9    A.  The same observation as the last side.

10   Q.  Moving on to slide number 12, please, Mr. Hassard.

11             What, if anything, did you rely on in your analysis in

12   slide number 12?

13   A.  The same as the last slide, and otherwise generally the

14   same thing we talked about.

15   Q.  Moving on to slide number 13.  What, if anything, did you

16   rely on in slide number 13 in your analysis?

17   A.  This slide was helpful in my observation earlier that this

18   invoice does not appear to be inflated in any way, such that

19   it's meant to be a cover where legitimate revenue covers

20   illicit funds.  There does not appear to be that sort of

21   invoice, to me.

22             MR. EKELAND:  Mr. Hassard, if you could take down

23   Government Exhibit 305, and then put up what is in evidence as

24   Government Exhibit 325.

25   BY MR. EKELAND:

1    Q.  Professor Verret, do you recognize Government Exhibit 325?

2    A.  I do.

3    Q.  What do you recognize it as?

4    A.  As an exhibit and chart that Mr. Scholl used in his

5    testimony about Fog operator earnings.

6    Q.  And did you review this exhibit in coming to your

7    conclusions about the fees that the Bitcoin Fog

8    administrator --

9    A.  I did and -- I did, as well as the deposits tab which has

10   the underlying data about each transaction.

11   Q.  And is -- Bitcoin Fog didn't take dollars, did it?

12   A.  Correct.

13           MR. BROWN:  Object to language.

14   BY MR. EKELAND:

15   Q.  Do you see the --

16           THE COURT:  I've got to rule on the objection.

17           MR. BROWN:  And/or calls for speculation.

18           THE COURT:  I don't think there's a foundation, so

19   I'll sustain the objection.

20           MR. EKELAND:  I'm sorry.  I didn't hear you.

21           THE COURT:  I don't think there's a foundation for

22   it.  I'll sustain the objection.

23   BY MR. EKELAND:

24   Q.  Professor Verret, turning your attention to the upper

25   left-hand conner where it says, "USD deposits," what's your

1    understanding of what that means?

2    A.  I understand that to be an estimate of the value of Bitcoin

3    total deposits as of the date of the deposit, the date it was

4    sent to Fog.

5    Q.  And what's your understanding of how that estimate was

6    made?

7    A.  I believe I heard Mr. Scholl testify that he pushed a

8    button in the Chainalysis software that generated this value.

9                MR. BROWN:  Object to mischaracterization of

10   testimony.

11               THE COURT:  The jury's recollection of the testimony

12   will control.

13   BY MR. EKELAND:

14   Q.  Do you know what times those valuations were made?

15   A.  They were made using the Bitcoin price as of the day they

16   were deposited to Fog, first deposited to Fog.

17   Q.  And if, I believe, as you testified earlier, if somebody

18   didn't exchange the Bitcoin for U.S. dollars as soon as it was

19   received, the price could be -- the valuation could be

20   significantly different?

21   A.  Correct.

22   Q.  Is there anything else on Government Exhibit 325 that you

23   relied on in reaching your conclusions that you want to share

24   with the jury?

25   A.  Can you scroll down?

```
 1                    I'm sorry.  Okay.
 2                    So as I described, at least most of this -- the last
 3     time we discussed it, I took the values of Bitcoin in this raw
 4     deposits, the quantity of Bitcoin at each time.  Instead of
 5     using the price at the date it was deposited, I used the price
 6     a year later, two years later, three years later, et cetera.
 7     And in using that price, the data came from blockchain.com,
 8     which is a block explorer discussed previously, I think, in
 9     testimony.  And I used the intraday low, just to make sure I
10     wasn't inflating.  I didn't use the high or the high of the
11     day.  I used the low of that day because it can be variable.
12     Q.  You referred to the chart that you showed to the jury
13     earlier with your calculations.
14     A.  That goes into the hundreds of millions of dollars, that's
15     correct.
16                    MR. EKELAND:  I pass the witness, Your Honor.
17                    THE COURT:  Okay.  All right.  Mr. Brown?
18                         CROSS-EXAMINATION
19     BY MR. BROWN:
20     Q.  Good afternoon, Professor Verret.
21     A.  Good afternoon, Mr. Brown.
22     Q.  Professor, I noticed you've been in the courtroom for
23     several days during this trial, right?
24     A.  Correct.
25     Q.  And sometimes you sat in the gallery?
```

1    A.   Yes.

2    Q.   And sometimes you sat at the counsel table with the defense

3    attorneys and the defendant, right?

4    A.   Correct.

5    Q.   How many times have you sat at counsel table during this

6    trial?

7    A.   I don't remember exactly.  Two or three times.

8    Q.   And are you allowed to do that because you're not

9    testifying as a fact witness, but only as an expert witness?

10    A.   I'm not an expert in the Rules of Evidence.

11    Q.   Are you aware that fact witnesses generally have to be

12    sequestered so they don't hear what other witnesses are saying

13    in their testimony before they testify?

14    A.   I -- again, I'm not an expert in the Rules of Evidence.

15    I've heard you say that in this courtroom, but I'm not an

16    expert in that question.

17    Q.   You are a lawyer, though, aren't you?

18    A.   That's correct.

19    Q.   And remind the jury --

20            MR. EKELAND:  Objection.  Argumentative.

21            THE COURT:  Overruled.

22    BY MR. BROWN:

23    Q.   Remind the jury where you went to law school.

24    A.   Harvard Law School.

25    Q.   Have you ever helped the defense in responding to

1  government objections or government briefs in this case?

2  A.  As a consulting expert, I've provided them with

3  information, useful, particularly in issues having to do with

4  me.

5  Q.  Now, you're employed by an expert witness consulting firm

6  called Veritas Financial Analytics, LLC, correct?

7  A.  That's the name of my LLC that I do expert witness

8  consulting through.

9  Q.  And you sell your services as an expert witnesses, right?

10  A.  That's correct.

11  Q.  And one of the services you market yourself for is

12  "Cryptocurrency forensics and valuation," is that correct?

13  A.  Correct.

14  Q.  And isn't today the first time that you've ever testified

15  in a cryptocurrency case?

16  A.  It's the first time I've testified in a cryptocurrency case

17  in court, yes.

18  Q.  And you have a faculty page at George Mason University,

19  correct?

20  A.  Correct.

21  Q.  And you recently updated your faculty page, haven't you?

22  A.  Correct.

23  Q.  Your faculty bio now says, "Professor Verret was recently

24  deemed a forensic expert in a $300 million federal money

25  laundering case by Judge Moss in *U.S. v. Sterlingov,*" right?

```
 1    A.   That's right.

 2    Q.   Now, you serve on the board of the Zcash Foundation?

 3    A.   Correct.

 4    Q.   And Zcash is an alternative to cryptocurrency that markets

 5    itself as a way to allow users to obscure blockchain tracing,

 6    isn't that correct?

 7    A.   I think the marketing is more emphasis on privacy rather

 8    than obscuring from tracing, to maintain the privacy of your

 9    transactions.  Our slogan is -- well, a different company that

10    works in Zcash has the slogan "Privacy is normal."  That is

11    often repeated in the Zcash community.

12    Q.   What is the main difference between Zcash and Bitcoin?

13    A.   Zcash has the option to do shielded transactions on the

14    Zcash auction, as I mentioned this morning, that are not

15    traceable.  And it also has the option to do transparent

16    transactions that can be used to comply with exchange

17    requirements, or something like that.

18    Q.   So, does Zcash offer users the ability to obscure their

19    transactions from blockchain analysis?

20    A.   That's one of the effects of using Zcash shielded, yes.

21    Q.   And you're familiar with the term CBDC, or central bank

22    digital currency?

23    A.   Sure.

24    Q.   You have publicly described central bank digital currency

25    as evil, isn't that true?
```

1   A.  That sounds like me.

2   Q.  And you have described financial surveillance as

3   "Institutional evil," is that correct?

4   A.  Again, that sounds like me.

5   Q.  It sounds like you, but is that correct?

6   A.  I think that's probably correct, yes.  I don't remember

7   exactly what you're talking about, but that sounds like me.

8   Q.  Did you issue a Tweet, maybe in 2002, where you said

9   "Financial surveillance is the modern face of institutional

10  evil"?

11  A.  Probably, yeah.  You said 2002.

12  Q.  Sorry.

13  A.  It would not have been in 2002.  But that's sounds like

14  something I said.

15  Q.  If I said 2002, I misspoke.  2022, does that sound about

16  right?

17  A.  It does.

18  Q.  And you're working on a book where the working title is

19  *Hide Money Using Crypto*, correct?

20  A.  So, I -- as we've talked about previously at a hearing, I

21  joked about that on a podcast.  You asked about the working

22  title.  The book is in review -- peer review now with MIT

23  Press.  The focus has become a little more academic than it was

24  before.  It's not a retail book.

25          The working title, since you asked, is *Crypto*

1    *Forensics and Privacy*.  The book's thesis along with that title

2    is *The Interplay Between Privacy and Forensics,* the challenges

3    and the conflict between those two concepts.  But, yes, I did

4    mention that that would be maybe a title at some point in a

5    podcast.

6    Q.  You're aware that the U.S. Department of Justice has

7    charged the creators of a service called Tornado Cash with

8    money laundering, correct?

9    A.  That's correct.

10   Q.  And Tornado Cash is another kind of mixing service, isn't

11   that correct?

12   A.  On a different blockchain in a different way, but, yes.

13   Q.  And you've described that prosecution as "A grave

14   miscarriage of justice," didn't you?

15   A.  Yes.  And I've also participated in an amicus brief related

16   to a designation of that service.

17   Q.  Now, you testified on direct that you are charging a fee

18   for your participation in this case?

19   A.  That's -- contractually, yes.  But I haven't been paid and

20   I don't believe I'm likely to be paid, so I -- the answer is

21   yes, simply.  But that added a little background to the answer.

22   Q.  At the outset of this case, you gave the defense team an

23   engagement letter, correct?

24   A.  Correct.

25   Q.  And what was the hourly rate in that engagement letter?

1    A.  I believe it was 450.

2    Q.  Are you sure it was 450?

3    A.  Yes.  It was a discount from my usual rate.

4    Q.  And you testified on direct that you've worked -- or,

5    you've billed approximately 300 hours?

6    A.  No, no.  The -- the bill -- the invoice I sent was for

7    about 110,000.

8          I believe what I said in my testimony was that since

9    that time, that September invoice, I have told the defense team

10   I won't bill for any more hours.  And those free hours, the pro

11   bono hours, amount to, I would guess, about 300 hours.  But as

12   they're pro bono, I'm not counting anymore.

13   Q.  When you first started in this case, you had an

14   understanding that the defendant had several hundred thousand

15   dollars that been seized and frozen by the government, correct?

16   A.  Correct.

17   Q.  And when you first started this case, you had a

18   conversation with defense counsel in which you conveyed the

19   understanding that if there was an acquittal in this case, then

20   you would get paid, correct?

21   A.  It wasn't contingent on an acquittal, no.

22   Q.  Is it your testimony here today that when you first started

23   this case you had no understanding that you could stand to

24   receive some of the defendant's seized funds?

25   A.  I knew that it was possible, sure.

1    Q.  When you say you knew that it was possible, what you mean

2    was that you told them that if it ends up becoming the case

3    that you don't get that money, then that's fine with you,

4    correct?

5    A.  My understanding has evolved as I've gotten into the case.

6    I don't remember exactly what I said at the beginning.

7    Q.  Would -- would something help refresh your memory?

8    A.  Sure.

9    Q.  If I could ask you -- I'm showing you the transcript of

10   your pretrial *Daubert* testimony at page 134.

11          If I could have you read lines 13 through 21.

12          MR. EKELAND:  Objection, Your Honor.  This is for

13   refreshing recollection.

14          THE COURT:  Yes.  Just to himself.

15          MR. BROWN:  Yes.  Apology.

16   BY MR. BROWN:

17   Q.  If I could have you silently review what I've just circled

18   as line 13 through 22.

19          Look up when you're done, please.

20          MR. EKELAND:  And, Your Honor, does the government

21   have a copy of this for the defense, or is this an exhibit

22   somewhere?

23          THE COURT:  Well, when the witness is done looking at

24   it, if you would like to look at it as well.

25          MR. EKELAND:  I would like to look at it.  Thank you.

 1          MR. BROWN:  This is Professor Verret's June 19th,

 2     2023, hearing transcript, which you should have.

 3          (Pause.)

 4          THE WITNESS:  Okay.

 5          MR. BROWN:  (Hands transcript to defense counsel.)

 6     BY MR. BROWN:

 7     Q.  Professor Verret, does that refresh your memory of what

 8     your original understanding was?

 9     A.  Sure.

10     Q.  And what was your original understanding -- as you stand

11     here today, what's your testimony that your original

12     understanding was as to whether you stood to receive payment in

13     this case?

14     A.  That there was substantial uncertainty in whether I would

15     be paid or not, but that after my review of -- the initial

16     review of the evidence and the indictment and other materials,

17     it was pretty obvious to me --

18          MR. BROWN:  Object to the answer.

19          THE COURT:  Yeah.

20          MR. BROWN:  Nonresponsive.

21          THE COURT:  I'll strike that testimony.

22          Just answer the question that he's putting to you

23     with respect to what your understanding was with respect to

24     whether you're going to be paid or not.

25          THE WITNESS:  There was substantial uncertainty in

1    whether I would be paid or not.

2    BY MR. BROWN:

3    Q.  And the source of that substantial uncertainty was whether

4    or not the defendant is acquitted, isn't that correct?

5    A.  No, I don't think that's correct.

6    Q.  It's your testimony that the uncertainty about whether you

7    get paid did not depend in any way on whether the defendant

8    gets acquitted?

9           MR. EKELAND:  Objection.  Asked and answered.

10           THE COURT:  Overruled.

11           THE WITNESS:  I wasn't certain about what you're

12    describing.  I didn't know, if he was found guilty, whether his

13    funds would be seized or not because I wasn't sure which of the

14    counts he would be found guilty on.

15           I wasn't certain if the lawyers were going to raise

16    money for the case.  I wasn't certain if the lawyers were going

17    to try to get money from BCJ, the court funding mechanism.  I

18    wasn't certain whether the frozen assets would be a part of

19    that or not, or it would be part of the court funding mechanism

20    for people with frozen assets, or whether it would be part of

21    the funds that the lawyers were raising in the case that I

22    understand they were trying to raise.  I just wasn't sure any

23    way around it.  I thought it was a case -- well, I --

24    BY MR. BROWN:

25    Q.  That's your testimony here today?

```
 1    A.  Yes.

 2    Q.  Professor Verret, I would like to ask you to read into the

 3    record your prior -- or, let's back up.

 4         You testified on July 19th, 2023, correct?

 5    A.  Correct.

 6    Q.  And you were asked about whether you were getting paid in

 7    the case?

 8    A.  Correct.  In what I just read, yes.

 9    Q.  And you were under oath on July 19th, 2023?

10    A.  Correct.

11    Q.  And you knew that it was important to testify truthfully on

12    July 19th, 2023?

13    A.  Yes, I believe it is.

14              MR. BROWN:  Your Honor, at this time I would request

15    Professor Verret to read into the record his testimony,

16    transcript page 134, lines 13 through 221.

17              MR. EKELAND:  Objection.  Improper impeachment.

18              THE COURT:  I am -- I don't have them in front of me.

19              Do you have a copy -- do you want to put it up on the

20    Elmo so I can look at it?

21              If you want to pass it up to me, that's fine, too.

22              MR. BROWN:  Your Honor, we're pulling it up.

23              I would like to ask the witness to read lines 13

24    through 21 on the screen there.

25              MR. EKELAND:  Objection.  Improper impeachment.
```

1           THE COURT:  Give me a minute to read it, please.

2           (Pause.)

3           THE COURT:  All right.  What's the objection?

4           MR. EKELAND:  Just improper impeachment.  I don't

5    understand what the --

6           THE COURT:  Yeah, I think it's appropriate

7    impeachment.  And it's under oath, so I think it comes in as

8    substantive evidence as well.

9           You may ask the witness.

10   BY MR. BROWN:

11   Q.  Professor Verret, could you please read lines 13 through

12   21?

13   A.  Sure.

14          "Secondly, I did not ask for a retainer in this case,

15   although it's pretty unheard of for me to never have a

16   retainer -- to not have a retainer before I began an expert

17   matter.  And in discussions with counsel, they've made clear

18   when they described that the defendant's assets were frozen,

19   they said, look, just to be clear, you might not get paid.  And

20   I told them very specifically that after reviewing the issues

21   in this case, if this ends up becoming, because of all that,

22   effectively, a pro bono matter, I'm comfortable with it.

23          "I haven't been paid" -- do you want me to keep

24   going?

25   Q.  No.  Thank you.

```
1              MR. BROWN:  Your Honor, the government -- we can

2     excerpt this.  And we move to admit this transcript cite as

3     Government's Exhibit 915.

4              THE COURTROOM DEPUTY:  I'm sorry.  I didn't hear you.

5     9 --

6              MR. BROWN:  915, a new exhibit.

7              THE COURT:  915?

8              MR. BROWN:  Yes, Your Honor.

9              THE COURT:  Any other objection?

10             MR. EKELAND:  No.

11             THE COURT:  Exhibit 915 is admitted and may be

12    published to the jury.  Or, it's up to you if you want to

13    publish it.

14             MR. BROWN:  Your Honor, we do move to publish.  Yes,

15    please.

16    BY MR. BROWN:

17    Q.  And, Professor Verret, if the defendant -- if the

18    defendant's funds are released, you -- you stand to receive

19    your $110,000 that you've invoiced in this case, isn't that

20    correct?

21    A.  That may be.  In that subject there are a few

22    qualifications, if I can --

23    Q.  If you need to explain your answer, please go ahead.

24    A.  First -- and this goes to what's here -- it's my experience

25    if you don't get the money up front, you don't get the money no
```

1    matter what happens.  That's why I ask for a retainer.

2            What I remember describing here is that the reason

3    why I couldn't get a retainer up front is because of the frozen

4    assets.  I'm not sure that if he's found innocent, I will be

5    paid because, frankly, it would cost me more than $100,000 to

6    collect on a $100,000 invoice.  That's just the way it works.

7            So the frozen assets is the reason why I wasn't able

8    to ask for a retainer.  I conveyed here that I moved forward

9    without a retainer because of the things I said here about what

10    I saw and what I understood.

11            I've also communicated with counsel about the

12    $110,000 invoice.  I think I conveyed, in my earlier questions,

13    that I've told them, look, if he's returning to his life, I

14    don't want that money to stand in the way of him getting back

15    to a normal life, so I'm willing to negotiate it down.

16    Q.  And that is a different understanding than what you had

17    when you first started the case, isn't that correct?

18    A.  Some of it changed and evolved, sure.

19    Q.  And isn't it true that a contingent fee arrangement in a

20    criminal case is generally considered unethical?

21    A.  That's correct.  And that's not what I did.

22    Q.  Now, Professor Verret, in your work on this case did you

23    prepare any notes?

24    A.  Yes.

25    Q.  And what notes have you prepared?

1    A.  So I have notes about my direct and notes that describe

2    my -- am I allowed to mention notes of the forensic interviews?

3    Q.  Excepting what has been excluded from the scope of your

4    testimony, did you prepare notes about the subject matter of

5    your testimony here today?

6    A.  So excluding the notes of my interviews of the defendant --

7    Q.  Excuse me.

8              MR. BROWN:  Objection, Your Honor.

9              THE COURT:  Yeah.  So that answer is stricken.

10             THE WITNESS:  Okay.

11             Yes is the answer.

12   BY MR. BROWN:

13   Q.  The subject matter of your testimony here today, did you

14   create any Excel spreadsheets?

15   A.  At some point, yes.  Probably in making calculations that

16   went into the slides.

17   Q.  Sure.

18             Did you use scrap paper to do any calculations or make

19   notes about the subject matter of your testimony here today?

20   A.  I think those are all in the notes about my direct.

21   Q.  And I saw that you were working on your laptop computer

22   during part of the trial.

23             Did you create notes about the subject matter of your

24   testimony here today while you've been sitting in court?

25   A.  Sure.  I think so, yeah.

1    Q.  And what sort of notes -- what sort of documents did you

2    create?

3    A.  Documents in Google Drive.

4    Q.  Did you trade emails with other experts on the case about

5    the subject matter of your testimony here today?

6    A.  Yes.

7              MR. BROWN:  Your Honor, may we get on the phone,

8    please?

9              (Bench conference:)

10             MR. BROWN:  I move to strike the witness's testimony

11   under both 26.2 and Rule 16.  He's just testified that he

12   created extensive notes, spreadsheets, other documents, emails

13   with other experts about the subject matter of the testimony.

14   None of that has been produced to the government.

15             MR. EKELAND:  We did produce -- we'd do a *Jencks*

16   production, but the government also hasn't moved the Court for

17   *Jencks* production.  It's my understanding that the rule

18   requires the government to make a motion for *Jencks* materials

19   before they start their cross, and I don't believe that's been

20   done.

21             MR. BROWN:  Your Honor, we have requested *Jencks*

22   materials repeatedly from the defense, including today, and it

23   is -- number one, it's not just *Jencks* materials.  But, number

24   two, it's -- number one, it's not just *Jencks* materials, it's

25   Rule 16.

1          Number two, we repeatedly had to remind Mr. Ekeland

2    today to produce *Jencks*.  And they produced over lunch today a

3    handful of emails, none of which fit the description of what

4    Professor Verret just testified to today.

5          MR. EKELAND:  We went through and reviewed our emails

6    this morning when Mr. Brown mentioned it, and that's what we

7    found.  We're happy to go look for more material.

8          I don't -- you know, I'm not quite sure

9    what Mr. Brown mean when he says there's extensive material,

10   what he's referring to, but we're happy to produce it.  And if

11   they want to make Professor Verret subject to recall to cross

12   on it.  But I don't think there's anything there that hasn't

13   been disclosed in the expert disclosures, in the slide decks,

14   or anything.  I don't think there's any hidden smoking gun here

15   in terms of any kind of math.

16         And, again, they haven't made the motion to the Court

17   before they started their cross.

18         MR. BROWN:  Your Honor, again, under Rule 16 we have

19   repeatedly asked this witness for -- we've asked the defense --

20   every one of our discovery letters asks the defense for

21   reciprocal production.  We have asked the defense about *Jencks*.

22   We've asked the defense about their Rule 16 materials the

23   witness just created.  He created spreadsheets.  He created

24   notes.  He did all these other things.  He worked on his

25   computer.  None of this has been disclosed to the government.

1          MR. EKELAND:  That is incorrect.  We have disclosed

2     to the government.  We gave them disclosure.  To the extent

3     that stuff is privileged, we're not obligated to produce to the

4     government.  Again, they haven't made a *Jencks* motion before we

5     began the cross-examination.

6          MR. BROWN:  Your Honor, we didn't make a *Jencks*

7     motion because defense represented they had produced *Jencks* to

8     us before we started cross-examination.  It wasn't until I had

9     the question to -- questioned Mr. Verret about the scope of his

10    documentary production that we actually discovered that there

11    was additional *Jencks* and Rule 16 material.

12         MR. EKELAND:  The material that Mr. Brown is

13    referring to is -- was not when we went and did a review.  It's

14    not what was in, you know, my computers and my emails that I

15    turned up.  I'm happy to do more extensive review.  And, again,

16    if they want to recall Professor Verret to cross him, if

17    there's something.  But I don't think there's anything that's

18    material in there.

19         MR. BROWN:  Your Honor, we can't just sit here and

20    have people testify and then be subject to recall.  We're in

21    week four of a four-week trial.  Professor Verret is here

22    today.  The defense has had ample time.  The defense has

23    received our requests again and again and again for these

24    materials, and they have ignored it.

25         MR. EKELAND:  That's not true, Your Honor.  And the

1  government has been less than fulsome in its *Jencks* disclosure

2  and has been disclosing a lot of stuff at the last minute.

3          THE COURT:  Last minute is different than after the

4  last minute though.

5          MR. EKELAND:  But there's no pending motion for

6  disclosure of *Jencks*.

7          THE COURT:  Can you pull up the rule you're relying

8  on that there has to be a motion for -- of *Jencks* after the

9  direct and before the cross?

10          MR. EKELAND:  I would have to go look at the rule.

11  If you give me a second.

12          MR. BROWN:  Your Honor --

13          THE COURT:  Mr. Brown, can you point me to what he's

14  referring to?

15          MR. BROWN:  I think he's referring to 26.2, but I

16  don't think the rule is actually structured in that way.  And

17  for -- to the extent it matters -- there's no sort of time

18  limit on --

19          THE COURT:  I'm going to let the jury take a break

20  now, and we'll sort this out.

21          (Open court:)

22          THE COURT:  Members of the jury, rather than having

23  to sit here while we sort this out, take a break.  Why don't we

24  come back at 3:25.

25          Please don't discuss the case among yourselves or

1 conduct any research.  And I'll see you back here at 3:25.

2    (Whereupon the jurors leave the courtroom.)

3    THE COURT:  The witness needs a break as well.  I ask

4 you don't discuss your testimony with anybody until it's

5 complete.

6    I'm looking at 26.2.  It says:  After a witness other

7 than the defendant has testified, the Court, on motion of a

8 party who did not call the witness, must order the attorney to

9 produce it.

10    I do think you're right.  I suspect that this is

11 structured in a way that *Jencks* is usually structured.  The

12 government is not required to turn over *Jencks* until after the

13 witness has testified.  It doesn't mean the government can't

14 turn it over beforehand or there can't be a request beforehand.

15    What I would suggest that we do is, Mr. Ekeland, as

16 an officer of the court, I'm just going to direct that you,

17 right now, if there's anything that hasn't been disclosed, that

18 you show it to Mr. Brown right at this moment.  And I expect it

19 to be a complete disclosure.

20    And I see the witness is in the room now.  Can I ask

21 him to step out for a moment.

22    (Whereupon the witness leaves the courtroom.)

23    THE COURT:  And, I mean, I expect it to be complete.

24 And I'll allow Mr. Brown to examine the witness further about

25 what notes exist.  And if it turns out that it's not complete

1      at this point and the witness comes back and says there were

2      other notes, the government can make a motion to strike it's

3      testimony at this point.

4            You do need to speak up.

5            MR. EKELAND:  I'm happy to go through what I have on,

6      you know, my computers and servers.  It's not clear to me

7      whether or not I have all of the witness's --

8            THE COURT:  Don't get into any discussion of his

9      testimony, but I will simply allow you to ask the witness to

10     describe to you any and all notes that he has that could be

11     responsive under Rule 16 and Rule 26, but don't go into

12     discussing how he should testify in any way with respect to

13     that.  I don't want him to tell you anything.

14           Only thing I want you to do is to ask him the

15     question and say, you know:  Describe for me in total any notes

16     or materials that you have that you created.  And you can

17     describe to him what Rule 26 and Rule 16 require, but nothing

18     further.

19           MR. EKELAND:  Could I just have him send them to me

20     and then I send it to the government?

21           THE COURT:  Yeah.

22           MR. EKELAND:  Maybe that's the solution.  I get what

23     they have and we'll look through our stuff and produce it,

24     whatever we have.

25           THE COURT:  That should have happened before now, but

1    that's where we are.

2            MR. EKELAND:  I will go -- I'll go --

3            THE COURT:  I think it's been obvious there's been

4    more because I've been sitting here watching Professor Verret

5    taking notes throughout the proceeding, and so --

6            MR. EKELAND:  But I don't -- well, without knowing

7    what those are, I'm not going to make any representations.

8            THE COURT:  I tend to doubt -- in fact, he asked

9    permission to be able to use his computer during the

10   proceedings so that he could take notes during the proceedings.

11   He's not writing emails to family and friends.  He clearly was

12   taking notes about his testimony in this case because that's

13   what he asked permission to do of the Court.

14           MR. EKELAND:  To the extent they're related to the

15   subject matter of his testimony, he'll produce them.  I'll go

16   ask him right now.

17           We're back at 3:25, Your Honor?  I'm going to talk to

18   him right now.

19           THE COURT:  You go talk to him and let me know.  Why

20   don't I come back in ten minutes, just to get a sense of what

21   the scope of this is.

22           (Recess.)

23           THE COURT:  All right.  Where are we?

24           MR. BROWN:  So, Your Honor, our proposal -- and I

25   think the defense is in alignment with this -- is they are

1    gathering *Jencks* materials.  They will send those to us soon.

2    But in the meantime, the government proposes that we just

3    continue with the cross now.  We'll be able to review those

4    *Jencks* materials overnight and, I think, if we can reserve our

5    right to recall Professor Verret for further cross-

6    examination -- we may not need to, but just reserve that right

7    and then -- and deal with it that way.

8              THE COURT:  So that's fine.  Let's get the witness.

9              MR. EKELAND:  He's down the hallway.

10             THE COURT:  And get the jury.

11             (Whereupon the jurors enter the courtroom.)

12             THE COURTROOM DEPUTY:  Jury is present.  You may be

13    seated and come to order.

14             THE COURT:  All right.

15             And, Mr. Brown, you may continue.

16    BY MR. BROWN:

17    Q.  Professor Verret, do you recall, during your direct

18    testimony you testified that you reviewed a report by

19    Chainalysis about mixing, is that right?

20    A.  Yes.

21    Q.  And I would like to direct your attention -- if we could

22    pull up what has not been admitted into evidence, but Defense

23    Exhibit 18.

24             THE COURTROOM DEPUTY:  Defense Exhibit 18.  Okay.

25    BY MR. BROWN:

1    Q.  Now, Professor Verret, is this the Chainalysis mixer report

2    that you were referencing?

3    A.  I know that multiple ones make up this point or similar

4    points.  But this looks like it might have been the one I'm

5    referencing, yes.

6    Q.  Did you review another Chainalysis mixer report?

7    A.  I reviewed their annual report on crypto crime, which has

8    some related observations.

9    Q.  And you testified on direct about -- that it was your

10   contention that Chainalysis characterized most mixing as

11   legitimate, right?

12   A.  It's my understanding that most mixing is legitimate, and I

13   think this is consistent with that idea.

14   Q.  Is that based on this report?

15   A.  In part, yes.

16   Q.  And isn't this report -- this is not the original

17   Chainalysis study, is it?

18   A.  I'm sorry?

19   Q.  Defense Exhibit 18 is not the original Chainalysis study,

20   is it?

21   A.  I --

22   Q.  If we could scroll down.

23   A.  I don't know that for a fact.  I'm not familiar.

24   Q.  If we could scroll down.  If you could take some time to

25   review this defense exhibit.

1          Are you familiar with this defense exhibit?

2     A.  Sure.

3     Q.  Is this the basis for your testimony about what Chainalysis

4     says about mixing?

5     A.  In part, yes.

6     Q.  And this is not the study itself, but a *Bitcoin Magazine*

7     write-up of a Chainalysis webinar, correct?

8     A.  Yes.

9     Q.  And have you watched the Chainalysis webinar?

10    A.  I haven't seen the full webinar, no.

11    Q.  And so you've never examined the underlying data for this

12    Chainalysis webinar, have you, that's reported on in the

13    *Bitcoin Magazine* report?

14    A.  Not for that webinar, no.

15    Q.  Nothing in this article talks about --

16          MR. EKELAND:  Objection, Your Honor.  This article is

17    not in evidence, and we need to move it into evidence if we're

18    having so much testimony about it.

19          MR. BROWN:  Your Honor, the witness has testified as

20    an expert.  Experts can form their opinions on the basis of

21    inadmissible materials.  We are not seeking the admission of

22    it, but we're trying to get a basis for his opinion.

23          THE COURT:  That's fine.  The objection is overruled.

24    BY MR. BROWN:

25    Q.  Professor Verret, this article talks about indirect

1    transfers, correct?

2    A.  I don't believe so, no.

3    Q.  So somebody transfers funds from a darknet market to an

4    intermediate address and then to a KYC account -- or, excuse

5    me -- and then to a mixer, that would -- there's nothing in

6    this article that says that transaction would be picked up as a

7    transaction from -- or, to or from a mixer, correct?

8    A.  No.

9    Q.  And isn't it true -- you heard the testimony of FBI Staff

10   Operations Specialist Luke Scholl, correct?

11   A.  Yes.

12   Q.  And do you recall him testifying about what percentage of

13   funds coming into Bitcoin Fog were from darknet markets?

14   A.  I don't remember the exact percentage he said.

15   Q.  Now, you testified that you examined the Kraken To the Moon

16   account records, is that correct?

17   A.  Right.

18   Q.  Now -- and you testified that you didn't see evidence --

19   let me see if I got it right.

20       You testified you didn't see evidence of an attempt to

21   hide or camouflage illicit payments by hiding them with regular

22   customer payments, correct?

23   A.  Right, because I didn't see any corollary evidence of --

24   or, purported evidence of customer payments, in part.

25   Q.  You didn't see any evidence of customer payments at all in

 1    the Kraken To the Moon account?

 2    A.  By "customers," I mean customers other than Mr. Sterlingov.

 3    Q.  You didn't prepare any written work product on this

 4    analysis, did you?

 5    A.  I provided my analysis in testimony.

 6    Q.  But you didn't think you had to show your work to the jury,

 7    is that correct?

 8    A.  I didn't think that was required because there were no cash

 9    flows from other customers to analyze.

10    Q.  I would like to pull up Government's Exhibit 418-H, as in

11    hotel, which has previously been admitted.

12           And if we could expand the fields here.

13           Professor Verret, do you see Government Exhibit 418-H?

14    A.  I do.

15    Q.  And if I could ask this to be published to the jury.  Thank

16    you.

17           So, Professor Verret, these are the account transaction

18    records for the Kraken To the Moon account, is that correct?

19    A.  I -- I don't doubt you, but I don't memorize the exact

20    transaction IDs.

21           I don't have any reason to believe that's not the

22    case.

23    Q.  I'm curious.  When you look at the deposit transactions in

24    this spreadsheet, how can you tell what kind of deposit that

25    is?

1    A.  They are -- there's nothing here that's consistent with

2    attempting to show customer payments.  And this is consistent

3    with putting money into that account to use as an operating

4    account for Kraken -- for To the Moon expenses.

5    Q.  And so I would like to direct your attention to -- let's

6    start out with lines 2 and 3.

7         Now, to begin with, do these deposits -- do these

8    deposit transactions appear to be doubled up?

9              MR. EKELAND:  Objection.  Vague and ambiguous.

10             THE COURT:  If the witness understands.

11             THE WITNESS:  Yes, that's what they appear to be.

12   BY MR. BROWN:

13   Q.  And so what -- what is the transaction shown in lines 2 and

14   3?

15   A.  A deposit for .7 Bitcoin.

16   Q.  And what's the date of that transaction?

17   A.  March 10th, 2016.

18   Q.  And then looking at lines 4 and 5, what sort of transaction

19   is occurring here?

20   A.  It looks like a trade.

21   Q.  A trade of what for what?

22   A.  Traded Bitcoin for euros.

23   Q.  So in other words, he's selling his Bitcoin that he just

24   deposited for euros?

25   A.  Correct.

1    Q.  And then looking at line 6 and 7, what sort of transaction

2    is shown here?

3    A.  A withdrawal of those euros.

4    Q.  And isn't it true that if you look through this whole

5    spreadsheet, that's the same pattern that you see again and

6    again of deposit of Bitcoin, conversion to euros, and then just

7    withdrawing those euros?

8    A.  Correct.

9    Q.  Now, you heard testimony from Larry Harmon, didn't you?

10   A.  Yes.

11   Q.  And you heard him testify about running a darknet -- mixer

12   site called Helix, right?

13   A.  I did.

14   Q.  And you haven't done any sort of study of how Mr. Harmon

15   paid himself his fees out of Helix, have you?

16   A.  I have reviewed analysis contained in discovery, including

17   notes taken and the indictment and the other court documents in

18   that case.

19   Q.  So you would agree with me, based on your review, that

20   Mr. Harmon opened accounts at two cryptocurrency exchanges,

21   Coinbase and Circle to help cash out his proceeds, wouldn't

22   you?

23   A.  I understand that he used KYC -- KYC exchange accounts to

24   cash out proceeds, yes.

25   Q.  And you would also agree with me that he testified that he

1    only sent small amounts to these two exchanges in the

2    beginning.  Isn't that correct?

3    A.  I don't remember that exact testimony, but I understand he

4    mentioned he had frictions with KYC exchanges.

5    Q.  Now, you testified about this back-of-the-envelope

6    calculation about the expected fee income for Bitcoin Fog,

7    isn't that correct?

8    A.  In the *Daubert* hearing, that's correct.  Yes.

9    Q.  And today, didn't you testify about expected fee income for

10    Bitcoin Fog?

11    A.  I wouldn't describe anything that I've provided today as a

12    back-of-the-envelope calculation.

13    Q.  Well, setting aside that characterization.  You testified

14    today about what you would calculate as the expected fee income

15    for Bitcoin Fog?

16    A.  Correct.

17    Q.  And I would like to direct your attention to the Defense

18    Exhibit 128 that you discussed during your direct testimony.

19          Now, Professor Verret, who created this exhibit?

20    A.  So this exhibit was prepared by someone at a Bitcoin think

21    tank called Laurent at my direction.

22    Q.  So you did not create this exhibit, did you?

23    A.  I did not create it.  I spot-checked it for accuracy and it

24    was created according to my direction.

25    Q.  But you did testify on your direct about -- as if you had

1    created this and as if these were your calculations?

2    A.  I said I didn't create it.  I said this is what I relied

3    on.  And this is the design that I thought was best to value

4    Bitcoin Fog's operator's earnings.

5    Q.  And Mr. Laurent is a French citizen, correct?

6    A.  I don't know where he's a citizen.

7    Q.  And he's associated with Samourai Wallet, isn't that

8    correct?

9    A.  I understand that he works at a Bitcoin think tank

10   associated with Samourai Wallet.  That's correct.

11   Q.  And Samourai Wallet is a service that -- it's a mixer-like

12   service, isn't that correct?

13   A.  It's a CoinJoin, but achieve the same -- a similar result,

14   but without using a central custodian, is my understanding.

15   Q.  Now, you testified about -- we can take this down.

16        You testified about Bitcoin Pizza Day, isn't that

17   correct?

18   A.  Correct.

19   Q.  So let me ask you:  If in the year 2010 you had paid 10,000

20   Bitcoin to buy two pizzas, how much Bitcoin would you have left

21   today?

22   A.  I'm sorry?

23   Q.  If you -- in the year 2010, you had spent 10,000 Bitcoin to

24   buy two pizzas, how much Bitcoin would you have left today?

25   A.  It depends on how many I had to start with.

1    Q.  Let's say you started out with 10,000 Bitcoin and you spent

2    10,000 Bitcoin in 2010 to buy two pizzas.  How much Bitcoin

3    would you have left?

4    A.  It depends upon how much Bitcoin I bought after that

5    transaction.

6    Q.  But you would agree with me that you would not have any of

7    that 10,000 Bitcoin left that you spent for the two pizzas,

8    correct?

9    A.  Correct.

10   Q.  And how much -- how much pizza would you have left today,

11   in the year 2024?

12   A.  I would have eaten it.

13   Q.  So in your analysis of how much the Bitcoin Fog

14   administrator would have collected in terms of fees, you're

15   assuming that to reach that, you know, north-of-billion-dollar

16   figure, you're assuming that he never sold a single Bitcoin,

17   isn't that correct?

18   A.  To reach the ceiling of 1.5 Bitcoin.  But I think I also

19   testified that I don't rely on the ceiling.  The ceiling is

20   useful to understand the highest amount it could be.  It's

21   under -- it's useful to understand that it's unlikely that he

22   held it for that long, but that's the ceiling.

23           I stand behind the 80 to 120 million, or potentially

24   higher if you compare to Harmon's earnings of 200 million.  I

25   stand by that amount as the best estimate of what the Bitcoin

1    Fog operator earned.

2    Q.  But the entire spreadsheet in Mr. Laurent's exhibit,

3    Defense Exhibit 128, it spins anything from low end of about

4    $3 million to high end of -- up in the billions, isn't that

5    correct?

6    A.  Well, the $3 million is the low end of Mr. Scholl's

7    analysis.  The median of Mr. Scholl's analysis was a little

8    less than 8 million -- 7.7 million, I think -- which it still

9    leaves a mystery, compared to the 1.7 million net worth of

10   Mr. Sterlingov.  But those replicate the Scholl analysis.  They

11   also offer a number of different options to use, and I picked

12   one based on my best judgement.

13   Q.  But the option that is realistic is not the, you know,

14   north-of-billion-dollar option, correct?

15        You would agree?

16   A.  I -- I do not believe that the operator of Bitcoin Fog

17   earned 1.5 billion.  That's the maximum they could have earned.

18   I believe they sold it before then.  But that's also why I

19   don't believe that the operator of Fog would have held -- in

20   other words, would have squirreled it away and it wouldn't be

21   sold somewhere.  I don't believe that's likely.

22        But it -- I'm rambling.  Yes, is the answer to your

23   question.

24   Q.  And isn't it true that Mr. Sterlingov kept substantial

25   assets outside of his KYC accounts?

```
 1              MR. EKELAND:  Objection.  Your Honor, we're opening
 2    the door here, I think, if I understand the government's prior
 3    objections.  But if -- you know...
 4              MR. BROWN:  Your Honor, my intent was not to open the
 5    door.  My intent was -- Mr. Verret made certain
 6    characterizations of Ms. Glave's testimony and her analysis.
 7    Ms. Glave, herself, explored the limits of that analysis and
 8    I'm trying to explore the same limits with Mr. Verret.  I'm not
 9    asking for any inadmissible evidence.
10              THE COURT:  So long as it's based on the evidence
11    that's been admitted, that's fine.
12    BY MR. BROWN:
13    Q.  And Mr. -- and let me ask you this.  I withdraw that
14    question.
15         Mr. Verret, isn't it true that Mr. Sterlingov had a
16    Mycelium wallet app on his phone when he was arrested?
17    A.  Yes.
18    Q.  And in that app he was carrying, at the time of his arrest,
19    Bitcoin valued at more than $500,000 on his phone?
20    A.  That's what I understand, yes.
21    Q.  And wouldn't it be possible that Mr. Sterlingov had other
22    Bitcoin wallets that were not on his phone, that he didn't
23    travel with?
24    A.  Yes.
25    Q.  Wouldn't it be possible that he had a ledger or a Trezor in
```

1    cold storage in one of his prior residences?

2    A.  Yes.

3    Q.  And if we could pull up Exhibit 51, which has previously

4    been admitted.

5         Professor Verret, are you familiar with Exhibit 51?

6    A.  Yes.

7    Q.  And this is a statement of Mr. Sterlingov's, quote/unquote,

8    net worth that he prepared for a pretrial proceeding in this

9    case, isn't that correct?

10   A.  Yes.

11   Q.  And looking at the first page of this here, isn't there an

12   entry for gold in his mother's possession?

13   A.  There is, yes.

14   Q.  And then looking a little bit further down the page.

15        Isn't there an entry for an Eclair wallet, which is a

16   Bitcoin wallet?

17   A.  Yes.

18   Q.  And that's not a KYC account, is it?

19   A.  I don't understand it to be.

20   Q.  And then there's also an Exhibit 4, Mr. Sterlingov's

21   Mycelium wallet, isn't that correct?

22   A.  Correct.

23   Q.  And, in fact, Mr. Sterlingov values it at approximately

24   half of what the actual worth was, which was 10 -- a little bit

25   more than 10 Bitcoin, isn't that true?

1    A.  I don't know -- I don't know that fact.  I'm not aware of

2    that fact.

3    Q.  And looking at the next page here, isn't it true that

4    Mr. Sterlingov just had a category of "Various old crypto

5    accounts," isn't that true?

6    A.  Yes.

7    Q.  And turning to Exhibit 305, which is Ms. Glave's analysis,

8    Table 2, which is on page 2.

9         Isn't it true that Ms. Glave only looked at certain

10   accounts that were at financial institutions that were either

11   in Mr. Sterlingov's name or attributable to email addresses

12   that he used?

13   A.  That's correct.

14   Q.  And isn't it true that Ms. Glave never said that this was a

15   comprehensive list of all of the Bitcoin that Mr. Sterlingov

16   has ever received?

17   A.  That's correct.

18   Q.  So I would like to direct your attention to Exhibit 702,

19   which has been previously admitted into evidence.

20        MR. BROWN:  And I think we need to pull down the --

21   sorry, the public gallery because this shows private password

22   information.

23        THE COURTROOM DEPUTY:  And share it to the jury?

24        MR. BROWN:  Yes.  Yes, please.

25   BY MR. BROWN:

1    Q.  And, Mr. Verret -- Professor Verret, excuse me, isn't this

2    a password file that was found on one of Mr. Sterlingov's

3    electronic devices?

4    A.  I know that that happened.  I know that it's been said in

5    court that that happened, but I don't know that this document

6    is that.

7    Q.  Professor Verret, scrolling down to line 46, please.

8         Isn't it true that under column A, line 46 refers to an

9    account at Advcash?

10   A.  I see that here.

11   Q.  And Advcash is an online payment processer?

12   A.  Okay.

13   Q.  And looking down at line 49, isn't it true that this refers

14   to an account that Mr. Sterlingov controlled at ANXBTC?

15   A.  I see that listed here.

16   Q.  Isn't it true that ANXBTC is another cryptocurrency

17   exchange?

18   A.  I'm not sure that he controlled it because I just -- I'm

19   not sure that he controlled it.

20   Q.  I'm sorry?

21   A.  I'm sorry.  I'm not sure that he solely controlled it.

22   Q.  Professor Verret, can you see in columns B and C there

23   appear to be -- there appears to be an email address and then a

24   password for the ANXBTC account?

25   A.  I do see that.

1    Q.  Then scrolling down to line 68, isn't it true that under

2    column A there's another account listed here for CentreGold,

3    correct?

4    A.  I see that here.

5    Q.  Then scrolling down to line 88, isn't there an account

6    indicated here for Goldmoney?

7    A.  I see that here.

8    Q.  And then scrolling down to line 120, isn't it true that

9    there's an account here for Perfect Money?

10   A.  I see that here.

11   Q.  And Perfect Money is another online payment service,

12   correct?

13   A.  I'm not familiar with Perfect Money.

14   Q.  So going back to Exhibit 305 on table 1.  Isn't it true

15   that the accounts that Ms. Glave examined are not even

16   realistically close to capturing all of Mr. Sterlingov's

17   financial accounts?

18   A.  I find it highly unlikely that someone could have access to

19   this kind of wealth in any of those accounts and not have it

20   touch their personal life over a ten-year period.  That would

21   require an incredible amount of discipline.  It's fairly

22   limited in what you can actually spend Bitcoin on or gold on.

23   And so I find it highly unlike that, in answer to your

24   question, that a substantial amount of funds was in those

25   accounts.

1          I don't know that other funds were not in those

2     accounts.  I don't know that, I haven't seen it, the evidence

3     of that.  But I find it highly unlikely that a substantial

4     amount of funds was in that account.

5     Q.  Professor Verret, if you could listen closely to my

6     question, please.  Isn't it true there are potentially a

7     substantial number of other financial institution accounts that

8     Mr. Sterlingov controlled, as exhibited from his password file,

9     that are not included in Ms. Glave's table 1 accounts?

10    A.  It's possible, yes.

11    Q.  And if we could turn to the next page.  You referred to the

12    2707 BTC figure, correct?

13    A.  Correct.

14    Q.  And that's the total inflows into those table 1 accounts of

15    Bitcoin?

16    A.  Correct.

17    Q.  What about the outflows from those accounts?  Doesn't this

18    show that there are also -- there have also been substantial

19    trades and other outflows from those accounts that Ms. Glave

20    reviewed?

21    A.  Correct.

22    Q.  And are those trades selling Bitcoin for other assets?

23    A.  Sometimes that occurs in the Kraken accounts and the other

24    accounts.

25    Q.  Well, isn't it true that Ms. Glave's analysis identified

1    more than 1700 Bitcoin worth of trades, selling Bitcoin for

2    other assets, isn't that true?

3    A.  That's listed here.

4              MR. BROWN:  No further questions, subject to the

5    discussion earlier.

6              THE COURT:  Okay.  Mr. Ekeland.

7              MR. EKELAND:  Mr. Hassard, if we could get up what is

8    not in evidence as Defendant's Exhibit Number 18.

9              And if we could scroll to the top.

10             Is that Defense Exhibit 18, Mr. Hassard?

11             And if we could -- are we at the top of it?  Can you

12   zoom out a little bit?

13             That is not it.  Excuse us for a moment.

14                       REDIRECT EXAMINATION

15   BY MR. EKELAND:

16   Q.  And, Professor Verret, do you recall just testifying about

17   this article just now?

18   A.  Correct.

19   Q.  And you reviewed this article in preparation for your

20   testimony?

21   A.  Correct.

22   Q.  And is this the article that led to your belief that most

23   mixers were used for privacy reasons?

24   A.  In part.

25   Q.  And is this an accurate and authentic depiction of that

1    article?

2    A.  Yes.

3         MR. EKELAND:  Your Honor, at this point in time, the

4    defense would like to move what's been marked for

5    identification as Defense Exhibit 18 into evidence.

6         MR. BROWN:  Objection.  Hearsay.

7         MR. EKELAND:  Effect on listener.  We're not saying

8    that the statement is necessarily true.

9         MR. BROWN:  Your Honor, I don't think that's what

10   effect on listener means, so that --

11        MR. EKELAND:  It's also a reputable -- it's from

12   *Bitcoin Magazine*.  It's a publication.  It's what's led to his

13   belief that privacy mixers are fundamentally used for privacy.

14        THE COURT:  He can testify what he relied upon in

15   forming his expert opinions, but otherwise it's hearsay.  So --

16   but he can testify to what he relied upon, if there's portions

17   of it you want to draw his attention to.

18        MR. BROWN:  If it's what he relied upon for purposes

19   of --

20        MR. EKELAND:  Certainly.

21   BY MR. EKELAND:

22   Q.  Do you see the chart there that Mr. Hassard has up?  Did

23   you rely on that in coming to your opinion?

24   A.  Again, in part.

25   Q.  What part of it did you rely on, if you could just explain

1   to the jury, if you relied on it?

2   A.  You see a couple of things mentioned here.  Darknet market

3   is in green for use of mixers.  You see stolen funds in brown,

4   other mixing, mining pools, gambling, exchanges, sources of

5   funds.  The only ones that I would define as clearly illicit

6   are darknet market, stolen funds.  Gambling depends on the

7   jurisdiction and the loss, so it's unclear.

8   Q.  So what's your understanding -- based on this, what's your

9   conclusion as to what rough percentage of funds going through

10  mixers are illicit?

11  A.  You take out darknet market and stolen funds, that's 8, 9,

12  10 -- 8.8 percent, and then what you're left with is 91.2

13  percent.

14  Q.  What does that 91.2 percent number represent?

15          MR. BROWN:  Your Honor, the witness is misstating the

16  document here.  That is not the correct math.

17  A.  Sorry.  Stolen funds, 8.1.  I should have taken out my

18  calculator.  10.8 percent is represented to be listed, and so

19  that means 88.2 percent (sic).

20          MR. BROWN:  Your Honor, the objection is he's

21  testifying to hearsay.

22          THE COURT:  I'm sorry.  88 .2 percent is what?  I

23  didn't hear the witness.

24          THE WITNESS:  It's not clearly illicit.

25          THE COURT:  It's not clearly illicit.  Okay.

1          MR. EKELAND:  Mr. Hassard, could you just scroll down

2     through this article and, Professor Verret, if you see anything

3     else in this article that you relied on in reaching your expert

4     conclusion, could you tell Mr. Hassard to stop?

5          MR. BROWN:  Your Honor, this is not a proper

6     question.  Is there anything else?

7          THE COURT:  If you want to direct him to something in

8     particular.

9          MR. EKELAND:  Mr. -- Professor Verret -- well,

10    Mr. Hassard, could you just scroll down a little more?

11          And if you could scroll back to the top.

12          And if you could scroll down just a little bit under

13    the Chainalysis there.

14    BY MR. EKELAND:

15    Q.  Do you see that first sentence there?

16    A.  I do.

17    Q.  Above that, is that -- did you rely on that in reaching

18    your expert conclusion?

19    A.  In part, yes.

20          THE COURT:  I'm sorry.  Before you do that, I need to

21    understand -- you can get on the telephone here.

22          (Bench conference:)

23          THE COURT:  It's not clear to me that this is

24    Chainalysis that's saying that or some other person is writing

25    an article about something they heard from Chainalysis.  I'm

1    not sure what this is or whether it's a sort of statement that

2    that -- a reputable expert would rely upon for purposes of

3    forming an expert opinion.

4         MR. EKELAND:  As the government pointed out, this is

5    a *Bitcoin Magazine* article, which is an industry standard,

6    reporting on a webinar that Chainalysis did.

7         THE COURT:  Mr. Brown?

8         MR. BROWN:  Your Honor, it's my understanding that

9    this magazine reporting, first of all, it's not, quote/unquote,

10   industry reputable.  It is not accurately stating the

11   underlying source data from Chainalysis.  This is essentially

12   an editorial slant that is actually not a factually accurate

13   representation of the underlying Chainalysis webinar, which the

14   witness has testified he hasn't reviewed.

15        MR. EKELAND:  Well, the article, I believe, and the

16   pie charts is reproducing the charts from the Chainalysis

17   webinar.

18        THE COURT:  So I allowed that, but the question is,

19   this is sort of commentary about whoever is writing the

20   article.  If someone in the *Washington Post* writes an article

21   saying, you know, I attended a scientific event and this is

22   what they said at the scientific event today, if they were

23   reproducing what's at the scientific event, that's the sort of

24   thing I could imagine an expert would reasonably rely on.  I'm

25   not sure an expert would reasonably rely on someone's report --

1    that I don't actually know anything about -- but someone's

2    report as a characterization, really, of what they see.

3              So I think what's relevant here -- and I think you've

4    already done this -- is the underlying data.  And I know the

5    Government's response to that is that it only reflects the

6    direct transactions and not indirect transactions, but I think

7    you brought that out already.  And I think someone else's

8    characterization of that, strikes me as beyond something that a

9    reasonable expert would rely upon under those circumstance,

10   like a backdoor way of trying to get into evidence some

11   editorial comment by somebody who I have no idea whether they

12   have any expertise or knowledge in this field.

13             MR. EKELAND:  We'll move on, Your Honor.

14             (Open court:)

15             THE COURT:  Objection is sustained.

16   BY MR. EKELAND:

17   Q.  Do you recall, on cross just now, Mr. Brown asking you, I

18   think, questions that was about To the Moon?

19   A.  Yes.

20   Q.  And he -- I think you testified that To the Moon had no

21   customers?

22   A.  That's my understanding.

23   Q.  And then do you recall Mr. Brown showing you the

24   spreadsheet with a number of transactions in them?

25   A.  Sure.

1    Q.  What, if any, is your understanding of those transactions

2    and in relation to the To the Moon?

3            MR. BROWN:  Object to the extent that this goes

4    outside the parameters of Professor Verret's testimony as

5    previously discussed.

6            MR. EKELAND:  The cross-examination specifically

7    brought up the spreadsheet, and in relation to To the Moon, and

8    then was singling out certain transactions by line numbers.

9    And I'm merely asking --

10           THE COURT:  Well, I think it's fine.  Why don't you

11   focus on that.  I think it's fine for you to focus on what was

12   brought out on cross, but I'm not sure that opens the door to

13   just more generally say what conclusions do you draw more

14   generally.  So he can focus on what came out on cross.

15           MR. EKELAND:  Certainly, Your Honor.

16   BY MR. EKELAND:

17   Q.  Professor Verret, do you recall, Mr. Brown asked you very

18   specific questions about the spreadsheet and certain

19   transactions in that spreadsheet?

20   A.  Yes.

21   Q.  What, if any, is your understanding of those specific

22   transactions?

23   A.  That looks very consistent to me, to -- Bitcoin goes into

24   Kraken, sold for euros, euros sold for small expenses to get To

25   the Moon VPN up and running.  That's perfectly consistent with

1    that pattern.

2    Q.  But you don't consider anything about those transactions to

3    be unusual in any way?

4    A.  I --

5              MR. BROWN:  Objection.

6              THE COURT:  I'm sorry.  There's an objection.

7              MR. BROWN:  Objection.  Calls for speculation.  And I

8    think we are --

9              THE COURT:  Yeah.  I think it's leading, in any

10   event, so I'll sustain the objection.

11   BY MR. EKELAND:

12   Q.  And do you recall Mr. Brown asking you questions about

13   Larry Harmon and the way that Larry Harmon used KYC accounts?

14   A.  Yes.

15   Q.  Is it your understanding that Mr. Harmon only used KYC

16   accounts to launder his money?

17   A.  That's not my understanding, no.

18   Q.  What is your understanding of how Mr. Harmon laundered his

19   money?

20   A.  I recall an analysis -- or maybe it was just notes from a

21   federal agent interviewing Mr. Harmon --

22             MR. BROWN:  Objection.  This -- this calls for

23   testimony about hearsay and evidence that is not in the record

24   here.

25             MR. EKELAND:  I believe the government did put in the

1    statement of facts related to Mr. Harmon.  I do believe

2    Mr. Harmon --

3             THE COURT:  Yeah.  So if it's in the statement of

4    facts, in that case that's fine.

5             MR. EKELAND:  And I also, Your Honor, believe I

6    cross-examined -- maybe I'm confusing Lichtenstein and Harmon

7    right now.

8             I do believe I cross-examined on this point, but --

9    so, Professor Verret --

10            THE COURT:  Yeah.  I guess the question is -- I don't

11   remember if -- whether he was in the room or not, and it --

12   whatever his recollection is he can testify about, and the jury

13   can -- should rely on its recollection about what the testimony

14   actually was.

15            MR. EKELAND:  Certainly, Your Honor.

16   BY MR. EKELAND:

17   Q.  Professor Verret, were you in the room when Mr. Harmon

18   testified?

19   A.  Yes.

20   Q.  And did you review Mr. Harmon's statement of facts

21   related -- statement of the offense that was entered into

22   evidence?

23   A.  Yes.

24   Q.  And limiting yourself to what you remember of Mr. Harmon's

25   testimony and the statement of offense of Mr. Harmon, what do

1    you recall in relation to Mr. Harmon that he did in order to

2    money launder?

3    A.  I believe -- generally speaking, I remember it was

4    mentioned that he used non-KYC accounts --

5              THE COURT:  I'm sorry.  I apologize.  Just for a

6    second here.  But I think Mr. Hassard has just put up a

7    document which I'm not sure you had actually proposed that he

8    put up.  And I don't know if it's in front of the witness or

9    not.  So why don't you at least take that down for now.

10             MR. EKELAND:  Yeah.  Could you take that down,

11   Mr. Hassard.

12             Thank you, Your Honor.

13             THE COURT:  You're welcome.

14   BY MR. EKELAND:

15   Q.  If you remember the question, please continue answering it.

16   A.  I remember him -- I remember it mentioned that he used

17   various schemes and non-KYC accounts to launder his funds.

18   Q.  And did you -- in your review of Mr. -- the discovery

19   related to Mr. Sterlingov, did you see Mr. Sterlingov engaged

20   in the same kinds of activities as Mr. Harmon?

21   A.  No.

22   Q.  The -- you recall testifying about the Mycelium wallet that

23   was found on -- on Mr. Sterlingov's phone?

24   A.  Yes.

25   Q.  Do you know when that valuation of $500,000 worth of

1    Bitcoin was done, at what date?

2    A.  I'm not sure.

3    Q.  And you can't KYC a Mycelium wallet, can you?

4    A.  I don't --

5          THE COURT:  This seems leading.

6    BY MR. EKELAND:

7    Q.  Well, I -- what I'm wondering, did you hear Mr. Brown, I

8    think, testifying about Eclair wallet and other accounts that

9    were KYC?

10          MR. BROWN:  Objection.  I have not testified.

11          THE COURT:  Yeah.  Sustained.

12          MR. EKELAND:  I'm sorry.  I didn't hear the --

13          THE COURT:  Yeah.  I think -- I think you incorrectly

14    said that Mr. Brown had testified, and he was just asking

15    questions.

16          MR. EKELAND:  That's fair.  I apologize.

17          THE COURT:  I think -- I think we should avoid that

18    as well now and just ask questions.

19    BY MR. EKELAND:

20    Q.  Can you KYC every type of wallet?

21    A.  No.

22    Q.  And you saw -- Mr. Brown asked you questions about

23    Mr. Sterlingov's password list?

24    A.  Correct.

25    Q.  Have you reviewed that password list before?

1    A.  I don't recall whether I've seen it or not, and I -- I

2    don't recall whether it was -- I was permitted to view it.

3    Q.  Do you know -- so you don't -- you wouldn't know what the

4    dates range of all of those accounts are?

5    A.  No.

6    Q.  But to your knowledge, Ms. Glave had full access to that

7    password list?

8    A.  I -- I don't know.

9    Q.  And -- but you -- did you see any of those accounts from

10   that password list that Mr. Brown was asking you about anywhere

11   in Ms. Glave's slide deck or report?

12   A.  No.

13   Q.  And are you aware of anywhere in the discovery that you've

14   reviewed of any of those accounts having any funds?

15   A.  No.

16   Q.  Are you aware of any transaction records related to those

17   accounts?

18   A.  No.

19   Q.  Do you have any reason to believe that Mr. Sterlingov,

20   based on your review, is hiding substantial assets somewhere?

21              THE COURT:  Sorry, the -- better pick up for a second

22   here.

23              (Bench conference:)

24              THE COURT:  So I don't know if this is getting into

25   the jailhouse forensics issue or not.

1         MR. EKELAND:  Maybe I inartfully phrased that.  I'm

2    not trying to go there.  I think what I'm trying to get at is

3    in reviewing the discovery, did you see anything that led you

4    to believe that Mr. Sterlingov is hiding assets somewhere.

5         I'm not trying to get into the -- any kind of

6    interview.  That's not the intent I have.

7         THE COURT:  All right.  Mr. Brown?

8         MR. BROWN:  Your Honor, this is just -- is such a

9    general question, asking the witness to comment on essentially

10   the sufficiency of the evidence.  We think it's outside of the

11   scope of 702 and will not be helpful to the jury.

12        MR. EKELAND:  On cross Mr. Brown made the clear

13   implication that Mr. Sterlingov could be hiding assets all over

14   the place, and so this question is merely a response to that on

15   redirect, asking, you know --

16        THE COURT:  Well, what is -- I guess what I'm

17   puzzling about is, what is the basis for that?  And what

18   would -- what would the basis be for the witness's expert

19   testimony that he wasn't hiding assets elsewhere?  Because, you

20   know, by definition, if you're hiding something elsewhere, it

21   may not show up.  And so I don't -- I'm not quite sure how he

22   would be able to testify in a way that wasn't misleading that

23   there was no evidence that he was hiding assets elsewhere.

24        MR. EKELAND:  Well, it's my understanding -- and

25   maybe I should maybe lay down a little bit of the foundation,

1    if necessary -- that one of the things that financial forensics

2    investigators do and certified fraud examiners do is they look

3    for evidence of hidden assets.

4         And so I do think that's actually squarely in the

5    area of his expertise.  And I'm merely, you know, asking --

6    wanted to ask one or two questions in that area based, you

7    know, on his expertise as a certified, you know, forensic -- I

8    mean, that's what forensic -- financial forensics means, is

9    you're going in and you're examining the financial evidence and

10    you're looking for clues as to what the financial reality is.

11    And it's my understanding one aspect of that is that you're

12    looking for evidence that the individual you're investigating

13    is hiding assets, whatever that may be.

14         MR. BROWN:  Your Honor, number one, I think we are --

15    we're bumping back into the -- the *Daubert* issue that we

16    discussed in the beginning of the day and throughout the day.

17         And, number two, this is just outside the scope of

18    the cross-examination.  We have not objected to the defense

19    going through the list of accounts that were referenced during

20    cross-examination.  To the extent the witness has knowledge and

21    can testify about that, we don't object to that.  But we do

22    object to this sort of blanket calls for a conclusory statement

23    about the sufficiency of the government's evidence, statement

24    which is -- it is outside the scope of his expert testimony,

25    it's beyond the scope of cross, and it's just not relevant and

1    it won't be helpful for the jury.

2              THE COURT:  So I agree with that, in part at least.

3    I mean, I do think that given the questions that Mr. Brown

4    asked, it's permissible to follow up on those.  But I do think

5    that your question, which is the problem that I've had with a

6    lot of your questioning, is there -- is there any evidence in

7    this case that -- I just -- that's problematic because it is --

8    it is asking the person to step in the shoes of the jury.

9    You've heard all the evidence in this case, you've examined

10   piles and piles of evidence and, you know, what is your

11   conclusion?

12             But if you want to direct him to particular exhibits

13   and ask him whether it shows evidence of hidden assets or ask

14   the question in a more narrow, focused way, I think that's

15   appropriate.

16             My concern is just with the open-ended, you know,

17   you're an expert, you're -- you trace forensics, is it your

18   opinion that he has hidden assets?  Is was there any evidence

19   in the piles of evidence in the case that he's done so?

20             So I think as long as you focus it, it's okay.  But

21   just not the sort of open-ended, any -- is there any evidence

22   of this.

23             MR. EKELAND:  Yeah.  I just want to ask you on the

24   phone, so I don't, like, ask the wrong questions.

25             THE COURT:  Okay.

1          EKELAND:  I mean, can I just ask him if he's seen

2     anything that's led him to believe that Mr. Sterlingov is

3     hiding assets?

4          MR. BROWN:  Your Honor, I think that's -- that's the

5     thing, is the question -- that's the same issue or set of

6     issues as Mr. Ekeland's original question.  Like, that is not a

7     specific question about a specific exhibit or financial account

8     or whatnot that would be, you know, within the scope of

9     anything.

10         THE COURT:  Is there a way for you to focus this a

11    little bit more?

12         MR. EKELAND:  Yes, I can try.  But I'm realizing one

13    of the jurors just stood up and maybe -- I don't know if we

14    need to stretch, a break.

15         THE COURT:  He stood up, as well, because we're on

16    the telephone.

17         If you can really -- really focus on it, I'll allow

18    it.  I just -- I do think the concern is just, that, you know,

19    you've examined all the evidence in this case and do you see

20    anything with respect to hidden assets? because I don't think

21    that is disclosed, and I think it also runs into this problem

22    that I have just with the notion of someone opining in the

23    abstract that I just don't see any evidence, which puts someone

24    in the shoes -- puts them in the shoes of the jury.

25         MR. EKELAND:  Understood, Your Honor.

```
 1                     THE COURT:  Okay.

 2                     (Open court:)

 3                     MR. EKELAND:  Could I -- Mr. Hassard, could we get up

 4      what is in evidence as Government Exhibit 702.

 5                     And if we could go to line 46.

 6      BY MR. EKELAND:

 7      Q.  Professor Verret, do you recall Mr. Brown asking you

 8      questions about Advcash.com?

 9      A.  I do.

10      Q.  Do you know what Advcash.com was?

11      A.  I'm not familiar with that service particularly, no.

12      Q.  Did -- in your review of the discovery, did you find any

13      evidence of any substantial funds -- flow of funds through

14      Advcash.com?

15      A.  No.

16      Q.  Turning your attention to line number 49.

17                     And do you see the personal.ANXBTC?

18      A.  I do.

19      Q.  Do you know what that is?

20      A.  I'm not -- I didn't see that in the evidence.

21      Q.  And in your review of the evidence, did you see any

22      substantial flow of funds through ANXBTC?

23      A.  No.

24                     MR. BROWN:  Objection.

25                     THE COURT:  I think the witness -- he testified that
```

1    he didn't see any evidence, I think.

2              Mr. Brown?

3              MR. BROWN:  Could we get on the phone, please?

4              (Bench conference:)

5              MR. BROWN:  Your Honor, this is a highly misleading

6    line of cross and I think it will -- or, line of redirect, and

7    I think it will require recross because the reason why the

8    witness is not seeing flows of funds that he can characterize

9    one way or the other in the discovery for these accounts is

10   that these accounts were not in the discovery.

11             The way defense counsel is posing these questions

12   implies a fact that is not only not in evidence, but it is

13   contrary to the truth and it is highly misleading.  It's like a

14   missing witness argument.

15             And I think that -- we need to be extremely careful

16   about this line of questioning, and I think that we're going to

17   have to have a recross at this point.

18             THE COURT:  Yeah, so -- okay.  Mr. Ekeland?

19             MR. EKELAND:  The government has the burden of proof,

20   and here they are pointing to accounts and saying, "Look, there

21   could have been a lot of money going through there."  And I

22   think that is highly misleading and that we are totally well

23   within our rights to simply ask our financial forensics expert

24   whether or not he saw anything related to any funds related to

25   these accounts.

1          I don't think it's misleading.  It is merely

2     rebutting the government's assertion that somehow there is

3     missing money, when they're the ones with the burden of proof.

4          THE COURT:  So I think the right way for me to

5     resolve this is to just allow the jury to exercise its

6     judgment.  And, Mr. Sterlingov, (sic) I will give you some rope

7     on this.  And I'll allow Mr. Brown to redirect for the reasons

8     that he's given.

9          MR. EKELAND:  Recross, Your Honor.

10         THE COURT:  Recross.  But the -- you know, and if you

11    want to go back and sort of even re-ask the broader questions,

12    you can.  As long as there's going to be a recross, I'm open to

13    that.  My concern was if it was going to be misleading to the

14    jury coming up, you know, for the first time on redirect of

15    issues that weren't disclosed in the expert reports, haven't

16    been explored or reported in the case, and just have the

17    subject of a redirect, which I think was -- am I right that it

18    was invited by Mr. Brown, but Mr. Brown's questions were

19    invited by your questions?  You were suggesting that Ms. Glave

20    had found all of the assets.

21         And so I think he -- that opened the door to doing

22    what he did, which then opened the door to what you're doing.

23    And I think the best resolution is let's just let it -- wash it

24    all out in front of the jury.  You can ask your questions, and

25    Mr. Brown can come back on recross.

1          MR. EKELAND:  Just to make sure I understood the

2    Court correctly, because I think the Court just said that if --

3    I can now ask slightly broader questions because there's going

4    to be a recross?

5          Again, I just -- why I'm asking this on the phone, so

6    I don't like -- so I could basically ask if he's seen evidence

7    of, like, Mr. Sterlingov hiding substantial assets?

8          THE COURT:  Yeah, as long as Mr. Brown can come back

9    on his recross and draw out what the witness can and can't know

10   and then what the basis is for that opinion, I think it's okay.

11         MR. EKELAND:  Thank you, Your Honor.

12         MR. BROWN:  Thank you, Your Honor.

13         (Open court:)

14         MR. EKELAND:  If -- Mr. Hassard, if we could put up

15   what's in evidence as Government Exhibit 702 again.

16         And if we could go to line 68.

17   BY MR. EKELAND:

18   Q.  Do you recall Mr. Brown asking you a question about

19   CentreGold?

20   A.  I do.

21   Q.  Do you know what CentreGold is?

22   A.  I don't, in part because I've already seen one example

23   where something was called "gold" but didn't have anything to

24   do with gold in evidence.

25   Q.  I'm sorry?

1    A.  I don't know what it is because the label "gold" doesn't

2    necessarily mean it is about gold, I know that.

3    Q.  Understood.  And are you aware of any -- anything in your

4    review of the discovery that showed a substantial flow of funds

5    going through CentreGold?

6    A.  No.

7    Q.  And in your review of the government's discovery, did

8    anything lead you to the belief that Mr. Sterlingov was hiding

9    substantial assets in some way?

10   A.  No.

11              MR. EKELAND:  I pass the witness, Your Honor.

12              THE COURT:  All right.  Mr. Brown.

13                       RECROSS-EXAMINATION

14   BY MR. BROWN:

15   Q.  Professor Verret, you were asked by defense counsel about

16   Advcash and whether you found any -- anything in Advcash

17   indicating intent to conceal assets.  Is that fair to say?

18   A.  Right.  Yes.

19   Q.  Isn't -- and you answered that in the negative, correct?

20   A.  Correct.

21   Q.  And the reason why you answered that in the negative is

22   because there is nothing in the government's discovery about

23   Advcash, correct?

24   A.  I didn't see it in the discovery.

25   Q.  And that's because Advcash doesn't respond to U.S. legal

1  process.  It's based overseas, isn't that correct?

2  A.  I don't know.  I don't have knowledge of that.  I believe

3  it, if you tell me.

4  Q.  And you were also asked about whether you saw anything in

5  the discovery indicating a pattern of intent to conceal assets

6  involving ANXBTC, correct?

7  A.  Correct.

8  Q.  And you answered that in the negative, correct?

9  A.  Correct.

10  Q.  And the reason why you didn't see any such transactional

11  patterns is because there was nothing in the discovery about

12  ANXBTC, correct?

13  A.  I didn't see anything about it, no.

14  Q.  And same question about CentreGold.  There was nothing in

15  the discovery about CentreGold, isn't that correct?

16  A.  That's my knowledge, yes.

17         MR. BROWN:  Now, if I could ask -- if we could call

18  up Exhibit 710-A, please, on page 4.

19         This has been previously admitted.

20         MR. EKELAND:  What Exhibit?

21         MR. BROWN:  Exhibit 710-A, as in alpha.

22         THE COURTROOM DEPUTY:  It's coming.

23         (Pause.)

24         THE COURTROOM DEPUTY:  Can you unplug and plug back

25  in, please?

1    BY MR. BROWN:

2    Q.  And, Professor Verret, isn't Exhibit 710-A -- isn't this a

3    reproduction of some of the defendant's notes that were found

4    on his electronic devices?

5    A.  They appear to be.

6    Q.  And under "Apps to back up," do you see the first line

7    beneath that?

8    A.  Yes.

9    Q.  And doesn't it say, "Protectimus" and then, in parentheses,

10   "It's for access to the Advcash, important as F word," correct?

11   A.  I see that.

12                MR. BROWN:  No further questions.

13                THE COURT:  Okay.  Witness may be excused.

14                MR. EKELAND:  Your Honor, isn't the witness subject

15   to recall?

16                THE COURT:  Yes, subject to recall.  So you should

17   stick around, in case you're needed.

18                THE WITNESS:  Today?

19                THE COURT:  I don't think it will be today.

20                MR. EKELAND:  And also just -- he should be

21   instructed not to talk about his --

22                THE COURT:  Yeah.  Don't talk to anyone about your

23   testimony.

24                THE WITNESS:  Return tomorrow at 9:00?

25                THE COURT:  Return tomorrow at 9:00.  Don't talk to

1    anybody.

2         All right.

3         (Bench conference:)

4         MR. EKELAND:  So, the defense requests that we

5    adjourn for the day and then come back tomorrow because of some

6    of the issues that we -- I don't know if "issues" is the right

7    word.  For lack of a better word, some of the issues that we

8    have with the discovery.  We haven't had an opportunity to

9    speak in private with Mr. Fischbach after his review of the

10   devices.

11        There is a question with one of the pieces of the

12   evidence that the government brought in through Ms. Mazars that

13   they say came from Mr. Sterlingov's leader.  The Court may

14   recall --

15        THE COURT:  I notice the witness is listening in on

16   all of our conversations.  He's been doing this throughout the

17   trial.  I'm just not sure that's appropriate.

18        MR. EKELAND:  I'm sorry?

19        THE COURT:  The witness has been listening in on all

20   of our conversations, as though he were your co-counsel,

21   Mr. Fischbach.

22        MR. EKELAND:  Well, he's our expert.

23        THE COURT:  I know.  I understand.  But the experts

24   don't usually participate in sidebars.

25        MR. EKELAND:  Do you want him to be off the phone?

1          THE COURT:  He is off the phone now.

2          MR. EKELAND:  Okay.  Your Honor, I didn't see that.

3     So, do you want us to keep him off the phone?

4          THE COURT:  Yes.

5          MR. EKELAND:  Okay.  Not a problem, Your Honor.

6          So, essentially there's -- the Court may recall

7     the -- what Ms. Mazars testified to as something coming from

8     Mr. Sterlingov's, like, E-reader, with the beard, and he was

9     saying the money laundering thing.

10         THE COURT:  Can I just interrupt for a second here?

11    Because I'm not sure we need to resolve this right now.  We

12    have another half an hour or so today.  Actually, I think there

13    has been plenty of time, frankly, to confer with them,

14    Mr. Fischbach, about this.

15         I understood he wanted to get something to eat, and

16    then when you all didn't show up, the deputy clerk is, Where

17    are they?  And they had left the building for lunch, rather

18    than grabbing a sandwich downstairs.  The break we took was

19    probably about an-hour-and-a-half-or-so break.  The time to eat

20    a sandwich is not substantial.  And, also, this could have been

21    done well before today.

22         But I think what we ought to do is get started with

23    the testimony.  I suspect you won't need to get to this issue

24    tonight.  We can talk about it overnight.  And you can talk to

25    the government about it overnight and we can come back to it.

1    But, then you can at least get started.

2          MR. EKELAND:  Your Honor, if I may explain the issue.

3    The representation made by Ms. Mazars from the stand as to

4    relation to where that piece of evidence came from on the

5    devices we've discovered was incorrect.  And we asked the

6    government for that information, I think yesterday, after we

7    discovered that, based on our analysis.  We were told the

8    correct location for where that evidence was this morning, and

9    we asked to power up the device in order for us to confirm it.

10          And this is a substantial, material piece of

11   evidence.  This is the one where the government is claiming

12   it's Mr. Sterlingov saying, oh, look, I'm money laundering.

13   And what it looks, like, actually, is it's not him, and it

14   didn't come from the source that Ms. Mazars testified from the

15   stand that it did.  And since we are unable to power up the

16   device itself and look, what Mr. Fischbach has done is arranged

17   to take the image from that device and put it up on another

18   device tonight.

19          I need to review this and talk to him about this and

20   the rest of his review.  And if he takes the stand right now,

21   he's going to be sequestered and I'm going to be unable to get

22   the results from him of his forensic investigation, which I

23   think -- well, I will have in the morning.  And then I think if

24   we just take the short break now, we can finish up the *Jencks*

25   review.  I can, you know, get confidence and talk to him about

1          the device review.  We can take care of this.

2                  I think, potentially major evidentiary issue that

3          potentially involves a misrepresentation from the government's

4          forensic investigator on the stand to a piece of evidence that

5          is claiming -- the government is claiming to be Mr. Sterlingov

6          saying, oh, ha, ha, I'm money laundering --

7                  THE COURT:  I understand.  What -- I guess my only

8          concern here is about the sequestering.  What's the

9          government's view on that?

10                 Your phone is not working.

11                 MS. PELKER:  Your Honor, first of all, I think that

12         defense counsel has just completely misstated what Ms. -- what

13         CS Mazars' testimony was about this file, as well as well as

14         where it was found.  The defense has known that this was on the

15         Boox tablet.  They then asked for the particular file path and

16         we provided that to them.  They've had ample time to sort this

17         out on their own.  The exhibit was titled Boox Chat.  There was

18         no mystery about where this came from and defense has had since

19         last week to be able to pull it up.

20                 All that said, just to keep things moving, we're fine

21         if Mr. -- at this point, if Mr. Fischbach wants to take the

22         stand, start his testimony, and then defense wants to talk to

23         him about this discrete issue after his testimony begins,

24         overnight, that's fine.

25                 THE COURT:  Okay.  So why don't we just do it that

1    way.  You can get started, and you can talk to him about this

2    discrete issue overnight.

3              MR. EKELAND:  I would like to talk to him about this

4    discrete issue and his review of the devices today, if that is

5    okay.

6              THE COURT:  Ms. Pelker?

7              MS. PELKER:  That's fine, Your Honor.  We'd just like

8    to move forward.

9              THE COURT:  Let's get going.  All right.

10             (Open court:)

11             THE COURT:  All right.  You can call your next

12    witness.

13             MR. EKELAND:  The defense calls Jeff Fischbach.

14                       JEFF FISCHBACH,

15    was called as a witness and, having been first duly sworn, was

16    examined and testified as follows:

17             THE COURT:  You may proceed.

18             MR. EKELAND:  Thank you, Your Honor.

19                       DIRECT EXAMINATION

20    BY MR. EKELAND:

21    Q.  Mr. Fischbach, could you -- let me know when you're ready,

22    Mr. Fischbach.

23    A.  Yeah.  If -- if I may, I prepared something for the court

24    reporter, for any spellings.

25             THE COURT:  We can deal with that later.  Why don't

1    you -- why don't you -- I don't think we're going to get into

2    that now, so why don't you just get going and we'll -- we'll

3    deal with that later.

4             MR. EKELAND:  Certainly, Your Honor.

5    BY MR. EKELAND:

6    Q.  Mr. Fischbach, could you just introduce yourself to the

7    jury, spelling your name.

8    A.  Yeah.  My name is Jeff Fischbach.  It's F-I-S-C-H-B-A-C-H.

9    Jeff, with a J.

10            I'm a forensic technologist, and sort of become by

11   way of 28 years a trial consultant.

12   Q.  And could you explain to the jury what kind of work you do

13   as a forensic technologist?

14   A.  Yeah.  Well, start off mostly looking at hard drives, and

15   that was the -- that was the beginning, almost three decades

16   ago; now it's everything.  It can be -- certainly lots and lots

17   of cell phones, lots and lots of network devices.

18            The internet wasn't quite what it is today three

19   decades ago.  But even washing machines now are keeping logs

20   and, of course, video game machines.  And your car has a

21   complete -- basically a black box, similar to an airplane.

22   Gosh, I even solved a case with a washing machine -- records

23   from a watching machine.

24            So just about anything you can think of, I try to --

25   I try to get into and see if I can get information.

```
 1   Q.  Do you have experience with computer networks?

 2   A.  I do.  Extensive, yes.

 3   Q.  Hard drives?

 4   A.  Hard drives, yep.

 5   Q.  Cell phones?

 6   A.  Absolutely.

 7   Q.  Social media?

 8   A.  Yeah.  I'm not as popular as I would like to be, but yes.

 9   Q.  Do you have any certifications for your work or is it based

10   on just your experience?

11   A.  It's -- it's my experience.  I'm trying to think.  I have

12   probably, here and there, gotten some certifications, just

13   simply because they came by way of training.  But nothing I've

14   really particularly kept track of.

15   Q.  And how long have you been doing this -- your work as a

16   forensic technologist?

17   A.  This will be my 28th year.

18   Q.  And where are you based out of?

19   A.  Out of Los Angeles.

20   Q.  And did you -- what were you doing before you were a

21   forensic technologist?

22   A.  Let's see.  Immediately before I was a forensic

23   technologist, I was -- I was also doing consulting specifically

24   with the internet.  I was fortunate to have access to the

25   internet through my father, who was a professor in the computer
```

1    science building at what apparently was the third node on the

2    internet.  So it had -- he didn't know what to do with it, but

3    I had access to the internet, really, as a child.

4          So once I was in college, I was asked to help do some

5    consulting for a large accounting firm.  And it's a long story,

6    but by way of that I fell into this and ended up in a criminal

7    case helping to -- to solve that case.  And the phone hasn't

8    stopped ringing since.

9    Q.  And -- excuse me -- do you have professional experience

10   with domain names?

11   A.  Yeah.  Well, I -- my -- my first domain name registration

12   was probably in the early '90s.  But the current domain name

13   that I have for my company, secondwave.com, was registered in

14   1996.  So I've -- I've had hundreds and hundreds of domain

15   names over the years.

16   Q.  And you've -- you registered those domain names yourself?

17   A.  Yes, always.  I can't think of any reason to ask somebody

18   else.  It's a pretty easy process.  Although, it wasn't in the

19   early '90s.  It was almost like computer programming to get a

20   domain name.

21   Q.  And are you familiar with web servers?

22   A.  Very much so.  I maintain three today.  Again, probably

23   something somebody else should do, but it's just relatively

24   simple today.

25   Q.  But you know how to set up a server?

1    A.  Yeah.  I've set up numerous servers.  Early on in my

2    career, before I knew I could actually make a living, that the

3    phone would keep ringing, I did a lot of network consulting,

4    just to make ends meet.  So -- so I was doing it when it was

5    actually fairly difficult and I've enjoyed it and done it in my

6    own office since.

7    Q.  And are you familiar with DNS?

8    A.  Absolutely.  It's required as a part of domain and -- and

9    hosting.

10   Q.  And could you just remind the jury again what DNS is?

11   A.  Yeah.  It's a domain name system, or server, depending on

12   which way you're using it.  Your -- your server will be a

13   domain name server.

14          But basically it's -- it's sort of like -- and I

15   think this would be nice -- it's almost like if you -- instead

16   of memorizing a phone number to call somebody, they could just

17   apply for, like, a really easy word, like their name, and it

18   would just forward to their phone number.

19          So every website on the internet -- and actually

20   everybody's home right now, and, in fact, my watch and my

21   insulin pump and -- I don't know, I probably have four or five

22   IP addresses live on me right now.  Everything, basically, is

23   using one of these, up to 12 digit numbers, with the decimal

24   points for every three digits.

25          And, you know, while that's fine when the machines

1    are working with each other, from the standpoint of getting a

2    web page, I think it was just determined very early on that it

3    would be very difficult for anyone to remember a number like

4    that in order to get to a web page.  So the domain name system

5    was set up where you could register for a name and then your

6    DNS, your domain name server, is basically the forwarding

7    system.  It's how it gets to the IP address.

8              But in reality, every time you type in www.google.com

9    it's going to a -- to a number resolving.

10   Q.  Is that number, is that the same that you're talking about,

11   that the DNS name goes to?  Is that the same as the IP address?

12   A.  That is the IP address, yes.

13   Q.  And so are you familiar with IP addresses?

14   A.  Very much so.

15   Q.  And could you just remind the jury one more time what an IP

16   address is?

17   A.  IP stands for internet protocol.

18             And when I first got on the internet, there were no

19   domain names.  So I had a sheet of paper with the IP address

20   for the MIT library so I could plagiarize reports for

21   elementary school, which pretty much always got me caught.

22             So back then you just -- you kind of kept your own

23   list and there were only -- gosh, there were just a few dozen

24   websites anyway, so it wasn't a very long list.

25   Q.  And are you familiar with Dynamic DNS?

1    A.  Yes.

2    Q.  And could you just briefly explain to the jury what Dynamic

3    DNS is?

4    A.  So I mentioned that everybody -- everyone here has an IP

5    address.  Everyone that's holding a phone, as long it's a smart

6    phone, has at least one IP address.  If you have a watch,

7    you'll have another one.

8            But what ends up happening is unless you have a web

9    server, unless you're running something like Amazon or Google

10   or something like that, there really isn't a need to have

11   what's called a static IP address, where there's always an IP

12   address.  But if you look it up, it's fairly easy to look up,

13   you can find out what the IP address is for Google.  It's been

14   the same thing for a very long time.  You could type in that

15   number and you could go to Google.

16           At home, that's not necessary.  So what ends up

17   happening at home is your internet service provider, which

18   would be the ISP, is basically what they refer to as leasing,

19   and I think it's more appropriate to say loaning you an IP

20   address.

21           So they can change that address at any time, they can

22   give it to your neighbors.  And you will have a period of

23   time -- in fact, you can look it up on your computer, where it

24   will tell you, roughly, how long you've been loaned that IP

25   address.

1          The problem with that is if you do want to do

2     something fairly advanced at home, like run a security system,

3     or -- I mean, in my case, I have a remote control for the door

4     to the chicken coop at home and -- yeah, we have a chicken

5     coop -- I can feed the cats and I can watch a video feed and

6     see the cats come to -- to run to get food.

7          More recently, companies have set up services that

8     will take care of that.  You get an app and you pay them every

9     month.  But you've been able to do that for a long time by

10    visiting your IP address.  But if your IP address changes, how

11    do you know what it is while you're out of town and you want to

12    check in our your cats or, you know, see your surveillance

13    cameras?

14         So what a Dynamic DNS does is you put a piece of

15    software or hardware on your network -- so it can just be a

16    piece of software you run on your Windows and Mac machine, just

17    something in your home.  All Linksys devices actually have a

18    place that you can set a Dynamic DNS in there.

19         And once you sign up with a Dynamic DNS -- usually

20    free, but I prefer to pay for them because I want to know that

21    it's going to be there when I need it, and it's relatively

22    cheap -- what happens is your network, your computer, your

23    Linksys, or however you use it, is basically pinging that

24    service regularly and letting it know if your IP address has

25    changed.

1          So it gives you the sense of being able to type in,

2     you know, fischbach.dynamicdns.com and get to my home very

3     easily, without having to call my wife and say, Would you

4     please find out what our IP address is today?

5          Sorry for the long explanation, but --

6     Q.  And are you familiar with hosting?

7     A.  Yes.  Yes.  I -- I host my own site.

8     Q.  Can you just briefly explain for the jury what hosting is?

9     A.  Yeah.  Hosting, basically, unless you are a major company

10    where you've got your own servers running, you will --

11    generally, if you want to make your own -- your own website,

12    you want to start a business or do something like that, you'll

13    go to a company that hosts.  And sometimes it's the same

14    company where you get your domain name, so like GoDaddy --

15    sorry.  I'll slow down.

16         So, like GoDaddy will -- will allow you to get a

17    domain name and allow you to pay for monthly hosting with them

18    as well.  And it's basically just -- they've got very large

19    servers that have -- typically you'll rent what's called a

20    virtual server, so you're just sharing the same piece of

21    equipment with everybody else.

22         In my case, we don't host physically on property

23    anymore.  Once we moved -- prior to the pandemic, I closed up

24    my office and just decided I like working at home.  I don't

25    host out of my home.  I moved my servers into what's called a

```
1    co-location facility.  So basically you could pay, also,

2    GoDaddy or Amazon or other places just to hold onto your server

3    and keep it running 24/7.  That's the part I don't like doing,

4    is making sure my server is running, so I pay somebody for

5    that.

6    Q.  And are you familiar with the Tor browser and the Tor

7    network?

8    A.  I am, yes.  I've been using it for years.

9    Q.  And could you just briefly explain to the jury again what

10   that Tor browser and the Tor network is?

11   A.  Yeah.  So the -- The Onion Router was originally started

12   by -- if I remember correctly, I think it was the Navy, U.S.

13   Navy, and it's basically a system that -- it does -- well, I

14   think we've heard people talk about hops today.

15           It is like a hopping system.  What happens when you

16   are running a Tor browser and you type in a domain name that

17   you want to go to, even not a Tor domain name, but even if you

18   just type in "Google," before it gets to Google what it will do

19   is it will go to a Tor node, somebody that is volunteering,

20   typically, to just run, pay -- like a repeater.  It's kind of

21   like a repeating system and it will do a number of hops before

22   it comes out on the other side.

23           And it is a -- basically, it's a security mechanism

24   because if you are just using Chrome, for example, and you go

25   to visit my website, I am -- I promise I am not using it for
```

1  malicious purposes -- but I am collecting information on your

2  computer.  If you visit me through a Tor browser, I -- the only

3  thing I get is the last node that you connected to.

4  Q.  And then, how did you get started as a forensic

5  technologist?

6  A.  Well, it got me started.  I was -- as I said -- a good

7  friend of mine that went to -- went to school and became an

8  accountant, he started working at a law -- at an accounting

9  firm that the -- one of the lead partners in the firm,

10  Grobstein, Horwath & Company, if I remember correctly, they --

11  he decided -- well, 30 years ago -- or, longer then I've been

12  doing this, he decided that they wanted to get into the

13  internet as an accounting firm, which I thought was really

14  weird and made no sense to me.

15          But his vision was that eventually there would be --

16  and he didn't call it e-commerce, but eventually people would

17  spend money and trade money and buy things and do things on the

18  internet, which just wasn't even on anybody's radar at the

19  time, and they would need accountants.  So he wanted to show

20  the world that -- early on that they were the first ones that

21  understood that and knew that and could be experts.  They even

22  leased an entire extra floor of their building to be able to

23  set that up.

24          Because my friend was the youngest working there at

25  the time, they asked him, Do you know anybody who knows how to

1    do that?  He said, I've got a friend who has been hacking since

2    he was in elementary school, I'm sure he knows something.  My

3    name was given.  I showed up and started working for them.

4         And long story short, they called me up one day and

5    told me that one of their clients was being hacked and extorted

6    online and could I go and take care of it?  And I said that's

7    not what I do, and they said, Well, you know, we know that

8    you've done some hacking, at least as a -- as a minor.  I'm

9    sure you can at least help them out.  And I showed up and

10   literally just unplugged the internet and, next thing you know,

11   the FBI is on my doorstep asking how I stopped the hack.

12        And I had contacted -- because there weren't that

13   many people on the internet, I contacted a friend that I

14   thought might be able to trace the hack, who ended up coming up

15   with a name.  And it turns out that it was somebody that had

16   threatened the law firm before and the FBI ended up arresting

17   him.  And I am became friends with Agent Manny Hurtado, who was

18   starting the first computer crime squad, as I understood.  And

19   I don't think they call it that anymore in Los Angeles.  And I

20   felt like I had the most interesting day I would ever have in

21   my life and I would go back to my old job.  But the phone never

22   stopped ringing from that day.

23   Q.  And then do you offer your services to both the prosecution

24   and the defense?

25   A.  Oh, yeah, any -- by way of me trying to slow myself down

1    for the court reporter -- I love this.  This is cool.

2            So, yeah, anybody who calls, I would be more than

3    happy to advise.  I don't typically charge the government

4    because it's a -- it's just a much bigger deal getting paid.

5    And I admire when somebody from the government actually calls

6    and wants to make sure that their -- that the work that they're

7    doing is solid.  So there's a number of prosecutors that I take

8    phone calls from all the time.

9    Q.  Has the government ever asked you to testify?

10   A.  I've been asked.  I've been put on call.  I've never

11   actually been put on the stand.  I kind of understand it

12   because I think we've got a room full of people here with my

13   qualifications who can testify, who are already paid for by the

14   government.  And I think over the years I've become expensive,

15   so I get it.

16   Q.  How would you characterize your background?

17   A.  Lucky.  I'm not sure what you're asking.  I think I just

18   gave it to you.  I mean, I was a very curious kid who took

19   everything apart my parents ever gave you.  They will, to this

20   day, tell you that over and over again.  Which, back then, was

21   basically the definition of a hacker.  And I did get involved

22   with some people who, in fact, even got arrested for hacking.

23   Kevin Mitnick, who was one of the most notorious hackers, who,

24   coincidentally, lived down the street from me.  And so I'm --

25            THE COURT:  I was going to suggest maybe just try and

```
 1    focus on the qualifications for the proceedings here today.
 2    BY MR. EKELAND:
 3    Q.  Do you have any special qualifications or certifications?
 4    A.  I think asked and answered.  But, nothing special.
 5    Q.  And then had you belonged to any associations related to
 6    your work?
 7    A.  Yeah.  I mean, I joined lots of associations over the
 8    years.  The IEEE because -- I'm trying to remember exactly what
 9    it stands for -- electronics -- a number of forensic
10    organizations.  The -- but at the same time, I've also tried to
11    balance out joining prosecutorial organizations to be able to
12    provide information there, and also defense organizations.  So
13    I'm a member of the Black Prosecutors Association last time I
14    checked, and I'm also a member of the National Association of
15    Criminal Defense Lawyers.
16              Why black prosecutors?  Because, honestly, it was the
17    only black -- it was the only -- sorry, it was the only
18    prosecutorial association that wanted me, that accepted my
19    request to join.  So, they got me.
20    Q.  And have you qualified to testify as an expert before?
21    A.  Oh, yes.  I've lost count.
22    Q.  And what kinds of courts?
23    A.  Federal, state -- military, I've been in a number of
24    military courts.  I think I've worked for all but one of the
25    branches.  And then I do a lot of mitigation work and that sort
```

1    of thing.  I'm not the mitigator, but I'm brought in to help

2    with mitigation.  And even though I don't like them as much as

3    criminal work, I do have one or two divorce attorneys that I'll

4    help out, but mostly because their divorces are practically

5    criminal, so I find them interesting.

6    Q.  How many states have you qualified as an expert?

7    A.  I think about half of the lower 48 and then also Alaska.  I

8    haven't been fortunate enough to get sent to Hawaii, but I'm

9    waiting.

10   Q.  Have you received any special clearances in order to

11   perform a forensic examination?

12   A.  Yes, I have.

13   Q.  What type -- excuse me -- what type of special clearances

14   have you received?

15   A.  I have to be careful.  That's one of those if I tell you, I

16   might have to kill you kind of things.  But there was a case

17   that involved national security military secrets and I had to

18   go --

19               THE COURT:  I think he was asking you what clearance

20   you hold.

21               THE WITNESS:  Well, I've learned, posthumously, after

22   the fact, it would have been top -- apparently top secret

23   because of the room that I was put in.

24   BY MR. EKELAND:

25   Q.  And was that a SCIF?

1    A.  Yeah, SCIF, secure compartmentalized information facility.

2    I didn't know what my level of security was, but I was told in

3    a case in Alaska that you can't get into a SCIF by the

4    prosecutor unless you have top-level security.  So apparently

5    that's what I had.

6    Q.  Have you ever been hired to work directly for a court?

7    A.  Yeah, as a special master.  I've done that a number of

8    times directly with judges.

9    Q.  Have you ever worked on a case like this one?

10   A.  No, not quite like this one.  I've been adjacent to it, but

11   I haven't really seen anything quite like this ever before, not

12   in three decades, which was probably why I'm here.

13           THE COURT:  I'm sorry.  We're just doing

14   qualifications here.  You can -- you can --

15           MR. EKELAND:  Huh?

16           THE COURT:  The witness was sort of going beyond his

17   qualifications.  I think we should just keep to his

18   qualifications.

19           MR. EKELAND:  Okay.  I've got a few more, and then

20   I'll move on.

21           THE COURT:  That's fine.

22   BY MR. EKELAND:

23   Q.  Do you have experience with cryptocurrencies?

24   A.  Personal experience with cryptocurrency, and I've done a

25   few cases that have involved cryptocurrency.

1    Q.  Do you have any experience with crypto mining?

2    A.  Yes.  I -- I mined what would today be about $160,000 worth

3    of Bitcoin, and threw away my wallet because it was only worth

4    pocket change at the time and I needed the computer for

5    something else.  And today I still have what are called helium

6    miners.  They're basically wireless -- they're helping to

7    provide 5G service to cell phones.  And I just thought it was a

8    pretty interesting project.  But it mines cryptocurrency in

9    exchange for providing your rooftop and your internet service

10   to provide 5G service to customers in the area, to fill in the

11   network.

12   Q.  So you're familiar with what a public key is in relation to

13   Bitcoin?

14   A.  Absolutely.  Yes, I have several.

15   Q.  You're familiar with what a private key is in relation to

16   Bitcoin?

17   A.  Yes.  And now that I don't lose them anymore, I have

18   several of them, as well.

19   Q.  You know what a seed phrase is?

20   A.  Yes.

21   Q.  Outside of forensics, do you do any other kind of

22   specialized work?

23   A.  Yeah, I over -- well, I'm a part of a group that oversees

24   the nation's second largest school districts.  A budget of --

25   it was about $50 billion when I started.  We've spent some of

1    that.  So we're -- I'm just part of this group that we

2    basically -- before the district is able to spend that money,

3    because so much of the money disappeared, I was asked if I

4    would help to oversee that money.  I'm now on my third term of

5    that, and in part because I helped write the bylaws, I'm now

6    terming myself out.  So this will be my last term.  And it's

7    been fantastic.  And I think we've done a spectacular job.

8    Q.  And -- I'm sorry?

9    A.  Yeah.

10   Q.  When were you asked to work on this case?

11   A.  Gosh, I wrote it down.  Gosh, it was about two years ago.

12   I could get the exact date, if I look at my machine.

13   Q.  If I told you it was April 17th, 2022, would you disagree

14   with me?

15   A.  Two days before I got a pretty famous case, yes.

16   Q.  How much have you been paid on this case up through today?

17   A.  Last I checked it was about $20,000.  But all of that has

18   gone to expenses entirely, and probably a little bit -- a lot

19   bit in the hole at this point.

20   Q.  What do you normally charge?

21   A.  $700 an hour is my normal fee off of a -- I'm told I should

22   raise this -- but off a $30,000 retainer.

23   Q.  Do you do pro bono work?

24   A.  Yes.  That's why I charge $700 an hour.  About 50 percent

25   of my work is pro bono.

1          MR. EKELAND:  Your Honor, at this time the defense

2     moves to qualify Mr. Fischbach as an expert on computer

3     forensics.

4          THE COURT:  All right.  Any objection?

5          MS. PELKER:  No objection.  But based on the

6     Court's -- prior *Daubert* testimony, we may need to discuss some

7     of the scope later this evening.

8          THE COURT:  That's fine.  So the Court concludes that

9     Mr. Fischbach is qualified to testify as an expert on forensic

10    technology.

11         MR. EKELAND:  Okay.  Your Honor, I think this would

12    be a good --

13         THE COURT:  I should say, computer forensic

14    technology.

15         MR. EKELAND:  Your Honor, I think this would be a

16    good stopping point.

17         THE COURT:  Let's break for the evening.  Do we have

18    anything in the morning?

19         THE COURTROOM DEPUTY:  I'm sorry, Judge.  Say that

20    again?

21         THE COURT:  What time should we start in the morning?

22    Do we have anything?  9:00 or 9:15?

23         We'll start at 9 o'clock tomorrow morning.  Mind you,

24    even though we're in the defense case now, still don't discuss

25    the case with anybody.  Don't conduct any research in any way

1    relating to anything having to do with this case.  And I'll see

2    you back tomorrow.

3                 (Whereupon the jurors leave the courtroom.)

4                 THE COURT:  All right.  The witness is excused for

5    the evening.  I'll just ask that you not talk about your

6    testimony with anybody, with the exception that you can talk to

7    Mr. Ekeland with respect to what you put on the record.

8                 MR. EKELAND:  The book issue and the device review.

9                 THE COURT:  The book issue?

10                MR. EKELAND:  That's the E-reader.  That's what I was

11   talking to the Court about, the exhibit that's -- where we have

12   a difference with the government.

13                THE COURT:  Well, if you haven't had a chance to

14   discuss that with Mr. Ekeland, you may still.

15                THE WITNESS:  Your Honor, if I may, while I got the

16   mic, I don't know if Mr. Ekeland discussed this with you, but I

17   am physically residing in the same building.  I can

18   certainly -- I'm a grown up.  I can keep to myself and go to my

19   room.

20                THE COURT:  You can talk about what's for dinner, and

21   just don't talk about your testimony, other than those two

22   things.

23                THE WITNESS:  I wanted to make sure that was good.

24                MR. EKELAND:  Thank you, Your Honor.

25                MS. PELKER:  Your Honor, one thing just before the

1    witness is excused.  The government will make a formal motion

2    under 26.2 and *Jencks* for Mr. Fischbach's statements pertaining

3    to his testimony.  And so to the extent that -- we have not yet

4    received anything, so to the extent that Mr. Ekeland needs to

5    discuss that with Mr. Fischbach to obtain the materials, that's

6    fine with us as well.

7            THE COURT:  Okay.  You can also discuss that as well.

8    You may.

9            MR. EKELAND:  Then we'll just get that out tonight.

10   I don't --

11           THE COURT:  I'd appreciate if you would do it in

12   advance, just so we don't have to take a break in trial between

13   the direct and cross.

14           MR. EKELAND:  This would be the last witness on that

15   front.  So after Mr. Fischbach is Mr. Sterlingov.

16           THE COURT:  Okay.  All right.  Anything else that we

17   need to address tonight?

18           MR. BROWN:  No, Your Honor.

19           MS. PELKER:  Your Honor, we do still have a pending

20   question on the scope of Mr. Fischbach's testimony from the

21   *Daubert*.  We can do it tonight.  We can do it before the jury

22   comes back tomorrow.  I think it will be brief.

23           THE COURT:  Why don't I go ahead and excuse

24   Mr. Fischbach now.  And if you want to at least just tell me

25   what the issue is, and then I can get a sense for how much time

1    we'll need for it.  I do have in front of me his supplemental

2    expert disclosures, with my notes on that.

3            MS. PELKER:  And, Your Honor, it should be brief.  At

4    the prior -- when the Court was issuing its guidance from the

5    bench, I believe the Court indicated it would reserve judgment

6    about whether Mr. Fischbach could testify as to how mixers

7    worked and what would be required to operate a custodial mixer

8    like Bitcoin Fog.

9            The government has no concern with Mr. Fischbach

10    testifying to what is involved with setting -- with using Tor

11    or even setting up a Tor site generally.  But we think it's

12    clear that the details relating to how one operates a custodial

13    mixer is far outside Mr. Fischbach's area of expertise.  And to

14    the extent that Mr. Ekeland was asking Mr. Fischbach questions

15    about private keys, public keys, seed phrases, seems to suggest

16    that there may be inviting testimony that would go beyond the

17    scope of the disclosure.

18            THE COURT:  All right.  So before I spend the evening

19    reading through the *Daubert* hearing on this, Mr. Ekeland, is

20    this going to come up?

21            MR. EKELAND:  I don't -- I think -- in relation to

22    particulars about operating a mixer, it's not my intent to

23    elicit testimony from Mr. Fischbach on that.

24            The setting up a server, DNS registration, things

25    like that, where he's clearly an expert, I am going to elicit

1      testimony on that.  But, honestly, I don't think anybody

2      knows -- is an expert, at least in this room, on -- on how the

3      mixer functions.

4              So I think the short answer is, I'm not intending on

5      asking about that.

6              In terms of just the private keys and the seed

7      phrases and whatnot, that's just -- more just basic sort of

8      facts stuff and not meant to --

9              THE COURT:  I -- I could even testify on that.

10             MR. EKELAND:  Precisely.

11             So in short, we're not intending on eliciting

12     testimony about the specifics of the mixer, beyond the stuff

13     that is already in Government Exhibit 1, with, you know,

14     Akemashite Ometedou talking about, oh, I've got a front end,

15     I've got a back end, I've got multiple servers.  That, I think,

16     is just simple fact stuff, not going into, oh, it's running on

17     this kind of node.

18             THE COURT:  If you're just pointing to evidence

19     that's in the record --

20             MR. EKELAND:  Yes.

21             THE COURT:  -- that seems okay to me.

22             But if he's then going to opine on that and what that

23     means, it may raise an issue.

24             MR. EKELAND:  Okay.  So, understood.

25             THE COURT:  Okay.  All right.  You'll let us know in

1    advance if he's going to do that, so we have a chance to

2    discuss it, rather than --

3              MR. EKELAND:  Yes.  And I'll tell you, it's not -- I

4    don't have -- you know, you -- sometimes you get up on the

5    stand -- you're doing this and all of the sudden you end up

6    there, but it's not my intention to do that at all.

7              THE COURT:  Okay.  All right.  Well, before you do

8    it, let me know if it comes up.

9              MR. EKELAND:  Understood.

10             THE COURT:  If you have the urge.

11             All right.  Anything else tonight?

12             MS. PELKER:  No, Your Honor.

13             THE COURT:  All right.  I will see you all in the

14   morning.  Thank you.

15                              *   *   *

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3       I, JANICE DICKMAN, do hereby certify that the above and

4   foregoing constitutes a true and accurate transcript of my

5   stenographic notes and is a full, true and complete transcript

6   of the proceedings to the best of my ability.

7                       Dated this 5th day of March, 2024

8

9

10                      _____

11                      Janice E. Dickman, CRR, CMR, CCR
                        Official Court Reporter
12                      Room 6523
                        333 Constitution Avenue, N.W.
13                      Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

    WITNESSES:

3

        J.W. Verret
4           Direct Examination (Cont.) By Mr. Ekeland.........  2
            Cross-Examination By Mr. Brown................... 16
5           Redirect Examination By Mr Ekeland............... 55
            Recross-Examination By Mr. Brown................. 75

6

        Jeff Fischbach
7           Direct Examination By Mr. Ekeland................ 82

8

    EXHIBIT ADMITTED:

9

        Government's Exhibit 915............................ 28

10
                              *   *   *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100,000** [2] - 29:5, 29:6
**$110,000** [2] - 28:19, 29:12
**$160,000** [1] - 98:2
**$20,000** [1] - 99:17
**$30,000** [1] - 99:22
**$300** [1] - 18:24
**$450,000** [1] - 11:9
**$50** [1] - 98:25
**$500,000** [2] - 49:19, 64:25
**$700** [1] - 99:21, 99:24

## '

**'90s** [2] - 85:12, 85:19

## 1

**1** [4] - 53:14, 54:9, 54:14, 104:13
**1.5** [2] - 47:18, 48:17
**1.7** [1] - 48:9
**10** [5] - 12:11, 12:13, 50:24, 50:25, 57:12
**10,000** [5] - 46:19, 46:23, 47:1, 47:2, 47:7
**10.8** [1] - 57:18
**10th** [1] - 43:17
**11** [2] - 13:5, 13:7
**110,000** [1] - 22:7
**12** [3] - 13:10, 13:12, 86:23
**12-year** [1] - 11:9
**120** [2] - 47:23, 53:8
**128** [2] - 45:18, 48:3
**13** [7] - 13:15, 13:16, 23:11, 23:18, 26:16, 26:23, 27:11
**134** [2] - 23:10, 26:16
**16** [8] - 3:13, 31:11, 31:25, 32:18, 32:22, 33:11, 36:11, 36:17
**16,000** [1] - 11:8
**1700** [1] - 55:1
**17th** [1] - 99:13
**18** [6] - 38:23, 38:24, 39:19, 55:8, 55:10, 56:5
**1996** [1] - 85:14
**19th** [4] - 24:1, 26:4, 26:9, 26:12

## 2

**2** [5] - 43:6, 43:13, 51:8, 57:22

**200** [1] - 47:24
**20001** [1] - 106:13
**2002** [4] - 20:8, 20:11, 20:13, 20:15
**2010** [3] - 46:19, 46:23, 47:2
**2011** [1] - 11:3
**2012** [1] - 11:4
**2013** [2] - 9:3, 11:4
**2014** [2] - 9:3, 11:4
**2015** [1] - 11:5
**2016** [2] - 11:6, 43:17
**2017** [1] - 11:6
**2018** [1] - 11:6
**2019** [1] - 11:7
**2020** [1] - 11:7
**2021** [1] - 11:7
**2022** [3] - 11:8, 20:15, 99:13
**2023** [4] - 24:2, 26:4, 26:9, 26:12
**2024** [2] - 47:11, 106:7
**21** [3] - 23:11, 26:24, 27:12
**22** [1] - 23:18
**221** [1] - 26:16
**24,000** [1] - 11:7
**24/7** [1] - 91:3
**25** [1] - 10:25
**25,000** [1] - 11:4
**26** [2] - 36:11, 36:17
**26.2** [4] - 31:11, 34:15, 35:6, 102:2
**2707** [8] - 3:25, 4:5, 8:7, 8:9, 8:11, 9:20, 9:21, 54:12
**28** [1] - 83:11
**28th** [1] - 84:17

## 3

**3** [4] - 43:6, 43:14, 48:4, 48:6
**3,000** [1] - 11:8
**30** [1] - 92:11
**300** [2] - 22:5, 22:11
**305** [4] - 2:13, 13:23, 51:7, 53:14
**325** [3] - 13:24, 14:1, 15:22
**333** [1] - 106:12
**3:25** [3] - 34:24, 35:1, 37:17

## 4

**4** [5] - 8:19, 8:20, 43:18, 50:20, 76:18
**40** [1] - 10:25
**40,000** [1] - 11:7

**41** [1] - 10:25
**418-H** [2] - 42:10, 42:13
**42,000** [1] - 11:7
**44** [1] - 10:25
**44,000** [1] - 11:4
**450** [2] - 22:1, 22:2
**46** [3] - 52:7, 52:8, 71:5
**48** [1] - 96:7
**49** [2] - 52:13, 71:16

## 5

**5** [3] - 9:4, 9:7, 43:18
**50** [3] - 10:19, 10:23, 99:24
**51** [2] - 50:3, 50:5
**57** [1] - 10:25
**57,000** [1] - 11:6
**59** [1] - 10:25
**59,000** [1] - 11:5
**5G** [2] - 98:7, 98:10
**5th** [1] - 106:7

## 6

**6** [2] - 9:11, 44:1
**60,000** [2] - 10:19, 10:23
**63** [1] - 10:25
**63,000** [1] - 11:6
**6523** [1] - 106:12
**66** [1] - 10:25
**66,000** [1] - 11:5
**67,000** [1] - 11:5
**68** [2] - 53:1, 74:16

## 7

**7** [4] - 9:15, 9:17, 43:15, 44:1
**7.7** [1] - 48:8
**702** [4] - 51:18, 67:11, 71:4, 74:15
**710-A** [3] - 76:18, 76:21, 77:2

## 8

**8** [4] - 10:1, 10:4, 48:8, 57:11
**8.1** [1] - 57:17
**8.8** [1] - 57:12
**80** [1] - 47:23
**88** [2] - 53:5, 57:22
**88.2** [1] - 57:19

## 9

**9** [8] - 10:24, 11:17, 11:20, 11:22, 12:4, 28:5, 57:11, 100:23
**9,000** [1] - 11:4
**91.2** [2] - 57:12, 57:14
**915** [4] - 28:3, 28:6, 28:7, 28:11
**9:00** [3] - 77:24, 77:25, 100:22
**9:15** [1] - 100:22

## A

**ability** [2] - 19:18, 106:6
**able** [12] - 4:12, 29:7, 37:9, 38:3, 67:22, 81:19, 89:9, 90:1, 92:22, 93:14, 95:11, 99:2
**absolutely** [3] - 84:6, 86:8, 98:14
**abstract** [1] - 70:23
**academic** [1] - 20:23
**accepted** [1] - 95:18
**access** [5] - 53:18, 66:6, 77:10, 84:24, 85:3
**according** [2] - 8:10, 45:24
**account** [22] - 6:18, 7:7, 7:8, 7:14, 8:23, 9:2, 41:4, 41:16, 42:1, 42:17, 42:18, 43:3, 43:4, 50:18, 52:9, 52:14, 52:24, 53:2, 53:5, 53:9, 54:4, 70:7
**accountant** [1] - 92:8
**accountant's** [1] - 3:8
**accountants** [1] - 92:19
**accounting** [3] - 85:5, 92:8, 92:13
**accounts** [41] - 5:17, 6:2, 6:3, 6:9, 6:20, 6:22, 7:1, 7:8, 7:21, 8:22, 44:20, 44:23, 48:25, 51:5, 51:10, 53:15, 53:17, 53:19, 53:25, 54:2, 54:7, 54:9, 54:14, 54:17, 54:19, 54:23, 54:24, 62:13, 62:16, 64:4, 64:17, 65:8, 66:4, 66:9, 66:14, 66:17, 68:19, 72:9, 72:10, 72:20, 72:25
**accuracy** [1] - 45:23
**accurate** [3] - 55:25,

59:12, 106:4
**accurately** [1] - 59:10
**achieve** [1] - 46:13
**acquittal** [2] - 22:19, 22:21
**acquitted** [2] - 25:4, 25:8
**activities** [1] - 64:20
**activity** [1] - 8:21
**actual** [1] - 50:24
**add** [1] - 12:3
**added** [1] - 21:21
**addition** [1] - 7:8
**additional** [2] - 3:6, 33:11
**address** [22] - 12:16, 41:4, 52:23, 87:7, 87:11, 87:12, 87:16, 87:19, 88:5, 88:6, 88:11, 88:12, 88:13, 88:20, 88:21, 88:25, 89:10, 89:24, 90:4, 102:17
**addresses** [3] - 51:11, 86:22, 87:13
**addressing** [1] - 3:13
**adds** [1] - 10:13
**adjacent** [1] - 97:10
**adjourn** [1] - 78:5
**adjustments** [1] - 8:8
**administrator** [2] - 14:8, 47:14
**admire** [1] - 94:5
**admission** [1] - 40:21
**admit** [1] - 28:2
**admitted** [7] - 28:11, 38:22, 42:11, 49:11, 50:4, 51:19, 76:19
**advance** [2] - 102:12, 105:1
**advanced** [1] - 89:2
**advantage** [1] - 9:2
**Advcash** [7] - 52:9, 52:11, 75:16, 75:23, 75:25, 77:10
**Advcash.com** [3] - 71:8, 71:10, 71:14
**advise** [1] - 94:3
**afternoon** [2] - 16:20, 16:21
**agent** [1] - 62:21
**Agent** [1] - 93:17
**ages** [1] - 41:4
**ago** [4] - 83:16, 83:19, 92:11, 99:11
**agree** [5] - 44:19, 44:25, 47:6, 48:15, 69:2
**ahead** [2] - 28:23, 102:23

**airplane** [1] - 83:21
**Akemashite** [1] - 104:14
**Alaska** [2] - 96:7, 97:3
**alignment** [1] - 37:25
**allow** [9] - 4:17, 19:5, 35:24, 36:9, 70:17, 73:5, 73:7, 90:16, 90:17
**allowed** [3] - 17:8, 30:2, 59:18
**almost** [3] - 83:15, 85:19, 86:15
**alpha** [1] - 76:21
**alternative** [1] - 19:4
**Amazon** [2] - 88:9, 91:2
**ambiguous** [1] - 43:9
**amicus** [1] - 21:15
**amount** [7] - 8:23, 22:11, 47:20, 47:25, 53:21, 53:24, 54:4
**amounts** [1] - 45:1
**ample** [2] - 33:22, 81:16
**an-hour-and-a-half-or-so** [1] - 79:19
**analysis** [22] - 4:1, 7:7, 8:12, 11:21, 12:14, 13:8, 13:11, 13:16, 19:19, 42:4, 42:5, 44:16, 47:13, 48:7, 48:10, 49:6, 49:7, 51:7, 54:25, 62:20, 80:7
**Analytics** [1] - 18:6
**analyze** [1] - 42:9
**Angeles** [2] - 84:19, 93:19
**annual** [1] - 39:7
**answer** [11] - 9:14, 21:20, 21:21, 24:18, 24:22, 28:23, 30:9, 30:11, 48:22, 53:23, 104:4
**answered** [6] - 4:6, 25:9, 75:19, 75:21, 76:8, 95:4
**answering** [1] - 64:15
**ANXBTC** [6] - 52:14, 52:16, 52:24, 71:22, 76:6, 76:12
**anyway** [1] - 87:24
**apart** [1] - 94:19
**apologize** [2] - 64:5, 65:16
**apology** [1] - 23:15
**app** [3] - 49:16, 49:18, 89:8
**appear** [6] - 13:18, 13:20, 43:8, 43:11,

52:23, 77:5
**apply** [1] - 86:17
**appreciate** [1] - 102:11
**appropriate** [4] - 27:6, 69:15, 78:17, 88:19
**Apps** [1] - 77:6
**April** [1] - 99:13
**area** [4] - 68:5, 68:6, 98:10, 103:13
**argument** [1] - 72:14
**argumentative** [1] - 17:20
**arranged** [1] - 80:16
**arrangement** [1] - 29:19
**arrest** [1] - 49:18
**arrested** [2] - 49:16, 94:22
**arresting** [1] - 93:16
**arrive** [1] - 5:11
**article** [15] - 40:15, 40:16, 40:25, 41:6, 55:17, 55:19, 55:22, 56:1, 58:2, 58:3, 58:25, 59:5, 59:15, 59:20
**aside** [1] - 45:13
**aspect** [1] - 68:11
**assertion** [1] - 73:2
**assets** [24] - 25:18, 25:20, 27:18, 29:4, 29:7, 48:25, 54:22, 55:2, 66:20, 67:4, 67:13, 67:19, 67:23, 68:3, 68:13, 69:13, 69:18, 70:3, 70:20, 73:20, 74:7, 75:9, 75:17, 76:5
**associated** [6] - 6:4, 6:7, 10:14, 46:7, 46:10
**Association** [2] - 95:13, 95:14
**association** [1] - 95:18
**associations** [2] - 95:5, 95:7
**assuming** [2] - 47:15, 47:16
**attempt** [1] - 41:20
**attempting** [1] - 43:2
**attended** [1] - 59:21
**attention** [8] - 5:2, 14:24, 38:21, 43:5, 45:17, 51:18, 56:17, 71:16
**attorney** [1] - 35:8
**attorneys** [2] - 17:3, 96:3
**attributable** [1] - 51:11
**auction** [1] - 19:14

**authentic** [1] - 55:25
**Avenue** [1] - 106:12
**avoid** [1] - 65:17
**aware** [7] - 10:21, 17:11, 21:6, 51:1, 66:13, 66:16, 75:3
**awareness** [1] - 12:18

## B

**back-of-the-envelope** [2] - 45:5, 45:12
**backdoor** [1] - 60:10
**background** [2] - 21:21, 94:16
**balance** [1] - 95:11
**bank** [6] - 6:18, 10:14, 19:21, 19:24
**based** [14] - 6:25, 7:20, 39:14, 44:19, 48:12, 49:10, 57:8, 66:20, 68:6, 76:1, 80:7, 84:9, 84:18, 100:5
**basic** [1] - 104:7
**basis** [6] - 40:3, 40:20, 40:22, 67:17, 67:18, 74:10
**BCJ** [1] - 25:17
**beard** [1] - 79:8
**became** [2] - 92:7, 93:17
**become** [3] - 20:23, 83:10, 94:14
**becoming** [2] - 23:2, 27:21
**beforehand** [1] - 35:14
**began** [2] - 27:16, 33:5
**begin** [1] - 43:7
**beginning** [4] - 23:6, 45:2, 68:16, 83:15
**begins** [1] - 81:23
**behind** [1] - 47:23
**belief** [3] - 55:22, 56:13, 75:8
**belonged** [1] - 95:5
**Bench** [1] - 3:3
**bench** [6] - 31:9, 58:22, 66:23, 72:4, 78:3, 103:5
**beneath** [1] - 77:7
**best** [5] - 46:3, 47:25, 48:12, 73:23, 106:6
**better** [1] - 66:21, 78:7
**between** [4] - 4:10, 19:12, 21:3, 102:12
**Between** [1] - 21:2
**beyond** [5] - 60:8, 68:25, 97:16, 103:16, 104:12

**bigger** [1] - 94:4
**bill** [2] - 22:6, 22:10
**billed** [1] - 22:5
**billion** [4] - 47:15, 48:14, 48:17, 98:25
**billions** [1] - 48:4
**Binance** [1] - 6:3
**bio** [1] - 18:23
**bit** [11] - 3:21, 3:25, 12:6, 50:14, 50:24, 55:12, 58:12, 67:25, 70:11, 99:18, 99:19
**Bitcoin** [66] - 6:4, 6:6, 6:8, 6:11, 6:20, 7:9, 7:17, 8:9, 9:2, 9:3, 9:21, 10:15, 14:7, 14:11, 15:2, 15:15, 15:18, 16:3, 16:4, 19:12, 40:6, 40:13, 41:13, 43:15, 43:22, 42:23, 44:6, 45:6, 45:10, 45:15, 45:20, 46:4, 46:9, 46:16, 46:20, 46:23, 46:24, 47:1, 47:2, 47:4, 47:7, 47:13, 47:16, 47:18, 47:25, 48:16, 49:19, 49:22, 50:16, 50:25, 51:15, 53:22, 54:15, 54:22, 55:1, 56:12, 59:5, 61:23, 65:1, 98:3, 98:13, 98:16, 103:8
**BitCoins** [1] - 6:17
**Bitnex** [1] - 6:3
**BitPay** [5] - 6:3, 6:4, 6:5, 6:7, 7:3
**Bitstamp** [1] - 6:12
**Black** [1] - 95:13
**black** [3] - 83:21, 95:16, 95:17
**blanket** [1] - 68:22
**block** [1] - 16:8
**blockchain** [3] - 19:5, 19:19, 21:12
**blockchain.com** [1] - 16:7
**board** [1] - 19:2
**bono** [5] - 22:11, 22:12, 27:22, 99:23, 99:25
**book** [5] - 20:18, 20:22, 20:24, 101:8, 101:9
**book's** [1] - 21:1
**Boox** [2] - 81:15, 81:17
**bottom** [3] - 7:3, 8:7, 10:16
**bought** [1] - 47:4
**box** [2] - 2:5, 83:21

**branches** [1] - 95:25
**break** [9] - 34:19, 34:23, 35:3, 70:14, 79:18, 79:19, 80:24, 100:17, 102:12
**brief** [1] - 21:15, 102:22, 103:3
**briefly** [3] - 88:2, 90:8, 91:9
**briefs** [1] - 18:1
**broader** [2] - 73:11, 74:3
**brought** [5] - 60:7, 61:7, 61:12, 78:12, 96:1
**brown** [29] - 16:17, 16:21, 32:6, 32:9, 33:12, 34:13, 35:18, 35:24, 38:15, 57:3, 59:7, 60:17, 60:23, 61:17, 62:12, 65:7, 65:14, 65:22, 66:10, 67:7, 67:12, 69:3, 71:7, 73:7, 73:18, 73:25, 74:8, 74:18, 75:12
**Brown** [1] - 72:2
**BROWN** [75] - 2:3, 3:1, 3:4, 7:22, 11:23, 12:21, 14:13, 14:17, 15:9, 16:19, 17:22, 23:15, 23:16, 24:1, 24:5, 24:6, 24:18, 24:20, 25:2, 25:24, 26:14, 26:22, 27:10, 28:1, 28:6, 28:8, 28:14, 28:16, 30:8, 30:12, 31:7, 31:10, 31:21, 32:18, 33:6, 33:19, 34:12, 34:15, 37:24, 38:16, 38:25, 40:19, 40:24, 43:12, 49:4, 49:12, 51:20, 51:24, 51:25, 55:4, 56:6, 56:9, 56:18, 57:15, 57:20, 58:5, 59:8, 61:3, 62:5, 62:7, 62:22, 65:10, 67:8, 68:14, 70:4, 71:24, 72:3, 72:5, 74:12, 75:14, 76:17, 76:21, 77:1, 77:12, 102:18
**brown's** [1] - 73:18
**browser** [4] - 91:6, 91:10, 91:16, 92:2
**BTC** [3] - 6:8, 6:12, 54:12
**BTC-e** [2] - 6:8, 6:12
**budget** [1] - 98:24
**building** [4] - 79:17, 85:1, 92:22, 101:17
**bumping** [1] - 68:15

**burden** [2] - 72:19, 73:3
**business** [1] - 90:12
**button** [1] - 15:8
**buy** [5] - 6:6, 46:20, 46:24, 47:2, 92:17
**BY** [47] - 2:17, 5:8, 5:14, 6:21, 8:4, 10:3, 11:10, 12:2, 13:6, 13:25, 14:14, 14:23, 15:13, 16:19, 17:22, 23:16, 24:6, 25:2, 25:24, 27:10, 28:16, 30:12, 38:16, 38:25, 40:24, 43:12, 49:12, 51:25, 55:15, 56:21, 58:14, 60:16, 61:16, 62:11, 63:16, 64:14, 65:6, 65:19, 71:6, 74:7, 75:14, 77:1, 82:20, 83:5, 95:2, 96:24, 97:22
**bylaws** [1] - 99:5

# C

**calculate** [1] - 45:14
**calculation** [2] - 45:6, 45:12
**calculations** [6] - 11:11, 11:14, 16:13, 30:15, 30:18, 46:1
**calculator** [1] - 57:18
**cameras** [1] - 89:13
**camouflage** [1] - 41:21
**capturing** [1] - 53:16
**car** [1] - 83:20
**card** [1] - 10:14
**cards** [3] - 7:2, 7:4, 10:15
**care** [3] - 81:1, 89:8, 93:6
**career** [1] - 86:2
**careful** [2] - 72:15, 96:15
**carrying** [1] - 49:18
**case** [51] - 4:24, 18:1, 18:15, 18:16, 18:25, 21:18, 21:22, 22:13, 22:17, 22:19, 22:23, 23:2, 23:5, 24:13, 25:16, 25:21, 25:23, 26:7, 27:14, 27:21, 28:19, 29:17, 29:20, 29:22, 31:4, 34:25, 37:12, 42:22, 44:18, 50:9, 63:4, 69:7, 69:9, 69:19, 70:19, 73:16, 77:17, 83:22, 85:7,

89:3, 90:22, 96:16, 97:3, 97:9, 99:10, 99:15, 99:16, 100:24, 100:25, 101:1
**cases** [1] - 97:25
**Cash** [2] - 21:7, 21:10
**cash** [3] - 42:8, 44:21, 44:24
**category** [1] - 51:4
**cats** [3] - 89:5, 89:6, 89:12
**caught** [1] - 87:21
**CBDC** [1] - 19:21
**CCR** [1] - 106:11
**ceiling** [4] - 47:18, 47:19, 47:22
**cell** [3] - 83:17, 84:5, 98:7
**central** [3] - 19:21, 19:24, 46:14
**CentreGold** [6] - 53:2, 74:19, 74:21, 75:5, 76:14, 76:15
**certain** [9] - 3:5, 25:11, 25:15, 25:16, 25:18, 49:5, 51:9, 61:8, 61:18
**certainly** [6] - 56:20, 61:15, 63:15, 83:4, 83:16, 101:18
**CERTIFICATE** [1] - 106:1
**certifications** [3] - 84:9, 84:12, 95:3
**certified** [2] - 68:2, 68:7
**certify** [1] - 106:3
**cetera** [1] - 16:6
**Chainalysis** [18] - 15:8, 38:19, 39:1, 39:6, 39:10, 39:17, 39:19, 40:3, 40:7, 40:9, 40:12, 58:13, 58:24, 58:25, 59:6, 59:11, 59:13, 59:16
**challenges** [1] - 21:2
**chance** [2] - 101:13, 105:1
**change** [2] - 88:21, 98:4
**changed** [2] - 29:18, 89:25
**changes** [1] - 89:10
**characterization** [3] - 45:13, 60:2, 60:8
**characterizations** [1] - 49:6
**characterize** [2] - 72:8, 94:16
**characterized** [1] -

39:10
**charge** [3] - 94:3, 99:20, 99:24
**charged** [1] - 21:7
**charging** [1] - 21:17
**chart** [3] - 14:4, 16:12, 56:22
**charts** [2] - 59:16
**Chat** [1] - 81:17
**cheap** [1] - 89:22
**check** [1] - 89:12
**checked** [3] - 45:23, 95:14, 99:17
**chicken** [2] - 89:4
**child** [1] - 85:3
**Chrome** [1] - 91:24
**Circle** [1] - 44:21
**circled** [1] - 23:17
**circumstance** [1] - 60:9
**cite** [1] - 28:2
**citizen** [2] - 46:5, 46:6
**claiming** [3] - 80:11, 81:5
**clear** [7] - 3:13, 27:17, 27:19, 36:6, 58:23, 67:12, 103:12
**clearance** [1] - 96:19
**clearances** [2] - 96:10, 96:13
**clearly** [5] - 37:11, 57:5, 57:24, 57:25, 103:25
**clerk** [1] - 79:16
**client** [1] - 12:8
**clients** [1] - 93:5
**close** [2] - 12:21, 53:16
**closed** [1] - 90:23
**closely** [1] - 54:5
**clues** [1] - 68:10
**CMR** [1] - 106:11
**co** [2] - 78:20, 91:1
**co-counsel** [1] - 78:20
**co-location** [1] - 91:1
**Coinbase** [2] - 6:8, 44:21
**coincidentally** [1] - 94:24
**CoinJoin** [1] - 46:13
**cold** [1] - 50:1
**collect** [1] - 29:6
**collected** [1] - 47:14
**collecting** [1] - 92:1
**college** [1] - 85:4
**column** [2] - 52:8, 53:2
**columns** [1] - 52:22
**comfortable** [1] -

27:22
**coming** [12] - 8:6, 8:14, 8:20, 9:7, 9:13, 14:6, 41:13, 56:23, 73:14, 76:22, 79:7, 93:14
**comment** [2] - 60:11, 67:9
**commentary** [1] - 59:19
**commenting** [1] - 3:9
**commerce** [1] - 92:16
**communicated** [1] - 29:11
**community** [1] - 19:11
**companies** [1] - 89:7
**company** [5] - 19:9, 85:13, 90:9, 90:13, 90:14
**Company** [1] - 92:10
**compare** [1] - 47:24
**compared** [1] - 48:9
**compares** [1] - 12:15
**compartmentalized** [1] - 97:1
**complete** [6] - 35:5, 35:19, 35:23, 35:25, 83:21, 106:5
**completely** [1] - 81:12
**comply** [1] - 19:16
**comprehensive** [1] - 51:15
**computer** [13] - 30:21, 32:25, 37:9, 84:1, 84:25, 85:19, 88:23, 89:22, 92:2, 93:18, 98:4, 100:2, 100:13
**computers** [2] - 33:14, 36:6
**conceal** [2] - 75:17, 76:5
**concepts** [1] - 21:3
**concern** [5] - 69:16, 70:18, 73:13, 81:8, 103:9
**concluded** [2] - 4:7, 9:21
**concludes** [1] - 100:8
**conclusion** [5] - 4:16, 57:9, 58:4, 58:18, 69:11
**conclusions** [15] - 3:18, 5:11, 6:25, 7:20, 8:6, 8:15, 8:20, 9:7, 9:13, 9:18, 10:5, 11:15, 14:7, 15:23, 61:13
**conclusory** [1] - 68:22
**conduct** [2] - 35:1, 100:25
**conducting** [1] - 13:8

**confer** [1] - 79:13
**conference** [6] - 3:3, 31:9, 58:22, 66:23, 72:4, 78:3
**confidence** [1] - 80:25
**confirm** [1] - 80:9
**conflict** [1] - 21:3
**confusing** [1] - 63:6
**connected** [2] - 7:14, 92:3
**conner** [1] - 14:25
**consider** [1] - 62:2
**considered** [1] - 29:20
**consistent** [9] - 9:1, 9:8, 12:7, 39:13, 43:1, 43:2, 61:23, 61:25
**constitutes** [1] - 106:4
**Constitution** [1] - 106:12
**consultant** [1] - 83:11
**consulting** [6] - 18:2, 18:5, 18:8, 84:23, 85:5, 86:3
**Cont** [1] - 2:16
**contacted** [2] - 93:12, 93:13
**contained** [1] - 44:16
**contention** [1] - 39:10
**contingent** [2] - 22:21, 29:19
**continue** [4] - 2:10, 38:3, 38:15, 64:15
**contractually** [1] - 21:19
**contrary** [1] - 72:13
**control** [2] - 15:12, 89:3
**controlled** [5] - 52:14, 52:18, 52:19, 52:21, 54:8
**conversation** [1] - 22:18
**conversations** [2] - 78:16, 78:20
**conversion** [1] - 44:6
**conveyed** [3] - 22:18, 29:8, 29:12
**cool** [1] - 94:1
**coop** [2] - 89:4, 89:5
**copy** [2] - 23:21, 26:19
**corollary** [1] - 41:23
**correct** [95] - 6:24, 8:13, 9:23, 10:11, 11:16, 12:12, 14:12, 15:21, 16:15, 16:24, 17:4, 17:18, 18:6, 18:10, 18:12, 18:13, 18:19, 18:20, 18:22, 19:3, 19:6, 20:3, 20:5, 20:6, 20:19, 21:8, 21:9,

21:11, 21:23, 21:24, 22:15, 22:16, 22:20, 23:4, 25:4, 25:5, 26:4, 26:5, 26:8, 26:10, 28:20, 29:17, 29:21, 40:7, 41:1, 41:7, 41:10, 41:16, 41:22, 42:7, 42:18, 43:25, 44:8, 45:2, 45:7, 45:8, 45:16, 46:5, 46:8, 46:10, 46:12, 46:17, 46:18, 47:8, 47:9, 47:17, 48:5, 48:14, 50:9, 50:21, 50:22, 51:13, 51:17, 53:3, 53:12, 54:12, 54:13, 54:16, 54:21, 55:18, 55:21, 57:16, 65:24, 75:19, 75:20, 75:23, 76:1, 76:6, 76:7, 76:8, 76:9, 76:12, 76:15, 77:10, 80:8
**correctly** [3] - 74:2, 91:12, 92:10
**cost** [1] - 29:5
**counsel** [10] - 17:2, 17:5, 22:18, 24:5, 27:17, 29:11, 72:11, 75:15, 78:20, 81:12
**count** [3] - 3:25, 8:9, 95:21
**counting** [1] - 22:12
**counts** [1] - 25:14
**couple** [1] - 57:2
**course** [1] - 83:20
**Court** [13] - 31:16, 32:16, 35:7, 37:13, 74:2, 78:13, 79:6, 100:8, 101:11, 103:4, 103:5, 106:11
**court** [16] - 5:7, 18:17, 25:17, 25:19, 30:24, 34:21, 35:16, 44:17, 52:5, 60:14, 71:2, 74:13, 82:10, 82:23, 94:1, 97:6
**COURT** [137] - 2:2, 2:4, 2:6, 2:10, 3:21, 4:3, 4:17, 5:6, 5:12, 5:18, 5:21, 6:1, 7:24, 11:1, 11:25, 12:25, 13:4, 14:16, 14:18, 14:21, 15:11, 16:17, 17:21, 23:14, 23:23, 24:19, 24:21, 25:10, 26:18, 27:1, 27:3, 27:6, 28:7, 28:9, 28:11, 30:9, 34:3, 34:7, 34:13, 34:19, 34:22, 35:3, 35:23, 36:8, 36:21, 36:25, 37:3, 37:8,

37:19, 37:23, 38:8, 38:10, 38:14, 40:23, 43:10, 49:10, 55:6, 56:14, 57:22, 57:25, 58:7, 58:20, 58:23, 59:7, 59:18, 60:15, 61:10, 62:6, 62:9, 63:3, 63:10, 64:5, 64:13, 65:5, 65:11, 65:13, 65:17, 66:21, 66:24, 67:7, 67:16, 69:2, 69:25, 70:10, 70:15, 71:1, 71:25, 72:18, 73:4, 73:10, 74:8, 75:12, 77:13, 77:16, 77:19, 77:22, 77:25, 78:15, 78:19, 78:23, 79:1, 79:4, 79:10, 81:7, 81:25, 82:6, 82:9, 82:11, 82:17, 82:25, 94:25, 96:19, 97:13, 97:16, 97:21, 100:4, 100:8, 100:13, 100:17, 100:21, 101:4, 101:9, 101:13, 101:20, 102:7, 102:11, 102:16, 102:23, 103:18, 104:9, 104:18, 104:21, 104:25, 105:7, 105:10, 105:13, 106:1

**Court's** [1] - 100:6
**courtroom** [7] - 2:7, 16:22, 17:15, 35:2, 35:22, 38:11, 101:3
**COURTROOM** [10] - 2:8, 2:14, 5:24, 28:4, 38:12, 38:24, 51:23, 76:22, 76:24, 100:19
**courts** [2] - 95:22, 95:24
**cover** [2] - 3:5, 13:19
**covered** [1] - 12:10
**covers** [1] - 13:19
**create** [6] - 30:14, 30:23, 31:2, 45:22, 45:23, 46:2
**created** [8] - 31:12, 32:23, 36:16, 45:19, 45:24, 46:1
**creators** [1] - 21:7
**crime** [2] - 39:7, 93:18
**Criminal** [1] - 95:15
**criminal** [4] - 29:20, 85:6, 96:3, 96:5
**CROSS** [1] - 16:18
**cross** [21] - 31:19, 32:11, 32:17, 33:5, 33:8, 33:16, 34:9, 38:3, 38:5, 60:17, 61:6, 61:12, 61:14, 63:6,

63:8, 67:12, 68:18, 68:20, 68:25, 72:6, 102:13
**CROSS-EXAMINATION** [1] - 16:18
**cross-examination** [5] - 33:5, 33:8, 61:6, 68:18, 68:20
**cross-examined** [2] - 63:6, 63:8
**CRR** [1] - 106:11
**crypto** [3] - 39:7, 51:4, 98:1
**Crypto** [2] - 20:19, 20:25
**cryptocurrencies** [1] - 97:23
**Cryptocurrency** [1] - 18:12
**cryptocurrency** [8] - 18:15, 18:16, 19:4, 44:20, 52:16, 97:24, 97:25, 98:8
**CS** [1] - 81:13
**curious** [2] - 42:23, 94:18
**currency** [2] - 19:22, 19:24
**current** [2] - 4:1, 85:12
**cursor** [1] - 10:8
**custodial** [2] - 103:7, 103:12
**custodian** [1] - 46:14
**customer** [4] - 41:22, 41:24, 41:25, 43:2
**customers** [5] - 42:2, 42:9, 60:21, 98:10

# D

**D.C** [1] - 106:13
**darknet** [6] - 41:3, 41:13, 44:11, 57:2, 57:6, 57:11
**data** [5] - 14:10, 16:7, 40:11, 59:11, 60:4
**date** [6] - 15:3, 16:5, 43:16, 65:1, 99:12
**Dated** [1] - 106:7
**dates** [1] - 66:4
**Daubert** [6] - 23:10, 45:8, 68:15, 100:6, 102:21, 103:19
**days** [3] - 6:12, 16:23, 99:15
**deal** [5] - 8:22, 38:7, 82:25, 83:3, 94:4
**debit** [3] - 7:2, 7:4, 10:14

**decades** [3] - 83:15, 83:19, 97:12
**decided** [3] - 90:24, 92:11, 92:12
**decimal** [1] - 86:23
**deck** [12] - 2:18, 2:21, 2:23, 2:25, 3:8, 3:15, 3:17, 4:1, 4:2, 4:14, 5:9, 66:11
**decks** [1] - 32:13
**deemed** [1] - 18:24
**defendant** [7] - 17:3, 22:14, 25:4, 25:7, 28:17, 30:6, 35:7
**defendant's** [4] - 22:24, 27:18, 28:18, 77:3
**Defendant's** [1] - 55:8
**Defense** [6] - 38:22, 45:17, 48:3, 55:10, 56:5, 95:15
**defense** [35] - 3:11, 17:2, 17:25, 21:22, 22:9, 22:18, 23:21, 24:5, 31:22, 32:19, 32:20, 32:21, 32:22, 33:7, 33:22, 37:25, 38:24, 39:19, 39:25, 40:1, 56:4, 68:18, 72:11, 75:15, 78:4, 81:12, 81:14, 81:18, 81:22, 82:13, 93:24, 95:12, 100:1, 100:24
**define** [1] - 57:5
**definition** [2] - 67:20, 94:21
**Department** [1] - 21:6
**depiction** [1] - 55:25
**deposit** [6] - 15:3, 42:23, 42:24, 43:8, 43:15, 44:6
**deposited** [4] - 15:16, 16:5, 43:24
**deposits** [5] - 14:9, 14:25, 15:3, 16:4, 43:7
**DEPUTY** [10] - 2:8, 2:14, 5:24, 28:4, 38:12, 38:24, 51:23, 76:22, 76:24, 100:19
**deputy** [1] - 79:16
**describe** [5] - 30:1, 36:10, 36:15, 36:17, 45:11
**described** [5] - 16:2, 19:24, 20:2, 21:13, 27:18
**describing** [2] - 25:12, 29:2
**description** [1] - 32:3
**design** [1] - 46:3

**designation** [1] - 21:16
**destination** [1] - 12:9
**details** [1] - 103:12
**determination** [1] - 12:19
**determined** [1] - 87:2
**device** [6] - 80:9, 80:16, 80:17, 80:18, 81:1, 101:8
**devices** [7] - 52:3, 77:4, 78:10, 80:5, 82:4, 83:17, 89:17
**DICKMAN** [1] - 106:3
**Dickman** [1] - 106:11
**difference** [3] - 4:10, 19:12, 101:12
**different** [8] - 3:4, 15:20, 19:9, 21:12, 29:16, 34:3, 48:11
**difficult** [2] - 86:5, 87:3
**digit** [1] - 86:23
**digital** [2] - 19:22, 19:24
**digits** [1] - 86:24
**dinner** [1] - 101:20
**direct** [18] - 21:17, 22:4, 30:1, 30:20, 34:9, 35:16, 38:17, 38:21, 39:9, 43:5, 45:17, 45:18, 45:25, 51:18, 58:7, 60:6, 69:12, 102:13
**DIRECT** [2] - 2:16, 82:19
**direction** [2] - 45:21, 45:24
**directly** [3] - 6:5, 97:6, 97:8
**disagree** [1] - 99:13
**disappeared** [1] - 99:3
**discipline** [1] - 53:21
**disclose** [1] - 3:18
**disclosed** [7] - 3:16, 32:13, 32:25, 33:1, 35:17, 70:21, 73:15
**disclosing** [1] - 34:2
**disclosure** [6] - 3:12, 33:2, 34:1, 34:6, 35:19, 103:17
**disclosures** [2] - 32:13, 103:2
**discount** [1] - 22:3
**discovered** [3] - 33:10, 80:5, 80:7
**discovery** [17] - 6:23, 32:20, 44:16, 64:18, 66:13, 67:3, 71:12, 72:9, 72:10, 75:4, 75:7,

75:22, 75:24, 76:5, 76:11, 76:15, 78:8
**discrete** [3] - 81:23, 82:2, 82:4
**discuss** [8] - 34:25, 35:4, 100:6, 100:24, 101:14, 102:5, 102:7, 105:2
**discussed** [6] - 16:3, 16:8, 45:18, 61:5, 68:16, 101:16
**discussing** [1] - 36:12
**discussion** [2] - 36:8, 55:5
**discussions** [1] - 27:17
**district** [1] - 99:2
**districts** [1] - 98:24
**divorce** [1] - 96:3
**divorces** [1] - 96:4
**DNS** [10] - 86:7, 86:10, 87:6, 87:11, 87:25, 88:3, 89:14, 89:18, 89:19, 103:24
**document** [3] - 52:5, 57:16, 64:7
**documentary** [1] - 33:10
**documents** [4] - 31:1, 31:3, 31:12, 44:17
**dollar** [2] - 47:15, 48:14
**dollars** [4] - 14:11, 15:18, 16:14, 22:15
**domain** [16] - 85:10, 85:11, 85:12, 85:14, 85:16, 85:20, 86:8, 86:11, 86:13, 87:4, 87:6, 87:19, 90:14, 90:17, 91:16, 91:17
**done** [15] - 7:4, 23:19, 23:23, 31:20, 44:14, 60:4, 65:1, 69:19, 79:21, 80:16, 86:5, 93:8, 97:7, 97:24, 99:7
**door** [6] - 49:2, 49:5, 61:12, 73:21, 73:22, 89:3
**doorstep** [1] - 93:11
**doubled** [1] - 43:8
**doubt** [2] - 37:8, 42:19
**down** [24] - 13:22, 15:25, 29:15, 38:9, 39:22, 39:24, 46:15, 50:14, 51:20, 52:7, 52:13, 53:1, 53:5, 53:8, 58:1, 58:10, 58:12, 64:9, 64:10, 67:25, 90:15, 93:25, 94:24, 99:11

**downstairs** [1] - 79:18
**dozen** [1] - 87:23
**draw** [3] - 56:17, 61:13, 74:9
**drawing** [1] - 5:2
**drew** [1] - 5:3
**Drive** [1] - 31:3
**drives** [3] - 83:14, 84:3, 84:4
**duly** [1] - 82:15
**during** [9] - 11:9, 16:23, 17:5, 30:22, 37:9, 37:10, 38:17, 45:18, 68:19
**Dynamic** [5] - 87:25, 88:2, 89:14, 89:18, 89:19

## E

**e-commerce** [1] - 92:16
**E-reader** [2] - 79:8, 101:10
**early** [6] - 6:11, 85:12, 85:19, 86:1, 87:2, 92:20
**earned** [4] - 4:11, 48:1, 48:17
**earnings** [4] - 4:8, 14:5, 46:4, 47:24
**easily** [1] - 90:3
**easy** [3] - 85:18, 86:17, 88:12
**eat** [2] - 79:15, 79:19
**eaten** [1] - 47:12
**Eclair** [2] - 50:15, 65:8
**editorial** [2] - 59:12, 60:11
**effect** [2] - 56:7, 56:10
**effectively** [1] - 27:22
**effects** [1] - 19:20
**effort** [1] - 9:19
**either** [3] - 6:7, 10:13, 51:10
**Ekeland** [12] - 2:10, 3:5, 32:1, 35:15, 55:6, 72:18, 101:7, 101:14, 101:16, 102:4, 103:14, 103:19
**EKELAND** [133] - 2:11, 2:17, 2:24, 3:14, 3:24, 4:13, 5:5, 5:8, 5:14, 6:21, 7:25, 8:2, 8:4, 10:1, 10:3, 11:10, 12:2, 12:23, 13:2, 13:5, 13:6, 13:22, 13:25, 14:14, 14:20, 14:23, 15:13, 16:16, 17:20, 23:12, 23:20, 23:25, 25:9,

26:17, 26:25, 27:4, 28:10, 31:15, 32:5, 33:1, 33:12, 33:25, 34:5, 34:10, 36:5, 36:19, 36:22, 37:2, 37:6, 37:14, 38:9, 40:16, 43:9, 49:1, 55:7, 55:15, 56:3, 56:7, 56:11, 56:20, 56:21, 58:1, 58:9, 58:14, 59:4, 59:15, 60:13, 60:16, 61:6, 61:15, 61:16, 62:11, 62:25, 63:5, 63:15, 63:16, 64:10, 64:14, 65:6, 65:12, 65:16, 65:19, 67:1, 67:12, 67:24, 69:23, 70:1, 70:12, 70:25, 71:3, 71:6, 72:19, 73:9, 74:1, 74:11, 74:14, 74:17, 75:11, 76:20, 77:14, 77:20, 78:4, 78:18, 78:22, 78:25, 79:2, 79:5, 80:2, 82:3, 82:13, 82:18, 82:20, 83:4, 83:5, 95:2, 96:24, 97:15, 97:19, 97:22, 100:1, 100:11, 100:15, 101:8, 101:10, 101:24, 102:9, 102:14, 103:21, 104:10, 104:20, 104:24, 105:3, 105:9
**Ekeland's** [1] - 70:6
**electronic** [2] - 52:3, 77:4
**electronics** [1] - 95:9
**elementary** [2] - 87:21, 93:2
**elicit** [2] - 103:23, 103:25
**eliciting** [1] - 104:11
**Elmo** [1] - 26:20
**elsewhere** [3] - 67:19, 67:20, 67:23
**email** [2] - 51:11, 52:23
**emails** [6] - 31:4, 31:12, 32:3, 32:5, 33:14, 37:11
**emphasis** [1] - 19:7
**employed** [1] - 18:5
**end** [7] - 6:6, 48:3, 48:4, 48:6, 104:14, 104:15, 105:5
**ended** [6] - 12:15, 69:16, 69:21, 85:6, 93:14, 93:16
**ends** [5] - 23:2, 27:21, 86:4, 88:8, 88:16
**engaged** [1] - 64:19

**engagement** [2] - 21:23, 21:25
**enjoyed** [1] - 86:5
**enter** [1] - 38:11
**entered** [1] - 63:21
**entire** [2] - 48:2, 92:22
**entirely** [1] - 99:18
**entitled** [1] - 3:15
**entry** [2] - 50:12, 50:15
**envelope** [2] - 45:5, 45:12
**equipment** [1] - 90:21
**error** [1] - 12:17
**errors** [2] - 12:16, 12:24
**essentially** [3] - 59:11, 67:9, 79:6
**estimate** [3] - 15:2, 15:5, 47:25
**et** [1] - 16:6
**euros** [7] - 43:22, 43:24, 44:3, 44:6, 44:7, 61:24
**evening** [4] - 100:7, 100:17, 101:5, 103:18
**event** [5] - 12:10, 59:21, 59:22, 59:23, 62:10
**eventually** [2] - 92:15, 92:16
**Evidence** [2] - 17:10, 17:14
**evidence** [52] - 2:13, 3:23, 13:23, 24:16, 27:8, 38:22, 40:17, 41:18, 41:20, 41:23, 41:24, 41:25, 49:9, 49:10, 51:19, 54:2, 55:8, 56:5, 60:10, 62:23, 63:22, 67:10, 67:23, 68:3, 68:9, 68:12, 68:23, 69:6, 69:9, 69:10, 69:13, 69:18, 69:19, 69:21, 70:19, 70:23, 71:4, 71:13, 71:20, 71:21, 72:1, 72:12, 74:6, 74:15, 74:24, 78:12, 80:4, 80:8, 80:11, 81:4, 104:18
**evidentiary** [1] - 81:2
**evil** [3] - 19:25, 20:3, 20:10
**evolved** [2] - 23:5, 29:18
**exact** [5] - 11:3, 41:14, 42:19, 45:3, 99:12
**exactly** [4] - 17:7, 20:7, 23:6, 95:8
**examination** [7] -

33:5, 33:8, 38:6, 61:6, 68:18, 68:20, 96:11
**EXAMINATION** [5] - 2:16, 16:18, 55:14, 75:13, 82:19
**examine** [1] - 35:24
**examined** [8] - 40:11, 41:15, 53:15, 63:6, 63:8, 69:9, 70:19, 82:16
**examiners** [1] - 68:2
**examining** [1] - 68:9
**example** [2] - 74:22, 91:24
**Excel** [1] - 30:14
**except** [1] - 7:3
**excepting** [1] - 30:3
**exception** [1] - 101:6
**excerpt** [1] - 28:2
**exchange** [9] - 6:3, 6:8, 7:15, 7:16, 15:18, 19:16, 44:23, 52:17, 98:9
**exchanges** [4] - 44:20, 45:1, 45:4, 57:4
**excluded** [1] - 30:3
**excluding** [1] - 30:6
**excuse** [7] - 30:7, 41:4, 52:1, 55:13, 85:9, 96:13, 102:23
**excused** [3] - 77:13, 101:4, 102:1
**executed** [2] - 7:15, 7:16
**exercise** [1] - 73:5
**Exhibit** [30] - 2:13, 13:23, 13:24, 14:1, 15:22, 28:3, 28:11, 38:23, 38:24, 39:19, 42:10, 42:13, 45:18, 48:3, 50:3, 50:5, 50:20, 51:7, 51:18, 53:14, 55:8, 55:10, 56:5, 71:4, 74:15, 76:18, 76:20, 76:21, 77:2, 104:13
**exhibit** [16] - 2:19, 8:10, 10:18, 14:4, 14:6, 23:21, 28:6, 39:25, 40:1, 45:19, 45:20, 45:22, 48:2, 70:7, 81:17, 101:11
**exhibited** [1] - 54:8
**exhibits** [1] - 69:12
**exist** [1] - 35:25
**expand** [1] - 42:12
**expect** [2] - 35:18, 35:23
**expected** [3] - 45:6, 45:9, 45:14
**expenditure** [1] -

10:22
**expenditures** [1] - 11:9
**Expenses** [2] - 10:6, 10:9
**expenses** [5] - 10:13, 11:12, 43:4, 61:24, 99:18
**expensive** [1] - 94:14
**experience** [8] - 28:24, 84:1, 84:10, 84:11, 85:9, 97:23, 97:24, 98:1
**expert** [34] - 3:10, 17:9, 17:10, 17:14, 17:16, 18:2, 18:5, 18:7, 18:9, 18:24, 27:16, 32:13, 40:20, 56:15, 58:3, 58:18, 59:2, 59:3, 59:24, 59:25, 60:9, 67:18, 68:24, 69:17, 72:23, 73:15, 78:22, 95:20, 96:6, 100:2, 100:9, 103:2, 103:25, 104:2
**expertise** [4] - 60:12, 68:5, 68:7, 103:13
**experts** [5] - 31:4, 31:13, 40:20, 78:23, 92:21
**explain** [7] - 28:23, 56:25, 80:2, 83:12, 88:2, 90:8, 91:9
**explanation** [1] - 90:5
**explore** [1] - 49:8
**explored** [2] - 49:7, 73:16
**explorer** [1] - 16:8
**extensive** [4] - 31:12, 32:9, 33:15, 84:2
**extent** [13] - 4:21, 5:2, 6:12, 7:3, 11:23, 33:2, 34:17, 37:14, 61:3, 68:20, 102:3, 102:4, 103:14
**extorted** [1] - 93:5
**extra** [1] - 92:22
**extremely** [1] - 72:15

---

**F**

---

**F-I-S-C-H-B-A-C-H** [1] - 83:8
**face** [1] - 20:9
**facilitate** [1] - 6:14
**facility** [2] - 91:1, 97:1
**fact** [13] - 17:9, 17:11, 37:8, 39:23, 50:23, 51:1, 51:2, 72:12, 86:20, 88:23, 94:22,

96:22, 104:16
**facts** [4] - 63:1, 63:4, 63:20, 104:8
**factually** [1] - 59:12
**faculty** [3] - 18:18, 18:21, 18:23
**fair** [2] - 65:16, 75:17
**fairly** [4] - 53:21, 86:5, 88:12, 89:2
**familiar** [14] - 19:21, 39:23, 40:1, 50:5, 53:13, 71:11, 85:21, 86:7, 87:13, 87:25, 90:6, 91:6, 98:12, 98:15
**family** [1] - 37:11
**famous** [1] - 99:15
**fantastic** [1] - 99:7
**far** [1] - 103:13
**father** [1] - 84:25
**FBI** [3] - 41:9, 93:11, 93:16
**federal** [3] - 18:24, 62:21, 95:23
**fee** [6] - 21:17, 29:19, 45:6, 45:9, 45:14, 99:21
**feed** [2] - 89:5
**fees** [3] - 14:7, 44:15, 47:14
**fell** [1] - 85:6
**felt** [1] - 93:20
**few** [5] - 9:9, 28:21, 87:23, 97:19, 97:25
**field** [1] - 60:12
**fields** [1] - 42:12
**figure** [3] - 4:6, 47:16, 54:12
**file** [4] - 52:2, 54:8, 81:13, 81:15
**fill** [1] - 98:10
**financial** [10] - 20:2, 51:10, 53:17, 54:7, 68:1, 68:8, 68:9, 68:10, 70:7, 72:23
**Financial** [3] - 6:19, 18:6, 20:9
**fine** [16] - 4:3, 23:3, 26:21, 38:8, 40:23, 49:11, 61:10, 61:11, 63:4, 81:20, 81:24, 82:7, 86:25, 97:21, 100:8, 102:6
**finish** [1] - 80:24
**firm** [6] - 18:5, 85:5, 92:9, 92:13, 93:16
**first** [20] - 6:2, 15:16, 18:14, 18:16, 22:17, 22:22, 28:24, 29:17, 50:11, 58:15,

59:9, 73:14, 77:6, 81:11, 82:15, 85:11, 87:18, 92:20, 93:18
**FISCHBACH** [1] - 82:14
**fischbach** [1] - 100:9
**Fischbach** [18] - 78:9, 78:21, 79:14, 80:16, 81:21, 82:13, 82:21, 82:22, 83:6, 83:8, 100:2, 102:5, 102:15, 102:24, 103:6, 103:9, 103:14, 103:23
**Fischbach's** [3] - 102:2, 102:20, 103:13
**fischbach. dynamicdns.com** [1] - 90:2
**fit** [1] - 32:3
**five** [1] - 86:21
**floor** [1] - 92:22
**flow** [3] - 71:13, 71:22, 75:4
**flows** [2] - 42:9, 72:8
**focus** [8] - 20:23, 61:11, 61:14, 69:20, 70:10, 70:17, 95:1
**focused** [1] - 69:14
**Fog** [19] - 7:9, 7:13, 7:17, 8:22, 14:5, 14:7, 14:11, 15:4, 15:16, 41:13, 45:6, 45:10, 45:15, 47:13, 48:1, 48:16, 48:19, 103:8
**Fog's** [1] - 46:4
**follow** [1] - 69:4
**follows** [1] - 82:16
**food** [1] - 89:6
**foregoing** [1] - 106:4
**forensic** [16] - 18:24, 30:2, 68:7, 68:8, 80:22, 81:4, 83:10, 83:13, 84:16, 84:21, 84:22, 92:4, 95:9, 96:11, 100:9, 100:13
**Forensics** [2] - 21:1, 21:2
**forensics** [8] - 18:12, 66:25, 68:1, 68:8, 69:17, 72:23, 98:21, 100:3
**form** [2] - 9:9, 40:20
**formal** [1] - 102:1
**forming** [3] - 4:22, 56:15, 59:3
**fortunate** [2] - 84:24, 96:8
**forward** [3] - 29:8, 82:8, 86:18
**forwarding** [1] - 87:6

**foundation** [3] - 14:18, 14:21, 67:25
**Foundation** [1] - 19:2
**four** [3] - 33:21, 86:21
**four-week** [1] - 33:21
**frankly** [2] - 29:5, 79:13
**fraud** [1] - 68:2
**free** [2] - 22:10, 89:20
**French** [1] - 46:5
**frictions** [1] - 45:4
**friend** [4] - 92:7, 92:24, 93:1, 93:13
**friends** [2] - 37:11, 93:17
**front** [9] - 7:17, 26:18, 28:25, 29:3, 64:8, 73:24, 102:15, 103:1, 104:14
**frozen** [6] - 22:15, 25:18, 25:20, 27:18, 29:3, 29:7
**full** [4] - 40:10, 66:6, 94:12, 106:5
**fulsome** [1] - 34:1
**functions** [1] - 104:3
**fundamentally** [1] - 56:13
**funding** [2] - 25:17, 25:19
**funds** [27] - 6:9, 7:9, 12:8, 13:20, 22:24, 25:13, 25:21, 28:18, 41:3, 41:13, 53:24, 54:1, 54:4, 57:3, 57:5, 57:6, 57:9, 57:11, 57:17, 64:17, 66:14, 71:3, 71:22, 72:8, 72:24, 75:4

## G

**gallery** [2] - 16:25, 51:21
**gambling** [2] - 57:4, 57:6
**game** [1] - 83:20
**gathering** [1] - 38:1
**general** [2] - 3:18, 67:9
**generally** [8] - 13:13, 17:11, 29:20, 61:13, 61:14, 64:3, 90:11, 103:11
**generated** [1] - 15:8
**George** [1] - 18:18
**given** [4] - 11:24, 69:3, 73:8, 93:3
**Glave** [9] - 8:8, 10:18, 49:7, 51:9, 51:14,

53:15, 54:19, 66:6, 73:19
**Glave's** [9] - 2:22, 4:7, 4:16, 9:19, 49:6, 51:7, 54:9, 54:25, 66:11
**GoDaddy** [3] - 90:14, 90:16, 91:2
**gold** [6] - 50:12, 53:22, 74:23, 74:24, 75:1, 75:2
**Goldmoney** [1] - 53:6
**Google** [6] - 31:3, 88:9, 88:13, 88:15, 91:18
**gosh** [4] - 83:22, 87:23, 99:11
**Government** [8] - 13:23, 13:24, 14:1, 15:22, 42:13, 71:4, 74:15, 104:13
**government** [35] - 3:16, 3:20, 3:24, 18:1, 22:15, 23:20, 28:1, 31:14, 31:16, 31:18, 32:25, 33:2, 33:4, 34:1, 35:12, 35:13, 36:2, 36:20, 38:2, 59:4, 62:25, 72:19, 78:12, 79:25, 80:6, 80:11, 81:5, 94:3, 94:5, 94:9, 94:14, 101:12, 102:1, 103:9
**Government's** [4] - 2:13, 28:3, 42:10, 60:5
**government's** [10] - 3:8, 4:4, 6:23, 49:2, 68:23, 73:2, 75:7, 75:22, 81:3, 81:9
**Gox** [3] - 6:12, 8:23, 8:24
**grabbing** [1] - 79:18
**graphic** [1] - 9:9
**grave** [1] - 21:13
**green** [1] - 57:3
**Grobstein** [1] - 92:10
**group** [2] - 98:23, 99:1
**grown** [1] - 101:18
**guess** [5] - 3:21, 22:11, 63:10, 67:16, 81:7
**guidance** [1] - 103:4
**guilty** [2] - 25:12, 25:14
**gun** [1] - 32:14

## H

**hack** [3] - 8:24, 93:11, 93:14
**hacked** [1] - 93:5

**hacker** [1] - 94:21
**hackers** [1] - 94:23
**hacking** [3] - 93:1, 93:8, 94:22
**half** [4] - 50:24, 79:12, 79:19, 96:7
**hallway** [1] - 38:9
**hand** [1] - 14:25
**handful** [1] - 32:3
**hands** [1] - 24:5
**happy** [5] - 32:7, 32:10, 33:15, 36:5, 94:3
**hard** [3] - 83:14, 84:3, 84:4
**hardware** [1] - 89:15
**Harmon** [15] - 44:9, 44:14, 44:20, 62:13, 62:15, 62:18, 62:21, 63:1, 63:2, 63:6, 63:17, 63:25, 64:1, 64:20
**Harmon's** [3] - 47:24, 63:20, 63:24
**Harvard** [1] - 17:24
**hassard** [1] - 2:12
**Hassard** [16] - 2:24, 5:16, 8:2, 10:2, 13:10, 13:22, 55:7, 55:10, 56:22, 58:1, 58:4, 58:10, 64:6, 64:11, 71:3, 74:14
**Hawaii** [1] - 96:8
**heads** [3] - 5:13, 5:20, 5:25
**hear** [7] - 13:3, 14:20, 17:12, 28:4, 57:23, 65:7, 65:12
**heard** [8] - 15:7, 17:15, 41:9, 44:9, 44:11, 58:25, 69:9, 91:14
**hearing** [4] - 20:20, 24:2, 45:8, 103:19
**hearsay** [4] - 56:6, 56:15, 57:21, 62:23
**held** [2] - 47:22, 48:19
**helium** [1] - 98:5
**Helix** [2] - 44:12, 44:15
**help** [7] - 23:7, 44:21, 85:4, 93:9, 96:1, 96:4, 99:4
**helped** [3] - 6:13, 17:25, 99:5
**helpful** [4] - 4:13, 13:17, 67:11, 69:1
**helping** [2] - 85:7, 98:6
**hereby** [1] - 106:3
**herself** [1] - 49:7
**hidden** [5] - 32:14,

68:3, 69:13, 69:18, 70:20
**Hide** [1] - 20:19
**hide** [3] - 7:10, 7:13, 41:21
**hiding** [11] - 41:21, 66:20, 67:4, 67:13, 67:19, 67:20, 67:23, 68:13, 70:3, 74:7, 75:8
**high** [3] - 16:10, 48:4
**higher** [1] - 47:24
**highest** [1] - 47:20
**highly** [6] - 53:18, 53:23, 54:3, 72:5, 72:13, 72:22
**himself** [2] - 23:14, 44:15
**hired** [1] - 97:6
**hold** [2] - 91:2, 96:20
**holding** [1] - 88:5
**hole** [1] - 99:19
**home** [9] - 86:20, 88:16, 88:17, 89:2, 89:4, 89:17, 90:2, 90:24, 90:25
**honestly** [2] - 95:16, 104:1
**Honor** [67] - 2:3, 2:11, 3:1, 3:14, 5:5, 7:22, 13:2, 16:16, 23:12, 23:20, 26:14, 26:22, 28:1, 28:8, 28:14, 30:8, 31:7, 31:21, 32:18, 33:6, 33:19, 33:25, 34:12, 37:17, 37:24, 40:16, 40:19, 49:1, 49:4, 56:3, 56:9, 57:15, 57:20, 58:5, 59:8, 60:13, 61:15, 63:5, 63:15, 64:12, 67:8, 68:14, 70:4, 70:25, 72:5, 73:9, 74:11, 74:12, 75:11, 77:14, 79:2, 79:5, 80:2, 81:11, 82:7, 82:18, 83:4, 100:1, 100:11, 100:15, 101:15, 101:24, 101:25, 102:18, 102:19, 103:3, 105:12
**hopping** [1] - 91:15
**hops** [2] - 91:14, 91:21
**Horwath** [1] - 92:10
**host** [3] - 90:7, 90:22, 90:25
**hosting** [5] - 86:9, 90:6, 90:8, 90:9, 90:17
**hosts** [1] - 90:13
**hotel** [1] - 42:11
**hour** [4] - 79:12, 79:19, 99:21, 99:24

**hourly** [1] - 21:25
**hours** [5] - 22:5, 22:10, 22:11
**hundred** [1] - 22:14
**hundreds** [3] - 16:14, 85:14
**Hurtado** [1] - 93:17

## I

**idea** [2] - 39:13, 60:11
**identification** [1] - 56:5
**identified** [1] - 54:25
**IDs** [1] - 42:20
**IEEE** [1] - 95:8
**ignored** [1] - 33:24
**illicit** [6] - 13:20, 41:21, 57:5, 57:10, 57:24, 57:25
**image** [1] - 80:17
**imagine** [1] - 59:24
**immediately** [1] - 84:22
**impeachment** [4] - 26:17, 26:25, 27:4, 27:7
**implication** [1] - 67:13
**implies** [1] - 72:12
**important** [2] - 26:11, 77:10
**improper** [3] - 26:17, 26:25, 27:4
**inadmissible** [2] - 40:21, 49:9
**inartfully** [1] - 67:1
**included** [1] - 54:9
**including** [3] - 12:18, 31:22, 44:16
**income** [3] - 45:6, 45:9, 45:14
**incorrect** [2] - 33:1, 80:5
**incorrectly** [1] - 65:13
**increase** [1] - 9:2
**incredible** [1] - 53:21
**independent** [1] - 11:11
**indicated** [2] - 53:6, 103:5
**indicating** [3] - 10:10, 75:17, 76:5
**indictment** [2] - 24:16, 44:17
**indirect** [2] - 40:25, 60:6
**individual** [1] - 68:12
**industry** [2] - 59:5, 59:10
**inflated** [1] - 13:18

**inflating** [1] - 16:10
**inflows** [1] - 54:14
**information** [11] - 5:3, 5:10, 6:22, 9:8, 18:3, 51:22, 80:6, 83:25, 92:1, 95:12, 97:1
**initial** [1] - 24:15
**innocent** [1] - 29:4
**instead** [2] - 16:4, 86:15
**institution** [1] - 54:7
**Institutional** [1] - 20:3
**institutional** [1] - 20:9
**institutions** [1] - 51:10
**instructed** [1] - 77:21
**insulin** [1] - 86:21
**intending** [2] - 104:4, 104:11
**intent** [6] - 49:4, 49:5, 67:6, 75:17, 76:5, 103:22
**intention** [1] - 105:6
**interact** [2] - 6:15, 6:16, 6:17
**interesting** [3] - 93:20, 96:5, 98:8
**intermediate** [1] - 41:4
**internet** [14] - 83:18, 84:24, 84:25, 85:2, 85:3, 86:19, 87:17, 87:18, 88:17, 92:13, 92:18, 93:10, 93:13, 98:9
**Interplay** [1] - 21:2
**interrupt** [1] - 79:10
**interview** [1] - 67:6
**interviewing** [1] - 62:21
**interviews** [2] - 30:2, 30:6
**intraday** [1] - 16:9
**introduce** [1] - 83:6
**investigating** [1] - 68:12
**investigation** [1] - 80:22
**investigator** [1] - 81:4
**investigators** [1] - 68:2
**invited** [2] - 73:18, 73:19
**inviting** [1] - 103:16
**invoice** [7] - 12:17, 13:18, 13:21, 22:6, 22:9, 29:6, 29:12
**invoiced** [1] - 28:19
**invoices** [5] - 4:2, 12:15, 12:19, 12:22, 12:24
**involve** [1] - 6:9

**involved** [5] - 6:5, 94:21, 96:17, 97:25, 103:10
**involves** [1] - 81:3
**involving** [1] - 76:6
**IP** [19] - 86:22, 87:7, 87:11, 87:12, 87:13, 87:15, 87:17, 87:19, 88:4, 88:6, 88:11, 88:13, 88:19, 88:24, 89:10, 89:24, 90:4
**ISP** [1] - 88:18
**issue** [14] - 20:8, 66:25, 68:15, 70:5, 79:23, 80:2, 81:2, 81:23, 82:2, 82:4, 101:8, 101:9, 102:25, 104:23
**issues** [7] - 18:3, 27:20, 70:6, 73:15, 78:6, 78:7
**issuing** [1] - 103:4
**itself** [3] - 19:5, 40:6, 80:16

## J

**J.W** [1] - 2:15
**jailhouse** [1] - 66:25
**JANICE** [1] - 106:3
**Janice** [1] - 106:11
**Jeff** [3] - 82:13, 83:8, 83:9
**JEFF** [1] - 82:14
**Jencks** [21] - 31:15, 31:17, 31:18, 31:21, 31:23, 31:24, 32:2, 32:21, 33:4, 33:6, 33:7, 33:11, 34:1, 34:6, 34:8, 35:11, 35:12, 38:1, 38:4, 80:24, 102:2
**job** [2] - 93:21, 99:7
**join** [1] - 95:19
**joined** [1] - 95:7
**joining** [1] - 95:11
**joked** [1] - 20:21
**Judge** [2] - 18:25, 100:19
**judgement** [1] - 48:12
**judges** [1] - 97:8
**judgment** [2] - 73:6, 103:5
**July** [3] - 26:4, 26:9, 26:12
**June** [1] - 24:1
**jurisdiction** [1] - 57:7
**juror** [1] - 2:6
**jurors** [4] - 35:2, 38:11, 70:13, 101:3
**JURORS** [3] - 5:13,

5:20, 5:25
**jury** [41] - 2:2, 2:4, 2:7, 2:8, 4:15, 5:1, 5:10, 5:12, 5:18, 5:24, 7:20, 11:20, 15:24, 16:12, 17:19, 17:23, 28:12, 34:19, 34:22, 38:10, 38:12, 42:6, 42:15, 51:23, 57:1, 63:12, 67:11, 69:1, 69:8, 70:24, 73:5, 73:14, 73:24, 83:7, 83:12, 86:10, 87:15, 88:2, 90:8, 91:9, 102:21
**jury's** [1] - 15:11
**Justice** [1] - 21:6
**justice** [1] - 21:14

## K

**keep** [7] - 27:23, 79:3, 81:20, 86:3, 91:3, 97:17, 101:18
**keeping** [1] - 83:19
**kept** [3] - 48:24, 84:14, 87:22
**Kevin** [1] - 94:23
**key** [2] - 98:12, 98:15
**keys** [3] - 103:15, 104:6
**kid** [1] - 94:18
**kill** [1] - 96:16
**kind** [12] - 21:10, 32:15, 42:24, 53:19, 67:5, 83:12, 87:22, 91:20, 94:11, 96:16, 98:21, 104:17
**kinds** [2] - 64:20, 95:22
**know..** [1] - 49:3
**knowing** [1] - 37:6
**knowledge** [5] - 60:12, 66:6, 68:20, 76:2, 76:16
**known** [1] - 81:14
**knows** [3] - 92:25, 93:2, 104:2
**Kracken** [1] - 7:7
**Kraken** [10] - 6:9, 7:8, 7:10, 7:11, 41:15, 42:1, 42:18, 43:4, 54:23, 61:24
**KYC** [19] - 7:14, 7:15, 7:16, 8:22, 9:2, 10:15, 41:4, 44:23, 45:4, 48:25, 50:18, 62:13, 62:15, 64:4, 64:17, 65:3, 65:9, 65:20

# L

**label** [1] - 75:1
**lack** [1] - 78:7
**laid** [1] - 7:17
**language** [1] - 14:13
**laptop** [1] - 30:21
**large** [2] - 85:5, 90:18
**largest** [1] - 98:24
**Larry** [1] - 44:9, 62:13
**last** [14] - 9:8, 9:14, 13:9, 13:13, 16:2, 34:2, 34:3, 34:4, 81:19, 92:3, 95:13, 99:6, 99:17, 102:14
**launder** [1] - 62:16, 64:2, 64:17
**laundered** [1] - 62:18
**laundering** [5] - 18:25, 21:8, 79:9, 80:12, 81:6
**Laurent** [2] - 45:21, 46:5
**Laurent's** [1] - 48:2
**law** [3] - 17:23, 92:8, 93:16
**Law** [1] - 17:24
**lawyer** [1] - 17:17
**lawyers** [3] - 25:15, 25:16, 25:21
**Lawyers** [1] - 95:15
**lay** [1] - 67:25
**lead** [2] - 75:8, 92:9
**leader** [1] - 78:13
**leading** [2] - 62:9, 65:5
**learned** [1] - 96:21
**leased** [1] - 92:22
**leasing** [1] - 88:18
**least** [9] - 16:2, 64:9, 69:2, 80:1, 88:6, 93:8, 93:9, 102:24, 104:2
**leave** [2] - 35:2, 101:3
**leaves** [2] - 35:22, 48:9
**led** [4] - 55:22, 56:12, 67:3, 70:2
**ledger** [1] - 49:25
**left** [10] - 8:7, 10:8, 14:25, 46:20, 46:24, 47:3, 47:7, 47:10, 57:12, 79:17
**left-hand** [1] - 14:25
**legal** [1] - 75:25
**legitimate** [3] - 13:19, 39:11, 39:12
**less** [2] - 34:1, 48:8
**letter** [2] - 21:23, 21:25
**letters** [1] - 32:20
**letting** [1] - 89:24

**level** [2] - 97:2, 97:4
**library** [1] - 87:20
**Lichtenstein** [1] - 63:6
**life** [4] - 29:13, 29:15, 53:20, 93:21
**likely** [2] - 21:20, 48:21
**limit** [1] - 34:18
**limited** [1] - 53:22
**limiting** [1] - 63:24
**limits** [2] - 49:7, 49:8
**line** [19] - 10:6, 10:7, 10:8, 23:18, 44:1, 52:7, 52:8, 52:13, 53:1, 53:5, 53:8, 61:8, 71:5, 71:16, 72:6, 72:16, 74:16, 77:6
**lines** [7] - 23:11, 26:16, 26:23, 27:11, 43:6, 43:13, 43:18
**Linksys** [1] - 89:17, 89:23
**Linux** [1] - 6:8
**list** [10] - 5:17, 6:2, 51:15, 65:23, 65:25, 66:7, 66:10, 68:19, 87:23, 87:24
**listed** [7] - 7:1, 7:2, 7:4, 52:15, 53:2, 55:3, 57:18
**listen** [1] - 54:5
**listener** [2] - 56:7, 56:10
**listening** [2] - 78:15, 78:19
**literally** [1] - 93:10
**live** [1] - 86:22
**lived** [1] - 94:24
**living** [1] - 86:2
**LLC** [2] - 18:6, 18:7
**loaned** [1] - 88:24
**loaning** [1] - 88:19
**local** [1] - 6:17
**LocalBitcoins** [1] - 6:13
**location** [2] - 80:8, 91:1
**logs** [1] - 83:19
**Look** [1] - 72:20
**look** [18] - 23:19, 23:24, 23:25, 26:20, 27:19, 29:13, 32:7, 34:10, 36:23, 42:23, 44:4, 68:2, 80:12, 80:16, 88:12, 88:23, 99:12
**looked** [2] - 11:19, 51:9
**looking** [12] - 8:19, 23:23, 35:6, 43:18,

44:1, 50:11, 50:14, 51:3, 52:13, 68:10, 68:12, 83:14
**looks** [5] - 3:6, 39:4, 43:20, 61:23, 80:13
**Los** [2] - 84:19, 93:19
**lose** [1] - 98:17
**loss** [2] - 3:21, 57:7
**lost** [2] - 8:23, 95:21
**love** [1] - 94:1
**low** [4] - 16:9, 16:11, 48:3, 48:6
**lower** [1] - 96:7
**lucky** [1] - 94:17
**Luke** [1] - 41:10
**lunch** [3] - 11:24, 32:2, 79:17

# M

**Mac** [1] - 89:16
**machine** [4] - 83:22, 83:23, 89:16, 99:12
**machines** [3] - 83:19, 83:20, 86:25
**magazine** [1] - 59:9
**Magazine** [4] - 40:6, 40:13, 56:12, 59:5
**main** [1] - 19:12
**MAIN** [1] - 6:9
**maintain** [2] - 19:8, 85:22
**major** [2] - 81:2, 90:9
**malicious** [1] - 92:1
**Manny** [1] - 93:17
**March** [2] - 43:17, 106:7
**marked** [1] - 56:4
**market** [5] - 18:11, 41:3, 57:2, 57:6, 57:11
**marketing** [1] - 19:7
**markets** [2] - 19:4, 41:13
**Mason** [1] - 18:18
**master** [1] - 97:7
**material** [7] - 3:6, 32:7, 32:9, 33:11, 33:12, 33:18, 80:10
**materials** [12] - 24:16, 31:18, 31:22, 31:23, 31:24, 32:22, 33:24, 36:16, 38:1, 38:4, 40:21, 102:5
**math** [2] - 32:15, 57:16
**matter** [10] - 27:17, 27:22, 29:1, 30:4, 30:13, 30:19, 30:23, 31:5, 31:13, 37:15
**matters** [1] - 34:17
**maximum** [1] - 48:17

**Mazars** [4] - 78:12, 79:7, 80:3, 80:14
**Mazars'** [1] - 81:13
**mean** [13] - 3:9, 23:1, 32:9, 35:13, 35:23, 42:2, 68:8, 69:3, 70:1, 75:2, 89:3, 94:18, 95:7
**means** [5] - 15:1, 56:10, 57:19, 68:8, 104:23
**meant** [2] - 13:19, 104:8
**meantime** [1] - 38:2
**mechanism** [3] - 25:17, 25:19, 91:23
**media** [1] - 84:7
**median** [1] - 48:7
**meet** [1] - 86:4
**member** [2] - 95:13, 95:14
**members** [1] - 34:22
**memorize** [1] - 42:19
**memorizing** [1] - 86:16
**memory** [2] - 23:7, 24:7
**mention** [2] - 21:4, 30:2
**mentioned** [7] - 19:14, 32:6, 45:4, 57:2, 64:4, 64:16, 88:4
**merely** [5] - 12:23, 61:9, 67:14, 68:5, 73:1
**mic** [1] - 101:16
**might** [4] - 27:19, 39:4, 93:14, 96:16
**military** [3] - 95:23, 95:24, 96:17
**million** [8] - 18:24, 47:23, 47:24, 48:4, 48:6, 48:8, 48:9
**millions** [1] - 16:14
**mind** [1] - 100:23
**mine** [1] - 92:7
**mined** [1] - 98:2
**miners** [1] - 98:6
**mines** [1] - 98:8
**mining** [2] - 57:4, 98:1
**minor** [1] - 93:8
**minute** [4] - 27:1, 34:2, 34:3, 34:4
**minutes** [1] - 37:20
**miscarriage** [1] - 21:14
**mischaracterization** [1] - 15:9
**misleading** [6] - 67:22, 72:5, 72:13, 72:22, 73:1, 73:13
**misrepresentation** [1]

- 81:3
missing [2] - 72:14, 73:3
misspoke [1] - 20:15
misstated [1] - 81:12
misstating [1] - 57:15
mistakes [1] - 12:19
MIT [2] - 20:22, 87:20
mitigation [2] - 95:25, 96:2
mitigator [1] - 96:1
Mitnick [1] - 94:23
mixer [12] - 12:8, 39:1, 39:6, 41:5, 41:7, 44:11, 46:11, 103:7, 103:13, 103:22, 104:3, 104:12
mixer-like [1] - 46:11
mixers [5] - 55:23, 56:13, 57:3, 57:10, 103:6
mixing [6] - 21:10, 38:19, 39:10, 39:12, 40:4, 57:4
modern [1] - 20:9
moment [3] - 35:18, 35:21, 55:13
money [22] - 18:24, 21:8, 23:3, 25:16, 25:17, 28:25, 29:14, 43:3, 62:16, 62:19, 64:2, 72:21, 73:3, 79:9, 80:12, 81:6, 92:17, 99:2, 99:3, 99:4
Money [4] - 20:19, 53:9, 53:11, 53:13
month [1] - 89:9
monthly [1] - 90:17
Moon [11] - 6:10, 7:7, 41:15, 42:1, 42:18, 43:4, 60:18, 60:20, 61:2, 61:7, 61:25
morning [9] - 12:20, 19:14, 32:6, 80:8, 80:23, 100:18, 100:21, 100:23, 105:14
Moss [1] - 18:25
most [8] - 6:9, 6:11, 16:2, 39:10, 39:12, 55:22, 93:20, 94:23
mostly [3] - 7:2, 83:14, 96:4
mother's [1] - 50:12
motion [9] - 31:18, 32:16, 33:4, 33:7, 34:5, 34:8, 35:7, 36:2, 102:1
move [18] - 5:16, 7:25, 9:4, 9:10, 9:15, 9:24, 11:17, 12:11, 13:1, 13:4, 28:2, 28:14, 31:10, 40:17, 56:4,

60:13, 82:8, 97:20
moved [4] - 29:8, 31:16, 90:23, 90:25
moves [1] - 100:2
moving [5] - 9:1, 13:5, 13:10, 13:15, 81:20
MR [207] - 2:3, 2:11, 2:17, 2:24, 3:1, 3:4, 3:14, 3:24, 4:13, 5:5, 5:8, 5:14, 6:21, 7:22, 7:25, 8:2, 8:4, 10:1, 10:3, 11:10, 11:23, 12:2, 12:21, 12:23, 13:2, 13:5, 13:6, 13:22, 13:25, 14:13, 14:14, 14:17, 14:20, 14:23, 15:9, 15:13, 16:16, 16:19, 17:20, 17:22, 23:12, 23:15, 23:16, 23:20, 23:25, 24:1, 24:5, 24:6, 24:18, 24:20, 25:2, 25:9, 25:24, 26:14, 26:17, 26:22, 26:25, 27:4, 27:10, 28:1, 28:6, 28:8, 28:10, 28:14, 28:16, 30:8, 30:12, 31:7, 31:10, 31:15, 31:21, 32:5, 32:18, 33:1, 33:6, 33:12, 33:19, 33:25, 34:5, 34:10, 34:12, 34:15, 36:5, 36:19, 36:22, 37:2, 37:6, 37:14, 37:24, 38:9, 38:16, 38:25, 40:16, 40:19, 40:24, 43:9, 43:12, 49:1, 49:4, 49:12, 51:20, 51:24, 51:25, 55:4, 55:7, 55:15, 56:3, 56:6, 56:7, 56:9, 56:11, 56:18, 56:20, 56:21, 57:15, 57:20, 58:1, 58:5, 58:9, 58:14, 59:4, 59:8, 59:15, 60:13, 60:16, 61:3, 61:6, 61:15, 61:16, 62:5, 62:7, 62:11, 62:22, 62:25, 63:5, 63:15, 63:16, 64:10, 64:14, 65:6, 65:10, 65:12, 65:16, 65:19, 67:1, 67:8, 67:12, 67:24, 68:14, 69:23, 70:4, 70:12, 70:25, 71:3, 71:6, 71:24, 72:3, 72:5, 72:19, 73:9, 74:1, 74:11, 74:12, 74:14, 74:17, 75:11, 75:14, 76:17, 76:20, 76:21, 77:1, 77:12, 77:14,

77:20, 78:4, 78:18, 78:22, 78:25, 79:2, 79:5, 80:2, 82:3, 82:13, 82:18, 82:20, 83:4, 83:5, 95:2, 96:24, 97:15, 97:19, 97:22, 100:1, 100:11, 100:15, 101:8, 101:10, 101:24, 102:9, 102:14, 102:18, 103:21, 104:10, 104:20, 104:24, 105:3, 105:9
MS [7] - 81:11, 82:7, 100:5, 101:25, 102:19, 103:3, 105:12
Mt [3] - 6:12, 8:23, 8:24
multiple [2] - 39:3, 104:15
must [1] - 35:8
Mycelium [4] - 49:16, 50:21, 64:22, 65:3
mystery [2] - 48:9, 81:18

N

N.W [1] - 106:12
name [21] - 7:5, 18:7, 51:11, 83:7, 83:8, 85:11, 85:12, 85:20, 86:11, 86:13, 86:17, 87:4, 87:5, 87:6, 87:11, 90:14, 90:17, 91:16, 91:17, 93:3, 93:15
names [4] - 85:10, 85:15, 85:16, 87:19
naming [1] - 10:8
narrow [1] - 69:14
nation's [1] - 98:24
National [1] - 95:14
national [1] - 96:17
Navy [2] - 91:12, 91:13
necessarily [2] - 56:8, 75:2
necessary [2] - 68:1, 88:16
need [17] - 28:23, 36:4, 38:6, 40:17, 51:20, 58:20, 70:14, 72:15, 79:11, 79:23, 80:19, 88:10, 89:21, 92:19, 100:6, 102:17, 103:1
needed [2] - 77:17, 98:4
needs [2] - 35:3, 102:4
negative [3] - 75:19, 75:21, 76:8
negotiate [1] - 29:15

neighbors [1] - 88:22
net [2] - 48:9, 50:8
network [7] - 83:17, 86:3, 89:15, 89:22, 91:7, 91:10, 98:11
networks [1] - 84:1
never [7] - 10:18, 27:15, 40:11, 47:16, 51:14, 93:21, 94:10
new [2] - 12:9, 28:6
next [10] - 5:16, 7:25, 8:2, 8:17, 9:10, 9:24, 51:3, 54:11, 82:11, 93:10
nice [1] - 86:15
nine [1] - 11:2
node [4] - 85:1, 91:19, 92:3, 104:17
non [3] - 7:15, 64:4, 64:17
non-KYC [3] - 7:15, 64:4, 64:17
none [3] - 31:14, 32:3, 32:25
nonresponsive [1] - 24:20
Nordea [1] - 6:18
normal [3] - 19:10, 29:15, 99:21
normally [1] - 99:20
north [2] - 47:15, 48:14
north-of-billion-dollar [2] - 47:15, 48:14
notes [25] - 29:23, 29:25, 30:1, 30:2, 30:4, 30:6, 30:19, 30:20, 30:23, 31:1, 31:12, 32:24, 35:25, 36:2, 36:10, 36:15, 37:5, 37:10, 37:12, 44:17, 62:20, 77:3, 103:2, 106:5
nothing [10] - 5:15, 36:17, 40:15, 41:5, 44:3, 75:22, 76:11, 76:14, 84:13, 95:4
notice [1] - 78:15
noticed [1] - 16:22
notion [1] - 70:22
notorious [1] - 94:23
number [54] - 3:25, 7:2, 8:7, 8:8, 8:9, 8:11, 8:19, 8:20, 9:4, 9:7, 9:11, 9:15, 9:17, 9:20, 9:21, 10:1, 10:4, 11:17, 11:20, 11:22, 12:4, 12:11, 12:13, 12:17, 13:5, 13:7, 13:10, 13:12, 13:15, 13:16,

31:23, 31:24, 32:1, 48:11, 54:7, 57:14, 60:24, 68:14, 68:17, 71:16, 86:16, 86:18, 87:3, 87:9, 87:10, 88:15, 91:21, 94:7, 95:9, 95:23, 97:7

**Number** [2] - 2:13, 55:8

**numbers** [4] - 11:3, 61:8, 86:23

**numerous** [1] - 86:1

## O

**o'clock** [1] - 100:23
**oath** [2] - 26:9, 27:7
**object** [7] - 11:23, 14:13, 15:9, 24:18, 61:3, 68:21, 68:22
**objected** [2] - 3:24, 68:18
**objection** [29] - 4:4, 12:21, 14:16, 14:19, 14:22, 17:20, 23:12, 25:9, 26:17, 26:25, 27:3, 28:9, 30:8, 40:16, 40:23, 43:9, 49:1, 56:6, 57:20, 60:15, 62:5, 62:6, 62:7, 62:10, 62:22, 65:10, 71:24, 100:4, 100:5
**objections** [2] - 18:1, 49:3
**obligated** [1] - 33:3
**obscure** [2] - 19:5, 19:18
**obscuring** [1] - 19:8
**observation** [4] - 12:7, 12:23, 13:9, 13:17
**observations** [1] - 39:8
**observe** [1] - 8:25
**observed** [6] - 7:9, 8:25, 10:17, 10:18, 10:20, 10:22
**obtain** [1] - 102:5
**obvious** [2] - 24:17, 37:3
**occurring** [1] - 43:19
**occurs** [1] - 54:23
**OF** [1] - 106:1
**offense** [2] - 63:21, 63:25
**offer** [3] - 19:18, 48:11, 93:23
**office** [2] - 86:6, 90:24
**officer** [1] - 35:16
**OFFICIAL** [1] - 106:1
**Official** [1] - 106:11

**often** [1] - 19:11
**old** [2] - 51:4, 93:21
**Ometedou** [1] - 104:14
**once** [3] - 85:4, 89:19, 90:23
**one** [40] - 2:6, 6:3, 6:10, 7:2, 7:5, 8:25, 18:11, 19:20, 31:23, 31:24, 32:20, 39:4, 48:12, 50:1, 52:2, 68:1, 68:6, 68:11, 68:14, 70:12, 72:9, 74:22, 78:11, 80:11, 86:23, 87:15, 88:6, 88:7, 92:9, 93:4, 93:5, 94:23, 95:24, 96:3, 96:15, 97:9, 97:10, 101:25, 103:12
**ones** [5] - 6:5, 39:3, 57:5, 73:3, 92:20
**Onion** [1] - 91:11
**online** [4] - 6:6, 52:11, 53:11, 93:6
**open** [8] - 34:21, 49:4, 60:14, 69:16, 69:21, 73:12, 74:13, 82:10
**Open** [2] - 5:7, 71:2
**open-ended** [2] - 69:16, 69:21
**opened** [3] - 44:20, 73:21, 73:22
**opening** [1] - 49:1
**opens** [1] - 61:12
**operate** [1] - 103:7
**operates** [1] - 103:12
**operating** [2] - 43:3, 103:22
**Operations** [1] - 41:10
**operator** [4] - 14:5, 48:1, 48:16, 48:19
**operator's** [1] - 46:4
**opine** [1] - 104:22
**opining** [1] - 70:22
**opinion** [5] - 40:22, 56:23, 59:3, 69:18, 74:10
**opinions** [3] - 4:23, 40:20, 56:15
**opportunity** [1] - 78:8
**Optical** [1] - 6:19
**option** [4] - 19:13, 19:15, 48:13, 48:14
**options** [1] - 48:11
**order** [7] - 2:9, 35:8, 38:13, 64:1, 80:9, 87:4, 96:10
**organizations** [1] - 95:10, 95:11, 95:12
**original** [6] - 24:8,

24:10, 24:11, 39:16, 39:19, 70:6
**originally** [1] - 91:11
**otherwise** [3] - 8:25, 13:13, 56:15
**ought** [1] - 79:22
**outflows** [3] - 10:14, 54:17, 54:19
**outset** [1] - 21:22
**outside** [7] - 48:25, 61:4, 67:10, 68:17, 68:24, 98:21, 103:13
**overnight** [5] - 38:4, 79:24, 79:25, 81:24, 82:2
**overruled** [3] - 17:21, 25:10, 40:23
**overseas** [1] - 76:1
**oversee** [1] - 99:4
**oversees** [1] - 98:23
**own** [10] - 6:16, 7:4, 7:5, 81:17, 86:6, 87:22, 90:7, 90:10, 90:11
**owned** [1] - 8:10

## P

**page** [14] - 7:17, 8:14, 18:18, 18:21, 23:10, 26:16, 50:11, 50:14, 51:3, 51:8, 54:11, 76:18, 87:2, 87:4
**paid** [16] - 21:19, 21:20, 22:20, 24:15, 24:24, 25:1, 25:7, 26:6, 27:19, 27:23, 29:5, 44:15, 46:19, 94:4, 94:13, 99:16
**pandemic** [1] - 90:23
**paper** [2] - 30:18, 87:19
**parameters** [1] - 61:4
**parentheses** [1] - 77:9
**parents** [1] - 94:19
**part** [18] - 25:18, 25:19, 25:20, 30:22, 39:15, 40:5, 41:24, 55:24, 56:24, 56:25, 58:19, 69:2, 74:22, 86:8, 91:3, 98:23, 99:1, 99:5
**participate** [1] - 78:24
**participated** [1] - 21:15
**participation** [1] - 21:18
**particular** [4] - 5:15, 58:8, 69:12, 81:15
**particularly** [3] - 18:3, 71:11, 84:14

**particulars** [1] - 103:22
**partners** [1] - 92:9
**party** [1] - 35:8
**pass** [3] - 16:16, 26:21, 75:11
**password** [8] - 51:21, 52:2, 52:24, 54:8, 65:23, 65:25, 66:7, 66:10
**path** [1] - 81:15
**pattern** [5] - 9:1, 12:8, 44:5, 62:1, 76:5
**patterns** [1] - 76:11
**pause** [2] - 24:3, 76:23
**Pause** [1] - 27:2
**pay** [6] - 89:8, 89:20, 90:17, 91:1, 91:4, 91:20
**payment** [3] - 24:12, 52:11, 53:11
**payments** [5] - 41:21, 41:22, 41:24, 41:25, 43:2
**PayPal** [1] - 6:19
**peer** [13] - 6:13, 6:14, 6:15, 6:16, 6:17, 7:15, 20:22
**peer-to-peer** [2] - 6:13, 6:14
**Pelker** [1] - 82:6
**PELKER** [7] - 81:11, 82:7, 100:5, 101:25, 102:19, 103:3, 105:12
**pending** [2] - 34:5, 102:19
**people** [9] - 6:14, 12:18, 25:20, 33:20, 91:14, 92:16, 93:13, 94:12, 94:22
**percent** [7] - 57:12, 57:13, 57:14, 57:18, 57:19, 57:22, 99:24
**percentage** [3] - 41:12, 41:14, 57:9
**Perfect** [3] - 53:9, 53:11, 53:13
**perfectly** [2] - 3:14, 61:25
**perform** [1] - 96:11
**period** [3] - 11:9, 53:20, 88:22
**permissible** [3] - 4:23, 5:4, 69:4
**permission** [2] - 37:9, 37:13
**permitted** [1] - 66:2
**person** [2] - 58:24, 69:8
**personal** [4] - 6:18,

53:20, 97:24
**personal.ANXBTC** [1] - 71:17
**perspective** [1] - 7:6
**pertaining** [1] - 102:2
**phone** [21] - 3:1, 31:7, 49:16, 49:19, 49:22, 64:23, 69:24, 72:3, 74:5, 78:25, 79:1, 79:3, 81:10, 85:7, 86:3, 86:16, 86:18, 88:5, 88:6, 93:21, 94:8
**phones** [3] - 83:17, 84:5, 98:7
**phrase** [1] - 98:19
**phrased** [1] - 67:1
**phrases** [2] - 103:15, 104:7
**physically** [2] - 90:22, 101:17
**pick** [1] - 66:21
**picked** [2] - 41:6, 48:11
**pie** [1] - 59:16
**piece** [6] - 80:4, 80:10, 81:4, 89:14, 89:16, 90:20
**pieces** [1] - 78:11
**piles** [3] - 69:10, 69:19
**pinging** [1] - 89:23
**Pizza** [1] - 46:16
**pizza** [1] - 47:10
**pizzas** [4] - 46:20, 46:24, 47:2, 47:7
**place** [2] - 67:14, 89:18
**places** [1] - 91:2
**plagiarize** [1] - 87:20
**plenty** [1] - 79:13
**plug** [1] - 76:24
**pocket** [1] - 98:4
**podcast** [2] - 20:21, 21:5
**point** [14] - 4:21, 5:10, 21:4, 30:15, 34:13, 36:1, 36:3, 39:3, 56:3, 63:8, 72:17, 81:21, 99:19, 100:16
**pointed** [1] - 59:4
**pointing** [2] - 72:20, 104:18
**points** [2] - 39:4, 86:24
**police** [1] - 4:18
**pools** [1] - 57:4
**popular** [1] - 84:8
**portions** [1] - 56:16
**posing** [1] - 72:11
**possession** [1] - 50:12

**possible** [5] - 22:25, 23:1, 49:21, 49:25, 54:10
**Post** [1] - 59:20
**post** [1] - 7:13
**post-Fog** [1] - 7:13
**posthumously** [1] - 96:21
**potentially** [4] - 47:23, 54:6, 81:2, 81:3
**power** [2] - 80:9, 80:15
**practically** [1] - 96:4
**precisely** [1] - 104:10
**prefer** [1] - 89:20
**premises** [1] - 5:3
**Prepaid** [1] - 6:19
**prepaid** [4] - 6:20, 7:2, 7:4, 10:15
**preparation** [1] - 55:19
**prepare** [3] - 29:23, 30:4, 42:3
**prepared** [5] - 3:12, 29:25, 45:20, 50:8, 82:23
**present** [2] - 2:8, 38:12
**presents** [1] - 9:9
**Press** [1] - 20:23
**pretrial** [3] - 3:12, 23:10, 50:8
**pretty** [6] - 24:17, 27:15, 85:18, 87:21, 98:8, 99:15
**previously** [7] - 16:8, 20:20, 42:11, 50:3, 51:19, 61:5, 76:19
**price** [6] - 9:3, 15:15, 15:19, 16:5, 16:7
**privacy** [5] - 19:7, 19:8, 55:23, 56:13
**Privacy** [1] - 19:10, 21:1, 21:2
**private** [5] - 51:21, 78:9, 98:15, 103:15, 104:6
**privileged** [1] - 33:3
**pro** [5] - 22:10, 22:12, 27:22, 99:23, 99:25
**problem** [4] - 69:5, 70:21, 79:5, 89:1
**problematic** [1] - 69:7
**proceed** [1] - 82:17
**proceeding** [2] - 37:5, 50:8
**proceedings** [4] - 37:10, 95:1, 106:6
**proceeds** [2] - 44:21, 44:24
**process** [2] - 76:1,

85:18
**processer** [1] - 52:11
**produce** [7] - 31:15, 32:2, 32:10, 33:3, 35:9, 36:23, 37:15
**produced** [3] - 31:14, 32:2, 33:7
**product** [1] - 42:3
**production** [4] - 31:16, 31:17, 32:21, 33:10
**professional** [1] - 85:9
**Professor** [43] - 2:18, 3:11, 3:15, 4:14, 12:3, 14:1, 14:24, 16:20, 18:23, 24:1, 24:7, 26:2, 26:15, 27:11, 28:17, 29:22, 32:4, 32:11, 33:16, 33:21, 37:4, 38:5, 38:17, 39:1, 40:25, 42:13, 42:17, 45:19, 50:5, 52:1, 52:7, 52:22, 54:5, 55:16, 58:2, 58:9, 61:4, 61:17, 63:9, 63:17, 71:7, 75:15, 77:2
**professor** [2] - 16:22, 84:25
**programming** [1] - 85:19
**project** [1] - 98:8
**promise** [1] - 91:25
**proof** [2] - 72:19, 73:3
**proper** [1] - 58:5
**property** [1] - 90:22
**proposal** [1] - 37:24
**proposed** [1] - 64:7
**proposes** [1] - 38:2
**prosecution** [1] - 21:13, 93:23
**prosecutor** [1] - 97:4
**prosecutorial** [2] - 95:11, 95:18
**prosecutors** [2] - 94:7, 95:16
**Prosecutors** [1] - 95:13
**Protectimus** [1] - 77:9
**protocol** [1] - 87:17
**provide** [3] - 95:12, 98:7, 98:10
**provided** [4] - 18:2, 42:5, 45:11, 81:16
**provider** [1] - 88:17
**providing** [1] - 98:9
**public** [3] - 51:21, 98:12, 103:15
**publication** [1] - 56:12
**publicly** [1] - 19:24
**publish** [2] - 28:13,

28:14
**published** [2] - 28:12, 42:15
**pull** [6] - 34:7, 38:22, 42:10, 50:3, 51:20, 81:19
**pulling** [1] - 26:22
**pump** [1] - 86:21
**purchase** [1] - 10:21
**purchased** [1] - 10:22
**purported** [1] - 41:24
**purposes** [4] - 4:22, 56:18, 59:2, 92:1
**pushed** [1] - 15:7
**put** [13] - 8:9, 13:23, 26:19, 62:25, 64:6, 64:8, 74:14, 80:17, 89:14, 94:10, 94:11, 96:23, 101:7
**puts** [2] - 70:23, 70:24
**putting** [2] - 24:22, 43:3
**puzzling** [1] - 67:17

## Q

**qualifications** [7] - 28:22, 94:13, 95:1, 95:3, 97:14, 97:17, 97:18
**qualified** [3] - 95:20, 96:6, 100:9
**qualify** [1] - 100:2
**quantity** [1] - 16:4
**questioned** [1] - 33:9
**questioning** [2] - 69:6, 72:16
**questions** [20] - 29:12, 55:4, 60:18, 61:18, 62:12, 65:15, 65:18, 65:22, 68:6, 69:3, 69:24, 71:8, 72:11, 73:11, 73:18, 73:19, 73:24, 74:3, 77:12, 103:14
**quite** [6] - 12:6, 32:8, 67:21, 83:18, 97:10, 97:11
**quote/unquote** [2] - 50:7, 59:9

## R

**radar** [1] - 92:18
**raise** [4] - 25:15, 25:22, 99:22, 104:23
**raising** [1] - 25:21
**rambling** [1] - 48:22
**range** [1] - 66:4
**rate** [2] - 21:25, 22:3

**rather** [4] - 19:7, 34:22, 79:17, 105:2
**raw** [1] - 16:3
**re** [1] - 73:11
**re-ask** [1] - 73:11
**reach** [2] - 47:15, 47:18
**reaching** [5] - 4:16, 10:5, 15:23, 58:3, 58:17
**read** [7] - 23:11, 26:2, 26:8, 26:15, 26:23, 27:1, 27:11
**reader** [2] - 79:8, 101:10
**reading** [1] - 103:19
**ready** [2] - 2:2, 82:21
**realistic** [1] - 48:13
**realistically** [1] - 53:16
**reality** [2] - 68:10, 87:8
**realizing** [1] - 70:12
**really** [10] - 4:24, 60:2, 70:17, 84:14, 85:3, 86:17, 88:10, 92:13, 97:11
**reason** [9] - 4:5, 29:2, 29:7, 42:21, 66:19, 72:7, 75:21, 76:10, 85:17
**reasonable** [1] - 60:9
**reasonably** [2] - 59:24, 59:25
**reasons** [2] - 55:23, 73:7
**rebuttal** [1] - 3:19
**rebutting** [2] - 3:12, 73:2
**receive** [4] - 7:9, 22:24, 24:12, 28:18
**received** [6] - 15:19, 33:23, 51:16, 96:10, 96:14, 102:4
**recently** [3] - 18:21, 18:23, 89:7
**recess** [1] - 37:22
**reciprocal** [1] - 32:21
**recognize** [3] - 2:18, 14:1, 14:3
**recollection** [4] - 15:11, 23:13, 63:12, 63:13
**record** [5] - 26:3, 26:15, 62:23, 101:7, 104:19
**records** [4] - 41:16, 42:18, 66:16, 83:22
**recross** [8] - 72:7, 72:17, 73:9, 73:10, 73:12, 73:25, 74:4, 74:9

**RECROSS** [1] - 75:13
**RECROSS-EXAMINATION** [1] - 75:13
**redirect** [5] - 67:15, 72:6, 73:7, 73:14, 73:17
**REDIRECT** [1] - 55:14
**refer** [1] - 88:18
**referenced** [1] - 68:19
**referencing** [2] - 39:2, 39:5
**referred** [3] - 4:5, 16:12, 54:11
**referring** [5] - 10:24, 32:10, 33:13, 34:14, 34:15
**refers** [2] - 52:8, 52:13
**reflects** [1] - 60:5
**refresh** [2] - 23:7, 24:7
**refreshing** [1] - 23:13
**regarding** [1] - 12:4
**register** [1] - 87:5
**registered** [2] - 85:13, 85:16
**registration** [2] - 85:11, 103:24
**regular** [1] - 41:21
**regularly** [1] - 89:24
**related** [12] - 4:2, 12:17, 21:15, 37:14, 39:8, 63:1, 63:21, 64:19, 66:16, 72:24, 95:5
**relating** [2] - 101:1, 103:12
**relation** [7] - 61:2, 61:7, 64:1, 80:4, 98:12, 98:15, 103:21
**relatively** [2] - 85:23, 89:21
**released** [1] - 28:18
**relevant** [5] - 3:23, 4:19, 4:24, 60:3, 68:25
**relied** [11] - 4:22, 5:10, 11:14, 11:21, 15:23, 46:2, 56:14, 56:16, 56:18, 57:1, 58:3
**rely** [15] - 9:6, 10:4, 12:13, 13:7, 13:11, 13:16, 47:19, 56:23, 56:25, 58:17, 59:2, 59:24, 59:25, 60:9, 63:13
**relying** [1] - 34:7
**remember** [17] - 12:6, 17:7, 20:6, 23:6, 29:2, 41:14, 45:3, 63:11, 63:24, 64:3, 64:15, 64:16, 87:3, 91:12,

92:10, 95:8
**remind** [5] - 17:19, 17:23, 32:1, 86:10, 87:15
**reminder** [1] - 11:20
**remote** [1] - 89:3
**rent** [1] - 90:19
**repeat** [1] - 11:1
**repeated** [1] - 19:11
**repeatedly** [3] - 31:22, 32:1, 32:19
**repeater** [1] - 91:20
**repeating** [1] - 91:21
**repetitive** [1] - 11:25
**replicate** [1] - 48:10
**report** [11] - 4:16, 38:18, 39:1, 39:6, 39:7, 39:14, 39:16, 40:13, 59:25, 60:2, 66:11
**reported** [2] - 40:12, 73:16
**REPORTER** [2] - 11:1, 106:1
**Reporter** [1] - 106:11
**reporter** [2] - 82:24, 94:1
**reporting** [2] - 59:6, 59:9
**reports** [2] - 73:15, 87:20
**represent** [1] - 57:14
**representation** [2] - 59:13, 80:3
**representations** [1] - 37:7
**represented** [2] - 33:7, 57:18
**reproducing** [2] - 59:16, 59:23
**reproduction** [1] - 77:3
**reputable** [3] - 56:11, 59:2, 59:10
**request** [2] - 26:14, 35:14, 95:19
**requested** [1] - 31:21
**requests** [2] - 33:23, 78:4
**require** [3] - 36:17, 53:21, 72:7
**required** [4] - 35:12, 42:8, 86:8, 103:7
**requirements** [1] - 19:17
**requires** [1] - 31:18
**research** [2] - 35:1, 100:25
**reserve** [3] - 38:4, 38:6, 103:5
**residences** [1] - 50:1

**residing** [1] - 101:17
**resolution** [1] - 73:23
**resolve** [2] - 73:5, 79:11
**resolving** [1] - 87:9
**respect** [6] - 7:8, 24:23, 36:12, 70:20, 101:7
**respond** [1] - 75:25
**responding** [1] - 17:25
**response** [2] - 60:5, 67:14
**responsive** [1] - 36:11
**rest** [1] - 80:20
**result** [1] - 46:13
**results** [1] - 80:22
**retail** [1] - 20:24
**retainer** [8] - 27:14, 27:16, 29:1, 29:3, 29:8, 29:9, 99:22
**return** [2] - 77:24, 77:25
**returning** [1] - 29:13
**returns** [1] - 2:7
**revenue** [1] - 13:19
**review** [29] - 7:1, 7:20, 8:6, 14:6, 20:22, 23:17, 24:15, 24:16, 33:13, 33:15, 38:3, 39:6, 39:25, 44:19, 63:20, 64:18, 66:20, 71:12, 71:21, 75:4, 75:7, 78:9, 80:19, 80:20, 80:25, 81:1, 82:4, 101:8
**reviewed** [10] - 6:22, 32:5, 38:18, 39:7, 44:16, 54:20, 55:19, 59:14, 65:25, 66:14
**reviewing** [2] - 27:20, 67:3
**rights** [1] - 72:23
**ringing** [3] - 85:8, 86:3, 93:22
**rooftop** [1] - 98:9
**Room** [1] - 106:12
**room** [7] - 35:20, 63:11, 63:17, 94:12, 96:23, 101:19, 104:2
**rope** [1] - 73:6
**rough** [2] - 11:3, 57:9
**roughly** [9] - 11:3, 11:4, 11:5, 11:6, 11:7, 88:24
**round** [4] - 11:6, 11:8
**rounded** [1] - 11:5
**Router** [1] - 91:11
**Rule** [10] - 3:13, 31:11, 31:25, 32:18, 32:22, 33:11, 36:11, 36:17
**rule** [5] - 14:16, 31:17,

34:7, 34:10, 34:16
**rules** [1] - 7:17
**Rules** [2] - 17:10, 17:14
**run** [4] - 89:2, 89:6, 89:16, 91:20
**running** [8] - 44:11, 61:25, 88:9, 90:10, 91:3, 91:4, 91:16, 104:16
**runs** [1] - 70:21

## S

**Samourai** [3] - 46:7, 46:10, 46:11
**sandwich** [2] - 79:18, 79:20
**sat** [3] - 16:25, 17:2, 17:5
**saw** [5] - 29:10, 30:21, 65:22, 72:24, 76:4
**schemes** [1] - 64:17
**Scholl** [4] - 14:4, 15:7, 41:10, 48:10
**Scholl's** [2] - 48:6, 48:7
**school** [5] - 17:23, 87:21, 92:7, 93:2, 98:24
**School** [1] - 17:24
**science** [1] - 85:1
**scientific** [3] - 59:21, 59:22, 59:23
**SCIF** [3] - 96:25, 97:1, 97:3
**scope** [11] - 30:3, 33:9, 37:21, 67:11, 68:17, 68:24, 68:25, 70:8, 100:7, 102:20, 103:17
**scrap** [1] - 30:18
**screen** [3] - 5:19, 5:21, 26:24
**scroll** [8] - 15:25, 39:22, 39:24, 55:9, 58:1, 58:10, 58:11, 58:12
**scrolling** [4] - 52:7, 53:1, 53:5, 53:8
**seated** [2] - 2:9, 38:13
**second** [7] - 2:25, 3:2, 34:11, 64:6, 66:21, 79:10, 98:24
**secondly** [1] - 27:14
**secondwave.com** [1] - 85:13
**secret** [1] - 96:22
**secrets** [1] - 96:17
**secure** [1] - 97:1

**security** [5] - 89:2, 91:23, 96:17, 97:2, 97:4
**see** [47] - 5:19, 10:12, 10:24, 14:15, 35:1, 35:20, 41:18, 41:19, 41:20, 41:23, 41:25, 42:13, 44:5, 52:10, 52:15, 52:22, 52:25, 53:4, 53:7, 53:10, 56:22, 57:2, 57:3, 58:2, 58:15, 60:2, 64:19, 66:9, 67:3, 70:19, 70:23, 71:17, 71:20, 71:21, 72:1, 75:24, 76:10, 76:13, 77:6, 77:11, 79:2, 83:25, 84:22, 89:6, 89:12, 101:1, 105:13
**seed** [3] - 98:19, 103:15, 104:6
**seeing** [1] - 72:8
**seeking** [1] - 40:21
**seized** [3] - 22:15, 22:24, 25:13
**sell** [2] - 9:3, 18:9
**selling** [3] - 43:23, 54:22, 55:1
**send** [3] - 36:19, 36:20, 38:1
**sending** [1] - 12:8
**sense** [4] - 37:20, 90:1, 92:14, 102:25
**sent** [6] - 7:11, 7:14, 15:4, 22:6, 45:1, 96:8
**sentence** [1] - 58:15
**September** [1] - 22:9
**sequestered** [2] - 17:12, 80:21
**sequestering** [1] - 81:8
**serve** [1] - 19:2
**server** [10] - 85:25, 86:11, 86:12, 86:13, 87:6, 88:9, 90:20, 91:2, 91:4, 103:24
**servers** [7] - 36:6, 85:21, 86:1, 90:10, 90:19, 90:25, 104:15
**service** [12] - 21:7, 21:10, 21:16, 46:11, 46:12, 53:11, 71:11, 88:17, 89:24, 98:7, 98:9, 98:10
**services** [4] - 18:9, 18:11, 89:7, 93:23
**Services** [1] - 6:19
**set** [7] - 70:5, 85:25, 86:1, 87:5, 89:7, 89:18, 92:23

**setting** [4] - 45:13, 103:10, 103:11, 103:24
**several** [4] - 16:23, 22:14, 98:14, 98:18
**Shake** [1] - 5:13
**share** [4] - 7:19, 7:23, 15:23, 51:23
**shares** [1] - 4:14
**sharing** [1] - 90:20
**sheet** [1] - 87:19
**shielded** [2] - 19:13, 19:20
**shoes** [3] - 69:8, 70:24
**short** [4] - 80:24, 93:4, 104:4, 104:11
**show** [7] - 35:18, 42:6, 43:2, 54:18, 67:21, 79:16, 92:19
**showed** [5] - 8:21, 16:12, 75:4, 93:3, 93:9
**showing** [2] - 23:9, 60:23
**shown** [2] - 43:13, 44:2
**shows** [2] - 51:21, 69:13
**sic** [1] - 73:6
**sic)** [1] - 57:19
**side** [2] - 13:9, 91:22
**sidebars** [1] - 78:24
**sign** [1] - 89:19
**significantly** [1] - 15:20
**silently** [1] - 23:17
**similar** [3] - 39:3, 46:13, 83:21
**simple** [2] - 85:24, 104:16
**simply** [5] - 3:16, 21:21, 36:9, 72:23, 84:13
**single** [1] - 47:16
**singling** [1] - 61:8
**sit** [2] - 33:19, 34:23
**site** [3] - 44:12, 90:7, 103:11
**sitting** [2] - 30:24, 37:4
**slant** [1] - 59:12
**slide** [53] - 2:18, 2:21, 2:22, 2:23, 2:25, 3:7, 3:8, 3:15, 3:17, 4:2, 4:14, 5:9, 5:15, 5:16, 7:21, 7:25, 8:3, 8:5, 8:17, 8:19, 9:4, 9:6, 9:8, 9:10, 9:11, 9:12, 9:14, 9:15, 9:17, 9:20, 9:24, 10:1, 10:4, 11:17, 11:19, 11:22, 12:4, 12:10, 12:11, 12:13,

13:5, 13:7, 13:10, 13:12, 13:13, 13:15, 13:16, 13:17, 32:13, 66:11
**slides** [3] - 3:6, 9:9, 30:16
**slightly** [1] - 74:3
**slogan** [2] - 19:9, 19:10
**slow** [2] - 90:15, 93:25
**small** [2] - 45:1, 61:24
**smart** [1] - 88:5
**smoking** [1] - 32:14
**social** [1] - 84:7
**software** [3] - 15:8, 89:15, 89:16
**sold** [5] - 47:16, 48:18, 48:21, 61:24
**solely** [1] - 52:21
**solid** [1] - 94:7
**solution** [1] - 36:22
**solve** [1] - 85:7
**solved** [7] - 83:22
**someone** [7] - 6:15, 45:20, 53:18, 59:20, 60:7, 70:22, 70:23
**sometimes** [6] - 6:5, 16:25, 17:2, 54:23, 90:13, 105:4
**somewhere** [4] - 23:22, 48:21, 66:20, 67:4
**soon** [2] - 15:18, 38:1
**Sorry** [1] - 11:2
**sorry** [25] - 13:2, 14:20, 16:1, 20:12, 28:4, 39:18, 46:22, 51:21, 52:20, 52:21, 57:17, 57:22, 58:20, 62:6, 64:5, 65:12, 66:21, 74:25, 78:18, 90:5, 90:15, 95:17, 97:13, 99:8, 100:19
**sort** [22] - 3:7, 13:20, 31:1, 34:17, 34:20, 34:23, 43:18, 44:1, 44:14, 59:1, 59:19, 59:23, 68:22, 69:21, 73:11, 81:16, 83:10, 86:14, 95:25, 97:16, 104:7
**sound** [1] - 20:15
**sounds** [5] - 20:1, 20:4, 20:5, 20:7, 20:13
**source** [3] - 25:3, 59:11, 80:14
**sources** [1] - 57:4
**speaking** [1] - 64:3
**special** [5] - 95:3, 95:4, 96:10, 96:13,

97:7

**Specialist** [1] - 41:10
**specialized** [1] - 98:22
**specific** [4] - 61:18, 61:21, 70:7
**specifically** [3] - 27:20, 61:6, 84:23
**specifics** [1] - 104:12
**spectacular** [1] - 99:7
**speculation** [2] - 14:17, 62:7
**spelling** [1] - 83:7
**spellings** [1] - 82:24
**spend** [5] - 10:23, 53:22, 92:17, 99:2, 103:18
**spending** [5] - 6:4, 6:8, 6:20, 7:5, 10:15
**spent** [5] - 10:19, 46:23, 47:1, 47:7, 98:25
**spins** [1] - 48:3
**spot** [1] - 45:23
**spot-checked** [1] - 45:23
**spreadsheet** [7] - 42:24, 44:5, 48:2, 60:24, 61:7, 61:18, 61:19
**spreadsheets** [3] - 30:14, 31:12, 32:23
**squad** [1] - 93:18
**squarely** [1] - 68:4
**squirreled** [1] - 48:20
**Staff** [1] - 41:9
**stand** [13] - 22:23, 24:10, 28:18, 29:14, 47:23, 47:25, 80:3, 80:15, 80:20, 81:4, 81:22, 94:11, 105:5
**standard** [1] - 59:5
**standpoint** [1] - 87:1
**stands** [2] - 87:17, 95:9
**start** [9] - 11:2, 31:19, 43:6, 46:25, 81:22, 83:14, 90:12, 100:21, 100:23
**started** [16] - 22:13, 22:17, 22:22, 29:17, 32:17, 33:8, 47:1, 79:22, 80:1, 82:1, 91:11, 92:4, 92:6, 92:8, 93:3, 98:25
**starting** [1] - 93:18
**state** [1] - 95:23
**statement** [10] - 50:7, 56:8, 59:1, 63:1, 63:3, 63:20, 63:21, 63:25, 68:22, 68:23

**statements** [1] - 102:2
**states** [1] - 96:6
**static** [1] - 88:11
**stating** [1] - 59:10
**stenographic** [1] - 106:5
**step** [2] - 35:21, 69:8
**Sterlingov** [28] - 6:10, 8:9, 8:21, 9:22, 10:18, 18:25, 42:2, 48:10, 48:24, 49:15, 49:21, 50:23, 51:4, 51:15, 52:14, 54:8, 64:19, 66:19, 67:4, 67:13, 70:2, 73:6, 74:7, 75:8, 80:12, 81:5, 102:15
**Sterlingov's** [12] - 4:8, 7:1, 11:12, 50:7, 50:20, 51:11, 52:2, 53:16, 64:23, 65:23, 78:13, 79:8
**stick** [1] - 77:17
**still** [6] - 3:21, 48:8, 98:5, 100:24, 101:14, 102:19
**stolen** [4] - 57:3, 57:6, 57:11, 57:17
**stood** [3] - 24:12, 70:13, 70:15
**stop** [1] - 58:4
**stopped** [3] - 85:8, 93:11, 93:22
**stopping** [1] - 100:16
**storage** [1] - 50:1
**story** [2] - 85:5, 93:4
**straight** [1] - 7:11
**street** [1] - 94:24
**stretch** [1] - 70:14
**stricken** [1] - 30:9
**strike** [3] - 24:21, 31:10, 36:2
**strikes** [1] - 60:8
**structured** [3] - 34:16, 35:11
**study** [4] - 39:17, 39:19, 40:6, 44:14
**stuff** [6] - 33:3, 34:2, 36:23, 104:8, 104:12, 104:16
**subject** [14] - 28:21, 30:4, 30:13, 30:19, 30:23, 31:5, 31:13, 32:11, 33:20, 37:15, 55:4, 73:17, 77:14, 77:16
**substantial** [16] - 24:14, 24:25, 25:3, 48:24, 53:24, 54:3, 54:7, 54:18, 66:20, 71:13, 71:22, 74:7,

75:4, 75:9, 79:20, 80:10
**substantive** [1] - 27:8
**subtotal** [4] - 10:12, 10:13, 10:16, 10:24
**sudden** [1] - 105:5
**sufficiency** [2] - 67:10, 68:23
**suggest** [3] - 35:15, 94:25, 103:15
**suggesting** [1] - 73:19
**sum** [1] - 4:8
**supplemental** [1] - 103:1
**supported** [1] - 9:19
**surprise** [1] - 3:19
**surveillance** [3] - 20:2, 20:9, 89:12
**suspect** [2] - 35:10, 79:23
**sustain** [3] - 14:19, 14:22, 62:10
**sustained** [4] - 4:5, 7:24, 60:15, 65:11
**sworn** [1] - 82:15
**system** [7] - 86:11, 87:4, 87:7, 89:2, 91:13, 91:15, 91:21

## T

**tab** [1] - 14:9
**table** [5] - 17:2, 17:5, 53:14, 54:9, 54:14
**Table** [1] - 51:8
**tablet** [1] - 81:15
**talks** [2] - 40:15, 40:25
**tank** [2] - 45:21, 46:9
**team** [2] - 21:22, 22:9
**technologist** [6] - 83:10, 83:13, 84:16, 84:21, 84:23, 92:5
**technology** [2] - 100:10, 100:14
**telephone** [2] - 58:21, 70:16
**ten** [2] - 37:20, 53:20
**ten-year** [1] - 53:20
**tend** [1] - 37:8
**term** [3] - 19:21, 99:4, 99:6
**terming** [1] - 99:6
**terms** [3] - 32:15, 47:14, 104:6
**Tesla** [1] - 10:21
**testified** [33] - 4:10, 12:20, 15:17, 18:14, 18:16, 21:17, 22:4, 26:4, 31:11, 32:4, 35:7, 35:13, 38:18, 39:9,

40:19, 41:15, 41:18, 41:20, 44:25, 45:5, 45:13, 46:15, 46:16, 47:19, 59:14, 60:20, 63:18, 65:10, 65:14, 71:25, 79:7, 80:14, 82:16
**testify** [20] - 3:19, 15:7, 17:13, 26:11, 33:20, 36:12, 44:11, 45:9, 45:25, 56:14, 56:16, 63:12, 67:22, 68:21, 94:9, 94:13, 95:20, 100:9, 103:6, 104:9
**testifying** [7] - 17:9, 41:12, 55:16, 57:21, 64:22, 65:8, 103:10
**testimony** [63] - 3:10, 4:20, 4:22, 11:24, 12:4, 12:17, 12:22, 14:5, 15:10, 15:11, 16:9, 17:13, 22:8, 22:22, 23:10, 24:11, 24:21, 25:6, 25:25, 26:15, 30:4, 30:5, 30:13, 30:19, 30:24, 31:5, 31:10, 31:13, 35:4, 36:3, 36:9, 37:12, 37:15, 38:18, 40:3, 40:18, 41:9, 42:5, 44:9, 45:3, 45:18, 49:6, 55:20, 61:4, 62:23, 63:13, 63:25, 67:19, 68:24, 77:23, 79:23, 81:13, 81:22, 81:23, 100:6, 101:6, 101:21, 102:3, 102:20, 103:16, 103:23, 104:1, 104:12
**THE** [163] - 2:2, 2:4, 2:6, 2:8, 2:10, 2:14, 3:21, 4:3, 4:17, 5:6, 5:12, 5:13, 5:18, 5:20, 5:21, 5:24, 5:25, 6:1, 6:2, 7:24, 8:1, 11:1, 11:2, 11:25, 12:25, 13:4, 14:16, 14:18, 14:21, 15:11, 16:17, 17:21, 23:14, 23:23, 24:4, 24:19, 24:21, 24:25, 25:10, 25:11, 26:18, 27:1, 27:3, 27:6, 28:4, 28:7, 28:9, 28:11, 30:9, 30:10, 34:3, 34:7, 34:13, 34:19, 34:22, 35:3, 35:23, 36:8, 36:21, 36:25, 37:3, 37:8, 37:19, 37:23, 38:8, 38:10, 38:12, 38:14, 38:24, 40:23, 43:10, 43:11, 49:10,

51:23, 55:6, 56:14, 57:22, 57:24, 57:25, 58:7, 58:20, 58:23, 59:7, 59:18, 60:15, 61:10, 62:6, 62:9, 63:3, 63:10, 64:5, 64:13, 65:5, 65:11, 65:13, 65:17, 66:21, 66:24, 67:7, 67:16, 69:2, 69:25, 70:10, 70:15, 71:1, 71:25, 72:18, 73:4, 73:10, 74:8, 75:12, 76:22, 76:24, 77:13, 77:16, 77:18, 77:19, 77:22, 77:24, 77:25, 78:15, 78:19, 78:23, 79:1, 79:4, 79:10, 81:7, 81:25, 82:6, 82:9, 82:11, 82:17, 82:25, 94:25, 96:19, 96:21, 97:13, 97:16, 97:21, 100:4, 100:8, 100:13, 100:17, 100:19, 100:21, 101:4, 101:9, 101:13, 101:15, 101:20, 101:23, 102:7, 102:11, 102:16, 102:23, 103:18, 104:9, 104:18, 104:21, 104:25, 105:7, 105:10, 105:13

**thesis** [1] - 21:1
**they've** [3] - 27:17, 81:16, 90:18
**third** [2] - 85:1, 99:4
**thousand** [1] - 22:14
**threatened** [1] - 93:16
**three** [7] - 16:6, 17:7, 83:15, 83:18, 85:22, 86:24, 97:12
**threw** [1] - 98:3
**throughout** [3] - 37:5, 68:16, 78:16
**timing** [1] - 8:21
**title** [5] - 20:18, 20:22, 20:25, 21:1, 21:4
**titled** [1] - 81:17
**today** [36] - 10:17, 18:14, 22:22, 24:11, 25:25, 30:5, 30:13, 30:19, 30:24, 31:5, 31:22, 32:2, 32:4, 33:22, 45:9, 45:11, 45:14, 46:21, 46:24, 47:10, 59:22, 77:18, 77:19, 79:12, 79:21, 82:4, 83:18, 85:22, 85:24, 90:4, 91:14, 95:1, 98:2, 98:5, 99:16
**tomorrow** [6] - 77:24,

77:25, 78:5, 100:23, 101:2, 102:22
**tonight** [6] - 79:24, 80:18, 102:9, 102:17, 102:21, 105:11
**took** [3] - 16:3, 79:18, 94:18
**top** [6] - 55:9, 55:11, 58:11, 96:22, 97:4
**top-level** [1] - 97:4
**Tor** [11] - 4:2, 91:6, 91:10, 91:16, 91:17, 91:19, 92:2, 103:10, 103:11
**Tornado** [2] - 21:7, 21:10
**total** [6] - 4:8, 4:11, 11:8, 15:3, 36:15, 54:14
**totally** [1] - 72:22
**touch** [1] - 53:20
**toward** [1] - 7:3
**town** [1] - 89:11
**trace** [3] - 4:12, 69:17, 93:14
**traceable** [1] - 19:15
**tracing** [2] - 19:5, 19:8
**track** [1] - 84:14
**tracked** [1] - 11:9
**trade** [4] - 31:4, 43:20, 43:21, 92:17
**traded** [1] - 43:22
**trades** [3] - 54:19, 54:22, 55:1
**training** [1] - 84:13
**transaction** [11] - 14:10, 41:6, 41:7, 42:17, 42:20, 43:13, 43:16, 43:18, 44:1, 47:5, 66:16
**transactional** [1] - 76:10
**transactions** [15] - 6:14, 19:9, 19:13, 19:16, 19:19, 42:23, 43:8, 60:6, 60:24, 61:1, 61:8, 61:19, 61:22, 62:2
**transcript** [7] - 23:9, 24:2, 24:5, 26:16, 28:2, 106:4, 106:5
**transfer** [2] - 7:13, 8:22
**transfers** [3] - 9:1, 41:1, 41:3
**transparent** [1] - 19:15
**travel** [1] - 49:23
**Trezor** [1] - 49:25
**trial** [7] - 16:23, 17:6, 30:22, 33:21, 78:17,

83:11, 102:12
**tried** [1] - 95:10
**true** [24] - 19:25, 29:19, 33:25, 41:9, 44:4, 48:24, 49:15, 50:25, 51:3, 51:5, 51:9, 51:14, 52:8, 52:13, 52:16, 53:1, 53:8, 53:14, 54:6, 54:25, 55:2, 56:8, 106:4, 106:5
**truth** [1] - 72:13
**truthfully** [1] - 26:11
**try** [5] - 25:17, 70:12, 83:24, 83:25, 94:25
**trying** [10] - 25:22, 40:22, 49:8, 60:10, 67:2, 67:5, 84:11, 93:25, 95:8
**turn** [3] - 35:12, 35:14, 54:11
**turned** [1] - 33:15
**turning** [3] - 14:24, 51:7, 71:16
**turns** [2] - 35:25, 93:15
**Tweet** [1] - 20:8
**two** [19] - 6:9, 12:15, 16:6, 17:7, 21:3, 31:24, 32:1, 44:20, 45:1, 46:20, 46:24, 47:2, 47:7, 68:6, 68:17, 96:3, 99:11, 99:15, 101:21
**type** [8] - 65:20, 87:8, 88:14, 90:1, 91:16, 91:18, 96:13
**typically** [3] - 90:19, 91:20, 94:3

## U

**U.S** [5] - 15:18, 18:25, 21:6, 75:25, 91:12
**unable** [2] - 80:15, 80:21
**uncertainty** [4] - 24:14, 24:25, 25:3, 25:6
**unclear** [1] - 57:7
**under** [13] - 7:4, 26:9, 27:7, 31:11, 32:18, 36:11, 47:21, 52:8, 53:1, 58:12, 60:9, 77:6, 102:2
**underlying** [5] - 14:10, 40:11, 59:11, 59:13, 60:4
**understood** [11] - 4:4, 4:24, 29:10, 70:25, 74:1, 75:3, 79:15,

92:21, 93:18, 104:24, 105:9
**undisclosed** [1] - 3:10
**unethical** [1] - 29:20
**unheard** [1] - 27:15
**University** [1] - 18:18
**unless** [4] - 88:8, 88:9, 90:9, 97:4
**unlike** [1] - 53:23
**unlikely** [3] - 47:21, 53:18, 54:3
**unloaded** [1] - 7:11
**unplug** [1] - 76:24
**unplugged** [1] - 93:10
**unusual** [1] - 62:3
**up** [83] - 2:12, 5:12, 5:18, 5:22, 10:13, 11:5, 11:6, 11:8, 12:15, 13:23, 23:2, 23:19, 26:3, 26:19, 26:21, 26:22, 27:21, 28:12, 28:25, 29:3, 33:15, 34:7, 36:4, 38:22, 39:3, 40:7, 41:6, 42:10, 43:8, 48:4, 50:3, 55:7, 56:22, 61:7, 61:25, 64:6, 64:8, 66:21, 67:21, 69:4, 70:13, 70:15, 71:3, 73:14, 74:14, 76:18, 77:6, 79:16, 80:9, 80:15, 80:17, 80:24, 81:19, 85:6, 85:25, 86:1, 86:23, 87:5, 88:8, 88:12, 88:16, 88:23, 89:7, 89:19, 90:23, 92:23, 93:3, 93:4, 93:9, 93:14, 93:16, 99:16, 101:18, 103:11, 103:20, 103:24, 105:4, 105:5, 105:8
**updated** [1] - 18:21
**upper** [1] - 14:24
**urge** [1] - 105:10
**USD** [1] - 14:25
**useful** [3] - 18:3, 47:20, 47:21
**users** [2] - 19:5, 19:18
**usual** [1] - 22:3
**utilize** [1] - 9:12
**utilized** [3] - 8:5, 8:20, 9:20

## V

**vague** [1] - 43:9
**valuation** [3] - 15:19, 18:12, 64:25
**valuations** [1] - 15:14
**value** [3] - 15:2, 15:8, 46:3

**valued** [1] - 49:19
**values** [2] - 16:3, 50:23
**variable** [1] - 16:11
**various** [1] - 64:17
**Various** [1] - 51:4
**Veritas** [1] - 18:6
**VERRET** [1] - 2:15
**Verret** [46] - 2:18, 3:11, 3:15, 4:14, 12:3, 14:1, 14:24, 16:20, 18:23, 24:7, 26:2, 26:15, 27:11, 28:17, 29:22, 32:4, 32:11, 33:9, 33:16, 33:21, 37:4, 38:5, 38:17, 39:1, 40:25, 42:13, 42:17, 45:19, 49:5, 49:8, 49:15, 50:5, 52:1, 52:7, 52:22, 54:5, 55:16, 58:2, 58:9, 61:17, 63:9, 63:17, 71:7, 75:15, 77:2
**Verret's** [3] - 3:6, 24:1, 61:4
**versus** [1] - 4:12
**video** [2] - 83:20, 89:5
**view** [2] - 66:2, 81:9
**violated** [1] - 7:16
**virtual** [1] - 90:20
**vision** [1] - 92:15
**visit** [2] - 91:25, 92:2
**visiting** [1] - 89:10
**volunteering** [1] - 91:19
**VPN** [1] - 61:25

# W

**waiting** [2] - 2:6, 96:9
**walk** [1] - 3:7
**Wallet** [3] - 46:7, 46:10, 46:11
**wallet** [9] - 49:16, 50:15, 50:16, 50:21, 64:22, 65:3, 65:8, 65:20, 98:3
**wallets** [1] - 49:22
**wants** [3] - 81:21, 81:22, 94:6
**wash** [1] - 73:23
**washing** [2] - 83:19, 83:22
**Washington** [2] - 59:20, 106:13
**watch** [3] - 86:20, 88:6, 89:5
**watched** [1] - 40:9
**watching** [2] - 37:4, 83:23

**wealth** [1] - 53:19
**web** [4] - 85:21, 87:2, 87:4, 88:8
**webinar** [8] - 40:7, 40:9, 40:10, 40:12, 40:14, 59:6, 59:13, 59:17
**website** [5] - 6:13, 7:18, 86:19, 90:11, 91:25
**websites** [1] - 87:24
**week** [3] - 33:21, 81:19
**weird** [1] - 92:14
**welcome** [1] - 64:13
**whatnot** [2] - 70:8, 104:7
**whereas** [1] - 4:9
**whole** [1] - 44:4
**wife** [1] - 90:3
**willing** [1] - 29:15
**Windows** [1] - 89:16
**wireless** [1] - 98:6
**withdraw** [1] - 49:13
**withdrawal** [1] - 44:3
**withdrawing** [1] - 44:7
**witness** [48] - 2:5, 4:6, 4:25, 16:16, 17:9, 18:5, 18:7, 23:23, 26:23, 27:9, 32:19, 32:23, 35:3, 35:6, 35:8, 35:13, 35:20, 35:22, 35:24, 36:1, 36:9, 38:8, 40:19, 43:10, 57:15, 57:23, 59:14, 64:8, 67:9, 68:20, 71:25, 72:8, 72:14, 74:9, 75:11, 77:13, 77:14, 78:15, 78:19, 82:12, 82:15, 97:16, 101:4, 102:1, 102:14
**WITNESS** [14] - 6:2, 8:1, 11:2, 24:4, 24:25, 25:11, 30:10, 43:11, 57:24, 77:18, 77:24, 96:21, 101:15, 101:23
**witness's** [4] - 4:19, 31:10, 36:7, 67:18
**witnesses** [3] - 17:11, 17:12, 18:9
**wondering** [1] - 65:7
**word** [5] - 10:20, 77:10, 78:7, 86:17
**words** [2] - 43:23, 48:20
**works** [3] - 19:10, 29:6, 46:9
**world** [1] - 92:20
**worth** [7] - 48:9, 50:8, 50:24, 55:1, 64:25,

98:2, 98:3
**write** [2] - 40:7, 99:5
**write-up** [1] - 40:7
**writes** [1] - 59:20
**writing** [3] - 37:11, 58:24, 59:19
**written** [1] - 42:3
**wrote** [1] - 99:11
**www.google.com** [1] - 87:8

# X

**XMLGold** [1] - 6:20

# Y

**year** [8] - 10:19, 10:23, 16:6, 46:19, 46:23, 47:11, 53:20, 84:17
**years** [9] - 16:6, 83:11, 85:15, 91:8, 92:11, 94:14, 95:8, 99:11
**yesterday** [1] - 80:6
**youngest** [1] - 92:24
**yourself** [4] - 18:11, 63:24, 83:6, 85:16
**yourselves** [1] - 34:25

# Z

**Zcash** [9] - 19:2, 19:4, 19:10, 19:11, 19:12, 19:13, 19:14, 19:18, 19:20
**zoom** [1] - 55:12