1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,      ) Criminal Action
                                    ) No. 21-cr-399
4                    Plaintiff,     )
                                    ) JURY TRIAL
5    vs.                            )
                                    ) Washington, DC
6    Roman Sterlingov,             ) March 7, 2024
                                    ) Time:  1:30 p.m.
7                    Defendant.     )
     _____
8
                   TRANSCRIPT OF JURY TRIAL
9                      HELD BEFORE
          THE HONORABLE JUDGE RANDOLPH D. MOSS
10              UNITED STATES DISTRICT JUDGE
     _____
11
                  A P P E A R A N C E S
12

13   For Plaintiff:     **Christopher Brown**
                         DOJ-USAO
14                       601 D Street, NW, Suite 5.1527
                         Washington, DC  20530
15                       Email:  Christopher.brown6@usdoj.gov
                         **Catherine Pelker**
16                       US DOJ
                         950 Pennsylvania Avenue NW
17                       Washington, DC  20530
                         Email:  Catherine.pelker@usdoj.gov
18                       **Jeffrey Pearlman**
                         DOJ-CRM
19                       1301 New York Avenue NW
                         Washington, DC  20005
20                       Email:  Jeffrey.pearlman@usdoj.gov

21   For Defendant:     **Tor Ekeland**
                         **Michael Hassard**
22                       Tor Ekeland Law PLLC
                         30 Wall Street, 8th Floor
23                       Brooklyn, NY  10005
                         Email:  Tor@torekeland.com
24                       Email:  Michael@torekeland.com

25   Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                         Email:  Janice_e_dickman@dcd.uscourts.gov

```
 1        *   *   *   *   *   *   *P R O C E E D I N G S*   *   *   *   *   *   *

 2              THE COURT:  Ready to get the jury?

 3              MS. PELKER:  Yes, Your Honor.

 4              (Whereupon the jurors enter the courtroom.)

 5              THE COURTROOM DEPUTY:  Jury is present.

 6              You may be seated and come to order.

 7              THE COURT:  All right.  Welcome -- welcome back,

 8        everybody.  I can see some of you.

 9              Ms. Pelker, you may continue when you're ready.

10              MS. PELKER:  Thank you.

11              And if -- with Ms. Walker's assistance, if we could

12        get the PowerPoint put back up.

13              Thank you, Ms. Walker.

14              Members of the jury, you heard the evidence, that it

15        was the defendant who has behind Bitcoin Fog.  Because he set

16        up, ran, and took profits from Bitcoin Fog as a money

17        laundering conspiracy, the defendant is charged with four

18        counts:  Money laundering conspiracy, sting money laundering,

19        operating an unlicensed money transmission business, and D.C.

20        illegal money transmitting.

21              Judge Moss will instruct you on the law later this

22        afternoon, but I'm going to walk you through the elements of

23        each and briefly explain how you already know that the

24        defendant's actions meet each of the elements.

25              Count 1 is a conspiracy to commit money laundering.
```

1    So, first, what is money laundering?  Well, it's exactly what

2    it sounds like.

3         First, doing a financial transaction.  And here, you

4    have thousands and thousands of Bitcoin transactions that the

5    defendant conducted through Bitcoin Fog.

6         Second, the defendant knew the money was proceeds of

7    some kind of unlawful activity.  And the defendant absolutely

8    did know that.  He had set up Bitcoin Fog for people with real

9    problems with the law, who would go to jail if their

10   transaction information were revealed.  And he talks repeatedly

11   about all the things he's doing to hide from the authorities.

12   The defendant knew there was dirty money going through Bitcoin

13   Fog.

14        Third, the money did come from an unlawful activity.

15   Here, narcotics trafficking.  And you saw voluminous evidence

16   of the tens of millions of dollars of darknet drug proceeds

17   going through Bitcoin Fog and coming out untraceable.

18        Mr. Scholl and Special Agent Santell walked you

19   through examples of over a dozen specific vendors who used

20   Bitcoin Fog to launder their drug proceeds.  And there were

21   hundreds more.

22        And, fourth, that the defendant intended to promote

23   or conceal the unlawful activity.

24        Judge Moss will explain that this conspiracy has two

25   different potential objects:  Promotional money laundering and

1    concealment money laundering.  And you can find that the

2    defendant committed either or both.

3           Judge Moss will instruct you that to promote the

4    carrying on of an activity means to contribute to the

5    prosperity of something, or to further it.  And conceal just

6    means what it sounds like, to hide or to disguise.

7           And, again, how do you know the defendant did this?

8    Because that's what Bitcoin Fog was intended to do.  The

9    defendant says so.  He is going to extreme lengths to help his

10   customers hide from the authorities, to conceal their

11   transactions, and to promote their activity.  To contribute to

12   their prosperity and his own prosperity in the process.

13          Bitcoin Fog was a money laundering site, plain and

14   simple.  Its stated and entire purpose for existing was to

15   launder money.  So that's money laundering.

16          And here the defendant is charged with money

17   laundering conspiracy.  That means the defendant doesn't need

18   to have been the one conducting each of these individual

19   transactions.  He is charged with the conspiracy, the agreement

20   to do these transactions.

21          A conspiracy is just an agreement and it doesn't have

22   to be a formal, written agreement.  Sometimes conspiracies

23   exist where different parties depend on one another for the

24   success of a common enterprise.  They may not all know each

25   other, but each one is like a link in a chain and the

1    conspiracy rises or falls based on each party playing their

2    part.

3              Here, you have several different players involved for

4    peddling drugs for Bitcoin online.  We have the darknet market

5    administrators and vendors who are selling the drugs and we

6    have the buyers who are purchasing drugs online.  But in order

7    for that drug trafficking to evade detection, they need to use

8    Bitcoin and they need a way to move Bitcoin that is not

9    traceable by the authorities.  That's where Bitcoin Fog came

10   in.

11             Bitcoin Fog supplied the missing link for those

12   online drug deals.  It provided a way for buyers to pay in

13   Bitcoin without having it trace back to them and it let the

14   vendors cash out their Bitcoin without having it tied to their

15   known darknet market activity.

16             Without Bitcoin Fog, these drug deals would have been

17   traceable by the authorities.  With Bitcoin Fog, everything is

18   hidden in the fog.  Everyone in this illicit arrangement

19   benefits; the drug market, dealers and sellers who can carry on

20   their drug trafficking without fear of detection, and Bitcoin

21   Fog, the defendant, who gets a cut of every transaction.  That

22   is a conspiracy.

23             Judge Moss will instruct you that in a conspiracy the

24   defendant doesn't need to personally know all of the other

25   conspirators.  He doesn't have to be involved in each aspect of

1    the scheme, he just has to have a general understanding of the

2    scope of the conspiracy.

3          Criminal conspiracies often have people entering at

4    different points.  The defendant is active in this conspiracy

5    from the very beginning.  As time went on, additional drug

6    markets emerged and more drug dealers and criminals joined the

7    conspiracy.

8          As I expect Judge Moss will likely instruct you, it

9    doesn't matter when a person becomes part of a criminal

10   conspiracy, even if it's just at the beginning or just at the

11   end.  The conspirators are criminally liable for everything

12   that happens as part of the conspiracy, as long as it's

13   foreseeable to them before or after they join.

14         Count 2 is the sting money laundering count.  This

15   charge relates to the undercover transaction that

16   Special Agent Price conducted here in D.C. where he told

17   Bitcoin Fog the funds were the proceeds of illegal activity.

18         Sting money laundering has three elements:  First,

19   that the defendant conducted or tried to conduct a transaction.

20   Second, the transaction involved property that law enforcement

21   represented were illicit proceeds.  And, third, the defendant

22   had the intent to promote specified unlawful activity or to

23   conceal or disguise certain things about the property.  Similar

24   to the money laundering conspiracy count that we just

25   discussed.

1         Here, you know there was a transaction, and

2    Special Agent Price represented that it was illicit proceeds.

3    He said he wanted Bitcoin Fog's help in cleaning his Bitcoin;

4    that's concealment.  And he asked for help with future drug

5    money laundering; that is promoting a future offense.  And the

6    defendant sent the Bitcoin on anyway; that is sting money

7    laundering.

8         The message system that Special Agent Price used to

9    contact the defendant, that's the messaging system built into

10   the Bitcoin Fog site.  The message system that the defendant,

11   posting as Akemashite Omedetou, told everyone to use.

12        On BitcoinTalk, he repeatedly referenced reading the

13   messages.  And, of course, you would if you were running a

14   money laundering site that depended on customers entrusting you

15   with their money.  That's just good customer service.

16        Bitcoin Fog never replied to Special Agent Price.

17   But what happened?  The funds moved.  They went into the fog.

18   Mr. Scholl testified to how he tracked the IRS and FBI

19   undercover transactions and that if he hadn't had the records,

20   he would not have been able to trace them through the fog.  The

21   service worked as it was intended, as the defendant designed.

22        Count 3 is the federal charge of operating an

23   unlicensed money transmitting business.  As you've heard, in

24   the United States there are regulations and requirements for

25   financial institutions.  They're in place to protect the U.S.

1    financial system and all American citizens from money

2    laundering.  And one of those requirements is that any entity

3    in the business of transmitting funds must register with the

4    U.S. Department of Treasury.  That requirement comes along with

5    some other obligations, like collecting identifying information

6    about your customers, filing reports, or SARs, that would

7    notify law enforcement of suspected money laundering.  Those

8    requirements applied to businesses that transmitted funds,

9    including Bitcoin, from one person or location to another.

10          Now, Bitcoin Fog was not designed to comply with

11    financial regulations, but that doesn't make the law any less

12    applicable.  You could argue Bitcoin Fog and money laundering

13    services like it are the reason these regulations are in

14    effect.

15          So was Bitcoin Fog in the business of transmitting

16    funds?  Absolutely.  That was its entire purpose.  Bitcoin

17    Fog's core business was money transmitting, taking funds from

18    one address and remitting them to another.

19          And that means it was required to register with the

20    financial crimes enforcement network, or FinCEN, the Treasury

21    agency tasked with overseeing some of these laws.  And it was

22    required to register with state authorities and state

23    regulators, including the District of Columbia's Department of

24    Insurance, Securities, and Banking, or DISB.  But Bitcoin Fog

25    didn't register.  Of course it didn't.

1          Under the law there are three different ways you can

2     be unlicensed, and the defendant did all three:  First, he

3     didn't register Bitcoin Fog as a money transmitter with D.C. or

4     any other state.  Second, he didn't register Bitcoin Fog with

5     FinCEN.  You heard Mr. Vlahakis from FinCEN tell you that all

6     money transmitters must register and must follow the Bank

7     Secrecy Act.  Bitcoin Fog, the defendant, never did that.

8          And there's a third way that the law considers

9     Bitcoin Fog unlicensed.  Even if the defendant had

10    registered -- which he didn't -- he would still be guilty if

11    the funds in the business were derived from criminal activity.

12    And here, you know they were.  The defendant set up the whole

13    operation to help criminals hide their assets.

14         To prove Count 3 the government must also show that

15    the defendant controlled or managed Bitcoin Fog in some way.

16    And that's what all of the evidence before you has shown.

17         And finally, the government must show that Bitcoin

18    Fog affected interstate commerce.  Again, here, that is

19    abundantly clear.  Bitcoin Fog moved payments across the globe;

20    that is affecting interstate commerce.

21         The last charge is a D.C. code offense.  The District

22    of Columbia is a special place to be a juror because usually

23    federal charges are brought in federal court and state charges

24    are brought in a separate court.  But here, in D.C., as a

25    juror, you are responsible for both.  All in one case.

1          So, Count 4 is the local D.C. corollary to Count 3,

2     the federal money transmitting business violation.

3          Count 4 charges the defendant with operating his

4     business without registering in D.C.  This has just two

5     elements:  First, that the defendant was engaged in the

6     business of money transmission.  And, second, that the

7     defendant did not have a license to engage in the business of

8     money transmission in the District of Columbia.

9          And you saw that D.C.'s DISB queried its records and

10    Bitcoin Fog never registered, despite processing payments to

11    and from people located in the District of Columbia, like IRS

12    Undercover Matthew Price and FBI Undercover Alexandra Comolli.

13         Judge Moss will give you instructions on a number of

14    different legal concepts.  You should pay close attention to

15    all of them, but there are several in particular I want to

16    highlight for you here.

17         Judge Moss will give you an instruction on what's

18    called aiding and abetting.  Aiding and abetting means that if

19    the defendant intentionally helped someone commit these crimes,

20    under the law he is guilty of the crime itself.

21         Now, it's clear from the evidence before you that

22    Roman Sterlingov was instrumental in setting up and running

23    Bitcoin Fog.  Other people may have helped him along the way.

24         In posting as Akemashite Omedetou, the defendant

25    refers repeatedly to the "Fog team," but legally that doesn't

1    matter.  Even if the only thing Roman Sterlingov had done was

2    register the Bitcoin Fog domain, if he did that to help the

3    conspiracy, knowing what Bitcoin Fog was, he is guilty of

4    conspiring to commit money laundering and he is guilty of

5    aiding and abetting.  But we know that Roman Sterlingov did

6    much more than that because he continued to operate and profit

7    from Bitcoin Fog right up until he was arrested.

8            A statute of limitations is when the clock starts

9    running to charge an offense.  Count 2 occurred on a specific

10   date within the statute of limitations.  Judge Moss will

11   instruct you that on -- Counts 1, 3, and 4 are continuing

12   offenses.  A continuing offense is a continuous course of

13   unlawful conduct.  The statute of limitations for a continuing

14   offense only begins to run after the last day of that

15   continuing offense.

16           For Bitcoin Fog we've argued, and the evidence shows,

17   that unlawful conduct continued all the way up to April 2021.

18           Judge Moss will instruct you on venue.  Bitcoin Fog

19   was accessed from computers right here in the District of

20   Columbia.  You heard from Special Agent Matt Price and

21   Alexandra Comolli how they did transactions on the site while

22   sitting right here in D.C.  Money was moving back and forth

23   between Bitcoin Fog and Washington, D.C.

24           As I mentioned before, D.C. is a special place to be

25   a juror.  And that's for more reasons than one.  The District

1    of Colombia is the seat of the federal government and home of

2    the Department of Treasury, including the Financial Crimes

3    Enforcement Network.  That means that failing to register with

4    FinCEN, that omission is a crime occurring in D.C.

5              The same holds true for the defendant failing to

6    obtain a money transmitter license from DISB.  That's an

7    omission that occurs in the District of Columbia.  And that

8    failure to register or obtain a license was more than just not

9    filling out paperwork.  Evading FinCEN, regulators, and the

10   authorities was central to the defendant's money laundering

11   scheme, and that crime occurred here in Washington, D.C.

12             The Court will also instruct you on the concept of

13   knowledge.  And in the law, knowledge and intent matter.  What

14   did the defendant know about the nature of the funds going

15   through Bitcoin Fog?  And what did he intend for Bitcoin Fog to

16   do?

17             Now, there is very rarely direct evidence of intent

18   or knowledge in a case.  No one can see inside a defendant's

19   mind.  But you can infer knowledge and intent based on all the

20   evidence that you've seen and by applying your own common

21   sense.

22             Judge Moss will instruct you that it's not a defense

23   to deliberately cover your eyes and ears to avoid learning the

24   truth.  Think of an ostrich sticking its head in the sand.

25   Under the law, if the defendant knew there was a high

1    probability of Bitcoin Fog being used to move drug proceeds and

2    he deliberately blinded himself to avoid learning the details

3    of those drug deals, that can be considered evidence of

4    knowledge.  He can't just stick his head in the sand.

5         Like any good money launderer, the defendant designed

6    Bitcoin Fog to avoid learning unnecessary details of his

7    customers' crimes.  He set up his service to automatically

8    delete logs.  He added features to allow people to delete their

9    messages and transaction history.  He even deliberately

10   designed his site to avoid collecting even basic records of its

11   users.  Even if they wanted to, users couldn't even add an

12   email address to allow for password resets.  That was all done

13   intentionally by the defendant.

14        And here, the defendant absolutely knew that huge

15   amounts of illicit proceeds were moving through his site.

16   That's what he built it for.  It is exactly what he intended.

17   He specifically designed Bitcoin Fog to move money for serious

18   criminals.

19        When Mr. Brown spoke to you nearly a month ago, he

20   asked you to listen carefully to the witnesses and pay close

21   attention to the evidence.  We appreciate your focus these past

22   several weeks as the evidence was introduced.

23        Second, Mr. Brown asked you to follow Judge Moss's

24   instructions on the law, and you'll be receiving more of those

25   instructions later today, which will walk you through what the

```
 1   government must prove.

 2              And, third, Mr. Brown asked you to use your common

 3   sense, to apply the common sense that you use every day outside

 4   this courtroom, to deliberate and be the judges of the facts in

 5   this case.

 6              Now that you have seen and heard all the evidence,

 7   you can see clearly through the fog.  All the evidence in this

 8   case leads to a single inescapable conclusion, that the

 9   defendant, Roman Sterlingov, is guilty beyond a reasonable

10   doubt of all charges.

11              THE COURT:  All right.  Thank you.  And the jurors

12   can stand and stretch for a minute while Mr. Ekeland gets set

13   up.

14              MR. EKELAND:  Can we just take a short break while we

15   set up?

16              THE COURT:  We'll just -- I think we can just --

17   folks can just stretch in here while you get set up.

18              (Off-the-record discussion.)

19              THE COURT:  So, I guess we're going to go ahead and

20   take a break.  But even though now you've heard the

21   government's closing, please don't discuss the case among

22   yourselves.  We're just taking a restroom break, and we'll be

23   back in ten minutes.

24              (Whereupon the jurors leave the courtroom.)

25              (Recess from 2:00 p.m. to 2:06 p.m.)
```

```
1              THE COURT:  All right.  Ready to get the jury?

2              MR. EKELAND:  Yes, Your Honor.

3              THE COURT:  Okay.

4              (Whereupon the jurors enter the courtroom.)

5              THE COURT:  Mr. Ekeland, you can proceed whenever you

6      are ready.

7              MR. EKELAND:  Thank you, Your Honor.

8              Good afternoon.  I think no single piece of evidence

9      in this case typifies the government's case than this piece of

10     evidence right here.  What you were told about this piece of

11     evidence from the government was that it was a chat by

12     Mr. Sterlingov --

13             THE JURORS:  (Raise hands.)

14             MR. EKELAND:  I'm sorry, is it not published to the

15     jury?

16             THE COURTROOM DEPUTY:  I am so sorry.  I am so sorry.

17             MR. EKELAND:  How about now?  Can you see it now?

18             THE JURORS:  Yes.

19             MR. EKELAND:  Okay.  Great.  Sorry about that.

20             So what you were told by the government about this

21     piece of evidence is that this was a chat, a screen capture of

22     a chat of Mr. Sterlingov, and in it you can see that he's

23     supposedly saying -- referencing money laundering.  But what

24     did we discover?

25             What we discovered was that this actually wasn't a
```

1    chat by Mr. Sterlingov, but it came from a kind of an e-Book

2    that was on his NOOK reader.  Yet Ms. Mazars de Mazarin, the

3    government's alleged expert, who is the same forensic expert

4    that wants you to believe the IP overlap address analysis that

5    she did, she's the one who told you that this was

6    Mr. Sterlingov's chat, essentially.  But it wasn't.  And you

7    saw the government just now trying to withdraw it.

8            You can see here the page in the book, on the bottom

9    left, where that chat actually came from.  And you just heard

10   her today say, "Well, this was, you know, pulled out by this

11   AXIOM software that the IRS gave me."  She said -- and she said

12   she didn't check it.

13           Okay, well, you've seen a lot of software in this

14   case.  You've seen a lot of stuff coming from the IRS.  As a

15   matter of fact, one of the things that Ms. Mazars de Mazarin

16   testified to was that those IP addresses that she based her

17   analysis on, that she got those from the IRS, too, and that she

18   actually never examined the native server logs to those servers

19   because the government doesn't have them, just like the

20   government doesn't have Mr. Sterlingov's Bunker Number 10

21   computer, the one that Mr. Sterlingov testified to that he

22   logged into, that was his home computer.

23           For some reason the government never got it, even

24   though the government was in contact with Swedish law

25   enforcement.  And if the government had gotten that computer,

1    Mr. Sterlingov's computer, they could have checked their work.

2    But you see that time and time again in this case.  You don't

3    have any corroborating evidence.

4         There's a blowup of that chat.  You don't have any

5    servers.  You don't have the Bitcoin Fog servers.  You don't

6    have Bitcoin Fog server logs.  You don't have Bitcoin Fog

7    ledgers.  You have no communications that you can point to

8    between Mr. Sterlingov and anybody, anybody operating Bitcoin

9    Fog.  You know, you've got the government sort of pointing all

10   over the place to things.  They say, you know, the shormint

11   email kind of shows he's Akemashite Omedetou.  But you did not

12   hear Ms. Mazars de Mazarin say, "Oh, Mr. Sterlingov is

13   definitely shormint."

14        You're getting a bunch of stuff about an IP address

15   overlap on VPNs, which thousands of people can be using, that

16   they told you that they didn't have the traffic logs to, that

17   they don't have the native server logs to, then they use words

18   like "likely," "probably," "maybe," right?  But have you seen

19   any corroborating evidence at all that definitively shows

20   Mr. Sterlingov is shormint@hotmail.com, is Akemashite Omedetou?

21   Because I have not this entire trial, and I can't think of it.

22        You may remember when I was crossing Mr. Scholl and I

23   asked him sort of the same question, and he said, "It's the

24   totality of the government's case."  But no one can ever point

25   to any specific thing showing it's Mr. Sterlingov.

18

1          Same thing with the traces.  You don't see anything

2     in his notes.  They caught him with years and years and years

3     of his notes, details about all sorts of stuff and they pored

4     through it.  You saw all these little extracts that they took

5     out, trying to make him look bad.  Imagine if you had ten

6     years, or however long it was, of notes and the government's

7     going through it after they've arrested you at the airport;

8     your diaries, everything.  Yet not a single thing, not one

9     thing referencing Bitcoin Fog.

10          There's no evidence anywhere that Mr. Sterlingov ever

11    operated Bitcoin Fog.  Think about it.  Look back on this

12    entire trial.  Point to something that's not innuendo.  Or,

13    like what I told you in the beginning, in my opening, point to

14    me some piece of evidence that doesn't involve you having to

15    guess, to speculate, to take some leap of faith.

16          You hear over and over again in this case people

17    telling you, well, yeah, that trace is consistent with

18    Mr. Sterlingov just selling Bitcoin, but it could be consistent

19    with him doing something nefarious.  Well, he could be logging

20    into his home computer, or he could be running Bitcoin Fog.

21    Right?

22          This case a great example of what the government's

23    burden of proof is and why we have it.  The government, not the

24    defendant, the government has to prove every element of its

25    case beyond a reasonable doubt.  That means the government has

1    to prove that Mr. Sterlingov was operating Bitcoin Fog, not

2    that Mr. Sterlingov has to prove that he wasn't.

3            You're the jury, you decide the facts.

4            And the prosecution needs to prove each and every

5    element of its case, every element beyond a reasonable doubt.

6    And we start with the presumption of innocence in America, not

7    the presumption of guilt.  The presumption of innocence.  That

8    means you're looking at Mr. Sterlingov as if he's innocent and

9    you're asking the question:  Has the government met its burden?

10   Not the other way around.

11           So if you have a situation where, well, this is

12   entirely consistent with Mr. Sterlingov logging into his home

13   computer, or I could speculate and say he's logging into some

14   darknet server, you've got to go with his innocence, right?  He

15   doesn't have to prove he's innocent.  He's already presumed

16   innocent.  That's a crucial, crucial, crucial feature of our

17   system that sets us apart from a lot of countries in this

18   world.

19           So you just heard from the government outlining the

20   counts.  And, of course, Judge Moss is the ultimate arbiter of

21   the law, but I do think it's helpful and I agree with the

22   government here that it's helpful to go through these counts

23   and just sort of have a framework as you're going through

24   everything.

25           And you're going to get a whole log, packet, listing

 1    the nuance to this, right?  But essentially, Count 1, it's a

 2    conspiracy count, and that essentially -- what you need -- the

 3    essence of it is that you need to find that Mr. Sterlingov

 4    entered into an agreement to commit money laundering.  And when

 5    you get the packet, you'll see that there's a couple, two types

 6    of money laundering listed -- and there's more detail to

 7    this -- and that he intentionally -- intentionally -- joined

 8    this conspiracy.  And that's where I think there's a huge

 9    problem here, because what evidence is there of him

10    intentionally joining any conspiracy?

11          They're showing you a bunch of traces from 2011,

12    which you've heard from the government's own witnesses saying

13    those are consistent with maybe him just selling Bitcoin.  If

14    you look at that one -- I think it's -- what is it?  313?  It's

15    the one where they're saying he's paying for the BitcoinFog.com

16    Clearnet registration.  Right in that first hop where you're

17    going into that Bitcoin address, you heard Mr. Scholl say we

18    don't have the private key for that.  So we don't have any

19    definitive evidence of who actually controls that address.

20    Right there it breaks down.  Right?

21          And even though -- consider -- just think, if it even

22    is Mr. Sterlingov going all the way through and registering a

23    DNS for a Clearnet domain site in 2011, that's not criminal.

24    Registering a website DNS is not criminal, right?  And you

25    still have to make the leap that somehow he's intentionally

1      joining a conspiracy doing that.  But you don't even have him

2      doing that.  I look at these traces in this case, and what I

3      think a lot is the only reason that they're naming

4      Mr. Sterlingov is because those are the only KYC accounts that

5      they can trace back to.  You heard Mr. Scholl say it would have

6      been really easy for somebody just to start this panic using a

7      wallet that isn't KYC.  Right?  Like, it doesn't make sense.

8      When you start to look at these transactions and these traces,

9      it doesn't make sense that somebody like Akemashite Omedetou,

10     who is so sophisticated and talking about, you know, timing of

11     transactions and tracing and all this stuff, is going -- he or

12     she, it -- he, she, it, I don't know.  They set up the DNS

13     registration for Bitcoin Fog starting with the KYC account, a

14     Mt. Gox KYC account in 2011, when you weren't even required to

15     KYC your account?  That's what the government wants you to

16     believe, right?

17             So, two opposites of the conspiracy.  The first --

18     either one, if you find beyond a reasonable doubt that

19     that's -- you know, you don't have to find both the objects,

20     you can find just one of the objects -- that's money

21     laundering, in violation of 18 U.S.C. 1956(a)(1)(A)(i).  You

22     will get the paperwork on that.  And then there's another

23     second object you can find.

24             Count 2 is what they call a substantive charge.  So

25     conspiracy, this is incohat because it's just an agreement.

1    You don't actually to have done it, you just have to agree to

2    do it.  Right?

3              The substantive charge, Count 2, money laundering.

4    The defendant conducted or attempted to conduct a financial

5    transaction.  The transaction involved property represented by

6    law enforcement to be the proceeds of unlawful activity.

7              Now, here you heard Ms. Pelker talking about the --

8    the undercover transaction in D.C., and I think you just saw --

9    and it's in evidence, the message sort of sent to Bitcoin Fog

10   customer support or help desk, or whatever it was, right?

11   saying:  Hi, I just sold some drugs.  I just sold Mollies.

12   It's a really safe place to, you know, launder my money.

13             Something to think about here.  No response.  Zero

14   response.  And have you seen any evidence that Mr. Sterlingov

15   ever saw that message?  Have you seen any evidence that

16   Mr. Sterlingov was operating Bitcoin Fog at the time that that

17   message was sent, which was in 2019?

18             Think about how much evidence in this case you're

19   seeing from 2011; 14 years ago.  And, yeah, Mr. Sterlingov said

20   a lot on the stand:  I can't remember.  Yeah, I can't remember

21   what I did 13 years ago.  I have, like, you know, big-picture

22   stuff.  But if you asked me:  How much money did you withdraw

23   from the ATM on October 27th, 2011, you know, I'd draw a blank.

24             So, Number 3, the defendant acted with intent.

25   Intent.  And that's important.  He intentionally did what he's

1    being accused of to promote the carrying on of the unspecified,

2    unlawful activity.  Again, you decide.  That's your role as the

3    jury, right? whether or not there's evidence to support the

4    fact that he intentionally did it.

5            Four, that the defendant acted with the intent to

6    conceal or disguise the nature, location, source, ownership, or

7    control of the property he believed -- again, you decide

8    whether or not he had the intent -- that he believed to be the

9    proceeds of the specified unlawful activity.

10           Count 3 is operating an unlicensed money transmission

11   business.  You have to find that Bitcoin Fog was an unlicensed

12   money transmission business.  The defendant knowingly -- and

13   here's the key thing -- knowingly controlled, conducted,

14   managed, supervised, directed, or owned that business.

15           Where is that in the evidence?  Again, you're being

16   asked to believe that certain traces in 2011, that are entirely

17   consistent with Mr. Sterlingov selling Bitcoin peer to peer, a

18   whole host of things, that's the government's primary evidence

19   that Mr. Sterlingov is running Bitcoin Fog.

20           Think about it.  What have you seen from 2012, 2013,

21   2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021?  Right?  What

22   have you seen?  No eyewitnesses.  No eyewitnesses.  And you may

23   remember that they -- they mentioned, I think, Ms. Mazars'

24   example of the white Nissan at the bank, right? where you see

25   the person.  Well, that example involves an eyewitness.

1        You haven't heard from a single eyewitness in this

2    case.  What you're hearing from in this case is people who are

3    sitting at their desks, thousands of miles away, running

4    software like the AXIOM software that, you know, sort of pulled

5    that e-Book chat off and that they tried to pass off on you as

6    Mr. Sterlingov's own chat, right?  That's what you're seeing.

7        You're not seeing anybody in Sweden, like on the

8    ground.  You're not even getting his home computer because for

9    some -- whatever reason, you heard Ms. Mazars de Mazarin say, I

10   don't know, they didn't get the computer.  Maybe it was

11   paperwork, or whatever.

12       Well, if this case was so important, why didn't they

13   get his BunkerX computer?  Is it because maybe if they got it

14   they could actually check their work and find out that

15   everything that they did in their investigation was wrong?

16   Were they just trying to avoid actually checking their work,

17   just like they avoided checking their work on that e-Book

18   extraction?  That's up for you to decide.

19       Then the third thing is that the money transmission

20   business affected interstate or foreign commerce.

21       Now, before, money transmission without a license in

22   D.C., that the defendant, again, knowingly engaged in the

23   business of money transmission in the District of Columbia.

24   Ask yourself what evidence there is of Mr. Sterlingov knowingly

25   conducting a business in D.C., when he's in Sweden this entire

```
 1    time, right?

 2            And that the defendant did not have a license to

 3    engage in the business of money transmission in the District of

 4    Columbia.  We'll admit that.  We've seen that, right?

 5    Mr. Sterlingov didn't get a license in D.C.  Probably because

 6    he wasn't running Bitcoin Fog.

 7            Venue.  Venue, you have to decide on -- this is a

 8    little different.  This is the one part -- and, again,

 9    Judge Moss tells you the law.  That is not -- the standard is

10    not beyond a reasonable doubt.  It's by the preponderance of

11    the evidence, which is a civil standard, which is generally

12    described as more likely than not.  And there's nuances to it.

13    Just look carefully at it and ask yourself, well, is there

14    venue in D.C., when Mr. Sterlingov spent the majority of his

15    time in Sweden?

16            As a matter of fact, the only time that

17    Mr. Sterlingov seems to have ever been in D.C. is after he was

18    arrested and hauled into this court to be charged with

19    operating Bitcoin Fog.

20            The statute of limitations, you do have to find

21    beyond each -- that each crime occurred within the relevant

22    statute of limitations beyond a reasonable doubt.  Again, this

23    is nuanced.  Read what Judge Moss is going to show you on that,

24    listen to what he says.

25            But for Count 1, the relevant statute of limitations
```

 1    is July 18th, 2017 and forward.  Now, if something had occurred

 2    before July 17th and then continues, like Ms. Pelker was saying

 3    a continuing offense, then it comes within the statute of

 4    limitations.  But these are the cutoffs I'm giving you.

 5             Count 2, June 14, 2016.  Count 3, it's June 4th,

 6    (sic) 2016.  Count 4, June 14th, 2015.

 7             Please, I ask, on Mr. Sterlingov's behalf, that you

 8    just pay attention to those dates when you're looking at the

 9    evidence because a lot of this evidence that you're seeing is

10    outside those dates.  Well outside those dates, right?  And you

11    have to decide whether or not, you know, the crime that was

12    maybe -- even if it was committed back in 2011, it was

13    continuing to go within the statute of limitations.

14             So you heard from Mr. Sterlingov, and I -- I think

15    you are well qualified to judge what he said.  Remember what he

16    said?  Judge his credibility.  That's the traditional role of

17    juries for centuries, right?

18             He got into Bitcoin early, in 2010.  In 2010, you

19    could get one Bitcoin for roughly 30 cents.  Right?  And I

20    don't know if you saw the papers the other day, but Bitcoin hit

21    an all-time high of $69,000.  All right.

22             You heard him say, when he was talking about his

23    Mycelium wallet, like it was like a magic wallet, and that he

24    would be spending his Bitcoin because he didn't have a job,

25    right?  But he would spend the Bitcoin and he would still end

1    up with more money afterwards because Bitcoin was going up so

2    much.

3         You learned his first purchases were offline in

4    peer-to-peer transactions, you know, in person.  He's going on

5    LocalBitcoins, he's meeting -- going to Meetups, right?  He

6    could have interacted with somebody who actually started

7    Bitcoin Fog.  Maybe he was at one of these meetings.  We don't

8    know, right?  And the government has the burden of proof there,

9    again, to prove beyond a reasonable doubt.  Mr. Sterlingov

10   doesn't have to prove his innocence.

11        He worked in tech, he had side jobs freelancing.  But

12   you also heard that in 2013 he stopped freelancing because he

13   was a little bit worried about the gray areas.  Right?  And one

14   of the gray areas was math.  Right?  That mathexploit.io

15   where -- it was a hacking site, right, and he -- it's not --

16   that account was shared.  None of those posts the government

17   have shown you mentioned Bitcoin Fog at all.  Right?  They're

18   trying to make you think, okay, he's some kind of scary hacker

19   who has all these skills.  But have you seen any evidence of

20   him hacking anywhere?

21        You see him like, you know, trash talking.  What is

22   he?  He's like 21, 22 at the time.  Right?  But have you seen

23   any evidence of him actually running around and hacking things?

24   No.  Nothing has come in, right?

25        So you've got his To the Moon VPN server, sort of his

1   failed business that really never makes any money.  They're

2   trying to make it sound sinister, right?  They were like, Oh,

3   there's a -- was it Bitcoin Core on -- software on one of

4   the -- you know, one of the hard drives.  Well, yeah, that's

5   how, like, the business was meant to -- for you to be able to

6   go get VPN, by paying Bitcoin.  So that's what you need to take

7   payments in Bitcoin.  Right?

8            But you heard the government's witnesses and you

9   heard Mr. Fischbach testify, look, the remaining -- government

10  was basically surveilling the signal traffic on the To the Moon

11  server.  And there's nothing related to Bitcoin Fog from it.

12  Nothing.  Right?

13           And you've heard repeatedly from government witnesses

14  that they never got the Bitcoin Fog servers.  So I just don't

15  think any kind of theory that the To the Moon server,

16  singular -- Ms. Pelker said on her closing "servers," plural;

17  well, it's just one server -- was the Bitcoin Fog server.

18           And here's something else.  They keep saying that

19  the -- where the hard drives on that server were wiped.  But

20  you heard Mr. Fischbach say, oh, that's entirely consistent,

21  that it's just a new hard drive or unformatted hard drive.

22           If you're the operator of Bitcoin Fog and you've got

23  millions of dollars worth of Bitcoin on your hard drive, are

24  you going to wipe it or are you just going to encrypt it, if

25  something happens?  It doesn't make sense that you would wipe

1    the hard drive -- that may have millions of dollars on it --

2    with some kind of kill switch, which you haven't seen -- heard

3    any evidence of being on that server.

4        You heard, I think, Ms. Pelker start talking about

5    the kill switch on Mr. Sterlingov's phone, which is a feature

6    built into Android related to VPNs.  Not about, you know,

7    triggering some server somewhere or turning off some server.

8        And in relation to that -- in relation to the

9    supposed last withdrawal of Bitcoin Fog happening two days

10   after Mr. Sterlingov's arrest, number one, how did he shut it

11   off if he was in jail?  And, number 2, you've heard that the

12   United States government issued a press release and the press

13   covered Mr. Sterlingov's arrest.

14       If I'm the real operator of Bitcoin Fog and I see

15   that somebody has been popped for Bitcoin Fog, that's a good

16   time for me to step out.  And that $70 million that they're

17   saying is in Bitcoin Fog, that's not the Bitcoin Fog

18   operator's, that's somebody -- or, people who are still sending

19   money through Bitcoin Fog.

20       I just don't think this theory that Mr. Sterlingov

21   somehow shut down Bitcoin Fog, that there was a kill switch --

22   which you haven't heard any evidence of anywhere -- is just at

23   all plausible.

24       So you heard that he sold Bitcoin at Meetups,

25   conferences, peer-to-peer, through chat forums.  You heard that

1    he shared account logins, like that math exploit account was

2    one.  You've seen his password list, right?  Look at how long

3    his password list is.  What have you seen on his password list

4    related to Bitcoin Fog?  Like, you don't have any administrator

5    login to Bitcoin, you don't have anything like that.

6         What kind -- look how detailed Mr. Sterlingov is with

7    his stuff, right?  Like he's got -- you've got a detailed list

8    of this guy's passwords that were encrypted.  They caught him

9    at the airport, right?  They arrest him at the airport with a

10   ton of stuff and nothing -- nothing on it shows him operating

11   Bitcoin Fog.

12        You're getting these sort of like, you know,

13   red-yarn-and-thumbtack theories about, well, you know, he

14   talked about Tor, Tor hidden services, or, you know, over here

15   this and that.  Right?  We've gone down the rabbit hole.  But

16   ask yourself, well, in all of that, where's the concrete

17   evidence?  Right?  Where is something that's not a guess, not

18   speculation?  That's for you to decide.

19        Here's the other thing, Mr. Sterlingov -- all these

20   accounts -- almost all of them that you're hearing about,

21   they're KYC accounts, Know Your Customer.  He's getting photo

22   IDs for stuff.  He's putting his passport up.

23        They want you to believe that Akemashite Omedetou was

24   taking the license fees from Bitcoin Fog and just depositing

25   them in his KYC accounts.  Think about -- go back and look at

```
1    Government Exhibit 1, which is Akemashite Omedetou's posts on
2    Bitcoin Fog, and just go read them and tell me if you think
3    they were -- come to your own conclusion if you think that that
4    person -- that that person would be putting all their
5    post-mixed funds KYC accounts, or that they'd even pay for the
6    DNS registration through some convoluted, you know, layering
7    thing.  Start in the KYC account.
8         Mr. Sterlingov was KYCing his Mt. Gox account when he
9    didn't have to.  Here you see -- here is a couple of exhibits
10   that show Mr. Sterlingov trading peer-to-peer through local
11   Bitcoins.
12        Now, you heard from Mr. Fischbach, our expert.  He's
13   the one who pointed out that Ms. Mazars wasn't correct when she
14   testified, essentially, that the government had found a chat
15   that they could attribute to Mr. Sterlingov.  I mean, I just
16   can't get over that in this case that's all about making an
17   attribution to Mr. Sterlingov.  The government just made this
18   huge misattribution and they -- they presented it to you like
19   it was the truth.
20        Now, you've also heard from Mr. Fischbach, that the
21   registered owner of Bitcoin Fog updated the DNS registration
22   after Mr. Sterlingov's arrest.  You can imagine the kind of
23   scrutiny he was under after his arrest.
24        You heard Mr. Fischbach talk about that, you know,
25   LiveLTE router, the government wants you to believe is some
```

1    sort of exotic -- I don't know what -- spyware that

2    Mr. Sterlingov is using to operate Bitcoin Fog on the road, but

3    think about -- who was it -- I think it was maybe Mr. Price,

4    Matt Price, or Rovensky talking about it in Miami when

5    Mr. Sterlingov was in Miami for three months in 2017 and he's

6    under investigation.  Have you heard a peep about the

7    government's surveillance of Mr. Sterlingov in Miami for months

8    during this case?  No.  They've kept quiet about that, and

9    that's something you should think about.  That's another place

10   where, like, why aren't they talking about that, if they found

11   something?

12           MR. PEARLMAN:  Objection.

13           THE COURT:  Pick up.

14           (Bench conference:)

15           MR. PEARLMAN:  There's nothing to find.  He's putting

16   something before the jury that is not in evidence.

17           MR. EKELAND:  I believe Mr. Price and Mr. Rovensky

18   testified as to the surveillance in Miami, and I am making an

19   argument about it.

20           MR. PEARLMAN:  Neither Price nor Rovensky were

21   present for any surveillance in Miami.

22           MR. EKELAND:  Did he read the case files?  I asked

23   him that and he said, I believe, something to the effect that I

24   did do something about that.  And I'm -- Your Honor, I think

25   that's totally justified.

```
 1                THE COURT:  Anything else?

 2                MR. PEARLMAN:  Nothing else, Your Honor.

 3                THE COURT:  I've told the jury about a thousand times

 4     they're not supposed to do any independent research.  You

 5     certainly went beyond the evidence.  Did you read the paper?

 6     Did you see what the price is today?  What I've been telling

 7     the jury not to do.  I may, when you're done -- they're

 8     supposed to make the decision based on the evidence and not

 9     anything they read outside of the courtroom.

10                MR. EKELAND:  That's fine, Your Honor.

11                (Open court:)

12                MR. EKELAND:  Mr. Fischbach told you about how the

13     Tor network is regularly used by computer professionals and the

14     legitimate uses for the Tor network.  I think he even

15     testified, or you heard testimony that the Tor network was

16     originally developed by the United States Navy and shared with

17     the public and that you can go to the Tor non-profit and

18     download it yourself and use it.

19                You also heard him testify that there was no kill

20     switches anywhere in his device review of Mr. Sterlingov's

21     devices and that there was no evidence of a remote kill switch

22     access by Mr. Sterlingov.

23                Now, after less than four months from that original

24     DNS registration that -- the government showing you all those

25     traces for, Akemashite Omedetou transfers the
```

1    www.BitcoinFog.com site away from highhosting.  Ask yourself

2    what you've seen in evidence of Mr. Sterlingov being involved

3    in that, because there's nothing.  Right?

4         On October 12th, 2015, the registered owner removed

5    the DNS registration from Bitcoin Fog through 2026.  Ask

6    yourself, again, what evidence there is in the record of

7    Mr. Sterlingov having anything to do with that?  And you know

8    the answer.  There's nothing.

9         And October 5th, 2022, the registered owner removed

10   the DNS registration from www.BitcoinFog.com.  And this is

11   after Mr. Sterlingov is arrested.  And ask yourself what

12   evidence you've seen that Mr. Sterlingov was involved in that?

13   And, of course, the answer is nothing.

14        And then on December 1st, 2023, the registered owner

15   updated the DNS registration for www.BitcoinFog.com.  Same

16   question.  What evidence have you seen that Mr. Sterlingov was

17   involved with that?  Absolutely nothing.

18        Then you've got the mystery of the missing Bitcoin

19   that Professor Verret talked to you about.  And I think

20   Ms. Pelker showed the chart that Mr. Scholl did where

21   Mr. Scholl just calculated how much Bitcoin the operator of

22   Bitcoin Fog should have based on a 1 to 3 percent randomized

23   fee.  But Mr. Scholl made the assumption that as soon as the

24   Bitcoin Fog operator got the Bitcoin, he, she, or it converted

25   it to U.S. dollars.  And that's a big assumption because we all

 1    know at this point, we've seen that Bitcoin is going up and

 2    down and it's appreciating greatly.  So even if you wait, you

 3    know, a month, a few months, year, whatever, that sum would be

 4    a lot, lot higher.

 5         And if Mr. Sterlingov actually was the operator of

 6    Bitcoin Fog when the government arrested him, he should have

 7    had a lot more money than what he was arrested with.  Yeah, he

 8    had a good chunk of money because he got into Bitcoin in 2010.

 9    Right?  Who doesn't wish they had gotten into Bitcoin in 2010.

10    Right?

11         But like on the high end, you heard from Mr. Verret

12    that this could be close to $1 billion, right?  Or maybe

13    hundreds of millions of dollars, or even 10 or $20 million,

14    which is much more than the roughly 1.8, a little bit less than

15    $2 million that the government has seized from Mr. Sterlingov.

16    The numbers, the math just doesn't add up.

17         You heard from Professor Verret about the massive

18    appreciation that Bitcoin had, and you also heard about how

19    roughly less than 10 percent of funds going into mixers were

20    illicit.

21         And here's a key point:  Using a mixer is legal,

22    right?  Like, assuming you license it with FinCEN and you're

23    not using it to launder money, right?  So Mr. Sterlingov

24    isn't -- you know, he's being charged with, you know,

25    conspiracy to money launder and running an unlicensed mixer,

1    but that's a core concept that mixing just per se isn't

2    illegal.

3            You heard from Luke Scholl.  That was one of the

4    government's early witnesses.  And he told you that he never

5    traced through Bitcoin Fog for any of Mr. Sterlingov's

6    transactions.  And this is a key point because they keep on

7    saying that the source of Mr. Sterlingov's funds was Bitcoin

8    Fog.  That's not true.

9            You heard from Mr. Sterlingov himself, he told you

10    what he did is he took his Bitcoin that he'd gotten 2010, 2011,

11    2012, '13 and he mixed it through Bitcoin Fog and then he put

12    it in his KYC account.  You know, his KYC account, his personal

13    one, his one for To the Moon.  Right?  Like, Mr. Scholl never

14    traced through.  They can't actually tell you the course of the

15    funds because Bitcoin Fog worked, right?  And they haven't

16    really shown you anything on the other side of Bitcoin Fog that

17    Mr. Sterlingov putting his funds through.  But when you hear

18    him saying, oh, it's the source of funds, that's not true,

19    right?  Mr. Sterlingov isn't receiving license fees from

20    Bitcoin Fog.  If he did, he would have a ton, ton more money.

21            You also heard that Mr. Sterlingov's -- all those

22    traces they're showing were consistent with him just selling

23    Bitcoin.  Right?  So, like, where is the evidence that they

24    actually were illegal?  Right?  Here you are, 13 years later,

25    looking at traces.  You know, it does, it looks like a

1    conspiracy theory chart with red pieces of yarn, right?

2            You've got to go down the rabbit hole.  Maybe if they

3    had corroborating evidence, right? when they arrested him.  And

4    I think this is really what happened here, that when they

5    arrested him, they were rolling the dice.  And what they were

6    saying is when we get him, we'll get the evidence.  Then

7    they're like, uh-oh, oh, there's nothing on there.  Let's go

8    through his notes.  Well, he talks about Tor.  Does he talk

9    about Bitcoin Fog?  Is his password on there?  No.  Right?  I

10   think you can figure that out.

11           And you also know -- have you heard anybody just come

12   out and say here's definitive evidence that Mr. Sterlingov is

13   behind the shormint@hotmail.com.  I asked -- you know, I asked

14   Mr. Scholl about that.  You heard him talking about the

15   totality of the circumstances and everyone is pointing over

16   here and I'm hearing about IP address overlaps when there's not

17   even an overlap because they're not occurring at the same time

18   and all this stuff.  Right?

19           But ask yourself:  Where's the definitive

20   attribution?  Even Ms. Mazars de Mazarin said I'm not making

21   a -- these aren't exactly her words, but she said:  I'm not

22   making a definitive attribution.  Where is it?  You're looking

23   at IP addresses from 13 years ago, you don't even have the

24   server logs to, that you're getting from the IRS, just like you

25   got that e-Book information or that -- you know, that chat

1    they're showing and we're supposed to take that as a definitive

2    attribution?

3        MR. PEARLMAN:  Objection.  Misstates evidence.

4        THE COURT:  Phone, please.

5        (Bench discussion:)

6        MR. PEARLMAN:  He stated that the evidence for all

7    the other evidence in the case came in the same way as the

8    tablet, and that's simply not accurate.  I certainly don't

9    object to him saying that.  That's kind of a shoddy approach,

10   and you could consider that, but he's making a direct statement

11   that that is the way that it was brought in.

12       THE COURT:  I'm looking at the actual language.  Give

13   me a second.

14       (Pause.)

15       THE COURT:  I think it certainly can be construed

16   that way.  Maybe there's some ambiguity in it, Mr. Ekeland?

17       MR. EKELAND:  I don't have the transcript in front of

18   me.  I'm not going to argue with the Court.  I'm just -- I can

19   move on.

20       THE COURT:  All right.  And, Mr. Pearlman, you can

21   just clean it up in your rebuttal.

22       MR. PEARLMAN:  Very well.

23       THE COURT:  Thank you.

24       (Open court:)

25       MR. EKELAND:  You also heard that the government

1    doesn't have the private keys to key points in those traces.

2    And I'm talking about the first hop in that trace -- I always

3    forget the number, I think it's Government Exhibit 313 --

4    leading to the DNS registration.  And if you look at that trace

5    where they're saying it's Mr. Sterlingov making the first

6    deposit into Bitcoin Fog, right on that first hop, right to

7    that first address there, they don't have the private key to

8    that.

9           And, again, not to belabor the point, but if you

10   don't have the private key, you don't have definitive evidence

11   about who controls it because whoever has got the private key

12   to an address is the person who controls it.  And if you look

13   at that long trace, where they're saying it's Mr. Sterlingov

14   making a deposit, the first deposit into Bitcoin Fog, right?

15   it goes through two wallets, which that analysis is based on

16   the sort of co-spend heuristic from Chainalysis Reactor which

17   they couldn't tell you any of the error rates for and all that

18   stuff.

19          And if you look in between those two wallets, again,

20   there's another address that the government doesn't have the

21   private key to.  So right at the start of that, it could be

22   Mr. Sterlingov selling Bitcoin to somebody.  There's no

23   evidence that Mr. Sterlingov controlled that first wallet.

24   Then in between that first wallet and the second wallet, I

25   think Mr. Scholl said it looks like two separate people

1    controlled it.  There's another address that they don't have

2    the private key to.  There's like -- I think there's like ten

3    hops in that transaction, involving 19 different addresses, and

4    the only one that's KYC is the one they traced all back to.

5              I mean, I keep thinking when I look at this case, the

6    reason Mr. Sterlingov is sitting in that seat over there is

7    because he's the only one who was KYCing his account that you

8    could trace it back to.  Right?  Like, I mean, take a look at

9    that transaction.  No private keys.

10             Flow of control is different than the flow of funds,

11   right?  And this is important when you look at these traces,

12   right?  That that's the example of, okay, I'm going into

13   Starbucks and I've giving them 20 bucks for a latte.  They give

14   that 20-dollar bill to somebody else as change.  That person

15   spends it at Duane Reade.  Duane Reade gives it to somebody

16   who, you know, gets it and then buys drugs with it.  I haven't

17   bought drugs.  Right?

18             I think about the flow of funds is not the same as

19   the flow of control of the funds.  And so think about that when

20   you're looking through the traces.  Well, how do we know who is

21   controlling these funds, you know, at every hop?

22             Government Exhibit Number 1, Akemashite Omedetou.

23   He, she, or it understood tracing.  Right?  I mean, just --

24   you-all can read.  You can see how he, she, or it understood,

25   okay, well, if I use the same amount of money at relatively the

1    same time, people can trace me.  So what did that first

2    transaction for the DNS registration -- and ask yourself, would

3    Akemashite Omedetou actually do something like this?  Because

4    it's a similar sum of money going through accounts in a

5    relatively close period of time.  Right?  You're the judge of

6    that.

7           But, like I said, use your common sense there.

8    Right?  Because when you start to look closely at stuff in this

9    case, it doesn't make sense.  It's only when you step back and

10   you sort of make the assumption that the government must be

11   right; they wouldn't have arrested him without a reason.  They

12   have all this fancy software.  Then, yeah, okay, but once you

13   start to be critical about it and look at it, it doesn't make

14   sense.

15          So.  Ms. Mazara de Mazarin, she told you -- she's

16   another one of the witnesses that the government doesn't have

17   the Bitcoin Fog servers, logs, ledgers, source code or the back

18   end.  And she talked to you about file carving.  And if you

19   remember, file carving is a forensic way of going through

20   devices and looking for diluted information and finding stuff.

21   And she told you they file-carved Mr. Sterlingov's devices.

22   And then, again, what did they find showing Mr. Sterlingov

23   operating Bitcoin Fog when they file-carved his devices?  No

24   surprise.  They didn't find anything.  Right?

25          So we're back to speculation.  We're back to

1   conjecture.  Right?  We're back to 2011, you know, with traces

2   being done by people who really weren't even working on the

3   case until after Mr. Sterlingov was arrested, right? who were

4   being told Mr. Sterlingov has been arrested, he operated

5   Bitcoin Fog.  Go confirm what we already think.  Right?

6           MR. PEARLMAN:  Objection.

7           THE COURT:  I think the jury should disregard

8   counsel's speculation, if it's not in evidence, about what

9   someone may or may not have been told.

10          MR. EKELAND:  May I proceed?

11          THE COURT:  You may.

12          MR. EKELAND:  The government has not shown you any

13  communications between Mr. Sterlingov and anybody operating

14  Bitcoin Fog.  You haven't seen anything in the To the Moon

15  packet -- server packet captures related to Bitcoin Fog.

16          They don't definitively attribute the

17  shormint@hotmail.com email to Mr. Sterlingov.  Right?  You get

18  a bunch of, sort of, you know, what I would characterize as

19  ambivalent answers.

20          Shormint@hotmail.com doesn't appear in the PCAP

21  captures, including the BunkerX access, is consistent with

22  Mr. Sterlingov accessing his home computer through Tor.

23  Again, I -- in this case, I just fail to understand why the

24  United States government did not get Mr. Sterlingov's home

25  computer.  And you've heard testimony that they were talking to

1    Swedish law enforcement.  Right?

2              Like, you've learned about the screenshot, right?

3    which turned out to be from an e-Reader book.  And she also

4    told you that her IP address analysis was unscientific.

5    Elizabeth Bisbee, from Chainalysis, she said straight up at the

6    top, she's not making any attribution to Mr. Sterlingov.  And

7    after you heard about how great their software was and all that

8    stuff about the software, ask yourself this question:  Why

9    didn't Chainanalysis Reactor attribute anything to

10   Mr. Sterlingov?

11             The government will tell you that's because we didn't

12   hire them to make that attribution.  But why didn't the

13   government hire them to make that attribution?

14             She told you that she didn't know the error rates,

15   she didn't know the false positive rates, she didn't know the

16   false negative rates.  She told you that there's no scientific

17   peer reviewed paper attesting to Chainalysis Reactors'

18   accuracy.  She told you that there's no industry standards or

19   industry oversight of blockchain tracing.  And she told you

20   that there's no independent audit of Chainanalysis Reactor

21   software.

22             Sarah Glave.  She didn't do any analysis of any of

23   Mr. Sterlingov's early accounts.  She just analyzed what she

24   was given by the government.  But there's -- you know, you

25   heard Mr. Sterlingov testify about his paper wallets and all

1   sorts of stuff.  Right?  So it's not safe to assume that her

2   analysis has the whole universe of Mr. Sterlingov's assets

3   going back to 2010.  Again, she is someone coming in after the

4   fact, after Mr. Sterlingov has been arrested, doing an analysis

5   based just on what, you know, she's being handed by the

6   government.  And it's primarily an analysis based on

7   Mr. Sterlingov's KYC accounts.

8          Ilya Lichtenstein.  One of the government's

9   cooperating witnesses who pled guilty to conspiracy, I believe,

10  to money laundering.  He doesn't know Mr. Sterlingov.  He

11  hacked Bitfinex for, what was it? 120,000 Bitcoin.  And when

12  they arrested -- they arrested Mr. Lichtenstein -- I think this

13  is the key point -- they caught him with the private keys.

14  Right?

15         When they arrested Lichtenstein, they found

16  corroborating evidence.  That's in sharp contrast to

17  Mr. Sterlingov.  He had a luxurious lifestyle and the

18  government seized hundreds of millions of dollars from

19  Mr. Lichtenstein.  Again, that stands in stark contrast to

20  Mr. Sterlingov.

21         Larry D. Harmon.  He took a guilty plea.  He's got a

22  cooperation deal, just like Ilya Lichtenstein.  He didn't know

23  Mr. Sterlingov.  He operated the Helix mixer, the Helix Light

24  mixer, and Grams.  And the government got the Helix mixer

25  private keys, they seized hundreds of millions of dollars,

```
1    multiple bank accounts --

2              MR. PEARLMAN:  Objection.

3              (Bench conference:)

4              MR. PEARLMAN:  We didn't seize the private keys.

5              THE COURT:  Is there any evidence that the private

6    keys were seized?

7              MR. EKELAND:  I thought that was in his testimony,

8    but maybe that's a mistake.

9              THE COURT:  Do you want to correct that yourself

10   then?

11             MR. EKELAND:  I'll correct it, yeah.

12             THE COURT:  I mean, I don't know --

13             MR. PEARLMAN:  He turned them over.  For Helix he did

14   not -- no.  He essentially deleted the service by 2017.  He was

15   arrested later.

16             MR. EKELAND:  The government is saying that you

17   didn't get any private keys from Mr. Harmon?

18             THE COURT:  For Helix, I think.

19             MR. PEARLMAN:  For Helix, which I thought is what you

20   referred to.

21             MR. EKELAND:  I was referring -- okay.  I'll clarify

22   that.  But they did get private keys.

23             MR. PEARLMAN:  We got some private keys, but not for

24   the mixer.

25             MR. EKELAND:  I'll clarify that.
```

```
1                    MR. PEARLMAN:  Thank you.
2                    (Open court:)
3                    MR. EKELAND:  The government didn't get private keys
4         from the mixer, but they did get some private keys from
5         Mr. Harmon.
6                    You also heard Mr. Harmon testify about how -- I
7         think there was a photo or picture -- excuse me -- of him -- of
8         the operating -- the admin panel, I think, to one of the
9         mixers, I think he testified.  You guys can, I think, remember
10        that.  Right?
11                   Long story short, with Ilya Lichtenstein and Harmon,
12        when they were arrested, the government found evidence that
13        proved their case.  That's why those guys took pleas.
14                   MR. PEARLMAN:  Objection.
15                   THE COURT:  Yeah.  Why don't you just move on from
16        this.  I think you know what the concern is.
17                   MR. EKELAND:  Sir William Blackstone.  Outside this
18        courthouse, there's a statue of William Blackstone.  He's one
19        of my heroes.  He grew up with a single mom in 18th century
20        London and then went on to write some of the most famous works
21        in the history of our legal tradition called the Commentaries
22        on the Laws of England, very influential.  Like, Abraham
23        Lincoln trained on it.  If you know who John Marshall is, one
24        of our first great Supreme Court justices, whose house was
25        right outside of here, his dad bought him a first edition of
```

1    Blackstone.

2         Blackstone once said that it is better to let

3    ten guilty people escape than one innocent person suffer.  And

4    that -- when he's saying that, what he's doing is he's

5    embodying the core ideal in our criminal justice system for

6    centuries, and that is that the government's burden of proof is

7    beyond a reasonable doubt for every element of the crime.

8         I thank you, Mr. Sterlingov thanks you, the defense

9    team thanks you.  I think the government thanks you.  The Court

10   thanks you for taking your time to listen and be part of a

11   very, very important tradition that's about 800, 900 years old

12   in our legal system -- the jury system, the great bulwark of

13   liberty in our system.

14        So now I have said my peace.  This is the last time

15   you're going to hear from me and I hand off Mr. Sterlingov's

16   future to you.  And I've never ever, ever known a jury not to

17   take the role seriously.  So thank you immensely for your time.

18        THE COURT:  All right.  Thank you.

19        Just two things I wanted to add before we hear

20   finally from the government.

21        And first of all, I think at one point in time

22   Mr. Ekeland referred to something that was in the newspapers

23   and said, "You may have all seen in the newspapers."  I've been

24   instructing you all along that you're not supposed to be

25   conducting any type of research or bringing anything that you

1    learned outside of the courtroom to the case, and so I would

2    ask that you ignore those comments.  Everything you decide has

3    to be based on the evidence that was presented in the

4    courtroom.

5            And finally, with the references to Blackstone at the

6    end, I will instruct you on the law and what the

7    beyond-a-reasonable-doubt standard means.

8            All right.  You can proceed.

9            MR. PEARLMAN:  Court's brief indulgence.

10           So, may it please the Court, defense counsel,

11   Mr. Sterlingov, members of the jury.  Good afternoon.  We're

12   almost done.  I'll only take a few minutes to talk to you about

13   a couple of the things that Mr. Ekeland said and stress a

14   couple of points that I think might be useful to you as you go

15   back and look at all the evidence.

16           I want to particularly focus on the concept of

17   circumstantial evidence and its role in this case, the

18   defendant's credibility, and how you might view some of the

19   evidence.

20           I want to start off by saying your factual

21   recollection controls, not the attorneys.  If you agree to

22   something Ms. Pelker and I said or disagree with something that

23   Mr. Ekeland said, again, your recollection controls.

24           For example, you may have listened to the testimony

25   of Mr. Scholl and recalled that the charts that he referred to

1    over several hours were consistent with layering, not with

2    standard runoff transactions.

3         And then Mr. Scholl was fairly definitive in his view

4    of what those charts said.  That the first transaction in

5    Chart 313, that's the -- that's the first major chart that

6    involves the incorporation of bitcoinfog.com.  That was not an

7    ambiguous transaction that had something to do with heuristics

8    that required the use of Chainalysis software.  No.  This was

9    something that Mr. Scholl was able to determine by himself

10   because it directly went from Mr. Sterlingov's account to

11   certain other identified addresses, back over to Mt. Gox.

12        Chainalysis, just -- just so we're clear, is there

13   something in question about anything that Chainalysis has done

14   in this case with respect to their analysis and has the defense

15   offered any reason to question the credibility of Chainalysis?

16        We would suggest that Ms. Bisbee testified, she

17   testified that Chainalysis was something that she had worked

18   with for a long time, it was useful, it was accurate.  And

19   Mr. Scholl testified at some length about the chain tracing

20   technique and it is a valid way to view these various

21   transactions that are on the blockchain.

22        Go back and ask yourself, was there some question

23   about some of the work that they did?

24        You may disagree with the ultimate conclusions, but

25   is -- is there some question that Chainalysis doesn't work?  Or

1    that Mr. Scholl can't trace by hand certain transactions?  I

2    would stipulate (sic) that the answer is no.  There is no

3    question there.  They are both credible sources of information

4    that you can consider under the circumstances.

5            Now, you've heard Mr. Ekeland throughout this trial,

6    it's a litany; no logs, no servers, no passkeys.  And you heard

7    Mr. Scholl say, yeah, passkeys would be a nice thing to have.

8    So how do you resolve that conflict?

9            Well, ladies and gentlemen, there's a certain thing

10    called circumstantial evidence.  Right now I think everyone in

11    this room can say we really don't know if it's raining outside.

12    Now, if someone walks through that door and shouts out, wow,

13    it's really coming down outside.  Well, then we know.  That's

14    direct evidence.  We could put that person on the stand and

15    they could testify it was raining and we could count on that

16    direct evidence.

17            But suppose a couple of people came in from those

18    doors with rain coats and umbrellas and they're shaking those

19    umbrellas out -- off, and they're wiping the water from those

20    jackets, do you need those people to tell you that it's raining

21    outside?  No.  You can put two and two together.  Common sense.

22    We do it all the time.

23            And this is a case involving circumstantial evidence.

24    And the judge will tell you that you can, if you choose,

25    consider circumstantial evidence to be just as relevant in

1    assessing whether the government has met the burden of proof on

2    the elements in this case.  You can decide that.

3          There is no video of the defendant operating Bitcoin

4    Fog.  So what?  The question you need to ask yourself is:  Has

5    the government met its burden with the evidence that we've

6    brought forth?

7          And I got to tell you that the evidence about the

8    Chainalysis and the tracing of Bitcoin and the various ways in

9    which we attribute the identity of Akemashite Omedetou to the

10   defendant is something that you can decide, if you choose,

11   well, that's enough.  You have the ability to do that.  I agree

12   with Mr. Ekeland, you are the judge of these facts.  You are.

13         I want to clear something up about mixers.  Other

14   than what came out of the defendant's mouth concerning why

15   someone might use a mixer, because there might be some physical

16   robbery, have you heard any evidence that anyone would use a

17   mixer for anything other than illegal conduct?

18         It's not illegal to use a mixer.  You can use a

19   mixer.  You could go out today and use a mixer.  But the

20   evidence in this case, it seems, is that the vast, overwhelming

21   purpose of Bitcoin Fog specifically was to mix illegal fund

22   activity from the darknet.  That's its stated purpose.  That's

23   what it was designed to do.

24         Yes, we're not -- we're not blaming Mr. Sterlingov

25   if, in fact, he used Bitcoin Fog just because he wanted to mix

1  innocent money that he obtained legitimately.  No, that's not

2  our point at all.

3          We're saying that the Bitcoin Fog that

4  Mr. Sterlingov -- I'm sorry.  Bitcoin Fog Bitcoin that

5  Mr. Sterlingov had came because he ran Bitcoin Fog and he took

6  the 2 percent fee and he put that in various places where we

7  recovered some of the money.  Kraken, the Mycelium wallet,

8  Poloniex, and so forth.

9          Bitcoin Fog was about laundering money for darknet

10  drug markets.  Markets that included Trevor Philips

11  Enterprises, which gave not-so-helpful instructions on what to

12  do if you're using their high-quality drugs, and came out and

13  said they could be lethal.  Right?  The darknet, which gives

14  people access to CSAM material.

15          The defendant, as you have heard, knew what the

16  darknet was for.  The defendant is not a fool.  He knew what it

17  was for.  He had various messages and chats about his knowledge

18  of exactly what the darknet was for.  He used it himself.  And

19  so not even he really believed in this for any notion of

20  privacy.  It wasn't out of fear.  Even in 2020, when Bitcoin is

21  much more developed, he is still sending $280,000 worth of

22  Bitcoin out of Bitcoin Fog right to his Mycelium wallet.

23  That's not about fear.  That's not about fear.

24          Let's talk about a little bit Ms. Mazars, computer

25  scientist, Mazars.  I think you could read her testimony to be

1    that essentially she made a mistake because that one piece of

2    evidence she was not involved in processing, she ran it through

3    a machine that did process it, and the way that it came out,

4    she wasn't able to tell what it came from in e-Book.  We own

5    that mistake.  She owns that mistake.  That's got nothing to do

6    with any of the other evidence in this case.

7         Did you hear any problem with any of the other

8    evidence recovered in this case?  Is there an argument that we

9    mistranslated something or that we got something else flat out

10   wrong?  No.  Is that a reason to doubt an entirely separate IP

11   analysis?

12        And when you go back there, do me a favor.  Take a

13   look at Exhibit 363.  That is the analysis.  Do you even need

14   an expert, ask yourself, to look at that analysis and think

15   it's anything other than one person?  You know all those

16   addresses, that were together for a fairly short time period,

17   back and forth, back and forth, like notes in a symphony, and

18   they're singing one song.  And that's him.

19        As the defendant said -- this is on the Meth! chats,

20   and that's Exhibit 55.a (sic).  You'll have a chance to see it.

21   There is no 100 percent protection from anything at all --

22   this, by the way, is a month before he opens up Bitcoin Fog --

23   there are only levels of probabilities that you will be found.

24   As far as I understand, that's why you want a VPN.

25        The more money you launder, the darker the schemes

1    you crank out, the more information about you is leaking out to

2    the network, et cetera, the higher is this probability.  You

3    can read all of it.  The more you do to isolate yourself from

4    what you're doing, the better off you'll be.

5            It is, as the defendant said, up to you.  It is

6    important to understand that, by all means, it is our burden.

7    There's enough evidence in this case to convict the defendant,

8    we would suggest.  But the fact that certain things weren't

9    found doesn't mean that we haven't proven our case.

10           Take, for example, the defendant coming into LAX

11   airport.  I think Mr. Ekeland said at the beginning of this

12   case he's kind of a digital nomad.  There's no evidence of

13   that.

14           By 2021, use your common experience.  People are able

15   to access the internet.  They're able to access servers and

16   there's nothing that was found on him that is inconsistent, and

17   is, in fact, consistent with his ability to get ahold of a Tor

18   hidden service.

19           Now, that by itself is not a bad thing.  If you want

20   to go to a Tor hidden service for some particular reason, that

21   doesn't make you a criminal.  It also doesn't make you a

22   criminal for most people if who happen to own a gun.  But if

23   there's a gun crime, you sure want to know if the person that

24   you're investigating had a gun in the first place, and that's

25   what we did here.

1          And you heard a lot of testimony about what was

2     located on the defendant at LAX because it's important to

3     understand the defendant, up until the point he got arrested,

4     was still able to access the Tor network, was still able to do

5     things consistent with the administrator of Bitcoin Fog.

6          And now the bigger details, such as the various

7     charts.  We hope those don't give you nightmares, but those

8     are, again, not just consistent, but actually strong

9     circumstantial evidence, we would suggest, of the defendant's

10    series of choices that he made.  It's important to point that

11    out.

12         You heard the defendant get up on that stand and give

13    you -- give you an invoice like he were Bitcoin stamp.  You

14    heard some of the things he said.  And some of those things,

15    some of you might find just isn't credible.  The same way he

16    was talking to Bitcoin stamp -- I'm sorry, Bitstamp.  The

17    defendant was in a tricky position because all those

18    transactions are locked in stone.  They are things that

19    happened.  They're all charted out.  The defendant knew it.

20         He'd listened to all the evidence in this case and he

21    got up and testified.  And he had a problem because if he

22    rejected those transactions, well, he knew how strong the case

23    was that the government had brought.  And if he accepted them,

24    well, then he's essentially confessing.  So he walked a

25    tightrope.

1          But you heard Mr. Brown question him, for example,

2     about the Bitstamp transaction.  Bitstamp, those annoying

3     people who are doing their jobs, those customer service

4     representatives, asking him questions to clarify a February

5     2017 transaction.  You remember those conversations.  And he

6     got frustrated.  Why did he get frustrated and why did he show

7     them an invoice that he testified to you was for transactions

8     from 2014 or 2015?  It doesn't make any sense.

9          What he was doing with those invoices, you may infer,

10    is the same thing he's doing with those payment cards.  It's

11    laundering.

12         He's trying to turn those funds into legit

13    transactions so that he can turn that Bitcoin into something

14    that he can actually spend.  Because that's the problem when

15    you have all this Bitcoin, it's not that easy to spend.  So

16    he's constantly trying to turn it into something else.  And

17    that's what he was trying to do with Bitstamp.

18         If he didn't have a problem with the transaction in

19    February 2017 from Bitcoin Fog that he sent to Bitstamp, why

20    can't he just tell Bitstamp that he got the transaction from

21    Bitcoin Fog?

22         On the statute of limitations, ladies and gentlemen,

23    we've demonstrated that Charges 1, 3, and 4 were within the

24    statute of limitations.  Now, there's $70 million sitting in a

25    pot somewhere in those deposit addresses.  There's $17 million

1    of deposits in the wallet over the first four months of 2021.

2    Bitcoin Fog was doing pretty well.  It was largely automated by

3    that point.  And it ground to a halt only after the defendant

4    was arrested.

5           The defendant, as recently as June of 2020,

6    transferred a $280,000 deposit to the Mycelium wallet.  As

7    recently as 2018, he was not been truthful with Bitstamp about

8    where his funds had come from.  And you can consider that a

9    further act in the course of the conspiracy.

10          I would just note a couple more things.  When you go

11   back and look at Akemashite's posts, take a close look at who

12   he's talking about when it comes to taking security

13   precautions.  Akemashite only got to his referring to the users

14   of Bitcoin Fog.  He's not talking about himself.

15          Mr. Ekeland talked to you about the money.  What we

16   know is that he took the vast majority of his $2.3 million in

17   his recovered Mycelium wallet and his other exchanges, and that

18   their argument is the theory that all this money came from the

19   fact that he just happened to come along to Bitcoin in the

20   early 2010s.

21          But he didn't have any saved account credentials for

22   any Bitcoin Fog user profile in his password files.  He told

23   you he had to open accounts with Bitcoin Fog 20 or 30 times.

24   And he never wrote that down.  And why?  And why would you even

25   do it 20 or 30 times?  Larry Harmon told you how clunky the

1    site is, how annoying it was to have to log on.  In fact, it

2    was a feature of Helix that you didn't have to log on.

3           You can recall from your common experience, is it

4    enjoyable to go into a site and create a new login and new

5    registration every time you go in, when you're using that site

6    on multiple, multiple occasions?  That doesn't make any sense.

7           With respect to Professor Verret, he would have to be

8    one of the best investors in history to have bought Bitcoin and

9    figured that you'd hold onto it in the likelihood that it would

10   be at the price that it is as of February 2024.  I wish that

11   people could invest by buying low and selling high all the

12   time.  But you can consider whether a person making about

13   $40,000 a year is just constantly saving their money or he's

14   got expenses.  And that's one of the things that Ms. Glave

15   testified about.

16          He's got a lot of outlays.  He's using a lot of this

17   money.  He's moving it into accounts.  He's moving it into more

18   than, what? $90,000 worth of prepaid cards over a little over

19   two years?  And he's -- by his own acknowledgment, he's

20   trading.  Those coins are moving in and out.  And so, when this

21   man testifies about the 2700-some Bitcoin going in and out,

22   that's consistent.  That makes sense.

23          Professor Verret, who -- by the way, you'll have an

24   exhibit, Government Exhibit 915, about whether Professor Verret

25   was even truthful to you about his compensation scheme for this

1    case.  Professor Verret looks at Bitcoin as if back in 2011

2    it's just Christmas presents, unwrapped Christmas presents to

3    look under a tree.

4            No.  Bitcoin, at the time, was a commodity like any

5    other, that had certain risks, and people tried to figure it

6    out for themselves.  There's no reason, and Mr. Verret doesn't

7    provide you much of a reason why you should assume that anybody

8    who's got this Bitcoin stuff in 2011, 2012 is going to hold

9    onto it for one, two, three, four, years, make a billion

10   dollars.  That's pie in the sky thinking and that doesn't make

11   any sense.  And you can consider that that is not common sense.

12           Mr. Ekeland also talked about the domain

13   registration.  And I just want to be clear.  There are a couple

14   of changes to the bitcoinfog.com domain after the defendant was

15   arrested.  There isn't evidence about whether the registrar

16   automatically changed it for some reason or changed it on its

17   own or whether the defendant changed it or whether somebody

18   else changed it.  It's ambiguous.

19           We contend not knowing why the registrar changed more

20   than a year after the defendant was arrested is still

21   consistent with finding the defendant guilty.

22           Now, I have two more things to say, and I swear I'll

23   sit down.  It is possible that one of you is going to say, when

24   you go back there, Well, was he working with somebody?  And

25   that is conceivable.  Under conspiracy, multiple people can

1    come together and have a general arrangement.  The strength of

2    this conspiracy here, if you will, is the conspiracy between

3    the admin of Bitcoin Fog and the various drug dealers who were

4    using it to make a profit.

5          Is it possible that Mr. Sterlingov had help?  Sure.

6    But that's what aiding and abetting is all about.  That's about

7    whether the defendant was acting or wasn't acting.  If he

8    helped incorporate that Bitcoin Fog site and that assisted in

9    the running in the conspiracy of Bitcoin Fog, you could find

10   that that is sufficient to establish that he's a member of that

11   conspiracy.

12         I want to be very clear.  The evidence is that he is

13   the owner and operator of Bitcoin Fog.  But if he assisted, he

14   is as guilty as if he was the primary person.

15         To think that the defendant was simply -- to think

16   that he was simply caught up in all these transactions and

17   wasn't involved, had made all this money, but not by operating

18   Bitcoin Fog, you would have to think that the defendant was

19   both the most unlucky person you've ever heard of for having

20   been trapped in all these transactions, and yet the luckiest

21   person for having kept just enough Bitcoin to explain why he's

22   got so much Bitcoin Fog in his assets.

23         Ladies and gentlemen, as the other attorneys have

24   indicated, thank you for your attention.  Thank you for your

25   time.  Take a look at the judge's instructions and good luck.

```
1              THE COURT:  All right.  Thank you.

2              So that concludes the arguments in the case.  The

3     only two things left to do in the case, I need to offer you the

4     instructions on the law, and then you need to deliberate.

5              So, why don't we just take a short, just a ten-minute

6     break, come back.  I will give you the legal instructions

7     tonight, and then that way you can just start fresh tomorrow

8     morning with your deliberations.

9              And even though -- now you've even heard all the

10    arguments, I'm still going to ask that you not discuss the

11    case, even amongst yourselves, until you've received my

12    instructions and we've sent them back to you in the jury room

13    and tell you it's time to start your deliberations.  You're

14    getting close, but you're not there.  So I'll see you all in

15    ten minutes.

16             (Whereupon the jurors leave the courtroom.)

17             THE COURT:  All right.

18             (Recess from 3:23 p.m. to 3:37 p.m.)

19             (Whereupon the jurors enter the courtroom.)

20             THE COURT:  The time has now come when all the

21    evidence is in and you've heard the closing arguments of the

22    lawyers.  And we're about to enter your final duty in the case,

23    which is to decide the issues of fact and to return a verdict.

24             It's up to me to instruct you on the law, and I ask

25    that you listen carefully, just as you have throughout the
```

1    trial.

2         Before we talk about the specific charges alleged

3    here and some of the specific issues in this case, however, I

4    want to take a few minutes to talk about some general rules of

5    law.  Some of this may repeat what I told you in my preliminary

6    instructions.

7         To start, I will provide you with a copy of my

8    instructions.  During your deliberations, you may, if you want

9    to, refer to these instructions.  While you may refer to any

10   particular portion of the instructions, you are to consider the

11   instructions as a whole, and you may not follow some and ignore

12   others.  If you have any questions about the instructions, you

13   should feel free to send me a note, and please return your

14   instructions to me when your verdict is rendered.

15        My function is to conduct the trial in a orderly,

16   fair and efficient manner, to rule on questions of law, and to

17   instruct you on the law that applies in this case.  It is your

18   duty to accept the law as I instruct you.  You should consider

19   all the instructions as a whole.  You may not ignore or refuse

20   to follow any of them.

21        Your function as the jury is to determine what the

22   facts are in this case.  You are the sole judges of the facts.

23   While it is my responsibility to decide what is admitted as

24   evidence during the trial, you alone decide what weight, if

25   any, to give to that evidence.  You alone decide the

1    credibility or believability of the witnesses.  You should

2    determine the facts without prejudice, fear, sympathy or

3    favoritism.  You should not be improperly influenced by

4    anyone's race, ethnicity, nationality, gender or any such

5    trait.  You must decide the case solely from a fair

6    consideration of the evidence.

7          You shall not take anything that I may have said or

8    done during the trial as indicating how I think you should

9    decide this case.  If you believe that I've expressed or

10   indicated any such opinion, you should ignore it.  The verdict

11   in this case is your sole and exclusive responsibility.

12         If any reference by me or the attorneys to the

13   evidence is different from your own memory of the evidence, it

14   is your memory that should control during your deliberations.

15         During the trial I have permitted all jurors who want

16   to do so to take notes.  You may take your notebooks with you

17   to the jury room and use them during your deliberations, if you

18   wish.  As I told you at the beginning of the trial, your notes

19   are only to be an aid to your memory.  They are not evidence in

20   the case and you should -- they should not replace your own

21   memory of the evidence.

22         Those jurors who have not taken notes should rely on

23   their own memories of the evidence.  The notes are intended to

24   be for the notetaker's own personal use.

25         During your deliberations you may consider only the

1    evidence properly admitted in this trial.  The evidence in this

2    case consists of the sworn testimony of the witnesses, and the

3    exhibits that were admitted into evidence, and the facts and

4    testimony stipulated to by the parties.

5            During the trial you were told that the parties have

6    stipulated -- that is, agreed -- to certain facts.  And as I

7    told you, you should consider any stipulation of fact to be

8    undisputed evidence.

9            When you consider the evidence you are permitted to

10   draw from the facts that you find have been proven such

11   reasonable inferences as you feel are justified in light of

12   your experience.  You should give any evidence such weight as

13   in your judgment it is fairly entitled to receive.

14           The statements and arguments of the lawyers are not

15   evidence, they are only intended to assist you in understanding

16   the evidence.  Similarly, the questions of the lawyers are not

17   evidence.

18           The indictment is merely the formal way of accusing a

19   person of a crime.  You must not consider the indictment as

20   evidence of any kind.  You may not consider it as any evidence

21   of the defendant's guilt or draw any inference of guilt from

22   it.

23           Every defendant in a criminal case is presumed to be

24   innocent.  This presumption of innocence remains with the

25   defendant throughout the trial, unless and until the government

1    has proven he is guilty beyond a reasonable doubt.  This burden

2    never shifts throughout the trial.  The law does not require

3    the defendant to prove his innocence or to produce any evidence

4    at all.

5              If you find that the government has proven beyond a

6    reasonable doubt every element of an offense with which the

7    defendant is charged, it is your duty to find him guilty of

8    that offense.

9              On the other hand, if you find the government has

10   failed to prove any particular element -- I'm sorry -- prove

11   any element of a particular offense beyond a reasonable doubt,

12   you must find the defendant not guilty of that offense.

13             The government has the burden of proving the

14   defendant guilty beyond a reasonable doubt.  In civil cases,

15   it's only necessary to prove that a fact is more likely true

16   than not, or, in some cases, that its truth is highly probable.

17   This is a criminal case, however, and in criminal cases the

18   government's proof must be more powerful than that.  It must be

19   beyond a reasonable doubt.

20             Reasonable doubt, as the name implies, is a doubt

21   based on reason.  A doubt for which you have a reason based

22   upon the evidence or lack of evidence in the case.  If, after

23   careful, honest, and impartial consideration of all the

24   evidence, you cannot say that you are firmly convinced of the

25   defendant's guilt, then you have a reasonable doubt.

1    Reasonable doubt is the kind of -- kind of doubt that would

2    cause a reasonable person, after careful and thoughtful

3    reflection, to hesitate to act in the graver or more important

4    matters in life.  However, it is not an imaginary doubt, nor a

5    doubt based on speculation or guesswork.  It is a doubt based

6    on reason.

7          The government is not required to prove guilt beyond

8    all doubt or to a mathematical or scientific certainty.  Its

9    burden is to prove guilt beyond a reasonable doubt.

10          There are two types of evidence from which you may

11    determine what the facts are in this case, direct evidence and

12    circumstantial evidence.

13          When a witness, such as an eyewitness, asserts actual

14    knowledge of a fact, that witness's testimony is direct

15    evidence.  On the other hand, evidence of facts and

16    circumstances from which reasonable inferences may be drawn is

17    circumstantial evidence.

18          Let me give you an example.  Assume a person looked

19    out a window and saw that the snow was falling.  If he later

20    testified in court about what he had seen, his testimony would

21    be direct evidence that snow was falling at the time he saw it

22    happen.  Assume, however, that he looked out the window and saw

23    no snow on the ground and then he went to sleep and saw snow on

24    the ground after he woke up.  His testimony about what he had

25    seen would be circumstantial evidence, that it had snowed while

1    he was asleep.

2            The law says that both direct and circumstantial

3    evidence are acceptable as means of proving a fact.  The law

4    does not favor one form of evidence over another.  It is for

5    you to decide how much weight to give to any particular

6    evidence, whether it is direct or circumstantial.  You are

7    permitted to give equal weight to both.  Circumstantial

8    evidence does not require a greater degree of certainty than

9    direct evidence.  In reaching a verdict in this case, you

10   should consider all the evidence presented, both direct and

11   circumstantial.

12           One of the questions you were asked when we were

13   selecting this jury was whether the nature of the charges

14   themselves would affect your ability to reach a fair and

15   impartial verdict.  We asked you that question because you must

16   not allow the nature of a charge to affect your verdict.  You

17   must consider only the evidence that has been presented in this

18   case in reaching a fair and impartial verdict.

19           The weight of the evidence is not necessarily

20   determined by the number of witnesses testifying for each side.

21   Rather, you should consider all the facts and circumstances in

22   evidence to determine whether -- which of the -- I'm sorry --

23   to determine which of the witnesses you believe.  You might

24   find that the testimony of a smaller number of witnesses on one

25   side is more believable than the testimony of a greater number

1      of witnesses on the other side, or you might find the opposite.

2             The lawyers in this case sometimes objected when the

3      other side asked a question, made an argument, or offered

4      evidence that the objecting lawyer believed was not proper.

5      You must not hold such objections against the lawyer who made

6      them or the party he represents or she represents.  It is the

7      lawyer's responsibility to object to evidence that they believe

8      is not admissible.

9             If, during the course of the trial, I sustained an

10     objection to a lawyer's question, you should ignore the

11     question and you must not speculate as to what the answer would

12     have been.  If, after a witness answered a question, I ruled

13     that the answer should be stricken, you should ignore both the

14     question and the answer and they should play no part in your

15     deliberations.  Likewise, exhibits as to which I have sustained

16     an objection or that I ordered stricken are not evidence and

17     you must not consider them in your deliberations.

18            In determining whether the government has proven the

19     charges against the defendant beyond a reasonable doubt, you

20     must consider the testimony of all the witnesses who have

21     testified.  You are the sole judges of the credibility of the

22     witnesses.  You alone determine whether to believe any witness

23     and the extent to which a witness should be believed.

24            Judging the witness's credibility means evaluating

25     whether the witness has testified truthfully, and also whether

1    the witness accurately observed, recalled, and described the

2    matters about which the witness testified.

3            As I instructed you at the beginning of trial, you

4    should evaluate the credibility of witnesses free from

5    prejudices and biases.  You may consider anything else that in

6    your judgment affects the credibility of any witness.

7            For example, you may consider the demeanor and the

8    behavior of the witness on the witness stand, the witness's

9    manner of testifying, whether the witness impresses you as

10   having an accurate memory, or the witness has any reason for

11   not telling the truth, whether the witness had a meaningful

12   opportunity to observe the matter about which he or she has

13   testified, and whether the witness has any interest in the

14   outcome of this case, stands to gain anything by testifying, or

15   has friendship or hostility toward other people concerned with

16   this case.

17           In evaluating the accuracy of a witness's memory you

18   may consider the circumstances surrounding the event, including

19   the time that elapsed between the event and any later

20   recollection of the event, and the circumstances under which

21   the witness was asked to recall details of the event.

22           You may consider whether there are any consistencies

23   or inconsistencies in a witness's testimony or between the

24   witness's testimony and any previous statement made by the

25   witness.  You may also consider any consistencies or

1    inconsistencies between the witness's testimony and any other

2    evidence that you credit.  You may consider whether any

3    inconsistencies are the result of lapses in memory, mistake,

4    misunderstanding, intentional falsehood or differences in

5    perception.  You may consider the reasonableness or

6    unreasonableness, the probability or unprobability of the

7    testimony of a witness in determining whether to accept it as

8    true and accurate.  You may consider whether the witness has

9    been contradicted or supported by other evidence that you

10   credit.

11        If you believe that any witness has shown him or

12   herself to be biased or prejudiced, for or against either side

13   in this trial, or motivated by self-interest, you may consider

14   and determine whether such bias or prejudice has colored the

15   testimony of the witness so as to affect the desire and

16   capability of that witness to tell the truth.  You should give

17   the testimony of each witness such weight as in your judgment

18   it is fairly entitled to receive.

19        You've heard evidence that Ilya Lichtenstein and

20   Larry Harmon entered into plea agreements with the government

21   pursuant to which each agreed to testified truthfully in this

22   case.  And the government agreed to bring Mr. Lichtenstein's

23   and Mr. Harmon's cooperation to the attention of their

24   respective sentencing judges and to consider filing papers with

25   the respective sentencing judges which would permit those

1    judges to impose a more lenient sentence than those judges

2    might otherwise be able to impose.

3         The government is permitted to enter into this kind

4    of plea agreement.  You, in turn, may accept the testimony of

5    such a witness and convict the defendant on the basis of this

6    testimony alone if it convinces you of the defendant's guilt

7    beyond a reasonable doubt.

8         A witness who has entered into a plea agreement is

9    under the same obligation to tell the truth as is any other

10   witness.  The plea agreement does not protect him against a

11   prosecution for perjury or false statement, should he lie under

12   oath.

13        However, you may consider whether a witness who has

14   entered into such an agreement has a interest different from

15   other types of witnesses.  You may consider whether the plea

16   agreement the witness entered into with the government has

17   motivated him to testify falsely against the defendant.  The

18   testimony of a witness who has entered into a plea agreement

19   should be considered with caution.  You should give the

20   testimony as much weight as in your judgment it deserves.

21        A law enforcement agent's testimony should be

22   evaluated by you just as any other evidence in this case.  In

23   evaluating the officer's or agent's credibility, you should use

24   the same guidelines that you apply to the testimony of any

25   witness.  In no event should you give either greater or lesser

1    weight to the testimony of any witness merely because she or he

2    is a law enforcement agent.

3         A defendant has a right to become a witness in his

4    own behalf.  His testimony should not be disbelieved merely

5    because he is the defendant.  In evaluating his testimony,

6    however, you may consider the fact that the defendant has a

7    keen interest in the outcome of this trial.  As with the

8    testimony of any other witness, you should give the defendant's

9    testimony as much weight as, in your judgment, it deserves.

10        In this case you heard the testimony of six witnesses

11   who expressed opinions concerning the following topics:  Luke

12   Scholl on blockchain analysis and cryptocurrency, Valerie

13   Mazars de Mazarin on internet routing, network and IP analysis,

14   digital device forensics, operational security used by cyber

15   criminals, particularly tools and techniques used to conceal

16   location and identity online, as well as cyber terms and tools.

17        Sarah Glave on forensic accounting.

18        Elizabeth Bisbee on cryptocurrency and blockchain

19   analysis.

20        J.W. Verret on financial forensics and forensic

21   accounting.

22        And Jeffrey Fischbach on computer forensics.

23        If scientific, technical, or other specialized

24   knowledge might assist the jury in understanding the evidence

25   or determining a fact at issue, a witness who possesses

1    knowledge, skill, experience, training, or education may

2    testify and state an opinion concerning such matters.  You are

3    not bound to accept this witness's opinion.  If you find that

4    the opinion is not based on sufficient education or experience,

5    that the reasons supporting the opinion are not sound or the

6    opinion is outweighed by other evidence, you may completely or

7    partially disregard the opinion.  You should consider this

8    evidence with all the other evidence in the case and give it as

9    much weight as you think it fairly deserves.

10          Motive is not an element of the offenses charged, and

11    the government is not required to prove motive in this case.

12    You may, however, consider evidence of motive or lack of

13    evidence of motive in deciding whether or not the government

14    has proved the charges beyond a reasonable doubt.

15          I have admitted multiple documents that are in

16    Russian and Swedish along with English translations.  While

17    some of you may know the languages used, it is important that

18    all jurors consider the same evidence and, therefore, you must

19    accept the English translations.

20          If, however, you have a question as to the accuracy

21    of an English translation, you should bring this matter to my

22    attention immediately by raising your hand or with a note.  You

23    should not ask your question or make any comments about the

24    translation in the presence of any jurors or otherwise share

25    your question or concerns with any of them, and I will take

1    steps to see if your question can be answered and any

2    discrepancy resolved.  If, however, after such efforts a

3    discrepancy remains, you must rely upon only the English

4    translation provided by the court interpreter or the other

5    interpreter and not on your own translation.

6           Certain charts or summaries have been shown to you in

7    order to help you -- to help explain the facts disclosed by the

8    files, records, or other underlying evidence in this case.

9    Those charts or summaries are used for your convenience.  These

10   charts and summaries are not themselves evidence or proof of

11   any facts.  You should determine the facts from the evidence.

12          Certain charts and summaries have been received into

13   evidence.  Charts and summaries are valid only to the extent

14   that they accurately affect the underlying supporting evidence.

15   You should give them only such weight as you think they

16   deserve.

17          You've heard evidence that the defendant purchased

18   drugs on Silk Road.  It is up to you to decide whether to

19   accept that evidence.  If you find that the defendant did

20   purchase drugs on Silk Road or otherwise visited the site, you

21   may use this evidence only for the limited purpose of deciding

22   whether the government has proven beyond a reasonable doubt

23   that the defendant knew that money or property that Bitcoin Fog

24   mixed was the proceeds of some kind of unlawful activity.  You

25   may not use this evidence for any other purpose.

1          The defendant is only on trial for the crimes

2     charged.  He's not charged in this case with any offense

3     related to his purchase of drugs on Silk Road or any other

4     similar market and you may not use this evidence to conclude

5     the defendant's a bad character or that he has a criminal

6     personality.  The law does not allow you to convict him simply

7     because you believe he may have done bad things not

8     specifically charged as crimes in this case.

9          Someone's state of mind ordinarily cannot be proved

10    directly because there's no way of knowing what a person is

11    actually thinking.  But you may infer someone's intent from the

12    surrounding circumstances.  You may consider any statement made

13    or act done by the defendant and all other facts and

14    circumstances received in evidence which indicate his or her

15    intent.

16         You may infer but are not required to infer that a

17    person intends the natural and probable consequences of acts he

18    or she intentionally did or did not do.  It is entirely up to

19    you, however, to decide what facts to find from the evidence

20    received during this trial.  You should consider all the

21    circumstances in evidence that you think are relevant in

22    determining whether the government has proved beyond a

23    reasonable doubt the defendant acted with the necessary state

24    of mind.

25         The word "knowingly," as that term is used from time

1    to time in these instruction, means that the act was done

2    voluntarily and intentionally and not because of ignorance,

3    mistake or accident.

4           In considering whether the defendant had knowledge of

5    a fact, you may consider whether he deliberately closed his

6    eyes to what would otherwise have been obvious to him, when

7    knowledge of the existence of a particular fact is an element

8    of an offense, such knowledge can be established if a person

9    has a subjective belief of a high probability of its existence,

10   unless he actually believes that it does not exist.

11          Thus, other knowledge on the part of the defendant

12   cannot be established merely by demonstrating the defendant was

13   negligent, reckless, careless or foolish.  Knowledge can be

14   inferred if the defendant deliberately blinded himself to the

15   existence of a fact that he believed to a high probability of

16   certainty existed.

17          As I've already instructed you, you should consider

18   all the circumstances in evidence that you think are relevant

19   in determining whether the government has proved beyond a

20   reasonable doubt the defendant acted with the necessary state

21   of mind.

22          In criminal cases, a mistake of law on the part of

23   the accused does not justify his actions.  If a defendant

24   deliberately and intentionally engaged in conduct the law

25   prohibits, his actions are criminal, regardless of his belief

1     that his actions were lawful or guided by high motive.  To

2     summarize, ignorance of the law does not negate a defendant's

3     criminal liability if the government proves the elements of the

4     offense beyond a reasonable doubt.

5          The indictment charges that certain offenses were

6     committed on or about the period from October 27th, 2011 to

7     April 27th, 2021.  The proof need not establish to a certainty

8     the exact date of the alleged offense.  It is sufficient if the

9     evidence in the case establishes beyond a reasonable doubt that

10    the offense was committed on a date reasonably near the dates

11    alleged.

12         I now want to talk with you about the specific

13    offenses charged in this case.  The alleged crimes are charged

14    in what are called counts.  And the indictment contains four

15    counts.

16         In Count 1, the indictment charges that from on or

17    about October 27, 2011, and continuing until at least on or

18    about April 27th, 2021, the defendant, together with others,

19    known and unknown, including darknet vendors and darknet market

20    administrative teams, conspired to commit certain offenses

21    against the United States through the use of a Bitcoin mixer

22    known as Bitcoin Fog.

23         Count 1 alleges two objects of this conspiracy, both

24    involving the alleged laundering of monetary instruments in

25    violation of 18 U.S.C. Section 1956(a)(1).

1          In Count 2 the indictment charges that the defendant

2    conducted a money laundering transaction involving property

3    represented to be the proceeds of unlawful activity on or about

4    November 21st, 2019, in violation of 18 U.S.C. Section

5    1956(a)(3).

6          In Count 3 the indictment charges that from on or

7    about October 27, 2011, and continuing until at least on or

8    about April 27th, 2021, the defendant operated an unlicensed

9    money transmitting business known as Bitcoin Fog, or aided and

10   abided others in doing so, in violation of 18 U.S.C. Section

11   1960(a) and 19 U.S.C. Section 2.

12         And in Count 4 the indictment charges that from on or

13   about October 27th, 2011, and continuing until at least on or

14   about April 27th, 2021, the defendant, through the operation of

15   Bitcoin Fog, engaged in the business of money transmission

16   without a license in the District of Columbia, in violation of

17   Section 26-1023(c) of the D.C. code.

18         Each count of a multiple indictment -- I'm sorry each

19   count of the indictment charges a separate offense.  You should

20   consider each offense and the evidence which applies to it

21   separately, and you should return separate verdicts as to each

22   count.  The fact that you may find the defendant guilty or not

23   guilty on any one count of the indictment should not influence

24   your verdict with respect to any other count of the indictment.

25         I'll now discuss with you the rules that govern

1    whether the crimes charged have been proven beyond a reasonable

2    doubt.

3        In Count 1 defendant is charged with conspiring to

4    commit two offenses against the United States.  First, money

5    laundering in violation of 18 U.S.C. Section 1956(a)(1)(A)(i),

6    and, second, money laundering in violation of 18 U.S.C. Section

7    1956(a)(1)(B)(i).  These are called the objects of the

8    conspiracy.

9        The charge of conspiracy to launder money is a

10    separate charge from money laundering itself, with which the

11    defendant is also charged.  And I will instruct you on

12    conspiracy and then I'll discuss each of the two alleged

13    objects of the conspiracy.

14        A conspiracy is an agreement by two or more persons

15    to commit an unlawful act.  In other words, it is a kind of

16    partnership for criminal purposes.  Every member of the

17    conspiracy becomes the agent or partner of every other member.

18        The elements of conspiracy, each of which the

19    government must prove beyond a reasonable doubt, are that,

20    first, that from on or about October 27th, 2011, through on or

21    about April 27, 2021, an agreement existed between two or more

22    people to commit an act in violation of, first, Title 18 U.S.

23    Code § 1956(a)(1)(A)(i), or, second, Title 18 U.S. Code

24    § 1956(a)(1)(B)(i).  This does not have to be a formal

25    agreement or plan in which everyone involved sat down together

1    and worked out the details.  On the other hand, merely because

2    people get together and talk about common interests or do

3    similar things does not necessarily show that an agreement

4    exists.  It is enough that the government proves beyond a

5    reasonable doubt that there was a common understanding among

6    those who were involved to commit at least one of the two

7    crimes that are the alleged objects of the conspiracy, which,

8    as I mentioned, I'll instruct you about in just a moment.

9         So the first thing the government must prove is the

10   existence of an agreement.  Second, the government must prove

11   the defendant intentionally joined in that agreement.  It is

12   not necessary to find that he agreed to all the details of the

13   crime, or that he knew the identity of all the other people the

14   government has claimed were participating in the agreement.  A

15   person may become a member of a conspiracy even if that person

16   agrees to play only a minor part, as long as that person

17   understands the unlawful nature of the plan and voluntarily,

18   knowingly, and intentionally joins in it with the intent to

19   advance or further the unlawful object of the conspiracy.

20        Different people may become part of the conspiracy at

21   different times.  However, mere presence at the scene of the

22   agreement or the crime, or merely being with the other

23   participants does not show that a defendant knowingly joins in

24   the agreement.  Also, unknowingly acting in a way that helps

25   the participants, or merely knowing about the agreement itself,

1    without more, does not make the defendant part of the

2    conspiracy.  So the second thing that must be shown is that the

3    defendant was part of the conspiracy.

4        A conspiracy can be proved indirectly, by facts and

5    circumstances that lead to a conclusion that a conspiracy

6    existed.  The government must prove that such facts and

7    circumstances existed and that they lead to the conclusion that

8    a conspiracy existed.

9        Someone's intent or knowledge ordinarily cannot be

10   proved directly because there's no way of knowing what a person

11   is actually thinking.  But you may infer someone's intent or

12   knowledge from the surrounding circumstances.  You may consider

13   any statement made or acts done or omitted by the defendant and

14   all other facts and circumstances received in evidence which

15   indicate his intent or knowledge.

16       You may infer, but are not required to infer, that a

17   person intends the natural and probable consequences of acts he

18   or she intentionally did or did not do.  It is entirely up to

19   you, however, to decide what facts to find from the evidence

20   received during this trial.

21       You should consider all the circumstances in evidence

22   that you think are relevant in determining whether the

23   government has proved beyond a reasonable doubt that the

24   defendant acted with the necessary state of mind.

25       There is no requirement that all members of the

1    conspiracy be charged and prosecuted or tried together in one

2    proceeding.  Nor is there any requirement that the names of all

3    the other conspirators are listed in the indictment.  An

4    indictment can charge a defendant with a conspiracy involving

5    people whose names are not given, as long as the government can

6    prove that the defendant conspired with one or more of them,

7    whether they are named or not does not matter.

8            To prove that the defendant committed conspiracy, the

9    government is not required to prove that the objective of

10    committing an act in violation of, first, 18 U.S.C. Section

11    1956(a)(1)(A)(i) or, second, 18 U.S.C. Section 1956(a)(1)(B)(i)

12    was achieved.  The government must prove, however, the

13    defendant conspired to commit one of these two offenses.  You

14    must be unanimous to at least one of the objectives the

15    defendant conspired to accomplish.

16            I'll now discuss with you the elements of the two

17    substantive offenses charged as the objects of the conspiracy.

18            The first alleged object of the conspiracy is money

19    laundering, in violation of 19 U.S.C. Section 1956(a)(1)(A)(i).

20    And that crime includes four elements:  First, that the

21    defendant knowingly conducted or attempted to conduct a

22    financial transaction.

23            Second, that the defendant knew that the money or

24    property involved in the transaction was the proceeds of some

25    kind of unlawful activity.

 1          Third, that the money or property came from an

 2   unlawful activity.  Specifically, the felonious manufacture,

 3   importation, receiving, concealment, buying, selling, or

 4   otherwise dealing in a controlled substance or listed chemical,

 5   in violation of 21 U.S.C. Sections 841(a)(1) and 846.

 6          And, fourth, that the defendant acted with intent to

 7   promote the carrying on of a specified unlawful activity,

 8   specifically, the felonious manufacture, importation,

 9   receiving, concealment, buying, selling, or otherwise dealing

10   in a controlled substance or listed chemical, in violation of

11   21 U.S.C. Sections 841(a)(1) and 846.

12          The second alleged object of the conspiracy is money

13   laundering, in violation of 18 U.S.C. Section 1956(a)(1)(B)(i).

14   That crime includes four elements:

15          First, the defendant conducted or attempted to

16   conduct a financial transaction.

17          Second, that the defendant knew that the money or

18   property involved in the transaction was the proceeds of some

19   kind of unlawful activity.

20          Third, that the defendant -- that the money or

21   property did come from an unlawful activity, specifically, the

22   felonous manufacture, importation, receiving, concealment,

23   buying, selling or otherwise dealing in a controlled substance

24   or listed chemical, in violation of 21 U.S.C. Sections

25   841(a)(1) and 846.

1    And, fourth, the defendant knew that the transaction

2    was designed, in whole or in part, to conceal or disguise the

3    nature, location, source, ownership, or the control of the

4    proceeds.

5    In other words, the government must prove that the

6    transaction was motivated, at least in part, by a desire to

7    conceal or disguise the nature, location, source, ownership, or

8    control of the proceeds.  The money laundering section does not

9    criminalize mere spending or investing of illegally obtained

10   funds.

11   For purposes of both the first and second alleged

12   objects of the money laundering conspiracy, you should use the

13   following definitions and instructions:

14   To, "act with the intent to promote the carrying on

15   of a specified unlawful activity," means the defendant acted

16   willfully, not by mistake or accident, with the deliberate

17   purpose of promoting, facilitating, or assisting the carrying

18   on of the specified unlawful activity.

19   To promote the carrying on of an activity means to

20   contribute to the prosperity of something or to further

21   something.

22   To "conduct a transaction," means to start or to

23   finish a transaction or to participate in a transaction at any

24   point.

25   A "transaction" includes a purchase, sale, transfer,

1    delivery, or other disposition.

2         And with respect to a financial institution, includes

3    a deposit, withdrawal, transfer between accounts, exchange of

4    currency, or other payments, transfers, or delivery by,

5    through, or to a financial institution by whatever means

6    affected.

7         A "financial transaction" means, A., a transaction

8    which in any way or degree affects interstate or foreign

9    commerce involving the movement of funds by wire or other

10   means, or, B., a transaction involving the use of a financial

11   institution which is engaged in or the activities which affect

12   interstate or foreign commerce in any way or degree.  For

13   purposes of this definition, the term "funds" includes Bitcoin.

14        The term "financial institution" includes any person

15   or entity who engages as a business in the transmission of

16   funds, including any person who engages as a business in an

17   informal money transfer system or any network of people who

18   engage as a business in facilitating the transfer of money,

19   domestically or internationally, outside the conventional

20   financial institution system.

21        "Interstate or foreign commerce" means trade and

22   other business activity between people or businesses in at

23   least two states or between people or businesses in the

24   United States and people or businesses outside the

25   United States.  The government is not required to prove the

1    defendant knew or intended the effect on interstate commerce,

2    merely that such effect occurred.

3        To know "that the money or property involved in the

4    transaction came from some kind of unlawful activity" is to

5    know that the money or property came from an activity that is a

6    felony under state, federal, or foreign law.  This knowledge

7    requirement includes instances of willful blindness.  The

8    government is not required to prove the defendant knew what the

9    unlawful activity was.

10       The term "proceeds" means any property derived from

11   or obtained or retained directly or indirectly through some

12   form of unlawful activity, including the gross receipts of the

13   activity.  The government is not required to prove that all of

14   the funds involved in the charged transactions were the

15   proceeds of the specified unlawful activity.  It is sufficient

16   if the government proves beyond a reasonable doubt that at

17   least part of the funds involved in a transaction represented

18   proceeds of specified unlawful activity.

19       The phrase "specified unlawful activity" means the

20   felonious manufacture, importation, receiving, concealment,

21   buying, selling, or otherwise dealing in a controlled substance

22   or listed chemical, in violation of 21 U.S.C. Sections

23   841(a)(1) and 846.

24       And I will instruct you as a matter of law that it is

25   a felony to manufacture, distribute, or dispense, or possess

1    with intent to manufacture, distribute, or dispense a

2    controlled substance, or to attempt or to conspire to commit

3    such an offense.

4            In this case, the defendant is not charged with

5    committing the underlying specified unlawful activity himself,

6    only the conspiring to launder the proceeds of specified

7    unlawful activity committed by others.  In other words, the

8    government does not need to prove the defendant himself

9    committed or is responsible for any controlled substance

10    offense.  However, the government needs to prove that at least

11    some amount of money or property the defendant conspired to

12    launder represented proceeds of the manufacture, distribution,

13    or dispensing of controlled substances.

14            And as I explained above, the defendant is charged

15    with conspiring to commit one or both of these alleged crimes.

16    The government is not required to prove that either of those

17    objectives was achieved, but it is required to prove beyond a

18    reasonable doubt that the defendant joined a conspiracy to

19    commit one or both of those crimes.

20            Count 2 of the indictment charges the defendant with

21    violating or attempting to violate 18 U.S.C. Section

22    1956(a)(3)(A) and (B).  And that statute provides, in relevant

23    part:  Whoever, with the intent to promote the carrying on or

24    specified unlawful activity, or to conceal or disguise the

25    nature, location, source, ownership, or control of property

1    believed to be the proceeds of specified unlawful activity,

2    conducts or attempts to conduct a financial transaction

3    involving property represented to be the proceeds of specified

4    unlawful activity or property used to conduct or facilitate

5    specified unlawful activity shall be guilty of an offense

6    against the United States.

7         The charge of money laundering, in violation of

8    18 U.S.C. Section 1956(a)(3)(A) and (B) contains three

9    elements, each of which the government must prove beyond a

10   reasonable doubt.

11        First, the defendant conducted or attempted to

12   conduct the financial transaction.

13        Second, that the transaction involved property

14   represented by a law enforcement officer to be the proceeds of

15   some form of unlawful activity.

16        Third, that, first, the defendant acted with the

17   intent to promote the carrying on of the specified unlawful

18   activity, or, second, the defendant acted with the intent to

19   conceal or disguise the nature, location, source, ownership, or

20   control of the property he believed to be the proceeds of the

21   specified unlawful activity.

22        I just wanted to correct one minor thing.  When I

23   read you from the statute, I think I used the word "or" and it

24   should have been "of."  So I'll read you the statute one more

25   time.

1          Whoever, with the intent to promote the carrying on

2     of specified unlawful activity -- and I had said "or" by

3     mistake the first time through, so that should be "of."

4          Here, the indictment alleges that the property

5     represented to be the proceeds of specified unlawful

6     activity -- that is, the felonious manufacturer, importation,

7     receiving, concealment, buying, selling, or otherwise dealing

8     in a controlled substance -- was the November 21, 2019,

9     movement of approximately 0.01146764 Bitcoin by wire or other

10    means from Bitcoin Fog to an IRS-CI controlled undercover

11    wallet.

12         The government is the not required to prove that the

13    law enforcement officer made an express, affirmative statement

14    to the defendant that the property involved was the proceeds of

15    unlawful activity.  Instead, the government must prove that the

16    law enforcement officer represented to the defendant

17    circumstances from which a reasonable person would infer that

18    the property was the proceeds of illegal activity.

19         You should consider all of the evidence in

20    determining whether the government has satisfied this standard.

21         The phrase "To act with the intent to promote and

22    carry on -- carry on specified unlawful activity," "conduct a

23    transaction," "transaction," "financial transaction,"

24    "financial institution," "interstate or foreign commerce,"

25    "proceeds," and "specified unlawful activity," have the same

1   meaning that I just described to you in addressing the objects

2   of the conspiracy count and you should rely on those same

3   definitions in your deliberations.

4          And you can consider it merciful -- both to you and

5   to me -- not to have to read through all those definitions

6   again.

7          In this case, the defendant is not charged with

8   committing the underlying specified unlawful activity himself,

9   only with laundering property represented to be the proceeds of

10  specified unlawful activity committed by others or intended to

11  be used to promote specified unlawful activity committed by

12  others.  In other words, the government does not need to prove

13  the defendant himself committed or was responsible for any

14  controlled substance offense.

15         Count 3 of the indictment charges the defendant with

16  violating 18 U.S.C. Section 1960(a).  This statute provides, in

17  relevant part:  Whoever knowingly conducts, controls, manages,

18  supervises, directs, or owns all or part of an unlicensed money

19  transmitting business shall be guilty of an offense against the

20  United States.

21         In order to find the defendant guilty of violating 18

22  U.S.C. Section 1960(a), the government must prove the following

23  elements beyond a reasonable doubt:  First, that Bitcoin Fog

24  was an unlicensed money transmitting business.  And I will

25  explain what an unlicensed money transmitting business is in a

1      moment.

2              Second, that the defendant knowingly -- knowingly

3      controlled, conducted, managed, supervised, directed, or

4      otherwise owned the business.  The government is not required

5      to prove the defendant did all of the things in this list, but

6      only that he did one of them.

7              And, third, that the money transmitting business

8      affected interstate or foreign commerce.

9              For purposes of this count, interstate or foreign

10     commerce simply means the movement of goods, services, money in

11     individuals between states or between the United States and a

12     foreign state or nation.

13             The government must prove that the money transmitting

14     business affected interstate or foreign commerce in any

15     manner -- I'm sorry.

16             The government must prove that the money transmitting

17     business affected interstate or foreign commerce in any manner,

18     no matter how minimal.

19             Now I'll provide more explanation about the first

20     element the government must prove beyond a reasonable doubt,

21     that Bitcoin Fog was an unlicensed money transmitting business.

22             A business is a commercial enterprise that is

23     regularly carried on for profit.  A single, isolated instance

24     of money transmitting is not a business under this definition.

25             The term "money transmitting" includes transferring

1    funds on behalf of the public by any and all means, including,

2    but not limited to, transfers within this country or to

3    locations abroad by wire, check, draft, facsimile, or courier.

4    For purposes of this definition, the term "funds" includes

5    Bitcoin.

6            An unlicensed money transmitting business means a

7    money transmitting business that satisfies any one of the

8    following three elements:

9            You can find the defendant guilty on this count if

10   you unanimously find any one of the elements -- of these

11   elements were satisfied.  You don't have to find that all three

12   were satisfied.

13           The first is that the money transmitting business

14   operated with an appropriate money transmitting license -- I'm

15   sorry.

16           The money transmitting business operated without an

17   appropriate money transmitting license in the District of

18   Columbia where such operation is punishable as a misdemeanor or

19   felony under District of Columbia law, whether or not the

20   defendant knew a license was required or was punishable by

21   District of Columbia law.

22           Second, the money transmitting business failed to

23   comply with the money transmitting business registration

24   requirements under federal law.

25           Or, third, the money transmitting business involved

1    the transportation or transmission of funds that are known to

2    the defendant to have been derived from a criminal offense or

3    intended to be used to promote or support unlawful activity.

4         So I'll now walk through each of these three for

5    purposes of considering whether the defendant operated an

6    unlicensed money laundering business in a state where doing so

7    is punishable as a misdemeanor or felony.

8         I will instruct you the term "state" includes the

9    District of Columbia, and that a violation of Section

10   26-1023(c) of the D.C. Code is punishable as a felony.

11        The elements of money transmission without a license,

12   in violation of Section 26-1023(c) of the D.C. Code, each of

13   which the government must prove beyond a reasonable doubt, are

14   as follows:

15        First, the defendant knowingly engaged in the

16   business of money transmission in the District of Columbia.

17   And, second, the defendant did not have a license to engage in

18   the business of money transmission in the District of Columbia.

19        Under D.C. law money transmission means the sale or

20   issuance of payment instruments or engaging in the business of

21   receiving money for transmission or transmitting money within

22   the United States or to a location abroad by any and all means,

23   including, but not limited to, payment instrument, wire,

24   facsimile, or electronic transfer.  D.C. law, in turn, requires

25   that someone -- that someone engaged in a money transmission

1    business obtain a license from the D.C. government to operate

2    in the District of Columbia.  For purposes of this provision,

3    the term "money" includes Bitcoin.

4         To satisfy the District of Columbia licensing

5    element, the government does not need to prove the defendant

6    knew that a license was required by D.C. law to operate a money

7    transmitting business, but it must prove that he knowingly

8    operated a money transmitting business in the District of

9    Columbia and that he did not have a license to do so.

10        The government may also satisfy the unlawful money

11   transmitting business element by proving the defendant failed

12   to comply with the money transmitting business registration

13   requirements under 31 U.S.C. Section 5330 or its implementing

14   regulations.  And this is the second way.

15        Under those regulations, money services businesses

16   must register with the Secretary of Treasury, or FinCEN.  The

17   term "money services business" is defined to include any money

18   transmitter.  A money transmitter is a person or entity that

19   provides money transmission services for any other person or

20   entity engaged in the transfer of funds.

21        "Money transmission services" means the acceptance of

22   currency from one person in the transmission of currency,

23   funds, or other value that substitutes for currency to another

24   location or person by any means, including an electronic

25   transfer network or an informal value transfer system.

1          Money transmission services are required to register

2     if they are doing business, whether or not on a regular basis,

3     or as an organized or licensed business, in substantial part

4     with the United States.

5          For purposes of these definitions, the term "funds"

6     includes Bitcoin.  The movement of Bitcoin from one Bitcoin

7     address to another Bitcoin address on the Bitcoin blockchain

8     can represent movement of funds from one location or person to

9     another location or person.

10          And then, finally, and this is the third way the

11     government can satisfy the unlicensed money transmitting

12     business requirement, by proving that the money transmitting

13     business involved the transportation or transmission of funds

14     that were known to the defendant to have been derived from a

15     criminal offense, or that were intended to be used to promote

16     or to support unlawful activity.  For purposes of this element,

17     any criminal offense or unlawful activity is sufficient.  The

18     government is not limited to proving that the funds were

19     derived from or intended to promote a specific criminal

20     offense.

21          As I explained above, to return a verdict of guilty

22     on Count 3 you do not need to find that the defendant operated

23     an unlicensed money transmitting business in all three of the

24     ways I've just described, but you must unanimously find beyond

25     a reasonable doubt that he did so in at least one of these

 1    ways.

 2            The verdict form will ask you, if you find the

 3    defendant guilty on Count 3, to indicate which one, two, or

 4    three of the ways I've described you unanimously agree applies

 5    here.

 6            Count 4 charges the defendant with money transmission

 7    without a license, in violation of D.C. Code § 26-1023(c).  The

 8    elements of that offense, both of which the government must

 9    prove beyond a reasonable doubt are as follows:

10            First, of the defendant knowingly engaged in the

11    business of money transmission in the District of Columbia,

12    and, second, the defendant did not have a license to engage in

13    the business of money transmission in the District of Columbia.

14            Engaging in the business of money transmission means

15    engaging in the business of receiving money for transmission,

16    or transmitting money within the United States or to a location

17    abroad by any and all means including but not limited to

18    payment instrument, wire, facsimile or electronic transfer.

19    D.C. law, in turns, requires that any money transmission

20    business obtain a license from the D.C. government to operate

21    in the District of Columbia.  For purposes of these provisions

22    the term "money" includes Bitcoin.

23            To satisfy the District of Columbia licensing element

24    the government does not need to prove the defendant knew a

25    license was required by D.C. law to operate a money

1    transmitting business, but it must prove that he knowingly

2    operated a money transmitting business in the District of

3    Columbia and that he did not have a license to do so.

4            You may find the defendant guilty of a crime charged

5    in the indictment without finding that he personally committed

6    each of the acts constituting the offense or was personally

7    present at the commission of the offense.  A defendant is

8    responsible for an act which he willfully causes to be done if

9    the act would be criminal if performed by him directly or by

10   another.  To cause an act to be done means to bring it about.

11           You may convict the defendant of the offense charged

12   if you find that the government has proved beyond a reasonable

13   doubt each element in the offense, and the defendant willfully

14   caused such an act to be done, with the intent to commit the

15   crime.

16           You may find the defendant guilty of any of the

17   crimes charged in the indictment without finding that he

18   personally committed each of the acts that make up the crime,

19   or that he was present while the crime was being committed.

20   Any person who in some way intentionally participates in the

21   commission of a crime can be found guilty either as an aider

22   and abettor or as a principal offender.  It makes no difference

23   which label you attach, the person is as guilty of the crime as

24   he would be if he had personally committed each of the acts

25   that make up the crime.

To fine that a defendant aided and abetted in committing a crime you must find the defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about, and that intended by his actions to make it succeed.

Such affirmative conduct by the defendant in planning or carrying out the crime is necessary.  Mere physical presence by the defendant at the place in time the crime is committed is not by itself sufficient to establish his guilt.  It is not necessary that you find the defendant was actually present while the crime was being committed.  The government is not required to prove that anyone discussed or agreed upon a specific time or method of committing the crime.

The government is not required to prove the crime was committed in the particular way planned or agreed upon.  Nor need the government prove that the principal offender and the person alleged to be the aider and abetter directly communicated with each other.  It is not necessary that all people who committed the crime be caught or identified.  It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone and that the defendant knowingly and intentionally aided and abetted in committing that crime.

For each offense charged in the indictment, the indictment alleges that some act or omission in furtherance of the offense occurred in the District of Columbia.  There is no

1    requirement that all aspects of the offense charged take place

2    in the District of Columbia.  But for you to return a guilty

3    verdict the government must convince you that some act or

4    omission in furtherance of the crime charged took place in the

5    District of Columbia.

6         Like all the elements that I've described, this fact

7    only has to be proved by a preponderance of the evidence.  This

8    means the government only has to convince you that it is more

9    likely than not that some act or omission in furtherance of the

10   crime charged took place here.  Remember that the government

11   must prove all the elements I've described -- all the other

12   elements I've described to you beyond a reasonable doubt.

13        For Count 1 there is no requirement that the entire

14   or even a substantial portion of the alleged conspiracy take

15   place in this district.  But in order for you to return a

16   guilty verdict the government must prove by a preponderance of

17   the evidence that either an agreement to commit an unlawful act

18   or an overt act took place in this district, even if the

19   defendant never set foot in this district.  And an overt act is

20   an act performed to affect the object or objects of a

21   conspiracy, although it remains separate and distinct from the

22   conspiracy itself.  Although the overt act need not be criminal

23   in nature, it must be done in furtherance of the object or

24   objects of the conspiracy.  The overt act need not be completed

25   by the defendant, or even by a co-conspirator; it can be

1    completed by a government agent, as long as it was made in

2    furtherance of the object or objects of the conspiracy.

3          For Count 2, venue is proper under 18 U.S.C. Section

4    had 1956(i)(1)(A), in any District in which the financial or

5    money transaction that constitutes the offense is conducted.

6    It is not necessarily that the entire transaction occur in this

7    district.  Rather, all that required is that the transaction

8    start or finish, or that someone participate in the transaction

9    at any point in this district.

10          For count 3 and 4 venue is proper in any district

11    where the offense was committed.  This means that venue is

12    proper in any district where some conduct constituting the

13    offense occurred.  For crimes that allege a failure to register

14    or to obtain a license, the conduct constituting the offense

15    includes the failure to register or to obtain a license in the

16    jurisdiction where doing so is required.  But the relevant

17    conduct can also include the underlying financial transactions.

18          In general, the statute of limitations is not part of

19    the case that the government has to prove.  However, if the

20    defendant raises a defense that the statute of limitations has

21    elapsed for any crime -- any of the crimes charged in the

22    indictment, then the government must prove the crime was

23    committed during the limitations period.

24          The money laundering conspiracy charged in Count 1 is

25    a continuing offense.  Similarly, the unlicensed money

1    transmitting business offenses charged in Counts 3 and 4 are

2    also continuing offenses.  A continuing offense is defined as a

3    continuous course of unlawful conduct.  The statute of

4    limitations for a continuing offense only begins to run after

5    the last of the continuing offense -- or, the last day of the

6    continuing offense.

7            I will instruct you that the government must prove

8    beyond a reasonable doubt that conduct related to Counts 1, 3,

9    and 4, if any, continued up to at least the following dates --

10           I'm sorry.  Let me read that again.  I will instruct

11   you the government must prove beyond a reasonable doubt that

12   the conduct related to Counts 1, 3, and 4, if any, continued up

13   to at least the following days to be within the applicable

14   statute of limitation period:  For Count 1, July 18th 2017.

15   For Count 3, July -- or, June 14th, 2016.  And for Count 4,

16   June 14th, 2015.

17           For Count 2, I will instruct you that the government

18   move prove beyond a reasonable doubt that the financial

19   transaction charged in Count 2 must have occurred on or after

20   the following date to be within the applicable statute of

21   limitations, and that's June 14th, 2016.

22           A verdict must represent the considered judgment of

23   each juror.  And in order to return a verdict each juror must

24   agree on the verdict.  In other words, your verdict on each

25   count must be unanimous.

1          As I previously explained, for purposes of Count 1
2   you need to reach a unanimous verdict with respect to the crime
3   charged in that count.  And you must reach a unanimous verdict
4   with respect to each of the two alleged objects of the
5   conspiracy.  You may find the defendant guilty on this count
6   only if the government proves beyond a reasonable doubt that
7   the defendant conspired to commit at least one of the two
8   alleged objects of the conspiracy.

9          For purposes of Count 3 you need to reach a unanimous
10  verdict with respect to the crime charged in that count and you
11  must reach a unanimous verdict with respect to each of the
12  three alternative ways in which the government alleges the
13  defendant engaged in an unlicensed money transacting business.
14  You may find the defendant guilty on this count only if the
15  government proves beyond a reasonable doubt the defendant
16  conducted an unlicensed money transmitting business in at least
17  of the these three ways.

18          We're getting close.

19          You will be provided with a verdict form for use when
20  you have concluded your deliberations.  The form is not
21  evidence in this case and nothing in it should be taken to
22  suggest or convey any opinion by me as to what verdict -- what
23  the verdict should be.  Nothing in the form replaces the
24  instructions of law I've already given you.  And nothing in it
25  replaces or modifies the instructions about the elements which

1    the government must prove beyond a reasonable doubt.  The form

2    is meant only to assist you in returning or recording your

3    verdict.

4            I will be sending into the jury room with you the

5    exhibits that have been admitted into evidence.  You may

6    examine any and all of them as you consider your verdicts.

7    Please keep in mind that the exhibits that were only marked for

8    identification but were not admitted into evidence will not be

9    given to you to examine or consider in reaching your verdict.

10           During the course of this trial a number of the

11   exhibits were admitted in evidence and sometimes only portions

12   of an exhibit was admitted, such as portions of a document with

13   some words or pictures blacked out or otherwise removed.  There

14   are a variety of reasons why only a portion of an exhibit is

15   admitted, including that the other portions are inadmissible or

16   implicate an individual's privacy.

17           As you examine these exhibits and you see or hear

18   portions where there appear to be omissions, you should

19   consider only the portions that were admitted.  You should not

20   guess as to what has been taken out or why and you should not

21   hold it against either party.  You are to decide the facts only

22   from the evidence that is before you.

23           When you return to the jury room, you should first

24   select a foreperson to preside over your deliberations and to

25   be your spokesperson here in court.  There are no specific

1    rules regarding how you should select a foreperson; that is up

2    to you.  However, as you go about the task, be mindful of your

3    mission to reach a fair and just verdict based on the evidence.

4    Consider selecting a foreperson who will be able to facilitate

5    your discussions, who can help you organize the evidence, will

6    encourage civility and mutual respect among all of you, who

7    will invite each juror to speak up regarding his or her views

8    about the evidence, and who will promote a full and fair

9    consideration of that evidence.

10          The question of possible punishment of the defendant

11   in the event of a conviction is not a concern of yours and

12   should not enter into or influence your deliberations in any

13   way.  The duty of imposing sentence in the event of a

14   conviction rests exclusively with me.  Your verdict should be

15   based solely on the evidence in this case and you should not

16   consider the matter of punishment at all.

17          I would like to remind you that in some cases,

18   although not necessarily this one, there may be reports in the

19   newspaper or on the radio, internet, or television concerning

20   the case.  If there should be such media coverage in this case,

21   you may be tempted to read, listen to, or watch it.  You must

22   not read, listen to, or watch such reports because you must

23   decide this case solely on the evidence presented in the

24   courtroom.

25          If any publicity about this trial inadvertently comes

1    to your attention, do not discuss it with other jurors or with

2    anyone else.  Just let me or the clerk know as soon as it

3    happens and we will briefly discuss it with you.

4            And as you retire to the jury room to deliberate, I

5    want to remind you of an instruction that I gave you at the

6    beginning of the trial and I've given you throughout the trial:

7    During your deliberations you may not communicate with anyone

8    not on the jury about this case.  That includes any electronic

9    communication, such as email or text or any blogging about the

10    case.

11            In addition, you may not conduct any independent

12    investigation of any kind during your deliberations.  This

13    means that you may not conduct any research in person,

14    electronically via the internet or in any other way.

15            If it becomes necessary during your deliberations to

16    communicate with me, you may send a note by the deputy clerk or

17    marshal, signed by your foreperson or by one more members of

18    the jury.  No members of jury should try to communicate with me

19    except by such a signed note.  And I will never communicate

20    with any member of the jury on any matter concerning the merits

21    of this case, except in writing or orally here in open count.

22            Bear in mind, also, that you are never, under any

23    circumstances, to reveal to any person -- not the deputy clerk,

24    the marshal, or me -- how jurors are voting until you have

25    reached a unanimous verdict.  This means that you should not

1    tell me, in writing or in open court, how the jury is divided

2    on any matter; for example, 6 to 6, or 7 to 5, or 11 to 1, or

3    any other fashion, whether the vote is for conviction or

4    acquittal, or on any other issue.

5          The attitude and conduct of jurors at the beginning

6    of their deliberations is a matter of considerable importance.

7    It may not be useful for a juror, upon entering the jury room,

8    to voice a strong expression of an opinion on the case or to

9    announce a determination to stand for a certain verdict.  When

10   one does that at the outset, a sense of pride may cause that

11   juror to hesitate to back away from an announced position after

12   discussion of the case.

13         Furthermore, many juries find it useful to avoid an

14   initial vote upon retiring to the jury room.  Calmly reviewing

15   and discussing the case at the beginning of deliberations is

16   often a more useful way to proceed.  Remember that you are not

17   partisans or advocates in this matter, but you are the judges

18   of the facts.

19         The last thing I must do before you -- excusing you

20   for the day is to excuse the alternate jurors.  And as I told

21   you, the selection of alternate jurors was an entirely random

22   process.  It is nothing personal.  We selected the four seats

23   to be the alternate seats before you entered the courtroom,

24   before you even began the jury selection process.

25         And I will now excuse the alternate jurors who are in

1    seats 6, 11, and 14.  And before you leave, I'm going to ask

2    that you tear the pages out of your notebooks -- or give your

3    notebooks -- or, tear a page out of your notebook and write

4    your name and daytime number and hand it to the deputy clerk.

5         I do this because it's possible, although unlikely,

6    that we will need to summon you back to rejoin the jury in case

7    something happens to a regular juror.  And since that

8    possibility exists, I'm going to instruct you not to discuss

9    the case with anyone until we call you to let you know that we

10   have a verdict in the case.  My earlier instruction on the use

11   of the internet still applies.  Do not research the case or

12   communicate about it on the internet.

13        In all likelihood we'll be calling to tell you

14   there's been a verdict and you are now free to discuss the

15   case.  There is, however, a small chance that we will need to

16   bring you back onto the jury.

17        I thank you very much for your service.  And I'll ask

18   that you give your juror badge to the deputy clerk.

19        I will say in particular, in a case of this length,

20   this is one of the things that pains me the most.  I mean, it

21   may be that some people are perfectly happy not to deliberate,

22   but there are others who have sat though a long proceeding and

23   won't join in the deliberations, and I -- I'm sorry for that.

24   It's something that's important to the system.  But I really am

25   extremely appreciative to your -- to your participation in this

1    case because it's something of enormous importance.

2            And we had four alternates, given the length of this

3    case, and we only ended up losing one juror along the way,

4    which is unusual for a case of this length.  So I do thank you

5    for your service.

6            So I am now going to excuse you briefly with the

7    deputy clerk and she can provide you with a little bit of

8    orientation and then you can start your deliberations first

9    thing tomorrow morning.

10           You can -- you can start your deliberations as soon

11   as all of you are convened.  You should not start your

12   deliberations until every one of the jurors is in the jury room

13   because we do not want anyone missing out or not participating

14   fully in all of the discussion.  So only deliberate, both at

15   the beginning and throughout the process, when all of the

16   jurors are present.

17           And we will have my jury instructions for you and

18   copies for each of you in the morning.  And we will also have

19   the exhibits available for you then.

20           So -- yes?

21           A JUROR:  Should everyone who is deliberating wait

22   until the alternates leave before they start deliberating?

23           THE COURT:  Well, no, because they're not going to

24   start -- because it's the end of the day, so they're not going

25   to start their deliberations until tomorrow morning anyway.  So

```
 1    I think that's fine, and you're welcome to say -- I know you've

 2    all been together, so you're welcome to say your farewells as

 3    well in that -- in that process.

 4            And then, you know, what time would you like to start

 5    tomorrow?  9 o'clock?  Does that make sense?

 6            THE JURORS:  Nine.

 7            THE COURT:  Yes?

 8            THE JURORS:  At 9 there's an appointment I should

 9    call into.  So I can physically be here, but...

10            THE COURT:  How long will it take?

11            THE JURORS:  If it starts on time, it will be done at

12    9:20.

13            THE COURT:  All right.  So why don't we do this:  Why

14    doesn't everyone try and be here at 9 so that at 9:30 -- you

15    can really promptly start at 9:30.

16            Everyone try and get here at 9.  We'll have

17    breakfast.  You get lunch during deliberations, as well.  And

18    get here early and we'll plan at 9:30 to be able to close the

19    door and start your deliberations right then.

20            Anything else before I excuse you all for the night?

21            Oh, and I just remind you, still don't discuss the

22    case with anybody.  And don't discuss even with each other

23    until you're ready to start your deliberations.

24            So, thank you.  We'll see you tomorrow.

25            (Whereupon the jurors leave the courtroom.)
```

```
 1              THE COURT:  So everyone should be -- I guess you
 2    don't need to be here available until 9:30.  But counsel for
 3    both sides should be available on ten minutes call.  So don't
 4    go far.  And you probably want to set up in the attorneys'
 5    lounge or somewhere like that, or certainly nearby so that when
 6    you get a call from the deputy clerk, you can be here in ten
 7    minutes, if we get a note or anything from the jury.
 8              Yes?
 9              MR. PEARLMAN:  The Court wants us here at 9:30
10    tomorrow morning though?
11              THE COURT:  No.  I don't think -- that's up to you,
12    but I don't think we need to bring the jury -- unless you saw
13    any reason to bring the jurors in, just to see all of you
14    before they begin their deliberations.
15              MR. PEARLMAN:  No.
16              THE COURT:  So I just need you to be available
17    starting at 9:30, in case there's an immediate note.  Seems
18    unlikely, but you never know.
19              One question I have for you, though, is if the
20    deliberations go beyond a day, do you want me to convene the
21    jury at the end of the day to instruct them not to talk about
22    the case and to tell them to be back the next day, or on
23    Monday?  Or are you content with leaving that up to the deputy
24    clerk, to just keep us all updated on when they want to come
25    back?
```

1          And if they want to leave at 4, they're welcome to

2     leave at 4.  If they want to stay until 5, they're welcome to

3     say until 5, and just have the deputy clerk keep us posted.

4          MR. PEARLMAN:  From the government's perspective, the

5     deputy clerk keeping them posted, or something informal.

6          THE COURT:  Mr. Ekeland?

7          MR. EKELAND:  The defense agrees with the government.

8          THE COURT:  Okay.  So we'll do that.  I will ask the

9     deputy clerk to remind them -- even though they are sick of

10    hearing it -- not to discuss the case with anybody if and when

11    they go home at the end of the day.

12          MR. EKELAND:  And, Your Honor, they're -- I'm

13    assuming the jury is sitting for the full day tomorrow, right?

14          THE COURT:  Say it again?

15          MR. EKELAND:  The jury is going to sit for the full

16    day tomorrow?

17          THE COURT:  As far as I know they are.  Yeah, I'm not

18    aware -- other that that item I just heard about just now, I'm

19    not aware of any issues.

20          The first issue I have is on Wednesday, there is

21    somebody who has a medical appointment.  But you never know,

22    there could be more.

23          All right.  Well, we will keep you posted.  So thank

24    you all.

25          You may have noticed, I think there were one or two

1    small changes -- one typo I caught as I was reading through the

2    instructions, so we'll just make that correction when we send

3    it back to the jury.

4                                    *   *   *

5

6

7

8              CERTIFICATE OF OFFICIAL COURT REPORTER

9

10        I, JANICE DICKMAN, do hereby certify that the above and

11   foregoing constitutes a true and accurate transcript of my

12   stenographic notes and is a full, true and complete transcript

13   of the proceedings to the best of my ability.

14                        Dated this 8th day of March, 2024

15

16

17              _____

18              Janice E. Dickman, CRR, CMR, CCR
                Official Court Reporter
19              Room 6523
                333 Constitution Avenue, N.W.
20              Washington, D.C.  20001

21

22

23

24

25

## $

**$17** [1] - 56:25
**$20** [1] - 35:13
**$280,000** [2] - 52:21, 57:6
**$40,000** [1] - 58:13
**$69,000** [1] - 26:21
**$70** [2] - 29:16, 56:24
**$90,000** [1] - 58:18

## '

**'** 
**'13** [1] - 36:11

## 0

**0.01146764** [1] - 89:9

## 1

**1** [19] - 2:25, 11:11, 20:1, 25:25, 31:1, 34:22, 35:12, 40:22, 56:23, 77:16, 77:23, 79:3, 99:13, 100:24, 101:8, 101:12, 101:14, 102:1, 106:2
**1.8** [1] - 35:14
**10** [3] - 16:20, 35:13, 35:19
**100** [1] - 53:21
**11** [1] - 106:2
**120,000** [1] - 44:11
**12th** [1] - 34:4
**13** [3] - 22:21, 36:24, 37:23
**14** [2] - 22:19, 26:5
**14th** [4] - 26:6, 101:15, 101:16, 101:21
**17th** [1] - 26:2
**18** [16] - 21:21, 77:25, 78:4, 78:10, 79:5, 79:6, 79:22, 79:23, 82:10, 82:11, 83:13, 87:21, 88:8, 90:16, 90:21, 100:3
**18th** [3] - 26:1, 46:19, 101:14
**19** [3] - 40:3, 78:11, 82:19
**1956(a)(1)** [1] - 77:25
**1956(a)(1)(A)(i** [3] - 79:5, 79:23, 82:11
**1956(a)(1)(A)(i)** [2] - 21:21, 82:19
**1956(a)(1)(B)(i** [1] - 82:11
**1956(a)(1)(B)(i)** [3] - 79:7, 79:24, 83:13

**1956(a)(3)** [1] - 78:5
**1956(a)(3)(A** [2] - 87:22, 88:8
**1956(i)(1)(A** [1] - 100:4
**1960(a** [2] - 78:11, 90:22
**1960(a)** [1] - 90:16
**1st** [1] - 34:14

## 2

**2** [14] - 6:14, 11:9, 21:24, 22:3, 26:5, 29:11, 35:15, 52:6, 78:1, 78:11, 87:20, 100:3, 101:17, 101:19
**2.3** [1] - 57:16
**20** [3] - 40:13, 57:23, 57:25
**20-dollar** [1] - 40:14
**2010** [6] - 26:18, 35:8, 35:9, 36:10, 44:3
**2010s** [1] - 57:20
**2011** [16] - 20:11, 20:23, 21:14, 22:19, 22:23, 23:16, 26:12, 36:10, 42:1, 59:1, 59:8, 77:6, 77:17, 78:7, 78:13, 79:20
**2012** [3] - 23:20, 36:11, 59:8
**2013** [2] - 23:20, 27:12
**2014** [2] - 23:21, 56:8
**2015** [5] - 23:21, 26:6, 34:4, 56:8, 101:16
**2016** [5] - 23:21, 26:5, 26:6, 101:15, 101:21
**2017** [7] - 23:21, 26:1, 32:5, 45:14, 56:5, 56:19, 101:14
**2018** [2] - 23:21, 57:7
**2019** [4] - 22:17, 23:21, 78:4, 89:8
**2020** [3] - 23:21, 52:20, 57:5
**2021** [9] - 11:17, 23:21, 54:14, 57:1, 77:7, 77:18, 78:8, 78:14, 79:21
**2022** [1] - 34:9
**2023** [1] - 34:14
**2024** [1] - 58:10
**2026** [1] - 34:5
**21** [6] - 27:22, 83:5, 83:11, 83:24, 86:22, 89:8
**21st** [1] - 78:4
**22** [1] - 27:22
**26-1023(c** [3] - 78:17, 93:10, 93:12

**26-1023(c)** [1] - 96:7
**27** [3] - 77:17, 78:7, 79:21
**2700-some** [1] - 58:21
**27th** [8] - 22:23, 77:6, 77:7, 77:18, 78:8, 78:13, 78:14, 79:20
**2:00** [1] - 14:25
**2:06** [1] - 14:25

## 3

**3** [19] - 7:22, 9:14, 10:1, 11:11, 22:24, 23:10, 26:5, 34:22, 56:23, 78:6, 90:15, 95:22, 96:3, 100:10, 101:1, 101:8, 101:12, 101:15, 102:9
**30** [3] - 26:19, 57:23, 57:25
**31** [1] - 94:13
**313** [3] - 20:14, 39:3, 49:5
**363** [1] - 53:13
**3:23** [1] - 61:18
**3:37** [1] - 61:18

## 4

**4** [12] - 10:1, 10:3, 11:11, 26:6, 56:23, 78:12, 96:6, 100:10, 101:1, 101:9, 101:12, 101:15
**4th** [1] - 26:5

## 5

**5** [1] - 106:2
**5330** [1] - 94:13
**55.a** [1] - 53:20
**5th** [1] - 34:9

## 6

**6** [2] - 106:2

## 7

**7** [1] - 106:2

## 8

**800** [1] - 47:11
**841(a)(1** [4] - 83:5, 83:11, 83:25, 86:23
**846** [4] - 83:5, 83:11, 83:25, 86:23

## 9

**900** [1] - 47:11
**915** [1] - 58:24

## A

**abetted** [2] - 98:1, 98:22
**abetter** [1] - 98:17
**abetting** [4] - 10:18, 11:5, 60:6
**abettor** [1] - 97:22
**abided** [1] - 78:10
**ability** [3] - 51:11, 54:17, 67:14
**able** [10] - 7:20, 28:5, 49:9, 53:4, 54:14, 54:15, 55:4, 71:2, 104:4
**Abraham** [1] - 46:22
**abroad** [3] - 92:3, 93:22, 96:17
**absolutely** [4] - 3:7, 8:16, 13:14, 34:17
**abundantly** [1] - 9:19
**accept** [6] - 62:18, 70:7, 71:4, 73:3, 73:19, 74:19
**acceptable** [1] - 67:3
**acceptance** [1] - 94:21
**accepted** [1] - 55:23
**access** [6] - 33:22, 42:21, 52:14, 54:15, 55:4
**accessed** [1] - 11:19
**accessing** [1] - 42:22
**accident** [2] - 76:3, 84:16
**accomplish** [1] - 82:15
**account** [13] - 21:13, 21:14, 21:15, 27:16, 30:1, 31:7, 31:8, 36:12, 40:7, 49:10, 57:21
**accounting** [2] - 72:17, 72:21
**accounts** [12] - 21:4, 30:20, 30:21, 30:25, 31:5, 41:4, 43:23, 44:7, 45:1, 57:23, 58:17, 85:3
**accuracy** [3] - 43:18, 69:17, 73:20
**accurate** [4] - 38:8, 49:18, 69:10, 70:8
**accurately** [2] - 69:1, 74:14
**accused** [2] - 23:1, 76:23

**accusing** [1] - 64:18
**achieved** [2] - 82:12, 87:17
**acknowledgment** [1] - 58:19
**acquittal** [1] - 106:4
**act** [22] - 57:9, 66:3, 75:13, 76:1, 79:15, 79:22, 82:10, 84:14, 89:21, 97:8, 97:9, 97:10, 97:14, 98:24, 99:3, 99:9, 99:17, 99:18, 99:19, 99:20, 99:22, 99:24
**Act** [1] - 9:7
**acted** [9] - 22:24, 23:5, 75:23, 76:20, 81:24, 83:6, 84:15, 88:16, 88:18
**acting** [3] - 60:7, 80:24
**actions** [5] - 2:24, 76:23, 76:25, 77:1, 98:5
**active** [1] - 6:4
**activities** [1] - 85:11
**activity** [53] - 3:7, 3:14, 3:23, 4:4, 4:11, 5:15, 6:17, 6:22, 9:11, 22:6, 23:2, 23:9, 51:22, 74:24, 78:3, 82:25, 83:2, 83:7, 83:19, 83:21, 84:15, 84:18, 84:19, 85:22, 86:4, 86:5, 86:9, 86:12, 86:13, 86:15, 86:18, 86:19, 87:5, 87:7, 87:24, 88:1, 88:4, 88:5, 88:15, 88:18, 88:21, 89:2, 89:6, 89:15, 89:18, 89:22, 89:25, 90:8, 90:10, 90:11, 93:3, 95:16, 95:17
**acts** [6] - 75:17, 81:13, 81:17, 97:6, 97:18, 97:24
**actual** [2] - 38:12, 66:13
**add** [3] - 13:11, 35:16, 47:19
**added** [1] - 13:8
**addition** [1] - 105:11
**additional** [1] - 6:5
**address** [14] - 8:18, 13:12, 16:4, 17:14, 20:17, 20:19, 37:16, 39:7, 39:12, 39:20, 40:1, 43:4, 95:7
**addresses** [6] - 16:16, 37:23, 40:3, 49:11, 53:16, 56:25

**addressing** [1] - 90:1
**admin** [2] - 46:8, 60:3
**administrative** [1] - 77:20
**administrator** [2] - 30:4, 55:5
**administrators** [1] - 5:5
**admissible** [1] - 68:8
**admit** [1] - 25:4
**admitted** [10] - 62:23, 64:1, 64:3, 73:15, 103:5, 103:8, 103:11, 103:12, 103:15, 103:19
**advance** [1] - 80:19
**advocates** [1] - 106:12
**affect** [6] - 67:14, 67:16, 70:15, 74:14, 85:11, 99:20
**affected** [6] - 9:18, 24:20, 85:6, 91:8, 91:14, 91:17
**affecting** [1] - 9:20
**affects** [2] - 69:6, 85:8
**afternoon** [3] - 2:22, 15:8, 48:11
**afterwards** [1] - 27:1
**agency** [1] - 8:21
**Agent** [6] - 3:18, 6:16, 7:2, 7:8, 7:16, 11:20
**agent** [3] - 72:2, 79:17, 100:1
**agent's** [2] - 71:21, 71:23
**ago** [4] - 13:19, 22:19, 22:21, 37:23
**agree** [6] - 19:21, 22:1, 48:21, 51:11, 96:4, 101:24
**agreed** [6] - 64:6, 70:21, 70:22, 80:12, 98:12, 98:15
**agreement** [22] - 4:19, 4:21, 4:22, 20:4, 21:25, 71:4, 71:8, 71:10, 71:14, 71:16, 71:18, 79:14, 79:21, 79:25, 80:3, 80:10, 80:11, 80:14, 80:22, 80:24, 80:25, 99:17
**agreements** [1] - 70:20
**agrees** [1] - 80:16
**ahead** [1] - 14:19
**ahold** [1] - 54:17
**aid** [1] - 63:19
**aided** [3] - 78:9, 98:1, 98:22
**aider** [2] - 97:21, 98:17
**aiding** [4] - 10:18,

11:5, 60:6
**airport** [4] - 18:7, 30:9, 54:11
**Akemashite** [12] - 7:11, 10:24, 17:11, 17:20, 21:9, 30:23, 31:1, 33:25, 40:22, 41:3, 51:9, 57:13
**Akemashite's** [1] - 57:11
**Alexandra** [2] - 10:12, 11:21
**all-time** [1] - 26:21
**allege** [1] - 100:13
**alleged** [16] - 16:3, 62:2, 77:8, 77:11, 77:13, 77:24, 79:12, 80:7, 82:18, 83:12, 84:11, 87:15, 98:17, 99:14, 102:4, 102:8
**alleges** [4] - 77:23, 89:4, 98:24, 102:12
**allow** [4] - 13:8, 13:12, 67:16, 75:6
**almost** [2] - 30:20, 48:12
**alone** [4] - 62:24, 62:25, 68:22, 71:6
**alternate** [4] - 106:20, 106:21, 106:23, 106:25
**alternative** [1] - 102:12
**ambiguity** [1] - 38:16
**ambiguous** [2] - 49:7, 59:18
**ambivalent** [1] - 42:19
**America** [1] - 19:6
**American** [1] - 8:1
**amount** [2] - 40:25, 87:11
**amounts** [1] - 13:15
**analysis** [15] - 16:4, 16:17, 39:15, 43:4, 43:22, 44:2, 44:4, 44:6, 49:14, 53:11, 53:13, 53:14, 72:12, 72:13, 72:19
**analyzed** [1] - 43:23
**Android** [1] - 29:6
**announce** [1] - 106:9
**announced** [1] - 106:11
**annoying** [2] - 56:2, 58:1
**answer** [6] - 34:8, 34:13, 50:2, 68:11, 68:13, 68:14
**answered** [2] - 68:12, 74:1
**answers** [1] - 42:19

**anyway** [1] - 7:6
**apart** [1] - 19:17
**appear** [2] - 42:20, 103:18
**applicable** [3] - 8:12, 101:13, 101:20
**applied** [1] - 8:8
**applies** [3] - 62:17, 78:20, 96:4
**apply** [2] - 14:3, 71:24
**applying** [1] - 12:20
**appreciate** [1] - 13:21
**appreciating** [1] - 35:2
**appreciation** [1] - 35:18
**approach** [1] - 38:9
**appropriate** [2] - 92:14, 92:17
**April** [6] - 11:17, 77:7, 77:18, 78:8, 78:14, 79:21
**arbiter** [1] - 19:20
**areas** [2] - 27:13, 27:14
**argue** [2] - 8:12, 38:18
**argued** [1] - 11:16
**argument** [4] - 32:19, 53:8, 57:18, 68:3
**arguments** [4] - 61:2, 61:10, 61:21, 64:14
**arrangement** [2] - 5:18, 60:1
**arrest** [5] - 29:10, 29:13, 30:9, 31:22, 31:23
**arrested** [21] - 11:7, 18:7, 25:18, 34:11, 35:6, 35:7, 37:3, 37:5, 41:11, 42:3, 42:4, 44:4, 44:12, 44:15, 45:15, 46:12, 55:3, 57:4, 59:15, 59:20
**asleep** [1] - 67:1
**aspect** [1] - 5:25
**aspects** [1] - 99:1
**asserts** [1] - 66:13
**assessing** [1] - 51:1
**assets** [3] - 9:13, 44:2, 60:22
**assist** [3] - 64:15, 72:24, 103:2
**assistance** [1] - 2:11
**assisted** [2] - 60:8, 60:13
**assisting** [1] - 84:17
**associated** [1] - 98:3
**assume** [4] - 44:1, 59:7, 66:18, 66:22
**assuming** [1] - 35:22
**assumption** [3] -

34:23, 34:25, 41:10
**ATM** [1] - 22:23
**attach** [1] - 97:23
**attempt** [1] - 87:2
**attempted** [4] - 22:4, 82:21, 83:15, 88:11
**attempting** [1] - 87:21
**attempts** [1] - 88:2
**attention** [7] - 10:14, 13:21, 26:8, 60:24, 70:23, 73:22, 105:1
**attesting** [1] - 43:17
**attitude** [1] - 106:5
**attorneys** [3] - 48:21, 60:23, 63:12
**attribute** [4] - 31:15, 42:16, 43:9, 51:9
**attribution** [7] - 31:17, 37:20, 37:22, 38:2, 43:6, 43:12, 43:13
**audit** [1] - 43:20
**authorities** [6] - 3:11, 4:10, 5:9, 5:17, 8:22, 12:10
**automated** [1] - 57:2
**automatically** [2] - 13:7, 59:16
**avoid** [6] - 12:23, 13:2, 13:6, 13:10, 24:16, 106:13
**avoided** [1] - 24:17
**AXIOM** [2] - 16:11, 24:4

# B

**B)** [1] - 87:22
**bad** [4] - 18:5, 54:19, 75:5, 75:7
**Bank** [1] - 9:6
**bank** [2] - 23:24, 45:1
**Banking** [1] - 8:24
**based** [16] - 5:1, 12:19, 16:16, 33:8, 34:22, 39:15, 44:5, 44:6, 48:3, 65:21, 66:5, 73:4, 104:3, 104:15
**basic** [1] - 13:10
**basis** [2] - 71:5, 95:2
**bear** [1] - 105:22
**become** [2] - 72:3, 80:15, 80:20
**becomes** [3] - 6:9, 79:17, 105:15
**began** [1] - 106:24
**beginning** [9] - 6:5, 6:10, 18:13, 54:11, 63:18, 69:3, 105:6, 106:5, 106:15
**begins** [2] - 11:14,

101:4
**behalf** [3] - 26:7, 72:4, 92:1
**behavior** [1] - 69:8
**behind** [2] - 2:15, 37:13
**belabor** [1] - 39:9
**belief** [2] - 76:9, 76:25
**believability** [1] - 63:1
**believable** [1] - 67:25
**believes** [1] - 76:10
**bench** [3] - 32:14, 38:5, 45:3
**benefits** [1] - 5:19
**best** [1] - 58:8
**better** [2] - 47:2, 54:4
**between** [15] - 11:23, 17:8, 39:19, 39:24, 42:13, 60:2, 69:19, 69:23, 70:1, 79:21, 85:3, 85:22, 85:23, 91:11
**beyond** [47] - 14:9, 18:25, 19:5, 21:18, 25:10, 25:21, 25:22, 27:9, 33:5, 47:7, 48:7, 65:1, 65:5, 65:11, 65:14, 65:19, 66:7, 66:9, 68:19, 71:7, 73:14, 74:22, 75:22, 76:19, 77:4, 77:9, 79:1, 79:19, 80:4, 81:23, 86:16, 87:17, 88:9, 90:23, 91:20, 93:13, 95:24, 96:9, 97:12, 98:20, 99:12, 101:8, 101:11, 101:18, 102:6, 102:15, 103:1
**beyond-a-reasonable-doubt** [1] - 48:7
**bias** [1] - 70:14
**biased** [1] - 70:12
**biases** [1] - 69:5
**big** [2] - 22:21, 34:25
**big-picture** [1] - 22:21
**bigger** [1] - 55:6
**bill** [1] - 40:14
**billion** [2] - 35:12, 59:9
**Bisbee** [3] - 43:5, 49:16, 72:18
**bit** [3] - 27:13, 35:14, 52:24
**Bitcoin** [186] - 2:15, 2:16, 3:4, 3:5, 3:8, 3:12, 3:17, 3:20, 4:8, 4:13, 5:4, 5:8, 5:9, 5:11, 5:13, 5:14, 5:16, 5:17, 5:20, 6:17, 7:3, 7:6, 7:10, 7:16, 8:9,

8:10, 8:12, 8:15, 8:16, 8:24, 9:3, 9:4, 9:7, 9:9, 9:15, 9:17, 9:19, 10:10, 10:23, 11:2, 11:3, 11:7, 11:16, 11:18, 11:23, 12:15, 13:1, 13:6, 13:17, 17:5, 17:6, 17:8, 18:9, 18:11, 18:18, 18:20, 19:1, 20:13, 20:17, 21:13, 22:9, 22:16, 23:11, 23:17, 23:19, 25:6, 25:19, 26:18, 26:19, 26:20, 26:24, 26:25, 27:1, 27:7, 27:17, 28:3, 28:6, 28:7, 28:11, 28:14, 28:17, 28:22, 28:23, 29:9, 29:14, 29:15, 29:17, 29:19, 29:21, 29:24, 30:4, 30:5, 30:11, 30:24, 31:2, 31:21, 32:2, 34:5, 34:18, 34:21, 34:22, 34:24, 35:1, 35:6, 35:8, 35:9, 35:18, 36:5, 36:7, 36:10, 36:11, 36:15, 36:16, 36:20, 36:23, 37:9, 39:6, 39:14, 39:22, 41:17, 41:23, 42:5, 42:14, 42:15, 44:11, 51:3, 51:8, 51:21, 51:25, 52:3, 52:4, 52:5, 52:9, 52:20, 52:22, 53:22, 55:5, 55:13, 55:16, 56:13, 56:15, 56:19, 56:21, 57:2, 57:14, 57:19, 57:22, 57:23, 58:8, 58:21, 59:1, 59:4, 59:8, 60:3, 60:8, 60:9, 60:13, 60:18, 60:21, 60:22, 74:23, 77:21, 77:22, 78:9, 78:15, 85:13, 89:9, 89:10, 90:23, 91:21, 92:5, 94:3, 95:6, 95:7, 96:22
**bitcoinfog.com** [2] - 49:6, 59:14
**BitcoinFog.com** [1] - 20:15
**Bitcoins** [1] - 31:11
**BitcoinTalk** [1] - 7:12
**Bitfinex** [1] - 44:11
**Bitstamp** [7] - 55:16, 56:2, 56:17, 56:19, 56:20, 57:7
**blacked** [1] - 103:13
**Blackstone** [5] - 46:17, 46:18, 47:1, 47:2, 48:5

**blaming** [1] - 51:24
**blank** [1] - 22:23
**blinded** [2] - 13:2, 76:14
**blindness** [1] - 86:7
**blockchain** [5] - 43:19, 49:21, 72:12, 72:18, 95:7
**blogging** [1] - 105:9
**blowup** [1] - 17:4
**Book** [5] - 16:1, 24:5, 24:17, 37:25, 53:4
**book** [2] - 16:8, 43:3
**bottom** [1] - 16:8
**bought** [3] - 40:17, 46:25, 58:8
**bound** [1] - 73:3
**break** [4] - 14:14, 14:20, 14:22, 61:6
**breaks** [1] - 20:20
**brief** [1] - 48:9
**briefly** [2] - 2:23, 105:3
**bring** [4] - 70:22, 73:21, 97:10, 98:4
**bringing** [1] - 47:25
**brought** [5] - 9:23, 9:24, 38:11, 51:6, 55:23
**brown** [4] - 13:19, 13:23, 14:2, 56:1
**bucks** [1] - 40:13
**built** [3] - 7:9, 13:16, 29:6
**bulwark** [1] - 47:12
**bunch** [3] - 17:14, 20:11, 42:18
**Bunker** [1] - 16:20
**BunkerX** [2] - 24:13, 42:21
**burden** [10] - 18:23, 19:9, 27:8, 47:6, 51:1, 51:5, 54:6, 65:1, 65:13, 66:9
**business** [67] - 2:19, 7:23, 8:3, 8:15, 8:17, 9:11, 10:2, 10:4, 10:6, 10:7, 23:11, 23:12, 23:14, 24:20, 24:23, 24:25, 25:3, 28:1, 28:5, 78:9, 78:15, 85:15, 85:16, 85:18, 85:22, 90:19, 90:24, 90:25, 91:4, 91:7, 91:14, 91:17, 91:21, 91:22, 91:24, 92:6, 92:7, 92:13, 92:16, 92:22, 92:23, 92:25, 93:6, 93:16, 93:18, 93:20, 94:1, 94:7, 94:8, 94:11, 94:12, 94:17, 95:2,

95:3, 95:12, 95:13,
95:23, 96:11, 96:13,
96:14, 96:15, 96:20,
97:1, 97:2, 101:1,
102:13, 102:16
  **businesses** [5] - 8:8,
85:22, 85:23, 85:24,
94:15
  **buyers** [2] - 5:6, 5:12
  **buying** [6] - 58:11,
83:3, 83:9, 83:23,
86:21, 89:7
  **buys** [1] - 40:16

## C

  **calculated** [1] - 34:21
  **calmly** [1] - 106:14
  **cannot** [4] - 65:24,
75:9, 76:12, 81:9
  **capability** [1] - 70:16
  **capture** [1] - 15:21
  **captures** [2] - 42:15,
42:21
  **cards** [2] - 56:10,
58:18
  **careful** [2] - 65:23,
66:2
  **carefully** [3] - 13:20,
25:13, 61:25
  **careless** [1] - 76:13
  **carried** [1] - 91:23
  **carry** [3] - 5:19, 89:22
  **carrying** [10] - 4:4,
23:1, 83:7, 84:14,
84:17, 84:19, 87:23,
88:17, 89:1, 98:7
  **carved** [2] - 41:21,
41:23
  **carving** [2] - 41:18,
41:19
  **case** [87] - 9:25, 12:18,
14:5, 14:8, 14:21, 15:9,
16:14, 17:2, 17:24,
18:16, 18:22, 18:25,
19:5, 21:2, 22:18, 24:2,
24:12, 31:16, 32:8,
32:22, 38:7, 40:5, 41:9,
42:3, 42:23, 46:13,
48:1, 48:17, 49:14,
50:23, 51:2, 51:20,
53:6, 53:8, 54:7, 54:9,
54:12, 55:20, 55:22,
59:1, 61:2, 61:3, 61:11,
61:22, 62:3, 62:17,
62:22, 63:5, 63:9,
63:11, 63:20, 64:2,
64:23, 65:17, 65:22,
66:11, 67:9, 67:18,
68:2, 69:14, 69:16,

70:22, 71:22, 72:10,
73:8, 73:11, 74:8, 75:2,
75:8, 77:9, 77:13, 87:4,
90:7, 100:19, 102:21,
104:15, 104:20,
104:23, 105:8, 105:10,
105:21, 106:8, 106:12,
106:15
  **cases** [5] - 65:14,
65:16, 65:17, 76:22,
104:17
  **cash** [1] - 5:14
  **caught** [5] - 18:2,
30:8, 44:13, 60:16,
98:19
  **caused** [1] - 97:14
  **causes** [1] - 97:8
  **caution** [1] - 71:19
  **central** [1] - 12:10
  **cents** [1] - 26:19
  **centuries** [2] - 26:17,
47:6
  **century** [1] - 46:19
  **certain** [13] - 6:23,
23:16, 49:11, 50:1,
50:9, 54:8, 59:5, 64:6,
74:6, 74:12, 77:5,
77:20, 106:9
  **certainly** [3] - 33:5,
38:8, 38:15
  **certainty** [4] - 66:8,
67:8, 76:16, 77:7
  **cetera** [1] - 54:2
  **chain** [2] - 4:25, 49:19
  **Chainalysis** [10] -
39:16, 43:5, 43:17,
49:8, 49:12, 49:13,
49:15, 49:17, 49:25,
51:8
  **Chainanalysis** [2] -
43:9, 43:20
  **chance** [1] - 53:20
  **change** [1] - 40:14
  **changed** [5] - 59:16,
59:17, 59:18, 59:19
  **changes** [1] - 59:14
  **character** [1] - 75:5
  **characterize** [1] -
42:18
  **charge** [11] - 6:15,
7:22, 9:21, 11:9, 21:24,
22:3, 67:16, 79:9,
79:10, 82:4, 88:7
  **charged** [34] - 2:17,
4:16, 4:19, 25:18,
35:24, 65:7, 73:10,
75:2, 75:8, 77:13, 79:1,
79:3, 79:11, 82:1,
82:17, 86:14, 87:4,
87:14, 90:7, 97:4,

97:11, 97:17, 98:23,
99:1, 99:4, 99:10,
100:21, 100:24, 101:1,
101:19, 102:3, 102:10
  **charges** [17] - 9:23,
10:3, 14:10, 62:2,
67:13, 68:19, 73:14,
77:5, 77:16, 78:1, 78:6,
78:12, 78:19, 87:20,
90:15, 96:6
  **Charges** [1] - 56:23
  **chart** [3] - 34:20, 37:1,
49:5
  **Chart** [1] - 49:5
  **charted** [1] - 55:19
  **charts** [8] - 48:25,
49:4, 55:7, 74:6, 74:9,
74:10, 74:12, 74:13
  **chat** [12] - 15:11,
15:21, 15:22, 16:1,
16:6, 16:9, 17:4, 24:5,
24:6, 29:25, 31:14,
37:25
  **chats** [2] - 52:17,
53:19
  **check** [3] - 16:12,
24:14, 92:3
  **checked** [1] - 17:1
  **checking** [2] - 24:16,
24:17
  **chemical** [4] - 83:4,
83:10, 83:24, 86:22
  **choices** [1] - 55:10
  **choose** [2] - 50:24,
51:10
  **Christmas** [2] - 59:2
  **chunk** [1] - 35:8
  **CI** [1] - 89:10
  **circumstances** [17] -
37:15, 50:4, 66:16,
67:21, 69:18, 69:20,
75:12, 75:14, 75:21,
76:18, 81:5, 81:7,
81:12, 81:14, 81:21,
89:17, 105:23
  **circumstantial** [12] -
48:17, 50:10, 50:23,
50:25, 55:9, 66:12,
66:17, 66:25, 67:2,
67:6, 67:7, 67:11
  **citizens** [1] - 8:1
  **civil** [2] - 25:11, 65:14
  **civility** [1] - 104:6
  **claimed** [1] - 80:14
  **clarify** [3] - 45:21,
45:25, 56:4
  **clean** [1] - 38:21
  **cleaning** [1] - 7:3
  **clear** [6] - 9:19, 10:21,
49:12, 51:13, 59:13,

60:12
  **clearly** [1] - 14:7
  **Clearnet** [2] - 20:16,
20:23
  **clerk** [3] - 105:2,
105:16, 105:23
  **clock** [1] - 11:8
  **close** [7] - 10:14,
13:20, 35:12, 41:5,
57:11, 61:14, 102:18
  **closed** [1] - 76:5
  **closely** [1] - 41:8
  **closing** [3] - 14:21,
28:16, 61:21
  **clunky** [1] - 57:25
  **co** [2] - 39:16, 99:25
  **co-conspirator** [1] -
99:25
  **co-spend** [1] - 39:16
  **coats** [1] - 50:18
  **Code** [5] - 79:23,
93:10, 93:12, 96:7
  **code** [3] - 9:21, 41:17,
78:17
  **coins** [1] - 58:20
  **collecting** [2] - 8:5,
13:10
  **Colombia** [1] - 12:1
  **colored** [1] - 70:14
  **Columbia** [25] - 9:22,
10:8, 10:11, 11:20,
12:7, 24:23, 25:4,
78:16, 92:18, 92:19,
92:21, 93:9, 93:16,
93:18, 94:2, 94:4, 94:9,
96:11, 96:13, 96:21,
96:23, 97:3, 98:25,
99:2, 99:5
  **Columbia's** [1] - 8:23
  **coming** [5] - 3:17,
16:14, 44:3, 50:13,
54:10
  **Commentaries** [1] -
46:21
  **comments** [2] - 48:2,
73:23
  **commerce** [12] - 9:18,
9:20, 24:20, 85:9,
85:12, 85:21, 86:1,
89:24, 91:8, 91:10,
91:14, 91:17
  **commercial** [1] -
91:22
  **commission** [3] -
97:7, 97:21, 98:3
  **commit** [16] - 2:25,
10:19, 11:4, 20:4,
77:20, 79:4, 79:15,
79:22, 80:6, 82:13,
87:2, 87:15, 87:19,

97:14, 99:17, 102:7
**committed** [21] - 4:2, 26:12, 77:6, 77:10, 82:8, 87:7, 87:9, 90:10, 90:11, 90:13, 97:5, 97:18, 97:19, 97:24, 98:8, 98:11, 98:15, 98:19, 98:21, 100:11, 100:23
**committing** [6] - 82:10, 87:5, 90:8, 98:2, 98:13, 98:22
**commodity** [1] - 59:4
**common** [11] - 4:24, 12:20, 14:2, 14:3, 41:7, 50:21, 54:14, 58:3, 59:11, 80:2, 80:5
**communicate** [4] - 105:7, 105:16, 105:18, 105:19
**communicated** [1] - 98:18
**communication** [1] - 105:9
**communications** [2] - 17:7, 42:13
**Comolli** [2] - 10:12, 11:21
**compensation** [1] - 58:25
**completed** [2] - 99:24, 100:1
**completely** [1] - 73:6
**comply** [3] - 8:10, 92:23, 94:12
**computer** [14] - 16:21, 16:22, 16:25, 17:1, 18:20, 19:13, 24:8, 24:10, 24:13, 33:13, 42:22, 42:25, 52:24, 72:22
**computers** [1] - 11:19
**conceal** [10] - 3:23, 4:5, 4:10, 6:23, 23:6, 72:15, 84:2, 84:7, 87:24, 88:19
**concealment** [7] - 4:1, 7:4, 83:3, 83:9, 83:22, 86:20, 89:7
**conceivable** [1] - 59:25
**concept** [3] - 12:12, 36:1, 48:16
**concepts** [1] - 10:14
**concern** [2] - 46:16, 104:11
**concerned** [1] - 69:15
**concerning** [5] - 51:14, 72:11, 73:2, 104:19, 105:20

**concerns** [1] - 73:25
**conclude** [1] - 75:4
**concluded** [1] - 102:20
**concludes** [1] - 61:2
**conclusion** [4] - 14:8, 31:3, 81:5, 81:7
**conclusions** [1] - 49:24
**concrete** [1] - 30:16
**conduct** [24] - 6:19, 11:13, 11:17, 22:4, 51:17, 62:15, 76:24, 82:21, 83:16, 84:22, 88:2, 88:4, 88:12, 89:22, 98:6, 100:12, 100:14, 100:17, 101:3, 101:8, 101:12, 105:11, 105:13, 106:5
**conducted** [12] - 3:5, 6:16, 6:19, 22:4, 23:13, 78:2, 82:21, 83:15, 88:11, 91:3, 100:5, 102:16
**conducting** [3] - 4:18, 24:25, 47:25
**conducts** [2] - 88:2, 90:17
**conference** [2] - 32:14, 45:3
**conferences** [1] - 29:25
**confessing** [1] - 55:24
**confirm** [1] - 42:5
**conflict** [1] - 50:8
**conjecture** [1] - 42:1
**consequences** [2] - 75:17, 81:17
**consider** [49] - 20:21, 38:10, 50:4, 50:25, 57:8, 58:12, 59:11, 62:10, 62:18, 63:25, 64:7, 64:9, 64:19, 64:20, 67:10, 67:17, 67:21, 68:17, 68:20, 69:5, 69:7, 69:18, 69:22, 69:25, 70:2, 70:5, 70:8, 70:13, 70:24, 71:13, 71:15, 72:6, 73:7, 73:12, 73:18, 75:12, 75:20, 76:5, 76:17, 78:20, 81:12, 81:21, 89:19, 90:4, 103:6, 103:9, 103:19, 104:4, 104:16
**considerable** [1] - 106:6
**consideration** [3] - 63:6, 65:23, 104:9
**considered** [3] - 13:3,

71:19, 101:22
**considering** [2] - 76:4, 93:5
**considers** [1] - 9:8
**consistencies** [2] - 69:22, 69:25
**consistent** [14] - 18:17, 18:18, 19:12, 20:13, 23:17, 28:20, 36:22, 42:21, 49:1, 54:17, 55:5, 55:8, 58:22, 59:21
**consists** [1] - 64:2
**conspiracies** [2] - 4:22, 6:3
**conspiracy** [66] - 2:17, 2:18, 2:25, 3:24, 4:17, 4:19, 4:21, 5:1, 5:22, 5:23, 6:2, 6:4, 6:7, 6:10, 6:12, 6:24, 11:3, 20:2, 20:8, 20:10, 21:1, 21:17, 21:25, 35:25, 37:1, 44:9, 57:9, 59:25, 60:2, 60:9, 60:11, 77:23, 79:8, 79:9, 79:12, 79:13, 79:14, 79:17, 79:18, 80:7, 80:15, 80:19, 80:20, 81:2, 81:3, 81:4, 81:5, 81:8, 82:1, 82:4, 82:8, 82:17, 82:18, 83:12, 84:12, 87:18, 90:2, 99:14, 99:21, 99:22, 99:24, 100:2, 100:24, 102:5, 102:8
**conspirator** [1] - 99:25
**conspirators** [3] - 5:25, 6:11, 82:3
**conspire** [1] - 87:2
**conspired** [6] - 77:20, 82:6, 82:13, 82:15, 87:11, 102:7
**conspiring** [4] - 11:4, 79:3, 87:6, 87:15
**constantly** [2] - 56:16, 58:13
**constitutes** [1] - 100:5
**constituting** [3] - 97:6, 100:12, 100:14
**construed** [1] - 38:15
**contact** [2] - 7:9, 16:24
**contains** [2] - 77:14, 88:8
**contend** [1] - 59:19
**continue** [1] - 2:9
**continued** [4] - 11:6, 11:17, 101:9, 101:12
**continues** [1] - 26:2

**continuing** [15] - 11:11, 11:12, 11:13, 11:15, 26:3, 26:13, 77:17, 78:7, 78:13, 100:25, 101:2, 101:4, 101:5, 101:6
**continuous** [2] - 11:12, 101:3
**contradicted** [1] - 70:9
**contrast** [2] - 44:16, 44:19
**contribute** [3] - 4:4, 4:11, 84:20
**control** [8] - 23:7, 40:10, 40:19, 63:14, 84:3, 84:8, 87:25, 88:20
**controlled** [15] - 9:15, 23:13, 39:23, 40:1, 83:4, 83:10, 83:23, 86:21, 87:2, 87:9, 87:13, 89:8, 89:10, 90:14, 91:3
**controlling** [1] - 40:21
**controls** [6] - 20:19, 39:11, 39:12, 48:21, 48:23, 90:17
**convenience** [1] - 74:9
**conventional** [1] - 85:19
**conversations** [1] - 56:5
**converted** [1] - 34:24
**convey** [1] - 102:22
**convict** [4] - 54:7, 71:5, 75:6, 97:11
**conviction** [2] - 104:11, 104:14, 106:3
**convince** [2] - 99:3, 99:8
**convinced** [1] - 65:24
**convinces** [1] - 71:6
**convoluted** [1] - 31:6
**cooperating** [1] - 44:9
**cooperation** [2] - 44:22, 70:23
**copy** [1] - 62:7
**Core** [1] - 28:3
**core** [3] - 8:17, 36:1, 47:5
**corollary** [1] - 10:1
**correct** [4] - 31:13, 45:9, 45:11, 88:22
**corroborating** [4] - 17:3, 17:19, 37:3, 44:16
**counsel** [1] - 48:10
**counsel's** [1] - 42:8
**count** [32] - 2:25, 6:14,

6:24, 7:22, 10:3, 11:9,
20:2, 21:24, 23:10,
26:5, 50:15, 77:23,
78:18, 78:19, 78:22,
78:23, 78:24, 87:20,
90:2, 90:15, 91:9, 92:9,
96:6, 100:10, 101:25,
102:3, 102:5, 102:10,
102:14, 105:21
  **Count** [24] - 9:14,
10:1, 20:1, 22:3, 25:25,
26:6, 77:16, 78:1, 78:6,
78:12, 79:3, 95:22,
96:3, 99:13, 100:3,
100:24, 101:14,
101:15, 101:17,
101:19, 102:1, 102:9
  **countries** [1] - 19:17
  **country** [1] - 92:2
  **Counts** [4] - 11:11,
101:1, 101:8, 101:12
  **counts** [5] - 2:18,
19:20, 19:22, 77:14,
77:15
  **couple** [7] - 20:5, 31:9,
48:13, 48:14, 50:17,
57:10, 59:13
  **courier** [1] - 92:3
  **course** [10] - 7:13,
8:25, 11:12, 19:20,
34:13, 36:14, 57:9,
68:9, 101:3, 103:10
  **Court** [5] - 12:12,
38:18, 46:24, 47:9,
48:10
  **court** [10] - 9:23, 9:24,
25:18, 33:11, 38:24,
46:2, 66:20, 74:4,
103:25, 106:1
  **COURT** [27] - 2:2, 2:7,
14:11, 14:16, 14:19,
15:1, 15:3, 15:5, 32:13,
33:1, 33:3, 38:4, 38:12,
38:15, 38:20, 38:23,
42:7, 42:11, 45:5, 45:9,
45:12, 45:18, 46:15,
47:18, 61:1, 61:17,
61:20
  **court's** [1] - 48:9
  **courthouse** [1] - 46:18
  **courtroom** [11] - 2:4,
14:4, 14:24, 15:4, 33:9,
48:1, 48:4, 61:16,
61:19, 104:24, 106:23
  **COURTROOM** [2] -
2:5, 15:16
  **cover** [1] - 12:23
  **coverage** [1] - 104:20
  **covered** [1] - 29:13
  **crank** [1] - 54:1

  **create** [1] - 58:4
  **credentials** [1] - 57:21
  **credibility** [9] - 26:16,
48:18, 49:15, 63:1,
68:21, 68:24, 69:4,
69:6, 71:23
  **credible** [2] - 50:3,
55:15
  **credit** [2] - 70:2, 70:10
  **crime** [36] - 10:20,
12:4, 12:11, 25:21,
26:11, 47:7, 54:23,
64:19, 80:13, 80:22,
82:20, 83:14, 97:4,
97:15, 97:18, 97:19,
97:21, 97:23, 97:25,
98:2, 98:3, 98:4, 98:7,
98:8, 98:11, 98:13,
98:14, 98:19, 98:20,
98:22, 99:4, 99:10,
100:21, 100:22, 102:2,
102:10
  **crimes** [13] - 8:20,
10:19, 13:7, 75:1, 75:8,
77:13, 79:1, 80:7,
87:15, 87:19, 97:17,
100:13, 100:21
  **Crimes** [1] - 12:2
  **criminal** [22] - 6:3, 6:9,
9:11, 20:23, 20:24,
47:5, 54:21, 54:22,
64:23, 65:17, 75:5,
76:22, 76:25, 77:3,
79:16, 93:2, 95:15,
95:17, 95:19, 97:9,
99:22
  **criminalize** [1] - 84:9
  **criminally** [1] - 6:11
  **criminals** [4] - 6:6,
9:13, 13:18, 72:15
  **critical** [1] - 41:13
  **crossing** [1] - 17:22
  **crucial** [3] - 19:16
  **cryptocurrency** [2] -
72:12, 72:18
  **CSAM** [1] - 52:14
  **currency** [4] - 85:4,
94:22, 94:23
  **Customer** [1] - 30:21
  **customer** [3] - 7:15,
22:10, 56:3
  **customers** [3] - 4:10,
7:14, 8:6
  **customers'** [1] - 13:7
  **cut** [1] - 5:21
  **cutoffs** [1] - 26:4
  **cyber** [2] - 72:14,
72:16

# D

  **D.C** [29] - 2:19, 6:16,
9:3, 9:21, 9:24, 10:1,
10:4, 11:22, 11:23,
11:24, 12:4, 12:11,
22:8, 24:22, 24:25,
25:5, 25:14, 25:17,
78:17, 93:10, 93:12,
93:19, 93:24, 94:1,
94:6, 96:7, 96:19,
96:20, 96:25
  **D.C.'s** [1] - 10:9
  **dad** [1] - 46:25
  **darker** [1] - 53:25
  **darknet** [11] - 3:16,
5:4, 5:15, 19:14, 51:22,
52:9, 52:13, 52:16,
52:18, 77:19
  **date** [4] - 11:10, 77:8,
77:10, 101:20
  **dates** [5] - 26:8, 26:10,
77:10, 101:9
  **days** [2] - 29:9, 101:13
  **de** [7] - 16:2, 16:15,
17:12, 24:9, 37:20,
41:15, 72:13
  **deal** [1] - 44:22
  **dealers** [5] - 5:19, 6:6,
60:3
  **dealing** [5] - 83:4,
83:9, 83:23, 86:21,
89:7
  **deals** [3] - 5:12, 5:16,
13:3
  **December** [1] - 34:14
  **decide** [22] - 19:3,
23:2, 23:7, 24:18, 25:7,
26:11, 30:18, 48:2,
51:2, 51:10, 61:23,
62:23, 62:24, 62:25,
63:5, 63:9, 67:5, 74:18,
75:19, 81:19, 103:21,
104:23
  **deciding** [2] - 73:13,
74:21
  **decision** [1] - 33:8
  **defendant** [171] - 2:15,
2:17, 3:5, 3:6, 3:7,
3:12, 3:22, 4:2, 4:7,
4:9, 4:16, 4:17, 5:21,
5:24, 6:4, 6:19, 6:21,
7:6, 7:9, 7:10, 7:21,
9:2, 9:7, 9:9, 9:12,
9:15, 10:3, 10:5, 10:7,
10:19, 10:24, 12:5,
12:14, 12:25, 13:5,
13:13, 13:14, 14:9,
18:24, 22:4, 22:24,
23:5, 23:12, 24:22,

25:2, 51:3, 51:10,
52:15, 52:16, 53:19,
54:5, 54:7, 54:10, 55:2,
55:3, 55:12, 55:17,
55:19, 57:3, 57:5,
59:14, 59:17, 59:20,
59:21, 60:7, 60:15,
60:18, 64:23, 64:25,
65:3, 65:7, 65:12,
65:14, 68:19, 71:5,
71:17, 72:3, 72:5, 72:6,
74:17, 74:19, 74:23,
75:1, 75:13, 75:23,
76:4, 76:11, 76:12,
76:14, 76:20, 76:23,
77:18, 78:1, 78:8,
78:14, 78:22, 79:3,
79:11, 80:11, 80:23,
81:1, 81:3, 81:13,
81:24, 82:4, 82:6, 82:8,
82:13, 82:15, 82:21,
82:23, 83:6, 83:15,
83:17, 83:20, 84:1,
84:15, 86:1, 86:8, 87:4,
87:8, 87:11, 87:14,
87:18, 87:20, 88:11,
88:16, 88:18, 89:14,
89:16, 90:7, 90:13,
90:15, 90:21, 91:2,
91:5, 92:9, 92:20, 93:2,
93:5, 93:15, 93:17,
94:5, 94:11, 95:14,
95:22, 96:3, 96:6,
96:10, 96:12, 96:24,
97:4, 97:7, 97:11,
97:13, 97:16, 98:1,
98:2, 98:6, 98:8, 98:10,
98:21, 99:19, 99:25,
100:20, 102:5, 102:7,
102:13, 102:14,
102:15, 104:10
  **defendant's** [12] -
2:24, 12:10, 12:18,
48:18, 51:14, 55:9,
64:21, 65:25, 71:6,
72:8, 75:5, 77:2
  **defense** [5] - 12:22,
47:8, 48:10, 49:14,
100:20
  **defined** [2] - 94:17,
101:2
  **definitely** [1] - 17:13
  **definition** [3] - 85:13,
91:24, 92:4
  **definition** [4] - 84:13,
90:3, 90:5, 95:5
  **definitive** [7] - 20:19,
37:12, 37:19, 37:22,
38:1, 39:10, 49:3
  **definitively** [2] - 17:19,

42:16

**degree** [3] - 67:8, 85:8, 85:12
**delete** [2] - 13:8
**deleted** [1] - 45:14
**deliberate** - 14:4, 61:4, 84:16, 105:4
**deliberately** [6] - 12:23, 13:2, 13:9, 76:5, 76:14, 76:24
**deliberations** [17] - 61:8, 61:13, 62:8, 63:14, 63:17, 63:25, 68:15, 68:17, 90:3, 102:20, 103:24, 104:12, 105:7, 105:12, 105:15, 106:6, 106:15
**delivery** [2] - 85:1, 85:4
**demeanor** [1] - 69:7
**demonstrated** [1] - 56:23
**demonstrating** [1] - 76:12
**Department** [3] - 8:4, 8:23, 12:2
**depended** [1] - 7:14
**deposit** [6] - 39:6, 39:14, 56:25, 57:6, 85:3
**depositing** [1] - 30:24
**deposits** [1] - 57:1
**DEPUTY** [2] - 2:5, 15:16
**deputy** [2] - 105:16, 105:23
**derived** [5] - 9:11, 86:10, 93:2, 95:14, 95:19
**described** [8] - 25:12, 69:1, 90:1, 95:24, 96:4, 99:6, 99:11, 99:12
**deserve** [1] - 74:16
**deserves** [3] - 71:20, 72:9, 73:9
**designed** [7] - 7:21, 8:10, 13:5, 13:10, 13:17, 51:23, 84:2
**desire** [2] - 70:15, 84:6
**desk** [1] - 22:10
**desks** [1] - 24:3
**despite** [1] - 10:10
**detail** [1] - 20:6
**detailed** [2] - 30:6, 30:7
**details** [7] - 13:2, 13:6, 18:3, 55:6, 69:21, 80:1, 80:12
**detection** [2] - 5:7, 5:20

**determination** [1] - 106:9
**determine** [9] - 49:9, 62:21, 63:2, 66:11, 67:22, 67:23, 68:22, 70:14, 74:11
**determined** [1] - 67:20
**determining** [7] - 68:18, 70:7, 72:25, 75:22, 76:19, 81:22, 89:20
**developed** [2] - 33:16, 52:21
**device** [2] - 33:20, 72:14
**devices** [4] - 33:21, 41:20, 41:21, 41:23
**diaries** [1] - 18:8
**dice** [1] - 37:5
**difference** [1] - 97:22
**differences** [1] - 70:4
**different** [13] - 3:25, 4:23, 5:3, 6:4, 9:1, 10:14, 25:8, 40:3, 40:10, 63:13, 71:14, 80:20, 80:21
**digital** [2] - 54:12, 72:14
**diluted** [1] - 41:20
**direct** [11] - 12:17, 38:10, 50:14, 50:16, 66:11, 66:14, 66:21, 67:2, 67:6, 67:9, 67:10
**directed** [2] - 23:14, 91:3
**directly** [6] - 49:10, 75:10, 81:10, 86:11, 97:9, 98:17
**directs** [1] - 90:18
**dirty** [1] - 3:12
**disagree** [2] - 48:22, 49:24
**DISB** [3] - 8:24, 10:9, 12:6
**disbelieved** [1] - 72:4
**disclosed** [1] - 74:7
**discover** [1] - 15:24
**discovered** [1] - 15:25
**discrepancy** [2] - 74:2, 74:3
**discuss** [7] - 14:21, 61:10, 78:25, 79:12, 82:16, 105:1, 105:3
**discussed** [2] - 6:25, 98:12
**discussing** [1] - 106:15
**discussion** [3] - 14:18, 38:5, 106:12
**discussions** [1] -

104:5

**disguise** [7] - 4:6, 6:23, 23:6, 84:2, 84:7, 87:24, 88:19
**dispense** [2] - 86:25, 87:1
**dispensing** [1] - 87:13
**disposition** [1] - 85:1
**disregard** [2] - 42:7, 73:7
**distinct** [1] - 99:21
**distribute** [2] - 86:25, 87:1
**distribution** [1] - 87:12
**District** [28] - 8:23, 9:21, 10:8, 10:11, 11:19, 11:25, 12:7, 24:23, 25:3, 78:16, 92:17, 92:19, 92:21, 93:9, 93:16, 93:18, 94:2, 94:4, 94:8, 96:11, 96:13, 96:21, 96:23, 97:2, 98:25, 99:2, 99:5, 100:4
**district** [7] - 99:15, 99:18, 99:19, 100:7, 100:9, 100:10, 100:12
**divided** [1] - 106:1
**DNS** [11] - 20:23, 20:24, 21:12, 31:6, 31:21, 33:24, 34:5, 34:10, 34:15, 39:4, 41:2
**document** [1] - 103:12
**documents** [1] - 73:15
**dollars** [8] - 3:16, 28:23, 29:1, 34:25, 35:13, 44:18, 44:25, 59:10
**domain** [4] - 11:2, 20:23, 59:12, 59:14
**domestically** [1] - 85:19
**done** [16] - 11:1, 13:12, 22:1, 33:7, 42:2, 48:12, 49:13, 63:8, 75:7, 75:13, 76:1, 81:13, 97:8, 97:10, 97:14, 99:23
**door** [1] - 50:12
**doors** [1] - 50:18
**doubt** [55] - 14:10, 18:25, 19:5, 21:18, 25:10, 25:22, 27:9, 47:7, 48:7, 53:10, 65:1, 65:6, 65:11, 65:14, 65:19, 65:20, 65:21, 65:25, 66:1, 66:4, 66:5, 66:8, 66:9, 68:19, 71:7,

73:14, 74:22, 75:23, 76:20, 77:4, 77:9, 79:2, 79:19, 80:5, 81:23, 86:16, 87:18, 88:10, 90:23, 91:20, 93:13, 95:25, 96:9, 97:13, 98:20, 99:12, 101:8, 101:11, 101:18, 102:6, 102:15, 103:1
**down** [9] - 20:20, 29:21, 30:15, 35:2, 37:2, 50:13, 57:24, 59:23, 79:25
**download** [1] - 33:18
**dozen** [1] - 3:19
**draft** [1] - 92:3
**draw** [3] - 22:23, 64:10, 64:21
**drawn** [1] - 66:16
**drive** [4] - 28:21, 28:23, 29:1
**drives** [2] - 28:4, 28:19
**drug** [14] - 3:16, 3:20, 5:7, 5:12, 5:16, 5:19, 5:20, 6:5, 6:6, 7:4, 13:1, 13:3, 52:10, 60:3
**drugs** [10] - 5:4, 5:5, 5:6, 22:11, 40:16, 40:17, 52:12, 74:18, 74:20, 75:3
**Duane** [2] - 40:15
**during** [17] - 32:8, 62:8, 62:24, 63:8, 63:14, 63:15, 63:17, 63:25, 64:5, 68:9, 75:20, 81:20, 100:23, 103:10, 105:7, 105:12, 105:15
**duty** [4] - 61:22, 62:18, 65:7, 104:13

---

**E**

**e-Book** [5] - 16:1, 24:5, 24:17, 37:25, 53:4
**e-Reader** [1] - 43:3
**early** [4] - 26:18, 36:4, 43:23, 57:20
**ears** [1] - 12:23
**easy** [2] - 21:6, 56:15
**edition** [1] - 46:25
**education** [2] - 73:1, 73:4
**effect** [4] - 8:14, 32:23, 86:1, 86:2
**efficient** [1] - 62:16
**efforts** [1] - 74:2
**either** [8] - 4:2, 21:18, 70:12, 71:25, 87:16,

97:21, 99:17, 103:21
**Ekeland** [11] - 14:12,
15:5, 38:16, 47:22,
48:13, 48:23, 50:5,
51:12, 54:11, 57:15,
59:12
**EKELAND** [21] -
14:14, 15:2, 15:7,
15:14, 15:17, 15:19,
32:17, 32:22, 33:10,
33:12, 38:17, 38:25,
42:10, 42:12, 45:7,
45:11, 45:16, 45:21,
45:25, 46:3, 46:17
**elapsed** [2] - 69:19,
100:21
**electronic** [4] - 93:24,
94:24, 96:18, 105:8
**electronically** [1] -
105:14
**element** [15] - 18:24,
19:5, 47:7, 65:6, 65:10,
65:11, 73:10, 76:7,
91:20, 94:5, 94:11,
95:16, 96:23, 97:13
**elements** [21] - 2:22,
2:24, 6:18, 10:5, 51:2,
77:3, 79:18, 82:16,
82:20, 83:14, 88:9,
90:23, 92:8, 92:10,
92:11, 93:11, 96:8,
99:6, 99:11, 99:12,
102:25
**Elizabeth** [2] - 43:5,
72:18
**email** [4] - 13:12,
17:11, 42:17, 105:9
**embodying** [1] - 47:5
**emerged** [1] - 6:6
**encourage** [1] - 104:6
**encrypt** [1] - 28:24
**encrypted** [1] - 30:8
**end** [5] - 6:11, 26:25,
35:11, 41:18, 48:6
**Enforcement** [1] -
12:3
**enforcement** [11] -
6:20, 8:7, 8:20, 16:25,
22:6, 43:1, 71:21, 72:2,
88:14, 89:13, 89:16
**engage** [5] - 10:7,
25:3, 85:18, 93:17,
96:12
**engaged** [10] - 10:5,
24:22, 76:24, 78:15,
85:11, 93:15, 93:25,
94:20, 96:10, 102:13
**engages** [2] - 85:15,
85:16
**engaging** [3] - 93:20,

96:14, 96:15
**England** [1] - 46:22
**English** [4] - 73:16,
73:19, 73:21, 74:3
**enjoyable** [1] - 58:4
**enter** [6] - 2:4, 15:4,
61:19, 61:22, 71:3,
104:12
**entered** [7] - 20:4,
70:20, 71:8, 71:14,
71:16, 71:18, 106:23
**entering** [2] - 6:3,
106:7
**enterprise** [2] - 4:24,
91:22
**Enterprises** [1] - 52:11
**entire** [7] - 4:14, 8:16,
17:21, 18:12, 24:25,
99:13, 100:6
**entirely** [7] - 19:12,
23:16, 28:20, 53:10,
75:18, 81:18, 106:21
**entitled** [1] - 64:13,
70:18
**entity** [4] - 8:2, 85:15,
94:18, 94:20
**entrusting** [1] - 7:14
**equal** [1] - 67:7
**error** [2] - 39:17, 43:14
**escape** [1] - 47:3
**essence** [1] - 20:3
**essentially** [7] - 16:6,
20:1, 20:2, 31:14,
45:14, 53:1, 55:24
**establish** [3] - 60:10,
77:7, 98:9
**established** [2] - 76:8,
76:12
**establishes** [1] - 77:9
**et** [1] - 54:2
**ethnicity** [1] - 63:4
**evade** [1] - 5:7
**evading** [1] - 12:9
**evaluate** [1] - 69:4
**evaluated** [1] - 71:22
**evaluating** [4] - 68:24,
69:17, 71:23, 72:5
**event** [7] - 69:18,
69:19, 69:20, 69:21,
71:25, 104:11, 104:13
**evidence** [169] - 2:14,
3:15, 9:16, 10:21,
11:16, 12:17, 12:20,
13:3, 13:21, 13:22,
14:6, 14:7, 15:8, 15:10,
15:11, 15:21, 17:3,
17:19, 18:10, 18:14,
20:9, 20:19, 22:9,
22:14, 22:15, 22:18,
23:3, 23:15, 23:18,

24:24, 25:11, 26:9,
27:19, 27:23, 29:3,
29:22, 30:17, 32:16,
33:5, 33:8, 33:21, 34:2,
34:6, 34:12, 34:16,
36:23, 37:3, 37:6,
37:12, 38:3, 38:6, 38:7,
39:10, 39:23, 42:8,
44:16, 45:5, 46:12,
48:3, 48:15, 48:17,
48:19, 50:10, 50:14,
50:16, 50:23, 50:25,
51:5, 51:7, 51:16,
51:20, 53:2, 53:6, 53:8,
54:7, 54:12, 55:9,
55:20, 59:15, 60:12,
61:21, 62:24, 62:25,
63:6, 63:13, 63:19,
63:21, 63:23, 64:1,
64:3, 64:8, 64:9, 64:12,
64:15, 64:16, 64:17,
64:20, 65:3, 65:22,
65:24, 66:10, 66:11,
66:12, 66:15, 66:17,
66:21, 66:25, 67:3,
67:4, 67:6, 67:8, 67:9,
67:10, 67:17, 67:19,
67:22, 68:4, 68:7,
68:16, 70:2, 70:9,
70:19, 71:22, 72:24,
73:6, 73:8, 73:12,
73:13, 73:18, 74:8,
74:10, 74:11, 74:13,
74:14, 74:17, 74:19,
74:21, 74:25, 75:4,
75:14, 75:19, 75:21,
76:18, 77:9, 78:20,
81:14, 81:19, 81:21,
89:19, 99:7, 99:17,
102:21, 103:5, 103:8,
103:11, 103:22, 104:3,
104:5, 104:8, 104:9,
104:15, 104:23
**exact** [1] - 77:8
**exactly** [4] - 3:1,
13:16, 37:21, 52:18
**examine** [3] - 103:6,
103:9, 103:17
**examined** [1] - 16:18
**example** [10] - 18:22,
23:24, 23:25, 40:12,
48:24, 54:10, 56:1,
66:18, 69:7, 106:2
**examples** [1] - 3:19
**except** [2] - 105:19,
105:21
**exchange** [1] - 85:3
**exchanges** [1] - 57:17
**exclusive** [1] - 63:11
**exclusively** [1] -

104:14
**excuse** [3] - 46:7,
106:20, 106:25
**excusing** [1] - 106:19
**Exhibit** [6] - 31:1,
39:3, 40:22, 53:13,
53:20, 58:24
**exhibit** [3] - 58:24,
103:12, 103:14
**exhibits** [7] - 31:9,
64:3, 68:15, 103:5,
103:7, 103:11, 103:17
**exist** [2] - 4:23, 76:10
**existed** [5] - 76:16,
79:21, 81:6, 81:7, 81:8
**existence** [4] - 76:7,
76:9, 76:15, 80:10
**existing** [1] - 4:14
**exists** [1] - 80:4
**exotic** [1] - 32:1
**expect** [1] - 6:8
**expenses** [1] - 58:14
**experience** [5] -
54:14, 58:3, 64:12,
73:1, 73:4
**expert** [4] - 16:3,
31:12, 53:14
**explain** [5] - 2:23,
3:24, 60:21, 74:7,
90:25
**explained** [3] - 87:14,
95:21, 102:1
**explanation** [1] -
91:19
**exploit** [1] - 30:1
**express** [1] - 89:13
**expressed** [2] - 63:9,
72:11
**expression** [1] - 106:8
**extent** [2] - 68:23,
74:13
**extraction** [1] - 24:18
**extracts** [1] - 18:4
**extreme** [1] - 4:9
**eyes** [2] - 12:23, 76:6
**eyewitness** [3] -
23:25, 24:1, 66:13
**eyewitnesses** [2] -
23:22

### F

**facilitate** [2] - 88:4,
104:4
**facilitating** [2] - 84:17,
85:18
**facsimile** [3] - 92:3,
93:24, 96:18
**fact** [21] - 16:15, 23:4,
25:16, 44:4, 51:25,

54:8, 54:17, 57:19, 58:1, 61:23, 64:7, 65:15, 66:14, 67:3, 72:6, 72:25, 76:5, 76:7, 76:15, 78:22, 99:6

**facts** [23] - 14:4, 19:3, 51:12, 62:22, 63:2, 64:3, 64:6, 64:10, 66:11, 66:15, 67:21, 74:7, 74:11, 75:13, 75:19, 81:4, 81:6, 81:14, 81:19, 103:21, 106:18

**factual** [1] - 48:20
**fail** [1] - 42:23
**failed** [4] - 28:1, 65:10, 92:22, 94:11
**failing** [2] - 12:3, 12:5
**failure** [3] - 12:8, 100:13, 100:15
**fair** [6] - 62:16, 63:5, 67:14, 67:18, 104:3, 104:8
**fairly** [5] - 49:3, 53:16, 64:13, 70:18, 73:9
**faith** [1] - 18:15
**falling** [2] - 66:19, 66:21
**falls** [1] - 5:1
**false** [3] - 43:15, 43:16, 71:11
**falsehood** [1] - 70:4
**falsely** [1] - 71:17
**famous** [1] - 46:20
**fancy** [1] - 41:12
**far** [1] - 53:24
**fashion** [1] - 106:3
**favor** [2] - 53:12, 67:4
**favoritism** [1] - 63:3
**FBI** [2] - 7:18, 10:12
**fear** [5] - 5:20, 52:20, 52:23, 63:2
**feature** [3] - 19:16, 29:5, 58:2
**features** [1] - 13:8
**February** [3] - 56:4, 56:19, 58:10
**federal** [7] - 7:22, 9:23, 10:2, 12:1, 86:6, 92:24
**fee** [2] - 34:23, 52:6
**fees** [2] - 30:24, 36:19
**felonious** [4] - 83:2, 83:8, 86:20, 89:6
**felonous** [1] - 83:22
**felony** [5] - 86:6, 86:25, 92:19, 93:7, 93:10
**few** [3] - 35:3, 48:12, 62:4

**figure** [2] - 37:10, 59:5
**figured** [1] - 58:9
**file** [4] - 41:18, 41:19, 41:21, 41:23
**file-carved** [2] - 41:21, 41:23
**files** [3] - 32:22, 57:22, 74:8
**filing** [2] - 8:6, 70:24
**filling** [1] - 12:9
**final** [1] - 61:22
**finally** [4] - 9:17, 47:20, 48:5, 95:10
**Financial** [1] - 12:2
**financial** [22] - 3:3, 7:25, 8:1, 8:11, 8:20, 22:4, 72:20, 82:22, 83:16, 85:2, 85:5, 85:7, 85:10, 85:14, 85:20, 88:2, 88:12, 89:23, 89:24, 100:4, 100:17, 101:18
**FinCEN** [7] - 8:20, 9:5, 12:4, 12:9, 35:22, 94:16
**fine** [2] - 33:10, 98:1
**finish** [2] - 84:23, 100:8
**firmly** [1] - 65:24
**First** [1] - 96:10
**first** [40] - 3:1, 3:3, 6:18, 9:2, 10:5, 20:16, 21:17, 27:3, 39:2, 39:5, 39:6, 39:7, 39:14, 39:23, 39:24, 41:1, 46:24, 46:25, 47:21, 49:4, 49:5, 54:24, 57:1, 79:4, 79:20, 79:22, 80:9, 82:10, 82:18, 82:20, 83:15, 84:11, 88:11, 88:16, 89:3, 90:23, 91:19, 92:13, 93:15, 103:23
**Fischbach** [7] - 28:9, 28:20, 31:12, 31:20, 31:24, 33:12, 72:22
**flat** [1] - 53:9
**flow** [4] - 40:10, 40:18, 40:19
**focus** [2] - 13:21, 48:16
**Fog** [123] - 2:15, 2:16, 3:5, 3:8, 3:13, 3:17, 3:20, 4:8, 4:13, 5:9, 5:11, 5:16, 5:17, 5:21, 6:17, 7:10, 7:16, 8:10, 8:12, 8:15, 8:24, 9:3, 9:4, 9:7, 9:9, 9:15, 9:18, 9:19, 10:10, 10:23, 10:25, 11:2,

11:3, 11:7, 11:16, 11:18, 11:23, 12:15, 13:1, 13:6, 13:17, 17:5, 17:6, 17:9, 18:9, 18:11, 18:20, 19:1, 21:13, 22:9, 22:16, 23:11, 23:19, 25:6, 25:19, 27:7, 27:17, 28:11, 28:14, 28:17, 28:22, 29:9, 29:14, 29:15, 29:17, 29:19, 29:21, 30:4, 30:11, 30:24, 31:2, 31:21, 32:2, 34:5, 34:22, 34:24, 35:6, 36:5, 36:8, 36:11, 36:15, 36:16, 36:20, 37:9, 39:6, 39:14, 41:17, 41:23, 42:5, 42:14, 42:15, 51:4, 51:21, 51:25, 52:3, 52:4, 52:5, 52:9, 52:22, 53:22, 55:5, 56:19, 56:21, 57:2, 57:14, 57:22, 57:23, 60:3, 60:8, 60:9, 60:13, 60:18, 60:22, 74:23, 77:22, 78:9, 78:15, 89:10, 90:23, 91:21
**fog** [4] - 5:18, 7:17, 7:20, 14:7
**Fog's** [2] - 7:3, 8:17
**folks** [1] - 14:17
**follow** [4] - 9:6, 13:23, 62:11, 62:20
**following** [7] - 72:11, 84:13, 90:22, 92:8, 101:9, 101:13, 101:20
**follows** [2] - 93:14, 96:9
**fool** [1] - 52:16
**foolish** [1] - 76:13
**foot** [1] - 99:19
**foreign** [11] - 24:20, 85:8, 85:12, 85:21, 86:6, 89:24, 91:8, 91:9, 91:12, 91:14, 91:17
**forensic** [4] - 16:3, 41:19, 72:17, 72:20
**forensics** [3] - 72:14, 72:20, 72:22
**foreperson** [4] - 103:24, 104:1, 104:4, 105:17
**foreseeable** [1] - 6:13
**forget** [1] - 39:3
**form** [8] - 67:4, 86:12, 88:15, 96:2, 102:19, 102:20, 102:23, 103:1
**formal** [3] - 4:22, 64:18, 79:24

**forth** [5] - 11:22, 51:6, 52:8, 53:17
**forums** [1] - 29:25
**forward** [1] - 26:1
**four** [9] - 2:17, 23:5, 33:23, 57:1, 59:9, 77:14, 82:20, 83:14, 106:22
**fourth** [3] - 3:22, 83:6, 84:1
**framework** [1] - 19:23
**free** [2] - 62:13, 69:4
**freelancing** [2] - 27:11, 27:12
**fresh** [1] - 61:7
**friendship** [1] - 69:15
**front** [1] - 38:17
**frustrated** [2] - 56:6
**full** [1] - 104:8
**function** [2] - 62:15, 62:21
**fund** [1] - 51:21
**funds** [35] - 6:17, 7:17, 8:3, 8:8, 8:16, 8:17, 9:11, 12:14, 31:5, 35:19, 36:7, 36:15, 36:17, 36:18, 40:10, 40:18, 40:19, 40:21, 56:12, 57:8, 84:10, 85:9, 85:13, 85:16, 86:14, 86:17, 92:1, 92:4, 93:1, 94:20, 94:23, 95:5, 95:8, 95:13, 95:18
**furtherance** [5] - 98:24, 99:4, 99:9, 99:23, 100:2
**furthermore** [1] - 106:13
**future** [3] - 7:4, 7:5, 47:16

## G

**gain** [1] - 69:14
**gender** [1] - 63:4
**general** [4] - 6:1, 60:1, 62:4, 100:18
**generally** [1] - 25:11
**gentlemen** [3] - 50:9, 56:22, 60:23
**given** [5] - 43:24, 82:5, 102:24, 103:9, 105:6
**Glave** [3] - 43:22, 58:14, 72:17
**globe** [1] - 9:19
**goods** [1] - 91:10
**govern** [1] - 78:25
**government** [122] - 9:14, 9:17, 12:1, 14:1,

15:11, 15:20, 16:7,
16:19, 16:20, 16:23,
16:24, 16:25, 17:9,
18:23, 18:24, 18:25,
19:9, 19:19, 19:22,
21:15, 27:8, 27:16,
28:9, 28:13, 29:12,
31:14, 31:17, 31:25,
33:24, 35:6, 35:15,
38:25, 39:20, 41:10,
41:16, 42:12, 42:24,
43:11, 43:13, 43:24,
44:6, 44:18, 44:24,
45:16, 46:3, 46:12,
47:9, 47:20, 51:1, 51:5,
55:23, 64:25, 65:5,
65:9, 65:13, 66:7,
68:18, 70:20, 70:22,
71:3, 71:16, 73:11,
73:13, 74:22, 75:22,
76:19, 77:3, 79:19,
80:4, 80:9, 80:10,
80:14, 81:6, 81:23,
82:5, 82:9, 82:12, 84:5,
85:25, 86:8, 86:13,
86:16, 87:8, 87:10,
87:16, 88:9, 89:12,
89:15, 89:20, 90:12,
90:22, 91:4, 91:13,
91:16, 91:20, 93:13,
94:1, 94:5, 94:10,
95:11, 95:18, 96:8,
96:20, 96:24, 97:12,
98:11, 98:14, 98:16,
99:3, 99:8, 99:10,
99:16, 100:1, 100:19,
100:22, 101:7, 101:11,
101:17, 102:6, 102:12,
102:15, 103:1
    **Government** [4] -
31:1, 39:3, 40:22,
58:24
    **government's** [14] -
14:21, 15:9, 16:3,
17:24, 18:6, 18:22,
20:12, 23:18, 28:8,
32:7, 36:4, 44:8, 47:6,
65:18
    **Gox** [3] - 21:14, 31:8,
49:11
    **Grams** [1] - 44:24
    **graver** [1] - 66:3
    **gray** [2] - 27:13, 27:14
    **great** [5] - 15:19,
18:22, 43:7, 46:24,
47:12
    **greater** [3] - 67:8,
67:25, 71:25
    **greatly** [1] - 35:2
    **grew** [1] - 46:19

    **gross** [1] - 86:12
    **ground** [4] - 24:8,
57:3, 66:23, 66:24
    **guess** [4] - 14:19,
18:15, 30:17, 103:20
    **guesswork** [1] - 66:5
    **guided** [1] - 77:1
    **guidelines** [1] - 71:24
    **guilt** [8] - 19:7, 64:21,
65:25, 66:7, 66:9, 71:6,
98:9
    **guilty** [30] - 9:10,
10:20, 11:3, 11:4, 14:9,
44:9, 44:21, 47:3,
59:21, 60:14, 65:1,
65:7, 65:12, 65:14,
78:22, 78:23, 88:5,
90:19, 90:21, 92:9,
95:21, 96:3, 97:4,
97:16, 97:21, 97:23,
99:2, 99:16, 102:5,
102:14
    **gun** [3] - 54:22, 54:23,
54:24
    **guys** [2] - 46:9, 46:13

**H**

    **hacked** [1] - 44:11
    **hacker** [1] - 27:18
    **hacking** [3] - 27:15,
27:20, 27:23
    **halt** [1] - 57:3
    **hand** [6] - 47:15, 50:1,
65:9, 66:15, 73:22,
80:1
    **handed** [1] - 44:5
    **hands** [1] - 15:13
    **hard** [6] - 28:4, 28:19,
28:21, 28:23, 29:1
    **Harmon** [5] - 44:21,
46:5, 46:11, 57:25,
70:20
    **harmon** [2] - 45:17,
46:6
    **Harmon's** [1] - 70:23
    **hauled** [1] - 25:18
    **head** [2] - 12:24, 13:4
    **hear** [7] - 17:12, 18:16,
36:17, 47:15, 47:19,
53:7, 103:17
    **heard** [60] - 2:14, 7:23,
9:5, 11:20, 14:6, 14:20,
16:9, 19:19, 20:12,
20:17, 21:5, 22:7, 24:1,
24:9, 26:14, 26:22,
27:12, 28:8, 28:9,
28:13, 28:20, 29:2,
29:4, 29:11, 29:22,
29:24, 29:25, 31:12,

31:20, 31:24, 32:6,
33:15, 33:19, 35:11,
35:17, 35:18, 36:3,
36:9, 36:21, 37:11,
37:14, 38:25, 42:25,
43:7, 43:25, 46:6, 50:5,
50:6, 51:16, 52:15,
55:1, 55:12, 55:14,
56:1, 60:19, 61:9,
61:21, 70:19, 72:10,
74:17
    **hearing** [3] - 24:2,
30:20, 37:16
    **Helix** [7] - 44:23,
44:24, 45:13, 45:18,
45:19, 58:2
    **help** [10] - 4:9, 7:3,
7:4, 9:13, 11:2, 22:10,
60:5, 74:7, 104:5
    **helped** [3] - 10:19,
10:23, 60:8
    **helpful** [3] - 19:21,
19:22, 52:11
    **helps** [1] - 80:24
    **heroes** [1] - 46:19
    **herself** [1] - 70:12
    **hesitate** [2] - 66:3,
106:11
    **heuristic** [1] - 39:16
    **heuristics** [1] - 49:7
    **hi** [1] - 22:11
    **hidden** [4] - 5:18,
30:14, 54:18, 54:20
    **hide** [4] - 3:11, 4:6,
4:10, 9:13
    **high** [8] - 12:25, 26:21,
35:11, 52:12, 58:11,
76:9, 76:15, 77:1
    **high-quality** [1] -
52:12
    **higher** [2] - 35:4, 54:2
    **highhosting** [1] - 34:1
    **highlight** [1] - 10:16
    **highly** [1] - 65:16
    **himself** [11] - 13:2,
36:9, 49:9, 52:18,
57:14, 76:14, 87:5,
87:8, 90:8, 90:13, 98:3
    **hire** [2] - 43:12, 43:13
    **history** [3] - 13:9,
46:21, 58:8
    **hit** [1] - 26:20
    **hold** [4] - 58:9, 59:8,
68:5, 103:21
    **holds** [1] - 12:5
    **hole** [2] - 30:15, 37:2
    **home** [7] - 12:1, 16:22,
18:20, 19:12, 24:8,
42:22, 42:24
    **honest** [1] - 65:23

    **Honor** [6] - 2:3, 15:2,
15:7, 32:24, 33:2,
33:10
    **hop** [4] - 20:16, 39:2,
39:6, 40:21
    **hope** [1] - 55:7
    **hops** [1] - 40:3
    **host** [1] - 23:18
    **hostility** [1] - 69:15
    **hours** [1] - 49:1
    **house** [1] - 46:24
    **huge** [3] - 13:14, 20:8,
31:18
    **hundreds** [4] - 3:21,
35:13, 44:18, 44:25

**I**

    **ideal** [1] - 47:5
    **identification** [1] -
103:8
    **identified** [2] - 49:11,
98:19
    **identifying** [1] - 8:5
    **identity** [3] - 51:9,
72:16, 80:13
    **IDs** [1] - 30:22
    **ignorance** [2] - 76:2,
77:2
    **ignore** [6] - 48:2,
62:11, 62:19, 63:10,
68:10, 68:13
    **illegal** [8] - 2:20, 6:17,
36:2, 36:24, 51:17,
51:18, 51:21, 89:18
    **illegally** [1] - 84:9
    **illicit** [5] - 5:18, 6:21,
7:2, 13:15, 35:20
    **Ilya** [4] - 44:8, 44:22,
46:11, 70:19
    **imaginary** [1] - 66:4
    **imagine** [1] - 31:22
    **Imagine** [1] - 18:5
    **immediately** [1] -
73:22
    **immensely** [1] - 47:17
    **impartial** [3] - 65:23,
67:15, 67:18
    **implementing** [1] -
94:13
    **implicate** [1] - 103:16
    **implies** [1] - 65:20
    **importance** [1] - 106:6
    **important** [9] - 22:25,
24:12, 40:11, 47:11,
54:6, 55:2, 55:10, 66:3,
73:17
    **importation** [5] - 83:3,
83:8, 83:22, 86:20,
89:6

impose [2] - 71:1, 71:2
imposing [1] - 104:13
impresses [1] - 69:9
improperly [1] - 63:3
inadmissible [1] -
103:15
inadvertently [1] -
104:25
include [2] - 94:17,
100:17
included [1] - 52:10
includes [15] - 82:20,
83:14, 84:25, 85:2,
85:13, 85:14, 86:7,
91:25, 92:4, 93:8, 94:3,
95:6, 96:22, 100:15,
105:8
including [13] - 8:9,
8:23, 12:2, 42:21,
69:18, 77:19, 85:16,
86:12, 92:1, 93:23,
94:24, 96:17, 103:15
incohat [1] - 21:25
inconsistencies [3] -
69:23, 70:1, 70:3
inconsistent [1] -
54:16
incorporate [1] - 60:8
incorporation [1] -
49:6
independent [3] -
33:4, 43:20, 105:11
indicate [3] - 75:14,
81:15, 96:3
indicated [2] - 60:24,
63:10
indicating [1] - 63:8
indictment [22] -
64:18, 64:19, 77:5,
77:14, 77:16, 78:1,
78:6, 78:12, 78:18,
78:19, 78:23, 78:24,
82:3, 82:4, 87:20, 89:4,
90:15, 97:5, 97:17,
98:23, 98:24, 100:22
indirectly [2] - 81:4,
86:11
individual [1] - 4:18
individual's [1] -
103:16
individuals [1] - 91:11
indulgence [1] - 48:9
industry [2] - 43:18,
43:19
inescapable [1] - 14:8
infer [9] - 12:19, 56:9,
75:11, 75:16, 81:11,
81:16, 89:17
inference [1] - 64:21
inferences [2] - 64:11,

66:16
inferred [1] - 76:14
influence [2] - 78:23,
104:12
influenced [1] - 63:3
influential [1] - 46:22
informal [2] - 85:17,
94:25
information [6] - 3:10,
8:5, 37:25, 41:20, 50:3,
54:1
initial [1] - 106:14
innocence [1] - 19:6,
19:7, 19:14, 27:10,
64:24, 65:3
innocent [6] - 19:8,
19:15, 19:16, 47:3,
52:1, 64:24
innuendo [1] - 18:12
inside [1] - 12:18
instance [1] - 91:23
instances [1] - 86:7
instead [1] - 89:15
institution [6] - 85:2,
85:5, 85:11, 85:14,
85:20, 89:24
institutions [1] - 7:25
instruct [19] - 2:21,
4:3, 5:23, 6:8, 11:11,
11:18, 12:12, 12:22,
48:6, 61:24, 62:17,
62:18, 79:11, 80:8,
86:24, 93:8, 101:7,
101:10, 101:17
instructed [2] - 69:3,
76:17
instructing [1] - 47:24
instruction [3] - 10:17,
76:1, 105:5
instructions [19] -
10:13, 13:24, 13:25,
52:11, 60:25, 61:4,
61:6, 61:12, 62:6, 62:8,
62:9, 62:10, 62:11,
62:12, 62:14, 62:19,
84:13, 102:24, 102:25
instrument [2] - 93:23,
96:18
instrumental [1] -
10:22
instruments [2] -
77:24, 93:20
Insurance [1] - 8:24
intend [1] - 12:15
intended [12] - 3:22,
4:8, 7:21, 13:16, 63:23,
64:15, 86:1, 90:10,
93:3, 95:15, 95:19,
98:5
intends [2] - 75:17,

81:17
intent [23] - 6:22,
12:13, 12:17, 12:19,
22:24, 22:25, 23:5,
23:8, 75:11, 75:15,
80:18, 81:9, 81:11,
81:15, 83:6, 84:14,
87:1, 87:23, 88:17,
88:18, 89:1, 89:21,
97:14
intentional [1] - 70:4
intentionally [16] -
10:19, 13:13, 20:7,
20:10, 20:25, 22:25,
23:4, 75:18, 76:2,
76:24, 80:11, 80:18,
81:18, 97:20, 98:22
interacted [1] - 27:6
interest [4] - 69:13,
70:13, 71:14, 72:7
interests [1] - 80:2
internationally [1] -
85:19
internet [4] - 54:15,
72:13, 104:19, 105:14
interpreter [2] - 74:4,
74:5
interstate [12] - 9:18,
9:20, 24:20, 85:8,
85:12, 85:21, 86:1,
89:24, 91:8, 91:9,
91:14, 91:17
introduced [1] - 13:22
invest [1] - 58:11
investigating [1] -
54:24
investigation [3] -
24:15, 32:6, 105:12
investing [1] - 84:9
investors [1] - 58:8
invite [1] - 104:7
invoice [2] - 55:13,
56:7
invoices [1] - 56:9
involve [1] - 18:14
involved [20] - 5:3,
5:25, 6:20, 22:5, 34:2,
34:12, 34:17, 53:2,
60:17, 79:25, 80:6,
82:24, 83:18, 86:3,
86:14, 86:17, 88:13,
89:14, 92:25, 95:13
involves [2] - 23:25,
49:6
involving [8] - 40:3,
50:23, 77:24, 78:2,
82:4, 85:9, 85:10, 88:3
IP [8] - 16:4, 16:16,
17:14, 37:16, 37:23,
43:4, 53:10, 72:13

IRS [7] - 7:18, 10:11,
16:11, 16:14, 16:17,
37:24, 89:10
IRS-CI [1] - 89:10
isolate [1] - 54:3
isolated [1] - 91:23
issuance [1] - 93:20
issue [2] - 72:25,
106:4
issued [1] - 29:12
issues [2] - 61:23,
62:3
itself [10] - 10:20,
54:19, 79:10, 80:25,
98:9, 99:22

## J

J.W [1] - 72:20
jackets [1] - 50:20
jail [2] - 3:9, 29:11
Jeffrey [1] - 72:22
job [1] - 26:24
jobs [2] - 27:11, 56:3
John [1] - 46:23
join [1] - 6:13
joined [4] - 6:6, 20:7,
80:11, 87:18
joining [2] - 20:10,
21:1
joins [2] - 80:18, 80:23
Judge [14] - 2:21,
3:24, 4:3, 5:23, 6:8,
10:13, 10:17, 11:10,
11:18, 12:22, 13:23,
19:20, 25:9, 25:23
judge [5] - 26:15,
26:16, 41:5, 50:24,
51:12
judge's [1] - 60:25
judges [8] - 14:4,
62:22, 68:21, 70:24,
70:25, 71:1, 106:17
judging [1] - 68:24
judgment [6] - 64:13,
69:6, 70:17, 71:20,
72:9, 101:22
July [4] - 26:1, 26:2,
101:14, 101:15
June [7] - 26:5, 26:6,
57:5, 101:15, 101:16,
101:21
juries [2] - 26:17,
106:13
jurisdiction [1] -
100:16
juror [8] - 9:22, 9:25,
11:25, 101:23, 104:7,
106:7, 106:11
jurors [16] - 2:4, 14:11,

14:24, 15:4, 61:16, 61:19, 63:15, 63:22, 73:18, 73:24, 105:1, 105:24, 106:5, 106:20, 106:21, 106:25

**JURORS** [2] - 15:13, 15:18

**jury** [30] - 2:2, 2:5, 2:14, 15:1, 15:15, 19:3, 23:3, 32:16, 33:3, 33:7, 42:7, 47:12, 47:16, 48:11, 61:12, 62:21, 63:17, 67:13, 72:24, 103:4, 103:23, 105:4, 105:8, 105:18, 105:20, 106:1, 106:7, 106:14, 106:24

**justice** [1] - 47:5

**justices** [1] - 46:24

**justified** [2] - 32:25, 64:11

**justify** [1] - 76:23

## K

**keen** [1] - 72:7

**keep** [4] - 28:18, 36:6, 40:5, 103:7

**kept** [2] - 32:8, 60:21

**key** [11] - 20:18, 23:13, 35:21, 36:6, 39:1, 39:7, 39:10, 39:11, 39:21, 40:2, 44:13

**keys** [15] - 39:1, 40:9, 44:13, 44:25, 45:4, 45:6, 45:17, 45:22, 45:23, 46:3, 46:4

**kill** [5] - 29:2, 29:5, 29:21, 33:19, 33:21

**kind** [20] - 3:7, 16:1, 17:11, 27:18, 28:15, 29:2, 30:6, 31:22, 38:9, 54:12, 64:20, 66:1, 71:3, 74:24, 79:15, 82:25, 83:19, 86:4, 105:12

**knowing** [5] - 11:3, 59:19, 75:10, 80:25, 81:10

**knowingly** [17] - 23:12, 23:13, 24:22, 24:24, 75:25, 80:18, 80:23, 82:21, 90:17, 91:2, 93:15, 94:7, 96:10, 97:1, 98:2, 98:21

**knowledge** [18] - 12:13, 12:18, 12:19, 13:4, 52:17, 66:14, 72:24, 73:1, 76:4, 76:7,

76:8, 76:11, 76:13, 81:9, 81:12, 81:15, 86:6

**known** [7] - 5:15, 47:16, 77:19, 77:22, 78:9, 93:1, 95:14

**Kraken** [1] - 52:7

**KYC** [13] - 21:4, 21:7, 21:13, 21:14, 21:15, 30:21, 30:25, 31:5, 31:7, 36:12, 40:4, 44:7

**KYCing** [2] - 31:8, 40:7

## L

**label** [1] - 97:23

**lack** [2] - 65:22, 73:12

**ladies** [3] - 50:9, 56:22, 60:23

**language** [1] - 38:12

**languages** [1] - 73:17

**lapses** [1] - 70:3

**largely** [1] - 57:2

**Larry** [3] - 44:21, 57:25, 70:20

**last** [7] - 9:21, 11:14, 29:9, 47:14, 101:5, 106:19

**latte** [1] - 40:13

**launder** [9] - 3:20, 4:15, 22:12, 35:23, 35:25, 53:25, 79:9, 87:6, 87:12

**launderer** [1] - 13:5

**laundering** [42] - 2:17, 2:18, 2:25, 3:1, 3:25, 4:1, 4:13, 4:15, 4:17, 6:14, 6:18, 6:24, 7:5, 7:7, 7:14, 8:2, 8:7, 8:12, 11:4, 12:10, 15:23, 20:4, 20:6, 21:21, 22:3, 44:10, 52:9, 56:11, 77:24, 78:2, 79:5, 79:6, 79:10, 82:19, 83:13, 84:8, 84:12, 88:7, 90:9, 93:6, 100:24

**law** [46] - 2:21, 3:9, 6:20, 8:7, 8:11, 9:1, 9:8, 10:20, 12:13, 12:25, 13:24, 16:24, 19:21, 22:6, 25:9, 43:1, 48:6, 61:4, 61:24, 62:5, 62:16, 62:17, 62:18, 65:2, 67:2, 67:3, 71:21, 72:2, 75:6, 76:22, 76:24, 77:2, 86:6, 86:24, 88:14, 89:13, 89:16, 92:19, 92:21,

92:24, 93:19, 93:24, 94:6, 96:19, 96:25, 102:24

**lawful** [1] - 77:1

**Laws** [1] - 46:22

**laws** [1] - 8:21

**lawyer** [2] - 68:4, 68:5

**lawyer's** [2] - 68:7, 68:10

**lawyers** [4] - 61:22, 64:14, 64:16, 68:2

**LAX** [2] - 54:10, 55:2

**layering** [2] - 31:6, 49:1

**lead** [2] - 81:5, 81:7

**leading** [1] - 39:4

**leads** [1] - 14:8

**leaking** [1] - 54:1

**leap** [2] - 18:15, 20:25

**learned** [3] - 27:3, 43:2, 48:1

**learning** [3] - 12:23, 13:2, 13:6

**least** [14] - 77:17, 78:7, 78:13, 80:6, 82:14, 84:6, 85:23, 86:17, 87:10, 95:25, 101:9, 101:13, 102:7, 102:16

**leave** [2] - 14:24, 61:16

**ledgers** [2] - 17:7, 41:17

**left** [2] - 16:9, 61:3

**legal** [5] - 10:14, 35:21, 46:21, 47:12, 61:6

**legally** [1] - 10:25

**legit** [1] - 56:12

**legitimate** [1] - 33:14

**legitimately** [1] - 52:1

**length** [1] - 49:19

**lengths** [1] - 4:9

**lenient** [1] - 71:1

**less** [4] - 8:11, 33:23, 35:14, 35:19

**lesser** [1] - 71:25

**lethal** [1] - 52:13

**levels** [1] - 53:23

**liability** [1] - 77:3

**liable** [1] - 6:11

**liberty** [1] - 47:13

**license** [25] - 10:7, 12:6, 12:8, 24:21, 25:2, 25:5, 30:24, 35:22, 36:19, 78:16, 92:14, 92:17, 92:20, 93:11, 93:17, 94:1, 94:6, 94:9, 96:7, 96:12, 96:20, 96:25, 97:3, 100:14, 100:15

**licensed** [1] - 95:3

**licensing** [2] - 94:4, 96:23

**Lichtenstein** [7] - 44:8, 44:12, 44:15, 44:19, 44:22, 46:11, 70:19

**Lichtenstein's** [1] - 70:22

**lie** [1] - 71:11

**life** [1] - 66:4

**lifestyle** [1] - 44:17

**light** [1] - 64:11

**Light** [1] - 44:23

**likelihood** [1] - 58:9

**likely** [5] - 6:8, 17:18, 25:12, 65:15, 99:9

**likewise** [1] - 68:15

**limitation** [1] - 101:14

**limitations** [15] - 11:8, 11:10, 11:13, 25:20, 25:22, 25:25, 26:4, 26:13, 56:22, 56:24, 100:18, 100:20, 100:23, 101:4, 101:21

**limited** [5] - 74:21, 92:2, 93:23, 95:18, 96:17

**Lincoln** [1] - 46:23

**link** [2] - 4:25, 5:11

**list** [5] - 30:2, 30:3, 30:7, 91:5

**listed** [6] - 20:6, 82:3, 83:4, 83:10, 83:24, 86:22

**listen** [6] - 13:20, 25:24, 47:10, 61:25, 104:21, 104:22

**listened** [2] - 48:24, 55:20

**listing** [1] - 19:25

**litany** [1] - 50:6

**LiveLTE** [1] - 31:25

**local** [2] - 10:1, 31:10

**LocalBitcoins** [1] - 27:5

**located** [2] - 10:11, 55:2

**location** [12] - 8:9, 23:6, 72:16, 84:3, 84:7, 87:25, 88:19, 93:22, 94:24, 95:8, 95:9, 96:16

**locations** [1] - 92:3

**locked** [1] - 55:18

**log** [3] - 19:25, 58:1, 58:2

**logged** [1] - 16:22

**logging** [3] - 18:19, 19:12, 19:13

**login** [2] - 30:5, 58:4
**logins** [1] - 30:1
**logs** [8] - 13:8, 16:18, 17:6, 17:16, 17:17, 37:24, 41:17, 50:6
**London** [1] - 46:20
**look** [25] - 18:5, 18:11, 20:14, 21:2, 21:8, 25:13, 28:9, 30:2, 30:6, 30:25, 39:4, 39:12, 39:19, 40:5, 40:8, 40:11, 41:8, 41:13, 48:15, 53:13, 53:14, 57:11, 59:3, 60:25
**looked** [2] - 66:18, 66:22
**looking** [7] - 19:8, 26:8, 36:25, 37:22, 38:12, 40:20, 41:20
**looks** [3] - 36:25, 39:25, 59:1
**low** [1] - 58:11
**luck** [1] - 60:25
**luckiest** [1] - 60:20
**Luke** [2] - 36:3, 72:11
**luxurious** [1] - 44:17

**M**

**machine** [1] - 53:3
**magic** [1] - 26:23
**major** [1] - 49:5
**majority** [2] - 25:14, 57:16
**man** [1] - 58:21
**managed** [3] - 9:15, 23:14, 91:3
**manages** [1] - 90:17
**manner** [4] - 62:16, 69:9, 91:15, 91:17
**manufacture** [7] - 83:2, 83:8, 83:22, 86:20, 86:25, 87:1, 87:12
**manufacturer** [1] - 89:6
**marked** [1] - 103:7
**market** [5] - 5:4, 5:15, 5:19, 75:4, 77:19
**markets** [3] - 6:6, 52:10
**marshal** [2] - 105:17, 105:24
**Marshall** [1] - 46:23
**massive** [1] - 35:17
**material** [1] - 52:14
**math** [3] - 27:14, 30:1, 35:16
**mathematical** [1] - 66:8

**mathexploit.io** [1] - 27:14
**Matt** [2] - 11:20, 32:4
**matter** [15] - 6:9, 11:1, 12:13, 16:15, 25:16, 69:12, 73:21, 82:7, 86:24, 91:18, 104:16, 105:20, 106:2, 106:6, 106:17
**matters** [3] - 66:4, 69:2, 73:2
**Matthew** [1] - 10:12
**Mazara** [1] - 41:15
**Mazarin** [7] - 16:2, 16:15, 17:12, 24:9, 37:20, 41:15, 72:13
**Mazars** [9] - 16:2, 16:15, 17:12, 24:9, 31:13, 37:20, 52:24, 52:25, 72:13
**Mazars'** [1] - 23:23
**mean** [6] - 31:15, 40:5, 40:8, 40:23, 45:12, 54:9
**meaning** [1] - 90:1
**meaningful** [1] - 69:11
**means** [37] - 4:4, 4:6, 4:17, 8:19, 10:18, 12:3, 18:25, 19:8, 48:7, 54:6, 67:3, 68:24, 76:1, 84:15, 84:19, 84:22, 85:5, 85:7, 85:10, 85:21, 86:10, 86:19, 89:10, 91:10, 92:1, 92:6, 93:19, 93:22, 94:21, 94:24, 96:14, 96:17, 97:10, 99:8, 100:11, 105:13, 105:25
**meant** [2] - 28:5, 103:2
**media** [1] - 104:20
**meet** [1] - 2:24
**meeting** [1] - 27:5
**meetings** [1] - 27:7
**Meetups** [2] - 27:5, 29:24
**member** [5] - 60:10, 79:16, 79:17, 80:15, 105:20
**members** [5] - 2:14, 48:11, 81:25, 105:17, 105:18
**memories** [1] - 63:23
**memory** [7] - 63:13, 63:14, 63:19, 63:21, 69:10, 69:17, 70:3
**mentioned** [4] - 11:24, 23:23, 27:17, 80:8
**merciful** [1] - 90:4
**mere** [3] - 80:21, 84:9, 98:7

**merely** [8] - 64:18, 72:1, 72:4, 76:12, 80:1, 80:22, 80:25, 86:2
**merits** [1] - 105:20
**message** [5] - 7:8, 7:10, 22:9, 22:15, 22:17
**messages** [3] - 7:13, 13:9, 52:17
**messaging** [1] - 7:9
**met** [3] - 19:9, 51:1, 51:5
**Meth** [1] - 53:19
**method** [1] - 98:13
**Miami** [5] - 32:4, 32:5, 32:7, 32:18, 32:21
**might** [9] - 48:14, 48:18, 51:15, 55:15, 67:23, 68:1, 71:2, 72:24
**miles** [1] - 24:3
**million** [6] - 29:16, 35:13, 35:15, 56:24, 56:25, 57:16
**millions** [6] - 3:16, 28:23, 29:1, 35:13, 44:18, 44:25
**mind** [7] - 12:19, 75:9, 75:24, 76:21, 81:24, 103:7, 105:22
**mindful** [1] - 104:2
**minimal** [1] - 91:18
**minor** [2] - 80:16, 88:22
**minute** [2] - 14:12, 61:5
**minutes** [4] - 14:23, 48:12, 61:15, 62:4
**misattribution** [1] - 31:18
**misdemeanor** [2] - 92:18, 93:7
**missing** [2] - 5:11, 34:18
**mission** [1] - 104:3
**misstates** [1] - 38:3
**mistake** [9] - 45:8, 53:1, 53:5, 70:3, 76:3, 76:22, 84:16, 89:3
**mistranslated** [1] - 53:9
**misunderstanding** [1] - 70:4
**mix** [2] - 51:21, 51:25
**mixed** [3] - 31:5, 36:11, 74:24
**mixer** [13] - 35:21, 35:25, 44:23, 44:24, 45:24, 46:4, 51:15, 51:17, 51:18, 51:19,

77:21
**mixers** [3] - 35:19, 46:9, 51:13
**mixing** [1] - 36:1
**modifies** [1] - 102:25
**Mollies** [1] - 22:11
**mom** [1] - 46:19
**moment** [2] - 80:8, 91:1
**monetary** [1] - 77:24
**money** [151] - 2:16, 2:18, 2:19, 2:20, 2:25, 3:1, 3:6, 3:12, 3:14, 3:25, 4:1, 4:13, 4:15, 4:16, 6:14, 6:18, 6:24, 7:5, 7:6, 7:14, 7:15, 7:23, 8:1, 8:7, 8:12, 8:17, 9:3, 9:6, 10:2, 10:6, 10:8, 11:4, 11:22, 12:6, 12:10, 13:5, 13:17, 15:23, 20:4, 20:6, 21:20, 22:3, 22:12, 22:22, 23:10, 23:12, 24:19, 24:21, 24:23, 25:3, 27:1, 28:1, 29:19, 35:7, 35:8, 35:23, 35:25, 36:20, 40:25, 41:4, 44:10, 52:1, 52:7, 52:9, 53:25, 57:15, 57:18, 58:13, 58:17, 60:17, 74:23, 78:2, 78:9, 78:15, 79:4, 79:6, 79:9, 79:10, 82:18, 82:23, 83:1, 83:12, 83:17, 83:20, 84:8, 84:12, 85:17, 85:18, 86:3, 86:5, 87:11, 88:7, 90:18, 90:24, 90:25, 91:7, 91:10, 91:13, 91:16, 91:21, 91:24, 91:25, 92:6, 92:7, 92:13, 92:14, 92:16, 92:17, 92:22, 92:23, 92:25, 93:6, 93:11, 93:16, 93:18, 93:19, 93:21, 93:25, 94:3, 94:6, 94:8, 94:10, 94:12, 94:15, 94:17, 94:18, 94:19, 94:21, 95:1, 95:11, 95:12, 95:23, 96:6, 96:11, 96:13, 96:14, 96:15, 96:16, 96:19, 96:22, 96:25, 97:2, 100:5, 100:24, 100:25, 102:13, 102:16
**month** [3] - 13:19, 35:3, 53:22
**months** [5] - 32:5, 32:7, 33:23, 35:3, 57:1

**Moon** [5] - 27:25, 28:10, 28:15, 36:13, 42:14
**morning** [1] - 61:8
**Moss** [13] - 2:21, 3:24, 4:3, 5:23, 6:8, 10:13, 10:17, 11:10, 11:18, 12:22, 19:20, 25:9, 25:23
**Moss's** [1] - 13:23
**most** [3] - 46:20, 54:22, 60:19
**motivated** [3] - 70:13, 71:17, 84:6
**motive** [5] - 73:10, 73:11, 73:12, 73:13, 77:1
**mouth** [1] - 51:14
**move** [6] - 5:8, 13:1, 13:17, 38:19, 46:15, 101:18
**moved** [2] - 7:17, 9:19
**movement** [5] - 85:9, 89:9, 91:10, 95:6, 95:8
**moving** [5] - 11:22, 13:15, 58:17, 58:20
**MR** [37] - 14:14, 15:2, 15:7, 15:14, 15:17, 15:19, 32:12, 32:15, 32:17, 32:20, 32:22, 33:2, 33:10, 33:12, 38:3, 38:6, 38:17, 38:22, 38:25, 42:6, 42:10, 42:12, 45:2, 45:4, 45:7, 45:11, 45:13, 45:16, 45:19, 45:21, 45:23, 45:25, 46:1, 46:3, 46:14, 46:17, 48:9
**MS** [2] - 2:3, 2:10
**Mt** [3] - 21:14, 31:8, 49:11
**multiple** [6] - 45:1, 58:6, 59:25, 73:15, 78:18
**must** [58] - 8:3, 9:6, 9:14, 9:17, 14:1, 41:10, 63:5, 64:19, 65:12, 65:18, 67:15, 67:17, 68:5, 68:11, 68:17, 68:20, 73:18, 74:3, 79:19, 80:9, 80:10, 81:2, 81:6, 82:12, 82:14, 84:5, 88:9, 89:15, 90:22, 91:13, 91:16, 91:20, 93:13, 94:7, 94:16, 95:24, 96:8, 97:1, 98:2, 99:3, 99:11, 99:16, 99:23, 100:22, 101:7, 101:11,

101:19, 101:22, 101:23, 101:25, 102:3, 102:11, 103:1, 104:21, 104:22, 106:19
**mutual** [1] - 104:6
**Mycelium** [5] - 26:23, 52:7, 52:22, 57:6, 57:17
**mystery** [1] - 34:18

## N

**name** [1] - 65:20
**named** [1] - 82:7
**names** [2] - 82:2, 82:5
**naming** [1] - 21:3
**narcotics** [1] - 3:15
**nation** [1] - 91:12
**nationality** [1] - 63:4
**native** [2] - 16:18, 17:17
**natural** [2] - 75:17, 81:17
**nature** [10] - 12:14, 23:6, 67:13, 67:16, 80:17, 84:3, 84:7, 87:25, 88:19, 99:23
**Navy** [1] - 33:16
**near** [1] - 77:10
**nearly** [1] - 13:19
**necessarily** [4] - 67:19, 80:3, 100:6, 104:18
**necessary** [9] - 65:15, 75:23, 76:20, 80:12, 81:24, 98:7, 98:10, 98:18, 105:15
**need** [23] - 4:17, 5:7, 5:8, 5:24, 20:2, 20:3, 28:6, 50:20, 51:4, 53:13, 61:3, 61:4, 77:7, 87:8, 90:12, 94:5, 95:22, 96:24, 98:16, 99:22, 99:24, 102:2, 102:9
**needs** [2] - 19:4, 87:10
**nefarious** [1] - 18:19
**negate** [1] - 77:2
**negative** [1] - 43:16
**negligent** [1] - 76:13
**Network** [1] - 12:3
**network** [9] - 8:20, 33:13, 33:14, 33:15, 54:2, 55:4, 72:13, 85:17, 94:25
**never** [15] - 7:16, 9:7, 10:10, 16:18, 16:23, 28:1, 28:14, 36:4, 36:13, 47:16, 57:24, 65:2, 99:19, 105:19,

105:22
**new** [3] - 28:21, 58:4
**newspaper** [1] - 104:19
**newspapers** [2] - 47:22, 47:23
**nice** [1] - 50:7
**nightmares** [1] - 55:7
**Nissan** [1] - 23:24
**nomad** [1] - 54:12
**non** [1] - 33:17
**non-profit** [1] - 33:17
**none** [1] - 27:16
**NOOK** [1] - 16:2
**not-so-helpful** [1] - 52:11
**note** [5] - 57:10, 62:13, 73:22, 105:16, 105:19
**notebooks** [1] - 63:16
**notes** [9] - 18:2, 18:3, 18:6, 37:8, 53:17, 63:16, 63:18, 63:22, 63:23
**notetaker's** [1] - 63:24
**nothing** [18] - 27:24, 28:11, 28:12, 30:10, 32:15, 33:2, 34:3, 34:8, 34:13, 34:17, 37:7, 53:5, 54:16, 102:21, 102:23, 102:24, 106:22
**notify** [1] - 8:7
**notion** [1] - 52:19
**November** [2] - 78:4, 89:8
**nuance** [1] - 20:1
**nuanced** [1] - 25:23
**nuances** [1] - 25:12
**number** [8] - 10:13, 29:10, 29:11, 39:3, 67:20, 67:24, 67:25, 103:10
**Number** [3] - 16:20, 22:24, 40:22
**numbers** [1] - 35:16

## O

**oath** [1] - 71:12
**object** [9] - 21:23, 38:9, 68:7, 80:19, 82:18, 83:12, 90:20, 99:23, 100:2
**objected** [1] - 68:2
**objecting** [1] - 68:4
**objection** [7] - 32:12, 38:3, 42:6, 45:2, 46:14, 68:10, 68:16
**objections** [1] - 68:5
**objective** [1] - 82:9
**objectives** [2] - 82:14,

87:17
**objects** [15] - 3:25, 21:19, 21:20, 77:23, 79:7, 79:13, 80:7, 82:17, 84:12, 90:1, 99:20, 99:24, 100:2, 102:4, 102:8
**obligation** [1] - 71:9
**obligations** [1] - 8:5
**observe** [1] - 69:12
**observed** [1] - 69:1
**obtain** [6] - 12:6, 12:8, 94:1, 96:20, 100:14, 100:15
**obtained** [3] - 52:1, 84:9, 86:11
**obvious** [1] - 76:6
**occasions** [1] - 58:6
**occur** [1] - 100:6
**occurred** [8] - 11:9, 12:11, 25:21, 26:1, 86:2, 98:25, 100:13, 101:19
**occurring** [2] - 12:4, 37:17
**occurs** [1] - 12:7
**October** [8] - 22:23, 34:4, 34:9, 77:6, 77:17, 78:7, 78:13, 79:20
**off-the-record** [1] - 14:18
**offender** [2] - 97:22, 98:16
**offense** [44] - 7:5, 9:21, 11:9, 11:12, 11:14, 11:15, 26:3, 65:6, 65:8, 65:11, 65:12, 75:2, 76:8, 77:4, 77:8, 77:10, 78:19, 78:20, 87:3, 87:10, 88:5, 90:14, 90:19, 93:2, 95:15, 95:17, 95:20, 96:8, 97:6, 97:7, 97:11, 97:13, 98:23, 98:25, 99:1, 100:5, 100:11, 100:13, 100:14, 100:25, 101:2, 101:4, 101:5, 101:6
**offenses** [10] - 11:12, 73:10, 77:5, 77:13, 77:20, 79:4, 82:13, 82:17, 101:1, 101:2
**offer** [1] - 61:3
**offered** [2] - 49:15, 68:3
**officer** [3] - 88:14, 89:13, 89:16
**officer's** [1] - 71:23
**offline** [1] - 27:3
**often** [2] - 6:3, 106:16

old [1] - 47:11
Omedetou [10] - 7:11,
10:24, 17:11, 17:20,
21:9, 30:23, 33:25,
40:22, 41:3, 51:9
Omedetou's [1] - 31:1
omission [5] - 12:4,
12:7, 98:24, 99:4, 99:9
omissions [1] -
103:18
omitted [1] - 81:13
once [2] - 41:12, 47:2
one [73] - 4:18, 4:23,
4:25, 8:2, 8:9, 8:18,
9:25, 11:25, 12:18,
16:5, 16:15, 16:21,
17:24, 18:8, 20:14,
20:15, 21:18, 21:20,
25:8, 26:19, 27:7,
27:13, 28:3, 28:4,
28:17, 29:10, 30:2,
31:13, 36:3, 36:13,
40:4, 40:7, 41:16, 44:8,
46:8, 46:18, 46:23,
47:3, 47:21, 53:1,
53:15, 53:18, 58:8,
58:14, 59:9, 59:23,
67:4, 67:12, 67:24,
78:23, 80:6, 82:1, 82:6,
82:13, 82:14, 87:15,
87:19, 88:22, 88:24,
91:6, 92:7, 92:10,
94:22, 95:6, 95:8,
95:25, 96:3, 102:7,
104:18, 105:17, 106:10
online [4] - 5:4, 5:6,
5:12, 72:16
open [5] - 33:11,
38:24, 57:23, 105:21,
106:1
Open [1] - 46:2
opening [1] - 18:13
opens [1] - 53:22
operate [6] - 11:6,
32:2, 94:1, 94:6, 96:20,
96:25
operated [10] - 18:11,
42:4, 44:23, 78:8,
92:14, 92:16, 93:5,
94:8, 95:22, 97:2
operating [14] - 2:19,
7:22, 10:3, 17:8, 19:1,
22:16, 23:10, 25:19,
30:10, 41:23, 42:13,
46:8, 51:3, 60:17
operation [3] - 9:13,
78:14, 92:18
operational [1] - 72:14
operator [6] - 28:22,
29:14, 34:21, 34:24,

35:5, 60:13
operator's [1] - 29:18
opinion [9] - 63:10,
73:2, 73:3, 73:4, 73:5,
73:6, 73:7, 102:22,
106:8
opinions [1] - 72:11
opportunity [1] -
69:12
opposite [1] - 68:1
opposites [1] - 21:17
orally [1] - 105:21
order [6] - 2:6, 5:9,
74:7, 90:21, 99:15,
101:23
ordered [1] - 68:16
orderly [1] - 62:15
ordinarily [2] - 75:9,
81:9
organize [1] - 104:5
organized [1] - 95:3
original [1] - 33:23
originally [1] - 33:16
ostrich [1] - 12:24
otherwise [11] - 71:2,
73:24, 74:20, 76:6,
83:4, 83:9, 83:23,
86:21, 89:7, 91:4,
103:13
outcome [2] - 69:14,
72:7
outlays [1] - 58:16
outlining [1] - 19:19
outset [1] - 106:10
outside [12] - 14:3,
26:10, 33:9, 46:17,
46:25, 48:1, 50:11,
50:13, 50:21, 85:19,
85:24
outweighed [1] - 73:6
overlap [3] - 16:4,
17:15, 37:17
overlaps [1] - 37:16
overseeing [1] - 8:21
oversight [1] - 43:19
overt [4] - 99:18,
99:19, 99:22, 99:24
overwhelming [1] -
51:20
own [15] - 4:12, 12:20,
20:12, 24:6, 31:3, 53:4,
54:22, 58:19, 59:17,
63:13, 63:20, 63:23,
63:24, 72:4, 74:5
owned [2] - 23:14,
91:4
owner [5] - 31:21,
34:4, 34:9, 34:14,
60:13
ownership [5] - 23:6,

84:3, 84:7, 87:25,
88:19
owns [2] - 53:5, 90:18

**P**

p.m [4] - 14:25, 61:18
packet [4] - 19:25,
20:5, 42:15
page [1] - 16:8
panel [1] - 46:8
panic [1] - 21:6
paper [3] - 33:5,
43:17, 43:25
papers [2] - 26:20,
70:24
paperwork [3] - 12:9,
21:22, 24:11
part [20] - 5:2, 6:9,
6:12, 25:8, 47:10,
68:14, 76:11, 76:22,
80:16, 80:20, 81:1,
81:3, 84:2, 84:6, 86:17,
87:23, 90:17, 90:18,
95:3, 100:18
partially [1] - 73:7
participants [2] -
80:23, 80:25
participate [2] - 84:23,
100:8
participated [1] - 98:4
participates [1] -
97:20
participating [1] -
80:14
particular [8] - 10:15,
54:20, 62:10, 65:10,
65:11, 67:5, 76:7,
98:15
particularly [2] -
48:16, 72:15
parties [3] - 4:23,
64:4, 64:5
partisans [1] - 106:17
partner [1] - 79:17
partnership [1] -
79:16
party [3] - 5:1, 68:6,
103:21
pass [1] - 24:5
passkeys [2] - 50:6,
50:7
passport [1] - 30:22
password [6] - 13:12,
30:2, 30:3, 37:9, 57:22
passwords [1] - 30:8
past [1] - 13:21
Pause [1] - 38:14
pay [5] - 5:12, 10:14,
13:20, 26:8, 31:5

paying [2] - 20:15,
28:6
payment [4] - 56:10,
93:20, 93:23, 96:18
payments [4] - 9:19,
10:10, 28:7, 85:4
PCAP [1] - 42:20
peace [1] - 47:14
Pearlman [1] - 38:20
PEARLMAN [16] -
32:12, 32:15, 32:20,
33:2, 38:3, 38:6, 38:22,
42:6, 45:2, 45:4, 45:13,
45:19, 45:23, 46:1,
46:14, 48:9
peddling [1] - 5:4
peep [1] - 32:6
peer [9] - 23:17, 27:4,
29:25, 31:10, 43:17
peer-to-peer [3] -
27:4, 29:25, 31:10
PELKER [2] - 2:3, 2:10
Pelker [7] - 2:9, 22:7,
26:2, 28:16, 29:4,
34:20, 48:22
people [33] - 3:8, 6:3,
10:11, 10:23, 13:8,
17:15, 18:16, 24:2,
29:18, 39:25, 41:1,
42:2, 47:3, 50:17,
50:20, 52:14, 54:14,
54:22, 56:3, 58:11,
59:5, 59:25, 69:15,
79:22, 80:2, 80:13,
80:20, 82:5, 85:17,
85:22, 85:23, 85:24,
98:19
per [1] - 36:1
percent [4] - 34:22,
35:19, 52:6, 53:21
perception [1] - 70:5
performed [2] - 97:9,
99:20
period [5] - 41:5,
53:16, 77:6, 100:23,
101:14
perjury [1] - 71:11
permit [1] - 70:25
permitted [4] - 63:15,
64:9, 67:7, 71:3
person [41] - 6:9, 8:9,
23:25, 27:4, 31:4,
39:12, 40:14, 47:3,
50:14, 53:15, 54:23,
58:12, 60:14, 60:19,
60:21, 64:19, 66:2,
66:18, 75:10, 75:17,
76:8, 80:15, 80:16,
81:10, 81:17, 85:14,
85:16, 89:17, 94:18,

94:19, 94:22, 94:24, 95:8, 95:9, 97:20, 97:23, 98:17, 105:13, 105:23
**personal** [3] - 36:12, 63:24, 106:22
**personality** [1] - 75:6
**personally** [5] - 5:24, 97:5, 97:6, 97:18, 97:24
**persons** [1] - 79:14
**Philips** [1] - 52:10
**phone** [2] - 29:5, 38:4
**photo** [2] - 30:21, 46:7
**phrase** [2] - 86:19, 89:21
**physical** [2] - 51:15, 98:7
**pick** [1] - 32:13
**picture** [2] - 22:21, 46:7
**pictures** [1] - 103:13
**pie** [1] - 59:10
**piece** [6] - 15:8, 15:9, 15:10, 15:21, 18:14, 53:1
**pieces** [1] - 37:1
**place** [8] - 7:25, 9:22, 11:24, 17:10, 22:12, 32:9, 54:24, 98:8, 99:1, 99:4, 99:10, 99:15, 99:18
**places** [1] - 52:6
**plain** [1] - 4:13
**plan** [2] - 79:25, 80:17
**planned** [1] - 98:15
**planning** [1] - 98:6
**plausible** [1] - 29:23
**play** [2] - 68:14, 80:16
**players** [1] - 5:3
**playing** [1] - 5:1
**plea** [7] - 44:21, 70:20, 71:4, 71:8, 71:10, 71:15, 71:18
**pleas** [1] - 46:13
**pled** [1] - 44:9
**plural** [1] - 28:16
**point** [16] - 17:7, 17:24, 18:12, 18:13, 35:1, 35:21, 36:6, 39:9, 44:13, 47:21, 52:2, 55:3, 55:10, 57:3, 84:24, 100:9
**pointed** [1] - 31:13
**pointing** [2] - 17:9, 37:15
**points** [3] - 6:4, 39:1, 48:14
**Poloniex** [1] - 52:8
**popped** [1] - 29:15

**pored** [1] - 18:3
**portion** [3] - 62:10, 99:14, 103:14
**portions** [5] - 103:11, 103:12, 103:15, 103:18, 103:19
**position** [2] - 55:17, 106:11
**positive** [1] - 43:15
**possess** [1] - 86:25
**possesses** [1] - 72:25
**possible** [3] - 59:23, 60:5, 104:10
**post** [1] - 31:5
**post-mixed** [1] - 31:5
**posting** [2] - 7:11, 10:24
**posts** [3] - 27:16, 31:1, 57:11
**pot** [1] - 56:25
**potential** [1] - 3:25
**powerful** [1] - 65:18
**PowerPoint** [1] - 2:12
**precautions** [1] - 57:13
**prejudice** [2] - 63:2, 70:14
**prejudiced** [1] - 70:12
**prejudices** [1] - 69:5
**preliminary** [1] - 62:5
**prepaid** [1] - 58:18
**preponderance** [3] - 25:10, 99:7, 99:16
**presence** [3] - 73:24, 80:21, 98:7
**present** [5] - 2:5, 32:21, 97:7, 97:19, 98:10
**presented** [5] - 31:18, 48:3, 67:10, 67:17, 104:23
**presents** [2] - 59:2
**preside** [1] - 103:24
**press** [2] - 29:12
**presumed** [2] - 19:15, 64:23
**presumption** [4] - 19:6, 19:7, 64:24
**pretty** [1] - 57:2
**previous** [1] - 69:24
**previously** [1] - 102:1
**Price** [8] - 6:16, 7:2, 7:8, 7:16, 10:12, 11:20, 32:4, 32:20
**price** [4] - 32:3, 32:17, 33:6, 58:10
**pride** [1] - 106:10
**primarily** [1] - 44:6
**primary** [2] - 23:18, 60:14

**principal** [2] - 97:22, 98:16
**privacy** [2] - 52:20, 103:16
**private** [17] - 20:18, 39:1, 39:7, 39:10, 39:11, 39:21, 40:2, 40:9, 44:13, 44:25, 45:4, 45:5, 45:17, 45:22, 45:23, 46:3, 46:4
**probabilities** [1] - 53:23
**probability** [5] - 13:1, 54:2, 70:6, 76:9, 76:15
**probable** [3] - 65:16, 75:17, 81:17
**problem** [5] - 20:9, 53:7, 55:21, 56:14, 56:18
**problems** [1] - 3:9
**proceed** [4] - 15:5, 42:10, 48:8, 106:16
**proceeding** [1] - 82:2
**proceeds** [30] - 3:6, 3:16, 3:20, 6:17, 6:21, 7:2, 13:1, 13:15, 22:6, 23:9, 74:24, 78:3, 82:24, 83:18, 84:4, 84:8, 86:10, 86:15, 86:18, 87:6, 87:12, 88:1, 88:3, 88:14, 88:20, 89:5, 89:14, 89:18, 89:25, 90:9
**process** [4] - 4:12, 53:3, 106:22, 106:24
**processing** [2] - 10:10, 53:2
**produce** [1] - 65:3
**professionals** [1] - 33:13
**Professor** [6] - 34:19, 35:17, 58:7, 58:23, 58:24, 59:1
**profile** [1] - 57:22
**profit** [4] - 11:6, 33:17, 60:4, 91:23
**profits** [1] - 2:16
**prohibits** [1] - 76:25
**promote** [17] - 3:22, 4:3, 4:11, 6:22, 23:1, 83:7, 84:14, 84:19, 87:23, 88:17, 89:1, 89:21, 90:11, 93:3, 95:15, 95:19, 104:8
**promoting** [2] - 7:5, 84:17
**promotional** [1] - 3:25
**proof** [7] - 18:23, 27:8, 47:6, 51:1, 65:18,

74:10, 77:7
**proper** [4] - 68:4, 100:3, 100:10, 100:12
**properly** [1] - 64:1
**property** [23] - 6:20, 6:23, 22:5, 23:7, 74:23, 78:2, 82:24, 83:1, 83:18, 83:21, 86:3, 86:5, 86:10, 87:11, 87:25, 88:3, 88:4, 88:13, 88:20, 89:4, 89:14, 89:18, 90:9
**prosecuted** [1] - 82:1
**prosecution** [2] - 19:4, 71:11
**prosperity** [4] - 4:5, 4:12, 84:20
**protect** [2] - 7:25, 71:10
**protection** [1] - 53:21
**prove** [58] - 9:14, 14:1, 18:24, 19:1, 19:2, 19:4, 19:15, 27:9, 27:10, 65:3, 65:10, 65:15, 66:7, 66:9, 73:11, 79:19, 80:9, 80:10, 81:6, 82:6, 82:8, 82:9, 82:12, 84:5, 85:25, 86:8, 86:13, 87:8, 87:10, 87:16, 87:17, 88:9, 89:12, 89:15, 90:12, 90:22, 91:5, 91:13, 91:16, 91:20, 93:13, 94:5, 94:7, 96:9, 96:24, 97:1, 98:12, 98:14, 98:16, 99:11, 99:16, 100:19, 100:22, 101:7, 101:11, 101:18, 103:1
**proved** [10] - 46:13, 73:14, 75:9, 75:22, 76:19, 81:4, 81:10, 81:23, 97:12, 99:7
**proven** [7] - 54:9, 64:10, 65:1, 65:5, 68:18, 74:22, 79:1
**proves** [5] - 77:3, 80:4, 86:16, 102:6, 102:15
**provide** [3] - 59:7, 62:7, 91:19
**provided** [3] - 5:12, 74:4, 102:19
**provides** [3] - 87:22, 90:16, 94:19
**proving** [5] - 65:13, 67:3, 94:11, 95:12, 95:18
**provision** [1] - 94:2
**provisions** [1] - 96:21

**public** [2] - 33:17, 92:1
**publicity** [1] - 104:25
**published** [1] - 15:14
**pulled** [2] - 16:10, 24:4
**punishable** [4] - 92:18, 92:20, 93:7, 93:10
**punishment** [2] - 104:10, 104:16
**purchase** [3] - 74:20, 75:3, 84:25
**purchased** [1] - 74:17
**purchases** [1] - 27:3
**purchasing** [1] - 5:6
**purpose** [7] - 4:14, 8:16, 51:21, 51:22, 74:21, 74:25, 84:17
**purposes** [12] - 79:16, 84:11, 85:13, 91:9, 92:4, 93:5, 94:2, 95:5, 95:16, 96:21, 102:1, 102:9
**pursuant** [1] - 70:21
**put** [5] - 2:12, 36:11, 50:14, 50:21, 52:6
**putting** [4] - 30:22, 31:4, 32:15, 36:17

## Q

**qualified** [1] - 26:15
**quality** [1] - 52:12
**queried** [1] - 10:9
**questions** [5] - 56:4, 62:12, 62:16, 64:16, 67:12
**quiet** [1] - 32:8

## R

**rabbit** [2] - 30:15, 37:2
**race** [1] - 63:4
**radio** [1] - 104:19
**rain** [1] - 50:18
**raining** [3] - 50:11, 50:15, 50:20
**Raise** [1] - 15:13
**raises** [1] - 100:20
**raising** [1] - 73:22
**ran** [3] - 2:16, 52:5, 53:2
**random** [1] - 106:21
**randomized** [1] - 34:22
**rarely** [1] - 12:17
**rates** [4] - 39:17, 43:14, 43:15, 43:16
**rather** [2] - 67:21, 100:7
**reach** [6] - 67:14,

102:2, 102:3, 102:9, 102:11, 104:3
**reached** [1] - 105:25
**reaching** [3] - 67:9, 67:18, 103:9
**Reactor** [3] - 39:16, 43:9, 43:20
**Reactors'** [1] - 43:17
**Read** [1] - 25:23
**read** [13] - 31:2, 32:22, 33:5, 33:9, 40:24, 52:25, 54:3, 88:23, 88:24, 90:5, 101:10, 104:21, 104:22
**Reade** [2] - 40:15
**reader** [1] - 16:2
**Reader** [1] - 43:3
**reading** [1] - 7:12
**ready** [4] - 2:2, 2:9, 15:1, 15:6
**real** [2] - 3:8, 29:14
**really** [9] - 21:6, 22:12, 28:1, 36:16, 37:4, 42:2, 50:11, 50:13, 52:19
**reason** [16] - 8:13, 16:23, 21:3, 24:9, 40:6, 41:11, 49:15, 53:10, 54:20, 59:6, 59:7, 59:16, 65:21, 66:6, 69:10
**reasonable** [51] - 14:9, 18:25, 19:5, 21:18, 25:10, 25:22, 27:9, 47:7, 48:7, 64:11, 65:1, 65:6, 65:11, 65:14, 65:19, 65:20, 65:25, 66:1, 66:2, 66:9, 66:16, 68:19, 71:7, 73:14, 74:22, 75:23, 76:20, 77:4, 77:9, 79:1, 79:19, 80:5, 81:23, 86:16, 87:18, 88:10, 89:17, 90:23, 91:20, 93:13, 95:25, 96:9, 97:12, 98:20, 99:12, 101:8, 101:11, 101:18, 102:6, 102:15, 103:1
**reasonableness** [1] - 70:5
**reasonably** [1] - 77:10
**reasons** [3] - 11:25, 73:5, 103:14
**rebuttal** [1] - 38:21
**recalled** [2] - 48:25, 69:1
**receipts** [1] - 86:12
**receive** [2] - 64:13, 70:18
**received** [6] - 61:11, 74:12, 75:14, 75:20,

81:14, 81:20
**receiving** [9] - 13:24, 36:19, 83:3, 83:9, 83:22, 86:20, 89:7, 93:21, 96:15
**recently** [2] - 57:5, 57:7
**recess** [2] - 14:25, 61:18
**reckless** [1] - 76:13
**recollection** [3] - 48:21, 48:23, 69:20
**record** [2] - 14:18, 34:6
**recording** [1] - 103:2
**records** [4] - 7:19, 10:9, 13:10, 74:8
**recovered** [2] - 52:7, 53:8, 57:17
**red** [2] - 30:13, 37:1
**red-yarn-and-thumbtack** [1] - 30:13
**refer** [2] - 62:9
**reference** [1] - 63:12
**referenced** [1] - 7:12
**references** [1] - 48:5
**referencing** [2] - 15:23, 18:9
**referred** [3] - 45:20, 47:22, 48:25
**referring** [2] - 45:21, 57:13
**refers** [1] - 10:25
**reflection** [1] - 66:3
**refuse** [1] - 62:19
**regarding** [2] - 104:1, 104:7
**regardless** [1] - 76:25
**register** [14] - 8:3, 8:19, 8:22, 8:25, 9:3, 9:4, 9:6, 11:2, 12:3, 12:8, 94:16, 95:1, 100:13, 100:15
**registered** [6] - 9:10, 10:10, 31:21, 34:4, 34:9, 34:14
**registering** [3] - 10:4, 20:22, 20:24
**registrar** [2] - 59:15, 59:19
**registration** [14] - 20:16, 21:13, 31:6, 31:21, 33:24, 34:5, 34:10, 34:15, 39:4, 41:2, 58:5, 59:13, 92:23, 94:12
**regular** [1] - 95:2
**regularly** [2] - 33:13, 91:23
**regulations** [5] - 7:24,

8:11, 8:13, 94:14, 94:15
**regulators** [2] - 8:23, 12:9
**rejected** [1] - 55:22
**related** [7] - 28:11, 29:6, 30:4, 42:15, 75:3, 101:8, 101:12
**relates** [1] - 6:15
**relation** [2] - 29:8
**relatively** [2] - 40:25, 41:5
**release** [1] - 29:12
**relevant** [9] - 25:21, 25:25, 50:25, 75:21, 76:18, 81:22, 87:22, 90:17, 100:16
**rely** [3] - 63:22, 74:3, 90:2
**remaining** [1] - 28:9
**remains** [2] - 64:24, 74:3, 99:21
**Remember** [1] - 106:16
**remember** [9] - 17:22, 22:20, 23:23, 26:15, 41:19, 46:9, 56:5, 99:10
**remind** [1] - 104:17, 105:5
**remitting** [1] - 8:18
**remote** [1] - 33:21
**removed** [3] - 34:4, 34:9, 103:13
**rendered** [1] - 62:14
**repeat** [1] - 62:5
**repeatedly** [4] - 3:10, 7:12, 10:25, 28:13
**replace** [1] - 63:20
**replaces** [2] - 102:23, 102:25
**replied** [1] - 7:16
**reports** [3] - 8:6, 104:18, 104:22
**represent** [2] - 95:8, 101:22
**representatives** [1] - 56:4
**represented** [11] - 6:21, 7:2, 22:5, 78:3, 86:17, 87:12, 88:3, 88:14, 89:5, 89:16, 90:9
**represents** [2] - 68:6
**require** [2] - 65:2, 67:8
**required** [24] - 8:19, 8:22, 21:14, 49:8, 66:7, 73:11, 75:16, 81:16, 82:9, 85:25, 86:8, 86:13, 87:16, 87:17,

89:12, 91:4, 92:20, 94:6, 95:1, 96:25, 98:12, 98:14, 100:7, 100:16
**requirement** [7] - 8:4, 81:25, 82:2, 86:7, 95:12, 99:1, 99:13
**requirements** [5] - 7:24, 8:2, 8:8, 92:24, 94:13
**requires** [2] - 93:24, 96:19
**research** [3] - 33:4, 47:25, 105:13
**resets** [1] - 13:12
**resolve** [1] - 50:8
**resolved** [1] - 74:2
**respect** [9] - 49:14, 58:7, 78:24, 85:2, 102:2, 102:4, 102:10, 102:11, 104:6
**respective** [2] - 70:24, 70:25
**response** [2] - 22:13, 22:14
**responsibility** [3] - 62:23, 63:11, 68:7
**responsible** [4] - 9:25, 87:9, 90:13, 97:8
**restroom** [1] - 14:22
**rests** [1] - 104:14
**result** [1] - 70:3
**retained** [1] - 86:11
**retire** [1] - 105:4
**retiring** [1] - 106:14
**return** [8] - 61:23, 62:13, 78:21, 95:21, 99:2, 99:15, 101:23, 103:23
**returning** [1] - 103:2
**reveal** [1] - 105:23
**revealed** [1] - 3:10
**review** [1] - 33:20
**reviewed** [1] - 43:17
**reviewing** [1] - 106:14
**rises** [1] - 5:1
**risks** [1] - 59:5
**Road** [2] - 74:18, 74:20, 75:3
**road** [1] - 32:2
**robbery** [1] - 51:16
**role** [4] - 23:2, 26:16, 47:17, 48:17
**rolling** [1] - 37:5
**Roman** [4] - 10:22, 11:1, 11:5, 14:9
**room** [8] - 50:11, 61:12, 63:17, 103:4, 103:23, 105:4, 106:7, 106:14

**roughly** [3] - 26:19, 35:14, 35:19
**router** [1] - 31:25
**routing** [1] - 72:13
**Rovensky** [3] - 32:4, 32:17, 32:20
**rule** [1] - 62:16
**ruled** [1] - 68:12
**rules** [3] - 62:4, 78:25, 104:1
**run** [2] - 11:14, 101:4
**running** [10] - 7:13, 10:22, 11:9, 16:20, 23:19, 24:3, 25:6, 27:23, 35:25, 60:9
**runoff** [1] - 49:2
**Russian** [1] - 73:16

## S

**safe** [2] - 22:12, 44:1
**sale** [2] - 84:25, 93:19
**sand** [2] - 12:24, 13:4
**Santell** [1] - 3:18
**Sarah** [2] - 43:22, 72:17
**SARs** [1] - 8:6
**sat** [1] - 79:25
**satisfied** [3] - 89:20, 92:11, 92:12
**satisfies** [1] - 92:7
**satisfy** [4] - 94:4, 94:10, 95:11, 96:23
**saved** [1] - 57:21
**saving** [1] - 58:13
**saw** [11] - 3:15, 10:9, 16:7, 18:4, 22:8, 22:15, 26:20, 66:19, 66:21, 66:22, 66:23
**scary** [1] - 27:18
**scene** [1] - 80:21
**scheme** [3] - 6:1, 12:11, 58:25
**schemes** [1] - 53:25
**Scholl** [19] - 3:18, 7:18, 17:22, 20:17, 21:5, 34:20, 34:21, 34:23, 36:3, 36:13, 37:14, 39:25, 48:25, 49:3, 49:9, 49:19, 50:1, 50:7, 72:12
**scientific** [3] - 43:16, 66:8, 72:23
**scientist** [1] - 52:25
**scope** [1] - 6:2
**screen** [1] - 15:21
**screenshot** [1] - 43:2
**scrutiny** [1] - 31:23
**se** [1] - 36:1
**seat** [2] - 12:1, 40:6

**seated** [1] - 2:6
**seats** [2] - 106:22, 106:23
**second** [24] - 3:6, 6:20, 9:4, 10:6, 13:23, 21:23, 38:13, 39:24, 79:6, 79:23, 80:10, 81:2, 82:11, 82:23, 83:12, 83:17, 84:11, 88:13, 88:18, 91:2, 92:22, 93:17, 94:14, 96:12
**Secrecy** [1] - 9:7
**Secretary** [1] - 94:16
**section** [1] - 84:8
**Section** [19] - 77:25, 78:4, 78:10, 78:11, 78:17, 79:5, 79:6, 82:10, 82:11, 82:19, 83:13, 87:21, 88:8, 90:16, 90:22, 93:9, 93:12, 94:13, 100:3
**Sections** [4] - 83:5, 83:11, 83:24, 86:22
**Securities** [1] - 8:24
**security** [2] - 57:12, 72:14
**see** [19] - 2:8, 12:18, 14:7, 15:17, 15:22, 16:8, 17:2, 18:1, 20:5, 23:24, 27:21, 29:14, 31:9, 33:6, 40:24, 53:20, 61:14, 74:1, 103:17
**seeing** [4] - 22:19, 24:6, 24:7, 26:9
**seize** [1] - 45:4
**seized** [4] - 35:15, 44:18, 44:25, 45:6
**select** [2] - 103:24, 104:1
**selected** [1] - 106:22
**selecting** [2] - 67:13, 104:4
**selection** [2] - 106:21, 106:24
**self** [1] - 70:13
**self-interest** [1] - 70:13
**sellers** [1] - 5:19
**selling** [12] - 5:5, 18:18, 20:13, 23:17, 36:22, 39:22, 58:11, 83:3, 83:9, 83:23, 86:21, 89:7
**send** [2] - 62:13, 105:16
**sending** [3] - 29:18, 52:21, 103:4
**sense** [16] - 12:21,

14:3, 21:7, 21:9, 28:25, 41:7, 41:9, 41:14, 50:21, 56:8, 58:6, 58:22, 59:11, 106:10
**sent** [5] - 7:6, 22:9, 22:17, 56:19, 61:12
**sentence** [2] - 71:1, 104:13
**sentencing** [2] - 70:24, 70:25
**separate** [7] - 9:24, 39:25, 53:10, 78:19, 78:21, 79:10, 99:21
**separately** [1] - 78:21
**series** [1] - 55:10
**serious** [1] - 13:17
**seriously** [1] - 47:17
**server** [15] - 16:18, 17:6, 17:17, 19:14, 27:25, 28:11, 28:15, 28:17, 28:19, 29:3, 29:7, 37:24, 42:15
**servers** [8] - 16:18, 17:5, 28:14, 28:16, 41:17, 50:6, 54:15
**service** [7] - 7:15, 7:21, 13:7, 45:14, 54:18, 54:20, 56:3
**services** [8] - 8:13, 30:14, 91:10, 94:15, 94:17, 94:19, 94:21, 95:1
**set** [9] - 2:15, 3:8, 9:12, 13:7, 14:12, 14:15, 14:17, 21:12, 99:19
**sets** [1] - 19:17
**setting** [1] - 10:22
**several** [4] - 5:3, 10:15, 13:22, 49:1
**shaking** [1] - 50:18
**shall** [3] - 63:7, 88:5, 90:19
**share** [1] - 73:24
**shared** [3] - 27:16, 30:1, 33:16
**sharp** [1] - 44:16
**shifts** [1] - 65:2
**shoddy** [1] - 38:9
**shormint** [2] - 17:10, 17:13
**shormint@hotmail. com** [4] - 17:20, 37:13, 42:17, 42:20
**short** [4] - 14:14, 46:11, 53:16, 61:5
**shouts** [1] - 50:12
**show** [7] - 9:14, 9:17, 25:23, 31:10, 56:6, 80:3, 80:23

**showed** [1] - 34:20
**showing** [6] - 17:25, 20:11, 33:24, 36:22, 38:1, 41:22
**shown** [7] - 9:16, 27:17, 36:16, 42:12, 70:11, 74:6, 81:2
**shows** [4] - 11:16, 17:11, 17:19, 30:10
**shut** [2] - 29:10, 29:21
**sic** [2] - 26:6, 50:2
**sic)** [1] - 53:20
**side** [7] - 27:11, 36:16, 67:20, 67:25, 68:1, 68:3, 70:12
**signal** [1] - 28:10
**signed** [2] - 105:17, 105:19
**Silk** [3] - 74:18, 74:20, 75:3
**similar** [4] - 6:23, 41:4, 75:4, 80:3
**similarly** [2] - 64:16, 100:25
**simple** [1] - 4:14
**simply** [5] - 38:8, 60:15, 60:16, 75:6, 91:10
**singing** [1] - 53:18
**single** [6] - 14:8, 15:8, 18:8, 24:1, 46:19, 91:23
**singular** [1] - 28:16
**sinister** [1] - 28:2
**sit** [1] - 59:23
**site** [14] - 4:13, 7:10, 7:14, 11:21, 13:10, 13:15, 20:23, 27:15, 34:1, 58:1, 58:4, 58:5, 60:8, 74:20
**sitting** [4] - 11:22, 24:3, 40:6, 56:24
**situation** [1] - 19:11
**six** [1] - 72:10
**skill** [1] - 73:1
**skills** [1] - 27:19
**sky** [1] - 59:10
**sleep** [1] - 66:23
**smaller** [1] - 67:24
**snow** [4] - 66:19, 66:21, 66:23
**snowed** [1] - 66:25
**software** [10] - 16:11, 16:13, 24:4, 28:3, 41:12, 43:7, 43:8, 43:21, 49:8
**sold** [3] - 22:11, 29:24
**sole** [3] - 62:22, 63:11, 68:21
**solely** [3] - 63:5,

104:15, 104:23
**someone** [9] - 10:19, 42:9, 44:3, 50:12, 51:15, 93:25, 98:21, 100:8
**sometimes** [3] - 4:22, 68:2, 103:11
**somewhere** [2] - 29:7, 56:25
**song** [1] - 53:18
**soon** [4] - 34:23, 105:2
**sophisticated** [1] - 21:10
**sorry** [12] - 15:14, 15:16, 15:19, 52:4, 55:16, 65:10, 67:22, 78:18, 91:15, 92:15, 101:10
**sort** [11] - 17:9, 17:23, 19:23, 22:9, 24:4, 27:25, 30:12, 32:1, 39:16, 41:10, 42:18
**sorts** [2] - 18:3, 44:1
**sound** [2] - 28:2, 73:5
**sounds** [2] - 3:2, 4:6
**source** [8] - 23:6, 36:7, 36:18, 41:17, 84:3, 84:7, 87:25, 88:19
**sources** [1] - 50:3
**Special** [6] - 3:18, 6:16, 7:2, 7:8, 7:16, 11:20
**special** [2] - 9:22, 11:24
**specialized** [1] - 72:23
**specific** [9] - 3:19, 11:9, 17:25, 62:2, 62:3, 77:12, 95:19, 98:13, 103:25
**specifically** [6] - 13:17, 51:21, 75:8, 83:2, 83:8, 83:21
**specified** [23] - 6:22, 23:9, 83:7, 84:15, 84:18, 86:15, 86:18, 86:19, 87:5, 87:6, 87:24, 88:1, 88:3, 88:5, 88:17, 88:21, 89:2, 89:5, 89:22, 89:25, 90:8, 90:10, 90:11
**speculate** [3] - 18:15, 19:13, 68:11
**speculation** [4] - 30:18, 41:25, 42:8, 66:5
**spend** [4] - 26:25, 39:16, 56:14, 56:15
**spending** [2] - 26:24, 84:9

**spends** [1] - 40:15
**spent** [1] - 25:14
**spokesperson** [1] - 103:25
**spyware** [1] - 32:1
**stamp** [2] - 55:13, 55:16
**stand** [6] - 14:12, 22:20, 50:14, 55:12, 69:8, 106:9
**standard** [5] - 25:9, 25:11, 48:7, 49:2, 89:20
**standards** [1] - 43:18
**stands** [2] - 44:19, 69:14
**Starbucks** [1] - 40:13
**stark** [1] - 44:19
**start** [14] - 19:6, 21:6, 21:8, 29:4, 31:7, 39:21, 41:8, 41:13, 48:20, 61:7, 61:13, 62:7, 84:22, 100:8
**started** [1] - 27:6
**starting** [1] - 21:13
**starts** [1] - 11:8
**state** [13] - 8:22, 9:4, 9:23, 73:2, 75:9, 75:23, 76:20, 81:24, 86:6, 91:12, 93:6, 93:8
**statement** [6] - 38:10, 69:24, 71:11, 75:12, 81:13, 89:13
**statements** [1] - 64:14
**States** [14] - 7:24, 29:12, 33:16, 42:24, 77:21, 79:4, 85:24, 85:25, 88:6, 90:20, 91:11, 93:22, 95:4, 96:16
**states** [2] - 85:23, 91:11
**statue** [1] - 46:18
**statute** [19] - 11:8, 11:10, 11:13, 25:20, 25:22, 25:25, 26:3, 26:13, 56:22, 56:24, 87:22, 88:23, 88:24, 90:16, 100:18, 100:20, 101:3, 101:14, 101:20
**step** [2] - 29:16, 41:9
**steps** [1] - 74:1
**sterlingov** [3] - 27:9, 30:19, 44:23
**Sterlingov** [77] - 10:22, 11:1, 11:5, 14:9, 15:12, 15:22, 16:1, 16:21, 17:8, 17:12, 17:20, 17:25, 18:10, 18:18, 19:1, 19:2, 19:8,

19:12, 20:3, 20:22, 21:4, 22:14, 22:16, 22:19, 23:17, 23:19, 24:24, 25:5, 25:14, 25:17, 26:14, 29:20, 30:6, 31:8, 31:10, 31:15, 31:17, 32:2, 32:5, 32:7, 33:22, 34:2, 34:7, 34:11, 34:12, 34:16, 35:5, 35:15, 35:23, 36:9, 36:17, 36:19, 37:12, 39:5, 39:13, 39:22, 39:23, 40:6, 41:22, 42:3, 42:4, 42:13, 42:17, 42:22, 43:6, 43:10, 43:25, 44:4, 44:10, 44:17, 44:20, 47:8, 48:11, 51:24, 52:4, 52:5, 60:5
**Sterlingov's** [20] - 16:6, 16:20, 17:1, 24:6, 26:7, 29:5, 29:10, 29:13, 31:22, 33:20, 36:5, 36:7, 36:21, 41:21, 42:24, 43:23, 44:2, 44:7, 47:15, 49:10
**stick** [1] - 13:4
**sticking** [1] - 12:24
**still** [9] - 9:10, 20:25, 26:25, 29:18, 52:21, 55:4, 59:20, 61:10
**sting** [4] - 2:18, 6:14, 6:18, 7:6
**stipulate** [1] - 50:2
**stipulated** [2] - 64:4, 64:6
**stipulation** [1] - 64:7
**stone** [1] - 55:18
**stopped** [1] - 27:12
**story** [1] - 46:11
**straight** [1] - 43:5
**strength** [1] - 60:1
**stress** [1] - 48:13
**stretch** [2] - 14:12, 14:17
**stricken** [2] - 68:13, 68:16
**strong** [3] - 55:8, 55:22, 106:8
**stuff** [15] - 16:14, 17:14, 18:3, 21:11, 22:22, 30:7, 30:10, 30:22, 37:18, 39:18, 41:8, 41:20, 43:8, 44:1, 59:8
**subjective** [1] - 76:9
**substance** [8] - 83:4, 83:10, 83:23, 86:21, 87:2, 87:9, 89:8, 90:14

**substances** [1] - 87:13

**substantial** [2] - 95:3, 99:14

**substantive** [3] - 21:24, 22:3, 82:17

**substitutes** [1] - 94:23

**succeed** [1] - 98:5

**success** [1] - 4:24

**suffer** [1] - 47:3

**sufficient** [7] - 60:10, 73:4, 77:8, 86:15, 95:17, 98:9, 98:20

**suggest** [4] - 49:16, 54:8, 55:9, 102:22

**sum** [2] - 35:3, 41:4

**summaries** [5] - 74:6, 74:9, 74:10, 74:12, 74:13

**summarize** [1] - 77:2

**supervised** [2] - 23:14, 91:3

**supervises** [1] - 90:18

**supplied** [1] - 5:11

**support** [4] - 22:10, 23:3, 93:3, 95:16

**supported** [1] - 70:9

**supporting** [2] - 73:5, 74:14

**suppose** [1] - 50:17

**supposed** [5] - 29:9, 33:4, 33:8, 38:1, 47:24

**supposedly** [1] - 15:23

**Supreme** [1] - 46:24

**surprise** [1] - 41:24

**surrounding** [3] - 69:18, 75:12, 81:12

**surveillance** [3] - 32:7, 32:18, 32:21

**surveilling** [1] - 28:10

**suspected** [1] - 8:7

**sustained** [2] - 68:9, 68:15

**swear** [1] - 59:22

**Sweden** [3] - 24:7, 24:25, 25:15

**Swedish** [3] - 16:24, 43:1, 73:16

**switch** [4] - 29:2, 29:5, 29:21, 33:21

**switches** [1] - 33:20

**sworn** [1] - 64:2

**sympathy** [1] - 63:2

**symphony** [1] - 53:17

**system** [12] - 7:8, 7:9, 7:10, 8:1, 19:17, 47:5, 47:12, 47:13, 85:17, 85:20, 94:25

## T

**tablet** [1] - 38:8

**talks** [2] - 3:10, 37:8

**task** [1] - 104:2

**tasked** [1] - 8:21

**team** [2] - 10:25, 47:9

**teams** [1] - 77:20

**tech** [1] - 27:11

**technical** [1] - 72:23

**technique** [1] - 49:20

**techniques** [1] - 72:15

**television** [1] - 104:19

**tempted** [1] - 104:21

**ten** [6] - 14:23, 18:5, 40:2, 47:3, 61:5, 61:15

**ten-minute** [1] - 61:5

**tens** [1] - 3:16

**term** [11] - 75:25, 85:13, 85:14, 86:10, 91:25, 92:4, 93:8, 94:3, 94:17, 95:5, 96:22

**terms** [1] - 72:16

**testified** [19] - 7:18, 16:16, 16:21, 31:14, 32:18, 33:15, 46:9, 49:16, 49:17, 49:19, 55:21, 56:7, 58:15, 66:20, 68:21, 68:25, 69:2, 69:13, 70:21

**testifies** [1] - 58:21

**testify** [7] - 28:9, 33:19, 43:25, 46:6, 50:15, 71:17, 73:2

**testifying** [3] - 67:20, 69:9, 69:14

**testimony** [32] - 33:15, 42:25, 45:7, 48:24, 52:25, 55:1, 64:2, 64:4, 66:14, 66:20, 66:24, 67:24, 67:25, 68:20, 69:23, 69:24, 70:1, 70:7, 70:15, 70:17, 71:4, 71:6, 71:18, 71:20, 71:21, 71:24, 72:1, 72:4, 72:5, 72:8, 72:9, 72:10

**text** [1] - 105:9

**THE** [31] - 2:2, 2:5, 2:7, 14:11, 14:16, 14:19, 15:1, 15:3, 15:5, 15:13, 15:16, 15:18, 32:13, 33:1, 33:3, 38:4, 38:12, 38:15, 38:20, 38:23, 42:7, 42:11, 45:5, 45:9, 45:12, 45:18, 46:15, 47:18, 61:1, 61:17, 61:20

**themselves** [3] - 59:6, 67:14, 74:10

**theories** [1] - 30:13

**theory** [4] - 28:15, 29:20, 37:1, 57:18

**therefore** [1] - 73:18

**they've** [2] - 18:7, 32:8

**thinking** [4] - 40:5, 59:10, 75:11, 81:11

**third** [11] - 3:14, 6:21, 9:8, 14:2, 24:19, 83:1, 83:20, 88:16, 91:7, 92:25, 95:10

**thoughtful** [1] - 66:2

**thousand** [1] - 33:3

**thousands** [4] - 3:4, 17:15, 24:3

**three** [13] - 6:18, 9:1, 9:2, 32:5, 59:9, 88:8, 92:8, 92:11, 93:4, 95:23, 96:4, 102:12, 102:17

**throughout** [5] - 50:5, 61:25, 64:25, 65:2, 105:6

**thumbtack** [1] - 30:13

**tied** [1] - 5:14

**tightrope** [1] - 55:25

**timing** [1] - 21:10

**Title** [2] - 79:22, 79:23

**today** [4] - 13:25, 16:10, 33:6, 51:19

**together** [7] - 50:21, 53:16, 60:1, 77:18, 79:25, 80:2, 82:1

**tomorrow** [1] - 61:7

**ton** [3] - 30:10, 36:20

**tonight** [1] - 61:7

**took** [10] - 2:16, 18:4, 36:10, 44:21, 46:13, 52:5, 57:16, 99:4, 99:10, 99:18

**tools** [2] - 72:15, 72:16

**top** [1] - 43:6

**topics** [1] - 72:11

**Tor** [11] - 30:14, 33:13, 33:14, 33:15, 33:17, 37:8, 42:22, 54:17, 54:20, 55:4

**totality** [2] - 17:24, 37:15

**totally** [1] - 32:25

**toward** [1] - 69:15

**trace** [10] - 5:13, 7:20, 18:17, 21:5, 39:2, 39:4, 39:13, 40:8, 41:1, 50:1

**traceable** [2] - 5:9, 5:17

**traced** [3] - 36:5, 36:14, 40:4

**traces** [12] - 18:1, 20:11, 21:2, 21:8,

23:16, 33:25, 36:22, 36:25, 39:1, 40:11, 40:20, 42:1

**tracing** [5] - 21:11, 40:23, 43:19, 49:19, 51:8

**tracked** [1] - 7:18

**trade** [1] - 85:21

**trading** [2] - 31:10, 58:20

**tradition** [2] - 46:21, 47:11

**traditional** [1] - 26:16

**traffic** [2] - 17:16, 28:10

**trafficking** [3] - 3:15, 5:7, 5:20

**trained** [1] - 46:23

**training** [1] - 73:1

**trait** [1] - 63:5

**transacting** [1] - 102:13

**transaction** [47] - 3:3, 3:10, 5:21, 6:15, 6:19, 6:20, 7:1, 13:9, 22:5, 22:8, 40:3, 40:9, 41:2, 49:4, 49:7, 56:2, 56:5, 56:18, 56:20, 78:2, 82:22, 82:24, 83:16, 83:18, 84:1, 84:6, 84:22, 84:23, 84:25, 85:7, 85:10, 86:4, 86:17, 88:2, 88:12, 88:13, 89:23, 100:5, 100:6, 100:7, 100:8, 101:19

**transactions** [21] - 3:4, 4:11, 4:19, 4:20, 7:19, 11:21, 21:8, 21:11, 27:4, 36:6, 49:2, 49:21, 50:1, 55:18, 55:22, 56:7, 56:13, 60:16, 60:20, 86:14, 100:17

**transcript** [1] - 38:17

**transfer** [9] - 84:25, 85:3, 85:17, 85:18, 93:24, 94:20, 94:25, 96:18

**transferred** [1] - 57:6

**transferring** [1] - 91:25

**transfers** [3] - 33:25, 85:4, 92:2

**translation** [4] - 73:21, 73:24, 74:4, 74:5

**translations** [2] - 73:16, 73:19

**transmission** [29] - 2:19, 10:6, 10:8, 23:10,

23:12, 24:19, 24:21,
24:23, 25:3, 78:15,
85:15, 93:1, 93:11,
93:16, 93:18, 93:19,
93:21, 93:25, 94:19,
94:21, 94:22, 95:1,
95:13, 96:6, 96:11,
96:13, 96:14, 96:15,
96:19
   **transmitted** [1] - 8:8
   **transmitter** [4] - 9:3,
12:6, 94:18
   **transmitters** [1] - 9:6
   **transmitting** [38] -
2:20, 7:23, 8:3, 8:15,
8:17, 10:2, 78:9, 90:19,
90:24, 90:25, 91:7,
91:13, 91:16, 91:21,
91:24, 91:25, 92:6,
92:7, 92:13, 92:14,
92:16, 92:17, 92:22,
92:23, 92:25, 93:21,
94:7, 94:8, 94:11,
94:12, 95:11, 95:12,
95:23, 96:16, 97:1,
97:2, 101:1, 102:16
   **transportation** [2] -
93:1, 95:13
   **trapped** [1] - 60:20
   **trash** [1] - 27:21
   **Treasury** [4] - 8:4,
8:20, 12:2, 94:16
   **tree** [1] - 59:3
   **Trevor** [1] - 52:10
   **trial** [24] - 17:21,
18:12, 50:5, 62:1,
62:15, 62:24, 63:8,
63:15, 63:18, 64:1,
64:5, 64:25, 65:2, 68:9,
69:3, 70:13, 72:7, 75:1,
75:20, 81:20, 103:10,
104:25, 105:6
   **tricky** [1] - 55:17
   **tried** [4] - 6:19, 24:5,
59:5, 82:1
   **triggering** [1] - 29:7
   **true** [5] - 12:5, 36:8,
36:18, 65:15, 70:8
   **truth** [6] - 12:24,
31:19, 65:16, 69:11,
70:16, 71:9
   **truthful** [2] - 57:7,
58:25
   **truthfully** [2] - 68:25,
70:21
   **try** [1] - 105:18
   **trying** [8] - 16:7, 18:5,
24:16, 27:18, 28:2,
56:12, 56:16, 56:17
   **turn** [5] - 56:12, 56:13,

56:16, 71:4, 93:24
   **turned** [2] - 43:3,
45:13
   **turning** [1] - 29:7
   **turns** [1] - 96:19
   **two** [28] - 3:24, 10:4,
20:5, 21:17, 29:9,
39:15, 39:19, 39:25,
47:19, 50:21, 58:19,
59:9, 59:22, 61:3,
66:10, 77:23, 79:4,
79:12, 79:14, 79:21,
80:6, 82:13, 82:16,
85:23, 96:3, 102:4,
102:7
   **type** [1] - 47:25
   **types** [3] - 20:5, 66:10,
71:15
   **typifies** [1] - 15:9

## U

   **U.S** [5] - 7:25, 8:4,
34:25, 79:22, 79:23
   **U.S.C** [21] - 21:21,
77:25, 78:4, 78:10,
78:11, 79:5, 79:6,
82:10, 82:11, 82:19,
83:5, 83:11, 83:13,
83:24, 86:22, 87:21,
88:8, 90:16, 90:22,
94:13, 100:3
   **uh-oh** [1] - 37:7
   **ultimate** [2] - 19:20,
49:24
   **umbrellas** [2] - 50:18,
50:19
   **unanimous** [7] -
82:14, 101:25, 102:2,
102:3, 102:9, 102:11,
105:25
   **unanimously** [3] -
92:10, 95:24, 96:4
   **under** [20] - 9:1, 10:20,
12:25, 31:23, 32:6,
50:4, 59:3, 59:25,
69:20, 71:9, 71:11,
86:6, 91:24, 92:19,
92:24, 93:19, 94:13,
94:15, 100:3, 105:22
   **Undercover** [2] -
10:12
   **undercover** [4] - 6:15,
7:19, 22:8, 89:10
   **underlying** [5] - 74:8,
74:14, 87:5, 90:8,
100:17
   **understood** [2] -
40:23, 40:24
   **undisputed** [1] - 64:8

   **unformatted** [1] -
28:21
   **United** [14] - 7:24,
29:12, 33:16, 42:24,
77:21, 79:4, 85:24,
85:25, 88:6, 90:20,
91:11, 93:22, 95:4,
96:16
   **universe** [1] - 44:2
   **unknowingly** [1] -
80:24
   **unknown** [1] - 77:19
   **unlawful** [50] - 3:7,
3:14, 3:23, 6:22, 11:13,
11:17, 22:6, 23:2, 23:9,
74:24, 78:3, 79:15,
80:17, 80:19, 82:25,
83:2, 83:7, 83:19,
83:21, 84:15, 84:18,
86:4, 86:9, 86:12,
86:15, 86:18, 86:19,
87:5, 87:7, 87:24, 88:1,
88:4, 88:5, 88:15,
88:17, 88:21, 89:2,
89:5, 89:15, 89:22,
89:25, 90:8, 90:10,
90:11, 93:3, 94:10,
95:16, 95:17, 99:17,
101:3
   **unless** [2] - 64:25,
76:10
   **unlicensed** [19] - 2:19,
7:23, 9:2, 9:9, 23:10,
23:11, 35:25, 78:8,
90:18, 90:24, 90:25,
91:21, 92:6, 93:6,
95:11, 95:23, 100:25,
102:13, 102:16
   **unlucky** [1] - 60:19
   **unnecessary** [1] -
13:6
   **unprobability** [1] -
70:6
   **unreasonableness** [1]
- 70:6
   **unscientific** [1] - 43:4
   **unspecified** [1] - 23:1
   **untraceable** [1] - 3:17
   **unwrapped** [1] - 59:2
   **up** [40] - 2:12, 2:16,
3:8, 9:12, 10:22, 11:7,
11:17, 13:7, 14:13,
14:15, 14:17, 21:12,
24:18, 27:1, 30:22,
32:13, 35:1, 35:16,
38:21, 43:5, 46:19,
51:13, 53:22, 54:5,
55:3, 55:12, 55:21,
60:16, 61:24, 66:24,
74:18, 75:18, 81:18,

97:18, 97:25, 101:9,
101:12, 104:1, 104:7
   **updated** [2] - 31:21,
34:15
   **useful** [5] - 48:14,
49:18, 106:7, 106:13,
106:16
   **user** [1] - 57:22
   **users** [3] - 13:11,
57:13
   **uses** [1] - 33:14

## V

   **Valerie** [1] - 72:12
   **valid** [2] - 49:20, 74:13
   **value** [2] - 94:23,
94:25
   **variety** [1] - 103:14
   **various** [6] - 49:20,
51:8, 52:6, 52:17, 55:6,
60:3
   **vast** [2] - 51:20, 57:16
   **vendors** [4] - 3:19,
5:5, 5:14, 77:19
   **venue** [7] - 11:18,
25:7, 25:14, 100:3,
100:10, 100:11
   **verdict** [29] - 61:23,
62:14, 63:10, 67:9,
67:15, 67:16, 67:18,
78:24, 95:21, 96:2,
99:3, 99:16, 101:22,
101:23, 101:24, 102:2,
102:3, 102:10, 102:11,
102:19, 102:22,
102:23, 103:3, 103:9,
104:3, 104:14, 105:25,
106:9
   **verdicts** [2] - 78:21,
103:6
   **Verret** [9] - 34:19,
35:11, 35:17, 58:7,
58:23, 58:24, 59:1,
59:6, 72:20
   **via** [1] - 105:14
   **video** [1] - 51:3
   **view** [3] - 48:18, 49:3,
49:20
   **views** [1] - 104:7
   **violate** [1] - 87:21
   **violating** [3] - 87:21,
90:16, 90:21
   **violation** [20] - 10:2,
21:21, 77:25, 78:4,
78:10, 78:16, 79:5,
79:6, 79:22, 82:10,
82:19, 83:5, 83:10,
83:13, 83:24, 86:22,
88:7, 93:9, 93:12, 96:7

**visited** [1] - 74:20
**Vlahakis** [1] - 9:5
**voice** [1] - 106:8
**voluminous** [1] - 3:15
**voluntarily** [2] - 76:2, 80:17
**vote** [1] - 106:3, 106:14
**voting** [1] - 105:24
**VPN** [3] - 27:25, 28:6, 53:24
**VPNs** [2] - 17:15, 29:6

## W

**wait** [1] - 35:2
**walk** [3] - 2:22, 13:25, 93:4
**walked** [2] - 3:18, 55:24
**walker** [1] - 2:13
**walker's** [1] - 2:11
**walks** [1] - 50:12
**wallet** [12] - 21:7, 26:23, 39:23, 39:24, 52:7, 52:22, 57:1, 57:6, 57:17, 89:11
**wallets** [3] - 39:15, 39:19, 43:25
**wants** [3] - 16:4, 21:15, 31:25
**Washington** [2] - 11:23, 12:11
**watch** [2] - 104:21, 104:22
**water** [1] - 50:19
**ways** [7] - 9:1, 51:8, 95:24, 96:1, 96:4, 102:12, 102:17
**website** [1] - 20:24
**weeks** [1] - 13:22
**weight** [11] - 62:24, 64:12, 67:5, 67:7, 67:19, 70:17, 71:20, 72:1, 72:9, 73:9, 74:15
**welcome** [2] - 2:7
**white** [1] - 23:24
**whole** [7] - 9:12, 19:25, 23:18, 44:2, 62:11, 62:19, 84:2
**willful** [1] - 86:7
**willfully** [3] - 84:16, 97:8, 97:13
**William** [2] - 46:17, 46:18
**window** [2] - 66:19, 66:22
**wipe** [2] - 28:24, 28:25
**wiped** [1] - 28:19
**wiping** [1] - 50:19

**wire** [5] - 85:9, 89:9, 92:3, 93:23, 96:18
**wish** [3] - 35:9, 58:10, 63:18
**wished** [1] - 98:4
**withdraw** [2] - 16:7, 22:22
**withdrawal** [2] - 29:9, 85:3
**witness** [33] - 66:13, 68:12, 68:22, 68:23, 68:25, 69:1, 69:2, 69:6, 69:8, 69:9, 69:10, 69:11, 69:13, 69:21, 69:25, 70:7, 70:8, 70:11, 70:15, 70:16, 70:17, 71:5, 71:8, 71:10, 71:13, 71:16, 71:18, 71:25, 72:1, 72:3, 72:8, 72:25
**witness's** [8] - 66:14, 68:24, 69:8, 69:17, 69:23, 69:24, 70:1, 73:3
**witnesses** [18] - 13:20, 20:12, 28:8, 28:13, 36:4, 41:16, 44:9, 63:1, 64:2, 67:20, 67:23, 67:24, 68:1, 68:20, 68:22, 69:4, 71:15, 72:10
**woke** [1] - 66:24
**word** [2] - 75:25, 88:23
**words** [8] - 17:17, 37:21, 79:15, 84:5, 87:7, 90:12, 101:24, 103:13
**works** [1] - 46:20
**world** [1] - 19:18
**worried** [1] - 27:13
**worth** [3] - 28:23, 52:21, 58:18
**wow** [1] - 50:12
**write** [1] - 46:20
**writing** [2] - 105:21, 106:1
**written** [1] - 4:22
**wrote** [1] - 57:24
**www.BitcoinFog.com** [3] - 34:1, 34:10, 34:15

## Y

**yarn** [2] - 30:13, 37:1
**year** [3] - 35:3, 58:13, 59:20
**years** [11] - 18:2, 18:6, 22:19, 22:21, 36:24, 37:23, 47:11, 58:19,

59:9
**you-all** [1] - 40:24
**yourself** [15] - 24:24, 25:13, 30:16, 33:18, 34:1, 34:6, 34:11, 37:19, 41:2, 43:8, 45:9, 49:22, 51:4, 53:14, 54:3
**yourselves** [2] - 14:22, 61:11

## Z

**zero** [1] - 22:13

## §

**§** [3] - 79:23, 79:24, 96:7